UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS | ) | |
| SHE IS THE ADMINISTRATRIX OF THE | ) | |
| ESTATE OF AWILDA SANTIAGO, ESSEX | ) | |
| PROBATE COURT DOCKET #03P-2499AD1, | ) | |
| P/P/A VERONICA ROSARIO AND | ) | |
| CHRISTINA SANTIAGO, AND AS | ) | |
| SHE IS THE ADMINISTRATRIX OF THE | ) | |
| ESTATE OF JOSE SANTIAGO, BERLIN | ) | Civil Action #05-CV-10617MLW |
| (CONNECTICUT) | ) | |
| PROBATE COURT, CASE #03-0713 | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RARE HOSPITALITY INTERNATIONAL, INC. | ) | |
| d/b/a LONGHORN STEAKHOUSE | ) | |
|     Defendant | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO RARE HOSPITALITY'S
MOTION FOR PROTECTIVE ORDER**

**Overview**

Claiming work product doctrine protection, defendant Rare Hospitality International, Inc. ("RARE") has moved for a protective order, seeking to prevent the deposition of John DiNatale, a investigator working on its behalf, and for sanctions. Because that doctrine was never meant to insulate the type of improper conduct engaged in here by Mr. DiNatale, who, the record compels, sought out, met with and purposely misled Jude Connelly, a critical liability witness on key issues in this case shortly before his deposition, the motion for a protective order should be denied, and RARE's private investigator should be ordered to fully testify about his conversations and interactions with Mr. Connelly and other fact witnesses.

1

**Background Facts**

On the early morning of September 27, 2003, a Dodge Dakota pick-up truck, driven on Route 495 in Westford, Massachusetts at over 100 miles per hour by Jeffrey Southworth ("Southworth"), crashed into the rear of a Honda Accord driven by Jose Santiago ("Jose"). Riding with Jose at that time were his three daughters, Awilda Santiago ("Awilda"), Veronica Rosario ("Veronica") and Christina Santiago ("Christina").  As a result of this catastrophe, Jose and Awilda were killed and the survivors suffered enormous, life altering injuries.  Christina, 12 years old at time, was hospitalized for 50 days, has suffered traumatic brain injury and to date has incurred over $162,257.30 in medical and hospital bills.  Her sister, Veronica, then 11 years old, was hospitalized for a week and has incurred over $43,000 in medical and hospital bills.  Both girls suffered numerous permanent physical injuries and are in counseling, as is their mother, Nancy Rosario ("Nancy"), in an effort to try to cope with this devastating, life altering tragedy.

Southworth was drinking at the defendant RARE's Leominster, Massachusetts Longhorn Steakhouse (the "Leominster Longhorn") on the evening of September 26, 2003, and as a result, was highly intoxicated at the time of the accident.  Southworth was subsequently convicted of various accident-related charges, including motor vehicle homicide and operating under the influence of intoxicating alcohol.  He is currently serving prison sentences of not more than twenty (20), nor less than twelve (12), years and, from and after that sentence, a term of not more than five (5), nor less than two and one half (2 ½), years.

2

In November of 2003, Nancy sued Southworth (the "State Court Actions").[1]  Discovery in the State Court Actions included the depositions of Jude Connelly ("Connelly") and Thomas Espey ("T. Espey"), who were with Southworth from early afternoon until late that day, and Michael Espey, who joined Southworth for dinner on September 26, 2003.[2]  Connelly's written statement to the police, his grand jury testimony and his deposition in the State Court Actions disclose that on the evening of September 26, 2003, Southworth, along with a group of friends, was drinking heavily at the Leominster Longhorn.

Connelly was the only member of Southworth's party not drinking that night, since he was underage.  On November 2, 2003, in a handwritten statement made at the request of the Massachusetts State Police, he wrote:

> "We arrived there [the Leominster Longhorn] around 8:30.  We waited for a table and around 9:00 p.m. we were seated.  We had dinner.  Jeff had a couple beers (maybe 2) and maybe 3 drinks with Jack Daniels with dinner."

Farrah Aff., Tab A

Connelly subsequently confirmed this testimony before the Middlesex Grand Jury in the following exchange:

> Q.     "What do you believe Jeffrey Southworth had to drink at the table that night?
>
> A.     "I would say that he probably had two to three beers and a couple of Manhattans.  I would say he had two, maybe three.  I can't specifically recall."

Farrah Aff., Tab C, page 114, line 22 through page 115, line 17.

---

[1] She also brought suit in that action against Enterprise Rent A Car of Boston, Inc., the owner of the truck being operated by Southworth the night of the accident.

[2] Copies of depositions and portions of depositions relevant to this discovery dispute are attached to the Affidavit of Albert L. Farrah, Jr..  References to various deposition portions in this Memorandum will be "Farrah Aff., Tab___"

In his State Court Actions deposition, Connelly testified that when Southworth, T. Espey and he arrived at the Leominster Longhorn at approximately 8:00 to 8:15 p.m., they proceeded to the bar where, it was his "best memory", Southworth consumed "more than one" twenty-five (25) ounce beer while waiting to be seated at a table for dinner. Farrah Aff., Tab B, Connelly Deposition, pages 28-30; Farrah Aff., Tab F, T. Espey Deposition, page 64. Southworth, T. Espey and Connelly then left the bar area of the restaurant and proceeded to tables in the dining area, where they were joined by other friends for dinner.

Consistent with his written statement to the police and his grand jury testimony, Connelly testified in his State Court Actions deposition that during the meal Southworth continued consuming alcoholic beverages. According to Connelly, who was sitting directly across the table from him, Southworth had four (4) twenty-five (25) ounce beers with his meal and at least two (2) Jack Daniels Manhattans. Farrah Aff., Tab B, Connelly Deposition, pages 29-30; 38-40.

Southworth wasn't the only member of his party who was over served alcoholic beverages that evening. In response to a record keeper subpoena in the State Court Actions, RARE produced a Longhorn Steakhouse receipt for service to some of the Southworth group (the "Audit Report") Farrah Aff., Tab J. The Audit Report shows that, in the forty four (44) minutes between 8:40 p.m., when the first drink order was entered in the computer system, and 9:24 p.m., when the last drinks were entered, the Southworth party of seven (including Connelly, who had only soft drinks) ordered seventeen (17) Jack Daniels Manhattans and two (2) 25 ounce beers.[3]

_____

[3] According to Kristen O'Donnell, the bartender who made them, the Jack Daniels Manhattans were straight up. Farrah Aff., Tab H, Kristen O'Donnell Deposition, Volume 2, pages 29 through 41. Each was an extremely potent drink, free poured by Ms. O'Donnell, containing at a

In the State Court Actions deposition Connelly testified that, at the time of the service of the last drink to him, Southworth was displaying signs of intoxication, including that he was sloppier looking than usual, was not standing straight, was louder than usual and had glassy eyes. Farrah Aff., Tab B, Connelly Deposition, pages 49-51; Farrah Aff., Tab K, Connelly Affidavit. He also testified the Southworth party was so loud that evening that, at approximately 9:30 p.m., the time of service of the last drink to the table, either a restaurant manager or waitress requested that the table quiet down. Farrah Aff., Tab B, Connelly Deposition, pages 41-44.[4]

The Southworth group left the Longhorn restaurant and proceeded to the Four Points Hotel in Leominster, MA where Southworth had one 12 ounce beer. Thereafter, he drank no further alcoholic beverages. Farrah Aff., Tab B, Connelly Deposition, Pages 52-56.

Southworth, T. Espey and Connelly left the hotel and proceeded to a nightclub in Leominster known as "The Other Side". Either leaving the hotel or when the party pulled into the parking lot of The Other Side, T. Espey and Connelly had a conversation with Southworth in which they told Southworth that he was "too drunk to drive". Farrah Aff., Tab B, Connelly Deposition, pages 51. Although the party originally intended to go into the nightclub, they made a decision not to do so. Farrah Aff., Tab F, T. Espey Deposition, pages 115-116.

After the nightclub, T. Espey then drove Connelly and Southworth to Littleton where T.

---

minimum of 2 ounces of Jack Daniels and 1/4 ounce of vermouth, and probably more of each, since the RARE Bar Recipes handbook required the Manhattans be served in a six ounce glass, filled to within one quarter inch of the rim with drink. Farrah Aff., Tab I.

[4] Michael Espey, another member of Southworth's party that night, started drinking alcoholic beverages at 4:00 or 5:00 in the afternoon. Despite that, in his own words, he was "drunk" while at the Longhorn Steakhouse, he was served at least a Manhattan and a beer. Farrah Aff., Tab I, Michael Espey Deposition, pages 25-26.

Espey's motor vehicle was parked. Because Southworth had too much to drink, T. Espey told him to "just sleep in his truck". (T. Espey Deposition, Farrah Aff., Tab F, page 118). Southworth refused to do so. He jumped into the front seat of the Dodge Dakota truck. He was intoxicated and, except for his dogs, alone in the vehicle. (T. Espey Deposition, Farrah Aff., Tab F, pages 116-117). Southworth, in backing out of the parking lot, drove over T. Espey's ankle. (T. Espey Deposition, Farrah Aff., Tab F, pages 117-118; Connelly Deposition, Page 60-61).

Soon after, Southworth crashed into the Santiago vehicle on Route 495.

### Procedural History of This Litigation

On February 28, 2005, Nancy commenced an action against RARE in Essex County Superior Court for negligently serving Southworth alcoholic beverages. RARE subsequently removed that action to this court.

This action is predicated upon the theory that RARE knew or should have known that Southworth was intoxicated on September 26, 2003 and should have refused to serve him any further alcoholic beverages. RARE's conduct implicates both criminal statutes,[5] and creates civil liability. As the Supreme Judicial Court has stated,

"[A] tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated patron unless the tavern keeper knows or reasonably should have known that the patron is intoxicated." *Vickowski v. Polish Am. Citizens Club of Deerfield, Inc., 422 Mass. 606, 609 (1996)*, quoting *Cimino v. Milford Keg, Inc., 385 Mass. 323, 327 (1982)*. Thus, on a claim for negligent service

---

[5]   G. L. c. 138, section 69 states "No alcoholic beverage shall be sold or delivered on any premises licensed under this chapter to an intoxicated person." Section 62 of that chapter sets out criminal penalties for a violation of section 69.

of alcohol to an intoxicated patron, a plaintiff must come forward with some evidence that the patron's intoxication was apparent at the time he was served by the defendant.

*Douillard v. LMR, Inc., 433 Mass. 162, 164-5*

It is obvious under the *Douillard* standard that, as the only member of the Southworth party not imbibing that evening, Connelly is a very important witness in this dram shop action. On February 10, 2006 he was deposed in this case. Profound changes in his testimony from that which he gave in deposition in the State Court Actions, and his explanations for those deviations, form the basis for the dispute presently before the Court. Connelly was asked a series of questions about his observations of Southworth on September 26, 2003. From the outset, his testimony differed significantly from his deposition testimony in the State Court Actions.

For one, while in the State Court Actions Connelly testified that his best memory was that at the bar Southworth had more than one 25 ounce beer (Farrah Aff., Tab B, Connelly Deposition, pages 28-30; Farrah Aff., Tab F; T. Espey Deposition, page 64 ), in his USDC deposition he began by claiming Southworth had only one beer.

USDC Deposition

Farrah Aff., Tab C, ***Page 12, Lines 3 through 10***

Q.    *At the bar, did you see Mr. Southworth drinking at all?*

A.    *I did.*

Q.    *What did you see him drinking?*

A.    *I saw him drinking a beer.*

Q.    *And do you know how many beers Mr. Southworth had at the bar that day?*

A.    *I remember him having one.*

7

\*                    \*                    \*                    \*

Farrah Aff., Tab C, ***Page 19, Line 23 through Page 20, Line 10***

*Q.  I want to ask you this question.  Is it your best memory as you sit here now that while he was at the bar, Jeff Southworth had more than one beer?*

*MR. GILLIS:  Objection.*

*A.  No.*

*Q.  Do you recall that you were asked that question at your deposition?*[6]

*A.  Yes.*

*Q.  And that your answer at that time was, "I'd say so, yes"?*

*A.  Yes.*

Pressed, Connelly disclosed his changed testimony resulted from a meeting a month earlier with John DiNatale, RARE's private investigator, who showed and discussed with Connelly the Audit Report, reflecting drinks served the Southworth party once it had been seated at the table.

<u>USDC Deposition</u>

Farrah Aff., Tab C, ***Page 20, Line 11 through Page 21, Line 11***

*Q.  Do you have any explanation for why your answer today is different from your testimony back in August of 2004?*

*A.  To be honest with you, after looking at the receipt for the bill, I'm pretty sure that there could be no way that he had more than one beer at the bar.*

***Q.  Did you see the receipt for the bar?***

---

[6]  Referring to his August 19, 2004 deposition in the State Court Actions.

A. *I believe the bill for the bar was with the bill for the table.*

Q. *What makes you say that?*

A. *That's as I remember that.*

Q. *When did you see the receipt for the bill?*

A. *Maybe a month ago.*

Q. *Where did you see it?*

A. *When I met with John DiNatale.*

Q. *A private investigator?*

A. *Yes.*

Q. *What did Mr. DiNatale say to you?*

A. *He just wanted to go over what I had said in some of the depositions and show me the* **receipt for the bar***, and just tell me when I come in here to tell the truth and if I don't know the answer, don't speculate; just only say what I know.* **(Emphasis added)**.

        \*              \*             \*             \*

Farrah Aff., Tab C, ***Page 21, Line 24 through Page 22, Line 9***

Q. *When you testified on August 19, 2004, you were sworn to tell the truth before you testified; isn't that right?*

A. *Yes.*

Q. *Okay, and you did the best you could to tell the truth at that time; isn't that right?*

A. *Yes.*

Q. *Since that time, Mr. DiNatale has seen you; is that right?*

A. *Yes.*

        \*              \*             \*             \*

Farrah Aff., Tab C, *Page 24, Lines 9 through 12*

*Q. Before you testified in August of 2004, had any investigators, other than police investigators, spoken to you about your upcoming testimony?*

*A. No.*

Connelly was then shown the Audit Report and confirmed it was one of the documents DiNatale showed him.

<u>USDC Deposition</u>

Farrah Aff., Tab C, *Page 25, Lines 2 through 7*

*Q. And he showed you some documents; is that right?*

*A. Yes.*

*Q. One of the documents he showed you was **a printout of the bar check; is that right?***

*A. That's right.* **(Emphasis added)**.

    *        *        *        *

Farrah Aff., Tab C, *Page 25, Lines 17 through 19*

*Q. Is that the document that Mr. DiNatale showed you when you met with him?*

*A. I think so, yes.*

The Audit Report was marked as Exhibit 2 to Connelly's deposition, and he was then asked questions about his discussions with DiNatale about the Audit Report. The excerpt below shows how DiNatale was successful in his improper efforts to confuse Connelly and influence his testimony, by falsely suggesting to Connelly that the two beers shown on the Audit Report

were the first two beers ordered – one by Southworth and the other by T. Espey – when they first

entered the bar at the Leominster Longhorn.

USDC Deposition

Farrah Aff., Tab C, *Page 26, Line 12 through Page 27, Line 12*

*Q. And you and he discussed what now has been marked as Exhibit 2 in your deposition; is that right?*

*A. Yes.*

*Q. Based in part on that discussion, you now do not believe that Jeff Southworth had more than one beer at the bar; is that right?*

*MR. GILLIS: Objection.*

*A. Correct.*

*Q. That's because there's something in Exhibit 2 that suggests to you that it was an impossibility that he had more than one beer at the bar?*

*MR. GILLIS: Objection.*

*Q. Is that right?*

*A. Yes.*

       \*            \*            \*            \*

Farrah Aff., Tab C, *Page 27, Line 21 through Page 27, Line 12*

*Q. Did Mr. DiNatale point to something in Exhibit 2 that led you to conclude that it was impossible for Jeff to have had more than one beer at the bar?*

*A. He asked me what I remembered him having at the bar, and I told him that I remembered him having a beer.* ***It was a possibility that he could have had more, and I told him I remembered Scott having a beer as well, and at that point he said, "There were only two beers ordered. So where did the third beer come from," and I said, "I***

11

*guess it didn't come."*

**(Emphasis added)**.

The beers ordered at the bar were <u>not</u> included on the Audit Report, something DiNatale knew, or should have known. One month after Connelly's deposition in this case, Leigh Chabot, the waitress who served the Southworth party of September 26, 2003, was asked questions about the Audit Report, which had been marked as Exhibit 8 in her deposition. Chabot testified as follows.

USDC Deposition

Farrah Aff., Tab E, Chabot Deposition, *Page 51, Lines 12 through 22*

*Q.    So, the two beers that appear on the first page of Exhibit 8, (2) twenty-five ounce Bud Lights beers were served by you to the table the night of September 26th is that right?*

*A.    Yes.*

*Q.    Nobody from the bar, no bartender asked you to add to your check any beers that had been ordered by table patrons while they had been at the bar that night, is that right?*

*A.    Correct.*

There was simply no basis for DiNatale to suggest to Connelly that the beers ordered at the bar were shown on the Audit Report. The well was poisoned, and it is clear from the remainder of Connelly's deposition that he was profoundly affected by DiNatale's influence.

**Remainder of USDC Deposition**

Connelly's entire United States District Court deposition has been provided to the Court for its review. Farrah Aff., Tab C. It is obvious that the "confusion" created by DiNatale's suggestions about the Audit Report and its supposed relationship to what Southworth consumed

at the bar before being seated for dinner had a profound effect on Connelly and his testimony. By way of example only, following are references to other portions of Connelly's testimony affected by DiNatale.

Farrah Aff., Tab C, page 39, lines 4 through 14 (DiNatale pointed to the two beers on the Audit Report and "said those were the two beers that were ordered", "those were the two beers they were drinking").

DiNatale shared with Connelly that "he wanted to talk to me and just sort of tell me what I am coming in here to do" (Farrah Aff., Tab C, page 43) and, "not to make something up" (Farrah Aff., Tab C, page 44), subtly suggesting that Connelly's earlier testimony was made up. DiNatale shared with Connelly that he was there to see Connelly to "kind of tell me where I stand in all of this" (Farrah Aff., Tab C, page 45). DiNatale established the standard for Connelly when he told him "the most important thing is to come in here and tell what I know and not to say something I don't know for sure" (Farrah Aff., Tab C, page 47), again sending the message to Connelly that he was not sure of what he had testified to before.

Significantly, DiNatale was very familiar with the Audit Report. He "counted up the number of Jack Daniels drinks that were ordered", told Connelly "what was ordered here", "what was drinking here", and "that was all that was ordered throughout the night"(Farrah Aff., Tab C, page 49).

Clearly, at some point during his meeting with RARE's investigator, Connelly became of the belief the beers ordered at the bar were reflected on the Audit Report. He shared that belief with DiNatale who then said, referring to the Audit Report, "well if those are the two beers then

Jeff had a beer" (Farrah Aff., Tab C Page 50). DiNatale plainly knew no bar beers were shown on the Audit Report. When given the opportunity to correct Connelly's mistake on that point, DiNatale refused to do so and "did not disagree" when Connelly said the bar beers were shown on the Audit Report (Farrah Aff., Tab C, page 51). It is irrelevant whether Connelly or DiNatale first mentioned to the other that the beers ordered at the bar were reflected on the Audit Report, since it is inconceivable DiNatale did not know, by the time he met with Connelly, what Chabot, RARE's former employee, testified to a month later, namely that the beers on the Audit Report were served by her to the table and had absolutely nothing to do with the beers ordered at the bar by Southworth and T. Espey.

DiNatale spent considerable time reviewing the 17 Jack Daniels Manhattans in the Audit Report (Farrah Aff., Tab C, page 72), pointing out and "interpreting" the bill for Connelly (Farrah Aff., Tab C, page 74). DiNatale talked about the relationship between the 17 Jack Daniels Manhattan and the six people of drinking age at the table and discussed "unaccounted for drinks" with Connelly. In an obvious effort to minimize the breathtaking amount of alcohol served to the table in less than 45 minutes, DiNatale asked whether there was an eighth person at the table (Farrah Aff., Tab C, page 88), and suggested, if there were an eighth person at the table there would be fewer "unaccounted for drinks" (Farrah Aff., Tab C, page 89).

Connelly's wholesale disavowance of his November 3, 2003 statement to the police about what Southworth had to drink with dinner ("a couple of beers and maybe three drinks with Jack Daniels", Farrah Aff., Tab A) and what he testified to before the Grand Jury about what Southworth had to drink at dinner ("he probably had two to three beers and a couple of

14

Manhattans I would say he had two maybe three", Farrah Aff., Tab C, page 114, line 22 through page 115, line 17) is solely attributable to DiNatale's "spin" on the Audit Report (Farrah Aff., Tab C, page 116).

DiNatale's influence extended to Connelly's earlier testimony about Southworth exhibiting signs of intoxication, another subject DiNatale took up with Connelly, who stepped back from his earlier testimony that Southworth was showing signs of intoxication (  Farrah Aff., Tab C, page 53). In fact, it is no stretch to say that, after – and solely because of – DiNatale's "intervention", Connelly retreated from virtually every important point he had testified to before the grand jury or during the State Court Actions deposition.

Connelly confirms that, but for being shown the Audit Report, his best memory regarding what Southworth had to drink with dinner is reflected in the statement to the police, his Grand Jury testimony and his State Court Actions deposition (Farrah Aff., Tab C, pages 118-119), and, similarly, but for the poisoning effects of his encounter with DiNatale, his best memory of what Southworth drank at the bar is reflected in his State Court Actions Deposition (Farrah Aff., Tab C, page 119).

### Events Leading to Motion for Protective Order

Understandably concerned about this development, plaintiff noticed DiNatale's deposition. Still on the offensive, RARE responded with a motion for a protective order, calling

15

plaintiff's efforts to depose its investigator a "surreptitious attempt" to obtain its work product, and claiming the work product doctrine prohibits any inquiry into the actions of DiNatale.[7]

As the discussion below shows, RARE's got it wrong. This dispute is not about protecting the mental thoughts and impressions of an attorney, but about fair play. Far from shielding him, the Federal Rules permit full inquiry into precisely the type of activity DiNatale engaged in, since the ultimate goal of discovery is to "make litigation less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States* v. *Procter & Gamble Co., 356 U.S. 677, 682 (1958).*

## Argument

### Plaintiff's Position Regarding The Contested Issue of Whether DiNatale May Be Deposed

Plaintiff is entitled to inquire about the following: (a) the conversation between DiNatale and Connelly, (b) conversations DiNatale had with other witnesses about statements they made or facts they observed or heard, including RARE employees, and (c) any non privileged basis for any understanding or belief of DiNatale that the two beers shown on the Audit Report reflected

---

[7] RARE doubtless is aware that tampering with a witness is a crime. 18 U.S.C. §1512(b)(1) provides as follows:

> "whoever knowingly uses intimidation, threatens or corruptly persuades another person or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay or prevent the testimony of any person in an official proceeding shall be punished ....." (Emphasis added).

The §1512 requirement that a jury find intent and proof of a nexus between the corrupt persuasion and a particular proceeding is easily met in this action. See, *Arthur Anderson, LLP v. United States, 544 U.S. 696 (2005).*

beers ordered at the bar.   As the supporting legal authority set forth immediately below shows,

none of what plaintiff seeks is protected work product.

### Discovery Generally

Fed. R. Civ. P. 26(b)(1) sets out the familiar principles underlying discovery in the

federal Courts and provides:

> (1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The plain language of Rule 26(b)(1) contemplates wide-ranging discovery to the fullest

possible extent. *Klonoski v. Mahlab, 156 F.3d 255, 267    (1st Cir. 1998).*   Relevancy is to be

construed broadly and encompass any matter that bears on any issue that is or may be involved

in the case. *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978).*   There is no dispute that

discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help

define and clarify the issues. *Hickman v. Taylor, 329 U.S. 495, 501 (1947).*

Plaintiff does not intend to use the deposition of DiNatale to invade, or learn about,

RARE's attorney's work product.   For one, as RARE admits in its memorandum, plaintiff does

not seek documents, but the testimony of a witness.[8]   Specifically, plaintiff wishes to inquire

---

[8] The only documents plaintiff would seek, if DiNatale testified he received them, would be statements from witnesses in this action, which are clearly discoverable, and not work product. Connelly is not sure if he signed a statement for DiNatale (Farrah Aff., Tab C, page 143).

about the following: (a) the conversation between DiNatale and Connelly, (b) conversations DiNatale had with other witnesses about statements they made or facts they observed or heard, including RARE employees, and (c) any non privileged basis for any understanding or belief of DiNatale that the two beers shown on the Audit Report reflected beers ordered at the bar.    None of this is protected work product.

The conversation between DiNatale and Connelly falls within the scope of 26(b)(1) since it is obviously relevant to the differences in the events of September 26, 2003 that Connelly related to the police and testified to before the grand jury and in deposition in the Superior Court Actions, and those to which he testified in his recent USDC deposition.    It has long been the rule that discovery is not limited to issues raised by the pleadings or even to the merits of a case, for, as has happened in this case, a variety of fact-oriented issues may arise during litigation that are not related to the merits. Discovery should be allowed if there is any possibility that the information may be relevant to the general subject matter of the action.    *National Credit Union Administration v. First Union Capital Market Corp., D.Md. 1999, 189 F.R.D. 158.*    See also*, In Re Air Crash Disaster near Roselawn, ID, D.C., Illinois, 1997, 172 F.R.D. 295; Oppenheimer Fund, at 351.*

Plaintiff should be entitled to inquire of DiNatale what he said to Connelly and, to the extent that, as reported by Connelly, DiNatale represented that the two beers shown on the audit statement reflected beers served at the bar to Southworth and T. Espey, the basis for such a representation.

18

Facts related to DiNatale in conversations he had with other witnesses are also discoverable, and not work product.  Facts known to the opposing party – not strategy or work product – are without exception discoverable.  "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise." *Hickman* at *507*.

### Conclusion

DiNatale, RARE's investigator, has information about why Connelly's testimony changed so dramatically at his recent deposition.  The fact that he caused that change, while working for RARE, may be embarrassing or worse, makes no difference to a Rule 26 analysis.

The motion for protective order should be denied.

Plaintiff
By her attorney,


ALBERT L. FARRAH, JR., ESQ.
One Washington Mall, 5th Floor
Boston, MA 02108
(617) 742-7766
B.B.O. #159340

Date: August 17, 2006

CERTIFICATE OF SERVICE

SUFFOLK, SS                                                  August _15_, 2006

A copy of Plaintiff's Memorandum in Opposition to RARE Hospitality's Motion For Protective Order was today emailed and mailed, postage prepaid to Michael Gillis, Esq., Gillis & Bikofsky, 1150 Walnut Street, Newton Highlands, MA 02461.

_____
Albert L. Farrah, Jr., Esq.