UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NANCY ROSARIO, INDIVIDUALLY, AS          )
SHE IS THE ADMINISTRATRIX OF THE         )
ESTATE OF AWILDA SANTIAGO, ESSEX         )
PROBATE COURT DOCKET #03P-2499AD1,       )
P/P/A VERONICA ROSARIO AND               )
CHRISTINA SANTIAGO, AND AS               )
SHE IS THE ADMINISTRATRIX OF THE         )
ESTATE OF JOSE SANTIAGO, BERLIN          )          Civil Action #05-CV-10617MLW
(CONNECTICUT)                            )
PROBATE COURT, CASE #03-0713             )
    Plaintiff                                )
                                         )
v.                                       )
                                         )
RARE HOSPITALITY INTERNATIONAL, INC.     )
d/b/a LONGHORN STEAKHOUSE                 )
    Defendant                                )

## AFFIDAVIT OF ALBERT L. FARRAH, JR.

1.     My name is Albert L. Farrah, Jr. at all times pertinent hereto, I have been counsel to the plaintiffs in the above matter.

2.     Attached hereto are copies of the following documents:

     A.     Handwritten statement of Jude Connelly dated November 3, 2003;

     B.     Deposition of Jude Connelly dated August 19, 2004 in the matter of Nancy Rosario, et al v. Jeffrey Southworth, et al, Middlesex Superior Court C.A. #03-4704L2;

     C.     Deposition of Jude Connelly in this action dated February 10, 2006;

     D.     Handwritten statement of Leigh Chabot dated November 2, 2003;

     E.     Portions of the deposition of Leigh Chabot in this action dated March 10, 2006;

     F.     Portions of the deposition of Thomas Espey dated June 22, 2004 in the

matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2;

       G.     Portions of the deposition of Michael Espey dated June 22, 2004 in the matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2;

       H.     Portions of the deposition of Kristen O'Donnell in this action dated December 28, 2005;

       I.     Portions of the Longhorn Steakhouse Bar Recipes, Revised 2002;

       J.     Longhorn Steakhouse Audit Report dated September 26, 2003;

       K.     Affidavit of Jude Connelly dated May 6, 2005 in the matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2; and

     3.     Attached hereto as Tab L is various correspondence between my office and that of RARE's attorney regarding the deposition of John DiNatale. From the outset, Mr. Gillis made it clear to me that he would not produce Mr. DiNatale for deposition and as the attached correspondence shows, we agreed early on that he would file a motion for protective order.

     4.     I do not believe, given the obvious effect John DiNatale had on Jude Connelly's testimony, that there was any obligation on my part to specify why I believed I was entitled to take Mr. DiNatale's deposition, particularly since Mr. Gillis made it plain he was not going to produce Mr. DiNatale. Nevertheless, I regret the use of the expression "take a shot at" Mr. DiNatale.

     5.     The reasons supporting plaintiff's claim she has a right to depose Mr. DiNatale are fully set in the accompanying memorandum.

Signed under the pains and penalties of perjury this 15th day of August, 2006.

_____
ALBERT L. FARRAH, JR., ESQ.

## CERTIFICATE OF SERVICE

SUFFOLK, SS                                                    August 15, 2006

A copy of the Affidavit of Albert L. Farrah, Jr. was today mailed, postage prepaid to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA 02461.

_____
Albert L. Farrah, Jr., Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS | ) | |
| SHE IS THE ADMINISTRATRIX OF THE | ) | |
| ESTATE OF AWILDA SANTIAGO, ESSEX | ) | |
| PROBATE COURT DOCKET #03P-2499AD1, | ) | |
| P/P/A VERONICA ROSARIO AND | ) | |
| CHRISTINA SANTIAGO, AND AS | ) | |
| SHE IS THE ADMINISTRATRIX OF THE | ) | |
| ESTATE OF JOSE SANTIAGO, BERLIN | ) | Civil Action #05-CV-10617MLW |
| (CONNECTICUT) | ) | |
| PROBATE COURT, CASE #03-0713 | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RARE HOSPITALITY INTERNATIONAL, INC. | ) | |
| d/b/a LONGHORN STEAKHOUSE | ) | |
| Defendant | ) | |

## AFFIDAVIT OF ALBERT L. FARRAH, JR.

1.      My name is Albert L. Farrah, Jr. at all times pertinent hereto, I have been counsel

to the plaintiffs in the above matter.

2.      Attached hereto are copies of the following documents:

A.      Handwritten statement of Jude Connelly dated November 3, 2003;

B.      Deposition of Jude Connelly dated August 19, 2004 in the matter of

Nancy Rosario, et al v. Jeffrey Southworth, et al, Middlesex Superior Court C.A. #03-4704L2;

C.      Deposition of Jude Connelly in this action dated February 10, 2006;

D.      Handwritten statement of Leigh Chabot dated November 2, 2003;

E.      Portions of the deposition of Leigh Chabot in this action dated March 10,

2006;

F.      Portions of the deposition of Thomas Espey dated June 22, 2004 in the

Affidavit of Albert L. Farrah, Jr. (MPO)
8/15/06                                                1

matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2;

G.     Portions of the deposition of Michael Espey dated June 22, 2004 in the matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2;

H.     Portions of the deposition of Kristen O'Donnell in this action dated December 28, 2005;

I.     Portions of the Longhorn Steakhouse Bar Recipes, Revised 2002;

J.     Longhorn Steakhouse Audit Report dated September 26, 2003;

K.     Affidavit of Jude Connelly dated May 6, 2005 in the matter of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2; and

3.     Attached hereto as Tab L is various correspondence between my office and that of RARE's attorney regarding the deposition of John DiNatale. From the outset, Mr. Gillis made it clear to me that he would not produce Mr. DiNatale for deposition and as the attached correspondence shows, we agreed early on that he would file a motion for protective order.

4.     I do not believe, given the obvious effect John DiNatale had on Jude Connelly's testimony, that there was any obligation on my part to specify why I believed I was entitled to take Mr. DiNatale's deposition, particularly since Mr. Gillis made it plain he was not going to produce Mr. DiNatale. Nevertheless, I regret the use of the expression "take a shot at" Mr. DiNatale.

5.     The reasons supporting plaintiff's claim she has a right to depose Mr. DiNatale are fully set in the accompanying memorandum.

Affidavit of Albert L. Farrah, Jr. (MPO)
8/15/06                                   2

Signed under the pains and penalties of perjury this 15th day of August, 2006.

_____

ALBERT L. FARRAH, JR., ESQ.

## CERTIFICATE OF SERVICE

SUFFOLK, SS                                                    August 15, 2006

     A copy of the Affidavit of Albert L. Farrah, Jr. was today mailed, postage prepaid to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA 02461.

_____

Albert L. Farrah, Jr., Esq.

GRAND JURY
EXHIBIT
18
11/5/03 RC

Jude Connelly - Jude Lowndes        DOB - 3/23/85
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                Nov. 2nd, 2003    3:25pm

We were dirtbiking in Templeton, Ma at
the sandpits when it got dark, we left
Templeton. Scott espey drove from Templeton to
the Long Horn resturaunt in Leominster, Ma. We
arrived there around 8:30. We waited for a table
and around 9:00pm we were seated. We had
dinner. Jeff had a couple beers (maybe 2) and
maybe 3 drinks with Jack Daniels with dinner. At
around 11:00pm when the resturaunt was closing we
'll left We went from the long horn to the four
seasons hotel I believe (over RMV in fitchburg). We staye
there for maybe 15-20 min. Scott was drove from
the longhorn to the hotel and then to the other
side, Scott, Jeff and I dropped one of the others
off at the long horn with the others. Then Scott
drove Jeff and I with the 2 dogs to Pond view
Apartment homes in Littleton, Ma by the 495 exit. We
unloaded our stuff (me, scott) and Jeff left with h
2 dogs. We realized we did not have the keys so we
called Jeff. I got through to him and he said tha
he would turn around to bring us the keys. We wa
maybe 15-20 min and Jeff had not shown up. We call
l n again and got through. He said he was alright,
but he was in an accident and to come get h
We had to break a window out in Scotts truck to ge

on the south side. We turned around in Westford
nd headed south. We saw lots of police cars and
emt vehicles we could not see any thing that looked
like Jeffs truck We could not see any vehicles off
the road We decided not to stop and we then we
back to harvard ~~be~~ where I was dropped off.

_Judd brually_

**1**

```
 1              Volume:  1
               Pages: 1-101
 2             Exhibits:  1-2

 3       COMMONWEALTH OF MASSACHUSETTS

 4   Middlesex, ss      Superior Court Dept.
              C.A. No. 03-4704L2
 5   * * * * * * * * * * * * * * * *

 6   NANCY ROSARIO, INDIVIDUALLY AND AS
     SHE IS THE ADMINISTRATRIX OF THE
 7   ESTATE OF AWILDA SANTIAGO, ESSEX
     PROBATE COURT DOCKET NO. 03P-2499AD1
 8   AND P/P/A VERONICA ROSARIO AND
     CHRISTINA SANTIAGO,
 9              Plaintiff,
         vs.
10   JEFFREY SOUTHWORTH, ENTERPRISE
     RENT-A-CAR OF BOSTON, INC.,
11              Defendants.
     * * * * * * * * * * * * * * * *

12

13       DEPOSITION of JUDE P. CONELLY, a

14   witness called by counsel for the Plaintiff,

15   taken pursuant to Rule 30 of the Massachusetts

16   Rules of Civil Procedure before Alene M.

17   Jennette, Certified Shorthand Reporter and

18   Notary Public in and for the Commonwealth of

19   Massachusetts, at the offices of Albert L.

20   Farrah, Jr., One Washington Mall, Boston,

21   Massachusetts on Thursday, August 19, 2004,

22   commencing at 9:40 a.m.

23

24
```

**2**

```
 1   APPEARANCES:

 2

 3   ALBERT L. FARRAH, JR., ESQ.

 4   One Washington Mall

 5   Boston, Massachusetts 02108

 6     On Behalf of the Plaintiff

 7

 8   AVERY DOOLEY POST & AVERY, LLP

 9   By James T. Sullivan, Esq.

10   90 Concord Avenue

11   Belmont, Massachusetts 02478

12     On Behalf of the Defendant

13     Jeffrey Southworth

14

15   KOPELMAN AND PAIGE, P.C.

16   By Thomas P. Lane, Jr.

17   31 St. James Avenue

18   Boston, Massachusetts 02116

19     On Behalf of the Defendant Enterprise

20     Rent-a-Car of Boston, Incorporated
21
22
23

24
```

**3**

```
 1                  I N D E X

 2

 3   WITNESS:          DIRECT        CROSS

 4   JUDE P. CONELLY

 5

 6   By Mr. Farrah       4

 7   By Mr. Sullivan              87

 8   By Mr. Lane                  94

 9

10

11             E X H I B I T S

12

13   NO.        DESCRIPTION        PAGE

14   1    LongHorn Steakhouse Proposed

15        Floor Plan            32

16   2    Photocopy of Guest Pass to

17        The Other Side        92

18

19

20

21

22   Exhibits retained by Attorney Farrah.

23

24
```

**4**

```
 1          P R O C E E D I N G S
 2              STIPULATIONS
 3       It is hereby stipulated and agreed by
 4   and between counsel for the respective parties
 5   that the witness will read and sign the
 6   deposition transcript within 30 days.  The
 7   notarization of the signature and filing of the
 8   deposition may be waived.
 9       It is further stipulated that all
10   objections, except as to the form of the
11   question, and motions to strike will be
12   reserved until the time of trial.
13          JUDE P. CONELLY,
14   a witness called for examination by counsel for
15   the Plaintiff, having been satisfactorily
16   identified and duly sworn, was examined and
17   testified as follows:
18          DIRECT EXAMINATION
19   BY MR. FARRAH:
20       Q. Tell us your full name for the
21   record.
22       A. Jude Patrick Connelly.
23       Q. My name is Albert Farrah, and I
24   represent Nancy Rosario, who has brought suit
```

**5**

1   in her own name and as administratrix of her
2   daughter's estate against Jeffrey Southworth
3   and Enterprise Rent-a-Car of Boston.
4        And I'm going to be asking you some
5   questions, and Mr. Sullivan and Mr. Lane may
6   ask you some questions as well. If you don't
7   understand any questions that I ask or they
8   ask, please let me know, and I'll try to
9   rephrase it. If you need a break, let me know,
10  and you can have a break.
11       At the end of the deposition, the
12  transcript of your testimony, which is what is
13  happening right now, will be sent to you, and
14  you'll have 30 days to review it for accuracy.
15  And to the extent there are any, make a list of
16  inaccuracies on a sheet of paper, sign that
17  sheet, and send it back.
18       If we don't get it back from you
19  within 30 days, we're going to, for the
20  purposes of this lawsuit, deem that the
21  transcript was satisfactory to you and then use
22  it for whatever purposes transcripts are used
23  for in lawsuits. Is that all okay for you?
24       A. Yeah.

**6**

1        Q. Great. All right. Where do you
2   live?
3        A. Harvard, Mass.
4        Q. What is your address?
5        A. 15 Lovers Lane.
6        Q. And how old are you?
7        A. 19.
8        Q. Your date of birth is what?
9        A. 3/23/85.
10       Q. Are you working or going to school
11  right now?
12       A. Ah, I do both. I haven't started
13  school.
14       Q. Where are you working right now?
15       A. In Fitchburg at Napa Auto Parts.
16       Q. Does Scott Espy work at Napa Auto
17  Parts?
18       A. No.
19       Q. Does his brother work at Napa Auto
20  Parts?
21       A. No.
22       Q. How long have you worked there?
23       A. I've worked there probably three
24  months.

**7**

1        Q. And where did you go to school?
2        A. I go to school -- actually, I'm in
3   between schools right now, I used to go to
4   UMass Lowell. Now I'm transferring to Mount
5   Wachusett.
6        Q. Mount Wachusett College?
7        A. Yes.
8        Q. Where is that?
9        A. It's in Gardner, Mass.
10       Q. Will you be boarding or a day
11  student?
12       A. I'll be a day student.
13       Q. Have you completed enough credits to
14  finish your freshman year?
15       A. Ah, I don't actually know. No, I
16  don't think so. I think I'm a little bit
17  short.
18       Q. Is it accurate to say that you
19  attended UMass Lowell from September of 2003 to
20  sometime in 2004?
21       A. Yes.
22       Q. And you graduated from Harvard High
23  School; is that right?
24       A. Yeah. It's actually called The

**8**

1   Bromfield School.
2        Q. What year did you graduate from The
3   Bromfield School?
4        A. 2003.
5        Q. Okay. For how long have you known
6   Jeffrey Southworth?
7        A. Ah, known him about two years maybe.
8        Q. Okay. So that would bring us back to
9   summer of 2002, more or less; is that right?
10       A. Yes.
11       Q. You didn't know him prior to that, as
12  best as you can recall?
13       A. No, I didn't. I mean, I'd heard of
14  him, but I never really met him.
15       Q. What had you heard of him before you
16  met him?
17       A. Well, I just heard he used to go to
18  our school, and he lived in Harvard for some
19  time, and then he moved out.
20       Q. Your school is The Bromfield School?
21       A. Yes.
22       Q. Did you hear before you met him that
23  he had been expelled from The Bromfield School?
24       A. No.

**9**

1    Q. Did you subsequently come to learn
2 that he had been expelled from The Bromfield
3 School?
4    A. No.
5    Q. Okay. Do you recall the
6 circumstances of your first meeting with
7 Jeffrey Southworth?
8    A. Not really. I mean, I can tell you
9 that it's most likely we were going
10 dirt-biking. I was going dirt-biking, and he
11 was there.
12    Q. Okay. You're pretty clear that the
13 first meeting had something to do with
14 dirt-biking; is that right?
15    A. Yeah. Well, I think the first time
16 that I was actually with him, just me and him,
17 you know, he called me up and asked me if I
18 wanted to go dirt-biking.
19    Q. But prior to that time, you had been
20 in a place where there was dirt-biking going on
21 and he was there as well as you and others; is
22 that right?
23    A. Yes.
24    Q. And approximately from the time that

**10**

1 you first saw him dirt-biking until September
2 26, 2003, on how many occasions were you either
3 alone or in the company of others dirt-biking
4 with Jeffrey Southworth?
5    A. I would say, you know, 15 times.
6    Q. Okay. And where would that
7 dirt-biking happen? What locations?
8    A. Well, there is a few different
9 places. Down in Uxbridge, Massachusetts --
10 well, it's closed now, but there was an -- it's
11 called Uxbridge Motor Sports Park. Just a guy
12 ran a little track. You pay $20 and ride for
13 the day.
14    Then there is a sandpit out in
15 Templeton, Mass. that we went to a lot. There
16 was a -- now it's owned by the Marshalls, the
17 Marshalls from Stow, Mass. But we did a lot of
18 riding there. Those are the two spots that we
19 rode.
20    Q. Any place else that you can think of
21 that you rode with Jeff Southworth?
22    A. We went other places, but we didn't
23 ride there. We went to actual dirt-bike races,
24 Southwick, Mass., Winchester Speed Park. It

**11**

1 wasn't very often.
2    Q. In addition to being in his company
3 and involved in dirt-biking activities, either
4 dirt-biking yourselves or going to dirt-bike
5 races as you just testified, were you in his
6 company in any other settings?
7    A. Very rarely. I mean, I was, but you
8 know, it was sort of, you know, I'd go to a
9 party, and he'd be there, and I'd see him. And
10 it wasn't like I was hanging out with him, but
11 he was there.
12    Q. Okay. And can you tell me where some
13 of the parties were that you saw him?
14    A. They were in Harvard. There weren't
15 very many of them. I just remember seeing him
16 at a few parties around town.
17    Q. This would have been sometime between
18 the summer of 2002 and September of 2003; is
19 that right?
20    A. Yes. Yeah. Actually, I think it was
21 the summer of 2003.
22    Q. That you saw him at the parties?
23    A. Yeah, yes.
24    Q. Do you remember the names of any of

**12**

1 the houses that you were at for parties?
2    A. There was -- we were at one party. I
3 think it was -- the name was Vanecola, Dave
4 or -- yeah, Dave Vanecola.
5    Q. Vanecola?
6    A. Yeah. I'm not exactly sure on the
7 spelling.
8    Q. What street was that on in Harvard?
9    A. I couldn't tell you. I know how to
10 get there. I just don't know the street name.
11    Q. Any other parties that you remember
12 seeing him at in the summer of 2003?
13    A. Not that I can, you know, like, know
14 for a fact.
15    Q. During the fall of 2003, did you have
16 your own dirt bike?
17    A. Fall of -- no, I don't think -- No, I
18 didn't.
19    Q. So when you dirt-biked during the
20 summer of 2002 to fall of 2003 time frame,
21 whose dirt bike or bikes did you use?
22    A. I used -- my brother has a few bikes.
23 I used one of his. And, actually, now it's
24 mine.

**13**

1    Q. Good brother. Okay. Did you ever
2  use Jeffrey Southworth's dirt bikes at all?
3    A. I mean, I've ridden on them, but I
4  never really rode them that much.
5    Q. You said he called you up to
6  dirt-bike?
7    A. Mm-hmm.
8    Q. On more than one occasion?
9    A. Yes.
10    Q. And he would call you on your cell
11  phone?
12    A. Yes.
13    Q. What is that number?
14    A. 978-239-6954.
15    Q. That was your number back in
16  September of 2003; is that right?
17    A. And still is.
18    Q. Okay. Before I get to that, did he
19  ever ask you to drive his motor vehicle while
20  you were in Massachusetts?
21    A. Yes.
22    Q. When is the first time he asked you
23  to drive his motor vehicle?
24    A. Ah, it was, you know, I can say for a

**14**

1  fact that it was definitely when we were going
2  dirt-biking. I just can't tell you exactly
3  when.
4    Q. Did he tell you that time why he
5  wanted you to drive his motor vehicle?
6    A. No. He just said that he didn't want
7  the cops seeing, you know, us. He didn't
8  really say anything specific. I know that he
9  didn't want the cops seeing him in Harvard.
10    I don't know why. At that time, I
11  wasn't sure, you know, I wasn't -- now I
12  realize that he didn't have his license. But
13  at that time, you know, he got -- a lot of
14  people in Harvard sort of have -- don't really
15  like him.
16    Q. Like him?
17    A. Yes. And this is also stuff that
18  I've learned from his past, like when he got, I
19  guess, expelled from Bromfield School. So you
20  know, he just didn't really like to be seen in
21  Harvard.
22    Q. Okay. So when you were driving him
23  through the streets of Harvard, was he ducking
24  down in the truck?

**15**

1    A. No, no.
2    Q. He wasn't in any disguises or
3  anything like that, was he?
4    A. No.
5    Q. Did he ever tell you, other than he
6  didn't want to be seen in Harvard, why he
7  wanted you to drive his car or his motor
8  vehicle?
9    A. No. He never really mentioned
10  anything. I mean, he had other people drive it
11  as well, you know, whoever was there. Whether
12  it be Scott Espy or, you know, whoever we were
13  dirt-biking with.
14    Q. Round numbers again, your best
15  estimate, how many times were you dirt-biking
16  with Scott Espy and Jeff Southworth up through
17  September 26, 2003?
18    A. I would -- I definitely dirt-biked
19  with Jeff probably 15 times. Whether Scott was
20  there -- he was probably there ten of the
21  times.
22    Q. Did you ever, prior to September 26,
23  2003, drive Jeff Southworth's motor vehicle
24  because he was too drunk to drive?

**16**

1    A. No. Wait, prior to 2003?
2    Q. Prior to September 26, 2003 --
3    A. Oh, no, no, no.
4    Q. -- did you ever drive because he was
5  too drunk?
6    A. No.
7    Q. Okay. On September 26, 2003, which
8  is -- I don't know if I've got the date right.
9  I think I do. Give my one second -- yeah,
10  which is the date that you were at the LongHorn
11  Steakhouse with him.
12    A. Okay.
13    Q. By the way, other than that day,
14  September 26, 2003, did you ever go to the
15  LongHorn with Jeff Southworth?
16    A. No.
17    Q. Did you ever go to any restaurant
18  with Jeff Southworth prior to September 26,
19  2003 after dirt-biking?
20    A. No.
21    Q. Okay. And you live at home with your
22  parents?
23    A. Yes.
24    Q. So on that day, the LongHorn

**17**

1 Steakhouse day -- which I'm sure you remember?
2     A. Yup.
3     Q. What time did you first meet up with
4 him?
5     A. Well, we met up with him -- I met up
6 with him earlier on in the afternoon because we
7 were going dirt-biking out in Templeton, that
8 sandpit.
9     Q. So give me an idea. What time was
10 it?
11     A. It was probably, you know, early
12 afternoon. Two, maybe three.
13     Q. And were you working then?
14     A. No, I wasn't.
15     Q. Were you in school then?
16     A. Yes.
17     Q. At UMass Lowell?
18     A. Yes.
19     Q. And you were a day student there?
20     A. Yes, full-time.
21     Q. School had started by September 26,
22 2003, hadn't it?
23     A. Yes, mm-hmm.
24     Q. But you were not at school that

**18**

1 afternoon; is that right?
2     A. Yeah.
3     Q. Do you know how it was that -- what
4 the arrangement was that lead the two of you to
5 go dirt-biking that day, September 26?
6     A. Ah, well, you know, it was a thing we
7 did, you know, every week or so. You know, a
8 couple times a week we'd go riding. That was
9 one particular day that we decided to do it.
10     Q. You don't remember who called whom?
11     A. Oh, no. He probably called me.
12 That's what usually happened. But I can't
13 really recall.
14     Q. And how did you get to the sandpit in
15 Templeton that day?
16     A. I actually met up with him. He
17 was -- actually, I went out there and met -- I
18 was with my brother earlier. We were riding.
19 Now I'm starting to remember a little more. I
20 was out there earlier on with my brother
21 dirt-biking.
22         And we had been in contact with Jeff
23 and Scott. They were together, and they were
24 going to meet us out there. And then they

**19**

1 didn't. They came out -- they probably -- if I
2 had to time when they got there, you know, it
3 would probably be around five o'clock.
4     Q. But you had gone out with your
5 brother earlier?
6     A. Yes.
7     Q. What is his name?
8     A. Dylan.
9     Q. D-Y?
10     A. L-A-N, yes. Conelly.
11     Q. Okay. You said the Marshalls now own
12 the Templeton sandpit; is that right?
13     A. Well, a portion of them, I think.
14 Well, the rest of it is owned by the Town, but
15 I'm not positive.
16     Q. Give me an idea of how many other
17 people were out dirt-biking that day at that
18 sandpit when you met up with Southworth?
19     A. I know for a fact that it was us
20 four: my brother, myself, Jeff, and Scott. I
21 don't remember anyone else. But, you know,
22 it's a sandpit that a lot of people go to,
23 especially on the weekends. But I don't think
24 it was a weekend. So I don't recall anyone

**20**

1 else.
2     Q. You don't recall seeing anyone else?
3     A. No. Might be an occasional
4 dirt-biker that came by, but I don't, you know,
5 specifically remember.
6     Q. Is this a sandpit that has no trees
7 on it?
8     A. Ah, well, it's actually -- it's a
9 couple of sandpits. You know, there is trails
10 that go from one to the other. But they are
11 very close. They maybe have a little section
12 of trees or a tree line in between them. It's
13 not very -- it's not like a forest or anything.
14 It just...
15     Q. Most of the dirt-biking goes on in
16 the sandpits themselves as opposed to in the
17 trees?
18     A. Yes.
19     Q. So you would be able to see most of
20 the other people who were dirt-biking there?
21     A. Oh, yeah.
22     Q. While you were dirt-biking with Jeff,
23 and Scott, did anybody have anything to drink,
24 alcoholic or nonalcoholic beverages?

**21**

1    A. I don't -- no. I mean, we were
2  always out there when we were -- at least what
3  I went out there to do, I don't recall any
4  drinking. We went out there because, you
5  know -- this year I started racing dirt bikes.
6  And we were actually out there training.
7         So I definitely wasn't. I don't
8  remember them either, you know, they were doing
9  the same thing. They were training. Scott
10 wasn't racing, but he was, you know, he was out
11 there, you know, riding with us.
12     Q. Okay. What time did you leave the
13 sandpit?
14     A. It was, you know, shortly after it
15 got dark. Maybe eight, eight o'clock, say,
16 late, 7:30 maybe.
17     Q. Before you all left the sandpit, but
18 after you were done dirt-biking --
19     A. Mm-hmm.
20     Q. -- did you see Jeff have a beer?
21     A. No.
22     Q. Have you heard from anybody that
23 before you all left the sandpit but after you
24 were done dirt-biking that day Jeff had a beer?

**22**

1    A. No.
2    Q. Where did you go from the sandpit
3  next, or where did you next go from the
4  sandpit?
5    A. We got on the highway and went to --
6  we were going to head to Harvard, and then we
7  decided to go to the LongHorn and get dinner.
8    Q. All right. And you were riding with
9  whom at that time?
10   A. I was with -- at that time, my
11 brother actually left. He lived out in western
12 Mass., goes to school out in Amherst. He left
13 earlier on, and he took my bike, because I
14 don't have a truck. So, and I was with Scott
15 and Jeff. And we went back. I was with them.
16   Q. So your brother left. Did he leave
17 at the same time you all left the sandpit, or
18 did he leave earlier?
19   A. It was right at the same time. I
20 mean, not like -- we didn't follow him out.
21 But, you know, we finished dirt-biking; then he
22 left.
23   Q. All right. How long, approximately,
24 did it take to get from Templeton to the

**23**

1  LongHorn?
2    A. Twenty-five minutes, half an hour.
3    Q. Do you know what route you drove?
4    A. Yes. We took Route 2.
5    Q. Route 2?
6    A. Yup.
7    Q. And Scott drove; is that right?
8    A. Yes.
9    Q. Jeff was sitting in the front with
10 Scott; is that right?
11   A. Yes.
12   Q. You were sitting in the back?
13   A. Mm-hmm.
14   Q. Okay. Did Jeff have anything to
15 drink on that trip?
16   A. Ah, you mean in the car?
17   Q. Yes.
18   A. No.
19   Q. Are you sure?
20   A. At least I didn't see him drink
21 anything.
22   Q. Did you see a cooler in the car?
23   A. No.
24   Q. So am I correct that you can't recall

**24**

1  whether anybody had anything at all to drink
2  from five o'clock until 7:30 or eight
3  o'clock when you all left the pit?
4    A. Yeah, yes.
5    Q. I'm talking water, Coke?
6    A. Oh, we always -- we bring lots of
7  water. We drink water just to hydrate
8  ourselves. But...
9    Q. Where was the water that you were
10 drinking that day while you were at the pit?
11   A. I mean, we usually leave it either
12 in, you know, the back, in the bed of the truck
13 or right inside the truck or, you know, right
14 by the truck somewhere.
15   Q. In a cooler?
16   A. No. We just grab a gallon jug on the
17 way out. There's a gas station.
18   Q. Do you remember having a gallon jug
19 that day?
20   A. I don't remember it, but I most
21 likely did.
22   Q. Okay. And do you know whether Jeff
23 and Scott had any water or other nonalcoholic
24 beverages that they were drinking?

**25**

1    A. Well, I can be almost -- pretty
2    positive they did. You know, because that's
3    what we always -- we always had lots of water
4    with us.
5    Q. Do you know where they kept their
6    water?
7    A. I mean, right near the truck.
8    Q. Do you have a memory of seeing it
9    that day, September 26?
10   A. Ah, no, I don't. I mean, I know we
11   had a lot of water. Jeff and Scott actually, a
12   few times when we were dirt-biking, they'd
13   bring an extra gallon or so and just douse
14   themselves down, take a shower almost, after we
15   were done. But it was a little bit cold, I
16   think.
17   Q. That day?
18   A. Getting colder, you know. It was
19   late September. I don't think they were doing
20   that.
21   Q. So approximately what time did you
22   get to the LongHorn Steakhouse?
23   A. Maybe 8:30, 8:45, you know.
24   Q. Did you wear a watch that day, do you

**26**

1    know?
2    A. No.
3    Q. Between leaving the pit and getting
4    to the LongHorn Steakhouse, did anybody in your
5    party make any attempt to hook up with, get
6    together with, other people that night?
7    A. Yeah. Actually, well, it wasn't in
8    the car ride. It was actually once we got to
9    the --
10   Q. LongHorn?
11   A. -- LongHorn.
12   Q. What happened?
13   A. Well, we went in. We found out there
14   was a short wait. So I can't recall exactly.
15   It might have been either Scott calling his
16   brother or, you know, Jeff calling Scott's
17   brother, or someone calling someone with
18   Scott's bother. But somehow we did get in
19   touch with Scott's brother, Michael Espy, and
20   the kids that he was with.
21   Q. Okay. As far as you know, you didn't
22   initiate these calls; is that right?
23   A. Yes, no.
24   Q. Because -- did you know Scott's

**27**

1    brother Michael?
2    A. Yes, I knew him.
3    Q. But he's a little older than you;
4    isn't that right?
5    A. Yeah, yeah.
6    Q. In fact, all of these --
7    A. They're all older.
8    Q. -- guys are all older than you?
9    A. Mm-hmm.
10   Q. Is it accurate to say that you knew
11   Scott from dirt-biking?
12   A. Well --
13   Q. And not otherwise?
14   A. Well, I knew him from dirt-biking.
15   But I knew him really from high school, you
16   know, playing soccer. We played on the soccer
17   team, and he also went to UMass Lowell.
18   Q. Okay. The phone calls to Michael,
19   were they made from inside the LongHorn?
20   A. Yeah, I think they were.
21   Q. And did your group, this is just the
22   three of you now, go to the bar at some point
23   in time at the LongHorn?
24   A. We were waiting at the bar for our --

**28**

1    for the 15, 20 minutes that it took for their
2    table to be cleared.
3    Q. And during that time, the 15 to 20
4    minutes it took for the table to be cleared,
5    did you see Jeff Southworth drinking at all?
6    A. Yes.
7    Q. What did you see him drinking?
8    A. He had a beer.
9    Q. And do you know whether it was from a
10   bottle or a mug?
11   A. I -- yeah, it was from a mug, I'm
12   pretty sure. Yes.
13   Q. And what did you have to drink at the
14   bar?
15   A. Coke. I honestly couldn't remember.
16   I know that it wasn't alcoholic.
17   Q. Do you know what Scott had to drink
18   at the bar?
19   A. He had the same, you know. He just
20   ordered a beer. It was the same thing Jeff
21   had, a mug, glass.
22   Q. Do you know whether or not Jeff had
23   more than one beer while he was at the bar?
24   A. You know, I think he did. I'm not --

**29**

1  I don't know for a fact, but, you know, he
2  probably did.
3       Q. Same kind of beer, a mug?
4       A. Yes.
5       Q. Is that right?
6       A. Yeah.
7       Q. Big mug?
8       A. I mean, I don't really -- you know,
9  the normal glass that you'd get in a
10  restaurant.
11      Q. Let me ask you this. After you sat
12  at the table, did you see Jeff have more beer?
13      A. You mean once we got to our seat?
14      Q. At the table as opposed to the bar?
15      A. Yes.
16      Q. After you sat at the table, did you
17  see Jeff have more beer?
18      A. Yes.
19      Q. And was the vessel, okay, in which
20  that beer was delivered to him at the table the
21  same as the vessel in which he received the
22  beer or more beer -- more than one beer at the
23  bar?
24      A. Yes, it was.

**30**

1       Q. Same mug?
2       A. Yes. Well, not the exact same.
3       Q. Same size?
4       A. The same, same, same cup. Same size,
5  yeah.
6       Q. Do you remember any of the
7  conversation at the bar?
8       A. Not really. Um, I remember we were
9  waiting for -- we were really just sitting
10  there waiting for Mike and Todd Currie, who was
11  with him, and two other kids. I think they
12  were from out of state. I'd never met them
13  before. That was the first time I met them.
14  I'm not sure of their names.
15      Q. By the way, I just want to sort of
16  ask the question one more way. Is it your best
17  memory as you sit here now that while he was at
18  the bar, Jeff Southworth had more than one
19  beer?
20      A. I'd say so, yes.
21      Q. You were at the bar you think for 15
22  to 20 minutes before you were seated at the
23  table; is that right?
24      A. Yeah.

**31**

1       Q. Do you know who served Jeff at the
2  bar?
3       A. I mean, the bartender. I remember it
4  was a girl.
5       Q. Woman. Woman.
6       A. Yes. I don't specifically remember.
7  I think she had blond hair. I just remember
8  seeing blond hair.
9       Q. While you all were in the bar area,
10  were you seated at the bar?
11      A. No.
12      Q. Were you standing at the bar?
13      A. Yes, I was.
14      Q. Okay. Was Jeff standing at the bar
15  as well?
16      A. Yes. I think we were all standing
17  there, and then a seat opened up, and one of
18  them took it. But, I mean, we were really just
19  standing there next to the bar.
20      Q. Okay. I'm going to show you a sheet
21  of paper that I got from the Licensing
22  Commission of the City of Leominster.
23      A. Okay.
24      Q. It's entitled Proposed Floor Plan

**32**

1  Leominster, Mass., LongHorn Steakhouse. I'm
2  going to ask you to look at this for a moment
3  or two and see if you can familiarize yourself
4  with the piece of paper, and then tell me --
5  the question I want you to answer is, Does the
6  piece of paper fairly and accurately depict the
7  layout, looking down from above, of the
8  LongHorn Steakhouse as it appeared to you the
9  night of September 26, 2003, okay?
10      (Pause.)
11      A. Yes, it does.
12      MR. FARRAH: Can we have that marked
13  as the first exhibit.
14      (Exhibit No. 1 marked for
15      identification.)
16      Q. So can you point to the bar area on
17  Exhibit 1 for me?
18      A. It's right here (indicating).
19      Q. And can you point to where your
20  group, Southworth, Scott, and you, were
21  standing at the bar when you first got to the
22  bar?
23      A. Right in this corner (indicating).
24      Q. Okay. So can you let me get a red

**33**

1 pen. Okay, I have a blue pen. This is good.
2 Can you just circle the area where the three of
3 you were first standing for me?
4 (Witness complies.)
5 Q. And then will you put a 3 here and
6 then just make an arrow into that circle for
7 me?
8 (Witness complies.)
9 Q. Thanks. And do you have any memory
10 as you sit here now of where the seat that
11 opened up was?
12 A. Yes.
13 Q. Great. Tell me where that was. Just
14 point to it.
15 A. Right there. I think -- I don't -- I
16 don't think there were four tables. I think
17 there was actually a big table.
18 Q. Okay. That's --
19 A. That's where we were sitting.
20 Q. Before we go there, I just want to
21 get you to tell me, if you remember, where the
22 seat at the bar that you testified earlier
23 opened up and someone sat; can you point to it
24 for me first?

**34**

1 (Witness complies.)
2 Q. That's actually the little circle,
3 presumably depicting a seat, that's closest to
4 the point of the arrow that you made; is that
5 right?
6 A. Yeah.
7 Q. You were joined by others that night?
8 Your group was joined by others that night?
9 A. Mm-hmm.
10 Q. Did that happen while the three of
11 you were still in the bar area?
12 A. No. We were actually -- it was just
13 as we were being seated.
14 Q. Okay. Did Scott, while he was at the
15 bar, have more than one beer, to the best of
16 your knowledge?
17 A. I would say that he did, yes.
18 Q. That night, throughout that night,
19 from when you got to the LongHorn Steakhouse
20 until you last saw Jeffrey Southworth, did you
21 have any alcoholic beverages at all to drink?
22 A. No.
23 Q. Who paid the bar tab?
24 A. Well, I didn't -- Jeff paid for me.

**35**

1 But everyone else paid for themselves.
2 Q. Am I correct that there was only
3 Jeff, Scott, and you at the bar?
4 A. Oh, yes. At the bar, yes.
5 Q. So who paid the bar tab?
6 A. You know what? I think he actually
7 had the -- whatever the bill was, I think they
8 just had it sent to our table and added it on
9 to the end. I don't believe -- I don't
10 remember anyone paying right at the bar. I may
11 be mistaken on that, but I seem to remember
12 that as being what happened.
13 Q. You didn't pay the bar tab; is that
14 right?
15 A. Yeah. Well, actually, I didn't have
16 any money or anything on me, so Jeff told me
17 he'd buy me dinner.
18 Q. Okay. As far as you know, the person
19 serving Jeff at the --serving all of you at the
20 bar was a blond woman?
21 A. I believe so.
22 Q. Approximately how old?
23 A. Early 20s. Maybe 20 -- well, maybe
24 mid-20s, 25, you know, 26.

**36**

1 Q. And do you remember any conversation
2 that anybody in your party had with her?
3 A. With the bartender?
4 Q. Yes.
5 A. No, not really. I mean, other than
6 ordering.
7 Q. Did she seem to know Scott and Jeff?
8 A. No, not -- I mean, I couldn't notice
9 anything.
10 Q. Okay. And it's your best memory that
11 you were at the bar 15 to 20 minutes before you
12 were seated; is that right?
13 A. Mm-hmm.
14 Q. While you were at the bar, were you
15 most of the time no further than a few feet
16 away from Jeff?
17 A. Yeah, I'd say so.
18 Q. Okay. Now, when you were seated at a
19 table, can you just point to the area of the
20 table?
21 A. Right where these four tables were.
22 Q. Okay. And is it your memory as you
23 sit here today that there were four tables in
24 that area, each table with four chairs around

**37**

1    it?
2        A. No. I actually -- I only remember
3    our table being there and the booths around us.
4    There's a few booths here, here, and on the
5    side. But I only remember there being one
6    table.
7        Q. Okay. And can you just draw in the
8    shape of the table that you remember, in the
9    area you remember it being in, on Exhibit 1 for
10    me?
11        A. Sure.
12        Q. Thanks.
13        (Witness complies.)
14        Q. And why don't you just shade it in a
15    little bit, so it shows up a little better,
16    okay?
17        (Witness complies.)
18        Q. Am I correct that the person that
19    served your group at the table was not the same
20    person that served the three of you at the bar?
21        A. Yes. It was a different person.
22        Q. Okay. By the way, can you just
23    circle the table, put an arrow pointing to it,
24    and write the word "table" out here in the

**38**

1    margin, so we know what we're talking about?
2        A. Sure.
3        (Witness complies.)
4        Q. Okay. While you were at the table,
5    did you see Jeff Southworth drinking any
6    alcoholic beverages?
7        A. Yes.
8        Q. Did you see him drinking beers?
9        A. Yes.
10        Q. How many beers, to your best memory,
11    did you see him drink at the table?
12        A. Maybe four, maybe.
13        Q. Okay. And while he was at the table,
14    did you also see him drinking Manhattans?
15        A. Yes.
16        Q. And what is your best memory of the
17    number of Manhattans you saw him drinking at
18    the table?
19        A. Probably two. I know that he
20    ordered, like, a round of them. I don't, you
21    know, I don't really remember how many. I
22    think, you know, I'd probably say two.
23        Q. Approximately how long was your group
24    at the table?

**39**

1        A. I know that we were there until right
2    as they -- pretty -- as they were closing.
3    Maybe two hours, hour and -- close to two hours
4    there.
5        Q. Let me ask you this. Did Jeff have
6    some food while he was at the table?
7        A. Yes.
8        Q. What did he have; do you remember?
9        A. Um, kind of remember maybe having
10    ribs? I know it was something beef.
11        Q. What makes you say that your group
12    was there until just about closing?
13        A. Well, I kind of remember there not
14    being a lot of people around, you know. The
15    restaurant was sort of -- people emptying out.
16    And, you know, they were starting to clean up a
17    little bit, and there weren't very many cars
18    out in the parking lot when we left.
19        Q. But can you tell me what time you
20    left?
21        A. I would say that it was, if not just
22    before, right around 11 o'clock.
23        Q. But you didn't wear a watch?
24        A. No, I didn't. I wasn't wearing a

**40**

1    watch.
2        Q. The beers that you saw Jeff drink at
3    the table -- I think I've asked this already
4    but -- were in the same size container as the
5    beers you saw him drink at the bar; is that
6    right?
7        A. Yes, they were.
8        Q. Did you see others drink at your
9    table?
10        A. Yeah.
11        Q. Did you see Thomas Espy drink at your
12    table?
13        A. Ah, is that Mike?
14        Q. Mike Espy, right.
15        A. Okay, yeah, all right.
16        Q. Mike?
17        A. Is that his first name?
18        Q. One of them is Thomas, and it's
19    either Scott or Mike, but Thomas is the real
20    name. I'm totally confused.
21        A. I'm pretty sure their father's name
22    is Thomas. So it's probably Thomas Mike Espy.
23        Q. The one I'm talking about is the one
24    that was not dirt-biking with you. Did you see

**41**

1  him drink --
2      A. Yeah, I did.
3      Q. -- at the table?  What was he
4  drinking?
5      A. He had a beer, you know.  He had, I
6  don't know, maybe a couple of them.  And he
7  also had -- I know when they ordered a round of
8  Manhattans, he had one.
9      Q. Did he appear to be under the
10  influence of alcohol to you?  This is the
11  non-dirt-biking Espy.
12      A. I mean, I didn't really notice
13  anything.  You know, he wasn't, like, acting
14  crazy or anything.  Nothing noticeable.
15      Q. This is Espy we're talking about?
16      A. Yes, Mike.
17      Q. Okay.  Was there more than one
18  waitress serving your table that night?
19      A. Ah, I honestly couldn't tell you.  I
20  don't believe so, but there may have -- I mean,
21  you know, there could have been someone who
22  came over and dropped something off.  And I
23  guess I don't remember seeing two waitresses.
24      Q. When you describe where you were

**42**

1  sitting as a long table, or you've described
2  where you were sitting as a long table --
3      A. Yeah, well, I'm pretty sure it was a
4  couple of tables put together, you know.
5      Q. That's what I wanted to know.  And
6  help me out and tell me how much time elapsed
7  between when the three of you were seated at
8  the table and the others who joined you that
9  evening arrived.
10      A. Um, well, I kind of remember us all
11  being like, you know -- they told us our seat
12  was ready.  And pretty much at the same time, I
13  think they were walking in; and we met up with
14  them right as we were sitting down.
15      Q. Did anybody say while you were at the
16  table that night that he was feeling drunk, or
17  words to that effect?
18      A. Who?
19      Q. Anybody at the table.
20      A. Anyone feeling drunk?
21      Q. Anybody say it, yes.
22      A. No, not that I can remember.
23      Q. Did anybody while you were at the
24  table that night say --

**43**

1      A. I --
2      Q. I'm sorry.
3      A. I kind of remember now -- I don't
4  know who it was, whether it was, you know, a
5  manager or someone.  It might have even been
6  our waitress.  I remember someone coming over
7  and asking our table to be quiet, a little bit
8  quieter, you know.
9      Q. That was because the table was loud?
10      A. Yes.
11      Q. There is no question in your mind
12  about the table being loud that night; is
13  that right?
14      A. It was loud to me.  I don't know
15  whether to everyone else.
16      Q. Who was making a lot of noise that
17  night at the table?
18      A. I think, you know, pretty much just
19  everyone.
20      Q. Jeff included?
21      A. Yes.
22      Q. Was Jeff particularly loud that
23  evening at the table?
24      A. Um, not particularly loud.  But, you

**44**

1  know, pretty -- not real loud, but I guess
2  everyone was loud enough to have a waiter or
3  someone come over and ask us to tone it down.
4      Q. And when the waiter or waitress came
5  over and asked everybody to tone it down, that
6  was at what point in the meal?
7      A. That was, you know, I think pretty
8  much after we had finished, and it was, like,
9  we were just sitting there.
10      Q. Just sitting?
11      A. Yes.
12      Q. Drinking?
13      A. They were.
14      Q. And give me your best estimate of how
15  much time elapsed from when the woman came over
16  and told you to tone to it down and when you
17  all left the restaurant.
18      A. Um, maybe 25 minutes, half an hour.
19      Q. Did the group tone it down somewhat
20  after that?
21      A. Yes.
22      Q. Other than beers and Manhattans, do
23  you know what anybody else was drinking this
24  night?  And Cokes for you or whatever you were

45

1    drinking.
2       A. I don't remember anything else. Beer
3    or Manhattans. I remember everyone, you know,
4    ordering a beer with their meal. And then once
5    we got the meal, they ordered a round of
6    Manhattans.
7       Q. What did the waitress who served you,
8    what did she look like?
9       A. She was also young, probably around
10   the same age as the bartender. I don't
11   actually -- I don't really remember too much
12   about her.
13      Q. Do you remember the color of her
14   hair?
15      A. I'd say blond, just because there was
16   a lot of blond girls that were working there.
17   But I don't want to tell you the wrong thing.
18      Q. Fair enough. Did I ask you what you
19   ate?
20      A. No.
21      Q. I'm going to ask you, what did you
22   eat?
23      A. I had a steak.
24      Q. Did you have any chowder?

46

1       A. No. Clam chowder?
2       Q. Any kind of chowder.
3       A. No.
4       Q. Did you have any chicken fingers?
5       A. No.
6       Q. You were drinking what?
7       A. Ah, either Sprite or a Coke. I was
8    drinking water for a while, actually.
9       Q. Jut give me a second. Do you
10   remember anyone having chowder?
11      A. I kind of do. I mean, I kind of, ah,
12   I'd say that if anyone ordered it, it was
13   probably Mike Espy. I kind of remember
14   chowder, clam chowder or some sort of soup
15   being ordered. I just remember seeing it on
16   the table.
17      Q. Okay. And you had a steak; you're
18   sure of that?
19      A. Um...
20      Q. Well, let me withdraw the question.
21   Let me ask you this. Did you order your steak
22   well done?
23      A. I'm almost positive that I ordered a
24   steak, because, you know, when I -- at least

47

1    when I've been to the LongHorn, I've always
2    ordered a steak. But I know for a fact that if
3    I ordered a steak, it would have been well
4    done.
5       Q. It would have been well done?
6       A. Yes.
7       Q. Because that's the way you like it,
8    right?
9       A. Yes. In fact, if it was anything,
10   hamburger, whatever, that they ask your
11   preference on how they cooked it, it would be
12   well done.
13      Q. How long did it take from when the
14   check was paid for your table until you left
15   the LongHorn?
16      A. I think we left just as we were
17   paying. Pretty sure, yes.
18      Q. Did anyone in your group drink
19   anywhere else at the LongHorn that night other
20   than at the table after the check was paid?
21      A. Well, I mean, before at the bar,
22   but...
23      Q. I understand that. But after the
24   check was paid at the table, did your group

48

1    then proceed to the bar, let's say?
2       A. No.
3       Q. And did you then get back into the
4    truck with Jeff and Scott?
5       A. Yes.
6       Q. And the same seating arrangement?
7       A. Yes.
8       Q. Was it the same seating arrangement?
9       A. Yes.
10      Q. Okay. Did you then proceed to the
11   Four Points Hotel in Fitchburg?
12      A. Yes.
13      Q. Do you remember any of the
14   conversation during that trip?
15      A. Um, yeah, I think -- well, I know
16   that the two kids from out of town were staying
17   at the hotel.
18      Q. Yup.
19      A. And I remember Jeff and Scott
20   debating whether they -- because I know that
21   the rest of group was going -- you know,
22   besides Scott, myself, and Jeff, the rest of
23   the group, Mike, Todd, and the other two kids,
24   they were going to go to The Other Side. It's,

**49**

1    like, a strip club down the street in
2    Fitchburg.  And Scott and Jeff were debating
3    whether they wanted to go to it.
4         Q. This is on the ride from the LongHorn
5    to the Four Points?
6         A. Yes.
7         Q. That's when they had that
8    conversation?
9         A. Mm-hmm.
10        Q. Is that yes?
11        A. Yes.
12        Q. Okay.  While you were at the
13   LongHorn, did Jeff appear to you to be under
14   the influence of what he had been drinking at
15   the LongHorn?
16        A. I mean, yeah, a little bit.
17        Q. What did he -- what did he show, what
18   did he manifest that makes you say that?
19        A. Um, I don't know.  Well, Jeff is,
20   like, every time I've seen him, he always
21   stands up real straight.  He's a big kid.  You
22   know, he kind of -- he's not -- it's not like
23   he talks a lot, you know.  He waits until he is
24   talked to or -- unless he's talking to someone,

**50**

1    he doesn't really -- he's not an obnoxious kid
2    or anything, you know.
3         That night he was, you know, sort of
4    just seemed to me that he was a little bit
5    under the influence just because by the way he
6    didn't really hold himself -- at least it
7    looked like he didn't hold himself the same way
8    as he usually did.
9         Q. Was he sloppier looking than he
10   usually is?
11        A. A little bit, yes.
12        Q. Was he louder than he usually
13   appeared to you?
14        A. Yeah, I mean, yeah.
15        Q. Was he more boisterous than he
16   usually is?
17        A. Ah, not that much.  I mean, he's
18   usually -- when he wants to say something, he
19   says it and, you know.
20        Q. Was his speech slurred at all that
21   night at the LongHorn Steakhouse?
22        A. No.  Not that I remember.
23        Q. Okay.  Were his eyes glassy at all?
24        A. Maybe, yeah.

**51**

1         Q. At the Steakhouse?
2         A. Yeah, I don't remember specifically
3    seeing his eyes, you know, looking -- seeing
4    them glossy.  But very well, very well could
5    have.  That could be.
6         Q. Were his eyes closed somewhat while
7    he was at the Steakhouse?
8         A. No.
9         Q. Let me ask you this.  At some point
10   in time, there was a discussion among Scott,
11   Jeff, and you about that Jeff was too drunk to
12   drive; isn't that right?
13        A. Is this at the Steakhouse?
14        Q. No.  At some point in time that
15   night.
16        A. Um, I kind of -- yeah, I kind of
17   remember it when we got to the -- no, did,
18   ah -- I don't know whether it was when we were
19   leaving the hotel or when we pulled into the
20   parking lot of The Other Side, whether it was
21   right then, but, yeah, I do kind of remember
22   something of that.
23        Q. While you were sitting in the parking
24   lot at The Other Side, do you remember at least

**52**

1    Scott and Jeff having a conversation about that
2    Jeff was too drunk to drive?
3         A. Um, well, I don't remember them
4    saying, you know, he was too drunk to drive.
5    But I remember Scott saying, I'm going to
6    drive; you know, you're not going to.  And
7    actually, when we left the hotel and went --
8    drove to The Other Side, Jeff was actually
9    sitting in the back.
10        Q. By then?
11        A. Yes.  He was with his dogs, actually.
12        Q. Was he slumped over in the back of
13   the truck from the trip -- on the trip from the
14   hotel to The Other Side?
15        A. No.  I mean, I wasn't -- I was
16   sitting up front.  I wasn't really looking
17   back.  But, no.  I mean, he was -- it was kind
18   of crowded, I think.  He has two dogs.  His two
19   rottweilers are always with him.  And we had --
20   Mike Espy actually came with us for that ride.
21        Q. Oh, Mike was in the Dakota; is that
22   right?
23        A. Yeah, Dakota, I think, yeah.  So they
24   were in the back with the two dogs.  So it was

53

1 a little bit crowded.
2     Q. Do you remember anything that they
3 said during that trip, Jeff and Mike, in the
4 back?
5     A. Not really.
6     Q. Okay. To drive from the LongHorn to
7 the --
8     A. The Other Side?
9     Q. No, to the Four Points.
10     A. Oh, oh, yes. Yes.
11     Q. Which is the drive you took that day,
12 took approximately how long?
13     A. Um, 10 minutes, 15 minutes.
14     Q. Did you go on Route 12?
15     A. Um, well, I know that you have to get
16 on Route 12 to go to the Four Points. You
17 know, it's off of Route 12. I kind of -- I
18 think we took Route 2. I mean, that's the way
19 I'd go. I don't actually remember
20 specifically.
21     Q. Do you know what the distance is from
22 the LongHorn to the Four Points?
23     A. It's probably, you know, three miles
24 maybe. It's not very far.

54

1     Q. Okay.
2     A. It's actually one exit down on
3 Route 2, and they're both a very short distance
4 off of the off-ramp.
5     Q. So it's one exit off of Route 2?
6     A. Mm-hmm.
7     Q. Route 2 is -- the LongHorn is right
8 at the intersection of Route 2 and Route 12?
9     A. Well, not directly. But there is,
10 like, a big shopping plaza, and it's right next
11 to the shopping plaza.
12     Q. And as far as you know, the three of
13 you went directly from the LongHorn to the Four
14 Points; is that right?
15     A. Yes. There were four of us in the
16 car at that point.
17     Q. At that point, there were four?
18     A. Yes.
19     Q. Who was the fourth?
20     A. Mike Espy.
21     Q. Was Jeff in the front during that
22 ride, or was he back with the dogs by then?
23     A. He was in the back.
24     Q. By then he was in the back?

55

1     A. Mm-hmm.
2     Q. This is from the LongHorn to the --
3     A. Yes, yes.
4     Q. -- to the Four Points?
5     A. He was in the back.
6     Q. And did he say why he wanted to be in
7 the back?
8     A. Um, I mean, I kind of remember him
9 saying he wanted to be -- I don't think Mike
10 really wanted to be sitting next to the dogs.
11 So I think Jeff -- I kind of remember him
12 saying he was sitting in the back just to take
13 care of the dogs. But I mean, I don't remember
14 him saying anything else but that.
15     Q. Approximately how long were you at
16 the Four Points?
17     A. Thirty-five minutes, 40 minutes.
18     Q. And you stayed inside the hotel in a
19 corridor next to the room; is that right?
20     A. Yeah, it was, like, right next to the
21 elevators.
22     Q. Do you remember testifying before the
23 grand jury in this case?
24     A. Yes.

56

1     Q. In the criminal case against Jeff
2 Southworth?
3     A. Mm-hmm (nodding.)
4     Q. Do you remember then saying that you
5 were 15 to 20 minutes in the area outside the
6 room?
7     A. Yeah.
8     Q. That sounds about right to you?
9     A. Yeah.
10     Q. Okay. And Jeff had one beer at that
11 point; is that right?
12     A. Yeah.
13     Q. And it was from a can; is that right?
14     A. Yes, it was.
15     Q. Do you know the difference between a
16 12-ounce can and a 16-ounce can?
17     A. Yeah, it's got --
18     Q. One is bigger.
19     A. Yeah, it's got more in it.
20     Q. Do you know which one he was drinking
21 from?
22     A. Twelve-ounce, I'd say.
23     Q. Okay. And while he was drinking from
24 that 12-ounce can -- strike that.

**57**

```
 1        Do you know how long it took you to
 2   drive from the hotel to The Other Side?
 3        A. Takes about five minutes.  It's a
 4   very short distance.  It's right on Route 12,
 5   I'm pretty sure.
 6        Q. Route what?
 7        A. Route 12.  I know it's at least --
 8   you don't turn unless Route -- well, Route 12
 9   may make a turn off.  But I know that you stay
10   on the same road.
11        Q. And do you know how long you were in
12   the parking lot of The Other Side?
13        A. Yeah.
14        Q. Before you left?
15        A. Actually, we -- I didn't really want
16   to go there.  I kind of didn't want to go to
17   dinner.  I kind of thought -- I didn't know we
18   were going to go to dinner.  So I was like, We
19   should just go back to Harvard and get dropped
20   off.  And Jeff was like, All right, yeah, I'm
21   ready to go; I don't really want to go inside
22   either.  So we actually -- he still had Mike in
23   the car.  Well, he got back in the car from the
24   hotel with us.
```

**58**

```
 1        Q. Mike?
 2        A. Yes.
 3        Q. Right.
 4        A. And we dropped him off, you know,
 5   right outside.  Pulled in, basically.  We
 6   didn't even get out of the car.  He got out,
 7   and then we left.
 8        Q. Okay.  So you were in the parking lot
 9   at The Other Side only as long as it took to
10   drive through the parking lot to the door of
11   The Other Side and let Mike exit the Dodge
12   Dakota, and then shut the door and leave the
13   parking lot?
14        A. Yes.
15        Q. Is that right?  Okay.  And then did
16   the three of you, Jeff, Scott, and yourself,
17   did you then proceed back to Templeton?
18        A. No.
19        Q. Where did you go?
20        A. We went -- well, we were heading back
21   to Harvard.  But we had to go to -- it's
22   actually -- it's -- I believe it's in
23   Littleton.  It's right off of 495.  There is an
24   apartment or condominium complex.  I know that
```

**59**

```
 1   Scott had left his car there.  That's where
 2   he -- I guess his grandmother lives there.  So
 3   he left his truck there.
 4        Q. So you went from The Other Side to
 5   the apartment complex in Littleton?
 6        A. Yes.
 7        Q. Which is right off 495; is that
 8   right?
 9        A. Yes.
10        Q. And the route that you traversed, the
11   route you drove from The Other Side to the
12   apartment complex was Route 2; is that right?
13        A. Yeah.  Um, yeah, it was Route 2 to
14   495.
15        Q. Okay.  How long were the three of you
16   at the apartment complex together that night?
17        A. Um, well, I mean, we pulled in, you
18   know, right across from Scott's truck.  Scott
19   and I got out.  Jeff got out, got in the
20   driver's seat.
21        I jumped up in the bed and grabbed my
22   bag, you know, and Scott left his stuff with
23   Jeff.  I just grabbed my dirt-biking bag, my
24   boots, my helmut, and just threw it off the
```

**60**

```
 1   truck, got out of the bed, and he left.
 2        Q. He took off, Jeff?
 3        A. Yeah.
 4        Q. So that whole process of pulling in
 5   and parking beside Scott's truck through Jeff
 6   taking off and leaving --
 7        A. Mm-hmm.
 8        Q. -- was a matter of how long,
 9   approximately?
10        A. Two minutes, three minutes.  It was
11   very short.
12        Q. Jeff drove over Scott's foot on the
13   way out?
14        A. Yes.  He -- we -- you know, you pull
15   in right here.  And Scott was parked over here,
16   and Jeff pulled in over here (indicating).  I
17   threw all my stuff -- you know, there is a
18   little island of grass.  I threw it all right
19   there, and I jumped out.  That's where I was
20   standing.
21        And Scott was telling me, you know,
22   hurry up and grab my stuff so we can go.  And I
23   did that.  And he was standing at that point
24   still right next to the truck.
```

**61**

1  Q. Scott?
2  A. Yes.
3  Q. And --
4  A. And Jeff, you know, backed out. And
5  however it happened, his ankle got stuck or
6  went underneath the tire or something. And,
7  you know, Scott immediately said to me, he's
8  like, Oh, he just ran over my ankle.
9      And he was still walking on it. He
10  didn't think it was, you know -- at that point,
11  he didn't think it was broken until, you know,
12  Jeff pulled out of the parking lot and he was
13  gone.
14      We, like, started walking over to the
15  truck, and, you know, immediately Scott, you
16  know, went over and sat down on his truck and
17  took his shoe off, looked right at this ankle,
18  and was, like, Something is wrong, you know.
19  Q. At any point in time that night, were
20  you looking to get away from Jeff, leave Jeff?
21  A. Ah, no, I wasn't trying to get away
22  from him. I was just actually trying to get
23  home.
24  Q. Did your parents know that you were

**62**

1  going to go out that night?
2  A. You mean dirt-biking or?
3  Q. Late, after dirt-biking.
4  A. They figured I would.
5  Q. Why did you want to get home?
6  A. Ah, I think I -- I was just, you
7  know, out, and I wanted to go home. I had been
8  dirt-biking. I wanted to take a shower. I
9  didn't know we were going to go out to dinner.
10  So I kind of assumed that I was going --
11  originally, from the sandpit, I was going to go
12  with my brother out to his place and stay out
13  there for the night.
14  Q. In Amherst?
15  A. Yes. But then I decided I'll just go
16  back home. But I hadn't called my parents or
17  anything and told them what my plans were, so
18  at that point, they assumed I was just coming
19  home that night. So I figured that's what I'd
20  do.
21  Q. Did Jeff pay for your -- you said
22  Jeff paid for your dinner food?
23  A. Dinner, yes.
24  Q. Did he pay with cash?

**63**

1  A. Yes, he did.
2  Q. You didn't see him use a credit card
3  at all?
4  A. No, I didn't.
5  Q. And did the others pay with cash as
6  well?
7  A. I'm pretty sure we did, yeah. I
8  think the whole bill was paid for in cash.
9  Q. Do you remember any conversations
10  that anyone in your group had with anyone at
11  the restaurant, any employee or person you
12  understood to be an employee at the restaurant
13  while you were at the restaurant other than the
14  conversation with the employee who said to
15  quiet down?
16  A. No, no.
17  Q. Do you remember the waitress asking
18  anyone in your group for an ID, some proof that
19  people in the group were old enough to drink?
20  A. I don't remember that, no.
21  Q. How about at the bar? Do you
22  remember the bartender asking anyone in your
23  group for identification?
24  A. No, I don't recall that either.

**64**

1  Q. Scott realized at some point in time
2  while you were in the parking lot of the
3  apartment complex Jeff had driven off with his
4  keys; is that right?
5  A. Yeah. It was, like, he realized that
6  something was wrong with his ankle. And he,
7  like, opened his bed, the door to the truck,
8  the bed of the truck, and he sat down, and he
9  was looking at the ankle. And he said, All
10  right, let's go.
11      And he reached into his pocket and
12  was like, you know, it was the worst thing that
13  can happen. And then right then, we tried
14  calling Jeff. And I remember getting in touch
15  with him on his cell phone. I called him, you
16  know.
17      I was like, Jeff, you know, you just
18  ran over his ankle, you know. He's like, I
19  did? I was like, Yeah, I think it's broken.
20  And we also left the keys in the truck; you're
21  going have to turn around. He was like, Oh,
22  all right, you know, I'll turn around at the
23  next exit.
24      I don't remember specifically what we

65

1    were saying, but I remember telling him that he
2    ran over his ankle and that we forgot the keys.
3    He was like, All right, I'm turning around.
4         Q. You made the call to Jeff from your
5    cell phone; is that right?
6         A. Yes. We were both trying, but I
7    think I was the first one to get through.
8         Q. And do you know from the time that
9    Jeff pulled out of the parking lot until you
10   got through to Jeff and had that conversation
11   with him, how much time elapsed?
12        A. Not more than five minutes, you know.
13   We were sort of worried about -- I was sort of
14   worried about Scott's ankle before. You know,
15   we were trying to get into the truck. And we
16   realized afterwards that he didn't have his
17   keys and started calling him.
18        Q. So is it accurate to say you didn't
19   get through on the first call to Jeff?
20        A. Yes.
21        Q. But is it also accurate to say it
22   wasn't a matter of more than a few minutes
23   before someone, you think yourself, was able to
24   get through to Jeff?

66

1         A. Yes.
2         Q. And when next after that conversation
3    with Jeff where he said, in effect, that he
4    would turn around, was it that you had any
5    communication with Jeff?
6         A. Well, we waited there for a while for
7    Jeff to come back. It was, you know, probably
8    maybe a half an hour, maybe even more. I know
9    that it was a good wile. And we figured, you
10   know, he'd show up.
11        And then we started to call him
12   again, try to get in touch with him. We
13   weren't sure where he was, why he wasn't
14   showing up. He couldn't have been that far
15   down the road. We figured maybe he had, you
16   know, another five, two minutes to get to the
17   next, you know, exit so he could turn around.
18   Because at that point he was on 495.
19        Q. He told you he was on 495 when you
20   spoke to him?
21        A. Um, yes. Yeah, well, I know for a
22   fact that he was on 495. But I also think he
23   said he was on 495.
24        Q. So you waited for about half an hour,

67

1    but my question to you was when was it that you
2    next had any communication with him?
3         A. Oh, yes. Well, we figured that he
4    wasn't going to be coming, you know. We waited
5    there for a while. We were -- I remember keep
6    on trying to call him. And I don't -- I can't
7    quite remember whether it was Scott or I that
8    got in touch with him. But I know that we did.
9         And he said, you know, I got into an
10   accident, you know. And we were, like, you
11   know, Why didn't you call us? You know, What's
12   going on? Are you all right? You know, Where
13   are you, you know. He didn't say anything. He
14   didn't say much. Then the call just ended.
15        And at that point, we were like,
16   Well, who are we going to call? I think it was
17   almost -- I think it was around almost one
18   o'clock at that point. So we didn't really
19   want to call Scott's parents to see if they
20   could bring the extra set of keys. So we ended
21   up just breaking one of the windows in Scott's
22   car so he could get in, because he had an extra
23   key in his car.
24        Q. So your best memory of what time it

68

1    was when Jeff told you he got into the accident
2    was how long after he left the apartment
3    complex?
4         A. Maybe 40 minutes, 45 minutes almost,
5    yeah.
6         Q. After that conversation, did you have
7    any further contact with Jeff that day?
8         A. No. Um, after we spoke with -- I
9    can't -- don't remember which one of us it was
10   speaking with him. I remember trying to call
11   him after we talked to him and he said that
12   he'd crashed. I remember specifically trying
13   to call him, like, lots of times. I left
14   messages saying, Where are you? Are you all
15   right? Can we come get you?
16        I know for a fact that I left a
17   message. And I don't know if Scott -- but I'm
18   guessing that he left a message on his cell
19   phone. We eventually just figured that he was
20   on 495.
21        So what we did was, you know, after
22   we broke the window, we cleared, like, all the
23   glass away, we just started heading up 495.
24   Because we didn't know -- we knew he was

**69**

1    somewhere on 495. So we headed up 495 North,
2    and we didn't really -- didn't know how far he
3    would have gotten. Tried to figure it out, our
4    judgment. And we got on at the on-ramp right
5    next to the apartment complex.
6        Q. Route 2?
7        A. No. This is 495.
8        Q. But at what intersection is that on
9    495, if you know?
10       A. Well, I know that there are two exits
11   for Littleton on 495 North.
12       Q. Mm-hmm.
13       A. And South. I know we were at the
14   first one. So we got on at the first one.
15   And, you know, we passed the second exit for
16   Littleton Common and Groton and Acton.
17       Q. Yup.
18       A. And between there and the next
19   exit -- Westford; Boston Road, Westford, I
20   think -- we saw, you know, all these cops lying
21   on the south side. We saw lots of cop cars,
22   you know, ambulances, all sorts of police and
23   ambulance vehicles.
24       So we assumed that that was, you

**70**

1    know, he must have crashed there. And we
2    realized it was definitely something serious.
3    So we drove up to the Westford exit, and we
4    turned around.
5        And we actually made the cycle, like,
6    I believe we went and turned around again just
7    to make sure that we -- because we were trying
8    to see. The first time we drove by, we
9    couldn't, you know, couldn't see any cars. You
10   could just see the police cars.
11       Q. Yup.
12       A. So I couldn't see, you know. I was
13   looking for his truck.
14       Q. Yup.
15       A. To try and figure out if it was his
16   crash or some other crash, if he was even
17   there. All the meanwhile we were trying to
18   call him, and we couldn't get in touch with
19   him.
20       We didn't see any trucks or any cars
21   at all. We didn't see anything crashed. We
22   just saw all the squad cars and the ambulances.
23   So that's -- we took another loop around to see
24   if we could. And it was the same thing. We

**71**

1    couldn't see anything.
2        And at that point, we got off at the
3    Groton/Acton exit. It was, you know, we
4    headed, like, over to the south side, because
5    we figured if he was anywhere, you know, he'd
6    either be at the crash scene, you know, with
7    the cops or whatnot.
8        But we hadn't talked to him, you
9    know. We figured he'd call us. So what we did
10   is we stayed in that area, and we continued to
11   try and get in touch with him. That's when we
12   left messages, Where are you? Can we come get
13   you? Are you all right? What happened? And
14   he never called us. And, you know, we never
15   got in touch with him.
16       Q. So finally you went home?
17       A. Yes.
18       Q. Have you spoken to Jeff since that
19   night?
20       A. No, I have not.
21       Q. Have you spoken to anybody that you
22   understand is assisting Jeff in this matter?
23       A. Um, other than my brother, who is
24   taking care of his dogs, I actually -- I talked

**72**

1    to his mother on the phone once. She called
2    looking for my brother. But no, no one else.
3    I didn't really talk to her about anything.
4        Q. Do you know how it is your brother is
5    taking care of Jeff's dogs?
6        A. Yeah. Um, well, my brother actually
7    just got -- this was last -- the beginning of
8    last -- beginning -- the summer of 2003.
9        Q. Yes.
10       A. My brother purchased a rottweiler
11   puppy. So he had just gotten a dog, and it was
12   a few months after that he had just picked up
13   the responsibility of a dog. And he liked the
14   rottweilers. And we were all used to his two
15   dogs, Ruby and Daisy. We knew them. They were
16   familiar with us, with my brother's dogs.
17       So he decided, you know, his parents
18   didn't want to, you know, keep them and take
19   care of them. So my brother, I guess -- I
20   don't whether he said he would or they asked
21   him. I'm not really sure.
22       Q. Where does your brother live in
23   Amherst?
24       A. He actually lives at, it's right next

**73**

1    to Amherst. It's like 15 minutes out of
2    Amherst. Shutesbury.
3        Q. Shutesbury?
4        A. Yes.
5        Q. Does he have a house?
6        A. Yes, he rents part of a house.
7        Q. At the LongHorn that night, do you
8    recall whether there were, in the area between
9    the booths here and the booths here
10   (indicating), any tables other than the tables
11   that you all were sitting at?
12       A. Um, I kind of don't remember any
13   other tables being in between the booths and
14   stuff.
15       Q. Within the area that you've encircled
16   here on Exhibit 1, do you remember any tables
17   other than the table that your group was at,
18   the table or tables that your group was at?
19       A. No. No.
20       Q. Do you remember any people while your
21   group was at its table, any people sitting in
22   any of the booths on either side of your table?
23       A. Um, yeah. I was actually sitting,
24   like, on -- I was sitting on this side facing

**74**

1    that way (indicating). And I know -- I'm
2    pretty sure there were a few people here, but I
3    can't really remember. I know there was a
4    group of people sitting in the corner booth.
5    And I know there was at least one group of
6    people in one of those booths.
7        Q. Can you put an X where there was a
8    group sitting in the corner?
9        (Witness complies.)
10       Q. Circle that X for me.
11       A. Sure.
12       Q. And put a Y where you found some
13   people sitting in another booth you pointed out
14   earlier.
15       A. I'm not really sure which booth it
16   was. I'll just put it right here.
17       Q. Why don't you circle that, too.
18       (Witness complies.)
19       Q. Just put your initials where you were
20   sitting, small though.
21       (Witness complies.)
22       Q. Where was Jeff sitting?
23       A. He was sitting, like, across from me
24   at the end of the table.

**75**

1        Q. At the head of the table?
2        A. Well, it wasn't at the end. I don't
3    think -- I don't know if anyone was sitting at
4    the end. He was sitting like, at the corner.
5    Like, say this was the table. He was sitting
6    right here, where I am.
7        Q. Put Jeff in for me, JS.
8        (Witness complies.)
9        Q. So Jeff and you were both sitting at,
10   as you face Exhibit 1, the right-hand end of
11   the table; is that right?
12       A. Yes.
13       Q. And was there anything while you were
14   sitting there obstructing your view of Jeff
15   across the table?
16       A. Um, nothing really. I mean, there
17   was maybe, like, a lantern on the table or
18   something. But nothing obvious.
19       Q. You could see his face when you were
20   talking to him?
21       A. Yeah.
22       Q. Okay. Did you ever learn that Jeff
23   had been charged with trafficking drugs, in
24   federal court, in Vermont?

**76**

1        A. No.
2        Q. You didn't know that?
3        A. No.
4        Q. Now you do.
5        A. (Witness nods.)
6        Q. Did you know that Jeff had been
7    charged with driving under the influence and
8    leaving the scene of an accident in Amherst,
9    Mass., in 2003?
10       A. No. I had heard that he had gotten
11   into an accident -- or his truck -- I remember
12   hearing that his truck was totalled out in
13   Amherst. But I don't remember hearing much
14   about it.
15       Q. Do you remember Jeff ever saying to
16   you that his license to operate was suspended
17   in Massachusetts?
18       A. No.
19       Q. Did you ever see Jeff smoke
20   marijuana?
21       A. Nope, never have.
22       Q. Did you ever see him ingest any
23   narcotics?
24       A. No.

**77**

1    Q. I'm near the end, I think.  Just give
2  me a second or two, please.  Do you know what a
3  fire wrap is at the LongHorn Steakhouse?
4    A. No.  Is it a blanket or something to
5  wrap someone with if they're on fire?
6    Q. You don't know of a dish of food
7  named a fire wrap; is that right?
8    A. No.
9    Q. Do you know what Jeff's father did
10  for work?
11    A. No, I don't.
12    Q. Did Jeff ever talk to you about what
13  his father did for work?
14    A. Nope.
15    Q. Did he ever talk to you about his
16  father?
17    A. Not that I can remember.
18    Q. Do you remember Jeff ever saying to
19  you --
20    A. Actually, I remember his father -- he
21  did say one thing about his father.  I remember
22  that he was talking about his father getting a
23  new boat and that he was wanted to get his
24  dad's old boat.

**78**

1    And he was -- it was a sailing boat
2  he was talking about.  And, like, his dad was
3  into sailing a lot.  And his dad got a new
4  boat, and Jeff was saying he wanted to try to
5  get into it, and he wanted to get his dad's old
6  boat.
7    Q. Did he get his dad's old boat, as far
8  as you know?
9    A. I think so, yeah.
10    Q. When did you have that conversation
11  with him?
12    A. You mean about what his dad --
13    Q. His dad's boat, getting his dad's
14  boat.
15    A. Um, you know, it was probably two
16  weeks, a week prior to all of this happening.
17    Q. And did he describe the dad's new
18  boat, his dad's new boat to you?
19    A. No.  I remember him showing me, like,
20  a printout or something.  It was like a
21  computer printout of, like, pictures of the
22  boat that his dad owned, though.
23    Q. The new boat or the old boat?
24    A. The old boat.

**79**

1    Q. The old boat?
2    A. Yes.
3    Q. Was it a sailboat?
4    A. Yes.
5    Q. And did you know how big it was?
6    A. Ah, no.  I mean, I think it was,
7  like, 30 feet maybe.  I'm not positive.
8    Q. What makes you say that Jeff got that
9  boat?
10    A. I remember -- well, he was, like,
11  really into -- he was really -- he seemed like
12  he really wanted to get it.  And I remember him
13  saying that he was, you know -- he didn't say
14  anything about he wasn't going to get it.  He
15  didn't say anything about his dad selling the
16  boat.  He said he was going to get his dad's
17  boat, yes.
18    Q. He told you his dad was going to give
19  him his boat?
20    A. Yes.  Well, I don't know whether he
21  was going to give it to him.  I don't know what
22  the situation was.  I just remember him saying
23  he was going to acquire a boat.
24    Q. Do you know where the boat was when

**80**

1  you were talking about it?
2    A. Well, I know it was -- maybe, well, I
3  assumed it was in Portsmouth, because I knew
4  that's where his father and his mother and he
5  lived.
6    Q. You never went sailing with Jeff?
7    A. No.
8    Q. Did you have any other conversations
9  with Jeff about Jeff getting things from his
10  father?
11    A. No.
12    Q. Did Jeff ever tell you that his
13  father had a lot of money or words to that
14  effect?
15    A. He never mentioned anything.  I kind
16  of assumed just because, I mean, Harvard,
17  there's a lot of rich people from Harvard.
18  Also, he had a pretty nice truck.  I kind of,
19  you know, didn't think that the average kid
20  would drive a brand new truck like that.
21    So I kind of figured that his
22  parents, you know, having boats and his kid
23  driving a nice car like that and they were from
24  Harvard, and -- I just kind of assumed that

**81**

1  they had money.
2      Q. The truck that he was driving the
3  night of the accident was a rental truck,
4  that's the Dodge Dakota; is that right?
5      A. Yes.
6      Q. But the truck you're talking about,
7  the pretty nice truck, was some other truck; is
8  that right?
9      A. Yes.
10     Q. What was that?
11     A. Um, I'm pretty sure it was, like, a
12  Chevy Silverado. I think it was a -- I know it
13  was diesel. I think it was -- I don't know the
14  exact name. I think it's, like, Duramax Diesel
15  or something, the name of the model or
16  something.
17     Q. Was that the truck that he had had
18  the accident with in Amherst, if you know?
19     A. No. It's -- I remember hearing that
20  he had, you know -- a car, a truck got totaled.
21  And then he got -- he had this new truck. And
22  that was -- that's the new truck that I was
23  talking about. It was brand new, pretty much.
24  I think it was brand new.

**82**

1      Q. Did Jeff work?
2      A. Um, not that I knew of.
3      Q. Did you ever talk to him about how he
4  supported himself?
5      A. No.
6      Q. Did anyone ever tell you how he
7  supported himself?
8      A. No.
9      Q. Did you ever see Jeff use a credit
10  card?
11     A. Nope.
12     Q. Prior to that night, September 26,
13  2003, had you ever seen Jeff when you believed
14  he was under the influence of alcoholic
15  beverages?
16     A. I'd seen him at the party that I
17  mentioned before. I mean, I'd seen him
18  drinking. I don't know if I can say that I've
19  seen him drunk. I don't think I can, for a
20  fact.
21     Q. But my question is, have you ever
22  seen him exhibiting what you understood or
23  interpreted to be signs of being under the
24  influence of alcoholic beverages?

**83**

1      A. Um, no.
2      Q. Prior that night?
3      A. No.
4      Q. Did you ever see Jeff in a fight?
5      A. Well, yeah, actually.
6      Q. Fist-fight?
7      A. Yeah, I have once.
8      Q. Where?
9      A. It was in Harvard.
10     Q. Where in Harvard?
11     A. Right in the center, actually. At a
12  kid's house. It's right across from the
13  school. His name is Bob West.
14     Q. Was Jeff drinking that night?
15     A. Ah, actually I don't know. I was
16  inside the house. And I came out, and he was
17  there along with -- my brother was there. It
18  was actually -- the fight actually happened --
19  Bob West, he's a year older than me. And my
20  brother's a year older than him. So when I was
21  in, you know, say 9th grade, Bob would be in
22  10th grade. My brother was in 11th.
23     And Bob West was dating this girl
24  from my grade. Her name was Ashley Vallente.

**84**

1  And my brother liked her. And, you know,
2  eventually somehow -- I don't -- a lot of
3  tension was between my brother and Bob West.
4  And now my brother is dating Ashley.
5      But I know that there is a lot --
6  they don't like to ever see each other, talk to
7  each other. They don't ever talk about
8  anything. But I know that my brother and Jeff
9  were there. And there were other people. I
10  can't -- I don't remember really who else was
11  there.
12     And, you know, Bob, like -- when I
13  came outside, they were all in the driveway.
14  And Bob West and a few of his friends, they had
15  been drinking, you know. Very well -- I'd say,
16  he was probably drunk. He was telling, you
17  know, my brother -- and specifically he was
18  telling my brother he couldn't be there
19  and that, you know, basically anyone that was
20  with him wasn't allowed there.
21     And, you know, what sort of happened
22  was, like, you know, whenever there's a party
23  in Harvard, Bob West and his friends would go
24  there. And no one would ever tell them that

85

1    they couldn't be there.
2        So a little bit of a conflict. They
3    were saying, Oh, there's no reason that I can't
4    be here, blah, blah, blah. I don't even know
5    who, like, threw the first punch or whatever.
6    I know that Jeff was on crutches at the time.
7    And somehow a fight broke out.
8        Q. When was this?
9        A. This was probably the summer of --
10   2002? Yes.
11       Q. Okay.
12       A. Maybe towards the winter, a little
13   towards the winter.
14       Q. Do you know why he was on crutches?
15       A. No, I don't. I kind of assumed it
16   was maybe dirt-biking, but I'm not positive.
17       Q. Okay. Have you ever met Jeff's
18   father?
19       A. No, I haven't.
20       Q. Have you ever met his mother?
21       A. Yes.
22       Q. When is the last time you spoke to
23   her?
24       A. I spoke to her on the phone very

86

1    briefly when she called looking for my brother.
2    But the last time I actually spoke to her
3    was -- she -- Jeff left at my house underneath
4    our garage, we left his -- the cap to his
5    truck. Because we took it off to throw the
6    dirt bikes in. They didn't fit with it on
7    there.
8        And his mother was selling his truck
9    after everything happened. This was, you know,
10   earlier, the spring, I believe. And his mother
11   came to pick it up with the buyer of the truck,
12   and you know, because they were going to buy it
13   for, you know, an extra, whatever, 500 bucks or
14   something. But they all came down to pick it
15   up. And that was the last time I had seen her
16   and really spoke to her.
17       Q. Did you speak to her about the
18   accident at all?
19       A. No, I didn't.
20       Q. Have you ever spoken to Jeff's
21   sister?
22       A. No. I didn't even know he had a
23   sister.
24       MR. FARRAH: I don't think I have

87

1    anything else. Thank you. At least right now.
2        CROSS EXAMINATION
3    BY MR. SULLIVAN:
4        Q. My name is Jim Sullivan. I represent
5    Mr. Southworth in this case. I just have a few
6    follow-up questions for you. Just give me a
7    second to take a look at my notes.
8        A. All right.
9        Q. You were asked some questions earlier
10   about Jeff's father's old boat?
11       A. Okay.
12       Q. And I think you indicated that you
13   thought that Jeff may have become the owner of
14   that old boat, correct?
15       A. Yes.
16       Q. What did you base that on?
17       A. Well, um, I remember Jeff showing me
18   the pictures of it and saying, This is my dad's
19   boat and, you know, I want to get it, and he's
20   getting a new one. I kind of just figured, you
21   know, his dad is getting a new boat.
22       I don't think he would have any --
23   maybe if he's collecting them, he'd kept the
24   other one, but he never told me anything about

88

1    his dad collecting boats.
2        I kind of just assumed that, you
3    know, his son was into it; if my dad had a boat
4    and he was getting a new boat, I'd, you know --
5    and I was into boats, I just kind of base it on
6    a situation like that, you know.
7        Q. But it's more of an assumption?
8        A. Yes. But I do remember him saying
9    that, Oh, I want to get this boat from my dad;
10   he's getting a new one.
11       Q. Did Jeff ever tell you that his
12   father had transferred the title to the boat
13   over to him?
14       A. No.
15       Q. Did he ever indicate that his father
16   had ever signed any papers transferring the
17   boat to him?
18       A. No.
19       Q. You testified that Jeff had taken
20   off -- when you were at the apartment
21   complex -- that Jeff had taken off with Scott's
22   keys?
23       A. Yes.
24       Q. Why did Jeff have Scott's keys that

89

1    night?
2        A. Well, I mean, he didn't have them on
3    him. They were -- I'm pretty sure, like -- I
4    always take off my cell phone and my wallet and
5    stuff and just throw it somewhere in the truck
6    when we're dirt-biking, just so I know it's in
7    a safe spot. I'm pretty sure that's what Scott
8    was doing also. Just never grabbed them.
9        Q. They didn't have any discussion
10   earlier about --
11       A. No.
12       Q. -- Jeff taking Scott's keys or
13   anything like that?
14       A. No, no, no.
15       Q. Now, at the time Jeff left the
16   apartment complex, did you have an
17   understanding of what his destination was to
18   be?
19       A. Yes. I mean, he said he was going
20   home. So I assumed that he was going to
21   Portsmouth, back to his house.
22       Q. You and Scott were intending to go
23   back to Harvard?
24       A. Yeah, that's correct.

90

1        Q. Do you know how long a drive it is
2    from the apartment complex in Littleton to
3    Harvard, approximately?
4        A. Um, to Harvard or to, like, the
5    center, to my house?
6        Q. To your house.
7        A. Twelve minutes maybe, 10 minutes.
8        Q. How far approximately, if you know,
9    is it from that apartment complex to Portsmouth
10   where Jeff was going?              .
11       A. Like an hour and a half.
12       Q. You mentioned that when you were at
13   the Four Points you saw Jeff with a can of
14   beer?
15       A. Yes.
16       Q. Do you know where that can of beer
17   came from?
18       A. Um, no, I don't. I know that we were
19   standing out right in front of the room that
20   the two friends of Mike and Todd that were
21   either from out of town or -- but they were
22   staying in that room. I kind of thought that,
23   you know, that they came from their room.
24       I know that we were out in front of

91

1    the hall, like, right between the elevator and
2    the room. We were actually talking. There
3    was, like -- that weekend, there was a big
4    festival going on in Fitchburg. The hotel is
5    right next to the airport.
6        Q. Okay.
7        A. And they have a big rock show. There
8    was, like, a local bazooka or something, some
9    sort of concert. And they were -- in, like,
10   the room next to the room that we were in front
11   of, that the two kids were staying in, there
12   was two body -- or two -- they were like
13   guards, or bodyguards for two -- or a band that
14   was going to be playing there. And that's
15   where they got the idea to go to The Other
16   Side. These guys gave them passes and stuff.
17   They were there. They were drinking, you know.
18       Q. Excuse me. When you say they gave
19   him the passes, they gave the passes to who?
20       A. They gave all of us passes.
21   Actually, I still have one if you want to see
22   it.
23       Q. Sure.
24       (Pause.)

92

1        A. But the two band bodyguards or
2    whatever they were, security guards, they
3    somehow had been in touch with either the owner
4    or something. And they got free, a bunch,
5    like, a big -- they had a big stack of free
6    passes, and they handed them out to everyone.
7    Jeff, myself, Scott, Mike, everyone that we
8    were with. This is it (passing document).
9        (Pause.)
10       A. You can keep it if you would like. I
11   don't need it.
12       Q. That's okay.
13       MR. FARRAH: Why don't we make a
14   picture of it. In fact, can we take a
15   five-minute break?
16       MR. SULLIVAN: Sure.
17       (Recess taken.)
18       (Exhibit No. 2 marked for
19       identification.)
20       Q. So before we took a break, I think
21   you were telling me how the security people had
22   given the passes to The Other Side, correct?
23       A. Yes. They were right out with
24   everyone, you know, the group of us, Scott,

93

1    myself, Mike, Jeff, you know, the two other
2    kids -- don't know their names -- and the two
3    security guards.
4         Q. And we've marked the copy of the pass
5    that you gave us earlier as Exhibit 2, correct?
6         A. All right.
7         Q. Now, the two kids whose names you
8    can't remember, do you know why they were
9    staying at the Four Points?
10        A. No.  I know that they were from --
11   that one of them was -- or at least one of
12   them -- I'm assuming they're from the same
13   town -- they're from Vermont.  I don't know
14   really where.  I know that they were also
15   dirt-bikers.  No, but I don't know why they
16   were in town.
17        Q. Do you know if they were friends of
18   Jeff as well as of Mike Espy?
19        A. Well, no, I don't know the actual
20   scenario.  I know that he seemed comfortable
21   and didn't see -- didn't greet them and say
22   Hey, it's nice to meet you.  So I kind of
23   assumed that he knew them.
24        Q. He, being Jeff?

94

1         A. Yes, yes.  But no, I don't -- you
2    know, they never met, you know, formally
3    greeted each other or anything.  I just assumed
4    that they knew each other because they were,
5    you know, everyone sort of knew each other,
6    except I didn't know them.
7         Q. All right.  And at the point that the
8    decision was made to go from the LongHorn to
9    the Four Points, what was the reason for going
10   to the Four Points?
11        A. Well, I know that the two -- the two
12   people that I don't know, they had to go back
13   to their room or something.  And Todd and Mike
14   were with them.  Like, they drove them to the
15   LongHorn, or at least Todd drove his car with
16   them to the LongHorn.  Mike was with them.
17   They came.  But he had to bring them back to
18   the hotel because he brought them there.
19        Q. Okay.  That was the only reason for
20   going to the Four Points, just to drop these
21   two guys off?
22        A. That I know of.
23        MR. SULLIVAN:  That is all I have for
24   you.  Thank you.

95

1              CROSS EXAMINATION
2    BY MR. LANE:
3         Q. Just a couple of quick questions,
4    Mr. Conelly.  My name is Tom Lane, and I
5    represent Enterprise Rent-a-Car Company of
6    Boston, Incorporated.  You mentioned that
7    Mr. Southworth was driving a Dodge Dakota on
8    this day?
9         A. Yes.
10        Q. Do you have any knowledge as to how
11   he came to be in possession of that vehicle?
12        A. I know that he rented it.  I don't
13   know, um, you know -- he said -- he called me,
14   or I talked to him earlier on in the day.  He
15   said, you know, he was coming to go
16   dirt-biking, you know.  I didn't even know that
17   he had a rental truck.  I just figured he had
18   his truck, or that his truck was in the shop or
19   something, and that he somehow rented a truck.
20        Q. You learned that his car was in the
21   shop that day?
22        A. Um, no.  I mean, I don't recall.  I
23   kind of, you know, I guess I probably asked
24   him, said or, you know, someone said, you know,

96

1    Where is your truck, or something, and he said,
2    you know -- I remember learning that his car
3    was in the shop.  I just don't exactly remember
4    when I learned it.
5         Q. Do you recall when you had last gone
6    dirt-biking with him before this date?
7         A. Not specifically.  It was probably
8    the week before maybe, that weekend before.
9         Q. The last time you had seen him, did
10   he have his own truck, or did he have the
11   rental truck?
12        A. He had, yeah, he had his truck.
13        Q. Okay.  Is it fair to say that was the
14   first day you saw him with the rental truck?
15        A. Yes.
16        Q. At some point, you found out that his
17   car was in the shop?
18        A. Mm-hmm, that's correct.
19        Q. But you don't have any knowledge as
20   to where he rented the rental truck?
21        A. No.  Well, yes.  No, I didn't know.
22        Q. Do you know now where he rented it?
23        A. Yes.  Enterprise.
24        Q. Is that because of the questions in

**97**

1 today's deposition?
2 A. Yes. Well, when I received the
3 envelope in the mail, that said Enterprise. So
4 I assume Enterprise.
5 Q. Just so we're clear, the paperwork
6 referring to your deposition today?
7 A. Yes.
8 Q. Have you given a statement to anyone
9 about the happening of the accident?
10 A. Yes. I -- it was -- I don't remember
11 the officer's name. It was the State Police in
12 Concord. He called me up one day and asked --
13 said, You need to talk to me about, you know,
14 Jeff Southworth and what happened that night.
15 And he said that, I could either come out to
16 the office or I could go out to Concord. I
17 said, Sure, I'm coming out.
18 I went out there, and he had me make
19 a statement, and I wrote it down. First he,
20 like, had me -- or describe it to him, and then
21 I wrote it down. And I'm pretty sure that
22 Scott Espy did the same with the same officer.
23 Q. And that was with the Concord State
24 Police?

**98**

1 A. Yes.
2 Q. Is that the only statement you've
3 ever given about this incident?
4 A. Yes.
5 Q. You testified in front of the grand
6 jury?
7 A. Yes.
8 Q. Have you testified anywhere else
9 about this incident?
10 A. No.
11 Q. Have you ever spoken to any insurance
12 representatives at all about the incident?
13 A. No.
14 Q. Do you have any knowledge -- I know
15 Mr. Farrah asked you about Mr. Southworth's
16 Massachusetts license. Do you have any
17 knowledge that he had a New Hampshire license
18 to operate motor vehicles?
19 A. No. Well, I mean, I don't have
20 any -- no. I mean, I assume he did.
21 Q. Okay. Why did you assume that he had
22 a New Hampshire license?
23 A. Well, he lived in New Hampshire, and
24 so I kind of assumed that he'd have a license

**99**

1 for the state that he lived in.
2 Q. Did you ever see that New Hampshire
3 license at all?
4 A. No.
5 Q. You mentioned before, a little bit,
6 testifying as to why different people would
7 drive Mr. Southworth's vehicle. And is it fair
8 to say your understanding was that he just
9 didn't want people in Harvard seeing him
10 driving a car?
11 A. Yes.
12 Q. He never told you that he wasn't
13 licensed in Massachusetts?
14 A. No.
15 MR. LANE: I have no further
16 questions.
17 MR. FARRAH: I think I'm done. Thank
18 you very much for coming in.
19 THE WITNESS: No problem.
20 (Whereupon, the deposition was
21 concluded at 11:37 a.m.)
22
23
24

**100**

1   SIGNATURE PAGE/ERRATA SHEET
Re: Nancy Rosario, et al.
2 Vs: Jeffrey Southworth, et al.
08/19/04: Deposition of Jude P. Conelly
3

4   I, JUDE P. CONELLY, do hereby certify
5 that I have read the foregoing transcript of my
6 testimony and that it is a true and accurate
7 record of my testimony (with the exception of
8 the corrections listed below):
9 Page  Line        Correction
10 ___  ___  _____
11 ___  ___  _____
12 ___  ___  _____
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20
21   Signed under the pains and penalties of
perjury this ___ day of _____,
22 2004.
23
24   _____
JUDE P. CONELLY

```
 1                    CERTIFICATE

 2     Commonwealth of Massachusetts
       Suffolk, ss.
 3

 4       I, Alene M. Jennette, Certified Shorthand

 5     Reporter and Notary Public in and for the

 6     Commonwealth of Massachusetts, do hereby

 7     certify that JUDE P. CONELLY, the witness whose

 8     deposition is hereinbefore set forth, was duly

 9     sworn by me and that such deposition is a true

10     record of the testimony given by the witness.

11       I further certify that I am neither related

12     to or employed by any of the parties in or

13     counsel to this action, nor am I financially

14     interested in the outcome of this action.

15       In witness whereof, I hereunto set my hand

16     and seal this ___ day of _____, 2004.

17

18

19               _____
                 Notary Public, CSR
20               My commission expires:
                 April 9, 2010
21
22

23

24
```

**Page 1**

```
1                           Volume: I
                            Pages: 1-179
2                           Exhibits: 1-4

3            UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
4    *********************************
     NANCY ROSARIO, INDIVIDUALLY, AS    *
5    SHE IS THE ADMINISTRATRIX OF THE   *
     ESTATE OF AWILDA SANTIAGO, ESSEX   *
6    PROBATE COURT #03P-2499AD1, P/P/A  *
     VERONICA ROSARIO AND CHRISTINA     *
7    SANTIAGO, AND AS SHE IS THE        *
     ADMINISTRATRIX OF THE ESTATE OF    *
8    JOSE SANTIAGO, BERLIN (CONNECTICUT)*
     PROBATE COURT, CASE #03-0713,      *
9          Plaintiff,                   *
              VS                        * C.A. No
10   RARE HOSPITALITY INTERNATIONAL,    * 05-CV-10617MLW
     INC. d/b/a LONGHORN STEAKHOUSE,    *
11         Defendant.                   *
     *********************************
12         DEPOSITION OF JUDE CONNELLY, a witness

13         called on behalf of the Plaintiff, taken

14         pursuant to Notice under the applicable

15         provisions of the Federal Rules of Civil

16         Procedure, before Barbara J. Simon, a

17         Professional Shorthand Reporter and Notary

18         Public, in and for the Commonwealth of

19         Massachusetts, at the law offices of Albert L.

20         Farrah, Jr., One Washington Mall, Boston,

21         Massachusetts, on Friday, February 10, 2006,

22         commencing at 10:15 a.m.

23              SHEA COURT REPORTING SERVICES
                     (617) 227-3097
24
```

**Page 2**

```
1          A P P E A R A N C E S

2    ALBERT L FARRAH, JR., ESQ.
     Law Offices of Albert L. Farrah, Jr.
3    One Washington Mall
     Boston, MA 02108
4    (617) 742-7766
          Counsel for the Plaintiff
5
     MICHAEL K GILLIS, ESQ
6    Gillis & Bikofsky, P.C.
     1150 Walnut Street
7    Newton, MA 02461
     (617) 244-4300
8         Counsel for the Defendant

9
     Also Present:
10   Neil Schnurbach, Esq.
     Ann Rudy
11
```

**Page 3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JUDE CONNELLY | | | | |
| (By Mr. Farrah) | 4 | | 171 | |
| (By Mr. Gillis ) | | 143 | | 172 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Floor plan | 17 |
| 2 | Bar bill | 26 |
| 3 | Written statement | 42 |
| 4 | Affidavit | 61 |

(The exhibits were retained by Mr. Farrah.)

**Page 4**

P R O C E E D I N G S

JUDE CONNELLY, having been satisfactorily identified and duly sworn, on oath, deposes and says as follows:

DIRECT EXAMINATION

BY MR. FARRAH:

Q. Just for the record, could you tell us your name, please?

A. Jude Connelly.

Q. Mr. Connelly, my name is Albert Farrah and I represent the plaintiff, Nancy Rosario, in various capacities in this lawsuit.

Counsel have agreed that you will have a copy of your transcript delivered to you and that you will have thirty days from the date of your receipt of that transcript to note, in writing on a sheet of paper that will accompany the transcript, any errors that you feel were made in the transcription of your testimony, and you'll need to return that errata sheet to me within thirty days of your receipt in order

Page 5

1    for the notations to have any effect in this
2    case.
3        Otherwise, your transcript will be deemed
4    accurate if we don't receive that back from you
5    within thirty days -- the errata sheet.  Do you
6    understand that?
7    A. Yes.
8    Q. Tell us, please, where you live.
9    A. Harvard, Massachusetts.
10    Q. What is the address?
11    A. Fifteen Lovers Lane.
12    Q. And how old are you?
13    A. I am twenty years old.
14    Q. What is your date of birth, sir?
15    A. March 23, 1985.
16    Q. And are you currently in school?
17    A. I am.
18    Q. Where?
19    A. Fitchburg State College.
20    Q. Is that full time?
21    A. Full time.
22    Q. And do you work?
23    A. Yes.
24    Q. Where do you work?

Page 6

1    A. I work at a small convenience store in Bolton.
2    Q. What is the name of that store?
3    A. Country Cupboard.
4    Q. Calling your attention back to the year 2003,
5    did you know a person named Jeffrey Southworth?
6    A. Yes.
7    Q. Can you tell us approximately when it was that
8    you first met Mr. Southworth?
9    A. I believe it was some time in the summer of
10    2002.
11    Q. Do you know the setting, where you met him?
12    A. Not particularly.
13    Q. During the summer of 2003, did Mr. Southworth
14    and you engage in any dirt biking activities
15    together?
16    A. Yes.
17    Q. Can you tell me approximately how many times
18    during the summer of 2003 Mr. Southworth and
19    you were dirt biking together?
20    A. I would say about a dozen times.
21    Q. And on one of those occasions after dirt
22    biking, did Mr. Southworth and you go to the
23    Longhorn Steakhouse in Leominster,
24    Massachusetts?

Page 7

1    A. Yes.
2    Q. Was that on September 26, 2003?
3    A. Yes, I believe so.
4    Q. Calling your attention to that day, September
5    26, 2003, do you recall where you were dirt
6    biking with Mr. Southworth that day?
7    A. I do.
8    Q. Where was that?
9    A. It was in Templeton, Massachusetts.
10    Q. Is there a particular location at Templeton
11    that you were dirt baking?  Does it have a
12    name?
13    A. It doesn't have a name.  It is just a sand pit,
14    if you want to call it that.
15    Q. A sand pit?
16    A. Yes.
17    Q. Do you know what time you arrived at the sand
18    pit that day?
19    A. Early afternoon, maybe 2:00, 3:00.
20    Q. How did you get there that day?
21    A. I went to Templeton with my brother.
22    Q. What is your brother's name?
23    A. Dylan Connelly.
24    Q. And when you arrived at the sand pit that day,

Page 8

1    was Jeffrey Southworth there?
2    A. No, he was not.
3    Q. At some point in time, did he arrive at the
4    sand pit?  Did you see him there?
5    A. Yes.
6    Q. And by the way, if you just nod, we won't have
7    a record of your answers.  So you need to say
8    your answer.
9        When you first saw him, was he in the
10    company of anyone else?
11    A. Yes.
12    Q. Who was that?
13    A. Scott Espy.
14    Q. Did you know Mr. Espy prior to September 26,
15    2003?
16    A. I did.
17    Q. Did you know him in a dirt biking setting?
18    A. I did.
19    Q. And others?
20    A. Yes.
21    Q. For how long did you remain dirt biking at the
22    sand pit in Templeton that day?
23    A. We were there until about dark, although I
24    stopped dirt biking a little bit before.

Page 9

1 Q. Before what?
2 A. Before Jeff and Scott finished. My brother
3     actually took my dirt bike with him back to
4     school when he left.
5 Q. So you said you arrived with your brother, and
6     did you arrive in your brother's motor vehicle?
7 A. Yes.
8 Q. And did your brother leave Templeton, the sand
9     pit, at some point in time that day?
10 A. Yes.
11 Q. When did he leave, approximately?
12 A. Around 6:00.
13 Q. And did he take your dirt bike with him that
14     day when he left around 6:00?
15 A. Yes.
16 Q. So you stopped dirt biking at that point; is
17     that right?
18 A. Yes.
19 Q. At what time did Mr. Southworth stop dirt
20     biking?
21 A. It was right around when it got dark. I don't
22     specifically remember.
23 Q. And at some point in time, did you leave the
24     Templeton sand pit that day?

Page 10

1 A. We did.
2 Q. And did you leave in the company of anybody?
3 A. I left with Jeff and Scott.
4 Q. And approximately when was it that you left?
5 A. I know it was just getting dark or just shortly
6     after, maybe around 7:00.
7 Q. And prior to leaving the sand pit in Templeton,
8     did you see Jeffrey Southworth have any
9     alcoholic beverages?
10 A. No.
11 Q. Did all of you leave the sand pit together --
12     Jeffrey Southworth, Mr. Espy and yourself?
13 A. We did.
14 Q. And in whose motor vehicle did you leave the
15     sand pit?
16 A. It was Jeff's. I believe it was a rented
17     truck.
18 Q. And where did the three of you go?
19 A. We went to the Longhorn Steakhouse.
20 Q. And were there any other persons in the motor
21     vehicle, the rented truck, other than Jeff
22     Southworth, Mr. Espy and yourself, on the trip
23     from the sand pit to the Longhorn Steakhouse?
24 A. No, there were not.

Page 11

1 Q. Were there any pets in that motor vehicle?
2 A. There were. There were two dogs.
3 Q. Whose dogs were they?
4 A. They were Jeff's.
5 Q. And what was the layout of people and pets in
6     the motor vehicle on the trip from the sand pit
7     to the Longhorn Steakhouse?
8 A. I believe I was sitting in the back with the
9     two dogs, and Jeff and Scott were in the front.
10 Q. Who was driving?
11 A. Jeff was.
12 Q. And at approximately what time did you arrive
13     at the Longhorn Steakhouse?
14     Let me ask the question another way.
15     Approximately, how long did it take you to get
16     to the Longhorn Steakhouse from Templeton?
17 A. About half an hour.
18 Q. And when you arrived at the Longhorn
19     Steakhouse, where did you go? Where did you
20     first go?
21 A. We went in and we put our name in for a table,
22     and it was busy. So we went over to the bar to
23     wait for the table.
24 Q. That was the three of you -- Jeff, yourself and

Page 12

1     Mr. Espy?
2 A. Correct.
3 Q. At the bar, did you see Mr. Southworth drinking
4     at all?
5 A. I did.
6 Q. What did you see him drinking?
7 A. I saw him drinking a beer.
8 Q. And do you know how many beers Mr. Southworth
9     had at the bar that day?
10 A. I remember him having one.
11 Q. Do you remember testifying at a deposition in
12     this case or in a related case back in August
13     of 2004?
14 A. I do.
15 Q. And do you remember being asked the question --
16     Let me show you the bottom here on page 28 at
17     Line 22.
18     "Do you know whether or not Jeff had more
19     than one beer while he was at the bar?"
20     Do you see that question?
21 A. Yes, I do.
22 Q. Do you remember that your answer was, "You
23     know, I think he did. I'm not -- I don't know
24     for a fact but, you know, he probably did."

|  | Page 13 |
|---|---|
| 1 | Do you see that? |
| 2 | A. I see that. |
| 3 | Q. So is it your best memory today that he |
| 4 | probably had more than one beer while he was |
| 5 | drinking at the bar? |
| 6 | MR. GILLIS: Objection. |
| 7 | A. I don't know.  I don't remember.  I remember |
| 8 | him ordering one beer. |
| 9 | Q. Do you have any explanation for why you |
| 10 | testified on August 19, 2004 that he probably |
| 11 | had more than one beer? |
| 12 | MR. GILLIS: Objection.  That's not his |
| 13 | testimony. |
| 14 | He said on 28 he had a beer, and then you |
| 15 | asked him further when you were unhappy with |
| 16 | the answer, and he said "maybe." |
| 17 | His testimony isn't ever that he had more |
| 18 | than one beer. |
| 19 | MR. FARRAH: His testimony is his |
| 20 | testimony, and his testimony is in response to |
| 21 | the question, "Do you know whether or not Jeff |
| 22 | had more than one beer while he was at the |
| 23 | bar?" |
| 24 | His testimony is, "You know, I think he |

|  | Page 14 |
|---|---|
| 1 | did.  I'm not -- I don't know for a fact, but, |
| 2 | you know, he probably did." |
| 3 | MR. GILLIS: That's taken out of context. |
| 4 | You're not bringing the whole statement in on |
| 5 | 28 when you asked him, "What did you see him |
| 6 | drinking?"  He said "A beer." |
| 7 | If you're going to ask him a question, |
| 8 | give him the whole sequence.  Don't take it out |
| 9 | of order. |
| 10 | MR. FARRAH: Motion to strike.  You can |
| 11 | ask him what you want to ask him. |
| 12 | Q. My question to you is, do you have any |
| 13 | explanation for why you testified on August 19, |
| 14 | 2004 that you think he had more than one beer |
| 15 | at the bar? |
| 16 | MR. GILLIS: Where did you say he said he |
| 17 | thinks he had more than one beer at the bar? |
| 18 | MR. FARRAH: I'm looking at 22 through 24. |
| 19 | MR. GILLIS: 22 to 23 is a question. |
| 20 | Maybe I'm missing something.  On page 29, Lines |
| 21 | 21 to 24 I don't see anywhere -- What line are |
| 22 | you saying that he said he had more than one |
| 23 | beer as opposed to you asking a question? |
| 24 | Q. On page 28, Line 22, the question is, "Do you |

|  | Page 15 |
|---|---|
| 1 | know whether or not Jeff had more than one beer |
| 2 | while he was at the bar?" |
| 3 | The answer is, "You know, I think he did." |
| 4 | So my question -- |
| 5 | MR. GILLIS: What page are you on? |
| 6 | MR. FARRAH: I'm on page 28. |
| 7 | MR. GILLIS: Line? |
| 8 | MR. FARRAH: 22. |
| 9 | MR. GILLIS: Again, I object.  If you're |
| 10 | going to ask him a question, ask him to read |
| 11 | the whole page because you're just taking |
| 12 | things out of context. |
| 13 | Q. For the third time, can you explain why you |
| 14 | testified back in August of 2004 that you |
| 15 | thought Jeff had more than one beer while he |
| 16 | was at the bar? |
| 17 | A. I guess I said it because I think it could have |
| 18 | been possible. |
| 19 | Q. Can you explain why in August of 2004 you |
| 20 | testified that he probably -- on top of page |
| 21 | 29 -- that he probably had more than one beer |
| 22 | while he was at the bar? |
| 23 | MR. GILLIS: Objection. |
| 24 | Q. You can answer. |

|  | Page 16 |
|---|---|
| 1 | A. I don't. |
| 2 | Q. Fair enough.  At some point in time, were you |
| 3 | seated at a table? |
| 4 | A. Yes, we were. |
| 5 | Q. And by the way, while you were at the bar, how |
| 6 | far away were you from Jeff? |
| 7 | A. I don't remember. |
| 8 | Q. Do you remember what part of the bar you were |
| 9 | seated at or standing at? |
| 10 | A. Not particularly.  I kind of remember it being |
| 11 | somewhat busy and us not having seats. |
| 12 | Q. But you don't remember what section of the bar? |
| 13 | A. I don't. |
| 14 | Q. I'm going to show you what has been marked as |
| 15 | Exhibit 1 in your earlier deposition. |
| 16 | Do you recall looking at that floor plan |
| 17 | at some point in time? |
| 18 | A. Yes. |
| 19 | Q. Do you recall circling the area where the "3" |
| 20 | is located as the area where Jeff, you and |
| 21 | Mr. Espy were at the bar? |
| 22 | A. Yes. |
| 23 | Q. Does that refresh your memory about what part |
| 24 | of the bar the three of you were at on that |

Page 17

1    night?
2    A. It does.
3    Q. Is it accurate to say that you were at the area
4        circled with a "3" and an arrow pointing to it
5        on Exhibit 1 of your earlier deposition?
6    A. Yes.
7        MR. FARRAH: Can we mark that as Number 1
8        in this deposition?
9
10        (Exhibit Number 1 was marked for
11        identification.)
12
13    Q. Do you recall what the bartender or bartenders
14        who served you at the bar looked like that
15        night?
16    A. I don't.
17    Q. Do you remember testifying that it was a woman,
18        you thought, with blonde hair who had served
19        you that night?
20    A. I don't know whether she was at the bar or
21        serving a table. I remember a female that I
22        thought had blonde hair.
23    Q. Could you turn to page 31? Read the first
24        seven or eight lines of page 31 to yourself.

Page 18

1        (Witness reviews document.)
2    A. Okay.
3    Q. Does that refresh your recollection that it was
4        a blonde woman who waited on you at the bar?
5    A. I don't remember. I mean, I guess so.
6    Q. Okay. For the record, you were asked the
7        question --
8        MR. GILLIS: For the record, we want an
9        accurate transcript. So we'd prefer your best
10        memory, but if you're guessing, please don't do
11        that.
12        Neither Mr. Farrah nor I want you to guess
13        at answers you don't know.
14    A. I honestly don't remember.
15    Q. Do you recall testifying that you thought the
16        woman who served you at the bar had blonde
17        hair; is that right?
18        MR. GILLIS: Objection. I think his
19        testimony was that he didn't specifically
20        remember.
21    Q. "I think she has blonde hair," what it says
22        there. "I just remember seeing blonde hair."
23        MR. GILLIS: Read the whole answer. His
24        testimony isn't that he saw a woman with blonde

Page 19

1    hair.
2        His testimony is, "I don't remember. I
3    just remember seeing blonde hair." Read the
4    whole answer.
5        MR. FARRAH: For the record, "Do you know
6    who served Jeff at the bar?"
7        "Answer: I mean, the bartender I remember
8    it was a girl?"
9        "Question: Woman? Women?
10        "Answer: Yes. I don't specifically
11    remember. I think she had blonde hair. I just
12    remember seeing blonde hair."
13    Q. By the way, is it your best memory as you sit
14        here now that while he was at the bar, Jeffrey
15        Southworth had more than one beer?
16        MR. GILLIS: Objection, asked and
17        answered.
18    Q. You can answer.
19        MR. GILLIS: If you know.
20    Q. Read on page 30 the question that begins on
21        Line 15 to yourself and then your answer.
22        (Witness reviews document.)
23    Q. I want to ask you this question. Is it your
24        best memory as you sit here now that while he

Page 20

1    was at the bar, Jeff Southworth had more than
2        one beer?
3        MR. GILLIS: Objection.
4    A. No.
5    Q. Do you recall that you were asked that question
6        at your deposition?
7    A. Yes.
8    Q. And that your answer at that time was, "I'd say
9        so, yes"?
10    A. Yes.
11    Q. Do you have any explanation for why your answer
12        today is different from your testimony back in
13        August of 2004?
14    A. To be honest with you, after looking at the
15        receipt for the bill, I'm pretty sure that
16        there could be no way that he had more than one
17        beer at the bar.
18    Q. Did you see the receipt for the bar?
19    A. I believe the bill for the bar was with the
20        bill for the table.
21    Q. What makes you say that?
22    A. That's as I remember that.
23    Q. When did you see the receipt for the bill?
24    A. Maybe a month ago.

Page 21

1   Q. Where did you see it?
2   A. When I met with John DiNatale.
3   Q. A private investigator?
4   A. Yes.
5   Q. What did Mr. DiNatale say to you?
6   A. He just wanted to go over what I had said in
7      some of the depositions and show me the receipt
8      for the bar, and just tell me when I come in
9      here to tell the truth and if I don't know the
10     answer, don't speculate; just only say what I
11     know.
12  Q. Okay, and you didn't speculate when you
13     testified at your deposition, did you?
14     MR. GILLIS: Objection. The prior one
15     you're referring to?
16     MR. FARRAH: Either deposition.
17  A. I suppose I may have.
18  Q. You speculated at your deposition?
19  A. Well, I don't think I was making things up, but
20     when I say I don't exactly remember, this could
21     have been the case.
22     I remember one thing, but certainly
23     another thing could have happened.
24  Q. When you testified on August 19, 2004, you were

Page 22

1      sworn to tell the truth before you testified;
2      isn't that right?
3   A. Yes.
4   Q. Okay, and you did the best you could to tell
5      the truth at that time; isn't that right?
6   A. Yes.
7   Q. Since that time, Mr. DiNatale has seen you; is
8      that right?
9   A. Yes.
10  Q. Did he tell you who he was working for?
11  A. I can't remember. I know he is working for one
12     of the sides -- one of the law firms.
13  Q. How long did you spend with Mr. DiNatale?
14  A. Maybe twenty minutes.
15  Q. And he showed you some records?
16  A. Yes.
17  Q. What did he show you?
18  A. He showed me the printout when I was at the
19     grand jury.
20  Q. The printout of the bill at the grand jury for
21     the Longhorn?
22  A. He showed me a printout of the receipt, and
23     also when I went into the grand jury in Lowell
24     before the grand jury.

Page 23

1   Q. You gave some testimony?
2   A. Yes.
3   Q. He showed you that?
4   A. Yes.
5   Q. Was that accurate?
6   A. Yes.
7   Q. Was your deposition accurate in August of 2004?
8      MR. GILLIS: Which part? You asked the
9      same question at the deposition five times, and
10     you kept asking it because you didn't like the
11     answer.
12     So if you're going to ask him if it's
13     accurate, which time? The time when he said he
14     had only one beer or the time you asked him
15     three pages later?
16  Q. Was your deposition accurate?
17     MR. GILLIS: Which part?
18     MR. FARRAH: Any part.
19  A. I believe so, yes.
20     MR. FARRAH: Now, I just want to stop for
21     a second. I'll be right back. I want the
22     receipt of what Mr. DiNatale showed you.
23     (Off the record.)
24  Q. Back on the record. Back to Mr. DiNatale, did

Page 24

1      he tell you who he was working for?
2   A. He did. I know he's working for one of the law
3      firms. I don't know.
4   Q. Did he tell you he was working for Mr. Gillis's
5      firm? That is the gentleman sitting next to
6      you.
7   A. I suppose he did. I honestly don't remember
8      which firm he said he was working for.
9   Q. Before you testified in August of 2004, had any
10     investigators, other than police investigators,
11     spoken to you about your upcoming testimony?
12  A. No.
13  Q. So when you went into that testimony, you
14     didn't have the benefit of anybody's assistance
15     in preparing for the deposition; is that right?
16     MR. GILLIS: Objection.
17  A. Yes.
18  Q. But Mr. DiNatale knew that you were coming to
19     be deposed in this case; isn't that right?
20     MR. GILLIS: Objection.
21  A. Yes.
22  Q. He told you to tell the truth at the
23     deposition; isn't that right?
24     MR. GILLIS: Objection.

**Page 25**

1  A. Yes.

2  Q. And he showed you some documents; is that

3     right?

4  A. Yes.

5  Q. One of the documents he showed you was a

6     printout of the bar check; is that right?

7  A. That's right.

8  Q. I want you to look at this document which is

9     Exhibit 11 in the Kristin O'Donnell deposition.

10    It's a few page document. I'd like you to look

11    at it, if you could. Take a moment.

12        (Witness reviews document.)

13 Q. It's Table 52; is that right? Take as long as

14    you need to look at it to familiarize yourself

15    with the document.

16        (Witness reviews document.)

17 Q. Is that the document that Mr. DiNatale showed

18    you when you met with him?

19 A. I think so, yes.

20    MR. FARRAH: That, for the record, is

21    Exhibit 11 to Ms. O'Donnell's deposition.

22        Why don't we mark it as Exhibit 2 to this

23    deposition?

24

**Page 26**

1         (Exhibit Number 2 was marked for

2          identification.)

3

4  Q. Was it just Mr. DiNatale and you who met, and

5     nobody else?

6  A. Correct.

7  Q. Where did you meet with him?

8  A. He came to my house.

9  Q. He had called you beforehand to arrange that

10    meeting?

11 A. Yes.

12 Q. Your best memory of when the meeting happened

13    is when?

14 A. I believe it was around a month ago.

15 Q. He gave you his card?

16 A. Yes.

17 Q. Do you still have it?

18 A. Not on me, but I do have it.

19 Q. Do you remember his first name?

20 A. I think it's John.

21 Q. And you and he discussed what now has been

22    marked as Exhibit 2 in your deposition; is that

23    right?

24 A. Yes.

**Page 27**

1  Q. Based in part on that discussion, you now do

2     not believe that Jeff Southworth had more than

3     one beer at the bar; is that right?

4     MR. GILLIS: Objection.

5  A. Correct.

6  Q. That's because there's something in Exhibit 2

7     that suggests to you that it was an

8     impossibility that he had more than one beer at

9     the bar?

10    MR. GILLIS: Objection.

11 Q. Is that right?

12 A. Yes.

13 Q. What is it about that that Mr. DiNatale pointed

14    out to you in Exhibit 2?

15    MR. GILLIS: Objection. You're putting in

16    evidence that's not there. You're saying what

17    did he point to, and there's no evidence here

18    that he pointed to anything.

19        You can't lead the witness. It's your

20    deposition.

21 Q. Did Mr. DiNatale point to something in

22    Exhibit 2 that led you to conclude that it was

23    impossible for Jeff to have had more than one

24    beer at the bar?

**Page 28**

1  A. He asked me what I remembered him having at the

2     bar, and I told him that I remembered him

3     having a beer.

4         It was a possibility that he could have

5     had more, and I told him I remembered Scott

6     having a beer as well, and at that point he

7     said, "There were only two beers ordered. So

8     where did the third beer come from," and I

9     said, "I guess it didn't come."

10 Q. Did Mr. DiNatale show you where there were only

11    two beers ordered as reflected in what has now

12    been marked as Exhibit 2 in your deposition?

13 A. Yes.

14 Q. Could you show me what he pointed to?

15 A. There's one at the top of what says page 8, and

16    the second one is towards the end of page 9

17    right here.

18 Q. The one at the top of page 8 -- You said

19    page 8?

20 A. Yes.

21 Q. Is that the very top line on page 8?

22 A. It is.

23 Q. It says "$3.99, twenty-five-ounce Bud Light"?

24 A. Correct.

Page 29

1 Q. And to review that, you need to go to the
2    previous page; is that right?
3 A. Yes.
4 Q. That's part of an order that was placed at
5    8:40 p.m.; is that right?
6 A. Yes.
7 Q. So that's one of the references that
8    Mr. DiNatale pointed out to you about the
9    beers; is that right?
10 A. Yes.
11 Q. And the other reference that Mr. DiNatale
12    pointed out to you, I think you said was on
13    page 9; is that right?
14 A. Towards the end.
15 Q. Again, we're looking at Exhibit 2 to your
16    deposition; is that right?
17 A. Yes.
18 Q. Do you see it?
19 A. Yes.
20 Q. It looks like at 9:15 p.m. there was an order
21    for a $3.99 twenty-five-ounce Bud Light?
22 A. Yes.
23 Q. So based on Mr. DiNatale showing you the
24    earlier reference at 8:40 p.m. and the second

Page 30

1    reference at 9:15 p.m., you now understand that
2    it was not possible for Jeff to have had more
3    than one beer at the bar; is that right?
4    MR. GILLIS: Objection.
5 A. I believe so.
6 Q. Did Mr. DiNatale tell you that what's been
7    marked as Exhibit 2 to your deposition included
8    the bill for the beers that were served at the
9    bar to Jeff and Mr. Espy?
10 A. He didn't say whether they were or weren't.
11 Q. Well, if you can tell me what it is about
12    Exhibit 2 that Mr. DiNatale pointed out to you
13    that suggested to you that the two beers we've
14    been talking about, 8:40 and 9:15, were the
15    beers that were served to them at the bar?
16    MR. GILLIS: Objection.
17 A. The fact that I just remember the bar tab being
18    carried over to the table. I mean, it's
19    obvious that they're different times, I guess.
20    I don't know.
21 Q. I want to know.
22    MR. GILLIS: If you don't know, say you
23    don't know, but don't guess.
24    MR. FARRAH: This is not your witness.

Page 31

1    MR. GILLIS: You're asking him to guess
2    because you don't want the accurate testimony.
3    I'm just telling him to tell the truth.
4    If you have a problem with that, then fine.
5    MR. FARRAH: I have no problem with that.
6    I'm trying to find out what Mr. DiNatale said
7    at a later date.
8 Q. What did Mr. DiNatale tell you about the beer
9    at 8:40 and the beer at 9:15? What did he tell
10    you?
11 A. He told me those were the two beers of the
12    bill.
13 Q. Did he say what they meant and what they
14    reflected?
15 A. He just said those are reflected, the two beers
16    that they were drinking.
17 Q. At the bar?
18    MR. GILLIS: Objection.
19 A. I don't know.
20 Q. Did he say that the two beers that are
21    reflected on Exhibit 2 to your deposition were
22    two beers that were served at the bar?
23    MR. GILLIS: Objection.
24 A. I don't remember.

Page 32

1 Q. Is it accurate to say that you're basing your
2    testimony that Jeff probably did not have more
3    than one beer at the bar on Exhibit 2 that
4    Mr. DiNatale showed you?
5    MR. GILLIS: Objection.
6 A. Solely or entire? Can you repeat it one more
7    time?
8 Q. Yes.
9 A. I remember him having a beer at the bar, but
10    that was at the bar. I remember him having one
11    beer, you know, throughout the night.
12    I remember him having a beer, but whether
13    he ordered another beer, which I don't remember
14    or not, at the table, that would not be at the
15    bar.
16 Q. Do you remember testifying that at the table
17    Jeff had probably four beers?
18    MR. GILLIS: Objection.
19 A. I believe I did. I mean, I think I read that
20    somewhere.
21 Q. Your memory of the events back in August of '04
22    was better than your memory of the events
23    today; isn't that right?
24    MR. GILLIS: Objection.

Page 33

1  A. I guess you can say that.
2  Q. And back in August of '04 on Page 38, Line 4 of
3     your deposition began a series of questions
4     that you were asked about Jeff drinking at the
5     table.
6         Do you recall being asked the question,
7     "While you were at the table, did you see Jeff
8     drinking any alcoholic beverages?"
9         Do you recall that?
10  A. Yes.
11  Q. And your answer was, "Yes."
12         Did you see him drinking any beers?
13  A. Yes.
14  Q. How many beers, to your best memory, did you
15     see him drink at the table?
16  A. Do you want me to read off of this?
17  Q. Tell me, first of all, what you testified to
18     back in August.
19  A. I answered "Maybe four, maybe."
20  Q. My question to you today is, did you see him
21     drinking beers at the table?
22  A. I know that he had a beer at the table.
23  Q. Do you know if he had more than one beer at the
24     table?

Page 34

1  A. I don't know.
2  Q. Do you have any explanation for why back in
3     August of 2004 you testified that your best
4     memory was he had maybe four beers at the
5     table?
6  A. I mean anything is possible. I know that he
7     had a beer, but I guess it's possible that he
8     could have had more beers.
9  Q. You testified that he had maybe four beers;
10     isn't that right?
11  A. Correct. That would be why, the possibility of
12     why I said that.
13  Q. Now, prior to your August 2004 testimony,
14     nobody had spoken to you about your upcoming
15     testimony; isn't that right?
16  A. Right.
17  Q. Prior to today's testimony, Mr. DiNatale had
18     spoken to you; isn't that right?
19  A. Yes.
20  Q. Did you discuss the question of how many beers
21     to the best of your memory did you see him
22     drink at the table, with Mr. DiNatale?
23  A. No.
24  Q. Did you understand that Mr. DiNatale was

Page 35

1     working for the lawyers who are representing
2     the Longhorn Steakhouse?
3         MR. GILLIS: Objection.
4  A. At that time, yes.
5  Q. He told you that; isn't that right?
6  A. Yes.
7  Q. And while he was at the table, did you also see
8     Jeff drinking Manhattans?
9  A. Yes.
10  Q. How many Manhattans did you see him drink at
11     the table?
12  A. I remember him having at least a Manhattan. As
13     of right now, I don't know what I testified to.
14  Q. Let's read it. Do you see the question
15     beginning on page 38, Line 16? Let me read the
16     question.
17         It says, "What is your best memory of the
18     number of Manhattans that you saw him drinking
19     at the table?"
20         What was your answer?
21  A. "Probably two. I know that he ordered like a
22     round of them. I don't, you know, I don't
23     really remember how many. I think, you know,
24     I'd probably say two."

Page 36

1  Q. Do you remember giving a statement to the
2     police after the investigation or after the
3     accident?
4  A. Yes.
5  Q. And you had not spoken to Mr. DiNatale before
6     you gave that statement; isn't that right?
7  A. Correct.
8  Q. And nobody had talked to you, other than the
9     police, about what Jeff had to drink at the
10     restaurant; is that right?
11  A. Correct.
12  Q. Now, let me ask you this. Is there any
13     question in your mind about that when Jeff and
14     Mr. Espy and you first arrived at the
15     restaurant, you went to the bar?
16  A. Okay.
17  Q. Is there any question in your mind about that?
18  A. I know we went to the bar.
19  Q. You didn't have anything to drink that night --
20     alcoholic beverages -- did you?
21  A. No.
22  Q. And is there any question in your mind about
23     that both Jeff and Mr. Espy when they went to
24     the bar, they ordered a beer upon arrival at

Page 37

1    the bar?
2  A. No.
3  Q. That happened; is that right?
4  A. Correct.
5  Q. And they made that order at the same time; is
6    that right?
7  A. As best as I can remember. I can't
8    specifically recall them both saying, you know,
9    the time when they said, "Can I have a beer?"
10  Q. But the three of you were in the bar area for
11    some period of time before the others in your
12    group arrived; isn't that right?
13  A. Yes.
14  Q. Fifteen or twenty minutes?
15  A. Yes.
16  Q. And during that fifteen or twenty minutes, it
17    was just the three of you at the bar; isn't
18    that right?
19  A. Correct.
20  Q. And they were drinking beer at the bar; isn't
21    that right?
22  A. Correct.
23  Q. So when you were talking to Mr. DiNatale about
24    your testimony at your August 2004 deposition

Page 38

1    and he showed you this Exhibit 2 to your
2    deposition, did you have any discussion with
3    him about the times that the beers were shown
4    to have been ordered on Exhibit 2?
5  A. No, other than him pointing out just the two
6    beers were ordered. We didn't discuss anything
7    further.
8  Q. But you understood that the bar tab was on
9    Exhibit 2; isn't that right?
10      MR. GILLIS: Objection.
11  A. Yes.
12  Q. Mr. DiNatale told you that; isn't that right?
13      MR. GILLIS: Objection.
14  A. I don't know. I don't believe so.
15  Q. What then was the basis for your understanding
16    that the bar tab is on Exhibit 2?
17  A. Me recalling that the bar -- whatever the bill
18    at the bar was -- they just asked for it to be
19    brought to the table.
20      I don't specifically remember them paying
21    the tab at the bar.
22  Q. That's the sole basis for your statement that
23    the bar tab is on Exhibit 2?
24  A. Yes.

Page 39

1  Q. Mr. DiNatale didn't tell you that the bar tab
2    was on Exhibit 2, did he?
3  A. No.
4  Q. But he pointed to the two beers on Exhibit 2,
5    didn't he?
6  A. Yes.
7  Q. What did he say about them?
8  A. He said those were the two beers that were
9    ordered.
10  Q. Ordered at the bar?
11      MR. GILLIS: Objection.
12  A. He didn't say or he may have said. I don't
13    remember. I remember him saying those are the
14    two beers that they were drinking.
15  Q. Mr. DiNatale was not at the Longhorn Steakhouse
16    the night of September 26 to the best of your
17    memory; isn't that right?
18  A. Correct.
19  Q. Did you see Jeff drinking beer while he was at
20    the table?
21  A. Yes.
22  Q. And how many beers did you see Jeff drinking
23    while he was at the table?
24  A. I remember him having a mug in front of him.

Page 40

1  Q. The same size at the table that he had had at
2    the bar?
3  A. Yes.
4  Q. The same beer perhaps at the table that he had
5    had at the bar?
6  A. Yes.
7  Q. And the same kind of beer?
8  A. Yes.
9  Q. And how many drinks of Jack Daniels did Jeff
10    have at the table?
11  A. I remember seeing him have at least one. After
12    seeing this, it's clear that it looks like he
13    had two --
14      MR. GILLIS: Objection.
15  A. -- if the rounds were ordered.
16  Q. Did Mr. DiNatale and you discuss how many Jack
17    Daniels Manhattans are reflected on Exhibit 2?
18  A. Yes.
19  Q. How many are reflected on Exhibit 2?
20  A. I can't remember. I need to count them.
21  Q. Do you remember other people drinking Jack
22    Daniels Manhattans as well?
23  A. Yes.
24  Q. And so my question to you is, what is your best

Page 41

1  memory of the number of Manhattans that you saw
2  Jeff drinking at the table?
3      MR. GILLIS: Objection, already asked and
4  answered.
5  A. Two.
6  Q. What is your best memory of the number of beers
7  you saw Jeff drinking at the table?
8      MR. GILLIS: Objection.
9  A. One.
10 Q. And can we agree that your best memory of the
11 number of beers you remember him drinking at
12 the table in 2004 was four?
13     MR. GILLIS: Objection. That's not what
14 the answer says.
15 Q. Maybe four?
16     MR. GILLIS: Objection.
17 A. I testified to that.
18 Q. Before you saw Mr. DiNatale?
19     MR. GILLIS: Objection.
20 Q. Is that right?
21 A. Yes.
22 Q. Now, before you saw Mr. DiNatale, you also
23 signed a statement for the police; isn't that
24 right?

Page 42

1  A. Yes.
2  Q. Take a look at this and see if that is the
3  statement that you signed for the police.
4  A. It looks like it.
5  Q. And how many drinks with Jack Daniels did you
6  tell the police Jeff had with dinner?
7  A. It says here maybe three drinks with Jack
8  Daniels.
9  Q. Was that true?
10 A. Yes.
11 Q. Okay, and you also said, "We had dinner. Jeff
12 had a couple of beers (maybe two)," in your
13 statement to the police; isn't that right?
14 A. Yes.
15 Q. Was that true?
16 A. Yes.
17     MR. FARRAH: Can we have this marked as
18 the next exhibit?
19
20     (Exhibit Number 3 was marked for
21     identification.)
22
23     (Off the record.)
24 Q. I want to talk about Mr. DiNatale again. What

Page 43

1  I'd like you to do for me in your own words is
2  tell me as best as you can recall everything
3  Mr. DiNatale said to you and everything you
4  said to Mr. DiNatale during your
5  twenty-minutes-or-so meeting with him.
6  A. Well, when he first came, he introduced himself
7  and I introduced myself to him, and he asked me
8  if I was in school, and I told him that I was
9  currently going to Fitchburg State.
10     I think it was during my winter break. So
11 I was not in class, and he made a little chat
12 and asked me what sports or what I liked to do.
13     I said I liked to snowboard and ski, and
14 he mentioned that his -- I'm not sure who it
15 was -- some relative of his is going to be in
16 the Olympics, to watch out for him.
17     Then he told me that he wanted to talk to
18 me and just sort of tell me what I'm coming in
19 here to do, and he showed me Exhibit 2, and he
20 asked me what I remembered Jeff having to drink
21 that night, and, you know, if I remembered the
22 bar tab being brought over to the table, and I
23 told him I did, and he went through Exhibit 2
24 and he counted the beers and he counted the

Page 44

1  Jack Daniels drinks, and he asked me if I
2  remembered them being ordered, and I said I
3  remembered them being ordered in rounds.
4      So then he just told me when I came in
5  here to don't make something up if you don't
6  know it.
7      He just wanted me to know that I'm coming
8  in here to tell what I know and if I don't
9  know, then I'm not going to tell it.
10 Q. Did he suggest to you that you had made
11 something up before?
12     MR. GILLIS: Objection.
13 A. No.
14 Q. Because you had not made something up before,
15 had you?
16 A. I had not made something up. I mean, I just
17 believed that it could have been possible.
18 Q. By the way, did he say what sport his relative
19 was going to participate in, in the Olympics?
20 A. I believe it's snowboarding.
21 Q. Did he say the name of the relative?
22 A. He did. I don't remember it.
23 Q. Okay. After that discussion, you testified a
24 little while ago that he told you what you were

Page 45

1    coming in here to do; do you recall that?
2    A. Yes.
3    Q. What did he tell you you were coming in here to
4       do?
5    A. He was telling me that I was being deposed to
6       come in here to tell what I knew about the
7       night regarding Jeff Southworth and the
8       Longhorn Steakhouse.
9    Q. Did he tell you what he was coming to see you
10      to do?
11   A. He told me that he was coming to see me to, you
12      know, kind of tell me where I stand in all of
13      this.
14   Q. And did he tell you why he was coming to tell
15      you to do that?
16   A. Because he was hired.
17       MR. GILLIS: If you know. Don't guess.
18       MR. FARRAH: This is not your witness.
19       MR. GILLIS: If he's guessing, I don't
20   want a guess. You can tell from his mannerisms
21   that he is.
22       MR. FARRAH: Whatever you think you can
23   tell, you can tell, but let the witness
24   testify. I don't think this is your witness

Page 46

1    yet.
2        MR. GILLIS: Do you have a problem with me
3    telling him to tell the truth and not to guess
4    if he doesn't know?
5        MR. FARRAH: I have a problem with you
6    interrupting him. When it's your turn, you can
7    ask him whatever you want.
8        MR. GILLIS: Why do you have a problem
9    with him telling the truth?
10       MR. FARRAH: I have no problem with him
11   telling the truth.
12       MR. GILLIS: Why do you have a problem
13   with him not guessing?
14       MR. FARRAH: I have a problem with you
15   saying don't guess.
16       MR. GILLIS: What's wrong with that?
17       MR. FARRAH: Because he's in the middle of
18   answering. That's the problem I have.
19       MR. GILLIS: If you think he's guessing,
20   you should ask him that.
21       MR. FARRAH: You're the one who thinks
22   he's guessing. This is not your witness. As
23   far as I know, you don't represent him.
24       MR. GILLIS: I don't represent him.

Page 47

1    Q. Now, back to the question. Did Mr. DiNatale
2       tell you why he was coming to see you?
3    A. He told me that he was working as a private
4       investigator for the case, and he was hired
5       to -- Well, I don't know exactly what he was
6       hired to do, but he was, you know, going to
7       come and talk to me and just, you know, kind of
8       show me, like, for example, Exhibit 2 and
9       discuss it, and, you know, just once again kind
10      of tell me the most important thing is to come
11      in here and tell what I know and to not say
12      something that I don't know for sure.
13   Q. "Don't guess"? Is that what he said to you?
14   A. I don't know the words that he said, but yes.
15   Q. But you were not guessing before, were you?
16   A. I don't think so.
17   Q. Okay. When you testified before the grand
18      jury, were you guessing?
19   A. No.
20   Q. When you gave the statement marked as Exhibit 3
21      in your deposition today to the police, were
22      you guessing?
23   A. No.
24   Q. When you testified on August of 2004, were you

Page 48

1    guessing?
2    A. No.
3    Q. Okay. One of the other things that
4       Mr. DiNatale told you was where you stood in
5       all of this. At least that is what you
6       testified to a moment ago. What did he say
7       about that?
8    A. He just told me that I was the witness that was
9       with Jeff that night and I had not had anything
10      to drink, and that, you know, whatever I would
11      remember would probably be the most accurate
12      with respect to the people and members of the
13      group who had had drinks.
14   Q. Did he tell you anything else about where you
15      stood other than that?
16   A. I don't remember.
17   Q. Okay. Did he say you were the only one who was
18      sober at the table or words that effect?
19       MR. GILLIS: Objection.
20   A. He said I was the only one who was not
21      drinking.
22   Q. You knew that.
23   A. Yes.
24   Q. You didn't need Mr. DiNatale to tell you that,

Page 49

1   did you?
2   A. No.
3   Q. Did Mr. DiNatale tell you anything else about
4      where you stood in all of this?
5   A. I don't remember him saying anything else.
6   Q. When he showed you Exhibit 2, what did he say
7      about it?  Exhibit 2 is the tab.
8   A. Well, he first asked me what I remembered being
9      ordered and who was drinking and who was at the
10     table, and I told him that I thought that the
11     tab was brought over from the bar, and he asked
12     me what I remembered being ordered at the bar,
13     and he counted up the number of Jack Daniels
14     drinks that were ordered and the number of
15     beers in Exhibit 2.
16  Q. And did he say anything about Exhibit 2, other
17     than counting up the number of Jack Daniels?
18     Did he say anything about it to you?
19  A. He told me that what was ordered here, what was
20     drinking here, and well, I don't remember him
21     specifically saying if the tab from the bar was
22     brought over, then that was all that was
23     ordered throughout the night, but that was what
24     I had taken from this.

Page 50

1   Q. Did you say to him that you believed that what
2      was ordered at the bar was reflected in
3      Exhibit 2?
4   A. I think so.
5   Q. Well, let's see if we can do better than that.
6      Do you have a memory?
7   A. I don't.
8   Q. When you were meeting with him, it was your
9      belief that what was ordered at the bar was
10     reflected in Exhibit 2?
11  A. Yes.
12  Q. Did you share that belief with him?
13  A. I'm pretty sure I did.
14  Q. When you shared that belief with him, what did
15     he say about that?
16  A. Well, he asked me who were the ones I
17     remembered having the beers, and I told him
18     that I remembered Jeff having one and Scott
19     having one, and then he told me that, "Well, if
20     those are the two beers, then Jeff had a beer."
21  Q. Referring to Exhibit 2?
22  A. Correct.
23  Q. And did he tell you whether Jeff's beer at the
24     bar was the one that is reflected at 8:40 or

Page 51

1   the one that is reflected at 9:15?
2   A. No.
3   Q. He didn't tell you which one was the one that
4      Jeff ordered at the bar?
5   A. He didn't.
6   Q. But you understood that what Jeff ordered at
7      the bar was either the one that is reflected at
8      8:40 or the one that is reflected at 9:15; is
9      that right?
10  A. Yes.
11  Q. Did you tell him that, that you understood,
12     looking at Exhibit 2, that what Jeff had
13     ordered at the bar was reflected as either the
14     8:40 beer or the 9:15 beer?
15  A. I never told him that.  What I told him was
16     that I thought that the tab from the bar was
17     brought over and represented in this exhibit.
18  Q. Did he disagree with that?
19  A. No.
20  Q. Did he agree with that?
21  A. I think so.  I honestly don't remember him
22     saying "I agree."
23        MR. GILLIS:  Objection.
24  Q. But you don't remember him saying, "I disagree

Page 52

1   with that," do you?
2   A. No.
3   Q. What were you drinking that night?
4   A. To be honest with you, I don't remember.  I
5      remember being asked the question before, and I
6      don't remember what I said.
7   Q. Coke?  Were you drinking Coke?
8   A. I know I was having soda.
9   Q. And typically, what kind of soda do you order?
10  A. Mostly either Coke or maybe a Sprite.
11  Q. Did Mr. DiNatale and you talk at all about what
12     you were drinking that night?
13  A. No.
14  Q. Did Mr. DiNatale and you discuss at all whether
15     what you were drinking that night is reflected
16     on Exhibit 2 to your deposition?
17  A. I don't remember talking about that.
18  Q. Have you looked at Exhibit 2 to your deposition
19     to see whether or not what you were drinking
20     that night is reflected on it?
21  A. No.
22  Q. What were you eating that night?
23  A. I think I had some ribs.  I'm not 100 percent
24     sure.

|  | Page 53 |
|---|---|
| 1 | Q. Now, at the bar did Jeff order any Jack Daniels |
| 2 | Manhattans? |
| 3 | A. No. |
| 4 | Q. Are you sure? |
| 5 | A. Yes, at the time. |
| 6 | Q. At the time that Jeff was delivered his last |
| 7 | drink, was he exhibiting any signs of |
| 8 | intoxication to you? |
| 9 | A. No. |
| 10 | Q. Was he loud? |
| 11 | A. He didn't stand out to be. I mean, I don't |
| 12 | know exactly what you mean by "loud." |
| 13 | Q. Was the table loud? |
| 14 | A. Yes. Do you mean with respect to everything |
| 15 | else? |
| 16 | Q. Was the table loud? |
| 17 | A. Not extremely. |
| 18 | Q. Okay. Did Mr. DiNatale talk to you at all |
| 19 | about whether or not Jeff was exhibiting any |
| 20 | signs of intoxication that evening? |
| 21 | A. I believe he did. |
| 22 | Q. Can you tell us what you remember about that? |
| 23 | A. I'm pretty sure he asked me if I remembered him |
| 24 | acting like he was drunk. |

|  | Page 54 |
|---|---|
| 1 | Q. "Drunk"? Is that what he said? |
| 2 | A. I don't know what he said. |
| 3 | Q. What do you remember he said? |
| 4 | MR. GILLIS: Objection. |
| 5 | A. I remember him asking, I guess, if he was |
| 6 | exhibiting signs of alcohol. |
| 7 | MR. GILLIS: Objection, and I'm going to |
| 8 | say it again, we cannot have answers here that |
| 9 | are guesses. He said "I guess it was." |
| 10 | We have to have your memory, not a guess. |
| 11 | A. I honestly don't know what questions he asked |
| 12 | me. |
| 13 | Q. What did you say? |
| 14 | A. I told him that I didn't see any signs of being |
| 15 | drunk or intoxicated. |
| 16 | Q. While you were at the Longhorn, did Jeff appear |
| 17 | to you to be under the influence of what he had |
| 18 | been drinking at the Longhorn? |
| 19 | MR. GILLIS: Objection. |
| 20 | A. No. |
| 21 | Q. Can you turn to page 49 of your earlier |
| 22 | deposition? Will you go down to Line 12, and |
| 23 | do you recall being asked in August of 2004 the |
| 24 | question, "Okay, while you were at the |

|  | Page 55 |
|---|---|
| 1 | Longhorn, did Jeff appear to you to be under |
| 2 | the influence of what he had been drinking at |
| 3 | the Longhorn," and your answer was, "I mean, |
| 4 | yeah, a little bit." Do you see that? |
| 5 | A. I do. |
| 6 | Q. Did he appear to be under the influence of what |
| 7 | he was drinking at the Longhorn? |
| 8 | MR. GILLIS: Objection. |
| 9 | A. I don't remember him -- I don't know how to say |
| 10 | this, you know, exhibiting clear signs of |
| 11 | intoxication. |
| 12 | I mean, I guess obviously anyone who is |
| 13 | drinking anything will be under the influence |
| 14 | of what they're drinking, but I don't remember |
| 15 | him clearly showing signs of intoxication. |
| 16 | Q. Okay. So is it your testimony today that he |
| 17 | appeared to be under the influence of what he |
| 18 | was drinking at the Longhorn because anybody |
| 19 | who is drinking is under the influence of what |
| 20 | he is drinking? |
| 21 | A. Yes. |
| 22 | Q. And he did appear to you to be under the |
| 23 | influence of what he was drinking; is that |
| 24 | right? |

|  | Page 56 |
|---|---|
| 1 | MR. GILLIS: Objection. |
| 2 | A. Yes. |
| 3 | Q. Did Jeff appear to hold himself that night at |
| 4 | the Longhorn in the same way he usually did? |
| 5 | A. Without reading this, I honestly don't |
| 6 | remember. |
| 7 | Q. Let me withdraw that question. I guess you've |
| 8 | answered it. |
| 9 | At some point in time, did somebody come |
| 10 | over from the restaurant and ask the table to |
| 11 | quiet down? |
| 12 | A. Yes. |
| 13 | Q. And that was how long before you left? |
| 14 | A. I honestly don't remember. |
| 15 | Q. Could you look at pages 43 and 44, please? |
| 16 | Actually, you have to start at 42. |
| 17 | A. All right. |
| 18 | Q. I started to ask you a question at the bottom |
| 19 | of 42. |
| 20 | "Did anybody while you were at the table |
| 21 | that night say," and then you interrupted. You |
| 22 | said "I," and then I said, "I'm sorry?" |
| 23 | Then you said, "I kind of remember now. I |
| 24 | don't know who it was, whether it was, you |

## Page 57

1    know, a manager or someone. It might have even

2    been our waitress. I remember someone coming

3    over and asking our table to be quiet, a little

4    bit quieter."

5       Do you remember that happening?

6  A. Yes.

7  Q. Do you remember that testimony?

8  A. Yes.

9  Q. And then I'm going to ask you now on the

10   record, was that because the table was loud?

11  A. Yes.

12  Q. And who was making a lot of noise that night at

13   the table?

14       MR. GILLIS: Are you asking the question?

15  Q. I'm asking the question. Who was making a lot

16   of noise that night at the table?

17  A. We all were.

18  Q. Jeff included?

19  A. Yes.

20  Q. And then I asked you on page 44, Line 14, "Give

21   me your best estimate of how much time elapsed

22   from when the woman came over and told you to

23   tone it down and when you left the restaurant,"

24   and your answer was, "Maybe twenty-five minutes

## Page 58

1    to half an hour."

2       Does that refresh your memory as to how

3    long after you were told to quiet down it was

4    that the group left the restaurant?

5  A. Yes.

6  Q. Now, by the way, am I correct that the person

7   that served your group at the table was not the

8   person that served you at the bar?

9  A. Yes.

10  Q. Both blonde?

11  A. Yes.

12  Q. Can you turn back to page 49 for me?

13  A. All right.

14  Q. Now, my question to you is, was Jeff sloppier

15   looking that night than he usually is? I'm

16   asking you the question now on the record.

17  A. Yes.

18  Q. Was he louder that night than he usually

19   appeared to you?

20  A. No.

21  Q. Do you recall being asked on page 50, the

22   question was, "Was he louder than he usually

23   appeared to you?"

24       Do you see that?

## Page 59

1  A. Yes, I do.

2  Q. What was your answer?

3  A. "Yeah, I mean, yes."

4  Q. Do you have any explanation as to why you

5   testified differently today than how you

6   testified in your deposition in August?

7  A. Well, everyone was loud at the table. So

8   that's why I said that.

9  Q. That's your explanation as to why you testified

10   differently today than how you testified in

11   August?

12  A. Well, I guess if -- I won't guess. If he was

13   being loud at the table, then it would be

14   louder with respect to everyone else in the

15   restaurant, you know, and I mean, he's not a

16   loud kid, but he was not a quiet kid.

17       So yes, he was being a little bit louder

18   than he usually is, you know, as a one on one

19   or, you know, just to talk with him.

20  Q. So which is it today, Mr. Connelly? Was he

21   louder that night than he usually is or wasn't

22   he?

23  A. He was.

24  Q. Do you have any explanation for why a moment

## Page 60

1    ago you said he wasn't?

2  A. Well --

3       MR. GILLIS: Objection.

4  A. You know, when you talk to him, he would be

5   pronounced. So he was somewhat of a -- As I

6   said, he was not quiet.

7       So that would be why I said it, but

8   everyone was loud with respect to everyone else

9   in the restaurant. So he was a little bit

10   louder.

11  Q. Was that because, in your opinion, of what he

12   had to drink?

13       MR. GILLIS: Objection.

14  A. No.

15  Q. Was Mr. Southworth exhibiting signs of

16   intoxication at the time that the waitress came

17   over to the table and asked you to quiet down?

18  A. No.

19  Q. Do you remember making an affidavit?

20  A. I do.

21  Q. Do you remember talking to Mr. DiNatale about

22   your affidavit?

23  A. What is the affidavit?

24  Q. Do you remember talking with Mr. DiNatale about

Page 61

1    your affidavit?
2  A. Which is the affidavit? I remember doing an
3    affidavit, but I don't remember it. I know we
4    had a couple of things with him.
5  Q. Is that your signature?
6  A. It is. I've done this a few times, and I just
7    don't know which one is which.
8  Q. Take a look at this document.
9        (Witness reviews document.)
10        (Short recess.)
11        MR. FARRAH: Could we have his affidavit
12    marked as the next exhibit, please?
13
14        (Exhibit Number 4 was marked for
15        identification.)
16
17  Q. Mr. Connelly, I'm going to show you what has
18    been marked as Exhibit 4 in this deposition.
19        Do you see it?
20  A. Yes.
21  Q. It's your affidavit; is that right?
22  A. Correct.
23  Q. That's your signature?
24  A. It is.

Page 62

1  Q. On page 2?
2  A. Yes.
3  Q. Would you turn to Paragraph 5? Paragraph 5
4    reads, "In my deposition of pages 49 to 51, I
5    testified that during the course of the evening
6    at the Longhorn Steakhouse, Mr. Southworth
7    seemed to be under the influence of the
8    alcoholic beverages he was being served at the
9    restaurant."
10        Do you see that?
11  A. Yes.
12  Q. Did I read that correctly?
13  A. You did.
14  Q. And you understood you made this affidavit
15    under the pains and penalties of perjury in May
16    of 2005?
17  A. Yes.
18  Q. My question is, during the course of the
19    evening at the Longhorn Steakhouse, did
20    Mr. Southworth seem to be under the influence
21    of the alcoholic beverages he was being served?
22        MR. GILLIS: Objection.
23  A. Yes.
24  Q. And then Paragraph 6 of your affidavit reads,

Page 63

1    "I also testified on pages 42 to 44 of my
2    deposition that approximately one half hour
3    before we left the Longhorn Steakhouse,
4    everyone at the table was loud, including
5    Mr. Southworth, and either a waitress or a
6    manager at the restaurant came and asked us to
7    be quiet."
8        Do you see that?
9  A. I do.
10  Q. Did I read that correctly?
11  A. Yes.
12  Q. Was that true that approximately one half hour
13    before you left, everyone at the table was
14    loud, including Mr. Southworth, and either a
15    waitress or a manager came to you and asked you
16    to be quiet?
17  A. Yes.
18  Q. Paragraph 7 reads, "At that time when the table
19    was asked to quiet down, Mr. Southworth was
20    exhibiting all the signs of intoxication I
21    testified about on pages 49 through 51 of my
22    deposition."
23        Do you see that?
24  A. Yes.

Page 64

1  Q. Did I read that right?
2  A. You did.
3  Q. And is that true that at the time when the
4    table was asked to quiet down, Mr. Southworth
5    was exhibiting all the signs of intoxication
6    that you testified to on pages 49 through 51 of
7    your deposition?
8        MR. GILLIS: Objection.
9  A. Yes.
10  Q. Let's look at pages 49 to 51 of your
11    deposition.
12        My question I asked some time ago was,
13    "Was Jeff holding himself at the time the table
14    was asked to quiet down the same way he usually
15    held himself?"
16  A. I honestly don't remember. So I'm going to use
17    this because this is what is going to be
18    correct.
19  Q. Do you recall testifying in August of 2004 in
20    response to the question, "What did he show?
21    What did he manifest that makes you say that,"
22    and that was that he appeared to be a little
23    bit under the influence of what he was
24    drinking?

Page 65

1   Do you remember answering in part, "That
2   night he was, you know, sort of just seemed to
3   me that he was a little bit under the influence
4   just because by the way he didn't really hold
5   himself. At least it looked like he didn't
6   hold himself the same way as he usually did."
7   Do you recall that testimony?
8 A. Yes.
9 Q. Is that accurate that that night he didn't hold
10   himself the same way he usually did?
11   MR. GILLIS: Objection.
12 A. Yes. Let me just say what I just answered is
13   yes, but also, I mean, I think that this had
14   something to do with it, but what I said is
15   what I said and it is yes, but, you know, we
16   were dirt biking, and it's not, you know, when
17   I usually see him, we're dirt biking, and I
18   have never really spent that much time with him
19   not dirt biking.
20   So, you know, what I remember him holding
21   himself is from dirt biking.
22 Q. You've seen him in fights; isn't that right?
23   MR. GILLIS: Objection.
24 A. I have.

Page 66

1 Q. You've seen him at parties; isn't that right?
2 A. I remember seeing him at a party.
3 Q. You've seen him in at least one fist fight;
4   isn't that right?
5 A. I do. At that point, I was not really familiar
6   with him, but yes, that's correct.
7 Q. You testified about seeing him in a fist fight.
8   You remember that, don't you?
9 A. If I did, I did. I don't remember, but I guess
10   I did.
11 Q. Did you talk to the private investigator,
12   DiNatale, about your testimony at the
13   deposition?
14 A. This?
15 Q. Did you talk to Mr. DiNatale when he came to
16   your house about the testimony that you've
17   given at your earlier deposition?
18 A. I think he asked -- I don't think we -- No, we
19   didn't discuss, you know, what was asked and
20   what was answered in the deposition.
21 Q. Did Mr. DiNatale, for example, say to you
22   something like, "You testified at your
23   deposition that Jeff had four beers maybe at
24   the table"?

Page 67

1   MR. GILLIS: Objection.
2 A. No.
3 Q. Let's go back to what I was asking you before.
4   That night at the Longhorn, was Jeff sloppier
5   looking than he usually is?
6 A. Yes.
7 Q. Was he louder than he usually appeared to you?
8 A. Yes.
9 Q. Were his eyes glassy?
10 A. Can I use this answer because I honestly don't
11   remember?
12   MR. GILLIS: That's your answer. He can't
13   use that as his answer. It has to be his
14   memory.
15 Q. Do you have a memory?
16 A. I don't.
17 Q. Do you have a memory of whether or not Jeff's
18   eyes were glassy at all that night?
19 A. I don't.
20 Q. Can you read to yourself page 50, Line 23
21   through page 51, Line 4?
22   (Witness reviews document.)
23 Q. Have you done that?
24 A. Yes.

Page 68

1 Q. Does that refresh your memory about whether or
2   not Jeff's eyes were glassy that night at the
3   restaurant at the time you were asked to quiet
4   down?
5 A. A little bit.
6 Q. What is your memory now of whether or not
7   Jeff's eyes were glassy at the time your table
8   was asked to quiet down?
9   MR. GILLIS: Objection.
10 A. They could have been.
11 Q. They very well could have been?
12   MR. GILLIS: Objection.
13 A. They could have been, but I don't specifically
14   remember. I don't remember looking at him and,
15   you know, looking into his eyes and wondering
16   if they were glassy. As I say, they could have
17   been.
18 Q. They very well could have been?
19   MR. GILLIS: Objection, asked and
20   answered.
21 A. Yes.
22 Q. Do you have any explanation as to why you
23   testified in August of 2004 that his eyes very
24   well could have been glassy?

Page 69

1    MR. GILLIS: Objection. Are you talking
2    about the top of 51? What line are you looking
3    at?
4    MR. FARRAH: You figure it out.
5    MR. GILLIS: What line are you referring
6    to?
7    MR. FARRAH: I'm asking him a question.
8    MR. GILLIS: No, you're not. You're
9    asking him to read something in the book. Are
10    you asking him to read it?
11    MR. FARRAH: I'm asking him if he has an
12    explanation for why he testified that his eyes
13    very well could have been glassy.
14    MR. GILLIS: If you put the book in front
15    of him, I want a page reference so we can put
16    it on the record.
17    MR. FARRAH: He's already testified.
18    A. It's possible that his eyes could have been
19    glassy. That's why.
20    Q. Do you have a memory of it?
21    A. Of seeing his eyes glassy?
22    Q. Yes.
23    A. No.
24    Q. Do you have any explanation for why you

Page 70

1    testified, "They very well could have been
2    glassy"?
3    MR. GILLIS: Objection.
4    A. Other than it's possible, I don't.
5    Q. What is your best memory as you sit here today
6    as to how many Jack Daniels Manhattans that
7    Jeff had at the table?
8    MR. GILLIS: Objection.
9    A. Two.
10    Q. And the basis for that is what?
11    A. I specifically remember a round being ordered,
12    and then I see that some more were ordered, and
13    I don't know whether they were ordered in a
14    round or, you know, a few here and a few there,
15    but it looks like apparently he had another
16    one.
17    Q. That testimony is based on the fact that you
18    have now seen Exhibit 2 to your deposition; is
19    that right?
20    MR. GILLIS: Objection.
21    A. Yes.
22    Q. Before you saw Exhibit 2 to your deposition,
23    you had testified about how many Jack Daniels
24    Manhattans he had had in August of 2004; isn't

Page 71

1    that right?
2    A. Yes.
3    Q. At that time, you said two; is that right?
4    A. Yes.
5    Q. And when you gave the statement to the police
6    on November 2, 2003 which has been marked as
7    Exhibit 3 in your deposition, you had not seen
8    what has been now marked as Exhibit 2, the tab?
9    A. No.
10    Q. And at that time, you wrote that he had had
11    maybe three drinks with Jack Daniels with
12    dinner; is that right?
13    A. Yes.
14    Q. What was the basis for making that statement
15    back in November of 2003?
16    A. Well, the first one would be the round that I
17    specifically remember being ordered.
18    The second one would be when more were
19    ordered and the possibility that he drank
20    another one.
21    Q. Your memory of the events of September 26 was
22    better in November of 2003 than it is today?
23    A. Yes.
24    Q. A lot better?

Page 72

1    A. I'd say so.
2    MR. GILLIS: Objection.
3    Q. Do you remember anybody else drinking beers at
4    the table, besides Jeff?
5    A. I remember Scott having beer.
6    Q. At the table?
7    A. Yes.
8    Q. Ordered from the waitress?
9    A. I don't remember if it was ordered from the
10    waitress or ordered from the bartender.
11    Q. Do you have a memory of Jeff carrying a beer
12    from the bar over to the table?
13    A. Yes.
14    Q. And do you have a memory of Scott carrying a
15    beer over from the bar to the table?
16    A. Well, I remember seeing Jeff bringing his beer
17    over, and I remember them saying something
18    about having the tab brought over to the table.
19    I don't remember seeing Scott carry the
20    beer over to the table as I did Jeff.
21    Q. Then do you remember Jeff ordering beers while
22    he was at the table?
23    A. I don't.
24    Q. Do you remember Jeff ordering chowder while he

| Page 73 | Page 75 |
|---|---|
| 1 was at the table? | 1 to him as Fat Matt. They didn't call him Fat |
| 2 A. I don't. | 2 Matt. |
| 3 Q. How about fingers, whatever they are? Do you | 3 Q. So he asked you how many people were there at |
| 4 remember ordering those at the table? | 4 the table. |
| 5 A. I don't remember any of the specific things or | 5 So does that mean including yourself, |
| 6 who or when they were ordered specifically, | 6 there were seven people at the table? |
| 7 besides the round of Manhattans. | 7 A. That I remember. |
| 8 Q. You remember one round of Manhattans being | 8 Q. You don't remember any other people, do you? |
| 9 ordered? | 9 A. No. |
| 10 A. Yes. | 10 Q. You had two tables pulled together for your |
| 11 Q. You've looked at the check, and do you see that | 11 party; is that right? |
| 12 more than one round of Manhattans is reflected | 12 A. Yes, I believe it was at least two tables. |
| 13 on that check; is that right? | 13 Q. And you were sitting across from Jeff; is that |
| 14 A. Yes. | 14 right? |
| 15 Q. Did you discuss that at all with Mr. DiNatale? | 15 A. Yes. |
| 16 A. Yes. | 16 Q. And you had nothing obstructing your view of |
| 17 Q. What did he say and what did you say about | 17 Jeff; is that right? |
| 18 that? | 18 A. Correct. |
| 19 A. Well, he asked me what I remember being ordered | 19 Q. What I want to know is, where is the first |
| 20 in reference to the Manhattans, and I told him | 20 round of Manhattans that is on Exhibit 2? |
| 21 I remembered the first round of drinks being | 21 Which is the first round of Manhattans that |
| 22 ordered and that I remembered more being | 22 you're referring to? |
| 23 ordered, but I don't know whether they were in | 23 A. It has to be this one. |
| 24 a round or individuals ordered them or, you | 24 Q. Okay, and you're pointing to the 8:51 round; is |

| Page 74 | Page 76 |
|---|---|
| 1 know, this side of the table said we'll take | 1 that right? |
| 2 another round or how it exactly came about. | 2 A. Yes. I see there are some ordered before that. |
| 3 Q. What did he say? | 3 I mean, I must be wrong in saying the first |
| 4 A. Well, he pointed out that the first one looked | 4 time it was ordered it was not a full round. |
| 5 like it was a round ordered, and he said that | 5 That's what I remembered. |
| 6 there were more ordered and that it looked | 6 Q. I want to know what you remember talking to |
| 7 like, you know, if going with the round that | 7 Mr. DiNatale about as it relates to the |
| 8 was first ordered that each person would have | 8 Manhattans, the rounds of Manhattans that were |
| 9 had another one. | 9 ordered. |
| 10 Q. So did he say anything else about the Jack | 10 A. I remember telling him that a round was |
| 11 Daniels that were ordered? | 11 ordered, and then there were more ordered, and |
| 12 A. I remember him asking me how many people I | 12 they went around to the different people that |
| 13 specifically remembered being there with | 13 were at the table, and he, once again, asked me |
| 14 reference to how many drinks were ordered. | 14 who I remembered at the table, and then he, you |
| 15 Q. What did you tell him? | 15 know, kind of did like some calculation and |
| 16 A. I told him that I remembered besides myself, I | 16 added up all the Jack Daniels that were |
| 17 remembered Scott Espy, Jeff Southworth, Michael | 17 ordered, which I cannot remember how many there |
| 18 Espy, Todd Perry, and then two other people | 18 were, and he asked me what -- No, I don't |
| 19 whom I didn't know. | 19 remember what he asked me. |
| 20 I believe I referred to them as one was a | 20 He just made reference to, you know, there |
| 21 snowmobiler and one I remember them calling him | 21 were seven people that I remembered being |
| 22 Fat Matt. | 22 there, and then there were this many Jack |
| 23 Q. Who called him Fat Matt? | 23 Daniels ordered. |
| 24 A. Everyone. I didn't call him -- They referred | 24 Q. After he had calculated the number of people at |

| | Page 77 |
|---|---|
| 1 | the table and the number of Jack Daniels that |
| 2 | were ordered, did he do anything with those |
| 3 | calculations? |
| 4 | A. Well, he asked me if I remembered them being |
| 5 | rounds and I said yes. |
| 6 | Q. What did you say? |
| 7 | A. He asked me how I remembered them being ordered |
| 8 | and I told him, you know, rounds, and then he |
| 9 | told me, "All right. So there's this many |
| 10 | people at the table and a round is ordered and |
| 11 | then another round is ordered," and then I |
| 12 | believe there were I'm not sure how many. |
| 13 | I don't remember the number, but I don't |
| 14 | believe that accounted for all of them. |
| 15 | Q. So did he interpret that for you at all? |
| 16 | MR. GILLIS: Objection. |
| 17 | A. No, not that I remember. |
| 18 | Q. I'm going to represent to you that there were |
| 19 | seventeen Jack Daniels drinks ordered. |
| 20 | Does that sound like the number that |
| 21 | Mr. DiNatale shared with you? |
| 22 | A. Yes. |
| 23 | Q. There were six people, according to your |
| 24 | testimony, who were of drinking age -- |

| | Page 78 |
|---|---|
| 1 | A. Okay. |
| 2 | Q. -- at table that night. Does that sound like |
| 3 | what you and Mr. DiNatale talked about? |
| 4 | A. Yes. |
| 5 | Q. Did he talk at all about the relationship |
| 6 | between seventeen Jack Daniels Manhattans and |
| 7 | six people of drinking age at the table? |
| 8 | A. Well, I believe that he told me that if what I |
| 9 | remember was being ordered as rounds, then |
| 10 | there were unaccounted-for drinks. |
| 11 | Q. Unaccounted-for drinks? |
| 12 | A. Yes. |
| 13 | Q. What did he mean by that? |
| 14 | MR. GILLIS: Objection. |
| 15 | A. Drinks that I said I remembered a round being |
| 16 | ordered and then more rounds and I guess |
| 17 | another round was ordered, and I didn't |
| 18 | specifically say another round being ordered, |
| 19 | but there were more drinks ordered to the |
| | ... |
| | ...ted that out to you? |
| | ...lid he say about that? |
| | ... remember. I mean, I don't remember |

| | Page 79 |
|---|---|
| 1 | exactly what he said. |
| 2 | He said that there were -- I believe he |
| 3 | asked me who had them, and I told him that I |
| 4 | didn't remember. |
| 5 | Q. But you know you didn't have any; is that |
| 6 | right? |
| 7 | A. Yes. |
| 8 | Q. Okay, and Scott, Jeff and you were seated |
| 9 | before the others arrived; is that right? |
| 10 | A. No. |
| 11 | Q. Just before the others arrived? |
| 12 | A. We were seated -- Well, I honestly don't |
| 13 | remember at this point. I remember them coming |
| 14 | in the door. |
| 15 | I don't remember whether we sat down right |
| 16 | before them or if we all sat down right |
| 17 | together. |
| 18 | Q. And do you remember the first order of Jack |
| 19 | Daniels, that is, how many were ordered? |
| 20 | A. I remember a round being ordered. |
| 21 | Q. Who ordered it? |
| 22 | A. I think Jeff did. |
| 23 | Q. You'd seen Jeff drink Jack Daniels Manhattans |
| 24 | before? |

| | Page 80 |
|---|---|
| 1 | MR. GILLIS: Objection. |
| 2 | A. No. |
| 3 | Q. How are the Jack Daniels Manhattans served -- |
| 4 | on the rocks or straight up? |
| 5 | A. I don't know. |
| 6 | Q. Do you know the difference? |
| 7 | A. Yes; one has ice and one doesn't. |
| 8 | Q. So it's your best memory that Jeff ordered the |
| 9 | first round of Jack Daniels Manhattans? |
| 10 | A. Yes. |
| 11 | Q. At the time he ordered those Jack Daniels |
| 12 | Manhattans, did he also order a beer? |
| 13 | MR. GILLIS: Objection. |
| 14 | A. I can't say for sure. |
| 15 | Q. Can you describe the waitress? |
| 16 | A. I remember her being a woman, and I remember |
| 17 | her having blonde hair. |
| 18 | Q. Tall? Short? |
| 19 | A. I don't know. |
| 20 | Q. Older or younger than the barmaid? |
| 21 | A. Well, I don't really remember the bartender |
| 22 | that well. So I don't really know how to base |
| 23 | an answer on that. |
| 24 | I remember her being like maybe in her |

Page 81

1    mid-twenties.
2    Q. Who are we talking about?
3    A. The waitress.
4    Q. Do you remember the age of the barmaid?
5    A. No.
6    Q. Do you have any memory of the age of the
7       barmaid?
8         MR. GILLIS: Objection.
9    A. No.
10   Q. Is your memory exhausted as to the age of the
11      barmaid?
12   A. Yes.
13   Q. Can you turn to page 35, please, the bottom.
14      Just read 18 to 24 to yourself.
15         (Witness reviews document.)
16   A. Okay.
17   Q. Does reading that refresh your memory as to how
18      old the barmaid was?
19   A. Not specifically.
20   Q. Do you have any reason to doubt that your
21      testimony back in August about her age was
22      accurate?
23         MR. GILLIS: Objection.
24   Q. August of 2004.

Page 82

1         MR. GILLIS: Objection.
2    A. I'm sure whatever I said here is what I
3       remembered. I don't remember it now.
4    Q. When you say "here," you mean in your
5       deposition of August of 2004?
6    A. Correct.
7    Q. And do you remember anyone at the table after
8       Jeff ordered the first round of Jack Daniels
9       Manhattans, do you remember anyone at the table
10      saying anything about the delay in receiving
11      the drinks?
12   A. No.
13   Q. And how long after you had sat at the table was
14      it that the first round was ordered by Jeff?
15   A. I don't know.
16   Q. And do you have a memory as you sit here today
17      that a second round of Jack Daniels Manhattans
18      was ordered?
19   A. Yes.
20   Q. By Jeff?
21   A. I can't say that for sure.
22   Q. Who do you remember ordered the second round?
23         MR. GILLIS: Objection.
24   A. I don't recall who specifically ordered it.

Page 83

1    Q. What was the basis for your memory that a
2       second round of Jack Daniels was ordered?
3    A. Well, I remember more Jack Daniels at the
4       table, and this exhibit shows that there were
5       more.
6    Q. Exhibit 2?
7    A. Yes.
8    Q. Do you have a memory that a third round of Jack
9       Daniels Manhattans was ordered?
10   A. No.
11   Q. Do you have a memory that there was a third
12      instance where Jack Daniels Manhattans were
13      ordered?
14         MR. GILLIS: Objection.
15   A. I do not remember. It is apparent that there
16      was. I just don't specifically remember.
17   Q. Do you remember talking to Mr. DiNatale about
18      that?
19   A. A third?
20   Q. Yes, a third round of Jack Daniels Manhattans
21      being ordered.
22   A. I don't remember him saying anything about a
23      third round. I remember him talking about --
24      as I referred to before -- the unaccounted-for

Page 84

1    drinks.
2    Q. When the check came to the table, did it come
3       to Jeff?
4    A. I don't know. It was put on the table.
5    Q. Jeff paid for you that night; is that right?
6    A. Correct.
7    Q. When the person came over and told the table to
8       quiet down, what is your best memory of who
9       that person was, what that person looked like?
10         MR. GILLIS: Objection.
11   A. I don't really remember. I just remember
12      someone came over and asked the table to, you
13      know, be a little bit quieter.
14   Q. A man? A woman?
15   A. I don't remember specifically. I'm not
16      supposed to guess.
17   Q. Is that because Mr. Gillis tells you not to
18      guess?
19   A. No. I don't think that I should guess.
20   Q. Mr. DiNatale told you not to guess, right?
21   A. He did tell me not to guess, but if I don't
22      know the truth, not to come up with one.
23   Q. What do you remember whoever the person was
24      that came over to the table saying about

Page 85

1  quieting down?
2      MR. GILLIS: Objection.
3  A. I just remember them asking us to tone it down
4     a little bit.
5  Q. Do you remember to whom at the table that
6     person spoke or with whom at the table that
7     person spoke?
8  A. As far as I remember, it was speaking to the
9     whole table.
10 Q. You could hear that person?
11 A. Yes.
12 Q. How far away were you from the other end the
13    table, the furthest end away from you?
14 A. Well, the way I remember it --
15 Q. Let's look at Exhibit 1, if that helps you.
16 A. Could I use the pen for a minute?
17 Q. If you're going to write on something, why
18    don't you --
19 A. I can explain it, but it would be a lot easier.
20 Q. Here's a blank one for you.
21 A. This section right here is where we sat. There
22    weren't four tables there.
23     What I remember is, if you just imagine,
24    this is the table that everyone sat at, whether

Page 86

1  it be one, two or three or how many tables.
2      I remember Scott sitting on the end and
3  Jeff sitting here and I was sitting here. I
4  don't specifically remember what the order of
5  the other people was.
6      So I believe that there would be two more
7  people, and then at the end of the table
8  someone else would be right there on the other
9  end. So I would be two seats away.
10 Q. Do you remember anyone seated to your right?
11 A. Besides Scott, no.
12 Q. Well, am I wrong that this is you right here?
13 A. No. That's Jeff. I'm facing this way.
14 Q. Do you remember anyone seated to your left?
15 A. Yes.
16 Q. Who?
17 A. I don't know who.
18 Q. You were not drinking any alcoholic beverages
19    that night, were you?
20 A. No.
21 Q. Do you have any explanation for who drank the
22    seven Jack Daniels Manhattans that were
23    ordered, according to Exhibit 2, at 8:51 p.m.?
24 A. Well, that was the round. I honestly don't

Page 87

1  know exactly how it happened, but I remember,
2  you know, whoever ordered the first round,
3  which I believe was Jeff, ordered a round, and
4  the waitress came over and put them down, and
5  you know, then they were drinking.
6      I guess if she ordered seven, then she
7  counted the number of people that were at the
8  table and brought over seven. That would be my
9  accounting for those.
10 Q. You remember Jeff saying words to the effect
11    "Bring us a round of Jack Daniels Manhattans"?
12 A. Yes.
13 Q. And do you remember Jeff at that time ordering
14    for you something to drink?
15 A. I think I already had a drink at that point.
16 Q. From the bar?
17 A. Yes, I guess. Well, I can't say that, sorry.
18 Q. So my question is, do you remember Jeff
19    ordering a drink for you?
20     MR. GILLIS: Objection.
21 Q. By "a drink," I don't mean an alcoholic
22    beverage. I mean something to drink.
23 A. No. I'm pretty sure she asked me what I wanted
24    and I ordered it.

Page 88

1  Q. The waitress?
2  A. Yes.
3  Q. Now, when the first round came, was there some
4     discussion about that there was an extra drink
5     there?
6  A. I don't remember any discussion. I suppose
7     since there was an extra drink that -- I don't
8     remember anything.
9  Q. Do you know who drank the extra drink?
10     MR. GILLIS: Objection.
11 A. No.
12 Q. Did Mr. DiNatale tell you that Table 52
13    reflected the table that you were at that
14    night?
15 A. Yes.
16 Q. He told you that; is that right?
17 A. Yes. He also said this, which I don't think I
18    mentioned before.
19     He asked me when he was speaking to me
20    about the unaccounted-for drinks. He asked me
21    if I remembered an eighth person, which I told
22    him I didn't remember an eighth person. Those
23    were the people that I remembered.
24 Q. Did he tell you that there was an eighth person

**Page 89**

1    at the table?

2  A. He didn't tell me that there was an eighth

3    person at the table.

4  Q. Did he suggest that there was an eighth person

5    at the table?

6       MR. GILLIS: Objection.

7  A. Well, what he did is he did the same thing as

8    he did with the seven people at the table with

9    eight people at the table, leaving less

10    unaccounted-for drinks.

11  Q. Try to tell me what you remember him saying

12    about doing the same thing with eight people at

13    the table as he had done with seven people at

14    the table.

15  A. If there were seventeen drinks and there were

16    six other people and me, if there were seven

17    people that would be one round would be six,

18    second round would be twelve, leaving five

19    unaccounted-for drinks.

20  Q. That's what he called them?

21  A. I don't know what he called them. That's what

22    I'm calling them.

23  Q. What did he call them?

24  A. I don't remember.

**Page 90**

1  Q. What did he say about the five what you've

2    called unaccounted-for drinks?

3  A. I don't know. I just remember him asking me if

4    there was a possibility that there was another

5    person, and then him doing the same

6    calculation.

7       So there would be seven other people than

8    me, so the first round seven, second round

9    fourteen, leaving three unaccounted-for drinks,

10    as what I'm calling them.

11  Q. But he went through that calculation with you?

12  A. I don't know if he went through that

13    calculation. He said there would be less other

14    drinks -- less drinks that I'm calling

15    unaccounted-for.

16  Q. Did you discuss with Mr. DiNatale the 8:40

17    order?

18  A. I believe so.

19  Q. What did he say about the 8:40 order?

20  A. He may have said something else, but what I

    remember is he was just counting them up,

    ling all the other ones.

      8:40 order reflects a beer as well as

    hattans; isn't that right?

**Page 91**

1  A. Yes.

2  Q. Did you discuss that with him?

3  A. Other than him counting it up and asking me how

4    many beers I thought were drinking throughout

5    the evening, no.

6  Q. Did Mr. DiNatale discuss with you at all how a

7    check is generated at the Longhorn Steakhouse?

8  A. Yes. He said that they have to enter it -- the

9    waitress, that is. Each waitress, dealing with

10    each table, has to log it into a computer.

11  Q. So he explained that to you; is that right?

12  A. Yes.

13  Q. What else did he tell you about how the check

14    is generated?

15  A. That's all I remember him telling me. He said

16    the last one out reflects everything, but I

17    don't remember anything else.

18  Q. And do you have a memory that Jeff ordered at

19    the bar chowder?

20  A. No.

21  Q. Fingers?

22  A. No.

23  Q. Any food at the bar at all?

24  A. No.

**Page 92**

1  Q. At any time that night while you were at the

2    restaurant, did anyone get up and leave the

3    table?

4  A. Yes; specifically, Jeff.

5  Q. When did he get up and leave the table?

6  A. It was some point after we had been served our

7    dinner.

8  Q. And where did he go?

9  A. He went to the bathroom.

10  Q. And how do you know that?

11  A. Well, our location where our table was was

12    relatively close to the bathroom, and I saw him

13    walk over and use the bathroom.

14  Q. And did you see him come back to the table?

15  A. Yes.

16  Q. Did anybody else get up at any point in time

17    and leave the table that you recall?

18  A. Not specifically. I'm sure if someone had to

19    go and get up and use the restroom they did,

20    but I remember Jeff doing that and not anyone

21    else.

22  Q. What did you have to eat that night?

23  A. I'm pretty sure that I had ribs.

24  Q. Anything else?

**Page 93**

1 A. No.
2 Q. Did you all order food at the same time,
3    everybody at your able?
4 A. I'm pretty sure.
5 Q. Did you have any discussions with Mr. DiNatale
6    about how many meals were ordered by this
7    table?
8 A. No.
9 Q. Have you looked at Exhibit 2 to see how many
10    meals were ordered by this table?
11 A. No.
12 Q. Did everybody eat? As far as you know, did
13    everybody order a meal?
14 A. I believe so.
15 Q. Now, do you remember Jeff, while you were
16    sitting at the table, ordering a beer?
17 A. I don't specifically remember him ordering a
18    beer at the table.
19 Q. But you remember him drinking a beer at the
20    table; is that right?
21 A. Yes.
22 Q. Do you remember him drinking more than one beer
23    at the table?
24      MR. GILLIS: Objection.

**Page 94**

1 A. I cannot say that for sure.
2 Q. You have no memory today; is that right?
3 A. Right.
4 Q. You had a memory in the past but not today?
5      MR. GILLIS: Objection.
6 A. Yes.
7 Q. Now, did Mr. DiNatale and you discuss, when you
8    were reviewing Exhibit 2, that it seems to
9    reflect that at 9:21 p.m. four Jack Daniels
10    Manhattans were ordered?
11 A. Okay.
12 Q. Did you discuss that?
13 A. I believe so.
14 Q. Is that right, did you?
15 A. Yes.
16 Q. What did he say and what did you say about
17    that?
18 A. Well, when I mean discuss it, we didn't discuss
19    this order in particular. We discussed all of
20    them together.
21 Q. My question to you is, can we agree, I guess
22    initially, that Exhibit 2 shows that at 9:21
23    four Jack Daniels were ordered by the table?
24 A. Yes.

**Page 95**

1 Q. Did you discuss that with him?
2 A. Yes.
3 Q. Here's four that were ordered?
4      MR. GILLIS: Are you asking did he discuss
5    that specific round?
6      MR. FARRAH: That's right, that specific
7    round, 9:21.
8 A. He made reference to that login saying four
9    rounds were ordered, but we never discussed
10    each of these.
11      Then this next one there was 9:24, that
12    one and then the next or whatever happened
13    about that. We didn't discuss each of them.
14    We discussed all of them.
15      He went through and he said this one at
16    this time these were ordered, and at this time
17    these were ordered and at this time these were
18    ordered.
19 Q. He's telling you this; is that right?
20      MR. GILLIS: Objection.
21 A. Yes.
22 Q. What is he saying about it, besides telling you
23    this?
24 A. He was just using those as evidence for how

**Page 96**

1    many Manhattans were ordered to the table,
2    trying to come up with, you know, how many
3    drinks were drinking by each person.
4 Q. Did he ever say words to the effect, "If you
5    divide seventeen by six you get almost three"?
6      MR. GILLIS: Objection.
7 A. No.
8 Q. What did he say about trying to figure out how
9    many drinks were drunk by each person?
10 A. I think he was trying to account for which
11    drinks were drinking by which people and how
12    many drinks each person had, but I don't
13    remember who had what drink and how many each
14    person had.
15 Q. Do you remember anyone at the table appearing
16    drunk to you that night?
17      MR. GILLIS: Objection.
18 A. No.
19 Q. How about the Espy who was not there with you
20    that night? Did he appear under the influence
21    to you?
22 A. Not particularly.
23 Q. Have you ever spoken with him since this
24    incident?

Page 97

1    A. You mean since that night?
2    Q. Since that night.
3    A. Yes.
4        MR. GILLIS: The Espy?
5    Q. The Espy that was not dirt biking with you.
6    A. Yes.
7    Q. Did you learn from speaking with him that he
8        had been drinking beers in the hotel room with
9        his two other friends that afternoon?
10       MR. GILLIS: Objection.
11   Q. After September 26 did you learn?
12   A. After the restaurant when we left the
13       restaurant?
14   Q. No. In your conversations with Mike Espy after
15       September 26, 2003, did he ever tell you that
16       he had been drinking beers that afternoon,
17       September 26, 2003, before going to the
18       restaurant with two of his friends?
19   A. Before the restaurant?
20   Q. Yes.
21   A. No.
22   Q. He didn't tell you that?
23   A. No.
24   Q. Did he tell you what he had been doing that

Page 98

1        afternoon before he came to the restaurant?
2    A. I mean, when you said I've spoken with him,
3        I've spoken to him because my brother is
4        friends with him.
5        He's a little bit closer in age to some of
6        these kids, and he every once in a while will
7        hang out with them.
8        I actually play on an indoor soccer team
9        with Scott, and his brother will come every
10       once in a while and I'll speak to him, but we
11       never discussed that night.
12   Q. Who have you discussed that night with?
13   A. Other than you and people that I have been
14       deposed to talk to or the grand jury or
15       Mr. DiNatale or the state police or anyone else
16       that had me come in and talk to them.
17   Q. You have not spoken to Mr. Gillis prior to
18       today, have you?
19   A. No.
20   Q. How about anyone from his office? Have you
21       spoken to anyone from his office prior to
22       today?
23   A. No.
24   Q. Are you sure?

Page 99

1    A. Well, I don't know. I mean --
2    Q. Have you spoken to anybody, other than
3        Mr. DiNatale?
4    A. I know what you're talking about. I spoke
5        to -- I just didn't think he was in the same
6        office.
7        I spoke to Mr. Parkinson. I thought he
8        was in a different office.
9        MR. GILLIS: Let's put on the record
10       there's no one named Parkinson in my office.
11   Q. When did you speak to Mr. Parkinson?
12   A. It was sometime during last semester.
13   Q. Last semester being the semester that ended
14       when?
15   A. About December 21.
16   Q. Of 2005?
17   A. Yes.
18   Q. And your best memory of when it is that you
19       spoke to Mr. DiNatale is when?
20   A. It was over break.
21   Q. Is that after December 21, 2005?
22   A. Yes.
23   Q. When is your best memory?
24   A. Let me think for a minute. I went on vacation.

Page 100

1        I had to reschedule this because I was going on
2        vacation just after New Year's, and I remember
3        speaking to him like on the phone.
4        He was saying that I want to meet with
5        you, and then I went on vacation and it was
6        probably two weeks after that, I want to say.
7    Q. When did you come back from vacation?
8    A. I came back, I think like -- Does anyone have a
9        calendar?
10   Q. Give me your best estimate.
11   A. It was probably the eighth of January.
12   Q. And approximately two weeks after that you
13       spoke to Mr. DiNatale; is that right?
14       MR. GILLIS: Objection.
15   A. Yes. So I guess I said it was a month ago, but
16       I guess it was not a month ago.
17   Q. Mr. Parkinson is someone you spoke to before
18       the end of the semester; is that right?
19   A. Correct.
20   Q. The semester ended December 21. What is your
21       best memory of when you spoke to Mr. Parkinson?
22   A. I can't say for sure. I know I met with him
23       two different times, and the first time he
24       asked me some questions about that night, and

|  | Page 101 |
|---|---|
| 1 | he came up with an affidavit, something similar |
| 2 | to this, and then he sent it to me, and he |
| 3 | wanted me to return it, but then he called me |
| 4 | and said, "I'll just meet you again to get it |
| 5 | from you," so he could see me sign so I don't |
| 6 | have to go to the notary. |
| 7 | So then I met with him again, and then he |
| 8 | had to make like a new one or he had to change |
| 9 | something. |
| 10 | I remember what it was. He said we were |
| 11 | dirt biking in Leominster, and I wanted him to |
| 12 | change it to Templeton, and I had to go to the |
| 13 | notary and send it to him. |
| 14 | Q. And who did you understand Mr. Parkinson was |
| 15 | working for? |
| 16 | A. He said that he was representing Rare |
| 17 | Hospitality. |
| 18 | Q. What is your best memory of when you met with |
| 19 | Mr. Parkinson? |
| 20 | A. Maybe mid November, early November. |
| 21 | Q. And where did you meet with him? |
| 22 | A. In Leominster at the restaurant Panera Bread. |
| 23 | Q. P-a-n-e-r-a? |
| 24 | A. Yes. |

|  | Page 102 |
|---|---|
| 1 | Q. And who else was there? |
| 2 | A. It was just me and Mr. Parkinson. |
| 3 | Q. How old is Mr. Parkinson? |
| 4 | A. I don't know. |
| 5 | Q. Did he give you a card? |
| 6 | A. No. He wrote down a cellphone number, and he |
| 7 | didn't give me a card. |
| 8 | Q. Do you still have that information? |
| 9 | A. No. |
| 10 | Q. You threw it away? |
| 11 | A. I just lost track of it. |
| 12 | Q. How long were you with him that first time? |
| 13 | A. Well, we met over lunch, so maybe thirty-five |
| 14 | minutes or so. |
| 15 | Q. He paid for lunch? |
| 16 | A. Yes, he did. |
| 17 | Q. And he was taking notes of your conversation? |
| 18 | A. He was. |
| 19 | Q. What was he talking to you about? |
| 20 | A. Well, he just sort of wanted me to run through |
| 21 | the events as I remembered them. |
| 22 | Q. Did he refer to your testimony in the grand |
| 23 | jury at all? |
| 24 | A. I don't remember him referring to -- I remember |

|  | Page 103 |
|---|---|
| 1 | him just sort of having a notepad, and I went |
| 2 | through the events of the night, and I'm pretty |
| 3 | sure that is all we did. |
| 4 | Q. Do you remember him referring to your |
| 5 | deposition testimony at all? |
| 6 | A. No. |
| 7 | Q. Do you remember him referring to the statement |
| 8 | you gave the police which has been marked as an |
| 9 | exhibit in your deposition today, Exhibit 3? |
| 10 | A. I kind of remember him mentioning that. We |
| 11 | didn't discuss it, but I remember him |
| 12 | mentioning that I had made a statement to the |
| 13 | state police. |
| 14 | Q. Do you remember him mentioning the affidavit |
| 15 | that you made in the other case which has been |
| 16 | marked as Exhibit 4 today? |
| 17 | A. Well, I remember him saying that or him asking |
| 18 | me who I have spoken with or who have I been |
| 19 | deposed by, and I told him I came in here once |
| 20 | and that I had done the grand jury thing. |
| 21 | Q. Did he say whether or not he knew you had been |
| 22 | deposed before? |
| 23 | A. No. |
| 24 | Q. Did he seem surprised when you told him you had |

|  | Page 104 |
|---|---|
| 1 | come in here and been deposed? |
| 2 | A. No. |
| 3 | Q. Did he seem surprised when you told him that |
| 4 | you had done the grand jury thing? |
| 5 | A. No. |
| 6 | Q. And you were with him thirty-five minutes or |
| 7 | so; is that right? |
| 8 | A. Around then. |
| 9 | Q. Tell me what you remember him saying and what |
| 10 | you remember yourself saying during that |
| 11 | meeting. |
| 12 | A. Well, I remember we kind of introduced |
| 13 | ourselves. We didn't know each other, and he |
| 14 | asked me a similar scenario to when I meet with |
| 15 | people I don't know. They ask me if I'm in |
| 16 | school, what I'm studying, what kind of things |
| 17 | I like to do. |
| 18 | He mentioned that he just moved up here |
| 19 | with I don't know whether it was his wife or |
| 20 | fiancee, and I asked him if he had been skiing |
| 21 | and such and he said a little bit, and he asked |
| 22 | me where any good places were. |
| 23 | Q. To do what? |
| 24 | A. To go skiing, and I mentioned a few places that |

Page 105

1    I liked, and then he, you know, he told me that
2    he wanted me to run through the course of the
3    evening as I remembered it.
4  Q. So what did you do?
5  A. I basically just told him what I remembered,
6    starting from when I went to the dirt bike
7    track until Scott dropped me off.
8  Q. And what did he say during that?
9  A. He didn't really say much. He just let me
10    talk.
11  Q. Just took notes?
12  A. Yes.
13  Q. Didn't ask you any questions?
14  A. He may have. I don't remember him specifically
15    asking any questions.
16  Q. You just talked?
17  A. Yes.
18  Q. He said, "What happened? Tell me what
19    happened"?
20  A. Yes. I remember him saying that he wanted to
21    hear the whole story from me as I remember it.
22    So he just let me go through the events.
23  Q. And did he stop you at any point to ask you
24    questions, like how much did Jeff have to

Page 106

1    drink?
2  A. Yes, he did. Well, I don't know if he asked me
3    that question.
4    I remember him stopping and asking me
5    like, you know, you're going to be asked when
6    you go into your deposition how many drinks
7    Jeff had and such, when I got to that point in
8    the narrative.
9  Q. He told you that you would be asked that during
10    the deposition; is that right?
11  A. Yes.
12  Q. And what did he say about that?
13  A. He told me that what I remembered is what I
14    needed to tell.
15  Q. Now, did you tell him at that point that you
16    had already been deposed and told what you
17    remembered back in August of 2004?
18    MR. GILLIS: Objection.
19  A. I don't think so. I don't think I made
20    reference to that.
21    I think I might have said, "Well, I have
22    already been deposed." I honestly don't know.
23    I never told him that "I said this"
24    because I didn't remember.

Page 107

1  Q. So when he told you that you were going to be
2    asked when you go into the deposition how much
3    Jeff had to drink, did he say anything else
4    about that?
5  A. I believe he asked me if I remembered any, you
6    know, noticeable signs of him being drunk or --
7  Q. "Noticeable signs"? Is that what he said?
8  A. I don't know how he stated it.
9  Q. What did you say?
10  A. I believe I told him that I didn't see any
11    clear signs of him being drunk.
12  Q. What else did he say about that?
13  A. Well, I don't know. I don't remember. I
14    remember that.
15  Q. What else do you remember him saying that day?
16  A. I remember him saying that I, being the one
17    that had not been drinking that night, was kind
18    of a big factor in what, I guess, the final
19    decision, how the case plays out.
20  Q. He told you that?
21  A. Yes. One thing I remember specifically about
22    when I met with John DiNatale, I remember him
23    specifically mentioning these words.
24    He said, "Tell the truth and let the cards

Page 108

1    fall where they will."
2  Q. Did you need DiNatale to tell you to tell the
3    truth?
4    MR. GILLIS: Objection.
5  A. No.
6  Q. Tell me what else Mr. Parkinson -- By the way,
7    I asked you how old he was. He never gave you
8    a card?
9  A. No, he didn't.
10  Q. Never told you where he worked?
11  A. Well, he told me that he had just moved up
12    here, and he said where he was living, but I
13    don't remember.
14    He said he was working in Boston or
15    Cambridge or somewhere.
16  Q. Working for Rare or representing Rare?
17  A. Yes.
18  Q. Did he tell you that he was a lawyer?
19  A. Yes, an attorney or lawyer. He said he was
20    representing Rare Hospitality.
21  Q. Your best memory is that this conversation
22    occurred in November?
23  A. Yes.
24  Q. And what else did you say to him or he say to

Page 109

1  you during that Panera Bread meeting?
2  A. Well, he wanted to make sure that after I had
3  gone through my narrative that he asked me if
4  that's how I remember it and if there's
5  anything else I remembered.
6      He wanted to make sure that I had told the
7  story as I remembered it, and that was pretty
8  much it.
9  Q. Then he met with you a second time; is that
10  right?
11  A. He did.
12  Q. And how long after the first visit was it that
13  you met with Mr. Parkinson again?
14  A. Maybe like two weeks.
15  Q. Where was that meeting?
16  A. It was the same place.
17  Q. Lunch again?
18  A. Yes.
19  Q. Mr. Parkinson paid again?
20  A. Correct.
21  Q. And did he have a document for you at that
22  time?
23  A. He had talked to me on the phone, and I told
24  him that I wanted to make some changes, and

Page 110

1  then he brought the document down so that I
2  could make the changes and tell him what I
3  wanted to change.
4  Q. So am I correct that in between the first
5  meeting at Panera Bread and the second meeting,
6  he sent you a document somehow?
7  A. No. If I said that, that's incorrect. He sent
8  it after the second meeting.
9  Q. There was a second meeting with him?
10  A. Yes.
11  Q. At the second meeting, did he have a document
12  with him?
13  A. Yes.
14  Q. Did you read the document at the second
15  meeting?
16  A. Yes.
17  Q. There were things in it that were not right?
18  A. Yes. As I told you before, he made the
19  mistake. It's not essential, but I wanted it
20  to be right.
21      He said we were dirt biking in the
22  Leominster area, and I said well, it was
23  technically in Templeton.
24      So he said he wanted to make sure it was

Page 111

1  all correct. He wanted to have it done.
2  Q. Were there any other changes he wanted made in
3  that document?
4  A. No.
5  Q. Did the document speak to how much Jeff had to
6  drink that night?
7  A. Yes.
8  Q. And did the document speak to how much he had
9  at the bar?
10  A. Yes. I think it more generally spoke about
11  everything he had to drink as opposed to what
12  he drank here and at the table.
13  Q. At the second meeting with Mr. Parkinson, did
14  you discuss with him that you had already given
15  statements, either in writing or under oath,
16  before the grand jury or at a deposition about
17  how much Jeff had to drink?
18  A. What do you mean by "discussing"?
19  Q. Well, was there any discussion about whether or
20  not the document that Mr. Parkinson wanted you
21  to sign was going to align with the statements
22  you had given earlier both in the grand jury
23  and at deposition under oath and the written
24  statements?

Page 112

1  A. When I ran through the narrative, I'm pretty
2  sure I remember him saying, "Well, you know
3  what you said here is along the lines of what
4  has been said in the grand jury and what other
5  people have said." It was something along the
6  lines of that.
7  Q. Well, were you concerned at all with respect to
8  the Parkinson document about whether or not
9  what you were saying in the Parkinson document
10  was going to align with what you had testified
11  to at your deposition back in August?
12  A. Well, I didn't really remember what I had said
13  in the deposition. So I could not really make
14  a judgment on if there were going to be
15  differences.
16      I just assumed that there was going to be
17  what I thought happened.
18      MR. FARRAH: Why don't we take a break?
19      (Luncheon recess.)
20
21
22
23
24

Page 113

1          AFTERNOON SESSION
2
3   Q. So you had a second meeting with Mr. Parkerson;
4      is that correct?
5   A. Yes.
6   Q. And he presented you with a document to sign at
7      that meeting?
8   A. Yes, he did.
9   Q. You didn't like some of the things that were in
10     it; is that right?
11  A. Yes.
12  Q. So what did you do after that with respect to
13     Mr. Parkerson?
14  A. He went back to his office, and I'm not sure
15     what the time frame was, and he came up with a
16     new one and sent it to me, and I had to bring
17     it to the notary, sign it, and send it back to
18     him.
19  Q. Did you do that?
20  A. Yes.
21  Q. Did you keep a copy of that document?
22  A. No, I don't think so.
23  Q. And did you ever hear from Mr. Parkerson again?
24  A. No.

Page 114

1   Q. Now, do you remember testifying before the
2      grand jury?
3   A. Yes, I do.
4   Q. Do you remember being asked the question, "When
5      you were seated once your table was available,
6      do you know if you checked out at the bar, or
7      did the tab move to the table?"
8         Do you remember being asked that question?
9         MR. GILLIS: What page are you reading
10        from?
11        MR. FARRAH: 17.
12  A. I don't know.
13  Q. Do you remember your answer? Can you read it
14     into the record?
15  A. "I'm pretty sure we checked out at the bar."
16  Q. And do you have any explanation as to why your
17     testimony is now different from what you
18     testified to the grand jury on the question of
19     whether or not the bar tab went to the table?
20        MR. GILLIS: Objection.
21  A. No.
22  Q. Do you remember being asked the question before
23     the grand jury, "What do you believe Jeffrey
24     Southworth had to drink at the table that

Page 115

1      night?"
2         MR. GILLIS: Page, please?
3         MR. FARRAH: 19.
4   Q. Do you see that question?
5   A. Yes.
6   Q. Do you remember your answer? Can you read it
7      for the record?
8   A. "I would say that he probably, that he had
9      probably two to three beers and a couple of
10     Manhattans. I would say he had two beers,
11     maybe three. I can't specifically recall."
12  Q. Let's try that one more time. Could you read
13     it again?
14  A. "I would say he had probably two to three beers
15     and a couple of Manhattans. I would say he had
16     two, maybe three. I can't specifically
17     recall."
18  Q. And when you were saying "two, maybe three,"
19     were you referring to Manhattans in your grand
20     jury testimony?
21  A. I don't know.
22  Q. Do you have any explanation as to why your
23     testimony today with respect to how many beers
24     he drank at the table that night is different

Page 116

1      from what you testified to before the grand
2      jury?
3         MR. GILLIS: Objection.
4   A. The bill.
5   Q. Seeing the bill with Mr. DiNatale?
6   A. Just seeing the bill, I mean, shows that there
7      are two.
8   Q. Two beers that were served at the table?
9   A. Yes.
10  Q. One at 8:40 and the other one at 9:15?
11  A. Correct.
12  Q. What is it about those two beers that were
13     served at the table that is inconsistent with
14     your testimony before the grand jury that Jeff
15     probably had two to three beers with dinner at
16     the table?
17  A. Well, I said that there were two to three beers
18     drinking at the table, and there were only two
19     beers ordered to the table.
20        So I know that the three is out of the
21     question, and I believe that Scott was drinking
22     beer at the table as well.
23        So I can't say for sure, but I presume
24     that one of the beers ordered at the table in

Page 117

1    Exhibit 2 went to him but I didn't log it in.
2    I can't say for sure.
3  Q. You presume one of the beers that is shown on
4    Exhibit 2 went to him while he was at the
5    table?
6  A. Yes.
7  Q. And the other beer, you presume, went to Jeff
8    while he was sitting at the table?
9      MR. GILLIS: Objection.
10 A. Yes.
11 Q. So help me out with your testimony this morning
12    that you had discussions with Mr. DiNatale
13    about the beers reflected on Exhibit 2 are the
14    beers that were served at the bar.
15 A. What is that again?
16 Q. Before you saw what has been marked as
17    Exhibit 2, you testified at the grand jury that
18    your best memory was Jeff had two to three
19    beers while he was sitting at dinner; is that
20    right?
21      MR. GILLIS: Objection.
22 A. Yes.
23 Q. Do you see it?
24 A. Yes.

Page 118

1  Q. Before you saw Exhibit 2, you testified at your
2    deposition that Jeff had maybe four beers while
3    he was sitting at the table; is that correct?
4      MR. GILLIS: Objection.
5  Q. Do you remember that testimony?
6  A. Yes. It's in here.
7  Q. And before you saw Exhibit 2, you gave a
8    written statement to Trooper Sullivan, which
9    has been marked as Exhibit 3 in this
10    deposition, that Jeff had a couple of beers,
11    maybe two, and three drinks at dinner. Do you
12    see that?
13 A. Yes.
14 Q. And is it accurate to say that except for what
15    you believe Exhibit 2 shows, your earlier
16    testimony regarding the number of beers he had
17    at the table is your best memory of what he had
18    at the table?
19      MR. GILLIS: Objection.
20 A. Yes.
21 Q. Before you saw Exhibit 2, your best memory
22    regarding the number of Jack Daniels Manhattans
23    that Jeff had with dinner is what is reflected
24    in your grand jury testimony and your

Page 119

1    deposition; is that right?
2  A. Yes.
3  Q. And before you saw Exhibit 2, your best memory
4    about how many beers Jeff had at the bar is
5    what is reflected in your deposition; is that
6    right?
7      MR. GILLIS: Objection.
8  A. Yes.
9  Q. Now, Exhibit 2 indicates that the check was
10    paid at 9:57 p.m. Do you see that?
11 A. Yes.
12 Q. And after paying the check, where did you go?
13    I'm sorry. You did not pay for yourself; is
14    that right?
15 A. Correct.
16 Q. Jeff paid for you?
17 A. Yes.
18 Q. Once the check was paid, you left the
19    restaurant; is that right?
20 A. Yes.
21 Q. And that was about 9:57 p.m.; is that right?
22      MR. GILLIS: Objection.
23 A. Yes, or shortly after.
24 Q. And where did you go?

Page 120

1  A. We went to the hotel that the two people that I
2    didn't know were staying at.
3  Q. And had the seating arrangement in the car
4    changed or the truck changed at that point?
5  A. Yes.
6  Q. You were in the front; is that right?
7  A. I think so, yes.
8  Q. Jeff was in the back with his dogs; is that
9    right?
10 A. Yes.
11 Q. Can you tell me why Jeff went in the back with
12    the dogs?
13 A. Other than the fact that the dogs are
14    Rottweilers and they had been in the truck for
15    quite some time, you know, maybe he wanted -- I
16    can't say. I don't know.
17 Q. Did he say anything about why he wanted to go
18    in the back with the dogs?
19 A. No.
20 Q. Did he fall asleep in the back with the dogs
21    during the trip out of the Longhorn?
22 A. No.
23 Q. And where did you go from there?
24 A. To the hotel.

Page 121

1   Q. Which hotel?
2   A. I think it's called the Four Points or Four
3      Seasons or Four something.
4   Q. And what did you do there?
5   A. The two people that were staying there, they
6      wanted to go change or they went into their
7      room, and we were waiting outside in the
8      hallway, and we were talking to these two guys
9      that were there.
10        There was a music festival that was going
11     on at the airport next to the hotel. So there
12     were a lot of people staying there, and there
13     were two bouncers or security guards for a
14     certain band who we were talking to out in the
15     hall.
16  Q. And where was Jeff while you guys were at the
17     Four Points Hotel?
18  A. He was in the hallway with us.
19  Q. By the way, just a few wrap-up type questions.
20     I may have asked you this already.
21        What was the age of the waitress who
22     served you guys?
23        MR. GILLIS: Objection.
24  Q. Can you estimate for me the age of the waitress

Page 122

1      that served you guys?
2   A. Early to mid twenties.
3   Q. Okay, and do you have a memory of whether or
4      not any other waitresses or waiters served your
5      table that night?
6   A. I don't believe so.
7   Q. Did you say you had steak that night or ribs?
8   A. I think I told you I had ribs.
9   Q. Do you remember you had ribs or are you not
10     sure?
11  A. I thought I had ribs. I'm not 100 percent sure
12     on it.
13  Q. Okay. You were not wearing a watch that night;
14     is that right?
15  A. Yes.
16  Q. And did Jeff have anything to drink while you
17     were at the Four Points?
18  A. He did.
19  Q. What did he have there?
20  A. He had a beer.
21  Q. Twelve-ounce? Sixteen-ounce? Do you know?
22  A. I think it was a twelve-ounce. I'm pretty sure
23     it was a can.
24  Q. And am I correct -- I think I asked you this

Page 123

1      already. I know I asked you in the Superior
2      Court case. The size of the container of the
3      beers that Jeff had or whatever amount of beer
4      he had at the bar and whatever amount he had at
5      the table, they were all in the same size
6      container; is that right?
7         MR. GILLIS: Objection.
8   A. Yes.
9   Q. Were they all in the same size container -- the
10     beers at the table and the beers at the bar?
11        MR. GILLIS: Objection.
12  A. I believe so.
13  Q. And then from the hotel, where did you all go?
14  A. We went to the Other Side, which is a strip
15     club.
16  Q. Approximately, how long were you at the hotel,
17     best memory?
18  A. Anywhere from half an hour to forty minutes.
19  Q. Okay, and how long did it take you to get from
20     the Longhorn to the hotel?
21  A. Maybe like five minutes. It's pretty close.
22  Q. Do you remember testifying ten to fifteen
23     minutes before?
24  A. I think so.

Page 124

1         MR. GILLIS: What page?
2         MR. FARRAH: Page 53.
3   Q. Is it is your best memory as you sit here today
4      it was ten minutes more or less?
5         MR. GILLIS: Objection.
6   A. Yes.
7   Q. And then you drove from the hotel to the strip
8      club; is that right?
9   A. Correct.
10  Q. Who was in the car when you did that?
11  A. It was myself, Scott, his brother Mike and
12     Jeff.
13  Q. Had Mike been in the car on the trip from the
14     Longhorn to the hotel?
15  A. He was not.
16  Q. What was the seating arrangement in the ride
17     from the hotel to the strip club?
18  A. I was in the passenger seat, and Scott was
19     driving, and Jeff and Mike were in the back.
20  Q. Was Jeff asleep on the ride to the strip club?
21        MR. GILLIS: Objection.
22  A. I don't think so.
23  Q. Was the plan initially to go into the strip
24     club?

Page 125

1   A. It was.
2   Q. But that changed at some point in time; is that
3      right?
4   A. Yes.
5   Q. And what brought about that change?
6   A. Well, I actually didn't even want to go to
7      dinner. I wanted to go back, so Jeff offered
8      to buy me dinner and I said yes, and then when
9      we were going there, I probably said something
10     like I had class in the morning.
11        I honestly don't remember how we came to
12     the decision, but I think Scott and I decided
13     we didn't want to stay out too much later.
14  Q. Okay, and so you guys did not go to the strip
15     club; is that right?
16  A. Correct.
17  Q. But you dropped off Scott's brother there; is
18     that right?
19  A. Yes.
20  Q. And then where did you go from the Other Side?
21  A. We went to the apartment or housing complex
22     where Scott's truck was in Littleton.
23  Q. Approximately, how long did it take you guys to
24     go from the Other Side to the apartment complex

Page 126

1      in Littleton?
2   A. Maybe thirty to thirty-five minutes.
3   Q. And the apartment complex is just off of
4      Route 495; is that right?
5   A. Yes.
6   Q. And was there any discussion on route between
7      some or all of the three about whether or not
8      Jeff should drive his truck?
9   A. Not that I remember.
10  Q. Do you remember anyone saying in effect, "Jeff,
11     you're too drunk to drive"?
12        MR. GILLIS: Objection.
13  A. No.
14  Q. Where was Jeff on the ride from the Other Side
15     to the apartment complex?
16  A. He was in the back.
17  Q. Still in the back?
18  A. Yes.
19  Q. Sleeping or awake?
20  A. He was awake, I'm pretty sure.
21  Q. And when you got to the apartment complex, what
22     happened?
23  A. Well, I jumped out and I grabbed my bag off the
24     back of the truck, and actually, I don't know

Page 127

1      if I had my bag with me.
2         I know I had to grab something, some sort
3      of dirt biking gear. It might have been my
4      boots or something. I jumped off and brought
5      it over to Scott's truck.
6   Q. Then what happened?
7   A. Jeff left.
8   Q. Jeff left the apartment complex?
9   A. Correct.
10  Q. So he left the back seat and got into the
11     driver's side?
12  A. Yes.
13  Q. Did something happen when Jeff was leaving the
14     apartment complex?
15  A. Yes.
16  Q. What happened?
17  A. Actually, I didn't see it, but apparently, he
18     must have backed over or ran over part of
19     Scott's foot.
20  Q. Did you hear Scott say something as Jeff was
21     leaving or soon after Jeff left?
22  A. Yes, soon after.
23  Q. What did he say?
24  A. He started complaining about his ankle hurting,

Page 128

1      and he said that he backed over it, ran over
2      it.
3   Q. Do you remember while you were at the
4      restaurant the waitress asking anyone in your
5      group for an ID, some proof of age?
6   A. I don't recall.
7   Q. Do you remember? That is my question.
8   A. I do not remember anyone being IDed.
9   Q. Do you remember anyone being IDed at the bar?
10  A. Well, I don't remember that either.
11  Q. Okay. Now, after Scott made some statement
12     about Jeff running over his foot, what happened
13     next?
14  A. We went to get into Scott's truck, and he
15     realized he didn't have his keys.
16  Q. Okay. So what happened at that point?
17  A. We tried calling Jeff to let him know that he
18     had to turn around and bring us the keys.
19  Q. And you called from a cellphone; is that right?
20  A. Yes.
21  Q. How long did it take you to get through to
22     Jeff?
23  A. Maybe five, ten minutes.
24  Q. And what was the conversation that you had with

Page 129

1  Jeff at that point? Was it you, by the way,
2  that had the conversation?
3  A. I believe it was. I know from that point on,
4  there were two conversations with him.
5  Q. Tell me about the first one.
6  A. I told him that he had the keys -- he had
7  Scott's keys -- and that he had backed over
8  Scott's foot when he was leaving.
9  Q. And what did Jeff say?
10  A. He didn't say much. I don't even quite
11  remember him telling me he was going to turn
12  around.
13  Q. And again, the apartment complex which in the
14  parking lot of which you were calling Jeff from
15  that night was located how far from Route 495?
16  A. One hundred yards.
17  Q. And so after that conversation with Jeff, did
18  you see Jeff later on that night?
19  A. No.
20  Q. At some point in time after that conversation
21  with Jeff, did you try to have another
22  conversation with him? Did you try to call him
23  on the phone?
24  A. Yes.

Page 130

1  Q. Did you wait for Jeff to come back?
2  A. We did.
3  Q. Can you tell me approximately how long you
4  waited for Jeff to come back?
5  A. Probably close to twenty minutes.
6  Q. Do you remember testifying at your
7  deposition -- this is on page 66 -- that it was
8  probably maybe half an hour that you waited?
9  A. Okay.
10  Q. Do you see that?
11  A. It could have been a half an hour. I'm sure
12  that this is more accurate than what I remember
13  today.
14  Q. Your deposition?
15  A. Yes.
16  Q. In all respects?
17     MR. GILLIS: Objection.
18  A. In that respect at least.
19     MR. GILLIS: I move to strike that last
20  comment.
21     MR. FARRAH: I thought we were reserving
22  motions to strike until trial.
23  Q. At some point in time did the two of you take
24  some action to be able to drive the truck?

Page 131

1  A. Yes.
2  Q. What did you do?
3  A. We broke into the truck by smashing out the
4  sliding glass door in the back windshield.
5  Q. On the back?
6  A. Yes. We knew he had a spare key in the car.
7  Q. And after you had cleared away whatever you
8  needed to clear away to get into the car, what
9  did you do next?
10  A. I don't know whether we had talked to Jeff at
11  that point or we started driving.
12     We must have talked to him again by that
13  point because we would have just gone back
14  home.
15  Q. Do you remember having a second conversation
16  with Jeff that night after he left the
17  apartment complex parking lot?
18  A. Yes.
19  Q. Was that conversation with you or with Scott?
20  A. I believe it was with me.
21  Q. Tell me what you remember about that
22  conversation.
23  A. I remember him saying -- Yes, it was with me.
24  I remember him saying he had been in an

Page 132

1  accident and that I was like immediately,
2  "Where are you," and he didn't really say that
3  much.
4     I'm pretty sure it got cut off, and we
5  decided to go try and find the accident. We
6  didn't know what happened.
7  Q. So was it at that point that you got on 495?
8  A. Yes.
9  Q. If you had been heading home that night as
10  opposed to looking for Jeff, which way would
11  you have headed on 495 from the apartment
12  complex?
13  A. We would not have gotten on 495.
14  Q. At all?
15  A. Correct.
16  Q. When you got on 495, in which direction did you
17  head?
18  A. North.
19  Q. Why was that?
20  A. Jeff was going home, which was north.
21  Q. Where did you understand he lived at that time?
22  A. In Portsmouth.
23  Q. New Hampshire?
24  A. Yes.

Page 133

1   Q. And when you got on 495 North, what happened?
2   A. Well, we drove and we didn't see anything and
3       we were going to turn around, and then we
4       decided to drive a little bit farther, and as
5       we were getting close to the Westford exit, we
6       saw an accident scene with like all sorts of
7       ambulances and police cars and just a lot of
8       emergency vehicles, lights going on the
9       southbound side.
10  Q. The southbound side of 495?
11  A. Yes.
12  Q. How many exits down from where the apartment
13      complex was, was it that you had traveled
14      before you saw the accident scene?
15  A. I think Westford is two up from where we got
16      on.
17  Q. Had you passed the Westford exit when you saw
18      this accident scene?
19  A. No.
20  Q. So this was before the Westford exit on 495
21      North that you saw the accident scene on the
22      other side of the highway; is that right?
23  A. Yes.
24  Q. What did you do?

Page 134

1   A. We got off at the Westford exit, and we started
2       heading southbound so we could drive by the
3       accident.
4   Q. Did you call Jeff at all during that time?
5   A. Yes.
6   Q. And were you able to reach him at all?
7   A. No.
8   Q. What did you see when you drove by on 495
9       southbound now?
10  A. We couldn't see anything. It looked like an
11      accident. All we could see was police cars and
12      the police and EMTs and ambulances.
13      We didn't see any cars that had been in an
14      accident, specifically the truck. That was
15      what we were looking for and the dirt bikes.
16  Q. And did you make any other efforts to find Jeff
17      that night?
18  A. Yes.
19  Q. What were those efforts? Describe those for
20      me, if you could.
21  A. We circled back up north to get off of the
22      Westford exit again.
23  Q. Then what happened?
24  A. No, that's incorrect. We didn't circle back

Page 135

1   yet. We got off at the Littleton exit.
2       We drove on this back road and tried
3       calling him and telling him. I think we left
4       him a voice mail saying, "Where are you? Are
5       you all right? Give us a call. Let us know
6       what is going on," but we could not get ahold
7       of him.
8       So what we did was we decided to drive up
9       to Westford again one more time to see if we
10      could see if that was his accident, if we could
11      see his truck.
12  Q. Did you have any luck?
13  A. No.
14  Q. Prior to September 26, 2003, had you ever seen
15      Jeff when you believed he was under the
16      influence of alcoholic beverages?
17  A. I think so once.
18  Q. Did he exhibit some of the same signs you saw
19      the night of September 26, 2003 that night?
20      MR. GILLIS: Objection.
21  A. You know, I'd seen him when I thought he was a
22      little bit drunk, but I mean I just assumed
23      that he was drunk. I cannot say that he was.
24      It was at that party that I mentioned before.

Page 136

1   Q. Were people drinking at that party?
2   A. Yes. That's why I assumed he was drunk.
3   Q. What sorts of things did he exhibit that led
4       you to assume he was drunk?
5   A. Well, I didn't notice anything he was
6       exhibiting. I sort of just figured that he was
7       drunk or on his way to being drunk since he had
8       been at the party and other people were there,
9       and they were drinking.
10  Q. Was he louder than usual at that party?
11  A. I didn't notice him being loud.
12  Q. Were his eyes glassy at all at the party?
13  A. I could not tell you.
14  Q. What is it that led you to say a few moments
15      ago that he had exhibited signs of intoxication
16      in the past to you?
17  A. Actually, I remember one thing. When we went
18      outside, he was getting one of his dogs all
19      riled up.
20      They're Rottweilers. So they can be
21      nasty. I mean they're pretty good dogs.
22      I remember him getting one of them all
23      riled up and like kind of pointing to someone
24      because he was a very well-behaved dog, and if

Page 137

1  you pointed at someone and you started going
2  after them, say you grabbed his arm, the dog
3  would jump up on him and try to think he needed
4  to protect him, and I remember that happened.
5  That was something that he normally didn't do.
6  Q. My question to you is, what is it that he was
7  exhibiting that night prior to September 26,
8  2003 that leads you to say he was exhibiting
9  signs of being intoxicated?
10  A. It would be getting his dog all riled up.
11  Q. Anything else?
12  A. No.
13  Q. You're sure?
14  A. Yes. I was not really paying attention that
15  well. I was not even there that long.
16  Q. But you believed he was exhibiting signs of
17  intoxication that night; is that right?
18  A. Yes.
19  Q. Okay. Now, at some point in time, did you meet
20  with the police to talk about the events of
21  September 26?
22  A. The state police?
23  Q. Any police.
24  A. I remember going to the state police in Concord

Page 138

1  and talking to one of the troopers.
2  Q. Trooper Sullivan?
3  A. Yes.
4  Q. How long was that after the accident?
5  A. I think it was pretty short. I can't say for
6  sure. It was a couple of days.
7  Q. Did you tell him what had happened that night?
8  A. I told him a little about what happened, but he
9  wanted me to just write it all down.
10  Q. Okay, and did you write it all down for him?
11  A. Yes.
12  Q. Now, what has been marked as Exhibit 3 in your
13  deposition has a date of November 2, 2003,
14  3:25 p.m. Do you see that?
15  A. Yes.
16  Q. That's five-and-a-half weeks, six weeks after
17  the accident; can we agree?
18  A. Yes.
19  Q. Do you remember that you had met with him
20  before November 2, 2003? This is Trooper
21  Sullivan.
22  A. No.
23  Q. Do you remember only one meeting with
24  Trooper Sullivan?

Page 139

1  A. Yes. I remember him calling me and telling me
2  that he wanted me to meet with him, and he
3  could come down or I could come down and meet
4  him, and I said I would come down, and I think
5  it was the same day that I talked to him and
6  went down there.
7  Q. But it was five weeks after the accident?
8  A. Yes.
9  Q. That refreshes your memory?
10  A. Yes.
11  Q. In between that time, September 26, 2003 and
12  November 2, 2003, did you give anybody else any
13  statements about the accident?
14  A. I don't think so.
15  Q. Or about that night, did you give anybody else
16  any statements about that night?
17  A. No.
18  Q. When did you learn that Jeff had been in this
19  accident?
20  A. It was the next day. A friend of mine called
21  me and told me that he saw the accident on the
22  news and that he saw something about Jeff being
23  in an accident on the news.
24  Q. Can you just describe how it was that you gave

Page 140

1  this statement to the state police?
2  A. Yes. I went into the barracks and I had to
3  give them some ID and show them who I was, and
4  they took me into one of the offices and sat me
5  down and asked me if I was with Jeff that night
6  and if I was in fact Jude and some questions
7  like that.
8  Then he said, "All right. Now, I want you
9  to write what you remember down and give me a
10  statement on paper."
11  Q. And that's what you did?
12  A. Yes.
13  Q. How long were you with him that day?
14  A. It was probably under an hour. It was not
15  extremely long.
16  Q. Anybody else there besides the trooper and you?
17  A. No.
18  Q. Was your meeting tape recorded, do you know?
19  A. I don't know.
20  Q. Was your meeting with DiNatale tape recorded?
21  A. I don't think so.
22  Q. How about with the lawyer -- I can't remember
23  his name now -- Parkerson, was that tape
24  recorded?

Page 141

1  A. I don't think so.
2  Q. Did anybody ask you for permission to tape
3     record in any of the meetings you had to
4     discuss what happened?
5  A. I kind of remember someone asking me, but I
6     don't know whether it was one of these meetings
7     or a meeting where I was in a place in here.
8        Maybe it might have been when I had to
9     testify -- I can't say for sure. I just
10    remember someone saying, "I'm going to be tape
11    recording you."
12 Q. Is that your handwriting on Exhibit 3?
13 A. Yes.
14 Q. And did anybody in any way influence what you
15    wrote on Exhibit 3 at the time you were writing
16    it?
17 A. No.
18 Q. Did anybody put words in your mouth?
19 A. No.
20 Q. Did anybody suggest anything to you?
21 A. No.
22 Q. And then you testified at the grand jury; is
23    that right?
24 A. Yes.

Page 142

1  Q. And did you testify truthfully before the grand
2     jury to the best of your ability?
3  A. Yes.
4  Q. And approximately how long was that after the
5     meeting with the state trooper, if you know?
6  A. I don't know. I think it was sometime after.
7  Q. And then in between then, when you testified
8     before the grand jury and when you testified at
9     your deposition in August of 2004, did anybody
10    that you understood was representing anyone
11    involved in either a civil or criminal lawsuit
12    contact you to discuss what happened the
13    evening of September 26, 2003?
14 A. No.
15 Q. And when you came to testify on August of 2004,
16    that was the first time we had spoken?
17 A. Yes.
18 Q. After testifying on August of 2004, and with
19    the exception of Mr. Parkerson and
20    Mr. DiNatale, has anyone spoken to you about
21    the events of September 26, 2003 whom you have
22    understood was working for any defendant in any
23    civil lawsuit?
24 A. No.

Page 143

1        MR. FARRAH: Michael, I think I'm just
2     about done. Give me a minute to run out and
3     I'll be right back.
4        (Short recess.)
5  Q. Did you sign a statement for DiNatale?
6  A. No.
7  Q. You did sign a statement for Parkerson?
8  A. Yes.
9  Q. You're sure you didn't sign a statement for
10    DiNatale?
11 A. I don't remember. I don't know.
12 Q. It was not that long ago -- two weeks.
13 A. It was a little bit longer than that.
14 Q. But you don't remember?
15 A. I don't remember.
16       MR. FARRAH: Thanks. I'm done.
17
18       CROSS-EXAMINATION
19
20 BY MR. GILLIS:
21 Q. Mr. Connelly, you have in front of you
22    Exhibit 3, your statement there, and when you
23    said in that statement that he had a couple of
24    beers, maybe two and maybe three drinks, that

Page 144

1     was the total amount of drinks that you think
2     he might have had at the restaurant; is that
3     right?
4        MR. FARRAH: Objection.
5  A. Correct.
6  Q. Let me ask it a different way. From looking at
7     your statement, can you tell me how many drinks
8     you thought Mr. Southworth maybe had at the
9     restaurant?
10 A. In total?
11       MR. FARRAH: Objection. Are you looking
12    at Exhibit 3?
13       MR. GILLIS: Yes.
14 A. It would be maybe five.
15 Q. Was that everything at the restaurant or just
16    at the table?
17       MR. FARRAH: Objection.
18 A. I believe that was at the restaurant, not at
19    the table.
20 Q. Is it your memory that the beers that were
21    gotten at the bar were brought over to the
22    table?
23       MR. FARRAH: Objection.
24 A. Yes.

Page 145

1  Q. This is dated November 2, 2003. That's when
2     that was actually done by you, correct?
3  A. Yes.
4  Q. Your memory was a lot fresher back then as to
5     the events of this, correct?
6  A. Yes.
7  Q. You said that you left approximately 11:00, is
8     that correct, the restaurant?
9  A. Yes.
10 Q. Give or take a few minutes?
11 A. Yes.
12 Q. It could have been 10:30; it could have been
13    11:30?
14    MR. FARRAH: Objection.
15 A. It was probably not later. It was probably,
16    you know, 11:00 or before.
17 Q. Subsequently, you were under oath when you gave
18    your grand jury testimony, correct?
19 A. Yes.
20 Q. You said "probably two, maybe a couple of
21    Manhattans" on page 9 of your sworn testimony.
22 A. Correct.
23 Q. At the end of that you were asked, were you
24    not, whether or not Mr. Southworth was

Page 146

1     exhibiting any change in his demeanor at any
2     time? Do you remember being asked that?
3     MR. FARRAH: What page is that?
4     MR. GILLIS: Page 34.
5  A. Yes.
6  Q. That was a lot closer to the time of this
7     accident than today, correct?
8  A. Correct.
9  Q. Did they put your statement in as an exhibit
10    when you were at the grand jury?
11 A. Yes.
12 Q. That was the fifth of November of 2003,
13    correct?
14 A. Yes.
15 Q. That was when you said that there was no change
16    at any time in his demeanor while he was at the
17    Longhorn; is that correct?
18 A. Yes.
19 Q. You testified there that you had known him for
20    about a year prior to this accident, correct?
21 A. Yes.
22 Q. Do you know him primarily from dirt bike
23    racing, or how did you know him?
24 A. I knew him from dirt bike racing.

Page 147

1  Q. You had known him long enough to know whether
2     his demeanor was changing, correct?
3     MR. FARRAH: Objection.
4  A. The only time that I believed that he was drunk
5     was the time that I had seen him at the party.
6  Q. That was not the question. You've known him
7     long enough that you would be able to tell
8     whether or not his demeanor was changing on the
9     night of September 26, 2003, correct?
10 A. Yes.
11 Q. Now, those are the statements that you gave
12    before lawyers got involved in the case,
13    correct?
14 A. Yes.
15 Q. Then you met with Mr. Farrah, correct?
16    MR. FARRAH: Objection.
17 A. Yes.
18 Q. When did you first meet with him?
19 A. It was over a year. I honestly don't know.
20 Q. How many times have you met with Mr. Farrah?
21 A. Only once, besides today.
22 Q. When was that?
23 A. I don't know. It was sometime after the grand
24    jury.

Page 148

1  Q. Before your deposition?
2     MR. FARRAH: Are you asking him did we
3     meet before his deposition?
4     MR. GILLIS: Yes.
5     MR. FARRAH: Objection to the form.
6  A. The deposition, was that the grand jury?
7     MR. FARRAH: This is your deposition,
8     right here (pointing to transcript).
9  A. When was this taken? I thought the deposition
10    was when I met with Mr. Farrah.
11 Q. You came in before a situation like this and
12    gave a deposition?
13 A. Yes.
14 Q. Prior to that, had you met with anybody from
15    Mr. Farrah's office?
16 A. No.
17 Q. Then you met with his office, didn't you, to
18    put together an affidavit?
19 A. Yes.
20 Q. Who wrote that up for you?
21 A. I don't know.
22 Q. Who contacted you and asked you to do an
23    affidavit for them? Was that Mr. Farrah's
24    office?

Page 149

1  A. Yes.
2  Q. And did they send you that in the mail, or did
3     you come in to sign it?
4  A. They sent it to me.
5  Q. Do you know who from the office you spoke with?
6  A. No. I presume it was Mr. Farrah.
7  Q. Was it a male or a female?
8  A. I don't know.
9  Q. Do you remember what you spoke about?
10 A. Just, you know, they were going to send it to
11    me and I needed to sign it and get it back to
12    them.
13 Q. You also testified at trial in this matter,
14    correct?
15 A. Correct.
16 Q. And you were under oath at that time, correct?
17 A. Correct.
18 Q. You didn't have any of the lawyers in this room
19    forming the questions that you were answering,
20    correct?
21 A. Correct.
22 Q. At that trial do you remember testifying that
23    you had a Sprite and some food at the
24    restaurant?

Page 150

1  A. Yes.
2  Q. Do you remember testifying that there was
3     nothing unusual at all that evening at the
4     Longhorn as to how Mr. Southworth was speaking
5     or walking?
6     MR. FARRAH: Objection.
7  A. Yes.
8  Q. Do you remember testifying that Mr. Southworth
9     brought the beer that he got at the bar with
10    him to the table?
11    MR. FARRAH: Objection.
12 A. Yes.
13 Q. Prior to Mr. Farrah in 2004 suggesting
14    different signs of inebriation, did you ever
15    testify anywhere that Mr. Southworth showed any
16    signs of inebriation that evening?
17 A. I don't believe so.
18 Q. You didn't say it to the police, correct?
19 A. No.
20 Q. You didn't put it in your statement, did you?
21 A. No.
22 Q. You didn't say it at the grand jury, correct?
23 A. No.
24 Q. You didn't testify at trial to that, did you?

Page 151

1  A. No.
2  Q. In fact, when you were asked the first time by
3     Mr. Farrah what signs were exhibited, you said,
4     "I don't know"; isn't that correct?
5     MR. FARRAH: Objection.
6  Q. Page 49, "What did he show? What did he
7     manifest that makes you say that?" "I don't
8     know."
9        That's the first part of your answer,
10    correct?
11 A. Yes.
12 Q. It was not until he suggested to you that he
13    was sloppier that you said, "A little bit,
14    yes," correct?
15    MR. FARRAH: Objection. The record is the
16    record.
17 A. Correct.
18 Q. It was not until he suggested that he was
19    louder that you said yes, correct?
20    MR. FARRAH: Objection.
21 A. Correct.
22 Q. It was not until he suggested that he was
23    boisterous that you ever thought about it as a
24    possibility, correct?

Page 152

1     MR. FARRAH: Objection.
2  A. Correct.
3  Q. But even then you said he was not boisterous,
4     correct?
5     MR. FARRAH: Objection.
6  A. Correct.
7  Q. You said his speech was not slurred, correct?
8  A. Correct.
9  Q. And when Mr. Farrah asked about his glassy
10    eyes, you said, "I don't remember specifically
11    seeing his eyes." Do you remember saying that?
12    MR. FARRAH: Objection.
13 A. Yes.
14 Q. As you sit here today, can you honestly say
15    whether or not his eyes were glassy that
16    evening?
17    MR. FARRAH: Objection.
18 A. No.
19 Q. Prior to Mr. Farrah suggesting these things in
20    the deposition, you've never told anybody that
21    he had glassy eyes, correct?
22    MR. FARRAH: Objection.
23 A. No.
24 Q. You never told anybody that he was louder than

Page 153

1    normal, correct?
2        MR. FARRAH: Objection.
3    A. No.
4    Q. You never told anybody that he was sloppier
5        looking than he usually is, correct?
6        MR. FARRAH: Objection.
7    A. No.
8    Q. Now, I know that you've tried your best at
9        these various times to give the best answers
10       that you can, but I want you to think back.
11           From the time that you gave testimony at
12       the grand jury saying nothing changed about his
13       demeanor to the time that you testified at your
14       deposition with Mr. Farrah back in 2004, did
15       you learn anything that changed your opinion of
16       what happened that evening?
17           MR. FARRAH: Objection.
18   A. No.
19   Q. By the way, was anyone from Rare there at that
20       deposition, do you remember?
21   A. I don't know.
22   Q. Now, the first time that you were asked what
23       Mr. Southworth had to drink that evening, you
24       said, I believe, that he had a beer; isn't that

Page 154

1    correct?
2    A. Yes.
3        MR. FARRAH: What page are we talking
4        about?
5        MR. GILLIS: Page 28.
6    Q. "What did you see him drink?" "He had a beer,"
7        correct?
8    A. Yes.
9        MR. FARRAH: Objection.
10   Q. Prior to Mr. Farrah suggesting that he might
11       have had more at that time, did you ever
12       testify to anybody that he had more than a beer
13       at the bar that evening?
14       MR. FARRAH: Objection.
15   A. No.
16   Q. In fact, he didn't even have a full beer at the
17       bar, did he? He brought it to the table,
18       correct?
19       MR. FARRAH: Objection.
20   A. Correct.
21   Q. Was the first beer that he got at the bar the
22       first one he took over to the table?
23       MR. FARRAH: Objection.
24   A. As far as I know.

Page 155

1    Q. You didn't have anything to drink at the sand
2        pit, correct, any alcohol?
3    A. No.
4    Q. Mr. Southworth didn't have any alcohol at the
5        sand pit, correct?
6    A. No.
7    Q. In fact, you guys bring jugs of water instead,
8        correct?
9    A. Yes.
10   Q. Now, when Mr. Farrah was asking you these
11       questions without Rare being at the deposition
12       a year and a half ago, he asked you whether or
13       not someone paid the bar tab, correct?
14   A. Yes.
15   Q. And you told him back then a year and a half
16       ago that the bar tab was transferred to the
17       check, correct?
18       MR. FARRAH: Objection.
19   A. Yes.
20   Q. I'm going to show you testimony on page 35 and
21       ask you to read that page. Just read it
22       quickly. Read it to yourself.
23           (Witness reviews document.)
24   Q. Is it your memory that the beers that were

Page 156

1    gotten at the bar were added on to the check at
2        the table?
3        MR. FARRAH: Objection.
4    A. Yes.
5    Q. And that's sworn testimony you gave to
6        Mr. Farrah a year and a half ago, correct?
7    A. Correct.
8    Q. That was a year and a half before you met
9        Mr. DiNatale, correct?
10   A. Yes.
11   Q. Do you remember telling Mr. Farrah that
12       Mr. Southworth ordered a beer with his dinner?
13       MR. FARRAH: Where are we talking about?
14   I object.
15   A. I don't remember the question.
16   Q. By the way, do you remember telling Mr. Farrah
17       that you ordered a steak; you were positive
18       about that?
19   A. No.
20   Q. Let me show you the bottom of page 46 and top
21       of page 47 at your prior deposition. Look at
22       that.
23           (Witness reviews document.)
24       MR. FARRAH: What is the question?

Page 157

1 Q. Does that refresh your recollection of what you
2   had to eat that night?
3 A. Yes.
4 Q. You said earlier in the deposition that you saw
5   Mr. Southworth get up and go to the bathroom,
6   correct?
7 A. Yes.
8 Q. Did you observe him walking to and from the
9   bathroom?
10 A. Yes.
11 Q. The bathroom is in the back corner; isn't that
12   right?
13 A. Yes.
14 Q. The hallway leading to the bathroom doesn't
15   lead to any other part of the restaurant,
16   correct?
17 A. Correct.
18 Q. You can't get to the bar by going to the
19   bathroom, correct?
20 A. Yes.
21 Q. Was he walking fine when you saw him go to the
22   bathroom?
23 A. Yes.
24 Q. Did you see him stagger at all?

Page 158

1 A. No.
2 Q. Was he unsteady on his feet?
3 A. No.
4 Q. Did he show any signs that were other than his
5   normal self when he went to the bathroom?
6 A. No.
7 Q. You testified to Mr. Farrah back in 2004 that
8   you left just before or just right around
9   11:00; is that correct?
10   MR. FARRAH: Objection.
11 A. Correct.
12 Q. Is that your memory as to what time you left,
13   as you sit here today?
14 A. Yes.
15 Q. It was not 10:00, correct?
16   MR. FARRAH: Objection.
17 A. No.
18 Q. Do you know whether or not any of the people at
19   the table that night ate just an appetizer or
20   an appetizer and a cup of soup as opposed to an
21   entree?
22 A. I don't know for certain.
23 Q. In fact, you can't quite remember what you had,
24   correct?

Page 159

1 A. Correct.
2 Q. Nobody that night at the table said to anyone
3   else that they thought they were intoxicated,
4   correct?
5   MR. FARRAH: Objection.
6 A. No.
7 Q. You told that to Mr. Farrah, didn't you, a year
8   and a half ago?
9   MR. FARRAH: What page are we talking
10   about?
11   MR. GILLIS: 42.
12 A. No.
13 Q. That's your memory today, correct?
14 A. Yes.
15 Q. Nobody at the table thought that anybody else
16   was intoxicated, correct?
17   MR. FARRAH: Objection. That's not what
18   he testified to. I'm objecting.
19 A. No.
20 Q. You told him back then that Jeff was not
21   particularly loud; isn't that correct?
22 A. Correct.
23 Q. Was he any louder than anybody else at the
24   table?

Page 160

1 A. No.
2 Q. He was not any louder than you, correct?
3 A. No.
4 Q. You were not intoxicated, were you?
5 A. No.
6 Q. Seven guys in their early twenties, late teens
7   having dinner on a Friday night, correct?
8 A. Correct.
9 Q. Now, do you remember testifying that you were
10   at Four Points closer to forty minutes rather
11   than ten or fifteen minutes?
12 A. Yes.
13 Q. Now, you've testified various ways. What is
14   your memory as you sit here today? Do you
15   remember whether it was thirty-five minutes or
16   forty minutes or whatever minutes?
17   MR. FARRAH: Objection.
18 A. It was probably around half an hour.
19 Q. Okay. That's your best estimate as you sit
20   here today, correct?
21 A. Correct.
22 Q. Did you see Jeff Southworth go into the room
23   that you were standing outside of in the hotel?
24 A. No.

Page 161

1  Q. He never went in the room?
2  A. Not that I know of.
3  Q. Did someone bring the beer out to him, or did
4     he go into the room to get it?
5  A. I'm pretty sure somebody brought it out.
6  Q. People in the room were bringing beers out to
7     people in the hallway?
8     MR. FARRAH: Objection.
9  A. I don't know whether the beer was brought from
10    the room the two people I didn't know were
11    staying in or the two bouncers or security that
12    we were talking to.
13 Q. Somebody was supplying beer to you people if
14    you wanted it at the hotel, correct?
15 A. Yes.
16 Q. And you were able to get it for the half hour
17    that you were there at the hotel if you wanted
18    it, correct?
19 A. Yes.
20 Q. And nobody was limiting anybody as to the
21    number of beers they had in the hotel, correct?
22 A. Correct.
23 Q. Nobody said, "Look, we only have enough for
24    everybody to have one," or "You're limited to

Page 162

1     one beer," correct?
2  A. Yes.
3  Q. Do you know what type of beer it was?
4  A. I don't.
5  Q. Do you know how big the cooler was in the back
6     of Mr. Southworth's car?
7  A. No.
8  Q. Did you see the cooler?
9  A. No.
10 Q. Were you aware that he had a cooler in the back
11    seat?
12 A. No.
13 Q. You don't remember what the bartender looked
14    like, correct?
15 A. Not specifically.
16 Q. She didn't appear to be a friend of Scott's or
17    Jeff's, did she?
18 A. No.
19 Q. I know you were trying to answer the best you
20    could in the first deposition, but when you
21    answered "maybe" to these questions on page 38,
22    was that an accurate statement or was that a
23    guesstimate on your part?
24    MR. FARRAH: Objection.

Page 163

1  A. An estimate or a guesstimate.
2  Q. Is it fair to say that you were guessing at
3     that point?
4     MR. FARRAH: Objection.
5  A. I don't think I was guessing. I think I was
6     thinking that there was more a possibility that
7     he had had more.
8  Q. So when you said "maybe four," that's a
9     possibility, not an accurate statement as to
10    what you know him to have drunk at the table
11    that day, correct?
12    MR. FARRAH: Objection.
13 A. Yes.
14 Q. In fact, six weeks after the accident you told
15    the state police that he had maybe two,
16    correct?
17    MR. FARRAH: Objection.
18 A. Correct.
19 Q. Was it your understanding that you were at the
20    Longhorn close to two hours that evening?
21    MR. FARRAH: Objection.
22 A. Yes.
23 Q. Do you remember exactly how long you were at
24    the apartment complex that night before you

Page 164

1     left?
2  A. Not exactly.
3  Q. What is your best estimate?
4     MR. FARRAH: Objection.
5  A. At least twenty-five minutes, at the most
6     thirty-five minutes.
7  Q. How long did it take you to get from the
8     apartment complex to the scene of the accident?
9  A. Like close to ten minutes.
10 Q. The dogs were in the car for the whole time you
11    were in the restaurant?
12 A. Yes.
13 Q. They were sitting there for about two hours,
14    correct?
15 A. Yes.
16 Q. Did he let the dogs out of the car when you
17    went to the truck?
18    MR. FARRAH: Objection.
19 A. I don't remember.
20 Q. Did he rile the dogs up at any point when he
21    came out of the restaurant?
22    MR. FARRAH: Objection.
23 A. No.
24    MR. GILLIS: What is the nature of your

Page 165

1 objection?
2    MR. FARRAH: "Riled the dogs up," form of
3 the question.
4 Q. You testified earlier that the one time you
5 thought he was intoxicated he riled up the dogs
6 at a party, correct?
7    MR. FARRAH: Objection.
8 A. Yes.
9 Q. He didn't exhibit any of that behavior when you
10 left the Longhorn on the night of September 26,
11 2003, did he?
12 A. No.
13 Q. When the police asked you, you didn't tell them
14 that you thought Mr. Southworth was intoxicated
15 that evening, did you?
16 A. No.
17 Q. When you were under testimony at the grand
18 jury, you never said that Mr. Southworth was
19 intoxicated that evening, did you?
20 A. No.
21 Q. In fact, when you left there that night, you
22 didn't believe him to be intoxicated, did you?
23 A. No.
24 Q. After you left the Longhorn that evening, you

Page 166

1 first went to the hotel for a while, correct?
2 A. Yes.
3 Q. There was drinking in the hallway, correct?
4 A. Yes.
5 Q. Then you went to the strip bar, correct?
6    MR. FARRAH: Objection.
7 A. Yes.
8 Q. You left the strip bar without going into it
9 and went to the apartment complex, correct?
10 A. Correct.
11 Q. That was about a thirty-minute ride from the
12 Other Side to the apartment complex, correct?
13    MR. FARRAH: Objection.
14 A. Correct.
15 Q. Could it be a little less than that, do you
16 know?
17    MR. FARRAH: Objection.
18 A. If you were driving fast.
19 Q. Who was driving from the time you left the
20 Longhorn until the time that you arrived at the
21 apartment complex?
22 A. Scott.
23 Q. Did Scott have any more to drink that evening,
24 that you know of, than Mr. Southworth?

Page 167

1 A. I'm pretty sure that he had a beer at the
2 hotel.
3 Q. At the restaurant did they drink about the same
4 amount?
5    MR. FARRAH: Objection.
6 A. Correct.
7 Q. Did he show any signs of intoxication?
8 A. No.
9 Q. At any time at the restaurant do you remember
10 anybody at the table showing any signs of
11 intoxication?
12 A. No.
13 Q. After you left the restaurant and after there
14 was drinking at the hotel, did you see a change
15 in Mr. Southworth's demeanor after that point?
16 A. No.
17 Q. Did he seem intoxicated when he was getting in
18 his vehicle later on that evening?
19 A. No.
20 Q. Do you have any independent memory, not from
21 looking at documents today or anything else,
22 but your memory of the night of the accident?
23 Do you have a memory of there being any extra
24 drinks on the table?

Page 168

1    MR. FARRAH: Objection.
2 A. You mean just drinks that had been ordered and
3 not drinking?
4 Q. Yes.
5 A. No.
6 Q. When you say "checked out from the bar," did
7 you mean by that that you were just leaving the
8 bar to go to the table?
9    MR. FARRAH: Objection.
10 A. Yes.
11 Q. You didn't mean "cash out," correct?
12    MR. FARRAH: Objection.
13 A. No.
14 Q. If you had paid at the bar, you would have
15 said, "We paid the tab and went to the table,"
16 correct?
17    MR. FARRAH: Objection.
18 A. Yes.
19 Q. You answered several times today to questions
20 that you don't remember.
21 When you answer a question "I don't
22 remember" does that mean something didn't
23 happen or you just don't remember whether or
24 not it happened or didn't happen?

Page 169

1    MR. FARRAH: Objection.
2  A. I just don't remember whether it happened or
3     didn't happen.
4  Q. When you answered questions previously "I don't
5     remember," that is not to say whatever was
6     being talked about didn't happen. You just
7     don't remember whether it did or didn't,
8     correct?
9    MR. FARRAH: Objection.
10 A. Correct.
11 Q. Is it fair to say when the drinks came to the
12    table, they came one drink per person at a
13    time?
14    MR. FARRAH: Objection.
15 A. I think so but --
16 Q. I want your memory. Tell me your memory.
17    MR. FARRAH: Let him answer. He was
18    trying to.
19 A. I remember the round being ordered, but
20    according to the bill, there were seven drinks
21    brought to the table.
22 Q. That's why I'm asking for your memory. I know
23    what the bill says.
24    Your memory, as you sit here today, do you

Page 170

1     have a specific memory of seeing anybody with
2     more than one drink per round?
3  A. No.
4  Q. Did you see any of the managers walking around
5     there that night while you were at the
6     Longhorn?
7  A. I don't remember seeing any managers.
8  Q. Meaning you don't remember if they did or
9     didn't walk around?
10 A. Correct.
11 Q. Had you been to the Longhorn prior to this
12    date?
13 A. I had been there once before.
14 Q. How long prior to this accident was that?
15 A. It was probably a while, maybe a year before
16    then.
17 Q. Those are the only two times you have been to
18    the Longhorn?
19 A. Yes.
20    MR. GILLIS: I don't have any further
21    questions.
22
23
24

Page 171

1    REDIRECT EXAMINATION
2
3    BY MR. FARRAH:
4  Q. Is it accurate to say that as of September 26,
5     2003 Jeff was your friend?
6  A. Yes.
7  Q. And is it accurate to say that throughout this
8     process of speaking to different people about
9     the events of September 26, 2003 you have felt
10    uncomfortable about talking about Jeff, your
11    friend?
12    MR. GILLIS: Objection.
13 A. No.
14 Q. Is it accurate to say that you didn't want to
15    hurt Jeff as part of this process of speaking
16    to people about the events of September 26,
17    2003?
18    MR. GILLIS: Objection.
19 A. Well, not really because to be honest with you,
20    whatever happened that night and what will or
21    has happened, I think regardless of who it is,
22    they deserve whatever happens to them.
23 Q. Do you think Jeff deserves the punishment that
24    he got in the criminal case?

Page 172

1  A. I don't know exactly what he got.
2  Q. He was found guilty.
3  A. I know he was guilty. I don't know what his
4     sentencing was. I agree that he should serve
5     time.
6  Q. Do you think it was appropriate that Jeff be
7     found guilty of driving under the influence?
8     MR. GILLIS: Objection.
9  A. No. Well, what is driving under the influence?
10    Like having alcohol in your system and driving?
11    Then yes.
12 Q. Because he had alcohol in his system and he was
13    driving that night, wasn't he?
14 A. Yes.
15 Q. Throughout this process, have you tried to help
16    Jeff as best you can?
17    MR. GILLIS: Objection.
18 A. No.
19    MR. FARRAH: Okay. I'm done. Thank you.
20
21    RECROSS-EXAMINATION
22
23    BY MR. GILLIS:
24 Q. Have you spoken with Jeff since the accident?

|  | Page 173 |
|---|---|
| 1 | A. No. |
| 2 | Q. So whatever friendship you had, you have not |
| 3 | spoken with him in the last two-and-a-half |
| 4 | years, correct? |
| 5 | A. Correct. |
| 6 | Q. Even if he were a closer friend than he was, |
| 7 | you would not lie to the grand jury, would you? |
| 8 | MR. FARRAH: Objection. |
| 9 | A. No. |
| 10 | Q. Would you lie at trial to benefit Jeff? |
| 11 | MR. FARRAH: Objection. |
| 12 | A. No. |
| 13 | Q. Would you lie under oath at your deposition? |
| 14 | A. No. |
| 15 | Q. Would you lie on your affidavit to benefit |
| 16 | Jeff? |
| 17 | A. No. |
| 18 | Q. By the way, the affidavit, Paragraph 6, that |
| 19 | Mr. Farrah talked about states that you |
| 20 | testified at your deposition to certain things, |
| 21 | correct? |
| 22 | A. Correct. |
| 23 | Q. We have gone through a lot of those things to |
| 24 | specify them, correct? |

|  | Page 174 |
|---|---|
| 1 | A. Correct. |
| 2 | Q. It says here, "Everyone at the table was loud." |
| 3 | As you've testified, Mr. Southworth was not any |
| 4 | more particularly loud than anybody else, |
| 5 | correct? |
| 6 | A. Correct. |
| 7 | Q. You can't remember whether it was a waitress or |
| 8 | a manager who came over to you, correct? |
| 9 | A. Correct. |
| 10 | Q. That was twenty to twenty-five minutes before |
| 11 | you left the restaurant, correct? |
| 12 | MR. FARRAH: Objection. |
| 13 | A. Yes. |
| 14 | Q. Prior to that time nobody that you're aware of |
| 15 | complained of any of the behavior at the table, |
| 16 | correct? |
| 17 | MR. FARRAH: Objection. |
| 18 | A. Correct. |
| 19 | Q. Nobody had to come to the table and tell you |
| 20 | guys to be knock something off or quiet down, |
| 21 | correct? |
| 22 | A. Yes. |
| 23 | Q. When you said in your deposition you testified |
| 24 | to certain things on 49 to 51. You didn't see |

|  | Page 175 |
|---|---|
| 1 | any change in his demeanor that night while he |
| 2 | was at the Longhorn that would indicate to you |
| 3 | that he was under the influence, correct? |
| 4 | MR. FARRAH: Objection. |
| 5 | A. No. |
| 6 | Q. So in fact, in your opinion as you stated today |
| 7 | under oath, he was not under the influence of |
| 8 | alcohol that you could tell when he was at the |
| 9 | Longhorn that evening, correct? |
| 10 | MR. FARRAH: Objection. |
| 11 | A. I guess. Referring to the last question, what |
| 12 | exactly is "under the influence"? |
| 13 | Q. Let's go back to this. When you signed this |
| 14 | document that Mr. Farrah prepared for you where |
| 15 | he wrote on your behalf that Mr. Southworth |
| 16 | seemed to be under the influence of alcohol, |
| 17 | what did you think "under the influence of |
| 18 | alcohol" meant? |
| 19 | MR. FARRAH: Objection. |
| 20 | A. I can say that I don't think he was drunk. I |
| 21 | mean, he was under the influence in respect |
| 22 | that he had been drinking alcohol. |
| 23 | Q. So when you agreed to sign for Mr. Farrah this |
| 24 | statement, your understanding of what |

|  | Page 176 |
|---|---|
| 1 | Mr. Farrah wrote for you was being under the |
| 2 | influence of alcohol was the fact that you had |
| 3 | alcohol in your system, correct? |
| 4 | MR. FARRAH: Objection. |
| 5 | A. Correct. |
| 6 | Q. It didn't mean that he was drunk, correct? |
| 7 | MR. FARRAH: Objection. |
| 8 | A. Yes. |
| 9 | Q. And, in fact, while at the Longhorn, no slurred |
| 10 | speech, correct? |
| 11 | A. Correct. |
| 12 | Q. He was steady on his feet going to the |
| 13 | bathroom, correct? |
| 14 | A. Correct. |
| 15 | Q. No slurring at the table, correct? |
| 16 | A. Correct. |
| 17 | Q. No louder than anyone else at the table, |
| 18 | correct? |
| 19 | A. Correct. |
| 20 | Q. You don't have a specific memory of any glassy |
| 21 | eyes, correct? |
| 22 | MR. FARRAH: Objection. |
| 23 | A. Correct. |
| 24 | MR. GILLIS: I have no further questions. |

Page 177

1    MR. FARRAH: I think I've asked you
2    everything I need to ask you. Thanks a lot.
3    MR. GILLIS: You're done.
4
5        (Whereupon, the deposition was
6        concluded at 3:05 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 178

1    SIGNATURE PAGE/ERRATA SHEET
2    RE: Nancy Rosario, Individually, as she is the
       Administratrix of the Estate of Awilda
3    Santiago, Essex Probate Court Docket
       #03P-2499AD1, P/P/A Veronica Rosario and
4    Christina Santiago, and as she is the
       Administratrix of the Estate
5    of Jose Santiago, Berlin (Connecticut)
       Probate Court, Case #03-0713 v. Rare
6    Hospitality International, Inc. d/b/a
       Longhorn Steakhouse
7
     February 10, 2006
8    Deposition of Jude Connelly
9        I, JUDE CONNELLY, do hereby certify that I
10   have read the foregoing transcript of my
       testimony and further certify that it is a true
11   and accurate record of my testimony (with the
       exception of the following changes listed
12   below):
       Page   Line        Correction
13   ____  ____    _____
14   ____  ____    _____
15   ____  ____    _____
16   ____  ____    _____
17   ____  ____    _____
18   ____  ____    _____
19   ____  ____    _____
20       Signed under the pains and penalties of
21   perjury this _____ day of
22   _____, 2006.
23       _____
24            Jude Connelly

Page 179

1    C E R T I F I C A T E
2    COMMONWEALTH OF MASSACHUSETTS
3    COUNTY OF MIDDLESEX, SS
4
5        I, BARBARA J. SIMON, a Professional
       Shorthand Court Reporter and Notary Public in
6    and for the Commonwealth of Massachusetts, do
       hereby certify that the foregoing deposition of
7    Jude Connelly, was taken before me on Friday,
       February 10, 2006. The said witness was
8    satisfactorily identified and duly sworn before
       the commencement of his testimony; that the
9    said testimony was taken stenographically by
       myself and then transcribed by myself. To the
10   best of my knowledge, the within transcript is
       a complete, true and accurate record of said
       deposition.
11
         I am not connected by blood or marriage
12   with any of the said parties, nor interested
       directly or indirectly in the matter in
13   controversy.
14       In witness whereof, I have hereunto set my
       hand this 20th day of February, 2006.
15
16
17       _____
18       Barbara J. Simon, Notary Public
       My Commission Expires:
19       November 6, 2009
20
21
22
23
24

LEIGH Ann Chabot.                    12-17-80
SS#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
57 Fourth st
3Rd floor
Leominster Ma 01453
(978)-840-2810

There were about 8 men They
all had chowder & bread Then they had
salads, most had Steak or Ribs. They were
drinking manhattan's or Bud light draft. He had
3 ~~Bud Light~~ Manhattan's.

Leigh Chabot
NOV 2, 03

8:45pm

GRAND JURY
EXHIBIT
20
11/5/03 RC

THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
_____
NANCY ROSARIO, INDIVIDUALLY, AS )
SHE IS THE ADMINISTRATIX OF THE )
ESTATE OF AWILDA SANTIAGO, ESSEX )
PROBATE COURT DOCKET #03P-2499ADI)
P/P/A VERONICA ROSARIO AND       )
CHRISTINA SNATIAGO, AND AS SHE IS)
THE ADMINISTRATIX OF THE ESTATE  ) Civil Action Number:
OF JOSE SANTIAGO, BERLIN         ) 05 CV 1061MLW
(CONNECTICUT) PROBATE COURT,     )
CASE #03-0713,                   )
                    Plaintiff(s),)
    vs.                          )
                                 )
RARE HOPITALITY INTERNATIONAL,   )
INC., d/b/a LONGHORN STEAKHOUSE, )
                    Defendant.   )
_____
```

VIDEO DEPOSITION OF:

LEIGH CHABOT

* * * * *

SCHEDULED TO BE TAKEN ON:

March 10, 2006

Beginning at 10:00 A.M.

* * * * *

Starkings Court Reporting & Video Services
302 Mason Street, Post Office Box 1345
Telephone (910) 323-4232 or 1-800-328-3747

---

T A B L E   O F   C O N T E N T S

Title Page...........................................1
Table of Contents....................................2

Leigh Chabot - Witness:

Examination by Mr. Farrah ...........................3
Examination by Mr. Gillis .........................134
Examination by Mr. Farrah .........................163
Examination by Mr. Gillis .........................186
Examination by Mr. Farrah .........................187
Reporter's Certificate ............................189

Please Note:  Proper nouns MAY BE spelled
Phonetically.  No exhibits were presented to the
reporter to attached to the transcript.

A P P E A R A N C E S :

ON BEHALF OF THE PLAINTIFF(S):

ALBERT FARRAH, JR., ESQUIRE
One Washington Mall, 5th Floor
Boston, MA  02108
alf@afarrah.com

ON BEHALF OF THE DEFENDANT(s):

MICHAEL K. GILLIS, ESQUIRE
NEIL SCHNAURBACH, ESQUIRE
GILLIS & BIKOFSKY
1150 Walnut Street
Newton, MA  02446
mgillis@gillisandbikofsky.com

KRISTEN HATHCOAT, ESQUIRE
BEN WILSON, RISK ADMIN.
RARE HOSPITALITY
8215 Roswell Rd., Bldg., 600
Atlanta, GA  30350

---

(Whereupon,

LEIGH CHABOT

was called as a witness, duly sworn to tell

the truth, and testified under oath as follows:)

(10:11 A.M.)

EXAMINATION BY MR. FARRAH:

Q.     Good morning, Ms. Chabot.  My name is Albert
Farrah and I represent the Plaintiff in this action.  How
do you do?

A.     Good.

Q.     Could you tell us your full name for the
record, please?

A.     Lee Ann Blackington Chabot, maiden name
Blackington.

Q.     How old are you?

A.     Twenty-five.

Q.     And are you married?

A.     Yes.

Q.     Where do you live?

A.     Fayetteville, North Carolina.

Q.     Do you have any children?

A.     Yes, three.

Q.     Could you briefly tell me what your schooling
experience is?

A.     I attended high school through 11th grade at

---

1   Paradise Village Hills Pheonix, Arizona.  Later I

2   obtained my GED and served -- did one year at Mount

3   Monchuset (phonetic) Community College which ended in

4   2004.

5        Q.     Your age again is?

6        A.     Twenty-five.

7        Q.     Date of birth is what?

8        A.     December 17, 1980.

9        Q.     Can you tell me what experience you have

10  working in restaurants?

11       A.     I began working at J&B's Bar and Grill in

12  Townsend, Massachusetts in about May of 1998.  I

13  hostess'd there for about six months.  After that I

14  waitressed for the following time I was there, which was

15  about three years.  And then I moved on to Longhorn

16  sometime late 2000 and worked there until April 12, 2004,

17  which then I left when I joined the military.

18       Q.     You joined the military in 2004; is that

19  right?

20       A.     Yes, sir.

21       Q.     Were you in the Reserves prior to that time?

22       A.     No, sir.

23       Q.     When you worked at JMB's, is that the name of

24  it with an M in the middle?

25       A.     No, an "&" sign, J&B's.

1    Q.    Can you tell me approximately how long before
2  September 26, 2003 it was?
3    A.    Approximately, I would say at least four
4  months.
5    Q.    And can you tell me with what frequency, that
6  is how many times between that first sighting of him, for
7  lack of a better way to describe it, four months before
8  September 26, 2003, and September 26, 2003, you saw him
9  at the restaurant.
10    A.    His frequency I would say approximately would
11 be once a week.
12    Q.    Can you describe him to me as he appeared to
13 you back then?
14    A.    Back then he was, from what I remember, over
15 six foot, six two, well over 200 pounds.  I would say
16 220.
17    Q.    What kind of hair cut did he have during that
18 period?
19    A.    He had a buzz cut.
20    Q.    Buzz cut?
21    A.    Yeah.
22    Q.    Pretty distinctive looking fellow?
23    A.    I wouldn't pick him out from a crowd.  He had
24 a thicker build.  He wasn't fat.  A thicker kind of kid.
25 But he would not stand out to me in a crowd, no.

1    Q.    Do you have a memory during that four-month
2  period before September 26, 2003 of having waited on him
3  yourself?
4    A.    I may have waited on him one time maybe.
5    Q.    Do you know any of the other waitresses at
6  the Longhorn who waited on him during that four month
7  period before September 26, 2003?
8    A.    Yes.
9    Q.    Who?  Who else waited on him during that
10 period?
11    A.    Mary Clare did and Sherry did.
12    Q.    Mary Clare Fitzgerald?
13    A.    I believe, yes.
14    Q.    And Sherry?
15    A.    Samon.
16    Q.    How do you know Sherry Samon waited on him
17 before September 26, 2003?
18    A.    Just from memory.  I have been friends with
19 Sherry, and from the restaurant seeing him in there, I
20 had known Sherry to wait on him.  Usually Sherry and I
21 always work the same shifts.
22    Q.    Did you ever, after you realized that there
23 was this accident of September 27 in the early morning of
24 2003, did you speak to Sherry about this gentleman, Mr.
25 Southworth?

1    A.    I spoke to Sherry the following day.
2    Q.    Tell me what you said to her and what she
3  said to you during that conversation?
4    A.    It was -- I basically told Sherry that I had
5  seen him on the news and that he was involved in a fatal
6  accident.  And she said, are you sure it was him?  I
7  said, Yeah, I'm pretty sure, his picture was up there.
8  And she said, did they say a name.  And I said no.  And
9  that was about it.  She said no, it couldn't have been
10 him.
11    Q.    Why did she say no it couldn't have been him?
12    A.    Probably too much of a coincidence, you don't
13 think anyone you'd know would be on the news.
14    Q.    During that conversation did Sherry say to
15 you that she had waited on him before?
16    A.    Yes.  They're her regulars.
17    Q.    He was one of her regulars; is that right?
18    A.    Yes, sir.
19    Q.    What do you mean by a regular?
20    A.    Someone who you wait on when they normally
21 come in.  You would know that was your customer and they
22 may even ask for you instead of even sitting with someone
23 else.
24    Q.    Did customers have that ability to ask for a
25 particular waitress, I mean, if the restaurant level of

1  business allowed it?
2    A.    Absolutely.
3          MR. GILLIS:  Objection.
4    Q.    What made you understand that Mr. Southworth
5  was Sherry's customer?
6    A.    Normally when he came in from the shifts I
7  was on, and that I saw him in  the restaurant, Sherry was
8  waiting on him.
9    Q.    Did you ever hear him ask for Sherry?
10    A.    No, I never heard him ask.
11    Q.    Did you ever hear Sherry talk about him
12 during the period prior to September 26, 2003?
13    A.    Yes.
14    Q.    What sort of things did she say about him?
15    A.    She just, you know, she never mentioned him
16 by name, but if she came to the computer and we were
17 sitting there chatting, she would go oh, yeah, those kids
18 are so funny.  Or maybe tell me something they were
19 talking about at the table.  She mentioned frequently how
20 they'd always come in after dirt biking.  And that was
21 their ritual.  They would go out dirt biking for the day
22 and then come in for dinner.
23    Q.    Can you tell me how many times Sherry waited
24 on Mr. Southworth during that four-month period?
25          MR. GILLIS:  Objection.

1    (DEPOSITION EXHIBIT #10 WAS MARKED

2    FOR IDENTIFICATION.)

3    Q.    Do you recognize Exhibit #10 as depicting a

4  portion of the service bar at the Leominster Longhorn as

5  it appeared on September 26, 2003?

6    A.    I don't remember the corkboard being there.

7    Q.    Okay. Other than that does it look like a

8  portion of the service bar?

9    A.    Yes.

10    Q.    I am going to show you a photograph and ask

11  you if it fairly and accurately depicts a portion of the

12  Leominster Longhorn as it appeared on September 26, 2003?

13    A.    Yes.

14    Q.    What portion does that show?

15    A.    It shows the back alley where we receive our

16  food, the dish pit, and a small portion of the left side

17  where we make our drinks and put bread in.

18    MR. FARRAH:    Could we have that marked as

19  the next exhibit

20    (DEPOSITION EXHIBIT #11 WAS MARKED

21    FOR IDENTIFICATION.)

22    MR. GILLIS:    When are we going to get copies

23  of these? I believe you said we were going to get the

24  video and all the photographs that you took.

25    MR. FARRAH:    Did you get an e-mail -- can we

1  go off the record.

2    (Off the record.)

3    (Back on the record as follows:)

4  BY MR. FARRAH:

5    Q.    Could you show us where you get the food?

6    A.    (Indicating while testifying.) Right here we

7  get the main entrees.    Up here is where we get appetizers

8  and we pull our salads from there.

9    Q.    All right. Did you testify before the Grand

10  Jury?

11    A.    No, sir.

12    Q.    Did you speak to any other police after that

13  meeting with the police at the Longhorn on November 2,

14  2003?

15    A.    No, sir.

16    Q.    In Exhibit #7 you wrote among other things --

17  well, you wrote there were about eight men.    They all had

18  chowder and bread.    Then they had salads.    Most had

19  steaks or ribs.    They were drinking Manhattans or Bud

20  Light draft.    They had three Manhattans.    Do you see

21  that?

22    A.    Yes, sir.

23    Q.    And the he you are referring to there is Mr.

24  Southworth; is that right?

25    A.    Yes, sir.

---

1    Q.    Did he have any beers that you recall at the

2  table?

3    A.    Not that I recall.

4    Q.    Do you know who had the beers at the table?

5    A.    I know that I served a beer to a gentleman

6  who was in a black hat with black hair.

7    Q.    And you served another beer to that table

8  during that night; isn't that right?

9    A.    Yes, sir.

10    Q.    Who did you serve that too?

11    A.    I don't recall specifically, sir.

12    Q.    So the two beers that appear on the first

13  page of Exhibit #8, two 25 ounce Bud Light beers were

14  served by you to the table the night of September 26,

15  2003; is that right?

16    A.    Yes, sir.

17    Q.    Nobody from the bar, no bartender that night

18  asked you to add to your check any beers that had been

19  ordered by your table patrons while they had been at the

20  bar that night; is that right?

21    A.    Correct.

22    Q.    And the state trooper was the only police

23  officer you ever spoke to about this incident?

24    A.    Yes, sir.

25    Q.    Did you ever speak to Chuck Bulgain about

1  this incident?

2    A.    Not that I recall, no.

3    Q.    David -- not David Orr -- what's his first

4  name?

5    A.    Chris.

6    Q.    Chris Orr and you spoke about it that day, is

7  that right?

8    A.    Yes, sir.

9    Q.    Tell me everything you said to Chris and

10  Chris said to you that day about Southworth and what

11  happened that night?

12    A.    Chris asked me after speaking with the state

13  trooper, Chris basically knew exactly what had happened,

14  and so I spoke with Chris later that evening.    He told me

15  what the trooper had told him regarding that there was an

16  accident he was involved in.    That he had killed two

17  people and that they were backtracking his story for the

18  night.    And from what Chris was told from the trooper,

19  the only thing Chris knew is that they had stopped at, I

20  guess a strip club after Longhorn.    And Chris asked me do

21  I feel that they left here they were fine, that they were

22  not over served.    And I told him I believed they did.

23  They left the restaurant fine.

24    Q.    Have you told everything you recall about

25  talking to Chris about that night?

**1**

| | |
|---|---|
| 1 | Volume: 1 |
| | Pages: 1-141 |
| | Exhibits: 1 |
| 2 | |
| 3 | COMMONWEALTH OF MASSACHUSETTS |
| 4 | Middlesex, ss      Superior Court Dept. |
| | C.A. No. 03-4704L2 |
| 5 | |
| 6 | - - - - - - - - - - - - - - - - - |
| | NANCY ROSARIO, INDIVIDUALLY and as |
| | SHE IS THE ADMINISTRATRIX OF THE |
| 7 | ESTATE OF AWILDA SANTIAGO, ESSEX |
| | PROBATE COURT DOCKET #03P-2499AD1 |
| 8 | AND P/P/A VERONICA ROSARIO AND |
| | CHRISTINA SANTIAGO, |
| 9 | Plaintiff, |
| | vs. |
| 10 | JEFFREY SOUTHWORTH, ENTERPRISE |
| | RENT-A-CAR OF BOSTON, INC., |
| 11 | Defendants. |
| | - - - - - - - - - - - - - - - - - |
| 12 | |
| 13 | DEPOSITION of THOMAS SCOTT ESPY, a witness |
| 14 | called by counsel for the Plaintiff, taken |
| 15 | pursuant to Rule 30 of the Massachusetts Rules |
| 16 | of Civil Procedure before Alene M. Jennette, |
| 17 | Certified Shorthand Reporter and Notary Public |
| 18 | in and for the Commonwealth of Massachusetts, |
| 19 | at the offices of Albert L. Farrah, Jr., One |
| 20 | Washington Mall, Boston, Massachusetts on |
| 21 | Tuesday, June 22, 2004, commencing at |
| 22 | 10:05 a.m. |
| 23 | |
| 24 | |

**2**

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | ALBERT L. FARRAH, JR., ESQ. |
| 4 | One Washington Mall |
| 5 | Boston, Massachusetts 02108 |
| 6 | On Behalf of the Plaintiff |
| 7 | |
| 8 | AVERY DOOLEY POST & AVERY, LLP |
| 9 | By Robert P. Turner, Esq. |
| 10 | 90 Concord Avenue |
| 11 | Belmont, Massachusetts 02478 |
| 12 | On Behalf of the Defendant |
| 13 | Jeffrey Southworth |
| 14 | |
| 15 | KOPELMAN AND PAIGE, P.C. |
| 16 | By Thomas P. Lane, Esq. |
| 17 | 31 St. James Avenue |
| 18 | Boston, Massachusetts 02116 |
| 19 | On Behalf of the Defendant |
| 20 | Enterprise Rent-a-Car of Boston |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

**3**

| | | | |
|---|---|---|---|
| 1 | | I N D E X | |
| 2 | | | |
| 3 | WITNESS: | DIRECT | CROSS |
| 4 | THOMAS SCOTT ESPY | | |
| 5 | | | |
| 6 | By Mr. Farrah | 4 | |
| 7 | By Mr. Lane | | 133 |
| 8 | By Mr. Turner | | 135 |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | E X H I B I T S | | |
| 13 | | | |
| 14 | NO. | DESCRIPTION | PAGE |
| 15 | 1 | Proposed Floor Plan | 66 |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | Exhibits retained by Attorney Farrah. | | |
| 23 | | | |
| 24 | | | |

**4**

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Mr. Lane not present.) |
| 3 | MR. FARRAH:  Usual stipulations? |
| 4 | MR. TURNER:  Sure. |
| 5 | MR. FARRAH:  The parties have agreed |
| 6 | that all objections, except as to the form of |
| 7 | the question, and motions to strike will be |
| 8 | reserved until the time of trial. |
| 9 | THOMAS SCOTT ESPY, |
| 10 | a witness called for examination by counsel for |
| 11 | the Plaintiff, being first duly sworn, was |
| 12 | examined and testified as follows: |
| 13 | DIRECT EXAMINATION |
| 14 | BY MR. FARRAH: |
| 15 | Q. Can you tell me your name, please? |
| 16 | A. Thomas Espy.  I go by Scott, though. |
| 17 | Q. Mr. Espy, my name is Albert Farrah, |
| 18 | and I represent Nancy Rosario, who has brought |
| 19 | a lawsuit against Jeffrey Southworth and |
| 20 | Enterprise Motor Car -- or Rent-a-Car for |
| 21 | injuries that she suffered and her family |
| 22 | suffered as a result of an auto accident that |
| 23 | occurred in September of 2003. |
| 24 | As you can see, there is a court |

**61**

1  Q. I'm sorry. You believe you called
2  Todd?
3  A. Yup.
4  Q. Where were they?
5  A. Um, I think they were at the Four
6  Points.
7  Q. Okay. Where were you when you called
8  Todd?
9  A. At the LongHorn.
10  Q. Sitting at the bar?
11  A. I believe so.
12  Q. And how much later was it that they
13  showed up at the LongHorn?
14  A. I don't know. I think it was right
15  as we got our table, so I don't know.
16  Q. How long did you wait for a table
17  from when you got there until you were seated?
18  A. I think half an hour, somewhere
19  around there. I don't know.
20  Q. You were at the bar?
21  A. Yup.
22  Q. With Jeff and Jude; is that right?
23  A. Yeah. Well, Jude was waiting for the
24  table with us.

**62**

1  Q. Jude was at the bar?
2  A. He wasn't sitting at the bar.
3  Q. Was he standing at the bar?
4  A. Yeah.
5  Q. You were sitting at the bar?
6  A. I believe so, yes.
7  Q. With Jeff?
8  A. Yup.
9  Q. Can you tell me where at the bar you
10  were sitting with Jeff and --
11  A. I don't know.
12  Q. How much did you have to drink at the
13  bar?
14  A. I think just a beer.
15  Q. Okay. You had just a beer?
16  A. I believe so, yeah.
17  Q. What kind of beer?
18  A. Bud Light probably.
19  Q. Okay. And how much did Jeff have to
20  drink at the bar?
21  A. I don't know. A beer.
22  Q. More?
23  A. I don't know.
24  Q. Why don't you know?

**63**

1  A. Because I don't -- I wasn't keeping
2  track of how much he was drinking.
3  Q. So you don't know whether he had one
4  beer or three beers while he was sitting at the
5  bar; is that right?
6  A. Yeah.
7  Q. Who paid for whatever you drank?
8  A. I paid for whatever I had.
9  Q. And Jeff paid for whatever he had; is
10  that right?
11  A. Yes.
12  Q. You weren't really watching Jeff to
13  see how much he was drinking; is that right?
14  A. Nope.
15  Q. What were you doing while you were at
16  the bar?
17  A. Probably watching the Red Sox game.
18  Q. Did Jeff have any Manhattans while he
19  was at the bar?
20  A. No.
21  Q. Are you sure?
22  A. No, but...
23  Q. But what?
24  A. I -- I'm not sure either way.

**64**

1  Q. Okay. The Bud Light that you had was
2  a draft; is that right?
3  A. Yup.
4  Q. 24-ounce?
5  A. Yup.
6  Q. Is that right?
7  A. Yup.
8  Q. How many did you have?
9  A. One, I believe.
10  Q. Maybe two?
11  A. No, I don't think so.
12  Q. And the Bud Light that you saw Jeff
13  order when you came in was a 24-ounce; is that
14  right?
15  A. Yes.
16  Q. Is that typically what the two of you
17  would have when you went to the LongHorn
18  Steakhouse, the 24-ounce Bud Light?
19  A. Sometimes.
20  Q. Did you ever order a 12-ounce Bud
21  Light while you were there?
22  A. I believe so.
23  Q. Does dirt-biking make you thirsty?
24  A. Well, it's -- I mean, it's a

**1**

1   Volume: 1
    Pages: 1-44
    Exhibits: None
2
3   COMMONWEALTH OF MASSACHUSETTS
4   Middlesex, ss    Superior Court Dept.
                     C.A. No. 03-4704L2
5
    - - - - - - - - - - - - - - - - -
6   NANCY ROSARIO, INDIVIDUALLY and as
    SHE IS THE ADMINISTRATRIX OF THE
7   ESTATE OF AWILDA SANTIAGO, ESSEX
    PROBATE COURT DOCKET #03P-2499AD1
8   AND P/P/A VERONICA ROSARIO AND
    CHRISTINA SANTIAGO,
9            Plaintiff,
    vs.
10  JEFFREY SOUTHWORTH, ENTERPRISE
    RENT-A-CAR OF BOSTON, INC.,
11           Defendants.
    - - - - - - - - - - - - - - - - -
12
13      DEPOSITION of MICHAEL J. ESPY, a witness
14  called by counsel for the Plaintiff, taken
15  pursuant to Rule 30 of the Massachusetts Rules
16  of Civil Procedure before Alene M. Jennette,
17  Certified Shorthand Reporter and Notary Public
18  in and for the Commonwealth of Massachusetts,
19  at the offices of Albert L. Farrah, Jr., One
20  Washington Mall, Boston, Massachusetts on
21  Tuesday, June 22, 2004, commencing at 1:09 p.m.
22
23
24

**2**

1   APPEARANCES:
2
3   ALBERT L. FARRAH, JR., ESQ.
4   One Washington Mall
5   Boston, Massachusetts  02108
6     On Behalf of the Plaintiff
7
8   AVERY DOOLEY POST & AVERY, LLP
9   By Robert P. Turner, Esq.
10  90 Concord Avenue
11  Belmont, Massachusetts 02478
12    On Behalf of the Defendant
13    Jeffrey Southworth
14
15  KOPELMAN AND PAIGE, P.C.
16  By Thomas P. Lane, Esq.
17  31 St. James Avenue
18  Boston, Massachusetts 02116
19    On Behalf of the Defendant
20    Enterprise Rent-a-Car of Boston
21
22
23
24

**3**

1             I N D E X
2
3   WITNESS:    DIRECT  CROSS  REDIRECT
4   MICHAEL J. ESPY
5
6   By Mr. Farrah    4          40
7   By Mr. Lane           37
8
9
10
11          E X H I B I T S
12
13  NO.        DESCRIPTION        PAGE
14      (None)
15
16
17
18
19
20
21
22
23
24

**4**

1            P R O C E E D I N G S
2              STIPULATIONS
3       It is hereby stipulated and agreed by
4   and between counsel for the respective parties
5   that all objections, except as to the form of
6   the question, and motions to strike will be
7   reserved until the time of trial.
8          MICHEAL J. ESPY,
9   a witness called for examination by counsel for
10  the Plaintiff, being first duly sworn, was
11  examined and testified as follows:
12          DIRECT EXAMINATION
13  BY MR. FARRAH:
14      Q. Could you state your name for the
15  record, please?
16      A. Michael Joseph Espy.
17      Q. Mr. Espy, my name is Albert Farrah.
18  And in a lawsuit brought by Nancy Rosario
19  against Jeffrey Southworth, represented by
20  Mr. Turner, and Enterprise Rent-a-Car,
21  represented by Mr. Lane, I have noticed your
22  deposition.
23       And I and then these two gentlemen if
24  they care to are going to also ask you some

**25**

1 they? Manhattans.
2 Q. Do you remember how many beers and
3 how many Manhattans you had?
4 A. I don't know for sure.
5 Q. What did Jeff Southworth have to
6 drink?
7 A. I honestly don't know.
8 Q. Whose idea was it to order
9 Manhattans?
10 A. I don't know. Might have been mine.
11 I don't really know.
12 Q. Was Todd drinking with Matt and -- I
13 forget the other fellow's name.
14 A. Bruce.
15 Q. -- Bruce at the hotel?
16 A. He probably had a beer.
17 Q. Where does Todd live?
18 A. Harvard, Mass.
19 Q. Do you know the street?
20 A. 16 Westcott.
21 Q. Todd is someone you've known for a
22 long time?
23 A. Yes.
24 Q. Was Jeff Southworth exhibiting signs

**26**

1 of intoxication to you that night at the
2 restaurant?
3 A. Not that I can recall. I was drunk
4 myself, so I don't -- I wasn't really paying
5 attention to him.
6 Q. Did you drive or did Todd drive?
7 A. I didn't drive.
8 Q. So it must have been Todd?
9 A. Yup.
10 Q. Did you speak to the police after the
11 accident?
12 A. They came to my house, the State
13 Police, a younger State Police officer. And I
14 gave a statement.
15 Q. You gave a statement?
16 A. Yup.
17 Q. Do you have that statement?
18 A. No.
19 Q. Do you have it at your house?
20 A. No. My parents might. I don't have
21 a copy of it.
22 Q. Did you tell the police that at the
23 restaurant Jeff Southworth personally consumed
24 at last three of the Manhattans and two beers?

**27**

1 A. I don't think so.
2 Q. Okay. Do you have a memory of having
3 told the police that?
4 A. No.
5 Q. So you really can't remember what
6 happened?
7 A. No. I was drunk.
8 Q. Did you testify before the grand
9 jury?
10 A. No.
11 Q. Have you talked to anybody who was in
12 your party the night of September 26, 2003,
13 about what happened at the restaurant?
14 A. Um, not really specific details or
15 anything like that.
16 Q. Have you talked to Jude Connelly
17 about what happened that night?
18 A. No.
19 Q. Do you know where you were sitting at
20 the LongHorn Steakhouse that night?
21 A. No.
22 Q. Do you know if --
23 A. Actually, I remember my back was to
24 the bathroom.

**28**

1 Q. Okay. How many times have you been
2 in the LongHorn Steakhouse?
3 A. Probably two, at the most three
4 times.
5 Q. I'm going to show you what's been
6 marked as Exhibit 1 in your brother's
7 deposition. I'm going to ask you whether --
8 and this is a document I got from the
9 Leominster Licensing Board.
10 A. Mm-hmm.
11 Q. I'm going to ask you whether or not
12 this document fairly and accurately depicts the
13 layout of at least some of the features of the
14 LongHorn Steakhouse as it appeared to you that
15 night.
16 A. This would be the bar, right?
17 Q. That's the bar.
18 A. Then this would be the entrance.
19 Q. That's the entrance, so --
20 A. So, yes.
21 Q. Your memory is that your back was to
22 the rest room?
23 A. Yes.
24 Q. Were you sitting in a booth or table?

---

**Page 1**

```
                                    Volume:    II
                                    Pages:     1-119
                                    Exhibits:  None

              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

*********************************** *
NANCY ROSARIO, INDIVIDUALLY, AS SHE IS *
THE ADMINISTRATRIX OF THE ESTATE OF    *
AWILDA SANTIAGO, ESSEX PROBATE COURT   *
#03P-2499AD1, P/P/A VERONICA ROSARIO   *
AND CHRISTINA SANTIAGO, AND AS SHE IS  *
THE ADMINISTRATRIX OF THE ESTATE OF    *
JOSE SANTIAGO, BERLIN (CONNECTICUT)    *
PROBATE COURT, CASE #03-0713           *
     Plaintiff,                        *
                                       *
        VS                             * Civil Action No.
                                       * 05-CV-10617MLW
RARE HOSPITALITY INTERNATIONAL, INC.   *
d/b/a LONGHORN STEAKHOUSE,             *
     Defendant                         *
*********************************** *

        DEPOSITION OF KRISTIN O'DONNELL, a witness

    called on behalf of the Plaintiff, taken pursuant to

    Notice under the applicable provisions of the Federal

    Rules of Civil Procedure, before Barbara J  Simon, a

    Professional Shorthand Reporter and Notary Public, in

    and for the Commonwealth of Massachusetts, at the law

    offices of Albert L. Farrah, Jr , One Washington

    Mall, Boston, Massachusetts, on Wednesday, December

    28, 2005, commencing at 11:05 a.m.

            SHEA COURT REPORTING SERVICES
                   (617) 227-3097
```

---

**Page 2**

APPEARANCES

ALBERT L. FARRAH, JR., ESQ
Law Offices of Albert L. Farrah, Jr.
One Washington Mall
Boston, MA 02108
(617) 742-7766
    Counsel for the Plaintiff

MICHAEL K. GILLIS, ESQ
Gillis & Bikofsky, P.C.
1150 Walnut Street
Newton, MA 02461
(617) 244-4300
    Counsel for the Defendant

---

**Page 3**

INDEX

WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

KRISTIN O'DONNELL

(By Mr. Farrah)         4

EXHIBITS

There are no exhibits.

---

**Page 4**

PROCEEDINGS

KRISTIN O'DONNELL, having been previously
satisfactorily identified and duly sworn, on oath,
deposes and says as follows:

DIRECT EXAMINATION

BY MR. FARRAH:

Q. You're still under oath.  If I cover old ground, it's
not because I mean to.  I'm going to try to move
forward.

    Let me start by asking you, on the evening of
September 26, 2003, do you recall having a
conversation with Leigh Chabot about the Jack Daniels
Manhattans that she had ordered from you?

A. Yes.

Q. And did you ask Leigh about that table?

A. Yes.

Q. What did you ask her about the table?

A. I just wanted to make sure that they were eating
dinners.

Q. Did you say to her, in effect, "Are these people
eating food?"

A. Yes.

Page 29

1        (Court reporter reads back question.)
2        MR. GILLIS: I object.
3    A. No.
4    Q. The Jack Daniels Manhattans that you made for Leigh
5       Chabot that night, were they straight up, or on the
6       rocks, or don't you know?
7    A. Straight up.
8    Q. And you have a memory of that; is that right?
9    A. Yes.
10   Q. And you free-poured those; isn't that right?
11   A. Correct.
12   Q. Did you follow Longhorn's procedure with respect to,
13      first, the vessel into which the drinks were served
14      to the patrons?
15   A. What do you mean by "vessel"?
16   Q. I had to say "vessel." I just felt like saying
17      "vessel."
18   A. Is that the word we were not sure of last time?
19   Q. I'm showing you Exhibit 4 from the first day of your
20      deposition, which, for the record, is the Bar
21      Operations Manual. Do you remember that document?
22   A. Yes.
23   Q. And on the page which we have Bates stamped Rare
24      05271, bar glassware is described. Do you see that?

Page 30

1    A. Yes.
2    Q. What I want to know is, did you give to Leigh Chabot
3       the Jack Daniels Manhattans straight up in a
4       six-ounce cocktail glass, as is shown on this page of
5       Exhibit 4?
6        MR. GILLIS: Objection.
7    A. Yes.
8    Q. Is there any question in your mind about that?
9    A. No.
10   Q. Okay. You didn't serve those Jack Daniels Manhattans
11      in the fourteen-ounce cobalt-blue-rimmed martini
12      glass, did you?
13   A. No. That was only for Margaritas.
14   Q. Do you have any explanation as to why in the Longhorn
15      bar manual it is referred to as a martini glass?
16   A. I believe because of the shape and the design.
17   Q. That's your guess?
18   A. No. That would be exact. It says here as well --
19      specialty shaker Margaritas. We would never serve a
20      martini in those.
21   Q. How far from the lip of the glass -- the Manhattan
22      glass -- was it that you poured the drinks, the
23      Manhattans?
24   A. An inch below, and once the cherry goes in, it brings

Page 31

1       it up so the customers think they're getting more.
2    Q. Can we agree that the drink-making techniques portion
3       of Exhibit 4 to your deposition on page 298 requires
4       that all drinks be one-quarter inch from the lip of
5       the glass?
6    A. Yes.
7    Q. Is that what you did?
8    A. Once the cherry goes in it, it brings it up to about
9       a quarter inch.
10   Q. And you put one cherry in each glass of the Jack
11      Daniels Manhattans; is that right?
12   A. Yes.
13   Q. Describe for me how you filled the first order for
14      Jack Daniels Manhattans that Leigh presented you
15      with, which according to Exhibit 11 was for three
16      Jack Daniels Manhattans, placed at 8:40.
17       MR. GILLIS: Objection. Did you say that she
18      served?
19       MR. FARRAH: No; that Leigh served.
20       MR. GILLIS: I don't think there's any evidence
21      that the first round was the round that she served.
22       I don't think there's any evidence that she said
23      she served that first round.
24   Q. Let me back up. According to Exhibit 11, Leigh

Page 32

1       placed an order for Table 52 for three Jack Daniels
2       Manhattans at 8:40 p.m. Do you see that?
3    A. Yes.
4    Q. Do you agree with that, that that's what Exhibit 11
5       shows?
6    A. Yes.
7    Q. Did you make that round of drinks?
8    A. I don't recall.
9    Q. Do you have any reason to believe you did not make
10      that round of drinks?
11       MR. GILLIS: Objection; asked and answered.
12   A. I can't say for sure.
13   Q. Do you know whether you made the round of drinks for
14      seven Jack Daniels Manhattans which Leigh placed for
15      Table 52 at 8:51 p.m.?
16   A. Yes.
17   Q. What is it about that order that leads you to know
18      that you made that order?
19   A. I just remember the drinks on the tray.
20   Q. You remember seven drinks?
21   A. Yes.
22   Q. Had you ever made seven Jack Daniels Manhattans at
23      one time for one table while you worked at the
24      Longhorn, up to that point?

Page 33

1  A. No.
2  Q. Had you ever made Jack Daniels Manhattans straight up
3     for any customer up to that point while you worked at
4     the Longhorn?
5  A. Yes.
6  Q. Was it a drink you made often?
7  A. No.
8  Q. And when you worked at J.R.'s, is it accurate to say
9     that most of your customers were drinking beers?
10 A. Yes.
11 Q. On the night of September 26, 2003, was there any
12    Longhorn mandated procedure in place for keeping a
13    tally of the number of drinks that had been served by
14    the service bar to a particular table?
15 A. No.
16 Q. Was there any Longhorn mandated procedure in place,
17    as of September 26, 2003, that required communication
18    between the different bartenders as to how much each
19    bartender had made for service to a particular table?
20    MR. GILLIS: At the service bar?
21    MR. FARRAH: At the service bar, yes.
22 A. No, there was no set procedure.
23 Q. You're clear, if I understand your testimony right,
24    and I don't want to put words in your mouth, you're

Page 34

1     clear that you made the seven straight-up Jack
2     Daniels Manhattans that were made at 8:51; is that
3     right?
4  A. Yes.
5  Q. You're unsure about whether it was you that made the
6     four Jack Daniels Manhattans that were ordered at
7     8:40; is that right?
8  A. Yes.
9  Q. In either event, was there any means -- any way --
10    for you to learn as of the time you made those seven
11    Jack Daniels Manhattans that four Jack Daniels
12    Manhattans had been ordered eleven minutes earlier?
13 A. Are you asking if I knew, if I had a means of knowing
14    that?
15 Q. Yes, if you had a means of knowing that.
16 A. No.
17 Q. Was there a computer in the service bar area that
18    provided you with that information?
19 A. No.
20 Q. Was there a policy in place at the Longhorn that
21    required service bartenders -- the various service
22    bartenders working on any particular night -- to
23    share with one another information about the drinks
24    that they had prepared for service to any table?

Page 35

1  A. No.
2  Q. Now, can you describe for me what you did when you
3     got ready to make the order for the seven Jack
4     Daniels Manhattans?
5     MR. GILLIS: If you remember.
6  A. I put the seven glasses on the tray and then took a
7     rocks glass and filled it with ice, and then put the
8     alcohol in and strained it in and did that seven
9     times, and then put a cherry in each drink, and then
10    put her ticket on top.
11 Q. Is that how you were trained to make a Jack Daniels
12    Manhattan?
13 A. Yes.
14 Q. Who trained you to make a Jack Daniels Manhattan that
15    way?
16 A. Rebecca trained me at Longhorn.
17 Q. As far as you know, did Rebecca train you in making
18    the Jack Daniels Manhattans in accordance with the
19    Bar Operations Manual?
20 A. Yes.
21 Q. As far as you know, is the procedure that you just
22    described for making Jack Daniels Manhattans
23    straight-up the procedure that is described in the
24    Bar Operations Manual?

Page 36

1     MR. GILLIS: Objection.
2  A. I don't recall.
3  Q. Have you ever made Jack Daniels Manhattans a
4     different way from the way you just described the way
5     you made those seven during that order?
6  A. Yes, at different places I've worked.
7  Q. Before or after the Longhorn?
8  A. Both.
9  Q. While you were at the Longhorn, did you ever make a
10    Jack Daniels Manhattan a different way from the way
11    that you described you made the seven that night?
12 A. No.
13 Q. And it's your understanding that the way you made the
14    seven that night is the way that the Longhorn manual
15    requires it be made?
16 A. As far as I recall, yes.
17 Q. After that night while you were at the Longhorn, did
18    you ever again make Jack Daniels Manhattans for
19    anyone?
20 A. I would believe so.
21 Q. Do you have a memory?
22 A. I can't say specifically, no.
23 Q. Did you in making the Jack Daniels Manhattans that
24    night, did you use what's called Manhattan mix?

Page 37

1    A. No.
2    Q. Can we agree that Exhibit 11 shows a charge for
3       Manhattan mix of fifty cents per Jack Daniels
4       Manhattan?
5    A. Yes. It's sweet Vermouth.
6    Q. Did you, in making the Jack Daniels Manhattans, use
7       sweet Vermouth?
8    A. Yes.
9    Q. How much did you put in each Jack Daniels Manhattan
10      during that first round of seven?
11   A. A quarter ounce, probably.
12   Q. How much Jack Daniels did you put in each drink that
13      you've described for that first round of seven?
14   A. It's a long time. Where I work now, they have bigger
15      martinis. I believe it was two ounces, an ounce and
16      a half.
17        MR. GILLIS: Don't guess.
18   A. I can't remember.
19   Q. Do you remember testifying in the criminal trial of
20      Mr. Southworth?
21   A. Yes.
22   Q. Do you remember testifying in the criminal trial of
23      Mr. Southworth that you put one ounce of Jack Daniels
24      in each of those Manhattans?

Page 38

1    A. I guess so.
2        MR. GILLIS: I don't want you to guess.
3    A. I don't recall.
4        MR. GILLIS: If you don't have an answer, don't
5        guess.
6    A. I don't recall.
7    Q. As you sit here today, all you know about how much
8       Jack Daniels you put in that round of seven was that
9       you filled the rocks glass with ice and then Jack
10      Daniels; is that right?
11       MR. GILLIS: Objection.
12   A. No.
13   Q. How much Jack Daniels did you put in each drink
14      during that round of seven that you remember making?
15   A. I don't recall what the Longhorn recipe was.
16   Q. So you don't have any memory, as you sit here, of how
17      much you put in; is that right?
18       MR. GILLIS: Objection.
19   Q. Of how much Jack Daniels you put in any drink; is
20      that right?
21       MR. GILLIS: Objection.
22   A. It's whatever is in the manual.
23   Q. By the way, how was the request made to you that the
24      drinks be straight up as opposed to on the rocks?

Page 39

1       How was that communicated to you?
2    A. By the way they were rung in. It would say "rocks"
3       on the ticket if they wanted on the rocks.
4    Q. And when the request was communicated to you for the
5       Jack Daniels Manhattans, did it come to you as it
6       appears on this page of Exhibit 11, that is, Jack
7       Daniels and a Manhattan mix, or was it a Jack Daniels
8       Manhattan that was requested?
9    A. Jack Daniels Manhattan mix.
10   Q. As it appears in Exhibit 11; is that right?
11   A. Yes, without the prices.
12   Q. Do you know what a mixing glass is?
13   A. A glass you mix drinks in.
14   Q. Do you know what a mixing glass is as it's referred
15      to in the Bar Operations Manual of the Longhorn
16      Steakhouse, as it was in effect on September 26,
17      2003?
18       MR. GILLIS: Is that a particular page you're
19      referring to?
20       MR. FARRAH: Yes. It's Bates stamped 299.
21   Q. Take a moment and read that first part.
22       (Witness reviews document.)
23   Q. Do you see that procedure under "Stir and Strain" on
24      page 299 of Exhibit 4?

Page 40

1    A. Yes.
2    Q. Is that the procedure you followed in making the
3       Manhattans that evening?
4    A. Yes, minus the stirring.
5    Q. Did you fill a mixing glass two-thirds with ice?
6    A. I filled a rocks glass with ice.
7    Q. That was your mixing glass; is that right?
8    A. Yes.
9    Q. And did you fill it two-thirds with ice?
10   A. No. I usually filled them with ice to the top.
11   Q. And do you have a memory of after pouring the drinks
12      from the glass in which you mixed them into the
13      individual glasses in which they were to be served
14      during that round of seven that we've been talking
15      about, whether or not -- and after putting the
16      cherries into each of the glasses -- whether or not
17      you added more bourbon to bring the level of the
18      liquid in any of the seven glasses to within
19      one-quarter inch of the lip?
20   A. No.
21   Q. Do you have a memory of having done that?
22   A. No.
23   Q. But it's your memory that they went out to the table
24      with the liquid one-quarter inch from the lip; is

Page 41

1 that right?
2     MR. GILLIS: Objection. It's your memory, not
3     what your practice was.
4 A. No, I don't recall the exact measurement.
5 Q. We can agree, can't we, that the Longhorn Bar
6     Operations Manual called for the drinks going out,
7     that the liquid should be one-quarter of an inch
8     below the lip; is that right?
9 A. Yes.
10 Q. And that typically is what you tried to do; isn't
11     that right?
12 A. Yes, or it would be lower than that but never above.
13 Q. But you want to serve a good drink to the patron,
14     don't you?
15     MR. GILLIS: Objection.
16 A. Yes.
17 Q. The patron doesn't want to see the drink below the
18     level that other people are getting the drinks, does
19     he or she?
20 A. No.
21 Q. Now, at any time since you learned through the
22     conversation with Patty about that group of guys,
23     what happened the night of September 26, 2003, the
24     morning of September 27, 2003, have you tried to

Page 42

1 calculate in your mind the effects of the alcohol
2 that was served to that table on the different
3 patrons at that table?
4 A. No.
5 Q. Have you asked anyone to do that for you, other than
6     as part of the defense of this lawsuit?
7 A. No.
8 Q. Now, you were visited by a state trooper the night
9     before you testified -- I think it was last
10     September -- in the Southworth criminal trial; is
11     that right?
12 A. Yes.
13 Q. Had someone told you the state trooper was coming to
14     see you?
15 A. No.
16 Q. At what time of the day or night did the state
17     trooper arrive?
18 A. Night.
19 Q. Do you know what time?
20 A. It was very dark in September, so after 8:00.
21 Q. From the time you had the conversation with Sherri
22     until the state trooper arrived, had anybody spoken
23     to you about Southworth's criminal trial?
24     MR. GILLIS: Objection. Do you mean the

Page 43

1 conversation with Patty?
2 Q. Patty; I'm sorry. Had anybody spoken to you about
3     Southworth's criminal trial?
4 A. No.
5 Q. Did you know that he was charged with different
6     crimes?
7 A. No.
8 Q. What did Patty say to you about that group of guys,
9     best as you can recall it, when she had that
10     conversation with you?
11 A. That she had heard that there was some sort of
12     accident.
13 Q. Did she say anything else?
14 A. No.
15 Q. Did you think, at that point in time, that perhaps
16     one or more of the patrons at Table 52 was under the
17     influence of alcohol at the time that patron was
18     served his last drink?
19     MR. GILLIS: Objection.
20 A. No.
21 Q. At any time since Patty spoke to you about that group
22     of guys, have you considered whether or not any of
23     those guys became intoxicated while a customer at the
24     Longhorn?

Page 44

1 A. No.
2 Q. Do you know, as you sit here now, without
3     conversations with your counsel or people working for
4     your counsel, whether or not any of that group of
5     guys that Patty spoke to you about became intoxicated
6     while a customer at the Longhorn?
7 A. No.
8 Q. Do you believe that any of that group of guys became
9     intoxicated while a customer at the Longhorn?
10 A. No.
11 Q. Is it that you believe that they did not become
12     intoxicated while a customer at the Longhorn?
13 A. Yes.
14 Q. What is the basis for that belief?
15 A. I didn't see any visibly intoxicated customers
16     leaving that night, and they definitely would have
17     stuck out.
18     Longhorn is a family restaurant. It was not a
19     type of place where people were getting fall-down
20     drunk.
21     So I would definitely remember that, as well as
22     other servers would probably have been talking about
23     it.
24 Q. Is that what you were trained to look for in



# LONGHORN
S T E A K H O U S E

# Bar Recipes

Revised 2002



EXHIBIT



EXHIBIT

LONGHORN STEAKHOUSE BAR OPERATIONS MANUAL-MASTER   5/02

# BAR GLASSWARE

| GLASSWARE | | USAGE |
|---|---|---|
| Libbey #15245<br>3 dozen per case<br>7 oz. Rocks |  | Liquor drinks w/no mixer<br>Drinks Served on the Rocks<br>Drinks Served with a Splash<br>Shooters with cream or Juice mixers |
| Libbey #15243<br>3 dozen per case<br>12 oz. Rocks |  | Juice Drinks<br>Collins<br>Sours<br>2 Liquor cream drinks<br>Drinks w/ soda gun mixer |
| Libbey #8455<br>3 dozen per case<br>6 oz. Cocktail Glass | | All chilled up cocktails<br>Martini, Manhattan, Gimlet & Gibson<br>Martinis Up<br>Sours Up<br>Margaritas Up |
| Libbey #3965<br>3 dozen per case<br>8.5 oz. Wine Glass | | Wine/Champagne by the Glass |
| Libbey #3705<br>2 dozen per case<br>12 oz. Snifter Glass | | Aromatic Liqueurs<br>Brandies<br>Cognac |

RARE Hospitality International © May 2002

BAR INFORMATION page 2

**LONGHORN STEAKHOUSE BAR OPERATIONS MANUAL-MASTER    5/02**

| NAME | METHOD | INGREDIENTS | GARNISH | CAT. |
|---|---|---|---|---|
| LONG BEACH ICED TEA<br>14 oz. Tall Rocks | Mix | 2oz. Desert Island Tea Mix<br>4oz. Sweet/Sour<br>Fill to ¼" from top with 1 oz. Cranberry Juice. | Lemon squeeze | Liquor Special |
| LONG ISLAND ICED TEA<br>14 oz. Tall Rocks | Mix | 2 oz. Desert Island Tea Mix<br>4 oz. Sweet/Sour<br>Fill to ¼" from top with 1 oz. Coke | Lemon squeeze | Liquor Special |
| JACKALOPE TEA<br>14 oz. Tall Rocks | Mix | 1oz. Jack Daniels<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |
| RAZZMATAZZ TEA<br>14 oz. Tall Rocks | Mix | 1oz. Dekuyper Razzmatazz<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Sprite | Lemon Wedge | $5.25 |
| LIMON-ADE TEA<br>14 oz. Tall Rocks | Mix | 1oz. Bacardi Limon Rum<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |
| MAI-TAI<br>12 oz. Mug | Mix | 1¼ oz. House Rum<br>¾ oz. Triple Sec<br>2 oz. Sweet/Sour<br>½ oz. Grenadine<br>1 oz. Orange Juice<br>1 oz. Pineapple Juice<br>Float 151 | Orange, Cherry Flag | Liquor Special |
| MANHATTAN<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>¼ oz. Sweet Vermouth | Cherry | Call |
| MANHATTAN-DRY<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>¼ oz. Dry Vermouth | Lemon twist | Call |
| MANHATTAN PERFECT<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>Equal parts Sweet and Dry Vermouth | Lemon twist | Call |
| MANHATTAN UP<br>6 oz. Cocktail<br>With ice, build in mixing glass, stir until glass is foggy. Strain into chilled cocktail glass. | | 2 oz. House Bourbon<br>¼ oz. Sweet Vermouth | Cherry sword | Call |

RARE Hospitality International © May 2002

BAR INFORMATION page 9

Longhorn Steakhouse
Leominster
227 North Main Street

Server: LEIGH                09/26/2003
Table 52/1                      9:57 PM
Guests: 6

                                #20043

Reprint #: 5



Texas Tonion                       5.99
Chowder-Cup (2 @2.49)              4.98
Chicken Fingers                    4.99
Jack Daniels (17 @4.75)           80.75
  Manhattan Mixer (17 @0.50)       8.50
25oz Bud Light (2 @3.99)           7.98
8oz The Renegade                  10.99
Baby Back Ribs 1/2 Rack (3 @12.99) 38.97
12oz Prime Rib                    14.99
Baby Back Ribs & Chicken          14.99



Complete Subtotal                193.13

Sub Total                        193.13
Tax                                9.66

Total                            202.79

Cash                             240.00

        Make plans to dine with us at
            Longhorn Steakhouse.
        We will make your dining
          experience special.

        --- Check Closed ---

145 – Longhorn of Leominster
227 North Main Street

# Audit Report
### Date of Business: 09/26/2003

Page 7
12/01/2003 –   5:29 PM
5.2.5 180

| Time | Type | Transaction |
|------|------|-------------|
| | | 0.00 Rice |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 07:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | CLEARED ITEMS | Mgr 9882 LEIGH Emp 9882 LEIGH cleared $   1.89 from Table 63 Chk:40054 |
| | | 1.89 IBC [ 0.000000 Kg] |
| | | 0.00 MUG [ 0.000000 Kg] |
| 08:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   1.89 for Table 63 Chk:40054 |
| | | 1.89 IBC |
| | | 0.00 No Mug |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 1 time(s) |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:16 PM | APPLY PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | 57.22 Tip:0.00 ID:5511910207971723 Exp:0606 |
| 08:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 2 time(s) |
| 08:17 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:30066 for a total of 57.22 |
| 08:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:21 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 1 time(s) |
| 08:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:27 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:27 PM | ADJUST PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | Amt:57.22 Tip:0.00 -> 12.00 ID:5511910207971723 Exp:0606 |
| 08:28 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:32 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 1 time(s) |
| 08:32 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.99 for Table 53 Chk:40051 |
| | | 3.99 Pie |
| 08:32 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:37 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:37 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 1 time(s) |
| 08:37 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:40 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  35.70 for Table 52 Chk:20043 |
| | | 5.99 Tonion |
| | | 2.49 Chowder Cup |
| | | 2.49 Chowder Cup |
| | | 4.99 Fingers |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

**Audit Report**
Date of Business: 09/26/2003

Page 8
12/01/2003 —   5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 3.99 25oz Bud Light |
| 08:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:43 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH<br>50.00 |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH<br>5.00 |
| 08:43 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 2 time(s) |
| 08:43 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:40054 for a total of 50.41 |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   9.74 for Table 63 Chk:30084<br>4.99 25oz Wach<br>4.75 Sombrero |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   34.47 for Table 63 Chk:30084<br>16.99 14oz Strip CC<br>0.00 MR<br>0.00 FF<br>0.00 Caesar Salad<br>2.49 Side Mush<br>14.99 PR 12oz<br>0.00 MR PR<br>0.00 FF<br>0.00 Caesar Salad |
| 08:43 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH<br>50.00 |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH<br>20.00 |
| 08:44 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 2 time(s) |
| 08:44 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:40051 for a total of 56.28 |
| 08:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:51 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:51 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   36.75 for Table 52 Chk:20043<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix |
| 08:51 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:55 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:55 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   10.37 for Table 53 Chk:20047<br>6.59 Fire Wrap<br>1.89 Sprite<br>1.89 Sprite |
| 08:55 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:00 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  79.94 for Table 52 Chk:20043 |

145 - Longhorn of Leominster
227 North Main Street

## Audit Report
### Date of Business: 09/26/2003

Page 9
12/01/2003 — 5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 10.99 Sm-Top 8oz |
| | | 0.00 M |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Caesar Salad |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 14.99 PR 12oz |
| | | 0.00 M PR |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Mix Green Sal |
| | | 0.00 Ranch |
| | | 14.99 1/2 Rack/ Chix |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 0.00 Mix Green Sal |
| | | 0.00 Balsamic |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| 09:00 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:08 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:09 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  29.98 for Table 53 Chk:20047 |
| | | 10.99 Sm-Top 8oz |
| | | 0.00 Well Done |
| | | 0.00 BP |
| | | 0.00 S |
| | | 0.00 Mix Green Sal |
| | | 0.00 House |
| | | 18.99 Lky/ Sam CC |
| | | 0.00 Well Done |
| | | 0.00 Seasonal Veg |
| | | 0.00 Rice |
| | | 0.00 Mix Green Sal |
| | | 0.00 Italian |
| 09:09 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:15 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.99 for Table 52 Chk:20043 |
| | | 3.99 25oz Bud Light |
| 09:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:16 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:17 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 1 time(s) |
| 09:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:21 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  21.00 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

# Audit Report
## Date of Business: 09/26/2003

Page 10
12/01/2003 --  5:29 PM
5.2.6.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:24 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:24 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  15.75 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:24 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:31 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 1 time(s) |
| 09:31 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:33 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 2 time(s) |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 3 time(s) |
| 09:34 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:35 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:35 PM | APPLY PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |
| | | 46.42 Tip:0.00 ID:4491631021235627 Exp:1103 |
| 09:35 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:36 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 4 time(s) |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 50.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 1.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 2 time(s) |
| 09:36 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 62 Chk:50036 for a total of 61.56 |
| 09:36 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 1 time(s) |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:44 PM | APPLY PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | 42.37 Tip:0.00 ID:4773550000020827 Exp:1103 |
| 09:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:46 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:46 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 5 time(s) |
| 09:46 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:49 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:49 PM | ADJUST PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | Amt:42.37 Tip:0.00 -> 2.63 ID:4773550000020827 Exp:1103 |
| 09:49 PM | ADJUST PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |

145 ~ Longhorn of Leominster
227 North Main Street

# Audit Report
## Date of Business: 09/26/2003

Page 11
12/01/2003 -- 5:29 PM
5.2 5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | Amt:46.42 Tip:0.00 -> 7.00 ID:4491631021235627 Exp:1103 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:20047 for a total of 42.37 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:30084 for a total of 46.42 |
| 09:49 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.78 for Table 63 Chk:20052<br>1.89 Coke<br>1.89 Coke |
| 09:49 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:52 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:53 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.49 for Table 53 Chk:40069<br>3.49 Heineken<br>0.00 MUG<br>0.00 Water |
| 09:53 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:57 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>20.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>20.00 |
| 09:57 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 6 time(s) |
| 09:57 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:20043 for a total of 202.79 |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:58 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:58 PM | CLOSE CHECK | Emp: 9882 LEIGH Check Table 73 Chk:40070 was freed because it was empty. |
| 09:58 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   6.59 for Table 53 Chk:40069<br>6.59 Fire Wrap |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:03 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:03 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   4.99 for Table 53 Chk:40069<br>4.99 Fried Cake |
| 10:03 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:06 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:07 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  29.76 for Table 73 Chk:20054<br>1.89 Diet Coke<br>8.99 Sam Caes-D<br>0.00 With Hot<br>0.00 See Server<br>16.99 PR 16oz<br>0.00 Rare PR<br>0.00 Seasonal Veg<br>0.00 Caesar Salad<br>1.89 Tea |
| 10:07 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  24.98 for Table 73 Chk:20054<br>12.49 Fried Dinner<br>0.00 FF<br>0.00 Slaw<br>12.49 Fried Dinner |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS ) | |
| SHE IS THE ADMINISTRATRIX OF THE ) | |
| ESTATE OF AWILDA SANTIAGO, ESSEX ) | |
| PROBATE COURT DOCKET #03P-2499AD1, ) | |
| P/P/A VERONICA ROSARIO AND ) | |
| CHRISTINA SANTIAGO, AND AS ) | |
| SHE IS THE ADMINISTRATRIX OF THE ) | |
| ESTATE OF JOSE SANTIAGO, BERLIN ) | Civil Action #05-CV-10617MLW |
| (CONNECTICUT) ) | |
| PROBATE COURT, CASE #03-0713 ) | |
|   Plaintiff ) | |
|  ) | |
| v.  ) | |
|  ) | |
| RARE HOSPITALITY INTERNATIONAL, INC. ) | |
| d/b/a LONGHORN STEAKHOUSE ) | |
|   Defendant ) | |

## AFFIDAVIT OF JUDE CONNELLY

1.    My name is Jude Connelly, I am an adult and a resident of Harvard, Massachusetts.

2.    I was part of a group of young men who were customers at the Longhorn Steakhouse in Leominster, Massachusetts on September 26, 2003.

3.    Another member of that group was Jeffrey Southworth.

4.    Over the course of the evening, I observed Mr. Southworth being served and drinking various alcoholic beverages.  I have already testified at deposition concerning my observations of Mr. Southworth in the matter of Nancy Rosario, individually and as administratrix of the Estate of Awilda Santiago, et al v. Jeffrey Southworth, et al, Middlesex Superior Court C.A. #03-4704.  Portions of my deposition are attached hereto as Exhibit A.

5.    In my deposition at pages 49-51, I testified that during the course of the evening at the Longhorn Steakhouse, Mr. Southworth seemed to be under the influence of the alcoholic beverages he was being served at the restaurant.

6.    I also testified, at pages 42-44 of my deposition, that approximately one half-hour before we left the Longhorn, everyone at the table was loud, including Mr. Southworth, and that either a waitress or a manager of the restaurant came to us and asked us to be quiet.

7.    At that time, when the table was asked to quiet down, Mr. Southworth was exhibiting all the signs of intoxication I testified about at pages 49-51 of my deposition.

Signed under the pains and penalties of perjury this 6th day of May, 2005.


_____
JUDE CONNELLY


### CERTIFICATE OF SERVICE

SUFFOLK, SS                                                            May 12, 2005

    A copy of the Affidavit of Jude Connelly was today ~~mailed, postage prepaid~~ hand delivered (copy) to Brian Voke, Esq., Campbell, Campbell, Edwards & Conroy, One Constitution Plaza, Boston, MA 02129.


_____
Albert L. Farrah, Jr., Esq.

## Albert Farrah

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Tuesday, August 01, 2006 4:48 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:05-cv-10617-MLW Rosario v. Rare Hospitality International, Inc. "Motion for Protective Order" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Gillis, Michael K. entered on 8/1/2006 at 4:48 PM EDT and filed on 8/1/2006

**Case Name:**       Rosario v. Rare Hospitality International, Inc.
**Case Number:**    1:05-cv-10617
**Filer:**                Rare Hospitality International Inc.
**Document Number:** 16

**Docket Text:**
MOTION for Protective Order *and Sanctions* by Rare Hospitality International Inc..(Gillis, Michael)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=8/1/2006] [FileNumber=1521886-0]
[d3af6e134da9366b02366dd2da73fe9220bf4d1ef9687456500afa664326edd17ca0
26d7c53d44f69f51f182f95a7099933bd49f565d32ecca8fbefd9c5b41ed]]

**1:05-cv-10617 Notice will be electronically mailed to:**

David R. Bikofsky    dbikofsky@gillisandbikofsky.com

Albert L. Farrah    alf@corwinlaw.com

Michael K. Gillis    mgillis@gillisandbikofsky.com

Neil D. Schnurbach    nschnurbach@gillisandbikofsky.com

**1:05-cv-10617 Notice will not be electronically mailed to:**

## Albert Farrah

**From:**    Albert Farrah
**Sent:**    Tuesday, August 01, 2006 11:13 AM
**To:**    Michael Gillis (mgillis@gillisandbikofsky.com)

I have still not received your motion for a protective order regarding Mr. DiNatale, despite your repeated, months long claims that you intend to seek a protective order.  Are you waiving your objections to his deposition?  It certainly seems so.  Please get back to me asap on this, or better yet, forward to me your motion and supporting papers.

Albert L. Farrah, Jr., Esq.
One Washington Mall, 5th Floor
Boston, MA 02108
Phone:  (617) 742-7766
Fax:  (617) 742-2331
alf@corwinlaw.com
alf@afarrah.com
www.afarrah.com

FARRAH LAW OFFICES - CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

## Albert Farrah

**From:**     Albert Farrah
**Sent:**     Thursday, July 27, 2006 11:25 AM
**To:**       Michael Gillis (mgillis@gillisandbikofsky.com)

Thank you for accommodating me today.  Since I won't be at your office, will you please fax and mail to me today your motion for a protective order re Di Natale.  Also, what's your position regarding my motion to amend, and do you have good dates for Boullinne and Christina/Veronica?

I will be fed exing to you tomorrow Nancy's additional medicals and will call you with an update of her condition as soon as I have some information for you.

Albert L. Farrah, Jr., Esq.
One Washington Mall, 5th Floor
Boston, MA 02108
Phone:  (617) 742-7766
Fax:  (617) 742-2331
alf@corwinlaw.com
alf@afarrah.com
www.afarrah.com

FARRAH LAW OFFICES - CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

# ALBERT L. FARRAH, JR.

## COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

July 20, 2006

Michael Gillis, Esq.
Gillis & Bikofsky, P.C.
1150 Walnut Street
Newton Highlands, MA 02461

RE:   Nancy Rosario, et al v. RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse
       United Stated District Court Docket #05-CV-10617MLW

Dear Michael:

I am still waiting for your motion for a protective order with regard to Mr. DiNatale. When can I expect to receive it? Thank you.

Sincerely,

Albert L. Farrah, Jr. (pmp)

ALBERT L. FARRAH, JR.
pmp

FAX and REGULAR MAIL

cc:    Nancy Rosario
       Louis J. Farrah, II, Esq.

Santiago-RARE.ltr283

# ALBERT L. FARRAH, JR.

## COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

### FAX TRANSMITTAL COVER SHEET

Date:       July 20, 2006

To:         Michael Gillis, Esq.              (617-964-0862)
            Louis J. Farrah, II, Esq.         (1-978-682-3234)

From:       Albert L. Farrah, Jr., Esq.

RE:         Nancy Rosario, et al v. RARE Hospitality International, Inc.

Pages (including cover sheet): 2

Comments:

If you do not receive the correct number of pages, please call (617) 742-7766.

IMPORTANT NOTICE: THIS FAX (INCLUDING ALL ATTACHED PAGES) IS INTENDED ONLY FOR THE USE OF THE NAME ADDRESSEE(S) AND MAY CONTAIN INFORMATION THAT IS LEGALLY PRIVILEGED OR EXEMPT FROM DISCLOSURE. IF YOU ARE NOT A NAMED ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE DESTROY ALL COPIES AND NOTIFY US IMMEDIATELY BY TELEPHONE. THANK YOU.

✳ ✳ ✳ COMMUNICATION RESULT REPORT ( JUL. 20. 2006 11:18AM ) ✳ ✳ ✳

TTI  617-742-2331

TRANSMITTED/STORED JUL. 20. 2006 11:16AM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|------|------|--------|---------|--------|------|
| 2729 | MEMORY TX | | 6179640862 | OK | 2/2 |
| | | | 19786823234 | OK | 2/2 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION

# ALBERT L. FARRAH, JR.

## COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

## FAX TRANSMITTAL COVER SHEET

Date:      July 20, 2006

To:        Michael Gillis, Esq.           (617-964-0862)
           Louis J. Farrah, II, Esq.      (1-978-682-3234)

From:      Albert L. Farrah, Jr., Esq.

RE:        Nancy Rosario, et al v. RARE Hospitality International, Inc.

Pages (including cover sheet): 2

Comments:

If you do not receive the correct number of pages, please call (617) 742-7766.

IMPORTANT NOTICE: THIS FAX (INCLUDING ALL ATTACHED PAGES) IS INTENDED ONLY FOR THE USE OF THE NAME ADDRESSEE(S) AND MAY CONTAIN INFORMATION THAT IS LEGALLY PRIVILEGED OR EXEMPT FROM DISCLOSURE. IF YOU ARE NOT A NAMED ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE DESTROY ALL COPIES AND NOTIFY US IMMEDIATELY BY TELEPHONE. THANK YOU.

# GILLIS & BIKOFSKY, P.C.

### Attorneys At Law
1150 Walnut Street
Newton, Massachusetts 02461

Tel: (617) 244-4300
Fax: (617) 964-0862

Michael K. Gillis
David R. Bikofsky

Joseph C. Borsellino
Christopher M. Dailey
Rebecca L. Wilson
Neil D. Schnurbach

June 30, 2006

**VIA FACSIMILE AND REGULAR MAIL**
Albert L. Farrah Jr., Esq.
One Washington Mall, 5th Floor
Boston, MA  02108

RE:      Nancy Rosario, et al,
v.        Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse
C.A. No.:  05CV10617

Dear Attorney Farrah:

In response to your letter of June 20, 2006, I would like to memorialize some points.

Firstly, as a reminder, I am still awaiting discovery responses from you, which were served upon you on February 14, 2006. In the past, I was forced to postpone the deposition of your client to give you sufficient time to respond to her interrogatories. If I do not receive these discovery responses by Friday, July 7, 2006 I will be forced to once again postpone your client's deposition.  Despite your delay, in furnishing me with discovery responses, I will be furnishing you with such responses very shortly.

In terms of John DiNatale's deposition, Fed.R.Civ.P. 26(c) requires me to certify that I have in good faith conferred with you in order to resolve this discovery dispute absent a court order. I was awaiting response to my June 8, 2006 letter so that I could make such a representation to the Court. Since you have left me no choice, I will be filing this Motion for Protective order forthwith. If you would explain why you feel you are entitled to take Mr. DiNatale's deposition, perhaps we can resolve this dispute without having to go to court.

Lastly, on December 22, 2005, my office sent you responses to the Keeper of Records depositions we had received. We dispute the fact that there were a total of 82 such subpoenas, however, we will be sending your office further records of those responses shortly.

I would agree with your sentiment that these discovery matters should be resolved without having to go to court. I sincerely hope that you and your client will diligently

attempt to respond to the interrogatories propounded on February 14, over four and one half months after they were submitted to your attention.

Thank you for your courtesy and cooperation.

Very truly yours,

Michael K. Gillis
Neil D. Schnurbach

MKG:nhl

# ALBERT L. FARRAH, JR.

### COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

June 20, 2006

Michael Gillis, Esq.
Gillis & Bikofsky, P.C.
1150 Walnut Street
Newton Highlands, MA 02461

RE:   Nancy Rosario, et al v. RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse
      United Stated District Court Docket #05-CV-10617MLW

Dear Michael:

     we have several discovery matters that must be resolved.  On January 27, 2006, plaintiff's request for production of documents was served on you.  It is now 5 months later, and despite your repeated representations to me that you would furnish me the response to request for production of documents and responsive documents, I still have not received either.  Is there some problem? Please get both the response and the documents to me immediately.

     I have twice noticed the deposition of your investigator, Mr. DiNatale, and both times, based on your representations that you would seek a protective order, I have continued that deposition.  On June 8, 2006, you wrote me a letter, a copy of which is enclosed, in which you represented you would file the motion for a protective order if I had not given you indications by June 12, 2006 that I was not going forward with his deposition.  June 12, 2006 came and went, I gave you no such indications because I am intending to go forward with his deposition.  Where is your motion for protective order?

     Your predecessor and you served a total of 82 record keeper subpoenas.  All have been returned.  To date, I have received copies of very few of those records.  We have spoken about this issue on numerous occasions in the past and I still have no sense of why you have not produced copies of all records you received.

     I really want to resolve these issues without the need of moving in court.  Please get back to me on all these matters immediately.

Santiago-RARE.ltr278

Sincerely,

ALBERT L. FARRAH, JR.
pmp

FAX ONLY
cc:    Nancy Rosario
       Louis J. Farrah, II, Esq.
Dictated, but not read.

Santiago-RARE.ltr278

# ALBERT L. FARRAH, JR.

## COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

## FAX TRANSMITTAL COVER SHEET

Date:          June 20, 2006

To:            Michael Gillis, Esq.            (617-964-0862)
               Louis J. Farrah, II, Esq.       (1-978-682-3234)

From:          Albert L. Farrah, Jr., Esq.

RE:            Nancy Rosario, et al v. RARE Hospitality International, Inc.

Pages (including cover sheet): 3

Comments:

If you do not receive the correct number of pages, please call (617) 742-7766.

IMPORTANT NOTICE: THIS FAX (INCLUDING ALL ATTACHED PAGES) IS INTENDED ONLY FOR THE USE OF THE NAME ADDRESSEE(S) AND MAY CONTAIN INFORMATION THAT IS LEGALLY PRIVILEGED OR EXEMPT FROM DISCLOSURE. IF YOU ARE NOT A NAMED ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE DESTROY ALL COPIES AND NOTIFY US IMMEDIATELY BY TELEPHONE. THANK YOU.

```
         * * * COMMUNICATION RESULT REPORT ( JUN. 20. 20 ⌐ 12:06PM )  * * *

                                                            TTI  617-742-2331

TRANSMITTED/STORED  JUN. 20. 2006 12:04PM
FILE MODE          OPTION                ADDRESS                  RESULT        PAGE
-----------------------------------------------------------------------------------
1791 MEMORY TX                           6179640862                OK          3/3
                                         19786823234               OK          3/3




--------------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
```

### ALBERT L. FARRAH, JR.

COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

**FAX TRANSMITTAL COVER SHEET**

Date:        June 20, 2006

To:          Michael Gillis, Esq.           (617-964-0862)
             Louis J. Farrah, II, Esq.      (1-978-682-3234)

From:        Albert L. Farrah, Jr., Esq.

RE:          Nancy Rosario, et al v. RARE Hospitality International, Inc.

Pages (including cover sheet): 3

Comments:




If you do not receive the correct number of pages, please call (617) 742-7766.

IMPORTANT NOTICE: THIS FAX (INCLUDING ALL ATTACHED PAGES) IS INTENDED
ONLY FOR THE USE OF THE NAME ADDRESSEE(S) AND MAY CONTAIN INFORMATION
THAT IS LEGALLY PRIVILEGED OR EXEMPT FROM DISCLOSURE. IF YOU ARE NOT A
NAMED ADDRESSEE, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION,
DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS FAX IN ERROR, PLEASE DESTROY ALL COPIES AND NOTIFY US
IMMEDIATELY BY TELEPHONE. THANK YOU.

# GILLIS & BIKOFSKY, P.C.

## Attorneys At Law

1150 Walnut Street
Newton, Massachusetts 02461

Tel: (617) 244-4300
Fax: (617) 964-0862

Michael K. Gillis
David R. Bikofsky

Joseph C. Borsellino
Christopher M. Dailey
Rebecca L. Wilson
Neil D. Schnurbach

June 8, 2006

**VIA FACSIMILE AND REGULAR MAIL**
Albert L. Farrah Jr., Esq.
One Washington Mall, 5th Floor
Boston, MA 02108

| RE: | Nancy Rosario, et al, |
|---|---|
| v. | Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse |
| C.A. No.: | 05CV10617 |

Dear Attorney Farrah:

As you know, we oppose your effort to depose John DiNitale. When we spoke, I asked you your reasons for taking his deposition, and your response was that I could object but you still "wanted a shot at him".

As of this date, you have not articulated a right or a reason for deposing our investigator. Your request is well outside the bounds of the Federal Rules, in fact, it flies in the face of precedent in this Court. To require us to seek a protective order is inexcusable.

I will hold off until the end of business on Monday, June 12, 2006, to receive a letter from you stating that you are not going forward with Mr. DiNitale's deposition. If I do not receive the letter, I will have no choice but to file a motion for a protective order. Since you have not articulated any legitimate or recognizable need for the deposition, I will be seeking attorneys' fees and costs associated with the motion.

Thank you for your courtesy and cooperation.

Very truly yours,

Michael K. Gillis

MKG:jal

# GILLIS & BIKOFSKY, P.C.

### Attorneys At Law
1150 Walnut Street
Newton, Massachusetts 02461

Tel: (617) 244-4300
Fax: (617) 964-0862

Michael K. Gillis
David R. Bikofsky

Joseph C. Borsellino
Christopher M. Dailey
Rebecca L. Wilson
Neil D. Schnurbach

Albert L. Farrah Jr., Esq.                                    June 2, 2006
One Washington Mall, 5th Floor
Boston, MA  02108

RE:    **Nancy Rosario, Individually, as Administratrix of the Estate of Awilda
       Santiago, as Administratrix of the Estate of Jose Santiago, as Mother and
       Next Friend of Veronica Rosario, A Minor, and Christina Santiago, A Minor.**
v.     **Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse**
C.A. No.: 05CV10617

## VIA FACSIMILE AND REGULAR MAIL

Dear Attorney Farrah:

This letter is to confirm that as per our conversation of Thursday, June 1, 2006, the deposition of John DiNatale scheduled for Monday, June 5, 2006 will be postponed until a later date to give our office an opportunity to file a Motion for a Protective Order.

The deposition of William "Todd" Currie also scheduled for Monday, June 5, 2006 will go forward as planned.

If you have any questions, please feel free to contact my office.

Thank you for your courtesy and cooperation.

Very truly yours,

Neil D. Schnurbach

NDS:nhl

# ALBERT L. FARRAH, JR.

## COUNSELOR AT LAW

One Washington Mall • Boston, MA 02108

(617) 742-7766 • Fax: (617) 742-2331

alf@afarrah.com
www.afarrah.com

May 2, 2006

Michael Gillis, Esq.
Gillis & Bikofsky, P.C.
1150 Walnut Street
Newton Highlands, MA 02461

RE:     Nancy Rosario, et al v. RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse
United Stated District Court Docket #05-CV-10617MLW

Dear Michael:

I forwarded to you last week a Notice of Taking Deposition of John DiNatale.  Pursuant to the agreement I reached with Neil Schnurbach of your office, my office will not be required to subpoena Mr. DiNatale and you will file a motion for protective order which I will oppose. Furthermore, if that motion is denied I will not need to subpoena Mr. DiNatale.  Thank you for your consideration in this matter.

Sincerely,

ALBERT L. FARRAH, JR.
pmp

cc:     Nancy Rosario
Louis J. Farrah, II, Esq.

Santiago-RARE.ltr243