UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF AWILDA SANTIAGO, ESSEX PROBATE COURT DOCKET #03P-2499ADl, P/P/A VERONICA ROSARIO AND CHRISTINA SANTIAGO, AND AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF JOSE SANTIAGO, BERLIN (CONNECTICUT) PROBATE COURT, CASE #03-0713, | ) ) ) ) ) ) ) ) ) ) Civil Action Number: ) 05-CV-10617MLW |
| Plaintiffs | ) ) |
| v. | ) ) |
| RARE HOSPITALITY INTERNATIONAL, INC. d/b/a LONGHORN STEAKHOUSE, | ) ) ) |
| Defendant. | ) ) ) |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Defendant, RARE Hospitality International Inc., d/b/a LongHorn

Steakhouse, and, pursuant to Fed.R.Civ.P. 56, respectfully requests that this Honorable

Court grant it summary judgment. As reasons therefore, the Defendant states that there is

no evidence by which the Plaintiffs can prove key elements of its burden of proof,

specifically, there is no evidence in the record that Jeffrey Southworth ("Southworth") was

visibly intoxicated when served his last drink at the Defendant's restaurant, and there is no

evidence that Defendant's conduct warrants punitive damages. Absent such proof,

summary judgment must enter for the Defendant.

In support of the instant Motion, the Defendant submits a Memorandum in Support of its Motion for Summary Judgment as well as a Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment which are attached herewith.

## REQUEST FOR ORAL ARGUMENT

The Defendant hereby requests an oral argument on all issues presented.

The Defendant,
By Its Attorneys,

Michael K. Gillis, Esq.
BBO# 543551
Neil D. Schnurbach, Esq.
BBO# 664534
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA  02461
Tel. 617-244-4300

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NANCY ROSARIO, INDIVIDUALLY,       )
AS SHE IS THE ADMINISTRATRIX OF    )
THE ESTATE OF AWILDA SANTIAGO,     )
ESSEX PROBATE COURT DOCKET         )
#03P-2499AD1, P/P/A VERONICA       )
ROSARIO AND CHRISTINA SANTIAGO,    )
AND AS SHE IS THE ADMINISTRATRIX   )
OF THE ESTATE OF JOSE SANTIAGO,    )
BERLIN (CONNECTICUT) PROBATE       )
COURT, CASE #03-0713,              )      Civil Action Number:
                                   )      05-CV-10617MLW
    Plaintiffs                     )
                                   )
v.                                 )
                                   )
RARE HOSPITALITY INTERNATIONAL,    )
INC. d/b/a LONGHORN STEAKHOUSE,    )
                                   )
    Defendant.                     )

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

Now comes the Defendant, RARE Hospitality International Inc., d/b/a LongHorn

Steakhouse ("LongHorn"), and, pursuant to Fed.R.Civ.P. 56, respectfully requests that this

Honorable Court grant it summary judgment. As reasons therefore, the Defendant states that in

the early morning hours of September 27, 2003, Jeffrey Southworth ("Southworth") caused a car

accident that killed two people and injured two others. Mr. Southworth was charged, convicted, and

is now serving a prison sentence for his actions. After settling their civil case against Southworth

("Southworth action"), Plaintiffs brought this dramshop action against Defendant RARE Hospitality

International Inc., d/b/a LongHorn Steakhouse ("LongHorn"), the restaurant at which Southworth

ate dinner several hours before the accident. Plaintiffs allege that Southworth was "visibly

intoxicated" at the time he was served his last drink, and further, that Defendant's acts constitute willful, wanton conduct justifying punitive damages.

There are no material issues of facts in dispute as to several key elements of proof, without which Plaintiffs cannot meet their burden of proof. Although the injuries suffered by Plaintiffs are tragic, there is no evidence, including eyewitness testimony from at least six individuals, that Southworth was visibly intoxicated when served his last drink at the LongHorn. Therefore, and for all the reasons set forth below, Defendant LongHorn respectfully requests that this Court grant its motion for summary judgment.

## I. FACTS

On September 26, 2003, after dirt bike riding, Jude Connelly ("Connelly"), Scott Espey and Southworth drove to the LongHorn for dinner arriving at approximately 8:00 p.m. *Transcr. Depo. Jude Connelly* (Exhibit 1) 10:18-19. While en route, they invited Michael Espey (brother of Scott), William "Todd" Currie ("Currie"), Matthew Cenicola ("Cenicola") and Bruce Sirjane ("Sirjane") to join them. *Transcr. Depo. Michael Espey* (Exhibit 2) 37:22-24, 38:1-9. Connelly, Southworth and Scott Espey waited in the bar area until the remainder of their party arrived. *Transcr. Depo. Scott Espey* (Exhibit 3) 19:17-24; 21:13-16; *Transcr. Depo. Jude Connelly* 37:14-15. Southworth has not admitted to drinking any alcohol that evening[1], however, there is testimony that while he waited for his table, he ordered his first drink, a 25 ounce beer. *Transcr. Depo. Scott Espey* 20:3-10; *Transcr. Depo. Jude Connelly* 12:3-10.

At approximately 8:30 p.m., the Southworth party, now seven in total (Southworth, Connelly, Michael Espey, Scott Espey, Currie, Cenicola and Sirjane), were seated at their table.

---

[1] Southworth was charged with several criminal offenses including vehicular homicide stemming from the evening in question. He did not testify during his criminal trial. On May 17, 2006, the deposition of Jeffrey Southworth was taken. Southworth invoked his Fifth Amendment privilege against self-incrimination.

*Transcr. Depo. Jude Connelly* 74:16-24, 75:1-9. Southworth brought the unfinished beer that he

had ordered at the bar with him to the table. *Transcr. Depo. Jude Connelly* 144:20-24. At 8:40,

LongHorn server Leigh Chabot ("Chabot")[2] logged in an order of appetizers and four drinks;

three Jack Daniels Manhattans ("Manhattan") and one 25 oz. beer. *Audit Report* (Exhibit 4) p. 7-

8. These drinks were served to Michael Espey, Currie, Cenicola and Sirjane[3]. *Transcr. Depo.*

*Leigh Chabot* 69:25, 70:1-8 (Exhibit 6).

At 8:51 p.m., after receiving their appetizers, LongHorn served Southworth his second

drink as a part of a round of seven Manhattans ordered by the table, one for each patron. *Audit*

*Report* p. 8; *Transcr. Depo. Kristin O'Donnell (Part II)* 8:23-24, 9:1-2 (Exhibit 7); *Transcr.*

*Depo. Leigh Chabot* 163:17-19. At 9:00 p.m., Chabot entered dinner orders for the Southworth

party, all steaks or ribs with side orders and salads. *Audit Report* p. 8-9. At 9:15 p.m., a single 25

oz. beer was ordered for someone at the table. *Audit Report* p. 9. It was consumed by someone

other than Southworth. *Transcr. Depo. Leigh Chabot* 122:19-21. At least one of the two beers

served to the table that evening was served to and consumed by Michael Espey. *Nancy Rosario's*

*Answers to Interrogatories #19* at p.14 (Exhibit 8).

LongHorn served Southworth his third and final drink at approximately 9:24 p.m. *Audit*

*Report* p.9-10. The table's audit report shows that Chabot entered a final round of seven

Manhattans, one for each patron, in two entries at 9:21and and 9:24 p.m.[4] *Audit Report* p.9-10;

---

[2] Chabot was an experienced waitress of five years, three at the LongHorn, and was Bar Code certified in the safe service of alcohol.

[3] Plaintiffs' expert, Michael Marcantonio ("Marcantonio"), also opined that, based on his training and experience, as well as his review of the facts, Southworth did not receive a drink from this first round ordered by the table. *Transcr. Depo. Michael Marcantonio (Part I)* 104:1-7. (Exhibit 5).

[4] See also Marcantonio's report concurring that, based on his training and experience, the two orders of Manhattans three minutes apart totaling seven Manhattans comprised one drink for each patron at the table. *Transcr. Depo. Michael Marcantonio (Part I)*183:1-16.

*Transcr. Depo. Leigh Chabot* 95:5-8. There is no evidence that any drinks were brought to the table that evening other than those served by LongHorn server Chabot and contained in the bill and audit report. *Transcr. Depo. Leigh Chabot* 165:14-16.

There is no evidence in the record that when Southworth was served his last drink, he exhibited any signs of visible intoxication. *Transcr. Depo. Jude Connelly* 53:6-9; *Transcr. Depo. Scott Espey* 36:7-10; *Transcr. Depo. Leigh Chabot* 175:6-10; *Transcr. Depo. Sherri Salmond* 31:4-21; *Transcr. Depo. Todd Currie* p.32-33. Just prior to this round, Manager Noonan informed bartender Kristin O'Donnell that he observed the Southworth table and everyone seemed fine. *Transcr. Depo. Kristin O'Donnell (Part II)* 11:7. Connelly testified that Southworth did not exhibit signs of visible intoxication when served his last drink. *Transcr. Depo. Jude Connelly* 53:6-9[5]. Scott Espey was with Southworth from the afternoon onward and did not recall Southworth being under the influence of alcohol when he was served his last drink at the LongHorn[6]. *Transcr. Depo. Scott Espey* 36:7-10. Chabot is certain that Southworth did not exhibit any visible signs of intoxication at the time he was served his last drink. *Transcr. Depo. Leigh Chabot* 175:6-10. Both Connelly and Chabot watched Southworth rise from the table and walk to the bathroom, and Southworth was steady on his feet. *Transcr. Depo. Jude Connelly* 157:4-24, 158:1-6; *Transcr. Depo. Leigh Chabot* 150:13-24. Sherri Salmond, a LongHorn server who previously had served Southworth, saw Southworth at LongHorn on September 26, 2003, and he was not demonstrating any signs of intoxication. *Transcr. Depo. Sherri Salmond* 31:4-21 (Exhibit 10). Todd Currie, a patron at the Southworth table, does not recall Southworth appearing

---

[5] Prior to civil litigation commencing, Connelly gave similar testimony before the Grand Jury. *Grand Jury Testimony Jude Connelly* 20:1-4 (Exhibit 9).

[6] It should be noted that the standard in Massachusetts is not whether Southworth was "under the influence" of intoxicating beverages, but rather, whether he was "showing visible signs of intoxication" at the time he was served his last drink. See p. 6 *supra*

intoxicated on September 26, 2003. *Transcr. Depo. William Todd Currie* p. 32-33 (Exhibit 11).

Based on the evidence elicited from the percipient factual witnesses through deposition testimony

in this case, there is no evidence that Southworth was visibly intoxicated when served his last

drink at the LongHorn.

      Most, if not all, of the Manhattans served to the Southworth party that evening were

prepared by LongHorn bartender Kristin O'Donnell. *Transcr. Depo. Kristin O'Donnell (Part I)*

86:11-17 (Exhibit 12). O'Donnell mixed the Manhattans by pouring 1 ½ - 2 ounces of Jack

Daniels and ¼ ounce of sweet vermouth into a rocks glass that was filled with ice. *Transcr.*

*Depo. Kristin O'Donnell (Part II)* 35:6-10; 37-9-16. She would then strain the drink into a

cocktail glass and garnish it with a cherry. *Transcr. Depo. Kristin O'Donnell* (Part II) 35:8-10.

When completed, the Manhattan would be filled to within an inch from the top of the glass.

*Transcr. Depo. Kristin O'Donnell (Part II)* 30:24. Even after a cherry was added, the volume

drink would never reach higher than ¼ inch from the top of the glass. *Transcr. Depo. Kristin*

*O'Donnell (Part II)* 41:12. The LongHorn recipe calls for 2.0 oz. of Jack Daniels and 0.25 oz. of

sweet vermouth. See *RARE Hospitality Bar Recipe Book* (Exhibit 13).

      The Southworth party paid its bill at 9:57. *Audit Report* p.11. The party remained at the

table until approximately 11:00 p.m. *Transcr. Depo. Jude Connelly* 145:7-11. After leaving the

LongHorn, Southworth continued drinking at a local hotel. *Transcr. Depo. Scott Espey* 121:24,

122:1-5; 123:8-12. The group then proceeded to a strip club. *Transcr. Depo. Jude Connelly*

123:13-15, 19-21, 125:14-16. After leaving the strip club, Southworth, Connelly and Scott

Espey drove to Littleton to retrieve Scott Espey's car. *Transcr. Depo. Jude Connelly* 123:13-15,

19-21. At 12:10 a.m., approximately three (3) hours after being served his last drink at the

LongHorn, Jeffrey Southworth collided with the Santiago vehicle. *Collision Report* (Exhibit 14) p.1-3.

Plaintiffs brought and action against Southworth ("Southworth action") and settled the action it for $300,000. *Transcr. Depo. Nancy Rosario* 98:7-11 (Exhibit 15). Plaintiffs now bring this action seeking damages for the same injuries claimed in the Southworth action.

## II. LEGAL STANDARD

### A.    STANDARD FOR DRAM SHOP CASES

*Cimino v. Milford Keg, Inc.*, 385 Mass. 323 (1982) outlines the elements necessary to prevail in a Massachusetts dram shop action.  Plaintiffs must prove that: (1) the operator of the motor vehicle was a patron/social guest on the premises; (2) he was served an intoxicating liquor; (3) defendant served the patron while the patron was visibly intoxicated; (4) defendant knew or should have known that the patron was intoxicated; (5) the patron operated a motor vehicle while intoxicated; (6) the operation of a vehicle was reasonably foreseeable by the defendant; (7) a person of ordinary prudence would not have served said patron; and (8) the imposition of liability was not broken by the driving of an automobile as an intervening, superseding event because it was within the scope of foreseeable risks. *Cimino v. Milford Keg, Inc.*, 385 Mass. at 327; see also *Wiska v. St. Stanislaus Social Club, Inc.*, 7 Mass.App.Ct. 813, 816 (1979). In *Vickowski v. Polish American Citizens Club of the Town of Deerfield, Inc.*, 422 Mass. 606, 609 (1996), the Court affirmed this standard and specifically emphasized that the plaintiff must prove evidence of visible intoxication at the time when the defendant was last served alcohol to the intoxicated patron. Even if witnesses at the scene of the accident indicate that the operator was visibly intoxicated at the accident scene, one cannot infer "similar apparent signs of intoxication a half-hour and one beer earlier." *Id.* at 609. In fact, "this particular leap,

unsupported by additional probative evidence, direct or circumstantial... would not permit a

reasonable inference to a sufficient degree of probability and would, in effect, impose liability on

the basis of unacceptable speculation on the part of the jury." *Id. at 610.*

In *Douillard v. LMR, Inc.,* 433 Mass.162 (2001), the Court allowed the fact finder to infer

visible signs of intoxication if there was both an expert's opinion and "specific information

concerning this particular drinker's reaction to alcohol consumption." *Douillard,* 433 Mass. at

167. If an expert would "expect to see signs of intoxication at the blood alcohol level... reached

[by the drinker]" this opinion would need confirmation that the drinker would customarily

exhibit visible signs of intoxication at that blood alcohol level to infer visible signs of

intoxication. *Douillard* at 167.

## B.    SUMMARY JUDGMENT STANDARD

Summary Judgment is proper when there are no genuine issues of material fact and when

the moving party is entitled to judgment as a matter of law. Fed.R.Civ. P. 56(c). The moving

party is entitled to summary judgment if it shows that there is no evidence in the case that will

establish an essential element of the non-moving party's case. *Celotex v. Catrett,* 477 U.S. 317,

322 (1986) ("One of the chief purposes of the summary judgment rule is to isolate and dispose of

factually unsupported claims or defenses, and we think it should be interpreted in a way that

allows it to accomplish this purpose"). The non-moving party must produce "hard evidence of a

material factual dispute." *U.S. v. Bishop* CA#05-2744 (1st Cir. 2007). "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists." *Griggs-*

*Ryan v. Smith,* 904 F.3d 112, 115 (1st Cir. 1990). Additionally, "neither wishful thinking... nor

conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56

motion." *Griggs Ryan,* 904 F.3d at 115. Defeating summary judgment requires more than "the

7

frenzied brandishing of a cardboard sword." *Calvi*, 470 F.3d at 426. Further, "conclusory

allegations, improbable inferences, and unsupported speculation" are not sufficient to discharge

the non-movant's burden. *DePoutot v. Rafaelly*, 424 F.3d 112, 117 (1st. Cir. 1995).

### III.    ARGUMENT

A.    **THERE IS NO DISPUTE THAT THE PLAINTIFFS HAVE FAILED TO PROVE KEY ELEMENTS OF THEIR CASE, THEREFORE, SUMMARY JUDGMENT IS APPROPRIATE.**

While Plaintiffs' experts may quibble as to the exact amount of alcohol served to

Southworth while at the LongHorn (one expert giving him 2 beers and 2-3 Manhattans, the other

giving him more), and despite Plaintiffs attempt to muddy the factual waters with inadmissible

hearsay as to the amount of alcohol consumed by Southworth at the LongHorn, what is not in

dispute is that the Plaintiffs have no facts to prove essential elements of their case. As detailed

below, regardless of the amount of alcohol served to Southworth, there is no evidence that at any

time prior to his being served his last drink at the LongHorn that Southworth exhibited any signs

of visible intoxication. Not one of the six eye witnesses deposed in this action noticed

Southworth exhibiting visibly signs of intoxication when served his last drink at the LongHorn.

There is no evidence of a change in Southworth's demeanor while he was at the LongHorn that

would have alerted the server to stop serving him.

According to Plaintiffs' toxicologist, Jeffrey Southworth was served his last drink at 9:30 p.m.

*Transcr. Depo. David Benjamin (Part I)* 138:24,139:1. The standard amongst toxicologists is that a

non-tolerant drinker would need to reach a BAC of at least 0.15 before the majority of non-

tolerant drinkers would exhibit visible signs of intoxication. *Transcr. Depo. David Benjamin (Part*

*I)* 157:10-13. *Liquor Liability Update 2006,* MCLE p.98.According to Plaintiffs' toxicologist,

Jeffrey Southworth's BAC did not reach 0.15 until "after 9:35, 9:40." *Transcr. Depo. David*

*Benjamin (Part I)* 184:9-13 (Exhibit 16)[7]. Moreover, Plaintiffs' expert notes that Southworth was a tolerant drinker who could mask visible signs of intoxication. *Transcr. Depo. David Benjamin (Part I)* 157:19-24, 158:1-5.

The failure by the Plaintiffs to prove essential elements of their case requires that summary judgment be granted for the Defendant.

**B.    THERE IS NO EVIDENCE THAT THE SIGNS AS ALLEGED WERE EVIDENT PRIOR TO THE LAST SERVICE TO SOUTHWORTH, THEREFORE, SUMMARY JUDGMENT IS WARRANTED.**

Summary judgment is appropriate because the Plaintiffs have not "come forward with some evidence that the patron's intoxication was apparent at the time he was served by the defendant." *Douillard v. LMR*, 433 Mass. 162, 165 (and cases cited). Because of the possible delayed impact of the consumption of alcohol and the unknown effect of the last drink served, signs of intoxication must be observed prior to the patron being served his last drink. See *Vickowski v. Polish Am. Citizens Club of Deerfield, Inc.*, 422 Mass. 606, 612 (1996). In *McGuiggan*, the Court stated that evidence that a partygoer was intoxicated at the time he left the party does not relate in any way as to whether the guest was visibly intoxicated at the time he was served his last drink. *McGuiggan v. New England Tel. & Tel. Co.*, 398 Mass. 152, 162 & n.10 (1986). Plaintiffs' evidence "must be sufficient to establish that, more probably than not, the patron in question was exhibiting signs of intoxication before he or she was served a last alcoholic drink." *Vickowski*, 422 Mass. at 610. Signs evidenced subsequent to last service are not sufficient to meet the Plaintiffs' burden of proof. "Evidence of apparent intoxication... at some later point in time does not, by itself, suffice to show that the patron's intoxication was evident at the time the last drink was served." *Douillard*, 433 Mass. at 165.

---

[7] It should be noted that David Benjamin's Rule 26 Report is subject to a separate Motion to Strike which is being submitted separately from the instant Motion.

All of the percipient witnesses in this action, patrons and employees alike, uniformly agree that Southworth did not exhibit any visible sign of intoxication at the LongHorn. Independent eye witnesses Jude Connelly, Scott Espey and Todd Currie all testified that Southworth did not show any sign of intoxication. LongHorn employees Leigh Chabot, Sherri Salmond, and Chuck Noonan all confirm that they observed Southworth and his party and saw no discernable change in Southworth's behavior at any time that evening.

By manipulating hearsay evidence, Plaintiffs' allege four "signs" of intoxication. Plaintiffs claim that the table being loud is a sign of visible intoxication, however, this issue is a red herring. As discussed below, this is no evidence of this being a sign, and secondly, the evidence proves that the table being loud occurred well after the last service of alcohol to Southworth. The last service was at 9:24. See *Audit Report*. The check was cashed at 9:57. *Id.* The party left at 11:00 p.m. *Transcr. Depo. Jude Connelly* 145:7-9. The table allegedly was asked to quiet down approximately ½ hour prior to leaving the restaurant. *Transcr. Depo. Jude Connelly* 63:12-17. The incident occurred after the Southworth party was finished with dinner and just sitting at the table. *Transcr. Depo. Jude Connelly (Southworth Matter)* 44:4-9. This "sign", therefore occurred at approximately 10:30 p.m., one hour after Southworth was served his last drink, further indicating that summary judgment should be allowed. The other "signs", that Southworth was sloppier than usual, didn't carry himself as usual and may have had glassy eyes, are completely meaningless absent any evidence as to when these "signs" may have occurred. Plaintiffs' have not met their burden of proving signs of visible intoxication at the time of last service of alcohol to Southworth.

When signs were exhibited is also important because it evidences changes in behavior (a person early in the evening being jovial and later crying at the table) that would alert a server to a

patron's condition. Benjamin, David. *Liquor Liability Update, MCLE* p.116 (Exhibit 17); See also *Transcr. Depo. Michael Marcantonio* 159:14-15 (stating that the "cues" are critical to alerting a server as to intoxication). Whatever Southworth's demeanor that evening, the evidence is clear: it never changed at any time while he was at the LongHorn. *Transcr. Depo. Leigh Chabot*175:8-24. That Southworth's demeanor never changed bolsters the argument for continuing to serve him drinks, not preclude it. Without any evidence indicating that Southworth, prior to the service of his last drink at the LongHorn that evening, underwent a change in his demeanor in essence renders these alleged "signs" irrelevant. Without proving visible signs of intoxication prior to the last service of alcohol to Southworth, summary judgment is appropriate.

C.    **SOUTHWORTH DID NOT EXHIBIT VISIBLE SIGNS OF INTOXICATION WHEN LAST SERVED, THEREFORE, SUMMARY JUDGMENT IS WARRANTED**

The Defendant is entitled to summary judgment in this matter because there is simply no facts indicating that Jeffrey Southworth exhibited visible signs of intoxication prior to his being served his last drink at the LongHorn. Visible signs of intoxication are the *sine qua non* of Massachusetts dramshop actions. A server has no duty to refuse service to a patron unless they "know[] or reasonably should have known that the patron is intoxicated." *Cimino*, 385 Mass. at 327. For the Plaintiffs to recover against LongHorn for the injuries caused by Southworth, Plaintiffs must introduce "sufficient evidence from which the jury could infer that [the patron] was visibly intoxicated when he was served." *Cimino*, at 328 (emphasis added). See also *Vickowski*, 422 Mass. at 610 (in order for an alcohol service provider to be found negligent, the patron must already be "showing discernible signs of intoxication."). Plaintiffs cannot infer that Southworth was visibly intoxicated even if he drank a dozen beers. *Kirby v. Le Disco*, 34 Mass.App.Ct. 630, 632 (1993) (consumption of eight to twelve beers insufficient to infer visible

signs of intoxication); *Makyen v. Mustakangas*, 39 Mass.App.Ct. 309, 312 (consumption of five to six beers not enough to infer visible intoxication).

Several cases have outlined what "visible signs" of intoxication would be. See e.g. *Cimino v. Milford Keg, Inc.*, 383 Mass. 323, 325-328 (1982) (visible signs of intoxication include the patron being "totally drunk" and "loud and vulgar"). If there is no evidence of "obvious" intoxication, Plaintiffs' case must fail. See *Vickowski v. Polish American Citizens Club of Deerfield*, 422 Mass. 606 (1996); *Mayken v. Mustakangas*, 39 Mass.App.Ct. 309 (1995); *Kirby v. Le Disco, Inc.*, 34 Mass.App.Ct. 630 (1995).

The Court must discern the vast difference between impairment and visible signs of intoxication. One is presumed to be impaired from operation of a motor vehicle if his BAC meets or exceeds 0.08. M.G.L. c.90 §24(1)(a)(1); *Commonwealth v. Kelly*, 39 Mass.App.Ct. 448, n.2 (1995). Toxicologists, including Plaintiffs' expert, agree that it takes a BAC of 0.15, nearly double the BAC for impairment, before the majority of non-tolerant drinkers would exhibit visible signs of intoxication. *Transcr. Depo. David Benjamin (Part I)* 157:10-13. Southhworth, however, was a tolerant drinker who can mask visible signs. *Transcr. Depo. David Benjamin (Part I)* 157:19-24, 158:1-5. In fact, only 20-30% of tolerant drinkers would exhibit visible signs of intoxication at the much higher BAC of 0.20, well above the BAC Plaintiffs' expert assigns to Southworth, and significantly higher than the BAC of 0.15 at which non-tolerant drinkers would be expected to show visible signs of intoxication[8]. *Transcr. Depo. David Benjamin (Part II)* 93:14-19 (Exhibit 18). The types of signs which toxicologist would expect a non-tolerant drinker to exhibit at a BAC of 0.15 are slurred speech, lack of coordination, impaired balance, falling

---

[8] Dr. Benjamin's Rule 26 Report, using inflated drink totals not supported by the evidence, and a faulty Widmark formula, still concludes that at the time he was served his last drink, Jeffrey Southworth had a BAC of under 0.15, the level which he himself says a non-tolerant drinker would more likely than not show signs of intoxication. See Generally *Rule 26 Report of David Benjamin*.

and tripping. See *Liquor Liability Update 2006*, MCLE p.116. The "signs" proffered by Plaintiffs do not meet this standard and would not alert the server to stop serving Southworth.

Plaintiffs' experts admit that each of what Plaintiffs allege as signs, individually or combined, are not traditional visible signs of intoxication. See e.g. *Transcr. Depo. David Benjamin (Part II)* at 89-92. Alcohol service expert Michael Marcantonio does not know how the LongHorn server should have known that Southworth was visibly intoxicated based on these "signs." *Transcr. Depo. Michael Marcantonio (Part I)* 159:4-9. Marcantonio further admits that these "signs" would not put a server on notice for visible intoxication; in fact, he may well have served Southworth his last drink if he were the server. *Transcr. Depo. Michael Marcantonio (Part I)* 184:17-24, 185:1-2.

Despite having free reign in the Southworth action to develop evidence against LongHorn without LongHorn present, Plaintiffs still failed to elicit any evidence indicating how Southworth's characteristics and attire would constitute visible signs of intoxication. While Plaintiffs claim that Southworth did not hold himself the way he usually did, Plaintiffs never elicited how Southworth usually held himself, how the manner he held himself at the LongHorn differed from his normal manner, or how either manner would alert the server to stop serving him. Plaintiffs' expert couldn't even opine as to whether or not it was appropriate for LongHorn to have served Southworth based on the way he was carrying himself. *Transcr. Depo. Michael Marcantonio p.159-163*. He "really could not say" how server Chabot should have picked up on any changes in how Southworth was holding himself. *Transcr. Depo. Michael Marcantonio 161:17-18*. Plaintiffs' toxicologist, Dr. Benajamin, states that he could not determine that Southworth was exhibiting visible signs of intoxication or if Southworth should not have been denied service based on this "sign". *Transcr. Depo. David Benjamin (Part I) 164:11-17*.

13

That Southworth may have been a little bit sloppier looking than usual fails as a "sign" for similar reasons. There is simply no evidence as to how Southworth normally dressed or what about his attire that evening would warrant a server to stop serving him. In fact, when Southworth acted in the same way as he usually did when he was a patron at the LongHorn. *Transcr. Depo. Leigh Chabot* 175:21-24.

Plaintiffs' reference to Southworth being loud actually refers to the table, not Southworth himself. *Transcr. Depo. Jude Connelly* 57:12-17. Connelly testified that Southworth was no louder than anyone else at the table. *Transcr. Depo. Jude Connelly* 159:23-24, 160:1. Connelly testified that he himself was not intoxicated, and that Southworth was no louder than he was. *Transcr. Depo. Jude Connelly* 160:2-5. As set forth above, the time when the table was allegedly loud was well after Southworth was served his last drink.

Lastly, Plaintiffs allege, via inadmissible evidence, that Southworth exhibited glassy eyes that evening. What the witness actually testified to is that "I don't remember specifically seeing his eyes, you know, looking - seeing them glassy. But very well, very well could have. That could be." *Transcr. Depo. Jude Connelly (Southworth Matter)* 51:2-5. In this action, the witness clarified his testimony stating that he cannot remember Southworth's eyes being glassy that evening. *Transcr. Depo. Jude Connelly* 176:20-23. This statement by itself, particularly without reference to time, is not sufficient to prove visible signs.

Plaintiffs' "signs", concocted from Connelly's hearsay statements from Plaintiffs' prior case against Southworth, are simply not what Plaintiffs make them out to be. In fact, Connelly clarified his prior testimony during his deposition in this action. Connelly explained in this action that Southworth not "holding himself" the way he usually did meant that he did not hold himself the way that he usually did when dirt biking. *Transcr. Depo. Jude Connelly* 65:12-21. Connelly

clarified that he did not remember Southworth's eyes being glassy on the evening of September 26, 2003. *Transcr. Depo. Jude Connelly* 176:20-23. He clarified that Southworth was no louder than anyone else, and the table may have been asked to quiet down, but it was well after the bill was paid. *Transcr. Depo. Jude Connelly* 57:12-17; 159:23-24, 160:1-5; 145:7-9; 63:12-17.

These signs as alleged by Plaintiffs, even when taken as a group, are not sufficient to alert a server to stop service of alcohol to Southworth. They do not meet Plaintiffs' burden as set forth in *Cimino* that Southworth was visibly intoxicated when served his last drink. To the contrary, there was no duty to cease alcohol service to him based on the facts. *Cimino*, 385 Mass. at 327. Because Plaintiffs can offer no evidence from which a reasonable jury could infer that the LongHorn staff knew or should have known that Southworth was intoxicated, summary judgment should issue for the Defendant.

## D. EXPERT OPINIONS ALONE, WITHOUT CORROBORATING FACTS, ARE NOT ENOUGH TO MEET THE PLAINTIFFS' BURDEN.

Lacking any evidence that Southworth was visibly intoxicated when he was served his last drink, Plaintiffs attempt to meet their burden with expert testimony. No Massachusetts court, however, has ever permitted an expert to opine concerning a patron's "visible intoxication" in a dramshop accident in the absence of admissible evidence that the patron was visibly intoxicated when served his last drink or that the patron typically exhibited visible intoxication when consuming like amounts of alcohol. *Douillard v. LMR, Inc.*, 740 N.E.2d 618, 623 (Mass. 2001). In this case, the plaintiff has neither. No eyewitness recalls Southworth exhibiting visible signs of intoxication prior to being served his last drink at Longhorn. Plaintiffs can provide no evidence of that Southworth's reactions to alcohol were similar to that of the average person; to the contrary, Plaintiffs' expert admits that Southworth was not an average drinker but rather "he was a frequent alcohol consumer and would have been likely to demonstrate some tolerance to

the intoxicating effects of ethanol." *Rule 26 Report of David Benjamin* (Exhibit 20), p. 13.

Massachusetts does not permit Plaintiffs to fill the factual evidentiary gap with expert opinions

as to Southworth's likely BAC. Plaintiffs must accompany expert testimony with "direct

evidence of the defendant's own reactions to alcohol to confirm that they are in fact comparable

to the average drinker." *Douillard v. LMR, Inc.*, 740 N.E.2d 618, 623 (Mass. 2001); *Kirby*, at

861. ("[I]n the absence of evidence of Morales's own reactions to excessive consumption, the

expert's opinion testimony was properly excluded.") (internal citations omitted). In *Douillard*, for

example, the expert's opinion was only allowed because plaintiff provided additional factual

testimony of a witness who had seen the patron intoxicated on at least ten prior occasions as well

as the patron's own testimony about the amount of alcohol it took to render him intoxicated. *Id.*

620, 622 ("This record adds to the expert opinion specific information concerning this particular

drinker's reaction to alcohol consumption."). There, the Court vacated summary judgment

stating: "the plaintiff's case does not rest solely on an expert's assessment of how the 'average'

drinker would react to this much alcohol." *Douillard* 622-23; see also *Hopping v. Whirlaway,*

*Inc.*, 637 N.E.2d 866, 869 (Mass. App. Ct. 1994) (after ordering a new trial, the Appeals Court

said "plaintiffs ought not to be permitted to put to their toxicologist witness hypothetical

questions which ask him whether [patron] would have been recognizably intoxicated if he had

shown difficulty walking unless evidence is received that Regan, in fact, had demonstrated

difficulty in walking.").

     Even if the Plaintiffs could show visible signs, absent any evidence of Southworth's

reaction to alcohol consumption, his baseline, Plaintiffs' expert opinion cannot suffice to meet

the Plaintiffs' burden of proof. Each sign, without a time reference or a baseline reaction to

alcohol, precludes Plaintiffs from showing any evidence, factual or by expert opinion, that the

LongHorn server should have stopped serving alcohol to Southworth. See *Douillard*, 433 Mass. at 167. Expert testimony does not circumvent the requirement of visible signs of intoxication at the time of the last service of alcohol. *Id.* See also, *McGuiggan*, 398 Mass. at 162 and n.10. Lacking such corroborative evidence to support expert opinion, summary judgment should be granted.

**E. THERE IS NO EVIDENCE TO WARRANT AN AWARD OF PUNITIVE DAMAGES.**

In order to recover punitive damages in a wrongful death case, the Plaintiffs must prove that the "decedent's death was caused by the malicious, willful, wanton, or reckless conduct of the defendant or by the gross negligence of the defendant." G.L. c. 229 §2; *Coughlin v. Titus & Bean Graphics*, 54 Mass.App.Ct. 633, 641 (2002). The "malicious, willful, wanton, or reckless" and "gross negligence" standards are appreciably higher than the standards for ordinary negligence. *Coughlin*, 54 Mass.App.Ct. at 641. Massachusetts Courts have defined malicious, willful, wanton or reckless conduct as "much more than mere negligence... It involves conduct of a quasi criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or with a wanton and reckless disregard of its possible consequences." *DiGloria v. Chief of Police of Methuen,* 8 Mass.App.Ct. 506, 513. Moreover, gross negligence "is substantially and appreciably higher in magnitude than ordinary negligence... It is very great negligence, or the absence of slight diligence, or the want of even scant care... It is a heedless and palpable violation of legal duty respecting the rights of others." *Davis v. Walent,* 16 Mass.App.Ct. 83, 92 (1983) quoting from *Altman v. Aronson,* 231 Mass. 588, 591-592 (1919).

There is simply no evidence that the Defendant acted in a "quasi-criminal" manner. In the two hour period from when Southworth arrived at LongHorn until the bill was paid, the group of seven was served an average of three drinks per patron. Plaintiffs' own experts cannot say what, if any, visible signs of intoxication should have been observed by LongHorn or their employees. *Transcr. Depo. Michael Marcantonio* 162:21-24, 163:1-2. Plaintiffs' toxicologist calculates Southworths' BAC below where non-tolerant drinkers are likely to exhibit visible signs of intoxication, and well below where a tolerant drinker like Southworth would exhibit such signs. There are no visible signs of intoxication that Southworth exhibited at the LongHorn that evening, let alone prior to the last drink being served to Southworth. In fact, Plaintiffs' own expert may well have served Southworth his last drink had the expert been the server. *Transcr. Depo. Michael Marcantonio* 158:16-24, 159:1-9. Where Plaintiffs own experts state that they may have served Southworth his last drink, and that his estimated BAC at the time of last service was below the level at which they would expect Southworth would exhibit visible signs, Plaintiffs cannot prove their case for negligence, and they are a far cry from proving gross negligence. The lack of evidence for a claim of punitive damages is so crystal clear that the claim itself rises to the level of a frivolous action. Particularly as to the claims for punitive damages, summary judgment is unequivocally warranted and appropriate.

### III.    CONCLUSION

The essential elements for summary judgment are not in dispute. There are no witnesses who state that Jeffrey Southworth was visibly intoxicated prior to receiving his last drink at the LongHorn that evening. The "signs" as alleged by Plaintiffs, all based on inadmissible hearsay, are without reference to time or occurred well after Southworth was served his last drink. Plaintiffs' own experts state that the "signs" as alleged would not alert the server to stop serving

alcohol to Southworth, in fact, Plaintiffs' own expert may well have served Southworth under the

circumstances had he been the server. Expert testimony without corroborative evidence does not

resuscitate Plaintiffs' action. Absent proof of visibly intoxication at the time Southworth was

served his last drink, Massachusetts case precedent is clear that summary judgment must issue.

Lastly, because there is absolutely no evidence that Defendant engaged in willful, wanton or

reckless conduct, or the higher standard of gross negligence, summary judgment should issue on

Counts II and IV of the plaintiffs' complaint seeking punitive damages.

WHEREFORE, the defendant, RARE Hospitality International, Inc., respectfully

requests that this Honorable Court grant its motion for summary judgment.

The Defendant,
By Its Attorneys,

Michael K. Gillis, Esq.
BBO# 543551
Neil D. Schnurbach, Esq.
BBO# 664534
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA 02461
Tel. 617-244-4300

## CERTIFICATE OF SERVICE

I, Michael K. Gillis, of Gillis & Bikofsky, P.C., attorneys for Rare Hospitality International, Inc., hereby certify that on May 4, 2007, a true copy of the above document was served upon all counsel of record.

<div style="margin-left: 40%;">

RARE HOSPITALITY INTERNATIONAL, INC. d/b/a
LONGHORN STEAKHOUSE
By its Attorneys,

Michael K. Gillis, Esq.
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA 02461
(617) 244-4300
BBO# 543551

</div>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY,<br>AS SHE IS THE ADMINISTRATRIX OF<br>THE ESTATE OF AWILDA SANTIAGO,<br>ESSEX PROBATE COURT DOCKET<br>#03P-2499ADl, P/P/A VERONICA<br>ROSARIO AND CHRISTINA SANTIAGO,<br>AND AS SHE IS THE ADMINISTRATRIX<br>OF THE ESTATE OF JOSE SANTIAGO,<br>BERLIN (CONNECTICUT) PROBATE<br>COURT, CASE #03-0713<br><br>    Plaintiff<br><br>v.<br><br>RARE HOSPITALITY INTERNATIONAL,<br>INC. d/b/a LONGHORN STEAKHOUSE<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action Number:<br>)  05-CV-10617MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Now comes the defendant, RARE Hospitality International Inc., d/b/a LongHorn Steakhouse ("LongHorn"), and, pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, hereby submits its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1. On Friday, September 26, 2003, following an afternoon of dirtbiking, Jude Connelly ("Connelly"), Jeffrey Southworth ("Southworth") and Thomas "Scott" Espey ("Scott Espey") traveled to the LongHorn Steakhouse in Leominster, Massachusetts for dinner. *Transcr. Depo. Jude Connelly* 10:11-19.

2.   Connelly, Southworth and Scott Espey arrived at the LongHorn at approximately 8:00 p.m. and waited for other members of their party to arrive. *Transcr. Depo. Scott Espey* 19:17-24; *Rule 26 Report of David Benjamin* at p. 8.

3.   At approximately 8:30 p.m., Michael Espey (brother of Scott), William "Todd" Currie ("Currie"), Matthew Cenicola ("Cenicola") and Bruce Sirjane ("Sirjane") arrived at the LongHorn Steakhouse and were seated at a table with Southworth, Connelly and Scott Espey (the "Southworth party"). *Transcr. Depo. Michael Espey* 37:22-24, 38:1-9; *Transcr. Depo. Jude Connelly* 74:16-24, 75:1-9.

4.   At 8:40 p.m., LongHorn server Leigh Chabot ("Chabot") entered an order for the Southworth party of a fried onion appetizer ("tonion"), two cups of chowder, an appetizer order of chicken fingers, a 25 oz. beer and three Jack Daniels Manhattans ("Manhattan"); *Audit Report* p.7-8.

5.   At least two rounds of Manhattans served to the Southworth party were mixed by LongHorn bartender Kristin O'Donnell. *Transcr. Depo. Kristin O'Donnel (Part I)* 86:11-17.

6.   Kristin O'Donnell mixed Jack Daniels Manhattans by pouring 1 ½ - 2 ounces of Jack Daniels and ¼ ounce of sweet vermouth into a rocks glass that was filled with ice, straining the drink into a cocktail glass and garnishing it with a cherry *Transcr. Depo. Kristin O'Donnell (Part II)* 35:6-10; 37-9-16.

7.   The LongHorn recipe for a Manhattan called for 2.0 oz. of whiskey and 0.25 oz. of sweet vermouth. *RARE Hospitality Bar Recipes Book.*

8.   The drinks entered by Chabot at 8:40 p.m. went to Michael Espey, Currie, Cenicola and Sirjane, and not to the parties that waited at the bar (i.e. Southworth, Connelly and

Scott Espey). *Transcr. Depo. Leigh Chabot* 69:25, 70:1-8; See also *Transcr. Depo. Michael Marcantonio (Part I)* 104:1-18.

9.  At 8:51 p.m., Chabot entered another drink order consisting of seven Jack Daniels Manhattans. *Audit Report* p.8.

10. At that time, the Southworth party had appetizers and/or bread at the table. *Transcr. Depo. Leigh Chabot* 164:14-17.

11. At 9:00 p.m., Chabot entered six entrees for the Southworth party. *Audit Report* p.8-9.

12. One of the seven members of the Southworth party ate the appetizer order of chicken fingers as his meal. *Transcr. Depo. Leigh Chabot* 69:21-22.

13. The entrees ordered at 9:00 p.m. consisted of steaks and ribs with salads and side orders. *Audit Report* p.9.

14. At 9:15 p.m., the Southworth party ordered one 25 oz. Bud Light. *Audit Report* p.9.

15. This Bud Light draft beer ordered at 9:15 p.m. was served to someone other than Jeffrey Southworth. *Transcr. Depo. Leigh Chabot* 122:19-21.

16. At 9:21 and 9:24 p.m., Chabot registered a final round of Manhattans for the Southworth party. *Audit Report* p.9-10; *Transcr. Depo. Leigh Chabot* 169:19-22; See also *Transcr. Depo. Michael Marcantonio (Part I)* 182:24, 183:1-18; 186:10-15.

17. Prior to Southworth being served his final drink, server Leigh Chabot and patron Jude Connelly observed Jeffrey Southworth rise from the table and walk to the bathroom. At that time he was steady on his feet and was exhibiting no signs of intoxication. *Transcr. Depo. Jude Connelly* 157:4-24, 158:1-6; *Transcr. Depo. Leigh Chabot* 150:13-24.

18. Prior to Southworth being served their final drink, LongHorn manager Chuck Noonan observed the table and relayed to bartender Kristin O'Donnell that they were sober. *Transcr. Depo. Kristin O'Donnell (Part II)* 11:7.

19. Prior to being served his last drink at the LongHorn on September 26, 2003, no one witnessed Jeffrey Southworth exhibiting any visible signs of intoxication. *Transcr. Depo. Jude Connelly* 53:6-9; *Transcr. Depo. Scott Espey* 36:7-10; *Transcr. Depo. Leigh Chabot* 175:6-10; *Transcr. Depo. Sherri Salmond* 31:4-21; *Transcr. Depo. Todd Currie* p.32-33.

20. Had the Manhattans served to Southworth been made according to the RARE Hospitality Bar Recipes Book, Plaintiffs' expert, if he were the server, may have served Southworth his last drink. *Transcr. Depo. Michael Marcantonio* 184:17-24; 185:1-2.

21. Had the Manhattans served to Southworth been made according to how bartender Kristin O'Donnell states she made them, Plaintiffs' expert, if he were the server, may have served Southworth his last drink. *Transcr. Depo. Michael Marcanto* 157:20-22;

22. According to Plaintiffs' toxicologist, Jeffrey Southworth was served his last drink at 9:30 p.m. *Transcr. Depo. David Benjamin (Part I)* 138:24,139:1.

23. The standard amongst toxicologists is that a non-tolerant drinker would need to reach a BAC of at least 0.15 before the majority of non-tolerant drinkers would exhibit visible signs of intoxication. *Transcr. Depo. David Benjamin (Part I)* 157:10-13. *Liquor Liability Update 2006,* MCLE p.98.

24. According to Plaintiffs' toxicologist, Jeffrey Southworth's BAC did not reach 0.15 until "after 9:35, 9:40." *Transcr. Depo. David Benjamin (Part I)* 184:9-13.

25. Southhworth was a tolerant drinker who could mask visible signs of intoxication. *Transcr. Depo. David Benjamin (Part I)* 157:19-24, 158:1-5.

26. Only 20-30% of tolerant drinkers would exhibit visible signs of intoxication at a BAC of 0.20. *Transcr. Depo. David Benjamin (Part II)* 93:17-19 (Exhibit 18).

27. The types of signs which toxicologist would expect a non-tolerant drinker to exhibit at a BAC of 0.15 are slurred speech, lack of coordination, impaired balance, falling and tripping. See *Liquor Liability Update 2006*, MCLE p.116.

28. The Southworth party paid their check at 9:57 p.m. *Audit Report* p.11.

29. After leaving the LongHorn, Southworth went to the Four Points Sheraton Hotel. *Transcr. Depo. Scott Espey* 121:24, 122:1-5, 123::8-12.

30. Southworth continued to drink while at the hotel; *Transcr. Depo. Jude Connelly* 161:3-24, 162:1-2.

31. From the hotel, the Southworth party proceeded to a strip club. *Transcr. Depo. Jude Connelly* 123:13-15, 19-21.

32. After leaving the strip club, Southworth, Connelly and Scott Espey drove to Littleton to where Scott Espey's car was parked. *Transcr. Depo. Jude Connelly* 123:20-22.

33. At 12:10 a.m., Jeffrey Southworth collided with a motor vehicle driven by Jose Santiago, killing Santiago and his daughter Awilda Santiago and injuring his daughters Veronica Rosario and Christina Santiago. *Collision Report* p.1-3.

The Defendant,
By Its Attorneys,

Michael K. Gillis, Esq.
BBO# 543551
Neil D. Schnurbach, Esq.
BBO# 664534
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA  02461
Tel. 617-244-4300

Page 1

```
 1                                  Volume:  I
                                    Pages:   1-179
 2                                  Exhibits: 1-4

 3            UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
 4    *****************************************
      NANCY ROSARIO, INDIVIDUALLY, AS      *
 5    SHE IS THE ADMINISTRATRIX OF THE     *
      ESTATE OF AWILDA SANTIAGO, ESSEX     *
 6    PROBATE COURT #02P-2499AD1, P/P/A     *
      VERONICA ROSARIO AND CHRISTINA       *
 7    SANTIAGO, AND AS SHE IS THE          *
      ADMINISTRATRIX OF THE ESTATE OF      *
 8    JOSE SANTIAGO, BERLIN (CONNECTICUT)* 
      PROBATE COURT, CASE #03-0713,        *
 9           Plaintiff,                    *
                                           * C.A. No.
10          VS                             * 05-CV-10617MLW
      RARE HOSPITALITY INTERNATIONAL,      *
11    INC. d/b/a LONGHORN STEAKHOUSE,      *
             Defendant                     *
12    *****************************************
          DEPOSITION OF JUDE CONNELLY, a witness

13        called on behalf of the Plaintiff, taken

14        pursuant to Notice under the applicable

15        provisions of the Federal Rules of Civil

16        Procedure, before Barbara J. Simon, a

17        Professional Shorthand Reporter and Notary

18        Public, in and for the Commonwealth of

19        Massachusetts, at the law offices of Albert L.

20        Farrah, Jr., One Washington Mall, Boston,

21        Massachusetts, on Friday, February 10, 2006,

22        commencing at 10:15 a.m.

23             SHEA COURT REPORTING SERVICES
                    (617) 227-3097
24
```

Page 2

```
 1        A P P E A R A N C E S

 2    ALBERT L. FARRAH, JR., ESQ.
      Law Offices of Albert L. Farrah, Jr.
 3    One Washington Mall
      Boston, MA 02108
 4    (617) 742-7766
          Counsel for the Plaintiff
 5
      MICHAEL K. GILLIS, ESQ.
 6    Gillis & Bikofsky, P.C.
      1150 Walnut Street
 7    Newton, MA 02461
      (617) 244-4300
 8        Counsel for the Defendant

 9
      Also Present:
10    Neil Schnurbach, Esq.
      Ann Rudy
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page

| | I N D E X | | | |
|---|---|---|---|---|
| 1 | | | | |
| 2 | WITNESS | DIRECT | CROSS | REDIRECT RECROS |
| 3 | JUDE CONNELLY | | | |
| 4 | (By Mr. Farrah) | 4 | 171 | |
| 5 | (By Mr. Gillis ) | | 143 | 172 |

```
 6            E X H I B I T S
 7
 8    NO.   DESCRIPTION              PAGE
 9    1     Floor plan                17
10    2     Bar bill                  26
11    3     Written statement         42
12    4     Affidavit                 61
13
14    (The exhibits were retained by Mr. Farrah.)
```

Page

```
 1          P R O C E E D I N G S

 2

 3        JUDE CONNELLY, having been satisfactorily

 4    identified and duly sworn, on oath, deposes and

 5    says as follows:

 6

 7            DIRECT EXAMINATION

 8

 9    BY MR. FARRAH:

10    Q. Just for the record, could you tell us your

11       name, please?

12    A. Jude Connelly.

13    Q. Mr. Connelly, my name is Albert Farrah and I

14       represent the plaintiff, Nancy Rosario, in

15       various capacities in this lawsuit.

16           Counsel have agreed that you will have a

17       copy of your transcript delivered to you and

18       that you will have thirty days from the date of

19       your receipt of that transcript to note, in

20       writing on a sheet of paper that will accompany

21       the transcript, any errors that you feel were

22       made in the transcription of your testimony,

23       and you'll need to return that errata sheet to

24       me within thirty days of your receipt in order
```

Page 5

1  for the notations to have any effect in this
2  case.
3      Otherwise, your transcript will be deemed
4  accurate if we don't receive that back from you
5  within thirty days -- the errata sheet. Do you
6  understand that?
7  A. Yes.
8  Q. Tell us, please, where you live.
9  A. Harvard, Massachusetts.
10 Q. What is the address?
11 A. Fifteen Lovers Lane.
12 Q. And how old are you?
13 A. I am twenty years old.
14 Q. What is your date of birth, sir?
15 A. March 23, 1985.
16 Q. And are you currently in school?
17 A. I am.
18 Q. Where?
19 A. Fitchburg State College.
20 Q. Is that full time?
21 A. Full time.
22 Q. And do you work?
23 A. Yes.
24 Q. Where do you work?

Page

1  A. Yes.
2  Q. Was that on September 26, 2003?
3  A. Yes, I believe so.
4  Q. Calling your attention to that day, September
5  26, 2003, do you recall where you were dirt
6  biking with Mr. Southworth that day?
7  A. I do.
8  Q. Where was that?
9  A. It was in Templeton, Massachusetts.
10 Q. Is there a particular location at Templeton
11 that you were dirt baking? Does it have a
12 name?
13 A. It doesn't have a name. It is just a sand pit,
14 if you want to call it that.
15 Q. A sand pit?
16 A. Yes.
17 Q. Do you know what time you arrived at the sand
18 pit that day?
19 A. Early afternoon, maybe 2:00, 3:00.
20 Q. How did you get there that day?
21 A. I went to Templeton with my brother.
22 Q. What is your brother's name?
23 A. Dylan Connelly.
24 Q. And when you arrived at the sand pit that day,

Page 6

1  A. I work at a small convenience store in Bolton.
2  Q. What is the name of that store?
3  A. Country Cupboard.
4  Q. Calling your attention back to the year 2003,
5  did you know a person named Jeffrey Southworth?
6  A. Yes.
7  Q. Can you tell us approximately when it was that
8  you first met Mr. Southworth?
9  A. I believe it was some time in the summer of
10 2002.
11 Q. Do you know the setting, where you met him?
12 A. Not particularly.
13 Q. During the summer of 2003, did Mr. Southworth
14 and you engage in any dirt biking activities
15 together?
16 A. Yes.
17 Q. Can you tell me approximately how many times
18 during the summer of 2003 Mr. Southworth and
19 you were dirt biking together?
20 A. I would say about a dozen times.
21 Q. And on one of those occasions after dirt
22 biking, did Mr. Southworth and you go to the
23 Longhorn Steakhouse in Leominster,
24 Massachusetts?

Page

1  was Jeffrey Southworth there?
2  A. No, he was not.
3  Q. At some point in time, did he arrive at the
4  sand pit? Did you see him there?
5  A. Yes.
6  Q. And by the way, if you just nod, we won't have
7  a record of your answers. So you need to say
8  your answer.
9      When you first saw him, was he in the
10 company of anyone else?
11 A. Yes.
12 Q. Who was that?
13 A. Scott Espy.
14 Q. Did you know Mr. Espy prior to September 26,
15 2003?
16 A. I did.
17 Q. Did you know him in a dirt biking setting?
18 A. I did.
19 Q. And others?
20 A. Yes.
21 Q. For how long did you remain dirt biking at the
22 sand pit in Templeton that day?
23 A. We were there until about dark, although I
24 stopped dirt biking a little bit before.

**Page 9**

1  Q. Before what?

2  A. Before Jeff and Scott finished. My brother

3     actually took my dirt bike with him back to

4     school when he left.

5  Q. So you said you arrived with your brother, and

6     did you arrive in your brother's motor vehicle?

7  A. Yes.

8  Q. And did your brother leave Templeton, the sand

9     pit, at some point in time that day?

10  A. Yes.

11  Q. When did he leave, approximately?

12  A. Around 6:00.

13  Q. And did he take your dirt bike with him that

14     day when he left around 6:00?

15  A. Yes.

16  Q. So you stopped dirt biking at that point; is

17     that right?

18  A. Yes.

19  Q. At what time did Mr. Southworth stop dirt

20     biking?

21  A. It was right around when it got dark. I don't

22     specifically remember.

23  Q. And at some point in time, did you leave the

24     Templeton sand pit that day?

**Page 10**

1  A. We did.

2  Q. And did you leave in the company of anybody?

3  A. I left with Jeff and Scott.

4  Q. And approximately when was it that you left?

5  A. I know it was just getting dark or just shortly

6     after, maybe around 7:00.

7  Q. And prior to leaving the sand pit in Templeton,

8     did you see Jeffrey Southworth have any

9     alcoholic beverages?

10  A. No.

11  Q. Did all of you leave the sand pit together --

12     Jeffrey Southworth, Mr. Espy and yourself?

13  A. We did.

14  Q. And in whose motor vehicle did you leave the

15     sand pit?

16  A. It was Jeff's. I believe it was a rented

17     truck.

18  Q. And where did the three of you go?

19  A. We went to the Longhorn Steakhouse.

20  Q. And were there any other persons in the motor

21     vehicle, the rented truck, other than Jeff

22     Southworth, Mr. Espy and yourself, on the trip

23     from the sand pit to the Longhorn Steakhouse?

24  A. No, there were not.

**Page 11**

1  Q. Were there any pets in that motor vehicle?

2  A. There were. There were two dogs.

3  Q. Whose dogs were they?

4  A. They were Jeff's.

5  Q. And what was the layout of people and pets in

6     the motor vehicle on the trip from the sand pit

7     to the Longhorn Steakhouse?

8  A. I believe I was sitting in the back with the

9     two dogs, and Jeff and Scott were in the front.

10  Q. Who was driving?

11  A. Jeff was.

12  Q. And at approximately what time did you arrive

13     at the Longhorn Steakhouse?

14     Let me ask the question another way.

15     Approximately, how long did it take you to get

16     to the Longhorn Steakhouse from Templeton?

17  A. About half an hour.

18  Q. And when you arrived at the Longhorn

19     Steakhouse, where did you go? Where did you

20     first go?

21  A. We went in and we put our name in for a table,

22     and it was busy. So we went over to the bar to

23     wait for the table.

24  Q. That was the three of you -- Jeff, yourself and

**Page 12**

1     Mr. Espy?

2  A. Correct.

3  Q. At the bar, did you see Mr. Southworth drinking

4     at all?

5  A. I did.

6  Q. What did you see him drinking?

7  A. I saw him drinking a beer.

8  Q. And do you know how many beers Mr. Southworth

9     had at the bar that day?

10  A. I remember him having one.

11  Q. Do you remember testifying at a deposition in

12     this case or in a related case back in August

13     of 2004?

14  A. I do.

15  Q. And do you remember being asked the question --

16     Let me show you the bottom here on page 28 at

17     Line 22.

18     "Do you know whether or not Jeff had more

19     than one beer while he was at the bar?"

20     Do you see that question?

21  A. Yes, I do.

22  Q. Do you remember that your answer was, "You

23     know, I think he did. I'm not -- I don't know

24     for a fact but, you know, he probably did."

**Page 13**

1    Do you see that?
2 A. I see that.
3 Q. So is it your best memory today that he
4    probably had more than one beer while he was
5    drinking at the bar?
6    MR. GILLIS: Objection.
7 A. I don't know. I don't remember. I remember
8    him ordering one beer.
9 Q. Do you have any explanation for why you
10    testified on August 19, 2004 that he probably
11    had more than one beer?
12    MR. GILLIS: Objection. That's not his
13    testimony.
14    He said on 28 he had a beer, and then you
15    asked him further when you were unhappy with
16    the answer, and he said "maybe."
17    His testimony isn't ever that he had more
18    than one beer.
19    MR. FARRAH: His testimony is his
20    testimony, and his testimony is in response to
21    the question, "Do you know whether or not Jeff
22    had more than one beer while he was at the
23    bar?"
24    His testimony is, "You know, I think he

**Page 14**

1    did. I'm not -- I don't know for a fact, but,
2    you know, he probably did."
3    MR. GILLIS: That's taken out of context.
4    You're not bringing the whole statement in on
5    28 when you asked him, "What did you see him
6    drinking?" He said "A beer."
7    If you're going to ask him a question,
8    give him the whole sequence. Don't take it out
9    of order.
10    MR. FARRAH: Motion to strike. You can
11    ask him what you want to ask him.
12 Q. My question to you is, do you have any
13    explanation for why you testified on August 19,
14    2004 that you think he had more than one beer
15    at the bar?
16    MR. GILLIS: Where did you say he said he
17    thinks he had more than one beer at the bar?
18    MR. FARRAH: I'm looking at 22 through 24.
19    MR. GILLIS: 22 to 23 is a question.
20    Maybe I'm missing something. On page 29, Lines
21    21 to 24 I don't see anywhere -- What line are
22    you saying that he said he had more than one
23    beer as opposed to you asking a question?
24 Q. On page 28, Line 22, the question is, "Do you

**Page 15**

1    know whether or not Jeff had more than one beer
2    while he was at the bar?"
3    The answer is, "You know, I think he did."
4    So my question --
5    MR. GILLIS: What page are you on?
6    MR. FARRAH: I'm on page 28.
7    MR. GILLIS: Line?
8    MR. FARRAH: 22.
9    MR. GILLIS: Again, I object. If you're
10    going to ask him a question, ask him to read
11    the whole page because you're just taking
12    things out of context.
13 Q. For the third time, can you explain why you
14    testified back in August of 2004 that you
15    thought Jeff had more than one beer while he
16    was at the bar?
17 A. I guess I said it because I think it could have
18    been possible.
19 Q. Can you explain why in August of 2004 you
20    testified that he probably -- on top of page
21    29 -- that he probably had more than one beer
22    while he was at the bar?
23    MR. GILLIS: Objection.
24 Q. You can answer.

**Page 16**

1 A. I don't.
2 Q. Fair enough. At some point in time, were you
3    seated at a table?
4 A. Yes, we were.
5 Q. And by the way, while you were at the bar, how
6    far away were you from Jeff?
7 A. I don't remember.
8 Q. Do you remember what part of the bar you were
9    seated at or standing at?
10 A. Not particularly. I kind of remember it being
11    somewhat busy and us not having seats.
12 Q. But you don't remember what section of the bar?
13 A. I don't.
14 Q. I'm going to show you what has been marked as
15    Exhibit 1 in your earlier deposition.
16    Do you recall looking at that floor plan
17    at some point in time?
18 A. Yes.
19 Q. Do you recall circling the area where the "3"
20    is located as the area where Jeff, you and
21    Mr. Espy were at the bar?
22 A. Yes.
23 Q. Does that refresh your memory about what part
24    of the bar the three of you were at on that

Page 17

1 night?
2 A. It does.
3 Q. Is it accurate to say that you were at the area
4 circled with a "3" and an arrow pointing to it
5 on Exhibit 1 of your earlier deposition?
6 A. Yes.
7     MR. FARRAH: Can we mark that as Number 1
8 in this deposition?
9
10     (Exhibit Number 1 was marked for
11     identification.)
12
13 Q. Do you recall what the bartender or bartenders
14 who served you at the bar looked like that
15 night?
16 A. I don't.
17 Q. Do you remember testifying that it was a woman,
18 you thought, with blonde hair who had served
19 you that night?
20 A. I don't know whether she was at the bar or
21 serving a table. I remember a female that I
22 thought had blonde hair.
23 Q. Could you turn to page 31? Read the first
24 seven or eight lines of page 31 to yourself.

Page 18

1     (Witness reviews document.)
2 A. Okay.
3 Q. Does that refresh your recollection that it was
4 a blonde woman who waited on you at the bar?
5 A. I don't remember. I mean, I guess so.
6 Q. Okay. For the record, you were asked the
7 question --
8     MR. GILLIS: For the record, we want an
9 accurate transcript. So we'd prefer your best
10 memory, but if you're guessing, please don't do
11 that.
12     Neither Mr. Farrah nor I want you to guess
13 at answers you don't know.
14 A. I honestly don't remember.
15 Q. Do you recall testifying that you thought the
16 woman who served you at the bar had blonde
17 hair; is that right?
18     MR. GILLIS: Objection. I think his
19 testimony was that he didn't specifically
20 remember.
21 Q. "I think she has blonde hair," is what it says
22 there. "I just remember seeing blonde hair."
23     MR. GILLIS: Read the whole answer. His
24 testimony isn't that he saw a woman with blonde

Page

1 hair.
2     His testimony is, "I don't remember. I
3 just remember seeing blonde hair." Read the
4 whole answer.
5     MR. FARRAH: For the record, "Do you know
6 who served Jeff at the bar?"
7     "Answer: I mean, the bartender I remember
8 it was a girl?
9     "Question: Woman? Women?
10     "Answer: Yes. I don't specifically
11 remember. I think she had blonde hair. I just
12 remember seeing blonde hair."
13 Q. By the way, is it your best memory as you sit
14 here now that while he was at the bar, Jeffrey
15 Southworth had more than one beer?
16     MR. GILLIS: Objection, asked and
17 answered.
18 Q. You can answer.
19     MR. GILLIS: If you know.
20 Q. Read on page 30 the question that begins on
21 Line 15 to yourself and then your answer.
22     (Witness reviews document.)
23 Q. I want to ask you this question. Is it your
24 best memory as you sit here now that while he

Page 2

1 was at the bar, Jeff Southworth had more than
2 one beer?
3     MR. GILLIS: Objection.
4 A. No.
5 Q. Do you recall that you were asked that question
6 at your deposition?
7 A. Yes.
8 Q. And that your answer at that time was, "I'd say
9 so, yes"?
10 A. Yes.
11 Q. Do you have any explanation for why your answer
12 today is different from your testimony back in
13 August of 2004?
14 A. To be honest with you, after looking at the
15 receipt for the bill, I'm pretty sure that
16 there could be no way that he had more than one
17 beer at the bar.
18 Q. Did you see the receipt for the bar?
19 A. I believe the bill for the bar was with the
20 bill for the table.
21 Q. What makes you say that?
22 A. That's as I remember that.
23 Q. When did you see the receipt for the bill?
24 A. Maybe a month ago.

Page 21

1  Q. Where did you see it?
2  A. When I met with John DiNatale.
3  Q. A private investigator?
4  A. Yes.
5  Q. What did Mr. DiNatale say to you?
6  A. He just wanted to go over what I had said in
7     some of the depositions and show me the receipt
8     for the bar, and just tell me when I come in
9     here to tell the truth and if I don't know the
10    answer, don't speculate; just only say what I
11    know.
12 Q. Okay, and you didn't speculate when you
13    testified at your deposition, did you?
14       MR. GILLIS: Objection. The prior one
15    you're referring to?
16       MR. FARRAH: Either deposition.
17 A. I suppose I may have.
18 Q. You speculated at your deposition?
19 A. Well, I don't think I was making things up, but
20    when I say I don't exactly remember, this could
21    have been the case.
22       I remember one thing, but certainly
23    another thing could have happened.
24 Q. When you testified on August 19, 2004, you were

Page 22

1     sworn to tell the truth before you testified;
2     isn't that right?
3  A. Yes.
4  Q. Okay, and you did the best you could to tell
5     the truth at that time; isn't that right?
6  A. Yes.
7  Q. Since that time, Mr. DiNatale has seen you; is
8     that right?
9  A. Yes.
10 Q. Did he tell you who he was working for?
11 A. I can't remember. I know he is working for one
12    of the sides -- one of the law firms.
13 Q. How long did you spend with Mr. DiNatale?
14 A. Maybe twenty minutes.
15 Q. And he showed you some records?
16 A. Yes.
17 Q. What did he show you?
18 A. He showed me the printout when I was at the
19    grand jury.
20 Q. The printout of the bill at the grand jury for
21    the Longhorn?
22 A. He showed me a printout of the receipt, and
23    also when I went into the grand jury in Lowell
24    before the grand jury.

Page 2

1  Q. You gave some testimony?
2  A. Yes.
3  Q. He showed you that?
4  A. Yes.
5  Q. Was that accurate?
6  A. Yes.
7  Q. Was your deposition accurate in August of 2004?
8       MR. GILLIS: Which part? You asked the
9     same question at the deposition five times, and
10    you kept asking it because you didn't like the
11    answer.
12       So if you're going to ask him if it's
13    accurate, which time? The time when he said he
14    had only one beer or the time you asked him
15    three pages later?
16 Q. Was your deposition accurate?
17       MR. GILLIS: Which part?
18       MR. FARRAH: Any part.
19 A. I believe so, yes.
20       MR. FARRAH: Now, I just want to stop for
21    a second. I'll be right back. I want the
22    receipt of what Mr. DiNatale showed you.
23       (Off the record.)
24 Q. Back on the record. Back to Mr. DiNatale, did

Page 2

1     he tell you who he was working for?
2  A. He did. I know he's working for one of the law
3     firms. I don't know.
4  Q. Did he tell you he was working for Mr. Gillis's
5     firm? That is the gentleman sitting next to
6     you.
7  A. I suppose he did. I honestly don't remember
8     which firm he said he was working for.
9  Q. Before you testified in August of 2004, had any
10    investigators, other than police investigators,
11    spoken to you about your upcoming testimony?
12 A. No.
13 Q. So when you went into that testimony, you
14    didn't have the benefit of anybody's assistance
15    in preparing for the deposition; is that right?
16       MR. GILLIS: Objection.
17 A. Yes.
18 Q. But Mr. DiNatale knew that you were coming to
19    be deposed in this case; isn't that right?
20       MR. GILLIS: Objection.
21 A. Yes.
22 Q. He told you to tell the truth at the
23    deposition; isn't that right?
24       MR. GILLIS: Objection.

Page 25

1  A. Yes.
2  Q. And he showed you some documents; is that
3     right?
4  A. Yes.
5  Q. One of the documents he showed you was a
6     printout of the bar check; is that right?
7  A. That's right.
8  Q. I want you to look at this document which is
9     Exhibit 11 in the Kristin O'Donnell deposition.
10    It's a few page document. I'd like you to look
11    at it, if you could. Take a moment.
12       (Witness reviews document.)
13 Q. It's Table 52; is that right? Take as long as
14    you need to look at it to familiarize yourself
15    with the document.
16       (Witness reviews document.)
17 Q. Is that the document that Mr. DiNatale showed
18    you when you met with him?
19 A. I think so, yes.
20    MR. FARRAH: That, for the record, is
21    Exhibit 11 to Ms. O'Donnell's deposition.
22    Why don't we mark it as Exhibit 2 to this
23    deposition?
24

Page 26

1       (Exhibit Number 2 was marked for
2       identification.)
3
4  Q. Was it just Mr. DiNatale and you who met, and
5     nobody else?
6  A. Correct.
7  Q. Where did you meet with him?
8  A. He came to my house.
9  Q. He had called you beforehand to arrange that
10    meeting?
11 A. Yes.
12 Q. Your best memory of when the meeting happened
13    is when?
14 A. I believe it was around a month ago.
15 Q. He gave you his card?
16 A. Yes.
17 Q. Do you still have it?
18 A. Not on me, but I do have it.
19 Q. Do you remember his first name?
20 A. I think it's John.
21 Q. And you and he discussed what now has been
22    marked as Exhibit 2 in your deposition; is that
23    right?
24 A. Yes.

Page 27

1  Q. Based in part on that discussion, you now do
2     not believe that Jeff Southworth had more than
3     one beer at the bar; is that right?
4     MR. GILLIS: Objection.
5  A. Correct.
6  Q. That's because there's something in Exhibit 2
7     that suggests to you that it was an
8     impossibility that he had more than one beer at
9     the bar?
10    MR. GILLIS: Objection.
11 Q. Is that right?
12 A. Yes.
13 Q. What is it about that that Mr. DiNatale pointed
14    out to you in Exhibit 2?
15    MR. GILLIS: Objection. You're putting in
16    evidence that's not there. You're saying what
17    did he point to, and there's no evidence here
18    that he pointed to anything.
19       You can't lead the witness. It's your
20    deposition.
21 Q. Did Mr. DiNatale point to something in
22    Exhibit 2 that led you to conclude that it was
23    impossible for Jeff to have had more than one
24    beer at the bar?

Page 28

1  A. He asked me what I remembered him having at the
2     bar, and I told him that I remembered him
3     having a beer.
4       It was a possibility that he could have
5     had more, and I told him I remembered Scott
6     having a beer as well, and at that point he
7     said, "There were only two beers ordered. So
8     where did the third beer come from," and I
9     said, "I guess it didn't come."
10 Q. Did Mr. DiNatale show you where there were only
11    two beers ordered as reflected in what has now
12    been marked as Exhibit 2 in your deposition?
13 A. Yes.
14 Q. Could you show me what he pointed to?
15 A. There's one at the top of what says page 8, and
16    the second one is towards the end of page 9
17    right here.
18 Q. The one at the top of page 8 -- You said
19    page 8?
20 A. Yes.
21 Q. Is that the very top line on page 8?
22 A. It is.
23 Q. It says "$3.99, twenty-five-ounce Bud Light"?
24 A. Correct.

Page 29

1  Q. And to review that, you need to go to the
2     previous page; is that right?
3  A. Yes.
4  Q. That's part of an order that was placed at
5     8:40 p.m.; is that right?
6  A. Yes.
7  Q. So that's one of the references that
8     Mr. DiNatale pointed out to you about the
9     beers; is that right?
10 A. Yes.
11 Q. And the other reference that Mr. DiNatale
12    pointed out to you, I think you said was on
13    page 9; is that right?
14 A. Towards the end.
15 Q. Again, we're looking at Exhibit 2 to your
16    deposition; is that right?
17 A. Yes.
18 Q. Do you see it?
19 A. Yes.
20 Q. It looks like at 9:15 p.m. there was an order
21    for a $3.99 twenty-five-ounce Bud Light?
22 A. Yes.
23 Q. So based on Mr. DiNatale showing you the
24    earlier reference at 8:40 p.m. and the second

Page

1     MR. GILLIS: You're asking him to guess
2  because you don't want the accurate testimony.
3     I'm just telling him to tell the truth.
4  If you have a problem with that, then fine.
5     MR. FARRAH: I have no problem with that.
6  I'm trying to find out what Mr. DiNatale said
7  at a later date.
8  Q. What did Mr. DiNatale tell you about the beer
9     at 8:40 and the beer at 9:15? What did he tell
10    you?
11 A. He told me those were the two beers of the
12    bill.
13 Q. Did he say what they meant and what they
14    reflected?
15 A. He just said those are reflected, the two beers
16    that they were drinking.
17 Q. At the bar?
18    MR. GILLIS: Objection.
19 A. I don't know.
20 Q. Did he say that the two beers that are
21    reflected on Exhibit 2 to your deposition were
22    two beers that were served at the bar?
23    MR. GILLIS: Objection.
24 A. I don't remember.

Page 30

1     reference at 9:15 p.m., you now understand that
2     it was not possible for Jeff to have had more
3     than one beer at the bar; is that right?
4     MR. GILLIS: Objection.
5  A. I believe so.
6  Q. Did Mr. DiNatale tell you that what's been
7     marked as Exhibit 2 to your deposition included
8     the bill for the beers that were served at the
9     bar to Jeff and Mr. Espy?
10 A. He didn't say whether they were or weren't.
11 Q. Well, if you can tell me what it is about
12    Exhibit 2 that Mr. DiNatale pointed out to you
13    that suggested to you that the two beers we've
14    been talking about, 8:40 and 9:15, were the
15    beers that were served to them at the bar?
16    MR. GILLIS: Objection.
17 A. The fact that I just remember the bar tab being
18    carried over to the table. I mean, it's
19    obvious that they're different times, I guess.
20    I don't know.
21 Q. I want to know.
22    MR. GILLIS: If you don't know, say you
23    don't know, but don't guess.
24    MR. FARRAH: This is not your witness.

Page 3

1  Q. Is it accurate to say that you're basing your
2     testimony that Jeff probably did not have more
3     than one beer at the bar on Exhibit 2 that
4     Mr. DiNatale showed you?
5     MR. GILLIS: Objection.
6  A. Solely or entire? Can you repeat it one more
7     time?
8  Q. Yes.
9  A. I remember him having a beer at the bar, but
10    that was at the bar. I remember him having one
11    beer, you know, throughout the night.
12    I remember him having a beer, but whether
13    he ordered another beer, which I don't remember
14    or not, at the table, that would not be at the
15    bar.
16 Q. Do you remember testifying that at the table
17    Jeff had probably four beers?
18    MR. GILLIS: Objection.
19 A. I believe I did. I mean, I think I read that
20    somewhere.
21 Q. Your memory of the events back in August of '04
22    was better than your memory of the events
23    today; isn't that right?
24    MR. GILLIS: Objection.

Page 33

1  A. I guess you can say that.
2  Q. And back in August of '04 on Page 38, Line 4 of
3     your deposition began a series of questions
4     that you were asked about Jeff drinking at the
5     table.
6        Do you recall being asked the question,
7     "While you were at the table, did you see Jeff
8     drinking any alcoholic beverages?"
9        Do you recall that?
10 A. Yes.
11 Q. And your answer was, "Yes."
12    Did you see him drinking any beers?
13 A. Yes.
14 Q. How many beers, to your best memory, did you
15    see him drink at the table?
16 A. Do you want me to read off of this?
17 Q. Tell me, first of all, what you testified to
18    back in August.
19 A. I answered "Maybe four, maybe."
20 Q. My question to you today is, did you see him
21    drinking beers at the table?
22 A. I know that he had a beer at the table.
23 Q. Do you know if he had more than one beer at the
24    table?

Page 34

1  A. I don't know.
2  Q. Do you have any explanation for why back in
3     August of 2004 you testified that your best
4     memory was he had maybe four beers at the
5     table?
6  A. I mean anything is possible. I know that he
7     had a beer, but I guess it's possible that he
8     could have had more beers.
9  Q. You testified that he had maybe four beers;
10    isn't that right?
11 A. Correct. That would be why, the possibility of
12    why I said that.
13 Q. Now, prior to your August 2004 testimony,
14    nobody had spoken to you about your upcoming
15    testimony; isn't that right?
16 A. Right.
17 Q. Prior to today's testimony, Mr. DiNatale had
18    spoken to you; isn't that right?
19 A. Yes.
20 Q. Did you discuss the question of how many beers
21    to the best of your memory did you see him
22    drink at the table, with Mr. DiNatale?
23 A. No.
24 Q. Did you understand that Mr. DiNatale was

Page 35

1     working for the lawyers who are representing
2     the Longhorn Steakhouse?
3        MR. GILLIS: Objection.
4  A. At that time, yes.
5  Q. He told you that; isn't that right?
6  A. Yes.
7  Q. And while he was at the table, did you also see
8     Jeff drinking Manhattans?
9  A. Yes.
10 Q. How many Manhattans did you see him drink at
11    the table?
12 A. I remember him having at least a Manhattan. As
13    of right now, I don't know what I testified to.
14 Q. Let's read it. Do you see the question
15    beginning on page 38, Line 16? Let me read the
16    question.
17    It says, "What is your best memory of the
18    number of Manhattans that you saw him drinking
19    at the table?"
20    What was your answer?
21 A. "Probably two. I know that he ordered like a
22    round of them. I don't, you know, I don't
23    really remember how many. I think, you know,
24    I'd probably say two."

Page 36

1  Q. Do you remember giving a statement to the
2     police after the investigation or after the
3     accident?
4  A. Yes.
5  Q. And you had not spoken to Mr. DiNatale before
6     you gave that statement; isn't that right?
7  A. Correct.
8  Q. And nobody had talked to you, other than the
9     police, about what Jeff had to drink at the
10    restaurant; is that right?
11 A. Correct.
12 Q. Now, let me ask you this. Is there any
13    question in your mind about that when Jeff and
14    Mr. Espy and you first arrived at the
15    restaurant, you went to the bar?
16 A. Okay.
17 Q. Is there any question in your mind about that?
18 A. I know we went to the bar.
19 Q. You didn't have anything to drink that night --
20    alcoholic beverages -- did you?
21 A. No.
22 Q. And is there any question in your mind about
23    that both Jeff and Mr. Espy when they went to
24    the bar, they ordered a beer upon arrival at

Page 37

1    the bar?
2  A. No.
3  Q. That happened; is that right?
4  A. Correct.
5  Q. And they made that order at the same time; is
6    that right?
7  A. As best as I can remember. I can't
8    specifically recall them both saying, you know,
9    the time when they said, "Can I have a beer?"
10  Q. But the three of you were in the bar area for
11    some period of time before the others in your
12    group arrived; isn't that right?
13  A. Yes.
14  Q. Fifteen or twenty minutes?
15  A. Yes.
16  Q. And during that fifteen or twenty minutes, it
17    was just the three of you at the bar; isn't
18    that right?
19  A. Correct.
20  Q. And they were drinking beer at the bar; isn't
21    that right?
22  A. Correct.
23  Q. So when you were talking to Mr. DiNatale about
24    your testimony at your August 2004 deposition

Page 38

1    and he showed you this Exhibit 2 to your
2    deposition, did you have any discussion with
3    him about the times that the beers were shown
4    to have been ordered on Exhibit 2?
5  A. No, other than him pointing out just the two
6    beers were ordered. We didn't discuss anything
7    further.
8  Q. But you understood that the bar tab was on
9    Exhibit 2; isn't that right?
10      MR. GILLIS: Objection.
11  A. Yes.
12  Q. Mr. DiNatale told you that; isn't that right?
13      MR. GILLIS: Objection.
14  A. I don't know. I don't believe so.
15  Q. What then was the basis for your understanding
16    that the bar tab is on Exhibit 2?
17  A. Me recalling that the bar -- whatever the bill
18    at the bar was -- they just asked for it to be
19    brought to the table.
20    I don't specifically remember them paying
21    the tab at the bar.
22  Q. That's the sole basis for your statement that
23    the bar tab is on Exhibit 2?
24  A. Yes.

Page 3

1  Q. Mr. DiNatale didn't tell you that the bar tab
2    was on Exhibit 2, did he?
3  A. No.
4  Q. But he pointed to the two beers on Exhibit 2,
5    didn't he?
6  A. Yes.
7  Q. What did he say about them?
8  A. He said those were the two beers that were
9    ordered.
10  Q. Ordered at the bar?
11      MR. GILLIS: Objection.
12  A. He didn't say or he may have said. I don't
13    remember. I remember him saying those are the
14    two beers that they were drinking.
15  Q. Mr. DiNatale was not at the Longhorn Steakhouse
16    the night of September 26 to the best of your
17    memory; isn't that right?
18  A. Correct.
19  Q. Did you see Jeff drinking beer while he was at
20    the table?
21  A. Yes.
22  Q. And how many beers did you see Jeff drinking
23    while he was at the table?
24  A. I remember him having a mug in front of him.

Page 4

1  Q. The same size at the table that he had had at
2    the bar?
3  A. Yes.
4  Q. The same beer perhaps at the table that he had
5    had at the bar?
6  A. Yes.
7  Q. And the same kind of beer?
8  A. Yes.
9  Q. And how many drinks of Jack Daniels did Jeff
10    have at the table?
11  A. I remember seeing him have at least one. After
12    seeing this, it's clear that it looks like he
13    had two --
14      MR. GILLIS: Objection.
15  A. -- if the rounds were ordered.
16  Q. Did Mr. DiNatale and you discuss how many Jack
17    Daniels Manhattans are reflected on Exhibit 2?
18  A. Yes.
19  Q. How many are reflected on Exhibit 2?
20  A. I can't remember. I need to count them.
21  Q. Do you remember other people drinking Jack
22    Daniels Manhattans as well?
23  A. Yes.
24  Q. And so my question to you is, what is your best

**Page 41**

1  memory of the number of Manhattans that you saw
2  Jeff drinking at the table?
3     MR. GILLIS: Objection, already asked and
4  answered.
5  A. Two.
6  Q. What is your best memory of the number of beers
7  you saw Jeff drinking at the table?
8     MR. GILLIS: Objection.
9  A. One.
10 Q. And can we agree that your best memory of the
11 number of beers you remember him drinking at
12 the table in 2004 was four?
13    MR. GILLIS: Objection. That's not what
14 the answer says.
15 Q. Maybe four?
16    MR. GILLIS: Objection.
17 A. I testified to that.
18 Q. Before you saw Mr. DiNatale?
19    MR. GILLIS: Objection.
20 Q. Is that right?
21 A. Yes.
22 Q. Now, before you saw Mr. DiNatale, you also
23 signed a statement for the police; isn't that
24 right?

**Page 42**

1  A. Yes.
2  Q. Take a look at this and see if that is the
3  statement that you signed for the police.
4  A. It looks like it.
5  Q. And how many drinks with Jack Daniels did you
6  tell the police Jeff had with dinner?
7  A. It says here maybe three drinks with Jack
8  Daniels.
9  Q. Was that true?
10 A. Yes.
11 Q. Okay, and you also said, "We had dinner. Jeff
12 had a couple of beers (maybe two)," in your
13 statement to the police; isn't that right?
14 A. Yes.
15 Q. Was that true?
16 A. Yes.
17    MR. FARRAH: Can we have this marked as
18 the next exhibit?
19
20    (Exhibit Number 3 was marked for
21    identification.)
22
23    (Off the record.)
24 Q. I want to talk about Mr. DiNatale again. What

**Page 43**

1  I'd like you to do for me in your own words is
2  tell me as best as you can recall everything
3  Mr. DiNatale said to you and everything you
4  said to Mr. DiNatale during your
5  twenty-minutes-or-so meeting with him.
6  A. Well, when he first came, he introduced himself
7  and I introduced myself to him, and he asked me
8  if I was in school, and I told him that I was
9  currently going to Fitchburg State.
10    I think it was during my winter break. So
11 I was not in class, and he made a little chat
12 and asked me what sports or what I liked to do.
13    I said I liked to snowboard and ski, and
14 he mentioned that his -- I'm not sure who it
15 was -- some relative of his is going to be in
16 the Olympics, to watch out for him.
17    Then he told me that he wanted to talk to
18 me and just sort of tell me what I'm coming in
19 here to do, and he showed me Exhibit 2, and he
20 asked me what I remembered Jeff having to drink
21 that night, and, you know, if I remembered the
22 bar tab being brought over to the table, and I
23 told him I did, and he went through Exhibit 2
24 and he counted the beers and he counted the

**Page 44**

1  Jack Daniels drinks, and he asked me if I
2  remembered them being ordered, and I said I
3  remembered them being ordered in rounds.
4     So then he just told me when I came in
5  here to don't make something up if you don't
6  know it.
7     He just wanted me to know that I'm coming
8  in here to tell what I know and if I don't
9  know, then I'm not going to tell it.
10 Q. Did he suggest to you that you had made
11 something up before?
12    MR. GILLIS: Objection.
13 A. No.
14 Q. Because you had not made something up before,
15 had you?
16 A. I had not made something up. I mean, I just
17 believed that it could have been possible.
18 Q. By the way, did he say what sport his relative
19 was going to participate in, in the Olympics?
20 A. I believe it's snowboarding.
21 Q. Did he say the name of the relative?
22 A. He did. I don't remember it.
23 Q. Okay. After that discussion, you testified a
24 little while ago that he told you what you were

Page 45

1    coming in here to do; do you recall that?
2    A. Yes.
3    Q. What did he tell you you were coming in here to
4       do?
5    A. He was telling me that I was being deposed to
6       come in here to tell what I knew about the
7       night regarding Jeff Southworth and the
8       Longhorn Steakhouse.
9    Q. Did he tell you what he was coming to see you
10      to do?
11   A. He told me that he was coming to see me to, you
12      know, kind of tell me where I stand in all of
13      this.
14   Q. And did he tell you why he was coming to tell
15      you to do that?
16   A. Because he was hired.
17       MR. GILLIS: If you know. Don't guess.
18       MR. FARRAH: This is not your witness.
19       MR. GILLIS: If he's guessing, I don't
20   want a guess. You can tell from his mannerisms
21   that he is.
22       MR. FARRAH: Whatever you think you can
23   tell, you can tell, but let the witness
24   testify. I don't think this is your witness

Page 46

1    yet.
2        MR. GILLIS: Do you have a problem with me
3    telling him to tell the truth and not to guess
4    if he doesn't know?
5        MR. FARRAH: I have a problem with you
6    interrupting him. When it's your turn, you can
7    ask him whatever you want.
8        MR. GILLIS: Why do you have a problem
9    with him telling the truth?
10       MR. FARRAH: I have no problem with him
11   telling the truth.
12       MR. GILLIS: Why do you have a problem
13   with him not guessing?
14       MR. FARRAH: I have a problem with you
15   saying don't guess.
16       MR. GILLIS: What's wrong with that?
17       MR. FARRAH: Because he's in the middle of
18   answering. That's the problem I have.
19       MR. GILLIS: If you think he's guessing,
20   you should ask him that.
21       MR. FARRAH: You're the one who thinks
22   he's guessing. This is not your witness. As
23   far as I know, you don't represent him.
24       MR. GILLIS: I don't represent him.

Page 4

1    Q. Now, back to the question. Did Mr. DiNatale
2       tell you why he was coming to see you?
3    A. He told me that he was working as a private
4       investigator for the case, and he was hired
5       to -- Well, I don't know exactly what he was
6       hired to do, but he was, you know, going to
7       come and talk to me and just, you know, kind of
8       show me, like, for example, Exhibit 2 and
9       discuss it, and, you know, just once again kind
10      of tell me the most important thing is to come
11      in here and tell what I know and to not say
12      something that I don't know for sure.
13   Q. "Don't guess"? Is that what he said to you?
14   A. I don't know the words that he said, but yes.
15   Q. But you were not guessing before, were you?
16   A. I don't think so.
17   Q. Okay. When you testified before the grand
18      jury, were you guessing?
19   A. No.
20   Q. When you gave the statement marked as Exhibit 3
21      in your deposition today to the police, were
22      you guessing?
23   A. No.
24   Q. When you testified on August of 2004, were you

Page 4

1    guessing?
2    A. No.
3    Q. Okay. One of the other things that
4       Mr. DiNatale told you was where you stood in
5       all of this. At least that is what you
6       testified to a moment ago. What did he say
7       about that?
8    A. He just told me that I was the witness that was
9       with Jeff that night and I had not had anything
10      to drink, and that, you know, whatever I would
11      remember would probably be the most accurate
12      with respect to the people and members of the
13      group who had had drinks.
14   Q. Did he tell you anything else about where you
15      stood other than that?
16   A. I don't remember.
17   Q. Okay. Did he say you were the only one who was
18      sober at the table or words that effect?
19       MR. GILLIS: Objection.
20   A. He said I was the only one who was not
21      drinking.
22   Q. You knew that.
23   A. Yes.
24   Q. You didn't need Mr. DiNatale to tell you that,

Page 49

1    did you?

2    A. No.

3    Q. Did Mr. DiNatale tell you anything else about

4    where you stood in all of this?

5    A. I don't remember him saying anything else.

6    Q. When he showed you Exhibit 2, what did he say

7    about it?  Exhibit 2 is the tab.

8    A. Well, he first asked me what I remembered being

9    ordered and who was drinking and who was at the

10    table, and I told him that I thought that the

11    tab was brought over from the bar, and he asked

12    me what I remembered being ordered at the bar,

13    and he counted up the number of Jack Daniels

14    drinks that were ordered and the number of

15    beers in Exhibit 2.

16    Q. And did he say anything about Exhibit 2, other

17    than counting up the number of Jack Daniels?

18    Did he say anything about it to you?

19    A. He told me that what was ordered here, what was

20    drinking here, and well, I don't remember him

21    specifically saying if the tab from the bar was

22    brought over, then that was all that was

23    ordered throughout the night, but that was what

24    I had taken from this.

Page 50

1    Q. Did you say to him that you believed that what

2    was ordered at the bar was reflected in

3    Exhibit 2?

4    A. I think so.

5    Q. Well, let's see if we can do better than that.

6    Do you have a memory?

7    A. I don't.

8    Q. When you were meeting with him, it was your

9    belief that what was ordered at the bar was

10    reflected in Exhibit 2?

11    A. Yes.

12    Q. Did you share that belief with him?

13    A. I'm pretty sure I did.

14    Q. When you shared that belief with him, what did

15    he say about that?

16    A. Well, he asked me who were the ones I

17    remembered having the beers, and I told him

18    that I remembered Jeff having one and Scott

19    having one, and then he told me that, "Well, if

20    those are the two beers, then Jeff had a beer."

21    Q. Referring to Exhibit 2?

22    A. Correct.

23    Q. And did he tell you whether Jeff's beer at the

24    bar was the one that is reflected at 8:40 or

Page 5

1    the one that is reflected at 9:15?

2    A. No.

3    Q. He didn't tell you which one was the one that

4    Jeff ordered at the bar?

5    A. He didn't.

6    Q. But you understood that what Jeff ordered at

7    the bar was either the one that is reflected at

8    8:40 or the one that is reflected at 9:15; is

9    that right?

10    A. Yes.

11    Q. Did you tell him that, that you understood,

12    looking at Exhibit 2, that what Jeff had

13    ordered at the bar was reflected as either the

14    8:40 beer or the 9:15 beer?

15    A. I never told him that.  What I told him was

16    that I thought that the tab from the bar was

17    brought over and represented in this exhibit.

18    Q. Did he disagree with that?

19    A. No.

20    Q. Did he agree with that?

21    A. I think so.  I honestly don't remember him

22    saying "I agree."

23        MR. GILLIS:  Objection.

24    Q. But you don't remember him saying, "I disagree

Page 5

1    with that," do you?

2    A. No.

3    Q. What were you drinking that night?

4    A. To be honest with you, I don't remember.  I

5    remember being asked the question before, and I

6    don't remember what I said.

7    Q. Coke?  Were you drinking Coke?

8    A. I know I was having soda.

9    Q. And typically, what kind of soda do you order?

10    A. Mostly either Coke or maybe a Sprite.

11    Q. Did Mr. DiNatale and you talk at all about what

12    you were drinking that night?

13    A. No.

14    Q. Did Mr. DiNatale and you discuss at all whether

15    what you were drinking that night is reflected

16    on Exhibit 2 to your deposition?

17    A. I don't remember talking about that.

18    Q. Have you looked at Exhibit 2 to your deposition

19    to see whether or not what you were drinking

20    that night is reflected on it?

21    A. No.

22    Q. What were you eating that night?

23    A. I think I had some ribs.  I'm not 100 percent

24    sure.

Page 53

1  Q. Now, at the bar did Jeff order any Jack Daniels
2     Manhattans?
3  A. No.
4  Q. Are you sure?
5  A. Yes, at the time.
6  Q. At the time that Jeff was delivered his last
7     drink, was he exhibiting any signs of
8     intoxication to you?
9  A. No.
10 Q. Was he loud?
11 A. He didn't stand out to be. I mean, I don't
12    know exactly what you mean by "loud."
13 Q. Was the table loud?
14 A. Yes. Do you mean with respect to everything
15    else?
16 Q. Was the table loud?
17 A. Not extremely.
18 Q. Okay. Did Mr. DiNatale talk to you at all
19    about whether or not Jeff was exhibiting any
20    signs of intoxication that evening?
21 A. I believe he did.
22 Q. Can you tell us what you remember about that?
23 A. I'm pretty sure he asked me if I remembered him
24    acting like he was drunk.

Page 5

1     Longhorn, did Jeff appear to you to be under
2     the influence of what he had been drinking at
3     the Longhorn," and your answer was, "I mean,
4     yeah, a little bit." Do you see that?
5  A. I do.
6  Q. Did he appear to be under the influence of what
7     he was drinking at the Longhorn?
8        MR. GILLIS: Objection.
9  A. I don't remember him -- I don't know how to say
10    this, you know, exhibiting clear signs of
11    intoxication.
12       I mean, I guess obviously anyone who is
13    drinking anything will be under the influence
14    of what they're drinking, but I don't remember
15    him clearly showing signs of intoxication.
16 Q. Okay. So is it your testimony today that he
17    appeared to be under the influence of what he
18    was drinking at the Longhorn because anybody
19    who is drinking is under the influence of what
20    he is drinking?
21 A. Yes.
22 Q. And he did appear to you to be under the
23    influence of what he was drinking; is that
24    right?

Page 54

1  Q. "Drunk"? Is that what he said?
2  A. I don't know what he said.
3  Q. What do you remember he said?
4        MR. GILLIS: Objection.
5  A. I remember him asking, I guess, if he was
6     exhibiting signs of alcohol.
7        MR. GILLIS: Objection, and I'm going to
8     say it again, we cannot have answers here that
9     are guesses. He said "I guess it was."
10       We have to have your memory, not a guess.
11 A. I honestly don't know what questions he asked
12    me.
13 Q. What did you say?
14 A. I told him that I didn't see any signs of being
15    drunk or intoxicated.
16 Q. While you were at the Longhorn, did Jeff appear
17    to you to be under the influence of what he had
18    been drinking at the Longhorn?
19       MR. GILLIS: Objection.
20 A. No.
21 Q. Can you turn to page 49 of your earlier
22    deposition? Will you go down to Line 12, and
23    do you recall being asked in August of 2004 the
24    question, "Okay, while you were at the

Page 5

1        MR. GILLIS: Objection.
2  A. Yes.
3  Q. Did Jeff appear to hold himself that night at
4     the Longhorn in the same way he usually did?
5  A. Without reading this, I honestly don't
6     remember.
7  Q. Let me withdraw that question. I guess you've
8     answered it.
9        At some point in time, did somebody come
10    over from the restaurant and ask the table to
11    quiet down?
12 A. Yes.
13 Q. And that was how long before you left?
14 A. I honestly don't remember.
15 Q. Could you look at pages 43 and 44, please?
16    Actually, you have to start at 42.
17 A. All right.
18 Q. I started to ask you a question at the bottom
19    of 42.
20       "Did anybody while you were at the table
21    that night say," and then you interrupted. You
22    said "I," and then I said, "I'm sorry?"
23       Then you said, "I kind of remember now. I
24    don't know who it was, whether it was, you

Page 57

1    know, a manager or someone. It might have even
2    been our waitress. I remember someone coming
3    over and asking our table to be quiet, a little
4    bit quieter."
5        Do you remember that happening?
6    A. Yes.
7    Q. Do you remember that testimony?
8    A. Yes.
9    Q. And then I'm going to ask you now on the
10    record, was that because the table was loud?
11    A. Yes.
12    Q. And who was making a lot of noise that night at
13    the table?
14        MR. GILLIS: Are you asking the question?
15    Q. I'm asking the question. Who was making a lot
16    of noise that night at the table?
17    A. We all were.
18    Q. Jeff included?
19    A. Yes.
20    Q. And then I asked you on page 44, Line 14, "Give
21    me your best estimate of how much time elapsed
22    from when the woman came over and told you to
23    tone it down and when you left the restaurant,"
24    and your answer was, "Maybe twenty-five minutes

Page 58

1    to half an hour."
2        Does that refresh your memory as to how
3    long after you were told to quiet down it was
4    that the group left the restaurant?
5    A. Yes.
6    Q. Now, by the way, am I correct that the person
7    that served your group at the table was not the
8    person that served you at the bar?
9    A. Yes.
10    Q. Both blonde?
11    A. Yes.
12    Q. Can you turn back to page 49 for me?
13    A. All right.
14    Q. Now, my question to you is, was Jeff sloppier
15    looking that night than he usually is? I'm
16    asking you the question now on the record.
17    A. Yes.
18    Q. Was he louder that night than he usually
19    appeared to you?
20    A. No.
21    Q. Do you recall being asked on page 50, the
22    question was, "Was he louder than he usually
23    appeared to you?"
24        Do you see that?

Page 59

1    A. Yes, I do.
2    Q. What was your answer?
3    A. "Yeah, I mean, yes."
4    Q. Do you have any explanation as to why you
5    testified differently today than how you
6    testified in your deposition in August?
7    A. Well, everyone was loud at the table. So
8    that's why I said that.
9    Q. That's your explanation as to why you testified
10    differently today than how you testified in
11    August?
12    A. Well, I guess if -- I won't guess. If he was
13    being loud at the table, then it would be
14    louder with respect to everyone else in the
15    restaurant, you know, and I mean, he's not a
16    loud kid, but he was not a quiet kid.
17        So yes, he was being a little bit louder
18    than he usually is, you know, as a one on one
19    or, you know, just to talk with him.
20    Q. So which is it today, Mr. Connelly? Was he
21    louder that night than he usually is or wasn't
22    he?
23    A. He was.
24    Q. Do you have any explanation for why a moment

Page 60

1    ago you said he wasn't?
2    A. Well --
3        MR. GILLIS: Objection.
4    A. You know, when you talk to him, he would be
5    pronounced. So he was somewhat of a -- As I
6    said, he was not quiet.
7        So that would be why I said it, but
8    everyone was loud with respect to everyone else
9    in the restaurant. So he was a little bit
10    louder.
11    Q. Was that because, in your opinion, of what he
12    had to drink?
13        MR. GILLIS: Objection.
14    A. No.
15    Q. Was Mr. Southworth exhibiting signs of
16    intoxication at the time that the waitress came
17    over to the table and asked you to quiet down?
18    A. No.
19    Q. Do you remember making an affidavit?
20    A. I do.
21    Q. Do you remember talking to Mr. DiNatale about
22    your affidavit?
23    A. What is the affidavit?
24    Q. Do you remember talking with Mr. DiNatale about

Page 61

1    your affidavit?
2    A. Which is the affidavit? I remember doing an
3        affidavit, but I don't remember it. I know we
4        had a couple of things with him.
5    Q. Is that your signature?
6    A. It is. I've done this a few times, and I just
7        don't know which one is which.
8    Q. Take a look at this document.
9            (Witness reviews document.)
10           (Short recess.)
11       MR. FARRAH: Could we have his affidavit
12       marked as the next exhibit, please?
13
14           (Exhibit Number 4 was marked for
15           identification.)
16
17   Q. Mr. Connelly, I'm going to show you what has
18       been marked as Exhibit 4 in this deposition.
19       Do you see it?
20   A. Yes.
21   Q. It's your affidavit; is that right?
22   A. Correct.
23   Q. That's your signature?
24   A. It is.

Page 6

1    "I also testified on pages 42 to 44 of my
2        deposition that approximately one half hour
3        before we left the Longhorn Steakhouse,
4        everyone at the table was loud, including
5        Mr. Southworth, and either a waitress or a
6        manager at the restaurant came and asked us to
7        be quiet."
8            Do you see that?
9    A. I do.
10   Q. Did I read that correctly?
11   A. Yes.
12   Q. Was that true that approximately one half hour
13       before you left, everyone at the table was
14       loud, including Mr. Southworth, and either a
15       waitress or a manager came to you and asked you
16       to be quiet?
17   A. Yes.
18   Q. Paragraph 7 reads, "At that time when the table
19       was asked to quiet down, Mr. Southworth was
20       exhibiting all the signs of intoxication I
21       testified about on pages 49 through 51 of my
22       deposition."
23           Do you see that?
24   A. Yes.

Page 62

1    Q. On page 2?
2    A. Yes.
3    Q. Would you turn to Paragraph 5? Paragraph 5
4        reads, "In my deposition of pages 49 to 51, I
5        testified that during the course of the evening
6        at the Longhorn Steakhouse, Mr. Southworth
7        seemed to be under the influence of the
8        alcoholic beverages he was being served at the
9        restaurant."
10           Do you see that?
11   A. Yes.
12   Q. Did I read that correctly?
13   A. You did.
14   Q. And you understood you made this affidavit
15       under the pains and penalties of perjury in May
16       of 2005?
17   A. Yes.
18   Q. My question is, during the course of the
19       evening at the Longhorn Steakhouse, did
20       Mr. Southworth seem to be under the influence
21       of the alcoholic beverages he was being served?
22       MR. GILLIS: Objection.
23   A. Yes.
24   Q. And then Paragraph 6 of your affidavit reads,

Page 6

1    Q. Did I read that right?
2    A. You did.
3    Q. And is that true that at the time when the
4        table was asked to quiet down, Mr. Southworth
5        was exhibiting all the signs of intoxication
6        that you testified to on pages 49 through 51 of
7        your deposition?
8        MR. GILLIS: Objection.
9    A. Yes.
10   Q. Let's look at pages 49 to 51 of your
11       deposition.
12           My question I asked some time ago was,
13       "Was Jeff holding himself at the time the table
14       was asked to quiet down the same way he usually
15       held himself?"
16   A. I honestly don't remember. So I'm going to use
17       this because this is what is going to be
18       correct.
19   Q. Do you recall testifying in August of 2004 in
20       response to the question, "What did he show?
21       What did he manifest that makes you say that,"
22       and that was that he appeared to be a little
23       bit under the influence of what he was
24       drinking?

Page 65

1    Do you remember answering in part, "That
2    night he was, you know, sort of just seemed to
3    me that he was a little bit under the influence
4    just because by the way he didn't really hold
5    himself.  At least it looked like he didn't
6    hold himself the same way as he usually did."
7        Do you recall that testimony?
8  A. Yes.
9  Q. Is that accurate that that night he didn't hold
10    himself the same way he usually did?
11        MR. GILLIS:  Objection.
12  A. Yes.  Let me just say what I just answered is
13    yes, but also, I mean, I think that this had
14    something to do with it, but what I said is
15    what I said and it is yes, but, you know, we
16    were dirt biking, and it's not, you know, when
17    I usually see him, we're dirt biking, and I
18    have never really spent that much time with him
19    not dirt biking.
20        So, you know, what I remember him holding
21    himself is from dirt biking.
22  Q. You've seen him in fights; isn't that right?
23        MR. GILLIS:  Objection.
24  A. I have.

Page 66

1  Q. You've seen him at parties; isn't that right?
2  A. I remember seeing him at a party.
3  Q. You've seen him in at least one fist fight;
4    isn't that right?
5  A. I do.  At that point, I was not really familiar
6    with him, but yes, that's correct.
7  Q. You testified about seeing him in a fist fight.
8    You remember that, don't you?
9  A. If I did, I did.  I don't remember, but I guess
10    I did.
11  Q. Did you talk to the private investigator,
12    DiNatale, about your testimony at the
13    deposition?
14  A. This?
15  Q. Did you talk to Mr. DiNatale when he came to
16    your house about the testimony that you've
17    given at your earlier deposition?
18  A. I think he asked -- I don't think we -- No, we
19    didn't discuss, you know, what was asked and
20    what was answered in the deposition.
21  Q. Did Mr. DiNatale, for example, say to you
22    something like, "You testified at your
23    deposition that Jeff had four beers maybe at
24    the table"?

Page 67

1        MR. GILLIS:  Objection.
2  A. No.
3  Q. Let's go back to what I was asking you before.
4    That night at the Longhorn, was Jeff sloppier
5    looking than he usually is?
6  A. Yes.
7  Q. Was he louder than he usually appeared to you?
8  A. Yes.
9  Q. Were his eyes glassy?
10  A. Can I use this answer because I honestly don't
11    remember?
12        MR. GILLIS:  That's your answer.  He can't
13    use that as his answer.  It has to be his
14    memory.
15  Q. Do you have a memory?
16  A. I don't.
17  Q. Do you have a memory of whether or not Jeff's
18    eyes were glassy at all that night?
19  A. I don't.
20  Q. Can you read to yourself page 50, Line 23
21    through page 51, Line 4?
22        (Witness reviews document.)
23  Q. Have you done that?
24  A. Yes.

Page 68

1  Q. Does that refresh your memory about whether or
2    not Jeff's eyes were glassy that night at the
3    restaurant at the time you were asked to quiet
4    down?
5  A. A little bit.
6  Q. What is your memory now of whether or not
7    Jeff's eyes were glassy at the time your table
8    was asked to quiet down?
9        MR. GILLIS:  Objection.
10  A. They could have been.
11  Q. They very well could have been?
12        MR. GILLIS:  Objection.
13  A. They could have been, but I don't specifically
14    remember.  I don't remember looking at him and,
15    you know, looking into his eyes and wondering
16    if they were glassy.  As I say, they could have
17    been.
18  Q. They very well could have been?
19        MR. GILLIS:  Objection, asked and
20    answered.
21  A. Yes.
22  Q. Do you have any explanation as to why you
23    testified in August of 2004 that his eyes very
24    well could have been glassy?

Page 69

```
 1        MR. GILLIS: Objection. Are you talking
 2   about the top of 51? What line are you looking
 3   at?
 4        MR. FARRAH: You figure it out.
 5        MR. GILLIS: What line are you referring
 6   to?
 7        MR. FARRAH: I'm asking him a question.
 8        MR. GILLIS: No, you're not. You're
 9   asking him to read something in the book. Are
10   you asking him to read it?
11        MR. FARRAH: I'm asking him if he has an
12   explanation for why he testified that his eyes
13   very well could have been glassy.
14        MR. GILLIS: If you put the book in front
15   of him, I want a page reference so we can put
16   it on the record.
17        MR. FARRAH: He's already testified.
18   A. It's possible that his eyes could have been
19      glassy. That's why.
20   Q. Do you have a memory of it?
21   A. Of seeing his eyes glassy?
22   Q. Yes.
23   A. No.
24   Q. Do you have any explanation for why you
```

Page 70

```
 1      testified, "They very well could have been
 2      glassy"?
 3        MR. GILLIS: Objection.
 4   A. Other than it's possible, I don't.
 5   Q. What is your best memory as you sit here today
 6      as to how many Jack Daniels Manhattans that
 7      Jeff had at the table?
 8        MR. GILLIS: Objection.
 9   A. Two.
10   Q. And the basis for that is what?
11   A. I specifically remember a round being ordered,
12      and then I see that some more were ordered, and
13      I don't know whether they were ordered in a
14      round or, you know, a few here and a few there,
15      but it looks like apparently he had another
16      one.
17   Q. That testimony is based on the fact that you
18      have now seen Exhibit 2 to your deposition; is
19      that right?
20        MR. GILLIS: Objection.
21   A. Yes.
22   Q. Before you saw Exhibit 2 to your deposition,
23      you had testified about how many Jack Daniels
24      Manhattans he had had in August of 2004; isn't
```

Page 7

```
 1      that right?
 2   A. Yes.
 3   Q. At that time, you said two; is that right?
 4   A. Yes.
 5   Q. And when you gave the statement to the police
 6      on November 2, 2003 which has been marked as
 7      Exhibit 3 in your deposition, you had not seen
 8      what has been now marked as Exhibit 2, the tab?
 9   A. No.
10   Q. And at that time, you wrote that he had had
11      maybe three drinks with Jack Daniels with
12      dinner; is that right?
13   A. Yes.
14   Q. What was the basis for making that statement
15      back in November of 2003?
16   A. Well, the first one would be the round that I
17      specifically remember being ordered.
18         The second one would be when more were
19      ordered and the possibility that he drank
20      another one.
21   Q. Your memory of the events of September 26 was
22      better in November of 2003 than it is today?
23   A. Yes.
24   Q. A lot better?
```

Page 7

```
 1   A. I'd say so.
 2        MR. GILLIS: Objection.
 3   Q. Do you remember anybody else drinking beers at
 4      the table, besides Jeff?
 5   A. I remember Scott having beer.
 6   Q. At the table?
 7   A. Yes.
 8   Q. Ordered from the waitress?
 9   A. I don't remember if it was ordered from the
10      waitress or ordered from the bartender.
11   Q. Do you have a memory of Jeff carrying a beer
12      from the bar over to the table?
13   A. Yes.
14   Q. And do you have a memory of Scott carrying a
15      beer over from the bar to the table?
16   A. Well, I remember seeing Jeff bringing his beer
17      over, and I remember them saying something
18      about having the tab brought over to the table.
19         I don't remember seeing Scott carry the
20      beer over to the table as I did Jeff.
21   Q. Then do you remember Jeff ordering beers while
22      he was at the table?
23   A. I don't.
24   Q. Do you remember Jeff ordering chowder while he
```

Page 73

1   was at the table?
2   A. I don't.
3   Q. How about fingers, whatever they are? Do you
4      remember ordering those at the table?
5   A. I don't remember any of the specific things or
6      who or when they were ordered specifically,
7      besides the round of Manhattans.
8   Q. You remember one round of Manhattans being
9      ordered?
10  A. Yes.
11  Q. You've looked at the check, and do you see that
12     more than one round of Manhattans is reflected
13     on that check; is that right?
14  A. Yes.
15  Q. Did you discuss that at all with Mr. DiNatale?
16  A. Yes.
17  Q. What did he say and what did you say about
18     that?
19  A. Well, he asked me what I remember being ordered
20     in reference to the Manhattans, and I told him
21     I remembered the first round of drinks being
22     ordered and that I remembered more being
23     ordered, but I don't know whether they were in
24     a round or individuals ordered them or, you

Page 74

1      know, this side of the table said we'll take
2      another round or how it exactly came about.
3   Q. What did he say?
4   A. Well, he pointed out that the first one looked
5      like it was a round ordered, and he said that
6      there were more ordered and that it looked
7      like, you know, if going with the round that
8      was first ordered that each person would have
9      had another one.
10  Q. So did he say anything else about the Jack
11     Daniels that were ordered?
12  A. I remember him asking me how many people I
13     specifically remembered being there with
14     reference to how many drinks were ordered.
15  Q. What did you tell him?
16  A. I told him that I remembered besides myself, I
17     remembered Scott Espy, Jeff Southworth, Michael
18     Espy, Todd Perry, and then two other people
19     whom I didn't know.
20        I believe I referred to them as one was a
21     snowmobiler and one I remember them calling him
22     Fat Matt.
23  Q. Who called him Fat Matt?
24  A. Everyone. I didn't call him -- They referred

Page 75

1      to him as Fat Matt. They didn't call him Fat
2      Matt.
3   Q. So he asked you how many people were there at
4      the table.
5         So does that mean including yourself,
6      there were seven people at the table?
7   A. That I remember.
8   Q. You don't remember any other people, do you?
9   A. No.
10  Q. You had two tables pulled together for your
11     party; is that right?
12  A. Yes, I believe it was at least two tables.
13  Q. And you were sitting across from Jeff; is that
14     right?
15  A. Yes.
16  Q. And you had nothing obstructing your view of
17     Jeff; is that right?
18  A. Correct.
19  Q. What I want to know is, where is the first
20     round of Manhattans that is on Exhibit 2?
21     Which is the first round of Manhattans that
22     you're referring to?
23  A. It has to be this one.
24  Q. Okay, and you're pointing to the 8:51 round; is

Page 76

1      that right?
2   A. Yes. I see there are some ordered before that.
3      I mean, I must be wrong in saying the first
4      time it was ordered it was not a full round.
5      That's what I remembered.
6   Q. I want to know what you remember talking to
7      Mr. DiNatale about as it relates to the
8      Manhattans, the rounds of Manhattans that were
9      ordered.
10  A. I remember telling him that a round was
11     ordered, and then there were more ordered, and
12     they went around to the different people that
13     were at the table, and he, once again, asked me
14     who I remembered at the table, and then he, you
15     know, kind of did like some calculation and
16     added up all the Jack Daniels that were
17     ordered, which I cannot remember how many there
18     were, and he asked me what -- No, I don't
19     remember what he asked me.
20        He just made reference to, you know, there
21     were seven people that I remembered being
22     there, and then there were this many Jack
23     Daniels ordered.
24  Q. After he had calculated the number of people at

Page 77

1      the table and the number of Jack Daniels that
2      were ordered, did he do anything with those
3      calculations?
4    A. Well, he asked me if I remembered them being
5      rounds and I said yes.
6    Q. What did you say?
7    A. He asked me how I remembered them being ordered
8      and I told him, you know, rounds, and then he
9      told me, "All right. So there's this many
10     people at the table and a round is ordered and
11     then another round is ordered," and then I
12     believe there were I'm not sure how many.
13       I don't remember the number, but I don't
14     believe that accounted for all of them.
15    Q. So did he interpret that for you at all?
16         MR. GILLIS: Objection.
17    A. No, not that I remember.
18    Q. I'm going to represent to you that there were
19     seventeen Jack Daniels drinks ordered.
20       Does that sound like the number that
21     Mr. DiNatale shared with you?
22    A. Yes.
23    Q. There were six people, according to your
24     testimony, who were of drinking age --

Page 78

1    A. Okay.
2    Q. -- at table that night. Does that sound like
3     what you and Mr. DiNatale talked about?
4    A. Yes.
5    Q. Did he talk at all about the relationship
6     between seventeen Jack Daniels Manhattans and
7     six people of drinking age at the table?
8    A. Well, I believe that he told me that if what I
9     remember was being ordered as rounds, then
10     there were unaccounted-for drinks.
11    Q. Unaccounted-for drinks?
12    A. Yes.
13    Q. What did he mean by that?
14         MR. GILLIS: Objection.
15    A. Drinks that I said I remembered a round being
16     ordered and then more rounds and I guess
17     another round was ordered, and I didn't
18     specifically say another round being ordered,
19     but there were more drinks ordered to the
20     table.
21    Q. He pointed that out to you?
22    A. Yes.
23    Q. What did he say about that?
24    A. I don't remember. I mean, I don't remember

Page 79

1     exactly what he said.
2       He said that there were -- I believe he
3     asked me who had them, and I told him that I
4     didn't remember.
5    Q. But you know you didn't have any; is that
6     right?
7    A. Yes.
8    Q. Okay, and Scott, Jeff and you were seated
9     before the others arrived; is that right?
10    A. No.
11    Q. Just before the others arrived?
12    A. We were seated -- Well, I honestly don't
13     remember at this point. I remember them coming
14     in the door.
15       I don't remember whether we sat down right
16     before them or if we all sat down right
17     together.
18    Q. And do you remember the first order of Jack
19     Daniels, that is, how many were ordered?
20    A. I remember a round being ordered.
21    Q. Who ordered it?
22    A. I think Jeff did.
23    Q. You'd seen Jeff drink Jack Daniels Manhattans
24     before?

Page 80

1         MR. GILLIS: Objection.
2    A. No.
3    Q. How are the Jack Daniels Manhattans served --
4     on the rocks or straight up?
5    A. I don't know.
6    Q. Do you know the difference?
7    A. Yes; one has ice and one doesn't.
8    Q. So it's your best memory that Jeff ordered the
9     first round of Jack Daniels Manhattans?
10    A. Yes.
11    Q. At the time he ordered those Jack Daniels
12     Manhattans, did he also order a beer?
13         MR. GILLIS: Objection.
14    A. I can't say for sure.
15    Q. Can you describe the waitress?
16    A. I remember her being a woman, and I remember
17     her having blonde hair.
18    Q. Tall? Short?
19    A. I don't know.
20    Q. Older or younger than the barmaid?
21    A. Well, I don't really remember the bartender
22     that well. So I don't really know how to base
23     an answer on that.
24       I remember her being like maybe in her

Page 81

1 mid-twenties.
2 Q. Who are we talking about?
3 A. The waitress.
4 Q. Do you remember the age of the barmaid?
5 A. No.
6 Q. Do you have any memory of the age of the
7 barmaid?
8     MR. GILLIS: Objection.
9 A. No.
10 Q. Is your memory exhausted as to the age of the
11 barmaid?
12 A. Yes.
13 Q. Can you turn to page 35, please, the bottom.
14 Just read 18 to 24 to yourself.
15     (Witness reviews document.)
16 A. Okay.
17 Q. Does reading that refresh your memory as to how
18 old the barmaid was?
19 A. Not specifically.
20 Q. Do you have any reason to doubt that your
21 testimony back in August about her age was
22 accurate?
23     MR. GILLIS: Objection.
24 Q. August of 2004.

Page 82

1     MR. GILLIS: Objection.
2 A. I'm sure whatever I said here is what I
3 remembered. I don't remember it now.
4 Q. When you say "here," you mean in your
5 deposition of August of 2004?
6 A. Correct.
7 Q. And do you remember anyone at the table after
8 Jeff ordered the first round of Jack Daniels
9 Manhattans, do you remember anyone at the table
10 saying anything about the delay in receiving
11 the drinks?
12 A. No.
13 Q. And how long after you had sat at the table was
14 it that the first round was ordered by Jeff?
15 A. I don't know.
16 Q. And do you have a memory as you sit here today
17 that a second round of Jack Daniels Manhattans
18 was ordered?
19 A. Yes.
20 Q. By Jeff?
21 A. I can't say that for sure.
22 Q. Who do you remember ordered the second round?
23     MR. GILLIS: Objection.
24 A. I don't recall who specifically ordered it.

Page 8

1 Q. What was the basis for your memory that a
2 second round of Jack Daniels was ordered?
3 A. Well, I remember more Jack Daniels at the
4 table, and this exhibit shows that there were
5 more.
6 Q. Exhibit 2?
7 A. Yes.
8 Q. Do you have a memory that a third round of Jack
9 Daniels Manhattans was ordered?
10 A. No.
11 Q. Do you have a memory that there was a third
12 instance where Jack Daniels Manhattans were
13 ordered?
14     MR. GILLIS: Objection.
15 A. I do not remember. It is apparent that there
16 was. I just don't specifically remember.
17 Q. Do you remember talking to Mr. DiNatale about
18 that?
19 A. A third?
20 Q. Yes, a third round of Jack Daniels Manhattans
21 being ordered.
22 A. I don't remember him saying anything about a
23 third round. I remember him talking about --
24 as I referred to before -- the unaccounted-for

Page 8

1 drinks.
2 Q. When the check came to the table, did it come
3 to Jeff?
4 A. I don't know. It was put on the table.
5 Q. Jeff paid for you that night; is that right?
6 A. Correct.
7 Q. When the person came over and told the table to
8 quiet down, what is your best memory of who
9 that person was, what that person looked like?
10     MR. GILLIS: Objection.
11 A. I don't really remember. I just remember
12 someone came over and asked the table to, you
13 know, be a little bit quieter.
14 Q. A man? A woman?
15 A. I don't remember specifically. I'm not
16 supposed to guess.
17 Q. Is that because Mr. Gillis tells you not to
18 guess?
19 A. No. I don't think that I should guess.
20 Q. Mr. DiNatale told you not to guess, right?
21 A. He did tell me not to guess, but if I don't
22 know the truth, not to come up with one.
23 Q. What do you remember whoever the person was
24 that came over to the table saying about

Page 85

1    quieting down?
2        MR. GILLIS: Objection.
3    A. I just remember them asking us to tone it down
4        a little bit.
5    Q. Do you remember to whom at the table that
6        person spoke or with whom at the table that
7        person spoke?
8    A. As far as I remember, it was speaking to the
9        whole table.
10   Q. You could hear that person?
11   A. Yes.
12   Q. How far away were you from the other end the
13       table, the furthest end away from you?
14   A. Well, the way I remember it --
15   Q. Let's look at Exhibit 1, if that helps you.
16   A. Could I use the pen for a minute?
17   Q. If you're going to write on something, why
18       don't you --
19   A. I can explain it, but it would be a lot easier.
20   Q. Here's a blank one for you.
21   A. This section right here is where we sat. There
22       weren't four tables there.
23       What I remember is, if you just imagine,
24       this is the table that everyone sat at, whether

Page 86

1    it be one, two or three or how many tables.
2        I remember Scott sitting on the end and
3    Jeff sitting here and I was sitting here. I
4    don't specifically remember what the order of
5    the other people was.
6        So I believe that there would be two more
7    people, and then at the end of the table
8    someone else would be right there on the other
9    end. So I would be two seats away.
10   Q. Do you remember anyone seated to your right?
11   A. Besides Scott, no.
12   Q. Well, am I wrong that this is you right here?
13   A. No. That's Jeff. I'm facing this way.
14   Q. Do you remember anyone seated to your left?
15   A. Yes.
16   Q. Who?
17   A. I don't know who.
18   Q. You were not drinking any alcoholic beverages
19       that night, were you?
20   A. No.
21   Q. Do you have any explanation for who drank the
22       seven Jack Daniels Manhattans that were
23       ordered, according to Exhibit 2, at 8:51 p.m.?
24   A. Well, that was the round. I honestly don't

Page 87

1    know exactly how it happened, but I remember,
2    you know, whoever ordered the first round,
3    which I believe was Jeff, ordered a round, and
4    the waitress came over and put them down, and
5    you know, then they were drinking.
6        I guess if she ordered seven, then she
7    counted the number of people that were at the
8    table and brought over seven. That would be my
9    accounting for those.
10   Q. You remember Jeff saying words to the effect
11       "Bring us a round of Jack Daniels Manhattans"?
12   A. Yes.
13   Q. And do you remember Jeff at that time ordering
14       for you something to drink?
15   A. I think I already had a drink at that point.
16   Q. From the bar?
17   A. Yes, I guess. Well, I can't say that, sorry.
18   Q. So my question is, do you remember Jeff
19       ordering a drink for you?
20       MR. GILLIS: Objection.
21   Q. By "a drink," I don't mean an alcoholic
22       beverage. I mean something to drink.
23   A. No. I'm pretty sure she asked me what I wanted
24       and I ordered it.

Page 88

1    Q. The waitress?
2    A. Yes.
3    Q. Now, when the first round came, was there some
4        discussion about that there was an extra drink
5        there?
6    A. I don't remember any discussion. I suppose
7        since there was an extra drink that -- I don't
8        remember anything.
9    Q. Do you know who drank the extra drink?
10       MR. GILLIS: Objection.
11   A. No.
12   Q. Did Mr. DiNatale tell you that Table 52
13       reflected the table that you were at that
14       night?
15   A. Yes.
16   Q. He told you that; is that right?
17   A. Yes. He also said this, which I don't think I
18       mentioned before.
19       He asked me when he was speaking to me
20       about the unaccounted-for drinks. He asked me
21       if I remembered an eighth person, which I told
22       him I didn't remember an eighth person. Those
23       were the people that I remembered.
24   Q. Did he tell you that there was an eighth person

Page 89

1   at the table?
2   A. He didn't tell me that there was an eighth
3      person at the table.
4   Q. Did he suggest that there was an eighth person
5      at the table?
6         MR. GILLIS: Objection.
7   A. Well, what he did is he did the same thing as
8      he did with the seven people at the table with
9      eight people at the table, leaving less
10     unaccounted-for drinks.
11  Q. Try to tell me what you remember him saying
12     about doing the same thing with eight people at
13     the table as he had done with seven people at
14     the table.
15  A. If there were seventeen drinks and there were
16     six other people and me, if there were seven
17     people that would be one round would be six,
18     second round would be twelve, leaving five
19     unaccounted-for drinks.
20  Q. That's what he called them?
21  A. I don't know what he called them. That's what
22     I'm calling them.
23  Q. What did he call them?
24  A. I don't remember.

Page 9

1   A. Yes.
2   Q. Did you discuss that with him?
3   A. Other than him counting it up and asking me how
4      many beers I thought were drinking throughout
5      the evening, no.
6   Q. Did Mr. DiNatale discuss with you at all how a
7      check is generated at the Longhorn Steakhouse?
8   A. Yes. He said that they have to enter it -- the
9      waitress, that is. Each waitress, dealing with
10     each table, has to log it into a computer.
11  Q. So he explained that to you; is that right?
12  A. Yes.
13  Q. What else did he tell you about how the check
14     is generated?
15  A. That's all I remember him telling me. He said
16     the last one out reflects everything, but I
17     don't remember anything else.
18  Q. And do you have a memory that Jeff ordered at
19     the bar chowder?
20  A. No.
21  Q. Fingers?
22  A. No.
23  Q. Any food at the bar at all?
24  A. No.

Page 90

1   Q. What did he say about the five what you've
2      called unaccounted-for drinks?
3   A. I don't know. I just remember him asking me if
4      there was a possibility that there was another
5      person, and then him doing the same
6      calculation.
7         So there would be seven other people than
8      me, so the first round seven, second round
9      fourteen, leaving three unaccounted-for drinks,
10     as what I'm calling them.
11  Q. But he went through that calculation with you?
12  A. I don't know if he went through that
13     calculation. He said there would be less other
14     drinks -- less drinks that I'm calling
15     unaccounted-for.
16  Q. Did you discuss with Mr. DiNatale the 8:40
17     order?
18  A. I believe so.
19  Q. What did he say about the 8:40 order?
20  A. He may have said something else, but what I
21     remember is he was just counting them up,
22     including all the other ones.
23  Q. The 8:40 order reflects a beer as well as
24     Manhattans; isn't that right?

Page 9

1   Q. At any time that night while you were at the
2      restaurant, did anyone get up and leave the
3      table?
4   A. Yes; specifically, Jeff.
5   Q. When did he get up and leave the table?
6   A. It was some point after we had been served our
7      dinner.
8   Q. And where did he go?
9   A. He went to the bathroom.
10  Q. And how do you know that?
11  A. Well, our location where our table was was
12     relatively close to the bathroom, and I saw him
13     walk over and use the bathroom.
14  Q. And did you see him come back to the table?
15  A. Yes.
16  Q. Did anybody else get up at any point in time
17     and leave the table that you recall?
18  A. Not specifically. I'm sure if someone had to
19     go and get up and use the restroom they did,
20     but I remember Jeff doing that and not anyone
21     else.
22  Q. What did you have to eat that night?
23  A. I'm pretty sure that I had ribs.
24  Q. Anything else?

Page 93

1   A. No.
2   Q. Did you all order food at the same time,
3       everybody at your able?
4   A. I'm pretty sure.
5   Q. Did you have any discussions with Mr. DiNatale
6       about how many meals were ordered by this
7       table?
8   A. No.
9   Q. Have you looked at Exhibit 2 to see how many
10      meals were ordered by this table?
11  A. No.
12  Q. Did everybody eat?  As far as you know, did
13      everybody order a meal?
14  A. I believe so.
15  Q. Now, do you remember Jeff, while you were
16      sitting at the table, ordering a beer?
17  A. I don't specifically remember him ordering a
18      beer at the table.
19  Q. But you remember him drinking a beer at the
20      table; is that right?
21  A. Yes.
22  Q. Do you remember him drinking more than one beer
23      at the table?
24      MR. GILLIS:  Objection.

Page 94

1   A. I cannot say that for sure.
2   Q. You have no memory today; is that right?
3   A. Right.
4   Q. You had a memory in the past but not today?
5       MR. GILLIS:  Objection.
6   A. Yes.
7   Q. Now, did Mr. DiNatale and you discuss, when you
8       were reviewing Exhibit 2, that it seems to
9       reflect that at 9:21 p.m. four Jack Daniels
10      Manhattans were ordered?
11  A. Okay.
12  Q. Did you discuss that?
13  A. I believe so.
14  Q. Is that right, did you?
15  A. Yes.
16  Q. What did he say and what did you say about
17      that?
18  A. Well, when I mean discuss it, we didn't discuss
19      this order in particular.  We discussed all of
20      them together.
21  Q. My question to you is, can we agree, I guess
22      initially, that Exhibit 2 shows that at 9:21
23      four Jack Daniels were ordered by the table?
24  A. Yes.

Page 9

1   Q. Did you discuss that with him?
2   A. Yes.
3   Q. Here's four that were ordered?
4       MR. GILLIS:  Are you asking did he discuss
5       that specific round?
6       MR. FARRAH:  That's right, that specific
7       round, 9:21.
8   A. He made reference to that login saying four
9       rounds were ordered, but we never discussed
10      each of these.
11      Then this next one there was 9:24, that
12      one and then the next or whatever happened
13      about that.  We didn't discuss each of them.
14      We discussed all of them.
15      He went through and he said this one at
16      this time these were ordered, and at this time
17      these were ordered and at this time these were
18      ordered.
19  Q. He's telling you this; is that right?
20      MR. GILLIS:  Objection.
21  A. Yes.
22  Q. What is he saying about it, besides telling you
23      this?
24  A. He was just using those as evidence for how

Page 9

1   many Manhattans were ordered to the table,
2   trying to come up with, you know, how many
3   drinks were drinking by each person.
4   Q. Did he ever say words to the effect, "If you
5       divide seventeen by six you get almost three"?
6       MR. GILLIS:  Objection.
7   A. No.
8   Q. What did he say about trying to figure out how
9       many drinks were drunk by each person?
10  A. I think he was trying to account for which
11      drinks were drinking by which people and how
12      many drinks each person had, but I don't
13      remember who had what drink and how many each
14      person had.
15  Q. Do you remember anyone at the table appearing
16      drunk to you that night?
17      MR. GILLIS:  Objection.
18  A. No.
19  Q. How about the Espy who was not there with you
20      that night?  Did he appear under the influence
21      to you?
22  A. Not particularly.
23  Q. Have you ever spoken with him since this
24      incident?

Page 97

1  A. You mean since that night?
2  Q. Since that night.
3  A. Yes.
4      MR. GILLIS: The Espy?
5  Q. The Espy that was not dirt biking with you.
6  A. Yes.
7  Q. Did you learn from speaking with him that he
8      had been drinking beers in the hotel room with
9      his two other friends that afternoon?
10     MR. GILLIS: Objection.
11 Q. After September 26 did you learn?
12 A. After the restaurant when we left the
13     restaurant?
14 Q. No. In your conversations with Mike Espy after
15     September 26, 2003, did he ever tell you that
16     he had been drinking beers that afternoon,
17     September 26, 2003, before going to the
18     restaurant with two of his friends?
19 A. Before the restaurant?
20 Q. Yes.
21 A. No.
22 Q. He didn't tell you that?
23 A. No.
24 Q. Did he tell you what he had been doing that

Page 98

1      afternoon before he came to the restaurant?
2  A. I mean, when you said I've spoken with him,
3      I've spoken with him because my brother is
4      friends with him.
5      He's a little bit closer in age to some of
6      these kids, and he every once in a while will
7      hang out with them.
8      I actually play on an indoor soccer team
9      with Scott, and his brother will come every
10     once in a while and I'll speak to him, but we
11     never discussed that night.
12 Q. Who have you discussed that night with?
13 A. Other than you and people that I have been
14     deposed to talk to or the grand jury or
15     Mr. DiNatale or the state police or anyone else
16     that had me come in and talk to them.
17 Q. You have not spoken to Mr. Gillis prior to
18     today, have you?
19 A. No.
20 Q. How about anyone from his office? Have you
21     spoken to anyone from his office prior to
22     today?
23 A. No.
24 Q. Are you sure?

Page 99

1  A. Well, I don't know. I mean --
2  Q. Have you spoken to anybody, other than
3      Mr. DiNatale?
4  A. I know what you're talking about. I spoke
5      to -- I just didn't think he was in the same
6      office.
7      I spoke to Mr. Parkinson. I thought he
8      was in a different office.
9      MR. GILLIS: Let's put on the record
10     there's no one named Parkinson in my office.
11 Q. When did you speak to Mr. Parkinson?
12 A. It was sometime during last semester.
13 Q. Last semester being the semester that ended
14     when?
15 A. About December 21.
16 Q. Of 2005?
17 A. Yes.
18 Q. And your best memory of when it is that you
19     spoke to Mr. DiNatale is when?
20 A. It was over break.
21 Q. Is that after December 21, 2005?
22 A. Yes.
23 Q. When is your best memory?
24 A. Let me think for a minute. I went on vacation.

Page 100

1      I had to reschedule this because I was going on
2      vacation just after New Year's, and I remember
3      speaking to him like on the phone.
4      He was saying that I want to meet with
5      you, and then I went on vacation and it was
6      probably two weeks after that, I want to say.
7  Q. When did you come back from vacation?
8  A. I came back, I think like -- Does anyone have a
9      calendar?
10 Q. Give me your best estimate.
11 A. It was probably the eighth of January.
12 Q. And approximately two weeks after that you
13     spoke to Mr. DiNatale; is that right?
14     MR. GILLIS: Objection.
15 A. Yes. So I guess I said it was a month ago, but
16     I guess it was not a month ago.
17 Q. Mr. Parkinson is someone you spoke to before
18     the end of the semester; is that right?
19 A. Correct.
20 Q. The semester ended December 21. What is your
21     best memory of when you spoke to Mr. Parkinson?
22 A. I can't say for sure. I know I met with him
23     two different times, and the first time he
24     asked me some questions about that night, and

**Page 101**

1  he came up with an affidavit, something similar
2  to this, and then he sent it to me, and he
3  wanted me to return it, but then he called me
4  and said, "I'll just meet you again to get it
5  from you," so he could see me sign so I don't
6  have to go to the notary.
7      So then I met with him again, and then he
8  had to make like a new one or he had to change
9  something.
10     I remember what it was.  He said we were
11  dirt biking in Leominster, and I wanted him to
12  change it to Templeton, and I had to go to the
13  notary and send it to him.
14 Q. And who did you understand Mr. Parkinson was
15    working for?
16 A. He said that he was representing Rare
17    Hospitality.
18 Q. What is your best memory of when you met with
19    Mr. Parkinson?
20 A. Maybe mid November, early November.
21 Q. And where did you meet with him?
22 A. In Leominster at the restaurant Panera Bread.
23 Q. P-a-n-e-r-a?
24 A. Yes.

**Page 102**

1  Q. And who else was there?
2  A. It was just me and Mr. Parkinson.
3  Q. How old is Mr. Parkinson?
4  A. I don't know.
5  Q. Did he give you a card?
6  A. No.  He wrote down a cellphone number, and he
7     didn't give me a card.
8  Q. Do you still have that information?
9  A. No.
10 Q. You threw it away?
11 A. I just lost track of it.
12 Q. How long were you with him that first time?
13 A. Well, we met over lunch, so maybe thirty-five
14    minutes or so.
15 Q. He paid for lunch?
16 A. Yes, he did.
17 Q. And he was taking notes of your conversation?
18 A. He was.
19 Q. What was he talking to you about?
20 A. Well, he just sort of wanted me to run through
21    the events as I remembered them.
22 Q. Did he refer to your testimony in the grand
23    jury at all?
24 A. I don't remember him referring to -- I remember

**Page 10**

1  him just sort of having a notepad, and I went
2  through the events of the night, and I'm pretty
3  sure that is all we did.
4  Q. Do you remember him referring to your
5     deposition testimony at all?
6  A. No.
7  Q. Do you remember him referring to the statement
8     you gave the police which has been marked as an
9     exhibit in your deposition today, Exhibit 3?
10 A. I kind of remember him mentioning that.  We
11    didn't discuss it, but I remember him
12    mentioning that I had made a statement to the
13    state police.
14 Q. Do you remember him mentioning the affidavit
15    that you made in the other case which has been
16    marked as Exhibit 4 today?
17 A. Well, I remember him saying that or him asking
18    me who I have spoken with or who have I been
19    deposed by, and I told him I came in here once
20    and that I had done the grand jury thing.
21 Q. Did he say whether or not he knew you had been
22    deposed before?
23 A. No.
24 Q. Did he seem surprised when you told him you had

**Page 10**

1  come in here and been deposed?
2  A. No.
3  Q. Did he seem surprised when you told him that
4     you had done the grand jury thing?
5  A. No.
6  Q. And you were with him thirty-five minutes or
7     so; is that right?
8  A. Around then.
9  Q. Tell me what you remember him saying and what
10    you remember yourself saying during that
11    meeting.
12 A. Well, I remember we kind of introduced
13    ourselves.  We didn't know each other, and he
14    asked me a similar scenario to when I meet with
15    people I don't know.  They ask me if I'm in
16    school, what I'm studying, what kind of things
17    I like to do.
18     He mentioned that he just moved up here
19    with I don't know whether it was his wife or
20    fiancee, and I asked him if he had been skiing
21    and such and he said a little bit, and he asked
22    me where any good places were.
23 Q. To do what?
24 A. To go skiing, and I mentioned a few places that

Page 105

1     I liked, and then he, you know, he told me that
2     he wanted me to run through the course of the
3     evening as I remembered it.
4   Q. So what did you do?
5   A. I basically just told him what I remembered,
6     starting from when I went to the dirt bike
7     track until Scott dropped me off.
8   Q. And what did he say during that?
9   A. He didn't really say much. He just let me
10     talk.
11   Q. Just took notes?
12   A. Yes.
13   Q. Didn't ask you any questions?
14   A. He may have. I don't remember him specifically
15     asking any questions.
16   Q. You just talked?
17   A. Yes.
18   Q. He said, "What happened? Tell me what
19     happened"?
20   A. Yes. I remember him saying that he wanted to
21     hear the whole story from me as I remember it.
22     So he just let me go through the events.
23   Q. And did he stop you at any point to ask you
24     questions, like how much did Jeff have to

Page 106

1     drink?
2   A. Yes, he did. Well, I don't know if he asked me
3     that question.
4     I remember him stopping and asking me
5     like, you know, you're going to be asked when
6     you go into your deposition how many drinks
7     Jeff had and such, when I got to that point in
8     the narrative.
9   Q. He told you that you would be asked that during
10     the deposition; is that right?
11   A. Yes.
12   Q. And what did he say about that?
13   A. He told me that what I remembered is what I
14     needed to tell.
15   Q. Now, did you tell him at that point that you
16     had already been deposed and told what you
17     remembered back in August of 2004?
18     MR. GILLIS: Objection.
19   A. I don't think so. I don't think I made
20     reference to that.
21     I think I might have said, "Well, I have
22     already been deposed." I honestly don't know.
23     I never told him that "I said this"
24     because I didn't remember.

Page 10

1   Q. So when he told you that you were going to be
2     asked when you go into the deposition how much
3     Jeff had to drink, did he say anything else
4     about that?
5   A. I believe he asked me if I remembered any, you
6     know, noticeable signs of him being drunk or --
7   Q. "Noticeable signs"? Is that what he said?
8   A. I don't know how he stated it.
9   Q. What did you say?
10   A. I believe I told him that I didn't see any
11     clear signs of him being drunk.
12   Q. What else did he say about that?
13   A. Well, I don't know. I don't remember. I
14     remember that.
15   Q. What else do you remember him saying that day?
16   A. I remember him saying that I, being the one
17     that had not been drinking that night, was kind
18     of a big factor in what, I guess, the final
19     decision, how the case plays out.
20   Q. He told you that?
21   A. Yes. One thing I remember specifically about
22     when I met with John DiNatale, I remember him
23     specifically mentioning these words.
24     He said, "Tell the truth and let the cards

Page 10

1     fall where they will."
2   Q. Did you need DiNatale to tell you to tell the
3     truth?
4     MR. GILLIS: Objection.
5   A. No.
6   Q. Tell me what else Mr. Parkinson -- By the way,
7     I asked you how old he was. He never gave you
8     a card?
9   A. No, he didn't.
10   Q. Never told you where he worked?
11   A. Well, he told me that he had just moved up
12     here, and he said where he was living, but I
13     don't remember.
14     He said he was working in Boston or
15     Cambridge or somewhere.
16   Q. Working for Rare or representing Rare?
17   A. Yes.
18   Q. Did he tell you that he was a lawyer?
19   A. Yes, an attorney or lawyer. He said he was
20     representing Rare Hospitality.
21   Q. Your best memory is that this conversation
22     occurred in November?
23   A. Yes.
24   Q. And what else did you say to him or he say to

Page 109

1 you during that Panera Bread meeting?
2 A. Well, he wanted to make sure that after I had
3 gone through my narrative that he asked me if
4 that's how I remember it and if there's
5 anything else I remembered.
6      He wanted to make sure that I had told the
7 story as I remembered it, and that was pretty
8 much it.
9 Q. Then he met with you a second time; is that
10 right?
11 A. He did.
12 Q. And how long after the first visit was it that
13 you met with Mr. Parkinson again?
14 A. Maybe like two weeks.
15 Q. Where was that meeting?
16 A. It was the same place.
17 Q. Lunch again?
18 A. Yes.
19 Q. Mr. Parkinson paid again?
20 A. Correct.
21 Q. And did he have a document for you at that
22 time?
23 A. He had talked to me on the phone, and I told
24 him that I wanted to make some changes, and

Page 110

1 then he brought the document down so that I
2 could make the changes and tell him what I
3 wanted to change.
4 Q. So am I correct that in between the first
5 meeting at Panera Bread and the second meeting,
6 he sent you a document somehow?
7 A. No. If I said that, that's incorrect. He sent
8 it after the second meeting.
9 Q. There was a second meeting with him?
10 A. Yes.
11 Q. At the second meeting, did he have a document
12 with him?
13 A. Yes.
14 Q. Did you read the document at the second
15 meeting?
16 A. Yes.
17 Q. There were things in it that were not right?
18 A. Yes. As I told you before, he made the
19 mistake. It's not essential, but I wanted it
20 to be right.
21      He said we were dirt biking in the
22 Leominster area, and I said well, it was
23 technically in Templeton.
24      So he said he wanted to make sure it was

Page 11

1 all correct. He wanted to have it done.
2 Q. Were there any other changes he wanted made in
3 that document?
4 A. No.
5 Q. Did the document speak to how much Jeff had to
6 drink that night?
7 A. Yes.
8 Q. And did the document speak to how much he had
9 at the bar?
10 A. Yes. I think it more generally spoke about
11 everything he had to drink as opposed to what
12 he drank here and at the table.
13 Q. At the second meeting with Mr. Parkinson, did
14 you discuss with him that you had already given
15 statements, either in writing or under oath,
16 before the grand jury or at a deposition about
17 how much Jeff had to drink?
18 A. What do you mean by "discussing"?
19 Q. Well, was there any discussion about whether or
20 not the document that Mr. Parkinson wanted you
21 to sign was going to align with the statements
22 you had given earlier both in the grand jury
23 and at deposition under oath and the written
24 statements?

Page 11

1 A. When I ran through the narrative, I'm pretty
2 sure I remember him saying, "Well, you know
3 what you said here is along the lines of what
4 has been said in the grand jury and what other
5 people have said." It was something along the
6 lines of that.
7 Q. Well, were you concerned at all with respect to
8 the Parkinson document about whether or not
9 what you were saying in the Parkinson document
10 was going to align with what you had testified
11 to at your deposition back in August?
12 A. Well, I didn't really remember what I had said
13 in the deposition. So I could not really make
14 a judgment on if there were going to be
15 differences.
16      I just assumed that there was going to be
17 what I thought happened.
18      MR. FARRAH: Why don't we take a break?
19      (Luncheon recess.)
20
21
22
23
24

Page 113

1    AFTERNOON SESSION

2

3    Q. So you had a second meeting with Mr. Parkerson;
4       is that correct?
5    A. Yes.
6    Q. And he presented you with a document to sign at
7       that meeting?
8    A. Yes, he did.
9    Q. You didn't like some of the things that were in
10      it; is that right?
11   A. Yes.
12   Q. So what did you do after that with respect to
13      Mr. Parkerson?
14   A. He went back to his office, and I'm not sure
15      what the time frame was, and he came up with a
16      new one and sent it to me, and I had to bring
17      it to the notary, sign it, and send it back to
18      him.
19   Q. Did you do that?
20   A. Yes.
21   Q. Did you keep a copy of that document?
22   A. No, I don't think so.
23   Q. And did you ever hear from Mr. Parkerson again?
24   A. No.

Page 114

1    Q. Now, do you remember testifying before the
2       grand jury?
3    A. Yes, I do.
4    Q. Do you remember being asked the question, "When
5       you were seated once your table was available,
6       do you know if you checked out at the bar, or
7       did the tab move to the table?"
8       Do you remember being asked that question?
9          MR. GILLIS: What page are you reading
10         from?
11         MR. FARRAH: 17.
12   A. I don't know.
13   Q. Do you remember your answer? Can you read it
14      into the record?
15   A. "I'm pretty sure we checked out at the bar."
16   Q. And do you have any explanation as to why your
17      testimony is now different from what you
18      testified to the grand jury on the question of
19      whether or not the bar tab went to the table?
20         MR. GILLIS: Objection.
21   A. No.
22   Q. Do you remember being asked the question before
23      the grand jury, "What do you believe Jeffrey
24      Southworth had to drink at the table that

Page 11

1    night?"
2          MR. GILLIS: Page, please?
3          MR. FARRAH: 19.
4    Q. Do you see that question?
5    A. Yes.
6    Q. Do you remember your answer? Can you read it
7       for the record?
8    A. "I would say that he probably, that he had
9       probably two to three beers and a couple of
10      Manhattans. I would say he had two beers,
11      maybe three. I can't specifically recall."
12   Q. Let's try that one more time. Could you read
13      it again?
14   A. "I would say he had probably two to three beers
15      and a couple of Manhattans. I would say he had
16      two, maybe three. I can't specifically
17      recall."
18   Q. And when you were saying "two, maybe three,"
19      were you referring to Manhattans in your grand
20      jury testimony?
21   A. I don't know.
22   Q. Do you have any explanation as to why your
23      testimony today with respect to how many beers
24      he drank at the table that night is different

Page 11

1    from what you testified to before the grand
2       jury?
3          MR. GILLIS: Objection.
4    A. The bill.
5    Q. Seeing the bill with Mr. DiNatale?
6    A. Just seeing the bill, I mean, shows that there
7       are two.
8    Q. Two beers that were served at the table?
9    A. Yes.
10   Q. One at 8:40 and the other one at 9:15?
11   A. Correct.
12   Q. What is it about those two beers that were
13      served at the table that is inconsistent with
14      your testimony before the grand jury that Jeff
15      probably had two to three beers with dinner at
16      the table?
17   A. Well, I said that there were two to three beers
18      drinking at the table, and there were only two
19      beers ordered to the table.
20      So I know that the three is out of the
21      question, and I believe that Scott was drinking
22      beer at the table as well.
23      So I can't say for sure, but I presume
24      that one of the beers ordered at the table in

Page 117

1    Exhibit 2 went to him but I didn't log it in.
2    I can't say for sure.
3    Q. You presume one of the beers that is shown on
4    Exhibit 2 went to him while he was at the
5    table?
6    A. Yes.
7    Q. And the other beer, you presume, went to Jeff
8    while he was sitting at the table?
9        MR. GILLIS: Objection.
10   A. Yes.
11   Q. So help me out with your testimony this morning
12   that you had discussions with Mr. DiNatale
13   about the beers reflected on Exhibit 2 are the
14   beers that were served at the bar.
15   A. What is that again?
16   Q. Before you saw what has been marked as
17   Exhibit 2, you testified at the grand jury that
18   your best memory was Jeff had two to three
19   beers while he was sitting at dinner; is that
20   right?
21       MR. GILLIS: Objection.
22   A. Yes.
23   Q. Do you see it?
24   A. Yes.

Page 118

1    Q. Before you saw Exhibit 2, you testified at your
2    deposition that Jeff had maybe four beers while
3    he was sitting at the table; is that correct?
4        MR. GILLIS: Objection.
5    Q. Do you remember that testimony?
6    A. Yes. It's in here.
7    Q. And before you saw Exhibit 2, you gave a
8    written statement to Trooper Sullivan, which
9    has been marked as Exhibit 3 in this
10   deposition, that Jeff had a couple of beers,
11   maybe two, and three drinks at dinner. Do you
12   see that?
13   A. Yes.
14   Q. And is it accurate to say that except for what
15   you believe Exhibit 2 shows, your earlier
16   testimony regarding the number of beers he had
17   at the table is your best memory of what he had
18   at the table?
19       MR. GILLIS: Objection.
20   A. Yes.
21   Q. Before you saw Exhibit 2, your best memory
22   regarding the number of Jack Daniels Manhattans
23   that Jeff had with dinner is what is reflected
24   in your grand jury testimony and your

Page 119

1    deposition; is that right?
2    A. Yes.
3    Q. And before you saw Exhibit 2, your best memory
4    about how many beers Jeff had at the bar is
5    what is reflected in your deposition; is that
6    right?
7        MR. GILLIS: Objection.
8    A. Yes.
9    Q. Now, Exhibit 2 indicates that the check was
10   paid at 9:57 p.m. Do you see that?
11   A. Yes.
12   Q. And after paying the check, where did you go?
13   I'm sorry. You did not pay for yourself; is
14   that right?
15   A. Correct.
16   Q. Jeff paid for you?
17   A. Yes.
18   Q. Once the check was paid, you left the
19   restaurant; is that right?
20   A. Yes.
21   Q. And that was about 9:57 p.m.; is that right?
22       MR. GILLIS: Objection.
23   A. Yes, or shortly after.
24   Q. And where did you go?

Page 120

1    A. We went to the hotel that the two people that I
2    didn't know were staying at.
3    Q. And had the seating arrangement in the car
4    changed or the truck changed at that point?
5    A. Yes.
6    Q. You were in the front; is that right?
7    A. I think so, yes.
8    Q. Jeff was in the back with his dogs; is that
9    right?
10   A. Yes.
11   Q. Can you tell me why Jeff went in the back with
12   the dogs?
13   A. Other than the fact that the dogs are
14   Rottweilers and they had been in the truck for
15   quite some time, you know, maybe he wanted -- I
16   can't say. I don't know.
17   Q. Did he say anything about why he wanted to go
18   in the back with the dogs?
19   A. No.
20   Q. Did he fall asleep in the back with the dogs
21   during the trip out of the Longhorn?
22   A. No.
23   Q. And where did you go from there?
24   A. To the hotel.

Page 121

1 Q. Which hotel?
2 A. I think it's called the Four Points or Four
3   Seasons or Four something.
4 Q. And what did you do there?
5 A. The two people that were staying there, they
6   wanted to go change or they went into their
7   room, and we were waiting outside in the
8   hallway, and we were talking to these two guys
9   that were there.
10      There was a music festival that was going
11   on at the airport next to the hotel. So there
12   were a lot of people staying there, and there
13   were two bouncers or security guards for a
14   certain band who we were talking to out in the
15   hall.
16 Q. And where was Jeff while you guys were at the
17   Four Points Hotel?
18 A. He was in the hallway with us.
19 Q. By the way, just a few wrap-up type questions.
20   I may have asked you this already.
21      What was the age of the waitress who
22   served us guys?
23      MR. GILLIS: Objection.
24 Q. Can you estimate for me the age of the waitress

Page 122

1   that served you guys?
2 A. Early to mid twenties.
3 Q. Okay, and do you have a memory of whether or
4   not any other waitresses or waiters served your
5   table that night?
6 A. I don't believe so.
7 Q. Did you say you had steak that night or ribs?
8 A. I think I told you I had ribs.
9 Q. Do you remember you had ribs or are you not
10   sure?
11 A. I thought I had ribs. I'm not 100 percent sure
12   on it.
13 Q. Okay. You were not wearing a watch that night;
14   is that right?
15 A. Yes.
16 Q. And did Jeff have anything to drink while you
17   were at the Four Points?
18 A. He did.
19 Q. What did he have there?
20 A. He had a beer.
21 Q. Twelve-ounce? Sixteen-ounce? Do you know?
22 A. I think it was a twelve-ounce. I'm pretty sure
23   it was a can.
24 Q. And am I correct -- I think I asked you this

Page 123

1   already. I know I asked you in the Superior
2   Court case. The size of the container of the
3   beers that Jeff had or whatever amount of beer
4   he had at the bar and whatever amount he had at
5   the table, they were all in the same size
6   container; is that right?
7      MR. GILLIS: Objection.
8 A. Yes.
9 Q. Were they all in the same size container -- the
10   beers at the table and the beers at the bar?
11      MR. GILLIS: Objection.
12 A. I believe so.
13 Q. And then from the hotel, where did you all go?
14 A. We went to the Other Side, which is a strip
15   club.
16 Q. Approximately, how long were you at the hotel,
17   best memory?
18 A. Anywhere from half an hour to forty minutes.
19 Q. Okay, and how long did it take you to get from
20   the Longhorn to the hotel?
21 A. Maybe like five minutes. It's pretty close.
22 Q. Do you remember testifying ten to fifteen
23   minutes before?
24 A. I think so.

Page 124

1      MR. GILLIS: What page?
2      MR. FARRAH: Page 53.
3 Q. Is it is your best memory as you sit here today
4   it was ten minutes more or less?
5      MR. GILLIS: Objection.
6 A. Yes.
7 Q. And then you drove from the hotel to the strip
8   club; is that right?
9 A. Correct.
10 Q. Who was in the car when you did that?
11 A. It was myself, Scott, his brother Mike and
12   Jeff.
13 Q. Had Mike been in the car on the trip from the
14   Longhorn to the hotel?
15 A. He was not.
16 Q. What was the seating arrangement in the ride
17   from the hotel to the strip club?
18 A. I was in the passenger seat, and Scott was
19   driving, and Jeff and Mike were in the back.
20 Q. Was Jeff asleep on the ride to the strip club?
21      MR. GILLIS: Objection.
22 A. I don't think so.
23 Q. Was the plan initially to go into the strip
24   club?

Page 125

1   A. It was.
2   Q. But that changed at some point in time; is that
3       right?
4   A. Yes.
5   Q. And what brought about that change?
6   A. Well, I actually didn't even want to go to
7       dinner. I wanted to go back, so Jeff offered
8       to buy me dinner and I said yes, and then when
9       we were going there, I probably said something
10      like I had class in the morning.
11          I honestly don't remember how we came to
12      the decision, but I think Scott and I decided
13      we didn't want to stay out too much later.
14  Q. Okay, and so you guys did not go to the strip
15      club; is that right?
16  A. Correct.
17  Q. But you dropped off Scott's brother there; is
18      that right?
19  A. Yes.
20  Q. And then where did you go from the Other Side?
21  A. We went to the apartment or housing complex
22      where Scott's truck was in Littleton.
23  Q. Approximately, how long did it take you guys to
24      go from the Other Side to the apartment complex

Page 126

1       in Littleton?
2   A. Maybe thirty to thirty-five minutes.
3   Q. And the apartment complex is just off of
4       Route 495; is that right?
5   A. Yes.
6   Q. And was there any discussion on route between
7       some or all of the three about whether or not
8       Jeff should drive his truck?
9   A. Not that I remember.
10  Q. Do you remember anyone saying in effect, "Jeff,
11      you're too drunk to drive"?
12          MR. GILLIS: Objection.
13  A. No.
14  Q. Where was Jeff on the ride from the Other Side
15      to the apartment complex?
16  A. He was in the back.
17  Q. Still in the back?
18  A. Yes.
19  Q. Sleeping or awake?
20  A. He was awake, I'm pretty sure.
21  Q. And when you got to the apartment complex, what
22      happened?
23  A. Well, I jumped out and I grabbed my bag off the
24      back of the truck, and actually, I don't know

Page 127

1       if I had my bag with me.
2           I know I had to grab something, some sort
3       of dirt biking gear. It might have been my
4       boots or something. I jumped off and brought
5       it over to Scott's truck.
6   Q. Then what happened?
7   A. Jeff left.
8   Q. Jeff left the apartment complex?
9   A. Correct.
10  Q. So he left the back seat and got into the
11      driver's side?
12  A. Yes.
13  Q. Did something happen when Jeff was leaving the
14      apartment complex?
15  A. Yes.
16  Q. What happened?
17  A. Actually, I didn't see it, but apparently, he
18      must have backed over or ran over part of
19      Scott's foot.
20  Q. Did you hear Scott say something as Jeff was
21      leaving or soon after Jeff left?
22  A. Yes, soon after.
23  Q. What did he say?
24  A. He started complaining about his ankle hurting,

Page 128

1       and he said that he backed over it, ran over
2       it.
3   Q. Do you remember while you were at the
4       restaurant the waitress asking anyone in your
5       group for an ID, some proof of age?
6   A. I don't recall.
7   Q. Do you remember? That is my question.
8   A. I do not remember anyone being IDed.
9   Q. Do you remember anyone being IDed at the bar?
10  A. Well, I don't remember that either.
11  Q. Okay. Now, after Scott made some statement
12      about Jeff running over his foot, what happened
13      next?
14  A. We went to get into Scott's truck, and he
15      realized he didn't have his keys.
16  Q. Okay. So what happened at that point?
17  A. We tried calling Jeff to let him know that he
18      had to turn around and bring us the keys.
19  Q. And you called from a cellphone; is that right?
20  A. Yes.
21  Q. How long did it take you to get through to
22      Jeff?
23  A. Maybe five, ten minutes.
24  Q. And what was the conversation that you had with

Page 129

```
 1    Jeff at that point?  Was it you, by the way,
 2    that had the conversation?
 3  A. I believe it was.  I know from that point on,
 4    there were two conversations with him.
 5  Q. Tell me about the first one.
 6  A. I told him that he had the keys -- he had
 7    Scott's keys -- and that he had backed over
 8    Scott's foot when he was leaving.
 9  Q. And what did Jeff say?
10  A. He didn't say much.  I don't even quite
11    remember him telling me he was going to turn
12    around.
13  Q. And again, the apartment complex which in the
14    parking lot of which you were calling Jeff from
15    that night was located how far from Route 495?
16  A. One hundred yards.
17  Q. And so after that conversation with Jeff, did
18    you see Jeff later on that night?
19  A. No.
20  Q. At some point in time after that conversation
21    with Jeff, did you try to have another
22    conversation with him?  Did you try to call him
23    on the phone?
24  A. Yes.
```

Page 13

```
 1  A. Yes.
 2  Q. What did you do?
 3  A. We broke into the truck by smashing out the
 4    sliding glass door in the back windshield.
 5  Q. On the back?
 6  A. Yes.  We knew he had a spare key in the car.
 7  Q. And after you had cleared away whatever you
 8    needed to clear away to get into the car, what
 9    did you do next?
10  A. I don't know whether we had talked to Jeff at
11    that point or we started driving.
12      We must have talked to him again by that
13    point because we would have just gone back
14    home.
15  Q. Do you remember having a second conversation
16    with Jeff that night after he left the
17    apartment complex parking lot?
18  A. Yes.
19  Q. Was that conversation with you or with Scott?
20  A. I believe it was with me.
21  Q. Tell me what you remember about that
22    conversation.
23  A. I remember him saying -- Yes, it was with me.
24    I remember him saying he had been in an
```

Page 130

```
 1  Q. Did you wait for Jeff to come back?
 2  A. We did.
 3  Q. Can you tell me approximately how long you
 4    waited for Jeff to come back?
 5  A. Probably close to twenty minutes.
 6  Q. Do you remember testifying at your
 7    deposition -- this is on page 66 -- that it was
 8    probably maybe half an hour that you waited?
 9  A. Okay.
10  Q. Do you see that?
11  A. It could have been a half an hour.  I'm sure
12    that this is more accurate than what I remember
13    today.
14  Q. Your deposition?
15  A. Yes.
16  Q. In all respects?
17      MR. GILLIS:  Objection.
18  A. In that respect at least.
19      MR. GILLIS:  I move to strike that last
20    comment.
21      MR. FARRAH:  I thought we were reserving
22    motions to strike until trial.
23  Q. At some point in time did the two of you take
24    some action to be able to drive the truck?
```

Page 13

```
 1    accident and that I was like immediately,
 2    "Where are you," and he didn't really say that
 3    much.
 4      I'm pretty sure it got cut off, and we
 5    decided to go try and find the accident.  We
 6    didn't know what happened.
 7  Q. So was it at that point that you got on 495?
 8  A. Yes.
 9  Q. If you had been heading home that night as
10    opposed to looking for Jeff, which way would
11    you have headed on 495 from the apartment
12    complex?
13  A. We would not have gotten on 495.
14  Q. At all?
15  A. Correct.
16  Q. When you got on 495, in which direction did you
17    head?
18  A. North.
19  Q. Why was that?
20  A. Jeff was going home, which was north.
21  Q. Where did you understand he lived at that time?
22  A. In Portsmouth.
23  Q. New Hampshire?
24  A. Yes.
```

Page 133

1  Q. And when you got on 495 North, what happened?
2  A. Well, we drove and we didn't see anything and
3     we were going to turn around, and then we
4     decided to drive a little bit farther, and as
5     we were getting close to the Westford exit, we
6     saw an accident scene with like all sorts of
7     ambulances and police cars and just a lot of
8     emergency vehicles, lights going on the
9     southbound side.
10 Q. The southbound side of 495?
11 A. Yes.
12 Q. How many exits down from where the apartment
13    complex was, was it that you had traveled
14    before you saw the accident scene?
15 A. I think Westford is two up from where we got
16    on.
17 Q. Had you passed the Westford exit when you saw
18    this accident scene?
19 A. No.
20 Q. So this was before the Westford exit on 495
21    North that you saw the accident scene on the
22    other side of the highway; is that right?
23 A. Yes.
24 Q. What did you do?

Page 13

1     yet. We got off at the Littleton exit.
2        We drove on this back road and tried
3     calling him and telling him. I think we left
4     him a voice mail saying, "Where are you? Are
5     you all right? Give us a call. Let us know
6     what is going on," but we could not get ahold
7     of him.
8        So what we did was we decided to drive up
9     to Westford again one more time to see if we
10    could see if that was his accident, if we could
11    see his truck.
12 Q. Did you have any luck?
13 A. No.
14 Q. Prior to September 26, 2003, had you ever seen
15    Jeff when you believed he was under the
16    influence of alcoholic beverages?
17 A. I think so once.
18 Q. Did he exhibit some of the same signs you saw
19    the night of September 26, 2003 that night?
20    MR. GILLIS: Objection.
21 A. You know, I'd seen him when I thought he was a
22    little bit drunk, but I mean I just assumed
23    that he was drunk. I cannot say that he was.
24    It was at that party that I mentioned before.

Page 134

1  A. We got off at the Westford exit, and we started
2     heading southbound so we could drive by the
3     accident.
4  Q. Did you call Jeff at all during that time?
5  A. Yes.
6  Q. And were you able to reach him at all?
7  A. No.
8  Q. What did you see when you drove by on 495
9     southbound now?
10 A. We couldn't see anything. It looked like an
11    accident. All we could see was police cars and
12    the police and EMTs and ambulances.
13       We didn't see any cars that had been in an
14    accident, specifically the truck. That was
15    what we were looking for and the dirt bikes.
16 Q. And did you make any other efforts to find Jeff
17    that night?
18 A. Yes.
19 Q. What were those efforts? Describe those for
20    me, if you could.
21 A. We circled back up north to get off of the
22    Westford exit again.
23 Q. Then what happened?
24 A. No, that's incorrect. We didn't circle back

Page 13

1  Q. Were people drinking at that party?
2  A. Yes. That's why I assumed he was drunk.
3  Q. What sorts of things did he exhibit that led
4     you to assume he was drunk?
5  A. Well, I didn't notice anything he was
6     exhibiting. I sort of just figured that he was
7     drunk or on his way to being drunk since he had
8     been at the party and other people were there,
9     and they were drinking.
10 Q. Was he louder than usual at that party?
11 A. I didn't notice him being loud.
12 Q. Were his eyes glassy at all at the party?
13 A. I could not tell you.
14 Q. What is it that led you to say a few moments
15    ago that he had exhibited signs of intoxication
16    in the past to you?
17 A. Actually, I remember one thing. When we went
18    outside, he was getting one of his dogs all
19    riled up.
20       They're Rottweilers. So they can be
21    nasty. I mean they're pretty good dogs.
22       I remember him getting one of them all
23    riled up and like kind of pointing to someone
24    because he was a very well-behaved dog, and if

Page 137

1  you pointed at someone and you started going
2  after them, say you grabbed his arm, the dog
3  would jump up on him and try to think he needed
4  to protect him, and I remember that happened.
5  That was something that he normally didn't do.
6  Q. My question to you is, what is it that he was
7  exhibiting that night prior to September 26,
8  2003 that leads you to say he was exhibiting
9  signs of being intoxicated?
10 A. It would be getting his dog all riled up.
11 Q. Anything else?
12 A. No.
13 Q. You're sure?
14 A. Yes. I was not really paying attention that
15 well. I was not even there that long.
16 Q. But you believed he was exhibiting signs of
17 intoxication that night; is that right?
18 A. Yes.
19 Q. Okay. Now, at some point in time, did you meet
20 with the police to talk about the events of
21 September 26?
22 A. The state police?
23 Q. Any police.
24 A. I remember going to the state police in Concord

Page 13

1  A. Yes. I remember him calling me and telling me
2  that he wanted me to meet with him, and he
3  could come down or I could come down and meet
4  him, and I said I would come down, and I think
5  it was the same day that I talked to him and
6  went down there.
7  Q. But it was five weeks after the accident?
8  A. Yes.
9  Q. That refreshes your memory?
10 A. Yes.
11 Q. In between that time, September 26, 2003 and
12 November 2, 2003, did you give anybody else any
13 statements about the accident?
14 A. I don't think so.
15 Q. Or about that night, did you give anybody else
16 any statements about that night?
17 A. No.
18 Q. When did you learn that Jeff had been in this
19 accident?
20 A. It was the next day. A friend of mine called
21 me and told me that he saw the accident on the
22 news and that he saw something about Jeff being
23 in an accident on the news.
24 Q. Can you just describe how it was that you gave

Page 138

1  and talking to one of the troopers.
2  Q. Trooper Sullivan?
3  A. Yes.
4  Q. How long was that after the accident?
5  A. I think it was pretty short. I can't say for
6  sure. It was a couple of days.
7  Q. Did you tell him what had happened that night?
8  A. I told him a little about what happened, but he
9  wanted me to just write it all down.
10 Q. Okay, and did you write it all down for him?
11 A. Yes.
12 Q. Now, what has been marked as Exhibit 3 in your
13 deposition has a date of November 2, 2003,
14 3:25 p.m. Do you see that?
15 A. Yes.
16 Q. That's five-and-a-half weeks, six weeks after
17 the accident; can we agree?
18 A. Yes.
19 Q. Do you remember that you had met with him
20 before November 2, 2003? This is Trooper
21 Sullivan.
22 A. No.
23 Q. Do you remember only one meeting with
24 Trooper Sullivan?

Page 14

1  this statement to the state police?
2  A. Yes. I went into the barracks and I had to
3  give them some ID and show them who I was, and
4  they took me into one of the offices and sat me
5  down and asked me if I was with Jeff that night
6  and if I was in fact Jude and some questions
7  like that.
8     Then he said, "All right. Now, I want you
9  to write what you remember down and give me a
10 statement on paper."
11 Q. And that's what you did?
12 A. Yes.
13 Q. How long were you with him that day?
14 A. It was probably under an hour. It was not
15 extremely long.
16 Q. Anybody else there besides the trooper and you?
17 A. No.
18 Q. Was your meeting tape recorded, do you know?
19 A. I don't know.
20 Q. Was your meeting with DiNatale tape recorded?
21 A. I don't think so.
22 Q. How about with the lawyer -- I can't remember
23 his name now -- Parkerson, was that tape
24 recorded?

Page 141

1  A. I don't think so.
2  Q. Did anybody ask you for permission to tape
3     record in any of the meetings you had to
4     discuss what happened?
5  A. I kind of remember someone asking me, but I
6     don't know whether it was one of these meetings
7     or a meeting where I was in a place in here.
8        Maybe it might have been when I had to
9     testify -- I can't say for sure. I just
10    remember someone saying, "I'm going to be tape
11    recording you."
12 Q. Is that your handwriting on Exhibit 3?
13 A. Yes.
14 Q. And did anybody in any way influence what you
15    wrote on Exhibit 3 at the time you were writing
16    it?
17 A. No.
18 Q. Did anybody put words in your mouth?
19 A. No.
20 Q. Did anybody suggest anything to you?
21 A. No.
22 Q. And then you testified at the grand jury; is
23    that right?
24 A. Yes.

Page 142

1  Q. And did you testify truthfully before the grand
2     jury to the best of your ability?
3  A. Yes.
4  Q. And approximately how long was that after the
5     meeting with the state trooper, if you know?
6  A. I don't know. I think it was sometime after.
7  Q. And then in between then, when you testified
8     before the grand jury and when you testified at
9     your deposition in August of 2004, did anybody
10    that you understood was representing anyone
11    involved in either a civil or criminal lawsuit
12    contact you to discuss what happened the
13    evening of September 26, 2003?
14 A. No.
15 Q. And when you came to testify on August of 2004,
16    that was the first time we had spoken?
17 A. Yes.
18 Q. After testifying on August of 2004, and with
19    the exception of Mr. Parkerson and
20    Mr. DiNatale, has anyone spoken to you about
21    the events of September 26, 2003 whom you have
22    understood was working for any defendant in any
23    civil lawsuit?
24 A. No.

Page 143

1       MR. FARRAH: Michael, I think I'm just
2     about done. Give me a minute to run out and
3     I'll be right back.
4        (Short recess.)
5  Q. Did you sign a statement for DiNatale?
6  A. No.
7  Q. You did sign a statement for Parkerson?
8  A. Yes.
9  Q. You're sure you didn't sign a statement for
10    DiNatale?
11 A. I don't remember. I don't know.
12 Q. It was not that long ago -- two weeks.
13 A. It was a little bit longer than that.
14 Q. But you don't remember?
15 A. I don't remember.
16       MR. FARRAH: Thanks. I'm done.
17
18       CROSS-EXAMINATION
19
20 BY MR. GILLIS:
21 Q. Mr. Connelly, you have in front of you
22    Exhibit 3, your statement there, and when you
23    said in that statement that he had a couple of
24    beers, maybe two and maybe three drinks, that

Page 144

1     was the total amount of drinks that you think
2     he might have had at the restaurant; is that
3     right?
4        MR. FARRAH: Objection.
5  A. Correct.
6  Q. Let me ask it a different way. From looking at
7     your statement, can you tell me how many drinks
8     you thought Mr. Southworth maybe had at the
9     restaurant?
10 A. In total?
11       MR. FARRAH: Objection. Are you looking
12    at Exhibit 3?
13       MR. GILLIS: Yes.
14 A. It would be maybe five.
15 Q. Was that everything at the restaurant or just
16    at the table?
17       MR. FARRAH: Objection.
18 A. I believe that was at the restaurant, not at
19    the table.
20 Q. Is it your memory that the beers that were
21    gotten at the bar were brought over to the
22    table?
23       MR. FARRAH: Objection.
24 A. Yes.

Page 145

1  Q. This is dated November 2, 2003. That's when
2     that was actually done by you, correct?
3  A. Yes.
4  Q. Your memory was a lot fresher back then as to
5     the events of this, correct?
6  A. Yes.
7  Q. You said that you left approximately 11:00, is
8     that correct, the restaurant?
9  A. Yes.
10 Q. Give or take a few minutes?
11 A. Yes.
12 Q. It could have been 10:30; it could have been
13    11:30?
14    MR. FARRAH: Objection.
15 A. It was probably not later. It was probably,
16    you know, 11:00 or before.
17 Q. Subsequently, you were under oath when you gave
18    your grand jury testimony, correct?
19 A. Yes.
20 Q. You said "probably two, maybe a couple of
21    Manhattans" on page 9 of your sworn testimony.
22 A. Correct.
23 Q. At the end of that you were asked, were you
24    not, whether or not Mr. Southworth was

Page 146

1     exhibiting any change in his demeanor at any
2     time? Do you remember being asked that?
3     MR. FARRAH: What page is that?
4     MR. GILLIS: Page 34.
5  A. Yes.
6  Q. That was a lot closer to the time of this
7     accident than today, correct?
8  A. Correct.
9  Q. Did they put your statement in as an exhibit
10    when you were at the grand jury?
11 A. Yes.
12 Q. That was the fifth of November of 2003,
13    correct?
14 A. Yes.
15 Q. That was when you said that there was no change
16    at any time in his demeanor while he was at the
17    Longhorn; is that correct?
18 A. Yes.
19 Q. You testified there that you had known him for
20    about a year prior to this accident, correct?
21 A. Yes.
22 Q. Do you know him primarily from dirt bike
23    racing, or how did you know him?
24 A. I knew him from dirt bike racing.

Page 14

1  Q. You had known him long enough to know whethe
2     his demeanor was changing, correct?
3     MR. FARRAH: Objection.
4  A. The only time that I believed that he was drunk
5     was the time that I had seen him at the party.
6  Q. That was not the question. You've known him
7     long enough that you would be able to tell
8     whether or not his demeanor was changing on the
9     night of September 26, 2003, correct?
10 A. Yes.
11 Q. Now, those are the statements that you gave
12    before lawyers got involved in the case,
13    correct?
14 A. Yes.
15 Q. Then you met with Mr. Farrah, correct?
16    MR. FARRAH: Objection.
17 A. Yes.
18 Q. When did you first meet with him?
19 A. It was over a year. I honestly don't know.
20 Q. How many times have you met with Mr. Farrah?
21 A. Only once, besides today.
22 Q. When was that?
23 A. I don't know. It was sometime after the grand
24    jury.

Page 14

1  Q. Before your deposition?
2     MR. FARRAH: Are you asking him did we
3     meet before his deposition?
4     MR. GILLIS: Yes.
5     MR. FARRAH: Objection to the form.
6  A. The deposition, was that the grand jury?
7     MR. FARRAH: This is your deposition,
8     right here (pointing to transcript).
9  A. When was this taken? I thought the deposition
10    was when I met with Mr. Farrah.
11 Q. You came in before a situation like this and
12    gave a deposition?
13 A. Yes.
14 Q. Prior to that, had you met with anybody from
15    Mr. Farrah's office?
16 A. No.
17 Q. Then you met with his office, didn't you, to
18    put together an affidavit?
19 A. Yes.
20 Q. Who wrote that up for you?
21 A. I don't know.
22 Q. Who contacted you and asked you to do an
23    affidavit for them? Was that Mr. Farrah's
24    office?

Page 149

1   A. Yes.
2   Q. And did they send you that in the mail, or did
3       you come in to sign it?
4   A. They sent it to me.
5   Q. Do you know who from the office you spoke with?
6   A. No.  I presume it was Mr. Farrah.
7   Q. Was it a male or a female?
8   A. I don't know.
9   Q. Do you remember what you spoke about?
10  A. Just, you know, they were going to send it to
11      me and I needed to sign it and get it back to
12      them.
13  Q. You also testified at trial in this matter,
14      correct?
15  A. Correct.
16  Q. And you were under oath at that time, correct?
17  A. Correct.
18  Q. You didn't have any of the lawyers in this room
19      forming the questions that you were answering,
20      correct?
21  A. Correct.
22  Q. At that trial do you remember testifying that
23      you had a Sprite and some food at the
24      restaurant?

Page 150

1   A. Yes.
2   Q. Do you remember testifying that there was
3       nothing unusual at all that evening at the
4       Longhorn as to how Mr. Southworth was speaking
5       or walking?
6       MR. FARRAH: Objection.
7   A. Yes.
8   Q. Do you remember testifying that Mr. Southworth
9       brought the beer that he got at the bar with
10      him to the table?
11      MR. FARRAH: Objection.
12  A. Yes.
13  Q. Prior to Mr. Farrah in 2004 suggesting
14      different signs of inebriation, did you ever
15      testify anywhere that Mr. Southworth showed any
16      signs of inebriation that evening?
17  A. I don't believe so.
18  Q. You didn't say it to the police, correct?
19  A. No.
20  Q. You didn't put it in your statement, did you?
21  A. No.
22  Q. You didn't say it at the grand jury, did you?
23  A. No.
24  Q. You didn't testify at trial to that, did you?

Page 15

1   A. No.
2   Q. In fact, when you were asked the first time by
3       Mr. Farrah what signs were exhibited, you said,
4       "I don't know"; isn't that correct?
5       MR. FARRAH: Objection.
6   Q. Page 49, "What did he show?  What did he
7       manifest that makes you say that?"  "I don't
8       know."
9       That's the first part of your answer,
10      correct?
11  A. Yes.
12  Q. It was not until he suggested to you that he
13      was sloppier that you said, "A little bit,
14      yes," correct?
15      MR. FARRAH: Objection.  The record is the
16      record.
17  A. Correct.
18  Q. It was not until he suggested that he
19      louder that you said yes, correct?
20      MR. FARRAH: Objection.
21  A. Correct.
22  Q. It was not until he suggested that he was
23      boisterous that you ever thought about it as a
24      possibility, correct?

Page 15

1       MR. FARRAH: Objection.
2   A. Correct.
3   Q. But even then you said he was not boisterous,
4       correct?
5       MR. FARRAH: Objection.
6   A. Correct.
7   Q. You said his speech was not slurred, correct?
8   A. Correct.
9   Q. And when Mr. Farrah asked about his glassy
10      eyes, you said, "I don't remember specifically
11      seeing his eyes."  Do you remember saying that?
12      MR. FARRAH: Objection.
13  A. Yes.
14  Q. As you sit here today, can you honestly say
15      whether or not his eyes were glassy that
16      evening?
17      MR. FARRAH: Objection.
18  A. No.
19  Q. Prior to Mr. Farrah suggesting these things in
20      the deposition, you've never told anybody that
21      he had glassy eyes, correct?
22      MR. FARRAH: Objection.
23  A. No.
24  Q. You never told anybody that he was louder than

## Page 153

1    normal, correct?
2        MR. FARRAH: Objection.
3    A. No.
4    Q. You never told anybody that he was sloppier
5        looking than he usually is, correct?
6        MR. FARRAH: Objection.
7    A. No.
8    Q. Now, I know that you've tried your best at
9        these various times to give the best answers
10       that you can, but I want you to think back.
11           From the time that you gave testimony at
12       the grand jury saying nothing changed about his
13       demeanor to the time that you testified at your
14       deposition with Mr. Farrah back in 2004, did
15       you learn anything that changed your opinion of
16       what happened that evening?
17           MR. FARRAH: Objection.
18   A. No.
19   Q. By the way, was anyone from Rare there at that
20       deposition, do you remember?
21   A. I don't know.
22   Q. Now, the first time that you were asked what
23       Mr. Southworth had to drink that evening, you
24       said, I believe, that he had a beer; isn't that

## Page 154

1    correct?
2    A. Yes.
3        MR. FARRAH: What page are we talking
4        about?
5        MR. GILLIS: Page 28.
6    Q. "What did you see him drink?" "He had a beer,"
7        correct?
8    A. Yes.
9        MR. FARRAH: Objection.
10   Q. Prior to Mr. Farrah suggesting that he might
11       have had more at that time, did you ever
12       testify to anybody that he had more than a beer
13       at the bar that evening?
14           MR. FARRAH: Objection.
15   A. No.
16   Q. In fact, he didn't even have a full beer at the
17       bar, did he? He brought it to the table,
18       correct?
19           MR. FARRAH: Objection.
20   A. Correct.
21   Q. Was the first beer that he got at the bar the
22       first one he took over to the table?
23           MR. FARRAH: Objection.
24   A. As far as I know.

## Page 15

1    Q. You didn't have anything to drink at the sand
2        pit, correct, any alcohol?
3    A. No.
4    Q. Mr. Southworth didn't have any alcohol at the
5        sand pit, correct?
6    A. No.
7    Q. In fact, you guys bring jugs of water instead,
8        correct?
9    A. Yes.
10   Q. Now, when Mr. Farrah was asking you these
11       questions without Rare being at the deposition
12       a year and a half ago, he asked you whether or
13       not someone paid the bar tab, correct?
14   A. Yes.
15   Q. And you told him back then a year and a half
16       ago that the bar tab was transferred to the
17       check, correct?
18           MR. FARRAH: Objection.
19   A. Yes.
20   Q. I'm going to show you testimony on page 35 and
21       ask you to read that page. Just read it
22       quickly. Read it to yourself.
23           (Witness reviews document.)
24   Q. Is it your memory that the beers that were

## Page 15

1    gotten at the bar were added on to the check at
2    the table?
3        MR. FARRAH: Objection.
4    A. Yes.
5    Q. And that's sworn testimony you gave to
6        Mr. Farrah a year and a half ago, correct?
7    A. Correct.
8    Q. That was a year and a half before you met
9        Mr. DiNatale, correct?
10   A. Yes.
11   Q. Do you remember telling Mr. Farrah that
12       Mr. Southworth ordered a beer with his dinner?
13           MR. FARRAH: Where are we talking about?
14       I object.
15   A. I don't remember the question.
16   Q. By the way, do you remember telling Mr. Farrah
17       that you ordered a steak; you were positive
18       about that?
19   A. No.
20   Q. Let me show you the bottom of page 46 and top
21       of page 47 at your prior deposition. Look at
22       that.
23           (Witness reviews document.)
24           MR. FARRAH: What is the question?

Page 157

1  Q. Does that refresh your recollection of what you
2     had to eat that night?
3  A. Yes.
4  Q. You said earlier in the deposition that you saw
5     Mr. Southworth get up and go to the bathroom,
6     correct?
7  A. Yes.
8  Q. Did you observe him walking to and from the
9     bathroom?
10 A. Yes.
11 Q. The bathroom is in the back corner; isn't that
12    right?
13 A. Yes.
14 Q. The hallway leading to the bathroom doesn't
15    lead to any other part of the restaurant,
16    correct?
17 A. Correct.
18 Q. You can't get to the bar by going to the
19    bathroom, correct?
20 A. Yes.
21 Q. Was he walking fine when you saw him go to the
22    bathroom?
23 A. Yes.
24 Q. Did you see him stagger at all?

Page 158

1  A. No.
2  Q. Was he unsteady on his feet?
3  A. No.
4  Q. Did he show any signs that were other than his
5     normal self when he went to the bathroom?
6  A. No.
7  Q. You testified to Mr. Farrah back in 2004 that
8     you left just before or just right around
9     11:00; is that correct?
10     MR. FARRAH: Objection.
11 A. Correct.
12 Q. Is that your memory as to what time you left,
13    as you sit here today?
14 A. Yes.
15 Q. It was not 10:00, correct?
16     MR. FARRAH: Objection.
17 A. No.
18 Q. Do you know whether or not any of the people at
19    the table that night ate just an appetizer or
20    an appetizer and a cup of soup as opposed to an
21    entree?
22 A. I don't know for certain.
23 Q. In fact, you can't quite remember what you had,
24    correct?

Page 15

1  A. Correct.
2  Q. Nobody that night at the table said to anyone
3     else that they thought they were intoxicated,
4     correct?
5     MR. FARRAH: Objection.
6  A. No.
7  Q. You told that to Mr. Farrah, didn't you, a year
8     and a half ago?
9     MR. FARRAH: What page are we talking
10    about?
11     MR. GILLIS: 42.
12 A. No.
13 Q. That's your memory today, correct?
14 A. Yes.
15 Q. Nobody at the table thought that anybody else
16    was intoxicated, correct?
17     MR. FARRAH: Objection. That's not what
18    he testified to. I'm objecting.
19 A. No.
20 Q. You told him back then that Jeff was not
21    particularly loud; isn't that correct?
22 A. Correct.
23 Q. Was he any louder than anybody else at the
24    table?

Page 16

1  A. No.
2  Q. He was not any louder than you, correct?
3  A. No.
4  Q. You were not intoxicated, were you?
5  A. No.
6  Q. Seven guys in their early twenties, late teens
7     having dinner on a Friday night, correct?
8  A. Correct.
9  Q. Now, do you remember testifying that you were
10    at Four Points closer to forty minutes rather
11    than ten or fifteen minutes?
12 A. Yes.
13 Q. Now, you've testified various ways. What is
14    your memory as you sit here today? Do you
15    remember whether it was thirty-five minutes or
16    forty minutes or whatever minutes?
17     MR. FARRAH: Objection.
18 A. It was probably around half an hour.
19 Q. Okay. That's your best estimate as you sit
20    here today, correct?
21 A. Correct.
22 Q. Did you see Jeff Southworth go into the room
23    that you were standing outside of in the hotel?
24 A. No.

Page 161

1  Q. He never went in the room?
2  A. Not that I know of.
3  Q. Did someone bring the beer out to him, or did
4     he go into the room to get it?
5  A. I'm pretty sure somebody brought it out.
6  Q. People in the room were bringing beers out to
7     people in the hallway?
8        MR. FARRAH: Objection.
9  A. I don't know whether the beer was brought from
10    the room the two people I didn't know were
11    staying in or the two bouncers or security that
12    we were talking to.
13 Q. Somebody was supplying beer to you people if
14    you wanted it at the hotel, correct?
15 A. Yes.
16 Q. And you were able to get it for the half hour
17    that you were there at the hotel if you wanted
18    it, correct?
19 A. Yes.
20 Q. And nobody was limiting anybody as to the
21    number of beers they had in the hotel, correct?
22 A. Correct.
23 Q. Nobody said, "Look, we only have enough for
24    everybody to have one," or "You're limited to

Page 162

1     one beer," correct?
2  A. Yes.
3  Q. Do you know what type of beer it was?
4  A. I don't.
5  Q. Do you know how big the cooler was in the back
6     of Mr. Southworth's car?
7  A. No.
8  Q. Did you see the cooler?
9  A. No.
10 Q. Were you aware that he had a cooler in the back
11    seat?
12 A. No.
13 Q. You don't remember what the bartender looked
14    like, correct?
15 A. Not specifically.
16 Q. She didn't appear to be a friend of Scott's or
17    Jeff's, did she?
18 A. No.
19 Q. I know you were trying to answer the best you
20    could in the first deposition, but when you
21    answered "maybe" to these questions on page 38,
22    was that an accurate statement or was that a
23    guesstimate on your part?
24       MR. FARRAH: Objection.

Page 16_

1  A. An estimate or a guesstimate.
2  Q. Is it fair to say that you were guessing at
3     that point?
4        MR. FARRAH: Objection.
5  A. I don't think I was guessing. I think I was
6     thinking that there was more a possibility that
7     he had had more.
8  Q. So when you said "maybe four," that's a
9     possibility, not an accurate statement as to
10    what you know him to have drunk at the table
11    that day, correct?
12       MR. FARRAH: Objection.
13 A. Yes.
14 Q. In fact, six weeks after the accident you told
15    the state police that he had maybe two,
16    correct?
17       MR. FARRAH: Objection.
18 A. Correct.
19 Q. Was it your understanding that you were at the
20    Longhorn close to two hours that evening?
21       MR. FARRAH: Objection.
22 A. Yes.
23 Q. Do you remember exactly how long you were at
24    the apartment complex that night before you

Page 16_

1     left?
2  A. Not exactly.
3  Q. What is your best estimate?
4        MR. FARRAH: Objection.
5  A. At least twenty-five minutes, at the most
6     thirty-five minutes.
7  Q. How long did it take you to get from the
8     apartment complex to the scene of the accident?
9  A. Like close to ten minutes.
10 Q. The dogs were in the car for the whole time you
11    were in the restaurant?
12 A. Yes.
13 Q. They were sitting there for about two hours,
14    correct?
15 A. Yes.
16 Q. Did he let the dogs out of the car when you
17    went to the truck?
18       MR. FARRAH: Objection.
19 A. I don't remember.
20 Q. Did he rile the dogs up at any point when he
21    came out of the restaurant?
22       MR. FARRAH: Objection.
23 A. No.
24       MR. GILLIS: What is the nature of your

Page 165

1    objection?
2        MR. FARRAH: "Riled the dogs up," form of
3    the question.
4    Q. You testified earlier that the one time you
5    thought he was intoxicated he riled up the dogs
6    at a party, correct?
7        MR. FARRAH: Objection.
8    A. Yes.
9    Q. He didn't exhibit any of that behavior when you
10    left the Longhorn on the night of September 26,
11    2003, did he?
12    A. No.
13    Q. When the police asked you, you didn't tell them
14    that you thought Mr. Southworth was intoxicated
15    that evening, did you?
16    A. No.
17    Q. When you were under testimony at the grand
18    jury, you never said that Mr. Southworth was
19    intoxicated that evening, did you?
20    A. No.
21    Q. In fact, when you left there that night, you
22    didn't believe him to be intoxicated, did you?
23    A. No.
24    Q. After you left the Longhorn that evening, you

Page 166

1    first went to the hotel for a while, correct?
2    A. Yes.
3    Q. There was drinking in the hallway, correct?
4    A. Yes.
5    Q. Then you went to the strip bar, correct?
6        MR. FARRAH: Objection.
7    A. Yes.
8    Q. You left the strip bar without going into it
9    and went to the apartment complex, correct?
10    A. Correct.
11    Q. That was about a thirty-minute ride from the
12    Other Side to the apartment complex, correct?
13        MR. FARRAH: Objection.
14    A. Correct.
15    Q. Could it be a little less than that, do you
16    know?
17        MR. FARRAH: Objection.
18    A. If you were driving fast.
19    Q. Who was driving from the time you left the
20    Longhorn until the time that you arrived at the
21    apartment complex?
22    A. Scott.
23    Q. Did Scott have any more to drink that evening,
24    that you know of, than Mr. Southworth?

Page 16

1    A. I'm pretty sure that he had a beer at the
2    hotel.
3    Q. At the restaurant did they drink about the same
4    amount?
5        MR. FARRAH: Objection.
6    A. Correct.
7    Q. Did he show any signs of intoxication?
8    A. No.
9    Q. At any time at the restaurant do you remember
10    anybody at the table showing any signs of
11    intoxication?
12    A. No.
13    Q. After you left the restaurant and after there
14    was drinking at the hotel, did you see a change
15    in Mr. Southworth's demeanor after that point?
16    A. No.
17    Q. Did he seem intoxicated when he was getting in
18    his vehicle later on that evening?
19    A. No.
20    Q. Do you have any independent memory, not from
21    looking at documents today or anything else,
22    but your memory of the night of the accident?
23    Do you have a memory of there being any extra
24    drinks on the table?

Page 16

1        MR. FARRAH: Objection.
2    A. You mean just drinks that had been ordered and
3    not drinking?
4    Q. Yes.
5    A. No.
6    Q. When you say "checked out from the bar," did
7    you mean by that that you were just leaving the
8    bar to go to the table?
9        MR. FARRAH: Objection.
10    A. Yes.
11    Q. You didn't mean "cash out," correct?
12        MR. FARRAH: Objection.
13    A. No.
14    Q. If you had paid at the bar, you would have
15    said, "We paid the tab and went to the table,"
16    correct?
17        MR. FARRAH: Objection.
18    A. Yes.
19    Q. You answered several times today to questions
20    that you don't remember.
21        When you answer a question "I don't
22    remember" does that mean something didn't
23    happen or you just don't remember whether or
24    not it happened or didn't happen?

Page 169

1          MR. FARRAH: Objection.
2   A. I just don't remember whether it happened or
3      didn't happen.
4   Q. When you answered questions previously "I don't
5      remember," that is not to say whatever was
6      being talked about didn't happen. You just
7      don't remember whether it did or didn't,
8      correct?
9          MR. FARRAH: Objection.
10  A. Correct.
11  Q. Is it fair to say when the drinks came to the
12     table, they came one drink per person at a
13     time?
14         MR. FARRAH: Objection.
15  A. I think so but --
16  Q. I want your memory. Tell me your memory.
17         MR. FARRAH: Let him answer. He was
18     trying to.
19  A. I remember the round being ordered, but
20     according to the bill, there were seven drinks
21     brought to the table.
22  Q. That's why I'm asking for your memory. I know
23     what the bill says.
24         Your memory, as you sit here today, do you

Page 170

1      have a specific memory of seeing anybody with
2      more than one drink per round?
3   A. No.
4   Q. Did you see any of the managers walking around
5      there that night while you were at the
6      Longhorn?
7   A. I don't remember seeing any managers.
8   Q. Meaning you don't remember if they did or
9      didn't walk around?
10  A. Correct.
11  Q. Had you been to the Longhorn prior to this
12     date?
13  A. I had been there once before.
14  Q. How long prior to this accident was that?
15  A. It was probably a while, maybe a year before
16     then.
17  Q. Those are the only two times you have been to
18     the Longhorn?
19  A. Yes.
20         MR. GILLIS: I don't have any further
21     questions.
22
23
24

Page 171

1          REDIRECT EXAMINATION
2
3   BY MR. FARRAH:
4   Q. Is it accurate to say that as of September 26,
5      2003 Jeff was your friend?
6   A. Yes.
7   Q. And is it accurate to say that throughout this
8      process of speaking to different people about
9      the events of September 26, 2003 you have felt
10     uncomfortable about talking about Jeff, your
11     friend?
12         MR. GILLIS: Objection.
13  A. No.
14  Q. Is it accurate to say that you didn't want to
15     hurt Jeff as part of this process of speaking
16     to people about the events of September 26,
17     2003?
18         MR. GILLIS: Objection.
19  A. Well, not really because to be honest with you,
20     whatever happened that night and what will or
21     has happened, I think regardless of who it is,
22     they deserve whatever happens to them.
23  Q. Do you think Jeff deserves the punishment that
24     he got in the criminal case?

Page 172

1   A. I don't know exactly what he got.
2   Q. He was found guilty.
3   A. I know he was guilty. I don't know what his
4      sentencing was. I agree that he should serve
5      time.
6   Q. Do you think it was appropriate that Jeff be
7      found guilty of driving under the influence?
8          MR. GILLIS: Objection.
9   A. No. Well, what is driving under the influence?
10     Like having alcohol in your system and driving?
11     Then yes.
12  Q. Because he had alcohol in his system and he was
13     driving that night, wasn't he?
14  A. Yes.
15  Q. Throughout this process, have you tried to help
16     Jeff as best you can?
17         MR. GILLIS: Objection.
18  A. No.
19         MR. FARRAH: Okay. I'm done. Thank you.
20
21         RECROSS-EXAMINATION
22
23  BY MR. GILLIS:
24  Q. Have you spoken with Jeff since the accident?

Page 173

1   A. No.
2   Q. So whatever friendship you had, you have not
3       spoken with him in the last two-and-a-half
4       years, correct?
5   A. Correct.
6   Q. Even if he were a closer friend than he was,
7       you would not lie to the grand jury, would you?
8       MR. FARRAH: Objection.
9   A. No.
10  Q. Would you lie at trial to benefit Jeff?
11      MR. FARRAH: Objection.
12  A. No.
13  Q. Would you lie under oath at your deposition?
14  A. No.
15  Q. Would you lie on your affidavit to benefit
16      Jeff?
17  A. No.
18  Q. By the way, the affidavit, Paragraph 6, that
19      Mr. Farrah talked about states that you
20      testified at your deposition to certain things,
21      correct?
22  A. Correct.
23  Q. We have gone through a lot of those things to
24      specify them, correct?

Page 17

1       any change in his demeanor that night while he
2       was at the Longhorn that would indicate to you
3       that he was under the influence, correct?
4       MR. FARRAH: Objection.
5   A. No.
6   Q. So in fact, in your opinion as you stated today
7       under oath, he was not under the influence of
8       alcohol that you could tell when he was at the
9       Longhorn that evening, correct?
10      MR. FARRAH: Objection.
11  A. I guess. Referring to the last question, what
12      exactly is "under the influence"?
13  Q. Let's go back to this. When you signed this
14      document that Mr. Farrah prepared for you where
15      he wrote on your behalf that Mr. Southworth
16      seemed to be under the influence of alcohol,
17      what did you think "under the influence of
18      alcohol" meant?
19      MR. FARRAH: Objection.
20  A. I can say that I don't think he was drunk. I
21      mean, he was under the influence in respect
22      that he had been drinking alcohol.
23  Q. So when you agreed to sign for Mr. Farrah this
24      statement, your understanding of what

Page 174

1   A. Correct.
2   Q. It says here, "Everyone at the table was loud."
3       As you've testified, Mr. Southworth was not any
4       more particularly loud than anybody else,
5       correct?
6   A. Correct.
7   Q. You can't remember whether it was a waitress or
8       a manager who came over to you, correct?
9   A. Correct.
10  Q. That was twenty to twenty-five minutes before
11      you left the restaurant, correct?
12      MR. FARRAH: Objection.
13  A. Yes.
14  Q. Prior to that time nobody that you're aware of
15      complained of any of the behavior at the table,
16      correct?
17      MR. FARRAH: Objection.
18  A. Correct.
19  Q. Nobody had to come to the table and tell you
20      guys to be knock something off or quiet down,
21      correct?
22  A. Yes.
23  Q. When you said in your deposition you testified
24      to certain things on 49 to 51. You didn't see

Page 17

1       Mr. Farrah wrote for you was being under the
2       influence of alcohol was the fact that you had
3       alcohol in your system, correct?
4       MR. FARRAH: Objection.
5   A. Correct.
6   Q. It didn't mean that he was drunk, correct?
7       MR. FARRAH: Objection.
8   A. Yes.
9   Q. And, in fact, while at the Longhorn, no slurred
10      speech, correct?
11  A. Correct.
12  Q. He was steady on his feet going to the
13      bathroom, correct?
14  A. Correct.
15  Q. No slurring at the table, correct?
16  A. Correct.
17  Q. No louder than anyone else at the table,
18      correct?
19  A. Correct.
20  Q. You don't have a specific memory of any glassy
21      eyes, correct?
22      MR. FARRAH: Objection.
23  A. Correct.
24      MR. GILLIS: I have no further questions.

Page 177

1    MR. FARRAH: I think I've asked you

2   everything I need to ask you. Thanks a lot.

3    MR. GILLIS: You're done.

4

5    (Whereupon, the deposition was

6    concluded at 3:05 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 1

1         CERTIFICATE

2   COMMONWEALTH OF MASSACHUSETTS

3   COUNTY OF MIDDLESEX, SS

4

5       I, BARBARA J. SIMON, a Professional
    Shorthand Court Reporter and Notary Public in
6   and for the Commonwealth of Massachusetts, do
    hereby certify that the foregoing deposition of
    Jude Connelly, was taken before me on Friday,
7   February 10, 2006. The said witness was
    satisfactorily identified and duly sworn before
8   the commencement of his testimony; that the
    said testimony was taken stenographically by
9   myself and then transcribed by myself. To the
    best of my knowledge, the within transcript is
10  a complete, true and accurate record of said
    deposition.
11
       I am not connected by blood or marriage
12  with any of the said parties, nor interested
    directly or indirectly in the matter in
13  controversy.
14     In witness whereof, I have hereunto set my
    hand this 20th day of February, 2006.
15
16
17   _____
18   Barbara J. Simon, Notary Public
     My Commission Expires:
19   November 6, 2009
20
21
22
23
24

Page 178

1    SIGNATURE PAGE/ERRATA SHEET

2   RE: Nancy Rosario, Individually, as she is the
      Administratrix of the Estate of Awilda
3     Santiago, Essex Probate Court Docket
      #03P-2499AD1, P/P/A Veronica Rosario and
4     Christina Santiago, and as she is the
      Administratrix of the Estate
5     of Jose Santiago, Berlin (Connecticut)
      Probate Court, Case #03-0713 v. Rare
6     Hospitality International, Inc. d/b/a
      Longhorn Steakhouse

7

8   February 10, 2006
    Deposition of Jude Connelly

9     I, JUDE CONNELLY, do hereby certify that I
    have read the foregoing transcript of my
10  testimony and further certify that it is a true
    and accurate record of my testimony (with the
11  exception of the following changes listed
    below):

12   Page   Line       Correction

13   ____   ____    _____

14   ____   ____    _____

15   ____   ____    _____

16   ____   ____    _____

17   ____   ____    _____

18   ____   ____    _____

19   ____   ____    _____

20     Signed under the pains and penalties of

21  perjury this _____ day of

22  _____, 2006.

23   _____
          Jude Connelly
24

**Page 1**

```
 1                        Volume:
                          Pages:   1 - 76
 2                        Exhibits:  1 - 2

 3            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4
                   Civil Action #05-CV-10617MLW
 5

 6   NANCY ROSARIO, INDIVIDUALLY,
     AS SHE IS THE ADMINISTRATRIX
 7   OF THE ESTATE OF AWILDA SANTIAGO,
     ESSEX PROBATE COURT DOCKET #03P-2499AD1,
 8   P/P/A VERONICA ROSARIO AND
     CHRISTINA SANTIAGO, AND AS SHE IS
 9   THE ADMINISTRATRIX OF THE ESTATE
     OF JOSE SANTIAGO, BERLIN (CONNECTICUT)
10   PROBATE COURT, CASE #03-0713,
                                    Plaintiff
11   vs.

12   RARE HOSPITALITY INTERNATIONAL, INC., d/b/a
     LONGHORN STEAKHOUSE,
13                                  Defendant

14

15        Deposition of MICHAEL ESPEY, a witness

16   called on behalf of the Plaintiff, pursuant

17   to the Federal Rules of Civil Procedure,

18   before Rosamond K. Marcy, a Certified

19   Shorthand/Registered Professional Reporter

20   and Notary Public in and for the Commonwealth

21   of Massachusetts, at the Offices of Albert L.

22   Farrah, Jr., Esquire, One Washington Mall,

23   Boston, Massachusetts 02108, commencing at

24   10:00 A.M. on Tuesday, April 25, 2006.
```

**Page 2**

```
 1   APPEARANCES:

 2   ALBERT L. FARRAH, JR., ESQUIRE
        One Washington Mall
 3      Boston, Massachusetts    02108
        for the Plaintiff.
 4
     MICHAEL K. GILLIS, ESQUIRE
 5   [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 6      Newton, Massachusetts   02461
        for the Defendant.
 7
     NEIL D. SCHNURBACH, ESQUIRE
 8   [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 9      Newton, Massachusetts   02461
        for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 3**

```
 1                   I N D E X

 2   Deposition of:  DIRECT CROSS REDIRECT RECROSS

 3   MICHAEL ESPEY

 4   (By Mr. Farrah)      4          72
                                     73
 5
     (By Mr. Gillis)       39         73
 6

 7

 8            E X H I B I T S

 9   Michael Espey
     Number:                         For Ident.
10
     1 -  Handwritten document by
11        Mike Espey                     37

12   2 -  Document entitled Longhorn
          Steakhouse                     45
13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1            STIPULATIONS

 2        It is hereby stipulated and

 3   agreed by and between counsel for the

 4   respective parties that the witness will

 5   read and sign the deposition transcript

 6   within thirty days.  The sealing and

 7   filing of the deposition transcript are

 8   waived.

 9        It is further stipulated and

10   agreed that all objections, except as to

11   form, and motions to strike will be

12   reserved to the time of trial.

13        MICHAEL ESPEY,

14   a witness called on behalf of the

15   Plaintiff, having first been properly

16   identified and duly sworn, deposes and

17   says as follows:

18        DIRECT EXAMINATION

19        BY MR. FARRAH

20   Q. Good morning.  As you know my name is

21   Albert Farrah and I represent the

22   plaintiff Nancy Rosario in this lawsuit.

23   We have agreed that you will have thirty

24   days from the date of your receipt of
```

**Page 5**

1   the transcript of your testimony to
2   indicate on a separate sheet of paper
3   any changes you feel should be made in
4   that transcript and if you choose to do
5   so within that thirty-day period you
6   need to return the separate sheet of
7   paper with the changes to me. Do you
8   understand that?
9   A. Yes.
10   Q. Tell me your full name.
11   A. Michael Joseph Espey.
12   Q. Where do you live, sir?
13   A. 80 Old Mill Road in Harvard,
14   Massachusetts.
15   Q. What is your date of birth?
16   A. August 31, 1979.
17   Q. What is your Social Security number?
18   A. 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.
19   Q. Are you currently employed?
20   A. Yes, sir.
21   Q. Where are you employed?
22   A. Foreign Motors West Mercedes Benz.
23   Q. What do you do there?
24   A. Sales.

**Page 6**

1   Q. How long have you been employed there?
2   A. A month.
3   Q. Can you briefly describe your
4   educational background for us.
5   A. I graduated high school in 1997. I went
6   to college for several years. I did not
7   graduate.
8   Q. Do you know Jeffrey Southworth?
9   A. Yes.
10   Q. Can you tell me approximately when you
11   first met Mr. Southworth?
12   A. I approximately met Mr. Southworth
13   sometime during the beginning of high
14   school, maybe younger than that.
15   Q. Did you live in the same town?
16   A. Yes.
17   Q. And were you in Mr. Southworth's
18   presence on September 26, 2003?
19   A. Yes.
20   Q. In between those two times, that is when
21   you first met him and when you were with
22   him on September 26, 2003, can you
23   quantify for me how many times you were
24   in Mr. Southworth's presence?

**Page 7**

1   A. I'm going to say approximately twenty.
2     MR. GILLIS: If you know
3   answer the question. Don't guess.
4     THE WITNESS: I wouldn't
5   know an exact number of times but it was
6   not a very large amount.
7   Q. Your best estimate is about twenty
8   times?
9   A. Yes.
10   Q. Do you understand that your deposition
11   is being taken in connection with an
12   automobile accident that occurred in the
13   early morning hours of September 27,
14   2003?
15   A. Yes, I do.
16   Q. In connection with that accident has
17   anyone who you understood to be a
18   private investigator ever spoken to you?
19   A. I have had somebody contact me, yes.
20   Q. On how many occasions has the private
21   investigator contacted you?
22   A. Once or twice.
23   Q. Do you know how close in time it was to
24   the accident of September 27, 2003 that

**Page 8**

1   that private investigator contacted you?
2   A. I would guess it was a couple of months
3   afterwards but I can't remember exactly
4   the date.
5   Q. If you say guess, you will incur the
6   wrath of Mr. Gillis.
7   A. I don't know.
8   Q. Your best estimate is a few months
9   afterwards, is that right?
10   A. Yes.
11   Q. Do you know who that private
12   investigator was, that is, his or her
13   name?
14   A. No, I don't remember.
15   Q. Do you know for whom the private
16   investigator was working?
17   A. I thought it was for Mr. Southworth.
18   Q. Did you give that private investigator a
19   statement?
20   A. I don't believe so.
21   Q. Since that time has any other private
22   investigator been in contact with you?
23   A. I don't believe so.
24   Q. Has anyone from the Dinatale Detective

Page 9

1    Agency been in contact with you?
2  A. Not that I know of.
3  Q. Prior to September 26, 2003 had you ever
4     seen Jeffrey Southworth in what you
5     believe to be a condition of
6     intoxication?
7  A. Yes.
8  Q. On approximately how many occasions
9     prior to that date did you see him in
10    such a state?
11 A. Maybe four or five.
12 Q. Were there any particular manifestations
13    of that intoxication that led you to
14    believe he was intoxicated?
15 A. Just being around a bunch of other
16    people that were intoxicated I would
17    say.
18 Q. Was loudness one of the characteristics
19    that he exhibited when he was
20    intoxicated?
21       MR. GILLIS: Objection.  I
22    have to object for the record but if you
23    can answer the question go ahead and
24    answer it.

Page 10

1  A. Yes, sure.
2  Q. Did he in the past exhibit loud speech
3     as one of the characteristics of
4     intoxication that you observed?
5        MR. GILLIS: Objection.
6  A. Yes.
7  Q. Your brother's name is Thomas Scott
8     Espey?
9  A. Yes.
10 Q. He is known as Scott, is that right?
11 A. That's correct.
12 Q. To your knowledge was Scott spending
13    time in the presence of Jeffrey
14    Southworth during the spring and summer
15    of 2003?
16 A. I believe so, yes.
17 Q. Did you ever have any discussions with
18    Scott during that period about Jeffrey
19    Southworth?
20 A. Yes.
21 Q. Did you ever have discussions with him
22    around whether or not in your opinion it
23    was a good idea for him to spend time
24    with Jeffrey Southworth?

Page 1

1  A. I don't think so.
2  Q. Were you at the Longhorn Steakhouse in
3     Leominster, Massachusetts with a party
4     that included Jeffrey Southworth on
5     September 26, 2003?
6  A. Yes.
7  Q. And do you know approximately what time
8     you arrived at the Longhorn Steakhouse?
9  A. Without guessing, no.
10 Q. Do you know what you had been doing that
11    day prior to arriving at the Longhorn
12    Steakhouse?
13 A. Yes.
14 Q. What had you been doing that day?
15 A. I had seen some friends from Vermont
16    that I hadn't seen in a long time.
17 Q. When did you first meet up with them?
18 A. I'd say probably sometime early
19    afternoon.
20 Q. Where did you meet up with them?
21 A. In Leominster at a hotel right by BJ's,
22    Four Points.
23 Q. Was it in a room at the Four Points that
24    you met up with these friends?

Page 1

1  A. Yes.
2  Q. What are their names?
3  A. Bruce Sirjane and Matthew Cenicola.
4  Q. During the time that you were with Matt
5     and Bruce at the hotel did you
6     personally have any alcoholic beverages
7     to drink?
8  A. Yes, I did.
9  Q. Can you tell me what alcoholic beverages
10    you had to drink while you were at the
11    hotel with them?
12 A. I would say probably some beers and
13    probably some Jack Daniels but I don't
14    know for sure.  I'm guessing.
15 Q. What is your best memory of what you had
16    to drink?
17 A. Beers and Jack Daniels.
18 Q. Can you quantify for me how many beers
19    you had at the hotel before you went to
20    the restaurant?
21 A. I would have no idea.
22 Q. Can you tell me when you started
23    drinking those beers?
24 A. Probably mid afternoon.

Page 13

1 Q. Three o'clock?
2 A. Sure.
3 Q. Was Bruce drinking that afternoon with
4    you as well?
5 A. I believe so.
6 Q. Is there any doubt in your mind about
7    whether or not Bruce was drinking with
8    you that afternoon?
9 A. There's a lot of doubt in my mind about
10    the whole day.
11 Q. And that's because you were drunk.
12       MR. GILLIS: Objection.
13 A. Yes.
14 Q. My question to you is do you know
15    whether or not Bruce had anything to
16    drink while you and he were together at
17    the hotel?
18 A. I would say yes.
19 Q. Do you know what he was drinking?
20 A. I would say beers.
21 Q. Was he drinking Jack Daniels as well?
22 A. Possibly but I don't know for sure.
23 Q. Who brought the Jack Daniels to the
24    room?

Page 14

1 A. I would say one of the two of them
2    brought it with them.
3 Q. You did not bring it as far as you know.
4 A. As far as I know.
5 Q. Who brought the beers to the room?
6 A. I would say probably the two of them as
7    well.
8 Q. You didn't supply any of the alcoholic
9    beverages that day.
10 A. No.
11 Q. Was Matt drinking alcoholic beverages
12    that afternoon with Bruce and you?
13 A. Yes.
14 Q. Do you know what Matt was drinking that
15    afternoon?
16 A. Beers and Jack Daniels.
17 Q. At any point in time that afternoon did
18    you say to Matt or to Bruce in effect,
19    "I'm drunk"?
20 A. No.
21 Q. Do you remember having any discussion
22    with Matt or Bruce that afternoon about
23    your level of intoxication?
24 A. No.

Page 1

1 Q. Do you remember having any discussion
2    that afternoon about Matt's level of
3    intoxication?
4 A. No.
5 Q. Do you remember having any discussion
6    that afternoon about Bruce's level of
7    intoxication?
8 A. No.
9 Q. Was there any point in time from when
10    you started drinking that afternoon at
11    the hotel until you left the hotel that
12    you were not drinking alcoholic
13    beverages?
14       MR. GILLIS: Objection.
15 A. I would say I wasn't drinking every
16    second of the afternoon. I don't know
17    how to answer it. I would say no.
18 Q. Do you have a memory of at any point in
19    time during that afternoon while you
20    were at the hotel of consciously
21    stopping drinking alcoholic beverages?
22 A. No.
23 Q. Do you have a memory at any point in
24    that afternoon while you were at the

Page 1

1    hotel of Matt consciously stopping
2    drinking alcoholic beverages?
3 A. No.
4 Q. Do you have any memory of any point in
5    time in that afternoon of Bruce
6    consciously stopping drinking alcoholic
7    beverages?
8 A. No.
9 Q. Did you go from the hotel to the
10    Longhorn Steakhouse directly?
11 A. Yes.
12 Q. Do you have an opinion as of the time
13    you left the hotel whether or not Matt
14    was under the influence of alcoholic
15    beverages?
16 A. I would say he was.
17 Q. Do you have an opinion as of the time
18    you left the hotel whether or not Bruce
19    was under the influence of alcoholic
20    beverages?
21 A. I would say he was.
22 Q. Do you have an opinion as of the time
23    you left the hotel whether or not Matt
24    was intoxicated?

Page 17

1 A. I wouldn't have an opinion either way,
2    no.
3 Q. How about Bruce?
4 A. I wouldn't have an opinion either way.
5 Q. Can you tell me approximately how many
6    beers per hour you drank while you were
7    at the hotel and if it's less than one
8    beer per hour use a fraction.
9 A. I would say one to two.
10 Q. Can you tell me approximately how many
11    Jack Daniels drinks you had per hour,
12    and again if it's less than one use a
13    fraction, while you were at the hotel?
14       MR. GILLIS: Objection.
15 A. I had put the two together in the other
16    question so probably one and one, one
17    beer per hour and one Jack Daniels per
18    hour.
19 Q. And that was from mid afternoon until
20    you left the hotel, is that right?
21 A. Yes.
22 Q. How were you drinking the Jack Daniels?
23 A. Mixing it with Coke, I believe.
24       MR. GILLIS: Objection.

Page 18

1 Q. How was Bruce drinking the Jack Daniels?
2 A. The same way, again with Coke.
3 Q. How was Matt drinking them?
4 A. Probably the same way with Coke.
5 Q. Do you know how, that is by way of mode
6    of transport, you went from the Four
7    Points to the Longhorn that night?
8 A. I believe by car.
9 Q. Do you know whose car?
10 A. I think we took Bruce's truck and
11    William Todd Currie drove.
12 Q. Was Mr. Currie somebody who was drinking
13    with you that afternoon at the hotel?
14 A. I don't believe so, no.
15 Q. When did you come into the presence of
16    Mr. Currie that day?
17 A. I went with him to the hotel.
18 Q. You went with him to the hotel?
19 A. Yup.
20 Q. How did you get to the hotel?
21 A. In his car.
22 Q. What kind of car does he drive?
23 A. A BMW.
24 Q. Where had you driven from, Mr. Currie

Page 1

1    and you, to the hotel?
2 A. I believe my house.
3 Q. So he had picked you up by
4    pre-arrangement that day, is that right?
5 A. Yes.
6 Q. What was your plan when you left your
7    house that day, if you had one,
8    Mr. Currie and you?
9 A. To go see two friends I hadn't seen in a
10    while and go to dinner with them later
11    on.
12 Q. Was Mr. Currie with Bruce and you, that
13    is, in your presence throughout the
14    afternoon at the hotel?
15 A. Yes.
16 Q. And is it your best memory that
17    Mr. Currie had no alcoholic beverages to
18    drink at that time?
19 A. I wouldn't say zero but I don't think he
20    had more than one or two.
21 Q. As opposed to the rest of you.
22 A. Yes.
23 Q. The one or two alcoholic beverages that
24    Mr. Currie had during this time were

Page 2

1    what?
2 A. Beer, I would think.
3 Q. Was that Mr. Currie's drink of choice?
4 A. A drink of choice? There are so many to
5    choose from.
6 Q. Did he have a favorite?
7 A. I know now what his favorite is. I
8    didn't know what his favorite was at the
9    time.
10 Q. What is his favorite now?
11 A. Vodka and grape juice.
12 Q. Do you know why Mr. Currie drove Bruce's
13    truck from Four Points to the Longhorn?
14 A. More space. There were four people.
15 Q. Why didn't Bruce drive his truck?
16 A. I would think because he had a couple of
17    more drinks.
18 Q. When you say a couple more drinks, do
19    you mean he had been drinking along the
20    order of what you testified to already?
21       MR. GILLIS: Objection.
22 A. Yes.
23 Q. Do you remember any conversation among
24    any of the four of you prior to the time

Page 25

1  A. I have no idea.
2  Q. Do you believe you had Jack Daniels
3     Manhattans at the Longhorn that night?
4        MR. GILLIS: Objection.
5  A. I believe I did.
6  Q. Did you have Jack Daniels Manhattans at
7     the Longhorn that night?
8        MR. GILLIS: Objection.
9  A. I believe so.
10  Q. And can you tell me how many Jack
11     Daniels Manhattans you believe you had
12     at the Longhorn Steakhouse that night?
13  A. I have no idea.
14  Q. What's your best judgment of the number
15     of Jack Daniels Manhattans you had at
16     the Longhorn that night?
17        MR. GILLIS: Objection.
18  A. One to three.
19  Q. The Jack Daniels Manhattans that you
20     believe you had at the Longhorn that
21     night were they straight up or on the
22     rocks?
23  A. I have no idea.
24  Q. Do you know the difference in what I

Page 2

1     the question. Do you have any memory as
2     to what he was drinking that night?
3        MR. GILLIS: Objection.
4  A. No, I do not.
5  Q. Do you know what any of the other
6     persons at your table were drinking that
7     night?
8  A. I am sure there were beers and I'm sure
9     there were Manhattans.
10  Q. Tell me who else you are sure was
11     drinking beers that night at your table.
12        MR. GILLIS: Objection.
13  A. Everybody but Jude.
14  Q. Tell me who at your table was drinking
15     Jack Daniels Manhattans that night.
16  A. I have no idea.
17  Q. Was Jeffrey Southworth exhibiting what
18     you took to be signs of intoxication at
19     any point in time that evening?
20  A. Yes. Let me just describe when I'm
21     intoxicated a lot of people around you
22     appear to be intoxicated and you think
23     if somebody's smiling they're drunk. I
24     would say yes.

Page 26

1     mean by straight up versus on the rocks?
2  A. Yes.
3  Q. Had you ever been at a restaurant with
4     Jeffrey Southworth at which he was
5     having Jack Daniels Manhattans prior to
6     September 26, 2003?
7  A. Yes.
8  Q. Do you recall how, that is on the rocks
9     or straight up, he was drinking Jack
10     Daniels Manhattans?
11  A. I don't remember. I don't recall.
12  Q. Do you know what Jeffrey Southworth had
13     to drink that night?
14  A. No idea.
15  Q. Do you have any belief, based on your
16     observations of him that night as to
17     what he had to drink that night?
18        MR. GILLIS: Objection.
19  A. I could only guess.
20  Q. Even I am going to join with Mr. Gillis
21     in saying that we don't want you to only
22     guess. If you have any memory at all of
23     what Mr. Southworth was drinking that
24     night I would like you to try to answer

Page 2

1  Q. Can you tell me what signs of
2     intoxication he exhibited to you that
3     evening?
4        MR. GILLIS: Objection.
5  A. No. I would say maybe loud.
6  Q. Can you tell me at what point in time in
7     the evening he first began to exhibit to
8     you what you interpreted to be signs of
9     intoxication?
10  A. No, I can't.
11  Q. Can you tell me whether or not there was
12     any point in time while you were at the
13     Longhorn that evening when
14     Mr. Southworth was not exhibiting to you
15     what you took to be signs of
16     intoxication?
17        MR. GILLIS: Objection.
18  A. You kind of twisted that question on me.
19     Can you repeat that one?
20        MR. FARRAH: Will you repeat
21     the question I just asked.
22        [Question read.]
23        MR. GILLIS: He has already
24     said he exhibited no signs that he can

Page 29

```
 1    say.
 2            MR. FARRAH: That's not
 3    true.
 4            MR. GILLIS: That's exactly
 5    what he said.
 6            MR. FARRAH: Let him answer
 7    the question.
 8            MR. GILLIS: If you can
 9    answer that question in its double
10    negative form go ahead.
11            MR. FARRAH: This is not
12    your witness. You are not instructing
13    him.
14            MR. GILLIS: He instructed
15    you he doesn't understand your question.
16            THE WITNESS: I can't answer
17    that question.
18 Q. Do you know at what point in time
19    Mr. Southworth first appeared to you to
20    be intoxicated that evening at the
21    Longhorn?
22            MR. GILLIS: Objection.
23 A. No, I don't know at what point.
24            MR. GILLIS: He testified he
```

Page 30

```
 1    was intoxicated at the Longhorn. You
 2    are asking really sneaky sleazy
 3    questions. If you want to ask him a
 4    straight question go ahead.
 5            [Discussion off the record.]
 6 Q. When did Mr. Southworth first exhibit
 7    what you took to be signs of
 8    intoxication that evening?
 9 A. I don't know exactly when.
10 Q. Was it before you left the restaurant
11    that he first exhibited signs of
12    intoxication that evening?
13            MR. GILLIS: Objection.
14 A. Yes. The only time I saw him was pretty
15    much at the restaurant.
16 Q. Can you tell me how long before you left
17    the restaurant it was that he first
18    exhibited what you took to be signs of
19    intoxication that evening?
20 A. I don't have a good sense of time from
21    that evening.
22 Q. Do you have a recollection of whether or
23    not at any point in time that evening
24    anyone you understood to be an employee
```

Page 3

```
 1    of the Longhorn came to your table and
 2    asked your table to quiet down or words
 3    to that effect?
 4 A. I do not believe so.
 5 Q. After leaving the Longhorn where did you
 6    go that evening?
 7 A. To the Other Side, to a strip club.
 8 Q. Prior to going to the Other Side did you
 9    return to the hotel?
10 A. I don't know whether we went back to the
11    hotel.
12 Q. Did you drive from the Longhorn to
13    wherever you went next?
14 A. I did not drive anywhere.
15 Q. Do you know who drove when you left the
16    Longhorn to wherever you went next that
17    evening?
18 A. Todd.
19 Q. What did he drive?
20 A. Bruce's truck.
21 Q. Who was with you when you left the
22    Longhorn in Bruce's truck with Todd
23    driving that evening?
24 A. Todd, myself, Bruce, and Matt.
```

Page 3

```
 1 Q. Did you eat while you were at the
 2    Longhorn?
 3 A. Yes.
 4 Q. Do you know what you ate?
 5 A. I do not know.
 6 Q. Do you know where you spent the night?
 7 A. At the hotel.
 8 Q. Are you sure?
 9 A. No.
10 Q. Do you know what you did the next day?
11 A. I was at a concert with Bruce and Matt.
12 Q. Did you go to the Other Side that you
13    answered a little earlier was a
14    destination that evening?
15 A. Yes.
16 Q. Did you go in?
17 A. Yes.
18 Q. Who went in with you?
19 A. Bruce, Matt, and Todd.
20 Q. Do you know how long you were there?
21 A. I don't.
22 Q. Were you drinking there?
23 A. I believe so.
24 Q. Do you know how you got from the Other
```

Page 33

1     Side club to wherever you went next?
2 A. The same way we got to the hotel. It
3     was Bruce's truck.
4 Q. Do you know where you went next in
5     location after leaving the Other Side?
6 A. Back to the hotel.
7 Q. And is your best memory that's where you
8     spent the night.
9 A. I don't honestly know where I spent the
10    night. I think I might have actually
11    gone home because I had to get my car to
12    go to the concert the next day.
13 Q. Do you know how you got home?
14 A. Yes. I got home with Todd.
15 Q. Was Todd drinking at the Other Side?
16 A. I do not know.
17 Q. Was Todd drinking at the Longhorn?
18 A. I don't know. He might have had a beer
19    but I can't swear on the record that
20    yes, he had a beer.
21 Q. Is Todd someone in your experience who
22    is more moderate in his drinking habits
23    than, say, you?
24       MR. GILLIS: Objection.

Page 34

1 A. Not always.
2 Q. Was Todd a designated driver of sorts
3    that day?
4       MR. GILLIS: Objection.
5 A. Yes.
6 Q. Was that the arrangement that you had
7    made with Todd?
8 A. Kind of tricked him into it.
9 Q. He became the de facto designated driver
10    as the day unfolded?
11 A. Yes.
12 Q. Did you have any discussions with him
13    about that?
14 A. No.
15 Q. In your way of thinking was Todd sober
16    enough to drive from the Four Points to
17    the Longhorn?
18 A. I believe so.
19 Q. To your way of thinking was he sober
20    enough to drive from the Longhorn to
21    wherever you went next?
22 A. I believe so.
23 Q. Have you testified before the Grand Jury
24    in this matter?

Page 3

1 A. No.
2 Q. Did you testify in the criminal case
3    against Mr. Southworth?
4 A. In the case in court?
5 Q. Yes, sir.
6 A. No.
7 Q. Have you testified anywhere except in an
8    earlier deposition that I and some
9    different lawyers conducted?
10 A. No.
11 Q. Have you spoken to anyone about the
12    events of that evening?
13 A. Yes.
14 Q. Have you discussed with anyone other
15    than in the deposition that I took
16    whether or not Jeffrey Southworth was
17    intoxicated while a customer at the
18    Longhorn?
19 A. I talked to my brother about it.
20 Q. When did you have a conversation with
21    your brother about it?
22 A. The next morning.
23 Q. Tell me what you remember he said and
24    you said in that conversation.

Page 3

1 A. I remember the conversation being along
2    the line of what happened and trying to
3    put together the pieces. I remember my
4    brother's foot was run over. Did I have
5    a conversation with him the next
6    morning? He was in the hospital the
7    next morning. I know I talked to my
8    brother about what happened. I know his
9    foot was broken. I don't know how his
10    foot was broken. Jeff ran over his
11    foot.
12 Q. My question to you is did you have
13    conversations with anyone about whether
14    or not Jeff Southworth was under the
15    influence of intoxicating beverages
16    while he was a customer at the Longhorn
17    that evening?
18 A. No.
19 Q. Do you remember discussing with anyone
20    whether or not Jeff was drunk that
21    evening?
22 A. No.
23 Q. I'm going to show you a document and ask
24    you if that is your signature at the

Page 37

1    bottom.
2  A. Yes.
3  Q. Is that your handwriting as well?
4  A. Yes, it is.
5         [Handwritten document by
6         Mike Espey marked Michael
7         Espey Exhibit No. 1 for
8         Identification.]
9  Q. Do you remember the circumstances under
10    which you wrote and then signed this
11    document, Exhibit 1?
12  A. I believe there was some kind of a
13    police officer that came and asked for a
14    statement.
15  Q. Can you tell me how close in time it was
16    that he came and asked for a statement
17    to the evening of September 26, 2003?
18  A. Not with any certainty.
19  Q. Do you know where you made this
20    statement?
21  A. At my house.
22  Q. The third line down reads, "While at the
23    Longhorn we received a call from my
24    brother," is that right?

Page 38

1  A. Yes.
2  Q. This is your brother Scott?
3  A. Yes.
4  Q. Do you know where Scott was when you
5    received that call?
6  A. On his way back from riding dirt bikes.
7  Q. Was it you that Scott called?
8        MR. GILLIS: Objection.
9  A. I believe so.
10  Q. What's your cell phone number?
11  A. Then or now? I don't know what it was
12    then. It's different now.
13  Q. What is it now?
14  A. It's 978-424-5827.
15  Q. Who is your carrier?
16  A. Cingular.
17  Q. Back in 2003 who was your carrier?
18  A. Verizon, if I had a cell phone then.
19  Q. Can you tell me what other carriers than
20    Verizon and Cingular you have had cell
21    phone service with?
22  A. That is every one.
23  Q. What is your brother's cell phone
24    number?

Page 39

1  A. I don't know.
2  Q. Do you know what it was back in
3    September of 2003?
4  A. No.
5  Q. What is it today?
6  A. 978-407-3115.
7  Q. You see that this document that has been
8    marked as Exhibit 1 in your deposition
9    has a photocopy of a sticker that says
10    Grand Jury Exhibit 19 at the bottom.
11    See that?
12  A. Yes.
13  Q. Do you have a memory of actually
14    physically appearing before the Grand
15    Jury?
16  A. No.
17         CROSS-EXAMINATION
18         BY MR. GILLIS
19  Q. My name is Michael Gillis. I represent
20    Longhorn Steakhouse and I want to ask
21    you some questions about the night of
22    September 26, 2003. You have been shown
23    a document in front of you that is
24    marked Exhibit 1, correct?

Page 40

1  A. Yes.
2  Q. When you look at that that's a statement
3    you gave to the State Police, correct?
4  A. Correct.
5  Q. What was the date of that statement?
6  A. I do not know the exact date.
7  Q. It was submitted to the Grand Jury on
8    November 5, '03, correct?
9  A. Correct.
10  Q. That was two months after the accident,
11    correct?
12  A. Correct.
13  Q. And at that time you had told the State
14    Police that you had gone back to the
15    Four Points Hotel for about forty-five
16    minutes, correct?
17        MR. FARRAH: Objection.
18  A. The document says thirty to forty-five
19    minutes.
20  Q. You went back thirty to forty-five
21    minutes, is that correct?
22  A. According to the document, yes.
23  Q. That was your best memory at the time,
24    is that correct?

Page 41

1   A. Yes. Probably more accurate than my
2      memory now.
3   Q. So if your memory today differs from
4      back then it's not because of any
5      intoxication today, correct?
6   A. No.
7   Q. It's just because of the passage of
8      time, is that correct?
9   A. Correct.
10  Q. When you said that you couldn't remember
11     a lot of things in answer to
12     Mr. Farrah's questions is that because
13     of the passage of time as well?
14         MR. FARRAH: Objection.
15  A. As well as the intoxication?
16  Q. Yes.
17  A. Yes.
18  Q. It could be, correct?
19         MR. FARRAH: Objection.
20  A. Yes.
21  Q. Specifically what time did you arrive at
22     the Four Points Hotel that afternoon?
23  A. Sometime early afternoon.
24  Q. But you don't know with any specificity,

Page 42

1      correct?
2   A. Correct.
3   Q. You can no more say that it was two
4      o'clock than four o'clock, correct?
5         MR. FARRAH: Objection.
6         MR. GILLIS: What's the
7      nature of the objection?
8         MR. FARRAH: It doesn't
9      matter. Go on.
10        MR. GILLIS: There has to be
11     a reasonable basis for your objection.
12     This is cross-examination. I can ask a
13     question.
14        MR. FARRAH: I'm objecting.
15        MR. GILLIS: You have to
16     have a basis.
17        MR. FARRAH: We'll take it
18     up with some judge at some time.
19  Q. Could it have been five o'clock?
20        MR. FARRAH: Objection.
21  A. Possibly.
22  Q. Todd picked you up at the house?
23  A. Correct.
24  Q. What was he wearing?

Page 43

1   A. I have no idea.
2   Q. When you arrived at the hotel what floor
3      did you go to?
4   A. I have no idea.
5   Q. Were you intoxicated when you got to the
6      hotel?
7   A. No.
8   Q. What was the name of the people you met
9      upstairs again?
10  A. Matthew Cenicola and Bruce Sirjane.
11  Q. What were they wearing?
12  A. I have no idea.
13  Q. What room were you in?
14  A. No idea.
15  Q. In hours and minutes can you tell me how
16     long you were in the room?
17  A. I have no idea.
18  Q. Other than guessing do you know exactly
19     what you had to drink in the hotel
20     before you went to the restaurant?
21        MR. FARRAH: Objection.
22  Q. Do you have any memory of having any
23     drinks at the bar at the restaurant
24     prior to sitting down?

Page 44

1   A. No.
2   Q. When you said everybody at the table had
3      a beer, that was a guess, wasn't it?
4         MR. FARRAH: Objection.
5   A. I didn't say everybody at the table had
6      a beer.
7   Q. Did you testify that everybody at the
8      table but you had a beer?
9   A. Yes.
10  Q. Is that a guess?
11        MR. FARRAH: Objection.
12  A. It's a reasonable assumption.
13  Q. It's an assumption, is that correct?
14  A. Yes.
15  Q. I'm going to show you a document that
16     has been introduced in other depositions
17     and it's represented as the bill for
18     your table that night showing two beers
19     for the entire table for the evening.
20     Does that refresh your recollection at
21     all as to whether or not everybody at
22     the table had a beer served to them?
23        MR. FARRAH: Objection.
24  A. It sounds like I was wrong.

Page 45

1      [Document entitled Longhorn
2      Steakhouse marked Michael
3      Espey Exhibit No. 2 for
4      Identification.]
5    Q. Who contacted you about this deposition?
6    A. I believe the deposition said the law
7       offices of Al Farrah.
8    Q. Have you had any phone conversations
9       with him about setting up the
10      deposition?
11   A. No.
12   Q. You hadn't been contacted by anybody in
13      Mr. Farrah's office prior to today about
14      coming in here today?
15   A. No.
16   Q. You were contacted by them for your
17      prior deposition, is that correct?
18   A. Correct.
19   Q. That was in June of 2004, correct?
20   A. Correct.
21   Q. Was your memory fresher back then than
22      it is today?
23   A. By about two years.
24   Q. When you spoke to the State Trooper when

Page 46

1       you gave your statement that is marked
2       Exhibit 1 did he ask you what signs of
3       intoxication Mr. Southworth exhibited,
4       if any, on the evening of September 26?
5    A. I have no idea.
6    Q. You don't have any memory whatsoever of
7       Mr. Southworth exhibiting any loudness
8       on September 26, 2003 while at the
9       Longhorn, do you?
10             MR. FARRAH: Objection.
11   A. No.
12   Q. Your brother was with you on
13      September 26, 2003 at the restaurant,
14      correct?
15   A. Correct.
16   Q. What is his name again?
17   A. Thomas Scott Espey.
18   Q. Is he older or younger than you?
19   A. Younger.
20   Q. By how much?
21   A. Two years.
22   Q. After living with him for most of your
23      life does he have a reputation for
24      truthfulness?

Page 4

1             MR. FARRAH: Objection.
2    A. Yes.
3    Q. If he had said that you arrived at the
4       Longhorn around 8:30 would that refresh
5       your recollection at all?
6             MR. FARRAH: Objection.
7    A. I would have to believe it.
8    Q. You don't really have a memory of what
9       time you showed up at the Longhorn that
10      night, correct?
11   A. No.
12   Q. Do you remember testifying two years ago
13      at your deposition in the other lawsuit
14      that you had eaten ribs at the Longhorn
15      that night?
16   A. I don't recall the specifics of the two
17      years ago deposition. I am looking at
18      the tab here and it says "ribs" so I
19      would assume I had ribs.
20   Q. Can you tell me why you can't remember
21      what you testified to two years ago in a
22      deposition by Mr. Farrah involving the
23      same action?
24   A. Because it was two years ago.

Page 4

1    Q. What does that mean?
2    A. It means there's a lot of stuff I've had
3       to know and remember and learn since
4       that day.
5    Q. Is it fair to say that over the passage
6       of time you've forgotten certain things?
7    A. Correct.
8    Q. Including facts concerning this
9       accident, correct?
10   A. Yes, sir.
11   Q. What type of truck was it that your
12      friend Bruce had?
13   A. It was a Chevy.
14   Q. Do you remember what year?
15   A. I don't know. I think it was '99, 2000,
16      2001.
17   Q. Did you meet with them the next day to
18      go to the concert?
19   A. Yes.
20   Q. Do you remember who sponsored the
21      concert?
22   A. I believe that concert was sponsored by
23      WAAF.
24   Q. And that was at the Fitchburg Airport?

Page 49

1  A. Correct.
2  Q. Have you ever read your prior deposition
3     in the case Mr. Farrah deposed you in?
4  A. No.
5  Q. Have you spoken with any of the
6     attorneys in that case or
7     representatives of their office other
8     than to schedule a deposition in that
9     case?
10 A. No.
11 Q. While you were at the hotel sometime
12    before you went to the Longhorn on
13    September 26, 2003 do you know where
14    your brother and Mr. Southworth were?
15 A. Riding dirt bikes.
16 Q. Were they drinking while they were
17    driving dirt bikes?
18 A. I do not know. I do not believe so.
19 Q. Did he ever tell you they were drinking
20    while driving dirt bikes?
21 A. No.
22 Q. You talked earlier about your definition
23    of intoxication and I want to make sure
24    I have this right.

Page 50

1         Is it your understanding
2      that others around you seem intoxicated
3      when you are intoxicated?
4            MR. FARRAH: Objection.
5  A. Yes.
6  Q. When you said that others were
7     intoxicated was that the definition you
8     were using?
9            MR. FARRAH: Objection.
10 A. Yes.
11 Q. You weren't stating that they were
12    intoxicated based on any visible signs
13    that they exhibited that you saw,
14    correct?
15           MR. FARRAH: Objection.
16 A. Correct.
17 Q. In fact at no time during the time that
18    you were at the Longhorn that night did
19    you see Jeffrey Southworth exhibit any
20    signs of intoxication, correct?
21           MR. FARRAH: Objection.
22 A. Correct.
23 Q. You went back to the hotel afterwards
24    with the group after you left the

Page 5

1     Longhorn, correct?
2  A. Correct.
3  Q. And there was still Jack Daniels and
4     beer in the hotel, is that correct?
5  A. As far as I can remember.
6  Q. Was anybody guarding that or preventing
7     anybody from drinking the Jack Daniels
8     or the beer?
9           MR. FARRAH: Objection.
10 A. Not to my recollection.
11 Q. In fact anybody was free to have
12    whatever they wanted back at the hotel,
13    correct?
14           MR. FARRAH: Objection.
15 A. Correct.
16 Q. You had drank Jack Daniels with
17    Mr. Southworth prior to that night at
18    the 99 Restaurant, correct?
19 A. Correct.
20 Q. You knew that he drank Manhattans made
21    of Jack Daniels, correct?
22 A. Correct?
23 A. And nobody was stopping him from
24    drinking more Jack Daniels back at the

Page 5

1     hotel after you left the Longhorn that
2     night, correct?
3           MR. FARRAH: Objection.
4  A. If he wanted it he probably could have
5     had it.
6  Q. And he could have drank beer as well,
7     correct?
8           MR. FARRAH: Objection.
9  Q. Did you see him drinking beer back at
10    the hotel afterwards?
11 A. I do not recall.
12 Q. You have testified in several of your
13    answers "I would guess." When you
14    answered questions "I would guess," is
15    it fair to assume you are guessing?
16           MR. FARRAH: Objection.
17 A. Yes.
18 Q. Were you, in fact, guessing on those
19    questions?
20           MR. FARRAH: Objection.
21 A. Yes.
22 Q. You answered "I think" to several
23    questions. Do you remember starting
24    sentences with those words?

Page 53

```
1   A. Yes.
2   Q. Those are also guesses.
3         MR. FARRAH: Objection.
4   A. Yes.
5   Q. And you said in a few questions "I don't
6      believe." Do you remember starting your
7      sentences prefaced with that?
8   A. Yes.
9   Q. Were those guesses?
10        MR. FARRAH: Objection.
11  A. Yes.
12  Q. When you started a sentence with "I
13     believe," were those guesstimates as
14     well?
15        MR. FARRAH: Objection.
16  A. Yes.
17  Q. Is it fair to say that your brother in
18     your opinion did not have as much to
19     drink on the night of September 26, 2003
20     that you did?
21  A. Yes.
22  Q. You're not sure where you were the next
23     morning when you woke up, correct?
24  A. Correct.
```

Page 54

```
1   Q. Whether you were at home or whether you
2      were at the hotel and the reason you
3      can't remember is the passage of time
4      not because you were still intoxicated,
5      is that correct?
6         MR. FARRAH: Objection.
7   A. Probably some combination of both.
8   Q. How much did you have to drink back at
9      the hotel after you left the Longhorn?
10        MR. FARRAH: Objection.
11  A. I have no idea.
12  Q. How much did you have to drink at the
13     strip bar after you left the hotel?
14  A. No idea.
15  Q. Do you remember what you were drinking
16     at the hotel after you left the
17     Longhorn?
18        MR. FARRAH: Objection.
19  A. Not with any specificity.
20  Q. When you said, "I believe I had Jack
21     Daniels Manhattans at the restaurant,"
22     that's a guess, isn't it?
23        MR. FARRAH: Objection.
24  A. That's a guess.
```

Page 55

```
1   Q. And when you said you had one to three
2      Manhattans, that's a guess, isn't it?
3   A. Yes.
4   Q. As you sit here today you don't know
5      where your brother was when you spoke to
6      him the next day about this, correct?
7   A. Correct.
8   Q. Do you remember what time of day you
9      spoke to him?
10  A. No.
11  Q. Was it while you were at the concert, do
12     you know?
13  A. No, it was not while I was at the
14     concert.
15  Q. You know that.
16  A. I'm pretty sure it wasn't.
17  Q. Were you drinking at the concert?
18  A. No.
19  Q. When the police officer who took the
20     statement from you that has been marked
21     as Exhibit 1 came to your house, can you
22     describe him physically, what he looked
23     like, age, size, etcetera?
24  A. I remember he was younger.  That's about
```

Page 56

```
1      as much as I can remember.
2   Q. You remember he drove a truck.
3   A. I remember he rides dirt bikes and HUVs.
4   Q. How old was he?
5   A. Exact age I do not know.
6   Q. Can you give me a ballpark?
7   A. Under thirty.
8   Q. Can you be any more specific than he was
9      under thirty?
10  A. Under thirty.
11  Q. Can you remember how tall he was?
12  A. I think he was shorter than me.
13  Q. You think.  You're not sure?
14  A. I'm not sure.
15  Q. You don't know how tall he was.
16  A. No.
17  Q. Do you know what color hair he had?
18  A. No.
19  Q. You were sober when you talked to him,
20     correct?
21  A. Yes.
22  Q. You can't remember due to the passage of
23     time, is that correct?
24  A. Correct.
```

Page 57

1 Q. You can't remember whether or not you
2    had a cell phone in 2003, is that
3    correct?
4 A. Correct.
5 Q. That is not due to any intoxication,
6    correct?
7 A. Correct.
8 Q. In fact as you sit here today you don't
9    even know what your brother's cell phone
10    number is without looking it up on your
11    phone, correct?
12 A. Correct.
13 Q. In your prior deposition do you remember
14    testifying that when Mr. Southworth is
15    intoxicated he gets belligerent?
16        MR. FARRAH: Objection.
17 Q. You said, "I do know that to be true of
18    Mr. Southworth." He never exhibited any
19    signs of being belligerent on
20    September 26, 2003, is that correct?
21        MR. FARRAH: Objection.
22 A. Not that I recall.
23 Q. He didn't show any signs of slurred
24    speech on September 26, 2003, correct?

Page 58

1        MR. FARRAH: Objection.
2 A. Not that I recall.
3 Q. When you drank with him at the 99 you
4    said he showed some visible signs of
5    intoxication, isn't that correct?
6 A. I do not recall.
7 Q. Have you ever been with Mr. Southworth
8    at the Longhorn Restaurant in Leominster
9    prior to September 26, 2003?
10 A. I do not believe so.
11 Q. Did Mr. Southworth have a reputation in
12    town prior to September 26, 2003 of
13    being a troublemaker?
14 A. Yes.
15 Q. He wasn't a troublemaker on
16    September 26, 2003, was he?
17        MR. FARRAH: Objection.
18 A. Not that I recall.
19 Q. He didn't pick any fights at the
20    Longhorn, did he?
21 A. No.
22 Q. You were aware that Mr. Southworth's
23    Massachusetts driver's license was
24    suspended on September 26, 2003,

Page 59

1    correct?
2 A. Correct.
3 Q. You didn't tell anybody at the Longhorn
4    that, did you?
5 A. No.
6 Q. Do you remember testifying that it was
7    your idea to order the Manhattans that
8    night at the Longhorn?
9        MR. FARRAH: Objection.
10 A. No, I do not remember that.
11 Q. Isn't it fair to say that the signs of
12    intoxication you saw, if any, of
13    Mr. Southworth on the night of
14    September 26, 2003 were back in the
15    hotel or at the strip joint?
16        MR. FARRAH: Objection.
17 A. It's possible.
18 Q. Do you know that Mr. Southworth had done
19    drugs back in high school?
20 A. Yes.
21 Q. What do you know about that?
22        MR. FARRAH: Objection. You
23    are asking for personal knowledge?
24 Q. Whatever knowledge you have from

Page 60

1    whatever source.
2 A. I don't know exactly what types of drugs
3    or anything like that, but I'm sure he
4    enjoyed partying like anybody else in
5    high school.
6 Q. When you say partying like anyone else
7    in high school you mean alcohol and some
8    form of drug, correct?
9 A. Correct.
10 Q. What would be the drug of choice?
11        MR. FARRAH: Objection.
12 Q. Pot or something more?
13 A. I'm sure that he smoked weed.
14 Q. Was anybody smoking pot back at the
15    hotel after you left the Longhorn on
16    September 26, 2003?
17 A. I do not believe so.
18 Q. Are you sure one way or the other?
19        MR. FARRAH: Objection.
20 A. No.
21 Q. Do you have a memory as to how many
22    people were with you that evening at the
23    Longhorn when you were there?
24        MR. FARRAH: Objection.

Page 61

1  A. How many people were with me?
2  Q. How many people, if you remember, were
3     at the table with you when you were
4     sitting down at the Longhorn on
5     September 26, 2003?
6         MR. FARRAH: Objection.
7  A. I know that there were seven of us.
8  Q. Seven including you?
9  A. Including me.
10 Q. Have you ever been dirt biking with
11    Mr. Southworth?
12 A. I do now.
13 Q. Is there any particular reason you
14    didn't go dirt biking with him?
15 A. I didn't ride dirt bikes at that time.
16 Q. You have had dirt bikes since that time.
17 A. Correct.
18 Q. The friends you had that were there,
19    they were from Vermont, is that correct?
20 A. Correct.
21 Q. And you met them in college up at
22    Castleton, is that correct?
23 A. Correct.
24 Q. Do they live in Vermont?

Page 62

1  A. No. One actually lives in New York and
2     one is originally from New Jersey.
3  Q. When you were in college with them did
4     either of them smoke any pot in college?
5         MR. FARRAH: Objection.
6  A. Yes.
7  Q. Did you ever smoke any pot with them
8     back in college?
9  A. Yes.
10 Q. Were they continuing to smoke pot in
11    2003?
12 A. I don't know.
13 Q. Do you know approximately what time you
14    left to go to the Other Side from the
15    hotel on September 26, 2003?
16 A. I have no idea.
17 Q. During the evening of September 26, 2003
18    at any time from the time you first
19    arrived at the hotel until after you
20    left the Other Side did you stop
21    drinking at any time period and by that
22    I don't mean for two seconds, for an
23    appreciable period of time?
24         MR. FARRAH: Objection.

Page 6

1  A. No.
2  Q. So you continued to drink after Longhorn
3     back at the hotel, correct?
4         MR. FARRAH: Objection.
5  A. Correct.
6  Q. And then at the Other Side, correct?
7  A. Correct.
8  Q. Did you go anywhere after the Other
9     Side?
10 A. Not that I recall.
11 Q. Did you have anything to drink in the
12    vehicle on your way to and from the
13    Other Side?
14 A. I would say no.
15 Q. So you were not so intoxicated that you
16    don't remember whether or not you were
17    drinking at a certain point, correct?
18 A. I know that Todd as the driver would not
19    have allowed us to drink in the car.
20 Q. In your statement which has been marked
21    as Exhibit 1 you said, "They met us for
22    dinner. We ate dinner and had a couple
23    drinks. I can't remember who drank what
24    or how much but I think it was mostly

Page 6

1     beers and Manhattans." Did I read that
2     correctly?
3  A. Yes.
4  Q. When you said you met them and had
5     drinks, you have no idea of the quantity
6     that each individual had to drink,
7     correct?
8         MR. FARRAH: Objection.
9  A. Yes.
10 Q. In fact you don't know whether each
11    individual didn't drink at all other
12    than Jude, correct?
13 A. Correct.
14 Q. Did the police ask you if you were
15    intoxicated that evening?
16 A. No. I don't remember.
17 Q. You don't remember or they didn't ask
18    you?
19 A. I don't remember.
20 Q. What did the police from what you
21    remember ask you to write that evening?
22 A. I believe they asked me to give them a
23    sworn statement.
24 Q. You knew that this sworn statement was

Page 65

1   to be used as evidence against
2   Mr. Southworth in the criminal trial,
3   correct?
4       MR. FARRAH: Objection.
5   A. I assumed so.
6   Q. You assumed they were trying to prove he
7   was operating a motor vehicle when he
8   was under the influence of alcohol,
9   correct?
10      MR. FARRAH: Objection.
11  A. I assume so.
12  Q. You assumed they were looking for
13  evidence from you that he was
14  intoxicated at some point, correct?
15      MR. FARRAH: Objection.
16  A. Correct.
17  Q. And at no point did you tell them that
18  he was intoxicated, correct?
19      MR. FARRAH: Objection.
20  A. Correct.
21  Q. That was something they would have asked
22  you to put in the statement if it was
23  true, correct?
24      MR. FARRAH: Objection.

Page 66

1   A. Yes.
2   Q. If you thought he was intoxicated and
3   the police came to your house and asked
4   you if he was would you have lied for
5   Mr. Southworth?
6       MR. FARRAH: Objection.
7   A. No.
8   Q. If he was intoxicated and the police
9   came and got a report for a criminal
10  trial against him for driving under the
11  influence you would have written that in
12  the statement if you were asked and it
13  was correct.
14      MR. FARRAH: Objection.
15  A. Yes.
16  Q. Do you remember them asking you whether
17  or not Mr. Southworth at any time that
18  evening showed visible signs of
19  intoxication?
20  A. I do not remember.
21  Q. But you understood that was what they
22  were after.
23      MR. FARRAH: Objection.
24  A. Correct.

Page 67

1   Q. Did you know the server that served you
2   at the Longhorn on the night of
3   September 26, 2003?
4   A. No.
5   Q. Prior to this night how many times had
6   you been in the Longhorn, if you have a
7   memory?
8   A. Once or twice.
9   Q. And who was with you when you were there
10  those other times?
11  A. My brother and one of his friends.
12  Q. Were you ever there previously with
13  Mr. Southworth?
14  A. No.
15  Q. Do you remember being carded when you
16  came to the Longhorn that evening?
17  A. I do not recall.
18  Q. You have no memory of Mr. Southworth's
19  eyes being glassy while you were at the
20  Longhorn Restaurant on September 26,
21  2003, is that correct?
22  A. Correct.
23  Q. You have no memory of him slurring his
24  speech at the Longhorn Restaurant on

Page 68

1   September 26, 2003, correct?
2   A. Correct.
3   Q. You have no memory of him being unsteady
4   on his feet at the Longhorn Restaurant
5   on September 26, 2003, is that correct?
6   A. Correct.
7   Q. You have no memory of him picking a
8   fight with anybody at the Longhorn
9   Restaurant on September 26, 2003,
10  correct?
11  A. Correct.
12  Q. You have nothing more than a guess as to
13  what, if anything, Mr. Southworth had to
14  drink at the Longhorn Restaurant on
15  September 26, 2003, correct?
16      MR. FARRAH: Objection.
17  A. Correct.
18  Q. Can you describe what the waitress
19  looked like who served you the food at
20  the Longhorn Restaurant on September 26,
21  2003?
22  A. I have no idea.
23  Q. Have you ever been to Chopsticks?
24  A. Yes.

Page 69

```
 1  Q. Can you tell me what type of place that
 2     is?
 3  A. A Chinese restaurant.
 4  Q. Does it have a bar?
 5  A. I don't know. I think so.
 6  Q. How would you describe the Longhorn
 7     Restaurant, as a family restaurant or is
 8     it a bar? How would you characterize
 9     it?
10         MR. FARRAH: Objection.
11  A. I would not characterize it as a bar.
12  Q. Could you please characterize for me the
13     Longhorn Restaurant in Leominster, MA
14     based on your experience of having been
15     there?
16         MR. FARRAH: Objection.
17  A. It's a steakhouse.
18  Q. Is that someplace you and your friends
19     would go at night primarily to drink or
20     primarily to eat?
21         MR. FARRAH: Objection.
22  A. Primarily to eat.
23  Q. If you and your friends wanted to go
24     someplace just to drink where would you
```

Page 70

```
 1     go?
 2         MR. FARRAH: Objection.
 3  A. A bar.
 4  Q. What bar?
 5  A. There are so many of them. There isn't
 6     one specific spot.
 7  Q. The Longhorn isn't a place you would go
 8     primarily to drink, correct?
 9         MR. FARRAH: Objection.
10  A. Correct.
11  Q. That was not your intention on
12     September 26, 2003 was it?
13  A. No?
14         MR. GILLIS: I have no
15     further questions.
16         REDIRECT EXAMINATION
17         BY MR. FARRAH
18  Q. Prior to your deposition of two years
19     ago did you speak to anyone in my office
20     about anything except getting directions
21     to the deposition?
22  A. No.
23  Q. Did you speak with me, for example,
24     prior to your deposition of two years
```

Page 71

```
 1     ago about anything related to the case?
 2  A. No.
 3  Q. Were you smoking marijuana at any point
 4     in time on September 26, 2003?
 5  A. Not that I recall.
 6  Q. Was anyone in your party at the Four
 7     Points smoking marijuana before you went
 8     to the Longhorn that day?
 9  A. Not that I recall.
10  Q. To the extent you have a memory that you
11     returned from the Longhorn to the Four
12     Points at some point in time did you see
13     anyone smoking marijuana at the Four
14     Points after the Longhorn that day?
15  A. Not that I recall.
16  Q. Did you smell the smell of marijuana at
17     any point in time while you were at the
18     Four Points that day?
19  A. Not that I recall.
20  Q. Where is Chopsticks Restaurant?
21  A. Chopsticks is in Leominster by the Sears
22     Town Mall.
23  Q. Was there any discussion among your
24     group that evening about going to
```

Page 72

```
 1     Chopsticks?
 2  A. Not that I recall.
 3  Q. Have you ever been to Chopsticks with
 4     Mr. Southworth?
 5  A. No.
 6  Q. Prior to today you had not spoken to
 7     Mr. Gillis, is that right?
 8  A. Correct.
 9  Q. Nor anyone from his office?
10  A. Correct.
11  Q. Or anyone who you understood was
12     representing the defendant Rare
13     Hospitality or assisting in the
14     representation of Rare Hospitality, is
15     that right?
16  A. Correct.
17         MR. FARRAH: Thank you.
18         RECROSS-EXAMINATION
19         BY MR. GILLIS
20  Q. Four Points is within a quarter of a
21     mile from the Longhorn, correct?
22  A. No.
23  Q. How far is the Four Points from the
24     Longhorn Steakhouse?
```

Page 73

1  A. It might be a mile away at the most.
2  Q. A two-minute ride, correct?
3       MR. FARRAH: Objection.
4  A. About that.
5  Q. And Chopsticks is about the same
6     distance, correct?
7  A. A little bit further.
8  Q. When you answered that you did not
9     recall whether or not people were
10    smoking pot or you smelled pot is it
11    fair to say you don't have a memory when
12    you say you don't recall?
13 A. Correct.
14      MR. GILLIS: Thank you.
15      FURTHER REDIRECT EXAMINATION
16      BY MR. FARRAH
17 Q. Was anyone smoking pot that evening at
18    the Four Points?
19 A. I do not remember.
20 Q. If someone was smoking do you think you
21    would remember?
22      MR. GILLIS: Objection.
23 A. Probably not.
24      MR. FARRAH: That's all I

Page 74

1  have.
2       [The deposition was
3  concluded.]

Page

1  SIGNATURE PAGE/ERRATA SHEET
2  Re: Nancy Rosario
   Vs: Rare Hospitality International, Inc.,
3  d/b/a
   4/25/2006 - Deposition of MICHAEL ESPEY
4
5  I, MICHAEL ESPEY, do hereby certify that
   I have read the foregoing transcript of my
   testimony and it is a true and correct record
6  of my testimony (with the exception of the
   corrections, if any, listed below.
7
8  PAGE LINE  CORRECTION
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 DATE          MICHAEL ESPEY
21
22
23
24

Page

1     C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS  )
3  COUNTY OF SUFFOLK              )
4     I, Rosamond K. Marcy, Certified
   Shorthand/Registered Professional Reporter, a
5  Notary Public in and for the Commonwealth of
   Massachusetts, do hereby certify:
6
      That MICHAEL ESPEY, the witness whose
7  deposition is hereinbefore set forth, was
   duly sworn by me and that such deposition is
8  a true record of the testimony given by said
   witness.
9
      I further certify that I am not related
10 to any of the parties to this action by blood
   or marriage, and that I am in no way
11 interested in the outcome of this matter.
12    IN WITNESS WHEREOF, I have hereunto set
   my hand and affixed my seal of office this
13 23rd day of May, 2006.
14
15      _____
        ROSAMOND K. MARCY
16 My commission expires:
   April 6, 2012.
17
18 PLEASE NOTE:
19    THE FOREGOING CERTIFICATION OF THIS
      TRANSCRIPT DOES NOT APPLY TO ANY
20    REPRODUCTION OF THE SAME BY ANY
      MEANS UNLESS UNDER THE DIRECT
21    CONTROL AND/OR DIRECTION OF THE
      CERTIFYING REPORTER.
22
23
24

**Page 1**

```
 1                      Volume:
                        Pages:  1 - 158
 2                      Exhibits:  1

 3          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 4
            Civil Action #05-CV-10617MLW
 5
    NANCY ROSARIO, INDIVIDUALLY,
 6  AS SHE IS THE ADMINISTRATRIX
    OF THE ESTATE OF AWILDA SANTIAGO,
 7  ESSEX PROBATE COURT DOCKET #03P-2499ADI,
    P/P/A VERONICA ROSARIO AND
 8  CHRISTINA SANTIAGO, AND AS SHE IS
    THE ADMINISTRATRIX OF THE ESTATE
 9  OF JOSE SANTIAGO, BERLIN (CONNECTICUT)
    PROBATE COURT, CASE #03-0713,
10                               Plaintiff

11  vs.

12  RARE HOSPITALITY INTERNATIONAL, INC., d/b/a
    LONGHORN STEAKHOUSE,
13                               Defendant

14       Deposition of THOMAS SCOTT ESPEY, a

15  witness called on behalf of the Plaintiff,

16  pursuant to the Federal Rules of Civil

17  Procedure, before Rosamond K. Marcy, a

18  Certified Shorthand/Registered Professional

19  Reporter and Notary Public in and for the

20  Commonwealth of Massachusetts, at the Offices

21  of Albert L. Farrah, Jr., Esquire, One

22  Washington Mall, Boston, Massachusetts 02108,

23  commencing at 12:15 P.M. on Tuesday,

24  April 25, 2006.
```

**Page**

```
 1              I N D E X

 2  Deposition of:  DIRECT CROSS REDIRECT RECROSS

 3  THOMAS SCOTT ESPEY

 4  (By Mr. Farrah)      4          145

 5  (By Mr. Gillis)      101         155

 6

 7

 8              E X H I B I T S

 9  Thomas Scott Espey
    Number:                    For Ident.
10
    1 - Handwritten document by
11      Scott Espey              71

12
```

**Page 2**

```
 1  APPEARANCES:

 2  ALBERT L. FARRAH, JR., ESQUIRE
        One Washington Mall
 3      Boston, Massachusetts    02108
        for the Plaintiff.
 4
    MICHAEL K. GILLIS, ESQUIRE
 5  [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 6      Newton, Massachusetts   02461
        for the Defendant.
 7
    NEIL D. SCHNURBACH, ESQUIRE
 8  [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 9      Newton, Massachusetts   02461
        for the Defendant.
```

**Page 4**

1    STIPULATIONS
2        It is hereby stipulated and
3    agreed by and between counsel for the
4    respective parties that the witness will
5    read and sign the deposition transcript
6    within thirty days. The sealing and
7    filing of the deposition transcript are
8    waived.
9        It is further stipulated and
10   agreed that all objections, except as to
11   form, and motions to strike will be
12   reserved to the time of trial.
13       THOMAS SCOTT ESPEY,
14   a witness called on behalf of the
15   Plaintiff, having first been properly
16   identified and duly sworn, deposes and
17   says as follows:
18       DIRECT EXAMINATION
19       BY MR. FARRAH
20   Q. Good afternoon. My name is Albert
21   Farrah and I represent the plaintiff
22   Nancy Rosario in this action which has
23   been brought against Rare Hospitality,
24   Inc., the owner of the Longhorn

Page 5

1  Steakhouse in Leominster, MA. You do
2  know that my questions and your answers
3  are being transcribed and at the end of
4  the deposition a transcript of your
5  testimony will be made and sent to you.
6  You will have thirty days from your
7  receipt of that transcript to indicate
8  on a separate piece of paper which you
9  will sign any changes you think should
10  be made in the transcript. Do you
11  understand all of that?
12 A. I do.
13 Q. And if you don't send it back to us,
14  that is the sheet with any changes that
15  you want made, by the end of that thirty
16  days then the transcript as it was sent
17  to you will be the transcript that is
18  used in the case.
19  Can you tell us your full
20  name, please.
21 A. Thomas Scott Espey.
22 Q. What's your date of birth?
23 A. 10/6/1981.
24 Q. And your Social Security number?

Page 6

1  A. 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.
2  Q. Where do you live?
3  A. 80 Old Mill Road, Harvard, MA.
4  Q. You live there with your parents, is
5  that correct?
6  A. Correct.
7  Q. And your brother?
8  A. Same residence.
9  Q. Can you tell me briefly what your
10  educational background is?
11 A. I graduated from Bromfield High School
12  in Harvard in 2000. I just graduated
13  from UMass. Lowell last spring, 2005.
14 Q. What did you get your degree in?
15 A. Bachelor's in Accounting and Finance.
16 Q. Are you currently employed?
17 A. I am.
18 Q. Where?
19 A. Akamai Technology.
20 Q. In what capacity?
21 A. I am a revenue accountant.
22 Q. And you are a new hire there, is that
23  right?
24 A. That's correct.

Page 7

1  Q. Calling your attention back to
2  September 26, 2003 were you that day in
3  the company of Jeffrey Southworth?
4  A. I was.
5  Q. For how long prior to September 26, 2003
6  had you known Mr. Southworth?
7  A. I had known him on and off for a while.
8  I didn't really start associating with
9  him until that summer.
10 Q. Can you tell me on how many occasions
11  during the summer of 2003 you were in
12  the company of Mr. Southworth?
13 A. I don't know. We used to go ride dirt
14  bikes frequently.
15 Q. How frequently?
16 A. Several times a week.
17 Q. And after dirt biking did Mr. Southworth
18  and you from time to time go to the
19  Longhorn Restaurant in Leominster, MA?
20 A. Yes.
21 Q. Can you tell me your best memory of the
22  number of times during the summer of
23  2003 that Mr. Southworth and you went to
24  the Longhorn Restaurant in Leominster

Page 8

1  MA?
2  A. I don't know a number.
3  Q. Was it more frequently than once a month
4  during the summer?
5  A. Probably, yes.
6  Q. Was it more frequently than once every
7  two weeks that you went to the
8  Leominster Longhorn?
9  A. Again I don't know.
10 Q. At what time on September 26, 2003 did
11  you first come into Mr. Southworth's
12  company?
13 A. Probably sometime after work, three or
14  four.
15 Q. Where was it that you and he first
16  hooked up?
17 A. I believe in Littleton.
18 Q. Where in Littleton?
19 A. At my grandmother's apartment complex.
20 Q. Do you know where that's located in
21  Littleton?
22 A. It's called Pond Side Apartments.
23 Q. Where in Littleton are the Pond Side
24  Apartments?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 3 of 40

Page 9

1   A. 2A and 495.
2   Q. At the intersection of 2A and 495, is
3      that right?
4   A. Correct.
5   Q. Had the two of you by pre-arrangement
6      agreed to meet at your grandmother's
7      apartment complex that day?
8   A. I believe so, yes.
9   Q. Where did you go from the Pond Side
10     Apartments that day?
11  A. Templeton, MA.
12  Q. How did you get to Templeton, MA that
13     day?
14  A. One of us drove his truck.
15  Q. Was it you who drove his truck?
16  A. I believe so.
17  Q. Is there any question in your mind about
18     whether it was you who drove the truck
19     to Templeton from the Pond Side
20     Apartments?
21  A. Whatever I said in my previous statement
22     would be better to go by.
23  Q. Do you have a memory as you sit here now
24     whether you drove from the Pond Side

Page 10

1      Apartments to Templeton?
2   A. Again I don't.
3   Q. Do you have a memory?
4   A. I don't know who drove. I believe it
5      was me. I believe I said before it was
6      me.
7   Q. What did you do when you got to
8      Templeton?
9   A. We unloaded our bikes and rode for a
10     couple of hours.
11  Q. Dirt bikes, is that right?
12  A. Correct.
13  Q. Do you know the location of the place
14     you dirt biked in Templeton?
15  A. It's off of Route 202.
16  Q. Does it have a name?
17  A. No.
18  Q. Were you alone dirt biking that day?
19  A. No.
20  Q. Who else was with you and Mr. Southworth
21     dirt biking that day?
22  A. Jude Connelly and his brother Dillon.
23  Q. After dirt biking that day did you go to
24     the Longhorn Steakhouse?

Page 11

1   A. Yes.
2   Q. And who drove to the Longhorn
3      Steakhouse?
4   A. Again I believe I did but I'm not
5      positive.
6   Q. Did you know at the time, that is as of
7      September 26, 2003, whether or not
8      Jeffrey's license to drive in
9      Massachusetts had been suspended?
10  A. I know he had a New Hampshire license.
11  Q. Did he tell you that his Massachusetts
12     license had been revoked?
13  A. I believe it had been suspended.
14  Q. And is that why you drove that day?
15  A. I believe so.
16  Q. Do you have a memory that that's why you
17     drove?
18  A. I think so. I know he had a
19     New Hampshire license, though.
20  Q. Is it accurate to say that you
21     frequently, after dirt biking with
22     Jeffrey Southworth, went to the Longhorn
23     Steakhouse during that summer?
24        MR. GILLIS: I'm going to

Page 12

1      make objections and when I ask you
2      questions Mr. Farrah will make
3      objections but you still testify. We
4      have legal reasons to object but you
5      still answer the questions.
6   A. We went there once in a while.
7   Q. My question is is it accurate to say you
8      frequently went there after dirt biking?
9         MR. GILLIS: Objection.
10  A. We went there a couple of times. I
11     don't know frequently.
12  Q. Do you have a memory of whether or not
13     you went there frequently after dirt
14     biking?
15        MR. GILLIS: Objection.
16  A. Again we went there several times that
17     summer.
18  Q. Do you remember testifying earlier in a
19     deposition in a related case?
20  A. I do.
21  Q. In my office.
22  A. Yes.
23  Q. This same room, remember that?
24  A. Yes.

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 4 of 40

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitality

Page 13

1  Q. Do you remember testifying that you went
2     there frequently, that is to the
3     Longhorn, after dirt biking, if you
4     remember?
5             MR. GILLIS: Just for the
6     record you are showing him a record.
7     The question was does he remember
8     testifying they went there frequently.
9             [Witness examining
10    document.]
11 Q. Have you looked at what I pointed out to
12    you?
13 A. I'm not exactly sure which highlighted
14    section you were pointing out.
15 Q. Right there.
16 A. I did testify to that.
17 Q. You said you went there frequently, is
18    that right?
19 A. Correct.
20 Q. Does that refresh your memory that you
21    went there frequently after dirt biking?
22            MR. GILLIS: Objection.
23 A. Sure.
24 Q. Did you have a regular waitress at the

Page 14

1     Longhorn that summer?
2  A. I don't know.
3  Q. Do you remember any of the waitresses
4     that waited on Jeffrey and you at the
5     Longhorn that summer?
6  A. No, not any more.
7  Q. Do you know what time you left Templeton
8     on September 26, 2003 to go to the
9     Longhorn?
10 A. Probably right around sunset.
11 Q. Did you have any alcoholic beverage to
12    drink in Templeton before you left for
13    the Longhorn?
14 A. I believe we had a beer.
15 Q. You had a beer?
16 A. Yes.
17 Q. Did Jeff have a beer?
18 A. I believe so.
19 Q. Do you have any memory that Jeff had a
20    beer that day at Templeton before you
21    went to the Longhorn?
22 A. I believe we had a beer.
23 Q. When you say you believe, do you mean
24    it's your best memory that you had a

Page 15

1     beer?
2             MR. GILLIS: Objection.
3  A. Yes.
4  Q. Had you brought a cooler?
5  A. I did.
6  Q. Was there a six-pack of beer in that
7     cooler?
8  A. I believe so.
9  Q. Is that your best memory?
10 A. It is.
11 Q. Was it Bud Light beer?
12 A. I believe so.
13 Q. Is that your best memory?
14 A. It is.
15            MR. GILLIS: Objection.
16    Just for the record if you have a memory
17    please state it but if you are guessing
18    please don't guess.
19 Q. Did you have more than one beer at
20    Templeton that night?
21 A. I don't believe so.
22 Q. Did Jeff have more than one beer at
23    Templeton that night?
24 A. I don't believe so.

Page 16

1  Q. That's your best memory?
2  A. It is.
3  Q. The beer that you had at Templeton was
4     how big, if you remember?
5  A. I don't remember.
6  Q. Approximately how long did it take to
7     get from Templeton to the Longhorn
8     Steakhouse?
9  A. Twenty minutes, twenty-five minutes.
10 Q. Do you know what route you traveled?
11 A. Route 2.
12 Q. Route 202 to Route 2, is that right?
13 A. Correct.
14 Q. Did you drive from Templeton to the
15    Longhorn?
16 A. I believe so.
17 Q. Is that your best memory?
18 A. It is.
19 Q. Did you drive his truck that summer
20    previous to September 26, 2003?
21 A. I did.
22 Q. Is that your best memory?
23            MR. GILLIS: Objection.
24 A. It is.

Page 17

1  Q. In the truck from Templeton to the
2     Longhorn were who that night?
3  A. Myself, Jeff, and Jude.
4  Q. Where was Jude sitting?
5  A. In the back seat.
6  Q. Did Jeff have his dogs with him that
7     day?
8  A. Yes.
9  Q. The two rottweilers?
10 A. Yes.
11 Q. And was it a truck that had two bench
12    seats, front and back?
13 A. Yes.
14 Q. Did anyone have any alcoholic beverages
15    to drink on the ride from Templeton to
16    the Longhorn?
17 A. I don't recall.
18 Q. Do you have any memory of anyone having
19    any alcoholic beverages on that ride?
20 A. It doesn't stand out.
21 Q. Where was the cooler?
22 A. Probably in the bed of the truck.
23 Q. Do you have a memory of where it was?
24 A. No.

Page 18

1  Q. Approximately what time did you get to
2     the Longhorn?
3  A. I'd say twenty-five minutes after we
4     left Templeton.
5  Q. Can you fix the time for me, your best
6     memory of when you arrived?
7  A. I can't. I don't know.
8  Q. Were you wearing a watch?
9  A. No.
10 Q. Do you typically wear a watch?
11 A. Only when I dress up.
12 Q. Did you have a cell phone then?
13 A. I did.
14 Q. What was the number?
15 A. I don't know.
16 Q. Who was the carrier?
17 A. Verizon.
18 Q. Do you have a cell phone today?
19 A. I do.
20 Q. What is the number?
21 A. 978-407-3115.
22 Q. Who is your carrier today?
23 A. Cingular.
24 Q. You switched at some point in time, is

Page 19

1     that correct?
2  A. Yes.
3  Q. Do you know when, approximately?
4  A. Last summer.
5  Q. And you switched from Verizon to
6     Cingular?
7  A. Yes.
8  Q. As far as you know did you have that
9     number in 2003 with Verizon that you had
10    last summer when you switched?
11 A. Yes.
12 Q. The same number.
13 A. Yes.
14 Q. Do you have any memory as you sit here
15    now what that number was?
16 A. 978. That's the best I can do.
17 Q. When you got to the Longhorn Steakhouse
18    did you go to the bar?
19 A. Yes.
20 Q. Do you remember where at the bar you
21    went?
22 A. I don't.
23 Q. Who did you go to the bar with?
24 A. Jeff, myself, and Jude.

Page 20

1  Q. Did you order anything at the bar?
2  A. I ordered a beer.
3  Q. What size beer was it?
4  A. Tall.
5  Q. Twenty-five-ounce?
6  A. Yes.
7  Q. What did Jeff order, if anything?
8  A. The same thing.
9  Q. Bud Light?
10 A. Yes.
11 Q. What did Jude order?
12 A. A non-alcoholic beverage.
13 Q. Did Jude have any beer at Templeton
14    after you were dirt biking?
15 A. I don't recall.
16 Q. Did Jude have any alcoholic beverages to
17    drink while you were at the Longhorn
18    Restaurant on September 26, 2003?
19 A. I don't recall.
20 Q. Do you have any memory of Jude having
21    any alcoholic beverages to drink?
22 A. I don't.
23 Q. Did anyone ask you when you went to the
24    bar at the Longhorn Restaurant to

Thomas Scott Espey, 4/25/2006    Condensdit!    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 6 of 40

Page 21

1    produce an I.D. or a driver's license?
2  A. I believe so.
3  Q. Did they ask Jude for that as well?
4  A. I don't know.
5  Q. How many beers did you have at the bar?
6  A. I believe we only ordered one and we got
7     our table.
8  Q. My question is how many beers did you
9     have at the bar, your best memory?
10        MR. GILLIS: Objection.
11     Asked and answered.
12  A. Not even a full one.
13  Q. How long were you at the bar?
14  A. A few minutes.
15  Q. What's your best memory?
16  A. Fifteen, twenty minutes maybe.
17  Q. Did you pay for that beer at the bar?
18  A. I can't recall.
19  Q. How many beers did Jeff have at the bar?
20  A. I can't recall.
21  Q. Did he have more than one?
22  A. I can't recall again.
23  Q. Who paid for the beers at the bar?
24        MR. GILLIS: Objection.

Page 22

1  A. Again I can't recall.
2  Q. You don't know if you paid or Jeff paid?
3  A. I don't.
4  Q. While you were at the bar were you
5     talking to anyone else besides Jeff and
6     Jude?
7  A. I can't recall.
8  Q. What's your best memory of how long you
9     were at the bar before you were seated
10     at a table?
11  A. A few minutes.
12  Q. Do you remember testifying in a
13     deposition taken on June 22, 2004 in
14     this office?
15  A. Yes.
16  Q. Do you remember being asked the question
17     on Page 70, "And it's your best memory
18     that you were about half an hour at the
19     bar, is that right, before you were
20     seated for a table?" Do you remember
21     being asked that question?
22  A. I do now.
23  Q. Do you remember your answer was,
24     "Somewhere in that range"? Do you

Page 23

1     remember that?
2  A. That's what it says.
3  Q. Was your memory of the events of the
4     night of September 26, 2003 better on
5     June 22, 2004 than it is today?
6  A. I would think so.
7  Q. Is that your better sense that your
8     memory was better then than it is now?
9  A. I would think it was better then than it
10     is now.
11  Q. Is that your belief, that your memory
12     was better then than it is now?
13        MR. GILLIS: Objection.
14  A. I would believe so.
15  Q. So is your memory refreshed now that you
16     were seated at the bar for about half an
17     hour before you were at a table?
18        MR. GILLIS: Objection.
19  A. Again, I said we were there for a few
20     minutes.
21  Q. Half an hour doesn't mean a few minutes
22     to you, does it?
23  A. I said fifteen or twenty minutes.
24  Q. At your deposition you said somewhere in

Page 24

1     the range of half an hour, isn't that
2     right?
3        MR. GILLIS: Objection.
4     That's not what he said. That's what
5     you said. There's no testimony prior to
6     Page 70 that says he was there a half an
7     hour. That's you saying a half an hour
8     and you are asking him to adopt your
9     testimony.
10        MR. FARRAH: Which
11     apparently he did.
12        MR. GILLIS: He didn't say
13     he was there half an hour. You said it
14     and he responded to what you said was
15     the time.
16  Q. And the question was, "And it's your
17     best memory that you were about half an
18     hour at the bar, is that right, before
19     you were seated for a table?" The
20     answer was, "Somewhere in that range,"
21     isn't that right?
22  A. Yes.
23  Q. You called before you arrived at the bar
24     that day, is that right?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 7 of 40

Page 25

1  A. Correct.
2  Q. Was that something you typically did
3     when Jeff and you were coming into the
4     Longhorn, call ahead?
5  A. Yes, sometimes.
6  Q. And your cell phone number at the time
7     was 978-302-9620?
8  A. That's what I said there.
9  Q. Does that refresh your memory as to what
10    your cell phone number was back then?
11  A. Yes.
12  Q. What did you say when you called in?
13  A. I was trying to make a reservation.
14  Q. For how many people?
15  A. I don't know. Three? We were supposed
16    to meet a bunch of people there.
17  Q. Do you remember how many people you
18    asked to make a reservation for?
19  A. I don't.
20  Q. At some point in time you communicated
21    with your brother about being at the
22    Longhorn that night, is that right?
23  A. That is correct.
24  Q. Do you remember when you did?

Page 26

1  A. I don't.
2  Q. Was it earlier that day that your
3    brother and you had agreed to hook up at
4    the Longhorn that night?
5  A. I don't think so.
6  Q. Did you call your brother or did your
7    brother call you about getting together
8    at the Longhorn that night?
9  A. I don't recall.
10  Q. Do you remember what either of you said
11    to the other about getting together at
12    the Longhorn that night?
13  A. I think we were both in the area and he
14    had friends and I had friends.
15  Q. And you agreed to try to get together,
16    is that right?
17  A. Yes.
18  Q. Was your brother already at the
19    restaurant before you arrived?
20  A. No, I don't think so.
21  Q. Do you know how long it was after you
22    arrived at the restaurant that you first
23    saw your brother?
24  A. I don't.

Page 27

1  Q. Do you have any way of estimating for me
2    how long it was?
3  A. I believe it was before we got a table.
4  Q. Do you remember seeing your brother at
5    the bar at the Longhorn that night?
6  A. Briefly.
7  Q. What was he drinking at the bar?
8        MR. GILLIS: Objection.
9  A. I don't recall.
10  Q. From the time you arrived at the
11    Longhorn until you left how many beers
12    did you have?
13  A. I don't know.
14  Q. From the time you arrived at the
15    Longhorn until you left did you have any
16    Jack Daniels Manhattans?
17  A. I may have.
18  Q. Do you have a memory of having a Jack
19    Daniels Manhattan?
20  A. I believe so.
21  Q. Is it your best memory that you had more
22    than one Jack Daniels Manhattan that
23    evening?
24        MR. GILLIS: Objection.

Page 28

1  A. I don't remember it.
2  Q. Do you remember being asked a question
3    at your deposition on the bottom of
4    Page 73 and continuing to Page 74, "Let
5    me ask you this. From the time that you
6    got there, how much did you have to
7    drink while you were at the Longhorn?"
8    Your answer was, "A beer or two. From
9    when I -- can you --" I asked the
10    question again, "Until you left. From
11    when you got there until you left, how
12    much did you have to drink?" Do you
13    remember answering, "I would have to say
14    two beers." Does that refresh your
15    memory as to how much beer you had while
16    you were at the Longhorn?
17  A. Somewhat.
18  Q. Do you remember also being asked the
19    question, "Two beers?" And your answer
20    was, "I don't know. I don't know. I
21    don't know what I had to drink." Do you
22    remember that?
23  A. I do now.
24  Q. Do you know what you had to drink that

Case 1:05-cv-10617-MBB   Document 26-6   Filed 05/04/2007   Page 8 of 40

Thomas Scott Espey, 4/25/2006                    Condensett                    Rosario vs. Rare Hospitality

Page 29

1    night at the Longhorn?
2    A. I don't.
3    Q. Then the question was asked of you, "Did
4       you have any Manhattans that night?" Do
5       you see that?
6    A. Yes.
7    Q. And your answer was, "I might have had
8       one. I don't know." Do you see that?
9    A. Yes.
10   Q. Is that your memory today that you might
11      have had one Manhattan but you don't
12      know?
13          MR. GILLIS: Objection.
14   A. Yes.
15   Q. So your memory is the same today as it
16      was back in June of 2004 when you were
17      deposed about how much you had to drink.
18          MR. GILLIS: Objection.
19   A. I don't know how much I had to drink.
20   Q. Do you know where you sat that evening?
21   A. I don't.
22   Q. Do you know the name of your server?
23   A. I don't.
24   Q. Did you know the names of any of the

Page 30

1    servers at the Longhorn that summer?
2    A. I see the name or they introduced
3       themselves.
4    Q. But you had no regular server.
5    A. No.
6    Q. Jeff had no regular server that you know
7       of.
8    A. Not that I recall.
9    Q. Jeff liked Jack Daniels Manhattans, is
10      that right?
11          MR. GILLIS: Objection.
12   A. I don't know.
13   Q. Did he drink Jack Daniels Manhattans
14      that evening?
15   A. Again I don't know. I know they were
16      being served.
17   Q. The Manhattans that were being served
18      were they on the rocks or straight up?
19   A. I don't know.
20   Q. Was there a way that Jeff typically
21      liked to have his Manhattan served?
22   A. Again I can't remember.
23   Q. On Page 93 of your deposition you were
24      asked a series of questions about the

Page 31

1    Manhattans. At Line 11 you were asked,
2    "So you don't know how many Jack
3    Daniels Manhattans were received to the
4    table, is that right?" Do you see
5    that?
6    A. Yes.
7    Q. And your answer was, "I don't." Do you
8       see that?
9    A. I do.
10   Q. Is that your memory today that you don't
11      know how many Jack Daniels Manhattans
12      were delivered to the table?
13   A. Correct.
14   Q. Then you were asked the question, "Were
15      the Manhattans that you do know of
16      served on the rocks or straight up?" Do
17      you see that?
18   A. I do.
19   Q. And your answer after some stuttering,
20      if you'll pardon my characterization,
21      was, "I think straight up, but -- I
22      think straight up." Do you see that?
23   A. I do.
24   Q. Is that your answer today that the

Page 32

1    Manhattans that were delivered to the
2    table were delivered straight up?
3          MR. GILLIS: Objection.
4    A. Again I can't remember.
5    Q. Then you were asked the question, "Is
6       that typically how Jeff liked the
7       Manhattans?" See that?
8    A. I do.
9    Q. Your answer was, "Yup." Do you see
10      that?
11   A. I do.
12   Q. Is that your memory today that that was
13      typically how Jeff liked the
14      Manhattans?
15          MR. GILLIS: Objection.
16   A. Again I don't have any memory.
17   Q. Do you have any memory today of how
18      Jeff, as of September 26, 2003, liked
19      his Manhattans, on the rocks or straight
20      up?
21   A. I don't know.
22   Q. Is your memory exhausted as to how Jeff
23      liked his Manhattans, on the rocks or
24      straight up?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 9 of 40

Thomas Scott Espey, 4/25/2006                    Condenseit                    Rosario vs. Rare Hospitality

Page 33

1    MR. GILLIS: Objection.
2 Q. Do you have a memory of how he liked
3    them?
4 A. I don't.
5 Q. You have no memory of how they were
6    served to the table?
7 A. I don't know that today.
8 Q. It's your best memory you had one
9    Manhattan that night, is that right?
10    MR. GILLIS: Objection.
11 A. I don't know.
12 Q. You may have had no Manhattans that
13    night, is that right?
14    MR. GILLIS: Objection.
15 A. I don't know.
16 Q. You drove that night after you left the
17    Longhorn, is that right?
18 A. I don't know who drove. I don't
19    remember.
20 Q. Today you don't remember?
21 A. I don't.
22 Q. Do you remember testifying in the
23    criminal trial in Lowell?
24 A. I remember testifying.

Page 34

1 Q. Did you testify in the criminal trial
2    that you drove?
3 A. I believe I did.
4 Q. Is there any question in your mind about
5    whether you drove that night after
6    leaving the Longhorn?
7 A. Again I believe I drove.
8 Q. My question to you is is there any doubt
9    in your mind about whether you drove
10    that night after leaving the Longhorn?
11    MR. GILLIS: Objection.
12 A. No.
13 Q. You know you drove, isn't that right?
14    MR. GILLIS: Objection.
15 A. I believe so.
16 Q. You know you drove.
17    MR. GILLIS: Objection. He
18    has answered five times. If you don't
19    like the answer that doesn't give you
20    the right to keep asking.
21 Q. You drove, isn't that right?
22    MR. GILLIS: Objection.
23 A. I believe so.
24 Q. You can't say yes or no to that

Page 35

1    question?
2    MR. GILLIS: Objection.
3 A. Two and a half years ago.
4 Q. That was an especially vivid night in
5    your memory, isn't that right?
6    MR. GILLIS: Objection.
7 Q. Who drove from the Longhorn to wherever
8    you went next?
9    MR. GILLIS: Objection.
10    Asked and answered.
11 A. Again I believe it was myself. That's
12    what I've testified before.
13 Q. After the Longhorn where did you go?
14 A. There's a hotel right around the corner.
15 Q. How long did it take to get there?
16 A. Not very long. It's just over Route 2.
17 Q. While you were at the Longhorn was
18    anyone at your table exhibiting what you
19    took to be signs of intoxication?
20 A. Not that I recall.
21 Q. Have you since spoken to your brother
22    about whether he was drunk or not that
23    night?
24 A. Not that I recall.

Page 36

1 Q. Has your brother told you he was drunk
2    that night at any point?
3 A. Not that I recall.
4 Q. Did Jeff order any Jack Daniels
5    Manhattans at the Longhorn that night?
6 A. I can't recall. I believe so.
7 Q. Was Jeff at the time of the service of
8    the last drink to the table under the
9    influence of intoxicating beverages?
10 A. Not that I recall.
11 Q. Was he loud that night?
12 A. Not that I recall.
13 Q. Was he somewhat loud that night?
14 A. Not that I recall.
15 Q. Do you remember being asked the question
16    at the bottom of Page 80, "Was he loud?"
17    Do you see that?
18 A. I do.
19 Q. Your answer was, "Well -- I think he was
20    somewhat loud but I don't know." Do you
21    see that?
22 A. I do.
23 Q. Does that refresh your memory about
24    whether Jeff was loud that night?

Page 37

1  A. No more so than any other time.
2  Q. Jeff was just a loud guy, is that right?
3        MR. GILLIS: Objection.
4  A. I don't know.
5  Q. What do you mean by no more so than any
6     other time?
7  A. It doesn't stand out in my head.
8  Q. What doesn't stand out in your head?
9  A. That he was loud that night.
10 Q. Were there other times when he was loud?
11 A. Not that I recall.
12 Q. What do you mean no more so than any
13    other time?
14 A. You asked me if it refreshed my memory.
15    I said not that I recall, no more so
16    than any other time.
17 Q. My question is was Jeff loud that night
18    that you can recall?
19        MR. GILLIS: Objection.
20 A. No, not that I can recall at this time.
21 Q. Did anyone who you understood to be an
22    employee of the Longhorn come to the
23    table at any point in time and ask your
24    table to quiet down?

Page 38

1  A. Not that I recall.
2  Q. Is there any question in your mind
3     whether Jeff was intoxicated that night
4     at the restaurant?
5        MR. GILLIS: Objection. Do
6     you understand the question?
7        THE WITNESS: Will you say
8     it one more time.
9  Q. Is there any question in your mind he
10    was intoxicated that night at the
11    restaurant?
12 A. Yes.
13 Q. You're not sure whether he was
14    intoxicated or not, is that right?
15        MR. GILLIS: Objection.
16 A. I'm not sure.
17 Q. He had enough to drink to be intoxicated
18    to your way of thinking, isn't that
19    right?
20        MR. GILLIS: Objection.
21 A. I don't know.
22 Q. You don't know what he had to drink?
23 A. I don't.
24 Q. Has anyone ever told you that there were

Page 39

1     seventeen Jack Daniels Manhattans served
2     to your table that night?
3  A. Not that I remember.
4  Q. Has anyone ever told you how many Jack
5     Daniels Manhattans were served to your
6     table that night?
7  A. I believe it was mentioned at the
8     criminal trial but I don't know.
9  Q. How many people were at the table that
10    night?
11 A. I think seven or eight.
12 Q. Who were they?
13 A. There was myself, my brother, Jeff and
14    Jude and then three of my brother's
15    friends.
16 Q. Who were they?
17 A. Todd and two of his friends from
18    college.
19 Q. Do you know their names?
20 A. I don't.
21 Q. So that's seven people, is that right?
22 A. Yes.
23 Q. Was Jude drinking alcoholic beverages to
24    your memory that night?

Page 40

1  A. Not that I recall.
2  Q. So six of you were drinking alcoholic
3     beverages, is that correct?
4  A. Yes.
5  Q. Among the six of you do you know who
6     drank the seventeen Jack Daniels
7     Manhattans that were delivered to the
8     table?
9        MR. GILLIS: Objection.
10 A. I don't.
11 Q. Did you have more than one Jack Daniels
12    Manhattan at the table that night?
13        MR. GILLIS: Objection.
14 A. I don't recall.
15 Q. Did Jeff have more than one Jack Daniels
16    Manhattan at the table that night?
17 A. I don't recall.
18 Q. How about your brother, did he have more
19    than one?
20 A. I don't recall.
21 Q. Does your brother like beer?
22 A. Does he or did he?
23 Q. Did he.
24 A. Yeah.

Page 41

1  Q. And is it accurate to say that you don't
2     know whether Jeff was drunk by the way
3     he appeared at the restaurant that
4     night?
5          MR. GILLIS: Objection.
6  A. I don't know.
7  Q. One way or the other, is that right?
8  A. That's correct.
9  Q. At the time you were served the last
10    drink you don't know one way or the
11    other whether he was drunk, is that
12    right?
13         MR. GILLIS: Objection.
14 A. That's right.
15 Q. Was Jeff exhibiting behavior that night
16    at the time of the service of the last
17    drink that was consistent with behavior
18    of his that you had seen on other
19    earlier occasions where he was
20    intoxicated?
21         MR. GILLIS: Objection.
22 A. I don't recall.
23 Q. You have seen Jeff intoxicated on other
24    occasions, isn't that right?

Page 42

1  A. I don't know.
2  Q. It's your best memory that you might
3     have had one Jack Daniels Manhattan at
4     the Longhorn that night?
5          MR. GILLIS: Objection.
6  A. I don't recall.
7  Q. I'm going to show you Page 93 of your
8     deposition where I asked you the
9     question, "Is that typically how Jeff
10    liked the Manhattans?" Your answer was
11    "Yup."
12         "Were the Manhattans
13    already mixed when they were delivered
14    to the table?" Your answer was, "You
15    mean already made? Yeah. Yeah."
16         "You don't remember having
17    any, is that right?" Your answer,
18    "I might have had one. I might have
19    had one. I think I had one, but --" Do
20    you see that?
21 A. I do.
22 Q. Does that refresh your memory about
23    whether you had more than one Jack
24    Daniels Manhattan that night at the

Page 43

1     restaurant?
2          MR. GILLIS: Objection.
3  A. No.
4  Q. What is your best memory as to how many
5     Jack Daniels you had that night at the
6     restaurant?
7  A. I don't know.
8  Q. Had you had few enough Jack Daniels
9     Manhattans so that you felt comfortable
10    driving after you left the restaurant?
11 A. I believe so.
12 Q. While you were at the Longhorn do you
13    remember anyone saying to anybody else
14    at the table, "You've had too much to
15    drink" or words to that effect?
16 A. I don't recall.
17 Q. Do you have any memory of anyone saying
18    anything like that to Jeff?
19 A. I don't.
20 Q. Do you remember anyone saying that to
21    you?
22 A. I don't.
23 Q. To your way of thinking as of the time
24    you left the Longhorn had you had too

Page 44

1     much to drink?
2  A. No.
3  Q. How long were you at the Four Points?
4  A. I don't know. Not very long.
5  Q. Do you remember Jeff having a beer
6     there?
7  A. I believe so.
8  Q. Do you remember him having more than one
9     beer while he was there?
10 A. I don't recall.
11 Q. Do you remember Jeff smoking any pot
12    while he was there, marijuana?
13 A. I don't recall.
14 Q. Do you remember anyone smoking marijuana
15    at the hotel?
16 A. No.
17 Q. Was anyone smoking marijuana as far as
18    you knew at the hotel?
19         MR. GILLIS: Objection.
20 A. I don't know.
21 Q. By the time Jeff had had a beer at the
22    Four Points was he exhibiting any signs
23    of intoxication?
24 A. Not that I recall.

Thomas Scott Espey, 4/25/2006    Condensed    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 12 of 49

Page 45

1  Q. At some point in time did you all leave
2     the Four Points?
3  A. We did.
4  Q. Where did you go?
5  A. The Other Side.
6  Q. On the drive from the Longhorn to the
7     Four Points who was where in the truck?
8  A. I don't recall.
9  Q. Your best memory is that you drove.
10 A. I believe so.
11 Q. Is it your best memory, yes or no?
12        MR. GILLIS: Objection.
13 A. Yes.
14 Q. Did I ask you where you next went after
15    the Four Points?
16 A. You did.
17 Q. And you told me where, again?
18 A. The Other Side.
19 Q. And in what town is the Other Side?
20 A. Leominster or Fitchburg.
21 Q. Had you been there before?
22 A. I believe I went there once.
23 Q. Who drove from the Four Points to the
24    Other Side?

Page 46

1  A. I believe I did.
2  Q. Is that your best memory that you drove?
3  A. Yes.
4  Q. Do you know where people were arrayed in
5     the vehicle at that time?
6  A. I don't.
7  Q. Was it Jeff's truck that you drove from
8     the Longhorn to the Four Points?
9  A. It was a rental.
10 Q. That Jeff had had with him when you
11    first met up with him that day?
12 A. Yes.
13 Q. Do you remember what color it was?
14 A. I don't.
15 Q. And was it that same rental truck that
16    you drove from the Four Points to the
17    Other Side?
18 A. Yes.
19 Q. Was Jude with you on both legs of this
20    trip, that is from Longhorn to Four
21    Points and Four Points to the Other
22    Side?
23 A. Yes.
24 Q. And Jeff was in the truck as well on

Page 47

1     both legs of that trip, is that right?
2  A. Yes.
3  Q. Along with his rottweilers.
4  A. Yes.
5  Q. What were their names?
6  A. Daisy and Ruby.
7  Q. Do you have them now?
8  A. I don't.
9  Q. Did you have them at any point in time?
10 A. I did.
11 Q. Did your brother take them?
12 A. No.
13 Q. Did Jude take them?
14 A. No.
15 Q. What happened to Daisy and Ruby?
16 A. Jude's brother took care of them.
17 Q. Where are they today?
18 A. They found either a home for them or a
19    shelter.
20 Q. How did you learn that?
21 A. Dillon told me.
22 Q. Jude's brother?
23 A. Yes.
24 Q. Have you spoken to Mrs. Southworth since

Page 48

1     September 26, 2003?
2  A. Not that I recall.
3  Q. How about Mister?
4  A. Not that I recall.
5  Q. How about Jeff?
6  A. Once.
7  Q. When did you speak to Jeff?
8  A. I don't know.  He called me randomly one
9     day.
10 Q. From prison?
11 A. Yes.
12 Q. Was he awaiting trial or had he been
13    tried already?
14 A. I think he was awaiting.
15 Q. What did he say?
16 A. Nothing really.
17 Q. Did he talk about your upcoming
18    testimony in the criminal trial?
19 A. Not especially.
20 Q. Tell me what you remember he said about
21    your upcoming testimony in the criminal
22    trial.
23        MR. GILLIS: Objection.
24 A. I don't remember talking about it.

Page 49

1  Q. What do you mean by "not especially"?
2  A. He said, "I'm going to trial soon."
3  Q. You knew that, didn't you?
4  A. Yes.
5  Q. Did he talk about what you were going to
6     testify to?
7  A. No.
8  Q. How long was that conversation?
9  A. Not very long.
10 Q. How did he sound, upbeat?
11        MR. GILLIS: Objection.
12 A. I don't know.
13 Q. On the trip from the Longhorn to the
14    Four Points was Jeff in the back with
15    the dogs?
16 A. No.  I believe he was in the back from
17    the Four Points to the Other Side.
18 Q. Was he asleep at any point in time in
19    the back seat on the trip from the Four
20    Points to the Other Side?
21        MR. GILLIS: Objection.
22 A. Not that I recall.
23 Q. Did any of you go into the Other Side?
24 A. No.

Page 50

1  Q. Approximately how long did it take to
2     drive from the Four Points to the Other
3     Side?
4  A. Ten minutes.
5  Q. Why didn't you go into the Other Side?
6  A. We decided we didn't want to.
7  Q. Why?
8         MR. GILLIS: Objection.
9  A. It was getting late.
10 Q. So what was the conversation about going
11    into the Other Side?
12 A. It was, "Let's not go inside."
13 Q. Why?
14        MR. GILLIS: Objection.
15 A. It was getting late.
16 Q. Did the three of you decide you were
17    tired and didn't feel like going in?
18        MR. GILLIS: Objection.
19 A. I believe so.
20 Q. How long were you in the parking lot at
21    the Other Side?
22 A. Briefly.
23 Q. Was there anybody else in the truck from
24    the Four Points to the Other Side that

Page 51

1     you can recall?
2  A. No, not that I can recall.
3  Q. When you say briefly, are we talking
4     less than five minutes in the parking
5     lot?
6  A. Yes.
7  Q. And then where next did your group go?
8  A. We went to Littleton.
9  Q. Did Jeff have anything to drink that you
10    know of in the trip from the Four Points
11    to the Other Side?
12 A. Not that I know of.
13 Q. Did Jeff have anything to drink that you
14    know of in the trip from the Longhorn to
15    the Four Points?
16 A. Not that I know of.
17 Q. Where did you go in Littleton?
18 A. Back to get my vehicle.
19 Q. And the route that you traversed from
20    the Four Points to the Other Side if you
21    can tell us was what?
22 A. Route 12.
23 Q. Did you take what you thought was a
24    direct route from the Four Points to the

Page 52

1     Other Side?
2  A. I believe so.
3  Q. And then the route that you traversed
4     from the Other Side to Littleton was
5     what?
6  A. Probably back to Route 2 and down
7     Route 2.
8  Q. And it took twenty minutes to half an
9     hour to go from the Other Side to
10    Littleton, is that right?
11 A. Yes, I would say so.
12 Q. On the ride from the Other Side to
13    Littleton did you have any conversations
14    with Jeff about Jeff as to whether he
15    should just sleep in the truck?
16 A. I believe it came up and he said he was
17    fine.
18 Q. Do you remember telling him that he
19    should just sleep in the truck?
20 A. I don't remember the exact words.
21 Q. Do you remember being deposed and on
22    Page 118 you were asked the question,
23    "Had there been any arguments between
24    Jeff and you in the ride from the strip

Case 1:05-cv-10617-MBB     Document 26-6     Filed 05/04/2007     Page 14 of 40

Page 53

1    club to Littleton?" Do you see that?
2  A. Yes.
3  Q. Your answer was, "Um, I think I -- I --
4    for some reason I remember telling him
5    that he should just sleep in his truck."
6    Do you see that?
7  A. Yes.
8  Q. Do you remember saying that to him?
9  A. Not those exact words.
10  Q. Do you remember in essence telling him
11    that he should just sleep in the truck?
12  A. I don't remember telling him that but I
13    know it was discussed.
14  Q. Between Jeff and you?
15  A. Yes.
16  Q. And the reason it was discussed was
17    because to your way of thinking Jeff had
18    had too much to drink that night, isn't
19    that right?
20        MR. GILLIS: Objection.
21  A. Sorry, one more time.
22  Q. The reason it was discussed was because
23    to your way of thinking Jeff had had too
24    much to drink that night, isn't that

Page 54

1    right?
2        MR. GILLIS: Objection.
3  A. It's more if you go out with somebody
4    you ask them if they are all right.
5  Q. After saying that you remembered telling
6    him that he should just sleep in the
7    truck do you remember being asked the
8    question, "And that was because he'd had
9    too much to drink, isn't that right?"
10    Do you remember that?
11        MR. GILLIS: Objection.
12  A. I do now.
13  Q. You see it here in your deposition.
14  A. Yes.
15  Q. And your answer was, "Yes, yes." Do you
16    see that?
17  A. I do.
18  Q. And did you believe that night when you
19    told him he should sleep in the truck
20    that he had had too much to drink and
21    should not drive?
22  A. I don't recall.
23  Q. Is your memory refreshed by what you see
24    here on Page 118 of your deposition as

Page 55

1    to whether you told him that night that
2    he should just sleep in the truck
3    because to your way of thinking he had
4    had too much to drink?
5        MR. GILLIS: Objection.
6  A. I said it there but I don't remember it.
7  Q. Was your memory better of the events in
8    June of 2004 than it is today?
9        MR. GILLIS: Objection.
10  A. It's a smaller time frame.
11  Q. Was your memory better back then of the
12    events than it is today?
13        MR. GILLIS: Objection.
14  A. Yes.
15  Q. Do you have any reason to doubt the
16    accuracy of your testimony on Page 118
17    that you told him he should sleep in the
18    truck because he had had too much to
19    drink?
20        MR. GILLIS: Objection.
21  A. Say that one more time.
22  Q. Do you have any reason to doubt the
23    accuracy of your memory back in June of
24    2004 that you told him he should sleep

Page 56

1    in the truck because he had had too much
2    to drink?
3        MR. GILLIS: Objection.
4        MR. FARRAH: Could you read
5    back that question, please, Ros.
6        [Question read.]
7  Q. Yes, no, or I don't understand the
8    question?
9        MR. GILLIS: Objection.
10  A. I don't understand the question.
11  Q. This transcript on Page 118 says you
12    said at your deposition, of which this
13    transcript, I believe, is an accurate
14    recitation, you said the words, "I
15    remember telling him that he should just
16    sleep in his truck," isn't that right?
17    Do you remember saying those words?
18        MR. GILLIS: Objection.
19  A. Not exactly.
20  Q. Do you remember having a conversation
21    with him about that he should just sleep
22    in the truck?
23  A. I remember it being discussed, yes.
24  Q. And do you remember saying to him, "You

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 15 of 40

Thomas Scott Espey, 4/25/2006              Condenselt              Rosario vs. Rare Hospitality

Page 57

1      should just sleep in the truck," or
2      words to that effect?
3   A. Again I remember it being discussed.
4   Q. What do you remember about the
5      discussion, Mr. Espey?
6   A. I asked him if he was all right to
7      drive.
8   Q. Because you thought he had had too much
9      to drink, isn't that right?
10         MR. GILLIS: Objection.
11  A. That's what you do when you go out with
12     somebody.  You ask them if they are all
13     right.
14  Q. Well, if they've had too much to drink,
15     isn't that right?
16         MR. GILLIS: Objection.
17  A. Not always.
18  Q. In this case that night when you asked
19     him if he was all right was it because
20     you believed he had too much to drink?
21         MR. GILLIS: Objection.
22  A. I don't know.
23  Q. You don't know?  You're here under oath.
24  A. I know.   Again I don't know.

Page 58

1   Q. Do you remember what you said to him
2      back in June of 2004 as to why you said
3      to him he should just sleep in his
4      truck?
5   A. I see it right there.
6   Q. Why you said that to him back then was
7      because, let me read it again, "Because
8      he had too much to drink," isn't that
9      right?
10         MR. GILLIS: That's your
11     testimony.
12  Q. What was your answer to that question?
13  A. I answered yes.
14  Q. You answered truthfully yes, isn't that
15     right, back in 2004?
16  A. Yes.  I was under oath.
17  Q. And you are under oath today.
18  A. Yes.
19  Q. Is your memory refreshed that you had
20     the conversation with him about just
21     sleeping in his truck because you
22     believed he had too much to drink?
23         MR. GILLIS: Objection.
24     Asked and answered about ten times.

Page 59

1   A. I asked him if he was all right to
2      drive.
3   Q. Because you thought he had too much to
4      drink, isn't that right?
5         MR. GILLIS: Objection.
6   A. Because I was a concerned friend.
7   Q. And you were concerned because you
8      thought he had had too much to drink,
9      isn't that right?
10         MR. GILLIS: Objection.
11  Q. Isn't that right?
12  A. I don't know what I thought then.
13  Q. You know what you thought back in June
14     of 2004.
15  A. It's on the paper right there.
16  Q. Do you adopt that?
17         MR. GILLIS: Objection.
18  A. I believe I did it out of being
19     concerned.
20  Q. Because you thought he had had too much
21     to drink as you testified to in June of
22     2004, isn't that right?
23         MR. GILLIS: Objection.  He
24     never testified to that.

Page 60

1         MR. FARRAH:  Of course he
2      testified to that.
3         MR. GILLIS: He adopted your
4      statement.
5         MR. FARRAH:  That's not
6      testifying to it?
7         MR. GILLIS: Objection to
8      the question.
9   Q. Did I speak to you before your
10     deposition about anything you were going
11     to testify to back in June of 2004 or
12     any time before June of 2004, sir?
13  A. Not that I recall.
14         MR. GILLIS: Objection.
15     Referring to Lines 13 and 14 it was your
16     testimony as to why he did it and he
17     just adopted your testimony.
18  Q. What did Jude say that night about
19     whether or not Mr. Southworth should
20     sleep in the truck?
21         MR. GILLIS: Objection.
22  A. I don't know what Jude said.
23  Q. Do you remember Jude being part of that
24     conversation?

Page 61

1   A. I don't remember.
2   Q. What did Mr. Southworth say when you
3       told him he should just sleep in the
4       truck?
5   A. I don't remember.
6   Q. Did he say "Okay"?
7   A. Apparently not.
8   Q. Did he swear at you?
9   A. I don't remember.
10  Q. Were you afraid of him?
11  A. No.
12  Q. A little bit?
13  A. I wouldn't say so.
14  Q. Are you afraid of him now?
15  A. No.
16  Q. Are you sure?
17  A. Yes.
18  Q. Is it accurate to say that the reason
19      you didn't go into the strip club was
20      because Jeff was too drunk?
21         MR. GILLIS: Objection.
22  A. I don't recall.
23  Q. Do you remember what he said about going
24      into the strip club while you were in

Page 62

1       the parking lot?
2   A. I don't recall.
3   Q. At some point in time did Jeff become
4       adamant that he wanted to go home that
5       night?
6   A. I believe we all did.
7   Q. My question to you is at some point in
8       time did Jeff become adamant that he
9       wanted to go home that night?
10         MR. GILLIS: Objection.
11  A. I don't recall.
12  Q. Do you remember being asked that
13      question on Page 119, "And he was
14      adamant about that, is that right?" Do
15      you remember that?
16  A. I see it.
17  Q. The answer was, "Yeah, he did not want
18      to go," and that was to go into the
19      strip club, isn't that right?
20         MR. GILLIS: Objection.
21  Q. Is that right?
22  A. Yes.
23  Q. Do you remember being asked the
24      question, "And you weren't going to mess

Page 63

1       with him, isn't that right?"  That was
2       in your deposition on Page 119, Line 14.
3       Do you remember what your answer was?
4   A. I see it now.
5   Q. And the truth of the matter is you were
6       afraid of Jeff, isn't that right?
7          MR. GILLIS: Objection.
8   A. He's a big guy.
9   Q. Can you give me a "Yes, I was afraid of
10      Jeff because he is a big guy" as your
11      answer?
12         MR. GILLIS: Objection.
13      Read the whole answer.
14  Q. The truth of the matter is you were
15      afraid of Jeff, isn't that right?
16         MR. GILLIS: Objection.
17  A. Physically?
18  Q. Yes.
19  A. Yes.
20  Q. That wasn't so hard, was it, to say yes?
21         MR. GILLIS: Objection and
22      move to strike.
23  Q. And you were afraid of Jeff all the way
24      up through the time that you testified

Page 64

1       at the criminal trial, isn't that right?
2       ?
3          MR. GILLIS: Objection.
4   A. I don't believe so.
5   Q. Did you testify truthfully at the
6       criminal trial?
7   A. Yes.
8   Q. Did you give it your best effort at the
9       criminal trial?
10  A. Yes.
11  Q. Did you give it your best effort at your
12      deposition in June of 2004?
13  A. Yes.
14  Q. And you are doing that today, is that
15      right?
16  A. Yes.
17  Q. Jeff ran over your ankle backing out of
18      the parking lot, is that right?
19  A. Correct.
20  Q. And you had to go to the hospital, isn't
21      that right?
22  A. Correct.
23  Q. And when you went to the hospital you
24      told people you injured yourself dirt

Thomas Scott Espey, 4/25/2006    Condensent    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB  Document 26-6  Filed 05/04/2007  Page 17 of 40

Page 65

1    biking, is that correct?
2 A. Right.
3 Q. Why did you lie?
4 A. I wasn't sure what the insurance was
5    going to cover.
6 Q. You wanted to be sure the insurance
7    covered you, is that right?
8 A. I wasn't sure about insurance. I really
9    didn't want to get involved.
10 Q. So you told a lie, is that right?
11      MR. GILLIS: Objection.
12 Q. That was a lie, wasn't it?
13 A. That was, yes.
14 Q. And that's the only lie you've ever told
15    about what happened with Jeff Southworth
16    that night, is that right?
17 A. Correct.
18 Q. Did Jeff say anything to you as he ran
19    over your ankle that night?
20 A. Not that I recall.
21 Q. Which ankle was it?
22 A. My right.
23 Q. And how much time elapsed from when you
24    pulled into the parking lot at your

Page 66

1    grandmother's apartment complex, the
2    Pond Side, until Jeff ran over your
3    ankle?
4 A. I don't recall. Not a long time,
5    though.
6 Q. What happened in the parking lot prior
7    to the time that he ran over your ankle?
8 A. We unloaded our dirt bike gear and he
9    started backing out.
10 Q. Did you give Jeff the keys to the truck
11    so he could drive away?
12 A. I don't recall.
13 Q. Did you leave the keys in the ignition
14    and get out the driver's seat?
15 A. I don't recall.
16 Q. What were you doing when he ran over
17    your ankle?
18 A. I believe I was getting some stuff out
19    of the bed of the truck.
20 Q. You had not yet retrieved all of
21    whatever it was you had put in the bed
22    of his truck before he ran over your
23    ankle, is that right?
24      MR. GILLIS: Objection.

Page 67

1 A. I don't know.
2 Q. What was in the bed of his truck?
3 A. Dirt bikes and dirt bike gear.
4 Q. What of yours was in the bed of his
5    truck that you had to retrieve that
6    night?
7 A. I had a helmet and some other protective
8    equipment and Jude had a bunch of
9    equipment.
10 Q. What was the other protective equipment
11    that you had besides the helmet?
12 A. Knee pads, chest protector, different
13    clothing.
14 Q. Were they in a duffel bag or something
15    like a duffel bag?
16 A. Yes.
17 Q. So what you had to retrieve from the
18    truck was your helmet and duffel bag, is
19    that right?
20 A. I believe we were getting Jude's stuff.
21 Q. I just want to know what you had to
22    retrieve from the truck. Helmet and
23    duffel bag?
24 A. I believe so.

Page 68

1 Q. Your cooler too?
2 A. I don't recall.
3 Q. Where was the cooler during the trip
4    from Longhorn to the Four Points?
5 A. I believe it was in the bed.
6 Q. Not where the seats are but in the back
7    where the bikes were, is that right?
8 A. I believe so.
9 Q. And Jude had to retrieve what from the
10    truck at Littleton?
11 A. Helmet and duffel bag.
12 Q. Same as you.
13 A. Correct.
14 Q. Is it accurate to say that you could
15    carry the helmet in one hand and the
16    duffel bag in the other hand or over the
17    other shoulder?
18 A. Yes.
19 Q. You didn't need to make two trips to
20    carry the helmet and the duffel bag, is
21    that right?
22 A. Not that I recall.
23 Q. Is that, "No, we didn't need to make two
24    trips"?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 18 of 40

Thomas Scott Espey, 4/23/2006                    Condenselt™                    Rosario vs. Rare Hospitality

Page 69

1  A. Not that I recall.
2  Q. And Jeff on the trip from the Other Side
3     to the parking lot in Littleton was in
4     the second row of seats, the back seat,
5     is that right?
6  A. I don't recall.
7  Q. Wasn't he in back there with his dogs?
8  A. He was at some point.
9  Q. Do you have any belief that he changed
10    seats from where he was in the trip from
11    the Four Points to the Other Side in the
12    trip from the Other Side to Littleton?
13 A. I don't believe so.
14 Q. How much time elapsed from when you got
15    out of the truck before Jeff ran over
16    your ankle?
17 A. A couple of minutes.
18 Q. Was there any discussion that went on
19    during that couple of minutes?
20 A. I believe I asked him if he was all
21    right to drive and he said yes.
22 Q. How many times up to that point had you
23    asked him if he was all right to drive?
24 A. I believe only once.

Page 70

1  Q. And that's when you had the conversation
2     about should he sleep in the truck or
3     not.
4  A. I believe so.
5  Q. Jeff is bigger than you.
6  A. Yes.
7  Q. How much bigger than you is he?
8  A. I was about 180 at the time.  He was
9     like 220, 230.
10 Q. You had seen him in fights before, is
11    that right?
12 A. Yes.
13 Q. And you had seen him beat up people
14    before, is that right?
15 A. It's not like a big long fight.
16 Q. It was quick, he beat them up quick, is
17    that right?
18        MR. GILLIS: Objection.
19 A. No.  I've seen him throw a punch or two.
20 Q. Did he ever throw a punch at you?
21 A. No.
22 Q. You didn't want him to throw a punch at
23    you, is that right?
24        MR. GILLIS: Objection.

Page 7

1  Q. After he ran over your ankle did you say
2     anything to him?
3  A. Not that I recall.
4  Q. Did you say anything at all after he ran
5     over your ankle that you can recall?
6  A. I probably cursed a little bit.
7  Q. Do you remember cursing a little bit?
8  A. I just got run over.
9  Q. I'm going to show you a document and ask
10    you if you recognize your signature at
11    the bottom.
12 A. I do.
13 Q. And that's a document you gave the
14    police, is that right?
15 A. Yes.
16 Q. Is that your handwriting?
17 A. It is.
18 Q. And do you agree with the date of
19    November 2, 2003 as on or about the date
20    you made the document?
21 A. I believe so.
22        [Handwritten document by
23        Scott Espey marked Scott
24        Espey Exhibit No. 1 for

Page 7

1        Identification.]
2  Q. The police asked you to make this
3     document, is that right?
4  A. Correct.
5  Q. At your house or someplace else?
6  A. My house.
7  Q. Was your brother with you when you made
8     this document?
9  A. I don't believe so.
10 Q. How many police officers came to see
11    you?
12 A. One.
13 Q. I apologize because a bit of it has been
14    cut off but at the bottom it says here
15    on the third line down, "We couldn't
16    help so we returned home."  Then it
17    says, "At the" something "we all ordered
18    beer and Manhattans."  Do you see that?
19 A. I do.
20 Q. What does that sentence read?
21 A. It says "At the Longhorn," I believe,
22    "we all ordered beer and Manhattans."
23 Q. Is that true that at the Longhorn you
24    all ordered beer and Manhattans?

Case 1:05-cv-10617-MBB   Document 26-6   Filed 05/04/2007   Page 19 of 40

Page 73

1    MR. GILLIS: Objection.
2 Q. That's what you believed at the time?
3 A. Yes.
4 Q. Did you believe the persons who were
5    drinking alcoholic beverages at the
6    table, the six people, were drinking
7    beers as well as Manhattans?
8      MR. GILLIS: Objection.
9 A. That's what I believed then.
10 Q. That your memory was better two months
11    after the accident than it is today
12    would you agree with me?
13 A. I would agree.
14 Q. What happened next after he ran over
15    you?
16 A. I got up and went to my truck and
17    realized I didn't have my keys to the
18    vehicle.
19 Q. What did you do at that point?
20 A. We tried contacting him.
21 Q. By cell phone?
22 A. Correct.
23 Q. Did you speak to him?
24 A. One of us did.

Page 74

1 Q. Do you remember what was said to him?
2 A. One of us said, "We're locked out of
3    Scott's vehicle. You just ran over his
4    ankle."
5 Q. What did he say?
6 A. I think he kind of questioned it at
7    first.
8 Q. Really?
9 A. I believe so.
10 Q. Do you remember what he said?
11 A. I don't.
12 Q. You took it to be disbelief on his part
13    that he could actually have done that,
14    is that right?
15      MR. GILLIS: Objection.
16 A. Again I don't recall.
17 Q. You just testified he questioned it.
18    What did you mean by that?
19      MR. GILLIS: Objection.
20 A. It was more surprise than disbelief.
21 Q. How long after he ran over your ankle
22    was it that you had this conversation?
23 A. Not long at all.
24 Q. Less than five minutes?

Page 7

1 A. Yes.
2 Q. Did he tell you where he was when you
3    had that conversation?
4 A. I believe he said he was on 495.
5 Q. Did he tell you what he would do in that
6    conversation?
7      MR. GILLIS: Objection.
8 A. Eventually he said he was turning
9    around.
10 Q. To bring back the keys as far as you
11    know.
12 A. As far as I know.
13 Q. When you say eventually what do you
14    mean?
15 A. For some reason I believe there was a
16    string of calls back and forth.
17 Q. Initially.
18 A. Initially, yes.
19 Q. What do you remember was said during
20    those calls back and forth?
21      MR. GILLIS: Objection.
22 A. That we were locked out and I had a
23    broken ankle.
24 Q. Do you remember what he said in response

Page 7

1    other than disbelief?
2 A. I don't know what he said.
3 Q. Do you know why it took a string of
4    calls for him to agree to come back with
5    the keys?
6 A. I believe there was cell phone reception
7    or something.
8 Q. At some point in time did you come to
9    understand that he was heading back with
10    the keys?
11 A. I did.
12 Q. Did he come back with the keys?
13 A. No.
14 Q. At some point in time did you take some
15    action to be able to drive your truck?
16 A. We did.
17 Q. What did you do?
18 A. I had a spare key in the truck so Jude
19    knocked out a rear window. I told him
20    to.
21 Q. He broke the window, is that right?
22 A. Yes.
23 Q. How long did you wait for him to come
24    back before you decided it would be

Page 77

1 better to knock out the window?
2 A. I don't know. A little while.
3 Q. Ten minutes, fifteen minutes?
4 A. I was in a lot of pain.
5 Q. Then after you knocked out the window
6   did you ever again speak to Jeff
7   Southworth?
8 A. Not for a long time.
9 Q. Finally he called you on the cell phone
10   at night?
11 A. No. After we had waited for a while he
12   called and said he was in an accident.
13 Q. Then you knocked out the window.
14 A. Yes.
15 Q. How much time elapsed between the last
16   of the calls to confirm that he was
17   going to come back with the keys until
18   he called you and said, "I'm in an
19   accident"?
20 A. I don't know. Not a long time.
21 Q. What did he say about the accident?
22 A. He just said he was in an accident.
23 Q. Did he say where?
24 A. I don't remember.

Page 78

1 Q. Did he say he needed help?
2 A. I believe so, yes.
3 Q. Did you ask him where he was?
4 A. I don't know if I asked or if he said or
5   if we just knew he was on 495.
6 Q. And the question is, "Do you remember
7   the conversation you had with him when
8   he told you he had been in an accident?"
9   Your answer was, "He told me he was in
10   an accident and he needed help." Do you
11   see that?
12 A. I do.
13 Q. And that is in accordance with your
14   memory of what happened that night, is
15   that right?
16 A. Yes.
17 Q. And then the question was, "What else
18   did he say?" "That was it, I believe."
19   "What did you say to him?" "I said -- I
20   believe I asked him where he was. He
21   said 495." Do you remember that?
22 A. I do now.
23 Q. Does that accord with your memory of the
24   conversation you had with him that

Page 79

1   night?
2 A. Yes.
3 Q. Did you have any more conversation with
4   him in that phone call about the
5   accident other than what is in your
6   deposition and you have adopted today?
7       MR. GILLIS: Objection.
8 A. Not that I recall.
9 Q. After that phone call and the back
10   window was broken in the truck and you
11   grabbed the keys did you try to find
12   him?
13       MR. GILLIS: Objection.
14 A. Yes.
15 Q. Tell me where you went, what you did,
16   what you saw.
17 A. We just went up 495 and saw him. It was
18   a pretty bad accident.
19 Q. You went up 495 northbound initially, is
20   that right?
21 A. Correct.
22 Q. Why did you head north on 495?
23 A. Because he lived north of Middleton.
24 Q. Was that the direction you believed he

Page 80

1   was headed in?
2 A. Yes.
3 Q. As you were proceeding northbound on 495
4   did you see this pretty bad accident
5   that you talked about a few moments ago?
6       MR. GILLIS: Objection.
7 A. We saw emergency vehicles.
8 Q. Were they northbound on 495?
9 A. Southbound.
10 Q. Can you tell me the approximate location
11   of where you saw the emergency vehicles
12   southbound on 495?
13 A. Chelmsford and Westford.
14 Q. As you were traveling northbound on 495
15   did you see these emergency vehicles on
16   the southbound side?
17 A. I did.
18 Q. What did you do, if anything?
19 A. First we didn't believe it was his
20   accident so we kept going and we didn't
21   see anything else so we turned around
22   and drove back.
23 Q. Why didn't you believe it was his
24   accident?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 21 of 40

Thomas Scott Espey, 4/23/2006                    Condenselt!                    Rosario vs. Rare Hospitality

Page 81

1 A. It was a pretty bad accident scene.
2 Q. Describe for me what you remember about
3    that accident.
4 A. Police cars and ambulances.
5 Q. Fire trucks?
6 A. Maybe. I don't recall. A lot of
7    emergency vehicles.
8 Q. You saw this from the northbound lane,
9    is that right?
10 A. Correct.
11 Q. As you kept going southbound you didn't
12    see any what appeared to be accident
13    scenes, is that right?
14 A. That's correct.
15 Q. So you turned around and then had an
16    opportunity to see from the southbound
17    lane of travel the accident scene, is
18    that right?
19       MR. GILLIS: Objection.
20 A. We went by it.
21 Q. Tell me what you saw.
22 A. We saw a lot of emergency vehicles,
23    firemen, EMTs, police officers.
24 Q. Ambulances?

Page 82

1 A. Yes.
2 Q. Did you see Mr. Southworth anywhere?
3 A. I didn't.
4 Q. Did you see his car anywhere?
5 A. I didn't.
6 Q. Did you see any non-official vehicle,
7    any cars?
8 A. Not that I recall.
9 Q. Any evidence of any vehicles you thought
10    had been in the accident?
11 A. Not that I recall.
12 Q. What did you do after you traveled past
13    the accident scene?
14 A. Went home.
15 Q. Did you try to call Mr. Southworth at
16    all from the time that he told you he
17    was in an accident until you went home?
18 A. I believe I tried calling him later but
19    there was no answer.
20 Q. Is it accurate to say that as of the
21    summer of 2003 Jeff Southworth was your
22    friend?
23 A. Yes.
24 Q. Did you own a dirt bike as of the summer

Page 83

1    of 2003?
2 A. I did not.
3 Q. And was Jeff letting you use one of his
4    dirt bikes that summer?
5 A. He was.
6 Q. And had Jeff and you talked about buying
7    the dirt bike from him?
8 A. It was discussed.
9 Q. Was that your hope that summer that you
10    could buy the dirt bike from Jeff?
11 A. We talked about it. I don't know if it
12    was going to happen or not.
13 Q. You wanted it to happen, is that right?
14 A. Yes.
15 Q. Is it accurate to say that you did not
16    want any testimony you gave in any
17    proceeding to hurt your friend Jeff
18    Southworth, is that accurate to say?
19       MR. GILLIS: Objection.
20 A. No.
21 Q. What is inaccurate about that statement?
22 A. I'm not going to hurt myself for him.
23 Q. What do you mean by that?
24 A. You say you don't want my testimony to

Page 84

1    hurt him. I'm not going to sit here
2    under oath and say something that is not
3    the truth.
4 Q. Did you speak to any police officers
5    about this night?
6 A. Yes.
7 Q. How many times did you speak to police
8    officers about this night?
9 A. Just once.
10 Q. Do you know who you spoke to?
11 A. A State Trooper.
12 Q. Did you speak to any prosecutors about
13    testifying in the criminal case?
14 A. I was subpoenaed to the Grand Jury in
15    the criminal case.
16 Q. You testified in the Grand Jury?
17 A. Yes.
18 Q. You testified truthfully in the Grand
19    Jury to the best you recall?
20 A. Yes.
21 Q. Then you testified at trial, is that
22    right?
23 A. That's right.
24 Q. You testified truthfully at the trial?

Page 85

1   A. I did.
2   Q. And you have testified truthfully here
3      today.
4   A. Yes.
5   Q. And you testified truthfully in June of
6      2004, is that right?
7   A. I did.
8   Q. Did you ever speak to any attorneys you
9      understood were representing Jeff
10     Southworth?
11   A. Just that one day in June.
12   Q. Did you ever speak to anyone you
13     understood was Jeff's criminal lawyer?
14   A. I was questioned by him at the criminal
15     case.
16   Q. Other than being examined by him during
17     the criminal trial did you ever speak to
18     him?
19   A. No, not that I recall.
20   Q. Did you ever speak to any investigators
21     that you understood were working for
22     Jeff's lawyers?
23   A. I was contacted by them.
24   Q. Who contacted you?

Page 86

1   A. I don't know what his name was.
2   Q. Did he give you a card?
3   A. He didn't.
4   Q. Did you meet with him?
5   A. He called on my cell phone.
6   Q. What did he say to you?
7   A. He asked me a few questions and I didn't
8      really want to talk to him.
9   Q. Why was that?
10   A. I didn't know who he was.
11   Q. He told you who he was, didn't he?
12   A. Yes. He called me randomly on the cell
13     phone and said, "I'm so-and-so."
14   Q. Did he want to meet with you?
15   A. I don't believe so.
16   Q. Have you at any time spoken to any
17     persons you understand to be
18     investigators about this incident?
19   A. Yes.
20   Q. Who have you spoken to?
21   A. Somebody came to my house a week or two
22     ago.
23   Q. Mr. Dinatale?
24   A. I don't know his name.

Page 87

1   Q. He identified himself as a private
2      investigator, is that right?
3   A. Yes.
4   Q. How did he happen to come to your house?
5   A. He knocked on the door and that was it.
6   Q. Had he called in advance to let you know
7      he was coming?
8   A. No.
9   Q. Had he spoken to your mother or your
10     father to let you know?
11   A. No.
12   Q. About a week ago this happened, is that
13     right?
14   A. Yes. Last Monday.
15   Q. What time of day or night was it
16     came?
17   A. The middle of the day.
18   Q. Without warning?
19        MR. GILLIS: Objection.
20   A. Yes.
21   Q. What did he look like?
22   A. Middle age.
23   Q. What color hair?
24   A. Gray.

Page 88

1   Q. Short or tall?
2   A. Average size.
3   Q. Did he give you a card?
4   A. Yes.
5   Q. Do you have it with you?
6   A. I don't think so.
7   Q. Will you check?
8        [Short pause.]
9        THE WITNESS: I don't have
10     it.
11   Q. How long were you with him that day?
12   A. Not long, ten minutes.
13   Q. Did you invite him into the house?
14   A. No.
15   Q. Where did you have the conversation?
16   A. Right at the front door.
17   Q. Who else was present?
18   A. Myself and him.
19   Q. What did he say to you?
20   A. He gave me my transcripts and that was
21     about it.
22   Q. Which transcripts did he give you?
23   A. From when I was here last June.
24   Q. You had that transcript already, didn't

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 23 of 40

Page 89

1    you?
2    A. Somewhere at my house.
3    Q. You said he gave you your transcripts.
4    A. He gave me my transcript and my
5       brother's transcript.
6    Q. Both of you.
7    A. Yes.
8    Q. Did he say, "This other transcript is
9       for your brother"?
10   A. Yes.
11   Q. You hadn't contacted him to come down
12      with those transcripts, had you?
13   A. No.
14   Q. And you hadn't contacted anyone to have
15      someone like this fellow come down and
16      bring the transcripts to you, is that
17      right?
18   A. That's right.
19   Q. Has Mr. Gillis's office been in touch
20      with you prior to today?
21   A. No.
22   Q. No one from Mr. Gillis's office got in
23      touch with you prior to today, is that
24      right?

Page 90

1    A. That's correct.
2    Q. This fellow showed up at your door with
3       two transcripts, is that right?
4    A. Yes.
5    Q. And a business card.
6    A. Yes.
7    Q. But you can't now find the card, is that
8       right?
9    A. I don't have it with me, no.
10   Q. You talked to him for about ten minutes,
11      is that right?
12   A. Yes.
13   Q. What did he say and what did you say?
14   A. He asked me my name and I identified
15      myself. He said, "Basically you're
16      going to have a deposition next week"
17      and I confirmed that. I asked him what
18      the procedure is, if I needed
19      representation and what happens if I
20      don't show, rescheduling, stuff like
21      that.
22   Q. He identified himself as who?
23   A. I can't remember his name. He was a
24      private investigator.

Page 91

1    Q. Working for Rare Hospitality?
2    A. Essentially, yes, I believe so.
3    Q. Did he mention Mr. Gillis's law firm's
4       name?
5    A. He said Mr. Gillis.
6    Q. From the day you were born until today
7       had you ever spoken to Mr. Gillis?
8    A. No.
9    Q. You had never met him, is that right?
10   A. That's correct.
11   Q. From the day you were born until today
12      other than this fellow who came to your
13      house last Monday had you ever spoken to
14      anyone you understood was working on Mr.
15      Gillis's behalf?
16   A. No.
17   Q. Or on the behalf of Mr. Gillis's
18      clients?
19   A. No.
20   Q. You asked him about the procedure for
21      the deposition.
22   A. Somewhat, yes.
23   Q. Did you trust this person?
24   A. No more than any other person that shows

Page 92

1       up at your door.
2    Q. Why were you asking him about the
3       procedure if you didn't trust him?
4    A. He had a transcript. He had a card.
5    Q. So you trusted him.
6            MR. GILLIS: Objection.
7    A. I asked him for his input on the
8       situation.
9    Q. Why did you ask him for his input on the
10      situation?
11   A. Because he seemed to be a part of the
12      situation.
13   Q. You understood that he was working for
14      one side in this case, isn't that right?
15   A. That's right.
16   Q. And did you believe when you asked him
17      for his input into the situation that he
18      would answer your request with input
19      that was favorable to his side of the
20      case?
21   A. It was more what happens if I don't show
22      up? Is this something that can be
23      rescheduled, and that was about it.
24   Q. What other input did you ask him for?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 24 of 40

Thomas Scott Espey, 4/25/2006          Condenseit          Rosario vs. Rare Hospitalit

Page 93

```
 1  A. That's it.
 2  Q. Did you discuss with him at all other
 3     than what you have just told me your
 4     testimony today?
 5  A. No, I did not.
 6  Q. Did you discuss with him at all the
 7     events of the night of September 26,
 8     2003 at the Longhorn?
 9  A. I did not.
10  Q. You testified earlier today that you are
11     not even sure whether you had finished
12     the beer that you ordered at the bar.
13     Do you recall that testimony?
14         MR. GILLIS: Objection.
15  A. I do.
16  Q. And what I want to know is did you
17     discuss at all with this fellow who
18     showed up on Monday at your house that
19     issue?
20  A. No.
21  Q. When is the first time you told anyone
22     that you are not sure whether you
23     finished the beer that you had at the
24     bar?
```

Page 9

```
 1  A. That I was only there a few minutes at
 2     the bar?
 3  Q. Yes.
 4  A. I don't, no.
 5  Q. That's another guess, isn't it, that you
 6     probably told the Grand Jury the first
 7     time that you were only at the bar for a
 8     few minutes?
 9  A. I would say that's an estimation.
10  Q. A guess.
11         MR. GILLIS: Objection.
12     Asked and answered.
13  A. An estimation. I don't know.
14  Q. Do you have a memory of what you told
15     the Grand Jury about how long you were
16     at the bar?
17  A. No.
18  Q. Have you ever seen your Grand Jury
19     transcript?
20  A. I know it was presented to me at the
21     criminal trial.
22  Q. Who presented it to you?
23  A. I think the D.A. I don't know.
24  Q. Do you have a memory today that you
```

Page 94

```
 1         MR. GILLIS: Objection.
 2  A. Probably when I testified here last
 3     summer.
 4  Q. Did you review your testimony to see if
 5     that was the case?
 6  A. I didn't.
 7  Q. You are just guessing, is that right,
 8     when you answer the question that way?
 9  A. I told you the truth then. I'm telling
10     you the truth now.
11  Q. You also testified today about how long
12     you were at the bar, that it might have
13     been just a few minutes you were at the
14     bar. Do you remember that testimony?
15  A. Yes.
16  Q. Do you remember discussion that with the
17     fellow who showed up at your house?
18  A. No.
19  Q. When is the first time you told anybody
20     that you might have been at the bar only
21     a few minutes that night?
22  A. Probably at the Grand Jury.
23  Q. Do you have any memory of telling that
24     to the Grand Jury?
```

Page 9

```
 1     testified to the Grand Jury that you
 2     were only at the bar for a few minutes
 3     before you were seated at the table?
 4  A. Yes.
 5  Q. You also have a memory that you
 6     testified in June of 2004 that you were
 7     seated at the bar for approximately half
 8     an hour before you went to the table.
 9         MR. GILLIS: Objection.
10  A. A few minutes.
11  Q. Half an hour? Is that what you meant
12     by a few minutes?
13  A. I said twenty minutes earlier to that.
14     I said a few minutes. You said, "How
15     long?" I said fifteen or twenty and in
16     here it says a half hour.
17  Q. What does a few minutes mean to you?
18  A. Twenty minutes, twenty-five minutes,
19     half hour.
20  Q. And that's what you meant when you told
21     the Grand Jury you were at the bar for a
22     few minutes?
23  A. Yes.
24  Q. And is it your testimony that after dirt
```

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 25 of 40

Page 97

1  biking for a few hours that you are not
2  even sure whether you finished one beer
3  during the fifteen, twenty to thirty
4  minute time that you have now admitted
5  you were at the bar before you were
6  seated at the table?
7       MR. GILLIS: Objection.
8  A. I don't know how much I had to drink.
9  Q. And that's because you were drunk that
10  night, isn't that right?
11       MR. GILLIS: Objection.
12  A. I don't think so.
13  Q. But you're not sure, are you?
14  A. I was never given a sobriety test but I
15  don't think I was.
16  Q. You are not sure at the time you were
17  served your last drink at the Longhorn
18  Steakhouse whether or not you were under
19  the influence of intoxicating alcohol,
20  isn't that right?
21       MR. GILLIS: Objection.
22  A. I had a few drinks.
23  Q. You were feeling good, is that right?
24       MR. GILLIS: Objection.

Page 98

1  A. I didn't say that.
2  Q. But were you?
3       MR. GILLIS: Objection.
4  A. I had a beer or two. I couldn't tell
5  you.
6  Q. But were you feeling good at the time
7  you were served your last drink at the
8  Longhorn?
9       MR. GILLIS: Objection.
10  A. I can't remember.
11  Q. Have you told me everything that you can
12  remember about the conversation that you
13  had with Mr. Dinatale at your house last
14  Monday?
15  A. I did.
16  Q. Have you described everything that Mr.
17  Dinatale gave to you during that evening
18  to the best of your ability?
19  A. I have.
20  Q. That was his business card, your
21  transcript from the Superior Court case,
22  and your brother's transcript from the
23  Superior Court case.
24       MR. GILLIS: Objection.

Page 99

1  A. It was from this deposition.
2  Q. Did Mr. Dinatale give you anything else
3  that day?
4  A. Not that I know of.
5  Q. Did you take any notes of the meeting
6  with Mr. Dinatale?
7  A. I did not.
8  Q. Did he take any notes of the meeting
9  with you?
10  A. He did not.
11  Q. That you know of, is that right?
12  A. Not that I know of.
13  Q. He didn't take any tape recording?
14  A. Not that I know of.
15  Q. Did he ask your permission to
16  tape-record you?
17  A. No.
18  Q. Was that the first person you ever met
19  with that you understood to be acting on
20  behalf of Rare Hospitality?
21  A. Yes.
22  Q. Did you ever meet with an attorney from
23  the law firm of Campbell, Campbell &
24  Edwards?

Page 100

1  A. Not that I know of.
2  Q. Did you ever talk to an attorney from
3  the law firm of Campbell, Campbell &
4  Edwards?
5  A. Unless it was in court or here not that
6  I know of.
7  Q. Have you since last Monday spoken to
8  Mr. Dinatale?
9  A. No.
10  Q. Have you since then spoken to anyone
11  that you understood was working for him?
12  A. No.
13  Q. Or from his agency or office?
14  A. Not that I know of.
15  Q. How did you leave it with Mr. Dinatale?
16       MR. GILLIS: Objection.
17  Q. Any threat to do anything else?
18       MR. GILLIS: Objection.
19  A. No.
20  Q. Did he give you any suggestions about
21  how to testify?
22  A. No.
23  Q. Did he tell you to tell the truth?
24  A. Yes.

Page 101

```
1   Q. Did he need to tell you to tell the
2      truth?
3           MR. GILLIS: Objection.
4   A. No.
5   Q. What else did he say to you that you
6      haven't told us?
7   A. That's it.
8   Q. Did he talk about how you were an
9      important witness in the case?
10  A. No.
11  Q. Are you sure?
12  A. I'm sure.
13          MR. FARRAH: I don't have
14     any more questions.
15          CROSS-EXAMINATION
16          BY MR. GILLIS
17  Q. Mr. Espey, my name is Michael Gillis and
18     I am representing Longhorn Steakhouse.
19     Longhorn, just so you know, is the same
20     company that Mr. Farrah has been
21     referring to as Rare Hospitality.
22  A. Okay.
23  Q. Prior to you meeting with Mr. Dinatale
24     you gave a deposition to Mr. Farrah, is
```

Page 103

```
1      there, correct?
2   A. Correct.
3   Q. That was before you met with any
4      investigator in this case, correct, from
5      either Mr. Farrah's office or my office.
6   A. Correct.
7   Q. The only investigator you met was
8      Mr. Southworth's, correct?
9   A. No, the State Trooper.
10  Q. And at that time when you were asked
11     questions at the Grand Jury you
12     testified that Mr. Southworth was not
13     intoxicated at the Longhorn, correct?
14          MR. FARRAH: Objection.
15  A. I don't know if he was or was not.
16  Q. Do you remember that specific question
17     being asked of you in the Grand Jury?
18          MR. FARRAH: Objection.
19  A. I don't recall. I'm sure it was
20     probably asked, though.
21  Q. Do you remember any of the specific
22     questions you were asked at the Grand
23     Jury?
24  A. No.
```

Page 102

```
1      that correct?
2   A. Correct.
3   Q. Nobody from Rare Hospitality or Longhorn
4      was present there, correct?
5   A. Correct.
6   Q. No one had the opportunity to ask you
7      questions, is that correct?
8   A. From your client?
9   Q. Anybody from Longhorn Steakhouse.
10  A. No.
11  Q. They weren't invited to that deposition
12     that you know of, correct?
13  A. Not that I know of.
14  Q. Between that deposition and the time you
15     met with Mr. Dinatale did you give any
16     testimony to the Grand Jury?
17  A. Yes.
18  Q. And you told the truth as best you
19     could, correct?
20  A. Correct.
21  Q. There was no one from Mr. Farrah's
22     office present for that, correct?
23  A. Correct.
24  Q. And there was no one from our office
```

Page 104

```
1   Q. So anything that you testified to today
2      as to the Grand Jury would be guesses on
3      your part, correct?
4   A. I'm trying the best I can.
5   Q. But it would be a guess, correct?
6           MR. FARRAH: Objection.
7   A. What I said then is probably more
8      accurate than now.
9   Q. For purposes of your testimony it has
10     been a long period of time since this
11     accident occurred, correct?
12  A. Correct.
13  Q. Is it fair to say over time you remember
14     less about this incident, is that fair
15     to say?
16  A. I would say so.
17  Q. And would you say that your Grand Jury
18     testimony was more accurate than what
19     you might be testifying to today?
20          MR. FARRAH: Objection.
21  A. Probably.
22  Q. Is that because of the passage of time?
23  A. Yes.
24  Q. And the same is true with your statement
```

Page 105

1   to the State Police shortly after the
2   accident.
3       MR. FARRAH: Objection.
4 A. Correct.
5 Q. That was two months after the accident
6   or less.
7 A. November, whatever it was.
8 Q. Whatever number of weeks from
9   September 26, 2003 to November 2, 2003
10   that's how close it was to the accident,
11   correct?
12 A. Correct.
13 Q. At that time when asked by the State
14   Trooper you didn't say that
15   Mr. Southworth was intoxicated at the
16   Longhorn that night, is that correct?
17       MR. FARRAH: Objection.
18 A. I don't believe so.
19 Q. You were asked about that, weren't you?
20       MR. FARRAH: Objection.
21 A. I'm sure I was.
22 Q. He asked you if he showed any visible
23   signs of intoxication, didn't he?
24       MR. FARRAH: Objection.

Page 106

1 A. I believe so.
2 Q. Six weeks or whatever it was after the
3   accident at that point it was your
4   testimony that there were no visible
5   signs of intoxication by Mr. Southworth
6   at the Longhorn Steakhouse, correct?
7       MR. FARRAH: Objection.
8 A. Yes.
9 Q. And that's because that was your memory
10   at that time, correct?
11       MR. FARRAH: Objection.
12 A. Yes.
13 Q. From the date of this accident,
14   September 26, 2003 to today, have you
15   ever told anybody that Mr. Southworth
16   was unsteady on his feet at the Longhorn
17   Steakhouse on September 26, 2003?
18       MR. FARRAH: Objection.
19 A. No.
20 Q. Have you ever testified that
21   Mr. Southworth's eyes were glassy at the
22   Longhorn Steakhouse on September 26,
23   2003?
24 A. Not that I recall.

Page 107

1 Q. Have you ever testified that
2   Mr. Southworth's speech was slurred at
3   the Longhorn Steakhouse on September 26,
4   2003?
5 A. Not that I recall.
6 Q. Do you have any specific memory as you
7   sit here today of Jeffrey Southworth
8   being visibly intoxicated at the
9   Longhorn Steakhouse on September 26,
10   2003?
11       MR. FARRAH: Objection.
12 A. No.
13 Q. Do you have any memory as you sit here
14   today of him stumbling at all at the
15   Longhorn Steakhouse on September 26,
16   2003?
17 A. No.
18 Q. Do you have any memory of his speech
19   being slurred at the Longhorn on that
20   date?
21 A. No.
22 Q. Do you have any specific memory as you
23   sit here today of him being glassy-eyed
24   at the Longhorn on September 26, 2003?

Page 108

1 A. No.
2 Q. Do you have any memory of him knocking
3   any drinks over at the table at the
4   Longhorn on September 26, 2003?
5 A. Not that I recall.
6 Q. Do you have any memory as you sit here
7   today of him ever swaying or unable to
8   sit up straight at the Longhorn on
9   September 26, 2003?
10       MR. FARRAH: Objection.
11 A. Not that I recall.
12 Q. In fact whenever you have been asked any
13   questions about his intoxication you
14   have testified that you have no evidence
15   that he was visibly intoxicated at the
16   Longhorn Restaurant on September 26,
17   2003, is that correct?
18       MR. FARRAH: Objection.
19 A. I have no evidence.
20 Q. Mr. Farrah asked you earlier whether or
21   not you were afraid of Mr. Southworth,
22   is that correct?
23 A. Correct.
24 Q. He was your friend, was he not?

Case 1:05-cv-10617-MBB   Document 26-6   Filed 05/04/2007   Page 28 of 40

Thomas Scott Espey, 4/25/2006                    Condensed!                    Rosario vs. Rare Hospitality

Page 109

1  A. I thought so.
2  Q. And you went dirt biking with him
3     several times a week, is that correct?
4  A. Yes.
5  Q. And you borrowed his bike, correct?
6  A. Correct.
7  Q. You went out to dinner with him on
8     regular occasions, correct?
9  A. Correct.
10 Q. You wouldn't do that with somebody you
11    were afraid of, is that correct?
12       MR. FARRAH: Objection.
13 A. No.
14 Q. He didn't force you to go dirt biking
15    with him, did he?
16 A. No.
17 Q. He didn't hold a gun to your head and
18    say, "You've got to come dirt biking,"
19    correct?
20 A. No.
21 Q. Previously in your answers to questions
22    asked you by Mr. Farrah you prefaced
23    those questions by probably.  When you
24    answer questions probably is that

Page 110

1     because you don't have a specific memory
2     of whether it did or did not happen?
3        MR. FARRAH: Objection.
4  A. Yes.
5  Q. And you also answered questions with "I
6     believe."  Is it fair to say that when
7     you answered that way that you don't
8     have a specific memory of what was
9     asked, if it happened or didn't, is that
10    correct?
11       MR. FARRAH: Objection.
12 A. Correct.
13 Q. When he showed you your transcript, he
14    asked you to look at testimony that you
15    had previously testified, correct?
16 A. Correct.
17 Q. You don't have a memory of what you said
18    back then.  You just agreed that what
19    was in the transcript is true, correct?
20 A. Well, I read it over after they sent it
21    to me.
22 Q. If you said that's your best memory, you
23    just adopted that not because it
24    refreshed your recollection but because

Page 111

1     that was in the prior transcript, isn't
2     that true?
3        MR. FARRAH: Objection.
4  A. Correct.
5  Q. Did that change your memory any bit
6     today, your actual memory of what you
7     actually remember?
8        MR. FARRAH: Objection.
9  A. No.
10 Q. When you said, "I don't think so," does
11    that mean you're not sure?
12       MR. FARRAH: Objection.
13 A. Yes, I'm not positive.
14 Q. When you said, "I don't think so," that
15    means you're not sure whether the facts
16    that were asked of you occurred or
17    didn't occur, correct?
18       MR. FARRAH: Objection.
19 A. Correct.
20 Q. And furthermore when you answered a
21    question, "I think," that means you
22    don't know one way or the other,
23    correct?
24       MR. FARRAH: Objection.

Page 112

1  A. Yes.
2  Q. That was your best guess, correct?
3  A. Yes.
4  Q. In fact all those premises were your
5     best guess, correct?
6        MR. FARRAH: Objection.
7  A. Correct.
8  Q. Almost two years ago you were deposed in
9     this case, June of 2004, correct?
10 A. Yes.
11 Q. Your memory was a little better then
12    than it is today, is that fair to say?
13 A. Yes.
14 Q. You brought the cooler that day, is that
15    correct?
16 A. Correct.
17 Q. And you said you had a six-pack in the
18    cooler, correct?
19 A. I don't know how much was in the cooler.
20 Q. When you buy beer, do you buy
21    twelve-ounce beers?
22 A. Yes.
23 Q. The beers in that cooler were
24    twelve-ounce, correct?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 29 of 49

Thomas Scott Espey, 4/25/2006          Condensed!          Rosario vs. Rare Hospitality

Page 113

1  MR. FARRAH: Objection.
2  A. I would think so.
3  Q. You don't know whether they were or not,
4  correct?
5  A. I don't, but probably.
6  Q. Was it your practice back then when you
7  bought a six-pack to get a six-pack of
8  twelve-ounce beers as opposed to any
9  other size beer?
10  A. Yes.
11  Q. When you said that the cooler was in the
12  bed of the truck, is it fair to say that
13  you don't know if it was in the back
14  seat with Mr. Southworth or whether it
15  was physically in the bed that evening,
16  is that correct?
17  MR. FARRAH: Objection.
18  A. As I sit here today I don't know.
19  Q. If someone else like Jude testified it
20  was in the back seat, would you disagree
21  with them?
22  MR. FARRAH: Objection.
23  A. No.
24  Q. As you sit here today you can't remember

Page 114

1  your cell phone number back in September
2  of 2003, correct?
3  A. No.
4  Q. And that's not because you are
5  intoxicated or anything, correct?
6  A. Correct.
7  Q. And the reason you may not remember
8  everything from that evening is not
9  because you were intoxicated, correct?
10  A. Yes.
11  Q. Mr. Farrah says that you never told
12  anybody before that you didn't finish
13  your beer at the bar that night. Do you
14  have any memory of anybody ever even
15  asking you that question before today?
16  MR. FARRAH: Objection.
17  A. No.
18  Q. As you sit here today do you remember
19  anybody ever asking you whether or not
20  you finished your beer at the bar prior
21  to Mr. Farrah asking you that today?
22  MR. FARRAH: Objection to
23  that mischaracterization of my question.
24  A. Not that I recall.

Page 115

1  Q. Do you know whether or not the tab for
2  the beer that you purchased at the bar
3  was carried over to the dinner check or
4  whether it was paid at the bar?
5  MR. FARRAH: Objection.
6  A. I don't know.
7  Q. You called beforehand to get a table, is
8  that correct?
9  A. Correct.
10  Q. The reason you called was so that you
11  wouldn't have to wait very long, is that
12  correct?
13  A. Correct.
14  Q. And you get put into whatever order it
15  is for a table once you call in for a
16  reservation, correct?
17  MR. FARRAH: Objection.
18  A. Correct.
19  Q. Whatever time it was, a few minutes that
20  you characterized as ten, fifteen, or
21  twenty minutes which Mr. Farrah
22  suggested to you in your deposition,
23  whatever time it was you only had one
24  drink at the bar which you didn't finish

Page 116

1  and brought to the table, correct?
2  MR. FARRAH: Objection.
3  A. I believe so.
4  Q. As you sit here today do you have any
5  specific memory of having ordered more
6  than one drink at the bar on
7  September 26, 2003?
8  MR. FARRAH: Objection.
9  A. I don't.
10  Q. As you sit here today do you have any
11  specific memory of Mr. Southworth having
12  any more to drink than one beer at the
13  bar on September 26, 2003?
14  MR. FARRAH: Objection.
15  A. I don't.
16  Q. You don't have a specific memory as you
17  sit here today as to what, if anything,
18  Mr. Southworth had to drink at the table
19  once you all were seated, correct?
20  A. Correct.
21  Q. And the three people who were at the bar
22  that night were you, Jude Connelly, and
23  Mr. Southworth, correct?
24  A. Correct.

Page 117

1   Q. The remainder of the group met you and
2     were seated at a table, correct?
3        MR. FARRAH: Objection.
4   A. Correct.
5   Q. You don't have any memory as you sit
6     here today of anybody other than the
7     three of you ordering drinks at the bar
8     that evening, correct?
9   A. Not that I recall.
10   Q. In your statement that is Exhibit 1 in
11     this case you mention to the State
12     Police that you had beer and Manhattans
13     which you believe were ordered by the
14     table, correct? Starting at the
15     third-to-last line it says, "At the"
16     something "we all ordered beer and
17     Manhattans. We all ordered," and
18     something is cut off "table so I can't
19     be sure who drank how much." Correct?
20   A. Correct.
21   Q. You have no idea how much Mr. Southworth
22     had to drink, correct?
23   A. Correct.
24   Q. You had no idea what anybody had to

Page 118

1     drink, correct?
2   A. Correct.
3   Q. And when you say beer and Manhattans
4     that means that people had beer or
5     Manhattans, not beer and Manhattans, is
6     that correct?
7        MR. FARRAH: Objection.
8   A. I don't know who drank what.
9   Q. Do you have a specific memory as you sit
10     here today that everybody at the table
11     had a beer and a Manhattan?
12        MR. FARRAH: Objection.
13   A. Again I don't know who drank what.
14   Q. Let me show you what was introduced as
15     an exhibit in your brother's deposition
16     which shows two beers ordered that night
17     at the table. Does that refresh your
18     recollection as to whether or not
19     everybody at the table had a beer?
20        MR. FARRAH: Objection to
21     that characterization that there were
22     two beers ordered at the table. You can
23     answer the question.
24   A. There were more people than beers.

Page 119

1   Q. I'm going to suggest for purposes of
2     this question that this is the bill for
3     that evening and on there there are two
4     Bud Lights. Does that refresh your
5     recollection as to whether or not
6     everybody at the table had a beer at the
7     table?
8        MR. FARRAH: Objection.
9   A. It suggests they didn't.
10   Q. But does it reflect your recollection in
11     any way?
12   A. No.
13   Q. Do you have any specific memory as you
14     sit here today whether or not everybody
15     at the table had either a beer or a
16     Manhattan or both a beer and a
17     Manhattan?
18   A. I don't have a specific recollection.
19   Q. Mr. Farrah was questioning you on
20     Page 74 about your testimony about the
21     Manhattans. You testified that you had
22     two beers. "I don't know. I don't
23     know. I don't know what I had to
24     drink." Isn't that your testimony?

Page 120

1   A. Yes.
2   Q. You don't know what you had to drink
3     yourself that night, correct?
4   A. Correct.
5   Q. You don't know how many Manhattans you
6     had that night.
7   A. Correct.
8   Q. All you know in your statement that you
9     gave to the State Police is that you
10     were ordering in rounds, correct?
11        MR. FARRAH: Objection.
12   A. I believe so.
13   Q. What does it mean to you when you say
14     you ordered as a table?
15   A. That whoever at the table needed a drink
16     ordered.
17   Q. As you sit here today do you have any
18     specific memory of anybody being served
19     more than one drink at a table, multiple
20     drinks per round?
21        MR. FARRAH: Objection.
22   A. I don't recall.
23   Q. Have you ever been to the Longhorn when
24     they served any person at your table

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 31 of 40

Thomas Scott Espey, 4/25/2006          Condensett                    Rosario vs. Rare Hospitality

Page 121

1    more than one drink per round?
2    A. I don't believe so.
3    Q. Would that be unusual to you?
4        MR. FARRAH: Objection.
5    A. Yes.
6    Q. Now if I were to represent to you that
7       the first round of drinks that were
8       ordered at that table were four drinks,
9       do you have a memory as to whether those
10      were for the four people who joined the
11      three of you at the restaurant?
12       MR. FARRAH: Objection.
13   A. I don't recall.
14   Q. In your prior deposition did Mr. Farrah
15      ever show you a copy of what you guys
16      had to order that night?
17       MR. FARRAH: Objection.
18   A. I don't recall.
19   Q. Did he show you the check for that
20      night?
21       MR. FARRAH: Objection.
22   A. I don't know. I have seen it somewhere
23      in various rounds.
24   Q. How far is the Four Points Hotel from

Page 122

1    the Longhorn?
2    A. Maybe half a mile.
3    Q. It takes two minutes for you to get
4       there?
5    A. Yes.
6    Q. Do you know where Chopsticks is?
7    A. Yes.
8    Q. Are you familiar with the place?
9    A. I haven't been there in a while.
10   Q. How would you characterize Chopsticks?
11   A. A Chinese restaurant.
12   Q. Does it have a bar and a lounge,
13      etcetera?
14   A. I assume so.
15   Q. Back in September of 2003 if you were to
16      go to a bar just to drink with your
17      friends where would you go?
18       MR. FARRAH: Objection.
19   A. I don't know. There's no regular place.
20   Q. Is it fair to say Longhorn's is a place
21      you might to go eat as opposed to drink?
22       MR. FARRAH: Objection.
23   A. Yes.
24   Q. If you were going out to drink for the

Page 123

1    night would you go to Longhorn's?
2    A. Just to drink?
3    Q. Yes.
4    A. Probably not.
5    Q. It's more of a steakhouse restaurant, in
6       your opinion, is that right?
7        MR. FARRAH: Objection.
8    A. Correct.
9    Q. When you got back to the Four Points you
10      went to see some friends with your
11      brother, correct?
12   A. Correct.
13   Q. There was beer and Jack Daniels in the
14      room?
15   A. I don't recall Jack Daniels.
16   Q. If your brother testified that there was
17      Jack Daniels in the room would you doubt
18      him?
19       MR. FARRAH: Objection.
20   A. No.
21   Q. When you left the Longhorn that evening
22      you felt perfectly fine to drive,
23      correct?
24   A. Correct.

Page 124

1    Q. You wouldn't get in an automobile and
2       drive if you were visibly intoxicated,
3       is that correct?
4        MR. FARRAH: Objection.
5    A. Correct.
6    Q. You didn't feel you were visibly
7       intoxicated that evening, correct?
8        MR. FARRAH: Objection.
9    A. Correct.
10   Q. Were you stumbling when you were at the
11      Longhorn that night?
12   A. Not that I felt.
13   Q. Were you slurring your words?
14   A. Not that I recall.
15   Q. Were you unsteady on your feet?
16   A. Not that I recall.
17   Q. Did you knock over any drinks?
18   A. Not that I recall.
19   Q. Were you unable to get up and go to the
20      bathroom without knocking something
21      over?
22   A. Not that I recall.
23   Q. Were you ever told by anyone at the
24      Longhorn that you shouldn't have any

Case 1:05-cv-10617-MBB   Document 26-6   Filed 05/04/2007   Page 32 of 40

Thomas Scott Espey, 4/25/2006                    Condenseit                    Rosario vs. Rare Hospitalit

Page 125

1   more to drink that night?
2   A. Not that I recall.
3   Q. I want to read to you from the bottom of
4     Page 74. "So you can't tell me where
5     you sat that night, is that right?"
6     "Not with certainty, no." "Is that
7     because you were too intoxicated to
8     remember?" "No, no."
9          Did I read that testimony
10    correctly?
11  A. Yes.
12         MR. FARRAH: I will
13    stipulate to that.
14  Q. Your testimony back then was clear that
15    you were not intoxicated at the
16    Longhorn, correct?
17         MR. FARRAH: Objection.
18  A. Correct.
19  Q. Having had that read, does that refresh
20    your recollection as to whether or not
21    you were at any time on September 26,
22    2003 when you were at the Longhorn
23    Steakhouse intoxicated?
24  A. No.

Page 126

1   Q. Were you intoxicated that night at the
2     Longhorn?
3   A. No.
4   Q. Is it your memory that Jeff had some
5     beer to drink at the Four Points after
6     you left the Longhorn that evening?
7   A. I believe so.
8   Q. Do you know whether or not back in
9     September of 2003 Jeff Southworth was a
10    person who used marijuana?
11  A. Not that I had seen.
12  Q. Had you heard of him smoking pot?
13         MR. FARRAH: Objection.
14  A. It wasn't a topic of discussion, no.
15  Q. Did you ever smoke marijuana back at
16    that time period?
17         MR. FARRAH: Objection.
18    What difference does it make whether he
19    has ever smoked marijuana?
20         MR. GILLIS: The same
21    difference it has when you asked him if
22    he was intoxicated.
23         MR. FARRAH: Why don't you
24    tell him what the implications are of

Page 127

1   answering that question?
2          MR. GILLIS: The same as the
3     implications of the questions you asked
4     him whether he was driving intoxicated.
5   Q. Isn't it true that you testified in the
6     criminal trial that Jeff Southworth was
7     not intoxicated when he left the
8     Longhorn Restaurant?
9          MR. FARRAH: Objection.
10  A. To the best of my knowledge.
11  Q. Were the dogs in the back seat of the
12    car with him or were they in the cab of
13    the car?
14  A. They always were in the back seat.
15  Q. When he continued asking you on the
16    bottom of Page 118 and the top of 119 as
17    to why you asked him whether or not he
18    should sleep, Lines 10 and 11 on
19    Page 119 say, "I don't recall it. I
20    just remember him saying I want to go
21    home."
22         Is that accurately read?
23         MR. FARRAH: Objection.
24  A. Yes.

Page 128

1   Q. Is it fair to say that you don't have a
2     specific memory as you sit here today as
3     to why you asked him whether or not he
4     wanted to stay in the vehicle and sleep?
5   A. As I said before I was just being a
6     concerned person.
7   Q. Is it your practice or custom when you
8     are leaving friends at the end of the
9     night to ask them whether or not they
10    want to stay around or drive home?
11         MR. FARRAH: Objection.
12  A. Yes.
13  Q. If you thought they were intoxicated you
14    wouldn't let them drive, you would stop
15    them, is that correct?
16  A. Correct.
17  Q. As you sit here today do you know of
18    anything of yours that was left in the
19    truck that you hadn't removed yet when
20    he started to back up the truck, that
21    were in the bed?
22  A. I think somehow I left a helmet in
23    there.
24  Q. Are you sure or you don't know?

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 33 of 40

Thomas Scott Espey, 4/25/2006        Condenseit        Rosario vs. Rare Hospitality

Page 129

1  A. I'm not positive.
2  Q. At the time he was backing up, at that
3     point in time you weren't aware that
4     your keys were still in the car,
5     correct?
6  A. Correct.
7  Q. As you sit here today to the best you
8     know you had removed everything you were
9     going to remove from that car when he
10    started backing up, is that correct?
11 A. Correct.
12 Q. Mr. Farrah asked you earlier about
13    whether you would testify if it might
14    hurt Jeff.  Would you lie for Jeff
15    Southworth?
16 A. No.
17 Q. Would you lie under oath for Jeff
18    Southworth?
19 A. No.
20 Q. Would you commit perjury for Jeff
21    Southworth?
22 A. No.
23 Q. Have you ever lied for Jeff Southworth
24    in this case?

Page 130

1  A. No.
2  Q. Either in this case, in the civil case,
3     or the criminal case have you ever lied
4     for Jeff Southworth?
5  A. No.
6  Q. Has he ever asked you to lie for him?
7  A. No.
8  Q. Has anybody asked you to lie for him?
9  A. No.
10 Q. Prior to this incident on September 26,
11    2003 you had seen Mr. Southworth what
12    you would call intoxicated, correct?
13 A. I can't say for sure whether he was or
14    was not.
15 Q. Did you ever see him showing signs of
16    intoxication?
17 A. Yes.
18 Q. You have seen him before that night
19    where he got giddy is the word you used,
20    correct?
21 A. Correct.
22 Q. That he had red eyes, correct?
23       MR. FARRAH: Objection.
24 A. Not that I can recall specifically right

Page 131

1     now.
2  Q. Regardless, you didn't see any of the
3     signs that you previously noticed of him
4     when he may have been intoxicated, none
5     of those signs were present on
6     September 26, 2003 at the Longhorn
7     Steakhouse, is that correct?
8        MR. FARRAH: Objection.
9  A. Correct.
10 Q. In fact, from your experience of being
11    out with Mr. Southworth prior to this
12    night was he a person who could hold his
13    liquor?
14       MR. FARRAH: Objection.
15 A. He was a big kid.
16 Q. Haven't you seen him drink six to ten
17    beers and still look okay?
18       MR. FARRAH: Objection.
19 A. Again I don't keep track of what other
20    people drink.
21 Q. You've seen him drink more than a
22    six-pack and look to not be visibly
23    intoxicated, correct?
24       MR. FARRAH: Objection.

Page 132

1  A. Probably.
2  Q. Isn't that what you testified to at your
3     last deposition that he could drink six
4     to ten beers without being visibly
5     intoxicated?
6        MR. FARRAH: Objection.
7  A. I believe so.
8  Q. You also testified in that deposition
9     that you mainly went to the Longhorn to
10    eat, not to drink, is that correct?
11 A. I believe so.
12 Q. And that was in a deposition prior to
13    Longhorn even being involved in this
14    case, correct?
15 A. As far as I know.
16 Q. Before any investigator going out to see
17    you, correct?
18 A. Correct.
19 Q. Prior to September 26, 2003 you've seen
20    Mr. Southworth drink two to three
21    Manhattans and look perfectly fine,
22    correct?
23       MR. FARRAH: Objection.
24 A. I believe so.  Again, I don't keep track

Page 133

1    of what people drink.
2 Q. You've seen him drink Manhattans before
3    and not appear intoxicated, correct?
4 A. Correct.
5 Q. You've seen him drink multiple
6    Manhattans before September 26, 2003 and
7    not appear to be intoxicated, correct?
8        MR. FARRAH: Objection.
9 A. I believe so.
10 Q. You have no evidence as you sit here
11    today of Mr. Southworth having anything
12    to drink prior to getting to the
13    Longhorn other than the one twelve-ounce
14    beer he had just after dirt biking,
15    correct?
16 A. Correct.
17 Q. You don't have any evidence one way or
18    the other whether or not he was drinking
19    out of the cooler in the vehicle after
20    you left the Longhorn, do you?
21        MR. FARRAH: Objection.
22 A. No.
23 Q. Is it fair to say that prior to
24    September 26, 2003 you have seen

Page 134

1    Mr. Southworth drink a beer or two and a
2    Manhattan or two and not appear to be
3    visibly intoxicated?
4        MR. FARRAH: Objection.
5 A. Correct.
6 Q. The reason you were driving
7    Mr. Southworth's vehicle that night was
8    not because he was too drunk to drive,
9    correct?
10        MR. FARRAH: Objection.
11 A. Correct.
12 Q. That's what you testified to when
13    Mr. Farrah asked you that question
14    nearly two years ago, is that correct?
15        MR. FARRAH: Objection.
16 A. Correct.
17 Q. You testified back in 2004 that you
18    arrived at the restaurant around 8:30 to
19    9 o'clock. Do you remember that?
20 A. The testimony?
21 Q. Yes.
22 A. Yes.
23 Q. Do you remember if that is accurate as
24    to about what time you arrived give or

Page 135

1    take a few minutes?
2 A. I would think so.
3 Q. It was your practice to dirt bike until
4    it was almost dark, is that correct?
5 A. Yes.
6 Q. So from about the time it was almost
7    dark, say dusk, give or take twenty-five
8    minutes, that would be about the time
9    you arrived at the restaurant.
10        MR. FARRAH: Objection.
11 A. Probably, yes.
12 Q. Prior to September 26, 2003 when you had
13    been out with Mr. Southworth had you had
14    dinner with him with more than just him
15    and yourself, with groups of people?
16 A. Yes.
17 Q. Was it common to order a round for the
18    table?
19        MR. FARRAH: Objection.
20 A. Yes, it's common practice.
21 Q. And that's a common practice for you
22    when you go out to dinner with a group
23    of people to order a round.
24        MR. FARRAH: Objection.

Page 136

1 A. Yes.
2 Q. When you got a round, again that would
3    be one drink per person at the table.
4        MR. FARRAH: Objection.
5 A. Correct.
6 Q. You are not aware of any time that you
7    have been with Mr. Southworth that he
8    ordered a round of drinks that anyone
9    has gotten more than one alcoholic drink
10    at a time.
11        MR. FARRAH: Objection.
12 A. Correct.
13 Q. And that's not just on September 26,
14    2003. That's any night you have been
15    out with him, correct?
16        MR. FARRAH: Objection.
17 A. Correct.
18 Q. You were carded that evening, is that
19    correct?
20 A. I can't say for sure. I would think so.
21 Q. Do you remember testifying to that
22    effect in your prior deposition?
23 A. I don't remember the specific question,
24    no.

Page 137

1  Q. On Page 76, the question is on Line 20
2     and the answer is on Line 23.
3     "Question: Do you remember being
4     carded, that is, asked to show your
5     driver's license to anybody that night?"
6     "Answer: I believe so, yeah."
7           Did I read that correctly?
8  A. Yes.
9  Q. Mr. Farrah discussed with you whether or
10    not you may have been loud that evening,
11    and I believe you testified, and correct
12    me if I am wrong, that "Not particularly
13    loud." Is that a fair representation of
14    what you said?
15          MR. FARRAH: Objection.
16 A. Yes.
17 Q. Do you have a specific memory as to
18    whether or not anybody was loud that
19    evening at any time?
20          MR. FARRAH: Objection.
21 A. No.
22 Q. Do you remember anybody being loud
23    towards the end of the evening after you
24    got your check?

Page 138

1           MR. FARRAH: Objection.
2  A. I don't.
3  Q. As you sit here today do you have any
4     specific memory of Jeffrey Southworth
5     being visibly intoxicated at any time
6     while at the Longhorn Steakhouse on
7     September 26, 2003?
8           MR. FARRAH: Objection.
9  A. I don't.
10 Q. Do you remember testifying that when
11    Mr. Southworth gets drunk he gets
12    aggressive?
13 A. I do.
14 Q. And when he gets intoxicated he gets
15    jumpy.
16 A. Not specifically, no.
17 Q. Do you remember saying that when he is
18    intoxicated he sort of snaps at people?
19 A. Yes.
20 Q. Let me direct you to Page 83 of your
21    deposition, Lines 7 through 9 and let me
22    know if I read that correctly. "He just
23    gets, ah, I don't know. He just gets
24    like -- I don't know, jumpy I guess,

Page 139

1     short-fused."
2           Did I read that correctly?
3  A. Yes.
4  Q. Line 17, "Jeff sort of snaps at people
5     and he -- he's just -- it's hard to
6     explain."
7           Did I read that correctly?
8  A. Yes.
9  Q. Did he show any of those signs at the
10    Longhorn Steakhouse on September 26,
11    2003?
12          MR. FARRAH: Objection.
13 A. No.
14 Q. On September 26, 2003 at any time while
15    he was at the Longhorn Steakhouse was
16    Mr. Southworth jumpy?
17 A. Not that I recall.
18 Q. On September 26, 2003 at the Longhorn
19    Steakhouse at any time that evening was
20    Mr. Southworth short-fused?
21 A. Not that I recall.
22 Q. At any time on September 26, 2003 at the
23    Longhorn Steakhouse did Jeff Southworth
24    snap at anybody?

Page 140

1  A. Not that I recall.
2  Q. You saw him prior to this night get into
3     a fight when he was intoxicated at the
4     Wine Cellar, correct?
5  A. That's correct.
6  Q. When he got into a fight at the Wine
7     Cellar did you see any of those signs at
8     the Longhorn Steakhouse on September 26,
9     2003?
10 A. Not that I recall.
11 Q. Did you tell Mr. Farrah at your last
12    deposition that Mr. Southworth was not
13    intoxicated at the Longhorn Steakhouse
14    that night?
15          MR. FARRAH: Objection.
16 A. I believe I said I don't know.
17 Q. Let me show you Page 88 starting with
18    Line 16. Question by Mr. Farrah. "Was
19    he as intoxicated that night as he was
20    the night of this accident,
21    September 26, 2003, when you left or
22    when you were eating at the restaurant?"
23    The answer was "No. Can you rephrase
24    that again? No, he wasn't as

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 36 of 40

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitality

Page 141

1    intoxicated at the Longhorn." Question:
2    "As he was at the Wine Cellar?"
3    Answer: Yes."
4        Did I read that correctly?
5  A. Yes.
6  Q. You testified in the prior deposition
7     that by nature Jeff is an aggressive
8     guy.
9  A. Correct.
10  Q. He was not showing any signs of
11     aggressiveness on September 26, 2003,
12     correct?
13        MR. FARRAH: Objection.
14  A. Not that I recall.
15  Q. You've been out with Jeff when he has
16     had too much to drink, correct?
17        MR. FARRAH: Objection.
18  A. I don't know.
19  Q. Let me show you Page 97, Line 5. The
20     question was: "But you have been in
21     settings where Jeff has had too much to
22     drink, isn't that right?" The answer
23     was, "Yeah."
24        Is that your testimony?

Page 142

1  A. Yes.
2  Q. As you sit here today on September 26,
3     2003 while at the Longhorn Restaurant
4     those signs that you saw in
5     Mr. Southworth on other occasions when
6     he had too much to drink, none of them
7     was shown by him that night at the
8     restaurant, correct?
9        MR. FARRAH: Objection.
10  A. Not that I recall.
11  Q. In fact, the first time you saw any sign
12     of intoxication by Mr. Southworth that
13     night was when he was drinking at the
14     hotel, correct?
15        MR. FARRAH: Objection.
16  A. Again I'm not sure.
17  Q. Page 107, Line 19. The question was,
18     "What did you do at the Four Points?"
19     "Definitely had a beer," and it goes on
20     from there. Page 108. "Did Jeff have a
21     beer?" The answer was, "Yes." Skip
22     down to Line 7. "By that time when he
23     had his beer was he showing obvious
24     signs of intoxication to you?" "Um,

Page 143

1    somewhat. I guess he was aggressive, as
2    always, as Jeff is." If he showed any
3    signs of intoxication that evening the
4    first time you saw it was after drinking
5    beer at the Four Points Hotel, correct?
6        MR. FARRAH: Objection.
7  A. Based on that statement, correct.
8  Q. That's your prior testimony, correct?
9  A. Correct.
10  Q. And that's what you meant, correct?
11        MR. FARRAH: What he meant?
12  Q. When he first showed signs of
13     intoxication after he got his beer at
14     the hotel, correct?
15        MR. FARRAH: Objection.
16  A. Correct.
17  Q. Not at the restaurant, correct?
18        MR. FARRAH: Objection.
19  A. Not that I recall.
20  Q. You had a conversation with Jude
21     Connelly about this accident sometime
22     after the accident, correct?
23  A. Correct.
24  Q. What did Jude tell you to do?

Page 144

1        MR. FARRAH: Objection.
2  A. It was more that we were both obviously
3     going to be questioned about it.
4  Q. Do you remember testifying to Mr. Farrah
5     based on questions when asked what Jude
6     said that he told you to tell the truth?
7  A. I think it was more --
8  Q. Go to Page 131, Line 17. "And what did
9     Jude say?" "He said we have to tell the
10     truth."
11        Is that what Jude told you
12     to do?
13  A. Yeah.
14  Q. And is that what you have done?
15  A. Yes.
16  Q. Do you know of any reason other than the
17     passage of time that your testimony
18     today may be a little different than
19     what you previously testified?
20        MR. FARRAH: Objection.
21  A. I don't.
22  Q. Did you wear to the Longhorn that night
23     the clothes that you were dirt biking
24     in?

Page 145

1 A. No, I don't believe so.
2 Q. Do you have a specific memory of what
3    you wore that night?
4 A. I don't.
5 Q. Do you have a specific memory as you sit
6    here today as to what Jeff Southworth
7    wore that night?
8 A. I don't.
9 Q. You can't tell me whether he did or did
10   not change into another outfit from dirt
11   biking, correct?
12 A. We normally change.
13 Q. That night you don't know whether he was
14   wearing sweat pants to the Longhorn or
15   whether he got dressed up in other
16   clothes, correct?
17 A. I don't know what he wore.
18       MR. GILLIS: No further
19   questions.
20       REDIRECT EXAMINATION
21       BY MR. FARRAH
22 Q. You talked a little bit about Jude
23   telling you to tell the truth. Do you
24   remember that?

Page 146

1 A. Yes.
2 Q. As far as you know Jude told the truth
3    about what happened that night, isn't
4    that right?
5       MR. GILLIS: Objection.
6 A. I would think so.
7 Q. He never discussed with you lying about
8    what happened that night, did he?
9 A. No.
10 Q. You were asked some questions about
11   instances where Mr. Southworth had
12   multiple Manhattans. Do you remember
13   Mr. Gillis asking you about that?
14 A. Yes.
15 Q. These were instances during the summer
16   of 2003 at the Longhorn Steakhouse where
17   Mr. Southworth was served multiple
18   Manhattans, isn't that right?
19       MR. GILLIS: Objection.
20 A. I don't know where it happened.
21 Q. You were with him at the Longhorn
22   Steakhouse on at least a half a dozen
23   occasions during the summer of 2003,
24   isn't that right?

Page 147

1 A. Yes.
2 Q. He liked Manhattans, is that right?
3       MR. GILLIS: Objection.
4 A. I have seen him drink them before.
5 Q. You have seen him drink multiple
6    Manhattans prior to September 26, 2003
7    at the Longhorn, isn't that right?
8       MR. GILLIS: Objection.
9 A. At the Longhorn, yes.
10 Q. Is it your best memory that your brother
11   and the people that he was with were at
12   the bar drinking at the Longhorn that
13   night before you all went to the table?
14       MR. GILLIS: Objection.
15 A. I don't recall when they showed up.
16 Q. That's not my question. My question is
17   is it your best memory that your brother
18   and the others that he was with that
19   night were drinking at the bar before
20   you all went to the table?
21       MR. GILLIS: Objection.
22 A. I don't know.
23 Q. Think hard.
24       MR. GILLIS: Objection.

Page 148

1 Q. Do you remember your brother having a
2    drink at the bar?
3       MR. GILLIS: Objection.
4 A. I don't.
5 Q. Do you remember any of the people he was
6    with having a drink at the bar?
7       MR. GILLIS: Objection.
8 A. I don't remember when they got there.
9 Q. Is it fair to say you don't remember one
10   way or the other whether they had drinks
11   at the bar that night?
12 A. That's correct.
13 Q. You testified on more than one occasion,
14   I think, both during my examination and
15   Mr. Gillis's that you didn't know
16   whether or not Jeff Southworth was under
17   the influence of alcohol at the time he
18   was at the Longhorn Restaurant. Do you
19   remember that testimony?
20       MR. GILLIS: Objection.
21 A. Yes.
22 Q. You also testified to Mr. Gillis's
23   question that Mr. Southworth was
24   exhibiting none of the signs of

## Page 149

1    intoxication you had seen on prior
2    occasions. Do you remember that
3    testimony?
4  A. Yes.
5  Q. Yet you can't say as you sit here today
6    whether he was under the influence of
7    intoxicating alcohol at the time he was
8    at the Longhorn, is that right?
9        MR. GILLIS: Objection.
10 A. Either way I can't say.
11 Q. Is that because of the amount of alcohol
12   that he was served that night?
13       MR. GILLIS: Objection.
14 A. I don't know what he was served.
15 Q. My question to you is given that your
16   testimony is that he did not exhibit to
17   your eye any of the signs of
18   intoxication that you had previously
19   seen in him where he was under the
20   influence of alcohol, why is it you
21   cannot say that you know he was not
22   under the influence of alcohol that
23   night?
24 A. Two and a half years ago? I don't know

## Page 150

1    either way.
2  Q. He had a fair amount to drink while he
3    was at the Longhorn that night, isn't
4    that right?
5        MR. GILLIS: Objection.
6  A. I don't know what he had to drink.
7  Q. You know he had Manhattans, isn't that
8    right?
9        MR. GILLIS: Objection.
10 A. I know that there were some ordered.
11 Q. Seventeen were ordered, isn't that
12   right?
13       MR. GILLIS: Objection.
14 Q. You have seen the tab for the
15   restaurant, haven't you?
16 A. Yes.
17 Q. You know seventeen Jack Daniels
18   Manhattans were ordered in a space of
19   time between 8:40 P.M. and 9:24 P.M.
20   that night.
21       MR. GILLIS: Objection.
22 Q. Isn't that right?
23 A. I don't know the time frame.
24 Q. You don't know that?

## Page 151

1  A. No.
2  Q. I'll represent to you that that's what
3    the documents supplied by Rare
4    Hospitality says happened. You know
5    that Jeff had some of those Jack Daniels
6    Manhattans that were ordered, isn't that
7    right?
8        MR. GILLIS: Objection.
9  A. Yeah.
10 Q. You know that two people got killed in
11   an accident, don't you?
12 A. Yes.
13 Q. And you know that other people got
14   seriously injured in the accident, don't
15   you?
16 A. Yes.
17 Q. You understand that part of the case
18   that my clients have brought against
19   Rare is that it served him too much
20   alcohol that night, you understand that.
21 A. Yes.
22 Q. You want to tell the truth, isn't that
23   right?
24 A. Yes.

## Page 152

1  Q. So now do you know or don't you know
2    that Jeff Southworth had Jack Daniels
3    Manhattans at the table that night?
4        MR. GILLIS: Objection.
5  A. Yes.
6  Q. Do you know how many he had that night?
7  A. No.
8  Q. Did he have more than one that night?
9  A. Possibly.
10 Q. Do you believe he had more than one that
11   night?
12       MR. GILLIS: Objection.
13 A. Yeah.
14 Q. Do you believe he had more than two that
15   night?
16 A. I don't know.
17 Q. How about beers at the bar?
18 A. I don't know.
19 Q. How many beers did he have at the bar?
20 A. I don't know.
21 Q. During the half hour that you were at
22   the bar how many beers did he have?
23 A. I know of the first one that we ordered.
24 Q. How about a second one?

Page 153

1  A.  I don't know.
2  Q.  How about beers at the table?  Did you
3      see Jeff drinking beers at the table?
4          MR. GILLIS:  Objection.
5  A.  I can't recall.
6  Q.  Do you have any memory at all as you sit
7      here of seeing Jeff drink beers from the
8      cooler that you had brought after you
9      left the dirt bikes?  Do you have a
10     memory of seeing him reach into the
11     cooler and pull out a beer after that?
12 A.  Just one.
13 Q.  That was at Templeton?
14 A.  Correct.
15 Q.  Do you have any reason to believe that
16     he had any more beers from that cooler
17     after the one that each of you had at
18     Templeton?
19 A.  I don't.
20 Q.  Do you have any reason to believe that
21     Jeff was smoking pot that night?
22 A.  I don't.
23 Q.  You were asked some questions about
24     whether or not you would ever drive if

Page 154

1      you were under the influence of alcohol,
2      and if you care not to answer this
3      question that's fine, but have you ever
4      driven while you were under the
5      influence of alcohol?
6          MR. GILLIS:  Objection.
7  A.  I don't want to answer that question.
8  Q.  Have you been convicted of a misdemeanor
9      in the last five years?
10 A.  No.
11 Q.  You were arrested for possession of
12     marijuana, isn't that right?
13 A.  Correct.
14 Q.  What was the disposition of that case?
15 A.  Somebody else dropped in my vehicle and
16     he complained it.
17 Q.  Are you telling me that as far as you
18     know you were found not guilty?
19 A.  Yes.
20 Q.  In what court was that case pending?
21 A.  Clinton.
22 Q.  District Court?
23 A.  Yes.
24          MR. FARRAH:  That's all I

Page 155

1      have.
2          RECROSS-EXAMINATION
3          BY MR. GILLIS
4  Q.  Other than Mr. Farrah pestering you with
5      the same questions do you have any
6      explanation as to why in the answer to
7      his recent question you said he may have
8      had one or more Manhattans when every
9      other time you've testified you don't
10     know what he had to drink?
11         MR. FARRAH:  Objection.
12 A.  Just the bill.
13 Q.  Other than the bill you have no memory
14     whatsoever as to what Mr. Southworth had
15     to drink on September 26, 2003 at the
16     Longhorn, is that correct?
17         MR. FARRAH:  Objection.
18 A.  Correct.
19         [The deposition was
20     concluded.]
21
22
23
24

Page 156

1          SIGNATURE PAGE/ERRATA SHEET
2  Re:  Nancy Rosario
   Vs:  Rare Hospitality International, Inc.,
3      d/b/a Longhorn Steakhouse
4  4/25/2006 - Deposition of THOMAS SCOTT ESPEY
5      I, THOMAS SCOTT ESPEY, do hereby certify
   that I have read the foregoing transcript of
   my testimony and it is a true and correct
6  record of my testimony (with the exception of
   the corrections, if any, listed below.
7
8  PAGE LINE   CORRECTION
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 DATE            THOMAS SCOTT ESPEY
21
22
23
24

Case 1:05-cv-10617-MBB    Document 26-6    Filed 05/04/2007    Page 40 of 40

Thomas Scott Espey, 4/25/2006                 Condenseit              Rosario vs. Rarc Hospitalit

Page 157

```
 1        C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS )
                                    )
 3   COUNTY OF SUFFOLK              )

 4        I, Rosamond K. Marcy, Certified
     Shorthand/Registered Professional Reporter, a
 5   Notary Public in and for the Commonwealth of
     Massachusetts, do hereby certify:
 6
          That THOMAS SCOTT ESPEY, the witness
 7   whose deposition is hereinbefore set forth,
     was duly sworn by me and that such deposition
 8   is a true record of the testimony given by
     said witness.
 9
          I further certify that I am not related
10   to any of the parties to this action by blood
     or marriage, and that I am in no way
11   interested in the outcome of this matter.

12        IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office this
13   23rd day of May, 2006.

14

15        _____
              ROSAMOND K. MARCY

16   My commission expires:
     April 6, 2012.
17

18
     PLEASE NOTE:
19        THE FOREGOING CERTIFICATION OF THIS
          TRANSCRIPT DOES NOT APPLY TO ANY
20        REPRODUCTION OF THE SAME BY ANY
          MEANS UNLESS UNDER THE DIRECT
21        CONTROL AND/OR DIRECTION OF THE
          CERTIFYING REPORTER.

22

23

24
```

Longhorn Steakhouse
Leominster
227 North Main Street
Server: LEIGH                    09/26/2003
Table 52/1                          9:57 PM
Guests: 6

                                   #20043
Reprint #: 5


Texas Tonion                         5.99
Chowder-Cup (2 @2.49)                4.98
Chicken Fingers                      4.99
Jack Daniels (17 @4.75)             80.75
 Manhattan Mixer (17 @0.50)          8.50
5oz Bud Light (2 @3.99)              7.98
oz The Renegade                     10.99
Baby Back Ribs 1/2 Rack (3 @12.99)  38.97
20z Prime Rib                       14.99
Baby Back Ribs & Chicken            14.99


Note Subtotal                      193.13

Sub Total                          193.13
Tax                                  9.66

Total                              202.79

Cash                               240.00


     Make plans to dine with us at
          Longhorn Steakhouse.
        We will make your dining
          experience special.

   --- Check Closed ---

145 – Longhorn of Leominster
227 North Main Street

# Audit Report
## Date of Business: 09/26/2003

Page 7
12/01/2003 —  5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 0.00 Rice |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 07:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | CLEARED ITEMS | Mgr 9882 LEIGH Emp 9882 LEIGH cleared $    1.89 from Table 63 Chk:40054 |
| | | 1.89 IBC [ 0.000000 Kg] |
| | | 0.00 MUG [ 0.000000 Kg] |
| 08:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    1.89 for Table 63 Chk:40054 |
| | | 1.89 IBC |
| | | 0.00 No Mug |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 1 time(s) |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:16 PM | APPLY PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | 57.22 Tip:0.00 ID:5511910207971723 Exp:0606 |
| 08:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 2 time(s) |
| 08:17 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:30066 for a total of 57.22 |
| 08:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:21 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 1 time(s) |
| 08:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:27 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:27 PM | ADJUST PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | Amt:57.22 Tip:0.00 -> 12.00 ID:5511910207971723 Exp:0606 |
| 08:28 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:32 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 1 time(s) |
| 08:32 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    3.99 for Table 53 Chk:40051 |
| | | 3.99 Pie |
| 08:32 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:37 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:37 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 1 time(s) |
| 08:37 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:40 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   35.70 for Table 52 Chk:20043 |
| | | 5.99 Tonion |
| | | 2.49 Chowder Cup |
| | | 2.49 Chowder Cup |
| | | 4.99 Fingers |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

**Audit Report**
Date of Business: 09/26/2003

Page 8
12/01/2003 —  5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 3.99 25oz Bud Light |
| 08:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:43 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH 50.00 |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH 5.00 |
| 08:43 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 2 time(s) |
| 08:43 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:40054 for a total of 50.41 |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   9.74 for Table 63 Chk:30084 |
| | | 4.99 25oz Wach |
| | | 4.75 Sombrero |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  34.47 for Table 63 Chk:30084 |
| | | 16.99 14oz Strip CC |
| | | 0.00 MR |
| | | 0.00 FF |
| | | 0.00 Caesar Salad |
| | | 2.49 Side Mush |
| | | 14.99 PR 12oz |
| | | 0.00 MR PR |
| | | 0.00 FF |
| | | 0.00 Caesar Salad |
| 08:43 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH 50.00 |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH 20.00 |
| 08:44 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 2 time(s) |
| 08:44 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:40051 for a total of 56.28 |
| 08:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:51 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:51 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  36.75 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 08:51 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:55 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:55 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  10.37 for Table 53 Chk:20047 |
| | | 6.59 Fire Wrap |
| | | 1.89 Sprite |
| | | 1.89 Sprite |
| 8:55 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:00 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  79.94 for Table 52 Chk:20043 |

145 - Longhorn of Leominster
227 North Main Street

## Audit Report
### Date of Business: 09/26/2003

Page 9

12/01/2003 --- 5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 10.99 Sm-Top 8oz |
| | | 0.00 M |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Caesar Salad |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 14.99 PR 12oz |
| | | 0.00 M PR |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Mix Green Sal |
| | | 0.00 Ranch |
| | | 14.99 1/2 Rack/ Chix |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 0.00 Mix Green Sal |
| | | 0.00 Balsamic |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| 09:00 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:08 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:09 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $ 29.98 for Table 53 Chk:20047 |
| | | 10.99 Sm-Top 8oz |
| | | 0.00 Well Done |
| | | 0.00 BP |
| | | 0.00 S |
| | | 0.00 Mix Green Sal |
| | | 0.00 House |
| | | 18.99 Lky/ Sam CC |
| | | 0.00 Well Done |
| | | 0.00 Seasonal Veg |
| | | 0.00 Rice |
| | | 0.00 Mix Green Sal |
| | | 0.00 Italian |
| 09:09 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:15 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $ 3.99 for Table 52 Chk:20043 |
| | | 3.99 25oz Bud Light |
| 09:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:16 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:17 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 1 time(s) |
| 09:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:21 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $ 21.00 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

# Audit Report
## Date of Business: 09/26/2003

Page 10
12/01/2003 –  5:29 PM
5.2.5.190

| Time | Type | Transaction |
|------|------|-------------|
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:24 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:24 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  15.75 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:24 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:31 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 1 time(s) |
| 09:31 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:33 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 2 time(s) |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 3 time(s) |
| 09:34 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:35 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:35 PM | APPLY PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |
| | | 46.42 Tip:0.00 ID:4491631021235627 Exp:1103 |
| 09:35 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:36 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 4 time(s) |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 50.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 1.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 2 time(s) |
| 09:36 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 62 Chk:50036 for a total of 61.56 |
| 09:36 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 1 time(s) |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:44 PM | APPLY PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | 42.37 Tip:0.00 ID:4773550000020827 Exp:1103 |
| 09:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:46 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:46 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 5 time(s) |
| 09:46 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:49 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 9:49 PM | ADJUST PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | Amt:42.37 Tip:0.00 -> 2.63 ID:4773550000020827 Exp:1103 |
| 09:49 PM | ADJUST PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |

145 - Longhorn of Leominster
227 North Main Street

Case 1:05-cv-10617-MBB    Document 26-7    Filed 05/04/2007    Page 6 of 6

Audit Report
Date of Business: 09/26/2003

Page 11
12/01/2003 —  5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
|  |  | Amt:46.42 Tip:0.00 -> 7.00 ID:4491631021235627 Exp:1103 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:20047 for a total of 42.37 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:30084 for a total of 46.42 |
| 09:49 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    3.78 for Table 63 Chk:20052 |
|  |  | 1.89 Coke |
|  |  | 1.89 Coke |
| 09:49 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:52 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:53 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    3.49 for Table 53 Chk:40069 |
|  |  | 3.49 Heineken |
|  |  | 0.00 MUG |
|  |  | 0.00 Water |
| 09:53 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:57 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH |
|  |  | 100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH |
|  |  | 100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH |
|  |  | 20.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH |
|  |  | 20.00 |
| 09:57 PM | PRINT CHECK | Emp 9882 LEIGH printed Table 52 Chk:20043  Printed 6 time(s) |
| 09:57 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:20043 for a total of 202.79 |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:58 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:58 PM | CLOSE CHECK | Emp: 9882 LEIGH Check Table 73 Chk:40070 was freed because it was empty. |
| 09:58 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    6.59 for Table 53 Chk:40069 |
|  |  | 6.59 Fire Wrap |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:03 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:03 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $    4.99 for Table 53 Chk:40069 |
|  |  | 4.99 Fried Cake |
| 10:03 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:06 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:07 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   29.76 for Table 73 Chk:20054 |
|  |  | 1.89 Diet Coke |
|  |  | 8.99 Sam Caes-D |
|  |  | 0.00 With Hot |
|  |  | 0.00 See Server |
|  |  | 16.99 PR 16oz |
|  |  | 0.00 Rare PR |
|  |  | 0.00 Seasonal Veg |
|  |  | 0.00 Caesar Salad |
|  |  | 1.89 Tea |
| 10:07 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   24.98 for Table 73 Chk:20054 |
|  |  | 12.49 Fried Dinner |
|  |  | 0.00 FF |
|  |  | 0.00 Slaw |
|  |  | 12.49 Fried Dinner |



# GABRIEL & SWEENEY
## COURT REPORTING

Transcript of the Testimony of:
# Michael A. Marcantonio

### In the Case of:
## Nancy Rosario, et al
## vs.
## Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse

### Taken on:
## March 1, 2007

**Gabriel & Sweeney Court Reporting**
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton, MA   01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321   Fax   (978) 263-0669
email:  gsreporting@yahoo.com

Page 1

```
        Volume I
      Pages 1 - 235
      UNITED STATES DISTRICT COURT
      DISTRICT OF MASSACHUSETTS
      CIVIL ACTION NO. 05CV-10617-MEW

. . . . . . . . . . . . . .

NANCY ROSARIO, INDIVIDUALLY, AS   *
  SHE IS THE ADMINISTRATRIX OF THE *
  ESTATE OF CAROLINA SANTIAGO, ESSEX *
PROBATE COURT DOCKET NO.           *
  05P-2499-ADI, PPA VERONICA        *
  ROSARIO AND CHRISTINA SANTIAGO   *
AND AS SHE IS THE ADMINISTRATRIX   *
  OF THE ESTATE OF JOSE SANTIAGO,  *
BERLIN CONNECTICUT PROBATE         *
  COURT, CASE NO. 03-0773.1        *

versus                             *

RARE HOSPITALITY INTERNATIONAL,    *
  INC., d/b/a LONGHORN STEAKHOUSE  *

. . . . . . . . . . . . . .

      DEPOSITION OF MICHAEL A. MARCANTONIO,
  taken on behalf of the Defendants, pursuant to the
  Massachusetts Rules of Civil Procedure, before
  Kathryn E. Sweeney, a Registered Professional
  Reporter, Certified Realtime Reporter and Notary
  Public within and for the Commonwealth of
  Massachusetts, at the offices of Gillis &
  Bikofsky, P.C., 1150 Walnut Street,
  Newton, Massachusetts, on Thursday, March 1, 2007,
  commencing at 10:15 a.m.

  GABRIEL & SWEENEY COURT REPORTING
  15 Van Wart Path | 35 Gardner Street
  Newton, MA 02459 | Aspen, MA 04726
  (617) 969-4791 Phone (978) 266-1352
  (617) 964-1321 Fax (978) 267-0669
```

Page 2

```
1   APPEARANCES:
2
3
4   MICHAEL K. GILLIS, ESQUIRE
5   NEIL SCHNURBACH, ESQUIRE
6   DAVID BIKOFSKY, ESQUIRE
7     Gillis & Bikofsky, P.C.
8     1150 Walnut Street
9     Newton, Massachusetts 02461
10    Appearing for Defendant
11
12  ALBERT L. FARRAH, JR., ESQUIRE
13    One Washington Mall
14    Boston, Massachusetts 02108
15    Appearing for Plaintiff
16
17
18
19
20
21
22
23
24
```

Page 3

```
1          I N D E X
2
3   WITNESS -- MICHAEL A. MARCANTONIO    Page
4
5   Examination by Mr. Gillis        4
6
7          E X H I B I T S
8
9   Number  Description      Marked on Page
10
11   1   Supplement to Rule 26 report   4
12   2A - EE Photocopies of photographs   4
13   3   Rule 26 report         12
14   4   Educational experience    53
15   5   Updated testimony       57
16   6   Affidavit          69
17   7   Audit report          129
18   8   Page 68 of Bar Code       231
19
20
21
22
23
24
```

Page 4

```
1          P R O C E E D I N G S
2        IT IS HEREBY STIPULATED AND AGREED by
3   and between counsel for the respective parties
4   that the deposition transcript shall be read and
5   signed by the deponent within thirty days upon
6   receipt of said transcript under the pains and
7   penalties of perjury.
8        It is further stipulated that all
9   objections, except as to form, and motions to
10  strike are reserved to the time of trial.
11        MICHAEL A. MARCANTONIO,
12  having been satisfactorily identified by the
13  production of his Massachusetts driver's license
14  and duly sworn by the Notary Public, was examined
15  and testified as follows:
16        (Exhibit No. 1, supplement to Rule 26
17  report, marked for identification.)
18        (Exhibit Nos. 2A through EE, photocopies
19  of photographs, marked for
20  identification.)
21  EXAMINATION BY MR. GILLIS:
22  Q. Could you please state your name for the record?
23  A. Michael A. Marcantonio.  Anthony.
24  Q. Mr. Marcantonio, I'm here today to ask you
```

Page 5

```
1   questions about a case that you've been retained
2   as an expert in.
3        If at any time you don't understand my
4   questions, just let me know, and I will try to
5   rephrase them.  If at any time you need a break,
6   let me know.
7        I take it you've been deposed before?
8   A. Yes.
9   Q. Okay.  So you understand the ground rules?
10  A. Yes, sir.
11  Q. Okay.  And you understand the English language,
12  correct?
13  A. Yes, sir.
14  Q. So it's fair to assume that if I ask you a
15  question and you answer it, you understood the
16  question?
17  A. Yes, sir.
18  Q. Okay.
19        MR. GILLIS:  Before we get started, I
20  just want to make a statement on the record that
21  based on the plaintiff filing yesterday a
22  supplemental Rule 26 response for Mr. Marcantonio,
23  I feel compelled to put on the record that this is
24  four months to the day after which we received his
```

Page 6

```
1   Rule 26 disclosure; that it is patently unfair to
2   expect us, on less than 24 hours notice, to
3   prepare for a deposition based on the supplemental
4   response; that we intend to move that it be
5   stricken based on its untimeliness; and that we
6   reserve the right to go forward with -- at a
7   further date, if the court allows you to continue
8   and allows this supplement to be -- denies our
9   motion to strike the supplement.
10        And it does not appear to us that the
11  testimony contained therein is a result of any new
12  or recently disclosed information that would have
13  precluded Mr. Marcantonio from making these
14  statements in a timely fashion four months ago
15  when the expert answers were due; and that it
16  makes it patently unfair for us, in that we've
17  already deposed all of the fact witnesses
18  concerning alcohol and the service of alcohol, and
19  we would have to go back and re-depose at this
20  point in order to address the issues that have
21  been raised at this time.
22        In addition to which, we'd have to depose
23  again Dr. Benjamin in light of the disclosure, in
24  addition to which we've -- the disclosure on its
```

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 7

```
 1    face is invalid.
 2        And I just want to state that for the
 3    record.
 4        MR. FARRAH:  Let me just have a quick
 5    response, and we can get on to the business of
 6    this deposition.
 7        As I offered in the email to you
 8    yesterday, and as I offer again, to the extent
 9    that you feel you need an additional day to depose
10    him, or additional time to depose him because you
11    didn't have sufficient time to review the
12    supplemental disclosure, I have no objection to
13    that.
14        In terms of deposing fact witnesses, it's
15    my understanding that there are still fact
16    witnesses to be deposed.  Mr. Sirjane and another
17    fellow who was with -- allegedly with the group
18    that night.  So I don't see any --
19        (Discussion held off the record.)
20        MR. FARRAH:  And generally, I don't see
21    any prejudice here, but we can certainly talk
22    about this later.  Thanks.
23        MR. GILLIS:  Very briefly, you're right
24    there are two more fact witnesses who were there,
```

Page 8

```
 1    but the majority, the six other people at the
 2    table, plus all the servers, plus all the managers
 3    have already been deposed.
 4        But that having been said, let's go
 5    forward.
 6    Q.  Mr. Marcantonio, could you please tell me whether
 7        or not you've reviewed any additional documents
 8        since you filed your original Rule 26 disclosure
 9        back on October 31st, which documents or papers
10        relate to this case?
11    A.  I don't believe so.
12    Q.  Okay.
13    A.  Other than just the experiment that we did to
14        confirm what I put in my report.
15    Q.  Okay.  Have you reviewed any further testimony of
16        Dr. Benjamin's?
17    A.  I don't believe I have.
18    Q.  Well, you --
19    A.  I think -- well, actually, I did review his
20        information, but I don't know whether it was
21        before -- after my report.
22    Q.  Okay.  My understanding from reading your report
23        is that you reviewed an affidavit of Dr. Benjamin,
24        correct?
```

Page 9

```
 1    A.  Yes.
 2    Q.  And since your report was written before his
 3        Rule 26 disclosure, can we agree that that was his
 4        60(j) affidavit that was filed in this case?
 5    A.  I believe that's true.
 6    Q.  Okay.  You --
 7    A.  I hadn't reviewed his deposition, if that's what
 8        you're --
 9    Q.  All right.  Have you reviewed his Rule 26
10        disclosure in this case, which was filed on
11        October 31st?
12    A.  I really can't remember.  I -- whatever's on my
13        report is what I reviewed.
14    Q.  Okay.  Your report just says an affidavit of
15        Dr. Benjamin.  He's actually filed two.
16        MR. GILLIS:  Perhaps, all, you could --
17        MR. FARRAH:  I don't think he has
18    reviewed the Rule 26.
19        MR. GILLIS:  Okay.
20    Q.  So since November 1st you're not aware of
21        anything -- other than these photographs that have
22        been premarked as Exhibits 2A through EE, you've
23        not reviewed any other documents concerning this
24        case?
```

Page 10

```
 1    A.  I don't believe I have.
 2    Q.  Well, when you say you believe, do you have any
 3        reason to believe you have reviewed anything?
 4    A.  No, I don't.
 5    Q.  Let's just go over first the supplemental response
 6        that's been marked Exhibit 1, which was forwarded
 7        to us yesterday, February 28th, 2007.
 8        You're aware of this supplement, correct?
 9    A.  Yes.
10    Q.  Was there anything in the supplement that -- well,
11        strike that.
12        The supplement primarily deals with you
13        making certain measurements -- or attempting to
14        make measurements concerning pouring alcohol in a
15        drink glass, correct?
16    A.  Correct.
17    Q.  Okay.  When were you first retained in this case?
18    A.  That would be on my list of things that you have
19        there.
20        I don't remember the exact date that I
21        was retained.  I'm sure you have that somewhere
22        which indicates the date.
23        MR. GILLIS:  Let's get this marked.
24    Q.  Do you recognize this document?
```

Page 11

```
 1    A.  That's the report that I filed for the --
 2        MR. FARRAH:  Do you have a copy for me?
 3        MR. SCHNURBACH:  (Hands document.)
 4        MR. FARRAH:  Thank you.  What is
 5    Exhibit 1?
 6        MR. GILLIS:  Exhibit 1 is his
 7    supplemental.
 8        MR. FARRAH:  Okay.  And Exhibit 2?
 9        MR. GILLIS:  Photographs.  And that would
10    be 2A through EE.
11        MR. FARRAH:  Okay.
12    Q.  Do you recognize the document?
13    A.  Yes, sir.
14    Q.  What is that document?
15    A.  It's a report that I filed, based on what I had
16        reviewed.
17    Q.  In this case?
18    A.  Yes, sir.
19    Q.  Okay.  That's -- I'm going to refer to that
20        document as your Rule 26 disclosure, okay?
21    A.  Yes.
22        MR. GILLIS:  Let's have that marked as
23    Exhibit 3.
24
```

Page 12

```
 1        (Exhibit No. 3, Rule 26 report, marked
 2        for identification.)
 3    Q.  Now, I'm going to give you 3 to look at.  Can you
 4        tell me, based on that document, when you were
 5        retained in this case?
 6    A.  No, I don't think it has the date that I
 7        actually retained.
 8    Q.  Do you know how long before you wrote your report
 9        you were retained in this case?
10    A.  I would say within maybe eight or nine months.
11    Q.  Okay.  During that eight or nine months did you
12        have the opportunity to do the measurements that
13        you've done as stated in Exhibits 1 and 2, your
14        supplemental report and the photographs?
15    A.  I never did that particular type of measurement,
16        other than my practical experience as a bartender.
17        And I always knew that a Manhattan or
18    martini straight up in that size glass was a
19    minimum of two, pharmacologically, up to three
20    drinks in one glass to fill it to that level.
21        So based on experience, I already knew
22    that, and I had done that kind of testing before
23    in the past.
24        After this report I did one of those
```

2 (Pages 7 to 12)

Page 13

1 kinds of reports -- tests at any own home using
2 old granddad, and not using ice that was coming
3 from a restaurant, not using ExactoPours.
4     And I made that point to Al.
5 Q. Okay. This'll go a lot faster if you answer the
6     question.
7         MR. FARRAH: Just answer the question,
8 yes.
9         THE WITNESS: I'm sorry.
10 Q. The question was: Did you have the opportunity,
11     during the eight or nine months prior to filing
12     your report, to do the type of testing that you
13     did that's reflected in Exhibits 1 and 2 of this
14     deposition?
15 A. No.
16 Q. Why not?
17 A. Because I already knew it from experience.
18 Q. Okay. And why isn't it your experience of what
19     the amounts of the alcohol came up with? Why
20     aren't they in your report?
21 A. They are in my report.
22 Q. Your first report there?
23 A. Yes, sir.
24 Q. Okay. Where does it -- can you point out to me

Page 14

1     where it has the measurements as to exactly how
2     far up in the glass a Manhattan at the Longhorn
3     Steakhouse goes?
4 A. When it's double -- when I -- on that -- if you
5     look to Page -- Point Number 6 -- in the report,
6     if you look to the one, two, third page, and where
7     it says in my opinion. Point Number 4, it says
8     that they were -- served were double and
9     potentially triple drinks in the form of 25 ounce
10     beers and the Jack Daniels Manhattans served
11     straight up in a six ounce glass filled one
12     quarter of an inch from the top.
13 Q. Okay. Why didn't you do these experiments prior
14     to filing your original report, the one that
15     you're now supplementing?
16 A. Because I didn't think I needed to, because I knew
17     from experience that that was in fact true.
18 Q. Okay. So you didn't need to do this --
19 A. No, sir.
20 Q. -- to render your opinion in this case, correct?
21 A. That's correct.
22 Q. And so why did you do this subsequently?
23 A. Why?
24 Q. Yes.

Page 15

1 A. To prove to Al, plaintiff's counsel, that my point
2     was correct.
3 Q. Okay. Did you -- were you requested to do this?
4 A. I suggested it. I did it on my own first, and
5     then we spoke about it, and then he and I together
6     went to The Point and conducted it with
7     ExactoPour.
8 Q. When did you do that?
9 A. I think it was last week.
10 Q. Is there anything in your schedule that would have
11     physically prevented you from doing the exact same
12     thing that you did last week at The Point with
13     Attorney Farrah that you could not have done prior
14     to filing your original report with this court on
15     October 31st, 2006?
16 A. No.
17 Q. Okay. The supplemental report that you have
18     submitted, which has been marked as Exhibit 1,
19     does this in any way change your opinions in the
20     report that was submitted on October 31st, which
21     has been marked as Exhibit 3?
22 A. No, sir.
23 Q. It doesn't change your opinion in any way?
24 A. It confirms it.

Page 16

1 Q. Okay. So you don't need this supplement in order
2     to render your opinion in this case, correct?
3 A. Correct.
4 Q. And you didn't draw any conclusions in this
5     supplemental report either, correct?
6 A. That I hadn't already drawn, no.
7 Q. Well, this report, and correct me if I'm wrong,
8     states what you did, but it doesn't draw any
9     conclusions from what you did, correct?
10 A. It would confirm my conclusions.
11         Maybe I don't understand your question,
12 Mr. Gillis.
13 Q. Is there any conclusion included in the
14     supplemental report, which has been marked
15     Exhibit 1?
16 A. The conclusion is that pharmacologically a
17     Manhattan is at least two to three drinks in one
18     glass.
19 Q. Okay. Where does it say that in the report?
20 A. What I just read to you.
21 Q. No, I'm saying in your supplemental report. Where
22     does it conclude in that supplemental report that
23     statement?
24 A. I don't believe it does.

Page 17

1 Q. Okay. So to get back to the original question:
2     There's nothing in Exhibit 1 that draws any
3     conclusions that you've put in writing as part of
4     that exhibit, correct?
5 A. As part of this exhibit?
6 Q. Exhibit 1. Not Exhibit 3, Exhibit 1.
7         MR. FARRAH: The supplemental report.
8 A. I don't believe so.
9 Q. Okay.
10     (Pause.)
11 Q. Okay. On the back part of Exhibit 3 it has your
12     curriculum vitae, and I just want to go over that
13     briefly with you, if I could.
14         Can you tell me how far you've gone in
15     school?
16 A. High school, Watertown, '71 graduated.
17 Q. Have you had any formal education after Watertown
18     High School?
19 A. I went to UMass for a semester.
20 Q. And did you complete that semester?
21 A. I believe I did.
22 Q. Okay. Any formal education after that point?
23 A. No, sir.
24 Q. As far as personal background, are you married?

Page 18

1 A. Yes.
2 Q. Any children?
3 A. No, sir.
4 Q. What's your date of birth?
5 A. 3/4/53.
6 Q. Happy birthday.
7 A. Thank you.
8         MR. FARRAH: When is it?
9         THE WITNESS: 4th of March.
10         MR. GILLIS: Sunday.
11         THE WITNESS: I'm working a double.
12 Q. And is it fair to say that for -- without going
13     through your entire resume here, for approximately
14     the last 20 years you've been doing TIPS training
15     and testifying on service of alcohol?
16 A. Yes.
17 Q. Okay. If I look at your resume, your last job
18     prior to training was assistant manager of Tom
19     Foolery's from 1983 to 1985, correct?
20 A. Correct.
21 Q. Okay. When you were at Tom Foolery's, did you
22     bartend or were you just a manager?
23 A. I was assistant manager.
24 Q. Okay.

3 (Pages 13 to 18)

Page 19

1  A. There'd be times I would bartend, of course. You
2     do everything when you're assistant manager.
3  Q. Okay. Were you TIPS certified when you were at
4     Tom Foolery's?
5  A. I was a trainer in October of '84.
6  Q. Okay. You left there in June of '85, correct?
7  A. Yes.
8  Q. So for a portion of that time you were TIPS
9     certified?
10 A. Yes.
11 Q. Okay. And prior to that you owned a restaurant as
12    well, correct?
13 A. I was partners in a restaurant, yes.
14 Q. Well, your title says owner, correct?
15 A. Yes.
16 Q. And at that restaurant you served alcohol,
17    correct?
18 A. Yes, sir.
19 Q. And you bartended, correct?
20 A. Yes, sir.
21 Q. Okay. Did you free pour?
22 A. Yes, sir.
23 Q. Okay. Do you have a problem with free pouring?
24    MR. FARRAH: Objection. Did he or does

Page 20

1     he?
2  Q. Yes. When you were a bartender, did you think it
3     was improper to free pour?
4  A. No, only -- no, I didn't at that point, because I
5     was trained to know what to look for and how to
6     pour.
7  Q. Okay. So as long as people know what to look for
8     and are properly trained, free pouring is an
9     appropriate way to serve a drink, would you agree?
10    MR. FARRAH: Objection.
11 A. If they're properly trained, I would say yes.
12 Q. Okay. Did you use the ExactoPour?
13 A. No.
14 Q. Did you need an ExactoPour?
15 A. No.
16 Q. Did you know about the ExactoPour?
17 A. I don't even think ExactoPour was in back then.
18 Q. Okay. Did you think it was improper service not
19    to use an ExactoPour when you were bartending?
20    MR. FARRAH: Objection.
21 A. No, I did not.
22 Q. Okay. And you were a bartender at T.G.I. Friday's
23    back in '77 to '81, correct?
24 A. Yes.

Page 21

1  Q. Okay.
2  A. I was -- not during that whole time. I had to go
3     through their training program.
4  Q. And when you were a bartender there, that was back
5     when Massachusetts allowed happy hours, correct?
6  A. Yes, sir.
7  Q. Okay. And you served people two-for-one drinks,
8     correct?
9  A. I don't remember that we had two-for-ones at
10    Friday's back then.
11 Q. If you were two-for-ones at Barbyann's?
12 A. No, sir.
13 Q. How about the Tom Foolery's?
14 A. I --
15    MR. FARRAH: Did they have two-for-ones
16    there?
17 Q. Two-for-ones at Tom Foolery's?
18 A. I don't believe we did. I can't recall that we
19    ever did that there, no.
20 Q. Have you ever worked at a restaurant that served
21    two-for-ones?
22 A. I can't recall that, no.
23 Q. Okay. Have you ever -- were you aware, when you
24    were a bartender, that restaurants served

Page 22

1     two-for-ones?
2  A. Yes.
3  Q. Okay. Did you have an opinion that that was
4     inappropriate service of alcohol at that time?
5     MR. FARRAH: Objection.
6  A. Yes.
7  Q. So back when you were a bartender and it
8     was legal to serve two for one drinks, you felt
9     that was inappropriate service of alcohol?
10    MR. FARRAH: Objection.
11 A. I did believe that.
12 Q. Okay. What was inappropriate about it?
13 A. Well, if customer has half a drink in front of
14    them or a full drink in front of them, they tend
15    to drink that one quick, so the second one doesn't
16    come out -- come before. So it tends to cause people to
17    drink a little bit faster.
18 Q. Well, that would be the same today if they served
19    them one drink when they had half a drink in front
20    of them, correct?
21 A. Yes, sir.
22 Q. Okay. So you think that any time someone has a
23    drink in front of them, if they get another drink
24    that's inappropriate service?

Page 23

1     MR. FARRAH: Objection.
2  A. I would say you have to use your people skills.
3     If you're properly trained and you know that it's
4     safe to serve them another beer, that would be
5     fine, but it depends on the circumstances.
6     But generally, if a person has a half a
7     drink in front of them, you put up another one,
8     it's going to inspire them to drink faster.
9  Q. Okay. So is that inappropriate service or not?
10 A. In certain circumstances, yes.
11 Q. Okay. So it's not always inappropriate, correct?
12    MR. FARRAH: Objection.
13 A. It would depend on the circumstance, yes.
14 Q. Okay. It's a case-by-case analysis that the
15    person making the service of alcohol would have to
16    make, correct?
17 A. Certainly.
18 Q. Okay. And that would be based on their own
19    training, correct?
20 A. Correct.
21 Q. And it would be based on any indicators that they
22    see in the person to whom they're serving the
23    alcohol, correct?
24 A. Certainly.

Page 24

1  Q. And they'd review their inhibitions, correct?
2  A. Yes.
3  Q. Their coordination, correct?
4  A. Certainly.
5  Q. Any other things that -- judgment, correct?
6  A. Judgment and reactions.
7  Q. Reaction. They look at all those things, and it
8     would be a judgment that they would have to make,
9     because they're the ones who are there serving the
10    drink, correct?
11    MR. FARRAH: Are you testifying or is he?
12    Objection.
13    MR. GILLIS: I'm going to strike the
14    comment.
15 Q. But go ahead and answer.
16    MR. FARRAH: You can't strike the comment
17    from the record.
18 A. Shall I continue?
19 Q. Yes.
20    MR. FARRAH: I object.
21 A. Would you rephrase the question again for me,
22    because I've lost my train of thought. I'm sorry.
23 Q. There are circumstances when serving someone who
24    has a half a drink in front of them is not

4 (Pages 19 to 24)

Page 25

1    inappropriate, correct?
2    A. I don't think it's wise, but it -- there'd be
3    certain circumstances where I would -- I might do
4    that.
5        I have to be very cognizant of what the
6    strength of the drink is that I'm serving them,
7    and the speed in which they're drinking.
8        I would also have to be aware of whether
9    they're eating or not.
10       Again, we talked about inhibitions,
11   judgment, reactions and coordination. I would
12   also be concerned about the intoxication rate
13   factors, and the stress, exhaustion and mood an
14   individual might be under at the time.
15   Q. Okay. So let's get off the fence. Either it's
16   appropriate or it's inappropriate to serve someone
17   with a half a drink in front of them. Which is
18   it?
19       MR. FARRAH: Objection to the form. He's
20   answered the question.
21   A. I would basically say that I have answered the
22   question. It's a judgment call based on the
23   individual circumstances, but I don't recommend
24   it.

Page 26

1    Q. Okay. Did you ever serve anybody a drink with a
2    half a drink in front of them when you were a
3    bartender?
4    A. I honestly can't remember that far back.
5    Q. Okay.
6    A. It's been a while since I've been behind the
7    stick.
8    Q. You currently train quite regularly people in the
9    TIPS program, correct?
10   A. Yes, I do.
11   Q. And do you instruct them specifically never to
12   give a drink to anyone who has a portion of a
13   drink in front of them; never get them another
14   drink?
15   A. Yes, I do.
16   Q. You state that in every seminar that you give?
17   A. Yes. The standard line I give them is if you have
18   half a drink in front of you, and I put up another
19   one, what would you do with the one in front of
20   you? And inevitably, more than 99 percent of the
21   time they say I would finish it faster.
22   Q. Okay.
23   A. Once in a while somebody will say I'll give it
24   back to you and take the new one.

Page 27

1    Q. As apart of the TIPS program, you give them, the
2    people, written materials as well, correct?
3    A. Yes, sir.
4    Q. And you do video training as well, correct?
5    A. Yes, sir.
6    Q. Nothing in the written materials says don't serve
7    someone who has a portion of a drink left in front
8    of them, correct?
9    A. It actually says do not serve a fresh drink
10   without taking away the glass from the last drink.
11   Q. Okay. Massachusetts allows people to get served
12   two drinks simultaneously, correct?
13       MR. FARRAH: Objection.
14   A. The state law says you cannot deliver to one
15   person any more than two drinks at a time.
16       There are cities and towns that recommend
17   only one drink per person at a time.
18   Q. What does Leominster recommend?
19   A. I haven't looked at the Leominster regulations.
20   Q. Did you think that was important in this case?
21   A. It would be wise, true.
22   Q. So why didn't you do it?
23   A. I just never got around to doing it.
24   Q. Didn't have time?

Page 28

1    A. You could -- I don't -- didn't even really thought
2    about it.
3    Q. But it's perfectly legal in Massachusetts to give
4    one person two drinks to take away and do with
5    what they wish, correct, other than give it to a
6    minor or intoxicated person?
7        MR. FARRAH: Objection to the form.
8    A. I can't answer that question yes or no. Every
9    time somebody orders two drinks from me, if I'm a
10   bartender or I train people, if they order two
11   drinks, you ask where's the other one going? And
12   if they say they're both for him, then I say,
13   listen, I'm going to be here all night long, I'll
14   give them to you one at a time.
15   Q. So you disagree with the current Massachusetts law
16   that allows a person to get two drinks at one
17   time?
18   A. No, I didn't say that. I disagree if it's for
19   their own consumption.
20   Q. Okay. If a person buys two drinks for their own
21   consumption, is it legal in Massachusetts?
22   A. In certain cities it is, yes.
23   Q. What cities it not legal in?
24   A. Worcester. Quincy recommends, but doesn't

Page 29

1    regulate.
2    Q. Okay.
3    A. So it's important to know what the city or town
4    requires.
5    Q. Other than Worcester, in what city or town in
6    Massachusetts is it illegal by town ordinance to
7    give someone two drinks?
8    A. I really haven't bothered to look at all the
9    cities' and towns' rules and regulations on that
10   specific item, but it is contrary to responsible
11   beverage service.
12   Q. Okay. So you disagree with the Massachusetts law
13   that allows someone to serve one person two
14   drinks, even if it's for their own consumption?
15   A. No. If it's for some -- if they're buying it for
16   somebody else, I don't disagree with it, as long
17   as I know where the drink is going.
18       If it's for their own consumption, I
19   would say one drink per person at a time would be
20   wise.
21   Q. And that was my question. Do you disagree with
22   the Massachusetts law that allows a person to get
23   two drinks for their own consumption, correct?
24   A. The law doesn't say that. The regulation says you

Page 30

1    cannot deliver to one person any more than two
2    drinks at a time. That's all it says.
3        When it was originally written back in
4    the early '80s, when McCarthy was at the ABCC, it
5    was one drink per person at a time. But through
6    the lobby efforts of the MRA, they loosened it up
7    to read two, because of the argument I'd like to
8    get my wife a glass of wine while we're waiting
9    for dinner.
10       That's how long I've been in this
11   business.
12   Q. Or people want to get two drinks at a sporting
13   event because of the length of the line?
14   A. Again, if it's both for them, they tend to drink
15   faster, so that's a problem.
16   Q. Okay. So every guy who goes up to get two beers
17   at Fenway Park, you disagree with that service of
18   alcohol, correct, if those two drinks are for
19   their own consumption?
20   A. If it was for their own consumption, yes, I do.
21   Q. Okay. And you agree with -- you disagree with
22   that same premise at TD Banknorth Garden, correct?
23   A. TD Banknorth Garden leaves it up to the discretion
24   of the individual server.

5 (Pages 25 to 30)

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 31

```
 1        If you feel that this person's drinking
 2   too fast, and you assume those two beers are for
 3   them, then you can go to one beer at a time.
 4   Q.  That wasn't the question.  Do you disagree with TD
 5        Banknorth serving two beers to one person for
 6        their own consumption?
 7   A.  I don't agree with that.
 8   Q.  Okay.  Do you agree with Foxboro Stadium which
 9        serves -- serving two beers to one patron for
10        their own consumption?
11   A.  I do not agree with that.
12   Q.  Do you agree with the Worcester
13        Centrum -- disagree with the Worcester Centrum
14        serving two beers to one person for their own
15        consumption at a sporting event?
16   A.  Whatever venue you say, I'm going to say the same
17        answer.  No, I do not agree with that.
18   Q.  No matter where in Massachusetts, even if it's
19        legal, they serve two beers or two alcoholic
20        drinks to one person for their own consumption,
21        you disagree with that?
22   A.  Yes.
23   Q.  Okay.  Are you aware of the Team Program in New
24        Hampshire?
```

Page 32

```
 1   A.  Yes.
 2   Q.  Can you tell me about the Team Program?
 3            MR. FARRAH:  Objection to the form.
 4   A.  Team Program is more --
 5            MR. GILLIS:  What was wrong with the form
 6        of that question?
 7            MR. FARRAH:  What do you want him to tell
 8        you about it?  We'll be here a long time.
 9            MR. GILLIS:  Well, fine.  We're not in a
10        rush.
11   A.  The Team Program is a program that the liquor
12        commission puts on that covers laws and IDs, and
13        touches upon briefly pharmacological effects.
14   Q.  Do you think that's an adequate program?
15            MR. FARRAH:  Objection.
16   A.  It depends who's training it.
17   Q.  Well, when did you come up with that?  Haven't you
18        previously testified that you said that that
19        program is inadequate?
20            MR. FARRAH:  Objection.
21   A.  Yes, I did.
22   Q.  And said that more than 50 percent of the
23        bartenders in New Hampshire who have taken that
24        state program are not properly trained?  Isn't
```

Page 33

```
 1        that your testimony?
 2   A.  Yes, it was.
 3   Q.  So it wasn't --
 4   A.  It wasn't testimony actually.  It might have been
 5        testimony, but it was -- I wrote it in a chapter
 6        in a book, I'm sure.
 7   Q.  You quoted it from your deposition, correct?
 8   A.  Yes.
 9   Q.  Are you now saying that that was inaccurate?
10   A.  No.  I still believe it.  I wouldn't let them
11        train my dog.
12   Q.  Okay.  So in addition to it being inappropriate
13        service at all these venues across Massachusetts,
14        you think that the New Hampshire state program for
15        training their bartenders is insufficient,
16        correct?
17   A.  If the people who are training the people that
18        trained me, yes.
19   Q.  Okay.  Are you aware of any other trainers, other
20        than who trained you?
21   A.  Not in New Hampshire, no.  I was disappointed --
22   Q.  You --
23   A.  I had been trained by a guy by the name of Randall
24        Avery in the past who was the chairman -- who
```

Page 34

```
 1        might be the chairman of the New Hampshire
 2        Commission at this point in time.
 3   Q.  And you felt that the service -- that the training
 4        he gave you was inadequate?
 5   A.  No.  Randall Avery did a good job back in -- this
 6        is back in the, early '80s.  In fact, I
 7        called him and complained about the people who
 8        trained me when I took the program.
 9   Q.  Other than Mr. Avery and the person who trained
10        you, have you sat through any other training for
11        the Team Program in New Hampshire?
12   A.  No.
13   Q.  Okay.  So you're not personally aware of how any
14        other trainers do the program, because --
15   A.  Not in that --
16   Q.  -- you haven't been there, correct?
17   A.  That's correct.
18   Q.  You were on the Governor's Highway Safety Bureau
19        from 1984 to '85, correct?
20   A.  Yes.
21   Q.  Well, according to your resume here.
22   A.  Yes.
23   Q.  What you did do in that one year on the Highway
24        Safety Bureau?
```

Page 35

```
 1   A.  It was a --
 2            MR. FARRAH:  Objection to the form.
 3   A.  It was a voluntary committee I was on to research
 4        programs that were in the United States to teach
 5        people how to sell and serve alcohol responsibly.
 6   Q.  How much time did you spend during that time
 7        period working on that project?
 8   A.  I can't tell you specifically.  It was well over
 9        20 years ago.
10   Q.  Okay.  Was it --
11   A.  It was significant.  I spent a -- I did a lot of
12        research.
13   Q.  Did you have a full-time job at the time?
14   A.  Yes, sir.  I was at Tom Foolery's, I believe.
15   Q.  Okay.  So whatever time you spent was in your
16        spare time when you weren't working full-time?
17   A.  Correct.
18   Q.  So it wasn't a full-time job for you to look up
19        these programs, correct?
20   A.  No.
21   Q.  And the program you got was out of Washington
22        D.C., the TIPS program, correct?
23   A.  I chose --
24            MR. FARRAH:  I'm sorry.  Was the question
```

Page 36

```
 1        the program you got?
 2   Q.  The program that you found and settled on through
 3        your research was the TIPS program, which was
 4        based out of Washington D.C., correct?
 5            MR. FARRAH:  Objection to the form.
 6   A.  Yes.
 7   Q.  Okay.  And you suggested it to the state, correct?
 8   A.  I don't know if I -- I don't know if I can say
 9        that I suggested it to the state, but I -- out of
10        all the research that I did, I thought it was the
11        most credible program at the time.
12   Q.  Well, you say on your website that you found the
13        program and brought it to Massachusetts.  Is that
14        accurate?
15   A.  Probably.  I found it when I did my research, I
16        chose it, and I've been teaching it every since.
17        I've trained over 40,000 people in the program.
18   Q.  Okay.  But you've had no affiliation with that
19        organization for the past 22 years, correct?
20   A.  The Governor's Highway Safety Bureau?
21   Q.  Yes.
22   A.  Off and on I have.
23   Q.  Well, why is it not included in your resume?
24   A.  Because I don't care about my resume.  I'm a TIPS
```

6 (Pages 31 to 36)

Page 37

trainer. That's what I do.
**Q. Okay.**
A. The resume is not -- it's just a guideline. It doesn't matter to me. What matters to me is --
**Q. It does matter to people who are trying to depose you to find out what your experience is.**
A. Well --
**Q. Are you aware -- can you tell me exactly what experience you have with the Governor's Highway Safety Bureau since 1985 that's not included in your curriculum vitae?**
A. I had a list of educational -- additional educational experiences, and I had a list -- I don't have it with me -- that talked about the variety of different alcohol awareness seminars that I participated in with the Governor's Highway Safety Bureau. And that occurred throughout the '80s, into the '90s.
**Q. And where is that?**
A. In my office.
**Q. Did you provide it to counsel as part of your CV?**
A. I don't recall. I might have. I really don't recall.
**Q. Will you provide him a copy to give to us?**

Page 38

A. Absolutely.
**Q. You spent six years on the Alcohol Awareness Advisory Committee, correct?**
A. Yes, that's the -- that was the -- that was a subsection of the Governor's Highway Safety -- that's what they called the committee.
**Q. Okay. What did you do on that committee?**
A. Basically conducted a portion in an all-day seminar that they had conducted at the different counties in Massachusetts; and also attended some of the other seminars that they -- the Governor's Highway Safety Bureau would put seminars together in different counties, and a variety of different speakers would speak.
**Q. Were you paid for those speaking engagements?**
A. I was given -- not initially. And then later on I was given a stipend.
**Q. During that six-year period how many seminars would you approximate that you gave?**
A. I really don't know. I'd have to look at the paper that I have.
**Q. You have that all written down someplace?**
A. Pretty much.
**Q. And that's in the documents that you will give to**

Page 39

**your lawyer?**
A. Absolutely.
**Q. What was your affiliation, if any, with the Mass Restaurant Association from 1988 to 1993?**
A. I was part of their alcohol awareness committee to -- that dealt basically with alcohol issues.
**Q. How much time did that require?**
A. It depended on what I was doing. I helped to -- I pretty much put together a program called Project Stop, which taught people how to recognize and properly check IDs; recognize fake IDs. And that took some time.
**Q. Is there a reason why you haven't had any affiliation with them since 1993?**
A. Yes.
**Q. What?**
A. I had testified against bars and restaurants as an expert witness, and they frowned upon that. And then they basically didn't want me to be part of that group anymore.
**Q. Who told you that was the reason you were asked to leave?**
A. I wasn't asked --
MR. FARRAH: Objection to the form.

Page 40

THE WITNESS: I'm sorry.
MR. FARRAH: No, it's all right.
**Q. Just to speed things along, he can object to the form of the question. It doesn't stop you from answering it. So when he objects, you can go ahead and answer anyways.**
A. Very well.
**Q. And if he doesn't want you to answer, he'll tell you not to.**
A. Very good. Who told me that --
**Q. That was the reason why you were no longer on the advisory committee?**
A. I believe Tom McCane did.
**Q. And where is Tom McCane?**
A. I don't know where he is now. He was the owner of Tom Foolery's.
He was a past president of the Mass Restaurant Association, and he encouraged me not to teach -- not to testify against any establishment.
**Q. So your former boss is the one that you believe precluded you from being involved with the Alcohol Awareness Advisory Committee for the Mass Restaurant Association?**

Page 41

MR. FARRAH: Objection.
A. One of a few, yes.
**Q. By the way, during that time period, '88 to '93, you testified against restaurants, is that correct?**
A. I had.
**Q. Okay.**
A. I think in '87 was one of the first cases I worked on.
**Q. And you've been testifying since, correct?**
A. Yes.
**Q. Okay. What percentage of your testifying is for plaintiffs, as opposed to defendant restaurants in the cases that you're involved in?**
MR. FARRAH: In Dram Shoppe type cases, is that what you're --
MR. GILLIS: Yes, Dram Shoppe type cases.
A. Primarily all. There's been a couple that I've worked for the defense.
**Q. How much money do you make a year as an expert?**
A. I don't know what the dollar value is, but I -- in a recent deposition I was asked to do a percentage of income, and I can tell you the -- at the most I think one year was 12 percent. It could be as

Page 42

little as one percent.
My primary income source is responsible alcohol server training.
**Q. When you say 12 percent, let's take 2006. What amount of money did you make as an expert in 2006?**
A. I have no idea right off the top of my head.
**Q. Do you have a ballpark?**
MR. FARRAH: Objection to the form.
A. I really can't tell you. Do you want me to guess?
**Q. No. You know how to work a deposition. You've been deposed before.**
A. I do.
**Q. And you know nobody wants guesses. I'm just asking you to state under oath whether or not you can tell me what income you derived, with approximation, not guessing, for the calendar year 2006.**
A. I would say under 20,000. I would say more than -- maybe more than 10. Somewhere around there.
**Q. And how much money in 2006 did you earn as a server trainer?**
A. I know the gross income for my company was 260-some-odd thousand dollars, I think. Or in

Page 43

1    that ballpark. Over $250,000 was the gross
2    income.
3    Q. Just from doing training programs?
4    A. Training programs, awareness seminars, and sale of
5    manuals.
6    Q. Okay. And the manuals are the TIPS manuals that
7    you stamp your name and company on the front of?
8    A. That, and driver's license guidebooks, ultraviolet
9    lights and microscopes.
10   Q. Okay. You sell the driver's license books?
11   A. Certainly.
12   Q. Did Rare -- excuse me. Did the Longhorn have a
13   driver's license book on September 26th, 2003?
14   A. I have no knowledge of that.
15   Q. Either way?
16   A. No way.
17   Q. Is that something that you wanted to know?
18   A. It's not absolutely necessary for me to know in
19   this circumstance.
20   Q. Well, did you ask your counsel to find out for
21   you?
22   A. No, I did not.
23   Q. Okay.
24      MR. FARRAH: By the way, when you're

Page 44

1    saying your counsel, you mean me, counsel for the
2    plaintiffs, don't you?
3       MR. GILLIS: Correct.
4    Q. When you say you're a charter member of the
5    Responsible Beverage Service Council in
6    California, can you tell me what that entails?
7    A. Jim Peters was the first person that exposed me to
8    any responsible alcohol server training issues,
9    and that's back when he was up in the UMass
10   Amherst area, North Hampton.
11      And over the years we've grown apart, so
12   I haven't seen or talked to him in quite some
13   time.
14   Q. Okay. When was the last time you had any activity
15   with the Responsible Beverage Service Council of
16   Scotts Valley, California?
17   A. I really don't remember.
18   Q. More than ten years?
19   A. Probably.
20   Q. More than 20 years?
21   A. No. I know I've seen him at some conferences
22   somewhere long the line, but I can't remember
23   exactly where.
24   Q. When you saw him -- I want to differentiate

Page 45

1    between when you see this guy and you actually
2    participate with this council.
3       When was the last time you did anything
4    with the council, not bumped into the person.
5    A. I really haven't -- other than being -- could be
6    20 years. Could be 15 to 20 years.
7    Q. Okay. And 20 years ago what did you do as a
8    charter member for this council?
9    A. Shared information, basically. That's about it.
10   Q. How many meetings did you have?
11   A. Everything was verbal on the phone, so -- or we'd
12   run into each either at different conferences.
13   Q. How frequently would you meet?
14   A. Not very frequently.
15   Q. Once a year?
16   A. Maybe.
17   Q. Maybe once a year?
18   A. Maybe.
19   Q. Okay. You state that you appeared in court on
20   October 23rd, 2002 in a case in which the
21   plaintiff's counsel was George Balko at Bowditch &
22   Dewey, correct?
23   A. Yes.
24   Q. Did you testify in that case?

Page 46

1    A. Yes.
2    Q. Okay. And that was the date that you testified?
3    A. Yes.
4    Q. And that was for the plaintiff, correct?
5    A. Yes.
6    Q. And what was the substance of your testimony?
7       MR. FARRAH: Objection to the form.
8    Q. Well, did it have to do with fake IDs --
9    A. No, it was concerning responsible alcohol service.
10   Q. Okay. What were the facts of that case?
11   A. In that case, I think a guy was served a couple of
12   beers at a Christmas party, and then he went to
13   the bar and was at the bar for about three hours,
14   and the bartender was drinking with him, doing
15   shots. He left the bar and hit a tree, and he
16   became a quadriplegic. And his BAC was .295 at
17   the last he was served alcohol, I believe.
18      So the toxicologist in the case I think
19   determined that he would have had to have had 17
20   drinks in three hours.
21   Q. And the deposition, just below that on your prior
22   court cases, that was in Utah?
23   A. That one, I don't remember.
24   Q. Okay. West Virginia, you testified down there in

Page 47

1    2004, is that correct?
2    A. Yes.
3    Q. What was that case about?
4    A. That's -- I think that -- I don't know why, but I
5    remember some guy sitting at a slot machine being
6    served, and he had puke all over him. He
7    was -- appeared to be asleep a couple of times,
8    and when he woke up, he was served, and then he
9    injured somebody, I believe.
10   Q. In that case you thought the service was
11   inappropriate?
12   A. I did.
13   Q. And then in New Hampshire, is that correct, in
14   '04?
15      MR. FARRAH: Do you want to ask him what
16   the facts were?
17   Q. Do you know the facts of that case?
18   A. That one, I can't remember. The particular facts
19   in that case escape me.
20   Q. And you did some work in Rhode Island for
21   Mr. Mandell, correct?
22   A. Yes.
23   Q. What was the facts of that case?
24   A. Gentleman was served at a Chinese restaurant and

Page 48

1    caused a person to become a quadriplegic, I
2    believe, with a very high BAC.
3    Q. And then you were -- had a court appearance in
4    Washington County Superior Court, correct?
5    A. That was that same case, correct.
6    Q. Because Washington County is Rhode Island,
7    correct?
8    A. That's right.
9    Q. So you were deposed, and then you appeared at
10   trial?
11   A. Correct.
12   Q. You have no depositions in Massachusetts in the
13   last five years?
14   A. I probably do. I don't think it was -- it wasn't
15   asked of me to produce that.
16   Q. Well, you've been an expert before, correct?
17   A. Yes.
18   Q. And you understand that you're supposed to produce
19   all of your court and deposition testimony for
20   cases in the last five years, correct?
21   A. No.
22      MR. FARRAH: Objection. That's not --
23   Q. The last four years?
24   A. I didn't get a subpoena from you to ask for any

8 (Pages 43 to 48)

| | Page 49 |
|---|---|

1  specific records, so I didn't bring anything with
2  me. I apologize if that's what I'm supposed to
3  do. I am not --
4  MR. FARRAH: That's not what he's asking
5  you.
6  THE WITNESS: I'm sorry.
7  Q. Well, did you talk to your lawyer -- strike that.
8  You filed a Rule 26 disclosure in this
9  case, correct, which is Exhibit 3?
10  MR. FARRAH: The report.
11  A. Yes, the report I filed.
12  Q. Okay. Did you review Rule 26 to see what was
13  required of you of prior testimony?
14  A. I did not.
15  Q. Okay. When the deposition's over will you review
16  it with counsel and provide us all of the cases
17  that that Rule requires?
18  A. Yes, I will.
19  MR. FARRAH: But just for the record,
20  less the record be unclear, you first asked
21  him -- you first asked him whether he had
22  testified in Massachusetts in the last five years,
23  I think under the misapprehension that Rule 26
24  required that witnesses go back five and not four

| | Page 50 |
|---|---|

1  years.
2  And his report, which has been marked as
3  Exhibit 3, on the page that begins with the
4  discussion of prior testimony, starts with the
5  following are court appearances or court cases
6  that I've given depositions within the last four
7  years.
8  If there's more, we'll certainly get it
9  for you, but I don't want the record to be
10  left --
11  MR. GILLIS: I agree with what you said,
12  and I believe I asked the question the second way.
13  But just in case I didn't, let me do it
14  appropriately.
15  Q. Are you aware of any other testimony, either by
16  deposition or at trial, that you've given in any
17  case in the last four years which is not included
18  in this list which is part of Exhibit 3?
19  MR. FARRAH: That's four years back from
20  October 31, 2006. So October 31, 2006.
21  A. I would have to look at my records to answer that
22  properly.
23  MR. FARRAH: We will, and if there's
24  more, we'll get it for you. And if you want to

| | Page 51 |
|---|---|

1  bring him back to ask about that, I don't have a
2  problem with that.
3  Q. Without pinning you down precisely, do you have any
4  memory of testifying in Massachusetts within the
5  last four years for any reason? That'd be 19 --
6  A. In civil or criminal?
7  Q. Either. 2002 to 2006?
8  A. I did testify in a criminal case in September, I
9  think it was, of this past year.
10  Q. Okay. Where was that?
11  A. That was at Middlesex Superior Court.
12  Q. And what was the nature of the case?
13  A. I was inline blading, skating in a cemetery down
14  the street from my house, and I saw a gentleman
15  who was staggering to a motorcycle. I -- and this
16  was in April. I called the police, and they
17  subpoenaed me to testify as to what I saw, because
18  they did catch him.
19  Q. So that was as a fact witness, not as an expert,
20  correct?
21  A. Correct.
22  Q. Do you know of any other testimony, off the top of
23  your head? And again, I know you're going to go
24  check your records and so forth, but can you think

| | Page 52 |
|---|---|

1  of any other testimony while we're sitting here
2  that you've testified in Massachusetts, or for
3  that matter anywhere else, in the last four years
4  that's not included in there?
5  MR. FARRAH: Exhibit 3, your report.
6  A. I really -- I'd have to look at my files to see
7  that, sir.
8  Q. Okay.
9  THE WITNESS: Can I take a quick one?
10  MR. GILLIS: Sure. Five-minute break?
11  THE WITNESS: (Short break was taken.)
12  (Short break was taken.)
13  Q. Okay. During the break you've provided me with
14  two additional documents?
15  The first is -- says Dram Shoppe
16  Consultants at the top, and it says related
17  educational experience.
18  Do you recognize that document?
19  A. Yes.
20  Q. And can you tell me what that document is?
21  A. It was a list of the seminars that I attended, and
22  things that related to responsible alcohol service
23  in the years -- and it has the Governor's Highway
24  Safety Bureau seminars on it, to the best of my

| | Page 53 |
|---|---|

1  knowledge, as you requested.
2  Q. Okay. Let's get that marked.
3  (Exhibit No. 4, educational experience,
4  marked for identification.)
5  Q. Now, have you -- other than your TIPS training,
6  which you do -- you do that fairly regularly,
7  correct?
8  A. Yes.
9  Q. Other than your TIPS training, are there any other
10  seminars that you have done since this -- since
11  this list, which you can take a look at it, but it
12  looks to me like the last date on here is 2002,
13  with the Lobster Boat Restaurant in Yarmouth.
14  MR. FARRAH: Seminars to taken or given?
15  MR. GILLIS: Given.
16  A. I do seminars in Yarmouth every year for the
17  Yarmouth Restaurant Association. It's more of an
18  awareness seminar, kind of an overview. I do
19  awareness seminars, like for Smith College.
20  The awareness seminar covers laws, IDs,
21  how to recognize intoxication and intervention
22  strategies, but I don't list them when I do them.
23  Q. Okay. Why is that?
24  MR. FARRAH: Why doesn't he list them?

| | Page 54 |
|---|---|

1  MR. GILLIS: Yes.
2  A. I don't think it's necessary.
3  Q. Does it deal with the service of alcohol by
4  servers?
5  A. It would be, or it could be a social host setting,
6  sure.
7  Q. You don't think that's relevant to your disclosure
8  as to seminars?
9  A. Well, I mean, it may very well be relevant in this
10  circumstance, but I didn't think it was necessary.
11  And do I have to provide every single
12  TIPS class I -- because I probably do 150 to 200
13  TIPS classes a year, so I'm confused.
14  Q. I already accepted -- I asked the question except
15  for your TIPS classes.
16  A. Sorry.
17  Q. Other than Smith College and Yarmouth, are you
18  aware of any other organizations that you do
19  training for that's not listed on here, other than
20  your TIPS training --
21  MR. FARRAH: Exhibit 4.
22  Q. -- concerning alcohol service and awareness?
23  A. I -- nothing comes to the top of my head right
24  now.

9 (Pages 49 to 54)

|  | Page 55 |
|---|---|

```
 1   Q. Okay.
 2        (Pause.)
 3   A. Oh, I'm sorry, I have done -- I did an awareness
 4      seminar for 600 freshman, for the freshman class
 5      of Williams College in the past two years.
 6   Q. How does that awareness program differ from TIPS
 7      training?
 8   A. It basically focuses on the liabilities, and how
 9      they can make a difference as a friend
10      being -- when you're watching your friends consume
11      or overconsume alcohol.
12   Q. Okay.
13   A. And basically touches upon the liability.  I kind
14      of designed it around the audience, if you will.
15   Q. Okay.  And you've provided me with another
16      document, which I'll ask you to identify.
17   A. It's the more recent -- after '02, the more
18      recent -- I did a deposition -- I participated in
19      a deposition on January 25th, '07 on a case in
20      Georgia.
21           And that's I think the only additional
22      information that we have on that, compared to what
23      you had before.
24   Q. As part of the disclosure pursuant -- in
```

|  | Page 56 |
|---|---|

```
 1      Exhibit 3, correct, that's the only other case
 2      that's been added is the '07?
 3   A. Yes, that's the only other deposition I've been
 4      involved in, I believe.  I haven't even read
 5      the -- like I said, I haven't reviewed it yet.
 6   Q. And what were you requested to testify to in that
 7      case?
 8   A. The responsible service of Ruby Tuesday's.
 9   Q. Okay.  And what was the facts scenario in that?
10   A. The facts and the scenario in that is people were
11      served a large amount of alcohol, and then
12      collided with an ATV with six children on it.  And
13      I think five of the children were killed, and one
14      was seriously injured.
15   Q. When you say a large amount of alcohol, how much
16      alcohol was the driver served?
17   A. I don't know exactly.  I can't tell you exactly at
18      this point in time.  It was -- I don't know the
19      exact specifics.  I think it was shots.  I think
20      there was some beers involved, but I can't
21      remember specifics of it right at this point in
22      time.
23   Q. Okay.  We'll get this marked as an exhibit.
24        (Exhibit No. 5, updated testimony, marked
```

|  | Page 57 |
|---|---|

```
 1      for identification.)
 2   Q. You have in front of you Exhibit 3, correct?
 3   A. Yes.
 4   Q. And that's your Rule 26 disclosure, is what we've
 5      been calling it, in this case, correct?
 6   A. Yes.
 7   Q. Based on --
 8        (Pause.)
 9   Q. You list in there, under I believe Section G --
10        MR. FARRAH:  What page?
11        MR. GILLIS:  Second page.
12        MR. FARRAH:  Okay.
13   Q. You start out with the first page, Paragraph 1,
14      Paragraph 2, and then a bunch of alphabetical
15      paragraphs, correct?
16   A. The one that says I have developed and lectured?
17   Q. Well, let's start at the beginning.  Paragraph A,
18      it says that you conclude these conclusions to a
19      reasonable degree of responsible alcohol beverage
20      service certainty, is that correct?
21        MR. FARRAH:  That's Paragraph 1.
22        MR. GILLIS:  Yes.
23   Q. And it's beverage, correct?
24   A. I am not a good speller.  I'd like to blame it on
```

|  | Page 58 |
|---|---|

```
 1      somebody else, but I'm the one that types it, yes.
 2   Q. Okay.  Paragraph 2 goes over what you pretty much
 3      talked about already, about your service and
 4      training?
 5   A. Yes.
 6   Q. And in Paragraph F, sub --
 7        MR. FARRAH:  2F.
 8   Q. You talk about your peer reviewed studies and
 9      articles that you serve as a scientific basis for
10      the TIPS and Alcohol Abuse Council, I think,
11      Subparagraph 2F, 1 through 5, correct?
12   A. Yes.
13   Q. What articles are you referring to?
14   A. Oh, gosh.  They would be articles that the NHTSA,
15      National Highway Safety Bureau, would have
16      provided over the years.
17           They would be articles of the National
18      Alcohol and Alcohol Abuse Council, I think,
19      Dr. Chafetz's writings from TIPS.  And mostly
20      Dr. Chafetz's writing.
21   Q. How do you spell Chafetz?
22   A. C-H-A-F-E-T-Z.
23   Q. F-E-T-Z?
24   A. Yes.
```

|  | Page 59 |
|---|---|

```
 1   Q. And where is he located?
 2   A. I think he's -- his son, Adam Chafetz, runs Health
 3      Communications, which is in Arlington, Virginia.
 4      And he might be in Arlington, Virginia, or he
 5      could still be in Washington, D.C.  They're real
 6      close to each other.
 7   Q. And that's the company that runs the TIPS program,
 8      correct?
 9   A. Yes, sir.
10   Q. And in addition to training like you do, they
11      actually have an online training program as well,
12      correct?
13   A. They have developed an online training program.
14   Q. And where did you find Dr. Chafetz, his writings,
15      that you relied upon?
16        MR. FARRAH:  Where did he find them?
17        MR. GILLIS:  Yes.
18        MR. FARRAH:  Is that what you asked?
19   A. I don't know.  I don't have the book in front of
20      me.  I really don't know.
21           I'm sure I've read a bunch of his stuff
22      over the years, because we're talking 23 years of
23      contact with that group, just about.
24   Q. As you sit here today, can you remember any of
```

|  | Page 60 |
|---|---|

```
 1      those articles that dealt specifically with
 2      determining the amount of volume in a glass of
 3      alcohol, similar to what you've done in Exhibits 1
 4      and 2?
 5   A. Not specifically, no.
 6   Q. Okay.  Have you ever been retained as an expert to
 7      testify as to the volume of liquid in a particular
 8      glass, whether it be alcohol or not alcohol?
 9   A. I don't believe so, no.
10   Q. Okay.  Do you have an expertise in that area?
11   A. Not other than common sense, no.
12   Q. Okay.  You've never taken any training in that
13      area, correct?
14   A. No, sir.
15   Q. Okay.  And while you've done this, Exhibit 1 and
16      Exhibit 2, this is done not in your field of
17      expertise, but just something you physically are
18      able to do, correct?
19   A. Certainly.
20   Q. Okay.  These five categories that you address,
21      these are the categories that you routinely
22      address in the TIPS program, correct?
23   A. Yes.
24   Q. In the TIPS program, and in these five paragraphs,
```

10 (Pages 55 to 60)

Page 61

1  none of them deal with measuring the amount of
2  liquid in a glass, correct?
3  A. Well, the effects of alcohol consumption on
4  individuals would also -- would always include
5  that.
6  For example, the TIPS programs teaches
7  that one ounce of 100 proof spirits is equal to
8  five ounces of wine, is equal to 12 ounces of
9  beer.
10  All three of those measurements roughly
11  have a half an ounce of pure ethyl alcohol. And
12  four of those drinks in an hour for 150-pound man
13  on an empty stomach could bring that man's BAC to
14  a .10.
15  Q. Agreed. I agree with all that. But my question
16  was: Do these topics deal not with the amount of
17  pure alcohol, but how to measure the amount of
18  volume in a drink, based on the glass, like you've
19  done here on Exhibits 1 and 2?
20  A. Well, it's part of the training. I mean, if you
21  don't know how much wine you pour in a wine glass,
22  if you don't know how much beer you pour in a beer
23  glass.
24  So I would say to a degree it does have

Page 62

1  something to do with that.
2  Q. Where specifically in the TIPS training programs
3  that you run, or in the literature, does it say if
4  you have a six ounce glass that's filled to a
5  quarter inch from the top, it equals X amount of
6  volume of liquid?
7  A. I don't know that it actually has that, per se,
8  but Bar Code will tell you that a martini is
9  considered two drinks, at least.
10  Q. Okay. I'm not getting into the alcohol. I'm
11  getting into the volume, the number of ounces of a
12  drink, regardless of their strength.
13  Do you teach, by looking at a glass, like
14  in these photographs, people how to determine from
15  looking at the glass how much liquid is in the
16  glass, whether it's alcohol or not alcohol?
17  A. Do I teach that?
18  Q. Yes.
19  A. Yes.
20  Q. Okay. How do you teach that? What specifically?
21  A. If I go into a bar or restaurant -- if I was going
22  into The Gillis, for example, and I was to train
23  your staff, I would do a measurement of the amount
24  of liquid that would be in a particular cocktail

Page 63

1  that you would be serving. In other words,
2  perceived value.
3  If you had a five ounce rocks
4  glass -- generally, when a glass is given to a
5  guest, they expect it to be at least full or a
6  quarter of an inch from the top.
7  To do that with a five ounce rocks glass,
8  you'd have to pack that with ice, and you'd pour
9  an ounce and a half of vodka in there, and it
10  would fill to that level.
11  So those are the kinds of things that I
12  need to know, so that when I ask a bartender in a
13  training program how much booze do you pour in a
14  vodka and tonic, do you make Long Island iced
15  teas, I generally ask the managers and then I ask
16  the servers.
17  For example, a manager may often tell me
18  that, yes, a martini is supposed to be
19  three-quarters of an inch from the top. And then
20  I'll ask a server when you bring a glass to the
21  table, do you spill it? Oh, yes. So then it's
22  really like, what, when you get it from the bar,
23  up to the top or a quarter inch from the
24  top, isn't it? Oh, yes.

Page 64

1  To do that, how much booze would have to
2  be poured over ice to get that water melted to
3  lift to that level? That's a standard question I
4  ask in every class.
5  When they have 25 ounce beers, if they
6  have a 16 ounce draft beer, for example, because a
7  lot of people are serving beers in 16 ounce
8  glasses, three of those is equal to four beers
9  pharmacologically.
10  Servers need to know that, because
11  alcohol's a drug, it should be dispensed in a
12  measured dose, because a stiff drink will cause a
13  customer to lose track. And those are very
14  important issues that have to be covered in
15  responsible server training.
16  Q. Okay. Have you now told me everything
17  that -- dealing specifically with volume in a
18  glass that you teach in your TIPS program?
19  MR. FARRAH: Objection.
20  A. I don't know if it's everything, but it's a
21  significant amount.
22  Q. Okay. As you sit here right now, you can't think
23  of anything else that you routinely teach in the
24  TIPS program as concerns volume in a glass,

Page 65

1  correct?
2  A. Not off the top of my head, no.
3  Q. Okay.
4  A. It would all depend on the particular
5  establishment, correct.
6  Q. It's a case-by-case analysis, correct?
7  A. Not -- there's no state law that says you can't
8  pour a ten ounce martini, so it be would be a
9  case-by-case issue.
10  Q. You said that the standard -- in a five ounce
11  glass, if I put an ounce and a quarter of vodka
12  and I fill it up with ice, that'll bring it to the
13  top, is that correct?
14  A. About a quarter of an inch from the top of a rocks
15  glass.
16  Q. And that's vodka on the rocks, correct?
17  A. If you're using a five ounce rocks glass, you pack
18  that with ice, it usually comes to about a quarter
19  of an inch from the top.
20  Q. Okay. How about in a straight up martini?
21  MR. FARRAH: Objection to -- is that the
22  question, how about a straight up martini?
23  Objection.
24  Q. How about a straight up martini, how high would

Page 66

1  that come in a glass?
2  MR. FARRAH: Objection.
3  A. Well, delivered to the guest a straight up martini
4  would probably be about a quarter of an inch from
5  the top.
6  Q. Okay.
7  A. If it's a four and a half ounce up glass, to chill
8  it down it would take at least two and a half
9  ounces worth of 80 proof booze, which is
10  pharmacologically two drinks in one glass.
11  Q. Okay. You've previously taught that two and a
12  half ounces of vodka will fill a four and a half
13  ounce martini type glass to within a quarter of an
14  inch, based on the amount of alcohol and the
15  amount of melt off from the ice, correct?
16  MR. FARRAH: Objection.
17  A. Correct.
18  Q. Okay. And that gives it a perceived value of a
19  full drink, correct?
20  A. Yes, sir.
21  Q. Okay. So a four and a half ounce martini type
22  glass has a perceived value of being full with
23  only two and a half ounces of vodka, correct?
24  A. Perhaps, yes.

11 (Pages 61 to 66)

Page 67

1          MR. FARRAH: Objection.
2   Q. Well, not perhaps. Yes or no?
3   A. Yes.
4   Q. Okay. Now, under Paragraph 3, and then it's got
5       subparagraphs, instead of alphabet you've got
6       numbers 1 through 13. These are the materials
7       that you reviewed in order to make your opinion in
8       this case, correct?
9   A. Yes. At this point -- at the time this was
10      written.
11          MR. FARRAH: I'm sorry, I was making a
12      note about the last question. Did you ask him
13      about the documents that are listed under --
14          MR. GILLIS: 3.
15          MR. FARRAH: -- 3, 1 through 13, the
16      documents he reviewed as part of his preparation
17      of his Rule 26 report?
18          MR. GILLIS: Yes.
19          MR. FARRAH: Okay. Thank you.
20   Q. And I think you testified earlier that since that
21      time you haven't reviewed any other documents,
22      correct?
23   A. Correct.
24   Q. Okay. Are there any documents that you wish you

Page 68

1       had had to review in this case that you haven't
2       reviewed already?
3   A. Not that I can think of.
4   Q. Okay. And again, Number 2, the affidavit of David
5       Benjamin, just so we're clear, you're considering
6       that the 60(j) affidavit in this case, correct?
7   A. I don't know what that means.
8   Q. Okay.
9          MR. FARRAH: I think you've already asked
10      him. I'm pretty sure that's what he's testified
11      to.
12          MR. GILLIS: Off the record.
13          (Discussion held off the record.)
14   Q. I had asked you earlier if you had seen
15      Dr. Benjamin's affidavit pursuant to his -- what's
16      commonly referred to as a 60(j) affidavit.
17          Do you know what a 60(j) affidavit is?
18   A. No, sir.
19   Q. Okay. Have you ever heard that term before?
20   A. I don't think so.
21   Q. Okay.
22          MR. FARRAH: There's a chance you'll
23      learn something.
24          THE WITNESS: Thank you.

Page 69

1          (Pause.)
2   A. Yes, that looks familiar to me.
3          MR. FARRAH: Wait. How can you -- it's
4       upside down. It's upside down.
5   Q. I'm going to show you a document and ask you if
6       you recognize it.
7          MR. FARRAH: Take your time.
8          (Pause.)
9   A. Yes, I believe this is the one that I reviewed.
10   Q. All right. I'll take that back and just take a
11      one-minute break to copy it. We'll mark that when
12      we get it.
13          (Short break was taken.)
14          (Exhibit No. 6, affidavit, marked for
15          identification.)
16   Q. This affidavit, which has been marked as
17      Exhibit 6, when you state that you reviewed the
18      affidavit of Dr. Benjamin, that's the one that
19      you're referring to, correct?
20   A. Yes, sir.
21   Q. Have you referred to any further reports or
22      deposition testimony of Dr. Benjamin?
23   A. No, I haven't.
24   Q. Are you aware that his opinion has changed since

Page 70

1       that affidavit?
2          MR. FARRAH: Objection.
3   A. I -- no.
4   Q. Okay. Are you aware that his Rule 26 disclosure
5       states that at the time of the last service of
6       alcohol he believes that the blood alcohol for
7       Mr. Southworth was .149, and not in the range of
8       .18 to .22 that's in that affidavit?
9          MR. FARRAH: Objection.
10   A. No.
11   Q. If you had that information, would it change your
12      opinion in this case?
13          MR. FARRAH: Objection.
14   A. Probably not.
15   Q. Okay. So .22 is almost 50 percent higher than a
16      .15, correct?
17   A. If you do the math, yes.
18   Q. Okay. And the fact that his opinion now is 50
19      percent lower than what it was when you reviewed
20      his affidavit, you don't believe that that would
21      have any effect on your opinion in this case?
22          MR. FARRAH: Objection.
23   A. My opinion is based on the responsible service of
24      alcohol. And the BAC has some significance, but

Page 71

1       I'm not a toxicologist, so --
2   Q. Okay. Well, you understand that --
3          MR. FARRAH: Let him finish his answer,
4       please.
5   Q. I'm sorry. Finish your answer.
6          MR. FARRAH: There's was a so. I don't
7       know many people who end their sentences with so.
8   Q. Were you finished?
9   A. Probably.
10   Q. Okay.
11   A. The context is.
12   Q. Okay. You'd agree, though, that a .07 blood
13      alcohol difference would indicate to you less
14      service of alcohol to an individual, correct?
15          MR. FARRAH: Objection.
16   A. Conceivably.
17   Q. Conceivably or --
18   A. Well, it depends. I mean, from what I know about
19      blood alcohol content, it could rise up to two
20      hours after the person stopped drinking.
21          So if they had a lot of drinks
22      beforehand, it depends on when they did the BAC.
23      But if he had food in his stomach, that would slow
24      alcohol's rate of entry into the bloodstream, but

Page 72

1       ultimately it would get there.
2   Q. Did you -- as part of your determination of
3       whether or not there was appropriate service in
4       this case, did you determine how many drinks
5       Mr. Southworth had -- excuse me, Mr. Southworth
6       was served while he was at the Longhorn on
7       September 26th, 2003?
8          MR. FARRAH: Objection.
9   A. There was conflicting testimony, but I understand
10      that it was roughly two 25 ounce beers and three
11      Manhattans.
12   Q. Okay. That's what you're basing your opinion on,
13      the assumption of that number of drinks?
14          MR. FARRAH: Objection.
15   A. I don't know the exact number of drinks. I'm
16      basing it on the speed and the amount of alcohol,
17      based on the number of people at the table.
18   Q. Okay. So as part of your opinion in this case,
19      you don't have an opinion as to how much alcohol
20      was served to Mr. Southworth in total while at the
21      Longhorn, correct?
22          MR. FARRAH: Objection.
23   Q. Regardless of time?
24          MR. FARRAH: Object.

12 (Pages 67 to 72)

Page 73

1    A. I don't know the exact amount, no.
2    Q. But when you say you don't know the exact amount,
3       do you have an estimate of what he drank at the
4       Longhorn?
5           MR. FARRAH: Objection.
6    A. The estimate would be two 25-ounce beers and three
7       Manhattans.
8           MR. FARRAH: Is this at the table or the
9       bar, or where?
10          THE WITNESS: From the time they arrived
11      until --
12          (Discussion held off the record.)
13   Q. Is it fair to say that your estimate of two 25
14      ounce beers and three Manhattans is based on the
15      amount of alcohol you believe Mr. Southworth was
16      served during the entire time he was at the
17      Longhorn Steakhouse on September 26th, 2003?
18          MR. FARRAH: Objection.
19   A. Again, I don't know the exact amount he was served
20      in the time he was there. I'm going based on Jude
21      Connolly's testimony.
22          I'm also going based on Lee's testimony
23      of the three Manhattans that she told the police
24      or said that she had served him or he had

Page 74

1       consumed.
2           I don't know that they know the exact
3       amount of alcohol, because I mean there seems to
4       be some discrepancy about -- everybody seemed to
5       be drinking beers, but there was only two beers on
6       the check. So there was a cash transaction at the
7       bar. It could have been a cash transaction
8       throughout. I really don't know.
9    Q. But this number that you're coming up with, this
10      isn't just at the table, this is your estimate for
11      what he drink at the table and the bar that
12      evening, correct?
13          MR. FARRAH: Objection.
14   A. As far as I know.
15   Q. Okay. You're not aware of more alcohol being
16      served to him that evening at the Longhorn other
17      than what you've just testified to, the two 25
18      ounce beers and the three Manhattans, correct?
19          MR. FARRAH: Objection.
20   A. I have no knowledge of that.
21   Q. Now, you in your training programs talk about the
22      effect of a 12 ounce beer or five ounce glass of
23      wine or one ounce glass of 100 proof liquor all
24      being the same amount of alcohol, correct?

Page 75

1    A. Yes.
2    Q. And they all include .05 pure alcohol, correct;
3       .05 ounces?
4    A. A half an ounce of pure alcohol.
5    Q. I'm sorry, a half an ounce.
6           And you also, in your materials, you
7       state that any one of those three drinks in a
8       150-pound male is roughly the equivalent of a
9       blood alcohol of .025, correct?
10          MR. FARRAH: You said in his training
11      materials?
12   A. Basically I said four drinks in an hour for
13      150-pound man on an empty stomach would bring that
14      man's BAC to a .10.
15   Q. Right.
16   A. So you're breaking it down into one would be .025,
17      a quarter of that.
18   Q. Okay. That's how you get to that?
19   A. Basically.
20   Q. In fact, in the TIPS materials, it says two drinks
21      is --
22   A. Is .05, and four drinks is .10.
23   Q. And are you aware of what effect -- whether it's
24      .02 or .025 or .03 for that matter, what the

Page 76

1       effect of a 12 ounce beer or a five ounce glass of
2       wine or a one ounce glass of 100 proof liquor
3       would have on a 210-pound experienced drinker?
4           MR. FARRAH: Object.
5    A. As in BAC, or is it observable cues? And it would
6       matter depending on the issues. I mean, there's a
7       number of different issues.
8           I can't -- I don't think anybody can say
9       that guy's at a .10. I mean, you can't pick that
10      out.
11   Q. Okay. You'd agree with me, though, that it's
12      likely, with the same amount of alcohol, that
13      someone like Mr. Southworth, who weighs 210
14      pounds, would have less of a blood alcohol than
15      150-pound person, correct?
16          MR. FARRAH: Objection.
17   A. Yes.
18   Q. Okay. How much less?
19          MR. FARRAH: Objection.
20   A. I think from one of the charts I've seen over the
21      years, a 200-pound man has six drinks in an hour,
22      his BAC would be a .10. So somewhere in --
23   Q. Okay. And if he's over that, then it would be
24      slightly less? If he's 210 or 220, it might be

Page 77

1       slightly less?
2           MR. FARRAH: Objection.
3    A. Well, it would depend on body fat as well.
4    Q. Have you seen pictures of Mr. Southworth?
5    A. I don't believe I have, no.
6    Q. So you don't know if he's thin or fat or muscular
7       or -- correct?
8    A. No.
9    Q. Do you think that would be important to your
10      opinion in this case?
11          MR. FARRAH: Objection.
12   A. Not -- no, not in the amount of alcohol in the
13      period of time, I don't believe it would change
14      much.
15   Q. Okay.
16          (Pause.)
17   Q. You state that you became Bar Code certified in
18      2001, correct?
19   A. Yes, sir.
20   Q. You're not a Bar Code trainer, correct?
21   A. No, sir.
22   Q. Okay. You went and you got your car Bar Code
23      certificate at that time, correct?
24   A. Yes.

Page 78

1    Q. Have you ever renewed that certificate?
2    A. No.
3    Q. So that certificate is no longer valid, correct?
4    A. No, you're certified for life in that program.
5    Q. There's no every three years, like the TIPS?
6    A. They've since disbanded Bar Code, because -- I
7       don't really know the reason why, but now they
8       call it Serve Safe Alcohol, and they require that
9       more quality controls are built into the program,
10      and they require that they be recertified every
11      three years.
12   Q. And when -- are you aware that Bar Code in 2003
13      required retraining every three years?
14   A. I don't believe I have an expiration -- I'm not
15      sure in 2003. I was certified in '01, I believe,
16      so I don't -- can't answer that.
17   Q. Okay. Have you taken any Bar Code courses since
18      2001?
19   A. No.
20   Q. Okay. And you don't -- strike that.
21          In Paragraph 5 at the bottom of Page 2 of
22      your disclosure, you talk about the TIPS program,
23      which stands for Training and Intervention
24      Procedures, correct?

Page 79

1   A. Yes, sir.
2   Q. And that's the program you've been teaching for
3      the last 22 years?
4   A. Yes.
5   Q. Okay. Going down to Paragraph 6 there, you agree
6      that on the day of this accident that Bar Code was
7      accepted as the industry -- in the industry, and
8      was an appropriate procedure for responsible
9      alcohol service practices?
10  A. It contained appropriate procedures, yes.
11  Q. Did you have any problems with the Bar Code
12     program in September of 2006 -- of '03 as being an
13     appropriate training program for bartenders and
14     servers?
15        MR. FARRAH: Objection to the form.
16  A. It covered the basics. It all depends on who the
17     trainer was, really, but it does cover the basics.
18  Q. Well, isn't that true for no matter what program
19     you have?
20  A. Absolutely, I agree with that.
21  Q. Including the TIPS program, correct?
22  A. Absolutely, certainly.
23        MR. FARRAH: You should both let one
24     another finish before you speak again.

Page 80

1        THE WITNESS: I'm sorry.
2        MR. GILLIS: I think we're getting along
3   okay.
4        MR. FARRAH: Well, you may think so, but
5   you should both let one another finish before you
6   speak again.
7   Q. So regardless of the program, the person training
8      is important, correct?
9   A. I would agree with that.
10  Q. Okay. In one of your bullet paragraphs under
11     Paragraph 6, there's one, two, three, four -- I
12     think it's the fourth bullet, you said the
13     deviation, which refers back to the Bar Code
14     standard, was causally related to Mr. Southworth
15     becoming intoxicated and then crashing the Dodge
16     into the Santiago auto, correct?
17  A. Yes, sir.
18  Q. Okay. I understand -- strike that.
19        You're not testifying as a toxicologist,
20     correct?
21  A. No, sir.
22  Q. Okay. So you're not testifying as to what point
23     during the evening Mr. Southworth became
24     intoxicated, are you?

Page 81

1   A. I can't do that.
2   Q. Okay. And you're not an accident
3      reconstructionist, correct?
4   A. No, sir.
5   Q. Okay. Tell me the facts around the manner in
6      which the Southworth vehicle was being operated
7      prior to striking the Santiago vehicle.
8        MR. FARRAH: Objection to the form.
9   A. I really can't answer that.
10  Q. Because you don't know?
11  A. I don't recall the specifics on that. I didn't
12     really focus on any of the written materials for
13     that. It doesn't apply -- pertain to me. I'm
14     more concerned with what happened at the Longhorn.
15  Q. Okay. So you don't know if he was swerving
16     through lanes, correct?
17  A. I really don't.
18        MR. FARRAH: Which he?
19        MR. GILLIS: Mr. Southworth.
20        MR. FARRAH: Sorry.
21  Q. You don't know if he was inappropriately stopping
22     or speeding up on the highway, correct?
23  A. I do not.
24  Q. You don't know if he fell asleep at the wheel,

Page 82

1      correct?
2   A. I do not.
3   Q. Okay. So you have absolutely no evidence that the
4      manner in which he was operating his vehicle prior
5      to it striking the Santiago vehicle was caused due
6      to intoxication, correct?
7   A. Run that question by me again? I'm sorry.
8   Q. Do you have any evidence that it was intoxication
9      of Mr. Southworth, and not some other factor, such
10     as just driving fast, that caused the accident
11     that evening?
12  A. No.
13  Q. Okay. Getting down to your last bullet in
14     Paragraph 6, you talk about in my opinion, the
15     following are ways Rare deviated from Bar Code and
16     accepted industry standards in effect at the time
17     of alcohol service on September 26th, 2003.
18        Now, before we get into those nine
19     paragraphs, are there any other variations that
20     you're aware of today that are not included in
21     those nine paragraphs?
22  A. No.
23        MR. FARRAH: In your opinion. In his
24     opinion?

Page 83

1   A. Not that I can --
2        MR. FARRAH: Objection.
3   Q. Okay. The first one that you put in there is that
4      they served him too much alcohol over too short a
5      period of time, violating the Bar Code and
6      industry standards, correct?
7   A. Yes.
8   Q. Okay. He was served five drinks over the course
9      of an hour and 40 to an hour and 45 minutes, is
10     that your understanding?
11        MR. FARRAH: Objection.
12  A. No.
13  Q. Okay. When was he started to be served alcohol at
14     the Longhorn Steakhouse on September 26th, 2003?
15     He --
16        MR. FARRAH: Objection.
17  Q. Him I assume you're referring to is
18     Mr. Southworth, correct?
19  A. Yes.
20        MR. FARRAH: And I object to the
21     question.
22  A. I -- from my knowledge, at 8 o'clock is when he
23     got started to be served at the bar.
24  Q. Okay. And when was his last drink served to him?

Page 84

1   A. Somewhere around --
2        MR. FARRAH: Objection.
3   A. Somewhere around 9:27, I think, is when the last
4      drinks were served at the table.
5   Q. Okay. And you base that on the order report you
6      had?
7        MR. FARRAH: Objection.
8   A. That and testimony from Jude Law, because he was
9      with him at the bar.
10  Q. Jude Connolly?
11  A. Sorry about that. Jude Connolly.
12        MR. FARRAH: Did you say Jude Law?
13        THE WITNESS: Yes.
14  A. And Espy.
15        MR. GILLIS: E-S-P-Y.
16  Q. Michael or Thomas?
17  A. I think it was Thomas -- Scott he called him.
18  Q. So that would be an hour and a half period of time
19     over which he was served what you believe was five
20     drinks, correct?
21        MR. FARRAH: Objection.
22  A. I don't believe there were five drinks. There
23     were purported to be five drinks, but
24     pharmacologically they weren't five drinks.

14 (Pages 79 to 84)

Page 85

1  Q. We'll get into that, but there were five vessels
2    of alcohol that came --
3  A. I'll go with a vessel.
4  Q. Okay.
5        MR. FARRAH: Objection to the question.
6  Q. The first drink -- what is your understanding was
7    the first drink served to Mr. Southworth that
8    evening, and at what time?
9  A. 25 ounce beer upon arrival.
10 Q. Okay. And you understand that that 25 ounce beer
11   includes the head on the beer as well, correct?
12       MR. FARRAH: Objection.
13 A. I would assume, but it depends on the beer that
14   night and whether it does have head.
15 Q. Well, did you read any testimony to the effect that a 25 ounce
16   beer actually only contains about 23 to 24 ounces
17   of beer in it?
18       MR. FARRAH: Did he read testimony to
19   that effect?
20       MR. GILLIS: Yes.
21 A. I don't recall reading testimony to that effect.
22 Q. Okay.
23 A. And if I did, I would still question it.
24 Q. Well, based on your experience, if a 25 ounce beer

Page 86

1    mug is filled with beer, how many ounces of beer
2    is in a glass?
3  A. In a 25 ounce --
4  Q. Yes.
5  A. At least 24 ounces of beer. Could be 24 and a
6    half.
7  Q. Okay. You think --
8  A. Could be 23, depending on the head and how the
9    bartender pours it and whether the customer
10   complains and the bartender succumbs to the
11   complaint, if you will.
12 Q. So you think it's right up to the very lip there?
13       MR. FARRAH: Objection.
14 A. No. I would say it might be about a quarter of an
15   inch from the top.
16 Q. And whatever that amount of volume is, that would
17   be -- you'd subtract from 25 and you'd have what
18   you drink, correct?
19 A. Somewhere in that vicinity, sure.
20 Q. And that's the way, in your experience doing this
21   business for 20-plus years, draft beers are
22   served, correct?
23       MR. FARRAH: Objection.
24 A. It depends on the establishment.

Page 87

1  Q. Well, how did this establishment pour it?
2  A. I don't know.
3  Q. Did you ever make any effort to find out?
4        MR. FARRAH: Beyond whatever he says he
5    did in his report?
6        MR. GILLIS: Yes.
7  A. I have been there. And when I got a 25 ounce
8    beer, it was probably about a quarter of an inch
9    head from the top.
10 Q. Okay. When were you there?
11 A. Couple months back, I think.
12 Q. So you wrote your report before you went there,
13   correct?
14 A. I probably wrote my report after. After I went
15   there. So it must have been about four months
16   ago.
17 Q. Okay.
18 A. Four or five months ago. I can't remember the
19   exact --
20 Q. So based on your experience of looking at glasses
21   and determining how much alcohol was in there, how
22   much beer did you determine was in the 25 ounce
23   glass of -- that you received when you went to the
24   Longhorn?

Page 88

1  A. I would say about 24 ounces.
2  Q. Okay. So a quarter inch from the top of the beer
3    mug, in your opinion, equates to 24 ounces,
4    correct?
5  A. Somewhere in that vicinity.
6  Q. What do you mean somewhere in that vicinity?
7  A. Could be off by a quarter of an ounce.
8  Q. Okay. And similar to the experiment you did here,
9    did you do any experiments on a 25 ounce glass to
10   determine how much liquid was in the glass when it
11   was filled to a quarter of an inch from the top?
12 A. I did not.
13 Q. Why not?
14 A. I never thought of doing it. I thought the most
15   dangerous cocktail was the Manhattan.
16 Q. Okay. When was the second drink served, in your
17   opinion, to Mr. Southworth at the Longhorn
18   Steakhouse on September 26th, 2003?
19       MR. FARRAH: Objection.
20 A. I would say right around the 8:20 or somewhere in
21   that same half hour at the bar, I would think.
22 Q. Okay. Do you have any criticism of serving a
23   second 25 ounce beer to Mr. Southworth at 8:20
24   that evening?

Page 89

1  A. Yes.
2  Q. What is your criticism?
3  A. You're basically serving the customer four drinks
4    in a half an hour. That's a man with a purpose.
5    That's a man who's looking to get buzzed.
6        I might have -- you know, I would have
7    slowed him down at that point, tried to get him to
8    eat something.
9  Q. Was there food at the bar that night?
10 A. That wasn't -- I've read no testimony to that
11   effect.
12 Q. What efforts did you do to find out whether or not
13   there was food served at the bar that night, as
14   far as knickknacks on the bar?
15       MR. FARRAH: Beyond what he did in his
16   report?
17       MR. GILLIS: Beyond what's in the report.
18       MR. FARRAH: Thank you.
19 A. I do not know of anything -- I didn't do anything
20   on that.
21 Q. Okay. At that point, at 8:20 when he was served
22   the second beer, was Mr. -- are you aware of any
23   evidence that Mr. Southworth was showing any
24   visible signs of intoxication?

Page 90

1  A. Not from any of the testimony that I read.
2  Q. Okay. Are you aware of it from any other source?
3  A. No.
4  Q. Okay. Are you aware at that point whether or not
5    any of his -- if you look -- any inhibitions that
6    he had changed in that time period?
7        MR. FARRAH: I'm sorry, I didn't -- did
8    you say any of his inhibitions had changed?
9        MR. GILLIS: Yes.
10       MR. FARRAH: Objection to the form.
11 A. I read no testimony that indicated that.
12 Q. You're not going to opine on that, are you?
13 A. No. If I have no evidence, I have no opinion.
14 Q. Okay. Did you see any signs at 8:20, from the
15   materials you read and from what you reviewed in
16   this case, that his judgment had changed by the
17   time he was served the second beer that night?
18 A. The only thing I could say that would go into
19   the judgment category would be the speed at which
20   he consumed the first drink, and the fact that he
21   was on to the second drink right away.
22       So speed of drink is an issue that goes
23   in the judgment category, how fast a person
24   drinks.

15 (Pages 85 to 90)

Page 91

1  Q. Well, the fact that a person drinks quickly
2  doesn't necessarily mean that they're intoxicated,
3  correct; that in and of by itself?
4      MR. FARRAH: Objection to the form.
5  A. It would lead you to believe that they were
6  planning on getting that way. The faster you
7  drink, the quicker you get drunk.
8  Q. Assuming you continue drinking?
9  A. Which he did.
10 Q. Okay. Well, that's an assumption you made that
11 when he got that second drink, he was intending to
12 get intoxicated?
13     MR. FARRAH: Objection.
14 A. No. That he was going to drink it. That he went
15 right to it.
16 Q. Would you -- if he ordered a second beer at 8:20,
17 and the first beer had been completed, as a
18 trainer would you tell the bartender not to give
19 him another drink?
20 A. What I might suggest to the bartender, here's some
21 ice water, you seem really thirsty. Would you
22 like me to get you a menu to see what you want to
23 eat?
24 Q. Okay. That doesn't answer the question. Would

Page 92

1  you preclude him from getting another drink at
2  that point?
3  A. That size beer, yes.
4  Q. Okay. You would shut him off after --
5  A. No, I didn't say that.
6  Q. That's my terminology. Let me -- you would not
7  serve another beer at 8:20 if he had been served a
8  beer -- a double beer at -- a 25 ounce beer at
9  8 o'clock and finished it by 8:20, is that
10 correct?
11 A. What I would do is try to slow him down and get
12 him to eat something, and maybe give him a glass
13 of ice water and say, listen, let's see if this
14 last one worked. Because I haven't had an
15 opportunity to see -- observe -- I've just served
16 him two beers in, you know, roughly ten minutes.
17 Q. Roughly 20 minutes.
18 A. Again, we're not sure of the exact time between
19 the time they got served and the time they got
20 there.
21     We know that he got there at 8 o'clock.
22 He could have had that -- so yes, roughly 20
23 minutes. It's still too -- it's drinking fast is
24 what it is.

Page 93

1  Q. Let me get back to the question that you haven't
2  answered? Would you -- if he insisted on getting
3  another 25 ounce beer at 8:20, is it your
4  testimony that the bartender should not have
5  served him at that time?
6      MR. FARRAH: Objection. He has answered
7  the question.
8  A. I can only answer it by saying this is where
9  intervention should begin.
10 Q. Okay. And assuming he doesn't want a glass of
11 water or a menu, would you have served him another
12 25 ounce beer at that point?
13     MR. FARRAH: Objection.
14 A. Would I? No.
15 Q. Okay. Do you train people not to serve the second
16 25 ounce beer if they complete the first
17 one -- their first drink of the night at the bar
18 in 20 minutes?
19     MR. FARRAH: Objection.
20 A. If they drink rapidly, based on all the facts that
21 I know about this guy, that I know he came from
22 dirt biking, that he had been -- that he worked
23 out pretty heavy before he got there, I would try
24 to get him to eat something and get him to slow

Page 94

1  down at that point.
2      I would suggest that I'll gladly serve
3  you a 12 ounce beer if you take your time with
4  this one, no problem. But I can't serve you these
5  as fast as you want to drink them, is basically
6  what I would train people to say.
7  Q. Okay. Would you train people not to give him that
8  second 25 ounce beer? Yes or no.
9  A. I would say probably not.
10     MR. FARRAH: Objection.
11 A. I would suggest that they would go with a smaller
12 beer and get them to pace him. Because it's hard
13 to take a drink away from somebody once you've
14 given it to them.
15 Q. Okay. And that's something you train in your
16 program?
17 A. Yes.
18     MR. FARRAH: Objection.
19 A. I would rather -- I'm sorry.
20     (Discussion off the record.)
21 A. I would suggest that they slow him down at this
22 point in time; that you begin to pace him, if you
23 will, and not serve him as fast. Because trying
24 to take a drink away from somebody after you've

Page 95

1  given it to them is really difficult.
2  Q. What would be the appropriate amount of time,
3  assuming that the bartender served him the 25
4  ounce beer at 8 o'clock, before -- what would be
5  the appropriate amount of time, in your opinion,
6  before you would serve him a second 25 ounce beer?
7      MR. FARRAH: Objection.
8  A. Quite frankly, I don't think 25 ounce beers are
9  appropriate at all. I think 12 to 16 at the most.
10     And 16s I'm concerned about.
11     But I would have to gauge the person's
12 cues that they give me, and I would have to keep
13 into consideration the issues of BAC.
14 Q. Well, based on your review of the materials in
15 this case, and your review of what you
16 know about Mr. Southworth, at what point would it
17 have been appropriate for the bartender to serve
18 him a second 25 ounce beer on September 26th, 2003?
19     MR. FARRAH: Objection.
20 A. I might give him a half an hour before I'd serve
21 him the second 25 ounce beer, and I would still
22 continue to speak with him to get him to slow down
23 and have something to eat.
24 Q. Okay. So at 8:30, that would have been

Page 96

1  appropriate?
2  A. It might have been.
3  Q. Okay. Again, judgment call by the bartender,
4  correct?
5  A. Yes, sir.
6  Q. Okay. And you're not surprised that a 21-year-old
7  guy out dirt biking might drink the first beer
8  quickly because he's thirsty, correct?
9  A. Absolutely not. I'm not surprised by that at all.
10 Q. And the fact that he would drink that quickly
11 doesn't in and of itself indicate that he will
12 continue to drink at that rate for the rest of the
13 evening, correct?
14 A. Nothing confirms it, but it would make me
15 suspicious.
16 Q. Okay. When, in your opinion, was the next drink
17 served to Mr. Southworth that evening?
18     MR. FARRAH: Objection.
19 A. I think it's at the table.
20 Q. Okay. Do you know at what time at the table?
21 A. I don't have the list of the times in which the
22 drinks were rung in on that check, but I think it
23 was somewhere around 9:12 or 8:50, or something
24 like that. I'm not sure. I'd have to look at the

16 (Pages 91 to 96)

Page 97

1  check again.
2  Q. As you sit here today you can't tell me when the
3     next drink was served to Mr. Southworth, correct?
4         MR. FARRAH: Objection.
5  A. No.
6  Q. Okay. Are you critical of when the next drink was
7     served to Mr. Southworth?
8  A. Yes, because the next drink wasn't just one drink,
9     it was two to three drinks in one glass.
10 Q. Okay. So your -- is your criticism limited to the
11    amount of alcohol in the glass, or the time that
12    it was served?
13 A. Probably both.
14        MR. FARRAH: Objection.
15 A. I think -- I can't remember exactly, but the first
16    round of drinks might have went out at 8:50.
17 Q. Which would have been --
18 A. I don't know why that sticks in my mind.
19 Q. So that'd be about 30 minutes after he got his
20    second beer, correct?
21 A. Yes.
22 Q. Are you critical to serve him a drink at 8:50 if
23    he had been served a beer at -- the 25 ounce beer
24    at 8:20?

Page 98

1  A. Yes, because the drink he was getting served was
2     three drinks -- two to three drinks in one glass.
3  Q. Okay. Time wise, though, was that an appropriate
4     time period, 30 minutes, for him to complete the
5     25 ounce beer?
6  A. I can't say that that's true. If you look at the
7     Bar Code program, people his size would have three
8     to four beers in an hour is what they gave you as
9     a gauge or a reference, and then maybe one drink
10    at a time thereafter to watch as it progresses.
11 Q. Okay. Maybe I'm not articulating my question.
12        You stated earlier that on the first
13    drink you would have liked to have seen 30 minutes
14    between the first 25 ounce beer and the second 25
15    ounce beer, correct?
16 A. At a minimum.
17 Q. And you're now stating that between 8:20 and 8:50,
18    that's 30 minutes between the second 25 ounce beer
19    and the first Manhattan, correct?
20 A. Yes.
21 Q. Do you think that time period in and of
22    itself -- I understand you're saying there's too
23    much alcohol in the Manhattan, but the time frame
24    alone, was that an appropriate time frame between

Page 99

1  drinks at that point before he would be served
2  some other cocktail?
3        MR. FARRAH: If you can answer the
4  question.
5  A. I can't answer that question really, only because,
6     again, there's a -- the fact that he had worked
7     out hard, as far as dirt biking is concerned, that
8     he was probably dehydrated or whatever. He might
9     have been tired at that point. Maybe it would be
10    time to not serve him any alcohol, just get him to
11    eat something. I really can't say. I wasn't
12    there.
13 Q. Okay. So you don't have an opinion as you sit
14    here today whether or not it was appropriate or
15    inappropriate to serve him a drink at 8:50, just
16    based on time, if his last drink had been served
17    to him, the 25 ounce beer, at 8:20?
18        MR. FARRAH: Objection to the form.
19 A. It wasn't a drink. It was two to three drinks.
20    And in that circumstance, I would say it would be
21    inappropriate.
22 Q. Okay. I'm going to get to that.
23 A. I'm sorry.
24 Q. I'm going to get to the inappropriateness of the

Page 100

1  amount of alcohol in that drink, as you allege.
2  I'm just talking about time frame now.
3        Was that an appropriate interval between
4  drinks.
5        MR. FARRAH: He can't answer. He's
6  already told you that.
7  A. It's -- again, it would be based on the issues
8     that we -- I just discussed. I really can't give
9     you a firm answer to that one, because as we
10    talked about before, it would be a judgment call
11    on all the issues, and it would concern me.
12 Q. Okay. So you're not going to testify at trial
13    that that time period of 30 minutes between the
14    second beer and the subsequent drink in and of
15    itself was too short a period of time to serve him
16    another drink, correct?
17        MR. FARRAH: Objection to the form.
18 A. It may have been too short a period of time, it
19    may not have been. It depends on the cues. But
20    it would probably be, I would say -- again, if you
21    go with the guidelines for Bar Code, it would be
22    inappropriate because it was ten minutes shy of
23    the one hour for four drinks, because those were
24    two 25 ounce drafts.

Page 101

1  Q. Well, what is your opinion? You said it may be,
2     it may not be. What is it? Is it or is it not?
3  A. I would say it wouldn't be.
4  Q. Okay, fine. Now, let's get to the drink. The
5     Manhattan that was -- the first Manhattan that was
6     served to Mr. Southworth at the table that night
7     was, you believe, 8:50, correct?
8        MR. FARRAH: Objection.
9  A. I -- without looking at the check, it's -- I think
10    it was somewhere around -- I don't know why 8:50
11    sticks in my mind, but it does. If I could look
12    at the check, maybe I would be able to say that
13    that is, in fact, the time.
14 Q. Okay. You want to see the check?
15 A. That'd be good.
16        MR. GILLIS: Let's take a break and get
17    it.
18        (Short break was taken.)
19 Q. Okay. I'm going to show you a document and ask
20    you if you recognize it.
21        MR. FARRAH: Take a moment, look at it.
22    Make sure you have enough time.
23 A. I know I've seen it.
24 Q. Okay. On the bottom of the first page at 8:40

Page 102

1  where it says Leigh, that's the server, and it's
2  Table 52?
3  A. Yes.
4  Q. I'm going to suggest to you that that was
5     the -- that was the table that has been alleged
6     Mr. Southworth was sitting at that evening.
7        And if you look at the second page, under
8     8:51, it shows seven Jack Daniel Manhattans being
9     served to Table 52. Do you see that?
10 A. Yes.
11 Q. Okay. And is it your understanding that when it
12    says Jack Daniels and then Manhattan next, those
13    two combined make one Jack Daniels Manhattan,
14    correct?
15        MR. FARRAH: Objection.
16 A. Yes.
17 Q. Okay. And so 8:51 is your understanding of when
18    Mr. Southworth got his first Manhattan that
19    evening?
20        MR. FARRAH: Objection.
21 A. I'm a little confused about this. On the first
22    page at 8:40 Jack Daniels were ordered. One, two,
23    three of them.
24 Q. Correct. And how many people sitting at the

17 (Pages 97 to 102)

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 103

1    table?
2         MR. FARRAH: Objection.
3    A. The table at the time?
4    Q. Yes.
5    A. Would be seven.
6    Q. And was it your understanding that there were
7      three people, including Mr. Southworth, at the bar
8      before the table?
9    A. Yes.
10   Q. And there were four people who came in from
11     outside the restaurant to join them for dinner,
12     correct?
13   A. Yes.
14   Q. Okay. And the seven of them sat together. Is
15     that your understanding of the facts?
16   A. Yes.
17   Q. And is it your understanding that that first round
18     of four drinks is for the four people who walked
19     in?
20        MR. FARRAH: Objection.
21   A. It may have been. Hang on a minute now. I know
22     they all met at the bar, but I don't recall
23     testimony that they got served at the bar either.
24     I think they went right to the table.

Page 104

1    Q. Okay. Is it your understanding that the four guys
2      who were not with Mr. Southworth at the bar came
3      in from the outside and got their first drink at
4      the table?
5    A. Yes.
6    Q. Okay.
7    A. Yes, that would be true.
8    Q. And at 8:40, those four drinks would be the four
9      guys who joined Mr. Southworth at the table,
10     correct?
11        MR. FARRAH: Objection.
12   A. You can assume that.
13   Q. That's a logical assumption, correct?
14        MR. FARRAH: Objection.
15   A. I would think it would be.
16   Q. And that's based on your training and experience
17     that assumption, correct?
18   A. Again, it's merely an assumption.
19   Q. Okay. Well, that's the assumption you made for
20     your opinion here, because you weren't there,
21     correct?
22   A. I was not.
23   Q. Okay. So all of your statements as to what are
24     facts here are based on your assumptions based on

Page 105

1      your education, training and experience, correct?
2         MR. FARRAH: Objection.
3    A. More to the testimony of Leigh Chabot and Jude
4      Connolly.
5    Q. Okay. Those you gave more weight to, correct?
6         MR. FARRAH: Objection.
7    A. Yes.
8    Q. But you looked at all of it in order to come up
9      with what you thought was the most reasonable fact
10     pattern, correct?
11        MR. FARRAH: Objection.
12   A. Certainly.
13   Q. And all of the things you looked at and the
14     documents that we've previously talked about
15     listed in your report, correct?
16   A. Yes.
17   Q. Now, if you look at that -- at 8:40 you'll see
18     that they had already been served to the table
19     chicken fingers, two cups of chowder, a Tonion,
20     along with the drinks that were served at that
21     time, correct?
22        MR. FARRAH: Objection.
23   A. That also goes over to the following page where it
24     says one 25 ounce Bud Light, too.

Page 106

1    Q. Right. Three Manhattans and one Bud. Four total,
2      correct?
3    A. Yes.
4    Q. And that's because of the four people that came
5      in?
6         MR. FARRAH: Objection.
7    A. Okay. I'm sorry.
8    Q. But to the table there were appetizers served,
9      correct?
10   A. They were ordered, yes.
11   Q. Okay. And what's your opinion as to when those
12     appetizers that are ordered at 8:40 arrived at the
13     table?
14        MR. FARRAH: Objection.
15   A. I really don't know.
16   Q. Do you have an opinion on whether or not they
17     reached the table before the next round of drinks
18     was ordered?
19        MR. FARRAH: Objection.
20   A. Which would be 8:51?
21   Q. Yes.
22   A. It's possible.
23   Q. Okay. Do you remember Leigh Chabot saying that
24     she went and got the appetizers right away

Page 107

1      before -- right after she put in the order?
2    A. Yes.
3    Q. Okay. And she brought bread and so forth to the
4      table, correct?
5    A. Yes.
6    Q. And she brought water to the table, correct?
7    A. I don't recall her saying that, but if you say
8      that that happened, I don't recall the exact --
9    Q. Well, what are you -- what's your understanding of
10     whether or not water was brought to the table that
11     evening?
12   A. I wasn't -- I don't remember. I don't recall
13     reading that.
14   Q. Okay. So you don't have an opinion one way or the
15     other?
16   A. Right.
17   Q. You're not saying it didn't happen, correct?
18   A. No, sir.
19   Q. And you're not saying it did happen?
20   A. No, sir.
21   Q. Okay. At 8:51 that round of Jack Daniels was
22     ordered, correct?
23   A. Yes.
24   Q. What -- now, did you read the testimony of Kristen

Page 108

1      O'Donnell?
2    A. Yes.
3    Q. Who is Kristen O'Donnell?
4    A. She's a bartender that was on duty that night.
5    Q. Okay. Did you read what she testified to as to
6      how much alcohol she put in the drink, the
7      Manhattans that evening?
8    A. I remember her saying that she poured it so that
9      it would be a quarter of an ounce -- a quarter of
10     an inch from the top. And what she did is she put
11     it in a seven ounce glass, filled it with ice,
12     poured from that glass, strained it into the
13     martini glasses.
14        She put up seven martini glasses, poured
15     the ingredients into a glass filled with ice, and
16     then strained it into each one.
17   Q. Did she shake it?
18        MR. FARRAH: Objection.
19   A. I don't recall her saying that she shook it.
20   Q. Okay. Do you have an opinion one way or the other
21     whether she shook it or didn't shake it?
22        MR. FARRAH: Objection.
23   A. I don't have an opinion on that specifically. I
24     sense that she might have just put it in there and

18 (Pages 103 to 108)

Page 109

1  then strained it right out, because it was busy at
2  the time.
3  Q. Okay. When you sense it, is that a guess?
4       MR. FARRAH: Objection. Are you asking
5  him if he remembers what the testimony was?
6       MR. GILLIS: No. I think the question
7  was pretty clear. He can answer it.
8  A. I would -- I can't say that it's a guess or not.
9  I think she was in a rush to satisfy the orders
10 that were being called upon her at that point in
11 time, and she had to make -- she made it in
12 each -- each individual drink in that glass filled
13 with ice and then strained it in. That's all I
14 recall her saying in the testimony. I don't
15 recall her saying she shook it.
16 Q. Where in the testimony does it say that she was
17 rushed to make these drinks that evening?
18 A. She didn't say she was rushed. They had to wait
19 for a table. It was busy that night. The
20 testimony indicates that it was busy that night,
21 that's all I remember.
22 Q. Okay. So you have no --
23 A. At that point in time.
24 Q. Okay. You have no evidence that she was in any

Page 110

1  rush to make those specific drinks that evening,
2  correct?
3       MR. FARRAH: Objection.
4  A. Only assumptions.
5  Q. Okay. Assumptions based on what facts?
6  A. On the facts that they had to wait for a table,
7  that the place was busy.
8  Q. Okay.
9  A. Is the testimony that I read.
10 Q. How many people were serving drinks that night
11 from behind the bar?
12      MR. FARRAH: I'm sorry, from the end of
13 the bar?
14      MR. GILLIS: From behind the bar.
15      MR. FARRAH: How many bartenders were --
16      MR. GILLIS: That wasn't my question.
17 Q. How many people were serving drinks from --
18 A. I think there were two, or maybe three.
19 Q. And how many people does the place seat?
20 A. I don't know.
21 Q. So how can you determine whether or not she was
22 rushed based on the capacity and the people having
23 to wait for tables if you don't even know how many
24 tables are in the place?

Page 111

1       MR. FARRAH: Objection.
2  A. All I know is somebody -- they said it was busy in
3  their testimony, and I can't remember if it was
4  Leigh or it was Kristen that said it, but
5  they -- what I did read is that it was busy. I
6  can't -- other than that -- I can't assume any
7  more than that.
8  Q. Assuming it was busy, what evidence do you have
9  that they didn't have appropriate number of
10 personnel to handle a busy restaurant that
11 evening?
12      MR. FARRAH: Objection.
13 A. I don't.
14 Q. Okay. So you have no evidence that she was in any
15 rush to make those drinks at 8:51 that evening,
16 correct?
17      MR. FARRAH: Objection.
18 A. No, I don't.
19      (Pause.)
20 Q. Are you going to render an opinion in this case as
21 to how much alcohol was in each of those drinks
22 when they left the bar and went to the table that
23 evening for that round of Manhattans at 8:51?
24      MR. FARRAH: Objection.

Page 112

1  A. Just what I put in my report.
2  Q. Okay. You don't have a specific amount of alcohol
3  in each drink, correct?
4       MR. FARRAH: Objection.
5  A. I don't have a specific amount right on the money,
6  no.
7  Q. Okay. Now, what did Kristen O'Donnell say was the
8  amount of alcohol she put in the drink?
9  A. I think she said she followed the recipe, which is
10 two ounces of Jack Daniels and a quarter of an
11 ounce of vermouth.
12 Q. Well, you think or you know?
13 A. That's what I think. I'd have to look at her
14 testimony to find that.
15 Q. Okay. Her actual testimony was she put an ounce
16 and a quarter of Jack Daniels in the drink. Do
17 you remember that?
18      MR. FARRAH: Objection.
19 A. That would --
20      MR. FARRAH: I'm sorry, I didn't hear
21 your answer.
22 A. I don't know. I remember -- I think it was Leigh
23 that said there's an ounce that goes in there, and
24 they normally use a jigger. And you might be

Page 113

1  right on that. I think it might be -- she might
2  have testified an ounce and a half. I apologize.
3  Q. Well, whether it was a double or triple drink,
4  wouldn't it be important to know how much alcohol
5  the bartender said she put in the drink to
6  determine that?
7  A. I wouldn't take credence in the bartender. If the
8  bartender told me that it was a quarter of an inch
9  from the top, then what she says doesn't match
10 what was real.
11 Q. Okay. Did she say in her deposition that she
12 usually puts it an inch from the top? Did you
13 read that?
14 A. She -- I think she said something to that effect,
15 and then she puts the maraschino cherry in it, and
16 it brings it right up to a quarter of an inch.
17 Q. She said it never goes above a quarter of an inch?
18 A. Correct. And the maraschino cherry --
19 Q. So is it your testimony that it was two -- so what
20 was her testimony? She normally does it to an
21 inch from the top --
22      MR. FARRAH: Objection.
23 Q. -- or that it never --
24 A. If I could look at her deposition again in that

Page 114

1  area, I could -- I can't confirm it on -- from the
2  top of my head.
3       I do recall that she -- her saying that
4  putting the maraschino cherry brings it up to no
5  more than a quarter of an inch from the top.
6  Q. Okay. At no time in her deposition did she ever
7  say that it goes higher than a quarter of an inch
8  from the top of the glass, correct?
9  A. Not that I recall, no.
10 Q. And her practice was, when she was serving tables,
11 to put it an inch from the top, do you remember
12 that testimony?
13      MR. FARRAH: Objection.
14 A. I can't remember specifically, but I can -- if
15 you --
16 Q. Assuming that's her testimony, isn't that
17 important in determining whether or not that was a
18 double or a triple drink?
19      MR. FARRAH: Objection.
20 A. If it was in fact true, it would be important.
21 Q. Okay. And what evidence do you have that that's
22 not true?
23      MR. FARRAH: That what's not true?
24 Q. That she pours it to an inch -- that it comes to

19 (Pages 109 to 114)

Page 115

1    an inch from the top of the glass?
2        MR. FARRAH: Objection.
3  A. That she said that the drink ultimately goes out
4    at a quarter of an inch from the top, no more. To
5    do that, you'd have to pour more alcohol than hat
6    she claims that she pours.
7  Q. Okay. So you --
8  A. Based on my experience as a bartender.
9  Q. You claim that she said that her drinks go up to a
10    quarter of an inch all the time when they go out?
11        MR. FARRAH: Objection.
12  A. Based on what you just told me, unless I get the
13    deposition again to refresh my memory, no more
14    than a quarter of an inch from the top.
15  Q. Okay. Well, the testimony is --
16        MR. FARRAH: That's right, the testimony
17    is what the testimony is.
18  Q. But you're basing it -- so as you sit here today,
19    you don't know exactly what you -- where she
20    brought the top of the drink in order to determine
21    what you thought was a two or three ounce -- two
22    or -- a double or a triple drink, correct?
23  A. Based on what I -- sitting here, no.
24  Q. Okay.

Page 116

1  A. I wasn't there.
2  Q. Now, do you know what the Longhorn recipe is for
3    alcohol in a drink -- in a Manhattan?
4  A. I believe I read that it was a two ounce -- two
5    ounces of Jack Daniels and a quarter of an ounce
6    of vermouth.
7  Q. And do you consider that -- how many drinks do you
8    consider that to be?
9  A. Close to two pharmacologically.
10  Q. How close to two?
11  A. I think Jack Daniels is 80 proof, and roughly an
12    ounce and a quarter of 80 proof is equal to one
13    ounce of 100 proof spirits, so two and a half
14    ounces worth of booze would be two drinks in one
15    glass.
16        Vermouth is lower proof, so it's closer
17    to two than it is to one drink pharmacologically,
18    I can say that.
19  Q. It's not two drinks, though, correct?
20  A. It's --
21        MR. FARRAH: Objection.
22  A. Clearly it's not two drinks, per se.
23  Q. Okay. Two ounces of 80 proof liquor would be
24    .08 -- would be .8 ounces of pure ethanol,

Page 117

1    correct?
2  A. It would be a half an ounce shy of two drinks
3    pharmacologically, I'll go that route.
4  Q. Okay. And the vermouth would add a little bit,
5    but not much, correct?
6        MR. FARRAH: Objection.
7  A. Yes.
8  Q. Because you're only adding a quarter ounce of a
9    very low percentage of alcohol, correct?
10        MR. FARRAH: Objection.
11  A. Overall, correct.
12  Q. So this isn't a double or a triple drink, correct?
13        MR. FARRAH: Objection.
14  A. It's more like a double, if it's made according to
15    recipe.
16  Q. If it's made to the recipe, it's less than a
17    double, correct?
18  A. Actually, if I remember correctly, Bar Code and
19    the Rare manuals both say -- lean towards a double
20    for those two drinks; for that type of drink, a
21    martini and a Manhattan.
22  Q. For purposes of your opinion in this case, what
23    are you basing the drink on? What the Bar Code
24    says a Manhattan is? What Longhorn's recipe says

Page 118

1    it is? Or what the server said she put into the
2    drink?
3        MR. FARRAH: Objection.
4  A. I'm basing it on the bartender saying that she
5    pours no more than a quarter of an ounce from the
6    top, including the cherry. And to do that --
7        MR. FARRAH: Quarter of an inch?
8        THE WITNESS: I'm sorry, thank you.
9  A. Quarter of an inch from the top. And to do that,
10    you have to pour a good two and a half ounces
11    worth of booze, of JD with some vermouth in there.
12        So I'm basing it on the water melt, and
13    to get to that level of the drink -- it's more
14    than what the recipe calls for, is what I'm basing
15    it. What the exact amount is, I don't know. I
16    wasn't there.
17        I do know that she did not measure it,
18    she free poured, and I know -- that's all I know.
19  Q. Okay. Is there a particular reason why you
20    more credence to the quarter of an inch from the
21    top of the glass, than her testimony as to exactly
22    what she puts into the drink?
23  A. Yes.
24  Q. Why's that?

Page 119

1  A. Because you can't pour an ounce and a half of Jack
2    Daniels with a quarter of an ounce of vermouth and
3    get it to be that level. It won't come to that
4    level.
5  Q. Assuming she testified that that's the level she
6    brought it to every time she poured it, correct?
7        MR. FARRAH: Objection.
8  A. I'm sorry?
9  Q. Well, if she testified that she brings it to an
10    inch from the top, she could do that with less
11    than two ounces of bourbon and a quarter ounce of
12    vermouth, correct?
13  A. No.
14  Q. Okay.
15  A. Roughly -- it would take -- if you poured two
16    ounces worth of Jack, based on the recipe, and a
17    quarter of an ounce of vermouth and chilled it, it
18    would be about three-quarters of an inch from the
19    top, strained into the glass.
20  Q. How many ounces would that be in total?
21        MR. FARRAH: I'm sorry, how many ounces
22    of what would that be in total?
23        MR. GILLIS: Liquid.
24  A. If you poured two ounces worth of Jack Daniels and

Page 120

1    a quarter of an ounce of vermouth over ice and
2    chilled it and poured it into an up glass, it
3    would come about three-quarters of an
4    ounce -- three-quarters of an inch from the top.
5  Q. And how many ounces in liquid would that be?
6  A. Approximately? Probably close to three. A little
7    under three.
8  Q. And what do you base that on?
9  A. On experience and practice.
10  Q. Well, your experience that you testified
11    previously under oath is that two and a half
12    ounces of 80 proof vodka melted over ice would be
13    three and a half ounces of liquid in the glass,
14    correct?
15  A. What I said is if you -- if you used a four and a
16    half ounce up glass and you poured two and a half
17    ounces worth of 80 proof booze over ice, with the
18    water melt and a quarter of an ounce of vermouth
19    and the fruit, it would bring it up to that level
20    of roughly quarter of an inch from the top.
21  Q. Which is three and a half ounces?
22        MR. FARRAH: I'm sorry, he hadn't
23    finished, so I don't know what you're --
24  Q. Go ahead.

20 (Pages 115 to 120)

Page 121

```
 1   A. It would be roughly about three and a half ounces
 2     worth of fluid.
 3   Q. So if that's three and a half ounces of fluid, why
 4     is it in this situation it's only three ounces
 5     with the ice melt?
 6   A. Because I don't think she let it sit long enough
 7     in the martini glass to get enough water melt
 8     there.
 9   Q. Based on what evidence?
10   A. On her evidence that she just strained
11     them -- poured it into the glass, strained it, and
12     did another one, strained it, did another one,
13     strained it, as opposed to stirring it around and
14     getting a nice mist on the outside of the glass,
15     which I think the recipe calls for.
16   Q. You think the recipe calls for it to sit and get a
17     mist?
18   A. Uh-huh, so the outside of the mixing glass is kind
19     of foggy, if you will, or you could see the ice or
20     the cold.
21   Q. So your testimony is that you read in the
22     deposition that she didn't let them sit?
23        MR. FARRAH: Objection.
24   A. That's what I -- that's how I gleaned the
```

Page 122

```
 1     information. That's how I read her information.
 2   Q. Okay. But had she let it sit, you would have
 3     expected it to be at least three and a half
 4     ounces, correct?
 5        MR. FARRAH: Objection.
 6   A. Maybe a little less, but somewhere in that
 7     vicinity.
 8   Q. Okay. And three and a half ounces of liquid in
 9     that glass would come how far from the top of the
10     glass?
11        MR. FARRAH: Which glass are we talking
12     about?
13   A. Six ounce up glass.
14   Q. Up glass?
15   A. Might be two ounces or an ounce, I don't know. I
16     haven't -- I don't know that specific measurement
17     based on what it looks like in that glass. I
18     didn't do that specific three and a half ounces
19     worth of fluid in a glass to see where it would
20     go.
21   Q. Okay. So assuming that the menu were properly
22     followed so that it sat, was strained, it would
23     come out around three and a half ounces, you don't
24     have an opinion as to where in the glass that
```

Page 123

```
 1     would go?
 2   A. Not in this particular circumstance, no. And
 3     that's if it's a two and a half ounce pour with a
 4     quarter of an ounce. We're talking about the
 5     martini. I think we're getting confused here.
 6     Not the two ounce pour.
 7   Q. Well, two and a quarter. Two ounces of --
 8   A. Well, what I said before --
 9   Q. Two ounces of bourbon and a quarter ounce of
10     vermouth, correct?
11   A. Two ounces of bourbon and a quarter ounce of
12     vermouth is what the recipe calls for.
13   Q. And if properly situated -- left to sit and then
14     strained, where -- how far from the top of the six
15     ounce up glass in inches would you expect that
16     amount of liquid to come?
17        MR. FARRAH: Didn't you ask him that
18     already?
19        MR. GILLIS: No.
20        MR. FARRAH: Objection. I think you did.
21   A. I would say if they let it sit for a while, where
22     enough water melt could be there, it would
23     probably come around two ounces from the top,
24     maybe two and a half ounces. Two and a half
```

Page 124

```
 1     inches, I'm sorry. I'm getting confused now. No,
 2     three-quarters of -- I'm sorry.
 3        If I do a two ounce pour over ice with a
 4     quarter of an ounce of water melt --
 5   Q. Quarter of an ounce of vermouth.
 6   A. Vermouth, thank you. Then I might get three
 7     ounces worth of fluid if it sat long enough for it
 8     to get the outside chill on the glass.
 9   Q. So you think it would be a full half ounce
10     difference than preparing a two and a half ounce
11     martini the same way?
12        MR. FARRAH: Objection.
13   A. Two and a half ounce martini, as in two and a half
14     ounces worth of vodka? I'm not --
15   Q. You previously testified that two and a half
16     ounces of 80 proof vodka chilled over ice with the
17     water pouroff would fill up approximately three
18     and a half ounces in a glass? Whether it's a four
19     and a half glass or six ounce glass, it doesn't
20     matter, it would be three and a half ounces,
21     correct?
22   A. With a quarter of an ounce of vermouth and the
23     fruit is what I meant in that circumstance when we
24     talked about the martini earlier.
```

Page 125

```
 1   Q. Well, that's not what your writings say, correct?
 2     They don't even mention vermouth, correct?
 3   A. If it was a martini, vermouth is part of a
 4     martini.
 5   Q. Not a dry martini.
 6   A. No.
 7   Q. Okay. You've written that two and a half ounces
 8     of a martini, eight and a half ounces -- excuse
 9     me, strike that.
10        Two and a half ounce of 80 proof vodka
11     over ice create an ounce of water melt to give the
12     customer the three and one half ounces of fluid
13     necessary to make the glass look full.
14        Do you remember --
15   A. That's if it's a four or four and a half ounce up
16     glass with fruit, right. That's what I meant by
17     that in writing that chapter.
18   Q. But two and a half ounces of just vodka gives
19     the -- creates three and a half ounces of liquid
20     once strained over ice, correct?
21   A. At the most you'd get an ounce of water melt,
22     correct.
23   Q. Well, you don't say in your writings at the most.
24     You just say that's what it creates, right?
```

Page 126

```
 1   A. Correct.
 2        MR. FARRAH: Let me see this.
 3   Q. And so why would the Longhorn recipe for the
 4     Manhattan, Jack Daniels Manhattan in this case, be
 5     a half an ounce less than this recipe?
 6        MR. FARRAH: Objection.
 7   A. Because I don't believe it was strained to the
 8     level of that -- of most of the martinis would
 9     be --
10   Q. Okay. Assuming --
11   A. -- to allow the water to become part of that
12     drink, I'm sorry.
13   Q. Assuming it was properly strained, would you
14     expect it to be at the same level, that being
15     three and a half ounces?
16        MR. FARRAH: Objection.
17   A. Because it's a little -- it would be a quarter of
18     an ounce less. It would be a little bit less, but
19     it would be close to the ballpark.
20   Q. Three and a quarter?
21   A. Yes.
22   Q. Okay.
23        MR. FARRAH: Can we take -- can we eat?
24        MR. GILLIS: Just give me five more
```

21 (Pages 121 to 126)

Page 127

```
1    minutes.
2         MR. FARRAH: Okay. Let's make it five
3    more minutes. I'm starving.
4    Q. Now, in the six ounce up glass how far from the
5    rim would three and a quarter ounces be?
6         MR. FARRAH: Objection.
7    A. I don't know in inches. I would say it would be
8    close to three-quarters -- three-quarters of the
9    way down the glass. Maybe close to half.
10       I'd say less than half, but more like
11   three-quarters, somewhere in that vicinity.
12   Q. Okay. So three and a half ounce -- three and a
13   quarter ounces would fill the six ounce up glass
14   to the halfway up the glass or less, correct?
15   A. Yes, somewhere in that --
16        MR. FARRAH: Objection. There's no
17   such -- he's talking inches. Objection.
18   Q. Correct?
19   A. Roughly three-quarters of an inch from the top, is
20   what I meant to say.
21   Q. Okay. Let's make sure we're all on the same page.
22        You believe that three and a quarter
23   ounces in a six ounce up rock glass would bring
24   the level of the drink to approximately
```

Page 128

```
1    three-quarters of an inch from the top of the rim?
2    A. The lip.
3    Q. And are you measuring the three-quarters on the
4    side of the glass or straight up to the top?
5         MR. FARRAH: Objection.
6    A. From the lip down, I would assume.
7    Q. And if you did it straight up, it would be even
8    less, correct?
9         MR. FARRAH: Objection.
10   A. I imagine, but I'm not a math wizard.
11        MR. GILLIS: Why don't we just go break
12   now.
13        MR. FARRAH: Frame that question the way
14   you want to after I've put something in my
15   stomach.
16        (Lunch break was taken.)
17
18
19
20
21
22
23
24
```

Page 129

```
1
2         A F T E R N O O N   S E S S I O N
3
4    CONTINUED EXAMINATION BY MR. GILLIS:
5    Q. You have in front of you a document that you've
6    been referring to that on first the page says it's
7    the audit report, correct?
8    A. I'm sorry, I didn't hear your last --
9    Q. It says audit report at the top of --
10   A. Yes, it does.
11   Q. And that's your understanding of the bill which
12   shows the drinks and food served to the Southworth
13   table on September 26th, 2003, correct?
14        MR. FARRAH: Objection.
15   A. Yes.
16        MR. GILLIS: Could we have that marked as
17   Exhibit 7.
18        (Exhibit No. 7, audit report, marked for
19   identification.)
20   Q. Do you have an opinion, at the time that
21   Mr. Southworth was served the Manhattan at 8:51,
22   what his blood alcohol was at that point?
23        MR. FARRAH: Objection.
24   A. No.
25   Q. Is your opinion that when he got his first
```

Page 130

```
1    drink order at 8:51 that evening, first drink
2    order at the table, that he was in the red zone?
3         MR. FARRAH: Objection.
4    A. No.
5    Q. Okay. No, he wasn't in the red zone, or no, you
6    don't have an opinion?
7    A. No, he wasn't in the red zone.
8    Q. Okay. Where would you put him?
9    A. From the evidence that I -- yellow zone.
10   Q. And what do you base him being in the yellow zone
11   on?
12   A. On the fact that he had already four
13   pharmacological drinks at the bar, and he was
14   drinking rather quickly.
15   Q. Okay. And quickly to you is two 25 ounce beers
16   over a 50 minute period?
17   A. Within a 50 minute period, yes.
18   Q. Okay. And I believe you said earlier that using
19   one drink as either 12 ounce -- one drink is 12
20   ounces of beer, correct? That's what you count as
21   a beer?
22   A. Five ounces of wine and one ounce of 100 proof
23   spirits, yes.
24   Q. But we're just dealing with beer right now --
```

Page 131

```
1    A. Uh-huh.
2    Q. -- so we can agree that the 25 ounces was two
3    drinks, correct?
4    A. Yes.
5    Q. So he had the equivalent of four drinks in 50
6    minutes, correct?
7         MR. FARRAH: Objection.
8    A. Yes.
9    Q. And you testified earlier that you'd expect
10   someone of his height and weight to be at a .01
11   when he had six drinks in an hour, correct?
12        MR. FARRAH: Objection.
13   A. What I said is a 200 pound man, according to a
14   chart I've seen before, has six drinks in an hour,
15   his BAC is .10, not .01.
16   Q. I'm sorry, .10.
17   A. .10.
18   Q. And you would expect -- and it's your
19   understanding that a burnoff rate for someone like
20   Mr. Southworth would be approximately .02 per
21   hour, correct?
22        MR. FARRAH: Objection.
23   A. No, I'm not a toxicologist, so I can't tell you
24   the exact burnoff rate of an individual's burnoff.
```

Page 132

```
1         I know that when we teach the TIPS
2    program, we say that the liver eliminates less
3    than one ounce of pure alcohol per hour. But I've
4    seen toxicologists in court testimony say less
5    than .02. I've seen people say .015, .010. So
6    I'm not a toxicologist and can't speak --
7    Q. Well, based on your experience and training in
8    this field, what would you expect -- if he had
9    four drinks in 50 minutes, how much of that would
10   have been burnt off by the time he sat down and
11   ordered his first drink at 8:51?
12        MR. FARRAH: Objection.
13   A. Almost a one 12 ounce beer.
14   Q. So at the time he was ordering the Manhattan at
15   8:51, he had the equivalent in him still of three
16   12 ounce beers, is that fair to say?
17        MR. FARRAH: Objection.
18   A. If we -- we also have to take into account that he
19   had a beer prior to his arrival there, too.
20   Q. Okay. And that was at 7 o'clock?
21   A. Somewhere in that vicinity, after they finished
22   dirt biking.
23   Q. And that had burnt off before he even got to the
24   restaurant, correct?
```

22 (Pages 127 to 132)

Page 133

1  MR. FARRAH: Objection.
2  A. If in fact he had it at 7 o'clock, sure.
3  Q. Well, what's your understanding as to when he had
4     it?
5  A. I would say to you yes. I mean, one beer, an hour
6     roughly. Roughly a 12 ounce beer.
7  Q. So for all intents and purposes, that's a
8     nonfactor when he gets to the restaurant, because
9     it would have burnt off by 8 o'clock, correct?
10 A. If everything's the way -- the testimony is right,
11    yes.
12 Q. Well, you tell me. You read the testimony.
13    MR. FARRAH: Objection.
14 A. Yes, from what I read, he only had one beer.
15 Q. At what time?
16 A. I'm not sure of the exact time. It was after dirt
17    biking, so it could have been around that
18    7 o'clock when it would start to get dark.
19 Q. So whatever dusk is, that's when he had it,
20    correct? Is that your memory of the testimony?
21 A. I think it was that.
22 Q. Okay.
23 A. Because I think they said it took about a half an
24    hour to go from Templeton to --

Page 134

1  Q. Littleton?
2     MR. FARRAH: Leominster.
3  A. From Templeton to Leominster I think is what they
4     said.
5  Q. And if he -- if six drinks gets him to a .01,
6     that's about .016 per drink, correct?
7     MR. FARRAH: Objection.
8  A. .10, you mean?
9  Q. .10, I'm sorry.
10    MR. FARRAH: Objection.
11 A. If the math adds appropriately. Again, I told you
12    I'm not a math whiz.
13 Q. But if we were to take .1 and divide it by six
14    drinks --
15 A. He's doing that now.
16 Q. -- and then we were to multiply that by three
17    beers, that would be the approximate blood alcohol
18    you would expect him to be at 8:51, correct?
19    MR. FARRAH: Objection.
20 A. Perhaps. Again, I'm not a toxicologist. I don't
21    purport to be.
22 Q. You're not a toxicologist, we know that, correct?
23 A. Yes.
24 Q. And you don't expect the servers to be

Page 135

1  toxicologists either, correct?
2  A. I don't expect them to be a toxicologist, no.
3  Q. But you expect them, as part of your training, to
4     have some semblance of the approximate amount of
5     alcohol in a drink so that they can help gauge
6     what zone the various customers are in, correct?
7  A. Yes.
8  Q. Okay. And one way to do that is to have an
9     approximation as to what the person's blood
10    alcohol is, even if you're not a toxicologist,
11    correct?
12 A. Certainly.
13 Q. Okay. So what -- if he had the equivalent of four
14    beers in 50 minutes, and during that time period
15    he would have burnt off approximately one beer,
16    what would you expect the ballpark blood alcohol
17    to be for Mr. Southworth at 8:51 when he ordered
18    the Manhattan?
19    MR. FARRAH: Objection.
20 A. Could have been somewhere over .05 to .075,
21    somewhere in that vicinity.
22 Q. Okay. And for you, in your determination, that
23    would put him in the yellow zone on this evening?
24 A. The speed in which he drank those drinks, the fact

Page 136

1  that he would -- had just come off of a decent
2     workout would worry me.
3  Q. Okay. By 8:50 -- strike that.
4     Would you have not served him a Manhattan
5     at 8:51 on September 26th, 2003?
6     MR. FARRAH: Objection.
7  A. I would have looked long and hard at all the
8     issues, and probably been a little bit concerned.
9     I don't know that I would or wouldn't. I would
10    have to be there.
11 Q. Well, you're an expert here on responsible
12    service. Do you think it would be responsible for
13    Miss Chabot to serve him a Manhattan at 8:51 on
14    that evening, based on all the facts in the case
15    that you've reviewed and rendered professional
16    opinions upon?
17    MR. FARRAH: Objection.
18 A. I would be concerned about it, because it's three
19    drinks in one glass. I may not do it. If I did
20    do it, I might be ready to take it back from him.
21    Again, I wasn't there, I don't know what
22    he -- what cues he gave me -- gave at that point
23    in time. And the fact is, I'm giving him three
24    drinks in one glass. That's what worries me.

Page 137

1  Q. Okay. The fact that she served him a drink --
2     well, let's change it. If she served him a 12
3     ounce beer at that point, you would have had a
4     problem with that?
5     MR. FARRAH: Objection.
6  A. As long as he's starting to eat now, maybe I
7     wouldn't, maybe I would. Again, it all depends on
8     what visual cues I would have from him as well.
9  Q. Okay. What were the visible cues that she had of
10    Mr. Southworth at 8:51 p.m. when she took the
11    drink order for a Manhattan?
12 A. I don't think there was ever any evidence in the
13    depositions to indicate that.
14 Q. Okay.
15 A. In fact, she thought they were all fine throughout
16    the night.
17 Q. And do you have any reason to disbelieve that
18    testimony?
19    MR. FARRAH: Objection.
20 A. That they were all fine? Yes. Michael Espy said
21    he was drunk when he got there.
22 Q. Do you have any reason to believe that
23    Mr. Southworth exhibited any signs that evening,
24    while at the table before he was served his last

Page 138

1  drink, that showed that he wasn't fine?
2     MR. FARRAH: Objection.
3  A. I don't have any evidence to indicate that.
4  Q. Okay. And if I have -- I don't want to
5     paraphrase, you tell me, but you can't opine one
6     way or the other whether or not it was appropriate
7     to serve him that Manhattan at 8:51, correct?
8     MR. FARRAH: Objection. Which -- are you
9     talking --
10    MR. GILLIS: Mr. Southworth at 8:51.
11    MR. FARRAH: He's talking about the
12    Manhattan he views as three drinks.
13    MR. GILLIS: Correct.
14    MR. FARRAH: Okay.
15 A. All I can say is I would be concerned about doing
16    it. I have no trouble with the 12 ounce beer, and
17    I'd watch to make sure he ate, but giving him
18    three drinks at that point in time would worry me.
19 Q. Okay. But would you not serve him?
20    MR. FARRAH: Objection.
21 A. I can't say that from where I'm seated.
22 Q. Okay. So you can't say whether you would or would
23    not have served him at 8:51 that Manhattan,
24    correct?

23 (Pages 133 to 138)

Page 139

1  A. Correct.
2  Q. Okay. Now, you keep calling this a triple drink,
3     correct?
4  A. Two to three drinks is what I keep saying.
5  Q. Okay. But you've already admitted that the
6     Longhorn recipe computes out to less than one
7     ounce of pure alcohol, correct?
8        MR. FARRAH: Objection.
9  A. It would probably be right around that one ounce
10    of pure alcohol, because it's a two ounce pour of
11    80 proof, plus the quarter ounce of vermouth. So
12    it's closer to one ounce than it is a half an
13    ounce.
14 Q. Okay. Two ounces of 80 proof is .8 ounces of pure
15    alcohol, correct?
16 A. I imagine, if you did the math. I didn't do it.
17 Q. Well, you tell me. You're the expert.
18 A. I told you I'm not a math expert.
19 Q. You can't compute the amount of alcohol in two
20    ounces of bourbon; pure alcohol?
21 A. Well, I would say an ounce and a quarter of 80
22    proof is equal to one ounce of 100 proof spirits,
23    five ounces of wine, and 12 ounces of beer. So if
24    I had to sit down and compute it with a

Page 140

1     calculator, maybe I could. But it's still a good
2     two -- close to two drinks in one glass, and maybe
3     three.
4  Q. Okay. Would you disagree with Dr. Benjamin saying
5     it's .84 ounces of pure alcohol?
6  A. I would not disagree with Dr. Benjamin.
7        MR. FARRAH: That's the Rare recipe?
8        MR. GILLIS: Rare recipe, correct.
9  Q. So the amount of alcohol pursuant to the recipe is
10    less than two drinks, correct?
11 A. Yes.
12 Q. Okay. And you keep calling it a double to a
13    triple drink, correct?
14 A. Yes.
15 Q. What evidence do you have that that drink that
16    evening was poured in excess of the recipe?
17       MR. FARRAH: Other than what he's
18    testified to already?
19       MR. GILLIS: Yes.
20 A. There's nothing else I can say other than what I
21    testified to already.
22 Q. You remember her testimony that she poured it to
23    one inch from the top before she put in the
24    cherry, correct?

Page 141

1  A. I think she said that. Again, you didn't show me
2     in the deposition, but you've told me that that's
3     what she's testified to.
4  Q. Well, don't you think that's important for your
5     report as to where the server said she poured the
6     alcohol that evening?
7  A. I don't take much credence what the server said.
8     What I do is take credence in is the server was
9     concerned enough to call the manager and server
10    about the Manhattans that were being served at
11    that table, and nothing was done about it.
12       That's about the only thing I really have
13    credence in her testimony.
14 Q. Okay. The server -- the manager was not contacted
15    until the last round, correct?
16       MR. FARRAH: Objection.
17 A. From what I heard.
18 Q. Nobody had a problem with the round at 8:51 that
19    you're aware of, correct?
20 A. Not that I'm aware of.
21 Q. Okay. Do you have any criticism of that round?
22       MR. FARRAH: Objection.
23 A. If Michael Espy's testimony is correct, and he was
24    intoxicated when he got there, because they were

Page 142

1     drinking shots -- they were drinking Jack Daniels
2     and beers at the hotel before they got there, then
3     yes, I would have a problem.
4  Q. Okay. Were they drinking Jack Daniels and beer
5     after they leave the Longhorn?
6        MR. FARRAH: After they left the
7     Longhorn?
8        MR. GILLIS: Yes.
9        MR. FARRAH: Objection.
10 A. I don't recall. They may have when they went back
11    to the hotel room.
12 Q. Okay. As to Mr. Southworth, what evidence was
13    there that prior to that last round, when
14    Miss O'Donnell talked to the manager, that there
15    was any concern of serving him the Manhattan at
16    that time?
17       MR. FARRAH: Objection. Whose concern?
18 A. Other than the fact that they --
19       THE WITNESS: I'm sorry.
20       MR. GILLIS: Miss O'Donnell.
21 A. Other than the fact that they were loud, and that
22    she was serving Manhattans to the table, and she
23    probably knew that they were stronger than normal
24    drinks.

Page 143

1  Q. She, being the bartender?
2  A. That's who you're talking about, Kristin
3     O'Donnell, right?
4  Q. Okay. What evidence do you have, if any, that
5     they were loud before they were served their last
6     drink at the Longhorn that night?
7        MR. FARRAH: Objection.
8  A. I don't have any specific -- I don't know the
9     exact time of when they were served, compared to
10    when the concern was. I really don't know.
11 Q. In fact, there's absolutely no evidence that they
12    were loud prior to serving their last drink, isn't
13    that true?
14       MR. FARRAH: Objection.
15 A. Not that I've read.
16 Q. Okay. You read Jude Connolly's deposition, when
17    he said it was around 10:30, correct?
18       MR. FARRAH: Objection.
19 A. I believe so.
20 Q. Okay. And you know that the bill was paid at
21    9:51, correct?
22       MR. FARRAH: 7.
23 Q. 9:57, correct?
24 A. Yes.

Page 144

1  Q. Okay. So the loudness was 33 minutes after the
2     bill was paid, correct?
3        MR. FARRAH: Objection.
4  A. I thought the issue of the loudness was when
5     it -- in and around the last round was served.
6  Q. Based on whose testimony?
7  A. I think it was Kristen's. And she said that as
8     long as they're eating, I guess it's okay.
9     Because she touched base -- she talked with Leigh,
10    and she talked with the manager. She said she
11    talked to both of them.
12 Q. Okay.
13 A. And I don't think she talked to them separately,
14    but I'm not sure.
15 Q. So your understanding of the facts is that the
16    bartender could hear them being loud, and was
17    concerned about that?
18 A. It seems that way from what I read. It's
19    possible. Or it could have been just the number
20    of drinks going to the table.
21 Q. And that's the basis of your opinion, is that she
22    could tell that they were loud before they got
23    their last drink?
24       MR. FARRAH: Objection.

24 (Pages 139 to 144)

Page 145

```
 1   A.  I'm not sure.  Like I said, it's possible.  It
 2       seemed like it was in that time frame that
 3       the -- when the drinks were served.  Or they had
 4       been served that that issue was brought up to
 5       management and Leigh.  From what I read.
 6   Q.  Okay.  From what you read, Leigh -- Kristen was
 7       the one who brought it up with management of their
 8       being loud?
 9   A.  Kristen said she did speak to the manager, and she
10       did speak to Leigh.  And Jude did say that they
11       did come over and make mention of the fact that
12       they were being loud, from what I recall.
13   Q.  From what you recall?
14   A.  From what I recall, yes.
15   Q.  And that's something that you'd remember, because
16       that's important to your opinion, isn't it?
17   A.  Certainly.
18   Q.  Let's get back to that question.  How do you
19       compute that to be three drinks in the glass?
20   A.  I said two to three drinks, because it would take
21       that much to get it up to that level of a quarter
22       of an inch from the top, with the maraschino
23       cherry.
24   Q.  You did the experiment that has been labeled
```

Page 146

```
 1       Exhibits 1 and 2 in this case, correct?
 2   A.  Yes, I participated in --
 3   Q.  Okay.  And using the Longhorn recipe, two drinks
 4       was well above a quarter inch from the top,
 5       correct?
 6   A.  Right to the top of the glass.
 7   Q.  Okay.  It was well above the quarter of an inch
 8       from the top, correct?
 9   A.  Yes.  And we backed --
10           MR. FARRAH:  Objection to the form.
11           THE WITNESS:  I'm sorry.
12           MR. FARRAH:  Don't be sorry, it's just I
13       should have objected the first time.
14   A.  It was at the top of the glass.  And then what we
15       did is we backed off to a quarter of an inch from
16       the top, and we found that that was in fact an
17       ounce of fluid.
18   Q.  So you made two drinks of two ounces of bourbon
19       and a quarter ounce of vermouth, correct?
20   A.  In each one, right.
21   Q.  Okay.  So that's a combined four ounces of bourbon
22       and a half ounce of vermouth, correct?
23   A.  Yes.
24   Q.  And you found that four and a half ounces --
```

Page 147

```
 1   A.  Chilled.
 2   Q.  -- chilled was six ounces of liquid in total,
 3       correct?
 4           MR. FARRAH:  Objection.
 5   A.  Yes, right up to the very top of the glass.
 6   Q.  Okay.  So if the drink were poured to a quarter of
 7       an inch from the top, you would expect that drink
 8       to be an ounce less than the two drinks combined,
 9       correct?
10   A.  That's correct.
11   Q.  Okay.  And a good portion of that ounce less would
12       be the alcohol, correct?
13           MR. FARRAH:  Objection.
14   A.  Yes.
15   Q.  Okay.  So what would -- what's your understanding
16       of what the most pure alcohol could have been in
17       that drink if it was poured to one quarter inch
18       from the top of the lip?
19           MR. FARRAH:  Objection.
20   A.  I would say it's close to three and three-quarters
21       to three and a half of pure -- of the alcohol
22       itself.  Maybe four ounces of alcohol itself, with
23       an ounce of water melt.
24   Q.  Well, one drink properly strained creates,
```

Page 148

```
 1       according to your prior testimony, an ounce of
 2       meltoff, correct?
 3           MR. FARRAH:  Objection.
 4   A.  If it's chilled with the -- just about.
 5   Q.  Right.
 6   A.  I mean, again, I didn't use Exacto.  It's been
 7       from experience, but it's close to.
 8   Q.  Okay.  So we know one drink brings it to three and
 9       a quarter to three and a half, correct?
10           MR. FARRAH:  Objection.  One drink brings
11       two and a quarter to three and a quarter, three
12       and a half?
13   Q.  Three and a quarter to three and a half ounces of
14       fluid in the glass, correct?
15           MR. FARRAH:  Objection.
16   A.  If it's an ounce and a -- if it's two and a
17       half -- I'm sorry.
18           If it's two and a quarter ounces worth of
19       booze, based on the Longhorn recipe, and you chill
20       it, you could get three.  If you chilled it to the
21       point where it sat in the ice for a bit, you could
22       get three and a quarter ounces of fluid.
23   Q.  Okay.
24   A.  It may be less.  I mean, the way we did it, it to
```

Page 149

```
 1       would probably be less, because it
 2       was (gesturing.)
 3   Q.  Well, assuming that that's what the facts say
 4       happened, correct?
 5           MR. FARRAH:  Assuming what?
 6   Q.  There's no testimony whatsoever -- strike that.
 7           The question was never asked in the
 8       deposition as to how long she let it sit before
 9       she strained it, correct?
10   A.  That wasn't, no, it wasn't.
11   Q.  Okay.  So you don't know that, correct?
12           MR. FARRAH:  Objection.
13   A.  That's the missing link.
14   Q.  Okay.  And that's very important to you in
15       determining the strength of that drink, correct?
16           MR. FARRAH:  Objection.
17   A.  It would be important to me as far as the water
18       melt as part of that drink, sane.
19   Q.  Correct.  And the water melt's important because
20       it determines for you whether it's one and a half
21       drinks, two drinks or three drinks, correct?
22           MR. FARRAH:  Objection.
23   A.  Yes.
24   Q.  Okay.  And assuming it was properly poured and
```

Page 150

```
 1       properly strained, your opinion is that there
 2       would be one ounce of runoff along with the
 3       alcohol in the drink that is called for by the
 4       menu, correct?
 5           MR. FARRAH:  Objection.
 6   A.  Conceivably.
 7   Q.  Okay.  So the most that five ounces would be would
 8       be one and a half times what the menu calls for,
 9       correct?
10           MR. FARRAH:  Objection.
11   A.  What did you say, 1.5 more?
12   Q.  I'm saying that if one drink properly poured,
13       stirred, strained equals three and a quarter
14       ounces of liquid --
15   A.  Yes.
16   Q.  -- five ounces would be approximately one and a
17       half times the menu proportions properly strained
18       and chilled, correct?
19   A.  Con -- I would have to agree with that.
20   Q.  Okay.  So as far as whether it's two drinks, three
21       drinks or whatever, the most it could be is one
22       and a half times the menu -- what the menu drink
23       calls for, correct?
24           MR. FARRAH:  Objection.
```

25 (Pages 145 to 150)

Page 151

1   A. Conceivably.
2   Q. Okay. And we've agreed that the menu calls for
3      two ounces of bourbon and a quarter ounce of
4      vermouth, correct?
5   A. Yes.
6   Q. Okay. And that is .84 ounces of pure alcohol,
7      correct?
8   A. According to the toxicologist's testimony.
9   Q. Okay. So the most that that drink could be, based
10     on the evidence, would be one and a half times
11     that, correct?
12         MR. FARRAH: Objection.
13  A. I would imagine.
14  Q. So we're talking about 1.25 pure ounces of
15     alcohol, correct?
16         MR. FARRAH: Objection.
17  A. Okay.
18  Q. You agree?
19  A. I guess.
20  Q. Okay. And that's at the very most, correct?
21         MR. FARRAH: Objection.
22  A. I don't -- maybe.
23  Q. Okay. Did you measure how much liquid is in the
24     glass if it's filled, as Kristen O'Donnell

Page 152

1      testified to, to one inch from the lip?
2   A. I don't believe -- I don't believe we did.
3   Q. Okay. So you don't know how much alcohol would be
4      in the drink based on the proportions that she
5      said she poured, correct?
6   A. Right.
7   Q. Okay. Wouldn't that be important in determining
8      whether it was a double or a single drink?
9          MR. FARRAH: Objection.
10  A. I think it would be important if it was a double
11     or a triple drink, yes.
12  Q. Well --
13  A. It's not a single drink.
14  Q. She testified that she put an ounce and a quarter
15     of bourbon with a quarter to a half ounce of
16     vermouth, strained it over ice, and it came to an
17     inch from the bottom of -- from the top of the
18     glass. Is that a double drink, in your opinion?
19         MR. FARRAH: Objection.
20  A. Not that one, no.
21  Q. Okay. That's a single?
22  A. What did you say, an ounce and a quarter of?
23  Q. 80 proof.
24  A. And then a quarter of an ounce of -- a little bit

Page 153

1      more than a single.
2   Q. Okay. You wouldn't have any problem with serving
3      Mr. Southworth at 8:51 that ratio of alcohol in a
4      Manhattan, correct?
5          MR. FARRAH: Objection.
6   A. That ratio?
7          MR. FARRAH: Objection.
8   A. From what I've read, probably not.
9   Q. Okay.
10  A. But again, I would watch to see how fast he drank
11     it at that point, sure.
12  Q. And would you have any problems with him being
13     served another Manhattan at no earlier than 9:21,
14     30 minutes after that first one?
15         MR. FARRAH: Objection.
16  A. Again, that's where I'd be concerned.
17     This -- people don't drink Manhattans for the
18     flavor. Those are drinks that knock you on your
19     butt. And if it was that measurement, I'd still
20     be a little bit concerned.
21         But it depends on how much he ate, and
22     any cues, and so forth.
23  Q. Well, what's your understanding that he had to eat
24     that night?

Page 154

1   A. I thought it was ribs.
2   Q. Okay. Pretty full meal, right?
3          MR. FARRAH: Objection.
4   A. Yes.
5   Q. There was salads to the table, correct?
6   A. That's what I saw, yes.
7   Q. There was chowder to the table?
8          MR. FARRAH: Objection.
9   A. Yes.
10  Q. There was a Tonion to the table?
11  A. Yes.
12  Q. Do you know what a Tonion is?
13  A. I would guess it's like a blooming onion or a
14     fried onion.
15  Q. And fried fatty foods is good for people who are
16     drinking, correct?
17  A. If you eat before or during, sure. It helps slow
18     alcohol's rate of entry into the bloodstream.
19  Q. But you don't know when that came, before or after
20     the service of drinks, correct?
21         MR. FARRAH: What are we talking about,
22     the Tonion?
23         MR. GILLIS: The Tonion.
24  A. No, I don't.

Page 155

1   Q. Okay. Certainly it was there before the drink at
2      9:21 if it was ordered at 8:40, correct?
3   A. I would hope so.
4   Q. So he's got Tonion, chowder, salad, ribs in him
5      when he gets that second Manhattan, correct?
6          MR. FARRAH: Objection.
7   A. I believe. I would think so.
8   Q. Okay.
9   A. But I didn't see anything where it says the food
10     went out. I don't know if that says that on this.
11  Q. I think it does.
12  A. Other items. Logout. Is that the logout there?
13         MR. FARRAH: Are you representing, by the
14     way, that there's something in the evidence that
15     he had chowder, Tonions --
16         MR. GILLIS: I'm not answering your
17     questions, Al. If you want to ask him afterwards,
18     go right ahead.
19         MR. FARRAH: Okay.
20  Q. On the bottom of Page 5 of the audit report -- I'm
21     sorry, Page 8.
22  A. Is this the one we're looking at?
23  Q. Page 8, yes.
24  A. Okay.

Page 156

1   Q. That's Page 9. But it goes on -- you're right.
2          Starting right here at 9 o'clock, and
3      going up here to the top of Page 9, and it's the
4      same table, Table 52, correct?
5   A. Yes, I believe so.
6   Q. And that's all the food that was ordered to the
7      table, correct?
8          MR. FARRAH: Objection.
9   A. I think the other stuff was ordered earlier.
10     Wasn't the chowder and the Tonion --
11  Q. Right.
12  A. Yes. I think the appetizers went in before this.
13  Q. Right. So we had appetizers at 8:40, correct,
14     based on the first page?
15         MR. FARRAH: Objection.
16  A. Right.
17  Q. We had bread to the table right when they arrived,
18     correct?
19  A. I believe so.
20  Q. Okay. And we have food ordered, ribs, salads and
21     so forth, at 9 o'clock, correct?
22  A. Yes.
23  Q. And based on your training and experience and
24     prior experience in a restaurant, a business, you

26 (Pages 151 to 156)

Page 157

1 understand that the salads and the appetizers come
2 out before the main meal, correct?
3 A. Yes.
4 Q. Okay. And so all of that came out before the ribs
5 would have come out some time after 9 o'clock,
6 correct?
7 A. Yes.
8 Q. And is it your understanding that she brought the
9 food to the table when she took that next order of
10 drinks, the ribs and so forth?
11 A. I don't know, but maybe. It's quite possible.
12 Q. Okay. But based on what you see here for food,
13 and based on what you reviewed in this case, would
14 you have not served him a second Manhattan at 9:21
15 that evening?
16 MR. FARRAH: Objection.
17 A. If it was two to three drinks in one glass, I
18 might be concerned about serving him at all. If
19 it's -- whatever -- we've been talking about two
20 different types of pours. So if you're talking
21 about the pours that Kristen's talking about, it's
22 possible. We don't -- I don't see anything that
23 tells me that those ribs came out before that
24 round of drinks was served, so I don't know what

Page 158

1 time they came out.
2 Q. Okay.
3 A. But if you eat after you drink, it really doesn't
4 matter. It's like closing the door after the
5 horse left the barn.
6 Q. But he's already started with the appetizers,
7 correct?
8 MR. FARRAH: Objection.
9 A. Yes.
10 Q. Okay. Assuming Kristen's pour, would you have a
11 problem if she had poured him one of -- what she
12 said was the pour at 8:51, would you not serve him
13 another one of what we'll call the Kristen pour,
14 at 9:21?
15 MR. FARRAH: Objection.
16 Q. Based on your -- what you know about this case?
17 MR. FARRAH: Objection.
18 A. I don't know. I think in this -- right around
19 this time frame it might be when they were
20 creating a little bit of a disturbance or a
21 loud -- a loudness to the point where Kristen was
22 aware of it, which means that it might have
23 happened prior to this, I don't know. So I don't
24 know what kind of behavior they displayed.

Page 159

1 There's not enough evidence for me to
2 say, yes, I would feel comfortable. Right at this
3 point, I can't say that I would feel comfortable.
4 Q. So if you don't -- if you can't say whether she
5 should or should not have served him at that time,
6 then clearly you can't be critical of her serving
7 him at that time, correct?
8 MR. FARRAH: Objection.
9 A. I guess that would be safe to assume.
10 Q. Well, do you have a criticism, based on if it was
11 her pour, of serving him another Manhattan at this
12 point?
13 MR. FARRAH: Objection.
14 A. I really don't know. I'd have to be there to see
15 that, see the kind of cues that they were giving.
16 Q. Other than the loudness, are you aware of any cues
17 that Mr. Southworth exhibited before he was served
18 the last round of drinks at the Longhorn that
19 evening that would have indicated to the server
20 that he should not be served any more alcohol?
21 MR. FARRAH: Objection.
22 A. All I know is that Jude mentioned the fact that he
23 had glassy eyes, and that he was -- didn't carry
24 himself the way he normally does. So that's the

Page 160

1 only thing.
2 What time that actually happened, I
3 don't -- we -- I don't think we have an actual on
4 that.
5 Q. Okay. So you can't opine whether or not she
6 should have served him because of the way he
7 carried himself, because you don't know when he
8 wasn't carrying himself, wherever it was, the way
9 he was carrying himself, correct?
10 MR. FARRAH: Objection.
11 A. Right.
12 Q. And you don't even know if the way he was carrying
13 himself at that time, which Jude said was
14 different from the way he normally carried
15 himself, was in any way indicative to the server
16 that he shouldn't have been served alcohol,
17 correct?
18 MR. FARRAH: Objection.
19 A. Based on that time issue, yes.
20 Q. Well, not just based on the time. How did the way
21 he carry himself change?
22 A. I don't know the specifics.
23 MR. FARRAH: From when to when?
24 A. From usual to now?

Page 161

1 Q. Well, you said he was carrying himself differently
2 than he normally does, correct?
3 MR. FARRAH: Jude said that.
4 Q. Jude said that.
5 A. Jude said that.
6 Q. How does he normally carry himself?
7 MR. FARRAH: Objection.
8 A. I don't know. I'd have to ask Jude.
9 Q. Okay. How was he then carrying himself when he
10 was carrying himself differently at the
11 restaurant?
12 A. Again, I'd have to ask Jude.
13 Q. Okay. So can you opine whether or not the
14 waitress should have known the difference based on
15 what you know about the facts?
16 MR. FARRAH: Objection.
17 A. The only thing that -- again, with the time issue,
18 I don't have it, so I really can't say.
19 Q. Well, regardless of the time issue.
20 A. If he had glassy eyes, he shouldn't have been
21 served at all.
22 Q. Let's stick to this issue first.
23 A. Okay.
24 MR. FARRAH: Which issue is this?

Page 162

1 Q. The issue here is the issue of the way he was
2 carrying himself.
3 You say that Jude Connolly said he was
4 carrying himself differently, correct?
5 A. Yes.
6 Q. Okay. What about the way he was carrying himself
7 differently, regardless of time, should have
8 alerted the server that he shouldn't have gotten
9 more alcohol?
10 MR. FARRAH: That standing alone,
11 carrying himself?
12 MR. GILLIS: Yes, that by itself.
13 MR. FARRAH: Objection.
14 A. There's not enough of a description, other than
15 the fact that he said he was carrying himself
16 differently, to give me an opinion or be able to
17 make an opinion at this point.
18 Q. Okay. So you -- okay.
19 A. He didn't give me enough information, is I guess
20 what I'm saying.
21 Q. There's no evidence in there that the way he was
22 carrying himself differently was so different or
23 bizarre that a server should have picked up on it,
24 correct?

27 (Pages 157 to 162)

Page 163

1          MR. FARRAH: Objection.
2    A. I don't know.
3    Q. Okay. And was Mr. Southworth the only loud person
4        at the table, or was the entire table loud?
5    A. I think the entire table was loud.
6    Q. Okay. So is it your opinion that the entire table
7        should not have been served any more alcohol when
8        it became loud?
9          MR. FARRAH: Objection.
10   A. It's possible. I don't know. I don't know about
11       the specifics. I don't know the time frame, or
12       degree, or length of time that they were loud.
13       All I know is Michael Espy did testify that he was
14       intoxicated and he had been drinking before he got
15       there, so that would worry me. And if he's in a
16       group of people that are drinking hard liquor
17       drinks, that would worry me, too.
18          That would be a table that I might shut
19       the whole table off based on the revelry of the
20       party.
21   Q. Okay. But you didn't answer the question. You
22       said possibly.
23          Would you have shut the whole table off
24       based on the fact that they were loud that night?

Page 164

1          MR. FARRAH: Just based on the fact that
2        they were loud?
3          MR. GILLIS: Yes.
4    A. Possibly, yes.
5    Q. So you don't have an opinion yes or no, it's just
6        a possibility?
7    A. Well, it's just -- it's more of a probability than
8        not, especially with the fact that there was one
9        guy in a black cowboy hat and black hair that was
10       ordering for the table; that drinks were brought
11       to the table that were taken back to the bar,
12       which leads me to believe that nobody was asked if
13       they wanted a drink, that a drink would be put in
14       front of them; that seven Manhattans went out to
15       the table and there were only six people of age
16       there at that time. So it leads me to believe
17       that they were padding the check.
18          There's no evidence to indicate that that
19       martini -- that Manhattan that was taken off the
20       bill -- was ever taken off the bill that was
21       brought back to the bar.
22          So it's like, okay, here we go, we got a
23       good table coming, we're going to have a
24       high-volume check.

Page 165

1    Q. So it's your opinion in this case that Leigh
2        Chabot was padding the bill?
3          MR. FARRAH: Objection.
4    A. It seemed that way to me.
5    Q. Are you going to opine that at trial, based on the
6        evidence and the facts that you've seen in this
7        case, that Leigh Chabot padded that bill?
8          MR. FARRAH: Objection. What he's going
9        to opine to at trial is in part based on my
10       strategy, so I object to the question.
11   Q. You can still answer.
12   A. The fact that she didn't -- that there's no
13       evidence to indicate that Jack Daniels was taken
14       off the bill; that there was no evidence to
15       indicate that she asked everybody if they'd like
16       a drink, which is contrary to their trainings, would
17       lead me to believe so.
18   Q. And is that to a reasonable degree of alcoholic
19       safe service that you're going to opine that she
20       padded the check?
21          MR. FARRAH: It's the same objection.
22       You can answer.
23   A. It would be -- as far as responsible service of
24       alcohol, it is not responsible service of alcohol.

Page 166

1    Q. No. Are you going to opine to a
2        reasonable -- like you said in your opinion, to a
3        reasonable degree of -- to a reasonable degree of
4        responsible alcoholic beverage service certainty
5        and professional certainty Leigh Chabot padded
6        that bill?
7    A. Sure.
8          MR. FARRAH: Objection.
9    Q. Sure?
10   A. Yes.
11   Q. That's your opinion?
12   A. Yes.
13   Q. Okay. Is it your opinion that 19 drinks in an of
14       itself is inappropriate to serve to any table?
15          MR. FARRAH: Objection. Are we talking
16       about the double and triple drinks or the
17       drinks --
18          MR. GILLIS: 19 drinks in total.
19          MR. FARRAH: Objection.
20   A. Run the question by me again, please.
21   Q. Is it your opinion that it's inappropriate to
22       serve 19 drinks to a table, period?
23          MR. FARRAH: Period?
24   A. Just to any table? With any -- one person at it

Page 167

1        or --
2    Q. Just any table.
3          MR. FARRAH: Objection.
4    A. It would concern me. It would seem irresponsible.
5    Q. Regardless of how many people at the table?
6    A. No. That's not what you asked me. If there was
7        one person at a table, it would definitely be
8        irresponsible. If it's 19 drinks, it would
9        concern me. If they're double drinks or triple
10       drinks, then it really isn't that many, it's close
11       to 40 drinks.
12   Q. If there were 40 people at the table, would you
13       have a problem with the 19 drinks being served?
14          MR. FARRAH: Objection.
15   A. If nobody's intoxicated and everybody's of age, no
16       harm.
17   Q. Okay. So you'd agree with me that the number of
18       people drinking the drinks is important, correct?
19   A. Absolutely.
20   Q. Okay. And based on the number of drinks served to
21       this table that night, which was 17 Manhattans and
22       two beers, vessels of beer and vessels of
23       Manhattan, the total number of drinks divided by
24       the number of people there is two drinks for

Page 168

1        everybody, and three drinks for four people,
2        correct?
3          MR. FARRAH: Objection.
4    A. Well, again, that's what we disagree about. The
5        vessel, in my opinion, is at least two drinks in
6        all of those, so you'd have to double that number.
7    Q. Okay. But let's just get to that in a sec.
8          MR. FARRAH: Are you finished answering?
9    Q. Are you done?
10         THE WITNESS: I think so.
11         MR. FARRAH: Okay.
12   Q. Regardless of the size of the drinks, and not what
13       the drink equates to in pure ethanol, there were
14       17 vessels of alcohol brought to the table that
15       night, correct?
16         MR. FARRAH: 19.
17         MR. GILLIS: 19, I'm sorry.
18   A. 19.
19   Q. And you would agree that 19 is two rounds of
20       drinks, regardless of when it is, to everybody,
21       and four to -- three drinks -- three vessels of
22       drinks to four of the people, correct?
23         MR. FARRAH: Objection. Don't answer
24       that question. If you're asking him is 19 divided

28 (Pages 163 to 168)

Page 169

1  by seven two and five-sevenths, we can stipulate I
2  think to that. Is it two and five-sevenths?
3        MR. GILLIS: Four-sevenths.
4        MR. FARRAH: If you're asking him is 19
5  divided by 6 three and a sixth --
6        MR. GILLIS: Okay. If you want to
7  testify, do it on your own time.
8        MR. FARRAH: I do want to testify.
9        MR. GILLIS: No, I'm not allowing --
10       MR. FARRAH: We'll stipulate to both of
11 those.
12 Q. The 19 vessels of drinks that came to the table
13    that evening --
14       MR. FARRAH: 17 Jack Daniels, two 25
15 ounce beers, per the check, that's 19.
16 Q. How do you divide that up amongst the people at
17    the table as to who had what?
18       MR. FARRAH: Objection.
19 A. I don't know. You're the one that's doing the
20 math thing. All I know is that there were six
21 people drinking the alcoholic beverages, and there
22 were 19 drinks. So if you divide six into 19, you
23 get three and some change per person.
24 Q. Well, what if seven people were drinking?

Page 170

1        MR. FARRAH: Objection.
2  A. Then you'd be -- then that much less per person.
3  Q. Okay. So if you can't determine what each person
4     drank that night, how do you have an opinion as to
5     whether or not they were reasonably served
6     alcohol?
7        MR. FARRAH: Objection.
8  A. Because again, Michael Espy was intoxicated upon
9  arrival, according to his testimony, which would
10 make it irresponsible; because there was only six
11 people that were of age at that table that night;
12 and those drinks are double drinks and maybe even
13 triple in some circumstances. I don't know
14 exactly how much was in the Manhattan.
15 Q. You've already testified that the --
16 A. I've said this before.
17 Q. Let's go back to Leigh Chabot for a second. What
18    evidence do you have that she padded the bill?
19 A. The only evidence I have that she padded the bill
20 is THAT she didn't ask -- that she did not -- I
21 don't see any evidence to indicate that she took
22 that Manhattan off the check; and I don't see any
23 evidence that she asked people if they wanted
24 drinks, she just put them in front of them.

Page 171

1  Q. What evidence do you have that she didn't ask
2     them?
3  A. She said that one person, the guy with the black
4  hat and the black hair, ordered the drinks; she
5  brought them out, and then took one back.
6        The fact that she took one back leads me
7  to believe, leads me to believe, and I think it's
8  only common sense --
9  Q. Okay. So you -- there's no evidence whatsoever
10    that she didn't ask every person at the table,
11    correct?
12       MR. FARRAH: Objection.
13 A. There's no evidence to indicate --
14       MR. FARRAH: That he knows of?
15 Q. That you're aware of.
16 A. That I'm aware of.
17 Q. So as far as your basis that she padded the check,
18    she didn't ask everybody, you don't know whether
19    she did or didn't because that question was never
20    asked at her deposition, correct?
21 A. No, sir, it wasn't.
22 Q. Okay. So you have no basis for that opinion,
23    correct?
24 A. The only basis I have is what I just explained to

Page 172

1  you.
2  Q. Okay.
3  A. Why would a drink be brought out and then taken
4  back if the person wasn't asked and wasn't ready?
5  Q. Well, isn't it the testimony that the drink was
6     ordered, brought out, and maybe the person left the
7     restaurant and left one full drink on the table
8     which she then brought back?
9        MR. FARRAH: Objection.
10 A. No.
11 Q. That's not the testimony?
12 A. The testimony that I recall is that she walked out
13 and saw that somebody didn't finish a drink and
14 bought it back, and it sat at the bar. And then
15 she said he probably finished it and then just
16 didn't ask me to bring it back. I think that's
17 how I read her testimony.
18 Q. Okay. Your understanding of the testimony, upon
19    which you base your opinion that she padded the
20    check, was that while they were sitting at the
21    table she brought one of the drinks back to the
22    bar?
23 A. Because this person -- this individual did not
24 have the one he had in front of him finished.

Page 173

1  Q. And that would be responsible service not to bring
2     a drink over while someone else had a drink in
3     front of them, correct?
4        MR. FARRAH: Objection.
5  A. Responsible service would be to ask the guest if
6  they would like a drink, and not make it until you
7  know it's safe to do so.
8  Q. Well, is there --
9  A. For example --
10 Q. Do you take --
11       MR. FARRAH: Wait. I don't think he's
12 finished.
13 Q. Go ahead. Finish your example.
14 A. If their house policy, which I suspected, which
15 testimony reveals it was, that you wouldn't bring
16 a drink out until they finish the one they had,
17 and then when you brought out the drink and the
18 person saw that you were going to take it back,
19 they would finish this one rather quickly. That's
20 generally what people do. It's rare that people
21 will say, yes, you can take that, I'm ready for
22 mine.
23 Q. Okay. And this -- do you think it's improper
24    service to take a drink order while people have

Page 174

1  some portion of a drink still in front of them?
2  A. If it's safe to do so, I don't think it's
3  improper.
4  Q. Okay. And if when you make that drink that person
5     still hadn't finished their drink, it would be
6     appropriate not to bring the new drink over to the
7     table, correct?
8  A. I wouldn't -- it wouldn't be appropriate to make
9  the drink until the one that they had was
10 finished.
11 Q. Okay. So your -- you train people in TIPS not to
12    even take a drink order until the drink in front
13    of the person is completely gone?
14 A. No. What I train people to do is do not serve a
15 fresh drink without taking away the glass from the
16 last drink.
17 Q. Do not serve a fresh drink?
18 A. Correct.
19 Q. Okay. So if she left the drink at the bar and
20    didn't serve it because the gentleman still had
21    something in his glass, that would be safe
22    service, correct?
23 A. No, that would be not a fresh drink, because
24 drinks will warm up or die. You want the drink to

29 (Pages 169 to 174)

Page 175

1     be fresh, you want it to be good when it goes out
2     there, which means it should be made at the
3     time -- it should be just made and then delivered
4     right away.
5  Q. Well, what do you do under the
6     circumstance -- well, it's all right to take a
7     drink order when the person still has some alcohol
8     in front of them, correct?
9  A. Yes.
10  Q. Okay. It's not all right to serve that drink as
11     long as that person has that drink in front of
12     them, correct?
13  A. We teach that you do not serve a fresh drink
14     without taking away the glass from the last drink.
15  Q. So when you -- so it was appropriate for her to
16     order the drink when it was ordered and the person
17     only had a little left, correct?
18        MR. FARRAH: Objection.
19  A. One of the strategies that we use in the training
20     program is, obviously, as I said many times, do
21     not serve a fresh drink without taking away the
22     glass from the last drink. When they're ready,
23     you bring it to them. But if they're not ready,
24     you don't bring it to them. And you're the only

Page 176

1     one that can decide when they're ready. You have
2     to gauge people's sobriety per sip. If you bring
3     it to them quickly, they'll end up drinking fast.
4  Q. So it was appropriate for her not to bring that
5     drink over to the table if the person was either,
6     A, still drinking that drink, or B, until you took
7     that drink away with something in it, correct?
8  A. Yes.
9  Q. Okay. And if that person was still drinking and
10     didn't want the glass taken away, it was
11     appropriate for her not to bring that additional
12     drink over to the table at that time, correct?
13  A. Yes.
14  Q. Okay. So do you have any evidence, other than
15     that one drink, that there were any drinks ordered
16     for that table that didn't -- that weren't
17     consumed at the table?
18  A. No.
19  Q. Okay. So you're testifying that she padded the
20     bill because a drink was ordered but wasn't
21     actually drunk at the table?
22        MR. FARRAH: Objection. He's already
23     testified as to the basis for the padding of the
24     bill, and it was more than that.

Page 177

1  A. Yes, I did. It was more than that, right.
2  Q. Okay. You would expect that if a person ordered
3     the drink, the drink was made, the drink wasn't
4     served because the person hadn't drank completely
5     their prior drink, that it's incumbent upon the
6     restaurant then to remove that from the bill if
7     the people pay and leave?
8        MR. FARRAH: Objection.
9  A. It should have been -- yes, it should have been
10     removed from the bill.
11  Q. Failure to do that is padding the check?
12        MR. FARRAH: Objection.
13  A. That's what I -- that's what I perceive as padding
14     the check, yes.
15  Q. And that -- you teach that in the TIPS program?
16        MR. FARRAH: Objection.
17  A. Pad the check?
18  Q. That not taking a drink off, even if it was
19     ordered, is equivalent of padding the check?
20        MR. FARRAH: Objection.
21  A. No, I never get to that, because --
22  Q. Okay.
23  A. -- we don't have to go that far.
24        (Short break was taken.)

Page 178

1  Q. I think we've exhausted the Kristen pour and the
2     padding of the check, so let's go back to the
3     other pour, which I will suggest to you, for the
4     purposes of these questions, is what we'll call
5     the menu pour, the two ounces of bourbon and the
6     quarter ounce, okay?
7  A. Sure.
8        MR. FARRAH: Wait a minute. Just so I
9     understand, that is if the drink were made exactly
10     as the recipe called for it?
11        MR. GILLIS: Correct.
12        MR. FARRAH: Okay. All right.
13  Q. If the drink was made to the recipe, and assuming
14     that the recipe was followed when Mr. Southworth
15     got his first drink at 8:51, would you believe
16     that it was inappropriate -- is it your opinion
17     that it was inappropriate to serve him another
18     menu'd dimensional drink at 9:21, based on what
19     you know about the facts in this case?
20        MR. FARRAH: Objection.
21  A. It might be. Again, it depends. At this point
22     we're talking he's already had four beers
23     pharmacologically and he's already had a drink and
24     some change. So it's five and maybe a half drinks

Page 179

1     that he's had in that time frame. So then I would
2     be concerned about him not having something to eat
3     before he has another -- anything else to drink.
4  Q. Well, is it your opinion that as of 9:21 he didn't
5     have anything to drink?
6        MR. FARRAH: To drink?
7  A. Eat, you mean?
8  Q. Excuse me, to eat.
9  A. I think he might have started, but it wasn't
10     anything substantial. Perhaps maybe a -- I don't
11     know how fast he ate. I mean, I don't know what
12     his specific intake was that night. I don't -- I
13     didn't see anything from him that says what he
14     ate.
15  Q. Okay.
16  A. I don't even know if he ate his whole meal either.
17  Q. We have no evidence that he didn't eat his meal,
18     correct?
19  A. True.
20  Q. Okay. And you have no evidence that he didn't eat
21     his chowder or his Tonion, correct?
22  A. No.
23  Q. And you have no evidence that he didn't eat his
24     salad, correct?

Page 180

1  A. No.
2  Q. You have no evidence that all of that except for
3     the entree came prior to getting his drink at
4     9:21, correct?
5        MR. FARRAH: Objection.
6  A. Correct.
7  Q. Okay. And when you make these opinions, you're
8     not there at the restaurant --
9  A. No, sir.
10  Q. -- to actually see this, correct?
11  A. Yes.
12  Q. Okay. So you have to do it on what's the most
13     reasonable fact pattern, correct?
14        MR. FARRAH: Objection.
15  A. I would say yes.
16  Q. Okay. And you opine on what you find to be the
17     reasonable set of facts and conditions based on
18     your training, your experience, and your
19     education, correct?
20        MR. FARRAH: Objection.
21  A. Yes.
22  Q. Okay. And based on all of that, it's your opinion
23     that he had eaten food -- maybe not his entree,
24     but he had eaten food before 9:21 p.m. that

30 (Pages 175 to 180)

Page 181

1    evening, correct?
2 A. I would think.
3 Q. Okay. Now, if you're not sure whether you would
4    or would not have served him at 9:21, assuming
5    that at 8:51 he got his Manhattan that was made to
6    the menu specifications, and that his Manhattan at
7    9:21 was made to the manufacturer's -- the menu's
8    specifications, is it fair to say that you cannot
9    criticize the server for bringing that drink,
10    because you're not sure whether or not the drink
11    should have been brought in in the first place?
12       MR. FARRAH: Objection.
13 A. Probably.
14 Q. Okay. Now, at 9:21 there's one, two, three, four
15    Jack Daniels Manhattans brought, correct? Three
16    at the bottom of that page, one at the top of the
17    next?
18 A. Yes.
19 Q. And three minutes later there's three more, for a
20    total of seven drinks, correct?
21 A. They were rang in at that time, yes.
22 Q. Okay. And is it your understanding that's another
23    one round for seven for the table?
24       MR. FARRAH: Objection.

Page 182

1 A. I'm not sure. I don't know if they brought the
2    three afterwards and the four first, or all
3    together at once. I'm really not sure. It
4    doesn't say enough there to tell me.
5 Q. Okay. Based on --
6 A. It was seven drinks that went out in a period of
7    three minutes, four minutes.
8 Q. Based on your experience, your training, your
9    education, your 22-plus years of training people
10    on alcohol awareness, is it your opinion that
11    those seven drinks combined went to the seven
12    individuals at the table?
13       MR. FARRAH: Objection.
14 A. Perhaps.
15 Q. Well, what logical conclusion do you draw, based
16    on the fact that seven Manhattans were served to
17    the table, four ordered at 9:21 and three ordered
18    at 9:24, in light of the fact that at 8:51 seven
19    were ordered for the whole table all at once?
20       MR. FARRAH: Objection.
21 A. 8:51, okay. I'm not sure when she took that last
22    Manhattan back. It could have been in this group
23    of Manhattans then, correct?
24 Q. I'm not getting to that yet. I'm just getting to

Page 183

1    were these orders which were three minutes apart
2    totaling seven, is it your understanding that that
3    was one round for everybody at the table?
4 A. Perhaps, yes.
5       MR. FARRAH: Objection.
6 Q. Well, not perhaps. What is your -- what do you
7    believe it is?
8       MR. FARRAH: Objection.
9 Q. What's your opinion?
10       MR. FARRAH: Objection.
11 A. It may very well be.
12 Q. Okay. Do you have an opinion as to where those
13    seven Manhattans went when they were ordered at
14    9:21 and 9:24?
15       MR. FARRAH: Objection.
16 A. To the seven people at the table.
17 Q. Okay. And that's based on your education,
18    training and experience, and your review of the
19    materials that you reviewed in this case, correct?
20       MR. FARRAH: Objection.
21 A. Yes.
22 Q. Okay. Now, one of those drinks is the one that
23    was brought back, correct?
24 A. Probably.

Page 184

1 Q. Okay. Now, if the seven came for the seven people
2    at the table, it's your understanding that one of
3    them went to Mr. Southworth, correct?
4 A. Yes.
5 Q. Okay. Are you aware of any other drinks that were
6    served to Mr. Southworth at the Longhorn
7    Steakhouse that evening?
8       MR. FARRAH: Objection.
9 A. Not from what I've read.
10 Q. Okay. And at 9:57 you see that they cashed out,
11    correct? Page 11.
12 A. The check was printed at 9:57, closed out check at
13    9:57, logged out at 9:58.
14 Q. Okay.
15 A. Yes.
16       (Pause.)
17 Q. At what point that evening, based on what you've
18    just testified to as to what was served to
19    Mr. -- well, strike that.
20       I believe you testified, and correct me
21    if I'm wrong, that at 9:21 you can't say whether
22    you would or would not have served Mr. Southworth
23    that Manhattan if it was served to the menu
24    specifications, correct?

Page 185

1       MR. FARRAH: Objection.
2 A. Right. I think I said that.
3 Q. So at least if the drinks were served to him at
4    the menu specifications, you would agree that he
5    was not in the red zone, correct?
6       MR. FARRAH: Objection.
7 A. No.
8 Q. You would not agree?
9 A. No.
10 Q. Okay. Well, you wouldn't serve someone in the red
11    zone, correct?
12 A. I'd probably -- there's times I won't serve people
13    in the yellow zone, too.
14 Q. Okay. But you're not sure whether you would or
15    would not have served him at 9:21, correct?
16       MR. FARRAH: Objection.
17 A. Right. I've said that -- I've testified to that.
18 Q. So he couldn't have been in the red zone, because
19    there's no way you would have served him if you
20    thought he was in the red zone at 9:21, correct?
21 A. There's absolutely no way I would have served him
22    if he was in the red zone, correct.
23 Q. And do you know whether his drink was part of the
24    9:21 order or the 9:24 order?

Page 186

1       MR. FARRAH: Objection.
2 A. I think we talked about the fact that you thought
3    it was all delivered at the same time, within a
4    three-minute time frame.
5 Q. You don't see a difference between the two?
6       MR. FARRAH: Objection.
7 A. Not in terms of the way you phrased the last
8    questions to me, no.
9 Q. Well, I --
10 A. I think we just both agreed that they were going
11    to be delivered all at the same time.
12 Q. Is that your understanding, based on the review of
13    the facts?
14       MR. FARRAH: Objection.
15 A. It seems that way to me.
16 Q. Okay. Is that the most logical fact pattern,
17    based on your experience, training and expertise?
18       MR. FARRAH: Objection.
19 A. I don't know how logical it is. I don't
20    understand why it wasn't rung in all at once at
21    the same time, why it was broken down like that.
22    There may be an explanation to it. She might have
23    been distracted by somebody else and had to go
24    somewhere and then came back. I really don't

31 (Pages 181 to 186)

Page 187

1  know. I wasn't there.
2  Q. Okay. You testified -- you state in your opinion
3  that Rare served Mr. Southworth into and while in
4  the red zone.
5  That's under -- it's Paragraph 2 under
6  Section 6.
7  What do you base that conclusion on?
8  A. On the testimony of Jude.
9  Q. What testimony?
10 A. That he was -- he had glassy eyes, that he was
11 loud, and that according to -- he didn't carry
12 himself in the same way. But the fact -- glassy
13 eyes would be an indication his finer motor skills
14 were being affected, then somebody with that
15 should not be served alcohol. That would be red
16 zone, as far as I was concerned. That's what I
17 mean by that.
18 Q. What he actually -- so it's the glassy eyes,
19 correct?
20 A. The glassy eyes are very significant.
21 Q. Very significant. But you don't know when in the
22 evening he exhibited glassy eyes, do you?
23 A. I do not know the exact time.
24 Q. And if he didn't exhibit glassy eyes until some

Page 188

1  time after 9:24, then that wouldn't be a factor as
2  to whether or not he was served in the red zone,
3  correct?
4  A. It's possible. It could be only because what I
5  think a drink is in the vessel as opposed to what
6  you tell me in the Rare recipe, yes.
7  Q. Is it fair to assume that if you're claiming they
8  shouldn't have served him, that he was in the red
9  zone, that he would have to be in the red zone at
10 the time they served him? Is that fair to say?
11 A. No, no. You can get into the red zone after one
12 sip of a drink. But you could also -- like I told
13 you before, I -- the way to responsible server
14 training is to not get somebody in the red zone.
15 Q. Okay.
16 A. Is to intervene before they become intoxicated,
17 which means certainly in the beginning, and then
18 definitely at the beginning of the yellow zone.
19 Q. You have testified in this case that they served
20 him when he was already in the red zone, correct?
21 A. Correct.
22 Q. And the reason you say he was in the red zone was
23 his eyes were glassy, correct?
24 A. Yes.

Page 189

1  Q. Okay. But there's no evidence whatsoever in the
2  testimony to date in this case that indicates that
3  his eyes were glassy before he was served his last
4  drink, isn't that correct?
5  MR. FARRAH: Objection.
6  A. We don't have an exact time of when his eyes were
7  glassy. We don't have an exact time of when he
8  was loud, when the table was disruptive to the
9  point where manager and server had to go there.
10 But those are all significant issues for red zone
11 behavior.
12 Q. Okay. And if that red zone behavior occurred
13 around 10:30 p.m., that wouldn't play a factor in
14 whether or not he was in the red zone at 9:24 when
15 the last drink was ordered, correct?
16 MR. FARRAH: Objection.
17 A. I don't know that for sure, no.
18 Q. Okay. Well, how can you put him in the red zone
19 for signs that occurred 30 minutes plus after he
20 was served the drink?
21 MR. FARRAH: If they occurred 30 minutes
22 plus after? If they occurred?
23 MR. GILLIS: Yes.
24 A. Based on the number of drinks that were served to

Page 190

1  him before that 30-minute time frame. Based on
2  the actual number. And I don't agree with the
3  recipe. I don't agree with her comments.
4  Q. You already testified, based on the recipe, you're
5  not sure if you would or would not have served him
6  at 9:24, correct?
7  A. More than likely or not I wouldn't have.
8  Q. Well, you're not sure one way or the other,
9  correct?
10 MR. FARRAH: Objection.
11 A. Yes, I'm not sure one way or the other.
12 Q. Okay. And you understand that the testimony as to
13 his eyes being glassy, you said Jude said that?
14 A. I believe so.
15 Q. Okay. But Jude also said that he wasn't even
16 looking at his eyes. Do you remember that
17 testimony?
18 A. No.
19 Q. Well, let me show it to you. This is Page 50, 51
20 of his deposition. You can start reading at the
21 bottom of 50 and then --
22 A. Which one is this? What's the date of this one?
23 Q. This is in the prior case, the one before we got
24 involved and only Mr. Farrah was asking questions.

Page 191

1  A. When it was closer towards the accident scene, or
2  when the -- closer towards that, as opposed
3  to -- he had two depositions, didn't he?
4  Q. Yes. Start at the bottom here, and read the
5  question.
6  (Pause.)
7  A. Well, down on Page -- on Page 51 it says, yes, his
8  eyes, yes, maybe were glassy.
9  Q. Maybe?
10 A. Yes.
11 Q. Okay. And then what does it say at the top of the
12 next page?
13 A. I don't remember specifically seeing his eyes, you
14 know, looking, seeing them, the glassy. But very
15 well, very well could have. That could be.
16 Q. Okay. So based on that testimony, you've opined
17 that his eyes were glassy, even though he says he
18 doesn't remember looking at his eyes?
19 MR. FARRAH: Objection. You don't have
20 to argue with the witness. I mean, the testimony
21 is --
22 MR. GILLIS: I'll ask my questions my
23 way, okay?
24 MR. FARRAH: I understand, but you don't

Page 192

1  have to argue with the witness.
2  A. Based on the fact of the amount of alcohol that
3  was served to him for this person to see the
4  slightest hint of that stuff leads me to believe
5  that it's more likely than not that he was in the
6  red zone at that point in time.
7  Q. Did you look at any of the grand jury testimony
8  that was prior to that deposition?
9  A. I don't believe I did.
10 Q. Okay. And if I was to tell you the grand jury
11 said there were no visible signs of intoxication
12 that evening, would that affect your opinion in
13 this case?
14 MR. FARRAH: Objection.
15 A. Not based on the amount of alcohol that was served
16 over that period of time.
17 Q. You keep talking about the amount of alcohol that
18 was served. Is it your opinion that the
19 Manhattans that were served to Mr. Southworth had
20 more alcohol in them than the menu called for?
21 MR. FARRAH: Objection.
22 A. Yes.
23 Q. Based on what?
24 A. Based on experience. Based on the fact that the

32 (Pages 187 to 192)

Page 193

1    alcohol came about a quarter of an inch from the
2    top of the glass. Based on perceived value.
3    Q. But you don't have an opinion as to how much
4    alcohol was in the glass?
5    A. I have a -- I would -- I can safely say that it's
6    two to three drinks in one glass, somewhere in
7    that vicinity, pharmacologically. I can't tell
8    you the exact amount of alcohol, but it was
9    definitely not one drink pharmacologically.
10   Q. And pharmacologically one drink would be
11   characterized as .5 ounces of pure alcohol,
12   correct?
13   A. Half an ounce of pure alcohol, correct.
14   Q. So based on what Kristen says, you don't have a
15   problem with the amount of alcohol that she says
16   was poured in the drinks, correct?
17        MR. FARRAH: Objection.
18   A. The -- she said she poured an ounce and a quarter
19   of Jack Daniels and a quarter of an ounce -- or a
20   half an ounce of vermouth, somewhere in that
21   vicinity. If it was that kind of a drink, then it
22   wouldn't be that -- as bad as what I suspect it
23   really truly was.
24   Q. And if it was based on the menu, you've already

Page 194

1    testified that you might or might not serve him
2    that last drink at 9:21 or 24?
3    A. More than likely.
4        MR. FARRAH: Objection.
5    Q. So the only criticism you have is your opinion
6    that there was more than the menu amount of
7    alcohol in that drink, based on the drink being up
8    to one quarter inch from the top, correct?
9        MR. FARRAH: Objection.
10   A. Yes, I believe so.
11   Q. Okay. And you read Chuck Boulliane's deposition
12   where he said the drinks come to no more than a
13   third of an inch from the top, correct?
14   A. Was it a third or an inch from the top?
15   Q. Boulliane said no more than a third, correct?
16       MR. FARRAH: Objection.
17   A. Yes, I think he -- I think he said something to
18   that effect. I thought it was an inch, but it
19   might have been a third. I'm sorry, a third from
20   the top, okay.
21   Q. Right. He says the drink is two-thirds full in
22   the glass?
23   A. Right, right, yes, exactly.
24   Q. And that's because these have to be carried on a

Page 195

1    tray, correct? And you know those glasses,
2    correct?
3        MR. FARRAH: Objection.
4    Q. Those glasses sway very easily, don't they?
5        MR. FARRAH: Objection to the three
6    questions.
7    Q. So if the glass were filled to the top, a good
8    portion would pour out most likely before you get
9    to a table, correct?
10       MR. FARRAH: Objection.
11   A. It's conceivable, yes.
12   Q. Conceivable or probable?
13       MR. FARRAH: Objection.
14   A. It's probably more probable than not that some
15   would spill out.
16   Q. Okay. So even if it were filled up to the top,
17   when it got to the table it wouldn't be at the
18   top, correct?
19   A. If it spilled on the way, no.
20   Q. And your -- there's no evidence in any of the
21   materials that you read that you're basing your
22   opinion on, it's just based on your experience of
23   perceived value, correct?
24       MR. FARRAH: Objection.

Page 196

1    A. Yes.
2    Q. Number 3, under 6 is you say that they failed to
3    implement a policy of having different people in
4    different parts of the restaurant communicate to
5    one another the amounts Mr. Southworth was -- had
6    consumed, violating Bar Code and industry
7    standards, correct?
8    A. Yes.
9        MR. FARRAH: Can you hold one second? I
10   just need to know where we are.
11       MR. GILLIS: Paragraph 3 under
12   Paragraph 6.
13       MR. FARRAH: Okay. Thank you very much.
14   Q. Is it your testimony there was no communication
15   between the various parties that worked for the
16   Longhorn Steakhouse on that evening concerning the
17   alcohol served to Mr. Southworth?
18   A. It was --
19       MR. FARRAH: Objection.
20   A. There was testimony by Leigh indicating that she
21   did not check from the bartender whether he
22   had -- how many drinks he had at the bar. And I
23   think Kristen testifies that there was nothing
24   trained that told them to do that.

Page 197

1    Q. Okay. Is it your understanding that
2    proper -- safe and proper alcohol service requires
3    a server to go to the bartender and find out what
4    the person at their table had to drink every time
5    someone sits at their table came from the bar?
6        MR. FARRAH: Objection.
7    A. It would be a good idea to do that. We encourage
8    that, absolutely.
9    Q. Okay. So for safe service, every time -- well,
10   you said you encourage it. Do you --
11   A. If you have to wait for a table, and waiting for a
12   table means that people will be drinking in the
13   bar on an empty stomach before they sat down to
14   dinner.
15   Q. Okay.
16   A. And that's one of the most important times to
17   communicate with the bartender, and vice versa.
18   Q. So it would be improper for any restaurant that
19   you train not to have the server go over to the
20   bartender and find out what they had to drink at
21   the bar before they came to their table if there
22   was a wait for dinner?
23   A. It wouldn't be totally improper in every
24   circumstance, no.

Page 198

1    Q. Well, what circumstances would it be proper and
2    what circumstances would it be improper?
3    A. Well, I would say that the -- these guys just came
4    off of a full day of -- or a full afternoon of
5    dirt biking, and they were thirsty and drinking,
6    and that would be one of the circumstances where I
7    would go over and say how many did these guys
8    have, how long were they waiting for a table? I
9    might ask them that first. Have you guys been
10   waiting a long time for a table? Yes. No, ten
11   minutes. Okay. Half an hour, I'll go check.
12   Q. So it was incumbent upon Miss Chabot -- well,
13   strike that.
14       You said that she should have asked
15   because they had been dirt biking and they had
16   been drinking at the bar, correct?
17   A. That would have been a good idea, yes, absolutely.
18   Q. Okay. And how was she supposed to know all of
19   this when they sat down?
20   A. Well, they had been at the place I think 12 times
21   prior, so they had a little bit of a history
22   there, and she kind of knew them anyway. So
23   there's a little bit of a pattern there with these
24   guys.

33 (Pages 193 to 198)

Page 199

1  Q. So she's improperly serving these people if, when
2     they sit down at the table, and she has experience
3     with them, she doesn't find out from the bartender
4     what they had to drink before they got to the
5     table?
6         MR. FARRAH: Objection.
7  A. I don't know if I would say it would be totally
8     improper if they didn't display any cues, but it
9     would be wise to do so.
10 Q. Okay. Well, what cues if they did they display
11    when they first sat down at the table?
12 A. I don't have any specific testimony that tells me
13    what kind of cues they displayed when they sat
14    down at the table, that I can recall.
15 Q. There were no cues that would have alerted her to
16    their drinking that night when they sat down at
17    the table, based on the facts that you've reviewed
18    in this case, correct?
19 A. No --
20        MR. FARRAH: Hold it, I didn't hear the
21    question. There were no cues to alert her to the
22    fact that they were drinking that night? Is that
23    what you said? Could you read the question back?
24        (Readback.)

Page 200

1         MR. FARRAH: Objection.
2  A. No, there were.
3  Q. What?
4  A. Michael Espy's testimony that he was drunk when he
5     got there; that the boys were drinking Jack
6     Daniels and beer at the hotel before they arrived;
7     and the two beers that -- the two 25 ounce beers
8     or the four beers that Southworth had when he got
9     to the table.
10 Q. Okay. What cues did Espy exhibit at the table
11    when he first sat down?
12 A. There was -- in his testimony I didn't read any
13    specific issues. There was -- all he said was he
14    was drunk.
15 Q. But what should the server have seen? Was his --
16 A. I don't know. I don't know. There's no testimony
17    in his deposition that gives me the specific cues,
18    other than his comment that he was drunk when
19    he --
20 Q. Okay. So as far as you know, you can't -- as you
21    sit here today, you can't mention one cue that
22    Espy exhibited when he sat down at the table that
23    would have alerted the server that he was
24    intoxicated, correct?

Page 201

1  A. Other than his testimony that he was drunk, no.
2  Q. No, forget the testimony. Is the testimony a cue?
3  A. No.
4  Q. Okay. I'm asking you what cues did he exhibit
5     when he got to the table that alerted her that he
6     was intoxicated, if any?
7  A. None that I read.
8  Q. Okay. What cues did anybody at the table exhibit
9     when they first sat down that would alert Leigh
10    Chabot that they were intoxicated?
11 A. None that I read.
12 Q. Okay. So what cues should she have seen that
13    would alert her to go to the bar and ask the
14    bartender what they had to drink before they got
15    to the table?
16 A. Nothing that I read.
17 Q. Okay. Are you aware of any evidence that you
18    didn't read that would alert her?
19 A. Not -- no, I'm not.
20 Q. Okay. In fact, the bartender did communicate with
21    Leigh Chabot during the course of the evening,
22    correct?
23        MR. FARRAH: Objection.
24 A. She does testify to that.

Page 202

1  Q. Okay. And the manager touched the table to make
2     sure everything was okay, correct?
3  A. Kristen testified to that. I think Leigh did,
4     too. And I think -- well, yes.
5  Q. And one of the managers too, correct?
6         MR. FARRAH: One of the managers what?
7  Q. Testified that they touched the table? Every
8     table that -- during the evening, correct?
9         MR. FARRAH: Objection.
10 A. Well, Boulliane says that that's their policy,
11    that they touch the tables.
12        But I didn't read anything on Noonan.
13    Apparently he was the manager at the time.
14 Q. Didn't Noonan say that they touch every table
15    every night?
16 A. I think it was Boulliane that said that. At least
17    from what I read. I don't think I read --
18 Q. Well, regardless of who it was, you read testimony
19    that a manager came over to the table that night,
20    correct?
21 A. Yes.
22 Q. And so there were policies in place for
23    communication between the manager, the bartender
24    and the waitress that evening, correct?

Page 203

1  A. There was.
2  Q. Okay.
3         (Pause.)
4  Q. Other than the manager communicating about the
5     number of drinks they had there that night, and
6     touching the table, and Leigh Chabot communicating
7     with the people at the table, and Kristen
8     O'Donnell communicating with Leigh Chabot, the
9     server, about what they were drinking that night,
10    who else in the restaurant should have been
11    communicating with those people in order to
12    properly implement the policy that you referred to
13    in Paragraph 6 -- 3?
14        MR. FARRAH: Objection.
15 A. What I was referring to is there is Leigh never went
16    to the bar to find out or inquire how many drinks
17    they had.
18        She had to be alerted by Kristen, who was
19    not -- did not have contact with that customer at
20    that time, about the concern.
21 Q. That's your only issue that is the basis of
22    Paragraph 3, correct?
23        MR. FARRAH: Objection.
24 A. That, and the fact that Kristen didn't say

Page 204

1     anything to them beforehand. And the fact that
2     she did say something about them alerts me to the
3     fact that maybe they -- she was concerned about
4     how many drinks she served them before they'd
5     eaten anything.
6  Q. Okay. You read in Kristen's deposition that if
7     she felt there was any issues whatsoever with a
8     person who had been drinking at the bar before
9     they sat at the table, she would directly
10    communicate that to the server, correct?
11 A. Yes.
12 Q. And she didn't in this case, because she had no
13    issues with Mr. Southworth, correct?
14        MR. FARRAH: Objection.
15 A. At that -- at the time they sat at the table, no,
16    apparently.
17 Q. Okay. And as you've previously testified, there
18    were no signs by Mr. Southworth or anybody else at
19    the table when they sat down to have dinner that
20    night that would have alerted Miss Chabot that she
21    should go talk to the bartender about what they
22    had to drink, correct?
23 A. None that I've read in the testimony. I've said
24    that. Nothing that I read in the depositions.

34 (Pages 199 to 204)

Page 205

1   Q. So there would have been no reason for her to go
2     to the bartender at that point and ask them what
3     they had to drink, correct?
4       MR. FARRAH: Objection.
5   A. It's always a good practice. If you've been
6     waiting for a table for a half an hour, it would
7     be a good practice to ask how many drinks have
8     they had at the bar.
9   Q. Okay. So in every restaurant that a person waits
10    a half an hour at the bar before they have drinks,
11    you would fault the server for not going up to the
12    bartender and saying what did that person -- that
13    new person at my table have to drink at the bar,
14    even if they exhibited no symptoms that would
15    alert the server when they arrived at the table?
16   A. I wouldn't say fault the server. I would say that
17    it would be wise to do it.
18   Q. Is it improper not to do it?
19      MR. FARRAH: Objection.
20   A. It's not wise to do it. Whether it -- it depends
21    on the circumstances and the issues.
22   Q. Okay. I don't care if it's wise. Is it improper
23    under these circumstances for Leigh Chabot not to
24    have walked over to the bar when they arrived,

Page 206

1    based on the facts before her at that time?
2   A. Based on the responsible server alcohol training
3    that's out there, yes, it would be improper.
4   Q. Okay. Based on what? What alerted her to go to
5    the bar at that point?
6   A. Nothing alerted her that -- that would have
7    alerted -- in other words, training programs teach
8    check with the previous server before serving to
9    determine how many drinks they had prior to the
10    table, or prior to their arrival to your table.
11    That's what it says in responsible server training
12    practices. Bar Code says that. TIPS says that.
13   Q. A different server, not the bartender, correct?
14      MR. FARRAH: Objection.
15   Q. If you had someone else handling that table, isn't
16    that what they mean by that?
17
18      MR. FARRAH: Objection.
19   A. I'm lost now. I'm talking about Leigh.
20   Q. Okay.
21   A. Leigh going to Kristen and saying how many drinks
22    did they have at the bar. That's what
23    training -- responsible training programs teach.
24   Q. Okay. And so if someone doesn't do that in every

Page 207

1    circumstance, you'd find that to be improper?
2      MR. FARRAH: Objection.
3   A. It wouldn't be following the responsible server
4    training guidelines, correct.
5   Q. That's not the question. Would you find it to be
6    improper? Yes or no.
7      MR. FARRAH: Objection.
8   A. Yes.
9   Q. Okay. You train restaurants, correct?
10   A. Yes, sir. Yes.
11   Q. You train busy restaurants, correct?
12   A. Yes.
13   Q. You train chain restaurants, correct?
14   A. Yes.
15   Q. What chains do you train in Massachusetts?
16   A. I've trained Friday's. I've trained John Harvard
17    Brewhouse. I've trained -- well, there's no chain
18    now, but Ritz Carltons. Is that a chain? I've
19    trained Marriotts. I've trained Olive Garden
20    people. I've trained -- oh, God, I -- a lot
21    of -- off the top of my head I'm stumped here, but
22    I've trained a lot of people who have worked in
23    chains.
24   Q. Okay. In fact, you trained --

Page 208

1   A. Pizzeria Uno people I've trained. Tons.
2   Q. Okay. Chains like the Olive Gardens and
3    T.G.I. Friday's are very busy restaurants,
4    correct?
5      MR. FARRAH: Objection.
6   A. Yes, they are.
7   Q. It's not unusual for a busy chain restaurant to
8    have a half an hour wait for a table, correct?
9   A. Yes, that's not unusual.
10   Q. And when you trained Friday's, did you tell them
11    that it was improper service not -- for the server
12    not to go to the bar every time someone came from
13    the bar and had been sitting there waiting for a
14    table and then came to their table?
15      MR. FARRAH: Objection.
16   A. I would -- I would answer the question in this
17    manner: That it is proper service to check with
18    the previous server before serving to determine
19    whether they've had a few drinks before they sat
20    at the table. I would suggest to them that use
21    the business as a tool in your favor. I'll be
22    right with you, sir, and check to see how many
23    drinks they've had. That would be proper service.
24   Q. Okay. Based on your experience, is that what

Page 209

1    normally happens at the Friday's that you've
2    trained?
3      MR. FARRAH: Objection.
4   A. I haven't been at the Friday's to see people do
5    this. I've done it myself, so I can't tell you
6    what they're going to do after I train them.
7   Q. Okay.
8   A. That's management's job to make sure that that
9    kind of stuff is done.
10   Q. Name one restaurant that you're aware of that as a
11    practice every time someone who's waited at the
12    bar goes to sit at a table to have dinner, the
13    waiter or waitress then goes to the bartender to
14    inquire as to the amount of alcohol they had to
15    drink at the bar prior to sitting at the table?
16      MR. FARRAH: Objection.
17   A. I can't name one restaurant that does it.
18    It's -- they've been trained to do it. Whether
19    they do it or not, I can't tell you right off the
20    top of my head, because I'm not there when the
21    actual service occurs.
22   Q. Okay. So you tell them to live to this standard
23    that you know nobody agree -- nobody actually
24    practices?

Page 210

1      MR. FARRAH: Objection.
2   A. No, I didn't say that. People do practice this.
3   Q. Well, you can't name one restaurant that does it
4    that way, can you?
5   A. I imagine if I thought about it, I probably could
6    come up with something.
7   Q. But as you sit here today, you can't?
8      MR. FARRAH: Objection.
9   A. As I sit here today right now at this moment, I
10    can't.
11   Q. Okay. How many other people should have been in
12    the loop of this communication, other than the
13    manager, the bartender and the server?
14      MR. FARRAH: Objection.
15   Q. If anyone?
16   A. That would be sufficient to facilitate --
17   Q. So the number of people was sufficient. You just
18    thought that Leigh Chabot should have gone over to
19    the bar at the beginning of -- before she served
20    these people anything to drink, correct?
21      MR. FARRAH: Objection.
22   A. To find out how many they had before they sat
23    down.
24   Q. Okay. Now, as part of -- your next thing says

35 (Pages 205 to 210)

Page 211

1　that served what were double and potentially
2　triple drinks in the form of the 25 ounce beer and
3　the Jack Daniels Manhattans served straight up in
4　a six ounce glass within one quarter inch of the
5　lip.
6　　　　I think we've pretty much beaten it to a
7　dead horse that to get it to a quarter inch from the
8　top is the equivalent, with all the ice meltoff,
9　of one and a half times the mene quantity of
10　alcohol that the Longhorn puts in their drink
11　recipe book, is that fair to say?
12　　　　MR. FARRAH: Objection.
13　A. I would say at a minimum we've agreed to that.
14　Q. Well, what would be the maximum?
15　　　　MR. FARRAH: Objection.
16　A. I don't know. I'd have to see it. It would
17　depend on how long they let it sit in the ice. I
18　think we've beat this one pretty good.
19　Q. So if we're at a quarter inch lip, we're under
20　five ounces of alcohol -- of liquid in the glass,
21　correct?
22　　　　MR. FARRAH: Objection.
23　A. I think we're at five ounces.
24　Q. Okay.

Page 212

1　A. Actually, we might be slightly down, because the
2　cherry I think disperses about a quarter -- an
3　eighth of an inch. No, an eighth of an ounce, I'm
4　sorry. An eighth of an ounce.
5　Q. So we're just under five ounces of liquid --
6　A. Fluid.
7　Q. -- with the cherry in it? Fluid.
8　A. Yes.
9　Q. And I believe we've already agreed or -- we may
10　not agree, but it's my understanding from your
11　prior testimony that one and a half times the menu
12　amount of alcohol in the Longhorn Manhattan comes
13　out to about one and a quarter ounce of pure
14　alcohol, correct?
15　　　　MR. FARRAH: Objection. That's your
16　understanding? Objection.
17　A. I think so. I think that's what we agreed to.
18　Q. .84 for what the menu says.
19　A. That's what we agreed to.
20　　　　MR. GILLIS: Do you need to take a break?
21　　　　MR. FARRAH: No, no. Don't stop.
22　Q. So that's clearly not a triple drink, correct?
23　　　　MR. FARRAH: Objection.
24　A. If in fact it's poured to that, no.

Page 213

1　Q. Okay. And again, the only way you get to a triple
2　drink is based on what you believe was in the
3　drink that night, and not what the testimony is to
4　what was in the drink that night, correct?
5　　　　MR. FARRAH: Objection.
6　A. Again, depending on how long it was sitting in the
7　ice.
8　Q. And in fact, when you did double the recipe, you
9　were at the edge or over, correct?
10　　　　MR. FARRAH: Objection.
11　A. You were at the edge.
12　Q. But if you properly let it sit in the ice, you'd
13　be over the edge, correct?
14　　　　MR. FARRAH: Objection.
15　A. Either that, or it might have had a meniscus. It
16　might have been six ounces.
17　Q. Well, properly chilled before it was poured,
18　you've testified, should come to three and a
19　quarter ounces of liquid, correct?
20　　　　MR. FARRAH: Objection.
21　A. In a -- with a two and a half ounce pour, over ice
22　chilled, in a four and a half ounce glass.
23　Q. Double that is six and a half, correct?
24　A. If in fact that's -- yes.

Page 214

1　Q. Okay. I know you're not a math major --
2　A. Thank you.
3　Q. -- but three and a quarter and three and a quarter
4　is six and a half, correct?
5　A. I would agree with that.
6　Q. So if you properly poured it the way the menu
7　says, and the meltoff is what you have written
8　about in your book as to what it should be, then
9　double this shouldn't be six ounces, it should be
10　pouring over the edge, correct?
11　　　　MR. FARRAH: Objection.
12　A. It would -- based on those figures, it would pour
13　over the edge.
14　Q. Okay. And if, according to what you say, the
15　drinks were even higher than that, then much more
16　than that should be poured over the edge, correct?
17　　　　MR. FARRAH: Objection.
18　A. Certainly.
19　Q. Okay. So it's physically impossible to put double
20　the menu recipe in the glass, let alone any more
21　alcohol, correct?
22　　　　MR. FARRAH: Objection.
23　A. No, we did put double the recipe into the glass,
24　and you wouldn't have much more room for any more

Page 215

1　alcohol when we did it.
2　Q. Did you have any more room?
3　A. Yes, we could have got some more in there.
4　Q. How much more?
5　A. Maybe a quarter of an ounce. Maybe, because we
6　didn't have a meniscus. It was right about at the
7　top of the glass.
8　Q. By the way, do any of the places, other than the
9　Longhorn, that you trained serve 25 ounce beers?
10　A. I'm sure they do.
11　Q. And do you tell those people who serve 25 ounce
12　beers that that's inappropriate service?
13　A. Yes.
14　Q. And that's part of your training, you tell them
15　that?
16　A. Yes.
17　Q. And you train over at Anheuser-Busch, correct?
18　A. I train trainers at Anheuser-Busch, yes.
19　Q. And you get paid by Anheuser-Busch to train people
20　at different places, correct?
21　A. I have, yes.
22　Q. And you tell them then that they shouldn't be
23　allowing people to serve their beer in 25 ounce
24　mugs, correct?

Page 216

1　A. What I tell them basically is it's stupid to do
2　that. If you're going to do it, realize that it's
3　two drinks in one glass and not one beer.
4　Q. It's not the size of the glass that makes somebody
5　intoxicated, it's the amount of alcohol they
6　drink, correct?
7　A. Correct.
8　Q. And so you can safely serve 25 ounce beers, as
9　long as you leave the appropriate time interval in
10　between, correct?
11　　　　MR. FARRAH: Objection.
12　A. Certainly.
13　Q. Okay. So the size of the drink isn't the problem,
14　it's the manner in which the drink is served,
15　correct?
16　　　　MR. FARRAH: Objection.
17　A. As in speed and so forth? Sure, I would agree
18　with that.
19　Q. Okay. So why do you criticize them for -- tell
20　people it's stupid for serving a 25 ounce drink
21　that you say can be safely served?
22　A. I didn't say it can be safely -- it can be safely
23　served, yes, that's true, but what I tend to find
24　out in my experience is most people drink beer a

36 (Pages 211 to 216)

Page 217

```
 1       little bit quicker in that circumstance, as they
 2    do in pitchers of beer, because they don't want it
 3    to warm up or die, because it's easily accessible.
 4    Q. And what scientific --
 5    A. Not scientific.
 6    Q. Okay. It's just your experience?
 7    A. Correct.
 8    Q. But not scientific. You don't have any --
 9    A. When I told you that before --
10        MR. FARRAH: You should let him finish
11    the question, by the way.
12    Q. You don't have any studies that prove that,
13      correct?
14    A. No, sir.
15    Q. That's not a peer reviewed -- there's no peer
16      reviewed article that states that people who drink
17      taller beers drink faster than if they drink a 12
18      ounce beer, correct?
19    A. I don't know of any written article, no.
20    Q. Okay. In fact, that's not even an opinion that is
21      widely accepted in the training field, correct?
22    A. If you're calling my students part of the training
23      field, then they would -- they would agree with
24      it. I haven't had anybody object to it. They
```

Page 220

```
 1       better to serve a 12 ounce beer.
 2    Q. And you've never put it in writing to them that
 3      that's inappropriate service, correct?
 4    A. No, sir.
 5    Q. Okay. You have read the depositions of the two
 6      people who were with Mr. Southworth at the bar
 7      that evening, correct?
 8    A. Yes.
 9    Q. And that was Jude Connolly, correct?
10    A. Yes.
11    Q. And who was the other gentleman?
12    A. Scott Espy.
13    Q. Okay. And when you read their testimony -- did
14      you read both depositions of Mr. Connolly?
15    A. I believe I did.
16    Q. Okay. And is it your understanding that his
17      testimony was, in the second deposition, that he
18      believes that Mr. Southworth had one 25 ounce beer
19      at the bar that evening?
20        MR. FARRAH: Objection.
21    A. I believe he had.
22    Q. Okay. And in the first case he said -- his first
23      answer was one beer at the bar that evening,
24      correct?
```

Page 218

```
 1       agree with that statement.
 2    Q. I'm not talking about the students. I'm talking
 3      about the people who do the training.
 4    A. I haven't spoken to them specifically on it that I
 5      recall where I can see something, especially in
 6      writing.
 7    Q. Okay. Do you ever write letters to these people
 8      and tell them that it's stupid to serve a 25 ounce
 9      beer?
10    A. I don't think I've ever written it, put it in
11      writing.
12    Q. Just mention it to them when you do their training
13      program?
14    A. Absolutely.
15    Q. So you get paid to do a training program for these
16      companies that you know are providing stupid
17      service, correct?
18        MR. FARRAH: Objection.
19    A. No. When I say the word stupid, you're making it
20      sound like it's a derogatory statement. Their
21      explanation is the competition's doing it, so
22      that's why I'm doing it. And I said, well, know
23      that if you are serving a five or a ten ounce
24      martini, that there's really four -- three to four
```

Page 221

```
 1        MR. FARRAH: Objection.
 2    A. In the first deposition?
 3    Q. His -- when he was first asked the question, his
 4      answer was he had a beer, correct?
 5    A. Are we talking about the --
 6        MR. FARRAH: Objection.
 7    A. Which deposition?
 8    Q. First deposition now.
 9    A. I'm not sure exactly. I know that in one of those
10      depositions he spoke of two, and I think in one of
11      those depositions they asked the question of what
12      would you say to the police at that time, and he
13      said two.
14        I know the second deposition there was
15      discrepancy between the first deposition, but it
16      was probably two years thereafter.
17    Q. Okay. Well, in the first one he actually said he
18      had one beer, and then on further questioning by
19      Mr. Farrah, could it have been more than one, he
20      said maybe, yes. Is that correct?
21        MR. FARRAH: Objection.
22    Q. Is that your memory?
23    A. I think so.
24    Q. Okay. So what are you basing him having two 25
```

Page 219

```
 1       to five drinks in one glass. Know that if you
 2    serve a 24 ounce beer or 25 ounce beer, you're
 3    really serving two beers to a customer in one
 4    glass, period.
 5    Q. No one from Longhorn has ever told you that's why
 6      they serve a 25 ounce beer, correct?
 7        MR. FARRAH: Objection.
 8    A. I'm sorry?
 9    Q. No one from Longhorn has ever said that we serve
10      25 ounce beers because that's what the competition
11      does, correct?
12    A. No.
13    Q. And no one from Longhorn says that's why we serve
14      a martini that particular glass, correct?
15    A. Nobody.
16    Q. These are from your other customers, correct?
17    A. Indeed.
18    Q. Okay. And do you train establishments that serve
19      16 ounce beers?
20    A. Yes, I do.
21    Q. And you're critical of serving a 16 ounce beer,
22      correct?
23    A. I have been -- I have said that to some of my
24      clients, yes, in certain circumstances it would be
```

Page 222

```
 1       ounce beers at the bar on that evening, as opposed
 2    to one 25 ounce beer?
 3        MR. FARRAH: Objection.
 4    A. Jude's deposition, or the comments that he made to
 5      the police, which was closer to the time the
 6      accident occurred.
 7    Q. Okay. Is it based on the police comments, the
 8      first deposition, or the second deposition?
 9        MR. FARRAH: Objection.
10    A. Well, there's no real clear-cut indication one way
11      or the other, so I guess I went towards the two,
12      as opposed to the one.
13    Q. Why?
14    A. Because I figured at that point in time, he was a
15      man that was ready to drink that night, and it was
16      more likely than not within a half an hour he
17      would have done two 25 ounce beers.
18    Q. What was your assumption going into the bar that
19      evening that Jeffrey Southworth was on a mission
20      when he arrived at the Longhorn that night?
21        MR. FARRAH: Objection.
22    A. It was more deeper into the -- well, two 25 ounce
23      beers in a half an hour would be a man on a
24      mission. And then going to Manhattans would be a
```

37 (Pages 217 to 222)

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 223

1  man on a mission.
2  Q. You've testified that the reason you gave credence
3  to two beers, as opposed to one, was that you felt
4  that when he got there he was on a mission.
5  So how did you make that determination if
6  there's evidence that he may have only had one
7  beer at the bar?
8  MR. FARRAH: Objection.
9  A. There's also evidence -- I'm sorry.
10  MR. FARRAH: Go ahead.
11  A. There's also evidence to indicate that he might
12  have had three or four I think in some of the
13  deposition transcripts I read. So it's -- people
14  are all over the place with this. There's nothing
15  I can pin down.
16  Q. There's not one single person that said he had
17  four beers at the bar that night, isn't that
18  correct?
19  MR. FARRAH: He didn't say at the bar.
20  A. I said three or four overall. There was people
21  that were saying that everybody had beer at the
22  table, and there's only two beers that were on the
23  check, so that makes me wonder did somebody go to
24  the bar and buy beer and come back? I don't know.

Page 224

1  That's what I mean about the -- nothing's
2  hard and fast. I can't put my finger on anything.
3  So it's more likely than not that he had two,
4  basically, is what I went towards.
5  Q. And that's what -- we all went full circle there,
6  but I'm trying to get back to the original
7  question. When he arrived there, and there's
8  testimony he had a 25 ounce beer --
9  A. Yes.
10  Q. -- what makes you think at that point he was on a
11  mission, if there was testimony that he only had
12  one beer at the bar?
13  MR. FARRAH: Objection.
14  A. Because I didn't believe he only had one beer at
15  the bar, because I heard or saw testimony that
16  indicated that he might have had three or four
17  beers throughout the night.
18  So somewhere along the line he had
19  another beer somewhere; that other people said
20  there was more -- that everybody was drinking beer
21  at the table.
22  Q. Okay.
23  A. So that's why I figured two would be safe.
24  Q. You knew that that testimony that everybody was

Page 225

1  drinking beer at the table was not true, correct?
2  MR. FARRAH: Objection.
3  A. I don't know that anything is true on that. I
4  really don't know.
5  Q. Okay. Based on the evidence, is that the most
6  logical conclusion you've drawn, based on looking
7  at the audit report and the bill?
8  MR. FARRAH: Objection.
9  A. I would say that it wouldn't be -- it would be
10  more likely than not that he would have had two
11  beers.
12  Q. Before he got to the table?
13  A. Or he was going to the table with the second beer
14  in hand.
15  Q. Okay.
16  (Pause.)
17  Q. The next paragraph, employees do not recognize the
18  potency of these drinks and were not trained by
19  Rare to do so.
20  MR. FARRAH: Paragraph 5?
21  MR. GILLIS: Paragraph 5.
22  Q. What do you base that opinion on?
23  A. The testimony of Leigh, and the testimony of
24  Kristen.

Page 226

1  Q. What specifically did Leigh say that she didn't
2  understand the potency of the drink?
3  A. She thought martinis -- Manhattans were only one
4  drink. Nobody told her that it was -- it was
5  considered two drinks, or that they should be
6  considered two drinks.
7  I don't think she knew the difference. I
8  think she said something to the effect that it was
9  equal to a four-ounce glass of wine.
10  Q. Where did -- well, based on Kristen's --
11  A. Kristen?
12  Q. Based on what Kristen said was in the Manhattan,
13  that would be accurate, correct?
14  MR. FARRAH: I'm sorry?
15  A. Based on what Kristen said, that would be
16  accurate?
17  Q. Right, that it's one drink?
18  A. Slightly off, because Kristen said an ounce and a
19  quarter, and then a half an ounce of vermouth, so
20  it would be a little bit higher than a four ounce
21  glass of wine, pharmacologically.
22  Q. Well, actually, it would be right at .5, wouldn't
23  it?
24  A. An ounce and a quarter of 80 proof, plus a half an

Page 227

1  ounce of vermouth would be a little bit higher.
2  Not much, but a little bit.
3  Q. We'll do the math.
4  A. I guess.
5  Q. So if she going by Kristen's description of what
6  she put in the glass, she did know, correct?
7  A. She wouldn't be far off.
8  Q. Okay. You wouldn't have -- you wouldn't have a
9  criticism of what the potency was, whether or not
10  she knew the potency, if in fact it was poured the
11  way Kristen said it was poured, correct?
12  MR. FARRAH: Objection.
13  A. Probably.
14  Q. And if it was poured pursuant to the menu, it
15  didn't amount to two drinks; we've established
16  that, correct?
17  MR. FARRAH: Objection.
18  A. No, I think we -- it was closer to two drinks than
19  it was one drink.
20  Q. Okay. But it wasn't a double? .84, correct?
21  A. I think that's what we said.
22  Q. Okay. And is there any other employee
23  that -- strike that.
24  You said Kristen didn't understand the

Page 228

1  potency of the drink?
2  A. Yes.
3  Q. On what do you base that?
4  A. I think Kristen also didn't -- thought that a
5  Manhattan wasn't two drinks. And also Boulliane I
6  don't knew -- he didn't believe that Bar
7  Code was correct in saying that you
8  should -- obviously assume that it was more than
9  one drink.
10  Q. Okay. Bar Code says that if you have one pure
11  ounce of ethanol in it, you should consider that
12  two drinks, correct?
13  MR. FARRAH: Objection.
14  A. Correct.
15  Q. So if it's less than that, it's not two drinks,
16  correct?
17  MR. FARRAH: Objection.
18  A. Yes.
19  Q. So when Boulliane and everyone else says it's not
20  two drinks, they're correct?
21  MR. FARRAH: Objection.
22  Q. Based on the menu description of the Manhattans
23  made at the Longhorn, correct?
24  MR. FARRAH: Objection.

38 (Pages 223 to 228)

Page 229

```
 1   A. If you're looking at it that way, exactly two
 2   drinks, no.
 3   Q. Okay. And in fact, the Longhorn menu for a
 4   Manhattan is well below the standard in the
 5   industry, correct?
 6   A. I wouldn't say that it was below the standard in
 7   the industry.
 8   Q. Okay. Well, you reviewed the Bar Code book,
 9   correct?
10   A. Yes.
11   Q. And it says in there that a Manhattan is one and a
12   quarter ounces of pure alcohol, and that's what's
13   to be counted as two drinks, correct?
14       MR. FARRAH: What book are you -- you're
15   showing him something -- hold on.
16   A. Is that pure alcohol?
17       MR. GILLIS: This is the book that you
18   showed Mr. Boulliane.
19       MR. FARRAH: Is it?
20       MR. GILLIS: Yes.
21       MR. FARRAH: So which exhibit was this in
22   the Boulliane deposition?
23       MR. GILLIS: No idea.
24       MR. FARRAH: Okay.
```

Page 232

```
 1   him. We're suspending now and when we resume,
 2   which should be soon, that when you're done, and I
 3   think your limit is seven hours, and I've -- we've
 4   deposed him -- you've deposed him for four so far
 5   today, something like that.
 6       MR. GILLIS: Right.
 7       MR. FARRAH: That I'm going to have
 8   questions for him after you finish, whether it
 9   takes you one, two, or three hours to finish.
10       MR. GILLIS: Okay.
11       MR. FARRAH: Okay.
12       MR. GILLIS: And it doesn't include any
13   redirect after you've cross-examined him.
14       MR. FARRAH: I don't care about him.
15   You can have all the direct you want. I don't
16   care about that.
17       MR. GILLIS: Okay.
18       MR. FARRAH: So why don't we suspend, and
19   let's see if we can agree on a date now.
20       MR. GILLIS: That's good.
21       (Deposition suspended at 3:00 p.m.)
22
23
24
```

Page 230

```
 1       MR. GILLIS: If you'd like, I'll
 2   photocopy the page, and we can put it in as an
 3   exhibit, if you'd like.
 4       MR. FARRAH: Yes, let's do that. Let's
 5   also be aware of the fact that it's five minutes
 6   of 3.
 7       MR. GILLIS: Let's finish this issue.
 8       (Discussion held off the record.)
 9   Q. You're looking at a document that we're having
10   photocopied and that we will put in as Exhibit 8.
11   And in there it says that pursuant to Bar
12   Code, a Manhattan has one and a quarter ounces of
13   pure alcohol, correct?
14   A. It says 1.15.
15   Q. Okay. And 1.15 --
16   A. It should be counted --
17   Q. -- ounces of pure alcohol should be counted as two
18   drinks, correct?
19   A. That's what it says in here.
20   Q. Okay. We've established that pursuant to the
21   Longhorn menu, what they put in their drinks is
22   .84, correct?
23       MR. FARRAH: Objection.
24   A. I think we did.
```

Page 233

```
 1       COMMONWEALTH OF MASSACHUSETTS
 2   . . . . . . . . . . . .
 3
 4   NANCY ROSARIO, INDIVIDUALLY, AS    *
 5   SHE IS THE ADMINISTRATRIX OF THE   *
     ESTATE OF AWILDA SANTIAGO, ESSEX   *
     PROBATE COURT DOCKET NO.
 6   03P-2499-ADI, PIPA VERONICA         *
     ROSARIO AND CHRISTINA SANTIAGO,     *
 7   AND AS SHE IS THE ADMINISTRATRIX    *
     OF THE ESTATE OF JOSE SANTIAGO,     *
 8   BERLIN (CONNECTICUT) PROBATE        *
     COURT, CASE NO. 03-0713            *
 9
10   versus                             *
11   RARE HOSPITALITY INTERNATIONAL,     *
     INC., d/b/a LONGHORN STEAKHOUSE    *
12
13   . . . . . . . . . . . .
14   I, MICHAEL A. MARCANTONIO, do hereby certify
15   that I have read the foregoing transcript of
     testimony and further certify that said transcript
     is a true and accurate record of my testimony
16   given at a deposition in the above-captioned
     matter on March 1, 2007, at Newton, Massachusetts.
17
18   Signed under the pains and penalties of
     perjury this ____ day of _____
19   2007, at _____, Massachusetts.
20
21
22
23   _____
     MICHAEL A. MARCANTONIO
24
```

Page 231

```
 1   Q. Okay. And so according to the Longhorn menu, that
 2   is below what the standard Bar Code has for a
 3   Manhattan, correct?
 4   A. Yes.
 5   Q. Okay. It's well below, about 40 percent below,
 6   correct?
 7       MR. FARRAH: Objection.
 8   A. If the math figures that way, sure.
 9       MR. FARRAH: Mark that.
10       (Exhibit No. 8, Page 68 of Bar Code,
11   marked for identification.)
12       MR. GILLIS: I just want to put on the
13   record we're paying for one deposition.
14       If we continue it, I'm not paying another
15   $1200 for a second day, because he said he
16   had -- strike it.
17   Q. What's your fee for a deposition?
18   A. 1250.
19   Q. Okay.
20       MR. GILLIS: So the fact that you want to
21   leave today and come back later, that's fine, but
22   we're still paying for one deposition.
23       MR. FARRAH: And that's fine. I just
24   want you to know that I'll have some questions for
```

Page 234

```
 1      E R R A T A    S H E E T
 2   PAGE    LINE      DESCRIPTION
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

39 (Pages 229 to 234)

Page 235

C E R T I F I C A T E
1
2   COMMONWEALTH OF MASSACHUSETTS )
                                 )   ss.
3   COUNTY OF MIDDLESEX          )
4       I, Kathryn R. Sweeney, a Registered
5   Professional Reporter, Certified Realtime Reporter
6   and Notary Public within and for the Commonwealth
7   of Massachusetts, do hereby certify:
8       That MICHAEL A. MARCANTONIO, the witness
9   whose deposition is hereinbefore set forth, was by
10  me satisfactorily identified by his Massachusetts
11  driver's license and duly sworn, and that the
12  foregoing transcript is a true record of the
13  testimony of said witness.
14      I further certify that I am not related to
15  any of the parties in this matter or their counsel
16  by blood or marriage, and that I am in no way
17  interested in the outcome of said cause.
18      Dated this 7th day of March, 2007, at Acton,
19  Massachusetts.
20
21
                    _____
22              KATHRYN R. SWEENEY
                NOTARY PUBLIC
23
    MY COMMISSION EXPIRES:
24  April 27, 2012

40 (Page 235)

THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NANCY ROSARIO, INDIVIDUALLY, AS )
SHE IS THE ADMINISTRATIX OF THE )
ESTATE OF AWILDA SANTIAGO, ESSEX )
PROBATE COURT DOCKET #03P-2499ADI) )
P/P/A VERONICA ROSARIO AND )
CHRISTINA SNATIAGO, AND AS SHE IS)
THE ADMINISTRATIX OF THE ESTATE ) Civil Action Number:
OF JOSE SANTIAGO, BERLIN ) 05 CV 1061MLW
(CONNECTICUT) PROBATE COURT, )
CASE #03-0713, )
                    Plaintiff(s),)
        vs.                      )
                                 )
RARE HOPITALITY INTERNATIONAL,   )
INC., d/b/a LONGHORN STEAKHOUSE, )
                    Defendant.   )

VIDEO DEPOSITION OF:

LEIGH CHABOT

* * * * *

SCHEDULED TO BE TAKEN ON:

March 10, 2006

Beginning at 10:00 A.M.

* * * * *

Starkings Court Reporting & Video Services
302 Mason Street, Post Office Box 1345
Telephone (910) 323-4232 or 1-800-328-3747

---

T A B L E   O F   C O N T E N T S

Title Page.........................................1
Table of Contents.................................2

Leigh Chabot - Witness:

Examination by Mr. Farrah ........................3
Examination by Mr. Gillis ......................134
Examination by Mr. Farrah ......................183
Examination by Mr. Gillis ......................186
Examination by Mr. Farrah ......................187
Reporter's Certificate .........................189

Please Note:  Proper nouns MAY BE spelled
Phonetically.  No exhibits were presented to the
reporter to attached to the transcript.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF(S):

ALBERT FARRAH, JR., ESQUIRE
One Washington Mall, 5th Floor
Boston, MA  02108
alf@afarrah.com

ON BEHALF OF THE DEFENDANT(s):

MICHAEL K. GILLIS, ESQUIRE
NEIL SCHNAURBACH, ESQUIRE
GILLIS & BIKOFSKY
1150 Walnut Street
Newton, MA  02446
mgillis@gillisandbikofsky.com

KRISTEN HATHCOAT, ESQUIRE
BEN WILSON, RISK ADMIN.
RARE HOSPITALITY
8215 Roswell Rd., Bldg., 600
Atlanta, GA  30350

---

(Whereupon,

LEIGH CHABOT

was called as a witness, duly sworn to tell

the truth, and testified under oath as follows:)

(10:11 A.M.)

EXAMINATION BY MR. FARRAH:

Q.    Good morning, Ms. Chabot.  My name is Albert
Farrah and I represent the Plaintiff in this action.  How
do you do?

A.    Good.

Q.    Could you tell us your full name for the
record, please?

A.    Lee Ann Blackington Chabot, maiden name
Blackington?

Q.    How old are you?

A.    Twenty-five.

Q.    And are you married?

A.    Yes.

Q.    Where do you live?

A.    Fayetteville, North Carolina.

Q.    Do you have any children?

A.    Yes, three.

Q.    Could you briefly tell me what your schooling
experience is?

A.    I attended high school through 11th grade at

---

1  Paradise Village Hills Pheonix, Arizona.  Later I
2  obtained my GED and served -- did one year at Mount
3  Monchuset (phonetic) Community College which ended in
4  2004.
5      Q.    Your age again is?
6      A.    Twenty-five.
7      Q.    Date of birth is what?
8      A.    December 17, 1980.
9      Q.    Can you tell me what experience you have
10 working in restaurants?
11     A.    I began working at J&B's Bar and Grill in
12 Townsend, Massachusetts in about May of 1998.  I
13 hostess'd there for about six months.  After that I
14 waitressed for the following time I was there, which was
15 about three years.  And then I moved on to Longhorn
16 sometime late 2000 and worked there until April 12, 2004,
17 which then I left when I joined the military.
18     Q.    You joined the military in 2004; is that
19 right?
20     A.    Yes, sir.
21     Q.    Were you in the Reserves prior to that time?
22     A.    No, sir.
23     Q.    When you worked at JMB's, is that the name of
24 it with an M in the middle?
25     A.    No, an "&" sign, J&B's.

1    Q.   Oh, J&B's.  Okay, when you worked at J&B's,

2 after working as a hostess you worked as a server; is

3 that right?

4    A.   Yes, sir.

5    Q.   Did you serve alcoholic beverages to

6 customers there?

7    A.   Yes.

8    Q.   Can you tell me what your training in service

9 of alcoholic beverages was prior to the time you went to

10 work at the Longhorn restaurant in Leominster?

11    A.   That would be training I got at J&B's, which

12 was on the floor training where we trained with a

13 trainer.  And then we were handed a booklet briefly on

14 bar ethics and bar codes.

15    Q.   What kind of a restaurant is J&B's if you can

16 tell me?

17    A.   A family dining restaurant.

18    Q.   In Townsend; is that right?

19    A.   Yes, sir.

20    Q.   And you were hired at the Longhorn sometime

21 in the year 2000; is that right?

22    A.   Yes, sir.

23    Q.   That your best memory?

24    A.   Yes, sir.

25    Q.   As of September 26, 2003 you were still

---

1 working at the Longhorn; is that right?

2    A.   Yes, sir.

3    Q.   Can you tell me during that period from when

4 you were hired until September 26, 2003 approximately how

5 many days a week you worked at the Longhorn.

6    A.   I worked at the least, five days a week,

7 which two of those contained doubles on Saturdays and

8 Sundays.

9    Q.   At the most, during that period again, how

10 many days a week did you work?

11    A.   At the most it could be seven depending if a

12 shift needed to be picked up or not.

13    Q.   When did you get married?

14    A.   I got married October 23rd of 1999.

15    Q.   Why did you leave the Longhorn?

16    A.   I was joining the service.

17    Q.   Had you planned to do that for some time?

18    A.   I had planned to do that my whole life and

19 then especially situations arising from 9/11 my mother

20 flew that day and had a big impact.  As soon as my kids

21 grew up, and it was okay to be with my husband for a

22 period of time, I decided it was time to go.

23    Q.   How old were your kids when you joined the

24 service?

25    A.   My son would have been -- he turned June the

---

1 following month after I left -- June was his birthday,

2 so he turned four.  And my other son was six.

3    Q.   So when you joined the service you had a son

4 who just turned four and a son who was six; is that

5 right?

6    A.   Yes, sir.

7    Q.   It was after September 11, 2001, that you

8 decided you wanted to join the service; is that right?

9    A.   I had wanted to before then, and that just

10 put an extra impact on it.

11    Q.   It was three years later that you joined the

12 service; is that right?

13    A.   Yes, sir.

14    Q.   Now, you have another child?

15    A.   Yes, sir, I do.

16    Q.   Is that a boy or girl?

17    A.   She's a girl.

18    Q.   How old is she?

19    A.   She's nine months.

20    Q.   Congratulations.

21    A.   Thank you.

22    Q.   Do you remember the last day, the date of the

23 last day you worked at the Longhorn?

24    A.   I would say -- not positive of the exact date

25 that I left the Longhorn, but I would say it was April

---

1 24th or 25th.

2    Q.   2004?

3    A.   Yes, sir.

4    Q.   Now, are you represented today by Mr. Gillis?

5    A.   Yes, sir.

6    Q.   And you've spoken to him prior to today; is

7 that right?

8    A.   Yesterday, sir.

9    Q.   Had you met him before today?  Before

10 yesterday, pardon me.

11    A.   Before yesterday, no.

12    Q.   Now, once you went to the Longhorn, did you

13 receive any training in the responsible service of

14 alcoholic beverages?

15    A.   Yes, sir.

16    Q.   Can you tell me where you received that

17 training?

18    A.   We received that training at the restaurant

19 before it opened.

20    Q.   It was a new Longhorn at Leominster that you

21 went to work at in 2000; is that right?

22    A.   Yes.

23    Q.   You should try to wait a second just to let

24 me finish my questions before you answer if you could.

25    MR. GILLIS:  To just assist you on that, the

1  stenographer can only take down one of you, so if --
2  he'll, I'm sure, will wait for you to finish your answer
3  if you could just wait for him to finish his question.
4      Q.    You were trained at the restaurant before it
5  opened up; is that fair to say?
6      A.    Yes.
7      Q.    Who trained you?
8      A.    There are many trainers from all different
9  kinds of Longhorns that came in. They are trainers that
10 travel to each Longhorn before they open and they train
11 you.
12     Q.    Do you know how long that training lasted?
13     A.    It was extensive training for a week before
14 the restaurant even opened.  And then at least for one
15 month we had trainers in there on a consistent basis
16 every shift with us, guiding us through everything we
17 did.
18     Q.    Okay.  Is it fair to say that the training
19 you received at that time was in not only responsible
20 serving of alcoholic beverages, but also in just being a
21 waitress at the Longhorn Restaurant and how the
22 restaurant operated?
23     A.    Yes.
24     Q.    At some point in time did you become -- did
25 you receive what's called tips training?

1      A.    Tips training I don't specifically remember,
2  no.
3      Q.    Do you remember receiving anything called bar
4  code training?
5      A.    Yes.
6      Q.    When did you receive that training?
7      A.    That would have been throughout the first
8  week that we did training without anybody -- without
9  having customers yet in the restaurant.
10     Q.    What does bar code mean to you?
11     A.    The bar code is the system that you go by on
12 determining how you are going to serve someone, how the
13 serving comes about, systems that they go through
14 determining when someone's had too much to drink, or
15 getting close to having too much to drink.
16     Q.    Did you receive some booklets or publications
17 in connection with that training?
18     A.    Yes.
19     Q.    Do you have them now; do you still keep them?
20     A.    No.
21     Q.    Let me show you some booklets and you tell me
22 if you recognize them. The first booklet I want to show
23 you has been marked Exhibit #5 to Christen O'Donnell's
24 deposition.  You know Christen O'Donnell, don't you .
25     A.    Yes, sir.

1      Q.    And it's entitled, "Bar Code Server Guide,"
2  could you take a  moment and look at that please and tell
3  me if you recognize it?
4      A.    (Peruses document.)  Yes, I do.
5      Q.    Is this one of the booklets that you received
6  from Longhorn as part of your tips training -- bar code
7  training?
8      A.    Yes, bar code training.
9            MR. FARRAH:  Can I get this marked as the
10 first exhibit please.
11           (DEPOSITION EXHIBIT #1 WAS MARKED
12           FOR IDENTIFICATION.)
13     Q.    I am going to show you what has been marked
14 as Exhibit #2 to Christen's deposition and it is entitled
15 "Longhorn Steakhouse Bar Recipes, revised 2002."  Do you
16 recognize that document?
17     A.    No, I don't.
18     Q.    Take a moment and look at it.
19     A.    (Peruses document.)  No, I don't.
20           MR. FARRAH:  Can we have this marked as
21 Exhibit #2 please?
22           (DEPOSITION EXHIBIT #2 WAS MARKED
23           FOR IDENTIFICATION.)
24           MR. GILLIS:  What number is that from the
25 prior deposition?

1            MR. FARRAH:  That was -- It's #2 in both
2  depositions.
3      Q.    Did you receive at the time you started
4  working at the Longhorn any document that you understood
5  contained the recipes for different drinks served at the
6  Longhorn restaurant?
7      A.    Did I remember receive any?
8      Q.    Yes.  Any document that has the recipes for
9  the different drinks that are served at the Longhorn ?
10     A.    No, not that I can remember.
11     Q.    Do you remember receiving any training in
12 recipes for the different drinks that were served at the
13 Longhorn at any time prior to September 26, 2003?
14     A.    Yes.
15     Q.    What training was that?
16     A.    It may not necessarily have been training,
17 but when any new drink came out that we were adding to
18 the menu, they would tell us what was in it so that we
19 would know, so we could sell it as a promotion?
20     Q.    Other than that, do you remember receiving
21 any training from the time you started the Longhorn until
22 September 26, 2003 about recipes for making different
23 drinks at the Longhorn?
24     A.    Not necessarily the recipes, exactly what was
25 in them, but we'd have to know that, you know, in  what

14

1  type of drinks was what alcohol so that if someone
2  ordered vodka and tonic, what kind of vodka would they
3  want with it. We knew the brands of alcohol, what
4  alcohols were in each drink, but the recipes to make
5  them, no.
6       Q.    Here is a big one.  This is Exhibit #3 to
7  Christen's deposition.  It is entitled "Wanted:  Longhorn
8  Steakhouse Server and Bartender Trainee Edition."  It's
9  about an inch think.  Does that look familiar to you?
10      A.    Yes.
11      Q.    Does this look like a document that you
12 received at the time you started work at the Longhorn?
13      A.    When I started there, yes.
14            MR. FARRAH:  Can we have this marked please.
15 Did I say this is Exhibit #3 to Christen's deposition?
16            (DEPOSITION EXHIBIT #3 WAS MARKED
17            FOR IDENTIFICATION.)
18            MR. GILLIS:  Yes.
19            MR. FARRAH:  It's #3 to Ms. Chabot's
20 deposition.
21      Q.    Do you recall other than the two documents
22 you've identified so far and that are exhibits now in the
23 case, any other documents that you received from the
24 Longhorn at the time you first were employed there?
25      A.    We received many documents, many booklets,

1  train the trainer guides, thing -- chemical spill, we had
2  to know about in the back, we received that booklet.
3       Q.    Any other documents about -- that you recall,
4  relating to serving alcoholic beverages responsibly?
5       A.    No, not that I can remember.
6       Q.    Let me show you what has been marked as
7  Exhibit #6 to Christen's deposition.  This one is the
8  "Longhorn Steakhouse Training Test Booklet for Server and
9  Bartender Team Members."  Does that look familiar to you?
10      A.    Yes.
11      Q.    Does it look familiar as a document that you
12 received about the time you started at the Longhorn?
13      A.    Yes.
14            MR. FARRAH:  Could we have this marked
15 please.
16            (DEPOSITION EXHIBIT #4 WAS MARKED
17            FOR IDENTIFICATION.)
18      Q.    Throughout the time that you were at the
19 Longhorn, did you know of any -- did you know of any
20 policy that the Longhorn had to reprimand employees who
21 did not follow the guidelines set forth in the training
22 documents?
23      A.    Such as what would happen to them if they
24 didn't follow it to a T?
25      Q.    Such as what would happen to them if they

15

1  didn't follow the training guidelines, yes.
2       A.    It was zero tolerance.
3       Q.    How do you know that?
4       A.    That was just standards set forth through
5  Longhorn, and I don't know of any time that anyone had
6  ever had been reprimanded for it.
7       Q.    How do you know that that was the standard,
8  zero tolerance that was set forth through Longhorn?
9       A.    They made it very clear, did I know it to be
10 a fact, did they do it to anyone, I do not know.
11      Q.    How did they make it very clear?
12      A.    They spoke to us about it on several
13 occasions.  We'd have meetings on Saturday mornings we'd
14 came in, learn about new menu items, any issues that may
15 have came up, and throughout the training in the
16 beginning, made it very clear what our standard was and
17 that we were to live up to that standard.
18      Q.    Okay.  Did you receive any documents, other
19 than the documents we've identified now, that set forth
20 that zero tolerance policy you've just described from the
21 time you started working at Longhorn until you left?
22      A.    Just the documents I have already seen.
23      Q.    This ones that are exhibits in the case?
24      A.    Yes, sir.
25      Q.    And other than the training you received

16

1  initially, have you had any -- did you have any
2  retraining from that time until you left the Longhorn in
3  serving alcoholic beverages responsibly?
4       A.    Specifically, no.
5       Q.    And you were bar code certified at some point
6  in time; is that right?
7       A.    Yes, sir.
8       Q.    That was fairly early on in your career at
9  the Longhorn?
10      A.    Yes, sir.
11      Q.    Are there any written policies regarding the
12 service of alcoholic beverages responsibly that you
13 understood were in force at the Longhorn during the time
14 you worked there, that you have not now described to us?
15      A.    No, sir.
16      Q.    Were there any other verbal policies
17 concerning the responsible service of alcohol that were
18 in place at the Longhorn during the time that you worked
19 there, that you have not told us about?
20      A.    Just that the managers, you know, were very
21 confident in us, and that, you know, every case may not
22 be a "by the book" but a very much so a judgment call in
23 our training, that if we felt anything was wrong or okay,
24 that as long as our judgment was fine with it, they were
25 fine with it.

18

1    Q.    The managers told you that; is that right?

2    A.    That the managers told us they were fine with

3  it?

4    Q.    Yes.

5    A.    That they trusted our judgment, that we had

6  judgment calls.

7    Q.    Okay, so the managers at the Longhorn told

8  you that really it was up to you whether to serve

9  somebody or not?

10    A.    Yes.

11    Q.    When you started at the Longhorn, how much

12  were you paid per hour?

13    A.    $2.63.

14    Q.    When you left how much were you paid per

15  hour?

16    A.    $2.63.

17    Q.    What's the most hours a week you worked at

18  the Longhorn?

19    A.    It would vary.  The shifts were 5:00 till

20  close, but close may be 11:00 and we might not get out

21  until 1:00.  So it could go anywhere 30 to 40 hours a

22  week.

23    Q.    When you worked seven days a week, how many

24  hours was the most you worked, if you can recall?

25    A.    It was probably 42, maybe at the most.

1    Q.    Fourty-two did you say?

2    A.    Yes, sir.

3    Q.    Okay.  And some days you worked double

4  shifts, you told us, is that right?

5    A.    Yes, they may be doubles, but then you get a

6  lunch break and if it's not busy, they probably let you

7  go from around 11:00 to 3:00, or anywhere from, you know,

8  noon when they notice the rush isn't big until 3:00 or

9  4:00.  Then you come back.

10    Q.    When -- did you act as your own bus boys,

11  clearing table?

12    A.    We bussed 90 percent of the tables.  If there

13  were glasses left when the guest left, then the hostesses

14  would clear those.

15    Q.    But there were no bus boys working at the

16  Longhorn?

17    A.    No, sir.

18    Q.    At any time you worked there; is that right?

19    A.    Yes, sir.

20    Q.    So they hostesses that were on duty also did

21  some bussing functions; is that right?

22    A.    Yes, sir.

23    Q.    On Friday nights what time did you stop

24  serving?

25    A.    Stopped serving food?

19

1    Q.    Yes.

2    A.    We stopped serving food on Friday nights,

3  from what I remember, 11:00.

4    Q.    What time did stop serving alcohol on Friday

5  nights?

6    A.    Usually the bartender would call last call

7  about 20 to 15 minutes before actual closing time.

8    Q.    Before 20 to 15 minutes before 11:00?

9    A.    Yes, sir.

10    Q.    There were some nights that you stayed after

11  closing, at 11:00 until as late as 1:00 you just

12  testified; is that right?

13    A.    Yes, sir.

14    Q.    What sorts of things did you do between 11:00

15  and 1:00 on those nights?

16    A.    You have to check each server out.  As a

17  closer you have to check servers out and make sure

18  they've done their side work, make sure they've done

19  everything right on their tables.  We have to do the

20  final close down of the alley, which consisting of

21  putting salad dressing away, making sure bread is thrown

22  out, making sure the ice is filled, the whole alley  way

23  is ready, and any rolling of silverware that was left to

24  do, we had to do.

25    Q.    That was in addition to your waitressing

20

1  functions; is that right?

2    A.    Yes.

3    Q.    Sort of readying the place for the next day's

4  operation?

5    A.    Yes, sir.

6    Q.    Is that a fair way to describe that?

7    A.    Yes, sir.

8    Q.    Were you paid for that?

9    A.    No, sir.

10    Q.    You weren't paid hourly for that?

11    A.    The hours we were on the clock, we were paid

12  for.

13    Q.    So tips were an important part of your

14  compensation at Longhorn; is that right?

15    A.    Yes, sir.

16    Q.    During the time that you worked there, tell

17  me the range per night what you made in tips?

18    A.    In a night it can go anywhere from $40 to

19  $120, $130.

20    Q.    During the time that you worked at the

21  Longhorn, were there any reviews, I mean official reviews

22  of your performance?  Do you know what I mean by that?

23    A.    Yes.

24    Q.    Were there any?

25    A.    Yes, there were.

22

1    Q.    What shape would they take?

2    A.    Usually they would call you into the office,

3 it was probably at the end of the night, when you were

4 getting ready to leave at the end of your shift, when

5 you're turning in your stuff, and they would go over just

6 a basic review of how you were doing, how your sales

7 were, how your attitude's been.

8    Q.    When you say how your sales were, what do you

9 mean by that?

10    A.    With any promotions that we have, were we

11 selling the promotions, were we suggestively selling,

12 were we adding things on to the meal.

13    Q.    What do you mean by suggestively selling?

14    A.    Were we mentioning the fact that we had a new

15 steak on the menu.  Were we mentioning the fact that for

16 $1.99 they could add a salad.

17    Q.    How did your managers know, if you know,

18 whether or not you were mentioning that for 1.99 people

19 could add on a salad?

20    A.    Specifically, I don't know if they know if I

21 said it, or if the person asked for it.  They wouldn't

22 know unless they were standing at my table.

23    Q.    So during the reviews, how frequently --

24 sorry about that, during the reviews.

25           How frequently did you receive what you

---

23

1 understood to be official reviews?

2    A.    I would say if I had to guess, maybe once a

3 month.

4         MR. GILLIS:  Okay, for purposes of the

5 deposition, if you have an estimate, that's fine, but we

6 don't want any guessing.  We want there to be no guessing

7 on the record.  If you don't know, that is fine.

8    A.    I don't know then.

9    Q.    Did you ever see any written reviews of your

10 performance at Longhorn?

11    A.    No, not that I can remember.

12    Q.    Did anyone ever say to you -- any manager at

13 Longhorn ever say to you that he knew how much alcohol --

14 that is how much in dollar amount of alcoholic beverages

15 you were selling at any particular time?

16    A.    No.

17    Q.    Did the company have the ability to calculate

18 that, that is how much alcohol you were selling at any

19 particular time?

20         MR. GILLIS:  Objection.

21    A.    Yes.

22    Q.    But no one ever spoke to you about it?

23    A.    No.

24    Q.    Now, you realize -- do you realize that we're

25 here today because of an allegation that a customer of

---

23

1 the Longhorn who was at the restaurant on September 26,

2 2003, which was a Friday, was involved in an auto

3 accident the next morning in which two people were killed

4 and two people were injured?

5         MR. GILLIS:  Objection

6    A.    Yes.

7    Q.    At some point in time, did you realize that

8 it was your customer who was -- from the night before who

9 was involved in that automobile accident?

10         MR. GILLIS:  Objection

11    A.    Yes.

12    Q.    How did you come to that conclusion?

13    A.    I believe it was the following night.  I had

14 already been home from work, woken up, and I guess

15 probably used the restroom, went back to bed.  Our TV was

16 still on, and I had actually seen his picture flash

17 across the screen and just heard, involved in fatal

18 accident, and that was all I caught out of it, and that

19 was all I knew about it.

20    Q.    When you saw the picture flash across the

21 screen, did you recognize the picture of the person you

22 saw?

23    A.    Yes.

24    Q.    Did you recognize him at that time as Jeffrey

25 Southworth?

---

24

1    A.    I was not sure of his name, positive of

2 exactly what his name was.

3    Q.    Did you think his name at that time -- at

4 that time, did you think his name was Jeffrey Southworth?

5    A.    From what I knew of it to be, yes.

6    Q.    What was the basis for when the TV image of

7 him flashed across the screen, thinking at that time that

8 his name was Jeffrey Southworth?

9    A.    I just recognized his face from the

10 restaurant.

11    Q.    Did you know his name at the time you saw his

12 picture on the screen?

13    A.    No.

14    Q.    When is the first time you recall seeing Mr.

15 Southworth at the Longhorn?

16    A.    I don't know when the first time would be.

17    Q.    Is it accurate to say that prior to the

18 evening of September 26, 2003, and but prior to the -- I

19 mean, days, weeks or months before September 26, 2003,

20 you had first seen Mr. Southworth at the Longhorn?

21    A.    The first time I ever saw him was at the

22 Longhorn.

23    Q.    That was before September 26, 2003; is that

24 right?

25    A.    Yes.

1    A.    No.

2    Q.    Do you know any -- strike that.  What else

3 did Sherry and you talk about the night of -- excuse me,

4 the next day after you learned there had been this

5 accident?

6    A.    That was it.  We knew nothing else of what

7 had happened.  There was nothing to talk about.

8    Q.    At any time up to the time of that

9 conversation, the one where you learned about the

10 accident, after you learned about the accident, did

11 Sherry or you talk about the kinds of drinks that Mr.

12 Southworth liked to drink?

13    A.    Between when?

14    Q.    Between when you first saw him four months

15 before the accident, and when you learned that he had

16 been involved in the accident?

17    A.    Yes.

18    Q.    What sorts of conversations did you have

19 about what he liked to drink?

20    A.    It wasn't necessarily a conversation, but a

21 comment on the fact of what he drank, because that kind

22 of drink was not typical for the younger guys.  Usually

23 guys came in and drank beer.

24    Q.    What did he drink?

25    A.    He usually drank Manhattans.

Starkings Court Reporting & Video Services

---

1    Q.    Jack Daniels Manhattans?

2    A.    Yes, sir.

3    Q.    Sherry knew that?

4    A.    Yes.

5    Q.    Because she served him Jack Daniels

6 Manhattans; is that right?

7    A.    I would say so, yes, sir.

8    Q.    What else did he like to drink?

9    A.    As far as I know?

10    Q.    Yes.

11    A.    The Jack Daniels Manhattans.

12    Q.    That was after dirt biking; is that right?

13    A.    Yes, sir.

14    Q.    I am going to show you what has been marked

15 as Exhibits #9 to Christen's deposition and ask you if

16 you recognize that fellow?

17    A.    Yes, I would say I do.

18    Q.    Is that Mr. Southworth?

19    A.    I believe so, yes.

20    Q.    You saw him at the restaurant on September

21 26, 2003?

22    A.    Yes.

23    Q.    That is the fellow who's image flashed across

24 the television screen that early morning after the

25 accident?

Starkings Court Reporting & Video Services

---

31

1    A.    From what I remember, yes.

2    MR. FARRAH:  Thank you.  Could we have this

3 marked as the next exhibit.

4    (DEPOSITION EXHIBIT #5 WAS MARKED

5    FOR IDENTIFICATION.)

6    Q.    And I'm going to show you Exhibit #10 to Ms.

7 O'Donnell's deposition.  Do you recognize Mr. Southworth

8 in that photo as well?

9    A.    I recognize this, yes.

10    Q.    Do you recognize him in it?

11    A.    Yes.

12    MR. FARRAH:  Okay. Can we have that marked as

13 the next exhibit.

14    (DEPOSITION EXHIBIT #6 WAS MARKED

15    FOR IDENTIFICATION.)

16    Q.    And that's Mr. Southworth?

17    A.    Yes.

18    Q.    Have you told us everything that Sherry and

19 you talked about in the conversation that -- everything

20 that Sherry and you talked about in the conversation that

21 you had after you realized that he had been in an

22 accident, after September 26, 2003?

23    A.    Yes, from what I remember.

24    Q.    Did you talk to Sherry at all during that

25 conversation about how much Mr. Southworth had had to

---

32

1 drink at the restaurant?

2    A.    Not that I remember, no.

3    Q.    Was there any conversation with Sherry that

4 you recall during that first telephone call about --

5    A.    It was in person that Sherry and I talked.

6    MR. GILLS:  Objection.

7    Q.    So it wasn't a telephone call that you had

8 with Sherry when you talked about Mr. Southworth being

9 the fellow who'd driven the car?

10    A.    Not from what I remember, it was in person at

11 our next shift, that following Sunday.

12    Q.    During that -- and it was Sunday is your best

13 memory of when that conversation occurred?

14    A.    Yes, because it was the following night after

15 it happened, so it would have been Saturday night.  My

16 next shift would have been Sunday.

17    Q.    Just so we are on all of the same page here.

18 September 26, 2003 was a Friday?

19    A.    Yes.  And I didn't see it that night.

20    Q.    Did you work the next day, do you know,

21 September 27, 2003?

22    A.    The next day shift?

23    Q.    Or night.

24    A.    I do not remember if I did, but it is

25 probably that I did.

```
 1      Q.     And you don't recall while you were working
 2 at the restaurant on Saturday the 27th, be it day or
 3 night, any conversation with anyone about Mr. Southworth;
 4 is that right?
 5      A.     Correct.
 6      Q.     You didn't know as of Saturday, September
 7 27th, that there had been this accident; is that right?
 8      A.     Correct.
 9      Q.     It was in the evening between Saturday night
10 and Sunday morning, September 27th and September 28th
11 that you saw on TV the picture of Mr. Southworth; is that
12 right?
13      A.     Yes, sir.
14      Q.     You spoke to Sherry Sunday, the 28th about
15 him; is that right?
16      A.     Yes, sir.
17      Q.     During that conversation was there any
18 discussion about where else besides the Longhorn Mr.
19 Southworth had been drinking on the night of September
20 26, 2003?
21      A.     No, sir.
22      Q.     During that -- Have you told us everything
23 you can recall now about that conversation with Sherry?
24      A.     Yes, sir.
25      Q.     As of the time you had that conversation with
```

```
 1 Sherry, had you spoken to anybody else other than your
 2 husband about the fact that Mr. Southworth had been
 3 involved in this automobile accident?
 4      A.     No, sir.
 5      Q.     Had you spoken, as of the time of the Sherry
 6 conversation, on the 28th, with anybody else about the
 7 fact that Mr. Southworth had been your customer on the
 8 26th?
 9      A.     No, sir.
10      Q.     From the date of that conversation with
11 Sherry 9/28/03 until today, have you talked about Mr.
12 Southworth with Sherry at all?
13      A.     Not Mr. Southworth specifically, no.
14      Q.     Have you talked about how much in the way of
15 alcoholic beverages he was served that night with Sherry
16 at all?
17      A.     No, not particularly.
18      Q.     How about at all?
19      A.     No.
20      Q.     What do you mean by not particular?
21      A.     That wasn't a particular part of the
22 conversation, alcohol he was served?
23      Q.     What did you talk to Sherry about as it
24 related to this accident since the original conversation
25 since September 28, 2003?
```

35

```
 1      A.     I guess when things started stirring up up
 2 there, and she was getting calls about a deposition and
 3 it was asked because Longhorn and RARE were trying to
 4 contact me, and they were asked if they could have a
 5 contact number, and I told Sherry that was fine.  That
 6 was it, and then when it came deposition time, Sherry was
 7 just nervous about giving her deposition.  Didn't like
 8 driving into Boston.
 9      Q.     Had she talked to you about the deposition
10 beforehand?
11      A.     Just that she was didn't like driving into
12 Boston alone.
13      Q.     Did she talk to you after the deposition?
14      A.     I have talked to Sherry -- not that day after
15 the deposition, but I have talked to Sherry since her
16 deposition, yes.
17      Q.     What did she tell you about the deposition?
18      A.     She hasn't told me much.  We talk about --
19      Q.     What did she tell you?
20      A.     She said she went in and gave her deposition.
21 She was glad that it was over, and we talked about other
22 things.
23      Q.     The people that -- so have you now told us --
24 sorry about that.  Strike "the people that."
25             Have you now told us about everything that
```

36

```
 1 Sherry and you have ever discussed about Jeffrey
 2 Southworth and the fact that he was a customer of the
 3 Longhorn that was involved in an automobile accident the
 4 morning of September 27, 2003?
 5      A.     Yes.
 6      Q.     You've told me everything?
 7      A.     Yes.
 8      Q.     Okay.  Earlier on today you mentioned that
 9 there was -- you mentioned that there were some folks or
10 people that Southworth was with during that four-month
11 period that he would come in with.  Do you recall that?
12      A.     I don't recall saying that, but yes, he
13 usually came in with other people.
14      Q.     Quantify for me the largest number of people
15 you ever saw him come in with during that period.
16      A.     The largest amount of people I've ever seen
17 him come in with was the amount of people he was in the
18 night I served him.
19      Q.     Prior to that, what was the largest number of
20 people you saw him come in with?
21      A.     From what I recall, three.
22      Q.     Did you ever see Mr. Southworth drinking
23 alcoholic beverages of any kind at the bar, as opposed to
24 as a restaurant pat -- restaurant table patron?
25      A.     No.
```

38

1    Q.    And I mean to ask that question for -- from
2 when you first saw him four months before September 26,
3 2003 until September 26, 2003, did you ever see him
4 drinking at the bar?
5    A.    No.
6    Q.    After -- So -- strike that.  Was Sherry the
7 first person you talked to about Southworth after you
8 realized he was the one driving the car, other than your
9 husband?
10    A.    Yes.  Other than my husband, yes.
11    Q.    Who was the next person you talked to about
12 Southworth after speaking to Sherry?
13    A.    From what I can remember, it was our manager,
14 and one of the state troopers that came in inquiring
15 about it.
16    Q.    Okay.  When was that conversation in relation
17 to the Sunday, September 28th conversation with Sherry?
18    A.    I am not positive how far apart they were.
19    Q.    Are we talking weeks?
20    A.    I would say longer.
21    Q.    So is it accurate to say that although or
22 once you realized Southworth had driven the car that had
23 caused this accident on the morning of September 27,
24 2003, it was only Sherry and your husband that you
25 voluntarily engaged in conversations with about it?

1    MR. GILLIS:  Objection
2    A.    I did not know he drove the vehicle and was
3 involved in an accident.  The only thing I knew was his
4 face and involved in fatal accident.
5    Q.    Did you not, once you saw his face, and once
6 you saw he was involved in a fatal accident, did you not
7 make any effort to seek out more information about what
8 his involvement was in that accident?
9    MR. GILLIS:  Objection.
10    A.    No, I did not.
11    Q.    Why was that?
12    A.    He was not a close friend of mine.  He is not
13 someone I knew, so it is not something I would seek out.
14 I would have no reason to.
15    Q.    Did you not want to know what his involvement
16 was?
17    MR. GILLIS:  Objection.
18    A.    No.
19    Q.    Were you afraid of what his involvement was
20 in the accident?
21    A.    Not at all.
22    Q.    Were you upset when you spoke to Sherry about
23 the fact that you had learned he had been involved in an
24 accident?
25    A.    Upset, no.

39

1    Q.    Can you characterize for me, if you had one,
2 what your emotion was when you learned that he had some
3 involvement in this accident?
4    A.    Slight concern.  You never want to see a
5 person injured or someone injure someone else, so there
6 was concern, but upset, no.
7    Q.    Did you know that two people had died in that
8 accident?
9    A.    No.
10    Q.    Did you know that anybody had been injured in
11 that accident?
12    A.    Someone was injured.  It said fatal accident,
13 so someone had died.  How many, who, no, I did not know.
14    Q.    Is it accurate to say that you didn't seek
15 out any of that kind of information until you spoke to
16 the state trooper and your manager?
17    MR. GILLIS:  Objection.
18    A.    I did not seek it out.  I was told.
19    Q.    So you never sought -- is it accurate to say
20 that you never sought out additional information about
21 the extent of injuries caused by that accident?
22    A.    Correct.
23    Q.    Chuck was your manager who came to you with
24 the state trooper; is that right?
25    A.    No.

40

1    Q.    Who was your manager that came to you at the
2 station?
3    A.    From what I remember, the manager that was
4 there the day the trooper came was Chris.
5    Q.    Chris Orr?
6    A.    Yes, sir.
7    Q.    What was Chris's job at the Longhorn, do you
8 remember?
9    A.    Chris held a couple managerial positions
10 while he was there.  He was a manager the whole time, but
11 he was over the kitchen at one time and over the bar at
12 one time.
13    Q.    Was he working the night of September 26,
14 2003?
15    A.    I can't remember.
16    Q.    At some point in time you signed a statement
17 for the police; is that right?
18    A.    Yes, sir.
19    Q.    I am going to show you what has been marked
20 as the Grand Injury Exhibit #20 dated November 5, 2003.
21 That's the date of the exhibit.  The document is dated
22 November 2, 2003, do you recognize it?
23    A.    Yes.
24    Q.    That is your signature?
25    A.    Yes, sir.

```
 1      Q.      And that's your handwriting?

 2      A.      Yes, sir.

 3              MR. FARRAH:  Could we have that marked as the

 4 next exhibit, please.

 5              (DEPOSITION EXHIBIT #7 WAS MARKED

 6              FOR IDENTIFICATION.)

 7      Q.      So at the time you were living on Fourth

 8 Street in Leominster; is that right?

 9      A.      Yes, sir.

10      Q.      This document is dated -- Exhibit #7 to your

11 deposition, Ms. Chabot, is dated November 2, 2003.  Do

12 you see that?

13      A.      Yes, sir.

14      Q.      Was that the date that Chris and you and the

15 state trooper had this meeting you described earlier?

16      A.      Yes.

17      Q.      Tell me everything you recall about that

18 meeting.

19      A.      The only --

20              MR. GILLIS:  Objection.

21      A.      -- thing I recall about that meeting is at

22 first the trooper and Chris were interviewing another

23 server that they had assumed to be the server that night.

24 And when I heard -- when I overheard what they were

25 speaking about, I realized that it was me because of me
```

```
 1 serving him Friday and then knowing that I saw him on the

 2 news the following night.  So I pulled Chris aside and I

 3 said, Chris, I believe it was who served him that

 4 night.  And from there Chris kind of investigated a

 5 little bit, looked into checks and so forth and found out

 6 it was myself who served him.  And so then we sat down,

 7 the trooper briefly told us that he was involved in an

 8 accident, two people had been killed and that he needed a

 9 statement pertaining to anything that happened that

10 night.

11      Q.      What makes you say that the trooper and Chris

12 were interviewing the server they assumed to be the

13 person who served Southworth that night?

14      A.      Because I was eavesdropping.  I was listening

15 in on what they were talking about.

16      Q.      What were they saying?

17      A.      They were asking was he in here?  If Jessica

18 remembered serving him, and at that time she was saying

19 that she did, but she didn't think it was then.  The

20 dates weren't matching up, and that's what made me assume

21 that it was the night that I had thought it was.

22      Q.      Jessica's last name is what?

23      A.      I don't remember Jessica's last name.

24      Q.      So Jessica had served Southworth before at

25 some point in time at the Longhorn; is that right?
```

```
                                                        43

 1      A.      She must have, if it was her.

 2      Q.      Do you know why Chris thought it was Jessica?

 3      A.      No, I do not.

 4      Q.      So during this conversation that you somehow

 5 overheard, you were eavesdropping, to use your word, if

 6 you don't mind.

 7      A.      No, that's fine.

 8      Q.      Okay, you realized it was you that had served

 9 them that night; is that right?

10      A.      Yes, sir.

11      Q.      And you told Chris this; right?

12      A.      Yes.

13      Q.      And then Chris did something with some checks

14 you said, what did he do?

15      A.      He didn't do anything with checks.  He went

16 back and he looked through checks and whatever

17 documentation they have as managers, to find these things

18 out.  When he pulled the check and the night that it

19 happened, Chris can look up and see what night it

20 happened and see who they believe waited on them.  And

21 when he came up with the check that he believed to be

22 their's, my name was on it.

23      Q.      And he brought that out?

24      A.      Yes, sir.

25      Q.      And then Chris, the trooper, and you had a
```

```
                                                        44

 1 conversation; is that right?

 2      A.      Yes.

 3      Q.      I am going to show you a document and ask you

 4 if you recognize it?

 5      A.      Yes, I do.

 6              MR. GILLIS:  For the record, it's multiple

 7 pages.  If you wouldn't mind, Mr. Farrah, just break it

 8 down.  It's actually two documents.  Ask her if she

 9 recognizes each one individually.

10      Q.      Take a look at the whole document I have

11 shown you first.

12      A.      Yes, I do.

13              MR. FARRAH:  Can we have this marked as the

14 next exhibit.

15              (DEPOSITION EXHIBIT #8 WAS MARKED

16              FOR IDENTIFICATION.)

17      Q.      Does Exhibit #8 look like what Chris brought

18 out for you and the state trooper to look at that night?

19              MR. GILLIS:  Which part of it?

20      A.      The only part of it that Chris brought out to

21 show us was the check portion.

22      Q.      Okay.  Tell me everything you can recall you

23 said, Chris said, and the trooper said in the order it

24 was said, once Chris brought the check portion out that

25 day?
```

46

1    A.    The only thing I recall being said is the
2 trooper asked me what I can remember of what I served
3 him, what the table ate, what he ate, and Chris and the
4 trooper -- the trooper asked me to write a statement and
5 I wrote a statement while the trooper and Chris had their
6 own separate conversation.
7    Q.    And other than what has been marked as
8 Exhibit #7 I think it is, yeah, Exhibit #7 to your
9 deposition, have you ever written another statement to
10 anyone about the events of that night?
11    A.    No, sir.
12    Q.    Have you written any report for RARE
13 Hospitality or that employer?
14    A.    No, sir.
15    Q.    Did you give a recorded statement to anyone
16 at any time about this event?
17    A.    No, sir.
18    Q.    Have you met with any investigators to talk
19 about this event?
20    A.    No, sir.
21    Q.    Now Mr. Southworth had been your customer on
22 occasions prior to September 26, 2003; is that right?
23    A.    No, maybe one occasion.
24    Q.    Is it yes, maybe one occasion?
25    A.    Yes, maybe one occasion.

---

1    Q.    Okay.  And he'd had Jack Daniels Manhattans
2 on that occasion; is that right?
3    A.    From what I remember, yes.
4    Q.    On the night in question September 26, 2003
5 he was served those Manhattans straight up; is that
6 right?
7    A.    No, sir.
8    Q.    How was he served those Manhattans on that
9 night?
10    A.    From what I remember, it was in a rocks
11 glass.
12    Q.    Have you spoken to Christen O'Donnell about
13 how those Manhattans were served to him that night?
14    A.    No.
15    Q.    Do you know what she has testified to as to
16 how they were served to him that night?
17    A.    Yes.
18    Q.    What has she testified to?
19    A.    From what I have been told she's testified to
20 is that they were in a tall Martinee glass.
21    Q.    Straight up?
22    A.    Yes.
23    Q.    But that's not your memory?
24    A.    No, sir.
25    Q.    Your memory is on the rocks?

---

47

1    A.    Yes, sir.
2    Q.    When Sherry served him, how were they served
3 to him?
4         MR. GILLIS:  Objection.
5    Q.    If you know?
6    A.    I don't recall.
7    Q.    I am going to show you a photograph I
8 represent to you I took with the assistance of Mr.
9 Gillis.
10        MR. GILLIS:  Objection
11    Q.    Ask you if you recognize anything in that
12 photograph?
13    A.    I recognize all of the glasses.
14    Q.    And do you recognize those as glasses used at
15 the Longhorn Steakhouse?
16    A.    Yes.
17    Q.    Are there straight up glasses in that
18 photograph?
19    A.    Yes
20    Q.    And those are the straight up glasses that
21 Manhattans are served in; is that right?
22    A.    Yes.
23        MR. FARRAH:  Could we have this marked as the
24 next exhibit?
25

---

48

1        (DEPOSITION EXHIBIT #9 WAS MARKED
2         FOR IDENTIFICATION.)
3        MR. GILLIS:  Let's put on the record too, the
4 assistance that you're referring to is that we allowed
5 you to take photographs of the restaurant, not that we
6 were actually photographing with you.
7        MR. FARRAH:  You held the door open for me.
8    Q.    I want to show you another photograph and ask
9 you if it fairly and accurately depicts a portion of the
10 Longhorn Restaurant as it appeared to you on the night of
11 September 26, 2003?
12    A.    I would say, no.
13    Q.    Do you recognize in the photograph that I
14 have shown you, any glassware that was employed at the
15 Longhorn Steakhouse as of September 26, 2003?  By
16 employed I mean used.
17    A.    Yes.
18    Q.    What glassware is that?
19    A.    The snifter behind the large Texas margarita
20 glasses.
21    Q.    Are the blue glasses in that photograph the
22 Texas margarita glasses you referred to?
23    A.    Yes.
24        MR. FARRAH:  Could we have that marked as
25 the next exhibit.

50

```
 1              (DEPOSITION EXHIBIT #10 WAS MARKED
 2         FOR IDENTIFICATION.)
 3       Q.    Do you recognize Exhibit #10 as depicting a
 4  portion of the service bar at the Leominster Longhorn as
 5  it appeared on September 26, 2003?
 6       A.    I don't remember the corkboard being there.
 7       Q.    Okay.  Other than that does it look like a
 8  portion of the service bar?
 9       A.    Yes.
10       Q.    I am going to show you a photograph and ask
11  you if it fairly and accurately depicts a portion of the
12  Leominster Longhorn as it appeared on September 26, 2003?
13       A.    Yes.
14       Q.    What portion does that show?
15       A.    It shows the back alley where we receive our
16  food, the dish pit, and a small portion of the left side
17  where we make our drinks and put bread in.
18            MR. FARRAH:   Could we have that marked as
19  the next exhibit.
20            (DEPOSITION EXHIBIT #11 WAS MARKED
21         FOR IDENTIFICATION.)
22            MR. GILLIS:   When are we going to get copies
23  of these?  I believe you said we were going to get the
24  video and all the photographs that you took.
25            MR. FARRAH:   Did you get an e-mail -- can we
```

---

```
 1  go off the record.
 2            (Off the record.)
 3            (Back on the record as follows:)
 4  BY MR. FARRAH:
 5       Q.    Could you show us where you get the food?
 6       A.    (Indicating while testifying.)  Right here we
 7  get the main entrees.  Up here is where we get appetizers
 8  and we pull our salads from there.
 9       Q.    All right.  Did you testify before the Grand
10  Jury?
11       A.    No, sir.
12       Q.    Did you speak to any other police after that
13  meeting with the police at the Longhorn on November 2,
14  2003?
15       A.    No, sir.
16       Q.    In Exhibit #7 you wrote among other things --
17  well, you wrote there were about eight men.  They all had
18  chowder and bread.  Then they had salads.  Most had
19  steaks or ribs.  They were drinking Manhattans or Bud
20  Light draft.  They had three Manhattans.  Do you see
21  that?
22       A.    Yes, sir.
23       Q.    And the he you are referring to there is Mr.
24  Southworth; is that right?
25       A.    Yes, sir.
```

---

51

```
 1       Q.    Did he have any beers that you recall at the
 2  table?
 3       A.    Not that I recall.
 4       Q.    Do you know who had the beers at the table?
 5       A.    I know that I served a beer to a gentleman
 6  who was in a black hat with black hair.
 7       Q.    And you served another beer to that table
 8  during that night; isn't that right?
 9       A.    Yes, sir.
10       Q.    Who did you serve that too?
11       A.    I don't recall specifically, sir.
12       Q.    So the two beers that appear on the first
13  page of Exhibit #8, two 25 ounce Bud Light beers were
14  served by you to the table the night of September 26,
15  2003; is that right?
16       A.    Yes, sir.
17       Q.    Nobody from the bar, no bartender that night
18  asked you to add to your check any beers that had been
19  ordered by your table patrons while they had been at the
20  bar that night; is that right?
21       A.    Correct.
22       Q.    And the state trooper was the only police
23  officer you ever spoke to about this incident?
24       A.    Yes, sir.
25       Q.    Did you ever speak to Chuck Bulgain about
```

---

52

```
 1  this incident?
 2       A.    Not that I recall, no.
 3       Q.    David -- not David Orr -- what's his first
 4  name?
 5       A.    Chris.
 6       Q.    Chris Orr and you spoke about it that day, is
 7  that right?
 8       A.    Yes, sir.
 9       Q.    Tell me everything you said to Chris and
10  Chris said to you that day about Southworth and what
11  happened that night?
12       A.    Chris asked me after speaking with the state
13  trooper, Chris basically knew exactly what had happened,
14  and so I spoke with Chris later that evening.  He told me
15  what the trooper had told him regarding that there was an
16  accident he was involved in.  That he had killed two
17  people and that they were backtracking his story for the
18  night.  And from what Chris was told from the trooper,
19  the only thing Chris knew is that they had stopped at, I
20  guess a strip club after Longhorn.  And Chris asked me do
21  I feel that they left here they were fine, that they were
22  not over served.  And I told him I believed they did.
23  They left the restaurant fine.
24       Q.    Have you told everything you recall about
25  talking to Chris about that night?
```

1    A.    Yes.

2    Q.    Have you spoken since that conversation with

3 anybody in management at Longhorn about what happened

4 that night?

5    A.    Not that I recall.

6    Q.    Has anybody from management sought you out to

7 speak to you about what happened that night?

8    A.    No.

9    Q.    Has Mr. Wilson who is here today sought you

10 out to speak about what happened that night?

11    A.    No, sir.

12    Q.    Has anyone on his behalf sought you out?

13    MR. GILLIS:  Objection.

14    A.    No, sir.

15    Q.    You have spoken to lawyers representing RARE;

16 is that right?

17    A.    Yes, sir.

18    Q.    Has Mr. -- I don't want to know what you

19 spoke to -- what you said to one another, but is Mr.

20 Gillis the first lawyer you spoke to representing RARE

21 about what happened that night?

22    A.    Yes.

23    Q.    Did you ever speak to any lawyers from the

24 Campbell Law Office in Boston?

25    A.    I know I spoke to someone representing RARE,

Starkings Court Reporting & Video Services

---

1 what their name was I don't recall.  And then I know that

2 I was handed over to Neil and Mr. Gillis.

3    Q.    Obviously you've spoken to Neil in the past?

4    A.    Yes, sir.  Yes.

5    Q.    Even before yesterday; is that right?

6    A.    Yes.

7    Q.    Now, are you aware of the fact that you

8 placed orders for 17 Jack Daniels Manhattans and two 25

9 ounce beers for this table in the time between 8:40 p.m.

10 and 9:24 p.m.?

11    MR. GILLIS:  Objection.

12    A.    I am aware that I served that many drinks.

13 The time frame exactly sounds about right.

14    Q.    And can we agree that between 8:40 p.m. and

15 9:24 p.m. is 44 minutes?

16    A.    Yes, sir.

17    Q.    And are you aware that you served 17 Jack

18 Daniels Manhattans and two 25 ounce beers in that

19 44-minute period?

20    A.    Yes.

21    Q.    Did any police officer ask you why you

22 permitted to be placed that magnitude of orders?

23    MR. GILLIS:  Objection.

24    A.    No, sir.

25    Q.    Did any employee with whom you spoke at RARE

Starkings Court Reporting & Video Services

---

55

1 about that evening ask you why you permitted to be placed

2 orders for that number of drinks?

3    MR. GILLIS:  Objection.  I instruct you not

4 to answer.

5    MR. FARRAH:  Other than attorneys?

6    MR. GILLIS:  I am still -- who specifically,

7 because if it's management and if it's in anticipation of

8 preparation for trial, I think it's privileged.

9    MR. FARRAH:  I don't think she's told us that

10 she's spoke to one person at RARE management other than

11 Chris Orr that night.

12    MR. GILLIS:  Why don't you ask the question

13 again, maybe I misunderstood.

14    Q.    Did any employee at RARE ask you why you

15 permitted to be placed orders for that number of drinks

16 during that time period?

17    MR. GILLIS:  Non-management employees?

18    Q.    Non-management.

19    A.    While I was ordering them?

20    Q.    No, at any time?

21    A.    No.

22    Q.    Other than Sherry, have you talked to anybody

23 -- Sherry and your husband -- Sherry and your --

24    Other than Sherry, have you spoken to any --

25 and Chris, have you spoken to any RARE employee about

---

56

1 this night?

2    A.    No.

3    Q.    No one?

4    A.    No.

5    VIDEOGRAPHER:    We need to go off the

6 record to change the tape.

7    (Off the record.)

8    (Back on the record as follows:)

9 BY MR. FARRAH:

10    Q.    So other than Chris, have you ever spoken to

11 any management at RARE about the night in question?

12    A.    No.

13    Q.    And have you told us everything you can

14 recall about the conversation you had with Chris about

15 whether or not it was okay to serve Mr. S -- it was

16 appropriate to serve Mr. Southworth alcoholic beverages

17 that night?

18    A.    It wasn't that if it was appropriate.  the

19 asked me on my judgment call, did I think the was fine

20 when they left and I told him yes.

21    Q.    What did you base that on?

22    A.    I based it on Mr. Southworth's appearance,

23 how the seemed to me, how the whole table was acting.

24    Q.    The table was acting well?

25    A.    Yes.

58

1   Q.   Not loud?

2   A.   No.

3   Q.   Had you ever seen him prior to that night,

4 Mr. Southworth, in a state that you considered to be

5 intoxicated?

6   A.   No.

7   Q.   Had you ever seen him prior to that night --

8 had you ever seen any of his people that were with him

9 prior to that night in a state that you considered to be

10 intoxicated?

11  A.   No.

12  Q.   Had you ever seen the fellow with the black

13 hair and the black hat that you served the beer to prior

14 to that night?

15  A.   Not that I recall, no.

16  Q.   Is Friday night one of the busiest nights of

17 the week at the restaurant?

18  A.   Yes.

19  Q.   Is the time between 8:00 and 10:00 p.m. the

20 busiest time of the night?

21  A.   I would say between 6:00 to 10:00.

22  Q.   Was it busy that night?

23  A.   I don't recall how busy it was that night.

24  Q.   Do you know how many tables you were waiting

25 on that night?

1   A.   From what I recall, I had four table section

2 that night.

3   Q.   You had a four table section?

4   A.   Yes, sir.

5   Q.   You've have looked at pages other than the

6 first page of Exhibit #8; isn't that right?

7   A.   Yes, sir.

8   Q.   And was the Southwoth -- was the table that

9 Mr. Southworth was at a double table?

10  A.   It was two tables pushed together with the

11 leaves pulled out.

12  Q.   Do you know what two numbered tables were

13 pushed together that night?

14  A.   From what I recall it was 52 and 62.

15  Q.   52 and 62?

16  A.   Yes, sir.

17  Q.   And I am going to show you a document called

18 proposed floor plan, Leominster, Mass Longhorn that I

19 will represent to you, I got it from the Leominster

20 licensing board commission.  And ask you if it looks like

21 a floor plan of the restaurant as it appeared on the

22 night of September 26, 2003?

23  A.   Yes, it does.

24      MR. FARRAH:   Could we have that marked as

25 the next exhibit, pleas.

59

1       (DEPOSITION EXHIBIT #12 WAS MARKED

2       FOR IDENTIFICATION.)

3   Q.   Would you mark on this exhibit in pen, tables

4 52 and you said 62?

5   A.   Yes.

6   Q.   Is that right?

7   A.   Yes. (Complies.)

8   Q.   May I see it.  Could you mark for me the

9 numbers of the tables that are -- as you're looking at

10 it, to the right of 62, the next table and then the table

11 after that, just what those are?

12  A.   (Complies.)

13  Q.   And those were 72 and 82; is that right?

14  A.   Yes, sir.

15  Q.   What other two tables did you have that

16 night?

17  A.   I don't recall but usually the section that

18 it would be, it would most likely be these two booths, 41

19 and 51.

20  Q.   Your -- the second page of Exhibit #7-- #8,

21 pardon me, Exhibit #8 indicates that you had table 63; do

22 you see that?

23  A.   Yes.

24  Q.   And where is table 63?

25  A.   63 would be right here.

60

1   Q.   Would you mark 63 there for me please.

2   A.   Yes. (Complies.)

3   Q.   And the second page of Exhibit #7 [sic] also

4 indicates that you had table 53.  Do you see that?

5   A.   Yes.

6   Q.   Could you mark table 53 for me?

7   A.   (Complies.)

8   Q.   Is that your best memory, 52, 62, 53, 63 of

9 the tables you had that night?

10  A.   Yes, sir.

11  Q.   Is any of the activity with regard to the

12 party that Mr. Southworth was with that night, the others

13 in his party, is any of that activity reflected on a

14 check specific to table 62, if you know?

15  A.   The check prior on here to 62?

16  Q.   No, no.  You served Mr. Southworth and his

17 party that night; is that right?

18  A.   Yes.

19  Q.   Okay.  And the first page of Exhibit #8 is a

20 check; is that right?

21  A.   Yes.

22  Q.   That is a check, and the table number on that

23 check is 52/1; do you see that?

24  A.   Yes.

25  Q.   What I want to know is, is it your belief

1 that the first page of Exhibit #8, the check table 52/1
2 was the only check you delivered to Mr. Southworth and
3 his party the night of September 26, 2003?
4    A.    Yes, this is the only check I gave them.
5    Q.    Is there any particular reason why you
6 indicated on the top of it, table 52/1?
7    A.    I would not indicate the /1.  The only thing
8 that I would assume that came from is when you have two
9 tables put together you can highlight --
10      MR. GILLIS:  Again, I'm going to object.  If
11 you have an answer.  I don't want you to assume anything.
12      MR. FARRAH:  Right.  I don't either.
13    A.    Then I don't know why it would say /1.
14    Q.    Now, at that time, as of September 26, 2003,
15 did Longhorn have any policy in place preventing a
16 customer at a table from getting up and buying a drink at
17 the bar?
18    A.    I don't know of a specific policy they had in
19 place, no.
20    Q.    Who was the manager on duty that night?
21    A.    I don't recall.
22    Q.    Is there -- do you have any memory of whether
23 or not -- strike that.
24      Did you see Mr. Southworth before the came to
25 your table that night?

Starkings Court Reporting & Video Services

1    A.    Anywhere in the restaurant?
2    Q.    Yes, ma'am.
3    A.    No.
4    Q.    Do you know whether he was waiting at the bar
5 before the came to the table?
6    A.    Yes.
7    Q.    How do you know that?
8    A.    Because I knew they were getting my two
9 tables ready for a party, and they said half of them are
10 at the bar waiting for the other half.
11    Q.    Who told you that?
12    A.    The hostess.
13    Q.    Did you know it was Mr. Southworth that was
14 at the bar waiting?
15    A.    Not specifically, no.  At that time no.
16    Q.    Do you know what he had to drink at the bar
17 that night before the became your customer?
18    A.    No.
19    Q.    Has anyone ever told -- other than lawyers or
20 Chris Orr, has anyone ever told you what he had to drink
21 at the bar before the became your customer?
22      MR. GILLIS:  Objection
23    A.    No.
24    Q.    Have you tried to find out what he had to
25 drink at the bar before the became your customer?

Starkings Court Reporting & Video Services

63

1    A.    No.
2    Q.    That night did you try to find out what he
3 had at the bar before he became your customer?
4    A.    No.
5    Q.    Did anyone at the bar that night tell you
6 prior to or after he became your customer at the table
7 what Mr. Southworth had to drink at the bar that night?
8    A.    No.
9    Q.    Does RARE have a policy -- did RARE have a
10 policy in place at that time obligating bartenders to
11 tell waitresses how much their customers had to drink at
12 the bar prior to becoming customers at tables?
13    A.    It was not a set in policy.
14    Q.    Were there any systems in place at the
15 Longhorn as of September 26, 2003 for monitoring how many
16 drinks a customer had been served?
17    A.    No.
18    Q.    Was there any practice in place at the
19 Longhorn as of September 26, 2003 for monitoring how many
20 drinks a customer had been served?
21    A.    The bartenders would monitor on their own.
22 If they had any concerns they would certainly let us
23 know.
24    Q.    You are speculating about that; is that
25 right?

64

1    A.    No.
2    Q.    Was there any official practice, Longhorn
3 sanctioned practice in place as of September 26, 2003
4 that required bartenders to tell waitresses what
5 customers had had to drink at the bar prior to becoming
6 waitresses -- waitress customers?
7      MR. GILLIS:  Objection.  Under what
8 circumstances?
9      MR. FARRAH:  Any circumstances.
10    A.    I would not know.  I wasn't a bartender.
11    Q.    Did any bartender ever tell you the entire
12 time you worked at the Longhorn what a customer that had
13 been at the bar that because a table customer of yours
14 has had to drink?
15    A.    Not that I recall, specifically.
16    Q.    Was there any requirement at the Longhorn in
17 place as of September 26, 2003 that you knew of,
18 requiring bartenders to share with waitresses the amount
19 of alcoholic beverages that a customer had had to drink
20 at the bar prior to becoming a customer at a table of
21 that waitress?
22      MR. GILLIS:  Objection.  Under all
23 circumstances or every time they went to a table or --
24      MR. FARRAH:  Any circumstance.
25    Q.    Any procedure you knew of?

1    A.    Written procedure?

2    Q.    Any kind of procedure?

3          MR. GILLIS:  Are you talking procedures now

4  or practices, what was common practice or just procedure.

5          MR. FARRAH:  Procedure is what I've asked

6  her.

7          MR. GILLIS:  No, you've asked written policy.

8  You've asked procedures, you've asked practices.

9          MR. FARRAH:  This question is procedure.

10    A.    Procedure, if a bartender thought one of her

11  customers should not have another drink and they were

12  sitting at a table to eat, the waitress would tell us.

13    Q.    The waitress would tell you?

14    A.    The bartender, excuse me.

15    Q.    No bartender ever told you that; isn't that

16  right?

17    A.    Me specifically --

18    Q.    Yes.

19    A.    -- no.

20    Q.    And the basis for saying this was a procedure

21  at the Longhorn is what?

22    A.    I didn't say it was a procedure.  The

23  bartender would do it at their on discretion.

24    Q.    What is the basis for you to offer that

25  testimony?

Starkings Court Reporting & Video Services

---

1    A.    Because I have heard bartenders say it to

2  other servers.

3    Q.    What?

4    A.    By the way, that customer you just had -- had

5  three beers at the bar, an FYI to inform the waitress so

6  that she could keep a closer eye on them, if need be.

7    Q.    Now, did you ask to see identification for

8  anyone at the Southworth table the night in question, age

9  identification?

10    A.    Specifically that was my policy.  I would say

11  I did.

12    Q.    How many people were in that party?

13    A.    From what I recall, seven.

14    Q.    Now, the statement you gave to the -- the

15  statement you gave to the police officer on September

16  --excuse me, November 2, 2003 was that there were eight

17  people at the table; is that right?

18    A.    Yes, sir.

19    Q.    That was your best memory then; is that

20  right?

21    A.    Then, yes.

22    Q.    And the check that you opened the night in

23  question said there were six people; isn't that right?

24    A.    Yes.

25    Q.    And that was your best memory then; isn't

Starkings Court Reporting & Video Services

---

67

1  that right?

2          MR. GILLIS:  Objection.

3    A.    That was not my best memory.  It was at the

4  time, you know, there were nights where you didn't throw

5  the correct amount of guests in the screen.  And if maybe

6  only six were there at the time, but more joined them

7  later, it wasn't uncommon not to change the guest amount.

8    Q.    But you are purely speculating about six were

9  there at the time and then more joined them later, when

10  you make that answer; isn't that true?

11          MR. GILLIS:  Objection.

12    Q.    Isn't that true?

13    A.    Am I speculating that there were six at the

14  time I put it in?

15    Q.    Yes.  No.  Are you speculating that the

16  explanation for why you have written there are six

17  people, why you entered that there were six people on the

18  check is that because six were there at the time when

19  they first sat down and then others came?

20    A.    Yes, that could have been a reason.

21    Q.    But that's pure speculation on your part,

22  isn't it?

23          MR. GILLIS:  Objection.

24    A.    Yes.

25    Q.    You don't have any memory of that happening,

---

68

1  do you?

2    A.    No.

3    Q.    It was your custom to accurately reflect the

4  time you opened the check, the number of people who were

5  seated at the table; isn't that right?

6          MR. GILLIS:  Objection.

7    A.    That's what we were supposed to do.

8    Q.    Okay, and you tried to do what you were

9  supposed to do while you worked at the Longhorn; isn't

10  that right?

11          MR. GILLIS:  Objection.

12    A.    Yes.

13    Q.    And you've looked now at the check?

14    A.    Yes.

15    Q.    Isn't that right?  And you realized that

16  there were six meals that were served to that table;

17  isn't that right?

18          MR. GILLIS:  Objection.  Can I put a running

19  objection so I don't have to say it every time, but you

20  know, it's your direct witness, and so that I don't have

21  to object every time on the record and interrupt the flow

22  of your questions, I just want on the record where it's a

23  direct witness and my belief you don't have the right to

24  ask leading questions.  So if you're going to continue to

25  ask the leading questions, I am going to have a running

1  objection to that affect.
2          MR. FARRAH:  You don't think I have the right
3  to ask a former employee of the defendant leading
4  questions, who's represented by you today?
5          MR. GILLIS:  I think you do if you were
6  cross-examining her, but you are one who noticed the
7  deposition and you're taking a direct examination, not a
8  cross, and I'd rather just have it on as an ongoing
9  objection than to have it on the record every time you
10  have a question that it's in them middle of the answer.
11          MR. FARRAH:  I'm happy to let -- allow you to
12  have the ongoing objection, but I believe most
13  respectfully you're wrong.
14      Q.    How many meals are shown on the check?
15      A.    Meals?
16      Q.    Meals, ma'am?
17      A.    There are -- this is cutoff.  Usually there
18  will be a number next to how many of each was ordered.
19  There is -- okay, there's three baby back ribs there, I
20  see that now.  So there was three, four, five, six meals,
21  and from what I recall, the chicken tenders were ordered
22  as a -- chicken fingers were ordered as a meal.
23      Q.    Who ordered the chicken fingers?
24      A.    I don't recall.
25      Q.    Do you have any memory that anyone of Mr.

---

70

1  Southworth's party when first seated brought any drinks
2  from the bar to the table with them?
3      A.    Yes.  The ones who were waiting at the bar
4  for the others to join them brought drinks with them.
5      Q.    How do you know that?
6      A.    I recall from that night they had come down.
7  I didn't serve a full round with the ones who had sat
8  down.
9      Q.    What drinks did they bring with them from the
10  bar?
11      A.    I don't recall, but from what they drank from
12  then on the night, I would say they were Manhattans.
13      Q.    And the basis for that is just what they
14  drank from there on out?
15      A.    They continued -- you -- from my experience
16  as a waitress, when someone comes with a drink, that is
17  what they continue to drink.
18      Q.    The first order -- go to page two of Exhibit
19  #8 if you would please.  And that indicates that the
20  first order was placed at 8:40 p.m.; is that right?
21      A.    Yes, sir.
22      Q.    What is a Tonion for $5.99?
23      A.    It's a Tonion, it's an appetizer.  It's like
24  a Bloomin' onion.  It's onion peels battered, dipped and
25  fried.

---

71

1      Q.    You have no memory who ordered that; is that
2  right?
3      A.    Not specifically ordered it, no.
4      Q.    Someone at that table?
5      A.    Yes, sir.
6      Q.    Is it also correct that there were two orders
7  of chowder cup?
8      A.    Yes.
9      Q.    And an order of fingers?
10      A.    Yes, sir.
11      Q.    What's that?
12      A.    Chicken fingers.
13      Q.    Chicken fingers, okay.  So how many
14  appetizers were ordered at 8:40 p.m.?
15      A.    Specifically appetizers there are the
16  Tonions, the chicken fingers and the two cups of chowder.
17      Q.    Is that four appetizers?
18      A.    Yes.
19      Q.    Did any of the people who came from the bar
20  bring appetizers with them along with their drinks that
21  you remember?
22      A.    No, not that I remember.
23      Q.    So is it accurate to say that none of the
24  people who came from the bar ordered appetizers from you?
25      A.    They were all sitting at the table, and they

---

72

1  ordered these appetizers as a whole party.
2      Q.    Did they share the chowder cups?
3      A.    The chowder cups, no, two individuals
4  probably had those.
5      Q.    Are you guessing?
6      A.    I am not guessing, no.  I would say two
7  individuals, one each, had a chowder cup.
8      Q.    So the appetizers then were shared by -- the
9  remaining appetizers were shared by the rest of the
10  party; is that right?
11      A.    Yes.
12      Q.    Were the remaining appetizers shared by the
13  rest of the party, if you know?
14          MR. GILLIS:  Objection.
15      A.    Do I recall specifically seeing --
16      Q.    Yes.
17      A.    -- every single one of them eat it, no.
18      Q.    At that time four Jack Daniels -- excuse me,
19  three Jack Daniels Manhattans and a Bud Light, 25 ounce
20  Bud Light were ordered; is that right?
21      A.    Yes, sir.
22      Q.    How much pure alcohol is there in a 25 ounce
23  Bud Light?
24      A.    I don't know.
25      Q.    How much pure alcohol is there in the Jack

74

1  Daniels Manhattan?

2      A.    I don't know.

3      Q.    How much -- how many ounces of Jack Daniels

4  are in the Jack Daniels Manhattan?

5      A.    From what I recall working there, I would say

6  a little over an ounce.

7      Q.    What is the basis for that statement?

8      A.    Usually from when they make the drinks it's

9  always a jigger, and the way they set it up on the bar

10 and pour them in, the jiggers were all consistent.

11     Q.    Do you recall watching Christen make the

12 drinks that night?

13     A.    No.

14     Q.    Do you recall watching Christen use a jigger

15 that night?

16     A.    No.

17     Q.    Did she use a jigger that night?

18     A.    I don't know.

19     Q.    Prior to that night had you ever ordered Jack

20 Daniels Manhattans before?

21     A.    Yes.

22     Q.    Is it your memory that -- And how were they

23 made?  Were they made with jiggers?

24     A.    The ones I've seen made, yes.

25     Q.    So do you have a memory of whether or not

1  drinks were free poured at the Longhorn prior to

2  September 26, 2003, in the service bar?

3      A.    All of the time?

4      Q.    Well, do you have a memory of whether drinks

5  were ever free poured on the service bar?

6      A.    Occasionally, yes.

7      Q.    Do you have a memory of whether or not

8  jiggers were used in the service bar at the Longhorn

9  prior to September 26, 2003?

10     A.    Yes, they were.

11     Q.    Which was used more, if you can tell me, free

12 pour or jiggers?

13     A.    I couldn't give an accurate --

14     Q.    Do you have any memory at all?

15           MR. GILLIS:  Objection.

16     A.    No.

17     Q.    Was anybody under age at the table?  By under

18 age, I mean under 21?

19     A.    Not that I recall.

20     Q.    Did you serve soft drinks to anyone at the

21 table?

22     A.    From what I recall, I did put one Sprite down

23 on the table.

24     Q.    When did you do that?

25     A.    From what I recall, it would have been with

75

1  the appetizers.

2      Q.    Is it shown on Exhibit #8?

3      A.    The bill?

4      Q.    It is shown on any portion of Exhibit #8,

5  that Sprite?

6      A.    No.

7      Q.    It's not?

8      A.    No.

9      Q.    And you've looked for it; is that right?

10     A.    Have I looked --

11     Q.    The Sprite?

12           MR. GILLIS:  Why don't you look through the

13 whole document first.  Not just the first page, but the

14 whole thing.

15     A.    There is Sprites on here but not for his

16 table.

17     Q.    After ordering -- by the way, the computer

18 allows you, if you erroneously indicated the number of

19 people sitting at the table, the computer allowed you to

20 overwrite -- did the computer allow you to overwrite the

21 number of people at the table?

22     A.    From what I recall, yes.

23     Q.    Now, what did you do according to Exhibit #8,

24 between 8:40 when you placed that order that we just

25 talked about, and 8:51 when you placed another order for

76

1  that table?

2      A.    What did I do between the time?

3      Q.    What does Exhibit #8 indicate you did?

4      A.    It indicates I rang in those drinks.  I

5  cashed out table 63.  Printed a check for table 63.

6  Entered some more drinks for a new table that was sitting

7  at 63.  Ordered a meal for 63.  Logged in and out of the

8  computer.  Applied a payment to table 53 and printed a

9  check for table 53.  And closed table 53.  And logged

10 out, logged back in, ordered drinks for table 52.

11     Q.    All of that between 8:40 and 8:51; is that

12 right?

13           MR. GILLIS:  Objection.

14     A.    Yes.

15     Q.    Do you know which computer terminal you

16 performed those various entries upon?

17     A.    No.

18     Q.    There were terminals at different -- were

19 there terminals at different places in the restaurant

20 that night available to you to do this?

21     A.    Yes.

22     Q.    From time to time in the past did you have to

23 wait, once you had ordered drinks through the terminal,

24 for those drinks to be prepared by the service bartender?

25     A.    Yes.

78

```
 1    Q.    What is the most you can recall -- most
 2  amount of time you can recall waiting for drinks to be
 3  prepared?
 4    A.    I recall waiting up to about 15 minutes for a
 5  drink to be made.
 6    Q.    Do you have a memory this Friday night,
 7  whether or not once you placed the order at 8:40 p.m. for
 8  the three Jack Daniels Manhattans and the 25 ounce beer,
 9  you waited for those drinks to be made?
10    A.    No.
11    Q.    Do you have any memory one way or the other
12  whether you waited for those drinks to be made?
13    A.    No.
14    Q.    Is it your belief that you waited for the
15  drinks to be made?
16    A.    I don't remember.
17    Q.    Given that it was a Friday night?
18    A.    Given that it was a Friday night, yes,
19  probably waited.
20    Q.    Do you know at what time you served the
21  drinks that you ordered at 8:40, the three Jack Daniels
22  Manhattans and the 25 ounce beer, to whomever had ordered
23  those drinks?
24    A.    Do I remember what time I served them to
25  them?
```

Starkings Court Reporting & Video Services

```
 1    Q.    Yes, ma'am.
 2    A.    Specifically no.
 3    Q.    Do you know whether or not you served those
 4  drinks to them at the same trip to the table at which the
 5  8:51 p.m. drinks, seven Jack Daniels Manhattans were
 6  ordered?
 7    A.    Did I make them both in the same trip?
 8    Q.    Do you know whether or not you served the
 9  four drinks ordered at 8:40 p.m. at the same trip to the
10  table at which you -- an order for seven Jack Daniels
11  Manhattans that you placed at 8:51 p.m. was given to you?
12        MR. GILLIS:  Objection.
13    A.    No.
14    Q.    Do you know one way or the other whether you
15  did that?
16        MR. GILLIS:  Did what?
17        MR. FARRAH:  Whether she served the drinks
18  that were ordered at 8:40 at the same time she took the
19  order for -- the same trip to the table, that she took
20  the order for the drinks ordered at 8:51?
21        MR. GILLIS:  Can you just clarify, are you
22  asking did she put those four drinks down and then take
23  another order or did --
24        MR. FARRAH:  Yeah.
25        MR. GILLIS:  -- she put those drinks down
```

Starkings Court Reporting & Video Services

79

```
 1  previously and come back?
 2        MR. FARRAH:  No, I'm asking did she put the
 3  four drinks down and take another order.
 4        MR. GILLIS:  Do you understand the question?
 5    A.    I understand the question.  From what I
 6  recall, no.
 7    Q.    Do you know what happened -- is it your -- do
 8  you have a memory of whether or not -- do you have a
 9  memory of whether or not the four drinks that were logged
10  into the computer by you at 8:40 had been finished by the
11  people to whom you served those four drinks by the time
12  you took the order from the table that you logged into
13  the computer at 8:51?
14        MR. GILLIS:  Second round, first round.  I
15  don't understand --
16        MR. FARRAH:  Let her answer the question,
17  please.
18        MR. GILLIS:  Well, I want to see if I can
19  understand so I can object to it.  You're asking was the
20  first round completely drank before she ordered it, or
21  was it drink when she brought them.  What's your
22  question?
23        MR. FARRAH:  Could we go off the record for a
24  second.
25        (Off the record.)
```

80

```
 1        (Back on the record as follows:
 2  BY MR. FARRAH:
 3        COURT REPORTER:  The question was:  Do you
 4  have a memory of whether or not the four drinks that were
 5  logged into the computer by you at 8:40 had been finished
 6  by the people to whom you served those four drinks by the
 7  time you took the order from the table that you logged
 8  into the computer at 8:51?
 9        MR. GILLIS:  Objection.
10    A.    I do not recall if they were done with them
11  by the time I took that order, no.
12    Q.    Do you have a memory whether they were done
13  with them by the time you took that order?
14    A.    I don't remember either way.
15    Q.    Do you have a memory of whether they had
16  received the drinks that they ordered, that you logged in
17  at 8:40 by the time you took the order for the 8:51
18  drinks?
19    A.    They would have received them by 8:51.
20    Q.    What is the basis for that statement?
21    A.    There is -- in my experience, and what I have
22  done through Longhorn, there is no way between putting
23  drinks in, waiting on all of these other tables, that I
24  would have not at least gotten that table their drink
25  even before taking a second drink order.  That would
```

82

```
1   happen.  I wouldn't have not given them their first
2   drinks, but already taken an order for a second.  That
3   wouldn't have happened.
4        Q.   Do you have a memory of whether or not as
5   part of the trip to the table at which you delivered the
6   drinks that you logged in at 8:40, you took the order for
7   the seven Jack Daniels Manhattans that you logged in at
8   8:51?
9            MR. GILLIS:  Objection.
10       A.   I don't understand that?
11       Q.   My question is, do you have a memory of
12  whether or not when you were bringing the drinks that had
13  been logged in at 8:40, you put those drinks down on the
14  table, and then you took an order for seven Jack Daniels
15  Manhattans that you logged in at 8:51?
16       A.   I don't recall that specifically, no.
17       Q.   But you don't recall that it didn't happen,
18  either, do you?
19           MR. GILLIS:  Objection.
20       A.   Correct.
21       Q.   Now, do you recall any conversations with
22  Christen O'Donnell that night about that she had -- about
23  whether or not she had run out of glasses to make the
24  Jack Daniels Manhattans that you were ordering?
25       A.   No.
```

Starkings Court Reporting & Video Services

83

```
1   computer, the 9:00 food order, whether or not you had
2   delivered the seven Jack Daniels Manhattans that had been
3   ordered at 8:51 to the customers?
4        A.   I do not recall.
5        Q.   Do you recall during that part of the evening
6   from 8:40 to 9:24, any conversations with Christen about
7   the table that Mr. Southworth was at?
8        A.   Yes.
9        Q.   Do you recall when in the sort of the order
10  of ordering that we have been talking about, you had the
11  first conversation with Christen?
12       A.   I only had one conversation with Christen and
13  that was on the last round that I had ordered for the
14  table.
15       Q.   That round was placed at what time?
16       A.   Says 9:21.
17       Q.   Can you turn to the next page?
18       A.   9:24.
19       Q.   So you placed an order at 9:24 -- you entered
20  into the computer at 9:24; is that right?
21       A.   Yes.
22       Q.   Then you had a conversation with Christen
23  after you entered into the computer; is that right?
24       A.   When I went to pick them up from the bar,
25  that is when I had the conversation with Christen.
```

82

```
1        Q.   Do you recall that night that any of the Jack
2   Daniels Manhattans that were delivered to the table were
3   delivered in the blue glasses --
4        A.   None of them were --
5        Q.   -- shown on Exhibit #10?
6        A.   I'm sorry.  None of them were, no.
7        Q.   Now, can you tell us according to Exhibit #8
8   the -- I want to say the -- we're now on to the third
9   page of Exhibit #8, what activity you undertook according
10  to Exhibit #8 from 8:51 when the seven Jack Daniels
11  Manhattans were ordered, until food was ordered by table
12  52?
13       A.   I ordered appetizers and a drink for table
14  53.  Logged out, logged in to table 52, and then ordered
15  their meals.
16       Q.   Now, let me ask you this.  Do you know when
17  the drinks ordered at 8:51 p.m. the seven Jack Daniels
18  Manhattans were delivered by you to the table?
19       A.   No.
20       Q.   Was there a practice that you employed as of
21  that time, September 26, 2003, of delivering drinks and
22  then taking a meal order at the same trip to the table?
23       A.   Not a specific practice, no.
24       Q.   Do you know by the time you had delivered --
25  excuse me.  By the time you had entered into the
```

Starkings Court Reporting & Video Services

84

```
1        Q.   Was the time that you went to pick them up
2   from the bar after 9:24?
3        A.   Yes.
4        Q.   Sometime after 9:24 depending upon how busy
5   the restaurant was?
6        A.   Yes.
7        Q.   Can you tell us how long after 9:24 it was
8   that you had that conversation with Christen?
9        A.   No.
10       Q.   What do you remember she said and what did
11  you say during that conversation?
12       A.   She specifically asked if it was for my
13  table.  She asked me how many each of them had had and if
14  I thought they were okay.  I said yes, and that was it.
15       Q.   She asked you three questions, didn't she?
16       A.   Not from what I recall, no.
17       Q.   You just told us that she asked you were they
18  specifically for your table?
19       A.   Yes.
20       Q.   And you answered yes to that; is that right?
21       A.   Yes.
22       Q.   Then she asked you, according to what you
23  just told us, how much each customer had had, do you
24  recall that?
25       A.   Yes.
```

86

```
 1      Q.    What did you say in answer to that question?
 2      A.    I told her at the time each of them had had
 3 two at that time; had had -- there was one order here.  I
 4 had served -- this was going on their second round.
 5      Q.    What did you tell Christen, as best as you
 6 can recall?
 7      A.    That this was going to be their second round.
 8      Q.    Their second round of Jack Daniels
 9 Manhattans?
10      A.    From myself, yes.
11      Q.    What was the basis for saying that?
12      A.    That is how many I had served them.
13      Q.    Okay. This was the 9:24 order; is that right?
14      A.    Yes.  That was going to be their second
15 drink.
16      Q.    Then the third question she asked you was,
17 are they okay?
18      A.    Yes.
19      Q.    Is that what she said; are they okay?
20      A.    She said, how do you think they are, do you
21 think they are okay?  And I said yes.
22      Q.    What was the basis for that statement?
23      A.    My observation of their behavior.
24      Q.    Was that this was the second round of drinks
25 that you had ordered for them also part of the basis for
```

the statement that they were okay?

```
 1
 2      A.    I don't understand that.
 3      Q.    Tell me all of the factors you considered in
 4 answering yes, to the question Christen asked you, are
 5 they okay?
 6      A.    It was my belief that if I served them one
 7 more drink they would still be fine.
 8      Q.    Tell me all of the factors you considered,
 9 though, in telling her that that was your belief?
10            MR. GILLIS:  Objection.
11      A.    I consider at the time --
12      Q.    Wait a minute.  Strike that.  I withdraw the
13 question.  Tell me all of the factors you considered in
14 telling her they were okay?
15            MR. GILLIS:  Objection.
16      A.    I considered their behavior at the table, the
17 food that they had consumed, my observation of how each
18 of them acted, how they acted as a group, how they would
19 react with one more drink in their system.  My experience
20 being in the business and serving other people of their
21 height, stature, weight, personalities, drinks and how
22 they've reacted.
23      Q.    Is it accurate -- have you ever seen in the
24 time -- the entire time you worked at the Longhorn, have
25 you ever seen a Longhorn customer that you considered to
```

87

```
 1 be intoxicated?
 2      A.    No.
 3      Q.    What did Christen say when you answered
 4 whatever you answered to her?
 5      A.    She -- from what I recall, she didn't say
 6 anything.
 7      Q.    Who ordered the first beer from you, that is
 8 the 8:40 beer?
 9      A.    I would say the gentleman with the black hat
10 and the curly hair.
11      Q.    Describe his hat for me?
12      A.    From what I recall, it was just an all black
13 baseball cap.
14      Q.    How were these people dressed?
15      A.    From what I recall, the three who sat down
16 were dressed how they normally do when they come in after
17 dirt biking, just kind of dirty boots and Mr. Southworth
18 usually just wore like sweat pants and a baggy T-shirt
19 and boots.  And like a --
20      Q.    You can remember that --
21      A.    -- a flannel kind of jacket the used to wear.
22      Q.    Is that how the was dressed that night?
23      A.    The had his boots and sweat pants on from
24 what I recall.
25      Q.    You said the three who sat down; what do you
```

88

```
 1 mean by that?
 2      A.    The three who were waiting at the bar for the
 3 other ones before they joined.
 4      Q.    They sat down first?
 5      A.    They came over and the other four followed,
 6 yes.  The three that sat down already had drinks, yes.
 7      Q.    And Mr. Southworth was one of them those; is
 8 that right?
 9      A.    Yes.
10      Q.    What did he bring over for a drink?
11      A.    I don't specifically recall.
12      Q.    How were the others dressed?
13      A.    T-shirts, baseball caps.
14      Q.    Now, during the night was this table loud, at
15 all?
16      A.    Not that I recall, no.
17      Q.    Did the manager speak to them that night?
18      A.    I am sure he did.
19      Q.    My question to you though is, do you know
20 whether the manager spoke to them that night?
21      A.    No.
22      Q.    You are just speculating that the manager
23 spoke to them?
24            MR. GILLIS:  Objection.
25      A.    Yes, the manager speaks to every table.
```

90

1    Q.    That is the manager's policy?

2    A.    Yes, they are to walk through the dining room
3 and touch on every table.

4    Q.    Do you have a recollection that the manager
5 came -- that any manager went to that table that night,
6 the Southworth table, and asked the table to quiet down?

7    A.    No.

8    Q.    Has anyone ever told you that the manager
9 came to the table and ask the table to quiet down?

10    A.    No.

11    Q.    Do you know whether or not Leigh [sic] asked
12 the manager on duty that night to go take a look at the
13 table to make sure they were okay?

14        MR. GILLIS:  Objection.

15    A.    No.

16    Q.    Did you here Leigh ask the manager to do
17 that?

18        MR. GILLIS:  Objection.

19    A.    Lee, the manager, to do that?

20    Q.    I'm sorry, you're Leigh.  Pardon me.  Do you
21 know --

22    A.    There is a manager Lee, so

23    Q.    Is there?

24    A.    Yes.

25    Q.    Lee who?

1    A.    Lee Bull.  She was a manager there while I
2 was there.

3    Q.    In September of --

4    A.    I'm not sure when she worked there.  There
5 was a manager Lee Bull.

6    Q.    Pardon me.  Do you know whether Christen
7 asked the manager, whatever manager was on duty that
8 night to go over and make sure the table was okay?

9        MR. GILLIS:  Objection.

10    A.    No, I don't.

11    Q.    Do you know whether Christen ask the manager
12 to do anything -- manager on duty to do anything with
13 regard to that table that night?

14        MR. GILLIS:  Objection.

15    A.    No, I don't.

16    Q.    Did Christen tell you what her concerns were
17 when she asked you those questions?

18    A.    No.

19    Q.    And at the time she asked you those
20 questions, how many rounds had you served to the table?

21    A.    Before the last round I had only served the
22 table one round.

23    Q.    That was the seven drinks that you ordered at
24 8:51; is that right?

25    A.    I had served one and a half rounds.  It was a

91

1 full round and then the four who didn't have drinks got a
2 round when they sat down.

3    Q.    And you have a memory of that?

4    A.    Yes.

5    Q.    Then after you took the food orders at 9:00
6 can you tell us from Exhibit #8 what you did between then
7 and 9:21 when you placed an order for four Jack Daniels
8 Manhattans?

9        MR. GILLIS:  Objection.

10    A.    I logged in and out of the computer, ordered
11 for table 53, ordered a Bud Light for table 52, logged
12 out, logged in, logged out, logged in.  Printed table
13 52's check, logged out, logged in and then ordered the
14 Jack Daniels.

15    Q.    Now, were you keeping a record of how many
16 drinks each person at that table that night had had to
17 drink, other than what's -- well, were you keeping any
18 record of how many drinks they had to drink?

19        MR. GILLIS:  Objection.

20        MR. FARRAH:  Any kind of record.

21    A.    Mental record.

22    Q.    Mental record?

23    A.    Yes.

24    Q.    Where were you keeping that?

25    A.    Mentally.

92

1    Q.    Were you doing the same thing for all of the
2 other tables you were serving that night?

3    A.    I would only do it for tables I was serving
4 alcohol to, and that would be it.

5    Q.    Were you doing it for all of the other tables
6 you were serving alcohol to that night?

7    A.    Yes.

8    Q.    Mental record.  Was there any requirement in
9 place as of September 26, 2003 at the Longhorn that you
10 keep a written record of how many drinks were being
11 served to your customers?

12    A.    No.

13        MR. GILLIS:  Objection.

14    Q.    Do you know why you printed the check at 9:17
15 p.m.?

16    A.    No.

17    Q.    Do you know to whom you served the beer that
18 was logged in at 9:15 p.m.?

19    A.    I don't recall, no.

20    Q.    Is it your best memory as you sit here now
21 that one or more of your customers were drinking both
22 beers and Jack Daniels Manhattans that night?

23        MR. GILLIS:  Objection.

24    A.    I don't recall.

25    Q.    And then at 9:21 p.m. -- By the way, did you

1 clear the glasses off the table?

2    A.    Yes.

3    Q.    Typically, where would you take -- where did

4 you take the glasses that you cleared off the table while

5 you were working on a Friday night at the Longhorn?

6    A.    Right to the dish pit and put them in a glass

7 rack.

8    Q.    For cleaning?

9    A.    Yes.  Certain glasses went to the dish pit.

10 Certain glasses went back to the bar.

11    Q.    To the service bartender?

12    A.    Yes.

13    Q.    Which glasses went back to the service

14 bartender?

15    A.    The straight up Manhattan glasses and the

16 Texas margarita shaker glasses. Beer mugs, the large beer

17 mugs went back to the bar also.

18    Q.    The Texas margarita shaker glasses

19 are the ones shown, the blue ones shown in Exhibit #10;

20 is that right?

21    A.    Yes.

22    Q.    And the straight up Manhattan glasses are the

23 ones shown on the lower shelf of Exhibit #9; is that

24 right?

25    A.    Yes.

Starkings Court Reporting & Video Services

---

1    Q.    Then at 9:21 you ordered four Jack Daniels

2 Manhattans; is that right?

3    A.    Yes.

4    Q.    Then you came back and at 9:24 you ordered

5 four more; is that right -- excuse me, three more?  .

6    A.    Yes.

7    Q.    Can you explain to me what happened there?

8    A.    I would think that what happened there --

9    Q.    Do you remember what happened?

10    A.    Specifically remember?

11    Q.    Yes, ma'am.

12    A.    Specifically, no.

13    Q.    What do you think happened there?

14    A.    That because of the difference and some

15 people already having drinks from the bar, and the others

16 not, that these four had finished their second drinks

17 sooner than the other three, so they ordered there's and

18 then within a few minutes the other ones ordered theres.

19    Q.    That's your -- what you're sort of

20 speculating happened now; is that right?

21    MR. GILLIS:  Objection.

22    A.    Yes.

23    Q.    Is that anything from but speculation?

24    MR. GILLIS:  Objection.

25    A.    No.

Starkings Court Reporting & Video Services

---

95

1    Q.    And is it your best -- do you have a memory

2 of whether or not Christen gave you the seven Jack

3 Daniels Manhattans that had been ordered in two segments,

4 one segment at 9:21 and other at 9:24 at the same time?

5    Q.    Did she give them all to me at the same time?

6    Q.    Yes, ma'am.

7    A.    I would have picked them up all at the same

8 time.

9    Q.    And that's when you had the conversation with

10 her, are these people okay?

11    A.    Yes.

12    Q.    Then did you print the check at 9:34 p.m?

13    A.    Yes.

14    Q.    Why did you do that?  If you know.

15    A.    Why did I print it?

16    Q.    Yes, ma'am.

17    A.    They were done with everything.

18    Q.    Is that what you remember?

19    A.    I --

20    Q.    Do you know why you printed it?

21    A.    No.

22    Q.    Then you printed it a third time at 9:34; is

23 that right?

24    A.    Yes.

25    Q.    Do you know why you did that?

---

96

1    A.    No.

2    Q.    Then at 9:36 -- excuse me.  Then at 9:36 you

3 printed it a fourth time?

4    A.    Yes.

5    Q.    Do you know why you did that?

6    A.    No.

7    Q.    Do you know what you did with the checks you

8 printed?

9    A.    No.

10    Q.    Then at 9:36 you did some things here, do you

11 see that?

12    A.    Yes.

13    Q.    Tell me what the Exhibit #8 indicates you did

14 at 9:36?

15    A.    At 9:36 I applied payment to 62.  The total

16 payment to 62, which you have to log in by denominations.

17 I closed out.  I printed the check for table 62.  Closed

18 out a check for 62.

19    Q.    And that happened all at 9:36; is that right?

20    A.    Yes.

21    Q.    And how much cash did table 62 deliver to you

22 at 9:36?

23    A.    From what I entered 71.

24    Q.    And the bill was how much for that table?

25    A.    $51.56.

98

1  Q.   $61.66.

2  A.   Okay.

3  Q.   I don't want to put words in your mouth.  Do

4 you want my glasses to try  --

5  A.   No, thank you.

6  Q.   Does it look like -- looks -- can you tell?

7  A.   Can -- yes, it looks like it says $61.56.

8  Q.   And the difference between the $70 on the

9 table and the $61.56 is your tip; is that right?

10  A.   Yes.

11  Q.   Who was sitting at table 62?

12  A.   62, I don't recall.  I recall the two tables

13 being pushed together.  It could have been a table before

14 they sat.

15  Q.   62 was part of this group, wasn't it?

16       MR. GILLIS:  Objection.

17  Q.   Did you tell us this morning that tables 52

18 and 62 were joined together for the Southworth party?

19  A.   From what I recalled, yes.

20  Q.   And if tables 52 and 62 -- well, strike that.

21 What activity is there on Exhibit #8 for table 62 that

22 you can see up to the time that you cashed that table

23 out?

24  A.   I don't see any.

25  Q.   Do you know what was served to table 62 prior

1 to 9:36 p.m. when the table was cashed out?

2  A.   No.

3  Q.   Do you have any memory at all?

4  A.   No.

5  Q.   And your best memory is that table 62 was the

6 table that was joined with 52 for Mr. Southworth's party;

7 is that right?

8       MR. GILLIS:  Objection.

9  A.   Yes.

10  Q.   Do you know when you opened the check for

11 table 62 that was cashed, the one that was cashed out at

12 9:36?

13  A.   No.

14  Q.   Now in any event at what time did the

15 Southworth table -- what time does Exhibit #8 indicated

16 that table 52 cashed out?

17  A.   It cashed out at 9:57.

18  Q.   And can you tell me the denominations of

19 bills that were placed on the table for you?

20  A.   No.

21  Q.   Can you tell from looking at Exhibit #8 what

22 the denomination of the bills placed on the table for you

23 were?

24  A.   One hundred, one hundred, twenty, twenty.

25  Q.   Is that two one hundred dollar bills and two

99

1 twenty dollar bills as best as you know?

2  A.   Yes.

3  Q.   And the total check was how much, ma'am?

4  A.   $202.79.

5  Q.   So the tip from table 52 was the difference

6 between $240 and $202.79; is that right?

7  A.   Yes.

8       MR. GILLIS:  Objection.

9  Q.   What was the amount of the tip that you

10 received from table 52 that night?

11  A.   Simply math would show it's about $37.

12  Q.   21 cents?

13  A.   $37.21 yes.

14  Q.   And the tip from table 62 was how much,

15 ma'am?

16  A.   Roughly about, from what I just recall

17 reading, $9.

18  Q.   And can you tell me why you at 9:56 printed

19 the check a fifth time?

20  A.   No.

21  Q.   Can you tell me why at 9:36 you printed the

22 check a fourth time, this is the check for table 52?

23  A.   Correct.  No.

24  Q.   That night as you were serving Mr.

25 Southworth, did you have an expectation that he would

1 become intoxicated?

2  A.   No.

3  Q.   Were you concerned that night that he would

4 become intoxicated?

5  A.   No.

6  Q.   Did you calculate that night the amount of

7 alcoholic beverages he drank?

8       MR. GILLIS:  Objection.

9  A.   No.

10  Q.   Did you -- in determining that you had no

11 expectation that he would become intoxicated that night,

12 did you take into effect the volume of alcoholic

13 beverages that he had been served?

14       MR. GILLIS:  Objection.

15  A.   What I served him?

16  Q.   Yes, ma'am.

17  A.   Yes.

18  Q.   And you knew you served him what?

19  A.   I served him two rounds of Manhattans.

20  Q.   Now, is that your testimony today?

21  A.   Yes.

22  Q.   You served him two Jack Daniels Manhattans?

23  A.   Yes.

24  Q.   But you told -- you made a statement that he

25 had three Manhattans on November 2, 2003; isn't that

102

1 right?

2    A.    Yes.

3    Q.    And that's because the best you remember it

4 back on November 2, 2003, you served him three Manhattans

5 isn't that right?

6         MR. GILLIS:  Objection.

7    A.    It doesn't say that I served him three

8 Manhattans, but it says he had three Manhattans.  So from

9 what I know, he may have had one before myself.  So I

10 served him two.

11   Q.    So if you served Mr. -- If your testimony is

12 you served Mr. Southworth two Manhattans, what I'd like

13 to know is how many Manhattans did you serve the other

14 folks who were at the table?

15        MR. GILLIS:  Which ones?

16   Q.    Any.

17   A.    I would have served the ones who came from

18 the bar with Mr. Southworth two, and the ones who did not

19 joint him from the bar, three.

20   Q.    So you would have served four persons three

21 Manhattans each; is that right?

22        MR. GILLIS:  Objection.

23   A.    Yes.

24   Q.    That's 12 Manhattans?  Then you would have

25 served Mr. Southworth two Manhattans; is that right?

Starkings Court Reporting & Video Services

1    A.    Yes.

2    Q.    That is 14 Manhattans.  How many Manhattans

3 did you serve that night?

4    A.    Seventeen.

5    Q.    Who got the other three?

6    A.    Obviously members at the table.

7         MR. GILLIS:  Objection.

8    Q.    Which other members --

9         MR. GILLIS:  Can we go off the record for a

10 second?

11        (Off the record.)

12        (Back on the record as follows:)

13 BY MR. FARRAH:

14   Q.    You served a total of 17 Jack Daniels

15 Manhattans that night, ma'am; is that right?

16   A.    Yes.

17   Q.    And you served two 24 ounce beers that night;

18 is that right?

19   A.    Yes.

20   Q.    Two of those Jack Daniels Manhattans you say

21 you served to Mr. Southworth; is that right?

22   A.    Yes.

23   Q.    At least 15 Jack Daniels Manhattans?

24   A.    Yes.

25   Q.    Did you serve Mr. Southworth a beer that

Starkings Court Reporting & Video Services

103

1 night?

2    A.    Not from what I recall.

3    Q.    So that leaves for how many people 15 Jack

4 Daniels Manhattans and two beers to divide up?

5    A.    Six.

6    Q.    And do you know who drank what of those 17

7 drinks?

8    A.    I don't recall, no, except for the boy in the

9 black hat that I know had a beer.

10   Q.    Do you know what you served table 62 prior to

11 9:36 that night when it paid you -- paid a check

12 totalling $61.56?

13   A.    No.

14   Q.    Were you trained to calculate the effect of

15 -- strike that.

16        Were you trained to estimate the effect of

17 alcoholic beverages on your customers?

18   A.    We were given tools on how to make a decision

19 on how it would affect them.

20   Q.    Let me ask you this, did you consider the

21 Jack Daniels Manhattans that you were serving to any of

22 the customers to be single drinks or double drinks?

23   A.    I considered them to be single drinks.

24   Q.    And what was the basis for that?

25   A.    Because they weren't doubled.  To

104

1 specifically get a double drink you have to specifically

2 order and Longhorn didn't do doubles anyway.

3    Q.    Do you know what the Longhorn recipe for

4 Manhattans called for in terms of how much Jack Daniels

5 to be put in?

6    A.    From what I recall, a little over an ounce.

7    Q.    What's the basis for that statement?

8    A.    The rocks glasses were only so big so to fit

9 Jack Daniels and they fit in the jigger, the jiggers were

10 only about an ounce and a half.

11   Q.    What's the basis for that statement?

12   A.    We were taught that.

13   Q.    Were you concerned that any time you were

14 serving Mr. Southworth that night that you were serving

15 someone who was intoxicated?

16   A.    Did I ever consider that?

17   Q.    Yes, ma'am.

18   A.    No.

19   Q.    Were you concerned that you were serving

20 someone who could become intoxicated as a result of what

21 you served him?

22   A.    No.

23   Q.    Did you know at that time whether or not the

24 effects of alcohol increased over a period of time?

25   A.    Did I know for a fact?

1    Q.    Yes, ma'am.

2    A.    For a fact, no.

3    Q.    Had you been trained in whether or not the

4 effects of alcohol increased over time?

5    A.    Yes.

6    Q.    What had you been trained?

7    A.    That over time if -- depending on whether

8 eating food that your metabolism with food in it added to

9 alcohol slows down the process of alcohol.

10    Q.    Do you know how many drinks of alcohol the

11 body can process at any -- per hour?

12    A.    No.

13    Q.    Had you been trained in that?

14    A.    I'm sure we were.

15    Q.    You just don't remember now?

16    A.    Correct.

17    Q.    Did you know back in November?

18    A.    I don't know.

19    Q.    Can we just spend a minute or two looking at

20 some documents. Let me first show you this. Showing you

21 what's been marked as Exhibit #2 to your deposition. I

22 represent to you it's the Longhorn Bar Recipe document

23 that was giving to me, produced to me by Longhorn,

24 Longhorn's lawyers, and I want to point out to you that

25 -- I want you to read, actually, the ingredients that go

1 into a Manhattan as you say on the rocks.

2    A.    Two ounces house bourbon and a quarter ounce

3 dry vermouth.

4    Q.    Do you have any reason to believe that Ms.

5 O'Donnell did not follow -- do you want to show him -- Do

6 you have any reason to believe that Ms. O'Donnell did not

7 follow Longhorn policies in making that Manhattan?

8           MR. GILLIS:   Objection.

9    A.    No.

10    Q.    So if the Manhattan that she -- the

11 Manhattans that she made you contained not a little over

12 an ounce of alcohol, but two ounces of bourbon, would

13 that change your opinion about whether or not Mr.

14 Southworth was intoxicated at the time the was served his

15 last drink?

16    A.    No.

17    Q.    Why is that?

18    A.    Based on my observations and my judgment call

19 on him, I don't believe he was intoxicated.

20    Q.    But you understood, did you not, that he was

21 receiving Manhattans, however many Manhattans he received

22 from you, he was receiving Manhattans that contained a

23 little over one ounce of Bourbon in them?

24           MR. GILLIS:   Objection.

25    Q.    Is that what you understood?

107

1    A.    I didn't base it on the amount of what I knew

2 to be a fact of alcohol in there. I knew what he was

3 receiving, the exact amount did not factor -- whether

4 it's a half an ounce or not, it still wouldn't have

5 changed my opinion on whether he was drunk or not.

6    Q.    He was receiving double drinks; isn't that

7 right?

8    A.    No.

9    Q.    Weren't you trained that the Manhattan is a

10 double drink?

11           MR. GILLIS:   Objection.

12    Q.    Weren't you trained that, is my question?

13 Were you trained that the Manhattan is a double drink?

14           MR. GILLIS:   Objection.

15    A.    No. We were trained it was a more alcoholic

16 drink.

17    Q.    Oh, yeah. Where were you trained that?

18    A.    It didn't have a mixer in it, is what we were

19 trained.

20    Q.    It's got vermouth in it, doesn't it?

21    A.    It's not a mixer such as orange juice or

22 something like that, that's what we considered mixer.

23    Q.    I'm now referring you to Exhibit #1, which is

24 the Server Guide. It's going to take me a minute. Can

25 you turn to page 13. Do you remember reading the Server

108

1 Guide.

2    A.    I remember reading it.

3    Q.    You didn't refer to it -- did you refer to it

4 after you had become certified?

5    A.    No.

6    Q.    Sort of brush up a little bit? Keep aware of

7 what you had learned back in the year 2000?

8    A.    No, not that I recall.

9    Q.    By the way, did you -- were you trained and

10 certified, that is bar code trained and certified all in

11 the same day?

12    A.    No.

13    Q.    How many days after the training was it that

14 you took the test and pasted it?

15    A.    I am not positive.

16    Q.    On page 6 can you look at page 6 of this

17 exhibit, Exhibit #2. Do you see at the top, where it

18 says, use these comparisons to estimate how much alcohol

19 a guest has consumed? Do you see that?

20    A.    Yes.

21    Q.    Then it goes on to say, always be alert for

22 several other factors that can affect the strength of a

23 drink; do you see that?

24    A.    Yes.

25    Q.    And you see down three bullet points down is,

1 drinks made with double the amount of liquor such as
2 martinis and Manhattans; is that right?
3     A.    Yes.
4     Q.    Were you alert for that fact that night when
5 you were deciding whether or not Mr. Southworth was
6 intoxicated?
7     A.    Was I alert for it, no.
8     Q.    You didn't consider that, did you?
9     A.    No.
10    Q.    And how many Manhattans did you see Mr.
11 Southworth -- did you personally see -- How many
12 Manhattans did you see Mr. Southworth -- did you
13 personally see, how many of these Jack Daniels Manhattans
14 did you personally see Mr. Southworth consume as of the
15 time he left the restaurant?  You personally?
16    A.    He personally -- the ones that I served him,
17 did I watch him drink the whole entire thing, no.  I
18 couldn't be at the table the whole time.
19    Q.    My question is, did he bring a Manhattan,
20 it's your testimony that he brought a Manhattan with him
21 from the bar?
22    A.    He brang a drink with him from the bar.
23          MR. GILLIS:  Objection.
24    Q.    You don't know what he brought; is that
25 right?

Starkings Court Reporting & Video Services

1     A.    I don't recall.
2     Q.    And it's your best memory that -- well, so he
3 may have brought a beer with him from the bar; is that
4 right?
5     A.    I don't recall.
6     Q.    Back two and a half years ago, it was your
7 memory that he had had three Manhattans; is that right?
8          MR. GILLIS:  Objection.
9     A.    Yes.
10    Q.    So back then, what was your memory of how
11 many Jack Daniels Manhattans Mr. Southworth had consumed
12 that night?
13    A.    Back then, three.
14          MR. GILLIS:  Objection.
15    Q.    Do you have any reason to believe that your
16 memory of the events of that night is better today than
17 it was two and a half years ago, a month, a little over a
18 month after that night?
19    A.    Yes.
20    Q.    Your memory is better today?
21    A.    I believe so.
22    Q.    Tell me why your memory is better today?
23    A.    I believe after reviewing the two things I
24 did, then it was they showed me the check, write a
25 statement and that was it.  You know, and I remembered

Starkings Court Reporting & Video Services

111

1 certain characteristics about that night but after being
2 able to review the bill and the other report, after
3 reviewing step by step and going through everything, I
4 believe my memory -- certain things have stood out.
5     Q.    What other report?
6     A.    This report.  The audit report.
7     Q.    So you think your memory is better today of
8 the events that happened two and a half years ago then it
9 was a month after the accident; is this right?
10          MR. GILLIS:  Objection.  On what issues?
11    Q.    On how much the was served?
12    A.    Yes.
13    Q.    And between November of 2003 and when you
14 first talked to Neil, or counsel for RARE, you did
15 nothing at all to refresh your memory about the events of
16 this night; is that right?
17    A.    To refresh it, no.
18    Q.    To do anything to --
19    A.    Had I thought about it, yes.  Did I practice
20 anything to remember, no.
21    Q.    So there were no documents that you reviewed
22 between then, that is November of 2003, and first
23 speaking to RARS's attorneys that helped you refresh your
24 memory; is that right?
25          MR. GILLIS:  Objection, that's not a fair

112

1 characterization at all.
2          MR. FARRAH:  You can answer the question.
3          MR. GILLIS:  No, you can't.  I am going to
4 instruct her not the answer like that.  There's no
5 evidence in here that we did anything to refresh her
6 recollection.  If you want to ask a fair question, go
7 ahead.
8     Q.    Your memory, ma'am, your memory as of the day
9 before you spoke to RARE's attorneys about how much Mr.
10 Southworth had to drink that night was as reflected in
11 your November 2, 2003 statement; isn't that right?
12          MR. GILLIS:  Objection.
13    A.    From how many I said e had to how many he was
14 served in here?
15    Q.    Your memory as of before the time that you
16 met RARE's attorneys was that he had had three Jack
17 Daniels Manhattans that night; isn't that right?
18          MR. GILLIS:  Objection
19    A.    From what I could recall.
20    Q.    Yes.  And you recalled that a month after the
21 incident, or a month and a week after the incident; is
22 that right?
23    A.    That was a month after and only looking at
24 the bill.  I couldn't remember I believe accurately
25 unless I had been showed that bill that night also.

114

```
 1     Q.   Tell me what you remember about serving table
 2 62 that night, prior to the time you cashed them out at
 3 9:36?
 4     A.   I remembered that they were a group of guys,
 5 they were a friendly group of guys that I had know --
 6     Q.   62.
 7     A.   62.
 8     Q.   62.
 9     A.   I don't remember anything about 62.
10     Q.   What does the document you were -- table 62
11 was the table you matched up with table 52 that night
12 isn't it?  Wasn't it?
13          MR. GILLIS:  Objection.  At what time during
14 the night.  You're talking about 62.  She obviously had
15 more than one group at that table.
16     Q.   You told us that you matched up table 52 and
17 62 to accommodate that nice group of guys that you just
18 mentioned; isn't that right?
19     A.   Yes.
20     Q.   Okay.  What I want to know is, when you
21 cashed that nice group of guys out at 9:36 for table 62,
22 what had you served them?
23          MR. GILLIS:  Objection.  There is no evidence
24 that that was the check for the table.
25          MR. FARRAH:  I think there is plenty in the
```

Starkings Court Reporting & Video Services

```
 1 record that that was the check for the table.
 2     Q.   What I want to know is, what did you serve
 3 them?
 4     A.   There was nothing in this report showing what
 5 I served them.  So I do not remember what I served that
 6 table off the top of my head; 62 I do not know.
 7     Q.   The report that you reviewed and the report
 8 -- the report that you reviewed, ma'am, was a report that
 9 was accompanied by -- did you ever see this letter
10 before?
11          MR. GILLIS:  Objection.
12     Q.   Just, did you ever see it?
13     A.   No.
14          MR. FARRAH:  Okay.  Can we mark it please.
15          (DEPOSITION EXHIBIT #13 WAS MARKED
16          FOR IDENTIFICATION.)
17     Q.   For the record, the report that you reviewed
18 is part of a document that was delivered to me by RARE's
19 prior counsel, under cover, that is letter dated May 18,
20 2004.  What I want to ask you is, does the report that
21 you reviewed show any activity of yours prior to 7:59
22 p.m.?  If you can look at Exhibit #8.
23     A.   Prior to 7:59?
24     Q.   Yes, ma'am.
25     A.   No.
```

Starkings Court Reporting & Video Services

115

```
 1     Q.   And stick with that page for a second.  Does
 2 -- what is the page number of the report that you
 3 reviewed, when it starts, what page is that at the top?
 4     A.   Seven.
 5     Q.   Have you reviewed pages 1 through 6 of the
 6 audit report, date of business, 9/26/2003 for your
 7 activity that night?
 8     A.   No, sir.
 9     Q.   Has anyone shown it to you?
10     A.   No, sir.
11     Q.   Has anyone offered it to you?
12     A.   No, sir.
13          MR. FARRAH::  Do you have it?
14          MR. GILLIS:  Go off the record for a second.
15          (Off the record.)          12:35 p.m.
16          (A lunch recess was taken.)
17          (Back on the record as follows:)  1:33 p.m.
18 BY MR. FARRAH:
19     Q.   Good afternoon.  Is it true that the first
20 time you saw the pages 2 through the end of Exhibit #8
21 was when you met with RARE's lawyers for the first time?
22          MR. GILLIS:  Objection.
23     A.   The first time I saw these?
24     Q.   Yes, ma'am.
25     A.   Yes.
```

116

```
 1     Q.   When is the first time you saw pages 2, not 1
 2 which is the check, but pages 2 through the end of what's
 3 been marked as Exhibit #8?
 4     A.   Yesterday.
 5     Q.   Yesterday.  And prior to that time was it
 6 your belief that Mr. Southworth was served three Jack
 7 Daniels Manhattans by you at the table?
 8     A.   At it states on here, he had had three
 9 Manhattans.  It doesn't say what I had served him, so --
10     Q.   My question to you is, prior to yesterday was
11 it your belief that you had served Mr. Southworth three
12 Jack Daniels Manhattans at the table?
13          MR. GILLIS:  Objection.
14     A.   No.  I had served him two, but he had had
15 three.
16     Q.   So you knew that, that was your memory prior
17 to yesterday; is that right?
18     A.   Yes.
19     Q.   Can I ask you why you didn't write that, that
20 is that you had served him two and he had had another
21 one, when you wrote out for the police on November 2,
22 2003 whatever you wrote out?
23          MR. GILLIS:  Objection.
24     A.   I don't know why.
25     Q.   You had at that time, when you wrote out for
```

118

1  the police whatever you wrote out, you had the check
2  which is the first part of the Exhibit #8 available to
3  you; isn't that right?
4      A.    Yes.
5      Q.    Can I ask you why you wrote at that time on
6  Exhibit #8 that there were about eight men?
7      A.    Excuse me.  Because I believed then that the
8  table may have been set up for more, but only a certain
9  amount had sat.
10     Q.    Can I ask you why you wrote on November 2,
11 2003 they all had chowder and bread?
12     A.    I may have not seen the check, but I knew
13 chowder was at the table.
14     Q.    Can I ask you why you wrote they all had
15 chowder and bread?
16     A.    I do not know why I would have wrote that.
17     Q.    That was wrong, wasn't it?
18     A.    Yes.
19     Q.    It was wrong that there were eight men; isn't
20 that right?
21     A.    Yes.
22     Q.    Now, a little earlier today I asked you how
23 many meals were served and you said six; is that right?
24     A.    Yes.
25     Q.    Did you also say that you believe that one of

Starkings Court Reporting & Video Services

1  the persons ordered an appetizer as a meal?
2      A.    Yes.
3      Q.    Which person ordered an appetizer as a meal?
4      A.    I couldn't say for sure which person.
5      Q.    Which appetizer did the person order as a
6  meal?
7      A.    I would say the chicken fingers.
8      Q.    Do you have a memory as you sit here today
9  that someone actually ordered the chicken fingers as a
10 meal?
11     A.    Excuse me?
12     Q.    Do you have a memory as you sit here today
13 that someone ordered the chicken fingers as a meal?
14     A.    Yes.
15     Q.    Didn't you tell us earlier today that they
16 all shared the chicken fingers as an appetizer?
17     A.    It was put in as an appetizer.
18     Q.    Didn't you tell us today that they all shared
19 the chicken fingers as an appetizer?
20     A.    I believe --
21     Q.    Did you tell us that?
22           MR. GILLIS:  Objection.
23     Q.    Do you remember it?
24     A.    I believe I had said I knew that the Tonion
25 was shared and that I had put it in as an appetizer.

Starkings Court Reporting & Video Services

119

1      Q.    That is what you remember testifying earlier
2  today?
3      A.    That is what I remember.
4      Q.    So it's now your testimony that somebody
5  ordered the chicken fingers as a meal?
6           MR. GILLIS:  Objection.
7      A.    I had said that earlier, yes.
8      Q.    Is it your testimony that somebody ordered
9  the chicken fingers as a meal?
10     A.    From what I recall, yes.
11     Q.    When did that person announce to you the
12 chicken fingers would be his meal?
13           MR. GILLIS:  Objection.
14     A.    The may have taken them as I brought them as
15 an appetizer and kept them for himself only, and that
16 would have been his meal.
17     Q.    What is your basis for saying that the person
18 ordered the chicken fingers as his meal?
19     A.    Because I remember that everyone at that
20 table ate a meal.  Not one person went without eating
21 that night.
22     Q.    You only served six meals; isn't that right?
23     A.    Yes.
24     Q.    No one ordered -- no one said to you, I am
25 having these chicken finger as my meal; isn't that right?

120

1      A.    If I came to him and the was going to order
2  --
3      Q.    Isn't that right?
4           MR. GILLIS:  Objection, let her finish her
5  answer.
6           MR. FARRAH:  I want her to answer the
7  question.
8           MR. GILLIS:  No, you don't like the answer
9  she is giving you, so you're cutting her off.
10          MR. FARRAH:  I'd just like her to respond to
11 the question.
12          MR. GILLIS:  And she has if you'll give her
13 the opportunity to finish her answer.
14     Q.    No one said to you, I am ordering these
15 chicken fingers as a meal; isn't that right?
16     A.    If I came to him and he was going to order
17 something, and he had nothing to order, he would have
18 said, the chicken fingers are my meal.  I am all set or
19 I'm good.
20     Q.    No one said that to you --
21          MR. GILLIS:  Objection.  Asked and answered.
22     Q.    Isn't that right.
23     A.    I just answered.  I believe I answered your
24 questions?
25     Q.    Did someone say to you, I am having these

122

1  chicken fingers as my meal; yes or no.
2      A.    Yes.
3      Q.    Is that what you remember now?
4      A.    Yes.
5      Q.    You don't remember that you told us earlier
6  that those chicken fingers were shared by everybody?
7      A.    I said they were put in as an appetizer.
8  that I did not specifically see each person eat a piece
9  of each appetizer.
10      Q.    You remember what you testified to earlier;
11  is that right?
12          MR. GILLIS:  Objection.  Have you got a
13  question that you haven't already asked that you want to
14  ask her.
15          MR. FARRAH:  I just asked her that question
16  that I haven't already asked.
17          MR. GILLIS:  You've asked it six times and
18  she's answered it six times.  Why don't you go on to
19  another subject.
20          MR. FARRAH:  That's your memory.
21      Q.    Now, do you know what Mr. Southworth had to
22  drink at the bar?
23      A.    I don't recall specifically, no.
24      Q.    Do you know what he had to drink at the bar
25  is my question?

Starkings Court Reporting & Video Services

1      A.    No.
2      Q.    Did you ever know what he had to drink at the
3  bar?
4      A.    No.
5      Q.    When you said you don't recall what he had to
6  drink at the bar, what do you mean?
7      A.    He sat down with a drink at my table.  Do I
8  remember what that was, no.  If he was drinking before
9  the got to my table, I do not know what he had at the
10  bar.
11      Q.    And you don't know what he brought to the
12  table; isn't that right?
13      A.    I don't remember what he brought to the
14  table.
15      Q.    Thank you.  You can't tell us whether or not
16  he had a beer at the table that you served him, can you?
17      A.    No.
18          MR. GILLIS:  Objection.
19      Q.    Do you know whether or not you served him a
20  beer at the table?
21      A.    I did not serve him a beer at the table.
22      Q.    You know whether you -- you did not served
23  him a beer at the table?
24      A.    Yes.
25      Q.    A moment ago you told us you couldn't tell us

Starkings Court Reporting & Video Services

123

1  whether or not you served him a beer at the table.
2      A.    I did not serve him a beer at the table.
3      Q.    Do you want to change your earlier testimony?
4      A.    No.
5      Q.    Who did you serve the other beer to at the
6  table?
7      A.    I believe I served a beer to the gentleman
8  with the black hat and the black hair.
9      Q.    We heard about him.  Who did you serve the
10  other beer to at the table.
11      A.    I don't recall who that one went to.
12      Q.    And you don't know whether you served Mr.
13  Southworth that other beer or not, do you?
14      A.    I did not serve Mr. Southworth a beer.
15      Q.    You remember that?
16      A.    Yes.
17      Q.    Was Mr. Southworth a good tipper?
18      A.    I had only waited on him the one time before.
19  With me, he was a decent tipper, yes.
20      Q.    Did Sherry tell you that he was a good
21  tipper?
22      A.    Yes, I believe she did.
23      Q.    A very good tipper?
24      A.    A good tipper.
25      Q.    He carried around hundred dollar bills; isn't

124

1  that right?
2          MR. GILLIS:  Objection
3      A.    No, I don't know that.
4      Q.    He left one hundred dollar bills on the
5  table.
6      A.    Because I entered one hundred dollar bill
7  does not mean that they left hundreds, because they are
8  denominations.  So I'm not going to sit there and enter
9  ten dollar bills ten times.  I'd rather quickly entered
10  it out one hundred, one hundred, twenty, fourty.
11      Q.    Why not enter 240?
12      A.    Because there's not a button for a two
13  hundred dollar bill.
14      Q.    Why not enter one hundred, one hundred,
15  fourty?
16      A.    There's not a button for a fourty dollar
17  bill.
18      Q.    Is it your belief the everything you did was
19  in accordance with the practice -- everything you did
20  that night was in accordance with the practices set forth
21  in the Server Guide, which has been marked as Exhibit #1
22  to your deposition?
23      A.    Yes.
24      Q.    It's your belief that everything you did that
25  night was in accordance with the Longhorn Server and

1  Bartender Trainee Edition, which has been marked as
2  Exhibit #3 to your deposition?
3      A.    Yes.
4      Q.    Have you reviewed either of these documents:
5  That's Exhibit #3 or Exhibit #1 to your deposition prior
6  to today?
7      A.    No.
8      Q.    So what's the basis for your belief that
9  everything you did is in accordance with the provisions
10 of these two documents?
11     A.    Because I believe that while working at
12 Longhorn I worked up to the Longhorn standards and what I
13 was trained with.
14     Q.    You believe you never made a mistake while
15 you were at Longhorn; is that right?
16     A.    I believe that I may have made mistakes.
17           MR. GILLIS:  Objection.
18     Q.    Did you make a mistake in serving too much
19 alcoholic beverages to Mr. Southworth that night?
20     A.    No.
21     Q.    Have you ever considered that you might have
22 made a mistake in serving too much in the way of
23 alcoholic beverages to him that night?
24     A.    No.
25     Q.    Ever?

1      A.    No.
2      Q.    Now, was anyone at that table drunk that
3  night?
4      A.    No, not in my opinion.
5      Q.    Was anyone at the table under the influence
6  that night?
7      A.    Not in my opinion, no.
8      Q.    Are you aware of the fact that one of the
9  people at the table testified the was drunk at the table
10 that night?
11           MR. GILLIS:  Objection.
12     A.    I am not aware of that.
13     Q.    You didn't see anybody that was drunk?
14     A.    No.
15     Q.    Were you looking?
16     A.    Yes.
17     Q.    Where is table 51, do you know?
18     A.    It is a booth against the wall, against the
19 kitchen.
20     Q.    Where?
21     A.    Right here.
22     Q.    Did you have -- could you mark 51, I'm sorry,
23 on Exhibit #12.
24     A.    (Complies.)
25     Q.    Did you have responsibility to serve table 51

1  that night?
2      A.    From what I believe my sec -- what I
3  remembered my section to be, I believed I was here?
4      Q.    Where?
5      A.    These tables right here.
6      Q.    Tables 5 --
7      A.    That's 52, 62.  It would have been -- the
8  sections are broken up different each night depending on
9  how many servers are on.  If I was in a four table
10 station, it would have been four here or four here.
11     Q.    What is your memory of what you had for the
12 four that night?
13     A.    I believe I said these two and these two.
14     Q.    So you believe your earlier testimony was
15 that you said 53, 63, 52 and 62?
16     A.    Correct.
17     Q.    Your first testimony?
18     A.    I believe that is what I said.
19     Q.    What is your memory, whatever you said?
20     A.    It was -- my memory is I had four tables in
21 that section, which exact four, I do not specifically
22 remember.
23     Q.    And your memory is you served Sprite to
24 somebody at the table?
25     A.    I do remember Sprite being at the table, yes.

1      Q.    Do you have any explanation for why no Sprite
2  is shown on Exhibit #8?
3      A.    There -- it may have been brought from the
4  bar, and refills are for free, so I wouldn't have charged
5  them again.  Or I simply didn't ring in a drink.
6      Q.    Do you have a memory that it was brought from
7  the bar and refills are free?
8      A.    Yes, refills are free.
9      Q.    Do you have a memory that night of someone
10 bringing a Sprite from the bar and you refilling it for
11 free?
12           MR. GILLIS:  Objection.
13     A.    No.
14     Q.    Are you -- do you know what your plans are in
15 terms of shipping out?  Are you -- do you know whether
16 you are staying here in North Carolina or where you are
17 going to be?
18     A.    I am stationed in North Carolina until 2009
19 deployable at any time.
20     Q.    Deployable at any time means you can be sent
21 out at any time?
22     A.    Yes.
23     Q.    On how much notice?
24     A.    It's a required 30 day notice.
25     Q.    Are you required to wear your uniform off

130

1  base?
2         MR. GILLIS:  Objection.  How is this supposed
3  to lead to discoverable evidence?
4         MR. FARRAH:  I just want to know whether
5  she's required to --
6         MR. GILLIS:  I am going to instruct her not
7  to answer.  It's no way is it in any way going to lead to
8  discoverable evidence and therefore it's not a question
9  -- no.
10        MR. FARRAH:  She's wearing a uniform today.
11  I think I have a --
12     Q.     Why are you wearing a uniform today?
13        MR. GILLIS:  No, don't answer.  It's not
14  calculated to lead to discoverable evidence therefore
15  it's not a valid question.
16        MR. FARRAH:  You're instructing her not to
17  answer?
18        MR. GILLIS:  I am.  If you want to ask a
19  question that's going to lead to discoverable evidence,
20  I'd be happy to have her answer it.
21        MR. FARRAH:  I think it's a relevant
22  question.
23        MR. GILLIS:  It's not relevant.
24        MR. FARRAH:  We'll argue that later.
25        (Off the record.)

Starkings Court Reporting & Video Services

---

131

1  party was at?
2     A.     The very far one, 52, 62, 72, or 42, 52, 62,
3  72.
4     Q.     Where is the service bar in relation to --
5     A.     Straight through the alleyway -- oh, the
6  service bar, you'd go back here, down the entire back
7  alley to the other side of the restaurant.
8     Q.     I'm going to show you a photograph and ask
9  you if you recognize what it depicts?
10    A.     No, I don't.
11    Q.     Ever see this before?
12    A.     No.
13        MR. FARRAH:  Could we have this marked
14  please.
15        (DEPOSITION EXHIBIT #15 WAS MARKED
16        FOR IDENTIFICATION.)
17    Q.     I'm going to show you a photograph and ask
18  you if you recognize it as any portion of the Longhorn?
19    A.     Yes.
20        MR. FARRAH:  Could we have this marked
21  please.
22        (DEPOSITION EXHIBIT #16 WAS MARKED
23        FOR IDENTIFICATION.)
24    Q.     What does Exhibit #16 show?
25    A.     It shows the top of the bar, some of the

---

132

1  (Back on the record as follows:)
2  BY MR. FARRAH:
3     Q.     I want to show you a photo and ask you if it
4  fairly and accurately depicts a portion of the Longhorn
5  Restaurant as it appeared to you on the night of
6  September 26, 2000?
7     A.     Yes.
8         MR. FARRAH:  Okay.  Can we have that marked
9  please.
10        (DEPOSITION EXHIBIT #14 WAS MARKED
11        FOR IDENTIFICATION.)
12    Q.     Does it show the tables that the Southworth
13  party was sitting in?
14    A.     Yes.
15    Q.     Could you point those tables out please for
16  us?
17    A.     The one at the very far end would be 52, 62.
18    Q.     And the booths, right there, that my thumb is
19  pointing to?
20    A.     51 -- 41, from what I remember, these are the
21  ones, whether it starts at 40 or 50 and goes down.
22    Q.     Could you point to 41.
23    A.     Whether it starts at 41 or 51, I don't
24  remember, but it goes from 41, 51, 61, 71.
25    Q.     And the tables again that the Southworth

Starkings Court Reporting & Video Services

---

132

1  condiments that go with some of the drinks.  Some of the
2  margaritas are listed here.  Some more of the margaritas,
3  and I can't read -- I would assume that's some of the --
4  I'm not sure what that is --
5         MR. GILLIS:  We don't want you to assume.  If
6  you know --
7         MR. FARRAH:  Don't assume.
8     A.     A wine glass, the shaker margarita glasses
9  and more wine glasses.
10    Q.     And the column that says, do they ask for,
11  and then the column that says suggest, what does those
12  mean?
13    A.     Did they ask for those at the time were our
14  -- when I was there at the time were -- the margaritas
15  were our promotional items at the time.
16    Q.     Did Longhorn suggest that if someone asked
17  for a Texas margarita, you offer them the ultimate
18  margarita instead?
19        MR. GILLIS:  Objection.
20    A.     Did you --
21    Q.     Is that what that means, do they ask for
22  Texas margarita, suggest ultimate margarita?
23        MR. GILLIS:  Objection.
24    A.     I couldn't know what they were suggesting by
25  asking that.

134

1    Q.    You don't know what this means?

2    A.    I did not see that on the bar.  That wasn't

3 there when I was there.

4    Q.    Okay, thank you.  Did Longhorn serve -- offer

5 a Texas Tea at that time?

6    A.    Yes.

7    Q.    Do you know what is in the Texas Tea?

8    A.    I don't recall now.

9    Q.    Do you recognize that photo?

10    A.    Yes.

11    Q.    What does that show?

12    A.    That shows another side of the alley, drinks,

13 bread, glasses are here, the dish pit and then a part of

14 the serving area.

15    MR. FARRAH:  Could we have this marked,

16 please.

17    (DEPOSITION EXHIBIT #17 WAS MARKED

18    FOR IDENTIFICATION.)

19    Q.    So just to wrap up, the only management at

20 Longhorn you spoke to prior to yesterday was whom, about

21 this incident?

22    A.    Was Chris.

23    MR. GILLIS:  Objection.

24    Q.    Chris Orr; is that right?

25    A.    Yes.

Starkings Court Reporting & Video Services

---

1    Q.    You never spoke to Chuck Bulgain about this

2 incident; is that right?

3    A.    I don't recall speaking to Chuck, ever, no.

4    Q.    And the only employees at Longhorn you spoke

5 with about the incident, the night in question is Sherry;

6 is that right?

7    A.    Yes.

8    Q.    How many times have you spoken to her about

9 it?

10    A.    Specifically about the incident since it

11 happened?

12    Q.    Yeah.

13    A.    Occasionally, maybe three, four times.

14    Q.    Is there a manager's incident log that you

15 know of at the restaurant for recording notable

16 incidents?

17    A.    Not that I know of.

18    MR. FARRAH:  That's it for me.  Thank you.

19

20    EXAMINATION BY MR. GILLIS:

21    Q.    It is afternoon now.  Good afternoon, Ms.

22 Chabot.  You said that you may be deployable at any time;

23 is that correct?

24    MR. FARRAH:  Objection.

25    A.    Yes, sir.

Starkings Court Reporting & Video Services

---

135

1    Q.    I am going to ask you some questions then

2 about your background in case you may not be here at the

3 time of trial, we may have to use this deposition.  Can

4 you tell me the names of your children?

5    A.    I have three children.  The oldest is Markus.

6 he's eight.  Tyler is five.

7    Q.    Those are both boys?

8    A.    Yes.

9    Q.    And the third is a daughter?

10    A.    Yes, Lindley, she's nine months old.

11    Q.    You had mentioned earlier that 911 had a

12 particular affect on you.  Can you explain that?

13    MR. FARRAH:  Objection, and just on the

14 record, I would object to all of these background

15 questions as being irrelevant and not reasonably designed

16 to lead to discoverable evidence, kid's names, 911,

17 things of that nature.  So that's my running objection.

18 I hope you'll accord me the same courtesy that I did you

19 in terms of your objection to my leading questions.

20    MR. GILLIS:  I think it's a little different

21 if we have to use this for trial, I have the opportunity

22 to put in her background to establish her credibility.  I

23 think I'm entitled to do that.

24    MR. FARRAH:  Well, I disagree and I'll object

25 to this line of questioning, how's that.

---

136

1    MR. GILLIS:  I honor your objection too,

2 although I for the record, disagree with that.

3    MR. FARRAH:  Yeah, I don't think background

4 has anything to do with credibility.

5    Q.    Getting back to the question, in the question

6 that Mr. Farrah asked you about why you went into the

7 service, you mentioned that there was a particular effect

8 that 911 had on you.  Can you tell me what that was?

9    A.    My mother is a flight attendant.  She flew

10 out of Boston that day.  And so when I had returned home,

11 you know, I had a bunch of phone calls questioning where

12 my mom was.  And I didn't even know it happened, because

13 I had been out during the day, hadn't seen the news and

14 wasn't paying attention to the radio.  So I really didn't

15 know and didn't know what happened to her for a few days

16 until she was finally allowed to call out to me.

17    Q.    Had you already made a decision before then

18 at sometime further in your life you wanted to join the

19 service?

20    A.    Yes.

21    Q.    Did that expedite it at all?

22    A.    Absolutely.

23    Q.    Since that happened in '01, why didn't you

24 join earlier?

25    A.    We had had the children and they were too

1 young and I felt that if I did get deployed right away or

2 went to training for four to six months that they were

3 too little for my husband to handle on his own.

4    Q.    And you've been in the service now just under

5 two years; is that correct?

6    A.    Yes.

7    Q.    Have you been given any commendations or

8 medals while you've been in the service?

9        MR. FARRAH:  Objection.

10    A.    When we graduate from basic, we get one of

11 our ribbons --

12    Q.    Let me rephrase the question.  Have you been

13 given any awards since you've been in the service?

14        MR. FARRAH:  Objection.

15    A.    I've gotten a star major coin and I've gotten

16 an ARCOM.

17    Q.    Can you explain what those are for?

18    A.    The ARCOM was for outstanding achievement at

19 the tact center, holding an OIC's position being an E1,

20 which is coming in with no rank.

21    Q.    Okay, can you explain for us lay people what

22 all that initials mean?

23    A.    There's a captain will run the tact center,

24 and of course she's an officer.  She's not enlisted.  And

25 doing as well as I did in the tact center, they put me in

1 her position and took her appointments and did things

2 that she would be overseeing and doing in the center I

3 was able to do.

4    Q.    What division are you in?

5    A.    I'm in 16th MP Brigade, XVIII Airborne Corps.

6    Q.    Can you explain what the Airborne Corps is.

7        MR. FARRAH:  Same running objection to the

8 relevancy of these, Mike.

9        MR. GILLIS:  I understand.

10    A.    The Airborne Corps is all trained in Airborne

11 operations, Airborne qualified.

12    Q.    You joined up specifically to be military

13 police; is that correct?

14    A.    Yes.

15    Q.    Why did you do that?

16    A.    That was a field I was always interested in,

17 even in the civilian field.  And I figured if I combined

18 it with military and civilian, that was what I was

19 interested in.

20    Q.    Were you aware of the likelihood of military

21 police being activated in 2004 when you joined?

22    A.    Aboslutely.

23    Q.    What was your understanding?

24    A.    That they extremely hi -- highly deployable.

25 The recruiter actually tried to talk me out of military

139

1 police into another field because me having children, the

2 didn't want -- the knew that it was a high probability

3 I'd get deployed right after training.

4    Q.    Has your unit been deployed?

5    A.    Yes, twice and they just got back from their

6 second deployment.

7    Q.    Have you yourself been deployed?

8    A.    No.

9    Q.    Can you tell us why you weren't deployed as

10 part of the unit?

11        MR. FARRAH:  Objection.

12    A.    I had joined the unit in October.  They were

13 set to deploy in February.  I was pregnant so I wasn't

14 able to deploy with them, but after my daughter was born,

15 I was scheduled to deploy two months later.

16    Q.    Did you go over at that time?

17    A.    No, I did not.

18    Q.    Why was that?

19    A.    My daughter was born with an extremity rare

20 congenital heart defect, which required surgery at five

21 days old, so I became nondeployable at that time due to

22 family medical problems.

23    Q.    What was the problem?

24    A.    My daughter needing the open heart surgery

25 which required she was hospitalized for four weeks and

140

1 then she had a recovery time of three months.

2        MR. FARRAH:  You know I'm objecting to all of

3 this?

4        MR. GILLIS:  Yes, I understand.

5    A.    The surgery was May 25.

6    Q.    And when was she born?

7    A.    May 20.

8    Q.    She was five days old?

9    A.    Yes.

10    Q.    Has she had any surgeries since?

11    A.    She did.  She had an operation the beginning

12 of January of '06.

13    Q.    What is her condition now?

14    A.    Now she is fully recuperated from that

15 surgery.

16    Q.    Now that she is fully recuperating, are you

17 able to be deployed at any day now?

18    A.    Yes.

19    Q.    Are you only deployable when your group out

20 again or can you be deployed with a different group?

21    A.    I can be deployed with anybody.

22    Q.    Explain how that works.

23    A.    There are, in 16th MP Brigade, five

24 deployable units and they're all combat units and they

25 strictly train, deploy, come back, train, deploy.  And

1  then there's one Garrison Unit.  Right now I'm in the
2  Garrison Unit, but if one of those line units was to need
3  me for a mission, I would be drafted there and then leave
4  with them.
5      Q.    If you were drafted into another unit,  what
6  position would you hold when you were activated?
7      A.    Military police officer.
8      Q.    Your position doesn't change?
9      A.    No.
10     Q.    Your current rank is what?
11     A.    Specialist.
12     Q.    Do you have any -- in addition to the awards
13 that you had mentioned earlier, do you have any specific
14 certifications for shooting, whatever for example?
15     A.    We have -- we are one of the only fields who
16 have to quality with our 9mm, which we qualify for --
17 that's our expert badge that I received.  We're qualified
18 in OC training.
19     Q.    Which is what?
20     A.    OC spray, we are able to use that.  Anything
21 that a police officer has to be certified in, we  go
22 through the same training.  It's called LTLEA (phonetic).
23     Q.    In the meanwhile while you're not deployed,
24 what do you know?
25          MR. FARRAH:  Objection.

---

1      A.    We do the garrison work on post.  We do the
2  same thing in the city, but we do it our post.  We do the
3  patrols --
4      Q.    Let me ask the question a different way.  Are
5  you deployed currently?
6      A.    No.
7      Q.    While you are not -- what are you currently
8  doing in the service as a part of your job?
9      A.    I work as a police officer.
10     Q.    Can you tell us what that entails?
11     A.    Patrolling post, responding to calls, working
12 the desk, working the RTO, taking calls.
13     Q.    Where are you doing this?
14     A.    On Fort Bragg.
15     Q.    What is your husband's name?
16     A.    Ronnie.
17     Q.    What does he do for work?
18     A.    He is a carpenter.  He is contracted out
19 through a company in Massachusetts that's got a contract
20 through FEMA, and he travels and he does disaster relief
21 work.
22     Q.    Can you explain what disaster relief work is?
23     A.    Mainly he works through the hurricane
24 seasons.  He worked in Miami recently for a few months,
25 and then did a month in New Orleans and came back.

---

1      Q.    Is that response to --
2      A.    Hurricaine Katrina.  Yes.
3      Q.    Now, getting back to your training at
4  Longhorn, how many training sessions did you have at
5  Longhorn before you actually served a table?
6      A.    We had a whole week of consecutive nightly
7  training.  It was during the nights, I would say from
8  5:00 on, probably until about 11:00.
9      Q.    This was when?
10     A.    Before the restaurant even opened.
11     Q.    Late December of 2000, would you think?
12     A.    Yes.
13     Q.    How long were the sessions, of the training
14 sessions?
15     A.    About six to seven hours.
16     Q.    Per session.
17     A.    Per night.
18     Q.    How many nights would you have to train?
19     A.    At least a week's worth.
20     Q.    Once you were trained, did you start out with
21 three or four tables or did you start out with less than
22 that?
23     A.    We started out with two tables.
24     Q.    Why was that?
25     A.    There were -- because it just started.  They

---

1  knew it was going to be a busy restaurant.  A lot of
2  people were there even new to waitressing.  So they had
3  the trainers in there following us around all night for
4  at least the first month, and staying on top of us, make
5  sure we were doing it the Longhorn way.
6      Q.    The date of the accident was September 2003,
7  you are aware of that; correct?
8      A.    Yes.
9      Q.    How many years experience had you had prior
10 to that as a waitress serving food and alcohol?
11     A.    Five years.
12     Q.    How many years experience did you have when
13 you came to Longhorn?
14     A.    Almost three years.
15     Q.    What training did you receive from Longhorn
16 other than the alcohol training you've already testified
17 to?
18     A.    Just general training regarding food.  They
19 taught us about the steaks, the side dishes, the salads.
20 They taught us how the whole kitchen worked, how the
21 whole front of the house worked, how the hostesses would
22 work.
23     Q.    Mr. Farrah asked you earlier about the bar
24 code system.  Can you tell us what you remember about the
25 bar code system, what you learn through them?

146

1          MR. FARRAH:  Objection.

2     A.    I remember from -- through the bar code

3 system it --

4     Q.    Let me ask you a different question since it

5 has been objected to.  Did you take bar code training?

6     A.    Yes.

7     Q.    Can you tell us what that entailed?

8     A.    It entailed -- we went through a booklet that

9 had tests and it had a system, kind of to guide us

10 through on how we should take things.  And like the -- I

11 believe there was like three steps.  I think they went by

12 like a traffic light type thing, red light, green light,

13 yellow light.

14     Q.    Can you explain those steps for us.

15     A.    Green light would be where you know, you've

16 got a perfectly -- someone just walks in, hasn't had

17 anything to drink, perfectly -- has all of their senses

18 intact.

19          Yellow light, you know, after a couple of

20 drinks they may be reacting some way to them.  And then

21 red light, where you obviously have noticed significant

22 changes in their behavior and have decided to  stop

23 serving them.

24     Q.    Can you explain for me if there are

25 differences among different people as to these various

1 zones?

2          MR. FARRAH:  Objection.

3     A.    Yes.  I would say no.

4     Q.    What are they?

5          MR. FARRAH:  Same Objection.

6     A.    Someone could just get glossy eyes and appear

7 to be tired or outspoken when they are not normally

8 outspoken, or quiet when they are not normally quiet.

9     Q.    If someone exhibited changes in behavior,

10 what did that indicate to you based on your training?

11          MR. FARRAH:  Objection.

12     A.    That the alcohol was starting to take some

13 sort of affect on them.

14     Q.    How would you know whether or not their

15 behavior was beginning to change?

16          MR. FARRAH:  Objection.

17     A.    Usually when we greet a table, we're taught

18 to greet them and introduce ourselves, try and find out

19 something about them, even what they did that day, what

20 were you out doing today.  Something to that affect, tell

21 them about the specials, they would ask questions about

22 the specials, so by the time we at least got a drink or

23 an appetizer order, we have spoken with them for at least

24 a few minutes.

25     Q.    Is that the baseline from which you determine

147

1 changes in behavior?

2     A.    Yes.

3     Q.    In addition to the bar code training in those

4 monthly meetings that you had at Longhorn, what issues

5 were arose concerning the service of alcohol?

6     A.    Anything that a bartender may have an issue

7 with, specifically it may be if we are taking too long to

8 pick up our drinks, or if maybe we're hounding on them

9 that we need our drinks, that they are taking too long.

10 They try and make us understand, you know, from their

11 point of view.

12     Q.    Can you describe for me what type of a

13 restaurant the Longhorn is, the one you worked at in

14 Leominster, Massachusetts which is the subject of this

15 litigation?

16          MR. FARRAH:  Objection.

17     A.    I would say it's more of a --

18     Q.    Let me ask it again.  You worked at the

19 Longhorn in Leominster; correct?

20     A.    Yes.

21     Q.    Can you describe it for me?

22          MR. FARRAH:  Objection.

23     A.    It was more of a dining establishment than --

24 I would say more of an upscale casual dining atmosphere

25 rather than an Applebee's and a TGIFriday's or something.

148

1     Q.    What do base that opinion on?

2          MR. FARRAH:  Objection.

3     A.    Having experience in the restaurant business,

4 working in two separate restaurants.  The customers we

5 have in there are more familiar, couples coming in there.

6     Q.    Do you consider this to be a gin mill?

7          MR. FARRAH:  Objection.

8     A.    No.

9     Q.    Do you know what a gin mill is?

10     A.    Yes.

11     Q.    Are there any in the area of the Leominster

12 Longhorn?

13     A.    I would say there's a few.

14     Q.    Such as?

15     A.    There is Slatery's, I would say.  There's

16 another Chinese restaurant down the street.

17     Q.    Do you know the name of that?

18     A.    Chop Sticks, I believe.  There is another one

19 that is almost a club down in Leominster.

20     Q.    If I wanted to go out and get drinks during

21 the evening as opposed to just sit and have a nice

22 dinner, where would I go in your opinion?

23          MR. FARRAH:  Objection.

24     A    Just to have drinks?

25     A.    Yes.

150

```
 1      A.    More one of the bar type atmosphere ones. I
 2 wouldn't say it was a place to just come and drink.
 3      Q.    There was a bar at Longhorn; correct?
 4      A.    Yes.
 5      Q.    Was there a bar crowd that normally came into
 6 the bar routinely?
 7            MR. FARRAH:  Objection.
 8      A.    No.
 9      Q.    Can you tell me what you base that on?
10      A.    Working there for four years and seeing the
11 crowds that come in.  The bar was usually, if we're
12 running a wait or some guys just want to come in and grab
13 lunch, you know, even if it's workers -- you know,
14 construction guys, they come in, might eat at the bar
15 because they're by themselves, and then run out real
16 quick during their lunch.
17      Q.    Based on your experience at Longhorn in the
18 evenings when you worked, what did the bar crowd consist
19 of?
20      A.    People waiting for tables.
21      Q.    Do you know Christen O'Donnell?
22      A.    Just from working with her.
23      Q.    When you worked with her, did you form an
24 opinion as to her abilities as a bartender?
25            MR. FARRAH:  Objection.
```

Starkings Court Reporting & Video Services

```
 1      A.    I do.  I believe she was a good bartender.
 2 She was responsible.
 3      Q.    Let me ask you the next question, what was
 4 your opinion?
 5      A.    She was a good bartender.
 6            MR. FARRAH:  Same objection.
 7      Q.    Turning my attention briefly to the night of
 8 September 26 and ask you about the particular night.  Did
 9 you see Mr. Southworth get up from the table at all that
10 evening?
11      A.    I did.
12      Q.    When?
13      A.    He got up at one point, I believe probably
14 from what I believe to be halfway through the meal, went
15 to the restroom.
16      Q.    You specifically remember that?
17      A.    Yes.
18      Q.    Did you make any observation of him going to
19 the men's room?
20      A.    Nothing that would make me standout.
21      Q.    Was there anything in his behavior when he
22 got up to go to the men's room that would cause you to
23 believe that he may be under the influence of alcohol?
24      A.    No.
25            MR. FARRAH:  Objection.
```

Starkings Court Reporting & Video Services

151

```
 1      Q.    Can you describe his -- Mr. Southworth, his
 2 demeanor the several times you served him at the
 3 Longhorn?
 4            MR. FARRAH:  Objection.
 5      A.    Just out of the times I know of him coming
 6 in, and the time I waited on him, he was a friendly kid.
 7 He wasn't overly outgoing.  If you talked to him, he'd
 8 talk back, but he wasn't one to initiate anything.
 9      Q.    Who at the table was ordering the drinks, the
10 rounds?
11      A.    Mainly it was the gentleman in the black hat
12 with black hair.
13      Q.    Did Mr. Southworth order any rounds from you
14 directly?
15      A.    Directly, no.
16      Q.    In your direct examination with Mr. Farrah,
17 he asked some questions about policies and procedures.
18 Do you remember those questions?
19      A.    Yes.
20      Q.    What was your practice -- what was the
21 practice of Longhorn when you worked there as to when a
22 bartender would come and talk to you about a particular
23 patron?  Was there a reason for them to do that?
24            MR. FARRAH:  Objection.
25      A.    Yes, if a bar --
```

152

```
 1      Q.    Let me ask the -- what would be the reason
 2 that a bartender might talk to you about a patron?
 3            MR. FARRAH:  Objection.
 4      A.    If they had any concerns that maybe that
 5 person shouldn't have any more to drink.  Or if that
 6 person had anything for them to be concerned about.  If
 7 they had asked him -- if she had served them a drink but
 8 didn't put on the bill, she would certainly come over and
 9 say, hey, he did have a beer from me, put it on his bill.
10 And we'd just hit, do not make, and then it would come up
11 at the bar, do not make, and she'd know not to make it.
12      Q.    Was there a mechanism at the Longhorn for you
13 to input a drink at the request of the bartender, so that
14 it would come out and be charged to the bill but not be
15 served at the bar?
16      A.    For?
17      Q.    Let me rephrase it.  You mentioned that there
18 were occasions where a bartender would tell you to put a
19 drink on that they hadn't had the opportunity to put on
20 at the bar; correct?
21      A.    Correct.
22      Q.    You would input that into the computer?
23            MR. FARRAH:  Objection.
24      A.    Yes.
25      Q.    When you input a drink on the computer, does
```

154

```
 1  it come out on the bill?
 2        MR. FARRAH:  Objection.
 3   A.    No.  The drink comes out on the bill.
 4   Q.    How does a drink come out on the bill that is
 5  not -- does not come out of the service bar?
 6        MR. FARRAH:  Objection.
 7   A.    The drink would come up at the service bar,
 8  but printed right on the little -- under it, it would
 9  say, do not make.  We have to type that in.  There is
10  like a little typ -- a little pad on the computer, we
11  write it in.  And anything that is written in will not
12  show up on the bill.
13   Q.    Let me ask it a different way.  What is the
14  mechanism for putting a bill on the drink -- a drink on
15  the bill so that it is on the bill charged, but not
16  poured?
17        MR. FARRAH: Objection.
18   A.    Do not make.
19   Q.    Has that ever happened with you?
20   A.    Yes.
21   Q.    Is it a common or uncommon practice?
22        MR. FARRAH:  Objection.
23   A.    Not very common.
24   Q.    In all of the time, the three years that you
25  -- well, strike that.
```

Starkings Court Reporting & Video Services

```
 1        What was your practice about when you would
 2  take an order of drinks from people who already had
 3  drinks at the table?
 4   A.    If they already had drinks at the table,
 5  their drink would have to be empty or very close to empty
 6  to the point if I knew I was returning with a drink it
 7  would be empty by the time I got there.
 8   Q.    Was there a policy in place at Longhorn as to
 9  when you were allowed to take the next drink order to
10  people who already had a drink.
11   A.    Not when we took the order no, but they were
12  not allowed to have two drinks in front of them.
13   Q.    If I had a drink with something in it, and
14  you were bringing me my next drink, would you serve that
15  drink to me?
16   A.    No.
17        MR. FARRAH:  Objection.
18   Q.    Why not?
19        MR. FARRAH:  Objeciton.
20   A.    That was Longhorn policy.
21   Q.    What would I have to do or what would you
22  have to do in order for me to get that next drink?
23   A.    I would either bring the drink back to the
24  bar and leave it there until your drink was done, or wait
25  until you were done with it, and then leave it.  But I
```

Starkings Court Reporting & Video Services

155

```
 1  would not leave it at the table while you still had some
 2  left.
 3   Q.    Could I give you the drink with some left to
 4  get the next drink?
 5        MR. FARRAH:  Objection.
 6   A.    Yes.
 7   Q.    In your -- I believe you worked at Longhorn
 8  for just over three years; correct?
 9   A.    Yes.
10   Q.    In the time period that you worked at
11  Longhorn, do you have a memory of ever giving somebody a
12  drink and leaving another drink in front of them?
13   A.    No.
14   Q.    Do you know if that ever happened to you?
15        MR. FARRAH:  Objection.
16   A.    No.
17   Q.    Did it happen on September 23, 2003 at the
18  Southworth table?
19   A.    No.
20   Q.    Now, you had mentioned earlier in response to
21  Mr. Farrah's questions that there was several people that
22  came from the bar; correct?
23   A.    Yes.
24   Q.    Do you remember what they were wearing when
25  they came from the bar?
```

156

```
 1   A.    They were wearing casual dress clothes,
 2  T-shirts, hats, pants, sneakers, boots.
 3   Q.    I am talking about the three who had
 4  drinks, were those the three who --
 5        MR. FARRAH:  Objection.
 6   A.    Yes.
 7   Q.    The people -- let me rephrase the question.
 8  The people who brought drinks to the table, do you
 9  remember what they were wearing?
10   A.    I remember specifically Mr. Southworth
11  because he was in my point of view mainly, most of the
12  time and he just had a shirt with some sweat pants and
13  boots.
14   Q.    He was one of the people who brought a drink
15  from the bar?
16        MR. FARRAH:  Objection.
17   A.    Yes.
18        VIDEOGRAPHER:  Can we go off the record
19  please to change tapes.
20        (Off the record.)
21        (Back on the record as follows:)
22  BY MR. GILLIS:
23   Q.    Back in September of 2003 what was your
24  practice when you took the initial order for appetizers
25  and drinks at the table?
```

158

```
1        A.    If I took an order for drinks and appetizers,
2   it would be to put the drinks and appetizers in right
3   away.  Get that first round out to them, so they have a
4   drink in front of them, and get some bread and appetizers
5   out to them after that.
6        Q.    Why do you do it in that order?
7        A.    So that the person's not sitting there at the
8   table with nothing.
9        Q.    Do you bring the menus or are they already
10  there?
11       A.    They are already there.
12       Q.    How do they get the menus?
13       A.    The hostess brings them.
14       Q.    Do they get the menus when they are seated?
15       A.    Yes.
16       Q.    Do you remember how many hostesses were on
17  back in September 2003 on Friday night?
18       A.    I don't remember specifically, but they'd
19  usually three or four.
20       Q.    How many managers were on on a Friday night
21  back in September 2003?
22       A.    At least two.
23       Q.    Could there be more than two?
24       A.    Yes.
25       Q.    You mentioned earlier that the managers touch
```
Starkings Court Reporting & Video Services

```
1   the table, do you remember stating that?
2        A.    Yes.
3        Q.    Can you explain what touching the table
4   means?
5        A.    One manager is assigned specifically to the
6   floor that night, and their job basically is to
7   consistently make sure that the hostess -- the table up
8   front, the hostess stand is going how it's supposed to be
9   going, they're keeping up with their times, and to walk
10  through the restaurant and greet each table that's sat
11  down, or at least stop by that table and ask how their
12  meal was that night.
13       Q.    Each time that it's reset they would do that?
14       A.    Yes.
15       MR. FARRAH:  Objection.
16       Q.    You had mentioned in response to Mr. Farrah's
17  questions that you made certain judgment calls; correct?
18       A.    Yes.
19       Q.    If you had a question about a patron, for any
20  reason, was there a policy in place as to what you could
21  do?
22       A.    You -- it was open door.  You could go to the
23  manager right away.
24       Q.    Is that what you were instructed?
25       MR. FARRAH:  Objection.
```
Starkings Court Reporting & Video Services

159

```
1        A.    Yes.
2        Q.    Have you ever gone to a manager for a
3   situation?
4        A.    Absolutely.
5        Q.    What types of situations?
6        A.    People upset about their food taking too
7   long.  People upset about how it's cooked, drinks taking
8   too long.
9        Q.    So your practice back in September of 2003
10  was that after you seat them, you get the appetizers and
11  the drinks; correct?
12       A.    Yes.
13       Q.    Usually, how long would it take you to get
14  the appetizers out?
15       A.    The appetizers was anywhere -- if it was
16  soup, it would be on me, so usually the soup doesn't take
17  long at all.  But any appetizers ordered could take up to
18  15 minutes.
19       Q.    When you say it's on you, can you explain
20  that?
21       A.    I go back and put the soup in a cup and bring
22  it out to them.
23       Q.    The soup is already out there where you have
24  access to it?
25       A.    Yes.
```

160

```
1        Q.    Just take a ladle and put it in?
2        A.    Yes.
3        Q.    So if people ordered -- that night, I'll call
4   the table the Southworth table.  If the Southworth table
5   ordered clam chowder, that would come out immediately?
6        A.    It could, but usually if there is other
7   appetizers I would just bring them all together.
8        Q.    As part of the bar code system that you were
9   trained in at Longhorn, can you tell us if it discussed
10  at all the effects of food on alcohol?
11       A.    Yes, it did.
12       Q.    What did it explain to you?
13       A.    It explained to us that more fatty foods,
14  heavier foods slow down the effects of alcohol on the
15  body.  And you know, if someone is not eating, but they
16  are drinking drinks pretty quick, it's going to have
17  effect on them right away, because it's soaking into
18  their blood stream right away.  But alcohol with food
19  kind of slows everything down.
20       Q.    Does it effect the -- Does it effect whether
21  or not they become intoxicated or does it just affect the
22  rate at which the alcohol absorbs into their system; what
23  you know from your training?
24       MR. FARRAH:  Objection.
25       A.    The rate of which it's absorbed into your
```

162

1  system.
2    Q.    Okay, let me rephrase the question.  Based on
3  your bar code training, how does giving someone food
4  affect their intoxication from the alcohol they may be
5  drinking?
6         MR. FARRAH:  Objection.
7    A.    It's going to affect the rate alcohol is
8  absorbed into their system.
9    Q.    Does it make them less intoxicated if they
10 get to that point?
11        MR. FARRAH:  Objection.
12   A.    No.
13   Q.    And you're aware of that?
14   A.    Yes.
15   Q.    Do you have any other training outside the
16 restaurant that -- concerning alcohol consumption at all?
17        MR. FARRAH:  As of September 26, 2003?
18   Q.    As of 26, 2003.
19   A.    After the fact?
20   Q.    Before the fact?
21   A.    Before the fact.  Just the training we got
22 briefly at J&B's.
23   Q.    What did that consist of?
24   A.    That was a more casual training setting
25 compared to the extensive training we had at Longhorn.

163

1    Q.    The first full round, we'll call it the seven
2  --.
3    A.    When I ordered seven together?
4    Q.    Yes.
5    A.    I don't recall how long it would have been.
6  But I don't believe I would have served them before they
7  got their salads.
8    Q.    Why is that?
9    A.    There having -- There drinking a round.  It
10 would have been too quick to have a round right with --
11 they drink a round and then have another round still with
12 their appetizers.
13   Q.    If you had ordered the seven and you went
14 back to the table and only three had finished, what would
15 you have done?
16        MR. FARRAH: Objection.
17   A.    Waited to either serve those three and held
18 the other four back, or held all seven back until all
19 seven were ready for their drinks.
20   Q.    In September 26, 2003 was your practice
21 concerning -- strike that.
22        You've already testified that back in
23 September of 2003 your practice when someone sat down was
24 to get their drinks right away when they initially sat
25 down; is that correct?

1  It was a more on the floor at your own judgment, but we
2  did have a small booklet we went through.
3    Q.    Do you remember whether or not the people who
4  brought drinks from the bar that night, their drinks were
5  full when they got to the table?
6    A.    I don't recall.
7    Q.    Now, you testified earlier that you put in
8  another order about 11 minutes thereafter; correct?
9    A.    Yes.
10   Q.    That is based on reviewing the audit report;
11 is that correct?
12   A.    Yes.
13   Q.    Did you have any independent knowledge of
14 that before you reviewed that audit report?
15   A.    No.
16   Q.    By the way, when was the first time you saw
17 that audit report?
18   A.    Yesterday.
19   Q.    Is that audit report consistent with your
20 memory as to how many drinks you served Mr. Southworth?
21        MR. FARRAH: Objection.
22   A.    Yes.
23   Q.    Do you remember how long it took to serve
24 that next round of drinks to the table?
25        MR. FARRAH:  The 8:51 round?

164

1    A.    Yes, sir.
2    Q.    We are now on to that second round which was
3  seven Manhattans at the Southworth table.  Did your
4  practice for a second round of drinks differ at all from
5  your practice when someone first sat down at the table?
6         MR. FARRAH:  Objection.
7    A.    The second round wasn't as rushed --
8    Q.    Did it affect it, yes or no?
9    A.    Yes.
10   Q.    Excuse me, was it different?
11   A.    Yes.
12   Q.    How was it different?
13        MR. FARRAH:  Same objection.
14   A.    I wouldn't rush to go get the drinks, because
15 I know they already have food in front of them.
16 Appetizers, if not appetizers, they at least had bread in
17 front of them.  They were occupied with something.  They
18 weren't at the table with nothing to eat or drink.
19   Q.    Subsequent to that you brought food to the
20 table; is that correct?
21   A.    Yes.
22   Q.    Later on in the evening you brought a final
23 round of drinks; correct?
24   A.    Yes.
25        MR. GILLIS:  Go off the record for a second.

166

1          (Off the record.)

2          (Back on the record as follows:)

3     BY MR. GILLIS:

4          Q.     Exhibit #8, when you were at Longhorn you

5     knew what this first page was; correct?

6          A.     Yes.

7          Q.     What does that first page represent?

8          A.     The check from that night.

9          Q.     Is that something you would normally print

10    out for the people at the table?

11         A.     Yes.

12         Q.     Is that the check for the Southworth table?

13         A.     Yes.

14         Q.     Do you remember serving that table anything

15    that's not included on that check?

16         A.     Just the Sprite.

17         Q.     Have you ever picked up a check where people

18    have left an amount of money that included the tip and

19    the charges?

20              MR. FARRAH:  Objection.

21         A.     Yes.

22         Q.     In September of 2003 was it a practice of --

23    have you ever picked up a check that people just left the

24    money on the table and left?

25         A.     Yes.

1          Q.     If you -- back in September of 2003, if you

2     didn't have to make change for a table, were you required

3     to put the check immediately in the computer?

4          A.     No.

5          Q.     Have you ever held onto the check until it

6     was less busy to put it in?

7          A.     Yes.

8          Q.     Do you know whether or not you did that on

9     this evening?

10              MR. FARRAH:  Objection.

11         A.     Not particularly.

12         Q.     Mr. Farrah has asked you several questions

13    about another table; do you remember that?

14         A.     Yes.

15         Q.     Do you remember any of the people from the

16    Southworth table being charged for that other tab that he

17    spoke about earlier in the deposition?

18         A.     No.

19              MR. FARRAH:  Objection.

20         Q.     If that were part of their bill, would it be

21    included on the front page of Exhibit #8?

22              MR. FARRAH:  Objection.

23         A.     I would assume so, yes.

24         Q.     Now, I want to point your attention to what

25    has been referred to earlier as the third round of

167

1     drinks; do you remember that?

2          A.     Yes.

3          Q.     Now, there are two entries here, at 9:21 and

4     I believe 9:24; is that correct?

5          A.     Yes.

6          Q.     I am referring now to the entries of drinks;

7     is that correct?

8          A.     Yes.

9          Q.     What are the two entries?

10         A.     It's four Jack Daniels Manhattans, and then

11    at 9:24, three Jack Daniels Manhattans.

12         Q.     Do you have an explanation why you have a

13    total of seven, but they're put in three minutes apart?

14         A.     The only explanation I have is that they

15    ordered them that way.  Three might have been ready for a

16    drink and the other four weren't, and then shortly right

17    after the four were ready.  Or I put in three and then

18    logged out and then put in four more.

19         Q.     What is the total number of years that you've

20    spent waitressing where you've, while you were

21    waitressing, you would serve alcoholic drinks as well?

22         A.     The whole time I've waitressed, which -- six

23    years.

24         Q.     Have you ever in your six years served drinks

25    three minutes apart to the same person?

168

1          A.     To the same -- No.

2          Q.     How far is the computer that you input these

3     drinks from the table?

4          A.     There is different computers all throughout

5     the restaurant.

6          Q.     How many computers?

7          A.     Four of them that I remember that we have

8     access to.

9          Q.     Where is the closest in relationship to the

10    table where the Southworth party was sitting?

11         A.     Right behind it.

12         Q.     Okay, if you were standing at the computer

13    importing something, could they talk to you from the

14    table?

15         A.     Absolutely.

16         Q.     I am going to show you what has been put in

17    by Mr. Farrah as Exhibit #14 to your deposition.  And I

18    would like for you, if you could, to hold up the picture

19    and point to the table and the closest computer terminal,

20    if you know?

21         A.     Their table is right here, and the computer

22    is right there.

23         Q.     So what's that about four feet?

24         A.     If that, yes.

25         Q.     Have you ever had an occasion before then

170

1  where you put one order in in two separate segments?

2      A.    Yes.

3      Q.    Is that a common practice?

4      A.    Yes.

5      Q.    Exhibit #13 that Mr. Farrah showed you, have

6  you ever seen that exhibit before today?

7      A.    No.

8      Q.    So you're not aware of Plaintiff's in this

9  case filing a separate lawsuit against Mr. Southworth?

10     A.    No.

11     Q.    When you brought that last round of Jack

12 Daniels Manhattans, do you remember if all of them were

13 drank that evening?

14     A.    I don't know if all of them --

15           MR. FARRAH:  Objection to the form.

16     Q.    Do you remember bringing that last round of

17 drinks to the table?

18     A.    Yes.

19     Q.    Did you bring them three and four separately

20 or did you bring them all together?

21     A.    I believe from what I remember I brought them

22 all together.

23     Q.    Were all of them drank that evening?

24     A.    Fully drank, I don't remember.

25     Q.    Do you ever remember one of them not being

Starkings Court Reporting & Video Services

---

1  touched at all?

2           MR. FARRAH:  Objection.

3      A.    Yes.

4      Q.    Can you explain to me whether or not --

5  strike that.

6           That last round of drinks, did you return any

7  of them to the bar?

8      A.    Yes.

9      Q.    Can you explain that?

10          MR. FARRAH:  Objection.

11     A.    I returned one to the bar.  I remember coming

12 to the table and one person had not finished with their

13 drink.  And I didn't drop it at the table, so I just

14 brought it back with me to the bar and left it there.

15     Q.    Did you -- is there anything that triggered

16 your memory as to why you remember that specifically?

17     A.    I remember the bartenders have a waste sheet

18 at the end of the night and it was still sitting at the

19 end of the bar because it was with their last round and

20 it was later in the evening, and Christen had said to me,

21 is this any good?  And I said no.

22          MR. FARRAH:  Objection

23     Q.    You spoke earlier about inputting money into

24 the computer.  Can you explain that process for us?

25     A.    When we go to cash out the check there is

Starkings Court Reporting & Video Services

---

171

1  options on the side we can check, cash, gift card, credit

2  card.  And if it is cash, we are going to hit -- select

3  cash.  And then it comes up with the denominational

4  buttons.  And if someone hands me $120, I am just going

5  to hit the one hundred dollar bill button and the twenty

6  dollar bill button.  I am not going to enter a ten dollar

7  bill button twelve times.

8      Q.    What are the denominations that you can chose

9  from on the computer at Longhorn when you were working

10 there in September of 2003?

11     A.    Normal dollar bills that you'd have in normal

12 use, a one, a five, a ten, a twenty, hundred.

13     Q.    So if someone gave you a hundred one dollar

14 bills, you had the option of putting in one dollar a

15 hundred times or a hundred in once; correct?

16     A.    Yes.

17     Q.    And do you remember how you put in the

18 amounts that evening?

19     A.    No.

20     Q.    Does that audit sheet show you how you

21 inputted the money that evening?

22     A.    Yes.

23     Q.    How did you put it in?

24     A.    A one hundred, a one hundred, a twenty and a

25 twenty.

---

172

1      Q.    For a total of $240?

2      A.    Yes.

3      Q.    On the bill of $202 plus change?

4      A.    Yes.

5      Q.    Was that common practice for you in September

6  of 2003?

7      A.    Yes.

8      Q.    I want to show you Exhibit #12 that was

9  introduced here, which shows the floor plan of the

10 Longhorn.  Can you point out, and why don't you take a

11 pen and circle the various computers where you could

12 input a drink for a patron to that evening?

13     A.    (Complies.)

14     Q.    Why don't you hold that up.  How many

15 different -- why don't you point out the various places

16 where there are computer terminals where you could input

17 something.

18     A.    There's a terminal here, a terminal here and

19 then in the back alley we have two.  One by the dish pit

20 and one right in front of the bar.

21     Q.    And the first one that you pointed out is the

22 one next to the Southworth table; correct?

23     A.    Yes.

24     Q.    Why would you go to one terminal as opposed

25 to another?

1    A.    Mostly likely would be because the terminal
2 is closest to our section.
3    Q.    Okay, but if someone was using that terminal,
4 where would you go?
5    A.    The back alley.
6    Q.    Going back to the audit report, the entire
7 exhibit there that's marked, had you ever seen audit
8 reports before you saw this audit report yesterday?
9    A.    No.
10    Q.    Is that something that is commonly provided
11 to the servers on a regular basis?
12        MR. FARRAH:  Objection.
13    A.    I have never seen one of those.
14    Q.    Did the state police, when you gave them this
15 statement, show you the audit report?
16    A.    No.
17    Q.    Did that audit report refresh your
18 recollection at all today?
19        MR. FARRAH:  Objection.
20    A.    Yes.
21    Q.    You had mentioned in response to Attorney
22 Farrah's questions that you had spoken with Christen
23 O'Donnell at the bar that evening; correct?
24    A.    Yes.
25    Q.    That was when you got that last -- what I am

1 calling that last round, which is the three and the four
2 Manhattans that were ordered three minutes apart.
3    A.    Yes.
4    Q.    After the seven Manhattans were ordered, is
5 that when the conversation took place?
6    A.    Yes.
7    Q.    Did you, on the basis of that conversation,
8 examine any further whether or not these patrons were
9 showing any signs of intoxication?
10        MR. FARRAH:  Objection.
11    A.    I believe it raised my awareness to if they
12 had ordered any more after that, I would have seriously
13 considered it.
14    Q.    Well, between the time that the drinks were
15 ordered and you brought them to the table, did you look
16 at them again?
17        MR. FARRAH:  Objection.
18    A.    I don't believe I did, no.
19    Q.    When you brought the drinks over to the
20 table, at that time, was there any question in your mind
21 that anybody at that table showed visible signs of
22 intoxication?
23    A.    No.
24        MR. FARRAH:  Objection.
25    Q.    When you brought that last round of drinks

175

1 over to the table, by that I mean the three and four
2 combined, was there any question in your mind as to
3 whether or not Mr. Southworth was showing any visible
4 signs of intoxication?
5    A.    None at all.
6    Q.    And by none at all, you mean he was showing
7 no signs?
8    A.    To me, no signs.  He was acting like he
9 normally acted.  He wasn't doing anything out of his
10 ordinary behavior.
11    Q.    Was he slurring his words?
12    A.    No.
13    Q.    Was he knocking over drinks?
14    A.    No.
15    Q.    Did he spill any drinks?
16    A.    No.
17    Q.    Was he asleep at the table?
18    A.    No.
19    Q.    Was he glassy-eyed?
20    A.    No.
21    Q.    Did he act in any manner other than when you
22 had previously served him and he appeared perfectly fine
23 to you?
24    A.    No.
25    Q.    I am sorry.  I know you answered it, but I

176

1 forgot your answer.  How many times had you served him
2 prior to this occasion?
3    A.    Maybe once.
4    Q.    How many times have you seen him in there
5 with other waitresses, or wait staff?
6    A.    I can't say exactly for sure.
7    Q.    You have seen him being served by Sherry
8 before; correct?
9    A.    Yes.
10    Q.    You've heard Sherry comment about him;
11 correct?
12    A.    Yes.
13    Q.    Did you feel that you had some knowledge of
14 this gentleman before you served him that evening?
15        MR. FARRAH:  Objection.
16    A.    Yes.
17    Q.    Is there a person -- this was not a person
18 you had served for the first time; correct?
19    A.    No.
20    Q.    Did you have any experience with him from
21 which you could further determine his degree of sobriety
22 that evening?
23        MR. FARRAH:  Objection.
24    A.    The first time I served him?
25    Q.    Yes.

1    A.    Yes.

2    Q.    You had mentioned in response to Attorney

3 Farrah's questions that there were -- you noticed that

4 there were five checks printed that evening; correct?

5    A.    Yes.

6    Q.    I believe you testified you're not sure why

7 five checks were printed; correct?

8    A.    Yes.

9    Q.    Based on your experience and training while

10 working for Longhorn Restaurant, can you tell me as you

11 sit here today, what are the possible reasons you would

12 print five checks for a table back in September of 2003?

13        MR. FARRAH:  Objection.

14    A.    No other reason except for if I had tried to

15 print it and it didn't print for some reason at that

16 computer, I'd go to another terminal, try it.  Or if I

17 had printed it and maybe sat the book down and had to

18 reprint it because I had put it down somewhere and didn't

19 have it.

20    Q.    Okay.  Have you ever printed multiple checks

21 for a table for people splitting the bill?

22    A.    Yes.

23    Q.    How do you do that? .

24    A.    You go in and you separate it and then you

25 have to print each individual check.

Starkings Court Reporting & Video Services

1    Q.    Could you print multiple copies to give to a

2 table and let them decide if they wanted to?

3        MR. FARRAH:  Objection.

4    A.    Yes.

5    Q.    Have you ever done that?

6    A.    Yes.

7    Q.    How many times did they sit around in the

8 restaurant after you served them that last round of

9 drink, if you remember?

10        MR. FARRAH:  Objection.

11    A.    If I remember it would have been at least a

12 half hour.

13    Q.    So from -- other than seeing Mr. Southworth

14 on the news the following evening, is there anything that

15 happened on the night of September 26, 2003 that was out

16 of the ordinary, that would have jogged your memory to

17 remember this evening?

18    A.    No.

19        MR. FARRAH:  Objection.

20    Q.    Was there anything that happened that night

21 while you were at the restaurant, before you learned

22 about Mr. Southworth on the news, that was out of the

23 ordinary?

24    A.    No.

25    Q.    Was there anything out of the ordinary that

Starkings Court Reporting & Video Services

179

1 night with any other table?

2    A.    No.

3    Q.    You had mentioned earlier in response to Mr.

4 Farrah's questions the suggestive selling.  Can you

5 explain what suggestive selling is?

6    A.    Any specials we have, we will suggest it to

7 them or try and sell them on that fact of if they order a

8 steak, we'll ask them if they want ribs with it.

9    Q.    Have you ever heard the term up-selling?

10    A.    Yes.

11    Q.    Can you tell me what your understanding of

12 up-selling is?

13    A.    Up-selling would be if someone asked for a

14 particular -- if they ask for a screwdriver, and it would

15 just -- if we didn't up-sell it, we'd just put it in with

16 our regular house vodka, or you know, we'd up-sell, oh,

17 would you like Absolute, Kettle One, so on and so forth.

18 Try and sell them on a more premium liquor to go in the

19 drink.

20    Q.    Does up-selling include in any way increase

21 in the amount of the drink or just using a higher caliber

22 liquor in the drink?

23    A.    Just a higher liquor in the drink.

24    Q.    By higher you mean better quality, not higher

25 volume of alcohol in the drink?

180

1    A.    Correct.

2    Q.    You gave the term vodka, rather than a bar

3 vodka, it might be Absolute or some other type of vodka;

4 is that correct?

5    A.    Yes.

6    Q.    Is there a difference in the price to that?

7    A.    Yes.

8        MR. GILLIS:  Could we go off the record just

9 a second.

10        (Off the record.)

11        (Back on the record as follows:)

12 BY MR. GILLIS:

13    Q.    Back when you were working at the Longhorn

14 and specifically September 2003, do you have a memory as

15 to how much food you would serve compared to alcohol?

16        MR. FARRAH:  In dollars?

17        MR. GILLIS:  In dollars, yes.

18        MR. FARRAH:  That would be apples and

19 oranges.

20        MR. GILLIS:  That's a good point.  Let me

21 just rephrase the question.

22    Q.    Dollarwise, do you have a memory as to how

23 much alcohol you served in relation to the amount of

24 dollars spent on food at the Longhorn when you were

25 working there back in September of 2003.

182

```
1     A.    I would say 85 to 90 percent of our sales
2 that night were food.
3     Q.    That was common for you?
4     A.    Yes.
5     Q.    So that would mean ten to 15 percent was
6 alcohol?
7     A.    Yes.
8     Q.    Now, you mentioned earlier that you consider
9 this a family restaurant; correct?
10    A.    Yes.
11         MR. FARRAH:   Objection.  I don't think she
12 said that, but go ahead.
13    Q.    In this -- in that restaurant when did it
14 start to slow down normally on Friday night?
15    A.    I would say about 9:30, 10:00.
16    Q.    By slow down, can you describe for me what
17 you mean by that?
18    A.    There wouldn't be a wait any more.  I would
19 say about 30 to 40 percent of the tables had already left
20 for the night, and probably wouldn't be reseat.
21    Q.    How does the noise level at 10:00 compare to
22 the noise level at let's say 8:00?
23    A.    There shouldn't be too much at all.
24    Q.    When the restaurant is full earlier in the
25 evening, is it generally loud in the restaurant?
```

```
1     A.    Yes.
2     Q.    Is it louder at 8:00 to 9:00 than it is 9:30
3 to 10:00 on average?
4         MR. FARRAH: Objection.
5     A.    Yes.
6     Q.    Do you remember when it started to slow down
7 on the night that you served Mr. Southworth in September
8 of 2003?
9     A.    I remember that right before they left it had
10 already slowed down, pretty much, probably for the night.
11    Q.    How long before they left had it slowed down?
12         MR. FARRAH: Objection.
13    A.    Twenty minutes.
14    Q.    Were you able to hear their conversation more
15 clearly at that point than earlier in the evening?
16    A.    Yes.
17    Q.    Do you remember the topics that they were
18 talking about?
19    A.    Not in particular, no.
20    Q.    Do you remember whether or not anybody at the
21 table slurring their words?
22    A.    I don't remember they were, no.
23    Q.    Do you remember if anybody was talking louder
24 than they had been previously in the evening?
25    A.    No.
```

183

```
1     Q.    If I spoke to same at 8:00 as I did at 10:00,
2 would it resinate further in the restaurant at that time
3 period?
4         MR. FARRAH:  Objection.
5     A.    Yes.
6     Q.    Why is that?
7     A.    You're speaking over the music that they've
8 turned up to kind of dull out the noise of everybody
9 talking, the noise of everyone around you, the crowd at
10 the front waiting area of everybody waiting, the crowd at
11 the bar of everybody waiting.  You're trying to speak
12 over all that to have other people hear you.
13    Q.    Is most of that background noise eliminated
14 later in the evening, by later I mean after 9:30 or so?
15         MR. FARRAH:  Objection.
16    A.    Yes.
17    Q.    Have you ever been deposed before?
18    A.    No.
19         MR. GILLIS:  I have no further questions.
20
21         EXAMINATION BY MR. FARRAH.
22    Q.    I only have a few.  What is intoxicated?
23 What does the expression of intoxicated mean to you?
24    A.    Intoxicated would be -- to me it would mean
25 that someone is showing visual signs of alcohol taking an
```

184

```
1 effect on their system.
2     Q.    Such as?
3     A.    Such as slurring their words, glossy-eyes,
4 stumbling, nystagmus in their eyes.
5     Q.    Did you say glossy eyes, G-L-O-S-S-Y.
6     A.    Yes.
7     Q.    And you said astagmus in their eyes?
8     A.    Yes.
9     Q.    S-T-A-G-N-E-S-S?
10    A.    Nystagmus.
11    Q.    Nystagmus, what is that? .
12    A.    Nystagmus is in your eyes when you try and
13 stare at something and you can't, your eyes can't focus
14 on it.
15    Q.    And have you learned that in your training as
16 a police officer?
17    A.    I've learned it again in my training as a
18 police officer.
19    Q.    You learned it before that, nystagmus, the
20 word?
21    A.    Yes.
22    Q.    From the bar code?
23    A.    No, not from the bar code.
24    Q.    From where?
25    A.    General knowledge, I think dealing with
```

186

```
 1  things.
 2      Q.    And have you ever served 17 Jack Daniels
 3  Manhattans to a table in the space of 44 minutes before
 4  that night?
 5            MR. GILLIS:  Objection.
 6      A.    No, sir.
 7      Q.    Had you ever served 17 Jack Daniels
 8  Manhattans and two 25 ounce beers to a table in the space
 9  of 44 minutes before that night?
10            MR. GILLIS:  Objection.
11      A.    No, sir.
12      Q.    Had you ever served the equivalent of 19
13  double drinks to a table in the space of 44 minutes
14  before that night?
15            MR. GILLIS:  Objection.
16      A.    No, sir.
17      Q.    Have you ever served the equivalent of 38
18  drinks, nearly a drink per minute, to a table before that
19  night?
20      A.    No, sir.
21      Q.    And there was nothing unusual about that
22  night; is that your testimony?
23      A.    Yes, sir.
24            MR. FARRAH:  I don't have any more questions.
25
```

Starkings Court Reporting & Video Services

```
 1            EXAMINATION BY MR. GILLIS:
 2      Q.    Just one or two.  When you factor in whether
 3  or not a person is or in the red or yellow zone, do you
 4  focus in on the total number of drinks served to people
 5  other than the person that you're focusing in on or do
 6  you just focus in on the drinks served to that one
 7  person?
 8            MR. FARRAH:  Objection.
 9      A.    I don't understand.
10      Q.    You're giving me a strange look.  That's
11  probably an inarticulate question.  You've heard Mr.
12  Farrah talk about all of these various drinks that came
13  to the table; correct?
14      A.    Yes.
15      Q.    There were how many people at the table?
16      A.    Seven.
17      Q.    How did your training and experience as a
18  waitress, did you take into account when making your
19  determinations whether or not a person is under the
20  effect of alcohol, how many drinks they had that evening,
21  or what other people had that evening?
22      A.    I take into account what they've had that
23  evening.
24            MR. GILLIS:  Okay, no further questions.
25
```

Starkings Court Reporting & Video Services

187

```
 1            EXAMINATION BY MR. FARRAH:
 2      Q.    I have a last question I should have asked it
 3  before.
 4            MR. GILLIS:  I am going to object if it goes
 5  beyond the scope of the redirect and recross.
 6      Q.    And my question is, someone did not touch his
 7  drink at that table, the last drink; is that right?
 8      A.    Yes, sir.
 9      Q.    Did that indicate anything to you that that
10  person did not touch his drink?
11      A.    That was one was left back on the bar, so he
12  may have finished the one he still had in front of him
13  and they never asked for it, so I thought nothing of it.
14      Q.    What do you mean it was left back on the bar?
15      A.    I did no serve that one to the table.  So
16  instead of dumping it in the dish pit, I bring it to the
17  bar and leave it there.
18      Q.    So there's one person who had a drink in
19  front of him when the last round was ordered; is that
20  right, who you did not serve?
21      A.    When I brought the last order over, still had
22  a drink with some alcohol in it, so I did not serve it to
23  the table.
24      Q.    And didn't finish the drink that was in front
25  of him and ask for the drink that you were bringing; is
```

188

```
 1  that right?
 2      A.    I don't remember if he finally finished it or
 3  not?
 4      Q.    Do you know who that was?
 5      A.    I do not know.
 6      Q.    Was it Mr. Southworth?
 7      A.    I do not know.
 8            MR. FARRAH:  Thank you, thank you very much.
 9            MR. GILLIS:  No further questions.
10            (Off the record.)
11            (And further, the witness sayeth naught.)
12
```

```
 1  State of North Carolina
 2  County of Cumberland
 3
 4              C E R T I F I C A T E
 5
 6          I, Sandra DeGarmo Wise, notary public and
 7  certified court reporter, do hereby certify that said
 8  witness was duly sworn prior to the examination
 9  beginning, and that said examination was taken and
10  transcribed by Suzanne Thornton under my direction; and
11  the foregoing pages constitute a true and correct
12  transcription of the testimony of the witness; and that I
13  am not a relative or employee of any counsel or the
14  parties in this cause and have no interest in the outcome
15  of same.
16          In witness whereof, I have hereunto set my
17  hand and affix my official notary seal.
18
19
20          _____
21               Sandra DeGarmo Wise
22          Notary Public - State of North Carolina
23          Nationally Certified Verbatim Reporter
24              Member:  NCRA, NVRA, NCVRA
25          My commission expires:  April 30, 2009
```

Starkings Court Reporting & Video Services

Page 1

```
 1                          Volume:    II
                           Pages:     1-119
 2                          Exhibits:  None

 3            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4

 5     *****************************************
       NANCY ROSARIO, INDIVIDUALLY, AS SHE IS *
 6     THE ADMINISTRATRIX OF THE ESTATE OF     *
       AWILDA SANTIAGO, ESSEX PROBATE COURT    *
 7     #03P-2499AD1, P/P/A VERONICA ROSARIO    *
       AND CHRISTINA SANTIAGO, AND AS SHE IS   *
 8     THE ADMINISTRATRIX OF THE ESTATE OF     *
       JOSE SANTIAGO, BERLIN (CONNECTICUT)     *
 9     PROBATE COURT, CASE #03-0713            *
            Plaintiff,                         *
10                                             *
            VS                                 * Civil Action No.
11                                             * 05-CV-10617MLW
       RARE HOSPITALITY INTERNATIONAL, INC.    *
12     d/b/a LONGHORN STEAKHOUSE,              *
            Defendant                          *
13     *****************************************

14         DEPOSITION OF KRISTIN O'DONNELL, a witness

15       called on behalf of the Plaintiff, taken pursuant to

16       Notice under the applicable provisions of the Federal

17       Rules of Civil Procedure, before Barbara J. Simon, a

18       Professional Shorthand Reporter and Notary Public, in

19       and for the Commonwealth of Massachusetts, at the law

20       offices of Albert L. Farrah, Jr., One Washington

21       Mall, Boston, Massachusetts, on Wednesday, December

22       28, 2005, commencing at 11:05 a.m.

23              SHEA COURT REPORTING SERVICES
                      (617) 227-3097
24
```

Page 2

```
 1        A P P E A R A N C E S

 2     ALBERT L. FARRAH, JR., ESQ.
       Law Offices of Albert L. Farrah, Jr.
 3     One Washington Mall
       Boston, MA 02108
 4     (617) 742-7766
            Counsel for the Plaintiff
 5
       MICHAEL K. GILLIS, ESQ.
 6     Gillis & Bikofsky, P.C.
       1150 Walnut Street
 7     Newton, MA 02461
       (617) 244-4300
 8          Counsel for the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page

```
 1                    I N D E X

 2     WITNESS           DIRECT  CROSS  REDIRECT  RECROSS

 3     KRISTIN O'DONNELL

 4     (By Mr. Farrah)          4

 5

 6                  E X H I B I T S

 7     There are no exhibits.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page

```
 1              P R O C E E D I N G S

 2

 3         KRISTIN O'DONNELL, having been previously

 4     satisfactorily identified and duly sworn, on oath,

 5     deposes and says as follows:

 6

 7              DIRECT EXAMINATION

 8     BY MR. FARRAH:

 9     Q. You're still under oath.  If I cover old ground, it's

10        not because I mean to.  I'm going to try to move

11        forward.

12           Let me start by asking you, on the evening of

13        September 26, 2003, do you recall having a

14        conversation with Leigh Chabot about the Jack Daniels

15        Manhattans that she had ordered from you?

16     A. Yes.

17     Q. And did you ask Leigh about that table?

18     A. Yes.

19     Q. What did you ask her about the table?

20     A. I just wanted to make sure that they were eating

21        dinners.

22     Q. Did you say to her, in effect, "Are these people

23        eating food?"

24     A. Yes.
```

Page 5

1    MR. FARRAH: I don't have the day of your
2    deposition. If you'll excuse me, I'll just get that.
3        (Off the record.)
4    Q. Why were you concerned about whether they were
5       eating?
6    A. It was just that it's typical procedure for myself
7       and most good bartenders just to check after a second
8       round of drinks, just to make sure that they're
9       eating.
10       MR. FARRAH: You're not going to believe this,
11    but I need to get up one more time.
12       (Off the record.)
13   Q. Do you know whether or not you asked her about that
14      table and whether it was eating when the first order
15      for Jack Daniels Manhattans came in?
16   A. No.
17   Q. According to Exhibit 11, that order was placed at
18      8:40 p.m. Do you see that?
19   A. Yes.
20   Q. And is it accurate to say that information about food
21      or appetizers ordered by a table is not transmitted
22      to the service bar with the request for drinks?
23   A. That's correct.
24   Q. Do you know whether or not you had the conversation

Page 6

1       with her about whether that table had ordered food at
2       8:51 p.m. or in connection with the 8:51 p.m. order
3       that is shown on Exhibit 11?
4    A. I would say no.
5    Q. You don't know or you didn't?
6    A. I don't recall exactly but the second round of
7       drinks, I would not have questioned the second round
8       of drinks.
9    Q. Can we agree that the second round of drinks, at
10      least as it is shown on Exhibit 11, is for seven Jack
11      Daniels Manhattans?
12   A. Correct.
13   Q. It's your best memory that that didn't prompt the
14      conversation you had with Leigh Chabot; is that
15      right?
16   A. Yes.
17   Q. Do you know whether the conversation you had with
18      Leigh Chabot was prompted by what is shown on
19      Exhibit 11 as the 9:21 p.m. order of some Jack
20      Daniels Manhattans?
21   A. Yes.
22   Q. Is it your best memory that that was the order that
23      prompted the conversation?
24   A. Yes.

Page

1    Q. What was it about that order that prompted the
2       conversation?
3    A. Just that it was the second full round of drinks.
4    Q. Okay. Was there anything else about that order that
5       prompted that conversation that you can think of now?
6    A. No.
7    Q. And do you know whether or not you had a conversation
8       with Leigh Chabot when you received notification of
9       the 9:24 p.m. order for three Jack Daniels
10      Manhattans?
11   A. No.
12   Q. Do you have a memory of having a conversation with
13      her about the 9:24 p.m. order?
14   A. No.
15   Q. Okay. Did you ask Leigh Chabot about the patrons at
16      that table because the patrons at that table were
17      loud that evening?
18   A. No.
19   Q. Did you ask her about the patrons at that table
20      because someone had told you that they were loud that
21      evening?
22   A. No.
23   Q. Could you hear them during the evening?
24   A. No.

Page

1    Q. Could you see them during the evening?
2    A. I could see down to that table from the back.
3    Q. From time to time?
4    A. Yes.
5    Q. Is it accurate to say that you were very busy that
6       evening?
7    A. I would say it was a regular Friday night busy crowd.
8    Q. Flat out?
9    A. I don't recall if I was pulling my hair out, but most
10      Friday nights were busy.
11   Q. Nonstop?
12       MR. GILLIS: Objection.
13   A. I don't recall.
14   Q. Were you surprised at the number of drinks that was
15      ordered by that table during the evening?
16   A. No, not for a large party.
17   Q. Did you know how many people were in that party that
18      evening?
19   A. At least as many as drinks were being ordered.
20   Q. Seventeen Jack Daniels Manhattans were ordered that
21      evening; is that right?
22   A. Yes.
23   Q. How many people were in that party?
24   A. However many the most round contained would be the

**Page 9**

1   minimum number because only one drink would go to
2   each person.
3   Q. But that's a guess on your part, isn't it, as to how
4   many people were in the party?
5   A. Yes.  That would be better for Leigh to answer.
6   Q. Fair enough.  Are you also aware that two
7   twenty-five-ounce Budweiser sport beers were served
8   to that table that evening?
9        MR. GILLIS:  Objection.
10  A. What do you mean by "sport"?
11  Q. That's what they're called, Longhorn sport beers.
12  A. I'm not familiar with that term.
13  Q. Are you also aware that two twenty-five-ounce beers
14  were served to that table that evening?
15  A. Yes.
16  Q. Did you have a conversation with Leigh Chabot about
17  those beers?
18  A. No.
19  Q. Do you know who those beers were for, what patron at
20  that table those beers were for?
21  A. No.
22  Q. Did you have any conversation during that evening,
23  while you were making drinks, with anyone else about
24  that table?  This is the evening of 9/26.

**Page 10**

1   A. I did ask the manager if he had been by the table as
2   well.
3   Q. Did you speak to the manager about that table before
4   or after you spoke to Leigh about the table?
5   A. After.
6   Q. And can you tell me how long after you spoke to Leigh
7   it was that you spoke to the manager about that
8   table?
9   A. I don't recall exactly how long.
10  Q. Was it a matter of minutes as opposed to seconds?
11       MR. GILLIS:  Objection.
12  A. I would say anywhere between ten minutes to fifteen
13  minutes.
14  Q. After you spoke to Leigh about the table; is that
15  right?
16  A. Yes.
17  Q. It was ten to fifteen minutes after you spoke to
18  Leigh about the table that you spoke to the manager
19  about the table; is that right?
20       MR. GILLIS:  Objection.
21  A. As far as I recall, yes.
22  Q. Was it Mr. Noonan that you spoke to?
23  A. Yes.
24  Q. As best as you can recall; is that right?

**Page 11**

1   A. Yes.
2   Q. What did you say to him about that table?
3   A. I just asked if he had been by the table yet.
4   Q. Been by the table?
5   A. Yes.
6   Q. What did he say?
7   A. He said, "Yes, and everyone seems fine."
8   Q. And why did you ask him if he had been by the table?
9   A. It's Longhorn practice for managers to go and check
10  on every table throughout the night.  They walk
11  around to make sure the meals come out okay, how the
12  service is, if they can get anything.
13       Knowing that, I wanted to see if he had been by,
14  just to get a second opinion.
15  Q. Did you ask Mr. Noonan if he had been by all the
16  other tables that night?
17  A. I did not.
18  Q. Was Table 52 the only table about which you asked
19  Mr. Noonan whether he had been by that night?
20  A. Yes, as far as I recall.
21  Q. Was it your practice to ask the manager if he had
22  been by each of the tables during the nights that you
23  worked as a service bartender?
24  A. No.

**Page 12**

1   Q. So what was it about Table 52 that prompted you to
2   ask Mr. Noonan if he had been by the table that
3   night?
4   A. Just that they were ordering Manhattans.
5   Q. An excessive amount of Manhattans, in your opinion?
6        MR. GILLIS:  Objection.
7   A. No.
8   Q. Was there something about the Manhattans that
9   prompted you to ask Mr. Noonan if he had been by the
10  table?
11  A. No.  I just wanted to make sure that they had eaten
12  because that had been my training.
13  Q. But Leigh Chabot had already told you that they had
14  ordered food.
15  A. Yes.
16  Q. Did you not believe her?
17       MR. GILLIS:  Objection.
18  A. No.
19  Q. You could see the table from where you were, couldn't
20  you?
21  A. Yes.
22  Q. And you could see that there was food on the table
23  after you spoke to Leigh Chabot; isn't that right?
24  A. I wouldn't say that I could see that far.  My eyes

Page 13

1    are not that good.
2    Q. You wear contact lenses?
3    A. I do.  Even with them, I still -- I could see people
4       at the table but --
5    Q. How far from where you were standing at the service
6       bar were you from the nearest point of Table 52 that
7       night?
8    A. I would say probably the length of this room and
9       maybe a quarter more to a half.
10   Q. How long is this room?
11   A. I have no idea.
12   Q. You're not good at estimating distances?
13   A. No.
14   Q. Is it your testimony that you could not see whether
15      they were eating food that night at Table 52?
16   A. Correct.
17   Q. And that is because your vision is so bad that even
18      if there were food at that table, you would not have
19      been able to see it; is that right?
20          MR. GILLIS: Objection.
21   A. No; the distance of it and the angle of the table.
22      You could see people at the table, but as far as
23      seeing over people's backs and onto the table.
24   Q. But Leigh Chabot had told you that they had ordered

Page 14

1       food; isn't that right?
2    A. Yes.
3    Q. And it was not anything that anyone at the table said
4       that prompted you to ask Mr. Noonan to take a look at
5       the table; is that right?
6    A. Correct.
7    Q. Did you ask him to take a look at the table or
8       whether he had been by the table already?
9    A. If he had been by the table, as far as I recall.
10   Q. Are you sure you didn't ask him to take a look at the
11      table for you -- check on the table?
12   A. I can't say for certain.
13   Q. You don't remember really, do you?
14   A. I remember asking him about the table.
15   Q. And that's because the table was loud?
16   A. No.
17   Q. That's because Jack Daniels Manhattans had been
18      ordered by that table?
19   A. Yes.
20   Q. Could you at least tell from where you stood -- I
21      assume you were standing while you were working at
22      the service bar.
23   A. Yes.
24   Q. Could you at least tell from where you stood in the

Page 15

1       service bar the sexes of the people who were at the
2       table?
3           MR. GILLIS: Objection.
4    Q. Male or female?
5    A. I don't recall specifically that table because it
6       would not be my practice to take that into account.
7    Q. As you sit here today, do you know the sexes of the
8       people who sat at that table?
9    A. I honestly don't know if there were any woman at the
10      table.  From what I gather, it was all men.
11   Q. What is the basis for that gathering?
12   A. Just from what I heard through the criminal trial and
13      here in this deposition.
14   Q. But you were at the criminal trial for a very brief
15      period of time; isn't that right?
16   A. Yes.
17   Q. Just long enough to testify; isn't that right?
18   A. Yes.
19   Q. Could you tell from your vantage point in the bar
20      whether there were any children at that table?
21   A. I could not tell.
22   Q. What did the manager say to you about the table that
23      night?
24   A. That they were fine.

Page 16

1    Q. And did you see him go over to the table?
2    A. I did not.
3    Q. How long after you first spoke to him about the table
4       was it that he told you that they were fine?
5    A. I don't recall.
6    Q. Is it accurate to say you had two conversations with
7       him -- one where you asked him to go look at the
8       table and the other when he came back and reported
9       what he had seen at the table?
10          MR. GILLIS: Objection.
11   A. I don't recall that.
12   Q. You don't know whether you had one conversation or
13      two conversations; is that right?
14   A. Right.
15   Q. Did you ask him to go to the table because you were
16      concerned about the amount of Jack Daniels Manhattans
17      that had been delivered to the table?
18          MR. GILLIS: Objection.
19   A. No.  I just wanted to make sure that they had been
20      eating food with them.
21   Q. Because?
22   A. My training had always been to make sure that people
23      are eating when they're drinking, to serve food.
24   Q. And you cannot tell us, if you had more than one

Page 17

1    conversation, when you had the first conversation
2    with Mr. Noonan about that table except to say that
3    it was after you had the conversation with Leigh
4    Chabot?
5    A. Correct.
6    Q. And you think it may have been as much as ten or
7    fifteen minutes after that conversation?
8    A. It may have been.  I don't recall.
9    Q. Did you speak to Patty that night about Table 52 and
10    its patrons?
11    A. No.
12    Q. Are you sure?
13        MR. GILLIS: Objection.
14    A. I don't recall exactly, but I cannot imagine that I
15    would have.
16    Q. Why not?
17    A. Because she had no contact with them.  Leigh was the
18    one that was waiting on them.  So she would have been
19    able to answer my question.
20    Q. But Patty was the person that you had a conversation
21    with some date after September 26, 2003 in which she
22    referred to that table; isn't that right?
23        MR. GILLIS: Objection.
24    A. Yes.

Page 18

1    Q. You remember testifying to that?
2    A. Yes.
3    Q. The first day?
4    A. Yes.
5    Q. And you've seen your deposition transcript from the
6    first day, haven't you?
7    A. Yes.
8        MR. GILLIS: Objection.  What are you referring
9    to?  What page?
10        MR. FARRAH: This is why I love the
11    minuscript -- page 62.
12        MR. GILLIS: The line he is referring to --
13        MR. FARRAH: We start on the bottom of page 61.
14        MR. GILLIS: What was the question again?
15    Q. My question was, Patty had referred to that table,
16    but more accurately, Patty had said to you, "Do you
17    remember that group of guys?"
18        MR. GILLIS: So the question is there was no
19    talk about the table, just that group of guys; is
20    that your question?
21        MR. FARRAH: Yes.
22    Q. Do you remember testifying on December 8 that Patty
23    had a conversation with you after September 26, 2003
24    in which she asked you, "Remember that group of

Page 19

1    guys?"
2    A. Yes.
3    Q. Do you remember that?
4    A. Yes.
5    Q. And you knew when she said that to you, sometime
6    after September 26, 2003, what group of guys she was
7    referring to; isn't that right?
8    A. Yes.
9    Q. Now, my question is, what was it about that group of
10    guys that made you know, when Patty spoke to you
11    sometime after September 26, 2003, which group of
12    guys she was referring to?
13    A. Perhaps I did say something to her that night or she
14    overheard me saying something to Leigh or something
15    to the manager.  I don't recall specifically.
16        MR. GILLIS: Don't guess.
17    A. I don't know.
18    Q. But as you sit here, even today, you remember that
19    group of guys at the restaurant on September 26,
20    2003; isn't that right?
21    A. I don't remember that group.  I just remember the
22    drink ticket.  I didn't wait on them.
23    Q. You remember Patty saying to you a few days later,
24    "Remember that group of guys"; isn't that right?

Page 20

1    A. I believe that's what she said.
2    Q. Do you remember what she said to you about that group
3    of guys on September 26, 2003?
4    A. That she heard there was an accident.
5    Q. No.  Do you remember what she said to you about that
6    group of guys on September 26, 2003?
7    A. No, I don't.
8    Q. Do you remember any conversation with her the night
9    the Manhattans were served about that group of guys?
10    A. No.
11    Q. But as you sit here now, you may have had a
12    conversation with her that night about that group of
13    guys; isn't that right?
14        MR. GILLIS: Objection.
15    A. I don't recall.
16    Q. How about Sherri Salmond?  Did you have a
17    conversation with her that night about the patrons at
18    Table 52?
19    A. I don't recall.
20    Q. Do you know that you did not have a conversation with
21    her that night about Table 52?
22        MR. GILLIS: Objection.
23    A. I don't know.
24    Q. You don't know?

Page 21

1  A. No.
2  Q. So you may have had a conversation with her that
3     night; is that right?
4        MR. GILLIS: Objection.
5  A. I worked with her. I'm sure we talked about a lot of
6     things, but I don't recall.
7  Q. And Sherri Salmond had what job at the restaurant
8     that night?
9  A. Waitress.
10 Q. Is she a friend?
11 A. We were friends when we worked together.
12 Q. Let's start with September 26, 2003. Do you remember
13    having any conversations with Sherri about Table 52?
14 A. Not that I remember.
15 Q. At any time after September 26, 2003, do you remember
16    having conversations with Sherri about the patrons of
17    Table 52?
18 A. I don't remember.
19 Q. No or you don't remember?
20 A. No, I don't remember.
21 Q. Did you ever write out a statement for anyone at all
22    about the events of September 26, 2003 at the
23    Longhorn Steakhouse?
24 A. No.

Page 22

1  Q. Did you ever speak to any employees of the Longhorn
2     Steakhouse about the events of September 26, 2003,
3     other than what you told me so far?
4  A. Yes.
5  Q. Who did you speak to about the events of September
6     26, 2003?
7  A. I don't remember her name. It was someone on the
8     phone.
9  Q. From the Longhorn?
10 A. Yes.
11 Q. And when did you speak to her?
12 A. I don't recall. It was while I was still employed
13    there.
14 Q. And did she identify herself as an employee of the
15    Longhorn?
16 A. Yes.
17 Q. And did she say why she was calling?
18       MR. GILLIS: I'm going to object and instruct
19    her not to answer.
20       I don't know who she spoke to, and if it was
21    someone from the legal department, it could be
22    privileged information.
23       She can identify the person, but I'm not going
24    to get into any of the detailed conversation.

Page 23

1        I'm going to let you ask her when she had the
2     conversation, who she spoke to, what their name
3     was -- that's fine, but as far as anything as to any
4     discussions between them, I think that's privileged,
5     and I am going to instruct her not to answer.
6        MR. FARRAH: Let me ask you this. I asked her
7     when and who already.
8        MR. GILLIS: And that's why I have not objected.
9        MR. FARRAH: And she has not identified that
10    person as a member of the legal department or working
11    for the legal department.
12       MR. GILLIS: Solely because she doesn't know.
13       MR. FARRAH: Well, if you have a good faith
14    basis to state on the record that it's your belief
15    that that was a conversation she had with somebody
16    from the legal department, that's fine and I won't
17    press it.
18       MR. GILLIS: I don't know of anybody at Longhorn
19    who has spoken to any of the people involved in this
20    case other than the legal department.
21       MR. FARRAH: But let me ask some more questions.
22    I'm going to reserve my rights.
23       MR. GILLIS: That's fine.
24 Q. Did this woman ask you what happened that night?

Page 24

1  A. I honestly don't remember what we talked about.
2  Q. Were you surprised at the conversation, that she was
3     calling you?
4        MR. GILLIS: Objection.
5  A. No. She didn't call me. I called her. I was at
6     work.
7  Q. Did somebody ask you to call her?
8  A. Yes.
9  Q. Who?
10 A. My manager.
11 Q. Mr. Noonan or Mr. --
12 A. -- Bouillaine.
13 Q. Did he say why he wanted you to call her?
14 A. I don't recall. He could probably help you better
15    answer that.
16 Q. I want you to help me as much as you can today.
17 A. I'm trying.
18 Q. And you can't tell me when this was in relation to
19    September 26, 2003?
20 A. No.
21 Q. Was it before or after you had the conversation with
22    Patty about that group of guys?
23 A. I don't recall. I would say after.
24       MR. FARRAH: I'm still reserving my rights to

Page 25

1    inquire into this conversation, although it seems she
2    doesn't remember anything that happened in the
3    conversation.
4  Q. Mr. Bouillaine, did he say why he wanted you to call
5    this woman?
6  A. I don't recall.
7  Q. Had Mr. Bouillaine asked you about what had happened
8    the night of September 26, 2003 by that time?
9  A. I'm not sure.
10  Q. Were you concerned that one or more of the patrons at
11    Table 52 was becoming intoxicated that night?
12      MR. GILLIS: What time period?
13  Q. When you were serving the drinks to Leigh Chabot,
14    were you concerned?
15      MR. GILLIS: Which round? The first one or the
16    second one?
17  Q. At any time that night, were you concerned that one
18    or more of the patrons at that table was becoming
19    intoxicated?
20  A. No. Both Leigh and my manager had been by and spoken
21    with them, so no.
22  Q. Did you perform any calculations in your mind of the
23    amount of alcohol that was being delivered to that
24    table that night?

Page 26

1  A. No.
2  Q. Did you perform any calculations in your mind about
3    the effect of the alcohol that was being delivered to
4    that table that night on one or more of the patrons?
5  A. No.
6  Q. Did you try to estimate in your mind how much alcohol
7    you had served that table through Leigh Chabot that
8    night?
9  A. No.
10  Q. Do you know who at the table consumed what alcoholic
11    beverages that were delivered by Leigh Chabot to the
12    table?
13  A. No.
14  Q. Did the Longhorn have any procedure in place, as of
15    September 26, 2003, for keeping a record of how much
16    alcohol had been delivered to a particular table?
17  A. No, not that I know of.
18  Q. Were there any policies in place as of September 26,
19    2003 that you were familiar with at the Longhorn as
20    to the maximum amount of alcohol that could be
21    delivered to any particular patron while at the
22    Longhorn?
23  A. One drink per person at one time.
24  Q. Were there any other procedures in force, as of

Page 27

1    September 26, 2003, that related to the maximum
2    amount of alcohol that could be delivered to any
3    patron at the Longhorn?
4      MR. GILLIS: In addition to the --
5      MR. FARRAH: One drink per person.
6      MR. GILLIS: In addition to all the training
7    stuff that she talked about in the first half of her
8    deposition?
9      MR. FARRAH: Sure, in addition to that.
10  A. No.
11  Q. Are you familiar with the concept of green zone,
12    yellow zone and red zone as it relates to service of
13    alcoholic beverages to customers?
14  A. Yes.
15  Q. Did you, at any time during that evening, seek to
16    estimate in what zone any of the patrons at Table 52
17    was, based solely upon the amount of alcoholic
18    beverages that were served by Leigh Chabot through
19    you to the table?
20  A. By inquiring as to whether they had eaten food or
21    not, yes.
22  Q. Did you undertake any other effort to determine in
23    what zone -- green, yellow or red -- any of the
24    patrons was at any particular time that evening,

Page 28

1    based solely upon the amount of alcoholic beverages
2    that were delivered to the table by Ms. Chabot?
3  A. No.
4  Q. Was there any requirement in place, other than all
5    the training materials that Mr. Gillis mentioned
6    earlier and you talked about during your first day of
7    your deposition, was there any requirement in place
8    that you were aware of at the Longhorn, as of
9    September 26, 2003, that servers undertake to
10    estimate, based on solely the amount of alcohol that
11    they had served to a particular patron, in which what
12    zone -- red, yellow or green -- that patron was at
13    any particular time while at the Longhorn?
14      MR. GILLIS: Any patron she served?
15      MR. FARRAH: Any patron.
16      MR. GILLIS: I object. You're assuming there's
17    one policy.
18      Are you asking about a policy for bartenders for
19    tables or for bartenders serving people at the bar?
20  Q. The policy doesn't matter, does it -- Longhorn's
21    policy?
22  A. Can you repeat the question?
23      MR. FARRAH: Why don't we have the question read
24    back?

| Page 29 | Page 31 |
|---|---|
| 1    (Court reporter reads back question.) | 1    it up so the customers think they're getting more. |
| 2    MR. GILLIS: I object. | 2   Q. Can we agree that the drink-making techniques portion |
| 3   A. No. | 3    of Exhibit 4 to your deposition on page 298 requires |
| 4   Q. The Jack Daniels Manhattans that you made for Leigh | 4    that all drinks be one-quarter inch from the lip of |
| 5    Chabot that night, were they straight up, or on the | 5    the glass? |
| 6    rocks, or don't you know? | 6   A. Yes. |
| 7   A. Straight up. | 7   Q. Is that what you did? |
| 8   Q. And you have a memory of that; is that right? | 8   A. Once the cherry goes in it, it brings it up to about |
| 9   A. Yes. | 9    a quarter inch. |
| 10   Q. And you free-poured those; isn't that right? | 10   Q. And you put one cherry in each glass of the Jack |
| 11   A. Correct. | 11    Daniels Manhattans; is that right? |
| 12   Q. Did you follow Longhorn's procedure with respect to, | 12   A. Yes. |
| 13    first, the vessel into which the drinks were served | 13   Q. Describe for me how you filled the first order for |
| 14    to the patrons? | 14    Jack Daniels Manhattans that Leigh presented you |
| 15   A. What do you mean by "vessel"? | 15    with, which according to Exhibit 11 was for three |
| 16   Q. I had to say "vessel." I just felt like saying | 16    Jack Daniels Manhattans, placed at 8:40. |
| 17    "vessel." | 17    MR. GILLIS: Objection. Did you say that she |
| 18   A. Is that the word we were not sure of last time? | 18    served? |
| 19   Q. I'm showing you Exhibit 4 from the first day of your | 19    MR. FARRAH: No; that Leigh served. |
| 20    deposition, which, for the record, is the Bar | 20    MR. GILLIS: I don't think there's any evidence |
| 21    Operations Manual. Do you remember that document? | 21    that the first round was the round that she served. |
| 22   A. Yes. | 22    I don't think there's any evidence that she said |
| 23   Q. And on the page which we have Bates stamped Rare | 23    she served that first round. |
| 24    05271, bar glassware is described. Do you see that? | 24   Q. Let me back up. According to Exhibit 11, Leigh |

| Page 30 | Page 32 |
|---|---|
| 1   A. Yes. | 1    placed an order for Table 52 for three Jack Daniels |
| 2   Q. What I want to know is, did you give to Leigh Chabot | 2    Manhattans at 8:40 p.m. Do you see that? |
| 3    the Jack Daniels Manhattans straight up in a | 3   A. Yes. |
| 4    six-ounce cocktail glass, as is shown on this page of | 4   Q. Do you agree with that, that that's what Exhibit 11 |
| 5    Exhibit 4? | 5    shows? |
| 6    MR. GILLIS: Objection. | 6   A. Yes. |
| 7   A. Yes. | 7   Q. Did you make that round of drinks? |
| 8   Q. Is there any question in your mind about that? | 8   A. I don't recall. |
| 9   A. No. | 9   Q. Do you have any reason to believe you did not make |
| 10   Q. Okay. You didn't serve those Jack Daniels Manhattans | 10    that round of drinks? |
| 11    in the fourteen-ounce cobalt-blue-rimmed martini | 11    MR. GILLIS: Objection; asked and answered. |
| 12    glass, did you? | 12   A. I can't say for sure. |
| 13   A. No. That was only for Margaritas. | 13   Q. Do you know whether you made the round of drinks for |
| 14   Q. Do you have any explanation as to why in the Longhorn | 14    seven Jack Daniels Manhattans which Leigh placed for |
| 15    bar manual it is referred to as a martini glass? | 15    Table 52 at 8:51 p.m.? |
| 16   A. I believe because of the shape and the design. | 16   A. Yes. |
| 17   Q. That's your guess? | 17   Q. What is it about that order that leads you to know |
| 18   A. No. That would be exact. It says here as well -- | 18    that you made that order? |
| 19    specialty shaker Margaritas. We would never serve a | 19   A. I just remember the drinks on the tray. |
| 20    martini in those. | 20   Q. You remember seven drinks? |
| 21   Q. How far from the lip of the glass -- the Manhattan | 21   A. Yes. |
| 22    glass -- was it that you poured the drinks, the | 22   Q. Had you ever made seven Jack Daniels Manhattans at |
| 23    Manhattans? | 23    one time for one table while you worked at the |
| 24   A. An inch below, and once the cherry goes in, it brings | 24    Longhorn, up to that point? |

Page 33

1  A. No.
2  Q. Had you ever made Jack Daniels Manhattans straight up
3     for any customer up to that point while you worked at
4     the Longhorn?
5  A. Yes.
6  Q. Was it a drink you made often?
7  A. No.
8  Q. And when you worked at J.R.'s, is it accurate to say
9     that most of your customers were drinking beers?
10 A. Yes.
11 Q. On the night of September 26, 2003, was there any
12    Longhorn mandated procedure in place for keeping a
13    tally of the number of drinks that had been served by
14    the service bar to a particular table?
15 A. No.
16 Q. Was there any Longhorn mandated procedure in place,
17    as of September 26, 2003, that required communication
18    between the different bartenders as to how much each
19    bartender had made for service to a particular table?
20    MR. GILLIS: At the service bar?
21    MR. FARRAH: At the service bar, yes.
22 A. No, there was no set procedure.
23 Q. You're clear, if I understand your testimony right,
24    and I don't want to put words in your mouth, you're

Page 34

1     clear that you made the seven straight-up Jack
2     Daniels Manhattans that were made at 8:51; is that
3     right?
4  A. Yes.
5  Q. You're unsure about whether it was you that made the
6     four Jack Daniels Manhattans that were ordered at
7     8:40; is that right?
8  A. Yes.
9  Q. In either event, was there any means -- any way --
10    for you to learn as of the time you made those seven
11    Jack Daniels Manhattans that four Jack Daniels
12    Manhattans had been ordered eleven minutes earlier?
13 A. Are you asking if I knew, if I had a means of knowing
14    that?
15 Q. Yes, if you had a means of knowing that.
16 A. No.
17 Q. Was there a computer in the service bar area that
18    provided you with that information?
19 A. No.
20 Q. Was there a policy in place at the Longhorn that
21    required service bartenders -- the various service
22    bartenders working on any particular night -- to
23    share with one another information about the drinks
24    that they had prepared for service to any table?

Page 35

1  A. No.
2  Q. Now, can you describe for me what you did when you
3     got ready to make the order for the seven Jack
4     Daniels Manhattans?
5     MR. GILLIS: If you remember.
6  A. I put the seven glasses on the tray and then took a
7     rocks glass and filled it with ice, and then put the
8     alcohol in and strained it in and did that seven
9     times, and then put a cherry in each drink, and then
10    put her ticket on top.
11 Q. Is that how you were trained to make a Jack Daniels
12    Manhattan?
13 A. Yes.
14 Q. Who trained you to make a Jack Daniels Manhattan that
15    way?
16 A. Rebecca trained me at Longhorn.
17 Q. As far as you know, did Rebecca train you in making
18    the Jack Daniels Manhattans in accordance with the
19    Bar Operations Manual?
20 A. Yes.
21 Q. As far as you know, is the procedure that you just
22    described for making Jack Daniels Manhattans
23    straight-up the procedure that is described in the
24    Bar Operations Manual?

Page 36

1     MR. GILLIS: Objection.
2  A. I don't recall.
3  Q. Have you ever made Jack Daniels Manhattans a
4     different way from the way you just described the way
5     you made those seven during that order?
6  A. Yes, at different places I've worked.
7  Q. Before or after the Longhorn?
8  A. Both.
9  Q. While you were at the Longhorn, did you ever make a
10    Jack Daniels Manhattan a different way from the way
11    that you described you made the seven that night?
12 A. No.
13 Q. And it's your understanding that the way you made the
14    seven that night is the way that the Longhorn manual
15    requires it be made?
16 A. As far as I recall, yes.
17 Q. After that night while you were at the Longhorn, did
18    you ever again make Jack Daniels Manhattans for
19    anyone?
20 A. I would believe so.
21 Q. Do you have a memory?
22 A. I can't say specifically, no.
23 Q. Did you in making the Jack Daniels Manhattans that
24    night, did you use what's called Manhattan mix?

Page 37

1   A. No.
2   Q. Can we agree that Exhibit 11 shows a charge for
3      Manhattan mix of fifty cents per Jack Daniels
4      Manhattan?
5   A. Yes. It's sweet Vermouth.
6   Q. Did you, in making the Jack Daniels Manhattans, use
7      sweet Vermouth?
8   A. Yes.
9   Q. How much did you put in each Jack Daniels Manhattan
10     during that first round of seven?
11  A. A quarter ounce, probably.
12  Q. How much Jack Daniels did you put in each drink that
13     you've described for that first round of seven?
14  A. It's a long time. Where I work now, they have bigger
15     martinis. I believe it was two ounces, an ounce and
16     a half.
17     MR. GILLIS: Don't guess.
18  A. I can't remember.
19  Q. Do you remember testifying in the criminal trial of
20     Mr. Southworth?
21  A. Yes.
22  Q. Do you remember testifying in the criminal trial of
23     Mr. Southworth that you put one ounce of Jack Daniels
24     in each of those Manhattans?

Page 38

1   A. I guess so.
2      MR. GILLIS: I don't want you to guess.
3   A. I don't recall.
4      MR. GILLIS: If you don't have an answer, don't
5      guess.
6   A. I don't recall.
7   Q. As you sit here today, all you know about how much
8      Jack Daniels you put in that round of seven was that
9      you filled the rocks glass with ice and then Jack
10     Daniels; is that right?
11     MR. GILLIS: Objection.
12  A. No.
13  Q. How much Jack Daniels did you put in each drink
14     during that round of seven that you remember making?
15  A. I don't recall what the Longhorn recipe was.
16  Q. So you don't have any memory, as you sit here, of how
17     much you put in; is that right?
18     MR. GILLIS: Objection.
19  Q. Of how much Jack Daniels you put in any drink; is
20     that right?
21     MR. GILLIS: Objection.
22  A. It's whatever is in the manual.
23  Q. By the way, how was the request made to you that the
24     drinks be straight up as opposed to on the rocks?

Page 39

1      How was that communicated to you?
2   A. By the way they were rung in. It would say "rocks"
3      on the ticket if they wanted on the rocks.
4   Q. And when the request was communicated to you for the
5      Jack Daniels Manhattans, did it come to you as it
6      appears on this page of Exhibit 11, that is, Jack
7      Daniels and a Manhattan mix, or was it a Jack Daniels
8      Manhattan that was requested?
9   A. Jack Daniels Manhattan mix.
10  Q. As it appears in Exhibit 11; is that right?
11  A. Yes, without the prices.
12  Q. Do you know what a mixing glass is?
13  A. A glass you mix drinks in.
14  Q. Do you know what a mixing glass is as it's referred
15     to in the Bar Operations Manual of the Longhorn
16     Steakhouse, as it was in effect on September 26,
17     2003?
18     MR. GILLIS: Is that a particular page you're
19     referring to?
20     MR. FARRAH: Yes. It's Bates stamped 299.
21  Q. Take a moment and read that first part.
22     (Witness reviews document.)
23  Q. Do you see that procedure under "Stir and Strain" on
24     page 299 of Exhibit 4?

Page 40

1   A. Yes.
2   Q. Is that the procedure you followed in making the
3      Manhattans that evening?
4   A. Yes, minus the stirring.
5   Q. Did you fill a mixing glass two-thirds with ice?
6   A. I filled a rocks glass with ice.
7   Q. That was your mixing glass; is that right?
8   A. Yes.
9   Q. And did you fill it two-thirds with ice?
10  A. No. I usually filled them with ice to the top.
11  Q. And do you have a memory of after pouring the drinks
12     from the glass in which you mixed them into the
13     individual glasses in which they were to be served
14     during that round of seven that we've been talking
15     about, whether or not -- and after putting the
16     cherries into each of the glasses -- whether or not
17     you added more bourbon to bring the level of the
18     liquid in any of the seven glasses to within
19     one-quarter inch of the lip?
20  A. No.
21  Q. Do you have a memory of having done that?
22  A. No.
23  Q. But it's your memory that they went out to the table
24     with the liquid one-quarter inch from the lip; is

Page 41

1  that right?
2      MR. GILLIS: Objection. It's your memory, not
3      what your practice was.
4  A. No, I don't recall the exact measurement.
5  Q. We can agree, can't we, that the Longhorn Bar
6      Operations Manual called for the drinks going out,
7      that the liquid should be one-quarter of an inch
8      below the lip; is that right?
9  A. Yes.
10 Q. And that typically is what you tried to do; isn't
11     that right?
12 A. Yes, or it would be lower than that but never above.
13 Q. But you want to serve a good drink to the patron,
14     don't you?
15     MR. GILLIS: Objection.
16 A. Yes.
17 Q. The patron doesn't want to see the drink below the
18     level that other people are getting the drinks, does
19     he or she?
20 A. No.
21 Q. Now, at any time since you learned through the
22     conversation with Patty about that group of guys,
23     what happened the night of September 26, 2003, the
24     morning of September 27, 2003, have you tried to

Page 42

1      calculate in your mind the effects of the alcohol
2      that was served to that table on the different
3      patrons at that table?
4  A. No.
5  Q. Have you asked anyone to do that for you, other than
6      as part of the defense of this lawsuit?
7  A. No.
8  Q. Now, you were visited by a state trooper the night
9      before you testified -- I think it was last
10     September -- in the Southworth criminal trial; is
11     that right?
12 A. Yes.
13 Q. Had someone told you the state trooper was coming to
14     see you?
15 A. No.
16 Q. At what time of the day or night did the state
17     trooper arrive?
18 A. Night.
19 Q. Do you know what time?
20 A. It was very dark in September, so after 8:00.
21 Q. From the time you had the conversation with Sherri
22     until the state trooper arrived, had anybody spoken
23     to you about Southworth's criminal trial?
24     MR. GILLIS: Objection. Do you mean the

Page 43

1      conversation with Patty?
2  Q. Patty; I'm sorry. Had anybody spoken to you about
3      Southworth's criminal trial?
4  A. No.
5  Q. Did you know that he was charged with different
6      crimes?
7  A. No.
8  Q. What did Patty say to you about that group of guys,
9      best as you can recall it, when she had that
10     conversation with you?
11 A. That she had heard that there was some sort of
12     accident.
13 Q. Did she say anything else?
14 A. No.
15 Q. Did you think, at that point in time, that perhaps
16     one or more of the patrons at Table 52 was under the
17     influence of alcohol at the time that patron was
18     served his last drink?
19     MR. GILLIS: Objection.
20 A. No.
21 Q. At any time since Patty spoke to you about that group
22     of guys, have you considered whether or not any of
23     those guys became intoxicated while a customer at the
24     Longhorn?

Page 44

1  A. No.
2  Q. Do you know, as you sit here now, without
3      conversations with your counsel or people working for
4      your counsel, whether or not any of that group of
5      guys that Patty spoke to you about became intoxicated
6      while a customer at the Longhorn?
7  A. No.
8  Q. Do you believe that any of that group of guys became
9      intoxicated while a customer at the Longhorn?
10 A. No.
11 Q. Is it that you believe that they did not become
12     intoxicated while a customer at the Longhorn?
13 A. Yes.
14 Q. What is the basis for that belief?
15 A. I didn't see any visibly intoxicated customers
16     leaving that night, and they definitely would have
17     stuck out.
18     Longhorn is a family restaurant. It was not a
19     type of place where people were getting fall-down
20     drunk.
21     So I would definitely remember that, as well as
22     other servers would probably have been talking about
23     it.
24 Q. Is that what you were trained to look for in

Page 45

1    determining whether or not to serve a patron, whether
2    the patron was fall-down drunk?
3        MR. GILLIS: Objection.
4    A. No.
5    Q. Other than that nobody was fall-down drunk at that
6    table at the time they were served their last drink,
7    what is the basis for your belief that nobody became
8    intoxicated while a customer at the Longhorn?
9        MR. GILLIS: No one at the table, you mean?
10       MR. FARRAH: That table, yes.
11   A. Usually, we look for changes in behavior -- if
12   someone seems quiet when they arrive and they become
13   louder, or loud people get quiet, changes in
14   language, changes in body movements. There's many
15   signs, and you have to take each person case by case.
16       Leigh would probably be better to answer that
17   than I, but from my vantage point at the bar, I did
18   not see anyone that I believe was intoxicated.
19   Q. From your vantage point at the bar, you couldn't even
20   see if they were eating or not; is that right?
21   A. Yes, but I could see the door -- people coming and
22   going.
23   Q. What is the significance of that?
24   A. If I noticed people leaving, if there was a group of

Page 46

1    people leaving.
2    Q. What would you do? If that group had left and you
3    noticed that, in your view, one or more of them was
4    intoxicated, what would you have done?
5    A. I would have had the manager go over to them and find
6    out who was driving and make sure that no one that
7    was intoxicated was driving.
8    Q. Have you ever done that while you worked at the
9    Longhorn?
10   A. No. I never had to.
11   Q. Was there any procedure in place, on September 26,
12   2003, whereby the amount of alcohol that a patron
13   consumed at the Longhorn was tracked?
14   A. No.
15   Q. Do you know whether or not any of the patrons at
16   Table 52 was a patron at the bar before or after
17   being seated at Table 52?
18   A. No.
19   Q. Have you heard from anyone, other than your attorneys
20   or people working on behalf of your attorneys, that
21   Jeffrey Southworth was a patron at the bar before he
22   sat down at Table 52?
23   A. No.
24   Q. Was the state trooper male or female?

Page 47

1    A. Male.
2    Q. When the state trooper came to your house, what did
3    he say and what did you say?
4    A. He asked if I still worked at Longhorn, and he asked
5    me if I knew of anything that had happened, and I
6    said I was unaware of any trial going on. I said I
7    was no longer employed there.
8        He asked me a few questions about the setup of
9    the restaurant.
10   Q. What did he ask you?
11   A. He asked where the bar was in relation to the table.
12   Q. What else did he ask you?
13   A. I don't recall much else.
14   Q. Did he ask you if you saw Jeffrey Southworth under
15   the influence of alcohol that night?
16   A. I don't recall that.
17   Q. Do you remember anything else that he asked you,
18   other than whether you worked there that night and
19   where the bar was in relation to the tables?
20   A. He asked if I would be willing to testify because the
21   D.A.'s office would be calling me.
22   Q. And you said, "Of course"?
23   A. Yes.
24   Q. Good citizen that you are.

Page 48

1    A. Yes.
2    Q. Did the D.A.'s office then call you that night?
3    A. The next morning she called.
4    Q. On the phone?
5    A. Yes.
6    Q. And what did she say and what did you say?
7    A. She said that they needed me to testify, and I said,
8    "Is there something I have to do today," meaning that
9    Thursday.
10       Actually, I think it was the Tuesday he might
11   have come, and she called me the next morning because
12   I wanted to make sure I didn't have class, and she
13   told me what happened. Up to that point, I had no
14   idea.
15   Q. What did she say to you?
16   A. She said that Mr. Southworth had been driving and a
17   friend of his or someone called him and said that he
18   had their keys, and he turned around on the highway
19   to bring back the keys, and he hit this family --
20   this father and daughters -- and I believe it killed
21   two people -- and he went to a hotel.
22       By the time the police found him, he was not
23   intoxicated. So that was it.
24   Q. Is it accurate to say that up to that point you did

Page 49

1    not know that one of that group of guys had been
2    involved in an accident where two people were killed?
3        MR. GILLIS: Objection.
4    A. Yes.
5    Q. All you can recall from your conversation with Patty
6       was that someone in that group of guys had been
7       involved in an accident?
8    A. Yes.
9    Q. And Patty had told you or you understood from the
10      conversation with Patty that that person had gone
11      home before being involved in the accident?
12   A. No. I don't recall anything specific like that.
13   Q. What else did the D.A. say to you during that phone
14      conversation?
15   A. That he was trying to say he was not driving the car,
16      and that I think they were actually trying to say
17      that they were never at Longhorn or the check was not
18      theirs or something like that.
19   Q. And what did you say during that conversation?
20   A. I said it was a long time ago, and she basically said
21      all they wanted from me was -- because Leigh was not
22      available -- if there was any way to ring in other
23      people's orders onto their table number.
24        They basically just wanted me to talk about the

Page 50

1    procedures for ringing in drinks.
2    Q. And do you remember reviewing any records with the
3       D.A. prior to the time that you testified?
4    A. Yes. I believe I saw things like this.
5    Q. You're talking about Exhibit 11?
6        MR. GILLIS: Which part of the exhibit?
7        THE WITNESS: This (pointing).
8    Q. That's the first page?
9    A. Yes. The first page I saw, and that's all I can
10      recall.
11   Q. Did the D.A. make you aware of the time frames of
12      when Jack Daniels Manhattans were delivered to the
13      table?
14   A. Not that I recall.
15   Q. What did she ask you to do, the D.A.?
16   A. They asked me to identify this as a check from
17      Longhorn and just explain to the court the system for
18      when a waitress punches in drinks, how they come up
19      to the service bar.
20   Q. Now, no one at Table 52 appeared visually intoxicated
21      to you at any time that night; is that right?
22   A. That I recall, yes.
23   Q. Are you sure?
24   A. Yes. Leigh would better answer that.

Page 51

1    Q. I understand. God willing, we're going to have Leigh
2       here at some point in time, but I'm asking you.
3        You're here now and you're under oath, and my
4       question to you is, did anyone at that table that
5       night, Table 52, appear visibly intoxicated to you?
6    A. No.
7    Q. Did anyone at that table, Table 52, appear to be
8       under the influence of alcohol that night?
9    A. Not that I know of.
10   Q. Have you ever wondered how anyone at that table could
11      not have been under the influence of alcohol that
12      night, given how much alcohol was delivered to that
13      table that night?
14        MR. GILLIS: Objection.
15   A. Obviously, they had drinks. I'm not saying they
16      didn't drink, but I don't think anybody was
17      intoxicated when they left Longhorn.
18   Q. Have you ever wondered how they could not have been
19      under the influence of alcohol, given how much was
20      served to that table that night?
21        MR. GILLIS: Objection. She already answered
22      that question.
23   A. No.
24   Q. Have you sat down and done the math to figure out how

Page 52

1    much alcohol was consumed by that table that night?
2    A. No.
3    Q. Do you know how much alcohol is in two ounces of Jack
4       Daniels?
5        MR. GILLIS: Are you talking the pure alcohol?
6        MR. FARRAH: Yes.
7        MR. GILLIS: He's not asking you two ounces of
8       alcohol. He's asking you have you done the
9       calculation on the percentage of alcohol, the proof
10      of Jack Daniels.
11   A. No, I have not done any of that.
12   Q. Were you trained to, as part of your training for
13      being a bartender at the Longhorn, were you trained
14      to do those calculations?
15   A. We were trained that the alcohol in a Manhattan is
16      the same as a four-ounce glass of wine or as a
17      twelve-ounce beer.
18   Q. Who gave you that training?
19   A. That's been everywhere including in Bar Code
20      training, but that was in my Longhorn training.
21   Q. You were trained at the Longhorn that the amount of
22      pure alcohol in a Jack Daniels Manhattan is the same
23      as in a four-ounce glass of wine; is that right?
24   A. Yes.

Page 53

1  Q. The amount of pure alcohol in a Jack Daniels
2     Manhattan is the same as in a twelve-ounce beer; is
3     that right?
4  A. Yes.
5  Q. Do you know how much pure alcohol is in a Jack
6     Daniels Manhattan, other than it's the same as four
7     ounces of wine?
8  A. I don't.
9  Q. Is it accurate to say that based on that training, on
10    the night of September 26, 2003 you were comfortable
11    that purely by virtue of the amount of alcohol served
12    to that table that night no one was under the
13    influence of alcohol?
14       MR. GILLIS: Objection.
15  A. What do you mean "under the influence"?
16  Q. Do you understand the question?
17  A. No, I don't. I'm not sure what you're asking me.
18  Q. Let me put it in color zones for you.
19       Is it accurate to say that based on your
20    training, as you just described as to the relative
21    amounts of alcohol in different drinks, that you were
22    confident that evening that based on the number of
23    drinks served to the patrons of that table, none of
24    the patrons at that table at the time of the service

Page 54

1     of the last drink to that table was in the red zone?
2        MR. GILLIS: Objection.
3  A. No one was in the red zone, to my recollection.
4  Q. You're confident of that; is that right?
5  A. Yes.
6  Q. And you're confident of that not based on what you
7     saw; you're confident on that based on your
8     calculations of how many drinks were delivered and
9     the alcoholic content of those drinks; is that right?
10       MR. GILLIS: Objection.
11  A. No. I told you I didn't calculate that.
12  Q. Weren't you trained to calculate the effect of drinks
13    on customers passing from one zone to the other?
14       MR. GILLIS: Objection. Are you asking her did
15    she calculate that or did she use her training to go
16    from one zone to the other -- the amount of alcohol
17    someone had as opposed to the actual pure alcohol in
18    one drink?
19  Q. Let me ask you this. I'll withdraw those earlier
20    questions.
21       At any time prior to September 26, 2003, were
22    you trained by the Longhorn to estimate the zone that
23    a particular customer was in at the time a drink was
24    served to that customer based on what you knew that

Page 5

1     customer had consumed, while at the Longhorn
2     restaurant previously, in alcoholic beverages.
3        MR. GILLIS: Under what circumstances?
4        MR. FARRAH: Let's just see if she was trained.
5        MR. GILLIS: You can't answer that question
6     without knowing weight, food. What are you asking?
7     It's a question you cannot answer in that form.
8        MR. FARRAH: You're not testifying; you know
9     that.
10       MR. GILLIS: Ask a question she can answer.
11       MR. FARRAH: Could you read the question back,
12    please?
13          (Court reporter reads back question.)
14       MR. GILLIS: Objection to that question in that
15    form.
16  A. It doesn't seem clear to me.
17  Q. Tell me what you were trained about red, green and
18    yellow zones prior to September 26, 2003 as an
19    employee of the Longhorn.
20  A. I would use that when I was serving people directly.
21  Q. What were you trained is my question.
22  A. To take into consideration each person on a case by
23    case basis that came into the bar -- what they ate,
24    what they were drinking, their individual behaviors,

Page 5

1     speech; things like that.
2        So whoever was directly serving people would do
3     that. The waitresses were responsible for that at
4     their own tables.
5  Q. The only question to you is, were you trained at any
6     time prior to September 26, 2003 by the Longhorn to
7     estimate the zone a patron was in at the time of the
8     service of a drink to that patron based upon what you
9     knew about the alcoholic content that patron had
10    consumed previously that day while at the Longhorn?
11       MR. GILLIS: Her directly or her at the service
12    bar?
13  Q. Were you trained?
14  A. Yes, I was trained.
15  Q. What were you trained to do?
16  A. As I said previously, to take each person case by
17    case and what they were drinking, what they were
18    eating; everything -- their size, their mannerisms,
19    their speech.
20  Q. By the way, I want to ask you this question again
21    because it's a little unclear to me. You see
22    Exhibit 5, the Bar Code Server Guide?
23  A. Yes.
24  Q. Am I correct that you did not receive that server

1    guide from Longhorn as of September 26, 2003?

2        MR. GILLIS: Objection.

3    A. We had them in the building and behind the bar, but I

4        was not personally handed a copy.

5    Q. You were personally handed a copy of the server guide

6        in December of 2003; is that right?

7    A. Yes.

8    Q. Were you handed a copy of the server guide, which has

9        been marked as Exhibit 5, prior to December of 2003?

10   A. No.

11   Q. Do you have a memory, as you sit here, as of

12       September 26, 2003 of ever having read the server

13       guide or a copy of the server guide which has been

14       marked as Exhibit 5 to your deposition as of the time

15       you were working in the service bar?

16   A. Yes.

17   Q. Can you tell me the context in which you read the

18       server guide which has been marked as Exhibit 5, or a

19       copy thereof, prior to September 26, 2003?

20   A. I just read it a few times at work.

21   Q. The whole thing?

22   A. No. I would just read bits and pieces, here and

23       there.

24   Q. Skim it?

1    A. No; read, when it was slow.

2    Q. Do you remember what portions of Exhibit 5 you had

3        read prior to September 26, 2003?

4    A. I don't recall.

5        MR. FARRAH: By the way, should we take a brief

6        break for lunch and then resume?

7        MR. GILLIS: Off the record for a second.

8        (Discussion off the record.)

9        (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    AFTERNOON SESSION

2

3    Q. I want to show you Exhibit 5. It's the server guide.

4        I'd like to refer you to the page Bates stamped Rare

5        0519 and then 20, and then ask you to take a moment

6        or two to look at them.

7            (Witness reviews document.)

8    Q. My question to you is, as of September 26, 2003, had

9        anybody at Rare required that you review those two

10       pages of Exhibit 5?

11   A. No.

12   Q. My next question to you is, do you have a memory of,

13       at any time prior to September 26, 2003, actually

14       reviewing the pages Bates stamped 19 and 20 of

15       Exhibit 5?

16   A. Yes.

17   Q. And do you know for what purpose you undertook that

18       review?

19   A. Just my own, just reading it myself.

20   Q. Do you know when you undertook that review?

21   A. I don't.

22   Q. Okay. That's all I have on that.

23       I wanted to ask you some questions about page 2

24       of Exhibit 11 and subsequent pages of Exhibit 11.

1        My first question is with respect to the entry

2        at 7:59 p.m., "logout." Do you see that?

3    A. Yes.

4    Q. Do you know what "logout" means in the context of

5        this document?

6    A. Closing the screen when you're done ordering so the

7        next person can put their number in.

8    Q. Am I correct that "login" means opening the screen?

9    A. Yes.

10   Q. At 8:10 p.m. there is a reference to "cleared items."

11       Do you know what that means?

12   A. It appears to be a voided item.

13   Q. Is that what you understand "cleared items" to mean?

14   A. Yes.

15   Q. 8:10 p.m., "order items," does that mean what it

16       sounds like it means?

17   A. Yes.

18   Q. At 8:10, "print check." What does that mean?

19   A. Prints the check.

20   Q. For delivery to the customer?

21   A. It could be or it could be for her own purpose. I

22       can't speak for why Leigh printed that.

23   Q. But during those times that you worked as a server,

24       did you have the opportunity to print a check at any

Page 61

1    time even though, for example, the customers at the
2    table were not finished?
3    A. Yes.
4    Q. And when we're talking about a "check," are we
5    talking about a check that could be handed to the
6    customers?
7    A. Yes.
8    Q. At 8:16 p.m. we've got "apply payment." What does
9    that mean?
10   A. Paying on a tab.
11   Q. Paying off a tab; is that what you said?
12   A. Applying payment to the check.
13   Q. At 8:17 p.m. we've got "print check," an entry for
14   "print check." Do you see that?
15   A. Yes.
16   Q. Further down on that line it says "printed two
17   times." Do you see that?
18   A. Yes.
19   Q. What does that mean, if you know?
20   A. It printed twice.
21   Q. Do you know why the check printed twice?
22   A. It may be that it's a credit card, and one's the
23   merchant copy and one is the customer copy.
24   Q. In your experience as a waitress, if it was a credit

Page 62

1    card and one was the merchant copy and one was the
2    customer copy, would the check print twice?
3    A. Yes. It's two separate slips.
4    Q. "Close check" means what?
5    A. Close the check.
6    Q. That means that that table is done?
7    A. Yes.
8    Q. "Adjust payment" at 8:27. Do you see that?
9    A. Yes.
10   Q. What does that mean?
11   A. Putting the tip on.
12   Q. Because at 8:16 there was no tip, and then at 8:27
13   there was a tip for $12. Does that seem to be what
14   it says?
15   A. Yes.
16   Q. Could we turn to the next page? Now, I'm talking
17   around the time of September 26, 2003.
18       Did any waitress ever complain to you when you
19   were working the service bar about how long it took
20   to receive a round of drinks once the order had been
21   placed in the computer?
22   A. Yes.
23   Q. Was that something you heard more than once a night
24   while you worked as the service bartender?

Page 6

1    A. Yes.
2    Q. Would you call it a frequent complaint of the
3    waitresses?
4    A. Yes.
5    Q. Did Leigh ever complain to you about that?
6    A. Yes. Everyone has. It's restaurant life. Service
7    bars, you put in your drinks and they have to wait to
8    get them because it's not an instant thing.
9    Q. Do you remember Leigh complaining to you about how
10   long she had to wait for drinks on September 26,
11   2003?
12   A. No.
13   Q. Did waitresses ever complain to you when you were
14   working the service bar that customers complained to
15   them about how long it took for drink orders to be
16   placed?
17   A. No, not that I recall.
18   Q. From the time that you first started working at the
19   Longhorn until you left, do you know of any efforts
20   Longhorn management undertook to try to alleviate
21   this problem?
22   A. No.
23   Q. Did anyone request of Longhorn management, that you
24   know of, to try to alleviate the problem?

Page 6

1    A. No.
2    Q. Now, can we turn to the page that has the Longhorn
3    number page 9 on the upper right-hand corner of
4    Exhibit 11? Do you see that?
5    A. Yes.
6    Q. Eighty-five percent of the way down on the bottom at
7    9:17 p.m., there is a reference to "print check." Do
8    you see that?
9    A. Yes.
10   Q. Can you tell from looking at this exhibit why at
11   9:17 p.m. Leigh printed the check for Table 52?
12   A. No. That would be a question for Leigh.
13   Q. In your experience, what sorts of circumstances led
14   you, as a waitress, to print checks while you worked
15   at the Longhorn?
16   A. Someone was leaving, either the whole group or one
17   person from the group, or if I wanted to make sure I
18   rang in something.
19   Q. Anything else that you can think of?
20   A. I can't think of any other reason for printing a
21   check.
22   Q. Can you turn to the next page? At 9:34 p.m., Leigh
23   printed the check for Table 52; is that right?
24   A. Yes.

## Page 65

1  Q. Then she printed it again at 9:34. Do you see that?
2  A. Yes.
3  Q. I know this is a question better asked of Leigh, but
4     first of all, do you know why she printed Table 52's
5     check twice at 9:34 that evening?
6  A. No.
7  Q. Can you tell me, in your experience as a waitress at
8     the Longhorn, those circumstances which would have
9     led you to print a table's check more than once prior
10    to the time the check was closed out?
11 A. If people either wanted to split the check, you can
12    take certain things if they were paying separately.
13       That would be my only thing, but I imagine it
14    would say "split check." So I cannot really say any
15    reason why.
16 Q. When you are talking about a split check, the
17    computer has the ability to divide the amount owed
18    for the check among however many patrons it is
19    requested that it be divided among?
20 A. No. You can specifically split it by if someone
21    said, "I had ribs and a Coke," you can split off the
22    ribs and the Coke and give them a check.
23 Q. You have that capability?
24 A. Yes.

## Page 66

1  Q. But if that were done, in your experience, there
2     would be some indication that it was a split check;
3     is that right?
4  A. Yes.
5  Q. You don't see any such indication here; is that
6     right?
7  A. Right.
8  Q. At 9:36 it appears that Leigh printed the check
9     again, now a fourth time; is that right?
10 A. Yes.
11 Q. You don't know why; is that right?
12 A. No.
13 Q. Can you tell me how the amount of the tip when it's
14    not a credit card tip is actually entered into the
15    computer?
16 A. It's not if it's cash.
17 Q. When it's cash, it's not entered into the computer;
18    is that right?
19 A. Right.
20 Q. So at 9:46 it appears that the check for Table 52 is
21    printed a fifth time; is that right?
22 A. Yes.
23 Q. You don't know why?
24 A. No.

## Page 6

1  Q. Can we turn to the next page? It appears that at
2     9:57 Leigh applied payment. Do you see that?
3  A. Yes.
4  Q. What does that mean "applied payment"?
5  A. As I said before, just paying the check.
6  Q. Do you know why she applied payment in four entries
7     at 9:57?
8  A. I don't know why.
9  Q. And can you tell me, looking at any part of
10    Exhibit 11 other than the first page, how much the
11    check finally was, what the check total was for Table
12    52 that evening? Don't look at the first page.
13 A. I don't see it anywhere else.
14 Q. I do -- "closed check, $202.79."
15 A. Yes.
16 Q. As of September 26, 2003, did Longhorn have any
17    procedure in place to prevent a patron at the
18    restaurant seated at a table from purchasing a drink
19    at the bar and then bringing it to the table?
20 A. No because it was not something that happened. If
21    someone bought a drink before they went to the table,
22    then they would take it with them.
23       Other than that, people would order from their
24    server.

## Page 6

1  Q. My question to you is, did Longhorn have any
2     procedure in place, as of September 26, 2003, to
3     prevent a customer seated at a table from getting up,
4     going to the bar, buying a drink and bringing it back
5     to the table?
6        MR. GILLIS: Objection. Are you talking about a
7     written procedure or a custom and practice?
8        MR. FARRAH: Any procedure.
9  A. No.
10 Q. Did the Longhorn have any way to monitor whether or
11    not customers who were seated at a table waiting for
12    their drink orders got up, walked to the bar and
13    bought drinks?
14 A. The waitress would know if they had a drink that she
15    didn't bring them.
16 Q. Was there any directive, that you can recall, that
17    was ever given to the waitresses regarding what to do
18    if the waitress came upon a customer who had a drink
19    that she had not given them?
20 A. She would not give them the drink. If she was
21    bringing a drink to them, she would not bring another
22    drink, and if it ever did happen, she would say
23    something to the customer, "I can get you your
24    drinks."

Page 69

1    Q. Do you know that to be a practice and procedure that
2       the Longhorn employed?
3    A. I don't recall that ever happening.
4    Q. You don't recall ever being told by the Longhorn what
5       to do in the event as a server waitress that you came
6       upon a customer who had brought a drink from the bar
7       to the table?
8         MR. GILLIS: Objection.
9    A. No.
10   Q. After you got the call from the D.A., after the visit
11      from the state police, to testify the next day, did
12      you contact anybody at the Longhorn?
13   A. No.
14   Q. Did you contact anybody after you got the call from
15      the visit from the state police?
16   A. I called my family's lawyer just to know what to
17      expect because I had never gone to a courthouse.
18   Q. Who was that?
19   A. Bob Kelly.
20   Q. Where is he?
21   A. Quincy.
22   Q. I don't want to know what you said, but did you talk
23      to him at all about that group of guys and what you
24      had learned they had done prior to the time you

Page 70

1       received the visit from the state police?
2         MR. GILLIS: Objection.
3    A. No.
4    Q. And since the conversation you had with Bob Kelly
5       that came out of the visit by the state police, have
6       you talked to Kelly again about anything related to
7       this case?
8    A. No.
9    Q. Now, did you tell the district attorney that you
10      supplied drinks for anyone that was underage that
11      evening?
12   A. No.
13   Q. Did you supply drinks for anyone underage at Table 52
14      that evening?
15   A. No.
16   Q. Do you have any information that anyone drinking
17      alcoholic beverages at Table 52 that evening was
18      underage?
19   A. No.
20   Q. Did anyone ever tell you how much alcoholic beverages
21      Jeffrey Southworth had to drink at the bar before he
22      sat down at the table?
23         MR. GILLIS: Objection.
24   A. No.

Page 71

1    Q. Did you have any conversation with Leigh Chabot
2       concerning, if you know, the order that was placed at
3       8:40 for four Jack Daniels Manhattans and some
4       appetizers?
5    A. No.
6    Q. Is it your best memory that the conversation you had
7       with Leigh Chabot about the customers was not in
8       connection with the 8:51 order for seven Jack Daniels
9       Manhattans?
10   A. That's my best memory.
11   Q. Your best memory is it was in connection with the
12      9:21 order for four Jack Daniels Manhattans?
13         MR. GILLIS: Objection.
14   A. Yes.
15   Q. Three Jack Daniels Manhattans; is that right?
16   A. Yes.
17   Q. At Longhorn were you taught any of the laws governing
18      the service of alcohol in Massachusetts?
19   A. Yes.
20   Q. This was as of September 26, 2003. Tell me what you
21      recall you were taught.
22   A. That someone has to be twenty-one years of age with a
23      valid picture ID, being a license or passport. I
24      don't think Longhorn even took military IDs. One

Page 72

1       drink per customer. It's illegal to serve somebody
2       who is already intoxicated. It's illegal to serve a
3       known alcoholic, but I don't know how you can judge
4       that.
5    Q. Anything else that you can recall?
6    A. One drink per person at any one time. You cannot
7       bring over two drinks for any one person.
8    Q. Did the Longhorn have a customer practice, as of
9       September 26, 2003, about whether or not at the time
10      of being delivered a drink a customer could order
11      another drink?
12   A. Let me see if I'm clear. If someone had a drink, if
13      they could order another drink?
14   Q. No. I want to know, did the Longhorn have a custom
15      or practice in place, as of September 26, 2003, that
16      prohibited a customer, upon delivery to that customer
17      of a drink, from ordering from the waitress another
18      drink at that time?
19         MR. GILLIS: Objection.
20   A. No.
21   Q. Did the Longhorn have a custom or a practice in
22      place, as of September 26, 2003, that prohibited a
23      server from bringing a drink to a customer who had
24      not finished the drink that that customer was

Page 73

1    drinking?
2    A. Yes.
3    Q. What was that practice?
4    A. Not to bring a drink until the other drink was gone;
5       take a glass when you leave a glass.
6    Q. And where is that practice memorialized?
7    A. I don't know.
8    Q. Is it in any of the documents you received from the
9       Longhorn at any time you were employed there?
10   A. I can't say.
11   Q. Is that something you were trained in by Rebecca?
12   A. Yes.
13   Q. So a customer could not have more than one drink on
14      the table at any time; is that right?
15   A. Alcoholic drinks, yes.
16   Q. That's what we're talking about; is that right?
17   A. Yes.
18   Q. Is it your testimony that Longhorn employees were
19      instructed to remove the drink that the customer was
20      drinking and supply the customer with a new drink?
21   A. Yes.
22   Q. Take the unfinished drink away from the customer?
23      MR. GILLIS: Objection.
24   A. No.

Page 74

1    Q. Was it Longhorn's custom and practice at that time,
2       September 26, 2003, to require its servers to take an
3       unfinished drink away from the customer and replace
4       it with a new drink?
5       MR. GILLIS: Objection.
6    A. No.
7    Q. So it was Longhorn's custom and practice at that time
8       to not deliver a new drink to a customer who had not
9       finished his previous drink?
10      MR. GILLIS: Objection.
11   A. Yes.
12   Q. Can you think of any situation, prior to September
13      26, 2003, when any customer you saw at the Longhorn
14      Steakhouse had more than one drink in front of that
15      customer?
16      MR. GILLIS: Objection.
17   A. I can't. I can only speak for myself, what I did.
18   Q. What did you do?
19   A. I never served anyone that had a drink that they had
20      not finished in front of them. I can't speak for
21      other waitresses.
22   Q. Would you not take an order from the customer, prior
23      to September 26, 2003, who had not finished his
24      drink?

Page 75

1    A. I would take the order.
2    Q. And if by the time you had filled the order -- let's
3       say you were a bartender; you just had to turn around
4       to fill the order -- by the time you had filled the
5       order, if the customer had not finished that drink,
6       would you not deliver the order to the customer?
7       MR. GILLIS: Objection.
8    A. I would not make it right away. I would go get
9       something else first -- go check on someone's food.
10      There's many ways around that to allow the
11      customer time to finish the drink.
12   Q. You never had a customer that you were serving who
13      had more than one drink in front of them at any time;
14      is that right?
15   A. Correct.
16   Q. Now, as of September 26, 2003, you had been made
17      aware of the requirement in the Longhorn documents
18      that each bartender at the beginning of each shift
19      undergo an Exact-O-Pour test; is that right?
20   A. Yes.
21   Q. But you didn't undergo an Exact-O-Pour test at the
22      beginning of each shift; isn't that right?
23   A. Correct.
24   Q. You knew that Longhorn management was violating

Page 76

1       company policies in not requiring you to do that;
2       isn't that right?
3       MR. GILLIS: Objection; if you know what the
4       company's policies were.
5       I think you need a question before that to
6       determine if she's able to answer that. She's not
7       Longhorn management.
8    Q. You believed or as far as you knew, the company
9       policies regarding the operation of the bar, let's
10      say, were reflected in the various documents that had
11      been supplied to you and have been marked as exhibits
12      in this case; isn't that right?
13   A. Yes.
14   Q. You knew that, for example, Longhorn wrote in effect
15      in its Bar Operations Manual that every bartender
16      must undergo an Exact-O-Pour test at the beginning of
17      each shift; isn't that right?
18      MR. GILLIS: Objection.
19   A. Yes.
20   Q. And you knew that you were not undergoing
21      Exact-O-Pour tests at the beginning of each shift;
22      isn't that right?
23   A. Correct.
24   Q. Did you ever ask anybody why not?

Page 77

1   A. No.  We did it a couple of times a week usually; so
2       no.  It was up to the managers.  It was not my job to
3       make sure every bartender was pouring.
4   Q. So this is a question that is better asked of
5       Mr. Noonan; is that right?
6   A. Yes.
7   Q. But you knew, nevertheless whether Mr. Noonan can
8       answer the question or not, as far as you knew,
9       Longhorn was violating its own procedures by not
10      requiring you to take the Exact-O-Pour test, isn't
11      that right, as far as you knew?
12  A. As far as I know, yes.
13  Q. And you knew that the Longhorn believed that
14      customers like to see a drink free poured; isn't that
15      right?
16          MR. GILLIS:  Objection.
17  A. I'm not sure about that.
18  Q. Did you ever fail an Exact-O-Pour test?
19  A. No, not that I recall.
20  Q. Tell me about up-selling at the Longhorn.  What does
21      that mean to you, up-selling?
22  A. If someone orders a Margarita, then rather than just
23      serve what we call the house Tequila, we say, "Do you
24      want Cuervo in that?" or "How about the Grand Gold

Page 7

1       appetizers and desserts and things.
2   Q. What are shooters at the Longhorn?
3   A. It's a shot.
4   Q. Are you familiar with the Bar Recipe Manual and the
5       various drinks called shooters in the Bar Recipe
6       Manual?
7   A. Yes.
8   Q. So not what are shots, but what are shooters?  That's
9       my question.
10  A. I believe they have more than one alcohol in them --
11      layered shots, like B52 or things like that.
12  Q. While you were at the Longhorn, did you ever make any
13      shooters for customers?
14  A. No, not that I recall.
15  Q. Did you ever see anyone make any shooters for
16      customers at the Longhorn?
17  A. I don't recall.
18  Q. Were shooters described in Longhorn's menu while you
19      worked there?
20  A. No.
21  Q. Did the Longhorn have a bar menu while you worked
22      there, that is a list of drinks available to people
23      at the bar?
24  A. They had the liquors listed and the beers listed,

Page 78

1       Margarita?"
2           It's just trying to get them to spend more
3       money, basically.
4   Q. Trying to get customers to order more expensive
5       drinks, basically?
6   A. Correct.
7   Q. Did you up-sell at the Longhorn?
8   A. Yes.
9   Q. How was your performance rated, if you know, while
10      you were at the Longhorn?
11  A. I would say very well.
12  Q. No, no, I don't mean how were you regarded, although
13      I'm sure you were regarded highly by everybody, but
14      if you know, what sort of ratings of your performance
15      did Longhorn have, keep, make, undertake?
16  A. I don't know.  We met with managers every so often,
17      and they would go over your performance.
18  Q. What sorts of things would the managers talk to you
19      about when they went over your performance?
20  A. Being punctual, appearance, uniform, being friendly
21      to customers.
22  Q. Up-selling drinks?
23  A. No; just menu knowledge in general, trying to get
24      your checks in general to be higher, offering

Page 8

1       wines and Margaritas, but nothing with shooters on
2       it.
3   Q. Let me ask you something.  Tell me how, if you know,
4       a Longhorn patron would be aware of the fact that the
5       Longhorn offered shooters.
6   A. They asked.
7   Q. Do you understand shooters to be an expression that
8       is not particular to the Longhorn Steakhouse
9       restaurants?
10  A. Correct.
11  Q. Let me ask you the next question.  If I'm a patron,
12      as of September 26, 2003, who wants a shooter, how do
13      you know what it's going to cost me to have the
14      shooter, to buy the shooter from you?
15  A. I would have to say, "Give me a second and I'll ring
16      it in and let you know."
17  Q. So as far as you know, there was no document
18      delivered to patrons as of September 26, 2003 that
19      informed the patron of what the shooter would cost?
20  A. No.  There are never liquor prices.  It's not
21      restaurant practice.
22  Q. It's not family restaurant practice; is that what
23      you're saying?
24  A. I don't know anywhere that puts prices next to

**Page 81**

1  drinks, but definitely not in a restaurant like a
2  Longhorn-type of place.
3      Most people are not coming in there to do shots
4  or have shooters.
5  Q. Can you tell me why several pages of the Longhorn Bar
6  Operations Manual are devoted to different shooters
7  by name?
8  A. I can't answer that. I did not write it.
9  Q. And if I came in and ordered a shooter but wanted to
10  know beforehand from you what it was going to cost as
11  of September 26, 2003, where would you go to get that
12  information?
13  A. To my computer.
14  Q. And your computer would tell you what it would be?
15  A. Once I rang it in, yes.
16  Q. But you never poured any shooter for any customer at
17  any time while you worked as a bartender at the
18  Longhorn; is that right?
19  A. As far as I recall, I did not.
20  Q. And you don't know of any advertising materials that
21  were available at any time that you worked at the
22  Longhorn encouraging customers to purchase shooters;
23  is that right?
24      MR. GILLIS: Objection.

**Page 82**

1  A. Correct.
2  Q. And you can't tell me, as you sit here today, the
3  price of any shooter; is that right?
4  A. Correct.
5  Q. Can you tell me the price of a twenty-five ounce beer
6  as of September 26, 2003?
7  A. I think it was like $4.10 with tax.
8  Q. It's your best memory that the names of the various
9  shooters described in the Longhorn Bar Operations
10  Manual are industry-wide names; is that right?
11  A. Yes.
12  Q. Do you remember ever having any conversations with
13  anyone at Longhorn management about trying to up-sell
14  shooters?
15  A. No.
16  Q. Did you ever, while you worked at the Longhorn,
17  suggest to a customer when that customer's first
18  drink was half full that the customer purchase
19  another round of drinks?
20  A. I would not say "half full"; at half full, no.
21  Q. Were you instructed, while you were at the Longhorn,
22  to follow the provisions of the Bar Operations
23  Manual?
24  A. Yes.

**Page 83**

1  Q. You expected to do that, didn't you?
2  A. Yes.
3  Q. That's Exhibit 2 to your deposition; is that right?
4  A. Yes.
5  Q. On page Bates stamped 693 about halfway down, it's
6  "Delivering Appetizers."
7  A. Yes.
8  Q. The manual reads, "Sell a second round of drinks.
9  Always suggest another round when the first guest's
10  drink is half full."
11  A. Yes.
12  Q. Is that right? Have I read that correctly?
13  A. Yes.
14  Q. But you never did that; is that right?
15  A. No, because I had drink access right there, as you
16  stated earlier. I was at the bar. So it would take
17  me less time.
18  Q. This is the Bar Operations Manual. Are you telling
19  me that you never followed Longhorn procedure that
20  you always suggest another round when the first
21  guest's drink is half full?
22      MR. GILLIS: Objection.
23  A. I didn't always do that, no.
24  Q. Did you ever do it?

**Page 84**

1  A. I may have if it was very busy and I thought it would
2  be a while before I would get back with the drinks,
3  then yes, I would have.
4  Q. Stick on this page for a minute, okay? This page, by
5  the way, sets out the order in which Longhorn would
6  like its bartenders to interact with customers; is
7  that right?
8      MR. GILLIS: Objection.
9  A. Yes.
10  Q. It instructs you to ring the drink up first and then
11  make the drink order; is that right?
12  A. Yes.
13  Q. You're to deliver that drink with a smile within two
14  minutes; is that right?
15  A. Yes.
16  Q. And that's within two minutes of ordering; is that
17  right?
18  A. That's what it says.
19  Q. And then while you're delivering that drink, the
20  manual tells you it's a perfect time to sell an
21  appetizer; is that right?
22  A. Yes.
23  Q. And you're then instructed to -- this is now about
24  forty percent of the way down under "Delivering

**Page 85**

1  Appetizers," "with a smile after the order of the
2  appetizer to deliver it within three to five
3  minutes"; is that right?
4  A. Yes.
5  Q. And you're instructed that this is the time to
6  suggest another drink; isn't that right?
7  A. Yes.
8  Q. How much time has elapsed from when the customer
9  first sat down and placed the drink order to when the
10  appetizer has been delivered?
11  MR. GILLIS: You're asking her what she did or
12  what it says?
13  Q. What does this say?
14  A. In a perfect world in an empty restaurant where
15  everything comes on time, according to this it would
16  be seven minutes, but that never happens.
17  Q. But that's what the Longhorn strived for; is that
18  right?
19  A. Yes.
20  Q. So within seven minutes -- and it's actually five to
21  seven minutes, isn't it, of when the customer has sat
22  down and ordered the first drink, the Longhorn
23  bartender is instructed in this manual to suggest to
24  the customer that she or he order another drink; is

**Page 86**

1  that right?
2  A. According to this, yes.
3  Q. Am I correct that you did not stir the Jack Daniels
4  Manhattans that you made on the evening of
5  September 26, 2003?
6  MR. GILLIS: Objection.
7  Q. Let's strike that. Did you stir the Jack Daniels
8  Manhattans that you made on the evening of
9  September 26, 2003?
10  A. No.
11  Q. Up to September 26, 2003, had you ever refused a
12  patron of the Longhorn Steakhouse a drink?
13  A. There was never a need to.
14  Q. So the answer is no, you never did?
15  A. Correct.
16  Q. Up to September 26, 2003, had you ever sought input
17  from management about whether or not a patron should
18  be served a drink?
19  A. Yes.
20  Q. When did you do that?
21  A. At any time that I felt that I needed to ask if they
22  were eating, just that it was my practice as a
23  bartender.
24  That was what I had always been taught, to make

**Page 87**

1  sure that people drinking were consuming food with
2  it.
3  So where I would have indirect service through
4  the service bar, I would inquire and communicate with
5  waitresses and managers often.
6  Q. Often?
7  A. Yes. It's pretty much what you do when you're a
8  bartender.
9  Q. Is ask managers to check and see if customers should
10  have more drinks?
11  A. No; to make sure that people were eating, in general.
12  Q. This is something you were taught; is that right?
13  A. Yes; proper alcohol service.
14  Q. You were not taught that at J.R.'s?
15  A. There wasn't food at J.R.'s.
16  Q. You were not taught anything about alcohol service at
17  J.R.'s; isn't that right?
18  A. No; just basic laws. It was owned by police
19  officers.
20  Q. You were not trained at J.R.'s.
21  A. No.
22  Q. And you were not TIPS trained as of September 26,
23  2003; isn't that right?
24  MR. GILLIS: Objection.

**Page 88**

1  A. Yes.
2  Q. Is that true?
3  A. Yes.
4  Q. That's true, correct?
5  A. Yes.
6  Q. You were not TIPS trained; is that right?
7  A. Correct.
8  Q. You were not Bar Code trained as of September 26,
9  2003; isn't that right?
10  A. Yes.
11  Q. At some point in time despite that you were not TIPS
12  trained or Bar Code trained, you requested of
13  Longhorn that you become a trainer in proper alcohol
14  service procedures for Longhorn employees; is that
15  right?
16  A. They approached me, yes.
17  Q. But you were not TIPS trained at that time; isn't
18  that right?
19  A. Correct.
20  Q. And you were not Bar Code trained at that time; is
21  that right?
22  A. Correct.
23  Q. But someone at the Longhorn approached you about
24  yourself training other Longhorn trainees; is that

## Page 89

1  right?

2  A. Yes.

3  Q. Who approached you?

4  A. The manager, Leigh.

5  Q. Leigh who?

6  A. I don't know her last name. I believe it's Bull,

7  B-u-l-l.

8  Q. Is she still at the Longhorn?

9  A. Not that Longhorn.

10  Q. She's at a different Longhorn?

11  A. Yes.

12  Q. Where?

13  A. I don't know.

14  Q. How do you know she's at a different one?

15  A. Someone told me she went to a different Longhorn.

16  Q. You don't know when?

17  A. No.

18  Q. What did she say to you when she asked you to become

19  a trainer?

20  A. She said, "Would you be interested in becoming a

21  trainer?"

22  Q. Anything else?

23  A. Not that I recall at that time.

24  Q. Okay, and up to that point, you had only worked at

## Page 90

1  Whiskeys, J.R.'s and Longhorn; is that right?

2  A. Yes.

3  Q. And as of September 26, 2003, you had been working at

4  the Longhorn for a matter of a few months, more or

5  less; is that accurate?

6  A. Yes.

7  Q. Is that right?

8  A. Yes.

9  Q. You started in June or July of 2003; is that right?

10  A. Yes.

11  Q. Which was it?

12  A. I'm not sure exactly; the end of June or early July.

13  Q. And you had worked about a year before that at

14  J.R.'s; is that right?

15  A. Yes.

16  Q. And you had worked at Whiskeys before J.R.'s for a

17  period of months; isn't that right?

18  A. Yes.

19  Q. Like three or four months?

20  A. Yes.

21  Q. Most of the time you worked at Whiskeys had been as a

22  waitress as opposed to a bartender; is that right?

23  A. As a cocktail waitress.

24  Q. In fact, quantify for me, if you can, in terms of

## Page 91

1  shifts how many shifts you worked at Whiskeys as a

2  bartender.

3  A. Not many.

4  Q. One?

5  A. I would say three or four, tops.

6  Q. Did you ever work at Whiskeys as a service bartender?

7  A. No.

8  Q. There was no need to have a service bartender at

9  J.R.'s; isn't that correct?

10  A. Correct.

11  Q. So the first service bartender experience you had in

12  your life was at the Longhorn; is that right?

13  A. Yes.

14  Q. Okay. As of September 26, 2003, how many nights had

15  you worked as a service bartender?

16  MR. GILLIS: Objection. I don't think it's been

17  establishment that anyone worked just at the service

18  bar.

19  She's already testified to that at length in the

20  first part of the deposition as to how they broke

21  that up.

22  Q. How many nights had you performed any service

23  bartending functions at the Longhorn, as of September

24  26, 2003?

## Page 92

1  A. Every shift I worked, which was four nights a week.

2  Q. Which four nights of the week?

3  A. Tuesday, Wednesday, Friday and Saturday nights.

4  Q. You dropped Tuesdays very early on; isn't that right?

5  A. I did.

6  Q. How many Tuesdays did you work at the Longhorn?

7  A. I can't say.

8  Q. One?

9  A. More than one.

10  Q. How long was it after September 26, 2003, if you can

11  tell me, that Leigh Bull came to you and asked you to

12  become a trainer?

13  A. I don't recall.

14  Q. Weeks?

15  A. I have no idea.

16  Q. Was it before you were supposed to take the TIPS

17  test?

18  A. I'm not sure.

19  Q. You said, "Yes, I want to become a trainer;" isn't

20  that right?

21  A. Yes.

22  Q. And you undertook to train some Longhorn employees

23  after that; is that right?

24  A. After I went through training to become a trainer.

Page 93

1  Q. After you yourself went through training to become a
2     trainer; is that right?
3  A. Yes.
4  Q. So my question again to you -- I'm sorry if it seems
5     like I'm asking the same question over and over
6     again.
7        While you were at the Longhorn, did you ever --
8     this is up to September 26, 2003 -- did you ever ask
9     anyone for a second opinion about whether or not a
10    particular customer should be served a drink?
11        MR. GILLIS: Are you talking about people she
12    served directly?
13  A. People at the bar?
14  Q. Yes.
15  A. No.
16  Q. Because you felt you knew, based on your experience,
17    whether or not that person should have a drink; is
18    that right?
19  A. Yes.
20  Q. At any time up to September 26, 2003 while you were
21    working as a server, as a waitress, did you ever ask
22    a second opinion of anyone at the Longhorn about
23    whether or not one of your customers should be served
24    a drink?

Page 94

1        MR. GILLIS: Objection.
2  A. No.
3  Q. At any time up to September 26, 2003 while you were
4     working as a service bartender, did you ever ask of
5     anyone at the Longhorn for a second opinion about
6     whether or not a waitress's customer should have
7     another drink?
8  A. Yes.
9  Q. Under what circumstances did you ask for that second
10    opinion?
11  A. When I asked Chuck, that we have been talking about
12    all day.
13  Q. That was the first time you ever asked anyone at the
14    Longhorn for a second opinion about whether a
15    customer should have another drink?
16        MR. GILLIS: Objection.
17  A. A second opinion other than my own or the waitress?
18    I don't know where you're going with this.
19  Q. I'll be happy to ask the questions again. I'm happy
20    to go over the questions I have just asked you again,
21    but I'd rather not for all of our sakes.
22        So what I want to know is, other than the night
23    of September 26, 2003 when you spoke to Chuck, either
24    asking him to go check and then having another

Page 95

1     conversation with him after he checked or just asking
2     him if he had checked, did you ever while you were
3     serving as a service bartender, did you ever ask of
4     anyone at the Longhorn for a second opinion about
5     whether any customer at the Longhorn should be served
6     another drink?
7        MR. GILLIS: Objection.
8  A. I don't recall specifically.
9  Q. So is it your best memory, as you sit here today,
10    that the first time you had occasion to ask anyone at
11    the Longhorn for a second opinion about whether or
12    not a customer should be served another drink is the
13    night of September 26, 2003?
14        MR. GILLIS: Objection. That was not the
15    question you asked.
16        You keep changing the questions to make them
17    sound the same, and it's not fair to her.
18        If you want to ask the same question, she told
19    you already that she doesn't recall a specific
20    occurrence, but she never said that that was the
21    first time she ever asked anybody.
22        So ask the right question instead of putting two
23    little bits, two different ones to try to trick on
24    the question.

Page 96

1        MR. FARRAH: I'm not trying to trick her.
2        MR. GILLIS: Well, it sure seems that way from
3     the way you're asking the questions.
4  Q. Let me ask you this. Other than September 26, 2003
5     when you spoke to Chuck, up to that point, had you
6     ever asked anybody at the Longhorn for a second
7     opinion about whether any customer should be served
8     another drink?
9  A. I can't recall specifically.
10  Q. So is it your best memory that the first time you
11    asked anyone at the Longhorn for a second opinion
12    about whether or not a customer should be served
13    another drink was the night of September 26, 2003?
14        MR. GILLIS: Objection. That's the same thing.
15  A. I don't know. I already said I can't remember if
16    that was the first time.
17  Q. But you can't think of any other times?
18        MR. GILLIS: That's a different question.
19  A. But that doesn't mean it's the first time.
20        MR. GILLIS: If you want to ask her if she has a
21    memory of asking a supervisor prior to that date, she
22    could answer that question, but to say it was the
23    first time that she ever asked a manager is a
24    deceptive question.

Page 97

1    Q. You have no memory of prior to September 26, 2003
2       asking anyone at the Longhorn for a second opinion
3       about whether or not a customer should have another
4       drink; isn't that right?
5    A. Correct.
6    Q. All right, that's fine. That's all I want to know.
7          Had you been trained, up to that point at the
8       Longhorn, about in what circumstances it was
9       appropriate to ask for a second opinion about whether
10      or not a customer should have another drink?
11   A. It was on your own judgment.
12   Q. No training other than that?
13   A. All the training -- using that training and applying
14      your judgment. Most of it is common sense.
15   Q. Were you taught to deliver drinks to customers as
16      quickly as you could when you were acting as a
17      waitress?
18         MR. GILLIS: Objection.
19   A. There were time lines set in the training manuals,
20      but it was very difficult to stick with them. So we
21      would do the best we could.
22   Q. Was it a Longhorn policy as of September 26, 2003 for
23      servers to check with previous servers -- Leigh to
24      check with the bartender -- to determine how much a

Page 9

1    Q. Was there any instruction that you ever saw from
2       Longhorn to its waitresses, prior to September 26,
3       2003, under any circumstances to check with the
4       bartender to see what a customer had had to drink?
5    A. No.
6    Q. Can we agree that the principal purpose of the bar at
7       the Longhorn Steakhouse was to serve as a place where
8       customers are waiting tables to have a drink before
9       going to the table? This is a family restaurant,
10      isn't it?
11   A. Right. People ate at the bar, though.
12   Q. But people also had a drink or two at the bar before
13      they went to the table; isn't that right?
14   A. Some people may have had a drink at the bar, yes.
15   Q. When you were acting as a bartender working the bar
16      as opposed to a bartender acting as the service
17      bartender, you served more than one drink to
18      customers you knew ultimately went and had dinner at
19      the Longhorn restaurant; isn't that right?
20         MR. GILLIS: Objection. Under what
21      circumstances?
22         MR. FARRAH: Ever, ever.
23         MR. GILLIS: That's different than saying she
24      served two drinks to anyone.

Page 98

1       patron had had to drink up to that point?
2          MR. GILLIS: Under what circumstances?
3          MR. FARRAH: Under any circumstances.
4    A. For a waitress to ask the bartender?
5    Q. Yes.
6    A. About her own tables?
7    Q. About what persons coming to her own table had to
8       drink while they were at the bar.
9    A. If she felt a need to.
10   Q. It sounds like a good commonsense answer, but what I
11      want to know is, did Longhorn have a practice, a
12      procedure, a custom in place as of September 26, 2003
13      instructing waitresses to check with the bartender to
14      determine how much a particular customer coming to
15      sit at a table had had to drink at the bar before
16      coming to sit at the table?
17         MR. GILLIS: In every occasion?
18         MR. FARRAH: For any occasion.
19         MR. GILLIS: Under what circumstances?
20         MR. FARRAH: That's going to be part two of the
21      question.
22   A. You're asking if there was a set policy?
23   Q. Yes.
24   A. No.

Page 10

1          MR. FARRAH: Would you read back the question?
2             (Court reporter reads back question.)
3             (Off the record.)
4    Q. Have there been occasions when you were working as
5       the bartender, not the service bartender, at the
6       Longhorn, when you served more than one drink at the
7       bar to a customer who then went to the restaurant to
8       eat?
9    A. Yes.
10   Q. Have there been occasions when you were working as a
11      bartender, as opposed to a service bartender, at the
12      Longhorn and you served as many as three drinks to a
13      customer who then went to the restaurant to eat?
14   A. I can't say for certain, no, one way or the other.
15   Q. At any time while you worked as a bartender at the
16      Longhorn prior to September 26, 2003, did you ever
17      communicate to a waitress the number of drinks that
18      you had served at the bar to any customer who then
19      went to the restaurant to eat?
20   A. If I felt that there was a need to I would.
21   Q. Do you have a memory of ever doing it?
22   A. I don't have a memory of any specific time, no.
23   Q. Okay. At any time prior to September 26, 2003, did
24      you ever take a drink away from a customer because

## Page 101

1     the customer was, in your opinion, not suitable to be
2     drinking?
3 A. No.
4 Q. Did you ever arrange safe passage home from the
5     Longhorn for an intoxicated person?
6 A. No.
7 Q. Did you ever have to call the police to the Longhorn
8     for any intoxicated patron?
9 A. No.
10 Q. Were the police ever called by anyone to the
11     Longhorn, to your knowledge, to deal with an
12     intoxicated patron?
13 A. Not to my knowledge.
14 Q. When you were acting as a bartender, how did you keep
15     track of the number of drinks that you had served to
16     a customer?
17 A. If they didn't have a tab, if they paid as they went,
18     I would keep track of it myself.
19 Q. In your head?
20 A. Yes.
21 Q. Not on paper?
22 A. No.
23 Q. Not by computer?
24 A. If they had an open check, then yes, by computer.

## Page 102

1 Q. Was there only one station to which waitresses could
2     go to get drinks from the service bartender for their
3     tables?
4 A. Yes.
5 Q. We've already talked about where that was located.
6     So my next question to you is, other than sitting on
7     the stools that were arrayed around the bar as of
8     September 26, 2003 at the Leominster Longhorn, were
9     customers permitted to stand and have drinks at the
10     bar?
11 A. Yes.
12 Q. And were there times on busy nights when customers
13     standing at the bar were two and three deep?
14 A. No.
15 Q. Quantify for me, mindful of the fact that there are
16     fourteen stools shown at least on this exhibit around
17     the bar -- and exclude for me, if you will, at least
18     for the time-being, Tables 1, 2 and 3 -- and tell me
19     on a busy night how many people at the busiest point
20     would be sitting and standing in the bar area at the
21     Leominster Longhorn.
22 A. I would say no more than thirty.
23 Q. A little more than double the number of stools; is
24     that right?

## Page 103

1         MR. GILLIS: Are you talking about standing and
2     sitting?
3         MR. FARRAH: Yes, standing and sitting.
4 Q. If we add in a two-top, a four-top and a two-top --
5     eight more -- we're talking at its busiest somewhere
6     around thirty-eighth customers in the bar area?
7 A. People sitting at Tables 1, 2 and 3 would eat there
8     and finish everything there and leave. They would
9     not sit there and then go to a table.
10 Q. The service bartender was responsible for Tables 1, 2
11     and 3; is that right?
12 A. When there were three bartenders on, yes, there would
13     be someone doing those tables.
14 Q. That would be the service bartender; is that right?
15         MR. GILLIS: Objection.
16 A. No.
17 Q. So at its busiest point, two bartenders would be in
18     charge of those persons sitting and standing at the
19     bar and Tables 1, 2 and 3 as shown on Exhibit 8; is
20     that right?
21         MR. GILLIS: Objection.
22 A. No.
23 Q. Who would be responsible to the patrons sitting and
24     standing at the bar and Tables 1, 2 and 3 at the

## Page 104

1     busiest time?
2         MR. GILLIS: With two or three bartenders?
3         MR. FARRAH: With three bartenders.
4 A. With three bartenders, there would probably be one
5     person doing the bar, one person doing the tables,
6     one person doing the service, and the table person
7     would back up and help.
8 Q. The table person would help who?
9 A. The service bar or the main bar, whoever needed it --
10     if they needed food brought out or anything;
11     stocking, they could help.
12 Q. So at its busiest point, one bartender could be
13     serving as many as thirty customers -- those persons
14     sitting at and standing around the bar; is that
15     right?
16         MR. GILLIS: Objection. Solely or with backup?
17         MR. FARRAH: That's what I'm trying to figure
18     out.
19         MR. GILLIS: She already told you that they have
20     backup.
21 Q. Well, I understood that the nonservice bartender was
22     responsible for Tables 1, 2 and 3 and for backing up
23     the others; is that right?
24 A. Yes.

## Page 105

1      MR. GILLIS: With two or three bartenders?
2      MR. FARRAH: Three bartenders -- all that was
3      going on, on September 26, 2003.
4    Q. And the bartender that backed up could do things like
5      take drink orders for patrons around the bar; is that
6      right?
7    A. Yes.
8    Q. Could that bartender who backed up also be making
9      drinks for the service bar at the same time that
10     someone else was making drinks for the service bar,
11     or would it get too crowded?
12   A. They could help with some things, but it is a small
13     area.
14   Q. Did you ever serve shots while you were a bartender
15     at the Longhorn?
16   A. Not that I recall.
17   Q. Do you know what I mean by a "shot"?
18   A. Yes.
19   Q. Not a shooter.
20   A. Yes, I know.
21   Q. Did the Longhorn have a limit on how many drinks it
22     would serve a patron on any one evening, that you
23     knew of?
24   A. No.

## Page 10

1    Q. That was when you acted as a waitress or a bartender?
2    A. No. $2.63 is currently minimum wage for waitresses.
3      I can't speak for 2003.
4    Q. $2.63?
5    A. Yes.
6    Q. And you waited from time to time; is that right?
7    A. Yes.
8    Q. Why was that?
9    A. Extra money.
10   Q. When you waitressed, were you paid $2.63 an hour?
11   A. Yes.
12   Q. Typically, how much can a good waitress earn in tips
13     for a night?
14   A. On a weeknight or weekend?
15   Q. Busy night.
16   A. Minimum, $100.
17   Q. What was the shift that a waitress worked at night?
18   A. They were staggered. The first one came in at 4:00;
19     the last one came in at 6:00.
20   Q. The ones that came in at 6:00 left when?
21   A. They closed.
22   Q. 11:00 on weekends?
23   A. Yes.
24   Q. Can you tell me, as you've used the expression in

## Page 106

1    Q. Did the Longhorn serve beer by the pitcher?
2    A. No.
3    Q. Am I correct that employees are not allowed to
4      consume alcohol while working?
5    A. Correct.
6    Q. Do you know whether the Longhorn had a manager
7      incident log or some similar document while you
8      worked there?
9    A. I don't know.
10   Q. Was there ever a time that you wanted to stop serving
11     alcohol to a customer and a manager at the Longhorn
12     overruled you?
13   A. No.
14   Q. Did you need management approval to stop serving
15     alcohol to a customer?
16   A. No.
17   Q. You never did it; is that right?
18   A. Right.
19   Q. How were you paid at the Longhorn? Did you get a
20     salary and tips?
21   A. Yes, hourly pay.
22   Q. Do you remember what your hourly pay was as of
23     September 26, 2003?
24   A. Six dollars, five.

## Page 10

1      your earlier deposition -- Let's go to page 62 of
2      your deposition.
3        If you go to the beginning of 61, this is the
4      conversation you had with Patty.
5        You answered on page 62 on line 4, "I don't know
6      where the information came from, and I just kind of
7      brushed it off."
8        Do you remember what information you were
9      talking about?
10   A. When she said that she heard there was an accident.
11   Q. You can't think of anything else that she said, other
12     than there was an accident with that group of guys;
13     is that right?
14   A. No.
15   Q. You don't remember her saying, "That group of guys
16     was drunk"?
17   A. No, nothing like that. Before she said, "Remember
18     the Manhattans you made," and then I said "Oh, yes,
19     the people at Leigh's table."
20   Q. How did she know that you made Manhattans for these
21     people?
22     MR. GILLIS: Objection.
23   A. Because she was there that night with me working.
24     MR. GILLIS: If you know. If you don't know,

Page 109

1    don't guess.
2    A. I can't speak for Patty. You probably have to ask
3       Patty that.
4    Q. To your knowledge, did anyone from Longhorn go over
5       to that table at any point in time that night and say
6       to the people at that table, "You're loud. Quiet
7       down," or words to that effect?
8    A. Not that I know of.
9    Q. Then a little further on in your answer you say
10      there -- this is line 7 -- I asked you, "What did you
11      say?" Your answer is, "That seems odd."
12         What seemed odd to you?
13   A. That someone got in an accident because no one left
14      there visibly intoxicated to me.
15   Q. So had Patty said something to you about that these
16      people were drunk or words to that effect?
17         MR. GILLIS: Objection.
18   Q. When she described it to you.
19   A. She just said she heard there was an accident. That
20      was it.
21   Q. But it's not odd that someone who was a restaurant
22      patron got into an accident, is it? That's was not
23      what you were responding to was odd, was it?
24   A. No. I don't recall exactly.

Page 110

1    Q. What Patty and you were talking about was that the
2       driver was alleged to have been intoxicated; isn't
3       that right?
4          MR. GILLIS: Objection.
5    A. Yes.
6    Q. What you said to her in effect was, "That's odd. I
7       don't recall anyone leaving here visibly
8       intoxicated," or words like that; isn't that right?
9    A. Correct.
10   Q. You were surprised that there was such a claim that
11      the driver was intoxicated; is that right?
12   A. Yes.
13   Q. Because you had not seen anybody visibly intoxicated;
14      is that right?
15   A. Correct.
16   Q. What do you mean by "visibly intoxicated"?
17   A. Someone appearing to be intoxicated, appearing drunk.
18   Q. Falling down?
19         MR. GILLIS: Objection.
20   Q. Is that one of the elements of "visibly intoxicated"
21      as you view it?
22   A. I would say someone falling down would be a red zone,
23      would be past that.
24         Someone appearing to be loud or staggering or

Page 11

1    anything of that nature, that's what I would mean by
2    "visibly intoxicated."
3    Q. Loud is an element of "visibly intoxicated;" is that
4       right?
5          MR. GILLIS: Objection.
6    A. Yes.
7          MR. GILLIS: Under what circumstances?
8          MR. FARRAH: Her definition. These are her
9       words -- "visibly intoxicated."
10         MR. GILLIS: She's saying that is one of the
11      elements. Nobody asked yet is that present in every
12      single person.
13         Are you asking what elements people show that
14      would lead you to that, or are you asking what does a
15      person have to show in every single circumstance?
16         MR. FARRAH: I'm asking her what she means and
17      what she meant by "visibly intoxicated."
18         MR. GILLIS: Under what circumstances?
19         MR. FARRAH: Under the circumstances of that
20      night.
21   Q. September 26, 2003, you told Patty and you have
22      testified that no one appeared visibly intoxicated to
23      you at that table; is that right?
24   A. In the restaurant; no one in the restaurant.

Page 11

1    Q. What I want to know is, without making a big deal out
2       of it, tell me all the things that visibly
3       intoxicated means to you.
4    A. Difficulty walking, any swaying, if someone falls
5       asleep at their table or things like that, obvious
6       signs.
7    Q. Anything else?
8    A. In addition, people being loud, changes in speech
9       patterns, everything that I said previous.
10   Q. Anything else?
11   A. No.
12         MR. FARRAH: Just give me a second.
13         (Off the record.)
14   Q. Just describe for me, if you can, instances where on
15      a night where three of you were working as bartenders
16      on Friday or Saturday night, a person who was working
17      as a service bartender would stop doing that for some
18      period of time.
19         What would trigger that, other than having to go
20      to the bathroom?
21   A. If they were going to have a cigarette, if they were
22      going to make a phone call -- anything. If they were
23      helping run food to the people sitting at the bar
24      because they were right there in the kitchen.

Page 113

1   Q. Correct me if I am wrong. On a busy Friday night,
2       like September 26, 2003, the need for the service
3       bartender to be making drinks for the waitresses was
4       virtually nonstop; isn't that right?
5           MR. GILLIS: Objection. There's been no
6       evidence whatsoever that that was the situation on
7       that specific evening.
8           She's testified that most Friday nights were
9       like that but not that specific night.
10  Q. Was Friday night, September 26, 2003, a typical, busy
11      Friday night in the fall of the year?
12  A. As far as I recall, yes.
13  Q. Straight-out or flat-out I think you testified to the
14      first day.
15          MR. GILLIS: Objection. Where is that
16      testimony?
17  A. I believe I said I don't recall it being that way.
18          MR. GILLIS: I don't think she ever testified on
19      this night that it was flat-out all night long.
20  Q. Was it flat-out, best as you can recall, between 7:00
21      and 10:00 on this Friday night, September 26, 2003?
22          MR. GILLIS: If you remember.
23  A. Typical Friday night, busy. I don't recall it being
24      abnormally busy. Fridays are generally busy.

Page 114

1   Q. What I want to know is during a normally busy Friday
2       night in the fall of 2003, was the need for a service
3       bartender to serve drinks, make drinks and get drinks
4       to the waitresses a constant need?
5           MR. GILLIS: Objection.
6   Q. Not the best question ever asked, but see if you can
7       answer.
8   A. I would not say it was constant. It was busy. It's
9       not a constant thing, not spewing tickets all night,
10      but you're busy.
11  Q. So is it accurate to say that of the three
12      bartenders, the service bartender is the busiest
13      bartender on a typically busy Friday night?
14          MR. GILLIS: Objection.
15  A. No.
16  Q. Or is everybody equally busy?
17  A. It all depends if you have people eating a lot at the
18      bar. It all depends.
19  Q. Do you have any memory of anybody spelling you? By
20      "spelling" I mean relieving you from your duties --
21      your service bartender duties -- the night of
22      September 26, 2003?
23          MR. GILLIS: Objection.
24  A. No, I don't recall.

Page 11

1   Q. Did you smoke back then?
2   A. I did.
3   Q. You've stopped since then, or else you'd be dying to
4       have a cigarette.
5   A. It's been two years, but I'm dying.
6           MR. FARRAH: But not to have a cigarette. I
7       don't think I have any more questions. Give me one
8       second.
9           (Off the record.)
10  Q. I don't want to know what you said, but do you know
11      who Ben Wilson is?
12  A. The name doesn't trigger anything with me.
13  Q. A Rare employee named Ben Wilson, did you ever hear
14      of him?
15  A. No.
16  Q. Manager of Risk Administration at Rare, did you ever
17      hear of that title?
18  A. It doesn't trigger anything with me.
19  Q. Have you ever spoken to Ben Wilson?
20  A. I'm going to say yes since you're asking me.
21          MR. GILLIS: No. If you don't know, don't
22      guess.
23  A. No. I can't say.
24          MR. GILLIS: If you know the answer, give the

Page 11

1       answer.
2   A. I don't know.
3   Q. Is Patty's last name Kreidler? Does that ring a
4       bell?
5   A. Yes, something along those lines.
6           MR. GILLIS: Don't guess.
7   A. I don't know.
8   Q. I'm going to ask you some names. Tell me whether you
9       know any of these people.
10          Jeffrey Southworth, do you know him?
11  A. Know him personally?
12  Q. Yes.
13  A. No.
14  Q. How about Jude Connolly? Do you know him?
15  A. No.
16  Q. Scott Espy?
17  A. No.
18  Q. Thomas Scott Espy?
19  A. No.
20  Q. Michael Espy?
21  A. No.
22  Q. William Todd Curry?
23  A. No.
24  Q. Bruce Sirjane?

Page 117

1  A. No.
2  Q. Matt Cenicola?
3  A. No.
4      MR. FARRAH:  Okay.
5
6      (Whereupon, the deposition was concluded at
7      2:45 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page

1         C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
3  COUNTY OF MIDDLESEX, SS
4
5      I, BARBARA J. SIMON, a Professional Shorthand
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify that
the foregoing deposition of Kristin O'Donnell, was
taken before me on Wednesday, December 28, 2005.  The
said witness was satisfactorily identified and duly
sworn before the commencement of her testimony; that
the said testimony was taken stenographically by
myself and then transcribed by myself.  To the best
of my knowledge, the within transcript is a complete,
true and accurate record of said deposition.
10
11      I am not connected by blood or marriage with any
of the said parties, nor interested directly or
indirectly in the matter in controversy.
12
13      In witness whereof, I have hereunto set my hand
this 4th day of January, 2006.
14
15
16
17      Barbara J. Simon, Notary Public
My Commission Expires:
November 6, 2009
18
19
20
21
22
23
24

Page 118

1      SIGNATURE PAGE/ERRATA SHEET
2  RE: Nancy Rosario, Individually, as she is the
Administratrix of the Estate of Awilda Santiago,
3  Essex Probate Court Docket #03P-2499AD1,
P/P/A Veronica Rosario and Christina Santiago,
4  and as she is the Administratrix of the Estate
of Jose Santiago, Berlin (Connecticut) Probate
5  Court, Case #03-0713
6  December 28, 2005
Deposition of Kristin O'Donnell
7
8      I, KRISTIN O'DONNELL, do hereby certify that I
have read the foregoing transcript of my testimony
9  and further certify that it is a true and accurate
record of my testimony (with the exception of the
10  following changes listed below):
11  Page   Line        Correction
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21      Signed under the pains and penalties of perjury
22  this _____ day of _____, 2006.
23
24        Kristin O'Donnell

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



EXHIBIT
KRS
7-25-06
Rosario

NANCY ROSARIO, INDIVIDUALLY,  )
AS SHE IS THE ADMINISTRATRIX OF  )
THE ESTATE OF AWILDA SANTIAGO,  )
ESSEX PROBATE COURT DOCKET  )
#03P-2499AD1, P/P/A VERONICA  )
ROSARIO AND CHRISTINA SANTIAGO,  )
AND AS SHE IS THE ADMINISTRATRIX  )
OF THE ESTATE OF JOSE SANTIAGO,  )
BERLIN (CONNECTICUT) PROBATE  )
COURT, CASE #03-0713  )     Civil Action Number:
                       )     05-CV-10617MLW
          Plaintiff    )
                       )
v.                     )
                       )
RARE HOSPITALITY INTERNATIONAL,  )
INC. d/b/a LONGHORN STEAKHOUSE  )
                       )
          Defendant    )
_____)

### NANCY ROSARIO'S ANSWERS TO INTERROGATORIES PROPOUNDED BY RARE HOSPITALITY INTERNATIONAL, INC. D/B/A LONGHORN STEAKHOUSE

Nancy Rosario ("Nancy") objects and responds to RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse ("RARE") Interrogatories as follows:

### General Objections

1.    Nancy objects to so much of the Interrogatories as would require her to provide information beyond the scope of discovery permitted by the Federal Rules of Civil Procedure.

2.    Nancy objects so much of the Interrogatories would require her to disclose information protected by the attorney-client privilege, information contained in attorney's work product or materials produced solely for the use by her in anticipation of

Page 1 of 19

litigation.

3.      Nancy objects to the Interrogatories on the grounds that they are ambiguous, vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

4.      Nancy objects to the Interrogatories as discovery in this matter is ongoing. Nancy continues to discover additional facts that may support her claims in this case.

## Interrogatories

1.      Please state your full name, address, date of birth, social security number, name and address of your employer and your job title.

A.      Nancy Rosario; 4A Fulton Street, Lawrence, MA 01841; March 20, 1974; 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; homemaker and mother.

2.      Please list each and every fact known to you supporting your allegation that Jeffrey Southworth was served alcohol while visibly intoxicated at the Leominster LongHorn on September 26, 2003.

A.      Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 20, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy.  As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

3.    Please identify all visible signs of intoxication exhibited by Jeffrey Southworth while at the Leominster LongHorn on September 26, 2003, specifying individually for each sign the identity of the person(s) making the observation; exactly what was observed or heard; the time; and where Jeffrey Southworth was when the observation was made.

A.    Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 11, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy.   As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

4.     Concerning the time period between 12:00 PM on September 26, 2003 and 12:10 AM on September 27, 2003, please set forth as best as you are able a verbatim recitation of each and every conversation between you and Jose Santiago setting forth what was said and by whom; the time of each such conversation and identifying each and every person present for any such conversation.

A.     Jose and I had three conversations on September 26, 2003.  The first took place on the telephone, at about 2:45 p.m.  Jose told me he would be at my house around 8:00 p.m. that evening to pick up the girls for the weekend.  I told him that was fine.

The second conversation was by telephone, also, and took place around 9:00 to 9:30 p.m. I asked Jose where he was.  He replied he had a flat tire and that was why he was late, but that he would be at my house shortly.

The third conversation took place outside my house when he arrived, around 10:30. Jose apologized to me for being late and asked if the girls were still awake. I replied that they were awake and that I had made a meal for them to take in the event anyone got hungry on the ride and that I would pack it up, which I then did. While I was doing that and getting the girls ready, Jose spoke to Jose Garcia, and shook his hand and said he didn't want to fight with Jose Garcia any more, that Jose Garcia was doing a good job raising the girls and thanked him for that. A short while later, they left. Present that evening were Jose Santiago, Julia Schmidt, Jose Garcia, the girls and Eileen Rosario.

5.      Insofar as you, your servants, agents, employees, attorneys and insurers are aware, please set forth in full and complete detail all facts known to you supporting your allegation that Jeffrey Southworth was visibly intoxicated when served any alcoholic beverage at the Leominster Longhorn on September 26, 2003. For each fact or allegation recited in your answer, state the name, address, employer, job title and business address of each and every person who was consulted and/or who conveyed this information to you; for each fact or allegation recited in your answer identify (by title, author, number of pages, and current location) all documents consulted and/or relied upon in support of said facts and/or allegations.

A.      Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified at deposition and made an affidavit that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 20, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy. As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

Page 7 of 19

6.      For each of your employers from January 1, 1998 to the present, please state their names and addresses; your rate of pay; a description of your job duties; the identity of your supervisor(s); the reason(s) for leaving each position; and the dates between which you were employed.

A.      During this period I was employed for approximately two months at Dunkin Donuts, serving coffee and doughnuts to customers at a store on South Broadway in Lawrence, MA. I was earning a minimum wage, the exact amount of which I cannot recall, and receiving tips. I left this job because I didn't enjoy it.

I was subsequently employed for approximately a year by Gillette, working in both Andover and Acton, MA. At that job, which involved packing products into boxes, I earned take home pay of up to $600 per week, depending on the number of hours I worked each week. I left that job because I was unable, after a time, to continue to physically perform the work because of an arthritis condition. I cannot remember the names of my supervisors at either job.

7.      Identify every insurer (including, without limitation, health insurers, disability insurers, and liability insurers) to which you, or persons acting on your behalf, have submitted claims for benefits as a result of the incident.

A.      None, other than making claim in Middlesex Superior Court against Jeffrey Southworth and Enterprise Rent a Car of Boston, Inc.   Various medical bills have been paid by Medicaid and Neighborhood Health Plan.

8.      If you have suffered financial loss as a result of the alleged accident or incident, please set forth said loss in specific detail, itemizing any and all claimed losses, including doctor's bills, nurse's bills, hospital expenses, funeral expenses, therapy expenses, and any loss in wages, salary or business.

A.    My medical bills have been paid by Medicaid and, I believe, Neighborhood Health Plan. Awilda's estate has incurred $9,509.75 in funeral expenses.

9.    Please set forth the identity of each person who has conducted an inspection or investigation of the scene of the incident, stating as to each such person the date or dates on which such inspections occurred, the identity of anyone present, and whether any photographs or videotapes were taken in connection with the inspection.

A.    Objection. This interrogatory is over broad and unduly burdensome.    This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I have no personal knowledge of the identities of each person who has conducted an inspection or investigation of the scene of the incident, other than my attorneys.

10.    Please set forth the identity of each person who has conducted an inspection or investigation of the Leominster LongHorn, stating as to each such person the date or dates on which such inspections occurred, the identity of anyone present, and whether any photographs or videotapes were taken in connection with the inspection.

A.    Objection. This interrogatory is over broad and unduly burdensome.    This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I have no personal knowledge of the identities of each person who has conducted an inspection or investigation of the Leominster LongHorn, other than my attorneys and persons working on their behalf, including Michael Marcantonio.

11.    If you, your attorney, insurers, or other representatives have taken the written or recorded statement of any person relative to the allegations set forth in the complaint, please

state the name, address, employer and job title of each person whose statement was taken, the date that each such statement was taken, as well as the name, address, employer and job title of the person(s) who took each such statement.

A.    Objection. This interrogatory is over broad and unduly burdensome. This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I do not know of any such statements except the depositions conducted in this action.

12.    Please identify every expert retained by you or someone on your behalf whom you expect to offer expert testimony on behalf of you and/or any other plaintiff, specifying for each such person; the subject matters on which he or she is expected to testify; the substance of the facts and opinions to which he or she is expected to testify; and the grounds for each opinion he or she is expected to express.

A.    Plaintiff may call some or all of the following persons as expert witnesses, and reserves the right to call other experts not listed below. Plaintiff will supply all expert reports on or before the deadlines set forth in joint scheduling order entered in this action.

Lloyd F. Price, M.D., 152 Holdenwood Road, Concord, MA 01742

David Benjamin, Ph.D., 77 Florence Street, Suite 107N, Chestnut Hill, MA 02467

Michael Marcantonio, Dram Shoppe Consultants, 25 Sylvester Road, Natick, MA 01760

Trooper Kerry A. Alvino, Massachusetts State Police, Collision Analysis and Reconstruction Section, 485 Maple Street, Danvers, MA, (978) 538-6065

13.    At any time since the date of your marriage to Jose Santiago, please state whether you or Jose Santiago commenced any proceeding for separate support, divorce, separation or

other limitation or termination of the marital relationship, and if so please state the date of each such proceeding; the court in which the same was filed; the docket number of each such proceeding; and the final result of each such proceeding.

A.    We never married.

14.    If at any time from the date of your marriage to Jose Santiago until his death, you and Jose Santiago had lived apart or in separate residences, please provide a complete description of each such separation, including the dates, the reasons for such separation, the address where both you and he resided at the time of separation and the full name and address of each person either party lived with during the time of said separation.

A.    We never married.

15.    Describe in complete detail all acts of companionship, support, society, sexual relationship and/or other contacts with your spouse which you allege were lost or impaired as a result of the alleged incident.

A.    We never married.

16.    Describe in complete detail all special acts of companionship, support, society and/or other contacts with your child, Awilda Santiago which you alleged were lost or impaired as a result of the alleged incident.

A.    Objection. This question calls for work product and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says the answer to this question, which is in part a matter of expert opinion, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action. By way of further answer plaintiff says:

Awilda was a wonderful, caring child and an excellent student. She shared what she had with me, her siblings and friends. Awilda was my regular companion. We did virtually everything together. Awilda exhibited a great sense of responsibility in our home. She enjoyed cooking, and would often prepare dinner for her sisters, me and her aunts and uncles. I could rely on her to baby sit her sisters and brother if I needed to take a nap. Awilda would take charge of her siblings in the mall, while shopping or when escorting her siblings to the movie theater and skating. In school, Awilda was often caretaker to her two sisters. She excelled in the school environment and enjoyed attending classes and interacting with her teachers. Awilda was proficient in the use of a computer and had expressed a desire to attend the Greater Lawrence Vocational High School, where she planned to study computers. It was my hope that Awilda would have received a college education and pursued and enjoyed a successful career, perhaps in the information technology field. Awilda's sisters and I were her best friends. Even if she married, at some point I believe Awilda would have wanted me to live with her and her family.

Awilda's records were reviewed by Catharine Newick, Business Decisions Services, 29 River Rd. #8, Bow, NH 03304, who has prepared a report of her findings and opinions. Her report will be will be provided as an expert report by plaintiff pursuant to the discovery order entered in this action.

17.    Please state the full name and date of birth of all of your biological children, including separately for each, the full name and address of their biological father.

A.    With Jose Santiago

Awilda: June 16, 1990
Christina:    May 23, 1991
Veronica:    May 16, 1992

With Jose Garcia

Esmerlelda:    January 22, 1998
Alejandro:     June 29, 1999

18.    Please identify all persons to whom you have been legally married, specifying for each, their name, date of birth, the place of marriage, and the manner in which the marriage was terminated.

A.    I have never married.

19.    Please state in detail all facts which show that the defendant, RARE Hospitality International, Inc. was negligent, as alleged in the complaint, in the sale, service and/or distribution of alcohol to Jeffrey Southworth on September 26, 2003 and how this alleged negligence caused or contributed to the deaths of Jose Santiago and Awilda Santiago and the injuries sustained by Veronica Rosario and Christina Santiago.

A.    Objection.  This interrogatory is over broad and unduly burdensome.  This question calls for work product, expert opinions, interpretations of questions of law, the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories.  Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents.  The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer, and without waiving any objections, plaintiff says that a tavern keeper has a duty to refuse to serve liquor to a patron whom the tavern keeper knows or should know is intoxicated. A breach of that duty will result in liability because it is a foreseeable risk that a person who had consumed liquor excessively on the premises would operate a motor

vehicle and that it is negligence for a licensee such as RARE to serve alcoholic beverages to a person RARE knew, or should have known, was under the influence of intoxicating alcohol. Southworth was highly intoxicated at the time of the accident. Discovery to date in this action and in Rosario v. Southworth, et al, Middlesex Superior Court CA 03-4704L2, shows that between approximately 8:00 p.m. and 9:30 p.m., the approximate time of the service of the last drink to Southworth's party, while a patron at the Leominster Longhorn Restaurant, Southworth was served as many as six 25 oz. beers, and no fewer than three 25 oz. beers, as well as at least three Jack Daniels Manhattans.

At the time of the service of the last drink, Southworth was exhibiting various signs of intoxication. According to Jude Connelly, who was the only member of Southworth's group not drinking alcoholic beverages since he was underage, during the meal Southworth was displaying signs of intoxication. Southworth appeared to be under the influence of what he had been drinking. In Connelly's view, at the time of the service of the last drink to him, Southworth was sloppier looking than usual, was not standing straight, was louder than usual (he was usually quiet, only speaking when spoken to) and his eyes were glassy. The Southworth party was so loud that evening that at approximately 9:30 p.m., the time of service of the last drink to the table, either a restaurant manager or waitress was forced to request that the table quiet down. Michael Espey, another member of Southworth's party that night, started drinking alcoholic beverages at 4:00 or 5:00 in the afternoon. Despite that, in his own words, he was "drunk" while at the Longhorn, he was served at least a Manhattan and a beer. David Benjamin calculates that Southworth, if he consumed three Jack Daniels Manhattans (containing 1 and ½ ounces of Jack Daniels and 3/4 ounce of sweet vermouth), two 25 ounce beers at the bar and four 25 oz beers at the table, had a BAC of approximately 0.22% at 9:30 p.m., the approximate time he was served

his last drink. He calculates that Southworth, if he consumed three Jack Daniels Manhattans

(containing 1 and ½ ounces of Jack Daniels and 3/4 ounce of sweet vermouth), two 25 ounce

beers at the bar and the two 25 oz beers at the table, had a BAC of over 0.18% at 9:30 pm, the

approximate time he was served his last drink. He is also of the opinion, to a reasonable degree

of scientific certainty, that 95% of non-alcoholic individuals with a BAC over 0.20%, and 89%

of individuals with a BAC between 0.15% and 0.20%, show visible signs of intoxication.

The Leominster Longhorn, which is surrounded by a generous parking lot, is a destination that

virtually all of its customers reach by motor vehicle. It is the plaintiff's position that any

responsible purveyor of alcoholic beverages would know, or should have known, the profoundly

intoxicating effect the quantities of alcoholic beverages served that evening by RARE employees

to Southworth would have on him, and that those effects would stay with Southworth, impairing

his judgment and his ability to operate a motor vehicle, for hours after he left the restaurant.

Indeed, the debilitating effects of over serving alcoholic beverages and guidelines for gauging

the amount of alcohol a patron has ingested, and should, if any, be served, are contained in the

various Bar Code materials RARE has produced in this case, guidelines RARE negligently failed

to enforce and it's employees negligently failed to observe.

As David Benjamin has already opined, based on the fact that even with Southworth's

large body mass of 210 lbs, he would be able to burn off only one half of a 25 oz beer in an hour,

to serve him up in 1 1/2 hours drinks, of the size and at the rate described above, the Longhorn

Steakhouse personnel knew or should have known that Southworth would accumulate the

ethanol in all drinks above one half of a 25 oz beer per hour and that his blood alcohol content

(BAC) would rapidly rise, due to the rapid rate of service and consumption of ethanol, and that it

is a scientific fact that an individual reaches a point when his/her enzymes that metabolize

ethanol become saturated and cannot metabolize any greater amount of ethanol. The result is that the ethanol accumulates in the blood and causes an increasing level of intoxication as the rate of consumption and absorption exceeds its rate of metabolism and elimination. This is called a "kinetic bottle-neck" and is similar to pouring water into a funnel. One can pour more water in or pour it at a faster rate, but the water will only come out of the funnel at the same rate all the time, due to the fixed size of the opening on the stem of the funnel. As more water is poured into the funnel it accumulates.

After leaving the Longhorn, Southworth's BAC continued to rise. See Mr. Benjamin's affidavit for more details. Numerous studies have concluded, and Mr. Benjamin's personal experience confirms, that a person with a BAC of approximately 0.20% is in a confusional stage of intoxication, marked by disorientation, mental confusion, loss of critical judgment, sensory-motor incoordination, dizziness, disturbances of vision and perception of colors, form, motion and dimensions and increased muscular in-coordination, all of which affect the ability of a person to operate a motor vehicle. As the result of RARE's negligence (and indeed gross negligence) in serving Southworth on the evening in question, he was intoxicated and impaired at the time of the accident, which intoxication and impairment were substantial contributing causes of the accident and the deaths and injuries suffered.

Furthermore, RARE, despite that it knew that many of its customers, such as Southworth, first drank at the Longhorn bar before proceeding to the table, negligently had no system in place on the night in question to monitor the total number of drinks a patron consumed while a customer, or a requirement that bartenders communicate with waitresses the number and type of drinks customers have consumed at the bar before being seated at a table; RARE negligently was serving, and indeed served Southworth, what were "double", and potentially "triple" drinks, in

the form of the 25 ounce beer and the Jack Daniels Manhattan served straight up in a six ounce glass filled to within one quarter inch of the lip, and not training employees to recognize this fact; RARE negligently allowed bartenders to free pour drinks without determining whether those bartenders were capable of accurately estimating the amount of alcohol poured, and they were not; RARE negligently failed, after implementing a policy of requiring its bartenders to pass an Exacto Pour test every shift, to administer the test;  RARE negligently failed, after implementing the various policies described in its Bar Code training and service materials, to carry out those procedures and negligently permitted the over serving of Southworth on the evening in question, a clear violation of the Bar Code responsible alcohol service procedures; RARE negligently employed personnel who served Southworth, who were not properly trained in responsible service of alcoholic beverages, and who, among others, did not know the potency of the drinks they made and served Southworth; RARE negligently failed to require its employees know the potency of those drinks, and negligently failed to train or retrain employees in these matters.

20.    Please state in detail all facts or information known to you as to whether Jeffrey Southworth consumed any alcoholic beverage between the time he left the Leominster LongHorn on September 26, 2003 and the time of the accident with Jose Santiago, specifying the amount of alcohol consumed, the time said alcohol was consumed, the type of alcohol consumed, the brand of alcohol consumed, the place the alcohol was consumed and the supplier of the alcohol.

A.    Objection.  This interrogatory is over broad and unduly burdensome.  This question calls for work product, expert opinions, interpretations of questions of law, the mental impressions of my attorneys and general information beyond that which is discoverable by way

of interrogatories. By way of further answer, I have no personal knowledge that Jeffrey Southworth consumed any alcoholic beverage between the time he left the Leominster LongHorn on September 26, 2003 and the time of the accident with Jose Santiago. I understand that one or more witnesses testified at deposition that, during that time frame, Jeffrey Southworth consumed one 12 ounce beer.

21.    With respect to your claim for punitive damages, please set forth each and every fact supporting your claim that the Defendant was grossly negligent.

A.    Objection. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has neither responded to plaintiff's request for production of documents nor produced responsive documents. Once such production has occurred, the answer to this question, which is a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action. By way of further answer, plaintiff says the negligence described in answer 19., above, which is incorporated by reference herein, amply supports a claim of gross negligence or wanton and reckless conduct.

22.    Please describe in detail the negligence of any third party which may have caused or contributed to the happening of the accident of September 26, 2003 in any way.

A.    Objection. This question calls for work product, expert opinions, legal conclusions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, suit was brought by me against Jeffrey Southworth alleging negligence.

Signed under the pains and penalties of perjury this 13 day of July, 2006.

_____
Nancy Rosario

As to all objections:

_____
Albert L. Farrah, Jr.

## CERTIFICATE OF SERVICE

SUFFOLK, SS                                                    July 14, 2006

   An original of Nancy Rosario's Answers to Interrogatories Propounded by RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse was ~~hand delivered~~ today, ~~postage prepaid~~ to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA 02461. *& Federal Expressed*

_____
Albert L. Farrah, Jr., Esq.

9

JUDE CONNELLY, Sworn.

Q.  (MacDougall.) Good morning, Mr. Connelly.  In a loud,

clear voice could you please introduce yourself to the

grand jury.

A.  Hello.  My name is Jude Connelly.

Q.  Spell your first and last name, sir.

A.  J-u-d-e C-o-n-n-e-l-l-y.

Q.  Mr. Connelly, how old are you?

A.  I'm 18.

Q.  Where do you live, sir?

A.  I live in Harvard, Mass.

Q.  How long have you lived in Harvard, Mass.?

A.  I've lived in Harvard since 1999.

Q.  Sir, do you know an individual named Jeffrey

Southworth?

A.  Yes, I do.

Q.  How do you know him?

A.  Well, I dirt-bike with him a lot, and I know him from

dirt-biking and dirt bike racing in particular.

Q.  When you say you dirt-bike with him, what do you mean

by that?

10

A.   We race-- we race and we train together.

Q.   Is there a number of people that train together in the
     Harvard area?

A.   Yes.

Q.   How long have you known Jeffrey Southworth?

A.   At most a year.

Q.   Sir, drawing your attention to Friday, September 26th
     of this year, do you remember that day?

A.   Yes.

Q.   Were you with Jeffrey Southworth on that day?

A.   Yes.

Q.   When did you first come to come in contact with Mr.
     Southworth on September 26th?

A.   I was previously out dirt-biking in Templeton,
     Massachusetts, and he came out to meet me later, and
     we were going to practice.

Q.   Is there a particular area in Templeton that is set up
     to practice dirt-biking?

A.   Yes.

Q.   Where is that?

A.   It's near the landfill in Templeton.  There's a sand
     pit and there's also-- we actually know a few people

11

from the Harvard area who own land that have actual
tracks set up there.

Q. What time did you first run into Jeffrey Southworth at
the sand pits in Templeton?

A. In the time of I would say five o'clock to 5:30.

Q. How did you get to Templeton?

A. I went with another friend, who dirt-bikes, from the
area, and he actually had to leave because he had to
go take his kid-- he had to go pick up his kid.

Q. So you had gotten a ride there and then your ride
left?

A. Yes, yes.

Q. Do you know how Mr. Southworth got to Templeton?

A. Yes.

Q. Did you see him arrive?

A. No.

Q. How do you know how he got there?

A. Well, he came with-- he came with this other person
Scott.

Q. Was that Scott Espey?

A. Yes, that's Scott Espey.

12

1

2   Q.    Did they both arrive at about five o'clock or shortly

3         after five o'clock?

4   A.    Yes.

5   Q.    Were any of you eating or drinking while you were

6         dirt-biking?

7   A.    No, besides water.

8   Q.    How long did you dirt bike for?

9

10  A.    Until like it was dark.  I mean, I can't quite

11        remember the time it gets dark, some time between six

12        and seven.

13  Q.    When it became too dark to dirt bike, you stopped?

14  A.    Yes.

15  Q.    At that point who else is there?

16  A.    At that point it was myself, Jeff, and Scott.

17  Q.    By Jeff do you mean Jeff Southworth?

18

19  A.    Yes, and Scott Espey.

20  Q.    How old is Jeff Southworth, if you know, is he older

21        than you?

22  A.    Yes, he's older than me.

23  Q.    At some point did you leave that area in Templeton?

24  A.    Yes.

25  Q.    What time was that?

13

A.    I believe around eight or shortly after.

Q.    Who left that area together?

A.    I left with Jeff Southworth and Scott Espey.

Q.    How did you leave?

A.    We left in a truck that Jeff had rented.

Q.    What kind of a truck was it?

A.    It was a Dodge Dakota, I believe, a green one.

Q.    Did you have equipment with you-bikes and other
      equipment for dirt-biking?

A.    Yes.

Q.    Where did that equipment go?

A.    Well, one of the persons that I was with actually took
      my equipment, and the rest of the equipment--Jeff's
      equipment and Scott's equipment--went with us.

Q.    What kind of--  in terms of a pickup truck, did it
      have a cab that could seat two, three?

A.    It had like four normal car doors, so I would say it
      could fit five people.

Q.    In addition to the three of you human beings, were
      there any other creatures with you?

A.    Yes, there were two dogs.

Q.    Whose dogs were those?

14

1

2   A.   Those were Jeff's.

3   Q.   What kind of dogs were they?

4   A.   They were Rottweilers.

5   Q.   Where did they travel; did they travel in the back or

6        did they travel in the passenger compartment?

7   A.   They traveled in the back.

8   Q.   Where did you go from Templeton, the three of you?

9

10  A.   We went to in Leominster, Massachusetts the Longhorn

11       Bar and Grill, The Longhorn something, Veal

12       House/Steakhouse.

13  Q.   Who drove from Templeton to Leominster?

14  A.   Scott did.

15  Q.   Scott Espey?

16  A.   Yes.

17  Q.   When you arrived at the Longhorn, was it the Longhorn

18       Steakhouse?

19

20  A.   Well, I know it's the Longhorn something. I don't

21       remember specifically.

22  Q.   When you arrived at the Longhorn, did you meet anyone

23       you knew there?

24  A.   Not right away, but we called a few people to come

25       down and meet us there, yes.

15

Q.   With respect to calling people, do you have a cell

     phone?

A.   Yes, I did.

Q.   What is your cell phone number?

A.   My cell phone number is (978) 239-6954.

Q.   Do you know whether Jeff Southworth had a cell phone

     on him that day?

A.   Yes, he did.

Q.   Did Scott Espey have a cell phone with him?

A.   Yes, he did.

Q.   Did you have either or both of their cell phones in

     your cell phone?

A.   Yes, I did.

Q.   What time would you say that you met up with these

     other people at the Longhorn?

A.   Shortly after nine o'clock.

Q.   How many people were there total by the time all of

     you were there?

A.   There were six people.

Q.   There was you?

A.   (Witness nodding.)

16

Q.   Jeff Southworth?

A.   (Witness nodding.)

Q.   Scott Espey?  Who were the other people?

A.   I'm sorry, I'm wrong there were seven people.

Q.   Who were the other people?

A.   I don't know specifically all of their names. I know
     Scott Espey's brother Michael Espey was there, another
     person by the name--that lives in Harvard, his name is
     Todd Currie, and the other two they were visiting from
     Vermont or somewhere.  Mike Espey was familiar with
     them.

Q.   Were they friends of Mike Espey's from out-of-town?

A.   Yes.

Q.   At some point did you all sit down for dinner?

A.   Yes.

Q.   Now, when you were waiting for dinner, what part of
     Longhorn did you wait in?

A.   Well, we originally had to wait for seating, so we
     waited over in the bar area; and after we had been
     seated, we all moved over to our table.

Q.   When you were waiting in the bar area, was anyone
     drinking?

17

1

2  A.  Yes.

3  Q.  Who was drinking?

4  A.  Everybody but me.

5  Q.  So six of them other than you?

6  A.  Yes.

7  Q.  Specifically with respect to Jeff Southworth, was he

8      drinking in the bar area?

9

10 A.  Yes.

11 Q.  Do you remember what he was drinking?

12 A.  He was drinking beer.

13 Q.  Do you remember what kind of beer?

14 A.  It was in a mug so it was on tap.

15 Q.  So you saw him with a mug?

16 A.  Yes.

17

18 Q.  Was it a regular 12 ounce mug or was it a larger one

19     than that?

20 A.  I would say, yeah, it was over 12 ounces, I would say.

21 Q.  When you were seated, once your table was available,

22     do you know if you checked out at the bar or did the

23     tab move to the table?

24 A.  I'm pretty sure we checked out at the bar, yeah.

25 Q.  Once you sat down at the table, did people order food?

18

1

2  A.  Yes.

3  Q.  Did people also order additional rounds of drinks?

4  A.  Yes.

5  Q.  What was Jeff Southworth drinking at the table?

6  A.  He was also drinking beer later, and he also had a

7     drink.  I'm not specific on the name, but I know that

8

9     it has Jack Daniels in it.

10 Q.  Could it have been a Manhattan?

11 A.  Yes.

12 Q.  Was there a cherry in the drink?

13 A.  Yes.

14 Q.  Were other people drinking those same drinks in

15    addition to Jeff Southworth?

16
   A.  Yes.
17

18 Q.  Was that the main drink at the table?

19 A.  Well beer was, I would say, over that drink.

20 Q.  As you sat at the table, did everyone continue to

21    drink other than you?

22 A.  Yes.

23
   Q.  How long were you at the Longhorn?
24

25 A.  We were there until it closed, which I believe was 11

      o'clock, so until around 11 o'clock.

19

Q.   At that point did you all pay for everything you had--
     your meals and your drinks you had at the table?

A.   Everyone except me.  Jeff paid for me.

Q.   Fair to say he paid cash?

A.   Yes.

Q.   Or you all paid cash, I understand you didn't pay
     cash.

A.   Yes.

Q.   When you left the table, were there any drinks left on
     the table that had not been consumed?

A.   I don't believe so.

Q.   Did you continue to pay any attention to what Jeff
     Southworth was drinking during the course of dinner?

A.   Not specifically.  I sat across the table from him not
     directly but at a diagonal, and I mean, I noticed what
     he was drinking, but I didn't like, you know, keep a
     count specifically.

Q.   What do you believe Jeff Southworth had to drink at
     the table that night?

A.   I would say that he had probably two to three beers
     and a couple Manhattans.  I would say he had two, maybe
     three.  I can't specifically recall.

20

Q.   At any point did you notice any changes in Jeff

     Southworth as a result of what he was drinking?

A.   Not in particular, no.

Q.   When you left the Longhorn, how did you leave?

A.   We left in the same truck that we came in.

Q.   Were the same three people in that truck?

A.   Yes.

Q.   Who was driving at that point?

A.   Scott Espey was still driving.

Q.   The dogs still in the truck?

A.   Yes.

Q.   Did you to leave as a group, meaning all seven of you

     that had been at dinner?

A.   Yes.  We had two cars.

Q.   So the other four of them were in a second car?

A.   Mm-hmm.

Q.   Where did you go from the Longhorn?

A.   We left the Longhorn, and we went to the hotel that

     the two other people from out of town were staying at

     in Fitchburg.  I believe it's called the Four Seasons.

Q.   That was also in Fitchburg, Massachusetts?

A.   Yes.

21

Q.   When you went to the hotel, did you go to a room?

A.   Yes.

Q.   Was that the room that the two friends of Mike Espey

     were staying in?

A.   Yes.

Q.   Were all seven of you at this point in the room?

A.   Actually, we weren't in the room.  We were right

     outside the room.

Q.   Inside or outside?

A.   Outside.

Q.   Outside the room but inside or outside?

A.   Inside the hotel, right in the corridor next to the

     room.

Q.   How long did you stay in that area?

A.   I would say 15 to 20 minutes, not very long.

Q.   What were you doing during that 15 to 20 minutes?

A.   Well we were waiting for a few of the kids--  the kid

     that were from out of town were waiting to hear from

     another friend.  They were going to meet up with him

     later on in Fitchburg.

Q.   At some point did you all leave that hotel?

A.   Yes, we did.

22

Q.   Now, during that fifteen to twenty minutes you were
     waiting outside the room, was anything eaten or had to
     drink by anybody?

A.   Yes.

Q.   What was that?

A.   Beer.

Q.   Who was drinking beer?

A.   Everyone was drinking beer besides me.

Q.   Specifically was Jeff Southworth drinking beer?

A.   Yes.

Q.   Do you remember what kind of beer that was?

A.   I believe it was Bud Light or something light, I know
     that.

Q.   Was he drinking it out of a can or a bottle?

A.   A can.

Q.   Do you know where that Bud Light or whatever it was
     had come from?

A.   I don't specifically.

Q.   During the time that you were in Jeff Southworth's
     truck, did you at any time notice a cooler?

A.   I did not.

Q.   So you didn't see a cooler in Jeff's truck anywhere?

23

A.    No.

Q.    So you said-- how many beers do you believe Jeff
      Southworth drank during that 15 to 20 minutes you were
      at the hotel?

A.    I would say only one.

Q.    How did you leave the hotel?

A.    We left once again in the truck that we came in.

Q.    Were the other four in the other vehicle?

A.    No.  Actually we had one of the others, so there were
      three in the other vehicle, and we had one other.

Q.    Do you remember who that was, was that one of the
      people from New York or someone you knew?

A.    That was Mike Espey.

Q.    So it was you, Mike Espey, Scott Espey, and Jeff?

A.    Yes.

Q.    Who drove from the hotel?

A.    Scott did.

Q.    Where'd you go?

A.    We went to The Other Side in Fitchburg.

Q.    What kind of establishment is The Other Side?

A.    It's a men's entertainment bar.

Q.    Is it a strip club?

24

A.    Yes.

Q.    When you got to The Other Side, did you stop the car;
      did Scott stop the car?

A.    Yes.

Q.    Did you all go in?

A.    No, we didn't.  We dropped off Mike Espey with the
      other three that had gone in the other car; and the
      three of us, Scott Espey, Jeff Southworth, and I
      decided that we weren't going to go in and that we
      were going to go home.

Q.    In order to go home what did you do?

A.    Scott drove Jeff and I to Littleton, Mass. so we could
      pick up Scott's truck.

Q.    Do know where Scott's truck was?

A.    It was at an apartment or condominium complex off the
      side of-- off 495 right in Littleton. I believe it's
      called Pondview.

Q.    Had he just left his truck there for convenience or
      did he know someone there, or do you know why Scott
      Espey's truck was at that location?

25

A.   He left it there out of convenience, but also he has a

     relative, I believe it's his grandmother who lives

     within the complex.

Q.   Where does Scott Espey live?

A.   He lives in Harvard, Mass.

Q.   You indicated you also live in Harvard?

A.   Yes.

Q.   Where does Jeff Southworth live?

A.   He lives New Hampshire.

Q.   Did he used to live in Harvard?

A.   Yes.

Q.   But currently he lives in New Hampshire?

A.   Yes.

Q.   When you got to the Pondview Apartments in Littleton,

     what happened?

A.   First we unloaded all my stuff—well, what I had left

     of my stuff, and Scott leaves his stuff usually with

     Jeff.  So we got our stuff out, and you know, got it

     off the truck and Jeff left, and we went over and put

     my stuff in Scott's truck.

Q.   I'm just going to stop you for one second.  When you

     say Jeff left, how did Jeff leave?

26

A.    He drove out of there in the Dakota.

Q.    That was the truck you indicated he had rented?

A.    Yes.

Q.    Who was with Jeff Southworth when he left?

A.    Only his two dogs.

Q.    At this point are the dogs in the back or are they in the passenger compartment?

A.    Well, I mean, they were always inside the truck.  They weren't in the bed of the truck, but they were in the back.

Q.    Now, you said you were putting your stuff in Scott Espey's truck?

A.    Yes.

Q.    Was Scott Espey going to give you a ride home?

A.    Yes.

Q.    What was the next thing that happened?

A.    Well, we realized that we did not--  Scott didn't have the keys, he left them in Jeff's truck, so we called him on the cell phone.

Q.    Do you know what time it was at this point, Mr. Connelly?

27

A.    When we first called him, I would say it was around

      1145.

Q.    Who called him, if you know?

A.    I did.

Q.    Were you able to reach him?

A.    Yes.

Q.    What, if any conversation, did you have with him at

      that time?

A.    Well, I told him that we did not have our keys, and we

      left them in the truck, and that he would have to come

      and turn around and give us the keys, and he agreed.

Q.    Did you talk to him once or more than once at that

      time?

A.    At that time we talked to him once.

Q.    During--  When you talked him at about 11:45, did you

      have any difficulty maintaining a signal when talking

      to him?

A.    Yes, yes.

Q.    So even though you had one conversation, did it

      involve calling him more than once?

A.    Yes.

28

1

Q.    You said you told him that he had the keys and he just

come back?

A.    Yes.

Q.    Did he indicate where he was at that time, how far he

had gotten?

A.    No.

Q.    Did he give you any estimate about how long it would

take him to get back?

A.    No, he didn't.  I assumed-- I mean, it was very

shortly after, within five minutes of him leaving, so

I assumed it would be five, maybe ten minutes.

Q.    At that point you were at the Pondview Apartments in

Littleton just off 495?

A.    Yes.

Q.    What happened after you hung up with Jeff after he

said he would come back?

A.    Well, Scott and I waited at the truck in Pondview

Apartments for about 15 to 20 minutes before realizing

that Jeff wasn't showing up, at which point we tried

calling him on the cell phone again.

Q.    Who called him this-  so now, it's around midnight, is

that fair to say?

29

A.    Yes.

Q.    Who called him?

A.    We both tried calling him.  You know, we really just
      wanted to get through to him and find out what was
      going on at that point.

Q.    Were you able to--  were either you or if you know
      Scott Espey able to reach him initially?

A.    One of us was.  I can't recall exactly which one, but
      we were able to reach him.

Q.    What, if anything--  did you specifically speak to him
      at that point?

A.    I cannot recall, I cannot.

Q.    At some point did you learn why he wasn't back there?

A.    Yes.

Q.    What did you learn?

A.    He said he was in an accident.

Q.    Did he say what kind of accident?

A.    No.

Q.    Did he indicate whether it was an accident by himself
      or with another vehicle?

A.    No, he did not.

Q.    Did he make any request of you or Scott Espey?

30

A.   He said, "I'm in an accident, come get me."

Q.   Did he tell you where he was?

A.   No.

Q.   Do you know if he told Scott Espey where he was?

A.   I don't believe so.

Q.   Did he indicate who was driving his vehicle at the time of accident?

A.   I believe it was him, but he did not indicate.

Q.   But when you had last saw him, he was the only one in his truck?

A.   He was driving, yes.

Q.   What's the next that happened, Mr. Connelly?

A.   Well, we had to break one of the windows in Scott Espey's truck, so we could get to his spare key. We got the spare key, and we decided, you know, we wanted to go see if he was all right; we were very worried about him. So we got on 495 north, and we drove up, you know, five/ten minutes, and we didn't see anything on the north side. But when we got in between I think it was right before Westford, we saw on the south side of 495 there was lots of police cars, and it looked like what would be an accident.

31

Q.   Who was driving the truck at that point?

A.   I was driving the truck.

Q.   Did you notice anything about the weather conditions

     or your ability to drive at that time?

A.   No, I did not.

Q.   Fair to say you were-- what speed were you traveling?

A.   I would say in the range of 60 to 70 miles an hour.

Q.   What, if anything, did you do as a result of seeing

     what looked like an accident scene on the southbound

     side of 495?

A.   We went to the next exit, which is Boston Road,

     Westford, and we turned around so we could head back

     down the south side of 495.

Q.   What, if anything, happened next?

A.   We drove right by the accident scene.  At that point

     we didn't know whether it was the accident scene or

     not, but we just assumed it was.

Q.   Did you see Jeff Southworth?

A.   No.

Q.   Did you see the truck, the Dakota?

A.   No, we didn't.

Q.   What, if anything, did you do next?

32

A.    We drove around again.

Q.    Meaning drove?

A.    Drove up 495 North and then turned around.

Q.    And turned back south?

A.    To see if we could see anything the second time.

Q.    Did you see anything the second time?

A.    No, we did not.

Q.    By this time what time was it?

A.    I would say it was around 12:45, getting towards 1
o'clock.

Q.    Did you have any further phone contact with Jeff
Southworth?

A.    No.  We tried calling him several times, but we never
got through to him after that one.

Q.    Did you get his voicemail or did you just not get
through it all?

A.    We got his voicemail.

Q.    Did you leave him any kind of a message?

A.    I believe we did leave him one, if not two, messages.

Q.    At some point did you go home?

A.    Yes.

Q.    So you said you drove by the accident scene twice?

33

A.    Yes.

Q.    Didn't see Jeff?

A.    Yes.

Q.    Didn't see Jeff's truck?

A.    Yes.

Q.    Could you see any vehicles that appeared to be

       involved in the crash?

A.    Not at all.

Q.    What did you see in terms of an accident scene?

A.    Well, we couldn't see much of anything.  I mean, it

       must have--  It was in the woods.  What we could see

       was just the side of the street.  They had--  I

       believe it was just the fast lane for the traveling

       cars and they had the other two lanes blocked off with

       police vehicles and such for stuff.

Q.    So only the left lane was open on the southbound side?

A.    Yes.

Q.    What time did you arrive home?

A.    I arrived home around 1:30, maybe.

Q.    Did you have any further contact with Jeff Southworth

       that night?

A.    No.

34

Q.   Have you had any contact with Jeff Southworth since
     then

A.   No, I have not.

Q.   Now, sir, you indicated that when you were at the
     Longhorn you didn't notice any changes in Jeff
     Southworth's demeanor.  At any time did you notice any
     changes in his demeanor?

A.   No.

Q.   Have you been with Jeff Southworth before when he's
     been drinking?

A.   Very rarely.

Q.   So have you ever seen Jeff Southworth when you
     believed him to be under the influence?

A.   No.

          MS. MACDOUGALL:  I have no further questions
     for this witness.  Do any of the grand jurors have
     questions for this witness?

          (Witness Excused.)

Volume:   I
Pages:    1-87
Exhibits: 1-2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
*******************************
NANCY ROSARIO, INDIVIDUALLY, AS          *
SHE IS THE ADMINISTRATRIX OF THE         *
ESTATE OF AWILDA SANTIAGO, ESSEX         *
PROBATE COURT #03P-2499AD1, P/P/A        *
VERONICA ROSARIO AND CHRISTINA           *
SANTIAGO, AND AS SHE IS THE              *
ADMINISTRATRIX OF THE ESTATE OF          *
JOSE SANTIAGO, BERLIN (CONNECTICUT)*
PROBATE COURT, CASE #03-0713,            *
        Plaintiff,                       *
             VS                          * C.A. No.
RARE HOSPITALITY INTERNATIONAL,          * 05-CV-10617MLW
INC. d/b/a LONGHORN STEAKHOUSE,          *
        Defendant                        *
*******************************
        DEPOSITION OF SHERRI SALMOND, a witness

    called on behalf of the Plaintiff, taken

    pursuant to Notice under the applicable

    provisions of the Federal Rules of Civil

    Procedure, before Barbara J. Simon, a

    Professional Shorthand Reporter and Notary

    Public, in and for the Commonwealth of

    Massachusetts, at the law offices of Albert L.

    Farrah, Jr., One Washington Mall, Boston,

    Massachusetts, on Friday, March 3, 2006,

    commencing at 12:15 p.m.

            SHEA COURT REPORTING SERVICES
                  (617) 227-3097

---

Page 2

1    APPEARANCES
2    ALBERT L. FARRAH, JR., ESQ.
     Law Offices of Albert L. Farrah, Jr.
3    One Washington Mall
     Boston, MA 02108
4    (617) 742-7766
        Counsel for the Plaintiff
5
     MICHAEL K. GILLIS, ESQ.
6    Gillis & Bikofsky, P.C.
     1150 Walnut Street
7    Newton, MA 02461
     (617) 244-4300
8       Counsel for the Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page

1              I N D E X
2    WITNESS          DIRECT CROSS REDIRECT RECROSS
3    SHERRI SALMOND
4    (By Mr. Farrah)      4
5
6            E X H I B I T S
7    NO.  DESCRIPTION                 PAGE
8    1   Restaurant bill and audit report    26
9    2   Answers to interrogatories          36
10
11   (The exhibits were retained by Mr. Farrah.)
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page

1          S T I P U L A T I O N S
2
3        It is hereby stipulated and agreed by and
4    between counsel for the respective parties that
5    all objections, except objections as to the
6    form of the question, and all motions to
7    strike, shall be reserved to the time of trial.
8        It is further stipulated and agreed that
9    the deponent shall have thirty (30) days in
10   which to read and sign the transcript, under
11   the pains and penalties of perjury, after which
12   time it shall be deemed to have been signed,
13   and that the certification, filing and sealing
14   of the deposition transcript are waived.
15
16        P R O C E E D I N G S
17
18        SHERRI SALMOND, first having been
19   satisfactorily identified and duly sworn, on
20   oath, deposes and says as follows:
21
22          DIRECT EXAMINATION
23   BY MR. FARRAH:
24   Q. Can you tell me your name, please?

Page 5

1  A. Sherri Salmond.
2  Q. Could you spell your name, please?
3  A. S-h-e-r-r-i, S-a-l-m-o-n-d.
4  Q. Where do you live?
5  A. I'm at Riceville Road in Athol, Mass.
6  Q. What number Riceville?
7  A. 992.
8  Q. How long have you lived there?
9  A. Five years.
10 Q. And what is your date of birth?
11 A. 12/7/73.
12 Q. And are you married?
13 A. Yes.
14 Q. Any children?
15 A. Yes.
16 Q. How many children?
17 A. Two.
18 Q. Where does your husband work?
19 A. Fitchburg State College.
20 Q. What does he do there?
21 A. Executive chef.
22 Q. Where did you go to high school?
23 A. Monte Tech -- Montechusset Technical Regional
24    Vocational School.

Page 6

1  Q. Where is that?
2  A. Fitchburg, Massachusetts.
3  Q. Where were you born?
4  A. Fitchburg.
5  Q. And when did you graduate from Monte Tech?
6  A. 1992.
7  Q. After graduating from Monte Tech, did you have
8    any more formal education?
9  A. Yes.
10 Q. Where?
11 A. At Mount Wachusett Community College.
12 Q. How long were you there?
13 A. Two years.
14 Q. Did you get an associate's degree?
15 A. No.
16 Q. You left Mount Wachusett in about 1994, 1995;
17    is that right?
18 A. Yes.
19 Q. When did you get married?
20 A. 1996.
21 Q. You're currently employed at the Leominster
22    Longhorn; is that right?
23 A. Yes.
24    MR. GILLIS: Just for the ground rules,

Page

1  she's taking down everything you say. So she
2  can't take you both at the same time. So wait
3  until he finishes his question before you
4  answer his question.
5     THE WITNESS: Okay.
6  Q. When did you start work there? What year?
7  A. Five years ago in January. So that would be
8    2000, when it first opened.
9  Q. Before you started work at the Leominster
10   Longhorn and closest in time to starting work
11   there, where did you work?
12 A. The Four Points Leominster.
13 Q. What did you do there?
14 A. Housekeeper.
15 Q. For how long did you work there?
16 A. Nine years.
17 Q. So you were working at Four Points Leominster
18   while you were going to college, for example;
19   is that right?
20 A. Yes.
21 Q. You were always a housekeeper there?
22 A. I did banquet waitressing.
23 Q. And have you had any employment since you
24   started at the Leominster Longhorn? Have you

Page

1  had any employment, other than working at the
2  Leominster Longhorn, through today?
3  A. No.
4  Q. How many days a week, typically, do you work
5    now at the Leominster Longhorn?
6  A. Four days a week.
7  Q. When you started, how many days a week,
8    typically, did you work?
9  A. Six.
10 Q. Six days a week?
11 A. Yes.
12 Q. And at what point in time did you cut down from
13   six to some other number of days per week?
14 A. When it started affecting my children being
15   home.
16 Q. Okay. That was when, approximately?
17 A. Two years ago.
18 Q. So February, March of 2004, does that sound
19   right?
20 A. Yes.
21 Q. And at that time, did you cut down from six
22   days to four days?
23 A. Yes.
24 Q. You've been pretty much four days a week ever

Page 9

1    since; is that right?
2    A. Yes.
3    Q. Have you ever worked at any other Longhorn?
4    A. No.
5    Q. And when you started at the Longhorn, what was
6      your job?
7    A. Waitress.
8    Q. And has that been your job throughout?
9    A. Yes.
10   Q. Have you ever worked as a bartender at the
11     Longhorn?
12   A. No.
13   Q. Did you receive some training in serving
14     alcoholic beverages responsibly to people when
15     you started at the Longhorn?
16   A. Yes.
17   Q. And was that TIPS training, do you know?
18   A. Yes.
19   Q. It was not Bar Code?
20   A. I don't remember.
21   Q. And since that original training that you got
22     back when the restaurant opened, have you had
23     any training in serving alcoholic beverages
24     responsibly -- formal training -- since then?

Page 10

1        MR. GILLIS: Objection. Outside of
2      Longhorn?
3    Q. At the Longhorn, have you been retrained at the
4      Longhorn?
5    A. No.
6    Q. And have you trained anybody since you started
7      working at the Leominster Longhorn?
8    A. Trained anybody?
9    Q. In waitressing.
10   A. Yes.
11   Q. Can you tell me how many people you've trained
12     in waitressing?
13   A. I don't remember.
14   Q. Many?
15   A. Many.
16   Q. Have you ever acted as a manager at the
17     Leominster Longhorn?
18   A. No.
19   Q. Let me show you some documents that I will
20     represent to you were all supplied to me by
21     Rare's lawyers.
22        The first one is Exhibit 1 to the
23     deposition of Kristin O'Donnell, and it's
24     entitled "Welcome to Longhorn Bartender

Page 11

1      Training."
2        Do you recognize that document?
3    A. No.
4    Q. Exhibit 2 to Ms. O'Donnell's deposition is
5      called "Longhorn Bar Recipes."
6        Do you recognize that document?
7    A. No.
8    Q. Exhibit 4 to her deposition is called "Longhorn
9      Bar Operations Manual."
10        Do you recognize that document?
11   A. No.
12   Q. Exhibit 5 to her deposition is called "Bar Code
13     Server Guide."
14        Do you recognize that document?
15   A. No, I don't.
16   Q. Exhibit 6 to her deposition is called "Longhorn
17     Steakhouse Training Test Booklet for Server and
18     Bartender Team Members."
19        Do you recognize that document?
20   A. No.
21   Q. And here's Exhibit 3. It is entitled "Wanted:
22     Longhorn Steakhouse Server and Bartender
23     Trainee Edition."
24        Do you recognize that document?

Page 12

1    A. Can I look inside?
2    Q. Absolutely.
3    A. Things have changed. Yes, that's probably --
4      yes.
5    Q. Does it look like something you received?
6    A. Yes.
7    Q. When you were training people at the Longhorn,
8      did you use any documents to train them?
9    A. Booklets?
10   Q. Documents of any kind.
11   A. This is called a document here?
12   Q. Sure, Exhibit 3 is a document.
13   A. Yes, we used that.
14   Q. Do you have your own copy of the trainee
15     edition?
16   A. No. I have the trainer edition.
17   Q. And how many different copies of that trainer's
18     edition have you received from the Longhorn?
19   A. I don't remember.
20   Q. Now, can I ask you what you did to prepare for
21     this deposition?
22        MR. GILLIS: Other than?
23   Q. I don't want to hear what you said to him or
24     anyone working for his office.

**Page 13**

1    MR. GILLIS: Other than conversations with
2    my office, with the attorneys in my office, did
3    you do anything else to prepare for the
4    deposition?
5    THE WITNESS: No.
6  Q. Did you talk to anyone, other than Mr. Gillis
7    or people from his office, about this
8    deposition?
9  A. No.
10 Q. And I don't want to know about conversations
11    with your husband either.
12 A. That's probably the only other one I talked to.
13 Q. Do you understand that my clients have brought
14    a suit against Rare?
15 A. Yes.
16 Q. Do you understand that the allegation in the
17    lawsuit is that a person who was a customer at
18    the Leominster Longhorn on the night of
19    September 26, 2003, early the next morning
20    operated a motor vehicle on Route 495 and got
21    into an accident in which two people were
22    killed and two people were injured?
23    MR. GILLIS: Objection.
24 Q. You can answer.

**Page 15**

1    a Friday night?
2  A. What would I do?
3  Q. Yes.
4  A. Clean, get things ready so I could go home
5    because I closed the restaurant; make sure the
6    alley's clean.
7  Q. You were working as a waitress back in
8    September 2003?
9  A. Yes.
10 Q. Did you have, in addition to your waitressing
11    responsibilities, some cleaning
12    responsibilities as well at that time?
13 A. Everybody has cleaning work to do at the end of
14    the night, like silverware, clean the counters,
15    restock the plates, clean your tables.
16 Q. So in addition to waitressing duties -- serving
17    duties -- there were also, back then, the kinds
18    of duties that you just described that were the
19    responsibility of different servers at the
20    Longhorn?
21 A. Yes. That's part of the serving -- cleaning up
22    after yourself when you're done.
23 Q. Did you have a locker back then there?
24 A. No.

**Page 14**

1  A. Yes.
2  Q. And I'll represent to you that September 26,
3    2003 was a Friday night.
4    My question to you is, were you working
5    that night at the Leominster Longhorn?
6  A. Yes.
7  Q. And what was your shift that night? When did
8    you come on and when did you leave?
9  A. I don't remember what time I came in and what
10    time I left.
11 Q. Typically, what time would you come in and
12    leave on a Friday night back then?
13 A. Probably about 5:00 and leave about 12:30.
14 Q. And typically back then, Fridays in 2003, the
15    fall of 2003, what time would the restaurant
16    close?
17 A. 11:00.
18 Q. And does that mean that the doors were locked
19    so the customers could not enter the restaurant
20    as of 11:00?
21 A. Yes.
22 Q. Typically, what would you do then at -- I'm
23    going to either call it the Leominster Longhorn
24    or the restaurant -- from 11:00 until 12:30 on

**Page 16**

1  Q. Did you have someplace where you put your
2    belongings while you were working?
3  A. I hang it up in the back in the hook.
4  Q. How about your pocketbook? Where would you put
5    your pocketbook?
6  A. I never brought my pocketbook in.
7  Q. In connection with the events of that night,
8    September 26, 2003, have you filed any sort of
9    a report with anybody, other than speaking to
10    Mr. Gillis?
11 A. No.
12 Q. Have you signed any documents in connection
13    with that night?
14 A. No.
15 Q. Have you testified before the grand jury in
16    connection with what happened that night?
17 A. No.
18 Q. Have you given any recorded statements to
19    anyone in connection with what happened that
20    night?
21 A. No.
22 Q. You answered a little earlier that you
23    understood we were here about a lawsuit in
24    which there was an allegation that a customer

## Page 17

1    at the Rare Restaurant, the Longhorn, had
2    gotten into an auto accident early the next
3    morning.
4      When did you first learn about that auto
5    accident?
6 A. The day after, a few days after, I talked to
7    Leigh, and she just told me that she saw him on
8    T.V.
9 Q. And the day after Friday is Saturday. Were you
10    working the next day, Saturday, the 27th of
11    September back then?
12 A. I don't remember.
13 Q. If my calculations are right, the September '03
14    time frame was within the period that you were
15    working six days a week at the Longhorn. Do
16    you agree?
17 A. I agree.
18 Q. Was there typically back then a day that you
19    took off each week?
20 A. No.
21 Q. It varied?
22 A. Yes.
23 Q. So you don't know whether you talked to Leigh
24    about the accident Saturday, the next day, or

## Page 19

1    spoke to her?
2 A. No, I don't remember.
3 Q. Was Leigh somebody that you chummed around with
4    outside of work?
5 A. Sometimes.
6 Q. Was she married at the time?
7 A. Yes.
8 Q. What is her husband's name?
9 A. Ronny Chabot.
10 Q. And where, back in September '03, did she live?
11 A. I don't remember.
12 Q. Do you remember the conversation you had with
13    her?
14 A. I don't remember the whole conversation, no.
15 Q. Tell me the best you can recall it, what you
16    said and what she said in the order it was said
17    in that conversation.
18 A. If I can remember -- I don't remember the whole
19    conversation -- that she had seen somebody that
20    had come into the restaurant on -- we could not
21    figure out what day he had come in -- but she
22    figured out that it was her, and then we
23    probably talked about other things. I don't
24    remember clearly.

## Page 18

1    sometime after that; is that right?
2 A. Yes.
3 Q. The conversation you had with her was at the
4    restaurant; is that right?
5 A. No.
6 Q. Where did you have that conversation with her?
7 A. On the telephone.
8 Q. Did you she call you or did you call her?
9 A. I don't remember.
10 Q. Were you at your house when you had that
11    conversation?
12 A. Yes.
13 Q. It was Riceville Road?
14 A. Yes.
15 Q. What is your phone number?
16 A. (978) 575-1407.
17 Q. That was your phone number back then?
18 A. I don't remember.
19 Q. You don't?
20 A. No, I don't remember. That's the same address,
21    though.
22 Q. Were you on the cellphone talking to her?
23 A. No.
24 Q. Do you remember if it was day or night when you

## Page 20

1 Q. She could not figure out what day he came in?
2    Is that what you said?
3 A. Yes.
4 Q. And then you said you figured out it was her?
5 A. That she was the server.
6 Q. That she had served him?
7 A. Yes.
8 Q. How did you figure that out?
9 A. We figured out the date and she was working and
10    it was her table.
11 Q. How did you figure out the date?
12 A. I don't remember.
13 Q. How did you figure out it was her table?
14 A. We just figured it out. I don't remember.
15 Q. Do you remember anything else that was said
16    during that conversation?
17 A. No.
18 Q. So where did you first hear about the accident
19    that had happened on 495?
20 A. When I told you that we talked about it a
21    couple of days later or the day after.
22 Q. And is it accurate to say that you learned that
23    the accident happened in the conversation you
24    had with Leigh?

1   A. Yes.
2   Q. As opposed to seeing it on T.V. that this
3     accident had happened?
4   A. No, I didn't see it on T.V.
5   Q. So is it accurate to say that she told you
6     about the accident?
7   A. Yes.
8   Q. Was she upset?
9   A. Yes.
10   Q. What did she say?
11   A. I don't remember.
12   Q. Was she crying?
13   A. No, she was not crying.
14   Q. What makes you say she was upset?
15   A. It was just that I remember that she was upset
16     that she was the server. I don't remember.
17     It's so long ago. I don't remember.
18   Q. I'm going to show you what has been marked as
19     Exhibit 10 to her deposition. Do you recognize
20     that fellow?
21   A. I believe so.
22   Q. Do you know his name?
23   A. No, I don't know his name.
24   Q. I just showed you Exhibit 1 to Kristin

1     O'Donnell's deposition. I'm going to show you
2     Exhibit 9 to Ms. O'Donnell's deposition. Do
3     you recognize him in that picture?
4   A. The same guy as that guy; I believe so.
5   Q. Do you remember seeing the gentleman whose
6     photographs are in Exhibit 9 and 10 to
7     Ms. O'Donnell's deposition at the Longhorn
8     Restaurant on Friday, September 26, 2003?
9   A. I believe so.
10   Q. Is there any question in your mind whether he
11     was there that night?
12   A. Yes, he was there.
13   Q. So there's no question in your mind?
14   A. No.
15   Q. Had you seen that gentleman before the night of
16     September 26, 2003 at the Longhorn Restaurant?
17   A. Yes.
18   Q. When had you first seen him, best as you can
19     remember, at the Longhorn Restaurant?
20   A. I don't remember exactly. I don't remember.
21   Q. Since you've been there since it's opened, was
22     it as early as around the time that the
23     restaurant opened that you first saw him there?
24   A. I don't remember.

1   Q. Best as you can remember, on how many occasions
2     before September 26, 2003, did you see this
3     gentleman at the Longhorn Restaurant?
4   A. I don't remember exactly.
5   Q. Well, give me your best estimate. I don't want
6     you to guess, but if you can give me your best
7     estimate.
8        MR. GILLIS: If you have a best estimate
9     without guessing, give it to him.
10   A. I don't want to guess.
11   Q. Is it accurate to say that before the night of
12     September 26, 2003 you saw him at the
13     restaurant on more than two occasions, which
14     would make a total of at least three by
15     September 26, 2003?
16   A. Honestly, I don't remember. I know he's been
17     to the restaurant, but I'm not sure how many
18     times he's been in there.
19   Q. Okay. Do you remember, as you sit here now,
20     that the gentleman who is depicted in
21     Exhibits 9 and 10 to Ms. O'Donnell's deposition
22     was seated at a table that Ms. Chabot waited on
23     the night of September 26, 2003?
24   A. Yes.

1   Q. And do you recall whether he was alone or in
2     the company of others at that table?
3   A. With other people.
4   Q. Were any of the people that he was with that
5     night people that you had seen in the
6     restaurant before that night?
7   A. I don't remember.
8   Q. Do you know how many people, approximately, he
9     was with that night, September 26, 2003?
10   A. No.
11   Q. Did you have sort of an area of the restaurant
12     that you typically worked in?
13   A. No.
14   Q. Do you remember what tables Leigh was waiting
15     on that night?
16   A. No.
17   Q. Do you remember what tables you were waiting on
18     that night?
19   A. No, I don't remember.
20        (Off the record.)
21   Q. That night, September 26, 2003, did you speak
22     with anyone who was in the group that the
23     gentleman -- who for the record, by the way, in
24     Exhibits 9 and 10 to Ms. O'Donnell's deposition

Page 25

1  is Jeffrey Southworth -- was a member of?
2  A. No.
3  Q. Did you speak to Mr. Southworth that night?
4  A. No.
5  Q. Did you speak with anyone that night about
6     Mr. Southworth?
7  A. No.
8  Q. Did you speak with anyone that night while you
9     were working at the restaurant about anyone in
10    Mr. Southworth's group?
11 A. No.
12 Q. Did you observe anyone who was an employee of
13    the Leominster Longhorn speak that night to
14    Mr. Southworth?
15 A. I don't remember.
16 Q. You don't remember?
17 A. I don't remember if anybody spoke to them.
18 Q. Do you remember seeing Leigh speak to them?
19 A. She was their server, so yes.
20 Q. From what vantage point did you see Leigh
21    speaking to them?
22 A. Maybe taking their order.
23 Q. Where were you when you saw her speaking to
24    them?

Page 26

1  A. Probably walking by, going to the computer. I
2     don't remember.
3  Q. I'm going to show you what has been marked as
4     Exhibit 11 in Ms. O'Donnell's deposition and
5     Exhibit 2 in a gentleman named Jude Connolly's
6     deposition.
7        I ask you to take a moment and look at it
8     and tell me if you recognize it.
9  A. No.
10 Q. Let me show you the whole thing. Do you
11    recognize any portion of what is marked as
12    Exhibit 11?
13 A. No.
14        MR. FARRAH: Can we have this marked as
15    Exhibit 1?
16        MR. GILLIS: Are you asking if she
17    recognizes that specific one rather than in
18    general what that represents?
19        MR. FARRAH: Right now, yes; sure.
20
21        (Exhibit Number 1 was marked for
22        identification.)
23
24 Q. Does the first page of what has now been marked

Page 27

1  as Exhibit 1 in your deposition appear to you
2  to be a check or a portion of a check for the
3  Longhorn Restaurant?
4  A. Yes.
5  Q. And do you know what an audit report is? I'm
6     referring to an audit report which is the
7     second page of your Exhibit 1.
8  A. No.
9  Q. Have you ever seen a document such as this
10    audit report before?
11 A. No.
12 Q. Is this audit report, the second page and
13    further of Exhibit 1 to your deposition, the
14    kind of document that you typically generate
15    serving a customer?
16 A. I don't understand the question. Do you mean I
17    give that to the customer?
18 Q. Do you create a document like this audit report
19    when you're serving a customer?
20 A. No.
21 Q. Let me ask you a question. As all these
22    questions are as of September 26, 2003, when a
23    customer first places an order with you for an
24    alcoholic beverage, what do you do to fill that

Page 28

1  order?
2  A. I put it in the computer.
3  Q. Then what happens?
4  A. It goes to the bar.
5  Q. The service bar?
6  A. Yes.
7  Q. And then what happens?
8  A. The bartender makes the drink.
9  Q. Then what happens?
10 A. I pick the drink up and bring it to the table.
11 Q. Is paper created as a result of that process
12    that you just described to me?
13 A. A little piece of paper goes to the service bar
14    and they make the drink.
15 Q. And let me show you what has been marked as
16    Exhibit 8 in Ms. O'Donnell's deposition.
17        Do you recognize this as a floor plan of
18    the Longhorn Restaurant as it existed on
19    September 26, 2003?
20 A. Are these the table numbers?
21 Q. Yes.
22        MR. GILLIS: He asked you first if this is
23    the layout. He'll ask you a second question on
24    the numbers.

Page 29

1  A. Let me see. I don't know if this is the
2     restaurant. I don't know. I don't know what
3     this is over here.
4        Oh, that's the bathroom. That looks like
5     the layout of the Longhorn.
6  Q. Does this look like the front door area?
7  A. Yes.
8  Q. The bar over here?
9  A. Yes, okay.
10 Q. "K" for the kitchen?
11 A. So this is basically the alley in here, yes.
12 Q. Are you comfortable that, generally speaking,
13    the layout of the Leominster Longhorn, as it
14    existed on September 26, 2003, is depicted in
15    Exhibit 8 to Ms. O'Donnell's deposition?
16 A. Yes.
17 Q. Exhibit 1 to your deposition is a check and
18    some audit report and backup for a check for
19    Table 52/1. Do you see that?
20 A. Yes, I see that.
21 Q. What does this mean to you, Table 52/1?
22 A. Table 52, it's the table number and one guest.
23 Q. It says "Guest 6" right below that. Do you see
24    that?

Page 30

1  A. Then I don't know what the Number "1" is.
2  Q. Are you comfortable that the location of
3     Table 52 is shown where the Number 52 is
4     indicated on Exhibit 8 to her deposition?
5  A. Yes.
6  Q. Looking at Exhibit 8 to Ms. O'Donnell's
7     deposition, does that refresh your memory as to
8     where you were working that night?
9  A. No.
10 Q. If you look at, again, the check which is
11    Exhibit 1 to your deposition, do you see that
12    the server is Leigh?
13 A. Yes.
14 Q. Does that refresh your recollection as to
15    whether or not Leigh was serving Table 52 that
16    night?
17 A. She was serving Table 52 that night.
18 Q. You remember that?
19 A. Do I remember that she was serving Table 52?
20 Q. Yes.
21 A. I'm just going by what it says on here. I
22    don't remember.
23 Q. Do you remember the location in the restaurant
24    where you saw the gentleman who is depicted on

Page 31

1     Exhibit 10 to Ms. O'Donnell's deposition?
2  A. He could have been at 51 or 52. I don't
3     remember.
4  Q. Do you remember seeing him at the bar that
5     evening?
6  A. No.
7  Q. Tell me what you remember about him that night.
8  A. I just remember seeing him. I don't remember
9     anything out of the ordinary.
10 Q. Do you remember him saying anything?
11 A. No.
12 Q. Do you remember him being loud?
13 A. No.
14 Q. Do you remember him appearing to you as
15    demonstrating any signs of intoxication?
16 A. No.
17 Q. Had you ever seen the gentleman who is depicted
18    in Exhibit 10 to Ms. O'Donnell's deposition as
19    demonstrating what appeared to you to be signs
20    of intoxication?
21 A. No.
22 Q. Let me ask you this. Had you ever seen any
23    customer at the Longhorn Steakhouse demonstrate
24    what appeared to you to be signs of

Page 32

1     intoxication?
2  A. Not at my tables, no, I have not.
3  Q. How about other places in the Longhorn? Did
4     you ever see anyone who showed you what
5     appeared to be signs of intoxication?
6  A. No, not shown to me.
7  Q. Has there ever been anyone, to your knowledge,
8     that you have seen in the Longhorn since you've
9     been working there who has demonstrated what
10    you interpreted to be any signs of
11    intoxication?
12 A. No, I don't remember.
13 Q. Did you talk to Leigh that night, the night of
14    September 26, 2003, about Mr. Southworth?
15 A. No.
16 Q. Did you talk to Leigh that night about the
17    patrons -- any of the patrons -- at
18    Mr. Southworth's table?
19 A. No.
20 Q. Did you talk to Leigh that night about what
21    Mr. Southworth was ordering from her?
22 A. No.
23 Q. Do you know, as you sit here now, what
24    alcoholic beverages were served to that table?

Page 33

1 A. Just by looking at that, but other than that,
2   no.
3 Q. By looking at Exhibit 1 to your deposition, you
4   know what was served to that table?
5 A. Yes because it says right here, but that's the
6   only way I know.
7 Q. So prior and excluding any conversations you
8   had with Mr. Gillis or anybody in his office,
9   is it accurate to say that prior to being shown
10  Exhibit 1, you did not know that customers at
11  that table had been served Jack Daniels
12  Manhattans?
13 A. No. I did not remember, no. I have never seen
14  that check and I didn't know.
15 Q. I understand you have never seen that check,
16  but my question to you is, for example, did
17  Leigh tell you that she had served Jack Daniels
18  Manhattans to this table?
19 A. No.
20 Q. Did Leigh tell you that she had served beer to
21  this table?
22 A. No.
23 Q. How did Leigh and you determine that it was her
24  customer who had driven the car early that

Page 34

1   morning or the truck early that morning?
2      MR. GILLIS: Objection.
3 A. I don't remember how we came to that
4   conclusion.
5 Q. Did she say to you, "That's my customer," who
6   had done that?
7 A. I don't remember.
8 Q. She called you, didn't she?
9 A. Yes, I believe so.
10 Q. She was upset?
11 A. She was upset.
12 Q. So my question to you is, and I know it's a
13  while ago, but my question to you is, when she
14  called you to talk about this, did she say to
15  you how she had come to conclude that it was
16  her customer who had driven the car?
17 A. I don't remember.
18 Q. Did she say to you during that conversation
19  anything about whether he was intoxicated or
20  not?
21 A. I don't remember.
22 Q. Why was she upset?
23 A. Because she had seen somebody that she had
24  waited on had an accident.

Page 35

1 Q. Is that what she said?
2 A. From what I recall. I don't remember the exact
3   conversation.
4 Q. I want you to give me your best memory of what
5   you do remember in that conversation.
6 A. Honestly, I don't remember the conversation
7   clearly to give you anything.
8 Q. I just want you to give me the best you can,
9   mindful of the fact that you're under oath.
10     My question is, have you told me
11  everything that you can remember about the
12  conversation you had with her that night?
13 A. All I remember is that she had seen him on T.V.
14  and that he had been in the restaurant, but I
15  do not remember anything else other than that.
16 Q. Did she say during that conversation anything
17  about what had happened in the restaurant that
18  night?
19 A. No, not that I remember, no.
20     MR. FARRAH: In this case Rare has
21  answered interrogatories, and I'm going to show
22  them to you and ask that that be marked as
23  Exhibit 2, Rare's answers to interrogatories.

Page 36

1      (Exhibit Number 2 was marked for
2      identification.)
3
4 Q. I'm going to show you what has been marked as
5   Exhibit 2 entitled "Defendant Rare Hospitality
6   International, Inc. Answers to Plaintiff's
7   First Set of Interrogatories."
8      Do you recognize this document?
9 A. No.
10 Q. Question Number 14 says, "Describe all
11  communications between any employee of Rare and
12  anyone on Rare's behalf occurring on
13  September 26, 2003 or after relating to the
14  Southworth party or Southworth."
15     The answer as it relates to you is as
16  follows: "Additionally, it is Rare's belief
17  that the server, Leigh Chabot, communicated
18  with bartender Kristin O'Donnell in order to
19  relay drink orders from Table 52. Rare
20  believes that there also came a point in time
21  where Ms. Chabot communicated with another
22  Longhorn server, Sherri Salmond, who recognized
23  one or more patrons at Table 52 as prior
24  patrons of the restaurant."

Page 37

1    My question to you is, do you have any
2    reason to --
3        MR. GILLIS: First of all, go ahead and
4    ask your question. I want her to read the
5    whole question and answer before she answers.
6    Q. My question to you is, do you have any memory
7    of Leigh Chabot that night at the restaurant
8    speaking to you about Southworth?
9        MR. GILLIS: Objection, and I note for the
10    record there is an objection for Number 14 as
11    part of the answers to interrogatories, but
12    that being said, you can go ahead and answer
13    the question.
14 A. I honestly do not remember a conversation.
15    Whether I did or didn't, I don't remember. It
16    was three years ago. So I don't remember. I
17    might have.
18 Q. She might have spoken to you?
19 A. I don't remember speaking to her.
20 Q. Do you remember Leigh saying to you at some
21    point in time something like, "A group just
22    ordered seven Jack Daniels Manhattans from me"?
23        MR. GILLIS: Objection.
24 A. I don't remember.

Page 38

1 Q. Have you ever had a group order seven Jack
2    Daniels Manhattans from you?
3 A. I don't remember. I could have maybe. I don't
4    remember.
5 Q. Then when you had the conversation with Leigh
6    after she saw on T.V. this, during that
7    conversation, she called you at your house and
8    she was upset and she described that it was one
9    of her customers who had driven the car.
10    Did you know which customer she was
11    talking about?
12        MR. GILLIS: Objection.
13 A. No.
14 Q. When did you learn that the customer she was
15    talking about is the fellow who is staring at
16    you in Exhibit 10?
17        MR. GILLIS: Objection.
18 A. I don't remember. It's so long ago. I don't
19    remember.
20 Q. After Leigh spoke to you about that night when
21    she called you about this accident and she was
22    upset, did the two of you ever again speak
23    about Mr. Southworth, ever?
24 A. Not in particular, no.

Page 3

1 Q. What do you mean by that?
2 A. Maybe. I don't remember. I honestly don't
3    remember.
4 Q. She was extremely upset that day when she
5    called; isn't that right?
6        MR. GILLIS: Objection.
7 A. I guess she was upset. I don't know if
8    extremely.
9 Q. And is it your testimony that you never again
10    spoke to her about the matters that made her
11    upset when she called you?
12        MR. GILLIS: Objection. That's not what
13    she answered.
14 A. I need to take a break for a minute. I have to
15    go to the restroom.
16        (Short recess.)
17 Q. Did you ever again speak to her about the
18    matters that made her upset in that telephone
19    conversation?
20 A. I might have talked to her. It's so long ago.
21    I don't remember the full conversations that I
22    talked to her.
23        It might have come up sometimes. It's not
24    something we sit and talk about.

Page 4

1 Q. Let me ask you this. Is there any question in
2    your mind, as you sit here under oath today,
3    about whether or not after that first phone
4    call you talked to her again about the
5    Southworth matter?
6 A. I might have. It might have come up. It might
7    have come up. I might have talked to her.
8        We have other things in common other than
9    this. We're friends. So it might have come
10    up; it might not have.
11        It's not something we sit and talk about.
12    So I don't know. It might have. It might not
13    have.
14 Q. You know it did come up again, don't you?
15        MR. GILLIS: Objection.
16 A. I'm saying it might have come up.
17 Q. It did come up again; isn't that right?
18        MR. GILLIS: Objection. She's already
19    been asked and answered that question. If you
20    want to testify for her.
21 A. It might have come up in conversation. Like I
22    said, I'm friends with her.
23        So I'm not going to say that we never said
24    anything, but we don't sit and dredge it out in

Page 41

1    conversations every time I talk to her.
2    Q. Okay.
3    A. So we don't sit around and talk about it.
4    Q. When next after the original, initial phone
5        call was it that the two of you talked about
6        Mr. Southworth?
7            MR. GILLIS: Objection.
8    A. I don't remember when next was.
9    Q. What do you remember the two of you said in the
10       next conversation you had about Mr. Southworth?
11           MR. GILLIS: Objection.
12   A. I don't remember. It's three years. I don't
13       remember.
14   Q. Do you remember her ever saying, in effect,
15       that she had served too much alcohol to
16       Mr. Southworth?
17   A. No, I don't remember.
18   Q. Do you remember or not?
19   A. No, I don't remember. I don't remember her
20       ever saying anything about him drinking too
21       much alcohol.
22   Q. Do you know how much he was served that night?
23   A. No.
24   Q. Has she ever told you how much he was served

Page 42

1        that night?
2    A. No, not that I can remember, no.
3    Q. Did she ever tell you that he was served Jack
4        Daniels Manhattans that night?
5    A. No, not that I remember.
6    Q. What did she talk about when she talked to you
7        about him after that initial conversation?
8            MR. GILLIS: Objection. It's been
9        established.
10   A. I don't remember. It's three years ago and I
11       don't remember, honestly.
12   Q. Have you ever talked to anyone else about the
13       conversation that you had with Leigh Chabot the
14       day after or shortly after the evening of
15       September 26, 2003?
16   A. Except my husband, no, I don't remember talking
17       to anybody.
18   Q. Did you ever speak to anybody at Rare about the
19       conversation you had with Leigh Chabot the day
20       after or shortly after September 26, 2003?
21   A. No.
22   Q. Did you ever write a report?
23   A. No, I don't remember, and I've never written a
24       report.

Page 43

1    Q. You're sure you've never written a report, but
2        you're not sure whether you ever spoke to
3        anybody at Rare?
4    A. No, I don't believe I wrote a report, and I
5        don't remember speaking to anybody at Rare
6        Hospitality because I was not the server that
7        night. I just worked. I don't know.
8    Q. At some point in time, did anyone at Rare ask
9        you whether you knew anything about what had
10       happened the night of September 26, 2003?
11   A. I don't remember.
12   Q. Are you taking any medication today?
13   A. No.
14   Q. Have you been convicted of a felony in the past
15       ten years?
16   A. No.
17   Q. How about a misdemeanor in the last five years?
18       Have you been convicted of a misdemeanor in the
19       last five years?
20   A. Besides a speeding ticket, no.
21   Q. When was the last time you spoke to Leigh?
22   A. I talked to her today about her dog. Her dog
23       poked his eye out. We talked on the phone.
24           We are friends. Even though she moved, we

Page 44

1        still stayed friends.
2    Q. Did you talk to Leigh today about that you were
3        coming to this deposition?
4    A. No.
5    Q. Have you ever talked to Leigh about that you
6        were coming to this deposition?
7    A. No.
8    Q. So as far as you know, she does not know, at
9        least from you, that you're being deposed in
10       this case; is that right?
11   A. Yes.
12   Q. With what frequency do you speak to Leigh?
13   A. It could go a month. We could go three months.
14       We're friends. We talk. We have kids that are
15       the same age.
16   Q. You just happened to talk to her today?
17   A. Yes.
18   Q. Did she call you or did you call her?
19   A. She called me.
20   Q. What time?
21   A. It was about maybe 9:30.
22   Q. This morning?
23   A. Yes.
24   Q. And you can't tell me the last time before

**Page 45**

1 today that you spoke to her?
2 A. No. It could have been three weeks ago.
3 Q. What is her number?
4 A. I don't have it off the top of my head.
5 Q. Can you tell me what is in a Jack Daniels
6 Manhattan?
7 A. Jack Daniels and vermouth.
8 Q. And can you tell me how many ounces of Jack
9 Daniels is in a Jack Daniels Manhattan at the
10 Leominster Longhorn?
11 A. No, I cannot.
12 Q. You don't know that; is that right?
13 A. Right.
14 Q. Can you tell me what proof Jack Daniels is?
15 A. No.
16 Q. You don't know that either?
17 A. No.
18 Q. Can you tell me what proof the vermouth is?
19 A. No.
20 Q. Did you know that back in September of '03?
21 A. No.
22 Q. Who was the manager that night?
23 A. I don't remember who it was.
24 Q. How many managers, typically, worked on a

**Page 46**

1 Friday night?
2 A. It could be three.
3 Q. It could be three?
4 A. Yes. It depends.
5 Q. What would they be doing?
6 A. Walking the tables, looking at the bar,
7 checking out everything in the window. It
8 could be in the kitchen. It could be anywhere
9 that they're needed.
10 Q. Do you know a woman named Jaime Kahl, K-a-h-l?
11 A. Yes.
12 Q. For how long have you known her?
13 A. Since she started working there. I don't know
14 when she started.
15 Q. Does she work there now?
16 A. Yes.
17 Q. When was the last time you spoke to Jaime?
18 A. Wednesday. She got engaged.
19 Q. Do you know Kristin O'Donnell?
20 A. Yes, from working at the Longhorn.
21 Q. And when was the last time you talked to
22 Kristin?
23 A. I might have seen her around Christmastime at
24 the mall.

**Page 47**

1 Q. Let me ask you this. Have you spoken to
2 anybody, other than your husband and Longhorn's
3 lawyers, about Jeffrey Southworth?
4 A. No.
5 Q. Have you spoken to anybody, other than your
6 husband or Longhorn's lawyers, about the events
7 of September 26, 2003?
8 MR. GILLIS: Other than what she already
9 testified about as to what she talked to Leigh
10 about?
11 Q. And whatever your testimony was as it relates
12 to Leigh.
13 A. I'm sure people have talked about it at work
14 because it happened at our Longhorn, so I'm
15 sure it's been brought up in conversations, but
16 I don't remember the exact conversations we
17 had, but we talked about it. It was a big
18 thing.
19 Q. It's a big thing?
20 A. It's a sad thing, you know. It's not something
21 that I wish upon anybody.
22 Q. You mean Leigh's situation?
23 A. No. I mean the whole accident in itself.
24 Q. Do you think it was preventable?

**Page 48**

1 MR. GILLIS: Objection.
2 A. I don't know what happened or why it happened.
3 So I don't know if it was preventable.
4 Q. Let me ask you this. Since you have worked at
5 the Longhorn, have you ever had patrons that
6 you have served at a table who were served at
7 the bar before being seated at the table?
8 A. They could. I'm not sure. They could go to
9 the bar, and I don't know if they had been to
10 the bar and sat at my table.
11 Q. Is there any question in your mind about
12 whether or not, since you started working at
13 the Longhorn, you have served people at tables
14 who earlier that day or evening had first been
15 at the bar? Is there any question in your
16 mind?
17 A. That they've been at the bar?
18 Q. Yes, that you served people on occasion who
19 first were at the bar before they sat at the
20 table.
21 A. I'm sure they have because they usually wait at
22 the bar, and then they are sat at the table.
23 Q. And you give little buzzers or beepers to
24 people, right?

Page 49

1  A. Yes.
2  Q. And while they're waiting for the table,
3     there's only one other place to wait and that's
4     the bar; isn't that right?
5          MR. GILLIS: Objection.
6  A. Or in the front walkway.
7  Q. And you have had many customers who have waited
8     at the bar before they come to your table over
9     the last four years; isn't that right?
10         MR. GILLIS: Objection.
11 A. Yes.
12 Q. Have you ever had the charge at the bar -- the
13    bill for what the people were drinking at the
14    bar -- have you ever had that put onto the
15    check that you generated for the table?
16 A. Yes.
17 Q. You've done that?
18 A. I've had bartenders give drinks to the
19    customers, and then they would tell me to ring
20    it under my check because they didn't have time
21    to ring it in on their bar.
22 Q. When is the last time that happened?
23 A. I don't remember. It doesn't happen all the
24    time.

Page 50

1  Q. Has it ever happened?
2  A. Yes, it's happened.
3  Q. How many times in your experience has it
4     happened?
5  A. I don't remember in five years.
6  Q. Give me your best estimate.
7  A. I don't want to estimate. I don't know. I've
8     been there five years. I don't know.
9  Q. More than ten times in the five years you've
10    been there?
11 A. Maybe; not more than ten times.
12 Q. More than five times?
13 A. Probably.
14 Q. Somewhere between five and ten times; is that
15    right?
16 A. I don't remember.
17 Q. Describe to me how that works, whatever number
18    of times that has happened. Tell me how it
19    works.
20 A. From what I remember, they get a drink at the
21    bar, and then they say, "Sherri, I forgot to
22    put such and such a drink or charged them for
23    such and such a drink. Put it on your check."
24 Q. They forget to do that?

Page 51

1  A. Yes because they have like fifty million people
2     at the bar. So if they don't have time or they
3     are running food or whatever, they just ask us
4     to do that.
5  Q. How do they do that?
6  A. They just tell us and then we ring it in.
7  Q. Does the bartender leave the bar area and find
8     you?
9  A. It could be the next time I walk around when
10    they see me and they see where the person went
11    to sit.
12 Q. And you think that's happened not more than ten
13    times?
14         MR. GILLIS: Objection.
15 A. I don't remember. I honestly don't remember.
16 Q. I've heard you say that many times today.
17 A. If I don't remember something, I'm not going to
18    guess on something because I'm under oath, and
19    I'd rather just say "I don't remember" if I
20    don't remember something specifically.
21 Q. Do you feel safe saying "I don't remember"?
22         MR. GILLIS: Objection. Don't answer
23    that.
24 Q. Let me ask you some more questions. Do you do

Page 52

1     that -- put it on the check?
2  A. I've done it.
3  Q. You remember doing that?
4  A. Yes.
5  Q. So back to when you're generating a check, when
6     you put the bartender's drink on the check that
7     you have at the table, does it generate another
8     slip?
9  A. No. It goes on to the table with the rest of
10    the food.
11 Q. Every time you punch in on the computer a
12    drink, a slip is generated at the service bar;
13    isn't that right?
14 A. Yes.
15 Q. So when you punch in a drink for the bartender
16    on how many occasions you do remember having
17    done that, isn't it true that a slip is
18    generated at the service bar for that drink?
19 A. Yes.
20 Q. And on the occasions that you have done that,
21    do you remember going then to the service
22    bartender and saying to her or to him, "Don't
23    bother making this drink."
24 A. There's a button that says "do not make."

Page 53

1  Q. There's a button that says "do not make"?
2  A. Yes. I don't know if it was in 2003. It might
3     have been updated since 2003.
4  Q. So today you have the capability of ordering a
5     drink then saying do not make it?
6  A. Yes, up on top.
7  Q. The purpose of that button is to cancel the
8     order that you mistakenly made; isn't that
9     right?
10 A. Yes.
11 Q. So when you cancel the order on the computer
12    that you mistakenly made, the order never shows
13    up on the check; isn't that right?
14 A. No. It could show up on the check. I believe
15    so. I'm getting confused there.
16 Q. There is a way to cancel a mistaken order;
17    isn't that right?
18 A. Yes. It will appear on the check.
19 Q. What does it appear on the check as?
20 A. What it is.
21 Q. Then you charge the customer for something that
22    was not made?
23 A. No. Then the manager takes it off.
24 Q. How does the manager do that?

Page 54

1  A. With his card.
2  Q. That's what you can do today; is that right?
3  A. Yes. I'm not sure about 2003. I don't know
4     what the system was in 2003.
5  Q. But you know the system has changed since 2003;
6     is that right?
7     MR. GILLIS: Objection.
8  A. Yes, I believe so.
9  Q. You know the system has changed; is that right?
10    MR. GILLIS: Objection.
11 A. I believe so.
12 Q. When did it change?
13 A. I don't know the date.
14 Q. Have you ever been deposed before?
15 A. No. Can't you tell?
16 Q. Did you talk to Chris Orr about the events of
17    September 26, 2003?
18 A. No.
19 Q. Was he on duty that night?
20 A. I don't remember.
21 Q. Do you remember who the service bartender was
22    that night?
23 A. No. I believe it's probably Kristin because
24    you have her here, but that's the only way I

Page 55

1     know it's her.
2  Q. Was there any mechanism in place at the
3     Longhorn back in September of 2003 whereby the
4     bartender could report to the waitresses
5     whatever alcohol a customer had been served at
6     the bar before being seated at a table?
7  A. Any mechanism? What do you mean?
8  Q. Was there any procedure in place?
9  A. I don't remember.
10    MR. GILLIS: Do you understand the
11    question?
12 A. Is it the bartender telling the server, no.
13    Just if they have a drink or you just --
14 Q. Let me ask it another way. As of September of
15    2003, was there any way for you to know how
16    much a particular customer who had been
17    drinking at the bar and then became your
18    customer at a table had had to drink at the
19    bar?
20 A. No.
21    MR. GILLIS: Are you talking about
22    equipment there, like checks, or by
23    conversations with people, or what?
24 Q. Any way at all.

Page 56

1  A. I mean, if someone had so much to drink, I'm
2     sure the bartender would tell the server, "This
3     person has had this much. Keep an eye on him,"
4     but I've never had it happen to me.
5  Q. You don't remember anyone ever telling you
6     that; is that right?
7  A. No. I never had to do that.
8  Q. As a waitress, did you share your tips with the
9     bartenders at that time?
10 A. Yes. We tip them out on bar sales.
11 Q. How do you calculate what you tip them out?
12 A. Five percent of your bar sales. I believe
13    that's how it is. So it's $100, it would be
14    five dollars.
15 Q. So you gave them five percent of your bar sale
16    as a tip; is that right?
17 A. If I remember correctly, yes.
18 Q. And that went to a service bartender?
19    MR. GILLIS: Objection.
20 A. I don't know how they disburse of it, sir. I
21    don't know how they do that.
22 Q. Is Friday night typically a busy night?
23 A. Yes, typically.
24 Q. Were there ever times that you had to wait for

Page 57

1    drinks?
2    A. Yes.
3    Q. What is the longest that you can remember
4      waiting for a drink?
5    A. Maybe seven or eight minutes.
6    Q. Do you have any memory of customers being upset
7      as a result of that -- having to wait for
8      drinks?
9    A. No because we bring them a glass of water if
10     they have to wait for a drink.
11   Q. Why do you have to wait for drinks?
12   A. Either the bartender is busy and they cannot
13     get to your drink.
14   Q. Did you ever help out other waitresses while
15     you worked at the Longhorn? By "help out" I
16     mean help serve their customers for them?
17   A. Do you mean bring things to the table for them?
18     Yes, because we work as a team.
19   Q. How would that work?
20   A. Someone would say, "Could you follow me? I
21     can't carry that." So I would just follow them
22     to the table.
23   Q. Did the Longhorn have any rule, as of September
24     26, 2003 that you know about, that prohibited

Page 58

1    customers from ordering a drink at the same
2    time they were delivered a drink?
3    A. You're not allowed to do that. You're not
4      allowed to order a drink when you have a drink
5      in front of you.
6    Q. And what is the basis for that statement?
7    A. What do you mean?
8    Q. You just told me that that was Longhorn's rule;
9      is that right? Was that Longhorn's rule?
10   A. I believe it's Longhorn's rule.
11   Q. What I want to know is --
12   A. Maybe I'm wrong.
13   Q. What is the basis for you saying that it's
14     Longhorn's rule? Is it written somewhere?
15   A. I don't know. I have not looked at the book in
16     a little while. I don't know. I don't
17     remember the exact.
18       I don't know. I don't remember. I just
19     don't. I don't know if it's a Longhorn rule.
20   Q. Where did you have your TIPS training?
21   A. At Four Points in Leominster.
22   Q. Before you came to the Longhorn?
23   A. Yes. I was probably still at the Longhorn
24     before I went there.

Page 5[9]

1    Q. Let's try that again. When you had the
2      training at the Four Points, was it in
3      connection with your employment as a sometimes
4      banquet waitress at the Four Points?
5    A. Yes.
6    Q. So when you came to the Longhorn, did you have
7      TIPS training again?
8    A. Honestly, I can't remember the last time I had
9      TIPS training.
10   Q. What I want to know is, did you have TIPS
11     training in connection with coming to the
12     Longhorn?
13   A. Not that I can remember.
14   Q. So you were already TIPS trained, is what
15     you're saying, before you came to the Longhorn;
16     is that right?
17   A. Yes.
18   Q. Do you have any way, you personally as a
19     waitress have any way to calculate the effect
20     of alcoholic beverages on a customer?
21       MR. GILLIS: Objection.
22   Q. Do you have a method that you use?
23   A. Red light, green right, yellow light. When
24     they first come in, you can pretty much order

Page 6[0]

1    what they want to order, and then yellow light
2    is when you slow down and bring them a glass of
3    water, and you don't ever want them to get into
4    the red light. You just want to monitor your
5    guests.
6    Q. And is it accurate to say that you never had a
7      customer who went into the red light?
8    A. Exactly, from what I remember.
9    Q. Is it accurate to say that you have never seen
10     a Longhorn customer who was in the red light?
11   A. Not at my tables, no.
12   Q. How about anywhere in the restaurant?
13   A. I'm sure it has happened, but I never actually
14     went over and saw it myself.
15   Q. I don't want you to imagine or speculate. I
16     want to know whether or not you have ever seen
17     anyone that you believed was in the red light
18     when you were working at the Longhorn.
19       MR. GILLIS: Objection.
20   A. I don't remember if I cannot speculate. I
21     don't remember.
22   Q. I don't want you to speculate.
23   A. I can't remember.
24   Q. How do you measure green light, yellow light

Page 61

1 and red light?

2 A. Probably from their weight, their size, their

3 gender, slurring, judgment, making sure that

4 they're not overdoing it.

5 We don't want them to ever get to the red

6 light. So you just make sure that they're not

7 acting any different.

8 Q. Is there any other way that you measure whether

9 somebody is in green, yellow or red than what

10 you just described?

11 A. That's how I judge. I make sure that they're

12 not acting funny. Most of the time people

13 don't come into Longhorn to get drunk. They

14 come into Longhorn to enjoy the atmosphere with

15 their family.

16 Q. You personally, were you trained to take into

17 account the number of drinks that somebody had

18 consumed in determining whether or not that

19 person was green light, red light or yellow

20 light?

21 A. No. I've never had to shut anybody off.

22 Q. What is the greatest number of drinks you have

23 served any customer that you can recall in,

24 say, a two-hour period?

Page 62

1 A. Maybe two drinks. They're mostly families that

2 I wait on.

3 Q. Did you ever serve Jeffrey Southworth?

4 A. Yes. I told you that I did.

5 Q. You told me that you saw him before.

6 A. Yes. I've served him before, I believe.

7 Q. How many times before the night of

8 September 26, 2003?

9 A. I can't recall. I don't know.

10 Q. What did you serve him?

11 A. I don't remember what I served him.

12 Q. Did he like Jack Daniels Manhattans?

13 MR. GILLIS: Objection.

14 A. I don't know, sir.

15 Q. Did you ever serve him a Jack Daniels

16 Manhattan?

17 A. I don't remember.

18 Q. Was he ever loud at the restaurant that you

19 were there?

20 A. Not that I can remember, no, from what I

21 remember.

22 Q. Have you talked to Chuck Bouillane about

23 Jeffrey Southworth?

24 A. No.

Page 6

1 Q. Have you talked to any private investigators

2 about Jeffrey Southworth or people you

3 understood to be private investigators?

4 A. No.

5 Q. Do you know how much ethanol is in a Jack

6 Daniels Manhattan?

7 A. No.

8 Q. Do you know what ethanol is?

9 A. No.

10 Q. So you can't tell me how much ethanol is in a

11 twenty-five-ounce beer, can you?

12 A. No. I don't know what ethanol is.

13 Q. Do you know what exact-o-pour is?

14 A. No.

15 Q. Did you ever hear of exact-o-pour?

16 A. No.

17 Q. Have you ever seen service bartenders

18 free-pouring drinks?

19 A. Yes.

20 Q. Do you know what I mean by "free-pouring"?

21 A. No.

22 Q. Okay. How could you answer yes to the

23 question?

24 A. From what I believe free-pouring is, is that

Page 6

1 they count to see what to put in the glass.

2 Q. Have you ever seen service bartenders

3 free-pouring drinks?

4 A. Yes.

5 Q. Have you ever seen service bartenders measuring

6 drinks as opposed to free-pouring?

7 A. Yes.

8 Q. Do you know whether or not it's a Rare policy

9 to measure drinks?

10 A. No, I can't tell you that.

11 Q. Have you ever served a customer an

12 After-burner?

13 A. No, not that I remember.

14 Q. How about an Alabama Slammer? Have you ever

15 served a customer one of those?

16 A. Maybe. I have served so many drinks.

17 Q. Is there a menu that has a list of mixed drinks

18 on it at Rare while you were working there?

19 A. They have specialty drinks that they make.

20 Q. My question is, was there a menu at the

21 Longhorn as of September 26, 2003 that listed

22 those specialty drinks?

23 MR. GILLIS: Are you talking about

24 something that goes to the patrons like a food

Page 65

1    menu?
2    Q. Menu.
3    A. Yes, there's a menu.
4    Q. That customers get; is that right?
5    A. Yes.
6    Q. With the specialty drinks on it?
7        MR. GILLIS: Objection.
8    A. Yes.
9    Q. Does the menu have specialty drinks on it?
10       MR. GILLIS: Objection.
11    A. Yes.
12    Q. And the prices of those drinks?
13    A. No.
14    Q. Just a list of the specialty drinks?
15    A. Yes.
16    Q. Who has that menu? Where is it kept at the
17    restaurant?
18    A. At the front door and on the tables. There's a
19    bifold on the table, and the hostesses give
20    each table a menu.
21    Q. Does Rare charge for the soft drinks that it
22    serves customers?
23    A. Yes.
24    Q. Was there in place, as of September 26, 2003,

Page 66

1    any policy that you know of that allowed a
2    waitress not to charge for soft drinks?
3    A. A policy, no.
4    Q. You're expected to charge for everything you
5    serve somebody; is that right?
6    A. Yes.
7    Q. So am I correct that since you started working
8    at Rare, you have never known how many
9    alcoholic beverages at the bar any of your
10    table customers had consumed?
11       MR. GILLIS: Objection.
12    A. You're asking me the same thing you asked me,
13    like is there any way to tell each other.
14    Q. I don't want to ask you is there any way
15    because I know there are many ways a person can
16    tell you this customer just had eight beers,
17    but what I want to know is, has any bartender
18    at Rare ever told you how many drinks a
19    customer who had come to be seated at your
20    table had had previously that day at the bar?
21       MR. GILLIS: Objection.
22    A. Not that I can remember.
23    Q. And since you started working at Rare, do you
24    know of any company policy that required

Page 67

1    bartenders to tell waitresses how much a
2    customer had had at the bar before being seated
3    at the table?
4       MR. GILLIS: Objection. Under what
5    conditions?
6    Q. You can answer the question.
7       MR. GILLIS: I want to know the question.
8    Are you asking every single person who sits
9    down or people in a particular situation?
10       MR. FARRAH: She can do the best she can.
11    You can object to the question, and I think you
12    have.
13       MR. GILLIS: Objection.
14    A. I don't remember. I'm getting confused with
15    all these questions.
16    Q. Do your best.
17    A. I don't remember, sir.
18    Q. You don't remember?
19    A. I don't even know. Honestly, I have no idea.
20       MR. GILLIS: Do you know what the question
21    is?
22       THE WITNESS: No, I don't. I've been
23    asked so many questions. I've been hearing the
24    same questions.

Page 68

1    Q. Do you have difficulty understanding all my
2    questions?
3    A. Not all of them. That's why I pause sometimes
4    and I tell you when I don't understand your
5    question.
6       MR. FARRAH: Could you read the question
7    back to us, please?
8       (Court reporter reads back question.)
9    A. Not that I can remember.
10    Q. We were talking earlier about how you place an
11    order, do you remember, and you had answered
12    that the only paper that was generated when you
13    ordered a drink to be made by a service
14    bartender was a slip that the service bartender
15    got. Do you remember that?
16    A. Yes.
17    Q. And is it similarly the case that the only
18    paper that is generated when you place a food
19    order would be a slip that the kitchen got?
20    A. No. There could be a slip in the back with the
21    cooks and in the alley.
22    Q. Could you point to that alley?
23    A. This is the alley. There's a slip here that we
24    put on this metal thing here, and then there's

Page 69

1   a cook that is back here that has a slip that
2   puts the steaks on. Then there's a salad fry
3   print too.
4 Q. So in the kitchen area for food orders, there
5   were at least three printers as of
6   September 26, 2003?
7 A. Besides the computer printers, yes.
8 Q. What do you mean by the computer printers?
9 A. There's a computer here and a computer here.
10 Q. Two computers in the kitchen?
11 A. Yes, and in the alley.
12 Q. And there's a computer at the service bar as
13   well?
14 A. There's a printer in the service bar.
15 Q. So in connection with a food order that you
16   place at the monitor, there are a number of
17   different either printers or computers that act
18   as printers in the kitchen area that can also
19   generate paper; is that right?
20 A. Yes.
21 Q. Am I correct that no check as in the first page
22   of Exhibit 1 to your deposition is a check,
23   that no check is generated until such time as
24   the server hits the "print check" button on the

Page 71

1 A. I have printed checks when they finish their
2   food so I can have it just in case they don't
3   want dessert.
4    If they do get dessert, I get rid of the
5   check and I print another check with the
6   dessert on it, or if I forget to put in a water
7   or Sprite, I reprint the check.
8    Any time that I need to print the check
9   that I feel I need to print the check, I print
10   the check for the table.
11 Q. If you forget to put a water -- A water did you
12   say?
13 A. A water, Sprite, Coke.
14 Q. You charge for water?
15 A. No.
16 Q. So why would you print a check if you forgot to
17   put a water on?
18 A. Because on the new computers, you have to put
19   in either "no beverage" or "water" if somebody
20   is eating at the table, for each guest, but I'm
21   not sure how it was in 2003.
22    If there's five people, you need to put in
23   "no beverage" or "water" or "Sprite" or "Coke"
24   or "fruit punch" or "lemonade."

Page 70

1   computer screen; is that right?
2 A. Yes. If you want to print it, you push
3   "print."
4 Q. And that prints a check?
5 A. Yes.
6 Q. Where does the check print?
7 A. On the printer.
8 Q. Where is the printer?
9 A. I just showed you right here, right here, right
10   here, over here, here.
11 Q. Okay. Is it correct to say that at each of the
12   monitors there is a printer as of September 26,
13   2003?
14 A. Yes.
15 Q. But until "print check" is actually pressed by
16   the server or somebody at the monitor, no check
17   is printed; is that right?
18 A. Yes.
19 Q. During the course of serving a table, under
20   what circumstances prior to delivering to that
21   customer the check for payment and the customer
22   says give me my check, under what circumstances
23   prior to that have you in the past printed
24   checks?

Page 72

1 Q. What happens if you don't do that?
2 A. You cannot print the check.
3 Q. The computer will not print the check?
4 A. Right.
5 Q. But what I want to know is, why would you print
6   the check, not what do you need to do -- punch
7   in "water" or "Sprite" in order to print a
8   check.
9    Why would you print the check short of the
10   customer asking you for the check, and you told
11   me maybe in anticipation of the customer asking
12   you for the check.
13 A. Right.
14 Q. Any other circumstances under which you would
15   print the check prior to the time that the
16   customer asks you for the check?
17 A. If I want to show the cook if they say they
18   didn't get the steak and they lost the ticket,
19   I will print the check and show them the check
20   that the steak is on the check. So that way
21   they will make it if the manager is not around.
22 Q. Any other reason that you would print the check
23   prior to the customer asking you for the check?
24 A. I believe that's why I would print the check.

Page 73

1  Q. When you print the check, what you get is a
2     check; is that right?
3  A. Right.
4  Q. Approximately four inches by eight inches;
5     something like that?
6  A. It looks about right.
7  Q. We're looking at Exhibit 1 to your deposition.
8     Do you know what this line here, "Reprint
9     Number 5" means?
10 A. I'm assuming that it means --
11    MR. GILLIS: Don't assume. If you know
12    what it is, say what it is.
13 A. Reprinted the tickets five times.
14 Q. This is the fifth time this check has been
15    printed; is that right?
16 A. Yes.
17 Q. Have you ever printed a check five times that
18    you can think of?
19 A. Not that I can remember.
20 Q. Did Leigh ever tell you that she was going to
21    see a lawyer about the incident of
22    September 26, 2003?
23 A. Not that I can remember, no.
24 Q. Not that you can remember?

Page 74

1  A. Not that I can remember.
2  Q. Or that any lawyer had seen her about it?
3  A. Not that I can remember.
4  Q. Did she ever tell you that she was afraid of a
5     lawsuit because of what had happened that
6     night?
7  A. No, not that I can remember.
8  Q. Did she ever tell you that she was afraid that
9     Rare was going to get sued because of what had
10    happened that night?
11 A. Not that I remember.
12 Q. Did anyone ever tell you that they were afraid
13    that Rare was going to get sued because of what
14    happened that night?
15 A. Not that I can remember.
16 Q. Do you own stock in Rare?
17 A. No.
18 Q. Do you have profit sharing as part of your
19    compensation?
20 A. No.
21 Q. Can I ask you how much as of September 26,
22    2003, how much were you paid an hour?
23 A. $2.63 an hour.
24 Q. By Rare; is that right?

1  A. I believe so.
2  Q. And the rest of what you earned was tips; is
3     that right?
4  A. Yes.
5  Q. On a good night, how much could you make in
6     tips?
7     MR. GILLIS: Now or back then?
8  Q. Back then.
9  A. Maybe $100, $125.
10 Q. And on a typical Friday night back then, how
11    many tables were you responsible for?
12 A. Three, if I remember.
13 Q. Three tables of four persons each?
14 A. Or it could be -- We have two-top tables. We
15    have a couple of tables.
16 Q. Maybe I should ask the question in terms of
17    customers or seats. Seats is probably the best
18    way to do this.
19    On a Friday night, how many seats were you
20    responsible for serving?
21 A. It depends what station you're in.
22 Q. What is the most and what is the least that you
23    recall you were responsible for serving on
24    Friday nights around that time?

1  A. It depends. I don't remember. I don't
2     remember how many.
3  Q. Do you know of instances where Longhorn
4     employees have been disciplined for anything at
5     all by the company?
6  A. No, I don't know.
7  Q. Did you ever hear of anybody being fired for
8     breaking or doing anything at all?
9  A. For doing anything at all?
10 Q. Yes.
11 A. I don't know.
12 Q. Well, let me ask you this. Has anybody ever,
13    to your knowledge, been fired from the
14    Leominster Longhorn since you worked there?
15 A. Sure. I don't know what for. I don't know all
16    the -- but people have been fired from
17    Longhorn.
18 Q. Can you tell me how many people you know of
19    that have been fired?
20 A. No, I can't.
21 Q. Is that because there are so many that you
22    can't?
23    MR. GILLIS: Objection.
24 A. No. I just don't remember how many have been

Page 77

1   fired.
2   Q. Do you know any of the reasons that anyone has
3     ever been fired from the Leominster Longhorn?
4   A. Maybe being rude. I don't know. I can't
5     remember exactly what people have been fired
6     for.
7   Q. Do you know of anyone at the Leominster
8     Longhorn ever being fired for not responsibly
9     serving alcoholic beverages to a patron?
10  A. No.
11  Q. I asked you earlier about formal training after
12     you got your TIPS certification.
13       Was there any sort of ongoing
14     communication between management and the wait
15     staff concerning serving alcoholic beverages
16     responsibly that you recall?
17  A. I can't recall.
18  Q. Have you ever served Jack Daniels Manhattans to
19     anybody that you can recall?
20  A. I'm sure I have.
21  Q. Have you ever served straight-up Manhattans to
22     anybody?
23  A. I'm sure I have. I don't recall.
24  Q. Did the company have in place any policy,

Page 78

1   written or otherwise, concerning how to measure
2     how much a patron had to drink as of September
3     26, 2003?
4       MR. GILLIS: Other than what she already
5     testified to?
6   A. Whatever I said -- the red light, green light,
7     yellow light. Like I said, weight, size,
8     judgment.
9       You're going to make sure that -- Like I
10     said, I never had to do it because I don't wait
11     on those kinds of people. I usually wait on
12     families and couples.
13  Q. You refuse to wait on those kind of people?
14  A. No, I don't refuse. It's not usually the
15     atmosphere that people come to, to get drunk.
16  Q. Was there any form that the company had you use
17     to measure, that is keep a tally of, how much
18     somebody had to drink?
19  A. No.
20  Q. Was there any instruction from the company to
21     you, as of September 26, 2003, regarding how to
22     measure how many drinks a patron had had?
23  A. Do you mean --
24  Q. Any instruction at all from the company about

Page 7

1   keeping a total of how many drinks somebody has
2     had.
3   A. When you put it in the commuter, you know how
4     many drinks the person has had.
5   Q. How do you know that?
6   A. Because usually you know. You just know that.
7     You know how many drinks a person has had at
8     your table.
9   Q. So is the answer other than whatever the
10     computer system generates in terms of a check,
11     there was no other policy that you recall
12     issued by the company as to keeping a tally of
13     how many drinks a customer had had?
14       MR. GILLIS: Written policy?
15  Q. Any kind of policy.
16  A. I can't remember.
17  Q. Did you teach red light, green light and yellow
18     light to the people you trained?
19  A. No. The bartender usually does that. I'm just
20     the service, basically.
21  Q. The bartender is in charge of teaching that?
22  A. A bartender or manager.
23  Q. Do you remember what bartenders were on duty
24     that night?

Page 8

1   A. Except for what I saw -- Kristin -- that's
2     about it.
3   Q. How about Patty? Was she on duty?
4   A. I don't remember her being there. I don't
5     remember.
6   Q. Am I correct that you have never refused to
7     serve any customer at Rare a drink?
8       MR. GILLIS: Objection.
9   A. From what I can remember, I don't remember
10     refusing anybody -- from what I remember.
11  Q. Am I correct that you cannot remember ever
12     having observed a customer at Rare being in a
13     condition that warranted refusing that customer
14     a drink; is that right?
15       MR. GILLIS: Objection.
16  A. Not at my table, sir. I might have seen it in
17     the restaurant. I don't remember.
18  Q. And you've never slowed down a customer either;
19     is that right?
20  A. I never had to.
21  Q. Can you tell me someone the size of
22     Mr. Southworth -- you're familiar with him --
23     how many drinks he would need to consume in one
24     hour to have a blood alcohol of point 10 if he

Page 81

1  was not eating anything?
2      MR. GILLIS: Objection. You've got to put
3  some parameters in there. She cannot tell from
4  the photograph what size, weight, what size
5  person.
6  Q. Do the best you can.
7  A. I don't know, sir.
8  Q. Can you tell me how many drinks somebody his
9     size --
10     MR. GILLIS: What size are you talking
11  about?
12     MR. FARRAH: This is a person she knows.
13     MR. GILLIS: It's a person she says she
14  saw in the restaurant, not well enough to
15  estimate his size and weight that she would
16  need to do in order to make that calculation.
17     If you want to give her a weight of a
18  person of his age, then I can understand that
19  question, but without that ingredient, you know
20  she can't answer that.
21  Q. Let me ask you, did you ever ask Mr. Southworth
22  before serving him a drink how tall he was?
23  A. No.
24  Q. Did you ever ask him how much he weighed?

Page 82

1  A. No.
2  Q. What I want to know is, can you tell me how
3     many drinks he would need to consume in one
4     hour, assuming he had nothing to eat, in order
5     to have a blood alcohol content of point 10 and
6     assuming he had nothing to eat beforehand?
7  A. I don't know.
8  Q. You can't calculate that for me?
9  A. No.
10 Q. Have you ever removed a customer's drink
11    because the customer was intoxicated?
12 A. No.
13 Q. Have you ever arranged safe passage home for a
14    customer?
15 A. No.
16 Q. So am I correct that you have never served a
17    customer in the yellow zone in your experience?
18     MR. GILLIS: Objection.
19 A. From what I can remember, no.
20 Q. Do you remember ever having served a customer
21    who was in the yellow zone an alcoholic
22    beverage?
23 A. No, I cannot remember. I don't believe so.
24 Q. Assuming that he had nothing to drink before

Page 8

1  coming to the Longhorn and had no food, how
2  many drinks would it take for Mr. Southworth to
3  be in the yellow zone?
4      MR. GILLIS: Objection.
5  A. I would have no idea. I don't know.
6  Q. One drink?
7      MR. GILLIS: Objection.
8  A. Sir, I don't know.
9  Q. Did you know, as of September 26, 2003, the
10    answer to that question?
11     MR. GILLIS: Objection.
12 A. No. I don't know.
13 Q. To your knowledge, did Rare maintain any sort
14    of a log book in which unusual incidents could
15    be entered?
16 A. I don't know of any book that I would write in
17    for Rare. I don't know of any log.
18 Q. Did anyone ever speak to you about such a log?
19 A. No.
20 Q. Did Rare have any drink promotions that you
21    know about while you worked there?
22 A. Now?
23 Q. Then.
24 A. I don't remember, sir.

Page 8

1  Q. How about now?
2  A. Yes, we have drink promotions.
3  Q. Tell me about them.
4  A. Just the sixteen-ounce Sam, sixteen-ounce
5     Miller Light, Bud Light, and a Perfect
6     Margarita.
7  Q. Those are your drink promotions?
8  A. Yes.
9  Q. And what makes you call them promotions?
10 A. Just special.
11 Q. Is there a special price to them?
12 A. No.
13 Q. What is special about them?
14 A. I don't know. They're just specials that the
15    company uses as specials.
16 Q. Do you still sell the twenty-five-ounce beer?
17 A. Yes.
18     MR. FARRAH: Give me one minute. I think
19  we're just about done.
20     (Short recess.).
21 Q. Let me ask you. Do you know somebody named
22    Jeanne-Louise Ogle, O-g-l-e?
23 A. No. I don't think so.
24 Q. I'll spell her name. J-e-a-n-n-e, hyphen,

Page 85

1   L-o-u-i-s-e, O-g-l-e?
2   A. I don't believe so.
3   Q. Do you know somebody named Janet Pruett,
4      P-r-u-e-t-t?
5   A. No.
6        MR. FARRAH:  That's it.
7
8        (Whereupon, the deposition was
9        concluded at 2:20 p.m.)

Page 86

1   CERTIFICATE
2   COMMONWEALTH OF MASSACHUSETTS
3   COUNTY OF MIDDLESEX, SS
4
5   I, BARBARA J. SIMON, a Professional Shorthand Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of Sherri Salmond, was taken before me on Friday, March 3, 2006. The said witness was satisfactorily identified and duly sworn before the commencement of her testimony; that the said testimony was taken stenographically by myself and then transcribed by myself. To the best of my knowledge, the within transcript is a complete, true and accurate record of said deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand this 9th day of March, 2006.

_____
Barbara J. Simon, Notary Public
My Commission Expires:
November 6, 2009

Page 86

1   SIGNATURE PAGE/ERRATA SHEET
2   RE: Nancy Rosario, Individually, as she is the Administratrix of the Estate of Awilda Santiago, Essex Probate Court Docket #03P-2499AD1, P/P/A Veronica Rosario and Christina Santiago, and as she is the Administratrix of the Estate of Jose Santiago, Berlin (Connecticut) Probate Court, Case #03-0713 v. Rare Hospitality International, Inc. d/b/a Longhorn Steakhouse

March 3, 2006
Deposition of Sherri Salmond

I, SHERRI SALMOND, do hereby certify that I have read the foregoing transcript of my testimony and further certify that it is a true and accurate record of my testimony (with the exception of the following changes listed below):
Page   Line        Correction

Signed under the pains and penalties of
perjury this _____ day of
_____, 2006.

_____
Sherri Salmond

Volume: I
Pages: 1 - 40
Exhibits: --

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-10617MLW

*********************
NANCY ROSARIO, et al,
        Plaintiffs,

    vs.

RARE HOSPITALITY INTERNATIONAL,
INC., d/b/a LONGHORN STEAKHOUSE
        Defendant.
*********************

            DEPOSITION of WILLIAM CURRIE,
taken on behalf of the Plaintiffs, pursuant
to the Federal Rules of Civil Procedure
before Eileen Baker, Registered Professional
Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at the
Law Offices of Albert L. Farrah, Jr., One
Washington Mall, Boston, Massachusetts, on
Wednesday, July 26, 2006, commencing at
11:11 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

APPEARANCES:

LAW OFFICES OF ALBERT L. FARRAH, JR.
(By Albert L. Farrah, Jr., Esq.)
One Washington Mall
Boston, Massachusetts 02108
    On behalf of the Plaintiffs

GILLIS & BIKOFSKY, P.C.
(By Michael K. Gillis, Esq.)
1150 Walnut Street
Newton, Massachusetts 02461
    On behalf of the Defendant

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

1                      I N D E X

2    WITNESS:              DIRECT/        CROSS/
                           REDIRECT       RECROSS
3
     WILLIAM CURRIE
4    By Mr. Farrah            4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

1             P-R-O-C-E-E-D-I-N-G-S
2         At the Law Offices of Albert L.
3    Farrah, Jr., One Washington Mall, Boston,
4    Massachusetts, on Wednesday, July 26, 2006,
5    commencing at 11:11 a.m.
6             STIPULATIONS
7         It is hereby stipulated and agreed
8    by and between counsel for the respective
9    parties that the reading and signing will
10   not be waived.  The sealing and filing are
11   waived.
12        It is further stipulated and agreed
13   that all objections, except objections to
14   the form of the questions, and motions to
15   strike will be reserved until the time of
16   trial.
17             WILLIAM CURRIE,
18   being first duly sworn, was examined and
19   testified as follows:
20             DIRECT EXAMINATION
21   BY MR. FARRAH:
22 Q.  Good morning.  Will you tell us your name,
23   please?
24 A.  William Todd Currie.

SHEA COURT REPORTING SERVICES
(617) 227-3097

5

1    Q.   Mr. Currie, thank you for coming here today.
2         My name is Albert Farrah and I'm the one who
3         has subpoenaed you, and I represent the
4         plaintiffs in this action against Rare
5         Hospitality, Inc. which is the owner of a
6         restaurant in Leominster, the Longhorn
7         restaurant in Leominster.  Mr. Gillis
8         represents the defendant Rare Hospitality.
9              Your testimony is being transcribed
10        as you can see today, and at the end of this
11        deposition a record, a transcript of your
12        testimony will be made and will be sent to
13        you.
14             You'll have 30 days from the date
15        you receive that transcript to indicate in
16        writing and return to me any errors in the
17        transcription that you feel were made.  If
18        you send that sheet or sheets of the errors
19        back to me, they will become part of the
20        record.  If you don't within that 30-day
21        period send a sheet or sheets back to me,
22        then the transcript as delivered to you will
23        be deemed to be the record of your testimony
24        in this case.

7

1    A.   Yes, it is.
2    Q.   Where did you go to high school?
3    A.   Bromfield School.
4    Q.   Where is that?
5    A.   Harvard, Massachusetts.
6    Q.   When did you graduate from Castleton?
7    A.   2001 I think.
8    Q.   From the Bromfield School, when did you
9         graduate from that?
10   A.   '97.
11   Q.   So, is it accurate to say that you pretty
12        much went straight from the Bromfield School
13        to and then through college?
14   A.   Yes.
15   Q.   Since you got out of college tell me where
16        you've worked.
17   A.   I've worked -- I was a professional
18        skateboarder for while.  I worked at a
19        skateboard shop, Eastern Boarder.  I worked
20        at a place called Rye Airfield Teaching
21        Camps.
22   Q.   Anywhere else that you can think of?
23   A.   New England Performance Cars.  Now I work
24        for Lamborghini Boston.

6

1              Do you understand that?
2    A.   Yes.
3    Q.   If you have any questions at any time about
4         anything I or Mr. Gillis ask you, ask us to
5         rephrase or repeat the question for you.  If
6         you want to take a break at any time, let us
7         know.  Okay?  How's that?
8    A.   That's good.
9    Q.   And answer verbally as opposed to by
10        gesturing if you can.  Okay?
11   A.   Sure.
12   Q.   Where do you live, Mr. Currie?
13   A.   Littleton.
14   Q.   What's the address?
15   A.   13 Adams Street.
16   Q.   What's your date of birth?
17   A.   4/13/79.
18   Q.   Could you just briefly tell me what your
19        educational background is?
20   A.   College graduate with a bachelor in
21        business.
22   Q.   Where did you graduate?
23   A.   Castleton State College.
24   Q.   Is that in Vermont?

8

1    Q.   Where is Lamborghini Boston located?
2    A.   Peabody.
3    Q.   What do you do there?
4    A.   Handle the sales department.
5    Q.   Are you a manager of the sales department?
6    A.   I do all the new car stuff.
7    Q.   So, if I want a Lamborghini you're the
8         person I should see?
9    A.   That's correct.
10   Q.   At the Rye Airfield what did you do?
11   A.   Taught skateboarding.
12   Q.   This deposition is about the events of
13        September 26th, 2003 and then the morning of
14        September 27th, 2003.  Do you recall being
15        at the Longhorn Steakhouse in 2003 with
16        Jeffrey Southworth?
17   A.   Yes.
18   Q.   Did you know Mr. Southworth prior to that
19        time?
20   A.   Yes.
21   Q.   For how long approximately had you known him
22        prior to September 26, 2003?
23   A.   We grew up in the same town.  So, I really
24        can't give you a date of how long I have

9

1   known the kid for.
2   Q.  Are you aware that Mr. Southworth is alleged
3       to have been in an automobile accident on
4       the morning of September 27th, 2003?
5   A.  Yes.
6   Q.  Are you aware that two people were killed in
7       that accident?
8   A.  Yes.
9   Q.  And that two people were seriously injured?
10  A.  Yes.
11  Q.  Are you aware that there is a claim made
12      against the defendant in this case that it
13      served alcoholic beverages to Mr. Southworth
14      when it should not have done so?
15          MR. GILLIS:  Objection.
16  A.  Can you repeat that, please?
17  Q.  Yes.  Are you aware that there is a claim
18      made in this lawsuit that the defendant
19      served alcohol beverages to Mr. Southworth
20      when it, the defendant, should not have done
21      so?
22          MR. GILLIS:  Objection.
23  A.  No.
24  Q.  Is this the first that you have heard of

10

1   such a claim?
2   A.  Yes.
3   Q.  Have you ever been deposed before?
4   A.  Have I ever been what?
5   Q.  This is a deposition.  Have you been deposed
6       before?
7   A.  No, I have not.
8   Q.  Have you spoken to Mr. Southworth since the
9       evening of September 26th, 2003?
10  A.  No.
11  Q.  Have you spoken to Michael Espey since the
12      evening of September 26th, 2003?
13  A.  Yes.
14  Q.  Have you spoken to him about the events of
15      September 26th, 2003?
16  A.  Yes.
17  Q.  Have you spoken to him about what happened
18      at the restaurant that evening, the Longhorn
19      restaurant?
20  A.  About what happened?
21  Q.  Yes.  Anything that happened at the
22      restaurant that evening.
23  A.  No.
24  Q.  What do you recall Mr. Espey and you said to

11

1   yourself about the events of September 26th,
2   2003?
3   A.  What did he say about the event?
4   Q.  Yes.  You told me you talked to him about
5       the events of that night.  What I'd like to
6       know is what you remember the two of you
7       talked about.
8   A.  Well, we spoke about the accident.  You said
9       that was the 27th.
10  Q.  That's right?
11  A.  You just asked me about the 26th.  So, I've
12      not spoken with him about the 26th.
13  Q.  What have you two spoken about in terms of
14      the accident of September 27th, 2003?
15  A.  I was watching the news that day and I saw
16      Jeff on the news.  So, later on that day I
17      spoke with him and asked him if he'd seen it
18      and he said yes.  Quite an eye opener.
19      That's all we really spoke about.
20  Q.  Do you remember anything else that the two
21      of you talked about at that time?
22  A.  That's three years ago.  I can't even tell
23      you how old I was three years ago.  It
24      sounds pretty stupid, but I don't have a

12

1   memory that good.
2   Q.  So, you don't remember one way or the other
3       the events of September 26th, 2003 and
4       September 27th, 2003; is that right?
5   A.  I remember I went out to dinner and then I
6       went home and I woke up the next morning,
7       watched the news and saw what happened.
8   Q.  Okay.  Do you remember where you were on the
9       26th of September before you went to the
10      Longhorn Steakhouse?
11  A.  Yes.
12  Q.  Where were you?
13  A.  I was in Fitchburg with some friends.
14  Q.  Do you remember their names?
15  A.  It was a bunch of kids that I was
16      skateboarding with.  So, I really don't
17      remember who I was with that day.
18  Q.  So, you don't remember the names of any of
19      the friends that you were skateboarding with
20      that day?
21  A.  No, I really don't.  Like I said, that was
22      three years ago.  The only reason I remember
23      what we were discussing is because of the
24      reason we're discussing it.  There was an

13

| | | |
|---|---|---|
| 1 | | accident. I remember that. Other than that |
| 2 | | I would have never remembered the day. |
| 3 | Q. | Do you remember being with Michael Espey |
| 4 | | that day? |
| 5 | A. | I think he was one of the people I was with. |
| 6 | Q. | Do you remember being with Michael Espey at |
| 7 | | a hotel that day prior to going to the |
| 8 | | Longhorn restaurant? |
| 9 | A. | Yes. |
| 10 | Q. | Do you remember who else you were with at |
| 11 | | the hotel that day? |
| 12 | A. | No. I really don't. |
| 13 | Q. | Were you with Bruce Sirjane at the hotel |
| 14 | | that day? |
| 15 | A. | I believe he was there. |
| 16 | Q. | Were you with Matt Cenicola at the hotel |
| 17 | | that day? |
| 18 | A. | I think he may have been there. |
| 19 | Q. | Do you have a memory one way or the other of |
| 20 | | whether he was there? |
| 21 | A. | I remember him being there that weekend. I |
| 22 | | don't remember if it was that specific day. |
| 23 | Q. | Where does Bruce live? |
| 24 | A. | Last I was told I think he lives in Vermont |

SHEA COURT REPORTING SERVICES
(617) 227-3097

14

| | | |
|---|---|---|
| 1 | | or New York. |
| 2 | Q. | Did you go to school with Bruce? |
| 3 | A. | Yes. |
| 4 | Q. | And have you seen him since graduation? |
| 5 | A. | Probably once or twice. |
| 6 | Q. | How about Matt, did you go to school with |
| 7 | | him? |
| 8 | A. | No. |
| 9 | Q. | Have you seen him since graduation? |
| 10 | A. | Probably last day I saw him was graduation. |
| 11 | Q. | And he just happened to be there? |
| 12 | A. | Yes. He didn't go to school. |
| 13 | Q. | Do you remember what time you got to that |
| 14 | | hotel, the one you were there with Mike |
| 15 | | Espey? |
| 16 | A. | I have no idea. |
| 17 | Q. | Do you know how long you were at the hotel? |
| 18 | A. | No idea. |
| 19 | Q. | Do you remember whether Mike was drinking |
| 20 | | alcoholic beverages at the hotel? |
| 21 | A. | No. Nobody was drinking at the hotel. I |
| 22 | | don't remember. I wasn't. |
| 23 | Q. | And you don't think anybody else was |
| 24 | | drinking at the hotel? |

SHEA COURT REPORTING SERVICES
(617) 227-3097

15

| | | |
|---|---|---|
| 1 | | MR. GILLIS: Can you narrow down |
| 2 | | the time period? Is this before dinner or |
| 3 | | after dinner, because there has been |
| 4 | | testimony there were two hotel sessions. |
| 5 | Q. | Before going to the Longhorn. |
| 6 | A. | I was at the hotel before. I believe so. |
| 7 | Q. | Fore Points Hotel, is that the one? |
| 8 | A. | Whichever one is in Fitchburg next to the |
| 9 | | airfield. |
| 10 | Q. | Can you tell us what time you got there? |
| 11 | A. | I have no idea. |
| 12 | Q. | Is that the same hotel that you were at with |
| 13 | | Mike Espey? |
| 14 | A. | I believe so. I don't think I was at any |
| 15 | | other hotel that day. |
| 16 | Q. | And as far as you can recall Bruce Sirjane |
| 17 | | was there as well; is that right? |
| 18 | A. | I believe so. |
| 19 | Q. | And how about Matt, was Matt there? |
| 20 | A. | I told you I really don't remember if he was |
| 21 | | there. He was in town for the weekend. |
| 22 | Q. | The reason I asked is we've got two hotel |
| 23 | | sessions as Mr. Gillis just pointed out, and |
| 24 | | just so I understand, do you remember |

SHEA COURT REPORTING SERVICES
(617) 227-3097

16

| | | |
|---|---|---|
| 1 | | anybody having any alcoholic beverages to |
| 2 | | drink at all before going to the Longhorn |
| 3 | | restaurant at that hotel? |
| 4 | A. | I really don't remember. |
| 5 | Q. | Do you know how you got from the hotel to |
| 6 | | the Longhorn restaurant? |
| 7 | A. | I think I may have driven. |
| 8 | Q. | And do you know whether you drove there |
| 9 | | alone or with somebody? |
| 10 | A. | I really don't remember. |
| 11 | Q. | Do you know what time you got to the |
| 12 | | Longhorn? |
| 13 | A. | No idea. |
| 14 | Q. | Do you remember what you had to eat at the |
| 15 | | Longhorn? |
| 16 | A. | No, I don't. |
| 17 | Q. | Did you have anything to drink at the |
| 18 | | Longhorn? |
| 19 | A. | Well, I had a drink or two. |
| 20 | Q. | Do you have a memory of having had a drink |
| 21 | | or two? |
| 22 | A. | I remember having a drink or two. I didn't |
| 23 | | get drunk. I just remember being there for |
| 24 | | a short period of time. |

SHEA COURT REPORTING SERVICES
(617) 227-3097

17

1  Q.  Do you remember what you drank?
2  A.  No idea.
3  Q.  I'm sorry?
4  A.  I said no idea.
5  Q.  Did you have Jack Daniels manhattans while
6      you were at the Longhorn?
7  A.  Probably.  Jack Daniels is my favorite
8      drink.  So, I wouldn't be surprised if I had
9      one.
10 Q.  Do you recall how many Jack Daniels
11     manhattans you had at the Longhorn?
12         MR. GILLIS:  Objection.
13 A.  I do not recall.
14 Q.  Was it more than one that you had ---
15         MR. GILLIS:  Objection.
16         MR. FARRAH:  Let me finish the
17     question.
18         MR. GILLIS:  He hasn't said that he
19     had one yet.  You're putting facts into
.0     evidence.
21 A.  I don't recall how many drinks I had that
22     night.
23 Q.  Do you recall having had a Jack Daniels
24     manhattan at the restaurant that night?

18

1  A.  I said I very well may have.  I don't
2      remember.  If I asked you what you had three
3      years ago on a random night to drink, would
4      you be able to tell me how many drinks you
5      had?
6  Q.  Let me ask you another question.  Do you
7      recall whether you had any beer while you
8      were at the Longhorn restaurant?
9  A.  I just told you I do not remember what I had
10     to drink that night.
11 Q.  Is it accurate to say that you don't
12     remember what you had to drink or how much
13     you had to drink?
14 A.  I don't drink heavily.  So, I don't think I
15     had very much.  I don't remember what I had
16     to drink that night.
17 Q.  Do you remember what anybody else had to
18     drink that night?
19 A.  No.  I can't remember what I had.  I don't
20     think I can remember what other people had.
21 Q.  Is it accurate to say that you have very
22     little memory of the events of that night?
23 A.  I remember going to dinner and leaving and
24     going home.

19

1  Q.  Do you remember anything else about that
2      night than what you've just told me?
3  A.  No.
4  Q.  And am I correct you can't tell us
5      approximately what time you got to the
6      Longhorn?
7  A.  I have no idea.
8  Q.  And am I also correct that you can't tell us
9      approximately what time you left the
10     Longhorn?
11 A.  I really don't remember.
12 Q.  Do you know where you went after you left
13     the Longhorn?
14 A.  I went home.
15 Q.  Do you remember going anyplace before you
16     went home after you left the Longhorn?
17 A.  No.
18 Q.  At the time where did you live?
19 A.  Harvard.
20 Q.  Harvard, Massachusetts?
21 A.  Yes.
22 Q.  With your parents?
23 A.  Yes.
24 Q.  Do you know whether or not you took Michael

20

1      Espey home with you from the Longhorn that
2      night?
3  A.  I may have, but I don't remember.
4  Q.  Do you know whether you drove Michael Espey
5      from the hotel to the Longhorn that day?
6  A.  You already asked me that and I said I don't
7      remember.
8  Q.  I apologize for asking you a question that I
9      already asked you.  Can you tell me how tall
10     Michael Espey is approximately?
11 A.  An inch or two taller than me.
12 Q.  How tall are you?
13 A.  5'11" probably.
14 Q.  Do you know how much he weighed at the time?
15 A.  I have no idea.
16 Q.  Prior to that night, prior to the night of
17     September 26th, 2003 had you ever seen
18     Jeffrey Southworth when, to your way of
19     thinking, he was intoxicated?
20 A.  Probably.  I mean I've known the kid for
21     many years.
22 Q.  So, is that a yes, I've seen Jeffrey
23     Southworth prior to September 26th, 2003
24     when to my way of thinking he was

21

1    intoxicated?
2        MR. GILLIS:  Objection.
3  A.  I don't know what you want me to say what my
4      way of thinking is.  I mean I've had drinks
5      with him if that's what you're asking.
6  Q.  Have you seen him intoxicated?
7  A.  I don't know what intoxicated is to him.
8  Q.  Have you seen him where he appeared to you
9      to be intoxicated?
10 A.  I don't remember.
11 Q.  You don't remember.  Have you ever seen
12     Mr. Southworth intoxicated?
13       MR. GILLIS:  Objection.
14 A.  I don't know what intoxication is to you.  I
15     have had a few drinks with him in the past.
16 Q.  Have you ever seen him when he was drunk to
17     your way of thinking?
18 A.  Possibly.  I don't know what drunk is to
19     him.  He probably has a different tolerance
20     than I do.
21 Q.  Have you ever seen him when he was buzzed to
22     your way of thinking?
23 A.  I would think so, because a couple of beers
24     would get you buzzed.

22

1  Q.  Have you ever seen him when he has had more
2      than a couple of beers on any given
3      occasion?
4  A.  I really don't remember.
5  Q.  Have you ever seen him when his eyes were
6      glassy?
7  A.  I can't answer that.  I don't look at
8      people's eyes from years back and remember
9      stuff like that.
10 Q.  You understand that you're under oath here?
11 A.  Yes, I do, but you're asking me questions
12     that are just out of control, I mean.
13 Q.  Have you ever seen him when he was unsteady
14     on his feet?
15 A.  No.
16 Q.  Have you ever been with him when his speech
17     was slurred?
18 A.  No.
19 Q.  Have you ever been with him when he was loud
20     after drinking?
21 A.  Not to my remembrance.
22 Q.  How about Scott Espey, have you ever seen
23     Scott -- excuse me.  When I say Scott, is it
24     Michael Scott Espey?  Is that what you

23

1      understand his name to be, Michael Scott
2      Espey?
3  A.  No.  There is two Espeys.
4  Q.  One is Michael and one is Scott?
5  A.  Yes.
6  Q.  Have you ever seen Michael Espey when he was
7      under the influence of alcohol?
8  A.  Yes.
9  Q.  What sort of characteristics has he
10     exhibited to you when he was under the
11     influence?
12 A.  I don't know.  I lived with him for three
13     years at college so ---
14 Q.  What outward signs of his intoxication did
15     he manifest when he showed those signs to
16     you?
17 A.  Excessive laughter.
18 Q.  Loud, was he loud?
19 A.  I didn't say loud.  I said excessive
20     laughter.
21 Q.  I'm asking you was he loud?
22 A.  Sometimes maybe.  I don't know what loud is
23     to you.
24 Q.  Have you ever seen Michael Espey when he was

24

1      drunk?
2  A.  Yes.
3  Q.  What sorts of characteristics did he exhibit
4      when he was drunk?
5  A.  Laughter, excessive laughter, being funny.
6  Q.  Was his speech slurred when he was drunk?
7  A.  No.
8  Q.  Was he louder than usual when he was drunk?
9  A.  Possibly.
10 Q.  Have you seen him on occasions when he was
11     drunk when he was louder than usual?
12 A.  Probably.
13       MR. GILLIS:  Objection.
14 Q.  Prior to September 26th, 2003 had you seen
15     him on occasions when he was louder than
16     usual when he was drunk?
17       MR. GILLIS:  Objection.
18 A.  Yes.
19 Q.  Prior to September 26th, 2003 had you seen
20     him on occasions when he was unsteady on his
21     feet when he was drunk?
22 A.  Not really.
23 Q.  Prior to September 26th, 2003 had you seen
24     him on occasions when his speech was slurred

25

1      when he was drunk?
2              MR. GILLIS:  Objection.
3   A.  No.
4   Q.  Prior to September 26th, 2003 had you seen
5      him on occasions when his eyes were glassy
6      because he was drunk?
7              MR. GILLIS:  Objection.
8   A.  Possibly.
9   Q.  Is that a yes?
10             MR. GILLIS:  Objection.
11  A.  Possibly.
12  Q.  Is it more likely than not that prior to
13     September 26th, 2003 you had seen him on
14     occasions when his eyes were glassy as the
15     result of being drunk?
16             MR. GILLIS:  Objection.
17  A.  No.
18  Q.  Was Mike Espey drunk on September 26th,
19     2003?
20             MR. GILLIS:  Objection.
21  A.  I don't know.
22  Q.  Did you see Mike Espey have anything to
23     drink on September 26th, 2003?
24  A.  He may have had a drink while I was there.

SHEA COURT REPORTING SERVICES
(617) 227-3097

26

1   Q.  Prior to coming to the restaurant did you
2      see Mr. Mike Espey have anything to drink on
3      September 26th, 2003?
4   A.  I don't think so.  Probably not.
5   Q.  Do you know how long you were with Mike
6      Espey at the hotel prior to going to the
7      Longhorn?
8   A.  No, I don't.
9   Q.  How about Bruce Sirjane, have you seen him
10     when he was drunk?
11  A.  Yes.
12  Q.  On many occasions?
13  A.  I wouldn't say many.
14             MR. GILLIS:  Objection.
15  Q.  How many occasions prior to September 26th,
16     2003?
17  A.  I really don't know.  Once again, a kid I
18     went to college with.
19  Q.  Was it typical to get drunk a lot in
20     college?
21             MR. GILLIS:  Objection.
22  A.  No.
23  Q.  So, my question to you is prior to
24     September 26th, 2003 on how many occasions

SHEA COURT REPORTING SERVICES
(617) 227-3097

27

1      did you see Bruce Sirjane drunk?
2   A.  I really don't know.
3   Q.  Prior to September 26th, 2003 on how many
4      occasions did you see Mike Espey drunk?
5   A.  I really can't answer that.  I told you I
6      lived with him for a few years, so probably
7      a couple.
8   Q.  One or two?
9   A.  I really can't answer that question, sir.
10  Q.  How about Matt Cenicola, did you ever see
11     Matt Cenicola drunk?
12  A.  Yes.
13  Q.  On how many occasions prior to
14     September 26th, 2003?
15  A.  I really don't know.
16  Q.  On how many occasions prior to
17     September 26th, 2003 did you see him drunk?
18  A.  I really don't know.
19  Q.  How about Jeff Southworth, did you ever see
20     Jeff drunk?
21             MR. GILLIS:  Objection.  Asked and
22     answered.
23  A.  We already went over this.
24  Q.  So, you have never seen Jeff Southworth

SHEA COURT REPORTING SERVICES
(617) 227-3097

28

1      drunk; is that right?
2   A.  I really don't know, Al.
3   Q.  How about Scott Espey, did you ever see
4      Scott Espey drunk prior to September 26th,
5      2003?
6   A.  Yes.
7   Q.  Was Scott drunk that night at the
8      restaurant?
9   A.  I really don't remember.
10  Q.  Was Jeff drunk that night at the restaurant?
11             MR. GILLIS:  Objection.  Asked and
12     answered.
13  A.  I don't know what other people were drinking
14     that night.
15  Q.  Was Jeff drunk that night at the restaurant
16     is my question to you.
17             MR. GILLIS:  Objection.
18  A.  And I'm answering I don't know.
19  Q.  Was that the first time that you had been to
20     this restaurant?
21  A.  Yes.
22  Q.  In your life?
23  A.  Yes.
24  Q.  Had you gone to that restaurant that night

SHEA COURT REPORTING SERVICES
(617) 227-3097

29

| | |
|---|---|
| 1 | by prearrangement? |
| 2 | A. No. |
| 3 | Q. Just happened? |
| 4 | A. Yes. |
| 5 | Q. Had you ever been dirt biking with Jeff |
| 6 | Southworth in your life? |
| 7 | A. No. |
| 8 | Q. Did you dirt bike at that time? Were you a |
| 9 | dirt biker at that time? |
| 10 | A. Yes. |
| 11 | Q. Had you ever had Jack Daniels manhattans |
| 12 | with Jeff Southworth prior to that night? |
| 13 | A. I don't know. I don't remember. |
| 14 | Q. You testified a little earlier that you like |
| 15 | Jack Daniels, correct? |
| 16 | A. Correct. |
| 17 | Q. When you have a Jack Daniels manhattan do |
| 18 | you have it straight up or on the rocks? |
| 19 | A. I don't drink manhattans. I drink Jack and |
| .0 | Cokes. |
| 21 | Q. Did you have Jack and Coke that night? |
| 22 | A. I don't remember. |
| 23 | Q. At any point in time the night of |
| 24 | September 26th, 2003 did anyone you |

SHEA COURT REPORTING SERVICES
(617) 227-3097

30

| | |
|---|---|
| 1 | understood to be an employee of the |
| 2 | restaurant come to the table and ask the |
| 3 | table, in effect, to quiet down? |
| 4 | A. I do not remember. |
| 5 | Q. Since the night of September 26th, 2003 have |
| 6 | you spoken -- you've told us about your |
| 7 | conversation with Mike Espey. Have you had |
| 8 | any other conversations with Mike Espey |
| 9 | since the one you told us about about the |
| 10 | accident? |
| 11 | A. No. |
| 12 | Q. Have you talked to Mike Espey about that he |
| 13 | was deposed in this office? |
| 14 | A. He mentioned it. |
| 15 | Q. When did you talk to him about that? |
| 16 | A. I really don't remember. |
| 17 | Q. What did Mike say to you about his |
| 18 | deposition? |
| 19 | A. Not much. We didn't talk much about it. He |
| 20 | just said I got one and you may see the |
| 21 | same, since you were there that night, and |
| 22 | that was it. |
| 23 | Q. At that time did the two of you talk at all |
| 24 | about what happened that night? |

SHEA COURT REPORTING SERVICES
(617) 227-3097

31

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. So, am I correct that with regard to Michael |
| 3 | Espey the only time you talked about the |
| 4 | events of September 26th or September 27th |
| 5 | was the 27th or shortly thereafter when you |
| 6 | saw Jeff on TV about the accident? |
| 7 | A. Probably. I really don't remember. It's a |
| 8 | long time ago. |
| 9 | Q. What I'm looking for is conversations with |
| 10 | Mike since the 27th. Do you remember any |
| 11 | other conversations with him about the |
| 12 | accident or about -- |
| 13 | A. I don't remember. |
| 14 | Q. -- what happened on September 26th, 2003 at |
| 15 | the restaurant? |
| 16 | A. No. I don't think so. |
| 17 | Q. How about Scott Espey, did you ever talk to |
| 18 | Scott Espey about what happened the 26th or |
| 19 | the 27th of September 2003? |
| 20 | A. I don't think so. |
| 21 | Q. So, other than talking to Mike Espey the |
| 22 | 27th or soon after when you saw Jeff on TV, |
| 23 | have you talked to anybody that you were |
| 24 | with that night at the restaurant about what |

SHEA COURT REPORTING SERVICES
(617) 227-3097

32

| | |
|---|---|
| 1 | happened that night or the 27th? |
| 2 | A. I don't think so. I don't even remember who |
| 3 | else was there that night. |
| 4 | Q. Have you talked to Jude Connelly at all |
| 5 | about what happened that night? |
| 6 | A. I don't remember, but I don't think so. |
| 7 | Q. Do you know Jude? |
| 8 | A. Yes. |
| 9 | Q. Now I want to expand the questions beyond |
| 10 | who was there that night. Have you talked |
| 11 | to anybody about the events of |
| 12 | September 26th, 2003 at the Longhorn or |
| 13 | September 27th, 2003 from September 27th, |
| 14 | 2003 until today? |
| 15 | A. We've obviously spoken with friends about |
| 16 | the event, about the accident. Not the |
| 17 | night prior. |
| 18 | Q. What friends have you spoken to about the |
| 19 | accident? |
| 20 | A. I really don't remember. It's three years |
| 21 | ago and I speak with a lot of people. |
| 22 | Q. Do you remember telling anybody that you |
| 23 | spoke to that Jeff was drunk that night at |
| 24 | the restaurant? |

SHEA COURT REPORTING SERVICES
(617) 227-3097

**33**

1  A.  No.
2  Q.  Do you remember telling anybody that you
3      spoke to afterwards that you were drunk that
4      night at the restaurant?
5  A.  No, because I wasn't drunk.
6  Q.  Have you spoken to the police at all about
7      the events of that night?
8  A.  No.
9  Q.  The police didn't interview you?
10 A.  Actually, I did go once, now that you said
11     that.
12 Q.  You did?
13 A.  Yes.
14 Q.  Do you remember where you went?
15 A.  I think it was in Concord.
16 Q.  State police?
17 A.  I believe so.
18 Q.  Did you give a statement to the police?
19 A.  I really don't remember.
20 Q.  Do you remember who you went with to the
21     state police?
22 A.  I believe I went by myself, but I'm not
23     sure.
24 Q.  Do you remember with whom you spoke at the

SHEA COURT REPORTING SERVICES
(617) 227-3097

**34**

1      state police?
2  A.  I have no idea.
3  Q.  You can't describe that person; is that
4      right?
5  A.  Wearing a police officer's uniform.
6  Q.  Did you speak to anyone from the district
7      attorney's office about the events of that
8      night?
9  A.  I don't think so. I really don't remember.
10 Q.  Did you speak to any investigators about the
11     events of that night?
12 A.  Maybe. I'm really not sure.
13 Q.  When first may you have spoken to any
14     investigators about the events of that
15     night?
16 A.  I really don't remember.
17 Q.  You spoke to a private investigator who had
18     been hired by the defendant in this case at
19     some point in time; isn't that right?
20     MR. GILLIS:  Objection.
21 A.  I really don't remember. I have had a
22     bunch, not a bunch but a few calls from you
23     guys, and I did go to the police once, like
24     I told you, and I don't remember what else

SHEA COURT REPORTING SERVICES
(617) 227-3097

**35**

1      I've been called on.
2  Q.  Do you remember the last time you were due
3      to come here you didn't come and we talked
4      to you on the phone?
5  A.  Yes.
6  Q.  Do you remember at that time you told us
7      that an investigator had spoken to you about
8      the subpoena that you had received?
9      MR. GILLIS:  Objection. I don't
10     think that's accurate, Al. He never
11     received the subpoena. You sent it to his
12     family's house, not his house.
13 Q.  Do you remember that we had a conversation
14     about the subpoena that was sent to your
15     family's house?
16 A.  Yes, I do.
17 Q.  Do you remember that you spoke to an
18     investigator about that subpoena?
19 A.  I think I may have. I don't remember. I
20     remember speaking to somebody. I don't
21     remember who it was or in regards to what.
22     I just know that I never got the subpoena,
23     because I don't live there.
24 Q.  Was he the one, this investigator, that

SHEA COURT REPORTING SERVICES
(617) 227-3097

**36**

1      pointed out to you that the subpoena called
2      for your attendance at one a.m. in the
3      morning?
4      MR. GILLIS:  Objection.
5  A.  You know, I don't remember who it was or --
6      I remember getting a phone call saying that
7      I was supposed to appear at one o'clock in
8      the morning and I laughed, and I said sure,
9      I'll see you there.
10 Q.  Did you ever meet with any investigators
11     that you understood were working for anybody
12     in this case, face-to-face meeting?
13 A.  I do not believe so, no.
14 Q.  Did you ever speak to any investigators or
15     have you spoken to any investigators that
16     you understand were working for anybody,
17     either side of this case since we had that
18     telephone conversation?
19 A.  I don't think so.
20 Q.  Do you know?
21 A.  I really don't know, Al. I get a hundred
22     phone calls a day in my business. I don't
23     remember individual phone calls like that.
24 Q.  Do you remember anyone identifying himself

SHEA COURT REPORTING SERVICES
(617) 227-3097

37

1     or herself as an investigator?
2 A.  I really can't remember.
3 Q.  Do you remember anyone calling you and
4     asking you questions about what happened
5     that evening, September 26th, 2003?
6 A.  I don't know.  I really don't think so.
7 Q.  Do you remember anyone calling you and
8     talking about your upcoming testimony at a
9     deposition?
10 A.  Your office.
11 Q.  Anybody else?
12 A.  I don't believe so.
13 Q.  Do you remember anyone calling you and
14     asking you to make a written statement about
15     what happened?
16 A.  I don't think so.  I think I may have done
17     one for the police, but other than that, I
18     don't remember.
19         MR. FARRAH:  Give me a second.  I'm
20     almost done.
21         (Brief recess.)
22 Q.  Just to finish up, you have no memory of
23     having spoken to any investigator that you
24     understood was working for any party in this

38

1     case since June 5th, 2006; is that right?
2 A.  I told you I have a recollection of somebody
3     calling me saying I'm supposed to be here
4     for a deposition.  I don't remember who they
5     were working for.  I said, you know, I
6     didn't get that in the mail, but send it to
7     the new address.
8 Q.  Other than that recollection, that
9     conversation, do you have a memory of having
10     spoken to any investigators that you
11     understood was working for any party in this
12     case since June 5th, 2006?
13 A.  I really don't remember.
14         MR. GILLIS:  Can we go off the
15     record for just a second.
16         (Discussion off the record.)
17         MR. FARRAH:  I'm done.  Thank you.
18         MR. GILLIS:  I have no questions.
19         (Whereupon, at 11:55 a.m. the
20     deposition was concluded.)
21
22
23
24

39

1            C E R T I F I C A T E
2     I, WILLIAM CURRIE, do hereby certify that I
3     have read the foregoing transcript of my
4     testimony taken on July 26, 2006, and I
5     further certify that said transcript is a
6     true and accurate record of said testimony
7     (with the exception of the following
8     corrections listed below):
9 Page     Line     Correction
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 Signed under the pains and penalties of
22 perjury this _____ day of _____, 2006
23            _____
24            WILLIAM CURRIE

40

1        COMMONWEALTH OF MASSACHUSETTS
2 SUFFOLK, ss.
3     I, Eileen Baker, Registered
4 Professional Reporter and Notary Public in
5 and for the Commonwealth of Massachusetts,
6 do hereby certify:
7     That WILLIAM CURRIE, the witness
8 whose deposition is hereinbefore set forth,
9 was duly sworn by me and that such
10 deposition is a true record of the testimony
11 given by the said witness.
12     IN WITNESS WHEREOF, I have hereunto
13 set my hand this 1st day of August, 2006.
14
15 THE FOREGOING CERTIFICATE OF THIS TRANSCRIPT
    DOES NOT APPLY TO ANY REPRODUCTION OF THE
16 SAME BY ANY MEANS UNLESS UNDER THE DIRECT
    CONTROL AND/OR DIRECTION OF THE CERTIFYING
17 REPORTER.
18
19
20        EILEEN BAKER, Notary Public
        My commission expires:
21       May 12, 2011
22
23
24

Page 1

```
 1                                  Volume:     I
                                    Pages:    1-98
 2                                  Exhibits:  1-11

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4

 5    ****************************************
      NANCY ROSARIO, INDIVIDUALLY, AS SHE IS  *
 6    THE ADMINISTRATRIX OF THE ESTATE OF     *
      AWILDA SANTIAGO, ESSEX PROBATE COURT    *
 7    #03P-2499AD1, P/P/A VERONICA ROSARIO    *
      AND CHRISTINA SANTIAGO, AND AS SHE IS   *
 8    THE ADMINISTRATRIX OF THE ESTATE OF     *
      JOSE SANTIAGO, BERLIN (CONNECTICUT)     *
 9    PROBATE COURT, CASE #03-0713            *
              Plaintiff,                      *
10                                            *
         vs                                   *
11                                            * Civil Action No.
      RARE HOSPITALITY INTERNATIONAL, INC.    * 05-CV-10617MLW
12    d/b/a LONGHORN STEAKHOUSE,              *
              Defendant.                      *
13    ****************************************

14         DEPOSITION OF KRISTIN O'DONNELL, a witness

15      called on behalf of the Plaintiff, taken pursuant to

16      Notice under the applicable provisions of the Federal

17      Rules of Civil Procedure, before Barbara J. Simon, a

18      Professional Shorthand Reporter and Notary Public, in

19      and for the Commonwealth of Massachusetts, at the law

20      offices of Albert L. Farrah, Jr., One Washington

21      Mall, Boston, Massachusetts, on Thursday, December 8,

22      2005, commencing at 10:10 a.m.

23              SHEA COURT REPORTING SERVICES
                       (617) 227-3097
24
```

Page 2

```
 1        APPEARANCES

 2    ALBERT L. FARRAH, JR., ESQ.
      Law Offices of Albert L. Farrah, Jr.
 3    One Washington Mall
      Boston, MA 02108
 4    (617) 742-7766
          Counsel for the Plaintiff
 5
      MICHAEL K. GILLIS, ESQ.
 6    Gillis & Bikofsky, P.C.
      1150 Walnut Street
 7    Newton, MA 02461
      (617) 244-4300
 8        Counsel for the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page

```
 1                 I N D E X

 2    WITNESS          DIRECT CROSS REDIRECT RECROSS

 3    KRISTIN O'DONNELL

 4    (By Mr. Farrah)        4

 5

 6              E X H I B I T S

 7    NO.   DESCRIPTION                    PAGE

 8     1    Training manual                 29

 9     2    Bar recipes manual              29

10     3    Server and bartender trainee edition   30

11     4    Bar operations manual           31

12     5    Bar Code server guide           32

13     6    Training test booklet           34

14     7    Floor plan                      38

15     8    Floor plan                      43

16     9    Copy of photograph              58

17    10    Copy of photograph              58

18    11    Check and audit report          87

19

20    (The exhibits were retained by Attorney Farrah.)
```
```
21

22

23

24
```

Page

```
 1           S T I P U L A T I O N S

 2

 3        It is hereby stipulated and agreed by and

 4    between counsel for the respective parties that all

 5    objections, except objections as to the form of the

 6    question, and all motions to strike, shall be

 7    reserved to the time of trial.

 8        It is further stipulated and agreed that the

 9    deponent shall have forty-five (45) days in which to

10    read and sign the transcript, under the pains and

11    penalties of perjury, after which time it shall be

12    deemed to have been signed, and that the

13    certification, filing and sealing of the deposition

14    transcript are waived.

15

16           P R O C E E D I N G S

17

18        KRISTIN O'DONNELL, first having been

19    satisfactorily identified and duly sworn, on oath,

20    deposes and says as follows:

21

22           DIRECT EXAMINATION

23    BY MR. FARRAH:

24    Q. Good morning.  Will you tell us your name, please?
```

Page 5

1  A. Kristin O'Donnell.
2  Q. Where do you live?
3  A. Fitchburg, Massachusetts.
4  Q. What is your address?
5  A. 60 Phillips Passway.
6  Q. What is your date of birth?
7  A. 3/11/80.
8  Q. And are you married?
9  A. No.
10 Q. How long have you lived at 60 Phillips Passway?
11 A. Probably two-and-a-half years.
12 Q. And are you currently employed?
13 A. I am.
14 Q. Where?
15 A. Slattery's Restaurant.
16 Q. That's where?
17 A. In Fitchburg.
18 Q. And can you tell me what your educational background
19    is?
20 A. I'm going to be completing a bachelor of science in
21    history in two weeks.
22 Q. Where?
23 A. Fitchburg State.
24 Q. And where did you go to high school?

Page 6

1  A. Scituate High School in Scituate.
2  Q. When did you graduate?
3  A. 1998.
4  Q. And after graduation from Scituate High School, when
5    did you first go to college?
6  A. I went immediately, that following September.
7  Q. To?
8  A. Fitchburg State.
9  Q. And what do you do at Slattery's Restaurant?
10 A. I bar-tend.
11 Q. What is the address of Slattery's, if you know?
12 A. It's Culley Street. I don't recall the exact number.
13 Q. In Fitchburg?
14 A. Yes.
15 Q. Right now how many days a week do you work at
16    Slattery's?
17 A. Usually, just two. Sometimes I'll pick up a third
18    shift.
19 Q. For how long have you been working at Slattery's?
20 A. It was a year in September.
21 Q. So you started September of 2004; is that right?
22 A. Yes.
23 Q. Have you ever been deposed before?
24 A. No.

Page

1  Q. And prior to starting at Slattery's, the closest in
2    time to starting at Slattery's, where did you work?
3  A. At Longhorn.
4  Q. That's the Longhorn Steakhouse Restaurant in
5    Leominster?
6  A. Yes.
7  Q. You need to let me finish my questions because if any
8    of us or all of us is talking at the same time, we're
9    going to have a bad record.
10 A. Sorry.
11 Q. It's all right. When did you start at Longhorn
12    Restaurant? Let's call it the Leominster Longhorn.
13    How does that sound?
14    MR. GILLIS: For purposes of the deposition, I
15    don't believe you've worked at any other Longhorn's,
16    correct?
17    THE WITNESS: No.
18    MR. GILLIS: Whenever Longhorn is used, we're
19    talking about the Leominster one.
20    MR. FARRAH: Okay.
21 Q. When did you first start at the Longhorn then?
22 A. I don't remember the exact date. I was there, I
23    believe, a little over two years, and I left in
24    October of 2004.

Page

1  Q. Is it fair to say you started at the Longhorn around
2    or slightly before October of 2002?
3  A. It was in the summer. It was June or July of 2002.
4  Q. Okay, and before you started at the Longhorn, and,
5    again, closest in time to when you started at the
6    Longhorn, where did you work?
7  A. I worked at J.R.'s which was a small bar in
8    Fitchburg.
9  Q. Do you know the address of J.R.'s?
10 A. It's North Street.
11 Q. And when did you start at J.R.'s, approximately?
12 A. August of that year; so August of 2001.
13 Q. And you worked at J.R.'s until when?
14 A. Until I started at Longhorn's.
15 Q. In June or July?
16 A. It's a college bar. So it's pretty much just for the
17    school year.
18 Q. And at J.R.'s, what was your job?
19 A. A bartender.
20 Q. Was that your job at Longhorn?
21 A. Yes.
22 Q. Before you started at J.R.'s and closest in time to
23    when you started at J.R.'s, where did you work?
24 A. At Whiskey's, in Boston, and also I also worked at

## Page 9

1    the State House at the same time.
2    Q. And when did you start at Whiskey's?
3    A. That was in May of 2001, I believe.
4    Q. May of 2001, and approximately how long did you work
5       at Whiskey's?
6    A. Just for a four-month period.
7    Q. Until you started working at J.R.'s?
8    A. Until I went back to school. They overlapped
9       slightly.
10   Q. Where is Whiskey's? Where in Boston is Whiskey's?
11   A. That's right on Tremont Street in the Back Bay. No,
12      excuse me, on Boylston Street.
13   Q. In the Back Bay?
14   A. Yes.
15   Q. Were you a bartender at Whiskey's as well?
16   A. I started as a cocktail waitress, and I did
17      bar-tending toward the end.
18   Q. You also worked at the State House?
19   A. I did.
20   Q. For how long?
21   A. I did that for one year from May of 2001 until August
22      of 2002.
23   Q. Were you in school during the period from September
24      of 2001 to August 2002?

## Page 10

1    A. I was not. I was working full time at the State
2       House.
3    Q. You were also working some of that time at J.R.'s; is
4       that right?
5    A. The very tail end of it in August. I may have
6       confused my years.
7    Q. How long did you work at the State House?
8    A. Just over a year, I believe.
9    Q. Who did you work for at the State House?
10   A. David Donnelly.
11   Q. Who is David Donnelly?
12   A. He was the state rep for West Roxbury and part of
13      Roslindale, chair of the House Judiciary Committee.
14      He's now a judge.
15   Q. Before Whiskey's, where did you work closest in time
16      to when you started in Whiskey's, other than the
17      State House?
18   A. Before that I was employed at Fitchburg State College
19      in Work Study in a college office.
20   Q. Whiskey's is the first job you had at a restaurant or
21      a bar; is that right?
22   A. Yes.
23   Q. Can you tell me what experience you've had or what
24      training you have had in the service of alcohol?

## Page 11

1    A. It was at Whiskey's. We went through training which
2       I would compare, now having undergone Bar Code
3       training, extremely similar to that.
4          I just don't think they submitted the tests. We
5       took tests, but they scored them on their own. I
6       don't know if it was an issue that they didn't want
7       to pay to have everyone trained or whatever, but they
8       did very extensive training there.
9    Q. At Whiskey's?
10   A. Yes, at Whiskey's. It was a four or five hour class
11      followed by a test.
12         Then while I was at Longhorn, I underwent the
13      Bar Code training. I left -- my grandmother passed
14      away -- and I never took the test.
15         I was scheduled to go to Longhorn in Nashua, New
16      Hampshire to take the test with them, and we had a
17      bad storm that day and I never went.
18   Q. So you never --
19   A. I am now Bar Code certified. I did get that
20      eventually.
21   Q. While you were working at Longhorn, you were not Bar
22      Code certified; is that right?
23   A. I was not. I did go through the training at
24      Longhorn, and I also did, through Rare Hospitality,

## Page 12

1    become a certified trainer on the bar.
2          I was given more extensive bar training than
3       most of the bartenders.
4    Q. By the way, can you speak a little bit more slowly
5       than you have been speaking so far?
6    A. Yes.
7    Q. In your previous answer you said you had more
8       training at Rare Hospitality?
9    A. Yes.
10   Q. What was that?
11   A. They did an in-house training. We went to Longhorn
12      in Marlborough, Massachusetts for some training to
13      become a certified trainer, through the corporate
14      offices, to train in-coming servers and bartenders.
15   Q. All right. Am I correct that you had no training in
16      the service of alcoholic beverages while you were at
17      J.R.'s?
18   A. Correct.
19   Q. And then you were trained while you were at
20      Whiskey's, but you never took a test similar to the
21      Bar Code test that you have now taken; is that right?
22   A. We took a test that seemed to me to be very similar
23      to that. It was just not submitted. I didn't get
24      the card that I now have.

## Page 13

1    Q. And that test was given to you at Whiskey's at what
2       point during your employment there?
3    A. Within the first month.
4    Q. What kind of an establishment is Whiskey's?
5    A. Whiskey's is mostly a restaurant. They do have a
6       large bar area in the evening that becomes more of a
7       bar.
8    Q. And who owns Whiskey's, if you know?
9    A. I don't recall exactly. It's something Restaurant
10      Group. They also own the Poor House which is a few
11      doors down.
12   Q. Do you remember any of the people that managed you
13      while you were at Whiskey's?
14   A. Becky Collogero. I don't know how to spell that.
15   Q. Anybody else?
16   A. I had a manager Steve Correia. I believe it was
17      C-o-r-r-e-i-a; I don't know.
18   Q. Anybody else?
19   A. There was another girl Katie -- I don't even know her
20      last name -- that managed sometimes.
21   Q. Were you full time at Whiskey's?
22   A. No.
23   Q. How many nights or days a week did you work?
24   A. I did Friday and Saturday nights.

## Page 14

1    Q. And for how long were you a bartender, as opposed to
2       a waitress, at Whiskey's?
3    A. Very occasionally I did bar. Predominantly, I was a
4       cocktail waitress.
5    Q. So would you say that the training you received was
6       in cocktail waitressing, as opposed in bar-tending,
7       while you were employed at Whiskey's?
8    A. No. It was taken with the bartenders in responsible
9       alcohol service.
10   Q. Do you remember who the trainer or trainers were that
11      trained you?
12   A. It was the GM, Becky.
13   Q. When you refer to "GM," you mean the general manager?
14   A. Yes.
15   Q. Were you at J.R.'s for the school year that began
16      approximately the end of August of 2001 through June
17      or July of 2002?
18   A. Yes.
19   Q. Were you working at the State House some of that time
20      too?
21   A. At the very end, when I started at J.R.'s.
22   Q. Do you think it might be more accurate to say that
23      you started at the State House in May of 2000 and
24      left in August of 2001?

## Page 15

1    A. No.
2    Q. But are you clear that you started at J.R.'s in
3       August of 2001?
4    A. No. I think it might be August of 2002. I'm sorry.
5       It's a long time ago.
6    Q. If you were at J.R.'s for a year beginning August of
7       2002, would that mean that you started at Longhorn in
8       June or July of 2003?
9    A. I must because when I left J.R.'s, I went to
10      Longhorn.
11   Q. Would that also mean that you worked at Longhorn for
12      a little over a year, from June or July of 2003 to
13      August of 2004?
14   A. Is that when this happened?
15   Q. I need to know, as best you can remember, how long
16      you worked at Longhorn.
17   A. I know when I left there, I will have been gone a
18      year. It will be two years this fall. I'm sorry.
19   Q. Do you have a sense of how long you actually worked
20      at Longhorn?
21   A. I thought it was close to two years.
22   Q. Well, before you started at the State House, where
23      did you work closest in time to starting at the State
24      House?

## Page 16

1    A. At Fitchburg State.
2    Q. Work Study; is that right?
3    A. Yes.
4    Q. You started in Fitchburg State in the fall of 1998;
5       is that right?
6    A. Yes.
7    Q. During what year you were at Fitchburg State were you
8       in Work Study? Freshman? Sophomore? Junior?
9    A. All of those years; every year I was there.
10   Q. Then that won't help us any. When did your
11      grandmother die?
12   A. It will be two years this year.
13   Q. What month?
14   A. December.
15   Q. Let's see how that works out for us. December of
16      2003 your grandmother died?
17   A. Yes.
18   Q. And you were going to take the Bar Code test at
19      Longhorn but didn't take that test because your
20      grandmother died; is that right?
21   A. Yes.
22   Q. For how long after you started at Longhorn, how much
23      time elapsed from when you started at Longhorn until
24      you were ready to take the test?

Page 17

1  A. I had worked there for quite a while beforehand.
2  Q. Months?
3  A. Yes.
4  Q. Was there any reason why you worked there for months
5     before you were ready to take the test?
6        MR. GILLIS: Objection.
7  A. That was how the restaurant did it. That was their
8     policy.
9  Q. Okay. Can you tell me how much training you received
10    from Longhorn in the service of alcoholic beverages
11    before you understood you were ready to take the
12    test?
13 A. When I was hired, I went through about a week and a
14    half of training. I shadowed a certified trainer on
15    the bar.
16 Q. Was that it?
17 A. She went over the responsible alcohol service with
18    me. Longhorn had quite extensive manuals on that,
19    quite a bit to read. She gave me different tests
20    every day.
21 Q. During that week and a half?
22 A. During that week and a half.
23 Q. Is it your understanding that once that week and a
24    half was done, you were ready to take the test?

Page 18

1  A. It was never said that I would take that. It's not
2     required to be Bar Code certified to bar-tend in
3     Massachusetts.
4        It is just usually a corporate decision on most
5     restaurants, or some insurance companies require it
6     for restaurants -- certified bartenders.
7        I felt comfortable serving in the restaurant. I
8     felt I was ready.
9  Q. Ready to serve or ready to take the test?
10 A. Ready to serve.
11 Q. If you remember, what was it that triggered the
12    decision that you were going to take the test in
13    December of 2003?
14 A. They were doing just restaurant-wide -- The entire
15    restaurant was going to be certified.
16 Q. Somebody told you that?
17 A. Yes.
18 Q. Who?
19 A. The general manager.
20 Q. Of the Longhorn in Leominster?
21 A. Yes.
22 Q. Who was that?
23 A. Chuck Bouillaine.
24 Q. Could you spell his name?

Page 19

1  A. B-o-u-i-l-l-a-i-n-e.
2  Q. When did he tell you restaurant-wide the testing was
3     getting ready to happen?
4  A. I'm not sure of when that happened. They just posted
5     signs throughout the server work areas, as they would
6     for restaurant meetings and things of that nature.
7  Q. Because your grandmother died, you didn't take the
8     test?
9  A. Yes.
10 Q. Do you know where those who took the test took it in
11    December of 2003?
12 A. It was at the restaurant at Longhorn.
13 Q. Do you remember the name of the woman that you
14    followed around for the week and a half during
15    training?
16 A. Rebecca, and her last name is escaping me now. She
17    still works there.
18 Q. What was her position?
19 A. She was a bartender at the time, and she was a
20    waitress. I don't know if she is still doing both.
21 Q. How do you know if she still works there?
22 A. I ran into her a couple of weeks ago. She is back in
23    the area.
24 Q. She had gone away for a while?

Page 20

1  A. She did. She went down to Georgia for a while and
2     was working at Longhorn there.
3  Q. How old is she, approximately?
4  A. She is twenty-six, I believe.
5  Q. Then sometime after December of 2003 you began to
6     train servers at Longhorn; is that right?
7  A. Yes.
8  Q. Approximately how long after December 2003 is it that
9     you began to train servers?
10 A. I don't recall.
11 Q. Can we agree that you left Longhorn in October of
12    2004?
13 A. Yes.
14 Q. For how long did you train servers at Longhorn?
15 A. I don't know of a set time period. I remember
16    training maybe four or five people that were hired as
17    new hires.
18 Q. Do you remember their names?
19 A. I don't. There were a couple of hostesses who I
20    don't think lasted very long; a waitress -- I don't
21    remember her name; and there were two people on the
22    bar -- Adam and Samantha.
23 Q. You trained both of them; is that right?
24 A. Yes; in addition to other people training them as

**Page 21**

1  well.
2  Q. Do you know Adam's last name?
3  A. No, I don't.
4  Q. How about Samantha?
5  A. I don't.
6  Q. Does either of them still work at Longhorn?
7  A. Samantha does. I'm not sure about Adam.
8  Q. How do you know that Samantha still works at
9     Longhorn?
10 A. I still see a lot of these people.
11 Q. Do you go to Longhorn from time to time now?
12 A. Yes, I do.
13 Q. How did you learn that you were going to be training
14    people?
15 A. I expressed interest in getting further training with
16    the company. So I went to my manager, and he felt
17    that I was a good candidate for it.
18 Q. And who was the manager that you went to?
19 A. Leigh.
20 Q. L-e-e?
21 A. L-e-i-g-h.
22 Q. Is that his first name?
23 A. That's a woman, and I don't remember her last name.
24 Q. She was the manager that you went to?

**Page 22**

1  A. Yes.
2  Q. And she felt you were a good candidate for further
3     training; is that right?
4  A. Yes.
5  Q. Approximately when was it that you went to Leigh and
6     expressed that interest?
7  A. I don't recall.
8  Q. After you missed the test because your grandmother
9     had died, did anybody at Longhorn ever say to you we
10    want you to take the test?
11 A. Yes.
12 Q. Who said that to you?
13 A. Chuck, the GM.
14 Q. How long after you missed the test was it that he
15    said that to you?
16 A. It was probably about a week or two after because he
17    wanted me to go up to the Nashua Longhorn to take it
18    with them.
19 Q. Did you do that, that is, go to the Nashua Longhorn?
20 A. No. We had a bad snowstorm that day. I did not go.
21 Q. After the day of the bad snowstorm, did anybody at
22    Longhorn ever say to you we want you to take the
23    test?
24 A. It may have come up once again, but I don't remember

**Page 23**

1  anyone. It was not a requirement to work there.
2  Q. When you spoke to Leigh expressing an interest in,
3     you said, getting further training from Longhorn,
4     were you thinking about a career with Longhorn at
5     that point?
6  A. No.
7  Q. What further training were you interested in getting
8     when you spoke to Leigh about it?
9  A. Just being able to train new employees.
10 Q. After you had that conversation with Leigh and before
11    you trained the first of the four or five people that
12    you ultimately trained, did you yourself undergo any
13    additional training?
14 A. I did.
15 Q. Where was that?
16 A. At the Marlborough Longhorn.
17 Q. In?
18 A. In Marlborough, Massachusetts.
19 Q. For how long was that training?
20 A. Probably about a half day.
21 Q. Tell me about that. What happened there?
22 A. There were videos, role play, going over situations,
23    and at the end we took a test.
24 Q. Do you know who gave that training?

**Page 24**

1  A. I don't. It was someone that worked for Rare
2     Hospitality.
3  Q. Prior to that training, had you not, while at
4     Longhorn, seen any videos as part of your training?
5  A. When I was first hired, there were videos.
6  Q. Were they the same videos that you saw in Marlborough
7     that you saw?
8  A. No.
9  Q. How many videos did you see when you were first
10    hired?
11 A. I can't say for sure; just a few on all different
12    aspects of service, safety, menu items.
13 Q. Is it accurate to say that the videos that you saw in
14    Marlborough were geared towards serving alcohol
15    responsibly, as opposed to generally Rare
16    Hospitality's operation?
17    MR. GILLIS: Objection.
18 Q. You can answer, if you can answer.
19 A. I don't remember the exact of what was in the videos.
20 Q. What kind of an establishment was J.R.'s?
21 A. College bar -- small, no food, not much bigger than
22    this room.
23 Q. Who did you report to at J.R.'s?
24 A. Chuck Simon.

Page 25

1  Q. Was he the owner?
2  A. He was.
3  Q. How many days or nights a week did you work while you
4     were at J.R.'s?
5  A. Thursday and Saturday nights.
6  Q. You worked the bar there; is that right?
7  A. Yes.
8  Q. Why did you leave J.R.'s?
9  A. It slowed down when school is not in session.
10 Q. And is it accurate to say that you had made a
11    decision that summer to stay in the Fitchburg area?
12 A. Yes.
13 Q. So you applied for the job at Longhorn?
14 A. Yes.
15 Q. Did you know people that worked at Longhorn?
16 A. I had a roommate that worked there once.
17 Q. What is her name?
18 A. Sara Latshaw.
19 Q. Would you spell that?
20 A. L-a-t-s-h-a-w. She hostessed for probably two weeks.
21    She didn't last long.
22 Q. Where is Sara today, do you know?
23 A. I have no idea. I have not spoken to her in a long
24    time. I think she's in Georgia, last I heard.

Page 26

1  Q. Did you have to fill out an application for
2     employment at Longhorn?
3  A. Yes.
4  Q. Do you remember who interviewed you?
5  A. Yes.
6  Q. Who?
7  A. Chris. Everyone's last name escapes me. He was the
8     bar manager at the time. He no longer works there.
9  Q. When did he leave Longhorn?
10 A. Probably six months before I did, but I don't
11    remember the exact time frame.
12 Q. He was the bar manager, you say?
13 A. Bar manager, yes.
14 Q. Did anybody else interview you before you were hired?
15 A. I did after Chris meet with Chuck -- Chuck
16    Bouillaine.
17 Q. And what was Chuck's job at the time?
18 A. He was general manager.
19 Q. Is it your understanding that the general manager was
20    sort of the highest level one could attain and still
21    work at that restaurant?
22 A. Yes.
23 Q. For how long was Chuck general manager?
24 A. He opened the store; so however long they have been

Page 2

1     open.
2  Q. When did Chuck leave the post of general manager?
3  A. He's still there.
4  Q. Do you remember anything about your interviews with
5     either Chris or Chuck when you were hired or before
6     you were hired?
7  A. No. Nothing really stands out.
8  Q. And then you were trained by a woman for a week and
9     half, you said; is that right?
10 A. Yes.
11 Q. I have asked you her name already?
12 A. Yes.
13 Q. Refresh my memory.
14 A. Rebecca.
15 Q. And when you say you were trained by her for a week
16    and a half, does that mean that you spent an entire
17    five-day week and then half of another five-day week
18    training with her?
19 A. No.
20 Q. Tell me how much time you actually spent training
21    with Rebecca.
22 A. Probably a total of five to six shifts.
23 Q. How long is a shift?
24 A. Usually about six hours.

Page 2

1  Q. And Rebecca was a waitress?
2  A. She was a bartender.
3  Q. So when you say you followed her around, you mean yo
4     stayed within the area of the bar and followed her
5     around?
6  A. Yes.
7  Q. You watched what she was doing?
8  A. Yes.
9  Q. I've got some documents. I don't know how many
10    you're going to be able to help me out with.
11       (Short recess.)
12 Q. I'm going to show you a document that has been given
13    to me by Rare's lawyers, their prior counsel,
14    Mr. Voke, which we have numbered the pages of, Bates
15    stamped Rare 05336 through 410, and the document is
16    headed "Welcome to Longhorn Bartender Training."
17       Mindful of the fact that this is over seventy
18    pages of document, I am going to ask you to just look
19    at it and see if you recognize it as a document that
20    you received while you worked at Rare.
21 A. Yes.
22 Q. You can do that just by looking at the first page?
23 A. Yes. I have it in my trunk still.
24    MR. FARRAH: Can we mark that as Exhibit 1.

Page 29

1    (Exhibit Number 1 was marked for
2    identification.)
3
4    Q. When were you given your copy of what has been marked
5       as Exhibit 1?
6    A. The first day of my training.
7    Q. June or July of 2003?
8    A. Yes.
9    Q. The next document that I want to show you, Bates
10      stamped, this one again received from Mr. Voke, is
11      Rare 05646 through 701, and I want to ask you if you
12      recognize that document.
13         It is headed "Longhorn Steakhouse Bar Recipes,
14      Revised 2002."
15   A. Yes.
16      MR. FARRAH: Can we have that marked as
17      Exhibit 2?
18
19         (Exhibit Number 2 was marked for
20         identification.)
21
22   Q. Exhibit 2, the bar recipes book, when did you receive
23      your copy of Exhibit 2?
24   A. When I began training.

Page 30

1    Q. Was there a copy of Exhibit 2 on the premises at Rare
2       when you worked there?
3    A. Yes.
4    Q. Where?
5    A. Right at the service bar.
6    Q. The next one is a monster. It's Bates stamped Rare
7       05411 through 636, received from Mr. Voke.
8         It's headed "Wanted: Longhorn Steakhouse Server
9       and Bartender Trainee Edition."
10         I'm going to ask you if you have ever seen a
11      copy of that document.
12   A. Yes.
13      MR. FARRAH: Can we have that marked as
14      Exhibit 3?
15
16         (Exhibit Number 3 was marked for
17         identification.)
18
19   Q. Is Exhibit 3 also a document that you received the
20      first day that you began work at Rare?
21   A. Yes.
22   Q. Okay. The next document that I received is Bates
23      stamped, again from Mr. Voke, Rare 05269 through 335,
24      and it's entitled "Longhorn Steakhouse Bar Operations

Page 31

1    Manual, May 2002, Training Module Number 5."
2       Do you recognize that document?
3    A. Yes.
4       MR. FARRAH: Can we have that marked, please?
5
6         (Exhibit Number 4 was marked for
7         identification.)
8
9    Q. Did you receive your copy of Exhibit 4 at the time
10      you started work at Rare?
11   A. Yes.
12   Q. Was there a copy of Exhibit 4 on the premises at Rare
13      at any time that you worked there?
14   A. Yes. There was a binder behind the bar, and then one
15      of Exhibit Number 4 and Exhibit Number 2 in the
16      liquor closet as well.
17   Q. So it is accurate to say that there was a copy of the
18      Longhorn bar recipes booklet that we have marked as
19      Exhibit 2 and a copy of the Longhorn Bar operations
20      manual, which we have marked as Exhibit 4, in the
21      service bar at all times that you were working at
22      Rare?
23   A. Yes.
24   Q. Is it also accurate to say that there was a copy of

Page 32

1    the Longhorn bar recipes booklet, which we marked as
2    Exhibit 2, and the bar operations manual, which we
3    have marked as Exhibit 4, at all times that you
4    worked at Rare, in the liquor closet area?
5    A. Yes.
6    Q. Were there any other areas where Exhibits 2 and 4
7       were, if you know, while you worked at Longhorn?
8    A. Where they're stored in the front of the restaurant.
9       There's a storage area underneath some of the tables
10      which housed all of the training materials.
11   Q. Am I correct that while you worked at Rare, you did
12      not receive any of the manager resource materials?
13   A. Correct.
14   Q. I'm going to show you a document entitled "Bar Code
15      Server Guide." I received this from Mr. Voke. We
16      have Bates stamped this as we have Bates stamped all
17      the other documents as Rare 05. In this case the
18      numbering is Rare 051 through 084. Do you recognize
19      that document?
20   A. Yes.
21      MR. FARRAH: Can we have that marked?
22
23         (Exhibit Number 5 was marked for
24         identification.)

## Page 33

1 Q. Did you receive what has been marked as Exhibit 5 the
2   day you started at Rare?
3 A. No.
4 Q. When did you first receive your copy of Exhibit 5?
5 A. I received mine when they gave the first class.
6 Q. They gave the first class?
7 A. The first training. I believe it was December.
8 Q. Of 2003?
9 A. Yes. There was one in the bar area when I worked
10   there.
11 Q. There was a server guide in the bar area when you
12   worked at Rare?
13 A. Yes.
14 Q. Prior to December of 2003?
15 A. Yes.
16 Q. And how many classes did you attend in December of
17   2003 before the test that you couldn't take because
18   of your grandmother's death was given?
19 A. Just one class. I think the Bar Code training is
20   four hours, I believe.
21 Q. That was at that time at Rare?
22 A. Yes.
23 Q. I'm going to show you what has been received from
24   Mr. Voke, Bates stamped Rare 05702 through 728,

## Page 34

1   entitled "Longhorn Steakhouse Training Test Booklet
2   for Server and Bartender Team Members."
3     Do you recognize that document?
4 A. Yes.
5     MR. FARRAH: And could we have that marked,
6   please?
7
8     (Exhibit Number 6 was marked for
9     identification.)
10
11 Q. Exhibit 6 was first received by you when?
12 A. I believe it was as each test was taken. My trainer
13   would give me the specific test for that day.
14 Q. And the test that you're referring to is the test
15   that you received during the five or six shifts that
16   you followed Rebecca around; is that right?
17 A. Yes.
18 Q. You passed all of those tests, of course?
19 A. Yes.
20 Q. How big was the bar at J.R.'s?
21 A. Probably a little longer than the length of this
22   table, so maybe fifteen feet.
23 Q. And how many seats or stools were there at the bar at
24   J.R.'s?

## Page 35

1 A. Probably about ten, and three booths behind that
2   would hold four in each.
3 Q. Is it accurate to say at J.R.'s there was seating for
4   approximately twenty-two patrons?
5 A. Yes.
6 Q. While you worked at J.R.'s, were you the only
7   bartender, on any particular day that you were
8   working there, on duty?
9 A. While I was working, I was the only bartender.
10 Q. Were there waitresses on duty while you were a
11   bartender?
12 A. No. The owner would come in and work with me when it
13   got busy.
14 Q. I think you told me this already, but I just want to
15   be sure. You worked at J.R.'s Tuesdays and
16   Saturdays; is that right?
17 A. No; Thursday and Saturday.
18 Q. When you started at Longhorn, how many days a week
19   were you working?
20 A. I began doing Wednesday night, Friday night and
21   Saturday night, and I think initially Tuesday as
22   well.
23 Q. Tuesday day?
24 A. Tuesday night.

## Page 36

1 Q. Do you have a memory that at some point in time you
2   dropped Tuesday nights; you ceased to work Tuesday
3   nights?
4 A. Yes.
5 Q. And once Tuesday nights were not part of your work
6   week, did your typical work week, while you were at
7   Rare, consist of Wednesday night, Friday night and
8   Saturday night thereafter?
9 A. Yes.
10 Q. Typically, which was the busiest of those three
11   nights?
12 A. Friday nights and Saturdays -- probably equally busy.
13 Q. Now, you have described J.R.'s as a college bar; is
14   that right?
15 A. Yes.
16 Q. Here's your chance to describe the Longhorn
17   establishment. What kind of establishment was that?
18 A. Restaurant predominantly that had a bar. It was a
19   family establishment.
20     My bar customers were usually folks waiting for
21   a table. On weekday nights, businessmen and couples
22   would come in and eat at the bar, a lot of regulars.
23 Q. A lot of regulars?
24 A. But mostly families and people with kids.

Page 37

1  Q. Your shift -- Wednesday night, Friday night and
2      Saturday night -- started at what time and ended at
3      what time?
4  A. 5:00 to close, I believe.
5  Q. 5:00 p.m. to whenever you closed; is that right?
6  A. Yes.
7  Q. When was closing?
8  A. 11:00 on weekend nights.
9  Q. You mentioned earlier that Chuck had opened the
10     restaurant, started the restaurant, and I'm going to
11     show you what I will represent to you is the plan
12     that we received sometime ago from the Leominster
13     Licensing Commission, and we Bates stamped it 04166.
14        The plan that I'm showing you is entitled
15     "Proposed Floor Plan, Leominster, Massachusetts,
16     Longhorn Steakhouse."
17        Take a moment, if you would please, and look at
18     it and see if it fairly and accurately depicts the
19     layout of at least some portions of the Longhorn
20     Steakhouse as those portions existed on September 26,
21     2003.
22  A. Yes.
23        MR. FARRAH: Can I have that marked as the next
24     exhibit, please?

Page 38

1        (Exhibit Number 7 was marked for
2         identification.)
3
4        (Off the record.)
5  Q. Am I correct that looking at Exhibit 7 that this area
6      that I've sort of circled is the front is the
7      entrance into the restaurant?
8  A. Yes.
9  Q. Could you write the word "entrance" and just point an
10     arrow to the entrance area for me?
11        (Witness complies.)
12  Q. Thank you. This area that I am encircling now, is
13     that the area of the bar at the restaurant?
14  A. Yes.
15  Q. Could you, in red, write "bar" and point it towards
16     the bar area?
17        (Witness complies.)
18  Q. Will you just point for me, if you would, to the
19     service bar portion of the bar?
20  A. Right there.
21  Q. Can you put "SB" in the service bar area?
22        (Witness complies.)
23  Q. You have "SBB"?
24  A. No. I tried to do an arrow, but I'm left handed.

Page 39

1  Q. The third character is not a "B"; it's an attempt at
2      an arrow? Is that what it is?
3  A. Yes.
4  Q. Am I correct that that portion of Exhibit 7 where you
5      have drawn the "S" is where the waitresses typically
6      would stand to receive drinks from you while you were
7      working at the service bar?
8  A. Yes.
9  Q. Am I correct that the area that I'm pointing to is
10     where you typically would stand to deliver the drinks
11     to them?
12  A. Yes.
13  Q. I want you to put a "K" where you would typically
14     stand.
15        (Witness complies.)
16  Q. This plan, Exhibit 7, shows fourteen chairs, I
17     believe, arrayed around the bar. Do you see that?
18  A. Yes.
19  Q. Does that comport with your memory of how many stools
20     or chairs were arrayed around the bar on
21     September 26, 2003.
22  A. Yes.
23  Q. Approximately fourteen stools?
24  A. Yes. Occasionally, one would be broken or out of

Page 40

1      service. So there might be a few less.
2  Q. What is shown on Exhibit 7 in the area that I'm
3      pointing to, these three rectangles?
4  A. In that area there's a table. It's what we call a
5      two-top -- two-seater.
6  Q. Can you write the words "two-top" and point towards
7      that table for me?
8        (Witness complies.)
9  Q. Am I correct that nearer to me there's a four-top?
10  A. Yes.
11  Q. A four-seater?
12  A. Yes.
13  Q. Could you put "four-top" there?
14        (Witness complies.)
15  Q. Am I correct that below the four-top is another
16     two-top?
17  A. Yes.
18  Q. Am I correct that on the other side of the two-top is
19     a four-top?
20  A. Yes.
21  Q. And then a two-top and four-top again?
22  A. Yes.
23  Q. On September 26, 2003, whose responsibility was it to
24     supply alcoholic beverages to customers at the

## Page 41

1     two-top, four-top and two-top that I'm pointing to
2     here?
3     A. That was the bar.
4     Q. So persons sitting as you look at them, the two-top,
5     four-top, and two-top on the right-hand side, if they
6     wanted drinks, needed to go up to the bar and order a
7     drink; is that right?
8     A. No.  On a Friday night, they would have a bartender
9     serve them at the table.
10    Q. A bartender would sort of act as a waiter; is that
11    right?
12    A. Yes.
13    Q. Is that also true that the bartender acting as a
14    waiter on Friday nights would be responsible for
15    serving the four-top, two-top and four-top on the
16    other side?
17    A. No.
18    Q. That was a waitress's job; is that right?
19    A. Yes.
20    Q. Just to make this clear, could you write in "two-top"
21    in red for me to identify the last two-top that the
22    bartender acting as a waiter would serve on Friday
23    nights?
24         (Witness complies.)

## Page 42

1     Q. I am going to mark in green -- that's why I have
2     green -- a "4" in the area of the four-top that a
3     waitress served on Friday nights.  I want to mark
4     this one right here.  Is that the right one to do it
5     in?
6     A. Yes.
7     Q. Then I'm going to mark in green a "2" in the area
8     where the waitress would serve the two-top on a
9     Friday night.  Is that where I should put the "2"?
10    A. Yes.
11    Q. I'm going to put another "4" in the four-top that is
12    below the two-top that has not gotten a "4" yet, and
13    that will be the last of the tops that a waitress
14    would serve on a Friday night; is that right?
15    A. Yes.
16    Q. Have I put that second "4" in the right spot?
17    A. Yes.
18    Q. The tables that are numbered in green -- "4," "2" and
19    "4," did they have numbers?
20    A. Yes.
21    Q. Do you know what their numbers were?
22    A. 11, 12 and 13.
23    Q. The ones in green are 11, 12 and 13?
24    A. Yes.

## Page 43

1     Q. I have another copy and we will mark this as
2     Exhibit 8.
3
4         (Exhibit Number 8 was marked for
5         identification.)
6
7     Q. The only thing I want to do on Exhibit 8, at least
8     for right now, is to number tables.
9         So in green, can you number tables 11, 12 and 13
10    on Exhibit 8?
11         (Witness complies.)
12    Q. Do the tables, that the bartender acting as a waiter
13    or waitress on Friday nights have responsibility for
14    serving, have numbers as well?
15         MR. GILLIS: Objection.
16    A. Yes.
17    Q. Could you number them?
18         (Witness complies.)
19    Q. You've numbered those "1," "2" and "3," right?
20    A. Yes.
21    Q. Do these tables have numbers?
22    A. Yes.
23    Q. What are their numbers?
24    A. I believe those are in the twenties.  It's been a

## Page 44

1     while.
2     Q. Do you know what numbers they were?
3     A. 21, 22, and 23.
4     Q. Could you mark them "21," "22," and "23"?
5         (Witness complies.)
6     Q. Are these booths that I'm pointing to here?
7     A. Yes.
8     Q. And can you tell me in this area that I'm moving back
9     and forth on Exhibit 8 in, how many patrons could be
10    accommodated?
11    A. Probably five to six, depending on their size.
12    Q. Do these booths have table numbers?
13    A. Yes.
14    Q. What were those table numbers?
15    A. 10 and 20.
16    Q. Could you mark those in for me?
17         (Witness complies.)
18    Q. At the restaurant were there four-tops on
19    September 26, 2003 in this area?
20    A. Yes.
21    Q. What numbers were they?
22    A. I believe 31, 32, and 33.
23    Q. Would you mark down what you believe 31, 32 and 33 to
24    be?

## Page 45

1    (Witness complies.)
2    Q. And then are we looking at a bank of four-tops in
3    this area?
4    A. Yes, booths.
5    Q. Are all the four-tops booths?
6    A. No, because these are tables and chairs and those are
7    four-tops. It just depends on how many people sit
8    there.
9    Q. So this is a bank of four-top booths on this wall?
10   A. Yes.
11   Q. And do you remember what their numbering was?
12        MR. GILLIS: If you know.
13   A. I don't recall. I know the forties.
14   Q. This bank of four-top booths consisting of, I think,
15   four, do you know their numbers?
16   A. Yes.
17   Q. Could you tell me what those are?
18   A. 41, 42, 43 and 44.
19   Q. Could you mark those for me?
20        (Witness complies.)
21   Q. These four-top tables in proximity to the four-top
22   booths, 41 through 44, do you know what their numbers
23   are?
24   A. Yes.

## Page 46

1    Q. What are those?
2    A. I believe 51, 52, 53 and 54.
3    Q. Could you mark those for me, please?
4        (Witness complies.)
5    Q. This accommodation in the corner, do you know what
6    number it was?
7    A. I want to say like 92.
8    Q. Will you mark "92" there?
9        (Witness complies.)
10   Q. That's sort of a corner booth; is that right?
11   A. Yes.
12   Q. What is this?
13   A. That's a booth as well, a four-seater.
14   Q. A four-seater?
15   A. Yes.
16   Q. Do you know the number?
17   A. I believe 93.
18   Q. Could you mark "93" in there for me?
19        (Witness complies.)
20   Q. Then what are these four things here?
21   A. Two tables and chairs -- four-tops.
22   Q. Two four-tops?
23   A. Yes.
24   Q. Could you mark their numbers down for me, please?

## Page 47

1    A. That might be one four-top table. I'm trying to
2    remember. Normally, it was for larger parties, like
3    a table of six.
4
5    Q. 94?
6    A. Yes.
7    Q. In this corner here, what is that?
8    A. It would be 95. That's a booth.
9    Q. A four-person booth, as far as you know?
10   A. Yes.
11   Q. The corner?
12   A. 96.
13   Q. What are we looking at in this area that I've
14   circled?
15   A. Those are when I worked there, I believe that is 60,
16   and I think they go 61, 62, 63, and then 64, 65, 66.
17   Q. They're 61 through 66 that you have pointed to or
18   what you believe to be 61 to 66 that you have pointed
19   to are four-top booths, each of them?
20   A. Yes.
21   Q. Could you mark in those numbers for us?
22        (Witness complies.)
23   Q. And on the other side of what you just marked in are
24   what?

## Page 48

1    A. Two-top booths.
2    Q. A pair of two-top booths?
3    A. Yes, on each end.
4    Q. Could you mark them, whatever numbers they are?
5    A. I don't recall those ones. I'm not sure where they
6    fit in the number scheme.
7    Q. Put a question mark there for me in the area of the
8    one you don't recall the number.
9        (Witness complies.)
10   Q. We have four four-top tables in this area. Do you
11   know their numbers?
12   A. Yes.
13   Q. What are they?
14   A. 71, 72, 73, 74.
15   Q. Would you mark those numbers?
16        (Witness complies.)
17   Q. We seem to have one, two, three, four, five -- that
18   bank of four-top booths that we talked about before
19   do you know what their numbers are?
20   A. I believe 81, 82, 83, 84 and 85.
21   Q. Could you mark those in?
22        (Witness complies.)
23   Q. And this area right here on Exhibit 8, what existed
24   as of September 26, 2003?

Page 49

1  A. Waiting area for patrons.
2  Q. From time to time while you were working at the
3     Longhorn, would patrons drink alcoholic beverages in
4     that waiting area?
5  A. I don't recall. We discouraged the practice of
6     people taking them out of the bar area.
7  Q. On Exhibit 8, there appears to be some sort of
8     separation between Booth 11 and Booth 1. Do you see
9     that?
10 A. Yes.
11 Q. What, if anything, did separate Booth 11 from Booth 1
12    on the night of September 26, 2003?
13 A. Just a wood panel to allow privacy from the table
14    next to you.
15 Q. Approximately how high was that panel? Any idea?
16 A. I would guesstimate a couple of feet from the table
17    surface. You could visibly see over it.
18 Q. If you were standing?
19 A. If you were standing or a taller person sitting.
20 Q. And was that the same sort of separation that existed
21    on that night, September 26, 2003, between Booths 2
22    and 12 and 13 and 3?
23 A. Yes.
24 Q. Behind, or around and behind booths 10 and 20 there

Page 50

1     appears to be some sort of structure that I'm sort of
2     moving around.
3        Do you know what that was?
4  A. It was a wall on either side, and mirrors behind that
5     went to the top.
6  Q. To the ceiling?
7  A. Yes.
8  Q. Can you just point an arrow to that full wall and
9     write in "full wall" for me?
10        (Witness complies.)
11 Q. While you were working in the service bar area on
12    September 26, 2003, did that full wall obstruct your
13    view at all of the various tables and booths that you
14    have numbered for me on Exhibit 8?
15    MR. GILLIS: Objection. If I recall I don't
16    think it's been established that she worked on that
17    day.
18 Q. Were you working on September 26, 2003?
19 A. Yes.
20 Q. While you were working an September 26, 2003, did
21    that full wall that you have marked on Exhibit 8
22    obstruct your view of the various tables and booths
23    that have been numbered by you on Exhibit 8?
24 A. The service bar is not in the main restaurant.

Page 5

1  Q. The service bar is not in the main restaurant?
2  A. No. It's in the kitchen area.
3  Q. This area right here which you have already marked on
4     Exhibit 7 with a "K" for the location where you
5     dispensed drinks to the servers and an "S" for the
6     location where the servers would stand when they were
7     receiving the drinks from you; do you recall that?
8  A. Yes.
9  Q. The separation between the "S" and the "K" on
10    Exhibit 7, as it existed on September 26, 2003, was
11    what? Consisted of what?
12 A. A counter area with a graded top and a drain
13    underneath.
14 Q. What was above the counter area to the ceiling, if
15    anything?
16 A. A shelf with glassware and some storage of bar
17    needs -- salt and such.
18 Q. So is it accurate to say that you looked through an
19    opening at the waitresses while you were serving them
20    their drinks?
21    MR. GILLIS: Objection.
22 A. Yes.
23 Q. And is it accurate to say that above the top of that
24    opening, as you were in the service bar at any time

Page 5

1     during September 26, 2003, that there were rows of
2     glasses available to you for mixing drinks?
3        MR. GILLIS: Objection.
4  A. Yes.
5  Q. From the location of "K" looking through that opening
6     at the waitresses who came to receive drinks from you
7     on September 26, 2003, could you see any of the
8     eating areas of the restaurant?
9        MR. GILLIS: Objection.
10 A. No, but I'm not confined to just that area.
11 Q. I understand that. I just want to know what you
12    could see from location "K" on Exhibit 7.
13 A. From there you can see into the alley where the food
14    comes up and drinks are rung in.
15 Q. The alley where the food comes up and the drinks are
16    rung in is this area right here?
17 A. Yes.
18 Q. That area where the drinks are rung up and the food
19    comes in has already been marked on Exhibit 8 as the
20    area of the full wall; is that right?
21 A. Yes.
22 Q. What was in that alley on the night of September 26,
23    2003?
24 A. Two computer terminals.

Page 53

1  Q. What else?
2  A. Soda fountains, small fridge with juice and milk,
3     take-out containers, plates, condiments, bread oven.
4  Q. Anything else that you can think of now?
5  A. No; that's everything -- salad dressings, everything
6     that is needed to get your food to you.
7  Q. Point, if you would please, on Exhibit 8 to the
8     kitchen area of the restaurant.
9  A. It would be all in this area.
10 Q. I'm going to put sort of an oval circle around that
11    area. I put a "K" in the middle. Is that the area
12    you pointed to?
13 A. Yes.
14 Q. What is this area here?
15 A. The dish pit.
16 Q. Is all of it the dish pit?
17 A. Yes, right here.
18 Q. This area is the dish pit; is that right?
19 A. Yes.
20 Q. So "DP." Did I put the "DP" in the dish pit area?
21 A. Yes.
22 Q. Is the dish pit area where the dirty dishes are first
23    deposited by people clearing off the tables?
24 A. Yes.

Page 54

1  Q. Are they washed in the dish pit area as well?
2  A. Yes.
3  Q. So is the area of the dish pit area with the "P" the
4     area where the cleaning occurs, if you recall?
5  A. Yes.
6  Q. And the area more towards the "D" is where the dirty
7     dishes are deposited; is that right?
8  A. Yes.
9  Q. Just to complete this, this is the bathroom area over
10    here?
11 A. Yes.
12 Q. Were there different bathrooms for staff as opposed
13    to customers, or did you use the customers'
14    bathrooms?
15 A. We used the same bathroom.
16 Q. What is this area here?
17 A. That was the walk-in cooler.
18 Q. "WIC"? Can I put that in there?
19 A. Yes.
20 Q. That's on Exhibit 8. This area here?
21 A. I'm not sure what that was.
22 Q. Did you have a freezer area?
23 A. Oh, you're right.
24 Q. I'll put an "F" in the freezer area. Over here on

Page 55

1     Exhibit 8, what are these, if you know?
2  A. I believe those were as they're labeled. There were
3     doors outside the building for electrical things.
4  Q. What is this over here?
5  A. The office.
6  Q. The manager's office?
7  A. Yes.
8  Q. This area right here?
9  A. Storage.
10 Q. Could you write in "storage" in this one and then
11    "MO". In fact, I'll do it.
12       I put an arrow and "MO" to the manager's office
13    Is that accurate on Exhibit 8?
14 A. Yes.
15 Q. I'm going to write in "storage." Did I put it in the
16    right area, the word "storage"?
17 A. Yes.
18 Q. What is this right here?
19 A. The liquor closet.
20 Q. I'm going to put an arrow and then "LC" for liquor
21    closet. Is that accurate?
22 A. Yes.
23 Q. This little space in here, what is that?
24 A. Freezer for glassware.

Page 56

1  Q. "F" for freezer. Is that accurate?
2  A. Yes.
3  Q. Not to be confused with the other "F" for freezer
4     that we have near the "WIC"; is that right?
5  A. Yes.
6  Q. And this and this are what?
7  A. Tubs for beer bottles.
8  Q. Can you write in "tubs" and then put two to them,
9     please?
10       (Witness complies.)
11 Q. Thank you. This over here?
12 A. I don't know what that is.
13 Q. Fair enough. On the inside of the bar, the bartender
14    side of the bar, were there any appliances or sinks
15    for mixing drinks or things like that?
16 A. Yes.
17       MR. FARRAH: Let's take a few-minute break,
18    okay?
19       MR. GILLIS: Sure.
20       (Lunch recess.)
21
22
23
24

Page 57

1     A F T E R N O O N   S E S S I O N
2
3     Q. On the night of September 26, 2003, you were working;
4        is that right?
5     A. Yes.
6     Q. That was a Friday night; is that right?
7     A. Yes.
8     Q. Let me ask you this. Prior to that night, did you
9        know Jeffrey Southworth?
10    A. No.
11    Q. Since that night, have you come to know who Jeffrey
12       Southworth is through conversations, other than ones
13       with attorneys?
14    A. Yes.
15    Q. When did you first learn who Jeffrey Southworth was?
16    A. A state trooper came to my house one night.
17    Q. Did he show you some photographs?
18    A. No.
19    Q. Have you ever seen photographs of Mr. Southworth?
20    A. No.
21    Q. Do you recognize that person?
22    A. I don't unless he's gained weight. When I did the
23       criminal case, he appeared a lot heavier than that to
24       me.

Page 58

1        MR. FARRAH: Let me back up. Let's mark this
2     photograph. Could you mark that, please?
3
4           (Exhibit Number 9 was marked for
5           identification.)
6
7     Q. Am I correct that you saw someone who was identified
8        to you as Jeffrey Southworth at the Middlesex
9        Superior Courthouse in Lowell during his fairly
10       recent criminal trial?
11    A. Yes.
12    Q. When you saw him in the courtroom, did you recognize
13       him as someone who was a customer at the Longhorn
14       Steakhouse?
15    A. No.
16    Q. Do you recognize that person?
17    A. No.
18       MR. FARRAH: Can we have that marked as the next
19       exhibit, please?
20
21          (Exhibit Number 10 was marked for
22          identification.)
23
24    Q. Tell me what did the state trooper say to you when he

Page 59

1     came to your house?
2     A. He asked if I was working at Longhorn on the night of
3        the incident and I said yes.
4           He asked if I still worked there -- I said no --
5        that they tracked me to that address, and that the
6        ADA would be contacting me in the morning for
7        testimony.
8     Q. Approximately how much time did you spend in that
9        conversation with the state trooper?
10    A. Maybe ten minutes.
11    Q. Where were you living at that time?
12    A. At 60 Phillips Passway.
13    Q. Same place?
14    A. Yes.
15    Q. When was this that the state trooper came to your
16       house?
17    A. The night before I testified in the criminal trial.
18       I don't remember the exact date.
19    Q. Prior to that time, is it accurate to say that no
20       state troopers had spoken to you about this incident?
21    A. No.
22    Q. And no persons you understood to the prosecutors or
23       assistant district attorneys had spoken to you about
24       this incident prior to the night before you

Page 60

1     testified?
2     A. Correct.
3     Q. When did you first learn that someone who was a
4        patron at the Longhorn Steakhouse on September 26,
5        2003 had been involved in an automobile accident?
6     A. A few days later.
7     Q. A few days after the accident?
8     A. My next shift, which probably would have been
9        probably Wednesday night, a bartender at Longhorn
10       said she had heard someone left Longhorn, and after
11       they had been home they went back out and there was
12       an accident, but she didn't really know any details.
13          I didn't realize what had happened until I spoke
14       with the ADA.
15    Q. You were working the Wednesday, Friday, Saturday
16       shift at that time; is that right?
17    A. Right.
18    Q. Is it your best memory that it was not the next day
19       of that shift, i.e., Saturday, that you had the
20       conversation with the bartender that you worked with?
21    A. Right. It was later, the following week, so the
22       Wednesday shift probably.
23    Q. What is the name of the bartender with whom you had
24       that conversation?

| Page 61 |
|---|
| 1   A. Patty. |
| 2   Q. Patty what? |
| 3   A. Again, with your last names; I don't know. She is |
| 4       still employed by Longhorn. |
| 5   Q. How long had she been at Longhorn as of the time that |
| 6       you had that conversation with her? |
| 7   A. She has been there, I believe, since the restaurant |
| 8       opened. |
| 9   Q. What does she look like? |
| 10  A. She's an older woman, probably in, I would say, her |
| 11      fifties. She may be older than that. She's older. |
| 12  Q. And she's a bartender? |
| 13  A. Yes. |
| 14  Q. Is she the only bartender who is up in that |
| 15      stratosphere? |
| 16  A. Yes. |
| 17  Q. Are there any male bartenders who are that old? |
| 18  A. No. |
| 19  Q. Next to Patty in age, how old is the oldest |
| 20      bartender, male or female? |
| 21  A. Probably at that time, late twenties. |
| 22  Q. What did Patty tell you when you had that |
| 23      conversation with her? |
| 24  A. She had said that she heard that there was an |

| Page 6 |
|---|
| 1       Leigh had been waiting on? |
| 2   A. Just that, as I said previously, that she heard that |
| 3       there was an accident. She didn't really say any |
| 4       specifics. I don't know if she overheard anything. |
| 5   Q. While Leigh was serving that table, could you see |
| 6       that table, see the people at that table? |
| 7   A. Yes. |
| 8   Q. Let me ask you some more questions before we go into |
| 9       that. |
| 10      On the night in question, September 26, 2003, |
| 11      were there two or three bartenders working? |
| 12  A. There were three. |
| 13  Q. You're sure of that? |
| 14  A. Yes. That was the restaurant policy on Friday nights |
| 15      that we had three bartenders. |
| 16  Q. Because Friday is the busiest night of the week |
| 17      generally; is that right? |
| 18          MR. GILLIS: Objection. |
| 19  A. Friday and Saturday nights are -- When I worked there |
| 20      at that time, on Friday and Saturday nights, they |
| 21      would have three bartenders. |
| 22  Q. You were the service bartender; is that right? |
| 23  A. I was not designated as such. We would usually |
| 24      switch around. |

| Page 62 |
|---|
| 1       accident and that there were people that had been at |
| 2       Longhorn, and she said, "Remember that group of guys? |
| 3       I heard that this happened." |
| 4           I don't know where the information came from, |
| 5       and I just kind of brushed it off. |
| 6   Q. What did you say? |
| 7   A. I said, "That seems odd. Did it happen right when |
| 8       they left here," and she said no, he had been home |
| 9       for a while because I didn't recall anyone leaving |
| 10      the restaurant that was visibly intoxicated to me, |
| 11      and no one in the restaurant expressed that to me. |
| 12  Q. Did you say anything else to her during that |
| 13      conversation? |
| 14  A. No. |
| 15  Q. Did she say anything else to you? |
| 16  A. No. That was pretty much it. |
| 17  Q. What group of guys was she referring to? |
| 18  A. The tables that Leigh had been waiting on because I |
| 19      believe Patty was working with me that night. |
| 20          There were three bartenders on, and when I was |
| 21      serving Manhattans, I did ask Leigh how they appeared |
| 22      to her, and I spoke to the manager, as well, to check |
| 23      on them, and they all felt that they were fine. |
| 24  Q. What did Patty say about that group of guys that |

| Page 6 |
|---|
| 1   Q. Patty was working with you as a bartender that night; |
| 2       is that right? |
| 3   A. Yes. |
| 4   Q. And the third person was whom? |
| 5   A. I don't recall. Off the top of my head, probably |
| 6       either Rebecca or -- |
| 7           MR. GILLIS: Don't guess. If you're not sure, |
| 8       don't say anything. |
| 9   Q. Rebecca or who? |
| 10  A. I'm not sure; maybe Sean. |
| 11  Q. Sean? |
| 12  A. Yes, but I don't know. |
| 13  Q. As of September 26, 2003, how many bartenders were |
| 14      employed at the Longhorn Steakhouse? |
| 15  A. Off the top of my head -- |
| 16  Q. As many as fifty? |
| 17  A. No; less than ten. |
| 18  Q. Fewer than ten, okay. So we have you, Kristin. |
| 19      Patty was a bartender at that time; is that right? |
| 20  A. Yes. |
| 21  Q. Rebecca was a bartender; is that right? |
| 22  A. Yes. |
| 23  Q. Sean was a bartender? |
| 24  A. Yes. |

| Page 65 | Page 6 |
|---|---|
| 1 Q. Who else? | 1 A. I do not recall that. |
| 2 A. Cynthia. | 2 Q. I don't mean, for example, what tables a specific |
| 3 Q. Do you have any last names at this point? I know | 3 waitress had responsibility for. |
| 4 last names are not important in the restaurant | 4 What I'm asking for is, do you know, for |
| 5 business, but do you have any last names for me? | 5 example, the waitress that had responsibility for |
| 6 A. I don't. | 6 table 81 that night, what other tables she was |
| 7 Q. Cynthia was a bartender. Who else? | 7 responsible for? |
| 8 A. There was Travis, but he was in and out of Iraq, so I | 8 A. There would usually be about a four table sections |
| 9 don't know if he was home or not; I'm not sure. | 9 within that vicinity. |
| 10 Q. Anybody else that you can think of? | 10 Q. So it's your best sense that each waitress had |
| 11 A. Not that I can think of, no. | 11 responsibility for approximately four tables that |
| 12 Q. On Wednesday nights when you worked your three-day | 12 night; is that right? |
| 13 shift -- Wednesday, Friday and Saturday -- on | 13 A. Yes. |
| 14 Wednesday nights when you worked, was there another | 14 Q. Did the three bartenders who worked that night -- |
| 15 bartender who worked with you? | 15 yourself, Patty and whoever was the third |
| 16 A. Yes. | 16 bartender -- did you all work until closing? |
| 17 Q. Were there some nights when only one bartender worked | 17 A. No. |
| 18 a shift? | 18 Q. So is it accurate to say that one of the bartenders |
| 19 A. Perhaps on Monday nights when it was slower. | 19 was the bartender who came on at 4:00 and worked |
| 20 Q. During the daytime, was it generally one bartender on | 20 until things slowed down? |
| 21 the shift? | 21 A. I didn't realize that was a question. You're asking |
| 22 A. Yes. | 22 if one of the bartenders was a 4:00 to slowdown |
| 23 Q. Were the shifts broken down to a day shift and an | 23 period? |
| 24 evening shift? | 24 Q. Yes. |

| Page 66 | Page 6 |
|---|---|
| 1 A. Yes. | 1 A. Yes. |
| 2 Q. So the evening shift was 5:00 to 11:00, and the day | 2 Q. It was not Patty who was the 4:00 to slowdown person; |
| 3 shift was something like 11:00 to 5:00; is that | 3 is that right? |
| 4 right? | 4 A. I can't answer that. I don't know. |
| 5 A. Usually 10:00 to 4:00, and then there was someone | 5 Q. It was not you who was the slowdown person? |
| 6 that didn't close the bar, like 4:00 to whatever | 6 A. No. |
| 7 cutoff point, once things slowed down. Then there | 7 Q. Did you close the bar? |
| 8 was the closer. | 8 A. I did. |
| 9 Q. Okay. So the 4:00 to when things closed down | 9 Q. Did you close the bar with somebody or by yourself? |
| 10 portion, was that a help during the Happy Hour; is | 10 A. By myself. |
| 11 that right? | 11 Q. That was about 11:00 is your best memory? |
| 12 MR. GILLIS: Objection. | 12 A. Yes. |
| 13 A. During the dinner hour when there was a rush. | 13 Q. How far before 11:00 was it that the later of the two |
| 14 Q. Was there ever a Happy Hour at Longhorn? | 14 bartenders to leave the bar left? |
| 15 A. No. It's illegal in Massachusetts to serve drink | 15 A. I can't say for certain. Usually, it would be forty |
| 16 specials. | 16 minutes before. |
| 17 Q. So the answer is, as far as you know, Longhorn never | 17 Q. And how much before 11:00 when you closed the bar was |
| 18 had a Happy Hour while you were working there? | 18 it that the earlier of the two bartenders left? |
| 19 A. They did not. | 19 A. Anywhere from an hour to an hour and a half. |
| 20 Q. On that Friday night, if you know, how many | 20 Q. While the three of you were there working, all three |
| 21 waitresses were working? | 21 of you were there working, the three bartenders, is |
| 22 A. I'm not sure of an exact number; less than fifteen. | 22 it accurate to say that your responsibility was the |
| 23 Q. Less than fifteen, okay. Do you know what tables | 23 service bar? |
| 24 each waitress had responsibility for that night? | 24 A. My responsibility specifically? |

Page 69

1  Q. Yes.
2  A. No.
3  Q. Is it accurate to say that the service bar, during
4     the time that all three of you were there, was the
5     specific responsibility of any one of the three
6     bartenders who were working that night?
7  A. Yes.
8  Q. Whose?
9  A. I'm sorry. I misunderstood you. By "any one of the
10    three" I thought you meant any one of the three could
11    do it. We usually shared the responsibility of it.
12 Q. Was there any method to your sharing of
13    responsibility of it?
14 A. Usually, the bartender waiting on the tables 1, 2 and
15    3 would do service in addition to one of the
16    bartenders, but we all just helped out.
17       It was not a strict you must stay here and do
18    this type of thing.
19 Q. Were you the bartender waiting on tables 1, 2 and 3
20    that night?
21 A. No.
22 Q. Who was it?
23 A. I can't say. I don't recall.
24 Q. Did you pool your tips with Patty and the other

Page 70

1     bartender?
2  A. We did.
3  Q. Would you split the tips first when the earlier of
4     the two bartenders to leave left?
5  A. Yes.
6  Q. And then split with the later of the two bartenders
7     to leave whatever tips had been generated from when
8     the first one left and the second one was leaving at
9     that time?
10 A. Yes.
11 Q. Did any bartender of the three working that night
12    have responsibility for, let's say, the seats that
13    were the seven that were closer to the entrance door?
14 A. Not that I can say one person specifically had them.
15    We would try to split sides, but on a busy night we
16    would work together and be in communication of what
17    was going on and try to help each other out, but one
18    person would predominantly stay in that end of the
19    bar.
20 Q. Was that you that night, staying down at that end,
21    the end near the entrance?
22 A. I can't say for sure, but being the closer, I
23    probably spent more time around the bar area.
24 Q. As opposed to what?

Page 71

1  A. As opposed to the table area and the backed-up
2     service.
3  Q. When you say backed-up service, is it accurate to say
4     that one of the three bartenders was principally
5     responsible during the night for the service bar?
6  A. Yes. One person principally did that but helped with
7     other responsibilities.
8  Q. And the person who principally did that, am I
9     correct, was the person who also waited on tables 1,
10    2 and 3?
11 A. No.
12 Q. Okay. How did you decide who was principally
13    responsible for the service bar on the night of
14    September 26, 2003?
15 A. Ask who wanted to do it of the three of us. We would
16    split the tasks.
17 Q. Who did it?
18 A. I don't recall. I know I was involved in the
19    process, but I don't know.
20       I did it in addition to someone else. I can't
21    remember which other bartender was there with me.
22 Q. Before you went on duty that night, did you undertake
23    an Exact-O-Pour test?
24 A. I did not that night.

Page 72

1  Q. You did not that night?
2  A. I did not that night.
3  Q. When did you first realize that you hadn't done it
4     that night?
5  A. I don't think it was anything that I thought about.
6  Q. Typically, before you went on duty, did you undergo
7     an Exact-O-Pour test?
8  A. Not every shift, but it was done.
9  Q. Half the time?
10 A. Yes; usually once or twice a week it was brought out
11    and done.
12 Q. When you were making the drinks in the service bar
13    area, you were free pouring the drinks; isn't that
14    right?
15 A. Yes.
16 Q. And there was no mechanism for pouring a specified
17    amount of alcohol at the Longhorn Steakhouse on
18    September 26, 2003; isn't that right?
19       MR. GILLIS: Objection. What do you mean by
20    "mechanism"? Like a shot glass or one of those big
21    things you pour in the bottle?
22 Q. You had a jigger glass there; isn't that right?
23 A. Right. We had measuring tools.
24 Q. But you didn't use those that night; isn't that

Page 73

1  right?
2      MR. GILLIS: Objection.
3  Q. The measuring tools.
4  A. I did not use them on the Manhattans because the
5    glass only holds the set amount of alcohol that it
6    takes.
7      It's a lot easier to measure those than if
8    you're pouring them into a glass of ice. The glass
9    only holds a certain amount of alcohol.
10 Q. Did you have any sort of apparatus available for
11   measuring alcohol on the night in question?
12 A. Yes.
13 Q. What was that?
14 A. The measuring cups. "Cups" is not the word I'm
15   looking for.
16     (Off the record.)
17 Q. I need to get a little clearer in my mind how things
18   worked, so if you'll excuse me.
19     Was there no agreement in place between the two
20   other bartenders working that night and you as to who
21   would be responsible for the service bar?
22 A. I can't recall if we decided on one specific person.
23 Q. Was the choice of who would work the service bar that
24   night one that was made by the three bartenders?

Page 74

1  A. Yes.
2  Q. Who was the manager on duty that night?
3  A. I believe Chuck Noonan.
4  Q. And in addition to Mr. Noonan, the three bartenders,
5    the fifteen or so waitresses, the kitchen staff, and
6    the bus staff --
7  A. We don't have a bus staff.
8  Q. Who else was on duty that night?
9  A. Probably two or three hostesses.
10 Q. And what are their names?
11 A. I have no idea who was working that night for
12   hostesses.
13 Q. What are the names of some of the hostesses that you
14   remember were working at that time?
15 A. I can't recall any of their names, I'm sorry.
16 Q. That's fine.
17 A. Hostesses usually don't last long in restaurants.
18 Q. Why?
19 A. Being a hostess is kind of -- Most people do it just
20   to get in to become a server. So it has a quick turn
21   around, and at the Longhorn, hostesses bussed tables
22   as well.
23 Q. It's your memory that there were probably two
24   hostesses on duty that night?

Page 7

1  A. Yes. At least two, probably closer to three.
2  Q. What were their responsibilities, other than bussing
3    tables?
4  A. Greeting guests at the door, opening the door, saying
5    goodbye when they left, taking names for our waiting
6    list.
7  Q. How did the waiting list operate? Were people given
8    a beeper or anything like that?
9  A. Yes. They were given a square pager that vibrates
10   when the numbers are called.
11 Q. We have not identified one of the most important
12   pieces of equipment in the restaurant yet on
13   Exhibit 8, and that is the cash register.
14     Where were the cash registers located in the
15   area of the bar?
16 A. Right there, in the middle.
17 Q. Okay. So can we just write in "CR" for cash
18   register?
19     Was there one register for the bar?
20 A. Yes.
21 Q. Correct me if I am wrong in this statement. The cash
22   register handled all the transactions between the bar
23   customers whether they were seated in stools or
24   standing in the bar area and the customers at tables

Page 7

1  1, 2 and 3; is that right?
2  A. Yes.
3  Q. Nobody else?
4  A. Nobody else.
5  Q. Approximately how much money was generated that night
6    in receipts at that register?
7  A. I can't say. We didn't have access to that
8    information.
9  Q. When you closed up the bar that night at 11:00, tell
10   me what you did.
11 A. I did all the cleaning, restocking; my tips, I
12   counted out. The managers handled all the
13   registers -- printing out the balances, the tapes.
14   They took all the money and counted it. So I have no
15   idea.
16 Q. So is it correct to say, as you sit here today, that
17   you have never known how much money was generated by
18   the bar on any night that you worked at the Longhorn?
19 A. I would say that.
20 Q. You don't know whether it was $100 or $10,000; is
21   that right?
22 A. I mean, I can judge based on if we were busy. If I
23   had two people at the bar on Wednesday night, then I
24   can know. Using your tips is another judge.

| Page 77 |
|---|
| 1  Q. My next question.  Approximately how much money did |
| 2     you make in tips that night? |
| 3  A. I can't say that night specifically.  Most Friday |
| 4     nights -- |
| 5         MR. GILLIS: If you don't know, you don't know. |
| 6  Q. Typically, what would the range of tips be on a busy |
| 7     Friday night for you closing up the bar? |
| 8  A. Anywhere between $100 and $200. |
| 9  Q. Did the waitresses share tips with the bartenders? |
| 10 A. They did. |
| 11 Q. And what was the formula by which the waitresses |
| 12    shared tips with the bartenders? |
| 13 A. It was the percentage of their liquor sales, and I |
| 14    don't recall the exact percentage. |
| 15 Q. And who established that percentage? |
| 16 A. I believe it was corporate policy. |
| 17 Q. Longhorn? |
| 18 A. Yes. |
| 19 Q. Was that procedure of the waitresses sharing their |
| 20    tips with the bartender in place when you started at |
| 21    Longhorn? |
| 22 A. Yes. |
| 23 Q. To your knowledge, did the procedure change at all |
| 24    from when you started until September 26, 2003? |

| Page 79 |
|---|
| 1     correct amount; is that right? |
| 2  A. Yes. |
| 3  Q. By the way, as of September 26, 2003, you were the |
| 4     most junior of the three bartenders working that |
| 5     night; is that right?  By "junior," I mean in terms |
| 6     of tenure at Longhorn. |
| 7  A. That sounds correct. |
| 8  Q. Would that make it more likely that you would be the |
| 9     bartender who would be in the service bar? |
| 10 A. Not necessarily, no. |
| 11 Q. Which is thought to be more difficult to do -- |
| 12    service bar or dealing with the customers directly at |
| 13    the bar -- if you have a feeling? |
| 14 A. Two different jobs. |
| 15 Q. Okay.  Do you know how the waitresses determined how |
| 16    much of their sales had been liquor sales? |
| 17 A. It would appear on a printout. |
| 18 Q. Which printout? |
| 19 A. Their final when they closed out at the end of the |
| 20    night. |
| 21 Q. How do you know that? |
| 22 A. From times I had served. |
| 23 Q. You worked as a waitress from time to time; is that |
| 24    right? |

| Page 78 |
|---|
| 1  A. No. |
| 2  Q. After September 26, 2003 and until you left Longhorn, |
| 3     did that procedure change at all? |
| 4  A. No. |
| 5  Q. How about the percentages?  To your knowledge, did |
| 6     the percentages change at all from when you started |
| 7     at Longhorn until you left? |
| 8  A. I can't say because I was not aware of what the |
| 9     percentage was. |
| 10 Q. Tell me physically how the money got from the |
| 11    waitress to the bartender. |
| 12       The money I'm talking about is the percentage of |
| 13    the waitress's liquor sales that they shared with the |
| 14    bartender as a tip. |
| 15 A. They would usually hand it to me. |
| 16 Q. At the end of the night? |
| 17 A. When they were leaving, yes. |
| 18 Q. They would come to you and say something like, "I did |
| 19    $100 in liquor sales.  Here's your share"? |
| 20 A. No; just "Thank you" and hand me the money. |
| 21 Q. And you never checked whether they had given you the |
| 22    correct amount; is that right? |
| 23 A. Correct. |
| 24 Q. You just accepted that they were giving you the |

| Page 80 |
|---|
| 1  A. Yes. |
| 2  Q. When did you work as a waitress? |
| 3  A. Near the end, the last few months that I worked |
| 4     there, I picked up some waitressing. |
| 5  Q. Describe for me on those nights that you worked as a |
| 6     waitress what procedure you went through to determine |
| 7     how much of your sales were liquor? |
| 8  A. I would ask someone I worked with.  I would just say, |
| 9     "Here's my liquor sales.  What should I give the |
| 10    bar," and they would say, "Give five dollars."  So I |
| 11    never learned a percentage. |
| 12 Q. What I want to know is -- I am not so interested in |
| 13    the percentage, but I am interested in knowing how |
| 14    you determined what your liquor sales were. |
| 15       How did you do that? |
| 16 A. It says "liquor" and then a dollar amount beside it. |
| 17 Q. What says that? |
| 18 A. The printout at the end of your shift. |
| 19 Q. What printout are you talking about? |
| 20 A. When you go to check out, it prints a whole slip with |
| 21    the time you clocked in, the time you're clocking |
| 22    out, your name, how many credits cards you had, cash, |
| 23    what you owe the restaurant, and it would break down |
| 24    food and liquor. |

| | Page 81 |
|---|---|
| 1 | Q. And when you go to check out, what do you do to go |
| 2 | check out? |
| 3 | A. After that, you take your money and your slips to the |
| 4 | manager, and they check it, count it, check out your |
| 5 | credit card slips. |
| 6 | Q. On the nights that you worked as a waitress and you |
| 7 | were going to check out, as you just described a |
| 8 | little bit for us, physically where did you go to |
| 9 | check out? |
| 10 | A. To the office. |
| 11 | Q. And the manager is there waiting for you; is that |
| 12 | right? |
| 13 | A. Yes. |
| 14 | Q. And you are carrying something when you go see the |
| 15 | manager; is that right? |
| 16 | A. Yes. |
| 17 | Q. What are you carrying? |
| 18 | A. Cash, credit card slips. |
| 19 | Q. What else? |
| 20 | A. And the printed checkout sheet. |
| 21 | Q. And you have taken possession of the printed checkout |
| 22 | sheet how? |
| 23 | A. You print it on the monitor when you go to check out, |
| 24 | when you clock out. I can't remember if it printed |

| | Page 82 |
|---|---|
| 1 | automatically or if you hit "printout." |
| 2 | Q. The monitors that you printed it on when you would go |
| 3 | to check out are located where? |
| 4 | A. Four in the restaurant and one behind the bar. |
| 5 | Q. Do you know what I want you to do? |
| 6 | A. Mark where the monitors are. |
| 7 | Q. Yes. Put little "M's" in orange. |
| 8 | (Witness complies.) |
| 9 | Q. And on those nights when you worked as a waitress, |
| 10 | you mentioned something about checking in. What does |
| 11 | that entail, checking in? |
| 12 | A. Clocking in. Usually, it was the last four digits of |
| 13 | your Social Security number. You punch it in and a |
| 14 | little slip prints. |
| 15 | Q. Punch it into any monitor? |
| 16 | A. Yes. |
| 17 | Q. To the best of your understanding, that was how the |
| 18 | time at which you started work on that night was |
| 19 | established; is that right? |
| 20 | A. Yes. |
| 21 | Q. Then on the nights you worked as a waitress, while |
| 22 | you were serving customers, how did you use the |
| 23 | monitors, if at all? |
| 24 | A. To bring in drinks, food, appetizers, desserts. Any |

| | Page 83 |
|---|---|
| 1 | transaction at all was done at those monitors -- |
| 2 | cashing out, checks, credit card, everything. |
| 3 | Q. So if you were the waitress who was responsible for |
| 4 | table 96 on Exhibit 8, after you took an order from |
| 5 | that table, you might walk to the monitor closest to |
| 6 | that table and punch in that order; is that right? |
| 7 | A. If it was available to be used. |
| 8 | Q. But if there were a line of others waiting to use |
| 9 | that monitor, you could use any of the other monitors |
| 10 | to punch in your order; is that right? |
| 11 | A. Yes. |
| 12 | Q. To the extent that what you were ordering at the |
| 13 | monitor were drinks, am I correct that that |
| 14 | information would somehow magically be delivered to |
| 15 | the service bar? |
| 16 | A. Yes. |
| 17 | Q. So did you have a monitor at the service bar? |
| 18 | A. Just a small little receipt printer that would print |
| 19 | up what we would call tickets that had the table |
| 20 | number and drinks. |
| 21 | Q. How big was a ticket back September 26, 2003? |
| 22 | A. It depends on how many drinks are on it when we tear |
| 23 | it. I think if a ticket was a one drink, it was a |
| 24 | lottery ticket size. |

| | Page 84 |
|---|---|
| 1 | Q. The width of the ticket receipt? |
| 2 | A. Guessing, three-and-a-half inches. |
| 3 | Q. And the length of the ticket receipt really depended |
| 4 | upon how many drinks were on that ticket receipt; is |
| 5 | that right? |
| 6 | A. Correct. |
| 7 | Q. And the receipt was noticed to the service bartender |
| 8 | that a particular waitress needed a particular drink |
| 9 | or drinks; is that right? |
| 10 | A. Yes. |
| 11 | Q. And what happened to the receipt once the drinks were |
| 12 | made by the service bartender? |
| 13 | A. The receipt was put either on top of the drink or |
| 14 | stuck to the side of the drink. |
| 15 | Q. So once the drinks were made, the receipt that had |
| 16 | generated the making of those drinks was placed in |
| 17 | some proximity to those drinks; is that right? |
| 18 | A. Yes. |
| 19 | Q. When the waitress or waiter -- Any waiters there? |
| 20 | A. Yes. |
| 21 | Q. -- took the drinks, did they take the receipt with |
| 22 | them typically? |
| 23 | A. No. They were supposed to stab it on the little |
| 24 | spindle. |

Page 85

1  Q. That was their job?
2  A. Yes.
3  Q. Do you have any way to quantify for me how many
4     drinks were made -- and by "made" I mean made, poured
5     or layered -- by the service bartender or bartenders
6     the night of September 26, 2003?
7  A. I don't know that off the top of my head, no.
8  Q. Describe in your own words how busy the service bar
9     was the night of September 26, 2003, if at all.
10 A. Very busy.
11 Q. Nonstop?
12 A. Nonstop.  Tickets come out.  Servers wait sometimes
13    ten minutes or longer for drinks because in addition
14    to doing that, we have the bar customers and tables.
15       So they can end up waiting a little bit from the
16    time they ring in their drinks for us to serve them.
17 Q. Why did you leave the Longhorn?
18 A. I went to Slattery's to work because I was looking
19    for more of a bar atmosphere to get into, less of a
20    restaurant style.
21 Q. More tips?
22 A. Yes.
23 Q. And without getting into personal information, the
24    tips are greater at Slattery's, better than the $100

Page 86

1     to $200 a night that you might make on a busy Friday
2     night?
3  A. Yes.
4  Q. While they were waiting for their drinks, was there a
5     place where the servers could wait?
6  A. While they were waiting for their drinks, they would
7     be getting salads or bread.  They would get their own
8     soda drinks and some waters.
9        Usually, they would do all those things while
10    they waited for drinks to come up.
11 Q. You made at least some of the drinks for Leigh that
12    night, Leigh Chabot; is that right?
13 A. Yes.
14 Q. And you made at least some of the Jack Daniels
15    Manhattans that were delivered to table 52; is that
16    right?
17 A. Yes.
18 Q. Do you know whether you made all the Jack Daniels
19    Manhattans that were delivered to table 52?
20 A. I do not.
21 Q. I'm going to show you a document, and I do have a
22    copy of this one for you.
23       Do you recognize that document that I just
24    handed you?

Page 8

1  A. Yes.  It's a check from Longhorn.
2  Q. The first page you recognize?
3  A. Yes.
4  Q. You do not recognize the remaining pages?  Take your
5     time.
6  A. This stuff managers would have access to.
7        MR. FARRAH:  Let's have this marked.
8
9        (Exhibit Number 11 was marked for
10       identification.)
11
12 Q. The first page of Exhibit 11, what do you recognize
13    that as?
14 A. A check for a table.
15 Q. And it's actually a check for table 52/1 9/26/2003;
16    is that right?
17 A. Yes.
18 Q. Leigh is the server?
19 A. Yes.
20 Q. There are six guests according to this check at
21    least; is that right?
22 A. Yes.
23 Q. What does the number "20043" mean?
24 A. I have no idea, probably the check number.

Page 8

1  Q. Is the first page of Exhibit 11 what a check
2     delivered to the customer at Longhorn would look like
3     at the time of payment?
4  A. Yes, just smaller.
5  Q. Do you understand that the table the transactions
6     with which are reflected on the first page of
7     Exhibit 11 was table 52 shown on Exhibit 8?
8  A. Yes, but with more than four people.  They would have
9     added one of these tables to it.
10 Q. When more than four people wished to sit at a table,
11    was one of the options available at Longhorn to push
12    two tables together?
13 A. Yes.
14 Q. And if you know, does the reference 52/1 mean that
15    table 52 and 51 were pushed together?
16 A. I don't know if there was any means for marking that
17    on the check or not.
18 Q. On the night in question when you were serving Leigh
19    at least some of the Jack Daniels Manhattans, did you
20    know where those Jack Daniels Manhattans were going?
21 A. I just knew based on the table number that was on the
22    slip.
23 Q. That it was going to table 52; is that right?
24 A. Yes.

**Page 89**

1  Q. And as you sit here today, do you have a memory of
2     talking to Leigh about any of those orders that she
3     made for table 52 on September 26, 2003?
4  A. Yes.
5  Q. When is the first time that anyone asked you a
6     question like that, other than lawyers?
7  A. I don't think anyone has. Can you restate that? I
8     don't know if I am following you.
9       MR. GILLIS: I object. That's assuming someone
10    has asked it previously.
11  Q. Well, this may be an unfair question to ask you.
12     When did you first realize that you had a memory of
13     conversations you had with Leigh on September 26,
14     2003 about that table?
15  A. When it was brought to my attention by my co-worker
16     Patty that she had heard something happened. That
17     sort of froze the night in my mind.
18  Q. So when Patty said to you something about that table;
19     is that right?
20  A. Yes.
21  Q. And you knew which table Patty was talking about when
22     she said that table; is that right?
23       MR. GILLIS: Objection.
24  A. I knew that it was the Manhattans that I had made.

**Page 90**

1  Q. Why did you know that?
2  A. Because I had asked Leigh about the table and I had
3     the manager go over as well, and they both came back
4     and said that they were fine.
5       It just stuck out in my mind because she had
6     said that to me. If she had never said anything to
7     me, I probably wouldn't.
8  Q. If Patty had never said anything to you?
9  A. Yes. I probably would not have thought about it
10    again.
11  Q. Patty saying that to you triggered in your mind the
12     conversations that you had with Leigh that night
13     about the people she was serving?
14       MR. GILLIS: Objection.
15  A. Not immediately, specifically that conversation, but
16     I just sort of went over the night in my mind.
17  Q. Let me ask you this. The first conversation you had
18     with Leigh about that table, the people at table 52,
19     what did you say and what did she say?
20  A. I said, "How many people are at the table? Are they
21     eating?"
22       She said they had ordered food, and I said,
23     "Okay. Just make sure that they're eating food with
24     this because it's the second round of drinks."

**Page 91**

1  Q. So the first conversation you had with Leigh about
2     that table was in connection with the second round of
3     drinks that were made for that table; is that right?
4       MR. GILLIS: Objection. Are you asking her the
5    second round that she's aware of, or the second round
6    in total? That's why I objected.
7  A. I can't say for sure. I just remember at one point
8     when I was giving her the drinks, I wanted to make
9     sure that they had eaten.
10  Q. Have you reviewed records now to know how many Jack
11     Daniels Manhattans were served to that table?
12  A. Yes. It's on what you just showed me. It's in
13     Exhibit 11.
14  Q. Have you reviewed records to know the breakdown of
15     those seventeen Jack Daniels Manhattans?
16  A. What do you mean by "breakdown"?
17  Q. How many were served at a particular time and when?
18  A. It says the times the stuff was brought out.
19  Q. My question to you is, have you reviewed any records
20     that indicate to you how many Jack Daniels Manhattans
21     were served the first round and each subsequent
22     round?
23  A. I was made aware of some time frames for the criminal
24     case. The ADA went over some frames with me.

**Page 92**

1  Q. Is it accurate to say that you have a memory of
2     having a conversation with Leigh Chabot about a round
3     of Jack Daniels Manhattans that you prepared for her?
4  A. Yes.
5  Q. And do you know whether that was the first round of
6     Jack Daniels Manhattans that was served to table 52?
7  A. I don't know.
8  Q. Do you know whether it was the second round of Jack
9     Daniels Manhattans that was served to table 52?
10  A. I don't know.
11  Q. Do you know whether it was the third round of Jack
12     Daniels Manhattans that was served to table 52?
13  A. It was sometime of the first two that I spoke to her.
14  Q. It was not the first round, was it?
15  A. No. It was between the first and second.
16  Q. You mean --
17  A. When the ticket came in for the second round, I asked
18     her if they were eating.
19  Q. Is it your memory that the ticket for the second
20     round of Jack Daniels Manhattans was for seven Jack
21     Daniels Manhattans?
22  A. I don't recall the exact number, but I know it was
23     for a large table.
24  Q. How did you know it was the second round of Jack

Page 93

1     Daniels Manhattans that generated that conversation
2     with Leigh?
3         How do you know that it was the second round of
4     Jack Daniels Manhattans?
5   A. I can't say for sure.
6   Q. Is it your memory that you had made a prior round of
7     Jack Daniels Manhattans for Leigh for that table
8     before you had the conversation with her?
9   A. It is my memory that I made drinks for her.
10  Q. If you can answer that question, is it your memory
11    that before the conversation with Leigh about is this
12    table all right, that you had made a prior round of
13    drinks for that table?
14  A. I would say yes, if I asked her about it.
15  Q. Let me ask you this. When the ticket came in to make
16    Jack Daniels Manhattans for table 52, did the ticket
17    tell you how many people were seated at table 52?
18  A. I don't recall if it says a number or not, but I know
19    from having served that you don't have to put in the
20    number of people, like you could have more people
21    even though it says six people.
22        I've done parties of eight, and it says one
23    guest because I rang it all on one receipt.
24  Q. But did you know when the ticket came in for table 52

Page 94

1     that table 52 contained more than four guests?
2   A. Only one drink would be served per guest.
3   Q. That's not my question. Did you know when the ticket
4     came in to make Jack Daniels Manhattans for table 52
5     whether table 52 contained more than four guests?
6   A. If there were more than four drinks on the ticket,
7     then yes.
8   Q. And that is because the company has a policy that you
9     cannot have more than one drink per person served at
10    a particular time?
11  A. Yes, and it's also Massachusetts law.
12  Q. Does the company have a policy as to how much time
13    needs to elapse between the service of one drink and
14    then the service of another drink to a customer?
15  A. I don't think they followed a set timeline, but I'm
16    just looking on this.
17        The time from when she rings them in to the time
18    you get them, more time goes by as far as her ringing
19    it, in waiting at the service bar doing other things.
20    She had other tables.
21        So a lot of things end up timing out drink
22    service without there being a set guideline.
23  Q. You testified earlier that waitresses could wait as
24    much as ten minutes for their drink; do you remember

Page 95

1     that?
2   A. Yes.
3   Q. On a Friday night, when is it that the waitresses are
4     waiting the longest?  When does it really bunch up?
5   A. That's hard to say.  Many things play a factor --
6     weather, time of year.
7         In the summer months, early fall, we are busier
8     towards the later because people are outside longer.
9     In December, the dinner-hour rush is earlier.
10  Q. In the late September time frame, when would it
11    really bunch up?
12  A. Probably solid from 7:00 to 10:00, right through,
13    very busy.
14  Q. Are you familiar with the computer system?
15  A. Yes.
16  Q. Look, if you would, with me at the second page of
17    Exhibit 11.
18        Are you familiar with the audit report document,
19    that form of document?
20  A. I had not seen one.  This is manager operations.
21  Q. Am I correct that you identified an exhibit at the
22    criminal trial of Jeffrey Southworth?
23  A. I think I remember them showing me something; I don't
24    recall specifically what.

Page 96

1   Q. Let's look at the second page of Exhibit 11 at the
2     bottom, "8:40 p.m. order items."  Do you see that
3     order entry?
4   A. Yes.
5   Q. Does the transaction type order items, does the time
6     of that transaction type at 8:40 indicate to you that
7     at 8:40 Leigh punched in that order at a monitor?
8   A. Yes.
9   Q. And not saying it did, but it could have been as much
10    as ten minutes later, 8:50, that Leigh actually got
11    that drink from you; is that right?
12  A. Correct.
13  Q. And then she would still need to deliver that drink
14    to the table; is that right?
15  A. Correct.
16        MR. FARRAH:  Is this a good spot to stop?
17        MR. GILLIS:  Yes.
18        MR. FARRAH:  We'll suspend until 11:00 next
19    Thursday.
20
21        (Whereupon the deposition was suspended at
22    2:00 p.m.)
23
24

Page 97

1      SIGNATURE PAGE/ERRATA SHEET

2      RE: Nancy Rosario, Individually, as she is the
          Administratrix of the Estate of Awilda Santiago,
3          Essex Probate Court Docket #03P-2499AD1,
          P/P/A Veronica Rosario and Christina Santiago,
4          and as she is the Administratrix of the Estate
          of Jose Santiago, Berlin (Connecticut) Probate
5          Court, Case #03-0713

6      December 8, 2004
       Deposition of Kristin O'Donnell

7

8          I, KRISTIN O'DONNELL, do hereby certify that I
       have read the foregoing transcript of my testimony
9      and further certify that it is a true and accurate
       record of my testimony (with the exception of the
10     following changes listed below):

11     Page   Line            Correction

12     ____   ____    _____

13     ____   ____    _____

14     ____   ____    _____

15     ____   ____    _____

16     ____   ____    _____

17     ____   ____    _____

18     ____   ____    _____

19     ____   ____    _____

20     ____   ____    _____

21        Signed under the pains and penalties of perjury

22     this _____ day of _____, 2005.

23

24                  _____
                       Kristin O'Donnell


Page 98

1          C E R T I F I C A T E

2      COMMONWEALTH OF MASSACHUSETTS

3      COUNTY OF MIDDLESEX, SS

4

5          I, BARBARA J. SIMON, a Professional Shorthand
       Court Reporter and Notary Public in and for the
6      Commonwealth of Massachusetts, do hereby certify that
       the foregoing deposition of Kristin O'Donnell, was
7      taken before me on Thursday, December 8, 2005. The
       said witness was satisfactorily identified and duly
8      sworn before the commencement of her testimony; that
       the said testimony was taken stenographically by
9      myself and then transcribed by myself. To the best
       of my knowledge, the within transcript is a complete,
10     true and accurate record of said deposition.

11         I am not connected by blood or marriage with any
       of the said parties, nor interested directly or
12     indirectly in the matter in controversy.

13         In witness whereof, I have hereunto set my hand
       this 19th day of December, 2005.

14

15

16                  _____
                       Barbara J. Simon, Notary Public
17                     My Commission Expires:
                       November 6, 2009
18

19

20

21

22

23

24

# BAR GLASSWARE

## GLASSWARE                                    ## USAGE

Libbey #15245                                   Liquor drinks w/no mixer

3 dozen per case            Drinks Served on the Rocks

7 oz. Rocks                                     Drinks Served with a Splash

                                                Shooters with cream or Juice mixer


Libbey #15243                                   Juice Drinks

3 dozen per case            Collins

12 oz. Rocks                                    Sours

                                                2 Liquor cream drinks

                                                Drinks w/ soda gun mixer


Libbey #8455                                    All chilled up cocktails

3 dozen per case            Martini, Manhattan, Gimlet & Gibso

6 oz. Cocktail Glass                            Martinis Up

                                                Sours Up

                                                Margaritas Up

Libbey #3965

3 dozen per case

8.5 oz. Wine Glass



Wine/Champagne by the Glass

Libbey #3705

2 dozen per case

12 oz. Snifter Glass



Aromatic Liqueurs

Brandies

Cognac

| NAME<br>GARNISH | METHOD<br>CAT. | INGREDIENTS | | |
|---|---|---|---|---|
| KIR ROYALE<br><br>Wine Glass | Build | 6 oz. Champagne Split<br>½ oz. Chambord | Lemon twist | Cham-<br>pagne |
| LONG BEACH<br>ICED TEA<br><br>14 oz. Tall Rocks | Mix | 2oz. Desert Island Tea Mix<br>4oz. Sweet/Sour<br>Fill to ¼ " from top with 1 oz.<br>Cranberry Juice. | Lemon squeeze | Liquor<br>Special |
| LONG ISLAND<br>ICED TEA<br><br>14 oz. Tall Rocks | Mix | 2 oz. Desert Island Tea Mix<br>4 oz. Sweet/Sour<br>Fill to ¼ " from top with 1 oz.<br>Coke | Lemon squeeze | Liquor<br>Special |
| JACKALOPE TEA<br><br>14 oz. Tall Rocks | Mix | 1oz. Jack Daniels<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |
| RAZZMATAZZ<br>TEA<br><br>14 oz. Tall Rocks | Mix | 1oz. Dekuyper Razzmatazz<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Sprite | Lemon Wedge | $5.25 |
| LIMON-ADE TEA<br><br>14 oz. Tall Rocks | Mix | 1oz. Bacardi Limon Rum<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |

| MAI-TAI | Mix | 1¼ oz. House Rum | Orange, Cherry | Liquor |
| 12 oz. Mug | | ¾ oz. Triple Sec | Flag | Special |
| | | 2 oz. Sweet/Sour | | |
| | | ½ oz. Grenadine | | |
| | | 1 oz. Orange Juice | | |
| | | 1 oz. Pineapple Juice | | |
| | | Float 151 | | |
| MANHATTAN | Build | 2 oz. House Bourbon | Cherry | Call |
| 7 oz. Rocks | | ¼ oz. Sweet Vermouth | | |
| MANHATTAN-DRY | Build | 2 oz. House Bourbon | Lemon twist | Call |
| 7 oz. Rocks | | ¼ oz. Dry Vermouth | | |
| MANHATTAN PERFECT | Build | 2 oz. House Bourbon | Lemon twist | Call |
| 7 oz. Rocks | | Equal parts Sweet and Dry Vermouth | | |

| NAME GARNISH | METHOD CAT. | INGREDIENTS | | |
| --- | --- | --- | --- | --- |
| MANHATTAN UP | | 2 oz. House Bourbon | Cherry sword | Call |
| 6 oz. Cocktail | | ¼ oz. Sweet Vermouth | | |
| With ice, build in mixing glass, stir until glass is foggy. Strain into chilled | | | | |

cocktail glass.

| | | | | |
|---|---|---|---|---|
| MARGARITA (HOUSE) 12 oz. Mug | Build | 1 1/4 oz. Cuervo Gold<br>¾ oz. Triple Sec<br>Lime Juice<br>½ oz. Sweet/Sour<br>4 oz. | Salt Rim<br>Lime Squeeze | Call |
| MARTINI 6 oz. Cocktail | Build | 2 oz. House Vodka or Gin<br>Dash of Dry Vermouth<br><br>**Martini Dry**: Less than a dash.<br>**Martini Extra Dry**: NO Vermouth<br>**Martini Dirty**: Dash olive juice | Two queen size olives sword or lemon twist | Call |
| MARTINI-UP 6 oz. Cocktail With ice, build in mixing glass, stir until glass is foggy. Strain into chilled cocktail glass. | | 2 oz. House Vodka or Gin<br>Dash of Dry Vermouth<br><br>**Martini Dry**: Less than a dash.<br>**Martini Extra Dry**: NO Vermouth<br>**Martini Dirty**: Dash olive juice | Two queen size olives sword or lemon twist | Call |
| LONGHORN GREEN APPLE | Chill | 1 ¼ oz. Grey Goose Vodka | No garnish | Special Liquor |

| MARTINI | | 1 ¼ oz. Dekuyper Apple Pucker | | +$.50 |
|---|---|---|---|---|
| 6 oz. Cocktail glass | | | | |
| | Mix/Strain | | | |

| TANQUERAY NO. TEN MARTINI | Chill | 2 oz. Tanqueray No. Ten Gin | Two green olives | Special Liquor |
|---|---|---|---|---|
| 6 oz. Cocktail glass | | ¼ oz. Dry Vermouth | | +$.50 |
| | Mix/Strain | | | |

| MIMOSA | Build | 6 oz. Champagne Split | Orange slice | Cham-pagne |
|---|---|---|---|---|
| Wine Glass | | 1 oz. Orange Juice | | |

| MUDDY RIVER | Mix | ½ oz. Vodka | | Prem. |
|---|---|---|---|---|
| 7 oz. Rocks | | ½ oz. Kahlua | | |
| | | ½ oz. Bailey's | | |

# <u>Drink Making Techniques</u>

- Fill your glass to the top with ice. Always full, not overflowing.
- When in doubt, look up the recipe.
- Follow proper drink making techniques.
- Fill drinks to proper serving Level. All drinks ¼" from the lip of the glass.
- Use fresh and proper garnishes.
- Check back with guest to see how the drink tastes.

<u>Blender Technique</u>: **ISLAND OASIS**

1. Fill ice hopper to within one inch of the top with cube ice. Be sure ice is free of any debris such as bottle caps. These can jam the machine and cause damage to the shaver blade.
2. Place cover on ice hopper and turn on power.
3. Use the Island Oasis measuring cup and pour the amounts of mix and liquor needed into the blender cup.
4. Place the blender into the blender base. Press the drink button and wait until blender cycle comes to a complete stop.
5. Remove the blender cup and pour the cocktail into your glass and garnish.

There should not be any over pour!  Practice, Practice, and Practice.

If you find the drink to be too thick you need to add more mix when putting in the liquid Ingredients.  If the drink is too runny, less mix should be used when adding the liquid Ingredients.  To insure a perfect pour, pay attention to the level of the liquid ingredients. The amount of ice should never change.

Examples: Frozen Margarita, Pina Colada, Strawberry Daiquiri.

<u>Build Technique</u>: The build technique is used with any drink that we pour the ingredients directly into the glass it is served in.   Fill the glass completely with



*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

**EDWARD A. FLYNN**
*SECRETARY*

**COLONEL THOMAS J. FOLEY**
*SUPERINTENDENT*

**Collision Analysis and Reconstruction Section**
**485 Maple Street**
**Danvers, MA 01923**
**978.538.6065**

To:  **Lieutenant Stephen R. Benanti**
     **Commanding Officer, C.A.R.S.**

From:  **Trooper Kerry A. Alvino #1374**

Subject:  **Two Vehicle Rear-End Double Fatal Collision**

Sir,

**01.**     The following reconstruction report summarizes an investigation conducted at the request of and in conjunction with the MA State Police A-3 Concord Barracks. The scope of this Trooper's involvement was limited to the reconstruction of the collision.

## SYNOPSIS

**02.**     It should be noted that the following synopsis is nothing more than a brief outline or general summary of the facts surrounding the events that occurred on Saturday, 27 September 2003 at approximately 0010 hours. This synopsis should not be considered a factual report of what actually transpired, but rather be employed to gain an overview of what occurred. The purpose of this synopsis is to assist the reader of this report in understanding the kinematics of the collision delineated here.

**03.**     On Saturday, 27 September 2003 at approximately 0010 hours, **Jose A. Santiago**, H/M, DOB 4-19-70, OLN [MA] 584834267 (status "suspended" as of 12-12-94), of 112 Beaver Street in New London, CT was traveling on Route 495 SB in the town of Westford. He was operating a 1993 Honda Accord bearing PA registration FCF5450 (hereinafter referred to as the "Honda" or the "Accord"). The Honda is owned by Luz I. Diaz of 831 Elm Street in Reading, PA. Mr. Santiago had the following four passengers in the Honda:

    1. Julia M. Schmidt, DOB 3-25-80, of 86 Gold Street, 1st floor, in New London, CT, the girlfriend of Jose Santiago, was seated in the right front passenger seat.
    2. Christina Santiago, DOB 5-23-91, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the right rear passenger seat.

*Excellence In Service Through Quality Policing*    Santiago 44

       3. Awilda Santiago, DOB 6-16-90, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the middle rear passenger seat.

       4. Veronica Rosario, DOB 5-16-92, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the left rear passenger seat.

Mr. Santiago had picked his three daughters up in Lawrence and was taking them to his home in Connecticut to spend the weekend with them.

**04.**       Simultaneously, **Jeffrey T. Southworth**, W/M, DOB 1-13-81, OLN [MA] S78712050 (status "suspended"), of 171 Gates Street in Portsmouth, NH was traveling on Route 495 SB in Westford. He was operating a 2003 Dodge Dakota bearing NH registration 1506670 (hereinafter referred to as the "Dodge" or the "Dakota" or the "pick-up"). The Dodge is owned by Enterprise Rent-a-Car of Boston, Inc. out of 6 Perimeter Road in East Londonderry, NH. Except for his two dogs, Mr. Southworth was alone in the pick-up. Located in the bed of the Dodge were two motorized dirt bikes along with protective riding gear in a duffle bag. Mr. Southworth has ties to the Harvard, MA area, and it is possible that is where he was headed.

**05.**       According to a witness, in the area of Route 495 SB south of Exit 32, Boston Road, Mr. Santiago's Honda was traveling at approximately 60-65 MPH in the center travel lane. Jeffrey Southworth was operating his Dodge at a very high rate of speed. He came upon the slower moving Honda and rear-ended the Honda most likely initially pushing the Honda to the left. Mr. Santiago steered right in an attempt to regain control of his Honda. The Accord entered a right bearing centripetal yaw and began to rotate in a clockwise direction as it veered to the right. The Honda left the travel portion of the roadway and entered the road shoulder. It is possible, in this area, that a secondary, minor collision occurred between the Honda and the Dodge as they crossed paths. One of the vehicles impacted a large Route 495 highway sign located on the road shoulder just off the edge of the asphalt. The sign stanchions were ripped from the ground, and the sign came to rest close to the tree line. The Honda continued rotating and sliding across the grassy shoulder. In the area of the tree line, approximately 40-50 feet from the edge of the road, the left side tires of the Honda dug into the grassy shoulder causing the vehicle to "trip". As the vehicle rolled into the woods, its roof was torn off. The occupants of the Honda were thrown from the vehicle. The Honda came to rest upright facing in a southwesterly direction approximately 20 feet into the woods. The occupants were scattered about the area around the Accord.

**06.**       Following the initial collision with the Honda, the Dodge also veered off towards the right road shoulder. It seems likely that in the area where the Route 495 Highway sign was impacted on the road shoulder, the right front tire of the Dodge came into contact with the left rear corner of the Honda in a minor secondary collision. The rear bumper cover of the Honda was found in this area with distinct tire rub marks on its left side that were made by the right front tire of the Dodge. The pick-up continued across the road shoulder and entered the wooded area approximately 100 north of the Honda. The right front portion of the Dodge impacted numerous small trees and

2

branches before the vehicle came to rest. The pick-up stabilized facing in a westerly direction approximately 5-10 feet into the woods.

07.          After the crash occurred, Julia Schmidt was the only conscious occupant of the Honda. She ran to the edge of the road and attempted to flag down passing motorists. Terry Essary, DOB 9-5-70, traveling southbound on Route 495 in Westford, stopped to assist. Mr. Essary observed Jeffrey Southworth emerge from the woods in the area south of the location of the Honda. He later saw Mr. Southworth talking with the occupant of a vehicle that pulled over to assist, It was later learned that Mr. Southworth was attempting to get a ride to flee the scene.

08.          Responding EMS personnel located Jose Santiago and his three daughters scattered about the area around their Honda. Jose Santiago and his daughter Awilda Santiago were pronounced dead at the scene. Christina Santiago was taken by ambulance to Children's Hospital in Boston with serious injuries. Veronica Rosario was initially taken to Lowell General then transferred to NE Medical Center with critical injuries. Julie Schmidt was transported by ambulance to Emerson Hospital in Concord with minor injuries. At approximately 0200 hours, personnel from the Office of the State Medical Examiner arrived on scene to transport the bodies of Jose and Awilda Santiago to their facility in Boston where autopsies were subsequently performed by Dr. Abraham Philip. The cause of death of Jose Santiago was listed as multiple injuries due to blunt trauma while the cause of death of Awilda Santiago was blunt trauma to the torso with a crushed spine. When police personnel arrived on scene, Jeffrey Southworth had fled the area. Upon the completion of the on-scene investigation, both vehicles were towed by Ferreira's Towing to A-Troop Headquarters in Danvers where they were secured for further examination.

09.          At approximately 0710 hours, Jeffrey Southworth was located at the Residence Inn on 7 Lan Drive (just off of Rte. 110 approximately 3 miles from the location of the crash) in Westford. He was placed under arrest by Tpr. Brad Kessel of the Concord Barracks. Mr. Southworth stated to Tpr. Kessel that he was in the Dodge when the crash occurred, but a friend was driving the vehicle at the time of the collision. Jeffrey Southworth was transported to A-3 for booking. Photographs of Mr. Southworth's injuries were taken by Sgt. Michael Holleran of the MSP Crime Scene Services Section at Devens. A search warrant to obtain a blood sample from Jeffrey Southworth was authorized by Judge Dilsday and obtained by Tpr. Kessel at approximately 1145 hours. Mr. Southworth was subsequently transported to Emerson Hospital where his blood was drawn by Carol Hood. The blood sample was transported to the MA State Police Crime Lab for chemical analysis.

## ROADWAY DESCRIPTION

10.          This collision occurred on **Route 495** in the town of Westford. Route 495 is a public way as defined under MGL C. 90, s. 01 that runs generally north and south. The locus of this collision was southbound approximately ½ mile north of Exit 31, Route 119. Here, the north and southbound sides of the roadway are separated by a treed and

3



# GABRIEL & SWEENEY
## COURT REPORTING

Transcript of the Testimony of:
# Nancy Rosario

In the Case of:
### Nancy Rosario
### vs.
### Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse

Taken on:
### July 25, 2006

**Gabriel & Sweeney Court Reporting**
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton,  MA   01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321   Fax   (978) 263-0669
email:  gsreporting@yahoo.com

Page 97

1  Q. So just to go through the insurance, it's your
2     understanding that Mr. Santiago's vehicle that
3     your children were in that evening did not carry
4     insurance, correct?
5  A. That's correct.
6  Q. And what you know of Mr. Southworth's vehicle,
7     being a New Hampshire vehicle, there was no
8     insurance that paid for the medical bills for your
9     children, correct?
10 A. Yes.
11 Q. Okay. And do you have -- back in 19 -- excuse me.
12    Back in 2003, in September, when this accident
13    occurred, did you have any vehicles in your
14    household, either you or Mr. Garcia?
15 A. Yes. Mr. Garcia.
16 Q. He did -- what vehicle did he have back in
17    September of 2003?
18 A. He had a Toyota.
19 Q. Okay. Was it insured?
20 A. Not at the time.
21 Q. You've filed a separate lawsuit in Middlesex
22    Superior Court against Mr. Southworth and
23    Enterprise Rent-A-Car of Boston, correct?
24 A. Yes.

Page 98

1  Q. Okay. Have you received any insurance payments in
2     that case?
3  A. My lawyers know about that.
4        MR. ALBERT FARRAH: I can tell you on the
5     record.
6        MR. GILLIS: Sure.
7        MR. ALBERT FARRAH: The case has been
8     settled. There has been a total payment -- I
9     think it's part of the record in that case, if you
10    go to Middlesex. Total payment was $300,000 from
11    Jeffrey Southworth, and $35,000 from Enterprise
12    Rent-A-Car of Boston, Inc.
13       MR. GILLIS: Okay. So as far as
14    collateral sources to this point, there's no PIP?
15       MR. ALBERT FARRAH: No PIP.
16       MR. GILLIS: There's no under insurance?
17       MR. ALBERT FARRAH: (Shakes head side to
18    side.)
19       MR. GILLIS: And there's a total paid out
20    in the other lawsuit of $335,000, correct?
21       MR. ALBERT FARRAH: Correct.
22       MR. GILLIS: And is that lawsuit now --
23       MR. ALBERT FARRAH: Dismissed.
24       MR. GILLIS: -- dismissed?

Page 99

1        MR. ALBERT FARRAH: And Southworth is
2     released.
3        MR. GILLIS: And Southworth is released.
4  Q. Other than the payments in that lawsuit, have you
5     received any money whatsoever concerning this
6     accident, from any source?
7        MR. ALBERT FARRAH: And the SSI, the
8     survivor's benefits.
9        MR. GILLIS: Okay.
10 Q. Other than the survivor benefits?
11 A. No, no.
12 Q. And as far as insurance is concerned, while we're
13    on this issue, maybe you can -- are there any
14    liens outstanding in this case? Or were they all
15    resolved in the first place?
16       MR. ALBERT FARRAH: Neighborhood Health
17    Plan still has a lien for approximately 40 or
18    $50,000. I can get you a copy of the settlement,
19    if you want.
20       MR. ALBERT FARRAH: And was there a settlement
21    petition filed in the Middlesex court for a minor?
22       MR. ALBERT FARRAH: I'm sorry? Yes,
23    settlement for a minor. A GAL was appointed.
24       MR. GILLIS: Who was the GAL appointed?

Page 100

1        MR. ALBERT FARRAH: John Fitzgerald.
2        MR. GILLIS: I know it's quarter past 12.
3     Maybe it's a good time to take a break?
4        MR. ALBERT FARRAH: Lawyers do that all
5     the time. I think that's a great idea.
6        MR. GILLIS: Let's go off the record.
7        THE VIDEOGRAPHER: The time is 12:14.
8     This is the end of Cassette Number 1. We are off
9     the record.
10       (Discussion held off the record.)
11       (Lunch break was taken.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1        A F T E R N O O N   S E S S I O N
2        (Readback.)
3        THE VIDEOGRAPHER: The time is 1:06 p.m.
4     This is the beginning of Cassette Number 2 in the
5     deposition of Nancy Rosario. We are on the
6     record.
7     CONTINUED EXAMINATION BY MR. GILLIS:
8  Q. Good afternoon, Ms. Rosario. A couple things that
9     I'd like to clear up from an earlier part of the
10    session.
11       First has to do with your testimony as to
12    the -- any rehabilitation that you've gotten for
13    drugs or alcohol.
14       My understanding is that prior to your
15    death of your daughter Awilda, you had gotten some
16    treatment for drug abuse, is that correct?
17       MR. ALBERT FARRAH: Objection to the
18    form. Prior to the -- prior to the death of
19    Awilda, did you get any treatment for drug abuse?
20 A. I don't understand. Can you repeat that to me?
21 Q. You testified this morning that you had gone to a
22    halfway house in Lynn prior to the death of your
23    daughter Awilda, is that correct?
24 A. No, that's not --

Page 102

1        MR. ALBERT FARRAH: It's the form of the
2     question.
3  Q. Did you ever seek treatment at a halfway house in
4     Lynn?
5  A. Yes.
6  Q. Okay. Was that while Awilda was still alive?
7  A. Yes.
8  Q. Okay. Before her death in September of 2003 did
9     you have any other treatment for drug or alcohol
10    abuse? This is before she died.
11 A. No.
12 Q. Okay. After she died, did you receive some drug
13    and alcohol treatment?
14 A. Yes, I did.
15 Q. Where did you receive that treatment?
16 A. At the Holy Family.
17 Q. And what was the nature of that treatment? Why
18    did you go to Holy Family?
19 A. Depression.
20 Q. Were you using any drugs or alcohol at that point?
21 A. Yes, I was.
22 Q. What drugs and/or alcohol were you using at that
23    time?
24 A. I was using cocaine, and I was drinking beer at

17 (Pages 97 to 102)

9

1    produce?
2              MR. FARRAH: Objection.
3    A.   Excuse me.
4              MR. FARRAH: You can answer.
5    A.   I don't have a normal or a typical type of
6         thing. Every report I write is case specific.
7    Q.   Based -- this particular report that you wrote
8         in this case, did you review documents before
9         writing it?
10   A.   Yes, I did.
11   Q.   And are those documents listed in here?
12   A.   They should be.
13   Q.   Why don't you take a look at it, and tell me
14        what you reviewed in order to mike your opinion
15        in this case?
16   A.   The documents reviewed for the preparation of
17        this report are listed on page three of the
18        report. When I refer to the number, I'm
19        referring to the numbers that I assigned to the
20        pages.
21   Q.   That would be three at the top of the page,
22        correct?
23   A.   That is correct, three at the top of the page.
24   Q.   Are there any other documents that you have

10

1         reviewed in the preparation of this report other
2         than the documents that are listed on page three
3         of your expert report?
4    A.   There may be one other document.
5    Q.   What would that be?
6    A.   That document would be a document that was put
7         out by one of the alcohol trade associations
8         providing guidance to tavern keepers about how
9         many drinks they should serve to people of
10        various body sizes in order to avoid getting
11        them intoxicated.
12   Q.   Why isn't that put in here with the document,
13        under Documents Reviewed?
14   A.   I believe it came to my attention after the
15        report was prepared.
16   Q.   Is that document here with you today?
17   A.   I do have a copy of it.
18   Q.   Could you get a copy of that out?
19   A.   Yes, sure.
20             Maybe you could just, instead of me
21        unhooking, just swivel around and get my little
22        briefcase case.
23             MR. FARRAH: This one here?
24        (Document handed to Attorney Gillis.)

11

1    A.   The document to which I was referring is called
2         a Server Guide. It's a three-page document and
3         I don't believe that I had seen it prior to
4         finalizing the report. I think I saw it
5         subsequently, so that's why it wasn't listed
6         among those documents.
7    Q.   Okay. You weren't given the entire book, you
8         were just given three pages of it?
9    A.   That is correct.
10             MR. FARRAH: Objection.
11   Q.   And you seem to have a bar recipe document with
12        you as well, is that correct?
13   A.   I do.
14   Q.   Did you review that in ordinary to make your
15        determination in this case?
16   A.   I'm not sure if I did or did not. Let me see if
17        I have listed it here.
18             I did not list it so the likelihood is
19        I did not rely on it.
20   Q.   When did you -- are there any documents that are
21        not listed in your expert report that you
22        reviewed but did not rely upon other than what
23        you have just mentioned, the bar recipe?
24   A.   Ask that again, please.

12

1    Q.   You have listed on page three of your report
2         documents upon which you relied and reviewed in
3         this case, correct?
4    A.   Yes.
5    Q.   You have just testified that you believe you
6         reviewed the bar recipe book papers that you
7         have there, but you did not rely upon it in
8         making your opinion in this case, correct?
9    A.   I'm not sure if I did or did not rely on that
10        bar recipe. I just don't --
11   Q.   Are there any other documents that you reviewed,
12        whether you relied on them or not, that are not
13        listed on page three of your expert report?
14   A.   I don't believe so.
15   Q.   Okay. Can I see the documents that you have
16        there with the bar recipe book, please?
17             This packet of documents that you have
18        handed to me, what does that -- what is that?
19   A.   That's a packet of documents I wanted to bring
20        with me because I thought it might be helpful to
21        me today.
22             MR. GILLIS: Can we get those marked
23        as an exhibit, please?
24             MR. FARRAH: Sure. Can we get copies?

13

1    MR. GILLIS: Sure.
2    MR. FARRAH: Do you want to say what
3    they are for the record, Mike?
4    MR. GILLIS: For the record, the first
5    page is, states it's the Longhorn Bar Recipe
6    followed by some various glasses. Subsequent to
7    that is a grand jury exhibit which appears to be
8    the statement of Jude Connelly. Following that,
9    testimony from -- which appears to be the grand
10   jury testimony of Jude Connelly. Following that
11   is an investigation of the EZ-ALC computer
12   program for the -- which I believe is the
13   Widmark Graph.
14   THE WITNESS: W-i-d-m-a-r-k.
15   MR. GILLIS: Following that is a
16   Widmark Formula with handwritten calculations.
17   And following that is the audit report which I
18   believe is already marked in this case as
19   Exhibit 4.
20   (Exhibit 5 marked for identification.)
21   THE WITNESS: Maybe you want to
22   include the Server Guide in that exhibit?
23   MR. GILLIS: Sure. For the purposes
24   of it, to add on to it, we'll put at the back of

14

1    that three pages which purport to be the cover
2    and a couple of pages from the server guide, bar
3    code server guide which we'll make as a part of
4    Exhibit 5.
5    Q.   Doctor, did any of the documents that are in
6         Exhibit 5 change your opinion in any way in this
7         case?
8         MR. FARRAH: Objection.
9    A.   Change my opinion from what to what, at what
10        point in time?
11   Q.   You gave a report, an opinion in this case that
12        is written and has been marked as an exhibit
13        here, correct?
14   A.   Yes.
15   Q.   And you stated that in Exhibit 5, you have
16        additional documents that you have reviewed
17        other than the ones that are in there, correct?
18   A.   Right. Over and above whatever I relied on for
19        the report.
20   Q.   With the exception of the audit report, those
21        other documents weren't documents that were
22        listed in your report, correct, as documents
23        that you reviewed?
24   A.   Well, maybe some of the witness statements and

15

1         deposition statements were, Mr. Gillis.
2    Q.   Were any of the documents that weren't already
3         listed as being reviewed that are part of that
4         packet, did any of them change in any way the
5         written opinion that you have given in this
6         case?
7    A.   Okay. Could I have that exhibit back, please?
8    Q.   Sure.
9    A.   I would say that the bar recipe document that we
10        have on the top of Exhibit 5, the second page of
11        that document down at the bottom where it says
12        Manhattan Up, which is the glass that's used to
13        serve the Manhattans, is described as a
14        six-ounce cocktail glass. The formula given for
15        preparing the Manhattan is two ounces of bourbon
16        and a quarter ounce of sweet vermouth. That's
17        two and a quarter ounces, yet there appear to be
18        an inconsistency between how you get two and a
19        quarter ounces into a glass that says six
20        ounces, when that glass was served, it was
21        supposed to only -- it's supposed to have volume
22        almost up to the top.
23             There seems to be a discrepancy
24        between the way the Manhattans are actually

16

1         served and the bar recipe in terms of the volume
2         of liquid in the glass.
3    Q.   You were not aware of that when you rendered
4         your opinion in this case?
5         MR. FARRAH: Objection.
6    A.   I was aware of a discrepancy. And I still have
7         not had adequately explained to me how that --
8         how they could serve a drink.
9             I saw the photo of a served drink
10        which is a -- in a six-ounce, Manhattan-type of
11        glass, and that certainly is more than two and a
12        quarter ounces. I don't understand how there
13        can be a representation that the Manhattan is
14        two and a quarter ounces at this formula, as
15        opposed to what I saw which was a -- an almost
16        six-ounce drink.
17   Q.   Where did you see the photograph?
18   A.   Mr. Farrah showed it to me.
19   Q.   He provided you with photographs of drinks?
20   A.   He showed me a photograph that he had taken.
21   Q.   He himself?
22   A.   Yes.
23   Q.   And the photograph was of a drink in a six-ounce
24        glass or that's what you thought it was?

17

1  A.   That's what it appeared to be and that's how it
2       was represented to me.
3  Q.   When were you shown the photograph?
4  A.   Months ago.
5  Q.   How many months ago?
6  A.   I can't break it down any closer than that for
7       you.
8  Q.   Was it last summer, last fall?  What time frame?
9  A.   I have -- it has no meaning to me at all,
10      Mr. Gillis.
11 Q.   Was it before or after November 1st?
12 A.   I can't answer that either.
13 Q.   But you were aware of the size of the glass
14      before you rendered your opinion, correct?
15 A.   I was, and it was a source of concern for me.
16 Q.   But you were able to render an opinion anyways,
17      correct?
18 A.   I was.
19            MR. FARRAH:  Objection to the form.
20            MR. GILLIS:  I don't believe those
21      photos have been produced.
22            MR. FARRAH:  To the extent they
23      haven't, I think he said a photo.  I'll produce
24      it.

18

1            MR. GILLIS:  I appreciate it.
2            MR. FARRAH:  Sure.
3  Q.   So in addition to the materials that you said
4       you reviewed, you have also reviewed a
5       photograph, correct?
6  A.   Yes.
7  Q.   Anything else that you reviewed in this case?
8  A.   Not that I recall.
9  Q.   Have you been out to the restaurant at all?
10 A.   No.
11 Q.   Have you measured any drinks yourself out at the
12      restaurant?
13 A.   No.
14 Q.   Has anybody brought you alcohol and asked you to
15      determine the alcohol content related to this
16      case?
17 A.   No.
18 Q.   Have you visited or aware of anybody who visited
19      the establishments where the employees who
20      worked there on September 26, 2003, are
21      currently worked or previously worked?
22 A.   I don't understand that question.
23 Q.   Did you go to any bar to review anything in this
24      case?

19

1  A.   No.
2  Q.   You haven't been to the Longhorn?
3  A.   Haven't been.
4  Q.   To the Longhorn Steakhouse in Leominster?
5  A.   I said I haven't been there.
6  Q.   Have you been to any Longhorn Steakhouse?
7  A.   No.
8  Q.   Have you been to any restaurant that you
9       understand employees who work there back in
10      September of 2003 are currently working?
11 A.   No.
12 Q.   Getting back to the question that we're on, is
13      there anything else now that you can -- physical
14      evidence or written materials -- anything that
15      you reviewed in order to make your opinion in
16      this case?
17 A.   No.
18 Q.   Okay.  Based on what you have been able to
19      review, do you feel you're able to make an
20      opinion in this case as to the amount of alcohol
21      that was served to Jeffrey Southworth that
22      evening?
23            MR. FARRAH:  Objection.
24 A.   I think I can represent the number of drinks,

20

1       and if I exclude the concern I have about the
2       Manhattan, the two volumes and the formulas
3       being inconsistent, I can certainly make an
4       estimate of what the minimal amount of alcohol
5       would have been in that Manhattan.
6  Q.   What did you use in order to render your opinion
7       in this case as the amount of alcohol in the
8       Manhattans that were served to Jeffrey
9       Southworth that evening?
10            MR. FARRAH:  Can he look at his
11      report?
12 A.   I think what I used was an ounce and a half of
13      Jack Daniels and three-quarters of an ounce of
14      vermouth.
15 Q.   How did you come up with that combination?
16 A.   When I asked plaintiff's counsel what kind of a
17      hypothetical or the facts of the hypothetical he
18      would be asking me in court, those were what I
19      was instructed to use.
20 Q.   So your opinion in this case is based on at some
21      point in the evening, Mr. Southworth having a
22      Jack Daniels Manhattan to drink, correct?
23 A.   Several.
24 Q.   For the purposes of those Jack Daniel

21

1    Manhattans, you're assigning to that drink one
2    and one-quarter ounce?
3  A. One and a half ounce of 80 proof Jack Daniels
4    and three-quarters of an ounce of sweet
5    vermouth.
6  Q. Based on the materials that you reviewed, did
7    you independently come up with any amount of
8    alcohol that you believe these drinks -- were
9    contained in these drinks this evening?
10           MR. FARRAH: Objection to the form.
11 A. I don't understand what you're asking mow.
12 Q. You read materials in this case, correct?
13 A. I did.
14 Q. Some of those materials had to do with drinks in
15   this case, correct?
16 A. With numbers of drinks served and the names of
17   the drinks.
18 Q. Based on anything that you reviewed in this
19   case, did you come up with an amount of alcohol
20   in those Manhattans that was different than what
21   you just testified to as provided to you by
22   plaintiff's counsel?
23 A. What I believe I just testified to was the
24   amount that I used in my calculations.

22

1  Q. Why did you use that amount?
2  A. Because that amount is lower than the amount in
3    the book that would not overestimate it, or it
4    gave me a conservative estimate that I could say
5    to you if indeed the formula was different, such
6    as two ounces of the higher proof liquor, or
7    maybe even more ounces to fill up the six-ounce
8    glass, the calculations that I did were more
9    conservative and would, therefore, represent a
10   blood alcohol concentration that was lower than
11   what a higher number could be.  So it was at
12   least what my calculation showed could be
13   higher.
14 Q. But the opinion you gave is the one that you
15   believe is most accurate opinion for that
16   evening, correct?
17           MR. FARRAH: Objection.
18 A. The one that I gave was the one that was based
19   on the hypothetical that would be put to me in
20   court.  And I felt it was reasonable to respond,
21   and I still have that same question in my mind,
22   Mr. Gillis.  There's no question about it.
23 Q. Did you, in putting together your chronology in
24   your expert report for that evening, did you

23

1    determine the chronology yourself or was that
2    given to you by plaintiff's counsel?
3           MR. FARRAH: Objection to the form.
4  A. It was a combination of both.  I went through
5    the -- what did you call it?  Not the bar bill.
6    You called it an inventory or something, was
7    that the expression that you used?  The
8    inventory.
9           I went through the inventory and I
10   tried to, between the inventory and the
11   testimony of the fact witnesses -- in
12   particular, the wait staff and the young lady
13   who was waiting on these gentlemen that night --
14   and the deposition testimony, the witness
15   statements and where I could not fill in the
16   blanks, I asked plaintiff's counsel to assist me
17   in completing the assumptions of the
18   hypothetical scenario.
19 Q. Can you determine which of the facts that you
20   used in your hypothetical are facts that you
21   determined and which are facts that were
22   determined by counsel?
23           MR. FARRAH: Objection.
24 A. Certainly, I cannot discriminate at that level,

24

1    no.
2  Q. Now, were any of the facts that you determined,
3    did you find conflicting testimony from various
4    sources?
5           MR. FARRAH: Objection.
6  A. That question is a little difficult to answer
7    because there was a major time period between
8    depositions being taken and so forth.  So there
9    were differences in the testimonies at various
10   times.
11 Q. And how did you resolve those differences in
12   order to come up with your chronology in this
13   case?
14           MR. FARRAH: Objection.
15 A. Well, specifically in the report that I put
16   together, I found that the second set of
17   depositions that were taken did not really add
18   any additional information.  In many instances,
19   the record was unclear and it was -- there was
20   some obfuscation on the record where I was not
21   able to take any additional information.  It
22   turns out that I would guess -- and I think I
23   said in the report, the second set of
24   depositions which I guess would be the ones for

**25**

1    the federal court proceeding.
2  Q.  This case?
3  A.  For this case, were not of any assistance to me.
4    Most of what I relied on were the earlier set
5    that were taken more contemporaneously with the
6    incident itself.
7  Q.  Why don't you take a look and make sure I read
8    this properly. Starting at the bottom of page
9    three, I believe you addressed that issue?
10 A.  Okay. How far do you want me to go with this?
11 Q.  I'll just read it and you tell me if I'm reading
12    it correctly.
13      The very last entry: I have also
14    reviewed the follow-up depositions of Jude
15    Connelly taken February 10, 2006, Michael Espey
16    taken April 25, 2006, and Thomas Scott Espey
17    taken April 25, 2006, and viewed photographs of
18    Jeffrey Southworth taken the day of his arrest,
19    September 27, 2003; is that correct?
20 A.  That is an actual reporting, yes.
21 Q.  My understanding is you did not find those
22    depositions to be helpful to you at all because
23    of the time delay for some reason?
24      MR. FARRAH: Objection.

**26**

1  A.  For all the reasons I stated earlier.
2  Q.  Is there -- I believe you state on the bottom of
3    page four that you found that to be speculative
4    and scanty and could not help you develop in
5    your facts of the night in question a more
6    accurate chronology, correct?
7  A.  I would agree with that, sure. That's how I
8    found it.
9  Q.  A lot of that is because the prior depositions
10    were taken more contemporaneous with the day of
11    the accident, is that correct?
12      MR. FARRAH: Objection.
13 A.  That's only part of it.
14 Q.  What's the other part?
15 A.  I felt that there was -- I felt that there was
16    some obfuscation of the record. I felt that
17    maybe you were trying to cut off the responses
18    and obfuscate information that was being
19    obtained. It did not appear that you were
20    providing sufficient time for the answers to be
21    rendered and I didn't feel that those were
22    helpful to me is the bottom line.
23 Q.  So you're, as part of your expertise in order to
24    make a scientific opinion in this case, you're

**27**

1    rendering credibility to various testimony that
2    you weren't present for?
3      MR. FARRAH: Objection.
4  A.  I'm not rendering credibility. What I'm doing
5    is I'm first determining whether it sheds any
6    additional light or is consistent with the prior
7    information. And second of all, I'm talking
8    about the semantics of the question-and-answer
9    process rather than the information that was
10    contained.
11 Q.  And Mr. Farrah was present at that deposition,
12    correct?
13 A.  Say again.
14 Q.  Mr. Farrah was present at that deposition,
15    correct?
16 A.  I assume so, but I don't recall specifically.
17 Q.  So you can't recall what lawyers were at the
18    deposition, but you remember what -- the
19    questions that were cut off and obfuscated?
20 A.  I remember that you were asking the questions.
21      MR. FARRAH: Objection.
22 Q.  You understand it was Mr. Farrah's deposition?
23      MR. FARRAH: Which deposition are we
24    talking about?

**28**

1      MR. GILLIS: All of them were yours.
2  A.  I don't believe that we're talking about the
3    same thing.
4  Q.  Are you aware of any of those depositions that
5    you have listed in this case that were
6    depositions by the defendant, not the plaintiff,
7    in this case?
8      MR. FARRAH: You mean noticed by
9    the --
10 Q.  Noticed by the defendants instead of the
11    plaintiffs?
12 A.  I really don't know who noticed what.
13 Q.  And all of them were noticed by the plaintiff,
14    and Mr. Farrah asked the questions before we
15    even got to ask one question; you're aware of
16    that, aren't you?
17      MR. FARRAH: Objection.
18 A.  It's not my recollection.
19 Q.  It's not your recollection?
20 A.  No.
21 Q.  But you do recollect that those aren't
22    trustworthy because the answers provided after
23    Mr. Farrah got through with the witnesses were
24    obfuscated?

**29**

1          MR. FARRAH: Objection.
2  A.  That was part of it, yes.
3  Q.  Did you put that in your report?
4  A.  No. I said --
5  Q.  Did you think it was relevant?
6          MR. FARRAH: You did tell him at the
7      beginning you would let him finish answering his
8      questions. At least you tried to. Here's your
9      chance to try to.
10  A.  I said in the report that the report was not
11      helpful to me, and provided no additional
12      information. And what was the part that I just
13      read into the record a moment ago?
14  Q.  The bottom of page four.
15  A.  Most of the testimony scanty and speculative and
16      didn't help me develop a better indication of
17      the facts or a more accurate chronology, I stand
18      by that statement.
19  Q.  For the purposes of your opinion, can you name
20      one deposition that you relied upon in this
21      case?
22          MR. FARRAH: For the purposes of his
23      opinion?
24          MR. GILLIS: Yes.

**30**

1          MR. FARRAH: Hasn't he put it in the
2      report?
3          MR. GILLIS: Maybe I'm missing it. I
4      don't see any depositions in this case.
5          MR. FARRAH: Page three.
6  A.  The bottom of page three. You asked me to just
7      read that into the record a few moments ago.
8  Q.  You said you didn't rely upon that because they
9      were too scanty and speculative, correct?
10  A.  Right. They didn't add anything over and above.
11  Q.  Are there any other depositions that were taken
12      in this case that you have reviewed at all?
13  A.  On page three, the depositions mentioned under
14      Documents Reviewed above the last sentence on
15      that page.
16  Q.  And none of those depositions are from this
17      case, that's my point?
18  A.  That is correct. They're from the earlier
19      proceeding.
20  Q.  So other than the ones that you rejected, did
21      you review any other depositions in this case?
22  A.  Well, when you say in this case, you mean taken
23      in this case.
24  Q.  Yes, taken in this case?

**31**

1  A.  I reviewed only what I put down, yes.
2  Q.  So you didn't review the testimony of the
3      waitress who actually served the drinks in this
4      case, correct? In order to assist you, her name
5      is Leigh Chabot.
6  A.  Excuse me, I reviewed the November 2003
7      deposition of Leigh Chabot.
8  Q.  You realize there was no deposition of Leigh
9      Chabot in 2003?
10  A.  Excuse me, it's her statement then. If it
11      wasn't a deposition; it was a statement.
12  Q.  Well, you tell me, was it a deposition or a
13      statement?
14  A.  A statement.
15  Q.  Did you review her deposition in this case?
16  A.  If I haven't listed it here, I did not.
17  Q.  Did you think that was important?
18  A.  It may have been.
19  Q.  May have been?
20  A.  Yes.
21  Q.  Why didn't you review it?
22  A.  I'm not certain.
23  Q.  Why didn't you review the bartender's
24      deposition?

**32**

1  A.  I'm not certain of that either.
2  Q.  Wouldn't that have been important?
3  A.  It may have been.
4  Q.  Why didn't you review the manager's report --
5      excuse me, the deposition?
6  A.  I have no special answer for you.
7  Q.  Why didn't you review Sherri Salmon for the
8      waitress who normally served Mr. Southworth at
9      the Longhorn, is there any reason why you didn't
10      review her deposition?
11  A.  Never heard that name, to the best of my
12      knowledge.
13  Q.  Is there anything that you have requested of
14      Mr. Farrah that he hasn't provided you
15      willingly?
16  A.  No.
17  Q.  You have written extensively on the importance
18      of a chronology, correct?
19  A.  Yes.
20  Q.  Don't you think reviewing the people who served
21      the alcohol that night, sworn testimony under
22      oath, would be important in helping you put
23      together that chronology?
24          MR. FARRAH: Objection.

Rosario vs. Longhorn Steakhouse      January 26, 20

33

1   A.   Sometimes.

2   Q.   Well, do you know if it was important in this

3       case?

4            MR. FARRAH: Objection.

5   A.   It may have been.

6   Q.   But you don't know because you didn't bother to

7       take the time to review it, did you?

8   A.   Well, I wouldn't phrase it that way. I am not

9       exactly certain why I didn't review them.

10   Q.   Normally, when you are preparing to give

11       testimony under oath in the case, those would be

12       the type of documents you would want to review;

13       correct?

14   A.   It depends.

15   Q.   There are circumstances where you have the

16       bartender's deposition, waitress's deposition,

17       and you don't think you want to review them to

18       see if they're relevant?

19            MR. FARRAH: Objection.

20   A.   Sometimes the amount of time that has transpired

21       is so long that there may not be any point to

22       it.

23   Q.   But you don't know until you review it, correct?

24   A.   Well, the amount of time is the issue. Not

34

1       necessarily what is said that an individual's

2       capacity to recall.

3   Q.   Can you tell me how you determined whether or

4       not they had the ability to recall, if you don't

5       bother to even look at their deposition?

6            MR. FARRAH: Objection.

7   A.   I don't know how to answer that question.

8   Q.   Did you review the plaintiff's Answers to

9       Interrogatories in this case?

10   A.   I'm not sure if I did or not.

11   Q.   Can you tell me what the relevance of reviewing

12       the statement of facts in a summary judgment

13       motion and the other case, the Southworth case,

14       what relevance that has to this case?

15            MR. FARRAH: Objection.

16   A.   It was a document that set forth the summary at

17       that point in time, it was available.

18   Q.   By the way, these depositions that you had, you

19       read each one of them?

20   A.   I did.

21   Q.   Front to back?

22   A.   Probably not.

23   Q.   So when you say you reviewed the deposition of

24       Michael Espey, we don't know what pages you read

35

1       and what pages you didn't read, correct?

2   A.   Right. I can tell you what I did do was look

3       through the deposition to find the testimony

4       that was pertinent about the time interval

5       involved on the evening in question. And

6       reading things about where the person grew up

7       and where they went to high school and things

8       like that were not important to me.

9   Q.   What someone like Michael Espey had to drink

10       that night is important, isn't it?

11   A.   That's right.

12   Q.   Those are the type of things you were looking

13       for?

14   A.   That's correct.

15   Q.   And you were looking for evidence from them as

16       to visible signs of intoxication, correct?

17   A.   Well, I was looking for first, how many drinks

18       were served and what type of drinks were served,

19       and then what their observations were about

20       Jeffrey.

21   Q.   Now, based on all of the documents that you have

22       reviewed in order to form your opinion in this

23       case, as well as the conversations and

24       information provided to you by Attorney Farrah,

36

1       what is your opinion as to the visible signs of

2       intoxication that Jeffrey Southworth would show

3       when he was intoxicated prior to the date of

4       this accident which we'll use September 26,

5       2003, even though it went into the morning of

6       the 27th?

7            MR. FARRAH: Objection.

8   A.   I really can't answer it in that form.

9   Q.   What form can you answer it in?

10            MR. FARRAH: Objection.

11   A.   Instead of saying would show, if you say showed,

12       that would help me.

13   Q.   Prior to September 26, 2003, based on your

14       review of all the documents in this case, as

15       well as the materials provided you from

16       Mr. Farrah that may not be here, as well as any

17       conversations you have had with Mr. Farrah, what

18       are the visible signs of intoxication that you

19       opine Jeffrey Southworth would exhibit when he

20       was intoxicated?

21            MR. FARRAH: Objection.

22   A.   I just said I couldn't answer using that

23       construction. If you ask me what testimony or

24       what statements were made about what he showed

37

1    that particular night, I can answer that
2    question.
3    Q.    Okay. I'm going to get to that in a minute. I
4          guess my point is this, based on all these
5          documents, can you make an opinion as to what
6          signs he showed when he was visibly intoxicated,
7          on occasions that he was visibly intoxicated
8          prior to September 26, 2003?
9                MR. FARRAH: Objection.
10   A.    I don't have an opinion to that question.
11   Q.    Based on these documents, can you tell me what
12         visible signs of intoxication Mr. Southworth
13         exhibited on this evening?
14   A.    His eyes were glazed; he was loud; he wasn't
15         carrying himself the way he usually does; and he
16         looked a little unkempt.
17   Q.    Okay, when was he loud that evening?
18   A.    When the manager or the person at the other
19         table came over and asked them all to quiet
20         down.
21   Q.    Is there any testimony that you reviewed that
22         indicated that it was Mr. Southworth solely who
23         was the person that was loud at the table?
24               MR. FARRAH: That he can recall right

38

1    now, you're asking him?
2                MR. GILLIS: That you can recall.
3                MR. FARRAH: Objection.
4    A.    I don't recall anything specific.
5    Q.    The basis of that, is it your memory that the
6          manager came to the table to speak to the entire
7          table, not specifically to Mr. Southworth?
8                MR. FARRAH: Objection.
9    A.    I recall it as talking to everybody at the
10         table.
11   Q.    Is it your opinion that if the entire table is
12         loud, all of the people at the table are
13         intoxicated?
14               MR. FARRAH: Objection.
15   A.    Not necessarily.
16   Q.    Which ones at the table were intoxicated based
17         on the loudness?
18   A.    The ones --
19               MR. FARRAH: Objection.
20   A.    The ones who drank the most in the shortest
21         period of time.
22   Q.    Of the seven people at the table that evening,
23         which ones drank the most and were intoxicated
24         when the table was loud?

39

1                MR. FARRAH: Objection.
2    A.    I haven't specifically tried to assign drinks to
3          people other than Mr. Southworth.
4    Q.    So how do you opine that the other people were
5          intoxicated due to loudness at the table?
6                MR. FARRAH: The same objection.
7    A.    I don't opine that. I just said that the
8          manager came over and told them all to be quiet.
9    Q.    According to your report, it wasn't the manager,
10         it was other patrons?
11   A.    Or other patrons.
12   Q.    There's nowhere in any of the materials you
13         reviewed that said any patron came up to the
14         table that night, isn't that correct?
15   A.    I'm not certain that I recall.
16   Q.    As you sit here today, you're not aware of any
17         evidence that any patron came up to the table
18         and told him to quiet down that evening,
19         correct?
20   A.    Actually, I do recall reading that statement but
21         I may have this case confused with another case.
22   Q.    You mentioned it twice in your report so you're
23         telling me you confused this case with another
24         case?

40

1    A.    If I mentioned it in the report, then there was
2          some document that stated that.
3    Q.    So you indicate on page three that it was so
4          loud, that other patrons had to ask them to be
5          more quiet. Can you tell me what document, if
6          anywhere, you got that from?
7    A.    No, I cannot.
8    Q.    You said on page two, Other patrons in the
9          Longhorn came over to Southworth's table and
10         asked him and his friends to be more quiet. Do
11         you know where you got that from?
12   A.    No, I do not.
13   Q.    In fact, you don't mention the manager coming to
14         the table, do you?
15   A.    No, I do not.
16   Q.    Do you know what time during the evening this
17         occurred?
18   A.    I don't recall.
19   Q.    Do you remember Jude Connelly testifying in the
20         earlier deposition, the one you found credible,
21         that they left around 11 o'clock; do you
22         remember that?
23   A.    Not specifically.
24   Q.    Do you remember his testimony that they were

**41**

1  quiet approximately -- that someone came to the
2  table approximately 25 minutes before they left?
3  A.  Would you say that again, please?
4  Q.  Never mind, I'll get the page out for you to
5  look at.
6  Page 35 of the Jude Connelly
7  deposition in the Southworth case, on page 39
8  here, line 19 through 22.  Can you take a look
9  at that?
10  MR. FARRAH:  39 or 35?  Which is it,
11  39 or 35?
12  MR. GILLIS:  I'll tell you in a
13  second.
14  THE WITNESS:  That's not the right
15  page.
16  MR. FARRAH:  39.
17  Q.  Can you tell me what time you left?
18  I would say that it was, if not just
19  before, right around 11 o'clock.
20  These three lines right here.  Does
21  that refresh your recollection of what time they
22  left that evening?
23  MR. FARRAH:  Objection.
24  A.  This is Connelly stating?

**42**

1  Q.  Yes.
2  A.  What time he left or what time he thinks he
3  left?
4  Q.  Correct.
5  A.  Okay.
6  Q.  Does that refresh your recollection at all?
7  MR. FARRAH:  Objection.
8  A.  About what?
9  Q.  About what time they left that evening, the
10  restaurant?
11  MR. FARRAH:  Objection.
12  A.  That isn't what time Mr. Southworth left.
13  Q.  Who did Mr. Southworth leave with?
14  A.  I don't recall.
15  Q.  Okay.  So you're not aware that he left with
16  Mr. Connelly, correct?
17  A.  I do not recall with whom he left.
18  Q.  Okay.  I want you to assume that he left with
19  Mr. Connelly.  Do you have any opinion
20  whatsoever as to what time they left that
21  evening?
22  MR. FARRAH:  Objection.
23  A.  Earlier than 11 o'clock.
24  Q.  Based on what?

**43**

1  A.  Well, it was, all right -- he had,
2  Mr. Southworth had another beer at 10:30 at a
3  second establishment.
4  Q.  Based on what?
5  A.  Based on the documents that I reviewed, that
6  they went to another establishment and he had
7  one beer, twelve-ounce beer.
8  Q.  You, in order to make your opinion, took a fair
9  amount of information from Jude Connelly's
10  deposition in the Southworth case, correct?
11  MR. FARRAH:  Objection.
12  A.  A fair amount of information.  I took whatever
13  information I needed.  I don't know if that's a
14  fair amount or not.
15  Q.  So when Jude Connelly says he left there at 11
16  o'clock, you don't believe that?
17  MR. FARRAH:  Objection.
18  A.  It's inconsistent with other documentation that
19  I found.  I chose to accept that there was a
20  second establishment that he went to, and that
21  he had another beer at 10:30.
22  Q.  What establishment was that?
23  A.  A hotel of some sort, I believe.
24  Q.  Do you know of anybody that said they left

**44**

1  before 10:30?
2  MR. FARRAH:  Objection.
3  A.  No, I do not.  I do not.
4  Q.  What is your opinion as to what time they left
5  that evening?
6  MR. FARRAH:  Objection.
7  A.  It would have to have been before 10:30.  The
8  bill was closed at 9:35, I believe, and another
9  round of drinks was issued at that time.
10  I don't believe that it's going to
11  take an hour and a half to sit there and finish
12  one more drink.
13  Q.  It's your understanding the bill was closed at
14  9:30 or 9:35?
15  A.  9:35.
16  Q.  And that's when they left?
17  A.  That's when the bill was closed.  And I think
18  that there was at 9:35, another drink was served
19  or ordered.
20  Q.  And what you're using to come up to that
21  conclusion, just so we know, is you're looking
22  at your programming of the Widmark, correct?
23  A.  Right.  I'm looking at the time chronology and
24  the drinks that I put in based on what I was

45

1    able to assemble as the best chronology from the
2    documents that I reviewed at the time that I
3    provided this.
4  Q.  So when you look at this document and say, Well,
5    it had to be closed out at 9:30, you're going by
6    what your Widmark shows, correct?
7        MR. FARRAH:  Objection.
8  Q.  You're not reading a deposition here, correct?
9  A.  No.  I told you that the 9:35 time reference
10    came from the inventory of the service.
11  Q.  Okay.
12  A.  And the 10:30 came from another independent
13    source.
14  Q.  What source?
15  A.  That I can't recall.
16  Q.  As you sit here today, you don't have any basis
17    for -- you don't have an opinion as to when they
18    left that night, based on all that you reviewed?
19        MR. FARRAH:  Objection.
20  A.  I don't have a recollection.
21  Q.  Doctor, have you ever done a back extrapolation
22    in any case?
23  A.  Certainly.
24  Q.  Can you tell me what a back extrapolation is?

46

1  A.  Yes.  A back extrapolation is when you start
2    with the blood alcohol concentration and a known
3    time and you determine that you are in the
4    postabsorptive time of alcohol disposition, and
5    you make an assessment as to what the person's
6    burn off rate is, and you add the amount that
7    was burnt off for each hour to the time that you
8    began with.
9  Q.  And so based on what you just told me, in order
10    to do a back extrapolation, you have to have a
11    blood alcohol, you have to know what the blood
12    alcohol is at a certain time point in order to
13    go backwards, correct?
14  A.  Certainly.
15  Q.  You are unable to do this in this case, correct,
16    because there is no blood alcohol count at some
17    point in the evening?
18        MR. FARRAH:  Objection.
19  A.  That's right.
20  Q.  You're not aware of any case where -- you have
21    been testifying in Massachusetts for quite a
22    while?
23  A.  I have.
24  Q.  You testify in other states as well?

47

1  A.  I do.
2  Q.  How many states have you testified in?
3  A.  I don't know, six, eight, ten maybe.
4  Q.  Are you aware of any state where you have been
5    able to back extrapolate without having some BAC
6    at a later point in the evening?
7        MR. FARRAH:  Objection.
8  A.  That's inconsistent with what back extrapolation
9    is.
10  Q.  You couldn't do it without that?
11  A.  That's correct.
12        MR. FARRAH:  Objection.
13  Q.  You're not aware of any case in Massachusetts
14    that's allowed that, correct?
15        MR. FARRAH:  Objection.
16  Q.  Not any legal case, correct?
17  A.  I am not.
18  Q.  Let's go back to your report and just start at
19    the beginning here.
20        You have the summary of your
21    qualifications and in that, you say that you
22    provide seminars for judges and lawyers and
23    other people, correct?
24  A.  I do.

48

1  Q.  One of the seminars that you do is a seminar for
2    MCLE on dram shot, correct?
3  A.  Yes.
4  Q.  In that you discuss, you provide papers and
5    lectures to lawyers on the proper way to
6    determine a blood alcohol based on certain
7    information that you get, correct?
8  A.  That's a little vague.
9  Q.  Well, what would you describe it as?
10        MR. FARRAH:  Objection.
11  A.  I would describe that I explain the absorption,
12    distribution, metabolism -- the absorption
13    distribution, metabolism and exclusion of
14    ethanol, and how to do proper ethanol
15    calculations.
16  Q.  And is it fair to say in doing your calculations
17    and what you lecture on in these is the use of
18    the Widmark Formula?
19  A.  Yes.
20  Q.  Can you tell us what the Widmark Formula is?
21  A.  Yes.  The Widmark Formula is a means of
22    determining a blood alcohol concentration based
23    on the amount of ethanol an individual ingests,
24    based on the person's height and weight, and

49

1    based on the time interval involved.

2  Q.  And the lecturing you do for judges on that

3    subject as well as lawyers, you don't have

4    different conclusions for each one, do you?

5        MR. FARRAH: Objection.

6  A.  I don't understand what that is asking.

7  Q.  We discussed the Widmark with lawyers, you tell

8    them the way you do the Widmark, correct?

9  A.  I tell them the way a proper Widmark calculation

10    is supposed to be done.

11  Q.  And you would lecture on the proper way to do a

12    Widmark when you lectured to judges as well,

13    correct?

14  A.  To anybody.

15  Q.  It doesn't matter who the audience is, the only

16    Widmark calculations that you write about and

17    speak about are those that are the proper way to

18    do it, correct?

19  A.  Yes.

20  Q.  In your summary of qualifications, you talk

21    about seven seminars for judges in Florida,

22    correct?

23  A.  Yes.

24  Q.  Did those involve the proper use of the Widmark

50

1    Formula, any of those seminars?

2  A.  It may be in some small way.

3  Q.  Is it fair to say that those lectures didn't

4    deal primarily with the proper calculations

5    under Widmark?

6  A.  Well, some of them did, but I found that it was

7    not terribly enjoyed to go through the

8    mathematics; so subsequently, I took a lot of

9    the hard math out of it, and just talked

10    generally about the formula and the manner of

11    calculation.

12  Q.  When you teach generally, you basically say a

13    12-ounce beer or four-ounce glass of wine or one

14    and a quarter ounce of 80 proof alcohol all have

15    about the same amount of alcohol content,

16    correct?

17        MR. FARRAH: Objection.

18  A.  They do.

19  Q.  And not specifics, in generalities, there are

20    about -- they will increase your blood alcohol

21    by .02, is that correct?

22  A.  If you want to use just a rule of thumb because

23    it's different from men and women and it's

24    different for body weight, you can use .02 as an

51

1    indicator.

2  Q.  And the burn off rate that you generally lecture

3    on, again generalities, is .02, correct?

4  A.  Well, actually what I really tell people is the

5    range from .01 to .025, but then using .02 can

6    provide a reasonable estimate.

7  Q.  That's what you teach in the MCLE seminars as

8    well, correct?

9  A.  That's right.

10  Q.  What did you -- you say here that you taught a

11    seminar at Suffolk Law School on the

12    breathalyzer, correct?

13  A.  Yes.

14  Q.  Did that lecture deal with proper calculations

15    of the Widmark?

16  A.  No.

17  Q.  The ethanol speech you gave the American Academy

18    of Forensic Scientists and the New Hampshire Bar

19    Association, did those deal with the proper

20    calculations under the Widmark?

21  A.  The one at the American Academy of Forensic

22    Sciences, I have given so many that I don't know

23    which one you're referring to.

24  Q.  Just the one that you put in your paper here?

52

1  A.  Well, I think, why don't you read that to me

2    where it says what I --

3  Q.  Spoken on ethanol at the American College of

4    Forensic Science and the New Hampshire Bar

5    Association?

6        MR. FARRAH: No, no, no. Forensic

7    science is parenthesis see resume, close

8    parenthesis.

9  Q.  We'll go through the resume, if you want to go

10    through each one.

11  A.  All I want to say is, excuse me, that's a

12    general statement. All I said is that I spoke

13    about ethanol at those symposiums.

14  Q.  I'm not trying to trick you or anything. I want

15    to find out how many of these things that -- you

16    speak on a lot of things, you speak on the

17    effects of drugs; correct?

18  A.  I do.

19  Q.  You speak on the topics other than just alcohol,

20    correct?

21  A.  Certainly.

22  Q.  And I'm trying to find out which one of these

23    that you put in your opinion deal directly with

24    the proper use of the Widmark Formula?

53

1           MR. FARRAH: Objection.
2   A.   I can't answer that.
3   Q.   Okay. Which one of your peer reviewed articles
4        deal with the proper calculations under the
5        Widmark?
6   A.   Well, certainly the one that I gave at the
7        Society for Forensic Toxicology last October
8        did.
9   Q.   So October of '06?
10  A.   Yes.
11  Q.   You gave a lecture to the Academy of Forensic
12       Scientists in which you discussed the proper use
13       of the Widmark?
14  A.   No, the Society of Forensic Toxicologists.
15  Q.   The society, where was that given?
16  A.   Nashville, maybe.
17  Q.   Did you provide a paper?
18  A.   No, an abstract.
19  Q.   Was the abstract published?
20  A.   Yes.
21  Q.   Where was it published?
22  A.   In the proceedings.
23  Q.   Is it published anywhere other than -- was this
24       a seminar?

54

1   A.   It was a workshop.
2   Q.   So you understand that to be a peer review where
3        you published something in a workshop?
4   A.   The abstract is peer reviewed by a peer review
5        committee before it's even accepted. If it
6        doesn't pass peer review, it's not accepted and
7        you don't present.
8   Q.   And so the society has its own peer review group
9        that reviewed it before you presented it?
10  A.   That is correct.
11  Q.   Where would I find a copy of that paper?
12  A.   I don't know.
13  Q.   Well, if it's published, where is it published
14       to?
15  A.   In the --
16  Q.   Just a workshop?
17  A.   In the proceedings of the workshop, yes.
18  Q.   It's not in any other volume or periodical?
19  A.   No.
20  Q.   Just the workshop?
21  A.   Yes.
22  Q.   Now, on the bottom of the page two of your
23       opinion, you conclude With reasonable scientific
24       certainty that Jeffrey Southworth consumed the

55

1        equivalent of 13 12-ounce beers in 90 minutes;
2        is that correct?
3   A.   Yes.
4           MR. FARRAH: Could we just let him
5        have a chance to look at it if he wants to?
6   A.   If that's what I said, that's what I said.
7        That's actually the middle-ish, see, so that
8        begins.
9   Q.   Is that what you said?
10  A.   Yes, I did.
11  Q.   Is there a reason why you translate everything
12       into beers as opposed to just putting in the
13       amount of alcohol he drank that evening?
14  A.   Yes.
15  Q.   Why is that?
16  A.   Because I'm translating it to number of drinks
17       is another way of expressing the amount of
18       ethanol, and people are frequently more familiar
19       with how many drinks somebody has.
20          To tell a lay person that a person has
21       a blood alcohol of a certain level may not have
22       exactly the same understandability, or that
23       person may not understand a blood alcohol
24       concentration as opposed to a number of drinks.

56

1   Q.   Is there a particular reason for using beer as
2        opposed to wine or one and a quarter ounces of
3        alcohol?
4   A.   No. I mean as you pointed out earlier, I could
5        have said 12 four-ounce glasses of wine at
6        twelve percent, or I could have said 12 mixed
7        drinks with one and a quarter ounces of 80 proof
8        spirits.
9   Q.   And you conclude to a reasonable degree of
10       scientific certainty certain facts, correct?
11          MR. FARRAH: Objection.
12  A.   Well, I don't know what you're referring to that
13       kind of like --
14  Q.   One, two, three, four, the fifth line of that
15       paragraph as part of your -- you conclude that
16       he became loud and had difficulty carrying
17       himself in the way he normally did. Correct?
18  A.   Yes.
19  Q.   You determined that to a reasonable degree of
20       scientific certainty?
21          MR. FARRAH: Objection.
22  A.   Based on testimony, yes.
23  Q.   But there's no testimony that Mr. Southworth
24       himself was the only person loud at the table,

57

1    correct?

2              MR. FARRAH: Objection.

3    A.  No, that's true.

4    Q.  The only testimony you have is that the table

5        itself at some point during the evening appeared

6        to be loud, correct?

7              MR. FARRAH: Objection.

8              MR. GILLIS: What's your objection?

9              MR. FARRAH: I think you're

10       mischaracterizing the testimony of the documents

11       that he reviewed.

12             MR. GILLIS: Well, then, he can tell

13       me if I'm wrong.

14             MR. FARRAH: Fine.

15   A.  The affidavit of Jude Connelly that was filed

16       the 6th of May 2005, the second page, item five,

17       when he references his own deposition, page 49

18       to 51, he says, I testified -- referring to that

19       deposition -- that during the course of the

20       evening at the Longhorn Steakhouse,

21       Mr. Southworth seemed to be under the influence

22       of alcoholic beverages he was being served at

23       the restaurant.

24   Q.  I think we're talking about the loudness. We'll

58

1        get to the restaurant.

2    A.  I'm not finished. Item 6 on the same page.

3    Q.  Is this concerning loudness?

4              MR. FARRAH: Let him answer. Then you

5        can ask him.

6              MR. GILLIS: If he wants to answer on

7        loudness, I'll let him answer.

8              MR. FARRAH: Otherwise, what are you

9        going to do, interrupt him?

10             MR. GILLIS: Yes, I am, because that's

11       not the question.

12             MR. FARRAH: Let him answer the

13       question.

14   Q.  The question is what evidence do you have that

15       Mr. Southworth, not the restaurant, was loud

16       that evening? That is all the question is.

17   A.  You don't need to raise your voice to me,

18       Mr. Gillis. I'm going to answer your

19       question --

20   Q.  Please do.

21   A.  -- right now. Item six. I also testified at

22       pages 42 to 44 of my deposition, that

23       approximately one-half hour before we left the

24       Longhorn, everyone at the table was loud,

59

1        including Mr. Southworth, and that either a

2        waitress or manager of the restaurant came to us

3        and asked us to be quiet.

4    Q.  So --

5    A.  Let me just add the last statement, then we can

6        move on to your next question.

7              At that time -- this is item seven

8        from the same affidavit -- when the table was

9        asked to quiet down, Mr. Southworth was

10       exhibiting all the signs of intoxication I

11       testified about at pages 49 to 51 of my

12       deposition. Signed under pains and penalties of

13       perjury, the 6th day of May 2005.

14   Q.  Okay, so the table was loud, correct?

15   A.  As well as Mr. Southworth.

16             MR. FARRAH: Objection.

17   A.  You know that statement was right there, I just

18       read it.

19   Q.  Are you aware of any independent testimony that

20       just -- that other than the table itself,

21       meaning everybody at the table, was loud?

22             MR. FARRAH: Objection.

23   A.  What do you mean by independent testimony? I

24       think this is independent testimony.

60

1    Q.  I'm talking about is there anywhere in any of

2        the things that you reviewed that said just

3        Mr. Southworth was loud as opposed to the whole

4        table?

5              MR. FARRAH: Objection.

6    A.  It doesn't -- excuse me. Well, to answer your

7        question, I'm sorry. To answer your question,

8        am I aware of that specific statement which you

9        just fabricated and put to me and has no

10       relevance as to what I just stated? No, I'm

11       not.

12   Q.  Okay. How do you delineate which of the seven

13       people were intoxicated based on being loud at

14       the table versus those who are loud at the table

15       but weren't intoxicated?

16             MR. FARRAH: Objection to the form.

17   A.  Did you say delineate?

18   Q.  How did you determine which ones because they're

19       loud or intoxicated, and which ones because they

20       are loud and not intoxicated?

21             MR. FARRAH: Objection.

22   A.  How do I determine? I determine because

23       Mr. Connelly made that statement in his

24       deposition. He made that statement and spoke

61

1     specifically about Mr. Southworth in this
2     affidavit, and those were credible testimonies;
3     and also consistent with the other statements
4     that Mr. Connelly made about the signs that
5     Mr. Southworth was exhibiting that evening.
6 Q.  As a hypothetical, if he said that they left at
7     11 o'clock, that would be around 10:30, 25
8     minutes beforehand that they were loud, correct?
9           MR. FARRAH: Objection.
10 A.  I'm sorry, I don't understand what you are
11     asking me.
12 Q.  Jude Connelly in that deposition which you have
13     given this weight to --
14 A.  Yes.
15 Q.  -- to show that signs of loudness were
16     indicative of his intoxication, you testified
17     that they were loud 25 minutes before they left,
18     that's what time you believe they were loud;
19     correct?
20           MR. FARRAH: Objection.
21 A.  I'm sorry, that question is far too complicated
22     for me to respond to.
23 Q.  I'm going to show you the pages that you
24     referred to in that affidavit. Specifically

62

1     page 44, and I'll read the question and the
2     answer and you tell me if I read it correctly.
3     Line 14?
4 A.  I can't do so without a copy.
5 Q.  Line 14. And giving me your best -- this is
6     Mr. Farrah asking the question -- and give me
7     your best estimate of how much time elapsed from
8     when the woman came over and told you to tone it
9     down and when you left the restaurant on maybe
10     25 minutes, half an hour, is that correct? Did
11     I read that correctly?
12 A.  You did read that correctly.
13 Q.  Is that your understanding as to when they were
14     loud 25 minutes before they left?
15           MR. FARRAH: I didn't hear the
16     question. Could you repeat the question?
17 Q.  Is that your understanding as to when they were
18     loud, 25 minutes before they left?
19           MR. FARRAH: Objection.
20 A.  There is no time reference in that. I can't
21     answer reference that.
22 Q.  What time reference do you need?
23 A.  I need some time reference. I just can't take a
24     statement like that without any qualifier as to

63

1     time.
2 Q.  Do you have any reason not to believe Jude
3     Connelly when he said that the time that they
4     were loud was 25 to 30 minutes before they left,
5     regardless of when they left?
6 A.  I don't have any reason to disbelieve that
7     statement.
8 Q.  On page 39 of his deposition -- this is again
9     Mr. Farrah asking the question because as you
10     know, we weren't invited at any of these
11     depositions.
12          I can tell you -- can you tell me at
13     what time you left? I would say that it was if
14     not just before, right around 11 o'clock,
15     correct?
16           MR. FARRAH: You read that correctly.
17     Good reading.
18 A.  When you say correct to me, you mean in my --
19 Q.  Did I read that correctly?
20 A.  Yes, you read it correctly.
21 Q.  Did you disbelieve Mr. Connelly that that's the
22     time that he left?
23           MR. FARRAH: Objection.
24 A.  I don't think that that is correct, no.

64

1 Q.  So you believe him when it suits your purpose,
2     that is, when it's loud, but you don't believe
3     him when he says they left at 11:00, correct?
4           MR. FARRAH: Objection.
5 A.  I think that the time -- I think that the timing
6     is incorrect, but I think that he is quite
7     correct when he describes everyone at the table
8     as being loud, and Mr. Southworth is as well.
9 Q.  What time do you say they left the restaurant
10     that evening?
11 A.  Well, if I'm -- if I knew the distance between
12     the hotel and the restaurant, I could give you a
13     fair assessment, but I would have to say it was
14     after 9:35, minutes after 9:35, because there
15     was still one more drink to consume.
16 Q.  How many minutes?
17           MR. FARRAH: Wait. I don't think he
18     finished his answer.
19 A.  I've got to --
20           MR. FARRAH: I know you're anxious --
21 A.  Let me run this out.
22           MR. FARRAH: -- to depose this man.
23 A.  It would have been after 9:35, but it would have
24     been enough time so that they could have gotten

**65**

1    to the hotel. If he had the last beer at around
2    10:30, 10:35, whatever that time was that I had
3    in my note, they would probably have gotten
4    there about 15 minutes before at the latest.
5    So I would say that the time that they left
6    would probably, and this is only inferring by
7    the other standards, sometime, they would have
8    left between quarter of ten and maybe five after
9    ten. Something like that.
10   Q.  I'm going to ask you to assume that the hotel is
11       less than a mile away.
12   A.  Okay.
13   Q.  What is your opinion as to when they left?
14           MR. FARRAH: Objection.
15   A.  Then they could have left a little bit later,
16       too. They could have left at 10:10 maybe.
17   Q.  Well, what is your opinion?
18           MR. FARRAH: Objection. He just
19   answered your question.
20           MR. GILLIS: No. He said it could
21   have been. I want to know what is your opinion.
22   Not what it could have been; not what it should
23   have been. What is your opinion based on what
24   you reviewed in this case as to when they left?

**66**

1           MR. FARRAH: Please. He is not being
2    asked to give opinions as to when people left or
3    didn't leave an establishment. You have asked
4    questions that are completely objectionable.
5           MR. GILLIS: Because he has given a
6    reasonable scientific certainty to exactly what
7    they drank and when.
8           MR. FARRAH: He doesn't have an
9    opinion as to when they left.
10          MR. GILLIS: That's not true. He does
11   have an opinion because he has them drinking in
12   the hole by 10:30. I want to know the basis of
13   that. When did they leave?
14          MR. FARRAH: Objection, same
15   objection. I think he's answered the question.
16   A.  I would say between 10:00 and 10:15.
17   Q.  Sometime after 10:00?
18   A.  Yes.
19          MR. FARRAH: Objection.
20   Q.  What did you base that on?
21          MR. FARRAH: Same objection.
22   A.  Based it on what I have stated earlier about the
23       next beer having been consumed at the hotel in
24       the 10:30, 10:35 period of time.

**67**

1    Q.  You don't know what you base that statement on,
2        correct?
3    A.  Well, I do know that those -- excuse me, those
4        were, the 10:30 was the last beer. Those were
5        based on the documents that I reviewed that were
6        listed in my report.
7    Q.  Which document?
8    A.  The documents that were listed under Documents
9        Reviewed in my report.
10   Q.  I understand, but which of those documents
11       reviewed? You reviewed many.
12   A.  I can't tell you. That's right, I did, and I
13       can't tell you which one.
14   Q.  When you have a situation like this where Jude
15       Connelly says that he left -- they left at 11
16       o'clock, and apparently somebody else must have
17       said they left earlier because you're saying
18       that person said he had a drink at the hotel at
19       10:30, how do you determine whose statement is
20       more accurate?
21          MR. FARRAH: Objection.
22   A.  I try to look at any consistency or
23       inconsistency among all of the documents I
24       looked at.

**68**

1    Q.  So there are portions of Jude Connelly's
2        testimony you find credible and other parts of
3        it you don't find credible, correct?
4           MR. FARRAH: Objection.
5    A.  Essentially true. I mean credible, excuse me --
6        I don't want to, I have a problem with the
7        credibility part in the sense that people can be
8        mistaken about time, and it doesn't mean that
9        they are deliberately trying to mislead
10       somebody. They're just mistaken and that's in
11       good faith. So I don't want to say that they're
12       not credible.
13          Just saying that when I had to make a
14       final decision on the times that I was going to
15       use, based on the documents on the totality of
16       the documents that I reviewed, and the
17       consistencies and inconsistencies I was able to
18       perceive among them, this was the best
19       chronology that I could come up with.
20   Q.  But you have no, you can't tell me which
21       documents you relied upon as to the 10:30
22       statement and why it is so, is that correct?
23   A.  You ask one question. I can't tell you the
24       specific document, no, I cannot.

69

1  Q. As you sit here today, you can't tell me why you
2      find some other document more credible than what
3      Jude Connelly stated was the time that they left
4      the restaurant?
5  A. No, I can't. But your inference is right,
6      that's what I believed at the time I wrote the
7      report.
8  Q. But you believed Jude Connelly enough that you
9      adopted his statement that the table was loud at
10     some point?
11 A. Well, that's a fact. The statement that you
12     read was that the young lady came over and told
13     them all to be quiet.
14 Q. That's what Jude Connelly testified to?
15 A. All right, okay.
16 Q. Correct? You determined what facts you wished
17     to put in your chronology and which ones you
18     don't?
19         MR. FARRAH: Objection. I think we
20     have pretty much covered that.
21 A. I think I already told you that I agreed with
22     that but I think he was mistaken about the time.
23 Q. How as an expert do you scientifically determine
24     which statements are misspoken and which

70

1      statements are accurate?
2          MR. FARRAH: Same objection.
3  A. I think I already answered that by the --
4  Q. Let's go over, starting on page five of your
5      expert report, you mention the Widmark method.
6          MR. FARRAH: Did you say page five?
7  A. Yes.
8  Q. Now, in this chronology you have the first beer
9      drunk by Mr. Southworth as a 12-ounce beer at
10     7:30 p.m., correct?
11 A. Yes, sir.
12 Q. What's the basis for that opinion?
13 A. The testimony that they were out dirt bike
14     riding, I believe, and that was the first beer
15     that they had.
16 Q. You understand that Jude Connelly testified that
17     there was no beer drank that he was aware of,
18     correct?
19         MR. FARRAH: Objection.
20 Q. In the deposition that you found credible, the
21     first deposition?
22 A. I don't have an independent recollection of that
23     at all.
24 Q. Okay. Well, if he didn't -- do you know what

71

1      time Jude Connelly said they stopped dirt biking
2      that night?
3  A. Yes, sometime before 7:30.
4  Q. Sometime before 7:00, correct?
5          MR. FARRAH: Objection.
6  A. 7:00 is before 7:30.
7  Q. What time do you believe they stopped dirt
8      biking that night?
9          MR. FARRAH: Objection.
10 A. Sometime before 7:30.
11 Q. How far before 7:30?
12 A. I can't tell you specifically.
13 Q. How long did it take them to get from there to
14     the Longhorn?
15 A. If -- at least a half an hour, approximately
16     half an hour.
17 Q. At least a half an hour?
18 A. From 7:30. They got there around eight o'clock.
19 Q. So in order to get there by eight, if it took 30
20     minutes, they would have had to finish their
21     beers sometime before 7:30, correct?
22 A. I don't think -- first of all, I don't know who
23     they is. I know Mr. Southworth had a beer.
24 Q. He would have had to have finished it by 7:30 in

72

1      order to drive 30 minutes to the Longhorn and
2      get there by eight o'clock, correct?
3          MR. FARRAH: Or drank it as he drove.
4          MR. GILLIS: Thank you, Mr. Farrah.
5      Do you want to testify?
6  A. Is there not a possibility that he took the can
7      into the car with him and drank as they were
8      going? Of course.
9  Q. I'm asking you what's your opinion: Did he
10     drink in the car?
11         MR. FARRAH: Objection.
12 A. The answer is that it's immaterial whether he
13     drank in the car or whether he drank before he
14     got into the car. The fact is whether or not he
15     had a beer and whether or not I have included it
16     in the summary of the ingestions, and I have.
17     Where he drank it doesn't make any difference.
18 Q. But the time he drank it does?
19 A. The time is important in some capacity. But it
20     isn't extremely important.
21 Q. Well, if he had that beer at seven o'clock and
22     his blood alcohol at the time he got to the
23     restaurant would be zero, not .01, correct?
24 A. It would be below .016. It may not be zero but

73

1　　it would be very low, you're absolutely right,
2　　very low.
3　Q.　That would have an effect on the calculations as
4　　to what you find his blood alcohol to be when he
5　　was served his last drink?
6　　　　　MR. FARRAH: Objection.
7　A.　Not really. Because by then, it certainly is
8　　gone from his body.
9　Q.　I want you to assume that Mr. Connelly testified
10　　that they stopped somewhere between 6:00 and
11　　7:00, and assuming that, what time do you opine
12　　that he had his last beer that night?
13　A.　Then between 7:00 and 7:30.
14　　　　　MR. FARRAH: You mean his first beer?
15　Q.　First beer.
16　A.　First beer, thank you.
17　Q.　And if it was closer to 7:00, it would have been
18　　almost all burnt off before he got to the
19　　Longhorn, correct?
20　A.　Yes.
21　Q.　The second beer you attribute to him is one
22　　25-ounce Bud Light at 8:10, correct?
23　A.　Yes.
24　Q.　How do you come up with 8:10?

74

1　A.　Their testimony was that they arrived at the
2　　Longhorn approximately eight o'clock and that
3　　they went over to the bar. And I'm figuring
4　　that if you order a drink and it's a busy night,
5　　it may take you five to ten minutes to get
6　　served.
7　Q.　That's your assumption?
8　A.　I think it's a reasonable assumption.
9　Q.　What is your assumption for him having another
10　　beer at 8:20?
11　A.　That there was testimony that they -- that he
12　　had two beers at the bar prior to having been
13　　seated. I think that's seated, I can't tell you
14　　specifically.
15　Q.　You don't know the basis of that opinion as you
16　　sit here today?
17　A.　I don't recall specifically.
18　Q.　Did you review the deposition of Michael Espey?
19　A.　I believe I did.
20　Q.　Did you find it to be credible?
21　A.　Gee, you know, I reviewed these so long ago,
22　　that I don't have any independent -- that's why
23　　you're asking all these questions. I just don't
24　　have all those independent facts at my disposal

75

1　　to it.
2　Q.　So you don't have, for purposes of your
3　　deposition today, you don't have the basis for
4　　your opinion that he had two beers at the bar?
5　　　　　MR. FARRAH: I'm sorry, I didn't -- I
6　　just didn't hear the beginning of that question.
7　　Could you repeat the beginning?
8　A.　For the purposes of your deposition.
9　Q.　I'll ask it a different way. As you sit here
10　　right now as an expert in this case, you can't
11　　tell me what was the basis for your opinion,
12　　what data or testimony you relied upon in coming
13　　to the conclusion that he got a second beer at
14　　the bar at 8:20?
15　A.　That's not correct.
16　Q.　What is it?
17　A.　The information that you're seeking would be
18　　within those documents that were described under
19　　Documents Reviewed, if we pulled all those
20　　documents out and went through them.
21　Q.　You can't tell me which one it is?
22　A.　That is correct.
23　Q.　They sat down at 8:40, correct?
24　A.　Approximately.

76

1　　　　　MR. FARRAH: Objection.
2　Q.　Well, we know that they sat down because the
3　　audit report shows an input of food and drinks
4　　at 8:41, correct?
5　A.　Yes.
6　Q.　Is it your opinion that they sat down by 8:40?
7　　　　　MR. FARRAH: Objection.
8　A.　I think the testimony was that they were seated
9　　approximately 8:30, and what you're referring to
10　　is the time the waitress comes over and actually
11　　takes the first drink order, and then records it
12　　on the computerized ordering system. So we're
13　　not really disagreeing here, Mr. Gillis.
14　Q.　So you have him ordering a beer at 8:20, getting
15　　it served, drinking it, and having it all done
16　　before he went and sat down at 8:30?
17　A.　I have him ordering a second beer. We're
18　　talking about the second beer.
19　Q.　It's your testimony, to a reasonable degree of
20　　scientific certainty, that he had a beer at 8:20
21　　and was able to drink a 25-ounce beer and finish
22　　it and get to the table by 8:30, is that your
23　　testimony?
24　　　　　MR. FARRAH: Objection. You can

77

1    answer.
2  A.  The fact that he started the second beer at 8:20
3       doesn't necessarily mean that he finished it by
4       the time they sat down.
5  Q.  Are you aware of any testimony that he brought
6       the beer with him to the table?
7  A.  I am not.
8  Q.  And did you review the deposition of Leigh
9       Chabot?
10 A.  I reviewed nothing before I came to this
11      deposition today.
12 Q.  Wouldn't that be important if the server said
13      the first round of drinks -- don't you think
14      it's important that the server testified that
15      that first round of four drinks was served to
16      those people who didn't come from the bar
17      because the other three brought their drinks
18      from the bar?
19 A.  What I had to go on at the time was what I
20      utilized.  And she was -- she testified as best
21      she could, but there were other things that I
22      relied on as well.
23 Q.  How do you know how she testified if you never
24      looked at it?

78

1  A.  Well, maybe I'm confusing the witness statements
2       with the depositions.  You may absolutely be
3       correct.
4  Q.  I'm going to ask you to assume that the four
5       drinks -- you have the audit report in front of
6       you, correct?
7  A.  I do.
8  Q.  And the audit report has been premarked as
9       Exhibit 4 in this case.  And you have at 8:45,
10      four drinks that were being ordered, correct?
11 A.  At 8:40?  Is that what you said?
12 Q.  The bottom of the page.
13 A.  Okay.  I'm in the wrong page here.  Yes, three
14      Jack Manhattans and a Bud, a large Bud.
15 Q.  Now, your understanding of the facts of this
16      case is that there were three people at the bar
17      before they sat down, correct?
18 A.  My understanding is that there were two people.
19 Q.  You only have two people at the bar before they
20      sat down?
21 A.  Yes.  Mr. Southworth and his dirt bike riding
22      friend.
23 Q.  Espey and nobody else?
24 A.  Those are the two I know.

79

1             MR. FARRAH:  Objection to Mr. Espey,
2       nobody else.
3  Q.  Who was at the bar, to the best of your
4       recollection, before the group sat down at the
5       table?
6  A.  I have no knowledge of people other than Jeffrey
7       Southworth and the fellow that he came in with.
8  Q.  Do you know what that fellow's name is?
9  A.  No.
10 Q.  Two people, correct?
11 A.  Yes.
12 Q.  And what is your understanding as to how many
13      people sat at the table?
14 A.  Gee, I don't really recall.
15 Q.  Well, isn't that important in order to assign
16      drinks to people, to know how many people are
17      sitting at the table?
18 A.  Not really.
19 Q.  Okay.  I want you to assume that Ms. Chabot
20      testified under oath on questions asked to her
21      by Mr. Farrah, that four gentlemen came in that
22      were not at the bar and that the first round of
23      drinks was served to those four gentlemen?
24 A.  The first round of drinks at the bar or at the

80

1       table?
2  Q.  At the table, there's three Manhattans and the
3       Bud Light?
4  A.  All right.  Now say that to me again, please?
5  Q.  I want you to assume that in the deposition of
6       Ms. Chabot, she said when the group of gentlemen
7       sat down at the table, there were four gentlemen
8       who sat down who did not come from the bar, and
9       those are the four that ordered those drinks.  I
10      want you to assume that, the three Manhattans
11      and the Bud Light?
12 A.  Okay.
13 Q.  Does that change your opinion in any way as to
14      what Mr. Southworth had to drink at the table
15      that evening?
16             MR. FARRAH:  Objection.
17 A.  No.
18 Q.  No?
19 A.  No.
20 Q.  Well, in your opinion, you say that
21      Mr. Southworth drank that Bud Light in that
22      first round, correct?
23             MR. FARRAH:  Objection.
24 A.  He drank two Bud, he drank two Bud Lights before

81

1    he sat down.
2  Q.  At the table, you said he had two Bud Lights in
3      your opinion, correct?
4          MR. FARRAH:  Can he look at his
5      opinion?
6          MR. GILLIS:  Sure, he can.  He's got
7      it right in front of him.
8          Why don't we take a two-minute break?
9          VIDEO OPERATOR:  The time is 1:36
10     p.m., and we're now off the record.
11       (Recess.)
12 Q.  On the top of page 6 --
13         VIDEO OPERATOR:  Stand by.  The time
14     is now 1:47 p.m. and we are now back on the
15     record.
16 Q.  On the top of page 6 of your expert opinion in
17     this case, you, as part of your chronology, give
18     a 25-ounce beer to Mr. Southworth, and then you
19     have parenthesis check 20043, correct?
20 A.  Yes.
21 Q.  Is that the beer that was ordered at 8:40?
22 A.  Yes.
23 Q.  But the only testimony is that -- are you aware
24     of any testimony that the server brought that

82

1      first round of drinks to Mr. Southworth as
2      opposed to the four gentlemen who just showed up
3      at the restaurant?
4          MR. FARRAH:  Objection.
5  A.  No.
6          VIDEO OPERATOR:  Counsel.
7          MR. FARRAH:  Sorry.
8  Q.  I want you to assume that Leigh Chabot has
9      testified that four gentlemen came in who were
10     not coming from the bar and those were the four
11     that got the drinks as they came -- that was in
12     the first round of drinks that night.  Does that
13     change your opinion in any way?
14         MR. FARRAH:  Objection.
15 A.  No.
16 Q.  Why not?
17 A.  Because apparently when I put this chronology
18     together, that was the conclusion that I drew.
19 Q.  Apparently?
20 A.  Or I wouldn't have put it down.
21 Q.  How did you conclude it?
22 A.  It had to be from the other documents that I
23     listed as documents that I reviewed.
24 Q.  You don't know which specific one?

83

1  A.  No.
2  Q.  What are you charging for this deposition today?
3  A.  $650 an hour.
4  Q.  You knew when you came here I would be asking
5      you questions about this case, correct?
6  A.  I did.
7  Q.  And at $650 an hour, you didn't think it
8      important enough to review your documents so
9      that you would have answers as to how you based
10     your opinions?
11         MR. FARRAH:  Objection.
12 A.  Well, I don't think that that's a fair
13     characterization.  I anticipated being able to
14     talk about the Widmark calculations and the
15     composition of the drink.  And there were so
16     much conflicting testimony among the people who
17     had testified, and with the several cases and
18     the witness statements and so forth, that I had
19     to use my best judgment when I put this
20     together.  And that's what I did.
21 Q.  And that best judgment that you used -- by the
22     way, you have already charged $6,600 in this
23     case before you got to the deposition, correct?
24 A.  I don't have a recollection as to what I have

84

1      been paid.  There's something in the Rule 26
2      report about what I have been paid.
3  Q.  Whatever it is, that's what you have been paid
4      to date?
5  A.  That would be true.
6  Q.  And based on all of that, you can't tell me the
7      basis of your chronology?
8  A.  No.
9          MR. FARRAH:  Objection.
10 Q.  Now, you just testified that there's a lot of
11     conflicting testimony, correct?
12 A.  Yes.
13 Q.  How did you determine facts to a reasonable
14     degree of scientific certainty when you yourself
15     say that there's a lot of conflicting facts in
16     the case?
17         MR. FARRAH:  Objection.
18 A.  When I reviewed the documents, I had all the
19     documents laid out and highlighted and yellow
20     stickered.  I went through them, and I put
21     together what at that time was scenario that was
22     the most likely to have occurred at that time.
23 Q.  The most likely to have occurred?
24 A.  Right.  And if I had any questions about what

85

1     had occurred, I asked plaintiff's counsel about

2     how to interpret those documents and how he

3     would be putting the hypothetical question to me

4     in court.

5  Q.  So if there was a problem with the chronology,

6     you asked plaintiff counsel to tell you what

7     chronology to use for purposes of the

8     hypothetical?

9  A.  Right.

10  Q.  So if the waitress says, I served the four

11     people who just came in from outside the

12     restaurant those drinks, and Mr. Farrah told you

13     to attribute that drink to Mr. Southworth, you

14     attributed that drink to Mr. Southworth,

15     correct?

16  A.  Most likely.

17         MR. FARRAH: Objection. You can

18     answer.

19  Q.  So is the chronology drawn up by you or by

20     Mr. Farrah?

21  A.  By me.

22  Q.  Whenever there's a question, you get what you

23     need for a hypothetical from Mr. Farrah,

24     correct?

86

1  A.  Yes.

2  Q.  Is it fair to say that your expertise is in

3     determining the blood alcohol based on the

4     chronology that you are given?

5         MR. FARRAH: Objection.

6  A.  My expertise is in taking the set of scenario or

7     set of circumstances with a given number of

8     drinks and then calculating what the blood

9     alcohol would be under that set of

10     circumstances.

11  Q.  Then why do you need Mr. Farrah to give you

12     anything in the chronology?

13         MR. FARRAH: Objection.

14  A.  Because at that time, there were things that I

15     might not have been able to fit in. As a matter

16     of fact, there are still inconsistencies as

17     you're pointing out right now.

18  Q.  How much of the chronology was prepared, based

19     on the input from Mr. Farrah, as to the

20     hypothetical he would ask you?

21         MR. FARRAH: Objection.

22  A.  I can't really answer that.

23  Q.  So you don't know what part of your chronology

24     is based on your determining what you believe to

87

1     be the facts, and what Mr. Farrah has told you

2     to assume for purposes of his hypothetical?

3         MR. FARRAH: Objection.

4  A.  That is correct.

5  Q.  And when you said earlier in your deposition

6     that you took the information that you needed,

7     what do you mean by that?

8  A.  I took the information about the type of drink

9     and the time that they were served, that's what

10     I needed.

11  Q.  Now, if the drink was ordered at 9:40, why do

12     you have it coming at 9:15?

13         MR. FARRAH: 8:40.

14  Q.  8:40, I'm sorry.

15  A.  Because one, there's a time for ordering a drink

16     and one is for serving the drink.

17  Q.  When you do your Widmark calculations, you don't

18     put the drink in when it was ordered, you put it

19     in at some other time?

20  A.  Well, when a person orders a drink, they don't

21     have it in front of them.

22  Q.  So that wouldn't be the appropriate time to put

23     it in for purposes of calculating, correct?

24  A.  It gives you a window of, say, five to ten

88

1     minutes, and whatever amount of time it takes

2     for the waitress to bring the drink over.

3  Q.  How did you choose the times that you determined

4     from when it was ordered to when it was served

5     and drank?

6  A.  I use a reasonable time interval, such as five

7     or ten minutes.

8  Q.  Do you use the same time or do you switch it

9     around?

10  A.  You mean in this case or in all cases?

11  Q.  In this case.

12  A.  I tried to make what is reasonable time

13     assessment.

14  Q.  How do you go about figuring out what is

15     reasonable?

16  A.  Just from my experiences and from having been in

17     the restaurant business myself.

18  Q.  When you find out -- in this particular, you

19     find out what's reasonable and you stick with it

20     throughout or you change it as it goes along?

21         MR. FARRAH: Objection to the form.

22  A.  If I get better information or something else

23     that would change my chronology, I would change

24     it.

89

1  Q.  What information, if any, do you have on
2      materials that you reviewed that talks about the
3      intervals between when the drink was ordered and
4      when it was actually served?
5  A.  I don't recall having any specific information
6      about it.
7  Q.  So this is just a guess you made when you said
8      it was ordered at 8:40, you guessed that it took
9      ten minutes to get to the table?
10         MR. FARRAH:  Objection.
11 A.  No, I estimated.
12 Q.  Based on what?
13         MR. FARRAH:  I think you have asked
14     him that already.
15 A.  Yes.
16 Q.  Let me ask it again.  Are there any facts in
17     this case that you have determined from all of
18     the materials that you reviewed that allow you
19     to conclude that the drink came ten minutes
20     later?
21 A.  Are there any specific facts that have been
22     testified to?
23 Q.  Yes.
24 A.  There aren't specific facts as to the time but

90

1      there are -- it takes a certain amount of time
2      to mix several martinis or Manhattans.  It takes
3      a certain amount of time to walk over to the
4      bar, to put in the order, to have the bartender
5      make them, to draw the beers, to bring them
6      back; so a five- or a ten-minute interval is a
7      perfectly reasonable estimate.
8  Q.  That's an estimate you made not based on any
9      facts that you gleaned from the materials in
10     this case?
11 A.  That's correct.
12 Q.  And how did you determine in that first round
13     that if Mr. Southworth got a drink, it was the
14     beer and not one of the three Manhattans?
15 A.  I had to assume that based on Mr. Farrah's
16     input.
17 Q.  Mr. Farrah told you to give him the beer in the
18     first round, correct?
19         MR. FARRAH:  Objection.
20 A.  Yes.
21 Q.  You're aware a 25-ounce beer has more alcohol
22     than a Manhattan, correct?
23 A.  Well, it would depend upon the alcohol
24     concentration, and it would depend upon the

91

1      circumstances, but as I calculated it in this
2      situation, a 25-ounce beer had a little bit more
3      than a Jack Manhattan.
4  Q.  Now, you then have food being ordered at nine
5      o'clock, correct?  According to your chronology
6      on the top of page six of your report.
7  A.  Yes, sir.
8  Q.  In fact, food was ordered at 8:40, wasn't it?
9      Based on the audit report?
10 A.  Well, there were some appetizers ordered at 8:40
11     but there were -- the main courses were ordered
12     later on.
13 Q.  Well, there was also bread served at 8:40,
14     correct, from Ms. Chabot?
15 A.  I don't know about bread but I have at 8:40
16     union soup and chowder and like chicken fingers
17     being ordered.  At nine o'clock, I have the
18     steaks and the ribs and the heavier food.
19 Q.  What effect would the appetizers have on the
20     alcohol absorption that evening?
21         MR. FARRAH:  You mean assuming that
22     Southworth had had them?
23         MR. GILLIS:  Yes.
24         MR. FARRAH:  Objection.

92

1  A.  The appetizers would have a minimal effect on
2      slowing down the rate of absorption, and the
3      food would have a significant effect.
4  Q.  How much effect would the appetizers have?
5          MR. FARRAH:  Objection.  He just
6      answered a minimal of.
7  Q.  Give me specifics.  Would it make it from 30 to
8      45 minutes?  30, 40, 60 minutes, what would it
9      do?
10         MR. FARRAH:  Objection.
11 A.  It probably wouldn't change it too much
12     actually.  Maybe a small amount.
13 Q.  Don't you normally teach people in the proper
14     Widmark formulations that if they're having
15     food, it makes the absorption time 60 minutes,
16     even if it's appetizers?
17 A.  I never said appetizers or specifically.  I said
18     that food will slow down the absorption rate.
19     And if you look at my calculations, you'll see
20     that I did do just exactly what you said.
21         I changed the absorption time from 30
22     to 60 minutes starting at 9:20, which would be
23     the amount of time that it would take for
24     somebody who was starting to eat some material

93

1    around nine o'clock, or maybe even a few chicken
2    fingers or small amount before, to have it in
3    their stomach.
4    Q.    40 minutes after it was ordered, you changed the
5          time, is that correct?
6                MR. FARRAH:  Objection.
7    A.    20 minutes.  9:20.
8    Q.    It was ordered at 8:40?
9                MR. FARRAH:  Objection.
10   A.    The appetizers were ordered at 8:40.  The larger
11         meal was ordered at 9:00 and then there was some
12         reference as to when it was actually served.
13   Q.    Do you remember writing an article for MCLE in
14         2006?
15   A.    Sure.
16   Q.    Do you remember giving a hypothetical in that as
17         to how food is absorbed?
18   A.    Why don't you show me what you're referring to?
19   Q.    I will.  Why don't you start at the bottom of
20         page 97?  They talk about a hypothetical where a
21         gentleman arrives at a tavern at one o'clock and
22         he has a 12-ounce Bud Light and some buffalo
23         wings.
24                MR. FARRAH:  Let me just look on.  You

94

1    want him to read something here, is that right?
2                MR. GILLIS:  He wanted to see his
3    article, there it is.
4                MR. FARRAH:  I don't think he said he
5    wanted --
6    A.    I'm asking what --
7                MR. FARRAH:  What do you want him to
8    do?
9    Q.    I'm directing you to look at that and on the
10         next page to look at your hypothetical.
11                MR. FARRAH:  I'm just reading it to
12         myself.
13   Q.    Do you see that hypothetical?
14                MR. FARRAH:  We haven't finished
15         reading it, or at least I haven't finished
16         reading it.
17                Is this, by the way, what you gave me
18         and then took away since you're asking him to
19         read it.
20                MR. GILLIS:  It was a good idea and I
21         took it away.
22                MR. FARRAH:  Okay.
23   Q.    This is your writing, correct, Dr. Benjamin?
24   A.    It is.

95

1    Q.    This is what you prepare for lawyers and judges
2          as to the proper formulation of the Widmark?
3    A.    Right.
4                MR. FARRAH:  Objection.
5    Q.    In your chronology, by the way, you stress
6          emphatically that the chronology is key in these
7          cases, correct?
8    A.    Chronology is important, yes.
9    Q.    You have given papers on the importance of the
10         chronology, correct?
11   A.    I have.
12   Q.    And in your chronology, you have at one o'clock,
13         you gave it ordering 12-ounce Bud Light and some
14         buffalo wings?
15   A.    Yes.
16   Q.    In your Widmark -- strike that.
17                Going back to the chronology, there is
18         no other food until 3:30 when there is a burger
19         and some fries, correct?
20   A.    Yes.
21   Q.    Yet that Widmark, you have an absorption rate of
22         60 minutes starting at one o'clock and
23         continuing on beyond the time of the burger
24         being ordered, correct?

96

1    A.    That is correct.
2                MR. FARRAH:  Objection.
3    Q.    And that is what you teach people, is that when
4          you get something as simple as buffalo wings,
5          that the absorption time is 60 minutes, not 30,
6          correct?
7    A.    You are mixing apples and oranges here,
8          Mr. Gillis.
9    Q.    How am I mixing apples and orange?
10   A.    In this hypothetical, it's one person consuming
11         all of the buffalo wings.  In the case that
12         we're involved in, there are seven people at the
13         table sharing all of the appetizers.  So people
14         are eating a couple of pieces of appetizers each
15         and some of --
16   Q.    Go ahead.
17   A.    That's all.  That there are seven people here
18         who are sharing the appetizers.  And in this
19         situation, the person is by himself eating all
20         the buffalo wings.  When the person is by
21         themselves eating all the buffalo wings, I think
22         it's appropriate to start with a 60-minute
23         absorption time; when people are eating less and
24         I think it's appropriate to start with a 30

97

1   absorption time, and then move it to 60 as more
2   food is ingested.
3   Q. Which of the appetizers did Mr. Southworth eat?
4   A. I don't know. I gave him the benefit of the
5      doubt by elongating the interval regardless.
6   Q. Who had the chowder?
7   A. I don't know that either.
8   Q. Who ate the tunion?
9   A. The what?
10  Q. The tunion. Look at your report, top first
11     thing ordered is a tunion.
12        MR. FARRAH: Is that in his report?
13        MR. GILLIS: Excuse me, the audit
14     report.
15        MR. FARRAH: Where is it in this
16     report?
17  A. I see it.
18        MR. GILLIS: I said in the audit
19     report.
20        Do you want me to say it again, Al?
21     The audit report.
22  A. Tunion.
23  Q. Who ate that?
24  A. I don't know.

98

1   Q. What is it?
2   A. Tunion. I thought it was union soup.
3   Q. So you don't even know what it is?
4   A. No.
5   Q. How big is it?
6   A. I don't know.
7   Q. Is it big enough to feed a whole table?
8   A. Well, I don't know, but the fact that I --
9   Q. Who ate the chicken fingers?
10  A. The fact that I used the 60 actually is the
11     right thing to do at that point in time. It's
12     not going to have any effect initially, and then
13     subsequently as it increases in the stomach,
14     then it's going to have an effect.
15        If he didn't eat it, if Mr. Southworth
16     did not eat any of those appetizers, then I
17     should go back and make that 30 instead of 60;
18     and then the blood alcohol will be even higher
19     faster.
20  Q. You didn't assign the 60 until 20 minutes after
21     the main meal was ordered, correct?
22  A. Yes.
23  Q. After the salads were served, correct?
24        MR. FARRAH: Objection.

99

1   A. Yes, salads.
2   Q. After all the chowder was served, correct?
3   A. Yes.
4   Q. After the chicken fingers were served, correct?
5   A. Yes.
6   Q. After the tunion was served, correct?
7   A. Yes.
8   Q. And you are now saying that that 60 is
9      inappropriate at 9:40 -- 9:30 when you put it
10     in?
11        MR. FARRAH: Objection.
12  A. No. All I'm saying is that if Mr. Southworth
13     didn't eat any of those appetizers, then I
14     should have used a shorter absorption, which
15     would have made it higher. As it is, I used a
16     longer absorption which favors your client.
17  Q. The Widmark, for an empty stomach, is 30,
18     correct? 30 minutes absorption time?
19  A. I used 30 minutes.
20  Q. It's actually 30 to 45, according to the
21     Widmark, correct?
22  A. Well --
23        MR. FARRAH: Objection.
24  A. It's actually, the statistics are that by 30

100

1   minutes, you reach peak on an empty stomach. It
2   would certainly depend upon what was drank. You
3   can't make a statement that it's 30 to 40
4   minutes because our -- taking a shot and
5   drinking a mixed drink or drinking a beer with
6   the same amount of alcohol have different
7   volumes and they're different concentrations.
8   Q. You gave no weight whatsoever to any of the
9      appetizers?
10  A. I didn't give much weight to the appetizers.
11  Q. You gave zero, correct?
12  A. Right.
13  Q. Don't you think that it would have had some
14     effect on the absorption rate?
15  A. Perhaps.
16  Q. Perhaps?
17  A. Yes.
18  Q. There was six salads and appetizers served to
19     the table, and you say perhaps it might have
20     some effect?
21        MR. FARRAH: Objection.
22  A. Yes.
23  Q. So what effect would it have?
24  A. The answer is it depends truly on the

101

1    interaction between how much food and how much
2    alcoholic beverage was ingested at that time,
3    and there's really --
4  Q.  How much bread did he eat?
5  A.  There's really not any way to be able to figure
6    all of that out.
7  Q.  What you are saying, between the time the food
8    was ordered at 8:45 and until you changed your
9    consumption to 60 minutes?
10 A.  9:20, was it?
11 Q.  9:20, for that 40 minutes, you're unable to
12    determine what effect, if any, the appetizers
13    and bread that he may have eaten had on this
14    absorption rate?
15        MR. FARRAH:  Objection.
16 A.  First of all, you haven't demonstrated nor has
17    anybody else that he ate any of that, to begin
18    with.  So I made an assessment that I thought
19    was fair.
20 Q.  Was that your assumption or is that an
21    assumption Mr. Farrah agreed you to take?
22 A.  Those are my assumptions.
23 Q.  So your assumption is he didn't have anything to
24    eat prior to 9:20?

102

1  A.  No, I didn't say that.  What I did say was that
2    the effect would be a negligible effect.
3  Q.  So tunions, salads, chowders, bread, have no
4    effect, but buffalo wings have an effect
5    immediately, is that your testimony?
6        MR. FARRAH:  Objection.
7  A.  No.  In the other scenario, there was one person
8    eating.  In this situation, there are a number
9    of people sharing the appetizers, and then the
10    salads came, then the heavier food came.
11 Q.  Now, there is another beer ordered to the table
12    at 9:15, correct?
13 A.  Yes.
14 Q.  And at this point, we know that appetizers had
15    been brought to the table, correct?
16        MR. FARRAH:  Objection.
17 A.  Yes.
18 Q.  And at that point, we know that according to
19    your chronology, you already ascribe to him a
20    25-ounce Bud Light, correct?
21 A.  Yes.
22 Q.  You have here that Bud Light coming?
23 A.  9:20.
24 Q.  9:20, correct, thank you.  Tell me the facts and

103

1    basis of your opinion that this round he was
2    able to get the beer in five minutes, when the
3    last round it took ten minutes?
4        MR. FARRAH:  Objection.
5  A.  When I looked at the subsequent drinks that he
6    had, the next Jack Daniels Manhattan and the
7    third Jack Daniels Manhattan after the 9:20 Bud,
8    there were so many drinks in that 15-minute
9    period that what I tried to do was spread them
10    out into a reasonable interval, dividing the
11    time interval into separate time periods.
12    Because there were so many drinks that were
13    served in that short period of time, that at
14    that point in time, I was more concerned with
15    trying to spread them out in a reasonable way
16    rather than specifically relate them to the time
17    of order and the time that they were delivered
18    to the table.
19 Q.  So it's not based on any actual testimony in
20    this case, it's something that you assigned to
21    it, correct?
22        MR. FARRAH:  Objection.
23 A.  It's something I assigned to it, exactly right.
24 Q.  I'm correct, am I not, that as far as you're

104

1    aware, there are only two 25-ounce beers that
2    were brought to the table that evening, correct?
3        MR. FARRAH:  Objection.
4        VIDEO OPERATOR:  Five minutes
5    remaining, counsel.
6  A.  I think that's right.
7  Q.  Well, you're aware that Michael Espey drank one
8    of those two beers, correct?
9        MR. FARRAH:  Objection.
10 A.  I'm not aware of that.
11 Q.  You're not?
12 A.  No.
13 Q.  Isn't that your conclusion?
14        MR. FARRAH:  His conclusion, did you
15    say?
16        MR. GILLIS:  Yes.
17        MR. FARRAH:  Objection.
18 A.  From where?
19 Q.  Didn't you sign an affidavit saying that he had
20    it?
21 A.  If I did, I did.
22 Q.  Okay.  Why don't you --
23        MR. FARRAH:  Show him, show him.
24 Q.  Exhibit 3 on the affidavit is your affidavit in

105

1    this case, correct?
2  A.  It is.
3  Q.  I want you to go to paragraph three on the
4    bottom of page seven.
5  A.  There's no paragraph three.
6  Q.  23, sorry.  Do you see the paragraph?
7  A.  I do, you're talking about item 23.
8  Q.  Yes.  You said he was served, the last line, at
9    least a Manhattan and a beer at the Longhorn
10    that evening, correct?
11         MR. FARRAH:  Do you want to read it?
12  A.  Sure, I'll read it.  Item 23 says, Mike Espey,
13    another member of Southworth's party that night,
14    started drinking alcoholic beverages at 4:00 or
15    5:00 in the afternoon.  Despite that, in his own
16    words, he was drunk.  Espey deposition page 26.
17    While at the Longhorn Steakhouse, he was served
18    at least a Manhattan and a beer.
19  Q.  You based your opinion on that, correct?
20         MR. FARRAH:  Objection.
21  A.  Well, that was what he said.
22  Q.  You based your opinion on it, did you not?
23         MR. FARRAH:  Objection.
24  A.  No, I don't think my opinion includes that.

106

1  Q.  Okay, go to page five, paragraph nine.
2         MR. FARRAH:  Of what?
3         MR. GILLIS:  Of that same document.
4  Q.  Tell me if I read this correctly.
5         From my review of these materials, I
6    have relied upon the following relevant
7    background facts on which I base my opinions.
8    Is that what you said under oath in this
9    affidavit?
10  A.  Okay.  That was what I said at the time the
11    affidavit was filed, yes.
12  Q.  So that was under the pains and penalty of
13    perjury, correct?
14  A.  Yes, it was.
15  Q.  And that was based on all of the documents that
16    you had reviewed in order to make this
17    affidavit, correct?
18  A.  Yes.
19  Q.  And your opinion, after basing it on all that,
20    to a reasonable degree of scientific certainty
21    was that Michael Espey had a beer and a
22    Manhattan, at least a Manhattan, a beer, at that
23    table that evening?
24         MR. FARRAH:  That's not what it says.

107

1    What he says here that's a relevant background
2    fact on which he based his opinion.
3  Q.  Did you base your opinion on Michael Espey being
4    served at least a Manhattan and a beer at the
5    Longhorn that night?
6  A.  No.
7  Q.  What does 23 say?
8  A.  That says just what it does, that this is what
9    he testified to in that deposition on that page.
10  Q.  But it's under the section that you say the
11    relevant facts upon which you base your opinion,
12    correct?
13  A.  Well, it's a fact that that's what he testified
14    to in that deposition.
15  Q.  What is its relevance here?
16  A.  That is not for me to determine.
17  Q.  Which of the beers did you allocate to him in
18    this audit report?
19         MR. FARRAH:  Objection.  He hasn't
20    said that he allocated any of the beers in the
21    audit report.
22  A.  Right, I did not allocate in the audit report
23    and in the -- in the report on October 26, I
24    used different facts and a different scenario

108

1    than the affidavit that was filed in May of '05.
2  Q.  What different facts did you use?
3  A.  The facts that I laid out were the ones that are
4    shown on page five and page six of that report.
5         VIDEO OPERATOR:  Two minutes, counsel.
6    The time is 2:17 p.m.  We are now off the
7    record.
8      (Recess)
9         VIDEO OPERATOR:  We are now recording
10    on the record.  This is the beginning of
11    cassette No. 2 in the deposition of Dr. David
12    Benjamin.  The time is 2:26 p.m.
13  Q.  Dr. Benjamin, you're aware that in cases like
14    this known as liquor liability cases, in order
15    for the plaintiff to go forward, they have to
16    file a 60-J affidavit?
17  A.  I know they have to file some sort of affidavit,
18    yes.
19  Q.  And as part of that in this case, you filed an
20    affidavit with the court, correct?
21  A.  Yes.
22  Q.  And that's been -- I have been calling it
23    Exhibit 3, it's actually Exhibit 2, correct?
24  A.  Well, it does say two, yes, it does.

109

1  Q. On page four of that exhibit, going on to page
2     five, it states the various documents that you
3     reviewed for purposes of that deposition, excuse
4     me, that affidavit?
5  A. Yes, it does.
6  Q. And on page three of your expert report in this
7     case, it says what documents you reviewed in
8     order to make your opinion in this case,
9     correct?
10 A. Yes.
11 Q. And then starting on page five of this, of your
12    affidavit that you filed in this case, you start
13    at paragraph nine, a series of paragraphs upon
14    which you say you relied upon them, paragraphs
15    10 through 30, correct?
16       MR. FARRAH: Objection to the form.
17 A. I'm not sure I understand that question.
18 Q. Okay. Paragraph nine says that you relied upon
19    the following relevant background facts on which
20    you based your opinion, correct?
21 A. Yes, it does.
22 Q. The paragraphs that you found to be relevant
23    background facts upon which you base your
24    opinions were paragraphs 10 through 30, correct?

110

1  A. Yes.
2  Q. And if they weren't relevant, you wouldn't have
3     put them in there, correct?
4  A. Most likely not.
5  Q. And the reason that you put in the fact that
6     Michael Espey had had a beer that night is that
7     that's relevant as to what was served to the
8     table that evening, correct?
9        MR. FARRAH: Objection.
10 A. I don't know specifically as to why I put that
11    in.
12 Q. But as you sit here today, even though you put
13    in an affidavit that said it was relevant that
14    he had a beer at the table that night, you're
15    not assigning any of the beers in this case to
16    him in your report?
17 A. I did not.
18       MR. FARRAH: Objection. No, excuse
19    me, just for the record, the question, the
20    paragraph does not say that Espey has a beer at
21    the table.
22 Q. Are you aware of Mr. Espey having anything to
23    drink that night other than what he drank at the
24    table? Again, we're talking Michael Espey.

111

1  A. Right, right. As I told you, there were so many
2     documents that I reviewed that I don't have a
3     clear recollection of the independent documents.
4  Q. Okay. So you're not aware, are you aware of
5     anybody who said he had anything to drink that
6     night at the Longhorn other than what he drank
7     at the table?
8  A. He who?
9  Q. Mike Espey.
10 A. I don't have any recollection, I don't have a
11    recollection one way or the other.
12 Q. But you read his deposition, correct?
13 A. I put it down there.
14 Q. You read it for purposes of your affidavit,
15    correct?
16 A. Right.
17 Q. You read it for purposes of your expert opinion
18    in this case, correct?
19 A. I did.
20 Q. And you said that it's a relevant fact that he
21    had a beer at the Longhorn, correct?
22 A. Well, let me just review that one particular
23    statement.
24 Q. Well, I'll withdraw the question. I want you to

112

1     assume that Michael Espey testified in the
2     Southworth case, the deposition you found to be
3     reliable, that when he arrived there, the only
4     thing he had to drink was what he had to drink
5     at the table?
6  A. Okay.
7  Q. I want you to assume that. Assuming that, does
8     that change your opinion in this case at all as
9     to how much Mr. Southworth had to drink at the
10    table that evening?
11       MR. FARRAH: Objection.
12 A. No.
13 Q. I want you -- have you read the interrogatory
14    answers of Mrs. Rosario?
15 A. Probably not.
16 Q. Do you understand that in the interrogatory
17    answers, she answers and signs under the pains
18    and penalty of perjury that Michael Espey had a
19    beer at the table that evening?
20 A. Mrs. Rosario?
21 Q. Yes.
22 A. Stated that.
23 Q. In her Answers to Interrogatories signed by
24    Mr. Farrah and her.

113

1   A.   I'm confused.  Where was Mrs. Rosario in this
2        scenario?
3   Q.   I don't believe she was there.  I'm just telling
4        you what's in the Answers to Interrogatories,
5        did you bother to read them?
6   A.   I don't know that it was a question of bothering
7        to read them.  It was --
8   Q.   Who told you to assign both beers to
9        Mr. Southworth that night, was that Mr. Farrah?
10              MR. FARRAH:  Objection.
11  A.   Yes.
12  Q.   That's not based on any independent statements
13       in any of the depositions, correct?
14              MR. FARRAH:  Objection.
15  A.   I cannot recall.
16  Q.   What else did he tell you to assume for a fact?
17  A.   Can you clarify something for me?
18  Q.   I'm not here to answer your questions.  I don't
19       mean to be disrespectful.  I think you know how
20       this works.
21  A.   All right.
22  Q.   What else did Mr. Farrah tell you to assume for
23       purposes of a hypothetical?
24              MR. FARRAH:  Objection.

114

1   A.   We're assuming that the drinks that were
2        consumed by Jeffrey Southworth were the ones
3        that I listed.  We're also assuming that the
4        composition of the Manhattan was what I was told
5        to use in my calculations.
6   Q.   Which was what, the one and a quarter ounce of
7        bourbon and the three-quarter ounce of vermouth?
8   A.   Yes, I think so.
9               MR. FARRAH:  Objection.
10  A.   Which differed, and is less than the recipe from
11       the Longhorn itself.
12  Q.   I hate to go over it again but I don't think I
13       understood the answer.  You said we were to
14       assume.  Does that mean that Mr. Farrah told you
15       to assume these things or you assumed them based
16       on your review of the documents?
17              MR. FARRAH:  Objection.
18  A.   No, I was asked to assume.  However, that
19       information came to me because I was unable to
20       figure out what it was from the -- the documents
21       as they were presented were inadequate to allow
22       me, so I would say, What formula shall I use?
23       And I was said -- told to use this formula.
24  Q.   He was the one who told you to assume that he

115

1        had both beers at the table?
2   A.   Yes.
3   Q.   Now you understand from the audit report that
4        there were two entries of Manhattans towards the
5        ends of the evening, one at 9:20 and one at
6        9:24?
7   A.   Let me just look at that.  At 9:21 and 9:24, is
8        that what you said?
9   Q.   Yes.
10  A.   Yes.
11  Q.   And combined, they totaled seven, correct?
12  A.   What is "they" referred to?
13  Q.   The number of drinks, the Manhattans, there's
14       four?
15  A.   You're talking about the total number of
16       Manhattans that were delivered to the table over
17       the course of the evening?
18  Q.   No.  Between 9:21 and 9:24, there were two
19       entries of Manhattans being ordered, correct?
20  A.   Yes.  We just said that.
21  Q.   Four in the first entry at 9:21, and three in
22       the second entry; correct?
23  A.   Yes, that is correct.
24  Q.   A total of seven ordered for the table, correct?

116

1   A.   That would be correct.
2   Q.   Earlier in the evening at 8:51, there are seven
3        Manhattans served ordered all at once, correct?
4   A.   That is correct.
5   Q.   Now, in putting together your chronology, I
6        believe you testified that you put together what
7        you find to be the most reasonable set of facts,
8        correct?
9   A.   Yes.
10  Q.   And is it reasonable to assume that if there
11       were seven people at the table, and seven
12       Manhattans were ordered, that each person got
13       one Manhattan?
14              MR. FARRAH:  Objection.
15  A.   Not really, no.
16  Q.   Who do you assign those seven drinks to?
17  A.   It's not possible to determine that.
18  Q.   You have seven possibly at the table?
19  A.   Right.
20  Q.   Seven drinks ordered?
21  A.   Right.
22  Q.   And you're unable to determine who got what
23       drink?
24  A.   That's correct.

117

1  Q.  Okay.  Now at 9:21 and 9:24, you have a total of
2      seven Manhattans ordered for the table, correct?
3  A.  That is correct.
4  Q.  Who do you assign those seven Manhattans to?
5  A.  Can't really be determined.
6  Q.  Why not?  There are seven people at the table?
7  A.  Sure, but you don't know if one person didn't
8      say, Bring me two.
9  Q.  So you can't determine who had what then?
10 A.  That's right.
11          MR. FARRAH:  Objection.
12 Q.  But you did determine for your chronology that
13     Mr. Southworth had one of each at those rounds?
14 A.  I did.
15 Q.  How did you determine that if you can't
16     determine who drank them?
17 A.  I was directed to assume that.
18 Q.  By counsel?
19 A.  Yes.
20 Q.  Okay.  You wouldn't assume that if seven beers
21     came -- seven drinks came for seven people, that
22     one person got two out of that round, would you?
23          MR. FARRAH:  Objection.
24 Q.  Based on your experience?

118

1  A.  Based on my experience, I have seen that happen,
2      sure.
3  Q.  I'm not asking what you have seen happen.  What
4      is the most likely scenario based on your
5      experience?
6          MR. FARRAH:  Objection.
7  A.  I can't say that there's necessarily one drink
8      for each person.
9  Q.  I'm not asking to say that there's necessarily
10     one for each.  I'm asking you a simple question:
11     What is your reasonable conclusion, based on
12     your education, your training, your experience,
13     and your years as a nationally recognized
14     expert, what is your most likely scenario of
15     where those seven drinks went?
16          MR. FARRAH:  Objection.
17 A.  They went to the table and they were distributed
18     among seven or fewer people.
19 Q.  The most reasonable fact scenario to you is not
20     that Mr. Southworth got one from each of those
21     rounds ordered three minutes apart, correct?
22          MR. FARRAH:  Objection.
23 A.  I didn't say that.
24 Q.  You think the most reasonable interpretation of

119

1      those seven drinks coming to this table is that
2      Mr. Southworth got two of those drinks?
3          MR. FARRAH:  Objection.
4  A.  I said that I could not determine.
5  Q.  You have a Jack Daniels Manhattan, according to
6      your chronology on page six of your answer,
7      excuse me, your expert answer.
8  A.  Expert answers.
9  Q.  Expert report on page six, Exhibit 1.  You have
10     a Jack Daniel Manhattan being served to
11     Mr. Southworth at 9:25, correct?
12 A.  I do.
13 Q.  Well, you have another Jack Daniels Manhattan
14     being served to Mr. --
15          MR. FARRAH:  Here's your sandwich.
16 Q.  -- Mr. Southworth at 9:35, correct?
17 A.  Yes.
18          MR. GILLIS:  You want to go off the
19     record and take a five-minute break?
20          VIDEO OPERATOR:  The time is 2:38 p.m.
21     and we're now off the record.
22     (Recess.)
23          VIDEO OPERATOR:  The time is 2:52 p.m.
24     We are now back on the record.

120

1  Q.  (MR. GILLIS:)  Just as an aside, Doctor, can you
2      tell me how much income you earn on an average
3      year testifying?
4  A.  No, I cannot.
5  Q.  You're under oath and you're going to tell me
6      you don't know what you earn testifying as an
7      expert?
8  A.  Exactly, right.
9  Q.  Do you know how much -- can you tell me how much
10     you earn as an expert in a year?
11 A.  I don't know that figure either.
12 Q.  Do you have a ball park range?
13          MR. FARRAH:  Objection to the form.
14 A.  No, I do not.
15          MR. FARRAH:  Estimate, maybe.
16 Q.  Would you estimate what you make, do you know,
17     in a year as an expert?
18 A.  I have no way of determining that figure.
19 Q.  Well, you file taxes, don't you?
20 A.  I do.
21 Q.  Are you telling me you don't remember what you
22     filed in previous years as to what you earned as
23     an expert?
24 A.  That's true, too, but I don't know what

121

1    percentage of that or what the numbers were that
2    came out from expert work.
3  Q.  How much money did you earn in 2005 as an
4    expert?
5  A.  I don't recall.
6  Q.  How much did you earn in 2006 as an expert?
7  A.  I don't know either of those numbers, I told you
8    that.
9  Q.  How much did you make in 2004 as an expert?
10  A.  I don't know that either.
11  Q.  How much did you earn last year in nonexpert
12    compensation for anything?
13  A.  I have never calculated any of those figures.
14  Q.  What did you earn in 2005 for income other than
15    being an expert?
16  A.  I never calculated that.
17  Q.  What have you earned in your various teaching
18    capacities over the last two years?
19  A.  I don't know what that figure is either.
20  Q.  Okay.  Now your exhibits are being copied so
21    I'll give you a blank copy of the audit report
22    just to follow along.  And you can look along,
23    too, with either your counsel.
24        MR. FARRAH:  Which is Exhibit 4 you're

122

1    talking about?
2        MR. GILLIS:  Exhibit 4 and his Exhibit
3    1, which is a report.
4  Q.  I think we got up to you at 9:20, so we have
5    determined the first beer at 8:50, you said,
6    came ten minutes after it was ordered.  And you
7    assigned to Mr. Southworth, correct?
8  A.  Whatever I said, I said.
9  Q.  And now you're saying the second beer came five
10    minutes after it was ordered, correct?
11  A.  Which beer are you referring to on this, sir?
12  Q.  The second Bud Light at 9:20, if you look at the
13    audit report, page nine, orders items at 9:15?
14  A.  This isn't my copy.
15  Q.  Your copy is being copied and while we're
16    waiting for that, I gave you that to look at.
17  A.  Okay.
18  Q.  Do you see 9:15, one Bud Light ordered to table
19    52?
20        MR. FARRAH:  Are you asking him to
21    look at the audit report now?
22        MR. GILLIS:  Yes.
23  A.  Yes, I do.
24  Q.  And that was ordered at 9:15, correct?

123

1  A.  Yes.
2  Q.  And you have assigned to Mr. Southworth 9:20 as
3    the time that he received that beer, correct?
4  A.  Yes.
5  Q.  Okay, and the next drink you have for him is
6    9:21, excuse me, 9:25, a Jack Daniels Manhattan
7    correct?
8  A.  Yes.
9  Q.  Now, if you look at that audit report on the
10    bottom of that page nine, you see three Jack
11    Daniels Manhattans being ordered and on the top
12    of page ten, one Jack Daniels in that same
13    order, correct?
14  A.  Yes.
15  Q.  That is the round of drinks that you're saying
16    was his next Manhattan, was his?
17  A.  You mean the one that came at 9:25?
18  Q.  Yes.
19  A.  Yes.
20  Q.  So you're now saying that the time of ordering
21    the drink to service is now down to four
22    minutes?
23        MR. FARRAH:  Is that a question?
24  Q.  Is that correct?

124

1        MR. FARRAH:  Objection.
2  A.  I explained to you before that I tried to divide
3    up those drinks in the amount of time that were
4    there.  That there were so many drinks that were
5    ordered, that I tried to divide those drinks up.
6    That's what I explained to you.
7  Q.  Is it your opinion that to a reasonable degree
8    of scientific certainty, that it's reasonable to
9    assume that he got a beer, a 25-ounce beer at
10    9:20, and then ordered a Manhattan one minute
11    later which he was served four minutes
12    thereafter?
13        MR. FARRAH:  Objection.
14  A.  Would you repeat that, please?
15  Q.  You have him getting the 25-ounce beer at 9:20,
16    correct?
17  A.  Yes.
18  Q.  And you have him ordering another beer at 9:21,
19    correct?
20        MR. FARRAH:  A Manhattan.
21  Q.  Excuse me, a Manhattan.
22  A.  A Manhattan.
23  Q.  Based on your expertise, is that a reasonable
24    fact pattern?

125

1  A.  Yes, it is.

2         MR. FARRAH: Objection.

3  Q.  One minute --

4         MR. FARRAH: Objection.

5  Q.  -- is reasonable between getting a drink and

6     ordering the next one?

7  A.  Yes.

8  Q.  And drinking the entire thing before the next

9     beer gets there 9:25, you think that's a

10    reasonable assumption to make here in this case,

11    correct?

12        MR. FARRAH: Objection.

13  A.  People have shots and beers all the time or

14    mixed drinks with beers all the time.

15  Q.  That wasn't the question, Doctor. What I asked

16    you was what is the most reasonable scenario?

17        MR. FARRAH: Objection.

18  A.  Your question was did I think it was reasonable

19    and I think the answer is yes.

20  Q.  If you tried to divide them up, how come you

21    assigned different time intervals between each

22    drink?

23        MR. FARRAH: Objection to the form.

24  A.  I used both the time of ordering and the amount

126

1     of time that was available before they left,

2     before they closed out and left. So I used both

3     of those. I just tried to divide the drinks up

4     in reasonable time intervals.

5  Q.  Wouldn't you divide them up equally in the time

6     frames in between?

7  A.  If they were ordered at equal times, I would.

8     But in this situation, that was the scenario

9     that I used.

10  Q.  So because it was ordered a minute after the

11    previous drink was served, you shortened up the

12    time that it was served?

13        MR. FARRAH: Objection.

14  A.  That wasn't the only thing. I told you I'm

15    trying to fit all the drinks into the allocated

16    time period before they close out the check.

17  Q.  So you have that 9:21 entered into the computer,

18    delivered to the table at 9:25, correct?

19  A.  Correct.

20  Q.  Okay. And then you have the next drink coming

21    at 9:35, is that correct, according to your

22    expert report?

23  A.  Yes, I do.

24  Q.  What time was that beer ordered?

127

1        MR. FARRAH: That Manhattan.

2        MR. GILLIS: The Manhattan, I'm sorry.

3  A.  9:25.

4  Q.  So to a reasonable degree of scientific

5     certainty, it is your opinion that

6     Mr. Southworth ordered his final Manhattan

7     before his previous Manhattan was even delivered

8     to the table?

9  A.  Yes.

10  Q.  Does it not seem more reasonable to you as an

11    expert in this area, that with seven people at

12    the table and seven drinks, all the same drink

13    being ordered three minutes apart, four in one,

14    three in the other, wouldn't it be more

15    reasonable if one went to each person at the

16    table?

17        MR. FARRAH: Objection.

18  A.  Not necessarily, no.

19  Q.  I'm not asking necessarily, I'm asking you

20    what's the most logical conclusion based on your

21    experience and training?

22        MR. FARRAH: Objection.

23  A.  That either scenario could be reasonable.

24  Q.  Is it your opinion as an expert that it's just

128

1     as likely that seven Manhattans that were

2     ordered for 9:21 and three at 9:24 for a table

3     of seven, it's just as likely one gentleman

4     drank from each of those rounds than the other

5     scenario of seven people each getting one drink?

6        MR. FARRAH: Objection.

7  A.  I can't answer that question.

8  Q.  Well, you just said a minute ago that they're

9     equally reasonable?

10  A.  That's the answer.

11  Q.  You think?

12  A.  Either one could have been possible, sure.

13  Q.  I'm not asking what's possible. I'm asking you

14    what is the most reasonable set of facts based

15    on your experience and training?

16  A.  Based on my experience and training there is

17    no -- there is no typical situation. There are

18    plenty of people who order one drink as they're

19    receiving another with the intent of wanting to

20    order that, especially getting late in the

21    evening and leaving.

22  Q.  That's as a reasonable an assumption that he had

23    one of each, correct?

24        MR. FARRAH: Objection.

**129**

1  A.  That's the time scenario that I used.

2  Q.  Okay.  Now, if there were four drinks in the

3     first round and three drinks in the second

4     round, you have concluded for purposes of this

5     case, and for putting together your chronology

6     that Mr. Southworth had one from each, correct?

7  A.  Yes.

8  Q.  How many other people at the table had one from

9     each of those two rounds?

10  A.  I don't know.

11  Q.  What's reasonable to assume based on the facts

12     you reviewed in this case?

13          MR. FARRAH:  Objection.

14  A.  That some of them had some of the drinks.  What

15     can I say?

16  Q.  So you don't have an opinion?  Mr. Southworth,

17     as far as you know, is the only person of the

18     seven there who had one from each round?

19          MR. FARRAH:  Objection.

20  A.  Mr. Southworth is a very heavy drinker, and he

21     drank a lot that night.

22  Q.  Maybe you can try answering my question for $650

23     an hour.

24          Do you have any evidence that anyone

**130**

1     other than Southworth had in your opinion two

2     drinks that night?

3          MR. FARRAH:  Two drinks, is that the

4     question?

5  Q.  One from each of those two rounds: 9:21 and

6     9:24?

7  A.  When you say do I have any evidence, you mean

8     was there anything in the record?

9  Q.  Yes.

10  A.  Not that I recall.  I don't recall.

11  Q.  What is the basis for your concluding that he

12     was the only one there who drank one of each of

13     those rounds of drinks?

14  A.  Being asked to assume.

15  Q.  So you were asked to assume that from

16     Mr. Farrah, correct?

17  A.  Yes.

18  Q.  That's not something that you would normally

19     assume, would you?

20          MR. FARRAH:  Objection.

21  A.  I might.

22  Q.  I'm not asking what you might.  What would you

23     normally assume if you saw seven drinks of the

24     same coming to seven people three minutes apart?

**131**

1          MR. FARRAH:  Objection.

2  A.  There is no typical scenario that constitutes

3     what I might normally assume.

4  Q.  So you can only put a value, you can only assume

5     what the hypothetical you're told from the

6     counsel, correct?

7  A.  That's true.

8  Q.  Okay.

9          VIDEO OPERATOR:  The time is 3:04 p.m

10     We are now off the record.

11  (Recess.)

12          VIDEO OPERATOR:  The time is 3:04

13     p.m. and we are now back on the record.

14  Q.  You have up until this point in your

15     calculations, your chronology, rather, assigned

16     either ten minutes or less for every drink that

17     came to the table that evening, correct?

18  A.  Whatever the document says is what it says.

19  Q.  But now when the drink that you are being asked

20     by Attorney Farrah to assume that Mr. Southworth

21     had a drink in that round at 9:24, you're now

22     assuming that it took 11 minutes for that drink

23     to get to the table, isn't that correct?

24  A.  Would you repeat that, please?

**132**

1  Q.  The last drink which Mr. Southworth was ordered,

2     according to the audit report -- and you can

3     have your originals back now -- was ordered at

4     9:24?  Is that correct?

5          MR. BIKOFSKY:  These are the documents

6     you wanted one copy of.

7  A.  9:24, the last group of Jack Manhattans.

8  Q.  Why is it then that you assigned 11 minutes

9     later for this Jack Daniels to get to the table

10     when the previous Jack Daniels was able to make

11     it there in four minutes?

12  A.  Well, I wanted to give them a little time to

13     drink the first one, too.

14  Q.  Well, you only gave them four minutes to drink a

15     25-ounce beer, why did you give him 11 minutes

16     to drink the two-ounce Manhattan?

17          MR. FARRAH:  Objection to the form.

18  A.  I don't have any special answer for that.

19  Q.  You have no basis for that, correct?

20          MR. FARRAH:  Objection.

21  A.  I have no basis in the record or anybody saying

22     he drank it at this time or whatever, no.

23  Q.  In fact, in your prior sworn testimony under

24     oath under the pain and penalties of perjury,

133

1   you said that he had that last drink at 9:30,
2   isn't that correct?
3   A.   That was in the affidavit?
4   Q.   Yes.
5   A.   Yes.
6        MR. FARRAH:  Can we see what the
7   affidavit says before we ask him to assume that?
8   Where is that?
9   Q.   Go to page seven of your previous affidavit.
10   And just below, it says 9:57, check closed out.
11   According to the Longhorn audit report, the last
12   drinks were served to Southworth departing the
13   Longhorn at approximately 9:30, the bill was
14   paid at 9:57.  Six meals and four appetizers
15   were served to table 52.  That's your opinion,
16   correct?
17        MR. FARRAH:  Objection.
18   A.   That's not my opinion.  That's a statement off
19   of the bill.
20   Q.   Where on the bill -- you have the bill there?
21   Where on the bill does it say they got the last
22   drink at 9:30?
23        MR. FARRAH:  It says approximately
24   9:30, Michael.

134

1   Q.   Where on the bill does it say they got the drink
2   at approximately 9:30?
3   A.   The last drink was ordered at 9:24.  The check
4   was printed at 9:36.  In the midst of that time
5   interval from 9:24 to 9:36, the drink would be
6   delivered or served.
7   Q.   And based on your affidavit in this case where
8   you were asked to give your opinion as to
9   Mr. Southworth's blood alcohol at various
10   levels, various times in the evening, you stated
11   that he got his last drink at 9:30, correct?
12        MR. FARRAH:  It says approximately.
13   A.   It says approximately.
14        MR. FARRAH:  Approximately 9:30.
15   Q.   You're on expert in this field, aren't you?
16   A.   I am.
17   Q.   You try -- and again, you say the chronology,
18   you try to make it as detailed and as accurate
19   as possible, correct?
20   A.   I do try.
21   Q.   And when you were doing that for the first time
22   in this case, you assigned 9:30 as the time when
23   the last drink was served, correct?
24        MR. FARRAH:  It says approximately.

135

1   I'm sorry.  You know, I keep forgetting.
2   Approximately, can you see it there?
3   Approximately, Mr. Gillis.
4        MR. GILLIS:  When we're asking you the
5   questions, then you can answer.
6        MR. FARRAH:  Just be true to what the
7   record is.
8        MR. GILLIS:  Don't tell me
9   Dr. Benjamin is an expert in this field isn't
10   able to answer his own questions.
11        MR. FARRAH:  Frame the questions
12   truthfully and he'll answer them.
13   Q.   You wouldn't say approximately 9:30 if you
14   didn't mean 9:30, would you?
15        MR. FARRAH:  You're going to say
16   approximately.
17        MR. GILLIS:  Will you let him answer
18   the question?  It's his question; not yours.
19        MR. FARRAH:  Please, I object.
20   A.   I said approximately 9:30.
21   Q.   And that was the time frame at that point when
22   you filed this affidavit under the pains and
23   penalty of perjury that you thought was most
24   accurate, correct?

136

1        MR. FARRAH:  Objection.
2   A.   I did at that time, yes.
3   Q.   And what have you reviewed since then that
4   changed your opinion from 9:30 to 9:36?
5        MR. FARRAH:  Approximately 9:30.
6        MR. GILLIS:  Yes.
7        MR. FARRAH:  To 9:35?
8   Q.   9:35, I'm sorry.
9        MR. FARRAH:  Thank you.
10   A.   Once again, I was trying to fit in that drink
11   into that time scenario.
12   Q.   Well, didn't you have the audit report when you
13   did your affidavit?
14   A.   I'm not sure if I did or not.  Did I list it
15   among the documents?
16   Q.   I want you to assume that it was listed.  On the
17   top of page five, Exhibit 5?
18   A.   Yes, I did have that.
19   Q.   Okay.  And at that time, you were trying to do
20   the same thing, weren't you, to put together as
21   accurate a chronology as you could?
22   A.   Yes, I was.
23        MR. FARRAH:  Objection.
24   Q.   At that time, you have a different time for the

137

1    drink than you currently have, correct?
2                MR. FARRAH: Objection.
3  A.  Now, just help me out. Which drink are you
4        referring to specifically, please?
5  Q.  Well, we know from the audit report that there
6        were no drinks ordered by this table after the
7        round of drinks at 9:24, correct?
8  A.  Right.
9  Q.  And we're trying to figure out from you is why
10      you assigned one time to it in your affidavit,
11      which you signed under the pains and penalties
12      of perjury with the same materials available to
13      you that you are currently assigning in your
14      expert submission to this, to the court in this
15      case?
16                MR. FARRAH: Objection.
17  A.  Which question, which time are you questioning?
18      The 9:35 time on the --
19  Q.  According to your affidavit, what do you assign
20      the last drink being served to Mr. Southworth
21      at, what time?
22  A.  9:24.
23                MR. FARRAH: No, no. According to
24      the -- the affidavit speaks for itself. The

138

1        question is what time was it served.
2                MR. GILLIS: Are you going to let him
3        answer the question?
4                MR. FARRAH: Come on. You have asked
5        the questions in the affidavit.
6  Q.  In this case in your expert submission, you're
7        saying the drink was served at the table at
8        9:35, correct?
9  A.  Excuse me, ask me that again.
10  Q.  In this case, in your expert submission?
11  A.  What are you referring to as the expert
12      submission, please? You keep calling things by
13      different names.
14  Q.  Document one.
15  A.  That's not helping me either. Call it either
16      the affidavit or the Rule 26 report, then I'll
17      understand.
18  Q.  Rule 26 report, page six, which you have in
19      front of you there, you have the last drink
20      being served at 9:35; correct?
21  A.  That is what I said, yes.
22  Q.  And that's not what you have in your affidavit,
23      correct?
24  A.  Here I have in the affidavit it was ordered 9:24

139

1        and I'm saying it's being served at 9:30,
2        approximately 9:30.
3  Q.  What documents have you reviewed between the
4        time you filed the affidavit and the time of
5        your Rule 26 submission that changed your time
6        sequence in the chronology as to when he was
7        served his last drink?
8  A.  The time sequences isn't changed at all. The
9        sequence is absolutely the same. It's only a
10      five-minute difference.
11  Q.  Well, the five-minute difference changes
12      substantially what his blood alcohol was when he
13      got served his last drink, doesn't it?
14  A.  No, it doesn't.
15                MR. FARRAH: Objection.
16  Q.  We'll get to that in a minute.
17                Can you tell me the equation that
18      makes up the Widmark Formula?
19                MR. FARRAH: Objection to the form.
20  A.  Yes. I've shown it to you already. It's right
21      here.
22  Q.  Okay. And that formula is typed up in your
23      affidavit at the top of page ten, correct?
24                MR. FARRAH: Let's see.

140

1                Page ten of his report or his
2        affidavit?
3  A.  Affidavit.
4  Q.  Does the -- what we have here that you are
5        looking at is a page that's part of Exhibit 5
6        which has some calculations that you did in
7        pencil, that's your handwriting, correct?
8  A.  It is.
9  Q.  And on the top of the equation, you used the
10      specific gravity of blood?
11  A.  Yes.
12  Q.  Does that ever change or is that always the
13      same?
14  A.  It changes.
15  Q.  How does the gravity of blood change?
16                MR. FARRAH: Objection.
17  A.  It's not the gravity, it's the specific gravity.
18  Q.  How does the specific gravity of blood change?
19  A.  It's a function of how much water is in the
20      blood and how many red blood cells are in the
21      blood.
22  Q.  How much water was in Mr. Southworth's blood
23      that night, and how much red blood cells was in
24      his body that night?

141

1  A.  Right.  Since it's impossible to determine that
2      in just about every case that you do, I used a
3      value that was common to both men and women and
4      overlapped that range.
5  Q.  Is it fair to say that when you can't tell the
6      exact number, you use like you do here, a number
7      that based on your scientific training is
8      consistent with most people?
9  A.  Well, I wouldn't phrase it that way.  I would
10     just say that I use a reasonable estimate that's
11     not extreme in any way.
12 Q.  Based on your experience and training, I believe
13     you put one point --
14 A.  06.
15 Q.  -- 06 is a reasonable estimate?
16 A.  Yes.
17 Q.  Next to that, you have the specific gravity of
18     ethanol, correct?
19 A.  Yes.
20 Q.  How do you determine the specific gravity of
21     ethanol?
22 A.  That's a given.  That's a known scientific fact.
23 Q.  That doesn't change this in any equation that
24     you do?

142

1  A.  It never changes.  It's always the same.
2  Q.  Next to that, you have the grams of ethanol,
3      correct?
4  A.  Yes.
5  Q.  And that is -- is that the total grams over the
6      course of evening or is it just per drink?
7         MR. FARRAH:  Objection.
8  A.  That's the total amount that is used in the time
9      interval that's being calculated.
10 Q.  Okay.  And underneath, you have the body weight
11     in kilograms, correct?
12 A.  Correct.
13 Q.  Now, in order to get kilograms in this case, you
14     had to take Mr. Southworth's weight in pounds
15     and convert it to kilograms, correct?
16 A.  I did.
17 Q.  What do you use to convert that?
18 A.  2.2 pounds per kilogram.
19 Q.  You divide his weight by 2.2?
20 A.  Yes.
21 Q.  And then next is a number that you call a
22     Widmark R?
23 A.  Yes.
24 Q.  What's a Widmark R?

143

1  A.  That's the distribution factor.
2  Q.  What does that mean?
3  A.  That is a factor to control for how extensively
4      the ethanol is distributed into the water
5      soluble parts of the body.
6  Q.  And is that like the specific gravity of blood,
7      that without knowing exactly the distribution
8      within the person, you take a constant?
9  A.  You can take the constant or you usually make an
10     adjustment on that constant based on height and
11     weight, and if you have a photo of the
12     individual, which I had as well.
13 Q.  And based on your -- the information that you
14     were provided in this case, did you make any
15     assumptions as to his body composition,
16     Mr. Southworth's?
17 A.  Just that he wasn't totally lean, and he had a
18     little bit of love handles hanging over his
19     belt.
20 Q.  Is that what you put in your report?
21 A.  I don't know what I put in my report about that.
22 Q.  And what did you assume as a Widmark R for him
23     in this case?
24 A.  .64.

144

1  Q.  Is there a calculation you can do to get an
2      accurate Widmark?
3         MR. FARRAH:  Objection to the form.
4  A.  You can weigh the person in water and weigh the
5      person on a scale.  Take the ratio.
6  Q.  Aren't there calculations you can do to get it?
7         MR. FARRAH:  Objection to the form.
8  A.  Well, I don't know.  Maybe you know some
9      calculations you can do.
10 Q.  Well, are you aware of any calculations you can
11     do?
12        MR. FARRAH:  Objection to the form.
13 A.  You have to measure like doing skin folds and
14     things like that and determine body fat.
15 Q.  Well, if you don't have all that available to
16     you, don't you teach people to assume that all
17     males are a .68 for purposes of calculation?
18        MR. FARRAH:  Objection.
19 A.  .68 is an average factor.
20 Q.  For males?
21 A.  Yes, it is.
22 Q.  And .55 for females?
23 A.  For females is correct.
24 Q.  Did you use that in this case?

**145**

1  A.   No, I used .64.
2  Q.   Why is that?
3  A.   Because I dropped it four points because when I
4       saw the photo of him because he had those love
5       handles.
6  Q.   I'm going to show you a copy, and I'm going to
7       suggest to you this is a copy of the Widmark R's
8       for males and females, and ask you if you can
9       find any male of any height in any size that has
10      a Widmark of a .64?
11         MR. FARRAH:  Objection, to whatever
12      that document is.
13         Can I have a copy it, by the way,
14      since you have shown it to him?
15         Before he answers, can I get a copy?
16      Will you give it to David?
17         So what is the question?  Thanks.
18  Q.   (MR. GILLIS:)  The question is -- well, let me
19      ask it two ways.  First of all, what literature
20      in the scientific community are you basing your
21      lower Widmark on to give him a 64 as opposed to
22      a .68?
23         MR. FARRAH:  Objection.
24  A.   I'm making that assessment myself.

**146**

1  Q.   You understand that for an average, male that a
2      .68 is the standard for males, correct?
3  A.   Yes.
4         MR. FARRAH:  Objection.
5  Q.   And you have testified in this case or you have
6      stated under oath in this case that
7      Mr. Southworth was not obese, correct?
8         MR. FARRAH:  Objection.
9  A.   Was not obese, yes.  That depends how you define
10      obese.
11  Q.   How do you define it?
12  A.   There's a formula for body mass index.
13  Q.   I'm going to show you your affidavit again on
14      page 10, and as part of your opinion, you put in
15      there he was not obese and had a height of
16      six-four, correct?
17  A.   He was not obese and had a height of six-four.
18  Q.   You assumed he weighed 210 pounds, correct?
19  A.   Yes.
20  Q.   And according to that chart, the appropriate
21      Widmark should be between 68 and 7, correct?
22         MR. FARRAH:  Objection.
23  Q.   .68 and .7 for someone of that height and
24      weight?

**147**

1  A.   I'm afraid I don't understand how to read the
2      chart.
3  Q.   You can't read the chart?  You take the height
4      at the top side and the weight on the top and
5      you take your two fingers and go right to the
6      number.  What number do you get in that 6-4,
7      210-pound range?
8         MR. FARRAH:  Objection.
9  A.   I'm sorry, I'm not understanding how to read
10      this chart.
11  Q.   Are you aware of anywhere that has a Widmark of
12      .64?
13         MR. FARRAH:  I'm sorry.
14  A.   Am I aware of what?
15  Q.   Anywhere on that chart, any height, any weight?
16         MR. FARRAH:  It might be helpful to
17      tell him where the chart comes from.
18  A.   I know where it comes from.
19  Q.   Where does it come from?
20  A.   It's from Bill Forest.
21  Q.   Do you know Mr. Forest?
22  A.   I do.
23  Q.   Who is he?
24  A.   He's a forensic guy over in England.

**148**

1  Q.   Have you met him before?
2  A.   I'm sorry.
3  Q.   Have you met him?
4  A.   Yes.
5  Q.   Is he someone whose opinion you respect?
6  A.   No, not particularly.  But I'm not understanding
7      this chart.  I'm very sorry, but I don't
8      understand this chart.
9  Q.   Well, let's go back to your article you
10      published.
11         MR. FARRAH:  Can I get a copy of the
12      article, since you have referred to it a few
13      times?  I'll waive any copyright claims against
14      you.
15         Thanks.  What page are we going to?
16  Q.   We'll get there.  Can you tell me what
17      scientific basis you have on any literature or
18      anything accepted in the forensic toxicology
19      field that assigns a .64 Widmark to a six foot
20      four, 210-pound male who's not obese?
21         MR. FARRAH:  Objection.
22  A.   I don't have anything to reference.
23  Q.   In fact, what's normally referenced is a .68,
24      correct?

149

1   A.   No.
2        MR. FARRAH:  Objection.
3   A.   .68 is the average for all males.
4   Q.   And why did you deviate from that in this case?
5   A.   Because he had that little two-inch love handles
6        protruding from his waist.
7   Q.   So all males, if you were to take all males that
8        are less fat than Mr. Southworth is, based on
9        your review of his picture in this case?
10       MR. FARRAH:  Objection.
11  A.   Say that again, please.
12  Q.   The Widmark would be higher if you have less
13       body fat, correct?
14       MR. FARRAH:  Objection.
15  A.   The Widmark what?
16  Q.   R.
17       MR. FARRAH:  Same objection.
18  A.   Would be higher if you have less body fat?
19  Q.   Right.
20  A.   Is that what you said?
21  Q.   Yes.
22  A.   Yes.  And lower if you have more body fat.
23  Q.   Taking the average of all males to be .68
24       looking at Mr. Southworth's picture?

150

1   A.   Right.
2   Q.   You have opined that he is fatter than the
3        average population of males in general?
4        MR. FARRAH:  Objection.
5   A.   Yes.
6        MR. FARRAH:  Not including anybody in
7        this room, of course.
8   Q.   Based on what?
9   A.   What?
10  Q.   Based on what?
11  A.   Based on my assessment.
12  Q.   I don't know your assessment.  What is the
13       average body fat of the males that get a .68 R
14       on the Widmark?
15  A.   Probably, well, I would have to speculate so I
16       can't answer.
17  Q.   So if you don't know what it is, you can't say
18       why you should assign anything differently to
19       Mr. Southworth, correct?
20  A.   No.  That's not the case at all.
21       MR. FARRAH:  Objection.
22  Q.   Is the picture that you looked at, what picture
23       was it?
24  A.   I think it was a picture of him with no shirt

151

1        on.
2   Q.   And that was part of the police report, correct?
3   A.   I believe so.
4   Q.   In the book that you provide for judges and
5        lawyers, you used a .68 Widmark Formula,
6        correct, R, in your formula?
7        MR. FARRAH:  Objection to the form.
8   A.   In an example?
9   Q.   Yes.
10  A.   Yes.  In one example.  One isolated example,
11       sure.
12  Q.   By the way, getting back to that, this is the
13       same one with the chronology of the buffalo
14       wings, you had the gentleman eating all the
15       buffalo kings, correct?
16  A.   Yes.
17  Q.   He orders them at one o'clock and then eats all
18       of them himself?
19  A.   Correct.
20  Q.   How many buffalo wings are you averaging on an
21       order here?
22  A.   There's no specific amount.
23  Q.   Does he eat them all at once or does he eat them
24       sequentially?

152

1   A.   This is a hypothetical.
2        MR. FARRAH:  Objection to the form.
3   A.   This is a hypothetical scenario of a person who
4        is eating them.
5   Q.   How long would you expect him to eat it?
6   A.   I don't know.  It depends on how many wings
7        there were in the order, and since it's
8        hypothetical, there's no specific amount.
9   Q.   Okay.  But not even knowing the rate at which he
10       was eating or how many buffalo wings he was
11       eating, you assigned an absorption rate of 60
12       minutes from the second he orders that until
13       3:30 when the burger is ordered, correct?
14  A.   I did.
15  Q.   That's what you find to be the most accurate
16       under these circumstances of this chronology,
17       correct?
18       MR. FARRAH:  Objection.
19  A.   Those were the parameters that I used in that
20       one particular example, yes.
21  Q.   Didn't you previously testify that this is the
22       manner in which you teach people to use the
23       Widmark?
24  A.   This is the manner in which I teach people.

153

1  Q.  This is the proper way to do it, correct?

2         MR. FARRAH:  Objection.

3  A.  This is an example of using the proper formula

4     and fitting the data into the formula, yes.

5  Q.  And the proper data for the average male is to

6     use a .68 R in the Widmark, correct?

7         MR. FARRAH:  Objection.

8  A.  For an average person, if you want to call that

9     person average, right.

10 Q.  Now, in addition to that, you used these to get

11    a particular blood BAC, correct?

12        MR. FARRAH:  Objection.

13 A.  I use those to calculate the blood alcohol at

14    various points in time.

15 Q.  And the blood alcohol is for a male 150 to 200

16    pounds, correct?

17        MR. FARRAH:  Objection.

18 A.  Whatever I have in that particular example, I

19    have in that example.

20 Q.  When you're using those BACs, you're calculating

21    it, when you say that at .15 in the forensic

22    toxicology community, that's the standard you

23    used for visible signs of intoxication, correct?

24        MR. FARRAH:  Objection.

154

1  A.  I say that that is the -- generally, the number

2     that is utilized that's correct.

3  Q.  That's the standard, isn't it?

4         MR. FARRAH:  Objection.

5  A.  Well, there is no firm standard because an

6     individual's tolerance and an individual's

7     ability to cope with the effects of alcohol vary

8     significantly.

9  Q.  There's no standard in the toxicology?

10 A.  Not for all people universally.  The .15

11    standard is the number that is given most often

12    because there is a change from 62 percent, I

13    think, to almost 90 percent at the .15 level.

14    So the .15 level is given as the standard but

15    you know that you need to evaluate each

16    individual on their own.

17 Q.  Let me show you a picture and ask you if that's

18    the photograph that you were referring to?

19        MR. FARRAH:  What is this from, do we

20    know.

21 A.  The one I have, the one I have is a more

22    complete picture of his abdomen.

23        MR. GILLIS:  Do you have other

24    photographs other than this?

155

1         MR. FARRAH:  I don't know if I do or

2     don't.

3  A.  That is not the full photo I saw.

4  Q.  This is the gentleman though, correct?

5  A.  Yes,.

6         MR. GILLIS:  Can we have this marked

7     as an exhibit?

8  (Exhibits 6-7 marked for identification.)

9  Q.  Doctor, I want you to take Exhibit 7, I want you

10    to turn to page 98 of that exhibit.  And on the

11    bottom of the page is a paragraph that starts

12    with the word However.  And one, two, three,

13    four, five lines down, there is a sentence that

14    starts in the beginning of that line that says,

15    This is why in the forensic toxicology

16    community, the BAC which serves as the standard

17    for visible intoxication is 0.15, is that what

18    you wrote?

19 A.  You're taking that out of context.  You need to

20    read the next two sentences, too.

21 Q.  Okay.  Does that mean everyone below .15?

22 A.  No, no, does this mean.

23 Q.  Does this mean that everyone between 15 will not

24    be visibly intoxicated.

156

1  A.  No.  Does this mean everyone below .15 percent,

2     keep going.

3  Q.  Go ahead, you read it.  It's your words.

4  A.  Okay.  Does this mean that everyone below .15

5     percent will not be visibly intoxicated?  Of

6     course not.  And does this mean that everyone

7     above .15 percent will be visibly intoxicated?

8     No, again.  Just what I said to you before.

9  Q.  I'm going to ask you a question, what's the

10    standard in the industry, knowing that people

11    can have different tolerances, what is the

12    standard for showing visible signs of

13    intoxication?

14        MR. FARRAH:  Objection.

15 A.  The standard is what other people who were with

16    that person say about his behavior at that time.

17 Q.  Are you telling me that you wrote that the

18    standard is visible intoxication is 0.15 percent

19    and now you don't agree with that?

20 A.  No, I'm not.

21 Q.  Is that the standard in the forensic -- is that

22    the standard in the forensic toxicology

23    community, yes or no?

24 A.  That is the standard --

### 157

1          MR. FARRAH: Objection.
2 A. -- for the blood alcohol concentration. The
3     standard for determining whether the individual
4     is intoxicated or not is the testimony of fact
5     witnesses who were with the person at that time.
6 Q. Now, you say that not everybody will show signs
7     at 15. Some show it before, some show it
8     afterwards, correct?
9 A. Absolutely.
10 Q. In the general public, this .15 at which the
11     standard in the industry is for nontolerant
12     drinkers, correct?
13 A. That is correct.
14          MR. FARRAH: Objection.
15 Q. That's the standard for a 150- to 200-pound
16     male, is that correct?
17 A. It doesn't make any difference about body
18     weight.
19 Q. You would expect someone who is a tolerant
20     drinker to be able to mask symptoms more easily
21     than a nontolerant drinker?
22 A. Not symptoms, signs.
23          MR. FARRAH: Objection.
24 Q. Is that correct?

### 158

1 A. Yes.
2 Q. So and you have put in your report that
3     Mr. Southworth in your opinion is a tolerant
4     drinker, correct?
5 A. Yes.
6 Q. He drinks a lot, doesn't he?
7 A. He does.
8          MR. FARRAH: Objection.
9 Q. So you would expect that he would not show
10     visible signs of intoxication unless he was
11     above the standard for nontolerant drinkers,
12     correct?
13          MR. FARRAH: Objection.
14 Q. On average?
15 A. I would expect that, yes.
16 Q. How much over .15 would you expect for someone
17     who drinks as much as he does?
18          MR. FARRAH: Objection.
19 A. It's very hard to say because one of the factors
20     that's very important is how fast you're
21     consuming the ethanol.
22 Q. Now, going back to the -- by the way, what time
23     did they cash out that evening?
24 A. Cash out?

### 159

1 Q. Cash out their checks?
2 A. You mean what time was the check paid?
3 Q. Yes. I would suggest it happened around page
4     11. It says apply payment.
5 A. Say again.
6 Q. Look at page 11 where it says, Apply payment.
7          MR. FARRAH: What about it?
8 Q. Do you see that?
9 A. Not yet. Now I see it.
10 Q. It's your understanding that the money was
11     actually put into the register at approximately
12     9:57, correct?
13 A. That is the way it looks to me.
14          MR. FARRAH: Objection.
15 Q. After that, obviously she brings the change and
16     so forth back to the table?
17 A. You can assume if you want.
18 Q. What did you assume?
19 A. I wasn't interested in whether she brought the
20     change back to the table or not or whether they
21     said we're all right.
22 Q. Knowing that she didn't cash the check until
23     9:57, does that change your opinion at all as to
24     when they left that evening?

### 160

1          MR. FARRAH: Objection.
2 A. But we don't know who was paying the check or
3     who may have left already.
4 Q. You don't even know who Mr. Southworth left
5     with, do you?
6 A. I don't recall.
7 Q. I want you to assume that he left with Jude
8     Connelly.
9 A. All right.
10 Q. And we have already gone over his testimony as
11     to when Jude Connelly said he left, correct?
12          MR. FARRAH: Objection.
13 Q. That Jude Connelly left at 11 o'clock?
14          MR. FARRAH: Objection.
15 A. He did say that and I disagreed with that.
16 Q. Based on what?
17 A. Based on the fact that he would have had to
18     leave sooner in order to have the next bar --
19     the next drink at the subsequent hotel bar that
20     they went to at 10:30.
21 Q. Let's go over the visible signs that you
22     assigned to Mr. Southworth that evening.
23          You would agree with me people can be
24     loud without being intoxicated, correct?

161

1   A.  They can be.
2   Q.  And at the time during the evening that they
3       were alleged to have been loud, was the place
4       full or empty or somewhere in between?
5           MR. FARRAH:  Objection.
6   A.  I don't know.
7   Q.  Wouldn't that be important?
8   A.  No.
9           MR. FARRAH:  Objection.
10  Q.  You would agree with me that it would be louder
11      if the place was empty talking at the same
12      decibels than it would have been earlier if it
13      was full?
14  A.  I don't agree with any such statement.
15          MR. FARRAH:  Objection.
16  Q.  And how was he carrying himself?
17          MR. FARRAH:  When?
18  Q.  During the evening?
19          MR. FARRAH:  Objection.
20  Q.  Mr. Southworth?
21          MR. FARRAH:  Objection.
22  A.  All I know is that Jude Connelly said he was not
23      carrying himself the way he usually does towards
24      the end of the evening.

162

1   Q.  Towards the end of the evening?
2   A.  Right.
3   Q.  Sometime just before they left, correct?
4           MR. FARRAH:  Objection.
5   A.  I wouldn't say just before, but let's say within
6       a half-hour or 45 minutes.
7   Q.  Based on what -- who said it was at that time
8       frame?
9           MR. FARRAH:  What is the basis for
10      that statement?
11  (BY MR. GILLIS:)
12  Q.  What's the basis for that time frame?
13          MR. FARRAH:  Objection.
14  A.  I don't recall the specific basis.  I believe it
15      had to do with when they came over to the table
16      and asked them to be quiet.
17  Q.  That's when he wasn't carrying himself the way
18      he usually does?
19  A.  There were four criteria that Jude testified to.
20  Q.  We've gone over the loudness quite a bit.  Let's
21      go -- that's why I'm getting to this.  I'm
22      trying to find out when in the evening did he
23      not carry himself, Mr. Southworth, carry himself
24      the way he usually did based on your review of

163

1       all the documents that you reviewed in this
2       case?
3           MR. FARRAH:  The question is does he
4       have a memory now?
5           MR. GILLIS:  Yes.
6   Q.  Do you know when in the evening he was not
7       carrying himself?
8   A.  I can't give you a specific time but it was
9       certainly while he was in the bar.
10  Q.  Okay.
11  A.  Before they left.
12  Q.  And do you know of anybody other than Jude
13      Connelly who says he wasn't carrying himself the
14      way he usually does?
15  A.  I don't recall.
16  Q.  And what was the way he normally carried
17      himself?
18  A.  These were observations by people who knew him.
19      I'm not a person who knew him.
20  Q.  So you wouldn't be able to tell me the
21      difference between how he normally carries
22      himself and how he was carrying himself at the
23      table that evening?
24  A.  No.  But his friends knew him and were able to

164

1       do so.
2   Q.  Okay.  How is anybody who didn't know him
3       supposed to know that he was carrying himself
4       differently than the way he is supposed to?
5           MR. FARRAH:  Objection.
6   A.  If by carrying himself differently meaning that
7       he had muscle relaxation and his shoulders were
8       slipping or his head was down, that might be a
9       posture that other people would be able to
10      recognize.
11  Q.  But that's not the case here, you have no
12      evidence to that?
13          MR. FARRAH:  Objection.
14  A.  I don't have specific.  I don't know what the
15      specific reference to not carrying himself the
16      way he usually does, I don't know what that
17      refers to.
18  Q.  If you don't know how he usually carries himself
19      and you don't know how he looked when he carried
20      himself differently, you can't opine that the
21      way he carried himself should have indicated to
22      the server that he was visibly intoxicated,
23      correct?
24          MR. FARRAH:  Objection.

January 26, 2007

Case 1:05-cv-10617-MBB     Document 26-19     Filed 05/04/2007     Rosario vs. Longhorn Steakhouse

165

1　A.　I base my opinion on what his friend Jude
2　　　Connelly said. It was not my -- it's not my
3　　　opinion, I took it from what he said.
4　Q.　What about the way he was carrying himself that
5　　　evening indicates to the server he's
6　　　intoxicated?
7　　　　　MR. FARRAH: Objection.
8　A.　You have to ask Jude Connelly about that, not
9　　　me.
10　Q.　Well, you're the one who opined that that was
11　　　one of the indicia that he was visibly
12　　　intoxicated, correct?
13　A.　I did say that but based upon --
14　Q.　What is the indicia, what is he showing you that
15　　　shows he's visibly intoxicated?
16　　　　　MR. FARRAH: Objection.
17　A.　The fact is that Jude Connelly characterized
18　　　him that way. Didn't carry himself the way he
19　　　usually did; his eyes were glazed over; he was
20　　　louder than usual. There were -- and there's a
21　　　fourth criteria which escapes me at the moment.
22　　　That is Mr. Connelly's characterization of him;
23　　　not mine.
24　　　　　I only relied on his characterization,

166

1　　　which he is saying was atypical or unusual and
2　　　to him connoted that he was intoxicated.
3　Q.　In your opinion, what about the way he was
4　　　carrying himself that night at the restaurant
5　　　should the server of the alcohol have picked up
6　　　on?
7　　　　　MR. FARRAH: Objection.
8　A.　Once again, you would have to ask that of Jude
9　　　Connelly.
10　Q.　So you have no idea based on the way he carried
11　　　himself that night, what the waitress, not what
12　　　you counted, but what the waitress should have
13　　　known?
14　A.　First of all, I don't know what the waitress --
15　　　let me put it a different way. It was
16　　　Mr. Connelly's characterization that he had some
17　　　abnormal way he was carrying himself or
18　　　posturing himself. That was his
19　　　characterization.
20　Q.　I understand what you're saying but that's not
21　　　the question I asked.
22　　　　　The question I asked was what about
23　　　the way he was carrying himself should have
24　　　indicated to that waitress who served him drinks

167

1　　　that night at the table that he may be visibly
2　　　intoxicated?
3　A.　Once again, you would have to ask Jude Connelly
4　　　what he meant about not carrying himself the way
5　　　he usually did.
6　Q.　And you were able to opine that his not carrying
7　　　himself the way he usually does was based solely
8　　　on his ingestion of alcohol that night as
9　　　opposed to any other reason?
10　　　　　MR. GILLIS: Objection.
11　A.　I inferred from Connelly's testimony that that
12　　　was what he was referring to.
13　Q.　Okay. And it had nothing to do with the fact he
14　　　had been dirt biking for three hours, is that
15　　　correct?
16　A.　So had the other fellow.
17　Q.　How were they carrying themselves?
18　A.　There was no testimony to that.
19　Q.　Now, you chose to believe Mr. Connelly's
20　　　deposition in the Southworth case over his
21　　　deposition in this case because it was closer in
22　　　time to the incident, correct?
23　A.　Yes.
24　Q.　And because, as you said, the testimony wasn't

168

1　　　obfuscated; correct?
2　　　　　MR. FARRAH: Objection.
3　Q.　Was not? You would agree with me --
4　A.　Yes.
5　Q.　And you would agree with me that statements
6　　　closer in time you assessed more reliability to,
7　　　correct?
8　A.　I did.
9　Q.　And you were aware that more than a year prior
10　　　to that deposition, Mr. Connelly gave sworn
11　　　testimony to the grand jury, correct?
12　A.　Yes, I do.
13　Q.　And based on what you said, that would be more
14　　　reliable because it's closer in time, correct?
15　A.　Using the time criterion, yes.
16　Q.　That's your criterion, correct?
17　A.　Yes.
18　Q.　Did you review that testimony in making your
19　　　opinion here in this case?
20　A.　For which document?
21　Q.　Either one?
22　A.　Well, I don't know, did I include it? Is it
23　　　included? I don't see them included in here.
24　Q.　I'm going to show you a packet that I'm going to

169

1   represent to you is page 20 from the grand jury
2   minutes and it's the testimony of Mr. Connelly.
3   A.   Okay.
4   Q.   I want you to read lines one through four.
5          MR. FARRAH:  Can I see it?
6   Q.   I'm going to suggest for the record, this grand
7   jury testimony was taken at the grand jury of
8   Middlesex County on Wednesday, November 5, 2003,
9   in Lowell Massachusetts.
10  A.   Okay.  I'm reading it.
11  Q.   Could you read it out loud for the record.
12  A.   Yes.
13          Question:  At any point did you notice
14  any changes in Jeff Southworth as a result of
15  what he was drinking?
16          Answer:  Not in particular, no.
17  Q.   Given that this was taken more than a year
18  before the deposition date --
19  A.   Mm-hmm.
20  Q.   -- you used as a basis for your opinion in this
21  case, does that change your opinion at all
22  whether or not he showed visible signs of
23  intoxication at any time as a result of what he
24  was drinking that night?

170

1   A.   No.
2          MR. FARRAH:  Objection.
3   A.   Not really, no.
4   Q.   It doesn't change your opinion at all?
5   A.   No.
6   Q.   Were you provided that by counsel?
7   A.   I don't think so.
8   Q.   It's something you would have wanted to review
9   in order to make your determination in this
10  case?
11  A.   I would have wanted to review all the documents
12  that were available, sure.
13  Q.   That would be helpful in getting an accurate
14  opinion, wouldn't it?
15  A.   It's good to have as many documents as possible.
16  Q.   I'm going to show you what is purported as page
17  34 of that same grand jury testimony.  I want
18  you, if you could, read out loud for the record
19  lines five through ten.
20          MR. FARRAH:  Let me see it.
21  A.   Okay.  It says, now, sir, you indicated that
22  when you -- who's questioning him here.  By the
23  way?
24  Q.   This is the district attorneys' office.

171

1   A.   The same thing in the first?
2   Q.   That's correct.
3   A.   Now, sir, you indicated that when you were at
4   the Longhorn, you didn't notice any changes in
5   Jeff Southworth's demeanor at any time.  Did you
6   notice any changes in his demeanor, and the
7   answer is no.
8   Q.   Does that change your opinion as to whether or
9   not Mr. Southworth showed visible signs of
10  intoxication while at the Longhorn Steakhouse on
11  September 26, 2003?
12  A.   No.  Because demeanor could refer to a person's
13  personality, not their physical way of carrying
14  themselves.
15  Q.   So what should the DA have asked?
16          MR. FARRAH:  Objection.
17  A.   Let me see the other testimony that you asked me
18  to look at.
19          The first one at any point -- this is
20  from page 20, lines one through four -- and at
21  any point, did you notice any changes in Jeff
22  Southworth as a result of what he was drinking?
23          Not in particular.
24          That is an extremely vague question,

172

1   and it would be very different from asking did
2   you notice any changes in the way he was
3   carrying himself or his body language or if you
4   asked for anything specific.
5   Q.   And you don't interpret demeanor to be specific
6   enough to ask that information, correct?
7   A.   Well --
8          MR. FARRAH:  Objection.
9   A.   I think demeanor can refer to a personality-type
10  of thing.  And then again demeanor -- actually,
11  Jude testified that he was louder.  So if he was
12  talking about demeanor, he probably didn't
13  understand the question and just wanted to give
14  an answer.
15  Q.   That's your assumption?
16  A.   That's my assumption.  I don't think that --
17  Q.   There's no scientific certainty to that?
18  A.   There's no signs.
19          MR. FARRAH:  Objection.
20  A.   This is my impression.  These are not really
21  well-formed questions.
22  Q.   So even though -- what would you want him to
23  ask?  Was he visibly intoxicated?  Is that what
24  you would want him to ask?

173

1          MR. FARRAH: Objection.

2   A.   That wouldn't be a bad question, Mr. Gillis.

3   Q.   That would help you in forming you opinion, if

4      he asked that question?

5   A.   Well, if it was more straightforward than a

6      question like that.

7   Q.   What should the DA ask -- the DA have asked at

8      the grand jury which was just six or eight weeks

9      after this accident that would be helpful in

10     forming your opinion?

11         MR. FARRAH: Objection.

12   A.   Well, now, you're asking me to second guess or

13     to play lawyer. I don't think that that's my

14     role here.

15   Q.   Well, you have played lawyer in this, haven't

16     you?

17   A.   No.

18   Q.   You have assessed credibility to all the facts

19     and come up with your own determination based on

20     the law, isn't that what you did?

21        MR. FARRAH: Objection.

22   A.   No, not at all.

23   Q.   Didn't you quote multiple cases in your

24     testimony as to the interpretation of Douillard

174

1     in other cases?

2   A.   Wait a minute, commenting on something is

3     something completely different. I commented on

4     an error in the interpretation on Douillard and

5     that is correct. That isn't playing lawyer;

6     that's pointing out a scientific, a set of

7     scientific facts that the courts did not take

8     into consideration. They counted the number of

9     drinks and never gave any recognition to the

10    time interval.

11   Q.   Let me give you -- I'm going to ask you to read

12     the entire page which is, I'll purport to you,

13     is page 34 of the testimony he gave that day.

14     Could you read that out loud for --

15   A.   Sure. You want the whole page?

16   Q.   Well, just the testimony.

17   A.   Line two.

18        Question: Have you had any contact

19     with Jeff Southworth since then?

20        Answer: Excuse me, no, I have not.

21        Now, sir, you indicated that when you

22     were at the Longhorn, you didn't notice any

23     changes in Jeff Southworth's demeanor at any

24     time. Did you notice any -- this is the same

175

1     thing we just read.

2   Q.   Just read the question.

3   A.   -- changes in his demeanor? No.

4        Have you been with Jeff Southworth

5     before when he's been drinking?

6        Very rarely.

7        So have you ever seen Jeff Southworth

8     when you believed him to be under the influence?

9        And he says no.

10       And Ms. MacDougal, I have no further

11     questions for this witness. Do any of the grand

12     jurors have any questions for this witness?

13   Q.   So according to the testimony under oath by

14     Mr. Connelly, within a couple of months after

15     this accident, Jude Connelly has never seen

16     Mr. Southworth under the influence of alcohol,

17     isn't that correct?

18        MR. FARRAH: Objection.

19   A.   That's certainly what he says in that document.

20   Q.   And that wouldn't change your opinion at all of

21     whether or not he showed visible signs of

22     intoxication this evening?

23   A.   What it does is it makes me suspicious of all of

24     the accounts, many of which are contradicting

176

1     one another, which is one of the first things

2     that I said to you when we started today.

3   Q.   So you make the basis of -- you're now

4     suspicious of the other documents, is that what

5     you're saying?

6        MR. FARRAH: Objection.

7   A.   No. I came here telling you that there were

8     things that I could not reconcile from the

9     record, that there were inconsistencies and

10    contradictions. And that when I picked up those

11    contradictions, I asked plaintiff's counsel How

12    shall I deal with this in my report or how shall

13    I deal with this in my affidavit? And I

14    received instructions and I dealt with them.

15    Assume this, assume that. And that's what I

16    did.

17   Q.   You didn't find any of these facts to a

18     reasonable degree of scientific certainty,

19     correct?

20        MR. FARRAH: Objection.

21   A.   Well, a fact would be of scientific certainty.

22     A person's opinion has some variability.

23   Q.   Everything that you put in as facts as part of

24     your opinion in this case?

177

1          MR. FARRAH: I'm sorry, could you

2     start that question again? I was turning the

3     page.

4 Q. Everything you state as facts in your Rule 26

5     disclosure is based upon opinions of other people

6     as to what happened that night, correct?

7          MR. FARRAH: Objection.

8 A. Well, I don't know. Facts or statements upon

9     which I relied. There's a difference between

10     the fact and the testimonial opinion.

11 Q. Okay.

12 A. I mean you can see that there are differences

13     from the same person answering the same question

14     at different times.

15 Q. I can't agree more. That's what I'm trying to

16     get from you.

17          Given the contrary testimony,

18     particularly of someone like Jude Connelly whose

19     testimony you cite several times in both your

20     affidavits and your expert report, how do you

21     determine what is the correct fact pattern or do

22     you just assume a fact pattern based on what you

23     were told by counsel?

24          MR. FARRAH: Objection.

178

1 A. I wouldn't assume on my own without being

2     instructed to do something. When I find an

3     inconsistency, I asked counsel how should I

4     handle this inconsistency. I'm then directed to

5     make the following assumption and that was how I

6     follow through.

7 Q. So which of the facts in your Rule 26 submission

8     are facts that you determined and which are the

9     facts that were determined for you by counsel?

10          MR. FARRAH: Why don't you point to

11     specific facts and ask him to go through it?

12 A. I think I have stated before that I can't

13     differentiate between those or among those at

14     this point in time.

15 Q. But you did testify as far as the chronology --

16     I withdraw the question.

17          Now, on page six of your expert Rule

18     26 submission?

19          MR. FARRAH: I've lost it, page six?

20          I've got it, sorry.

21          MR. GILLIS: All set?

22          MR. FARRAH: I am now.

23 A. Yes.

24 Q. At the very bottom, it says BAC is achieved

179

1     while drinking, correct?

2 A. That's the last line, yes.

3 Q. Two lines above, a few lines above that -- let's

4     go to the paragraph before that. You determined

5     for purposes of your calculation that each Jack

6     Daniel Manhattan contained two ounces of Jack

7     Daniels and a quarter ounce of sweet vermouth,

8     correct?

9 A. I don't know if it's fair to say I determined.

10     I at that point in time was utilizing the

11     formula that's here in the Longhorn bar recipes.

12 Q. That's what you used for the purposes of

13     calculating the drinks that night, correct?

14 A. That is what I used here, yes.

15 Q. So it wouldn't significantly underestimate it as

16     you said earlier using an ounce and a quarter

17     because you actually used two and a quarter for

18     purposes of your calculations here?

19          MR. FARRAH: Objection to the form.

20 A. What you said is true but it's somewhat

21     misleading. Because my biggest concern was the

22     photo of the glass, the triangular-shaped glass

23     that was filled almost to the top that

24     represents six ounces of volume. Even though --

180

1 but you will recognize that using one and a half

2 ounces of Jack Daniels and three-quarters of an

3 ounce of vermouth comes to a total of two and a

4 quarter ounces and using two ounces of Jack

5 Daniels and one-quarter ounce of vermouth also

6 comes to two and a quarter ounce, which still

7 makes it approximately a little less than a

8 third of what the total volume was of the drink.

9 Q. But as far as the amount of the ethanol

10 consumed, it's significantly different because

11 there's two ounces of an 80 proof as opposed to

12 one and a half ounces of an 80 proof, correct?

13 A. You're right. But you're right about the

14 amounts but you may not be right about using the

15 word significant. Because a half ounce of 40

16 proof is only .2 or about -- is only .2 ounces

17 of ethanol. Altogether, two-tenths of an ounce

18 of ethanol so it's a small amount of ethanol.

19 Q. But for purposes of your calculation, you

20 calculated based on the Longhorn recipe, not on

21 the one and a half, correct?

22 A. That is correct, I did do that.

23 Q. You say in there, too, because of a six-ounce

24 glass that it might underestimate it and you

181

1  said two to threefold?
2 A. Yes. The difference like from two ounces to six
3  ounces are threefold. So I'm saying
4  approximately two and a quarter ounces times
5  three would be six and three-quarter ounces.
6 Q. That would be larger than the glass?
7 A. That would be larger than the glass.
8 Q. So it couldn't be threefold?
9 A. It couldn't be threefold.
10 Q. You know because of the shape of the glass, the
11  further up you get on it because it's a wider
12  base, each ounce taking --
13 A. No, it's a narrower base, wider top.
14 Q. Wider top, each ounce takes up less?
15 A. Less vertical distance. That's part of my
16  reasoning, I agree with you.
17 Q. Now, on the top of page seven, you say that
18  because of Mr. Southworth's size, Widmark
19  calculations indicate that one 25-ounce Bud
20  Light beer consumed on an empty stomach would
21  produce a peak blood ethanol concentration of
22  approximately 02, approximately 60 minutes?
23 A. You have to put the units in. .02 percent, you
24  have to say that.

182

1 Q. .02 percent approximately 60 minutes after
2  beginning to drink the beer, is that correct?
3    MR. FARRAH: Have you read it right?
4 A. Hold on. Yes, concentration approximately .02
5  percent about 60 minutes after beginning.
6 Q. So the actual peak absorption of the ethanol at
7  that point is not 30 minutes later, but 60?
8 A. Under this particular calculation that I did, I
9  used 60 minutes.
10 Q. So if he isn't hitting peak ethanol for an hour
11  after he has the drink, and he has two drinks
12  within ten minutes of the last one being
13  ordered, those drinks aren't even -- they're
14  only slightly in his system at the time the last
15  drink is served?
16 A. That is correct.
17    MR. FARRAH: Objection to the form.
18 Q. By the way, on that same document you have your
19  Widmark calculations, correct?
20    MR. FARRAH: This is the Rule 26
21  report again?
22    MR. GILLIS: Yes.
23 A. Can you give me a page, Mr. Gillis?
24 Q. There's not a page on it, just a chart in the

183

1  middle.
2 A. Thank you.
3 Q. And if you look at the next page which has the
4  time sequences.
5 A. Yes.
6 Q. That starts at 9:05, correct?
7 A. Yes.
8 Q. Where is the calculations for prior to 9:05?
9 A. I didn't run them.
10 Q. Why is that?
11 A. Well, because I can only get two on the page and
12  the earlier period in time was not a significant
13  time interval for me.
14    MR. FARRAH: Can we run them for him?
15  Can we provide those when you come back again?
16    THE WITNESS: I don't know. I don't
17  know if I still have it on the computer. It may
18  have been purged.
19 Q. Well, you can still run them, it's just a matter
20  of putting in the information and getting a new
21  printout, correct?
22 A. Yes. I could run it, I can put the whole
23  scenario in and run it.
24 Q. And at 9:05, you have a BAC of .0951, is that

184

1  correct?
2 A. Yes.
3 Q. Is it your opinion in this case that
4  Mr. Southworth was visibly intoxicated at 9:05?
5 A. Probably not.
6    MR. FARRAH: Objection.
7 Q. At 9:10, you have him at .1058, is that correct?
8 A. Yes.
9 Q. Is it your opinion in this case that
10  Mr. Southworth was visibly intoxicated at 9:10?
11    MR. FARRAH: Same objection.
12 A. You're going to have to go up to a level over
13  .15, like after 9:35, 9:40.
14    MR. FARRAH: Objection.
15 Q. So the first -- if I'm reading this correctly --
16  the first reading over .15 is at 9:40, is that
17  correct?
18 A. 9:40, unless you want to round off the 9:35 one
19  to .15.
20 Q. And that's at the point that a nontolerant
21  person, based on the standard for the forensic
22  toxicology field, that is the point where a
23  nontolerant drinker is expected to show visible
24  signs of intoxication?

185

1      MR. FARRAH: Objection.

2  A.  On average.

3  Q.  By average, you mean it's more likely than not

4      at that point?

5  A.  No.  Because that would be more than average.

6      That would be at least 51 percent.  This is just

7      saying that a typical, nontolerant drinker would

8      usually show visible signs of intoxication

9      around approximately .5.

10  Q.  And in this case, a typical, nontolerant

11     drinker, not someone like Mr. Southworth but a

12     nontolerant would reach that 015 at 9:40?

13  A.  Yes.

14  Q.  You ascribed to him in this case a burn off rate

15     of .2, is that correct?

16  A.  .02.

17  Q.  Oh, 02, I'm sorry.  Is that correct?

18  A.  Yes.

19  Q.  And that is actually what you normally used for

20     someone who is a tolerant drinker, correct?

21  A.  An experienced drinker, yes.

22  Q.  That is not being used -- that's being used

23     because that's what's accurate for someone who

24     drinks the way Mr. Southworth drinks, correct?

186

1  A.  That a person who drinks a lot generally is

2      higher than the .015, yes.

3  Q.  In fact, when you did the two BACs -- was it

4      in the Euclair case, the Albert case, was it --

5      you had two different BACs and the burn off for

6      that gentleman was .021, correct?

7  A.  Yes.  .021 percent an hour, .021 per hour.  In

8      the Albert case when the jurors asked me to

9      subtract the differences between the times,

10     that's what the burn off rate came out to be,

11     and I had used .02.  That's a very good

12     correlation.

13  Q.  People who drink heavily, you ascribe a burn off

14     rate of between 02 and 025, correct?

15  A.  Even higher sometimes.

16  Q.  And had you ascribed a higher burn off rate to

17     Mr. Southworth in this case, that would decrease

18     his blood alcohol at --

19  A.  At each and every point where it was recorded.

20  Q.  So the .02 is on the low end for tolerant

21     drinkers, correct?

22  A.  It's a reasonable number for tolerant drinkers;

23     the higher ones are exceptional but they do

24     exist at certain points in time.

187

1  Q.  I want you to assume that Mr. Southworth only

2      had one of the two beers at the table that

3      night, and that the other beer went to

4      Mr. Michael Espey, I want you to assume that

5      from the facts?

6  A.  Okay.

7  Q.  How would that reduce Mr. Southworth's BAC at

8      9:40 that evening?

9      MR. FARRAH: Objection.

10  A.  It wouldn't have reduced it any more than .02.

11  Q.  So it could reduce?

12  A.  Probably less.  Especially if it was taken with

13     food.

14  Q.  So we have two different ones.  One of them you

15     said he didn't have food in him yet, and you

16     didn't assign him any of those appetizers,

17     correct?

18     MR. FARRAH: Objection to the full

19     statement.

20  A.  I'm referencing something else.  We just went to

21     that calculation I did that said that in 60

22     minutes on an empty stomach drinking a beer, he

23     would have a .02.  Remember, you just asked me

24     to read that into the record?

188

1  Q.  Yes.

2  A.  So for Mr. Southworth, if he had no food in his

3      stomach at all and he drank one beer and you

4      measured his blood alcohol 60 minutes later, it

5      would be .02.

6  Q.  What would it be 30 minutes later?

7      MR. FARRAH: Objection.

8  A.  Probably .01, .01, something heading towards

9      .02.

10     So the answer is that if he consumed

11     it on an empty stomach, was it one of the beers

12     that were like earlier in the evening, it

13     couldn't be more than .02 that it would be

14     reduced.

15     If it was one of the beers that was

16     later in the evening, it would be less than .02

17     because the food decreases the amount of ethanol

18     that's absorbed, not just elongates the amount

19     of time required.

20  Q.  The drinks that were -- the beers, the two beers

21     that were served at this table were 25-ounce

22     beers, correct?

23  A.  Yes.

24  Q.  So the peak, okay.  So you're saying the peak is

**189**

1  .02 an hour later because it's .04 minus the
2  hour for the burn off, correct?
3  A.  No.
4  Q.  Why -- the twelve-ounce beer, according to your
5  rule of thumb, will have a peak alcohol ethanol
6  of .02, correct, a 12-ounce beer?
7  A.  At?
8  Q.  At an hour afterwards?
9  A.  No.  If you're going to quote me, please quote
10  my properly.
11  Q.  That's what I'm asking.  An hour after a
12  12-ounce beer is consumed, if I get a beer at
13  nine o'clock, it's twelve ounces, and I'm
14  Jeffrey Southworth, what will be my peak ethanol
15  and when?
16        MR. FARRAH:  Objection.
17  Q.  If I have nothing else to drink?
18  A.  Try it again.  Say it more slowly and give me
19  all the specifics I need to answer the question.
20  Q.  Well, I want you to assume that Mr. Southworth
21  did not have that beer that you ascribed to him
22  that you say was served at 8:50, but which we
23  know was ordered at 8:40.  How would that change
24  his blood alcohol when he got his last drink at

**190**

1  the Longhorn Steakhouse that evening?
2        MR. FARRAH:  Objection.
3  A.  Okay.  The 8:50 beer, I have still a 30-minute
4  absorption time because it's not with any food.
5  Okay?
6  Q.  Yes.
7  A.  So the one that I cited for you was drinking
8  that beer on an empty stomach at 60 minutes,
9  this is drinking that same beer without any food
10  in his stomach on 30 minutes, it's going to be
11  higher than .02.  Probably .03 something.
12  Closer to maybe even .04.  Probably .03
13  something, because this is a 30-minute interval.
14  The other one you cited was a 60-minute
15  interval.
16  Q.  But that's what you assigned to him in this
17  case?
18  A.  Well, this is what I assigned to him before what
19  I believe the appetizers and the heavier food
20  came.  Then I used the 60.  Then on the 60, the
21  beers that are -- that is assigned with the
22  60-minute absorption rate, which is drink
23  No. 6 -- you see drink No. 6?
24  Q.  Yes.

**191**

1  A.  All right, that's at 9:20.  Because at that
2  time, they finished their whole meal.
3  Basically, they're winding down and getting
4  ready to pay the check and leave.  Have one more
5  or two more Jack Manhattans here, but the beer
6  that you are talking about, the one that you're
7  inquiring about now, that beer at 60 minutes is
8  only going to make a difference of about .01 or
9  so.
10  Q.  But that's not what you ascribed to it in this
11  case?  You ascribed to it a 30-minute time limit
12  to get into his system, correct?
13  A.  No.
14        MR. FARRAH:  Objection.
15  A.  Yes, but the difference was the 30-minute drinks
16  are at 8:50, 8:20 and 8:10.  8:10, he's still at
17  the bar; 8:20, he's still at the bar; there's no
18  food.  Finally, at 8:50, he sits down and he has
19  one more beer and they have ordered some of the
20  appetizers and the things that you talked about
21  earlier.
22  Q.  But you said that those appetizers hadn't
23  affected him yet?
24  A.  I said they had a minimal effect.  That's why

**192**

1  there's still a 30 minute time interval.
2  Q.  Based on the timeframes that you have assigned
3  to these drinks, the 30 minutes for the beer at
4  8:50, which he got at the table?
5  A.  Yes.
6  Q.  If that beer went to Michael Espey, how that
7  change his blood alcohol at 9:35?
8  A.  I don't know Michael Espey's height and weight.
9  I can't.  I only did that for Mr. Southworth.
10  Q.  That's what I'm saying.  If Michael Espey had
11  that beer, you subtracted out of that equation
12  and said Mr. Southworth didn't drink that beer,
13  how would it change his BAC when he got served
14  his last drink that night?
15  A.  Mr. Southworth?
16  Q.  Yes.
17  A.  That's what I'm trying to answer to you.  That
18  at 30 minutes, if that peaks at 30 minutes, it's
19  probably going to be maybe around .03.
20  Q.  Okay.  So that would reduce his BAC at 9:35 from
21  .1493 down to .1193, correct?
22  A.  Probably not.
23  Q.  Why not?
24  A.  The reason is the following.  If you look at the

193

1       second pages with the time scenario --
2   Q.  Yes.
3   A.  -- associated with the Widmark, now I suggest to
4       you you turn it horizontally as I am. Come over
5       behind me.
6           MR. FARRAH: I can see.
7   A.  Do you see that beginning at, you see at 10:35
8       that there is a value of .22 something?
9   Q.  I do.
10  A.  And do you see that that value of .22 something
11      is continued all the way up to 11:35, from 10:35
12      to 11:35?
13  Q.  Yes.
14  A.  Okay. You know from your past experiences that
15      those, that that's called a plateau phase?
16  Q.  Correct.
17  A.  That means that it stays right at that plateau.
18      It's not going up and it's not coming down. And
19      the reason for that is because the enzyme
20      systems in the body are overwhelmed by the
21      amount of alcohol that is there and that it
22      would make no difference if there were a hundred
23      more drinks in there because the enzymes can no
24      long metabolize the ethanol because the enzymes

194

1       are saturated. So taking out one beer is not
2       going to change that plateau because it's still
3       saturated.
4           It took a whole hour to burn off
5       enough alcohol for that plateau to start to come
6       down. And those drinks that are peaking around
7       10:35 are the ones that were ingested
8       approximately an hour to 90 minutes earlier
9       because those are the ones that were the last
10      couple of drinks when I had the 60 minute-time
11      period. So the drinks that he had later on are
12      so overwhelming his ability to metabolize it,
13      that if he missed one beer earlier in the
14      evening because it went to Mr. Espey -- is that
15      his name? -- instead of to Mr. Southworth, he's
16      still got so much alcohol in his system that he
17      can't metabolize it all. It takes a whole hour
18      before he even starts to come down.
19  Q.  It's your testimony that using the proper
20      Widmark Formula, that if I were to give every
21      drink you gave him that night and I was to
22      assume the exact same absorption rate that you
23      assumed, and the only thing that I changed was
24      that I didn't put a beer in him at 9:50, the

195

1       25-ounce beer.
2           MR. BIKOFSKY: It should be 8:50.
3   Q.  It should be 8:50. Let me start it again.
4           If I took your calculations that you
5       put in your expert report here and the only
6       thing I changed was I took out the beer that was
7       served as you say at 8:50, you're going to tell
8       me that his blood alcohol at 9:35 would not be
9       significantly different than the .1493 that you
10      came up with?
11          MR. FARRAH: Objection.
12  A.  Ask me that again, please, while I have these
13      documents in front of me.
14  Q.  What would be his blood alcohol at 9:35 if the
15      only thing you changed in your calculations was
16      you took out the 25-ounce Bud Light beer that he
17      had at 8:50?
18          MR. FARRAH: Objection.
19  A.  At 8:50, what would be his blood alcohol at what
20      time, sir?
21  Q.  9:35.
22  A.  It would be about .15, I think.
23  Q.  If you took that drink out, he would be higher
24      than he would having already drank that drink?

196

1   A.  At 9:35, he is about .16.
2   Q.  Maybe I'm looking at a different document.
3           I have the document here that says
4       here at 9:35 he's .1493.
5   A.  All right. This is a better readout. And you
6       want to know if you took out that one drink at
7       8:20?
8   Q.  Yes. 8:50?
9   A.  8:50. He might be a couple of points, he might
10      be .02 or so lower.
11  Q.  How about closer to .01?
12          MR. FARRAH: Objection.
13  A.  .01 lower.
14  Q.  Yes.
15  A.  If you want .01 lower, okay.
16  Q.  Do you think it would be closer to .01 based on
17      your training and experience?
18          MR. FARRAH: Objection.
19  A.  Well, if he drank that on an empty stomach, 60
20      minutes later it would have been .02. It should
21      be about, it should be a little higher at 30
22      minutes.
23  Q.  I'm going to show you the EZ-ALC V2.0 Calculated
24      Blood Alcohol Concentration Chart. I want you

197

1     to look at this document.

2 A.    Just hand it to me.

3       MR. FARRAH: Is there a copy for me?

4     Finishing up, I'm waiting until you finish up to

5     get a copy.

6 Q.    I'll make one if you want.

7 A.    Okay. Go ahead.

8 Q.    And that assumes that your R that you assigned

9     him of .64, correct?

10 A.    Yes.

11 Q.    That assumes the same assumptions as yours,

12     correct?

13       MR. FARRAH: Objection.

14 A.    Basically.

15 Q.    And it puts the drinks in at exactly the same

16     time that you put them in with the same rate of

17     absorption, correct?

18 A.    No. There's something wrong here. I see what

19     it is. You left out one drink on this.

20 Q.    At what time?

21 A.    You left out the 8:50 beer.

22 Q.    Right. That's what I'm saying. If everything

23     was the same except for the 8:50 drink, what

24     would be, according to the proper Widmark

198

1     Formula, his BAC at 9:35?

2       MR. FARRAH: Objection.

3 A.    This one says a little over .10.

4 Q.    Do you have any reason to doubt that?

5       MR. FARRAH: Objection.

6 A.    .04 is an awfully big drop.

7 Q.    Well, .04 is what you ascribed to a 25-ounce

8     beer, right?

9 A.    No, it wasn't. I said .02 at 60 minutes.

10 Q.    That's after it's been able to burn off a little

11     bit as well, correct? But the beer itself is

12     equivalent a .04, correct?

13 A.    I didn't say that at all.

14       MR. FARRAH: Objection.

15 A.    There's -- I told you that it would be .02 at 60

16     minutes. There's always contemporaneous burn

17     off.

18 Q.    What is different between that calculation and

19     your calculation other than the removal of the

20     25-ounce Bud Light at 8:50?

21 A.    They're essentially the same.

22 Q.    And according to the Widmark, that would drop it

23     all the way down to .1 something, correct?

24       MR. FARRAH: Objection.

199

1 A.    That's what this graph says.

2 Q.    Do you have any reason to doubt it?

3 A.    Yes, I do. He would not, Southworth would not

4     have a .04 difference from one drink.

5       MR. FARRAH: Shall we call it quits?

6       THE WITNESS: It's 4:30.

7       MR. GILLIS: Okay.

8       VIDEO OPERATOR: It's 4:29 p.m. and we

9 are now off the record.

10 (Exhibit 8 marked for identification.)

11 (Whereupon the deposition suspended at 4:29

12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

200

1       SIGNATURE PAGE/ERRATA SHEET

2

   Re: Rosario vs. Rare Hospitality International,
3 Inc., d/b/a Longhorn Steakhouse

4 Date: January 26, 2007

5 Deposition of: David M. Benjamin

6     I, David M. Benjamin, do hereby certify
7 that I have read the foregoing transcript of my
   testimony and further certify that it is a true
8 and accurate record of my testimony (with the
   exception of the following changes listed
9 below):

10 Page Line Correction

11 ____ ____ _____

12 ____ ____ _____

13 ____ ____ _____

14 ____ ____ _____

15 ____ ____ _____

16 ____ ____ _____

17 ____ ____ _____

18 ____ ____ _____

19 ____ ____ _____

20 ____ ____ _____

21 ____ ____ _____

22     Signed under the pains and penalties of
   perjury this  day of      , 2007.
23

24       _____
            David M. Benjamin

# Section 5
# UNDERSTANDING THE PHARMACOLOGY OF ETHANOL

David M. Benjamin, Ph.D.
*Clinical Pharmacologist and Forensic Toxicologist., Chestnut Hill*

## I.    HOW TO DEVELOP YOUR CASE FROM A PHARMACOLOGIC PERSPECTIVE

In my experience, there is only one method to use when evaluating a potential Dram Shop case, regardless of whether you are representing the plaintiff or the defendant. That method involves developing a chronology of the eating and drinking that occurred within the time frame of the day/evening in question.

The driver of the car involved in any accident that occurred and appropriate fact witnesses will be able to relate some information regarding the time they got to the establishment(s) that was patronized, what the driver was drinking and eating at each establishment, how many drinks, and at what time the driver left the establishment(s). Often there are copies of cash register receipts, bills, credit card receipts, or other written materials which help establish the chronology. Police reports can help establish the time of an accident, and hospital records can help establish an individual's Blood Alcohol Concentration (BAC) at a specific time.

Sometimes, people have ingested so much ethanol that they can't remember what happened, or sustained head injuries that prevent them from remembering what happened. It is then necessary to take the depositions of the fact witnesses who were with the driver at various times prior to the accident to help develop a timeline.

The question both plaintiffs and defendants want to answer is "Was the driver visibly intoxicated when he/she was served his/her last drink?" Security cameras also may be helpful in establishing the driver's conduct and appearance while in the establishment, but many times, the chronology will have to be developed from witness statements and depositions.

Let's take a hypothetical case and develop it. Assume John Smith is 5'10" tall and weighs 175 lbs. On the day of the accident, Mr. Smith leaves work early and goes to the local pub just before 1 pm for lunch. He orders a 12 oz. Bud Light beer and some Buffalo Wings. At 1:45 pm, he orders another beer, which he

follows with a "1.5 oz. shot of tequila". He orders another beer at 2 pm and a fourth beer at 3 pm, followed by another "1.5 oz. shot of tequila". He orders a burger and some fries at 3:30 pm and another beer at 4:30 pm and a final beer at 5 pm. He leaves the establishment at approximately 5:30 pm and is involved in a motor vehicle accident at 5:55 pm.

Chronology:

1 pm - 12 oz. Bud Light beer and some Buffalo Wings.
1:45 pm - another Bud Light beer
1:55 pm - 1.5 oz. shot of tequila
2 pm - another Bud Light beer
3 pm – a fourth Bud Light beer
3:10 pm - another 1.5 oz. shot of tequila
3:30 pm – a burger and some fries
4:30 pm - a fourth Bud Light beer
5 pm - a final Bud Light beer
approximately 5:30 pm – he leaves the establishment
5:55 pm – he is involved in a motor vehicle accident

Inputting the above data into the Widmark formula, the graph in Figure 1 was generated. This graph indicates that at 5 pm, the time the last drink was ordered, the hypothetical driver had a BAC of approximately 0.08%. Looking at Table I, it is obvious that only 32% of the tested population was visibly intoxicated at a BAC of 0.08%, and that even at BACs between 0.10% and 0.15%, only 62% of the tested population was visibly intoxicated.

However, when you look at the next group of BACs, between 0.15% and 0.20%, approximately 89% of the tested population was visibly intoxicated. Thus, just below 0.15% up to 6 out of 10 people were visibly intoxicated, while above 0.15%, approximately 9 out of 10 people were visibly intoxicated, a 150% increase over those with BACs below 0.15%. This is why in the forensic toxicology community, the BAC which serves as the standard for visible intoxication is 0.15%. Does this mean that everyone below 0.15% will not be visibly intoxicated? Of course not. And does this mean that everyone above 0.15% will be visibly intoxicated? No, again.



'. He orders another beer at 2 pm and a
er "1.5 oz. shot of tequila". He orders a
iother beer at 4:30 pm and a final beer at
proximately 5:30 pm and is involved in a

Buffalo Wings.

stablishment
icle accident

nark formula, the graph in Figure 1 was
pm, the time the last drink was ordered,
proximately 0.08%. Looking at Table I,
d population was visibly intoxicated at a
between 0.10% and 0.15%, only 62% of
ated.

iup of BACs, between 0.15% and 0.20%,
ation was visibly intoxicated. Thus, just
e were visibly intoxicated, while above
ble were visibly intoxicated, a 150% in-
5%. This is why in the forensic toxicol-
as the standard for visible intoxication is
below 0.15% will not be visibly intoxi-
ean that everyone above 0.15% will be

## Figure 1



### Table I

### Relationship Between BAC and Intoxication*

| Approximate Number of Drinks in You | Blood Alcohol Concentration | Average Percentage of Individuals Diagnosed as Drunk |
|---|---|---|
| 1-3 | less than 0.05% | 4 |
| 3-5 | 0.051- 0.10% | 32 |
| 6-8 | 0.101- 0.15% | 62 |
| 8-10 | 0.151- 0.20% | 89 |
| 11-13 | 0.201- 0.25% | 95 |
| 14-16 | 0.251 – 0.30% | 98 |
| 16-18 | 0.301 – 0.35% | 99 |

*Adapted from Alcohol and the Impaired Driver, The American Medical Association, Chapter II, page 9, 1968.

As a forensic expert, I have applied the "chronology method" to all my ethanol-related cases. It makes no difference whether it is a civil case or a criminal case, and it makes no difference whether I have been retained by the defense, the plaintiff or the prosecution. Moreover, when an opposing expert has used a different method or a different set of assumptions to calculate the BAC, the ability to utilize a graph such as Figure 1 as demonstrative evidence helps to assist the jury in determining the facts at issue, as shown in Figures 2 and 3.

Sometimes, there is a blood ethanol level that was drawn at a hospital after the accident. In those instances, if it can be established that no additional ethanol was ingested after leaving the bar, it is possible to "back-extrapolate" from the hospital blood value back to a time in the last bar patronized. If a drink or shot was ingested just prior to leaving the last establishment, one can usually back-extrapolate to a time 30-60 minutes after leaving, when it can be determined that the driver was in the post-absorptive phase of ethanol disposition.

When you are lucky enough to ha[...]
sequent BAC from a hospital, the[...]
lated values can serve to confirm[...]
However, hospital ethanol determi[...]
are frequently analyzed by a "scr[...]
than duplicate determinations. Th[...]
(weight) but usually don't rise to th[...]

### Tragic Dram-Shop C[...]

When Joseph Albert was found [...]
ing on his own vomit after a nig[...]
Lowell, it seemed a classic case [...]

Albert had been drinking heav[...]
was a startling..48 - six times th[...]

But the case was a bit more c[...]
witnesses, an inexplicable time[...]
mysterious bottle of liquor that [...]
outside of the bar.

And Albert, the plaintiff, tragi[...]
years after the incident.

Nevertheless, for the plaintiff's [...]
ing a patron enough drinks to p[...]
police officer who investigated [...]
had never seen someone whose [...]

"When closing arguments were[...]
verdict was coming back," reca[...]
whose initial demand was $11 m[...]

But defense attorneys Robert [...]
Myers of North Andover point [...]
at two establishments prior to a[...]
wards he was drinking from a f[...]
blood-alcohol level skyrocketing.

[1] Reprinted with permission from Lawyers W[...]

ble I

## BAC and Intoxication*

| :ohol ation | Average Percentage of Individuals Diagnosed as Drunk |
|---|---|
| )5% | 4 |
| % | 32 |
| % | 62 |
| % | 89 |
| % | 95 |
| )% | 98 |
| 5% | 99 |

ed Driver, The American Medical Asso-

: "chronology method" to all my ethanol-
nether it is a civil case or a criminal case,
have been retained by the defense, the
when an opposing expert has used a dif-
mptions to calculate the BAC, the ability
emonstrative evidence helps to assist the
. shown in Figures 2 and 3.

vel that was drawn at a hospital after the
be established that no additional ethanol
; possible to "back-extrapolate" from the
the last bar patronized. If a drink or shot
ast establishment, one can usually back-
:r leaving, when it can be determined that
ase of ethanol disposition.

When you are lucky enough to have both a well-founded chronology and a subsequent BAC from a hospital, the degree of agreement between the two calculated values can serve to confirm or invalidate one of the calculated values. However, hospital ethanol determinations are not done with a chain of custody, are frequently analyzed by a "screening level" test, and are only single rather than duplicate determinations. These factors can detract from their reliability (weight) but usually don't rise to the level to get them suppressed by the courts.

### Figure 2

**Tragic Dram-Shop Case Just Had Too Many Holes¹**

When Joseph Albert was found passed out in the middle of the road choking on his own vomit after a night of drinking at Gus and Paul's Tavern in Lowell, it seemed a classic case of dram-shop liability.

Albert had been drinking heavily at the bar and his blood-alcohol level was a startling .48 – six times the legal limit for operating a car.

But the case was a bit more complicated than that. There were missing witnesses, an inexplicable time gap during the night in question, and a mysterious bottle of liquor that Albert may have purchased on his own, outside of the bar.

And Albert, the plaintiff, tragically remains in a coma more than five years after the incident.

Nevertheless, for the plaintiff's attorney, it was a case of a bartender serving a patron enough drinks to put him in a dangerous state. The Lowell police officer who investigated the incident and testified at trial said he had never seen someone whose alcohol level was so high.

"When closing arguments were done, I really thought that a plaintiff's verdict was coming back," recalls Tyngsboro attorney Peter J. Nicosia, whose initial demand was $11 million.

But defense attorneys Robert J. Carnevale of Lowell and Andrew D. Myers of North Andover point wit that not only had Albert been drinking at two establishments prior to arriving at Gus and Paul's Tavern, but afterwards he was drinking from a fifth of Jack Daniels whiskey that sent his blood-alcohol level skyrocketing. The bottle, how-ever, was never found.

¹ Reprinted with permission from Lawyers Weekly, Inc., 41 West Street, Boston MA, 02111

"I played that off to be basically an untrue story and basically a red herring," Nicosia says of the Jack Daniels. "The bottle was never found; no one ever saw him drink it."

Toxicologists with widely differing reports then became a focal point of the five-day trial. The plaintiff's expert calculated Albert's BAC at between .25 and .29 when he was last served at the bar, which would have meant he had close to a dozen beers during his two hours at the tavern.

The defense expert, however, put that number closer to .15 based on witnesses saying Albert consumed no more than four or five 10-ounce beers at the bar.

Prompted by a question from the jury, the experts were asked to explain the "burn-off rate" of alcohol. The plaintiff's expert used a lower rate based on total body water, which tends to yield higher BAC levels, while the defense expert used the widely accepted Widmark formula used to measure levels in people with drinking experience.

"His methodology was just undisputable," Myers says of defense expert Dr. David M. Benjamin, an expert the attorney thinks won the jury over.

The timeframe of the evening also became a crucial element for the defense, as the lawyers tried to "widen the gap" between when 28-year-old Albert left the bar and when he was found in the road at approximately 12:30 a.m. on Nov. 8, 1996.

"That was my entire closing argument," says Myers. "The first thing I said to the jury was 'There's a hole in this case,' and I tried to make the hole as big as I could."

However, the defense's main witness, John Walker (who was Albert's drinking partner that evening), could not be located. The defense, in turn, was left to rely on his deposition testimony.

Nicosia says the missing witness worked in the defense's favor at trial.

"If the jury saw Johnnie Walker on the stand and saw his complete lack of credibility, that would have been a big factor in the outcome," asserts Nicosia. "This guy was just a pull-him-off-the-barstool drudge of society." (Though Nicosia now refers to the witness as "Johnnie Walker," attorneys on both sides of the case agreed before trial to refrain from using that reference because of its connotations to the popular brand of whisky.)

Instead of Walker testifying [...]
Walker's deposition. The tes[...]
around 11:30 p.m., a stateme[...]
Walker was keeping track of [...]
since 4 a.m. (Conversely, the [...]
left the bar around midnight.)

Leaving the bar at 11:30 "gave [...]
lot of that fifth (of Jack Daniel[...]
left at midnight and they foun[...]
in trouble with the timeline."

The plaintiff's case was also h[...]
at Albert's request, he had drop[...]
It is another theory the plaintif[...]
defense team says was damagin[...]

After only three hours of delib[...]
in a case that the attorneys had [...]

Ultimately, Nicosia says the ca[...]
some jurors admitting during th[...]
pathy for Albert - a young man[...]
was chronically unemployed.

"I think they felt that the kid g[...]
him one day anyway," Nicosia s[...]

ı untrue story and basically a red her-
ıiels. "The bottle was never found; no

; reports then became a focal point of
xpert calculated Albert's BAC at be-
t served at the bar, which would have
. during his two hours at the tavern.

hat number closer to .15 based on wit-
more than four or five 10-ounce beers

ury, the experts were asked to explain
ıe plaintiff's expert used a lower rate
ends to yield higher BAC levels, while
y accepted Widmark formula used to
:ing experience.

ıutable," Myers says of defense expert
the attorney thinks won the jury over.

ɔ became a crucial element for the de-
en the gap" between when 28-year-old
ɾas found in the road at approximately

ıment," says Myers. "The first thing I
le in this case,' and I tried to make the

:ness, John Walker (who was Albert's
ıld not be located. The defense, in turn,
ɔstimony.

ɾorked in the defense's favor at trial.

n the stand and saw his complete lack of
ı a big factor in the outcome," asserts
ıll-him-off-the-barstool drudge of soci-
to the witness as "Johnnie Walker," at-
agreed before trial to refrain from using
ɔtations to the popular brand of whisky.)

Instead of Walker testifying, it was a young attorney reading from Walker's deposition. The testimony stated that the pair left the bar at around 11:30 p.m., a statement the defense supported by claiming that Walker was keeping track of time that evening because he had been up since 4 a.m. (Conversely, the plaintiffs witnesses all claimed that Albert left the bar around midnight.)

Leaving the bar at 11:30 "gave them plenty of time for Joey to consume a lot of that fifth (of Jack Daniels) that he left with," says Carnevale. "If he left at midnight and they found him at 12:30 [a.m.], we would have been in trouble with the timeline."

The plaintiff's case was also hurt by testimony from Walker stating that, at Albert's request, he had dropped his passenger off with two prostitutes. It is another theory the plaintiff's attorney calls a red herring, but one the defense team says was damaging to the plaintiffs character in the end.

After only three hours of deliberating, the jury returned a defense verdict in a case that the attorneys had been working on for six years.

Ultimately, Nicosia says the case was an uphill battle from the start, with some jurors admitting during the selection process that they had no sympathy for Albert - a young man with a history of alcohol problems who was chronically unemployed.

"I think they felt that the kid got what eventually was going to happen to him one day anyway," Nicosia says disappointedly.

## Figure 3

### Jurors' Right to Question Testifying Expert Rights Lawyers' Wrongs

David M. Benjamin, Ph.D.

(Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Las Vegas, NV, February 20, 2004) In the Commonwealth of Massachusetts, judges may permit jurors to question testifying experts about unresolved issues not covered in direct testimony or cross-examination. At the conclusion of the expert's testimony, some Superior Court judges ask jurors if they have any questions to ask of the forensic expert. If so, the jurors are asked to write down their questions and submit them to the court. The judge calls the lawyers over to a side bar and reviews the questions with the attorneys. If one party has an objection to a question, it is raised at side bar, if both parties agree on a question, it is read to the expert by the judge and the expert has an opportunity to respond. The advantage of allowing jurors to question experts is proven by the results of a recent trial in which this author served as an expert for the defense on the toxicology of ethanol. The case involved a Dram Shop litigation. Dram Shop cases involve an allegation that a restaurant or bar served liquor to a patron who was already exhibiting visible signs of intoxication at the time that drink was served, and that patron then left the establishment and drove a motor vehicle that was subsequently involved in an accident where personal injury and/or property damage occurred. If it is proven that the patron was visibly intoxicated at the time the liquor establishment served him/her ethanol, then the bar or restaurant is civilly liable for the damages caused by the intoxicated driver.

Facts of the case: JA was a middle-aged male with a long history of alcohol abuse. On the night in question, JA was drinking at a local pub. During the course of the evening, JA left the bar with a friend, purchased a fifth of Jack Daniels, and returned to the bar where he met another friend. JA left the bar with the second friend and while driving around, they encountered two women who were "looking for company". JA got out of the care to join the women. Several hours later, JA was found on the street, barely able to crawl or talk. Paramedics were summoned to the scene and JA was taken to the hospital reeking of liquor and only semiconscious. JA subsequently developed respiratory depression and anoxic encephalopathy (brain damage due to lack of oxygen) secondary to ethanol intoxication. On admission, JA' blood alcohol concentration (BAC) was determined to have been approximately 0.450%, a nearly fatal level consistent with respiratory depression and brain damage. The question for the jurors to determine was whether or not an intoxicating amount of ethanol had

been served to JA and consu[...]
whether JA had consumed etha[...]

Testimony from patrons at the [...]
4-5 beers over 2 hours at the ba[...]
had appeared visibly intoxicate[...]
tiffs calculated JA's BAC usin[...]
combined amount of ethanol co[...]
these calculations, plaintiffs' e[...]
hour, an assumption based on[...]
which range from 0.01 to 0.02[...]
tend to yield a higher calculate[...]
tion in favor of the plaintiffs an[...]
JA had consumed enough etha[...]
toxication, despite the fact tha[...]
visibly intoxicated in the bar. T[...]
fendant bar, and calculated JA[...]
generally accepted method in t[...]
burn-off rate of 0.02% per hou[...]
more representative burn-off ra[...]
ethanol consumption. These ca[...]
have been well below the 0.15[...]
cology community as that BA[...]
would be present in a non-tolera[...]

After completing direct and cr[...]
they had any questions. Unbekn[...]
tions had been obtained by the [...]
in JA's BAC. The jurors asked[...]
from the serial BACs obtained.[...]
pert and complimented the jury [...]
tors had failed to ask. The judge[...]
the BAC was 0.406% and at 6:3[...]
rate can be calculated by calcula[...]
number by the amount of time [...]
$0.406 - 0.301 = 0.105$, and the ti[...]
5 yielded a burn-off rate of 0.0[...]
expert had assumed (0.02%) and[...]
rate plaintiffs' expert had emplo[...]
quested validated this expert's as[...]
discredited plaintiff's expert. The[...]
a defense verdict. Jurors' questio[...]
compensate for errors made by t[...]
perts or not asking key questions[...]

Key Terms: Jurors' Questions; D[...]

104

e

ure 3

**stion Testifying Expert
yers' Wrongs**

:njamin, Ph.D.

of Forensic Sciences, Jurisprudence
20, 2004) In the Commonwealth of
jurors to question testifying experts
ered in direct testimony or cross-
the expert's testimony, some Superior
e any questions to ask of the forensic
write down their questions and submit
the lawyers over to a side bar and re-
eys. If one party has an objection to a
both parties agree on a question, it is
d the expert has an opportunity to re-
urors to question experts is proven by
this author served as an expert for the
il. The case involved a Dram Shop liti-
an allegation that a restaurant or bar
already exhibiting visible signs of in-
is served, and that patron then left the
ehicle that was subsequently involved
y and/or property damage occurred. If
iibly intoxicated at the time the liquor
ol, then the bar or restaurant is civilly
e intoxicated driver.

-aged male with a long history of alco-
, JA was drinking at a local pub. Dur-
left the bar with a friend, purchased a
to the bar where he met another friend.
nd and while driving around, they en-
ooking for company". JA got out of the
urs later, JA was found on the street,
edics were summoned to the scene and
g of liquor and only semiconscious. JA
y depression and anoxic encephalopa-
xygen) secondary to ethanol intoxica-
ohol concentration (BAC) was deter-
0.450%, a nearly fatal level consistent
in damage. The question for the jurors
an intoxicating amount of ethanol had

been served to JA and consumed by JA while he was in the bar, or whether JA had consumed ethanol he had purchased, after he left the bar.

Testimony from patrons at the bar indicated that JA had consumed about 4-5 beers over 2 hours at the bar, and no patron was able to testify that JA had appeared visibly intoxicated while in the bar. The expert for the plaintiffs calculated JA's BAC using a calculation for total body water and the combined amount of ethanol consumed over a 2-hour time. In performing these calculations, plaintiffs' expert used a "burn-off' rate of 0.015% per hour, an assumption based on burn-off rates in the general population which range from 0.01 to 0.025% per hour. A lower burn-off rate would tend to yield a higher calculated BAC thus skewing the resulting calculation in favor of the plaintiffs and bolstering plaintiffs' expert's opinion that JA had consumed enough ethanol in the bar to cause visible signs of intoxication, despite the fact that no patron testified that JA had appeared visibly intoxicated in the bar. This author testified as an expert for the defendant bar, and calculated JA's BAC using the Widmark formula, the generally accepted method in the forensic toxicology community, using a burn-off rate of 0.02% per hour, a value published in the literature as a more representative burn-off rate for individuals accustomed to frequent ethanol consumption. These calculations indicated that JA's BAC would have been well below the 0.15% generally accepted by the forensic toxicology community as that BAC at which signs of visible intoxication would be present in a non-tolerant individual.

After completing direct and cross-examination, the court asked jurors if they had any questions. Unbeknown to this expert, serial BAC determinations had been obtained by the hospital, in order to monitor the decrease in JA's BAC. The jurors asked if the burn-off rate could be calculated from the serial BACs obtained. The judge posed the question to this expert and complimented the jury on asking an important question the litigators had failed to ask. The judge provided the following data: at 1:30 am, the BAC was 0.406% and at 6:30 am, the BAC was 0.301%. The burn-off rate can be calculated by calculating the change in BAC and dividing that number by the amount of time that transpired. The change in BAC was: 0.406 - 0.301 = 0.105, and the time interval was 5 hours. 0.105 divided by 5 yielded a burn-off rate of 0.021 % per hour, almost exactly what this expert had assumed (0.02%) and more than 33% higher than the burn-off rate plaintiffs' expert had employed. The calculations the jurors had requested validated this expert's assumption with regard to burn-off rate and discredited plaintiff's expert. The jurors found no negligence and returned a defense verdict. Jurors' questions can improve the quality of justice and compensate for errors made by the litigators in withholding data from experts or not asking key questions.

Key Terms: Jurors' Questions; Dram Shop; Burn-Off Rate

In the Dram Shop case described in Figures 2 and 3, Joseph Albert by his Guardian et al. v. Harold F. LeClair Co., D/B/A Gus and Paul's Tavern, the jurors were allowed to ask questions of the experts. One juror asked if the burn off rate could be calculated from two serial blood ethanol determinations drawn at the hospital approximately 5 hours apart. I went up to the "flip chart" and did the calculations suggested by the juror and it showed the burn off rate to be 0.021%/hr. I had used 0.02% in my calculations and the opposing expert had used 0.015%. Thus the answer to the juror's question provided support for the burn-off rate I used in my calculations and the jurors returned a verdict for the defendants, the party that had retained me. Moreover, this scenario was so compelling, that the judge complimented the jurors for asking a question the lawyers had not asked, and I wrote up the results and presented the case at the American Academy of Forensic Sciences (see Figure 3).

The information presented in the following pages will permit you to learn how to calculate the amount of ethanol in an alcoholic beverage, how to determine an appropriate time for the ethanol to be absorbed based on the amount of food in the stomach, and how to calculate an individual's BAC from the individual's height, weight, and amount of ethanol consumed over time. The ratio of height to weight provides information on lean body mass so the Widmark "r" factor (or distribution factor) can be selected. Included tables will provide guidance on the continuum of impairment that ensues after ingestion of ethanol, and how to determine the likelihood of visible intoxication at various BACs.

## II.    BASIC PHARMACOLOGY OF ETHANOL

Ethyl alcohol (ethanol, ETOH) or just alcohol has been described as the "perfect" drug. It is a small uncharged molecule, completely miscible (soluble) in water, the major constituent of all bodily fluids and tissues, and not subject to changes in molecular structure as a result of changes in the acidity (pH) of the stomach and intestinal fluids. Because ethanol is an uncharged molecule, it passes easily through the lipid membrane barriers of the body (e.g., from the stomach into the bloodstream or from the intestines into the bloodstream).

Approximately 25% of ingested ethanol is absorbed through the stomach wall, and the remainder is absorbed from the small intestines. Therefore, the faster ethanol leaves the stomach and enters the intestines, the more rapid the accumulation of ethanol in the blood. This is why the presence of food in the stomach decreases the rate of absorption of ethanol, because food delays "gastric emptying time." Medications that slow gastric emptying time also delay ethanol absorption, while medications that increase gastric emptying time increase the rate of absorption.

Because ethanol is not soluble in f[...] of the body. For example, consider[...] out of the refrigerator and set it o[...] water, it floats on top of the water [...] on the bottom. If you were to pour [...] dressing, the ethanol would go to [...] phase. The same analogy holds for [...] goes to the parts of the body that [...] gans, the muscles and the blood, p[...] cumulate very little ethanol.

The movement of ethanol or any ot[...] by the drug's pharmacokinetics. [...] movement. Pharmacokinetics is di[...] sorption, distribution, metabolis[...] has been absorbed into the blood, i[...] ject to metabolism and excretion. T[...] occur contemporaneously and con[...] sorbed, distributed, metabolized an[...]

A schematic model of the absorp[...] intestinal tract is shown in Figure 4[...] solve before they can be absorbed,[...] sorbed.

[...]

DRUG ABSORPTI[...]



106

Figures 2 and 3, Joseph Albert by his
'o., D/B/A Gus and Paul's Tavern, the ju-
he experts. One juror asked if the burn off
.al blood ethanol determinations drawn at
rt. I went up to the "flip chart" and did the
and it showed the burn off rate to
calculations and the opposing expert had
juror's question provided support for the
s and the jurors returned a verdict for the
me. Moreover, this scenario was so com-
ne jurors for asking a question the lawyers
lts and presented the case at the American
gure 3).

wing pages will permit you to learn how
n alcoholic beverage, how to determine an
absorbed based on the amount of food in
i individual's BAC from the individual's
l consumed over time. The ratio of height
a body mass so the Widmark "r" factor (or
cluded tables will provide guidance on the
after ingestion of ethanol, and how to de-
cation at various BACs.

## )LOGY OF ETHANOL

:t alcohol has been described as the "per-
iolecule, completely miscible (soluble) in
dily fluids and tissues, and not subject to
:sult of changes in the acidity (pH) of the
:se ethanol is an uncharged molecule, it
orane barriers of the body (e.g., from the
the intestines into the bloodstream).

iol is absorbed through the stomach wall,
the small intestines. Therefore, the faster
the intestines, the more rapid the accumu-
why the presence of food in the stomach
ianol, because food delays "gastric empty-
tric emptying time also delay ethanol ab-
ase gastric emptying time increase the rate

Because ethanol is not soluble in fat, it only goes into the water soluble portion
of the body. For example, consider a bottle of Italian dressing. When you take it
out of the refrigerator and set it on the table, because the oil is less dense than
water, it floats on top of the water phase, while the water and vinegar portion are
on the bottom. If you were to pour ethanol into this hypothetical bottle of Italian
dressing, the ethanol would go to the water phase with the vinegar, not the oil
phase. The same analogy holds for the human body. When ethanol is ingested, it
goes to the parts of the body that contain the most water. This includes the or-
gans, the muscles and the blood, primarily. Fat, bone, and connective tissue ac-
cumulate very little ethanol.

The movement of ethanol or any other drug into and out of the body is described
by the drug's pharmacokinetics. "Pharmaco" for drugs, and "kinetics" for
movement. Pharmacokinetics is divided into four contemporaneous phases: **ab-
sorption, distribution, metabolism and excretion.** As soon as some ethanol
has been absorbed into the blood, it is distributed throughout the body and sub-
ject to metabolism and excretion. The four phases of ethanol pharmaco-kinetics
occur contemporaneously and continuously until all the ethanol has been ab-
sorbed, distributed, metabolized and excreted from the body.

A schematic model of the absorption of drugs and ethanol from the gastro-
intestinal tract is shown in Figure 4. Note that pills have to disintegrate and dis-
solve before they can be absorbed, but ethanol is a liquid and gets rapidly ab-
sorbed.

### Figure 4

DRUG ABSORPTION AND DISPOSITION



## III.   ABSORPTION

The rate of absorption of ethanol and its subsequent appearance in the blood is dependent on the following factors:

1.   The rate of consumption: (chugging vs. sipping)

2.   The concentration or proof of ethanol in the beverage: (e.g., beer = ~4.2%-5.5%), wine = ~12%, and whiskey = Vodkas (40% or 50%), whiskeys (43%), schnapps (variable percentages, look at the bottle).

3.   The volume consumed, e.g., a 1.25-1.5 oz. shot vs. a 12 oz. beer vs. 4 oz. of wine.

4.   The presence or absence of carbonation, i.e., the ethanol from champagne or sparkling wine is absorbed more quickly than uncarbonated white wine, and the ethanol from scotch and soda would be absorbed more quickly than the ethanol from scotch and water.

5.   The presence or absence of food in this the stomach. The presence of food in the stomach delays the absorption of ethanol by increasing the amount of time it takes for the ethanol to move from the stomach to the small intestines, where ethanol is absorbed at its fastest rate. This phenomenon is known as gastric emptying time, and can also be influenced by drugs that affect gastrointestinal (GI) motility.

As a rule of thumb, an individual, drinking a 12 ounce beer on an empty stomach, over 15-20 minutes, will achieve a peak blood ethanol concentration approximately 30 minutes after starting the beer. With food in the stomach, the same person drinking the same 12 ounce beer with a full stomach over the same 15-20 minutes will achieve a peak blood ethanol concentration approximately 60-90 minutes after starting the beer, but the peak concentration will be much lower. This is because not only does food absorb some of the ethanol, food also slows down the gastrointestinal transit (movement) of the ethanol from the stomach to the small intestines.

## IV.   DISTRIBUTION

Once the ethanol has been absorbed from the stomach and/or the intestines into the blood, it is circulated or distributed to all water-containing portions of the body to which there is blood flow. When citizens are taken to the police station for breathalyzer testing, the CMR (501 CMR 2.55) require law enforcement to wait at least 15 minutes before initiating breathalyzer testing. This accomplishes

two things: 1) It minimizes the [...] alcohol present from the recent [...] tobacco, medications, mouthwas[...] citizen may have used during th[...] the likelihood that the subject is [...] tinal tract, which is known to p[...] cause of the differences between [...]

## V.   METABOLISM

Most ethanol metabolism occurs [...] genase. However, Alcohol Dehy[...] stomach and intestines which cau[...] absorption process. In addition to [...] body fat content, another reason[...] alcohol concentration (BAC) tha[...] because women have a lower am[...] ach and intestinal walls.

In the liver, ethanol is metaboliz[...] acetaldehyde, and acetaldehyde i[...] acetic acid, which re-enters the b[...] nary excretion.

The burn-off rate for ethanol in o[...] 0.010% per hour to 0.025% per [...] Those individuals who are freque[...] rates than infrequent drinkers. [...] 0.025% per hour, due to the induc[...] P-450 enzyme 2E1 or CYP2E1 en[...] liver, but are a different class of en[...]

## VI.   EXCRETION

The "burn-off rate" is a hybrid [...] excretion. The burn-off rate has t[...] metabolism. An individual's burn-[...] not have anything to do with the i[...] major differences in the abilities [...] Asian people and American India[...] Caucasians, so they may demonstra[...] impaired or intoxicated after consu[...]

its subsequent appearance in the blood is

1g vs. sipping)

anol in the beverage: (e.g., beer = ~4.2%-
key = Vodkas (40% or 50%), whiskeys
ages, look at the bottle).

5-1.5 oz. shot vs. a 12 oz. beer vs. 4 oz. of

1ation, i.e., the ethanol from champagne or
quickly than uncarbonated white wine, and
would be absorbed more quickly than the

in this the stomach. The presence of food
ion of ethanol by increasing the amount of
1ove from the stomach to the small intes-
. at its fastest rate. This phenomenon is
and can also be influenced by drugs that
y.

nking a 12 ounce beer on an empty stom-
ɔ a peak blood ethanol concentration ap-
the beer. With food in the stomach, the
ıce beer with a full stomach over the same
lood ethanol concentration approximately
but the peak concentration will be much
ood absorb some of the alcohol, food also
sit (movement) of the ethanol from the

rom the stomach and/or the intestines into
ed to all water-containing portions of the
hen citizens are taken to the police station
)1 CMR 2.55) require law enforcement to
ng breathalyzer testing. This accomplishes

two things: 1) It minimizes the likelihood that there will be any residual mouth alcohol present from the recent use of breath sprays, asthma inhalers, smokeless tobacco, medications, mouthwash, or any other alcohol-containing material the citizen may have used during the prior 15 minute interval, and 2) It minimizes the likelihood that the subject is still absorbing ethanol from his/her gastrointestinal tract, which is known to produce a falsely elevated breathalyzer test because of the differences between venous and arterial blood ethanol concentrations.

## V.   METABOLISM

Most ethanol metabolism occurs in the liver, by the enzyme Alcohol Dehydrogenase. However, Alcohol Dehydrogenase is also present in the walls of the stomach and intestines which causes some ethanol to be metabolized during the absorption process. In addition to their lower average body weights and higher body fat content, another reason why women tend to achieve a higher blood alcohol concentration (BAC) than men from comparable amounts of ethanol is because women have a lower amount of Alcohol Dehydrogenase in their stomach and intestinal walls.

In the liver, ethanol is metabolized by the enzyme Alcohol Dehydrogenase to acetaldehyde, and acetaldehyde is metabolized by Aldehyde Dehydrogenase to acetic acid, which re-enters the blood and is distributed to the kidneys for urinary excretion.

The burn-off rate for ethanol in occasional drinkers ranges from approximately 0.010% per hour to 0.025% per hour, with an average of 0.017% per hour. Those individuals who are frequent drinkers have higher burn-off (metabolic) rates than infrequent drinkers. Frequent drinkers average closer to 0.02%-0.025% per hour, due to the induction of another enzyme called the Cytochrome P-450 enzyme 2E1 or CYP2E1 enzyme. The CYP enzymes also are found in the liver, but are a different class of enzymes than Alcohol Dehydrogenase.

## VI.   EXCRETION

The "burn-off rate" is a hybrid constant encompassing both metabolism and excretion. The burn-off rate has the same numeric ranges shown above under metabolism. An individual's burn-off rate is based on his/her genetics, and does not have anything to do with the individual's body weight or height. There are major differences in the abilities of various individuals to metabolize ethanol. Asian people and American Indians typically have slower burn off rates than Caucasians, so they may demonstrate a reduced tolerance to ethanol and become impaired or intoxicated after consuming relatively small amounts of ethanol.

A small fraction of ethanol is also excreted in tears, sweat, breast milk, and expired air. For the breath, the ratio of the amount of ethanol in 1ml of blood to that in expired air is often cited as 1:2100. This is based on Henry's Law, which states that at 34°C, the amount of ethanol contained in 1ml of blood will be equal to the amount of ethanol contained in 2100 ml of deep lung air. This deep lung air is also called alveolar air, and is the air in the deep portions of the lung that are in equilibrium with the blood, which is on the other side of the capillary membrane that lines the deep alveoli in the lungs.

## VII.  GENERAL OVERVIEW OF ETHANOL PHARMACOKINETICS

As a person begins to drink ethanol, the blood levels begin to rise rapidly because the rate of absorption is greater than the rate of excretion (see Figure 5). When 50% of the ethanol has been absorbed from the GI tract, the absorption phase ends as ethanol blood levels reach a maximum concentration. This maximum concentration is depicted graphically as either a peak or plateau (see Figure 5). As metabolism continues, the rate of metabolism exceeds the rate of absorption, and the blood alcohol concentration begins to decline.

### Figure 5

### Graph of BAC vs. Time



Figure 5 depicts the pharmacokinetics of several drinks with the BAC shown on the vertical axis and time on the horizontal axis. Following the peak BAC, the BAC enters the post-absorptive or elimination phase when the rate of excretion

is greater than the rate of abs
change in BAC (∃), divided by
line with a slope that decrease
slope of this curve now repres
remains fairly constant for any
drinking habits change. At BA(
rate may change due to concer
tion, burn-off rates vary signif
subject variability).

## VIII.  CALCULATIN(
IN A BEVERAG

Let

A 12 oz. can of Budweiser Li
Twelve oz. of beer x 0.042% =
can or glass.

On

Scotch or rye whiskey is 86 pro
either "neat" or mixed, contains
ethanol. A 1.5 oz. shot of 80 p
0.40=0.60 fluid ounces of pure et

On

Wine usually contains 12% ethan
contains 4 fluid ounces. So, 4 oz
glass of wine. Port and other f
higher ethanol concentrations whi
tles.

As you can see, a 12 oz. can of be
whiskey all contain approximately

### Calculating an Individual's
### and the Amount of Ethanol

In order to calculate an individual'
sumed, one can use the Widmark
the Forensic Toxicology communit

110

reted in tears, sweat, breast milk, and ex-
he amount of ethanol in 1ml of blood to
.00. This is based on Henry's Law, which
ianol contained in 1ml of blood will be
ed in 2100 ml of deep lung air. This deep
is the air in the deep portions of the lung
which is on the other side of the capillary
the lungs.

## EW OF ETHANOL
## ICS

he blood levels begin to rise rapidly be-
than the rate of excretion (see Figure 5).
isorbed from the GI tract, the absorption
:h a maximum concentration. This maxi-
:ally as either a peak or plateau (see Fig-
ate of metabolism exceeds the rate of ab-
:ration begins to decline.

## ure 5

## of BAC vs. Time



of several drinks with the BAC shown on
ontal axis. Following the peak BAC, the
iination phase when the rate of excretion

is greater than the rate of absorption. At this time, the slope of the curve (the change in BAC (∋), divided by the change in time) is represented by a straight line with a slope that decreases from a upper left to lower right. The numeric slope of this curve now represents the elimination or burn-off rate. This rate remains fairly constant for any one person (little intra-subject variability) unless drinking habits change. At BACs below 0.01% or above 0.30%, the elimination rate may change due to concentration effects. However, in the general population, burn-off rates vary significantly among different individuals (great inter-subject variability).

## VIII.  CALCULATING THE AMOUNT OF ETHANOL IN A BEVERAGE

Let's start with a beer.

A 12 oz. can of Budweiser Light contains 4.2% ethanol volume to volume. Twelve oz. of beer x 0.042% = 0.50 fluid ounces of pure ethanol in the 12 oz. can or glass.

One Shot of whiskey:

Scotch or rye whiskey is 86 proof or 43% ethanol. A 1.25 oz. shot of whiskey, either "neat" or mixed, contains a total of 1.25 x 0.43=0.54 fluid ounces of pure ethanol. A 1.5 oz. shot of 80 proof whiskey (40%) contains a total of 1.5 x 0.40=0.60 fluid ounces of pure ethanol.

One glass of wine:

Wine usually contains 12% ethanol volume to volume. A glass of wine usually contains 4 fluid ounces. So, 4 oz. x .12=0.48 fluid ounces of ethanol in a 4 oz. glass of wine. Port and other fortified wines and "specialty drinks" contain higher ethanol concentrations which usually are printed on the labels of the bottles.

As you can see, a 12 oz. can of beer, a 4 oz. glass of wine, and a 1.25 oz. shot of whiskey all contain approximately the same amount of ethanol, one half ounce.

## Calculating an Individual's BAC from his/her Height, Weight and the Amount of Ethanol Consumed

In order to calculate an individual's BAC from the amount of ethanol they consumed, one can use the Widmark Formula, the Generally Accepted method in the Forensic Toxicology community.

### The Widmark Formula

$$\text{BAC} = \frac{\text{(SpGr Blood) (grams of ETOH) (SpGr ETOH)}}{\text{(Body Weight in kg.) (Widmark r)}} - \text{Total Widmark } \exists \text{ (amt. of ETOH burnt off)}$$

**Problem:** A 170 lb. man consumes a 12 oz. Budweiser Light on an empty stomach in 15 minutes,. What is his BAC 30 minutes later?

Constants: The SpGr (specific gravity) of Blood = ~1.06; the SpGr of ethanol = 0.79; A fluid ounce of water contains approximately 30 ml and weighs 30 grams. One kg.=2.2 lbs. Widmark r = 0.68 for men and 0.55 for women (who are not overweight).

Substituting into the Widmark equation:

$$\text{BAC} = \frac{(1.06)\ (0.5\ \text{oz of ETOH in a beer x 30})\ (0.79)}{(170\ \text{lbs.}/2.2 = 77.3\ \text{kg})\ (\text{Widmark r for non-fat males} = 0.68)\ \text{x 0.5 hr}} - 0.02\% \text{ per hr}$$

(170 lbs./2.2 = 77.3 kg) (Widmark r for non-fat males=0.68)

$$\text{BAC} = \frac{(1.06)\ (15\ \text{grams})\ (0.79)}{(77.3\ \text{kg})\ (0.68)} - 0.01$$

$$\text{BAC} = \frac{12.561}{52.564}\ \frac{\text{grams}}{\text{kg}} - 0.01 = \frac{0.24\ \text{grams}}{\text{kg}} - 0.01$$

But, percent (%) has the units grams/100ml, and a kg of water contains 1,000 ml, so we divide top and bottom by 10 by moving the decimal place one place to the left. So, 0.024 grams/100 ml less what was burnt-off in 30 minutes (0.01) and the BAC becomes 0.024 – 0.010 = 0.014%.

This formula is very useful for answering hypothetical questions regarding an individual's BAC following the ingestion of a certain number of alcoholic drinks. All the toxicologist has to do is develop a chronology from the depositions, bar receipts, and testimony of the fact witnesses as to how many of what type of drinks were ingested by the individual in question, calculate the amount of ethanol in each drink, select an absorption rate based on how much food the subject had consumed, determine the subject's height and weight so that the appropriate Widmark distribution factor (r) can be selected (average for men is 0.68, and the average for a woman is 0.55 because women have a higher percent of fat in their bodies), and then select an appropriate burn-off rate (∃), based on the individual's drinking habits (for light drinkers use the Widmark average of 0.017, for frequent drinkers use a faster burn-off rate of at least 0.02).

### General Rule of Thumb

A good general rule of thumb for each drink will produce a BAC of is approximately also 0.02% per as 20 mg/dl/hr. That is where the an hour without getting more i empty stomach, each drink will p and the burn-off rate will still be a

### Problem

A 170 lb. man goes into a bar and estimated to be when he leaves th BAC of 0.02%. That means that would have been 0.12%. But he b x 0.02 = 0.08, so his BAC when h 0.04% (0.12 – 0.08).

## IX.    BACK EXTRAPO
##        EXTRAPOLATIO

When ethanol is ingested, initially gets into the blood, distribution, absorption is greater than excretion rising. When absorption is equal when excretion is greater than abs descends at a rate equal to the in can only be carried out when the g cause only at that time is the relati straight line). Moreover, the contr SJC-08268 (2001) also recognizes every burn-off rate selected so the applied that reflect the variability i *Daubert* criterion of "potential erro effect (and a lower limit as well). I hour has been used, the variability burn-off rate would be 0.015% and Using an upper and lower limit may and best case scenarios.

## ark Formula

pGr ETOH) -   Total Widmark ∃

nark r)    (amt. of ETOH burnt off)

l2 oz. Budweiser Light on an empty stom-
0 minutes later?

) of Blood = ~1.06; the SpGr of ethanol =
ns approximately 30 ml and weighs 30
: 0.68 for men and 0.55 for women (who

n:

eer x 30) (0.79)        -   0.02% per hr
ark r for non-fat males=0.68) x 0.5 hr

r non-fat males=0.68)

01

ims - 0.01

100ml, and a kg of water contains 1,000
by moving the decimal place one place to
what was burnt-off in 30 minutes (0.01)
0.014%.

ering hypothetical questions regarding an
stion of a certain number of alcoholic
s develop a chronology from the deposi-
e fact witnesses as to how many of what
lividual in question, calculate the amount
orption rate based on how much food the
subject's height and weight so that the
r (r) can be selected (average for men is
.55 because women have a higher percent
an appropriate burn-off rate (∃), based on
ght drinkers use the Widmark average of
burn-off rate of at least 0.02).

### General Rule of Thumb

A good general rule of thumb for men 150-200 lbs is that on an empty stomach, each drink will produce a BAC of no more than 0.02% and that the burn-off rate is approximately also 0.02% per hour. Scientists also describe the burn-off rate as 20 mg/dl/hr. That is where the old adage about being able to drink one drink an hour without getting more intoxicated. For a woman 110-130 lbs, on an empty stomach, each drink will produce a BAC of no more than 0.025-0.03% and the burn-off rate will still be approximately 0.02% per hour (or a little less).

### Problem

A 170 lb. man goes into a bar and consumes 6 beers in 4 hours. What is his BAC estimated to be when he leaves the bar? He consumed 6 beers, each producing a BAC of 0.02%. That means that if no metabolism took place at all, his BAC would have been 0.12%. But he burnt off approximately 4 beers in 4 hours, or 4 x 0.02 = 0.08, so his BAC when he left the bar would have been approximately 0.04% (0.12 – 0.08).

## IX.    BACK EXTRAPOLATION OR RETROGRADE EXTRAPOLATION

When ethanol is ingested, initially only absorption occurs. Once some ethanol gets into the blood, distribution, metabolism and excretion also occur. When absorption is greater than excretion, the line on the BAC vs. Time graph will be rising. When absorption is equal to excretion, a plateau or peak occurs. And when excretion is greater than absorption, the line on the BAC vs. Time graph descends at a rate equal to the individual's burn-off rate. Back extrapolations can only be carried out when the graph is descending (see Figure 5). This is because only at that time is the relationship between BAC and time linear (i.e., a straight line). Moreover, the controlling case in Massachusetts, Com v. Senior SJC-08268 (2001) also recognizes that there is some variability associated with every burn-off rate selected so the case law asks that upper and lower limits be applied that reflect the variability in the calculations. This is consistent with the *Daubert* criterion of "potential error rate" and *Lanigan's* reference to a ceiling effect (and a lower limit as well). For example, if a burn-off rate of 0.02% per hour has been used, the variability is approximately +/- 0.005, so the lowest burn-off rate would be 0.015% and the highest burn off rate would be 0.025%. Using an upper and lower limit may be considered indications of the worst-case and best case scenarios.

*Example:*

A man orders his last drink at 11:15 pm and leaves a bar at midnight. He gets into an automobile accident at 1 am. At the hospital, his blood is drawn at 2 am and his BAC is determined to be 0.12%. What were his BACs at 1 am, at midnight, and at 11:15 pm when he ordered his last drink?

Hint: See the post-absorptive part of Figure 5.

**Using The Mean Value:**

Assume a mean burn-off rate of 0.02%/hr. Then if the BAC were 0.12% at 2 am, at 1 am it would have been 0.14% and at midnight it would have been 0.16%.

**Best Case Scenario** (i.e., the lowest possible BAC):

Assume a slow burnoff rate of 0.015/hr. Then if the BAC were 0.12% at 2 am, it would have been 0.015% higher or 0.135% at 1 am and it would have been 0.03% higher or 0.15% at midnight.

**Worst Case Scenario** (i.e., the highest possible BAC):

Assume a fast burnoff rate of 0.025/hr. Then if the BAC were 0.12% at 2 am, at 1 am it would have been 0.145% and at midnight it would have been 0.170%.

But what about at 11:15 pm when he ordered his last drink? It cannot be calculated using back-extrapolation because the BAC would have been rising between 11:15 pm and 11:45 pm. Therefore a value at 12 midnight, or possibly 11:45 pm, is as close to 11:15 pm as science will allow you to calculate using back-extrapolation.

## X.    ACTUAL VALUE FOR THE BURNOFF RATE

The only way to determine an individual's actual burn-off rate is to calculate it experimentally from two blood samples obtained at least 60 minutes apart (preferably longer). In the post-absorptive phase, the drop in BAC in one hour is equal to the burn off rate.

As I explained in the Albert v. Gus and Paul's case in Figure 3, pursuant to the juror's question, the judge provided the following data: at 1:30 am, the BAC was 0.406% and at 6:30 am, the BAC was 0.301%. The burn-off rate can be calculated by calculating the change in BAC and dividing that number by the amount of time that transpired. The change in BAC was: $0.406 - 0.301 = 0.105$, and the time interval was 5 hours. 0.105 divided by 5 yielded a burn-off rate of 0.021% per hour.

## XI.    CONVERTING B
## PLASMA LEVEL
## ETHANOL CONC

In the hospital, a blood sample fre
separate the red blood cells from
difference between serum and pla
terminations. In the absence of re
conduct. When results are repo
plasma), due to the differences in
and the effect of the red blood c
ethanol result by approximately
level. This can be accomplished by
For example, a serum ethanol of 0
suant to statute, you can then trun
501 CMR 2.56 (2) citing M.G.L.c.

The Office of Alcohol Testing (O
this chart uses ranges of serum etl
obtain a more valid result by doir
pert to do so.

## XII.    CONVERTING M
## TO PERCENT

Some hospital laboratories report
which is the same thing since there
of a liter. To convert a BAC repor
mal point 3 places to the left. For
and 80 MG/DL is the same as 0.08
serum ethanol results in MG/L, us
Since there are 1,000 ml in a liter,
ml), and moving the decimal plac
Sometimes, a hospital will report
1,000 mg to a gram, 1/10 of a gram

## XIII.    CORRELATING I

When we are sober, we operate "wi
conscience and inhibitions to stop u
we begin to feel the effects of etha
self-control is diminished and we
talking, spilling drinks, boisterous

and leaves a bar at midnight. He gets
the hospital, his blood is drawn at 2 am
. What were his BACs at 1 am, at mid-
his last drink?

are 5.

r. Then if the BAC were 0.12% at 2 am,
. midnight it would have been 0.16%.

sible BAC):

Then if the BAC were 0.12% at 2 am, it
135% at 1 am and it would have been

oossible BAC):

Then if the BAC were 0.12% at 2 am, at
midnight it would have been 0.170%.

rdered his last drink? It cannot be calcu-
: the BAC would have been rising be-
'ore a value at 12 midnight, or possibly
cience will allow you to calculate using

**R THE BURNOFF RATE**

al's actual burn-off rate is to calculate it
: obtained at least 60 minutes apart (pref-
phase, the drop in BAC in one hour is

1 Paul's case in Figure 3, pursuant to the
ne following data: at 1:30 am, the BAC
: was 0.301%. The burn-off rate can be
1 BAC and dividing that number by the
nge in BAC was: 0.406 − 0.301 = 0.105,
5 divided by 5 yielded a burn-off rate of

# XI. CONVERTING BLOOD SERUM OR BLOOD PLASMA LEVELS TO WHOLE BLOOD ETHANOL CONCENTRATIONS

In the hospital, a blood sample frequently will be "spun down" in a centrifuge to separate the red blood cells from the clear fluid called serum or plasma. The difference between serum and plasma is not material with respect to BAC determinations. In the absence of red blood cells, the test for ethanol is easier to conduct. When results are reported as serum ethanol (more common than plasma), due to the differences in water content between serum and whole blood and the effect of the red blood cells themselves, one has to lower the serum ethanol result by approximately 15% to convert that result to a whole blood level. This can be accomplished by multiplying the serum ethanol result by 0.85. For example, a serum ethanol of 0.100% is equivalent to a BAC of 0.085%. Pursuant to statute, you can then truncate the last number and call it a 0.08% (see 501 CMR 2.56 (2) citing M.G.L.c. 90 Section 24.

The Office of Alcohol Testing (OAT) publishes a serum conversion chart, but this chart uses ranges of serum ethanol, not single numbers. Therefore, you can obtain a more valid result by doing the conversion yourself or asking your expert to do so.

# XII. CONVERTING MG/DL (AND OTHER UNITS) TO PERCENT

Some hospital laboratories report their BAC results in MG/DL or mg/100 ml, which is the same thing since there are 100 ml to a deciliter (DL), which is 1/10 of a liter. To convert a BAC reported in MG/DL to percent, just move the decimal point 3 places to the left. For example, 100 MG/DL is the same as 0.100% and 80 MG/DL is the same as 0.08%. Mass. General Hospital usually reports its serum ethanol results in MG/L, using a three figure value such as 800 MG/L. Since there are 1,000 ml in a liter, 800 MG/L is the same as 80 MG/DL (or 100 ml), and moving the decimal place 4 places to the left gives a value of 0.08%. Sometimes, a hospital will report a BAC as 0.100 g/100 ml. Since there are 1,000 mg to a gram, 1/10 of a gram is 100 mg, so 0.1 g = 100 mg.

# XIII. CORRELATING BAC WITH IMPAIRMENT

When we are sober, we operate "with the brakes on." That is to say, we have our conscience and inhibitions to stop us from doing impulsive or illegal acts. When we begin to feel the effects of ethanol, we lose some of our inhibitions and our self-control is diminished and we begin to act "without the brakes on." Loud talking, spilling drinks, boisterous actions, bumping into other people all occur

because we are in less control of ourselves and our judgment and coordination are impaired.

It is important to recognize that the effects of ethanol are manifested in a graded manner, like a "dimmer switch" rather than an on/off switch. The first area of the body affected by ethanol is the brain's intellectual or cognitive functions. Therefore you "feel impaired" before you "appear impaired." In non-tolerant individuals, generally this will occur at BACs between 0.05%-0.10%. Impairment then begins to affect fine motor coordination. For example, at BACs consistent with impairment, ethanol affects the ability to put a key in the ignition before it causes you to stagger or fall. At higher BACs (0.10%-0.20%), speaking becomes slurred because you can't coordinate the muscles of the tongue and mouth. As impairment increases, the larger muscles of the arms and legs are affected and incoordination, staggering, impaired balance, and falling or tripping may occur. Finally, a severely intoxicated individual (BAC 0.20%-0.30%) will lack the strength to stand, will remain motionless, and perhaps fall asleep. When BACs exceed 0.30%, speaking, walking, talking, standing and become laborious. Should the BAC approach 0.40% most individuals are in danger of passing out, and when the BAC exceeds 0.45%, there is a real risk of death from the depression of respiration and circulatory collapse. These descriptions are a general guideline only and certainly do not describe everyone's response to alcohol all of the time.

However, tolerance to the effects of ethanol and the ability to develop "coping skills" to mask the signs of impairment do develop in frequent high dose imbibers of ethanol. People have been found to have BACs of 1.0% or higher (see Lancet Dec. 18, 1982 p.1394) which is classically described as fatal. Thus the onset and appearance of intoxication are quite variable among individuals and are dependent not only on the rate and amount of alcohol consumed, but also on tolerance, learned coping behaviors, the setting in which it is used, and the expectations of the person. The same amount of ethanol causes a person to laugh hysterically at a wedding, and cry mournfully at a funeral.

Demonstrating impairment is important in obtaining a conviction in a criminal OUI case, but the standard in a Dram Shop case and other types of civil liquor liability is "signs of visible intoxication." Impairment may not be visible to an external observer, but intoxication may be. According to Webster's Dictionary, intoxication involves a person who is stupefied to the point where physical and mental control are markedly diminished. Therefore, people get into fights, drive in the wrong direction on the highway, misjudge their speed or ability to negotiate a curve, and manifest difficulties with vision, hearing, speaking and performing several tasks at the same time (e.g., divided attention tasks). That is why law enforcement uses Standardized Field Sobriety Tests (sFST) which require you to do several things at one time (e.g., divided attention) to assess impairment.

## XIV.  SUMMARY

There is no substitute for the com
perienced attorney working toget
to one another. Many charlatans t
toxicology or drug pharmacology
the calculations described earlier i
leagues in the medical field, me
pharmacology or toxicology are a
in ethanol, but when their feet a
MDs frequently cannot do the mat
blood level.

When you retain an expert in eth
liquor liability work (like those on
her. If you find a potential expert
ences of attorneys with whom he c
he/she can convert serum levels t
individual's BAC from the data in
with the standard of care in the f
blood, serum, and urine ethanol sa
ence between a "screening" test a
expert if they are familiar with the
pert cannot answer in the affirmati
on thin ice, and your client's chanc

of ourselves and our judgment and coordination

.t the effects of ethanol are manifested in a graded
h" rather than an on/off switch. The first area of
is the brain's intellectual or cognitive functions.
" before you "appear impaired." In non-tolerant
l occur at BACs between 0.05%-0.10%. Impair-
motor coordination. For example, at BACs con-
ol affects the ability to put a key in the ignition
or fall. At higher BACs (0.10%-0.20%), speaking
can't coordinate the muscles of the tongue and
ses, the larger muscles of the arms and legs are
aggering, impaired balance, and falling or tripping
intoxicated individual (BAC 0.20%-0.30%) will
remain motionless, and perhaps fall asleep. When
g, walking, talking, standing and moving become
pproach 0.40% most individuals are in danger of
C exceeds 0.45%, there is a real risk of death from
and circulatory collapse. These descriptions are a
rtainly do not describe everyone's response to al-

cts of ethanol and the ability to develop "coping
pairment do develop in frequent high dose imbib-
een found to have BACs of 1.0% or higher (see
) which is classically described as fatal. Thus the
ication are quite variable among individuals and
rate and amount of alcohol consumed, but also on
aviors, the setting in which it is used, and the ex-
same amount of ethanol causes a person to laugh
cry mournfully at a funeral.

important in obtaining a conviction in a criminal
a Dram Shop case and other types of civil liquor
toxication." Impairment may not be visible to an
ation may be. According to Webster's Dictionary,
who is stupefied to the point where physical and
liminished. Therefore, people get into fights, drive
highway, misjudge their speed or ability to negoti-
culties with vision, hearing, speaking and perform-
ime (e.g., divided attention tasks). That is why law
d Field Sobriety Tests (sFST) which require you to
e.g., divided attention) to assess impairment.

## XIV. SUMMARY

There is no substitute for the combination of a well-qualified expert ar
perienced attorney working together to present the facts of the case to
to one another. Many charlatans try to pass themselves off as experts i
toxicology or drug pharmacology, when in fact, they are unable to do
the calculations described earlier in this chapter. With all due respect to
leagues in the medical field, medical doctors without specialized tra
pharmacology or toxicology are among those who may tell you they are
in ethanol, but when their feet are held to the fire during cross-exam
MDs frequently cannot do the math or convert a serum ethanol level to
blood level.

When you retain an expert in ethanol, call another attorney who does
liquor liability work (like those on today's panel) and get a referral from
her. If you find a potential expert on your own, ask the expert to provid
ences of attorneys with whom he or she has worked in the past. Ask the e
he/she can convert serum levels to whole blood levels, if they can calcu
individual's BAC from the data in the Widmark formula, and if they are f
with the standard of care in the forensic toxicology community for ana
blood, serum, and urine ethanol samples, and if they are familiar with the
ence between a "screening" test and a "confirmatory" test. Ask your po
expert if they are familiar with the limitations of back-extrapolation. If yo
pert cannot answer in the affirmative and the opposing expert can, then y
on thin ice, and your client's chance of prevailing will be greatly diminishe

## 2-1

```
 1                    Volume II
                     Pages 1 - 127
 2                   Exhibits 9 - 15

 3          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 4      No. 05-CV10617MLW

 5

        NANCY ROSARIO, INDIVIDUALLY, AS SHE    )
 6      IS THE ADMINISTRATRIX OF THE ESTATE OF )
        AWILDA SANTIAGO, ESSEX PROBATE COURT    )
 7      DOCKET 03P-2499ADI, P/P/A VERONICA      )
        ROSARIO AND CHRISTINA SANTIAGO, AND AS  )
 8      SHE IS THE ADMINISTRATRIX OF THE ESTATE )
        OF JOSE SANTIAGO, BERLIN (CONNECTICUT)  )
 9      PROBATE COURT CASE #03-0713             )
                     Plaintiffs  )
10                              )
              vs.               )
11                              )
        RARE HOSPITALITY INTERNATIONAL, INC.,  )
12      D/B/A LONGHORN STEAKHOUSE,             )
                     Defendants  )
13
14            CONTINUATION OF DEPOSITION OF DAVID
15      M. Benjamin, taken on behalf of the defendants, pursuant to
16      the Federal Rules of Relations Procedure, before Josephine
17      C. Aurelio, Registered Professional Reporter, a Notary
18      Public within and for the Commonwealth of Massachusetts, at
19      the Law Offices of Gillis & Bikofsky, 1150 Walnut Street,
20      Newton, Massachusetts, on Friday, February 9, 2007,
21      commencing at 2:09 p.m.
22
              GABRIEL & SWEENEY COURT REPORTING
23        15 Van Wart Path | 19 Summer Street
            Newton, MA 02459 | Acton, MA 01720
24         (617) 969-4791 Phone (978) 266-1352
```

## 2

```
 1      APPEARANCES:
 2        ALBERT I. FARRAH, JR.  ESQ.
            One Washington Mall
 3          Boston, MA 02108
            representing the plaintiffs
 4

 5        MICHAEL K. GILLIS, ESQ.
          DAVID BIKOFSKY, ESQ.
 6        NEIL SCHNURBACH, ESQ.
            Gillis & Bikofsky
 7          1150 Walnut Street
            Newton, MA 02461
 8          representing the defendants

          VIDEO OPERATOR, BRETT ST. GELAIS
 9          National Video Reports, Inc.
            58 Batterymarch Street, Suite 243
10          Boston, MA 02110

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

## 2-3

```
 1                    I N D E X
        Deposition of:   Direct  Cross  Redirect  Recross
 2
        DAVID M. BENJAMIN     4
 3

 4

 5

 6                    E X H I B I T S
        No.                              Page
 7
        9  Submission of February 1, 2007        8
 8
        10 Letter of January 29, 2007            8
 9
        11 EZ-ALC, Widmark formula              16
10
        12 Photographs                         40
11
        13 Graph                               78
12
        14,15  Photographs                     86
13

14
15
16
17
18
19
20
21
22
23
24
```

## 2-

```
 1                 P R O C E E D I N G S

 2

 3             DAVID M. BENJAMIN, called by the

 4      defendant, first having been satisfactorily identified by

 5      the production of his Massachusetts driver's license, and

 6      previously duly sworn by the Notary Public, on oath deposes

 7      and says as follows:

 8            CONTINUATION OF DIRECT EXAMINATION

 9                    BY MR. GILLIS

10             VIDEO OPERATOR: We're now recording and on

11      the record.  My name is Brett St. Gelais.  I'm a legal

12      video specialist for National Video Reporters.  Our

13      business address is 58 Batterymarch Street, Suite 243,

14      Boston, Massachusetts, 02110.

15             Today's date is February 9, 2007, and the

16      time is 2:09 p.m.

17             This is the deposition of Doctor David

18      Benjamin in the matter of Nancy Rosario, et al, plaintiff,

19      versus Rare Hospitality International, Incorporated, d/b/a,

20      Longhorn Steakhouse, defendants, in the U.S. District

21      Court, District of Massachusetts, Case No. 05-CV10617MLW.

22             This deposition is being taken at 1150

23      Walnut Street, Newton, Massachusetts, on behalf of the

24      defendant.  The court reporter is Josephine Aurelio of
```

2-5

1    Gabriel & Sweeney.
2            Counsel, will you please state your
3    appearance, and will the court reporter administer the
4    oath.
5            MR. FARRAH: I'm Albert Farrah, and I
6    represent the plaintiffs in this action.
7            MR. GILLIS: My name is Michael Gillis.
8    I'm here representing the defendants in this action.   With
9    me, but just left the room, is Attorney Neil Schnurbach.
10           Also present is Attorney David Bikofsky, all
11   representing the defendants in this action.
12       Q.  Doctor Benjamin, you understand that you're still
13   sworn from the prior portion of this deposition, correct?
14       A.  Yes, I do.
15           MR. GILLIS: Before we go on the record, I
16   just want to state that the plaintiffs have provided us,
17   which we'll get marked as an exhibit, documents that were
18   sent by plaintiff's counsel, Albert Farrah, to our office
19   on February 1 which is since the last day of Doctor
20   Benjamin's deposition.
21           I feel compelled to put the statement that
22   on the record that on May 16, 2005, Doctor Benjamin filed a
23   60-J affidavit in connection with this matter wherein he
24   expressed certain opinions relative to Jeff Southworth's

2-

1    consumption of alcohol, his state of intoxication at the
2    Longhorn Restaurant on the evening of September 26, 2003.
3            He again expresses his opinions in the
4    plaintiffs' answers to interrogatories filed on or about
5    July 14 2006.
6            On October 31, 2006, the plaintiffs filed a
7    Rule 26 disclosure containing Doctor Benjamin's opinions
8    and expected testimony concerning Southworth's consumption
9    of alcohol, his state of intoxication at the Longhorn
10   Restaurant on September 26, 2003.
11           The opinions and expected testimony
12   contained in the disclosure differed markedly from those
13   expressed in the 60-J affidavit and the plaintiff's answers
14   to interrogatories.
15           On January 26, 2007, Doctor Benjamin's
16   deposition was commenced, and following the deposition, we
17   received on date of February 1, 2007 a supplement to Doctor
18   Benjamin's Rule 26 disclosure which was filed with our
19   office.
20           Once again, Doctor Benjamin expressed new
21   opinions inconsistent and different from the previous ones
22   expressed.
23           Further, it's clear that the supplement,
24   that the new inconsistent opinions are not based on any

2-7

1    information or facts not available for answer when filed in
2    the Rule 26 disclosure was filed.
3            Thus, I'm reserving all rights to strike
4    Doctor Benjamin's supplemental answers and any new Rule 26
5    disclosure that is filed.
6            I'm reserving all rights to strike Doctor
7    Benjamin's supplemental or different opinions expressed
8    therein.
9            In light of Doctor Benjamin's schedule and
10   the deadline set by the Court in this litigation, we intend
11   to go forward today with the deposition and prior
12   testimony, prior expert opinions of Doctor Benjamin.   We
13   reserve all rights to file an appropriate motion to strike.
14           Moreover, in the event that the motion is
15   denied, we're reserving our rights to have another
16   opportunity to depose Doctor Benjamin concerning his new
17   opinions and will seek costs for the cost of the deposition
18   today based on the outdated testimony of Doctor Benjamin.
19           MR. FARRAH: Do you want me to respond?
20           MR. GILLIS: You can do whatever you'd like,
21   but I want to mark this first as the submission we got from
22   you dated February 1, and then we'll also mark the second
23   submission which is being copied right now which was your
24   letter, I believe dated January 29, to our office with

2-

1    various materials as well.
2            (Exhibit Nos. 9,10 marked
3            for Identification).
4            MR. FARRAH: Let me say this for the record,
5    because I think I ought to make a slight, at least a slight
6    response.
7            I provided you with both what have been
8    marked now as Exhibits 9 and 10, so you'll have them and
9    have an opportunity to examine Doctor Benjamin about the
10   statements and opinions contained in them.
11           With respect to the supplemental disclosure
12   and the reference in the supplemental disclosure to his
13   Rule 60-J affidavit, I want to point out to you that you've
14   marked the 60-J affidavit as an exhibit in this deposition
15   and have asked him a number of questions about the 60-J
16   affidavit already.
17           And I don't need to go to the prior day's
18   deposition to reference those pages, but I think you're
19   aware of that fact.
20           With respect to any other portions of this
21   supplemental disclosure, they are, to my way of looking at
22   them, consistent with the information already contained in
23   and an expansion on the Rule 26 report already supplied
24   you, and I'm going to object to any opportunity to take his

2-9

1  deposition further.
2          And I invite you to continue your inquiry
3  into what he disclosed in his Rule 60-J affidavit and
4  what's disclosed in the supplemental Rule 26 report marked
5  Exhibit 9 and the letter to you of January 29, 2007 marked
6  Exhibit 10.
7          I don't see any remote prejudice to you at
8  this stage of the proceeding in receiving these documents
9  when you received them.  But you choose to do what you
10 choose to do in terms of inquiring about what's contained
11 in Exhibits 9 and 10.
12         MR. GILLIS:  Well, you're well aware that we
13 just got these last week, and I'm on trial all week and it
14 will be impossible for us to get a full review of this by
15 our experts on this short date.
16         But this was the only date that you were
17 able to provide us in the month of February in order to get
18 Doctor Benjamin's deposition completed, correct?
19         MR. FARRAH:  I'm aware of the fact that
20 there are three lawyers sitting in this room during this
21 deposition as there were three lawyers from your firm
22 sitting in the deposition room during the last deposition.
23         There's no effort here to provide you with
24 anything less than a full opportunity to examine this

2-

1  witness.
2          And if you're telling me that you don't have
3  sufficient time, you didn't have sufficient time to review
4  this, we can talk about -- if you didn't have sufficient
5  time to review Exhibits 9 and 10, we can talk about a
6  continuation of his deposition at a later date.  That
7  choice is yours.
8      Q.  Doctor Benjamin, I believe when, not too far
9  before the time we finished up the first part of the
10 deposition, we had been going through with you those parts,
11 those visible signs of intoxication that you believe were
12 present in Jeffrey Southworth on the night in question, is
13 that correct?
14         MR. FARRAH:  Objection to the form.
15     A.  Not really what I believed.  What I cited from
16 Jude Connelly's deposition testimony.
17     Q.  And just so I can go through them, please restate
18 the visible signs that you believe were apparent in Jeffrey
19 Southworth on the night of this accident -- excuse me -- at
20 the Longhorn Steakhouse on this evening?
21     A.  Well, I have his deposition in front of me from
22 the Middlesex Superior Court case, and when he was asked
23 about what did he show that were indicative of
24 intoxication, the response on Page 50 starting at Line 9,

2-11

1  was he sloppier looking than he usually is?  A little bit,
2  yes.  Was he louder than he usually appeared?  Yeah, I
3  mean, yeah.  Were his eyes glassy at all, Line 23?  Maybe,
4  yeah.
5          And I know there was one other statement
6  that he wasn't carrying himself the way he normally did.
7      Q.  Okay.  We went into great detail about the
8  loudness last time, so we don't need to go into that again
9  today.  And I believe we carried the carrying as well.
10         But let me ask you one further question
11 about the carrying.  Based on everything that you
12 reviewed, how did the way he carried himself that night
13 affect, if you know, the way he was walking when he was at
14 the Longhorn?
15         MR. FARRAH:  Objection.
16     A.  Well, I don't interpret carrying one's self to
17 refer only when walking.
18     Q.  Okay.  But was there anything about the way he
19 was carrying himself that evening that you're aware of that
20 showed up in the way he walked?
21     A.  I have no other specific facts to go on other
22 than this witness's characterization, that he wasn't
23 carrying himself in the way that he usually did.
24         I wouldn't presume to try to interpret more

2-1

1  from it except that the only thing that I get out of it
2  when he's sober, he looks differently or carries himself
3  differently.  To me, it's the contrast that this gentleman
4  is making.
5      Q.  And that's with somebody who has some experience
6  with Jude Connelly and knows him when he's not drinking,
7  correct?
8          MR. FARRAH:  Objection.
9      A.  Yes.
10     Q.  What about the way he was carrying himself would
11 have alerted a waitress that he may have had too much to
12 drink?
13         MR. FARRAH:  Objection.
14     A.  Once again, I told you that I don't feel that I
15 can interpret that because you would have to ask Mr.
16 Connelly about what he specifically meant.
17     Q.  Okay.  So as far as visible signs, not carrying
18 himself, you can't say as you sit here today something
19 specifically that he did that alerted, should have alerted
20 the wait staff to his being under the influence based
21 solely on the way he was carrying himself, correct?
22         MR. FARRAH:  Objection.
23     A.  Well, I'm not sure that I can or cannot.  What I
24 can not do is I cannot look inside Mr. Connelly's mind and

2-13

1 no specifically what he was referring to.
2     Q. I agree with you. But from where in a situation
3 where he said he's not carrying himself the same way
4 because he was sleeping at the table, that's an indicia
5 that a wait person should be able to pick up on, correct?
6         MR. FARRAH: Objection.
7     A. Well, if somebody was sleeping on the table or
8 had their head down, you actually made a gesture of like
9 putting your head and your arm down like we all used to do
10 in elementary school when the teacher told us to take nap.
11 I don't know that that occurred.
12     Q. What time during the evening, what time frame was
13 it that Mr. Connelly observed Mr. Southworth not carrying
14 himself the way he normally did?
15     A. There is not a specific reference here to time.
16     Q. Okay. So that --
17     A. Let me finish, please. On Page 49, starting Line
18 12, he is asked, While you were at the Longhorn, did Jeff
19 appear to you to be under the influence of what he had been
20 drinking at the Longhorn?
21         And the answer is, I mean, yeah, a little
22 bit. So the time reference that he gives is while Jeff
23 and the others were at the Longhorn. That's the time
24 reference.

2-14

1         There's no clock time given, just the
2 interval.
3     Q. Okay. And the time that was given for when he
4 felt he was under the influence, correct?
5         MR. FARRAH: Objection.
6     A. I beg your pardon?
7     Q. You just read the time that he was under the
8 influence was while at the Longhorn, is that correct?
9         MR. FARRAH: Objection.
10     A. Yes.
11     Q. It doesn't say specifically what the time frame
12 was for when he wasn't carrying himself, correct?
13         MR. FARRAH: In the deposition that he just
14 read to you, you're asking?
15     Q. Do you have any evidence, evidence from any
16 source that you've reviewed that tells you specifically
17 that some time before he got his last drink that night, he
18 was showing signs of not carrying himself the way he
19 normally does?
20         MR. FARRAH: Objection.
21     A. I think the record does not provide specific time
22 notations, unfortunately.
23     Q. Thank you. Now, by the way, before I forget,
24 since the last deposition, the same deposition but the

2-15

1 previous day of it, have you reviewed any documents in
2 preparation for today?
3     A. I pulled out Jude Connelly's deposition. I
4 pulled out --
5     Q. And that's in the Southworth Middlesex action,
6 correct?
7     A. Yes, sir, the one I just cited a moment ago. I
8 pulled out Lee Chabot's witness statement, and that's about
9 what I did.
10         I also brought a couple of photos with me.
11 At least one of the photos of Jeffrey you showed me last
12 week was not the one that I had seen and I wanted to be
13 sure you had a opportunity, even though plaintiff's counsel
14 assures me that he sent them all to you.
15         And you did ask me to provide you with a
16 graph for the first half hour, and I ran that out for you.
17     Q. Okay. Let's very quickly mark some of these
18 things.
19         This is, the first one that we'll mark is
20 Exhibit 11, the EZ-ALC, which is the Widmark computer
21 calculation formula you used in these cases to make your
22 calculations, correct?
23     A. Not that I use. Your expert uses the same one.
24     Q. Are these the ones you use, yes or no?

2-16

1     A. This is the one I used.
2     Q. Okay. And this is for the time period that
3 wasn't included, that was prior to the starting time that's
4 in your expert report, correct, your Rule 26 submission?
5     A. Please ask that again.
6     Q. This particular page you gave me is starting at
7 7:30 and goes until nine o'clock, correct?
8     A. Yes, it does.
9     Q. And the one in your expert submission starts at
10 nine o'clock, correct?
11     A. That is correct.
12     Q. Okay?
13         MR. GILLIS: Let's have this marked as
14 Exhibit 11.
15         (Exhibit No. 11 marked for
16         Identification).
17     Q. Now, Doctor Benjamin, based on Exhibit 11 here
18 and based on your review of the evidence in this case, do
19 you have an opinion if at any time between 7:30 p.m. that
20 evening and nine o'clock p.m. that evening that Jeffrey
21 Southworth would have been showing any visible signs of
22 intoxication based on his alcohol consumption?
23         MR. FARRAH: Objection.
24     A. Based on his consumption or based on the blood

2-17

1 alcohol levels that are shown on the graph?
2    Q.  Based on the blood alcohol levels that are shown
3 on the graph.
4    A.  The likelihood that he'd be showing visible signs
5 at this point in time are low.
6    Q.  You're not going to render an opinion that he
7 showed visible signs of intoxication prior to nine p.m. on
8 that evening, are you?
9          MR. FARRAH:  Objection.
10    A.  Impairment, maybe.  Intoxication, no.
11    Q.  What signs of impairment are you aware of that
12 Mr. Southworth exhibited that evening before or up to nine
13 o'clock?
14          MR. FARRAH:  Objection.
15          MR. GILLIS:  What's the objection?
16          MR. FARRAH:  Before or up to.
17    Q.  Prior to nine o'clock that evening, are you aware
18 of any visible signs of impairment that Mr. Southworth
19 exhibited on the night of this accident?
20    A.  Well, I think that that question really has to be
21 addressed to one of the fact witnesses who was there
22 because, once again, I'm having difficulty interpreting Mr.
23 Connelly's statement who said that Jeff did show signs of
24 being under the influence while he was in the Longhorn.

2-

1          Certainly, this time interval represents the
2 time that he was in the Longhorn or a portion of the time
3 he was in the Longhorn.
4          But I said specifically a few moments ago
5 there was no time designation.  So I don't have any basis
6 for saying it.  But I don't have any basis for saying no,
7 either, Mr. Gillis.
8    Q.  As you sit here today, you have no basis for
9 saying that he was impaired prior to nine p.m. on June 26,
10 2007 -- "he" being Mr. Southworth -- at the Longhorn
11 Steakhouse, correct?
12    A.  I have a basis saying he's impaired because he's
13 at .08 which is the impairment level in the Commonwealth.
14          I draw a big distinction between the word
15 impairment and the word intoxication, and I believe the
16 Courts do as well.
17    Q.  How do they differ?
18    A.  Impairment means you're not normal.  It doesn't
19 necessarily mean you're showing those signs.
20          So in order to prove impairment, a police
21 officer might interview you and ask you to do some
22 psychomotor testing, or prove your memory, or answer some
23 questions.
24          But you might not be explicitly showing

2-19

1 external visible signs, whereas when you're intoxicated,
2 any person who's ever seen a drunk or a person who's
3 intoxicated would be able to characterize that person as
4 such.
5          Any of the jurors would because we've all
6 gone to weddings, bar mitzvahs, Christmas parties, and we
7 have that in our common knowledge.
8          So impairment starts in the brain first
9 where you have confusion or problems with judgment, and
10 then works its way down to where you're stumbling and
11 stuttering.
12    Q.  And .08 is the legal presumption of impairment,
13 not the fact that everybody is impaired at that rate,
14 correct?
15          MR. FARRAH:  Objection.
16    A.  Certainly, that's a per se level that is adopted,
17 I believe by statute, and that's it.  But I think what
18 we're talking about is just the difference between the word
19 impairment and intoxication.
20    Q.  You mentioned earlier that you felt he was a
21 little unkempt, is that correct?
22    A.  I think that that was, if I mentioned that, I was
23 quoting Mr. Connelly.
24    Q.  And unkempt and sloppy looking --

2-2

1    A.  Sloppy looking --
2          MR. FARRAH:  I'm sorry.  Please let him
3 finish his question so I'll have a change to object if I'm
4 going to object.
5    A.  I'm sorry.
6    Q.  When you said earlier in your deposition -- and
7 I'll assume you did say it -- that he was unkempt, is that
8 to you synonymous with sloppier looking than normal?
9    A.  Yes, and I believe sloppier looking was part of
10 the testimony given at one point in time.
11    Q.  So we can use those words interchangeably based
12 on your testimony?
13          MR. FARRAH:  Objection.
14    A.  If you want to define those -- unkempt and
15 sloppier looking -- to me, unkempt would be, you know, hair
16 disarrayed, maybe shirt pulled out, kind of -- not looking
17 well-groomed.
18    Q.  Okay.  And what would sloppier looking be in your
19 definition?
20    A.  About the same thing.  That's why I say, if we're
21 going to define those as being synonymous terms.
22    Q.  What were the specific characteristics of Mr.
23 Southworth when he was at the Longhorn Steakhouse on
24 September 26, 2003 that showed that he was sloppier looking

2-21

1 than normal?
2     A. That was never described to my knowledge. The
3 general statement was made.
4         But the things that you just asked me about
5 a moment ago, I didn't read nor do I recall any specific
6 statement about some of the things that might have led him
7 to say that. But it was certainly his impression.
8     Q. What time, hour -- I'll rephrase the question.
9         What specific time during the evening that
10 night at the Longhorn is it that you're understanding is
11 that he looked sloppier than normal?
12     A. Once again, Mr. Gillis, the question is a good
13 question because I never saw a specific time reference.
14     Q. Okay. And you realize they had been dirt
15 biking, correct?
16     A. Yes.
17     Q. And they wore helmets when they were birth
18 biking, correct?
19     A. Yes. I assume so.
20     Q. And that they went directly from dirt biking to
21 the restaurant, correct?
22     A. Yeah.
23     Q. Do you have any evidence that there coming
24 directly from dirt biking is what he meant by sloppier

2-2

1 looking than normal compared to anything to do with
2 alcohol?
3     A. You're going to have to ask me that again.
4     Q. Okay. Sloppier looking than normal, you can be
5 sloppier looking more than normal from things other than
6 being intoxicated, correct?
7     A. You could just be a slob.
8     Q. Correct. You could have just come from dirt
9 biking, correct?
10     A. Well, you can come from dirt biking and your
11 clothes might be dirty, but you can tuck them in and you
12 can comb your hair even when you took your helmet off.
13         And there were many opportunities when I was
14 a younger man where I played sand lot football with a bunch
15 of guys or baseball and --
16         MR. GILLIS: Move to strike.
17     A. Well, I'm sorry.
18         MR. FARRAH: Let him finish.
19     A. At least let me get it out before you strike it.
20         But there are times where somebody said,
21 let's go visit so and so, or let's go visit so and so, and
22 we were in play clothes with dirt on them.
23         But we tucked our clothes in and we combed
24 our hair, and we had some dirt from the field on us, but we

2-23

1 weren't unkempt or sloppy. We were just a little dirty.
2     Q. Okay. But before you cleaned yourself up, you
3 weren't intoxicated, were you?
4     A. Certainly not.
5     Q. So being sloppier looking than normal is not in
6 and of itself an indicia that someone is intoxicated,
7 correct?
8     A. Well, that depends. Apparently, in Mr.
9 Connelly's mind, when he was asked what were the indicia,
10 he volunteered that freely as his statement.
11         So that had meaning to him, and I can't
12 contradict what he thought was a salient point. So he
13 felt that that was significant.
14         You or I might characterize it differently,
15 and there could be a million other scenarios when something
16 else obtained. But he answered that question and he used
17 those descriptions.
18     Q. What was it about the way Mr. Southworth looked,
19 that being more sloppier than normal, that the wait staff
20 should have picked up on that evening while they were
21 serving him that would have indicated to them that he may
22 have visible signed of intoxication?
23         MR. FARRAH: Objection.
24     A. Once again, you need to address that question to

2-2

1 Mr. Connelly, not to myself because I understand the
2 general statement that was made.
3         But I can't break it down to the specifics
4 that you're asking of me.
5     Q. And what I am getting to, you're aware of
6 certain signs that are directly related to intoxication
7 such as a heavy odor of alcohol on your breath, correct?
8     A. Odor of alcohol on the breath is not a sign of
9 intoxication. It's a sign of prior ingestion.
10     Q. And glassy eyes, isn't that normally something
11 you see?
12         MR. FARRAH: Objection.
13     A. Glassy eyes would be, in my estimation, would be
14 a sign of alcohol effect.
15     Q. Slurred speech?
16     A. Yes.
17     Q. What else would be more likely than not to you a
18 sign of, a visible sign of intoxication like slurred
19 speech?
20     A. Slurred speech is another good one,
21 incoordination, being loud or boisterous.
22     Q. But when Mr. Connelly was asked visible signs of
23 intoxication, he didn't say that he was unsteady, Mr.
24 Southworth was unsteady on his feet, did he?

2-25

1    A.   They were seated at the time, sir.
2    Q.   At any time during the evening, he never said
3  that he got up know and was unsteady on his feet, correct?
4    A.   He said what I read to you out of the deposition.
5    Q.   He never said he was unable to speak coherently,
6  correct?
7    A.   I didn't see that statement.
8    Q.   Okay.  And you didn't see any incoordination at
9  the table, correct?
10       MR. FARRAH:  Objection.
11    A.   You mean I didn't read any description of Mr.
12  Southworth having exhibited incoordination at the table?
13    Q.   Correct?
14    A.   Did not, sir.
15    Q.   Okay.   You didn't read anything that Mr.
16  Connelly said that Mr. Southworth on that evening had a
17  heavy odor of alcohol on his breath, correct?
18    A.   Everybody but Jude was drinking.   Knowing that
19  the sense of smell becomes olfactory, once you have it in
20  yourself, you can't smell it in other people too terribly
21  well.
22    Q.   There's no indication from Jude Connelly that he
23  thought Mr. Southworth had a heavy smell of alcohol on
24  his breath, correct?

2-2

1    A.   I did not see any statement to that, but I would
2  not expect to have seen that.
3    Q.   Now, the glassy eyes, when that evening at the
4  Longhorn was it your understanding that the eyes were
5  glassy?
6    A.   I don't have a clock time for you.
7    Q.   And did he say that they were glassy or did he
8  say, may be they were glassy?
9    A.   Well, I see you have a page out of the
10  deposition.  You have me at a disadvantage.
11    Q.   Look at the bottom of Page 50.  You have it right
12  in front of you?
13    A.   Okay.  I'm looking at the bottom of Page 50.
14    Q.   Were they glassy at all?  Maybe, yeah, correct?
15       MR. FARRAH:  Did you just read from the
16  deposition?
17       MR. GILLIS:  Yes, Lines 23 and 24 on Page
18  50.
19       MR. FARRAH:  Could you read them again?
20  I'm sorry?  The question was what?  I don't have it in
21  front of me.
22    Q.   Were his eyes glassy at all?  Maybe, yeah.
23  That's the answer, correct?
24    A.   Maybe, yeah, right.

2-27

1    Q.   At the top of Page 51, he says he doesn't
2  remember specifically seeing Mr. Southworth's eyes looking,
3  seeing them glassy, correct?
4    A.   Well, he's asking about something else.  So why
5  don't we read the whole question and answer again so we're
6  not misleading.
7    Q.   I'll read it all.  Starting on Line 23 on Page
8  50.  Okay.  Were his eyes glassy at all?  Maybe, yeah.
9  Page 51, At the Steakhouse?
10       Answer:  Yeah, I don't remember specifically
11  seeing his eyes, you know, looking, seeing them glassy, but
12  very well, very well could have.  That could be.
13       Did I read that properly, Doctor Benjamin?
14    A.   You did.
15    Q.   Okay.  And from that, you've opined that his
16  eyes were glassy --
17       MR. FARRAH:  Objection.
18    Q.   -- that evening at the Longhorn Steakhouse?
19       MR. FARRAH:  Objection.
20    A.   Well, I would like to refer you -- I'm opining
21  and basing my testimony on Lines 23 and 24 on Page 50 where
22  he's asked a straightforward question, Were his eyes glassy
23  at all?  And as you read correctly, Maybe, yeah.
24    Q.   The fact that he follows that answer up with the

2-28

1  statement that he wasn't specifically even looking at his
2  eyes that night, that didn't enter into your opinion at
3  all, doctor?
4       MR. FARRAH:  Objection.  I'm sorry, is that
5  what it says, I specifically wasn't looking at his eyes?
6       MR. GILLIS:  I don't remember specifically
7  looking at his eyes.
8       MR. FARRAH:  I didn't hear it the second
9  time.  I just wanted to make sure.
10    A.   Well, the next statement in that deposition kind
11  of contradicts the prior one because he's asked, Were his
12  eyes closed somewhat when he was at the Steakhouse?  And he
13  says, No.
14       And I contend to you that if he says he
15  wasn't looking at his eyes, how could he answer yes or no.
16    Q.   So you find the testimony to be contradictory on
17  that issue?
18       MR. FARRAH:  Objection.
19    A.   I wouldn't call it contradictory.  I would just
20  say that sometimes follow-up questions tend to dilute the
21  thrust of a prior question.  That's all I'm saying.
22       And that sometimes, there's some obfuscation
23  of the record, and it's difficult to be able to extract
24  exactly what was there.  But the definitive and

2-29

```
1    declarative statements speak for themselves.
2        Q.  As far as obfuscation, you realize this is Mr.
3    Farrah asking these questions, correct?
4        A.  I'm talking about the record that's there
5    somehow.  The record is sometimes difficult for me to
6    understand.
7        Q.  Did you find to a reasonable degree of scientific
8    certainty that for purposes of your opinion, his eyes were
9    glassy that evening while at the Longhorn?
10            MR. FARRAH:  Objection.
11       A.  I think that if you asked me did I cite or did I
12   rely on certain statements that Jude Connelly made among
13   which was that the eyes were glassy, yes, I did rely on
14   that.
15       Q.  And again, the same question.  I have to ask
16   these questions.  During what time period while at the
17   Longhorn that evening were his eyes in your opinion glassy?
18       A.  I cannot respond to that question.  I have no
19   answer for that question.  I have no basis for answering
20   that question.
21            I would have to say between the time -- and
22   I don't mean this to be facetious, but between the time
23   they arrived and prior to when they left, probably
24   certainly more towards the latter part of the time when
```

2-3

```
1    more drinks had been consumed, but I think we all agree,
2    Mr. Gillis, there is no, somebody saying, at 9:02, he
3    looked fine, and at 9:27 he looked terrible.
4        Q.  You can't differentiate on those time frames,
5    correct?
6            MR. FARRAH:  Objection.
7        A.  I wouldn't use those time frames to
8    differentiate.  I'd be using the blood alcohols and the
9    rate of ingestion of the drinks.
10       Q.  I just want to shift gears for a little while.
11   In addition to this affidavit which is the Rule 26
12   submission -- that's what we've been calling it -- you
13   submitted in this case a 60-J affidavit, correct?
14       A.  I guess I submitted or --
15            MR. FARRAH:  I object to the form of that
16   question, but go ahead.
17       A.  I submitted an affidavit in conjunction with
18   plaintiff's 60-J affidavit.
19            MR. FARRAH:  I think it's Exhibit 2 in this
20   deposition.
21            VIDEO OPERATOR:  It's now 2:45 p.m. and
22   we're now off the record.
23            (Discussion off the record).
24            VIDEO OPERATOR:  The time is 2:53 p.m. and
```

2-31

```
1    we're now back on the record.
2        Q.  Doctor, during the break, we were able to locate
3    Exhibit 2 in this, previously marked Exhibit 2 in this
4    deposition which is entitled, affidavit of David M.
5    Benjamin, Ph.D., is that correct?
6        A.  Yes, it is.
7        Q.  And this affidavit was filed with you in
8    conjunction with the plaintiff's 60-J submission to the
9    Court in this case, correct?
10       A.  That is correct.
11       Q.  Okay.  And the opinions that you expressed in
12   here had held to you to a reasonable degree of scientific
13   certainty, is that correct?
14       A.  Yes.
15       Q.  Okay.  And in there, you give a little bit of
16   your background, correct?
17       A.  Yes.
18       Q.  And the background qualifications I believe are
19   Paragraphs 2 thru 7, correct?
20       A.  Yes.
21       Q.  And in Paragraph 3, you talk about numerous
22   teaching positions, correct?
23       A.  Yes.
24       Q.  Which of these positions deal strictly with
```

2-3

```
1    intoxication from ethanol as opposed to some other field of
2    toxicology?
3        A.  You notice that I have mentioned Stetson
4    University, College of Law?
5        Q.  Yes.
6        A.  I gave a couple of programs on liquor liability
7    at Stetson Law School.
8        Q.  When you say programs, were these semester long
9    courses or just one afternoon program?
10       A.  They were like two-hour presentations in a
11   medical injuries prudence class, and my topic for that
12   night was to discuss liquor liability.
13       Q.  Anything else that you can point out from that
14   paragraph?
15            MR. FARRAH:  Objection.  What do you mean
16   by, anything else you can point out?
17       Q.  Anything else you can point out from that
18   paragraph that's related to what I asked you earlier, that
19   being specifically related to intoxication due to ethanol
20   as opposed to other areas of toxicology?
21       A.  In that paragraph, I would say that of the
22   teaching venues that are in Paragraph 3, that's the one
23   that I specifically recall teaching about liquor liability.
24       Q.  And you believe you did that on two occasions?
```

2-33

1    A. I believe so.
2    Q. And what years were those?
3    A. Probably in the early to mid '90s.
4    Q. Okay. Paragraph 4, which of the various
5 seminars that you cite here deal solely with the effects of
6 ethanol on a person in a civil context as opposed to a
7 criminal context?
8    A. Well, --
9        MR. FARRAH: Solely, is that the question?
10       MR. GILLIS: Yes.
11   A. Well, my presentations don't distinguish between
12 civil and criminal.
13   Q. Okay.
14   A. They talk about how alcohol is handled in the
15 body.
16   Q. Can you tell me which one of these seminars if
17 you're aware deal with the issue of whether a person
18 becomes visibly intoxicated as opposed to, as you know, in
19 the criminal setting, impaired?
20   A. I think in every instance that I teach, I teach
21 the general formats that we went through last time, that
22 especially in naive individuals, that a .15 blood alcohol,
23 .15 percent is generally considered to be a blood level
24 where nontolerant individuals would show visible signs of

2-3

1 intoxication.
2    Q. Are you aware of any of the seminars that you
3 taught in in Paragraph 4 where you taught other than .15
4 being the standard for visible intoxication for nontolerant
5 drinkers?
6    A. I would say that I almost always say that .15 is
7 the number, quote unquote, the number. But just as you
8 read out of the MCLE portion of my submission to MCLE, does
9 that mean that everyone who will be .15 will be visibly
10 intoxicated, the answer is no.
11       And does that mean that everyone who is
12 under .15 will not be visibly intoxicated, and the answer
13 was of course not.
14       So I teach that while .15 is a reasonable
15 standard and generally accepted throughout the forensic
16 toxicology community, there's so much variability among
17 individuals, and in terms of how much volume of liquor is
18 ingested, what the proof of the liquor is --
19   Q. Are we still answering the question?
20   A. I am, of course I am.
21   Q. In any of those seminars, did you teach that .15
22 was not the standard?
23       We understand that people can show at
24 different points. But the question was: In any of these

2-35

1 seminars, did you teach anything other than .15 being the
2 standard, alibi people may change?
3        MR. FARRAH: Objection.
4    A. But I can't answer it just yes or no. I have to
5 clarify because I teach basically the same thing which is
6 basically what you read out of the MCLE presentation.
7        It would be pretty stupid for anyone to say
8 that one number is the number for everybody in the whole
9 wide world.
10   Q. I'm not suggesting that.
11   A. I thought you were.
12   Q. You understand that standard doesn't mean the
13 same in every single case. It's just that's the standard,
14 correct?
15       MR. FARRAH: Objection.
16   A. Well, that is a number that has some meaning to a
17 group of educated toxicologists.
18   Q. Paragraph 5, have you given any speeches to --
19 strike that.
20       Paragraph 5, which of these organizations
21 are you currently still a member of?
22   A. I'm still a fellow of the American College of
23 Clinical Pharmacology. I'm still a fellow of the American
24 College of Legal Medicine.

2-3

1        I'm still a fellow of the American Academy
2 of American Scientists in the toxicology section, and I'm
3 still a fellow of the American Society of Health Care Risk
4 Management.
5        I continue to be a member -- there's no
6 fellowship -- well, I continue to be a full member in the
7 American Academy of Criminal Toxicology, and so I'm still
8 active in all of those organizations.
9    Q. And you mentioned that you've read a chapter in
10 the Forensic Science Handbook, Volume 3, correct?
11   A. Yes.
12   Q. Do you find that to be a treatise that you rely
13 upon, that handbook in the course of your business?
14       MR. FARRAH: Objection. Volume 3 of the
15 Forensic Science Handbook?
16       MR. GILLIS: Yes.
17   A. Do I rely upon that in the course of my work?
18   Q. Yes.
19   A. I don't really refer too much to it because the
20 knowledge that I have is in my brain.
21   Q. Well, do you refer to it as a peer reviewed
22 document?
23       MR. FARRAH: Objection.
24   A. It's peer reviewed. It's reviewed by people

2-37

1  before it's published.
2      Q.  Is it a learned treatise in your area?
3      A.  When that handbook was reviewed by the American
4  Academy of Forensic Scientists, they referred to it as a
5  learned treatise.
6      Q.  Do you believe it's a learned treatise?
7      A.  If one of my learned colleagues who's objective
8  labeled it as a learned treatise, I don't think I'd quibble
9  with him.
10      Q.  Well, the article you wrote for that, do you
11  consider that to be a learned treatise?
12      A.  He included my -- it's not an article.  It's a
13  chapter, and he included my chapter among those that was
14  referred to as a learned treatise.
15      Q.  So is that a yes or no?
16      A.  That's what it is.  I said what I said.
17      Q.  Paragraph 8, you talk about various exhibits that
18  you reviewed in order to put together this affidavit,
19  correct?
20      A.  Yes.
21      Q.  Are you aware of any documents that are not
22  included in here that you have reviewed since then that
23  would change your opinion in this affidavit?
24      A.  Would you repeat that, please?

2-3

1      Q.  You list a group of documents that you reviewed
2  in order to give your opinion in this case, correct?
3      A.  I do.
4      Q.  And were those documents provided to you by
5  counsel for the plaintiff, Mr. Farrah?
6      A.  They were.
7      Q.  And were there any other documents that you
8  requested that you were not given at that time?
9      A.  No.
10      Q.  Are there any documents that you are aware of
11  that you wish you had that would have changed your opinion
12  in this case?
13          MR. FARRAH:  Objection.
14      A.  Documents, no.
15      Q.  Is there anything other than documents you wish
16  you had at the time that you wrote this affidavit that
17  would have assisted you in your opinion in this specific
18  affidavit?
19          MR. FARRAH:  Objection.
20      A.  Yes.
21      Q.  What?
22      A.  Two things.
23      Q.  Okay.
24      A.  I would have liked to have had the glass in which

2-39

1  the Jack Manhattans were served, and I would have liked to
2  have had the Jack Manhattans, one of them, anyhow, taken
3  out of the Longhorn so that we could have had the alcohol
4  content and the volume measured and calculated.
5      Q.  From the time that you got involved with this
6  case up until today, have you ever had a glass, the type of
7  glass that's used at the Longhorn Steakhouse for making
8  this type of drink?
9      A.  I haven't had a glass, no.
10      Q.  Okay.  Have you had a replica of any kind?
11      A.  Would you consider a photo a replica?
12      Q.  Other than the photo, have you had anything?
13      A.  No.
14      Q.  Okay.  You do have photos which you produced
15  last time -- well, which have been produced since, correct,
16  photos of the glass?
17      A.  I don't know.  I could show you an example, and
18  you could tell me if they've been produced.
19      Q.  Why don't you tell me what you're calling the
20  glass in this case.
21      A.  Okay.
22      Q.  Just so that we can expedite, why don't you give
23  me all the color copies?
24      A.  Okay.  I think they're all the same.  These are

2-4

1  all the same.  I tried to get them to print out so that
2  the glass was in the middle, but they all turned out to be
3  identical.
4          MR. GILLIS:  Why don't we have this marked
5  as one exhibit.
6              (Exhibit No. 12 marked for
7              Identification).
8      Q.  To your understanding, this has been represented
9  to you to be the type of glass that a straight-up Jack
10  Daniels Manhattan would go into at the Longhorn Steakhouse?
11      A.  It's more than just having been represented to
12  me.
13      Q.  How do you know more than having been more than
14  represented to you?
15      A.  That was photographed in the Longhorn.
16      Q.  By whom?
17      A.  By either plaintiff's counsel or member of
18  plaintiff's counsel's team.
19      Q.  Were you there?
20      A.  No.
21      Q.  Have you ever been to the Longhorn Steakhouse?
22      A.  No.
23      Q.  Ever in your life for anything?
24      A.  I don't think so.

2-41

1    Q.   Okay.
2    A.   Let me ask you this:  Where is the closest one?
3         MR. FARRAH:  You can't ask the questions.
4    A.   Well, I mean, I'm trying to answer the question.
5    I'm not a person who goes there --
6    Q.   I'll take your word for it.
7    A.   Okay.  Let me just say, modify my answer or amend
8    it to say I'm not aware of being in any Longhorn
9    Steakhouse.
10   Q.   Regardless, you didn't go to any Longhorn
11   Steakhouse as part of your investigation in this case?
12   A.   No.
13   Q.   And no one has brought you a drink from the
14   Longhorn that you could measure the alcohol, correct?
15   A.   I keep waiting for that to happen, yes.
16   Q.   Do you expect to do that before trial?
17   A.   I have recommended that to plaintiff's counsel.
18   Q.   When did you recommend that?
19   A.   Because --
20        MR. FARRAH:  When or why?
21   Q.   When?
22   A.   When?  When I was first aware of the photos, I
23   said that what would really be helpful would be to have the
24   actual volume so we could measure the volume and then also

2-42

1    get an alcohol calculation.
2    Q.   Because you lecture frequently that seeing a
3    picture of a drink is great, but it doesn't do anything as
4    far as letting you know how much alcohol is in it, correct?
5    A.   My job from a scientific perspective is to
6    evaluate the volume and the content, the alcoholic content.
7    So from a scientific perspective, seeing a picture does not
8    really do it for me.
9    Q.   Okay.  So that's something you normally do in
10   these cases.  You try get the drink so that you can
11   evaluate the alcohol content in a drink, correct?
12   A.   Okay.  I don't try to get them on my own.  I
13   frequently recommend to whoever has retained me to try and
14   get a hold of the drink.
15        If it's a drink with ice, to try and pour
16   out the contents without the ice, and carry it out of the
17   establishment, and bring it to me so that I can analyze it
18   and measure the volume.
19   Q.   I think you called before that the Old Marx
20   Brothers, put the hot water bottle in your pants?
21   A.   That's my wording.  I always say, put the hot
22   water bottle in your pants, just pour out and --
23   Q.   And you recommended that to counsel in this case,
24   correct?

2-43

1    A.   I certainly did.
2    Q.   And to this date, you still haven't gotten it?
3    A.   Hasn't been done, to the best of my knowledge.
4    Q.   But you did have available to you the schematics
5    of the glass which showed its size, correct?
6    A.   Well, I have that photo that tells me, and I can
7    juxtapose the photo of the glass against the other things
8    and get an idea of the size of the glass.
9    Q.   You can't draw any conclusions from just the
10   picture, though, correct?
11        MR. FARRAH:  Objection.
12   A.   Well, I wouldn't say that.  I can draw some
13   conclusions.
14   Q.   What conclusions did you draw?
15   A.   My conclusion, the major conclusion that I drew,
16   which I believe was in my Rule 26 report fairly
17   extensively, is that as that drink appears there with
18   approximately a quarter of an inch between the top of the
19   fluid and the top of the glass, that the volume in there,
20   even with the cherry, would certainly be more than the two
21   and one quarter ounces that was in the bartender's manual
22   about how to make a Jack Manhattan.
23   Q.   Can you tell from this photograph whether that's
24   a half inch or a third of an inch from the top?

2-44

1    A.   I can't tell precisely what it is, of course not.
2    Q.   And because the base is smaller than the top, you
3    don't know at each ounce level how high the drink rises in
4    the glass, correct?
5         MR. FARRAH:  I'm sorry.  Objection.
6    A.   I don't know specifically.  That is, if you ask
7    me, I can put a mark on the glass, the answer is no.
8    Q.   If you were to put a mark on the glass in the
9    picture marked Exhibit 12, you don't know what portion of
10   that drink, just from marking the glass, is melted ice,
11   correct?
12   A.   Well, there is no ice in that drink.
13   Q.   Well, in order to make it, don't you put it into
14   a shaker full of ice and then stir it around and shake it?
15        MR. FARRAH:  Objection.
16   A.   That would be one way to make it.  You could.
17   Q.   Well, what's your understanding of how the drink
18   was made in the case that you're now sitting as an expert?
19        MR. FARRAH:  Objection.
20   A.   Why don't we refer to the bartender's manual.
21   Why don't you pull that out which I believe was marked last
22   time and we'll get it specifically.
23        I'm not going to rely on my memory when we
24   have a document that will speak for itself.

2-45

1  Q.  So as you sit here today, you don't have a
2  specific memory of how it was made, correct?
3  A.  I have a vague recollection that something of
4  what you're describing --
5  Q.  What is your vague recollection that it was made
6  over ice?
7  A.  That the two liquors are poured into a shaker,
8  and that they're shaken up, and poured out, and ice is left
9  back.
10  Your question asked about how much of the
11  contribution of the ice would impart water to the drink.
12  Q.  Yes.
13  A.  Not a lot.
14  Q.  What's not a lot?
15  A.  Less than half an ounce, I would say.
16  Q.  Okay.  Two ounces of bourbon, half ounce of
17  vermouth --
18  A.  Quarter.
19  Q.  Sorry, quarter ounce of vermouth, and stirred,
20  shaken with ice.
21  Is it your testimony that that will not come
22  anywhere close to where this drink is in this glass marked
23  as Exhibit No. 12?
24  MR. FARRAH:  Objection.

2-4

1  A.  That's my belief is, yes.
2  Q.  Okay.  But you haven't tested it?
3  A.  No.
4  Q.  How much alcohol would you have to put in that
5  glass before it was filled to the very brim with the cherry
6  in it?
7  A.  Well, it was represented by the bartender that
8  that's a six ounce glass.
9  Q.  Correct?
10  A.  And that they fill it a little bit less, and that
11  the cherry brings up the volume a little bit higher.  So
12  the answer is probably that I would say if you take the
13  cherry out, there's probably at least five ounces of liquor
14  in that glass.
15  Q.  To get it up to the top?
16  A.  No.  It's a six ounce glass.
17  Q.  So you're saying you believe there's at least
18  five ounces of alcohol in that glass that's been marked as
19  Exhibit 12?
20  A.  Yes, I believe it's very close to five ounces,
21  yes.
22  Q.  And that's not water, that's the alcohol itself?
23  A.  No, it's not the alcohol itself.  That's not a
24  hundred percent alcohol.

2-47

1  Q.  What I meant is that five ounces is the bourbon
2  and the vermouth alone, correct?
3  MR. FARRAH:  Objection.
4  A.  Well, let's say that the bourbon and the vermouth
5  represents four and a half ounces, and some of the water
6  that comes off the ice when it's shaken, as you described,
7  might be another half ounce.  So that would be five ounces
8  there.
9  Q.  And how much further up does the cherry bring it?
10  MR. FARRAH:  Objection.
11  A.  The difference before what it was before then and
12  approximately that quarter inch.
13  Q.  Based on the way that this glass is funneled --
14  A.  Yes, it's conical shaped.
15  Q.  -- conical shape, in this photograph, how many
16  ounces are unused in this glass from the point where the
17  liquid is, the top of the liquid to the top of the glass?
18  A.  How many ounces?
19  Q.  Yes.
20  A.  I don't think I should speculate on that.
21  Q.  So you can't tell?
22  A.  I'm not going to speculate on that answer.  I
23  would like to, and I anticipate having an opport5unity to
24  actually do that exact measurement before trial, and I have

2-4

1  the intent of trying to actually do the exact same thing in
2  the courtroom right in front of the jurors.
3  Q.  But you haven't done it yet?
4  A.  No.
5  Q.  You signed this affidavit May 4, 2005, correct?
6  A.  Yes.
7  Q.  And you knew at that point that -- your practice
8  is to do this in front of the jury right in the courthouse,
9  correct?
10  MR. FARRAH:  Objection.
11  A.  No, it's not my practice.
12  Q.  Well, you intend on doing it?
13  A.  Yes.  But practice would be -- practice would
14  mean that I've done it on numerous occasions and do it
15  relatively routinely, at least say 50 percent of the time.
16  Q.  When did you make, when did you decide that you
17  wanted to do this in the courtroom?
18  A.  I wanted to do it in the courtroom from the first
19  day I was retained on the case and learned about it.
20  Q.  And you never found the time to do that before
21  you submitted your expert report November 1, 2006, correct?
22  A.  No, that is not correct.
23  Q.  Well, between the time you got chosen as an
24  expert in this case until the time you submitted your

2-49

1  affidavit, you didn't do it, correct?
2      A.  I didn't do it, that's correct.
3      Q.  You weren't physically unable to do it, you just
4  didn't do it, correct?
5      A.  Well, I was physically unable to do it.
6      Q.  How is that?
7      A.  Because I did not have the things I needed to
8  rely on.  I asked, bring me a glass.
9      Q.  Other than asking for the glass, what else did
10  you do?
11      MR. FARRAH:  Objection.
12      A.  I didn't do anything more in terms of actual
13  experimentation because I wanted to have an actual glass.
14  And if not an actual glass from the establishment, I wanted
15  to have a glass that was purchased that met the
16  characteristics that the bartender described.
17          And that's a conical glass that would hold
18  six ounces of liquid volume at that point in time, and it
19  hasn't been done yet.
20          The materials have not been brought to me,
21  or else I would have done that study.
22      Q.  How many times have you requested the materials?
23      A.  Only once or twice.
24      Q.  Okay.  You filed an affidavit under oath as to

2-5[0]

1  Mr. Southworth's intoxication in this case, correct?
2      A.  I did.
3      MR. FARRAH:  Objection.
4      Q.  And by affidavit, I'm referring here to Exhibit
5  2, and you swore under the pains and penalties of perjury
6  in that affidavit, correct?
7      A.  Yes, I did.  I signed under pains and perjury.
8      Q.  And you stated these were your opinions to a
9  reasonable degree of scientific certainty, correct?
10      A.  I did.
11      Q.  And if you had any question as to how much
12  alcohol was in that drink, all you had to do was go get a
13  glass and you could have resolved any of those questions
14  prior to giving sworn testimony under oath to a reasonable
15  degree of scientific certainty, correct?
16      MR. FARRAH:  Objection.
17      A.  I'm sorry.  But first of all, that
18  mischaracterizes my statements and it also mischaracterizes
19  my intentions.
20      Q.  I didn't ask you about your intentions.  I asked
21  you, you had ample time, time wasn't a factor before you
22  filed this 60-J affidavit, correct?
23      MR. FARRAH:  Objection.
24      A.  Time is always a factor.

2-51

1      Q.  Is it your testimony as you sit here today that
2  the reason you couldn't do this test is because you didn't
3  have time to do it before your 60-J affidavit was due?
4      A.  I never said that.
5      Q.  Okay, fine.  If you had any questions as to the
6  amount of alcohol in that glass before you filed this
7  affidavit, you had ample time to revolve those questions by
8  doing what it is you say you now want to do in Court,
9  correct?
10      MR. FARRAH:  Objection.
11      Q.  Go ahead.  You can answer.
12      MR. FARRAH:  Well, I just want to say for
13  the record that the affidavit is dated May 4, 2005, as I
14  understand it, that the testimony of Kristin O'Donnell --
15      MR. GILLIS:  Well, if you're going to start
16  testifying --
17      MR. FARRAH:  I want you to be fair to this
18  witness.  The testimony of Kristin O'Donnell about the
19  level of the alcohol, as I recall, didn't happen until
20  seven months later, December 28, 2005?
21      MR. GILLIS:  Correct.
22      MR. FARRAH:  Okay.
23      Q.  What prevented you other than counsel giving you
24  the glass from doing this experimentation prior to filing

2-5[2]

1  your affidavit in conjunction with the 60-J affidavit?
2      A.  Mr. Gillis, you answered your own question in
3  that question.
4      Q.  Just the glass?
5      MR. FARRAH:  Objection.
6      A.  You just answered.  I asked for this.  I said
7  please bring me a glass.  Please, as you quoted me, get the
8  liquid, go to the establishment, pour it into a hot water
9  bottle, take it out of there, bring it to me real quick so
10  that I can measure the volume, we'll send it to a forensic
11  lab, we'll get it analyzed.
12          I can do all of that for you.  My role in
13  the case is as expert.  I don't run the case.  Plaintiffs'
14  attorney runs the case.
15          If he didn't see fit to do that, he must
16  know what he's doing.  I have to defer to him.  He's the
17  attorney.  I am only a poor scientist answering questions.
18      Q.  Okay.  As a poor scientist, you didn't do any
19  independent work to get that glass other than to ask your
20  counsel, correct?
21      A.  That is not my role when I'm retained in the
22  case.
23      Q.  Is that a yes or no?
24      A.  The answer is what it is.  The answer is what it

2-53

1  is.  It is not my role.
2      Q.  Other than asking him to get the glass, did you
3  do anything else to obtain the glass in this case, "him"
4  being Mr. Farrah?
5      A.  What was the last part of that question?
6      Q.  Other than asking Mr. Farrah to get you the
7  glass, did you do anything else independently to get that
8  glass on your own?
9      A.  No.  That's not my role.
10     Q.  Okay, that's all.  The exhibit here that's been
11  marked, when did you first see this photograph?
12     A.  A long time ago.
13     Q.  More than a year?
14     A.  It may have been.  I cannot give you a date on
15  it because I didn't take the photos, but I know the photos
16  were e-mailed to me by plaintiff's counsel when they were
17  obtained, and it was quite a while ago.
18     Q.  Was it before you filed this affidavit?
19     A.  I wish I could tell you, but I really cannot.
20     Q.  Okay.  Anything else you wished you had before
21  you made your opinion in the affidavit that's been marked
22  Exhibit 2?
23     A.  I wish that I had a more accurate description of
24  how that drink was made rather than the description that

2-5

1  just said there were two ounces of Jack bourbon and a
2  quarter ounce of sweet vermouth because I never believe
3  that to be a true representation of the recipe or formula
4  for that drink.
5      Q.  Now, based on what you did review, you came up
6  with -- well, look at Paragraph 20 of that affidavit?
7      A.  Paragraph 20?
8      Q.  Paragraph 20, yes, on Page 6.
9          MR. FARRAH:  Of the affidavit?
10         MR. GILLIS:  60-J.
11         MR. FARRAH:  Paragraph 20?
12         MR. GILLIS:  On Page 6.
13         MR. FARRAH:  Oh, okay.
14     Q.  Let's go back just one step.  You wrote in
15  Paragraph 17 that Southworth, Connelly and Espey were
16  joined by three or four others for dinner including Espey's
17  brother Michael Espey, correct?
18     A.  Yes.
19     Q.  It's your understanding that Michael Espey just
20  showed up for the dinner, not for the predinner activities
21  at the bar that evening, correct?
22     A.  I know one of the Espeys was at the bar and one
23  was not.
24     Q.  Okay.  Going back to Paragraph 15, that would be

2-55

1  Thomas Espey, correct?
2      A.  That would be Thomas Espey --
3      Q.  -- that went to the bar with Southworth and
4  Connelly?
5      A.  Yes, I believe so.
6      Q.  And his brother Michael and some friends joined
7  them at the table, correct?
8      A.  Yes, sir.
9      Q.  In Paragraph 20, you put together a chronology,
10  correct, as to when food and alcohol was arrived, correct?
11     A.  I did.
12     Q.  And are these times the times to the best of
13  your -- to a scientific certainty that you believe based on
14  all the evidence that you looked at that these events
15  occurred?
16         MR. FARRAH:  Objection.
17     A.  Yes, it was based on all the events.  And where I
18  couldn't find specific notations either on the bar tab or
19  the -- what did we call it, the audit?
20     Q.  Audit?
21     A.  -- audit report, I tried to space out the drinks
22  so that there was reasonable distance among them,
23  reasonable time among them.
24     Q.  Okay.  And so in Paragraph 18, you have him, you

2-5

1  have Southworth having 4 24-ounce beers with his meal, and
2  at least two Jack Daniels, is that correct?
3          MR. FARRAH:  Objection.
4      A.  Yes, sir.  Four 24-ounce beers and at least two
5  Jack Manhattans.
6      Q.  Is that a conclusion you drew in this case?
7          MR. FARRAH:  Objection.
8      A.  I don't know if it's a conclusion, but it's based
9  on a statement from Jude Connelly in his deposition, Page
10  38.  And it's also based in part on the witness statement
11  from waitress Lee Chabot.
12     Q.  And again, you knew that from looking at all the
13  evidence including the audit report that he couldn't have
14  had four beers at the table because only two were served to
15  the entire group, correct?
16         MR. FARRAH:  Objection.
17     A.  I knew no such thing.
18     Q.  You didn't know that?
19         MR. FARRAH:  Objection.
20     A.  I knew no such thing.
21     Q.  Okay.  You had the audit report, correct?
22     A.  I did.
23     Q.  Did you review it?
24     A.  Certainly.

2-57

1   Q.  Didn't that seem odd to you that there's only two
2   beers served at the whole table, and you give four of them
3   to Southworth at the table?
4          MR. FARRAH:  Objection.
5   A.  Sometimes people go up to the bar and order a
6   drink when it takes too long to get served from the table.
7   Q.  What evidence do you have that that happened on
8   this evening?
9   A.  I personally do not have any evidence, but I was
10  asked to assume that that was the number of beers that was
11  used.  Moreover, that those numbers are consistent with
12  the testimony that are here.
13         To Jude Connelly, question, Page 38, Line
14  10, How many beers to the best memory did you see him drink
15  at that table?  Answer:  Maybe four, maybe.
16  Q.  And you ignored his subsequent testimony where he
17  changed that, correct?
18         MR. FARRAH:  Objection.
19  A.  Well, I used that statement.
20  Q.  As you sit here today, have you looked at the
21  audit report having had all the depositions and now having
22  discussed the reports given to the district attorney's
23  office and the grand jury and so forth, what is your
24  opinion as to how many beers Mr. Southworth was served

2-5

1   while he was sitting at the dinner table on January 26,
2   2003?
3          MR. FARRAH:  Objection.
4   Q.  Excuse me.  September 26, 2003?
5          MR. FARRAH:  Objection.  I'm not objecting
6   about the date.  Objection.  What's his opinion, is that
7   your question?
8          MR. GILLIS:  Yes.
9          MR. FARRAH:  Objection.
10  A.  My role in this case was really not to form an
11  opinion about how many drinks of which type was served.
12         My role was to review the documents and then
13  to take the assumption that I was, that was put to me by
14  plaintiff's counsel, and to put that into the Widmark
15  formula, and come out with numbers, and that is what I did.
16         I did not form an independent opinion on the
17  number of drinks, although I was guided -- we went through
18  this last time, Mr. Gillis.
19         I was guided by the testimony, the witness
20  statements and the audit report.  And where I found an
21  inconsistency, I asked plaintiff's counsel what do you want
22  me to assume for the purposes of writing this document, and
23  I was told what to assume.
24  Q.  Was that one of those inconsistencies that you

2-59

1   were told to assume, four beers at the table?
2          MR. FARRAH:  Objection.
3   A.  Well, it's not an inconsistency.  If it's
4   consistent with one statement and then there's another
5   statement that contradicts is, it's going to be consistent
6   with one and inconsistent with another, and that's a job I
7   believe for the jury to decide.
8   Q.  You don't think four drinks at the table is
9   inconsistent with the facts in this case based on the audit
10  report and everything else you reviewed?
11         MR. FARRAH:  Objection.
12  A.  I think I just answered that.
13  Q.  Who told you -- it was Mr. Farrah who told you to
14  assume four beers at the table, is that correct?
15  A.  Yes, sir.
16         MR. FARRAH:  Objection.  He just testified
17  it's in the evidence.
18  A.  That's right.
19         MR. GILLIS: No.  He testified earlier he
20  assumed it based on what you told him and that there's some
21  evidence either way, one that there were only two drinks at
22  the table, one that there were four, and to correct the
23  inconsistencies, he asked you.
24         MR. FARRAH:  That isn't what he testified

2-6

1   to.
2   A.  No.  That isn't what I testified to.  You
3   mischaracterize my testimony.
4          I read into the record the statements that
5   said that he had four beers at the table.  And you --
6   Q.  Why didn't you read into the record --
7          MR. FARRAH:  Why don't you let him finish
8   his answer?
9   Q.  Why didn't you read into the record that there
10  were only two drinks served at the table according to the
11  audit report?
12         MR. FARRAH:  Objection.
13  A.  You never asked me to read that in.
14  Q.  So you only read into -- in your report, you
15  don't put that there were only two beers in the audit
16  report, correct?
17         MR. FARRAH:  Objection.  Of course he does.
18  He recites what the audit report says right in his -- in
19  Paragraph 20 is the audit report, or at least it sets out
20  the audit report.  Please.
21         Can we have a break for some water?
22         MR. GILLIS:  Sure.
23         VIDEO OPERATOR:  The time is now 3:32 p.m.
24  and we're now off the record.

2-61

1    VIDEO OPERATOR:  The time is 3:41 p.m.
2  We're now back on the record.
3    Q.  Doctor Benjamin, as one of those four beers, did
4  you determine whether or not one of them was a beer that
5  Mr. Southworth had ordered at the bar but brought to the
6  table?
7    MR. FARRAH:  Objection.
8    A.  Did I determine?
9    Q.  Yes.
10   A.  What do you mean by determine?
11   Q.  Well, you have in your testimony that he had four
12 beers at the table that evening, correct?
13   A.  Right.
14   Q.  Was one of them a beer that he brought to the
15 table from the bar when his table was ready for them to be
16 seated?
17   MR. FARRAH:  Objection.
18   A.  No.  My interpretation is that the two beers
19 that were imbibed prior to being seated were consumed, and
20 then additional beers -- as a matter of fact, I believe
21 that's what Ms. Chabot says.
22   Q.  Well, did you read her deposition when she said
23 the three people that were at the bar brought their drinks
24 to the table?

2-6

1    MR. FARRAH:  Objection.
2    Q.  Not her statement, but her deposition.
3    MR. FARRAH:  Did you read her deposition?
4    A.  I did read her deposition at some point this
5  time, sure.
6    Q.  When was that?
7    A.  I beg your pardon?
8    Q.  When did you read her deposition?
9    A.  I can't tell you.  I don't know when.
10   Q.  You haven't listed it in any of the documents
11 that you based your opinion on, have you?
12   A.  I may stand corrected.
13   Q.  Okay.  Wouldn't that be important in rendering
14 your opinion to know that they actually brought drinks over
15 from the bar?
16   MR. FARRAH:  Objection.
17   A.  I don't think that that statement is any more or
18 less important than the witness statement, either.
19   Q.  Wouldn't you find the audit record more credible
20 given the fact it was a computer printout of what was
21 actually served to the table that night?
22   MR. FARRAH:  Objection.
23   A.  Well, what was on the audit report is what she
24 personally received as an order and put in.

2-63

1    Q.  Okay.  And you have no evidence of anything
2  being brought to the table that night other than what was
3  put in the computer, correct?
4    MR. FARRAH:  Objection.
5    A.  Just the numbers of the beers.
6    Q.  And those were what you were asked to assume by
7  Mr. Farrah, correct?
8    MR. FARRAH:  Objection.
9    A.  That's correct.
10   Q.  Paragraph 24, we went over this in some length in
11 the first part of the deposition, but you don't have any
12 specific testimony that you can point to like Jude
13 Connelly's deposition that you've been referring to
14 frequently, that says that they left at approximately ten,
15 ten p.m., correct?
16   MR. FARRAH:  Right now as he sits here?
17   MR. GILLIS:  Yes.
18   A.  Well, I don't have anything in front of me, no.
19   Q.  In fact, last time we talked at length about Jude
20 Connelly's deposition that says they left around eleven
21 o'clock, is that correct?
22   MR. FARRAH:  Objection.
23   Q.  I know you don't agree with that but that's what
24 it says, correct?

2-6

1    A.  If that's what it says, that's what it says.
2    Q.  If that's what it says, you don't agree with Jude
3  Connelly on that point, correct?
4    A.  That is correct.
5    Q.  And you say it's about ten minutes from drive
6  from there to the hotel, is that correct?
7    MR. FARRAH:  I'm sorry.  Can you just tell
8  me what --
9    MR. GILLIS:  Paragraph 24, fourth line, the
10 drive to the hotel took approximately 10 to 15 minutes.
11   Q.  Did I read that correctly?
12   A.  Yes, you did.
13   Q.  Okay.  Do you have any evidence from any source
14 that you're aware of that Mr. Southworth was showing signs
15 of intoxication from the time he left the table to Longhorn
16 until he got out of the door of the Longhorn?
17   A.  Do I have any evidence, is that what you asked
18 me?
19   Q.  Yes.
20   A.  Yes, I do.
21   Q.  What's that?
22   A.  I have the graphs that I compiled that show that
23 his blood alcohol was increasing and increasing and
24 increasing.

2-65

1    Q.  Other than that, you don't have anybody stating
2    he was walking in an odd way or anything like that to the
3    door, correct?
4        MR. FARRAH: Objection.
5    A.  I am not aware of any testimony to that effect.
6    Q.  Other than your Widmark testing, that's what
7    you're basing that on, correct?
8    A.  Well, there was an automobile accident as well.
9    Q.  I'm just talking about this time period which is
10   two hours before the accident?
11   A.  Okay.
12   Q.  What do you have other than your Widmark that
13   shows that he may have been showing signs of intoxication
14   from the time he got up from the table to leave and when he
15   actually left the restaurant that night?
16   A.  Well, I think that question is a little unfair.
17   Q.  I'm just asking you, tell me what it is other
18   than the graph, if you have anything.  If you don't, you
19   don't.
20       MR. FARRAH: Objection.
21   A.  Well, I'm saying when you say other than the
22   graph what do you have, I think that's an unfair question.
23   Q.  Well, I disagree with you, so just answer the
24   question.  I know you have your graph?

2-66

1    A.  Yes.
2    Q.  I'm trying to get the universe of things that you
3    might base an opinion on.
4        What other than your graph would you base an
5    opinion that he was not carrying himself normally from the
6    table to the door, plain and simple?
7        MR. FARRAH: Objection.
8    A.  I have no statements that I can refer to for you.
9    Q.  Thank you.  What evidence do you have that he
10   was showing visible signs of intoxication at the hotel that
11   they went to directly from the Longhorn?
12       MR. FARRAH: Objection.
13   A.  I would have to once again refer to my
14   calculations.
15   Q.  Other than your calculations, are you aware of
16   any evidence, testimony or otherwise, that would indicate
17   to you that he was showing visible signs of intoxication at
18   the hotel?
19   A.  Once again, I think that that is an unfair
20   question.
21   Q.  I understand you feel that way.  But I'm just
22   trying to narrow down so something doesn't pop up at trial,
23   there were four or five other things I saw in addition to
24   my graph.

2-67

1        I'm trying to get the universe of
2    information from which you would render an opinion.  So I
3    don't think that's unfair.
4        Now, having said that, at the hotel, other
5    than your Widmark information -- and you've made it clear
6    what you think of that, and I agree with you -- is there
7    anything else that you would rely upon to give testimony in
8    this case that would show he was visibly intoxicated in the
9    hotel where he left, after he left the restaurant that
10   evening?
11   A.  I don't know or I can't cite any specific
12   testimony to that effect.
13   Q.  Okay. So you're basing that on your Widmark
14   calculations, correct?
15   A.  Yes, sir.
16   Q.  Fine.  From the hotel to the other side, the
17   Gentlemen's Club that they went to next, other than your
18   Widmark formula, are you aware of any other evidence that
19   you would be relying upon to prove, to show that Mr.
20   Southworth was visibly intoxicated at that time period from
21   the hotel to the Gentlemen's Club?
22   A.  Once again, I can't cite any testimony for you.
23   Q.  Fine.  While they were sitting in the parking
24   lot at the Gentlemen's Club, are you aware of any

2-68

1    information or evidence other than your Widmark
2    calculations that you would be using to rely, to make an
3    opinion as to whether or not Mr. Southworth was visibly
4    intoxicated during that time period?
5    A.  No.
6    Q.  Okay. From the parking lot back to getting Mr.
7    Espey's pickup truck, are you aware of any evidence other
8    than your Widmark calculations that would lead you to
9    believe that Mr. Southworth was visibly intoxicated during
10   that time period?
11   A.  Other than the Widmark calculation?
12   Q.  Correct.
13   A.  No.
14   Q.  Okay. From leaving the parking lot of the
15   apartment up to but not including the accident, are you
16   aware of any evidence that, other than your Widmark
17   calculations that Mr. Southworth was showing visible signs
18   of intoxication during that time period?
19   A.  I think before I would answer, I would want to
20   see the police report.
21   Q.  And for what purpose, for speed?
22   A.  Well, to see what --
23       MR. FARRAH: Objection.
24   A.  To see what kind of descriptions were in the

2-69

1  police report or if other witnesses made descriptions or
2  the police officers recorded information about observers
3  who saw him driving prior to the impact and so forth.
4      Q.  I'm going to ask you to assume -- and we'll break
5  that time period down just to be fair to you -- that Mr.
6  Southworth left the apartment building and was heading
7  North on his way to New Hampshire when he received a phone
8  call that he had his friend's keys and he had to turn
9  around and come back, okay?
10      A.  Okay.
11      Q.  And I want you to assume that up to that point
12  before he turned around, there's no mention of the way he
13  was driving before he turned?
14      A.  No mention by whom?
15      Q.  In the police report about how he was driving
16  before he turned around.
17      A.  All right.
18      Q.  With that assumption, what are you aware of for
19  evidence other than your Widmark calculations that Mr.
20  Southworth was driving, was visibly intoxicated from the
21  time he left the apartment building until the time he
22  turned around to come back towards where he had left his
23  friends previously?
24      A.  Well, when you ask me to assume that, you more or

2-70

1  less back me into a corner of answering that I have no
2  other information.
3      Q.  Well, let's put it a different way.  If there's
4  nothing in the police report that talks about him on his
5  way back to New Hampshire but it only talks about him as
6  he's approaching the accident scene, you'd agree you have
7  no other evidence other than the Widmark, correct?
8          MR. FARRAH:  Objection.
9      A.  That I know of no other transcribed or
10  memorialized statements that would bolster that opinion.
11      Q.  Okay.  Now, you then get into, you start
12  numbering your paragraphs No. 1 again on Page 1.
13          Well, before I get to the method, let's go
14  back to the last three paragraphs on the top of Page 9,
15  Paragraphs 28, 29, 30.
16          It's your understanding that a blood sample
17  was secured at one p.m., correct?
18      A.  Yes.
19      Q.  Have you ever reviewed that blood sample?
20      A.  I know what the blood sample showed.
21      Q.  That wasn't the question.  Have you reviewed the
22  blood sample yourself?
23      A.  What is reviewed the blood sample mean?
24      Q.  Have you actually tested that blood sample at

2-71

1  all?
2      A.  Have I tested it, no.
3      Q.  When you said you reviewed it, you reviewed the
4  findings of it, correct?
5      A.  Yes, sir.
6      Q.  And when did you do that?
7      A.  Within the last six to twelve months.
8      Q.  Okay.  And the sample noted no alcohol in it,
9  correct?
10      A.  Yes.
11      Q.  And that was at one o'clock, correct?
12      A.  One p.m.
13          MR. FARRAH:  Objection.
14      Q.  One p.m., correct?
15      A.  Yes.
16      Q.  Now, getting into your methodology here, for
17  purposes of this opinion that you gave in this case --
18  strike that.  Let's just go right to your opinion.
19          MR. FARRAH:  This is Exhibit 2 still, is
20  that right?
21          MR. GILLIS:  Yes, starting on Page 10.
22      Q.  You say in that, you come up with a couple of
23  different conclusions in this case as to what his blood
24  alcohol could be, correct?

2-72

1          MR. FARRAH:  Objection.
2      A.  Well, you'll have to be more specific than that.
3  I'm sorry.
4      Q.  What based on your opinion do you find to be Mr.
5  Southworth's blood alcohol at the time he was served his
6  last drink at the Longhorn Steakhouse that evening?
7      A.  Based on?
8          MR. FARRAH:  In the 60-J?
9      Q.  In the 60-J.  All of this is document No. 2
10  here, Exhibit No. 2, I'm sorry.
11      A.  Could you repeat the question, please?
12          (Last question read).
13          MR. FARRAH:  Do you want to point him to
14  where in the affidavit he says that, and give him a chance
15  to read it?
16          MR. GILLIS:  I believe it's on the top of
17  Page 15.
18          MR. FARRAH:  Well, maybe we should start on
19  the bottom of Page 10, based on the consumption, Paragraph
20  3.
21      A.  Okay.  Well, Item 3 on Page 10 is a good place
22  to start.  And Paragraph 3 says that at 9:30, assuming
23  four beers were consumed, the blood alcohol would be .22
24  percent.

**2-73**

1  Q.  So it's your opinion that he had a .22 at 9:30
2  that evening at the Longhorn?
3      MR. FARRAH:  Objection.
4  A.  Based on, based on the four beers added to the
5  other two Manhattans.
6  Q.  And that was an assumption you were asked to make
7  by Mr. Farrah, correct?
8      MR. FARRAH:  Objection.
9  A.  Yes.
10  Q.  If he had only consumed two beers at the table,
11  that would be down to a .18, correct?
12  A.  .18 is correct.
13  Q.  How did you come up with these calculations?
14      MR. FARRAH:  Objection to the form.
15  A.  They're right off the same Widmark formula and
16  the printout that I gave you last time.
17  Q.  Is there a reason why in this case in this
18  affidavit here you give a range from a .18 to a .22, but in
19  your submission pursuant to Rule 26, you give a specific
20  amount at a particular time?
21  A.  Because as I told you during our last portion of
22  the deposition, there was some question as to the number of
23  drinks that were consumed, and I was asked to assume
24  different hypotheticals, and each hypothetical was a

**2-7**

1  different calculation, and I crunched the numbers through
2  the formula and reported the result.
3  Q.  Okay.  The first assumption was the four drinks
4  at the table, four double beers at the table, correct?
5  A.  Yes.
6  Q.  Plus two double beers at the bar before they got
7  to the table, correct?
8  A.  Yes.
9  Q.  Plus a beer after dirt biking, correct?
10  A.  Yes.
11  Q.  And how many Manhattans prior to 9:30 in that
12  assumption?
13  A.  Well, I don't have the source document with me.
14  Do you have it?  You have the exhibits from the last
15  deposition.
16  Q.  Well, the last deposition, the source documents
17  you gave us were for your Rule 26.  You didn't give us the
18  source documents for your 60-J affidavit.
19  A.  You never got the Widmark charts that went with
20  the affidavit?
21  Q.  Not unless they've come within the last week, no.
22  A.  Okay.  I'm as surprised as you are.
23  Q.  Was that something that you originally attached
24  to your affidavit?

**2-75**

1  A.  I made them -- I sent them all to plaintiff's
2  counsel.  What he forwarded to you was his determination.
3  Q.  Okay.  And that was obviously done prior to May
4  4, 2005 when you signed this, correct?
5  A.  I've sent him before I signed this, of course,
6  yes.
7  Q.  What did you use for Widmark R in those
8  calculations.
9  A.  I don't recall.  That's why I asked for a
10  replica of it so I could be able to recount that for you.
11      MR. FARRAH:  It's attached right here to
12  Exhibit 9.
13      MR. GILLIS:  Exhibit 9 is the letter that
14  you faxed to us a week ago, correct?  Mr. Farrah, is that
15  your fax, Exhibit 9?
16      MR. FARRAH:  Yes, that's right.
17  Q.  I'm not going to get into new stuff here.  But
18  assuming we've never seen this before this past week, I
19  want you to take a look at this, the last page and what Mr.
20  Farrah is saying your Widmark calculations for your 60-J,
21  your affidavit in conjunction with the 60-J information.
22  A.  Is there a question there, Mr. Gillis?
23  Q.  Yes.  Is that what you're referring to as your
24  Widmark calculation for your affidavit related to the 60-J

**2-7**

1  submission?
2  A.  I think it is.
3  Q.  Okay.  Why don't you take a minute and make sure
4  it is before we make a copy of it and use it for purposes
5  of your 60-J.
6      MR. GILLIS:  Is there a particular reason
7  why we didn't get this until a week ago if you had it as
8  part of his 60-J?
9      MR. FARRAH:  I don't think it was referenced
10  in the 60-J, Mike.  Like I said, you've had the 60-J since
11  May of 2005.
12      If it weren't referenced in it, is there any
13  particular reason why you didn't ask for it?
14      MR. GILLIS:  It's part of your required
15  disclosure.
16      MR. FARRAH:  Well, if it is and we didn't
17  disclose it, I apologize.
18      MR. GILLIS:  It's the photographs of
19  Southworth, then it's the photographs of the drinks, and
20  it's the copies of this.
21      MR. FARRAH:  You can pontificate all you
22  want.
23      MR. GILLIS:  Is there anything else we don't
24  have that you're going to give to us in dribs and drabs

2-77

1   after the fact?
2           MR. FARRAH:  The same question might be
3   asked of you.
4           MR. GILLIS:  What are you missing that we
5   haven't gotten to you?
6           MR. FARRAH:  You haven't given anything.  I
7   haven't seen a photograph from you.
8           MR. GILLIS:  We haven't taken any.  You've
9   got everything.
10          MR. FARRAH:  Fine.
11      Q.  Doctor Benjamin, have you had an opportunity to
12  review that?
13      A.  I have.
14      Q.  Is that your Widmark calculation for your
15  affidavit in conjunction with the 60-J submission?
16          MR. FARRAH:  Objection.  In conjunction
17  with?  I object to that.
18      A.  It does appear to be what I used for the 60-J
19  data.
20      Q.  Okay.  And Neil just came back with a copy.
21  Let's make that the next exhibit.
22          Just to be sure before we make it an
23  exhibit, that was submitted to counsel for the plaintiff
24  along with or prior to your affidavit pursuant to the 60-J

2-7

1   materials, correct?
2       A.  Yes.  I mean, I couldn't write the affidavit
3   without having generated the graft first.
4           MR. GILLIS:  Can we have that marked as an
5   exhibit, please.
6               (Exhibit No. 13 marked for
7               Identification).
8       Q.  Now, on this particular calculation, Widmark R
9   .68, correct?
10      A.  Yes.
11      Q.  And that is what is used for the average male,
12  correct?
13      A.  Yes.
14      Q.  And you used the Widmark data of a .2, correct?
15      A.  .02, yes.
16      Q.  And that concerns the burn-off rate, correct?
17      A.  Yes, it does.
18      Q.  Now, doctor, this seems to be like a flatness on
19  the top of this graft.  Did his blood alcohol rise any
20  higher than that or is that what you call the plateau?
21      A.  No.  It's off the chart.  It doesn't read any
22  higher than that and just gives you a straight line.
23          When you do the integration of it, which is
24  what this is that we had previously, then you can see

2-79

1   exactly what it is because it goes up higher.
2       Q.  For purposes of the record, you're referring to
3   Exhibit 11, correct?
4       A.  Right.  To Exhibit 11, the top portion, the top
5   half of the page which if it's turned horizontally, shows
6   that it goes up to about .28 whereas this also goes to .20.
7           This just cannot print any higher in that
8   particular graph.
9       Q.  Do you have an opinion as to how high his blood
10  alcohol could have gone that evening and still have with a
11  burn-off rate of .02 and still have a zero -- excuse me --
12  blood test next day at one p.m.?
13      A.  I think we can start to address that because you
14  can see the table starts to come down about three a.m. in
15  the morning.
16          But the answer is if we were to go backwards
17  from one p.m. to one a.m. which is twelve hours and use a
18  burn-off rate of .02, you could have a .24 blood alcohol at
19  one a.m. and be zero at one p.m.
20          So anything under .24 would show up as a
21  zero at one p.m. the next day.
22      Q.  Okay.  So according to this chart, it stops at
23  .2, but we know it's going up higher, correct?
24      A.  Yes, sir.

2-8

1       Q.  But it would have to be no higher than .24 at one
2   a.m. in order to get a zero blood test at one p.m. the
3   following day?
4       A.  If his burn-off rate was indeed .02.
5       Q.  Okay.  Well, that's what you assigned to him in
6   this case, correct?
7       A.  I used, in this particular situation, default
8   numbers, .68 for the R, and .02 for the beta, which is a
9   number that you know that I've used in the past for people
10  who are frequent drinkers.
11          So I put in what I thought were fair, and
12  there's another word that they use -- like default numbers,
13  standard numbers.
14      Q.  That's not just for the average person, though.
15  That's the number you normally use for a tolerant drinker,
16  correct?
17          MR. FARRAH:  Objection.
18      A.  Yes, at least .02 for a tolerant drinker, yes.
19      Q.  When you say .02, if you felt that it should have
20  been higher, you would have used a higher number, correct?
21      A.  Well, I mean, it's interesting the way you phrase
22  the question, if I felt.  Feel is a difficult word to
23  interpret in a scientific setting.
24      Q.  Let me rephrase the question then.  You

2-81

1  determined to a reasonable degree of scientific certainty
2  that the appropriate beta for purpose of your calculations
3  in coming up with the blood alcohol, the BAC of Mr.
4  Southworth as set forth with Exhibit 13, the most accurate
5  number that you decided to a reasonable degree of
6  scientific certainty is a Widmark beta of .02, correct?
7      A.  I'd have to correct that.  It's not the most
8  accurate.  The most accurate would be to know exactly what
9  his burn-off was.
10         This is a reasonable number to use as an
11 initial calculation.
12     Q.  Okay.  Not knowing what his actual burn-off rate
13 is, this is as accurate as you can get, is that fair to
14 say?
15     A.  No, it's not as accurate as you can get, but it's
16 a reasonable starting point.
17     Q.  How could you become more accurate without
18 knowing his exact burn-off rate?
19     A.  By doing just exactly what you have in mind for
20 your next two or three questions.
21         By finding out when he was zero, and then
22 extrapolating back to the last time that he had a value,
23 and taking those hours and figuring out how much he burned
24 off.

2-8?

1      The fact that he was zero at one p.m. though
2  doesn't mean that he wasn't zero at twelve noon or eleven,
3  either.
4      It only means we have one point in time
5  which is certainly not the greatest piece of scientific
6  datum.
7      Q.  Okay.  Because, as we discussed last time, we
8  don't have two readings so we can, to accurately determine
9  his actual burn-off rate like you did in the Albert case --
10     A.  Like I did in the Albert case, by subtracting the
11 two and dividing by the time interval.
12     Q.  We don't have that in this case, correct?
13     A.  We don't, no.
14     Q.  The only way you can do it is based on your
15 training and experience to use the numbers that you feel
16 are the most accurate under these circumstances, correct?
17     A.  Well, once again, I have a problem with the "most
18 accurate."  I am not charged with using the most accurate.
19         I am charged with doing one that is a
20 reasonable, reasonable certainty, that it's reasonable to
21 do that.
22         I've used reasonable care in selecting that
23 number.
24     Q.  Are you aware of any other number that is more

2-83

1  reasonably certain in this case than the .02 beta?
2      A.  Well, if I went back and crunch those numbers --
3  well, still, we still don't know at what time he became
4  zero, whether it was one p.m., whether it was 12:30, twelve
5  noon.  So this stands as a reasonable number.
6      Is it the absolute most accurate?  Of
7  course not.  It's a reasonable number, though.
8      Q.  And if he was at zero earlier, then that would
9  reduce the maximum that he could have been twelve hours
10 previously, correct --
11         MR. FARRAH:  Objection.
12     Q.  -- or eleven hours?
13     A.  Well, without knowing what his burn-off rate, if
14 his burn-off rate was higher, he would get lower sooner
15 even if he was higher.
16     Q.  This is the same burn-off rate you used in the
17 rule 26 admission?
18     A.  In the second report, it is indeed.
19     Q.  And based on this report, you opine that he was a
20 -- Paragraph 2 of your opinions, he's not obese, is that
21 correct?
22     A.  Did I say that?  Are you quoting me from
23 somewhere?
24     Q.  Yes.

2-8?

1      A.  Let me see.
2      Q.  Paragraph 2.  Read the first sentence there.
3      A.  Okay.  This is for the affidavit, and this is
4  prior to my having seen this photo.  Remember I asked you
5  about photos last time?
6      Q.  We'll get to that in a second, but I just want
7  you to answer one question at a time.
8      A.  All right.
9      Q.  As of May 5, 2005, you used a Widmark R of .68,
10 correct?
11     A.  I did.
12     Q.  Okay.  And you used that based on your opinion
13 that -- and if I read this incorrectly, let me know.
14         Assume that Jeff Southworth weighed 210
15 pounds and assumed 25 ounce Bud Lite, beer containing 30
16 grams of ethanol, that he was not obese, and that his
17 height of six four was a reasonable proportion to his
18 weight, I conclude that each 25 ounce beer consumed on an
19 empty stomach produced a blood alcohol concentration of
20 approximately .016 percent, correct?
21     A.  Based on those assumptions, that's what I
22 calculate.
23     Q.  Okay.  Did you have any photographs of Mr.
24 Southworth at that point in time?

2-85

1    A.  No.
2    Q.  Were you provided, did you ask for any
3 photographs of him at that time?
4    A.  I didn't know that they existed, so I didn't ask.
5    Q.  Well, did you ask for any police reports?
6    A.  I did ask for the police report.
7    Q.  And you know that the photographs you have come
8 from the police report, correct?
9         MR. FARRAH:  Objection.
10    A.  I know they came from the police department.  You
11 say police reports.
12         These were taken in the police station and
13 the police report may be just by the arresting officer, not
14 by the booking officer.
15    Q.  And I'm sorry, when were those pictures provided
16 to you?
17         MR. FARRAH:  Which pictures are we talking
18 about?
19         MR. GILLIS:  Of Mr. Southworth.
20         MR. FARRAH:  Do you want to mark it as an
21 exhibit?
22         MR. GILLIS:  They were marked last time, I
23 believe.
24         MR. FARRAH:  This was marked last time.

2-86

1         MR. GILLIS:  Okay.  Well, let's mark the
2 new pictures here.
3         MR. FARRAH:  And when I referred to "this,"
4 I was referring to Exhibit 6, which is Exhibit 10 to the
5 O'Donnell deposition.
6    Q.  Just so we're clear here, since two weeks ago,
7 you have not produced another photograph of Mr. Southworth
8 that you had prior to your making your Rule 26 opinion in
9 this case, correct?
10    A.  Not really.
11    Q.  Well, when did you get these photographs?
12    A.  I had those photographs previously because I
13 asked you about them at the first time we were here for
14 this deposition.
15         And you asked me, is this the photo that you
16 saw, and I just said no.
17    Q.  Okay.  And the photo that you had seen before is
18 the ones that we're about to mark, correct?
19    A.  Yes.
20         MR. GILLIS:  Let's mark that as Exhibit 14,
21 14 and 15.
22              (Exhibit Nos. 14,15 marked
23              for Identification).
24    Q.  When were these produced to you?

2-87

1    A.  I can't give you a date, but it was after the
2 affidavit was filed and before I did the Rule 26 report.
3    Q.  Did you think it was important for filing your
4 affidavit that you used the right Widmark R?
5    A.  Of course.
6    Q.  Did you request photographs of him so you could
7 determine that before you chose a Widmark R in your
8 affidavit which is marked as Exhibit 2?
9    A.  At the time of the affidavit, I hadn't, I wasn't
10 aware that those photos existed.
11    Q.  Did you request any photographs of him so you
12 could make a determination as to whether he was obese, not
13 obese, or otherwise?
14    A.  Well, if I didn't know that they existed, I
15 couldn't request them.
16    Q.  That wasn't the question.  Did you ask for any
17 photographs of him so you could see what he looked like?
18    A.  I did at some point in time which is how I came
19 to receive the photos.
20    Q.  Did you do it prior to filing Exhibit 2, the 60-J
21 affidavit?
22    A.  No.  That's what I just said a moment ago.
23    Q.  At any time prior to your 60-J affidavit, did you
24 request photographs of him?

2-88

1    A.  I don't think so.
2    Q.  Okay.  Why not?
3    A.  I don't know.
4    Q.  Now, what type of signs would you expect Mr.
5 Southworth to be exhibiting if he is at .2 or above while
6 at the Longhorn Steakhouse on September 26, 2003?
7         MR. FARRAH:  Objection.
8    A.  Well, I think that each person handles or holds
9 their liquor in a different way and compensates and
10 manifests signs differently.
11         So I think that it's, a side from making
12 general statements, I don't think that I have anything
13 other than to say other than what Jude Connelly said.
14         VIDEO OPERATOR:  Excuse me, counsel.  We
15 have under five minutes remaining.
16    Q.  Well, you lecture extensively that at certain
17 BACs, people show certain signs, correct?
18    A.  Well, what I do is I quote the literature and
19 talk about the table that's in the, published in the AMA
20 alcohol and impaired drivers with 6500 people in it.
21    Q.  And what are the public signs that you would
22 expect people to show at .2?
23    A.  Well, that particular table just refers to
24 visible signs of intoxication.

2-89

1    But in general, you would be looking for
2  things like slurred speech and lack of coordination,
3  stumbling.  See, the problem is they manifest themselves
4  differently and experienced drinkers can mask some of it.
5    So loudness is one of the things that was
6  already occurring in the Longhorn, and --
7    Q.  I just want to interrupt you for a second because
8  I want you to not start mixing what happened at Longhorn
9  and what didn't.
10    I want you to tell me based on the
11  literature what you expect to see in most subjects at a .2,
12  what visible signed, like you were mentioning muscle
13  coordination, large muscle groups versus small muscle
14  groups.
15    MR. FARRAH:  Objection.
16    Q.  Give us the literature.
17    MR. FARRAH:  Objection.
18    A.  You said what I would expect to see in most
19  subjects?
20    Q.  Yes.
21    A.  You'd have to describe that individual's
22  experience with liquor for me so that, because most
23  subjects, that table that I'm referring to is in
24  nontolerant individuals, and Mr. Southworth obviously was a

2-9

1  tolerant individual.
2    So when you say most individuals, you have
3  to define that for me a little bit better so I can answer
4  that question.
5    Q.  Let's start with nontolerant people because
6  that's what the literature shows.  What would you expect
7  nontolerant individuals to show at .2?
8    A.  Nontolerant individuals?
9    Q.  Yes.
10    A.  Lack of coordination, poor judgment and red eyes,
11  glassy eyes.
12    It also depends as to whether we're talking
13  about .2 on the way up or .2 on the way down.
14    Q.  Well, you have Mr. Southworth at .2 and going
15  upwards that evening, correct?
16    A.  Well, at some point in time, it was going up, and
17  at some point in time, it was going down.  If you look at
18  the graph, you can see that.
19    Even the graph that you showed me before
20  that was off the graph, there's still a portion that goes
21  up and a portion that comes down.
22    Q.  At 9:30, his blood alcohol was going up, correct?
23    A.  Correct.
24    Q.  At 9:30, so assume for a nontolerant person, I

2-91

1  don't want to know what the signs are that you'd expect to
2  see before .2.
3    What specific signs would you expect to
4  start seeing at .2, nontolerant?
5    A.  For a nontolerant at .2 --
6    VIDEO OPERATOR:  The time is now 4:24 p.m.,
7  and we're now off the record.
8    (Discussion off the record).
9    VIDEO OPERATOR:  The time is 4:33 p.m., and
10  we're now on the record.
11    Q.  Doctor Benjamin, just before we went off to
12  change the tape, I was asking you a question, and I'll just
13  try to repeat it.
14    What signs would you expect to see in a
15  nontolerant drinker at .2 and above?  I know there are
16  some signs below .2, but I'm just looking at that point,
17  what would you expect to start seeing?
18    A.  Probably a good deal of lack of coordination and
19  psychomotor coordination.
20    Q.  Can you give an example of what lack of
21  coordination you're talking about?  Are we talking about
22  falling down?
23    A.  They might.  But I'm thinking more of certainly
24  maybe, certainly wouldn't be able to thread a needle or

2-9

1  maybe have some problems getting dressed, putting their own
2  clothes on, or some slurred speech, probably their eyes
3  would look glassy, the lids might be droopy, and they would
4  probably -- depending upon how long it took.
5    Once again, if this is on the upward side of
6  the curve --
7    Q.  Right.
8    A.  -- those would be the things that I would be
9  looking for.
10    Q.  And assuming on the upward side of the curve, we
11  went to, in a nontolerant person, what would you start to
12  expect seeing at .25?
13    MR. FARRAH:  Nontolerant person?
14    MR. GILLIS:  Nontolerant.
15    A.  Further deterioration, staggering, difficulty
16  walking, difficulty doing typical things, can't find their
17  keys, can't get the key in the lock.
18    Q.  How about at .3?
19    A.  A lot of muscle relaxation, probably head
20  drooping, difficulty functioning.
21    Q.  Would you have difficulty walking at that point?
22    A.  Probably.
23    Q.  Would you be vomiting at that point?
24    A.  Can't tell.

2-93

1    Q.   And at these various stages -- .2, .25, .3 -- for
2  a tolerant person, you would expect them to show those
3  similar signs but at a higher BAC, is that fair to say?
4            MR. FARRAH:  Objection.
5    A.   You may or you may see some of the more -- you'd
6  certainly see more of the more subtle things starting to
7  occur as well.
8    Q.   Okay.  Do you have any opinion as to how far a
9  tolerant person would trail behind a nontolerant person as
10 far as showing these signs; for example, a nontolerant
11 might at .2, but a tolerant person would at .22, something
12 like that?
13           MR. FARRAH:  Objection.
14   A.   There's a paper that addresses that.  Almost
15 everybody shows some impairment at .2, even those who are
16 accustomed to drinking.
17           But instead of it being like a high
18 percentage of people like 70 or 80 percent, it's more like
19 20 or 30 percent who might show that.
20   Q.   For the tolerant drinkers?
21   A.   For tolerant drinkers.  And by about .3, nobody
22 is tolerant.  Everybody shows some sort of stigmata.
23   Q.   From this chart, you can't tell --
24           MR. FARRAH:  Which exhibit?

2-9[

1    Q.   Exhibit 13, you can't tell what was the absolute
2  high point for that evening of Mr. Southworth's blood
3  alcohol, correct?
4    A.   I can't tell from that chart, no.
5    Q.   Now, were you asked to assume a particular
6  Widmark R for purposes of your Rule 26 disclosure?
7    A.   No.
8    Q.   That's something you solely chose yourself,
9  correct?
10   A.   Yes.
11   Q.   How about the burn-off rate, did anybody ask you
12 to use a particular burn-off rate?
13   A.   No.
14   Q.   Okay.  But you have been for your various
15 opinions asked to assume certain fact patterns as to how
16 much alcohol Mr. Southworth had to drink, correct?
17   A.   Yes.
18   Q.   And in your 60-J affidavit, you were asked to
19 assume four 25-ounce beers at the table, correct?
20   A.   Yes.
21   Q.   In addition to two 25-ounce beers at the bar
22 prior to sitting at the table, correct?
23   A.   Yes.
24   Q.   And do you remember how many Manhattans you were

2-95

1  also asked to assume?
2    A.   Either two or three.
3    Q.   And those assumptions came from counsel, correct?
4    A.   Yes.
5    Q.   Okay.  And that's when you came up with the top
6  end of that range, correct, the .2 or plus?
7    A.   Well, if I took the hypothetical and plugged it
8  into the formula and then you asked me what would the BAC
9  be at a certain time, I just looked it up from the graph.
10   Q.   In your 60-J affidavit, on Page 15 at the top, it
11 says, at approximately 9:30 p.m. when he was served his
12 last drink at the Longhorn Steakhouse, his BAC was
13 approximately .18 to .22, is that correct?
14   A.   That's what it says.
15   Q.   Okay.  And the reason for that range is that you
16 assumed one amount of alcohol that he drank that night to
17 get to the high of a .22, and you were asked to assume a
18 lower amount of alcohol with a .18, correct?
19   A.   Yes.
20   Q.   And that's what I was referring to earlier.  The
21 .22 is the fact pattern that we just talked about, the four
22 25-ounce beers at the table, correct?
23   A.   Yes.
24   Q.   And two 25-ounce beers at the bar, correct?

2-9[

1    A.   Right.
2    Q.   And one beer at the pit before they got to the
3  Longhorn, correct?
4    A.   Right.
5    Q.   And two or three Manhattans at the table as well?
6    A.   Yes.
7    Q.   Can you tell from your report what you were asked
8  to assume that got you up to the .18 as opposed to the .22
9  low end of that range?
10   A.   Didn't we go through that?  Wasn't that specified
11 earlier?
12   Q.   If I had that, if I could put my finger on it, I
13 can give it to you.
14           MR. FARRAH:  Page 10.
15   A.   I'm almost certain we talked about it.  At the
16 bottom of Page 10, Item 3 carrying over to the top of Page
17 11 at the top, I think that's the scenario.
18           If he consumed four 25 beers, it was .22 at
19 9:30.  And if he consumed two 25, it was .18.  Do you see
20 that on Page 11?
21   Q.   Yes.  So the difference between your two
22 calculations is two 25-ounce beers at the table.
23 Everything else is the same, correct?
24   A.   That's correct.

2-97

1    Q. And the two 25-ounce beers at the table is what
2  the audit report shows was served to the table that
3  evening, correct?
4    A. Let me see your copy of the audit report, please.
5    Q. Here's the audit report, but I think it has the
6  total amount of the drinks to the table and the bill which
7  has been marked as an exhibit.
8          Here, Exhibit 5, can you tell how many
9  drinks on the bill it says how many beers were served to
10 the table that evening?  Just the one page.
11         MR. FARRAH: What's the question?
12         Could you read back the question, please?
13         (Last question read).
14   A. Yes, I think that's what it says, although part
15 of this is cut off, Mr. Gillis.  But I believe that this
16 line here that says, five ounce Bud Lites really means 25.
17   Q. So if we assume it should have been a two on the
18 photocopy, your understanding is that at least as to the
19 bill, there were only two 25-ounce Bud Lites served at the
20 table that evening, correct?
21   A. If you look at the audit report, that's what the
22 audit report says.
23   Q. Okay.  Now, on these two different assumptions
24 you were asked to consider in putting together your 60-J

2-9

1  affidavit, did you do any independent evaluation of the
2  evidence to determine the credibility, the fact pattern
3  that you were asked to assume?
4          MR. FARRAH: Objection.
5    A. I didn't weigh it, no.
6    Q. So for the one with four beers at the table, you
7  didn't do any independent evaluation as to the credibility
8  of the facts that would support that assumption, correct?
9          MR. FARRAH: Objection.
10   A. I did not.
11   Q. And for the one with two beers at the table, you
12 didn't do any independent evaluation as to the credibility
13 of the facts upon which the assumption was based, correct?
14   A. Well, the audit report said that.  But I didn't
15 weigh that, either.
16   Q. And then subsequent to that, you gave another
17 opinion with a different -- you came up to a different
18 blood alcohol in your Rule 26 submission in this case,
19 correct?
20   A. Well, I had a different set of assumptions.
21   Q. Okay.  And where did those assumptions come from
22 counsel?
23   A. In part.
24   Q. If we have to go through it all again, I will,

2-99

1  but what part of your assumption was from counsel and what
2  part of your assumption was based on your investigation?
3          MR. FARRAH: I think he's already answered
4  that he can't break it down for you, that's what I think he
5  answered.
6    A. That's what I told you at the last deposition,
7  but, you know, I can support from Jude Connelly what I
8  mentioned earlier today for beers and three Jack
9  Manhattans --
10   Q. Well --
11   A. -- at the table.
12   Q. On the assumptions that you made in your Rule 26
13 submission, did you make any independent investigation as
14 to the credibility of the facts you were asked to assume
15 for purposes of rendering the opinion in that submission
16 which has been marked as Exhibit 1?
17         MR. FARRAH: Objection.
18   A. No, I didn't weigh it.
19   Q. Okay.  Briefly, doctor, in that expert
20 submission, you've attached cases that you've recently
21 testified in, correct?
22   A. Well, within four years, I believe.
23   Q. And can you tell me why you didn't supply any of
24 the case citations?

2-10

1    A. Why I didn't supply any of the case citations?
2    Q. The actual citations so we could look up these
3  cases. It was just headings of cases, docket numbers.
4    A. I never knew that you had to.  I thought you
5  just had to put in the name.  That's all I've been doing.
6    Q. Now, starting -- you have the summary of your
7  qualifications here, and you talk about teaching seven
8  seminars for judges in Florida?
9          MR. FARRAH: Can you just tell us where
10 you're looking now?
11         MR. GILLIS: Page 1 of his Rule 26 report.
12         MR. FARRAH: 60-J?  No.  His Rule 26 report?
13         MR. GILLIS: Yes, his letter to you dated
14 October 18, 2006.
15   Q. The seven seminars that you said you spoke out in
16 Florida between '99 and 2006, which one of those deals with
17 the effect of ethanol and visible intoxication?
18   A. I don't talk too much about visible intoxication
19 except for referencing the AMA table because that's
20 primarily a criminal setting.
21         The judges are learning, it's a traffic
22 court seminar.
23   Q. So it has more to do with criminal impairment as
24 opposed to physical signs of intoxication in a civil case?

2-101

1    A.  Yes, sir.
2    Q.  And on Page 2, you talk about the title of a
3 presentation, the Importance of Developing a Chronology in
4 Determining the Proximate Cause of Impairment and Mixed
5 DUI, DUI cases, is that correct?
6    A.  Yes.
7    Q.  Where was that ever published?
8    A.  That was the citation I gave you last time in the
9 Society of Forensic Toxicology.  You wrote it down.  I
10 told you about that.
11    Q.  Could you repeat it for you?  I don't remember
12 writing it down.
13    A.  Sure I can repeat it for you.  Austin, Texas,
14 last year.
15    Q.  Okay.  I know a lot of this is repetitive, but
16 we're now on to your Rule 26.  And even though it's very
17 similar to the 60-J, I have to ask you the questions about
18 this as opposed to the other document.
19        On Page 2 of that document, the second
20 paragraph -- do you have it in front of you there?
21    A.  I'm not sure that I do.
22        MR. FARRAH:  It's Exhibit 1.
23    Q.  Page 1 is basically two paragraphs, and I'll
24 start with the bottom paragraph.

2-10

1        It says, the paragraph that starts with, I
2 conclude with reasonable scientific certainty --
3        MR. FARRAH:  Page 2.
4    Q.  I'm sorry, Page 2.  And, like I asked you about
5 your 60-J affidavit, as far as visibly intoxicated while
6 still at the Longhorn Steakhouse, you can't say
7 definitively during what time period he was visibly
8 intoxicated, correct?
9    A.  Well, I can tell you from between -- and I don't
10 mean to flip -- between the time he got there, after
11 8:30, before ten.
12        I mean, I don't think he was intoxicated
13 from the twelve-ounce beer after dirt biking and from the
14 two doubles that he had at the bar.  So that would bring
15 us up to about 8:30 when they were seated or so.
16    Q.  Can you tell me -- let me rephrase.  You can't
17 tell what time between when he got there and when he left,
18 whatever those time frames are --
19    A.  Well, I tried to just tell you --
20        MR. FARRAH:  I think he just answered that
21 question.
22    Q.  -- let me finish.
23        MR. GILLIS:  No, he didn't.  He put a time
24 frame in there.

2-103

1    Q.  You can't tell from when he got there to when he
2 left at what point during that time period, although you
3 know it's in that time period, when he showed visible signs
4 of intoxication, correct?
5    A.  Well -- read that back for me, please.
6        (Last question read).
7    A.  Well, I do know basically that, because the
8 drinks were accumulating and the drinks are coming more
9 quickly, that it's going to be in let's say the time
10 interval a half to 45 minutes before they leave rather than
11 in the earlier part of the evening.
12    Q.  Let's narrow that down.  You know based on the
13 way the alcohol was consumed it's more likely that he
14 showed those visible signs later in the evening while at
15 the Longhorn than earlier in the Longhorn, correct?
16    A.  That's exactly what I was trying to say, yes.
17    Q.  But you can't tell at exactly what time period it
18 occurred based on just a visible signs, correct?
19    A.  Well, at least rhetorically, I'm giving you a
20 time period.  What I can't give you an exact clock time.
21    Q.  Okay.  No exact clock time, correct?
22    A.  Yes.
23    Q.  And then you say other patrons at the Longhorn
24 came over to his table.  Do you know how many patrons came

2-10

1 over?
2    A.  Well, I know it's at least one.  It was either a
3 patron, or I think they said it was a woman who worked in
4 the bar or whatever, came over and told them to be quiet.
5    Q.  So when you conclude to a reasonable degree of
6 scientific certainty, you don't know whether it was an
7 employee or a patron, correct?
8    A.  I'm not certain, that's correct.
9    Q.  Or the exact clock time when that occurred,
10 correct?
11    A.  Right.  I mean, if it will make it easier, I
12 don't have a clock time answer for you in any of the
13 questions with the exception of the 9:30 time period when
14 all of the prior drinks have surmounted and he's ordering
15 the last one.
16    Q.  Well, that's based on the assumption that you
17 made as to when those drinks got to him and that those
18 drinks that were ordered were actually for him, correct?
19    A.  Basically, yes.
20    Q.  Okay.  And while you can calculate what his
21 blood alcohol is and what the standard is for nontolerant
22 people, whatever, you would expect him not to show visible
23 signs until higher than a nontolerant person because he's a
24 tolerant drinker, correct?

2-105

1    A.   No.   That mischaracterizes my testimony.
2    Q.   What is your testimony?
3    A.   My testimony --
4         MR. FARRAH:  Objection.
5    A.   -- is that whereas other people may be staggering
6    at that time, he may just be showing slumping of the
7    shoulders or not carrying himself or other less profound
8    stigmata, but still, of course in the eyes of his colleague
9    Jude Connelly, recognizable as indicating intoxication.
10   Q.   He would mask it better than a nontolerant
11   drinker, correct?
12   A.   Yes, he would.
13   Q.   Are you aware as you sit here today of anybody
14   other than Jude Connelly that you, that stated he showed
15   visible signs of intoxication at the table?
16   A.   I am not --
17   Q.   Okay?
18   A.   -- unless you want to include the person that
19   came over to the table and told him to be quiet.
20   Q.   I think we went through that last time.  The
21   fact that the table was loud --
22   A.   Right.
23   Q.   -- doesn't necessarily mean, is not conclusive
24   proof that Mr. Southworth was intoxicated, correct?

2-10

1    A.   Well, those are two independent statements, Okay?
2    And -- so those are two independent statements.
3    Q.   Are you going to testify in this case that the
4    patron came over to the table to tell him to quiet down
5    knew that he was visibly intoxicated, Mr. Southworth?
6         MR. FARRAH:  Objection.
7    A.   I don't know if the patron knew he was
8    intoxicated, but I knew certainly the patron knew that they
9    were making too much noise for the patron and his or her
10   friends to enjoy their dinner.
11   Q.   And "they" being the whole table, not just Mr.
12   Southworth, correct?
13   A.   Well, that's true.
14   Q.   Okay.  And --
15   A.   Let me amend that.  One of the things that Jude
16   Connelly said was that Jeffrey was usually a pretty quiet
17   person, didn't really speak up.  So the fact that he was
18   loud is a significant factor.
19   Q.   I don't want to mince words, but the testimony
20   was that the table was loud, correct?
21   A.   I understand, but --
22   Q.   There's no independent testimony that you're
23   aware of that says that Mr. Southworth, just Mr. Southworth
24   himself was loud, correct?

2-107

1         MR. FARRAH:  Objection to the form.
2    A.   Well, I don't know.  I'm thinking that Jude
3    Connelly said something to the effect of what I just
4    reported to you.
5    Q.   So your testimony is that Jude Connelly said
6    Southworth himself was loud as opposed to the table?
7    A.   Let me see if I can find it.
8    Q.   I'll withdraw the question.  It's not important
9    at this point.  We're running short on time.
10   A.   Okay.
11   Q.   The documents that you reviewed for this opinion
12   are listed on Page 3 going into the top of Page 4, correct?
13   A.   Yes, sir.
14   Q.   Is there any documents that you requested at the
15   time that you gave this opinion that you needed that were
16   not provided to you in order to make your opinion in this
17   case?
18   A.   No.
19   Q.   Was there anything that you needed at that time
20   prior to making this opinion that would have in your
21   opinion more accurately given you a more accurate opinion
22   in this case?
23   A.   Well, I revert to my prior comment about liking
24   to have one of the glasses and to have had the contents

2-10

1    from the glass so I could have gotten it analyzed, and then
2    I wouldn't have to rely on plaintiff's counsel to ask me to
3    assume something.  We would have had a concrete number.
4    Q.   And those requests were made but just not
5    complied with, correct?
6    A.   Well, he doesn't have to comply with my requests.
7    Q.   Based on your requests, did you ever get those
8    materials?
9    A.   No.
10        MR. FARRAH:  Haven't we been over that
11   already?
12        MR. GILLIS:  No.  Well, we went over it for
13   the purposes of the 60-J.  This is different.
14   A.   Although we were talking about the same data, Mr.
15   Gillis.
16   Q.   Since you gave this opinion, are there further
17   documents that you've reviewed in order to make your --
18   strike that.
19        Since you gave your opinion in this, have
20   you come upon new documents that have changed your opinion
21   in this case in any way?
22   A.   No.
23   Q.   And by your opinion, I'm talking about --
24   A.   My ultimate opinion.

2-109

1  Q. -- I'm talking about the exhibit that you
2  submitted that is --
3        MR. FARRAH: Exhibit 1.
4  A. We're talk about the Rule 26 report, the initial
5  Rule 26 report?
6  Q. What you have in front of you, Exhibit 1, yes.
7  A. We're talking about the same thing, yes.
8  Q. Okay. And you mention on Page 8, the paragraph
9  referring to Douille, D-o-u-i-l-l-e, certain -- I'll read
10  the sentence starting on Line 5.
11       Certain signs of visible intoxication will
12  constitute knowledge of the patron's intoxication but so
13  would the number of drinks consumed per hour, correct?
14  A. Yes.
15  Q. What number of drinks consumed per hour are you
16  opining should have put the Longhorn on notice of Mr.
17  Southworth's intoxication on September 26, 2003?
18       MR. FARRAH: Objection.
19  A. Well, I think in particular, between nine o'clock
20  and 9:35. But if you want to, you can take the entire
21  interval from a little after eight o'clock to 9:35. If
22  you take --
23  Q. Okay. So if --
24       MR. FARRAH: Let him finish.

2-11

1  A. Yes, let me just finish, okay? If you start at a
2  little after eight o'clock, assuming they come in and sit
3  at the bar a little after eight o'clock and they have two
4  25-ounce beers at the bar, and then they're seated around
5  8:30, 8:40, and then they cash out the last service --
6  let's just say this: The last service is at 9:35 and they
7  cash out at almost ten o'clock.
8        If you go from eight to 9:35, there are one,
9  two, three, four, five, six, seven drinks served.
10  Q. To Mr. Southworth?
11  A. I'm sorry?
12  Q. To Mr. Southworth?
13  A. Yes. Each one of those drinks, that's seven in
14  number. But each double beer is just that, it's like two
15  twelve-ounce beers.
16       And even with this calculation on the Jack
17  Manhattans, if you take the three Jack Manhattans at .85,
18  four ounces of ethanol and you add them together, that's
19  three eighths is 24, and twelve is about 25, that also
20  comes out to be more than -- it's just like a 1.4 beers,
21  1.4 beers, and 1.4 beers.
22       So it's like four beers. If I convert it to
23  equivalents, it's four beers for the Jacks and each of the
24  double beers are double beers.

2-111

1        So there is one, two, three, four double
2  beers is eight and four, so that's twelve. That would be
3  the equivalent of twelve, twelve-ounce cans of beer between
4  eight o'clock and 9:30.
5  Q. And that's assuming as to your assumptions as to
6  what he actually had that night are accurate, correct?
7  A. Well, what I have here, if just assuming that
8  that is the correct number, that is a large number of
9  drinks to serve in a short period of time.
10  Q. Okay.
11  A. That's also a criterion in the bartender's guide
12  that we had here as an exhibit that you marked last time,
13  and that's also consistent with what's taught in the TIPS
14  program in terms of how many drinks per unit time.
15  Q. That's, your entire answer is based on the
16  assumption you were asked to make for purposes of putting
17  together this opinion, correct?
18  A. Okay. Well, for purposes of doing this
19  calculation.
20  Q. Okay. And it's kind of a rhetorical question,
21  but if he didn't have all that to drink, your assumptions
22  would have to be different, correct?
23       MR. FARRAH: Objection.
24  A. If he didn't, the assumptions calculations and so

2-11

1  forth would be less. But depending upon how many few you
2  asked me to assume, Mr. Gillis, that would be the factor that
3  would depend on whether I answered you, that's excess, I
4  believe, and that's not excessive.
5  Q. Getting back to the original question here, how
6  many drinks would have to be served to Mr. Southworth that
7  evening at the Longhorn before the wait staff should have
8  been on notice of his intoxication?
9        MR. FARRAH: Objection.
10  A. Don't they have a policy on that?
11  Q. I'm asking you what your opinion is, not what the
12  policy is, not what Mr. Farrah, all the drinks he told you
13  to assume.
14       I'm asking, one to a hundred, how many
15  drinks could he have had before you feel that the wait
16  staff should have been on notice of his intoxication?
17       MR. FARRAH: Objection.
18  A. Okay. That's a fair question. Let me answer
19  it for you this way.
20       You know that I say that you can use about
21  .02 as a ballpark for each beer. With Mr. Southworth, he's
22  going to have on an empty stomach from a twelve-ounce beer
23  a lot lower than .02 because of his increased body weight.
24       So even if you use .02, which is not a

**2-113**

1 correct number but it's an easy number to work with in an
2 example, then that means if you're going to burn-off one
3 beer an hour and they're there from eight to 9:30, that's
4 an hour and a half.
5           As soon as he has his second double beer,
6 he's now already at the point what he can't burn those two
7 double beers off until more than two hours.
8           So everything he drinks beyond two double
9 beers is going to accumulate in his body. And those Jack
10 Manhattans, the way they're calculated, they are 1.6 beers
11 each because a typical Budweiser twelve-ounce can of beer
12 like the one that he had after dirt biking is about .5
13 alcohol.
14           And these are calculated, even with the
15 smaller amount of volume in the glass, these are calculated
16 to be .84.
17           MR. GILLIS: I'm going to move to strike.
18     Q. The question was very simple, David. What number
19 of drinks --
20           MR. FARRAH: He was answering your question.
21     Q. -- if you can put it in twelve-ounce beers like
22 you recalculated all the Manhattans to, and you
23 recalculated the double beers.
24           Based on your assumption that he was

**2-1**

1 drinking there from eight to 9:30, how many twelve-ounce
2 beers would they have to serve him before they should be on
3 notice of his visible intoxication?
4           MR. FARRAH: Objection.
5     A. Well, I'm not going to sit here and do that
6 calculation, but what I am going to reference you is to the
7 Rule 26 report where I laid out all of that.
8           I talked about what his rate of climb would
9 be on his blood alcohol.
10     Q. I know you did. But --
11           MR. FARRAH: Let him finish, please. This
12 is the second time you're interrupted him on a question you
13 obviously think is very important.
14     Q. You put in your --
15           MR. FARRAH: Let him answer the question.
16     Q. You put in your guide there what the rate of
17 climb of alcohol was based on what you were asked to
18 assume, correct?
19     A. Yes, I did.
20     Q. I'm not asking you that. I'm asking you very
21 simply as an expert, how many beers or the equivalency
22 thereof -- strike that.
23           What would they have to serve him in the
24 equivalency of twelve-ounce beers before they should be on

**2-115**

1 notice of his visible intoxication that evening if he was
2 there drinking from eight to 9:30?
3           MR. FARRAH: Objection.
4     Q. How many?
5     A. Well, we have the food, too, that we have to
6 factor in.
7     Q. Just give me an answer.
8           MR. FARRAH: Same objection.
9     A. Read back the question for me, please.
10           (Last question read).
11     A. Probably about twelve.
12     Q. Okay. And I'm going to ask the same question,
13 one word changed, and that is take out the word visible.
14           The equivalency of how many twelve-ounce
15 beers should they have to serve him before they should be
16 on notice of Mr. Southworth's intoxication?
17           MR. FARRAH: Objection.
18     A. Okay. Now, you recall at the beginning of this
19 deposition, I made a distinction between impairment and
20 intoxication.
21           And to me, intoxication means that people
22 can look and see. And you've taken the word visible out
23 but you've left the word intoxication in --
24     Q. I know, but in --

**2-11**

1           MR. FARRAH: Let him finish. This is the
2 third time you're interrupted him.
3     Q. Look at your sentence there what it says --
4           MR. FARRAH: Wait a minute. Let him finish.
5           MR. GILLIS: We can save three hours of
6 nonresponsive.
7           MR. FARRAH: Please. What are you showing
8 him?
9     Q. You put the patron's intoxication.
10           MR. GILLIS: Page 8 of Exhibit 1.
11     A. Yes. But I prefaced it on the prior line by
12 saying visible intoxication, and I'm using intoxication
13 there in the same way.
14     Q. Is it fair to say when you use the word
15 intoxication, a patron's intoxication and the word visible
16 is not there, you mean it's interchangeable with visible
17 intoxication?
18           MR. FARRAH: Objection.
19     A. Yes, that's what I'm saying.
20     Q. Okay. I don't want to put words in your mouth.
21 I just want to make sure these two things mean the same
22 thing?
23     A. Yes. That's helpful to me, Mike.
24           MR. GILLIS: Are you about ready?

2-117

1        MR. FARRAH:  First of all, I have questions
2    to ask him.  Are you saying, you're done?  I have a couple
3    of questions for him.
4        MR. GILLIS:  I'm not done.  I have a couple
5    more hours to go.  It's now 5:13 and he said he wanted to
6    leave at 5:05.
7        A.  I would be grateful if we could finish up.
8        MR. FARRAH:  I do have some questions I want
9    to ask him.
10       MR. GILLIS:  It's not your turn yet, Al.
11       MR. FARRAH:  I understand.  So let me also
12    say this.
13       MR. GILLIS:  No.  Then I'm going to keep
14    going if he's going to stay because I've got plenty more to
15    go at it.  Do you want to leave or do you want to --
16       A.  Well, I'd like to leave, of course.  I think we
17    all would.  It's Friday afternoon.
18       MR. FARRAH:  Well, let me make a statement
19    on the record, okay?
20        A couple of things.  First of all, I have
21    questions to ask him.
22        Secondly, at the beginning of this
23    deposition, you claimed some prejudice because you had not
24    had a chance to review the materials that were sent to you

2-11

1    with your colleagues, your two colleagues who accompanied
2    you to both depositions last week, and you talked about
3    reserving your right to take further depositions, a further
4    deposition of Mr. Benjamin.
5        I have questions I want to ask him.  You
6    and I have made an agreement that I can have 60 days from
7    the time that you file your motion for summary judgment to
8    respond, and in the interest of giving you every
9    opportunity to ask him any questions you want to ask him,
10    I'm willing to shorten that time on my end to 30 days -- I
11    don't need 60 days to respond -- and to work with Mr.
12    Benjamin and you to fix another date for his deposition at
13    which time you'll be able to ask him any questions you want
14    to ask him, and I can ask him any questions I want to ask
15    him and still accommodate the schedule that we've
16    established.
17        MR. GILLIS:  Well, I don't know how we can
18    do that without going to Court and moving to strike on
19    his --
20        MR. FARRAH:  I'm sorry.  I can't hear you.
21        MR. GILLIS:  One second.
22        MR. FARRAH:  Do you want Mr. Bikofsky to
23    tell you what he's written you?
24        MR. GILLIS:  No.  I can read it myself.

2-119

1        MR. FARRAH:  Okay.
2        MR. GILLIS:  Thank you very much, Al.
3        MR. FARRAH:  You're welcome.
4        MR. GILLIS:  I think we're going to have the
5    Court determine whether or not what you recently submitted
6    to me is going to be stricken or not in order to continue
7    his deposition, and I'll try to get that motion out
8    shortly.
9        MR. FARRAH:  Then let's do that.
10       MR. GILLIS:  Okay.  That's one thing.
11        Second of all, the prejudice we're claiming
12    is that you didn't provide us with materials that you have
13    had in your possession for more than two years, A; and B,
14    you've now two years after he submitted, almost two years
15    his first opinion and then six months after he submitted
16    his second opinion, and a week after we spent, what was it,
17    $2600 to take his deposition, you then change his opinion,
18    and he's already said there's no new evidence that he's
19    basing it upon.
20        So that's the prejudice, the failure to
21    provide materials that you had in your possession and you
22    were supposed to provide, A; and B, the change of your
23    opinion a third time well after the deadline and after his
24    deposition is commenced.

2-12

1        MR. FARRAH:  What materials didn't we
2    provide you that we had two years ago?
3        MR. GILLIS:  The Widmark for the 60-J
4    affidavit, the photographs, the photographs of the glass,
5    the photographs that he has now changing his entire Widmark
6    R on, the body weight.
7        MR. FARRAH:  Those photographs -- let me be
8    clear.  The photographs which are now Exhibits 13 in this
9    case are photographs that are as available to you as they
10    are available to me.
11        These are merely photographs that the police
12    produced and --
13        MR. GILLIS:  Are you saying you're not
14    required under the rules to produce those if you have them?
15        MR. FARRAH:  If I have documents that I got
16    from the police, not by subpoena, I don't think I'm under
17    an obligation to produce those to you.
18        MR. GILLIS:  I'll review the rules then.
19        MR. FARRAH:  But these are documents -- let
20    me just be clear on this.
21        Exhibits 14 and 15 are documents that he
22    referred to in his 60-J affidavit, and they're also
23    documents that he testified to -- excuse me.
24        They're documents that he referred to in his

2-121

1  Rule 26 report and they're also reports that he said he did
2  not have or asked for at the time of his 60-J affidavit.
3          With respect to the Exhibit 13 --
4          MR. GILLIS: What he referred to is --
5          MR. FARRAH: Let me finish. With respect to
6  Exhibit 13 which is the Widmark calculation, this was not
7  attached to -- I don't believe this was attached to the
8  60-J report or referenced in it. And it was through
9  oversight that that was not included.
10         There's no reason for us not to have
11 submitted to you the Widmark calculation. Simply an
12 oversight. I apologize for it.
13         I don't think you're prejudiced by it. You
14 had it as of last week.
15         In terms of -- and I just want to make this
16 statement for the record so that you can know where I'm
17 going because I think I know where you're going.
18         In terms of the prejudice of his
19 supplemental report saying that he's going to testify
20 consistent with or about what was in his 60-J affidavit is
21 something I have a hard time seeing since you made his 60-J
22 affidavit an exhibit in this case.
23         You questioned him about it, and certainly
24 had it available to give to your expert, and I dare say you

2-12

1  probably did give it to your expert.
2          You've questioned him about it the last time
3  and then again today, and the fact that he is, the fact
4  that he has expressed some opinions there in that affidavit
5  that are different from the Rule 26 report is simply, as I
6  think he's testified, that he's been asked to assume
7  different scenarios.
8          Given the evidence in this case, it can't be
9  prejudicial to you that we're now seeking, should the
10 occasion arise, to say to the jury, this is a calculation
11 you can consider based on the evidence in the case, based
12 on what Jude Connelly has testified to at the grand jury,
13 based on the statement he made, based on what the various
14 witnesses in the case have testified to.
15         The rest of the, of what was supplied to
16 you, Exhibit 9 which follows up on his statement to you
17 that he relied on certain hypotheticals and supplies you --
18 excuse me -- Exhibit 10 which follows up on the statement
19 to you that he was asked to assume certain hypotheticals
20 and provides the basis for the hypotheticals, it's
21 something you've had for a week and I don't think in any
22 way prejudices you. But that as it may.
23         So you decide. If you want to move to
24 strike, that's fine. I can't stop you. But I'm just

2-123

1  letting you know what our position is on the record. I
2  don't see the prejudice.
3          MR. GILLIS: It's more than that, Al.
4  First of all, we're going on the assumptions of his
5  published reports that he uses a 6-8 Widmark, and all of a
6  sudden, we find out it's a 6-4 --
7          MR. FARRAH: It's a 6-4 in his Rule 26
8  report.
9          MR. GILLIS: And he's using a 6-8, we find
10 out today in his prior report. That's extremely important.
11         You're now claiming he's going to use four
12 and a half ounces of alcohol in the drink, when all along,
13 you're claiming two and a quarter.
14         In addition, he's now telling us that for
15 three years, he's telling you he's going to get the
16 glass, get the drink, and do it in front of the jury.
17         MR. FARRAH: That's not what he testified to
18 at all.
19         MR. GILLIS: I think we both put our
20 positions on the table. I don't think we have to go any
21 further.
22         MR. FARRAH: Fine. But I want the record to
23 be clear. I have questions I want to ask him, so it's
24 really your call.

2-12

1          MR. GILLIS: On your dime, you're more than
2  welcome to.
3          MR. FARRAH: Well, let's resume, and we'll
4  do that.
5          MR. GILLIS: So we're suspended.
6          VIDEO OPERATOR: The time is now 5:23 p.m.,
7  and we're off the record.
8          (Deposition suspended at 5:23 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2-125

C E R T I F I C A T E

1
2

COMMONWEALTH OF MASSACHUSETTS   )

3

) ss.

4

COUNTY OF MIDDLESEX          )

5
6

I, Josephine C. Aurelio, Registered
Professional Reporter, a Notary Public within and for the
Commonwealth of Massachusetts, do hereby certify:

7
8
9

That DAVID M. BENJAMIN, whose deposition
is hereinbefore set forth, satisfactorily identified
themselves, was duly sworn by me, and that such deposition
is a true record of the testimony given by such witness.

10
11

I further certify that I am not related
to any of the parties to this action by blood or marriage
and that I am in no way interested in the outcome of this
matter.

12
13
14

IN WITNESS WHEREOF, I have hereunto set
my hand this 20th day of February 2007.

15
16
17
18

_____
Notary Public  in and for the
Commonwealth of Massachusetts

19
20

My Commission expires:
January 14, 2011

21
22
23
24

---

2-12

1    I, DAVID M. BENJAMIN, having been duly sworn
according to law, and under the pains and penalties of
2    perjury, depose and say that I have read the foregoing
transcript of testimony, and that it true and correct to
3    the best of my knowledge, information, and belief.

4
5
6

_____

7
8
9

COMMONWEALTH OF MASSACHUSETTS   )

10

) ss.

COUNTY OF                    )

11
12
13
14                having been satisfactorily
identified and duly sworn before me, this _____ day of
15    _____, 2007.

16
17

_____

18    Notary Public in and for the
Commonwealth of Massachusetts

19
20

My Commission expires:

21
22
23
24

---

2-127

1                ERRATA SHEET

2        Corrections should be made as follows:
Page, line           Should read:

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS ) <br> SHE IS THE ADMINISTRATRIX OF THE ) <br> ESTATE OF AWILDA SANTIAGO, ESSEX ) <br> PROBATE COURT DOCKET #03P-2499AD1 and ) <br> AND AS SHE IS THE ADMINISTRATRIX OF ) <br> THE ESTATE OF JOSE SANTIAGO, BERLIN ) <br> (CONNECTICUT) PROBATE COURT, ) <br> CASE #03-0713 AND NANCY ROSARIO AND ) <br> MICHAEL MILLER, AS GUARDIANS OF ) <br> CHRISTINA SANTIAGO AND VERONICA ) <br> ROSARIO, ESSEX PROBATE COURT DOCKET ) <br> #06p-0507GM ) <br>      <u>Plaintiffs</u> ) <br> ) <br> ) <br> v. ) <br> ) <br> RARE HOSPITALITY INTERNATIONAL, INC. ) <br> d/b/a LONGHORN STEAKHOUSE ) <br>      <u>Defendant</u> ) | Civil Action #05-CV-10617MLW |

## <u>RULE 26 REPORT OF DAVID M. BENJAMIN, PH.D.</u>

Plaintiffs
By their attorney,

ALBERT L. FARRAH, JR., ESQ.
One Washington Mall, 5th Floor
Boston, MA 02108
(617) 742-7766
B.B.O. #159340

Date: October 31, 2006

CERTIFICATE OF SERVICE

SUFFOLK, SS                                                    October 31, 2006

A copy of the Rule 26 Report of Dr. David M. Benjamin, Ph.D. was today HAND DELIVERED to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA

_____

Albert L. Farrah, Jr., Esq.

David M. Benjamin, Ph.D. Rule 26 Report Index

1.    Report dated October 18, 2006, with attachments

2.    Other cases in which expert has testified

3.    Qualifications and publications

4.    Exhibits to be used as a summary of, or as support for the opinions, of David M. Benjamin, Ph.D

# David M. Benjamin, Ph.D.

77 Florence Street
Suite 107N
Chestnut Hill, Mass. 02467-1918

Telephone (617) 969-1393
Facsimile (617) 969-4285
E-mail: medlaw@channel1.com

DAVID M. BENJAMIN, PH.D.
CLINICAL PHARMACOLOGIST & TOXICOLOGIST

New Email: medlaw@doctorbenjamin.com

October 18, 2006

Albert L. Farrah, Jr., Esq.
One Washington Mall
Boston, MA  02108

Re:  Nancy Rosario, et al v. RARE Hospitality, Inc. d/b/a Longhorn Steakhouse

Dear Attorney Farrah:

Pursuant to your request, I am submitting my report regarding my analysis of this case

pursuant to the format established by FRCP 26.

## Summary of Qualifications

My qualifications to review this case are based on my learning, training and more than 30

years of experience as a Clinical Pharmacologist and Toxicologist, my standing as a

nationally known expert in the absorption, distribution, metabolism, and excretion of

ethanol as evidenced by my extensive experience and teaching.  My teaching experience

includes  9 seminars for judges, beginning in 1999 when I taught a national

ABA/NHTSA conference in Newport, RI, followed by seven seminars for judges in

Florida (since 1999 and the next scheduled for Dec., 2006), and my teaching of judges in

Kentucky in April 2005.  I have also published on the blood levels of ethanol,

scientifically valid methods of back-extrapolation, and provided the Ethanol Toxicology

portion of the syllabus for the 1996, 1998 and 2006 MCLE seminars on dram shop and

2

civil liquor liability where I taught seminars on dram shop and civil liquor. I have also taught about the breathalyzer at a seminar at Suffolk Law School Feb.6, 2004 and spoken on ethanol at the American Academy of Forensic Sciences (see resume) and the NH Bar Association. At this year's meeting of the Society of Forensic Toxicologists (SOFT), I presented a paper in the SOFT/AAFS Drugs and Driving Committee special session (of which I am also a member) and the title of that presentation was, "The Importance of Developing a Chronology in Determining the Proximate Cause of Impairment in Mixed DUI/DUID Cases." This peer reviewed presentation speaks not only to my qualifications, but also demonstrates peer review and general acceptance of this method, which is the same method I have used to analyze this case (see methods section below). My publications and presentations on ethanol pharmacology and toxicology are all listed on my CV.

I conclude with reasonable scientific certainty that on the evening of September 26, 2003, Mr. Jeffrey Southworth consumed the equivalent of at least 13 "12 oz. beers" in 90 minutes, or more than 4 "12 oz. beers" per 30-minute interval. I further conclude with reasonable scientific certainty that as Mr. Southworth continued to drink, his BAC increased continuously and he became loud and had difficulty carrying himself the way he normally did. His changes in manner were apparent to his friends, one of whom described him as visibly intoxicated while still at the Longhorn Steakhouse. Moreover, before finishing dinner, other patrons in the Longhorn Steakhouse came over to Mr. Southworth's table and asked him and his friends to be more quiet. The amount of ethanol consumed over a relatively short 90-minute period of time, the changes in Mr.

Southworth's manner, and the fact that Mr. Southworth and his friends were so loud that other patrons had to ask them all to be more quiet indicate signs of intoxication from ethanol and permit me to conclude with reasonable scientific certainty that Mr. Southworth was visibly intoxicated when served his last drink at the Longhorn Steakhouse.

**Documents Reviewed**

In connection with services rendered to counsel for the plaintiff in the above action, counsel for the plaintiff has provided me the documents listed below, which I have read and relied upon:

The complaint filed in Middlesex Superior Court #03-4704L2 in February 2004;

Statement of facts in Support of Summary Judgment filed in the a case of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2. Affidavit of Albert L. Farrah, Jr. dated December 20, 2004 filed in the pending action With, among others, the following attached exhibits: the August 19, 2004 deposition of Jude Connelly; deposition of Thomas Scott Espey; the Massachusetts State Police Collision Reconstruction Report dated September 27, 2003; the November 2, 2003 statement of Leigh Chabot. Deposition of Michael J. Espey, dated June 22, 2004; A copy of the September 26, 2003 bill for the group believed to include Jeffrey Southworth and RARE Hospitality International, Inc., d/b/a Longhorn Steakhouse audit report of that date, reflecting food and beverages believed served to the Southworth group.

I have also reviewed the follow up depositions of: Jude Connolly taken February 10,

2006, Michael Espey taken April 25, 2006 and Thomas Scott Espey taken April 25, 2006, and viewed photographs of Jeffrey Southworth taken the day of his arrest, September 27, 2003.

## Methods

Based on the first set of depositions taken in 2004, and the statements of the fact witnesses obtained in 2004, I determined the approximate times of arrival at and departure from each establishment. Also, using the bill containing all the food and drinks ordered while in the Longhorn Steakhouse, I developed a chronology of the amount of food eaten and the number of alcoholic beverages consumed and the times that each was consumed. Using the generally accepted Widmark Formula, I calculated Mr. Jeffrey Southworth's blood alcohol concentration (BAC) over the time interval from 7:30 pm till the accident at 00:10 according to the section describing the Widmark Method.

Unfortunately, the follow up depositions of Jude Connolly taken February 10, 2006, Michael Espey taken April 25, 2006 and Thomas Scott Espey taken April 25, 2006 were not of any help to me because so much time had elapsed since the events in question, that none of the deponents could clearly recall what transpired on the night in question. Most of the testimony in those depositions was speculative and scanty, and could not help me develop a better indication of the facts on the night in question, or a more accurate chronology.

In the 2006 edition of the Massachusetts CLE syllabus for Liquor Liability Update, I told attorneys, "In my experience, there is only one method to use when evaluating a potential Dram Shop case, regardless of whether you are representing the plaintiff or the defendant. That method involves developing a chronology of the eating and drinking that occurred within the time frame of the day/evening in question." (page 97). I have also stressed this method in the two prior seminars I gave on civil liquor liability at MCLE in 1996 and 1998, as well as in the Judicial seminars I have given and the presentations I have given to forensic experts at the American Academy of Forensic Sciences (see CV).

**The Widmark Method**

Using Mr. Southworth's height as 6'4" and weight of 210 lbs. I have calculated Mr. Southworth's blood alcohol concentration (BAC) using a computerized version of the generally accepted Widmark Formula, which has been widely published in the peer reviewed forensic toxicology literature since the 1940s. Moreover, I have personally published a peer reviewed article using this computerized version of the Widmark Formula in the Medical Review Officer's "MRO Update" in February 1999 which was accepted for publication, and which the editor included the reference to the computer program in the citations. This is the publication of the American College of Occupational and Environmental Medicine (ACOEM) designed for members who work as Medical Review Officers (MROs).

**Chronology:**

7:30 pm one 12 oz beer

8:10 pm – one 25 oz Bud Light

8:20 pm – one 25 oz Bud Light

8:50 pm - one 25 oz. Bud Light (check 20043)

9:00 pm -  one Jack Daniels Manhattan - Food ordered

9:20 pm -  25 oz Bud Light  (check 20043); Food served

9:25 pm    Jack Daniels Manhattan  (check 20043)

9:35 pm    Jack Daniels Manhattan  (check 20043)

9:31-9:57 pm print check 20043 six times.

9:57 pm   close check 20043 for 202.79

10:30 pm – one 12 oz beer

Budweiser Light contains 4.2% ethanol (v/v).  The 12 oz can contained 4.2% x 12 oz or

0.50 oz of ethanol, a 25 oz beer contained 4.2% x 25 or 1.05 oz of ethanol.  Based on the

three-page document entitled the "Longhorn Bar Recipes", I determined that each Jack

Daniels Manhattan contained: 2.0 oz of Jack Daniels (80 proof, 40%) (2.0 x 0.4=0.8 oz

plus 0.25 oz of Sweet Vermouth (32 proof, 16%) (0.25 x 0.16=0.04 oz), or 0.84 oz of

ethanol .  However, there seems to be a discrepancy between this recipe and the actual

size of the drink when served, since the Jack Daniels Manhattan was served in a 6 oz

glass and the above recipe only accounts for 2.25 oz, which means that the above

calculations may significantly underestimate the ethanol content of the Jack Daniels

Manhattan by 2-3 fold.  Accordingly, my Widmark calculations may significantly

underestimate Mr. Southworth's BAC at the time he was served his last drink at 9:35 pm.


**BACs Achieved While Drinking**

Because of Mr. Southworth's size, Widmark calculations indicated that one 25 oz Bud Light beer, consumed on an empty stomach would produce a peak blood ethanol concentration of approximately 0.02% approximately 60 minutes after beginning to drink the beer. Widmark calculations also indicated that one Jack Daniels Manhattan, consumed on an empty stomach would produce a peak blood ethanol concentration of approximately 0.014% approximately 60 minutes after beginning to drink the Jack Daniels Manhattan. In order to account for the effect of the food that was consumed, after 9:20 pm, the time for peak absorption was changed from 30 to 60 minutes, due to the fact that food retards the rate and extent of absorption of ethanol, and increases the time to reach a peak blood concentration and decreases the peak BAC.

Based on my Widmark calculations, I calculated that when Mr. Southworth arrived at the Longhorn Steakhouse at approximately 8 pm, his BAC would have been approximately 0.01%, based on the beer he had consumed after bike riding. Before being seated at the table, Mr. Southworth consumed two 25 oz beers between approximately 8:10 pm and 8:40 pm. As soon as he was seated, Mr. Southworth ordered another 25 oz beer which was served at approximately 8:50 pm, at which time Mr. Southworth's BAC had increased to 0.07%. At approximately 9:00 pm Mr. Southworth consumed his first Jack Daniels Manhattan and his BAC was approximately 0.08%. This was followed by a 25 oz. beer at 9:20 pm and two additional Jack Daniels Manhattans at 9:25 pm and 9:35 pm, when his BAC would have been approximately 0.13% and 0.15% respectively. Thus during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately

8

0.13% to 0.15% in 15 minutes, an amount of ethanol that would require up to an hour to burn off or metabolize.

From the time Mr. Southworth arrived at the Longhorn Steakhouse around 8-8:05 pm, his BAC would have risen rapidly and steadily from 0.01% until it reached a peak of approximately 0.15% at 9:35 pm, a rate of approximately 0.0015% per minute, or more than one 12 oz beer per 10-minute interval. Stated still another way, the total amount of pure ethanol consumed during the 90-minute interval between 8:05 and 9:35 pm totaled 6.52 oz. Since the amount of ethanol in a "regular" 12 oz beer is 0.5 oz, in 90 minutes, Mr. Southworth consumed the equivalent of 6.52/0.5 = 13 beers in 90 minutes, or more than 4 beers per 30-minute interval.

Referring to Douillard v. LMR (433 Mass. 162, 740 N.E.2d 618), the Court cites Vickowski v. Polish Am. Citizens Club of Deerfield, Inc. (422 Mass. 606, 609, 664 N.E. 2d (1996) in pertinent part stating, "[A] tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated patron unless the tavern keeper knows or reasonably should have known that the person is intoxicated." Certainly signs of visible intoxication would constitute "knowledge" of a patron's intoxication, but so would the number of drinks consumed per hour. Many heavy drinkers are capable of "masking" some signs of intoxication and have developed tolerance and "coping skills" which allow them to compensate for their intoxication while standing or speaking. However, their judgment, coordination, vision, and reaction time behind the wheel of a car are still severely impaired. Such subtle cognitive signs of intoxication may not be directly observed by

9

another patron of a tavern or a bartender, but the number of drinks served per hour can easily be tracked, observed, counted and equated to a too rapid ingestion of ethanol likely to produce intoxication.

Although BAC is frequently calculated and reported by forensic toxicologists in civil liquor liability cases like the present case, a better indication of impairment is the rate of consumption of ethanol and the associated rate of rise of the BAC. Regardless of tolerance or body weight, when ethanol is consumed too rapidly, it produces a greater degree of intoxication than one would predict from BAC alone. In this case, the Longhorn Steakhouse served alcoholic drinks at such a fast rate and those drinks were consumed by Mr. Southworth and his friends over such a short time interval that Mr. Southworth and his friends were destined to become intoxicated as the ethanol was absorbed both while they were in the tavern and after they left. Indeed, fact witnesses noticed changes in Mr. Southworth's ability to carry himself, and his entire table was told to quiet down at one point during the evening.

Moreover, as stated above, during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately 0.13% to 0.15% in 15 minutes an amount of ethanol that would require up to an hour to burn off or metabolize. These drinks continued to be absorbed with time and then plateaued at approximately 0.22% an hour later at 10:30 pm, when Mr. Southworth then had another 12 oz beer. At this point in time, Mr. Southworth's BAC had plateaued at a level of 0.22%, because he still had so much

ethanol in his blood, that he was unable to burn it off. The plateau lasted until almost midnight, when his BAC dropped only 0.01% to 0.21% by midnight and remained at that level up until the time of the accident at 00:10am.

The Longhorn Steakhouse served drinks to Mr. Southworth at the approximate following times: 8:10 and 8:20 (at the bar) and 8:50, 9:00, 9:20, 9:25 and 9:35 pm. Since the body can only "burn off" or metabolize the amount of ethanol in one regular 12 oz beer each hour, consumption of more than 0.5 oz of ethanol per hour will lead to accumulation of ethanol in the blood. Serving high alcohol content beverages to patrons at this rate of service should most definitely alert the employees of Longhorn Steakhouse to the fact that Mr. Southworth was accumulating ethanol in his blood faster than he could burn it off. Therefore, employees of the Longhorn Steakhouse should have known that Mr. Southworth would become increasingly intoxicated as the ethanol was absorbed over the course of the evening. In fact, with a large amount of ethanol in his stomach and GI tract, Mr. Southworth became a walking time bomb, ready to become a drunk driver as he absorbed the ethanol that was served to him, and sequestered in his stomach and small intestines. The fact that Mr. Southworth was already loud and carrying himself differently when served his last drink at the Longhorn Steakhouse was evidence that he was intoxicated while at the Longhorn Steakhouse, and a harbinger of the tragedy that predictably and foreseeably would occur a few hours later, as the ethanol was absorbed from Mr. Southworth's GI tract and raised his BAC to over 0.20%.

Consider the following analogy regarding absorption and excretion of ethanol. If you run the water in your bath tub at 10 gallons per minute, but the drain can only accommodate 5 gallons per minute, you are going to accumulate 5 gallons per minute in the tub. Even if you slow down the filling rate (rate of ingestion) to 7 gallons per minute, the water level will continue to rise. Even if you stop the water, it will still take time for the water level to decrease because the drainage rate (excretion rate) is fixed at 5 gallons per minute and will not change.

The rate of onset of the effects of ethanol are related to the amount of ethanol consumed and the rate of consumption. Consider a typical 12 oz beer such as the one Mr. Southworth drank around 7:30 pm. It contains 0.5 oz of ethanol. The 25 oz beers contained twice as much ethanol (1.0 oz) and the Jack Daniels Manhattans contained almost 1.7 times as much ethanol (0.84 oz) as a 12 oz beer. Mr. Southworth drank a large amount of ethanol in the short period of time of approximately 1 ½ hours (8-9:25 pm). Since the body can only burn off or excrete ethanol at a fixed rate of approximately one 12 oz beer per hour, amounts of ethanol in excess of that accumulate in the blood. When Mr. Southworth continued to consume high ethanol content beverages at a rate in great excess over that which his body could burn off or excrete, Mr. Southworth's BAC continued to increase because his rate of consumption of ethanol exceeded the capacity of his body to excrete ethanol.

**Public Policy and Public Health Issues**

12

Referring once again to Douillard v. LMR (433 Mass. 162, 740 N.E.2d 618), the Court cites Vickowski v. Polish Am. Citizens Club of Deerfield, Inc. (422 Mass. 606, 609, 664 N.E. 2d (1996) in pertinent part stating, "[A] tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated patron unless the tavern keeper knows or reasonably should have known that the person is intoxicated." Tavern owners are sophisticated in their knowledge of ethanol absorption, distribution, metabolism and excretion. An establishment serving drinks that contain 1 ½ to 2 times the amount of ethanol as a typical beer (0.5 oz), a 4 oz glass of 12% wine (0.48 oz) or a 1 ¼ oz shot of 80 proof spirits (0.5 oz), must know that drinkers of such drinks are going to become intoxicated at a faster rate than if they were drinking smaller portions of ethanol. Accordingly, such establishments must reduce the rate at which they serve their customers accordingly, in order to avoid getting those patrons who drink too quickly intoxicated. Moreover, after consuming a large amount of ethanol with food, sophisticated tavern owners must know that the time required to absorb all the ingested ethanol will be extended to at least an hour. This sets up a situation where an individual may have consumed enough ethanol while in the establishment to become intoxicated 30-60 minutes later, as the ethanol is absorbed into the blood stream from the GI tract. This is a foreseeable and inevitable set of circumstances that will be fulfilled. Part of the requirement of the law that a tavern keeper not overserve a patron is due to the tavern owners duty to unknown third parties who share the public highways with patrons who drink in their establishment. Public policy issues and public health standards require that patrons in a tavern not be served so much ethanol that they become intoxicated and in so doing become a hazard on the highways.

**Standards in the Forensic Toxicology Community Regarding Signs of Visible Intoxication**

Based on a study published by the American Medical Association in Alcohol and the Impaired Driver (1968), 62% of non-tolerant individuals with a BAC between 0.10-0.15% will show signs of visible intoxication at that range of BACs, while at BACs between 0.15-0.20%, 89% of non-tolerant individuals will show signs of visible intoxication at that range. Because the 0.15% is so critical that signs of visible intoxication increase from approximately 6/10 to 9/10 at 0.15% (a 150% increase), the forensic toxicology community indicates that in general, 0.15% is the BAC generally considered representative of showing signs of visible intoxication. However, Mr. Southworth was not "non-tolerant", he was a frequent alcohol consumer and would have been likely to demonstrate some tolerance to the intoxicating effects of ethanol. Even so, he was described as showing signs of visible intoxication in the form of not carrying himself as he usually did, being more loud than usual, to the extent that people came over to his table and asked the group to be more quiet.

According to a study by Perper et al entitled "Tolerance at High Blood Alcohol Concentrations: A Study of 110 Cases and Review of the Literature", (see Journal of Forensic Sciences 1986; 31:212-221), of 110 alcoholics studied in a detoxification unit, out of 54 subjects with a BAC of 0.20% or higher, only 13 (24%) showed no sign of clinical intoxication. Speech was abnormal in 43%, gait was abnormal in 59%, vision was impaired in 56% and verbal comprehension was impaired in 24% and coordination was impaired in 65%. Also, by the time BACs reached 0.30%, none of the subjects

exhibited sobriety in all tested parameters. However, most of these participants would have been in the post-absorptive phase of ethanol disposition and their BACs would have been declining, unlike Mr. Southworth's BAC which was rising rapidly. Since people will be more impaired by ethanol when the BAC is rising than when it is falling (Mellanby Effect), the statistics on the percent of individuals who showed signs of impairment cited above would be lower than the what one would expect to find in a person who was drinking ethanol on a rapid basis and whose BAC was rising, rather than falling. This would have been the case with Mr. Southworth.

Moreover, during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately 0.13% to 0.15% in 15 minutes an amount of ethanol that would require up to an hour to burn off or metabolize. Serving the equivalent of 5 beers to a patron within the last 15 minutes they are in your establishment and knowing that they would go out and drive on a public way and put other citizens and themselves at an increased risk of a motor vehicle accident is certainly knowable, and constitutes irresponsible conduct which is not consistent with the language of Douillard.

Moreover, if you look at the times reflected on my Widmark graph, one can easily see that drinks were served to Mr. Southworth at the Longhorn Steakhouse at the approximate following times: 8:10, 8:20, 8:50, 9:00, 9:20 9:25 and 9:35 pm. Since the body can only "burn off" or metabolize the amount of ethanol in one regular 12 oz beer

each hour, consumption of more than 0.5 oz of ethanol per hour will lead to accumulation of ethanol in the blood.

**Conclusions**

I conclude with reasonable scientific certainty that Mr. Jeffrey Southworth was already visibly intoxicated when he was served his last drink at the Longhorn Steakhouse on the evening of September 26, 2003. As he continued to drink, his BAC increased continuously and he became loud and had difficulty carrying himself the way he normally did. His BAC continued to rise up until 10:20 pm when it peaked at 0.22%, and had only dropped 0.01% to 0.21% at the time of the tragic motor vehicle accident at approximately 00:10 am. The one 12 oz beer Mr. Southworth consumed at 10:30 pm would only have contributed less than 0.01% to his BAC, due to his size and the food remaining in his stomach.

**Fees**
To date I have received $6600 for my time.

**Prior Testimonies**
Prior Testimonies are attached.

**Publications**
My CV has already been submitted.

Very truly yours,

David M. Benjamin, Ph.D.
Clinical Pharmacologist and Toxicologist

EZ-ALC  Ver 2.0 - DataScreen

Subject Name :Mr. Jeffrey Southworth          : I.D.# :XX22X:
Body Weight  :210: Pounds.     Initial BAC :.0000:
Widmark Beta :.020: % per hour.
   Widmark r :.64:

| Drink Number | FlOz EtOH | Start Time | Absorb Time | | Drink Number | FlOz EtOH | Start Time | Absorb Time |
|---|---|---|---|---|---|---|---|---|
| 1 | 0.50 | 7:30 | 030 | | 13 | 0.00 | 0:00 | 060 |
| 2 | 1.00 | 8:10 | 030 | | 14 | 0.00 | 0:00 | 060 |
| 3 | 1.00 | 8:20 | 030 | | 15 | 0.00 | 0:00 | 060 |
| 4 | 1.00 | 8:50 | 030 | | 16 | 0.00 | 0:00 | 060 |
| 5 | 0.84 | 9:00 | 030 | | 17 | 0.00 | 0:00 | 060 |
| 6 | 1.00 | 9:20 | 060 | | 18 | 0.00 | 0:00 | 060 |
| 7 | 0.84 | 9:25 | 060 | | 19 | 0.00 | 0:00 | 060 |
| 8 | 0.84 | 9:35 | 060 | | 20 | 0.00 | 0:00 | 060 |
| 9 | 0.50 | 10:30 | 060 | | 21 | 0.00 | 0:00 | 060 |
| 10 | 0.00 | 0:00 | 060 | | 22 | 0.00 | 0:00 | 060 |
| 11 | 0.00 | 0:00 | 060 | | 23 | 0.00 | 0:00 | 060 |
| 12 | 0.00 | 0:00 | 060 | | 24 | 0.00 | 0:00 | 060 |

Main Menu

?  Help    DATA: Del File Edit List + -    BAC: View Screen Print TBA    QUIT



ANY KEY to return to DataScreen



```
              Absorb          .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .
   EtOH  Time                 0  0  0  0  0  0  0  0  0  0  1  1  1  1  1  1  1  1  1  1  2  2  2  2  2  2  2
  (FlOz)(Min) BAC  Time       0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5  6  7
              .0951   9:05   ----------.---------*.                  .                 .                 .
              .1058   9:10   ----------.----------.*                 .                 .                 .
              .1166   9:15   ----------.----------.--*               .                 .                 .
  1.00   60   .1273   9:20   ----------.----------.----*             .                 .                 .
  0.84   60   .1346   9:25   ----------.----------.------*           .                 .                 .
              .1448   9:30   ----------.----------.--------*.        .                 .                 .
  0.84   60   .1493   9:35   ----------.----------.---------*        .                 .                 .
              .1567   9:40   ----------.----------.----------.*      .                 .                 .
              .1640   9:45   ----------.----------.----------.--*    .                 .                 .
              .1714   9:50   ----------.----------.----------.---*   .                 .                 .
              .1787   9:55   ----------.----------.----------.-----* .                 .                 .
              .1861  10:00   ----------.----------.----------.------*.                 .                 .
              .1934  10:05   ----------.----------.----------.--------*.               .                 .
              .2008  10:10   ----------.----------.----------.---------*               .                 .
              .2081  10:15   ----------.----------.----------.----------.-*             .                 .
              .2155  10:20   ----------.----------.----------.----------.--*            .                 .
              .2195  10:25   ----------.----------.----------.----------.---*           .                 .
  0.50   60   .2206  10:30   ----------.----------.----------.----------.---*           .                 .
              .2235  10:35   ----------.----------.----------.----------.----*          .                 .
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

```
              Absorb          .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .
   EtOH  Time                 0  0  0  0  0  0  0  0  0  0  1  1  1  1  1  1  1  1  1  1  2  2  2  2  2  2  2
  (FlOz)(Min) BAC  Time       0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5  6  7  8
              .2235  10:40   ----------.----------.----------.----------.----*          .
              .2235  10:45   ----------.----------.----------.----------.----*          .
              .2235  10:50   ----------.----------.----------.----------.----*          .
              .2235  10:55   ----------.----------.----------.----------.----*          .
              .2236  11:00   ----------.----------.----------.----------.----*          .
              .2236  11:05   ----------.----------.----------.----------.----*          .
              .2236  11:10   ----------.----------.----------.----------.----*          .
              .2236  11:15   ----------.----------.----------.----------.----*          .
              .2236  11:20   ----------.----------.----------.----------.----*          .
              .2236  11:25   ----------.----------.----------.----------.----*.         .
              .2236  11:30   ----------.----------.----------.----------.----*          .
              .2220  11:35   ----------.----------.----------.----------.---*           .
              .2203  11:40   ----------.----------.----------.----------.---*           .
              .2186  11:45   ----------.----------.----------.----------.---*           .
              .2170  11:50   ----------.----------.----------.----------.--*            .
              .2153  11:55   ----------.----------.----------.----------.--*            .
              .2136  12:00   ----------.----------.----------.----------.-*             .
              .2120  12:05   ----------.----------.----------.----------.-*             .
              .2103  12:10   ----------.----------.----------.----------.-*             .
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.



```
            |======| EZ-ALC  Ver 2.0 - ScreenPrint |======
       Absorb          .   .   .   .   .   .
 EtOH  Time            0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2
(FlOz)(Min) BAC Time   0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
            .0951  9:05 ----------.---------*.
            .1058  9:10 ----------.---------.*
            .1166  9:15 ----------.---------.--*
1.00  60    .1273  9:20 ----------.---------.----*
0.84  60    .1346  9:25 ----------.---------.------*
            .1448  9:30 ----------.---------.--------*.
0.84  60    .1493  9:35 ----------.---------.---------*
            .1567  9:40 ----------.---------.---------.*
            .1640  9:45 ----------.---------.---------.--*
            .1714  9:50 ----------.---------.---------.---*
            .1787  9:55 ----------.---------.---------.-----*
            .1861 10:00 ----------.---------.---------.------*
            .1934 10:05 ----------.---------.---------.--------*.
            .2008 10:10 ----------.---------.---------.---------*
            .2081 10:15 ----------.---------.---------.---------.-*
            .2155 10:20 ----------.---------.---------.---------.--*
            .2195 10:25 ----------.---------.---------.---------.---*
0.50  60    .2206 10:30 ----------.---------.---------.---------.---*
            .2235 10:35 ----------.---------.---------.---------.----*

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

            |======| EZ-ALC  Ver 2.0 - ScreenPrint |======
       Absorb          .   .   .   .   .   .
 EtOH  Time            0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2
(FlOz)(Min) BAC Time   0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
            .2235 10:40 ----------.---------.---------.---------.----*
            .2235 10:45 ----------.---------.---------.---------.----*
            .2235 10:50 ----------.---------.---------.---------.----*
            .2235 10:55 ----------.---------.---------.---------.----*
            .2236 11:00 ----------.---------.---------.---------.----*
            .2236 11:05 ----------.---------.---------.---------.----*
            .2236 11:10 ----------.---------.---------.---------.----*
            .2236 11:15 ----------.---------.---------.---------.----*
            .2236 11:20 ----------.---------.---------.---------.----*
            .2236 11:25 ----------.---------.---------.---------.---*
            .2236 11:30 ----------.---------.---------.---------.----*
            .2220 11:35 ----------.---------.---------.---------.---*
            .2203 11:40 ----------.---------.---------.---------.---*
            .2186 11:45 ----------.---------.---------.---------.---*
            .2170 11:50 ----------.---------.---------.---------.--*
            .2153 11:55 ----------.---------.---------.---------.--*
            .2136 12:00 ----------.---------.---------.---------.--*
            .2120 12:05 ----------.---------.---------.---------.-*
            .2103 12:10 ----------.---------.---------.---------.-*

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.
```

*From Alcohol and the Impaired Driver*

© 1968 American Medical Association

CHAPTER II

# ACUTE ALCOHOLIC INTOXICATION

*NOTE: Measurements of blood-alcohol levels throughout this book are stated in terms of percentage, weight by volume, based upon the number of milligrams of alcohol per 100 milliliters of blood. For discussion and explanation see page XIII. Scientific and technical reports and publications referred to in the text are listed alphabetically, following Chapter X.*

## CHARACTERISTICS OF ACUTE INTOXICATION

### TABLE 3: RELATION BETWEEN BLOOD-ALCOHOL LEVEL AND DRUNKENNESS

| Percent of Persons Diagnosed as Drunk | | | | | | | | | Total Persons Examined | Investigator |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.00 to 0.05 | 0.051 to 0.10 | 0.101 to 0.15 | 0.151 to 0.20 | 0.201 to 0.25 | 0.251 to 0.30 | 0.301 to 0.35 | 0.351 to 0.40 | 0.401 | | |
| 0 | 19 | 50 | 83 | 93 | 98 | 100 | 100 | | 1942 | Widmark |
| 2 | 38 | 93 | 97 | 99 | 100 | 100 | | | 950 | Schwarz |
| 10 | 18 | 47 | 83 | 90 | 95 | 96 | 93 | 100 | 1000 | Jetter |
| 10 | 68 | 81 | 92 | 97 | 100 | | | | 1712 | Andresen |
| 0 | 46 | 50 | 92 | 100 | 100 | 100 | 100 | 100 | 140 | Harger |
| 0 | 14 | 69 | 90 | 94 | 94 | 100 | 100 | 100 | 100 | Prag |
| 7 | 25 | 49 | 85 | 93 | 97 | 98 | 100 | 99 | 750 | Hine |
| 4 | 32 | 62 | 89 | 95 | 98 | 99 | 99 | 100 | 6594 | Mean of above 7 |

percent weight by volume (0.05 percent w/v=50 mg/100 ml, 0.15 percent w/v=150 mg/100 ml) of Blood Alcohol

*Commonwealth vs. English; Salem Superior* Court, 10/12/06; For Defendant – Widmark calculations of blood ethanol;  impairing effects of toxic organic chemicals.

*Commonwealth vs. Roster; Wrentham District* Court, 7/18/06; For Defendant
Interpretation of urine and drug test results

*Commonwealth vs. White; Norfolk Superior* Court, 7/7/06; For Defendant – cocaine;
Urine drug screens

*Commonwealth vs. Jenkins; Suffolk Superior* Court, 7/7/06; For Defendant;
analysis of cocaine;

*Commonwealth vs. Decarlo;* Cambridge District Court, 1/11/06; For Defendant
Effects of illicit drugs

*Commonwealth vs. Doyle;* Middlesex Superior Court, 2/1/06; For Defendant
Effects of illicit drugs

*Commonwealth vs. Perella;* Middlesex Superior Court, 1/5/06; For Defendant
Effects of oral anti-diabetic medication

*Doucette vs. Abramofsky;* Suffolk Superior Court, 11/05; For Plaintiff
Dram Shop - Widmark calculations of blood ethanol

*Rowley vs. Tripathi;* Deposition – Maryland Superior Court, 10/10/05; For Defendant
Medical Negligence involving prescription drugs

*Commonwealth vs. Maurice Evans;* Dedham District Court, 9/23/05; For Defendant
Widmark calculations of blood ethanol

*Commonwealth vs. Annesc;* Hingham District Court, 6/28/05; For Defendant - OUI

*Commonwealth vs. Jerome Jones;* Middlesex Superior Court, 9/16/05; For Defendant
Effects of MDMA and amphetamines

*United States vs. Michelle Evans;* U.S. District Court, Boston, MA, 9/13/05;
For Defendant – Interpretation of serial urine screens for THC

*Callais vs. Main Street Brewery,* Deposition *10/28/05;* For Plaintiff
Dram Shop - Widmark calculations of blood ethanol

*Commonwealth vs. Mitrano;* Cambridge District Ct., 8/12/05; For Defendant

*Reynolds vs. GBR Electric, Inc. and Northern Adjusters, Inc.;* Alaska Workers' Compensation Board; Deposition by Phone 2/05; Phone Testimony for Workers'

Compensation Board 4/7/05; For Claimant. Interpretation of blood ethanol and methanol levels.

*Chartier vs. Dow;* Deposition - 2004, Polk County, FL; For Plaintiff
toxicity of organophosphates

*Commonwealth vs. Gava;* Concord District Court, 2004; For Defendant -OUI

*Fullerson vs. Berry;* California Superior Court; Deposition 10/14/03; Trial 4/04; For Plaintiff – Combined toxicities of lidocaine and bupivacaine

*In the matter of Patricia A. McGeady, deceased;* Superior Court of New Jersey, Trial 2004; For Plaintiff Effects of prescription drugs on cognitive abilities.

*Commonwealth vs. Robertson;* Quincy District Court, 2004; For Defendant

*United States vs. Brown;* U.S. District Court MA Springfield, 8/04; For Defendant
Differences among "crack", free base, and cocaine hydrochloride.

*Peggy Cooper Cafritz vs. Sibley Memorial Hospital, et al;* Superior Court of the District of Columbia; Deposition 2003; For Defendant toxicity of glucocorticoids

*Commonwealth vs. Petrin;* Trial Court of Massachusetts, District Court Department, 2003; For Defendant

*Joseph Albert vs. Gus and Paul's Tavern;* Lowell Superior Court; 3/31/03; For Defendant
Dram Shop -Widmark calculations of blood ethanol

*McGrail, et al vs. Harley-Sanford Post 4368, VFW of the U.S.;* Trial 2002/2003; For Defendant    Dram Shop -Widmark calculations of blood ethanol

*Hannah Christopher vs. Barkin Scrap Iron, et al; Michigan,* Deposition 2002; For Defendant   Effects of heroin withdrawal

*In the matter of the Estate of Madeleine L. Stockdale, deceased;* Superior Court of New Jersey, Chancery Division; Trial 2002; For Plaintiff   Effects of prescription drugs on cognitive abilities.

Case 1:05-cv-10617-MBB    Document 26-23    Filed 06/04/2007    Page 25 of 43

Clinical Pharmacologist & Toxicologist
77 Florence Street - Suite 107N
Chestnut Hill, MA 02467- 2121
Phone: 617-969-1393 - E-mail: medlaw@doctorbenjamin.com

## Brief Biography

### Academic

Boston University, B.A. in Biological Sciences, 1968
University of Vermont College of Medicine, M.S. & Ph.D. in Pharmacology, 1968-72
Kansas Univ. Medical Center, Fellowship, Clinical Pharmacology/Toxicology, 1972-3

### Work Experience in the Pharmaceutical Industry

Twelve years of experience in the Pharmaceutical Industry:  Conducting Clinical Drug Studies, Evaluat
Adverse Drug Reactions, Writing Labeling, and Filing INDs and NDAs with the FDA.

### Publications

Dr. Benjamin has more than 180 Presentations and Publications listed on his full CV, including a bo
chapter entitled "*Forensic Pharmacology*" in *Forensic Science Handbook Volume III*.  This textbook w
reviewed by the Journal of Forensic Sciences and described as follows:  "This third volume follows wl
has become a tradition of in depth chapters written by recognized forensic experts . . . . Forensic scien
practitioners and attorneys who interact with them, in either the criminal or civil areas, will find t
collection of learned treatises a required addition to their professional library."

### Teaching Experience

Adjunct Assistant Professor - Tufts University School of Medicine, 2001;  Harvard Medical School Risk
Management Program, Boston, MA, Dec.1999 - 2003; Breathalyzer and Blood Alcohol, Field Sobriety
Testing, Urine Drug Screening and Drug Recognition Testing, ABA/NHTSA Seminar for Judges, 4/30/99
Traffic Adjudication Seminar for Florida Judges, Dec. 1999 - 2003; Understanding Blood Alcohol Levels -
Mass. Academy of Trial Attorneys - Operating Under the Influence Seminar  Oct. 1994 - Mass. Continuin
Legal Education - 2/13/96, 5/21/96 & 7/27/98;GW University Law School (99-04); The Role of the
Occupational Health Specialist in a Toxic Chemical Exposure Case - Harvard School of Public Health -
1999-02;  Massachusetts College of Pharmacy & Allied Health Sciences, Adjunct Associate Professor of
Regulatory Affairs & Health Policy - 1999 - 2000; Food and Drug Law and Public Policy Issues - Fordham
Law School - April 1994-5; Scientific Evidence - Stetson University College of Law  - 1990, 1997-03;
American Board of Quality Assurance and Utilization Review Physicians - 1998 - 02;  American Academy
of Forensic Sciences;  American College of Legal Medicine;  Risk Management for Physicians - Harvard
Medical School - Jan. 1995; The Interface of Drug Product Liability and Medical Malpractice -  Conferenc
of the American Association of Legal Nurse Consultants - May 1995;  Statistics, Science and Using the
Medical Literature - ATLA's National College of Advocacy - Paralegal Program - June 1995;
Understanding the Analysis of Blood and Urine Samples for Drug Abuse - Mass. Continuing Legal
Education - 1994/95;  Presenting Scientific Evidence in Court: Meeting the *Daubert* Standards for
Reliability, Am. Acad. Forensic Sciences, 2/21/00; Chair, Teaching Forum, American College of Clinical
Pharmacology -1999-2004, Chair, Education Committee, 2003-2004.

### Professional Organizations

Fellow, American College of Clinical Pharmacology, Board of Regents, 2000-2005; Program Committee,
1999 & 2002-3; Education Committee, & Chair, Teaching Forum, 00-03; Fellow, American College of Leg
Medicine; Fellow, American Academy of Forensic Sciences (Toxicology); Member: American Society for
Clinical Pharmacology & Therapeutics; Am. Acad. of Clinical Toxicology; American Health Lawyers
Association - Member, Dispute Resolution Service for Mediation & Arbitration; American Public Health
Association, & Fellow, American Society for Healthcare Risk Management; Editorial Boards: J. Healthcare
Risk Management & J. of Clinical Pharmacology.

# David M. Benjamin, Ph.

Clinical Pharmacologist & Toxicologist
77 Florence Street - Suite 107N
Chestnut Hill, MA 02467- 2121
Phone: 617- 969-1393  Fax: 617- 969-4285
E-mail: medlaw@doctorbenjamin.com

## CURRICULUM VITAE

## EDUCATION
University of Kansas Medical Center, Departments of Medicine and Pharmacology,
Post-Doctoral Fellowship in Clinical Pharmacology and Toxicology, 1972-1973.

University of Vermont College of Medicine, Department of Pharmacology, M.S., 1970; Ph.D., 1972.

Boston University, Department of Biological Sciences, Biological Sciences with emphasis in Physiolo
B.A., 1968.

## CURRENT CONSULTING ACTIVITIES
inical Pharmacology, Clinical & Forensic Toxicology; Drug Interactions, Pharmacokinetics; Adverse D
Reactions; Drug Safety, Substance Abuse; Federal Regulations governing: Clinical Trials, IND/N
Filings; Product Labeling; Informed Consent, Human Rights; QC/QA; GMPs.

## EMPLOYMENT HISTORY IN THE PHARMACEUTICAL INDUSTRY (from most recent)
William H. Rorer, Inc./Revlon Health Care (Rorer acquired Revlon in 1985), Ethical Products Division,
USV Laboratories & Armour Pharmaceutical Company, Director, Clinical Research - 1984-1986.

Astra Pharmaceutical Products, Inc.
Director, Clinical Research (Local Anesthetic Products & Pain Control) - 1982-3

Hoffmann-La Roche, Inc.
Director, Corporate Licensing Department – 1980-1982
Clinical Research Scientist (Medical Monitor) - 1974-1980

Pfizer Pharmaceuticals
Assistant Director, Scientific Affairs - 1973-1974

## ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS

Tufts University School of Medicine
Dept. Pharmacology & Experimental Therapeutics
Adjunct Assistant Professor, 2001-Present

Cornell University Medical College,
Dept. of Pharmacology
Clinical Pharmacology Section,
Assistant Adjunct Professor, 1976-1982

University of Bonn School of Medicine
Bonn, Germany, Visiting Professor of Medicine
and Pharmacology, October, 1981.

Journal of Clinical Pharmacology
Editorial Board, 2000-Present

Massachusetts College of Pharmacy and Al
Adjunct Associate Professor of Regulatory
Affairs & Health Policy, 1999-2000

Massachusetts General Hospital
Division of Nuclear Medicine
Consultant in Drug Development - 1989-199

Drug Therapy, Department Editor, 1993-94

Journal of Healthcare Risk Management,
Editorial Review Board, 1998-Present

Journal of Quality Health Care
Editorial Board, 2001-Present

## ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS (cont'd)

Guest Faculty: Harvard School of Public Health - Occupational Health Policy & Administration Course 1995-2003
Stetson University College of Law (1990, 1997-Present), Fordham University School of Law (1994, 1995)
Harvard Medical School Risk Management Program (1999-Present); George Washington University Law School (99-Present)

## PROFESSIONAL SOCIETIES

Society of the Sigma Xi, 1975-Present
American Pharmaceutical Association, Academy of Pharmaceutical Research and Sciences 1974- Prese
American Society for Clinical Pharmacology and Therapeutics, since 1970s
member - Medical Education Committee, 1976-83, Program Committee, 1982-83
      Constitution and By-Laws Committee, 1984-85
      Committee on Substance Abuse, 1987-1999
American College of Clinical Pharmacology Member/Fellow1972-Present; Board of Regents, 2000-2005;
Chair, Teaching Forum, 1999-Present; Program & Education Committees 1999-00; Program Committee
2002
New York Academy of Sciences, 1976-2001
American Academy of Dermatology, 1978-79; 1983-84
American Federation for Clinical Research, 1970s-1998
Associates of Clinical Pharmacology, 1979-86; (President, 1981-82)
American Pain Society, 1982-84
American Association for the Advancement of Science, 1980-2001
American Society of Regional Anesthesia, 1983-Present
American Society of Anesthesiologists, 1983-Present
American Academy of Clinical Toxicology, since 1970s; member - Acute and Intensive Care Section,
1990-Present
American College of Legal Medicine, 1991; Elected Fellow 1998
American Society of Law, Medicine and Ethics  1991-1996
Drug Information Association, 1987-1998
National Forensic Center, 1986-2001, Member, Advisory Board, 1991-93
Association of Trial Lawyers of America, Non-Attorney Member 1990-Present
Defense Research Institute, Non-Attorney Member 1990-Present
The Hastings Center, 1992-1995
American Health Lawyers Association (formerly NHLA), Non-Attorney Member, 1993-1999
International Society of Occupational Medicine & Toxicology, 1994-Present
American Statistical Association, 1994-1998
Pittsburgh Institute of Legal Medicine, 1994-2001
American Academy of Forensic Sciences, (Forensic Toxicology) 1995-Present; Fellow, 2001
American Society for Healthcare Risk Management, 1996-Present; Fellow, June 2002
American Public Health Association, 1997-2001

## DISPUTE RESOLUTION PROGRAMS

NHLA/AAA Training Program in Arbitration - 1993
NHLA Training Program in Mediation - 1997
NHLA Alternative Dispute Resolution Service (Arbitration, 1993 & Mediation, 1997)
Negotiation and Conflict Resolution for Health Care - Harvard School of Public Health, 1997
Center for Medical Ethics and Mediation, San Diego, CA, Instructor, 1997, Board Member, 1998.

## ACADEMIC HONORS

Awarded Second Prize in Independent Research Competition, Vermont Chapter of the Sigma Xi, 1970.
Participant: ASPET's Third Supplementary Training Program in Molecular
Pharmacology- University of California Medical Center, SF, CA - July, 1971
Completed Massachusetts Institute of Technology's summer program in:  Enzymes in
Analysis and Diagnosis - Certificate of Completion - June, 1975
American Men and Women of Science, 14th Edition, 1979.  Who's Who in the East, 23rd Edition, 1990.

Conversational French, German and Italian.

## RESEARCH INTERESTS
Clinical Trial Methodology, Pharmacokinetics, Drug Interactions, Adverse Drug Reactions, Clinical Toxicology, Substance Abuse, Correlations Between Drug Blood Levels and Pharmacologic and Toxicologic Effects.

**BREATHALYZER TESTING:** Breath Alcohol Testing for Forensic Purposes; Principles, Practice and Present Status, Completed: August 24, 1999, at UCLA, as part of the International Association of Forens Sciences, LA, CA.

## DISSERTATIONS
Ph.D. Thesis:  A Study of Approaches to the Chemical Analysis of Aminoglycoside Antibiotics, September, 1972.

Master's Thesis:  Studies of the Molecular Interaction Between Warfarin and Cholestyramine, May, 1970

PRESENTATIONS AND PUBLICATIONS

Benjamin, David M., Robinson, Donald, S. and McCormack, John J.:
Cholestyramine Binding of Warfarin in Man and In Vitro. Clinical Research 18:336, 1970.

Benjamin, David M., McCormack, John J. and Gump, Deiter W.: Studies of Approaches
to the Chemical Determination of Kanamycin in Body Fluids. (Presented at the Eleventh Interscience
Conference on Antimicrobial Agents and Chemotherapy, Atlantic City, NJ, October, 1971).

Shoeman, Donald W., Benjamin, David M. and Azarnoff, Daniel L.:
Alteration of Human Serum Albumin in Uremia. (Presented: the New York Academy of Sciences'
Conference on Drug Protein Binding, New York, New York, January, 1973).

Maxwell, D.R., Benjamin, D.M., Donahay, S., et al: Randomized Double-Blind Study of
1, 25-dihydroxy-vitamin D-3. (Presented in part at the Clinical Dialysis and Transplant Forum of the Council
of Dialysis and Transplantation, National Kidney Foundation, Washington, DC, November, 1977).

Benjamin, David M., Symposium Chairperson: Clinical Pharmacology/Toxicology of Drug Abuse.
(Presented at the Seventh Annual Meeting of the American College of Clinical Pharmacology,
San Francisco, CA, April, 1978).

Benjamin, David M.: Patterns of Drug Abuse. (Presented at the Seventh Annual Meeting of the American
College of Clinical Pharmacology, San Francisco, CA, April, 1978).

Benjamin, David M.: Problems of Polypharmacy. (Presented in part at "Use of Psychopharmacologic and
Analgesic Agents in the Clinical and Psychosocial Care of the Dying Patient and the Bereaved",
Columbia-Presbyterian Medical Center, New York, New York, May, 1978).

Benjamin, David M., Carbone, John J. and Coutinho, Claude B.: Effects of Phenobarbital and SKF-525A
on the Metabolism and Hypnotic Effect of Flunitrazepam in Mice. (Presented at the Annual Meeting of the
Academy of Pharmaceutical Sciences, Hollywood, FL, November, 1978).

Diagnosis and Treatment of Drug Abuse, Invited Discussant, Rutgers Medical School,
Piscataway NJ, May, 1978.

Benjamin, David M., Berl, T., Maxwell, D. et al: Effects of Calcitriol on the Biochemical Abnormalities
Associated With Chronic Dialysis: A Multi-Center Double-Blind Controlled Study.
(Presented at the Annual Meeting of the American Society of Clinical Pharmacology and Therapeutics,
Kansas City, MO, March, 1979).

Benjamin, David M. - Co-Chairperson - Experimental Protocol Design, (Presented at the Annual Meeting of
the Associates of Clinical Pharmacology, Kansas City, MO, March, 1979).

Benjamin, David M.: Analgesia, Pain and Analgesic Drug Interactions.
(Presented at the American Cancer Society Symposium: Pain Control for the Cancer Patient: A
Multidisciplinary Approach, Nutley, NJ, April 23, 1980).

New Developments in Local Anesthetic Agents and Pain Control, Invited Presenter, Workshop on Regional
Anesthesia, Sponsored by the American Society of Regional Anesthesia,
Cambridge, MA, October, 1982.

Yagiela, J.A. and Benjamin, D.M.: Evaluation of Etidocaine For Topical Anesthesia.
J. Dental Research, September, 1983.

Greenblatt, D.J., Benjamin, D.M., Willis, C.R., et al: Two-Percent Lidocaine Solution: Systemic Plasma Levels Following Topical Oral Cavity Use, Or When Swallowed. (Presented at the Annual Meeting of the American College of Clinical Pharmacology, October, 1984).

Benjamin, D.M., Gordon, G., Baran, D. et al: Intranasal Calcitonin Lowers Alkaline Phosphatase In Page Patients. (Presented at the International Conference on Calcium and Bone Metabolism, Nice, France, October, 1986).

Benjamin, David M., et al: Open-Label Study of Intal (cromolyn sodium) in Patients With Eosinophilia Myalgia Syndrome Due to L-tryptophan. Preliminary report: L-T/EMS Update, November, 1990, and J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.: When Is A Drug Not A Drug? The L-Tryptophan Tragedy: Lessons To Be Learned. (Presented at the Annual Meeting of the Drug Information Agency, Washington, DC, June 18, 1991).

Robinson, Donald S., Benjamin, David M. and McCormack, John J.: Interaction of Warfarin and Nonsystemic Gastrointestinal Drugs, Clin. Pharmacol. Therap. 12:491-495.1971.

E      jamin, David, McCormack, John and Gump, Deiter: The Use of Newer Amino Group Reagents For T Detection And Determination of Kanamycin, Anal. Chem. 45:1531-1534, 1973.

Shoeman, Donald W., Benjamin, David M. and Azarnoff, Daniel L.: The Alteration of Plasma Protein in Uremia as Reflected in The Ability to Bind Diphenylhydantoin, Ann. N.Y. Acad. Sci. 226:127-130, 1973.

Maxwell, D.R., Benjamin, D.M., Donahay, S.L.: Effects of Calcitriol in Dialysis Patients, Clin. Pharmacol. Therap. 23:515-519, 1978.

Maxwell, D.R., Benjamin, D.M., Donahay,S.L., et al: Randomized Double-Blind Study of 1,25-dihydroxy-Vitamin D3 in Dialysis Patients, Proc. Clin. Dialy. Transpl. Forum. 7:166-169, 1977.

Benjamin, David M.: Problems of Polypharmacy, Arch. Thanatol. 7:11, 1978.

F    ed, M., Stanley, J., Stengel, F., Shupack, J. and Benjamin, D.: Mal De Meleda Treated With 13-cis Retinoic Acid, Arch. Dermatol. 115:605-608, 1979.

Willis, C.R., Greenblatt, D.J., Benjamin, D.M., et al: Simultaneous Determination of Lidocaine and Its Deethylated Metabolites Using GLC with Nitrogen-Phosphorous Detection, J. Chromatography, 307:200-205, 1984.

Greenblatt, D.J., Benjamin, D.M. et al: Lidocaine Plasma Concentrations Following Administration of Intraoral Lidocaine Solution, Arch. Otolaryngology, 111:298-300, 1985.

Benjamin, David M.: Drug Defects' Dilemmas: Drugs Don't Have Side Effects, People Do!, Expert Witness Journal, Vol. 1, No. 7, pages 1-ff, July, 1989.

Benjamin, David M.: The Legal and Social Ramifications of Urine Drug Testing In The Workplace, Sixth Annual Meeting of the National Forensic Center, San Antonio, TX, December 10, 1989.

Benjamin, David M.: Drug Product Liability Litigation: Federal Law vs. Nature's Law, Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March 16, 1990.

Hand, Robert P. and Benjamin, David M. (Eds.): What's Behind the L-tryptophan Ban? Medical Sciences

Benjamin, David M.: History and Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia Syndrome (EMS) and Approaches to Treatment. Presented: National ATLA meeting, San Diego, CA, July, 1990.

Benjamin, David M.: L-Tryptophan: A Pharmaceutical Detective Story, J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.: When Is A Drug Not A Drug? The L-Tryptophan Tragedy: Lessons To Be Learned, Drug Information Journal 26:(2) 231-236, 1992.

Benjamin, David M.: Risk Management Strategies for Prescribing Drugs, Presented at the Annual Meetin of the American College of Legal Medicine, Las Vegas, Nevada, March 11, 1993.

Benjamin, David M.: Elements of Causation in Toxic Tort Litigation: Science and Law Must Agree, J. Legal Medicine 14:153-165, 1993.

Benjamin, David M.: Prescriber Liability: Minimize Your Risks, Drug Therapy 23: (8) 15-26, 1993.

Benjamin, David M.: Distinguishing Reliable Science From Junk Science in the Post-Daubert Era, J. Mass. Acad. of Trial Attorneys, October, 1993, p.40-44.

Benjamin, David M.: Symposium Coordinator: The Impact of Daubert v. Merrell Dow Pharmaceuticals on the Admissibility of Expert Testimony, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.: The Use and Misuse of the Scientific Method, Statistics, and Epidemiology in the Evaluation of the Toxic Tort Case, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.: New Developments in Drug Therapy - Curses and Cures, Presented at the Annual Meeting of the American College of Legal Medicine, Anaheim, CA, March 11, 1994.

Benjamin, David M.: Communicating With Patients About Adverse Drug Reactions, Drug Therapy 24: (4) 36-38, 1994.

Benjamin, David M.: The Pharmacoepidemiology of Adverse Drug Reactions: The "First Year Effect" or Expansion of The Denominator. (Presented at the Annual Meeting of the Drug Information Association, Washington, DC, June 7, 1994.)

Benjamin, David M.: Recognizing & Preventing Adverse Drug Reactions, Drug Therapy 24: (6) 52-56, 19!

Benjamin, David M.: Understanding Blood Alcohol Levels. (Presented at the Massachusetts Academy of Trial Attorney's Seminar on "Preparing & Trying Your Drunk Driving Case Under the New OUI Amendments", Boston, MA, October 5, 1994.

Benjamin, David M.: Legal Update: New State and Federal Case Law Implications for Testifying as an Expert (Presented at the Spring Conference of the American Board of Vocational Experts, Marco Island, FL, March, 1995).

Benjamin, David M.: Symposium Chairperson: Opportunities and Challenges in the Evaluation and Management of Chronic Pain (Presented: the Annual Meeting of the American College of Legal Medicine

Orlando, FL, March, 1995).

Benjamin, David M.: Medical-Legal and Regulatory Implications of Analgesic Therapy
(Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March, 1995

Benjamin, David M.: Case Studies in Pharmaceutical Risk Management, Medical Sciences Bulletin
17:(12) 7, August, 1995; 18:(3) 3, November, 1995.

Benjamin, David M. and Buckman, Robert W.: Minimizing the Risk of Adverse Drug Reactions, The Fem
Patient 21:47-61, April, 1996.

Benjamin, David M.: Putting the Inmates in Charge of the Asylum: Ethical Issues Involved in Governmer
Sponsored LSD Testing in Unwitting Subjects, (Presented at Annual Meeting of the American Academy
Forensic Sciences, Jurisprudence Section, February 20, 1997).

Benjamin, David M. and Bursztajn, Harold J.: Surreptitious LSD Administration: Ethical, Toxicologic and
Psychiatric Impact on Toxic Tort Issues, (Presented at Annual Meeting of the American Academy of
Forensic Sciences, Toxicology Section, February 20, 1997).

njamin, David M.: Vicarious Liability of Physicians and Hospitals in Drug Product Liability Litigation,
(Presented at the Annual Meeting of the American College of Legal Medicine, Ft. Lauderdale, FL,
March 7, 1997).

Benjamin, David M.: Onset of Severe Bromocriptine-Related Adverse Effects Correlates Well With
Bromocriptine's Pharmacokinetic Profile, (Presented at the Annual meeting of the American Society for
Clinical Pharmacology and Therapeutics, San Diego, CA, March 8, 1997).

Benjamin, David M. and Buckman, Robert W.:  Selecting New Drugs for the Hospital Formulary,
Medical Sciences Bulletin, 1997;20(2):9.

Benjamin, DM: Pharmacist/Pharmacy Negligence Litigation, Medical Science Bulletin, 1997;20(3):8.

Benjamin, David M., Mediation: A Better, Faster, Cheaper Way to Resolve Health Care Disputes,
ssachusetts Lawyers Weekly, May 12, 1997, p. B5.

Benjamin, David M.: Alpha Blockers and the Law, (Presented at Annual Meeting of the American Acade
of Forensic Sciences, Toxicology Section, February 11, 1998).

Benjamin, David M.:  The Death of J. Edgar Hoover - Pharmacological Afterthoughts  (Presented at:
American Academy of Forensic Sciences, Jurisprudence Section, February 13, 1998).

Benjamin, David M.: Session Moderator, Contributed Papers, Annual Meeting of the American
College of Legal Medicine, Las Vegas, Nevada, March 19, 1998.

Benjamin, David M.: The Use of Medical Negligence Data in the Development of Risk Management
Programs, (Presented at Annual Meeting of the American College of Legal Medicine,
Las Vegas, Nevada, March 19, 1998).

Benjamin, David M.: Pharmaceutical Risk Management: Special Problems Encountered in the
Hospital Setting, J. Healthcare Risk Management, 1998;18:3 (winter) updated in spring edition.

Benjamin, David M.:  Alcohol from Cough Syrup, Medical Review Officer Update, February 1999.

Benjamin, David M.: Exhumation of Saponified Remains Determining Manner of Death: Malinda McIntos - Pharmacologic Analysis. (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, February 18, 1999).

Benjamin, David M.: Combinations of Ethanol and Prescription Drugs While Driving: Factoring Out the Effects of Ethanol. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Februa 19, 1999).

Benjamin, David M.: Symposium Chairperson: Mass Toxic Torts - Protecting the Public View While Advancing Medical Science: The Thin Red Line (Presented: the Annual Meeting of the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Pharmacological Overview of Mass Tort Litigation, (Presented: the Annual Meeting the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Testing for Drugs in the Exhumed Body: Confounding Issues in Quality Control, Specificity and Reliability, International Association of Forensic Sciences, Aug. 26, 1999, LA, CA.

Benjamin, David M.: Redesigning Drug Approval - Redefining Drug Safety: The Felbamate-Bromfenac radigm, (Presented at the Annual Meeting of the American College of Clinical Pharmacology, Sept. 18 1999, Rockville, MD).

Benjamin, David M.: Evaluating Claims for Medication Errors, (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 5, 1999, Chicago, IL)

Benjamin, David M. and Starrs, James E.: Presenting Scientific Evidence in Court: Meeting the *Daubert* Standard for Reliability, (Presented at: the 52nd Annual Meeting of the American Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Reno, Nevada, February 21, 2000).

Benjamin, David M.: Chair, Teaching Forum: Educational Issues in Clinical Pharmacology: Updating the Curriculum for the New Millennium, 29th Annual Meeting of the American College of Clinical Pharmacolog Chicago, IL, September 19, 2000.

Benjamin, David M.: Medication Mis-Adventures: Case Studies in Clinical Pharmacology, 29th Annual Meeting of the American College of Clinical Pharmacology, Chicago, IL, September 19, 2000.

Benjamin, David M.: Are Pharmacologists/Toxicologists Without Medical Degrees or MDs Best Qualified Testify About Drugs? (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Seattle, WA, February 23, 2001).

Benjamin, David M.: Common Defenses Asserted Against Driving Under the Influence of Drugs Claims. (Presented at: American Academy of Forensic Sciences Toxicology Section, Drug & Driving Committee Workshop: Drugs, Driving and Human Performance Testing, Seattle, WA, February 20, 2001).

Benjamin, David M. and Starrs, James E.: Abuse of Experts or Experts of Abuse? (Presented at: America Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Seattle, WA, February 20, 2001).

Benjamin, David M.: Drug Approvals, Drug Withdrawals: Deja Vu All Over Again, Pharmaceutical & Medical Devices Law Bulletin, Vol. 1, No. 6, June 2001.

Benjamin, David M.: Chair, Teaching Forum: Minimizing Medication Errors: Practical Pointers for

Prescribers, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Applications and Limitations of Back Extrapolation in Expert Testimony, Massachusetts Lawyers Weekly, page B-5, August 20, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety, (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 31, 2001, Boston, MA).

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety Through Better Communication, Focus on Patient Safety, National Patient Safety Foundation, 2001;4:6,8.

Benjamin, David M.: Patient Safety and New Drugs: View of a Clinical Pharmacologist, The More Things Change, the More Things Stay the Same Journal of Quality Health Care, 2002;1:17-21.

Benjamin, David M.: Driving Under the Influence of Medications: Are Physicians and Pharmacists Adequately Informing Their Patients of the Risks of Medication Use?  News & Vies (newsletter of Toxicologie Section of the AAFS) May 2002.

Benjamin, David M.: Chair, Teaching Forum: Legal Medicine for Clinical Pharmacologists, 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Theories of Liability Against Pharmaceutical Manufacturers, Investigators, Their Staff, Hospitals, Medical Schools & IRBs 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Development of Drugs and Dissemination of Safety Information by Healthcare Professionals (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 20, 2003).

Benjamin, David M.: Biological & Chemical Weapons: Perspectives in Clinical Pharmacology (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 21, 2003).

Benjamin, David M.: Medical, Legal and Public Policy Issues Arising out of Biological & Chemical Weapons (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M. and Blum, Richard S.: "Off-Label" Prescribing of Drugs: Are You Legal or Liable? (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Blum, Richard S. and Benjamin, David M.: The Dependence-Addiction Paradigm: Good vs. Bad - Treatment vs. Abuse (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M.: Minimizing Medication Errors: Practical Pointers for Prescribers, (Symposium Introduction) J Clin Pharmacol 2003;43:751-753.

Benjamin, David M. and Pendrak, Robert F.: Medication Errors: An Analysis Comparing PHICO's Close Claims Data and PHICO's Event Reporting Trending System (PERTS), J Clin Pharmacol 2003;43:754-759.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, J Clin Pharmacol 2003;43:768-783.

Benjamin, David M.: Chair, Teaching Forum: Ethics in Medicine, 32nd Annual Meeting of the American College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M.: The History of the Informed Consent Doctrine, 32nd Annual Meeting of the America College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M. : Symposium Chair : Application of the Principles of Pharmacology and Pharmacokinetics to the Interpretation of Drug Blood Levels. (Presented at: American Academy of Forensic Sciences, Las Vegas, NV, February 17, 2004).

Benjamin, David M. : Use of the Covino Algorithm in Evaluating the Additive Toxicity of Lidocaine and Pivacaine. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Las Vegas, NV, February 18, 2004).

Benjamin, David M. : The Death of Ted Binion: Drug OD/Suicide or Murder by Poisoning – When the Average Means Too Much. (Presented at: American Academy of Forensic Sciences, Last Word Society Las Vegas, NV, February 19, 2004).

Benjamin, David M. : Jurors' Right to Question Testifying Expert Rights Lawyers' Wrongs. (Presented at American Academy of Forensic Sciences, Jurisprudence Section, Las Vegas, NV, February 20, 2004).

Benjamin, David M.: Avoiding Medication Error: Using Therapeutic Drug Monitoring to Optimize Pharmaceutical Care with Gentamicin. *Protecting Your Practice*, February 2004, Farmers' Insurance.

Benjamin, David M.: Risk Management Strategies for Reducing Medication Errors. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

O'Donnell, James T. and Benjamin, David M.: Systems Failure in Oncology Drug Administration: Intrathecal Vincristine Leads to Permanent Paralysis. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

Benjamin, David M.: Reducing Medication errors by Re-Designing Your Medication Use Process. *Healthcare Perspectives*, April 2004, Farmers' Insurance.

<u>LECTURES</u>

Reporting of Side Effects and Drug Toxicity for FDA, Advanced Course for FDA Drug
Investigators, College of Physicians land Surgeons, Columbia University,
New York, New York, September 30, 1980.

The Regulation of New Drug Development land its Relationship to Drug Product
Liability Litigation, Pre-Meeting Workshop, Annual Meeting of the National
Forensic Center, Miami, FL, December 2, 1988.

The History land Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia
Syndrome (EMS) and Approaches to Treatment. Presented: National ATLA meeting
San Diego, CA, July, 1990.

A History of Drug Product Liability Litigation & The L-Tryptophan Tragedy, November 19, 1990,
Selecting & Working With Experts, Feb. 24, 1997, Stetson University College of Law, St. Petersburg, FL

The Adulteration of L-Tryptophan. Presented at the ATLA,
L-Tryptophan/EMS Educational Update Meeting, Albuquerque, NM, December, 1990.

Good Manufacturing Practices (GMPs) and Their Application to the Synthesis and Administration of
Radiopharmceuticals in Positron Emission Tomography (PET) Scanning, Massachusetts General Hospital
Dept. of Nuclear Medicine, Boston, MA, April, 1991.

Testifying As An Expert In Court: Legal And Ethical Guidelines, Presented at
the Annual Meeting of the National Forensic Center, Orlando, FL, Dec. 8, 1991.

The Development land Testing of New Drugs land Biologicals With Special Reference to
Pharmacokinetics, land The Pharmacoepidemiology of Adverse Drug Reactions. Biogen Inc., Cambridge
Mass., Feb. 23, 1994.

Understanding the Analysis of Blood & Urine Samples for Drug Abuse. Mass. CLE. 11/22/94 & 9/13/95.

The Clinical Pharmacology of Risk Management. Tufts University School of Medicine,
Division of Clinical Pharmacology, Boston, Mass., February 24, 1994, February 22, 1995, May 1, 1997.

Food land Drug Law 4/21/94. Regulation of New Drug Development land Public Policy Issues 4/13/95
Fordham University School of Law, New York, New York.

Risk Management Issues: Am I Going To Be Sued?, Boston Joint School Geriatrics
Symposium: Practical Issues in the Care of the Elderly, Harvard Medical School,
Boston, MA, January 21, 1995.

The Role of the Occupational Health Professional in the Toxic Chemical Exposure
Case, Harvard School of Public Health, Boston, MA, March 20, 1995, April 1, 1996, April 21, 1997,
March 9, 1998.

The Pharmacology of Blood Alcohol. Liquor Liability Update '96, 2/13/96; Liquor Liability Update '98,
7/27/98; OUI: The Basics land More. 5/5/96 Mass. CLE.

Benjamin, David M. land Bush, Donna M.: Preparing for Cross-Examination: Developing Active Listening
Skills. Annual meeting of the American Academy of Forensic Sciences, Nashville, TN, Feb. 20, 1996.

Preparing to Testify as an Expert - Session Moderator: Expert Negligence Revisited: Mattco Forge v.
Arthur Young & Co., & Developing "Active Listening" Skills, Annual Meeting of the American College of

Wecht, Cyril land Benjamin, David M.: Evaluation land Commentary of the Strengths land Weaknesses the Experts in the O. J. Simpson Trial. Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 8, 1996.

Substance Abuse land Motor Vehicle Operation. State of Connecticut Department of Motor Vehicles' Medical Advisory Board, Wethersfield, CT, May 2, 1996.

Forensic Pharmacology. Brigham land Women's Hospital, Boston, MA, Aug. 14, 1996.

Risk Management Strategies for Minimizing Liability During Drug Development, ACI Conference on Drug land Medical Device Litigation, New York, NY, December 6, 1996.

The Use of Mediators With "Subject Matter Knowledge" in the Resolution of Health Care Disputes. The Center for Medical Ethics land Mediation, San Diego, CA, March 9, 1997.

Case Studies in Pharmacist/Pharmacy Negligence, Brigham land Women's Hospital, Boston, MA, Dec. 1997.

How to Stay Out of Hot Water! Reduce Your Medical Liability Exposure, PHYCOR IPA OFFICE MANAGEMENT SEMINAR, Dallas, Texas, February 26, 1998.

Reducing Medication Errors, Southwest Physicians Group, Dallas, Texas, February 27, 1998. Pharmaceutical Risk Management, American Board of Quality Assurance land Utilization Review Physicians, Tampa, FL, February 28, 1998.

Managing Risk land Errors in Medicine, Panel Member, American Board of Quality Assurance land Utilization Review Physicians, Tampa, FL, February 28, 1998.

Preparing to Testify as an Expert in Occupational land Environmental Medicine, American Occupational Health Conference, Boston, MA, April 29, 1998.

New Developments in the Admission of Scientific Evidence in Court, Annual Meeting of the International Association of Accident Reconstruction Specialists, July 13, 1998, Boston, MA.

Risk Management, Medical Grand Rounds, Department of Internal Medicine, University of Florida Health Science Center, Jacksonville, Florida, October 28, 1998.

Risk Management Strategies for Preventing Medication Errors, Medical Grand Rounds, University of Florida College of Medicine, Shands Teaching Hospital, Gainesville, Florida, October 29, 1998.

Evolving Strategies for Minimizing the Risk of Medication Errors, American Board of Quality Assurance & Utilization Review Physicians, "The Future of Health Care, 2000 land Beyond", San Antonio, Texas, November 14, 1998.

Daubert v. Merrell Dow Pharmaceuticals land the Introduction of Scientific Evidence; Analyzing Forensic Cases Involving Ethanol; How the Expert Can Assist the Attorney in Understanding Scientific Evidence; Medical Jurisprudence, Stetson College of Law, St. Petersburg, Florida, 3 semesters in each of 1997 & 1998.

Constitutional land Evidentiary Issues in Testifying as an Expert in a Drug Testing Case, Annual Meeting

Risk Management Strategies for Reducing Medication Errors in Pharmacy Practice, Kaiser Healthcare, Department of Pharmacy, Kansas City, MO, February 12, 1999.

Minimizing Medication Errors in Your Practice, Department of Medicine, VA Medical Center, Shreveport, LA, April 8, 1999.

Reducing the Risk of Medication Errors land Medical Negligence, Louisiana Association for Healthcare Quality, Shreveport, LA, April 9, 1999.

Medical, Legal & Risk Management Issues for the Judicious Use of Medications by Neurologists, 51st Annual Meeting of the American Academy of Neurology, Toronto, Ontario, Canada, April 22, 1999.

Technology and Blood Alcohol, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 199

Field Sobriety Testing, Urine Drug Screening, land Drug Recognition Testing, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 1999.

Update on *Daubert* and *Kumho* for Educators, Associated Education Experts, Westerville, Ohio, May 18, 1999.

Preparing land Filing a Medical Device Regulatory Submission, DIA/MCPHS, Boston, MA, August 5-6, 1999.

Update on *Daubert* and *Kumho* for Vocational/Rehabilitation Experts, land Preparing to Testify as a Vocational or

Rehabilitation Expert Under *Daubert* land *Kumho*, California Association of Rehabilitation & Reemployment Professionals, San Diego, CA, October 16-17, 1999. Co-Presenter: David Stein, Ph.D., ABVE

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, San Diego, CA, November 6, 1999.

Understanding Ethanol Pharmacology land Breathalyzer Testing, 1999 Traffic Adjudication Seminar for Judges, Naples, FL , December 9, 1999. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Faculty, Harvard Medical School Risk Management Program Medical and Surgical Practitioners in Court land the Mental Health Clinician in Court: A Survival Guide, December 11, 1999.

Update on *Daubert, Joiner & Kumho* With Regard to the Admission of Expert Testimony in Court, George Washington University Law School, Washington, DC, January 19, 2000.

Product Liability Litigation as it Impacts Healthcare Professionals and Hospitals, American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, April 1, 2000.

The Application of Clinical Pharmacology to Risk Management: Minimizing the Risk of Litigation, Grand Rounds, Rush-Presbyterian- St. Lukes Medical Center, Chicago, IL, May 30, 2000

Faculty, American Bar Association 2000 Annual Meeting - Assassination of J. Edgar Hoover? A High-Tech Hearing - Presidential Showcase Status, New York, New York, July 8, 2000.

Risk Management Strategies for Reducing Medication Errors in a Hospital Setting, Wilcox Memorial Hospital, Kauai, HI, July 31, 2000 & Hawaii Association for Healthcare Risk Management, Honolulu, HI, August 1, 2000.

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, Chicago, IL, September 16, 2000.

Drug Product Liability Litigation and Vicarious Liability of Healthcare Professionals land Hospitals, American Board of Quality Assurance land Utilization Review Physicians, Chicago, IL, September 16, 2000.

Evidence-Based Drug Selection: Raising Your Consciousness About Medication Errors, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, November 18, 2000.

Minimizing Medication Mistakes, Harvard Medical School Risk Management Program, December 1, 2000, Boston, MA.

Recognizing & Responding to Trick Questions, Harvard Medical School Risk Management Program, December 2, 2000, Boston, MA.

Understanding Ethanol Pharmacology and Breathalyzer Testing, 2000 Traffic Adjudication Seminar for Judges, Palm Harbor, FL , December 7, 2000. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Medication Mis-Adventures: Perils of Prescribing, Woman's Hospital Medical Staff Leadership Retreat, New Orleans, LA, January 7, 2001.

Prescription for Malpractice: Legal Issues in the Prescriber-Patient Relationship, Faculty Panel Member, American Health Lawyers Association, New York, New York, January 25, 2001.

Responding to Subpoenas: "Know When to Hold 'Em land When to Fold 'Em", American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, March 3, 2001.

*Daubert, Joiner & Kumho* and the Admissibility of Expert Testimony for Forensic Nurses, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, 4/27/01

Drug Facilitated Rape: Which Drugs are Used land How do you Collect the Evidence, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, April 28, 2001.

Faculty, American Bar Association 2001 Annual Meeting - The Boston Strangler Case land the Death of Mary Sullivan  Were Drugs Involved?  American Bar Association Meeting  A High-Tech Hearing - Presidential Showcase Status, Chicago, IL, August 4, 2001.

The Impact of Daubert, Joiner & Kumho on Testifying as a Forensic Toxicologist, Annual Meeting of the Society of Forensic Toxicologists, New Orleans, LA, October 1, 2001.

Drug Product Liability and Vicarious Liability of Hospitals and Healthcare Professionals, Suffolk Law School, Boston, MA, October 16, 2001.

Using the Principles of Clinical Pharmacology in Risk Management, Thomas Jefferson University, Department of Medicine, Division of Clinical Pharmacology, Philadelphia, PA, November 9, 2001.

Patient Safety land Prescriber Risk Management, American Board of Quality Assurance land Utilization Review Physicians, Philadelphia, PA, November 10, 2001.

Benjamin, David M. and Langer, Carolyn S.: Liability Issues in Occupational Medicine, New England College of Occupational & Environmental Medicine, December 7, 2001, Boston, MA.

Benjamin, David M. land Hochhaus, Gunther: Perils of Prescribing - Introduction land Case Studies, Joint Meeting of AGAH land the American College of Clinical Pharmacology, Garmisch-Partenkirchen, Germany, January 27, 2002.

Understanding Ethanol Toxicology & Breathalyzer Testing, New Hampshire Bar Association, February 2002.

Integrated Drug Delivery: Quality Improvement land Patient Satisfaction, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, April 12, 2002.

Overview of Medication Errors, Saint Elizabeth's Hospital, Boston, MA, June 24, 2002.

Risk Management Strategies for Reducing Exposure to Litigation in the Pharmaceutical Industry, Pharmaceutical Risk Management Conference, Philadelphia, PA, December 2, 2002.

Clinical Pharmacology as a Risk Management Tool for Reducing Medication Errors. Keynote Address Lovelace Medical Fondation, Albuquerque, NM, March 15, 2003

Implementing Strategies to Decrease Medication Errors (workshop) Lovelace Medical Foundation, Albuquerque, NM, March 15, 2003

How to use Failure Mode Effect Analysis (FMEA) to identify areas of risk in your medication management system. David M. Benjamin, John Santell and Glenn Krasker. National Audio Conference, November 19, 2003. Sponsored by HCPro.

JCAHO National Patient Safety Goals : How to face changes coming in 2004. Richard J. Croteau, MD, David M. Benjamin, Ph.D., and Grena G. Porto, RN, ARM, CPHRM. National Audio Conference, December 2, 2003. Sponsored by the American Society for Healthcare Risk Management (ASHRM).

Using the Principles of Clinical Pharmacology to Reduce Medication Errors & Increase Patient Safety. Medication Safety & Quality Committee, Tufts-New England Medical Center, January 15, 2004.

Understanding How the Alcotest 7110 Breathalyzer Works. Understanding the New Law, Strategies for Trying an OUI Case, Suffolk Law School, February 6, 2004.

Risk Management Strategies for Reducing Medication Errors. Grand Rounds for the Medical House Staff at Tufts-New England Medical Center. Boston, MA, May 29, 2004.

Liquor Liability in the Civil and Criminal Courts. Presented at the annual meeting of American Association of Legal Nurse Consultants. Chicago, IL, April 2, 2004.

The Information-Technology Gap : The Greatest Obstacle to Quality Care. Grand Rounds, Thomas Jefferson University, Deptartment of Medicine, Division of Clinical Pharmacology. June 8, 2004

**BOOK CHAPTERS**

The Effects of Drugs on Sexual Response, in The New Sex Therapy, 2nd Edition, Kaplan, H.S., Brunner/Mazel, 1978.

Forensic Pharmacology, in Forensic Science Handbook, Volume III, Richard Saferstein, Ph.D., (Ed.), Prentice Hall, 1993.

Making the Expert a Part of the Litigations Team and Educating the Defense Witness About the Litigation Process (contributor), in Reengineering Healthcare Liability Litigation (Zaremski land Heckman, eds.), Michie, 1997.

PEARLS for Medication Error Reduction, David M. Benjamin, PhD, Chair, American Society for Healthcare Risk Management, October 2001.

A.  Exhibits to be used as a summary of, or as support for the opinions of David M. Benjamin, Ph.D

  1.  September 26, 2003 bill for the group believed to include Jeffrey Southworth, and the RARE Hospitality International, Inc., d/b/a Longhorn Steakhouse Audit Report of that date, reflecting food and beverages believed served to the Southworth group

  2.  Widmark computer calculations, copies of which are included with Dr. Benjamin's report

  3.  Chart from Chapter II entitled, "Acute Alcoholic Intoxication" from the 1968 American Medical Association publication "Alcohol and the Impaired Driver"

  4.  Various portions of Exhibit 5, entitled "Server Guide" and Exhibit 6, entitled "Manager Resource" to the deposition of Charles Boullaine

B.  Compensation for Dr. Benjamin's time in court is $500 per hour