UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF AWILDA SANTIAGO, ESSEX PROBATE COURT DOCKET #03P-2499ADl, P/P/A VERONICA ROSARIO AND CHRISTINA SANTIAGO, AND AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF JOSE SANTIAGO, BERLIN (CONNECTICUT) PROBATE COURT, CASE #03-0713 | ) ) ) ) ) ) ) ) ) ) Civil Action Number: ) 05-CV-10617MLW |
| Plaintiff | ) |
| v. | ) ) |
| RARE HOSPITALITY INTERNATIONAL, INC. d/b/a LONGHORN STEAKHOUSE | ) ) ) |
| Defendant | ) ) ) |

**DEFENDANT'S MOTION TO EXCLUDE THE EXPERT OPINION OF
DAVID BENJAMIN, PH. D.**

NOW COMES the defendant, RARE Hospitality International, Inc. d/b/a

LongHorn Steakhouse and pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Douillard v. LMR, Inc.,* 433 Mass.

162 hereby respectfully requests that this Honorable Court exclude the opinions of

plaintiffs' expert David Benjamin, Ph.D. ("Dr. Benjamin").

In support of said Motion, the defendant refers the Court to "Defendant's

Memorandum in Support of its Motion to Exclude the Expert Opinion of David

Benjamin, Ph. D.", attached hereto and incorporated herein.

The Defendant,
By Its Attorneys,

Michael K. Gillis, Esq.
BBO# 543551
Neil D. Schnurbach, Esq.
BBO# 664534
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA  02461
Tel. 617-244-4300

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF AWILDA SANTIAGO, ESSEX PROBATE COURT DOCKET #03P-2499ADl, P/P/A VERONICA ROSARIO AND CHRISTINA SANTIAGO, AND AS SHE IS THE ADMINISTRATRIX OF THE ESTATE OF JOSE SANTIAGO, BERLIN (CONNECTICUT) PROBATE COURT, CASE #03-0713 )))))))))) | |
| ) | Civil Action Number: |
| ) | 05-CV-10617MLW |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| RARE HOSPITALITY INTERNATIONAL, INC. d/b/a LONGHORN STEAKHOUSE ))) | |
| ) | |
| Defendant ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT OPINION OF DAVID BENJAMIN, PH. D.**

This Court should exclude the opinions of David Benjamin, Ph.D. ("Dr. Benjamin")

under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993), and *Douillard v. LMR, Inc.,* 433 Mass. 162 (2001).  Dr. Benjamin was retained to

provide testimony on the critical element of Plaintiffs' dramshop action against the Defendant

RARE Hospitality International, Inc., d/b/a, LongHorn Steakhouse ("LongHorn").  Specifically,

Dr. Benjamin's opinions and reconstruction are the only evidence Plaintiffs can offer that Mr.

Jeffrey Southworth ("Southworth") was "visibly intoxicated" at the time he was served his last

drink at the LongHorn on the night he was in an accident that killed Jose and Awilda Santiago

and injured Christina Santiago and Veronica Rosario.  Dr. Benjamin's opinion, however, should

be excluded because the opinion is not based on sufficient facts as required for the admission of

expert testimony in a Massachusetts and/or Federal dramshop action, his methodology is not based on acceptable standards within the scientific community, and his selective ignorance of facts and multiple disparate conclusions render his opinions patently unreliable.

First, Dr. Benjamin's opinion concerning Mr. Southworth's likely blood alcohol concentration ("BAC") is not accompanied by any admissible evidence of either Mr. Southworth's typical reactions to alcohol or that Mr. Southworth displayed signs of visible intoxication on the night in question. No Massachusetts court has ever permitted an expert to opine concerning visible intoxication in a dramshop accident without such additional evidence. See *Douillard v. LMR*, 433 Mass., 162 166 (2001). Second, Dr. Benjamin relies upon facts not typically relied on by experts in this field by ignoring all of the eyewitness testimony elicited during discovery in this action and instead uses inadmissible hearsay to reconstruct Mr. Southworth's likely BAC. Third, Dr. Benjamin's opinions misapply the industry standard "Widmark Formula" for calculating BAC by employing an unaccepted lower body mass constant and lower absorption rate solely to artificially create a higher BAC. Finally, Dr. Benjamin has inexplicably provided three vastly disparate opinions in this case concerning Mr. Southworth's likely BAC, all based on nearly identical information, rendering his opinion patently unreliable. Despite all of the above, Dr. Benjamin's opinions still do not place Mr. Southworth's likely BAC at a level at which Dr. Benjamin would expect Southworth, a tolerant drinker, to show visible signs of intoxication. His unreliable opinions will only confuse, not assist, the finder of fact.

## I. BACKGROUND FACTS

On September 26, 2003, after dirt bike riding, Jude Connelly ("Connelly"), Scott Espey and Southworth drove to the LongHorn for dinner, arriving at approximately 8:00 p.m. *Transcr. Depo. Jude Connelly* (Exhibit 1) 10:18-19. While en route, they invited Michael Espey (brother

of Scott), William "Todd" Currie ("Currie"), Matthew Cenicola ("Cenicola") and Bruce Sirjane ("Sirjane"), to join them at LongHorn. *Transcr. Depo. Michael Espey* (Exhibit 2) 37:22-24, 38:1-9. Connelly, Southworth and Scott Espey waited in the bar area until the remainder of their party arrived. *Transcr. Depo. Scott Espey* (Exhibit 3) 19:17-24; 21:13-16; *Transcr. Depo. Jude Connelly* 37:10-15. There is testimony that while at the bar, Southworth ordered a 25 ounce beer which he did not finish. *Transcr. Depo. Scott Espey* 20:3-10; *Transcr. Depo. Jude Connelly* 12:3-10. Southworth brought this beer with him from the bar to the table. *Transcr. Depo. Jude Connelly* 144:20-24.

At approximately 8:30 p.m., the Southworth party, now seven in total (Southworth, Connelly, Michael Espey, Scott Espey, Currie, Cenicola and Sirjane), were seated at their table. *Transcr. Depo. Jude Connelly* 74:16-24, 75:1-9. After taking the party's orders, LongHorn server Leigh Chabot ("Chabot")[1] logged in an order of appetizers as well as three Jack Daniels Manhattans ("Manhattan") (2.0 oz. of Jack Daniels and 0.25 oz. of sweet vermouth per LongHorn recipe book)[2] and one 25 oz. beer. *Audit Report* (Exhibit 5) p. 7-8. These drinks were served to Michael Espey, Currie, Cenicola and Sirjane. *Transcr. Depo. Leigh Chabot* 69:25, 70:1-8 (Exhibit 6).[3] After receiving their appetizers, at 8:51 p.m., the Southworth party ordered a round of seven Manhattans. *Audit Report* p. 8. Each member of the party consumed one beverage from that round. *Transcr. Depo. Kristin O'Donnell (Part II)* 8:23-24, 9:1-2 (Exhibit 8); At 9:00 p.m., Chabot entered dinner orders for the Southworth party, all steaks or ribs with side

---

[1] At the time of this accident, server Leigh Chabot was an experienced waitress having worked in said capacity for five years total, three years specifically at the LongHorn.

[2] See RARE Hospitality Bar Recipe Book (Exhibit 4).

[3] Plaintiffs' expert, Michael Marcantonio ("Marcantonio"), also opined that, based on his training and experience, as well as his review of the facts, Southworth did not receive a drink from this first round ordered by the table. *Transcr. Depo. Michael Marcantonio (Part I)* 104:1-7. (Exhibit 7).

orders and salads. *Audit Report* p. 8-9. At 9:15 p.m., a 25 oz. beer was ordered for someone at the table. *Audit Report* p. 9. It was consumed by someone other than Southworth. *Transcr. Depo. Leigh Chabot* 122:19-21. At 9:21 p.m. and 9:24 p.m., a final round of seven Manhattans was ordered for the table. *Audit Report* p.9-10. Each patron at the table had one Manhattan from the final round. *Transcr. Depo. Leigh Chabot* 95:5-8; 167:10-25, 168:1[4]

When Southworth was served his last drink, he did not exhibit any signs of visible intoxication. Just prior to this round, Manager Noonan informed bartender Kristin O'Donnell that he observed the table and that everyone seemed fine. *Transcr. Depo. Kristin O'Donnell (Part II)* 11:7. Connelly testified that Southworth did not exhibit signs of visible intoxication when served his last drink. *Transcr. Depo. Jude Connelly* 53:6-9[5]. Scott Espey was with Southworth from the afternoon onward and did not recall Southworth being under the influence of alcohol when he was served his last drink at the LongHorn.[6] *Transcr. Depo. Scott Espey* 36:7-10. Chabot is certain that Southworth did not exhibit any visible signs of intoxication at the time he was served his last drink. *Transcr. Depo. Leigh Chabot* 175:6:10. Both Connelly and Chabot watched Southworth rise from the table and walk to the bathroom, and Southworth was steady on his feet. *Transcr. Depo. Jude Connelly* 157:4-24, 158:1-6; *Transcr. Depo. Leigh Chabot* 150:13-24.

After leaving the LongHorn, Southworth continued drinking at a local hotel. *Transcr. Depo. Scott Espey* 123:13-20. The group then proceeded to a strip club. *Transcr. Depo. Jude Connelly* 123:13-15. After leaving the strip club, Southworth, while traveling south on Route

---

[4] See also Marcantonio's report concurring that, based on his training and experience, the two orders of Manhattans three minutes apart totaling seven Manhattans comprised one drink for each patron at the table. *Transcr. Depo. Michael Marcantonio (Part I)*183:1-16.

[5] Prior to civil litigation commencing, Connelly gave similar testimony before the Grand Jury. *Grand Jury Testimony Jude Connelly* 20:1-4 (Exhibit 9).

[6] It should be noted that the standard in Massachusetts is not whether Southworth was "under the influence" of intoxicating beverages, but rather, whether he was "showing visible signs of intoxication" at the time he was served his last drink. See p. 6 *supra*.

495, collided with Santiago's vehicle. *Collision Report* (Exhibit 10) p.1-3. Plaintiffs brought and

action against Southworth ("Southworth action") and settled the action it for $300,000. *Transcr.*

*Depo. Nancy Rosario* 98:7-11 (Exhibit 11). Plaintiffs now bring this action seeking damages for

the same injuries claimed in the Southworth action.

## II. LEGAL STANDARDS

## A. STANDARD FOR DRAM SHOP CASES

To recover against Longhorn, Plaintiffs must prove that (1) Southworth was a patron on

the premises; (2) he was served intoxicating liquor; (3) Longhorn served  Southworth while he

was visibly intoxicated; (4) Longhorn knew or should have known that Southworth was visibly

intoxicated; (5) Southworth operated a motor vehicle while intoxicated; (6) the operation of a

vehicle was reasonably foreseeable by Longhorn; (7) a person of ordinary prudence would not

have served Southworth; and (8) the imposition of liability was not broken by the driving of an

automobile as an intervening, superseding event because it was within the scope of foreseeable

risks. *Cimino v. Milford Keg, Inc.,* 385 Mass. 323 (1982).; see also *Wiska v. St. Stanislaus Social*

*Club, Inc.,* 7 Mass.App.Ct. 813, 816 (1979).

In *Vickowski v. Polish American Citizens Club of the Town of Deerfield, Inc.,* 422 Mass.

606, 609 (1996), Massachusetts reaffirmed its long held precedent that to meet their burden,

plaintiffs must prove <u>visible</u> signs of intoxication <u>at the time</u> the defendant last served alcohol to

the patron.  Even if witnesses at the scene of the accident indicate that the operator was visibly

intoxicated at the accident scene, one cannot infer "similar apparent signs of intoxication a half-

hour and one beer earlier." *Id.* at 609. In fact, "this particular leap, unsupported by additional

probative evidence, direct or circumstantial . . . would not permit a reasonable inference to a

sufficient degree of probability and would, in effect, impose liability on the basis of unacceptable speculation on the part of the jury." *Id.* at 610. In *Douillard v. LMR, Inc.,* 433 Mass. 162 (2001), the Court allowed the fact finder to infer visible signs of intoxication from an expert's opinion as to the patron's BAC <u>only</u> when the opinion was coupled with "specific information concerning this particular drinker's reaction to alcohol consumption." *Douillard,* 433 Mass. at 167.  To satisfy Plaintiffs' burden, however, the expert would have to opine that the drinker's BAC was such that "one would expect to see signs of intoxication at the blood alcohol level... reached [by the drinker]," and that opinion would require confirmatory evidence that the drinker customarily exhibited visible signs of intoxication at that BAC. *Douillard* at 167.

## B. STANDARD FOR EXPERT TESTIMONY

Evidence must be relevant to the facts of the case to be admissible.  It must make a fact "more probable or less probable than it would be without the evidence." Fed R. Evid. 401.  The same is true for experts.  Fed R. Evid. 702 mandates that before admitting expert testimony, the Court must determine whether the proffered testimony will assist the trier of fact.

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Trial courts must act as gatekeepers in screening proffered expert testimony for relevance and reliability.  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591-593 (1993); *see also Kumho Tire Co., v. Carmichael,* 526 U.S. 137, 147 (1999). After *Daubert,* federal judges ruling on expert witness testimony face a far more daunting task as they must engage in a two part analysis.  First, the Court must determine whether the expert's testimony reflects "scientific knowledge," whether their findings are "derived from the scientific method," and whether their

work product amounts to "good science." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). The second prong of the analysis requires the Court to "ensure that the proposed expert testimony is 'relevant to the task at hand'… *i.e.* that it logically advances a material aspect of the proposing party's case." *Id.* at 1316. The second part of the analysis is referred to as the "fit" requirement. *Id.* This "fit" requirement goes primarily to relevance, however, it is not limited to the general relevancy requirements of Rule 402. Rather, the expert testimony "carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* n. 17, (*citing Daubert*, 113 S. Ct. at 2798). Courts must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case will not mislead the jury. *Id.*

More importantly, even if the subject matter requires expert testimony, and the expert proposes to rely upon research characterized by rigorous application of the scientific method, the expert's opinions will only be admissible if it is "sufficiently tied to the facts of the case that it will aid the [fact finder] in resolving a factual dispute." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (a "theory that might meet certain *Daubert* factors …[still] should not be admitted if it does not apply to the specific facts of the case.") (quoting *Daubert*, 509 U.S. at 591), *cert. denied*, 531 U.S. 979 (2002); *cf: United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion.").

Requisite credentials alone are not enough to render an expert's opinion admissible. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are reliable and

relevant under the tests set forth by the Supreme Court in *Daubert*"). The District Court must in keeping with its gatekeepers duty, assess the reliability of the methodology of the expert is employed in arriving at an opinion. *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005).

## III. ARGUMENT

### A. Dr. Benjamin's opinion that Mr. Southworth was "visibly intoxocated" when served his last drink at LongHorn does not rely on any evidence of Southworth's typical reaction to alcohol consumption and therefore should be excluded.

No Massachusetts court has ever permitted an expert to opine concerning a patron's "visible intoxication" in a dramshop accident without also providing additional, admissible evidence that the patron was, in fact, visibly intoxicated or that the patron typically exhibited visible intoxication when consuming like amounts of alcohol. *Douillard v. LMR, Inc.*, 740 N.E.2d 618, 623 (Mass. 2001). In this case, the Plaintiffs can do neither. No eyewitness recalls any sign of intoxication from Southworth prior to being served his last drink at Longhorn. Plaintiffs have provided no evidence that Southworth's would typically exhibit signs of visible intoxication after consuming the amount of alcohol served to him at the Longhorn. To the contrary, Dr. Benjamin openly admits that Southworth was not an average drinker but rather "he was a frequent alcohol consumer and would have been likely to demonstrate some tolerance to the intoxicating effects of ethanol." *Rule 26 Report of David Benjamin* (Exhibit 12), p. 13. Benjamin opines that only 20-30% of tolerant drinkers would exhibit visible signs of intoxication at the much higher BAC of 0.20, well above the BAC he assigns to Southworth, and significantly higher than the BAC of 0.15 at which non-tolerant drinkers would be expected to show visible signs of intoxication. *Transcr. Depo. David Benjamin (Part II)* 93:14-19 (Exhibit 13).

Massachusetts does not permit Plaintiffs to fill the evidentiary gap with Dr. Benjamin's opinion as to Southworth's likely BAC without additional, "direct evidence of the defendant's

8

own reactions to alcohol to confirm that they are in fact comparable to the average drinker."

*Douillard v. LMR, Inc.*, 740 N.E.2d 618, 623 (Mass. 2001); *Kirby v. Morales,* 741 N.E.2d 855,

861 (Mass.App.Ct. 2001). ("[I]n the absence of evidence of Morales's own reactions to

excessive consumption, the expert's opinion testimony was properly excluded.") (internal

citations omitted). In *Douillard*, for example, the expert's opinion was only allowed because

plaintiff provided additional factual testimony of a witness who had seen the patron intoxicated

on at least ten prior occasions as well as the patron's own testimony about the amount of alcohol

it took to render him intoxicated. *Id.* 620, 622 ("This record adds to the expert opinion specific

information concerning this particular drinker's reaction to alcohol consumption.") There, the

Court vacated summary judgment stating: "the plaintiff's case does not rest solely on an expert's

assessment of how the 'average' drinker would react to this much alcohol." *Douillard* 622-23;

see also *Hopping v. Whirlaway*, Inc., 637 N.E.2d 866, 869 (Mass. App. Ct. 1994) (after ordering

a new trial, the Appeals Court said "plaintiffs ought not to be permitted to put to their

toxicologist witness hypothetical questions which ask him whether [patron] would have been

recognizably intoxicated if he had shown difficulty walking unless evidence is received that

Regan, in fact, had demonstrated difficulty in walking.").

Absent any evidence of Southworth's reaction to alcohol consumption, Dr. Benjamin

cites testimony from Plaintiffs' prior lawsuit against Southworth for his conclusion that

Southworth was "more loud than usual", did not "carry himself" normally, or "maybe" had

"glassy" eyes. This factual testimony is inadmissible in this action, and therefore cannot satisfy

Plaintiffs' burden. Barring evidence of Southworth's actual visible intoxication or typical

reactions to alcohol, Massachusetts precedent requires that Dr. Benjamin's report be stricken and

the testimony excluded.

**B. Benjamin's opinions are unreliable because they are based solely and selectively on inadmissible hearsay, and ignore all of the admissible, eyewitness testimony in this case.**

The parties have conducted extensive discovery in this case, including depositions of eyewitnesses present on the night in question. In forming his opinion that Mr. Southworth was "visibly intoxicated" at the Longhorn, however, Dr. Benjamin discounted and disregarded all of the testimony in this case. *Rule 26 Report David Benjamin* p.3-4. He instead chose to rely on inadmissible statements elicited by the plaintiffs in their prior lawsuit against Mr. Southworth, an action in which LongHorn had no chance to participate or cross-examine any witness. *Id.* In that regard, Dr. Benjamin's opinions are simply an attempt by Plaintiffs to offer inadmissible hearsay evidence under the guise of expert testimony.

Dr. Benjamin bases his opinions exclusively upon the testimony in the Southworth action, the depositions and statements of Jude Connelly (Aug. 19, 2004), Thomas Scott Espey (June 22, 2004), and Michael Espey (June 22, 2004). *Rule 26 Report David Benjamin* p.3-4. By contrast, Dr. Benjamin summarily dismissed the sworn testimony of the same witnesses taken in this action, in which LongHorn cross-examined the witnesses. *Rule 26 Report David Benjamin* p.3-4; *Transcr. Depo. David Benjamin (Part I)* 24:15-24, 25:1-6. (Exhibit 14). Even more troublesome, and telling, is Dr. Benjamin's failure to review, or even consider, the testimony in this action of percipient witnesses not deposed in the Southworth action, specifically, Leigh Chabot (waitress who served Southworth's party); Kristin O'Donnell (bartender working that evening), Patricia Kreidler (bartender working that evening) Sherri Salmond (regular server to Southworth who observed him that evening), Chuck Noonan (manager that evening who observed the Southworth table), and William Todd Currie (member of the Southworth party). Dr. Benjamin acknowledged that this evidence "may have been" important. *Transcr. Depo. David Benjamin (Part I)* 31:15-24; 32:1-12. At deposition, however, Dr. Benjamin admitted that

10

his opinion was not based on his own independent evaluation of the facts, but rather on the limited facts and assumptions supplied to him by Plaintiffs' counsel. *Transcr. Depo. David Benjamin (Part II)* 58:12-18.

Clearly statements and deposition testimony elicited by Plaintiffs in the Southworth action are inadmissible hearsay in this action against Longhorn. Fed.R.Evid. 801, 802. In *Kirby*, on facts identical to those present in this case, the Court held that statements of the allegedly intoxicated patron made during a deposition at which Defendant had no opportunity to attend were inadmissible. *Kirby v. Morales*, 741 N.E.2d 855, 859-60 (Mass. App. 2001) ("because the Lounge had no notice of the first deposition as it was not then a party, Morales' statements from the first deposition could not be used against it").

Fed.R.Evid. 703 provides a single, narrow exception to the general rule that expert opinions must rely upon admissible evidence. *See generally* P.J. Liacos, Massachusetts Evidence §§ 7.10.2-7.10.3 (6th ed. 1994 & Supp.1995); *Comm. v. Roman*, 606 N.E.2d 1333, 1335 (Mass. 1993); *Comm. v. Waite*, 665 N.E.2d 982, 990 (Mass. 1996). Specifically, Rule 703 allows an expert to base an opinion on inadmissible facts or data only if the facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The exception is purposefully narrow: "This part of the rule is designed to prevent enlarging the category of permissible data to break down the rules of exclusion unduly. It is especially important when the facts or data on which the expert seeks to rely have obvious characteristics of unreliability." *Riccardi v. Children's Hospital Medical Center*, 811 F.2d 18, 25 (1st Cir. 1987) (internal citations omitted). Plaintiffs bear the burden of establishing that Benjamin's factual basis for his opinions are the type that toxicologists would rely upon in forming their opinions and inferences. *Daubert,* 509 U.S. 579, 592 n.10 (1993).

11

The Rule 703 exception for inadmissible evidence is not intended to allow an expert to reconstruct past events by ignoring admissible evidence in favor hearsay testimony. No court has ever permitted such an exercise in deception. In fact, the 1972 committee notes to Rule 703 specifically state that an "accidentoligist" should not be permitted to provide his opinion as to an accident reconstruction based on the hearsay statements of bystanders because such evidence does not meet the standard. Instead, the standard "reasonably relied on by experts in the particular field" is meant to cover, e.g., a physician's opinion as to diagnosis, etc. *see also Manocchio v. Moran*, 919 F.2d 770, 780 (1st Cir. 1990) (admitting expert opinion of medical examiner despite reliance on reports by others because "physicians commonly base their opinions on tests and examinations performed by other physicians: for example, the reading of an x-ray by a radiologist"); *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988) ("[damages expert] testified that he derived his damage estimates by reviewing [party]'s business and financial records and through interviews with company personnel. We think it obvious that these are sources of information normally and reasonably relied upon by accountants."); *American Universal Insurance Co., et al. v. Falzone*, 644 F.2d 65, 66 (1st Cir. 1981) ("it is reasonable for one state fire marshal to rely on the contemporaneous and on-the-scene opinions of other investigators on his team").

Hearsay and counsel's assumptions are not facts or data "reasonably relied upon by experts" as contemplated by Rule 703, particularly in this case where Dr. Benjamin has available to him a wealth of admissible eyewitness testimony. To the contrary, toxicologists typically rely upon known BAC levels combined with the drinker's known reaction to alcohol,[7] which

---

[7] If the drinker in question has a known BAC at a certain point in time, toxicologists can employ a mathematical formula to determine what the drinker's BAC would have been at some point earlier. Since there is no known BAC in this case, Benjamin cannot employ this method, which is called back extrapolation or retrograde extrapolation. "Retrograde extrapolation is a mathematical calculation used to estimate a person's blood alcohol level at a particular point in time by working backward from the time the blood alcohol level was tested and factoring in rates of absorption and excretion." *Commonwealth v. Colturi*, 448 Mass. 809, n.2 (2007) quoting from *Commonwealth v. Senior*, 433 Mass. 453, 459 (2001).

evidence would include eyewitness testimony in this action.  Benjamin's reliance upon hearsay from prior cases in lieu of the sworn testimony of eyewitnesses in this case, as well as the lack of any BAC reading for Southworth, are not facts upon which toxicologists reasonably rely.

In at least five critical factors, Dr. Benjamin's opinions are not supported by the evidence in this action and will only confuse the finder of fact.  *United States v. Wilson*, 798 F.2d 509, 517 (1st Cir. 1986).  First, Dr. Benjamin assumes that Mr. Southworth consumed two 25 oz. beers at the LongHorn bar before sitting down for dinner where the evidence elicited shows Mr. Southworth consuming only one.  *Transcr. Depo. Jude Connelly* 12:3-10.  Second, Dr. Benjamin's assumption that Mr. Southworth consumed another 25 oz. beer at 8:50 p.m. is unsubstantiated and contrary to the testimony of eyewitnesses.  *Transcr. Depo. Leigh Chabot* 122:19-21. (See also Plaintiffs' own expert, Michael Marcantonio, who concludes the same.) *Transcr. Depo. Michael Marcantonio (Part I)* 104:1-7.  Third, Dr. Benjamin finds Southworth consuming a beer at 9:20 p.m,, however, no testimony in this case attributes this beer to Southworth.  Contrarily, Chabot remembers that she did not serve Southworth a beer at the table. *Transcr. Depo. Leigh Chabot* 122:19-21.

Fourth, Dr. Benjamin assumes that Southworth consumed two Manhattans from the final round of seven drinks ordered by the table at 9:21 and 9:24 p.m.[8]  No one in this action has testified to this, and even Plaintiffs' other liability expert does not find this to be credible as he concluded that each person at the table, including Southworth received one drink each from this final round.  *Transcr. Depo. Michael Marcantonio (Part I)* 183:1-21. (See also *Transcr. Depo. Leigh Chabot* 95:5-8; 167:10-25, 168:1.)  Lastly, Plaintiffs themselves state that one of the two beers served to the table that evening was served to Michael Espey, yet Benjamin opines that

---

[8] At 9:21 and 9:24 p.m., the Southworth party ordered seven Manhattans total, consisting of one "round" of drinks.

Southworth drank both beers served to the table that evening. See *Nancy Rosario's Answers to Interrogatories* p.14 (Exhibit 15); *Rule 26 Report of David Benjamin* at p.6.

Benjamin's testimony is clearly guesswork and speculation. When affirming exclusion of testimony, the First Circuit Court of Appeals stated "there was no evidence in the record to support the central assumption upon which it would be based. Thus, we agree with the district court that the testimony was excludable as guesswork, conjecture and speculation that would serve only to confuse the jury." *United States v. Wilson*, 798 F.2d 509, 517 (1st Cir. 1986). See also *Ricciardi v. Children's Hospital Medical Center*, 811 F.2d 18, 24 (1987) (An expert's report or opinion should be excluded "when the facts or data on which the expert seeks to rely have obvious characteristics of unreliability"). As gatekeeper, the Court must "ensure that the proposed expert testimony is 'relevant to the task at hand'... *i.e.* that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). The Court must be satisfied that the factual basis of Dr. Benjamin's opinion "fits". *Id.* This "fit" requirement it is not limited to the general relevancy requirements of Rule 402 but rather, the expert testimony "carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* n. 17, (*citing Daubert*, 113 S. Ct. at 2798).

Where Dr. Benjamin's opinion is not supported by the facts of the case, in fact they contradict them, his opinion is inherently unreliable and should be excluded. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). An expert cannot rely upon unreliable facts or data. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994). There must be a connection between the expert's testimony and the facts elicited. *United States v. Shay*, 57 F.3d

126,132-133 (1st Cir. 1995). Where his fundamental assumptions are unsupported by the evidence, admissible or inadmissable, Dr. Benjamin's opinions should be excluded.

**C. Dr. Benjamin's latest opinion is inherently unreliable because, applying the same set of facts, he has arrived at three vastly different conclusions.**

In his Rule 26 Report, dated October 31, 2006, Dr. Benjamin opines that Mr. Southworth's BAC at the time of his last service was 0.149 and that Southworth was served his last drink at 9:35. By contrast, in his 60J Affidavit, filed more than a year prior to his Rule 26 Report and based on the same set of facts, Dr. Benjamin opined that Mr. Southworth's BAC at the time of last service at the LongHorn was higher than his report in this action, and he concludes that Southworth was served his last drink at 9:25 p.m.[9] Had Benjamin's calculations for the Rule 26 report used as the time of last service, 9:25 p.m., as he did in his 60J Affidavit, Southworth's BAC would have been 0.1346. Both conclusions, 0.149 and 0.1346, are below the standard in the toxicology field at which a non-tolerant drinker would likely show visible signs of intoxication (0.150). *Liquor Liability Update 2006,* MCLE p.98 (Exhibit 16). Both were also well below the BAC of 0.20, the level at which Benjamin opines that only 20-30% of tolerant drinkers like Southworth would exhibit visible signs of intoxication. *Transcr. Depo. David Benjamin (Part II)* 93:14-19. In other words, according to Benjamin's various reports and readings, Southworth would not have been visibly intoxicated to a reasonable degree of scientific certainty when served his last drink at the LongHorn on September 26, 2003.

After being deposed in this action in January 2007 and approximately four months after submitting his Rule 26 report, Dr. Benjamin again changed his opinion. He now opines that Mr. Southworth's BAC at the time of last service was 0.1889. See *Supplement to David Benjamin*

---

[9] While Benjamin had new material at his disposal following his submission of the 60J Affidavit, since he chose to ignore all discovery elicited in the instant action, he relies on the same set of facts he used previous. See pp. 9-10 *infra*.

*Ph.D.'s Report*(Exhibit 17).[10]  In order to render his opinion, Dr. Benjamin conveniently doubles the volume of alcohol attributed to each drink, an assumption for which there is no factual basis. *Supplement to David Benjamin Ph.D.'s Report* at 1. Without any empirical evidence or eyewitness testimony, Dr. Benjamin guesses at the volume of liquid in the glass based on a picture of what Plaintiffs' purport to be a LongHorn Manhattan taken years after the events in question.  Even this last attempt to salvage a favorable opinion for the Plaintiffs falls below the measure at which Southworth would more likely than not show visible signs of intoxication.

The disparity of these three opinions, all based on the same facts, materials reviewed, and calculations, all sworn to under the pains and penalties of perjury, establishes conclusively that Dr. Benjamin's methodology and opinion(s) is/are too unreliable to be admitted. Additionally, in all three varying opinions, Dr. Benjamin concludes "to a reasonable degree of scientific certainty" that Mr. Southworth consumed three different amounts of alcohol. In his 60J Affidavit, he concludes that Southworth consumed the equivalent of 12 beers at the LongHorn. *60J Affidavit of David Benjamin* at p.13 (Exhibit 18). In the first Rule 26 report, it was 13 beers. *Rule 26 Report of David Benjamin* at 2. In the Supplemental Rule 26 report, after his opinion was exposed at deposition, Dr. Benjamin attempted to change his opinion to 26 beers. Dr. Benjamin's opinions, in addition to contradicting himself, contradict the plaintiffs themselves as well as Plaintiffs' other expert, Marcantonio.[11]  For example, in his 60J Affidavit, Dr. Benjamin assigns four 25 oz. beers to Mr. Southworth at the table. See *60J Affidavit* at 6. The evidence is clear, however, that only two beers were served to the entire table that evening. See *Audit Report*.  Plaintiffs themselves have admitted that Michael Espey consumed at least one of the

---

[10] This supplement to Dr. Benjamin's report is being challenged in a separate Motion to Strike.

[11] Marcantonio attributes two 25 oz. beers and 2-3 Manhattans to Jeffrey Southworth over the course of the evening. *Transcr. Depo. Michael Marcantonio* at p.72.

two beers served to the table. See *Plaintiffs' Answers to Interrogatories.* Server Chabot remembers that Southworth did not consume any beer at the table. *Transcr. Depo. Leigh Chabot* 122:19-21.

Expert opinions must be sufficiently reliable and relevant to assist the trier of fact. *Daubert,* 509 U.S. at 592. Massachusetts' "ultimate test" of the Court's gatekeeping inquiry is whether "the process underlying the expert's testimony" is reliable. *Commonwealth v. Lanigan,* 419 Mass. 15, 26 (1994). Benjamin's disparate opinions are not sufficiently reliable to assist the fact finder. Three contradictory conclusions would clearly confuse any finder of fact. The process he employs to arrive at his conclusions (i.e. hypotheticals assumptions presented by plaintiffs' counsel unsupported by the evidence) is not a reliable process and therefore should be excluded.

**D. Benjamin misapplies the scientifically accepted Widmark Formula by altering the accepted body mass ratio and food absorption rate**

To calculate Southworth's BAC, Benjamin employs the "Widmark Formula." Dr. Benjamin, however, misapplies the formula by altering the accepted standard for body mass (the "r" factor) and absorption rate for someone consuming food while drinking. Dr. Benjamin's misapplication deviates from the accepted standard within the scientific community, as well as Benjamin's own published works. See *Liquor Liability Update 2006,* MCLE, p.108-112. These deviations inflate Southworth's BAC and render Dr. Benjamin's calculation unreliable.

Dr. Benjamin consistently writes and testifies that the industry accepted absorption rate for alcohol for someone who is eating food is between 60-90 minutes. *Liquor Liability Update 2006,* MCLE p. 108, *Transcr. Depo. David Benjamin (Part I)* 152:9-14. Benjamin teaches, publishes and testifies that the "r" factor, which represents body mass, for purposes of the

Widmark formula is 0.68 for men and 0.55 for women.[12] *Liquor Liability Update 2006,* MCLE

p. 112; *Transcr. Depo. David Benjamin* 144:13-23.  Despite his own accepted standards for

determining BAC, Benjamin altered his calculations in this case by reducing the "r" factor to

0.64 and shortening the absorption time to 30 minutes. *See Rule 26 Report* at 16-17.  Benjamin

himself admits he has no scientific basis, based on literature or standards accepted in the forensic

toxicology field, that would assign a .64 Widmark "r" to Southworth, a 6"4, 210 pound male.

*Transcr. Depo. David Benjamin (Part I)* 148:16-22.

Misapplying these factors substantially and artificially inflates Southworth's BAC by

accelerating the rate at which the alcohol enters Southworth's system,, and then magnifying the

effect of that alcohol. Had Dr. Benjamin employed the Widmark formula appropriately, he

would have calculated a BAC for Southworth of 0.1153 instead of 0.149 at 9:35 p.m.[13]  See

*Widmark Chart* (Exhibit 19).  Benjamin's opinions as to Southworth's BAC are thus thrice

inflated: inflated as to the amount of alcohol Southworth imbibed, the effect of the alcohol, and

how quickly it would affect Southworth. Even with the inflated amount of alcohol attributed to

Southworth, had the Widmark formula been properly applied, not only would Southworth's BAC

fall well below the accepted scientific standard at which non-tolerant drinkers would likely

exhibit visible signs of intoxication, but it would fall almost 50% lower than the BAC at which

less than a third of tolerant drinkers would be expected to show visible signs of intoxication.

*Transcr. Depo. David Benjamin (Part II)* 93:14-19.

For Dr. Benjamin's opinion to be admitted under *Daubert,* plaintiffs must prove that: a)

the methodology is scientifically valid; and b) it can be properly applied to the facts of the case.

---

[12] Women have a lower BAC number because generally women have a higher body fat component than men. This is significant because the lower the "r" factor, the higher the BAC.

[13] This calculation assumes the inflated drink totals attributed to Southworth which RARE does not adopt.

*Vasallo v. Baxter Health Corp.,* 428 Mass. 1, 14 (1998). Dr. Benjamin's opinion fails both prongs of the test. He fails to point to any scientifically valid basis for assigning a Widmark "r" of .64 to Southworth, nor can he validate his hypothesis that Southworth's food absorption was 30 minutes until 9:20 p.m., despite having consumed bread, appetizers, salads, side orders, and beef. His testimony should be stricken as it is not sufficiently reliable to aid the fact finder.

## V. CONCLUSION

Dr. Benjamin's Rule 26 report and expected testimony fail the test outlined by Fed.R.Evid. 702 for admission of expert testimony. Dr.Benjamin ignores pertinent testimony in this case in favor of legal argument and hearsay. His opinions confuse, not assist, the fact finder. Dr. Benjamin's testimony is not sufficiently reliable, reaching three vastly different conclusions based on the same facts. Dr. Benjamin admits that his assumptions are based on hypotheticals supplied to him by Plaintiffs' counsel and not based on his independent evaluation of the facts. Dr. Benjamin misapplies the Widmark formula to reach an inflated BAC by altering the body mass factor and utilizes a food absorption rate that conflicts with his own, scientifically accepted, standard. Despite these glaring errors and omissions, Dr. Benjamin, calculates Southworth's BAC at below the accepted standard at which a non-tolerant drinker would likely exhibit visibly signs of intoxication and well below where Southworth, a tolerant drinker, might possibly show such signs. His opinion would not assist the fact finder but rather would confuse a potential jury.

WHEREFORE, the defendant, RARE Hospitality International, Inc., respectfully requests that this Honorable Court grant its Motion to Exclude the Expert Testimony of David Benjamin, Ph. D.

19

The Defendant,
By Its Attorneys,

Michael K. Gillis, Esq.
BBO# 543551
Neil D. Schnurbach, Esq.
BBO# 664534
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA  02461
Tel. 617-244-4300

## CERTIFICATE OF SERVICE

I, Michael K. Gillis, of Gillis & Bikofsky, P.C., attorneys for Rare Hospitality International, Inc., hereby certify that on May ___, 2007, a true copy of the above document was served upon all counsel of record.

RARE HOSPITALITY INTERNATIONAL, INC. d/b/a
LONGHORN STEAKHOUSE
By its Attorneys,

Michael K. Gillis, Esq.
GILLIS & BIKOFSKY, P.C.
1150 Walnut Street
Newton, MA 02461
(617) 244-4300
BBO# 543551

Page 1

```
 1                          Volume:  I
                            Pages:   1-179
 2                          Exhibits: 1-4

 3            UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 4    ******************************
      NANCY ROSARIO, INDIVIDUALLY, AS   *
 5    SHE IS THE ADMINISTRATRIX OF THE  *
      ESTATE OF AWILDA SANTIAGO, ESSEX  *
 6    PROBATE COURT #02P-2499AD1, P/P/A  *
      VERONICA ROSARIO AND CHRISTINA    *
 7    SANTIAGO, AND AS SHE IS THE       *
      ADMINISTRATRIX OF THE ESTATE OF   *
 8    JOSE SANTIAGO, BERLIN (CONNECTICUT)*
      PROBATE COURT, CASE #03-0713,     *
 9         Plaintiff,                    *
                VS              * C.A. No.
10    RARE HOSPITALITY INTERNATIONAL,   * 05-CV-10617MLW
      INC. d/b/a LONGHORN STEAKHOUSE,   *
11         Defendant                    *
      ******************************
12        DEPOSITION OF JUDE CONNELLY, a witness

13        called on behalf of the Plaintiff, taken

14        pursuant to Notice under the applicable

15        provisions of the Federal Rules of Civil

16        Procedure, before Barbara J. Simon, a

17        Professional Shorthand Reporter and Notary

18        Public, in and for the Commonwealth of

19        Massachusetts, at the law offices of Albert L.

20        Farrah, Jr., One Washington Mall, Boston,

21        Massachusetts, on Friday, February 10, 2006,

22        commencing at 10:15 a.m.

23            SHEA COURT REPORTING SERVICES
                    (617) 227-3097
24
```

Page

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROS |
|---|---|---|---|---|
| JUDE CONNELLY | | | | |
| (By Mr. Farrah) | 4 | | 171 | |
| (By Mr. Gillis ) | | 143 | | 172 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Floor plan | 17 |
| 2 | Bar bill | 26 |
| 3 | Written statement | 42 |
| 4 | Affidavit | 61 |

(The exhibits were retained by Mr. Farrah.)

Page 2

```
 1        A P P E A R A N C E S

 2    ALBERT L. FARRAH, JR., ESQ.
      Law Offices of Albert L. Farrah, Jr.
 3    One Washington Mall
      Boston, MA 02108
 4    (617) 742-7766
          Counsel for the Plaintiff
 5
      MICHAEL K. GILLIS, ESQ.
 6    Gillis & Bikofsky, P.C.
      1150 Walnut Street
 7    Newton, MA 02461
      (617) 244-4300
 8        Counsel for the Defendant

 9
      Also Present:
10    Neil Schnurbach, Esq.
      Ann Rudy
11
```

Page

P R O C E E D I N G S

JUDE CONNELLY, having been satisfactorily
identified and duly sworn, on oath, deposes and
says as follows:

DIRECT EXAMINATION

BY MR. FARRAH:

Q. Just for the record, could you tell us your
name, please?

A. Jude Connelly.

Q. Mr. Connelly, my name is Albert Farrah and I
represent the plaintiff, Nancy Rosario, in
various capacities in this lawsuit.

Counsel have agreed that you will have a
copy of your transcript delivered to you and
that you will have thirty days from the date of
your receipt of that transcript to note, in
writing on a sheet of paper that will accompany
the transcript, any errors that you feel were
made in the transcription of your testimony,
and you'll need to return that errata sheet to
me within thirty days of your receipt in order

Page 5

1  for the notations to have any effect in this
2  case.
3      Otherwise, your transcript will be deemed
4  accurate if we don't receive that back from you
5  within thirty days -- the errata sheet. Do you
6  understand that?
7  A. Yes.
8  Q. Tell us, please, where you live.
9  A. Harvard, Massachusetts.
10  Q. What is the address?
11  A. Fifteen Lovers Lane.
12  Q. And how old are you?
13  A. I am twenty years old.
14  Q. What is your date of birth, sir?
15  A. March 23, 1985.
16  Q. And are you currently in school?
17  A. I am.
18  Q. Where?
19  A. Fitchburg State College.
20  Q. Is that full time?
21  A. Full time.
22  Q. And do you work?
23  A. Yes.
24  Q. Where do you work?

Page

1  A. Yes.
2  Q. Was that on September 26, 2003?
3  A. Yes, I believe so.
4  Q. Calling your attention to that day, September
5  26, 2003, do you recall where you were dirt
6  biking with Mr. Southworth that day?
7  A. I do.
8  Q. Where was that?
9  A. It was in Templeton, Massachusetts.
10  Q. Is there a particular location at Templeton
11  that you were dirt baking? Does it have a
12  name?
13  A. It doesn't have a name. It is just a sand pit,
14  if you want to call it that.
15  Q. A sand pit?
16  A. Yes.
17  Q. Do you know what time you arrived at the sand
18  pit that day?
19  A. Early afternoon, maybe 2:00, 3:00.
20  Q. How did you get there that day?
21  A. I went to Templeton with my brother.
22  Q. What is your brother's name?
23  A. Dylan Connelly.
24  Q. And when you arrived at the sand pit that day,

Page 6

1  A. I work at a small convenience store in Bolton.
2  Q. What is the name of that store?
3  A. Country Cupboard.
4  Q. Calling your attention back to the year 2003,
5  did you know a person named Jeffrey Southworth?
6  A. Yes.
7  Q. Can you tell us approximately when it was that
8  you first met Mr. Southworth?
9  A. I believe it was some time in the summer of
10  2002.
11  Q. Do you know the setting, where you met him?
12  A. Not particularly.
13  Q. During the summer of 2003, did Mr. Southworth
14  and you engage in any dirt biking activities
15  together?
16  A. Yes.
17  Q. Can you tell me approximately how many times
18  during the summer of 2003 Mr. Southworth and
19  you were dirt biking together?
20  A. I would say about a dozen times.
21  Q. And on one of those occasions after dirt
22  biking, did Mr. Southworth and you go to the
23  Longhorn Steakhouse in Leominster,
24  Massachusetts?

Page

1  was Jeffrey Southworth there?
2  A. No, he was not.
3  Q. At some point in time, did he arrive at the
4  sand pit? Did you see him there?
5  A. Yes.
6  Q. And by the way, if you just nod, we won't have
7  a record of your answers. So you need to say
8  your answer.
9      When you first saw him, was he in the
10  company of anyone else?
11  A. Yes.
12  Q. Who was that?
13  A. Scott Espy.
14  Q. Did you know Mr. Espy prior to September 26,
15  2003?
16  A. I did.
17  Q. Did you know him in a dirt biking setting?
18  A. I did.
19  Q. And others?
20  A. Yes.
21  Q. For how long did you remain dirt biking at the
22  sand pit in Templeton that day?
23  A. We were there until about dark, although I
24  stopped dirt biking a little bit before.

**Page 9**

1  Q. Before what?
2  A. Before Jeff and Scott finished.  My brother
3     actually took my dirt bike with him back to
4     school when he left.
5  Q. So you said you arrived with your brother, and
6     did you arrive in your brother's motor vehicle?
7  A. Yes.
8  Q. And did your brother leave Templeton, the sand
9     pit, at some point in time that day?
10 A. Yes.
11 Q. When did he leave, approximately?
12 A. Around 6:00.
13 Q. And did he take your dirt bike with him that
14    day when he left around 6:00?
15 A. Yes.
16 Q. So you stopped dirt biking at that point; is
17    that right?
18 A. Yes.
19 Q. At what time did Mr. Southworth stop dirt
20    biking?
21 A. It was right around when it got dark.  I don't
22    specifically remember.
23 Q. And at some point in time, did you leave the
24    Templeton sand pit that day?

**Page 10**

1  A. We did.
2  Q. And did you leave in the company of anybody?
3  A. I left with Jeff and Scott.
4  Q. And approximately when was it that you left?
5  A. I know it was just getting dark or just shortly
6     after, maybe around 7:00.
7  Q. And prior to leaving the sand pit in Templeton,
8     did you see Jeffrey Southworth have any
9     alcoholic beverages?
10 A. No.
11 Q. Did all of you leave the sand pit together --
12    Jeffrey Southworth, Mr. Espy and yourself?
13 A. We did.
14 Q. And in whose motor vehicle did you leave the
15    sand pit?
16 A. It was Jeff's.  I believe it was a rented
17    truck.
18 Q. And where did the three of you go?
19 A. We went to the Longhorn Steakhouse.
20 Q. And were there any other persons in the motor
21    vehicle, the rented truck, other than Jeff
22    Southworth, Mr. Espy and yourself, on the trip
23    from the sand pit to the Longhorn Steakhouse?
24 A. No, there were not.

**Page 1**

1  Q. Were there any pets in that motor vehicle?
2  A. There were.  There were two dogs.
3  Q. Whose dogs were they?
4  A. They were Jeff's.
5  Q. And what was the layout of people and pets in
6     the motor vehicle on the trip from the sand pit
7     to the Longhorn Steakhouse?
8  A. I believe I was sitting in the back with the
9     two dogs, and Jeff and Scott were in the front.
10 Q. Who was driving?
11 A. Jeff was.
12 Q. And at approximately what time did you arrive
13    at the Longhorn Steakhouse?
14     Let me ask the question another way.
15     Approximately, how long did it take you to get
16    to the Longhorn Steakhouse from Templeton?
17 A. About half an hour.
18 Q. And when you arrived at the Longhorn
19    Steakhouse, where did you go?  Where did you
20    first go?
21 A. We went in and we put our name in for a table,
22    and it was busy.  So we went over to the bar to
23    wait for the table.
24 Q. That was the three of you -- Jeff, yourself and

**Page 1**

1     Mr. Espy?
2  A. Correct.
3  Q. At the bar, did you see Mr. Southworth drinking
4     at all?
5  A. I did.
6  Q. What did you see him drinking?
7  A. I saw him drinking a beer.
8  Q. And do you know how many beers Mr. Southwort
9     had at the bar that day?
10 A. I remember him having one.
11 Q. Do you remember testifying at a deposition in
12    this case or in a related case back in August
13    of 2004?
14 A. I do.
15 Q. And do you remember being asked the question --
16    Let me show you the bottom here on page 28 at
17    Line 22.
18     "Do you know whether or not Jeff had more
19    than one beer while he was at the bar?"
20     Do you see that question?
21 A. Yes, I do.
22 Q. Do you remember that your answer was, "You
23    know, I think he did.  I'm not -- I don't know
24    for a fact but, you know, he probably did."

Page 13

1    Do you see that?
2    A. I see that.
3    Q. So is it your best memory today that he
4    probably had more than one beer while he was
5    drinking at the bar?
6    MR. GILLIS: Objection.
7    A. I don't know. I don't remember. I remember
8    him ordering one beer.
9    Q. Do you have any explanation for why you
10    testified on August 19, 2004 that he probably
11    had more than one beer?
12    MR. GILLIS: Objection. That's not his
13    testimony.
14    He said on 28 he had a beer, and then you
15    asked him further when you were unhappy with
16    the answer, and he said "maybe."
17    His testimony isn't ever that he had more
18    than one beer.
19    MR. FARRAH: His testimony is his
20    testimony, and his testimony is in response to
21    the question, "Do you know whether or not Jeff
22    had more than one beer while he was at the
23    bar?"
24    His testimony is, "You know, I think he

Page 14

1    did. I'm not -- I don't know for a fact, but,
2    you know, he probably did."
3    MR. GILLIS: That's taken out of context.
4    You're not bringing the whole statement in on
5    28 when you asked him, "What did you see him
6    drinking?" He said "A beer."
7    If you're going to ask him a question,
8    give him the whole sequence. Don't take it out
9    of order.
10    MR. FARRAH: Motion to strike. You can
11    ask him what you want to ask him.
12    Q. My question to you is, do you have any
13    explanation for why you testified on August 19,
14    2004 that you think he had more than one beer
15    at the bar?
16    MR. GILLIS: Where did you say he said he
17    thinks he had more than one beer at the bar?
18    MR. FARRAH: I'm looking at 22 through 24.
19    MR. GILLIS: 22 to 23 is a question.
20    Maybe I'm missing something. On page 29, Lines
21    21 to 24 I don't see anywhere -- What line are
22    you saying that he said he had more than one
23    beer as opposed to you asking a question?
24    Q. On page 28, Line 22, the question is, "Do you

Page 15

1    know whether or not Jeff had more than one beer
2    while he was at the bar?"
3    The answer is, "You know, I think he did."
4    So my question --
5    MR. GILLIS: What page are you on?
6    MR. FARRAH: I'm on page 28.
7    MR. GILLIS: Line?
8    MR. FARRAH: 22.
9    MR. GILLIS: Again, I object. If you're
10    going to ask him a question, ask him to read
11    the whole page because you're just taking
12    things out of context.
13    Q. For the third time, can you explain why you
14    testified back in August of 2004 that you
15    thought Jeff had more than one beer while he
16    was at the bar?
17    A. I guess I said it because I think it could have
18    been possible.
19    Q. Can you explain why in August of 2004 you
20    testified that he probably -- on top of page
21    29 -- that he probably had more than one beer
22    while he was at the bar?
23    MR. GILLIS: Objection.
24    Q. You can answer.

Page 16

1    A. I don't.
2    Q. Fair enough. At some point in time, were you
3    seated at a table?
4    A. Yes, we were.
5    Q. And by the way, while you were at the bar, how
6    far away were you from Jeff?
7    A. I don't remember.
8    Q. Do you remember what part of the bar you were
9    seated at or standing at?
10    A. Not particularly. I kind of remember it being
11    somewhat busy and us not having seats.
12    Q. But you don't remember what section of the bar?
13    A. I don't.
14    Q. I'm going to show you what has been marked as
15    Exhibit 1 in your earlier deposition.
16    Do you recall looking at that floor plan
17    at some point in time?
18    A. Yes.
19    Q. Do you recall circling the area where the "3"
20    is located as the area where Jeff, you and
21    Mr. Espy were at the bar?
22    A. Yes.
23    Q. Does that refresh your memory about what part
24    of the bar the three of you were at on that

Page 17

1     night?

2     A. It does.

3     Q. Is it accurate to say that you were at the area

4        circled with a "3" and an arrow pointing to it

5        on Exhibit 1 of your earlier deposition?

6     A. Yes.

7        MR. FARRAH: Can we mark that as Number 1

8        in this deposition?

9

10        (Exhibit Number 1 was marked for

11        identification.)

12

13     Q. Do you recall what the bartender or bartenders

14        who served you at the bar looked like that

15        night?

16     A. I don't.

17     Q. Do you remember testifying that it was a woman,

18        you thought, with blonde hair who had served

19        you that night?

20     A. I don't know whether she was at the bar or

21        serving a table. I remember a female that I

22        thought had blonde hair.

23     Q. Could you turn to page 31? Read the first

24        seven or eight lines of page 31 to yourself.

Page

1     hair.

2        His testimony is, "I don't remember. I

3     just remember seeing blonde hair." Read the

4     whole answer.

5        MR. FARRAH: For the record, "Do you know

6     who served Jeff at the bar?"

7        "Answer: I mean, the bartender I remember

8     it was a girl?

9        "Question: Woman? Women?

10        "Answer: Yes. I don't specifically

11     remember. I think she had blonde hair. I just

12     remember seeing blonde hair."

13     Q. By the way, is it your best memory as you sit

14        here now that while he was at the bar, Jeffrey

15        Southworth had more than one beer?

16        MR. GILLIS: Objection, asked and

17     answered.

18     Q. You can answer.

19        MR. GILLIS: If you know.

20     Q. Read on page 30 the question that begins on

21        Line 15 to yourself and then your answer.

22        (Witness reviews document.)

23     Q. I want to ask you this question. Is it your

24        best memory as you sit here now that while he

Page 18

1        (Witness reviews document.)

2     A. Okay.

3     Q. Does that refresh your recollection that it was

4        a blonde woman who waited on you at the bar?

5     A. I don't remember. I mean, I guess so.

6     Q. Okay. For the record, you were asked the

7        question --

8        MR. GILLIS: For the record, we want an

9     accurate transcript. So we'd prefer your best

10     memory, but if you're guessing, please don't do

11     that.

12        Neither Mr. Farrah nor I want you to guess

13     at answers you don't know.

14     A. I honestly don't remember.

15     Q. Do you recall testifying that you thought the

16        woman who served you at the bar had blonde

17        hair; is that right?

18        MR. GILLIS: Objection. I think his

19     testimony was that he didn't specifically

20     remember.

21     Q. "I think she has blonde hair," is what it says

22        there. "I just remember seeing blonde hair."

23        MR. GILLIS: Read the whole answer. His

24     testimony isn't that he saw a woman with blonde

Page 2

1        was at the bar, Jeff Southworth had more than

2        one beer?

3        MR. GILLIS: Objection.

4     A. No.

5     Q. Do you recall that you were asked that question

6        at your deposition?

7     A. Yes.

8     Q. And that your answer at that time was, "I'd say

9        so, yes"?

10     A. Yes.

11     Q. Do you have any explanation for why your answer

12        today is different from your testimony back in

13        August of 2004?

14     A. To be honest with you, after looking at the

15        receipt for the bill, I'm pretty sure that

16        there could be no way that he had more than one

17        beer at the bar.

18     Q. Did you see the receipt for the bar?

19     A. I believe the bill for the bar was with the

20        bill for the table.

21     Q. What makes you say that?

22     A. That's as I remember that.

23     Q. When did you see the receipt for the bill?

24     A. Maybe a month ago.

Page 21

1   Q. Where did you see it?
2   A. When I met with John DiNatale.
3   Q. A private investigator?
4   A. Yes.
5   Q. What did Mr. DiNatale say to you?
6   A. He just wanted to go over what I had said in
7      some of the depositions and show me the receipt
8      for the bar, and just tell me when I come in
9      here to tell the truth and if I don't know the
10     answer, don't speculate; just only say what I
11     know.
12  Q. Okay, and you didn't speculate when you
13     testified at your deposition, did you?
14        MR. GILLIS: Objection. The prior one
15     you're referring to?
16        MR. FARRAH: Either deposition.
17  A. I suppose I may have.
18  Q. You speculated at your deposition?
19  A. Well, I don't think I was making things up, but
20     when I say I don't exactly remember, this could
21     have been the case.
22        I remember one thing, but certainly
23     another thing could have happened.
24  Q. When you testified on August 19, 2004, you were

Page 22

1      sworn to tell the truth before you testified;
2      isn't that right?
3   A. Yes.
4   Q. Okay, and you did the best you could to tell
5      the truth at that time; isn't that right?
6   A. Yes.
7   Q. Since that time, Mr. DiNatale has seen you; is
8      that right?
9   A. Yes.
10  Q. Did he tell you who he was working for?
11  A. I can't remember. I know he is working for one
12     of the sides -- one of the law firms.
13  Q. How long did you spend with Mr. DiNatale?
14  A. Maybe twenty minutes.
15  Q. And he showed you some records?
16  A. Yes.
17  Q. What did he show you?
18  A. He showed me the printout when I was at the
19     grand jury.
20  Q. The printout of the bill at the grand jury for
21     the Longhorn?
22  A. He showed me a printout of the receipt, and
23     also when I went into the grand jury in Lowell
24     before the grand jury.

Page 23

1   Q. You gave some testimony?
2   A. Yes.
3   Q. He showed you that?
4   A. Yes.
5   Q. Was that accurate?
6   A. Yes.
7   Q. Was your deposition accurate in August of 2004?
8         MR. GILLIS: Which part? You asked the
9      same question at the deposition five times, and
10     you kept asking it because you didn't like the
11     answer.
12        So if you're going to ask him if it's
13     accurate, which time? The time when he said he
14     had only one beer or the time you asked him
15     three pages later?
16  Q. Was your deposition accurate?
17        MR. GILLIS: Which part?
18        MR. FARRAH: Any part.
19  A. I believe so, yes.
20        MR. FARRAH: Now, I just want to stop for
21     a second. I'll be right back. I want the
22     receipt of what Mr. DiNatale showed you.
23        (Off the record.)
24  Q. Back on the record. Back to Mr. DiNatale, did

Page 24

1      he tell you who he was working for?
2   A. He did. I know he's working for one of the law
3      firms. I don't know.
4   Q. Did he tell you he was working for Mr. Gillis's
5      firm? That is the gentleman sitting next to
6      you.
7   A. I suppose he did. I honestly don't remember
8      which firm he said he was working for.
9   Q. Before you testified in August of 2004, had any
10     investigators, other than police investigators,
11     spoken to you about your upcoming testimony?
12  A. No.
13  Q. So when you went into that testimony, you
14     didn't have the benefit of anybody's assistance
15     in preparing for the deposition; is that right?
16        MR. GILLIS: Objection.
17  A. Yes.
18  Q. But Mr. DiNatale knew that you were coming to
19     be deposed in this case; isn't that right?
20        MR. GILLIS: Objection.
21  A. Yes.
22  Q. He told you to tell the truth at the
23     deposition; isn't that right?
24        MR. GILLIS: Objection.

Page 25

1  A. Yes.
2  Q. And he showed you some documents; is that
3     right?
4  A. Yes.
5  Q. One of the documents he showed you was a
6     printout of the bar check; is that right?
7  A. That's right.
8  Q. I want you to look at this document which is
9     Exhibit 11 in the Kristin O'Donnell deposition.
10    It's a few page document. I'd like you to look
11    at it, if you could. Take a moment.
12        (Witness reviews document.)
13  Q. It's Table 52; is that right? Take as long as
14    you need to look at it to familiarize yourself
15    with the document.
16        (Witness reviews document.)
17  Q. Is that the document that Mr. DiNatale showed
18    you when you met with him?
19  A. I think so, yes.
20    MR. FARRAH: That, for the record, is
21    Exhibit 11 to Ms. O'Donnell's deposition.
22        Why don't we mark it as Exhibit 2 to this
23    deposition?
24

Page 26

1        (Exhibit Number 2 was marked for
2        identification.)
3
4  Q. Was it just Mr. DiNatale and you who met, and
5    nobody else?
6  A. Correct.
7  Q. Where did you meet with him?
8  A. He came to my house.
9  Q. He had called you beforehand to arrange that
10    meeting?
11  A. Yes.
12  Q. Your best memory of when the meeting happened
13    is when?
14  A. I believe it was around a month ago.
15  Q. He gave you his card?
16  A. Yes.
17  Q. Do you still have it?
18  A. Not on me, but I do have it.
19  Q. Do you remember his first name?
20  A. I think it's John.
21  Q. And you and he discussed what now has been
22    marked as Exhibit 2 in your deposition; is that
23    right?
24  A. Yes.

Page 27

1  Q. Based in part on that discussion, you now do
2    not believe that Jeff Southworth had more than
3    one beer at the bar; is that right?
4        MR. GILLIS: Objection.
5  A. Correct.
6  Q. That's because there's something in Exhibit 2
7    that suggests to you that it was an
8    impossibility that he had more than one beer at
9    the bar?
10        MR. GILLIS: Objection.
11  Q. Is that right?
12  A. Yes.
13  Q. What is it about that that Mr. DiNatale pointed
14    out to you in Exhibit 2?
15        MR. GILLIS: Objection. You're putting in
16    evidence that's not there. You're saying what
17    did he point to, and there's no evidence here
18    that he pointed to anything.
19        You can't lead the witness. It's your
20    deposition.
21  Q. Did Mr. DiNatale point to something in
22    Exhibit 2 that led you to conclude that it was
23    impossible for Jeff to have had more than one
24    beer at the bar?

Page 28

1  A. He asked me what I remembered him having at the
2    bar, and I told him that I remembered him
3    having a beer.
4        It was a possibility that he could have
5    had more, and I told him I remembered Scott
6    having a beer as well, and at that point he
7    said, "There were only two beers ordered. So
8    where did the third beer come from," and I
9    said, "I guess it didn't come."
10  Q. Did Mr. DiNatale show you where there were only
11    two beers ordered as reflected in what has now
12    been marked as Exhibit 2 in your deposition?
13  A. Yes.
14  Q. Could you show me what he pointed to?
15  A. There's one at the top of what says page 8, and
16    the second one is towards the end of page 9
17    right here.
18  Q. The one at the top of page 8 -- You said
19    page 8?
20  A. Yes.
21  Q. Is that the very top line on page 8?
22  A. It is.
23  Q. It says "$3.99, twenty-five-ounce Bud Light"?
24  A. Correct.

Page 29

1  Q. And to review that, you need to go to the
2     previous page; is that right?
3  A. Yes.
4  Q. That's part of an order that was placed at
5     8:40 p.m.; is that right?
6  A. Yes.
7  Q. So that's one of the references that
8     Mr. DiNatale pointed out to you about the
9     beers; is that right?
10 A. Yes.
11 Q. And the other reference that Mr. DiNatale
12    pointed out to you, I think you said was on
13    page 9; is that right?
14 A. Towards the end.
15 Q. Again, we're looking at Exhibit 2 to your
16    deposition; is that right?
17 A. Yes.
18 Q. Do you see it?
19 A. Yes.
20 Q. It looks like at 9:15 p.m. there was an order
21    for a $3.99 twenty-five-ounce Bud Light?
22 A. Yes.
23 Q. So based on Mr. DiNatale showing you the
24    earlier reference at 8:40 p.m. and the second

Page

1     MR. GILLIS: You're asking him to guess
2  because you don't want the accurate testimony.
3     I'm just telling him to tell the truth.
4  If you have a problem with that, then fine.
5     MR. FARRAH: I have no problem with that.
6  I'm trying to find out what Mr. DiNatale said
7  at a later date.
8  Q. What did Mr. DiNatale tell you about the beer
9     at 8:40 and the beer at 9:15? What did he tell
10    you?
11 A. He told me those were the two beers of the
12    bill.
13 Q. Did he say what they meant and what they
14    reflected?
15 A. He just said those are reflected, the two beers
16    that they were drinking.
17 Q. At the bar?
18    MR. GILLIS: Objection.
19 A. I don't know.
20 Q. Did he say that the two beers that are
21    reflected on Exhibit 2 to your deposition were
22    two beers that were served at the bar?
23    MR. GILLIS: Objection.
24 A. I don't remember.

Page 30

1     reference at 9:15 p.m., you now understand that
2     it was not possible for Jeff to have had more
3     than one beer at the bar; is that right?
4     MR. GILLIS: Objection.
5  A. I believe so.
6  Q. Did Mr. DiNatale tell you that what's been
7     marked as Exhibit 2 to your deposition included
8     the bill for the beers that were served at the
9     bar to Jeff and Mr. Espy?
10 A. He didn't say whether they were or weren't.
11 Q. Well, if you can tell me what it is about
12    Exhibit 2 that Mr. DiNatale pointed out to you
13    that suggested to you that the two beers we've
14    been talking about, 8:40 and 9:15, were the
15    beers that were served to them at the bar?
16    MR. GILLIS: Objection.
17 A. The fact that I just remember the bar tab being
18    carried over to the table. I mean, it's
19    obvious that they're different times, I guess.
20    I don't know.
21 Q. I want to know.
22    MR. GILLIS: If you don't know, say you
23    don't know, but don't guess.
24    MR. FARRAH: This is not your witness.

Page 3

1  Q. Is it accurate to say that you're basing your
2     testimony that Jeff probably did not have more
3     than one beer at the bar on Exhibit 2 that
4     Mr. DiNatale showed you?
5     MR. GILLIS: Objection.
6  A. Solely or entire? Can you repeat it one more
7     time?
8  Q. Yes.
9  A. I remember him having a beer at the bar, but
10    that was at the bar. I remember him having one
11    beer, you know, throughout the night.
12    I remember him having a beer, but whether
13    he ordered another beer, which I don't remember
14    or not, at the table, that would not be at the
15    bar.
16 Q. Do you remember testifying that at the table
17    Jeff had probably four beers?
18    MR. GILLIS: Objection.
19 A. I believe I did. I mean, I think I read that
20    somewhere.
21 Q. Your memory of the events back in August of '04
22    was better than your memory of the events
23    today; isn't that right?
24    MR. GILLIS: Objection.

Page 33

1  A. I guess you can say that.
2  Q. And back in August of '04 on Page 38, Line 4 of
3     your deposition began a series of questions
4     that you were asked about Jeff drinking at the
5     table.
6        Do you recall being asked the question,
7     "While you were at the table, did you see Jeff
8     drinking any alcoholic beverages?"
9        Do you recall that?
10 A. Yes.
11 Q. And your answer was, "Yes."
12    Did you see him drinking any beers?
13 A. Yes.
14 Q. How many beers, to your best memory, did you
15    see him drink at the table?
16 A. Do you want me to read off of this?
17 Q. Tell me, first of all, what you testified to
18    back in August.
19 A. I answered "Maybe four, maybe."
20 Q. My question to you today is, did you see him
21    drinking beers at the table?
22 A. I know that he had a beer at the table.
23 Q. Do you know if he had more than one beer at the
24    table?

Page 34

1  A. I don't know.
2  Q. Do you have any explanation for why back in
3     August of 2004 you testified that your best
4     memory was he had maybe four beers at the
5     table?
6  A. I mean anything is possible. I know that he
7     had a beer, but I guess it's possible that he
8     could have had more beers.
9  Q. You testified that he had maybe four beers;
10    isn't that right?
11 A. Correct. That would be why, the possibility of
12    why I said that.
13 Q. Now, prior to your August 2004 testimony,
14    nobody had spoken to you about your upcoming
15    testimony; isn't that right?
16 A. Right.
17 Q. Prior to today's testimony, Mr. DiNatale had
18    spoken to you; isn't that right?
19 A. Yes.
20 Q. Did you discuss the question of how many beers
21    to the best of your memory did you see him
22    drink at the table, with Mr. DiNatale?
23 A. No.
24 Q. Did you understand that Mr. DiNatale was

Page 35

1     working for the lawyers who are representing
2     the Longhorn Steakhouse?
3        MR. GILLIS: Objection.
4  A. At that time, yes.
5  Q. He told you that; isn't that right?
6  A. Yes.
7  Q. And while he was at the table, did you also see
8     Jeff drinking Manhattans?
9  A. Yes.
10 Q. How many Manhattans did you see him drink at
11    the table?
12 A. I remember him having at least a Manhattan. As
13    of right now, I don't know what I testified to.
14 Q. Let's read it. Do you see the question
15    beginning on page 38, Line 16? Let me read the
16    question.
17       It says, "What is your best memory of the
18    number of Manhattans that you saw him drinking
19    at the table?"
20       What was your answer?
21 A. "Probably two. I know that he ordered like a
22    round of them. I don't, you know, I don't
23    really remember how many. I think, you know,
24    I'd probably say two."

Page 36

1  Q. Do you remember giving a statement to the
2     police after the investigation or after the
3     accident?
4  A. Yes.
5  Q. And you had not spoken to Mr. DiNatale before
6     you gave that statement; isn't that right?
7  A. Correct.
8  Q. And nobody had talked to you, other than the
9     police, about what Jeff had to drink at the
10    restaurant; is that right?
11 A. Correct.
12 Q. Now, let me ask you this. Is there any
13    question in your mind about that when Jeff and
14    Mr. Espy and you first arrived at the
15    restaurant, you went to the bar?
16 A. Okay.
17 Q. Is there any question in your mind about that?
18 A. I know we went to the bar.
19 Q. You didn't have anything to drink that night --
20    alcoholic beverages -- did you?
21 A. No.
22 Q. And is there any question in your mind about
23    that both Jeff and Mr. Espy when they went to
24    the bar, they ordered a beer upon arrival at

Page 37

1    the bar?
2    A. No.
3    Q. That happened; is that right?
4    A. Correct.
5    Q. And they made that order at the same time; is
6       that right?
7    A. As best as I can remember. I can't
8       specifically recall them both saying, you know,
9       the time when they said, "Can I have a beer?"
10   Q. But the three of you were in the bar area for
11      some period of time before the others in your
12      group arrived; isn't that right?
13   A. Yes.
14   Q. Fifteen or twenty minutes?
15   A. Yes.
16   Q. And during that fifteen or twenty minutes, it
17      was just the three of you at the bar; isn't
18      that right?
19   A. Correct.
20   Q. And they were drinking beer at the bar; isn't
21      that right?
22   A. Correct.
23   Q. So when you were talking to Mr. DiNatale about
24      your testimony at your August 2004 deposition

Page 38

1    and he showed you this Exhibit 2 to your
2    deposition, did you have any discussion with
3    him about the times that the beers were shown
4    to have been ordered on Exhibit 2?
5    A. No, other than him pointing out just the two
6       beers were ordered. We didn't discuss anything
7       further.
8    Q. But you understood that the bar tab was on
9       Exhibit 2; isn't that right?
10        MR. GILLIS: Objection.
11   A. Yes.
12   Q. Mr. DiNatale told you that; isn't that right?
13        MR. GILLIS: Objection.
14   A. I don't know. I don't believe so.
15   Q. What then was the basis for your understanding
16      that the bar tab is on Exhibit 2?
17   A. Me recalling that the bar -- whatever the bill
18      at the bar was -- they just asked for it to be
19      brought to the table.
20      I don't specifically remember them paying
21      the tab at the bar.
22   Q. That's the sole basis for your statement that
23      the bar tab is on Exhibit 2?
24   A. Yes.

Page 3

1    Q. Mr. DiNatale didn't tell you that the bar tab
2       was on Exhibit 2, did he?
3    A. No.
4    Q. But he pointed to the two beers on Exhibit 2,
5       didn't he?
6    A. Yes.
7    Q. What did he say about them?
8    A. He said those were the two beers that were
9       ordered.
10   Q. Ordered at the bar?
11        MR. GILLIS: Objection.
12   A. He didn't say or he may have said. I don't
13      remember. I remember him saying those are the
14      two beers that they were drinking.
15   Q. Mr. DiNatale was not at the Longhorn Steakhouse
16      the night of September 26 to the best of your
17      memory; isn't that right?
18   A. Correct.
19   Q. Did you see Jeff drinking beer while he was at
20      the table?
21   A. Yes.
22   Q. And how many beers did you see Jeff drinking
23      while he was at the table?
24   A. I remember him having a mug in front of him.

Page 4

1    Q. The same size at the table that he had had at
2       the bar?
3    A. Yes.
4    Q. The same beer perhaps at the table that he had
5       had at the bar?
6    A. Yes.
7    Q. And the same kind of beer?
8    A. Yes.
9    Q. And how many drinks of Jack Daniels did Jeff
10      have at the table?
11   A. I remember seeing him have at least one. After
12      seeing this, it's clear that it looks like he
13      had two --
14        MR. GILLIS: Objection.
15   A. -- if the rounds were ordered.
16   Q. Did Mr. DiNatale and you discuss how many Jack
17      Daniels Manhattans are reflected on Exhibit 2?
18   A. Yes.
19   Q. How many are reflected on Exhibit 2?
20   A. I can't remember. I need to count them.
21   Q. Do you remember other people drinking Jack
22      Daniels Manhattans as well?
23   A. Yes.
24   Q. And so my question to you is, what is your best

Page 41

1    memory of the number of Manhattans that you saw
2    Jeff drinking at the table?
3        MR. GILLIS: Objection, already asked and
4    answered.
5    A. Two.
6    Q. What is your best memory of the number of beers
7    you saw Jeff drinking at the table?
8        MR. GILLIS: Objection.
9    A. One.
10   Q. And can we agree that your best memory of the
11   number of beers you remember him drinking at
12   the table in 2004 was four?
13       MR. GILLIS: Objection. That's not what
14   the answer says.
15   Q. Maybe four?
16       MR. GILLIS: Objection.
17   A. I testified to that.
18   Q. Before you saw Mr. DiNatale?
19       MR. GILLIS: Objection.
20   Q. Is that right?
21   A. Yes.
22   Q. Now, before you saw Mr. DiNatale, you also
23   signed a statement for the police; isn't that
24   right?

Page 42

1    A. Yes.
2    Q. Take a look at this and see if that is the
3    statement that you signed for the police.
4    A. It looks like it.
5    Q. And how many drinks with Jack Daniels did you
6    tell the police Jeff had with dinner?
7    A. It says here maybe three drinks with Jack
8    Daniels.
9    Q. Was that true?
10   A. Yes.
11   Q. Okay, and you also said, "We had dinner. Jeff
12   had a couple of beers (maybe two)," in your
13   statement to the police; isn't that right?
14   A. Yes.
15   Q. Was that true?
16   A. Yes.
17       MR. FARRAH: Can we have this marked as
18   the next exhibit?
19
20       (Exhibit Number 3 was marked for
21       identification.)
22
23       (Off the record.)
24   Q. I want to talk about Mr. DiNatale again. What

Page 4

1    I'd like you to do for me in your own words is
2    tell me as best as you can recall everything
3    Mr. DiNatale said to you and everything you
4    said to Mr. DiNatale during your
5    twenty-minutes-or-so meeting with him.
6    A. Well, when he first came, he introduced himself
7    and I introduced myself to him, and he asked me
8    if I was in school, and I told him that I was
9    currently going to Fitchburg State.
10       I think it was during my winter break. So
11   I was not in class, and he made a little chat
12   and asked me what sports or what I liked to do.
13       I said I liked to snowboard and ski, and
14   he mentioned that his -- I'm not sure who it
15   was -- some relative of his is going to be in
16   the Olympics, to watch out for him.
17       Then he told me that he wanted to talk to
18   me and just sort of tell me what I'm coming in
19   here to do, and he showed me Exhibit 2, and he
20   asked me what I remembered Jeff having to drink
21   that night, and, you know, if I remembered the
22   bar tab being brought over to the table, and I
23   told him I did, and he went through Exhibit 2
24   and he counted the beers and he counted the

Page 4

1    Jack Daniels drinks, and he asked me if I
2    remembered them being ordered, and I said I
3    remembered them being ordered in rounds.
4        So then he just told me when I came in
5    here to don't make something up if you don't
6    know it.
7        He just wanted me to know that I'm coming
8    in here to tell what I know and if I don't
9    know, then I'm not going to tell it.
10   Q. Did he suggest to you that you had made
11   something up before?
12       MR. GILLIS: Objection.
13   A. No.
14   Q. Because you had not made something up before,
15   had you?
16   A. I had not made something up. I mean, I just
17   believed that it could have been possible.
18   Q. By the way, did he say what sport his relative
19   was going to participate in, in the Olympics?
20   A. I believe it's snowboarding.
21   Q. Did he say the name of the relative?
22   A. He did. I don't remember it.
23   Q. Okay. After that discussion, you testified a
24   little while ago that he told you what you were

**Page 45**

1    coming in here to do; do you recall that?
2    A. Yes.
3    Q. What did he tell you you were coming in here to
4        do?
5    A. He was telling me that I was being deposed to
6        come in here to tell what I knew about the
7        night regarding Jeff Southworth and the
8        Longhorn Steakhouse.
9    Q. Did he tell you what he was coming to see you
10       to do?
11   A. He told me that he was coming to see me to, you
12       know, kind of tell me where I stand in all of
13       this.
14   Q. And did he tell you why he was coming to tell
15       you to do that?
16   A. Because he was hired.
17       MR. GILLIS: If you know. Don't guess.
18       MR. FARRAH: This is not your witness.
19       MR. GILLIS: If he's guessing, I don't
20   want a guess. You can tell from his mannerisms
21   that he is.
22       MR. FARRAH: Whatever you think you can
23   tell, you can tell, but let the witness
24   testify. I don't think this is your witness

**Page 46**

1    yet.
2        MR. GILLIS: Do you have a problem with me
3    telling him to tell the truth and not to guess
4    if he doesn't know?
5        MR. FARRAH: I have a problem with you
6    interrupting him. When it's your turn, you can
7    ask him whatever you want.
8        MR. GILLIS: Why do you have a problem
9    with him telling the truth?
10       MR. FARRAH: I have no problem with him
11   telling the truth.
12       MR. GILLIS: Why do you have a problem
13   with him not guessing?
14       MR. FARRAH: I have a problem with you
15   saying don't guess.
16       MR. GILLIS: What's wrong with that?
17       MR. FARRAH: Because he's in the middle of
18   answering. That's the problem I have.
19       MR. GILLIS: If you think he's guessing,
20   you should ask him that.
21       MR. FARRAH: You're the one who thinks
22   he's guessing. This is not your witness. As
23   far as I know, you don't represent him.
24       MR. GILLIS: I don't represent him.

**Page 4**

1    Q. Now, back to the question. Did Mr. DiNatale
2        tell you why he was coming to see you?
3    A. He told me that he was working as a private
4        investigator for the case, and he was hired
5        to -- Well, I don't know exactly what he was
6        hired to do, but he was, you know, going to
7        come and talk to me and just, you know, kind of
8        show me, like, for example, Exhibit 2 and
9        discuss it, and, you know, just once again kind
10       of tell me the most important thing is to come
11       in here and tell what I know and to not say
12       something that I don't know for sure.
13   Q. "Don't guess"? Is that what he said to you?
14   A. I don't know the words that he said, but yes.
15   Q. But you were not guessing before, were you?
16   A. I don't think so.
17   Q. Okay. When you testified before the grand
18       jury, were you guessing?
19   A. No.
20   Q. When you gave the statement marked as Exhibit 3
21       in your deposition today to the police, were
22       you guessing?
23   A. No.
24   Q. When you testified on August of 2004, were you

**Page 4**

1    guessing?
2    A. No.
3    Q. Okay. One of the other things that
4        Mr. DiNatale told you was where you stood in
5        all of this. At least that is what you
6        testified to a moment ago. What did he say
7        about that?
8    A. He just told me that I was the witness that was
9        with Jeff that night and I had not had anything
10       to drink, and that, you know, whatever I would
11       remember would probably be the most accurate
12       with respect to the people and members of the
13       group who had had drinks.
14   Q. Did he tell you anything else about where you
15       stood other than that?
16   A. I don't remember.
17   Q. Okay. Did he say you were the only one who was
18       sober at the table or words that effect?
19       MR. GILLIS: Objection.
20   A. He said I was the only one who was not
21       drinking.
22   Q. You knew that.
23   A. Yes.
24   Q. You didn't need Mr. DiNatale to tell you that,

Page 49

1    did you?
2    A. No.
3    Q. Did Mr. DiNatale tell you anything else about
4    where you stood in all of this?
5    A. I don't remember him saying anything else.
6    Q. When he showed you Exhibit 2, what did he say
7    about it? Exhibit 2 is the tab.
8    A. Well, he first asked me what I remembered being
9    ordered and who was drinking and who was at the
10    table, and I told him that I thought that the
11    tab was brought over from the bar, and he asked
12    me what I remembered being ordered at the bar,
13    and he counted up the number of Jack Daniels
14    drinks that were ordered and the number of
15    beers in Exhibit 2.
16    Q. And did he say anything about Exhibit 2, other
17    than counting up the number of Jack Daniels?
18    Did he say anything about it to you?
19    A. He told me that what was ordered here, what was
20    drinking here, and well, I don't remember him
21    specifically saying if the tab from the bar was
22    brought over, then that was all that was
23    ordered throughout the night, but that was what
24    I had taken from this.

Page 50

1    Q. Did you say to him that you believed that what
2    was ordered at the bar was reflected in
3    Exhibit 2?
4    A. I think so.
5    Q. Well, let's see if we can do better than that.
6    Do you have a memory?
7    A. I don't.
8    Q. When you were meeting with him, it was your
9    belief that what was ordered at the bar was
10    reflected in Exhibit 2?
11    A. Yes.
12    Q. Did you share that belief with him?
13    A. I'm pretty sure I did.
14    Q. When you shared that belief with him, what did
15    he say about that?
16    A. Well, he asked me who were the ones I
17    remembered having the beers, and I told him
18    that I remembered Jeff having one and Scott
19    having one, and then he told me that, "Well, if
20    those are the two beers, then Jeff had a beer."
21    Q. Referring to Exhibit 2?
22    A. Correct.
23    Q. And did he tell you whether Jeff's beer at the
24    bar was the one that is reflected at 8:40 or

Page 5

1    the one that is reflected at 9:15?
2    A. No.
3    Q. He didn't tell you which one was the one that
4    Jeff ordered at the bar?
5    A. He didn't.
6    Q. But you understood that what Jeff ordered at
7    the bar was either the one that is reflected at
8    8:40 or the one that is reflected at 9:15; is
9    that right?
10    A. Yes.
11    Q. Did you tell him that, that you understood,
12    looking at Exhibit 2, that what Jeff had
13    ordered at the bar was reflected as either the
14    8:40 beer or the 9:15 beer?
15    A. I never told him that. What I told him was
16    that I thought that the tab from the bar was
17    brought over and represented in this exhibit.
18    Q. Did he disagree with that?
19    A. No.
20    Q. Did he agree with that?
21    A. I think so. I honestly don't remember him
22    saying "I agree."
23    MR. GILLIS: Objection.
24    Q. But you don't remember him saying, "I disagree

Page 5

1    with that," do you?
2    A. No.
3    Q. What were you drinking that night?
4    A. To be honest with you, I don't remember. I
5    remember being asked the question before, and I
6    don't remember what I said.
7    Q. Coke? Were you drinking Coke?
8    A. I know I was having soda.
9    Q. And typically, what kind of soda do you order?
10    A. Mostly either Coke or maybe a Sprite.
11    Q. Did Mr. DiNatale and you talk at all about what
12    you were drinking that night?
13    A. No.
14    Q. Did Mr. DiNatale and you discuss at all whether
15    what you were drinking that night is reflected
16    on Exhibit 2 to your deposition?
17    A. I don't remember talking about that.
18    Q. Have you looked at Exhibit 2 to your deposition
19    to see whether or not what you were drinking
20    that night is reflected on it?
21    A. No.
22    Q. What were you eating that night?
23    A. I think I had some ribs. I'm not 100 percent
24    sure.

Page 53

1  Q. Now, at the bar did Jeff order any Jack Daniels
2     Manhattans?
3  A. No.
4  Q. Are you sure?
5  A. Yes, at the time.
6  Q. At the time that Jeff was delivered his last
7     drink, was he exhibiting any signs of
8     intoxication to you?
9  A. No.
10  Q. Was he loud?
11  A. He didn't stand out to be.  I mean, I don't
12     know exactly what you mean by "loud."
13  Q. Was the table loud?
14  A. Yes.  Do you mean with respect to everything
15     else?
16  Q. Was the table loud?
17  A. Not extremely.
18  Q. Okay.  Did Mr. DiNatale talk to you at all
19     about whether or not Jeff was exhibiting any
20     signs of intoxication that evening?
21  A. I believe he did.
22  Q. Can you tell us what you remember about that?
23  A. I'm pretty sure he asked me if I remembered him
24     acting like he was drunk.

Page 54

1  Q. "Drunk"?  Is that what he said?
2  A. I don't know what he said.
3  Q. What do you remember he said?
4     MR. GILLIS: Objection.
5  A. I remember him asking, I guess, if he was
6     exhibiting signs of alcohol.
7     MR. GILLIS: Objection, and I'm going to
8     say it again, we cannot have answers here that
9     are guesses.  He said "I guess it was."
10     We have to have your memory, not a guess.
11  A. I honestly don't know what questions he asked
12     me.
13  Q. What did you say?
14  A. I told him that I didn't see any signs of being
15     drunk or intoxicated.
16  Q. While you were at the Longhorn, did Jeff appear
17     to you to be under the influence of what he had
18     been drinking at the Longhorn?
19     MR. GILLIS: Objection.
20  A. No.
21  Q. Can you turn to page 49 of your earlier
22     deposition?  Will you go down to Line 12, and
23     do you recall being asked in August of 2004 the
24     question, "Okay, while you were at the

Page 5

1     Longhorn, did Jeff appear to you to be under
2     the influence of what he had been drinking at
3     the Longhorn," and your answer was, "I mean,
4     yeah, a little bit."  Do you see that?
5  A. I do.
6  Q. Did he appear to be under the influence of what
7     he was drinking at the Longhorn?
8     MR. GILLIS: Objection.
9  A. I don't remember him -- I don't know how to say
10     this, you know, exhibiting clear signs of
11     intoxication.
12     I mean, I guess obviously anyone who is
13     drinking anything will be under the influence
14     of what they're drinking, but I don't remember
15     him clearly showing signs of intoxication.
16  Q. Okay.  So is it your testimony today that he
17     appeared to be under the influence of what he
18     was drinking at the Longhorn because anybody
19     who is drinking is under the influence of what
20     he is drinking?
21  A. Yes.
22  Q. And he did appear to you to be under the
23     influence of what he was drinking; is that
24     right?

Page 5

1     MR. GILLIS: Objection.
2  A. Yes.
3  Q. Did Jeff appear to hold himself that night at
4     the Longhorn in the same way he usually did?
5  A. Without reading this, I honestly don't
6     remember.
7  Q. Let me withdraw that question.  I guess you've
8     answered it.
9     At some point in time, did somebody come
10     over from the restaurant and ask the table to
11     quiet down?
12  A. Yes.
13  Q. And that was how long before you left?
14  A. I honestly don't remember.
15  Q. Could you look at pages 43 and 44, please?
16     Actually, you have to start at 42.
17  A. All right.
18  Q. I started to ask you a question at the bottom
19     of 42.
20     "Did anybody while you were at the table
21     that night say," and then you interrupted.  You
22     said "I," and then I said, "I'm sorry?"
23     Then you said, "I kind of remember now.  I
24     don't know who it was, whether it was, you

Page 57

1 know, a manager or someone. It might have even
2 been our waitress. I remember someone coming
3 over and asking our table to be quiet, a little
4 bit quieter."
5 Do you remember that happening?
6 A. Yes.
7 Q. Do you remember that testimony?
8 A. Yes.
9 Q. And then I'm going to ask you now on the
10 record, was that because the table was loud?
11 A. Yes.
12 Q. And who was making a lot of noise that night at
13 the table?
14 MR. GILLIS: Are you asking the question?
15 Q. I'm asking the question. Who was making a lot
16 of noise that night at the table?
17 A. We all were.
18 Q. Jeff included?
19 A. Yes.
20 Q. And then I asked you on page 44, Line 14, "Give
21 me your best estimate of how much time elapsed
22 from when the woman came over and told you to
23 tone it down and when you left the restaurant,"
24 and your answer was, "Maybe twenty-five minutes

Page 58

1 to half an hour."
2 Does that refresh your memory as to how
3 long after you were told to quiet down it was
4 that the group left the restaurant?
5 A. Yes.
6 Q. Now, by the way, am I correct that the person
7 that served your group at the table was not the
8 person that served you at the bar?
9 A. Yes.
10 Q. Both blonde?
11 A. Yes.
12 Q. Can you turn back to page 49 for me?
13 A. All right.
14 Q. Now, my question to you is, was Jeff sloppier
15 looking that night than he usually is? I'm
16 asking you the question now on the record.
17 A. Yes.
18 Q. Was he louder that night than he usually
19 appeared to you?
20 A. No.
21 Q. Do you recall being asked on page 50, the
22 question was, "Was he louder than he usually
23 appeared to you?"
24 Do you see that?

Page 59

1 A. Yes, I do.
2 Q. What was your answer?
3 A. "Yeah, I mean, yes."
4 Q. Do you have any explanation as to why you
5 testified differently today than how you
6 testified in your deposition in August?
7 A. Well, everyone was loud at the table. So
8 that's why I said that.
9 Q. That's your explanation as to why you testified
10 differently today than how you testified in
11 August?
12 A. Well, I guess if -- I won't guess. If he was
13 being loud at the table, then it would be
14 louder with respect to everyone else in the
15 restaurant, you know, and I mean, he's not a
16 loud kid, but he was not a quiet kid.
17 So yes, he was being a little bit louder
18 than he usually is, you know, as a one on one
19 or, you know, just to talk with him.
20 Q. So which is it today, Mr. Connelly? Was he
21 louder that night than he usually is or wasn't
22 he?
23 A. He was.
24 Q. Do you have any explanation for why a moment

Page 60

1 ago you said he wasn't?
2 A. Well --
3 MR. GILLIS: Objection.
4 A. You know, when you talk to him, he would be
5 pronounced. So he was somewhat of a -- As I
6 said, he was not quiet.
7 So that would be why I said it, but
8 everyone was loud with respect to everyone else
9 in the restaurant. So he was a little bit
10 louder.
11 Q. Was that because, in your opinion, of what he
12 had to drink?
13 MR. GILLIS: Objection.
14 A. No.
15 Q. Was Mr. Southworth exhibiting signs of
16 intoxication at the time that the waitress came
17 over to the table and asked you to quiet down?
18 A. No.
19 Q. Do you remember making an affidavit?
20 A. I do.
21 Q. Do you remember talking to Mr. DiNatale about
22 your affidavit?
23 A. What is the affidavit?
24 Q. Do you remember talking with Mr. DiNatale about

Page 61

1     your affidavit?
2 A. Which is the affidavit? I remember doing an
3     affidavit, but I don't remember it. I know we
4     had a couple of things with him.
5 Q. Is that your signature?
6 A. It is. I've done this a few times, and I just
7     don't know which one is which.
8 Q. Take a look at this document.
9         (Witness reviews document.)
10         (Short recess.)
11     MR. FARRAH: Could we have his affidavit
12     marked as the next exhibit, please?
13
14         (Exhibit Number 4 was marked for
15         identification.)
16
17 Q. Mr. Connelly, I'm going to show you what has
18     been marked as Exhibit 4 in this deposition.
19     Do you see it?
20 A. Yes.
21 Q. It's your affidavit; is that right?
22 A. Correct.
23 Q. That's your signature?
24 A. It is.

Page 62

1 Q. On page 2?
2 A. Yes.
3 Q. Would you turn to Paragraph 5? Paragraph 5
4     reads, "In my deposition of pages 49 to 51, I
5     testified that during the course of the evening
6     at the Longhorn Steakhouse, Mr. Southworth
7     seemed to be under the influence of the
8     alcoholic beverages he was being served at the
9     restaurant."
10     Do you see that?
11 A. Yes.
12 Q. Did I read that correctly?
13 A. You did.
14 Q. And you understood you made this affidavit
15     under the pains and penalties of perjury in May
16     of 2005?
17 A. Yes.
18 Q. My question is, during the course of the
19     evening at the Longhorn Steakhouse, did
20     Mr. Southworth seem to be under the influence
21     of the alcoholic beverages he was being served?
22     MR. GILLIS: Objection.
23 A. Yes.
24 Q. And then Paragraph 6 of your affidavit reads,

Page 6

1     "I also testified on pages 42 to 44 of my
2     deposition that approximately one half hour
3     before we left the Longhorn Steakhouse,
4     everyone at the table was loud, including
5     Mr. Southworth, and either a waitress or a
6     manager at the restaurant came and asked us to
7     be quiet."
8     Do you see that?
9 A. I do.
10 Q. Did I read that correctly?
11 A. Yes.
12 Q. Was that true that approximately one half hour
13     before you left, everyone at the table was
14     loud, including Mr. Southworth, and either a
15     waitress or a manager came to you and asked you
16     to be quiet?
17 A. Yes.
18 Q. Paragraph 7 reads, "At that time when the table
19     was asked to quiet down, Mr. Southworth was
20     exhibiting all the signs of intoxication I
21     testified about on pages 49 through 51 of my
22     deposition."
23     Do you see that?
24 A. Yes.

Page 6

1 Q. Did I read that right?
2 A. You did.
3 Q. And is that true that at the time when the
4     table was asked to quiet down, Mr. Southworth
5     was exhibiting all the signs of intoxication
6     that you testified to on pages 49 through 51 of
7     your deposition?
8     MR. GILLIS: Objection.
9 A. Yes.
10 Q. Let's look at pages 49 to 51 of your
11     deposition.
12     My question I asked some time ago was,
13     "Was Jeff holding himself at the time the table
14     was asked to quiet down the same way he usually
15     held himself?"
16 A. I honestly don't remember. So I'm going to use
17     this because this is what is going to be
18     correct.
19 Q. Do you recall testifying in August of 2004 in
20     response to the question, "What did he show?
21     What did he manifest that makes you say that,"
22     and that was that he appeared to be a little
23     bit under the influence of what he was
24     drinking?

Page 65

1    Do you remember answering in part, "That
2    night he was, you know, sort of just seemed to
3    me that he was a little bit under the influence
4    just because by the way he didn't really hold
5    himself. At least it looked like he didn't
6    hold himself the same way as he usually did."
7    Do you recall that testimony?
8  A. Yes.
9  Q. Is that accurate that that night he didn't hold
10    himself the same way he usually did?
11    MR. GILLIS: Objection.
12  A. Yes. Let me just say what I just answered is
13    yes, but also, I mean, I think that this had
14    something to do with it, but what I said is
15    what I said and it is yes, but, you know, we
16    were dirt biking, and it's not, you know, when
17    I usually see him, we're dirt biking, and I
18    have never really spent that much time with him
19    not dirt biking.
20    So, you know, what I remember him holding
21    himself is from dirt biking.
22  Q. You've seen him in fights; isn't that right?
23    MR. GILLIS: Objection.
24  A. I have.

Page 66

1  Q. You've seen him at parties; isn't that right?
2  A. I remember seeing him at a party.
3  Q. You've seen him in at least one fist fight;
4    isn't that right?
5  A. I do. At that point, I was not really familiar
6    with him, but yes, that's correct.
7  Q. You testified about seeing him in a fist fight.
8    You remember that, don't you?
9  A. If I did, I did. I don't remember, but I guess
10    I did.
11  Q. Did you talk to the private investigator,
12    DiNatale, about your testimony at the
13    deposition?
14  A. This?
15  Q. Did you talk to Mr. DiNatale when he came to
16    your house about the testimony that you've
17    given at your earlier deposition?
18  A. I think he asked -- I don't think we -- No, we
19    didn't discuss, you know, what was asked and
20    what was answered in the deposition.
21  Q. Did Mr. DiNatale, for example, say to you
22    something like, "You testified at your
23    deposition that Jeff had four beers maybe at
24    the table"?

Page 6

1    MR. GILLIS: Objection.
2  A. No.
3  Q. Let's go back to what I was asking you before.
4    That night at the Longhorn, was Jeff sloppier
5    looking than he usually is?
6  A. Yes.
7  Q. Was he louder than he usually appeared to you?
8  A. Yes.
9  Q. Were his eyes glassy?
10  A. Can I use this answer because I honestly don't
11    remember?
12    MR. GILLIS: That's your answer. He can't
13    use that as his answer. It has to be his
14    memory.
15  Q. Do you have a memory?
16  A. I don't.
17  Q. Do you have a memory of whether or not Jeff's
18    eyes were glassy at all that night?
19  A. I don't.
20  Q. Can you read to yourself page 50, Line 23
21    through page 51, Line 4?
22    (Witness reviews document.)
23  Q. Have you done that?
24  A. Yes.

Page 6

1  Q. Does that refresh your memory about whether or
2    not Jeff's eyes were glassy that night at the
3    restaurant at the time you were asked to quiet
4    down?
5  A. A little bit.
6  Q. What is your memory now of whether or not
7    Jeff's eyes were glassy at the time your table
8    was asked to quiet down?
9    MR. GILLIS: Objection.
10  A. They could have been.
11  Q. They very well could have been?
12    MR. GILLIS: Objection.
13  A. They could have been, but I don't specifically
14    remember. I don't remember looking at him and,
15    you know, looking into his eyes and wondering
16    if they were glassy. As I say, they could have
17    been.
18  Q. They very well could have been?
19    MR. GILLIS: Objection, asked and
20    answered.
21  A. Yes.
22  Q. Do you have any explanation as to why you
23    testified in August of 2004 that his eyes very
24    well could have been glassy?

Page 69

1    MR. GILLIS: Objection. Are you talking
2    about the top of 51? What line are you looking
3    at?
4    MR. FARRAH: You figure it out.
5    MR. GILLIS: What line are you referring
6    to?
7    MR. FARRAH: I'm asking him a question.
8    MR. GILLIS: No, you're not. You're
9    asking him to read something in the book. Are
10   you asking him to read it?
11   MR. FARRAH: I'm asking him if he has an
12   explanation for why he testified that his eyes
13   very well could have been glassy.
14   MR. GILLIS: If you put the book in front
15   of him, I want a page reference so we can put
16   it on the record.
17   MR. FARRAH: He's already testified.
18   A. It's possible that his eyes could have been
19   glassy. That's why.
20   Q. Do you have a memory of it?
21   A. Of seeing his eyes glassy?
22   Q. Yes.
23   A. No.
24   Q. Do you have any explanation for why you

Page 70

1    testified, "They very well could have been
2    glassy"?
3    MR. GILLIS: Objection.
4    A. Other than it's possible, I don't.
5    Q. What is your best memory as you sit here today
6    as to how many Jack Daniels Manhattans that
7    Jeff had at the table?
8    MR. GILLIS: Objection.
9    A. Two.
10   Q. And the basis for that is what?
11   A. I specifically remember a round being ordered,
12   and then I see that some more were ordered, and
13   I don't know whether they were ordered in a
14   round or, you know, a few here and a few there,
15   but it looks like apparently he had another
16   one.
17   Q. That testimony is based on the fact that you
18   have now seen Exhibit 2 to your deposition; is
19   that right?
20   MR. GILLIS: Objection.
21   A. Yes.
22   Q. Before you saw Exhibit 2 to your deposition,
23   you had testified about how many Jack Daniels
24   Manhattans he had had in August of 2004; isn't

Page 7

1    that right?
2    A. Yes.
3    Q. At that time, you said two; is that right?
4    A. Yes.
5    Q. And when you gave the statement to the police
6    on November 2, 2003 which has been marked as
7    Exhibit 3 in your deposition, you had not seen
8    what has been now marked as Exhibit 2, the tab?
9    A. No.
10   Q. And at that time, you wrote that he had had
11   maybe three drinks with Jack Daniels with
12   dinner; is that right?
13   A. Yes.
14   Q. What was the basis for making that statement
15   back in November of 2003?
16   A. Well, the first one would be the round that I
17   specifically remember being ordered.
18   The second one would be when more were
19   ordered and the possibility that he drank
20   another one.
21   Q. Your memory of the events of September 26 was
22   better in November of 2003 than it is today?
23   A. Yes.
24   Q. A lot better?

Page 7

1    A. I'd say so.
2    MR. GILLIS: Objection.
3    Q. Do you remember anybody else drinking beers at
4    the table, besides Jeff?
5    A. I remember Scott having beer.
6    Q. At the table?
7    A. Yes.
8    Q. Ordered from the waitress?
9    A. I don't remember if it was ordered from the
10   waitress or ordered from the bartender.
11   Q. Do you have a memory of Jeff carrying a beer
12   from the bar over to the table?
13   A. Yes.
14   Q. And do you have a memory of Scott carrying a
15   beer over from the bar to the table?
16   A. Well, I remember seeing Jeff bringing his beer
17   over, and I remember them saying something
18   about having the tab brought over to the table.
19   I don't remember seeing Scott carry the
20   beer over to the table as I did Jeff.
21   Q. Then do you remember Jeff ordering beers while
22   he was at the table?
23   A. I don't.
24   Q. Do you remember Jeff ordering chowder while he

Page 73

1   was at the table?
2   A. I don't.
3   Q. How about fingers, whatever they are?  Do you
4       remember ordering those at the table?
5   A. I don't remember any of the specific things or
6       who or when they were ordered specifically,
7       besides the round of Manhattans.
8   Q. You remember one round of Manhattans being
9       ordered?
10  A. Yes.
11  Q. You've looked at the check, and do you see that
12      more than one round of Manhattans is reflected
13      on that check; is that right?
14  A. Yes.
15  Q. Did you discuss that at all with Mr. DiNatale?
16  A. Yes.
17  Q. What did he say and what did you say about
18      that?
19  A. Well, he asked me what I remember being ordered
20      in reference to the Manhattans, and I told him
21      I remembered the first round of drinks being
22      ordered and that I remembered more being
23      ordered, but I don't know whether they were in
24      a round or individuals ordered them or, you

Page 74

1   know, this side of the table said we'll take
2   another round or how it exactly came about.
3   Q. What did he say?
4   A. Well, he pointed out that the first one looked
5       like it was a round ordered, and he said that
6       there were more ordered and that it looked
7       like, you know, if going with the round that
8       was first ordered that each person would have
9       had another one.
10  Q. So did he say anything else about the Jack
11      Daniels that were ordered?
12  A. I remember him asking me how many people I
13      specifically remembered being there with
14      reference to how many drinks were ordered.
15  Q. What did you tell him?
16  A. I told him that I remembered besides myself, I
17      remembered Scott Espy, Jeff Southworth, Michael
18      Espy, Todd Perry, and then two other people
19      whom I didn't know.
20      I believe I referred to them as one was a
21      snowmobiler and one I remember them calling him
22      Fat Matt.
23  Q. Who called him Fat Matt?
24  A. Everyone.  I didn't call him -- They referred

Page 7

1   to him as Fat Matt.  They didn't call him Fat
2   Matt.
3   Q. So he asked you how many people were there at
4       the table.
5       So does that mean including yourself,
6       there were seven people at the table?
7   A. That I remember.
8   Q. You don't remember any other people, do you?
9   A. No.
10  Q. You had two tables pulled together for your
11      party; is that right?
12  A. Yes, I believe it was at least two tables.
13  Q. And you were sitting across from Jeff; is that
14      right?
15  A. Yes.
16  Q. And you had nothing obstructing your view of
17      Jeff; is that right?
18  A. Correct.
19  Q. What I want to know is, where is the first
20      round of Manhattans that is on Exhibit 2?
21      Which is the first round of Manhattans that
22      you're referring to?
23  A. It has to be this one.
24  Q. Okay, and you're pointing to the 8:51 round; is

Page 7

1   that right?
2   A. Yes.  I see there are some ordered before that.
3       I mean, I must be wrong in saying the first
4       time it was ordered it was not a full round.
5       That's what I remembered.
6   Q. I want to know what you remember talking to
7       Mr. DiNatale about as it relates to the
8       Manhattans, the rounds of Manhattans that were
9       ordered.
10  A. I remember telling him that a round was
11      ordered, and then there were more ordered, and
12      they went around to the different people that
13      were at the table, and he, once again, asked me
14      who I remembered at the table, and then he, you
15      know, kind of did like some calculation and
16      added up all the Jack Daniels that were
17      ordered, which I cannot remember how many there
18      were, and he asked me what -- No, I don't
19      remember what he asked me.
20      He just made reference to, you know, there
21      were seven people that I remembered being
22      there, and then there were this many Jack
23      Daniels ordered.
24  Q. After he had calculated the number of people at

**Page 77**

1    the table and the number of Jack Daniels that
2    were ordered, did he do anything with those
3    calculations?
4    A. Well, he asked me if I remembered them being
5    rounds and I said yes.
6    Q. What did you say?
7    A. He asked me how I remembered them being ordered
8    and I told him, you know, rounds, and then he
9    told me, "All right. So there's this many
10   people at the table and a round is ordered and
11   then another round is ordered," and then I
12   believe there were I'm not sure how many.
13       I don't remember the number, but I don't
14   believe that accounted for all of them.
15   Q. So did he interpret that for you at all?
16       MR. GILLIS: Objection.
17   A. No, not that I remember.
18   Q. I'm going to represent to you that there were
19   seventeen Jack Daniels drinks ordered.
20       Does that sound like the number that
21   Mr. DiNatale shared with you?
22   A. Yes.
23   Q. There were six people, according to your
24   testimony, who were of drinking age --

**Page 78**

1    A. Okay.
2    Q. -- at table that night. Does that sound like
3    what you and Mr. DiNatale talked about?
4    A. Yes.
5    Q. Did he talk at all about the relationship
6    between seventeen Jack Daniels Manhattans and
7    six people of drinking age at the table?
8    A. Well, I believe that he told me that if what I
9    remember was being ordered as rounds, then
10   there were unaccounted-for drinks.
11   Q. Unaccounted-for drinks?
12   A. Yes.
13   Q. What did he mean by that?
14       MR. GILLIS: Objection.
15   A. Drinks that I said I remembered a round being
16   ordered and then more rounds and I guess
17   another round was ordered, and I didn't
18   specifically say another round being ordered,
19   but there were more drinks ordered to the
20   table.
21   Q. He pointed that out to you?
22   A. Yes.
23   Q. What did he say about that?
24   A. I don't remember. I mean, I don't remember

**Page 7**

1    exactly what he said.
2        He said that there were -- I believe he
3    asked me who had them, and I told him that I
4    didn't remember.
5    Q. But you know you didn't have any; is that
6    right?
7    A. Yes.
8    Q. Okay, and Scott, Jeff and you were seated
9    before the others arrived; is that right?
10   A. No.
11   Q. Just before the others arrived?
12   A. We were seated -- Well, I honestly don't
13   remember at this point. I remember them coming
14   in the door.
15       I don't remember whether we sat down right
16   before them or if we all sat down right
17   together.
18   Q. And do you remember the first order of Jack
19   Daniels, that is, how many were ordered?
20   A. I remember a round being ordered.
21   Q. Who ordered it?
22   A. I think Jeff did.
23   Q. You'd seen Jeff drink Jack Daniels Manhattans
24   before?

**Page 8**

1        MR. GILLIS: Objection.
2    A. No.
3    Q. How are the Jack Daniels Manhattans served --
4    on the rocks or straight up?
5    A. I don't know.
6    Q. Do you know the difference?
7    A. Yes; one has ice and one doesn't.
8    Q. So it's your best memory that Jeff ordered the
9    first round of Jack Daniels Manhattans?
10   A. Yes.
11   Q. At the time he ordered those Jack Daniels
12   Manhattans, did he also order a beer?
13       MR. GILLIS: Objection.
14   A. I can't say for sure.
15   Q. Can you describe the waitress?
16   A. I remember her being a woman, and I remember
17   her having blonde hair.
18   Q. Tall? Short?
19   A. I don't know.
20   Q. Older or younger than the barmaid?
21   A. Well, I don't really remember the bartender
22   that well. So I don't really know how to base
23   an answer on that.
24       I remember her being like maybe in her

Page 81

1    mid-twenties.
2    Q. Who are we talking about?
3    A. The waitress.
4    Q. Do you remember the age of the barmaid?
5    A. No.
6    Q. Do you have any memory of the age of the
7    barmaid?
8       MR. GILLIS: Objection.
9    A. No.
10   Q. Is your memory exhausted as to the age of the
11   barmaid?
12   A. Yes.
13   Q. Can you turn to page 35, please, the bottom.
14   Just read 18 to 24 to yourself.
15      (Witness reviews document.)
16   A. Okay.
17   Q. Does reading that refresh your memory as to how
18   old the barmaid was?
19   A. Not specifically.
20   Q. Do you have any reason to doubt that your
21   testimony back in August about her age was
22   accurate?
23      MR. GILLIS: Objection.
24   Q. August of 2004.

Page 82

1       MR. GILLIS: Objection.
2    A. I'm sure whatever I said here is what I
3    remembered. I don't remember it now.
4    Q. When you say "here," you mean in your
5    deposition of August of 2004?
6    A. Correct.
7    Q. And do you remember anyone at the table after
8    Jeff ordered the first round of Jack Daniels
9    Manhattans, do you remember anyone at the table
10   saying anything about the delay in receiving
11   the drinks?
12   A. No.
13   Q. And how long after you had sat at the table was
14   it that the first round was ordered by Jeff?
15   A. I don't know.
16   Q. And do you have a memory as you sit here today
17   that a second round of Jack Daniels Manhattans
18   was ordered?
19   A. Yes.
20   Q. By Jeff?
21   A. I can't say that for sure.
22   Q. Who do you remember ordered the second round?
23      MR. GILLIS: Objection.
24   A. I don't recall who specifically ordered it.

Page 8

1    Q. What was the basis for your memory that a
2    second round of Jack Daniels was ordered?
3    A. Well, I remember more Jack Daniels at the
4    table, and this exhibit shows that there were
5    more.
6    Q. Exhibit 2?
7    A. Yes.
8    Q. Do you have a memory that a third round of Jack
9    Daniels Manhattans was ordered?
10   A. No.
11   Q. Do you have a memory that there was a third
12   instance where Jack Daniels Manhattans were
13   ordered?
14      MR. GILLIS: Objection.
15   A. I do not remember. It is apparent that there
16   was. I just don't specifically remember.
17   Q. Do you remember talking to Mr. DiNatale about
18   that?
19   A. A third?
20   Q. Yes, a third round of Jack Daniels Manhattans
21   being ordered.
22   A. I don't remember him saying anything about a
23   third round. I remember him talking about --
24   as I referred to before -- the unaccounted-for

Page 8

1    drinks.
2    Q. When the check came to the table, did it come
3    to Jeff?
4    A. I don't know. It was put on the table.
5    Q. Jeff paid for you that night; is that right?
6    A. Correct.
7    Q. When the person came over and told the table to
8    quiet down, what is your best memory of who
9    that person was, what that person looked like?
10      MR. GILLIS: Objection.
11   A. I don't really remember. I just remember
12   someone came over and asked the table to, you
13   know, be a little bit quieter.
14   Q. A man? A woman?
15   A. I don't remember specifically. I'm not
16   supposed to guess.
17   Q. Is that because Mr. Gillis tells you not to
18   guess?
19   A. No. I don't think that I should guess.
20   Q. Mr. DiNatale told you not to guess, right?
21   A. He did tell me not to guess, but if I don't
22   know the truth, not to come up with one.
23   Q. What do you remember whoever the person was
24   that came over to the table saying about

Page 85

1    quieting down?
2        MR. GILLIS: Objection.
3    A. I just remember them asking us to tone it down
4      a little bit.
5    Q. Do you remember to whom at the table that
6      person spoke or with whom at the table that
7      person spoke?
8    A. As far as I remember, it was speaking to the
9      whole table.
10   Q. You could hear that person?
11   A. Yes.
12   Q. How far away were you from the other end the
13     table, the furthest end away from you?
14   A. Well, the way I remember it --
15   Q. Let's look at Exhibit 1, if that helps you.
16   A. Could I use the pen for a minute?
17   Q. If you're going to write on something, why
18     don't you --
19   A. I can explain it, but it would be a lot easier.
20   Q. Here's a blank one for you.
21   A. This section right here is where we sat. There
22     weren't four tables there.
23        What I remember is, if you just imagine,
24     this is the table that everyone sat at, whether

Page 86

1      it be one, two or three or how many tables.
2        I remember Scott sitting on the end and
3      Jeff sitting here and I was sitting here. I
4      don't specifically remember what the order of
5      the other people was.
6        So I believe that there would be two more
7      people, and then at the end of the table
8      someone else would be right there on the other
9      end. So I would be two seats away.
10   Q. Do you remember anyone seated to your right?
11   A. Besides Scott, no.
12   Q. Well, am I wrong that this is you right here?
13   A. No. That's Jeff. I'm facing this way.
14   Q. Do you remember anyone seated to your left?
15   A. Yes.
16   Q. Who?
17   A. I don't know who.
18   Q. You were not drinking any alcoholic beverages
19     that night, were you?
20   A. No.
21   Q. Do you have any explanation for who drank the
22     seven Jack Daniels Manhattans that were
23     ordered, according to Exhibit 2, at 8:51 p.m.?
24   A. Well, that was the round. I honestly don't

Page 8

1      know exactly how it happened, but I remember,
2      you know, whoever ordered the first round,
3      which I believe was Jeff, ordered a round, and
4      the waitress came over and put them down, and
5      you know, then they were drinking.
6        I guess if she ordered seven, then she
7      counted the number of people that were at the
8      table and brought over seven. That would be my
9      accounting for those.
10   Q. You remember Jeff saying words to the effect
11     "Bring us a round of Jack Daniels Manhattans"?
12   A. Yes.
13   Q. And do you remember Jeff at that time ordering
14     for you something to drink?
15   A. I think I already had a drink at that point.
16   Q. From the bar?
17   A. Yes, I guess. Well, I can't say that, sorry.
18   Q. So my question is, do you remember Jeff
19     ordering a drink for you?
20        MR. GILLIS: Objection.
21   Q. By "a drink," I don't mean an alcoholic
22     beverage. I mean something to drink.
23   A. No. I'm pretty sure she asked me what I wanted
24     and I ordered it.

Page 8

1    Q. The waitress?
2    A. Yes.
3    Q. Now, when the first round came, was there some
4      discussion about that there was an extra drink
5      there?
6    A. I don't remember any discussion. I suppose
7      since there was an extra drink that -- I don't
8      remember anything.
9    Q. Do you know who drank the extra drink?
10        MR. GILLIS: Objection.
11   A. No.
12   Q. Did Mr. DiNatale tell you that Table 52
13     reflected the table that you were at that
14     night?
15   A. Yes.
16   Q. He told you that; is that right?
17   A. Yes. He also said this, which I don't think I
18     mentioned before.
19        He asked me when he was speaking to me
20     about the unaccounted-for drinks. He asked me
21     if I remembered an eighth person, which I told
22     him I didn't remember an eighth person. Those
23     were the people that I remembered.
24   Q. Did he tell you that there was an eighth person

Page 89

1    at the table?
2    A. He didn't tell me that there was an eighth
3    person at the table.
4    Q. Did you suggest that there was an eighth person
5    at the table?
6        MR. GILLIS: Objection.
7    A. Well, what he did is he did the same thing as
8    he did with the seven people at the table with
9    eight people at the table, leaving less
10   unaccounted-for drinks.
11   Q. Try to tell me what you remember him saying
12   about doing the same thing with eight people at
13   the table as he had done with seven people at
14   the table.
15   A. If there were seventeen drinks and there were
16   six other people and me, if there were seven
17   people that would be one round would be six,
18   second round would be twelve, leaving five
19   unaccounted-for drinks.
20   Q. That's what he called them?
21   A. I don't know what he called them. That's what
22   I'm calling them.
23   Q. What did he call them?
24   A. I don't remember.

Page 9

1    A. Yes.
2    Q. Did you discuss that with him?
3    A. Other than him counting it up and asking me how
4    many beers I thought were drinking throughout
5    the evening, no.
6    Q. Did Mr. DiNatale discuss with you at all how a
7    check is generated at the Longhorn Steakhouse?
8    A. Yes. He said that they have to enter it -- the
9    waitress, that is. Each waitress, dealing with
10   each table, has to log it into a computer.
11   Q. So he explained that to you; is that right?
12   A. Yes.
13   Q. What else did he tell you about how the check
14   is generated?
15   A. That's all I remember him telling me. He said
16   the last one out reflects everything, but I
17   don't remember anything else.
18   Q. And do you have a memory that Jeff ordered at
19   the bar chowder?
20   A. No.
21   Q. Fingers?
22   A. No.
23   Q. Any food at the bar at all?
24   A. No.

Page 90

1    Q. What did he say about the five what you've
2    called unaccounted-for drinks?
3    A. I don't know. I just remember him asking me if
4    there was a possibility that there was another
5    person, and then him doing the same
6    calculation.
7        So there would be seven other people than
8    me, so the first round seven, second round
9    fourteen, leaving three unaccounted-for drinks,
10   as what I'm calling them.
11   Q. But he went through that calculation with you?
12   A. I don't know if he went through that
13   calculation. He said there would be less other
14   drinks -- less drinks that I'm calling
15   unaccounted-for.
16   Q. Did you discuss with Mr. DiNatale the 8:40
17   order?
18   A. I believe so.
19   Q. What did he say about the 8:40 order?
20   A. He may have said something else, but what I
21   remember is he was just counting them up,
22   including all the other ones.
23   Q. The 8:40 order reflects a beer as well as
24   Manhattans; isn't that right?

Page 9

1    Q. At any time that night while you were at the
2    restaurant, did anyone get up and leave the
3    table?
4    A. Yes; specifically, Jeff.
5    Q. When did he get up and leave the table?
6    A. It was some point after we had been served our
7    dinner.
8    Q. And where did he go?
9    A. He went to the bathroom.
10   Q. And how do you know that?
11   A. Well, our location where our table was was
12   relatively close to the bathroom, and I saw him
13   walk over and use the bathroom.
14   Q. And did you see him come back to the table?
15   A. Yes.
16   Q. Did anybody else get up at any point in time
17   and leave the table that you recall?
18   A. Not specifically. I'm sure if someone had to
19   go and get up and use the restroom they did,
20   but I remember Jeff doing that and not anyone
21   else.
22   Q. What did you have to eat that night?
23   A. I'm pretty sure that I had ribs.
24   Q. Anything else?

Page 93

1  A. No.
2  Q. Did you all order food at the same time,
3     everybody at your able?
4  A. I'm pretty sure.
5  Q. Did you have any discussions with Mr. DiNatale
6     about how many meals were ordered by this
7     table?
8  A. No.
9  Q. Have you looked at Exhibit 2 to see how many
10    meals were ordered by this table?
11 A. No.
12 Q. Did everybody eat? As far as you know, did
13    everybody order a meal?
14 A. I believe so.
15 Q. Now, do you remember Jeff, while you were
16    sitting at the table, ordering a beer?
17 A. I don't specifically remember him ordering a
18    beer at the table.
19 Q. But you remember him drinking a beer at the
20    table; is that right?
21 A. Yes.
22 Q. Do you remember him drinking more than one beer
23    at the table?
24    MR. GILLIS: Objection.

Page 94

1  A. I cannot say that for sure.
2  Q. You have no memory today; is that right?
3  A. Right.
4  Q. You had a memory in the past but not today?
5     MR. GILLIS: Objection.
6  A. Yes.
7  Q. Now, did Mr. DiNatale and you discuss, when you
8     were reviewing Exhibit 2, that it seems to
9     reflect that at 9:21 p.m. four Jack Daniels
10    Manhattans were ordered?
11 A. Okay.
12 Q. Did you discuss that?
13 A. I believe so.
14 Q. Is that right, did you?
15 A. Yes.
16 Q. What did he say and what did you say about
17    that?
18 A. Well, when I mean discuss it, we didn't discuss
19    this order in particular. We discussed all of
20    them together.
21 Q. My question to you is, can we agree, I guess
22    initially, that Exhibit 2 shows that at 9:21
23    four Jack Daniels were ordered by the table?
24 A. Yes.

Page 9

1  Q. Did you discuss that with him?
2  A. Yes.
3  Q. Here's four that were ordered?
4     MR. GILLIS: Are you asking did he discuss
5     that specific round?
6     MR. FARRAH: That's right, that specific
7     round, 9:21.
8  A. He made reference to that login saying four
9     rounds were ordered, but we never discussed
10    each of these.
11    Then this next one there was 9:24, that
12    one and then the next or whatever happened
13    about that. We didn't discuss each of them.
14    We discussed all of them.
15    He went through and he said this one at
16    this time these were ordered, and at this time
17    these were ordered and at this time these were
18    ordered.
19 Q. He's telling you this; is that right?
20    MR. GILLIS: Objection.
21 A. Yes.
22 Q. What is he saying about it, besides telling you
23    this?
24 A. He was just using those as evidence for how

Page 9

1     many Manhattans were ordered to the table,
2     trying to come up with, you know, how many
3     drinks were drinking by each person.
4  Q. Did he ever say words to the effect, "If you
5     divide seventeen by six you get almost three"?
6     MR. GILLIS: Objection.
7  A. No.
8  Q. What did he say about trying to figure out how
9     many drinks were drunk by each person?
10 A. I think he was trying to account for which
11    drinks were drinking by which people and how
12    many drinks each person had, but I don't
13    remember who had what drink and how many each
14    person had.
15 Q. Do you remember anyone at the table appearing
16    drunk to you that night?
17    MR. GILLIS: Objection.
18 A. No.
19 Q. How about the Espy who was not there with you
20    that night? Did he appear under the influence
21    to you?
22 A. Not particularly.
23 Q. Have you ever spoken with him since this
24    incident?

Page 97

1  A. You mean since that night?
2  Q. Since that night.
3  A. Yes.
4      MR. GILLIS: The Espy?
5  Q. The Espy that was not dirt biking with you.
6  A. Yes.
7  Q. Did you learn from speaking with him that he
8     had been drinking beers in the hotel room with
9     his two other friends that afternoon?
10     MR. GILLIS: Objection.
11 Q. After September 26 did you learn?
12 A. After the restaurant when we left the
13    restaurant?
14 Q. No. In your conversations with Mike Espy after
15    September 26, 2003, did he ever tell you that
16    he had been drinking beers that afternoon,
17    September 26, 2003, before going to the
18    restaurant with two of his friends?
19 A. Before the restaurant?
20 Q. Yes.
21 A. No.
22 Q. He didn't tell you that?
23 A. No.
24 Q. Did he tell you what he had been doing that

Page 98

1  afternoon before he came to the restaurant?
2  A. I mean, when you said I've spoken with him,
3     I've spoken with him because my brother is
4     friends with him.
5      He's a little bit closer in age to some of
6     these kids, and he every once in a while will
7     hang out with them.
8      I actually play on an indoor soccer team
9     with Scott, and his brother will come every
10    once in a while and I'll speak to him, but we
11    never discussed that night.
12 Q. Who have you discussed that night with?
13 A. Other than you and people that I have been
14    deposed to talk to or the grand jury or
15    Mr. DiNatale or the state police or anyone else
16    that had me come in and talk to them.
17 Q. You have not spoken to Mr. Gillis prior to
18    today, have you?
19 A. No.
20 Q. How about anyone from his office? Have you
21    spoken to anyone from his office prior to
22    today?
23 A. No.
24 Q. Are you sure?

Page 99

1  A. Well, I don't know. I mean --
2  Q. Have you spoken to anybody, other than
3     Mr. DiNatale?
4  A. I know what you're talking about. I spoke
5     to -- I just didn't think he was in the same
6     office.
7      I spoke to Mr. Parkinson. I thought he
8     was in a different office.
9      MR. GILLIS: Let's put on the record
10     there's no one named Parkinson in my office.
11 Q. When did you speak to Mr. Parkinson?
12 A. It was sometime during last semester.
13 Q. Last semester being the semester that ended
14    when?
15 A. About December 21.
16 Q. Of 2005?
17 A. Yes.
18 Q. And your best memory of when it is that you
19    spoke to Mr. DiNatale is when?
20 A. It was over break.
21 Q. Is that after December 21, 2005?
22 A. Yes.
23 Q. When is your best memory?
24 A. Let me think for a minute. I went on vacation.

Page 100

1  I had to reschedule this because I was going on
2  vacation just after New Year's, and I remember
3  speaking to him like on the phone.
4      He was saying that I want to meet with
5  you, and then I went on vacation and it was
6  probably two weeks after that, I want to say.
7  Q. When did you come back from vacation?
8  A. I came back, I think like -- Does anyone have a
9     calendar?
10 Q. Give me your best estimate.
11 A. It was probably the eighth of January.
12 Q. And approximately two weeks after that you
13    spoke to Mr. DiNatale; is that right?
14     MR. GILLIS: Objection.
15 A. Yes. So I guess I said it was a month ago, but
16    I guess it was not a month ago.
17 Q. Mr. Parkinson is someone you spoke to before
18    the end of the semester; is that right?
19 A. Correct.
20 Q. The semester ended December 21. What is your
21    best memory of when you spoke to Mr. Parkinson?
22 A. I can't say for sure. I know I met with him
23    two different times, and the first time he
24    asked me some questions about that night, and

Page 101

1   he came up with an affidavit, something similar
2   to this, and then he sent it to me, and he
3   wanted me to return it, but then he called me
4   and said, "I'll just meet you again to get it
5   from you," so he could see me sign so I don't
6   have to go to the notary.
7      So then I met with him again, and then he
8   had to make like a new one or he had to change
9   something.
10     I remember what it was.  He said we were
11  dirt biking in Leominster, and I wanted him to
12  change it to Templeton, and I had to go to the
13  notary and send it to him.
14  Q. And who did you understand Mr. Parkinson was
15     working for?
16  A. He said that he was representing Rare
17     Hospitality.
18  Q. What is your best memory of when you met with
19     Mr. Parkinson?
20  A. Maybe mid November, early November.
21  Q. And where did you meet with him?
22  A. In Leominster at the restaurant Panera Bread.
23  Q. P-a-n-e-r-a?
24  A. Yes.

Page 102

1   Q. And who else was there?
2   A. It was just me and Mr. Parkinson.
3   Q. How old is Mr. Parkinson?
4   A. I don't know.
5   Q. Did he give you a card?
6   A. No.  He wrote down a cellphone number, and he
7      didn't give me a card.
8   Q. Do you still have that information?
9   A. No.
10  Q. You threw it away?
11  A. I just lost track of it.
12  Q. How long were you with him that first time?
13  A. Well, we met over lunch, so maybe thirty-five
14     minutes or so.
15  Q. He paid for lunch?
16  A. Yes, he did.
17  Q. And he was taking notes of your conversation?
18  A. He was.
19  Q. What was he talking to you about?
20  A. Well, he just sort of wanted me to run through
21     the events as I remembered them.
22  Q. Did he refer to your testimony in the grand
23     jury at all?
24  A. I don't remember him referring to -- I remember

Page 10

1   him just sort of having a notepad, and I went
2   through the events of the night, and I'm pretty
3   sure that is all we did.
4   Q. Do you remember him referring to your
5      deposition testimony at all?
6   A. No.
7   Q. Do you remember him referring to the statement
8      you gave the police which has been marked as an
9      exhibit in your deposition today, Exhibit 3?
10  A. I kind of remember him mentioning that.  We
11     didn't discuss it, but I remember him
12     mentioning that I had made a statement to the
13     state police.
14  Q. Do you remember him mentioning the affidavit
15     that you made in the other case which has been
16     marked as Exhibit 4 today?
17  A. Well, I remember him saying that or him asking
18     me who I have spoken with or who have I been
19     deposed by, and I told him I came in here once
20     and that I had done the grand jury thing.
21  Q. Did he say whether or not he knew you had been
22     deposed before?
23  A. No.
24  Q. Did he seem surprised when you told him you had

Page 10

1   come in here and been deposed?
2   A. No.
3   Q. Did he seem surprised when you told him that
4      you had done the grand jury thing?
5   A. No.
6   Q. And you were with him thirty-five minutes or
7      so; is that right?
8   A. Around then.
9   Q. Tell me what you remember him saying and what
10     you remember yourself saying during that
11     meeting.
12  A. Well, I remember we kind of introduced
13     ourselves.  We didn't know each other, and he
14     asked me a similar scenario to when I meet with
15     people I don't know.  They ask me if I'm in
16     school, what I'm studying, what kind of things
17     I like to do.
18        He mentioned that he just moved up here
19     with I don't know whether it was his wife or
20     fiancee, and I asked him if he had been skiing
21     and such and he said a little bit, and he asked
22     me where any good places were.
23  Q. To do what?
24  A. To go skiing, and I mentioned a few places that

Page 105

1    I liked, and then he, you know, he told me that
2    he wanted me to run through the course of the
3    evening as I remembered it.
4    Q. So what did you do?
5    A. I basically just told him what I remembered,
6    starting just from when I went to the dirt bike
7    track until Scott dropped me off.
8    Q. And what did he say during that?
9    A. He didn't really say much. He just let me
10    talk.
11    Q. Just took notes?
12    A. Yes.
13    Q. Didn't ask you any questions?
14    A. He may have. I don't remember him specifically
15    asking any questions.
16    Q. You just talked?
17    A. Yes.
18    Q. He said, "What happened? Tell me what
19    happened"?
20    A. Yes. I remember him saying that he wanted to
21    hear the whole story from me as I remember it.
22    So he just let me go through the events.
23    Q. And did he stop you at any point to ask you
24    questions, like how much did Jeff have to

Page 10

1    Q. So when he told you that you were going to be
2    asked when you go into the deposition how much
3    Jeff had to drink, did he say anything else
4    about that?
5    A. I believe he asked me if I remembered any, you
6    know, noticeable signs of him being drunk or --
7    Q. "Noticeable signs"? Is that what he said?
8    A. I don't know how he stated it.
9    Q. What did you say?
10    A. I believe I told him that I didn't see any
11    clear signs of him being drunk.
12    Q. What else did he say about that?
13    A. Well, I don't know. I don't remember. I
14    remember that.
15    Q. What else do you remember him saying that day?
16    A. I remember him saying that I, being the one
17    that had not been drinking that night, was kind
18    of a big factor in what, I guess, the final
19    decision, how the case plays out.
20    Q. He told you that?
21    A. Yes. One thing I remember specifically about
22    when I met with John DiNatale, I remember him
23    specifically mentioning these words.
24        He said, "Tell the truth and let the cards

Page 106

1    drink?
2    A. Yes, he did. Well, I don't know if he asked me
3    that question.
4        I remember him stopping and asking me
5    like, you know, you're going to be asked when
6    you go into your deposition how many drinks
7    Jeff had and such, when I got to that point in
8    the narrative.
9    Q. He told you that you would be asked that during
10    the deposition; is that right?
11    A. Yes.
12    Q. And what did he say about that?
13    A. He told me that what I remembered is what I
14    needed to tell.
15    Q. Now, did you tell him at that point that you
16    had already been deposed and told what you
17    remembered back in August of 2004?
18        MR. GILLIS: Objection.
19    A. I don't think so. I don't think I made
20    reference to that.
21        I think I might have said, "Well, I have
22    already been deposed." I honestly don't know.
23        I never told him that "I said this"
24    because I didn't remember.

Page 10

1    fall where they will."
2    Q. Did you need DiNatale to tell you to tell the
3    truth?
4        MR. GILLIS: Objection.
5    A. No.
6    Q. Tell me what else Mr. Parkinson -- By the way,
7    I asked you how old he was. He never gave you
8    a card?
9    A. No, he didn't.
10    Q. Never told you where he worked?
11    A. Well, he told me that he had just moved up
12    here, and he said where he was living, but I
13    don't remember.
14        He said he was working in Boston or
15    Cambridge or somewhere.
16    Q. Working for Rare or representing Rare?
17    A. Yes.
18    Q. Did he tell you that he was a lawyer?
19    A. Yes, an attorney or lawyer. He said he was
20    representing Rare Hospitality.
21    Q. Your best memory is that this conversation
22    occurred in November?
23    A. Yes.
24    Q. And what else did you say to him or he say to

Page 109

1   you during that Panera Bread meeting?
2   A. Well, he wanted to make sure that after I had
3   gone through my narrative that he asked me if
4   that's how I remember it and if there's
5   anything else I remembered.
6         He wanted to make sure that I had told the
7   story as I remembered it, and that was pretty
8   much it.
9   Q. Then he met with you a second time; is that
10  right?
11  A. He did.
12  Q. And how long after the first visit was it that
13  you met with Mr. Parkinson again?
14  A. Maybe like two weeks.
15  Q. Where was that meeting?
16  A. It was the same place.
17  Q. Lunch again?
18  A. Yes.
19  Q. Mr. Parkinson paid again?
20  A. Correct.
21  Q. And did he have a document for you at that
22  time?
23  A. He had talked to me on the phone, and I told
24  him that I wanted to make some changes, and

Page 110

1   then he brought the document down so that I
2   could make the changes and tell him what I
3   wanted to change.
4   Q. So am I correct that in between the first
5   meeting at Panera Bread and the second meeting,
6   he sent you a document somehow?
7   A. No. If I said that, that's incorrect. He sent
8   it after the second meeting.
9   Q. There was a second meeting with him?
10  A. Yes.
11  Q. At the second meeting, did he have a document
12  with him?
13  A. Yes.
14  Q. Did you read the document at the second
15  meeting?
16  A. Yes.
17  Q. There were things in it that were not right?
18  A. Yes. As I told you before, he made the
19  mistake. It's not essential, but I wanted it
20  to be right.
21        He said we were dirt biking in the
22  Leominster area, and I said well, it was
23  technically in Templeton.
24        So he said he wanted to make sure it was

Page 111

1   all correct. He wanted to have it done.
2   Q. Were there any other changes he wanted made in
3   that document?
4   A. No.
5   Q. Did the document speak to how much Jeff had to
6   drink that night?
7   A. Yes.
8   Q. And did the document speak to how much he had
9   at the bar?
10  A. Yes. I think it more generally spoke about
11  everything he had to drink as opposed to what
12  he drank here and at the table.
13  Q. At the second meeting with Mr. Parkinson, did
14  you discuss with him that you had already given
15  statements, either in writing or under oath,
16  before the grand jury or at a deposition about
17  how much Jeff had to drink?
18  A. What do you mean by "discussing"?
19  Q. Well, was there any discussion about whether or
20  not the document that Mr. Parkinson wanted you
21  to sign was going to align with the statements
22  you had given earlier both in the grand jury
23  and at deposition under oath and the written
24  statements?

Page 112

1   A. When I ran through the narrative, I'm pretty
2   sure I remember him saying, "Well, you know
3   what you said here is along the lines of what
4   has been said in the grand jury and what other
5   people have said." It was something along the
6   lines of that.
7   Q. Well, were you concerned at all with respect to
8   the Parkinson document about whether or not
9   what you were saying in the Parkinson document
10  was going to align with what you had testified
11  to at your deposition back in August?
12  A. Well, I didn't really remember what I had said
13  in the deposition. So I could not really make
14  a judgment on if there were going to be
15  differences.
16        I just assumed that there was going to be
17  what I thought happened.
18        MR. FARRAH: Why don't we take a break?
19        (Luncheon recess.)
20
21
22
23
24

## Page 113

AFTERNOON SESSION

Q. So you had a second meeting with Mr. Parkerson; is that correct?

A. Yes.

Q. And he presented you with a document to sign at that meeting?

A. Yes, he did.

Q. You didn't like some of the things that were in it; is that right?

A. Yes.

Q. So what did you do after that with respect to Mr. Parkerson?

A. He went back to his office, and I'm not sure what the time frame was, and he came up with a new one and sent it to me, and I had to bring it to the notary, sign it, and send it back to him.

Q. Did you do that?

A. Yes.

Q. Did you keep a copy of that document?

A. No, I don't think so.

Q. And did you ever hear from Mr. Parkerson again?

A. No.

## Page 114

Q. Now, do you remember testifying before the grand jury?

A. Yes, I do.

Q. Do you remember being asked the question, "When you were seated once your table was available, do you know if you checked out at the bar, or did the tab move to the table?"

Do you remember being asked that question?

MR. GILLIS: What page are you reading from?

MR. FARRAH: 17.

A. I don't know.

Q. Do you remember your answer? Can you read it into the record?

A. "I'm pretty sure we checked out at the bar."

Q. And do you have any explanation as to why your testimony is now different from what you testified to the grand jury on the question of whether or not the bar tab went to the table?

MR. GILLIS: Objection.

A. No.

Q. Do you remember being asked the question before the grand jury, "What do you believe Jeffrey Southworth had to drink at the table that

## Page 115

night?"

MR. GILLIS: Page, please?

MR. FARRAH: 19.

Q. Do you see that question?

A. Yes.

Q. Do you remember your answer? Can you read it for the record?

A. "I would say that he probably, that he had probably two to three beers and a couple of Manhattans. I would say he had two beers, maybe three. I can't specifically recall."

Q. Let's try that one more time. Could you read it again?

A. "I would say he had probably two to three beers and a couple of Manhattans. I would say he had two, maybe three. I can't specifically recall."

Q. And when you were saying "two, maybe three," were you referring to Manhattans in your grand jury testimony?

A. I don't know.

Q. Do you have any explanation as to why your testimony today with respect to how many beers he drank at the table that night is different

## Page 116

from what you testified to before the grand jury?

MR. GILLIS: Objection.

A. The bill.

Q. Seeing the bill with Mr. DiNatale?

A. Just seeing the bill, I mean, shows that there are two.

Q. Two beers that were served at the table?

A. Yes.

Q. One at 8:40 and the other one at 9:15?

A. Correct.

Q. What is it about those two beers that were served at the table that is inconsistent with your testimony before the grand jury that Jeff probably had two to three beers with dinner at the table?

A. Well, I said that there were two to three beers drinking at the table, and there were only two beers ordered to the table.

So I know that the three is out of the question, and I believe that Scott was drinking beer at the table as well.

So I can't say for sure, but I presume that one of the beers ordered at the table in

Page 117

1    Exhibit 2 went to him but I didn't log it in.
2    I can't say for sure.
3    Q. You presume one of the beers that is shown on
4    Exhibit 2 went to him while he was at the
5    table?
6    A. Yes.
7    Q. And the other beer, you presume, went to Jeff
8    while he was sitting at the table?
9        MR. GILLIS: Objection.
10    A. Yes.
11    Q. So help me out with your testimony this morning
12    that you had discussions with Mr. DiNatale
13    about the beers reflected on Exhibit 2 are the
14    beers that were served at the bar.
15    A. What is that again?
16    Q. Before you saw what has been marked as
17    Exhibit 2, you testified at the grand jury that
18    your best memory was Jeff had two to three
19    beers while he was sitting at dinner; is that
20    right?
21        MR. GILLIS: Objection.
22    A. Yes.
23    Q. Do you see it?
24    A. Yes.

Page 118

1    Q. Before you saw Exhibit 2, you testified at your
2    deposition that Jeff had maybe four beers while
3    he was sitting at the table; is that correct?
4        MR. GILLIS: Objection.
5    Q. Do you remember that testimony?
6    A. Yes. It's in here.
7    Q. And before you saw Exhibit 2, you gave a
8    written statement to Trooper Sullivan, which
9    has been marked as Exhibit 3 in this
10    deposition, that Jeff had a couple of beers,
11    maybe two, and three drinks at dinner. Do you
12    see that?
13    A. Yes.
14    Q. And is it accurate to say that except for what
15    you believe Exhibit 2 shows, your earlier
16    testimony regarding the number of beers he had
17    at the table is your best memory of what he had
18    at the table?
19        MR. GILLIS: Objection.
20    A. Yes.
21    Q. Before you saw Exhibit 2, your best memory
22    regarding the number of Jack Daniels Manhattans
23    that Jeff had with dinner is what is reflected
24    in your grand jury testimony and your

Page 11

1    deposition; is that right?
2    A. Yes.
3    Q. And before you saw Exhibit 2, your best memory
4    about how many beers Jeff had at the bar is
5    what is reflected in your deposition; is that
6    right?
7        MR. GILLIS: Objection.
8    A. Yes.
9    Q. Now, Exhibit 2 indicates that the check was
10    paid at 9:57 p.m. Do you see that?
11    A. Yes.
12    Q. And after paying the check, where did you go?
13    I'm sorry. You did not pay for yourself; is
14    that right?
15    A. Correct.
16    Q. Jeff paid for you?
17    A. Yes.
18    Q. Once the check was paid, you left the
19    restaurant; is that right?
20    A. Yes.
21    Q. And that was about 9:57 p.m.; is that right?
22        MR. GILLIS: Objection.
23    A. Yes, or shortly after.
24    Q. And where did you go?

Page 12

1    A. We went to the hotel that the two people that I
2    didn't know were staying at.
3    Q. And had the seating arrangement in the car
4    changed or the truck changed at that point?
5    A. Yes.
6    Q. You were in the front; is that right?
7    A. I think so, yes.
8    Q. Jeff was in the back with his dogs; is that
9    right?
10    A. Yes.
11    Q. Can you tell me why Jeff went in the back with
12    the dogs?
13    A. Other than the fact that the dogs are
14    Rottweilers and they had been in the truck for
15    quite some time, you know, maybe he wanted -- I
16    can't say. I don't know.
17    Q. Did he say anything about why he wanted to go
18    in the back with the dogs?
19    A. No.
20    Q. Did he fall asleep in the back with the dogs
21    during the trip out of the Longhorn?
22    A. No.
23    Q. And where did you go from there?
24    A. To the hotel.

**Page 121**

1  Q. Which hotel?
2  A. I think it's called the Four Points or Four
3     Seasons or Four something.
4  Q. And what did you do there?
5  A. The two people that were staying there, they
6     wanted to go change or they went into their
7     room, and we were waiting outside in the
8     hallway, and we were talking to these two guys
9     that were there.
10        There was a music festival that was going
11    on at the airport next to the hotel. So there
12    were a lot of people staying there, and there
13    were two bouncers or security guards for a
14    certain band who we were talking to out in the
15    hall.
16 Q. And where was Jeff while you guys were at the
17    Four Points Hotel?
18 A. He was in the hallway with us.
19 Q. By the way, just a few wrap-up type questions.
20    I may have asked you this already.
21        What was the age of the waitress who
22    served you guys?
23    MR. GILLIS: Objection.
24 Q. Can you estimate for me the age of the waitress

**Page 122**

1     that served you guys?
2  A. Early to mid twenties.
3  Q. Okay, and do you have a memory of whether or
4     not any other waitresses or waiters served your
5     table that night?
6  A. I don't believe so.
7  Q. Did you say you had steak that night or ribs?
8  A. I think I told you I had ribs.
9  Q. Do you remember you had ribs or are you not
10    sure?
11 A. I thought I had ribs. I'm not 100 percent sure
12    on it.
13 Q. Okay. You were not wearing a watch that night;
14    is that right?
15 A. Yes.
16 Q. And did Jeff have anything to drink while you
17    were at the Four Points?
18 A. He did.
19 Q. What did he have there?
20 A. He had a beer.
21 Q. Twelve-ounce? Sixteen-ounce? Do you know?
22 A. I think it was a twelve-ounce. I'm pretty sure
23    it was a can.
24 Q. And am I correct -- I think I asked you this

**Page 123**

1     already. I know I asked you in the Superior
2     Court case. The size of the container of the
3     beers that Jeff had or whatever amount of beer
4     he had at the bar and whatever amount he had at
5     the table, they were all in the same size
6     container; is that right?
7     MR. GILLIS: Objection.
8  A. Yes.
9  Q. Were they all in the same size container -- the
10    beers at the table and the beers at the bar?
11    MR. GILLIS: Objection.
12 A. I believe so.
13 Q. And then from the hotel, where did you all go?
14 A. We went to the Other Side, which is a strip
15    club.
16 Q. Approximately, how long were you at the hotel,
17    best memory?
18 A. Anywhere from half an hour to forty minutes.
19 Q. Okay, and how long did it take you to get from
20    the Longhorn to the hotel?
21 A. Maybe like five minutes. It's pretty close.
22 Q. Do you remember testifying ten to fifteen
23    minutes before?
24 A. I think so.

**Page 124**

1     MR. GILLIS: What page?
2     MR. FARRAH: Page 53.
3  Q. Is it is your best memory as you sit here today
4     it was ten minutes more or less?
5     MR. GILLIS: Objection.
6  A. Yes.
7  Q. And then you drove from the hotel to the strip
8     club; is that right?
9  A. Correct.
10 Q. Who was in the car when you did that?
11 A. It was myself, Scott, his brother Mike and
12    Jeff.
13 Q. Had Mike been in the car on the trip from the
14    Longhorn to the hotel?
15 A. He was not.
16 Q. What was the seating arrangement in the ride
17    from the hotel to the strip club?
18 A. I was in the passenger seat, and Scott was
19    driving, and Jeff and Mike were in the back.
20 Q. Was Jeff asleep on the ride to the strip club?
21    MR. GILLIS: Objection.
22 A. I don't think so.
23 Q. Was the plan initially to go into the strip
24    club?

Page 125

1  A. It was.
2  Q. But that changed at some point in time; is that
3     right?
4  A. Yes.
5  Q. And what brought about that change?
6  A. Well, I actually didn't even want to go to
7     dinner. I wanted to go back, so Jeff offered
8     to buy me dinner and I said yes, and then when
9     we were going there, I probably said something
10    like I had class in the morning.
11        I honestly don't remember how we came to
12    the decision, but I think Scott and I decided
13    we didn't want to stay out too much later.
14 Q. Okay, and so you guys did not go to the strip
15    club; is that right?
16 A. Correct.
17 Q. But you dropped off Scott's brother there; is
18    that right?
19 A. Yes.
20 Q. And then where did you go from the Other Side?
21 A. We went to the apartment or housing complex
22    where Scott's truck was in Littleton.
23 Q. Approximately, how long did it take you guys to
24    go from the Other Side to the apartment complex

Page 126

1     in Littleton?
2  A. Maybe thirty to thirty-five minutes.
3  Q. And the apartment complex is just off of
4     Route 495; is that right?
5  A. Yes.
6  Q. And was there any discussion on route between
7     some or all of the three about whether or not
8     Jeff should drive his truck?
9  A. Not that I remember.
10 Q. Do you remember anyone saying in effect, "Jeff,
11    you're too drunk to drive"?
12     MR. GILLIS: Objection.
13 A. No.
14 Q. Where was Jeff on the ride from the Other Side
15    to the apartment complex?
16 A. He was in the back.
17 Q. Still in the back?
18 A. Yes.
19 Q. Sleeping or awake?
20 A. He was awake, I'm pretty sure.
21 Q. And when you got to the apartment complex, what
22    happened?
23 A. Well, I jumped out and I grabbed my bag off the
24    back of the truck, and actually, I don't know

Page 127

1     if I had my bag with me.
2        I know I had to grab something, some sort
3     of dirt biking gear. It might have been my
4     boots or something. I jumped off and brought
5     it over to Scott's truck.
6  Q. Then what happened?
7  A. Jeff left.
8  Q. Jeff left the apartment complex?
9  A. Correct.
10 Q. So he left the back seat and got into the
11    driver's side?
12 A. Yes.
13 Q. Did something happen when Jeff was leaving the
14    apartment complex?
15 A. Yes.
16 Q. What happened?
17 A. Actually, I didn't see it, but apparently, he
18    must have backed over or ran over part of
19    Scott's foot.
20 Q. Did you hear Scott say something as Jeff was
21    leaving or soon after Jeff left?
22 A. Yes, soon after.
23 Q. What did he say?
24 A. He started complaining about his ankle hurting,

Page 128

1     and he said that he backed over it, ran over
2     it.
3  Q. Do you remember while you were at the
4     restaurant the waitress asking anyone in your
5     group for an ID, some proof of age?
6  A. I don't recall.
7  Q. Do you remember? That is my question.
8  A. I do not remember anyone being IDed.
9  Q. Do you remember anyone being IDed at the bar?
10 A. Well, I don't remember that either.
11 Q. Okay. Now, after Scott made some statement
12    about Jeff running over his foot, what happened
13    next?
14 A. We went to get into Scott's truck, and he
15    realized he didn't have his keys.
16 Q. Okay. So what happened at that point?
17 A. We tried calling Jeff to let him know that he
18    had to turn around and bring us the keys.
19 Q. And you called from a cellphone; is that right?
20 A. Yes.
21 Q. How long did it take you to get through to
22    Jeff?
23 A. Maybe five, ten minutes.
24 Q. And what was the conversation that you had with

Page 129

1  Jeff at that point?  Was it you, by the way,
2  that had the conversation?
3  A. I believe it was.  I know from that point on,
4  there were two conversations with him.
5  Q. Tell me about the first one.
6  A. I told him that he had the keys -- he had
7  Scott's keys -- and that he had backed over
8  Scott's foot when he was leaving.
9  Q. And what did Jeff say?
10 A. He didn't say much.  I don't even quite
11 remember him telling me he was going to turn
12 around.
13 Q. And again, the apartment complex which in the
14 parking lot of which you were calling Jeff from
15 that night was located how far from Route 495?
16 A. One hundred yards.
17 Q. And so after that conversation with Jeff, did
18 you see Jeff later on that night?
19 A. No.
20 Q. At some point in time after that conversation
21 with Jeff, did you try to have another
22 conversation with him?  Did you try to call him
23 on the phone?
24 A. Yes.

Page 130

1  Q. Did you wait for Jeff to come back?
2  A. We did.
3  Q. Can you tell me approximately how long you
4  waited for Jeff to come back?
5  A. Probably close to twenty minutes.
6  Q. Do you remember testifying at your
7  deposition -- this is on page 66 -- that it was
8  probably maybe half an hour that you waited?
9  A. Okay.
10 Q. Do you see that?
11 A. It could have been a half an hour.  I'm sure
12 that this is more accurate than what I remember
13 today.
14 Q. Your deposition?
15 A. Yes.
16 Q. In all respects?
17     MR. GILLIS:  Objection.
18 A. In that respect at least.
19     MR. GILLIS:  I move to strike that last
20 comment.
21     MR. FARRAH:  I thought we were reserving
22 motions to strike until trial.
23 Q. At some point in time did the two of you take
24 some action to be able to drive the truck?

Page 13

1  A. Yes.
2  Q. What did you do?
3  A. We broke into the truck by smashing out the
4  sliding glass door in the back windshield.
5  Q. On the back?
6  A. Yes.  We knew he had a spare key in the car.
7  Q. And after you had cleared away whatever you
8  needed to clear away to get into the car, what
9  did you do next?
10 A. I don't know whether we had talked to Jeff at
11 that point or we started driving.
12     We must have talked to him again by that
13 point because we would have just gone back
14 home.
15 Q. Do you remember having a second conversation
16 with Jeff that night after he left the
17 apartment complex parking lot?
18 A. Yes.
19 Q. Was that conversation with you or with Scott?
20 A. I believe it was with me.
21 Q. Tell me what you remember about that
22 conversation.
23 A. I remember him saying -- Yes, it was with me.
24 I remember him saying he had been in an

Page 13

1  accident and that I was like immediately,
2  "Where are you," and he didn't really say that
3  much.
4      I'm pretty sure it got cut off, and we
5  decided to go try and find the accident.  We
6  didn't know what happened.
7  Q. So was it at that point that you got on 495?
8  A. Yes.
9  Q. If you had been heading home that night as
10 opposed to looking for Jeff, which way would
11 you have headed on 495 from the apartment
12 complex?
13 A. We would not have gotten on 495.
14 Q. At all?
15 A. Correct.
16 Q. When you got on 495, in which direction did you
17 head?
18 A. North.
19 Q. Why was that?
20 A. Jeff was going home, which was north.
21 Q. Where did you understand he lived at that time?
22 A. In Portsmouth.
23 Q. New Hampshire?
24 A. Yes.

Page 133

1   Q. And when you got on 495 North, what happened?
2   A. Well, we drove and we didn't see anything and
3      we were going to turn around, and then we
4      decided to drive a little bit farther, and as
5      we were getting close to the Westford exit, we
6      saw an accident scene with like all sorts of
7      ambulances and police cars and just a lot of
8      emergency vehicles, lights going on the
9      southbound side.
10  Q. The southbound side of 495?
11  A. Yes.
12  Q. How many exits down from where the apartment
13     complex was, was it that you had traveled
14     before you saw the accident scene?
15  A. I think Westford is two up from where we got
16     on.
17  Q. Had you passed the Westford exit when you saw
18     this accident scene?
19  A. No.
20  Q. So this was before the Westford exit on 495
21     North that you saw the accident scene on the
22     other side of the highway; is that right?
23  A. Yes.
24  Q. What did you do?

Page 134

1   A. We got off at the Westford exit, and we started
2      heading southbound so we could drive by the
3      accident.
4   Q. Did you call Jeff at all during that time?
5   A. Yes.
6   Q. And were you able to reach him at all?
7   A. No.
8   Q. What did you do when you drove by on 495
9      southbound now?
10  A. We couldn't see anything. It looked like an
11     accident. All we could see was police cars and
12     the police and EMTs and ambulances.
13     We didn't see any cars that had been in an
14     accident, specifically the truck. That was
15     what we were looking for and the dirt bikes.
16  Q. And did you make any other efforts to find Jeff
17     that night?
18  A. Yes.
19  Q. What were those efforts? Describe those for
20     me, if you could.
21  A. We circled back up north to get off of the
22     Westford exit again.
23  Q. Then what happened?
24  A. No, that's incorrect. We didn't circle back

Page 13

1      yet. We got off at the Littleton exit.
2      We drove on this back road and tried
3      calling him and telling him. I think we left
4      him a voice mail saying, "Where are you? Are
5      you all right? Give us a call. Let us know
6      what is going on," but we could not get ahold
7      of him.
8      So what we did was we decided to drive up
9      to Westford again one more time to see if we
10     could see if that was his accident, if we could
11     see his truck.
12  Q. Did you have any luck?
13  A. No.
14  Q. Prior to September 26, 2003, had you ever seen
15     Jeff when you believed he was under the
16     influence of alcoholic beverages?
17  A. I think so once.
18  Q. Did he exhibit some of the same signs you saw
19     the night of September 26, 2003 that night?
20     MR. GILLIS: Objection.
21  A. You know, I'd seen him when I thought he was a
22     little bit drunk, but I mean I just assumed
23     that he was drunk. I cannot say that he was.
24     It was at that party that I mentioned before.

Page 13

1   Q. Were people drinking at that party?
2   A. Yes. That's why I assumed he was drunk.
3   Q. What sorts of things did he exhibit that led
4      you to assume he was drunk?
5   A. Well, I didn't notice anything he was
6      exhibiting. I sort of just figured that he was
7      drunk or on his way to being drunk since he had
8      been at the party and other people were there,
9      and they were drinking.
10  Q. Was he louder than usual at that party?
11  A. I didn't notice him being loud.
12  Q. Were his eyes glassy at all at the party?
13  A. I could not tell you.
14  Q. What is it that led you to say a few moments
15     ago that he had exhibited signs of intoxication
16     in the past to you?
17  A. Actually, I remember one thing. When we went
18     outside, he was getting one of his dogs all
19     riled up.
20     They're Rottweilers. So they can be
21     nasty. I mean they're pretty good dogs.
22     I remember him getting one of them all
23     riled up and like kind of pointing to someone
24     because he was a very well-behaved dog, and if

Page 137

1      you pointed at someone and you started going
2      after them, say you grabbed his arm, the dog
3      would jump up on him and try to think he needed
4      to protect him, and I remember that happened.
5      That was something that he normally didn't do.
6  Q. My question to you is, what is it that he was
7      exhibiting that night prior to September 26,
8      2003 that leads you to say he was exhibiting
9      signs of being intoxicated?
10 A. It would be getting his dog all riled up.
11 Q. Anything else?
12 A. No.
13 Q. You're sure?
14 A. Yes.  I was not really paying attention that
15     well.  I was not even there that long.
16 Q. But you believed he was exhibiting signs of
17     intoxication that night; is that right?
18 A. Yes.
19 Q. Okay.  Now, at some point in time, did you meet
20     with the police to talk about the events of
21     September 26?
22 A. The state police?
23 Q. Any police.
24 A. I remember going to the state police in Concord

Page 13

1  A. Yes.  I remember him calling me and telling me
2      that he wanted me to meet with him, and he
3      could come down or I could come down and meet
4      him, and I said I would come down, and I think
5      it was the same day that I talked to him and
6      went down there.
7  Q. But it was five weeks after the accident?
8  A. Yes.
9  Q. That refreshes your memory?
10 A. Yes.
11 Q. In between that time, September 26, 2003 and
12     November 2, 2003, did you give anybody else any
13     statements about the accident?
14 A. I don't think so.
15 Q. Or about that night, did you give anybody else
16     any statements about that night?
17 A. No.
18 Q. When did you learn that Jeff had been in this
19     accident?
20 A. It was the next day.  A friend of mine called
21     me and told me that he saw the accident on the
22     news and that he saw something about Jeff being
23     in an accident on the news.
24 Q. Can you just describe how it was that you gave

Page 138

1      and talking to one of the troopers.
2  Q. Trooper Sullivan?
3  A. Yes.
4  Q. How long was that after the accident?
5  A. I think it was pretty short.  I can't say for
6      sure.  It was a couple of days.
7  Q. Did you tell him what had happened that night?
8  A. I told him a little about what happened, but he
9      wanted me to just write it all down.
10 Q. Okay, and did you write it all down for him?
11 A. Yes.
12 Q. Now, what has been marked as Exhibit 3 in your
13     deposition has a date of November 2, 2003,
14     3:25 p.m.  Do you see that?
15 A. Yes.
16 Q. That's five-and-a-half weeks, six weeks after
17     the accident; can we agree?
18 A. Yes.
19 Q. Do you remember that you had met with him
20     before November 2, 2003?  This is Trooper
21     Sullivan.
22 A. No.
23 Q. Do you remember only one meeting with
24     Trooper Sullivan?

Page 14

1      this statement to the state police?
2  A. Yes.  I went into the barracks and I had to
3      give them some ID and show them who I was, and
4      they took me into one of the offices and sat me
5      down and asked me if I was with Jeff that night
6      and if I was in fact Jude and some questions
7      like that.
8          Then he said, "All right.  Now, I want you
9      to write what you remember down and give me a
10     statement on paper."
11 Q. And that's what you did?
12 A. Yes.
13 Q. How long were you with him that day?
14 A. It was probably under an hour.  It was not
15     extremely long.
16 Q. Anybody else there besides the trooper and you?
17 A. No.
18 Q. Was your meeting tape recorded, do you know?
19 A. I don't know.
20 Q. Was your meeting with DiNatale tape recorded?
21 A. I don't think so.
22 Q. How about with the lawyer -- I can't remember
23     his name now -- Parkerson, was that tape
24     recorded?

**Page 141**

1   A. I don't think so.

2   Q. Did anybody ask you for permission to tape

3   record in any of the meetings you had to

4   discuss what happened?

5   A. I kind of remember someone asking me, but I

6   don't know whether it was one of these meetings

7   or a meeting where I was in a place in here.

8   Maybe it might have been when I had to

9   testify -- I can't say for sure. I just

10  remember someone saying, "I'm going to be tape

11  recording you."

12  Q. Is that your handwriting on Exhibit 3?

13  A. Yes.

14  Q. And did anybody in any way influence what you

15  wrote on Exhibit 3 at the time you were writing

16  it?

17  A. No.

18  Q. Did anybody put words in your mouth?

19  A. No.

20  Q. Did anybody suggest anything to you?

21  A. No.

22  Q. And then you testified at the grand jury; is

23  that right?

24  A. Yes.

**Page 142**

1   Q. And did you testify truthfully before the grand

2   jury to the best of your ability?

3   A. Yes.

4   Q. And approximately how long was that after the

5   meeting with the state trooper, if you know?

6   A. I don't know. I think it was sometime after.

7   Q. And then in between then, when you testified

8   before the grand jury and when you testified at

9   your deposition in August of 2004, did anybody

10  that you understood was representing anyone

11  involved in either a civil or criminal lawsuit

12  contact you to discuss what happened the

13  evening of September 26, 2003?

14  A. No.

15  Q. And when you came to testify on August of 2004,

16  that was the first time we had spoken?

17  A. Yes.

18  Q. After testifying on August of 2004, and with

19  the exception of Mr. Parkerson and

20  Mr. DiNatale, has anyone spoken to you about

21  the events of September 26, 2003 whom you have

22  understood was working for any defendant in any

23  civil lawsuit?

24  A. No.

**Page 14**

1   MR. FARRAH: Michael, I think I'm just

2   about done. Give me a minute to run out and

3   I'll be right back.

4   (Short recess.)

5   Q. Did you sign a statement for DiNatale?

6   A. No.

7   Q. You did sign a statement for Parkerson?

8   A. Yes.

9   Q. You're sure you didn't sign a statement for

10  DiNatale?

11  A. I don't remember. I don't know.

12  Q. It was not that long ago -- two weeks.

13  A. It was a little bit longer than that.

14  Q. But you don't remember?

15  A. I don't remember.

16  MR. FARRAH: Thanks. I'm done.

17

18  CROSS-EXAMINATION

19

20  BY MR. GILLIS:

21  Q. Mr. Connelly, you have in front of you

22  Exhibit 3, your statement there, and when you

23  said in that statement that he had a couple of

24  beers, maybe two and maybe three drinks, that

**Page 14**

1   was the total amount of drinks that you think

2   he might have had at the restaurant; is that

3   right?

4   MR. FARRAH: Objection.

5   A. Correct.

6   Q. Let me ask it a different way. From looking at

7   your statement, can you tell me how many drinks

8   you thought Mr. Southworth maybe had at the

9   restaurant?

10  A. In total?

11  MR. FARRAH: Objection. Are you looking

12  at Exhibit 3?

13  MR. GILLIS: Yes.

14  A. It would be maybe five.

15  Q. Was that everything at the restaurant or just

16  at the table?

17  MR. FARRAH: Objection.

18  A. I believe that was at the restaurant, not at

19  the table.

20  Q. Is it your memory that the beers that were

21  gotten at the bar were brought over to the

22  table?

23  MR. FARRAH: Objection.

24  A. Yes.

Page 145

1   Q. This is dated November 2, 2003. That's when
2       that was actually done by you, correct?
3   A. Yes.
4   Q. Your memory was a lot fresher back then as to
5       the events of this, correct?
6   A. Yes.
7   Q. You said that you left approximately 11:00, is
8       that correct, the restaurant?
9   A. Yes.
10  Q. Give or take a few minutes?
11  A. Yes.
12  Q. It could have been 10:30; it could have been
13      11:30?
14      MR. FARRAH: Objection.
15  A. It was probably not later. It was probably,
16      you know, 11:00 or before.
17  Q. Subsequently, you were under oath when you gave
18      your grand jury testimony, correct?
19  A. Yes.
20  Q. You said "probably two, maybe a couple of
21      Manhattans" on page 9 of your sworn testimony.
22  A. Correct.
23  Q. At the end of that you were asked, were you
24      not, whether or not Mr. Southworth was

Page 146

1   exhibiting any change in his demeanor at any
2   time? Do you remember being asked that?
3       MR. FARRAH: What page is that?
4       MR. GILLIS: Page 34.
5   A. Yes.
6   Q. That was a lot closer to the time of this
7       accident than today, correct?
8   A. Correct.
9   Q. Did they put your statement in as an exhibit
10      when you were at the grand jury?
11  A. Yes.
12  Q. That was the fifth of November of 2003,
13      correct?
14  A. Yes.
15  Q. That was when you said that there was no change
16      at any time in his demeanor while he was at the
17      Longhorn; is that correct?
18  A. Yes.
19  Q. You testified there that you had known him for
20      about a year prior to this accident, correct?
21  A. Yes.
22  Q. Do you know him primarily from dirt bike
23      racing, or how did you know him?
24  A. I knew him from dirt bike racing.

Page 14

1   Q. You had known him long enough to know whether
2       his demeanor was changing, correct?
3       MR. FARRAH: Objection.
4   A. The only time that I believed that he was drunk
5       was the time that I had seen him at the party.
6   Q. That was not the question. You've known him
7       long enough that you would be able to tell
8       whether or not his demeanor was changing on the
9       night of September 26, 2003, correct?
10  A. Yes.
11  Q. Now, those are the statements that you gave
12      before lawyers got involved in the case,
13      correct?
14  A. Yes.
15  Q. Then you met with Mr. Farrah, correct?
16      MR. FARRAH: Objection.
17  A. Yes.
18  Q. When did you first meet with him?
19  A. It was over a year. I honestly don't know.
20  Q. How many times have you met with Mr. Farrah?
21  A. Only once, besides today.
22  Q. When was that?
23  A. I don't know. It was sometime after the grand
24      jury.

Page 14

1   Q. Before your deposition?
2       MR. FARRAH: Are you asking him did we
3   meet before his deposition?
4       MR. GILLIS: Yes.
5       MR. FARRAH: Objection to the form.
6   A. The deposition, was that the grand jury?
7       MR. FARRAH: This is your deposition,
8   right here (pointing to transcript).
9   A. When was this taken? I thought the deposition
10      was when I met with Mr. Farrah.
11  Q. You came in before a situation like this and
12      gave a deposition?
13  A. Yes.
14  Q. Prior to that, had you met with anybody from
15      Mr. Farrah's office?
16  A. No.
17  Q. Then you met with his office, didn't you, to
18      put together an affidavit?
19  A. Yes.
20  Q. Who wrote that up for you?
21  A. I don't know.
22  Q. Who contacted you and asked you to do an
23      affidavit for them? Was that Mr. Farrah's
24      office?

Page 149

1    A. Yes.
2    Q. And did they send you that in the mail, or did
3       you come in to sign it?
4    A. They sent it to me.
5    Q. Do you know who from the office you spoke with?
6    A. No. I presume it was Mr. Farrah.
7    Q. Was it a male or a female?
8    A. I don't know.
9    Q. Do you remember what you spoke about?
10   A. Just, you know, they were going to send it to
11      me and I needed to sign it and get it back to
12      them.
13   Q. You also testified at trial in this matter,
14      correct?
15   A. Correct.
16   Q. And you were under oath at that time, correct?
17   A. Correct.
18   Q. You didn't have any of the lawyers in this room
19      forming the questions that you were answering,
20      correct?
21   A. Correct.
22   Q. At that trial do you remember testifying that
23      you had a Sprite and some food at the
24      restaurant?

Page 150

1    A. Yes.
2    Q. Do you remember testifying that there was
3       nothing unusual at all that evening at the
4       Longhorn as to how Mr. Southworth was speaking
5       or walking?
6       MR. FARRAH: Objection.
7    A. Yes.
8    Q. Do you remember testifying that Mr. Southworth
9       brought the beer that he got at the bar with
10      him to the table?
11      MR. FARRAH: Objection.
12   A. Yes.
13   Q. Prior to Mr. Farrah in 2004 suggesting
14      different signs of inebriation, did you ever
15      testify anywhere that Mr. Southworth showed any
16      signs of inebriation that evening?
17   A. I don't believe so.
18   Q. You didn't say it to the police, correct?
19   A. No.
20   Q. You didn't put it in your statement, did you?
21   A. No.
22   Q. You didn't say it at the grand jury, did you?
23   A. No.
24   Q. You didn't testify at trial to that, did you?

Page 15

1    A. No.
2    Q. In fact, when you were asked the first time by
3       Mr. Farrah what signs were exhibited, you said,
4       "I don't know"; isn't that correct?
5       MR. FARRAH: Objection.
6    Q. Page 49, "What did he show? What did he
7       manifest that makes you say that?" "I don't
8       know."
9          That's the first part of your answer,
10      correct?
11   A. Yes.
12   Q. It was not until he suggested to you that he
13      was sloppier that you said, "A little bit,
14      yes," correct?
15      MR. FARRAH: Objection. The record is the
16      record.
17   A. Correct.
18   Q. It was not until he suggested that he
19      louder that you said yes, correct?
20      MR. FARRAH: Objection.
21   A. Correct.
22   Q. It was not until he suggested that he was
23      boisterous that you ever thought about it as a
24      possibility, correct?

Page 15

1       MR. FARRAH: Objection.
2    A. Correct.
3    Q. But even then you said he was not boisterous,
4       correct?
5       MR. FARRAH: Objection.
6    A. Correct.
7    Q. You said his speech was not slurred, correct?
8    A. Correct.
9    Q. And when Mr. Farrah asked about his glassy
10      eyes, you said, "I don't remember specifically
11      seeing his eyes." Do you remember saying that?
12      MR. FARRAH: Objection.
13   A. Yes.
14   Q. As you sit here today, can you honestly say
15      whether or not his eyes were glassy that
16      evening?
17      MR. FARRAH: Objection.
18   A. No.
19   Q. Prior to Mr. Farrah suggesting these things in
20      the deposition, you've never told anybody that
21      he had glassy eyes, correct?
22      MR. FARRAH: Objection.
23   A. No.
24   Q. You never told anybody that he was louder than

Page 153

1   normal, correct?
2       MR. FARRAH: Objection.
3   A. No.
4   Q. You never told anybody that he was sloppier
5     looking than he usually is, correct?
6       MR. FARRAH: Objection.
7   A. No.
8   Q. Now, I know that you've tried your best at
9     these various times to give the best answers
10     that you can, but I want you to think back.
11       From the time that you gave testimony at
12     the grand jury saying nothing changed about his
13     demeanor to the time that you testified at your
14     deposition with Mr. Farrah back in 2004, did
15     you learn anything that changed your opinion of
16     what happened that evening?
17       MR. FARRAH: Objection.
18   A. No.
19   Q. By the way, was anyone from Rare there at that
20     deposition, do you remember?
21   A. I don't know.
22   Q. Now, the first time that you were asked what
23     Mr. Southworth had to drink that evening, you
24     said, I believe, that he had a beer; isn't that

Page 154

1   correct?
2   A. Yes.
3       MR. FARRAH: What page are we talking
4     about?
5       MR. GILLIS: Page 28.
6   Q. "What did you see him drink?" "He had a beer,"
7     correct?
8   A. Yes.
9       MR. FARRAH: Objection.
10   Q. Prior to Mr. Farrah suggesting that he might
11     have had more at that time, did you ever
12     testify to anybody that he had more than a beer
13     at the bar that evening?
14       MR. FARRAH: Objection.
15   A. No.
16   Q. In fact, he didn't even have a full beer at the
17     bar, did he? He brought it to the table,
18     correct?
19       MR. FARRAH: Objection.
20   A. Correct.
21   Q. Was the first beer that he got at the bar the
22     first one he took over to the table?
23       MR. FARRAH: Objection.
24   A. As far as I know.

Page 15

1   Q. You didn't have anything to drink at the sand
2     pit, correct, any alcohol?
3   A. No.
4   Q. Mr. Southworth didn't have any alcohol at the
5     sand pit, correct?
6   A. No.
7   Q. In fact, you guys bring jugs of water instead,
8     correct?
9   A. Yes.
10   Q. Now, when Mr. Farrah was asking you these
11     questions without Rare being at the deposition
12     a year and a half ago, he asked you whether or
13     not someone paid the bar tab, correct?
14   A. Yes.
15   Q. And you told him back then a year and a half
16     ago that the bar tab was transferred to the
17     check, correct?
18       MR. FARRAH: Objection.
19   A. Yes.
20   Q. I'm going to show you testimony on page 35 and
21     ask you to read that page. Just read it
22     quickly. Read it to yourself.
23       (Witness reviews document.)
24   Q. Is it your memory that the beers that were

Page 15

1   gotten at the bar were added on to the check at
2     the table?
3       MR. FARRAH: Objection.
4   A. Yes.
5   Q. And that's sworn testimony you gave to
6     Mr. Farrah a year and a half ago, correct?
7   A. Correct.
8   Q. That was a year and a half before you met
9     Mr. DiNatale, correct?
10   A. Yes.
11   Q. Do you remember telling Mr. Farrah that
12     Mr. Southworth ordered a beer with his dinner?
13       MR. FARRAH: Where are we talking about?
14     I object.
15   A. I don't remember the question.
16   Q. By the way, do you remember telling Mr. Farrah
17     that you ordered a steak; you were positive
18     about that?
19   A. No.
20   Q. Let me show you the bottom of page 46 and top
21     of page 47 at your prior deposition. Look at
22     that.
23       (Witness reviews document.)
24       MR. FARRAH: What is the question?

Page 157

1  Q. Does that refresh your recollection of what you
2     had to eat that night?
3  A. Yes.
4  Q. You said earlier in the deposition that you saw
5     Mr. Southworth get up and go to the bathroom,
6     correct?
7  A. Yes.
8  Q. Did you observe him walking to and from the
9     bathroom?
10 A. Yes.
11 Q. The bathroom is in the back corner; isn't that
12    right?
13 A. Yes.
14 Q. The hallway leading to the bathroom doesn't
15    lead to any other part of the restaurant,
16    correct?
17 A. Correct.
18 Q. You can't get to the bar by going to the
19    bathroom, correct?
20 A. Yes.
21 Q. Was he walking fine when you saw him go to the
22    bathroom?
23 A. Yes.
24 Q. Did you see him stagger at all?

Page 15[8]

1  A. Correct.
2  Q. Nobody that night at the table said to anyone
3     else that they thought they were intoxicated,
4     correct?
5        MR. FARRAH:  Objection.
6  A. No.
7  Q. You told that to Mr. Farrah, didn't you, a year
8     and a half ago?
9        MR. FARRAH:  What page are we talking
10       about?
11       MR. GILLIS:  42.
12 A. No.
13 Q. That's your memory today, correct?
14 A. Yes.
15 Q. Nobody at the table thought that anybody else
16    was intoxicated, correct?
17       MR. FARRAH:  Objection.  That's not what
18       he testified to.  I'm objecting.
19 A. No.
20 Q. You told him back then that Jeff was not
21    particularly loud; isn't that correct?
22 A. Correct.
23 Q. Was he any louder than anybody else at the
24    table?

Page 158

1  A. No.
2  Q. Was he unsteady on his feet?
3  A. No.
4  Q. Did he show any signs that were other than his
5     normal self when he went to the bathroom?
6  A. No.
7  Q. You testified to Mr. Farrah back in 2004 that
8     you left just before or just right around
9     11:00; is that correct?
10       MR. FARRAH:  Objection.
11 A. Correct.
12 Q. Is that your memory as to what time you left,
13    as you sit here today?
14 A. Yes.
15 Q. It was not 10:00, correct?
16       MR. FARRAH:  Objection.
17 A. No.
18 Q. Do you know whether or not any of the people at
19    the table that night ate just an appetizer or
20    an appetizer and a cup of soup as opposed to an
21    entree?
22 A. I don't know for certain.
23 Q. In fact, you can't quite remember what you had,
24    correct?

Page 16[0]

1  A. No.
2  Q. He was not any louder than you, correct?
3  A. No.
4  Q. You were not intoxicated, were you?
5  A. No.
6  Q. Seven guys in their early twenties, late teens
7     having dinner on a Friday night, correct?
8  A. Correct.
9  Q. Now, do you remember testifying that you were
10    at Four Points closer to forty minutes rather
11    than ten or fifteen minutes?
12 A. Yes.
13 Q. Now, you've testified various ways.  What is
14    your memory as you sit here today?  Do you
15    remember whether it was thirty-five minutes or
16    forty minutes or whatever minutes?
17       MR. FARRAH:  Objection.
18 A. It was probably around half an hour.
19 Q. Okay.  That's your best estimate as you sit
20    here today, correct?
21 A. Correct.
22 Q. Did you see Jeff Southworth go into the room
23    that you were standing outside of in the hotel?
24 A. No.

Page 161

1  Q. He never went in the room?
2  A. Not that I know of.
3  Q. Did someone bring the beer out to him, or did
4     he go into the room to get it?
5  A. I'm pretty sure somebody brought it out.
6  Q. People in the room were bringing beers out to
7     people in the hallway?
8     MR. FARRAH: Objection.
9  A. I don't know whether the beer was brought from
10    the room the two people I didn't know were
11    staying in or the two bouncers or security that
12    we were talking to.
13 Q. Somebody was supplying beer to you people if
14    you wanted it at the hotel, correct?
15 A. Yes.
16 Q. And you were able to get it for the half hour
17    that you were there at the hotel if you wanted
18    it, correct?
19 A. Yes.
20 Q. And nobody was limiting anybody as to the
21    number of beers they had in the hotel, correct?
22 A. Correct.
23 Q. Nobody said, "Look, we only have enough for
24    everybody to have one," or "You're limited to

Page 162

1     one beer," correct?
2  A. Yes.
3  Q. Do you know what type of beer it was?
4  A. I don't.
5  Q. Do you know how big the cooler was in the back
6     of Mr. Southworth's car?
7  A. No.
8  Q. Did you see the cooler?
9  A. No.
10 Q. Were you aware that he had a cooler in the back
11    seat?
12 A. No.
13 Q. You don't remember what the bartender looked
14    like, correct?
15 A. Not specifically.
16 Q. She didn't appear to be a friend of Scott's or
17    Jeff's, did she?
18 A. No.
19 Q. I know you were trying to answer the best you
20    could in the first deposition, but when you
21    answered "maybe" to these questions on page 38,
22    was that an accurate statement or was that a
23    guesstimate on your part?
24    MR. FARRAH: Objection.

Page 163

1  A. An estimate or a guesstimate.
2  Q. Is it fair to say that you were guessing at
3     that point?
4     MR. FARRAH: Objection.
5  A. I don't think I was guessing. I think I was
6     thinking that there was more a possibility that
7     he had had more.
8  Q. So when you said "maybe four," that's a
9     possibility, not an accurate statement as to
10    what you know him to have drunk at the table
11    that day, correct?
12    MR. FARRAH: Objection.
13 A. Yes.
14 Q. In fact, six weeks after the accident you told
15    the state police that he had maybe two,
16    correct?
17    MR. FARRAH: Objection.
18 A. Correct.
19 Q. Was it your understanding that you were at the
20    Longhorn close to two hours that evening?
21    MR. FARRAH: Objection.
22 A. Yes.
23 Q. Do you remember exactly how long you were at
24    the apartment complex that night before you

Page 164

1     left?
2  A. Not exactly.
3  Q. What is your best estimate?
4     MR. FARRAH: Objection.
5  A. At least twenty-five minutes, at the most
6     thirty-five minutes.
7  Q. How long did it take you to get from the
8     apartment complex to the scene of the accident?
9  A. Like close to ten minutes.
10 Q. The dogs were in the car for the whole time you
11    were in the restaurant?
12 A. Yes.
13 Q. They were sitting there for about two hours,
14    correct?
15 A. Yes.
16 Q. Did he let the dogs out of the car when you
17    went to the truck?
18    MR. FARRAH: Objection.
19 A. I don't remember.
20 Q. Did he rile the dogs up at any point when he
21    came out of the restaurant?
22    MR. FARRAH: Objection.
23 A. No.
24    MR. GILLIS: What is the nature of your

Page 165

1  objection?
2      MR. FARRAH: "Riled the dogs up," form of
3  the question.
4  Q. You testified earlier that the one time you
5  thought he was intoxicated he riled up the dogs
6  at a party, correct?
7      MR. FARRAH: Objection.
8  A. Yes.
9  Q. He didn't exhibit any of that behavior when you
10  left the Longhorn on the night of September 26,
11  2003, did he?
12  A. No.
13  Q. When the police asked you, you didn't tell them
14  that you thought Mr. Southworth was intoxicated
15  that evening, did you?
16  A. No.
17  Q. When you were under testimony at the grand
18  jury, you never said that Mr. Southworth was
19  intoxicated that evening, did you?
20  A. No.
21  Q. In fact, when you left there that night, you
22  didn't believe him to be intoxicated, did you?
23  A. No.
24  Q. After you left the Longhorn that evening, you

Page 166

1  first went to the hotel for a while, correct?
2  A. Yes.
3  Q. There was drinking in the hallway, correct?
4  A. Yes.
5  Q. Then you went to the strip bar, correct?
6      MR. FARRAH: Objection.
7  A. Yes.
8  Q. You left the strip bar without going into it
9  and went to the apartment complex, correct?
10  A. Correct.
11  Q. That was about a thirty-minute ride from the
12  Other Side to the apartment complex, correct?
13      MR. FARRAH: Objection.
14  A. Correct.
15  Q. Could it be a little less than that, do you
16  know?
17      MR. FARRAH: Objection.
18  A. If you were driving fast.
19  Q. Who was driving from the time you left the
20  Longhorn until the time that you arrived at the
21  apartment complex?
22  A. Scott.
23  Q. Did Scott have any more to drink that evening,
24  that you know of, than Mr. Southworth?

Page 16

1  A. I'm pretty sure that he had a beer at the
2  hotel.
3  Q. At the restaurant did they drink about the same
4  amount?
5      MR. FARRAH: Objection.
6  A. Correct.
7  Q. Did he show any signs of intoxication?
8  A. No.
9  Q. At any time at the restaurant do you remember
10  anybody at the table showing any signs of
11  intoxication?
12  A. No.
13  Q. After you left the restaurant and after there
14  was drinking at the hotel, did you see a change
15  in Mr. Southworth's demeanor after that point?
16  A. No.
17  Q. Did he seem intoxicated when he was getting in
18  his vehicle later on that evening?
19  A. No.
20  Q. Do you have any independent memory, not from
21  looking at documents today or anything else,
22  but your memory of the night of the accident?
23  Do you have a memory of there being any extra
24  drinks on the table?

Page 16

1      MR. FARRAH: Objection.
2  A. You mean just drinks that had been ordered and
3  not drinking?
4  Q. Yes.
5  A. No.
6  Q. When you say "checked out from the bar," did
7  you mean by that that you were just leaving the
8  bar to go to the table?
9      MR. FARRAH: Objection.
10  A. Yes.
11  Q. You didn't mean "cash out," correct?
12      MR. FARRAH: Objection.
13  A. No.
14  Q. If you had paid at the bar, you would have
15  said, "We paid the tab and went to the table,"
16  correct?
17      MR. FARRAH: Objection.
18  A. Yes.
19  Q. You answered several times today to questions
20  that you don't remember.
21      When you answer a question "I don't
22  remember" does that mean something didn't
23  happen or you just don't remember whether or
24  not it happened or didn't happen?

Page 169

1         MR. FARRAH: Objection.
2  A. I just don't remember whether it happened or
3     didn't happen.
4  Q. When you answered questions previously "I don't
5     remember," that is not to say whatever was
6     being talked about didn't happen. You just
7     don't remember whether it did or didn't,
8     correct?
9         MR. FARRAH: Objection.
10 A. Correct.
11 Q. Is it fair to say when the drinks came to the
12    table, they came one drink per person at a
13    time?
14        MR. FARRAH: Objection.
15 A. I think so but --
16 Q. I want your memory. Tell me your memory.
17        MR. FARRAH: Let him answer. He was
18    trying to.
19 A. I remember the round being ordered, but
20    according to the bill, there were seven drinks
21    brought to the table.
22 Q. That's why I'm asking for your memory. I know
23    what the bill says.
24        Your memory, as you sit here today, do you

Page 170

1     have a specific memory of seeing anybody with
2     more than one drink per round?
3  A. No.
4  Q. Did you see any of the managers walking around
5     there that night while you were at the
6     Longhorn?
7  A. I don't remember seeing any managers.
8  Q. Meaning you don't remember if they did or
9     didn't walk around?
10 A. Correct.
11 Q. Had you been to the Longhorn prior to this
12    date?
13 A. I had been there once before.
14 Q. How long prior to this accident was that?
15 A. It was probably a while, maybe a year before
16    then.
17 Q. Those are the only two times you have been to
18    the Longhorn?
19 A. Yes.
20        MR. GILLIS: I don't have any further
21    questions.
22
23
24

Page 17

1         REDIRECT EXAMINATION
2
3   BY MR. FARRAH:
4  Q. Is it accurate to say that as of September 26,
5     2003 Jeff was your friend?
6  A. Yes.
7  Q. And is it accurate to say that throughout this
8     process of speaking to different people about
9     the events of September 26, 2003 you have felt
10    uncomfortable about talking about Jeff, your
11    friend?
12        MR. GILLIS: Objection.
13 A. No.
14 Q. Is it accurate to say that you didn't want to
15    hurt Jeff as part of this process of speaking
16    to people about the events of September 26,
17    2003?
18        MR. GILLIS: Objection.
19 A. Well, not really because to be honest with you,
20    whatever happened that night and what will or
21    has happened, I think regardless of who it is,
22    they deserve whatever happens to them.
23 Q. Do you think Jeff deserves the punishment that
24    he got in the criminal case?

Page 17

1  A. I don't know exactly what he got.
2  Q. He was found guilty.
3  A. I know he was guilty. I don't know what his
4     sentencing was. I agree that he should serve
5     time.
6  Q. Do you think it was appropriate that Jeff be
7     found guilty of driving under the influence?
8         MR. GILLIS: Objection.
9  A. No. Well, what is driving under the influence?
10    Like having alcohol in your system and driving?
11    Then yes.
12 Q. Because he had alcohol in his system and he was
13    driving that night, wasn't he?
14 A. Yes.
15 Q. Throughout this process, have you tried to help
16    Jeff as best you can?
17        MR. GILLIS: Objection.
18 A. No.
19        MR. FARRAH: Okay. I'm done. Thank you.
20
21        RECROSS-EXAMINATION
22
23   BY MR. GILLIS:
24 Q. Have you spoken with Jeff since the accident?

Page 173

1  A. No.
2  Q. So whatever friendship you had, you have not
3     spoken with him in the last two-and-a-half
4     years, correct?
5  A. Correct.
6  Q. Even if he were a closer friend than he was,
7     you would not lie to the grand jury, would you?
8        MR. FARRAH: Objection.
9  A. No.
10 Q. Would you lie at trial to benefit Jeff?
11       MR. FARRAH: Objection.
12 A. No.
13 Q. Would you lie under oath at your deposition?
14 A. No.
15 Q. Would you lie on your affidavit to benefit
16    Jeff?
17 A. No.
18 Q. By the way, the affidavit, Paragraph 6, that
19    Mr. Farrah talked about states that you
20    testified at your deposition to certain things,
21    correct?
22 A. Correct.
23 Q. We have gone through a lot of those things to
24    specify them, correct?

Page 174

1  A. Correct.
2  Q. It says here, "Everyone at the table was loud."
3     As you've testified, Mr. Southworth was not any
4     more particularly loud than anybody else,
5     correct?
6  A. Correct.
7  Q. You can't remember whether it was a waitress or
8     a manager who came over to you, correct?
9  A. Correct.
10 Q. That was twenty to twenty-five minutes before
11    you left the restaurant, correct?
12       MR. FARRAH: Objection.
13 A. Yes.
14 Q. Prior to that time nobody that you're aware of
15    complained of any of the behavior at the table,
16    correct?
17       MR. FARRAH: Objection.
18 A. Correct.
19 Q. Nobody had to come to the table and tell you
20    guys to be knock something off or quiet down,
21    correct?
22 A. Yes.
23 Q. When you said in your deposition you testified
24    to certain things on 49 to 51. You didn't see

Page 17

1     any change in his demeanor that night while he
2     was at the Longhorn that would indicate to you
3     that he was under the influence, correct?
4        MR. FARRAH: Objection.
5  A. No.
6  Q. So in fact, in your opinion as you stated today
7     under oath, he was not under the influence of
8     alcohol that you could tell when he was at the
9     Longhorn that evening, correct?
10       MR. FARRAH: Objection.
11 A. I guess. Referring to the last question, what
12    exactly is "under the influence"?
13 Q. Let's go back to this. When you signed this
14    document that Mr. Farrah prepared for you where
15    he wrote on your behalf that Mr. Southworth
16    seemed to be under the influence of alcohol,
17    what did you think "under the influence of
18    alcohol" meant?
19       MR. FARRAH: Objection.
20 A. I can say that I don't think he was drunk. I
21    mean, he was under the influence in respect
22    that he had been drinking alcohol.
23 Q. So when you agreed to sign for Mr. Farrah this
24    statement, your understanding of what

Page 17

1     Mr. Farrah wrote for you was being under the
2     influence of alcohol was the fact that you had
3     alcohol in your system, correct?
4        MR. FARRAH: Objection.
5  A. Correct.
6  Q. It didn't mean that he was drunk, correct?
7        MR. FARRAH: Objection.
8  A. Yes.
9  Q. And, in fact, while at the Longhorn, no slurred
10    speech, correct?
11 A. Correct.
12 Q. He was steady on his feet going to the
13    bathroom, correct?
14 A. Correct.
15 Q. No slurring at the table, correct?
16 A. Correct.
17 Q. No louder than anyone else at the table,
18    correct?
19 A. Correct.
20 Q. You don't have a specific memory of any glassy
21    eyes, correct?
22       MR. FARRAH: Objection.
23 A. Correct.
24       MR. GILLIS: I have no further questions.

Page 177

```
1        MR. FARRAH:  I think I've asked you
2    everything I need to ask you.  Thanks a lot.
3        MR. GILLIS:  You're done.
4
5            (Whereupon, the deposition was
6            concluded at 3:05 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 178

```
1        CERTIFICATE
2    COMMONWEALTH OF MASSACHUSETTS
3    COUNTY OF MIDDLESEX, SS
4
5        I, BARBARA J. SIMON, a Professional
     Shorthand Court Reporter and Notary Public in
6    and for the Commonwealth of Massachusetts, do
     hereby certify that the foregoing deposition of
7    Jude Connelly, was taken before me on Friday,
     February 10, 2006.  The said witness was
8    satisfactorily identified and duly sworn before
     the commencement of his testimony; that the
9    said testimony was taken stenographically by
     myself and then transcribed by myself.  To the
10   best of my knowledge, the within transcript is
     a complete, true and accurate record of said
11   deposition.
12       I am not connected by blood or marriage
     with any of the said parties, nor interested
13   directly or indirectly in the matter in
     controversy.
14       In witness whereof, I have hereunto set my
     hand this 20th day of February, 2006.
15
16
17   _____
18   Barbara J. Simon, Notary Public
     My Commission Expires:
19   November 6, 2009
20
21
22
23
24
```

Page 178

```
1    SIGNATURE PAGE/ERRATA SHEET
2    RE: Nancy Rosario, Individually, as she is the
         Administratrix of the Estate of Awilda
3        Santiago, Essex Probate Court Docket
         #03P-2499AD1, P/P/A Veronica Rosario and
4        Christina Santiago, and as she is the
         Administratrix of the Estate
5        of Jose Santiago, Berlin (Connecticut)
         Probate Court, Case #03-0713 v. Rare
6        Hospitality International, Inc. d/b/a
         Longhorn Steakhouse
7
8    February 10, 2006
     Deposition of Jude Connelly
9        I, JUDE CONNELLY, do hereby certify that I
     have read the foregoing transcript of my
10   testimony and further certify that it is a true
     and accurate record of my testimony (with the
11   exception of the following changes listed
     below):
12   Page   Line        Correction
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20       Signed under the pains and penalties of
21   perjury this _____ day of
22   _____, 2006.
23       _____
24            Jude Connelly
```

Page 1

```
 1                        Volume:
 2                        Pages:   1 - 76
                          Exhibits: 1 - 2
 3          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4
                Civil Action #05-CV-10617MLW
 5
 6   NANCY ROSARIO, INDIVIDUALLY,
     AS SHE IS THE ADMINISTRATRIX
 7   OF THE ESTATE OF AWILDA SANTIAGO,
     ESSEX PROBATE COURT DOCKET #03P-2499AD1,
 8   P/P/A VERONICA ROSARIO AND
     CHRISTINA SANTIAGO, AND AS SHE IS
 9   THE ADMINISTRATRIX OF THE ESTATE
     OF JOSE SANTIAGO, BERLIN (CONNECTICUT)
10   PROBATE COURT, CASE #03-0713,
                                    Plaintiff
11   vs.
12   RARE HOSPITALITY INTERNATIONAL, INC., d/b/a
     LONGHORN STEAKHOUSE,
13                                  Defendant
14
15        Deposition of MICHAEL ESPEY, a witness
16   called on behalf of the Plaintiff, pursuant
17   to the Federal Rules of Civil Procedure,
18   before Rosamond K. Marcy, a Certified
19   Shorthand/Registered Professional Reporter
20   and Notary Public in and for the Commonwealth
21   of Massachusetts, at the Offices of Albert L.
22   Farrah, Jr., Esquire, One Washington Mall,
23   Boston, Massachusetts 02108, commencing at
24   10:00 A.M. on Tuesday, April 25, 2006.
```

Page 2

```
 1   APPEARANCES:
 2   ALBERT L. FARRAH, JR., ESQUIRE
        One Washington Mall
 3      Boston, Massachusetts    02108
        for the Plaintiff.
 4
     MICHAEL K. GILLIS, ESQUIRE
 5   [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 6      Newton, Massachusetts    02461
        for the Defendant.
 7
     NEIL D. SCHNURBACH, ESQUIRE
 8   [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 9      Newton, Massachusetts    02461
        for the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   Deposition of:  DIRECT CROSS REDIRECT RECROSS
 3   MICHAEL ESPEY
 4   (By Mr. Farrah)        4          72
                                       73
 5
     (By Mr. Gillis)        39          73
 6
 7
 8              E X H I B I T S
 9   Michael Espey
     Number:                         For Ident.
10
     1 -  Handwritten document by
11        Mike Espey                    37
12   2 -  Document entitled Longhorn
          Steakhouse                    45
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1            STIPULATIONS
 2        It is hereby stipulated and
 3   agreed by and between counsel for the
 4   respective parties that the witness will
 5   read and sign the deposition transcript
 6   within thirty days.  The sealing and
 7   filing of the deposition transcript are
 8   waived.
 9        It is further stipulated and
10   agreed that all objections, except as to
11   form, and motions to strike will be
12   reserved to the time of trial.
13            MICHAEL ESPEY,
14   a witness called on behalf of the
15   Plaintiff, having first been properly
16   identified and duly sworn, deposes and
17   says as follows:
18            DIRECT EXAMINATION
19            BY MR. FARRAH
20   Q. Good morning.  As you know my name is
21   Albert Farrah and I represent the
22   plaintiff Nancy Rosario in this lawsuit.
23   We have agreed that you will have thirty
24   days from the date of your receipt of
```

Page 5

1 the transcript of your testimony to
2 indicate on a separate sheet of paper
3 any changes you feel should be made in
4 that transcript and if you choose to do
5 so within that thirty-day period you
6 need to return the separate sheet of
7 paper with the changes to me. Do you
8 understand that?
9 A. Yes.
10 Q. Tell me your full name.
11 A. Michael Joseph Espey.
12 Q. Where do you live, sir?
13 A. 80 Old Mill Road in Harvard,
14    Massachusetts.
15 Q. What is your date of birth?
16 A. August 31, 1979.
17 Q. What is your Social Security number?
18 A. 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.
19 Q. Are you currently employed?
20 A. Yes, sir.
21 Q. Where are you employed?
22 A. Foreign Motors West Mercedes Benz.
23 Q. What do you do there?
24 A. Sales.

Page 7

1 A. I'm going to say approximately twenty.
2      MR. GILLIS: If you know
3    answer the question. Don't guess.
4      THE WITNESS: I wouldn't
5    know an exact number of times but it was
6    not a very large amount.
7 Q. Your best estimate is about twenty
8    times?
9 A. Yes.
10 Q. Do you understand that your deposition
11    is being taken in connection with an
12    automobile accident that occurred in the
13    early morning hours of September 27,
14    2003?
15 A. Yes, I do.
16 Q. In connection with that accident has
17    anyone who you understood to be a
18    private investigator ever spoken to you?
19 A. I have had somebody contact me, yes.
20 Q. On how many occasions has the private
21    investigator contacted you?
22 A. Once or twice.
23 Q. Do you know how close in time it was to
24    the accident of September 27, 2003 that

Page 6

1 Q. How long have you been employed there?
2 A. A month.
3 Q. Can you briefly describe your
4    educational background for us.
5 A. I graduated high school in 1997. I went
6    to college for several years. I did not
7    graduate.
8 Q. Do you know Jeffrey Southworth?
9 A. Yes.
10 Q. Can you tell me approximately when you
11    first met Mr. Southworth?
12 A. I approximately met Mr. Southworth
13    sometime during the beginning of high
14    school, maybe younger than that.
15 Q. Did you live in the same town?
16 A. Yes.
17 Q. And were you in Mr. Southworth's
18    presence on September 26, 2003?
19 A. Yes.
20 Q. In between those two times, that is when
21    you first met him and when you were with
22    him on September 26, 2003, can you
23    quantify for me how many times you were
24    in Mr. Southworth's presence?

Page 8

1    that private investigator contacted you?
2 A. I would guess it was a couple of months
3    afterwards but I can't remember exactly
4    the date.
5 Q. If you say guess, you will incur the
6    wrath of Mr. Gillis.
7 A. I don't know.
8 Q. Your best estimate is a few months
9    afterwards, is that right?
10 A. Yes.
11 Q. Do you know who that private
12    investigator was, that is, his or her
13    name?
14 A. No, I don't remember.
15 Q. Do you know for whom the private
16    investigator was working?
17 A. I thought it was for Mr. Southworth.
18 Q. Did you give that private investigator a
19    statement?
20 A. I don't believe so.
21 Q. Since that time has any other private
22    investigator been in contact with you?
23 A. I don't believe so.
24 Q. Has anyone from the Dinatale Detective

**Page 9**

1  Agency been in contact with you?
2  A. Not that I know of.
3  Q. Prior to September 26, 2003 had you ever
4    seen Jeffrey Southworth in what you
5    believe to be a condition of
6    intoxication?
7  A. Yes.
8  Q. On approximately how many occasions
9    prior to that date did you see him in
10   such a state?
11 A. Maybe four or five.
12 Q. Were there any particular manifestations
13   of that intoxication that led you to
14   believe he was intoxicated?
15 A. Just being around a bunch of other
16   people that were intoxicated I would
17   say.
18 Q. Was loudness one of the characteristics
19   that he exhibited when he was
20   intoxicated?
21         MR. GILLIS: Objection. I
22   have to object for the record but if you
23   can answer the question go ahead and
24   answer it.

**Page 10**

1  A. Yes, sure.
2  Q. Did he in the past exhibit loud speech
3    as one of the characteristics of
4    intoxication that you observed?
5         MR. GILLIS: Objection.
6  A. Yes.
7  Q. Your brother's name is Thomas Scott
8    Espey?
9  A. Yes.
10 Q. He is known as Scott, is that right?
11 A. That's correct.
12 Q. To your knowledge was Scott spending
13   time in the presence of Jeffrey
14   Southworth during the spring and summer
15   of 2003?
16 A. I believe so, yes.
17 Q. Did you ever have any discussions with
18   Scott during that period about Jeffrey
19   Southworth?
20 A. Yes.
21 Q. Did you ever have discussions with him
22   around whether or not in your opinion it
23   was a good idea for him to spend time
24   with Jeffrey Southworth?

**Page 11**

1  A. I don't think so.
2  Q. Were you at the Longhorn Steakhouse in
3    Leominster, Massachusetts with a party
4    that included Jeffrey Southworth on
5    September 26, 2003?
6  A. Yes.
7  Q. And do you know approximately what time
8    you arrived at the Longhorn Steakhouse?
9  A. Without guessing, no.
10 Q. Do you know what you had been doing that
11   day prior to arriving at the Longhorn
12   Steakhouse?
13 A. Yes.
14 Q. What had you been doing that day?
15 A. I had seen some friends from Vermont
16   that I hadn't seen in a long time.
17 Q. When did you first meet up with them?
18 A. I'd say probably sometime early
19   afternoon.
20 Q. Where did you meet up with them?
21 A. In Leominster at a hotel right by BJ's,
22   Four Points.
23 Q. Was it in a room at the Four Points that
24   you met up with these friends?

**Page 12**

1  A. Yes.
2  Q. What are their names?
3  A. Bruce Sirjane and Matthew Cenicola.
4  Q. During the time that you were with Matt
5    and Bruce at the hotel did you
6    personally have any alcoholic beverages
7    to drink?
8  A. Yes, I did.
9  Q. Can you tell me what alcoholic beverages
10   you had to drink while you were at the
11   hotel with them?
12 A. I would say probably some beers and
13   probably some Jack Daniels but I don't
14   know for sure. I'm guessing.
15 Q. What is your best memory of what you had
16   to drink?
17 A. Beers and Jack Daniels.
18 Q. Can you quantify for me how many beers
19   you had at the hotel before you went to
20   the restaurant?
21 A. I would have no idea.
22 Q. Can you tell me when you started
23   drinking those beers?
24 A. Probably mid afternoon.

Page 13

1  Q. Three o'clock?
2  A. Sure.
3  Q. Was Bruce drinking that afternoon with
4     you as well?
5  A. I believe so.
6  Q. Is there any doubt in your mind about
7     whether or not Bruce was drinking with
8     you that afternoon?
9  A. There's a lot of doubt in my mind about
10    the whole day.
11 Q. And that's because you were drunk.
12       MR. GILLIS: Objection.
13 A. Yes.
14 Q. My question to you is do you know
15    whether or not Bruce had anything to
16    drink while you and he were together at
17    the hotel?
18 A. I would say yes.
19 Q. Do you know what he was drinking?
20 A. I would say beers.
21 Q. Was he drinking Jack Daniels as well?
22 A. Possibly but I don't know for sure.
23 Q. Who brought the Jack Daniels to the
24    room?

Page 14

1  A. I would say one of the two of them
2     brought it with them.
3  Q. You did not bring it as far as you know.
4  A. As far as I know.
5  Q. Who brought the beers to the room?
6  A. I would say probably the two of them as
7     well.
8  Q. You didn't supply any of the alcoholic
9     beverages that day.
10 A. No.
11 Q. Was Matt drinking alcoholic beverages
12    that afternoon with Bruce and you?
13 A. Yes.
14 Q. Do you know what Matt was drinking that
15    afternoon?
16 A. Beers and Jack Daniels.
17 Q. At any point in time that afternoon did
18    you say to Matt or to Bruce in effect,
19    "I'm drunk"?
20 A. No.
21 Q. Do you remember having any discussion
22    with Matt or Bruce that afternoon about
23    your level of intoxication?
24 A. No.

Page 1

1  Q. Do you remember having any discussion
2     that afternoon about Matt's level of
3     intoxication?
4  A. No.
5  Q. Do you remember having any discussion
6     that afternoon about Bruce's level of
7     intoxication?
8  A. No.
9  Q. Was there any point in time from when
10    you started drinking that afternoon at
11    the hotel until you left the hotel that
12    you were not drinking alcoholic
13    beverages?
14       MR. GILLIS: Objection.
15 A. I would say I wasn't drinking every
16    second of the afternoon. I don't know
17    how to answer it. I would say no.
18 Q. Do you have a memory of at any point in
19    time during that afternoon while you
20    were at the hotel of consciously
21    stopping drinking alcoholic beverages?
22 A. No.
23 Q. Do you have a memory at any point in
24    that afternoon while you were at the

Page 1

1     hotel of Matt consciously stopping
2     drinking alcoholic beverages?
3  A. No.
4  Q. Do you have any memory of any point in
5     time in that afternoon of Bruce
6     consciously stopping drinking alcoholic
7     beverages?
8  A. No.
9  Q. Did you go from the hotel to the
10    Longhorn Steakhouse directly?
11 A. Yes.
12 Q. Do you have an opinion as of the time
13    you left the hotel whether or not Matt
14    was under the influence of alcoholic
15    beverages?
16 A. I would say he was.
17 Q. Do you have an opinion as of the time
18    you left the hotel whether or not Bruce
19    was under the influence of alcoholic
20    beverages?
21 A. I would say he was.
22 Q. Do you have an opinion as of the time
23    you left the hotel whether or not Matt
24    was intoxicated?

Page 17

1  A. I wouldn't have an opinion either way,
2     no.
3  Q. How about Bruce?
4  A. I wouldn't have an opinion either way.
5  Q. Can you tell me approximately how many
6     beers per hour you drank while you were
7     at the hotel and if it's less than one
8     beer per hour use a fraction.
9  A. I would say one to two.
10 Q. Can you tell me approximately how many
11    Jack Daniels drinks you had per hour,
12    and again if it's less than one use a
13    fraction, while you were at the hotel?
14        MR. GILLIS: Objection.
15 A. I had put the two together in the other
16    question so probably one and one, one
17    beer per hour and one Jack Daniels per
18    hour.
19 Q. And that was from mid afternoon until
20    you left the hotel, is that right?
21 A. Yes.
22 Q. How were you drinking the Jack Daniels?
23 A. Mixing it with Coke, I believe.
24        MR. GILLIS: Objection.

Page 18

1  Q. How was Bruce drinking the Jack Daniels?
2  A. The same way, again with Coke.
3  Q. How was Matt drinking them?
4  A. Probably the same way with Coke.
5  Q. Do you know how, that is by way of mode
6     of transport, you went from the Four
7     Points to the Longhorn that night?
8  A. I believe by car.
9  Q. Do you know whose car?
10 A. I think we took Bruce's truck and
11    William Todd Currie drove.
12 Q. Was Mr. Currie somebody who was drinking
13    with you that afternoon at the hotel?
14 A. I don't believe so, no.
15 Q. When did you come into the presence of
16    Mr. Currie that day?
17 A. I went with him to the hotel.
18 Q. You went with him to the hotel?
19 A. Yup.
20 Q. How did you get to the hotel?
21 A. In his car.
22 Q. What kind of car does he drive?
23 A. A BMW.
24 Q. Where had you driven from, Mr. Currie

Page 1

1     and you, to the hotel?
2  A. I believe my house.
3  Q. So he had picked you up by
4     pre-arrangement that day, is that right?
5  A. Yes.
6  Q. What was your plan when you left your
7     house that day, if you had one,
8     Mr. Currie and you?
9  A. To go see two friends I hadn't seen in a
10    while and go to dinner with them later
11    on.
12 Q. Was Mr. Currie with Bruce and you, that
13    is, in your presence throughout the
14    afternoon at the hotel?
15 A. Yes.
16 Q. And is it your best memory that
17    Mr. Currie had no alcoholic beverages to
18    drink at that time?
19 A. I wouldn't say zero but I don't think he
20    had more than one or two.
21 Q. As opposed to the rest of you.
22 A. Yes.
23 Q. The one or two alcoholic beverages that
24    Mr. Currie had during this time were

Page 2

1     what?
2  A. Beer, I would think.
3  Q. Was that Mr. Currie's drink of choice?
4  A. A drink of choice? There are so many to
5     choose from.
6  Q. Did he have a favorite?
7  A. I know now what his favorite is. I
8     didn't know what his favorite was at the
9     time.
10 Q. What is his favorite now?
11 A. Vodka and grape juice.
12 Q. Do you know why Mr. Currie drove Bruce's
13    truck from Four Points to the Longhorn?
14 A. More space. There were four people.
15 Q. Why didn't Bruce drive his truck?
16 A. I would think because he had a couple of
17    more drinks.
18 Q. When you say a couple more drinks, do
19    you mean he had been drinking along the
20    order of what you testified to already?
21        MR. GILLIS: Objection.
22 A. Yes.
23 Q. Do you remember any conversation among
24    any of the four of you prior to the time

Page 21

1  that Mr. Currie began to drive the truck
2  over to the Longhorn about whether or
3  not Bruce should drive?
4  A. I do not remember a conversation about
5  that.
6  Q. Do you remember any conversation among
7  the four of you during the drive from
8  the hotel to the restaurant about
9  whether or not Bruce was capable of
10  driving?
11  A. No.
12  Q. Can you tell me what time you got to the
13  restaurant?
14  A. My best approximation is eight o'clock.
15  Q. Was it dark when you got to the
16  restaurant?
17  A. It wasn't dark, it was dusk.
18  Q. When you got to the restaurant how much
19  time elapsed from when you got to the
20  restaurant until you were seated at a
21  table?
22  A. I have no idea.
23  Q. Do you know whether prior to being
24  seated at the table at the restaurant

Page 2

1  A. No.
2  Q. Is there any question in your mind about
3  whether or not from the moment you
4  arrived at the Longhorn Steakhouse until
5  you left you were drunk?
6      MR. GILLIS: Objection.
7  A. No.
8  Q. Were you drunk from the moment you
9  arrived at the Longhorn Steakhouse until
10  you left?
11      MR. GILLIS: Objection.
12  A. Yes.
13  Q. You don't remember whether you went to
14  the bar or not before you were seated at
15  a table, is that right?
16  A. I do not.
17  Q. At some point in time were you seated at
18  a table with Jeffrey Southworth?
19  A. I believe so. Yes.
20      MR. GILLIS: Don't guess if
21  you don't know.
22  Q. Is there any doubt in your mind about
23  whether you were seated at a table with
24  Mr. Southworth?

Page 22

1  you went to the bar?
2  A. I do not know. I have no idea.
3  Q. You have no memory?
4  A. No.
5  Q. Is that because in your own view you
6  were drunk that night?
7      MR. GILLIS: Objection.
8  A. Yes.
9  Q. You already testified in your earlier
10  deposition that you were drunk that
11  night, is that right?
12      MR. GILLIS: Objection.
13  A. Yes.
14  Q. There's no question in your mind that
15  while you were a customer at the
16  Longhorn Steakhouse you were drunk that
17  night, isn't that night?
18      MR. GILLIS: Objection.
19  A. Yes.
20  Q. Is there any question in your mind about
21  whether or not while you were a customer
22  at the Longhorn Steakhouse you were
23  drunk?
24      MR. GILLIS: Objection.

Page 2

1  A. No.
2  Q. Do you know what you had to drink, if
3  anything, while you were a customer at
4  the Longhorn Steakhouse that night?
5  A. I know I did have drinks. I believe I
6  was drinking any combination of beers,
7  Jack Daniels, and Manhattans.
8  Q. Do you know whether or not you had any
9  beers at the Longhorn Steakhouse that
10  night?
11  A. With any absolute certainty I do not
12  know what I had to drink that night.
13  Q. Do you believe you had beers while you
14  were at the Longhorn Steakhouse that
15  night?
16  A. Yes.
17  Q. Can you tell me how many beers you
18  believe you had at the Longhorn
19  Steakhouse that night?
20      MR. GILLIS: Objection.
21  A. Approximately one to three.
22  Q. Can you tell me whether or not you
23  believe those beers to be 12-ounce size
24  or different from 12-ounce size?

Page 25

1  A. I have no idea.
2  Q. Do you believe you had Jack Daniels
3     Manhattans at the Longhorn that night?
4         MR. GILLIS: Objection.
5  A. I believe I did.
6  Q. Did you have Jack Daniels Manhattans at
7     the Longhorn that night?
8         MR. GILLIS: Objection.
9  A. I believe so.
10 Q. And can you tell me how many Jack
11    Daniels Manhattans you believe you had
12    at the Longhorn Steakhouse that night?
13 A. I have no idea.
14 Q. What's your best judgment of the number
15    of Jack Daniels Manhattans you had at
16    the Longhorn that night?
17        MR. GILLIS: Objection.
18 A. One to three.
19 Q. The Jack Daniels Manhattans that you
20    believe you had at the Longhorn that
21    night were they straight up or on the
22    rocks?
23 A. I have no idea.
24 Q. Do you know the difference in what I

Page 26

1     mean by straight up versus on the rocks?
2  A. Yes.
3  Q. Had you ever been at a restaurant with
4     Jeffrey Southworth at which he was
5     having Jack Daniels Manhattans prior to
6     September 26, 2003?
7  A. Yes.
8  Q. Do you recall how, that is on the rocks
9     or straight up, he was drinking Jack
10    Daniels Manhattans?
11 A. I don't remember. I don't recall.
12 Q. Do you know what Jeffrey Southworth had
13    to drink that night?
14 A. No idea.
15 Q. Do you have any belief, based on your
16    observations of him that night as to
17    what he had to drink that night?
18        MR. GILLIS: Objection.
19 A. I could only guess.
20 Q. Even I am going to join with Mr. Gillis
21    in saying that we don't want you to only
22    guess. If you have any memory at all of
23    what Mr. Southworth was drinking that
24    night I would like you to try to answer

Page 2

1     the question. Do you have any memory as
2     to what he was drinking that night?
3         MR. GILLIS: Objection.
4  A. No, I do not.
5  Q. Do you know what any of the other
6     persons at your table were drinking that
7     night?
8  A. I am sure there were beers and I'm sure
9     there were Manhattans.
10 Q. Tell me who else you are sure was
11    drinking beers that night at your table.
12        MR. GILLIS: Objection.
13 A. Everybody but Jude.
14 Q. Tell me who at your table was drinking
15    Jack Daniels Manhattans that night.
16 A. I have no idea.
17 Q. Was Jeffrey Southworth exhibiting what
18    you took to be signs of intoxication at
19    any point in time that evening?
20 A. Yes. Let me just describe when I'm
21    intoxicated a lot of people around you
22    appear to be intoxicated and you think
23    if somebody's smiling they're drunk. I
24    would say yes.

Page 2

1  Q. Can you tell me what signs of
2     intoxication he exhibited to you that
3     evening?
4         MR. GILLIS: Objection.
5  A. No. I would say maybe loud.
6  Q. Can you tell me at what point in time in
7     the evening he first began to exhibit to
8     you what you interpreted to be signs of
9     intoxication?
10 A. No, I can't.
11 Q. Can you tell me whether or not there was
12    any point in time while you were at the
13    Longhorn that evening when
14    Mr. Southworth was not exhibiting to you
15    what you took to be signs of
16    intoxication?
17        MR. GILLIS: Objection.
18 A. You kind of twisted that question on me.
19    Can you repeat that one?
20        MR. FARRAH: Will you repeat
21    the question I just asked.
22        [Question read.]
23        MR. GILLIS: He has already
24    said he exhibited no signs that he can

Page 29

1  say.
2       MR. FARRAH: That's not
3  true.
4       MR. GILLIS: That's exactly
5  what he said.
6       MR. FARRAH: Let him answer
7  the question.
8       MR. GILLIS: If you can
9  answer that question in its double
10  negative form go ahead.
11       MR. FARRAH: This is not
12  your witness. You are not instructing
13  him.
14       MR. GILLIS: He instructed
15  you he doesn't understand your question.
16       THE WITNESS: I can't answer
17  that question.
18  Q. Do you know at what point in time
19  Mr. Southworth first appeared to you to
20  be intoxicated that evening at the
21  Longhorn?
22       MR. GILLIS: Objection.
23  A. No, I don't know at what point.
24       MR. GILLIS: He testified he

Page 30

1  was intoxicated at the Longhorn. You
2  are asking really sneaky sleazy
3  questions. If you want to ask him a
4  straight question go ahead.
5       [Discussion off the record.]
6  Q. When did Mr. Southworth first exhibit
7  what you took to be signs of
8  intoxication that evening?
9  A. I don't know exactly when.
10  Q. Was it before you left the restaurant
11  that he first exhibited signs of
12  intoxication that evening?
13       MR. GILLIS: Objection.
14  A. Yes. The only time I saw him was pretty
15  much at the restaurant.
16  Q. Can you tell me how long before you left
17  the restaurant it was that he first
18  exhibited what you took to be signs of
19  intoxication that evening?
20  A. I don't have a good sense of time from
21  that evening.
22  Q. Do you have a recollection of whether or
23  not at any point in time that evening
24  anyone you understood to be an employee

Page 3

1  of the Longhorn came to your table and
2  asked your table to quiet down or words
3  to that effect?
4  A. I do not believe so.
5  Q. After leaving the Longhorn where did you
6  go that evening?
7  A. To the Other Side, to a strip club.
8  Q. Prior to going to the Other Side did you
9  return to the hotel?
10  A. I don't know whether we went back to the
11  hotel.
12  Q. Did you drive from the Longhorn to
13  wherever you went next?
14  A. I did not drive anywhere.
15  Q. Do you know who drove when you left the
16  Longhorn to wherever you went next that
17  evening?
18  A. Todd.
19  Q. What did he drive?
20  A. Bruce's truck.
21  Q. Who was with you when you left the
22  Longhorn in Bruce's truck with Todd
23  driving that evening?
24  A. Todd, myself, Bruce, and Matt.

Page 3

1  Q. Did you eat while you were at the
2  Longhorn?
3  A. Yes.
4  Q. Do you know what you ate?
5  A. I do not know.
6  Q. Do you know where you spent the night?
7  A. At the hotel.
8  Q. Are you sure?
9  A. No.
10  Q. Do you know what you did the next day?
11  A. I was at a concert with Bruce and Matt.
12  Q. Did you go to the Other Side that you
13  answered a little earlier was a
14  destination that evening?
15  A. Yes.
16  Q. Did you go in?
17  A. Yes.
18  Q. Who went in with you?
19  A. Bruce, Matt, and Todd.
20  Q. Do you know how long you were there?
21  A. I don't.
22  Q. Were you drinking there?
23  A. I believe so.
24  Q. Do you know how you got from the Other

Page 33

```
1    Side club to wherever you went next?
2  A. The same way we got to the hotel.  It
3     was Bruce's truck.
4  Q. Do you know where you went next in
5     location after leaving the Other Side?
6  A. Back to the hotel.
7  Q. And is your best memory that's where you
8     spent the night.
9  A. I don't honestly know where I spent the
10    night.  I think I might have actually
11    gone home because I had to get my car to
12    go to the concert the next day.
13 Q. Do you know how you got home?
14 A. Yes.  I got home with Todd.
15 Q. Was Todd drinking at the Other Side?
16 A. I do not know.
17 Q. Was Todd drinking at the Longhorn?
18 A. I don't know.  He might have had a beer
19    but I can't swear on the record that
20    yes, he had a beer.
21 Q. Is Todd someone in your experience who
22    is more moderate in his drinking habits
23    than, say, you?
24       MR. GILLIS: Objection.
```

Page 34

```
1  A. Not always.
2  Q. Was Todd a designated driver of sorts
3     that day?
4        MR. GILLIS: Objection.
5  A. Yes.
6  Q. Was that the arrangement that you had
7     made with Todd?
8  A. Kind of tricked him into it.
9  Q. He became the de facto designated driver
10    as the day unfolded?
11 A. Yes.
12 Q. Did you have any discussions with him
13    about that?
14 A. No.
15 Q. In your way of thinking was Todd sober
16    enough to drive from the Four Points to
17    the Longhorn?
18 A. I believe so.
19 Q. To your way of thinking was he sober
20    enough to drive from the Longhorn to
21    wherever you went next?
22 A. I believe so.
23 Q. Have you testified before the Grand Jury
24    in this matter?
```

Page 3

```
1  A. No.
2  Q. Did you testify in the criminal case
3     against Mr. Southworth?
4  A. In the case in court?
5  Q. Yes, sir.
6  A. No.
7  Q. Have you testified anywhere except in an
8     earlier deposition that I and some
9     different lawyers conducted?
10 A. No.
11 Q. Have you spoken to anyone about the
12    events of that evening?
13 A. Yes.
14 Q. Have you discussed with anyone other
15    than in the deposition that I took
16    whether or not Jeffrey Southworth was
17    intoxicated while a customer at the
18    Longhorn?
19 A. I talked to my brother about it.
20 Q. When did you have a conversation with
21    your brother about it?
22 A. The next morning.
23 Q. Tell me what you remember he said and
24    you said in that conversation.
```

Page 3

```
1  A. I remember the conversation being along
2     the line of what happened and trying to
3     put together the pieces.  I remember my
4     brother's foot was run over.  Did I have
5     a conversation with him the next
6     morning?  He was in the hospital the
7     next morning.  I know I talked to my
8     brother about what happened.  I know his
9     foot was broken.  I don't know how his
10    foot was broken.  Jeff ran over his
11    foot.
12 Q. My question to you is did you have
13    conversations with anyone about whether
14    or not Jeff Southworth was under the
15    influence of intoxicating beverages
16    while he was a customer at the Longhorn
17    that evening?
18 A. No.
19 Q. Do you remember discussing with anyone
20    whether or not Jeff was drunk that
21    evening?
22 A. No.
23 Q. I'm going to show you a document and ask
24    you if that is your signature at the
```

Page 37

1  bottom.
2  A. Yes.
3  Q. Is that your handwriting as well?
4  A. Yes, it is.
5       [Handwritten document by
6       Mike Espey marked Michael
7       Espey Exhibit No. 1 for
8       Identification.]
9  Q. Do you remember the circumstances under
10    which you wrote and then signed this
11    document, Exhibit 1?
12 A. I believe there was some kind of a
13    police officer that came and asked for a
14    statement.
15 Q. Can you tell me how close in time it was
16    that he came and asked for a statement
17    to the evening of September 26, 2003?
18 A. Not with any certainty.
19 Q. Do you know where you made this
20    statement?
21 A. At my house.
22 Q. The third line down reads, "While at the
23    Longhorn we received a call from my
24    brother," is that right?

Page 38

1  A. Yes.
2  Q. This is your brother Scott?
3  A. Yes.
4  Q. Do you know where Scott was when you
5     received that call?
6  A. On his way back from riding dirt bikes.
7  Q. Was it you that Scott called?
8       MR. GILLIS: Objection.
9  A. I believe so.
10 Q. What's your cell phone number?
11 A. Then or now? I don't know what it was
12    then. It's different now.
13 Q. What is it now?
14 A. It's 978-424-5827.
15 Q. Who is your carrier?
16 A. Cingular.
17 Q. Back in 2003 who was your carrier?
18 A. Verizon, if I had a cell phone then.
19 Q. Can you tell me what other carriers than
20    Verizon and Cingular you have had cell
21    phone service with?
22 A. That is every one.
23 Q. What is your brother's cell phone
24    number?

Page 3

1  A. I don't know.
2  Q. Do you know what it was back in
3     September of 2003?
4  A. No.
5  Q. What is it today?
6  A. 978-407-3115.
7  Q. You see that this document that has been
8     marked as Exhibit 1 in your deposition
9     has a photocopy of a sticker that says
10    Grand Jury Exhibit 19 at the bottom.
11    See that?
12 A. Yes.
13 Q. Do you have a memory of actually
14    physically appearing before the Grand
15    Jury?
16 A. No.
17         CROSS-EXAMINATION
18         BY MR. GILLIS
19 Q. My name is Michael Gillis. I represent
20    Longhorn Steakhouse and I want to ask
21    you some questions about the night of
22    September 26, 2003. You have been shown
23    a document in front of you that is
24    marked Exhibit 1, correct?

Page 4

1  A. Yes.
2  Q. When you look at that that's a statement
3     you gave to the State Police, correct?
4  A. Correct.
5  Q. What was the date of that statement?
6  A. I do not know the exact date.
7  Q. It was submitted to the Grand Jury on
8     November 5, '03, correct?
9  A. Correct.
10 Q. That was two months after the accident,
11    correct?
12 A. Correct.
13 Q. And at that time you had told the State
14    Police that you had gone back to the
15    Four Points Hotel for about forty-five
16    minutes, correct?
17         MR. FARRAH: Objection.
18 A. The document says thirty to forty-five
19    minutes.
20 Q. You went back thirty to forty-five
21    minutes, is that correct?
22 A. According to the document, yes.
23 Q. That was your best memory at the time,
24    is that correct?

Page 41

1 A. Yes. Probably more accurate than my
2   memory now.
3 Q. So if your memory today differs from
4   back then it's not because of any
5   intoxication today, correct?
6 A. No.
7 Q. It's just because of the passage of
8   time, is that correct?
9 A. Correct.
10 Q. When you said that you couldn't remember
11   a lot of things in answer to
12   Mr. Farrah's questions is that because
13   of the passage of time as well?
14       MR. FARRAH: Objection.
15 A. As well as the intoxication?
16 Q. Yes.
17 A. Yes.
18 Q. It could be, correct?
19       MR. FARRAH: Objection.
20 A. Yes.
21 Q. Specifically what time did you arrive at
22   the Four Points Hotel that afternoon?
23 A. Sometime early afternoon.
24 Q. But you don't know with any specificity,

Page 42

1   correct?
2 A. Correct.
3 Q. You can no more say that it was two
4   o'clock than four o'clock, correct?
5       MR. FARRAH: Objection.
6       MR. GILLIS: What's the
7   nature of the objection?
8       MR. FARRAH: It doesn't
9   matter. Go on.
10       MR. GILLIS: There has to be
11   a reasonable basis for your objection.
12   This is cross-examination. I can ask a
13   question.
14       MR. FARRAH: I'm objecting.
15       MR. GILLIS: You have to
16   have a basis.
17       MR. FARRAH: We'll take it
18   up with some judge at some time.
19 Q. Could it have been five o'clock?
20       MR. FARRAH: Objection.
21 A. Possibly.
22 Q. Todd picked you up at the house?
23 A. Correct.
24 Q. What was he wearing?

Page 43

1 A. I have no idea.
2 Q. When you arrived at the hotel what floor
3   did you go to?
4 A. I have no idea.
5 Q. Were you intoxicated when you got to the
6   hotel?
7 A. No.
8 Q. What was the name of the people you met
9   upstairs again?
10 A. Matthew Cenicola and Bruce Sirjane.
11 Q. What were they wearing?
12 A. I have no idea.
13 Q. What room were you in?
14 A. No idea.
15 Q. In hours and minutes can you tell me how
16   long you were in the room?
17 A. I have no idea.
18 Q. Other than guessing do you know exactly
19   what you had to drink in the hotel
20   before you went to the restaurant?
21       MR. FARRAH: Objection.
22 Q. Do you have any memory of having any
23   drinks at the bar at the restaurant
24   prior to sitting down?

Page 44

1 A. No.
2 Q. When you said everybody at the table had
3   a beer, that was a guess, wasn't it?
4       MR. FARRAH: Objection.
5 A. I didn't say everybody at the table had
6   a beer.
7 Q. Did you testify that everybody at the
8   table but you had a beer?
9 A. Yes.
10 Q. Is that a guess?
11       MR. FARRAH: Objection.
12 A. It's a reasonable assumption.
13 Q. It's an assumption, is that correct?
14 A. Yes.
15 Q. I'm going to show you a document that
16   has been introduced in other depositions
17   and it's represented as the bill for
18   your table that night showing two beers
19   for the entire table for the evening.
20   Does that refresh your recollection at
21   all as to whether or not everybody at
22   the table had a beer served to them?
23       MR. FARRAH: Objection.
24 A. It sounds like I was wrong.

Page 45

1  [Document entitled Longhorn
2  Steakhouse marked Michael
3  Espey Exhibit No. 2 for
4  Identification.]
5  Q. Who contacted you about this deposition?
6  A. I believe the deposition said the law
7     offices of Al Farrah.
8  Q. Have you had any phone conversations
9     with him about setting up the
10    deposition?
11 A. No.
12 Q. You hadn't been contacted by anybody in
13    Mr. Farrah's office prior to today about
14    coming in here today?
15 A. No.
16 Q. You were contacted by them for your
17    prior deposition, is that correct?
18 A. Correct.
19 Q. That was in June of 2004, correct?
20 A. Correct.
21 Q. Was your memory fresher back then than
22    it is today?
23 A. By about two years.
24 Q. When you spoke to the State Trooper when

Page 4

1          MR. FARRAH: Objection.
2  A. Yes.
3  Q. If he had said that you arrived at the
4     Longhorn around 8:30 would that refresh
5     your recollection at all?
6          MR. FARRAH: Objection.
7  A. I would have to believe it.
8  Q. You don't really have a memory of what
9     time you showed up at the Longhorn that
10    night, correct?
11 A. No.
12 Q. Do you remember testifying two years ago
13    at your deposition in the other lawsuit
14    that you had eaten ribs at the Longhorn
15    that night?
16 A. I don't recall the specifics of the two
17    years ago deposition. I am looking at
18    the tab here and it says "ribs" so I
19    would assume I had ribs.
20 Q. Can you tell me why you can't remember
21    what you testified to two years ago in a
22    deposition by Mr. Farrah involving the
23    same action?
24 A. Because it was two years ago.

Page 46

1     you gave your statement that is marked
2     Exhibit 1 did he ask you what signs of
3     intoxication Mr. Southworth exhibited,
4     if any, on the evening of September 26?
5  A. I have no idea.
6  Q. You don't have any memory whatsoever of
7     Mr. Southworth exhibiting any loudness
8     on September 26, 2003 while at the
9     Longhorn, do you?
10         MR. FARRAH: Objection.
11 A. No.
12 Q. Your brother was with you on
13    September 26, 2003 at the restaurant,
14    correct?
15 A. Correct.
16 Q. What is his name again?
17 A. Thomas Scott Espey.
18 Q. Is he older or younger than you?
19 A. Younger.
20 Q. By how much?
21 A. Two years.
22 Q. After living with him for most of your
23    life does he have a reputation for
24    truthfulness?

Page 4

1  Q. What does that mean?
2  A. It means there's a lot of stuff I've had
3     to know and remember and learn since
4     that day.
5  Q. Is it fair to say that over the passage
6     of time you've forgotten certain things?
7  A. Correct.
8  Q. Including facts concerning this
9     accident, correct?
10 A. Yes, sir.
11 Q. What type of truck was it that your
12    friend Bruce had?
13 A. It was a Chevy.
14 Q. Do you remember what year?
15 A. I don't know. I think it was '99, 2000,
16    2001.
17 Q. Did you meet with them the next day to
18    go to the concert?
19 A. Yes.
20 Q. Do you remember who sponsored the
21    concert?
22 A. I believe that concert was sponsored by
23    WAAF.
24 Q. And that was at the Fitchburg Airport?

Page 49

1  A. Correct.
2  Q. Have you ever read your prior deposition
3     in the case Mr. Farrah deposed you in?
4  A. No.
5  Q. Have you spoken with any of the
6     attorneys in that case or
7     representatives of their office other
8     than to schedule a deposition in that
9     case?
10 A. No.
11 Q. While you were at the hotel sometime
12    before you went to the Longhorn on
13    September 26, 2003 do you know where
14    your brother and Mr. Southworth were?
15 A. Riding dirt bikes.
16 Q. Were they drinking while they were
17    driving dirt bikes?
18 A. I do not know. I do not believe so.
19 Q. Did he ever tell you they were drinking
20    while driving dirt bikes?
21 A. No.
22 Q. You talked earlier about your definition
23    of intoxication and I want to make sure
24    I have this right.

Page 50

1            Is it your understanding
2     that others around you seem intoxicated
3     when you are intoxicated?
4            MR. FARRAH: Objection.
5  A. Yes.
6  Q. When you said that others were
7     intoxicated was that the definition you
8     were using?
9            MR. FARRAH: Objection.
10 A. Yes.
11 Q. You weren't stating that they were
12    intoxicated based on any visible signs
13    that they exhibited that you saw,
14    correct?
15           MR. FARRAH: Objection.
16 A. Correct.
17 Q. In fact at no time during the time that
18    you were at the Longhorn that night did
19    you see Jeffrey Southworth exhibit any
20    signs of intoxication, correct?
21           MR. FARRAH: Objection.
22 A. Correct.
23 Q. You went back to the hotel afterwards
24    with the group after you left the

Page 51

1     Longhorn, correct?
2  A. Correct.
3  Q. And there was still Jack Daniels and
4     beer in the hotel, is that correct?
5  A. As far as I can remember.
6  Q. Was anybody guarding that or preventing
7     anybody from drinking the Jack Daniels
8     or the beer?
9            MR. FARRAH: Objection.
10 A. Not to my recollection.
11 Q. In fact anybody was free to have
12    whatever they wanted back at the hotel,
13    correct?
14           MR. FARRAH: Objection.
15 A. Correct.
16 Q. You had drank Jack Daniels with
17    Mr. Southworth prior to that night at
18    the 99 Restaurant, correct?
19 A. Correct.
20 Q. You knew that he drank Manhattans made
21    of Jack Daniels, correct?
22 A. Correct?
23 A. And nobody was stopping him from
24    drinking more Jack Daniels back at the

Page 52

1     hotel after you left the Longhorn that
2     night, correct?
3            MR. FARRAH: Objection.
4  A. If he wanted it he probably could have
5     had it.
6  Q. And he could have drank beer as well,
7     correct?
8            MR. FARRAH: Objection.
9  Q. Did you see him drinking beer back at
10    the hotel afterwards?
11 A. I do not recall.
12 Q. You have testified in several of your
13    answers "I would guess." When you
14    answered questions "I would guess," is
15    it fair to assume you are guessing?
16           MR. FARRAH: Objection.
17 A. Yes.
18 Q. Were you, in fact, guessing on those
19    questions?
20           MR. FARRAH: Objection.
21 A. Yes.
22 Q. You answered "I think" to several
23    questions. Do you remember starting
24    sentences with those words?

Page 53

1  A. Yes.
2  Q. Those are also guesses.
3        MR. FARRAH: Objection.
4  A. Yes.
5  Q. And you said in a few questions "I don't
6     believe." Do you remember starting your
7     sentences prefaced with that?
8  A. Yes.
9  Q. Were those guesses?
10       MR. FARRAH: Objection.
11 A. Yes.
12 Q. When you started a sentence with "I
13    believe," were those guesstimates as
14    well?
15       MR. FARRAH: Objection.
16 A. Yes.
17 Q. Is it fair to say that your brother in
18    your opinion did not have as much to
19    drink on the night of September 26, 2003
20    that you did?
21 A. Yes.
22 Q. You're not sure where you were the next
23    morning when you woke up, correct?
24 A. Correct.

Page 54

1  Q. Whether you were at home or whether you
2     were at the hotel and the reason you
3     can't remember is the passage of time
4     not because you were still intoxicated,
5     is that correct?
6        MR. FARRAH: Objection.
7  A. Probably some combination of both.
8  Q. How much did you have to drink back at
9     the hotel after you left the Longhorn?
10       MR. FARRAH: Objection.
11 A. I have no idea.
12 Q. How much did you have to drink at the
13    strip bar after you left the hotel?
14 A. No idea.
15 Q. Do you remember what you were drinking
16    at the hotel after you left the
17    Longhorn?
18       MR. FARRAH: Objection.
19 A. Not with any specificity.
20 Q. When you said, "I believe I had Jack
21    Daniels Manhattans at the restaurant,"
22    that's a guess, isn't it?
23       MR. FARRAH: Objection.
24 A. That's a guess.

Page 55

1  Q. And when you said you had one to three
2     Manhattans, that's a guess, isn't it?
3  A. Yes.
4  Q. As you sit here today you don't know
5     where your brother was when you spoke to
6     him the next day about this, correct?
7  A. Correct.
8  Q. Do you remember what time of day you
9     spoke to him?
10 A. No.
11 Q. Was it while you were at the concert, do
12    you know?
13 A. No, it was not while I was at the
14    concert.
15 Q. You know that.
16 A. I'm pretty sure it wasn't.
17 Q. Were you drinking at the concert?
18 A. No.
19 Q. When the police officer who took the
20    statement from you that has been marked
21    as Exhibit 1 came to your house, can you
22    describe him physically, what he looked
23    like, age, size, etcetera?
24 A. I remember he was younger. That's about

Page 56

1     as much as I can remember.
2  Q. You remember he drove a truck.
3  A. I remember he rides dirt bikes and HUVs.
4  Q. How old was he?
5  A. Exact age I do not know.
6  Q. Can you give me a ballpark?
7  A. Under thirty.
8  Q. Can you be any more specific than he was
9     under thirty?
10 A. Under thirty.
11 Q. Can you remember how tall he was?
12 A. I think he was shorter than me.
13 Q. You think. You're not sure?
14 A. I'm not sure.
15 Q. You don't know how tall he was.
16 A. No.
17 Q. Do you know what color hair he had?
18 A. No.
19 Q. You were sober when you talked to him,
20    correct?
21 A. Yes.
22 Q. You can't remember due to the passage of
23    time, is that correct?
24 A. Correct.

Page 57

1  Q. You can't remember whether or not you
2     had a cell phone in 2003, is that
3     correct?
4  A. Correct.
5  Q. That is not due to any intoxication,
6     correct?
7  A. Correct.
8  Q. In fact as you sit here today you don't
9     even know what your brother's cell phone
10    number is without looking it up on your
11    phone, correct?
12 A. Correct.
13 Q. In your prior deposition do you remember
14    testifying that when Mr. Southworth is
15    intoxicated he gets belligerent?
16        MR. FARRAH: Objection.
17 Q. You said, "I do know that to be true of
18    Mr. Southworth." He never exhibited any
19    signs of being belligerent on
20    September 26, 2003, is that correct?
21        MR. FARRAH: Objection.
22 A. Not that I recall.
23 Q. He didn't show any signs of slurred
24    speech on September 26, 2003, correct?

Page 5

1     correct?
2  A. Correct.
3  Q. You didn't tell anybody at the Longhorn
4     that, did you?
5  A. No.
6  Q. Do you remember testifying that it was
7     your idea to order the Manhattans that
8     night at the Longhorn?
9        MR. FARRAH: Objection.
10 A. No, I do not remember that.
11 Q. Isn't it fair to say that the signs of
12    intoxication you saw, if any, of
13    Mr. Southworth on the night of
14    September 26, 2003 were back in the
15    hotel or at the strip joint?
16        MR. FARRAH: Objection.
17 A. It's possible.
18 Q. Do you know that Mr. Southworth had done
19    drugs back in high school?
20 A. Yes.
21 Q. What do you know about that?
22        MR. FARRAH: Objection. You
23    are asking for personal knowledge?
24 Q. Whatever knowledge you have from

Page 58

1        MR. FARRAH: Objection.
2  A. Not that I recall.
3  Q. When you drank with him at the 99 you
4     said he showed some visible signs of
5     intoxication, isn't that correct?
6  A. I do not recall.
7  Q. Have you ever been with Mr. Southworth
8     at the Longhorn Restaurant in Leominster
9     prior to September 26, 2003?
10 A. I do not believe so.
11 Q. Did Mr. Southworth have a reputation in
12    town prior to September 26, 2003 of
13    being a troublemaker?
14 A. Yes.
15 Q. He wasn't a troublemaker on
16    September 26, 2003, was he?
17        MR. FARRAH: Objection.
18 A. Not that I recall.
19 Q. He didn't pick any fights at the
20    Longhorn, did he?
21 A. No.
22 Q. You were aware that Mr. Southworth's
23    Massachusetts driver's license was
24    suspended on September 26, 2003,

Page 6

1     whatever source.
2  A. I don't know exactly what types of drugs
3     or anything like that, but I'm sure he
4     enjoyed partying like anybody else in
5     high school.
6  Q. When you say partying like anyone else
7     in high school you mean alcohol and some
8     form of drug, correct?
9  A. Correct.
10 Q. What would be the drug of choice?
11        MR. FARRAH: Objection.
12 Q. Pot or something more?
13 A. I'm sure that he smoked weed.
14 Q. Was anybody smoking pot back at the
15    hotel after you left the Longhorn on
16    September 26, 2003?
17 A. I do not believe so.
18 Q. Are you sure one way or the other?
19        MR. FARRAH: Objection.
20 A. No.
21 Q. Do you have a memory as to how many
22    people were with you that evening at the
23    Longhorn when you were there?
24        MR. FARRAH: Objection.

1   A. How many people were with me?

2   Q. How many people, if you remember, were

3     at the table with you when you were

4     sitting down at the Longhorn on

5     September 26, 2003?

6        MR. FARRAH: Objection.

7   A. I know that there were seven of us.

8   Q. Seven including you?

9   A. Including me.

10   Q. Have you ever been dirt biking with

11     Mr. Southworth?

12   A. I do now.

13   Q. Is there any particular reason you

14     didn't go dirt biking with him?

15   A. I didn't ride dirt bikes at that time.

16   Q. You have had dirt bikes since that time.

17   A. Correct.

18   Q. The friends you had that were there,

19     they were from Vermont, is that correct?

20   A. Correct.

21   Q. And you met them in college up at

22     Castleton, is that correct?

23   A. Correct.

24   Q. Do they live in Vermont?

1   A. No. One actually lives in New York and

2     one is originally from New Jersey.

3   Q. When you were in college with them did

4     either of them smoke any pot in college?

5        MR. FARRAH: Objection.

6   A. Yes.

7   Q. Did you ever smoke any pot with them

8     back in college?

9   A. Yes.

10   Q. Were they continuing to smoke pot in

11     2003?

12   A. I don't know.

13   Q. Do you know approximately what time you

14     left to go to the Other Side from the

15     hotel on September 26, 2003?

16   A. I have no idea.

17   Q. During the evening of September 26, 2003

18     at any time from the time you first

19     arrived at the hotel until after you

20     left the Other Side did you stop

21     drinking at any time period and by that

22     I don't mean for two seconds, for an

23     appreciable period of time?

24        MR. FARRAH: Objection.

1   A. No.

2   Q. So you continued to drink after Longhorn

3     back at the hotel, correct?

4        MR. FARRAH: Objection.

5   A. Correct.

6   Q. And then at the Other Side, correct?

7   A. Correct.

8   Q. Did you go anywhere after the Other

9     Side?

10   A. Not that I recall.

11   Q. Did you have anything to drink in the

12     vehicle on your way to and from the

13     Other Side?

14   A. I would say no.

15   Q. So you were not so intoxicated that you

16     don't remember whether or not you were

17     drinking at a certain point, correct?

18   A. I know that Todd as the driver would not

19     have allowed us to drink in the car.

20   Q. In your statement which has been marked

21     as Exhibit 1 you said, "They met us for

22     dinner. We ate dinner and had a couple

23     drinks. I can't remember who drank what

24     or how much but I think it was mostly

1     beers and Manhattans." Did I read that

2     correctly?

3   A. Yes.

4   Q. When you said you met them and had

5     drinks, you have no idea of the quantity

6     that each individual had to drink,

7     correct?

8        MR. FARRAH: Objection.

9   A. Yes.

10   Q. In fact you don't know whether each

11     individual didn't drink at all other

12     than Jude, correct?

13   A. Correct.

14   Q. Did the police ask you if you were

15     intoxicated that evening?

16   A. No. I don't remember.

17   Q. You don't remember or they didn't ask

18     you?

19   A. I don't remember.

20   Q. What did the police from what you

21     remember ask you to write that evening?

22   A. I believe they asked me to give them a

23     sworn statement.

24   Q. You knew that this sworn statement was

Page 65

1   to be used as evidence against
2   Mr. Southworth in the criminal trial,
3   correct?
4       MR. FARRAH: Objection.
5   A. I assumed so.
6   Q. You assumed they were trying to prove he
7     was operating a motor vehicle when he
8     was under the influence of alcohol,
9     correct?
10      MR. FARRAH: Objection.
11  A. I assume so.
12  Q. You assumed they were looking for
13    evidence from you that he was
14    intoxicated at some point, correct?
15      MR. FARRAH: Objection.
16  A. Correct.
17  Q. And at no point did you tell them that
18    he was intoxicated, correct?
19      MR. FARRAH: Objection.
20  A. Correct.
21  Q. That was something they would have asked
22    you to put in the statement if it was
23    true, correct?
24      MR. FARRAH: Objection.

Page 66

1   A. Yes.
2   Q. If you thought he was intoxicated and
3     the police came to your house and asked
4     you if he was would you have lied for
5     Mr. Southworth?
6       MR. FARRAH: Objection.
7   A. No.
8   Q. If he was intoxicated and the police
9     came and got a report for a criminal
10    trial against him for driving under the
11    influence you would have written that in
12    the statement if you were asked and it
13    was correct.
14      MR. FARRAH: Objection.
15  A. Yes.
16  Q. Do you remember them asking you whether
17    or not Mr. Southworth at any time that
18    evening showed visible signs of
19    intoxication?
20  A. I do not remember.
21  Q. But you understood that was what they
22    were after.
23      MR. FARRAH: Objection.
24  A. Correct.

Page 6

1   Q. Did you know the server that served you
2     at the Longhorn on the night of
3     September 26, 2003?
4   A. No.
5   Q. Prior to this night how many times had
6     you been in the Longhorn, if you have a
7     memory?
8   A. Once or twice.
9   Q. And who was with you when you were there
10    those other times?
11  A. My brother and one of his friends.
12  Q. Were you ever there previously with
13    Mr. Southworth?
14  A. No.
15  Q. Do you remember being carded when you
16    came to the Longhorn that evening?
17  A. I do not recall.
18  Q. You have no memory of Mr. Southworth's
19    eyes being glassy while you were at the
20    Longhorn Restaurant on September 26,
21    2003, is that correct?
22  A. Correct.
23  Q. You have no memory of him slurring his
24    speech at the Longhorn Restaurant on

Page 6

1     September 26, 2003, correct?
2   A. Correct.
3   Q. You have no memory of him being unsteady
4     on his feet at the Longhorn Restaurant
5     on September 26, 2003, is that correct?
6   A. Correct.
7   Q. You have no memory of him picking a
8     fight with anybody at the Longhorn
9     Restaurant on September 26, 2003,
10    correct?
11  A. Correct.
12  Q. You have nothing more than a guess as to
13    what, if anything, Mr. Southworth had to
14    drink at the Longhorn Restaurant on
15    September 26, 2003, correct?
16      MR. FARRAH: Objection.
17  A. Correct.
18  Q. Can you describe what the waitress
19    looked like who served you the food at
20    the Longhorn Restaurant on September 26,
21    2003?
22  A. I have no idea.
23  Q. Have you ever been to Chopsticks?
24  A. Yes.

Page 69

1  Q. Can you tell me what type of place that
2     is?
3  A. A Chinese restaurant.
4  Q. Does it have a bar?
5  A. I don't know. I think so.
6  Q. How would you describe the Longhorn
7     Restaurant, as a family restaurant or is
8     it a bar? How would you characterize
9     it?
10        MR. FARRAH: Objection.
11 A. I would not characterize it as a bar.
12 Q. Could you please characterize for me the
13    Longhorn Restaurant in Leominster, MA
14    based on your experience of having been
15    there?
16        MR. FARRAH: Objection.
17 A. It's a steakhouse.
18 Q. Is that someplace you and your friends
19    would go at night primarily to drink or
20    primarily to eat?
21        MR. FARRAH: Objection.
22 A. Primarily to eat.
23 Q. If you and your friends wanted to go
24    someplace just to drink where would you

Page 70

1     go?
2         MR. FARRAH: Objection.
3  A. A bar.
4  Q. What bar?
5  A. There are so many of them. There isn't
6     one specific spot.
7  Q. The Longhorn isn't a place you would go
8     primarily to drink, correct?
9         MR. FARRAH: Objection.
10 A. Correct.
11 Q. That was not your intention on
12    September 26, 2003 was it?
13 A. No?
14        MR. GILLIS: I have no
15    further questions.
16        REDIRECT EXAMINATION
17        BY MR. FARRAH
18 Q. Prior to your deposition of two years
19    ago did you speak to anyone in my office
20    about anything except getting directions
21    to the deposition?
22 A. No.
23 Q. Did you speak with me, for example,
24    prior to your deposition of two years

Page 71

1     ago about anything related to the case?
2  A. No.
3  Q. Were you smoking marijuana at any point
4     in time on September 26, 2003?
5  A. Not that I recall.
6  Q. Was anyone in your party at the Four
7     Points smoking marijuana before you went
8     to the Longhorn that day?
9  A. Not that I recall.
10 Q. To the extent you have a memory that you
11    returned from the Longhorn to the Four
12    Points at some point in time did you see
13    anyone smoking marijuana at the Four
14    Points after the Longhorn that day?
15 A. Not that I recall.
16 Q. Did you smell the smell of marijuana at
17    any point in time while you were at the
18    Four Points that day?
19 A. Not that I recall.
20 Q. Where is Chopsticks Restaurant?
21 A. Chopsticks is in Leominster by the Sears
22    Town Mall.
23 Q. Was there any discussion among your
24    group that evening about going to

Page 72

1     Chopsticks?
2  A. Not that I recall.
3  Q. Have you ever been to Chopsticks with
4     Mr. Southworth?
5  A. No.
6  Q. Prior to today you had not spoken to
7     Mr. Gillis, is that right?
8  A. Correct.
9  Q. Nor anyone from his office?
10 A. Correct.
11 Q. Or anyone who you understood was
12    representing the defendant Rare
13    Hospitality or assisting in the
14    representation of Rare Hospitality, is
15    that right?
16 A. Correct.
17        MR. FARRAH: Thank you.
18        RECROSS-EXAMINATION
19        BY MR. GILLIS
20 Q. Four Points is within a quarter of a
21    mile from the Longhorn, correct?
22 A. No.
23 Q. How far is the Four Points from the
24    Longhorn Steakhouse?

## Page 73

1  A. It might be a mile away at the most.

2  Q. A two-minute ride, correct?

3       MR. FARRAH: Objection.

4  A. About that.

5  Q. And Chopsticks is about the same

6     distance, correct?

7  A. A little bit further.

8  Q. When you answered that you did not

9     recall whether or not people were

10    smoking pot or you smelled pot is it

11    fair to say you don't have a memory when

12    you say you don't recall?

13 A. Correct.

14      MR. GILLIS: Thank you.

15      FURTHER REDIRECT EXAMINATION

16        BY MR. FARRAH

17 Q. Was anyone smoking pot that evening at

18    the Four Points?

19 A. I do not remember.

20 Q. If someone was smoking do you think you

21    would remember?

22      MR. GILLIS: Objection.

23 A. Probably not.

24      MR. FARRAH: That's all I

## Page 74

1  have.

2       [The deposition was

3  concluded.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

1    SIGNATURE PAGE/ERRATA SHEET

2  Re: Nancy Rosario
   Vs: Rare Hospitality International, Inc.,
3  d/b/a
   4/25/2006 - Deposition of MICHAEL ESPEY
4
     I, MICHAEL ESPEY, do hereby certify that
5  I have read the foregoing transcript of my
   testimony and it is a true and correct record
6  of my testimony (with the exception of the
   corrections, if any, listed below.
7

8  PAGE  LINE   CORRECTION

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 DATE          MICHAEL ESPEY

21

22

23

24

1    C E R T I F I C A T E

2  COMMONWEALTH OF MASSACHUSETTS  )
                                  )
3  COUNTY OF SUFFOLK              )

4     I, Rosamond K. Marcy, Certified
   Shorthand/Registered Professional Reporter, a
5  Notary Public in and for the Commonwealth of
   Massachusetts, do hereby certify:
6
      That MICHAEL ESPEY, the witness whose
7  deposition is hereinbefore set forth, was
   duly sworn by me and that such deposition is
8  a true record of the testimony given by said
   witness.
9
      I further certify that I am not related
10 to any of the parties to this action by blood
   or marriage, and that I am in no way
11 interested in the outcome of this matter.

12    IN WITNESS WHEREOF, I have hereunto set
   my hand and affixed my seal of office this
13 23rd day of May, 2006.

14

15     _____
              ROSAMOND K. MARCY

16 My commission expires:
   April 6, 2012.
17

18

19 PLEASE NOTE:
      THE FOREGOING CERTIFICATION OF THIS
20 TRANSCRIPT DOES NOT APPLY TO ANY
   REPRODUCTION OF THE SAME BY ANY
21 MEANS UNLESS UNDER THE DIRECT
   CONTROL AND/OR DIRECTION OF THE
22 CERTIFYING REPORTER.

23

24

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 1 of 40

Thomas Scott Espey, 4/25/2006                Condensit                Rosario vs. Rare Hospitality

Page 1

```
 1                        Volume:
                    Pages:  1 - 158
 2                  Exhibits:  1

 3           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
 4
             Civil Action #05-CV-10617MLW
 5
   NANCY ROSARIO, INDIVIDUALLY,
 6 AS SHE IS THE ADMINISTRATRIX
   OF THE ESTATE OF AWILDA SANTIAGO,
 7 ESSEX PROBATE COURT DOCKET #03P-2499AD1,
   P/P/A VERONICA ROSARIO AND
 8 CHRISTINA SANTIAGO, AND AS SHE IS
   THE ADMINISTRATRIX OF THE ESTATE
 9 OF JOSE SANTIAGO, BERLIN (CONNECTICUT)
   PROBATE COURT, CASE #03-0713,
10                              Plaintiff

11 vs.

12 RARE HOSPITALITY INTERNATIONAL, INC., d/b/a
   LONGHORN STEAKHOUSE,
13                              Defendant

14      Deposition of THOMAS SCOTT ESPEY, a

15   witness called on behalf of the Plaintiff,

16   pursuant to the Federal Rules of Civil

17   Procedure, before Rosamond K. Marcy, a

18   Certified Shorthand/Registered Professional

19   Reporter and Notary Public in and for the

20   Commonwealth of Massachusetts, at the Offices

21   of Albert L. Farrah, Jr., Esquire, One

22   Washington Mall, Boston, Massachusetts 02108,

23   commencing at 12:15 P.M. on Tuesday,

24   April 25, 2006.
```

Page ...

```
 1              I N D E X

 2 Deposition of:  DIRECT CROSS REDIRECT RECROSS

 3 THOMAS SCOTT ESPEY

 4 (By Mr. Farrah)      4          145

 5 (By Mr. Gillis)      101         155

 6

 7

 8           E X H I B I T S

 9 Thomas Scott Espey
   Number:                    For Ident.
10
   1 - Handwritten document by
11       Scott Espey                  71
```

Page 2

```
 1 APPEARANCES:

 2 ALBERT L. FARRAH, JR., ESQUIRE
        One Washington Mall
 3      Boston, Massachusetts    02108
        for the Plaintiff.
 4
   MICHAEL K. GILLIS, ESQUIRE
 5 [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 6      Newton, Massachusetts    02461
        for the Defendant.
 7
   NEIL D. SCHNURBACH, ESQUIRE
 8 [Gillis & Bikofsky, P.C.]
        1150 Walnut Street
 9      Newton, Massachusetts    02461
        for the Defendant.
```

Page 4

```
 1          STIPULATIONS
 2      It is hereby stipulated and
 3  agreed by and between counsel for the
 4  respective parties that the witness will
 5  read and sign the deposition transcript
 6  within thirty days.  The sealing and
 7  filing of the deposition transcript are
 8  waived.
 9      It is further stipulated and
10  agreed that all objections, except as to
11  form, and motions to strike will be
12  reserved to the time of trial.
13      THOMAS SCOTT ESPEY,
14  a witness called on behalf of the
15  Plaintiff, having first been properly
16  identified and duly sworn, deposes and
17  says as follows:
18      DIRECT EXAMINATION
19      BY MR. FARRAH
20 Q. Good afternoon.  My name is Albert
21  Farrah and I represent the plaintiff
22  Nancy Rosario in this action which has
23  been brought against Rare Hospitality,
24  Inc., the owner of the Longhorn
```

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 2 of 40

Page 5

1   Steakhouse in Leominster, MA. You do
2   know that my questions and your answers
3   are being transcribed and at the end of
4   the deposition a transcript of your
5   testimony will be made and sent to you.
6   You will have thirty days from your
7   receipt of that transcript to indicate
8   on a separate piece of paper which you
9   will sign any changes you think should
10   be made in the transcript. Do you
11   understand all of that?
12 A. I do.
13 Q. And if you don't send it back to us,
14   that is the sheet with any changes that
15   you want made, by the end of that thirty
16   days then the transcript as it was sent
17   to you will be the transcript that is
18   used in the case.
19     Can you tell us your full
20   name, please.
21 A. Thomas Scott Espey.
22 Q. What's your date of birth?
23 A. 10/6/1981.
24 Q. And your Social Security number?

Page 6

1 A. 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.
2 Q. Where do you live?
3 A. 80 Old Mill Road, Harvard, MA.
4 Q. You live there with your parents, is
5   that correct?
6 A. Correct.
7 Q. And your brother?
8 A. Same residence.
9 Q. Can you tell me briefly what your
10   educational background is?
11 A. I graduated from Bromfield High School
12   in Harvard in 2000. I just graduated
13   from UMass. Lowell last spring, 2005.
14 Q. What did you get your degree in?
15 A. Bachelor's in Accounting and Finance.
16 Q. Are you currently employed?
17 A. I am.
18 Q. Where?
19 A. Akamai Technology.
20 Q. In what capacity?
21 A. I am a revenue accountant.
22 Q. And you are a new hire there, is that
23   right?
24 A. That's correct.

Page 7

1 Q. Calling your attention back to
2   September 26, 2003 were you that day in
3   the company of Jeffrey Southworth?
4 A. I was.
5 Q. For how long prior to September 26, 2003
6   had you known Mr. Southworth?
7 A. I had known him on and off for a while.
8   I didn't really start associating with
9   him until that summer.
10 Q. Can you tell me on how many occasions
11   during the summer of 2003 you were in
12   the company of Mr. Southworth?
13 A. I don't know. We used to go ride dirt
14   bikes frequently.
15 Q. How frequently?
16 A. Several times a week.
17 Q. And after dirt biking did Mr. Southworth
18   and you from time to time go to the
19   Longhorn Restaurant in Leominster, MA?
20 A. Yes.
21 Q. Can you tell me your best memory of the
22   number of times during the summer of
23   2003 that Mr. Southworth and you went to
24   the Longhorn Restaurant in Leominster

Page 8

1   MA?
2 A. I don't know a number.
3 Q. Was it more frequently than once a month
4   during the summer?
5 A. Probably, yes.
6 Q. Was it more frequently than once every
7   two weeks that you went to the
8   Leominster Longhorn?
9 A. Again I don't know.
10 Q. At what time on September 26, 2003 did
11   you first come into Mr. Southworth's
12   company?
13 A. Probably sometime after work, three or
14   four.
15 Q. Where was it that you and he first
16   hooked up?
17 A. I believe in Littleton.
18 Q. Where in Littleton?
19 A. At my grandmother's apartment complex.
20 Q. Do you know where that's located in
21   Littleton?
22 A. It's called Pond Side Apartments.
23 Q. Where in Littleton are the Pond Side
24   Apartments?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 3 of 40

Page 9

1  A. 2A and 495.
2  Q. At the intersection of 2A and 495, is
3     that right?
4  A. Correct.
5  Q. Had the two of you by pre-arrangement
6     agreed to meet at your grandmother's
7     apartment complex that day?
8  A. I believe so, yes.
9  Q. Where did you go from the Pond Side
10    Apartments that day?
11  A. Templeton, MA.
12  Q. How did you get to Templeton, MA that
13    day?
14  A. One of us drove his truck.
15  Q. Was it you who drove his truck?
16  A. I believe so.
17  Q. Is there any question in your mind about
18    whether it was you who drove the truck
19    to Templeton from the Pond Side
20    Apartments?
21  A. Whatever I said in my previous statement
22    would be better to go by.
23  Q. Do you have a memory as you sit here now
24    whether you drove from the Pond Side

Page 10

1     Apartments to Templeton?
2  A. Again I don't.
3  Q. Do you have a memory?
4  A. I don't know who drove. I believe it
5     was me. I believe I said before it was
6     me.
7  Q. What did you do when you got to
8     Templeton?
9  A. We unloaded our bikes and rode for a
10    couple of hours.
11  Q. Dirt bikes, is that right?
12  A. Correct.
13  Q. Do you know the location of the place
14    you dirt biked in Templeton?
15  A. It's off of Route 202.
16  Q. Does it have a name?
17  A. No.
18  Q. Were you alone dirt biking that day?
19  A. No.
20  Q. Who else was with you and Mr. Southworth
21    dirt biking that day?
22  A. Jude Connelly and his brother Dillon.
23  Q. After dirt biking that day did you go to
24    the Longhorn Steakhouse?

Page 11

1  A. Yes.
2  Q. And who drove to the Longhorn
3     Steakhouse?
4  A. Again I believe I did but I'm not
5     positive.
6  Q. Did you know at the time, that is as of
7     September 26, 2003, whether or not
8     Jeffrey's license to drive in
9     Massachusetts had been suspended?
10  A. I know he had a New Hampshire license.
11  Q. Did he tell you that his Massachusetts
12    license had been revoked?
13  A. I believe it had been suspended.
14  Q. And is that why you drove that day?
15  A. I believe so.
16  Q. Do you have a memory that that's why you
17    drove?
18  A. I think so. I know he had a
19    New Hampshire license, though.
20  Q. Is it accurate to say that you
21    frequently, after dirt biking with
22    Jeffrey Southworth, went to the Longhorn
23    Steakhouse during that summer?
24        MR. GILLIS: I'm going to

Page 12

1     make objections and when I ask you
2     questions Mr. Farrah will make
3     objections but you still testify. We
4     have legal reasons to object but you
5     still answer the questions.
6  A. We went there once in a while.
7  Q. My question is is it accurate to say you
8     frequently went there after dirt biking?
9        MR. GILLIS: Objection.
10  A. We went there a couple of times. I
11    don't know frequently.
12  Q. Do you have a memory of whether or not
13    you went there frequently after dirt
14    biking?
15        MR. GILLIS: Objection.
16  A. Again we went there several times that
17    summer.
18  Q. Do you remember testifying earlier in a
19    deposition in a related case?
20  A. I do.
21  Q. In my office.
22  A. Yes.
23  Q. This same room, remember that?
24  A. Yes.

Thomas Scott Espey, 4/25/2006 Condensen Rosario vs. Rare Hospitalit

Case 1:05-cv-10617-MBB Document 27-4 Filed 05/10/2007 Page 4 of 40

Page 13

1  Q. Do you remember testifying that you went
2     there frequently, that is to the
3     Longhorn, after dirt biking, if you
4     remember?
5         MR. GILLIS: Just for the
6     record you are showing me a record.
7     The question was does he remember
8     testifying they went there frequently.
9         [Witness examining
10    document.]
11 Q. Have you looked at what I pointed out to
12    you?
13 A. I'm not exactly sure which highlighted
14    section you were pointing out.
15 Q. Right there.
16 A. I did testify to that.
17 Q. You said you went there frequently, is
18    that right?
19 A. Correct.
20 Q. Does that refresh your memory that you
21    went there frequently after dirt biking?
22       MR. GILLIS: Objection.
23 A. Sure.
24 Q. Did you have a regular waitress at the

Page 14

1     Longhorn that summer?
2  A. I don't know.
3  Q. Do you remember any of the waitresses
4     that waited on Jeffrey and you at the
5     Longhorn that summer?
6  A. No, not any more.
7  Q. Do you know what time you left Templeton
8     on September 26, 2003 to go to the
9     Longhorn?
10 A. Probably right around sunset.
11 Q. Did you have any alcoholic beverage to
12    drink in Templeton before you left for
13    the Longhorn?
14 A. I believe we had a beer.
15 Q. You had a beer?
16 A. Yes.
17 Q. Did Jeff have a beer?
18 A. I believe so.
19 Q. Do you have any memory that Jeff had a
20    beer that day at Templeton before you
21    went to the Longhorn?
22 A. I believe we had a beer.
23 Q. When you say you believe, do you mean
24    it's your best memory that you had a

Page 15

1     beer?
2        MR. GILLIS: Objection.
3  A. Yes.
4  Q. Had you brought a cooler?
5  A. I did.
6  Q. Was there a six-pack of beer in that
7     cooler?
8  A. I believe so.
9  Q. Is that your best memory?
10 A. It is.
11 Q. Was it Bud Light beer?
12 A. I believe so.
13 Q. Is that your best memory?
14 A. It is.
15       MR. GILLIS: Objection.
16    Just for the record if you have a memory
17    please state it but if you are guessing
18    please don't guess.
19 Q. Did you have more than one beer at
20    Templeton that night?
21 A. I don't believe so.
22 Q. Did Jeff have more than one beer at
23    Templeton that night?
24 A. I don't believe so.

Page 16

1  Q. That's your best memory?
2  A. It is.
3  Q. The beer that you had at Templeton was
4     how big, if you remember?
5  A. I don't remember.
6  Q. Approximately how long did it take to
7     get from Templeton to the Longhorn
8     Steakhouse?
9  A. Twenty minutes, twenty-five minutes.
10 Q. Do you know what route you traveled?
11 A. Route 2.
12 Q. Route 202 to Route 2, is that right?
13 A. Correct.
14 Q. Did you drive from Templeton to the
15    Longhorn?
16 A. I believe so.
17 Q. Is that your best memory?
18 A. It is.
19 Q. Did you drive his truck that summer
20    previous to September 26, 2003?
21 A. I did.
22 Q. Is that your best memory?
23       MR. GILLIS: Objection.
24 A. It is.

Thomas Scott Espey, 4/25/2006    Condensed    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 5 of 40

Page 17

1  Q. In the truck from Templeton to the
2     Longhorn were who that night?
3  A. Myself, Jeff, and Jude.
4  Q. Where was Jude sitting?
5  A. In the back seat.
6  Q. Did Jeff have his dogs with him that
7     day?
8  A. Yes.
9  Q. The two rottweilers?
10 A. Yes.
11 Q. And was it a truck that had two bench
12    seats, front and back?
13 A. Yes.
14 Q. Did anyone have any alcoholic beverages
15    to drink on the ride from Templeton to
16    the Longhorn?
17 A. I don't recall.
18 Q. Do you have any memory of anyone having
19    any alcoholic beverages on that ride?
20 A. It doesn't stand out.
21 Q. Where was the cooler?
22 A. Probably in the bed of the truck.
23 Q. Do you have a memory of where it was?
24 A. No.

Page 18

1  Q. Approximately what time did you get to
2     the Longhorn?
3  A. I'd say twenty-five minutes after we
4     left Templeton.
5  Q. Can you fix the time for me, your best
6     memory of when you arrived?
7  A. I can't.  I don't know.
8  Q. Were you wearing a watch?
9  A. No.
10 Q. Do you typically wear a watch?
11 A. Only when I dress up.
12 Q. Did you have a cell phone then?
13 A. I did.
14 Q. What was the number?
15 A. I don't know.
16 Q. Who was the carrier?
17 A. Verizon.
18 Q. Do you have a cell phone today?
19 A. I do.
20 Q. What is the number?
21 A. 978-407-3115.
22 Q. Who is your carrier today?
23 A. Cingular.
24 Q. You switched at some point in time, is

Page 19

1     that correct?
2  A. Yes.
3  Q. Do you know when, approximately?
4  A. Last summer.
5  Q. And you switched from  Verizon to
6     Cingular?
7  A. Yes.
8  Q. As far as you know did you have that
9     number in 2003 with Verizon that you had
10    last summer when you switched?
11 A. Yes.
12 Q. The same number.
13 A. Yes.
14 Q. Do you have any memory as you sit here
15    now what that number was?
16 A. 978.  That's the best I can do.
17 Q. When you got to the Longhorn Steakhouse
18    did you go to the bar?
19 A. Yes.
20 Q. Do you remember where at the bar you
21    went?
22 A. I don't.
23 Q. Who did you go to the bar with?
24 A. Jeff, myself, and Jude.

Page 20

1  Q. Did you order anything at the bar?
2  A. I ordered a beer.
3  Q. What size beer was it?
4  A. Tall.
5  Q. Twenty-five-ounce?
6  A. Yes.
7  Q. What did Jeff order, if anything?
8  A. The same thing.
9  Q. Bud Light?
10 A. Yes.
11 Q. What did Jude order?
12 A. A non-alcoholic beverage.
13 Q. Did Jude have any beer at Templeton
14    after you were dirt biking?
15 A. I don't recall.
16 Q. Did Jude have any alcoholic beverages to
17    drink while you were at the Longhorn
18    Restaurant on September 26, 2003?
19 A. I don't recall.
20 Q. Do you have any memory of Jude having
21    any alcoholic beverages to drink?
22 A. I don't.
23 Q. Did anyone ask you when you went to the
24    bar at the Longhorn Restaurant to

Page 21

1    produce an I.D. or a driver's license?
2  A. I believe so.
3  Q. Did they ask Jude for that as well?
4  A. I don't know.
5  Q. How many beers did you have at the bar?
6  A. I believe we only ordered one and we got
7     our table.
8  Q. My question is how many beers did you
9     have at the bar, your best memory?
10        MR. GILLIS: Objection.
11     Asked and answered.
12  A. Not even a full one.
13  Q. How long were you at the bar?
14  A. A few minutes.
15  Q. What's your best memory?
16  A. Fifteen, twenty minutes maybe.
17  Q. Did you pay for that beer at the bar?
18  A. I can't recall.
19  Q. How many beers did Jeff have at the bar?
20  A. I can't recall.
21  Q. Did he have more than one?
22  A. I can't recall again.
23  Q. Who paid for the beers at the bar?
24        MR. GILLIS: Objection.

Page 22

1  A. Again I can't recall.
2  Q. You don't know if you paid or Jeff paid?
3  A. I don't.
4  Q. While you were at the bar were you
5     talking to anyone else besides Jeff and
6     Jude?
7  A. I can't recall.
8  Q. What's your best memory of how long you
9     were at the bar before you were seated
10    at a table?
11  A. A few minutes.
12  Q. Do you remember testifying in a
13    deposition taken on June 22, 2004 in
14    this office?
15  A. Yes.
16  Q. Do you remember being asked the question
17    on Page 70, "And it's your best memory
18    that you were about half an hour at the
19    bar, is that right, before you were
20    seated for a table?" Do you remember
21    being asked that question?
22  A. I do now.
23  Q. Do you remember your answer was,
24    "Somewhere in that range"? Do you

Page 23

1     remember that?
2  A. That's what it says.
3  Q. Was your memory of the events of the
4     night of September 26, 2003 better on
5     June 22, 2004 than it is today?
6  A. I would think so.
7  Q. Is that your better sense that your
8     memory was better then than it is now?
9  A. I would think it was better then than it
10    is now.
11  Q. Is that your belief, that your memory
12    was better then than it is now?
13        MR. GILLIS: Objection.
14  A. I would believe so.
15  Q. So is your memory refreshed now that you
16    were seated at the bar for about half an
17    hour before you were at a table?
18        MR. GILLIS: Objection.
19  A. Again, I said we were there for a few
20    minutes.
21  Q. Half an hour doesn't mean a few minutes
22    to you, does it?
23  A. I said fifteen or twenty minutes.
24  Q. At your deposition you said somewhere in

Page 24

1     the range of half an hour, isn't that
2     right?
3        MR. GILLIS: Objection.
4     That's not what he said. That's what
5     you said. There's no testimony prior to
6     Page 70 that says he was there a half an
7     hour. That's you saying a half an hour
8     and you are asking him to adopt your
9     testimony.
10        MR. FARRAH: Which
11    apparently he did.
12        MR. GILLIS: He didn't say
13    he was there half an hour. You said it
14    and he responded to what you said was
15    the time.
16  Q. And the question was, "And it's your
17    best memory that you were about half an
18    hour at the bar, is that right, before
19    you were seated for a table?" The
20    answer was, "Somewhere in that range,"
21    isn't that right?
22  A. Yes.
23  Q. You called before you arrived at the bar
24    that day, is that right?

Page 25

1  A. Correct.
2  Q. Was that something you typically did
3     when Jeff and you were coming into the
4     Longhorn, call ahead?
5  A. Yes, sometimes.
6  Q. And your cell phone number at the time
7     was 978-302-9620?
8  A. That's what I said there.
9  Q. Does that refresh your memory as to what
10    your cell phone number was back then?
11 A. Yes.
12 Q. What did you say when you called in?
13 A. I was trying to make a reservation.
14 Q. For how many people?
15 A. I don't know. Three? We were supposed
16    to meet a bunch of people there.
17 Q. Do you remember how many people you
18    asked to make a reservation for?
19 A. I don't.
20 Q. At some point in time you communicated
21    with your brother about being at the
22    Longhorn that night, is that right?
23 A. That is correct.
24 Q. Do you remember when you did?

Page 26

1  A. I don't.
2  Q. Was it earlier that day that your
3     brother and you had agreed to hook up at
4     the Longhorn that night?
5  A. I don't think so.
6  Q. Did you call your brother or did your
7     brother call you about getting together
8     at the Longhorn that night?
9  A. I don't recall.
10 Q. Do you remember what either of you said
11    to the other about getting together at
12    the Longhorn that night?
13 A. I think we were both in the area and he
14    had friends and I had friends.
15 Q. And you agreed to try to get together,
16    is that right?
17 A. Yes.
18 Q. Was your brother already at the
19    restaurant before you arrived?
20 A. No, I don't think so.
21 Q. Do you know how long it was after you
22    arrived at the restaurant that you first
23    saw your brother?
24 A. I don't.

Page 27

1  Q. Do you have any way of estimating for me
2     how long it was?
3  A. I believe it was before we got a table.
4  Q. Do you remember seeing your brother at
5     the bar at the Longhorn that night?
6  A. Briefly.
7  Q. What was he drinking at the bar?
8         MR. GILLIS: Objection.
9  A. I don't recall.
10 Q. From the time you arrived at the
11    Longhorn until you left how many beers
12    did you have?
13 A. I don't know.
14 Q. From the time you arrived at the
15    Longhorn until you left did you have any
16    Jack Daniels Manhattans?
17 A. I may have.
18 Q. Do you have a memory of having a Jack
19    Daniels Manhattan?
20 A. I believe so.
21 Q. Is it your best memory that you had more
22    than one Jack Daniels Manhattan that
23    evening?
24        MR. GILLIS: Objection.

Page 28

1  A. I don't remember it.
2  Q. Do you remember being asked a question
3     at your deposition on the bottom of
4     Page 73 and continuing to Page 74, "Let
5     me ask you this. From the time that you
6     got there, how much did you have to
7     drink while you were at the Longhorn?"
8     Your answer was, "A beer or two. From
9     when I -- can you --" I asked the
10    question again, "Until you left. From
11    when you got there until you left, how
12    much did you have to drink?" Do you
13    remember answering, "I would have to say
14    two beers." Does that refresh your
15    memory as to how much beer you had while
16    you were at the Longhorn?
17 A. Somewhat.
18 Q. Do you remember also being asked the
19    question, "Two beers?" And your answer
20    was, "I don't know. I don't know. I
21    don't know what I had to drink." Do you
22    remember that?
23 A. I do now.
24 Q. Do you know what you had to drink that

Thomas Scott Espey, 4/25/2006    Condensed!    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 8 of 40

Page 29

1    night at the Longhorn?
2    A. I don't.
3    Q. Then the question was asked of you, "Did
4        you have any Manhattans that night?" Do
5        you see that?
6    A. Yes.
7    Q. And your answer was, "I might have had
8        one. I don't know." Do you see that?
9    A. Yes.
10   Q. Is that your memory today that you might
11       have had one Manhattan but you don't
12       know?
13           MR. GILLIS: Objection.
14   A. Yes.
15   Q. So your memory is the same today as it
16       was back in June of 2004 when you were
17       deposed about how much you had to drink.
18           MR. GILLIS: Objection.
19   A. I don't know how much I had to drink.
20   Q. Do you know where you sat that evening?
21   A. I don't.
22   Q. Do you know the name of your server?
23   A. I don't.
24   Q. Did you know the names of any of the

Page 30

1    servers at the Longhorn that summer?
2    A. I see the name or they introduced
3        themselves.
4    Q. But you had no regular server.
5    A. No.
6    Q. Jeff had no regular server that you know
7        of.
8    A. Not that I recall.
9    Q. Jeff liked Jack Daniels Manhattans, is
10       that right?
11           MR. GILLIS: Objection.
12   A. I don't know.
13   Q. Did he drink Jack Daniels Manhattans
14       that evening?
15   A. Again I don't know. I know they were
16       being served.
17   Q. The Manhattans that were being served
18       were they on the rocks or straight up?
19   A. I don't know.
20   Q. Was there a way that Jeff typically
21       liked to have his Manhattan served?
22   A. Again I can't remember.
23   Q. On Page 93 of your deposition you were
24       asked a series of questions about the

Page 31

1    Manhattans. At Line 11 you were asked,
2    "So you don't know how many Jack
3    Daniels Manhattans were received to the
4    table, is that right?" Do you see
5    that?
6    A. Yes.
7    Q. And your answer was, "I don't." Do you
8        see that?
9    A. I do.
10   Q. Is that your memory today that you don't
11       know how many Jack Daniels Manhattans
12       were delivered to the table?
13   A. Correct.
14   Q. Then you were asked the question, "Were
15       the Manhattans that you do know of
16       served on the rocks or straight up?" Do
17       you see that?
18   A. I do.
19   Q. And your answer after some stuttering,
20       if you'll pardon my characterization,
21       was, "I think straight up, but -- I
22       think straight up." Do you see that?
23   A. I do.
24   Q. Is that your answer today that the

Page 32

1    Manhattans that were delivered to the
2    table were delivered straight up?
3            MR. GILLIS: Objection.
4    A. Again I can't remember.
5    Q. Then you were asked the question, "Is
6        that typically how Jeff liked the
7        Manhattans?" See that?
8    A. I do.
9    Q. Your answer was, "Yup." Do you see
10       that?
11   A. I do.
12   Q. Is that your memory today that that was
13       typically how Jeff liked the
14       Manhattans?
15           MR. GILLIS: Objection.
16   A. Again I don't have any memory.
17   Q. Do you have any memory today of how
18       Jeff, as of September 26, 2003, liked
19       his Manhattans, on the rocks or straight
20       up?
21   A. I don't know.
22   Q. Is your memory exhausted as to how Jeff
23       liked his Manhattans, on the rocks or
24       straight up?

Page 33

1    MR. GILLIS: Objection.
2  Q. Do you have a memory of how he liked
3    them?
4  A. I don't.
5  Q. You have no memory of how they were
6    served to the table?
7  A. I don't know that today.
8  Q. It's your best memory you had one
9    Manhattan that night, is that right?
10    MR. GILLIS: Objection.
11  A. I don't know.
12  Q. You may have had no Manhattans that
13    night, is that right?
14    MR. GILLIS: Objection.
15  A. I don't know.
16  Q. You drove that night after you left the
17    Longhorn, is that right?
18  A. I don't know who drove. I don't
19    remember.
20  Q. Today you don't remember?
21  A. I don't.
22  Q. Do you remember testifying in the
23    criminal trial in Lowell?
24  A. I remember testifying.

Page 34

1  Q. Did you testify in the criminal trial
2    that you drove?
3  A. I believe I did.
4  Q. Is there any question in your mind about
5    whether you drove that night after
6    leaving the Longhorn?
7  A. Again I believe I drove.
8  Q. My question to you is is there any doubt
9    in your mind about whether you drove
10    that night after leaving the Longhorn?
11    MR. GILLIS: Objection.
12  A. No.
13  Q. You know you drove, isn't that right?
14    MR. GILLIS: Objection.
15  A. I believe so.
16  Q. You know you drove.
17    MR. GILLIS: Objection. He
18    has answered five times. If you don't
19    like the answer that doesn't give you
20    the right to keep asking.
21  Q. You drove, isn't that right?
22    MR. GILLIS: Objection.
23  A. I believe so.
24  Q. You can't say yes or no to that

Page 35

1    question?
2    MR. GILLIS: Objection.
3  A. Two and a half years ago.
4  Q. That was an especially vivid night in
5    your memory, isn't that right?
6    MR. GILLIS: Objection.
7  Q. Who drove from the Longhorn to wherever
8    you went next?
9    MR. GILLIS: Objection.
10    Asked and answered.
11  A. Again I believe it was myself. That's
12    what I've testified before.
13  Q. After the Longhorn where did you go?
14  A. There's a hotel right around the corner.
15  Q. How long did it take to get there?
16  A. Not very long. It's just over Route 2.
17  Q. While you were at the Longhorn was
18    anyone at your table exhibiting what you
19    took to be signs of intoxication?
20  A. Not that I recall.
21  Q. Have you since spoken to your brother
22    about whether he was drunk or not that
23    night?
24  A. Not that I recall.

Page 36

1  Q. Has your brother told you he was drunk
2    that night at any point?
3  A. Not that I recall.
4  Q. Did Jeff order any Jack Daniels
5    Manhattans at the Longhorn that night?
6  A. I can't recall. I believe so.
7  Q. Was Jeff at the time of the service of
8    the last drink to the table under the
9    influence of intoxicating beverages?
10  A. Not that I recall.
11  Q. Was he loud that night?
12  A. Not that I recall.
13  Q. Was he somewhat loud that night?
14  A. Not that I recall.
15  Q. Do you remember being asked the question
16    at the bottom of Page 80, "Was he loud?"
17    Do you see that?
18  A. I do.
19  Q. Your answer was, "Well -- I think he was
20    somewhat loud but I don't know." Do you
21    see that?
22  A. I do.
23  Q. Does that refresh your memory about
24    whether Jeff was loud that night?

Page 37

1   A. No more so than any other time.
2   Q. Jeff was just a loud guy, is that right?
3       MR. GILLIS: Objection.
4   A. I don't know.
5   Q. What do you mean by no more so than any
6     other time?
7   A. It doesn't stand out in my head.
8   Q. What doesn't stand out in your head?
9   A. That he was loud that night.
10   Q. Were there other times when he was loud?
11   A. Not that I recall.
12   Q. What do you mean no more so than any
13     other time?
14   A. You asked me if it refreshed my memory.
15     I said not that I recall, no more so
16     than any other time.
17   Q. My question is was Jeff loud that night
18     that you can recall?
19       MR. GILLIS: Objection.
20   A. No, not that I can recall at this time.
21   Q. Did anyone who you understood to be an
22     employee of the Longhorn come to the
23     table at any point in time and ask your
24     table to quiet down?

Page 38

1   A. Not that I recall.
2   Q. Is there any question in your mind
3     whether Jeff was intoxicated that night
4     at the restaurant?
5       MR. GILLIS: Objection. Do
6     you understand the question?
7       THE WITNESS: Will you say
8     it one more time.
9   Q. Is there any question in your mind he
10     was intoxicated that night at the
11     restaurant?
12   A. Yes.
13   Q. You're not sure whether he was
14     intoxicated or not, is that right?
15       MR. GILLIS: Objection.
16   A. I'm not sure.
17   Q. He had enough to drink to be intoxicated
18     to your way of thinking, isn't that
19     right?
20       MR. GILLIS: Objection.
21   A. I don't know.
22   Q. You don't know what he had to drink?
23   A. I don't.
24   Q. Has anyone ever told you that there were

Page 39

1     seventeen Jack Daniels Manhattans served
2     to your table that night?
3   A. Not that I remember.
4   Q. Has anyone ever told you how many Jack
5     Daniels Manhattans were served to your
6     table that night?
7   A. I believe it was mentioned at the
8     criminal trial but I don't know.
9   Q. How many people were at the table that
10     night?
11   A. I think seven or eight.
12   Q. Who were they?
13   A. There was myself, my brother, Jeff and
14     Jude and then three of my brother's
15     friends.
16   Q. Who were they?
17   A. Todd and two of his friends from
18     college.
19   Q. Do you know their names?
20   A. I don't.
21   Q. So that's seven people, is that right?
22   A. Yes.
23   Q. Was Jude drinking alcoholic beverages to
24     your memory that night?

Page 40

1   A. Not that I recall.
2   Q. So six of you were drinking alcoholic
3     beverages, is that correct?
4   A. Yes.
5   Q. Among the six of you do you know who
6     drank the seventeen Jack Daniels
7     Manhattans that were delivered to the
8     table?
9       MR. GILLIS: Objection.
10   A. I don't.
11   Q. Did you have more than one Jack Daniels
12     Manhattan at the table that night?
13       MR. GILLIS: Objection.
14   A. I don't recall.
15   Q. Did Jeff have more than one Jack Daniels
16     Manhattan at the table that night?
17   A. I don't recall.
18   Q. How about your brother, did he have more
19     than one?
20   A. I don't recall.
21   Q. Does your brother like beer?
22   A. Does he or did he?
23   Q. Did he.
24   A. Yeah.

Page 41

1  Q. And is it accurate to say that you don't
2     know whether Jeff was drunk by the way
3     he appeared at the restaurant that
4     night?
5         MR. GILLIS: Objection.
6  A. I don't know.
7  Q. One way or the other, is that right?
8  A. That's correct.
9  Q. At the time you were served the last
10    drink you don't know one way or the
11    other whether he was drunk, is that
12    right?
13        MR. GILLIS: Objection.
14 A. That's right.
15 Q. Was Jeff exhibiting behavior that night
16    at the time of the service of the last
17    drink that was consistent with behavior
18    of his that you had seen on other
19    earlier occasions where he was
20    intoxicated?
21        MR. GILLIS: Objection.
22 A. I don't recall.
23 Q. You have seen Jeff intoxicated on other
24    occasions, isn't that right?

Page 42

1  A. I don't know.
2  Q. It's your best memory that you might
3     have had one Jack Daniels Manhattan at
4     the Longhorn that night?
5         MR. GILLIS: Objection.
6  A. I don't recall.
7  Q. I'm going to show you Page 93 of your
8     deposition where I asked you the
9     question, "Is that typically how Jeff
10    liked the Manhattans?" Your answer was
11    "Yup."
12        "Were the Manhattans
13    already mixed when they were delivered
14    to the table?" Your answer was, "You
15    mean already made? Yeah. Yeah."
16        "You don't remember having
17    any, is that right?" Your answer was,
18    "I might have had one. I might have
19    had one. I think I had one, but --" Do
20    you see that?
21 A. I do.
22 Q. Does that refresh your memory about
23    whether you had more than one Jack
24    Daniels Manhattan that night at the

Page 43

1     restaurant?
2         MR. GILLIS: Objection.
3  A. No.
4  Q. What is your best memory as to how many
5     Jack Daniels you had that night at the
6     restaurant?
7  A. I don't know.
8  Q. Had you had few enough Jack Daniels
9     Manhattans so that you felt comfortable
10    driving after you left the restaurant?
11 A. I believe so.
12 Q. While you were at the Longhorn do you
13    remember anyone saying to anybody else
14    at the table, "You've had too much to
15    drink" or words to that effect?
16 A. I don't recall.
17 Q. Do you have any memory of anyone saying
18    anything like that to Jeff?
19 A. I don't.
20 Q. Do you remember anyone saying that to
21    you?
22 A. I don't.
23 Q. To your way of thinking as of the time
24    you left the Longhorn had you had too

Page 44

1     much to drink?
2  A. No.
3  Q. How long were you at the Four Points?
4  A. I don't know. Not very long.
5  Q. Do you remember Jeff having a beer
6     there?
7  A. I believe so.
8  Q. Do you remember him having more than one
9     beer while he was there?
10 A. I don't recall.
11 Q. Do you remember Jeff smoking any pot
12    while he was there, marijuana?
13 A. I don't recall.
14 Q. Do you remember anyone smoking marijuana
15    at the hotel?
16 A. No.
17 Q. Was anyone smoking marijuana as far as
18    you knew at the hotel?
19        MR. GILLIS: Objection.
20 A. I don't know.
21 Q. By the time Jeff had had a beer at the
22    Four Points was he exhibiting any signs
23    of intoxication?
24 A. Not that I recall.

Thomas Scott Espey, 4/25/2006    Condensed    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 12 of 40

Page 45

1 Q. At some point in time did you all leave
2    the Four Points?
3 A. We did.
4 Q. Where did you go?
5 A. The Other Side.
6 Q. On the drive from the Longhorn to the
7    Four Points who was where in the truck?
8 A. I don't recall.
9 Q. Your best memory is that you drove.
10 A. I believe so.
11 Q. Is it your best memory, yes or no?
12        MR. GILLIS: Objection.
13 A. Yes.
14 Q. Did I ask you where you next went after
15    the Four Points?
16 A. You did.
17 Q. And you told me where, again?
18 A. The Other Side.
19 Q. And in what town is the Other Side?
20 A. Leominster or Fitchburg.
21 Q. Had you been there before?
22 A. I believe I went there once.
23 Q. Who drove from the Four Points to the
24    Other Side?

Page 46

1 A. I believe I did.
2 Q. Is that your best memory that you drove?
3 A. Yes.
4 Q. Do you know where people were arrayed in
5    the vehicle at that time?
6 A. I don't.
7 Q. Was it Jeff's truck that you drove from
8    the Longhorn to the Four Points?
9 A. It was a rental.
10 Q. That Jeff had had with him when you
11    first met up with him that day?
12 A. Yes.
13 Q. Do you remember what color it was?
14 A. I don't.
15 Q. And was it that same rental truck that
16    you drove from the Four Points to the
17    Other Side?
18 A. Yes.
19 Q. Was Jude with you on both legs of this
20    trip, that is from Longhorn to Four
21    Points and Four Points to the Other
22    Side?
23 A. Yes.
24 Q. And Jeff was in the truck as well on

Page 47

1    both legs of that trip, is that right?
2 A. Yes.
3 Q. Along with his rottweilers.
4 A. Yes.
5 Q. What were their names?
6 A. Daisy and Ruby.
7 Q. Do you have them now?
8 A. I don't.
9 Q. Did you have them at any point in time?
10 A. I did.
11 Q. Did your brother take them?
12 A. No.
13 Q. Did Jude take them?
14 A. No.
15 Q. What happened to Daisy and Ruby?
16 A. Jude's brother took care of them.
17 Q. Where are they today?
18 A. They found either a home for them or a
19    shelter.
20 Q. How did you learn that?
21 A. Dillon told me.
22 Q. Jude's brother?
23 A. Yes.
24 Q. Have you spoken to Mrs. Southworth since

Page 48

1    September 26, 2003?
2 A. Not that I recall.
3 Q. How about Mister?
4 A. Not that I recall.
5 Q. How about Jeff?
6 A. Once.
7 Q. When did you speak to Jeff?
8 A. I don't know. He called me randomly one
9    day.
10 Q. From prison?
11 A. Yes.
12 Q. Was he awaiting trial or had he been
13    tried already?
14 A. I think he was awaiting.
15 Q. What did he say?
16 A. Nothing really.
17 Q. Did he talk about your upcoming
18    testimony in the criminal trial?
19 A. Not especially.
20 Q. Tell me what you remember he said about
21    your upcoming testimony in the criminal
22    trial.
23        MR. GILLIS: Objection.
24 A. I don't remember talking about it.

Page 49

1 Q. What do you mean by "not especially"?
2 A. He said, "I'm going to trial soon."
3 Q. You knew that, didn't you?
4 A. Yes.
5 Q. Did he talk about what you were going to
6    testify to?
7 A. No.
8 Q. How long was that conversation?
9 A. Not very long.
10 Q. How did he sound, upbeat?
11      MR. GILLIS: Objection.
12 A. I don't know.
13 Q. On the trip from the Longhorn to the
14    Four Points was Jeff in the back with
15    the dogs?
16 A. No. I believe he was in the back from
17    the Four Points to the Other Side.
18 Q. Was he asleep at any point in time in
19    the back seat on the trip from the Four
20    Points to the Other Side?
21      MR. GILLIS: Objection.
22 A. Not that I recall.
23 Q. Did any of you go into the Other Side?
24 A. No.

Page 50

1 Q. Approximately how long did it take to
2    drive from the Four Points to the Other
3    Side?
4 A. Ten minutes.
5 Q. Why didn't you go into the Other Side?
6 A. We decided we didn't want to.
7 Q. Why?
8      MR. GILLIS: Objection.
9 A. It was getting late.
10 Q. So what was the conversation about going
11    into the Other Side?
12 A. It was, "Let's not go inside."
13 Q. Why?
14      MR. GILLIS: Objection.
15 A. It was getting late.
16 Q. Did the three of you decide you were
17    tired and didn't feel like going in?
18      MR. GILLIS: Objection.
19 A. I believe so.
20 Q. How long were you in the parking lot at
21    the Other Side?
22 A. Briefly.
23 Q. Was there anybody else in the truck from
24    the Four Points to the Other Side that

Page 51

1    you can recall?
2 A. No, not that I can recall.
3 Q. When you say briefly, are we talking
4    less than five minutes in the parking
5    lot?
6 A. Yes.
7 Q. And then where next did your group go?
8 A. We went to Littleton.
9 Q. Did Jeff have anything to drink that you
10    know of in the trip from the Four Points
11    to the Other Side?
12 A. Not that I know of.
13 Q. Did Jeff have anything to drink that you
14    know of in the trip from the Longhorn to
15    the Four Points?
16 A. Not that I know of.
17 Q. Where did you go in Littleton?
18 A. Back to get my vehicle.
19 Q. And the route that you traversed from
20    the Four Points to the Other Side if you
21    can tell us was what?
22 A. Route 12.
23 Q. Did you take what you thought was a
24    direct route from the Four Points to the

Page 52

1    Other Side?
2 A. I believe so.
3 Q. And then the route that you traversed
4    from the Other Side to Littleton was
5    what?
6 A. Probably back to Route 2 and down
7    Route 2.
8 Q. And it took twenty minutes to half an
9    hour to go from the Other Side to
10    Littleton, is that right?
11 A. Yes, I would say so.
12 Q. On the ride from the Other Side to
13    Littleton did you have any conversations
14    with Jeff about Jeff as to whether he
15    should just sleep in the truck?
16 A. I believe it came up and he said he was
17    fine.
18 Q. Do you remember telling him that he
19    should just sleep in the truck?
20 A. I don't remember the exact words.
21 Q. Do you remember being deposed and on
22    Page 118 you were asked the question,
23    "Had there been any arguments between
24    Jeff and you in the ride from the strip

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 14 of 49

Thomas Scott Espey, 4/25/2006                Condenselt!              Rosario vs. Rare Hospitality

Page 53

1    club to Littleton?"  Do you see that?
2  A. Yes.
3  Q. Your answer was, "Um, I think I -- I --
4    for some reason I remember telling him
5    that he should just sleep in his truck."
6    Do you see that?
7  A. Yes.
8  Q. Do you remember saying that to him?
9  A. Not those exact words.
10  Q. Do you remember in essence telling him
11    that he should just sleep in the truck?
12  A. I don't remember telling him that but I
13    know it was discussed.
14  Q. Between Jeff and you?
15  A. Yes.
16  Q. And the reason it was discussed was
17    because to your way of thinking Jeff had
18    had too much to drink that night, isn't
19    that right?
20       MR. GILLIS: Objection.
21  A. Sorry, one more time.
22  Q. The reason it was discussed was because
23    to your way of thinking Jeff had had too
24    much to drink that night, isn't that

Page 54

1    right?
2       MR. GILLIS: Objection.
3  A. It's more if you go out with somebody
4    you ask them if they are all right.
5  Q. After saying that you remembered telling
6    him that he should just sleep in the
7    truck do you remember being asked the
8    question, "And that was because he'd had
9    too much to drink, isn't that right?"
10    Do you remember that?
11       MR. GILLIS: Objection.
12  A. I do now.
13  Q. You see it here in your deposition.
14  A. Yes.
15  Q. And your answer was, "Yes, yes." Do you
16    see that?
17  A. I do.
18  Q. And did you believe that night when you
19    told him he should sleep in the truck
20    that he had had too much to drink and
21    should not drive?
22  A. I don't recall.
23  Q. Is your memory refreshed by what you see
24    here on Page 118 of your deposition as

Page 55

1    to whether you told him that night that
2    he should just sleep in the truck
3    because to your way of thinking he had
4    had too much to drink?
5       MR. GILLIS: Objection.
6  A. I said it there but I don't remember it.
7  Q. Was your memory better of the events in
8    June of 2004 than it is today?
9       MR. GILLIS: Objection.
10  A. It's a smaller time frame.
11  Q. Was your memory better back then of the
12    events than it is today?
13       MR. GILLIS: Objection.
14  A. Yes.
15  Q. Do you have any reason to doubt the
16    accuracy of your testimony on Page 118
17    that you told him he should sleep in the
18    truck because he had had too much to
19    drink?
20       MR. GILLIS: Objection.
21  A. Say that one more time.
22  Q. Do you have any reason to doubt the
23    accuracy of your memory back in June of
24    2004 that you told him he should sleep

Page 56

1    in the truck because he had had too much
2    to drink?
3       MR. GILLIS: Objection.
4       MR. FARRAH: Could you read
5    back that question, please, Ros.
6       [Question read.]
7  Q. Yes, no, or I don't understand the
8    question?
9       MR. GILLIS: Objection.
10  A. I don't understand the question.
11  Q. This transcript on Page 118 says you
12    said at your deposition, of which this
13    transcript, I believe, is an accurate
14    recitation, you said the words, "I
15    remember telling him that he should just
16    sleep in his truck," isn't that right?
17    Do you remember saying those words?
18       MR. GILLIS: Objection.
19  A. Not exactly.
20  Q. Do you remember having a conversation
21    with him about that he should just sleep
22    in the truck?
23  A. I remember it being discussed, yes.
24  Q. And do you remember saying to him, "You

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 15 of 40

Thomas Scott Espey, 4/25/2006          Condenseit          Rosario vs. Rare Hospitality

Page 57

1    should just sleep in the truck," or
2    words to that effect?
3  A. Again I remember it being discussed.
4  Q. What do you remember about the
5    discussion, Mr. Espey?
6  A. I asked him if he was all right to
7    drive.
8  Q. Because you thought he had had too much
9    to drink, isn't that right?
10        MR. GILLIS: Objection.
11  A. That's what you do when you go out with
12    somebody.  You ask them if they are all
13    right.
14  Q. Well, if they've had too much to drink,
15    isn't that right?
16        MR. GILLIS: Objection.
17  A. Not always.
18  Q. In this case that night when you asked
19    him if he was all right was it because
20    you believed he had too much to drink?
21        MR. GILLIS: Objection.
22  A. I don't know.
23  Q. You don't know?  You're here under oath.
24  A. I know.   Again I don't know.

Page 58

1  Q. Do you remember what you said to him
2    back in June of 2004 as to why you said
3    to him he should just sleep in his
4    truck?
5  A. I see it right there.
6  Q. Why you said that to him back then was
7    because, let me read it again, "Because
8    he had too much to drink," isn't that
9    right?
10        MR. GILLIS: That's your
11    testimony.
12  Q. What was your answer to that question?
13  A. I answered yes.
14  Q. You answered truthfully yes, isn't that
15    right, back in 2004?
16  A. Yes.  I was under oath.
17  Q. And you are under oath today.
18  A. Yes.
19  Q. Is your memory refreshed that you had
20    the conversation with him about just
21    sleeping in his truck because you
22    believed he had too much to drink?
23        MR. GILLIS: Objection.
24    Asked and answered about ten times.

Page 59

1  A. I asked him if he was all right to
2    drive.
3  Q. Because you thought he had too much to
4    drink, isn't that right?
5        MR. GILLIS: Objection.
6  A. Because I was a concerned friend.
7  Q. And you were concerned because you
8    thought he had had too much to drink,
9    isn't that right?
10        MR. GILLIS: Objection.
11  Q. Isn't that right?
12  A. I don't know what I thought then.
13  Q. You know what you thought back in June
14    of 2004.
15  A. It's on the paper right there.
16  Q. Do you adopt that?
17        MR. GILLIS: Objection.
18  A. I believe I did it out of being
19    concerned.
20  Q. Because you thought he had had too much
21    to drink as you testified to in June of
22    2004, isn't that right?
23        MR. GILLIS: Objection.  He
24    never testified to that.

Page 60

1        MR. FARRAH: Of course he
2    testified to that.
3        MR. GILLIS: He adopted your
4    statement.
5        MR. FARRAH: That's not
6    testifying to it?
7        MR. GILLIS: Objection to
8    the question.
9  Q. Did I speak to you before your
10    deposition about anything you were going
11    to testify to back in June of 2004 or
12    any time before June of 2004, sir?
13  A. Not that I recall.
14        MR. GILLIS: Objection.
15    Referring to Lines 13 and 14 it was your
16    testimony as to why he did it and he
17    just adopted your testimony.
18  Q. What did Jude say that night about
19    whether or not Mr. Southworth should
20    sleep in the truck?
21        MR. GILLIS: Objection.
22  A. I don't know what Jude said.
23  Q. Do you remember Jude being part of that
24    conversation?

Case 1:05-cv-10674-MBB   Document 27-4   Filed 05/10/2007   Page 16 of 40

Thomas Scott Espey, 4/25/2006                                    Condenseit                              Rosario vs. Rare Hospitality

Page 61

1  A. I don't remember.
2  Q. What did Mr. Southworth say when you
3     told him he should just sleep in the
4     truck?
5  A. I don't remember.
6  Q. Did he say "Okay"?
7  A. Apparently not.
8  Q. Did he swear at you?
9  A. I don't remember.
10  Q. Were you afraid of him?
11  A. No.
12  Q. A little bit?
13  A. I wouldn't say so.
14  Q. Are you afraid of him now?
15  A. No.
16  Q. Are you sure?
17  A. Yes.
18  Q. Is it accurate to say that the reason
19     you didn't go into the strip club was
20     because Jeff was too drunk?
21        MR. GILLIS: Objection.
22  A. I don't recall.
23  Q. Do you remember what he said about going
24     into the strip club while you were in

Page 62

1     the parking lot?
2  A. I don't recall.
3  Q. At some point in time did Jeff become
4     adamant that he wanted to go home that
5     night?
6  A. I believe we all did.
7  Q. My question to you is at some point in
8     time did Jeff become adamant that he
9     wanted to go home that night?
10        MR. GILLIS: Objection.
11  A. I don't recall.
12  Q. Do you remember being asked that
13     question on Page 119, "And he was
14     adamant about that, is that right?" Do
15     you remember that?
16  A. I see it.
17  Q. The answer was, "Yeah, he did not want
18     to go," and that was to go into the
19     strip club, isn't that right?
20        MR. GILLIS: Objection.
21  Q. Is that right?
22  A. Yes.
23  Q. Do you remember being asked the
24     question, "And you weren't going to mess

Page 63

1     with him, isn't that right?"  That was
2     in your deposition on Page 119, Line 14.
3     Do you remember what your answer was?
4  A. I see it now.
5  Q. And the truth of the matter is you were
6     afraid of Jeff, isn't that right?
7        MR. GILLIS: Objection.
8  A. He's a big guy.
9  Q. Can you give me a "Yes, I was afraid of
10     Jeff because he is a big guy" as your
11     answer?
12        MR. GILLIS: Objection.
13     Read the whole answer.
14  Q. The truth of the matter is you were
15     afraid of Jeff, isn't that right?
16        MR. GILLIS: Objection.
17  A. Physically?
18  Q. Yes.
19  A. Yes.
20  Q. That wasn't so hard, was it, to say yes?
21        MR. GILLIS: Objection and
22     move to strike.
23  Q. And you were afraid of Jeff all the way
24     up through the time that you testified

Page 64

1     at the criminal trial, isn't that right?
2     ?
3        MR. GILLIS: Objection.
4  A. I don't believe so.
5  Q. Did you testify truthfully at the
6     criminal trial?
7  A. Yes.
8  Q. Did you give it your best effort at the
9     criminal trial?
10  A. Yes.
11  Q. Did you give it your best effort at your
12     deposition in June of 2004?
13  A. Yes.
14  Q. And you are doing that today, is that
15     right?
16  A. Yes.
17  Q. Jeff ran over your ankle backing out of
18     the parking lot, is that right?
19  A. Correct.
20  Q. And you had to go to the hospital, isn't
21     that right?
22  A. Correct.
23  Q. And when you went to the hospital you
24     told people you injured yourself dirt

Page 65

1    biking, is that correct?
2  A. Right.
3  Q. Why did you lie?
4  A. I wasn't sure what the insurance was
5     going to cover.
6  Q. You wanted to be sure the insurance
7     covered you, is that right?
8  A. I wasn't sure about insurance. I really
9     didn't want to get involved.
10 Q. So you told a lie, is that right?
11       MR. GILLIS: Objection.
12 Q. That was a lie, wasn't it?
13 A. That was, yes.
14 Q. And that's the only lie you've ever told
15    about what happened with Jeff Southworth
16    that night, is that right?
17 A. Correct.
18 Q. Did Jeff say anything to you as he ran
19    over your ankle that night?
20 A. Not that I recall.
21 Q. Which ankle was it?
22 A. My right.
23 Q. And how much time elapsed from when you
24    pulled into the parking lot at your

Page 66

1     grandmother's apartment complex, the
2     Pond Side, until Jeff ran over your
3     ankle?
4  A. I don't recall. Not a long time,
5     though.
6  Q. What happened in the parking lot prior
7     to the time that he ran over your ankle?
8  A. We unloaded our dirt bike gear and he
9     started backing out.
10 Q. Did you give Jeff the keys to the truck
11    so he could drive away?
12 A. I don't recall.
13 Q. Did you leave the keys in the ignition
14    and get out the driver's seat?
15 A. I don't recall.
16 Q. What were you doing when he ran over
17    your ankle?
18 A. I believe I was getting some stuff out
19    of the bed of the truck.
20 Q. You had not yet retrieved all of
21    whatever it was you had put in the bed
22    of his truck before he ran over your
23    ankle, is that right?
24       MR. GILLIS: Objection.

Page 67

1  A. I don't know.
2  Q. What was in the bed of his truck?
3  A. Dirt bikes and dirt bike gear.
4  Q. What of yours was in the bed of his
5     truck that you had to retrieve that
6     night?
7  A. I had a helmet and some other protective
8     equipment and Jude had a bunch of
9     equipment.
10 Q. What was the other protective equipment
11    that you had besides the helmet?
12 A. Knee pads, chest protector, different
13    clothing.
14 Q. Were they in a duffel bag or something
15    like a duffel bag?
16 A. Yes.
17 Q. So what you had to retrieve from the
18    truck was your helmet and duffel bag, is
19    that right?
20 A. I believe we were getting Jude's stuff.
21 Q. I just want to know what you had to
22    retrieve from the truck. Helmet and
23    duffel bag?
24 A. I believe so.

Page 68

1  Q. Your cooler too?
2  A. I don't recall.
3  Q. Where was the cooler during the trip
4     from Longhorn to the Four Points?
5  A. I believe it was in the bed.
6  Q. Not where the seats are but in the back
7     where the bikes were, is that right?
8  A. I believe so.
9  Q. And Jude had to retrieve what from the
10    truck at Littleton?
11 A. Helmet and duffel bag.
12 Q. Same as you.
13 A. Correct.
14 Q. Is it accurate to say that you could
15    carry the helmet in one hand and the
16    duffel bag in the other hand or over the
17    other shoulder?
18 A. Yes.
19 Q. You didn't need to make two trips to
20    carry the helmet and the duffel bag, is
21    that right?
22 A. Not that I recall.
23 Q. Is that, "No, we didn't need to make two
24    trips"?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 18 of 40

Thomas Scott Espey, 4/23/2006                Condenseit!                Rosario vs. Rare Hospitalit

Page 69

1  A. Not that I recall.
2  Q. And Jeff on the trip from the Other Side
3     to the parking lot in Littleton was in
4     the second row of seats, the back seat,
5     is that right?
6  A. I don't recall.
7  Q. Wasn't he in back there with his dogs?
8  A. He was at some point.
9  Q. Do you have any belief that he changed
10    seats from where he was in the trip from
11    the Four Points to the Other Side in the
12    trip from the Other Side to Littleton?
13 A. I don't believe so.
14 Q. How much time elapsed from when you got
15    out of the truck before Jeff ran over
16    your ankle?
17 A. A couple of minutes.
18 Q. Was there any discussion that went on
19    during that couple of minutes?
20 A. I believe I asked him if he was all
21    right to drive and he said yes.
22 Q. How many times up to that point had you
23    asked him if he was all right to drive?
24 A. I believe only once.

Page 70

1  Q. And that's when you had the conversation
2     about should he sleep in the truck or
3     not.
4  A. I believe so.
5  Q. Jeff is bigger than you.
6  A. Yes.
7  Q. How much bigger than you is he?
8  A. I was about 180 at the time.  He was
9     like 220, 230.
10 Q. You had seen him in fights before, is
11    that right?
12 A. Yes.
13 Q. And you had seen him beat up people
14    before, is that right?
15 A. It's not like a big long fight.
16 Q. It was quick, he beat them up quick, is
17    that right?
18       MR. GILLIS: Objection.
19 A. No.  I've seen him throw a punch or two.
20 Q. Did he ever throw a punch at you?
21 A. No.
22 Q. You didn't want him to throw a punch at
23    you, is that right?
24       MR. GILLIS: Objection.

Page 7

1  Q. After he ran over your ankle did you say
2     anything to him?
3  A. Not that I recall.
4  Q. Did you say anything at all after he ran
5     over your ankle that you can recall?
6  A. I probably cursed a little bit.
7  Q. Do you remember cursing a little bit?
8  A. I just got run over.
9  Q. I'm going to show you a document and ask
10    you if you recognize your signature at
11    the bottom.
12 A. I do.
13 Q. And that's a document you gave the
14    police, is that right?
15 A. Yes.
16 Q. Is that your handwriting?
17 A. It is.
18 Q. And do you agree with the date of
19    November 2, 2003 as on or about the date
20    you made the document?
21 A. I believe so.
22       [Handwritten document by
23       Scott Espey marked Scott
24       Espey Exhibit No. 1 for

Page 7

1        Identification.]
2  Q. The police asked you to make this
3     document, is that right?
4  A. Correct.
5  Q. At your house or someplace else?
6  A. My house.
7  Q. Was your brother with you when you made
8     this document?
9  A. I don't believe so.
10 Q. How many police officers came to see
11    you?
12 A. One.
13 Q. I apologize because a bit of it has been
14    cut off but at the bottom it says here
15    on the third line down, "We couldn't
16    help so we returned home."  Then it
17    says, "At the" something "we all ordered
18    beer and Manhattans."  Do you see that?
19 A. I do.
20 Q. What does that sentence read?
21 A. It says "At the Longhorn," I believe,
22    "we all ordered beer and Manhattans."
23 Q. Is that true that at the Longhorn you
24    all ordered beer and Manhattans?

Page 73

```
 1        MR. GILLIS: Objection.
 2  Q. That's what you believed at the time?
 3  A. Yes.
 4  Q. Did you believe the persons who were
 5     drinking alcoholic beverages at the
 6     table, the six people, were drinking
 7     beers as well as Manhattans?
 8        MR. GILLIS: Objection.
 9  A. That's what I believed then.
10  Q. That your memory was better two months
11     after the accident than it is today
12     would you agree with me?
13  A. I would agree.
14  Q. What happened next after he ran over
15     you?
16  A. I got up and went to my truck and
17     realized I didn't have my keys to the
18     vehicle.
19  Q. What did you do at that point?
20  A. We tried contacting him.
21  Q. By cell phone?
22  A. Correct.
23  Q. Did you speak to him?
24  A. One of us did.
```

Page 74

```
 1  Q. Do you remember what was said to him?
 2  A. One of us said, "We're locked out of
 3     Scott's vehicle. You just ran over his
 4     ankle."
 5  Q. What did he say?
 6  A. I think he kind of questioned it at
 7     first.
 8  Q. Really?
 9  A. I believe so.
10  Q. Do you remember what he said?
11  A. I don't.
12  Q. You took it to be disbelief on his part
13     that he could actually have done that,
14     is that right?
15        MR. GILLIS: Objection.
16  A. Again I don't recall.
17  Q. You just testified he questioned it.
18     What did you mean by that?
19        MR. GILLIS: Objection.
20  A. It was more surprise than disbelief.
21  Q. How long after he ran over your ankle
22     was it that you had this conversation?
23  A. Not long at all.
24  Q. Less than five minutes?
```

Page 7

```
 1  A. Yes.
 2  Q. Did he tell you where he was when you
 3     had that conversation?
 4  A. I believe he said he was on 495.
 5  Q. Did he tell you what he would do in that
 6     conversation?
 7        MR. GILLIS: Objection.
 8  A. Eventually he said he was turning
 9     around.
10  Q. To bring back the keys as far as you
11     know.
12  A. As far as I know.
13  Q. When you say eventually what do you
14     mean?
15  A. For some reason I believe there was a
16     string of calls back and forth.
17  Q. Initially.
18  A. Initially, yes.
19  Q. What do you remember was said during
20     those calls back and forth?
21        MR. GILLIS: Objection.
22  A. That we were locked out and I had a
23     broken ankle.
24  Q. Do you remember what he said in response
```

Page 7

```
 1     other than disbelief?
 2  A. I don't know what he said.
 3  Q. Do you know why it took a string of
 4     calls for him to agree to come back with
 5     the keys?
 6  A. I believe there was cell phone reception
 7     or something.
 8  Q. At some point in time did you come to
 9     understand that he was heading back with
10     the keys?
11  A. I did.
12  Q. Did he come back with the keys?
13  A. No.
14  Q. At some point in time did you take some
15     action to be able to drive your truck?
16  A. We did.
17  Q. What did you do?
18  A. I had a spare key in the truck so Jude
19     knocked out a rear window. I told him
20     to.
21  Q. He broke the window, is that right?
22  A. Yes.
23  Q. How long did you wait for him to come
24     back before you decided it would be
```

Page 77

1    better to knock out the window?
2    A. I don't know. A little while.
3    Q. Ten minutes, fifteen minutes?
4    A. I was in a lot of pain.
5    Q. Then after you knocked out the window
6       did you ever again speak to Jeff
7       Southworth?
8    A. Not for a long time.
9    Q. Finally he called you on the cell phone
10      at night?
11   A. No. After we had waited for a while he
12      called and said he was in an accident.
13   Q. Then you knocked out the window.
14   A. Yes.
15   Q. How much time elapsed between the last
16      of the calls to confirm that he was
17      going to come back with the keys until
18      he called you and said, "I'm in an
19      accident"?
20   A. I don't know. Not a long time.
21   Q. What did he say about the accident?
22   A. He just said he was in an accident.
23   Q. Did he say where?
24   A. I don't remember.

Page 78

1    Q. Did he say he needed help?
2    A. I believe so, yes.
3    Q. Did you ask him where he was?
4    A. I don't know if I asked or if he said or
5       if we just knew he was on 495.
6    Q. And the question is, "Do you remember
7       the conversation you had with him when
8       he told you he had been in an accident?"
9       Your answer was, "He told me he was in
10      an accident and he needed help." Do you
11      see that?
12   A. I do.
13   Q. And that is in accordance with your
14      memory of what happened that night, is
15      that right?
16   A. Yes.
17   Q. And then the question was, "What else
18      did he say?" "That was it, I believe."
19      "What did you say to him?" "I said -- I
20      believe I asked him where he was. He
21      said 495." Do you remember that?
22   A. I do now.
23   Q. Does that accord with your memory of the
24      conversation you had with him that

Page 79

1    night?
2    A. Yes.
3    Q. Did you have any more conversation with
4       him in that phone call about the
5       accident other than what is in your
6       deposition and you have adopted today?
7          MR. GILLIS: Objection.
8    A. Not that I recall.
9    Q. After that phone call and the back
10      window was broken in the truck and you
11      grabbed the keys did you try to find
12      him?
13         MR. GILLIS: Objection.
14   A. Yes.
15   Q. Tell me where you went, what you did,
16      what you saw.
17   A. We just went up 495 and saw him. It was
18      a pretty bad accident.
19   Q. You went up 495 northbound initially, is
20      that right?
21   A. Correct.
22   Q. Why did you head north on 495?
23   A. Because he lived north of Middleton.
24   Q. Was that the direction you believed he

Page 80

1    was headed in?
2    A. Yes.
3    Q. As you were proceeding northbound on 495
4       did you see this pretty bad accident
5       that you talked about a few moments ago?
6          MR. GILLIS: Objection.
7    A. We saw emergency vehicles.
8    Q. Were they northbound on 495?
9    A. Southbound.
10   Q. Can you tell me the approximate location
11      of where you saw the emergency vehicles
12      southbound on 495?
13   A. Chelmsford and Westford.
14   Q. As you were traveling northbound on 495
15      did you see these emergency vehicles on
16      the southbound side?
17   A. I did.
18   Q. What did you do, if anything?
19   A. First we didn't believe it was his
20      accident so we kept going and we didn't
21      see anything else so we turned around
22      and drove back.
23   Q. Why didn't you believe it was his
24      accident?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 21 of 40

Thomas Scott Espey, 4/23/2006                    Condenseit!                    Rosario vs. Rare Hospitalit

Page 81

1  A. It was a pretty bad accident scene.
2  Q. Describe for me what you remember about
3     that accident.
4  A. Police cars and ambulances.
5  Q. Fire trucks?
6  A. Maybe. I don't recall. A lot of
7     emergency vehicles.
8  Q. You saw this from the northbound lane,
9     is that right?
10 A. Correct.
11 Q. As you kept going southbound you didn't
12    see any what appeared to be accident
13    scenes, is that right?
14 A. That's correct.
15 Q. So you turned around and then had an
16    opportunity to see from the southbound
17    lane of travel the accident scene, is
18    that right?
19        MR. GILLIS: Objection.
20 A. We went by it.
21 Q. Tell me what you saw.
22 A. We saw a lot of emergency vehicles,
23    firemen, EMTs, police officers.
24 Q. Ambulances?

Page 82

1  A. Yes.
2  Q. Did you see Mr. Southworth anywhere?
3  A. I didn't.
4  Q. Did you see his car anywhere?
5  A. I didn't.
6  Q. Did you see any non-official vehicle,
7     any cars?
8  A. Not that I recall.
9  Q. Any evidence of any vehicles you thought
10    had been in the accident?
11 A. Not that I recall.
12 Q. What did you do after you traveled past
13    the accident scene?
14 A. Went home.
15 Q. Did you try to call Mr. Southworth at
16    all from the time that he told you he
17    was in an accident until you went home?
18 A. I believe I tried calling him later but
19    there was no answer.
20 Q. Is it accurate to say that as of the
21    summer of 2003 Jeff Southworth was your
22    friend?
23 A. Yes.
24 Q. Did you own a dirt bike as of the summer

Page 8[3]

1     of 2003?
2  A. I did not.
3  Q. And was Jeff letting you use one of his
4     dirt bikes that summer?
5  A. He was.
6  Q. And had Jeff and you talked about buying
7     the dirt bike from him?
8  A. It was discussed.
9  Q. Was that your hope that summer that you
10    could buy the dirt bike from Jeff?
11 A. We talked about it. I don't know if it
12    was going to happen or not.
13 Q. You wanted it to happen, is that right?
14 A. Yes.
15 Q. Is it accurate to say that you did not
16    want any testimony you gave in any
17    proceeding to hurt your friend Jeff
18    Southworth, is that accurate to say?
19        MR. GILLIS: Objection.
20 A. No.
21 Q. What is inaccurate about that statement?
22 A. I'm not going to hurt myself for him.
23 Q. What do you mean by that?
24 A. You say you don't want my testimony to

Page 8[4]

1     hurt him. I'm not going to sit here
2     under oath and say something that is not
3     the truth.
4  Q. Did you speak to any police officers
5     about this night?
6  A. Yes.
7  Q. How many times did you speak to police
8     officers about this night?
9  A. Just once.
10 Q. Do you know who you spoke to?
11 A. A State Trooper.
12 Q. Did you speak to any prosecutors about
13    testifying in the criminal case?
14 A. I was subpoenaed to the Grand Jury in
15    the criminal case.
16 Q. You testified in the Grand Jury?
17 A. Yes.
18 Q. You testified truthfully in the Grand
19    Jury to the best you recall?
20 A. Yes.
21 Q. Then you testified at trial, is that
22    right?
23 A. That's right.
24 Q. You testified truthfully at the trial?

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 22 of 40

Page 85

1   A. I did.
2   Q. And you have testified truthfully here
3      today.
4   A. Yes.
5   Q. And you testified truthfully in June of
6      2004, is that right?
7   A. I did.
8   Q. Did you ever speak to any attorneys you
9      understood were representing Jeff
10     Southworth?
11  A. Just that one day in June.
12  Q. Did you ever speak to anyone you
13     understood was Jeff's criminal lawyer?
14  A. I was questioned by him at the criminal
15     case.
16  Q. Other than being examined by him during
17     the criminal trial did you ever speak to
18     him?
19  A. No, not that I recall.
20  Q. Did you ever speak to any investigators
21     that you understood were working for
22     Jeff's lawyers?
23  A. I was contacted by them.
24  Q. Who contacted you?

Page 86

1   A. I don't know what his name was.
2   Q. Did he give you a card?
3   A. He didn't.
4   Q. Did you meet with him?
5   A. He called on my cell phone.
6   Q. What did he say to you?
7   A. He asked me a few questions and I didn't
8      really want to talk to him.
9   Q. Why was that?
10  A. I didn't know who he was.
11  Q. He told you who he was, didn't he?
12  A. Yes. He called me randomly on the cell
13     phone and said, "I'm so-and-so."
14  Q. Did he want to meet with you?
15  A. I don't believe so.
16  Q. Have you at any time spoken to any
17     persons you understand to be
18     investigators about this incident?
19  A. Yes.
20  Q. Who have you spoken to?
21  A. Somebody came to my house a week or two
22     ago.
23  Q. Mr. Dinatale?
24  A. I don't know his name.

Page 87

1   Q. He identified himself as a private
2      investigator, is that right?
3   A. Yes.
4   Q. How did he happen to come to your house?
5   A. He knocked on the door and that was it.
6   Q. Had he called in advance to let you know
7      he was coming?
8   A. No.
9   Q. Had he spoken to your mother or your
10     father to let you know?
11  A. No.
12  Q. About a week ago this happened, is that
13     right?
14  A. Yes. Last Monday.
15  Q. What time of day or night was it he
16     came?
17  A. The middle of the day.
18  Q. Without warning?
19        MR. GILLIS: Objection.
20  A. Yes.
21  Q. What did he look like?
22  A. Middle age.
23  Q. What color hair?
24  A. Gray.

Page 88

1   Q. Short or tall?
2   A. Average size.
3   Q. Did he give you a card?
4   A. Yes.
5   Q. Do you have it with you?
6   A. I don't think so.
7   Q. Will you check?
8        [Short pause.]
9        THE WITNESS: I don't have
10     it.
11  Q. How long were you with him that day?
12  A. Not long, ten minutes.
13  Q. Did you invite him into the house?
14  A. No.
15  Q. Where did you have the conversation?
16  A. Right at the front door.
17  Q. Who else was present?
18  A. Myself and him.
19  Q. What did he say to you?
20  A. He gave me my transcripts and that was
21     about it.
22  Q. Which transcripts did he give you?
23  A. From when I was here last June.
24  Q. You had that transcript already, didn't

Page 89

1    you?
2  A. Somewhere at my house.
3  Q. You said he gave you your transcripts.
4  A. He gave me my transcript and my
5     brother's transcript.
6  Q. Both of you.
7  A. Yes.
8  Q. Did he say, "This other transcript is
9     for your brother"?
10 A. Yes.
11 Q. You hadn't contacted him to come down
12    with those transcripts, had you?
13 A. No.
14 Q. And you hadn't contacted anyone to have
15    someone like this fellow come down and
16    bring the transcripts to you, is that
17    right?
18 A. That's right.
19 Q. Has Mr. Gillis's office been in touch
20    with you prior to today?
21 A. No.
22 Q. No one from Mr. Gillis's office got in
23    touch with you prior to today, is that
24    right?

Page 90

1  A. That's correct.
2  Q. This fellow showed up at your door with
3     two transcripts, is that right?
4  A. Yes.
5  Q. And a business card.
6  A. Yes.
7  Q. But you can't now find the card, is that
8     right?
9  A. I don't have it with me, no.
10 Q. You talked to him for about ten minutes,
11    is that right?
12 A. Yes.
13 Q. What did he say and what did you say?
14 A. He asked me my name and I identified
15    myself. He said, "Basically you're
16    going to have a deposition next week"
17    and I confirmed that. I asked him what
18    the procedure is, if I needed
19    representation and what happens if I
20    don't show, rescheduling, stuff like
21    that.
22 Q. He identified himself as who?
23 A. I can't remember his name. He was a
24    private investigator.

Page 91

1  Q. Working for Rare Hospitality?
2  A. Essentially, yes, I believe so.
3  Q. Did he mention Mr. Gillis's law firm's
4     name?
5  A. He said Mr. Gillis.
6  Q. From the day you were born until today
7     had you ever spoken to Mr. Gillis?
8  A. No.
9  Q. You had never met him, is that right?
10 A. That's correct.
11 Q. From the day you were born until today
12    other than this fellow who came to your
13    house last Monday had you ever spoken to
14    anyone you understood was working on Mr.
15    Gillis's behalf?
16 A. No.
17 Q. Or on the behalf of Mr. Gillis's
18    clients?
19 A. No.
20 Q. You asked him about the procedure for
21    the deposition.
22 A. Somewhat, yes.
23 Q. Did you trust this person?
24 A. No more than any other person that shows

Page 92

1     up at your door.
2  Q. Why were you asking him about the
3     procedure if you didn't trust him?
4  A. He had a transcript. He had a card.
5  Q. So you trusted him.
6          MR. GILLIS: Objection.
7  A. I asked him for his input on the
8     situation.
9  Q. Why did you ask him for his input on the
10    situation?
11 A. Because he seemed to be a part of the
12    situation.
13 Q. You understood that he was working for
14    one side in this case, isn't that right?
15 A. That's right.
16 Q. And did you believe when you asked him
17    for his input into the situation that he
18    would answer your request with input
19    that was favorable to his side of the
20    case?
21 A. It was more what happens if I don't show
22    up? Is this something that can be
23    rescheduled, and that was about it.
24 Q. What other input did you ask him for?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 24 of 40

Thomas Scott Espey, 4/25/2006    Condensedt    Rosario vs. Rare Hospitality

Page 93

1  A. That's it.
2  Q. Did you discuss with him at all other
3     than what you have just told me your
4     testimony today?
5  A. No, I did not.
6  Q. Did you discuss with him at all the
7     events of the night of September 26,
8     2003 at the Longhorn?
9  A. I did not.
10 Q. You testified earlier today that you are
11    not even sure whether you had finished
12    the beer that you ordered at the bar.
13    Do you recall that testimony?
14       MR. GILLIS: Objection.
15 A. I do.
16 Q. And what I want to know is did you
17    discuss at all with this fellow who
18    showed up on Monday at your house that
19    issue?
20 A. No.
21 Q. When is the first time you told anyone
22    that you are not sure whether you
23    finished the beer that you had at the
24    bar?

Page 94

1       MR. GILLIS: Objection.
2  A. Probably when I testified here last
3     summer.
4  Q. Did you review your testimony to see if
5     that was the case?
6  A. I didn't.
7  Q. You are just guessing, is that right,
8     when you answer the question that way?
9  A. I told you the truth then. I'm telling
10    you the truth now.
11 Q. You also testified today about how long
12    you were at the bar, that it might have
13    been just a few minutes you were at the
14    bar. Do you remember that testimony?
15 A. Yes.
16 Q. Do you remember discussion that with the
17    fellow who showed up at your house?
18 A. No.
19 Q. When is the first time you told anybody
20    that you might have been at the bar only
21    a few minutes that night?
22 A. Probably at the Grand Jury.
23 Q. Do you have any memory of telling that
24    to the Grand Jury?

Page 9[5]

1  A. That I was only there a few minutes at
2     the bar?
3  Q. Yes.
4  A. I don't, no.
5  Q. That's another guess, isn't it, that you
6     probably told the Grand Jury the first
7     time that you were only at the bar for a
8     few minutes?
9  A. I would say that's an estimation.
10 Q. A guess.
11       MR. GILLIS: Objection.
12    Asked and answered.
13 A. An estimation. I don't know.
14 Q. Do you have a memory of what you told
15    the Grand Jury about how long you were
16    at the bar?
17 A. No.
18 Q. Have you ever seen your Grand Jury
19    transcript?
20 A. I know it was presented to me at the
21    criminal trial.
22 Q. Who presented it to you?
23 A. I think the D.A. I don't know.
24 Q. Do you have a memory today that you

Page 9[6]

1     testified to the Grand Jury that you
2     were only at the bar for a few minutes
3     before you were seated at the table?
4  A. Yes.
5  Q. You also have a memory that you
6     testified in June of 2004 that you were
7     seated at the bar for approximately half
8     an hour before you went to the table.
9       MR. GILLIS: Objection.
10 A. A few minutes.
11 Q. Half an hour? Is that what you meant
12    by a few minutes?
13 A. I said twenty minutes earlier to that.
14    I said a few minutes. You said, "How
15    long?" I said fifteen or twenty and in
16    here it says a half hour.
17 Q. What does a few minutes mean to you?
18 A. Twenty minutes, twenty-five minutes,
19    half hour.
20 Q. And that's what you meant when you told
21    the Grand Jury you were at the bar for a
22    few minutes?
23 A. Yes.
24 Q. And is it your testimony that after dirt

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 25 of 40

Page 97

1    biking for a few hours that you are not
2    even sure whether you finished one beer
3    during the fifteen, twenty to thirty
4    minute time that you have now admitted
5    you were at the bar before you were
6    seated at the table?
7              MR. GILLIS: Objection.
8    A. I don't know how much I had to drink.
9    Q. And that's because you were drunk that
10    night, isn't that right?
11              MR. GILLIS: Objection.
12    A. I don't think so.
13    Q. But you're not sure, are you?
14    A. I was never given a sobriety test but I
15    don't think I was.
16    Q. You are not sure at the time you were
17    served your last drink at the Longhorn
18    Steakhouse whether or not you were under
19    the influence of intoxicating alcohol,
20    isn't that right?
21              MR. GILLIS: Objection.
22    A. I had a few drinks.
23    Q. You were feeling good, is that right?
24              MR. GILLIS: Objection.

Page 99

1    A. It was from this deposition.
2    Q. Did Mr. Dinatale give you anything else
3    that day?
4    A. Not that I know of.
5    Q. Did you take any notes of the meeting
6    with Mr. Dinatale?
7    A. I did not.
8    Q. Did he take any notes of the meeting
9    with you?
10    A. He did not.
11    Q. That you know of, is that right?
12    A. Not that I know of.
13    Q. He didn't take any tape recording?
14    A. Not that I know of.
15    Q. Did he ask your permission to
16    tape-record you?
17    A. No.
18    Q. Was that the first person you ever met
19    with that you understood to be acting on
20    behalf of Rare Hospitality?
21    A. Yes.
22    Q. Did you ever meet with an attorney from
23    the law firm of Campbell, Campbell &
24    Edwards?

Page 98

1    A. I didn't say that.
2    Q. But were you?
3              MR. GILLIS: Objection.
4    A. I had a beer or two. I couldn't tell
5    you.
6    Q. But were you feeling good at the time
7    you were served your last drink at the
8    Longhorn?
9              MR. GILLIS: Objection.
10    A. I can't remember.
11    Q. Have you told me everything that you can
12    remember about the conversation that you
13    had with Mr. Dinatale at your house last
14    Monday?
15    A. I did.
16    Q. Have you described everything that Mr.
17    Dinatale gave to you during that evening
18    to the best of your ability?
19    A. I have.
20    Q. That was his business card, your
21    transcript from the Superior Court case,
22    and your brother's transcript from the
23    Superior Court case.
24              MR. GILLIS: Objection.

Page 100

1    A. Not that I know of.
2    Q. Did you ever talk to an attorney from
3    the law firm of Campbell, Campbell &
4    Edwards?
5    A. Unless it was in court or here not that
6    I know of.
7    Q. Have you since last Monday spoken to
8    Mr. Dinatale?
9    A. No.
10    Q. Have you since then spoken to anyone
11    that you understood was working for him?
12    A. No.
13    Q. Or from his agency or office?
14    A. Not that I know of.
15    Q. How did you leave it with Mr. Dinatale?
16              MR. GILLIS: Objection.
17    Q. Any threat to do anything else?
18              MR. GILLIS: Objection.
19    A. No.
20    Q. Did he give you any suggestions about
21    how to testify?
22    A. No.
23    Q. Did he tell you to tell the truth?
24    A. Yes.

Thomas Scott Espey, 4/25/2006    Condensit    Rosario vs. Rare Hospitality

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 26 of 40

Page 101

1 Q. Did he need to tell you to tell the
2 truth?
3      MR. GILLIS: Objection.
4 A. No.
5 Q. What else did he say to you that you
6 haven't told us?
7 A. That's it.
8 Q. Did he talk about how you were an
9 important witness in the case?
10 A. No.
11 Q. Are you sure?
12 A. I'm sure.
13      MR. FARRAH: I don't have
14 any more questions.
15      CROSS-EXAMINATION
16      BY MR. GILLIS
17 Q. Mr. Espey, my name is Michael Gillis and
18 I am representing Longhorn Steakhouse.
19 Longhorn, just so you know, is the same
20 company that Mr. Farrah has been
21 referring to as Rare Hospitality.
22 A. Okay.
23 Q. Prior to you meeting with Mr. Dinatale
24 you gave a deposition to Mr. Farrah, is

Page 102

1 that correct?
2 A. Correct.
3 Q. Nobody from Rare Hospitality or Longhorn
4 was present there, correct?
5 A. Correct.
6 Q. No one had the opportunity to ask you
7 questions, is that correct?
8 A. From your client?
9 Q. Anybody from Longhorn Steakhouse.
10 A. No.
11 Q. They weren't invited to that deposition
12 that you know of, correct?
13 A. Not that I know of.
14 Q. Between that deposition and the time you
15 met with Mr. Dinatale did you give any
16 testimony to the Grand Jury?
17 A. Yes.
18 Q. And you told the truth as best you
19 could, correct?
20 A. Correct.
21 Q. There was no one from Mr. Farrah's
22 office present for that, correct?
23 A. Correct.
24 Q. And there was no one from our office

Page 103

1 there, correct?
2 A. Correct.
3 Q. That was before you met with any
4 investigator in this case, correct, from
5 either Mr. Farrah's office or my office.
6 A. Correct.
7 Q. The only investigator you met was
8 Mr. Southworth's, correct?
9 A. No, the State Trooper.
10 Q. And at that time when you were asked
11 questions at the Grand Jury you
12 testified that Mr. Southworth was not
13 intoxicated at the Longhorn, correct?
14      MR. FARRAH: Objection.
15 A. I don't know if he was or was not.
16 Q. Do you remember that specific question
17 being asked of you in the Grand Jury?
18      MR. FARRAH: Objection.
19 A. I don't recall. I'm sure it was
20 probably asked, though.
21 Q. Do you remember any of the specific
22 questions you were asked at the Grand
23 Jury?
24 A. No.

Page 104

1 Q. So anything that you testified to today
2 as to the Grand Jury would be guesses on
3 your part, correct?
4 A. I'm trying the best I can.
5 Q. But it would be a guess, correct?
6      MR. FARRAH: Objection.
7 A. What I said then is probably more
8 accurate than now.
9 Q. For purposes of your testimony it has
10 been a long period of time since this
11 accident occurred, correct?
12 A. Correct.
13 Q. Is it fair to say over time you remember
14 less about this incident, is that fair
15 to say?
16 A. I would say so.
17 Q. And would you say that your Grand Jury
18 testimony was more accurate than what
19 you might be testifying to today?
20      MR. FARRAH: Objection.
21 A. Probably.
22 Q. Is that because of the passage of time?
23 A. Yes.
24 Q. And the same is true with your statement

Case 1:05-cv-10617-MBB  Document 27-4  Filed 05/10/2007  Page 27 of 40

Thomas Scott Espey, 4/25/2006                Condenseit                Rosario vs. Rare Hospitalit

Page 105

1    to the State Police shortly after the
2    accident.
3           MR. FARRAH: Objection.
4  A. Correct.
5  Q. That was two months after the accident
6    or less.
7  A. November, whatever it was.
8  Q. Whatever number of weeks from
9    September 26, 2003 to November 2, 2003
10   that's how close it was to the accident,
11   correct?
12 A. Correct.
13 Q. At that time when asked by the State
14   Trooper you didn't say that
15   Mr. Southworth was intoxicated at the
16   Longhorn that night, is that correct?
17         MR. FARRAH: Objection.
18 A. I don't believe so.
19 Q. You were asked about that, weren't you?
20         MR. FARRAH: Objection.
21 A. I'm sure I was.
22 Q. He asked you if he showed any visible
23   signs of intoxication, didn't he?
24         MR. FARRAH: Objection.

Page 106

1  A. I believe so.
2  Q. Six weeks or whatever it was after the
3    accident at that point it was your
4    testimony that there were no visible
5    signs of intoxication by Mr. Southworth
6    at the Longhorn Steakhouse, correct?
7           MR. FARRAH: Objection.
8  A. Yes.
9  Q. And that's because that was your memory
10   at that time, correct?
11         MR. FARRAH: Objection.
12 A. Yes.
13 Q. From the date of this accident,
14   September 26, 2003 to today, have you
15   ever told anybody that Mr. Southworth
16   was unsteady on his feet at the Longhorn
17   Steakhouse on September 26, 2003?
18         MR. FARRAH: Objection.
19 A. No.
20 Q. Have you ever testified that
21   Mr. Southworth's eyes were glassy at the
22   Longhorn Steakhouse on September 26,
23   2003?
24 A. Not that I recall.

Page 107

1  Q. Have you ever testified that
2    Mr. Southworth's speech was slurred at
3    the Longhorn Steakhouse on September 26,
4    2003?
5  A. Not that I recall.
6  Q. Do you have any specific memory as you
7    sit here today of Jeffrey Southworth
8    being visibly intoxicated at the
9    Longhorn Steakhouse on September 26,
10   2003?
11         MR. FARRAH: Objection.
12 A. No.
13 Q. Do you have any memory as you sit here
14   today of him stumbling at all at the
15   Longhorn Steakhouse on September 26,
16   2003?
17 A. No.
18 Q. Do you have any memory of his speech
19   being slurred at the Longhorn on that
20   date?
21 A. No.
22 Q. Do you have any specific memory as you
23   sit here today of him being glassy-eyed
24   at the Longhorn on September 26, 2003?

Page 108

1  A. No.
2  Q. Do you have any memory of him knocking
3    any drinks over at the table at the
4    Longhorn on September 26, 2003?
5  A. Not that I recall.
6  Q. Do you have any memory as you sit here
7    today of him ever swaying or unable to
8    sit up straight at the Longhorn on
9    September 26, 2003?
10         MR. FARRAH: Objection.
11 A. Not that I recall.
12 Q. In fact whenever you have been asked any
13   questions about his intoxication you
14   have testified that you have no evidence
15   that he was visibly intoxicated at the
16   Longhorn Restaurant on September 26,
17   2003, is that correct?
18         MR. FARRAH: Objection.
19 A. I have no evidence.
20 Q. Mr. Farrah asked you earlier whether or
21   not you were afraid of Mr. Southworth,
22   is that correct?
23 A. Correct.
24 Q. He was your friend, was he not?

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 28 of 40

Thomas Scott Espey, 4/25/2006              Condensed          Rosario vs. Rare Hospitality

Page 109

1   A. I thought so.
2   Q. And you went dirt biking with him
3      several times a week, is that correct?
4   A. Yes.
5   Q. And you borrowed his bike, correct?
6   A. Correct.
7   Q. You went out to dinner with him on
8      regular occasions, correct?
9   A. Correct.
10  Q. You wouldn't do that with somebody you
11     were afraid of, is that correct?
12        MR. FARRAH: Objection.
13  A. No.
14  Q. He didn't force you to go dirt biking
15     with him, did he?
16  A. No.
17  Q. He didn't hold a gun to your head and
18     say, "You've got to come dirt biking,"
19     correct?
20  A. No.
21  Q. Previously in your answers to questions
22     asked you by Mr. Farrah you prefaced
23     those questions by probably. When you
24     answer questions probably is that

Page 110

1      because you don't have a specific memory
2      of whether it did or did not happen?
3         MR. FARRAH: Objection.
4   A. Yes.
5   Q. And you also answered questions with "I
6      believe." Is it fair to say that when
7      you answered that way that you don't
8      have a specific memory of what was
9      asked, if it happened or didn't, is that
10     correct?
11        MR. FARRAH: Objection.
12  A. Correct.
13  Q. When he showed you your transcript, he
14     asked you to look at testimony that you
15     had previously testified, correct?
16  A. Correct.
17  Q. You don't have a memory of what you said
18     back then. You just agreed that what
19     was in the transcript is true, correct?
20  A. Well, I read it over after they sent it
21     to me.
22  Q. If you said that's your best memory, you
23     just adopted that not because it
24     refreshed your recollection but because

Page 111

1      that was in the prior transcript, isn't
2      that true?
3         MR. FARRAH: Objection.
4   A. Correct.
5   Q. Did that change your memory any bit
6      today, your actual memory of what you
7      actually remember?
8         MR. FARRAH: Objection.
9   A. No.
10  Q. When you said, "I don't think so," does
11     that mean you're not sure?
12        MR. FARRAH: Objection.
13  A. Yes, I'm not positive.
14  Q. When you said, "I don't think so," that
15     means you're not sure whether the facts
16     that were asked of you occurred or
17     didn't occur, correct?
18        MR. FARRAH: Objection.
19  A. Correct.
20  Q. And furthermore when you answered a
21     question, "I think," that means you
22     don't know one way or the other,
23     correct?
24        MR. FARRAH: Objection.

Page 112

1   A. Yes.
2   Q. That was your best guess, correct?
3   A. Yes.
4   Q. In fact all those premises were your
5      best guess, correct?
6         MR. FARRAH: Objection.
7   A. Correct.
8   Q. Almost two years ago you were deposed in
9      this case, June of 2004, correct?
10  A. Yes.
11  Q. Your memory was a little better then
12     than it is today, is that fair to say?
13  A. Yes.
14  Q. You brought the cooler that day, is that
15     correct?
16  A. Correct.
17  Q. And you said you had a six-pack in the
18     cooler, correct?
19  A. I don't know how much was in the cooler.
20  Q. When you buy beer, do you buy
21     twelve-ounce beers?
22  A. Yes.
23  Q. The beers in that cooler were
24     twelve-ounce, correct?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 29 of 49

Thomas Scott Espey, 4/25/2006                    Condense It                    Rosario vs. Rare Hospitality

Page 113

1    MR. FARRAH: Objection.
2  A. I would think so.
3  Q. You don't know whether they were or not,
4     correct?
5  A. I don't, but probably.
6  Q. Was it your practice back then when you
7     bought a six-pack to get a six-pack of
8     twelve-ounce beers as opposed to any
9     other size beer?
10 A. Yes.
11 Q. When you said that the cooler was in the
12    bed of the truck, is it fair to say that
13    you don't know if it was in the back
14    seat with Mr. Southworth or whether it
15    was physically in the bed that evening,
16    is that correct?
17    MR. FARRAH: Objection.
18 A. As I sit here today I don't know.
19 Q. If someone else like Jude testified it
20    was in the back seat, would you disagree
21    with them?
22    MR. FARRAH: Objection.
23 A. No.
24 Q. As you sit here today you can't remember

Page 114

1     your cell phone number back in September
2     of 2003, correct?
3  A. No.
4  Q. And that's not because you are
5     intoxicated or anything, correct?
6  A. Correct.
7  Q. And the reason you may not remember
8     everything from that evening is not
9     because you were intoxicated, correct?
10 A. Yes.
11 Q. Mr. Farrah says that you never told
12    anybody before that you didn't finish
13    your beer at the bar that night. Do you
14    have any memory of anybody ever even
15    asking you that question before today?
16    MR. FARRAH: Objection.
17 A. No.
18 Q. As you sit here today do you remember
19    anybody ever asking you whether or not
20    you finished your beer at the bar prior
21    to Mr. Farrah asking you that today?
22    MR. FARRAH: Objection to
23    that mischaracterization of my question.
24 A. Not that I recall.

Page 115

1  Q. Do you know whether or not the tab for
2     the beer that you purchased at the bar
3     was carried over to the dinner check or
4     whether it was paid at the bar?
5     MR. FARRAH: Objection.
6  A. I don't know.
7  Q. You called beforehand to get a table, is
8     that correct?
9  A. Correct.
10 Q. The reason you called was so that you
11    wouldn't have to wait very long, is that
12    correct?
13 A. Correct.
14 Q. And you get put into whatever order it
15    is for a table once you call in for a
16    reservation, correct?
17    MR. FARRAH: Objection.
18 A. Correct.
19 Q. Whatever time it was, a few minutes that
20    you characterized as ten, fifteen, or
21    twenty minutes which Mr. Farrah
22    suggested to you in your deposition,
23    whatever time it was you only had one
24    drink at the bar which you didn't finish

Page 116

1     and brought to the table, correct?
2     MR. FARRAH: Objection.
3  A. I believe so.
4  Q. As you sit here today do you have any
5     specific memory of having ordered more
6     than one drink at the bar on
7     September 26, 2003?
8     MR. FARRAH: Objection.
9  A. I don't.
10 Q. As you sit here today do you have any
11    specific memory of Mr. Southworth having
12    any more to drink than one beer at the
13    bar on September 26, 2003?
14    MR. FARRAH: Objection.
15 A. I don't.
16 Q. You don't have a specific memory as you
17    sit here today as to what, if anything,
18    Mr. Southworth had to drink at the table
19    once you all were seated, correct?
20 A. Correct.
21 Q. And the three people who were at the bar
22    that night were you, Jude Connelly, and
23    Mr. Southworth, correct?
24 A. Correct.

Case 1:05-cv-10617-MBB   Document 27-4   Filed 05/10/2007   Page 30 of 40

Thomas Scott Espey, 4/25/2006          Condenseit          Rosario vs. Rare Hospitality

Page 117

1  Q. The remainder of the group met you and
2     were seated at a table, correct?
3         MR. FARRAH: Objection.
4  A. Correct.
5  Q. You don't have any memory as you sit
6     here today of anybody other than the
7     three of you ordering drinks at the bar
8     that evening, correct?
9  A. Not that I recall.
10 Q. In your statement that is Exhibit 1 in
11    this case you mention to the State
12    Police that you had beer and Manhattans
13    which you believe were ordered by the
14    table, correct?  Starting at the
15    third-to-last line it says, "At the"
16    something "we all ordered beer and
17    Manhattans.  We all ordered," and
18    something is cut off "table so I can't
19    be sure who drank how much."  Correct?
20 A. Correct.
21 Q. You have no idea how much Mr. Southworth
22    had to drink, correct?
23 A. Correct.
24 Q. You had no idea what anybody had to

Page 118

1     drink, correct?
2  A. Correct.
3  Q. And when you say beer and Manhattans
4     that means that people had beer or
5     Manhattans, not beer and Manhattans, is
6     that correct?
7         MR. FARRAH: Objection.
8  A. I don't know who drank what.
9  Q. Do you have a specific memory as you sit
10    here today that everybody at the table
11    had a beer and a Manhattan?
12        MR. FARRAH: Objection.
13 A. Again I don't know who drank what.
14 Q. Let me show you what was introduced as
15    an exhibit in your brother's deposition
16    which shows two beers ordered that night
17    at the table.  Does that refresh your
18    recollection as to whether or not
19    everybody at the table had a beer?
20        MR. FARRAH: Objection to
21    that characterization that there were
22    two beers ordered at the table.  You can
23    answer the question.
24 A. There were more people than beers.

Page 119

1  Q. I'm going to suggest for purposes of
2     this question that this is the bill for
3     that evening and on there there are two
4     Bud Lights.  Does that refresh your
5     recollection as to whether or not
6     everybody at the table had a beer at the
7     table?
8         MR. FARRAH: Objection.
9  A. It suggests they didn't.
10 Q. But does it reflect your recollection in
11    any way?
12 A. No.
13 Q. Do you have any specific memory as you
14    sit here today whether or not everybody
15    at the table had either a beer or a
16    Manhattan or both a beer and a
17    Manhattan?
18 A. I don't have a specific recollection.
19 Q. Mr. Farrah was questioning you on
20    Page 74 about your testimony about the
21    Manhattans.  You testified that you had
22    two beers.  "I don't know.  I don't
23    know.  I don't know what I had to
24    drink."  Isn't that your testimony?

Page 120

1  A. Yes.
2  Q. You don't know what you had to drink
3     yourself that night, correct?
4  A. Correct.
5  Q. You don't know how many Manhattans you
6     had that night.
7  A. Correct.
8  Q. All you know in your statement that you
9     gave to the State Police is that you
10    were ordering in rounds, correct?
11        MR. FARRAH: Objection.
12 A. I believe so.
13 Q. What does it mean to you when you say
14    you ordered as a table?
15 A. That whoever at the table needed a drink
16    ordered.
17 Q. As you sit here today do you have any
18    specific memory of anybody being served
19    more than one drink at a table, multiple
20    drinks per round?
21        MR. FARRAH: Objection.
22 A. I don't recall.
23 Q. Have you ever been to the Longhorn when
24    they served any person at your table

Page 121

1     more than one drink per round?
2  A. I don't believe so.
3  Q. Would that be unusual to you?
4        MR. FARRAH: Objection.
5  A. Yes.
6  Q. Now if I were to represent to you that
7     the first round of drinks that were
8     ordered at that table were four drinks,
9     do you have a memory as to whether those
10    were for the four people who joined the
11    three of you at the restaurant?
12       MR. FARRAH: Objection.
13 A. I don't recall.
14 Q. In your prior deposition did Mr. Farrah
15    ever show you a copy of what you guys
16    had to order that night?
17       MR. FARRAH: Objection.
18 A. I don't recall.
19 Q. Did he show you the check for that
20    night?
21       MR. FARRAH: Objection.
22 A. I don't know.  I have seen it somewhere
23    in various rounds.
24 Q. How far is the Four Points Hotel from

Page 122

1     the Longhorn?
2  A. Maybe half a mile.
3  Q. It takes two minutes for you to get
4     there?
5  A. Yes.
6  Q. Do you know where Chopsticks is?
7  A. Yes.
8  Q. Are you familiar with the place?
9  A. I haven't been there in a while.
10 Q. How would you characterize Chopsticks?
11 A. A Chinese restaurant.
12 Q. Does it have a bar and a lounge,
13    etcetera?
14 A. I assume so.
15 Q. Back in September of 2003 if you were to
16    go to a bar just to drink with your
17    friends where would you go?
18       MR. FARRAH: Objection.
19 A. I don't know.  There's no regular place.
20 Q. Is it fair to say Longhorn's is a place
21    you might go to eat as opposed to drink?
22       MR. FARRAH: Objection.
23 A. Yes.
24 Q. If you were going out to drink for the

Page 123

1     night would you go to Longhorn's?
2  A. Just to drink?
3  Q. Yes.
4  A. Probably not.
5  Q. It's more of a steakhouse restaurant, in
6     your opinion, is that right?
7        MR. FARRAH: Objection.
8  A. Correct.
9  Q. When you got back to the Four Points you
10    went to see some friends with your
11    brother, correct?
12 A. Correct.
13 Q. There was beer and Jack Daniels in the
14    room?
15 A. I don't recall Jack Daniels.
16 Q. If your brother testified that there was
17    Jack Daniels in the room would you doubt
18    him?
19       MR. FARRAH: Objection.
20 A. No.
21 Q. When you left the Longhorn that evening
22    you felt perfectly fine to drive,
23    correct?
24 A. Correct.

Page 124

1  Q. You wouldn't get in an automobile and
2     drive if you were visibly intoxicated,
3     is that correct?
4        MR. FARRAH: Objection.
5  A. Correct.
6  Q. You didn't feel you were visibly
7     intoxicated that evening, correct?
8        MR. FARRAH: Objection.
9  A. Correct.
10 Q. Were you stumbling when you were at the
11    Longhorn that night?
12 A. Not that I felt.
13 Q. Were you slurring your words?
14 A. Not that I recall.
15 Q. Were you unsteady on your feet?
16 A. Not that I recall.
17 Q. Did you knock over any drinks?
18 A. Not that I recall.
19 Q. Were you unable to get up and go to the
20    bathroom without knocking something
21    over?
22 A. Not that I recall.
23 Q. Were you ever told by anyone at the
24    Longhorn that you shouldn't have any

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 32 of 40

Thomas Scott Espey, 4/25/2006        Condenseit        Rosario vs. Rare Hospitality

Page 125

1    more to drink that night?
2  A. Not that I recall.
3  Q. I want to read to you from the bottom of
4     Page 74. "So you can't tell me where
5     you sat that night, is that right?"
6     "Not with certainty, no." "Is that
7     because you were too intoxicated to
8     remember?" "No, no."
9         Did I read that testimony
10    correctly?
11 A. Yes.
12        MR. FARRAH: I will
13    stipulate to that.
14 Q. Your testimony back then was clear that
15    you were not intoxicated at the
16    Longhorn, correct?
17        MR. FARRAH: Objection.
18 A. Correct.
19 Q. Having had that read, does that refresh
20    your recollection as to whether or not
21    you were at any time on September 26,
22    2003 when you were at the Longhorn
23    Steakhouse intoxicated?
24 A. No.

Page 126

1  Q. Were you intoxicated that night at the
2     Longhorn?
3  A. No.
4  Q. Is it your memory that Jeff had some
5     beer to drink at the Four Points after
6     you left the Longhorn that evening?
7  A. I believe so.
8  Q. Do you know whether or not back in
9     September of 2003 Jeff Southworth was a
10    person who used marijuana?
11 A. Not that I had seen.
12 Q. Had you heard of him smoking pot?
13        MR. FARRAH: Objection.
14 A. It wasn't a topic of discussion, no.
15 Q. Did you ever smoke marijuana back at
16    that time period?
17        MR. FARRAH: Objection.
18    What difference does it make whether he
19    has ever smoked marijuana?
20        MR. GILLIS: The same
21    difference it has when you asked him if
22    he was intoxicated.
23        MR. FARRAH: Why don't you
24    tell him what the implications are of

Page 127

1     answering that question?
2         MR. GILLIS: The same as the
3     implications of the questions you asked
4     him whether he was driving intoxicated.
5  Q. Isn't it true that you testified in the
6     criminal trial that Jeff Southworth was
7     not intoxicated when he left the
8     Longhorn Restaurant?
9         MR. FARRAH: Objection.
10 A. To the best of my knowledge.
11 Q. Were the dogs in the back seat of the
12    car with him or were they in the cab of
13    the car?
14 A. They always were in the back seat.
15 Q. When he continued asking you on the
16    bottom of Page 118 and the top of 119 as
17    to why you asked him whether or not he
18    should sleep, Lines 10 and 11 on
19    Page 119 say, "I don't recall it. I
20    just remember him saying I want to go
21    home."
22        Is that accurately read?
23        MR. FARRAH: Objection.
24 A. Yes.

Page 128

1  Q. Is it fair to say that you don't have a
2     specific memory as you sit here today as
3     to why you asked him whether or not he
4     wanted to stay in the vehicle and sleep?
5  A. As I said before I was just being a
6     concerned person.
7  Q. Is it your practice or custom when you
8     are leaving friends at the end of the
9     night to ask them whether or not they
10    want to stay around or drive home?
11        MR. FARRAH: Objection.
12 A. Yes.
13 Q. If you thought they were intoxicated you
14    wouldn't let them drive, you would stop
15    them, is that correct?
16 A. Correct.
17 Q. As you sit here today do you know of
18    anything of yours that was left in the
19    truck that you hadn't removed yet when
20    he started to back up the truck, that
21    were in the bed?
22 A. I think somehow I left a helmet in
23    there.
24 Q. Are you sure or you don't know?

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 33 of 40

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitality

Page 129

1  A. I'm not positive.
2  Q. At the time he was backing up, at that
3     point in time you weren't aware that
4     your keys were still in the car,
5     correct?
6  A. Correct.
7  Q. As you sit here today to the best you
8     know you had removed everything you were
9     going to remove from that car when he
10    started backing up, is that correct?
11 A. Correct.
12 Q. Mr. Farrah asked you earlier about
13    whether you would testify if it might
14    hurt Jeff. Would you lie for Jeff
15    Southworth?
16 A. No.
17 Q. Would you lie under oath for Jeff
18    Southworth?
19 A. No.
20 Q. Would you commit perjury for Jeff
21    Southworth?
22 A. No.
23 Q. Have you ever lied for Jeff Southworth
24    in this case?

Page 130

1  A. No.
2  Q. Either in this case, in the civil case,
3     or the criminal case have you ever lied
4     for Jeff Southworth?
5  A. No.
6  Q. Has he ever asked you to lie for him?
7  A. No.
8  Q. Has anybody asked you to lie for him?
9  A. No.
10 Q. Prior to this incident on September 26,
11    2003 you had seen Mr. Southworth what
12    you would call intoxicated, correct?
13 A. I can't say for sure whether he was or
14    was not.
15 Q. Did you ever see him showing signs of
16    intoxication?
17 A. Yes.
18 Q. You have seen him before that night
19    where he got giddy is the word you used,
20    correct?
21 A. Correct.
22 Q. That he had red eyes, correct?
23        MR. FARRAH: Objection.
24 A. Not that I can recall specifically right

Page 131

1     now.
2  Q. Regardless, you didn't see any of the
3     signs that you previously noticed of him
4     when he may have been intoxicated, none
5     of those signs were present on
6     September 26, 2003 at the Longhorn
7     Steakhouse, is that correct?
8        MR. FARRAH: Objection.
9  A. Correct.
10 Q. In fact, from your experience of being
11    out with Mr. Southworth prior to this
12    night was he a person who could hold his
13    liquor?
14       MR. FARRAH: Objection.
15 A. He was a big kid.
16 Q. Haven't you seen him drink six to ten
17    beers and still look okay?
18       MR. FARRAH: Objection.
19 A. Again I don't keep track of what other
20    people drink.
21 Q. You've seen him drink more than a
22    six-pack and look to not be visibly
23    intoxicated, correct?
24       MR. FARRAH: Objection.

Page 132

1  A. Probably.
2  Q. Isn't that what you testified to at your
3     last deposition that he could drink six
4     to ten beers without being visibly
5     intoxicated?
6        MR. FARRAH: Objection.
7  A. I believe so.
8  Q. You also testified in that deposition
9     that you mainly went to the Longhorn to
10    eat, not to drink, is that correct?
11 A. I believe so.
12 Q. And that was in a deposition prior to
13    Longhorn even being involved in this
14    case, correct?
15 A. As far as I know.
16 Q. Before any investigator going out to see
17    you, correct?
18 A. Correct.
19 Q. Prior to September 26, 2003 you've seen
20    Mr. Southworth drink two to three
21    Manhattans and look perfectly fine,
22    correct?
23       MR. FARRAH: Objection.
24 A. I believe so. Again, I don't keep track

Page 133

1    of what people drink.
2    Q. You've seen him drink Manhattans before
3       and not appear intoxicated, correct?
4    A. Correct.
5    Q. You've seen him drink multiple
6       Manhattans before September 26, 2003 and
7       not appear to be intoxicated, correct?
8            MR. FARRAH: Objection.
9    A. I believe so.
10   Q. You have no evidence as you sit here
11      today of Mr. Southworth having anything
12      to drink prior to getting to the
13      Longhorn other than the one twelve-ounce
14      beer he had just after dirt biking,
15      correct?
16   A. Correct.
17   Q. You don't have any evidence one way or
18      the other whether or not he was drinking
19      out of the cooler in the vehicle after
20      you left the Longhorn, do you?
21           MR. FARRAH: Objection.
22   A. No.
23   Q. Is it fair to say that prior to
24      September 26, 2003 you have seen

Page 134

1    Mr. Southworth drink a beer or two and a
2    Manhattan or two and not appear to be
3    visibly intoxicated?
4            MR. FARRAH: Objection.
5    A. Correct.
6    Q. The reason you were driving
7       Mr. Southworth's vehicle that night was
8       not because he was too drunk to drive,
9       correct?
10           MR. FARRAH: Objection.
11   A. Correct.
12   Q. That's what you testified to when
13      Mr. Farrah asked you that question
14      nearly two years ago, is that correct?
15           MR. FARRAH: Objection.
16   A. Correct.
17   Q. You testified back in 2004 that you
18      arrived at the restaurant around 8:30 to
19      9 o'clock. Do you remember that?
20   A. The testimony?
21   Q. Yes.
22   A. Yes.
23   Q. Do you remember if that is accurate as
24      to about what time you arrived give or

Page 135

1    take a few minutes?
2    A. I would think so.
3    Q. It was your practice to dirt bike until
4       it was almost dark, is that correct?
5    A. Yes.
6    Q. So from about the time it was almost
7       dark, say dusk, give or take twenty-five
8       minutes, that would be about the time
9       you arrived at the restaurant.
10           MR. FARRAH: Objection.
11   A. Probably, yes.
12   Q. Prior to September 26, 2003 when you had
13      been out with Mr. Southworth had you had
14      dinner with him with more than just him
15      and yourself, with groups of people?
16   A. Yes.
17   Q. Was it common to order a round for the
18      table?
19           MR. FARRAH: Objection.
20   A. Yes, it's common practice.
21   Q. And that's a common practice for you
22      when you go out to dinner with a group
23      of people to order a round.
24           MR. FARRAH: Objection.

Page 136

1    A. Yes.
2    Q. When you got a round, again that would
3       be one drink per person at the table.
4            MR. FARRAH: Objection.
5    A. Correct.
6    Q. You are not aware of any time that you
7       have been with Mr. Southworth that he
8       ordered a round of drinks that anyone
9       has gotten more than one alcoholic drink
10      at a time.
11           MR. FARRAH: Objection.
12   A. Correct.
13   Q. And that's not just on September 26,
14      2003. That's any night you have been
15      out with him, correct?
16           MR. FARRAH: Objection.
17   A. Correct.
18   Q. You were carded that evening, is that
19      correct?
20   A. I can't say for sure. I would think so.
21   Q. Do you remember testifying to that
22      effect in your prior deposition?
23   A. I don't remember the specific question,
24      no.

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 35 of 40

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitalit

Page 137

1  Q. On Page 76, the question is on Line 20
2     and the answer is on Line 23.
3     "Question: Do you remember being
4     carded, that is, asked to show your
5     driver's license to anybody that night?"
6     "Answer: I believe so, yeah."
7          Did I read that correctly?
8  A. Yes.
9  Q. Mr. Farrah discussed with you whether or
10    not you may have been loud that evening,
11    and I believe you testified, and correct
12    me if I am wrong, that "Not particularly
13    loud." Is that a fair representation of
14    what you said?
15         MR. FARRAH: Objection.
16 A. Yes.
17 Q. Do you have a specific memory as to
18    whether or not anybody was loud that
19    evening at any time?
20         MR. FARRAH: Objection.
21 A. No.
22 Q. Do you remember anybody being loud
23    towards the end of the evening after you
24    got your check?

Page 138

1          MR. FARRAH: Objection.
2  A. I don't.
3  Q. As you sit here today do you have any
4     specific memory of Jeffrey Southworth
5     being visibly intoxicated at any time
6     while at the Longhorn Steakhouse on
7     September 26, 2003?
8          MR. FARRAH: Objection.
9  A. I don't.
10 Q. Do you remember testifying that when
11    Mr. Southworth gets drunk he gets
12    aggressive?
13 A. I do.
14 Q. And when he gets intoxicated he gets
15    jumpy.
16 A. Not specifically, no.
17 Q. Do you remember saying that when he is
18    intoxicated he sort of snaps at people?
19 A. Yes.
20 Q. Let me direct you to Page 83 of your
21    deposition, Lines 7 through 9 and let me
22    know if I read that correctly. "He just
23    gets, ah, I don't know. He just gets
24    like -- I don't know, jumpy I guess,

Page 139

1     short-fused."
2          Did I read that correctly?
3  A. Yes.
4  Q. Line 17, "Jeff sort of snaps at people
5     and he -- he's just -- it's hard to
6     explain."
7          Did I read that correctly?
8  A. Yes.
9  Q. Did he show any of those signs at the
10    Longhorn Steakhouse on September 26,
11    2003?
12         MR. FARRAH: Objection.
13 A. No.
14 Q. On September 26, 2003 at any time while
15    he was at the Longhorn Steakhouse was
16    Mr. Southworth jumpy?
17 A. Not that I recall.
18 Q. On September 26, 2003 at the Longhorn
19    Steakhouse at any time that evening was
20    Mr. Southworth short-fused?
21 A. Not that I recall.
22 Q. At any time on September 26, 2003 at the
23    Longhorn Steakhouse did Jeff Southworth
24    snap at anybody?

Page 140

1  A. Not that I recall.
2  Q. You saw him prior to this night get into
3     a fight when he was intoxicated at the
4     Wine Cellar, correct?
5  A. That's correct.
6  Q. When he got into a fight at the Wine
7     Cellar did you see any of those signs at
8     the Longhorn Steakhouse on September 26,
9     2003?
10 A. Not that I recall.
11 Q. Did you tell Mr. Farrah at your last
12    deposition that Mr. Southworth was not
13    intoxicated at the Longhorn Steakhouse
14    that night?
15         MR. FARRAH: Objection.
16 A. I believe I said I don't know.
17 Q. Let me show you Page 88 starting with
18    Line 16. Question by Mr. Farrah. "Was
19    he as intoxicated that night as he was
20    the night of this accident,
21    September 26, 2003, when you left or
22    when you were eating at the restaurant?"
23    The answer was "No. Can you rephrase
24    that again? No, he wasn't as

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 36 of 40

Thomas Scott Espey, 4/25/2006    Condenseit    Rosario vs. Rare Hospitalit

Page 141

1    intoxicated at the Longhorn." Question:
2    "As he was at the Wine Cellar?"
3    Answer: Yes."
4        Did I read that correctly?
5  A. Yes.
6  Q. You testified in the prior deposition
7    that by nature Jeff is an aggressive
8    guy.
9  A. Correct.
10 Q. He was not showing any signs of
11    aggressiveness on September 26, 2003,
12    correct?
13        MR. FARRAH: Objection.
14 A. Not that I recall.
15 Q. You've been out with Jeff when he has
16    had too much to drink, correct?
17        MR. FARRAH: Objection.
18 A. I don't know.
19 Q. Let me show you Page 97, Line 5. The
20    question was: "But you have been in
21    settings where Jeff has had too much to
22    drink, isn't that right?" The answer
23    was, "Yeah."
24        Is that your testimony?

Page 142

1  A. Yes.
2  Q. As you sit here today on September 26,
3    2003 while at the Longhorn Restaurant
4    those signs that you saw in
5    Mr. Southworth on other occasions when
6    he had too much to drink, none of them
7    was shown by him that night at the
8    restaurant, correct?
9        MR. FARRAH: Objection.
10 A. Not that I recall.
11 Q. In fact, the first time you saw any sign
12    of intoxication by Mr. Southworth that
13    night was when he was drinking at the
14    hotel, correct?
15        MR. FARRAH: Objection.
16 A. Again I'm not sure.
17 Q. Page 107, Line 19. The question was,
18    "What did you do at the Four Points?"
19    "Definitely had a beer," and it goes on
20    from there. Page 108. "Did Jeff have a
21    beer?" The answer was, "Yes." Skip
22    down to Line 7. "By that time when he
23    had his beer was he showing obvious
24    signs of intoxication to you?" "Um,

Page 143

1    somewhat. I guess he was aggressive, as
2    always, as Jeff is." If he showed any
3    signs of intoxication that evening the
4    first time you saw it was after drinking
5    beer at the Four Points Hotel, correct?
6        MR. FARRAH: Objection.
7  A. Based on that statement, correct.
8  Q. That's your prior testimony, correct?
9  A. Correct.
10 Q. And that's what you meant, correct?
11        MR. FARRAH: What he meant?
12 Q. When he first showed signs of
13    intoxication after he got his beer at
14    the hotel, correct?
15        MR. FARRAH: Objection.
16 A. Correct.
17 Q. Not at the restaurant, correct?
18        MR. FARRAH: Objection.
19 A. Not that I recall.
20 Q. You had a conversation with Jude
21    Connelly about this accident sometime
22    after the accident, correct?
23 A. Correct.
24 Q. What did Jude tell you to do?

Page 144

1        MR. FARRAH: Objection.
2  A. It was more that we were both obviously
3    going to be questioned about it.
4  Q. Do you remember testifying to Mr. Farrah
5    based on questions when asked what Jude
6    said that he told you to tell the truth?
7  A. I think it was more --
8  Q. Go to Page 131, Line 17. "And what did
9    Jude say?" "He said we have to tell the
10    truth."
11        Is that what Jude told you
12    to do?
13 A. Yeah.
14 Q. And is that what you have done?
15 A. Yes.
16 Q. Do you know of any reason other than the
17    passage of time that your testimony
18    today may be a little different than
19    what you previously testified?
20        MR. FARRAH: Objection.
21 A. I don't.
22 Q. Did you wear to the Longhorn that night
23    the clothes that you were dirt biking
24    in?

Page 145

1 A. No, I don't believe so.
2 Q. Do you have a specific memory of what
3    you wore that night?
4 A. I don't.
5 Q. Do you have a specific memory as you sit
6    here today as to what Jeff Southworth
7    wore that night?
8 A. I don't.
9 Q. You can't tell me whether he did or did
10    not change into another outfit from dirt
11    biking, correct?
12 A. We normally change.
13 Q. That night you don't know whether he was
14    wearing sweat pants to the Longhorn or
15    whether he got dressed up in other
16    clothes, correct?
17 A. I don't know what he wore.
18        MR. GILLIS: No further
19    questions.
20        REDIRECT EXAMINATION
21        BY MR. FARRAH
22 Q. You talked a little bit about Jude
23    telling you to tell the truth. Do you
24    remember that?

Page 146

1 A. Yes.
2 Q. As far as you know Jude told the truth
3    about what happened that night, isn't
4    that right?
5        MR. GILLIS: Objection.
6 A. I would think so.
7 Q. He never discussed with you lying about
8    what happened that night, did he?
9 A. No.
10 Q. You were asked some questions about
11    instances where Mr. Southworth had
12    multiple Manhattans. Do you remember
13    Mr. Gillis asking you about that?
14 A. Yes.
15 Q. These were instances during the summer
16    of 2003 at the Longhorn Steakhouse where
17    Mr. Southworth was served multiple
18    Manhattans, isn't that right?
19        MR. GILLIS: Objection.
20 A. I don't know where it happened.
21 Q. You were with him at the Longhorn
22    Steakhouse on at least a half a dozen
23    occasions during the summer of 2003,
24    isn't that right?

Page 147

1 A. Yes.
2 Q. He liked Manhattans, is that right?
3        MR. GILLIS: Objection.
4 A. I have seen him drink them before.
5 Q. You have seen him drink multiple
6    Manhattans prior to September 26, 2003
7    at the Longhorn, isn't that right?
8        MR. GILLIS: Objection.
9 A. At the Longhorn, yes.
10 Q. Is it your best memory that your brother
11    and the people that he was with were at
12    the bar drinking at the Longhorn that
13    night before you all went to the table?
14        MR. GILLIS: Objection.
15 A. I don't recall when they showed up.
16 Q. That's not my question. My question is
17    is it your best memory that your brother
18    and the others that he was with that
19    night were drinking at the bar before
20    you all went to the table?
21        MR. GILLIS: Objection.
22 A. I don't know.
23 Q. Think hard.
24        MR. GILLIS: Objection.

Page 148

1 Q. Do you remember your brother having a
2    drink at the bar?
3        MR. GILLIS: Objection.
4 A. I don't.
5 Q. Do you remember any of the people he was
6    with having a drink at the bar?
7        MR. GILLIS: Objection.
8 A. I don't remember when they got there.
9 Q. Is it fair to say you don't remember one
10    way or the other whether they had drinks
11    at the bar that night?
12 A. That's correct.
13 Q. You testified on more than one occasion,
14    I think, both during my examination and
15    Mr. Gillis's that you didn't know
16    whether or not Jeff Southworth was under
17    the influence of alcohol at the time he
18    was at the Longhorn Restaurant. Do you
19    remember that testimony?
20        MR. GILLIS: Objection.
21 A. Yes.
22 Q. You also testified to Mr. Gillis's
23    question that Mr. Southworth was
24    exhibiting none of the signs of

Page 149

1   intoxication you had seen on prior
2   occasions. Do you remember that
3   testimony?
4 A. Yes.
5 Q. Yet you can't say as you sit here today
6   whether he was under the influence of
7   intoxicating alcohol at the time he was
8   at the Longhorn, is that right?
9      MR. GILLIS: Objection.
10 A. Either way I can't say.
11 Q. Is that because of the amount of alcohol
12   that he was served that night?
13      MR. GILLIS: Objection.
14 A. I don't know what he was served.
15 Q. My question to you is given that your
16   testimony is that he did not exhibit to
17   your eye any of the signs of
18   intoxication that you had previously
19   seen in him where he was under the
20   influence of alcohol, why is it you
21   cannot say that you know he was not
22   under the influence of alcohol that
23   night?
24 A. Two and a half years ago? I don't know

Page 150

1   either way.
2 Q. He had a fair amount to drink while he
3   was at the Longhorn that night, isn't
4   that right?
5      MR. GILLIS: Objection.
6 A. I don't know what he had to drink.
7 Q. You know he had Manhattans, isn't that
8   right?
9      MR. GILLIS: Objection.
10 A. I know that there were some ordered.
11 Q. Seventeen were ordered, isn't that
12   right?
13      MR. GILLIS: Objection.
14 Q. You have seen the tab for the
15   restaurant, haven't you?
16 A. Yes.
17 Q. You know seventeen Jack Daniels
18   Manhattans were ordered in a space of
19   time between 8:40 P.M. and 9:24 P.M.
20   that night.
21      MR. GILLIS: Objection.
22 Q. Isn't that right?
23 A. I don't know the time frame.
24 Q. You don't know that?

Page 151

1 A. No.
2 Q. I'll represent to you that that's what
3   the documents supplied by Rare
4   Hospitality says happened. You know
5   that Jeff had some of those Jack Daniels
6   Manhattans that were ordered, isn't that
7   right?
8      MR. GILLIS: Objection.
9 A. Yeah.
10 Q. You know that two people got killed in
11   an accident, don't you?
12 A. Yes.
13 Q. And you know that other people got
14   seriously injured in the accident, don't
15   you?
16 A. Yes.
17 Q. You understand that part of the case
18   that my clients have brought against
19   Rare is that it served him too much
20   alcohol that night, you understand that.
21 A. Yes.
22 Q. You want to tell the truth, isn't that
23   right?
24 A. Yes.

Page 152

1 Q. So now do you know or don't you know
2   that Jeff Southworth had Jack Daniels
3   Manhattans at the table that night?
4      MR. GILLIS: Objection.
5 A. Yes.
6 Q. Do you know how many he had that night?
7 A. No.
8 Q. Did he have more than one that night?
9 A. Possibly.
10 Q. Do you believe he had more than one that
11   night?
12      MR. GILLIS: Objection.
13 A. Yeah.
14 Q. Do you believe he had more than two that
15   night?
16 A. I don't know.
17 Q. How about beers at the bar?
18 A. I don't know.
19 Q. How many beers did he have at the bar?
20 A. I don't know.
21 Q. During the half hour that you were at
22   the bar how many beers did he have?
23 A. I know of the first one that we ordered.
24 Q. How about a second one?

Page 153

1 A. I don't know.
2 Q. How about beers at the table? Did you
3    see Jeff drinking beers at the table?
4        MR. GILLIS: Objection.
5 A. I can't recall.
6 Q. Do you have any memory at all as you sit
7    here of seeing Jeff drink beers from the
8    cooler that you had brought after you
9    left the dirt bikes? Do you have a
10   memory of seeing him reach into the
11   cooler and pull out a beer after that?
12 A. Just one.
13 Q. That was at Templeton?
14 A. Correct.
15 Q. Do you have any reason to believe that
16   he had any more beers from that cooler
17   after the one that each of you had at
18   Templeton?
19 A. I don't.
20 Q. Do you have any reason to believe that
21   Jeff was smoking pot that night?
22 A. I don't.
23 Q. You were asked some questions about
24   whether or not you would ever drive if

Page 154

1    you were under the influence of alcohol,
2    and if you care not to answer this
3    question that's fine, but have you ever
4    driven while you were under the
5    influence of alcohol?
6        MR. GILLIS: Objection.
7 A. I don't want to answer that question.
8 Q. Have you been convicted of a misdemeanor
9    in the last five years?
10 A. No.
11 Q. You were arrested for possession of
12   marijuana, isn't that right?
13 A. Correct.
14 Q. What was the disposition of that case?
15 A. Somebody else dropped in my vehicle and
16   he complained it.
17 Q. Are you telling me that as far as you
18   know you were found not guilty?
19 A. Yes.
20 Q. In what court was that case pending?
21 A. Clinton.
22 Q. District Court?
23 A. Yes.
24        MR. FARRAH: That's all I

Page 155

1    have.
2        RECROSS-EXAMINATION
3        BY MR. GILLIS
4 Q. Other than Mr. Farrah pestering you with
5    the same questions do you have any
6    explanation as to why in the answer to
7    his recent question you said he may have
8    had one or more Manhattans when every
9    other time you've testified you don't
10   know what he had to drink?
11        MR. FARRAH: Objection.
12 A. Just the bill.
13 Q. Other than the bill you have no memory
14   whatsoever as to what Mr. Southworth had
15   to drink on September 26, 2003 at the
16   Longhorn, is that correct?
17        MR. FARRAH: Objection.
18 A. Correct.
19        [The deposition was
20   concluded.]
21
22
23
24

Page 156

1        SIGNATURE PAGE/ERRATA SHEET
2 Re: Nancy Rosario
  Vs: Rare Hospitality International, Inc.,
3    d/b/a Longhorn Steakhouse
4 4/25/2006 - Deposition of THOMAS SCOTT ESPEY
  I, THOMAS SCOTT ESPEY, do hereby certify
5 that I have read the foregoing transcript of
  my testimony and it is a true and correct
6 record of my testimony (with the exception of
  the corrections, if any, listed below.
7 PAGE LINE    CORRECTION
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 DATE        THOMAS SCOTT ESPEY
21
22
23
24

Case 1:05-cv-10617-MBB    Document 27-4    Filed 05/10/2007    Page 40 of 40

Page 157

```
 1       C E R T I F I C A T E

 2  COMMONWEALTH OF MASSACHUSETTS  )
                                   )
 3  COUNTY OF SUFFOLK              )

 4       I, Rosamond K. Marcy, Certified
    Shorthand/Registered Professional Reporter, a
 5  Notary Public in and for the Commonwealth of
    Massachusetts, do hereby certify:

 6
         That THOMAS SCOTT ESPEY, the witness
 7  whose deposition is hereinbefore set forth,
    was duly sworn by me and that such deposition
 8  is a true record of the testimony given by
    said witness.

 9
         I further certify that I am not related
10  to any of the parties to this action by blood
    or marriage, and that I am in no way
11  interested in the outcome of this matter.

12       IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal of office this
13  23rd day of May, 2006.

14
    _____
15         ROSAMOND K. MARCY

16  My commission expires:
    April 6, 2012.
17

18
    PLEASE NOTE:
19       THE FOREGOING CERTIFICATION OF THIS
         TRANSCRIPT DOES NOT APPLY TO ANY
20       REPRODUCTION OF THE SAME BY ANY
         MEANS UNLESS UNDER THE DIRECT
21       CONTROL AND/OR DIRECTION OF THE
         CERTIFYING REPORTER.

22

23

24
```

# BAR GLASSWARE

## GLASSWARE

## USAGE

Libbey #15245

3 dozen per case

7 oz. Rocks



Liquor drinks w/no mixer

Drinks Served on the Rocks

Drinks Served with a Splash

Shooters with cream or Juice mixer

Libbey #15243

3 dozen per case

12 oz. Rocks



Juice Drinks

Collins

Sours

2 Liquor cream drinks

Drinks w/ soda gun mixer

Libbey #8455

3 dozen per case

6 oz. Cocktail Glass



All chilled up cocktails

Martini, Manhattan, Gimlet & Gibso

Martinis Up

Sours Up

Margaritas Up

Libbey #3965

3 dozen per case

8.5 oz. Wine Glass



Wine/Champagne by the Glass

Libbey #3705

2 dozen per case

12 oz. Snifter Glass



Aromatic Liqueurs

Brandies

Cognac

| NAME GARNISH | METHOD CAT. | INGREDIENTS | | |
|---|---|---|---|---|
| KIR ROYALE<br>Wine Glass | Build | 6 oz. Champagne Split<br>½ oz. Chambord | Lemon twist | Cham-pagne |
| LONG BEACH ICED TEA<br>14 oz. Tall Rocks | Mix | 2oz. Desert Island Tea Mix<br>4oz. Sweet/Sour<br>Fill to ¼ " from top with 1 oz. Cranberry Juice. | Lemon squeeze | Liquor Special |
| LONG ISLAND ICED TEA<br>14 oz. Tall Rocks | Mix | 2 oz. Desert Island Tea Mix<br>4 oz. Sweet/Sour<br>Fill to ¼ " from top with 1 oz. Coke | Lemon squeeze | Liquor Special |
| JACKALOPE TEA<br>14 oz. Tall Rocks | Mix | 1oz. Jack Daniels<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |
| RAZZMATAZZ TEA<br>14 oz. Tall Rocks | Mix | 1oz. Dekuyper Razzmatazz<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Sprite | Lemon Wedge | $5.25 |
| LIMON-ADE TEA<br>14 oz. Tall Rocks | Mix | 1oz. Bacardi Limon Rum<br>1oz. Desert Island Tea Mix<br>4½ oz. Longhorn Sweet n Sour<br>Fill w/Coke | Lemon Wedge | $5.25 |

| NAME | METHOD | INGREDIENTS | GARNISH | CAT. |
|---|---|---|---|---|
| MAI-TAI<br>12 oz. Mug | Mix | 1¼ oz. House Rum<br>¾ oz. Triple Sec<br>2 oz. Sweet/Sour<br>½ oz. Grenadine<br>1 oz. Orange Juice<br>1 oz. Pineapple Juice<br>Float 151 | Orange, Cherry<br>Flag | Liquor<br>Special |
| MANHATTAN<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>¼ oz. Sweet Vermouth | Cherry | Call |
| MANHATTAN-DRY<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>¼ oz. Dry Vermouth | Lemon twist | Call |
| MANHATTAN<br>PERFECT<br>7 oz. Rocks | Build | 2 oz. House Bourbon<br>Equal parts Sweet and Dry<br>Vermouth | Lemon twist | Call |

| NAME<br>GARNISH | METHOD<br>CAT. | INGREDIENTS | | |
|---|---|---|---|---|
| MANHATTAN UP<br>6 oz. Cocktail<br>With ice, build in<br>mixing glass, stir<br>until glass is foggy.<br>Strain into chilled | | 2 oz. House Bourbon<br>¼ oz. Sweet Vermouth | Cherry sword | Call |

cocktail glass.

| | | | | |
|---|---|---|---|---|
| MARGARITA (HOUSE) 12 oz. Mug | Build | 1 1/4 oz. Cuervo Gold<br>¾ oz. Triple Sec<br>Lime Juice<br>½ oz. Sweet/Sour<br>4 oz. | Salt Rim<br>Lime Squeeze | Call |
| MARTINI 6 oz. Cocktail | Build | 2 oz. House Vodka or Gin<br>Dash of Dry Vermouth<br><br>**Martini Dry**: Less than a dash.<br>**Martini Extra Dry**: NO Vermouth<br>**Martini Dirty**: Dash olive juice | Two queen size olives sword or lemon twist | Call |
| MARTINI-UP 6 oz. Cocktail With ice, build in mixing glass, stir until glass is foggy. Strain into chilled cocktail glass. | | 2 oz. House Vodka or Gin<br>Dash of Dry Vermouth<br><br>**Martini Dry**: Less than a dash.<br>**Martini Extra Dry**: NO Vermouth<br>**Martini Dirty**: Dash olive juice | Two queen size olives sword or lemon twist | Call |
| LONGHORN GREEN APPLE | Chill | 1 ¼ oz. Grey Goose Vodka | No garnish | Special Liquor |

| MARTINI | | 1 ¼ oz. Dekuyper Apple Pucker | | +$.50 |
|---|---|---|---|---|
| 6 oz. Cocktail glass | | | | |
| | Mix/Strain | | | |

| TANQUERAY NO. TEN MARTINI | Chill | 2 oz. Tanqueray No. Ten Gin | Two green olives | Special Liquor |
|---|---|---|---|---|
| | | ¼ oz. Dry Vermouth | | +$.50 |
| 6 oz. Cocktail glass | | | | |
| | Mix/Strain | | | |

| MIMOSA | Build | 6 oz. Champagne Split | Orange slice | Cham-pagne |
|---|---|---|---|---|
| Wine Glass | | 1 oz. Orange Juice | | |

| MUDDY RIVER | Mix | ½ oz. Vodka | | Prem. |
|---|---|---|---|---|
| 7 oz. Rocks | | ½ oz. Kahlua | | |
| | | ½ oz. Bailey's | | |

# <u>Drink Making Techniques</u>

- Fill your glass to the top with ice. Always full, not overflowing.
- When in doubt, look up the recipe.
- Follow proper drink making techniques.
- Fill drinks to proper serving Level. All drinks ¼" from the lip of the glass.
- Use fresh and proper garnishes.
- Check back with guest to see how the drink tastes.

<u>Blender Technique</u>: **ISLAND OASIS**

1. Fill ice hopper to within one inch of the top with cube ice. Be sure ice is free of any debris such as bottle caps. These can jam the machine and cause damage to the shaver blade.
2. Place cover on ice hopper and turn on power.
3. Use the Island Oasis measuring cup and pour the amounts of mix and liquor needed into the blender cup.
4. Place the blender into the blender base. Press the drink button and wait until blender cycle comes to a complete stop.
5. Remove the blender cup and pour the cocktail into your glass and garnish.

There should not be any over pour! Practice, Practice, and Practice.

If you find the drink to be too thick you need to add more mix when putting in the liquid Ingredients. If the drink is too runny, less mix should be used when adding the liquid Ingredients. To insure a perfect pour, pay attention to the level of the liquid ingredients. The amount of ice should never change.

Examples: Frozen Margarita, Pina Colada, Strawberry Daiquiri.

<u>Build Technique</u>: The build technique is used with any drink that we pour the ingredients directly into the glass it is served in. Fill the glass completely with

Longhorn Steakhouse
Leominster
227 North Main Street

Server: LEIGH                    09/26/2003
Table 52/1                         9:57 PM
h  ts: 6

                                   #20043
Reprint #: 5


Texas Tonion                        5.99
Chowder-Cup (2 @2.49)               4.98
hicken Fingers                      4.99
ack Daniels (17 @4.75)             80.75
 Manhattan Mixer (17 @0.50)         8.50
5oz Bud Light (2 @3.99)             7.98
oz The Renegade                    10.99
aby Back Ribs 1/2 Rack (3 @12.99)  38.97
2oz Prime Rib                      14.99
aby Back Ribs & Chicken            14.99


Dine  te Subtotal                 193.13

ib Total                          193.13
ax                                  9.66

otal                              202.79

is                                240.00


        Make plans to dine with us at
            Longhorn Steakhouse.
          We will make your dining
            experience special.

        --- Check Closed ---

145 – Longhorn of Leominster
227 North Main Street

# Audit Report
## Date of Business: 09/26/2003

| Time | Type | Transaction |
|------|------|-------------|
| | | 0.00 Rice |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 07:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 07:59 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | CLEARED ITEMS | Mgr 9882 LEIGH Emp 9882 LEIGH cleared $   1.89 from Table 63 Chk:40054 |
| | | 1.89 IBC [ 0.000000 Kg] |
| | | 0.00 MUG [ 0.000000 Kg] |
| 08:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   1.89 for Table 63 Chk:40054 |
| | | 1.89 IBC |
| | | 0.00 No Mug |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:10 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 1 time(s) |
| 08:10 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:16 PM | APPLY PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | 57.22 Tip:0.00 ID:5511910207971723 Exp:0606 |
| 08:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:30066  Printed 2 time(s) |
| 08:17 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:30066 for a total of 57.22 |
| 08:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:21 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 1 time(s) |
| 08:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:27 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:27 PM | ADJUST PAYMENT | Mastercard on Table 52 Chk:30066 by 9882 LEIGH |
| | | Amt:57.22 Tip:0.00 -> 12.00 ID:5511910207971723 Exp:0606 |
| 08:28 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:32 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 1 time(s) |
| 08:32 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.99 for Table 53 Chk:40051 |
| | | 3.99 Pie |
| 08:32 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:37 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:37 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 1 time(s) |
| 08:37 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:40 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   35.70 for Table 52 Chk:20043 |
| | | 5.99 Tonlon |
| | | 2.49 Chowder Cup |
| | | 2.49 Chowder Cup |
| | | 4.99 Fingers |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

# Audit Report
### Date of Business: 09/26/2003

Page 8

12/01/2003 –    5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 3.99 25oz Bud Light |
| 08:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:43 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH<br>50.00 |
| 08:43 PM | APPLY PAYMENT | Cash on Table 63 Chk:40054 by 9882 LEIGH<br>5.00 |
| 08:43 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:40054  Printed 2 time(s) |
| 08:43 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:40054 for a total of 50.41 |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   9.74 for Table 63 Chk:30084<br>4.99 25oz Wach<br>4.75 Sombrero |
| 08:43 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   34.47 for Table 63 Chk:30084<br>16.99 14oz Strip CC<br>0.00 MR<br>0.00 FF<br>0.00 Caesar Salad<br>2.49 Side Mush<br>14.99 PR 12oz<br>0.00 MR PR<br>0.00 FF<br>0.00 Caesar Salad |
| 08:43 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH<br>50.00 |
| 08:44 PM | APPLY PAYMENT | Cash on Table 53 Chk:40051 by 9882 LEIGH<br>20.00 |
| 08:44 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:40051  Printed 2 time(s) |
| 08:44 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:40051 for a total of 56.28 |
| 08:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:51 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:51 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   36.75 for Table 52 Chk:20043<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix<br>4.75 Jack Daniels<br>0.50 Manhattan Mix |
| 08:51 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:55 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 08:55 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   10.37 for Table 53 Chk:20047<br>6.59 Fire Wrap<br>1.89 Sprite<br>1.89 Sprite |
| 8:55 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 08:59 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:00 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   79.94 for Table 52 Chk:20043 |

145 - Longhorn of Leominster
227 North Main Street

## Audit Report
### Date of Business: 09/26/2003

Page 9

12/01/2003 —  5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | 10.99 Sm-Top 8oz |
| | | 0.00 M |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Caesar Salad |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 14.99 PR 12oz |
| | | 0.00 M PR |
| | | 0.00 BP |
| | | 0.00 E |
| | | 0.00 Mix Green Sal |
| | | 0.00 Ranch |
| | | 14.99 1/2 Rack/ Chix |
| | | 0.00 FF |
| | | 0.00 Slaw |
| | | 0.00 Mix Green Sal |
| | | 0.00 Balsamic |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| | | 12.99 1/2 Rack |
| | | 0.00 FF |
| | | 0.00 FF |
| 09:00 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:08 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:09 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  29.98 for Table 53 Chk:20047 |
| | | 10.99 Sm-Top 8oz |
| | | 0.00 Well Done |
| | | 0.00 BP |
| | | 0.00 S |
| | | 0.00 Mix Green Sal |
| | | 0.00 House |
| | | 18.99 Lky/ Sam CC |
| | | 0.00 Well Done |
| | | 0.00 Seasonal Veg |
| | | 0.00 Rice |
| | | 0.00 Mix Green Sal |
| | | 0.00 Italian |
| 09:09 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:15 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:15 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.99 for Table 52 Chk:20043 |
| | | 3.99 25oz Bud Light |
| 09:15 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:16 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:16 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:17 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:17 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 1 time(s) |
| 09:17 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:21 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:21 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  21.00 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |

145 - Longhorn of Leominster
227 North Main Street

**Audit Report**
Date of Business: 09/26/2003

Page 10
12/01/2003 –  5:29 PM
5.2.5.190

| Time | Type | Transaction |
|------|------|-------------|
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:21 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:24 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:24 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $  15.75 for Table 52 Chk:20043 |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| | | 4.75 Jack Daniels |
| | | 0.50 Manhattan Mix |
| 09:24 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:31 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:31 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 1 time(s) |
| 09:31 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:33 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 2 time(s) |
| 09:34 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 3 time(s) |
| 09:34 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:35 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:35 PM | APPLY PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |
| | | 46.42 Tip:0.00 ID:4491631021235627 Exp:1103 |
| 09:35 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:36 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 4 time(s) |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 50.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 1.00 |
| 09:36 PM | APPLY PAYMENT | Cash on Table 62 Chk:50036 by 9882 LEIGH |
| | | 10.00 |
| 09:36 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 62 Chk:50036  Printed 2 time(s) |
| 09:36 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 62 Chk:50036 for a total of 61.56 |
| 09:36 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 1 time(s) |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:40 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:40 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:44 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:44 PM | APPLY PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | 42.37 Tip:0.00 ID:4773550000020827 Exp:1103 |
| 09:44 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:46 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:46 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 52 Chk:20043  Printed 5 time(s) |
| 09:46 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:49 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 9:49 PM | ADJUST PAYMENT | Visa on Table 53 Chk:20047 by 9882 LEIGH |
| | | Amt:42.37 Tip:0.00 -> 2.63 ID:4773550000020827 Exp:1103 |
| 09:49 PM | ADJUST PAYMENT | Visa on Table 63 Chk:30084 by 9882 LEIGH |

145 - Longhorn of Leominster
227 North Main Street

**Audit Report**
Date of Business: 09/26/2003

Page 11
12/01/2003 –   5:29 PM
5.2.5.180

| Time | Type | Transaction |
|------|------|-------------|
| | | Amt:46.42 Tip:0.00 -> 7.00 ID:4491631021235627 Exp:1103 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 53 Chk:20047  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 53 Chk:20047 for a total of 42.37 |
| 09:49 PM | PRINT CHECK | Emp: 9882 LEIGH printed Table 63 Chk:30084  Printed 2 time(s) |
| 09:49 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 63 Chk:30084 for a total of 46.42 |
| 09:49 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.78 for Table 63 Chk:20052<br>1.89 Coke<br>1.89 Coke |
| 09:49 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:52 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:53 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   3.49 for Table 53 Chk:40069<br>3.49 Heineken<br>0.00 MUG<br>0.00 Water |
| 09:53 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:57 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>100.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>20.00 |
| 09:57 PM | APPLY PAYMENT | Cash on Table 52 Chk:20043 by 9882 LEIGH<br>20.00 |
| 09:57 PM | PRINT CHECK | Emp 9882 LEIGH printed Table 52 Chk:20043  Printed 6 time(s) |
| 09:57 PM | CLOSE CHECK | Emp: 9882 LEIGH closed Table 52 Chk:20043 for a total of 202.79 |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 09:58 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 09:58 PM | CLOSE CHECK | Emp: 9882 LEIGH Check Table 73 Chk:40070 was freed because it was empty. |
| 09:58 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   6.59 for Table 53 Chk:40069<br>6.59 Fire Wrap |
| 09:58 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:03 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:03 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   4.99 for Table 53 Chk:40069<br>4.99 Fried Cake |
| 10:03 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:06 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:07 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   29.76 for Table 73 Chk:20054<br>1.89 Diet Coke<br>8.99 Sam Caes-D<br>0.00 With Hot<br>0.00 See Server<br>16.99 PR 16oz<br>0.00 Rare PR<br>0.00 Seasonal Veg<br>0.00 Caesar Salad<br>1.89 Tea |
| 10:07 PM | LOG OUT | Log Out Emp: 9882 LEIGH |
| 10:10 PM | LOG IN | Log In Emp: 9882 LEIGH |
| 10:10 PM | ORDER ITEMS | Emp 9882 LEIGH ordered $   24.98 for Table 73 Chk:20054<br>12.49 Fried Dinner<br>0.00 FF<br>0.00 Slaw<br>12.49 Fried Dinner |

THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
                                    )
NANCY ROSARIO, INDIVIDUALLY, AS     )
SHE IS THE ADMINISTRATIX OF THE     )
ESTATE OF AWILDA SANTIAGO, ESSEX    )
PROBATE COURT DOCKET #03P-2499ADI)  )
P/P/A VERONICA ROSARIO AND          )
CHRISTINA SNATIAGO, AND AS SHE IS)  )
THE ADMINISTRATIX OF THE ESTATE     ) Civil Action Number:
OF JOSE SANTIAGO, BERLIN            ) 05 CV 1061MLW
(CONNECTICUT) PROBATE COURT,        )
CASE #03-0713,                      )
                   Plaintiff(s),)   )
      vs.                           )
                                    )
RARE HOPITALITY INTERNATIONAL,      )
INC., d/b/a LONGHORN STEAKHOUSE,    )
              Defendant.            )
                                    )
```

VIDEO DEPOSITION OF:

LEIGH CHABOT

* * * * *

SCHEDULED TO BE TAKEN ON:

March 10, 2006

Beginning at 10:00 A.M.

* * * * *

Starkings Court Reporting & Video Services
302 Mason Street, Post Office Box 1345
Telephone (910) 323-4232 or 1-800-328-3747

---

T A B L E   O F   C O N T E N T S

Title Page..........................................1
Table of Contents...................................2

            Leigh Chabot - Witness:

Examination by Mr. Farrah .........................3
Examination by Mr. Gillis .......................134
Examiantion by Mr. Farrah .......................183
Examination by Mr. Gillis .......................186
Examination by Mr. Farrah .......................187
Reporter's Certificate ..........................189

Please Note:  Proper nouns MAY BE spelled
Phonetically.  No exhibits were presented to the
reporter to attached to the transcript.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF(S):

ALBERT FARRAH, JR., ESQUIRE
One Washington Mall, 5th Floor
Boston, MA  02108
alf@afarrah.com

ON BEHALF OF THE DEFENDANT(s):

MICHAEL K. GILLIS, ESQUIRE
NEIL SCHNAURBACH, ESQUIRE
GILLIS & BIKOFSKY
1150 Walnut Street
Newton, MA  02446
mgillis@gillisandbikofsky.com

KRISTEN HATHCOAT, ESQUIRE
BEN WILSON, RISK ADMIN.
RARE HOSPITALITY
8215 Roswell Rd., Bldg., 600
Atlanta, GA  30350

---

3

(Whereupon,

LEIGH CHABOT

was called as a witness, duly sworn to tell

the truth, and testified under oath as follows:)

(10:11 A.M.)

EXAMINATION BY MR. FARRAH:

Q.    Good morning, Ms. Chabot.  My name is Albert

Farrah and I represent the Plaintiff in this action.  How

do you do?

A.    Good.

Q.    Could you tell us your full name for the

record, please?

A.    Lee Ann Blackington Chabot, maiden name

Blackington?

Q.    How old are you?

A.    Twenty-five.

Q.    And are you married?

A.    Yes.

Q.    Where do you live?

A.    Fayetteville, North Carolina.

Q.    Do you have any children?

A.    Yes, three.

Q.    Could you briefly tell me what your schooling

experience is?

A.    I attended high school through 11th grade at

---

4

1  Paradise Village Hills Pheonix, Arizona.  Later I

2  obtained my GED and served -- did one year at Mount

3  Monchuset (phonetic) Community College which ended in

4  2004.

5      Q.    Your age again is?

6      A.    Twenty-five.

7      Q.    Date of birth is what?

8      A.    December 17, 1980.

9      Q.    Can you tell me what experience you have

10 working in restaurants?

11     A.    I began working at J&B's Bar and Grill in

12 Townsend, Massachusetts in about May of 1998.  I

13 hostess'd there for about six months.  After that I

14 waitressed for the following time I was there, which was

15 about three years.  And then I moved on to Longhorn

16 sometime late 2000 and worked there until April 12, 2004,

17 which then I left when I joined the military.

18     Q.    You joined the military in 2004; is that

19 right?

20     A.    Yes, sir.

21     Q.    Were you in the Reserves prior to that time?

22     A.    No, sir.

23     Q.    When you worked at JMB's, is that the name of

24 it with an M in the middle?

25     A.    No, an "&" sign, J&B's.

1    Q.   Oh, J&B's.  Okay, when you worked at J&B's,
2  after working as a hostess you worked as a server; is
3  that right?
4    A.   Yes, sir.
5    Q.   Did you serve alcoholic beverages to
6  customers there?
7    A.   Yes.
8    Q.   Can you tell me what your training in service
9  of alcoholic beverages was prior to the time you went to
10  work at the Longhorn restaurant in Leominster?
11    A.   That would be training I got at J&B's, which
12  was on the floor training where we trained with a
13  trainer.  And then we were handed a booklet briefly on
14  bar ethics and bar codes.
15    Q.   What kind of a restaurant is J&B's if you can
16  tell me?
17    A.   A family dining restaurant.
18    Q.   In Townsend; is that right?
19    A.   Yes, sir.
20    Q.   And you were hired at the Longhorn sometime
21  in the year 2000; is that right?
22    A.   Yes, sir.
23    Q.   That your best memory?
24    A.   Yes, sir.
25    Q.   As of September 26, 2003 you were still

1  working at the Longhorn; is that right?
2    A.   Yes, sir.
3    Q.   Can you tell me during that period from when
4  you were hired until September 26, 2003 approximately how
5  many days a week you worked at the Longhorn.
6    A.   I worked at the least, five days a week,
7  which two of those contained doubles on Saturdays and
8  Sundays.
9    Q.   At the most, during that period again, how
10  many days a week did you work?
11    A.   At the most it could be seven depending if a
12  shift needed to be picked up or not.
13    Q.   When did you get married?
14    A.   I got married October 23rd of 1999.
15    Q.   Why did you leave the Longhorn?
16    A.   I was joining the service.
17    Q.   Had you planned to do that for some time?
18    A.   I had planned to do that my whole life and
19  then especially situations arising from 9/11 my mother
20  flew that day and had a big impact.  As soon as my kids
21  grew up, and it was okay to be with my husband for a
22  period of time, I decided it was time to go.
23    Q.   How old were your kids when you joined the
24  service?
25    A.   My son would have been -- he turned June the

7

1  following month after I left -- June was his birthday,
2  so he turned four.  And my other son was six.
3    Q.   So when you joined the service you had a son
4  who just turned four and a son who was six; is that
5  right?
6    A.   Yes, sir.
7    Q.   It was after September 11, 2001, that you
8  decided you wanted to join the service; is that right?
9    A.   I had wanted to before then, and that just
10  put an extra impact on it.
11    Q.   It was three years later that you joined the
12  service; is that right?
13    A.   Yes, sir.
14    Q.   Now, you have another child?
15    A.   Yes, sir, I do.
16    Q.   Is that a boy or girl?
17    A.   She's a girl.
18    Q.   How old is she?
19    A.   She's nine months.
20    Q.   Congratulations.
21    A.   Thank you.
22    Q.   Do you remember the last day, the date of the
23  last day you worked at the Longhorn?
24    A.   I would say -- not positive of the exact date
25  that I left the Longhorn, but I would say it was April

8

1  24th or 25th.
2    Q.   2004?
3    A.   Yes, sir.
4    Q.   Now, are you represented today by Mr. Gillis?
5    A.   Yes, sir.
6    Q.   And you've spoken to him prior to today; is
7  that right?
8    A.   Yesterday, sir.
9    Q.   Had you met him before today?  Before
10  yesterday, pardon me.
11    A.   Before yesterday, no.
12    Q.   Now, once you went to the Longhorn, did you
13  receive any training in the responsible service of
14  alcoholic beverages?
15    A.   Yes, sir.
16    Q.   Can you tell me where you received that
17  training?
18    A.   We received that training at the restaurant
19  before it opened.
20    Q.   It was a new Longhorn at Leominster that you
21  went to work at in 2000; is that right?
22    A.   Yes.
23    Q.   You should try to wait a second just to let
24  me finish my questions before you answer if you could.
25      MR. GILLIS:   To just assist you on that, the

10

1  stenographer can only take down one of you, so if --
2  he'll, I'm sure, will wait for you to finish your answer
3  if you could just wait for him to finish his question.
4      Q.      You were trained at the restaurant before it
5  opened up; is that fair to say?
6      A.      Yes.
7      Q.      Who trained you?
8      A.      There are many trainers from all different
9  kinds of Longhorns that came in. They are trainers that
10 travel to each Longhorn before they open and they train
11 you.
12     Q.      Do you know how long that training lasted?
13     A.      It was extensive training for a week before
14 the restaurant even opened. And then at least for one
15 month we had trainers in there on a consistent basis
16 every shift with us, guiding us through everything we
17 did.
18     Q.      Okay.  Is it fair to say that the training
19 you received at that time was in not only responsible
20 serving of alcoholic beverages, but also in just being a
21 waitress at the Longhorn Restaurant and how the
22 restaurant operated?
23     A.      Yes.
24     Q.      At some point in time did you become -- did
25 you receive what's called tips training?

1      A.      Tips training I don't specifically remember,
2  no.
3      Q.      Do you remember receiving anything called bar
4  code training?
5      A.      Yes.
6      Q.      When did you receive that training?
7      A.      That would have been throughout the first
8  week that we did training without anybody -- without
9  having customers yet in the restaurant.
10     Q.      What does bar code mean to you?
11     A.      The bar code is the system that you go by on
12 determining how you are going to serve someone, how the
13 serving comes about, systems that they go through
14 determining when someone's had too much to drink, or
15 getting close to having too much to drink.
16     Q.      Did you receive some booklets or publications
17 in connection with that training?
18     A.      Yes.
19     Q.      Do you have them now; do you still keep them?
20     A.      No.
21     Q.      Let me show you some booklets and you tell me
22 if you recognize them. The first booklet I want to show
23 you has been marked Exhibit #5 to Christen O'Donnell's
24 deposition.  You know Christen O'Donnell, don't you .
25     A.      Yes, sir.

11

1      Q.      And it's entitled, "Bar Code Server Guide,"
2  could you take a  moment and look at that please and tell
3  me if you recognize it?
4      A.      (Peruses document.) Yes, I do.
5      Q.      Is this one of the booklets that you received
6  from Longhorn as part of your tips training -- bar code
7  training?
8      A.      Yes, bar code training.
9              MR. FARRAH:  Can I get this marked as the
10 first exhibit please.
11             (DEPOSITION EXHIBIT #1 WAS MARKED
12             FOR IDENTIFICATION.)
13     Q.      I am going to show you what has been marked
14 as Exhibit #2 to Christen's deposition and it is entitled
15 "Longhorn Steakhouse Bar Recipes, revised 2002."  Do you
16 recognize that document?
17     A.      No, I don't.
18     Q.      Take a moment and look at it.
19     A.      (Peruses document.)  No, I don't.
20             MR. FARRAH:  Can we have this marked as
21 Exhibit #2 please?
22             (DEPOSITION EXHIBIT #2 WAS MARKED
23             FOR IDENTIFICATION.)
24             MR. GILLIS:  What number is that from the
25 prior deposition?

12

1              MR. FARRAH:  That was -- It's #2 in both
2  depositions.
3      Q.      Did you receive at the time you started
4  working at the Longhorn any document that you understood
5  contained the recipes for different drinks served at the
6  Longhorn restaurant?
7      A.      Did I remember receive any?
8      Q.      Yes.  Any document that has the recipes for
9  the different drinks that are served at the Longhorn ?
10     A.      No, not that I can remember.
11     Q.      Do you remember receiving any training in
12 recipes for the different drinks that were served at the
13 Longhorn at any time prior to September 26, 2003?
14     A.      Yes.
15     Q.      What training was that?
16     A.      It may not necessarily have been training,
17 but when any new drink came out that we were adding to
18 the menu, they would tell us what was in it so that we
19 would know, so we could sell it as a promotion?
20     Q.      Other than that, do you remember receiving
21 any training from the time you started the Longhorn until
22 September 26, 2003 about recipes for making different
23 drinks at the Longhorn?
24     A.      Not necessarily the recipes, exactly what was
25 in them, but we'd have to know that, you know, in  what

14

1  type of drinks was what alcohol so that if someone
2  ordered vodka and tonic, what kind of vodka would they
3  want with it. We knew the brands of alcohol, what
4  alcohols were in each drink, but the recipes to make
5  them, no.
6      Q.    Here is a big one.  This is Exhibit #3 to
7  Christen's deposition.  It is entitled "Wanted:  Longhorn
8  Steakhouse Server and Bartender Trainee Edition."  It's
9  about an inch think.  Does that look familiar to you?
10     A.    Yes.
11     Q.    Does this look like a document that you
12 received at the time you started work at the Longhorn?
13     A.    When I started there, yes.
14           MR. FARRAH:  Can we have this marked please.
15 Did I say this is Exhibit #3 to Christen's deposition?
16           (DEPOSITION EXHIBIT #3 WAS MARKED
17           FOR IDENTIFICATION.)
18           MR. GILLIS:  Yes.
19           MR. FARRAH:  It's #3 to Ms. Chabot's
20 deposition.
21     Q.    Do you recall other than the two documents
22 you've identified so far and that are exhibits now in the
23 case, any other documents that you received from the
24 Longhorn at the time you first were employed there?
25     A.    We received many documents, many booklets,

Starkings Court Reporting & Video Services

1  train the trainer guides, thing -- chemical spill, we had
2  to know about in the back, we received that booklet.
3      Q.    Any other documents about -- that you recall,
4  relating to serving alcoholic beverages responsibly?
5      A.    No, not that I can remember.
6      Q.    Let me show you what has been marked as
7  Exhibit #6 to Christen's deposition.  This one is the
8  "Longhorn Steakhouse Training Test Booklet for Server and
9  Bartender Team Members."  Does that look familiar to you?
10     A.    Yes.
11     Q.    Does it look familiar as a document that you
12 received about the time you started at the Longhorn?
13     A.    Yes.
14           MR. FARRAH:  Could we have this marked
15 please.
16           (DEPOSITION EXHIBIT #4 WAS MARKED
17           FOR IDENTIFICATION.)
18     Q.    Throughout the time that you were at the
19 Longhorn, did you know of any -- did you know of any
20 policy that the Longhorn had to reprimand employees who
21 did not follow the guidelines set forth in the training
22 documents?
23     A.    Such as what would happen to them if they
24 didn't follow it to a T?
25     Q.    Such as what would happen to them if they

Starkings Court Reporting & Video Services

15

1  didn't follow the training guidelines, yes.
2      A.    It was zero tolerance.
3      Q.    How do you know that?
4      A.    That was just standards set forth through
5  Longhorn, and I don't know of any time that anyone had
6  ever had been reprimanded for it.
7      Q.    How do you know that that was the standard,
8  zero tolerance that was set forth through Longhorn?
9      A.    They made it very clear, did I know it to be
10 a fact, did they do it to anyone, I do not know.
11     Q.    How did they make it very clear?
12     A.    They spoke to us about it on several
13 occasions.  We'd have meetings on Saturday mornings we'd
14 came in, learn about new menu items, any issues that may
15 have came up, and throughout the training in the
16 beginning, made it very clear what our standard was and
17 that we were to live up to that standard.
18     Q.    Okay.  Did you receive any documents, other
19 than the documents we've identified now, that set forth
20 that zero tolerance policy you've just described from the
21 time you started working at Longhorn until you left?
22     A.    Just the documents I have already seen.
23     Q.    This ones that are exhibits in the case?
24     A.    Yes, sir.
25     Q.    And other than the training you received

16

1  initially, have you had any -- did you have any
2  retraining from that time until you left the Longhorn in
3  serving alcoholic beverages responsibly?
4      A.    Specifically, no.
5      Q.    And you were bar code certified at some point
6  in time; is that right?
7      A.    Yes, sir.
8      Q.    That was fairly early on in your career at
9  the Longhorn?
10     A.    Yes, sir.
11     Q.    Are there any written policies regarding the
12 service of alcoholic beverages responsibly that you
13 understood were in force at the Longhorn during the time
14 you worked there, that you have not now described to us?
15     A.    No, sir.
16     Q.    Were there any other verbal policies
17 concerning the responsible service of alcohol that were
18 in place at the Longhorn during the time that you worked
19 there, that you have not told us about?
20     A.    Just that the managers, you know, were very
21 confident in us, and that, you know, every case may not
22 be a "by the book" but a very much so a judgment call in
23 our training, that if we felt anything was wrong or okay,
24 that as long as our judgment was fine with it, they were
25 fine with it.

18

```
 1    Q.    The managers told you that; is that right?
 2    A.    That the managers told us they were fine with
 3 it?
 4    Q.    Yes.
 5    A.    That they trusted our judgment, that we had
 6 judgment calls.
 7    Q.    Okay, so the managers at the Longhorn told
 8 you that really it was up to you whether to serve
 9 somebody or not?
10    A.    Yes.
11    Q.    When you started at the Longhorn, how much
12 were you paid per hour?
13    A.    $2.63.
14    Q.    When you left how much were you paid per
15 hour?
16    A.    $2.63.
17    Q.    What's the most hours a week you worked at
18 the Longhorn?
19    A.    It would vary.  The shifts were 5:00 till
20 close, but close may be 11:00 and we might not get out
21 until 1:00.  So it could go anywhere 30 to 40 hours a
22 week.
23    Q.    When you worked seven days a week, how many
24 hours was the most you worked, if you can recall?
25    A.    It was probably 42, maybe at the most.
```

Starkings Court Reporting & Video Services

```
 1    Q.    Fourty-two did you say?
 2    A.    Yes, sir.
 3    Q.    Okay.  And some days you worked double
 4 shifts, you told us, is that right?
 5    A.    Yes, they may be doubles, but then you get a
 6 lunch break and if it's not busy, they probably let you
 7 go from around 11:00 to 3:00, or anywhere from, you know,
 8 noon when they notice the rush isn't big until 3:00 or
 9 4:00.  Then you come back.
10    Q.    When -- did you act as your own bus boys,
11 clearing table?
12    A.    We bussed 90 percent of the tables.  If there
13 were glasses left when the guest left, then the hostesses
14 would clear those.
15    Q.    But there were no bus boys working at the
16 Longhorn?
17    A.    No, sir.
18    Q.    At any time you worked there; is that right?
19    A.    Yes, sir.
20    Q.    So they hostesses that were on duty also did
21 some bussing functions; is that right?
22    A.    Yes, sir.
23    Q.    On Friday nights what time did you stop
24 serving?
25    A.    Stopped serving food?
```

Starkings Court Reporting & Video Services

19

```
 1    Q.    Yes.
 2    A.    We stopped serving food on Friday nights,
 3 from what I remember, 11:00.
 4    Q.    What time did stop serving alcohol on Friday
 5 nights?
 6    A.    Usually the bartender would call last call
 7 about 20 to 15 minutes before actual closing time.
 8    Q.    Before 20 to 15 minutes before 11:00?
 9    A.    Yes, sir.
10    Q.    There were some nights that you stayed after
11 closing, at 11:00 until as late as 1:00 you just
12 testified; is that right?
13    A.    Yes, sir.
14    Q.    What sorts of things did you do between 11:00
15 and 1:00 on those nights?
16    A.    You have to check each server out.  As a
17 closer you have to check servers out and make sure
18 they've done their side work, make sure they've done
19 everything right on their tables.  We have to do the
20 final close down of the alley, which consisting of
21 putting salad dressing away, making sure bread is thrown
22 out, making sure the ice is filled, the whole alley  way
23 is ready, and any rolling of silverware that was left to
24 do, we had to do.
25    Q.    That was in addition to your waitressing
```

20

```
 1 functions; is that right?
 2    A.    Yes.
 3    Q.    Sort of readying the place for the next day's
 4 operation?
 5    A.    Yes, sir.
 6    Q.    Is that a fair way to describe that?
 7    A.    Yes, sir.
 8    Q.    Were you paid for that?
 9    A.    No, sir.
10    Q.    You weren't paid hourly for that?
11    A.    The hours we were on the clock, we were paid
12 for.
13    Q.    So tips were an important part of your
14 compensation at Longhorn; is that right?
15    A.    Yes, sir.
16    Q.    During the time that you worked there, tell
17 me the range per night what you made in tips?
18    A.    In a night it can go anywhere from $40 to
19 $120, $130.
20    Q.    During the time that you worked at the
21 Longhorn, were there any reviews, I mean official reviews
22 of your performance?  Do you know what I mean by that?
23    A.    Yes.
24    Q.    Were there any?
25    A.    Yes, there were.
```

22

```
 1      Q.      What shape would they take?
 2      A.      Usually they would call you into the office,
 3 it was probably at the end of the night, when you were
 4 getting ready to leave at the end of your shift, when
 5 you're turning in your stuff, and they would go over just
 6 a basic review of how you were doing, how your sales
 7 were, how your attitude's been.
 8      Q.      When you say how your sales were, what do you
 9 mean by that?
10      A.      With any promotions that we have, were we
11 selling the promotions, were we suggestively selling,
12 were we adding things on to the meal.
13      Q.      What do you mean by suggestively selling?
14      A.      Were we mentioning the fact that we had a new
15 steak on the menu.  Were we mentioning the fact that for
16 $1.99 they could add a salad.
17      Q.      How did your managers know, if you know,
18 whether or not you were mentioning that for 1.99 people
19 could add on a salad?
20      A.      Specifically, I don't know if they know if I
21 said it, or if the person asked for it.  They wouldn't
22 know unless they were standing at my table.
23      Q.      So during the reviews, how frequently --
24 sorry about that, during the reviews.
25              How frequently did you receive what you
```

Starkings Court Reporting & Video Services

23

```
 1 the Longhorn who was at the restaurant on September 26,
 2 2003, which was a Friday, was involved in an auto
 3 accident the next morning in which two people were killed
 4 and two people were injured?
 5              MR. GILLIS:  Objection
 6      A.      Yes.
 7      Q.      At some point in time, did you realize that
 8 it was your customer who was -- from the night before who
 9 was involved in that automobile accident?
10              MR. GILLIS:  Objection
11      A.      Yes.
12      Q.      How did you come to that conclusion?
13      A.      I believe it was the following night.  I had
14 already been home from work, woken up, and I guess
15 probably used the restroom, went back to bed.  Our TV was
16 still on, and I had actually seen his picture flash
17 across the screen and just heard, involved in fatal
18 accident, and that was all I caught out of it, and that
19 was all I knew about it.
20      Q.      When you saw the picture flash across the
21 screen, did you recognize the picture of the person you
22 saw?
23      A.      Yes.
24      Q.      Did you recognize him at that time as Jeffrey
25 Southworth?
```

24

```
 1 understood to be official reviews?
 2      A.      I would say if I had to guess, maybe once a
 3 month.
 4              MR. GILLIS:  Okay, for purposes of the
 5 deposition, if you have an estimate, that's fine, but we
 6 don't want any guessing.  We want there to be no guessing
 7 on the record.  If you don't know, that is fine.
 8      A.      I don't know then.
 9      Q.      Did you ever see any written reviews of your
10 performance at Longhorn?
11      A.      No, not that I can remember.
12      Q.      Did anyone ever say to you -- any manager at
13 Longhorn ever say to you that he knew how much alcohol --
14 that is how much in dollar amount of alcoholic beverages
15 you were selling at any particular time?
16      A.      No.
17      Q.      Did the company have the ability to calculate
18 that, that is how much alcohol you were selling at any
19 particular time?
20              MR. GILLIS:  Objection.
21      A.      Yes.
22      Q.      But no one ever spoke to you about it?
23      A.      No.
24      Q.      Now, you realize -- do you realize that we're
25 here today because of an allegation that a customer of
```

Starkings Court Reporting & Video Services

24

```
 1      A.      I was not sure of his name, positive of
 2 exactly what his name was.
 3      Q.      Did you think his name at that time -- at
 4 that time, did you think his name was Jeffrey Southworth?
 5      A.      From what I knew of it to be, yes.
 6      Q.      What was the basis for when the TV image of
 7 him flashed across the screen, thinking at that time that
 8 his name was Jeffrey Southworth?
 9      A.      I just recognized his face from the
10 restaurant.
11      Q.      Did you know his name at the time you saw his
12 picture on the screen?
13      A.      No.
14      Q.      When is the first time you recall seeing Mr.
15 Southworth at the Longhorn?
16      A.      I don't know when the first time would be.
17      Q.      Is it accurate to say that prior to the
18 evening of September 26, 2003, and but prior to the -- I
19 mean, days, weeks or months before September 26, 2003,
20 you had first seen Mr. Southworth at the Longhorn?
21      A.      The first time I ever saw him was at the
22 Longhorn.
23      Q.      That was before September 26, 2003; is that
24 right?
25      A.      Yes.
```

26

```
 1      Q.   Can you tell me approximately how long before
 2  September 26, 2003 it was?
 3      A.   Approximately, I would say at least four
 4  months.
 5      Q.   And can you tell me with what frequency, that
 6  is how many times between that first sighting of him, for
 7  lack of a better way to describe it, four months before
 8  September 26, 2003, and September 26, 2003, you saw him
 9  at the restaurant.
10      A.   His frequency I would say approximately would
11  be once a week.
12      Q.   Can you describe him to me as he appeared to
13  you back then?
14      A.   Back then he was, from what I remember, over
15  six foot, six two, well over 200 pounds.  I would say
16  220.
17      Q.   What kind of hair cut did he have during that
18  period?
19      A.   He had a buzz cut.
20      Q.   Buzz cut?
21      A.   Yeah.
22      Q.   Pretty distinctive looking fellow?
23      A.   I wouldn't pick him out from a crowd.  He had
24  a thicker build.  He wasn't fat.  A thicker kind of kid.
25  But he would not stand out to me in a crowd, no.
```

Starkings Court Reporting & Video Services

```
 1      Q.   Do you have a memory during that four-month
 2  period before September 26, 2003 of having waited on him
 3  yourself?
 4      A.   I may have waited on him one time maybe.
 5      Q.   Do you know any of the other waitresses at
 6  the Longhorn who waited on him during that four month
 7  period before September 26, 2003?
 8      A.   Yes.
 9      Q.   Who?  Who else waited on him during that
10  period?
11      A.   Mary Clare did and Sherry did.
12      Q.   Mary Clare Fitzgerald?
13      A.   I believe, yes.
14      Q.   And Sherry?
15      A.   Samon.
16      Q.   How do you know Sherry Samon waited on him
17  before September 26, 2003?
18      A.   Just from memory.  I have been friends with
19  Sherry, and from the restaurant seeing him in there, I
20  had known Sherry to wait on him.  Usually Sherry and I
21  always work the same shifts.
22      Q.   Did you ever, after you realized that there
23  was this accident of September 27 in the early morning of
24  2003, did you speak to Sherry about this gentleman, Mr.
25  Southworth?
```

Starkings Court Reporting & Video Services

27

```
 1      A.   I spoke to Sherry the following day.
 2      Q.   Tell me what you said to her and what she
 3  said to you during that conversation?
 4      A.   It was -- I basically told Sherry that I had
 5  seen him on the news and that he was involved in a fatal
 6  accident.  And she said, are you sure it was him?  I
 7  said, Yeah, I'm pretty sure, his picture was up there.
 8  And she said, did they say a name.  And I said no.  And
 9  that was about it.  She said no, it couldn't have been
10  him.
11      Q.   Why did she say no it couldn't have been him?
12      A.   Probably too much of a coincidence, you don't
13  think anyone you'd know would be on the news.
14      Q.   During that conversation did Sherry say to
15  you that she had waited on him before?
16      A.   Yes.  They're her regulars.
17      Q.   He was one of her regulars; is that right?
18      A.   Yes, sir.
19      Q.   What do you mean by a regular?
20      A.   Someone who you wait on when they normally
21  come in.  You would know that was your customer and they
22  may even ask for you instead of even sitting with someone
23  else.
24      Q.   Did customers have that ability to ask for a
25  particular waitress, I mean, if the restaurant level of
```

28

```
 1  business allowed it?
 2      A.   Absolutely.
 3           MR. GILLIS:  Objection.
 4      Q.   What made you understand that Mr. Southworth
 5  was Sherry's customer?
 6      A.   Normally when he came in from the shifts I
 7  was on, and that I saw him in  the restaurant, Sherry was
 8  waiting on him.
 9      Q.   Did you ever hear him ask for Sherry?
10      A.   No, I never heard him ask.
11      Q.   Did you ever hear Sherry talk about him
12  during the period prior to September 26, 2003?
13      A.   Yes.
14      Q.   What sort of things did she say about him?
15      A.   She just, you know, she never mentioned him
16  by name, but if she came in to the computer and we were
17  sitting there chatting, she would go oh, yeah, those kids
18  are so funny.  Or maybe tell me something they were
19  talking about at the table.  And that was frequently how
20  they'd always come in after dirt biking.  And that was
21  their ritual.  They would go out dirt biking for the day
22  and then come in for dinner.
23      Q.   Can you tell me how many times Sherry waited
24  on Mr. Southworth during that four-month period?
25           MR. GILLIS:  Objection.
```

30

1    A.    No.

2    Q.    Do you know any -- strike that.  What else

3 did Sherry and you talk about the night of -- excuse me,

4 the next day after you learned there had been this

5 accident?

6    A.    That was it.  We knew nothing else of what

7 had happened.  There was nothing to talk about.

8    Q.    At any time up to the time of that

9 conversation, the one where you learned about the

10 accident, after you learned about the accident, did

11 Sherry or you talk about the kinds of drinks that Mr.

12 Southworth liked to drink?

13    A.    Between when?

14    Q.    Between when you first saw him four months

15 before the accident, and when you learned that he had

16 been involved in the accident?

17    A.    Yes.

18    Q.    What sorts of conversations did you have

19 about what he liked to drink?

20    A.    It wasn't necessarily a conversation, but a

21 comment on the fact of what he drank, because that kind

22 of drink was not typical for the younger guys.  Usually

23 guys came in and drank beer.

24    Q.    What did he drink?

25    A.    He usually drank Manhattans.

---

1    Q.    Jack Daniels Manhattans?

2    A.    Yes, sir.

3    Q.    Sherry knew that?

4    A.    Yes.

5    Q.    Because she served him Jack Daniels

6 Manhattans; is that right?

7    A.    I would say so, yes, sir.

8    Q.    What else did he like to drink?

9    A.    As far as I know?

10    Q.    Yes.

11    A.    The Jack Daniels Manhattans.

12    Q.    That was after dirt biking; is that right?

13    A.    Yes, sir.

14    Q.    I am going to show you what has been marked

15 as Exhibits #9 to Christen's deposition and ask you if

16 you recognize that fellow?

17    A.    Yes, I would say I do.

18    Q.    Is that Mr. Southworth?

19    A.    I believe so, yes.

20    Q.    You saw him at the restaurant on September

21 26, 2003?

22    A.    Yes.

23    Q.    That is the fellow who's image flashed across

24 the television screen that early morning after the

25 accident?

---

31

1    A.    From what I remember, yes.

2    MR. FARRAH:  Thank you.  Could we have this

3 marked as the next exhibit.

4    (DEPOSITION EXHIBIT #5 WAS MARKED

5    FOR IDENTIFICATION.)

6    Q.    And I'm going to show you Exhibit #10 to Ms.

7 O'Donnell's deposition.  Do you recognize Mr. Southworth

8 in that photo as well?

9    A.    I recognize this, yes.

10    Q.    Do you recognize him in it?

11    A.    Yes.

12    MR. FARRAH:  Okay. Can we have that marked as

13 the next exhibit.

14    (DEPOSITION EXHIBIT #6 WAS MARKED

15    FOR IDENTIFICATION.)

16    Q.    And that's Mr. Southworth?

17    A.    Yes.

18    Q.    Have you told us everything that Sherry and

19 you talked about in the conversation that -- everything

20 that Sherry and you talked about in the conversation that

21 you had after you realized that he had been in an

22 accident, after September 26, 2003?

23    A.    Yes, from what I remember.

24    Q.    Did you talk to Sherry at all during that

25 conversation about how much Mr. Southworth had had to

---

32

1 drink at the restaurant?

2    A.    Not that I remember, no.

3    Q.    Was there any conversation with Sherry that

4 you recall during that first telephone call about --

5    A.    It was in person that Sherry and I talked.

6    MR. GILLS:  Objection.

7    Q.    So it wasn't a telephone call that you had

8 with Sherry when you talked about Mr. Southworth being

9 the fellow who'd driven the car?

10    A.    Not from what I remember, it was in person at

11 our next shift, that following Sunday.

12    Q.    During that -- and it was Sunday is your best

13 memory of when that conversation occurred?

14    A.    Yes, because it was the following night after

15 it happened, so it would have been Saturday night.  My

16 next shift would have been Sunday.

17    Q.    Just so we are on all of the same page here.

18 September 26, 2003 was a Friday?

19    A.    Yes.  And I didn't see it that night.

20    Q.    Did you work the next day, do you know,

21 September 27, 2003?

22    A.    The next day shift?

23    Q.    Or night.

24    A.    I do not remember if I did, but it is

25 probably that I did.

34

1    Q.    And you don't recall while you were working
2 at the restaurant on Saturday the 27th, be it day or
3 night, any conversation with anyone about Mr. Southworth;
4 is that right?
5    A.    Correct.
6    Q.    You didn't know as of Saturday, September
7 27th, that there had been this accident; is that right?
8    A.    Correct.
9    Q.    It was in the evening between Saturday night
10 and Sunday morning, September 27th and September 28th
11 that you saw on TV the picture of Mr. Southworth; is that
12 right?
13    A.    Yes, sir.
14    Q.    You spoke to Sherry Sunday, the 28th about
15 him; is that right?
16    A.    Yes, sir.
17    Q.    During that conversation was there any
18 discussion about where else besides the Longhorn Mr.
19 Southworth had been drinking on the night of September
20 26, 2003?
21    A.    No, sir.
22    Q.    During that -- Have you told us everything
23 you can recall now about that conversation with Sherry?
24    A.    Yes, sir.
25    Q.    As of the time you had that conversation with

35

1    A.    I guess when things started stirring up up
2 there, and she was getting calls about a deposition and
3 it was asked because Longhorn and RARE were trying to
4 contact me, and they were asked if they could have a
5 contact number, and I told Sherry that was fine.  That
6 was it, and then when it came deposition time, Sherry was
7 just nervous about giving her deposition.  Didn't like
8 driving into Boston.
9    Q.    Had she talked to you about the deposition
10 beforehand?
11    A.    Just that she was didn't like driving into
12 Boston alone.
13    Q.    Did she talk to you after the deposition?
14    A.    I have talked to Sherry -- not that day after
15 the deposition, but I have talked to Sherry since her
16 deposition, yes.
17    Q.    What did she tell you about the deposition?
18    A.    She hasn't told me much.  We talk about --
19    Q.    What did she tell you?
20    A.    She said she went in and gave her deposition.
21 She was glad that it was over, and we talked about other
22 things.
23    Q.    The people that -- so have you now told us --
24 sorry about that.  Strike "the people that."
25         Have you now told us about everything that

36

1 Sherry, had you spoken to anybody else other than your
2 husband about the fact that Mr. Southworth had been
3 involved in this automobile accident?
4    A.    No, sir.
5    Q.    Had you spoken, as of the time of the Sherry
6 conversation, on the 28th, with anybody else about the
7 fact that Mr. Southworth had been your customer on the
8 26th?
9    A.    No, sir.
10    Q.    From the date of that conversation with
11 Sherry 9/28/03 until today, have you talked about Mr.
12 Southworth with Sherry at all?
13    A.    Not Mr. Southworth specifically, no.
14    Q.    Have you talked about how much in the way of
15 alcoholic beverages he was served that night with Sherry
16 at all?
17    A.    No, not particularly.
18    Q.    How about at all?
19    A.    No.
20    Q.    What do you mean by not particular?
21    A.    That wasn't a particular part of the
22 conversation, alcohol he was served?
23    Q.    What did you talk to Sherry about as it
24 related to this accident since the original conversation
25 since September 28, 2003?

1 Sherry and you have ever discussed about Jeffrey
2 Southworth and the fact that he was a customer of the
3 Longhorn that was involved in an automobile accident the
4 morning of September 27, 2003?
5    A.    Yes.
6    Q.    You've told me everything?
7    A.    Yes.
8    Q.    Okay.  Earlier on today you mentioned that
9 there was -- you mentioned that there were some folks or
10 people that Southworth was with during that four-month
11 period that he would come in with.  Do you recall that?
12    A.    I don't recall saying that, but yes, he
13 usually came in with other people.
14    Q.    Quantify for me the largest number of people
15 you ever saw him come in with during that period.
16    A.    The largest amount of people I've ever seen
17 him come in with was the amount of people he was in the
18 night I served him.
19    Q.    Prior to that, what was the largest number of
20 people you saw him come in with?
21    A.    From what I recall, three.
22    Q.    Did you ever see Mr. Southworth drinking
23 alcoholic beverages of any kind at the bar, as opposed to
24 as a restaurant pat -- restaurant table patron?
25    A.    No.

38

```
 1      Q.    And I mean to ask that question for -- from
 2  when you first saw him four months before September 26,
 3  2003 until September 26, 2003, did you ever see him
 4  drinking at the bar?
 5      A.    No.
 6      Q.    After -- So -- strike that.  Was Sherry the
 7  first person you talked to about Southworth after you
 8  realized he was the one driving the car, other than your
 9  husband?
10      A.    Yes.  Other than my husband, yes.
11      Q.    Who was the next person you talked to about
12  Southworth after speaking to Sherry?
13      A.    From what I can remember, it was our manager,
14  and one of the state troopers that came in inquiring
15  about it.
16      Q.    Okay.  When was that conversation in relation
17  to the Sunday, September 28th conversation with Sherry?
18      A.    I am not positive how far apart they were.
19      Q.    Are we talking weeks?
20      A.    I would say longer.
21      Q.    So is it accurate to say that although or
22  once you realized Southworth had driven the car that had
23  caused this accident on the morning of September 27,
24  2003, it was only Sherry and your husband that you
25  voluntarily engaged in conversations with about it?
```

Starkings Court Reporting & Video Services

```
 1              MR. GILLIS:  Objection
 2      A.    I did not know he drove the vehicle and was
 3  involved in an accident.  The only thing I knew was his
 4  face and involved in fatal accident.
 5      Q.    Did you not, once you saw his face, and once
 6  you saw he was involved in a fatal accident, did you not
 7  make any effort to seek out more information about what
 8  his involvement was in that accident?
 9              MR. GILLIS:  Objection.
10      A.    No, I did not.
11      Q.    Why was that?
12      A.    He was not a close friend of mine.  He is not
13  someone I knew, so it is not something I would seek out.
14  I would have no reason to.
15      Q.    Did you not want to know what his involvement
16  was?
17              MR. GILLIS:  Objection.
18      A.    No.
19      Q.    Were you afraid of what his involvement was
20  in the accident?
21      A.    Not at all.
22      Q.    Were you upset when you spoke to Sherry about
23  the fact that you had learned he had been involved in an
24  accident?
25      A.    Upset, no.
```

Starkings Court Reporting & Video Services

39

```
 1      Q.    Can you characterize for me, if you had one,
 2  what your emotion was when you learned that he  had some
 3  involvement in this accident?
 4      A.    Slight concern.  You never want to see a
 5  person injured or someone injure someone else, so there
 6  was concern, but upset, no.
 7      Q.    Did you know that two people had died in that
 8  accident?
 9      A.    No.
10      Q.    Did you know that anybody had been injured in
11  that accident?
12      A.    Someone was injured.  It said fatal accident,
13  so someone had died.  How many, who, no, I did not know.
14      Q.    Is it accurate to say that you didn't seek
15  out any of that kind of information until you spoke to
16  the state trooper and your manager?
17              MR. GILLIS:  Objection.
18      A.    I did not seek it out.  I was told.
19      Q.    So you never sought -- is it accurate to say
20  that you never sought out additional information about
21  the extent of injuries caused by that accident?
22      A.    Correct.
23      Q.    Chuck was your manager who came to you with
24  the state trooper; is that right?
25      A.    No.
```

40

```
 1      Q.    Who was your manager that came to you at the
 2  station?
 3      A.    From what I remember, the manager that was
 4  there the day the trooper came was Chris.
 5      Q.    Chris Orr?
 6      A.    Yes, sir.
 7      Q.    What was Chris's job at the Longhorn, do you
 8  remember?
 9      A.    Chris held a couple managerial positions
10  while he was there.  He was a manager the whole time, but
11  he was over the kitchen at one time and over the bar at
12  one time.
13      Q.    Was he working the night of September 26,
14  2003?
15      A.    I can't remember.
16      Q.    At some point in time you signed a statement
17  for the police; is that right?
18      A.    Yes, sir.
19      Q.    I am going to show you what has been marked
20  as the Grand Injury Exhibit #20 dated November 5, 2003.
21  That's the date of the exhibit.  The document is dated
22  November 2, 2003, do you recognize it?
23      A.    Yes.
24      Q.    That is your signature?
25      A.    Yes, sir.
```

42

```
 1      Q.    And that's your handwriting?
 2      A.    Yes, sir.
 3            MR. FARRAH:  Could we have that marked as the
 4  next exhibit, please.
 5            (DEPOSITION EXHIBIT #7 WAS MARKED
 6            FOR IDENTIFICATION.)
 7      Q.    So at the time you were living on Fourth
 8  Street in Leominster; is that right?
 9      A.    Yes, sir.
10      Q.    This document is dated -- Exhibit #7 to your
11  deposition, Ms. Chabot, is dated November 2, 2003.  Do
12  you see that?
13      A.    Yes, sir.
14      Q.    Was that the date that Chris and you and the
15  state trooper had this meeting you described earlier?
16      A.    Yes.
17      Q.    Tell me everything you recall about that
18  meeting.
19      A.    The only --
20            MR. GILLIS:  Objection.
21      A.    -- thing I recall about that meeting is at
22  first the trooper and Chris were interviewing another
23  server that they had assumed to be the server that night.
24  And when I heard -- when I overheard what they were
25  speaking about, I realized that it was me because of me
```

```
 1  serving him Friday and then knowing that I saw him on the
 2  news the following night.  So I pulled Chris aside and I
 3  said, Chris, I believe it was me who served him that
 4  night.  And from there Chris kind of investigated a
 5  little bit, looked into checks and so forth and found out
 6  it was myself who served him.  And so then we sat down,
 7  the trooper briefly told us that he was involved in an
 8  accident, two people had been killed and that he needed a
 9  statement pertaining to anything that happened that
10  night.
11      Q.    What makes you say that the trooper and Chris
12  were interviewing the server they assumed to be the
13  person who served Southworth that night?
14      A.    Because I was eavesdropping.  I was listening
15  in on what they were talking about.
16      Q.    What were they saying?
17      A.    They were asking was he in here?  If Jessica
18  remembered serving him, and at that time she was saying
19  that she did, but she didn't think it was then.  The
20  dates weren't matching up, and that's what made me assume
21  that it was the night that I had thought it was.
22      Q.    Jessica's last name is what?
23      A.    I don't remember Jessica's last name.
24      Q.    So Jessica had served Southworth before at
25  some point in time at the Longhorn; is that right?
```

43

```
 1      A.    She must have, if it was her.
 2      Q.    Do you know why Chris thought it was Jessica?
 3      A.    No, I do not.
 4      Q.    So during this conversation that you somehow
 5  overheard, you were eavesdropping, to use your word, if
 6  you don't mind.
 7      A.    No, that's fine.
 8      Q.    Okay, you realized it was you that had served
 9  them that night; is that right?
10      A.    Yes, sir.
11      Q.    And you told Chris this; right?
12      A.    Yes.
13      Q.    And then Chris did something with some checks
14  you said, what did he do?
15      A.    He didn't do anything with checks.  He went
16  back and he looked through checks and whatever
17  documentation they have as managers, to find these things
18  out.  When he pulled the check and the night that it
19  happened, Chris can look up and see what night it
20  happened and see who they believe waited on them.  And
21  when he came up with the check that he believed to be
22  their's, my name was on it.
23      Q.    And he brought that out?
24      A.    Yes, sir.
25      Q.    And then Chris, the trooper, and you had a
```

44

```
 1  conversation; is that right?
 2      A.    Yes.
 3      Q.    I am going to show you a document and ask you
 4  if you recognize it?
 5      A.    Yes, I do.
 6            MR. GILLIS:  For the record, it's multiple
 7  pages.  If you wouldn't mind, Mr. Farrah, just break it
 8  down.  It's actually two documents.  Ask her if she
 9  recognizes each one individually.
10      Q.    Take a look at the whole document I have
11  shown you first.
12      A.    Yes, I do.
13            MR. FARRAH:  Can we have this marked as the
14  next exhibit.
15            (DEPOSITION EXHIBIT #8 WAS MARKED
16            FOR IDENTIFICATION.)
17      Q.    Does Exhibit #8 look like what Chris brought
18  out for you and the state trooper to look at that night?
19            MR. GILLIS:  Which part of it?
20      A.    The only part of it that Chris brought out to
21  show us was the check portion.
22      Q.    Okay.  Tell me everything you can recall you
23  said, Chris said, and the trooper said in the order it
24  was said, once Chris brought the check portion out that
25  day?
```

46

1    A.    The only thing I recall being said is the
2  trooper asked me what I can remember of what I served
3  him, what the table ate, what he ate, and Chris and the
4  trooper -- the trooper asked me to write a statement and
5  I wrote a statement while the trooper and Chris had their
6  own separate conversation.
7    Q.    And other than what has been marked as
8  Exhibit #7 I think it is, yeah, Exhibit #7 to your
9  deposition, have you ever written another statement to
10 anyone about the events of that night?
11   A.    No, sir.
12   Q.    Have you written any report for RARE
13 Hospitality or that employer?
14   A.    No, sir.
15   Q.    Did you give a recorded statement to anyone
16 at any time about this event?
17   A.    No, sir.
18   Q.    Have you met with any investigators to talk
19 about this event?
20   A.    No, sir.
21   Q.    Now Mr. Southworth had been your customer on
22 occasions prior to September 26, 2003; is that right?
23   A.    No, maybe one occasion.
24   Q.    Is it yes, maybe one occasion?
25   A.    Yes, maybe one occasion.

1    Q.    Okay.  And he'd had Jack Daniels Manhattans
2  on that occasion; is that right?
3    A.    From what I remember, yes.
4    Q.    On the night in question September 26, 2003
5  he was served those Manhattans straight up; is that
6  right?
7    A.    No, sir.
8    Q.    How was he served those Manhattans on that
9  night?
10   A.    From what I remember, it was in a rocks
11 glass.
12   Q.    Have you spoken to Christen O'Donnell about
13 how those Manhattans were served to him that night?
14   A.    No.
15   Q.    Do you know what she has testified to as to
16 how they were served to him that night?
17   A.    Yes.
18   Q.    What has she testified to?
19   A.    From what I have been told she's testified to
20 is that they were in a tall Martinee glass.
21   Q.    Straight up?
22   A.    Yes.
23   Q.    But that's not your memory?
24   A.    No, sir.
25   Q.    Your memory is on the rocks?

47

1    A.    Yes, sir.
2    Q.    When Sherry served him, how were they served
3  to him?
4          MR. GILLIS:  Objection.
5    Q.    If you know?
6    A.    I don't recall.
7    Q.    I am going to show you a photograph I
8  represent to you I took with the assistance of Mr.
9  Gillis.
10         MR. GILLIS:  Objection
11   Q.    Ask you if you recognize anything in that
12 photograph?
13   A.    I recognize all of the glasses.
14   Q.    And do you recognize those as glasses used at
15 the Longhorn Steakhouse?
16   A.    Yes.
17   Q.    Are there straight up glasses in that
18 photograph?
19   A.    Yes
20   Q.    And those are the straight up glasses that
21 Manhattans are served in; is that right?
22   A.    Yes.
23         MR. FARRAH:  Could we have this marked as the
24 next exhibit?
25

48

1          (DEPOSITION EXHIBIT #9 WAS MARKED
2          FOR IDENTIFICATION.)
3          MR. GILLIS:  Let's put on the record too, the
4  assistance that you're referring to is that we allowed
5  you to take photographs of the restaurant, not that we
6  were actually photographing with you.
7          MR. FARRAH:  You held the door open for me.
8    Q.    I want to show you another photograph and ask
9  you if it fairly and accurately depicts a portion of the
10 Longhorn Restaurant as it appeared to you on the night of
11 September 26, 2003?
12   A.    I would say, no.
13   Q.    Do you recognize in the photograph that I
14 have shown you, any glassware that was employed at the
15 Longhorn Steakhouse as of September 26, 2003?  By
16 employed I mean used.
17   A.    Yes.
18   Q.    What glassware is that?
19   A.    The snifter behind the large Texas margarita
20 glasses.
21   Q.    Are the blue glasses in that photograph the
22 Texas margarita glasses you referred to?
23   A.    Yes.
24         MR. FARRAH:  Could we have that marked as
25 the next exhibit.

50

1          (DEPOSITION EXHIBIT #10 WAS MARKED
2      FOR IDENTIFICATION.)
3      Q.    Do you recognize Exhibit #10 as depicting a
4  portion of the service bar at the Leominster Longhorn as
5  it appeared on September 26, 2003?
6      A.    I don't remember the corkboard being there.
7      Q.    Okay.  Other than that does it look like a
8  portion of the service bar?
9      A.    Yes.
10     Q.    I am going to show you a photograph and ask
11  you if it fairly and accurately depicts a portion of the
12  Leominster Longhorn as it appeared on September 26, 2003?
13     A.    Yes.
14     Q.    What portion does that show?
15     A.    It shows the back alley where we receive our
16  food, the dish pit, and a small portion of the left side
17  where we make our drinks and put bread in.
18         MR. FARRAH:   Could we have that marked as
19  the next exhibit.
20         (DEPOSITION EXHIBIT #11 WAS MARKED
21      FOR IDENTIFICATION.)
22         MR. GILLIS:   When are we going to get copies
23  of these?  I believe you said we were going to get the
24  video and all the photographs that you took.
25         MR. FARRAH:  Did you get an e-mail -- can we

1  go off the record.
2          (Off the record.)
3          (Back on the record as follows:)
4  BY MR. FARRAH:
5      Q.    Could you show us where you get the food?
6      A.    (Indicating while testifying.) Right here we
7  get the main entrees.  Up here is where we get appetizers
8  and we pull our salads from there.
9      Q.    All right.  Did you testify before the Grand
10  Jury?
11     A.    No, sir.
12     Q.    Did you speak to any other police after that
13  meeting with the police at the Longhorn on November 2,
14  2003?
15     A.    No, sir.
16     Q.    In Exhibit #7 you wrote among other things --
17  well, you wrote there were about eight men.  They all had
18  chowder and bread.  Then they had salads.  Most had
19  steaks or ribs.  They were drinking Manhattans or Bud
20  Light draft.  They had three Manhattans.  Do you see
21  that?
22     A.    Yes, sir.
23     Q.    And the he you are referring to there is Mr.
24  Southworth; is that right?
25     A.    Yes, sir.

51

1      Q.    Did he have any beers that you recall at the
2  table?
3      A.    Not that I recall.
4      Q.    Do you know who had the beers at the table?
5      A.    I know that I served a beer to a gentleman
6  who was in a black hat with black hair.
7      Q.    And you served another beer to that table
8  during that night; isn't that right?
9      A.    Yes, sir.
10     Q.    Who did you serve that too?
11     A.    I don't recall specifically, sir.
12     Q.    So the two beers that appear on the first
13  page of Exhibit #8, two 25 ounce Bud Light beers were
14  served by you to the table the night of September 26,
15  2003; is that right?
16     A.    Yes, sir.
17     Q.    Nobody from the bar, no bartender that night
18  asked you to add to your check any beers that had been
19  ordered by your table patrons while they had been at the
20  bar that night; is that right?
21     A.    Correct.
22     Q.    And the state trooper was the only police
23  officer you ever spoke to about this incident?
24     A.    Yes, sir.
25     Q.    Did you ever speak to Chuck Bulgain about

1  this incident?
2      A.    Not that I recall, no.
3      Q.    David -- not David Orr -- what's his first
4  name?
5      A.    Chris.
6      Q.    Chris Orr and you spoke about it that day, is
7  that right?
8      A.    Yes, sir.
9      Q.    Tell me everything you said to Chris and
10  Chris said to you that day about Southworth and what
11  happened that night?
12     A.    Chris asked me after speaking with the state
13  trooper, Chris basically knew exactly what had happened,
14  and so I spoke with Chris later that evening.  He told me
15  what the trooper had told him regarding that there was an
16  accident he was involved in.  That he had killed two
17  people and that they were backtracking his story for the
18  night.  And from what Chris was told from the trooper,
19  the only thing Chris knew is that they had stopped at, I
20  guess a strip club after Longhorn.  And Chris asked me do
21  I feel that they left here they were fine, that they were
22  not over served.  And I told him I believed they did.
23  They left the restaurant fine.
24     Q.    Have you told everything you recall about
25  talking to Chris about that night?

52

54

1    A.    Yes.

2    Q.    Have you spoken since that conversation with

3 anybody in management at Longhorn about what happened

4 that night?

5    A.    Not that I recall.

6    Q.    Has anybody from management sought you out to

7 speak to you about what happened that night?

8    A.    No.

9    Q.    Has Mr. Wilson who is here today sought you

10 out to speak about what happened that night?

11    A.    No, sir.

12    Q.    Has anyone on his behalf sought you out?

13    MR. GILLIS:  Objection.

14    A.    No, sir.

15    Q.    You have spoken to lawyers representing RARE;

16 is that right?

17    A.    Yes, sir.

18    Q.    Has Mr. -- I don't want to know what you

19 spoke to -- what you said to one another, but is Mr.

20 Gillis the first lawyer you spoke to representing RARE

21 about what happened that night?

22    A.    Yes.

23    Q.    Did you ever speak to any lawyers from the

24 Campbell Law Office in Boston?

25    A.    I know I spoke to someone representing RARE,

Starkings Court Reporting & Video Services

1 what their name was I don't recall.  And then I know that

2 I was handed over to Neil and Mr. Gillis.

3    Q.    Obviously you've spoken to Neil in the past?

4    A.    Yes, sir.  Yes.

5    Q.    Even before yesterday; is that right?

6    A.    Yes.

7    Q.    Now, are you aware of the fact that you

8 placed orders for 17 Jack Daniels Manhattans and two 25

9 ounce beers for this table in the time between 8:40 p.m.

10 and 9:24 p.m.?

11    MR. GILLIS:  Objection.

12    A.    I am aware that I served that many drinks.

13 The time frame exactly sounds about right.

14    Q.    And can we agree that between 8:40 p.m. and

15 9:24 p.m. is 44 minutes?

16    A.    Yes, sir.

17    Q.    And are you aware that you served 17 Jack

18 Daniels Manhattans and two 25 ounce beers in that

19 44-minute period?

20    A.    Yes.

21    Q.    Did any police officer ask you why you

22 permitted to be placed that magnitude of orders?

23    MR. GILLIS:  Objection.

24    A.    No, sir.

25    Q.    Did any employee with whom you spoke at RARE

Starkings Court Reporting & Video Services

55

1 about that evening ask you why you permitted to be placed

2 orders for that number of drinks?

3    MR. GILLIS:  Objection.  I instruct you not

4 to answer.

5    MR. FARRAH:  Other than attorneys?

6    MR. GILLIS:  I am still -- who specifically,

7 because if it's management and if it's in anticipation of

8 preparation for trial, I think it's privileged.

9    MR. FARRAH:  I don't think she's told us that

10 she's spoke to one person at RARE management other than

11 Chris Orr that night.

12    MR. GILLIS:  Why don't you ask the question

13 again, maybe I misunderstood.

14    Q.    Did any employee at RARE ask you why you

15 permitted to be placed orders for that number of drinks

16 during that time period?

17    MR. GILLIS:  Non-management employees?

18    Q.    Non-management.

19    A.    While I was ordering them?

20    Q.    No, at any time?

21    A.    No.

22    Q.    Other than Sherry, have you talked to anybody

23 -- Sherry and your husband -- Sherry and your --

24    Other than Sherry, have you spoken to any --

25 and Chris, have you spoken to any RARE employee about

56

1 this night?

2    A.    No.

3    Q.    No one?

4    A.    No.

5    VIDEOGRAPHER:    We need to go off the

6 record to change the tape.

7    (Off the record.)

8    (Back on the record as follows:)

9 BY MR. FARRAH:

10    Q.    So other than Chris, have you ever spoken to

11 any management at RARE about the night in question?

12    A.    No.

13    Q.    And have you told us everything you can

14 recall about the conversation you had with Chris about

15 whether or not it was okay to serve Mr. S -- it was

16 appropriate to serve Mr. Southworth alcoholic beverages

17 that night?

18    A.    It wasn't that if it was appropriate.  the

19 asked me on my judgment call, did I think the was fine

20 when they left and I told him yes.

21    Q.    What did you base that on?

22    A.    I based it on Mr. Southworth's appearance,

23 how the seemed to me, how the whole table was acting.

24    Q.    The table was acting well?

25    A.    Yes.

58

1      Q.    Not loud?

2      A.    No.

3      Q.    Had you ever seen him prior to that night,

4   Mr. Southworth, in a state that you considered to be

5   intoxicated?

6      A.    No.

7      Q.    Had you ever seen him prior to that night --

8   had you ever seen any of his people that were with him

9   prior to that night in a state that you considered to be

10  intoxicated?

11     A.    No.

12     Q.    Had you ever seen the fellow with the black

13  hair and the black hat that you served the beer to prior

14  to that night?

15     A.    Not that I recall, no.

16     Q.    Is Friday night one of the busiest nights of

17  the week at the restaurant?

18     A.    Yes.

19     Q.    Is the time between 8:00 and 10:00 p.m. the

20  busiest time of the night?

21     A.    I would say between 6:00 to 10:00.

22     Q.    Was it busy that night?

23     A.    I don't recall how busy it was that night.

24     Q.    Do you know how many tables you were waiting

25  on that night?

1      A.    From what I recall, I had four table section

2   that night.

3      Q.    You had a four table section?

4      A.    Yes, sir.

5      Q.    You've have looked at pages other than the

6   first page of Exhibit #8; isn't that right?

7      A.    Yes, sir.

8      Q.    And was the Southwoth -- was the table that

9   Mr. Southworth was at a double table?

10     A.    It was two tables pushed together with the

11  leaves pulled out.

12     Q.    Do you know what two numbered tables were

13  pushed together that night?

14     A.    From what I recall it was 52 and 62.

15     Q.    52 and 62?

16     A.    Yes, sir.

17     Q.    And I am going to show you a document called

18  proposed floor plan, Leominster, Mass Longhorn that I

19  will represent to you, I got it from the Leominster

20  licensing board commission.  And ask you if it looks like

21  a floor plan of the restaurant as it appeared on the

22  night of September 26, 2003?

23     A.    Yes, it does.

24        MR. FARRAH:    Could we have that marked as

25  the next exhibit, pleas.

59

1        (DEPOSITION EXHIBIT #12 WAS MARKED

2        FOR IDENTIFICATION.)

3      Q.    Would you mark on this exhibit in pen, tables

4   52 and you said 62?

5      A.    Yes.

6      Q.    Is that right?

7      A.    Yes. (Complies.)

8      Q.    May I see it.  Could you mark for me the

9   numbers of the tables that are -- as you're looking at

10  it, to the right of 62, the next table and then the table

11  after that, just what those are?

12     A.    (Complies.)

13     Q.    And those were 72 and 82; is that right?

14     A.    Yes, sir.

15     Q.    What other two tables did you have that

16  night?

17     A.    I don't recall but usually the section that

18  it would be, it would most likely be these two booths, 41

19  and 51.

20     Q.    Your -- the second page of Exhibit #7-- #8,

21  pardon me, Exhibit #8 indicates that you had table 63; do

22  you see that?

23     A.    Yes.

24     Q.    And where is table 63?

25     A.    63 would be right here.

60

1      Q.    Would you mark 63 there for me please.

2      A.    Yes. (Complies.)

3      Q.    And the second page of Exhibit #7 [sic] also

4   indicates that you had table 53.  Do you see that?

5      A.    Yes.

6      Q.    Could you mark table 53 for me?

7      A.    (Complies.)

8      Q.    Is that your best memory, 52, 62, 53, 63 of

9   the tables you had that night?

10     A.    Yes, sir.

11     Q.    Is any of the activity with regard to the

12  party that Mr. Southworth was with that night, the others

13  in his party, is any of that activity reflected on a

14  check specific to table 62, if you know?

15     A.    The check prior on here to 62?

16     Q.    No, no.  You served Mr. Southworth and his

17  party that night; is that right?

18     A.    Yes.

19     Q.    Okay.  And the first page of Exhibit #8 is a

20  check; is that right?

21     A.    Yes.

22     Q.    That is a check, and the table number on that

23  check is 52/1; do you see that?

24     A.    Yes.

25     Q.    What I want to know is, is it your belief

62

1  that the first page of Exhibit #8, the check table 52/1
2  was the only check you delivered to Mr. Southworth and
3  his party the night of September 26, 2003?
4      A.    Yes, this is the only check I gave them.
5      Q.    Is there any particular reason why you
6  indicated on the top of it, table 52/1?
7      A.    I would not indicate the /1.  The only thing
8  that I would assume that came from is when you have two
9  tables put together you can highlight --
10         MR. GILLIS:  Again, I'm going to object.  If
11  you have an answer.  I don't want you to assume anything.
12         MR. FARRAH:  Right.  I don't either.
13      A.    Then I don't know why it would say /1.
14      Q.    Now, at that time, as of September 26, 2003,
15  did Longhorn have any policy in place preventing a
16  customer at a table from getting up and buying a drink at
17  the bar?
18      A.    I don't know of a specific policy they had in
19  place, no.
20      Q.    Who was the manager on duty that night?
21      A.    I don't recall.
22      Q.    Is there -- do you have any memory of whether
23  or not -- strike that.
24         Did you see Mr. Southworth before the came to
25  your table that night?

Starkings Court Reporting & Video Services

1      A.    Anywhere in the restaurant?
2      Q.    Yes, ma'am.
3      A.    No.
4      Q.    Do you know whether he was waiting at the bar
5  before the came to the table?
6      A.    Yes.
7      Q.    How do you know that?
8      A.    Because I knew they were getting my two
9  tables ready for a party, and they said half of them are
10  at the bar waiting for the other half.
11      Q.    Who told you that?
12      A.    The hostess.
13      Q.    Did you know it was Mr. Southworth that was
14  at the bar waiting?
15      A.    Not specifically, no.  At that time no.
16      Q.    Do you know what he had to drink at the bar
17  that night before the became your customer?
18      A.    No.
19      Q.    Has anyone ever told -- other than lawyers or
20  Chris Orr, has anyone ever told you what he had to drink
21  at the bar before the became your customer?
22         MR. GILLIS:  Objection
23      A.    No.
24      Q.    Have you tried to find out what he had to
25  drink at the bar before the became your customer?

Starkings Court Reporting & Video Services

63

1      A.    No.
2      Q.    That night did you try to find out what he
3  had at the bar before he became your customer?
4      A.    No.
5      Q.    Did anyone at the bar that night tell you
6  prior to or after he became your customer at the table
7  what Mr. Southworth had to drink at the bar that night?
8      A.    No.
9      Q.    Does RARE have a policy -- did RARE have a
10  policy in place at that time obligating bartenders to
11  tell waitresses how much their customers had to drink at
12  the bar prior to becoming customers at tables?
13      A.    It was not a set in policy.
14      Q.    Were there any systems in place at the
15  Longhorn as of September 26, 2003 for monitoring how many
16  drinks a customer had been served?
17      A.    No.
18      Q.    Was there any practice in place at the
19  Longhorn as of September 26, 2003 for monitoring how many
20  drinks a customer had been served?
21      A.    The bartenders would monitor on their own.
22  If they had any concerns they would certainly let us
23  know.
24      Q.    You are speculating about that; is that
25  right?

64

1      A.    No.
2      Q.    Was there any official practice, Longhorn
3  sanctioned practice in place as of September 26, 2003
4  that required bartenders to tell waitresses what
5  customers had had to drink at the bar prior to becoming
6  waitresses -- waitress customers?
7         MR. GILLIS:  Objection.  Under what
8  circumstances?
9         MR. FARRAH:  Any circumstances.
10      A.    I would not know.  I wasn't a bartender.
11      Q.    Did any bartender ever tell you the entire
12  time you worked at the Longhorn what a customer that had
13  been at the bar that because a table customer of yours
14  has had to drink?
15      A.    Not that I recall, specifically.
16      Q.    Was there any requirement at the Longhorn in
17  place as of September 26, 2003 that you knew of,
18  requiring bartenders to share with waitresses the amount
19  of alcoholic beverages that a customer had had to drink
20  at the bar prior to becoming a customer at a table of
21  that waitress?
22         MR. GILLIS:  Objection.  Under all
23  circumstances or every time they went to a table or --
24         MR. FARRAH:  Any circumstance.
25      Q.    Any procedure you knew of?

1    A.    Written procedure?

2    Q.    Any kind of procedure?

3         MR. GILLIS:  Are you talking procedures now

4  or practices, what was common practice or just procedure.

5         MR. FARRAH:  Procedure is what I've asked

6  her.

7         MR. GILLIS:  No, you've asked written policy.

8  You've asked procedures, you've asked practices.

9         MR. FARRAH:  This question is procedure.

10    A.    Procedure, if a bartender thought one of her

11  customers should not have another drink and they were

12  sitting at a table to eat, the waitress would tell us.

13    Q.    The waitress would tell you?

14    A.    The bartender, excuse me.

15    Q.    No bartender ever told you that; isn't that

16  right?

17    A.    Me specifically --

18    Q.    Yes.

19    A.    -- no.

20    Q.    And the basis for saying this was a procedure

21  at the Longhorn is what?

22    A.    I didn't say it was a procedure.  The

23  bartender would do it at their on discretion.

24    Q.    What is the basis for you to offer that

25  testimony?

1    A.    Because I have heard bartenders say it to

2  other servers.

3    Q.    What?

4    A.    By the way, that customer you just had -- had

5  three beers at the bar, an FYI to inform the waitress so

6  that she could keep a closer eye on them, if need be.

7    Q.    Now, did you ask to see identification for

8  anyone at the Southworth table the night in question, age

9  identification?

10    A.    Specifically that was my policy.  I would say

11  I did.

12    Q.    How many people were in that party?

13    A.    From what I recall, seven.

14    Q.    Now, the statement you gave to the -- the

15  statement you gave to the police officer on September

16  --excuse me, November 2, 2003 was that there were eight

17  people at the table; is that right?

18    A.    Yes, sir.

19    Q.    That was your best memory then; is that

20  right?

21    A.    Then, yes.

22    Q.    And the check that you opened the night in

23  question said there were six people; isn't that right?

24    A.    Yes.

25    Q.    And that was your best memory then; isn't

1  that right?

2         MR. GILLIS:  Objection.

3    A.    That was not my best memory.  It was at the

4  time, you know, there were nights where you didn't throw

5  the correct amount of guests in the screen.  And if maybe

6  only six were there at the time, but more joined them

7  later, it wasn't uncommon not to change the guest amount.

8    Q.    But you are purely speculating about six were

9  there at the time and then more joined them later, when

10  you make that answer; isn't that true?

11         MR. GILLIS:  Objection.

12    Q.    Isn't that true?

13    A.    Am I speculating that there were six at the

14  time I put it in?

15    Q.    Yes.  No.  Are you speculating that the

16  explanation for why you have written there are six

17  people, why you entered that there were six people on the

18  check is that because six were there at the time when

19  they first sat down and then others came?

20    A.    Yes, that could have been a reason.

21    Q.    But that's pure speculation on your part,

22  isn't it?

23         MR. GILLIS:  Objection.

24    A.    Yes.

25    Q.    You don't have any memory of that happening,

1  do you?

2    A.    No.

3    Q.    It was your custom to accurately reflect the

4  time you opened the check, the number of people who were

5  seated at the table; isn't that right?

6         MR. GILLIS:  Objection.

7    A.    That's what we were supposed to do.

8    Q.    Okay, and you tried to do what you were

9  supposed to do while you worked at the Longhorn; isn't

10  that right?

11         MR. GILLIS:  Objection.

12    A.    Yes.

13    Q.    And you've looked now at the check?

14    A.    Yes.

15    Q.    Isn't that right?  And you realized that

16  there were six meals that were served to that table;

17  isn't that right?

18         MR. GILLIS:  Objection.  Can I put a running

19  objection so I don't have to say it every time, but you

20  know, it's your direct witness, and so that I don't have

21  to object every time on the record and interrupt the flow

22  of your questions, I just want on the record where it's a

23  direct witness and my belief you don't have the right to

24  ask leading questions.  So if you're going to continue to

25  ask the leading questions, I am going to have a running

70

1  objection to that affect.

2         MR. FARRAH:  You don't think I have the right

3  to ask a former employee of the defendant leading

4  questions, who's represented by you today?

5         MR. GILLIS:  I think you do if you were

6  cross-examining her, but you are one who noticed the

7  deposition and you're taking a direct examination, not a

8  cross, and I'd rather just have it on as an ongoing

9  objection than to have it on the record every time you

10 have a question that it's in them middle of the answer.

11        MR. FARRAH:  I'm happy to let -- allow you to

12 have the ongoing objection, but I believe most

13 respectfully you're wrong.

14    Q.    How many meals are shown on the check?

15    A.    Meals?

16    Q.    Meals, ma'am?

17    A.    There are -- this is cutoff.  Usually there

18 will be a number next to how many of each was ordered.

19 There is -- okay, there's three baby back ribs there, I

20 see that now.  So there was three, four, five, six meals,

21 and from what I recall, the chicken tenders were ordered

22 as a -- chicken fingers were ordered as a meal.

23    Q.    Who ordered the chicken fingers?

24    A.    I don't recall.

25    Q.    Do you have any memory that anyone of Mr.

Starkings Court Reporting & Video Services

71

1    Q.    You have no memory who ordered that; is that

2  right?

3    A.    Not specifically ordered it, no.

4    Q.    Someone at that table?

5    A.    Yes, sir.

6    Q.    Is it also correct that there were two orders

7  of chowder cup?

8    A.    Yes.

9    Q.    And an order of fingers?

10   A.    Yes, sir.

11   Q.    What's that?

12   A.    Chicken fingers.

13   Q.    Chicken fingers, okay.  So how many

14 appetizers were ordered at 8:40 p.m.?

15   A.    Specifically appetizers there are the

16 Tonions, the chicken fingers and the two cups of chowder.

17   Q.    Is that four appetizers?

18   A.    Yes.

19   Q.    Did any of the people who came from the bar

20 bring appetizers with them along with their drinks that

21 you remember?

22   A.    No, not that I remember.

23   Q.    So is it accurate to say that none of the

24 people who came from the bar ordered appetizers from you?

25   A.    They were all sitting at the table, and they

72

1  Southworth's party when first seated brought any drinks

2  from the bar to the table with them?

3    A.    Yes.  The ones who were waiting at the bar

4  for the others to join them brought drinks with them.

5    Q.    How do you know that?

6    A.    I recall from that night they had come down.

7  I didn't serve a full round with the ones who had sat

8  down.

9    Q.    What drinks did they bring with them from the

10 bar?

11   A.    I don't recall, but from what they drank from

12 then on the night, I would say they were Manhattans.

13   Q.    And the basis for that is just what they

14 drank from there on out?

15   A.    They continued -- you -- from my experience

16 as a waitress, when someone comes with a drink, that is

17 what they continue to drink.

18   Q.    The first order -- go to page two of Exhibit

19 #8 if you would please.  And that indicates that the

20 first order was placed at 8:40 p.m.; is that right?

21   A.    Yes, sir.

22   Q.    What is a Tonion for $5.99?

23   A.    It's a Tonion, it's an appetizer.  It's like

24 a Bloomin' onion.  It's onion peels battered, dipped and

25 fried.

Starkings Court Reporting & Video Services

72

1  ordered these appetizers as a whole party.

2    Q.    Did they share the chowder cups?

3    A.    The chowder cups, no, two individuals

4  probably had those.

5    Q.    Are you guessing?

6    A.    I am not guessing, no.  I would say two

7  individuals, one each, had a chowder cup.

8    Q.    So the appetizers then were shared by -- the

9  remaining appetizers were shared by the rest of the

10 party; is that right?

11   A.    Yes.

12   Q.    Were the remaining appetizers shared by the

13 rest of the party, if you know?

14        MR. GILLIS:  Objection.

15   A.    Do I recall specifically seeing --

16   Q.    Yes.

17   A.    -- every single one of them eat it, no.

18   Q.    At that time four Jack Daniels -- excuse me,

19 three Jack Daniels Manhattans and a Bud Light, 25 ounce

20 Bud Light were ordered; is that right?

21   A.    Yes, sir.

22   Q.    How much pure alcohol is there in a 25 ounce

23 Bud Light?

24   A.    I don't know.

25   Q.    How much pure alcohol is there in the Jack

1 Daniels Manhattan?

2    A.    I don't know.

3    Q.    How much -- how many ounces of Jack Daniels

4 are in the Jack Daniels Manhattan?

5    A.    From what I recall working there, I would say

6 a little over an ounce.

7    Q.    What is the basis for that statement?

8    A.    Usually from when they make the drinks it's

9 always a jigger, and the way they set it up on the bar

10 and pour them in, the jiggers were all consistent.

11    Q.    Do you recall watching Christen make the

12 drinks that night?

13    A.    No.

14    Q.    Do you recall watching Christen use a jigger

15 that night?

16    A.    No.

17    Q.    Did she use a jigger that night?

18    A.    I don't know.

19    Q.    Prior to that night had you ever ordered Jack

20 Daniels Manhattans before?

21    A.    Yes.

22    Q.    Is it your memory that -- And how were they

23 made?  Were they made with jiggers?

24    A.    The ones I've seen made, yes.

25    Q.    So do you have a memory of whether or not

Starkings Court Reporting & Video Services

---

1 drinks were free poured at the Longhorn prior to

2 September 26, 2003, in the service bar?

3    A.    All of the time?

4    Q.    Well, do you have a memory of whether drinks

5 were ever free poured on the service bar?

6    A.    Occasionally, yes.

7    Q.    Do you have a memory of whether or not

8 jiggers were used in the service bar at the Longhorn

9 prior to September 26, 2003?

10    A.    Yes, they were.

11    Q.    Which was used more, if you can tell me, free

12 pour or jiggers?

13    A.    I couldn't give an accurate --

14    Q.    Do you have any memory at all?

15    MR. GILLIS:  Objection.

16    A.    No.

17    Q.    Was anybody under age at the table?  By under

18 age, I mean under 21?

19    A.    Not that I recall.

20    Q.    Did you serve soft drinks to anyone at the

21 table?

22    A.    From what I recall, I did put one Sprite down

23 on the table.

24    Q.    When did you do that?

25    A.    From what I recall, it would have been with

Starkings Court Reporting & Video Services

---

75

1 the appetizers.

2    Q.    Is it shown on Exhibit #8?

3    A.    The bill?

4    Q.    It is shown on any portion of Exhibit #8,

5 that Sprite?

6    A.    No.

7    Q.    It's not?

8    A.    No.

9    Q.    And you've looked for it; is that right?

10    A.    Have I looked --

11    Q.    The Sprite?

12    MR. GILLIS:  Why don't you look through the

13 whole document first.  Not just the first page, but the

14 whole thing.

15    A.    There is Sprites on here but not for his

16 table.

17    Q.    After ordering -- by the way, the computer

18 allows you, if you erroneously indicated the number of

19 people sitting at the table, the computer allowed you to

20 overwrite -- did the computer allow you to overwrite  the

21 number of people at the table?

22    A.    From what I recall, yes.

23    Q.    Now, what did you do according to Exhibit #8,

24 between 8:40 when you placed that order that we just

25 talked about, and 8:51 when you placed another order for

---

76

1 that table?

2    A.    What did I do between the time?

3    Q.    What does Exhibit #8 indicate you did?

4    A.    It indicates I rang in those drinks.  I

5 cashed out table 63.  Printed a check for table 63.

6 Entered some more drinks for a new table that was sitting

7 at 63.  Ordered a meal for 63.  Logged in and out of the

8 computer.  Applied a payment to table 53 and printed a

9 check for table 53.  And closed table 53.  And logged

10 out, logged back in, ordered drinks for table 52.

11    Q.    All of that between 8:40 and 8:51; is that

12 right?

13    MR. GILLIS:  Objection.

14    A.    Yes.

15    Q.    Do you know which computer terminal you

16 performed those various entries upon?

17    A.    No.

18    Q.    There were terminals at different -- were

19 there terminals at different places in the restaurant

20 that night available to you to do this?

21    A.    Yes.

22    Q.    From time to time in the past did you have to

23 wait, once you had ordered drinks through the terminal,

24 for those drinks to be prepared by the service bartender?

25    A.    Yes.

78

1    Q.    What is the most you can recall -- most
2 amount of time you can recall waiting for drinks to be
3 prepared?
4    A.    I recall waiting up to about 15 minutes for a
5 drink to be made.
6    Q.    Do you have a memory this Friday night,
7 whether or not once you placed the order at 8:40 p.m. for
8 the three Jack Daniels Manhattans and the 25 ounce beer,
9 you waited for those drinks to be made?
10    A.    No.
11    Q.    Do you have any memory one way or the other
12 whether you waited for those drinks to be made?
13    A.    No.
14    Q.    Is it your belief that you waited for the
15 drinks to be made?
16    A.    I don't remember.
17    Q.    Given that it was a Friday night?
18    A.    Given that it was a Friday night, yes,
19 probably waited.
20    Q.    Do you know at what time you served the
21 drinks that you ordered at 8:40, the three Jack Daniels
22 Manhattans and the 25 ounce beer, to whomever had ordered
23 those drinks?
24    A.    Do I remember what time I served them to
25 them?

Starkings Court Reporting & Video Services

1    Q.    Yes, ma'am.
2    A.    Specifically no.
3    Q.    Do you know whether or not you served those
4 drinks to them at the same trip to the table at which the
5 8:51 p.m. drinks, seven Jack Daniels Manhattans were
6 ordered?
7    A.    Did I make them both in the same trip?
8    Q.    Do you know whether or not you served the
9 four drinks ordered at 8:40 p.m. at the same trip to the
10 table at which you -- an order for seven Jack Daniels
11 Manhattans that you placed at 8:51 p.m. was given to you?
12    MR. GILLIS:  Objection.
13    A.    No.
14    Q.    Do you know one way or the other whether you
15 did that?
16    MR. GILLIS:  Did what?
17    MR. FARRAH:  Whether she served the drinks
18 that were ordered at 8:40 at the same time she took the
19 order for -- the same trip to the table, that she took
20 the order for the drinks ordered at 8:51?
21    MR. GILLIS:  Can you just clarify, are you
22 asking did she put those four drinks down and then take
23 another order or did --
24    MR. FARRAH:  Yeah.
25    MR. GILLIS:  -- she put those drinks down

Starkings Court Reporting & Video Services

79

1 previously and come back?
2    MR. FARRAH:  No, I'm asking did she put the
3 four drinks down and take another order.
4    MR. GILLIS:  Do you understand the question?
5    A.    I understand the question.  From what I
6 recall, no.
7    Q.    Do you know what happened -- is it your -- do
8 you have a memory of whether or not -- do you have a
9 memory of whether or not the four drinks that were logged
10 into the computer by you at 8:40 had been finished by the
11 people to whom you served those four drinks by the time
12 you took the order from the table that you logged into
13 the computer at 8:51?
14    MR. GILLIS:  Second round, first round. I
15 don't understand --
16    MR. FARRAH:  Let her answer the question,
17 please.
18    MR. GILLIS:  Well, I want to see if I can
19 understand so I can object to it.  You're asking was the
20 first round completely drank before she ordered it, or
21 was it drink when she brought them.  What's your
22 question?
23    MR. FARRAH:  Could we go off the record for a
24 second.
25    (Off the record.)

80

1    (Back on the record as follows:
2 BY MR. FARRAH:
3    COURT REPORTER:  The question was:  Do you
4 have a memory of whether or not the four drinks that were
5 logged into the computer by you at 8:40 had been finished
6 by the people to whom you served those four drinks by the
7 time you took the order from the table that you logged
8 into the computer at 8:51?
9    MR. GILLIS:  Objection.
10    A.    I do not recall if they were done with them
11 by the time I took that order, no.
12    Q.    Do you have a memory whether they were done
13 with them by the time you took that order?
14    A.    I don't remember either way.
15    Q.    Do you have a memory of whether they had
16 received the drinks that they ordered, that you logged in
17 at 8:40 by the time you took the order for the 8:51
18 drinks?
19    A.    They would have received them by 8:51.
20    Q.    What is the basis for that statement?
21    A.    There is -- in my experience, and what I have
22 done through Longhorn, there is no way between putting
23 drinks in, waiting on all of these other tables, that I
24 would have not at least gotten that table their drink
25 even before taking a second drink order.  That would

1  happen. I wouldn't have not given them their first
2  drinks, but already taken an order for a second. That
3  wouldn't have happened.
4      Q.    Do you have a memory of whether or not as
5  part of the trip to the table at which you delivered the
6  drinks that you logged in at 8:40, you took the order for
7  the seven Jack Daniels Manhattans that you logged in at
8  8:51?
9          MR. GILLIS:  Objection.
10     A.    I don't understand that?
11     Q.    My question is, do you have a memory of
12 whether or not when you were bringing the drinks that had
13 been logged in at 8:40, you put those drinks down on the
14 table, and then you took an order for seven Jack Daniels
15 Manhattans that you logged in at 8:51?
16     A.    I don't recall that specifically, no.
17     Q.    But you don't recall that it didn't happen,
18 either, do you?
19          MR. GILLIS:  Objection.
20     A.    Correct.
21     Q.    Now, do you recall any conversations with
22 Christen O'Donnell that night about that she had -- about
23 whether or not she had run out of glasses to make the
24 Jack Daniels Manhattans that you were ordering?
25     A.    No.

Starkings Court Reporting & Video Services

---

1      Q.    Do you recall that night that any of the Jack
2  Daniels Manhattans that were delivered to the table were
3  delivered in the blue glasses --
4      A.    None of them were --
5      Q.    -- shown on Exhibit #10?
6      A.    I'm sorry. None of them were, no.
7      Q.    Now, can you tell us according to Exhibit #8
8  the -- I want to say the -- we're now on to the third
9  page of Exhibit #8, what activity you undertook according
10 to Exhibit #8 from 8:51 when the seven Jack Daniels
11 Manhattans were ordered, until food was ordered by table
12 52?
13     A.    I ordered appetizers and a drink for table
14 53. Logged out, logged in to table 52, and then ordered
15 their meals.
16     Q.    Now, let me ask you this. Do you know when
17 the drinks ordered at 8:51 p.m. the seven Jack Daniels
18 Manhattans were delivered by you to the table?
19     A.    No.
20     Q.    Was there a practice that you employed as of
21 that time, September 26, 2003, of delivering drinks and
22 then taking a meal order at the same trip to the table?
23     A.    Not a specific practice, no.
24     Q.    Do you know by the time you had delivered --
25 excuse me. By the time you had entered into the

Starkings Court Reporting & Video Services

---

83

1  computer, the 9:00 food order, whether or not you had
2  delivered the seven Jack Daniels Manhattans that had been
3  ordered at 8:51 to the customers?
4      A.    I do not recall.
5      Q.    Do you recall during that part of the evening
6  from 8:40 to 9:24, any conversations with Christen about
7  the table that Mr. Southworth was at?
8      A.    Yes.
9      Q.    Do you recall when in the sort of the order
10 of ordering that we have been talking about, you had the
11 first conversation with Christen?
12     A.    I only had one conversation with Christen and
13 that was on the last round that I had ordered for the
14 table.
15     Q.    That round was placed at what time?
16     A.    Says 9:21.
17     Q.    Can you turn to the next page?
18     A.    9:24.
19     Q.    So you placed an order at 9:24 -- you entered
20 into the computer at 9:24; is that right?
21     A.    Yes.
22     Q.    Then you had a conversation with Christen
23 after you entered into the computer; is that right?
24     A.    When I went to pick them up from the bar,
25 that is when I had the conversation with Christen.

---

84

1      Q.    Was the time that you went to pick them up
2  from the bar after 9:24?
3      A.    Yes.
4      Q.    Sometime after 9:24 depending upon how busy
5  the restaurant was?
6      A.    Yes.
7      Q.    Can you tell us how long after 9:24 it was
8  that you had that conversation with Christen?
9      A.    No.
10     Q.    What do you remember she said and what did
11 you say during that conversation?
12     A.    She specifically asked if it was for my
13 table. She asked me how many each of them had had and if
14 I thought they were okay. I said yes, and that was it.
15     Q.    She asked you three questions, didn't she?
16     A.    Not from what I recall, no.
17     Q.    You just told us that she asked you were they
18 specifically for your table?
19     A.    Yes.
20     Q.    And you answered yes to that; is that right?
21     A.    Yes.
22     Q.    Then she asked you, according to what you
23 just told us, how much each customer had had, do you
24 recall that?
25     A.    Yes.

86

1    Q.    What did you say in answer to that question?

2    A.    I told her at the time each of them had had

3 two at that time; had had -- there was one order here. I

4 had served -- this was going on their second round.

5    Q.    What did you tell Christen, as best as you

6 can recall?

7    A.    That this was going to be their second round.

8    Q.    Their second round of Jack Daniels

9 Manhattans?

10    A.    From myself, yes.

11    Q.    What was the basis for saying that?

12    A.    That is how many I had served them.

13    Q.    Okay. This was the 9:24 order; is that right?

14    A.    Yes.  That was going to be their second

15 drink.

16    Q.    Then the third question she asked you was,

17 are they okay?

18    A.    Yes.

19    Q.    Is that what she said; are they okay?

20    A.    She said, how do you think they are, do you

21 think they are okay?  And I said yes.

22    Q.    What was the basis for that statement?

23    A.    My observation of their behavior.

24    Q.    Was that this was the second round of drinks

25 that you had ordered for them also part of the basis for

Starkings Court Reporting & Video Services

---

1 the statement that they were okay?

2    A.    I don't understand that.

3    Q.    Tell me all of the factors you considered in

4 answering yes, to the question Christen asked you, are

5 they okay?

6    A.    It was my belief that if I served them one

7 more drink they would still be fine.

8    Q.    Tell me all of the factors you considered,

9 though, in telling her that that was your belief?

10    MR. GILLIS:  Objection.

11    A.    I consider at the time --

12    Q.    Wait a minute.  Strike that.  I withdraw the

13 question.  Tell me all of the factors you considered in

14 telling her they were okay?

15    MR. GILLIS:  Objection.

16    A.    I considered their behavior at the table, the

17 food that they had consumed, my observation of how each

18 of them acted, how they acted as a group, how they would

19 react with one more drink in their system.  My experience

20 being in the business and serving other people of their

21 height, stature, weight, personalities, drinks and how

22 they've reacted.

23    Q.    Is it accurate -- have you ever seen in the

24 time -- the entire time you worked at the Longhorn, have

25 you ever seen a Longhorn customer that you considered to

Starkings Court Reporting & Video Services

---

87

1 be intoxicated?

2    A.    No.

3    Q.    What did Christen say when you answered

4 whatever you answered to her?

5    A.    She -- from what I recall, she didn't say

6 anything.

7    Q.    Who ordered the first beer from you, that is

8 the 8:40 beer?

9    A.    I would say the gentleman with the black hat

10 and the curly hair.

11    Q.    Describe his hat for me?

12    A.    From what I recall, it was just an all black

13 baseball cap.

14    Q.    How were these people dressed?

15    A.    From what I recall, the three who sat down

16 were dressed how they normally do when they come in after

17 dirt biking, just kind of dirty boots and Mr. Southworth

18 usually just wore like sweat pants and a baggy T-shirt

19 and boots.  And like a --

20    Q.    You can remember that --

21    A.    -- a flannel kind of jacket the used to wear.

22    Q.    Is that how he was dressed that night?

23    A.    The had his boots and sweat pants on from

24 what I recall.

25    Q.    You said the three who sat down; what do you

---

88

1 mean by that?

2    A.    The three who were waiting at the bar for the

3 other ones before they joined.

4    Q.    They sat down first?

5    A.    They came over and the other four followed,

6 yes.  The three that sat down already had drinks, yes.

7    Q.    And Mr. Southworth was one of them those; is

8 that right?

9    A.    Yes.

10    Q.    What did he bring over for a drink?

11    A.    I don't specifically recall.

12    Q.    How were the others dressed?

13    A.    T-shirts, baseball caps.

14    Q.    Now, during the night was this table loud, at

15 all?

16    A.    Not that I recall, no.

17    Q.    Did the manager speak to them that night?

18    A.    I am sure he did.

19    Q.    My question to you though is, do you know

20 whether the manager spoke to them that night?

21    A.    No.

22    Q.    You are just speculating that the manager

23 spoke to them?

24    MR. GILLIS:  Objection.

25    A.    Yes, the manager speaks to every table.

90

```
 1      Q.    That is the manager's policy?

 2      A.    Yes, they are to walk through the dining room

 3 and touch on every table.

 4      Q.    Do you have a recollection that the manager

 5 came -- that any manager went to that table that night,

 6 the Southworth table, and asked the table to quiet down?

 7      A.    No.

 8      Q.    Has anyone ever told you that the manager

 9 came to the table and ask the table to quiet down?

10      A.    No.

11      Q.    Do you know whether or not Leigh [sic] asked

12 the manager on duty that night to go take a look at the

13 table to make sure they were okay?

14            MR. GILLIS:  Objection.

15      A.    No.

16      Q.    Did you here Leigh ask the manager to do

17 that?

18            MR. GILLIS:  Objection.

19      A.    Lee, the manager, to do that?

20      Q.    I'm sorry, you're Leigh.  Pardon me.  Do you

21 know --

22      A.    There is a manager Lee, so

23      Q.    Is there?

24      A.    Yes.

25      Q.    Lee who?
```

Starkings Court Reporting & Video Services

91

```
 1 full round and then the four who didn't have drinks got a

 2 round when they sat down.

 3      Q.    And you have a memory of that?

 4      A.    Yes.

 5      Q.    Then after you took the food orders at 9:00

 6 can you tell us from Exhibit #8 what you did between then

 7 and 9:21 when you placed an order for four Jack Daniels

 8 Manhattans?

 9            MR. GILLIS:  Objection.

10      A.    I logged in and out of the computer, ordered

11 for table 53, ordered a Bud Light for table 52, logged

12 out, logged in, logged out, logged in.  Printed table

13 52's check, logged out, logged in and then ordered the

14 Jack Daniels.

15      Q.    Now, were you keeping a record of how many

16 drinks each person at that table that night had had to

17 drink, other than what's -- well, were you keeping any

18 record of how many drinks they had to drink?

19            MR. GILLIS:  Objection.

20            MR. FARRAH:  Any kind of record.

21      A.    Mental record.

22      Q.    Mental record?

23      A.    Yes.

24      Q.    Where were you keeping that?

25      A.    Mentally.
```

90

```
 1      A.    Lee Bull.  She was a manager there while I

 2 was there.

 3      Q.    In September of --

 4      A.    I'm not sure when she worked there.  There

 5 was a manager Lee Bull.

 6      Q.    Pardon me.  Do you know whether Christen

 7 asked the manager, whatever manager was on duty that

 8 night to go over and make sure the table was okay?

 9            MR. GILLIS:  Objection.

10      A.    No, I don't.

11      Q.    Do you know whether Christen ask the manager

12 to do anything -- manager on duty to do anything with

13 regard to that table that night?

14            MR. GILLIS:  Objection.

15      A.    No, I don't.

16      Q.    Did Christen tell you what her concerns were

17 when she asked you those questions?

18      A.    No.

19      Q.    And at the time she asked you those

20 questions, how many rounds had you served to the table?

21      A.    Before the last round I had only served the

22 table one round.

23      Q.    That was the seven drinks that you ordered at

24 8:51; is that right?

25      A.    I had served one and a half rounds.  It was a
```

Starkings Court Reporting & Video Services

92

```
 1      Q.    Were you doing the same thing for all of the

 2 other tables you were serving that night?

 3      A.    I would only do it for tables I was serving

 4 alcohol to, and that would be it.

 5      Q.    Were you doing it for all of the other tables

 6 you were serving alcohol to that night?

 7      A.    Yes.

 8      Q.    Mental record.  Was there any requirement in

 9 place as of September 26, 2003 at the Longhorn that you

10 keep a written record of how many drinks were being

11 served to your customers?

12      A.    No.

13            MR. GILLIS:  Objection.

14      Q.    Do you know why you printed the check at 9:17

15 p.m.?

16      A.    No.

17      Q.    Do you know to whom you served the beer that

18 was logged in at 9:15 p.m.?

19      A.    I don't recall, no.

20      Q.    Is it your best memory as you sit here now

21 that one or more of your customers were drinking both

22 beers and Jack Daniels Manhattans that night?

23            MR. GILLIS:  Objection.

24      A.    I don't recall.

25      Q.    And then at 9:21 p.m. -- By the way, did you
```

1  clear the glasses off the table?

2      A.    Yes.

3      Q.    Typically, where would you take -- where did

4  you take the glasses that you cleared off the table while

5  you were working on a Friday night at the Longhorn?

6      A.    Right to the dish pit and put them in a glass

7  rack.

8      Q.    For cleaning?

9      A.    Yes.  Certain glasses went to the dish pit.

10  Certain glasses went back to the bar.

11      Q.    To the service bartender?

12      A.    Yes.

13      Q.    Which glasses went back to the service

14  bartender?

15      A.    The straight up Manhattan glasses and the

16  Texas margarita shaker glasses. Beer mugs, the large beer

17  mugs went back to the bar also.

18      Q.    The Texas margarita shaker glasses

19  are the ones shown, the blue ones shown in Exhibit #10;

20  is that right?

21      A.    Yes.

22      Q.    And the straight up Manhattan glasses are the

23  ones shown on the lower shelf of Exhibit #9; is that

24  right?

25      A.    Yes.

---

1      Q.    Then at 9:21 you ordered four Jack Daniels

2  Manhattans; is that right?

3      A.    Yes.

4      Q.    Then you came back and at 9:24 you ordered

5  four more; is that right -- excuse me, three more? .

6      A.    Yes.

7      Q.    Can you explain to me what happened there?

8      A.    I would think that what happened there --

9      Q.    Do you remember what happened?

10      A.    Specifically remember?

11      Q.    Yes, ma'am.

12      A.    Specifically, no.

13      Q.    What do you think happened there?

14      A.    That because of the difference and some

15  people already having drinks from the bar, and the others

16  not, that these four had finished their second drinks

17  sooner than the other three, so they ordered there's and

18  then within a few minutes the other ones ordered theres.

19      Q.    That's your -- what you're sort of

20  speculating happened now; is that right?

21      MR. GILLIS:  Objection.

22      A.    Yes.

23      Q.    Is that anything from but speculation?

24      MR. GILLIS:  Objection.

25      A.    No.

---

1      Q.    And is it your best -- do you have a memory

2  of whether or not Christen gave you the seven Jack

3  Daniels Manhattans that had been ordered in two segments,

4  one segment at 9:21 and other at 9:24 at the same time?

5      A.    Did she give them all to me at the same time?

6      A.    Yes, ma'am.

7      A.    I would have picked them up all at the same

8  time.

9      Q.    And that's when you had the conversation with

10  her, are these people okay?

11      A.    Yes.

12      Q.    Then did you print the check at 9:34 p.m?

13      A.    Yes.

14      Q.    Why did you do that?  If you know.

15      A.    Why did I print it?

16      Q.    Yes, ma'am.

17      A.    They were done with everything.

18      Q.    Is that what you remember?

19      A.    I --

20      Q.    Do you know why you printed it?

21      A.    No.

22      Q.    Then you printed it a third time at 9:34; is

23  that right?

24      A.    Yes.

25      Q.    Do you know why you did that?

---

1      A.    No.

2      Q.    Then at 9:36 -- excuse me.  Then at 9:36 you

3  printed it a fourth time?

4      A.    Yes.

5      Q.    Do you know why you did that?

6      A.    No.

7      Q.    Do you know what you did with the checks you

8  printed?

9      A.    No.

10      Q.    Then at 9:36 you did some things here, do you

11  see that?

12      A.    Yes.

13      Q.    Tell me what the Exhibit #8 indicates you did

14  at 9:36?

15      A.    At 9:36 I applied payment to 62.  The total

16  payment to 62, which you have to log in by denominations.

17  I closed out.  I printed the check for table 62.  Closed

18  out a check for 62.

19      Q.    And that happened all at 9:36; is that right?

20      A.    Yes.

21      Q.    And how much cash did table 62 deliver to you

22  at 9:36?

23      A.    From what I entered 71.

24      Q.    And the bill was how much for that table?

25      A.    $51.56.

98

1   Q.    $61.66.

2   A.    Okay.

3   Q.    I don't want to put words in your mouth.  Do
4 you want my glasses to try  --

5   A.    No, thank you.

6   Q.    Does it look like -- looks -- can you tell?

7   A.    Can -- yes, it looks like it says $61.56.

8   Q.    And the difference between the $70 on the
9 table and the $61.56 is your tip; is that right?

10  A.    Yes.

11  Q.    Who was sitting at table 62?

12  A.    62, I don't recall.  I recall the two tables
13 being pushed together.  It could have been a table before
14 they sat.

15  Q.    62 was part of this group, wasn't it?

16        MR. GILLIS:  Objection.

17  Q.    Did you tell us this morning that tables 52
18 and 62 were joined together for the Southworth party?

19  A.    From what I recalled, yes.

20  Q.    And if tables 52 and 62 -- well, strike that.
21 What activity is there on Exhibit #8 for table 62 that
22 you can see up to the time that you cashed that table
23 out?

24  A.    I don't see any.

25  Q.    Do you know what was served to table 62 prior

Starkings Court Reporting & Video Services

---

1 to 9:36 p.m. when the table was cashed out?

2   A.    No.

3   Q.    Do you have any memory at all?

4   A.    No.

5   Q.    And your best memory is that table 62 was the
6 table that was joined with 52 for Mr. Southworth's party;
7 is that right?

8        MR. GILLIS:  Objection.

9   A.    Yes.

10  Q.    Do you know when you opened the check for
11 table 62 that was cashed, the one that was cashed out at
12 9:36?

13  A.    No.

14  Q.    Now in any event at what time did the
15 Southworth table -- what time does Exhibit #8 indicated
16 that table 52 cashed out?

17  A.    It cashed out at 9:57.

18  Q.    And can you tell me the denominations of
19 bills that were placed on the table for you?

20  A.    No.

21  Q.    Can you tell from looking at Exhibit #8 what
22 the denomination of the bills placed on the table for you
23 were?

24  A.    One hundred, one hundred, twenty, twenty.

25  Q.    Is that two one hundred dollar bills and two

Starkings Court Reporting & Video Services

---

99

1 twenty dollar bills as best as you know?

2   A.    Yes.

3   Q.    And the total check was how much, ma'am?

4   A.    $202.79.

5   Q.    So the tip from table 52 was the difference
6 between $240 and $202.79; is that right?

7   A.    Yes.

8        MR. GILLIS:  Objection.

9   Q.    What was the amount of the tip that you
10 received from table 52 that night?

11  A.    Simply math would show it's about $37.

12  Q.    21 cents?

13  A.    $37.21 yes.

14  Q.    And the tip from table 62 was how much,
15 ma'am?

16  A.    Roughly about, from what I just recall
17 reading, $9.

18  Q.    And can you tell me why you at 9:56 printed
19 the check a fifth time?

20  A.    No.

21  Q.    Can you tell me why at 9:36 you printed the
22 check a fourth time, this is the check for table 52?

23  A.    Correct.  No.

24  Q.    That night as you were serving Mr.
25 Southworth, did you have an expectation that he would

---

100

1 become intoxicated?

2   A.    No.

3   Q.    Were you concerned that night that he would
4 become intoxicated?

5   A.    No.

6   Q.    Did you calculate that night the amount of
7 alcoholic beverages he drank?

8        MR. GILLIS:  Objection.

9   A.    No.

10  Q.    Did you -- in determining that you had no
11 expectation that he would become intoxicated that night,
12 did you take into effect the volume of alcoholic
13 beverages that he had been served?

14        MR. GILLIS:  Objection.

15  A.    What I served him?

16  Q.    Yes, ma'am.

17  A.    Yes.

18  Q.    And you knew you served him what?

19  A.    I served him two rounds of Manhattans.

20  Q.    Now, is that your testimony today?

21  A.    Yes.

22  Q.    You served him two Jack Daniels Manhattans?

23  A.    Yes.

24  Q.    But you told -- you made a statement that he
25 had three Manhattans on November 2, 2003; isn't that

102

1  right?

2      A.    Yes.

3      Q.    And that's because the best you remember it

4  back on November 2, 2003, you served him three Manhattans

5  isn't that right?

6          MR. GILLIS:  Objection.

7      A.    It doesn't say that I served him three

8  Manhattans, but it says he had three Manhattans.  So from

9  what I know, he may have had one before myself.  So I

10  served him two.

11      Q.    So if you served Mr. -- If your testimony is

12  you served Mr. Southworth two Manhattans, what I'd like

13  to know is how many Manhattans did you serve the other

14  folks who were at the table?

15          MR. GILLIS:  Which ones?

16      Q.    Any.

17      A.    I would have served the ones who came from

18  the bar with Mr. Southworth two, and the ones who did not

19  joint him from the bar, three.

20      Q.    So you would have served four persons three

21  Manhattans each; is that right?

22          MR. GILLIS:  Objection.

23      A.    Yes.

24      Q.    That's 12 Manhattans?  Then you would have

25  served Mr. Southworth two Manhattans; is that right?

Starkings Court Reporting & Video Services

1      A.    Yes.

2      Q.    That is 14 Manhattans.  How many Manhattans

3  did you serve that night?

4      A.    Seventeen.

5      Q.    Who got the other three?

6      A.    Obviously members at the table.

7          MR. GILLIS:  Objection.

8      Q.    Which other members --

9          MR. GILLIS:  Can we go off the record for a

10  second?

11          (Off the record.)

12          (Back on the record as follows:)

13  BY MR. FARRAH:

14      Q.    You served a total of 17 Jack Daniels

15  Manhattans that night, ma'am; is that right?

16      A.    Yes.

17      Q.    And you served two 24 ounce beers that night;

18  is that right?

19      A.    Yes.

20      Q.    Two of those Jack Daniels Manhattans you say

21  you served to Mr. Southworth; is that right?

22      A.    Yes.

23      Q.    At least 15 Jack Daniels Manhattans?

24      A.    Yes.

25      Q.    Did you serve Mr. Southworth a beer that

Starkings Court Reporting & Video Services

103

1  night?

2      A.    Not from what I recall.

3      Q.    So that leaves for how many people 15 Jack

4  Daniels Manhattans and two beers to divide up?

5      A.    Six.

6      Q.    And do you know who drank what of those 17

7  drinks?

8      A.    I don't recall, no, except for the boy in the

9  black hat that I know had a beer.

10      Q.    Do you know what you served table 62 prior to

11  9:36 that night when it paid you -- paid a check

12  totalling $61.56?

13      A.    No.

14      Q.    Were you trained to calculate the effect of

15  -- strike that.

16          Were you trained to estimate the effect of

17  alcoholic beverages on your customers?

18      A.    We were given tools on how to make a decision

19  on how it would affect them.

20      Q.    Let me ask you this, did you consider the

21  Jack Daniels Manhattans that you were serving to any of

22  the customers to be single drinks or double drinks?

23      A.    I considered them to be single drinks.

24      Q.    And what was the basis for that?

25      A.    Because they weren't doubled.  To

104

1  specifically get a double drink you have to specifically

2  order and Longhorn didn't do doubles anyway.

3      Q.    Do you know what the Longhorn recipe for

4  Manhattans called for in terms of how much Jack Daniels

5  to be put in?

6      A.    From what I recall, a little over an ounce.

7      Q.    What's the basis for that statement?

8      A.    The rocks glasses were only so big so to fit

9  Jack Daniels and they fit in the jigger, the jiggers were

10  only about an ounce and a half.

11      Q.    What's the basis for that statement?

12      A.    We were taught that.

13      Q.    Were you concerned that any time you were

14  serving Mr. Southworth that night that you were serving

15  someone who was intoxicated?

16      A.    Did I ever consider that?

17      Q.    Yes, ma'am.

18      A.    No.

19      Q.    Were you concerned that you were serving

20  someone who could become intoxicated as a result of what

21  you served him?

22      A.    No.

23      Q.    Did you know at that time whether or not the

24  effects of alcohol increased over a period of time?

25      A.    Did I know for a fact?

1  Q.  Yes, ma'am.

2  A.  For a fact, no.

3  Q.  Had you been trained in whether or not the

4 effects of alcohol increased over time?

5  A.  Yes.

6  Q.  What had you been trained?

7  A.  That over time if -- depending on whether

8 eating food that your metabolism with food in it added to

9 alcohol slows down the process of alcohol.

10  Q.  Do you know how many drinks of alcohol the

11 body can process at any -- per hour?

12  A.  No.

13  Q.  Had you been trained in that?

14  A.  I'm sure we were.

15  Q.  You just don't remember now?

16  A.  Correct.

17  Q.  Did you know back in November?

18  A.  I don't know.

19  Q.  Can we just spend a minute or two looking at

20 some documents.  Let me first show you this.  Showing you

21 what's been marked as Exhibit #2 to your deposition.  I

22 represent to you it's the Longhorn Bar Recipe document

23 that was giving to me, produced to me by Longhorn,

24 Longhorn's lawyers, and I want to point out to you that

25 -- I want you to read, actually, the ingredients that go

---

1 into a Manhattan as you say on the rocks.

2  A.  Two ounces house bourbon and a quarter ounce

3 dry vermouth.

4  Q.  Do you have any reason to believe that Ms.

5 O'Donnell did not follow -- do you want to show him -- Do

6 you have any reason to believe that Ms. O'Donnell did not

7 follow Longhorn policies in making that Manhattan?

8  MR. GILLIS:  Objection.

9  A.  No.

10  Q.  So if the Manhattan that she -- the

11 Manhattans that she made you contained not a little over

12 an ounce of alcohol, but two ounces of bourbon, would

13 that change your opinion about whether or not Mr.

14 Southworth was intoxicated at the time the was served his

15 last drink?

16  A.  No.

17  Q.  Why is that?

18  A.  Based on my observations and my judgment call

19 on him, I don't believe he was intoxicated.

20  Q.  But you understood, did you not, that he was

21 receiving Manhattans, however many Manhattans he received

22 from you, he was receiving Manhattans that contained a

23 little over one ounce of Bourbon in them?

24  MR. GILLIS:  Objection.

25  Q.  Is that what you understood?

---

1  A.  I didn't base it on the amount of what I knew

2 to be a fact of alcohol in there.  I knew what he was

3 receiving, the exact amount did not factor -- whether

4 it's a half an ounce or not, it still wouldn't have

5 changed my opinion on whether he was drunk or not.

6  Q.  He was receiving double drinks; isn't that

7 right?

8  A.  No.

9  Q.  Weren't you trained that the Manhattan is a

10 double drink?

11  MR. GILLIS:  Objection.

12  Q.  Weren't you trained that, is my question?

13 Were you trained that the Manhattan is a double drink?

14  MR. GILLIS:  Objection.

15  A.  No.  We were trained it was a more alcoholic

16 drink.

17  Q.  Oh, yeah.  Where were you trained that?

18  A.  It didn't have a mixer in it, is what we were

19 trained.

20  Q.  It's got vermouth in it, doesn't it?

21  A.  It's not a mixer such as orange juice or

22 something like that, that's what we considered mixer.

23  Q.  I'm now referring you to Exhibit #1, which is

24 the Server Guide.  It's going to take me a minute.  Can

25 you turn to page 13.  Do you remember reading the Server

---

1 Guide.

2  A.  I remember reading it.

3  Q.  You didn't refer to it -- did you refer to it

4 after you had become certified?

5  A.  No.

6  Q.  Sort of brush up a little bit?  Keep aware of

7 what you had learned back in the year 2000?

8  A.  No, not that I recall.

9  Q.  By the way, did you -- were you trained and

10 certified, that is bar code trained and certified all in

11 the same day?

12  A.  No.

13  Q.  How many days after the training was it that

14 you took the test and pasted it?

15  A.  I am not positive.

16  Q.  On page 6 can you look at page 6 of this

17 exhibit, Exhibit #2.  Do you see at the top, where it

18 says, use these comparisons to estimate how much alcohol

19 a guest has consumed?  Do you see that?

20  A.  Yes.

21  Q.  Then it goes on to say, always be alert for

22 several other factors that can affect the strength of a

23 drink; do you see that?

24  A.  Yes.

25  Q.  And you see down three bullet points down is,

110

1  drinks made with double the amount of liquor such as
2  martinis and Manhattans; is that right?
3      A.    Yes.
4      Q.    Were you alert for that fact that night when
5  you were deciding whether or not Mr. Southworth was
6  intoxicated?
7      A.    Was I alert for it, no.
8      Q.    You didn't consider that, did you?
9      A.    No.
10     Q.    And how many Manhattans did you see Mr.
11 Southworth -- did you personally see -- How many
12 Manhattans did you see Mr. Southworth -- did you
13 personally see, how many of these Jack Daniels Manhattans
14 did you personally see Mr. Southworth consume as of the
15 time he left the restaurant?  You personally?
16     A.    He personally -- the ones that I served him,
17 did I watch him drink the whole entire thing, no.  I
18 couldn't be at the table the whole time.
19     Q.    My question is, did he bring a Manhattan,
20 it's your testimony that he brought a Manhattan with him
21 from the bar?
22     A.    He brang a drink with him from the bar.
23           MR. GILLIS:  Objection.
24     Q.    You don't know what he brought; is that
25 right?

Starkings Court Reporting & Video Services

111

1  certain characteristics about that night but after being
2  able to review the bill and the other report, after
3  reviewing step by step and going through everything, I
4  believe my memory -- certain things have stood out.
5      Q.    What other report?
6      A.    This report.  The audit report.
7      Q.    So you think your memory is better today of
8  the events that happened two and a half years ago then it
9  was a month after the accident; is this right?
10           MR. GILLIS:  Objection.  On what issues?
11     Q.    On how much the was served?
12     A.    Yes.
13     Q.    And between November of 2003 and when you
14 first talked to Neil, or counsel for RARE, you did
15 nothing at all to refresh your memory about the events of
16 this night; is that right?
17     A.    To refresh it, no.
18     Q.    To do anything to --
19     A.    Had I thought about it, yes.  Did I practice
20 anything to remember, no.
21     Q.    So there were no documents that you reviewed
22 between then, that is November of 2003, and first
23 speaking to RARS's attorneys that helped you refresh you
24 memory; is that right?
25           MR. GILLIS:  Objection, that's not a fair

112

1      A.    I don't recall.
2      Q.    And it's your best memory that -- well, so he
3  may have brought a beer with him from the bar; is that
4  right?
5      A.    I don't recall.
6      Q.    Back two and a half years ago, it was your
7  memory that he had had three Manhattans; is that right?
8           MR. GILLIS:  Objection.
9      A.    Yes.
10     Q.    So back then, what was your memory of how
11 many Jack Daniels Manhattans Mr. Southworth had consumed
12 that night?
13     A.    Back then, three.
14           MR. GILLIS:  Objection.
15     Q.    Do you have any reason to believe that your
16 memory of the events of that night is better today than
17 it was two and a half years ago, a month, a little over a
18 month after that night?
19     A.    Yes.
20     Q.    Your memory is better today?
21     A.    I believe so.
22     Q.    Tell me why your memory is better today?
23     A.    I believe after reviewing the two things I
24 did, then it was they showed me the check, write a
25 statement and that was it.  You know, and I remembered

Starkings Court Reporting & Video Services

112

1  characterization at all.
2           MR. FARRAH:  You can answer the question.
3           MR. GILLIS:  No, you can't.  I am going to
4  instruct her not the answer like that.  There's no
5  evidence in here that we did anything to refresh her
6  recollection.  If you want to ask a fair question, go
7  ahead.
8      Q.    Your memory, ma'am, your memory as of the day
9  before you spoke to RARE's attorneys about how much Mr.
10 Southworth had to drink that night was as reflected in
11 your November 2, 2003 statement; isn't that right?
12           MR. GILLIS:  Objection.
13     A.    From how many I said e had to how many he was
14 served in here?
15     Q.    Your memory as of before the time that you
16 met RARE's attorneys was that he had had three Jack
17 Daniels Manhattans that night; isn't that right?
18           MR. GILLIS:  Objection
19     A.    From what I could recall.
20     Q.    Yes.  And you recalled that a month after the
21 incident, or a month and a week after the incident; is
22 that right?
23     A.    That was a month after and only looking at
24 the bill.  I couldn't remember I believe accurately
25 unless I had been showed that bill that night also.

114

1    Q.    Tell me what you remember about serving table
2  62 that night, prior to the time you cashed them out at
3  9:36?
4    A.    I remembered that they were a group of guys,
5  they were a friendly group of guys that I had know --
6    Q.    62.
7    A.    62.
8    Q.    62.
9    A.    I don't remember anything about 62.
10    Q.    What does the document you were -- table 62
11  was the table you matched up with table 52 that night
12  isn't it?  Wasn't it?
13         MR. GILLIS:  Objection.  At what time during
14  the night.  You're talking about 62.  She obviously had
15  more than one group at that table.
16    Q.    You told us that you matched table 52 and
17  62 to accommodate that nice group of guys that you just
18  mentioned; isn't that right?
19    A.    Yes.
20    Q.    Okay.  What I want to know is, when you
21  cashed that nice group of guys out at 9:36 for table 62,
22  what had you served them?
23         MR. GILLIS:  Objection.  There is no evidence
24  that that was the check for the table.
25         MR. FARRAH:  I think there is plenty in the

Starkings Court Reporting & Video Services

1  record that that was the check for the table.
2    Q.    What I want to know is, what did you serve
3  them?
4    A.    There was nothing in this report showing what
5  I served them.  So I do not remember what I served that
6  table off the top of my head; 62 I do not know.
7    Q.    The report that you reviewed and the report
8  -- the report that you reviewed, ma'am, was a report that
9  was accompanied by -- did you ever see this letter
10  before?
11         MR. GILLIS:  Objection.
12    Q.    Just, did you ever see it?
13    A.    No.
14         MR. FARRAH:  Okay.  Can we mark it please.
15         (DEPOSITION EXHIBIT #13 WAS MARKED
16         FOR IDENTIFICATION.)
17    Q.    For the record, the report that you reviewed
18  is part of a document that was delivered to me by RARE's
19  prior counsel, under cover, that is letter dated May 18,
20  2004.  What I want to ask you is, does the report that
21  you reviewed show any activity of yours prior to 7:59
22  p.m.?  If you can look at Exhibit #8.
23    A.    Prior to 7:59?
24    Q.    Yes, ma'am.
25    A.    No.

Starkings Court Reporting & Video Services

115

1    Q.    And stick with that page for a second.  Does
2  -- what is the page number of the report that you
3  reviewed, when it starts, what page is that at the top?
4    A.    Seven.
5    Q.    Have you reviewed pages 1 through 6 of the
6  audit report, date of business, 9/26/2003 for your
7  activity that night?
8    A.    No, sir.
9    Q.    Has anyone shown it to you?
10    A.    No, sir.
11    Q.    Has anyone offered it to you?
12    A.    No, sir.
13         MR. FARRAH:  Do you have it?
14         MR. GILLIS:  Go off the record for a second.
15         (Off the record.)           12:35 p.m.
16         (A lunch recess was taken.)
17         (Back on the record as follows:)  1:33 p.m.
18  BY MR. FARRAH:
19    Q.    Good afternoon. Is it true that the first
20  time you saw the pages 2 through the end of Exhibit #8
21  was when you met with RARE's lawyers for the first time?
22         MR. GILLIS:  Objection.
23    A.    The first time I saw these?
24    Q.    Yes, ma'am.
25    A.    Yes.

116

1    Q.    When is the first time you saw pages 2, not 1
2  which is the check, but pages 2 through the end of what's
3  been marked as Exhibit #8?
4    A.    Yesterday.
5    Q.    Yesterday.  And prior to that time was it
6  your belief that Mr. Southworth was served three Jack
7  Daniels Manhattans by you at the table?
8    A.    At it states on here, he had had three
9  Manhattans.  It doesn't say what I had served him, so --
10    Q.    My question to you is, prior to yesterday was
11  it your belief that you had served Mr. Southworth three
12  Jack Daniels Manhattans at the table?
13         MR. GILLIS:  Objection.
14    A.    No.  I had served him two, but he had had
15  three.
16    Q.    So you knew that, that was your memory prior
17  to yesterday; is that right?
18    A.    Yes.
19    Q.    Can I ask you why you didn't write that, that
20  is that you had served him two and he had had another
21  one, when you wrote out for the police on November 2,
22  2003 whatever you wrote out?
23         MR. GILLIS:  Objection.
24    A.    I don't know why.
25    Q.    You had at that time, when you wrote out for

118

1  the police whatever you wrote out, you had the check
2  which is the first part of the Exhibit #8 available to
3  you; isn't that right?
4       A.    Yes.
5       Q.    Can I ask you why you wrote at that time on
6  Exhibit #8 that there were about eight men?
7       A.    Excuse me.  Because I believed then that the
8  table may have been set up for more, but only a certain
9  amount had sat.
10      Q.    Can I ask you why you wrote on November 2,
11 2003 they all had chowder and bread?
12      A.    I may have not seen the check, but I knew
13 chowder was at the table.
14      Q.    Can I ask you why you wrote they all had
15 chowder and bread?
16      A.    I do not know why I would have wrote that.
17      Q.    That was wrong, wasn't it?
18      A.    Yes.
19      Q.    It was wrong that there were eight men; isn't
20 that right?
21      A.    Yes.
22      Q.    Now, a little earlier today I asked you how
23 many meals were served and you said six; is that right?
24      A.    Yes.
25      Q.    Did you also say that you believe that one of

1  the persons ordered an appetizer as a meal?
2       A.    Yes.
3       Q.    Which person ordered an appetizer as a meal?
4       A.    I couldn't say for sure which person.
5       Q.    Which appetizer did the person order as a
6  meal?
7       A.    I would say the chicken fingers.
8       Q.    Do you have a memory as you sit here today
9  that someone actually ordered the chicken fingers as a
10 meal?
11      A.    Excuse me?
12      Q.    Do you have a memory as you sit here today
13 that someone ordered the chicken fingers as a meal?
14      A.    Yes.
15      Q.    Didn't you tell us earlier today that they
16 all shared the chicken fingers as an appetizer?
17      A.    It was put in as an appetizer.
18      Q.    Didn't you tell us today that they all shared
19 the chicken fingers as an appetizer?
20      A.    I believe --
21      Q.    Did you tell us that?
22            MR. GILLIS:  Objection.
23      Q.    Do you remember it?
24      A.    I believe I had said I knew that the Tonion
25 was shared and that I had put it in as an appetizer.

119

1       Q.    That is what you remember testifying earlier
2  today?
3       A.    That is what I remember.
4       Q.    So it's now your testimony that somebody
5  ordered the chicken fingers as a meal?
6             MR. GILLIS:  Objection.
7       A.    I had said that earlier, yes.
8       Q.    Is it your testimony that somebody ordered
9  the chicken fingers as a meal?
10      A.    From what I recall, yes.
11      Q.    When did that person announce to you the
12 chicken fingers would be his meal?
13            MR. GILLIS:  Objection.
14      A.    The may have taken them as I brought them as
15 an appetizer and kept them for himself only, and that
16 would have been his meal.
17      Q.    What is your basis for saying that the person
18 ordered the chicken fingers as his meal?
19      A.    Because I remember that everyone at that
20 table ate a meal.  Not one person went without eating
21 that night.
22      Q.    You only served six meals; isn't that right?
23      A.    Yes.
24      Q.    No one ordered -- no one said to you, I am
25 having these chicken finger as my meal; isn't that right?

120

1       A.    If I came to him and the was going to order
2  --
3       Q.    Isn't that right?
4             MR. GILLIS:  Objection, let her finish her
5  answer.
6             MR. FARRAH:  I want her to answer the
7  question.
8             MR. GILLIS:  No, you don't like the answer
9  she is giving you, so you're cutting her off.
10            MR. FARRAH:  I'd just like her to respond to
11 the question.
12            MR. GILLIS:  And she has if you'll give her
13 the opportunity to finish her answer.
14      Q.    No one said to you, I am ordering these
15 chicken fingers as a meal; isn't that right?
16      A.    If I came to him and he was going to order
17 something, and he had nothing to order, he would have
18 said, the chicken fingers are my meal.  I am all set or
19 I'm good.
20      Q.    No one said that to you --
21            MR. GILLIS:  Objection.  Asked and answered.
22      Q.    Isn't that right.
23      A.    I just answered.  I believe I answered your
24 questions?
25      Q.    Did someone say to you, I am having these

122

1  chicken fingers as my meal; yes or no.

2      A.    Yes.

3      Q.    Is that what you remember now?

4      A.    Yes.

5      Q.    You don't remember that you told us earlier

6  that those chicken fingers were shared by everybody?

7      A.    I said they were put in as an appetizer and

8  that I did not specifically see each person eat a piece

9  of each appetizer.

10     Q.    You remember what you testified to earlier;

11 is that right?

12          MR. GILLIS:  Objection.  Have you got a

13 question that you haven't already asked that you want to

14 ask her.

15          MR. FARRAH:   I just asked her that question

16 that I haven't already asked.

17          MR. GILLIS:  You've asked it six times and

18 she's answered it six times.  Why don't you go on to

19 another subject.

20          MR. FARRAH:  That's your memory.

21     Q.    Now, do you know what Mr. Southworth had to

22 drink at the bar?

23     A.    I don't recall specifically, no.

24     Q.    Do you know what he had to drink at the bar

25 is my question?

1      A.    No.

2      Q.    Did you ever know what he had to drink at the

3  bar?

4      A.    No.

5      Q.    When you said you don't recall what he had to

6  drink at the bar, what do you mean?

7      A.    He sat down with a drink at my table.  Do I

8  remember what that was, no.  If he was drinking before

9  the got to my table, I do not know what he had at the

10 bar.

11     Q.    And you don't know what he brought to the

12 table; isn't that right?

13     A.    I don't remember what he brought to the

14 table.

15     Q.    Thank you.  You can't tell us whether or not

16 he had a beer at the table that you served him, can you?

17     A.    No.

18          MR. GILLIS:  Objection.

19     Q.    Do you know whether or not you served him a

20 beer at the table?

21     A.    I did not serve him a beer at the table.

22     Q.    You know whether you -- you did not served

23 him a beer at the table?

24     A.    Yes.

25     Q.    A moment ago you told us you couldn't tell us

123

1  whether or not you served him a beer at the table.

2      A.    I did not serve him a beer at the table.

3      Q.    Do you want to change your earlier testimony?

4      A.    No.

5      Q.    Who did you serve the other beer to at the

6  table?

7      A.    I believe I served a beer to the gentleman

8  with the black hat and the black hair.

9      Q.    We heard about him.  Who did you serve the

10 other beer to at the table.

11     A.    I don't recall who that one went to.

12     Q.    And you don't know whether you served Mr.

13 Southworth that other beer or not, do you?

14     A.    I did not serve Mr. Southworth a beer.

15     Q.    You remember that?

16     A.    Yes.

17     Q.    Was Mr. Southworth a good tipper?

18     A.    I had only waited on him the one time before.

19 With me, he was a decent tipper, yes.

20     Q.    Did Sherry tell you that he was a good

21 tipper?

22     A.    Yes, I believe she did.

23     Q.    A very good tipper?

24     A.    A good tipper.

25     Q.    He carried around hundred dollar bills; isn't

124

1  that right?

2          MR. GILLIS:  Objection

3      A.    No, I don't know that.

4      Q.    He left one hundred dollar bills on the

5  table.

6      A.    Because I entered one hundred dollar bill

7  does not mean that they left hundreds, because they are

8  denominations.  So I'm not going to sit there and enter

9  ten dollar bills ten times.  I'd rather quickly entered

10 it out one hundred, one hundred, twenty, fourty.

11     Q.    Why not enter 240?

12     A.    Because there's not a button for a two

13 hundred dollar bill.

14     Q.    Why not enter one hundred, one hundred,

15 fourty?

16     A.    There's not a button for a fourty dollar

17 bill.

18     Q.    Is it your belief the everything you did was

19 in accordance with the practice -- everything you did

20 that night was in accordance with the practices set forth

21 in the Server Guide, which has been marked as Exhibit #1

22 to your deposition?

23     A.    Yes.

24     Q.    It's your belief that everything you did that

25 night was in accordance with the Longhorn Server and

126

```
 1  Bartender Trainee Edition, which has been marked as
 2  Exhibit #3 to your deposition?
 3      A.    Yes.
 4      Q.    Have you reviewed either of these documents:
 5  That's Exhibit #3 or Exhibit #1 to your deposition prior
 6  to today?
 7      A.    No.
 8      Q.    So what's the basis for your belief that
 9  everything you did is in accordance with the provisions
10  of these two documents?
11      A.    Because I believe that while working at
12  Longhorn I worked up to the Longhorn standards and what I
13  was trained with.
14      Q.    You believe you never made a mistake while
15  you were at Longhorn; is that right?
16      A.    I believe I may have made mistakes.
17           MR. GILLIS:  Objection.
18      Q.    Did you make a mistake in serving too much
19  alcoholic beverages to Mr. Southworth that night?
20      A.    No.
21      Q.    Have you ever considered that you might have
22  made a mistake in serving too much in the way of
23  alcoholic beverages to him that night?
24      A.    No.
25      Q.    Ever?
```

Starkings Court Reporting & Video Services

```
 1      A.    No.
 2      Q.    Now, was anyone at that table drunk that
 3  night?
 4      A.    No, not in my opinion.
 5      Q.    Was anyone at the table under the influence
 6  that night?
 7      A.    Not in my opinion, no.
 8      Q.    Are you aware of the fact that one of the
 9  people at the table testified the was drunk at the table
10  that night?
11           MR. GILLIS:  Objection.
12      A.    I am not aware of that.
13      Q.    You didn't see anybody that was drunk?
14      A.    No.
15      Q.    Were you looking?
16      A.    Yes.
17      Q.    Where is table 51, do you know?
18      A.    It is a booth against the wall, against the
19  kitchen.
20      Q.    Where?
21      A.    Right here.
22      Q.    Did you have -- could you mark 51, I'm sorry,
23  on Exhibit #12.
24      A.    (Complies.)
25      Q.    Did you have responsibility to serve table 51
```

Starkings Court Reporting & Video Services

127

```
 1  that night?
 2      A.    From what I believe my sec -- what I
 3  remembered my section to be, I believed I was here?
 4      Q.    Where?
 5      A.    These tables right here.
 6      Q.    Tables 5 --
 7      A.    That's 52, 62.  It would have been -- the
 8  sections are broken up different each night depending on
 9  how many servers are on.  If I was in a four table
10  station, it would have been four here or four here.
11      Q.    What is your memory of what you had for the
12  four that night?
13      A.    I believe I said these two and these two.
14      Q.    So you believe your earlier testimony was
15  that you said 53, 63, 52 and 62?
16      A.    Correct.
17      Q.    Your first testimony?
18      A.    I believe that is what I said.
19      Q.    What is your memory, whatever you said?
20      A.    It was -- my memory is I had four tables in
21  that section, which exact four, I do not specifically
22  remember.
23      Q.    And your memory is you served Sprite to
24  somebody at the table?
25      A.    I do remember Sprite being at the table, yes.
```

128

```
 1      Q.    Do you have any explanation for why no Sprite
 2  is shown on Exhibit #8?
 3      A.    There -- it may have been brought from the
 4  bar, and refills are for free, so I wouldn't have charged
 5  them again.  Or I simply didn't ring in a drink.
 6      Q.    Do you have a memory that it was brought from
 7  the bar and refills are free?
 8      A.    Yes, refills are free.
 9      Q.    Do you have a memory that night of someone
10  bringing a Sprite from the bar and you refilling it for
11  free?
12           MR. GILLIS:  Objection.
13      A.    No.
14      Q.    Are you -- do you know what your plans are in
15  terms of shipping out?  Are you -- do you know whether
16  you are staying here in North Carolina or where you are
17  going to be?
18      A.    I am stationed in North Carolina until 2009
19  deployable at any time.
20      Q.    Deployable at any time means you can be sent
21  out at any time?
22      A.    Yes.
23      Q.    On how much notice?
24      A.    It's a required 30 day notice.
25      Q.    Are you required to wear your uniform off
```

130

1  base?

2        MR. GILLIS:  Objection.  How is this supposed

3  to lead to discoverable evidence?

4        MR. FARRAH:  I just want to know whether

5  she's required to --

6        MR. GILLIS:  I am going to instruct her not

7  to answer.  It's no way is it in any way going to lead to

8  discoverable evidence and therefore it's not a question

9  -- no.

10       MR. FARRAH:  She's wearing a uniform today.

11  I think I have a --

12    Q.    Why are you wearing a uniform today?

13       MR. GILLIS:  No, don't answer.  It's not

14  calculated to lead to discoverable evidence therefore

15  it's not a valid question.

16       MR. FARRAH:  You're instructing her not to

17  answer?

18       MR. GILLIS:  I am.  If you want to ask a

19  question that's going to lead to discoverable evidence,

20  I'd be happy to have her answer it.

21       MR. FARRAH:  I think it's a relevant

22  question.

23       MR. GILLIS:  It's not relevant.

24       MR. FARRAH:  We'll argue that later.

25       (Off the record.)

Starkings Court Reporting & Video Services

---

1        (Back on the record as follows:)

2  BY MR. FARRAH:

3     Q.    I want to show you a photo and ask you if it

4  fairly and accurately depicts a portion of the Longhorn

5  Restaurant as it appeared to you on the night of

6  September 26, 2000?

7     A.    Yes.

8        MR. FARRAH:  Okay.  Can we have that marked

9  please.

10       (DEPOSITION EXHIBIT #14 WAS MARKED

11         FOR IDENTIFICATION.)

12    Q.    Does it show the tables that the Southworth

13  party was sitting in?

14    A.    Yes.

15    Q.    Could you point those tables out please for

16  us?

17    A.    The one at the very far end would be 52, 62.

18    Q.    And the booths, right there, that my thumb is

19  pointing to?

20    A.    51 -- 41, from what I remember, these are the

21  ones, whether it starts at 40 or 50 and goes down.

22    Q.    Could you point to 41.

23    A.    Whether it starts at 41 or 51, I don't

24  remember, but it goes from 41, 51, 61, 71.

25    Q.    And the tables again that the Southworth

Starkings Court Reporting & Video Services

---

131

1  party was at?

2     A.    The very far one, 52, 62, 72, or 42, 52, 62,

3  72.

4     Q.    Where is the service bar in relation to --

5     A.    Straight through the alleyway -- oh, the

6  service bar, you'd go back here, down the entire back

7  alley to the other side of the restaurant.

8     Q.    I'm going to show you a photograph and ask

9  you if you recognize what it depicts?

10    A.    No, I don't.

11    Q.    Ever see this before?

12    A.    No.

13       MR. FARRAH:  Could we have this marked

14  please.

15       (DEPOSITION EXHIBIT #15 WAS MARKED

16         FOR IDENTIFICATION.)

17    Q.    I'm going to show you a photograph and ask

18  you if you recognize it as any portion of the Longhorn?

19    A.    Yes.

20       MR. FARRAH:  Could we have this marked

21  please.

22       (DEPOSITION EXHIBIT #16 WAS MARKED

23         FOR IDENTIFICATION.)

24    Q.    What does Exhibit #16 show?

25    A.    It shows the top of the bar, some of the

---

132

1  condiments that go with some of the drinks.  Some of the

2  margaritas are listed here.  Some more of the margaritas,

3  and I can't read -- I would assume that's some of the --

4  I'm not sure what that is --

5        MR. GILLIS:  We don't want you to assume.  If

6  you know --

7        MR. FARRAH:  Don't assume.

8     A.    A wine glass, the shaker margarita glasses

9  and more wine glasses.

10    Q.    And the column that says, do they ask for,

11  and then the column that says suggest, what does those

12  mean?

13    A.    Did they ask for those at the time were our

14  -- when I was there at the time were -- the margaritas

15  were our promotional items at the time.

16    Q.    Did Longhorn suggest that if someone asked

17  for a Texas margarita, you offer them the ultimate

18  margarita instead?

19       MR. GILLIS:  Objection.

20    A.    Did you --

21    Q.    Is that what that means, do they ask for

22  Texas margarita, suggest ultimate margarita?

23       MR. GILLIS:  Objection.

24    A.    I couldn't know what they were suggesting by

25  asking that.

134

1    Q.    You don't know what this means?

2    A.    I did not see that on the bar.  That wasn't

3 there when I was there.

4    Q.    Okay, thank you.  Did Longhorn serve -- offer

5 a Texas Tea at that time?

6    A.    Yes.

7    Q.    Do you know what is in the Texas Tea?

8    A.    I don't recall now.

9    Q.    Do you recognize that photo?

10    A.    Yes.

11    Q.    What does that show?

12    A.    That shows another side of the alley, drinks,

13 bread, glasses are here, the dish pit and then a part of

14 the serving area.

15        MR. FARRAH:  Could we have this marked,

16 please.

17        (DEPOSITION EXHIBIT #17 WAS MARKED

18        FOR IDENTIFICATION.)

19    Q.    So just to wrap up, the only management at

20 Longhorn you spoke to prior to yesterday was whom, about

21 this incident?

22    A.    Was Chris.

23        MR. GILLIS:  Objection.

24    Q.    Chris Orr; is that right?

25    A.    Yes.

Starkings Court Reporting & Video Services

135

1    Q.    I am going to ask you some questions then

2 about your background in case you may not be here at the

3 time of trial, we may have to use this deposition.  Can

4 you tell me the names of your children?

5    A.    I have three children.  The oldest is Markus.

6 He's eight.  Tyler is five.

7    Q.    Those are both boys?

8    A.    Yes.

9    Q.    And the third is a daughter?

10    A.    Yes, Lindley, she's nine months old.

11    Q.    You had mentioned earlier that 911 had a

12 particular affect on you.  Can you explain that?

13        MR. FARRAH:  Objection, and just on the

14 record, I would object to all of these background

15 questions as being irrelevant and not reasonably designed

16 to lead to discoverable evidence, kid's names, 911,

17 things of that nature.  So that's my running objection.

18 I hope you'll accord me the same courtesy that I did you

19 in terms of your objection to my leading questions.

20        MR. GILLIS:  I think it's a little different

21 if we have to use this for trial, I have the opportunity

22 to put in her background to establish her credibility.  I

23 think I'm entitled to do that.

24        MR. FARRAH:  Well, I disagree and I'll object

25 to this line of questioning, how's that.

134

1    Q.    You never spoke to Chuck Bulgain about this

2 incident; is that right?

3    A.    I don't recall speaking to Chuck, ever, no.

4    Q.    And the only employees at Longhorn you spoke

5 with about the incident, the night in question is Sherry;

6 is that right?

7    A.    Yes.

8    Q.    How many times have you spoken to her about

9 it?

10    A.    Specifically about the incident since it

11 happened?

12    Q.    Yeah.

13    A.    Occasionally, maybe three, four times.

14    Q.    Is there a manager's incident log that you

15 know of at the restaurant for recording notable

16 incidents?

17    A.    Not that I know of.

18        MR. FARRAH:  That's it for me.  Thank you.

19

20        EXAMINATION BY MR. GILLIS:

21    Q.    It is afternoon now.  Good afternoon, Ms.

22 Chabot.  You said that you may be deployable at any time;

23 is that correct?

24        MR. FARRAH:  Objection.

25    A.    Yes, sir.

Starkings Court Reporting & Video Services

136

1        MR. GILLIS:  I honor your objection too,

2 although I for the record, disagree with that.

3        MR. FARRAH:  Yeah, I don't think background

4 has anything to do with credibility.

5    Q.    Getting back to the question, in the question

6 that Mr. Farrah asked you about why you went into the

7 service, you mentioned that there was a particular effect

8 that 911 had on you.  Can you tell me what that was?

9    A.    My mother is a flight attendant.  She flew

10 out of Boston that day.  And so when I had returned home,

11 you know, I had a bunch of phone calls questioning where

12 my mom was.  And I didn't even know it happened, because

13 I had been out during the day, hadn't seen the news and

14 wasn't paying attention to the radio.  So I really didn't

15 know and didn't know what happened to her for a few days

16 until she was finally allowed to call out to me.

17    Q.    Had you already made a decision before then

18 at sometime further in your life you wanted to join the

19 service?

20    A.    Yes.

21    Q.    Did that expedite it at all?

22    A.    Absolutely.

23    Q.    Since that happened in '01, why didn't you

24 join earlier?

25    A.    We had had the children and they were too

138

1  young and I felt that if I did get deployed right away or
2  went to training for four to six months that they were
3  too little for my husband to handle on his own.
4      Q.    And you've been in the service now just under
5  two years; is that correct?
6      A.    Yes.
7      Q.    Have you been given any commendations or
8  medals while you've been in the service?
9          MR. FARRAH:  Objection.
10     A.    When we graduate from basic, we get one of
11 our ribbons --
12     Q.    Let me rephrase the question.  Have you been
13 given any awards since you've been in the service?
14         MR. FARRAH:  Objection.
15     A.    I've gotten a star major coin and I've gotten
16 an ARCOM.
17     Q.    Can you explain what those are for?
18     A.    The ARCOM was for outstanding achievement at
19 the tact center, holding an OIC's position being an E1,
20 which is coming in with no rank.
21     Q.    Okay, can you explain for us lay people what
22 all that initials mean?
23     A.    There's a captain will run the tact center,
24 and of course she's an officer.  She's not enlisted.  And
25 doing as well as I did in the tact center, they put me in

140

1  her position and took her appointments and did things
2  that she would be overseeing and doing in the center I
3  was able to do.
4      Q.    What division are you in?
5      A.    I'm in 16th MP Brigade, XVIII Airborne Corps.
6      Q.    Can you explain what the Airborne Corps is.
7          MR. FARRAH:  Same running objection to the
8  relevancy of these, Mike.
9          MR. GILLIS:  I understand.
10     A.    The Airborne Corps is all trained in Airborne
11 operations, Airborne qualified.
12     Q.    You joined up specifically to be military
13 police; is that correct?
14     A.    Yes.
15     Q.    Why did you do that?
16     A.    That was a field I was always interested in,
17 even in the civilian field.  And I figured if I combined
18 it with military and civilian, that was what I was
19 interested in.
20     Q.    Were you aware of the likelihood of military
21 police being activated in 2004 when you joined?
22     A.    Absolutely.
23     Q.    What was your understanding?
24     A.    That they extremely hi -- highly deployable.
25 The recruiter actually tried to talk me out of military

139

1  police into another field because me having children, the
2  didn't want -- the knew that it was a high probability
3  I'd get deployed right after training.
4      Q.    Has your unit been deployed?
5      A.    Yes, twice and they just got back from their
6  second deployment.
7      Q.    Have you yourself been deployed?
8      A.    No.
9      Q.    Can you tell us why you weren't deployed as
10 part of the unit?
11         MR. FARRAH:  Objection.
12     A.    I had joined the unit in October.  They were
13 set to deploy in February.  I was pregnant so I wasn't
14 able to deploy with them, but after my daughter was born,
15 I was scheduled to deploy two months later.
16     Q.    Did you go over at that time?
17     A.    No, I did not.
18     Q.    Why was that?
19     A.    My daughter was born with an extremity rare
20 congenital heart defect, which required surgery at five
21 days old, so I became nondeployable at that time due to
22 family medical problems.
23     Q.    What was the problem?
24     A.    My daughter needing the open heart surgery
25 which required she was hospitalized for four weeks and

140

1  then she had a recovery time of three months.
2          MR. FARRAH:  You know I'm objecting to all of
3  this?
4          MR. GILLIS:  Yes, I understand.
5      A.    The surgery was May 25.
6      Q.    And when was she born?
7      A.    May 20.
8      Q.    She was five days old?
9      A.    Yes.
10     Q.    Has she had any surgeries since?
11     A.    She did.  She had an operation the beginning
12 of January of '06.
13     Q.    What is her condition now?
14     A.    Now she is fully recuperated from that
15 surgery.
16     Q.    Now that she is fully recuperating, are you
17 able to be deployed at any day now?
18     A.    Yes.
19     Q.    Are you only deployable when your group out
20 again or can you be deployed with a different group?
21     A.    I can be deployed with anybody.
22     Q.    Explain how that works.
23     A.    There are, in 16th MP Brigade, five
24 deployable units and they're all combat units and they
25 strictly train, deploy, come back, train, deploy.  And

1 then there's one Garrison Unit.  Right now I'm in the
2 Garrison Unit, but if one of those line units was to need
3 me for a mission, I would be drafted there and then leave
4 with them.
5    Q.    If you were drafted into another unit,  what
6 position would you hold when you were activated?
7    A.    Military police officer.
8    Q.    Your position doesn't change?
9    A.    No.
10    Q.    Your current rank is what?
11    A.    Specialist.
12    Q.    Do you have any -- in addition to the awards
13 that you had mentioned earlier, do you have any specific
14 certifications for shooting, whatever for example?
15    A.    We have -- we are one of the only fields who
16 have to quality with our 9mm, which we qualify for --
17 that's our expert badge that I received.  We're qualified
18 in OC training.
19    Q.    Which is what?
20    A.    OC spray, we are able to use that.  Anything
21 that a police officer has to be certified in, we  go
22 through the same training.  It's called LTLEA (phonetic).
23    Q.    In the meanwhile while you're not deployed,
24 what do you know?
25        MR. FARRAH:  Objection.

Starkings Court Reporting & Video Services

142

1    A.    We do the garrison work on post.  We do the
2 same thing in the city, but we do it our post.  We do the
3 patrols --
4    Q.    Let me ask the question a different way.  Are
5 you deployed currently?
6    A.    No.
7    Q.    While you are not -- what are you currently
8 doing in the service as a part of your job?
9    A.    I work as a police officer.
10    Q.    Can you tell us what that entails?
11    A.    Patrolling post, responding to calls, working
12 the desk, working the RTO, taking calls.
13    Q.    Where are you doing this?
14    A.    On Fort Bragg.
15    Q.    What is your husband's name?
16    A.    Ronnie.
17    Q.    What does he do for work?
18    A.    He is a carpenter.  He is contracted out
19 through a company in Massachusetts that's got a contract
20 through FEMA, and he travels and he does disaster relief
21 work.
22    Q.    Can you explain what disaster relief work is?
23    A.    Mainly he works through the hurricane
24 seasons.  He worked in Miami recently for a few months,
25 and then did a month in New Orleans and came back.

Starkings Court Reporting & Video Services

143

1    Q.    Is that response to --
2    A.    Hurricaine Katrina.  Yes.
3    Q.    Now, getting back to your training at
4 Longhorn, how many training sessions did you have at
5 Longhorn before you actually served a table?
6    A.    We had a whole week of consecutive nightly
7 training.  It was during the nights, I would say from
8 5:00 on, probably until about 11:00.
9    Q.    This was when?
10    A.    Before the restaurant even opened.
11    Q.    Late December of 2000, would you think?
12    A.    Yes.
13    Q.    How long were the sessions, of the training
14 sessions?
15    A.    About six to seven hours.
16    Q.    Per session.
17    A.    Per night.
18    Q.    How many nights would you have to train?
19    A.    At least a week's worth.
20    Q.    Once you were trained, did you start out with
21 three or four tables or did you start out with less than
22 that?
23    A.    We started out with two tables.
24    Q.    Why was that?
25    A.    There were -- because it just started.  They

144

1 knew it was going to be a busy restaurant.  A lot of
2 people were there even new to waitressing.  So they had
3 the trainers in there following us around all night for
4 at least the first month, and staying on top of us, make
5 sure we were doing it the Longhorn way.
6    Q.    The date of the accident was September 2003,
7 you are aware of that; correct?
8    A.    Yes.
9    Q.    How many years experience had you had prior
10 to that as a waitress serving food and alcohol?
11    A.    Five years.
12    Q.    How many years experience did you have when
13 you came to Longhorn?
14    A.    Almost three years.
15    Q.    What training did you receive from Longhorn
16 other than the alcohol training you've already testified
17 to?
18    A.    Just general training regarding food.  They
19 taught us about the steaks, the side dishes, the salads.
20 They taught us how the whole kitchen worked, how the
21 whole front of the house worked, how the hostesses would
22 work.
23    Q.    Mr. Farrah asked you earlier about the bar
24 code system.  Can you tell us what you remember about the
25 bar code system, what you learn through them?

1          MR. FARRAH:  Objection.
2      A.    I remember from -- through the bar code
3  system it --
4      Q.    Let me ask you a different question since it
5  has been objected to.  Did you take bar code training?
6      A.    Yes.
7      Q.    Can you tell us what that entailed?
8      A.    It entailed -- we went through a booklet that
9  had tests and it had a system, kind of to guide us
10 through on how we should take things.  And like the -- I
11 believe there was like three steps.  I think they went by
12 like a traffic light type thing, red light, green light,
13 yellow light.
14     Q.    Can you explain those steps for us.
15     A.    Green light would be where you know, you've
16 got a perfectly -- someone just walks in, hasn't had
17 anything to drink, perfectly -- has all of their senses
18 intact.
19          Yellow light, you know, after a couple of
20 drinks they may be reacting some way to them.  And then
21 red light, where you obviously have noticed significant
22 changes in their behavior and have decided to  stop
23 serving them.
24     Q.    Can you explain for me if there are
25 differences among different people as to these various

1  zones?
2          MR. FARRAH:  Objection.
3      A.    Yes.  I would say no.
4      Q.    What are they?
5          MR. FARRAH:  Same Objection.
6      A.    Someone could just get glossy eyes and appear
7  to be tired or outspoken when they are not normally
8  outspoken, or quiet when they are not normally quiet.
9      Q.    If someone exhibited changes in behavior,
10 what did that indicate to you based on your training?
11         MR. FARRAH:  Objection.
12     A.    That the alcohol was starting to take some
13 sort of affect on them.
14     Q.    How would you know whether or not their
15 behavior was beginning to change?
16         MR. FARRAH:  Objection.
17     A.    Usually when we greet a table, we're taught
18 to greet them and introduce ourselves, try and find out
19 something about them, even what they did that day, what
20 were you out doing today.  Something to that affect, tell
21 them about the specials, they would ask questions about
22 the specials, so by the time we at least got a drink or
23 an appetizer order, we have spoken with them for at least
24 a few minutes.
25     Q.    Is that the baseline from which you determine

1  changes in behavior?
2      A.    Yes.
3      Q.    In addition to the bar code training in those
4  monthly meetings that you had at Longhorn, what issues
5  were arose concerning the service of alcohol?
6      A.    Anything that a bartender may have an issue
7  with, specifically it may be if we are taking too long to
8  pick up our drinks, or if maybe we're hounding on them
9  that we need our drinks, that they are taking too long.
10 They try and make us understand, you know, from their
11 point of view.
12     Q.    Can you describe for me what type of a
13 restaurant the Longhorn is, the one you worked at in
14 Leominster, Massachusetts which is the subject of this
15 litigation?
16         MR. FARRAH:  Objection.
17     A.    I would say it's more of a --
18     Q.    Let me ask it again.  You worked at the
19 Longhorn in Leominster; correct?
20     A.    Yes.
21     Q.    Can you describe it for me?
22         MR. FARRAH:  Objection.
23     A.    It was more of a dining establishment than --
24 I would say more of an upscale casual dining atmosphere
25 rather than an Applebee's and a TGIFriday's or something.

1      Q.    What do base that opinion on?
2          MR. FARRAH:  Objection.
3      A.    Having experience in the restaurant business,
4  working in two separate restaurants.  The customers we
5  have in there are more familiar, couples coming in there.
6      Q.    Do you consider this to be a gin mill?
7          MR. FARRAH:  Objection.
8      A.    No.
9      Q.    Do you know what a gin mill is?
10     A.    Yes.
11     Q.    Are there any in the area of the Leominster
12 Longhorn?
13     A.    I would say there's a few.
14     Q.    Such as?
15     A.    There is Slatery's, I would say.  There's
16 another Chinese restaurant down the street.
17     Q.    Do you know the name of that?
18     A.    Chop Sticks, I believe.  There is another one
19 that is almost a club down in Leominster.
20     Q.    If I wanted to go out and get drinks during
21 the evening as opposed to just sit and have a nice
22 dinner, where would I go in your opinion?
23         MR. FARRAH:  Objection.
24     A     Just to have drinks?
25     Q.    Yes.

150

```
 1      A.    More one of the bar type atmosphere ones. I
 2 wouldn't say it was a place to just come and drink.
 3      Q.    There was a bar at Longhorn; correct?
 4      A.    Yes.
 5      Q.    Was there a bar crowd that normally came into
 6 the bar routinely?
 7           MR. FARRAH:  Objection.
 8      A.    No.
 9      Q.    Can you tell me what you base that on?
10      A.    Working there for four years and seeing the
11 crowds that come in.  The bar was usually, if we're
12 running a wait or some guys just want to come in and grab
13 lunch, you know, even if it's workers -- you know,
14 construction guys, they come in, might eat at the bar
15 because they're by themselves, and then run out real
16 quick during their lunch.
17      Q.    Based on your experience at Longhorn in the
18 evenings when you worked, what did the bar crowd consist
19 of?
20      A.    People waiting for tables.
21      Q.    Do you know Christen O'Donnell?
22      A.    Just from working with her.
23      Q.    When you worked with her, did you form an
24 opinion as to her abilities as a bartender?
25           MR. FARRAH:  Objection.
```

```
 1      A.    I do.  I believe she was a good bartender.
 2 She was responsible.
 3      Q.    Let me ask you the next question, what was
 4 your opinion?
 5      A.    She was a good bartender.
 6           MR. FARRAH:  Same objection.
 7      Q.    Turning my attention briefly to the night of
 8 September 26 and ask you about the particular night.  Did
 9 you see Mr. Southworth get up from the table at all that
10 evening?
11      A.    I did.
12      Q.    When?
13      A.    He got up at one point, I believe probably
14 from what I believe to be halfway through the meal, went
15 to the restroom.
16      Q.    You specifically remember that?
17      A.    Yes.
18      Q.    Did you make any observation of him going to
19 the men's room?
20      A.    Nothing that would make me standout.
21      Q.    Was there anything in his behavior when he
22 got up to go to the men's room that would cause you to
23 believe that he may be under the influence of alcohol?
24      A.    No.
25           MR. FARRAH:  Objection.
```

151

```
 1      Q.    Can you describe his -- Mr. Southworth, his
 2 demeanor the several times you served him at the
 3 Longhorn?
 4           MR. FARRAH:  Objection.
 5      A.    Just out of the times I know of him coming
 6 in, and the time I waited on him, he was a friendly kid.
 7 He wasn't overly outgoing.  If you talked to him, he'd
 8 talk back, but he wasn't one to initiate anything.
 9      Q.    Who at the table was ordering the drinks, the
10 rounds?
11      A.    Mainly it was the gentleman in the black hat
12 with black hair.
13      Q.    Did Mr. Southworth order any rounds from you
14 directly?
15      A.    Directly, no.
16      Q.    In your direct examination with Mr. Farrah,
17 he asked some questions about policies and procedures.
18 Do you remember those questions?
19      A.    Yes.
20      Q.    What was your practice -- what was the
21 practice of Longhorn when you worked there as to when a
22 bartender would come and talk to you about a particular
23 patron?  Was there a reason for them to do that?
24           MR. FARRAH:  Objection.
25      A.    Yes, if a bar --
```

152

```
 1      Q.    Let me ask the -- what would be the reason
 2 that a bartender might talk to you about a patron?
 3           MR. FARRAH:  Objection.
 4      A.    If they had any concerns that maybe that
 5 person shouldn't have any more to drink.  Or if that
 6 person had anything for them to be concerned about.  If
 7 they had asked him -- if she had served them a drink but
 8 didn't put on the bill, she would certainly come over and
 9 say, hey, he did have a beer from me, put it on his bill.
10 And we'd just hit, do not make, and then it would come up
11 at the bar, do not make, and she'd know not to make it.
12      Q.    Was there a mechanism at the Longhorn for you
13 to input a drink at the request of the bartender, so that
14 it would come out and be charged to the bill but not be
15 served at the bar?
16      A.    For?
17      Q.    Let me rephrase it.  You mentioned that there
18 were occasions where a bartender would tell you to put a
19 drink on that they hadn't had the opportunity to put on
20 at the bar; correct?
21      A.    Correct.
22      Q.    You would input that into the computer?
23           MR. FARRAH:  Objection.
24      A.    Yes.
25      Q.    When you input a drink on the computer, does
```

154

1  it come out on the bill?

2          MR. FARRAH:  Objection.

3      A.   No.  The drink comes out on the bill.

4      Q.   How does a drink come out on the bill that is

5  not -- does not come out of the service bar?

6          MR. FARRAH:  Objection.

7      A.   The drink would come up at the service bar,

8  but printed right on the little -- under it, it would

9  say, do not make.  We have to type that in.  There is

10  like a little typ -- a little pad on the computer, we

11  write it in.  And anything that is written in will not

12  show up on the bill.

13     Q.   Let me ask it a different way.  What is the

14  mechanism for putting a bill on the drink -- a drink on

15  the bill so that it is on the bill charged, but not

16  poured?

17         MR. FARRAH: Objection.

18     A.   Do not make.

19     Q.   Has that ever happened with you?

20     A.   Yes.

21     Q.   Is it a common or uncommon practice?

22         MR. FARRAH:  Objection.

23     A.   Not very common.

24     Q.   In all of the time, the three years that you

25  -- well, strike that.

Starkings Court Reporting & Video Services

---

1          What was your practice about when you would

2  take an order of drinks from people who already had

3  drinks at the table?

4      A.   If they already had drinks at the table,

5  their drink would have to be empty or very close to empty

6  to the point if I knew I was returning with a drink it

7  would be empty by the time I got there.

8      Q.   Was there a policy in place at Longhorn as to

9  when you were allowed to take the next drink order to

10  people who already had a drink.

11     A.   Not when we took the order no, but they were

12  not allowed to have two drinks in front of them.

13     Q.   If I had a drink with something in it, and

14  you were bringing me my next drink, would you serve that

15  drink to me?

16     A.   No.

17         MR. FARRAH:  Objection .

18     Q.   Why not?

19         MR. FARRAH:  Objeciton.

20     A.   That was Longhorn policy.

21     Q.   What would I have to do or what would you

22  have to do in order for me to get that next drink?

23     A.   I would either bring the drink back to the

24  bar and leave it there until your drink was done, or wait

25  until you were done with it, and then leave it.  But I

Starkings Court Reporting & Video Services

---

155

1  would not leave it at the table while you still had some

2  left.

3      Q.   Could I give you the drink with some left to

4  get the next drink?

5          MR. FARRAH:  Objection.

6      A.   Yes.

7      Q.   In your -- I believe you worked at Longhorn

8  for just over three years; correct?

9      A.   Yes.

10     Q.   In the time period that you worked at

11  Longhorn, do you have a memory of ever giving somebody a

12  drink and leaving another drink in front of them?

13     A.   No.

14     Q.   Do you know if that ever happened to you?

15         MR. FARRAH:  Objection.

16     A.   No.

17     Q.   Did it happen on September 23, 2003 at the

18  Southworth table?

19     A.   No.

20     Q.   Now, you had mentioned earlier in response to

21  Mr. Farrah's questions that there was several people that

22  came from the bar; correct?

23     A.   Yes.

24     Q.   Do you remember what they were wearing when

25  they came from the bar?

---

156

1      A.   They were wearing casual dress clothes,

2  T-shirts, hats, pants, sneakers, boots.

3      Q.   I am talking about the three who had the

4  drinks, were those the three who --

5          MR. FARRAH:  Objection.

6      A.   Yes.

7      Q.   The people -- let me rephrase the question.

8  The people who brought drinks to the table, do you

9  remember what they were wearing?

10     A.   I remember specifically Mr. Southworth

11  because he was in my point of view mainly, most of the

12  time and he just had a shirt with some sweat pants and

13  boots.

14     Q.   He was one of the people who brought a drink

15  from the bar?

16         MR. FARRAH:  Objection.

17     A.   Yes.

18         VIDEOGRAPHER:  Can we go off the record

19  please to change tapes.

20         (Off the record.)

21         (Back on the record as follows:)

22  BY MR. GILLIS:

23     Q.   Back in September of 2003 what was your

24  practice when you took the initial order for appetizers

25  and drinks at the table?

1    A.    If I took an order for drinks and appetizers,
2 it would be to put the drinks and appetizers in right
3 away.  Get that first round out to them, so they have a
4 drink in front of them, and get some bread and appetizers
5 out to them after that.
6    Q.    Why do you do it in that order?
7    A.    So that the person's not sitting there at the
8 table with nothing.
9    Q.    Do you bring the menus or are they already
10 there?
11    A.    They are already there.
12    Q.    How do they get the menus?
13    A.    The hostess brings them.
14    Q.    Do they get the menus when they are seated?
15    A.    Yes.
16    Q.    Do you remember how many hostesses were on
17 back in September 2003 on Friday night?
18    A.    I don't remember specifically, but they'd
19 usually three or four.
20    Q.    How many managers were on on a Friday night
21 back in September 2003?
22    A.    At least two.
23    Q.    Could there be more than two?
24    A.    Yes.
25    Q.    You mentioned earlier that the managers touch

1 the table, do you remember stating that?
2    A.    Yes.
3    Q.    Can you explain what touching the table
4 means?
5    A.    One manager is assigned specifically to the
6 floor that night, and their job basically is to
7 consistently make sure that the hostess -- the table up
8 front, the hostess stand is going how it's supposed to be
9 going, they're keeping up with their times, and to walk
10 through the restaurant and greet each table that's sat
11 down, or at least stop by that table and ask how their
12 meal was that night.
13    Q.    Each time that it's reset they would do that?
14    A.    Yes.
15        MR. FARRAH:  Objection.
16    Q.    You had mentioned in response to Mr. Farrah's
17 questions that you made certain judgment calls; correct?
18    A.    Yes.
19    Q.    If you had a question about a patron, for any
20 reason, was there a policy in place as to what you could
21 do?
22    A.    You -- it was open door.  You could go to the
23 manager right away.
24    Q.    Is that what you were instructed?
25        MR. FARRAH:  Objection.

159

1    A.    Yes.
2    Q.    Have you ever gone to a manager for a
3 situation?
4    A.    Absolutely.
5    Q.    What types of situations?
6    A.    People upset about their food taking too
7 long.  People upset about how it's cooked, drinks taking
8 too long.
9    Q.    So your practice back in September of 2003
10 was that after you seat them, you get the appetizers and
11 the drinks; correct?
12    A.    Yes.
13    Q.    Usually, how long would it take you to get
14 the appetizers out?
15    A.    The appetizers was anywhere -- if it was
16 soup, it would be on me, so usually the soup doesn't take
17 long at all.  But any appetizers ordered could take up to
18 15 minutes.
19    Q.    When you say it's on you, can you explain
20 that?
21    A.    I go back and put the soup in a cup and bring
22 it out to them.
23    Q.    The soup is already out there where you have
24 access to it?
25    A.    Yes.

160

1    Q.    Just take a ladle and put it in?
2    A.    Yes.
3    Q.    So if people ordered -- that night, I'll call
4 the table the Southworth table.  If the Southworth table
5 ordered clam chowder, that would come out immediately?
6    A.    It could, but usually if there is other
7 appetizers I would just bring them all together.
8    Q.    As part of the bar code system that you were
9 trained in at Longhorn, can you tell us if it discussed
10 at all the effects of food on alcohol?
11    A.    Yes, it did.
12    Q.    What did it explain to you?
13    A.    It explained to us that more fatty foods,
14 heavier foods slow down the effects of alcohol on the
15 body.  And you know, if someone is not eating, but they
16 are drinking drinks pretty quick, it's going to have
17 effect on them right away, because it's soaking into
18 their blood stream right away.  But alcohol with food
19 kind of slows everything down.
20    Q.    Does it effect the -- Does it effect whether
21 or not they become intoxicated or does it just affect the
22 rate at which the alcohol absorbs into their system; what
23 you know from your training?
24        MR. FARRAH:  Objection.
25    A.    The rate of which it's absorbed into your

1  system.

2      Q.    Okay, let me rephrase the question.  Based on

3  your bar code training, how does giving someone food

4  affect their intoxication from the alcohol they may be

5  drinking?

6          MR. FARRAH:  Objection.

7      A.    It's going to affect the rate alcohol is

8  absorbed into their system.

9      Q.    Does it make them less intoxicated if they

10  get to that point?

11          MR. FARRAH:  Objection.

12      A.    No.

13      Q.    And you're aware of that?

14      A.    Yes.

15      Q.    Do you have any other training outside the

16  restaurant that -- concerning alcohol consumption at all?

17          MR. FARRAH:  As of September 26, 2003?

18      Q.    As of 26, 2003.

19      A.    After the fact?

20      Q.    Before the fact?

21      A.    Before the fact.  Just the training we got

22  briefly at J&B's.

23      Q.    What did that consist of?

24      A.    That was a more casual training setting

25  compared to the extensive training we had at Longhorn.

1  It was a more on the floor at your own judgment, but we

2  did have a small booklet we went through.

3      Q.    Do you remember whether or not the people who

4  brought drinks from the bar that night, their drinks were

5  full when they got to the table?

6      A.    I don't recall.

7      Q.    Now, you testified earlier that you put in

8  another order about 11 minutes thereafter; correct?

9      A.    Yes.

10      Q.    That is based on reviewing the audit report;

11  is that correct?

12      A.    Yes.

13      Q.    Did you have any independent knowledge of

14  that before you reviewed that audit report?

15      A.    No.

16      Q.    By the way, when was the first time you saw

17  that audit report?

18      A.    Yesterday.

19      Q.    Is that audit report consistent with your

20  memory as to how many drinks you served Mr. Southworth?

21          MR. FARRAH: Objection.

22      A.    Yes.

23      Q.    Do you remember how long it took to serve

24  that next round of drinks to the table?

25          MR. FARRAH:  The 8:51 round?

163

1      Q.    The first full round, we'll call it the seven

2  --

3      A.    When I ordered seven together?

4      Q.    Yes.

5      A.    I don't recall how long it would have been.

6  But I don't believe I would have served them before they

7  got their salads.

8      Q.    Why is that?

9      A.    There having -- There drinking a round.  It

10  would have been too quick to have a round right with --

11  they drink a round and then have another round still with

12  their appetizers.

13      Q.    If you had ordered the seven and you went

14  back to the table and only three had finished, what would

15  you have done?

16          MR. FARRAH: Objection.

17      A.    Waited to either serve those three and held

18  the other four back, or held all seven back until all

19  seven were ready for their drinks.

20      Q.    In September 26, 2003 was your practice

21  concerning -- strike that.

22          You've already testified that back in

23  September of 2003 your practice when someone sat down was

24  to get their drinks right away when they initially sat

25  down; is that correct?

164

1      A.    Yes, sir.

2      Q.    We are now on to that second round which was

3  seven Manhattans at the Southworth table.  Did your

4  practice for a second round of drinks differ at all from

5  your practice when someone first sat down at the table?

6          MR. FARRAH:  Objection.

7      A.    The second round wasn't as rushed --

8      Q.    Did it affect it, yes or no?

9      A.    Yes.

10      Q.    Excuse me, was it different?

11      A.    Yes.

12      Q.    How was it different?

13          MR. FARRAH:  Same objection.

14      A.    I wouldn't rush to go get the drinks, because

15  I know they already have food in front of them.

16  Appetizers, if not appetizers, they at least had bread in

17  front of them.  They were occupied with something.  They

18  weren't at the table with nothing to eat or drink.

19      Q.    Subsequent to that you brought food to the

20  table; is that correct?

21      A.    Yes.

22      Q.    Later on in the evening you brought a final

23  round of drinks; correct?

24      A.    Yes.

25          MR. GILLIS:  Go off the record for a second.

165

1          (Off the record.)

2          (Back on the record as follows:)

3 BY MR. GILLIS:

4     Q.     Exhibit #8, when you were at Longhorn you

5 knew what this first page was; correct?

6     A.     Yes.

7     Q.     What does that first page represent?

8     A.     The check from that night.

9     Q.     Is that something you would normally print

10 out for the people at the table?

11    A.     Yes.

12    Q.     Is that the check for the Southworth table?

13    A.     Yes.

14    Q.     Do you remember serving that table anything

15 that's not included on that check?

16    A.     Just the Sprite.

17    Q.     Have you ever picked up a check where people

18 have left an amount of money that included the tip and

19 the charges?

20         MR. FARRAH:  Objection.

21    A.     Yes.

22    Q.     In September of 2003 was it a practice of --

23 have you ever picked up a check that people just left the

24 money on the table and left?

25    A.     Yes.

---

166

1     Q.     If you -- back in September of 2003, if you

2 didn't have to make change for a table, were you required

3 to put the check immediately in the computer?

4     A.     No.

5     Q.     Have you ever held onto the check until it

6 was less busy to put it in?

7     A.     Yes.

8     Q.     Do you know whether or not you did that on

9 this evening?

10         MR. FARRAH:  Objection.

11    A.     Not particularly.

12    Q.     Mr. Farrah has asked you several questions

13 about another table; do you remember that?

14    A.     Yes.

15    Q.     Do you remember any of the people from the

16 Southworth table being charged for that other tab that he

17 spoke about earlier in the deposition?

18    A.     No.

19         MR. FARRAH:  Objection.

20    Q.     If that were part of their bill, would it be

21 included on the front page of Exhibit #8?

22         MR. FARRAH:  Objection.

23    A.     I would assume so, yes.

24    Q.     Now, I want to point your attention to what

25 has been referred to earlier as the third round of

---

167

1 drinks; do you remember that?

2     A.     Yes.

3     Q.     Now, there are two entries here, at 9:21 and

4 I believe 9:24; is that correct?

5     A.     Yes.

6     Q.     I am referring now to the entries of drinks;

7 is that correct?

8     A.     Yes.

9     Q.     What are the two entries?

10    A.     It's four Jack Daniels Manhattans, and then

11 at 9:24, three Jack Daniels Manhattans.

12    Q.     Do you have an explanation why you have a

13 total of seven, but they're put in three minutes apart?

14    A.     The only explanation I have is that they

15 ordered them that way.  Three might have been ready for a

16 drink and the other four weren't, and then shortly right

17 after the four were ready.  Or I put in three and then

18 logged out and then put in four more.

19    Q.     What is the total number of years that you've

20 spent waitressing where you've, while you were

21 waitressing, you would serve alcoholic drinks as well?

22    A.     The whole time I've waitressed, which -- six

23 years.

24    Q.     Have you ever in your six years served drinks

25 three minutes apart to the same person?

---

168

1     A.     To the same -- No.

2     Q.     How far is the computer that you input these

3 drinks from the table?

4     A.     There is different computers all throughout

5 the restaurant.

6     Q.     How many computers?

7     A.     Four of them that I remember that we have

8 access to.

9     Q.     Where is the closest in relationship to the

10 table where the Southworth party was sitting?

11    A.     Right behind it.

12    Q.     Okay, if you were standing at the computer

13 importing something, could they talk to you from the

14 table?

15    A.     Absolutely.

16    Q.     I am going to show you what has been put in

17 by Mr. Farrah as Exhibit #14 to your deposition.  And I

18 would like for you, if you could, to hold up the picture

19 and point to the table and the closest computer terminal,

20 if you know?

21    A.     Their table is right here, and the computer

22 is right there.

23    Q.     So what's that about four feet?

24    A.     If that, yes.

25    Q.     Have you ever had an occasion before then

1 where you put one order in in two separate segments?

2     A.    Yes.

3     Q.    Is that a common practice?

4     A.    Yes.

5     Q.    Exhibit #13 that Mr. Farrah showed you, have

6 you ever seen that exhibit before today?

7     A.    No.

8     Q.    So you're not aware of Plaintiff's in this

9 case filing a separate lawsuit against Mr. Southworth?

10     A.    No.

11     Q.    When you brought that last round of Jack

12 Daniels Manhattans, do you remember if all of them were

13 drank that evening?

14     A.    I don't know if all of them --

15     MR. FARRAH:  Objection to the form.

16     Q.    Do you remember bringing that last round of

17 drinks to the table?

18     A.    Yes.

19     Q.    Did you bring them three and four separately

20 or did you bring them all together?

21     A.    I believe from what I remember I brought them

22 all together.

23     Q.    Were all of them drank that evening?

24     A.    Fully drank, I don't remember.

25     Q.    Do you ever remember one of them not being

---

1 touched at all?

2     MR. FARRAH:  Objection.

3     A.    Yes.

4     Q.    Can you explain to me whether or not --

5 strike that.

6     That last round of drinks, did you return any

7 of them to the bar?

8     A.    Yes.

9     Q.    Can you explain that?

10     MR. FARRAH:  Objection.

11     A.    I returned one to the bar.  I remember coming

12 to the table and one person had not finished with their

13 drink.  And I didn't drop it at the table, so I just

14 brought it back with me to the bar and left it there.

15     Q.    Did you -- is there anything that triggered

16 your memory as to why you remember that specifically?

17     A.    I remember the bartenders have a waste sheet

18 at the end of the night and it was still sitting at the

19 end of the bar because it was with their last round and

20 it was later in the evening, and Christen had said to me,

21 is this any good?  And I said no.

22     MR. FARRAH:  Objection

23     Q.    You spoke earlier about inputting money into

24 the computer.  Can you explain that process for us?

25     A.    When we go to cash out the check there is

---

1 options on the side we can check, cash, gift card, credit

2 card.  And if it is cash, we are going to hit -- select

3 cash.  And then it comes up with the denominational

4 buttons.  And if someone hands me $120, I am just going

5 to hit the one hundred dollar bill button and the twenty

6 dollar bill button.  I am not going to enter a ten dollar

7 bill button twelve times.

8     Q.    What are the denominations that you can chose

9 from on the computer at Longhorn when you were working

10 there in September of 2003?

11     A.    Normal dollar bills that you'd have in normal

12 use, a one, a five, a ten, a twenty, hundred.

13     Q.    So if someone gave you a hundred one dollar

14 bills, you had the option of putting in one dollar a

15 hundred times or a hundred in once; correct?

16     A.    Yes.

17     Q.    And do you remember how you put in the

18 amounts that evening?

19     A.    No.

20     Q.    Does that audit sheet show you how you

21 inputted the money that evening?

22     A.    Yes.

23     Q.    How did you put it in?

24     A.    A one hundred, a one hundred, a twenty and a

25 twenty.

---

1     Q.    For a total of $240?

2     A.    Yes.

3     Q.    On the bill of $202 plus change?

4     A.    Yes.

5     Q.    Was that common practice for you in September

6 of 2003?

7     A.    Yes.

8     Q.    I want to show you Exhibit #12 that was

9 introduced here, which shows the floor plan of the

10 Longhorn.  Can you point out, and why don't you take a

11 pen and circle the various computers where you could

12 input a drink for a patron to that evening?

13     A.    (Complies.)

14     Q.    Why don't you hold that up.  How many

15 different -- why don't you point out the various places

16 where there are computer terminals where you could input

17 something.

18     A.    There's a terminal here, a terminal here and

19 then in the back alley we have two.  One by the dish pit

20 and one right in front of the bar.

21     Q.    And the first one that you pointed out is the

22 one next to the Southworth table; correct?

23     A.    Yes.

24     Q.    Why would you go to one terminal as opposed

25 to another?

1  A.   Mostly likely would be because the terminal
2 is closest to our section.
3  Q.   Okay, but if someone was using that terminal,
4 where would you go?
5  A.   The back alley.
6  Q.   Going back to the audit report, the entire
7 exhibit there that's marked, had you ever seen audit
8 reports before you saw this audit report yesterday?
9  A.   No.
10  Q.   Is that something that is commonly provided
11 to the servers on a regular basis?
12      MR. FARRAH:  Objection.
13  A.   I have never seen one of those.
14  Q.   Did the state police, when you gave them this
15 statement, show you the audit report?
16  A.   No.
17  Q.   Did that audit report refresh your
18 recollection at all today?
19      MR. FARRAH:  Objection.
20  A.   Yes.
21  Q.   You had mentioned in response to Attorney
22 Farrah's questions that you had spoken with Christen
23 O'Donnell at the bar that evening; correct?
24  A.   Yes.
25  Q.   That was when you got that last -- what I am

1 calling that last round, which is the three and the four
2 Manhattans that were ordered three minutes apart.
3  A.   Yes.
4  Q.   After the seven Manhattans were ordered, is
5 that when the conversation took place?
6  A.   Yes.
7  Q.   Did you, on the basis of that conversation,
8 examine any further whether or not these patrons were
9 showing any signs of intoxication?
10      MR. FARRAH:  Objection.
11  A.   I believe it raised my awareness to if they
12 had ordered any more after that, I would have seriously
13 considered it.
14  Q.   Well, between the time that the drinks were
15 ordered and you brought them to the table, did you look
16 at them again?
17      MR. FARRAH:  Objection.
18  A.   I don't believe I did, no.
19  Q.   When you brought the drinks over to the
20 table, at that time, was there any question in your mind
21 that anybody at that table showed visible signs of
22 intoxication?
23  A.   No.
24      MR. FARRAH:  Objection.
25  Q.   When you brought that last round of drinks

---

175

1 over to the table, by that I mean the three and four
2 combined, was there any question in your mind as to
3 whether or not Mr. Southworth was showing any visible
4 signs of intoxication?
5  A.   None at all.
6  Q.   And by none at all, you mean he was showing
7 no signs?
8  A.   To me, no signs.  He was acting like he
9 normally acted.  He wasn't doing anything out of his
10 ordinary behavior.
11  Q.   Was he slurring his words?
12  A.   No.
13  Q.   Was he knocking over drinks?
14  A.   No.
15  Q.   Did he spill any drinks?
16  A.   No.
17  Q.   Was he asleep at the table?
18  A.   No.
19  Q.   Was he glassy-eyed?
20  A.   No.
21  Q.   Did he act in any manner other than when you
22 had previously served him and he appeared perfectly fine
23 to you?
24  A.   No.
25  Q.   I am sorry.  I know you answered it, but I

176

1 forgot your answer.  How many times had you served him
2 prior to this occasion?
3  A.   Maybe once.
4  Q.   How many times have you seen him in there
5 with other waitresses, or wait staff?
6  A.   I can't say exactly for sure.
7  Q.   You have seen him being served by Sherry
8 before; correct?
9  A.   Yes.
10  Q.   You've heard Sherry comment about him;
11 correct?
12  A.   Yes.
13  Q.   Did you feel that you had some knowledge of
14 this gentleman before you served him that evening?
15      MR. FARRAH:  Objection.
16  A.   Yes.
17  Q.   Is there a person -- this was not a person
18 you had served for the first time; correct?
19  A.   No.
20  Q.   Did you have any experience with him from
21 which you could further determine his degree of sobriety
22 that evening?
23      MR. FARRAH:  Objection.
24  A.   The first time I served him?
25  Q.   Yes.

178

1      A.    Yes.

2      Q.    You had mentioned in response to Attorney

3  Farrah's questions that there were -- you noticed that

4  there were five checks printed that evening; correct?

5      A.    Yes.

6      Q.    I believe you testified you're not sure why

7  five checks were printed; correct?

8      A.    Yes.

9      Q.    Based on your experience and training while

10  working for Longhorn Restaurant, can you tell me as you

11  sit here today, what are the possible reasons you would

12  print five checks for a table back in September of 2003?

13          MR. FARRAH:  Objection.

14      A.    No other reason except for if I had tried to

15  print it and it didn't print for some reason at that

16  computer, I'd go to another terminal, try it.  Or if I

17  had printed it and maybe sat the book down and had to

18  reprint it because I had put it down somewhere and didn't

19  have it.

20      Q.    Okay.  Have you ever printed multiple checks

21  for a table for people splitting the bill?

22      A.    Yes.

23      Q.    How do you do that? .

24      A.    You go in and you separate it and then you

25  have to print each individual check.

Starkings Court Reporting & Video Services

---

1      Q.    Could you print multiple copies to give to a

2  table and let them decide if they wanted to?

3          MR. FARRAH:  Objection.

4      A.    Yes.

5      Q.    Have you ever done that?

6      A.    Yes.

7      Q.    How many times did they sit around in the

8  restaurant after you served them that last round of

9  drink, if you remember?

10          MR. FARRAH:   Objection.

11      A.    If I remember it would have been at least a

12  half hour.

13      Q.    So from -- other than seeing Mr. Southworth

14  on the news the following evening, is there anything that

15  happened on the night of September 26, 2003 that was out

16  of the ordinary, that would have jogged your memory to

17  remember this evening?

18      A.    No.

19          MR. FARRAH:   Objection.

20      Q.    Was there anything that happened that night

21  while you were at the restaurant, before you learned

22  about Mr. Southworth on the news, that was out of the

23  ordinary?

24      A.    No.

25      Q.    Was there anything out of the ordinary that

Starkings Court Reporting & Video Services

---

179

1  night with any other table?

2      A.    No.

3      Q.    You had mentioned earlier in response to Mr.

4  Farrah's questions the suggestive selling.  Can you

5  explain what suggestive selling is?

6      A.    Any specials we have, we will suggest it to

7  them or try and sell them on that fact of if they order a

8  steak, we'll ask them if they want ribs with it.

9      Q.    Have you ever heard the term up-selling?

10      A.    Yes.

11      Q.    Can you tell me what your understanding of

12  up-selling is?

13      A.    Up-selling would be if someone asked for a

14  particular -- if they ask for a screwdriver, and it would

15  just -- if we didn't up-sell it, we'd just put it in with

16  our regular house vodka, or you know, we'd up-sell, oh,

17  would you like Absolute, Kettle One, so on and so forth.

18  Try and sell them on a more premium liquor to go in the

19  drink.

20      Q.    Does up-selling include in any way increase

21  in the amount of the drink or just using a higher caliber

22  liquor in the drink?

23      A.    Just a higher liquor in the drink.

24      Q.    By higher you mean better quality, not higher

25  volume of alcohol in the drink?

---

180

1      A.    Correct.

2      Q.    You gave the term vodka, rather than a bar

3  vodka, it might be Absolute or some other type of vodka;

4  is that correct?

5      A.    Yes.

6      Q.    Is there a difference in the price to that?

7      A.    Yes.

8          MR. GILLIS:  Could we go off the record just

9  a second.

10          (Off the record.)

11          (Back on the record as follows:)

12  BY MR. GILLIS:

13      Q.    Back when you were working at the Longhorn

14  and specifically September 2003, do you have a memory as

15  to how much food you would serve compared to alcohol?

16          MR. FARRAH:  In dollars?

17          MR. GILLIS:   In dollars, yes.

18          MR. FARRAH:  That would be apples and

19  oranges.

20          MR. GILLIS:  That's a good point.  Let me

21  just rephrase the question.

22      Q.    Dollarwise, do you have a memory as to how

23  much alcohol you served in relation to the amount of

24  dollars spent on food at the Longhorn when you were

25  working there back in September of 2003.

182

1    A.    I would say 85 to 90 percent of our sales
2  that night were food.
3    Q.    That was common for you?
4    A.    Yes.
5    Q.    So that would mean ten to 15 percent was
6  alcohol?
7    A.    Yes.
8    Q.    Now, you mentioned earlier that you consider
9  this a family restaurant; correct?
10   A.    Yes.
11   MR. FARRAH:    Objection.  I don't think she
12  said that, but go ahead.
13   Q.    In this -- in that restaurant when did it
14  start to slow down normally on Friday night?
15   A.    I would say about 9:30, 10:00.
16   Q.    By slow down, can you describe for me what
17  you mean by that?
18   A.    There wouldn't be a wait any more.  I would
19  say about 30 to 40 percent of the tables had already left
20  for the night, and probably wouldn't be reseat.
21   Q.    How does the noise level at 10:00 compare to
22  the noise level at let's say 8:00?
23   A.    There shouldn't be too much at all.
24   Q.    When the restaurant is full earlier in the
25  evening, is it generally loud in the restaurant?

1    A.    Yes.
2    Q.    Is it louder at 8:00 to 9:00 than it is 9:30
3  to 10:00 on average?
4    MR. FARRAH: Objection.
5    A.    Yes.
6    Q.    Do you remember when it started to slow down
7  on the night that you served Mr. Southworth in September
8  of 2003?
9    A.    I remember that right before they left it had
10  already slowed down, pretty much, probably for the night.
11   Q.    How long before they left had it slowed down?
12   MR. FARRAH: Objection.
13   A.    Twenty minutes.
14   Q.    Were you able to hear their conversation more
15  clearly at that point than earlier in the evening?
16   A.    Yes.
17   Q.    Do you remember the topics that they were
18  talking about?
19   A.    Not in particular, no.
20   Q.    Do you remember whether or not anybody at the
21  table slurring their words?
22   A.    I don't remember they were, no.
23   Q.    Do you remember if anybody was talking louder
24  than they had been previously in the evening?
25   A.    No.

183

1    Q.    If I spoke to same at 8:00 as I did at 10:00,
2  would it resinate further in the restaurant at that time
3  period?
4    MR. FARRAH:  Objection.
5    A.    Yes.
6    Q.    Why is that?
7    A.    You're speaking over the music that they've
8  turned up to kind of dull out the noise of everybody
9  talking, the noise of everyone around you, the crowd in
10  the front waiting area of everybody waiting, the crowd at
11  the bar of everybody waiting.  You're trying to speak
12  over all that to have other people hear you.
13   Q.    Is most of that background noise eliminated
14  later in the evening, by later I mean after 9:30 or so?
15   MR. FARRAH:  Objection.
16   A.    Yes.
17   Q.    Have you ever been deposed before?
18   A.    No.
19   MR. GILLIS:  I have no further questions.
20
21   EXAMINATION BY MR. FARRAH.
22   Q.    I only have a few.  What is intoxicated?
23  What does the expression of intoxicated mean to you?
24   A.    Intoxicated would be -- to me it would mean
25  that someone is showing visual signs of alcohol taking an

184

1  effect on their system.
2    Q.    Such as?
3    A.    Such as slurring their words, glossy-eyes,
4  stumbling, nystagmus in their eyes.
5    Q.    Did you say glossy eyes, G-L-O-S-S-Y.
6    A.    Yes.
7    Q.    And you said astagmus in their eyes?
8    A.    Yes.
9    Q.    S-T-A-G-N-E-S-S?
10   A.    Nystagmus.
11   Q.    Nystagmus, what is that? .
12   A.    Nystagmus is in your eyes when you try and
13  stare at something and you can't, your eyes can't focus
14  on it.
15   Q.    And have you learned that in your training as
16  a police officer?
17   A.    I've learned it again in my training as a
18  police officer.
19   Q.    You learned it before that, nystagmus, the
20  word?
21   A.    Yes.
22   Q.    From the bar code?
23   A.    No, not from the bar code.
24   Q.    From where?
25   A.    General knowledge, I think dealing with

1  things.

2      Q.    And have you ever served 17 Jack Daniels

3  Manhattans to a table in the space of 44 minutes before

4  that night?

5          MR. GILLIS:  Objection.

6      A.    No, sir.

7      Q.    Had you ever served 17 Jack Daniels

8  Manhattans and two 25 ounce beers to a table in the space

9  of 44 minutes before that night?

10          MR. GILLIS:  Objection.

11      A.    No, sir.

12      Q.    Had you ever served the equivalent of 19

13  double drinks to a table in the space of 44 minutes

14  before that night?

15          MR. GILLIS:  Objection.

16      A.    No, sir.

17      Q.    Have you ever served the equivalent of 38

18  drinks, nearly a drink per minute, to a table before that

19  night?

20      A.    No, sir.

21      Q.    And there was nothing unusual about that

22  night; is that your testimony?

23      A.    Yes, sir.

24          MR. FARRAH:  I don't have any more questions.

25

---

1          EXAMINATION BY MR. GILLIS:

2      Q.    Just one or two.  When you factor in whether

3  or not a person is or in the red or yellow zone, do you

4  focus in on the total number of drinks served to people

5  other than the person that you're focusing in on or do

6  you just focus in on the drinks served to that one

7  person?

8          MR. FARRAH:  Objection.

9      A.    I don't understand.

10      Q.    You're giving me a strange look.  That's

11  probably an inarticulate question.  You've heard Mr.

12  Farrah talk about all of these various drinks that came

13  to the table; correct?

14      A.    Yes.

15      Q.    There were how many people at the table?

16      A.    Seven.

17      Q.    How did your training and experience as a

18  waitress, did you take into account when making your

19  determinations whether or not a person is under the

20  effect of alcohol, how many drinks they had that evening,

21  or what other people had that evening?

22      A.    I take into account what they've had that

23  evening.

24          MR. GILLIS:  Okay, no further questions.

25

---

1          EXAMINATION BY MR. FARRAH:

2      Q.    I have a last question I should have asked it

3  before.

4          MR. GILLIS:  I am going to object if it goes

5  beyond the scope of the redirect and recross.

6      Q.    And my question is, someone did not touch his

7  drink at that table, the last drink; is that right?

8      A.    Yes, sir.

9      Q.    Did that indicate anything to you that that

10  person did not touch his drink?

11      A.    That was one was left back on the bar, so he

12  may have finished the one he still had in front of him

13  and they never asked for it, so I thought nothing of it.

14      Q.    What do you mean it was left back on the bar?

15      A.    I did not serve that one to the table.  So

16  instead of dumping it in the dish pit, I bring it to the

17  bar and leave it there.

18      Q.    So there's one person who had a drink in

19  front of him when the last round was ordered; is that

20  right, who you did not serve?

21      A.    When I brought the last order over, still had

22  a drink with some alcohol in it, so I did not serve it to

23  the table.

24      Q.    And didn't finish the drink that was in front

25  of him and ask for the drink that you were bringing; is

---

1  that right?

2      A.    I don't remember if he finally finished it or

3  not?

4      Q.    Do you know who that was?

5      A.    I do not know.

6      Q.    Was it Mr. Southworth?

7      A.    I do not know.

8          MR. FARRAH:  Thank you, thank you very much.

9          MR. GILLIS:  No further questions.

10          (Off the record.)

11          (And further, the witness sayeth naught.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  State of North Carolina
 2  County of Cumberland
 3
 4            C E R T I F I C A T E
 5
 6            I, Sandra DeGarmo Wise, notary public and
 7  certified court reporter, do hereby certify that said
 8  witness was duly sworn prior to the examination
 9  beginning, and that said examination was taken and
10  transcribed by Suzanne Thornton under my direction; and
11  the foregoing pages constitute a true and correct
12  transcription of the testimony of the witness; and that I
13  am not a relative or employee of any counsel or the
14  parties in this cause and have no interest in the outcome
15  of same.
16            In witness whereof, I have hereunto set my
17  hand and affix my official notary seal.
18
19
20            _____
21                  Sandra DeGarmo Wise
22            Notary Public - State of North Carolina
23            Nationally Certified Verbatim Reporter
24                Member:  NCRA, NVRA, NCVRA
25            My commission expires:  April 30, 2009
```

Starkings Court Reporting & Video Services



# GABRIEL & SWEENEY
## COURT REPORTING

Transcript of the Testimony of:
# Michael A. Marcantonio

In the Case of:
## Nancy Rosario, et al
## vs.
## Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse

Taken on:
## March 1, 2007

**Gabriel & Sweeney Court Reporting**
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton, MA   01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321   Fax   (978) 263-0669
email:  gsreporting@yahoo.com

Page 1

Volume 1
Pages 1 - 235

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05CV-10617-MLW

- - - - - - - - - - - -

NANCY ROSARIO, INDIVIDUALLY, AS
SHE IS THE ADMINISTRATRIX OF THE
ESTATE OF AWILDA SANTIAGO, ESSEX
PROBATE COURT DOCKET NO.
05IN2409(AD), FIRA VERONICA
ROSARIO AND CHRISTINA SANTIAGO,
AND AS SHE IS THE ADMINISTRATRIX
OF THE ESTATE OF JOSE SANTIAGO,
HEREIN CONNECTED PROBATE
CURICT, CASE NO. 03407LN

vs.

BARE HOSPITALITY INTERNATIONAL,
INC., d/b/a LONGHORN STEAKHOUSE

- - - - - - - - - - - -

DEPOSITION OF MICHAEL A. MARCANTONIO,
taken on behalf of the Defendant, pursuant to the
Massachusetts Rules of Civil Procedure, before
Kathryn K. Sweeney, a Registered Professional
Reporter, Certified Realtime Reporter and Notary
Public within and for the Commonwealth of
Massachusetts, at the offices of Gillis &
Bikofsky, P.C., 1150 Walnut Street,
Newton, Massachusetts, on February, March 1, 2007,
commencing at 10:15 a.m.

GABRIEL & SWEENEY COURT REPORTING
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Adam, MA 04720
(617) 969-4791 Phone (978) 266-1352
(617) 969-1321 Fax (978) 26-540609

Page 2

APPEARANCES:

MICHAEL K. GILLIS, ESQUIRE
NEIL SCHNURBACH, ESQUIRE
DAVID BIKOFSKY, ESQUIRE
    Gillis & Bikofsky, P.C.
    1150 Walnut Street
    Newton, Massachusetts 02461
    Appearing for Defendant

ALBERT L. FARRAH, JR., ESQUIRE
    One Washington Mall
    Boston, Massachusetts 02108
    Appearing for Plaintiff

Page 3

I N D E X

WITNESS -- MICHAEL A. MARCANTONIO    Page

Examination by Mr. Gillis        4

E X H I B I T S

Number  Description        Marked on Page

1   Supplement to Rule 26 report    4
2A - EE Photocopies of photographs    4
3   Rule 26 report        12
4   Educational experience    53
5   Updated testimony        57
6   Affidavit            69
7   Audit report        129
8   Page 68 of Bar Code    231

Page 4

P R O C E E D I N G S
IT IS HEREBY STIPULATED AND AGREED by
and between counsel for the respective parties
that the deposition transcript shall be read and
signed by the deponent within thirty days upon
receipt of said transcript under the pains and
penalties of perjury.
    It is further stipulated that all
objections, except as to form, and motions to
strike are reserved to the time of trial.
        MICHAEL A. MARCANTONIO,
having been satisfactorily identified by the
production of his Massachusetts driver's license
and duly sworn by the Notary Public, was examined
and testified as follows:
        (Exhibit No. 1, supplement to Rule 26
        report, marked for identification.)
        (Exhibit Nos. 2A through EE, photocopies
        of photographs, marked for
        identification.)
EXAMINATION BY MR. GILLIS:
Q. Could you please state your name for the record?
A. Michael A. Marcantonio. Anthony.
Q. Mr. Marcantonio, I'm here today to ask you

Page 5

questions about a case that you've been retained
as an expert in.
    If at any time you don't understand my
questions, just let me know, and I will try to
rephrase them. If at any time you need a break,
let me know.
    I take it you've been deposed before?
A. Yes.
Q. Okay. So you understand the ground rules?
A. Yes, sir.
Q. Okay. And you understand the English language,
correct?
A. Yes, sir.
Q. So it's fair to assume that if I ask you a
question and you answer it, you understood the
question?
A. Yes, sir.
Q. Okay.
        MR. GILLIS: Before we get started, I
just want to make a statement on the record that
based on the plaintiff filing yesterday a
supplemental Rule 26 response for Mr. Marcantonio,
I feel compelled to put on the record that this is
four months to the day after which we received his

Page 6

Rule 26 disclosure; that it is patently unfair to
expect us, on less than 24 hours notice, to
prepare for a deposition based on the supplemental
response; that we intend to move that it be
stricken based on its untimeliness; and that we
reserve the right to go forward with -- at a
further date, if the court allows you to continue
and allows this supplement to be -- denies our
motion to strike the supplement.
    And it does not appear to us that the
testimony contained therein is a result of any new
or recently disclosed information that would have
precluded Mr. Marcantonio from making these
statements in a timely fashion four months ago
when the expert answers were due; and that it
makes it patently unfair for us, in that we've
already deposed all of the fact witnesses
concerning alcohol and the service of alcohol, and
we would have to go back and re-depose at this
point in order to address the issues that have
been raised at this time.
    In addition to which, we'd have to depose
again Dr. Benjamin in light of the disclosure, in
addition to which we've -- the disclosure on its

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 7

1  face is invalid.
2      And I just want to state that for the
3  record.
4      MR. FARRAH:  Let me just have a quick
5  response, and we can get on to the business of
6  this deposition.
7      As I offered in the email to you
8  yesterday, and as I offer again, to the extent
9  that you feel you need an additional day to depose
10 him, or additional time to depose him because you
11 didn't have sufficient time to review the
12 supplemental disclosure, I have no objection to
13 that.
14      In terms of deposing fact witnesses, it's
15 my understanding that there are still fact
16 witnesses to be deposed.  Mr. Sirjane and another
17 fellow who was with -- allegedly with the group
18 that night.  So I don't see any --
19      (Discussion held off the record.)
20      MR. FARRAH:  And generally, I don't see
21 any prejudice here, but we can certainly talk
22 about this later.  Thanks.
23      MR. GILLIS:  Very briefly, you're right
24 there are two more fact witnesses who were there,

Page 8

1  but the majority, the six other people at the
2  table, plus all the servers, plus all the managers
3  have already been deposed.
4      But that having been said, let's go
5  forward.
6  Q.  Mr. Marcantonio, could you please tell me whether
7     or not you've reviewed any additional documents
8     since you filed your original Rule 26 disclosure
9     back on October 31st, which documents or papers
10    relate to this case?
11 A.  I don't believe so.
12 Q.  Okay.
13 A.  Other than just the experiment that we did to
14    confirm what I put in my report.
15 Q.  Okay.  Have you reviewed any further testimony of
16    Dr. Benjamin's?
17 A.  I don't believe I have.
18 Q.  Well, you --
19 A.  I think -- well, actually, I did review his
20    information, but I don't know whether it was
21    before -- after my report.
22 Q.  My understanding from reading your report
23    is that you reviewed an affidavit of Dr. Benjamin,
24    correct?

Page 9

1  A.  Yes.
2  Q.  And since your report was written before his
3     Rule 26 disclosure, can we agree that that was his
4     60(j) affidavit that was filed in this case?
5  A.  I believe that's true.
6  Q.  Okay.  You --
7  A.  I hadn't reviewed his deposition, if that's what
8     you're --
9  Q.  All right.  Have you reviewed his Rule 26
10    disclosure in this case, which was filed on
11    October 31st?
12 A.  I really can't remember.  I -- whatever's on my
13    report is what I reviewed.
14 Q.  Okay.  Your report just says an affidavit of
15    Dr. Benjamin.  He's actually filed two.
16    MR. GILLIS:  Perhaps, Al, you could --
17    MR. FARRAH:  I don't think he has
18    reviewed the Rule 26.
19    MR. GILLIS:  Okay.
20 Q.  So since November 1st you're not aware of
21    anything -- other than these photographs that have
22    been premarked as Exhibits 2A through EE, you've
23    not reviewed any other documents concerning this
24    case?

Page 10

1  A.  I don't believe I have.
2  Q.  Well, when you say you believe, do you have any
3     reason to believe you have reviewed anything?
4  A.  No, I don't.
5  Q.  Let's just go over first the supplemental response
6     that's been marked Exhibit 1, which was forwarded
7     to us yesterday, February 28th, 2007.
8         You're aware of this supplement, correct?
9  A.  Yes.
10 Q.  Was there anything in the supplement that -- well,
11    strike that.
12         The supplement primarily deals with you
13    making certain measurements -- or attempting to
14    make measurements concerning pouring alcohol in a
15    drink glass, correct?
16 A.  Correct.
17 Q.  Okay.  When were you first retained in this case?
18 A.  That would be on my list of things that you have
19    there.
20         I don't remember the exact date that I
21    was retained.  I'm sure you have that somewhere
22    which indicates the date.
23    MR. GILLIS:  Let's get this marked.
24 Q.  Do you recognize this document?

Page 11

1  A.  That's the report that I filed for the --
2     MR. FARRAH:  Do you have a copy for me?
3     MR. SCHNURBACH:  (Hands document.)
4     MR. FARRAH:  Thank you.  What is
5  Exhibit 1?
6     MR. GILLIS:  Exhibit 1 is his
7  supplemental.
8     MR. FARRAH:  Okay.  And Exhibit 2?
9     MR. GILLIS:  Photographs.  And that would
10 be 2A through EE.
11    MR. FARRAH:  Okay.
12 Q.  Do you recognize the document?
13 A.  Yes, sir.
14 Q.  What is that document?
15 A.  It's a report that I filed, based on what I had
16    reviewed.
17 Q.  In this case?
18 A.  Yes, sir.
19 Q.  Okay.  That's -- I'm going to refer to that
20    document as your Rule 26 disclosure, okay?
21 A.  Yes.
22    MR. GILLIS:  Let's have that marked as
23    Exhibit 3.
24

Page 12

1      (Exhibit No. 3, Rule 26 report, marked
2      for identification.)
3  Q.  Now, I'm going to give you 3 to look at.  Can you
4     tell me, based on that document, when you were
5     retained in this case?
6  A.  No, I don't think it has the date that I was
7     actually retained.
8  Q.  Do you know how long before you wrote your report
9     you were retained in this case?
10 A.  I would say within maybe eight or nine months.
11 Q.  Okay.  During that eight or nine months did you
12    have the opportunity to do the measurements that
13    you've done as stated in Exhibits 1 and 2, your
14    supplemental report and the photographs?
15 A.  I never did that particular type of measurement,
16    other than my practical experience as a bartender.
17         And I always knew that a Manhattan or
18    martini straight up in that size glass was a
19    minimum of two, pharmacologically, up to three
20    drinks in one glass to fill it to that level.
21         So based on experience, I already knew
22    that, and I had done that kind of testing before
23    in the past.
24         After this report I did one of those

2 (Pages 7 to 12)

Page 13

1    kinds of reports -- tests at any own home using
2    old granddad, and not using ice that was coming
3    from a restaurant, not using ExactoPours.
4        And I made that point to Al.
5  Q. Okay. This'll go a lot faster if you answer the
6    question.
7        MR. FARRAH: Just answer the question,
8    yes.
9        THE WITNESS: I'm sorry.
10 Q. The question was: Did you have the opportunity,
11    during the eight or nine months prior to filing
12    your report, to do the type of testing that you
13    did that's reflected in Exhibits 1 and 2 of this
14    deposition?
15 A. No.
16 Q. Why not?
17 A. Because I already knew it from experience.
18 Q. Okay. And why isn't it your experience of what
19    the amounts of the alcohol came up with? Why
20    aren't they in your report?
21 A. They are in my report.
22 Q. Your first report there?
23 A. Yes, sir.
24 Q. Okay. Where does it -- can you point out to me

Page 14

1    where it has the measurements as to exactly how
2    far up in the glass a Manhattan at the Longhorn
3    Steakhouse goes?
4  A. When it's double -- when I -- on that -- if you
5    look to Page -- Point Number 6 -- in the report,
6    if you look to the one, two, third page, and where
7    it says in my opinion. Point Number 4, it says
8    that they were -- served were double and
9    potentially triple drinks in the form of 25 ounce
10    beers and the Jack Daniels Manhattans served
11    straight up in a six ounce glass filled one
12    quarter of an inch from the top.
13 Q. Okay. Why didn't you do these experiments prior
14    to filing your original report, the one that
15    you're now supplementing?
16 A. Because I didn't think I needed to, because I knew
17    from experience that that was in fact true.
18 Q. Okay. So you didn't need to do this --
19 A. No, sir.
20 Q. -- to render your opinion in this case, correct?
21 A. That's correct.
22 Q. And so why did you do this subsequently?
23 A. Why?
24 Q. Yes.

Page 15

1  A. To prove to Al, plaintiff's counsel, that my point
2    was correct.
3  Q. Okay. Did you -- were you requested to do this?
4  A. I suggested it. I did it on my own first, and
5    then we spoke about it, then he and I together
6    went to The Point and conducted it with
7    ExactoPour.
8  Q. When did you do that?
9  A. I think it was last week.
10 Q. Is there anything in your schedule that would have
11    physically prevented you from doing the exact same
12    thing that you did last week at The Point with
13    Attorney Farrah that you could not have done prior
14    to filing your original report with this court on
15    October 31st, 2006?
16 A. No.
17 Q. Okay. The supplemental report that you have
18    submitted, which has been marked as Exhibit 1,
19    does this in any way change your opinions in the
20    report that was submitted on October 31st, which
21    has been marked as Exhibit 3?
22 A. No, sir.
23 Q. It doesn't change your opinion in any way?
24 A. It confirms it.

Page 16

1  Q. Okay. So you don't need this supplement in order
2    to render your opinion in this case, correct?
3  A. Correct.
4  Q. And you didn't draw any conclusions in this
5    supplemental report either, correct?
6  A. That I hadn't already drawn, no.
7  Q. Well, this report, and correct me if I'm wrong,
8    states what you did, but it doesn't draw any
9    conclusions from what you did, correct?
10 A. It would confirm my conclusions.
11        Maybe I don't understand your question,
12    Mr. Gillis.
13 Q. Is there any conclusion included in the
14    supplemental report, which has been marked
15    Exhibit 1?
16 A. The conclusion is that pharmacologically a
17    Manhattan is at least two to three drinks in one
18    glass.
19 Q. Okay. Where does it say that in the report?
20 A. What I just read to you.
21 Q. No, I'm saying in your supplemental report. Where
22    does it conclude in that supplemental report that
23    statement?
24 A. I don't believe it does.

Page 17

1  Q. Okay. So to get back to the original question:
2    There's nothing in Exhibit 1 that draws any
3    conclusions that you've put in writing as part of
4    that exhibit, correct?
5  A. As part of this exhibit?
6  Q. Exhibit 1. Not Exhibit 3. Exhibit 1.
7        MR. FARRAH: The supplemental report.
8  A. I don't believe so.
9  Q. Okay.
10        (Pause.)
11 Q. Okay. On the back part of Exhibit 3 it has your
12    curriculum vitae, and I just want to go over that
13    briefly with you, if I could.
14        Can you tell me how far you've gone in
15    school?
16 A. High school, Watertown, '71 graduated.
17 Q. Have you had any formal education after Watertown
18    High School?
19 A. I went to UMass for a semester.
20 Q. And did you complete that semester?
21 A. I believe I did.
22 Q. Okay. Any formal education after that point?
23 A. No, sir.
24 Q. As far as personal background, are you married?

Page 18

1  A. Yes.
2  Q. Any children?
3  A. No, sir.
4  Q. What's your date of birth?
5  A. 3/4/53.
6  Q. Happy birthday.
7  A. Thank you.
8        MR. FARRAH: When is it?
9        THE WITNESS: 4th of March.
10        MR. GILLIS: Sunday.
11        THE WITNESS: I'm working a double.
12 Q. And is it fair to say that for -- without going
13    through your entire resume here, for approximately
14    the last 20 years you've been doing TIPS training
15    and testifying on service of alcohol?
16 A. Yes.
17 Q. If I look at your resume, your last job
18    prior to training was assistant manager of Tom
19    Foolery's from 1983 to 1985, correct?
20 A. Correct.
21 Q. Okay. When you were at Tom Foolery's, did you
22    bartend or were you just a manager?
23 A. I was assistant manager.
24 Q. Okay.

3 (Pages 13 to 18)

Page 19

```
 1   A.  There'd be times I would bartend, of course.  You
 2       do everything when you're assistant manager.
 3   Q.  Okay.  Were you TIPS certified when you were at
 4       Tom Foolery's?
 5   A.  I was a trainer in October of '84.
 6   Q.  Okay.  You left there in June of '85, correct?
 7   A.  Yes.
 8   Q.  So for a portion of that time you were TIPS
 9       certified?
10   A.  Yes.
11   Q.  Okay.  And prior to that you owned a restaurant as
12       well, correct?
13   A.  I was partners in a restaurant, yes.
14   Q.  Well, your title says owner, correct?
15   A.  Yes.
16   Q.  And at that restaurant you served alcohol,
17       correct?
18   A.  Yes, sir.
19   Q.  And you bartended, correct?
20   A.  Yes, sir.
21   Q.  Okay.  Did you free pour?
22   A.  Yes, sir.
23   Q.  Okay.  Do you have a problem with free pouring?
24           MR. FARRAH:  Objection.  Did he or does
```

Page 20

```
 1       he?
 2   Q.  Yes.  When you were a bartender, did you think it
 3       was improper to free pour?
 4   A.  No, only -- no, I didn't at that point, because I
 5       was trained to know what to look for and how to
 6       pour.
 7   Q.  Okay.  So as long as people know what to look for
 8       and are properly trained, free pouring is an
 9       appropriate way to serve a drink, would you agree?
10           MR. FARRAH:  Objection.
11   A.  If they're properly trained, I would say yes.
12   Q.  Okay.  Did you use the ExactoPour?
13   A.  No
14   Q.  Did you need an ExactoPour?
15   A.  No.
16   Q.  Did you know about the ExactoPour?
17   A.  I don't even think ExactoPour was in back then.
18   Q.  Okay.  Did you think it was improper service not
19       to use an ExactoPour when you were bartending?
20           MR. FARRAH:  Objection.
21   A.  No, I did not.
22   Q.  Okay.  And you were a bartender at T.G.I. Friday's
23       back in '77 to '81, correct?
24   A.  Yes.
```

Page 21

```
 1   Q.  Okay.
 2   A.  I was -- not during that whole time.  I had to go
 3       through their training program.
 4   Q.  And when you were a bartender there, that was back
 5       when Massachusetts allowed happy hours, correct?
 6   A.  Yes, sir.
 7   Q.  Okay.  And you served people two-for-one drinks,
 8       correct?
 9   A.  I don't remember that we had two-for-ones at
10       Friday's back then.
11   Q.  If you were two-for-ones at Barbyann's?
12   A.  No, sir.
13   Q.  How about the Tom Foolery's?
14   A.  I --
15           MR. FARRAH:  Did they have two-for-ones
16       there?
17   Q.  Two-for-ones at Tom Foolery's?
18   A.  I don't believe we did.  I can't recall that we
19       ever did that there, no.
20   Q.  Have you ever worked at a restaurant that served
21       two-for-ones?
22   A.  I don't recall that, no.
23   Q.  Okay.  Have you ever -- were you aware, when you
24       were a bartender, that restaurants served
```

Page 22

```
 1       two-for-ones?
 2   A.  Yes.
 3   Q.  Okay.  Did you have an opinion that that was
 4       inappropriate service of alcohol at that time?
 5           MR. FARRAH:  Objection.
 6   A.  Yes.
 7   Q.  Okay.  So back when you were a bartender and it
 8       was legal to serve two for one drinks, you felt
 9       that two-for-ones was inappropriate service of alcohol?
10           MR. FARRAH:  Objection.
11   A.  I did believe that.
12   Q.  Okay.  What was inappropriate about it?
13   A.  Well, if customer has half a drink in front of
14       them or a full drink in front of them, they tend
15       to drink that one quick, so the second one doesn't
16       warm up or die.  So it tends to cause people to
17       drink a little bit faster.
18   Q.  Well, that would be the same today if they served
19       them one drink when they had half a drink in front
20       of them, correct?
21   A.  Yes, sir.
22   Q.  Okay.  So you think that any time someone has a
23       drink in front of them, if they get another drink
24       that's inappropriate service?
```

Page 23

```
 1           MR. FARRAH:  Objection.
 2   A.  I would say you have to use your people skills.
 3       If you're properly trained and you know that it's
 4       safe to serve them another beer, that would be
 5       fine, but it depends on the circumstances.
 6           But generally, if a person has a half a
 7       drink in front of them, you put up another one,
 8       it's going to inspire them to drink faster.
 9   Q.  Okay.  So is that inappropriate service or not?
10   A.  In certain circumstances, yes.
11   Q.  Okay.  So it's not always inappropriate, correct?
12           MR. FARRAH:  Objection.
13   A.  It would depend on the circumstance, yes.
14   Q.  Okay.  It's a case-by-case analysis that the
15       person making the service of alcohol would have to
16       make, correct?
17   A.  Certainly.
18   Q.  Okay.  And that would be based on their own
19       training, correct?
20   A.  Correct.
21   Q.  And it would be based on any indicators that they
22       see in the person to whom they're serving the
23       alcohol, correct?
24   A.  Certainly.
```

Page 24

```
 1   Q.  And they'd review their inhibitions, correct?
 2   A.  Yes.
 3   Q.  Their coordination, correct?
 4   A.  Certainly.
 5   Q.  Any other things that -- judgment, correct?
 6   A.  Judgment and reactions.
 7   Q.  Reaction.  They look at all those things, and it
 8       would be a judgment that they would have to make,
 9       because they're the ones who are there serving the
10       drink, correct?
11           MR. FARRAH:  Are you testifying or is he?
12       Objection.
13           MR. GILLIS:  I'm going to strike the
14       comment.
15   Q.  But go ahead and answer.
16           MR. FARRAH:  You can't strike the comment
17       from the record.
18   A.  Shall I continue?
19   Q.  Yes.
20           MR. FARRAH:  I object.
21   A.  Would you rephrase the question again for me,
22       because I've lost my train of thought.  I'm sorry.
23   Q.  There are circumstances when serving someone who
24       has a half a drink in front of them is not
```

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 25

1  inappropriate, correct?
2  A. I don't think it's wise, but it -- there'd be
3  certain circumstances where I would -- I might do
4  that.
5      I have to be very cognizant of what the
6  strength of the drink is that I'm serving them,
7  and the speed in which they're drinking.
8      I would also have to be aware of whether
9  they're eating or not.
10     Again, we talked about inhibitions,
11  judgment, reactions and coordination. I would
12  also be concerned about the intoxication rate
13  factors, and the stress, exhaustion and mood an
14  individual might be under at the time.
15 Q. Okay. So let's get off the fence. Either it's
16  appropriate or it's inappropriate to serve someone
17  with a half a drink in front of them. Which is
18  it?
19     MR. FARRAH: Objection to the form. He's
20  answered the question.
21 A. I would basically say that I have answered the
22  question. It's a judgment call based on the
23  individual circumstances, but I don't recommend
24  it.

Page 26

1  Q. Okay. Did you ever serve anybody a drink with a
2  half a drink in front of them when you were a
3  bartender?
4  A. I honestly can't remember that far back.
5  Q. Okay.
6  A. It's been a while since I've been behind the
7  stick.
8  Q. You currently train quite regularly people in the
9  TIPS program, correct?
10 A. Yes, I do.
11 Q. And do you instruct them specifically never to
12  give a drink to anyone who has a portion of a
13  drink in front of them; never get them another
14  drink?
15 A. Yes, I do.
16 Q. You state that in every seminar that you give?
17 A. Yes. The standard line I give them is if you have
18  half a drink in front of you, and I put up another
19  one, what would you do with the one in front of
20  you? And inevitably, more than 99 percent of the
21  time they say I would finish it faster.
22 Q. Okay.
23 A. Once in a while somebody will say I'll give it
24  back to you and take the new one.

Page 27

1  Q. As a part of the TIPS program, you give them, the
2  people, written materials as well, correct?
3  A. Yes, sir.
4  Q. And you do video training as well, correct?
5  A. Yes, sir.
6  Q. Nothing in the written materials says don't serve
7  someone who has a portion of a drink left in front
8  of them, correct?
9  A. It actually says do not serve a fresh drink
10  without taking away the glass from the last drink.
11 Q. Okay. Massachusetts allows people to get served
12  two drinks simultaneously, correct?
13     MR. FARRAH: Objection.
14 A. The state law says you cannot deliver to one
15  person any more than two drinks at a time.
16  There are cities and towns that recommend
17  only one drink per person at a time.
18 Q. What does Leominster recommend?
19 A. I haven't looked at the Leominster regulations.
20 Q. Did you think that was important in this case?
21 A. It would be wise, true.
22 Q. So why didn't you do it?
23 A. I just never got around to doing it.
24 Q. Didn't have time?

Page 28

1  A. You could -- I don't -- didn't even really thought
2  about it.
3  Q. But it's perfectly legal in Massachusetts to give
4  one person two drinks to take away and do with
5  what they wish, correct, other than give it to a
6  minor or intoxicated person?
7     MR. FARRAH: Objection to the form.
8  A. I can't answer that question yes or no. Every
9  time somebody orders two drinks from me, if I'm a
10  bartender or I train people, if they order two
11  drinks, you ask where's the other one going? And
12  if they say they're both for him, then I say,
13  listen, I'm going to be here all night long, I'll
14  give them to you one at a time.
15 Q. So you disagree with the current Massachusetts law
16  that allows a person to get two drinks at one
17  time?
18 A. No, I didn't say that. I disagree if it's for
19  their own consumption.
20 Q. Okay. If a person buys two drinks for their own
21  consumption, is that legal in Massachusetts?
22 A. In certain cities it is, yes.
23 Q. What cities is it not legal in?
24 A. Worcester. Quincy recommends, but doesn't

Page 29

1  regulate.
2  Q. Okay.
3  A. So it's important to know what the city or town
4  requires.
5  Q. Other than Worcester, in what city or town in
6  Massachusetts is it illegal by town ordinance to
7  give someone two drinks?
8  A. I really haven't bothered to look at all the
9  cities' and towns' rules and regulations on that
10  specific item, but it is contrary to responsible
11  beverage service.
12 Q. Okay. So you disagree with the Massachusetts law
13  that allows someone to serve one person two
14  drinks, even if it's for their own consumption?
15 A. No. If it's for some -- if they're buying it for
16  somebody else, I don't disagree with it, as long
17  as I know where the drink is going.
18     If it's for their own consumption, I
19  would say one drink per person at a time would be
20  wise.
21 Q. And that was my question. Do you disagree with
22  the Massachusetts law that allows a person to get
23  two drinks for their own consumption, correct?
24 A. The law doesn't say that. The regulation says you

Page 30

1  cannot deliver to one person any more than two
2  drinks at a time. That's all it says.
3     When it was originally written back in
4  the early '80s, when McCarthy was at the ABCC, it
5  was one drink per person at a time. But through
6  the lobby efforts of the MRA, they loosened it up
7  to read two, because of the argument I'd like to
8  get my wife a glass of wine while we're waiting
9  for dinner.
10     That's how long I've been in this
11  business.
12 Q. Or people want to get two drinks at a sporting
13  event because of the length of the line?
14 A. Again, if it's both for them, they tend to drink
15  them faster, so that's a problem.
16 Q. Okay. So every guy who goes up to get two beers
17  at Fenway Park, you disagree with that service of
18  alcohol, correct, if those two drinks are for
19  their own consumption?
20 A. If it was for their own consumption, yes, I do.
21 Q. Okay. And you agree with -- you disagree with
22  that same premise at TD Banknorth Garden, correct?
23 A. TD Banknorth Garden leaves it up to the discretion
24  of the individual server.

5 (Pages 25 to 30)

Page 31

1  If you feel that this person's drinking
2  too fast, and you assume those two beers are for
3  them, then you can go to one beer at a time.
4  Q. That wasn't the question. Do you disagree with TD
5  Banknorth serving two beers to one person for
6  their own consumption?
7  A. I don't agree with that.
8  Q. Okay. Do you agree with Foxboro Stadium which
9  serves -- serving two beers to one patron for
10  their own consumption?
11  A. I do not agree with that.
12  Q. Do you agree with the Worcester
13  Centrum -- disagree with the Worcester Centrum
14  serving two beers to one person for their own
15  consumption at a sporting event?
16  A. Whatever venue you say, I'm going to say the same
17  answer. No, I do not agree with that.
18  Q. No matter where in Massachusetts, even if it's
19  legal, they serve two beers or two alcoholic
20  drinks to one person for their own consumption,
21  you disagree with that?
22  A. Yes.
23  Q. Okay. Are you aware of the Team Program in New
24  Hampshire?

Page 32

1  A. Yes.
2  Q. Can you tell me about the Team Program?
3  MR. FARRAH: Objection to the form.
4  A. Team Program is more --
5  MR. GILLIS: What was wrong with the form
6  of that question?
7  MR. FARRAH: What do you want him to tell
8  you about it? We'll be here a long time.
9  MR. GILLIS: Well, fine. We're not in a
10  rush.
11  A. The Team Program is a program that the liquor
12  commission puts on that covers laws and IDs, and
13  touches upon briefly pharmacological effects.
14  Q. Do you think that's an adequate program?
15  MR. FARRAH: Objection.
16  A. It depends who's training it.
17  Q. Well, when did you come up with that? Haven't you
18  previously testified that you said that that
19  program is inadequate?
20  MR. FARRAH: Objection.
21  A. Yes, I did.
22  Q. And said that more than 50 percent of the
23  bartenders in New Hampshire who have taken that
24  state program are not properly trained? Isn't

Page 33

1  that your testimony?
2  A. Yes, it was.
3  Q. So it wasn't --
4  A. It wasn't testimony actually. It might have been
5  testimony, but it was -- I wrote it in a chapter
6  in a book, I'm sure.
7  Q. You quoted it from your deposition, correct?
8  A. Yes.
9  Q. Are you now saying that that was inaccurate?
10  A. No. I still believe it. I wouldn't let them
11  train my dog.
12  Q. Okay. So in addition to it being inappropriate
13  service at all these venues across Massachusetts,
14  you think that the New Hampshire state program for
15  training their bartenders is insufficient,
16  correct?
17  A. If the people who are training the people that
18  trained me, yes.
19  Q. Okay. Are you aware of any other trainers, other
20  than who trained you?
21  A. Not in New Hampshire, no. I was disappointed --
22  Q. Okay. You --
23  A. I had been trained by a guy by the name of Randall
24  Avery in the past who was the chairman -- who

Page 34

1  might be the chairman of the New Hampshire
2  Commission at this point in time.
3  Q. And you felt that the service -- that the training
4  he gave you was inadequate?
5  A. No. Randall Avery did a good job back in -- this
6  is back in the early, early '80s. In fact, I
7  called him and complained about the people who
8  trained me when I took the program.
9  Q. Other than Mr. Avery and the person who trained
10  you, have you sat through any other training for
11  the Team Program in New Hampshire?
12  A. No.
13  Q. Okay. So you're not personally aware of how any
14  other trainers do the program, because --
15  A. Not in that --
16  Q. -- you haven't been there, correct?
17  A. That's correct.
18  Q. You were on the Governor's Highway Safety Bureau
19  from 1984 to '85, correct?
20  A. Yes.
21  Q. Well, according to your resume here.
22  A. Yes.
23  Q. What you did do in that one year on the Highway
24  Safety Bureau?

Page 35

1  A. It was a --
2  MR. FARRAH: Objection to the form.
3  A. It was a voluntary committee I was on to research
4  programs that were in the United States to teach
5  people how to sell and serve alcohol responsibly.
6  Q. How much time did you spend during that time
7  period working on that project?
8  A. I can't tell you specifically. It was well over
9  20 years ago.
10  Q. Okay. Was it --
11  A. It was significant. I spent a -- I did a lot of
12  research.
13  Q. Did you have a full-time job at the time?
14  A. Yes, sir. I was at Tom Foolery's, I believe.
15  Q. Okay. So whatever time you spent was in your
16  spare time when you weren't working full-time?
17  A. Correct.
18  Q. So it wasn't a full-time job for you to look up
19  these programs, correct?
20  A. No.
21  Q. And the program you got was out of Washington
22  D.C., the TIPS program, correct?
23  A. I chose --
24  MR. FARRAH: I'm sorry. Was the question

Page 36

1  the program you got?
2  Q. The program that you found and settled on through
3  your research was the TIPS program, which was
4  based out of Washington D.C., correct?
5  MR. FARRAH: Objection to the form.
6  A. Yes.
7  Q. Okay. And you suggested it to the state, correct?
8  A. I don't know if I -- I don't know if I can say
9  that I suggested it to the state, but I -- out of
10  all the research that I did, I thought it was the
11  most credible program at the time.
12  Q. Well, you say on your website that you found the
13  program and brought it to Massachusetts. Is that
14  accurate?
15  A. Probably. I found it when I did my research, I
16  chose it, and I've been teaching it every since.
17  I've trained over 40,000 people in the program.
18  Q. Okay. But you've had no affiliation with that
19  organization for the past 22 years, correct?
20  A. The Governor's Highway Safety Bureau?
21  Q. Yes.
22  A. Off and on I have.
23  Q. Well, why is it not included in your resume?
24  A. Because I don't care about my resume. I'm a TIPS

Page 37

1    trainer. That's what I do.
2  Q. Okay.
3  A. The resume is not -- it's just a guideline. It
4     doesn't matter to me. What matters to me is --
5  Q. It does matter to people who are trying to depose
6     you to find out what your experience is.
7  A. Well --
8  Q. Are you aware -- can you tell me exactly what
9     experience you have with the Governor's Highway
10    Safety Bureau since 1985 that's not included in
11    your curriculum vitae?
12 A. I had a list of educational -- additional
13    educational experiences, and I had a list -- I
14    don't have it with me -- that talked about the
15    variety of different alcohol awareness seminars
16    that I participated in with the Governor's Highway
17    Safety Bureau. And that occurred throughout the
18    '80s, into the '90s.
19 Q. And where is that?
20 A. In my office.
21 Q. Did you provide it to counsel as part of your CV?
22 A. I don't recall. I might have. I really don't
23    recall.
24 Q. Will you provide him a copy to give to us?

Page 38

1  A. Absolutely.
2  Q. You spent six years on the Alcohol Awareness
3     Advisory Committee, correct?
4  A. Yes, that's the -- that was the -- that was a
5     subsection of the Governor's Highway
6     Safety -- that's what they called the committee.
7  Q. Okay. What did you do on that committee?
8  A. Basically conducted a portion in an all-day
9     seminar that they had conducted at the different
10    counties in Massachusetts; and also attended some
11    of the other seminars that they -- the Governor's
12    Highway Safety Bureau would put seminars together
13    in different counties, and a variety of different
14    speakers would speak.
15 Q. Were you paid for those speaking engagements?
16 A. I was given -- not initially. And then later on I
17    was given a stipend.
18 Q. During that six-year period how many seminars
19    would you approximate that you gave?
20 A. I really don't know. I'd have to look at the
21    paper that I have.
22 Q. You have that all written down someplace?
23 A. Pretty much.
24 Q. And that's in the documents that you will give to

Page 39

1     your lawyer?
2  A. Absolutely.
3  Q. What was your affiliation, if any, with the Mass
4     Restaurant Association from 1988 to 1993?
5  A. I was part of their alcohol awareness committee
6     to -- that dealt basically with alcohol issues.
7  Q. How much time did that require?
8  A. It depended on what I was doing. I helped to -- I
9     pretty much put together a program called Project
10    Stop, which taught people how to recognize and
11    properly check IDs; recognize fake IDs. And that
12    took some time.
13 Q. Is there a reason why you haven't had any
14    affiliation with them since 1993?
15 A. Yes.
16 Q. What?
17 A. I had testified against bars and restaurants as an
18    expert witness, and they frowned upon that. And
19    then they basically didn't want me to be part of
20    that group anymore.
21 Q. Who told you that was the reason you were asked to
22    leave?
23 A. I wasn't asked --
24    MR. FARRAH: Objection to the form.

Page 40

1     THE WITNESS: I'm sorry.
2     MR. FARRAH: No, it's all right.
3  Q. Just to speed things along, he can object to the
4     form of the question. It doesn't stop you from
5     answering it. So when he objects, you can go
6     ahead and answer anyways.
7  A. Very well.
8  Q. And if he doesn't want you to answer, he'll tell
9     you not to.
10 A. Very good. Who told me that --
11 Q. That was the reason why you were no longer on the
12    advisory committee?
13 A. I believe Tom McCane did.
14 Q. And where is Tom McCane?
15 A. I don't know where he is now. He was the owner of
16    Tom Foolery's.
17    He was a past president of the Mass
18    Restaurant Association, and he encouraged me not
19    to teach -- not to testify against any
20    establishment.
21 Q. So your former boss is the one that you believe
22    precluded you from being involved with the Alcohol
23    Awareness Advisory Committee for the Mass
24    Restaurant Association?

Page 41

1     MR. FARRAH: Objection.
2  A. One of a few, yes.
3  Q. By the way, during that time period, '88 to '93,
4     you testified against restaurants, is that
5     correct?
6  A. I had.
7  Q. Okay.
8  A. I think in '87 was one of the first cases I worked
9     on.
10 Q. And you've been testifying since, correct?
11 A. Yes.
12 Q. Okay. What percentage of your testifying is for
13    plaintiffs, as opposed to defendant restaurants in
14    the cases that you're involved in?
15    MR. FARRAH: In Dram Shoppe type cases,
16    is that what you're --
17    MR. GILLIS: Yes, Dram Shoppe type cases.
18 A. Primarily all. There's been a couple that I've
19    worked for the defense.
20 Q. How much money do you make a year as an expert?
21 A. I don't know what the dollar value is, but I -- in
22    a recent deposition I was asked to do a percentage
23    of income, and I can tell you the -- at the most I
24    think one year was 12 percent. It could be as

Page 42

1     little as one percent.
2     My primary income source is responsible
3     alcohol server training.
4  Q. When you say 12 percent, let's take 2006. What
5     amount of money did you make as an expert in 2006?
6  A. I have no idea right off the top of my head.
7  Q. Do you have a ballpark?
8     MR. FARRAH: Objection to the form.
9  A. I really can't tell you. Do you want me to guess?
10 Q. No. You know how to work a deposition. You've
11    been deposed before.
12 A. I do.
13 Q. And you know nobody wants guesses. I'm just
14    asking you to state under oath whether or not you
15    can tell me what income you derived, with
16    approximation, not guessing, for the calendar year
17    2006.
18 A. I would say under 20,000. I would say more
19    than -- maybe more than 10. Somewhere around
20    there.
21 Q. And how much money in 2006 did you earn as a
22    server trainer?
23 A. I know the gross income for my company was
24    260-some-odd thousand dollars, I think. Or in

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 49

```
 1   specific records, so I didn't bring anything with
 2   me. I apologize if that's what I'm supposed to
 3   do. I am not --
 4         MR. FARRAH: That's not what he's asking
 5   you.
 6         THE WITNESS: I'm sorry.
 7   Q. Well, did you talk to your lawyer -- strike that.
 8        You filed a Rule 26 disclosure in this
 9   case, correct, which is Exhibit 3?
10         MR. FARRAH: The report.
11   A. Yes, the report I filed.
12   Q. Okay. Did you review Rule 26 to see what was
13   required of you of prior testimony?
14   A. I did not.
15   Q. Okay. When the deposition's over will you review
16   it with counsel and provide us all of the cases
17   that that Rule requires?
18   A. Yes, I will.
19         MR. FARRAH: But just for the record,
20   less the record be unclear, you first asked
21   him -- you first asked him whether he had
22   testified in Massachusetts in the last five years,
23   I think under the misapprehension that Rule 26
24   required that witnesses go back five and not four
```

Page 50

```
 1   years.
 2        And his report, which has been marked as
 3   Exhibit 3, on the page that begins with the
 4   discussion of prior testimony, starts with the
 5   following are court appearances or court cases
 6   that I've given depositions within the last four
 7   years.
 8        If there's more, we'll certainly get it
 9   for you, but I don't want the record to be
10   left --
11         MR. GILLIS: I agree with what you said,
12   and I believe I asked the question the second way.
13   But just in case I didn't, let me do it
14   appropriately.
15   Q. Are you aware of any other testimony, either by
16   deposition or at trial, that you've given in any
17   case in the last four years which is not included
18   in this list which is part of Exhibit 3?
19   A. I would have to look at my records to answer that
20   October 31, 2006. So October 31, 2006.
21   A. I would have to look at my records to answer that
22   properly.
23         MR. FARRAH: We will, and if there's
24   more, we'll get it for you. And if you want to
```

Page 51

```
 1   bring him back to ask about that, I don't have a
 2   problem with that.
 3   Q. Without pinning you down exactly, do you have any
 4   memory of testifying in Massachusetts within the
 5   last four years for any reason? That'd be 19 --
 6   A. In civil or criminal?
 7   Q. Either. 2002 to 2006?
 8   A. I did testify in a criminal case in September, I
 9   think it was, of this past year.
10   Q. Okay. Where was that?
11   A. That was at Middlesex Superior Court.
12   Q. And what was the nature of the case?
13   A. I was inline blading, skating in a cemetery down
14   the street from my house, and I saw a gentleman
15   who was staggering to a motorcycle. I -- and this
16   was in April. I called the police, and they
17   subpoenaed me to testify as to what I saw, because
18   they did catch him.
19   Q. So that was as a fact witness, not as an expert,
20   correct?
21   A. Correct.
22   Q. Do you know of any other testimony, off the top of
23   your head? And again, I know you're going to go
24   check your records and so forth, but can you think
```

Page 52

```
 1   of any other testimony while we're sitting here
 2   that you've testified in Massachusetts, or for
 3   that matter anywhere else, in the last four years
 4   that's not included in here?
 5         MR. FARRAH: Exhibit 3, your report.
 6   A. I really -- I'd have to look at my files to see
 7   that, sir.
 8   Q. Okay.
 9         THE WITNESS: Can I take a quick one?
10         MR. GILLIS: Sure. Five-minute break?
11         THE WITNESS: Yes.
12        (Short break was taken.)
13   Q. Okay. During the break you've provided me with
14   two additional documents?
15   A. The first is -- says Dram Shoppe
16   Consultants at the top, and it says related
17   educational experience.
18        Do you recognize that document?
19   A. Yes.
20   Q. And can you tell me what that document is?
21   A. It was a list of the seminars that I attended, and
22   things that related to responsible alcohol service
23   in the years -- and it has the Governor's Highway
24   Safety Bureau seminars on it, to the best of my
```

Page 53

```
 1   knowledge, as you requested.
 2   Q. Okay. Let's get that marked.
 3        (Exhibit No. 4, educational experience,
 4   marked for identification.)
 5   Q. Now, have you -- other than your TIPS training,
 6   which you do -- you do that fairly regularly,
 7   correct?
 8   A. Yes.
 9   Q. Other than your TIPS training, are there any other
10   seminars that you have done since this -- since
11   this list, which you can take a look at it, but it
12   looks to me like the last date on here is 2002,
13   with the Lobster Boat Restaurant in Yarmouth.
14         MR. FARRAH: Seminars to taken or given?
15         MR. GILLIS: Given.
16   A. I do seminars in Yarmouth every year for the
17   Yarmouth Restaurant Association. It's more of an
18   awareness seminar, kind of an overview. I do
19   awareness seminars, like for Smith College.
20        The awareness seminar covers laws, IDs,
21   how to recognize intoxication and intervention
22   strategies, but I don't list them when I do them.
23   Q. Okay. Why is that?
24         MR. FARRAH: Why doesn't he list them?
```

Page 54

```
 1         MR. GILLIS: Yes.
 2   A. I don't think it's necessary.
 3   Q. Does it deal with the service of alcohol by
 4   servers?
 5   A. It would be, or it could be a social host setting,
 6   sure.
 7   Q. You don't think that's relevant to your disclosure
 8   as to seminars?
 9   A. Well, I mean, it may very well be relevant in this
10   circumstance, but I didn't think it was necessary.
11        And do I have to provide every single
12   TIPS class I -- because I probably do 150 to 200
13   TIPS classes a year, so I'm confused.
14   Q. I already accepted -- I asked the question except
15   for your TIPS classes.
16   A. Sorry.
17   Q. Other than Smith College and Yarmouth, are you
18   aware of any other organizations that you do
19   training for that's not listed on here, other than
20   your TIPS training --
21         MR. FARRAH: Exhibit 4.
22   Q. -- concerning alcohol service and awareness?
23   A. I -- nothing comes to the top of my head right
24   now.
```

9 (Pages 49 to 54)

Page 55

```
 1   Q.  Okay.
 2          (Pause.)
 3   A.  Oh, I'm sorry, I have done -- I did an awareness
 4       seminar for 600 freshman, for the freshman class
 5       of Williams College in the past two years.
 6   Q.  How does that awareness program differ from TIPS
 7       training?
 8   A.  It basically focuses on the liabilities, and how
 9       they can make a difference as a friend
10       being -- when you're watching your friends consume
11       or overconsume alcohol.
12   Q.  Okay.
13   A.  And basically touches upon the liability.  I kind
14       of designed it around the audience, if you will.
15   Q.  Okay.  And you've provided me with another
16       document, which I'll ask you to identify.
17   A.  It's the more recent -- after '02, the more
18       recent -- I did a deposition -- I participated in
19       a deposition on January 25th, '07 on a case in
20       Georgia.
21          And that's I think the only additional
22       information that we have on that, compared to what
23       you had before.
24   Q.  As part of the disclosure pursuant -- in
```

Page 56

```
 1       Exhibit 3, correct, that's the only other case
 2       that's been added is the '07?
 3   A.  Yes, that's the only other deposition I've been
 4       involved in, I believe.  I haven't even read
 5       the -- like I said, I haven't reviewed it yet.
 6   Q.  And what were you requested to testify to in that
 7       case?
 8   A.  The responsible service of Ruby Tuesday's.
 9   Q.  Okay.  And what was the facts scenario in that?
10   A.  The facts and the scenario in that is people were
11       served a large amount of alcohol, and they
12       collided with an ATV with six children on it.  And
13       I think five of the children were killed, and one
14       was seriously injured.
15   Q.  When you say a large amount of alcohol, how much
16       alcohol was the driver served?
17   A.  I don't know exactly.  I can't tell you exactly at
18       this point in time.  It was -- I don't know the
19       exact specifics.  I think it was shots.  I think
20       there was some beers involved, but I can't
21       remember specifics of it right at this point in
22       time.
23   Q.  Okay.  We'll get this marked as an exhibit.
24          (Exhibit No. 5, updated testimony, marked
```

Page 57

```
 1       for identification.)
 2   Q.  You have in front of you Exhibit 3, correct?
 3   A.  Yes.
 4   Q.  And that's your Rule 26 disclosure, is what we've
 5       been calling it, in this case, correct?
 6   A.  Yes.
 7   Q.  Based on --
 8          (Pause.)
 9   Q.  You list in there, under I believe Section G --
10          MR. FARRAH:  What page?
11          MR. GILLIS:  Second page.
12          MR. FARRAH:  Okay.
13   Q.  You start out with the first page, Paragraph 1,
14       Paragraph 2, and then a bunch of alphabetical
15       paragraphs, correct?
16   A.  The one that says I have developed and lectured?
17   Q.  Well, let's start at the beginning.  Paragraph A,
18       it says that you conclude these conclusions to a
19       reasonable degree of responsible alcohol beverage
20       service certainty, is that correct?
21          MR. FARRAH:  That's Paragraph 1.
22          MR. GILLIS:  Yes.
23   Q.  And it's beverage, correct?
24   A.  I am not a good speller.  I'd like to blame it on
```

Page 58

```
 1       somebody else, but I'm the one that types it, yes.
 2   Q.  Okay.  Paragraph 2 goes over what you pretty much
 3       talked about already, about your service and
 4       training?
 5   A.  Yes.
 6   Q.  And in Paragraph F, sub --
 7          MR. FARRAH:  2F.
 8   Q.  You talk about your peer reviewed studies and
 9       articles that you serve as a scientific basis for
10       the TIPS and which address the issues listed,
11       Subparagraph 2F, 1 through 5, correct?
12   A.  Yes.
13   Q.  What articles are you referring to?
14   A.  Oh, gosh.  They would be articles that the NHTSA,
15       National Highway Safety Bureau, would have
16       provided over the years.
17          They would be articles of the National
18       Alcohol and Alcohol Abuse Council, I think,
19       Dr. Chafetz's writings from TIPS.  And mostly
20       Dr. Chafetz's writing.
21   Q.  How do you spell Chafetz?
22   A.  C-H-A-F-E-T-Z.
23   Q.  F-E-T-Z?
24   A.  Yes.
```

Page 59

```
 1   Q.  And where is he located?
 2   A.  I think he's -- his son, Adam Chafetz, runs Health
 3       Communications, which is in Arlington, Virginia.
 4       And he might be in Arlington, Virginia, or he
 5       could still be in Washington, D.C.  They're real
 6       close to each other.
 7   Q.  And that's the company that runs the TIPS program,
 8       correct?
 9   A.  Yes, sir.
10   Q.  And in addition to training like you do, they
11       actually have an online training program as well,
12       correct?
13   A.  They have developed an online training program.
14   Q.  And where did you find Dr. Chafetz, his writings,
15       that you relied upon?
16          MR. FARRAH:  Where did he find them?
17          MR. GILLIS:  Yes.
18          MR. FARRAH:  Is that what you asked?
19   A.  I don't know.  I don't have the book in front of
20       me.  I really don't know.
21          I'm sure I've read a bunch of his stuff
22       over the years, because we're talking 23 years of
23       contact with that group, just about.
24   Q.  As you sit here today, can you remember any of
```

Page 60

```
 1       those articles that dealt specifically with
 2       determining the amount of volume in a glass of
 3       alcohol, similar to what you've done in Exhibits 1
 4       and 2?
 5   A.  Not specifically, no.
 6   Q.  Okay.  Have you ever been retained as an expert to
 7       testify as to the volume of liquid in a particular
 8       glass, whether it be alcohol or not alcohol?
 9   A.  I don't believe so, no.
10   Q.  Okay.  Do you have an expertise in that area?
11   A.  Not other than common sense, no.
12   Q.  Okay.  You've never taken any training in that
13       area, correct?
14   A.  No, sir.
15   Q.  Okay.  And while you've done this, Exhibit 1 and
16       Exhibit 2, this is done not in your field of
17       expertise, but just something you physically are
18       able to do, correct?
19   A.  Certainly.
20   Q.  Okay.  These five categories that you address,
21       these are the categories that you routinely
22       address in the TIPS program, correct?
23   A.  Yes.
24   Q.  In the TIPS program, and in these five paragraphs,
```

10 (Pages 55 to 60)

Page 61

1　　none of them deal with measuring the amount of
2　liquid in a glass, correct?
3　A. Well, the effects of alcohol consumption on
4　individuals would also -- would always include
5　that.
6　　For example, the TIPS programs teaches
7　that one ounce of 100 proof spirits is equal to
8　five ounces of wine, is equal to 12 ounces of
9　beer.
10　　All three of those measurements roughly
11　have a half an ounce of pure ethyl alcohol. And
12　four of those drinks in an hour for 150-pound man
13　on an empty stomach could bring that man's BAC to
14　a .10.
15　Q. Agreed. I agree with all that. But my question
16　was: Do these topics deal not with the amount of
17　pure alcohol, but how to measure the amount of
18　volume in a drink, based on the glass, like you've
19　done here on Exhibits 1 and 2?
20　A. Well, it's part of the training. I mean, if you
21　don't know how much wine you pour in a wine glass,
22　if you don't know how much beer you pour in a beer
23　glass.
24　　So I would say to a degree it does have

Page 62

1　　something to do with that.
2　Q. Where specifically in the TIPS training programs
3　that you run, or in the literature, does it say if
4　you have a six ounce glass that's filled to a
5　quarter inch from the top, it equals X amount of
6　volume of liquid?
7　A. I don't know that it actually has that, per se,
8　but Bar Code will tell you that a martini is
9　considered two drinks, at least.
10　Q. Okay. I'm not getting into the alcohol. I'm
11　getting into the volume, the number of ounces of a
12　drink, regardless of their strength.
13　　Do you teach, by looking at a glass, like
14　in these photographs, people how to determine from
15　looking at the glass how much liquid is in the
16　glass, whether it's alcohol or not alcohol?
17　A. Do I teach that?
18　Q. Yes.
19　A. Yes.
20　Q. Okay. How do you teach that? What specifically?
21　A. If I go into a bar or restaurant -- if I was going
22　into The Gillis, for example, and I was to train
23　your staff, I would do a measurement of the amount
24　of liquid that would be in a particular cocktail

Page 63

1　　that you would be serving. In other words,
2　perceived value.
3　　If you had a five ounce rocks
4　glass -- generally, when a glass is given to a
5　guest, they expect it to be at least full or a
6　quarter of an inch from the top.
7　　To do that with a five ounce rocks glass,
8　you'd have to pack that with ice, and you'd pour
9　an ounce and a half of vodka in there, and it
10　would fill to that level.
11　　So those are the kinds of things that I
12　need to know, so that when I ask a bartender in a
13　training program how much booze do you pour in a
14　vodka and tonic, do you make Long Island iced
15　teas, I generally ask the managers and then I ask
16　the servers.
17　　For example, a manager may often tell me
18　that, yes, a martini is supposed to be
19　three-quarters of an inch from the top. And then
20　I'll ask a server when you bring a glass to the
21　table, do you spill it? Oh, yes. So then it's
22　really like, what, when you get it from the bar,
23　up to the top or a quarter of an inch from the
24　top, isn't it? Oh, yes.

Page 64

1　　To do that, how much booze would have to
2　be poured over ice to get that water melted to
3　lift to that level? That's a standard question I
4　ask in every class.
5　　When they have 25 ounce beers, if they
6　have a 16 ounce draft beer, for example, because a
7　lot of people are serving beers in 16 ounce
8　glasses, three of those is equal to four beers
9　pharmacologically.
10　　Servers need to know that, because
11　alcohol's a drug, it should be dispensed in a
12　measured dose, because a stiff drink will cause a
13　customer to lose track. And those are very
14　important issues that have to be covered in
15　responsible server training.
16　Q. Okay. Have you now told me everything
17　that -- dealing specifically with volume in a
18　glass that you teach in your TIPS program?
19　　MR. FARRAH: Objection.
20　A. I don't know if it's everything, but it's a
21　significant amount.
22　Q. Okay. As you sit here right now, you can't think
23　of anything else that you routinely teach in the
24　TIPS program as concerns volume in a glass,

Page 65

1　　correct?
2　A. Not off the top of my head, no.
3　Q. Okay.
4　A. It would all depend on the particular
5　establishment, correct.
6　Q. It's a case-by-case analysis, correct?
7　A. Not -- there's no state law that says you can't
8　pour a ten ounce martini, so it be would be a
9　case-by-case analysis.
10　Q. You said that the standard -- in a five ounce
11　glass, if I put an ounce and a quarter of vodka
12　and I fill it up with ice, that'll bring it to the
13　top, is that correct?
14　A. About a quarter of an inch from the top of a rocks
15　glass.
16　Q. And that's vodka on the rocks, correct?
17　A. If you're using a five ounce rocks glass, you pack
18　that with ice, it usually comes to about a quarter
19　of an inch from the top.
20　Q. Okay. How about in a straight up martini?
21　　MR. FARRAH: Objection to -- is that the
22　question, how about a straight up martini?
23　Objection.
24　Q. How about a straight up martini, how high would

Page 66

1　　that come in a glass?
2　　MR. FARRAH: Objection.
3　A. Well, delivered to the guest a straight up martini
4　would probably be about a quarter of an inch from
5　the top.
6　Q. Okay.
7　A. If it's a four and a half ounce up glass, to chill
8　it over ice it would take at least two and a half
9　ounces worth of 80 proof booze, which is
10　pharmacologically two drinks in one glass.
11　Q. Okay. You've previously taught that two and a
12　half ounces of vodka will fill a four and a half
13　ounce martini type glass to within a quarter of an
14　inch, based on the amount of alcohol and the
15　amount of melt off from the ice, correct?
16　　MR. FARRAH: Objection.
17　A. Correct.
18　Q. Okay. And that gives it a perceived value of a
19　full drink, correct?
20　A. Yes, sir.
21　Q. Okay. So a four and a half ounce martini type
22　glass has a perceived value of being full with
23　only two and a half ounces of vodka, correct?
24　A. Perhaps, yes.

11 (Pages 61 to 66)

Page 67

1  MR. FARRAH: Objection.
2  Q. Well, not perhaps. Yes or no?
3  A. Yes.
4  Q. Okay. Now, under Paragraph 3, and then it's got
5     subparagraphs, instead of alphabet you've got
6     numbers 1 through 13. These are the materials
7     that you reviewed in order to make your opinion in
8     this case, correct?
9  A. Yes. At this point -- at the time this was
10    written.
11    MR. FARRAH: I'm sorry, I was making a
12    note about the last question. Did you ask him
13    about the documents that are listed under --
14    MR. GILLIS: 3.
15    MR. FARRAH: -- 3, 1 through 13, the
16    documents he reviewed as part of his preparation
17    of his Rule 26 report?
18    MR. GILLIS: Yes.
19    MR. FARRAH: Okay. Thank you.
20 Q. And I think you testified earlier that since that
21    time you haven't reviewed any other documents,
22    correct?
23 A. Correct.
24 Q. Okay. Are there any documents that you wish you

Page 68

1     had had to review in this case that you haven't
2     reviewed already?
3  A. Not that I can think of.
4  Q. Okay. And again, Number 2, the affidavit of David
5     Benjamin, just so we're clear, you're considering
6     that the 60(j) affidavit in this case, correct?
7  A. I don't know what that means.
8  Q. Okay.
9     MR. FARRAH: I think you've already asked
10    him. I'm pretty sure that's what he's testified
11    to.
12    MR. GILLIS: Off the record.
13    (Discussion held off the record.)
14 Q. I had asked you earlier if you had seen
15    Dr. Benjamin's affidavit pursuant to his -- what's
16    commonly referred to as a 60(j) affidavit.
17    Do you know what a 60(j) affidavit is?
18 A. No, sir.
19 Q. Okay. Have you ever heard that term before?
20 A. I don't think so.
21 Q. Okay.
22    MR. FARRAH: There's a chance you'll
23    learn something.
24    THE WITNESS: Thank you.

Page 69

1     (Pause.)
2  A. Yes, that looks familiar to me.
3     MR. FARRAH: Wait. How can you -- it's
4     upside down. It's upside down.
5  Q. I'm going to show you a document and ask you if
6     you recognize it.
7     MR. FARRAH: Take your time.
8     (Pause.)
9  A. Yes, I believe this is the one that I reviewed.
10 Q. All right. I'll take that back and just take a
11    one-minute break to copy it. We'll mark that when
12    we get it.
13    (Short break was taken.)
14    (Exhibit No. 6, affidavit, marked for
15    identification.)
16 Q. This affidavit, which has been marked as
17    Exhibit 6, when you state that you reviewed the
18    affidavit of Dr. Benjamin, that's the one that
19    you're referring to, correct?
20 A. Yes, sir.
21 Q. Have you referred to any further reports or
22    deposition testimony of Dr. Benjamin?
23 A. No, I haven't.
24 Q. Are you aware that his opinion has changed since

Page 70

1     that affidavit?
2     MR. FARRAH: Objection.
3  A. I -- no.
4  Q. Okay. Are you aware that his Rule 26 disclosure
5     states that at the time of the last service of
6     alcohol he believes that the blood alcohol for
7     Mr. Southworth was .149, and not in the range of
8     .18 to .22 that's in that affidavit?
9     MR. FARRAH: Objection.
10 A. No.
11 Q. If you had that information, would it change your
12    opinion in this case?
13    MR. FARRAH: Objection.
14 A. Probably not.
15 Q. Okay. So .22 is almost 50 percent higher than a
16    .15, correct?
17 A. If you do the math, yes.
18 Q. Okay. And the fact that his opinion now is 50
19    percent lower than what it was when you reviewed
20    his affidavit, you don't believe that that would
21    have any effect on your opinion in this case?
22    MR. FARRAH: Objection.
23 A. My opinion is based on the responsible service of
24    alcohol. And the BAC has some significance, but

Page 71

1     I'm not a toxicologist, so --
2  Q. Okay. Well, you understand that --
3     MR. FARRAH: Let him finish his answer,
4     please.
5  Q. I'm sorry. Finish your answer.
6     MR. FARRAH: There's was a so. I don't
7     know many people who end their sentences with so.
8  Q. Were you finished?
9  A. Probably.
10 Q. Okay.
11 A. The context is.
12 Q. Okay. You'd agree, though, that a .07 blood
13    alcohol difference would indicate to you less
14    service of alcohol to an individual, correct?
15    MR. FARRAH: Objection.
16 A. Conceivably.
17 Q. Conceivably or --
18 A. Well, it depends. I mean, from what I know about
19    blood alcohol content, it could rise up to two
20    hours after the person stopped drinking.
21    So if they had a lot of drinks
22    beforehand, it depends on when they did the BAC.
23    But if he had food in his stomach, that would slow
24    alcohol's rate of entry into the bloodstream, but

Page 72

1     ultimately it would get there.
2  Q. Did you -- as part of your determination of
3     whether or not there was appropriate service in
4     this case, did you determine how many drinks
5     Mr. Southworth had -- excuse me, Mr. Southworth
6     was served while he was at the Longhorn on
7     September 26th, 2003?
8     MR. FARRAH: Objection.
9  A. There was conflicting testimony, but I understand
10    that it was roughly two 25 ounce beers and three
11    Manhattans.
12 Q. Okay. That's what you're basing your opinion on,
13    the assumption of that number of drinks?
14    MR. FARRAH: Objection.
15 A. I don't know the exact number of drinks. I'm
16    basing it on the people and the amount of alcohol,
17    based on the number of people at the table.
18 Q. Okay. So as part of your opinion in this case,
19    you don't have an opinion as to how much alcohol
20    was served to Mr. Southworth in total while at the
21    Longhorn, correct?
22    MR. FARRAH: Objection.
23 Q. Regardless of time?
24    MR. FARRAH: Object.

12 (Pages 67 to 72)

Page 73

1   A. I don't know the exact amount, no.
2   Q. But when you say you don't know the exact amount,
3     do you have an estimate of what he drank at the
4     Longhorn?
5        MR. FARRAH: Objection.
6   A. The estimate would be two 25 ounce beers and three
7     Manhattans.
8        MR. FARRAH: Is this at the table or the
9     bar, or where?
10       THE WITNESS: From the time they arrived
11     until --
12      (Discussion held off the record.)
13   Q. Is it fair to say that your estimate of two 25
14     ounce beers and three Manhattans is based on the
15     amount of alcohol you believe Mr. Southworth was
16     served during the entire time he was at the
17     Longhorn Steakhouse on September 26th, 2003?
18        MR. FARRAH: Objection.
19   A. Again, I don't know the exact amount he was served
20     in the time he was there. I'm going based on Jude
21     Connolly's testimony.
22       I'm also going based on Lee's testimony
23     of the three Manhattans that she told the police
24     or said that she had served him or he had

Page 74

1     consumed.
2     I don't know that they know the exact
3     amount of alcohol, because I mean there seems to
4     be some discrepancy about -- everybody seemed to
5     be drinking beers, but there was only two beers on
6     the check. So there was a cash transaction at the
7     bar. It could have been a cash transaction
8     throughout. I really don't know.
9   Q. But this number that you're coming up with, this
10     isn't just at the table, this is your estimate for
11     what he drank at the table and the bar that
12     evening, correct?
13        MR. FARRAH: Objection.
14   A. As far as I know.
15   Q. Okay. You're not aware of more alcohol being
16     served to him that evening at the Longhorn other
17     than what you've just testified to, the two 25
18     ounce beers and the three Manhattans, correct?
19        MR. FARRAH: Objection.
20   A. I have no knowledge of that.
21   Q. Now, you in your training programs talk about the
22     effect of a 12 ounce beer or five ounce glass of
23     wine or one ounce glass of 100 proof liquor all
24     being the same amount of alcohol, correct?

Page 75

1   A. Yes.
2   Q. And they all include .05 pure alcohol, correct;
3     .05 ounces?
4   A. A half an ounce of pure alcohol.
5   Q. I'm sorry, a half an ounce.
6     And you also, in your materials, you
7     state that any one of those three drinks in
8     150-pound male is roughly the equivalent of a
9     blood alcohol of .025, correct?
10       MR. FARRAH: You said in his training
11     materials?
12   A. Basically I said four drinks in an hour for
13     150-pound man on an empty stomach would bring that
14     man's BAC to a .10.
15   Q. Right.
16   A. So you're breaking it down into one would be .025,
17     a quarter of that.
18   Q. Okay. That's how you get to that?
19   A. Basically.
20   Q. In fact, in the TIPS materials, it says two drinks
21     is --
22   A. Is .05, and four drinks is .10.
23   Q. And are you aware of what effect -- whether it's
24     .02 or .025 or .03 for that matter, what the

Page 76

1     effect of a 12 ounce beer or a five ounce glass of
2     wine or a one ounce glass of 100 proof liquor
3     would have on a 210-pound experienced drinker?
4        MR. FARRAH: Object.
5   A. As in BAC, or is it observable cues? And it would
6     matter depending on the issues. I mean, there's a
7     number of different issues.
8     I can't -- I don't think anybody can say
9     that guy's at a .10. I mean, you can't pick that
10     out.
11   Q. Okay. You'd agree with me, though, that it's
12     likely, with the same amount of alcohol, that
13     someone like Mr. Southworth, who weighs 210
14     pounds, would have less of a blood alcohol than
15     150-pound person, correct?
16       MR. FARRAH: Objection.
17   A. Yes.
18   Q. Okay. How much less?
19       MR. FARRAH: Objection.
20   A. I think from one of the charts I've seen over the
21     years, a 200-pound man has six drinks in an hour,
22     his BAC would be a .10. So somewhere in --
23   Q. Okay. And if he's over that, then it would be
24     slightly less? If he's 210 or 220, it might be

Page 77

1     slightly less?
2       MR. FARRAH: Objection.
3   A. Well, it would depend on body fat as well.
4   Q. Have you seen pictures of Mr. Southworth?
5   A. I don't believe I have, no.
6   Q. So you don't know if he's thin or fat or muscular
7     or -- correct?
8   A. No.
9   Q. Do you think that would be important to your
10     opinion in this case?
11       MR. FARRAH: Objection.
12   A. Not -- no, not in the amount of alcohol in the
13     period of time, I don't believe it would change
14     much.
15   Q. Okay.
16     (Pause.)
17   Q. You state that you became Bar Code certified in
18     2001, correct?
19   A. Yes, sir.
20   Q. You're not a Bar Code trainer, correct?
21   A. No, sir.
22   Q. Okay. You went and you got your car Bar Code
23     certificate at that time, correct?
24   A. Yes.

Page 78

1   Q. Have you ever renewed that certificate?
2   A. No.
3   Q. So that certificate is no longer valid, correct?
4   A. No, you're certified for life in that program.
5   Q. There's no every three years, like the TIPS?
6   A. They've since disbanded Bar Code, because -- I
7     don't really know the reason why, but now they
8     call it Serve Safe Alcohol, and they require that
9     more quality controls are built into the program,
10     and they require that they be recertified every
11     three years.
12   Q. And when -- are you aware that Bar Code in 2003
13     required retraining every three years?
14   A. I don't believe I have an expiration -- I'm not
15     sure in 2003. I was certified in '01, I believe,
16     so I don't -- can't answer that.
17   Q. Okay. Have you taken any Bar Code courses since
18     2001?
19   A. No.
20   Q. Okay. And you don't -- strike that.
21     In Paragraph 5 at the bottom of Page 2 of
22     your disclosure, you talk about the TIPS program,
23     which stands for Training and Intervention
24     Procedures, correct?

Page 79

1 A. Yes, sir.
2 Q. And that's the program you've been teaching for
3 the last 22 years?
4 A. Yes.
5 Q. Okay. Going down to Paragraph 6 there, you agree
6 that on the day of this accident that Bar Code was
7 accepted as the industry -- in the industry, and
8 was an appropriate procedure for responsible
9 alcohol service practices?
10 A. It contained appropriate procedures, yes.
11 Q. Did you have any problems with the Bar Code
12 program in September of 2006 -- of '03 as being an
13 appropriate training program for bartenders and
14 servers?
15     MR. FARRAH: Objection to the form.
16 A. It covered the basics. It all depends on who the
17 trainer was, really, but it does cover the basics.
18 Q. Well, isn't that true for no matter what program
19 you have?
20 A. Absolutely, I agree with that.
21 Q. Including the TIPS program, correct?
22 A. Absolutely, certainly.
23     MR. FARRAH: You should both let one
24 another finish before you speak again.

Page 80

1     THE WITNESS: I'm sorry.
2     MR. GILLIS: I think we're getting along
3 okay.
4     MR. FARRAH: Well, you may think so, but
5 you should both let one another finish before you
6 speak again.
7 Q. So regardless of the program, the person training
8 is important, correct?
9 A. I would agree with that.
10 Q. Okay. In one of your bullet paragraphs under
11 Paragraph 6, there's one, two, three, four -- I
12 think it's the fourth bullet, you said the
13 deviation, which refers back to the Bar Code
14 standard, was causally related to Mr. Southworth
15 becoming intoxicated and then crashing the Dodge
16 into the Santiago auto, correct?
17 A. Yes, sir.
18 Q. Okay. I understand -- strike that.
19     You're not testifying as a toxicologist,
20 correct?
21 A. No, sir.
22 Q. Okay. So you're not testifying as to what point
23 during the evening Mr. Southworth became
24 intoxicated, are you?

Page 81

1 A. I can't do that.
2 Q. Okay. And you're not an accident
3 reconstructionist, correct?
4 A. No, sir.
5 Q. Okay. Tell me the facts around the manner in
6 which the Southworth vehicle was being operated
7 prior to striking the Santiago vehicle.
8     MR. FARRAH: Objection to the form.
9 A. I really can't answer that.
10 Q. Because you don't know?
11 A. I don't recall the specifics on that. I didn't
12 really focus on any of the written materials for
13 that. It doesn't apply -- pertain to me. I'm
14 more concerned with what happened at the Longhorn.
15 Q. Okay. So you don't know if he was swerving
16 through lanes, correct?
17 A. I really don't.
18     MR. FARRAH: Which he?
19     MR. GILLIS: Mr. Southworth.
20     MR. FARRAH: Sorry.
21 Q. You don't know if he was inappropriately stopping
22 or speeding up on the highway, correct?
23 A. I do not.
24 Q. You don't know if he fell asleep at the wheel,

Page 82

1 correct?
2 A. I do not.
3 Q. Okay. So you have absolutely no evidence that the
4 manner in which he was operating his vehicle prior
5 to it striking the Santiago vehicle was caused due
6 to intoxication, correct?
7 A. Run that question by me again? I'm sorry.
8 Q. Do you have any evidence that it was intoxication
9 of Mr. Southworth, and not some other factor, such
10 as just driving fast, that caused the accident
11 that evening?
12 A. No.
13 Q. Okay. Getting down to your last bullet in
14 Paragraph 6, you talk about in my opinion, the
15 following are ways Rare deviated from Bar Code and
16 accepted industry standards in effect at the time
17 of alcohol service on September 26th, 2003.
18     Now, before we get into those nine
19 paragraphs, are there any other variations that
20 you're aware of today that are not included in
21 those nine paragraphs?
22 A. No.
23     MR. FARRAH: In your opinion. In his
24 opinion?

Page 83

1 A. Not that I can --
2     MR. FARRAH: Objection.
3 Q. Okay. The first one that you put in there is that
4 they served him too much alcohol over too short a
5 period of time, violating the Bar Code and
6 industry standards, correct?
7 A. Yes.
8 Q. Okay. He was served five drinks over the course
9 of an hour and 40 to an hour and 45 minutes, is
10 that your understanding?
11     MR. FARRAH: Objection.
12 A. No.
13 Q. Okay. When was he started to be served alcohol at
14 the Longhorn Steakhouse on September 26th, 2003?
15 He --
16     MR. FARRAH: Objection.
17 Q. Him I assume you're referring to is
18 Mr. Southworth, correct?
19 A. Yes.
20     MR. FARRAH: And I object to the
21 question.
22 A. I -- from my knowledge, at 8 o'clock is when he
23 got started to be served at the bar.
24 Q. Okay. And when was his last drink served to him?

Page 84

1 A. Somewhere around --
2     MR. FARRAH: Objection.
3 A. Somewhere around 9:27, I think, is when the last
4 drinks were served at the table.
5 Q. Okay. And you base that on the order report you
6 had?
7     MR. FARRAH: Objection.
8 A. That and testimony from Jude Law, because he was
9 with him at the bar.
10 Q. Jude Connolly?
11 A. Sorry about that. Jude Connolly.
12     MR. FARRAH: Did you say Jude Law?
13     THE WITNESS: Yes.
14 A. And Espy.
15     MR. GILLIS: E-S-P-Y.
16 Q. Michael or Thomas?
17 A. I think it was Thomas -- Scott he called him.
18 Q. So that would be an hour and a half period of time
19 over which he was served what you believe was five
20 drinks, correct?
21     MR. FARRAH: Objection.
22 A. I don't believe there were five drinks. There
23 were purported to be five drinks, but
24 pharmacologically they weren't five drinks.

14 (Pages 79 to 84)

Page 85

1  Q. We'll get into that, but there were five vessels
2     of alcohol that came --
3  A. I'll go with a vessel.
4  Q. Okay.
5        MR. FARRAH: Objection to the question.
6  Q. The first drink -- what is your understanding was
7     the first drink served to Mr. Southworth that
8     evening, and at what time?
9  A. 25 ounce beer upon arrival.
10 Q. Okay. And you understand that that 25 ounce beer
11    includes the head on the beer as well, correct?
12        MR. FARRAH: Objection.
13 A. I would assume, but it depends on the beer that
14    night and whether it does have head.
15 Q. Well, did you read any testimony that a 25 ounce
16    beer actually only contains about 23 to 24 ounces
17    of beer in it?
18        MR. FARRAH: Did he read testimony to
19    that effect?
20        MR. GILLIS: Yes.
21 A. I don't recall reading testimony to that effect.
22 Q. Okay.
23 A. And if I did, I would still question it.
24 Q. Well, based on your experience, if a 25 ounce beer

Page 86

1     mug is filled with beer, how many ounces of beer
2     is in a glass?
3  A. In a 25 ounce --
4  Q. Yes.
5  A. At least 24 ounces of beer. Could be 24 and a
6     half.
7  Q. Okay. You think --
8  A. Could be 23, depending on the head and how the
9     bartender pours it and whether the customer
10    complains and the bartender succumbs to the
11    complaint, if you will.
12 Q. So you think it's right up to the very lip there?
13        MR. FARRAH: Objection.
14 A. No. I would say it might be about a quarter of an
15    inch from the top.
16 Q. And whatever that amount of volume is, that would
17    be -- you'd subtract from 25 and you'd have what
18    you drink, correct?
19 A. Somewhere in that vicinity, sure.
20 Q. And that's the way, in your experience doing this
21    business for 20-plus years, draft beers are
22    served, correct?
23        MR. FARRAH: Objection.
24 A. It depends on the establishment.

Page 87

1  Q. Well, how did this establishment pour it?
2  A. I don't know.
3  Q. Did you ever make any effort to find out?
4        MR. FARRAH: Beyond whatever he says he
5     did in his report?
6        MR. GILLIS: Yes.
7  A. I have been there. And when I got a 25 ounce
8     beer, it was probably about a quarter of an inch
9     head from the top.
10 Q. Okay. When were you there?
11 A. Couple months back, I think.
12 Q. So you wrote your report before you went there,
13    correct?
14 A. I probably wrote my report after. After I went
15    there. So it must have been about four months
16    ago.
17 Q. Okay.
18 A. Four or five months ago. I can't remember the
19    exact --
20 Q. So based on your experience of looking at glasses
21    and determining how much alcohol was in there, how
22    much beer did you determine was in the 25 ounce
23    glass of -- that you received when you went to the
24    Longhorn?

Page 88

1  A. I would say about 24 ounces.
2  Q. Okay. So a quarter inch from the top of the beer
3     mug, in your opinion, equates to 24 ounces,
4     correct?
5  A. Somewhere in that vicinity.
6  Q. What do you mean somewhere in that vicinity?
7  A. Could be off by a quarter of an ounce.
8  Q. Okay. And similar to the experiment you did here,
9     did you do any experiments on a 25 ounce glass to
10    determine how much liquid was in the glass when it
11    was filled to a quarter of an inch from the top?
12 A. I did not.
13 Q. Why not?
14 A. I never thought of doing it. I thought the most
15    dangerous cocktail was the Manhattan.
16 Q. Okay. When was the second drink served, in your
17    opinion, to Mr. Southworth at the Longhorn
18    Steakhouse on September 26th, 2003?
19        MR. FARRAH: Objection.
20 A. I would say right around the 8:20 or somewhere in
21    that same half hour at the bar, I would think.
22 Q. Okay. Do you have any criticism of serving a
23    second 25 ounce beer to Mr. Southworth at 8:20
24    that evening?

Page 89

1  A. Yes.
2  Q. What is your criticism?
3  A. You're basically serving the customer four drinks
4     in a half an hour. That's a man with a purpose.
5     That's a man who's looking to get buzzed.
6        I might have -- you know, I would have
7     slowed him down at that point, tried to get him to
8     eat something.
9  Q. Was there food at the bar that night?
10 A. That wasn't -- I've read no testimony to that
11    effect.
12 Q. What efforts did you do to find out whether or not
13    there was food served at the bar that night, as
14    far as knickknacks on the bar?
15        MR. FARRAH: Beyond what he did in his
16    report?
17        MR. GILLIS: Beyond what's in the report.
18        MR. FARRAH: Thank you.
19 A. I do not know of anything -- I didn't do anything
20    on that.
21 Q. Okay. At that point, at 8:20 when he was served
22    the second beer, was Mr. -- are you aware of any
23    evidence that Mr. Southworth was showing any
24    visible signs of intoxication?

Page 90

1  A. Not from any of the testimony that I read.
2  Q. Okay. Are you aware of it from any other source?
3  A. No.
4  Q. Okay. Are you aware at that point whether or not
5     any of his -- if you look -- any inhibitions that
6     he had changed in that time period?
7        MR. FARRAH: I'm sorry, I didn't -- did
8     you say any of his inhibitions had changed?
9        MR. GILLIS: Yes.
10       MR. FARRAH: Objection to the form.
11 A. I read no testimony that indicated that.
12 Q. You're not going to opine to that, are you?
13 A. No. If I have no evidence, I have no opinion.
14 Q. Okay. Did you see any signs at 8:20, from the
15    materials you read and from what you reviewed in
16    this case, that his judgment had changed by the
17    time he was served the second beer that night?
18 A. The only thing that I could say that would go into
19    the judgment category would be the speed at which
20    he consumed the first drink, and the fact that he
21    was on to the second drink right away.
22       So speed of drink is an issue that goes
23    in the judgment category, how fast a person
24    drinks.

15 (Pages 85 to 90)

Page 91

1  Q. Well, the fact that a person drinks quickly
2     doesn't necessarily mean that they're intoxicated,
3     correct; that in and of by itself?
4        MR. FARRAH: Objection to the form.
5  A. It would lead you to believe that they were
6     planning on getting that way. The faster you
7     drink, the quicker you get drunk.
8  Q. Assuming you continue drinking?
9  A. Which he did.
10 Q. Okay. Well, that's an assumption you made that
11    when he got that second drink, he was intending to
12    get intoxicated?
13       MR. FARRAH: Objection.
14 A. No. That he was going to drink it. That he went
15    right to it.
16 Q. Would you -- if he ordered a second beer at 8:20,
17    and the first beer had been completed, as a
18    trainer would you tell the bartender not to give
19    him another beer?
20 A. What I might suggest to the bartender, here's some
21    ice water, you seem really thirsty. Would you
22    like me to get you a menu to see what you want to
23    eat?
24 Q. Okay. That doesn't answer the question. Would

Page 92

1     you preclude him from getting another drink at
2     that point?
3  A. That size beer, yes.
4  Q. Okay. You would shut him off after --
5  A. No, I didn't say that.
6  Q. That's my terminology. Let me -- you would not
7     serve another beer at 8:20 if he had been served a
8     beer -- a double beer at -- a 25 ounce beer at
9     8 o'clock and finished it by 8:20, is that
10    correct?
11 A. What I would do is try to slow him down and get
12    him to eat something, and maybe give him a glass
13    of ice water and say, listen, let's see if this
14    last one worked. Because I haven't had an
15    opportunity to see -- observe -- I've just served
16    him two beers in, you know, roughly ten minutes.
17 Q. Roughly 20 minutes.
18 A. Again, we're not sure of the exact time between
19    the time they got served and the time they got
20    there.
21       We know that he got there at 8 o'clock.
22    He could have had that -- so yes, roughly 20
23    minutes. It's still too -- it's drinking fast is
24    what it is.

Page 93

1  Q. Let me get back to the question that you haven't
2     answered? Would you -- if he insisted on getting
3     another 25 ounce beer at 8:20, is it your
4     testimony that the bartender should not have
5     served him at that time?
6        MR. FARRAH: Objection. He has answered
7     the question.
8  A. I can only answer it by saying this is where
9     intervention should begin.
10 Q. Okay. And assuming he doesn't want a glass of
11    water or a menu, would you have served him another
12    25 ounce beer at that point?
13       MR. FARRAH: Objection.
14 A. Would I? No.
15 Q. Okay. Do you train people not to serve the second
16    25 ounce beer if they complete the first
17    one -- their first drink of the night at the bar
18    in 20 minutes?
19       MR. FARRAH: Objection.
20 A. If they drink rapidly, based on all the facts that
21    I know about this guy, that I know he came from
22    dirt biking, that he had been -- that he worked
23    out pretty heavy before he got there, I would try
24    to get him to eat something and get him to slow

Page 94

1     down at that point.
2        I would suggest that I'll gladly serve
3     you a 12 ounce beer if you take your time with
4     this one, no problem, but I can't serve you these
5     as fast as you want to drink them, is basically
6     what I would train people to say.
7  Q. Okay. Would you train people not to give him that
8     second 25 ounce beer? Yes or no.
9  A. I would say probably not.
10       MR. FARRAH: Objection.
11 A. I would suggest that they would go with a smaller
12    beer and get them to pace him. Because it's hard
13    to take a drink away from somebody once you've
14    given it to them.
15 Q. Okay. And that's something you train in your
16    program?
17 A. Yes.
18       MR. FARRAH: Objection.
19 A. I would rather -- I'm sorry.
20       (Discussion off the record.)
21 A. I would suggest that they slow him down at this
22    point in time; that you begin to pace him, if you
23    will, and not serve him as fast. Because trying
24    to take a drink away from somebody after you've

Page 95

1     given it to them is really difficult.
2  Q. What would be the appropriate amount of time,
3     assuming that the bartender served him the 25
4     ounce beer at 8 o'clock, before -- what would be
5     the appropriate amount of time, in your opinion,
6     before you would serve him a second 25 ounce beer?
7        MR. FARRAH: Objection.
8  A. Quite frankly, I don't think 25 ounce beers are
9     appropriate at all. I think 12 to 16 at the most.
10    And 16s I'm concerned about.
11       But I would have to gauge the person's
12    cues that they give me, and I would have to keep
13    into consideration the issues of BAC.
14 Q. Well, based on your review of the materials in
15    this case, and based on your review of what you
16    know about Mr. Southworth, at what point would it
17    have been appropriate for the bartender to serve
18    him a second 25 ounce beer on September 26th, 2003?
19       MR. FARRAH: Objection.
20 A. I might give him a half an hour before I'd serve
21    him the second 25 ounce beer, and I would still
22    continue to speak with him to get him to slow down
23    and have something to eat.
24 Q. Okay. So at 8:30, that would have been

Page 96

1     appropriate?
2  A. It might have been.
3  Q. Okay. Again, judgment call by the bartender,
4     correct?
5  A. Yes, sir.
6  Q. Okay. And you're not surprised that a 21-year-old
7     guy out dirt biking might drink the first beer
8     quickly because he's thirsty, correct?
9  A. Absolutely not. I'm not surprised by that at all.
10 Q. And the fact that he would drink that quickly
11    doesn't in and of itself indicate that he will
12    continue to drink at that rate for the rest of the
13    evening, correct?
14 A. Nothing confirms it, but it would make me
15    suspicious.
16 Q. Okay. When, in your opinion, was the next drink
17    served to Mr. Southworth that evening?
18       MR. FARRAH: Objection.
19 A. I think it's at the table.
20 Q. Okay. Do you know at what time at the table?
21 A. I don't have the list of the times in which the
22    drinks were rung in on that check, but I think it
23    was somewhere around 9:12 or 8:50, or something
24    like that. I'm not sure. I'd have to look at the

16 (Pages 91 to 96)

Page 97

1     check again.
2  Q. As you sit here today you can't tell me when the
3     next drink was served to Mr. Southworth, correct?
4       MR. FARRAH: Objection.
5  A. No.
6  Q. Okay. Are you critical of when the next drink was
7     served to Mr. Southworth?
8  A. Yes, because the next drink wasn't just one drink,
9     it was two to three drinks in one glass.
10  Q. Okay. So your -- is your criticism limited to the
11     amount of alcohol in the glass, or the time that
12     it was served?
13  A. Probably both.
14       MR. FARRAH: Objection.
15  A. I think -- I can't remember exactly, but the first
16     round of drinks might have went out at 8:50.
17  Q. Which would have been --
18  A. I don't know why that sticks in my mind.
19  Q. So that'd be about 30 minutes after he got his
20     second beer, correct?
21  A. Yes.
22  Q. Are you critical to serve him a drink at 8:50 if
23     he had been served a beer at -- the 25 ounce beer
24     at 8:20?

Page 98

1  A. Yes, because the drink he was getting served was
2     three drinks -- two to three drinks in one glass.
3  Q. Okay. Time wise, though, was that an appropriate
4     time period, 30 minutes, for him to complete the
5     25 ounce beer?
6  A. I can't say that that's true. If you look at the
7     Bar Code program, people his size should have three
8     to four beers in an hour is what they gave you as
9     a gauge or a reference, and then maybe one drink
10     at a time thereafter to watch as it progresses.
11  Q. Okay. Maybe I'm not articulating my question.
12     You stated earlier that on the first
13     drink you would have liked to have seen 30 minutes
14     between the first 25 ounce beer and the second 25
15     ounce beer, correct?
16  A. At a minimum.
17  Q. And you're now stating that between 8:20 and 8:50,
18     that's 30 minutes between the second 25 ounce beer
19     and the first Manhattan, correct?
20  A. Yes.
21  Q. Do you think that time period in and of
22     itself -- I understand you're saying there's too
23     much alcohol in the Manhattan, but the time frame
24     alone, was that an appropriate time frame between

Page 99

1     drinks at that point before he would be served
2     some other cocktail?
3       MR. FARRAH: If you can answer the
4     question.
5  A. I can't answer that question really, only because,
6     again, there's a -- the fact that he had worked
7     out hard, as far as dirt biking is concerned, that
8     he was probably dehydrated or whatever. He might
9     have been tired at that point. Maybe it would be
10     time to not serve him any alcohol, just get him to
11     eat something. I really can't say. I wasn't
12     there.
13  Q. Okay. So you don't have an opinion as you sit
14     here today whether or not it was appropriate or
15     inappropriate to serve him a drink at 8:50, just
16     based on time, if his last drink had been served
17     to him, the 25 ounce beer, at 8:20?
18       MR. FARRAH: Objection to the form.
19  A. It wasn't a drink. It was two to three drinks.
20     And in that circumstance, I would say it would be
21     inappropriate.
22  Q. Okay. I'm going to get to that.
23  A. I'm sorry.
24  Q. I'm going to get to the inappropriateness of the

Page 100

1     amount of alcohol in that drink, as you allege.
2     I'm just talking about time frame now.
3     Was that an appropriate interval between
4     drinks.
5       MR. FARRAH: He can't answer. He's
6     already told you that.
7  A. It's -- again, it would be based on the issues
8     that we -- I just discussed. I really can't give
9     you a firm answer to that one, because as we
10     talked about before, it would be a judgment call
11     on all the issues, and it would concern me.
12  Q. Okay. So you're not going to testify at trial
13     that that time period of 30 minutes between the
14     second beer and the subsequent drink in and of
15     itself was too short a period of time to serve him
16     another drink, correct?
17       MR. FARRAH: Objection to the form.
18  A. It may have been too short a period of time, it
19     may not have been. It depends on the cues. But
20     it would probably be, I would say -- again, if you
21     go with the guidelines for Bar Code, it would be
22     inappropriate because it was ten minutes shy of
23     the one hour for four drinks, because those were
24     two 25 ounce drafts.

Page 101

1  Q. Well, what is your opinion? You said it may be,
2     it may not be. What is it? Is it or is it not?
3  A. I would say it wouldn't be.
4  Q. Okay, fine. Now, let's get to the drink. The
5     Manhattan that was -- the first Manhattan that was
6     served to Mr. Southworth at the table that night
7     was, you believe, 8:50, correct?
8       MR. FARRAH: Objection.
9  A. I -- without looking at the check, it's -- I think
10     it was somewhere around -- I don't know why 8:50
11     sticks in my mind, but it does. If I could look
12     at the check, maybe I would be able to say that
13     that is, in fact, the time.
14  Q. Okay. You want to see the check?
15  A. That'd be good.
16       MR. GILLIS: Let's take a break and get
17     it.
18       (Short break was taken.)
19  Q. Okay. I'm going to show you a document and ask
20     you if you recognize it.
21       MR. FARRAH: Take a moment, look at it.
22     Make sure you have enough time.
23  A. I know I've seen it.
24  Q. Okay. On the bottom of the first page at 8:40

Page 102

1     where it says Leigh, that's the server, and it's
2     Table 52?
3  A. Yes.
4  Q. I'm going to suggest to you that that was
5     the -- that was the table that has been alleged
6     Mr. Southworth was sitting at that evening.
7       And if you look at the second page, under
8     8:51, it shows seven Jack Daniel Manhattans being
9     served to Table 52. Do you see that?
10  A. Yes.
11  Q. Okay. And is it your understanding that when it
12     says Jack Daniels and then Manhattan next, those
13     two combined make one Jack Daniels Manhattan,
14     correct?
15       MR. FARRAH: Objection.
16  A. Yes.
17  Q. Okay. And so 8:51 is your understanding of when
18     Mr. Southworth got his first Manhattan that
19     evening?
20       MR. FARRAH: Objection.
21  A. I'm a little confused about this. On the first
22     page at 8:40 Jack Daniels were ordered. One, two,
23     three of them.
24  Q. Correct. And how many people sitting at the

17 (Pages 97 to 102)

Page 103

1  table?
2       MR. FARRAH:  Objection.
3  A.  The table at the time?
4  Q.  Yes.
5  A.  Would be seven.
6  Q.  And was it your understanding that there were
7     three people, including Mr. Southworth, at the bar
8     before the table?
9  A.  Yes.
10 Q.  And there were four people who came in from
11    outside the restaurant to join them for dinner,
12    correct?
13 A.  Yes.
14 Q.  Okay.  And the seven of them sat together.  Is
15    that your understanding of the facts?
16 A.  Yes.
17 Q.  And is it your understanding that that first round
18    of four drinks is for the four people who walked
19    in?
20       MR. FARRAH:  Objection.
21 A.  It may have been.  Hang on a minute now.  I know
22    they all met at the bar, but I don't recall
23    testimony that they got served at the bar either.
24    I think they went right to the table.

Page 104

1  Q.  Okay.  Is it your understanding that the four guys
2     who were not with Mr. Southworth at the bar came
3     in from the outside and got their first drink at
4     the table?
5  A.  Yes.
6  Q.  Okay.
7  A.  Yes, that would be true.
8  Q.  And at 8:40, those four drinks would be the four
9     guys who joined Mr. Southworth at the table,
10    correct?
11       MR. FARRAH:  Objection.
12 A.  You can assume that.
13 Q.  That's a logical assumption, correct?
14       MR. FARRAH:  Objection.
15 A.  I would think it would be.
16 Q.  And that's based on your training and experience
17    that assumption, correct?
18 A.  Again, it's merely an assumption.
19 Q.  Okay.  Well, that's the assumption you made for
20    your opinion here, because you weren't there,
21    correct?
22 A.  I was not.
23 Q.  Okay.  So all of your statements as to what are
24    facts here are based on your assumptions based on

Page 105

1  your education, training and experience, correct?
2       MR. FARRAH:  Objection.
3  A.  More to the testimony of Leigh Chabot and Jude
4     Connolly.
5  Q.  Those you gave more weight to, correct?
6       MR. FARRAH:  Objection.
7  A.  Yes.
8  Q.  But you looked at all of it in order to come up
9     with what you thought was the most reasonable fact
10    pattern, correct?
11       MR. FARRAH:  Objection.
12 A.  Certainly.
13 Q.  And all of the things you looked at and the
14    documents that we've previously talked about
15    listed in your report, correct?
16 A.  Yes.
17 Q.  Now, if you look at that -- at 8:40 you'll see
18    that they had already been served to the table
19    chicken fingers, two cups of chowder, a Tonion,
20    along with the drinks that were served at that
21    time, correct?
22       MR. FARRAH:  Objection.
23 A.  That also goes over to the following page where it
24    says one 25 ounce Bud Light, too.

Page 106

1  Q.  Right.  Three Manhattans and one Bud.  Four total,
2     correct?
3  A.  Yes.
4  Q.  And that's because of the four people that came
5     in?
6       MR. FARRAH:  Objection.
7  A.  Okay.  I'm sorry.
8  Q.  But to the table there were appetizers served,
9     correct?
10 A.  They were ordered, yes.
11 Q.  Okay.  And what's your opinion as to when those
12    appetizers that are ordered at 8:40 arrived at the
13    table?
14       MR. FARRAH:  Objection.
15 A.  I really don't know.
16 Q.  Do you have an opinion on whether or not they
17    reached the table before the next round of drinks
18    was ordered?
19       MR. FARRAH:  Objection.
20 A.  Which would be 8:51?
21 Q.  Yes.
22 A.  It's possible.
23 Q.  Okay.  Do you remember Leigh Chabot saying that
24    she went and got the appetizers right away

Page 107

1  before -- right after she put in the order?
2  A.  Yes.
3  Q.  Okay.  And she brought bread and so forth to the
4     table, correct?
5  A.  Yes.
6  Q.  And she brought water to the table, correct?
7  A.  I don't recall her saying that, but if you say
8     that that happened, I don't recall the exact --
9  Q.  Well, what are you -- what's your understanding of
10    whether or not water was brought to the table that
11    evening?
12 A.  I wasn't -- I don't remember.  I don't recall
13    reading that.
14 Q.  Okay.  So you don't have an opinion one way or the
15    other?
16 A.  Right.
17 Q.  You're not saying it didn't happen, correct?
18 A.  No, sir.
19 Q.  And you're not saying it did happen?
20 A.  No, sir.
21 Q.  Okay.  At 8:51 that round of Jack Daniels was
22    ordered, correct?
23 A.  Yes.
24 Q.  What -- now, did you read the testimony of Kristen

Page 108

1  O'Donnell?
2  A.  Yes.
3  Q.  Who is Kristen O'Donnell?
4  A.  She's a bartender that was on duty that night.
5  Q.  Okay.  Did you read what she testified to as to
6     how much alcohol she put in the drink, the
7     Manhattans that evening?
8  A.  I remember her saying that she poured it so that
9     it would be a quarter of an ounce -- a quarter of
10    an inch from the top.  And what she did is she put
11    it in a seven ounce glass, filled it with ice,
12    poured from that glass, strained it into the
13    martini glasses.
14       She put up seven martini glasses, poured
15    the ingredients into a glass filled with ice, and
16    then strained it into each one.
17 Q.  Did she shake it?
18       MR. FARRAH:  Objection.
19 A.  I don't recall her saying that she shook it.
20 Q.  Okay.  Do you have an opinion one way or the other
21    whether she shook it or didn't shake it?
22       MR. FARRAH:  Objection.
23 A.  I don't have an opinion on that specifically.  I
24    sense that she might have just put it in there and

18 (Pages 103 to 108)

Page 109

1    then strained it right out, because it was busy at
2    the time.
3  Q. Okay. When you sense it, is that a guess?
4       MR. FARRAH: Objection. Are you asking
5    him if he remembers what the testimony was?
6       MR. GILLIS: No. I think the question
7    was pretty clear. He can answer it.
8  A. I would -- I can't say that it's a guess or not.
9    I think she was in a rush to satisfy the orders
10   that were being called upon her at that point in
11   time, and she had to make -- she made it in
12   each -- each individual drink in that glass filled
13   with ice and then strained it in. That's all I
14   recall her saying in the testimony. I don't
15   recall her saying she shook it.
16  Q. Where in the testimony does it say that she was
17   rushed to make these drinks that evening?
18  A. She didn't say she was rushed. They had to wait
19   for a table. It was busy that night. The
20   testimony indicates that it was busy that night,
21   that's all I remember.
22  Q. Okay. So you have no --
23  A. At that point in time.
24  Q. Okay. You have no evidence that she was in any

Page 110

1    rush to make those specific drinks that evening,
2    correct?
3       MR. FARRAH: Objection.
4  A. Only assumptions.
5  Q. Okay. Assumptions based on what facts?
6  A. On the facts that they had to wait for a table,
7    that the place was busy.
8  Q. Okay.
9  A. Is the testimony that I read.
10  Q. How many people were serving drinks that night
11   from behind the bar?
12      MR. FARRAH: I'm sorry, from the end of
13   the bar?
14      MR. GILLIS: From behind the bar.
15      MR. FARRAH: How many bartenders were --
16      MR. GILLIS: That wasn't my question.
17  Q. How many people were serving drinks from --
18  A. I think there were two, or maybe three.
19  Q. And how many people does the place seat?
20  A. I don't know.
21  Q. So how can you determine whether or not she was
22   rushed based on the capacity and the people having
23   to wait for tables if you don't even know how many
24   tables are in the place?

Page 111

1      MR. FARRAH: Objection.
2  A. All I know is somebody -- they said it was busy in
3   their testimony, and I can't remember if it was
4   Leigh or it was Kristen that said it, but
5   they -- what I did read is that it was busy. I
6   can't -- other than that -- I can't assume any
7   more than that.
8  Q. Assuming it was busy, what evidence do you have
9   that they didn't have appropriate number of
10   personnel to handle a busy restaurant that
11   evening?
12      MR. FARRAH: Objection.
13  A. I don't.
14  Q. Okay. So you have no evidence that she was in any
15   rush to make those drinks at 8:51 that evening,
16   correct?
17      MR. FARRAH: Objection.
18  A. No, I don't.
19      (Pause.)
20  Q. Are you going to render an opinion in this case as
21   to how much alcohol was in each of those drinks
22   when they left the bar and went to the table that
23   evening for that round of Manhattans at 8:51?
24      MR. FARRAH: Objection.

Page 112

1  A. Just what I put in my report.
2  Q. Okay. You don't have a specific amount of alcohol
3   in each drink, correct?
4      MR. FARRAH: Objection.
5  A. I don't have a specific amount right on the money,
6   no.
7  Q. Okay. Now, what did Kristen O'Donnell say was the
8   amount of alcohol she put in the drink?
9  A. I think she said she followed the recipe, which is
10   two ounces of Jack Daniels and a quarter of an
11   ounce of vermouth.
12  Q. Well, you think or you know?
13  A. That's what I think. I'd have to look at her
14   testimony to find that.
15  Q. Okay. Her actual testimony was she put an ounce
16   and a quarter of Jack Daniels in the drink. Do
17   you remember that?
18      MR. FARRAH: Objection.
19  A. That would --
20      MR. FARRAH: I'm sorry, I didn't hear
21   your answer.
22  A. I don't know. I remember -- I think it was Leigh
23   that said there's an ounce that goes in there, and
24   they normally use a jigger. And you might be

Page 113

1    right on that. I think it might be -- she might
2    have testified an ounce and a half. I apologize.
3  Q. Well, whether it was a double or triple drink,
4   wouldn't it be important to know how much alcohol
5   the bartender said she put in the drink to
6   determine that?
7  A. I wouldn't take credence in the bartender. If the
8   bartender told me that it was a quarter of an inch
9   from the top, then what she says doesn't match
10   what was real.
11  Q. Okay. Did she say in her deposition that she
12   usually puts it an inch from the top? Did you
13   read that?
14  A. She -- I think she said something to that effect,
15   and then she puts the maraschino cherry in it, and
16   it brings it right up to a quarter of an inch.
17  Q. She said it never goes above a quarter of an inch?
18  A. Correct. And the maraschino cherry --
19  Q. So is it your testimony that it was two -- so what
20   was her testimony? She normally does it to an
21   inch from the top --
22      MR. FARRAH: Objection.
23  Q. -- or that it never --
24  A. If I could look at her deposition again in that

Page 114

1    area, I could -- I can't confirm it on -- from the
2    top of my head.
3      I do recall that she -- her saying that
4   putting the maraschino cherry brings it up to no
5   more than a quarter of an inch from the top.
6  Q. Okay. At no time in her deposition did she ever
7   say that it goes higher than a quarter of an inch
8   from the top of the glass, correct?
9  A. Not that I recall, no.
10  Q. And her practice was, when she was serving tables,
11   to put it an inch from the top, do you remember
12   that testimony?
13      MR. FARRAH: Objection.
14  A. I can't remember specifically, but I can -- if
15   you --
16  Q. Assuming that's her testimony, isn't that
17   important in determining whether or not that was a
18   double or a triple drink?
19      MR. FARRAH: Objection.
20  A. If it was in fact true, it would be important.
21  Q. Okay. And what evidence do you have that that's
22   not true?
23      MR. FARRAH: That what's not true?
24  Q. That she pours it to an inch -- that it comes to

19 (Pages 109 to 114)

Page 115

1 an inch from the top of the glass?
2      MR. FARRAH: Objection.
3 A. That she said that the drink ultimately goes out
4 at a quarter of an inch from the top, no more. To
5 do that, you'd have to pour more alcohol than hat
6 she claims that she pours.
7 Q. Okay. So you --
8 A. Based on my experience as a bartender.
9 Q. You claim that she said that her drinks go up to a
10 quarter of an inch all the time when they go out?
11      MR. FARRAH: Objection.
12 A. Based on what you just told me, unless I get the
13 deposition again to refresh my memory, no more
14 than a quarter of an inch from the top.
15 Q. Okay. Well, the testimony is --
16      MR. FARRAH: That's right, the testimony
17 is what the testimony is.
18 Q. But you're basing it -- so as you sit here today,
19 you don't know exactly what you -- where she
20 brought the top of the drink in order to determine
21 what you thought was a two or double -- two
22 or -- a double or a triple drink, correct?
23 A. Based on what I -- sitting here, no.
24 Q. Okay.

Page 116

1 A. I wasn't there.
2 Q. Now, do you know what the Longhorn recipe is for
3 alcohol in a drink -- in a Manhattan?
4 A. I believe I read that it was a two ounce -- two
5 ounces of Jack Daniels and a quarter of an ounce
6 of vermouth.
7 Q. And do you consider that -- how many drinks do you
8 consider that to be?
9 A. Close to two pharmacologically.
10 Q. How close to two?
11 A. I think Jack Daniels is 80 proof, and roughly an
12 ounce and a quarter of 80 proof is equal to one
13 ounce of 100 proof spirits, so two and a half
14 ounces worth of booze would be two drinks in one
15 glass.
16      Vermouth is lower proof, so it's closer
17 to two than it is to one drink pharmacologically.
18 I can say that.
19 Q. It's not two drinks, though, correct?
20 A. It's --
21      MR. FARRAH: Objection.
22 A. Clearly it's not two drinks, per se.
23 Q. Okay. Two ounces of 80 proof liquor would be
24 .08 -- would be .8 ounces of pure ethanol,

Page 117

1 correct?
2 A. It would be a half an ounce shy of two drinks
3 pharmacologically, I'll go that route.
4 Q. Okay. And the vermouth would add a little bit,
5 but not much, correct?
6      MR. FARRAH: Objection.
7 A. Yes.
8 Q. Because you're only adding a quarter ounce of a
9 very low percentage of alcohol, correct?
10      MR. FARRAH: Objection.
11 A. Overall, correct.
12 Q. So this isn't a double or a triple drink, correct?
13      MR. FARRAH: Objection.
14 A. It's more like a double, if it's made according to
15 recipe.
16 Q. If it's made to the recipe, it's less than a
17 double, correct?
18 A. Actually, if I remember correctly, the Bar Code and
19 the Rare manuals both say -- lean towards a double
20 for those two drinks; for that type of drink, a
21 martini and a Manhattan.
22 Q. For purposes of your opinion in this case, what
23 are you basing the drink on? What the Bar Code
24 says a Manhattan is? What Longhorn's recipe says

Page 118

1 it is? Or what the server said she put into the
2 drink?
3      MR. FARRAH: Objection.
4 A. I'm basing it on the bartender saying that she
5 pours no more than a quarter of an ounce from the
6 top, including the cherry. And to do that --
7      MR. FARRAH: Quarter of an inch?
8      THE WITNESS: I'm sorry, thank you.
9 A. Quarter of an inch from the top. And to do that,
10 you have to pour a good two and a half ounces
11 worth of booze, of JD with some vermouth in them.
12      So I'm basing it on the water melt, and
13 to get to that level of the drink -- it's more
14 than what the recipe calls for, is what I'm basing
15 it. What the exact amount is, I don't know. I
16 wasn't there.
17      I do know that she did not measure it,
18 she free poured, and I know -- that's all I know.
19 Q. Okay. Is there a particular reason why you give
20 more credence to the quarter of an inch from the
21 top of the glass, than her testimony as to exactly
22 what she puts into the drink?
23 A. Yes.
24 Q. Why's that?

Page 119

1 A. Because you can't pour an ounce and a half of Jack
2 Daniels with a quarter of an ounce of vermouth and
3 get it to that level. It won't come to that
4 level.
5 Q. Assuming she testified that that's the level she
6 brought it to every time she poured it, correct?
7      MR. FARRAH: Objection.
8 A. I'm sorry?
9 Q. Well, if she testified that she brings it to an
10 inch from the top, she could do that with less
11 than two ounces of bourbon and a quarter ounce of
12 vermouth, correct?
13 A. No.
14 Q. Okay.
15 A. Roughly -- it would take -- if you poured two
16 ounces worth of Jack, based on the recipe, and a
17 quarter of an ounce of vermouth and chilled it, it
18 would be about three-quarters of an inch from the
19 top, strained into the glass.
20 Q. How many ounces would that be in total?
21      MR. FARRAH: I'm sorry, how many ounces
22 of what would that be in total?
23      MR. GILLIS: Liquid.
24 A. If you poured two ounces worth of Jack Daniels and

Page 120

1 a quarter of an ounce of vermouth over ice and
2 chilled it and poured it into an up glass, it
3 would come about three-quarters of an
4 ounce -- three-quarters of an inch from the top.
5 Q. And how many ounces in liquid would that be?
6 A. Approximately? Probably close to three. A little
7 under three.
8 Q. And what do you base that on?
9 A. On experience and practice.
10 Q. Well, your experience that you testified
11 previously under oath is that two and a half
12 ounces of 80 proof vodka melted over ice would be
13 three and a half ounces of liquid in the glass,
14 correct?
15 A. What I said is if you -- if you used a four and a
16 half ounce up glass and you poured two and a half
17 ounces worth of 80 proof booze over ice, with the
18 water melt and a quarter of an ounce of vermouth
19 and the fruit, it would bring it up to that level
20 of roughly quarter of an inch from the top.
21 Q. Which is three and a half ounces?
22      MR. FARRAH: I'm sorry, he hadn't
23 finished, so I don't know what you're --
24 Q. Go ahead?

20 (Pages 115 to 120)

Page 121

1　A. It would be roughly about three and a half ounces
2　　　worth of fluid.
3　Q. So if that's three and a half ounces of fluid, why
4　　　is it in this situation it's only three ounces
5　　　with the ice melt?
6　A. Because I don't think she let it sit long enough
7　　　in the martini glass to get enough water melt
8　　　there.
9　Q. Based on what evidence?
10　A. On her evidence that she just strained
11　　　them -- poured it into the glass, strained it, and
12　　　did another one, strained it, did another one,
13　　　strained it, as opposed to stirring it around and
14　　　getting a nice mist on the outside of the glass,
15　　　which I think the recipe calls for.
16　Q. You think the recipe calls for it to sit and get a
17　　　mist?
18　A. Uh-huh, so the outside of the mixing glass is kind
19　　　of foggy, if you will, or you could see the ice or
20　　　the cold.
21　Q. So your testimony is that you read in the
22　　　deposition that she didn't let them sit?
23　　　　　MR. FARRAH: Objection.
24　A. That's what I -- that's how I gleaned the

Page 122

1　　　information. That's how I read her information.
2　Q. Okay. But had she let it sit, you would have
3　　　expected it to be at least three and a half
4　　　ounces, correct?
5　　　　　MR. FARRAH: Objection.
6　A. Maybe a little less, but somewhere in that
7　　　vicinity.
8　Q. Okay. And three and a half ounces of liquid in
9　　　that glass would come how far from the top of the
10　　　glass?
11　　　　　MR. FARRAH: Which glass are we talking
12　　　about?
13　A. Six ounce up glass.
14　Q. Up glass?
15　A. Might be two ounces or an ounce, I don't know. I
16　　　haven't -- I don't know that specific measurement
17　　　based on what it looks like in that glass. I
18　　　didn't do that specific three and a half ounces
19　　　worth of fluid in a glass to see where it would
20　　　go.
21　Q. Okay. So assuming that the menu were properly
22　　　followed so that it sat, was strained, it would
23　　　come out around three and a half ounces, you don't
24　　　have an opinion as to where in the glass that

Page 123

1　　　would go?
2　A. Not in this particular circumstance, no. And
3　　　that's if it's a two and a half ounce pour with a
4　　　quarter of an ounce. We're talking about the
5　　　martini. I think we're getting confused here.
6　　　Not the two ounce pour.
7　Q. Well, two and a quarter. Two ounces of --
8　A. Well, what I said before --
9　Q. Two ounces of bourbon and a quarter ounce of
10　　　vermouth, correct?
11　A. Two ounces of bourbon and a quarter ounce of
12　　　vermouth is what the recipe calls for.
13　Q. And if properly situated -- left to sit and then
14　　　strained, where -- how far from the top of the six
15　　　ounce up glass in inches would you expect that
16　　　amount of liquid to come?
17　　　　　MR. FARRAH: Didn't you ask him that
18　　　already?
19　　　　　MR. GILLIS: No.
20　　　　　MR. FARRAH: Objection. I think you did.
21　A. I would say if they let it sit for a while, where
22　　　enough water melt could be there, it would
23　　　probably come around two ounces from the top,
24　　　maybe two and a half ounces. Two and a half

Page 124

1　　　inches, I'm sorry. I'm getting confused now. No,
2　　　three-quarters of -- I'm sorry.
3　　　　　If I do a two ounce pour over ice with a
4　　　quarter of an ounce of water melt --
5　Q. Quarter of an ounce of vermouth.
6　A. Vermouth, thank you. Then I might get three
7　　　ounces worth of fluid if it sat long enough for it
8　　　to get the outside chill on the glass.
9　Q. So you think it would be a full half ounce
10　　　difference than preparing a two and a half ounce
11　　　martini the same way?
12　　　　　MR. FARRAH: Objection.
13　A. Two and a half ounce martini, as in two and a half
14　　　ounces worth of vodka? I'm not --
15　Q. You previously testified that two and a half
16　　　ounces of 80 proof vodka chilled over ice with the
17　　　water pouroff would fill up approximately three
18　　　and a half ounces in a glass? Whether it's a four
19　　　and a half glass or six ounce glass, it doesn't
20　　　matter, it would be three and a half ounces,
21　　　correct?
22　A. With a quarter of an ounce of vermouth and the
23　　　fruit is what I meant in that circumstance when we
24　　　talked about the martini earlier.

Page 125

1　Q. Well, that's not what your writings say, correct?
2　　　They don't even mention vermouth, correct?
3　A. If it was a martini, vermouth is part of a
4　　　martini.
5　Q. Not a dry martini.
6　A. No.
7　Q. Okay. You've written that two and a half ounces
8　　　of a martini, eight and a half ounces -- excuse
9　　　me, strike that.
10　　　　　Two and a half ounce of 80 proof vodka
11　　　over ice create an ounce of water melt to give the
12　　　customer the three and one half ounces of fluid
13　　　necessary to make the glass look full.
14　　　　　Do you remember --
15　A. That's if it's a four or four and a half ounce up
16　　　glass with fruit, right. That's what I meant by
17　　　that in writing that chapter.
18　Q. But two and a half ounces of just vodka gives
19　　　the -- creates three and a half ounces of liquid
20　　　once strained over ice, correct?
21　A. At the most you'd get an ounce of water melt,
22　　　correct.
23　Q. Well, you don't say in your writings at the most.
24　　　You just say that's what it creates, right?

Page 126

1　A. Correct.
2　　　　　MR. FARRAH: Let me see this.
3　Q. And so why would the Longhorn recipe for the
4　　　Manhattan, Jack Daniels Manhattan in this case, be
5　　　a half an ounce less than this recipe?
6　　　　　MR. FARRAH: Objection.
7　A. Because I don't believe it was strained to the
8　　　level of that -- of most of the martinis would
9　　　be --
10　Q. Okay. Assuming --
11　A. -- to allow the water to become part of that
12　　　drink. I'm sorry.
13　Q. Assuming it was properly strained, would you
14　　　expect it to be at the same level, that being
15　　　three and a half ounces?
16　　　　　MR. FARRAH: Objection.
17　A. Because it's a little -- it would be a quarter of
18　　　an ounce less. It would be a little bit less, but
19　　　it would be close to the ballpark.
20　Q. Three and a quarter?
21　A. Yes.
22　Q. Okay.
23　　　　　MR. FARRAH: Can we take -- can we eat?
24　　　　　MR. GILLIS: Just give me five more

21 (Pages 121 to 126)

Page 127

```
 1    minutes.
 2         MR. FARRAH: Okay. Let's make it five
 3    more minutes. I'm starving.
 4    Q. Now, in the six ounce up glass how far from the
 5    rim would three and a quarter ounces be?
 6         MR. FARRAH: Objection.
 7    A. I don't know in inches. I would say it would be
 8    close to three-quarters -- three-quarters of the
 9    way down the glass. Maybe close to half.
10        I'd say less than half, but more like
11    three-quarters, somewhere in that vicinity.
12    Q. Okay. So three and a half ounce -- three and a
13    quarter ounces would fill the six ounce up glass
14    to the halfway up the glass or less, correct?
15    A. Yes, somewhere in that --
16        MR. FARRAH: Objection. There's no
17    such -- he's talking inches. Objection.
18    Q. Correct?
19    A. Roughly three-quarters of an inch from the top, is
20    what I meant to say.
21    Q. Okay. Let's make sure we're all on the same page.
22        You believe that three and a quarter
23    ounces in a six ounce up rock glass would bring
24    the level of the drink to approximately
```

Page 128

```
 1    three-quarters of an inch from the top of the rim?
 2    A. The lip.
 3    Q. And are you measuring the three-quarters on the
 4    side of the glass or straight up to the top?
 5         MR. FARRAH: Objection.
 6    A. From the lip down, I would assume.
 7    Q. And if you did it straight up, it would be even
 8    less, correct?
 9         MR. FARRAH: Objection.
10    A. I imagine, but I'm not a math wizard.
11         MR. GILLIS: Why don't we just go break
12    now.
13         MR. FARRAH: Frame that question the way
14    you want to after I've put something in my
15    stomach.
16         (Lunch break was taken.)
17
18
19
20
21
22
23
24
```

Page 129

```
 1       A F T E R N O O N   S E S S I O N
 2
 3    CONTINUED EXAMINATION BY MR. GILLIS:
 4    Q. You have in front of you a document that you've
 5    been referring to that on first the page says it's
 6    the audit report, correct?
 7    A. I'm sorry, I didn't hear your last --
 8    Q. It says audit report at the top of --
 9    A. Yes, it does.
10    Q. And that's your understanding of the bill which
11    shows the drinks and food served to the Southworth
12    table on September 26th, 2003, correct?
13         MR. FARRAH: Objection.
14    A. Yes.
15         MR. GILLIS: Could we have that marked as
16    Exhibit 7.
17         (Exhibit No. 7, audit report, marked for
18    identification.)
19    Q. Do you have an opinion, at the time that
20    Mr. Southworth was served the Manhattan at 8:51,
21    what his blood alcohol was at that point?
22         MR. FARRAH: Objection.
23    A. No.
24    Q. Is it your opinion that when he got his first
```

Page 130

```
 1    drink order at 8:51 that evening, first drink
 2    order at the table, that he was in the red zone?
 3         MR. FARRAH: Objection.
 4    A. No.
 5    Q. Okay. No, he wasn't in the red zone, or no, you
 6    don't have an opinion?
 7    A. No, he wasn't in the red zone.
 8    Q. Okay. Where would you put him?
 9    A. From the evidence that I -- yellow zone.
10    Q. And what do you base him being in the yellow zone
11    on?
12    A. On the fact that he had already four
13    pharmacological drinks at the bar, and he was
14    drinking rather quickly.
15    Q. Okay. And quickly to you is two 25 ounce beers
16    over a 50 minute period?
17    A. Within a 50 minute period, yes.
18    Q. Okay. And I believe you said earlier that using
19    one drink as either 12 ounce -- one drink is 12
20    ounces of beer, correct? That's what you count as
21    a beer?
22    A. Five ounces of wine and one ounce of 100 proof
23    spirits, yes.
24    Q. But we're just dealing with beer right now --
```

Page 131

```
 1    A. Uh-huh.
 2    Q. -- so we can agree that the 25 ounces was two
 3    drinks, correct?
 4    A. Yes.
 5    Q. So he had the equivalent of four drinks in 50
 6    minutes, correct?
 7         MR. FARRAH: Objection.
 8    A. Yes.
 9    Q. And you testified earlier that that you'd expect
10    someone of his height and weight to be at a .01
11    when he had six drinks in an hour, correct?
12         MR. FARRAH: Objection.
13    A. What I said is a 200 pound man, according to a
14    chart I've seen before, has six drinks in an hour,
15    his BAC is .10, not .01.
16    Q. I'm sorry, .10.
17    A. .10.
18    Q. And you would expect -- and it's your
19    understanding that a burnoff rate for someone like
20    Mr. Southworth would be approximately .02 per
21    hour, correct?
22         MR. FARRAH: Objection.
23    A. No, I'm not a toxicologist, so I can't tell you
24    the exact burnoff rate of an individual's burnoff.
```

Page 132

```
 1    I know that when we teach the TIPS
 2    program, we say that the liver eliminates less
 3    than one ounce of pure alcohol per hour. But I've
 4    seen toxicologists in court testimony say less
 5    than .02. I've seen people say .015, .010. So
 6    I'm not a toxicologist and can't speak --
 7    Q. Well, based on your experience and training in
 8    this field, what would you expect -- if he had
 9    four drinks in 50 minutes, how much of that would
10    have been burnt off by the time he sat down and
11    ordered his first drink at 8:51?
12         MR. FARRAH: Objection.
13    A. Almost a one 12 ounce beer.
14    Q. So at the time he was ordering the Manhattan at
15    8:51, he had the equivalent in him still of three
16    12 ounce beers, is that fair to say?
17         MR. FARRAH: Objection.
18    A. If we -- we also have to take into account that he
19    had a beer prior to his arrival there, too.
20    Q. Okay. And that was at 7 o'clock?
21    A. Somewhere in that vicinity, after they finished
22    dirt biking.
23    Q. And that had burnt off before he even got to the
24    restaurant, correct?
```

22 (Pages 127 to 132)

Page 133

1    MR. FARRAH: Objection.
2  A. If in fact he had it at 7 o'clock, sure.
3  Q. Well, what's your understanding as to when he had
4     it?
5  A. I would say to you yes. I mean, one beer, an hour
6     roughly. Roughly a 12 ounce beer.
7  Q. So for all intents and purposes, that's a
8     nonfactor when he gets to the restaurant, because
9     it would have burnt off by 8 o'clock, correct?
10 A. If everything's the way -- the testimony is right,
11    yes.
12 Q. Well, you tell me. You read the testimony.
13    MR. FARRAH: Objection.
14 A. Yes, from what I read, he only had one beer.
15 Q. At what time?
16 A. I'm not sure of the exact time. It was after dirt
17    biking, so it could have been around that
18    7 o'clock when it would start to get dark.
19 Q. So whatever dusk is, that's when he had it,
20    correct? Is that your memory of the testimony?
21 A. I think it was that.
22 Q. Okay.
23 A. Because I think they said it took about a half an
24    hour to go from Templeton to --

Page 134

1  Q. Littleton?
2     MR. FARRAH: Leominster.
3  A. From Templeton to Leominster I think is what they
4     said.
5  Q. And if he -- if six drinks gets him to a .01,
6     that's about .016 per drink, correct?
7     MR. FARRAH: Objection.
8  A. .10, you mean?
9  Q. .10, I'm sorry.
10    MR. FARRAH: Objection.
11 A. If the math adds appropriately. Again, I told you
12    I'm not a math whiz.
13 Q. But if we were to take .1 and divide it by six
14    drinks --
15 A. He's doing that now.
16 Q. -- and then we were to multiply that by three
17    beers, that would be the approximate blood alcohol
18    you would expect him to be at 8:51, correct?
19    MR. FARRAH: Objection.
20 A. Perhaps. Again, I'm not a toxicologist. I don't
21    purport to be.
22 Q. You're not a toxicologist, we know that, correct?
23 A. Yes.
24 Q. And you don't expect the servers to be

Page 135

1     toxicologists either, correct?
2  A. I don't expect them to be a toxicologist, no.
3  Q. But you expect them, as part of their training, to
4     have some semblance of the approximate amount of
5     alcohol in a drink so that they can help gauge
6     what zone the various customers are in, correct?
7  A. Yes.
8  Q. Okay. And one way to do that is to have an
9     approximation as to what the person's blood
10    alcohol is, even if you're not a toxicologist,
11    correct?
12 A. Certainly.
13 Q. Okay. So what -- if he had the equivalent of four
14    beers in 50 minutes, and during that time period
15    he would have burnt off approximately one beer,
16    what would you expect the ballpark blood alcohol
17    to be for Mr. Southworth at 8:51 when he ordered
18    the Manhattan?
19    MR. FARRAH: Objection.
20 A. Could have been somewhere over .05 to .075,
21    somewhere in that vicinity.
22 Q. Okay. And for you, in your determination, that
23    would put him in the yellow zone on this evening?
24 A. The speed in which he drank those drinks, the fact

Page 136

1     that he would -- had just come off of a decent
2     workout would worry me.
3  Q. Okay. By 8:50 -- strike that.
4     Would you have not served him a Manhattan
5     at 8:51 on September 26th, 2003?
6     MR. FARRAH: Objection.
7  A. I would have looked long and hard at all the
8     issues, and probably been a little bit concerned.
9     I don't know that I would or wouldn't. I would
10    have to be there.
11 Q. Well, you're an expert here on responsible
12    service. Do you think it would be responsible for
13    Miss Chabot to serve him a Manhattan at 8:51 on
14    that evening, based on all the facts in the case
15    that you've reviewed and rendered professional
16    opinions upon?
17    MR. FARRAH: Objection.
18 A. I would be concerned about it, because it's three
19    drinks in one glass. I may not do it. If I did
20    do it, I might be ready to take it back from him.
21    Again, I wasn't there, I don't know what
22    he -- what cues he gave me -- gave at that point
23    in time. And the fact is, I'm giving him three
24    drinks in one glass. That's what worries me.

Page 137

1  Q. Okay. The fact that she served him a drink --
2     well, let's change it. If she served him a 12
3     ounce beer at that point, you would have had a
4     problem with that?
5     MR. FARRAH: Objection.
6  A. As long as he's starting to eat now, maybe I
7     wouldn't, maybe I would. Again, it all depends on
8     what visual cues I would have from him as well.
9  Q. Okay. What were the visible cues that she had of
10    Mr. Southworth at 8:51 p.m. when she took the
11    drink order for a Manhattan?
12 A. I don't think there was ever any evidence in the
13    depositions to indicate that.
14 Q. Okay.
15 A. In fact, she thought they were all fine throughout
16    the night.
17 Q. And do you have any reason to disbelieve that
18    testimony?
19    MR. FARRAH: Objection.
20 A. That they were all fine? Yes. Michael Espy said
21    he was drunk when he got there.
22 Q. Do you have any reason to believe that
23    Mr. Southworth exhibited any signs that evening,
24    while at the table before he was served his last

Page 138

1     drink, that showed that he wasn't fine?
2     MR. FARRAH: Objection.
3  A. I don't have any evidence to indicate that.
4  Q. Okay. And if I have -- I don't want to
5     paraphrase, you tell me, but you can't opine one
6     way or the other whether or not it was appropriate
7     to serve him that Manhattan at 8:51, correct?
8     MR. FARRAH: Objection. Which -- are you
9     talking --
10    MR. GILLIS: Mr. Southworth at 8:51.
11    MR. FARRAH: He's talking about the
12    Manhattan he views as three drinks.
13    MR. GILLIS: Correct.
14    MR. FARRAH: Okay.
15 A. All I can say is I would be concerned about doing
16    it. I have no trouble with the 12 ounce beer, and
17    I'd watch to make sure he ate, but giving him
18    three drinks at that point in time would worry me.
19 Q. Okay. But would you not serve him?
20    MR. FARRAH: Objection.
21 A. I can't say that from where I'm seated.
22 Q. Okay. So you can't say whether you would or would
23    not have served him at 8:51 that Manhattan,
24    correct?

23 (Pages 133 to 138)

Page 139

1    A. Correct.
2    Q. Okay. Now, you keep calling this a triple drink,
3       correct?
4    A. Two to three drinks is what I keep saying.
5    Q. Okay. But you've already admitted that the
6       Longhorn recipe computes out to less than one
7       ounce of pure alcohol, correct?
8           MR. FARRAH: Objection.
9    A. It would probably be right around that one ounce
10      of pure alcohol, because it's a two ounce pour of
11      80 proof, plus the quarter ounce of vermouth. So
12      it's closer to one ounce than it is a half an
13      ounce.
14   Q. Okay. Two ounces of 80 proof is .8 ounces of pure
15      alcohol, correct?
16   A. I imagine, if you did the math. I didn't do it.
17   Q. Well, you tell me. You're the expert.
18   A. I told you I'm not a math expert.
19   Q. You can't compute the amount of alcohol in two
20      ounces of bourbon; pure alcohol?
21   A. Well, I would say an ounce and a quarter of 80
22      proof is equal to one ounce of 100 proof spirits,
23      five ounces of wine, and 12 ounces of beer. So if
24      I had to sit down and compute it with a

Page 140

1       calculator, maybe I could. But it's still a good
2       two -- close to two drinks in one glass, and maybe
3       three.
4    Q. Okay. Would you disagree with Dr. Benjamin saying
5       it's .84 ounces of pure alcohol?
6    A. I would not disagree with Dr. Benjamin.
7           MR. FARRAH: That's the Rare recipe?
8           MR. GILLIS: Rare recipe, correct.
9    Q. So the amount of alcohol pursuant to the recipe is
10      less than two drinks, correct?
11   A. Yes.
12   Q. Okay. And you keep calling it a double to a
13      triple drink, correct?
14   A. Yes.
15   Q. What evidence do you have that that drink that
16      evening was poured in excess of the recipe?
17          MR. FARRAH: Other than what he's
18      testified to already?
19          MR. GILLIS: Yes.
20   A. There's nothing else I can say other than what I
21      testified to already.
22   Q. You remember her testimony that she poured it to
23      one inch from the top before she put in the
24      cherry, correct?

Page 141

1    A. I think she said that. Again, you didn't show me
2       in the deposition, but you've told me that that's
3       what she's testified to.
4    Q. Well, don't you think that's important for your
5       report as to whether the server said she poured the
6       alcohol that evening?
7    A. I don't take much credence what the server said.
8       What I do take credence in is the server was
9       concerned enough to call the manager and server
10      about the Manhattans that were being served at
11      that table, and nothing was done about it.
12          That's about the only thing I really have
13      credence in her testimony.
14   Q. Okay. The server -- the manager was not contacted
15      until the last round, correct?
16          MR. FARRAH: Objection.
17   A. From what I heard.
18   Q. Nobody had a problem with the round at 8:51 that
19      you're aware of, correct?
20   A. Not that I'm aware of.
21   Q. Okay. Do you have any criticism of that round?
22          MR. FARRAH: Objection.
23   A. If Michael Espy's testimony is correct, and he was
24      intoxicated when he got there, because they were

Page 142

1       drinking shots -- they were drinking Jack Daniels
2       and beers at the hotel before they got there, then
3       yes, I would have a problem.
4    Q. Okay. Were they drinking Jack Daniels and beer
5       after they leave the Longhorn?
6           MR. FARRAH: After they left the
7       Longhorn?
8           MR. GILLIS: Yes.
9           MR. FARRAH: Objection.
10   A. I don't recall. They may have when they went back
11      to the hotel room.
12   Q. Okay. As to Mr. Southworth, what evidence was
13      there that prior to that last round, when
14      Miss O'Donnell talked to the manager, that there
15      was any concern of serving him the Manhattan at
16      that time?
17          MR. FARRAH: Objection. Whose concern?
18   A. Other than the fact that they --
19          THE WITNESS: I'm sorry.
20          MR. GILLIS: Miss O'Donnell.
21   A. Other than the fact that they were loud, and that
22      she was serving Manhattans to the table, and she
23      probably knew that they were stronger than normal
24      drinks.

Page 143

1    Q. She, being the bartender?
2    A. That's who you're talking about, Kristin
3       O'Donnell, right?
4    Q. Okay. What evidence do you have, if any, that
5       they were loud before they were served their last
6       drink at the Longhorn that night?
7           MR. FARRAH: Objection.
8    A. I don't have any specific -- I don't know the
9       exact time of when they were served, compared to
10      when the concern was. I really don't know.
11   Q. In fact, there's absolutely no evidence that they
12      were loud prior to serving their last drink, isn't
13      that true?
14          MR. FARRAH: Objection.
15   A. Not that I've read.
16   Q. Okay. You read Jude Connolly's deposition, when
17      he said it was around 10:30, correct?
18          MR. FARRAH: Objection.
19   A. I believe so.
20   Q. Okay. And you know that the bill was paid at
21      9:51, correct?
22          MR. FARRAH: 7.
23   Q. 9:57, correct?
24   A. Yes.

Page 144

1    Q. Okay. So the loudness was 33 minutes after the
2       bill was paid, correct?
3           MR. FARRAH: Objection.
4    A. I thought the issue of the loudness was when
5       it -- in and around the last round was served.
6    Q. Based on what testimony?
7    A. I think it was Kristen's. And she said that as
8       long as they're eating, I guess it's okay.
9       Because she touched base -- she talked with Leigh,
10      and she talked with the manager. She said she
11      talked to both of them.
12   Q. Okay.
13   A. And I don't think she talked to them separately,
14      but I'm not sure.
15   Q. So your understanding of the facts is that the
16      bartender could hear them being loud, and was
17      concerned about that?
18   A. It seems that way from what I read. It's
19      possible. Or it could have been just the number
20      of drinks going to the table.
21   Q. And that's the basis of your opinion, is that she
22      could tell that they were loud before they got
23      their last drink?
24          MR. FARRAH: Objection.

24 (Pages 139 to 144)

Page 145

1  A. I'm not sure. Like I said, it's possible. It
2  seemed like it was in that time frame that
3  the -- when the drinks were served. Or they had
4  been served but that issue was brought up to
5  management and Leigh. From what I read.
6  Q. Okay. From what you read, Leigh -- Kristen was
7  the one who brought it up with management of their
8  being loud?
9  A. Kristen said she did speak to the manager, and she
10  did speak to Leigh. And Jude did say that they
11  did come over and make mention of the fact that
12  they were being loud, from what I recall.
13  Q. From what you recall?
14  A. From what I recall, yes.
15  Q. And that's something that you'd remember, because
16  that's important to your opinion, isn't it?
17  A. Certainly.
18  Q. Let's get back to that question. How do you
19  compute that to be three drinks in the glass?
20  A. I said two to three drinks, because it would take
21  that much to get it up to that level of a quarter
22  of an inch from the top, with the maraschino
23  cherry.
24  Q. You did the experiment that has been labeled

Page 146

1  Exhibits 1 and 2 in this case, correct?
2  A. Yes, I participated in --
3  Q. Okay. And using the Longhorn recipe, two drinks
4  was well above a quarter inch from the top,
5  correct?
6  A. Right to the top of the glass.
7  Q. Okay. It was well above the quarter of an inch
8  from the top, correct?
9  A. Yes. And we backed --
10  MR. FARRAH: Objection to the form.
11  THE WITNESS: I'm sorry.
12  MR. FARRAH: Don't be sorry, it's just I
13  should have objected the first time.
14  A. It was at the top of the glass. And then what we
15  did is we backed off to a quarter of an inch from
16  the top, and we found that that was in fact an
17  ounce of fluid.
18  Q. So you made two drinks of two ounces of bourbon
19  and a quarter ounce of vermouth, correct?
20  A. In each one, right.
21  Q. Okay. So that's a combined four ounces of bourbon
22  and a half ounce of vermouth, correct?
23  A. Yes.
24  Q. And you found that four and a half ounces --

Page 147

1  A. Chilled.
2  Q. -- chilled was six ounces of liquid in total,
3  correct?
4  MR. FARRAH: Objection.
5  A. Yes, right up to the very top of the glass.
6  Q. Okay. So if the drink were poured to a quarter of
7  an inch from the top, you would expect that drink
8  to be an ounce less than the two drinks combined,
9  correct?
10  A. That's correct.
11  Q. Okay. And a good portion of that ounce less would
12  be the alcohol, correct?
13  MR. FARRAH: Objection.
14  A. Yes.
15  Q. Okay. So what would -- what's your understanding
16  of what the most pure alcohol could have been in
17  that drink if it was poured to one quarter inch
18  from the top of the lip?
19  MR. FARRAH: Objection.
20  A. I would say it's close to three and three-quarters
21  to three and a half of pure -- of the alcohol
22  itself. Maybe four ounces of alcohol itself, with
23  an ounce of water melt.
24  Q. Well, one drink properly strained creates,

Page 148

1  according to your prior testimony, an ounce of
2  meltoff, correct?
3  MR. FARRAH: Objection.
4  A. If it's chilled with the -- just about.
5  Q. Right.
6  A. I mean, again, I didn't use Exacto. It's been
7  from experience, but it's close to.
8  Q. Okay. So we know one drink brings it to three and
9  a quarter to three and a half, correct?
10  MR. FARRAH: Objection. One drink brings
11  two and a quarter to three and a quarter, three
12  and a half?
13  Q. Three and a quarter to three and a half ounces of
14  fluid in the glass, correct?
15  MR. FARRAH: Objection.
16  A. If it's an ounce and a -- if it's two and a
17  half -- I'm sorry.
18  If it's two and a quarter ounces worth of
19  booze, based on the Longhorn recipe, and you chill
20  it, you could get three. If you chilled it to the
21  point where it sat in the ice for a bit, you could
22  get three and a quarter ounces worth of fluid.
23  Q. Okay.
24  A. It may be less. I mean, the way we did it, it to

Page 149

1  would probably be less, because it
2  was (gesturing.)
3  Q. Well, assuming that that's what the facts say
4  happened, correct?
5  MR. FARRAH: Assuming what?
6  Q. There's no testimony whatsoever -- strike that.
7  The question was never asked in the
8  deposition as to how long she let it sit before
9  she strained it, correct?
10  A. That wasn't, no, it wasn't.
11  Q. Okay. So you don't know that, correct?
12  MR. FARRAH: Objection.
13  A. That's the missing link.
14  Q. Okay. And that's very important to you in
15  determining the strength of that drink, correct?
16  MR. FARRAH: Objection.
17  A. It would be important to me as far as the water
18  melt as part of that drink, sure.
19  Q. Correct. And the water melt's important because
20  it determines for you whether it's one and a half
21  drinks, two drinks or three drinks, correct?
22  MR. FARRAH: Objection.
23  A. Yes.
24  Q. Okay. And assuming it was properly poured and

Page 150

1  properly strained, your opinion is that there
2  would be one ounce of runoff along with the
3  alcohol in the drink that is called for by the
4  menu, correct?
5  MR. FARRAH: Objection.
6  A. Conceivably.
7  Q. Okay. So the most that five ounces would be would
8  be one and a half times what the menu calls for,
9  correct?
10  MR. FARRAH: Objection.
11  A. What did you say, 1.5 more?
12  Q. I'm saying that if one drink properly poured,
13  stirred, strained equals three and a quarter
14  ounces of liquid --
15  A. Yes.
16  Q. -- five ounces would be approximately one and a
17  half times the menu proportions properly strained
18  and chilled, correct?
19  A. Con -- I would have to agree with that.
20  Q. Okay. So as far as whether it's two drinks, three
21  drinks or whatever, the most it could be is one
22  and a half times the menu -- what the menu drink
23  calls for, correct?
24  MR. FARRAH: Objection.

25 (Pages 145 to 150)

Page 151

1  A. Conceivably.
2  Q. Okay. And we've agreed that the menu calls for
3     two ounces of bourbon and a quarter ounce of
4     vermouth, correct?
5  A. Yes.
6  Q. Okay. And that is .84 ounces of pure alcohol,
7     correct?
8  A. According to the toxicologist's testimony.
9  Q. Okay. So the most that that drink could be, based
10    on the evidence, would be one and a half times
11    that, correct?
12       MR. FARRAH: Objection.
13 A. I would imagine.
14 Q. So we're talking about 1.25 pure ounces of
15    alcohol, correct?
16       MR. FARRAH: Objection.
17 A. Okay.
18 Q. You agree?
19 A. I guess.
20 Q. Okay. And that's at the very most, correct?
21       MR. FARRAH: Objection.
22 A. I don't -- maybe.
23 Q. Okay. Did you measure how much liquid is in the
24    glass if it's filled, as Kristen O'Donnell

Page 152

1     testified to, to one inch from the lip?
2  A. I don't believe -- I don't believe we did.
3  Q. Okay. So you don't know how much alcohol would be
4     in the drink based on the proportions that she
5     said she poured, correct?
6  A. Right.
7  Q. Well. Wouldn't that be important in determining
8     whether it was a double or a single drink?
9       MR. FARRAH: Objection.
10 A. I think it would be important if it was a double
11    or a triple drink, yes.
12 Q. Well --
13 A. It's not a single drink.
14 Q. She testified that she put an ounce and a quarter
15    of bourbon with a quarter to a half ounce of
16    vermouth, strained it over ice, and it came to an
17    inch from the bottom of -- from the top of the
18    glass. Is that a double drink, in your opinion?
19       MR. FARRAH: Objection.
20 A. Not that one, no.
21 Q. Okay. That's a single?
22 A. What did you say, an ounce and a quarter of?
23 Q. 80 proof.
24 A. And then a quarter of an ounce of -- a little bit

Page 153

1     more than a single.
2  Q. Okay. You wouldn't have any problem with serving
3     Mr. Southworth at 8:51 that ratio of alcohol in a
4     Manhattan, correct?
5       MR. FARRAH: Objection.
6  A. That ratio?
7       MR. FARRAH: Objection.
8  A. From what I've read, probably not.
9  Q. Okay.
10 A. But again, I would watch to see how fast he drank
11    it at that point, sure.
12 Q. And would you have any problems with him being
13    served another Manhattan at no earlier than 9:21,
14    30 minutes after that first one?
15       MR. FARRAH: Objection.
16 A. Again, that's where I'd be concerned.
17    This -- people don't drink Manhattans for the
18    flavor. Those are drinks that knock you on you
19    butt. And if it was that measurement, I'd still
20    be a little bit concerned.
21       But it depends on how much he ate, and
22    any cues, and so forth.
23 Q. Well, what's your understanding that he had to eat
24    that night?

Page 154

1  A. I thought it was ribs.
2  Q. Okay. Pretty full meal, right?
3       MR. FARRAH: Objection.
4  A. Yes.
5  Q. There was salads to the table, correct?
6  A. That's what I saw, yes.
7  Q. There was chowder to the table?
8       MR. FARRAH: Objection.
9  A. Yes.
10 Q. There was a Tonion to the table?
11 A. Yes.
12 Q. Do you know what a Tonion is?
13 A. I would guess it's like a blooming onion or a
14    fried onion.
15 Q. And fried fatty foods is good for people who are
16    drinking, correct?
17 A. If you eat before or during, sure. It helps slow
18    alcohol's rate of entry into the bloodstream.
19 Q. But you don't know when that came, before or after
20    the service of drinks, correct?
21       MR. FARRAH: What are we talking about,
22    the Tonion?
23       MR. GILLIS: The Tonion.
24 A. No, I don't.

Page 155

1  Q. Okay. Certainly it was there before the drink at
2     9:21 if it was ordered at 8:40, correct?
3  A. I would hope so.
4  Q. So he's got Tonion, chowder, salad, ribs in him
5     when he gets that second Manhattan, correct?
6       MR. FARRAH: Objection.
7  A. I believe. I would think so.
8  Q. Okay.
9  A. But I didn't see anything where it says the food
10    went out. I don't know if that says that on this.
11 Q. I think it does.
12 A. Other items. Logout. Is that the logout there?
13       MR. FARRAH: Are you representing, by the
14    way, that there's something in the evidence that
15    he had chowder, Tonions --
16       MR. GILLIS: I'm not answering your
17    questions, etal. If you want to ask him afterwards,
18    go right ahead.
19       MR. FARRAH: Okay.
20 Q. On the bottom of Page 5 of the audit report -- I'm
21    sorry, Page 8.
22 A. Is this the one we're looking at?
23 Q. Page 8, yes.
24 A. Okay.

Page 156

1  Q. That's Page 9. But it goes on -- you're right.
2       Starting right here at 9 o'clock, and
3     going up here to the top of Page 9, and it's the
4     same table, Table 52, correct?
5  A. Yes, I believe so.
6  Q. And that's all the food that was ordered to the
7     table, correct?
8       MR. FARRAH: Objection.
9  A. I think the other stuff was ordered earlier.
10    Wasn't the chowder and the Tonion --
11 Q. Right.
12 A. Yes. I think the appetizers went in before this.
13 Q. Right. So we had appetizers at 8:40, correct,
14    based on the first page?
15       MR. FARRAH: Objection.
16 A. Right.
17 Q. We had bread to the table right when they arrived,
18    correct?
19 A. I believe so.
20 Q. Okay. And we have food ordered, ribs, salads and
21    so forth, at 9 o'clock, correct?
22 A. Yes.
23 Q. And based on your training and experience and
24    prior experience in a restaurant, a business, you

26 (Pages 151 to 156)

Page 157

1 understand that the salads and the appetizers come
2 out before the main meal, correct?
3 A. Yes.
4 Q. Okay. And so all of that came out before the ribs
5 would have come out some time after 9 o'clock,
6 correct?
7 A. Yes.
8 Q. And is it your understanding that she brought the
9 food to the table when she took that next order of
10 drinks, the ribs and so forth?
11 A. I don't know, but maybe. It's quite possible.
12 Q. Okay. But based on what you see here for food,
13 and based on what you reviewed in this case, would
14 you have not served him a second Manhattan at 9:21
15 that evening?
16     MR. FARRAH: Objection.
17 A. If it was two to three drinks in one glass, I
18 might be concerned about serving him at all. If
19 it's -- whatever -- we've been talking about two
20 different types of pours. So if you're talking
21 about the pours that Kristen's talking about, it's
22 possible. We don't -- I don't see anything that
23 tells me that those ribs came out before that
24 round of drinks was served, so I don't know what

Page 158

1 time they came out.
2 Q. Okay.
3 A. But if you eat after you drink, it really doesn't
4 matter. It's like closing the door after the
5 horse left the barn.
6 Q. But he's already started with the appetizers,
7 correct?
8     MR. FARRAH: Objection.
9 A. Yes.
10 Q. Okay. Assuming Kristen's pour, would you have a
11 problem if she had poured him one of -- what she
12 said was the pour at 8:51, would you not serve him
13 another one of what we'll call the Kristen pour,
14 at 9:21?
15     MR. FARRAH: Objection.
16 Q. Based on your -- what you know about this case?
17     MR. FARRAH: Objection.
18 A. I don't know. I think in this -- right around
19 this time frame it might be when they were
20 creating a little bit of a disturbance or a
21 loud -- a loudness to the point where Kristen was
22 aware of it, which means that it might have
23 happened prior to this, I don't know. So I don't
24 know what kind of behavior they displayed.

Page 159

1     There's not enough evidence for me to
2 say, yes, I would feel comfortable. Right at this
3 point, I can't say that I would feel comfortable.
4 Q. So if you don't -- if you can't say whether she
5 should or should not have served him at that time,
6 then clearly you can't be critical of her serving
7 him at that time, correct?
8     MR. FARRAH: Objection.
9 A. I guess that would be safe to assume.
10 Q. Well, do you have a criticism, based on if it was
11 her pour, of serving him another Manhattan at this
12 point?
13     MR. FARRAH: Objection.
14 A. I really don't know. I'd have to be there to see
15 that, see the kind of cues that they were giving.
16 Q. Other than the loudness, are you aware of any cues
17 that Mr. Southworth exhibited before he was served
18 the last round of drinks at the Longhorn that
19 evening that would have indicated to the server
20 that he should not be served any more alcohol?
21     MR. FARRAH: Objection.
22 A. All I know is that Jude mentioned the fact that he
23 had glassy eyes, and that he was -- didn't carry
24 himself the way he normally does. So that's the

Page 160

1 only thing.
2     What time that actually happened, I
3 don't -- we -- I don't think we have an actual on
4 that.
5 Q. Okay. So you can't opine whether or not she
6 should have served him because of the way he
7 carried himself, because you don't know when he
8 wasn't carrying himself, wherever it was, the way
9 he was carrying himself, correct?
10     MR. FARRAH: Objection.
11 A. Right.
12 Q. And you don't even know if the way he was carrying
13 himself at that time, which Jude said was
14 different from the way he normally carried
15 himself, was in any way indicative to the server
16 that he shouldn't have been served alcohol,
17 correct?
18     MR. FARRAH: Objection.
19 A. Based on that time issue, yes.
20 Q. Well, not just based on the time. How did the way
21 he carry himself change?
22 A. I don't know the specifics.
23     MR. FARRAH: From when to when?
24 A. From usual to now?

Page 161

1 Q. Well, you said he was carrying himself differently
2 than he normally does, correct?
3     MR. FARRAH: Jude said that.
4 Q. Jude said that, correct?
5 A. Jude.
6 Q. How does he normally carry himself?
7     MR. FARRAH: Objection.
8 A. I don't know. I'd have to ask Jude.
9 Q. Okay. How was he then carrying himself when he
10 was carrying himself differently at the
11 restaurant?
12 A. Again, I'd have to ask Jude.
13 Q. Okay. So can you opine whether or not the
14 waitress should have known the difference based on
15 what you know about the facts?
16     MR. FARRAH: Objection.
17 A. The only thing that -- again, with the time issue,
18 I don't have it, so I really can't say.
19 Q. Well, regardless of the time issue.
20 A. If he had glassy eyes, he shouldn't have been
21 served at all.
22 Q. Let's stick to this issue first.
23 A. Okay.
24     MR. FARRAH: Which issue is this?

Page 162

1 Q. The issue here is the issue of the way he was
2 carrying himself.
3     You say that Jude Connolly said he was
4 carrying himself differently, correct?
5 A. Yes.
6 Q. Okay. What about the way he was carrying himself
7 differently, regardless of time, should have
8 alerted the server that he shouldn't have gotten
9 more alcohol?
10     MR. FARRAH: That standing alone,
11 carrying himself?
12     MR. GILLIS: Yes, that by itself.
13     MR. FARRAH: Objection.
14 A. There's not enough of a description, other than
15 the fact that he said he was carrying himself
16 differently, to give me an opinion or be able to
17 make an opinion at this point.
18 Q. Okay. So you -- okay.
19 A. He didn't give me enough information, is I guess
20 what I'm saying.
21 Q. There's no evidence in there that the way he was
22 carrying himself differently was so different or
23 bizarre that a server should have picked up on it,
24 correct?

Page 163

```
 1         MR. FARRAH: Objection.
 2  A. I don't know.
 3  Q. Okay. And was Mr. Southworth the only loud person
 4     at the table, or was the entire table loud?
 5  A. I think the entire table was loud.
 6  Q. Okay. So is it your opinion that the entire table
 7     should not have been served any more alcohol when
 8     it became loud?
 9         MR. FARRAH: Objection.
10  A. It's possible. I don't know. I don't know about
11     the specifics. I don't know the time frame, or
12     degree, or length of time that they were loud.
13     All I know is Michael Espy did testify that he was
14     intoxicated and he had been drinking before he got
15     there, so that would worry me. And if he's in a
16     group of people that are drinking hard liquor
17     drinks, that would worry me, too.
18         That would be a table that I might shut
19     the whole table off based on the revelry of the
20     party.
21  Q. Okay. But you didn't answer the question. You
22     said possibly.
23         Would you have shut the whole table off
24     based on the fact that they were loud that night?
```

Page 164

```
 1         MR. FARRAH: Just based on the fact that
 2     they were loud?
 3         MR. GILLIS: Yes.
 4  A. Possibly, yes.
 5  Q. So you don't have an opinion yes or no, it's just
 6     a possibility?
 7  A. Well, it's just -- it's more of a probability than
 8     not, especially with the fact that there was one
 9     guy in a black cowboy hat and black hair that was
10     ordering for the table; that drinks were brought
11     to the table that were taken back to the bar,
12     which leads me to believe that nobody was asked if
13     they wanted a drink, that a drink would be put in
14     front of them; that seven Manhattans went out to
15     the table and there were only six people of age
16     there at that time. So it leads me to believe
17     that they were padding the check.
18         There's no evidence to indicate that that
19     martini -- that Manhattan that was taken off the
20     bill -- was ever taken off the bill that was
21     brought back to the bar.
22         So it's like, okay, here we go, we got a
23     good table coming, we're going to have a
24     high-volume check.
```

Page 165

```
 1  Q. So it's your opinion in this case that Leigh
 2     Chabot was padding the bill?
 3         MR. FARRAH: Objection.
 4  A. It seemed that way to me.
 5  Q. Are you going to opine that at trial, based on the
 6     evidence and the facts that you've seen in this
 7     case, that Leigh Chabot padded that bill?
 8         MR. FARRAH: Objection. What he's going
 9     to opine to at trial is in part based on my
10     strategy, so I object to the question.
11  Q. You can still answer.
12  A. The fact that she didn't -- that there's no
13     evidence to indicate that Jack Daniels was taken
14     off the bill; that there was no evidence to
15     indicate that she asked everybody if they'd like a
16     drink, which is contrary to their trainings, would
17     lead me to believe so.
18  Q. And is that to a reasonable degree of alcoholic
19     safe service that you're going to opine that she
20     padded the check?
21         MR. FARRAH: It's the same objection.
22     You can answer.
23  A. It would be -- as far as responsible service of
24     alcohol, it is not responsible service of alcohol.
```

Page 166

```
 1  Q. No. Are you going to opine to a
 2     reasonable -- like you said in your opinion, to a
 3     reasonable degree of -- to a reasonable degree of
 4     responsible alcoholic beverage service certainty
 5     and professional alcoholic certainty Leigh Chabot padded
 6     that bill?
 7  A. Sure.
 8         MR. FARRAH: Objection.
 9  Q. Sure?
10  A. Yes.
11  Q. That's your opinion?
12  A. Yes.
13  Q. Okay. Is it your opinion that 19 drinks in an of
14     itself is inappropriate to serve to any table?
15         MR. FARRAH: Objection. Are we talking
16     about the double and triple drinks or the
17     drinks --
18         MR. GILLIS: 19 drinks in total.
19         MR. FARRAH: Objection.
20  A. Run the question by me again, please.
21  Q. Is it your opinion that it's inappropriate to
22     serve 19 drinks to a table, period?
23         MR. FARRAH: Period?
24  A. Just to any table? With any -- one person at it
```

Page 167

```
 1     or --
 2  Q. Just any table.
 3         MR. FARRAH: Objection.
 4  A. It would concern me. It would seem irresponsible.
 5  Q. Regardless of how many people at the table?
 6  A. No. That's not what you asked me. If there was
 7     one person at a table, it would definitely be
 8     irresponsible. If it's 19 drinks, it would
 9     concern me. If they're double drinks or triple
10     drinks, then it really isn't that many, it's close
11     to 40 drinks.
12  Q. If there were 40 people at the table, would you
13     have a problem with the 19 drinks being served?
14         MR. FARRAH: Objection.
15  A. If nobody's intoxicated and everybody's of age, no
16     harm.
17  Q. Okay. So you'd agree with me that the number of
18     people drinking the drinks is important, correct?
19  A. Absolutely.
20  Q. Okay. And based on the number of drinks served to
21     this table that night, which was 17 Manhattans and
22     two beers, vessels of beer and vessels of
23     Manhattan, the total number of drinks divided by
24     the number of people there is two drinks for
```

Page 168

```
 1     everybody, and three drinks for four people,
 2     correct?
 3         MR. FARRAH: Objection.
 4  A. Well, again, that's what we disagree about. The
 5     vessel, in my opinion, is at least two drinks in
 6     all of those, so you'd have to double that number.
 7  Q. Okay. But let's just get to that in a sec.
 8         MR. FARRAH: Are you finished answering?
 9  Q. Are you done?
10         THE WITNESS: I think so.
11         MR. FARRAH: Okay.
12  Q. Regardless of the size of the drinks, and not what
13     the drink equates to in pure ethanol, there were
14     17 vessels of alcohol brought to the table that
15     night, correct?
16         MR. FARRAH: 19.
17         MR. GILLIS: 19, I'm sorry.
18  A. 19.
19  Q. And you would agree that 19 is two rounds of
20     drinks, regardless of what's in it, to everybody,
21     and four to -- three drinks -- three vessels of
22     drinks to four of the people, correct?
23         MR. FARRAH: Objection. Don't answer
24     that question. If you're asking him is 19 divided
```

28 (Pages 163 to 168)

Page 169

1  by seven two and five-sevenths, we can stipulate I
2  think to that. Is it two and five-sevenths?
3          MR. GILLIS: Four-sevenths.
4          MR. FARRAH: If you're asking him is 19
5  divided by 6 three and a sixth --
6          MR. GILLIS: Okay. If you want to
7  testify, do it on your own time.
8          MR. FARRAH: I do want to testify.
9          MR. GILLIS: No, I'm not allowing --
10         MR. FARRAH: We'll stipulate to both of
11  those.
12  Q. The 19 vessels of drinks that came to the table
13     that evening --
14         MR. FARRAH: 17 Jack Daniels, two 25
15  ounce beers, per the check, that's 19.
16  Q. How do you divide that up amongst the people at
17     the table as to who had what?
18         MR. FARRAH: Objection.
19  A. I don't know. You're the one that's doing the
20  math thing. All I know is that there were six
21  people drinking the alcoholic beverages, and there
22  were 19 drinks. So if you divide six into 19, you
23  get three and some change per person.
24  Q. Well, what if seven people were drinking?

Page 170

1          MR. FARRAH: Objection.
2  A. Then you'd be -- then that much less per person.
3  Q. Okay. So if you can't determine what each person
4     drank that night, how do you have an opinion as to
5     whether or not they were reasonably served
6     alcohol?
7          MR. FARRAH: Objection.
8  A. Because again, Michael Espy was intoxicated upon
9  arrival, according to his testimony, which would
10  make it irresponsible; because there was only six
11  people that were of age at that table that night;
12  and those drinks are double drinks and maybe even
13  triple in some circumstances. I don't know
14  exactly how much was in the Manhattan.
15  Q. You've already testified that the --
16  A. I've said this before.
17  Q. Let's go back to Leigh Chabot for a second. What
18     evidence do you have that she padded the bill?
19  A. The only evidence I have is that she padded the bill
20  is THAT she didn't ask -- that she did not -- I
21  don't see any evidence to indicate that she took
22  that Manhattan off the check; and I don't see any
23  evidence that she asked people if they wanted
24  drinks, she just put them in front of them.

Page 171

1  Q. What evidence do you have that she didn't ask
2     them?
3  A. She said that one person, the guy with the black
4  hat and the black hair, ordered the drinks; she
5  brought them out, and then took one back.
6          The fact that she took one back leads me
7  to believe, leads me to believe, and I think it's
8  only common sense --
9  Q. Okay. So you -- there's no evidence whatsoever
10     that she didn't ask every person at the table,
11     correct?
12         MR. FARRAH: Objection.
13  A. There's no evidence to indicate --
14         MR. FARRAH: That he knows of?
15  Q. That you're aware of.
16  A. That I'm aware of.
17  Q. So as far as your basis that she padded the check,
18     she didn't ask everybody, you don't know whether
19     she did or didn't because that question was never
20     asked at her deposition, correct?
21  A. No, sir, it wasn't.
22  Q. Okay. So you have no basis for that opinion,
23     correct?
24  A. The only basis I have is what I just explained to

Page 172

1  you.
2  Q. Okay.
3  A. Why would a drink be brought out and then taken
4  back if the person wasn't asked and wasn't ready?
5  Q. Well, isn't it the testimony that the drink was
6     ordered, brought out, and the people left the
7     restaurant and left one full drink on the table
8     which she then brought back?
9          MR. FARRAH: Objection.
10  A. No.
11  Q. That's not the testimony?
12  A. The testimony that I recall is that she walked out
13  and saw that somebody didn't finish a drink and
14  bought it back, and it sat at the bar. And then
15  she said he probably finished it and then just
16  didn't ask me to bring it back. I think that's
17  how I read her testimony.
18  Q. Okay. Your understanding of the testimony, upon
19     which you base your opinion that she padded the
20     check, was that while they were sitting at the
21     table she brought one of the drinks back to the
22     bar?
23  A. Because this person -- this individual did not
24  have the one he had in front of him finished.

Page 173

1  Q. And that would be responsible service not to bring
2     a drink over while someone else had a drink in
3     front of them, correct?
4          MR. FARRAH: Objection.
5  A. Responsible service would be to ask the guest if
6  they would like a drink, and not make it until you
7  know it's safe to do so.
8  Q. Well, is there --
9  A. For example --
10  Q. Do you take --
11         MR. FARRAH: Wait. I don't think he's
12  finished.
13  Q. Go ahead. Finish your example.
14  A. If their house policy, which I suspected, which
15  testimony reveals it was, that you wouldn't bring
16  a drink out until they finish the one they had,
17  and then when you brought out the drink and the
18  person saw that you were going to take it back,
19  they would finish this one rather quickly. That's
20  generally what people do. It's rare that people
21  will say, yes, you can take that, I'm ready for
22  mine.
23  Q. Okay. And this -- do you think it's improper
24     service to take a drink order while people have

Page 174

1  some portion of a drink still in front of them?
2  A. If it's safe to do so, I don't think it's
3  improper.
4  Q. Okay. And if when you make that drink that person
5     still hadn't finished their drink, it would be
6     appropriate not to bring the new drink over to the
7     table, correct?
8  A. I wouldn't -- it wouldn't be appropriate to make
9  the drink until the one that they had was
10  finished.
11  Q. Okay. So your -- you train people in TIPS not to
12     even take a drink order until the drink in front
13     of the person is completely gone?
14  A. No. What I train people to do is do not serve a
15  fresh drink without taking away the glass from the
16  last drink.
17  Q. Do not serve a fresh drink?
18  A. Correct.
19  Q. Okay. So if she left the drink at the bar and
20     didn't serve it because the gentleman still had
21     something in his glass, that would be safe
22     service, correct?
23  A. No, that would be not a fresh drink, because
24  drinks will warm up or die. You want the drink to

Page 175

1  be fresh, you want it to be good when it goes out
2  there, which means it should be made at the
3  time -- it should be just made and then delivered
4  right away.
5  Q. Well, what do you do under the
6  circumstance -- well, it's all right to take a
7  drink order when the person still has some alcohol
8  in front of them, correct?
9  A. Yes.
10  Q. Okay. It's not all right to serve that drink as
11  long as that person has that drink in front of
12  them, correct?
13  A. We teach that you do not serve a fresh drink
14  without taking away the glass from the last drink.
15  Q. So when you -- so it was appropriate for her to
16  order the drink when it was ordered and the person
17  only had a little left, correct?
18      MR. FARRAH: Objection.
19  A. One of the strategies that we use in the training
20  program is, obviously, as I said many times, do
21  not serve a fresh drink without taking away the
22  glass from the last drink. When they're ready,
23  you bring it to them. But if they're not ready,
24  you don't bring it to them. And you're the only

Page 176

1  one that can decide when they're ready. You have
2  to gauge people's sobriety per sip. If you bring
3  it to them quickly, they'll end up drinking fast.
4  Q. So it was appropriate for her not to bring that
5  drink over to the table if the person was either,
6  A, still drinking that drink, or B, until you took
7  that drink away with something in it, correct?
8  A. Yes.
9  Q. Okay. And if that person was still drinking and
10  didn't want the glass taken away, it was
11  appropriate for her not to bring that additional
12  drink over to the table at that time, correct?
13  A. Yes.
14  Q. Okay. So do you have any evidence, other than
15  that one drink, that there were any drinks ordered
16  for that table that didn't -- that weren't
17  consumed at the table?
18  A. No.
19  Q. Okay. So you're testifying that she padded the
20  bill because a drink was ordered but wasn't
21  actually drunk at the table?
22      MR. FARRAH: Objection. He's already
23  testified as to the basis for the padding of the
24  bill, and it was more than that.

Page 177

1  A. Yes, I did. It was more than that, right.
2  Q. Okay. You would expect that if a person ordered
3  the drink, the drink was made, the drink wasn't
4  served because the person hadn't drank completely
5  their prior drink, that it's incumbent upon the
6  restaurant then to remove that from the bill if
7  the people pay and leave?
8      MR. FARRAH: Objection.
9  A. It should have been -- yes, it should have been
10  removed from the bill.
11  Q. Failure to do that is padding the check?
12      MR. FARRAH: Objection.
13  A. That's what I -- that's what I perceive as padding
14  the check, yes.
15  Q. And that -- you teach that in the TIPS program?
16      MR. FARRAH: Objection.
17  A. Pad the check?
18  Q. That not taking a drink off, even if it was
19  ordered, is equivalent of padding the check?
20      MR. FARRAH: Objection.
21  A. No, I never get to that, because --
22  Q. Okay.
23  A. -- we don't have to go that far.
24      (Short break was taken.)

Page 178

1  Q. I think we've exhausted the Kristen pour and the
2  padding of the check, so let's go back to the
3  other pour, which I will suggest to you, for the
4  purposes of these questions, is what we'll call
5  the menu pour, the two ounces of bourbon and the
6  quarter ounce, okay?
7  A. Sure.
8      MR. FARRAH: Wait a minute. Just so I
9  understand, that is if the drink were made exactly
10  as the recipe called for it?
11      MR. GILLIS: Correct.
12      MR. FARRAH: Okay. All right.
13  Q. If the drink was made to the recipe, and assuming
14  that the recipe was followed when Mr. Southworth
15  got his first drink at 8:51, would you believe
16  that it was inappropriate -- is it your opinion
17  that it was inappropriate to serve him another
18  menu'd dimensional drink at 9:21, based on what
19  you know about the facts in this case?
20      MR. FARRAH: Objection.
21  A. It might be. Again, it depends. At this point
22  we're talking he's already had four beers
23  pharmacologically and he's already had a drink and
24  some change. So it's five and maybe a half drinks

Page 179

1  that he's had in that time frame. So then I would
2  be concerned about him not having something to eat
3  before he has another -- anything else to drink.
4  Q. Well, is it your opinion that as of 9:21 he didn't
5  have anything to drink?
6      MR. FARRAH: To drink?
7  A. Eat, you mean?
8  Q. Excuse me, to eat.
9  A. I think he might have started, but it wasn't
10  anything substantial. Perhaps maybe a -- I don't
11  know how fast he ate. I mean, I don't know what
12  his specific intake was that night. I don't -- I
13  didn't see anything from him that says what he
14  ate.
15  Q. Okay.
16  A. I don't even know if he ate his whole meal either.
17  Q. We have no evidence he didn't eat his meal,
18  correct?
19  A. True.
20  Q. Okay. And you have no evidence that he didn't eat
21  his chowder or his Tonion, correct?
22  A. No.
23  Q. And you have no evidence that he didn't eat his
24  salad, correct?

Page 180

1  A. No.
2  Q. You have no evidence that all of that except for
3  the entree came prior to getting his drink at
4  9:21, correct?
5      MR. FARRAH: Objection.
6  A. Correct.
7  Q. Okay. And when you make these opinions, you're
8  not there at the restaurant --
9  A. No, sir.
10  Q. -- to actually see this, correct?
11  A. Yes.
12  Q. Okay. So you have to do it on what's the most
13  reasonable fact pattern, correct?
14      MR. FARRAH: Objection.
15  A. I would say yes.
16  Q. Okay. And you opine on what you find to be the
17  reasonable set of facts and conditions based on
18  your training, your experience, and your
19  education, correct?
20      MR. FARRAH: Objection.
21  A. Yes.
22  Q. Okay. And based on all of that, it's your opinion
23  that he had eaten food -- maybe not his entree,
24  but he had eaten food before 9:21 p.m. that

30 (Pages 175 to 180)

Page 181

1  evening, correct?
2  A. I would think.
3  Q. Okay. Now, if you're not sure whether you would
4    or would not have served him at 9:21, assuming
5    that at 8:51 he got his Manhattan that was made to
6    the menu specifications, and that his Manhattan at
7    9:21 was made to the manufacturer's -- the menu's
8    specifications, is it fair to say that you cannot
9    criticize the server for bringing that drink,
10   because you're not sure whether or not the drink
11   should have been brought in the first place?
12      MR. FARRAH: Objection.
13  A. Probably.
14  Q. Okay. Now, at 9:21 there's one, two, three, four
15    Jack Daniels Manhattans brought, correct? Three
16    at the bottom of that page, one at the top of the
17    next?
18  A. Yes.
19  Q. And three minutes later there's three more, for a
20    total of seven drinks, correct?
21  A. They were rang in at that time, yes.
22  Q. And is it your understanding that's another
23    one round for seven for the table?
24      MR. FARRAH: Objection.

Page 182

1  A. I'm not sure. I don't know if they brought the
2    three afterwards and the four first, or all
3    together at once. I'm really not sure. It
4    doesn't say enough there to tell me.
5  Q. Okay. Based on --
6  A. It was seven drinks that went out in a period of
7    three minutes, four minutes.
8  Q. Based on your experience, your training, your
9    education, your 22-plus years of training people
10   on alcohol awareness, is it your opinion that
11   those seven drinks combined went to the seven
12   individuals at the table?
13      MR. FARRAH: Objection.
14  A. Perhaps.
15  Q. Well, what logical conclusion do you draw, based
16    on the fact that seven Manhattans were served to
17    the table, four ordered at 9:21 and three ordered
18    at 9:24, in light of the fact that at 8:51 seven
19    were ordered for the whole table all at once?
20      MR. FARRAH: Objection.
21  A. 8:51, okay. I'm not sure when she took that last
22    Manhattan back. It could have been in this group
23    of Manhattans then, correct?
24  Q. I'm not getting to that yet. I'm just getting to

Page 183

1    were these orders which were three minutes apart
2    totaling seven, is it your understanding that that
3    was one round for everybody at the table?
4  A. Perhaps, yes.
5      MR. FARRAH: Objection.
6  Q. Well, not perhaps. What is your -- what do you
7    believe it is?
8      MR. FARRAH: Objection.
9  Q. What's your opinion?
10      MR. FARRAH: Objection.
11  A. It may very well be.
12  Q. Okay. Do you have an opinion as to where those
13    seven Manhattans went when they were ordered at
14    9:21 and 9:24?
15      MR. FARRAH: Objection.
16  A. To the seven people at the table.
17  Q. Okay. And that's based on your education,
18    training and experience, and your review of the
19    materials that you reviewed in this case, correct?
20      MR. FARRAH: Objection.
21  A. Yes.
22  Q. Okay. Now, one of those drinks is the one that
23    was brought back, correct?
24  A. Probably.

Page 184

1  Q. Okay. Now, if the seven came for the seven people
2    at the table, it's your understanding that one of
3    them went to Mr. Southworth, correct?
4  A. Yes.
5  Q. Okay. Are you aware of any other drinks that were
6    served to Mr. Southworth at the Longhorn
7    Steakhouse that evening?
8      MR. FARRAH: Objection.
9  A. Not from what I've read.
10  Q. Okay. And at 9:57 you see that they cashed out,
11    correct? Page 11.
12  A. The check was printed at 9:57, closed out check at
13    9:57, logged out at 9:58.
14  Q. Okay.
15  A. Yes.
16      (Pause.)
17  Q. At what point that evening, based on what you've
18    just testified to as to what was served to
19    Mr. -- well, strike that.
20      I believe you testified, and correct me
21    if I'm wrong, that at 9:21 you can't say whether
22    you would or would not have served Mr. Southworth
23    that Manhattan if it was served to the menu
24    specifications, correct?

Page 185

1      MR. FARRAH: Objection.
2  A. Right. I think I said that.
3  Q. So at least if the drinks were served to him at
4    the menu specifications, you would agree that he
5    was not in the red zone, correct?
6      MR. FARRAH: Objection.
7  A. No.
8  Q. You would not agree?
9  A. No.
10  Q. Okay. Well, you wouldn't serve someone in the red
11    zone, correct?
12  A. I'd probably -- there's times I won't serve people
13    in the yellow zone, too.
14  Q. Okay. But you're not sure whether you would or
15    would not have served him at 9:21, correct?
16      MR. FARRAH: Objection.
17  A. Right. I've said that -- I've testified to that.
18  Q. So he couldn't have been in the red zone, because
19    there's no way you would have served him if you
20    thought he was in the red zone at 9:21, correct?
21  A. There's absolutely no way I would have served him
22    if he was in the red zone, correct.
23  Q. And do you know whether his drink was part of the
24    9:21 order or the 9:24 order?

Page 186

1      MR. FARRAH: Objection.
2  A. I think we talked about the fact that you thought
3    it was all delivered at the same time, within a
4    three-minute time frame.
5  Q. You don't see a difference between the two?
6      MR. FARRAH: Objection.
7  A. Not in terms of the way you phrased the last
8    questions to me, no.
9  Q. Well, I --
10  A. I think we just both agreed that they were going
11    to be delivered all at the same time.
12  Q. Is that your understanding, based on the review of
13    the facts?
14      MR. FARRAH: Objection.
15  A. It seems that way to me.
16  Q. Okay. Is that the most logical fact pattern,
17    based on your experience, training and expertise?
18      MR. FARRAH: Objection.
19  A. I don't know how logical it is. I don't
20    understand why it wasn't rung in all at once at
21    the same time, why it was broken down like that.
22    There may be an explanation to it. She might have
23    been distracted by somebody else and had to go
24    somewhere and then came back. I really don't

31 (Pages 181 to 186)

Page 187

1  know. I wasn't there.
2  Q. Okay. You testified -- you state in your opinion
3    that Rare served Mr. Southworth into and while in
4    the red zone.
5        That's under -- it's Paragraph 2 under
6    Section 6.
7        What do you base that conclusion on?
8  A. On the testimony of Jude?
9  Q. What testimony?
10  A. That he was -- he had glassy eyes, that he was
11    loud, and that according to -- he didn't carry
12    himself in the same way. But the fact -- glassy
13    eyes would be an indication his finer motor skills
14    were being affected, then somebody with that
15    should not be served alcohol. That would be red
16    zone, as far as I was concerned. That's what I
17    mean by that.
18  Q. What he actually -- so it's the glassy eyes,
19    correct?
20  A. The glassy eyes are very significant.
21  Q. Very significant. But you don't know when in the
22    evening he exhibited glassy eyes, do you?
23  A. I do not know the exact time.
24  Q. And if he didn't exhibit glassy eyes until some

Page 188

1    time after 9:24, then that wouldn't be a factor as
2    to whether or not he was served in the red zone,
3    correct?
4  A. It's possible. It could be only because what I
5    think a drink is in the vessel as opposed to what
6    you tell me in the Rare recipe, is.
7  Q. Is it fair to assume that if you're claiming they
8    shouldn't have served him, that he was in the red
9    zone, that he would have to be in the red zone at
10    the time they served him? Is that fair to say?
11  A. No, no. You can get into the red zone after one
12    sip of a drink. But you could also -- like I told
13    you before, I -- the key to responsible server
14    training is to not get somebody in the red zone.
15  Q. Okay.
16  A. Is to intervene before they become intoxicated,
17    which means certainly in the beginning, and then
18    definitely at the beginning of the yellow zone.
19  Q. You have testified in this case that they served
20    him when he was already in the red zone, correct?
21  A. Correct.
22  Q. And the reason you say he was in the red zone was
23    his eyes were glassy, correct?
24  A. Yes.

Page 189

1  Q. Okay. But there's no evidence whatsoever in the
2    testimony to date in this case that indicates that
3    his eyes were glassy before he was served his last
4    drink, isn't that correct?
5        MR. FARRAH: Objection.
6  A. We don't have an exact time of when his eyes were
7    glassy. We don't have an exact time of when he
8    was loud, when the table was disruptive to the
9    point where manager and server had to go there.
10    But those are all significant issues for red zone
11    behavior.
12  Q. Okay. And if that red zone behavior occurred
13    around 10:30 p.m., that wouldn't play a factor in
14    whether or not he was in the red zone at 9:24 when
15    the last drink was ordered, correct?
16        MR. FARRAH: Objection.
17  A. I don't know that for sure, no.
18  Q. Okay. Well, how can you put him in the red zone
19    for signs that occurred 30 minutes plus after he
20    was served the drink?
21        MR. FARRAH: If they occurred 30 minutes
22    plus after? If they occurred?
23        MR. GILLIS: Yes.
24  A. Based on the number of drinks that were served to

Page 190

1    him before that 30-minute time frame. Based on
2    the actual number. And I don't agree with the
3    recipe. I don't agree with her comments.
4  Q. You already testified, based on the recipe, you're
5    not sure if you would or would not have served him
6    at 9:24, correct?
7  A. More than likely or not I wouldn't have.
8  Q. Well, you're not sure one way or the other,
9    correct?
10        MR. FARRAH: Objection.
11  A. Yes, I'm not sure one way or the other.
12  Q. Okay. And you understand that the testimony as to
13    his eyes being glassy, said Jude said that?
14  A. I believe so.
15  Q. Okay. But Jude also said that he wasn't even
16    looking at his eyes. Do you remember that
17    testimony?
18  A. No.
19  Q. Well, let me show it to you. This is Page 50, 51
20    of his deposition. You can start reading at the
21    bottom of 50 and then --
22  A. Which one is this? What's the date of this one?
23  Q. This is in the prior case, the one before we got
24    involved and only Mr. Farrah was asking questions.

Page 191

1  A. When it was closer towards the accident scene, or
2    when the -- closer towards that, as opposed
3    to -- he had two depositions, didn't he?
4  Q. Yes. Start at the bottom here, and read the
5    question.
6        (Pause.)
7  A. Well, down on Page -- on Page 51 it says, yes, his
8    eyes, yes, maybe were glassy.
9  Q. Maybe?
10  A. Yes.
11  Q. Okay. And then what does it say at the top of the
12    next page?
13  A. I don't remember specifically seeing his eyes, you
14    know, looking, seeing them, the glassy. But very
15    well, very well could have. That could be.
16  Q. Okay. So based on that testimony, you've opined
17    that his eyes were glassy, even though he says he
18    doesn't remember looking at his eyes?
19        MR. FARRAH: Objection. You don't have
20    to argue with the witness. I mean, the testimony
21    is --
22        MR. GILLIS: I'll ask my questions my
23    way, okay?
24        MR. FARRAH: I understand, but you don't

Page 192

1    have to argue with the witness.
2  A. Based on the fact of the amount of alcohol that
3    was served to him for this person to see the
4    slightest hint of that stuff leads me to believe
5    that it's more likely than not that he was in the
6    red zone at that point in time.
7  Q. Did you look at any of the grand jury testimony
8    that was prior to that deposition?
9  A. I don't believe I did.
10  Q. Okay. And if I was to tell you the grand jury
11    said there were no visible signs of intoxication
12    that evening, would that affect your opinion in
13    this case?
14        MR. FARRAH: Objection.
15  A. Not based on the amount of alcohol that was served
16    over that period of time.
17  Q. You keep talking about the amount of alcohol that
18    was served. Is it your opinion that the
19    Manhattans that were served to Mr. Southworth had
20    more alcohol in them than the menu called for?
21        MR. FARRAH: Objection.
22  A. Yes.
23  Q. Based on what?
24  A. Based on experience. Based on the fact that the

32 (Pages 187 to 192)

Page 193

1    alcohol came about a quarter of an inch from the
2    top of the glass. Based on perceived value.
3    Q. But you don't have an opinion as to how much
4    alcohol was in the glass?
5    A. I have a -- I would -- I can safely say that it's
6    two to three drinks in one glass, somewhere in
7    that vicinity, pharmacologically. I can't tell
8    you the exact amount of alcohol, but it was
9    definitely not one drink pharmacologically.
10   Q. And pharmacologically one drink would be
11   characterized as .5 ounces of pure alcohol,
12   correct?
13   A. Half an ounce of pure alcohol, correct.
14   Q. So based on what Kristen says, you don't have a
15   problem with the amount of alcohol that she says
16   was poured in the drinks, correct?
17       MR. FARRAH: Objection.
18   A. The -- she said she poured an ounce and a quarter
19   of Jack Daniels and a quarter of an ounce -- or a
20   half an ounce of vermouth, somewhere in that
21   vicinity. If it was that kind of a drink, then it
22   wouldn't be that -- as bad as what I suspect it
23   really truly was.
24   Q. And if it was based on the menu, you've already

Page 194

1    testified that you might or might not serve him
2    that last drink at 9:21 or 24?
3    A. More than likely.
4        MR. FARRAH: Objection.
5    Q. So the only criticism you have is your opinion
6    that there was more than the menu amount of
7    alcohol in that drink, based on the drink being up
8    to one quarter inch from the top, correct?
9        MR. FARRAH: Objection.
10   A. Yes, I believe so.
11   Q. Okay. And you read Chuck Boulliane's deposition
12   where he said the drinks come to no more than a
13   third of an inch from the top, correct?
14   A. Was it a third or an inch from the top?
15   Q. Boulliane said no more than a third, correct?
16       MR. FARRAH: Objection.
17   A. Yes. I think he -- I think he said something to
18   that effect. I thought it was an inch, but it
19   might have been a third. I'm sorry, a third from
20   the top, okay.
21   Q. Right. He says the drink is two-thirds full in
22   the glass?
23   A. Right, right, yes, exactly.
24   Q. And that's because these have to be carried on a

Page 195

1    tray, correct? And you know those glasses,
2    correct?
3        MR. FARRAH: Objection.
4    Q. Those glasses sway very easily, don't they?
5        MR. FARRAH: Objection to the three
6    questions.
7    Q. So if the glass were filled to the top, a good
8    portion would pour out most likely before you get
9    to a table, correct?
10       MR. FARRAH: Objection.
11   A. It's conceivable, yes.
12   Q. Conceivable or probable?
13       MR. FARRAH: Objection.
14   A. It's probably more probable than not that some
15   would spill out.
16   Q. Okay. So even if it were filled up to the top,
17   when it got to the table it wouldn't be at the
18   top, correct?
19   A. If it spilled on the way, no.
20   Q. And your -- there's no evidence in any of the
21   materials that you read that you're basing your
22   opinion on, it's just based on your experience of
23   perceived value, correct?
24       MR. FARRAH: Objection.

Page 196

1    A. Yes.
2    Q. Number 3, under 6 is you say that they failed to
3    implement a policy of having different people in
4    different parts of the restaurant communicate to
5    one another the amounts Mr. Southworth was -- had
6    consumed, violating Bar Code and industry
7    standards, correct?
8    A. Yes.
9        MR. FARRAH: Can you hold one second? I
10   just need to know where we are.
11       MR. GILLIS: Paragraph 3 under
12   Paragraph 6.
13       MR. FARRAH: Okay. Thank you very much.
14   Q. Is it your testimony there was no communication
15   between the various parties that worked for the
16   Longhorn Steakhouse on that evening concerning the
17   alcohol served to Mr. Southworth?
18   A. It was --
19       MR. FARRAH: Objection.
20   A. There was testimony by Leigh indicating that she
21   did not check from the bartender whether he
22   had -- how many drinks he had at the bar. And I
23   think Kristen testifies that there was nothing
24   trained that told them to do that.

Page 197

1    Q. Okay. Is it your understanding that
2    proper -- safe and proper alcohol service requires
3    a server to go to the bartender and find out what
4    the person at their table had to drink every time
5    someone sits at their table came from the bar?
6        MR. FARRAH: Objection.
7    A. It would be a good idea to do that. We encourage
8    that, absolutely.
9    Q. Okay. So for safe service, every time -- well,
10   you said you encourage it. Do you --
11   A. If you have to wait for a table, and waiting for a
12   table means that people will be drinking in the
13   bar on an empty stomach before they sat down to
14   dinner.
15   Q. Okay.
16   A. And that's one of the most important times to
17   communicate with the bartender, and vice versa.
18   Q. So it would be improper for any restaurant that
19   you train not to have the server go over to the
20   bartender and find out what they had to drink at
21   the bar before they came to their table if there
22   was a wait for dinner?
23   A. It wouldn't be totally improper in every
24   circumstance, no.

Page 198

1    Q. Well, what circumstances would it be proper and
2    what circumstances would it be improper?
3    A. Well, I would say that the -- these guys just came
4    off of a full day of -- or a full afternoon of
5    dirt biking, and they were thirsty and drinking,
6    and that would be one of the circumstances where I
7    would go over and say how many did these guys
8    have, how long were they waiting for a table? I
9    might ask them that first. Have you guys been
10   waiting a long time for a table? Yes. No, ten
11   minutes. Okay. Half an hour, I'll go check.
12   Q. So it was incumbent upon Miss Chabot -- well,
13   strike that.
14       You said that she should have asked
15   because they had been dirt biking and they had
16   been drinking at the bar, correct?
17   A. That would have been a good idea, yes, absolutely.
18   Q. Okay. And how was she supposed to know all of
19   this when they sat down?
20   A. Well, they had been at the place I think 12 times
21   prior, so they had a little bit of a history
22   there, and she kind of knew them anyway. So
23   there's a little bit of a pattern there with these
24   guys.

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 199

```
 1   Q. So she's improperly serving these people if, when
 2       they sit down at the table, and she has experience
 3       with them, she doesn't find out from the bartender
 4       what they had to drink before they got to the
 5       table?
 6           MR. FARRAH: Objection.
 7   A. I don't know if I would say it would be totally
 8       improper if they didn't display any cues, but it
 9       would be wise to do so.
10   Q. Okay. Well, what cues if they did they display
11       when they first sat down at the table?
12   A. I don't have any specific testimony that tells me
13       what kind of cues they displayed when they sat
14       down at the table, that I can recall.
15   Q. There were no cues that would have alerted her to
16       their drinking that night when they sat down at
17       the table, based on the facts that you've reviewed
18       in this case, correct?
19   A. No --
20           MR. FARRAH: Hold it, I didn't hear the
21       question. There were no cues to alert her to the
22       fact that they were drinking that night? Is that
23       what you said? Could you read the question back?
24       (Readback.)
```

Page 200

```
 1           MR. FARRAH: Objection.
 2   A. No, there were.
 3   Q. What?
 4   A. Michael Espy's testimony that he was drunk when he
 5       got there; that the boys were drinking Jack
 6       Daniels and beer at the hotel before they arrived;
 7       and the two beers that -- the two 25 ounce beers
 8       or the four beers that Southworth had when he got
 9       to the table.
10   Q. Okay. What cues did Espy exhibit at the table
11       when he first sat down?
12   A. There was -- in his testimony I didn't read any
13       specific cues. There was -- all he said was he
14       was drunk.
15   Q. But what should the server have seen? Was his --
16   A. I don't know. I don't know. There's no testimony
17       in his deposition that gives me the specific cues,
18       other than his comment that he was drunk when
19       he --
20   Q. Okay. So as far as you know, as you sit -- as you
21       sit here today, you can't mention one cue that
22       Espy exhibited when he sat down at the table that
23       would have alerted the server that he was
24       intoxicated, correct?
```

Page 201

```
 1   A. Other than his testimony that he was drunk, no.
 2   Q. No, forget the testimony. Is the testimony a cue?
 3   A. No.
 4   Q. Okay. I'm asking you what cues did he exhibit
 5       when he got to the table that alerted her that he
 6       was intoxicated, if any?
 7   A. None that I read.
 8   Q. Okay. What cues did anybody at the table exhibit
 9       when they first sat down at the table that would alert Leigh
10       Chabot that they were intoxicated?
11   A. None that I read.
12   Q. Okay. So what cues should she have seen that
13       would alert her to go to the bar and ask the
14       bartender what they had to drink before they got
15       to the table?
16   A. Nothing that I read.
17   Q. Okay. Are you aware of any evidence that you
18       didn't read that would alert her?
19   A. Not -- no, I'm not.
20   Q. Okay. In fact, the bartender did communicate with
21       Leigh Chabot during the course of the evening,
22       correct?
23           MR. FARRAH: Objection.
24   A. She does testify to that.
```

Page 202

```
 1   Q. Okay. And the manager touched the table to make
 2       sure everything was okay, correct?
 3   A. Kristen testified to that. I think Leigh did,
 4       too. And I think -- well, yes.
 5   Q. And one of the managers too, correct?
 6           MR. FARRAH: One of the managers what?
 7   Q. Testified that they touched the table? Every
 8       table that -- during the evening, correct?
 9           MR. FARRAH: Objection.
10   A. Well, Boulliane says that that's their policy,
11       that they touch the tables.
12           But I didn't read anything on Noonan.
13       Apparently he was the manager at the time.
14   Q. Didn't Noonan say that they touch every table
15       every night?
16   A. I think it was Boulliane that said that. At least
17       from what I read. No, I don't think I read --
18   Q. Well, regardless of who it was, you read testimony
19       that a manager came over to the table that night,
20       correct?
21   A. Yes.
22   Q. And so there were policies in place for
23       communication between the manager, the bartender
24       and the waitress that evening, correct?
```

Page 203

```
 1   A. There was.
 2   Q. Okay.
 3       (Pause.)
 4   Q. Other than the manager communicating about the
 5       number of drinks they had that night, and
 6       touching the table, and Leigh Chabot communicating
 7       with the people at the table, and Kristen
 8       O'Donnell communicating with Leigh Chabot, the
 9       server, about what they were drinking that night,
10       who else in the restaurant should have been
11       communicating with those people in order to
12       properly implement the policy that you referred to
13       in Paragraph 6 -- 3?
14           MR. FARRAH: Objection.
15   A. What I was referring to there is Leigh never went
16       to the bar to find out or inquire how many drinks
17       they had.
18       She had to be alerted by Kristen, who was
19       not -- did not have contact with that customer at
20       that time, about the concern.
21   Q. That's your only issue that is the basis of
22       Paragraph 3, correct?
23           MR. FARRAH: Objection.
24   A. That, and the fact that Kristen didn't say
```

Page 204

```
 1       anything to them beforehand. And the fact that
 2       she did say something about them alerts me to the
 3       fact that maybe they -- she was concerned about
 4       how many drinks she served them before they'd
 5       eaten anything.
 6   Q. Okay. You read in Kristen's deposition that if
 7       she felt there was any issues whatsoever with a
 8       person who had been drinking at the bar before
 9       they sat at the table, she would directly
10       communicate that to the server, correct?
11   A. Yes.
12   Q. And she didn't in this case, because she had no
13       issues with Mr. Southworth, correct?
14           MR. FARRAH: Objection.
15   A. At that -- at the time they sat at the table, no,
16       apparently.
17   Q. Okay. And as you've previously testified, there
18       were no signs by Mr. Southworth or anybody else at
19       the table when they sat down to have dinner that
20       night that would have alerted Miss Chabot that she
21       should go talk to the bartender about what they
22       had to drink, correct?
23   A. None that I've read in the testimony. I've said
24       that. Nothing that I read in the depositions.
```

34 (Pages 199 to 204)

Page 205

1    Q. So there would have been no reason for her to go
2    to the bartender at that point and ask them what
3    they had to drink, correct?
4       MR. FARRAH: Objection.
5    A. It's always a good practice. If you've been
6    waiting for a table for a half an hour, it would
7    be a good practice to ask how many drinks have
8    they had at the bar.
9    Q. Okay. So in every restaurant that a person waits
10    a half an hour at the bar before they have drinks,
11    you would fault the server for not going up to the
12    bartender and saying what did that person – that
13    new person at my table have to drink at the bar,
14    even if they exhibited no symptoms that would
15    alert the server when they arrived at the table?
16    A. I wouldn't say fault the server. I would say that
17    it would be wise to do it.
18    Q. Is it improper not to do it?
19       MR. FARRAH: Objection.
20    A. It's not wise to do it. Whether it -- it depends
21    on the circumstances and the issues.
22    Q. Okay. I don't care if it's wise. Is it improper
23    under these circumstances for Leigh Chabot not to
24    have walked over to the bar when they arrived,

Page 206

1    based on the facts before her at that time?
2    A. Based on the responsible server alcohol training
3    that's out there, yes, it would be improper.
4    Q. Okay. Based on what? What alerted her to go to
5    the bar at that point?
6    A. Nothing alerted her that -- that would have
7    alerted -- in other words, training programs teach
8    check with the previous server before serving to
9    determine how many drinks they had prior to the
10    table, or prior to their arrival to your table.
11    That's what it says in responsible server training
12    practices. Bar Code says that. TIPS says that.
13    Q. A different server, not the bartender, correct?
14       MR. FARRAH: Objection.
15    Q. If you had someone else handling that table, isn't
16    that what they mean by that?
17
18       MR. FARRAH: Objection.
19    A. I'm lost now. I'm talking about Leigh.
20    Q. Okay.
21    A. Leigh going to Kristen and saying how many drinks
22    did they have at the bar. That's what
23    training -- responsible training programs teach.
24    Q. Okay. And so if someone doesn't do that in every

Page 207

1    circumstance, you'd find that to be improper?
2       MR. FARRAH: Objection.
3    A. It wouldn't be following the responsible server
4    training guidelines, correct.
5    Q. That's not the question. Would you find it to be
6    improper? Yes or no.
7       MR. FARRAH: Objection.
8    A. Yes.
9    Q. Okay. You train restaurants, correct?
10    A. Yes, sir. Yes.
11    Q. You train busy restaurants, correct?
12    A. Yes.
13    Q. You train chain restaurants, correct?
14    A. Yes.
15    Q. What chains do you train in Massachusetts?
16    A. I've trained Friday's. I've trained John Harvard
17    Brewhouse. I've trained -- well, there's no chain
18    now, but Ritz Carltons. Is that a chain? I've
19    trained Marriotts. I've trained Olive Garden
20    people. I've trained -- oh, God, I -- a lot
21    of -- off the top of my head I'm stumped here, but
22    I've trained a lot of people who have worked in
23    chains.
24    Q. Okay. In fact, you trained --

Page 208

1    A. Pizzeria Uno people I've trained. Tons.
2    Q. Okay. Chains like the Olive Gardens and
3    T.G.I. Friday's are very busy restaurants,
4    correct?
5       MR. FARRAH: Objection.
6    A. Yes, they are.
7    Q. It's not unusual for a busy chain restaurant to
8    have a half an hour wait for a table, correct?
9    A. Yes, that's not unusual.
10    Q. And when you trained Friday's, did you tell them
11    that it was improper service not -- for the server
12    not to go to the bar every time someone came from
13    the bar and had been sitting there waiting for a
14    table and then came to their table?
15       MR. FARRAH: Objection.
16    A. I would -- I would answer the question in this
17    manner: That it is proper service to check with
18    the previous server before serving to determine
19    whether they've had a few drinks before they sat
20    at the table. I would suggest to them that use
21    the business as a tool in your favor. I'll be
22    right with you, sir, and check to see how many
23    drinks they've had. That would be proper service.
24    Q. Okay. Based on your experience, is that what

Page 209

1    normally happens at the Friday's that you've
2    trained?
3       MR. FARRAH: Objection.
4    A. I haven't been at the Friday's to see people do
5    this. I've done it myself, so I can't tell you
6    what they're going to do after I train them.
7    Q. Okay.
8    A. That's management's job to make sure that that
9    kind of stuff is done.
10    Q. Name one restaurant that you're aware of that as a
11    practice every time someone who's waited at the
12    bar goes to sit at a table to have dinner, the
13    waiter or waitress then goes to the bartender to
14    inquire as to the amount of alcohol they had to
15    drink at the bar prior to sitting at the table?
16       MR. FARRAH: Objection.
17    A. I can't name one restaurant that does it.
18    It's -- they've been trained to do it. Whether
19    they do it or not, I can't tell you right off the
20    top of my head, because I'm not there when the
21    actual service occurs.
22    Q. Okay. So you tell them to live to this standard
23    that you know nobody agree -- nobody actually
24    practices?

Page 210

1       MR. FARRAH: Objection.
2    A. No, I didn't say that. People do practice this.
3    Q. Well, you can't name one restaurant that does it
4    that way, can you?
5    A. I imagine if I thought about it, I probably could
6    come up with something.
7    Q. But as you sit here today, you can't?
8       MR. FARRAH: Objection.
9    A. As I sit here today right now at this moment, I
10    can't.
11    Q. Okay. How many other people should have been in
12    the loop of this communication, other than the
13    manager, the bartender and the server?
14       MR. FARRAH: Objection.
15    Q. If anyone?
16    A. That would be sufficient to facilitate --
17    Q. So the number of people was sufficient. You just
18    thought that Leigh Chabot should have gone over to
19    the bar at the beginning of -- before she served
20    these people anything to drink, correct?
21       MR. FARRAH: Objection.
22    A. To find out how many they had before they sat
23    down.
24    Q. Okay. Now, as part of -- your next thing says

35 (Pages 205 to 210)

Page 211

1　that served what were double and potentially
2　triple drinks in the form of the 25 ounce beer and
3　the Jack Daniels Manhattans served straight up in
4　a six ounce glass within one quarter inch of the
5　lip.
6　　　I think we've pretty much beaten it to a
7　dead horse that to get to a quarter inch from the
8　top is the equivalent, with all the ice melloff,
9　of one and a half times the menu quantity of
10　alcohol that the Longhorn puts in their drink
11　recipe book, is that fair to say?
12　　　MR. FARRAH: Objection.
13　A. I would say at a minimum we've agreed to that.
14　Q. Well, what would be the maximum?
15　　　MR. FARRAH: Objection.
16　A. I don't know. I'd have to see it. It would
17　depend on how long they let it sit in the ice. I
18　think we've beat this one pretty good.
19　Q. So if we're at a quarter inch lip, we're under
20　five ounces of alcohol -- of liquid in the glass,
21　correct?
22　　　MR. FARRAH: Objection.
23　A. I think we're at five ounces.
24　Q. Okay.

Page 212

1　A. Actually, we might be slightly down, because the
2　cherry I think disperses about a quarter -- an
3　eighth of an inch. No, an eighth of an ounce, I'm
4　sorry. An eighth of an ounce.
5　Q. So we're just under five ounces of liquid --
6　A. Fluid.
7　Q. -- with the cherry in it? Fluid.
8　A. Yes.
9　Q. And I believe we've already agreed or -- we may
10　not agree, but it's my understanding from your
11　prior testimony that one and a half times the menu
12　amount of alcohol in the Longhorn Manhattan comes
13　out to about one and a quarter ounce of pure
14　alcohol, correct?
15　　　MR. FARRAH: Objection. That's your
16　understanding? Objection.
17　A. I think so. I think that's what we agreed to.
18　Q. .84 for what the menu says.
19　A. That's what we agreed to.
20　　　MR. GILLIS: Do you need to take a break?
21　　　MR. FARRAH: No, no. Don't stop.
22　Q. So that's clearly not a triple drink, correct?
23　　　MR. FARRAH: Objection.
24　A. If in fact it's poured to that, no.

Page 213

1　Q. Okay. And again, the only way you get to a triple
2　drink is based on what you believe was in the
3　drink that night, and not what the testimony is to
4　what was in the drink that night, correct?
5　　　MR. FARRAH: Objection.
6　A. Again, depending on how long it was sitting in the
7　ice.
8　Q. And in fact, when you did double the recipe, you
9　were at the edge or over, correct?
10　　　MR. FARRAH: Objection.
11　A. You were at the edge.
12　Q. But if you properly let it sit in the ice, you'd
13　be over the edge, correct?
14　　　MR. FARRAH: Objection.
15　A. Either that, or it might have had a meniscus. It
16　might have been six ounces.
17　Q. Well, properly chilled before it was poured,
18　you've testified, should come to three and a
19　quarter ounces of liquid, correct?
20　　　MR. FARRAH: Objection.
21　A. In a -- with a two and a half ounce pour, over ice
22　chilled, in a four and a half ounce glass.
23　Q. Double that is six and a half, correct?
24　A. If in fact that's -- yes.

Page 214

1　Q. Okay. I know you're not a math major --
2　A. Thank you.
3　Q. -- but three and a quarter and three and a quarter
4　is six and a half, correct?
5　A. I would agree with that.
6　Q. So if you properly poured it the way the menu
7　says, and the meltoff is what you have written
8　about in your book as to what it should be, then
9　double this shouldn't be six ounces, it should be
10　pouring over the edge, correct?
11　　　MR. FARRAH: Objection.
12　A. It would -- based on those figures, it would pour
13　over the edge.
14　Q. Okay. And if, according to what you say, the
15　drinks were even higher than that, then much more
16　than that should be poured over the edge, correct?
17　　　MR. FARRAH: Objection.
18　A. Certainly.
19　Q. Okay. So it's physically impossible to put double
20　the menu recipe in the glass, let alone any more
21　alcohol, correct?
22　　　MR. FARRAH: Objection.
23　A. No, we did put double the recipe into the glass,
24　and you wouldn't have much more room for any more

Page 215

1　alcohol when we did it.
2　Q. Did you have any more room?
3　A. Yes, we could have got some more in there.
4　Q. How much more?
5　A. Maybe a quarter of an ounce. Maybe, because we
6　didn't have a meniscus. It was right about at the
7　top of the glass.
8　Q. By the way, do any of the places, other than the
9　Longhorn, that you trained serve 25 ounce beers?
10　A. I'm sure they do.
11　Q. And do you tell those people who serve 25 ounce
12　beers that that's inappropriate service?
13　A. Yes.
14　Q. And that's part of your training, you tell them
15　that?
16　A. Yes.
17　Q. And you train over at Anheuser-Busch, correct?
18　A. I train trainers at Anheuser-Busch, yes.
19　Q. And you get paid by Anheuser-Busch to train people
20　at different places, correct?
21　A. I have, yes.
22　Q. And you tell them then that they shouldn't be
23　allowing people to serve their beer in 25 ounce
24　mugs, correct?

Page 216

1　A. What I tell them basically is it's stupid to do
2　that. If you're going to do it, realize that it's
3　two drinks in one glass and not one beer.
4　Q. It's not the size of the glass that makes somebody
5　intoxicated, it's the amount of alcohol they
6　drink, correct?
7　A. Correct.
8　Q. And so you can safely serve 25 ounce beers, as
9　long as you leave the appropriate time interval in
10　between, correct?
11　　　MR. FARRAH: Objection.
12　A. Certainly.
13　Q. Okay. So the size of the drink isn't the problem,
14　it's the manner in which the drink is served,
15　correct?
16　　　MR. FARRAH: Objection.
17　A. As in speed and so forth? Sure, I would agree
18　with that.
19　Q. Okay. So why do you criticize them for -- tell
20　people it's stupid to serve a 25 ounce drink
21　that you say can be safely served?
22　A. I didn't say it can be safely -- it can be safely
23　served, yes, that's true, but what I tend to find
24　out in my experience is most people drink beer a

Page 217

1 little bit quicker in that circumstance, as they
2 do in pitchers of beer, because they don't want it
3 to warm up or die, because it's easily accessible.
4 Q. And what scientific --
5 A. Not scientific.
6 Q. Okay. It's just your experience?
7 A. Correct.
8 Q. But not scientific. You don't have any --
9 A. When I told you that before --
10 MR. FARRAH: You should let him finish
11 the question, by the way.
12 Q. You don't have any studies that prove that,
13 correct?
14 A. No, sir.
15 Q. That's not a peer reviewed -- there's no peer
16 reviewed article that states that people who drink
17 taller beers drink faster than if they drink a 12
18 ounce beer, correct?
19 A. I don't know of any written article, no.
20 Q. Okay. In fact, that's not even an opinion that is
21 widely accepted in the training field, correct?
22 A. If you're calling my students part of the training
23 field, then they would -- they would agree with
24 it. I haven't had anybody object to it. They

Page 218

1 agree with that statement.
2 Q. I'm not talking about the students. I'm talking
3 about the people who do the training.
4 A. I haven't spoken to them specifically on it that I
5 recall where I can see something, especially in
6 writing.
7 Q. Okay. Do you ever write letters to these people
8 and tell them that it's stupid to serve a 25 ounce
9 beer?
10 A. I don't think I've ever written it, put it in
11 writing.
12 Q. Just mention it to them when you do their training
13 program?
14 A. Absolutely.
15 Q. So you get paid to do a training program for these
16 companies that you know are providing stupid
17 service, correct?
18 MR. FARRAH: Objection.
19 A. No. When I say the word stupid, you're making it
20 sound like it's a derogatory statement. Their
21 explanation is the competition's doing it, so
22 that's why I'm doing it. And I said, well, know
23 that if you are serving a five or a ten ounce
24 martini, that there's really four -- three to four

Page 219

1 to five drinks in one glass. Know that if you
2 serve a 24 ounce beer or 25 ounce beer, you're
3 really serving two beers to a customer in one
4 glass, period.
5 Q. No one from Longhorn has ever told you that's why
6 they serve a 25 ounce beer, correct?
7 MR. FARRAH: Objection.
8 A. I'm sorry?
9 Q. No one from Longhorn has ever said that we serve
10 25 ounce beers because that's what the competition
11 does, correct?
12 A. No.
13 Q. And no one from Longhorn says that's why we serve
14 a martini that particular glass, correct?
15 A. Nobody.
16 Q. These are from your other customers, correct?
17 A. Indeed.
18 Q. Okay. And do you train establishments that serve
19 16 ounce beers?
20 A. Yes, I do.
21 Q. And you're critical of serving a 16 ounce beer,
22 correct?
23 A. I have been -- I have said that to some of my
24 clients, yes, in certain circumstances it would be

Page 220

1 better to serve a 12 ounce beer.
2 Q. And you've never put it in writing to them that
3 that's inappropriate service, correct?
4 A. No, sir.
5 Q. Okay. You have read the depositions of the two
6 people who were with Mr. Southworth at the bar
7 that evening, correct?
8 A. Yes.
9 Q. And that was Jude Connolly, correct?
10 A. Yes.
11 Q. And who was the other gentleman?
12 A. Scott Espy.
13 Q. Okay. And when you read their testimony -- did
14 you read both depositions of Mr. Connolly?
15 A. I believe I did.
16 Q. Okay. And is it your understanding that his
17 testimony was, in the second deposition, that he
18 believes that Mr. Southworth had one 25 ounce beer
19 at the bar that evening?
20 MR. FARRAH: Objection.
21 A. I believe he said that.
22 Q. Okay. And in the first case he said -- his first
23 answer was one beer at the bar that evening,
24 correct?

Page 221

1 MR. FARRAH: Objection.
2 A. In the first deposition?
3 Q. His -- when he was first asked the question, his
4 answer was he had a beer, correct?
5 A. Are we talking about the --
6 MR. FARRAH: Objection.
7 A. Which deposition?
8 Q. First deposition now.
9 A. I'm not sure exactly. I know that in one of those
10 depositions he spoke of two, and I think in one of
11 those depositions they asked the question of what
12 would you say to the police at that time, and he
13 said two.
14 I know the second deposition there was
15 discrepancy between the first deposition, but it
16 was probably two years thereafter.
17 Q. Okay. Well, in the first one he actually said he
18 had one beer, and then on further questioning by
19 Mr. Farrah, could it have been more than one, he
20 said maybe, yes. Is that correct?
21 MR. FARRAH: Objection.
22 Q. Is that your memory?
23 A. I think so.
24 Q. Okay. So what are you basing him having two 25

Page 222

1 ounce beers at the bar on that evening, as opposed
2 to one 25 ounce beer?
3 MR. FARRAH: Objection.
4 A. Jude's deposition, or the comments that he made to
5 the police, which was closer to the time the
6 accident occurred.
7 Q. Okay. Is it based on the police comments, the
8 first deposition, or the second deposition?
9 MR. FARRAH: Objection.
10 A. Well, there's no real clear-cut indication one way
11 or the other, so I guess I went towards the two,
12 as opposed to the one.
13 Q. Why?
14 A. Because I figured at that point in time, he was a
15 man that was ready to drink that night, and it was
16 more likely than not within a half an hour he
17 would have done two 25 ounce beers.
18 Q. What was your assumption going into the bar that
19 evening that Jeffrey Southworth was on a mission
20 when he arrived at the Longhorn that night?
21 MR. FARRAH: Objection.
22 A. It was more deeper into the -- well, two 25 ounce
23 beers in a half an hour would be a man on a
24 mission. And then going to Manhattans would be a

37 (Pages 217 to 222)

Page 223

1 man on a mission.
2 Q. You've testified that the reason you gave credence
3 to two beers, as opposed to one, was that you felt
4 that when he got there he was on a mission.
5 So how did you make that determination if
6 there's evidence that he may have only had one
7 beer at the bar?
8 MR. FARRAH: Objection.
9 A. There's also evidence -- I'm sorry.
10 MR. FARRAH: Go ahead.
11 A. There's also evidence to indicate that he might
12 have had three or four I think in some of the
13 deposition transcripts I read. So it's -- people
14 are all over the place with this. There's nothing
15 I can pin down.
16 Q. There's not one single person that said he had
17 four beers at the bar that night, isn't that
18 correct?
19 MR. FARRAH: He didn't say at the bar.
20 A. I said three or four overall. There was people
21 that were saying that everybody had beer at the
22 table, and there's only two beers that were on the
23 check, so that makes me wonder did somebody go to
24 the bar and buy beer and come back? I don't know.

Page 224

1 That's what I mean about the -- nothing's
2 hard and fast. I can't put my finger on anything.
3 So it's more likely than not that he had two,
4 basically, is what I went towards.
5 Q. And that's what -- we all went full circle there,
6 but I'm trying to get back to the original
7 question. When he arrived there, and there's
8 testimony he had a 25 ounce beer --
9 A. Yes.
10 Q. -- what makes you think at that point he was on a
11 mission, if there was testimony that he only had
12 one beer at the bar?
13 MR. FARRAH: Objection.
14 A. Because I didn't believe he only had one beer at
15 the bar, because I heard or saw testimony that
16 indicated that he might have had three or four
17 beers throughout the night.
18 So somewhere along the line he had
19 another beer somewhere; that other people said
20 there was more -- that everybody was drinking beer
21 at the table.
22 Q. Okay.
23 A. So that's why I figured two would be safe.
24 Q. You knew that that testimony that everybody was

Page 225

1 drinking beer at the table was not true, correct?
2 MR. FARRAH: Objection.
3 A. I don't know that anything is true on that. I
4 really don't know.
5 Q. Okay. Based on the evidence, is that the most
6 logical conclusion you've drawn, based on looking
7 at the audit report and the bill?
8 MR. FARRAH: Objection.
9 A. I would say that it wouldn't be -- it would be
10 more likely than not that he would have had two
11 beers.
12 Q. Before he got to the table?
13 A. Or he was going to the table with the second beer
14 in hand.
15 Q. Okay.
16 (Pause.)
17 Q. The next paragraph, employees do not recognize the
18 potency of these drinks and were not trained by
19 Rare to do so.
20 MR. FARRAH: Paragraph 5?
21 MR. GILLIS: Paragraph 5.
22 Q. What do you base that opinion on?
23 A. The testimony of Leigh, and the testimony of
24 Kristen.

Page 226

1 Q. What specifically did Leigh say that she didn't
2 understand the potency of the drink?
3 A. She thought martinis -- Manhattans were only one
4 drink. Nobody told her that it was -- it was
5 considered two drinks, or that they should be
6 considered two drinks.
7 I don't think she knew the difference. I
8 think she said something to the effect that it was
9 equal to a four-ounce glass of wine.
10 Q. Where did -- well, based on Kristen's --
11 A. Kristen?
12 Q. Based on what Kristen said was in the Manhattan,
13 that would be accurate, correct?
14 MR. FARRAH: I'm sorry?
15 A. Based on what Kristen said, that would be
16 accurate?
17 Q. Right, that it's one drink?
18 A. Slightly off, because Kristen said an ounce and a
19 quarter, and then a half an ounce of vermouth, so
20 it would be a little bit higher than a four ounce
21 glass of wine, pharmacologically.
22 Q. Well, actually, it would be right at .5, wouldn't
23 it?
24 A. An ounce and a quarter of 80 proof, plus a half an

Page 227

1 ounce of vermouth would be a little bit higher.
2 Not much, but a little bit.
3 Q. We'll do the math.
4 A. I guess.
5 Q. So if she going by Kristen's description of what
6 she put in the glass, she did know, correct?
7 A. She wouldn't be far off.
8 Q. Okay. You wouldn't have -- you wouldn't have a
9 criticism of what the potency was, whether or not
10 she knew the potency, if in fact it was poured the
11 way Kristen said it was poured, correct?
12 MR. FARRAH: Objection.
13 A. Probably.
14 Q. And if it was poured pursuant to the menu, it
15 didn't amount to two drinks; we've established
16 that, correct?
17 MR. FARRAH: Objection.
18 A. No, I think we -- it was closer to two drinks than
19 it was one drink.
20 Q. Okay. But it wasn't a double? .84, correct?
21 A. I think that's what we said.
22 Q. Okay. And is there any other employee
23 that -- strike that.
24 You said Kristen didn't understand the

Page 228

1 potency of the drink?
2 A. Yes.
3 Q. On what do you base that?
4 A. I think Kristen also didn't -- thought that a
5 Manhattan wasn't two drinks. And also Boulliane I
6 don't think knew -- he didn't believe that Bar
7 Code was correct in saying that you
8 should -- obviously assume that it was more than
9 one drink.
10 Q. Okay. Bar Code says that if you have one pure
11 ounce of ethanol in it, you should consider that
12 two drinks, correct?
13 MR. FARRAH: Objection.
14 A. Correct.
15 Q. So if it's less than that, it's not two drinks,
16 correct?
17 MR. FARRAH: Objection.
18 A. Yes.
19 Q. So when Boulliane and everyone else says it's not
20 two drinks, they're correct?
21 MR. FARRAH: Objection.
22 Q. Based on the menu description of the Manhattans
23 made at the Longhorn, correct?
24 MR. FARRAH: Objection.

38 (Pages 223 to 228)



Page 229

1   A. If you're looking at it that way, exactly two
2       drinks, no.
3   Q. Okay. And in fact, the Longhorn menu for a
4       Manhattan is well below the standard in the
5       industry, correct?
6   A. I wouldn't say that it was below the standard in
7       the industry.
8   Q. Okay. Well, you reviewed the Bar Code book,
9       correct?
10  A. Yes.
11  Q. And it says in there that a Manhattan is one and a
12      quarter ounces of pure alcohol, and that's what's
13      to be counted as two drinks, correct?
14      MR. FARRAH: What book are you -- you're
15      showing him something -- hold on.
16  A. Is that pure alcohol?
17      MR. GILLIS: This is the book that you
18      showed Mr. Boulliane.
19      MR. FARRAH: Is it?
20      MR. GILLIS: Yes.
21      MR. FARRAH: So which exhibit was this in
22      the Boulliane deposition?
23      MR. GILLIS: No idea.
24      MR. FARRAH: Okay.

Page 230

1       MR. GILLIS: If you'd like, I'll
2   photocopy the page, and we can put it in as an
3   exhibit, if you'd like.
4       MR. FARRAH: Yes, let's do that. Let's
5   also be aware of the fact that it's five minutes
6   of 3.
7       MR. GILLIS: Let's finish this issue.
8       (Discussion held off the record.)
9   Q. You're looking at a document that we're having
10      photocopied and that we will put in as Exhibit 8.
11      And in there it says that pursuant to Bar
12      Code, a Manhattan has one and a quarter ounces of
13      pure alcohol, correct?
14  A. It says 1.15.
15  Q. Okay. And 1.15 --
16  A. It should be counted --
17  Q. -- ounces of pure alcohol should be counted as two
18      drinks, correct?
19  A. That's what it says in here.
20  Q. Okay. We've established that pursuant to the
21      Longhorn menu, what they put in their drinks is
22      .84, correct?
23      MR. FARRAH: Objection.
24  A. I think we did.

Page 231

1   Q. Okay. And so according to the Longhorn menu, that
2       is below what the standard Bar Code has for a
3       Manhattan, correct?
4   A. Yes.
5   Q. Okay. It's well below, about 40 percent below,
6       correct?
7       MR. FARRAH: Objection.
8   A. If the math figures that way, sure.
9       MR. FARRAH: Mark that.
10      (Exhibit No. 8, Page 68 of Bar Code,
11      marked for identification.)
12      MR. GILLIS: I just want to put on the
13      record we're paying for one deposition.
14      If we continue it, I'm not paying another
15      $1200 for a second day, because he said he
16      had -- strike it.
17  Q. What's your fee for a deposition?
18  A. 1250.
19  Q. Okay.
20      MR. GILLIS: So the fact that you want to
21      leave today and come back later, that's fine, but
22      we're still paying for one deposition.
23      MR. FARRAH: And that's fine. I just
24      want you to know that I'll have some questions for

Page 232

1       him. We're suspending now and when we resume,
2       which should be soon, that when you're done, and I
3       think your limit is seven hours, and I've -- we've
4       deposed him -- you've deposed him for four so far
5       today, something like that.
6       MR. GILLIS: Right.
7       MR. FARRAH: That I'm going to have
8       questions for him after you finish, whether it
9       takes you one, two, or three hours to finish.
10      MR. GILLIS: Okay.
11      MR. FARRAH: Okay.
12      MR. GILLIS: And it doesn't include any
13      redirect after you've cross-examined him.
14      MR. FARRAH: I don't care about that.
15      You can have all the direct you want. I don't
16      care about that.
17      MR. GILLIS: Okay.
18      MR. FARRAH: So why don't we suspend, and
19      let's see if we can agree on a date now.
20      MR. GILLIS: That's good.
21      (Deposition suspended at 3:00 p.m.)
22
23
24

Page 233

1       COMMONWEALTH OF MASSACHUSETTS
2
3   . . . . . . . . . . . . . . .
4   NANCY ROSARIO, INDIVIDUALLY, AS   *
5   SHE IS THE ADMINISTRATRIX OF THE  *
    ESTATE OF AWILDA SANTIAGO, ESSEX  *
    PROBATE COURT DOCKET NO.
6   03P-2499-ADI, PIPA VERONICA       *
    ROSARIO AND CHRISTINA SANTIAGO,   *
7   AND AS SHE IS THE ADMINISTRATRIX  *
    OF THE ESTATE OF JOSE SANTIAGO,   *
8   DERLIN (CONNECTICUT) PROBATE      *
    COURT, CASE NO. 03-0713           *
9
10  versus                            *
11  RARE HOSPITALITY INTERNATIONAL,   *
    INC., d/b/a LONGHORN STEAKHOUSE   *
12
13  . . . . . . . . . . . . . . .
14      I, MICHAEL A. MARCANTONIO, do hereby certify
    that I have read the foregoing transcript of
15  testimony and further certify that said transcript
    is a true and accurate record of my testimony
16  given at a deposition in the above-captioned
    matter on March 1, 2007, at Newton, Massachusetts.
17
18      Signed under the pains and penalties of
    perjury this ____ day of _____
19  2007, at _____, Massachusetts.
20
21
22
23          _____
24              MICHAEL A. MARCANTONIO

Page 234

1           E R R A T A   S H E E T
2       PAGE    LINE    DESCRIPTION
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 235

1     C E R T I F I C A T E
2 COMMONWEALTH OF MASSACHUSETTS )
                   ) ss.
3 COUNTY OF MIDDLESEX      )
4    I, Kathryn R. Sweeney, a Registered
5 Professional Reporter, Certified Realtime Reporter
6 and Notary Public within and for the Commonwealth
7 of Massachusetts, do hereby certify:
8    That MICHAEL A. MARCANTONIO, the witness
9 whose deposition is hereinbefore set forth, was by
10 me satisfactorily identified by his Massachusetts
11 driver's license and duly sworn, and that the
12 foregoing transcript is a true record of the
13 testimony of said witness.
14    I further certify that I am not related to
15 any of the parties in this matter or their counsel
16 by blood or marriage, and that I am in no way
17 interested in the outcome of said cause.
18    Dated this 7th day of March, 2007, at Acton,
19 Massachusetts.
20
21
22          _____
            KATHRYN R. SWEENEY
            NOTARY PUBLIC
23
   MY COMMISSION EXPIRES:
24 April 27, 2012

GABRIEL & SWEENEY COURT REPORTING
(617) 969-4791 Phone (978) 266-1352

Page 1

| | | |
|---|---|---|
| 1 | | Volume: II |
| 2 | | Pages: 1-119 |
| | | Exhibits: None |

3        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS

5 ***************************************

6 NANCY ROSARIO, INDIVIDUALLY, AS SHE IS *
   THE ADMINISTRATRIX OF THE ESTATE OF *
7 AMILDA SANTIAGO, ESSEX PROBATE COURT *
   #03P-2499AD1, P/P/A VERONICA ROSARIO *
8 AND CHRISTINA SANTIAGO, AND AS SHE IS *
   THE ADMINISTRATRIX OF THE ESTATE OF *
9 JOSE SANTIAGO, BERLIN (CONNECTICUT) *
   PROBATE COURT, CASE #03-0713 *
10       Plaintiff, *
                        *
11      VS            * Civil Action No.
                      * 05-CV-10617MLW
   RARE HOSPITALITY INTERNATIONAL, INC. *
12 d/b/a LONGHORN STEAKHOUSE, *
     Defendant *
13 ***************************************

14      DEPOSITION OF KRISTIN O'DONNELL, a witness

15    called on behalf of the Plaintiff, taken pursuant to

16    Notice under the applicable provisions of the Federal

17    Rules of Civil Procedure, before Barbara J. Simon, a

18    Professional Shorthand Reporter and Notary Public, in

19    and for the Commonwealth of Massachusetts, at the law

20    offices of Albert L. Farrah, Jr., One Washington

21    Mall, Boston, Massachusetts, on Wednesday, December

22    28, 2005, commencing at 11:05 a.m.

23       SHEA COURT REPORTING SERVICES
          (617) 227-3097

Page

1            I N D E X

2 WITNESS         DIRECT CROSS REDIRECT RECROSS

3 KRISTIN O'DONNELL

4 (By Mr. Farrah)      4

6         E X H I B I T S

7 There are no exhibits.

---

Page 2

1    A P P E A R A N C E S

2 ALBERT L. FARRAH, JR., ESQ.
   Law Offices of Albert L. Farrah, Jr.
3 One Washington Mall
   Boston, MA 02108
4 (617) 742-7766
     Counsel for the Plaintiff

5 MICHAEL K. GILLIS, ESQ.
6 Gillis & Bikofsky, P.C.
   1150 Walnut Street
7 Newton, MA 02461
   (617) 244-4300
8      Counsel for the Defendant

Page

1        P R O C E E D I N G S

3      KRISTIN O'DONNELL, having been previously

4 satisfactorily identified and duly sworn, on oath,

5 deposes and says as follows:

7        DIRECT EXAMINATION

8 BY MR. FARRAH:

9 Q. You're still under oath. If I cover old ground, it's

10    not because I mean to. I'm going to try to move

11    forward.

12      Let me start by asking you, on the evening of

13    September 26, 2003, do you recall having a

14    conversation with Leigh Chabot about the Jack Daniels

15    Manhattans that she had ordered from you?

16 A. Yes.

17 Q. And did you ask Leigh about that table?

18 A. Yes.

19 Q. What did you ask her about the table?

20 A. I just wanted to make sure that they were eating

21    dinners.

22 Q. Did you say to her, in effect, "Are these people

23    eating food?"

24 A. Yes.

Page 5

1    MR. FARRAH: I don't have the day of your
2    deposition. If you'll excuse me, I'll just get that.
3         (Off the record.)
4    Q. Why were you concerned about whether they were
5       eating?
6    A. It was just that it's typical procedure for myself
7       and most good bartenders just to check after a second
8       round of drinks, just to make sure that they're
9       eating.
10        MR. FARRAH: You're not going to believe this,
11    but I need to get up one more time.
12        (Off the record.)
13   Q. Do you know whether or not you asked her about that
14      table and whether it was eating when the first order
15      for Jack Daniels Manhattans came in?
16   A. No.
17   Q. According to Exhibit 11, that order was placed at
18      8:40 p.m. Do you see that?
19   A. Yes.
20   Q. And is it accurate to say that information about food
21      or appetizers ordered by a table is not transmitted
22      to the service bar with the request for drinks?
23   A. That's correct.
24   Q. Do you know whether or not you had the conversation

Page 6

1    with her about whether that table had ordered food at
2    8:51 p.m. or in connection with the 8:51 p.m. order
3    that is shown on Exhibit 11?
4    A. I would say no.
5    Q. You don't know or you didn't?
6    A. I don't recall exactly but the second round of
7       drinks, I would not have questioned the second round
8       of drinks.
9    Q. Can we agree that the second round of drinks, at
10      least as it is shown on Exhibit 11, is for seven Jack
11      Daniels Manhattans?
12   A. Correct.
13   Q. It's your best memory that that didn't prompt the
14      conversation you had with Leigh Chabot; is that
15      right?
16   A. Yes.
17   Q. Do you know whether the conversation you had with
18      Leigh Chabot was prompted by what is shown on
19      Exhibit 11 as the 9:21 p.m. order of some Jack
20      Daniels Manhattans?
21   A. Yes.
22   Q. Is it your best memory that that was the order that
23      prompted the conversation?
24   A. Yes.

Page 7

1    Q. What was it about that order that prompted the
2       conversation?
3    A. Just that it was the second full round of drinks.
4    Q. Okay. Was there anything else about that order that
5       prompted that conversation that you can think of now?
6    A. No.
7    Q. And do you know whether or not you had a conversation
8       with Leigh Chabot when you received notification of
9       the 9:24 p.m. order for three Jack Daniels
10      Manhattans?
11   A. No.
12   Q. Do you have a memory of having a conversation with
13      her about the 9:24 p.m. order?
14   A. No.
15   Q. Okay. Did you ask Leigh Chabot about the patrons at
16      that table because the patrons at that table were
17      loud that evening?
18   A. No.
19   Q. Did you ask her about the patrons at that table
20      because someone had told you that they were loud that
21      evening?
22   A. No.
23   Q. Could you hear them during the evening?
24   A. No.

Page 8

1    Q. Could you see them during the evening?
2    A. I could see down to that table from the back.
3    Q. From time to time?
4    A. Yes.
5    Q. Is it accurate to say that you were very busy that
6       evening?
7    A. I would say it was a regular Friday night busy crowd.
8    Q. Flat out?
9    A. I don't recall if I was pulling my hair out, but most
10      Friday nights were busy.
11   Q. Nonstop?
12        MR. GILLIS: Objection.
13   A. I don't recall.
14   Q. Were you surprised at the number of drinks that was
15      ordered by that table during the evening?
16   A. No, not for a large party.
17   Q. Did you know how many people were in that party that
18      evening?
19   A. At least as many as drinks were being ordered.
20   Q. Seventeen Jack Daniels Manhattans were ordered that
21      evening; is that right?
22   A. Yes.
23   Q. How many people were in that party?
24   A. However many the most round contained would be the

Page 9

1    minimum number because only one drink would go to
2    each person.
3    Q. But that's a guess on your part, isn't it, as to how
4      many people were in the party?
5    A. Yes. That would be better for Leigh to answer.
6    Q. Fair enough. Are you also aware that two
7      twenty-five-ounce Budweiser sport beers were served
8      to that table that evening?
9      MR. GILLIS: Objection.
10   A. What do you mean by "sport"?
11   Q. That's what they're called, Longhorn sport beers.
12   A. I'm not familiar with that term.
13   Q. Are you also aware that two twenty-five-ounce beers
14     were served to that table that evening?
15   A. Yes.
16   Q. Did you have a conversation with Leigh Chabot about
17     those beers?
18   A. No.
19   Q. Do you know who those beers were for, what patron at
20     that table those beers were for?
21   A. No.
22   Q. Did you have any conversation during that evening,
23     while you were making drinks, with anyone else about
24     that table? This is the evening of 9/26.

Page 10

1    A. I did ask the manager if he had been by the table as
2      well.
3    Q. Did you speak to the manager about that table before
4      or after you spoke to Leigh about the table?
5    A. After.
6    Q. And can you tell me how long after you spoke to Leigh
7      it was that you spoke to the manager about that
8      table?
9    A. I don't recall exactly how long.
10   Q. Was it a matter of minutes as opposed to seconds?
11     MR. GILLIS: Objection.
12   A. I would say anywhere between ten minutes to fifteen
13     minutes.
14   Q. After you spoke to Leigh about the table; is that
15     right?
16   A. Yes.
17   Q. It was ten to fifteen minutes after you spoke to
18     Leigh about the table that you spoke to the manager
19     about the table; is that right?
20     MR. GILLIS: Objection.
21   A. As far as I recall, yes.
22   Q. Was it Mr. Noonan that you spoke to?
23   A. Yes.
24   Q. As best as you can recall; is that right?

Page 11

1    A. Yes.
2    Q. What did you say to him about that table?
3    A. I just asked if he had been by the table yet.
4    Q. Been by the table?
5    A. Yes.
6    Q. What did he say?
7    A. He said, "Yes, and everyone seems fine."
8    Q. And why did you ask him if he had been by the table?
9    A. It's Longhorn practice for managers to go and check
10     on every table throughout the night. They walk
11     around to make sure the meals come out okay, how the
12     service is, if they can get anything.
13       Knowing that, I wanted to see if he had been by,
14     just to get a second opinion.
15   Q. Did you ask Mr. Noonan if he had been by all the
16     other tables that night?
17   A. I did not.
18   Q. Was Table 52 the only table about which you asked
19     Mr. Noonan whether he had been by that night?
20   A. Yes, as far as I recall.
21   Q. Was it your practice to ask the manager if he had
22     been by each of the tables during the nights that you
23     worked as a service bartender?
24   A. No.

Page 12

1    Q. So what was it about Table 52 that prompted you to
2      ask Mr. Noonan if he had been by the table that
3      night?
4    A. Just that they were ordering Manhattans.
5    Q. An excessive amount of Manhattans, in your opinion?
6      MR. GILLIS: Objection.
7    A. No.
8    Q. Was there something about the Manhattans that
9      prompted you to ask Mr. Noonan if he had been by the
10     table?
11   A. No. I just wanted to make sure that they had eaten
12     because that had been my training.
13   Q. But Leigh Chabot had already told you that they had
14     ordered food.
15   A. Yes.
16   Q. Did you not believe her?
17     MR. GILLIS: Objection.
18   A. No.
19   Q. You could see the table from where you were, couldn't
20     you?
21   A. Yes.
22   Q. And you could see that there was food on the table
23     after you spoke to Leigh Chabot; isn't that right?
24   A. I wouldn't say that I could see that far. My eyes

Page 13

1    are not that good.
2    Q. You wear contact lenses?
3    A. I do. Even with them, I still -- I could see people
4       at the table but --
5    Q. How far from where you were standing at the service
6       bar were you from the nearest point of Table 52 that
7       night?
8    A. I would say probably the length of this room and
9       maybe a quarter more to a half.
10   Q. How long is this room?
11   A. I have no idea.
12   Q. You're not good at estimating distances?
13   A. No.
14   Q. Is it your testimony that you could not see whether
15      they were eating food that night at Table 52?
16   A. Correct.
17   Q. And that is because your vision is so bad that even
18      if there were food at that table, you would not have
19      been able to see it; is that right?
20          MR. GILLIS: Objection.
21   A. No; the distance of it and the angle of the table.
22      You could see people at the table, but as far as
23      seeing over people's backs and onto the table.
24   Q. But Leigh Chabot had told you that they had ordered

Page 14

1       food; isn't that right?
2    A. Yes.
3    Q. And it was not anything that anyone at the table said
4       that prompted you to ask Mr. Noonan to take a look at
5       the table; is that right?
6    A. Correct.
7    Q. Did you ask him to take a look at the table or
8       whether he had been by the table already?
9    A. If he had been by the table, as far as I recall.
10   Q. Are you sure you didn't ask him to take a look at the
11      table for you -- check on the table?
12   A. I can't say for certain.
13   Q. You don't remember really, do you?
14   A. I remember asking him about the table.
15   Q. And that's because the table was loud?
16   A. No.
17   Q. That's because Jack Daniels Manhattans had been
18      ordered by that table?
19   A. Yes.
20   Q. Could you at least tell from where you stood -- I
21      assume you were standing while you were working at
22      the service bar.
23   A. Yes.
24   Q. Could you at least tell from where you stood in the

Page 15

1       service bar the sexes of the people who were at the
2       table?
3           MR. GILLIS: Objection.
4    Q. Male or female?
5    A. I don't recall specifically that table because it
6       would not be my practice to take that into account.
7    Q. As you sit here today, do you know the sexes of the
8       people who sat at that table?
9    A. I honestly don't know if there were any woman at the
10      table. From what I gather, it was all men.
11   Q. What is the basis for that gathering?
12   A. Just from what I heard through the criminal trial and
13      here in this deposition.
14   Q. But you were at the criminal trial for a very brief
15      period of time; isn't that right?
16   A. Yes.
17   Q. Just long enough to testify; isn't that right?
18   A. Yes.
19   Q. Could you tell from your vantage point in the bar
20      whether there were any children at that table?
21   A. I could not tell.
22   Q. What did the manager say to you about the table that
23      night?
24   A. That they were fine.

Page 16

1    Q. And did you see him go over to the table?
2    A. I did not.
3    Q. How long after you first spoke to him about the table
4       was it that he told you that they were fine?
5    A. I don't recall.
6    Q. Is it accurate to say you had two conversations with
7       him -- one where you asked him to go look at the
8       table and the other when he came back and reported
9       what he had seen at the table?
10          MR. GILLIS: Objection.
11   A. I don't recall that.
12   Q. You don't know whether you had one conversation or
13      two conversations; is that right?
14   A. Right.
15   Q. Did you ask him to go to the table because you were
16      concerned about the amount of Jack Daniels Manhattans
17      that had been delivered to the table?
18          MR. GILLIS: Objection.
19   A. No. I just wanted to make sure that they had been
20      eating food with them.
21   Q. Because?
22   A. My training had always been to make sure that people
23      are eating when they're drinking, to serve food.
24   Q. And you cannot tell us, if you had more than one

Page 17

1    conversation, when you had the first conversation
2    with Mr. Noonan about that table except to say that
3    it was after you had the conversation with Leigh
4    Chabot?
5  A. Correct.
6  Q. And you think it may have been as much as ten or
7    fifteen minutes after that conversation?
8  A. It may have been.  I don't recall.
9  Q. Did you speak to Patty that night about Table 52 and
10   its patrons?
11 A. No.
12 Q. Are you sure?
13       MR. GILLIS: Objection.
14 A. I don't recall exactly, but I cannot imagine that I
15   would have.
16 Q. Why not?
17 A. Because she had no contact with them.  Leigh was the
18   one that was waiting on them.  So she would have been
19   able to answer my question.
20 Q. But Patty was the person that you had a conversation
21   with some date after September 26, 2003 in which she
22   referred to that table; isn't that right?
23       MR. GILLIS: Objection.
24 A. Yes.

Page 18

1  Q. You remember testifying to that?
2  A. Yes.
3  Q. The first day?
4  A. Yes.
5  Q. And you've seen your deposition transcript from the
6    first day, haven't you?
7  A. Yes.
8        MR. GILLIS: Objection.  What are you referring
9    to?  What page?
10       MR. FARRAH: This is why I love the
11   minuscript -- page 62.
12       MR. GILLIS: The line he is referring to --
13       MR. FARRAH: We start on the bottom of page 61.
14       MR. GILLIS: What was the question again?
15 Q. My question was, Patty had referred to that table,
16   but more accurately, Patty had said to you, "Do you
17   remember that group of guys?"
18       MR. GILLIS: So the question is there was no
19   talk about the table, just that group of guys; is
20   that your question?
21       MR. FARRAH: Yes.
22 Q. Do you remember testifying on December 8 that Patty
23   had a conversation with you after September 26, 2003
24   in which she asked you, "Remember that group of

Page 1

1    guys?"
2  A. Yes.
3  Q. Do you remember that?
4  A. Yes.
5  Q. And you knew when she said that to you, sometime
6    after September 26, 2003, what group of guys she was
7    referring to; isn't that right?
8  A. Yes.
9  Q. Now, my question is, what was it about that group of
10   guys that made you know, when Patty spoke to you
11   sometime after September 26, 2003, which group of
12   guys she was referring to?
13 A. Perhaps I did say something to her that night or she
14   overheard me saying something to Leigh or something
15   to the manager.  I don't recall specifically.
16       MR. GILLIS: Don't guess.
17 A. I don't know.
18 Q. But as you sit here, even today, you remember that
19   group of guys at the restaurant on September 26,
20   2003; isn't that right?
21 A. I don't remember that group.  I just remember the
22   drink ticket.  I didn't wait on them.
23 Q. You remember Patty saying to you a few days later,
24   "Remember that group of guys"; isn't that right?

Page 2

1  A. I believe that's what she said.
2  Q. Do you remember what she said to you about that group
3    of guys on September 26, 2003?
4  A. That she heard there was an accident.
5  Q. No.  Do you remember what she said to you about that
6    group of guys on September 26, 2003?
7  A. No, I don't.
8  Q. Do you remember any conversation with her the night
9    the Manhattans were served about that group of guys?
10 A. No.
11 Q. But as you sit here now, you may have had a
12   conversation with her that night about that group of
13   guys; isn't that right?
14       MR. GILLIS: Objection.
15 A. I don't recall.
16 Q. How about Sherri Salmond?  Did you have a
17   conversation with her that night about the patrons at
18   Table 52?
19 A. I don't recall.
20 Q. Do you know that you did not have a conversation with
21   her that night about Table 52?
22       MR. GILLIS: Objection.
23 A. I don't know.
24 Q. You don't know?

Page 21

1  A. No.
2  Q. So you may have had a conversation with her that
3     night; is that right?
4        MR. GILLIS: Objection.
5  A. I worked with her. I'm sure we talked about a lot of
6     things, but I don't recall.
7  Q. And Sherri Salmond had what job at the restaurant
8     that night?
9  A. Waitress.
10 Q. Is she a friend?
11 A. We were friends when we worked together.
12 Q. Let's start with September 26, 2003. Do you remember
13    having any conversations with Sherri about Table 52?
14 A. Not that I remember.
15 Q. At any time after September 26, 2003, do you remember
16    having conversations with Sherri about the patrons of
17    Table 52?
18 A. I don't remember.
19 Q. No or you don't remember?
20 A. No, I don't remember.
21 Q. Did you ever write out a statement for anyone at all
22    about the events of September 26, 2003 at the
23    Longhorn Steakhouse?
24 A. No.

Page 22

1  Q. Did you ever speak to any employees of the Longhorn
2     Steakhouse about the events of September 26, 2003,
3     other than what you told me so far?
4  A. Yes.
5  Q. Who did you speak to about the events of September
6     26, 2003?
7  A. I don't remember her name. It was someone on the
8     phone.
9  Q. From the Longhorn?
10 A. Yes.
11 Q. And when did you speak to her?
12 A. I don't recall. It was while I was still employed
13    there.
14 Q. And did she identify herself as an employee of the
15    Longhorn?
16 A. Yes.
17 Q. And did she say why she was calling?
18       MR. GILLIS: I'm going to object and instruct
19    her not to answer.
20       I don't know who she spoke to, and if it was
21    someone from the legal department, it could be
22    privileged information.
23       She can identify the person, but I'm not going
24    to get into any of the detailed conversation.

Page 2

1     I'm going to let you ask her when she had the
2     conversation, who she spoke to, what their name
3     was -- that's fine, but as far as anything as to any
4     discussions between them, I think that's privileged,
5     and I am going to instruct her not to answer.
6        MR. FARRAH: Let me ask you this. I asked her
7     when and who already.
8        MR. GILLIS: And that's why I have not objected.
9        MR. FARRAH: And she has not identified that
10    person as a member of the legal department or working
11    for the legal department.
12       MR. GILLIS: Solely because she doesn't know.
13       MR. FARRAH: Well, if you have a good faith
14    basis to state on the record that it's your belief
15    that that was a conversation she had with somebody
16    from the legal department, that's fine and I won't
17    press it.
18       MR. GILLIS: I don't know of anybody at Longhorn
19    who has spoken to any of the people involved in this
20    case other than the legal department.
21       MR. FARRAH: But let me ask some more questions.
22    I'm going to reserve my rights.
23       MR. GILLIS: That's fine.
24 Q. Did this woman ask you what happened that night?

Page 2

1  A. I honestly don't remember what we talked about.
2  Q. Were you surprised at the conversation, that she wa
3     calling you?
4        MR. GILLIS: Objection.
5  A. No. She didn't call me. I called her. I was at
6     work.
7  Q. Did somebody ask you to call her?
8  A. Yes.
9  Q. Who?
10 A. My manager.
11 Q. Mr. Noonan or Mr. --
12 A. -- Bouillaine.
13 Q. Did he say why he wanted you to call her?
14 A. I don't recall. He could probably help you better
15    answer that.
16 Q. I want you to help me as much as you can today.
17 A. I'm trying.
18 Q. And you can't tell me when this was in relation to
19    September 26, 2003?
20 A. No.
21 Q. Was it before or after you had the conversation wit
22    Patty about that group of guys?
23 A. I don't recall. I would say after.
24       MR. FARRAH: I'm still reserving my rights to

Page 25

1  inquire into this conversation, although it seems she
2  doesn't remember anything that happened in the
3  conversation.
4  Q. Mr. Bouillaine, did he say why he wanted you to call
5     this woman?
6  A. I don't recall.
7  Q. Had Mr. Bouillaine asked you about what had happened
8     the night of September 26, 2003 by that time?
9  A. I'm not sure.
10 Q. Were you concerned that one or more of the patrons at
11    Table 52 was becoming intoxicated that night?
12     MR. GILLIS: What time period?
13 Q. When you were serving the drinks to Leigh Chabot,
14    were you concerned?
15     MR. GILLIS: Which round? The first one or the
16    second one?
17 Q. At any time that night, were you concerned that one
18    or more of the patrons at that table was becoming
19    intoxicated?
20 A. No. Both Leigh and my manager had been by and spoken
21    with them, so no.
22 Q. Did you perform any calculations in your mind of the
23    amount of alcohol that was being delivered to that
24    table that night?

Page 26

1  A. No.
2  Q. Did you perform any calculations in your mind about
3     the effect of the alcohol that was being delivered to
4     that table that night on one or more of the patrons?
5  A. No.
6  Q. Did you try to estimate in your mind how much alcohol
7     you had served that table through Leigh Chabot that
8     night?
9  A. No.
10 Q. Do you know who at the table consumed what alcoholic
11    beverages that were delivered by Leigh Chabot to the
12    table?
13 A. No.
14 Q. Did the Longhorn have any procedure in place, as of
15    September 26, 2003, for keeping a record of how much
16    alcohol had been delivered to a particular table?
17 A. No, not that I know of.
18 Q. Were there any policies in place as of September 26,
19    2003 that you were familiar with at the Longhorn as
20    to the maximum amount of alcohol that could be
21    delivered to any particular patron while at the
22    Longhorn?
23 A. One drink per person at one time.
24 Q. Were there any other procedures in force, as of

Page 27

1  September 26, 2003, that related to the maximum
2  amount of alcohol that could be delivered to any
3  patron at the Longhorn?
4     MR. GILLIS: In addition to the --
5     MR. FARRAH: One drink per person.
6     MR. GILLIS: In addition to all the training
7  stuff that she talked about in the first half of her
8  deposition?
9     MR. FARRAH: Sure, in addition to that.
10 A. No.
11 Q. Are you familiar with the concept of green zone,
12    yellow zone and red zone as it relates to service of
13    alcoholic beverages to customers?
14 A. Yes.
15 Q. Did you, at any time during that evening, seek to
16    estimate in what zone any of the patrons at Table 52
17    was, based solely upon the amount of alcoholic
18    beverages that were served by Leigh Chabot through
19    you to the table?
20 A. By inquiring as to whether they had eaten food or
21    not, yes.
22 Q. Did you undertake any other effort to determine in
23    what zone -- green, yellow or red -- any of the
24    patrons was at any particular time that evening,

Page 28

1  based solely upon the amount of alcoholic beverages
2  that were delivered to the table by Ms. Chabot?
3  A. No.
4  Q. Was there any requirement in place, other than all
5     the training materials that Mr. Gillis mentioned
6     earlier and you talked about during your first day of
7     your deposition, was there any requirement in place
8     that you were aware of at the Longhorn, as of
9     September 26, 2003, that servers undertake to
10    estimate, based on solely the amount of alcohol that
11    they had served to a particular patron, in which what
12    zone -- red, yellow or green -- that patron was at
13    any particular time while at the Longhorn?
14     MR. GILLIS: Any patron she served?
15     MR. FARRAH: Any patron.
16     MR. GILLIS: I object. You're assuming there's
17    one policy.
18     Are you asking about a policy for bartenders for
19    tables or for bartenders serving people at the bar?
20 Q. The policy doesn't matter, does it -- Longhorn's
21    policy?
22 A. Can you repeat the question?
23     MR. FARRAH: Why don't we have the question read
24    back?

Page 29

1      (Court reporter reads back question.)
2      MR. GILLIS: I object.
3   A. No.
4   Q. The Jack Daniels Manhattans that you made for Leigh
5      Chabot that night, were they straight up, or on the
6      rocks, or don't you know?
7   A. Straight up.
8   Q. And you have a memory of that; is that right?
9   A. Yes.
10  Q. And you free-poured those; isn't that right?
11  A. Correct.
12  Q. Did you follow Longhorn's procedure with respect to,
13     first, the vessel into which the drinks were served
14     to the patrons?
15  A. What do you mean by "vessel"?
16  Q. I had to say "vessel." I just felt like saying
17     "vessel."
18  A. Is that the word we were not sure of last time?
19  Q. I'm showing you Exhibit 4 from the first day of your
20     deposition, which, for the record, is the Bar
21     Operations Manual. Do you remember that document?
22  A. Yes.
23  Q. And on the page which we have Bates stamped Rare
24     05271, bar glassware is described. Do you see that?

Page 30

1   A. Yes.
2   Q. What I want to know is, did you give to Leigh Chabot
3      the Jack Daniels Manhattans straight up in a
4      six-ounce cocktail glass, as is shown on this page of
5      Exhibit 4?
6      MR. GILLIS: Objection.
7   A. Yes.
8   Q. Is there any question in your mind about that?
9   A. No.
10  Q. Okay. You didn't serve those Jack Daniels Manhattans
11     in the fourteen-ounce cobalt-blue-rimmed martini
12     glass, did you?
13  A. No. That was only for Margaritas.
14  Q. Do you have any explanation as to why in the Longhorn
15     bar manual it is referred to as a martini glass?
16  A. I believe because of the shape and the design.
17  Q. That's your guess?
18  A. No. That would be exact. It says here as well --
19     specialty shaker Margaritas. We would never serve a
20     martini in those.
21  Q. How far from the lip of the glass -- the Manhattan
22     glass -- was it that you poured the drinks, the
23     Manhattans?
24  A. An inch below, and once the cherry goes in, it brings

Page 31

1      it up so the customers think they're getting more.
2   Q. Can we agree that the drink-making techniques portion
3      of Exhibit 4 to your deposition on page 298 requires
4      that all drinks be one-quarter inch from the lip of
5      the glass?
6   A. Yes.
7   Q. Is that what you did?
8   A. Once the cherry goes in it, it brings it up to about
9      a quarter inch.
10  Q. And you put one cherry in each glass of the Jack
11     Daniels Manhattans; is that right?
12  A. Yes.
13  Q. Describe for me how you filled the first order for
14     Jack Daniels Manhattans that Leigh presented you
15     with, which according to Exhibit 11 was for three
16     Jack Daniels Manhattans, placed at 8:40.
17     MR. GILLIS: Objection. Did you say that she
18     served?
19     MR. FARRAH: No; that Leigh served.
20     MR. GILLIS: I don't think there's any evidence
21     that the first round was the round that she served.
22     I don't think there's any evidence that she said
23     she served that first round.
24  Q. Let me back up. According to Exhibit 11, Leigh

Page 32

1      placed an order for Table 52 for three Jack Daniels
2      Manhattans at 8:40 p.m. Do you see that?
3   A. Yes.
4   Q. Do you agree with that, that that's what Exhibit 11
5      shows?
6   A. Yes.
7   Q. Did you make that round of drinks?
8   A. I don't recall.
9   Q. Do you have any reason to believe you did not make
10     that round of drinks?
11     MR. GILLIS: Objection; asked and answered.
12  A. I can't say for sure.
13  Q. Do you know whether you made the round of drinks for
14     seven Jack Daniels Manhattans which Leigh placed for
15     Table 52 at 8:51 p.m.?
16  A. Yes.
17  Q. What is it about that order that leads you to know
18     that you made that order?
19  A. I just remember the drinks on the tray.
20  Q. You remember seven drinks?
21  A. Yes.
22  Q. Had you ever made seven Jack Daniels Manhattans at
23     one time for one table while you worked at the
24     Longhorn, up to that point?

Page 33

1  A. No.
2  Q. Had you ever made Jack Daniels Manhattans straight up
3     for any customer up to that point while you worked at
4     the Longhorn?
5  A. Yes.
6  Q. Was it a drink you made often?
7  A. No.
8  Q. And when you worked at J.R.'s, is it accurate to say
9     that most of your customers were drinking beers?
10 A. Yes.
11 Q. On the night of September 26, 2003, was there any
12    Longhorn mandated procedure in place for keeping a
13    tally of the number of drinks that had been served by
14    the service bar to a particular table?
15 A. No.
16 Q. Was there any Longhorn mandated procedure in place,
17    as of September 26, 2003, that required communication
18    between the different bartenders as to how much each
19    bartender had made for service to a particular table?
20    MR. GILLIS: At the service bar?
21    MR. FARRAH: At the service bar, yes.
22 A. No, there was no set procedure.
23 Q. You're clear, if I understand your testimony right,
24    and I don't want to put words in your mouth, you're

Page 34

1     clear that you made the seven straight-up Jack
2     Daniels Manhattans that were made at 8:51; is that
3     right?
4  A. Yes.
5  Q. You're unsure about whether it was you that made the
6     four Jack Daniels Manhattans that were ordered at
7     8:40; is that right?
8  A. Yes.
9  Q. In either event, was there any means -- any way --
10    for you to learn as of the time you made those seven
11    Jack Daniels Manhattans that four Jack Daniels
12    Manhattans had been ordered eleven minutes earlier?
13 A. Are you asking if I knew, if I had a means of knowing
14    that?
15 Q. Yes, if you had a means of knowing that.
16 A. No.
17 Q. Was there a computer in the service bar area that
18    provided you with that information?
19 A. No.
20 Q. Was there a policy in place at the Longhorn that
21    required service bartenders -- the various service
22    bartenders working on any particular night -- to
23    share with one another information about the drinks
24    that they had prepared for service to any table?

Page 35

1  A. No.
2  Q. Now, can you describe for me what you did when you
3     got ready to make the order for the seven Jack
4     Daniels Manhattans?
5     MR. GILLIS: If you remember.
6  A. I put the seven glasses on the tray and then took a
7     rocks glass and filled it with ice, and then put the
8     alcohol in and strained it in and did that seven
9     times, and then put a cherry in each drink, and then
10    put her ticket on top.
11 Q. Is that how you were trained to make a Jack Daniels
12    Manhattan?
13 A. Yes.
14 Q. Who trained you to make a Jack Daniels Manhattan that
15    way?
16 A. Rebecca trained me at Longhorn.
17 Q. As far as you know, did Rebecca train you in making
18    the Jack Daniels Manhattans in accordance with the
19    Bar Operations Manual?
20 A. Yes.
21 Q. As far as you know, is the procedure that you just
22    described for making Jack Daniels Manhattans
23    straight-up the procedure that is described in the
24    Bar Operations Manual?

Page 36

1     MR. GILLIS: Objection.
2  A. I don't recall.
3  Q. Have you ever made Jack Daniels Manhattans a
4     different way from the way you just described the way
5     you made those seven during that order?
6  A. Yes, at different places I've worked.
7  Q. Before or after the Longhorn?
8  A. Both.
9  Q. While you were at the Longhorn, did you ever make a
10    Jack Daniels Manhattan a different way from the way
11    that you described you made the seven that night?
12 A. No.
13 Q. And it's your understanding that the way you made the
14    seven that night is the way that the Longhorn manual
15    requires it be made?
16 A. As far as I recall, yes.
17 Q. After that night while you were at the Longhorn, did
18    you ever again make Jack Daniels Manhattans for
19    anyone?
20 A. I would believe so.
21 Q. Do you have a memory?
22 A. I can't say specifically, no.
23 Q. Did you in making the Jack Daniels Manhattans that
24    night, did you use what's called Manhattan mix?

**Page 37**

1  A. No.

2  Q. Can we agree that Exhibit 11 shows a charge for

3  Manhattan mix of fifty cents per Jack Daniels

4  Manhattan?

5  A. Yes. It's sweet Vermouth.

6  Q. Did you, in making the Jack Daniels Manhattans, use

7  sweet Vermouth?

8  A. Yes.

9  Q. How much did you put in each Jack Daniels Manhattan

10  during that first round of seven?

11  A. A quarter ounce, probably.

12  Q. How much Jack Daniels did you put in each drink that

13  you've described for that first round of seven?

14  A. It's a long time. Where I work now, they have bigger

15  martinis. I believe it was two ounces, an ounce and

16  a half.

17  MR. GILLIS: Don't guess.

18  A. I can't remember.

19  Q. Do you remember testifying in the criminal trial of

20  Mr. Southworth?

21  A. Yes.

22  Q. Do you remember testifying in the criminal trial of

23  Mr. Southworth that you put one ounce of Jack Daniels

24  in each of those Manhattans?

**Page 38**

1  A. I guess so.

2  MR. GILLIS: I don't want you to guess.

3  A. I don't recall.

4  MR. GILLIS: If you don't have an answer, don't

5  guess.

6  A. I don't recall.

7  Q. As you sit here today, all you know about how much

8  Jack Daniels you put in that round of seven was that

9  you filled the rocks glass with ice and then Jack

10  Daniels; is that right?

11  MR. GILLIS: Objection.

12  A. No.

13  Q. How much Jack Daniels did you put in each drink

14  during that round of seven that you remember making?

15  A. I don't recall what the Longhorn recipe was.

16  Q. So you don't have any memory, as you sit here, of how

17  much you put in; is that right?

18  MR. GILLIS: Objection.

19  Q. Of how much Jack Daniels you put in any drink; is

20  that right?

21  MR. GILLIS: Objection.

22  A. It's whatever is in the manual.

23  Q. By the way, how was the request made to you that the

24  drinks be straight up as opposed to on the rocks?

**Page 3**

1  How was that communicated to you?

2  A. By the way they were rung in. It would say "rocks"

3  on the ticket if they wanted on the rocks.

4  Q. And when the request was communicated to you for the

5  Jack Daniels Manhattans, did it come to you as it

6  appears on this page of Exhibit 11, that is, Jack

7  Daniels and a Manhattan mix, or was it a Jack Daniels

8  Manhattan that was requested?

9  A. Jack Daniels Manhattan mix.

10  Q. As it appears in Exhibit 11; is that right?

11  A. Yes, without the prices.

12  Q. Do you know what a mixing glass is?

13  A. A glass you mix drinks in.

14  Q. Do you know what a mixing glass is as it's referred

15  to in the Bar Operations Manual of the Longhorn

16  Steakhouse, as it was in effect on September 26,

17  2003?

18  MR. GILLIS: Is that a particular page you're

19  referring to?

20  MR. FARRAH: Yes. It's Bates stamped 299.

21  Q. Take a moment and read that first part.

22  (Witness reviews document.)

23  Q. Do you see that procedure under "Stir and Strain" on

24  page 299 of Exhibit 4?

**Page 4**

1  A. Yes.

2  Q. Is that the procedure you followed in making the

3  Manhattans that evening?

4  A. Yes, minus the stirring.

5  Q. Did you fill a mixing glass two-thirds with ice?

6  A. I filled a rocks glass with ice.

7  Q. That was your mixing glass; is that right?

8  A. Yes.

9  Q. And did you fill it two-thirds with ice?

10  A. No. I usually filled them with ice to the top.

11  Q. And do you have a memory of after pouring the drinks

12  from the glass in which you mixed them into the

13  individual glasses in which they were to be served

14  during that round of seven that we've been talking

15  about, whether or not -- and after putting the

16  cherries into each of the glasses -- whether or not

17  you added more bourbon to bring the level of the

18  liquid in any of the seven glasses to within

19  one-quarter inch of the lip?

20  A. No.

21  Q. Do you have a memory of having done that?

22  A. No.

23  Q. But it's your memory that they went out to the table

24  with the liquid one-quarter inch from the lip; is

Page 41

1  that right?
2      MR. GILLIS: Objection. It's your memory, not
3  what your practice was.
4  A. No, I don't recall the exact measurement.
5  Q. We can agree, can't we, that the Longhorn Bar
6  Operations Manual called for the drinks going out,
7  that the liquid should be one-quarter of an inch
8  below the lip; is that right?
9  A. Yes.
10 Q. And that typically is what you tried to do; isn't
11 that right?
12 A. Yes, or it would be lower than that but never above.
13 Q. But you want to serve a good drink to the patron,
14 don't you?
15     MR. GILLIS: Objection.
16 A. Yes.
17 Q. The patron doesn't want to see the drink below the
18 level that other people are getting the drinks, does
19 he or she?
20 A. No.
21 Q. Now, at any time since you learned through the
22 conversation with Patty about that group of guys,
23 what happened the night of September 26, 2003, the
24 morning of September 27, 2003, have you tried to

Page 42

1  calculate in your mind the effects of the alcohol
2  that was served to that table on the different
3  patrons at that table?
4  A. No.
5  Q. Have you asked anyone to do that for you, other than
6  as part of the defense of this lawsuit?
7  A. No.
8  Q. Now, you were visited by a state trooper the night
9  before you testified -- I think it was last
10 September -- in the Southworth criminal trial; is
11 that right?
12 A. Yes.
13 Q. Had someone told you the state trooper was coming to
14 see you?
15 A. No.
16 Q. At what time of the day or night did the state
17 trooper arrive?
18 A. Night.
19 Q. Do you know what time?
20 A. It was very dark in September, so after 8:00.
21 Q. From the time you had the conversation with Sherri
22 until the state trooper arrived, had anybody spoken
23 to you about Southworth's criminal trial?
24     MR. GILLIS: Objection. Do you mean the

Page 4

1  conversation with Patty?
2  Q. Patty; I'm sorry. Had anybody spoken to you about
3  Southworth's criminal trial?
4  A. No.
5  Q. Did you know that he was charged with different
6  crimes?
7  A. No.
8  Q. What did Patty say to you about that group of guys,
9  best as you can recall it, when she had that
10 conversation with you?
11 A. That she had heard that there was some sort of
12 accident.
13 Q. Did she say anything else?
14 A. No.
15 Q. Did you think, at that point in time, that perhaps
16 one or more of the patrons at Table 52 was under the
17 influence of alcohol at the time that patron was
18 served his last drink?
19     MR. GILLIS: Objection.
20 A. No.
21 Q. At any time since Patty spoke to you about that group
22 of guys, have you considered whether or not any of
23 those guys became intoxicated while a customer at the
24 Longhorn?

Page 4

1  A. No.
2  Q. Do you know, as you sit here now, without
3  conversations with your counsel or people working for
4  your counsel, whether or not any of that group of
5  guys that Patty spoke to you about became intoxicated
6  while a customer at the Longhorn?
7  A. No.
8  Q. Do you believe that any of that group of guys became
9  intoxicated while a customer at the Longhorn?
10 A. No.
11 Q. Is it that you believe that they did not become
12 intoxicated while a customer at the Longhorn?
13 A. Yes.
14 Q. What is the basis for that belief?
15 A. I didn't see any visibly intoxicated customers
16 leaving that night, and they definitely would have
17 stuck out.
18     Longhorn is a family restaurant. It was not a
19 type of place where people were getting fall-down
20 drunk.
21     So I would definitely remember that, as well as
22 other servers would probably have been talking about
23 it.
24 Q. Is that what you were trained to look for in

Page 45

1   determining whether or not to serve a patron, whether
2   the patron was fall-down drunk?
3       MR. GILLIS: Objection.
4   A. No.
5   Q. Other than that nobody was fall-down drunk at that
6   table at the time they were served their last drink,
7   what is the basis for your belief that nobody became
8   intoxicated while a customer at the Longhorn?
9       MR. GILLIS: No one at the table, you mean?
10      MR. FARRAH: That table, yes.
11  A. Usually, we look for changes in behavior -- if
12  someone seems quiet when they arrive and they become
13  louder, or loud people get quiet, changes in
14  language, changes in body movements. There's many
15  signs, and you have to take each person case by case.
16      Leigh would probably be better to answer that
17  than I, but from my vantage point at the bar, I did
18  not see anyone that I believe was intoxicated.
19  Q. From your vantage point at the bar, you couldn't even
20  see if they were eating or not; is that right?
21  A. Yes, but I could see the door -- people coming and
22  going.
23  Q. What is the significance of that?
24  A. If I noticed people leaving, if there was a group of

Page 46

1   people leaving.
2   Q. What would you do? If that group had left and you
3   noticed that, in your view, one or more of them was
4   intoxicated, what would you have done?
5   A. I would have had the manager go over to them and find
6   out who was driving and make sure that no one that
7   was intoxicated was driving.
8   Q. Have you ever done that while you worked at the
9   Longhorn?
10  A. No. I never had to.
11  Q. Was there any procedure in place, on September 26,
12  2003, whereby the amount of alcohol that a patron
13  consumed at the Longhorn was tracked?
14  A. No.
15  Q. Do you know whether or not any of the patrons at
16  Table 52 was a patron at the bar before or after
17  being seated at Table 52?
18  A. No.
19  Q. Have you heard from anyone, other than your attorneys
20  or people working on behalf of your attorneys, that
21  Jeffrey Southworth was a patron at the bar before he
22  sat down at Table 52?
23  A. No.
24  Q. Was the state trooper male or female?

Page 47

1   A. Male.
2   Q. When the state trooper came to your house, what did
3   he say and what did you say?
4   A. He asked if I still worked at Longhorn, and he asked
5   me if I knew of anything that had happened, and I
6   said I was unaware of any trial going on. I said I
7   was no longer employed there.
8       He asked me a few questions about the setup of
9   the restaurant.
10  Q. What did he ask you?
11  A. He asked where the bar was in relation to the table.
12  Q. What else did he ask you?
13  A. I don't recall much else.
14  Q. Did he ask you if you saw Jeffrey Southworth under
15  the influence of alcohol that night?
16  A. I don't recall that.
17  Q. Do you remember anything else that he asked you,
18  other than whether you worked there that night and
19  where the bar was in relation to the tables?
20  A. He asked if I would be willing to testify because the
21  D.A.'s office would be calling me.
22  Q. And you said, "Of course"?
23  A. Yes.
24  Q. Good citizen that you are.

Page 48

1   A. Yes.
2   Q. Did the D.A.'s office then call you that night?
3   A. The next morning she called.
4   Q. On the phone?
5   A. Yes.
6   Q. And what did she say and what did you say?
7   A. She said that they needed me to testify, and I said,
8   "Is there something I have to do today," meaning that
9   Thursday.
10      Actually, I think it was the Tuesday he might
11  have come, and she called me the next morning because
12  I wanted to make sure I didn't have class, and she
13  told me what happened. Up to that point, I had no
14  idea.
15  Q. What did she say to you?
16  A. She said that Mr. Southworth had been driving and a
17  friend of his or someone called him and said that he
18  had their keys, and he turned around on the highway
19  to bring back the keys, and he hit this family --
20  this father and daughters -- and I believe it killed
21  two people -- and he went to a hotel.
22      By the time the police found him, he was not
23  intoxicated. So that was it.
24  Q. Is it accurate to say that up to that point you did

Page 49

1 not know that one of that group of guys had been
2 involved in an accident where two people were killed?
3     MR. GILLIS: Objection.
4 A. Yes.
5 Q. All you can recall from your conversation with Patty
6 was that someone in that group of guys had been
7 involved in an accident?
8 A. Yes.
9 Q. And Patty had told you or you understood from the
10 conversation with Patty that person had gone
11 home before being involved in the accident?
12 A. No. I don't recall anything specific like that.
13 Q. What else did the D.A. say to you during that phone
14 conversation?
15 A. That he was trying to say he was not driving the car,
16 and that I think they were actually trying to say
17 that they were never at Longhorn or the check was not
18 theirs or something like that.
19 Q. And what did you say during that conversation?
20 A. I said it was a long time ago, and she basically said
21 all they wanted from me was -- because Leigh was not
22 available -- if there was any way to ring in other
23 people's orders onto their table number.
24     They basically just wanted me to talk about the

Page 5

1 Q. I understand. God willing, we're going to have Leigh
2 here at some point in time, but I'm asking you.
3     You're here now and you're under oath, and my
4 question to you is, did anyone at that table that
5 night, Table 52, appear visibly intoxicated to you?
6 A. No.
7 Q. Did anyone at that table, Table 52, appear to be
8 under the influence of alcohol that night?
9 A. Not that I know of.
10 Q. Have you ever wondered how anyone at that table could
11 not have been under the influence of alcohol that
12 night, given how much alcohol was delivered to that
13 table that night?
14     MR. GILLIS: Objection.
15 A. Obviously, they had drinks. I'm not saying they
16 didn't drink, but I don't think anybody was
17 intoxicated when they left Longhorn.
18 Q. Have you ever wondered how they could not have been
19 under the influence of alcohol, given how much was
20 served to that table that night?
21     MR. GILLIS: Objection. She already answered
22 that question.
23 A. No.
24 Q. Have you sat down and done the math to figure out how

Page 50

1 procedures for ringing in drinks.
2 Q. And do you remember reviewing any records with the
3 D.A. prior to the time that you testified?
4 A. Yes. I believe I saw things like this.
5 Q. You're talking about Exhibit 11?
6     MR. GILLIS: Which part of the exhibit?
7     THE WITNESS: This (pointing).
8 Q. That's the first page?
9 A. Yes. The first page I saw, and that's all I can
10 recall.
11 Q. Did the D.A. make you aware of the time frames of
12 when Jack Daniels Manhattans were delivered to the
13 table?
14 A. Not that I recall.
15 Q. What did she ask you to do, the D.A.?
16 A. They asked me to identify this as a check from
17 Longhorn and just explain to the court the system for
18 when a waitress punches in drinks, how they come up
19 to the service bar.
20 Q. Now, no one at Table 52 appeared visually intoxicated
21 to you at any time that night; is that right?
22 A. That I recall, yes.
23 Q. Are you sure?
24 A. Yes. Leigh would better answer that.

Page 5

1 much alcohol was consumed by that table that night?
2 A. No.
3 Q. Do you know how much alcohol is in two ounces of Jac
4 Daniels?
5     MR. GILLIS: Are you talking the pure alcohol?
6     MR. FARRAH: Yes.
7     MR. GILLIS: He's not asking you two ounces of
8 alcohol. He's asking you have you done the
9 calculation on the percentage of alcohol, the proof
10 of Jack Daniels.
11 A. No, I have not done any of that.
12 Q. Were you trained to, as part of your training for
13 being a bartender at the Longhorn, were you trained
14 to do those calculations?
15 A. We were trained that the alcohol in a Manhattan is
16 the same as a four-ounce glass of wine or as a
17 twelve-ounce beer.
18 Q. Who gave you that training?
19 A. That's been everywhere including in Bar Code
20 training, but that was in my Longhorn training.
21 Q. You were trained at the Longhorn that the amount of
22 pure alcohol in a Jack Daniels Manhattan is the same
23 as in a four-ounce glass of wine; is that right?
24 A. Yes.

Page 53

1  Q. The amount of pure alcohol in a Jack Daniels
2     Manhattan is the same as in a twelve-ounce beer; is
3     that right?
4  A. Yes.
5  Q. Do you know how much pure alcohol is in a Jack
6     Daniels Manhattan, other than it's the same as four
7     ounces of wine?
8  A. I don't.
9  Q. Is it accurate to say that based on that training, on
10    the night of September 26, 2003 you were comfortable
11    that purely by virtue of the amount of alcohol served
12    to that table that night no one was under the
13    influence of alcohol?
14        MR. GILLIS: Objection.
15 A. What do you mean "under the influence"?
16 Q. Do you understand the question?
17 A. No, I don't. I'm not sure what you're asking me.
18 Q. Let me put it in color zones for you.
19        Is it accurate to say that based on your
20    training, as you just described about to the relative
21    amounts of alcohol in different drinks, that you were
22    confident that evening that based on the number of
23    drinks served to the patrons of that table, none of
24    the patrons at that table at the time of the service

Page 54

1     of the last drink to that table was in the red zone?
2        MR. GILLIS: Objection.
3  A. No one was in the red zone, to my recollection.
4  Q. You're confident of that; is that right?
5  A. Yes.
6  Q. And you're confident of that not based on what you
7     saw; you're confident on that based on your
8     calculations of how many drinks were delivered and
9     the alcoholic content of those drinks; is that right?
10        MR. GILLIS: Objection.
11 A. No. I told you I didn't calculate that.
12 Q. Weren't you trained to calculate the effect of drinks
13    on customers passing from one zone to the other?
14        MR. GILLIS: Objection. Are you asking her did
15    she calculate that or did she use her training to go
16    from one zone to the other -- the amount of alcohol
17    someone had as opposed to the actual pure alcohol in
18    one drink?
19 Q. Let me ask you this. I'll withdraw those earlier
20    questions.
21        At any time prior to September 26, 2003, were
22    you trained by the Longhorn to estimate the zone that
23    a particular customer was in at the time a drink was
24    served to that customer based on what you knew that

Page 55

1     customer had consumed, while at the Longhorn
2     restaurant previously, in alcoholic beverages.
3        MR. GILLIS: Under what circumstances?
4        MR. FARRAH: Let's just see if she was trained.
5        MR. GILLIS: You can't answer that question
6     without knowing weight, food. What are you asking?
7     It's a question you cannot answer in that form.
8        MR. FARRAH: You're not testifying; you know
9     that.
10        MR. GILLIS: Ask a question she can answer.
11        MR. FARRAH: Could you read the question back,
12    please?
13        (Court reporter reads back question.)
14        MR. GILLIS: Objection to that question in that
15    form.
16 A. It doesn't seem clear to me.
17 Q. Tell me what you were trained about red, green and
18    yellow zones prior to September 26, 2003 as an
19    employee of the Longhorn.
20 A. I would use that when I was serving people directly.
21 Q. What were you trained is my question.
22 A. To take into consideration each person on a case by
23    case basis that came into the bar -- what they ate,
24    what they were drinking, their individual behaviors,

Page 56

1     speech; things like that.
2        So whoever was directly serving people would do
3     that. The waitresses were responsible for that at
4     their own tables.
5  Q. The only question to you is, were you trained at any
6     time prior to September 26, 2003 by the Longhorn to
7     estimate the zone a patron was in at the time of the
8     service of a drink to that patron based upon what you
9     knew about the alcoholic beverages that patron had
10    consumed previously that day while at the Longhorn?
11        MR. GILLIS: Her directly or her at the service
12    bar?
13 Q. Were you trained?
14 A. Yes, I was trained.
15 Q. What were you trained to do?
16 A. As I said previously, to take each person case by
17    case and what they were drinking, what they were
18    eating; everything -- their size, their mannerisms,
19    their speech.
20 Q. By the way, I want to ask you this question again
21    because it's a little unclear to me. You see
22    Exhibit 5, the Bar Code Server Guide?
23 A. Yes.
24 Q. Am I correct that you did not receive that server

Page 57

1  guide from Longhorn as of September 26, 2003?
2      MR. GILLIS: Objection.
3  A. We had them in the building and behind the bar, but I
4      was not personally handed a copy.
5  Q. You were personally handed a copy of the server guide
6      in December of 2003; is that right?
7  A. Yes.
8  Q. Were you handed a copy of the server guide, which has
9      been marked as Exhibit 5, prior to December of 2003?
10  A. No.
11  Q. Do you have a memory, as you sit here, as of
12      September 26, 2003 of ever having read the server
13      guide or a copy of the server guide which has been
14      marked as Exhibit 5 to your deposition as of the time
15      you were working in the service bar?
16  A. Yes.
17  Q. Can you tell me the context in which you read the
18      server guide which has been marked as Exhibit 5, or a
19      copy thereof, prior to September 26, 2003?
20  A. I just read it a few times at work.
21  Q. The whole thing?
22  A. No. I would just read bits and pieces, here and
23      there.
24  Q. Skim it?

Page 58

1  A. No; read, when it was slow.
2  Q. Do you remember what portions of Exhibit 5 you had
3      read prior to September 26, 2003?
4  A. I don't recall.
5      MR. FARRAH: By the way, should we take a brief
6  break for lunch and then resume?
7      MR. GILLIS: Off the record for a second.
8      (Discussion off the record.)
9      (Luncheon recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 59

1      AFTERNOON SESSION
2
3  Q. I want to show you Exhibit 5. It's the server guide.
4      I'd like to refer you to the page Bates stamped Rare
5      0519 and then 20, and then ask you to take a moment
6      or two to look at them.
7      (Witness reviews document.)
8  Q. My question to you is, as of September 26, 2003, had
9      anybody at Rare required that you review those two
10      pages of Exhibit 5?
11  A. No.
12  Q. My next question to you is, do you have a memory of,
13      at any time prior to September 26, 2003, actually
14      reviewing the pages Bates stamped 19 and 20 of
15      Exhibit 5?
16  A. Yes.
17  Q. And do you know for what purpose you undertook that
18      review?
19  A. Just my own, just reading it myself.
20  Q. Do you know when you undertook that review?
21  A. I don't.
22  Q. Okay. That's all I have on that.
23      I wanted to ask you some questions about page 2
24      of Exhibit 11 and subsequent pages of Exhibit 11.

Page 60

1      My first question is with respect to the entry
2      at 7:59 p.m., "logout." Do you see that?
3  A. Yes.
4  Q. Do you know what "logout" means in the context of
5      this document?
6  A. Closing the screen when you're done ordering so the
7      next person can put their number in.
8  Q. Am I correct that "login" means opening the screen?
9  A. Yes.
10  Q. At 8:10 p.m. there is a reference to "cleared items."
11      Do you know what that means?
12  A. It appears to be a voided item.
13  Q. Is that what you understand "cleared items" to mean?
14  A. Yes.
15  Q. 8:10 p.m., "order items," does that mean what it
16      sounds like it means?
17  A. Yes.
18  Q. At 8:10, "print check." What does that mean?
19  A. Prints the check.
20  Q. For delivery to the customer?
21  A. It could be or it could be for her own purpose. I
22      can't speak for why Leigh printed that.
23  Q. But during those times that you worked as a server,
24      did you have the opportunity to print a check at any

Page 61

1  time even though, for example, the customers at the
2  table were not finished?
3  A. Yes.
4  Q. And when we're talking about a "check," are we
5  talking about a check that could be handed to the
6  customers?
7  A. Yes.
8  Q. At 8:16 p.m. we've got "apply payment." What does
9  that mean?
10 A. Paying on a tab.
11 Q. Paying off a tab; is that what you said?
12 A. Applying payment to the check.
13 Q. At 8:17 p.m. we've got "print check," an entry for
14 "print check." Do you see that?
15 A. Yes.
16 Q. Further down on that line it says "printed two
17 times." Do you see that?
18 A. Yes.
19 Q. What does that mean, if you know?
20 A. It printed twice.
21 Q. Do you know why the check printed twice?
22 A. It may be that it's a credit card, and one's the
23 merchant copy and one is the customer copy.
24 Q. In your experience as a waitress, if it was a credit

Page 62

1  card and one was the merchant copy and one was the
2  customer copy, would the check print twice?
3  A. Yes. It's two separate slips.
4  Q. "Close check" means what?
5  A. Close the check.
6  Q. That means that that table is done?
7  A. Yes.
8  Q. "Adjust payment" at 8:27. Do you see that?
9  A. Yes.
10 Q. What does that mean?
11 A. Putting the tip on.
12 Q. Because at 8:16 there was no tip, and then at 8:27
13 there was a tip for $12. Does that seem to be what
14 it says?
15 A. Yes.
16 Q. Could we turn to the next page? Now, I'm talking
17 around the time of September 26, 2003.
18     Did any waitress ever complain to you when you
19 were working the service bar about how long it took
20 to receive a round of drinks once the order had been
21 placed in the computer?
22 A. Yes.
23 Q. Was that something you heard more than once a night
24 while you worked as the service bartender?

Page 6

1  A. Yes.
2  Q. Would you call it a frequent complaint of the
3  waitresses?
4  A. Yes.
5  Q. Did Leigh ever complain to you about that?
6  A. Yes. Everyone has. It's restaurant life. Service
7  bars, you put in your drinks and they have to wait to
8  get them because it's not an instant thing.
9  Q. Do you remember Leigh complaining to you about how
10 long she had to wait for drinks on September 26,
11 2003?
12 A. No.
13 Q. Did waitresses ever complain to you when you were
14 working the service bar that customers complained to
15 them about how long it took for drink orders to be
16 placed?
17 A. No, not that I recall.
18 Q. From the time that you first started working at the
19 Longhorn until you left, do you know of any efforts
20 Longhorn management undertook to try to alleviate
21 this problem?
22 A. No.
23 Q. Did anyone request of Longhorn management, that you
24 know of, to try to alleviate the problem?

Page 6

1  A. No.
2  Q. Now, can we turn to the page that has the Longhorn
3  number page 9 on the upper right-hand corner of
4  Exhibit 11? Do you see that?
5  A. Yes.
6  Q. Eighty-five percent of the way down on the bottom at
7  9:17 p.m., there is a reference to "print check." Do
8  you see that?
9  A. Yes.
10 Q. Can you tell from looking at this exhibit why at
11 9:17 p.m. Leigh printed the check for Table 52?
12 A. No. That would be a question for Leigh.
13 Q. In your experience, what sorts of circumstances led
14 you, as a waitress, to print checks while you worked
15 at the Longhorn?
16 A. Someone was leaving, either the whole group or one
17 person from the group, or if I wanted to make sure I
18 rang in something.
19 Q. Anything else that you can think of?
20 A. I can't think of any other reason for printing a
21 check.
22 Q. Can you turn to the next page? At 9:34 p.m., Leigh
23 printed the check for Table 52; is that right?
24 A. Yes.

|  | Page 65 |  | Page 6 |
|---|---|---|---|
| 1 | Q. Then she printed it again at 9:34. Do you see that? | 1 | Q. Can we turn to the next page? It appears that at |
| 2 | A. Yes. | 2 | 9:57 Leigh applied payment. Do you see that? |
| 3 | Q. I know this is a question better asked of Leigh, but | 3 | A. Yes. |
| 4 | first of all, do you know why she printed Table 52's | 4 | Q. What does that mean "applied payment"? |
| 5 | check twice at 9:34 that evening? | 5 | A. As I said before, just paying the check. |
| 6 | A. No. | 6 | Q. Do you know why she applied payment in four entries |
| 7 | Q. Can you tell me, in your experience as a waitress at | 7 | at 9:57? |
| 8 | the Longhorn, those circumstances which would have | 8 | A. I don't know why. |
| 9 | led you to print a table's check more than once prior | 9 | Q. And can you tell me, looking at any part of |
| 10 | to the time the check was closed out? | 10 | Exhibit 11 other than the first page, how much the |
| 11 | A. If people either wanted to split the check, you can | 11 | check finally was, what the check total was for Table |
| 12 | take certain things if they were paying separately. | 12 | 52 that evening? Don't look at the first page. |
| 13 | That would be my only thing, but I imagine it | 13 | A. I don't see it anywhere else. |
| 14 | would say "split check." So I cannot really say any | 14 | Q. I do -- "closed check, $202.79." |
| 15 | reason why. | 15 | A. Yes. |
| 16 | Q. When you are talking about a split check, the | 16 | Q. As of September 26, 2003, did Longhorn have any |
| 17 | computer has the ability to divide the amount owed | 17 | procedure in place to prevent a patron at the |
| 18 | for the check among however many patrons it is | 18 | restaurant seated at a table from purchasing a drink |
| 19 | requested that it be divided among? | 19 | at the bar and then bringing it to the table? |
| 20 | A. No. You can specifically split it by if someone | 20 | A. No because it was not something that happened. If |
| 21 | said, "I had ribs and a Coke," you can split off the | 21 | someone bought a drink before they went to the table, |
| 22 | ribs and the Coke and give them a check. | 22 | then they would take it with them. |
| 23 | Q. You have that capability? | 23 | Other than that, people would order from their |
| 24 | A. Yes. | 24 | server. |

|  | Page 66 |  | Page 6 |
|---|---|---|---|
| 1 | Q. But if that were done, in your experience, there | 1 | Q. My question to you is, did Longhorn have any |
| 2 | would be some indication that it was a split check; | 2 | procedure in place, as of September 26, 2003, to |
| 3 | is that right? | 3 | prevent a customer seated at a table from getting up, |
| 4 | A. Yes. | 4 | going to the bar, buying a drink and bringing it back |
| 5 | Q. You don't see any such indication here; is that | 5 | to the table? |
| 6 | right? | 6 | MR. GILLIS: Objection. Are you talking about a |
| 7 | A. Right. | 7 | written procedure or a custom and practice? |
| 8 | Q. At 9:36 it appears that Leigh printed the check | 8 | MR. FARRAH: Any procedure. |
| 9 | again, now a fourth time; is that right? | 9 | A. No. |
| 10 | A. Yes. | 10 | Q. Did the Longhorn have any way to monitor whether or |
| 11 | Q. You don't know why; is that right? | 11 | not customers who were seated at a table waiting for |
| 12 | A. No. | 12 | their drink orders got up, walked to the bar and |
| 13 | Q. Can you tell me how the amount of the tip when it's | 13 | bought drinks? |
| 14 | not a credit card tip is actually entered into the | 14 | A. The waitress would know if they had a drink that she |
| 15 | computer? | 15 | didn't bring them. |
| 16 | A. It's not if it's cash. | 16 | Q. Was there any directive, that you can recall, that |
| 17 | Q. When it's cash, it's not entered into the computer; | 17 | was ever given to the waitresses regarding what to do |
| 18 | is that right? | 18 | if the waitress came upon a customer who had a drink |
| 19 | A. Right. | 19 | that she had not given them? |
| 20 | Q. So at 9:46 it appears that the check for Table 52 is | 20 | A. She would not give them the drink. If she was |
| 21 | printed a fifth time; is that right? | 21 | bringing a drink to them, she would not bring another |
| 22 | A. Yes. | 22 | drink, and if it ever did happen, she would say |
| 23 | Q. You don't know why? | 23 | something to the customer, "I can get you your |
| 24 | A. No. | 24 | drinks." |

Page 69

1  Q. Do you know that to be a practice and procedure that
2     the Longhorn employed?
3  A. I don't recall that ever happening.
4  Q. You don't recall ever being told by the Longhorn what
5     to do in the event as a server waitress that you came
6     upon a customer who had brought a drink from the bar
7     to the table?
8        MR. GILLIS: Objection.
9  A. No.
10 Q. After you got the call from the D.A., after the visit
11    from the state police, to testify the next day, did
12    you contact anybody at the Longhorn?
13 A. No.
14 Q. Did you contact anybody after you got the call from
15    the visit from the state police?
16 A. I called my family's lawyer just to know what to
17    expect because I had never gone to a courthouse.
18 Q. Who was that?
19 A. Bob Kelly.
20 Q. Where is he?
21 A. Quincy.
22 Q. I don't want to know what you said, but did you talk
23    to him at all about that group of guys and what you
24    had learned they had done prior to the time you

Page 70

1     received the visit from the state police?
2        MR. GILLIS: Objection.
3  A. No.
4  Q. And since the conversation you had with Bob Kelly
5     that came out of the visit by the state police, have
6     you talked to Kelly again about anything related to
7     this case?
8  A. No.
9  Q. Now, did you tell the district attorney that you
10    supplied drinks for anyone that was underage that
11    evening?
12 A. No.
13 Q. Did you supply drinks for anyone underage at Table 52
14    that evening?
15 A. No.
16 Q. Do you have any information that anyone drinking
17    alcoholic beverages at Table 52 that evening was
18    underage?
19 A. No.
20 Q. Did anyone ever tell you how much alcoholic beverages
21    Jeffrey Southworth had to drink at the bar before he
22    sat down at the table?
23       MR. GILLIS: Objection.
24 A. No.

Page 71

1  Q. Did you have any conversation with Leigh Chabot
2     concerning, if you know, the order that was placed at
3     8:40 for four Jack Daniels Manhattans and some
4     appetizers?
5  A. No.
6  Q. Is it your best memory that the conversation you had
7     with Leigh Chabot about the customers was not in
8     connection with the 8:51 order for seven Jack Daniels
9     Manhattans?
10 A. That's my best memory.
11 Q. Your best memory is it was in connection with the
12    9:21 order for four Jack Daniels Manhattans?
13       MR. GILLIS: Objection.
14 A. Yes.
15 Q. Three Jack Daniels Manhattans; is that right?
16 A. Yes.
17 Q. At Longhorn were you taught any of the laws governing
18    the service of alcohol in Massachusetts?
19 A. Yes.
20 Q. This was as of September 26, 2003. Tell me what you
21    recall you were taught.
22 A. That someone has to be twenty-one years of age with a
23    valid picture ID, being a license or passport. I
24    don't think Longhorn even took military IDs. One

Page 72

1     drink per customer. It's illegal to serve somebody
2     who is already intoxicated. It's illegal to serve a
3     known alcoholic, but I don't know how you can judge
4     that.
5  Q. Anything else that you can recall?
6  A. One drink per person at any one time. You cannot
7     bring over two drinks for any one person.
8  Q. Did the Longhorn have a customer practice, as of
9     September 26, 2003, about whether or not at the time
10    of being delivered a drink a customer could order
11    another drink?
12 A. Let me see if I'm clear. If someone had a drink, if
13    they could order another drink?
14 Q. No. I want to know, did the Longhorn have a custom
15    or practice in place, as of September 26, 2003, that
16    prohibited a customer, upon delivery to that customer
17    of a drink, from ordering from the waitress another
18    drink at that time?
19       MR. GILLIS: Objection.
20 A. No.
21 Q. Did the Longhorn have a custom or a practice in
22    place, as of September 26, 2003, that prohibited a
23    server from bringing a drink to a customer who had
24    not finished the drink that that customer was

Page 73

1 drinking?

2 A. Yes.

3 Q. What was that practice?

4 A. Not to bring a drink until the other drink was gone;

5 take a glass when you leave a glass.

6 Q. And where is that practice memorialized?

7 A. I don't know.

8 Q. Is it in any of the documents you received from the

9 Longhorn at any time you were employed there?

10 A. I can't say.

11 Q. Is that something you were trained in by Rebecca?

12 A. Yes.

13 Q. So a customer could not have more than one drink on

14 the table at any time; is that right?

15 A. Alcoholic drinks, yes.

16 Q. That's what we're talking about; is that right?

17 A. Yes.

18 Q. Is it your testimony that Longhorn employees were

19 instructed to remove the drink that the customer was

20 drinking and supply the customer with a new drink?

21 A. Yes.

22 Q. Take the unfinished drink away from the customer?

23 MR. GILLIS: Objection.

24 A. No.

Page 74

1 Q. Was it Longhorn's custom and practice at that time,

2 September 26, 2003, to require its servers to take an

3 unfinished drink away from the customer and replace

4 it with a new drink?

5 MR. GILLIS: Objection.

6 A. No.

7 Q. So it was Longhorn's custom and practice at that time

8 to not deliver a new drink to a customer who had not

9 finished his previous drink?

10 MR. GILLIS: Objection.

11 A. Yes.

12 Q. Can you think of any situation, prior to September

13 26, 2003, when any customer you saw at the Longhorn

14 Steakhouse had more than one drink in front of that

15 customer?

16 MR. GILLIS: Objection.

17 A. I can't. I can only speak for myself, what I did.

18 Q. What did you do?

19 A. I never served anyone that had a drink that they had

20 not finished in front of them. I can't speak for

21 other waitresses.

22 Q. Would you not take an order from the customer, prior

23 to September 26, 2003, who had not finished his

24 drink?

Page

1 A. I would take the order.

2 Q. And if by the time you had filled the order -- let's

3 say you were a bartender; you just had to turn around

4 to fill the order -- by the time you had filled the

5 order, if the customer had not finished that drink,

6 would you not deliver the order to the customer?

7 MR. GILLIS: Objection.

8 A. I would not make it right away. I would go get

9 something else first -- go check on someone's food.

10 There's many ways around that to allow the

11 customer time to finish the drink.

12 Q. You never had a customer that you were serving who

13 had more than one drink in front of them at any time;

14 is that right?

15 A. Correct.

16 Q. Now, as of September 26, 2003, you had been made

17 aware of the requirement in the Longhorn documents

18 that each bartender at the beginning of each shift

19 undergo an Exact-O-Pour test; is that right?

20 A. Yes.

21 Q. But you didn't undergo an Exact-O-Pour test at the

22 beginning of each shift; isn't that right?

23 A. Correct.

24 Q. You knew that Longhorn management was violating

Page

1 company policies in not requiring you to do that;

2 isn't that right?

3 MR. GILLIS: Objection; if you know what the

4 company's policies were.

5 I think you need a question before that to

6 determine if she's able to answer that. She's not

7 Longhorn management.

8 Q. You believed or as far as you knew, the company

9 policies regarding the operation of the bar, let's

10 say, were reflected in the various documents that had

11 been supplied to you and have been marked as exhibits

12 in this case; isn't that right?

13 A. Yes.

14 Q. You knew that, for example, Longhorn wrote in effect

15 in its Bar Operations Manual that every bartender

16 must undergo an Exact-O-Pour test at the beginning of

17 each shift; isn't that right?

18 MR. GILLIS: Objection.

19 A. Yes.

20 Q. And you knew that you were not undergoing

21 Exact-O-Pour tests at the beginning of each shift;

22 isn't that right?

23 A. Correct.

24 Q. Did you ever ask anybody why not?

Page 77

1　A. No. We did it a couple of times a week usually; so
2　　no. It was up to the managers. It was not my job to
3　　make sure every bartender was pouring.
4　Q. So this is a question that is better asked of
5　　Mr. Noonan; is that right?
6　A. Yes.
7　Q. But you knew, nevertheless whether Mr. Noonan can
8　　answer the question or not, as far as you knew,
9　　Longhorn was violating its own procedures by not
10　　requiring you to take the Exact-O-Pour test, isn't
11　　that right, as far as you knew?
12　A. As far as I know, yes.
13　Q. And you knew that the Longhorn believed that
14　　customers like to see a drink free poured; isn't that
15　　right?
16　　　　MR. GILLIS: Objection.
17　A. I'm not sure about that.
18　Q. Did you ever fail an Exact-O-Pour test?
19　A. No, not that I recall.
20　Q. Tell me about up-selling at the Longhorn. What does
21　　that mean to you, up-selling?
22　A. If someone orders a Margarita, then rather than just
23　　serve what we call the house Tequila, we say, "Do you
24　　want Cuervo in that?" or "How about the Grand Gold

Page 78

1　　Margarita?"
2　　　　It's just trying to get them to spend more
3　　money, basically.
4　Q. Trying to get customers to order more expensive
5　　drinks, basically?
6　A. Correct.
7　Q. Did you up-sell at the Longhorn?
8　A. Yes.
9　Q. How was your performance rated, if you know, while
10　　you were at the Longhorn?
11　A. I would say very well.
12　Q. No, no, I don't mean how were you regarded, although
13　　I'm sure you were regarded highly by everybody, but
14　　if you know, what sort of ratings of your performance
15　　did Longhorn have, keep, make, undertake?
16　A. I don't know. We met with managers every so often,
17　　and they would go over your performance.
18　Q. What sorts of things would the managers talk to you
19　　about when they went over your performance?
20　A. Being punctual, appearance, uniform, being friendly
21　　to customers.
22　Q. Up-selling drinks?
23　A. No; just menu knowledge in general, trying to get
24　　your checks in general to be higher, offering

Page 7[9]

1　　appetizers and desserts and things.
2　Q. What are shooters at the Longhorn?
3　A. It's a shot.
4　Q. Are you familiar with the Bar Recipe Manual and the
5　　various drinks called shooters in the Bar Recipe
6　　Manual?
7　A. Yes.
8　Q. So not what are shots, but what are shooters? That's
9　　my question.
10　A. I believe they have more than one alcohol in them --
11　　layered shots, like B52 or things like that.
12　Q. While you were at the Longhorn, did you ever make any
13　　shooters for customers?
14　A. No, not that I recall.
15　Q. Did you ever see anyone make any shooters for
16　　customers at the Longhorn?
17　A. I don't recall.
18　Q. Were shooters described in Longhorn's menu while you
19　　worked there?
20　A. No.
21　Q. Did the Longhorn have a bar menu while you worked
22　　there, that is a list of drinks available to people
23　　at the bar?
24　A. They had the liquors listed and the beers listed,

Page 8[0]

1　　wines and Margaritas, but nothing with shooters on
2　　it.
3　Q. Let me ask you something. Tell me how, if you know,
4　　a Longhorn patron would be aware of the fact that the
5　　Longhorn offered shooters.
6　A. They asked.
7　Q. Do you understand shooters to be an expression that
8　　is not particular to the Longhorn Steakhouse
9　　restaurants?
10　A. Correct.
11　Q. Let me ask you the next question. If I'm a patron,
12　　as of September 26, 2003, who wants a shooter, how do
13　　you know what it's going to cost me to have the
14　　shooter, to buy the shooter from you?
15　A. I would have to say, "Give me a second and I'll ring
16　　it in and let you know."
17　Q. So as far as you know, there was no document
18　　delivered to patrons as of September 26, 2003 that
19　　informed the patron of what the shooter would cost?
20　A. No. There are never liquor prices. It's not
21　　restaurant practice.
22　Q. It's not family restaurant practice; is that what
23　　you're saying?
24　A. I don't know anywhere that puts prices next to

Page 81

1    drinks, but definitely not in a restaurant like a
2    Longhorn-type of place.
3        Most people are not coming in there to do shots
4    or have shooters.
5    Q. Can you tell me why several pages of the Longhorn Bar
6    Operations Manual are devoted to different shooters
7    by name?
8    A. I can't answer that. I did not write it.
9    Q. And if I came in and ordered a shooter but wanted to
10   know beforehand from you what it was going to cost as
11   of September 26, 2003, where would you go to get that
12   information?
13   A. To my computer.
14   Q. And your computer would tell you what it would be?
15   A. Once I rang it in, yes.
16   Q. But you never poured any shooter for any customer at
17   any time while you worked as a bartender at the
18   Longhorn; is that right?
19   A. As far as I recall, I did not.
20   Q. And you don't know of any advertising materials that
21   were available at any time that you worked at the
22   Longhorn encouraging customers to purchase shooters;
23   is that right?
24       MR. GILLIS: Objection.

Page 82

1    A. Correct.
2    Q. And you can't tell me, as you sit here today, the
3    price of any shooter; is that right?
4    A. Correct.
5    Q. Can you tell me the price of a twenty-five ounce beer
6    as of September 26, 2003?
7    A. I think it was like $4.10 with tax.
8    Q. It's your best memory that the names of the various
9    shooters described in the Longhorn Bar Operations
10   Manual are industry-wide names; is that right?
11   A. Yes.
12   Q. Do you remember ever having any conversations with
13   anyone at Longhorn management about trying to up-sell
14   shooters?
15   A. No.
16   Q. Did you ever, while you worked at the Longhorn,
17   suggest to a customer when that customer's first
18   drink was half full that the customer purchase
19   another round of drinks?
20   A. I would not say "half full"; at half full, no.
21   Q. Were you instructed, while you were at the Longhorn,
22   to follow the provisions of the Bar Operations
23   Manual?
24   A. Yes.

Page 83

1    Q. You expected to do that, didn't you?
2    A. Yes.
3    Q. That's Exhibit 2 to your deposition; is that right?
4    A. Yes.
5    Q. On page Bates stamped 693 about halfway down, it's
6    "Delivering Appetizers."
7    A. Yes.
8    Q. The manual reads, "Sell a second round of drinks.
9    Always suggest another round when the first guest's
10   drink is half full."
11   A. Yes.
12   Q. Is that right? Have I read that correctly?
13   A. Yes.
14   Q. But you never did that; is that right?
15   A. No, because I had drink access right there, as you
16   stated earlier. I was at the bar. So it would take
17   me less time.
18   Q. This is the Bar Operations Manual. Are you telling
19   me that you never followed Longhorn procedure that
20   you always suggest another round when the first
21   guest's drink is half full?
22       MR. GILLIS: Objection.
23   A. I didn't always do that, no.
24   Q. Did you ever do it?

Page 84

1    A. I may have if it was very busy and I thought it would
2    be a while before I would get back with the drinks,
3    then yes, I would have.
4    Q. Stick on this page for a minute, okay? This page, by
5    the way, sets out the order in which Longhorn would
6    like its bartenders to interact with customers; is
7    that right?
8        MR. GILLIS: Objection.
9    A. Yes.
10   Q. It instructs you to ring the drink up first and then
11   make the drink order; is that right?
12   A. Yes.
13   Q. You're to deliver that drink with a smile within two
14   minutes; is that right?
15   A. Yes.
16   Q. And that's within two minutes of ordering; is that
17   right?
18   A. That's what it says.
19   Q. And then while you're delivering that drink, the
20   manual tells you it's a perfect time to sell an
21   appetizer; is that right?
22   A. Yes.
23   Q. And you're then instructed to -- this is now about
24   forty percent of the way down under "Delivering

Page 85

1   Appetizers," "with a smile after the order of the
2   appetizer to deliver it within three to five
3   minutes"; is that right?
4   A. Yes.
5   Q. And you're instructed that this is the time to
6   suggest another drink; isn't that right?
7   A. Yes.
8   Q. How much time has elapsed from when the customer
9   first sat down and placed the drink order to when the
10  appetizer has been delivered?
11      MR. GILLIS: You're asking her what she did or
12  what it says?
13  Q. What does this say?
14  A. In a perfect world in an empty restaurant where
15  everything comes on time, according to this it would
16  be seven minutes, but that never happens.
17  Q. But that's what the Longhorn strived for; is that
18  right?
19  A. Yes.
20  Q. So within seven minutes -- and it's actually five to
21  seven minutes, isn't it, of when the customer has sat
22  down and ordered the first drink, the Longhorn
23  bartender is instructed in this manual to suggest to
24  the customer that she or he order another drink; is

Page 8

1   sure that people drinking were consuming food with
2   it.
3       So where I would have indirect service through
4   the service bar, I would inquire and communicate with
5   waitresses and managers often.
6   Q. Often?
7   A. Yes. It's pretty much what you do when you're a
8   bartender.
9   Q. Is ask managers to check and see if customers should
10  have more drinks?
11  A. No; to make sure that people were eating, in general.
12  Q. This is something you were taught; is that right?
13  A. Yes; proper alcohol service.
14  Q. You were not taught that at J.R.'s?
15  A. There wasn't food at J.R.'s.
16  Q. You were not taught anything about alcohol service at
17  J.R.'s; isn't that right?
18  A. No; just basic laws. It was owned by police
19  officers.
20  Q. You were not trained at J.R.'s.
21  A. No.
22  Q. And you were not TIPS trained as of September 26,
23  2003; isn't that right?
24      MR. GILLIS: Objection.

Page 86

1   that right?
2   A. According to this, yes.
3   Q. Am I correct that you did not stir the Jack Daniels
4   Manhattans that you made on the evening of
5   September 26, 2003?
6       MR. GILLIS: Objection.
7   Q. Let's strike that. Did you stir the Jack Daniels
8   Manhattans that you made on the evening of
9   September 26, 2003?
10  A. No.
11  Q. Up to September 26, 2003, had you ever refused a
12  patron of the Longhorn Steakhouse a drink?
13  A. There was never a need to.
14  Q. So the answer is no, you never did?
15  A. Correct.
16  Q. Up to September 26, 2003, had you ever sought input
17  from management about whether or not a patron should
18  be served a drink?
19  A. Yes.
20  Q. When did you do that?
21  A. At any time that I felt that I needed to ask if they
22  were eating, just that it was my practice as a
23  bartender.
24      That was what I had always been taught, to make

Page 8

1   A. Yes.
2   Q. Is that true?
3   A. Yes.
4   Q. That's true, correct?
5   A. Yes.
6   Q. You were not TIPS trained; is that right?
7   A. Correct.
8   Q. You were not Bar Code trained as of September 26,
9   2003; isn't that right?
10  A. Yes.
11  Q. At some point in time despite that you were not TIPS
12  trained or Bar Code trained, you requested of
13  Longhorn that you become a trainer in proper alcohol
14  service procedures for Longhorn employees; is that
15  right?
16  A. They approached me, yes.
17  Q. But you were not TIPS trained at that time; isn't
18  that right?
19  A. Correct.
20  Q. And you were not Bar Code trained at that time; is
21  that right?
22  A. Correct.
23  Q. But someone at the Longhorn approached you about
24  yourself training other Longhorn trainees; is that

Page 89

1    right?
2    A. Yes.
3    Q. Who approached you?
4    A. The manager, Leigh.
5    Q. Leigh who?
6    A. I don't know her last name. I believe it's Bull,
7      B-u-l-l.
8    Q. Is she still at the Longhorn?
9    A. Not that Longhorn.
10   Q. She's at a different Longhorn?
11   A. Yes.
12   Q. Where?
13   A. I don't know.
14   Q. How do you know she's at a different one?
15   A. Someone told me she went to a different Longhorn.
16   Q. You don't know when?
17   A. No.
18   Q. What did she say to you when she asked you to become
19     a trainer?
20   A. She said, "Would you be interested in becoming a
21     trainer?"
22   Q. Anything else?
23   A. Not that I recall at that time.
24   Q. Okay, and up to that point, you had only worked at

Page 90

1      Whiskeys, J.R.'s and Longhorn; is that right?
2    A. Yes.
3    Q. And as of September 26, 2003, you had been working at
4      the Longhorn for a matter of a few months, more or
5      less; is that accurate?
6    A. Yes.
7    Q. Is that right?
8    A. Yes.
9    Q. You started in June or July of 2003; is that right?
10   A. Yes.
11   Q. Which was it?
12   A. I'm not sure exactly; the end of June or early July.
13   Q. And you had worked about a year before that at
14     J.R.'s; is that right?
15   A. Yes.
16   Q. And you had worked at Whiskeys before J.R.'s for a
17     period of months; isn't that right?
18   A. Yes.
19   Q. Like three or four months?
20   A. Yes.
21   Q. Most of the time you worked at Whiskeys had been as a
22     waitress as opposed to a bartender; is that right?
23   A. As a cocktail waitress.
24   Q. In fact, quantify for me, if you can, in terms of

Page 9

1      shifts how many shifts you worked at Whiskeys as a
2      bartender.
3    A. Not many.
4    Q. One?
5    A. I would say three or four, tops.
6    Q. Did you ever work at Whiskeys as a service bartender?
7    A. No.
8    Q. There was no need to have a service bartender at
9      J.R.'s; isn't that correct?
10   A. Correct.
11   Q. So the first service bartender experience you had in
12     your life was at the Longhorn; is that right?
13   A. Yes.
14   Q. Okay. As of September 26, 2003, how many nights had
15     you worked as a service bartender?
16       MR. GILLIS: Objection. I don't think it's been
17     establishment that anyone worked just at the service
18     bar.
19       She's already testified to that at length in the
20     first part of the deposition as to how they broke
21     that up.
22   Q. How many nights had you performed any service
23     bartending functions at the Longhorn, as of September
24     26, 2003?

Page 9

1    A. Every shift I worked, which was four nights a week.
2    Q. Which four nights of the week?
3    A. Tuesday, Wednesday, Friday and Saturday nights.
4    Q. You dropped Tuesdays very early on; isn't that right?
5    A. I did.
6    Q. How many Tuesdays did you work at the Longhorn?
7    A. I can't say.
8    Q. One?
9    A. More than one.
10   Q. How long was it after September 26, 2003, if you can
11     tell me, that Leigh Bull came to you and asked you to
12     become a trainer?
13   A. I don't recall.
14   Q. Weeks?
15   A. I have no idea.
16   Q. Was it before you were supposed to take the TIPS
17     test?
18   A. I'm not sure.
19   Q. You said, "Yes, I want to become a trainer;" isn't
20     that right?
21   A. Yes.
22   Q. And you undertook to train some Longhorn employees
23     after that; is that right?
24   A. After I went through training to become a trainer.

Page 93

1  Q. After you yourself went through training to become a
2     trainer; is that right?
3  A. Yes.
4  Q. So my question again to you -- I'm sorry if it seems
5     like I'm asking the same question over and over
6     again.
7        While you were at the Longhorn, did you ever --
8     this is up to September 26, 2003 -- did you ever ask
9     anyone for a second opinion about whether or not a
10    particular customer should be served a drink?
11       MR. GILLIS: Are you talking about people she
12    served directly?
13 A. People at the bar?
14 Q. Yes.
15 A. No.
16 Q. Because you felt you knew, based on your experience,
17    whether or not that person should have a drink; is
18    that right?
19 A. Yes.
20 Q. At any time up to September 26, 2003 while you were
21    working as a server, as a waitress, did you ever ask
22    a second opinion of anyone at the Longhorn about
23    whether or not one of your customers should be served
24    a drink?

Page 94

1        MR. GILLIS: Objection.
2  A. No.
3  Q. At any time up to September 26, 2003 while you were
4     working as a service bartender, did you ever ask of
5     anyone at the Longhorn for a second opinion about
6     whether or not a waitress's customer should have
7     another drink?
8  A. Yes.
9  Q. Under what circumstances did you ask for that second
10    opinion?
11 A. When I asked Chuck, that we have been talking about
12    all day.
13 Q. That was the first time you ever asked anyone at the
14    Longhorn for a second opinion about whether a
15    customer should have another drink?
16       MR. GILLIS: Objection.
17 A. A second opinion other than my own or the waitress?
18    I don't know where you're going with this.
19 Q. I'll be happy to ask the questions again. I'm happy
20    to go over the questions I have just asked you again,
21    but I'd rather not for all of our sakes.
22       So what I want to know is, other than the night
23    of September 26, 2003 when you spoke to Chuck, either
24    asking him to go check and then having another

Page 95

1     conversation with him after he checked or just asking
2     him if he had checked, did you ever while you were
3     serving as a service bartender, did you ever ask of
4     anyone at the Longhorn for a second opinion about
5     whether any customer at the Longhorn should be served
6     another drink?
7        MR. GILLIS: Objection.
8  A. I don't recall specifically.
9  Q. So is it your best memory, as you sit here today,
10    that the first time you had occasion to ask anyone at
11    the Longhorn for a second opinion about whether or
12    not a customer should be served another drink is the
13    night of September 26, 2003?
14       MR. GILLIS: Objection. That was not the
15    question you asked.
16       You keep changing the questions to make them
17    sound the same, and it's not fair to her.
18       If you want to ask the same question, she told
19    you already that she doesn't recall a specific
20    occurrence, but she never said that that was the
21    first time she ever asked anybody.
22       So ask the right question instead of putting two
23    little bits, two different ones to try to trick on
24    the question.

Page 96

1        MR. FARRAH: I'm not trying to trick her.
2        MR. GILLIS: Well, it sure seems that way from
3     the way you're asking the questions.
4  Q. Let me ask you this. Other than September 26, 2003
5     when you spoke to Chuck, up to that point, had you
6     ever asked anybody at the Longhorn for a second
7     opinion about whether any customer should be served
8     another drink?
9  A. I can't recall specifically.
10 Q. So is it your best memory that the first time you
11    asked anyone at the Longhorn for a second opinion
12    about whether or not a customer should be served
13    another drink was the night of September 26, 2003?
14       MR. GILLIS: Objection. That's the same thing.
15 A. I don't know. I already said I can't remember if
16    that was the first time.
17 Q. But you can't think of any other times?
18       MR. GILLIS: That's a different question.
19 A. But that doesn't mean it's the first time.
20       MR. GILLIS: If you want to ask her if she has a
21    memory of asking a supervisor prior to that date, she
22    could answer that question, but to say it was the
23    first time that she ever asked a manager is a
24    deceptive question.

Page 97

1  Q. You have no memory of prior to September 26, 2003
2     asking anyone at the Longhorn for a second opinion
3     about whether or not a customer should have another
4     drink; isn't that right?
5  A. Correct.
6  Q. All right, that's fine. That's all I want to know.
7        Had you been trained, up to that point at the
8     Longhorn, about in what circumstances it was
9     appropriate to ask for a second opinion about whether
10    or not a customer should have another drink?
11 A. It was on your own judgment.
12 Q. No training other than that?
13 A. All the training -- using that training and applying
14    your judgment. Most of it is common sense.
15 Q. Were you taught to deliver drinks to customers as
16    quickly as you could when you were acting as a
17    waitress?
18       MR. GILLIS: Objection.
19 A. There were time lines set in the training manuals,
20    but it was very difficult to stick with them. So we
21    would do the best we could.
22 Q. Was it a Longhorn policy as of September 26, 2003 for
23    servers to check with previous servers -- Leigh to
24    check with the bartender -- to determine how much a

Page 98

1     patron had had to drink up to that point?
2        MR. GILLIS: Under what circumstances?
3        MR. FARRAH: Under any circumstances.
4  A. For a waitress to ask the bartender?
5  Q. Yes.
6  A. About her own tables?
7  Q. About what persons coming to her own table had to
8     drink while they were at the bar.
9  A. If she felt a need to.
10 Q. It sounds like a good commonsense answer, but what I
11    want to know is, did Longhorn have a practice, a
12    procedure, a custom in place as of September 26, 2003
13    instructing waitresses to check with the bartender to
14    determine how much a particular customer coming to
15    sit at a table had had to drink at the bar before
16    coming to sit at the table?
17       MR. GILLIS: In every occasion?
18       MR. FARRAH: For any occasion.
19       MR. GILLIS: Under what circumstances?
20       MR. FARRAH: That's going to be part two of the
21    question.
22 A. You're asking if there was a set policy?
23 Q. Yes.
24 A. No.

Page 9

1  Q. Was there any instruction that you ever saw from
2     Longhorn to its waitresses, prior to September 26,
3     2003, under any circumstances to check with the
4     bartender to see what a customer had had to drink?
5  A. No.
6  Q. Can we agree that the principal purpose of the bar at
7     the Longhorn Steakhouse was to serve as a place where
8     customers are waiting tables to have a drink before
9     going to the table? This is a family restaurant,
10    isn't it?
11 A. Right. People ate at the bar, though.
12 Q. But people also had a drink or two at the bar before
13    they went to the table; isn't that right?
14 A. Some people may have had a drink at the bar, yes.
15 Q. When you were acting as a bartender working the bar
16    as opposed to a bartender acting as the service
17    bartender, you served more than one drink to
18    customers you knew ultimately went and had dinner at
19    the Longhorn restaurant; isn't that right?
20       MR. GILLIS: Objection. Under what
21    circumstances?
22       MR. FARRAH: Ever, ever.
23       MR. GILLIS: That's different than saying she
24    served two drinks to anyone.

Page 10

1        MR. FARRAH: Would you read back the question?
2        (Court reporter reads back question.)
3        (Off the record.)
4  Q. Have there been occasions when you were working as
5     the bartender, not the service bartender, at the
6     Longhorn, when you served more than one drink at the
7     bar to a customer who then went to the restaurant to
8     eat?
9  A. Yes.
10 Q. Have there been occasions when you were working as a
11    bartender, as opposed to a service bartender, at the
12    Longhorn and you served as many as three drinks to a
13    customer who then went to the restaurant to eat?
14 A. I can't say for certain, no, one way or the other.
15 Q. At any time while you worked as a bartender at the
16    Longhorn prior to September 26, 2003, did you ever
17    communicate to a waitress the number of drinks that
18    you had served at the bar to any customer who then
19    went to the restaurant to eat?
20 A. If I felt that there was a need to I would.
21 Q. Do you have a memory of ever doing it?
22 A. I don't have a memory of any specific time, no.
23 Q. Okay. At any time prior to September 26, 2003, did
24    you ever take a drink away from a customer because

Page 101

1    the customer was, in your opinion, not suitable to be
2    drinking?
3    A. No.
4    Q. Did you ever arrange safe passage home from the
5        Longhorn for an intoxicated person?
6    A. No.
7    Q. Did you ever have to call the police to the Longhorn
8        for any intoxicated patron?
9    A. No.
10   Q. Were the police ever called by anyone to the
11       Longhorn, to your knowledge, to deal with an
12       intoxicated patron?
13   A. Not to my knowledge.
14   Q. When you were acting as a bartender, how did you keep
15       track of the number of drinks that you had served to
16       a customer?
17   A. If they didn't have a tab, if they paid as they went,
18       I would keep track of it myself.
19   Q. In your head?
20   A. Yes.
21   Q. Not on paper?
22   A. No.
23   Q. Not by computer?
24   A. If they had an open check, then yes, by computer.

Page 102

1    Q. Was there only one station to which waitresses could
2        go to get drinks from the service bartender for their
3        tables?
4    A. Yes.
5    Q. We've already talked about where that was located.
6        So my next question to you is, other than sitting on
7        the stools that were arrayed around the bar as of
8        September 26, 2003 at the Leominster Longhorn, were
9        customers permitted to stand and have drinks at the
10       bar?
11   A. Yes.
12   Q. And were there times on busy nights when customers
13       standing at the bar were two and three deep?
14   A. No.
15   Q. Quantify for me, mindful of the fact that there are
16       fourteen stools shown at least on this exhibit around
17       the bar -- and exclude for me, if you will, at least
18       for the time-being, Tables 1, 2 and 3 -- and tell me
19       on a busy night how many people at the busiest point
20       would be sitting and standing in the bar area at the
21       Leominster Longhorn.
22   A. I would say no more than thirty.
23   Q. A little more than double the number of stools; is
24       that right?

Page 10

1        MR. GILLIS: Are you talking about standing and
2    sitting?
3        MR. FARRAH: Yes, standing and sitting.
4    Q. If we add in a two-top, a four-top and a two-top --
5        eight more -- we're talking at its busiest somewhere
6        around thirty-eightish customers in the bar area?
7    A. People sitting at Tables 1, 2 and 3 would eat there
8        and finish everything there and leave. They would
9        not sit there and then go to a table.
10   Q. The service bartender was responsible for Tables 1, 2
11       and 3; is that right?
12   A. When there were three bartenders on, yes, there would
13       be someone doing those tables.
14   Q. That would be the service bartender; is that right?
15       MR. GILLIS: Objection.
16   A. No.
17   Q. So at its busiest point, two bartenders would be in
18       charge of those persons sitting and standing at the
19       bar and Tables 1, 2 and 3 as shown on Exhibit 8; is
20       that right?
21       MR. GILLIS: Objection.
22   A. No.
23   Q. Who would be responsible to the patrons sitting and
24       standing at the bar and Tables 1, 2 and 3 at the

Page 10

1    busiest time?
2        MR. GILLIS: With two or three bartenders?
3        MR. FARRAH: With three bartenders.
4    A. With three bartenders, there would probably be one
5        person doing the bar, one person doing the tables,
6        one person doing the service, and the table person
7        would back up and help.
8    Q. The table person would help who?
9    A. The service bar or the main bar, whoever needed it --
10       if they needed food brought out or anything;
11       stocking, they could help.
12   Q. So at its busiest point, one bartender could be
13       serving as many as thirty customers -- those persons
14       sitting at and standing around the bar; is that
15       right?
16       MR. GILLIS: Objection. Solely or with backup?
17       MR. FARRAH: That's what I'm trying to figure
18   out.
19       MR. GILLIS: She already told you that they have
20   backup.
21   Q. Well, I understood that the nonservice bartender was
22       responsible for Tables 1, 2 and 3 and for backing up
23       the others; is that right?
24   A. Yes.

Page 105

1    MR. GILLIS: With two or three bartenders?
2    MR. FARRAH: Three bartenders -- all that was
3    going on, on September 26, 2003.
4  Q. And the bartender that backed up could do things like
5    take drink orders for patrons around the bar; is that
6    right?
7  A. Yes.
8  Q. Could that bartender who backed up also be making
9    drinks for the service bar at the same time that
10   someone else was making drinks for the service bar,
11   or would it get too crowded?
12 A. They could help with some things, but it is a small
13   area.
14 Q. Did you ever serve shots while you were a bartender
15   at the Longhorn?
16 A. Not that I recall.
17 Q. Do you know what I mean by a "shot"?
18 A. Yes.
19 Q. Not a shooter.
20 A. Yes, I know.
21 Q. Did the Longhorn have a limit on how many drinks it
22   would serve a patron on any one evening, that you
23   knew of?
24 A. No.

Page 106

1  Q. Did the Longhorn serve beer by the pitcher?
2  A. No.
3  Q. Am I correct that employees are not allowed to
4    consume alcohol while working?
5  A. Correct.
6  Q. Do you know whether the Longhorn had a manager
7    incident log or some similar document while you
8    worked there?
9  A. I don't know.
10 Q. Was there ever a time that you wanted to stop serving
11   alcohol to a customer and a manager at the Longhorn
12   overruled you?
13 A. No.
14 Q. Did you need management approval to stop serving
15   alcohol to a customer?
16 A. No.
17 Q. You never did it; is that right?
18 A. Right.
19 Q. How were you paid at the Longhorn? Did you get a
20   salary and tips?
21 A. Yes, hourly pay.
22 Q. Do you remember what your hourly pay was as of
23   September 26, 2003?
24 A. Six dollars, five.

Page 107

1  Q. That was when you acted as a waitress or a bartender?
2  A. No. $2.63 is currently minimum wage for waitresses.
3    I can't speak for 2003.
4  Q. $2.63?
5  A. Yes.
6  Q. And you waited from time to time; is that right?
7  A. Yes.
8  Q. Why was that?
9  A. Extra money.
10 Q. When you waitressed, were you paid $2.63 an hour?
11 A. Yes.
12 Q. Typically, how much can a good waitress earn in tips
13   for a night?
14 A. On a weeknight or weekend?
15 Q. Busy night.
16 A. Minimum, $100.
17 Q. What was the shift that a waitress worked at night?
18 A. They were staggered. The first one came in at 4:00;
19   the last one came in at 6:00.
20 Q. The ones that came in at 6:00 left when?
21 A. They closed.
22 Q. 11:00 on weekends?
23 A. Yes.
24 Q. Can you tell me, as you've used the expression in

Page 108

1    your earlier deposition -- Let's go to page 62 of
2    your deposition.
3      If you go to the beginning of 61, this is the
4    conversation you had with Patty.
5      You answered on page 62 on line 4, "I don't know
6    where the information came from, and I just kind of
7    brushed it off."
8      Do you remember what information you were
9    talking about?
10 A. When she said that she heard there was an accident.
11 Q. You can't think of anything else that she said, other
12   than there was an accident with that group of guys;
13   is that right?
14 A. No.
15 Q. You don't remember her saying, "That group of guys
16   was drunk"?
17 A. No, nothing like that. Before she said, "Remember
18   the Manhattans you made," and then I said "Oh, yes,
19   the people at Leigh's table."
20 Q. How did she know that you made Manhattans for these
21   people?
22   MR. GILLIS: Objection.
23 A. Because she was there that night with me working.
24   MR. GILLIS: If you know. If you don't know,

Page 109

1   don't guess.
2   A. I can't speak for Patty. You probably have to ask
3   Patty that.
4   Q. To your knowledge, did anyone from Longhorn go over
5   to that table at any point in time that night and say
6   to the people at that table, "You're loud. Quiet
7   down," or words to that effect?
8   A. Not that I know of.
9   Q. Then a little further on in your answer you say
10  there -- this is line 7 -- I asked you, "What did you
11  say?" Your answer is, "That seems odd."
12  What seemed odd to you?
13  A. That someone got in an accident because no one left
14  there visibly intoxicated to me.
15  Q. So had Patty said something to you about that these
16  people were drunk or words to that effect?
17  MR. GILLIS: Objection.
18  Q. When she described it to you.
19  A. She just said she heard there was an accident. That
20  was it.
21  Q. But it's not odd that someone who was a restaurant
22  patron got into an accident, is it? That's was not
23  what you were responding to was odd, was it?
24  A. No. I don't recall exactly.

Page 110

1   Q. What Patty and you were talking about was that the
2   driver was alleged to have been intoxicated; isn't
3   that right?
4   MR. GILLIS: Objection.
5   A. Yes.
6   Q. What you said to her in effect was, "That's odd. I
7   don't recall anyone leaving here visibly
8   intoxicated," or words like that; isn't that right?
9   A. Correct.
10  Q. You were surprised that there was such a claim that
11  the driver was intoxicated; is that right?
12  A. Yes.
13  Q. Because you had not seen anybody visibly intoxicated;
14  is that right?
15  A. Correct.
16  Q. What do you mean by "visibly intoxicated"?
17  A. Someone appearing to be intoxicated, appearing drunk.
18  Q. Falling down?
19  MR. GILLIS: Objection.
20  Q. Is that one of the elements of "visibly intoxicated"
21  as you view it?
22  A. I would say someone falling down would be a red zone,
23  would be past that.
24  Someone appearing to be loud or staggering or

Page 11

1   anything of that nature, that's what I would mean by
2   "visibly intoxicated."
3   Q. Loud is an element of "visibly intoxicated;" is that
4   right?
5   MR. GILLIS: Objection.
6   A. Yes.
7   MR. GILLIS: Under what circumstances?
8   MR. FARRAH: Her definition. These are her
9   words -- "visibly intoxicated."
10  MR. GILLIS: She's saying that is one of the
11  elements. Nobody asked yet is that present in every
12  single person.
13  Are you asking what elements people show that
14  would lead you to that, or are you asking what does a
15  person have to show in every single circumstance?
16  MR. FARRAH: I'm asking what she means and
17  what she meant by "visibly intoxicated."
18  MR. GILLIS: Under what circumstances?
19  MR. FARRAH: Under the circumstances of that
20  night.
21  Q. September 26, 2003, you told Patty and you have
22  testified that no one appeared visibly intoxicated to
23  you at that table; is that right?
24  A. In the restaurant; no one in the restaurant.

Page 11

1   Q. What I want to know is, without making a big deal out
2   of it, tell me all the things that visibly
3   intoxicated means to you.
4   A. Difficulty walking, any swaying, if someone falls
5   asleep at their table or things like that, obvious
6   signs.
7   Q. Anything else?
8   A. In addition, people being loud, changes in speech
9   patterns, everything that I said previous.
10  Q. Anything else?
11  A. No.
12  MR. FARRAH: Just give me a second.
13  (Off the record.)
14  Q. Just describe for me, if you can, instances where on
15  a night where three of you were working as bartenders
16  on Friday or Saturday night, a person who was working
17  as a service bartender would stop doing that for some
18  period of time.
19  What would trigger that, other than having to go
20  to the bathroom?
21  A. If they were going to have a cigarette, if they were
22  going to make a phone call -- anything. If they were
23  helping run food to the people sitting at the bar
24  because they were right there in the kitchen.

Page 113

1  Q. Correct me if I am wrong. On a busy Friday night,
2     like September 26, 2003, the need for the service
3     bartender to be making drinks for the waitresses was
4     virtually nonstop; isn't that right?
5         MR. GILLIS: Objection. There's been no
6     evidence whatsoever that there was the situation on
7     that specific evening.
8         She's testified that most Friday nights were
9     like that but not that specific night.
10 Q. Was Friday night, September 26, 2003, a typical, busy
11    Friday night in the fall of the year?
12 A. As far as I recall, yes.
13 Q. Straight-out or flat-out I think you testified to the
14    first day.
15        MR. GILLIS: Objection. Where is that
16    testimony?
17 A. I believe I said I don't recall it being that way.
18        MR. GILLIS: I don't think she ever testified on
19    this night that it was flat-out all night long.
20 Q. Was it flat-out, best as you can recall, between 7:00
21    and 10:00 on this Friday night, September 26, 2003?
22        MR. GILLIS: If you remember.
23 A. Typical Friday night, busy. I don't recall it being
24    abnormally busy. Fridays are generally busy.

Page 114

1  Q. What I want to know is during a normally busy Friday
2     night in the fall of 2003, was the need for a service
3     bartender to serve drinks, make drinks and get drinks
4     to the waitresses a constant need?
5         MR. GILLIS: Objection.
6  Q. Not the best question ever asked, but see if you can
7     answer.
8  A. I would not say it was constant. It was busy. It's
9     not a constant thing, not spewing tickets all night,
10    but you're busy.
11 Q. So is it accurate to say that of the three
12    bartenders, the service bartender is the busiest
13    bartender on a typically busy Friday night?
14        MR. GILLIS: Objection.
15 A. No.
16 Q. Or is everybody equally busy?
17 A. It all depends if you have people eating a lot at the
18    bar. It all depends.
19 Q. Do you have any memory of anybody spelling you? By
20    "spelling" I mean relieving you from your duties --
21    your service bartender duties -- the night of
22    September 26, 2003?
23        MR. GILLIS: Objection.
24 A. No, I don't recall.

Page 11

1  Q. Did you smoke back then?
2  A. I did.
3  Q. You've stopped since then, or else you'd be dying to
4     have a cigarette.
5  A. It's been two years, but I'm dying.
6         MR. FARRAH: But not to have a cigarette. I
7     don't think I have any more questions. Give me one
8     second.
9         (Off the record.)
10 Q. I don't want to know what you said, but do you know
11    who Ben Wilson is?
12 A. The name doesn't trigger anything with me.
13 Q. A Rare employee named Ben Wilson, did you ever hear
14    of him?
15 A. No.
16 Q. Manager of Risk Administration at Rare, did you ever
17    hear of that title?
18 A. It doesn't trigger anything with me.
19 Q. Have you ever spoken to Ben Wilson?
20 A. I'm going to say yes since you're asking me.
21        MR. GILLIS: No. If you don't know, don't
22    guess.
23 A. No. I can't say.
24        MR. GILLIS: If you know the answer, give the

Page 11

1     answer.
2  A. I don't know.
3  Q. Is Patty's last name Kreidler? Does that ring a
4     bell?
5  A. Yes, something along those lines.
6         MR. GILLIS: Don't guess.
7  A. I don't know.
8  Q. I'm going to ask you some names. Tell me whether you
9     know any of these people.
10        Jeffrey Southworth, do you know him?
11 A. Know him personally?
12 Q. Yes.
13 A. No.
14 Q. How about Jude Connolly? Do you know him?
15 A. No.
16 Q. Scott Espy?
17 A. No.
18 Q. Thomas Scott Espy?
19 A. No.
20 Q. Michael Espy?
21 A. No.
22 Q. William Todd Curry?
23 A. No.
24 Q. Bruce Sirjane?

Page 117

```
1    A. No.

2    Q. Matt Cenicola?

3    A. No.

4        MR. FARRAH:  Okay.

5

6        (Whereupon, the deposition was concluded at

7        2:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page

```
1            C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    COUNTY OF MIDDLESEX, SS

4

5        I, BARBARA J. SIMON, a Professional Shorthand
     Court Reporter and Notary Public in and for the
6    Commonwealth of Massachusetts, do hereby certify that
     the foregoing deposition of Kristin O'Donnell, was
7    taken before me on Wednesday, December 28, 2005.  The
     said witness was satisfactorily identified and duly
8    sworn before the commencement of her testimony; that
     the said testimony was taken stenographically by
9    myself and then transcribed by myself.  To the best
     of my knowledge, the within transcript is a complete,
10   true and accurate record of said deposition.

11       I am not connected by blood or marriage with any
     of the said parties, nor interested directly or
12   indirectly in the matter in controversy.

13       In witness whereof, I have hereunto set my hand
     this 4th day of January, 2006.

14

15

16

17       _____
         Barbara J. Simon, Notary Public
18       My Commission Expires:
         November 6, 2009

19

20

21

22

23

24
```

Page 118

```
1        SIGNATURE PAGE/ERRATA SHEET

2    RE: Nancy Rosario, Individually, as she is the
         Administratrix of the Estate of Awilda Santiago,
3        Essex Probate Court Docket #03P-2499AD1,
         P/P/A Veronica Rosario and Christina Santiago,
4        and as she is the Administratrix of the Estate
         of Jose Santiago, Berlin (Connecticut) Probate
5        Court, Case #03-0713

6    December 28, 2005
     Deposition of Kristin O'Donnell

7

8        I, KRISTIN O'DONNELL, do hereby certify that I
     have read the foregoing transcript of my testimony
9    and further certify that it is a true and accurate
     record of my testimony (with the exception of the
10   following changes listed below):

11   Page    Line         Correction

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21       Signed under the pains and penalties of perjury

22   this _____ day of _____, 2006.

23

24            _____
                  Kristin O'Donnell
```

9

JUDE CONNELLY, Sworn.

Q. (MacDougall.) Good morning, Mr. Connelly. In a loud,
   clear voice could you please introduce yourself to the
   grand jury.

A. Hello. My name is Jude Connelly.

Q. Spell your first and last name, sir.

A. J-u-d-e C-o-n-n-e-l-l-y.

Q. Mr. Connelly, how old are you?

A. I'm 18.

Q. Where do you live, sir?

A. I live in Harvard, Mass.

Q. How long have you lived in Harvard, Mass.?

A. I've lived in Harvard since 1999.

Q. Sir, do you know an individual named Jeffrey
   Southworth?

A. Yes, I do.

Q. How do you know him?

A. Well, I dirt-bike with him a lot, and I know him from
   dirt-biking and dirt bike racing in particular.

Q. When you say you dirt-bike with him, what do you mean
   by that?

10

A.   We race-- we race and we train together.

Q.   Is there a number of people that train together in the
     Harvard area?

A.   Yes.

Q.   How long have you known Jeffrey Southworth?

A.   At most a year.

Q.   Sir, drawing your attention to Friday, September 26th
     of this year, do you remember that day?

A.   Yes.

Q.   Were you with Jeffrey Southworth on that day?

A.   Yes.

Q.   When did you first come to come in contact with Mr.
     Southworth on September 26th?

A.   I was previously out dirt-biking in Templeton,
     Massachusetts, and he came out to meet me later, and
     we were going to practice.

Q.   Is there a particular area in Templeton that is set up
     to practice dirt-biking?

A.   Yes.

Q.   Where is that?

A.   It's near the landfill in Templeton.  There's a sand
     pit and there's also-- we actually know a few people

11

from the Harvard area who own land that have actual
tracks set up there.

Q. What time did you first run into Jeffrey Southworth at
the sand pits in Templeton?

A. In the time of I would say five o'clock to 5:30.

Q. How did you get to Templeton?

A. I went with another friend, who dirt-bikes, from the
area, and he actually had to leave because he had to
go take his kid-- he had to go pick up his kid.

Q. So you had gotten a ride there and then your ride
left?

A. Yes, yes.

Q. Do you know how Mr. Southworth got to Templeton?

A. Yes.

Q. Did you see him arrive?

A. No.

Q. How do you know how he got there?

A. Well, he came with-- he came with this other person
Scott.

Q. Was that Scott Espey?

A. Yes, that's Scott Espey.

12

Q. Did they both arrive at about five o'clock or shortly
    after five o'clock?

A. Yes.

Q. Were any of you eating or drinking while you were
    dirt-biking?

A. No, besides water.

Q. How long did you dirt bike for?

A. Until like it was dark.  I mean, I can't quite
    remember the time it gets dark, some time between six
    and seven.

Q. When it became too dark to dirt bike, you stopped?

A. Yes.

Q. At that point who else is there?

A. At that point it was myself, Jeff, and Scott.

Q. By Jeff do you mean Jeff Southworth?

A. Yes, and Scott Espey.

Q. How old is Jeff Southworth, if you know, is he older
    than you?

A. Yes, he's older than me.

Q. At some point did you leave that area in Templeton?

A. Yes.

Q. What time was that?

13

A.    I believe around eight or shortly after.

Q.    Who left that area together?

A.    I left with Jeff Southworth and Scott Espey.

Q.    How did you leave?

A.    We left in a truck that Jeff had rented.

Q.    What kind of a truck was it?

A.    It was a Dodge Dakota, I believe, a green one.

Q.    Did you have equipment with you-bikes and other
      equipment for dirt-biking?

A.    Yes.

Q.    Where did that equipment go?

A.    Well, one of the persons that I was with actually took
      my equipment, and the rest of the equipment--Jeff's
      equipment and Scott's equipment--went with us.

Q.    What kind of--  in terms of a pickup truck, did it
      have a cab that could seat two, three?

A.    It had like four normal car doors, so I would say it
      could fit five people.

Q.    In addition to the three of you human beings, were
      there any other creatures with you?

A.    Yes, there were two dogs.

Q.    Whose dogs were those?

14

A.    Those were Jeff's.

Q.    What kind of dogs were they?

A.    They were Rottweilers.

Q.    Where did they travel; did they travel in the back or
      did they travel in the passenger compartment?

A.    They traveled in the back.

Q.    Where did you go from Templeton, the three of you?

A.    We went to in Leominster, Massachusetts the Longhorn
      Bar and Grill, The Longhorn something, Veal
      House/Steakhouse.

Q.    Who drove from Templeton to Leominster?

A.    Scott did.

Q.    Scott Espey?

A.    Yes.

Q.    When you arrived at the Longhorn, was it the Longhorn
      Steakhouse?

A.    Well, I know it's the Longhorn something. I don't
      remember specifically.

Q.    When you arrived at the Longhorn, did you meet anyone
      you knew there?

A.    Not right away, but we called a few people to come
      down and meet us there, yes.

15

Q.   With respect to calling people, do you have a cell

     phone?

A.   Yes, I did.

Q.   What is your cell phone number?

A.   My cell phone number is (978) 239-6954.

Q.   Do you know whether Jeff Southworth had a cell phone

     on him that day?

A.   Yes, he did.

Q.   Did Scott Espey have a cell phone with him?

A.   Yes, he did.

Q.   Did you have either or both of their cell phones in

     your cell phone?

A.   Yes, I did.

Q.   What time would you say that you met up with these

     other people at the Longhorn?

A.   Shortly after nine o'clock.

Q.   How many people were there total by the time all of

     you were there?

A.   There were six people.

Q.   There was you?

A.   (Witness nodding.)

16

Q.    Jeff Southworth?

A.    (Witness nodding.)

Q.    Scott Espey?  Who were the other people?

A.    I'm sorry, I'm wrong there were seven people.

Q.    Who were the other people?

A.    I don't know specifically all of their names. I know
      Scott Espey's brother Michael Espey was there, another
      person by the name--that lives in Harvard, his name is
      Todd Currie, and the other two they were visiting from
      Vermont or somewhere.  Mike Espey was familiar with
      them.

Q.    Were they friends of Mike Espey's from out-of-town?

A.    Yes.

Q.    At some point did you all sit down for dinner?

A.    Yes.

Q.    Now, when you were waiting for dinner, what part of
      Longhorn did you wait in?

A.    Well, we originally had to wait for seating, so we
      waited over in the bar area; and after we had been
      seated, we all moved over to our table.

Q.    When you were waiting in the bar area, was anyone
      drinking?

17

A.   Yes.

Q.   Who was drinking?

A.   Everybody but me.

Q.   So six of them other than you?

A.   Yes.

Q.   Specifically with respect to Jeff Southworth, was he

     drinking in the bar area?

A.   Yes.

Q.   Do you remember what he was drinking?

A.   He was drinking beer.

Q.   Do you remember what kind of beer?

A.   It was in a mug so it was on tap.

Q.   So you saw him with a mug?

A.   Yes.

Q.   Was it a regular 12 ounce mug or was it a larger one

     than that?

A.   I would say, yeah, it was over 12 ounces, I would say.

Q.   When you were seated, once your table was available,

     do you know if you checked out at the bar or did the

     tab move to the table?

A.   I'm pretty sure we checked out at the bar, yeah.

Q.   Once you sat down at the table, did people order food?

18

A.  Yes.

Q.  Did people also order additional rounds of drinks?

A.  Yes.

Q.  What was Jeff Southworth drinking at the table?

A.  He was also drinking beer later, and he also had a
    drink.  I'm not specific on the name, but I know that
    it has Jack Daniels in it.

Q.  Could it have been a Manhattan?

A.  Yes.

Q.  Was there a cherry in the drink?

A.  Yes.

Q.  Were other people drinking those same drinks in
    addition to Jeff Southworth?

A.  Yes.

Q.  Was that the main drink at the table?

A.  Well beer was, I would say, over that drink.

Q.  As you sat at the table, did everyone continue to
    drink other than you?

A.  Yes.

Q.  How long were you at the Longhorn?

A.  We were there until it closed, which I believe was 11
    o'clock, so until around 11 o'clock.

19

Q. At that point did you all pay for everything you had--
your meals and your drinks you had at the table?

A. Everyone except me. Jeff paid for me.

Q. Fair to say he paid cash?

A. Yes.

Q. Or you all paid cash, I understand you didn't pay
cash.

A. Yes.

Q. When you left the table, were there any drinks left on
the table that had not been consumed?

A. I don't believe so.

Q. Did you continue to pay any attention to what Jeff
Southworth was drinking during the course of dinner?

A. Not specifically. I sat across the table from him not
directly but at a diagonal, and I mean, I noticed what
he was drinking, but I didn't like, you know, keep a
count specifically.

Q. What do you believe Jeff Southworth had to drink at
the table that night?

A. I would say that he had probably two to three beers
and a couple Manhattans. I would say he had two, maybe
three. I can't specifically recall.

20

Q.   At any point did you notice any changes in Jeff

Southworth as a result of what he was drinking?

A.   Not in particular, no.

Q.   When you left the Longhorn, how did you leave?

A.   We left in the same truck that we came in.

Q.   Were the same three people in that truck?

A.   Yes.

Q.   Who was driving at that point?

A.   Scott Espey was still driving.

Q.   The dogs still in the truck?

A.   Yes.

Q.   Did you to leave as a group, meaning all seven of you

that had been at dinner?

A.   Yes.  We had two cars.

Q.   So the other four of them were in a second car?

A.   Mm-hmm.

Q.   Where did you go from the Longhorn?

A.   We left the Longhorn, and we went to the hotel that

the two other people from out of town were staying at

in Fitchburg.  I believe it's called the Four Seasons.

Q.   That was also in Fitchburg, Massachusetts?

A.   Yes.

21

Q.   When you went to the hotel, did you go to a room?

A.   Yes.

Q.   Was that the room that the two friends of Mike Espey

were staying in?

A.   Yes.

Q.   Were all seven of you at this point in the room?

A.   Actually, we weren't in the room.  We were right

outside the room.

Q.   Inside or outside?

A.   Outside.

Q.   Outside the room but inside or outside?

A.   Inside the hotel, right in the corridor next to the

room.

Q.   How long did you stay in that area?

A.   I would say 15 to 20 minutes, not very long.

Q.   What were you doing during that 15 to 20 minutes?

A.   Well we were waiting for a few of the kids--  the kid

that were from out of town were waiting to hear from

another friend.  They were going to meet up with him

later on in Fitchburg.

Q.   At some point did you all leave that hotel?

A.   Yes, we did.

22

Q. Now, during that fifteen to twenty minutes you were

waiting outside the room, was anything eaten or had to

drink by anybody?

A. Yes.

Q. What was that?

A. Beer.

Q. Who was drinking beer?

A. Everyone was drinking beer besides me.

Q. Specifically was Jeff Southworth drinking beer?

A. Yes.

Q. Do you remember what kind of beer that was?

A. I believe it was Bud Light or something light, I know

that.

Q. Was he drinking it out of a can or a bottle?

A. A can.

Q. Do you know where that Bud Light or whatever it was

had come from?

A. I don't specifically.

Q. During the time that you were in Jeff Southworth's

truck, did you at any time notice a cooler?

A. I did not.

Q. So you didn't see a cooler in Jeff's truck anywhere?

23

A.  No.

Q.  So you said-- how many beers do you believe Jeff Southworth drank during that 15 to 20 minutes you were at the hotel?

A.  I would say only one.

Q.  How did you leave the hotel?

A.  We left once again in the truck that we came in.

Q.  Were the other four in the other vehicle?

A.  No.  Actually we had one of the others, so there were three in the other vehicle, and we had one other.

Q.  Do you remember who that was, was that one of the people from New York or someone you knew?

A.  That was Mike Espey.

Q.  So it was you, Mike Espey, Scott Espey, and Jeff?

A.  Yes.

Q.  Who drove from the hotel?

A.  Scott did.

Q.  Where'd you go?

A.  We went to The Other Side in Fitchburg.

Q.  What kind of establishment is The Other Side?

A.  It's a men's entertainment bar.

Q.  Is it a strip club?

24

A.   Yes.

Q.   When you got to The Other Side, did you stop the car;
     did Scott stop the car?

A.   Yes.

Q.   Did you all go in?

A.   No, we didn't.  We dropped off Mike Espey with the
     other three that had gone in the other car; and the
     three of us, Scott Espey, Jeff Southworth, and I
     decided that we weren't going to go in and that we
     were going to go home.

Q.   In order to go home what did you do?

A.   Scott drove Jeff and I to Littleton, Mass. so we could
     pick up Scott's truck.

Q.   Do know where Scott's truck was?

A.   It was at an apartment or condominium complex off the
     side of-- off 495 right in Littleton. I believe it's
     called Pondview.

Q.   Had he just left his truck there for convenience or
     did he know someone there, or do you know why Scott
     Espey's truck was at that location?

25

A.   He left it there out of convenience, but also he has a

relative, I believe it's his grandmother who lives

within the complex.

Q.   Where does Scott Espey live?

A.   He lives in Harvard, Mass.

Q.   You indicated you also live in Harvard?

A.   Yes.

Q.   Where does Jeff Southworth live?

A.   He lives New Hampshire.

Q.   Did he used to live in Harvard?

A.   Yes.

Q.   But currently he lives in New Hampshire?

A.   Yes.

Q.   When you got to the Pondview Apartments in Littleton,

what happened?

A.   First we unloaded all my stuff—well, what I had left

of my stuff, and Scott leaves his stuff usually with

Jeff.  So we got our stuff out, and you know, got it

off the truck and Jeff left, and we went over and put

my stuff in Scott's truck.

Q.   I'm just going to stop you for one second.  When you

say Jeff left, how did Jeff leave?

26

A.    He drove out of there in the Dakota.

Q.    That was the truck you indicated he had rented?

A.    Yes.

Q.    Who was with Jeff Southworth when he left?

A.    Only his two dogs.

Q.    At this point are the dogs in the back or are they in the passenger compartment?

A.    Well, I mean, they were always inside the truck.  They weren't in the bed of the truck, but they were in the back.

Q.    Now, you said you were putting your stuff in Scott Espey's truck?

A.    Yes.

Q.    Was Scott Espey going to give you a ride home?

A.    Yes.

Q.    What was the next thing that happened?

A.    Well, we realized that we did not--  Scott didn't have the keys, he left them in Jeff's truck, so we called him on the cell phone.

Q.    Do you know what time it was at this point, Mr. Connelly?

27

A.    When we first called him, I would say it was around

      1145.

Q.    Who called him, if you know?

A.    I did.

Q.    Were you able to reach him?

A.    Yes.

Q.    What, if any conversation, did you have with him at

      that time?

A.    Well, I told him that we did not have our keys, and we

      left them in the truck, and that he would have to come

      and turn around and give us the keys, and he agreed.

Q.    Did you talk to him once or more than once at that

      time?

A.    At that time we talked to him once.

Q.    During-- When you talked him at about 11:45, did you

      have any difficulty maintaining a signal when talking

      to him?

A.    Yes, yes.

Q.    So even though you had one conversation, did it

      involve calling him more than once?

A.    Yes.

28

Q.    You said you told him that he had the keys and he just

come back?

A.    Yes.

Q.    Did he indicate where he was at that time, how far he

had gotten?

A.    No.

Q.    Did he give you any estimate about how long it would

take him to get back?

A.    No, he didn't.  I assumed-- I mean, it was very

shortly after, within five minutes of him leaving, so

I assumed it would be five, maybe ten minutes.

Q.    At that point you were at the Pondview Apartments in

Littleton just off 495?

A.    Yes.

Q.    What happened after you hung up with Jeff after he

said he would come back?

A.    Well, Scott and I waited at the truck in Pondview

Apartments for about 15 to 20 minutes before realizing

that Jeff wasn't showing up, at which point we tried

calling him on the cell phone again.

Q.    Who called him this-  so now, it's around midnight, is

that fair to say?

29

A.    Yes.

Q.    Who called him?

A.    We both tried calling him.  You know, we really just

      wanted to get through to him and find out what was

      going on at that point.

Q.    Were you able to--  were either you or if you know

      Scott Espey able to reach him initially?

A.    One of us was.  I can't recall exactly which one, but

      we were able to reach him.

Q.    What, if anything--  did you specifically speak to him

      at that point?

A.    I cannot recall, I cannot.

Q.    At some point did you learn why he wasn't back there?

A.    Yes.

Q.    What did you learn?

A.    He said he was in an accident.

Q.    Did he say what kind of accident?

A.    No.

Q.    Did he indicate whether it was an accident by himself

      or with another vehicle?

A.    No, he did not.

Q.    Did he make any request of you or Scott Espey?

30

A.    He said, "I'm in an accident, come get me."

Q.    Did he tell you where he was?

A.    No.

Q.    Do you know if he told Scott Espey where he was?

A.    I don't believe so.

Q.    Did he indicate who was driving his vehicle at the time of accident?

A.    I believe it was him, but he did not indicate.

Q.    But when you had last saw him, he was the only one in his truck?

A.    He was driving, yes.

Q.    What's the next that happened, Mr. Connelly?

A.    Well, we had to break one of the windows in Scott Espey's truck, so we could get to his spare key. We got the spare key, and we decided, you know, we wanted to go see if he was all right; we were very worried about him. So we got on 495 north, and we drove up, you know, five/ten minutes, and we didn't see anything on the north side. But when we got in between I think it was right before Westford, we saw on the south side of 495 there was lots of police cars, and it looked like what would be an accident.

31

Q.   Who was driving the truck at that point?

A.   I was driving the truck.

Q.   Did you notice anything about the weather conditions

     or your ability to drive at that time?

A.   No, I did not.

Q.   Fair to say you were-- what speed were you traveling?

A.   I would say in the range of 60 to 70 miles an hour.

Q.   What, if anything, did you do as a result of seeing

     what looked like an accident scene on the southbound

     side of 495?

A.   We went to the next exit, which is Boston Road,

     Westford, and we turned around so we could head back

     down the south side of 495.

Q.   What, if anything, happened next?

A.   We drove right by the accident scene.  At that point

     we didn't know whether it was the accident scene or

     not, but we just assumed it was.

Q.   Did you see Jeff Southworth?

A.   No.

Q.   Did you see the truck, the Dakota?

A.   No, we didn't.

Q.   What, if anything, did you do next?

32

A.    We drove around again.

Q.    Meaning drove?

A.    Drove up 495 North and then turned around.

Q.    And turned back south?

A.    To see if we could see anything the second time.

Q.    Did you see anything the second time?

A.    No, we did not.

Q.    By this time what time was it?

A.    I would say it was around 12:45, getting towards 1 o'clock.

Q.    Did you have any further phone contact with Jeff Southworth?

A.    No.  We tried calling him several times, but we never got through to him after that one.

Q.    Did you get his voicemail or did you just not get through it all?

A.    We got his voicemail.

Q.    Did you leave him any kind of a message?

A.    I believe we did leave him one, if not two, messages.

Q.    At some point did you go home?

A.    Yes.

Q.    So you said you drove by the accident scene twice?

33

A.    Yes.

Q.    Didn't see Jeff?

A.    Yes.

Q.    Didn't see Jeff's truck?

A.    Yes.

Q.    Could you see any vehicles that appeared to be

involved in the crash?

A.    Not at all.

Q.    What did you see in terms of an accident scene?

A.    Well, we couldn't see much of anything.  I mean, it

must have--  It was in the woods.  What we could see

was just the side of the street.  They had--  I

believe it was just the fast lane for the traveling

cars and they had the other two lanes blocked off with

police vehicles and such for stuff.

Q.    So only the left lane was open on the southbound side?

A.    Yes.

Q.    What time did you arrive home?

A.    I arrived home around 1:30, maybe.

Q.    Did you have any further contact with Jeff Southworth

that night?

A.    No.

34

Q.   Have you had any contact with Jeff Southworth since
     then

A.   No, I have not.

Q.   Now, sir, you indicated that when you were at the
     Longhorn you didn't notice any changes in Jeff
     Southworth's demeanor.  At any time did you notice any
     changes in his demeanor?

A.   No.

Q.   Have you been with Jeff Southworth before when he's
     been drinking?

A.   Very rarely.

Q.   So have you ever seen Jeff Southworth when you
     believed him to be under the influence?

A.   No.

          MS. MACDOUGALL:  I have no further questions
     for this witness.  Do any of the grand jurors have
     questions for this witness?

          (Witness Excused.)



*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

**EDWARD A. FLYNN**
*SECRETARY*

**COLONEL THOMAS J. FOLEY**
*SUPERINTENDENT*

**Collision Analysis and Reconstruction Section**
**485 Maple Street**
**Danvers, MA 01923**
**978.538.6065**

To:     **Lieutenant Stephen R. Benanti**
            **Commanding Officer, C.A.R.S.**

From:   **Trooper Kerry A. Alvino #1374**

Subject:  **Two Vehicle Rear-End Double Fatal Collision**

Sir,

**01.**       The following reconstruction report summarizes an investigation conducted at the request of and in conjunction with the MA State Police A-3 Concord Barracks. The scope of this Trooper's involvement was limited to the reconstruction of the collision.

## SYNOPSIS

**02.**       It should be noted that the following synopsis is nothing more than a brief outline or general summary of the facts surrounding the events that occurred on Saturday, 27 September 2003 at approximately 0010 hours. This synopsis should not be considered a factual report of what actually transpired, but rather be employed to gain an overview of what occurred. The purpose of this synopsis is to assist the reader of this report in understanding the kinematics of the collision delineated here.

**03.**       On Saturday, 27 September 2003 at approximately 0010 hours, **Jose A. Santiago**, H/M, DOB 4-19-70, OLN [MA] 584834267 (status "suspended" as of 12-12-94), of 112 Beaver Street in New London, CT was traveling on Route 495 SB in the town of Westford. He was operating a 1993 Honda Accord bearing PA registration FCF5450 (hereinafter referred to as the "Honda" or the "Accord"). The Honda is owned by Luz I. Diaz of 831 Elm Street in Reading, PA. Mr. Santiago had the following four passengers in the Honda:

     1. Julia M. Schmidt, DOB 3-25-80, of 86 Gold Street, 1st floor, in New London, CT, the girlfriend of Jose Santiago, was seated in the right front passenger seat.

     2. Christina Santiago, DOB 5-23-91, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the right rear passenger seat.

1

      3. Awilda Santiago, DOB 6-16-90, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the middle rear passenger seat.

      4. Veronica Rosario, DOB 5-16-92, of 5 Washington Street in Lawrence, MA, the daughter of Jose Santiago, was seated in the left rear passenger seat.

Mr. Santiago had picked his three daughters up in Lawrence and was taking them to his home in Connecticut to spend the weekend with them.

**04.**      Simultaneously, **Jeffrey T. Southworth**, W/M, DOB 1-13-81, OLN [MA] S78712050 (status "suspended"), of 171 Gates Street in Portsmouth, NH was traveling on Route 495 SB in Westford. He was operating a 2003 Dodge Dakota bearing NH registration 1506670 (hereinafter referred to as the "Dodge" or the "Dakota" or the "pick-up"). The Dodge is owned by Enterprise Rent-a-Car of Boston, Inc. out of 6 Perimeter Road in East Londonderry, NH. Except for his two dogs, Mr. Southworth was alone in the pick-up. Located in the bed of the Dodge were two motorized dirt bikes along with protective riding gear in a duffle bag. Mr. Southworth has ties to the Harvard, MA area, and it is possible that is where he was headed.

**05.**      According to a witness, in the area of Route 495 SB south of Exit 32, Boston Road, Mr. Santiago's Honda was traveling at approximately 60-65 MPH in the center travel lane. Jeffrey Southworth was operating his Dodge at a very high rate of speed. He came upon the slower moving Honda and rear-ended the Honda most likely initially pushing the Honda to the left. Mr. Santiago steered right in an attempt to regain control of his Honda. The Accord entered a right bearing centripetal yaw and began to rotate in a clockwise direction as it veered to the right. The Honda left the travel portion of the roadway and entered the road shoulder. It is possible, in this area, that a secondary, minor collision occurred between the Honda and the Dodge as they crossed paths. One of the vehicles impacted a large Route 495 highway sign located on the road shoulder just off the edge of the asphalt. The sign stanchions were ripped from the ground, and the sign came to rest close to the tree line. The Honda continued rotating and sliding across the grassy shoulder. In the area of the tree line, approximately 40-50 feet from the edge of the road, the left side tires of the Honda dug into the grassy shoulder causing the vehicle to "trip". As the vehicle rolled into the woods, its roof was torn off. The occupants of the Honda were thrown from the vehicle. The Honda came to rest upright facing in a southwesterly direction approximately 20 feet into the woods. The occupants were scattered about the area around the Accord.

**06.**      Following the initial collision with the Honda, the Dodge also veered off towards the right road shoulder. It seems likely that in the area where the Route 495 Highway sign was impacted on the road shoulder, the right front tire of the Dodge came into contact with the left rear corner of the Honda in a minor secondary collision. The rear bumper cover of the Honda was found in this area with distinct tire rub marks on its left side that were made by the right front tire of the Dodge. The pick-up continued across the road shoulder and entered the wooded area approximately 100 north of the Honda. The right front portion of the Dodge impacted numerous small trees and

branches before the vehicle came to rest. The pick-up stabilized facing in a westerly direction approximately 5-10 feet into the woods.

07.          After the crash occurred, Julia Schmidt was the only conscious occupant of the Honda. She ran to the edge of the road and attempted to flag down passing motorists. Terry Essary, DOB 9-5-70, traveling southbound on Route 495 in Westford, stopped to assist. Mr. Essary observed Jeffrey Southworth emerge from the woods in the area south of the location of the Honda. He later saw Mr. Southworth talking with the occupant of a vehicle that pulled over to assist, It was later learned that Mr. Southworth was attempting to get a ride to flee the scene.

08.          Responding EMS personnel located Jose Santiago and his three daughters scattered about the area around their Honda. Jose Santiago and his daughter Awilda Santiago were pronounced dead at the scene. Christina Santiago was taken by ambulance to Children's Hospital in Boston with serious injuries. Veronica Rosario was initially taken to Lowell General then transferred to NE Medical Center with critical injuries. Julie Schmidt was transported by ambulance to Emerson Hospital in Concord with minor injuries. At approximately 0200 hours, personnel from the Office of the State Medical Examiner arrived on scene to transport the bodies of Jose and Awilda Santiago to their facility in Boston where autopsies were subsequently performed by Dr. Abraham Philip. The cause of death of Jose Santiago was listed as multiple injuries due to blunt trauma while the cause of death of Awilda Santiago was blunt trauma to the torso with a crushed spine. When police personnel arrived on scene, Jeffrey Southworth had fled the area. Upon the completion of the on-scene investigation, both vehicles were towed by Ferreira's Towing to A-Troop Headquarters in Danvers where they were secured for further examination.

09.          At approximately 0710 hours, Jeffrey Southworth was located at the Residence Inn on 7 Lan Drive (just off of Rte. 110 approximately 3 miles from the location of the crash) in Westford. He was placed under arrest by Tpr. Brad Kessel of the Concord Barracks. Mr. Southworth stated to Tpr. Kessel that he was in the Dodge when the crash occurred, but a friend was driving the vehicle at the time of the collision. Jeffrey Southworth was transported to A-3 for booking. Photographs of Mr. Southworth's injuries were taken by Sgt. Michael Holleran of the MSP Crime Scene Services Section at Devens. A search warrant to obtain a blood sample from Jeffrey Southworth was authorized by Judge Dilsday and obtained by Tpr. Kessel at approximately 1145 hours. Mr. Southworth was subsequently transported to Emerson Hospital where his blood was drawn by Carol Hood. The blood sample was transported to the MA State Police Crime Lab for chemical analysis.

## ROADWAY DESCRIPTION

10.          This collision occurred on **Route 495** in the town of Westford. Route 495 is a public way as defined under MGL C. 90, s. 01 that runs generally north and south. The locus of this collision was southbound approximately ½ mile north of Exit 31, Route 119. Here, the north and southbound sides of the roadway are separated by a treed and



# GABRIEL & SWEENEY
## COURT REPORTING

Transcript of the Testimony of:
# Nancy Rosario

In the Case of:
## Nancy Rosario
## vs.
## Rare Hospitality International, Inc., d/b/a Longhorn Steakhouse

Taken on:
## July 25, 2006

**Gabriel & Sweeney Court Reporting**
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton,  MA   01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321   Fax   (978) 263-0669
email:  gsreporting@yahoo.com

Page 97

1  Q. So just to go through the insurance, it's your
2     understanding that Mr. Santiago's vehicle that
3     your children were in that evening did not carry
4     insurance, correct?
5  A. That's correct.
6  Q. And what you know of Mr. Southworth's vehicle,
7     being a New Hampshire vehicle, there was no
8     insurance that paid for the medical bills for your
9     children, correct?
10 A. Yes.
11 Q. Okay. And do you have -- back in 19 -- excuse me.
12    Back in 2003, in September, when this accident
13    occurred, did you have any vehicles in your
14    household, either you or Mr. Garcia?
15 A. Yes. Mr. Garcia.
16 Q. He did -- what vehicle did he have back in
17    September of 2003?
18 A. He had a Toyota.
19 Q. Okay. Was it insured?
20 A. Not at the time.
21 Q. You've filed a separate lawsuit in Middlesex
22    Superior Court against Mr. Southworth and
23    Enterprise Rent-A-Car of Boston, correct?
24 A. Yes.

Page 98

1  Q. Okay. Have you received any insurance payments in
2     that case?
3  A. My lawyers know about that.
4        MR. ALBERT FARRAH: I can tell you on the
5     record.
6        MR. GILLIS: Sure.
7        MR. ALBERT FARRAH: The case has been
8     settled. There has been a total payment -- I
9     think it's part of the record in that case, if you
10    go to Middlesex. Total payment was $300,000 from
11    Jeffrey Southworth, and $35,000 from Enterprise
12    Rent-A-Car of Boston, Inc.
13       MR. GILLIS: Okay. So as far as
14    collateral sources to this point, there's no PIP?
15       MR. ALBERT FARRAH: No PIP.
16       MR. GILLIS: There's no under insurance?
17       MR. ALBERT FARRAH: (Shakes head side to
18    side.)
19       MR. GILLIS: And there's a total paid out
20    in the other lawsuit of $335,000, correct?
21       MR. ALBERT FARRAH: Correct.
22       MR. GILLIS: And is that lawsuit now --
23       MR. ALBERT FARRAH: Dismissed.
24       MR. GILLIS: -- dismissed?

Page 99

1        MR. ALBERT FARRAH: And Southworth is
2     released.
3        MR. GILLIS: And Southworth is released.
4  Q. Other than the payments in that lawsuit, have you
5     received any money whatsoever concerning this
6     accident, from any source?
7        MR. ALBERT FARRAH: And the SSI, the
8     survivor's benefits.
9        MR. GILLIS: Okay.
10 Q. Other than the survivor benefits?
11 A. No, no.
12 Q. And as far as insurance is concerned, while we're
13    on this issue, maybe you can -- are there any
14    liens outstanding in this case? Or were they all
15    resolved in the first place?
16       MR. ALBERT FARRAH: Neighborhood Health
17    Plan still has a lien for approximately 40 or
18    $50,000. I can get you a copy of the settlement,
19    if you want.
20       MR. GILLIS: And was there a settlement
21    petition filed in the Middlesex court for a minor?
22       MR. ALBERT FARRAH: I'm sorry? Yes,
23    settlement for a minor. A GAL was appointed.
24       MR. GILLIS: Who was the GAL appointed?

Page 100

1        MR. ALBERT FARRAH: John Fitzgerald.
2        MR. GILLIS: I know it's quarter past 12.
3     Maybe it's a good time to take a break?
4        MR. ALBERT FARRAH: Lawyers do that all
5     the time. I think that's a great idea.
6        MR. GILLIS: Let's go off the record.
7        THE VIDEOGRAPHER: The time is 12:14.
8     This is the end of Cassette Number 1. We are off
9     the record.
10       (Discussion held off the record.)
11       (Lunch break was taken.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1        A F T E R N O O N   S E S S I O N
2        (Readback.)
3        THE VIDEOGRAPHER: The time is 1:06 p.m.
4     This is the beginning of Cassette Number 2 in the
5     deposition of Nancy Rosario. We are on the
6     record.
7  CONTINUED EXAMINATION BY MR. GILLIS:
8  Q. Good afternoon, Ms. Rosario. A couple things that
9     I'd like to clear up from an earlier part of the
10    session.
11       First has to do with your testimony as to
12    the -- any rehabilitation that you've gotten for
13    drugs or alcohol.
14       My understanding is that prior to your
15    death of your daughter Awilda, you had gotten some
16    treatment for drug abuse, is that correct?
17       MR. ALBERT FARRAH: Objection to the
18    form. Prior to the -- prior to the death of
19    Awilda, did you get any treatment for drug abuse?
20 A. I don't understand. Can you repeat that to me?
21 Q. You testified this morning that you had gone to a
22    halfway house in Lynn prior to the death of your
23    daughter Awilda, is that correct?
24 A. No, that's not --

Page 102

1        MR. ALBERT FARRAH: It's the form of the
2     question.
3  Q. Did you ever seek treatment at a halfway house in
4     Lynn?
5  A. Yes.
6  Q. Okay. Was that while Awilda was still alive?
7  A. Yes.
8  Q. Okay. Before her death in September of 2003 did
9     you have any other treatment for drug or alcohol
10    abuse? This is before she died.
11 A. No.
12 Q. Okay. After she died, did you receive some drug
13    and alcohol treatment?
14 A. Yes, I did.
15 Q. Where did you receive that treatment?
16 A. At the Holy Family.
17 Q. And what was the nature of that treatment? Why
18    did you go to Holy Family?
19 A. Depression.
20 Q. Were you using any drugs or alcohol at that point?
21 A. Yes, I was.
22 Q. What drugs and/or alcohol were you using at that
23    time?
24 A. I was using cocaine, and I was drinking beer at

17 (Pages 97 to 102)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NANCY ROSARIO, INDIVIDUALLY, AS )
SHE IS THE ADMINISTRATRIX OF THE )
ESTATE OF AWILDA SANTIAGO, ESSEX )
PROBATE COURT DOCKET #03P-2499AD1 and )
AND AS SHE IS THE ADMINISTRATRIX OF )
THE ESTATE OF JOSE SANTIAGO, BERLIN )
(CONNECTICUT) PROBATE COURT, )
CASE #03-0713 AND NANCY ROSARIO AND )
MICHAEL MILLER, AS GUARDIANS OF )
CHRISTINA SANTIAGO AND VERONICA )
ROSARIO, ESSEX PROBATE COURT DOCKET )     Civil Action #05-CV-10617MLW
#06p-0507GM )
      Plaintiffs )
                        )
                        )
v. )
                        )
RARE HOSPITALITY INTERNATIONAL, INC. )
d/b/a LONGHORN STEAKHOUSE )
      Defendant )

## RULE 26 REPORT OF DAVID M. BENJAMIN, PH.D.

Plaintiffs
By their attorney,

ALBERT L. FARRAH, JR., ESQ.
One Washington Mall, 5th Floor
Boston, MA 02108
(617) 742-7766
B.B.O. #159340

Date: October 31, 2006

CERTIFICATE OF SERVICE

SUFFOLK, SS                                                                October 31, 2006

A copy of the Rule 26 Report of Dr. David M. Benjamin, Ph.D. was today HAND DELIVERED to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA

_____

Albert L. Farrah, Jr., Esq.

David M. Benjamin, Ph.D. Rule 26 Report Index

1.    Report dated October 18, 2006, with attachments

2.    Other cases in which expert has testified

3.    Qualifications and publications

4.    Exhibits to be used as a summary of, or as support for the opinions, of David M. Benjamin, Ph.D

# David M. Benjamin, Ph.D.

77 Florence Street
Suite 107N
Chestnut Hill, Mass. 02467-1918

Telephone (617) 969-1393
Facsimile (617) 969-4285
E-mail: medlaw@channel1.com

DAVID M. BENJAMIN, PH.D.
CLINICAL PHARMACOLOGIST & TOXICOLOGIST

New Email: medlaw@doctorbenjamin.com

October 18, 2006

Albert L. Farrah, Jr., Esq.
One Washington Mall
Boston, MA  02108

Re:  Nancy Rosario, et al v. RARE Hospitality, Inc. d/b/a Longhorn Steakhouse

Dear Attorney Farrah:

Pursuant to your request, I am submitting my report regarding my analysis of this case
pursuant to the format established by FRCP 26.

## Summary of Qualifications

My qualifications to review this case are based on my learning, training and more than 30
years of experience as a Clinical Pharmacologist and Toxicologist, my standing as a
nationally known expert in the absorption, distribution, metabolism, and excretion of
ethanol as evidenced by my extensive experience and teaching.  My teaching experience
includes  9 seminars for judges, beginning in 1999 when I taught a national
ABA/NHTSA conference in Newport, RI, followed by seven seminars for judges in
Florida (since 1999 and the next scheduled for Dec., 2006), and my teaching of judges in
Kentucky in April 2005.  I have also published on the blood levels of ethanol,
scientifically valid methods of back-extrapolation, and provided the Ethanol Toxicology
portion of the syllabus for the 1996, 1998 and 2006 MCLE seminars on dram shop and

civil liquor liability where I taught seminars on dram shop and civil liquor. I have also taught about the breathalyzer at a seminar at Suffolk Law School Feb.6, 2004 and spoken on ethanol at the American Academy of Forensic Sciences (see resume) and the NH Bar Association. At this year's meeting of the Society of Forensic Toxicologists (SOFT), I presented a paper in the SOFT/AAFS Drugs and Driving Committee special session (of which I am also a member) and the title of that presentation was, "The Importance of Developing a Chronology in Determining the Proximate Cause of Impairment in Mixed DUI/DUID Cases." This peer reviewed presentation speaks not only to my qualifications, but also demonstrates peer review and general acceptance of this method, which is the same method I have used to analyze this case (see methods section below). My publications and presentations on ethanol pharmacology and toxicology are all listed on my CV.

I conclude with reasonable scientific certainty that on the evening of September 26, 2003, Mr. Jeffrey Southworth consumed the equivalent of at least 13 "12 oz. beers" in 90 minutes, or more than 4 "12 oz. beers" per 30-minute interval. I further conclude with reasonable scientific certainty that as Mr. Southworth continued to drink, his BAC increased continuously and he became loud and had difficulty carrying himself the way he normally did. His changes in manner were apparent to his friends, one of whom described him as visibly intoxicated while still at the Longhorn Steakhouse. Moreover, before finishing dinner, other patrons in the Longhorn Steakhouse came over to Mr. Southworth's table and asked him and his friends to be more quiet. The amount of ethanol consumed over a relatively short 90-minute period of time, the changes in Mr.

Southworth's manner, and the fact that Mr. Southworth and his friends were so loud that other patrons had to ask them all to be more quiet indicate signs of intoxication from ethanol and permit me to conclude with reasonable scientific certainty that Mr. Southworth was visibly intoxicated when served his last drink at the Longhorn Steakhouse.

## Documents Reviewed

In connection with services rendered to counsel for the plaintiff in the above action, counsel for the plaintiff has provided me the documents listed below, which I have read and relied upon:

The complaint filed in Middlesex Superior Court #03-4704L2 in February 2004;

Statement of facts in Support of Summary Judgment filed in the a case of Nancy Rosario, et al v. Jeffrey Southworth, et al, Middlesex Superior Court C.A. #03-4704L2.

Affidavit of Albert L. Farrah, Jr. dated December 20, 2004 filed in the pending action With, among others, the following attached exhibits: the August 19, 2004 deposition of Jude Connelly; deposition of Thomas Scott Espey; the Massachusetts State Police Collision Reconstruction Report dated September 27, 2003; the November 2, 2003 statement of Leigh Chabot. Deposition of Michael J. Espey, dated June 22, 2004; A copy of the September 26, 2003 bill for the group believed to include Jeffrey Southworth and RARE Hospitality International, Inc., d/b/a Longhorn Steakhouse audit report of that date, reflecting food and beverages believed served to the Southworth group.

I have also reviewed the follow up depositions of: Jude Connolly taken February 10,

4

2006, Michael Espey taken April 25, 2006 and Thomas Scott Espey taken April 25, 2006, and viewed photographs of Jeffrey Southworth taken the day of his arrest, September 27, 2003.

## Methods

Based on the first set of depositions taken in 2004, and the statements of the fact witnesses obtained in 2004, I determined the approximate times of arrival at and departure from each establishment. Also, using the bill containing all the food and drinks ordered while in the Longhorn Steakhouse, I developed a chronology of the amount of food eaten and the number of alcoholic beverages consumed and the times that each was consumed. Using the generally accepted Widmark Formula, I calculated Mr. Jeffrey Southworth's blood alcohol concentration (BAC) over the time interval from 7:30 pm till the accident at 00:10 according to the section describing the Widmark Method.

Unfortunately, the follow up depositions of Jude Connolly taken February 10, 2006, Michael Espey taken April 25, 2006 and Thomas Scott Espey taken April 25, 2006 were not of any help to me because so much time had elapsed since the events in question, that none of the deponents could clearly recall what transpired on the night in question. Most of the testimony in those depositions was speculative and scanty, and could not help me develop a better indication of the facts on the night in question, or a more accurate chronology.

In the 2006 edition of the Massachusetts CLE syllabus for Liquor Liability Update, I told attorneys, "In my experience, there is only one method to use when evaluating a potential Dram Shop case, regardless of whether you are representing the plaintiff or the defendant. That method involves developing a chronology of the eating and drinking that occurred within the time frame of the day/evening in question." (page 97). I have also stressed this method in the two prior seminars I gave on civil liquor liability at MCLE in 1996 and 1998, as well as in the Judicial seminars I have given and the presentations I have given to forensic experts at the American Academy of Forensic Sciences (see CV).

**The Widmark Method**

Using Mr. Southworth's height as 6'4" and weight of 210 lbs. I have calculated Mr. Southworth's blood alcohol concentration (BAC) using a computerized version of the generally accepted Widmark Formula, which has been widely published in the peer reviewed forensic toxicology literature since the 1940s. Moreover, I have personally published a peer reviewed article using this computerized version of the Widmark Formula in the Medical Review Officer's "MRO Update" in February 1999 which was accepted for publication, and which the editor included the reference to the computer program in the citations. This is the publication of the American College of Occupational and Environmental Medicine (ACOEM) designed for members who work as Medical Review Officers (MROs).

**Chronology:**

7:30 pm one 12 oz beer

8:10 pm – one 25 oz Bud Light

8:20 pm – one 25 oz Bud Light

8:50 pm - one 25 oz. Bud Light (check 20043)

9:00 pm -  one Jack Daniels Manhattan - Food ordered

9:20 pm -  25 oz Bud Light  (check 20043); Food served

9:25 pm    Jack Daniels Manhattan  (check 20043)

9:35 pm    Jack Daniels Manhattan  (check 20043)

9:31-9:57 pm print check 20043 six times.

9:57 pm   close check 20043 for 202.79

10:30 pm – one 12 oz beer

Budweiser Light contains 4.2% ethanol (v/v).  The 12 oz can contained 4.2% x 12 oz or

0.50 oz of ethanol, a 25 oz beer contained 4.2% x 25 or 1.05 oz of ethanol.  Based on the

three-page document entitled the "Longhorn Bar Recipes", I determined that each Jack

Daniels Manhattan contained: 2.0 oz of Jack Daniels (80 proof, 40%) (2.0 x 0.4=0.8 oz

plus 0.25 oz of Sweet Vermouth (32 proof, 16%) (0.25 x 0.16=0.04 oz), or 0.84 oz of

ethanol .  However, there seems to be a discrepancy between this recipe and the actual

size of the drink when served, since the Jack Daniels Manhattan was served in a 6 oz

glass and the above recipe only accounts for 2.25 oz, which means that the above

calculations may significantly underestimate the ethanol content of the Jack Daniels

Manhattan by 2-3 fold.  Accordingly, my Widmark calculations may significantly

underestimate Mr. Southworth's BAC at the time he was served his last drink at 9:35 pm.


**BACs Achieved While Drinking**

Because of Mr. Southworth's size, Widmark calculations indicated that one 25 oz Bud Light beer, consumed on an empty stomach would produce a peak blood ethanol concentration of approximately 0.02% approximately 60 minutes after beginning to drink the beer. Widmark calculations also indicated that one Jack Daniels Manhattan, consumed on an empty stomach would produce a peak blood ethanol concentration of approximately 0.014% approximately 60 minutes after beginning to drink the Jack Daniels Manhattan. In order to account for the effect of the food that was consumed, after 9:20 pm, the time for peak absorption was changed from 30 to 60 minutes, due to the fact that food retards the rate and extent of absorption of ethanol, and increases the time to reach a peak blood concentration and decreases the peak BAC.

Based on my Widmark calculations, I calculated that when Mr. Southworth arrived at the Longhorn Steakhouse at approximately 8 pm, his BAC would have been approximately 0.01%, based on the beer he had consumed after bike riding. Before being seated at the table, Mr. Southworth consumed two 25 oz beers between approximately 8:10 pm and 8:40 pm. As soon as he was seated, Mr. Southworth ordered another 25 oz beer which was served at approximately 8:50 pm, at which time Mr. Southworth's BAC had increased to 0.07%. At approximately 9:00 pm Mr. Southworth consumed his first Jack Daniels Manhattan and his BAC was approximately 0.08%. This was followed by a 25 oz. beer at 9:20 pm and two additional Jack Daniels Manhattans at 9:25 pm and 9:35 pm, when his BAC would have been approximately 0.13% and 0.15% respectively. Thus during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately

8

0.13% to 0.15% in 15 minutes, an amount of ethanol that would require up to an hour to burn off or metabolize.

From the time Mr. Southworth arrived at the Longhorn Steakhouse around 8-8:05 pm, his BAC would have risen rapidly and steadily from 0.01% until it reached a peak of approximately 0.15% at 9:35 pm, a rate of approximately 0.0015% per minute, or more than one 12 oz beer per 10-minute interval. Stated still another way, the total amount of pure ethanol consumed during the 90-minute interval between 8:05 and 9:35 pm totaled 6.52 oz. Since the amount of ethanol in a "regular" 12 oz beer is 0.5 oz, in 90 minutes, Mr. Southworth consumed the equivalent of 6.52/0.5 = 13 beers in 90 minutes, or more than 4 beers per 30-minute interval.

Referring to Douillard v. LMR (433 Mass. 162, 740 N.E.2d 618), the Court cites Vickowski v. Polish Am. Citizens Club of Deerfield, Inc. (422 Mass. 606, 609, 664 N.E. 2d (1996) in pertinent part stating, "[A] tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated patron unless the tavern keeper knows or reasonably should have known that the person is intoxicated." Certainly signs of visible intoxication would constitute "knowledge" of a patron's intoxication, but so would the number of drinks consumed per hour. Many heavy drinkers are capable of "masking" some signs of intoxication and have developed tolerance and "coping skills" which allow them to compensate for their intoxication while standing or speaking. However, their judgment, coordination, vision, and reaction time behind the wheel of a car are still severely impaired. Such subtle cognitive signs of intoxication may not be directly observed by

another patron of a tavern or a bartender, but the number of drinks served per hour can easily be tracked, observed, counted and equated to a too rapid ingestion of ethanol likely to produce intoxication.

Although BAC is frequently calculated and reported by forensic toxicologists in civil liquor liability cases like the present case, a better indication of impairment is the rate of consumption of ethanol and the associated rate of rise of the BAC. Regardless of tolerance or body weight, when ethanol is consumed too rapidly, it produces a greater degree of intoxication than one would predict from BAC alone. In this case, the Longhorn Steakhouse served alcoholic drinks at such a fast rate and those drinks were consumed by Mr. Southworth and his friends over such a short time interval that Mr. Southworth and his friends were destined to become intoxicated as the ethanol was absorbed both while they were in the tavern and after they left. Indeed, fact witnesses noticed changes in Mr. Southworth's ability to carry himself, and his entire table was told to quiet down at one point during the evening.

Moreover, as stated above, during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately 0.13% to 0.15% in 15 minutes an amount of ethanol that would require up to an hour to burn off or metabolize. These drinks continued to be absorbed with time and then plateaued at approximately 0.22% an hour later at 10:30 pm, when Mr. Southworth then had another 12 oz beer. At this point in time, Mr. Southworth's BAC had plateaued at a level of 0.22%, because he still had so much

ethanol in his blood, that he was unable to burn it off. The plateau lasted until almost midnight, when his BAC dropped only 0.01% to 0.21% by midnight and remained at that level up until the time of the accident at 00:10am.

The Longhorn Steakhouse served drinks to Mr. Southworth at the approximate following times: 8:10 and 8:20 (at the bar) and 8:50, 9:00, 9:20, 9:25 and 9:35 pm. Since the body can only "burn off" or metabolize the amount of ethanol in one regular 12 oz beer each hour, consumption of more than 0.5 oz of ethanol per hour will lead to accumulation of ethanol in the blood. Serving high alcohol content beverages to patrons at this rate of service should most definitely alert the employees of Longhorn Steakhouse to the fact that Mr. Southworth was accumulating ethanol in his blood faster than he could burn it off. Therefore, employees of the Longhorn Steakhouse should have known that Mr. Southworth would become increasingly intoxicated as the ethanol was absorbed over the course of the evening. In fact, with a large amount of ethanol in his stomach and GI tract, Mr. Southworth became a walking time bomb, ready to become a drunk driver as he absorbed the ethanol that was served to him, and sequestered in his stomach and small intestines. The fact that Mr. Southworth was already loud and carrying himself differently when served his last drink at the Longhorn Steakhouse was evidence that he was intoxicated while at the Longhorn Steakhouse, and a harbinger of the tragedy that predictably and foreseeably would occur a few hours later, as the ethanol was absorbed from Mr. Southworth's GI tract and raised his BAC to over 0.20%.

Consider the following analogy regarding absorption and excretion of ethanol. If you run the water in your bath tub at 10 gallons per minute, but the drain can only accommodate 5 gallons per minute, you are going to accumulate 5 gallons per minute in the tub. Even if you slow down the filling rate (rate of ingestion) to 7 gallons per minute, the water level will continue to rise. Even if you stop the water, it will still take time for the water level to decrease because the drainage rate (excretion rate) is fixed at 5 gallons per minute and will not change.

The rate of onset of the effects of ethanol are related to the amount of ethanol consumed and the rate of consumption. Consider a typical 12 oz beer such as the one Mr. Southworth drank around 7:30 pm. It contains 0.5 oz of ethanol. The 25 oz beers contained twice as much ethanol (1.0 oz) and the Jack Daniels Manhattans contained almost 1.7 times as much ethanol (0.84 oz) as a 12 oz beer. Mr. Southworth drank a large amount of ethanol in the short period of time of approximately 1 ½ hours (8-9:25 pm). Since the body can only burn off or excrete ethanol at a fixed rate of approximately one 12 oz beer per hour, amounts of ethanol in excess of that accumulate in the blood. When Mr. Southworth continued to consume high ethanol content beverages at a rate in great excess over that which his body could burn off or excrete, Mr. Southworth's BAC continued to increase because his rate of consumption of ethanol exceeded the capacity of his body to excrete ethanol.

**Public Policy and Public Health Issues**

12

Referring once again to Douillard v. LMR (433 Mass. 162, 740 N.E.2d 618), the Court

cites Vickowski v. Polish Am. Citizens Club of Deerfield, Inc. (422 Mass. 606, 609, 664

N.E. 2d (1996) in pertinent part stating, "[A] tavern keeper does not owe a duty to refuse

to serve liquor to an intoxicated patron unless the tavern keeper knows or reasonably

should have known that the person is intoxicated." Tavern owners are sophisticated in

their knowledge of ethanol absorption, distribution, metabolism and excretion. An

establishment serving drinks that contain 1 ½ to 2 times the amount of ethanol as a

typical beer (0.5 oz), a 4 oz glass of 12% wine (0.48 oz) or a 1 ¼ oz shot of 80 proof

spirits (0.5 oz), must know that drinkers of such drinks are going to become intoxicated at

a faster rate than if they were drinking smaller portions of ethanol. Accordingly, such

establishments must reduce the rate at which they serve their customers accordingly, in

order to avoid getting those patrons who drink too quickly intoxicated. Moreover, after

consuming a large amount of ethanol with food, sophisticated tavern owners must know

that the time required to absorb all the ingested ethanol will be extended to at least an

hour. This sets up a situation where an individual may have consumed enough ethanol

while in the establishment to become intoxicated 30-60 minutes later, as the ethanol is

absorbed into the blood stream from the GI tract. This is a foreseeable and inevitable set

of circumstances that will be fulfilled. Part of the requirement of the law that a tavern

keeper not overserve a patron is due to the tavern owners duty to unknown third parties

who share the public highways with patrons who drink in their establishment. Public

policy issues and public health standards require that patrons in a tavern not be served so

much ethanol that they become intoxicated and in so doing become a hazard on the

highways.

**Standards in the Forensic Toxicology Community Regarding Signs of Visible Intoxication**

Based on a study published by the American Medical Association in Alcohol and the Impaired Driver (1968), 62% of non-tolerant individuals with a BAC between 0.10-0.15% will show signs of visible intoxication at that range of BACs, while at BACs between 0.15-0.20%, 89% of non-tolerant individuals will show signs of visible intoxication at that range. Because the 0.15% is so critical that signs of visible intoxication increase from approximately 6/10 to 9/10 at 0.15% (a 150% increase), the forensic toxicology community indicates that in general, 0.15% is the BAC generally considered representative of showing signs of visible intoxication. However, Mr. Southworth was not "non-tolerant", he was a frequent alcohol consumer and would have been likely to demonstrate some tolerance to the intoxicating effects of ethanol. Even so, he was described as showing signs of visible intoxication in the form of not carrying himself as he usually did, being more loud than usual, to the extent that people came over to his table and asked the group to be more quiet.

According to a study by Perper et al entitled "Tolerance at High Blood Alcohol Concentrations: A Study of 110 Cases and Review of the Literature", (see Journal of Forensic Sciences 1986; 31:212-221), of 110 alcoholics studied in a detoxification unit, out of 54 subjects with a BAC of 0.20% or higher, only 13 (24%) showed no sign of clinical intoxication. Speech was abnormal in 43%, gait was abnormal in 59%, vision was impaired in 56% and verbal comprehension was impaired in 24% and coordination was impaired in 65%. Also, by the time BACs reached 0.30%, none of the subjects

exhibited sobriety in all tested parameters. However, most of these participants would have been in the post-absorptive phase of ethanol disposition and their BACs would have been declining, unlike Mr. Southworth's BAC which was rising rapidly. Since people will be more impaired by ethanol when the BAC is rising than when it is falling (Mellanby Effect), the statistics on the percent of individuals who showed signs of impairment cited above would be lower than the what one would expect to find in a person who was drinking ethanol on a rapid basis and whose BAC was rising, rather than falling. This would have been the case with Mr. Southworth.

Moreover, during the 15-minute interval between 9:20 pm and 9:35 pm, Mr. Southworth consumed the equivalent of 5 "regular" or 12 oz beers and his BAC rose 0.02% from approximately 0.13% to 0.15% in 15 minutes an amount of ethanol that would require up to an hour to burn off or metabolize. Serving the equivalent of 5 beers to a patron within the last 15 minutes they are in your establishment and knowing that they would go out and drive on a public way and put other citizens and themselves at an increased risk of a motor vehicle accident is certainly knowable, and constitutes irresponsible conduct which is not consistent with the language of Douillard.

Moreover, if you look at the times reflected on my Widmark graph, one can easily see that drinks were served to Mr. Southworth at the Longhorn Steakhouse at the approximate following times: 8:10, 8:20, 8:50, 9:00, 9:20 9:25 and 9:35 pm. Since the body can only "burn off" or metabolize the amount of ethanol in one regular 12 oz beer

each hour, consumption of more than 0.5 oz of ethanol per hour will lead to accumulation of ethanol in the blood.

**Conclusions**

I conclude with reasonable scientific certainty that Mr. Jeffrey Southworth was already visibly intoxicated when he was served his last drink at the Longhorn Steakhouse on the evening of September 26, 2003. As he continued to drink, his BAC increased continuously and he became loud and had difficulty carrying himself the way he normally did. His BAC continued to rise up until 10:20 pm when it peaked at 0.22%, and had only dropped 0.01% to 0.21% at the time of the tragic motor vehicle accident at approximately 00:10 am. The one 12 oz beer Mr. Southworth consumed at 10:30 pm would only have contributed less than 0.01% to his BAC, due to his size and the food remaining in his stomach.

**Fees**
To date I have received $6600 for my time.

**Prior Testimonies**
Prior Testimonies are attached.

**Publications**
My CV has already been submitted.

Very truly yours,

David M. Benjamin, Ph.D.
Clinical Pharmacologist and Toxicologist



```
� EZ-ALC  Ver 2.0 - DataScreen ╞
Subject Name :Mr. Jeffrey Southworth        : I.D.# :XX22X:
Body Weight  :210: Pounds.     Initial BAC :.0000:
Widmark Beta :.020: % per hour.
Widmark r    :.64:

Drink   FlOz   Start   Absorb      Drink   FlOz   Start   Absorb
Number  EtOH   Time    Time        Number  EtOH   Time    Time
  1     0.50   7:30    030           13    0.00    0:00   060
  2     1.00   8:10    030           14    0.00    0:00   060
  3     1.00   8:20    030           15    0.00    0:00   060
  4     1.00   8:50    030           16    0.00    0:00   060
  5     0.84   9:00    030           17    0.00    0:00   060
  6     1.00   9:20    060           18    0.00    0:00   060
  7     0.84   9:25    060           19    0.00    0:00   060
  8     0.84   9:35    060           20    0.00    0:00   060
  9     0.50  10:30    060           21    0.00    0:00   060
 10     0.00   0:00    060           22    0.00    0:00   060
 11     0.00   0:00    060           23    0.00    0:00   060
 12     0.00   0:00    060           24    0.00    0:00   060

╡ Main Menu ╞
 ?  Help    DATA: Del File Edit List + -    BAC: View Screen Print TBA    QUIT
```

```
^^^^^^^^^^^^^^Ver 2.0 - ViewScreen ╞
.20
.19
.18
.17
.16
.15
.14
.13
B .12
. 11
A .10
.09
C .08
.07
.06
.05
.04
.03
.02
.01
.00
   7:30   8:30   9:30   10:30  11:30  12:30  1:30   2:30   3:30   4:30   5:30   6:30  7:
                               T I M E
```

ANY KEY to return to DataScreen



```
                    ┤ EZ-ALC  Ver 2.0 - ScreenPrint ├
          Absorb           . . .   . . .   . . .   . . .   . . .
       EtOH Time          0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2
      (FlOz)(Min) BAC Time 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
              .0951  9:05  ----------.---------*.         .         .         .
              .1058  9:10  ----------.----------.*        .         .         .
              .1166  9:15  ----------.----------.--*      .         .         .
  1.00   60  .1273  9:20  ----------.----------.----*     .         .         .
  0.84   60  .1346  9:25  ----------.----------.------*   .         .         .
              .1448  9:30  ----------.----------.--------*.         .         .
  0.84   60  .1493  9:35  ----------.----------.---------*          .         .
              .1567  9:40  ----------.----------.----------.*       .         .
              .1640  9:45  ----------.----------.----------.--*     .         .
              .1714  9:50  ----------.----------.----------.---*    .         .
              .1787  9:55  ----------.----------.----------.-----*  .         .
              .1861 10:00  ----------.----------.----------.------* .         .
              .1934 10:05  ----------.----------.----------.--------*.        .
              .2008 10:10  ----------.----------.----------.---------*        .
              .2081 10:15  ----------.----------.----------.---------.-*      .
              .2155 10:20  ----------.----------.----------.---------.--*     .
              .2195 10:25  ----------.----------.----------.---------.---*    .
  0.50   60  .2206 10:30  ----------.----------.----------.---------.---*    .
              .2235 10:35  ----------.----------.----------.---------.----*   .
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

```
                    ┤ EZ-ALC  Ver 2.0 - ScreenPrint ├
          Absorb           . . .   . . .   . . .   . . .   . . .
       EtOH Time          0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2
      (FlOz)(Min) BAC Time 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8
              .2235 10:40  ----------.----------.----------.---------.----*   .
              .2235 10:45  ----------.----------.----------.---------.----*   .
              .2235 10:50  ----------.----------.----------.---------.----*   .
              .2235 10:55  ----------.----------.----------.---------.----*   .
              .2236 11:00  ----------.----------.----------.---------.----*   .
              .2236 11:05  ----------.----------.----------.---------.----*   .
              .2236 11:10  ----------.----------.----------.---------.----*   .
              .2236 11:15  ----------.----------.----------.---------.----*   .
              .2236 11:20  ----------.----------.----------.---------.----*   .
              .2236 11:25  ----------.----------.----------.---------.----*.  .
              .2236 11:30  ----------.----------.----------.---------.----*   .
              .2220 11:35  ----------.----------.----------.---------.---*    .
              .2203 11:40  ----------.----------.----------.---------.---*    .
              .2186 11:45  ----------.----------.----------.---------.---*    .
              .2170 11:50  ----------.----------.----------.---------.--*     .
              .2153 11:55  ----------.----------.----------.---------.--*     .
              .2136 12:00  ----------.----------.----------.---------.-*      .
              .2120 12:05  ----------.----------.----------.---------.-*      .
              .2103 12:10  ----------.----------.----------.---------.-*      .
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.



```
                    ┤ EZ-ALC  Ver 2.0 - ScreenPrint ├
        Absorb
  EtOH  Time          0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2
 (FlOz)(Min) BAC Time 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
             .0951  9:05 ----------.---------*.
             .1058  9:10 ----------.---------.*
             .1166  9:15 ----------.---------.--*
 1.00  60    .1273  9:20 ----------.---------.----*
 0.84  60    .1346  9:25 ----------.---------.------*
             .1448  9:30 ----------.---------.--------*.
 0.84  60    .1493  9:35 ----------.---------.---------*
             .1567  9:40 ----------.---------.---------.*
             .1640  9:45 ----------.---------.---------.--*
             .1714  9:50 ----------.---------.---------.---*
             .1787  9:55 ----------.---------.---------.-----*
             .1861 10:00 ----------.---------.---------.------*
             .1934 10:05 ----------.---------.---------.--------*.
             .2008 10:10 ----------.---------.---------.---------*
             .2081 10:15 ----------.---------.---------.---------.-*
             .2155 10:20 ----------.---------.---------.---------.--*
             .2195 10:25 ----------.---------.---------.---------.---*
 0.50  60    .2206 10:30 ----------.---------.---------.---------.---*
             .2235 10:35 ----------.---------.---------.---------.----*
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

```
                    ┤ EZ-ALC  Ver 2.0 - ScreenPrint ├
        Absorb
  EtOH  Time          0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2
 (FlOz)(Min) BAC Time 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
             .2235 10:40 ----------.---------.---------.---------.----*
             .2235 10:45 ----------.---------.---------.---------.----*
             .2235 10:50 ----------.---------.---------.---------.----*
             .2235 10:55 ----------.---------.---------.---------.----*
             .2236 11:00 ----------.---------.---------.---------.----*
             .2236 11:05 ----------.---------.---------.---------.----*
             .2236 11:10 ----------.---------.---------.---------.----*
             .2236 11:15 ----------.---------.---------.---------.----*
             .2236 11:20 ----------.---------.---------.---------.----*
             .2236 11:25 ----------.---------.---------.---------.----*
             .2236 11:30 ----------.---------.---------.---------.----*
             .2220 11:35 ----------.---------.---------.---------.---*
             .2203 11:40 ----------.---------.---------.---------.---*
             .2186 11:45 ----------.---------.---------.---------.---*
             .2170 11:50 ----------.---------.---------.---------.--*
             .2153 11:55 ----------.---------.---------.---------.--*
             .2136 12:00 ----------.---------.---------.---------.--*
             .2120 12:05 ----------.---------.---------.---------.-*
             .2103 12:10 ----------.---------.---------.---------.-*
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

From *Alcohol and the Impaired Driver*
© 1968 American Medical Association

CHAPTER II

# ACUTE ALCOHOLIC INTOXICATION

*NOTE: Measurements of blood-alcohol levels throughout this book are stated in terms of percentage, weight by volume, based upon the number of milligrams of alcohol per 100 milliliters of blood. For discussion and explanation see page XIII. Scientific and technical reports and publications referred to in the text are listed alphabetically, following Chapter X.*

## CHARACTERISTICS OF ACUTE INTOXICATION

### TABLE 3: RELATION BETWEEN BLOOD-ALCOHOL LEVEL AND DRUNKENNESS

| \multicolumn Percent of Persons Diagnosed as Drunk | | | | | | | | | Total Persons Examined | Investig |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.00 to 0.05 | 0.051 to 0.10 | 0.101 to 0.15 | 0.151 to 0.20 | 0.201 to 0.25 | 0.251 to 0.30 | 0.301 to 0.35 | 0.351 to 0.40 | 0.401 | | |
| 0 | 19 | 50 | 83 | 93 | 98 | 100 | 100 | | 1942 | Widmark |
| 2 | 38 | 93 | 97 | 99 | 100 | 100 | | | 950 | Schwarz |
| 10 | 18 | 47 | 83 | 90 | 95 | 96 | 93 | 100 | 1000 | Jetter |
| 10 | 68 | 81 | 92 | 97 | 100 | | | | 1712 | Andrese |
| 0 | 46 | 50 | 92 | 100 | 100 | 100 | 100 | | 140 | Harger |
| 0 | 14 | 69 | 90 | 94 | 94 | 100 | 100 | 100 | 100 | Prag |
| 7 | 25 | 49 | 85 | 93 | 97 | 98 | 100 | 99 | 750 | Hine |
| 4 | 32 | 62 | 89 | 95 | 98 | 99 | 99 | 100 | 6594 | Mean above 7 |

rcent weight by volume (0.05 percent w/v=50 mg/100 ml, 0.15 percent w/v=150 mg/100 ml) of Blood Alcohol

*Commonwealth vs. English; Salem Superior* Court, 10/12/06; For Defendant – Widmark calculations of blood ethanol; impairing effects of toxic organic chemicals.

*Commonwealth vs.Roster; Wrentham District* Court, 7/18/06; For Defendant
Interpretation of urine and drug test results

*Commonwealth vs.White; Norfolk Superior* Court, 7/7/06; For Defendant – cocaine;
Urine drug screens

*Commonwealth vs.Jenkins; Suffolk Superior* Court, 7/7/06; For Defendant;
analysis of cocaine;

*Commonwealth vs. Decarlo;* Cambridge District Court, 1/11/06; For Defendant
Effects of illicit drugs

*Commonwealth vs. Doyle;* Middlesex Superior Court, 2/1/06; For Defendant
Effects of illicit drugs

*Commonwealth vs. Perella;* Middlesex Superior Court, 1/5/06; For Defendant
Effects of oral anti-diabetic medication

*Doucette vs. Abramofsky;* Suffolk Superior Court, 11/05; For Plaintiff
Dram Shop -Widmark calculations of blood ethanol

*Rowley vs. Tripathi;* Deposition – Maryland Superior Court, 10/10/05; For Defendant
Medical Negligence involving prescription drugs

*Commonwealth vs. Maurice Evans;* Dedham District Court, 9/23/05; For Defendant
Widmark calculations of blood ethanol

*Commonwealth vs. Annesc;* Hingham District Court, 6/28/05; For Defendant - OUI

*Commonwealth vs. Jerome Jones;* Middlesex Superior Court, 9/16/05; For Defendant
Effects of MDMA and amphetamines

*United States vs. Michelle Evans;* U.S. District Court, Boston, MA, 9/13/05;
For Defendant – Interpretation of serial urine screens for THC

*Callais vs. Main Street Brewery,* Deposition *10/28/05;* For Plaintiff
Dram Shop -Widmark calculations of blood ethanol

*Commonwealth vs. Mitrano;* Cambridge District Ct., 8/12/05; For Defendant

*Reynolds vs. GBR Electric, Inc. and Northern Adjusters, Inc.;* Alaska Workers' Compensation Board; Deposition by Phone 2/05; Phone Testimony for Workers'

Compensation Board 4/7/05; For Claimant. Interpretation of blood ethanol and methanol levels.

*Chartier vs. Dow;* Deposition - 2004, Polk County, FL; For Plaintiff
toxicity of organophosphates

*Commonwealth vs. Gava;* Concord District Court, 2004; For Defendant -OUI

*Fullerson vs. Berry;* California Superior Court; Deposition 10/14/03; Trial 4/04; For Plaintiff – Combined toxicities of lidocaine and bupivacaine

*In the matter of Patricia A. McGeady, deceased;* Superior Court of New Jersey, Trial 2004; For Plaintiff  Effects of prescription drugs on cognitive abilities.

*Commonwealth vs. Robertson;* Quincy District Court, 2004; For Defendant

*United States vs. Brown;* U.S. District Court MA Springfield, 8/04; For Defendant
Differences among "crack", free base, and cocaine hydrochloride.

*Peggy Cooper Cafritz vs. Sibley Memorial Hospital, et al;* Superior Court of the District of Columbia; Deposition 2003; For Defendant  toxicity of glucocorticoids

*Commonwealth vs. Petrin;* Trial Court of Massachusetts, District Court Department, 2003; For Defendant

*Joseph Albert vs. Gus and Paul's Tavern;* Lowell Superior Court; 3/31/03; For Defendant
Dram Shop -Widmark calculations of blood ethanol

*McGrail, et al vs. Harley-Sanford Post 4368, VFW of the U.S.;* Trial 2002/2003; For Defendant  Dram Shop -Widmark calculations of blood ethanol

*Hannah Christopher vs. Barkin Scrap Iron, et al; Michigan,* Deposition 2002; For Defendant  Effects of heroin withdrawal

*In the matter of the Estate of Madeleine L. Stockdale, deceased;* Superior Court of New Jersey, Chancery Division; Trial 2002; For Plaintiff  Effects of prescription drugs on cognitive abilities.

Clinical Pharmacologist & Toxicologist
77 Florence Street - Suite 107N
Chestnut Hill, MA 02467- 2121
Phone: 617-969-1393 - E-mail: medlaw@doctorbenjamin.com

## Brief Biography

### Academic

Boston University, B.A. in Biological Sciences, 1968
University of Vermont College of Medicine, M.S. & Ph.D. in Pharmacology, 1968-72
Kansas Univ. Medical Center, Fellowship, Clinical Pharmacology/Toxicology, 1972-3

### Work Experience in the Pharmaceutical Industry

Twelve years of experience in the Pharmaceutical Industry: Conducting Clinical Drug Studies, Evaluat
Adverse Drug Reactions, Writing Labeling, and Filing INDs and NDAs with the FDA.

### Publications

Dr. Benjamin has more than 180 Presentations and Publications listed on his full CV, including a bc
chapter entitled "*Forensic Pharmacology*" in *Forensic Science Handbook Volume III*. This textbook w
reviewed by the Journal of Forensic Sciences and described as follows: "This third volume follows wl
has become a tradition of in depth chapters written by recognized forensic experts . . . . Forensic scier
practitioners and attorneys who interact with them, in either the criminal or civil areas, will find t
collection of learned treatises a required addition to their professional library."

### Teaching Experience

Adjunct Assistant Professor - Tufts University School of Medicine, 2001; Harvard Medical School Risk
Management Program, Boston, MA, Dec.1999 - 2003; Breathalyzer and Blood Alcohol, Field Sobriety
Testing, Urine Drug Screening and Drug Recognition Testing, ABA/NHTSA Seminar for Judges, 4/30/99
Traffic Adjudication Seminar for Florida Judges, Dec. 1999 - 2003; Understanding Blood Alcohol Levels -
Mass. Academy of Trial Attorneys - Operating Under the Influence Seminar Oct. 1994 - Mass. Continuin
Legal Education - 2/13/96, 5/21/96 & 7/27/98;GW University Law School (99-04); The Role of the
Occupational Health Specialist in a Toxic Chemical Exposure Case - Harvard School of Public Health -
1999-02; Massachusetts College of Pharmacy & Allied Health Sciences, Adjunct Associate Professor of
Regulatory Affairs & Health Policy - 1999 - 2000; Food and Drug Law and Public Policy Issues - Fordham
Law School - April 1994-5; Scientific Evidence - Stetson University College of Law - 1990, 1997-03;
American Board of Quality Assurance and Utilization Review Physicians - 1998 - 02; American Academy
of Forensic Sciences; American College of Legal Medicine; Risk Management for Physicians - Harvard
Medical School - Jan. 1995; The Interface of Drug Product Liability and Medical Malpractice - Conferenc
of the American Association of Legal Nurse Consultants - May 1995; Statistics, Science and Using the
Medical Literature - ATLA's National College of Advocacy - Paralegal Program - June 1995;
Understanding the Analysis of Blood and Urine Samples for Drug Abuse - Mass. Continuing Legal
Education - 1994/95; Presenting Scientific Evidence in Court: Meeting the *Daubert* Standards for
Reliability, Am. Acad. Forensic Sciences, 2/21/00; Chair, Teaching Forum, American College of Clinical
Pharmacology -1999-2004, Chair, Education Committee, 2003-2004.

### Professional Organizations

Fellow, American College of Clinical Pharmacology, Board of Regents, 2000-2005; Program Committee,
1999 & 2002-3; Education Committee, & Chair, Teaching Forum, 00-03; Fellow, American College of Leg
Medicine; Fellow, American Academy of Forensic Sciences (Toxicology); Member: American Society for
Clinical Pharmacology & Therapeutics; Am. Acad. of Clinical Toxicology; American Health Lawyers
Association - Member, Dispute Resolution Service for Mediation & Arbitration; American Public Health
Association, & Fellow, American Society for Healthcare Risk Management; Editorial Boards: J. Healthcare
Risk Management & J. of Clinical Pharmacology.

# David M. Benjamin, Ph.
**Clinical Pharmacologist & Toxicologist**
**77 Florence Street - Suite 107N**
**Chestnut Hill, MA 02467- 2121**
**Phone: 617- 969-1393  Fax: 617- 969-4285**
**E-mail: medlaw@doctorbenjamin.com**

## CURRICULUM VITAE

### EDUCATION
University of Kansas Medical Center, Departments of Medicine and Pharmacology,
Post-Doctoral Fellowship in Clinical Pharmacology and Toxicology, 1972-1973.

University of Vermont College of Medicine, Department of Pharmacology, M.S., 1970; Ph.D., 1972.

Boston University, Department of Biological Sciences, Biological Sciences with emphasis in Physiolo
B.A., 1968.

### CURRENT CONSULTING ACTIVITIES
inical Pharmacology, Clinical & Forensic Toxicology; Drug Interactions, Pharmacokinetics; Adverse D
Reactions; Drug Safety, Substance Abuse; Federal Regulations governing: Clinical Trials, IND/N
Filings; Product Labeling; Informed Consent, Human Rights; QC/QA; GMPs.

### EMPLOYMENT HISTORY IN THE PHARMACEUTICAL INDUSTRY (from most recent)
William H. Rorer, Inc./Revlon Health Care (Rorer acquired Revlon in 1985), Ethical Products Division,
USV Laboratories & Armour Pharmaceutical Company, Director, Clinical Research - 1984-1986.

Astra Pharmaceutical Products, Inc.
Director, Clinical Research (Local Anesthetic Products & Pain Control) - 1982-3

Hoffmann-La Roche, Inc.
Director, Corporate Licensing Department – 1980-1982
Clinical Research Scientist (Medical Monitor) - 1974-1980

Pfizer Pharmaceuticals
Assistant Director, Scientific Affairs - 1973-1974

### ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS

Tufts University School of Medicine
Dept. Pharmacology & Experimental Therapeutics
Adjunct Assistant Professor, 2001-Present

Cornell University Medical College,
Dept. of Pharmacology
Clinical Pharmacology Section,
Assistant Adjunct Professor, 1976-1982

University of Bonn School of Medicine
Bonn, Germany, Visiting Professor of Medicine
and Pharmacology, October, 1981.

*Journal of Clinical Pharmacology*
Editorial Board, 2000-Present

Massachusetts College of Pharmacy and Al
Adjunct Associate Professor of Regulatory
Affairs & Health Policy, 1999-2000

Massachusetts General Hospital
Division of Nuclear Medicine
Consultant in Drug Development - 1989-199

*Drug Therapy*, Department Editor, 1993-94

*Journal of Healthcare Risk Management*,
Editorial Review Board, 1998-Present

*Journal of Quality Health Care*
Editorial Board, 2001-Present

## ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS (cont'd)

Guest Faculty: Harvard School of Public Health - Occupational Health Policy & Administration Course 1995-2003
Stetson University College of Law (1990, 1997-Present), Fordham University School of Law (1994, 1995)
Harvard Medical School Risk Management Program (1999-Present); George Washington University Law School (99-Present)

## PROFESSIONAL SOCIETIES
Society of the Sigma Xi, 1975-Present
American Pharmaceutical Association, Academy of Pharmaceutical Research and Sciences 1974- Prese
American Society for Clinical Pharmacology and Therapeutics, since 1970s
member - Medical Education Committee, 1976-83, Program Committee, 1982-83
      Constitution and By-Laws Committee, 1984-85
      Committee on Substance Abuse, 1987-1999
American College of Clinical Pharmacology Member/Fellow1972-Present; Board of Regents, 2000-2005;
Chair, Teaching Forum, 1999-Present; Program & Education Committees 1999-00; Program Committee
2002
New York Academy of Sciences, 1976-2001
American Academy of Dermatology, 1978-79; 1983-84
American Federation for Clinical Research, 1970s-1998
Associates of Clinical Pharmacology, 1979-86; (President, 1981-82)
American Pain Society, 1982-84
American Association for the Advancement of Science, 1980-2001
American Society of Regional Anesthesia, 1983-Present
American Society of Anesthesiologists, 1983-Present
American Academy of Clinical Toxicology, since 1970s; member - Acute and Intensive Care Section,
1990-Present
American College of Legal Medicine, 1991; Elected Fellow 1998
American Society of Law, Medicine and Ethics  1991-1996
Drug Information Association, 1987-1998
National Forensic Center, 1986-2001, Member, Advisory Board, 1991-93
Association of Trial Lawyers of America, Non-Attorney Member 1990-Present
Defense Research Institute, Non-Attorney Member 1990-Present
The Hastings Center, 1992-1995
American Health Lawyers Association (formerly NHLA), Non-Attorney Member, 1993-1999
International Society of Occupational Medicine & Toxicology, 1994-Present
American Statistical Association, 1994-1998
Pittsburgh Institute of Legal Medicine, 1994-2001
American Academy of Forensic Sciences, (Forensic Toxicology) 1995-Present; Fellow, 2001
American Society for Healthcare Risk Management, 1996-Present; Fellow, June 2002
American Public Health Association, 1997-2001

## DISPUTE RESOLUTION PROGRAMS
NHLA/AAA Training Program in Arbitration - 1993
NHLA Training Program in Mediation - 1997
NHLA Alternative Dispute Resolution Service (Arbitration, 1993 & Mediation, 1997)
Negotiation and Conflict Resolution for Health Care - Harvard School of Public Health, 1997
Center for Medical Ethics and Mediation, San Diego, CA, Instructor, 1997, Board Member, 1998.

## ACADEMIC HONORS
Awarded Second Prize in Independent Research Competition, Vermont Chapter of the Sigma Xi, 1970.
Participant: ASPET's Third Supplementary Training Program in Molecular
Pharmacology- University of California Medical Center, SF, CA - July, 1971
Completed Massachusetts Institute of Technology's summer program in:  Enzymes in
Analysis and Diagnosis - Certificate of Completion - June, 1975
American Men and Women of Science, 14th Edition, 1979.  Who's Who in the East, 23rd Edition, 1990.

Conversational French, German and Italian.

## RESEARCH INTERESTS
Clinical Trial Methodology, Pharmacokinetics, Drug Interactions, Adverse Drug Reactions, Clinical Toxicology, Substance Abuse, Correlations Between Drug Blood Levels and Pharmacologic and Toxicologic Effects.

**BREATHALYZER TESTING:** Breath Alcohol Testing for Forensic Purposes; Principles, Practice and Present Status, Completed: August 24, 1999, at UCLA, as part of the International Association of Forens Sciences, LA, CA.

## DISSERTATIONS
Ph.D. Thesis:  A Study of Approaches to the Chemical Analysis of Aminoglycoside Antibiotics, September, 1972.

Master's Thesis:  Studies of the Molecular Interaction Between Warfarin and Cholestyramine, May, 1970

PRESENTATIONS AND PUBLICATIONS

Benjamin, David M., Robinson, Donald, S. and McCormack, John J.:
Cholestyramine Binding of Warfarin in Man and In Vitro. Clinical Research 18:336, 1970.

Benjamin, David M., McCormack, John J. and Gump, Deiter W.: Studies of Approaches
to the Chemical Determination of Kanamycin in Body Fluids. (Presented at the Eleventh Interscience
Conference on Antimicrobial Agents and Chemotherapy, Atlantic City, NJ, October, 1971).

Shoeman, Donald W., Benjamin, David M. and Azarnoff, Daniel L.:
Alteration of Human Serum Albumin in Uremia. (Presented: the New York Academy of Sciences'
Conference on Drug Protein Binding, New York, New York, January, 1973).

Maxwell, D.R., Benjamin, D.M., Donahay, S., et al: Randomized Double-Blind Study of
1, 25-dihydroxy-vitamin D-3. (Presented in part at the Clinical Dialysis and Transplant Forum of the Council
of Dialysis and Transplantation, National Kidney Foundation, Washington, DC, November, 1977).

Benjamin, David M., Symposium Chairperson: Clinical Pharmacology/Toxicology of Drug Abuse.
(Presented at the Seventh Annual Meeting of the American College of Clinical Pharmacology,
San Francisco, CA, April, 1978).

Benjamin, David M.: Patterns of Drug Abuse. (Presented at the Seventh Annual Meeting of the American
College of Clinical Pharmacology, San Francisco, CA, April, 1978).

Benjamin, David M.: Problems of Polypharmacy. (Presented in part at "Use of Psychopharmacologic and
Analgesic Agents in the Clinical and Psychosocial Care of the Dying Patient and the Bereaved",
Columbia-Presbyterian Medical Center, New York, New York, May, 1978).

Benjamin, David M., Carbone, John J. and Coutinho, Claude B.: Effects of Phenobarbital and SKF-525A
on the Metabolism and Hypnotic Effect of Flunitrazepam in Mice. (Presented at the Annual Meeting of the
Academy of Pharmaceutical Sciences, Hollywood, FL, November, 1978).

Diagnosis and Treatment of Drug Abuse, Invited Discussant, Rutgers Medical School,
Piscataway NJ, May, 1978.

Benjamin, David M., Berl, T., Maxwell, D. et al: Effects of Calcitriol on the Biochemical Abnormalities
Associated With Chronic Dialysis: A Multi-Center Double-Blind Controlled Study.
(Presented at the Annual Meeting of the American Society of Clinical Pharmacology and Therapeutics,
Kansas City, MO, March, 1979).

Benjamin, David M. - Co-Chairperson - Experimental Protocol Design, (Presented at the Annual Meeting of
the Associates of Clinical Pharmacology, Kansas City, MO, March, 1979).

Benjamin, David M.: Analgesia, Pain and Analgesic Drug Interactions.
(Presented at the American Cancer Society Symposium: Pain Control for the Cancer Patient: A
Multidisciplinary Approach, Nutley, NJ, April 23, 1980).

New Developments in Local Anesthetic Agents and Pain Control, Invited Presenter, Workshop on Regional
Anesthesia, Sponsored by the American Society of Regional Anesthesia,
Cambridge, MA, October, 1982.

Yagiela, J.A. and Benjamin, D.M.: Evaluation of Etidocaine For Topical Anesthesia.
J. Dental Research, September, 1983.

Greenblatt, D.J., Benjamin, D.M., Willis, C.R., et al: Two-Percent Lidocaine Solution: Systemic Plasma Levels Following Topical Oral Cavity Use, Or When Swallowed. (Presented at the Annual Meeting of the American College of Clinical Pharmacology, October, 1984).

Benjamin, D.M., Gordon, G., Baran, D. et al: Intranasal Calcitonin Lowers Alkaline Phosphatase In Page Patients. (Presented at the International Conference on Calcium and Bone Metabolism, Nice, France, October, 1986).

Benjamin, David M., et al: Open-Label Study of Intal (cromolyn sodium) in Patients With Eosinophilia Myalgia Syndrome Due to L-tryptophan. Preliminary report: L-T/EMS Update, November, 1990, and J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.: When Is A Drug Not A Drug? The L-Tryptophan Tragedy: Lessons To Be Learned. (Presented at the Annual Meeting of the Drug Information Agency, Washington, DC, June 18, 1991).

Robinson, Donald S., Benjamin, David M. and McCormack, John J.: Interaction of Warfarin and Nonsystemic Gastrointestinal Drugs, Clin. Pharmacol. Therap. 12:491-495.1971.

E    jamin, David, McCormack, John and Gump, Deiter: The Use of Newer Amino Group Reagents For T Detection And Determination of Kanamycin, Anal. Chem. 45:1531-1534, 1973.

Shoeman, Donald W., Benjamin, David M. and Azarnoff, Daniel L.: The Alteration of Plasma Protein in Uremia as Reflected in The Ability to Bind Diphenylhydantoin, Ann. N.Y. Acad. Sci. 226:127-130, 1973.

Maxwell, D.R., Benjamin, D.M., Donahay, S.L.: Effects of Calcitriol in Dialysis Patients, Clin. Pharmacol. Therap. 23:515-519, 1978.

Maxwell, D.R., Benjamin, D.M., Donahay,S.L., et al: Randomized Double-Blind Study of 1,25-dihydroxy-Vitamin D3 in Dialysis Patients, Proc. Clin. Dialy. Transpl. Forum. 7:166-169, 1977.

Benjamin, David M.: Problems of Polypharmacy, Arch. Thanatol. 7:11, 1978.

F    ed, M., Stanley, J., Stengel, F., Shupack, J. and Benjamin, D.: Mal De Meleda Treated With 13-cis Retinoic Acid, Arch. Dermatol. 115:605-608, 1979.

Willis, C.R., Greenblatt, D.J., Benjamin, D.M., et al: Simultaneous Determination of Lidocaine and Its Deethylated Metabolites Using GLC with Nitrogen-Phosphorous Detection, J. Chromatography, 307:200-205, 1984.

Greenblatt, D.J., Benjamin, D.M. et al: Lidocaine Plasma Concentrations Following Administration of Intraoral Lidocaine Solution, Arch. Otolaryngology, 111:298-300, 1985.

Benjamin, David M.: Drug Defects' Dilemmas: Drugs Don't Have Side Effects, People Do!, Expert Witness Journal, Vol. 1, No. 7, pages 1-ff, July, 1989.

Benjamin, David M.: The Legal and Social Ramifications of Urine Drug Testing In The Workplace, Sixth Annual Meeting of the National Forensic Center, San Antonio, TX, December 10, 1989.

Benjamin, David M.: Drug Product Liability Litigation: Federal Law vs. Nature's Law, Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March 16, 1990.

Hand, Robert P. and Benjamin, David M. (Eds.): What's Behind the L-tryptophan Ban? Medical Sciences

Benjamin, David M.: History and Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia Syndrome (EMS) and Approaches to Treatment. Presented: National ATLA meeting, San Diego, CA, July, 1990.

Benjamin, David M.: L-Tryptophan: A Pharmaceutical Detective Story, J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.: When Is A Drug Not A Drug? The L-Tryptophan Tragedy: Lessons To Be Learned, Drug Information Journal 26:(2) 231-236, 1992.

Benjamin, David M.: Risk Management Strategies for Prescribing Drugs, Presented at the Annual Meeting of the American College of Legal Medicine, Las Vegas, Nevada, March 11, 1993.

Benjamin, David M.: Elements of Causation in Toxic Tort Litigation: Science and Law Must Agree, J. Legal Medicine 14:153-165, 1993.

Benjamin, David M.: Prescriber Liability: Minimize Your Risks, Drug Therapy 23: (8) 15-26, 1993.

Benjamin, David M.: Distinguishing Reliable Science From Junk Science in the Post-Daubert Era, J. Mass. Acad. of Trial Attorneys, October, 1993, p.40-44.

Benjamin, David M.: Symposium Coordinator: The Impact of Daubert v. Merrell Dow Pharmaceuticals on the Admissibility of Expert Testimony, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.: The Use and Misuse of the Scientific Method, Statistics, and Epidemiology in the Evaluation of the Toxic Tort Case, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.: New Developments in Drug Therapy - Curses and Cures, Presented at the Annual Meeting of the American College of Legal Medicine, Anaheim, CA, March 11, 1994.

Benjamin, David M.: Communicating With Patients About Adverse Drug Reactions, Drug Therapy 24: (4) 36-38, 1994.

Benjamin, David M.: The Pharmacoepidemiology of Adverse Drug Reactions: The "First Year Effect" or Expansion of The Denominator. (Presented at the Annual Meeting of the Drug Information Association, Washington, DC, June 7, 1994.)

Benjamin, David M.: Recognizing & Preventing Adverse Drug Reactions, Drug Therapy 24: (6) 52-56, 199

Benjamin, David M.: Understanding Blood Alcohol Levels. (Presented at the Massachusetts Academy of Trial Attorney's Seminar on "Preparing & Trying Your Drunk Driving Case Under the New OUI Amendments", Boston, MA, October 5, 1994.

Benjamin, David M.: Legal Update: New State and Federal Case Law Implications for Testifying as an Expert (Presented at the Spring Conference of the American Board of Vocational Experts, Marco Island, FL, March, 1995).

Benjamin, David M.: Symposium Chairperson: Opportunities and Challenges in the Evaluation and Management of Chronic Pain (Presented: the Annual Meeting of the American College of Legal Medicine

Orlando, FL, March, 1995).

Benjamin, David M.: Medical-Legal and Regulatory Implications of Analgesic Therapy (Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March, 1995

Benjamin, David M.: Case Studies in Pharmaceutical Risk Management, Medical Sciences Bulletin 17:(12) 7, August, 1995; 18:(3) 3, November, 1995.

Benjamin, David M. and Buckman, Robert W.: Minimizing the Risk of Adverse Drug Reactions, The Fem Patient 21:47-61, April, 1996.

Benjamin, David M.: Putting the Inmates in Charge of the Asylum: Ethical Issues Involved in Governmer Sponsored LSD Testing in Unwitting Subjects, (Presented at Annual Meeting of the American Academy Forensic Sciences, Jurisprudence Section, February 20, 1997).

Benjamin, David M. and Bursztajn, Harold J.: Surreptitious LSD Administration: Ethical, Toxicologic and Psychiatric Impact on Toxic Tort Issues, (Presented at Annual Meeting of the American Academy of Forensic Sciences, Toxicology Section, February 20, 1997).

njamin, David M.: Vicarious Liability of Physicians and Hospitals in Drug Product Liability Litigation, (Presented at the Annual Meeting of the American College of Legal Medicine, Ft. Lauderdale, FL, March 7, 1997).

Benjamin, David M.: Onset of Severe Bromocriptine-Related Adverse Effects Correlates Well With Bromocriptine's Pharmacokinetic Profile, (Presented at the Annual meeting of the American Society for Clinical Pharmacology and Therapeutics, San Diego, CA, March 8, 1997).

Benjamin, David M. and Buckman, Robert W.: Selecting New Drugs for the Hospital Formulary, Medical Sciences Bulletin, 1997;20(2):9.

Benjamin, DM: Pharmacist/Pharmacy Negligence Litigation, Medical Science Bulletin, 1997;20(3):8.

Benjamin, David M., Mediation: A Better, Faster, Cheaper Way to Resolve Health Care Disputes, ssachusetts Lawyers Weekly, May 12, 1997, p. B5.

Benjamin, David M.: Alpha Blockers and the Law, (Presented at Annual Meeting of the American Acade of Forensic Sciences, Toxicology Section, February 11, 1998).

Benjamin, David M.:  The Death of J. Edgar Hoover - Pharmacological Afterthoughts  (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, February 13, 1998).

Benjamin, David M.: Session Moderator, Contributed Papers, Annual Meeting of the American College of Legal Medicine, Las Vegas, Nevada, March 19, 1998.

Benjamin, David M.: The Use of Medical Negligence Data in the Development of Risk Management Programs, (Presented at Annual Meeting of the American College of Legal Medicine, Las Vegas, Nevada, March 19, 1998).

Benjamin, David M.: Pharmaceutical Risk Management: Special Problems Encountered in the Hospital Setting, J. Healthcare Risk Management, 1998;18:3 (winter) updated in spring edition.

Benjamin, David M.:  Alcohol from Cough Syrup, Medical Review Officer Update, February 1999.

Benjamin, David M.: Exhumation of Saponified Remains Determining Manner of Death: Malinda McInto - Pharmacologic Analysis. (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, February 18, 1999).

Benjamin, David M.: Combinations of Ethanol and Prescription Drugs While Driving: Factoring Out the Effects of Ethanol. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Februar 19, 1999).

Benjamin, David M.: Symposium Chairperson: Mass Toxic Torts - Protecting the Public View While Advancing Medical Science: The Thin Red Line (Presented: the Annual Meeting of the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Pharmacological Overview of Mass Tort Litigation, (Presented: the Annual Meeting the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Testing for Drugs in the Exhumed Body: Confounding Issues in Quality Control, Specificity and Reliability, International Association of Forensic Sciences, Aug. 26, 1999, LA, CA.

Benjamin, David M.: Redesigning Drug Approval - Redefining Drug Safety: The Felbamate-Bromfenac .radigm, (Presented at the Annual Meeting of the American College of Clinical Pharmacology, Sept. 18 1999, Rockville, MD).

Benjamin, David M.: Evaluating Claims for Medication Errors, (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 5, 1999, Chicago, IL)

Benjamin, David M. and Starrs, James E.: Presenting Scientific Evidence in Court: Meeting the *Daubert* Standard for Reliability, (Presented at: the 52nd Annual Meeting of the American Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Reno, Nevada, February 21, 2000).

Benjamin, David M.: Chair, Teaching Forum: Educational Issues in Clinical Pharmacology: Updating the Curriculum for the New Millennium, 29th Annual Meeting of the American College of Clinical Pharmacolog Chicago, IL, September 19, 2000.

Benjamin, David M.: Medication Mis-Adventures: Case Studies in Clinical Pharmacology, 29th Annual Meeting of the American College of Clinical Pharmacology, Chicago, IL, September 19, 2000.

Benjamin, David M.: Are Pharmacologists/Toxicologists Without Medical Degrees or MDs Best Qualified Testify About Drugs?  (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Seattle, WA, February 23, 2001).

Benjamin, David M.: Common Defenses Asserted Against Driving Under the Influence of Drugs Claims. (Presented at: American Academy of Forensic Sciences Toxicology Section, Drug & Driving Committee Workshop: Drugs, Driving and Human Performance Testing, Seattle, WA, February 20, 2001).

Benjamin, David M. and Starrs, James E.: Abuse of Experts or Experts of Abuse? (Presented at: America Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Seattle, WA, February 20, 2001).

Benjamin, David M.: Drug Approvals, Drug Withdrawals: Deja Vu All Over Again, Pharmaceutical & Medical Devices Law Bulletin, Vol. 1, No. 6, June 2001.

Benjamin, David M.: Chair, Teaching Forum: Minimizing Medication Errors: Practical Pointers for

Prescribers, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Applications and Limitations of Back Extrapolation in Expert Testimony, Massachusetts Lawyers Weekly, page B-5, August 20, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety, (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 31, 2001, Boston, MA).

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety Through Better Communication, Focus on Patient Safety, National Patient Safety Foundation, 2001;4:6,8.

Benjamin, David M.: Patient Safety and New Drugs: View of a Clinical Pharmacologist, The More Things Change, the More Things Stay the Same Journal of Quality Health Care, 2002;1:17-21.

Benjamin, David M.: Driving Under the Influence of Medications: Are Physicians and Pharmacists Adequately Informing Their Patients of the Risks of Medication Use?  News & Vies (newsletter of Toxicologie Section of the AAFS) May 2002.

Benjamin, David M.: Chair, Teaching Forum: Legal Medicine for Clinical Pharmacologists, 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Theories of Liability Against Pharmaceutical Manufacturers, Investigators, Their Staff, Hospitals, Medical Schools & IRBs 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Development of Drugs and Dissemination of Safety Information by Healthcare Professionals (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 20, 2003).

Benjamin, David M.: Biological & Chemical Weapons: Perspectives in Clinical Pharmacology (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 21, 2003).

Benjamin, David M.: Medical, Legal and Public Policy Issues Arising out of Biological & Chemical Weapons (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M. and Blum, Richard S.: "Off-Label" Prescribing of Drugs: Are You Legal or Liable? (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Blum, Richard S. and Benjamin, David M.: The Dependence-Addiction Paradigm: Good vs. Bad - Treatment vs. Abuse (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M.: Minimizing Medication Errors: Practical Pointers for Prescribers, (Symposium Introduction) J Clin Pharmacol 2003;43:751-753.

Benjamin, David M. and Pendrak, Robert F.: Medication Errors: An Analysis Comparing PHICO's Close Claims Data and PHICO's Event Reporting Trending System (PERTS), J Clin Pharmacol 2003;43:754-759.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, J Clin Pharmacol 2003;43:768-783.

Benjamin, David M.: Chair, Teaching Forum: Ethics in Medicine, 32nd Annual Meeting of the American College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M.: The History of the Informed Consent Doctrine, 32nd Annual Meeting of the America College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M. : Symposium Chair : Application of the Principles of Pharmacology and Pharmacokinetics to the Interpretation of Drug Blood Levels. (Presented at: American Academy of Forensic Sciences, Las Vegas, NV, February 17, 2004).

Benjamin, David M. : Use of the Covino Algorithm in Evaluating the Additive Toxicity of Lidocaine and Pivacaine. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Las Vegas, NV, February 18, 2004).

Benjamin, David M. : The Death of Ted Binion: Drug OD/Suicide or Murder by Poisoning – When the Average Means Too Much. (Presented at: American Academy of Forensic Sciences, Last Word Society Las Vegas, NV, February 19, 2004).

Benjamin, David M. : Jurors' Right to Question Testifying Expert Rights Lawyers' Wrongs. (Presented at American Academy of Forensic Sciences, Jurisprudence Section, Las Vegas, NV, February 20, 2004).

Benjamin, David M.: Avoiding Medication Error: Using Therapeutic Drug Monitoring to Optimize Pharmaceutical Care with Gentamicin. *Protecting Your Practice*, February 2004, Farmers' Insurance.

Benjamin, David M.: Risk Management Strategies for Reducing Medication Errors. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

O'Donnell, James T. and Benjamin, David M.: Systems Failure in Oncology Drug Administration: Intrathecal Vincristine Leads to Permanent Paralysis. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

Benjamin, David M.: Reducing Medication errors by Re-Designing Your Medication Use Process. *Healthcare Perspectives*, April 2004, Farmers' Insurance.

<u>LECTURES</u>

Reporting of Side Effects and Drug Toxicity to FDA, Advanced Course for FDA Drug
Investigators, College of Physicians land Surgeons, Columbia University,
New York, New York, September 30, 1980.

The Regulation of New Drug Development land its Relationship to Drug Product
Liability Litigation, Pre-Meeting Workshop, Annual Meeting of the National
Forensic Center, Miami, FL, December 2, 1988.

The History land Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia
Syndrome (EMS) and Approaches to Treatment.  Presented: National ATLA meeting
San Diego, CA, July, 1990.

A History of Drug Product Liability Litigation & The L-Tryptophan Tragedy, November 19, 1990,
Selecting & Working With Experts, Feb. 24, 1997, Stetson University College of Law, St. Petersburg, FL

The Adulteration of L-Tryptophan. Presented at the ATLA,
L-Tryptophan/EMS Educational Update Meeting, Albuquerque, NM, December, 1990.

Good Manufacturing Practices (GMPs) and Their Application to the Synthesis and Administration of
F  diopharmceuticals in Positron Emission Tomography (PET) Scanning, Massachusetts General Hospit
Dept. of Nuclear Medicine, Boston, MA, April, 1991.

Testifying As An Expert In Court: Legal And Ethical Guidelines, Presented at
the Annual Meeting of the National Forensic Center, Orlando, FL, Dec. 8, 1991.

The Development land Testing of New Drugs land Biologicals With Special Reference to
Pharmacokinetics, land The Pharmacoepidemiology of Adverse Drug Reactions.  Biogen Inc., Cambridg
Mass., Feb. 23, 1994.

Understanding the Analysis of Blood & Urine Samples for Drug Abuse.  Mass. CLE. 11/22/94 & 9/13/95.

The Clinical Pharmacology of Risk Management.  Tufts University School of Medicine,
Division of Clinical Pharmacology, Boston, Mass., February 24, 1994, February 22, 1995, May 1, 1997.

Food land Drug Law 4/21/94. Regulation of New Drug Development land Public Policy Issues 4/13/95
Fordham University School of Law, New York, New York.

Risk Management Issues: Am I Going To Be Sued?, Boston Joint School Geriatrics
Symposium: Practical Issues in the Care of the Elderly, Harvard Medical School,
Boston, MA, January 21, 1995.

The Role of the Occupational Health Professional in the Toxic Chemical Exposure
Case, Harvard School of Public Health, Boston, MA, March 20, 1995, April 1, 1996, April 21, 1997,
March 9, 1998.

The Pharmacology of Blood Alcohol.  Liquor Liability Update '96, 2/13/96; Liquor Liability Update '98,
7/27/98;  OUI: The Basics land More. 5/5/96 Mass. CLE.

Benjamin, David M. land Bush, Donna M.: Preparing for Cross-Examination: Developing Active Listening
Skills.  Annual meeting of the American Academy of Forensic Sciences, Nashville, TN, Feb. 20, 1996.

Preparing to Testify as an Expert - Session Moderator: Expert Negligence Revisited: Mattco Forge v.
Arthur Young & Co., & Developing "Active Listening" Skills, Annual Meeting of the American College of

Wecht, Cyril land Benjamin, David M.: Evaluation land Commentary of the Strengths land Weaknesses the Experts in the O. J. Simpson Trial. Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 8, 1996.

Substance Abuse land Motor Vehicle Operation. State of Connecticut Department of Motor Vehicles' Medical Advisory Board, Wethersfield, CT, May 2, 1996.

Forensic Pharmacology. Brigham land Women's Hospital, Boston, MA, Aug. 14, 1996.

Risk Management Strategies for Minimizing Liability During Drug Development, ACI Conference on Dru land Medical Device Litigation, New York, NY, December 6, 1996.

The Use of Mediators With "Subject Matter Knowledge" in the Resolution of Health Care Disputes. The Center for Medical Ethics land Mediation, San Diego, CA, March 9, 1997.

Case Studies in Pharmacist/Pharmacy Negligence, Brigham land Women's Hospital, Boston, MA, Dec. 1997.

How to Stay Out of Hot Water! Reduce Your Medical Liability Exposure, PHYCOR IPA OFFICE MANAGEMENT SEMINAR, Dallas, Texas, February 26, 1998.

Reducing Medication Errors, Southwest Physicians Group, Dallas, Texas, February 27, 1998.
Pharmaceutical Risk Management, American Board of Quality Assurance land Utilization Review Physicians,
Tampa, FL, February 28, 1998.

Managing Risk land Errors in Medicine, Panel Member, American Board of Quality Assurance land Utilization Review Physicians, Tampa, FL, February 28, 1998.

Preparing to Testify as an Expert in Occupational land Environmental Medicine, American Occupational Health Conference, Boston, MA, April 29, 1998.

. ew Developments in the Admission of Scientific Evidence in Court, Annual Meeting of the International Association of Accident Reconstruction Specialists, July 13, 1998, Boston, MA.

Risk Management, Medical Grand Rounds, Department of Internal Medicine, University of Florida Health Science Center, Jacksonville, Florida, October 28, 1998.

Risk Management Strategies for Preventing Medication Errors, Medical Grand Rounds, University of Florida College of Medicine, Shands Teaching Hospital, Gainesville, Florida, October 29, 1998.

Evolving Strategies for Minimizing the Risk of Medication Errors, American Board of Quality Assurance & Utilization Review Physicians, "The Future of Health Care, 2000 land Beyond", San Antonio, Texas, November 14, 1998.

Daubert v. Merrell Dow Pharmaceuticals land the Introduction of Scientific Evidence; Analyzing Forensic Cases Involving Ethanol; How the Expert Can Assist the Attorney in Understanding Scientific Evidence; Medical Jurisprudence, Stetson College of Law, St. Petersburg, Florida, 3 semesters in each of 1997 & 1998.

Constitutional land Evidentiary Issues in Testifying as an Expert in a Drug Testing Case, Annual Meeting

Risk Management Strategies for Reducing Medication Errors in Pharmacy Practice, Kaiser Healthcare, Department of Pharmacy, Kansas City, MO, February 12, 1999.

Minimizing Medication Errors in Your Practice, Department of Medicine, VA Medical Center, Shreveport, LA, April 8, 1999.

Reducing the Risk of Medication Errors land Medical Negligence, Louisiana Association for Healthcare Quality, Shreveport, LA, April 9, 1999.

Medical, Legal & Risk Management Issues for the Judicious Use of Medications by Neurologists, 51st Annual Meeting of the American Academy of Neurology, Toronto, Ontario, Canada, April 22, 1999.

Technology and Blood Alcohol, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 199

Field Sobriety Testing, Urine Drug Screening, land Drug Recognition Testing, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 1999.

Update on *Daubert* and *Kumho* for Educators, Associated Education Experts, Westerville, Ohio, May 18, 1999.

Preparing land Filing a Medical Device Regulatory Submission, DIA/MCPHS, Boston, MA, August 5-6, 1999.

Update on *Daubert* and *Kumho* for Vocational/Rehabilitation Experts, land Preparing to Testify as a Vocational or

Rehabilitation Expert Under *Daubert* land *Kumho*, California Association of Rehabilitation & Reemployment Professionals, San Diego, CA, October 16-17, 1999. Co-Presenter: David Stein, Ph.D., ABVE

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, San Diego, CA, November 6, 1999.

Understanding Ethanol Pharmacology land Breathalyzer Testing, 1999 Traffic Adjudication Seminar for Judges, Naples, FL , December 9, 1999. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Faculty, Harvard Medical School Risk Management Program Medical and Surgical Practitioners in Court land the Mental Health Clinician in Court: A Survival Guide, December 11, 1999.

Update on *Daubert, Joiner* & *Kumho* With Regard to the Admission of Expert Testimony in Court, George Washington University Law School, Washington, DC, January 19, 2000.

Product Liability Litigation as it Impacts Healthcare Professionals and Hospitals, American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, April 1, 2000.

The Application of Clinical Pharmacology to Risk Management: Minimizing the Risk of Litigation, Grand Rounds, Rush-Presbyterian- St. Lukes Medical Center, Chicago, IL, May 30, 2000

Faculty, American Bar Association 2000 Annual Meeting - Assassination of J. Edgar Hoover? A High-Tech Hearing - Presidential Showcase Status, New York, New York, July 8, 2000.

Risk Management Strategies for Reducing Medication Errors in the Hospital Setting, Wilcox Memorial Hospital, Kauai, HI, July 31, 2000 & Hawaii Association for Healthcare Risk Management, Honolulu, HI, August 1, 2000.

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, Chicago, IL, September 16, 2000.

Drug Product Liability Litigation and Vicarious Liability of Healthcare Professionals land Hospitals, American Board of Quality Assurance land Utilization Review Physicians, Chicago, IL, September 16, 2000.

Evidence-Based Drug Selection: Raising Your Consciousness About Medication Errors, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, November 18, 2000.

Minimizing Medication Mistakes, Harvard Medical School Risk Management Program, December 1, 2000, Boston, MA.

Recognizing & Responding to Trick Questions, Harvard Medical School Risk Management Program, December 2, 2000, Boston, MA.

Understanding Ethanol Pharmacology and Breathalyzer Testing, 2000 Traffic Adjudication Seminar for Judges, Palm Harbor, FL , December 7, 2000. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Medication Mis-Adventures: Perils of Prescribing, Woman's Hospital Medical Staff Leadership Retreat, New Orleans, LA, January 7, 2001.

Prescription for Malpractice: Legal Issues in the Prescriber-Patient Relationship, Faculty Panel Member, American Health Lawyers Association, New York, New York, January 25, 2001.

Responding to Subpoenas: "Know When to Hold 'Em land When to Fold 'Em", American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, March 3, 2001.

Daubert, Joiner & Kumho and the Admissibility of Expert Testimony for Forensic Nurses, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, 4/27/01

Drug Facilitated Rape: Which Drugs are Used land How do you Collect the Evidence, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, April 28, 2001.

Faculty, American Bar Association 2001 Annual Meeting - The Boston Strangler Case land the Death of Mary Sullivan  Were Drugs Involved?  American Bar Association Meeting  A High-Tech Hearing - Presidential Showcase Status, Chicago, IL, August 4, 2001.

The Impact of Daubert, Joiner & Kumho on Testifying as a Forensic Toxicologist, Annual Meeting of the Society of Forensic Toxicologists, New Orleans, LA, October 1, 2001.

Drug Product Liability and Vicarious Liability of Hospitals and Healthcare Professionals, Suffolk Law School, Boston, MA, October 16, 2001.

Using the Principles of Clinical Pharmacology in Risk Management, Thomas Jefferson University, Department of Medicine, Division of Clinical Pharmacology, Philadelphia, PA, November 9, 2001.

Patient Safety land Prescriber Risk Management, American Board of Quality Assurance land Utilization Review Physicians, Philadelphia, PA, November 10, 2001.

Benjamin, David M. and Langer, Carolyn S.: Liability Issues in Occupational Medicine, New England College of Occupational & Environmental Medicine, December 7, 2001, Boston, MA.

Benjamin, David M. land Hochhaus, Gunther: Perils of Prescribing - Introduction land Case Studies, Joi Meeting of AGAH land the American College of Clinical Pharmacology, Garmisch-Partenkirchen, Germany, January 27, 2002.

Understanding Ethanol Toxicology & Breathalyzer Testing, New Hampshire Bar Association, February 2002.

Integrated Drug Delivery: Quality Improvement land Patient Satisfaction, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, April 12, 2002.

Overview of Medication Errors, Saint Elizabeth's Hospital, Boston, MA, June 24, 2002.

Risk Management Strategies for Reducing Exposure to Litigation in the Pharmaceutical Industry, armaceutical Risk Management Conference, Philadelphia, PA, December 2, 2002.

Clinical Pharmacology as a Risk Management Tool for Reducing Medication Errors. Keynote Address Lovelace Medical Fondation, Albuquerque, NM, March 15, 2003

Implementing Strategies to Decrease Medication Errors (workshop) Lovelace Medical Foundation, Albuquerque, NM, March 15, 2003

How to use Failure Mode Effect Analysis (FMEA) to identify areas of risk in your medication managemen system. David M. Benjamin, John Santell and Glenn Krasker. National Audio Conference, November 19 2003. Sponsored by HCPro.

JCAHO National Patient Safety Goals : How to face changes coming in 2004. Richard J. Croteau, MD, David M. Benjamin, Ph.D., and Grena G. Porto, RN, ARM, CPHRM. National Audio Conference, cember 2, 2003. Sponsored by the American Society for Healthcare Risk Management (ASHRM).

Using the Principles of Clinical Pharmacology to Reduce Medication Errors & Increase Patient Safety. Medication Safety & Quality Committee, Tufts-New England Medical Center, January 15, 2004.

Understanding How the Alcotest 7110 Breathalyzer Works. Understanding the New Law, Strategies for Trying an OUI Case, Suffolk Law School, February 6, 2004.

Risk Management Strategies for Reducing Medication Errors. Grand Rounds for the Medical House Staf at Tufts-New England Medical Center. Boston, MA, May 29, 2004.

Liquor Liability in the Civil and Criminal Courts. Presented at the annual meeting of American Association of Legal Nurse Consultants. Chicago, IL, April 2, 2004.

The Information-Technology Gap : The Greatest Obstacle to Quality Care. Grand Rounds, Thomas Jefferson University, Deptartment of Medicine, Division of Clinical Pharmacology. June 8, 2004

**BOOK CHAPTERS**

The Effects of Drugs on Sexual Response, in The New Sex Therapy, 2nd Edition, Kaplan, H.S., Brunner/Mazel, 1978.

Forensic Pharmacology, in Forensic Science Handbook, Volume III, Richard Saferstein, Ph.D., (Ed.), Prentice Hall, 1993.

Making the Expert a Part of the Litigations Team and Educating the Defense Witness About the Litigation Process (contributor), in Reengineering Healthcare Liability Litigation (Zaremski land Heckman, eds.), Michie, 1997.

PEARLS for Medication Error Reduction, David M. Benjamin, PhD, Chair, American Society for Healthcare Risk Management, October 2001.

A.   Exhibits to be used as a summary of, or as support for the opinions of David M. Benjamin, Ph.D

    1.   September 26, 2003 bill for the group believed to include Jeffrey Southworth, and the RARE Hospitality International, Inc., d/b/a Longhorn Steakhouse Audit Report of that date, reflecting food and beverages believed served to the Southworth group

    2.   Widmark computer calculations, copies of which are included with Dr. Benjamin's report

    3.   Chart from Chapter II entitled, "Acute Alcoholic Intoxication" from the 1968 American Medical Association publication "Alcohol and the Impaired Driver"

    4.   Various portions of Exhibit 5, entitled "Server Guide" and Exhibit 6, entitled "Manager Resource" to the deposition of Charles Boullaine

B.   Compensation for Dr. Benjamin's time in court is $500 per hour

**2-1**

```
 1                        Volume II
                         Pages 1 - 127
 2                       Exhibits 9 - 15

 3            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4    No. 05-CV10617MLW

 5

      NANCY ROSARIO, INDIVIDUALLY, AS SHE   )
 6    IS THE ADMINISTRATRIX OF THE ESTATE OF )
      AWILDA SANTIAGO, ESSEX PROBATE COURT   )
 7    DOCKET 03P-2499ADI, P/P/A VERONICA     )
      ROSARIO AND CHRISTINA SANTIAGO, AND AS )
 8    SHE IS THE ADMINISTRATRIX OF THE ESTATE)
      OF JOSE SANTIAGO, BERLIN (CONNECTICUT) )
 9    PROBATE COURT CASE #03-0713            )
                       Plaintiffs )
10                               )
           vs.                   )
11                               )
      RARE HOSPITALITY INTERNATIONAL, INC.,  )
12    D/B/A LONGHORN STEAKHOUSE,       )
                       Defendants )

13

14            CONTINUATION OF DEPOSITION OF DAVID
15    M. Benjamin, taken on behalf of the defendants, pursuant to
16    the Federal Rules of Relations Procedure, before Josephine
17    C. Aurelio, Registered Professional Reporter, a Notary
18    Public within and for the Commonwealth of Massachusetts, at
19    the Law Offices of Gillis & Bikofsky, 1150 Walnut Street,
20    Newton, Massachusetts, on Friday, February 9, 2007,
21    commencing at 2:09 p.m.
22

              GABRIEL & SWEENEY COURT REPORTING
23        15 Van Wart Path | 19 Summer Street
            Newton, MA 02459 | Acton, MA 01720
24          (617) 969-4791 Phone (978) 266-1352
```

**2**

```
 1    APPEARANCES:
 2      ALBERT I. FARRAH, JR.  ESQ.
           One Washington Mall
 3         Boston, MA 02108
           representing the plaintiffs
 4

 5      MICHAEL K. GILLIS, ESQ.
        DAVID BIKOFSKY, ESQ.
 6      NEIL SCHNURBACH, ESQ.
           Gillis & Bikofsky
 7         1150 Walnut Street
           Newton, MA 02461
 8         representing the defendants

      VIDEO OPERATOR, BRETT ST. GELAIS
 9         National Video Reports, Inc.
           58 Batterymarch Street, Suite 243
10         Boston, MA 02110

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**2-3**

```
 1              I N D E X
      Deposition of:   Direct  Cross  Redirect  Recross
 2
      DAVID M. BENJAMIN    4
 3

 4

 5

 6              E X H I B I T S
      No.                        Page
 7
      9  Submission of February 1, 2007      8
 8
      10 Letter of January 29, 2007          8
 9
      11 EZ-ALC, Widmark formula            16
10
      12 Photographs                        40
11
      13 Graph                              78
12
      14,15  Photographs                    86
13

14
15
16
17
18
19
20
21
22
23
24
```

**2-**

```
 1              P R O C E E D I N G S
 2
 3              DAVID M. BENJAMIN, called by the
 4    defendant, first having been satisfactorily identified by
 5    the production of his Massachusetts driver's license, and
 6    previously duly sworn by the Notary Public, on oath deposes
 7    and says as follows:
 8              CONTINUATION OF DIRECT EXAMINATION
 9              BY MR. GILLIS:
10              VIDEO OPERATOR: We're now recording and on
11    the record.  My name is Brett St. Gelais. I'm a legal
12    video specialist for National Video Reporters.  Our
13    business address is 58 Batterymarch Street, Suite 243,
14    Boston, Massachusetts, 02110.
15              Today's date is February 9, 2007, and the
16    time is 2:09 p.m.
17              This is the deposition of Doctor David
18    Benjamin in the matter of Nancy Rosario, et al, plaintiff,
19    versus Rare Hospitality International, Incorporated, d/b/a,
20    Longhorn Steakhouse, defendants, in the U.S. District
21    Court, District of Massachusetts, Case No. 05-CV10617MLW.
22              This deposition is being taken at 1150
23    Walnut Street, Newton, Massachusetts, on behalf of the
24    defendant.  The court reporter is Josephine Aurelio of
```

2-5

1  Gabriel & Sweeney.
2        Counsel, will you please state your
3  appearance, and will the court reporter administer the
4  oath.
5        MR. FARRAH: I'm Albert Farrah, and I
6  represent the plaintiffs in this action.
7        MR. GILLIS: My name is Michael Gillis.
8  I'm here representing the defendants in this action.  With
9  me, but just left the room, is Attorney Neil Schnurbach.
10        Also present is Attorney David Bikofsky, all
11  representing the defendants in this action.
12    Q.  Doctor Benjamin, you understand that you're still
13  sworn from the prior portion of this deposition, correct?
14    A.  Yes, I do.
15        MR. GILLIS: Before we go on the record, I
16  just want to state that the plaintiffs have provided us,
17  which we'll get marked as an exhibit, documents that were
18  sent by plaintiff's counsel, Albert Farrah, to our office
19  on February 1 which is since the last day of Doctor
20  Benjamin's deposition.
21        I feel compelled to put the statement that
22  on the record that on May 16, 2005, Doctor Benjamin filed a
23  60-J affidavit in connection with this matter wherein he
24  expressed certain opinions relative to Jeff Southworth's

2-

1  consumption of alcohol, his state of intoxication at the
2  Longhorn Restaurant on the evening of September 26, 2003.
3        He again expresses his opinions in the
4  plaintiffs' answers to interrogatories filed on or about
5  July 14 2006.
6        On October 31, 2006, the plaintiffs filed a
7  Rule 26 disclosure containing Doctor Benjamin's opinions
8  and expected testimony concerning Southworth's consumption
9  of alcohol, his state of intoxication at the Longhorn
10  Restaurant on September 26, 2003.
11        The opinions and expected testimony
12  contained in the disclosure differed markedly from those
13  expressed in the 60-J affidavit and the plaintiff's answers
14  to interrogatories.
15        On January 26, 2007, Doctor Benjamin's
16  deposition was commenced, and following the deposition, we
17  received on date of February 1, 2007 a supplement to Doctor
18  Benjamin's Rule 26 disclosure which was filed with our
19  office.
20        Once again, Doctor Benjamin expressed new
21  opinions inconsistent and different from the previous ones
22  expressed.
23        Further, it's clear that the supplement,
24  that the new inconsistent opinions are not based on any

2-7

1  information or facts not available for answer when filed in
2  the Rule 26 disclosure was filed.
3        Thus, I'm reserving all rights to strike
4  Doctor Benjamin's supplemental answers and any new Rule 26
5  disclosure that is filed.
6        I'm reserving all rights to strike Doctor
7  Benjamin's supplemental or different opinions expressed
8  therein.
9        In light of Doctor Benjamin's schedule and
10  the deadline set by the Court in this litigation, we intend
11  to go forward today with the deposition and prior
12  testimony, prior expert opinions of Doctor Benjamin.  We
13  reserve all rights to file an appropriate motion to strike.
14        Moreover, in the event that the motion is
15  denied, we're reserving our rights to have another
16  opportunity to depose Doctor Benjamin concerning his new
17  opinions and will seek costs for the cost of the deposition
18  today based on the outdated testimony of Doctor Benjamin.
19        MR. FARRAH: Do you want me to respond?
20        MR. GILLIS: You can do whatever you'd like,
21  but I want to mark this first as the submission we got from
22  you dated February 1, and then we'll also mark the second
23  submission which is being copied right now which was your
24  letter, I believe dated January 29, to our office with

2-

1  various materials as well.
2        (Exhibit Nos. 9,10 marked
3        for Identification).
4        MR. FARRAH: Let me say this for the record,
5  because I think I ought to make a slight, at least a slight
6  response.
7        I provided you with both what have been
8  marked now as Exhibits 9 and 10, so you'll have them and
9  have an opportunity to examine Doctor Benjamin about the
10  statements and opinions contained in them.
11        With respect to the supplemental disclosure
12  and the reference in the supplemental disclosure to his
13  Rule 60-J affidavit, I want to point out to you that you've
14  marked the 60-J affidavit as an exhibit in this deposition
15  and have asked him a number of questions about the 60-J
16  affidavit already.
17        And I don't need to go to the prior day's
18  deposition to reference those pages, but I think you're
19  aware of that fact.
20        With respect to any other portions of this
21  supplemental disclosure, they are, to my way of looking at
22  them, consistent with the information already contained in
23  and an expansion on the Rule 26 report already supplied
24  you, and I'm going to object to any opportunity to take his

2-9

1  deposition further.
2        And I invite you to continue your inquiry
3  into what he disclosed in his Rule 60-J affidavit and
4  what's disclosed in the supplemental Rule 26 report marked
5  Exhibit 9 and the letter to you of January 29, 2007 marked
6  Exhibit 10.
7        I don't see any remote prejudice to you at
8  this stage of the proceeding in receiving these documents
9  when you received them.  But you choose to do what you
10  choose to do in terms of inquiring about what's contained
11  in Exhibits 9 and 10.
12        MR. GILLIS:  Well, you're well aware that we
13  just got these last week, and I'm on trial all week and it
14  will be impossible for us to get a full review of this by
15  our experts on this short date.
16        But this was the only date that you were
17  able to provide us in the month of February in order to get
18  Doctor Benjamin's deposition completed, correct?
19        MR. FARRAH:  I'm aware of the fact that
20  there are three lawyers sitting in this room during this
21  deposition as there were three lawyers from your firm
22  sitting in the deposition room during the last deposition.
23        There's no effort here to provide you with
24  anything less than a full opportunity to examine this

2-1

1  witness.
2        And if you're telling me that you don't have
3  sufficient time, you didn't have sufficient time to review
4  this, we can talk about -- if you didn't have sufficient
5  time to review Exhibits 9 and 10, we can talk about a
6  continuation of his deposition at a later date.  That
7  choice is yours.
8     Q.  Doctor Benjamin, I believe when, not too far
9  before the time we finished up the first part of the
10  deposition, we had been going through with you those parts,
11  those visible signs of intoxication that you believe were
12  present in Jeffrey Southworth on the night in question, is
13  that correct?
14        MR. FARRAH:  Objection to the form.
15     A.  Not really what I believed.  What I cited from
16  Jude Connelly's deposition testimony.
17     Q.  And just so I can go through them, please restate
18  the visible signs that you believe were apparent in Jeffrey
19  Southworth on the night of this accident -- excuse me -- at
20  the Longhorn Steakhouse on this evening?
21     A.  Well, I have his deposition in front of me from
22  the Middlesex Superior Court case, and when he was asked
23  about what did he show that were indicative of
24  intoxication, the response on Page 50 starting at Line 9,

2-11

1  was sloppier looking than he usually is?  A little bit,
2  yes.  Was he louder than he usually appeared?  Yeah, I
3  mean, yeah.  Were his eyes glassy at all, Line 23? Maybe,
4  yeah.
5        And I know there was one other statement
6  that he wasn't carrying himself the way he normally did.
7     Q.  Okay.  We went into great detail about the
8  loudness last time, so we don't need to go into that again
9  today.  And I believe we carried the carrying as well.
10        But let me ask you one further question
11  about the carrying.  Based on everything that you
12  reviewed, how did the way he carried himself that night
13  affect, if you know, the way he was walking when he was at
14  the Longhorn?
15        MR. FARRAH:  Objection.
16     A.  Well, I don't interpret carrying one's self to
17  refer only when walking.
18     Q.  Okay.  But was there anything about the way he
19  was carrying himself that evening that you're aware of that
20  showed up in the way he walked?
21     A.  I have no other specific facts to go on other
22  than this witness's characterization, that he wasn't
23  carrying himself in the way that he usually did.
24        I wouldn't presume to try to interpret more

2-1

1  from it except that the only thing that I get out of it
2  when he's sober, he looks differently or carries himself
3  differently.  To me, it's the contrast that this gentleman
4  is making.
5     Q.  And that's with somebody who has some experience
6  with Jude Connelly and knows him when he's not drinking,
7  correct?
8        MR. FARRAH:  Objection.
9     A.  Yes.
10     Q.  What about the way he was carrying himself would
11  have alerted a waitress that he may have had too much to
12  drink?
13        MR. FARRAH:  Objection.
14     A.  Once again, I told you that I don't feel that I
15  can interpret that because you would have to ask Mr.
16  Connelly about what he specifically meant.
17     Q.  Okay.  So as far as visible signs, not carrying
18  himself, you can't say as you sit here today something
19  specifically that he did that alerted, should have alerted
20  the wait staff to his being under the influence based
21  solely on the way he was carrying himself, correct?
22        MR. FARRAH:  Objection.
23     A.  Well, I'm not sure that I can or cannot.  What I
24  can not do is I cannot look inside Mr. Connelly's mind and

2-13

1  no specifically what he was referring to.
2      Q.  I agree with you.  But from where in a situation
3  where he said he's not carrying himself the same way
4  because he was sleeping at the table, that's an indicia
5  that a wait person should be able to pick up on, correct?
6          MR. FARRAH:  Objection.
7      A.  Well, if somebody was sleeping on the table or
8  had their head down, you actually made a gesture of like
9  putting your head and your arm down like we all used to do
10  in elementary school when the teacher told us to take nap.
11  I don't know that that occurred.
12      Q.  What time during the evening, what time frame was
13  it that Mr. Connelly observed Mr. Southworth not carrying
14  himself the way he normally did?
15      A.  There is not a specific reference here to time.
16      Q.  Okay.  So that --
17      A.  Let me finish, please.  On Page 49, starting Line
18  12, he is asked, While you were at the Longhorn, did Jeff
19  appear to you to be under the influence of what he had been
20  drinking at the Longhorn?
21          And the answer is, I mean, yeah, a little
22  bit.  So the time reference that he gives is while Jeff
23  and the others were at the Longhorn.  That's the time
24  reference.

2-14

1          There's no clock time given, just the
2  interval.
3      Q.  Okay.  And the time that was given for when he
4  felt he was under the influence, correct?
5          MR. FARRAH:  Objection.
6      A.  I beg your pardon?
7      Q.  You just read the time that he was under the
8  influence was while at the Longhorn, is that correct?
9          MR. FARRAH:  Objection.
10      A.  Yes.
11      Q.  It doesn't say specifically what the time frame
12  was for when he wasn't carrying himself, correct?
13          MR. FARRAH:  In the deposition that he just
14  read to you, you're asking?
15      Q.  Do you have any evidence, evidence from any
16  source that you've reviewed that tells you specifically
17  that some time before he got his last drink that night, he
18  was showing signs of not carrying himself the way he
19  normally does?
20          MR. FARRAH:  Objection.
21      A.  I think the record does not provide specific time
22  notations, unfortunately.
23      Q.  Thank you.  Now, by the way, before I forget,
24  since the last deposition, the same deposition but the

2-15

1  previous day of it, have you reviewed any documents in
2  preparation for today?
3      A.  I pulled out Jude Connelly's deposition.  I
4  pulled out --
5      Q.  And that's in the Southworth Middlesex action,
6  correct?
7      A.  Yes, sir, the one I just cited a moment ago.  I
8  pulled out Lee Chabot's witness statement, and that's about
9  what I did.
10          I also brought a couple of photos with me.
11  At least one of the photos of Jeffrey you showed me last
12  week was not the one that I had seen and I wanted to be
13  sure you had a opportunity, even though plaintiff's counsel
14  assures me that he sent them all to you.
15          And you did ask me to provide you with a
16  graph for the first half hour, and I ran that out for you.
17      Q.  Okay.  Let's very quickly mark some of these
18  things.
19          This is, the first one that we'll mark is
20  Exhibit 11, the EZ-ALC, which is the Widmark computer
21  calculation formula you used in these cases to make your
22  calculations, correct?
23      A.  Not that I use.  Your expert uses the same one.
24      Q.  Are these the ones you use, yes or no?

2-16

1      A.  This is the one I used.
2      Q.  Okay.  And this is for the time period that
3  wasn't included, that was prior to the starting time that's
4  in your expert report, correct, your Rule 26 submission?
5      A.  Please ask that again.
6      Q.  This particular page you gave me is starting at
7  7:30 and goes until nine o'clock, correct?
8      A.  Yes, it does.
9      Q.  And the one in your expert submission starts at
10  nine o'clock, correct?
11      A.  That is correct.
12      Q.  Okay?
13          MR. GILLIS:  Let's have this marked as
14  Exhibit 11.
15          (Exhibit No. 11 marked for
16          Identification).
17      Q.  Now, Doctor Benjamin, based on Exhibit 11 here
18  and based on your review of the evidence in this case, do
19  you have an opinion if at any time between 7:30 p.m. that
20  evening and nine o'clock p.m. that evening that Jeffrey
21  Southworth would have been showing any visible signs of
22  intoxication based on his alcohol consumption?
23          MR. FARRAH:  Objection.
24      A.  Based on his consumption or based on the blood

2-17

1    alcohol levels that are shown on the graph?
2        Q.   Based on the blood alcohol levels that are shown
3    on the graph.
4        A.   The likelihood that he'd be showing visible signs
5    at this point in time are low.
6        Q.   You're not going to render an opinion that he
7    showed visible signs of intoxication prior to nine p.m. on
8    that evening, are you?
9            MR. FARRAH:  Objection.
10       A.   Impairment, maybe.  Intoxication, no.
11       Q.   What signs of impairment are you aware of that
12   Mr. Southworth exhibited that evening before or up to nine
13   o'clock?
14           MR. FARRAH:  Objection.
15           MR. GILLIS:  What's the objection?
16           MR. FARRAH:  Before or up to.
17       Q.   Prior to nine o'clock that evening, are you aware
18   of any visible signs of impairment that Mr. Southworth
19   exhibited on the night of this accident?
20       A.   Well, I think that that question really has to be
21   addressed to one of the fact witnesses who was there
22   because, once again, I'm having difficulty interpreting Mr.
23   Connelly's statement who said that Jeff did show signs of
24   being under the influence while he was in the Longhorn.

2-

1            Certainly, this time interval represents the
2    time that he was in the Longhorn or a portion of the time
3    he was in the Longhorn.
4            But I said specifically a few moments ago
5    there was no time designation.   So I don't have any basis
6    for saying it.  But I don't have any basis for saying no,
7    either, Mr. Gillis.
8        Q.   As you sit here today, you have no basis for
9    saying that he was impaired prior to nine p.m. on June 26,
10   2007 -- "he" being Mr. Southworth -- at the Longhorn
11   Steakhouse, correct?
12       A.   I have a basis saying he's impaired because he's
13   at .08 which is the impairment level in the Commonwealth.
14           I draw a big distinction between the word
15   impairment and the word intoxication, and I believe the
16   Courts do as well.
17       Q.   How do they differ?
18       A.   Impairment means you're not normal.   It doesn't
19   necessarily mean you're showing those signs.
20           So in order to prove impairment, a police
21   officer might interview you and ask you to do some
22   psychomotor testing, or prove your memory, or answer some
23   questions.
24           But you might not be explicitly showing

2-19

1    external visible signs, whereas when you're intoxicated,
2    any person who's ever seen a drunk or a person who's
3    intoxicated would be able to characterize that person as
4    such.
5            Any of the jurors would because we've all
6    gone to weddings, bar mitzvahs, Christmas parties, and we
7    have that in our common knowledge.
8            So impairment starts in the brain first
9    where you have confusion or problems with judgment, and
10   then works its way down to where you're stumbling and
11   stuttering.
12       Q.   And .08 is the legal presumption of impairment,
13   not the fact that everybody is impaired at that rate,
14   correct?
15           MR. FARRAH:  Objection.
16       A.   Certainly, that's a per se level that is adopted,
17   I believe by statute, and that's it.  But I think what
18   we're talking about is just the difference between the word
19   impairment and intoxication.
20       Q.   You mentioned earlier that you felt he was a
21   little unkempt, is that correct?
22       A.   I think that that was, if I mentioned that, I was
23   quoting Mr. Connelly.
24       Q.   And unkempt and sloppy looking --

2-2

1        A.   Sloppy looking --
2            MR. FARRAH:  I'm sorry.  Please let him
3    finish his question so I'll have a change to object if I'm
4    going to object.
5        A.   I'm sorry.
6        Q.   When you said earlier in your deposition -- and
7    I'll assume you did say it -- that he was unkempt, is that
8    to you synonymous with sloppier looking than normal?
9        A.   Yes, and I believe sloppier looking was part of
10   the testimony given at one point in time.
11       Q.   So we can use those words interchangeably based
12   on your testimony?
13           MR. FARRAH:  Objection.
14       A.   If you want to define those -- unkempt and
15   sloppier looking -- to me, unkempt would be, you know, hair
16   disarrayed, maybe shirt pulled out, kind of -- not looking
17   well-groomed.
18       Q.   Okay.  And what would sloppier looking be in your
19   definition?
20       A.   About the same thing.  That's why I say, if we're
21   going to define those as being synonymous terms.
22       Q.   What were the specific characteristics of Mr.
23   Southworth when he was at the Longhorn Steakhouse on
24   September 26, 2003 that showed that he was sloppier looking

2-21

1  than normal?
2      A.  That was never described to my knowledge.   The
3  general statement was made.
4          But the things that you just asked me about
5  a moment ago, I didn't read nor do I recall any specific
6  statement about some of the things that might have led him
7  to say that.   But it was certainly his impression.
8      Q.  What time, hour -- I'll rephrase the question.
9          What specific time during the evening that
10 night at the Longhorn is it that you're understanding is
11 that he looked sloppier than normal?
12     A.  Once again, Mr. Gillis, the question is a good
13 question because I never saw a specific time reference.
14     Q.  Okay.   And you realize they had been dirt
15 biking, correct?
16     A.  Yes.
17     Q.  And they wore helmets when they were birth
18 biking, correct?
19     A.  Yes.  I assume so.
20     Q.  And that they went directly from dirt biking to
21 the restaurant, correct?
22     A.  Yeah.
23     Q.  Do you have any evidence that there coming
24 directly from dirt biking is what he meant by sloppier

2-22

1  looking than normal compared to anything to do with
2  alcohol?
3      A.  You're going to have to ask me that again.
4      Q.  Okay.  Sloppier looking than normal, you can be
5  sloppier looking more than normal from things other than
6  being intoxicated, correct?
7      A.  You could just be a slob.
8      Q.  Correct.   You could have just come from dirt
9  biking, correct?
10     A.  Well, you can come from dirt biking and your
11 clothes might be dirty, but you can tuck them in and you
12 can comb your hair even when you took your helmet off.
13         And there were many opportunities when I was
14 a younger man where I played sand lot football with a bunch
15 of guys or baseball and --
16         MR. GILLIS:  Move to strike.
17     A.  Well, I'm sorry.
18         MR. FARRAH: Let him finish.
19     A.  At least let me get it out before you strike it.
20         But there are times where somebody said,
21 let's go visit so and so, or let's go visit so and so, and
22 we were in play clothes with dirt on them.
23         But we tucked our clothes in and we combed
24 our hair, and we had some dirt from the field on us, but we

2-23

1  weren't unkempt or sloppy.   We were just a little dirty.
2      Q.  Okay.   But before you cleaned yourself up, you
3  weren't intoxicated, were you?
4      A.  Certainly not.
5      Q.  So being sloppier looking than normal is not in
6  and of itself an indicia that someone is intoxicated,
7  correct?
8      A.  Well, that depends.  Apparently, in Mr.
9  Connelly's mind, when he was asked what were the indicia,
10 he volunteered that freely as his statement.
11         So that had meaning to him, and I can't
12 contradict what he thought was a salient point.   So he
13 felt that that was significant.
14         You or I might characterize it differently,
15 and there could be a million other scenarios when something
16 else obtained.  But he answered that question and he used
17 those descriptions.
18     Q.  What was it about the way Mr. Southworth looked,
19 that being more sloppier than normal, that the wait staff
20 should have picked up on that evening while they were
21 serving him that would have indicated to them that he may
22 have visible signed of intoxication?
23         MR. FARRAH:  Objection.
24     A.  Once again, you need to address that question to

2-24

1  Mr. Connelly, not to myself because I understand the
2  general statement that was made.
3          But I can't break it down to the specifics
4  that you're asking of me.
5      Q.  And what I am getting to, you're aware of
6  certain signs that are directly related to intoxication
7  such as a heavy odor of alcohol on your breath, correct?
8      A.  Odor of alcohol on the breath is not a sign of
9  intoxication.  It's a sign of prior ingestion.
10     Q.  And glassy eyes, isn't that normally something
11 you see?
12         MR. FARRAH:  Objection.
13     A.  Glassy eyes would be, in my estimation, would be
14 a sign of alcohol effect.
15     Q.  Slurred speech?
16     A.  Yes.
17     Q.  What else would be more likely than not to you a
18 sign of, a visible sign of intoxication like slurred
19 speech?
20     A.  Slurred speech is another good one,
21 incoordination, being loud or boisterous.
22     Q.  But when Mr. Connelly was asked visible signs of
23 intoxication, he didn't say that he was unsteady, Mr.
24 Southworth was unsteady on his feet, did he?

2-25

1    A.  They were seated at the time, sir.
2    Q.  At any time during the evening, he never said
3  that he got up know and was unsteady on his feet, correct?
4    A.  He said what I read to you out of the deposition.
5    Q.  He never said he was unable to speak coherently,
6  correct?
7    A.  I didn't see that statement.
8    Q.  Okay.  And you didn't see any incoordination at
9  the table, correct?
10    MR. FARRAH:  Objection.
11    A.  You mean I didn't read any description of Mr.
12  Southworth having exhibited incoordination at the table?
13    Q.  Correct?
14    A.  Did not, sir.
15    Q.  Okay.  You didn't read anything that Mr.
16  Connelly said that Mr. Southworth on that evening had a
17  heavy odor of alcohol on his breath, correct?
18    A.  Everybody but Jude was drinking.  Knowing that
19  the sense of smell becomes olfactory, once you have it in
20  yourself, you can't smell it in other people too terribly
21  well.
22    Q.  There's no indication from Jude Connelly that he
23  thought Mr. Southworth had a heavy smell of alcohol on
24  his breath, correct?

2-2

1    A.  I did not see any statement to that, but I would
2  not expect to have seen that.
3    Q.  Now, the glassy eyes, when that evening at the
4  Longhorn was it your understanding that the eyes were
5  glassy?
6    A.  I don't have a clock time for you.
7    Q.  And did he say that they were glassy or did he
8  say, may be they were glassy?
9    A.  Well, I see you have a page out of the
10  deposition.  You have me at a disadvantage.
11    Q.  Look at the bottom of Page 50.  You have it right
12  in front of you?
13    A.  Okay.  I'm looking at the bottom of Page 50.
14    Q.  Were they glassy at all?  Maybe, yeah, correct?
15    MR. FARRAH:  Did you just read from the
16  deposition?
17    MR. GILLIS:  Yes, Lines 23 and 24 on Page
18  50.
19    MR. FARRAH:  Could you read them again?
20  I'm sorry?  The question was what?  I don't have it in
21  front of me.
22    Q.  Were his eyes glassy at all?  Maybe, yeah.
23  That's the answer, correct?
24    A.  Maybe, yeah, right.

2-27

1    Q.  At the top of Page 51, he says he doesn't
2  remember specifically seeing Mr. Southworth's eyes looking,
3  seeing them glassy, correct?
4    A.  Well, he's asking about something else.  So why
5  don't we read the whole question and answer again so we're
6  not misleading.
7    Q.  I'll read it all.  Starting on Line 23 on Page
8  50.  Okay.  Were his eyes glassy at all?  Maybe, yeah.
9  Page 51, At the Steakhouse?
10    Answer:  Yeah, I don't remember specifically
11  seeing his eyes, you know, looking, seeing them glassy, but
12  very well, very well could have.  That could be.
13    Did I read that properly, Doctor Benjamin?
14    A.  You did.
15    Q.  Okay.  And from that, you've opined that his
16  eyes were glassy --
17    MR. FARRAH:  Objection.
18    Q.  -- that evening at the Longhorn Steakhouse?
19    MR. FARRAH:  Objection.
20    A.  Well, I would like to refer you -- I'm opining
21  and basing my testimony on Lines 23 and 24 on Page 50 where
22  he's asked a straightforward question, Were his eyes glassy
23  at all?  And as you read correctly, Maybe, yeah.
24    Q.  The fact that he follows that answer up with the

2-2

1  statement that he wasn't specifically even looking at his
2  eyes that night, that didn't enter into your opinion at
3  all, doctor?
4    MR. FARRAH:  Objection.  I'm sorry, is that
5  what it says, I specifically wasn't looking at his eyes?
6    MR. GILLIS:  I don't remember specifically
7  looking at his eyes.
8    MR. FARRAH:  I didn't hear it the second
9  time.  I just wanted to make sure.
10    A.  Well, the next statement in that deposition kind
11  of contradicts the prior one because he's asked, Were his
12  eyes closed somewhat when he was at the Steakhouse?  And he
13  says, No.
14    And I contend to you that if he says he
15  wasn't looking at his eyes, how could he answer yes or no.
16    Q.  So you find the testimony to be contradictory on
17  that issue?
18    MR. FARRAH:  Objection.
19    A.  I wouldn't call it contradictory.  I would just
20  say that sometimes follow-up questions tend to dilute the
21  thrust of a prior question.  That's all I'm saying.
22    And that sometimes, there's some obfuscation
23  of the record, and it's difficult to be able to extract
24  exactly what was there.  But the definitive and

2-29

1  declarative statements speak for themselves.
2     Q.  As far as obfuscation, you realize this is Mr.
3  Farrah asking these questions, correct?
4     A.  I'm talking about the record that's there
5  somehow.  The record is sometimes difficult for me to
6  understand.
7     Q.  Did you find to a reasonable degree of scientific
8  certainty that for purposes of your opinion, his eyes were
9  glassy that evening while at the Longhorn?
10          MR. FARRAH:  Objection.
11     A.  I think that if you asked me did I cite or did I
12  rely on certain statements that Jude Connelly made among
13  which was that the eyes were glassy, yes, I did rely on
14  that.
15     Q.  And again, the same question.  I have to ask
16  these questions.  During what time period while at the
17  Longhorn that evening were his eyes in your opinion glassy?
18     A.  I cannot respond to that question.  I have no
19  answer for that question.  I have no basis for answering
20  that question.
21          I would have to say between the time -- and
22  I don't mean this to be facetious, but between the time
23  they arrived and prior to when they left, probably
24  certainly more towards the latter part of the time when

2-3

1  more drinks had been consumed, but I think we all agree,
2  Mr. Gillis, there is no, somebody saying, at 9:02, he
3  looked fine, and at 9:27 he looked terrible.
4     Q.  You can't differentiate on those time frames,
5  correct?
6          MR. FARRAH:  Objection.
7     A.  I wouldn't use those time frames to
8  differentiate.  I'd be using the blood alcohols and the
9  rate of ingestion of the drinks.
10     Q.  I just want to shift gears for a little while.
11  In addition to this affidavit which is the Rule 26
12  submission -- that's what we've been calling it -- you
13  submitted in this case a 60-J affidavit, correct?
14     A.  I guess I submitted or --
15          MR. FARRAH:  I object to the form of that
16  question, but go ahead.
17     A.  I submitted an affidavit in conjunction with
18  plaintiff's 60-J affidavit.
19          MR. FARRAH:  I think it's Exhibit 2 in this
20  deposition.
21          VIDEO OPERATOR:  It's now 2:45 p.m. and
22  we're now off the record.
23          (Discussion off the record).
24          VIDEO OPERATOR:  The time is 2:53 p.m. and

2-31

1  we're now back on the record.
2     Q.  Doctor, during the break, we were able to locate
3  Exhibit 2 in this, previously marked Exhibit 2 in this
4  deposition which is entitled, affidavit of David M.
5  Benjamin, Ph.D., is that correct?
6     A.  Yes, it is.
7     Q.  And this affidavit was filed with you in
8  conjunction with the plaintiff's 60-J submission to the
9  Court in this case, correct?
10     A.  That is correct.
11     Q.  Okay.  And the opinions that you expressed in
12  here had held to you to a reasonable degree of scientific
13  certainty, is that correct?
14     A.  Yes.
15     Q.  Okay.  And in there, you give a little bit of
16  your background, correct?
17     A.  Yes.
18     Q.  And the background qualifications I believe are
19  Paragraphs 2 thru 7, correct?
20     A.  Yes.
21     Q.  And in Paragraph 3, you talk about numerous
22  teaching positions, correct?
23     A.  Yes.
24     Q.  Which of these positions deal strictly with

2-3

1  intoxication from ethanol as opposed to some other field of
2  toxicology?
3     A.  You notice that I have mentioned Stetson
4  University, College of Law?
5     Q.  Yes.
6     A.  I gave a couple of programs on liquor liability
7  at Stetson Law School.
8     Q.  When you say programs, were these semester long
9  courses or just one afternoon program?
10     A.  They were like two-hour presentations in a
11  medical injuries prudence class, and my topic for that
12  night was to discuss liquor liability.
13     Q.  Anything else that you can point out from that
14  paragraph?
15          MR. FARRAH:  Objection.  What do you mean
16  by, anything else you can point out?
17     Q.  Anything else you can point out from that
18  paragraph that's related to what I asked you earlier, that
19  being specifically related to intoxication due to ethanol
20  as opposed to other areas of toxicology?
21     A.  In that paragraph, I would say that of the
22  teaching venues that are in Paragraph 3, that's the one
23  that I specifically recall teaching about liquor liability.
24     Q.  And you believe you did that on two occasions?

2-33

1  A. I believe so.
2  Q. And what years were those?
3  A. Probably in the early to mid '90s.
4  Q. Okay. Paragraph 4, which of the various
5  seminars that you cite here deal solely with the effects of
6  ethanol on a person in a civil context as opposed to a
7  criminal context?
8  A. Well, --
9          MR. FARRAH: Solely, is that the question?
10         MR. GILLIS: Yes.
11 A. Well, my presentations don't distinguish between
12 civil and criminal.
13 Q. Okay.
14 A. They talk about how alcohol is handled in the
15 body.
16 Q. Can you tell me which one of these seminars if
17 you're aware deal with the issue of whether a person
18 becomes visibly intoxicated as opposed to, as you know, in
19 the criminal setting, impaired?
20 A. I think in every instance that I teach, I teach
21 the general formats that we went through last time, that
22 especially in naive individuals, that a .15 blood alcohol,
23 .15 percent is generally considered to be a blood level
24 where nontolerant individuals would show visible signs of

2-3

1  intoxication.
2  Q. Are you aware of any of the seminars that you
3  taught in in Paragraph 4 where you taught other than .15
4  being the standard for visible intoxication for nontolerant
5  drinkers?
6  A. I would say that I almost always say that .15 is
7  the number, quote unquote, the number. But just as you
8  read out of the MCLE portion of my submission to MCLE, does
9  that mean that everyone who will be .15 will be visibly
10 intoxicated, the answer is no.
11         And does that mean that everyone who is
12 under .15 will not be visibly intoxicated, and the answer
13 was of course not.
14         So I teach that while .15 is a reasonable
15 standard and generally accepted throughout the forensic
16 toxicology community, there's so much variability among
17 individuals, and in terms of how much volume of liquor is
18 ingested, what the proof of the liquor is --
19 Q. Are we still answering the question?
20 A. I am, of course I am.
21 Q. In any of those seminars, did you teach that .15
22 was not the standard?
23         We understand that people can show at
24 different points. But the question was: In any of these

2-35

1  seminars, did you teach anything other than .15 being the
2  standard, alibi people may change?
3          MR. FARRAH: Objection.
4  A. But I can't answer it just yes or no. I have to
5  clarify because I teach basically the same thing which is
6  basically what you read out of the MCLE presentation.
7          It would be pretty stupid for anyone to say
8  that one number is the number for everybody in the whole
9  wide world.
10 Q. I'm not suggesting that.
11 A. I thought you were.
12 Q. You understand that standard doesn't mean the
13 same in every single case. It's just that's the standard,
14 correct?
15         MR. FARRAH: Objection.
16 A. Well, that is a number that has some meaning to a
17 group of educated toxicologists.
18 Q. Paragraph 5, have you given any speeches to --
19 strike that.
20         Paragraph 5, which of these organizations
21 are you currently still a member of?
22 A. I'm still a fellow of the American College of
23 Clinical Pharmacology. I'm still a fellow of the American
24 College of Legal Medicine.

2-3

1          I'm still a fellow of the American Academy
2  of American Scientists in the toxicology section, and I'm
3  still a fellow of the American Society of Health Care Risk
4  Management.
5          I continue to be a member -- there's no
6  fellowship -- well, I continue to be a full member in the
7  American Academy of Criminal Toxicology, and so I'm still
8  active in all of those organizations.
9  Q. And you mentioned that you've read a chapter in
10 the Forensic Science Handbook, Volume 3, correct?
11 A. Yes.
12 Q. Do you find that to be a treatise that you rely
13 upon, that handbook in the course of your business?
14         MR. FARRAH: Objection. Volume 3 of the
15 Forensic Science Handbook?
16         MR. GILLIS: Yes.
17 A. Do I rely upon that in the course of my work?
18 Q. Yes.
19 A. I don't really refer too much to it because the
20 knowledge that I have is in my brain.
21 Q. Well, do you refer to it as a peer reviewed
22 document?
23         MR. FARRAH: Objection.
24 A. It's peer reviewed. It's reviewed by people

2-37

1   before it's published.
2       Q.  Is it a learned treatise in your area?
3       A.  When that handbook was reviewed by the American
4   Academy of Forensic Scientists, they referred to it as a
5   learned treatise.
6       Q.  Do you believe it's a learned treatise?
7       A.  If one of my learned colleagues who's objective
8   labeled it as a learned treatise, I don't think I'd quibble
9   with him.
10      Q.  Well, the article you wrote for that, do you
11  consider that to be a learned treatise?
12      A.  He included my -- it's not an article.  It's a
13  chapter, and he included my chapter among those that was
14  referred to as a learned treatise.
15      Q.  So is that a yes or no?
16      A.  That's what it is.  I said what I said.
17      Q.  Paragraph 8, you talk about various exhibits that
18  you reviewed in order to put together this affidavit,
19  correct?
20      A.  Yes.
21      Q.  Are you aware of any documents that are not
22  included in here that you have reviewed since then that
23  would change your opinion in this affidavit?
24      A.  Would you repeat that, please?

2-3

1       Q.  You list a group of documents that you reviewed
2   in order to give your opinion in this case, correct?
3       A.  I do.
4       Q.  And were those documents provided to you by
5   counsel for the plaintiff, Mr. Farrah?
6       A.  They were.
7       Q.  And were there any other documents that you
8   requested that you were not given at that time?
9       A.  No.
10      Q.  Are there any documents that you are aware of
11  that you wish you had that would have changed your opinion
12  in this case?
13          MR. FARRAH:  Objection.
14      A.  Documents, no.
15      Q.  Is there anything other than documents you wish
16  you had at the time that you wrote this affidavit that
17  would have assisted you in your opinion in this specific
18  affidavit?
19          MR. FARRAH:  Objection.
20      A.  Yes.
21      Q.  What?
22      A.  Two things.
23      Q.  Okay.
24      A.  I would have liked to have had the glass in which

2-39

1   the Jack Manhattans were served, and I would have liked to
2   have had the Jack Manhattans, one of them, anyhow, taken
3   out of the Longhorn so that we could have had the alcohol
4   content and the volume measured and calculated.
5       Q.  From the time that you got involved with this
6   case up until today, have you ever had a glass, the type of
7   glass that's used at the Longhorn Steakhouse for making
8   this type of drink?
9       A.  I haven't had a glass, no.
10      Q.  Okay.  Have you had a replica of any kind?
11      A.  Would you consider a photo a replica?
12      Q.  Other than the photo, have you had anything?
13      A.  No.
14      Q.  Okay.  You do have photos which you produced
15  last time -- well, which have been produced since, correct,
16  photos of the glass?
17      A.  I don't know.  I could show you an example, and
18  you could tell me if they've been produced.
19      Q.  Why don't you tell me what you're calling the
20  glass in this case.
21      A.  Okay.
22      Q.  Just so that we can expedite, why don't you give
23  me all the color copies?
24      A.  Okay.  I think they're all the same.  These are

2-4

1   all the same.  I tried to get them to print out so that
2   the glass was in the middle, but they all turned out to be
3   identical.
4           MR. GILLIS:  Why don't we have this marked
5   as one exhibit.
6               (Exhibit No. 12 marked for
7                 Identification).
8       Q.  To your understanding, this has been represented
9   to you to be the type of glass that a straight-up Jack
10  Daniels Manhattan would go into at the Longhorn Steakhouse?
11      A.  It's more than just having been represented to
12  me.
13      Q.  How do you know more than having been more than
14  represented to you?
15      A.  That was photographed in the Longhorn.
16      Q.  By whom?
17      A.  By either plaintiff's counsel or member of
18  plaintiff's counsel's team.
19      Q.  Were you there?
20      A.  No.
21      Q.  Have you ever been to the Longhorn Steakhouse?
22      A.  No.
23      Q.  Ever in your life for anything?
24      A.  I don't think so.

2-41

1    Q. Okay.
2    A. Let me ask you this: Where is the closest one?
3        MR. FARRAH: You can't ask the questions.
4    A. Well, I mean, I'm trying to answer the question.
5    I'm not a person who goes there --
6    Q. I'll take your word for it.
7    A. Okay. Let me just say, modify my answer or amend
8    it to say I'm not aware of being in any Longhorn
9    Steakhouse.
10   Q. Regardless, you didn't go to any Longhorn
11   Steakhouse as part of your investigation in this case?
12   A. No.
13   Q. And no one has brought you a drink from the
14   Longhorn that you could measure the alcohol, correct?
15   A. I keep waiting for that to happen, yes.
16   Q. Do you expect to do that before trial?
17   A. I have recommended that to plaintiff's counsel.
18   Q. When did you recommend that?
19   A. Because --
20       MR. FARRAH: When or why?
21   Q. When?
22   A. When? When I was first aware of the photos, I
23   said that what would really be helpful would be to have the
24   actual volume so we could measure the volume and then also

2-42

1    get an alcohol calculation.
2    Q. Because you lecture frequently that seeing a
3    picture of a drink is great, but it doesn't do anything as
4    far as letting you know how much alcohol is in it, correct?
5    A. My job from a scientific perspective is to
6    evaluate the volume and the content, the alcoholic content.
7    So from a scientific perspective, seeing a picture does not
8    really do it for me.
9    Q. Okay. So that's something you normally do in
10   these cases. You try get the drink so that you can
11   evaluate the alcohol content in a drink, correct?
12   A. Okay. I don't try to get them on my own. I
13   frequently recommend to whoever has retained me to try and
14   get a hold of the drink.
15       If it's a drink with ice, to try and pour
16   out the contents without the ice, and carry it out of the
17   establishment, and bring it to me so that I can analyze it
18   and measure the volume.
19   Q. I think you called before that the Old Marx
20   Brothers, put the hot water bottle in your pants?
21   A. That's my wording. I always say, the hot
22   water bottle in your pants, just pour out and --
23   Q. And you recommended that to counsel in this case,
24   correct?

2-43

1    A. I certainly did.
2    Q. And to this date, you still haven't gotten it?
3    A. Hasn't been done, to the best of my knowledge.
4    Q. But you did have available to you the schematics
5    of the glass which showed its size, correct?
6    A. Well, I have that photo that tells me, and I can
7    juxtapose the photo of the glass against the other things
8    and get an idea of the size of the glass.
9    Q. You can't draw any conclusions from just the
10   picture, though, correct?
11       MR. FARRAH: Objection.
12   A. Well, I wouldn't say that. I can draw some
13   conclusions.
14   Q. What conclusions did you draw?
15   A. My conclusion, the major conclusion that I drew,
16   which I believe was in my Rule 26 report fairly
17   extensively, is that as that drink appears there with
18   approximately a quarter of an inch between the top of the
19   fluid and the top of the glass, that the volume in there,
20   even with the cherry, would certainly be more than the two
21   and one quarter ounces that was in the bartender's manual
22   about how to make a Jack Manhattan.
23   Q. Can you tell from this photograph whether that's
24   a half inch or a third of an inch from the top?

2-44

1    A. I can't tell precisely what it is, of course not.
2    Q. And because the base is smaller than the top, you
3    don't know at each ounce level how high the drink rises in
4    the glass, correct?
5        MR. FARRAH: I'm sorry. Objection.
6    A. I don't know specifically. That is, if you ask
7    me, I can put a mark on the glass, the answer is no.
8    Q. If you were to put a mark on the glass in the
9    picture marked Exhibit 12, you don't know what portion of
10   that drink, just from marking the glass, is melted ice,
11   correct?
12   A. Well, there is no ice in that drink.
13   Q. Well, in order to make it, don't you put it into
14   a shaker full of ice and then stir it around and shake it?
15       MR. FARRAH: Objection.
16   A. That would be one way to make it. You could.
17   Q. Well, what's your understanding of how the drink
18   was made in the case that you're now sitting as an expert?
19       MR. FARRAH: Objection.
20   A. Why don't we refer to the bartender's manual.
21   Why don't you pull that out which I believe was marked last
22   time and we'll get it specifically.
23       I'm not going to rely on my memory when we
24   have a document that will speak for itself.

2-45

1    Q.  So as you sit here today, you don't have a
2  specific memory of how it was made, correct?
3    A.  I have a vague recollection that something of
4  what you're describing --
5    Q.  What is your vague recollection that it was made
6  over ice?
7    A.  That the two liquors are poured into a shaker,
8  and that they're shaken up, and poured out, and ice is left
9  back.
10        Your question asked about how much of the
11  contribution of the ice would impart water to the drink.
12    Q.  Yes.
13    A.  Not a lot.
14    Q.  What's not a lot?
15    A.  Less than half an ounce, I would say.
16    Q.  Okay.  Two ounces of bourbon, half ounce of
17  vermouth --
18    A.  Quarter.
19    Q.  Sorry, quarter ounce of vermouth, and stirred,
20  shaken with ice.
21        Is it your testimony that that will not come
22  anywhere close to where this drink is in this glass marked
23  as Exhibit No. 12?
24        MR. FARRAH:  Objection.

2-4

1    A.  That's my belief is, yes.
2    Q.  Okay.  But you haven't tested it?
3    A.  No.
4    Q.  How much alcohol would you have to put in that
5  glass before it was filled to the very brim with the cherry
6  in it?
7    A.  Well, it was represented by the bartender that
8  that's a six ounce glass.
9    Q.  Correct?
10    A.  And that they fill it a little bit less, and that
11  the cherry brings the volume a little bit higher.  So
12  the answer is probably that I would say if you take the
13  cherry out, there's probably at least five ounces of liquor
14  in that glass.
15    Q.  To get it up to the top?
16    A.  No.  It's a six ounce glass.
17    Q.  So you're saying you believe there's at least
18  five ounces of alcohol in that glass that's been marked as
19  Exhibit 12?
20    A.  Yes, I believe it's very close to five ounces,
21  yes.
22    Q.  And that's not water, that's the alcohol itself?
23    A.  No, it's not the alcohol itself.  That's not a
24  hundred percent alcohol.

2-47

1    Q.  What I meant is that five ounces is the bourbon
2  and the vermouth alone, correct?
3        MR. FARRAH:  Objection.
4    A.  Well, let's say that the bourbon and the vermouth
5  represents four and a half ounces, and some of the water
6  that comes off the ice when it's shaken, as you described,
7  might be another half ounce.  So that would be five ounces
8  there.
9    Q.  And how much further up does the cherry bring it?
10        MR. FARRAH:  Objection.
11    A.  The difference before what it was before then and
12  approximately that quarter inch.
13    Q.  Based on the way that this glass is funneled --
14    A.  Yes, it's conical shaped.
15    Q.  -- conical shape, in this photograph, how many
16  ounces are unused in this glass from the point where the
17  liquid is, the top of the liquid to the top of the glass?
18    A.  How many ounces?
19    Q.  Yes.
20    A.  I don't think I should speculate on that.
21    Q.  So you can't tell?
22    A.  I'm not going to speculate on that answer.  I
23  would like to, and I anticipate having an opport5unity to
24  actually do that exact measurement before trial, and I have

2-4

1  the intent of trying to actually do the exact same thing in
2  the courtroom right in front of the jurors.
3    Q.  But you haven't done it yet?
4    A.  No.
5    Q.  You signed this affidavit May 4, 2005, correct?
6    A.  Yes.
7    Q.  And you knew at that point that -- your practice
8  is to do this in front of the jury right in the courthouse,
9  correct?
10        MR. FARRAH:  Objection.
11    A.  No, it's not my practice.
12    Q.  Well, you intend on doing it?
13    A.  Yes.  But practice would be -- practice would
14  mean that I've done it on numerous occasions and do it
15  relatively routinely, at least say 50 percent of the time.
16    Q.  When did you make, when did you decide that you
17  wanted to do this in the courtroom?
18    A.  I wanted to do it in the courtroom from the first
19  day I was retained on the case and learned about it.
20    Q.  And you never found the time to do that before
21  you submitted your expert report November 1, 2006, correct?
22    A.  No, that is not correct.
23    Q.  Well, between the time you got chosen as an
24  expert in this case until the time you submitted your

2-49

1  affidavit, you didn't do it, correct?
2      A.  I didn't do it, that's correct.
3      Q.  You weren't physically unable to do it, you just
4  didn't do it, correct?
5      A.  Well, I was physically unable to do it.
6      Q.  How is that?
7      A.  Because I did not have the things I needed to
8  rely on. I asked, bring me a glass.
9      Q.  Other than asking for the glass, what else did
10 you do?
11         MR. FARRAH:  Objection.
12     A.  I didn't do anything more in terms of actual
13 experimentation because I wanted to have an actual glass.
14 And if not an actual glass from the establishment, I wanted
15 to have a glass that was purchased that met the
16 characteristics that the bartender described.
17         And that's a conical glass that would hold
18 six ounces of liquid volume at that point in time, and it
19 hasn't been done yet.
20         The materials have not been brought to me,
21 or else I would have done that study.
22     Q.  How many times have you requested the materials?
23     A.  Only once or twice.
24     Q.  Okay.  You filed an affidavit under oath as to

2-5

1  Mr. Southworth's intoxication in this case, correct?
2      A.  I did.
3         MR. FARRAH:  Objection.
4      Q.  And by affidavit, I'm referring here to Exhibit
5  2, and you swore under the pains and penalties of perjury
6  in that affidavit, correct?
7      A.  Yes, I did. I signed under pains and perjury.
8      Q.  And you stated these were your opinions to a
9  reasonable degree of scientific certainty, correct?
10     A.  I did.
11     Q.  And if you had any question as to how much
12 alcohol was in that drink, all you had to do was go get a
13 glass and you could have resolved any of those questions
14 prior to giving sworn testimony under oath to a reasonable
15 degree of scientific certainty, correct?
16         MR. FARRAH:  Objection.
17     A.  I'm sorry.  But first of all, that
18 mischaracterizes my statements and it also mischaracterizes
19 my intentions.
20     Q.  I didn't ask you about your intentions.  I asked
21 you, you had ample time, time wasn't a factor before you
22 filed this 60-J affidavit, correct?
23         MR. FARRAH:  Objection.
24     A.  Time is always a factor.

2-51

1      Q.  Is it your testimony as you sit here today that
2  the reason you couldn't do this test is because you didn't
3  have time to do it before your 60-J affidavit was due?
4      A.  I never said that.
5      Q.  Okay, fine.  If you had any questions as to the
6  amount of alcohol in that glass before you filed this
7  affidavit, you had ample time to revolve those questions by
8  doing what it is you say you now want to do in Court,
9  correct?
10         MR. FARRAH:  Objection.
11     Q.  Go ahead.  You can answer.
12         MR. FARRAH:  Well, I just want to say for
13 the record that the affidavit is dated May 4, 2005, as I
14 understand it, that the testimony of Kristin O'Donnell --
15         MR. GILLIS:  Well, if you're going to start
16 testifying --
17         MR. FARRAH:  I want you to be fair to this
18 witness.  The testimony of Kristin O'Donnell about the
19 level of the alcohol, as I recall, didn't happen until
20 seven months later, December 28, 2005?
21         MR. GILLIS:  Correct.
22         MR. FARRAH:  Okay.
23     Q.  What prevented you other than counsel giving you
24 the glass from doing this experimentation prior to filing

2-52

1  your affidavit in conjunction with the 60-J affidavit?
2      A.  Mr. Gillis, you answered your own question in
3  that question.
4      Q.  Just the glass?
5         MR. FARRAH:  Objection.
6      A.  You just answered. I asked for this. I said
7  please bring me a glass. Please, as you quoted me, get the
8  liquid, go to the establishment, pour it into a hot water
9  bottle, take it out of there, bring it to me real quick so
10 that I can measure the volume, we'll send it to a forensic
11 lab, we'll get it analyzed.
12         I can do all of that for you.  My role in
13 the case is as expert.  I don't run the case.  Plaintiffs'
14 attorney runs the case.
15         If he didn't see fit to do that, he must
16 know what he's doing. I have to defer to him.  He's the
17 attorney.  I am only a poor scientist answering questions.
18     Q.  Okay.  As a poor scientist, you didn't do any
19 independent work to get that glass other than to ask your
20 counsel, correct?
21     A.  That is not my role when I'm retained in the
22 case.
23     Q.  Is that a yes or no?
24     A.  The answer is what it is.  The answer is what it

2-53

1  is.  It is not my role.
2      Q.   Other than asking him to get the glass, did you
3  do anything else to obtain the glass in this case, "him"
4  being Mr. Farrah?
5      A.   What was the last part of that question?
6      Q.   Other than asking Mr. Farrah to get you the
7  glass, did you do anything else independently to get that
8  glass on your own?
9      A.   No.  That's not my role.
10     Q.   Okay, that's all.  The exhibit here that's been
11 marked, when did you first see this photograph?
12     A.   A long time ago.
13     Q.   More than a year?
14     A.   It may have been.  I cannot give you a date on
15 it because I didn't take the photos, but I know the photos
16 were e-mailed to me by plaintiff's counsel when they were
17 obtained, and it was quite a while ago.
18     Q.   Was it before you filed this affidavit?
19     A.   I wish I could tell you, but I really cannot.
20     Q.   Okay.  Anything else you wished you had before
21 you made your opinion in the affidavit that's been marked
22 Exhibit 2?
23     A.   I wish that I had a more accurate description of
24 how that drink was made rather than the description that

2-5

1  just said there were two ounces of Jack bourbon and a
2  quarter ounce of sweet vermouth because I never believe
3  that to be a true representation of the recipe or formula
4  for that drink.
5      Q.   Now, based on what you did review, you came up
6  with -- well, look at Paragraph 20 of that affidavit?
7      A.   Paragraph 20?
8      Q.   Paragraph 20, yes, on Page 6.
9          MR. FARRAH:  Of the affidavit?
10         MR. GILLIS:  60-J.
11         MR. FARRAH:  Paragraph 20?
12         MR. GILLIS:  On Page 6.
13         MR. FARRAH:  Oh, okay.
14     Q.   Let's go back just one step.  You wrote in
15 Paragraph 17 that Southworth, Connelly and Espey were
16 joined by three or four others for dinner including Espey's
17 brother Michael Espey, correct?
18     A.   Yes.
19     Q.   It's your understanding that Michael Espey just
20 showed up for the dinner, not for the predinner activities
21 at the bar that evening, correct?
22     A.   I know one of the Espeys was at the bar and one
23 was not.
24     Q.   Okay.  Going back to Paragraph 15, that would be

2-55

1  Thomas Espey, correct?
2      A.   That would be Thomas Espey --
3      Q.   -- that went to the bar with Southworth and
4  Connelly?
5      A.   Yes, I believe so.
6      Q.   And his brother Michael and some friends joined
7  them at the table, correct?
8      A.   Yes, sir.
9      Q.   In Paragraph 20, you put together a chronology,
10 correct, as to when food and alcohol was arrived, correct?
11     A.   I did.
12     Q.   And are these times the times to the best of
13 your -- to a scientific certainty that you believe based on
14 all the evidence that you looked at that these events
15 occurred?
16         MR. FARRAH:  Objection.
17     A.   Yes, it was based on all the events.  And where I
18 couldn't find specific notations either on the bar tab or
19 the -- what did we call it, the audit?
20     Q.   Audit?
21     A.   -- audit report, I tried to space out the drinks
22 so that there was reasonable distance among them,
23 reasonable time among them.
24     Q.   Okay.  And so in Paragraph 18, you have him, you

2-5

1  have Southworth having 4 24-ounce beers with his meal, and
2  at least two Jack Daniels, is that correct?
3          MR. FARRAH:  Objection.
4      A.   Yes, sir.  Four 24-ounce beers and at least two
5  Jack Manhattans.
6      Q.   Is that a conclusion you drew in this case?
7          MR. FARRAH:  Objection.
8      A.   I don't know if it's a conclusion, but it's based
9  on a statement from Jude Connelly in his deposition, Page
10 38.  And it's also based in part on the witness statement
11 from waitress Lee Chabot.
12     Q.   And again, you knew that from looking at all the
13 evidence including the audit report that he couldn't have
14 had four beers at the table because only two were served to
15 the entire group, correct?
16         MR. FARRAH:  Objection.
17     A.   I knew no such thing.
18     Q.   You didn't know that?
19         MR. FARRAH:  Objection.
20     A.   I knew no such thing.
21     Q.   Okay.  You had the audit report, correct?
22     A.   I did.
23     Q.   Did you review it?
24     A.   Certainly.

2-57

1   Q.  Didn't that seem odd to you that there's only two
2   beers served at the whole table, and you give four of them
3   to Southworth at the table?
4           MR. FARRAH: Objection.
5   A.  Sometimes people go up to the bar and order a
6   drink when it takes too long to get served from the table.
7   Q.  What evidence do you have that that happened on
8   this evening?
9   A.  I personally do not have any evidence, but I was
10  asked to assume that that was the number of beers that was
11  used.  Moreover, that those numbers are consistent with
12  the testimony that are here.
13          To Jude Connelly, question, Page 38, Line
14  10, How many beers to the best memory did you see him drink
15  at that table?  Answer: Maybe four, maybe.
16  Q.  And you ignored his subsequent testimony where he
17  changed that, correct?
18          MR. FARRAH: Objection.
19  A.  Well, I used that statement.
20  Q.  As you sit here today, have you looked at the
21  audit report having had all the depositions and now having
22  discussed the reports given to the district attorney's
23  office and the grand jury and so forth, what is your
24  opinion as to how many beers Mr. Southworth was served

2-5

1   while he was sitting at the dinner table on January 26,
2   2003?
3           MR. FARRAH: Objection.
4   Q.  Excuse me.  September 26, 2003?
5           MR. FARRAH: Objection.  I'm not objecting
6   about the date.  Objection.  What's his opinion, is that
7   your question?
8           MR. GILLIS: Yes.
9           MR. FARRAH: Objection.
10  A.  My role in this case was really not to form an
11  opinion about how many drinks of which type was served.
12          My role was to review the documents and then
13  to take the assumption that I was, that was put to me by
14  plaintiff's counsel, and to put that into the Widmark
15  formula, and come out with numbers, and that is what I did.
16          I did not form an independent opinion on the
17  number of drinks, although I was guided -- we went through
18  this last time, Mr. Gillis.
19          I was guided by the testimony, the witness
20  statements and the audit report.  And where I found an
21  inconsistency, I asked plaintiff's counsel what do you want
22  me to assume for the purposes of writing this document, and
23  I was told what to assume.
24  Q.  Was that one of those inconsistencies that you

2-59

1   were told to assume, four beers at the table?
2           MR. FARRAH: Objection.
3   A.  Well, it's not an inconsistency.  If it's
4   consistent with one statement and then there's another
5   statement that contradicts is, it's going to be consistent
6   with one and inconsistent with another, and that's a job I
7   believe for the jury to decide.
8   Q.  You don't think four drinks at the table is
9   inconsistent with the facts in this case based on the audit
10  report and everything else you reviewed?
11          MR. FARRAH: Objection.
12  A.  I think I just answered that.
13  Q.  Who told you -- it was Mr. Farrah who told you to
14  assume four beers at the table, is that correct?
15  A.  Yes, sir.
16          MR. FARRAH: Objection.  He just testified
17  it's in the evidence.
18  A.  That's right.
19          MR. GILLIS: No.  He testified earlier he
20  assumed it based on what you told him and that there's some
21  evidence either way, one that there were only two drinks at
22  the table, one that there were four, and to correct the
23  inconsistencies, he asked you.
24          MR. FARRAH: That isn't what he testified

2-6

1   to.
2   A.  No.  That isn't what I testified to.  You
3   mischaracterize my testimony.
4           I read into the record the statements that
5   said that he had four beers at the table.  And you --
6   Q.  Why didn't you read into the record --
7           MR. FARRAH: Why don't you let him finish
8   his answer?
9   Q.  Why didn't you read into the record that there
10  were only two drinks served at the table according to the
11  audit report?
12          MR. FARRAH: Objection.
13  A.  You never asked me to read that in.
14  Q.  So you only read into -- in your report, you
15  don't put that there were only two beers in the audit
16  report, correct?
17          MR. FARRAH: Objection.  Of course he does.
18  He recites what the audit report says right in his -- in
19  Paragraph 20 is the audit report, or at least it sets out
20  the audit report.  Please.
21          Can we have a break for some water?
22          MR. GILLIS: Sure.
23          VIDEO OPERATOR: The time is now 3:32 p.m.
24  and we're now off the record.

2-61

1    VIDEO OPERATOR: The time is 3:41 p.m.
2  We're now back on the record.
3    Q.  Doctor Benjamin, as one of those four beers, did
4  you determine whether or not one of them was a beer that
5  Mr. Southworth had ordered at the bar but brought to the
6  table?
7    MR. FARRAH:  Objection.
8    A.  Did I determine?
9    Q.  Yes.
10    A.  What do you mean by determine?
11    Q.  Well, you have in your testimony that he had four
12  beers at the table that evening, correct?
13    A.  Right.
14    Q.  Was one of them a beer that he brought to the
15  table from the bar when his table was ready for them to be
16  seated?
17    MR. FARRAH:  Objection.
18    A.  No.  My interpretation is that the two beers
19  that were imbibed prior to being seated were consumed, and
20  then additional beers -- as a matter of fact, I believe
21  that's what Ms. Chabot says.
22    Q.  Well, did you read her deposition when she said
23  the three people that were at the bar brought their drinks
24  to the table?

2-6

1    MR. FARRAH:  Objection.
2    Q.  Not her statement, but her deposition.
3    MR. FARRAH:  Did you read her deposition?
4    A.  I did read her deposition at some point this
5  time, sure.
6    Q.  When was that?
7    A.  I beg your pardon?
8    Q.  When did you read her deposition?
9    A.  I can't tell you.  I don't know when.
10    Q.  You haven't listed it in any of the documents
11  that you based your opinion on, have you?
12    A.  I may stand corrected.
13    Q.  Okay.  Wouldn't that be important in rendering
14  your opinion to know that they actually brought drinks over
15  from the bar?
16    MR. FARRAH:  Objection.
17    A.  I don't think that that statement is any more or
18  less important than the witness statement, either.
19    Q.  Wouldn't you find the audit record more credible
20  given the fact it was a computer printout of what was
21  actually served to the table that night?
22    MR. FARRAH:  Objection.
23    A.  Well, what was on the audit report is what she
24  personally received as an order and put in.

2-63

1    Q.  Okay.  And you have no evidence of anything
2  being brought to the table that night other than what was
3  put in the computer, correct?
4    MR. FARRAH:  Objection.
5    A.  Just the numbers of the beers.
6    Q.  And those were what you were asked to assume by
7  Mr. Farrah, correct?
8    MR. FARRAH:  Objection.
9    A.  That's correct.
10    Q.  Paragraph 24, we went over this in some length in
11  the first part of the deposition, but you don't have any
12  specific testimony that you can point to like Jude
13  Connelly's deposition that you've been referring to
14  frequently, that says that they left at approximately ten,
15  ten p.m., correct?
16    MR. FARRAH:  Right now as he sits here?
17    MR. GILLIS:  Yes.
18    A.  Well, I don't have anything in front of me, no.
19    Q.  In fact, last time we talked at length about Jude
20  Connelly's deposition that says they left around eleven
21  o'clock, is that correct?
22    MR. FARRAH:  Objection.
23    Q.  I know you don't agree with that but that's what
24  it says, correct?

2-6

1    A.  If that's what it says, that's what it says.
2    Q.  If that's what it says, you don't agree with Jude
3  Connelly on that point, correct?
4    A.  That is correct.
5    Q.  And you say it's about ten minutes from drive
6  from there to the hotel, is that correct?
7    MR. FARRAH:  I'm sorry.  Can you just tell
8  me what --
9    MR. GILLIS:  Paragraph 24, fourth line, the
10  drive to the hotel took approximately 10 to 15 minutes.
11    Q.  Did I read that correctly?
12    A.  Yes, you did.
13    Q.  Okay.  Do you have any evidence from any source
14  that you're aware of that Mr. Southworth was showing signs
15  of intoxication from the time he left the table to Longhorn
16  until he got out of the door of the Longhorn?
17    A.  Do I have any evidence, is that what you asked
18  me?
19    Q.  Yes.
20    A.  Yes, I do.
21    Q.  What's that?
22    A.  I have the graphs that I compiled that show that
23  his blood alcohol was increasing and increasing and
24  increasing.

2-65

1    Q.  Other than that, you don't have anybody stating
2  he was walking in an odd way or anything like that to the
3  door, correct?
4         MR. FARRAH:  Objection.
5    A.  I am not aware of any testimony to that effect.
6    Q.  Other than your Widmark testing, that's what
7  you're basing that on, correct?
8    A.  Well, there was an automobile accident as well.
9    Q.  I'm just talking about this time period which is
10  two hours before the accident.
11   A.  Okay.
12   Q.  What do you have other than your Widmark that
13  shows that he may have been showing signs of intoxication
14  from the time he got up from the table to leave and when he
15  actually left the restaurant that night?
16   A.  Well, I think that question is a little unfair.
17   Q.  I'm just asking you, tell me what it is other
18  than the graph, if you have anything.  If you don't, you
19  don't.
20        MR. FARRAH:  Objection.
21   A.  Well, I'm saying when you say other than the
22  graph what do you have, I think that's an unfair question.
23   Q.  Well, I disagree with you, so just answer the
24  question.  I know you have your graph?

2-6

1    A.  Yes.
2    Q.  I'm trying to get the universe of things that you
3  might base an opinion on.
4         What other than your graph would you base an
5  opinion that he was not carrying himself normally from the
6  table to the door, plain and simple?
7         MR. FARRAH:  Objection.
8    A.  I have no statements that I can refer to for you.
9    Q.  Thank you.  What evidence do you have that he
10  was showing visible signs of intoxication at the hotel that
11  they went to directly from the Longhorn?
12        MR. FARRAH:  Objection.
13   A.  I would have to once again refer to my
14  calculations.
15   Q.  Other than your calculations, are you aware of
16  any evidence, testimony or otherwise, that would indicate
17  to you that he was showing visible signs of intoxication at
18  the hotel?
19   A.  Once again, I think that that is an unfair
20  question.
21   Q.  I understand you feel that way.  But I'm just
22  trying to narrow down so something doesn't pop up at trial,
23  there were four or five other things I saw in addition to
24  my graph.

2-67

1         I'm trying to get the universe of
2  information from which you would render an opinion.  So I
3  don't think that's unfair.
4         Now, having said that, at the hotel, other
5  than your Widmark information -- and you've made it clear
6  what you think of that, and I agree with you -- is there
7  anything else that you would rely upon to give testimony in
8  this case that would show he was visibly intoxicated in the
9  hotel when he left, after he left the restaurant that
10  evening?
11   A.  I don't know or I can't cite any specific
12  testimony to that effect.
13   Q.  Okay.  So you're basing that on your Widmark
14  calculations, correct?
15   A.  Yes, sir.
16   Q.  Fine.  From the hotel to the other side, the
17  Gentlemen's Club that they went to next, other than your
18  Widmark formula, are you aware of any other evidence that
19  you would be relying upon to prove, to show that Mr.
20  Southworth was visibly intoxicated at that time period from
21  the hotel to the Gentlemen's Club?
22   A.  Once again, I can't cite any testimony for you.
23   Q.  Fine.  While they were sitting in the parking
24  lot at the Gentlemen's Club, are you aware of any

2-68

1  information or evidence other than your Widmark
2  calculations that you would be using to rely, to make an
3  opinion as to whether or not Mr. Southworth was visibly
4  intoxicated during that time period?
5    A.  No.
6    Q.  Okay.  From the parking lot back to getting Mr.
7  Espey's pickup truck, are you aware of any evidence other
8  than your Widmark calculations that would lead you to
9  believe that Mr. Southworth was visibly intoxicated during
10  that time period?
11   A.  Other than the Widmark calculation?
12   Q.  Correct.
13   A.  No.
14   Q.  Okay.  From leaving the parking lot of the
15  apartment up to but not including the accident, are you
16  aware of any evidence that, other than your Widmark
17  calculations that Mr. Southworth was showing visible signs
18  of intoxication during that time period?
19   A.  I think before I would answer, I would want to
20  see the police report.
21   Q.  And for what purpose, for speed?
22   A.  Well, to see what --
23        MR. FARRAH:  Objection.
24   A.  To see what kind of descriptions were in the

2-69

1  police report or if other witnesses made descriptions or
2  the police officers recorded information about observers
3  who saw him driving prior to the impact and so forth.
4      Q.  I'm going to ask you to assume -- and we'll break
5  that time period down just to be fair to you -- that Mr.
6  Southworth left the apartment building and was heading
7  North on his way to New Hampshire when he received a phone
8  call that he had his friend's keys and he had to turn
9  around and come back, okay?
10     A.  Okay.
11     Q.  And I want you to assume that up to that point
12  before he turned around, there's no mention of the way he
13  was driving before he turned?
14     A.  No mention by whom?
15     Q.  In the police report about how he was driving
16  before he turned around.
17     A.  All right.
18     Q.  With that assumption, what are you aware of for
19  evidence other than your Widmark calculations that Mr.
20  Southworth was driving, was visibly intoxicated from the
21  time he left the apartment building until the time he
22  turned around to come back towards where he had left his
23  friends previously?
24     A.  Well, when you ask me to assume that, you more or

2-7

1  less back me into a corner of answering that I have no
2  other information.
3      Q.  Well, let's put it a different way.  If there's
4  nothing in the police report that talks about him on his
5  way back to New Hampshire but it only talks about him as
6  he's approaching the accident scene, you'd agree you have
7  no other evidence other than the Widmark, correct?
8          MR. FARRAH:  Objection.
9      A.  That I know of no other transcribed or
10  memorialized statements that would bolster that opinion.
11     Q.  Okay.  Now, you then get into, you start
12  numbering your paragraphs No. 1 again on Page 1.
13         Well, before I get to the method, let's go
14  back to the last three paragraphs on the top of Page 9,
15  Paragraphs 28, 29, 30.
16         It's your understanding that a blood sample
17  was secured at one p.m., correct?
18     A.  Yes.
19     Q.  Have you ever reviewed that blood sample?
20     A.  I know what the blood sample showed.
21     Q.  That wasn't the question.  Have you reviewed the
22  blood sample yourself?
23     A.  What is reviewed the blood sample mean?
24     Q.  Have you actually tested that blood sample at

2-71

1  all?
2      A.  Have I tested it, no.
3      Q.  When you said you reviewed it, you reviewed the
4  findings of it, correct?
5      A.  Yes, sir.
6      Q.  And when did you do that?
7      A.  Within the last six to twelve months.
8      Q.  Okay.  And the sample noted no alcohol in it,
9  correct?
10     A.  Yes.
11     Q.  And that was at one o'clock, correct?
12     A.  One p.m.
13         MR. FARRAH:  Objection.
14     Q.  One p.m., correct?
15     A.  Yes.
16     Q.  Now, getting into your methodology here, for
17  purposes of this opinion that you gave in this case --
18  strike that.  Let's just go right to your opinion.
19         MR. FARRAH:  This is Exhibit 2 still, is
20  that right?
21         MR. GILLIS:  Yes, starting on Page 10.
22     Q.  You say in that, you come up with a couple of
23  different conclusions in this case as to what his blood
24  alcohol could be, correct?

2-7

1          MR. FARRAH:  Objection.
2      A.  Well, you'll have to be more specific than that.
3  I'm sorry.
4      Q.  What based on your opinion do you find to be Mr.
5  Southworth's blood alcohol at the time he was served his
6  last drink at the Longhorn Steakhouse that evening?
7      A.  Based on?
8          MR. FARRAH:  In the 60-J?
9      Q.  In the 60-J.  All of this is document No. 2
10  here, Exhibit No. 2, I'm sorry.
11     A.  Could you repeat the question, please?
12         (Last question read).
13         MR. FARRAH:  Do you want to point him to
14  where in the affidavit he says that, and give him a chance
15  to read it?
16         MR. GILLIS:  I believe it's on the top of
17  Page 15.
18         MR. FARRAH:  Well, maybe we should start on
19  the bottom of Page 10, based on the consumption, Paragraph
20  3.
21     A.  Okay.  Well, Item 3 on Page 10 is a good place
22  to start.  And Paragraph 3 says that at 9:30, assuming
23  four beers were consumed, the blood alcohol would be .22
24  percent.

2-73

1  Q.  So it's your opinion that he had a .22 at 9:30
2  that evening at the Longhorn?
3          MR. FARRAH:  Objection.
4  A.  Based on, based on the four beers added to the
5  other two Manhattans.
6  Q.  And that was an assumption you were asked to make
7  by Mr. Farrah, correct?
8          MR. FARRAH:  Objection.
9  A.  Yes.
10  Q.  If he had only consumed two beers at the table,
11  that would be down to a .18, correct?
12  A.  .18 is correct.
13  Q.  How did you come up with these calculations?
14          MR. FARRAH:  Objection to the form.
15  A.  They're right off the same Widmark formula and
16  the printout that I gave you last time.
17  Q.  Is there a reason why in this case in this
18  affidavit here you give a range from a .18 to a .22, but in
19  your submission pursuant to Rule 26, you give a specific
20  amount at a particular time?
21  A.  Because as I told you during our last portion of
22  the deposition, there was some question as to the number of
23  drinks that were consumed, and I was asked to assume
24  different hypotheticals, and each hypothetical was a

2-7

1  different calculation, and I crunched the numbers through
2  the formula and reported the result.
3  Q.  Okay.  The first assumption was the four drinks
4  at the table, four double beers at the table, correct?
5  A.  Yes.
6  Q.  Plus two double beers at the bar before they got
7  to the table, correct?
8  A.  Yes.
9  Q.  Plus a beer after dirt biking, correct?
10  A.  Yes.
11  Q.  And how many Manhattans prior to 9:30 in that
12  assumption?
13  A.  Well, I don't have the source document with me.
14  Do you have it?  You have the exhibits from the last
15  deposition.
16  Q.  Well, the last deposition, the source documents
17  you gave us were for your Rule 26.  You didn't give us the
18  source documents for your 60-J affidavit.
19  A.  You never got the Widmark charts that went with
20  the affidavit?
21  Q.  Not unless they've come within the last week, no.
22  A.  Okay.  I'm as surprised as you are.
23  Q.  Was that something that you originally attached
24  to your affidavit?

2-75

1  A.  I made them -- I sent them all to plaintiff's
2  counsel.  What he forwarded to you was his determination.
3  Q.  Okay.  And that was obviously done prior to May
4  4, 2005 when you signed this, correct?
5  A.  I've sent him before I signed this, of course,
6  yes.
7  Q.  What did you use for Widmark R in those
8  calculations.
9  A.  I don't recall.  That's why I asked for a
10  replica of it so I could be able to recount that for you.
11          MR. FARRAH:  It's attached right here to
12  Exhibit 9.
13          MR. GILLIS:  Exhibit 9 is the letter that
14  you faxed to us a week ago, correct?  Mr. Farrah, is that
15  your fax, Exhibit 9?
16          MR. FARRAH:  Yes, that's right.
17  Q.  I'm not going to get into new stuff here.  But
18  assuming we've never seen this before this past week, I
19  want you to take a look at this, the last page and what Mr.
20  Farrah is saying your Widmark calculations for your 60-J,
21  your affidavit in conjunction with the 60-J information.
22  A.  Is there a question there, Mr. Gillis?
23  Q.  Yes.  Is that what you're referring to as your
24  Widmark calculation for your affidavit related to the 60-J

2-7

1  submission?
2  A.  I think it is.
3  Q.  Okay.  Why don't you take a minute and make sure
4  it is before we make a copy of it and use it for purposes
5  of your 60-J.
6          MR. GILLIS:  Is there a particular reason
7  why we didn't get this until a week ago if you had it as
8  part of his 60-J?
9          MR. FARRAH:  I don't think it was referenced
10  in the 60-J, Mike.  Like I said, you've had the 60-J since
11  May of 2005.
12          If it weren't referenced in it, is there any
13  particular reason why you didn't ask for it?
14          MR. GILLIS:  It's part of your required
15  disclosure.
16          MR. FARRAH:  Well, if it is and we didn't
17  disclose it, I apologize.
18          MR. GILLIS:  It's the photographs of
19  Southworth, then it's the photographs of the drinks, and
20  it's the copies of this.
21          MR. FARRAH:  You can pontificate all you
22  want.
23          MR. GILLIS:  Is there anything else we don't
24  have that you're going to give to us in dribs and drabs

2-77

1  after the fact?
2       MR. FARRAH: The same question might be
3  asked of you.
4       MR. GILLIS: What are you missing that we
5  haven't gotten to you?
6       MR. FARRAH: You haven't given anything. I
7  haven't seen a photograph from you.
8       MR. GILLIS: We haven't taken any. You've
9  got everything.
10      MR. FARRAH: Fine.
11      Q. Doctor Benjamin, have you had an opportunity to
12  review that?
13      A. I have.
14      Q. Is that your Widmark calculation for your
15  affidavit in conjunction with the 60-J submission?
16      MR. FARRAH: Objection. In conjunction
17  with? I object to that.
18      A. It does appear to be what I used for the 60-J
19  data.
20      Q. Okay. And Neil just came back with a copy.
21  Let's make that the next exhibit.
22      Just to be sure before we make it an
23  exhibit, that was submitted to counsel for the plaintiff
24  along with or prior to your affidavit pursuant to the 60-J

2-7

1  materials, correct?
2       A. Yes. I mean, I couldn't write the affidavit
3  without having generated the graft first.
4       MR. GILLIS: Can we have that marked as an
5  exhibit, please.
6       (Exhibit No. 13 marked for
7       Identification).
8       Q. Now, on this particular calculation, Widmark R
9  .68, correct?
10      A. Yes.
11      Q. And that is what is used for the average male,
12  correct?
13      A. Yes.
14      Q. And you used the Widmark data of a .2, correct?
15      A. .02, yes.
16      Q. And that concerns the burn-off rate, correct?
17      A. Yes, it does.
18      Q. Now, doctor, this seems to be like a flatness on
19  the top of this graft. Did his blood alcohol rise any
20  higher than that or is that what you call the plateau?
21      A. No. It's off the chart. It doesn't read any
22  higher than that and just gives you a straight line.
23      When you do the integration of it, which is
24  what this is that we had previously, then you can see

2-79

1  exactly what it is because it goes up higher.
2       Q. For purposes of the record, you're referring to
3  Exhibit 11, correct?
4       A. Right. To Exhibit 11, the top portion, the top
5  half of the page which if it's turned horizontally, shows
6  that it goes up to about .28 whereas this also goes to .20.
7       This just cannot print any higher in that
8  particular graph.
9       Q. Do you have an opinion as to how high his blood
10  alcohol could have gone that evening and still have with a
11  burn-off rate of .02 and still have a zero -- excuse me --
12  blood test next day at one p.m.?
13      A. I think we can start to address that because you
14  can see the table starts to come down about three a.m. in
15  the morning.
16      But the answer is if we were to go backwards
17  from one p.m. to one a.m. which is twelve hours and use a
18  burn-off rate of .02, you could have a .24 blood alcohol at
19  one a.m. and be zero at one p.m.
20      So anything under .24 would show up as a
21  zero at one p.m. the next day.
22      Q. Okay. So according to this chart, it stops at
23  .2, but we know it's going up higher, correct?
24      A. Yes, sir.

2-8

1       Q. But it would have to be no higher than .24 at one
2  a.m. in order to get a zero blood test at one p.m. the
3  following day?
4       A. If his burn-off rate was indeed .02.
5       Q. Okay. Well, that's what you assigned to him in
6  this case, correct?
7       A. I used, in this particular situation, default
8  numbers, .68 for the R, and .02 for the beta, which is a
9  number that you know that I've used in the past for people
10  who are frequent drinkers.
11      So I put in what I thought were fair, and
12  there's another word that they use -- like default numbers,
13  standard numbers.
14      Q. That's not just for the average person, though.
15  That's the number you normally use for a tolerant drinker,
16  correct?
17      MR. FARRAH: Objection.
18      A. Yes, at least .02 for a tolerant drinker, yes.
19      Q. When you say .02, if you felt that it should have
20  been higher, you would have used a higher number, correct?
21      A. Well, I mean, it's interesting the way you phrase
22  the question, if I felt. Feel is a difficult word to
23  interpret in a scientific setting.
24      Q. Let me rephrase the question then. You

2-81

```
1   determined to a reasonable degree of scientific certainty
2   that the appropriate beta for purpose of your calculations
3   in coming up with the blood alcohol, the BAC of Mr.
4   Southworth as set forth with Exhibit 13, the most accurate
5   number that you decided to a reasonable degree of
6   scientific certainty is a Widmark beta of .02, correct?
7       A.  I'd have to correct that.  It's not the most
8   accurate.  The most accurate would be to know exactly what
9   his burn-off was.
10          This is a reasonable number to use as an
11  initial calculation.
12      Q.  Okay.  Not knowing what his actual burn-off rate
13  is, this is as accurate as you can get, is that fair to
14  say?
15      A.  No, it's not as accurate as you can get, but it's
16  a reasonable starting point.
17      Q.  How could you become more accurate without
18  knowing his exact burn-off rate?
19      A.  By doing just exactly what you have in mind for
20  your next two or three questions.
21          By finding out when he was zero, and then
22  extrapolating back to the last time that he had a value,
23  and taking those hours and figuring out how much he burned
24  off.
```

2-8

```
1          The fact that he was zero at one p.m. though
2   doesn't mean that he wasn't zero at twelve noon or eleven,
3   either.
4          It only means we have one point in time
5   which is certainly not the greatest piece of scientific
6   datum.
7       Q.  Okay.  Because, as we discussed last time, we
8   don't have two readings so we can, to accurately determine
9   his actual burn-off rate like you did in the Albert case --
10      A.  Like I did in the Albert case, by subtracting the
11  two and dividing by the time interval.
12      Q.  We don't have that in this case, correct?
13      A.  We don't, no.
14      Q.  The only way you can do it is based on your
15  training and experience to use the numbers that you feel
16  are the most accurate under these circumstances, correct?
17      A.  Well, once again, I have a problem with the "most
18  accurate."  I am not charged with using the most accurate.
19          I am charged with doing one that is a
20  reasonable, reasonable certainty, that it's reasonable to
21  do that.
22          I've used reasonable care in selecting that
23  number.
24      Q.  Are you aware of any other number that is more
```

2-83

```
1   reasonably certain in this case than the .02 beta?
2       A.  Well, if I went back and crunch those numbers --
3   well, still, we still don't know at what time he became
4   zero, whether it was one p.m., whether it was 12:30, twelve
5   noon.  So this stands as a reasonable number.
6          Is it the absolute most accurate?  Of
7   course not.  It's a reasonable number, though.
8       Q.  And if he was at zero earlier, then that would
9   reduce the maximum that he could have been twelve hours
10  previously, correct --
11          MR. FARRAH:  Objection.
12      Q.  -- or eleven hours?
13      A.  Well, without knowing what his burn-off rate, if
14  his burn-off rate was higher, he would get lower sooner
15  even if he was higher.
16      Q.  This is the same burn-off rate you used in the
17  rule 26 admission?
18      A.  In the second report, it is indeed.
19      Q.  And based on this report, you opine that he was a
20  -- Paragraph 2 of your opinions, he's not obese, is that
21  correct?
22      A.  Did I say that?  Are you quoting me from
23  somewhere?
24      Q.  Yes.
```

2-8

```
1       A.  Let me see.
2       Q.  Paragraph 2.  Read the first sentence there.
3       A.  Okay.  This is for the affidavit, and this is
4   prior to my having seen this photo.  Remember I asked you
5   about photos last time?
6       Q.  We'll get to that in a second, but I just want
7   you to answer one question at a time.
8       A.  All right.
9       Q.  As of May 5, 2005, you used a Widmark R of .68,
10  correct?
11      A.  I did.
12      Q.  Okay.  And you used that based on your opinion
13  that -- and if I read this incorrectly, let me know.
14          Assume that Jeff Southworth weighed 210
15  pounds and assumed 25 ounce Bud Lite, beer containing 30
16  grams of ethanol, that he was not obese, and that his
17  height of six four was a reasonable proportion to his
18  weight, I conclude that each 25 ounce beer consumed on an
19  empty stomach produced a blood alcohol concentration of
20  approximately .016 percent, correct?
21      A.  Based on those assumptions, that's what I
22  calculate.
23      Q.  Okay.  Did you have any photographs of Mr.
24  Southworth at that point in time?
```

2-85

1    A.  No.
2    Q.  Were you provided, did you ask for any
3  photographs of him at that time?
4    A.  I didn't know that they existed, so I didn't ask.
5    Q.  Well, did you ask for any police reports?
6    A.  I did ask for the police report.
7    Q.  And you know that the photographs you have come
8  from the police report, correct?
9        MR. FARRAH:  Objection.
10   A.  I know they came from the police department.  You
11 say police reports.
12       These were taken in the police station and
13 the police report may be just by the arresting officer, not
14 by the booking officer.
15   Q.  And I'm sorry, when were those pictures provided
16 to you?
17       MR. FARRAH:  Which pictures are we talking
18 about?
19       MR. GILLIS:  Of Mr. Southworth.
20       MR. FARRAH:  Do you want to mark it as an
21 exhibit?
22       MR. GILLIS:  They were marked last time, I
23 believe.
24       MR. FARRAH:  This was marked last time.

2-8

1        MR. GILLIS:  Okay.  Well, let's mark the
2  new pictures here.
3        MR. FARRAH:  And when I referred to "this,"
4  I was referring to Exhibit 6, which is Exhibit 10 to the
5  O'Donnell deposition.
6    Q.  Just so we're clear here, since two weeks ago,
7  you have not produced another photograph of Mr. Southworth
8  that you had prior to your making your Rule 26 opinion in
9  this case, correct?
10   A.  Not really.
11   Q.  Well, when did you get these photographs?
12   A.  I had those photographs previously because I
13 asked you about them at the first time we were here for
14 this deposition.
15       And you asked me, is this the photo that you
16 saw, and I just said no.
17   Q.  Okay.  And the photo that you had seen before is
18 the ones that we're about to mark, correct?
19   A.  Yes.
20       MR. GILLIS:  Let's mark that as Exhibit 14,
21 14 and 15.
22              (Exhibit Nos. 14,15 marked
23              for Identification).
24   Q.  When were these produced to you?

2-87

1    A.  I can't give you a date, but it was after the
2  affidavit was filed and before I did the Rule 26 report.
3    Q.  Did you think it was important for filing your
4  affidavit that you used the right Widmark R?
5    A.  Of course.
6    Q.  Did you request photographs of him so you could
7  determine that before you chose a Widmark R in your
8  affidavit which is marked as Exhibit 2?
9    A.  At the time of the affidavit, I hadn't, I wasn't
10 aware that those photos existed.
11   Q.  Did you request any photographs of him so you
12 could make a determination as to whether he was obese, not
13 obese, or otherwise?
14   A.  Well, if I didn't know that they existed, I
15 couldn't request them.
16   Q.  That wasn't the question.  Did you ask for any
17 photographs of him so you could see what he looked like?
18   A.  I did at some point in time which is how I came
19 to receive the photos.
20   Q.  Did you do it prior to filing Exhibit 2, the 60-J
21 affidavit?
22   A.  No.  That's what I just said a moment ago.
23   Q.  At any time prior to your 60-J affidavit, did you
24 request photographs of him?

2-8

1    A.  I don't think so.
2    Q.  Okay.  Why not?
3    A.  I don't know.
4    Q.  Now, what type of signs would you expect Mr.
5  Southworth to be exhibiting if he is at .2 or above while
6  at the Longhorn Steakhouse on September 26, 2003?
7        MR. FARRAH:  Objection.
8    A.  Well, I think that each person handles or holds
9  their liquor in a different way and compensates and
10 manifests signs differently.
11       So I think that it's, a side from making
12 general statements, I don't think that I have anything
13 other than to say other than what Jude Connelly said.
14       VIDEO OPERATOR:  Excuse me, counsel.  We
15 have under five minutes remaining.
16   Q.  Well, you lecture extensively that at certain
17 BACs, people show certain signs, correct?
18   A.  Well, what I do is I quote the literature and
19 talk about the table that's in the, published in the AMA
20 alcohol and impaired drivers with 6500 people in it.
21   Q.  And what are the public signs that you would
22 expect people to show at .2?
23   A.  Well, that particular table just refers to
24 visible signs of intoxication.

2-89

1  But in general, you would be looking for
2  things like slurred speech and lack of coordination,
3  stumbling.  See, the problem is they manifest themselves
4  differently and experienced drinkers can mask some of it.
5  So loudness is one of the things that was
6  already occurring in the Longhorn, and --
7  Q.  I just want to interrupt you for a second because
8  I want you to not start mixing what happened at Longhorn
9  and what didn't.
10  I want you to tell me based on the
11  literature what you expect to see in most subjects at a .2,
12  what visible signed, like you were mentioning muscle
13  coordination, large muscle groups versus small muscle
14  groups.
15  MR. FARRAH:  Objection.
16  Q.  Give us the literature.
17  MR. FARRAH:  Objection.
18  A.  You said what I would expect to see in most
19  subjects?
20  Q.  Yes.
21  A.  You'd have to describe that individual's
22  experience with liquor for me so that, because most
23  subjects, that table that I'm referring to is in
24  nontolerant individuals, and Mr. Southworth obviously was a

2-9

1  tolerant individual.
2  So when you say most individuals, you have
3  to define that for me a little bit better so I can answer
4  that question.
5  Q.  Let's start with nontolerant people because
6  that's what the literature shows.  What would you expect
7  nontolerant individuals to show at .2?
8  A.  Nontolerant individuals?
9  Q.  Yes.
10  A.  Lack of coordination, poor judgment and red eyes,
11  glassy eyes.
12  It also depends as to whether we're talking
13  about .2 on the way up or .2 on the way down.
14  Q.  Well, you have Mr. Southworth at .2 and going
15  upwards that evening, correct?
16  A.  Well, at some point in time, it was going up, and
17  at some point in time, it was going down.  If you look at
18  the graph, you can see that.
19  Even the graph that you showed me before
20  that was off the graph, there's still a portion that goes
21  up and a portion that comes down.
22  Q.  At 9:30, his blood alcohol was going up, correct?
23  A.  Correct.
24  Q.  At 9:30, so assume for a nontolerant person, I

2-91

1  don't want to know what the signs are that you'd expect to
2  see before .2.
3  What specific signs would you expect to
4  start seeing at .2, nontolerant?
5  A.  For a nontolerant at .2 --
6  VIDEO OPERATOR:  The time is now 4:24 p.m.,
7  and we're now off the record.
8  (Discussion off the record).
9  VIDEO OPERATOR:  The time is 4:33 p.m., and
10  we're now on the record.
11  Q.  Doctor Benjamin, just before we went off to
12  change the tape, I was asking you a question, and I'll just
13  try to repeat it.
14  What signs would you expect to see in a
15  nontolerant drinker at .2 and above?  I know there are
16  some signs below .2, but I'm just looking at that point,
17  what would you expect to start seeing?
18  A.  Probably a good deal of lack of coordination and
19  psychomotor coordination.
20  Q.  Can you give an example of what lack of
21  coordination you're talking about?  Are we talking about
22  falling down?
23  A.  They might.  But I'm thinking more of certainly
24  maybe, certainly wouldn't be able to thread a needle or

2-9

1  maybe have some problems getting dressed, putting their own
2  clothes on, or some slurred speech, probably their eyes
3  would look glassy, the lids might be droopy, and they would
4  probably -- depending upon how long it took.
5  Once again, if this is on the upward side of
6  the curve --
7  Q.  Right.
8  A.  -- those would be the things that I would be
9  looking for.
10  Q.  And assuming on the upward side of the curve, we
11  went to, in a nontolerant person, what would you start to
12  expect seeing at .25?
13  MR. FARRAH:  Nontolerant person?
14  MR. GILLIS:  Nontolerant.
15  A.  Further deterioration, staggering, difficulty
16  walking, difficulty doing typical things, can't find their
17  keys, can't get the key in the lock.
18  Q.  How about at .3?
19  A.  A lot of muscle relaxation, probably head
20  drooping, difficulty functioning.
21  Q.  Would you have difficulty walking at that point?
22  A.  Probably.
23  Q.  Would you be vomiting at that point?
24  A.  Can't tell.

2-93

1    Q.  And at these various stages -- .2, .25, .3 -- for
2  a tolerant person, you would expect them to show those
3  similar signs but at a higher BAC, is that fair to say?
4         MR. FARRAH:  Objection.
5    A.  You may or you may see some of the more -- you'd
6  certainly see more of the more subtle things starting to
7  occur as well.
8    Q.  Okay.  Do you have any opinion as to how far a
9  tolerant person would trail behind a nontolerant person as
10  far as showing these signs; for example, a nontolerant
11  might at a .2, but a tolerant person would at a .22, something
12  like that?
13         MR. FARRAH:  Objection.
14    A.  There's a paper that addresses that.  Almost
15  everybody shows some impairment at .2, even those who are
16  accustomed to drinking.
17         But instead of it being like a high
18  percentage of people like 70 or 80 percent, it's more like
19  20 or 30 percent who might show that.
20    Q.  For the tolerant drinkers?
21    A.  For tolerant drinkers.  And by about .3, nobody
22  is tolerant.  Everybody shows some sort of stigmata.
23    Q.  From this chart, you can't tell --
24         MR. FARRAH:  Which exhibit?

2-9

1    Q.  Exhibit 13, you can't tell what was the absolute
2  high point for that evening of Mr. Southworth's blood
3  alcohol, correct?
4    A.  I can't tell from that chart, no.
5    Q.  Now, were you asked to assume a particular
6  Widmark R for purposes of your Rule 26 disclosure?
7    A.  No.
8    Q.  That's something you solely chose yourself,
9  correct?
10    A.  Yes.
11    Q.  How about the burn-off rate, did anybody ask you
12  to use a particular burn-off rate?
13    A.  No.
14    Q.  Okay.  But you have been for your various
15  opinions asked to assume certain fact patterns as to how
16  much alcohol Mr. Southworth had to drink, correct?
17    A.  Yes.
18    Q.  And in your 60-J affidavit, you were asked to
19  assume four 25-ounce beers at the table, correct?
20    A.  Yes.
21    Q.  In addition to two 25-ounce beers at the bar
22  prior to sitting at the table, correct?
23    A.  Yes.
24    Q.  And do you remember how many Manhattans you were

2-95

1  also asked to assume?
2    A.  Either two or three.
3    Q.  And those assumptions came from counsel, correct?
4    A.  Yes.
5    Q.  Okay.  And that's when you came up with the top
6  end of that range, correct, the .2 or plus?
7    A.  Well, if I took the hypothetical and plugged it
8  into the formula and then you asked me what would the BAC
9  be at a certain time, I just looked it up from the graph.
10    Q.  In your 60-J affidavit, on Page 15 at the top, it
11  says, at approximately 9:30 p.m. when he was served his
12  last drink at the Longhorn Steakhouse, his BAC was
13  approximately .18 to .22, is that correct?
14    A.  That's what it says.
15    Q.  Okay.  And the reason for that range is that you
16  assumed one amount of alcohol that he drank that night to
17  get to the high of a .22, and you were asked to assume a
18  lower amount of alcohol with a .18, correct?
19    A.  Yes.
20    Q.  And that's what I was referring to earlier.  The
21  .22 is the fact pattern that we just talked about, the four
22  25-ounce beers at the table, correct?
23    A.  Yes.
24    Q.  And two 25-ounce beers at the bar, correct?

2-9

1    A.  Right.
2    Q.  And one beer at the pit before they got to the
3  Longhorn, correct?
4    A.  Right.
5    Q.  And two or three Manhattans at the table as well?
6    A.  Yes.
7    Q.  Can you tell from your report what you were asked
8  to assume that got you up to the .18 as opposed to the .22
9  low end of that range?
10    A.  Didn't we go through that?  Wasn't that specified
11  earlier?
12    Q.  If I had that, if I could put my finger on it, I
13  can give it to you.
14         MR. FARRAH:  Page 10.
15    A.  I'm almost certain we talked about it.  At the
16  bottom of Page 10, Item 3 carrying over to the top of Page
17  11 at the top, I think that's the scenario.
18         If he consumed four 25 beers, it was .22 at
19  9:30.  And if he consumed two 25, it was .18.  Do you see
20  that on Page 11?
21    Q.  Yes.  So the difference between your two
22  calculations is two 25-ounce beers at the table.
23  Everything else is the same, correct?
24    A.  That's correct.

2-97

1    Q.  And the two 25-ounce beers at the table is what
2    the audit report shows was served to the table that
3    evening, correct?
4        A.  Let me see your copy of the audit report, please.
5        Q.  Here's the audit report, but I think it has the
6    total amount of the drinks to the table and the bill which
7    has been marked as an exhibit.
8            Here, Exhibit 5, can you tell how many
9    drinks on the bill it says how many beers were served to
10   the table that evening?  Just the one page.
11           MR. FARRAH:  What's the question?
12           Could you read back the question, please?
13           (Last question read).
14       A.  Yes, I think that's what it says, although part
15   of this is cut off, Mr. Gillis.  But I believe that this
16   line here that says, five ounce Bud Lites really means 25.
17       Q.  So if we assume it should have been a two on the
18   photocopy, your understanding is that at least as to the
19   bill, there were only two 25-ounce Bud Lites served at the
20   table that evening, correct?
21       A.  If you look at the audit report, that's what the
22   audit report says.
23       Q.  Okay.  Now, on these two different assumptions
24   you were asked to consider in putting together your 60-J

2-98

1    affidavit, did you do any independent evaluation of the
2    evidence to determine the credibility, the fact pattern
3    that you were asked to assume?
4            MR. FARRAH:  Objection.
5        A.  I didn't weigh it, no.
6        Q.  So for the one with four beers at the table, you
7    didn't do any independent evaluation as to the credibility
8    of the facts that would support that assumption, correct?
9            MR. FARRAH:  Objection.
10       A.  I did not.
11       Q.  And for the one with two beers at the table, you
12   didn't do any independent evaluation as to the credibility
13   of the facts upon which the assumption was based, correct?
14       A.  Well, the audit report said that.  But I didn't
15   weigh that, either.
16       Q.  And then subsequent to that, you gave another
17   opinion with a different -- you came up to a different
18   blood alcohol in your Rule 26 submission in this case,
19   correct?
20       A.  Well, I had a different set of assumptions.
21       Q.  Okay.  And where did those assumptions come from
22   counsel?
23       A.  In part.
24       Q.  If we have to go through it all again, I will,

2-99

1    but what part of your assumption was from counsel and what
2    part of your assumption was based on your investigation?
3            MR. FARRAH:  I think he's already answered
4    that he can't break it down for you, that's what I think he
5    answered.
6        A.  That's what I told you at the last deposition,
7    but, you know, I can support from Jude Connelly what I
8    mentioned earlier today for beers and three Jack
9    Manhattans --
10       Q.  Well --
11       A.  -- at the table.
12       Q.  On the assumptions that you made in your Rule 26
13   submission, did you make any independent investigation as
14   to the credibility of the facts you were asked to assume
15   for purposes of rendering the opinion in that submission
16   which has been marked as Exhibit 1?
17           MR. FARRAH:  Objection.
18       A.  No, I didn't weigh it.
19       Q.  Okay.  Briefly, doctor, in that expert
20   submission, you've attached cases that you've recently
21   testified in, correct?
22       A.  Well, within four years, I believe.
23       Q.  And can you tell me why you didn't supply any of
24   the case citations?

2-100

1        A.  Why I didn't supply any of the case citations?
2        Q.  The actual citations so we could look up these
3    cases.  It was just headings of cases, docket numbers.
4        A.  I never knew that you had to.  I thought you
5    just had to put in the name.  That's all I've been doing.
6        Q.  Now, starting -- you have the summary of your
7    qualifications here, and you talk about teaching seven
8    seminars for judges in Florida?
9            MR. FARRAH:  Can you just tell us where
10   you're looking now?
11           MR. GILLIS:  Page 1 of his Rule 26 report.
12           MR. FARRAH:  60-J?  No.  His Rule 26 report?
13           MR. GILLIS:  Yes, his letter to you dated
14   October 18, 2006.
15       Q.  The seven seminars that you said you spoke out in
16   Florida between '99 and 2006, which one of those deals with
17   the effect of ethanol and visible intoxication?
18       A.  I don't talk too much about visible intoxication
19   except for referencing the AMA table because that's
20   primarily a criminal setting.
21           The judges are learning, it's a traffic
22   court seminar.
23       Q.  So it has more to do with criminal impairment as
24   opposed to physical signs of intoxication in a civil case?

2-101

1    A.  Yes, sir.
2    Q.  And on Page 2, you talk about the title of a
3  presentation, the Importance of Developing a Chronology in
4  Determining the Proximate Cause of Impairment and Mixed
5  DUI, DUI cases, is that correct?
6    A.  Yes.
7    Q.  Where was that ever published?
8    A.  That was the citation I gave you last time in the
9  Society of Forensic Toxicology.  You wrote it down.  I
10  told you about that.
11    Q.  Could you repeat it for you?  I don't remember
12  writing it down.
13    A.  Sure I can repeat it for you.  Austin, Texas,
14  last year.
15    Q.  Okay.  I know a lot of this is repetitive, but
16  we're now on to your Rule 26.  And even though it's very
17  similar to the 60-J, I have to ask you the questions about
18  this as opposed to the other document.
19        On Page 2 of that document, the second
20  paragraph -- do you have it in front of you there?
21    A.  I'm not sure that I do.
22        MR. FARRAH:  It's Exhibit 1.
23    Q.  Page 1 is basically two paragraphs, and I'll
24  start with the bottom paragraph.

2-10

1        It says, the paragraph that starts with, I
2  conclude with reasonable scientific certainty --
3        MR. FARRAH:  Page 2.
4    Q.  I'm sorry, Page 2.  And, like I asked you about
5  your 60-J affidavit, as far as visibly intoxicated while
6  still at the Longhorn Steakhouse, you can't say
7  definitively during what time period he was visibly
8  intoxicated, correct?
9    A.  Well, I can tell you from between -- and I don't
10  mean to flip -- between the time he got there, after
11  8:30, before ten.
12        I mean, I don't think he was intoxicated
13  from the twelve-ounce beer after dirt biking and from the
14  two doubles that he had at the bar.  So that would bring
15  us up to about 8:30 when they were seated or so.
16    Q.  Can you tell me -- let me rephrase.  You can't
17  tell what time between when he got there and when he left,
18  whatever those time frames are --
19    A.  Well, I tried to just tell you --
20        MR. FARRAH:  I think he just answered that
21  question.
22    Q.  -- let me finish.
23        MR. GILLIS:  No, he didn't.  He put a time
24  frame in there.

2-103

1    Q.  You can't tell from when he got there to when he
2  left at what point during that time period, although you
3  know it's in that time period, when he showed visible signs
4  of intoxication, correct?
5    A.  Well -- read that back for me, please.
6        (Last question read).
7    A.  Well, I do know basically that, because the
8  drinks were accumulating and the drinks are coming more
9  quickly, that it's going to be in let's say the time
10  interval a half to 45 minutes before they leave rather than
11  in the earlier part of the evening.
12    Q.  Let's narrow that down.  You know based on the
13  way the alcohol was consumed it's more likely that he
14  showed those visible signs later in the evening while at
15  the Longhorn than earlier in the Longhorn, correct?
16    A.  That's exactly what I was trying to say, yes.
17    Q.  But you can't tell at exactly what time period it
18  occurred based on just a visible signs, correct?
19    A.  Well, at least rhetorically, I'm giving you a
20  time period.  What I can't give you an exact clock time.
21    Q.  Okay.  No exact clock time, correct?
22    A.  Yes.
23    Q.  And then you say other patrons at the Longhorn
24  came over to his table.  Do you know how many patrons came

2-104

1  over?
2    A.  Well, I know it's at least one.  It was either a
3  patron, or I think they said it was a woman who worked in
4  the bar or whatever, came over and told them to be quiet.
5    Q.  So when you conclude to a reasonable degree of
6  scientific certainty, you don't know whether it was an
7  employee or a patron, correct?
8    A.  I'm not certain, that's correct.
9    Q.  Or the exact clock time when that occurred,
10  correct?
11    A.  Right.  I mean, if it will make it easier, I
12  don't have a clock time answer for you in any of the
13  questions with the exception of the 9:30 time period when
14  all of the prior drinks have surmounted and he's ordering
15  the last one.
16    Q.  Well, that's based on the assumption that you
17  made as to when those drinks got to him and that those
18  drinks that were ordered were actually for him, correct?
19    A.  Basically, yes.
20    Q.  Okay.  And while you can calculate what his
21  blood alcohol is and what the standard is for nontolerant
22  people, whatever, you would expect him not to show visible
23  signs until higher than a nontolerant person because he's a
24  tolerant drinker, correct?

2-105

1     A. No. That mischaracterizes my testimony.
2     Q. What is your testimony?
3     A. My testimony --
4         MR. FARRAH: Objection.
5     A. -- is that whereas other people may be staggering
6 at that time, he may just be showing slumping of the
7 shoulders or not carrying himself or other less profound
8 stigmata, but still, of course in the eyes of his colleague
9 Jude Connelly, recognizable as indicating intoxication.
10     Q. He would mask it better than a nontolerant
11 drinker, correct?
12     A. Yes, he would.
13     Q. Are you aware as you sit here today of anybody
14 other than Jude Connelly that you, that stated he showed
15 visible signs of intoxication at the table?
16     A. I am not --
17     Q. Okay?
18     A. -- unless you want to include the person that
19 came over to the table and told him to be quiet.
20     Q. I think we went through that last time. The
21 fact that the table was loud --
22     A. Right.
23     Q. -- doesn't necessarily mean, is not conclusive
24 proof that Mr. Southworth was intoxicated, correct?

2-10

1     A. Well, those are two independent statements, Okay?
2 And -- so those are two independent statements.
3     Q. Are you going to testify in this case that the
4 patron came over to the table to tell him to quiet down
5 knew that he was visibly intoxicated, Mr. Southworth?
6         MR. FARRAH: Objection.
7     A. I don't know if the patron knew he was
8 intoxicated, but I knew certainly the patron knew that they
9 were making too much noise for the patron and his or her
10 friends to enjoy their dinner.
11     Q. And "they" being the whole table, not just Mr.
12 Southworth, correct?
13     A. Well, that's true.
14     Q. Okay. And --
15     A. Let me amend that. One of the things that Jude
16 Connelly said was that Jeffrey was usually a pretty quiet
17 person, didn't really speak up. So the fact that he was
18 loud is a significant factor.
19     Q. I don't want to mince words, but the testimony
20 was that the table was loud, correct?
21     A. I understand, but --
22     Q. There's no independent testimony that you're
23 aware of that says that Mr. Southworth, just Mr. Southworth
24 himself was loud, correct?

2-107

1         MR. FARRAH: Objection to the form.
2     A. Well, I don't know. I'm thinking that Jude
3 Connelly said something to the effect of what I just
4 reported to you.
5     Q. So your testimony is that Jude Connelly said
6 Southworth himself was loud as opposed to the table?
7     A. Let me see if I can find it.
8     Q. I'll withdraw the question. It's not important
9 at this point. We're running short on time.
10     A. Okay.
11     Q. The documents that you reviewed for this opinion
12 are listed on Page 3 going into the top of Page 4, correct?
13     A. Yes, sir.
14     Q. Is there any documents that you requested at the
15 time that you gave this opinion that you needed that were
16 not provided to you in order to make your opinion in this
17 case?
18     A. No.
19     Q. Was there anything that you needed at that time
20 prior to making this opinion that would have in your
21 opinion more accurately given you a more accurate opinion
22 in this case?
23     A. Well, I revert to my prior comment about liking
24 to have one of the glasses and to have had the contents

2-10

1 from the glass so I could have gotten it analyzed, and then
2 I wouldn't have to rely on plaintiff's counsel to ask me to
3 assume something. We would have had a concrete number.
4     Q. And those requests were made but just not
5 complied with, correct?
6     A. Well, he doesn't have to comply with my requests.
7     Q. Based on your requests, did you ever get those
8 materials?
9     A. No.
10         MR. FARRAH: Haven't we been over that
11 already?
12         MR. GILLIS: No. Well, we went over it for
13 the purposes of the 60-J. This is different.
14     A. Although we were talking about the same data, Mr.
15 Gillis.
16     Q. Since you gave this opinion, are there further
17 documents that you've reviewed in order to make your --
18 strike that.
19         Since you gave your opinion in this, have
20 you come upon new documents that have changed your opinion
21 in this case in any way?
22     A. No.
23     Q. And by your opinion, I'm talking about --
24     A. My ultimate opinion.

2-109

1   Q. -- I'm talking about the exhibit that you
2   submitted that is --
3        MR. FARRAH: Exhibit 1.
4   A. We're talk about the Rule 26 report, the initial
5   Rule 26 report?
6   Q. What you have in front of you, Exhibit 1, yes.
7   A. We're talking about the same thing, yes.
8   Q. Okay. And you mention on Page 8, the paragraph
9   referring to Douille, D-o-u-i-l-l-e, certain -- I'll read
10  the sentence starting on Line 5.
11       Certain signs of visible intoxication will
12  constitute knowledge of the patron's intoxication but so
13  would the number of drinks consumed per hour, correct?
14  A. Yes.
15  Q. What number of drinks consumed per hour are you
16  opining should have put the Longhorn on notice of Mr.
17  Southworth's intoxication on September 26, 2003?
18       MR. FARRAH: Objection.
19  A. Well, I think in particular, between nine o'clock
20  and 9:35. But if you want to, you can take the entire
21  interval from a little after eight o'clock to 9:35. If
22  you take --
23  Q. Okay. So if --
24       MR. FARRAH: Let him finish.

2-11

1   A. Yes, let me just finish, okay? If you start at a
2   little after eight o'clock, assuming they come in and sit
3   at the bar a little after eight o'clock and they have two
4   25-ounce beers at the bar, and then they're seated around
5   8:30, 8:40, and then they cash out the last service --
6   let's just say this: The last service is at 9:35 and they
7   cash out at almost ten o'clock.
8        If you go from eight to 9:35, there are one,
9   two, three, four, five, six, seven drinks served.
10  Q. To Mr. Southworth?
11  A. I'm sorry?
12  Q. To Mr. Southworth?
13  A. Yes. Each one of those drinks, that's seven in
14  number. But each double beer is just that, it's like two
15  twelve-ounce beers.
16       And even with this calculation on the Jack
17  Manhattans, if you take the three Jack Manhattans at .85,
18  four ounces of ethanol and you add them together, that's
19  three eighths is 24, and twelve is about 25, that also
20  comes out to be more than -- it's just like a 1.4 beers,
21  1.4 beers, and 1.4 beers.
22       So it's like four beers. If I convert it to
23  equivalents, it's four beers for the Jacks and each of the
24  double beers are double beers.

2-111

1        So there is one, two, three, four double
2   beers is eight and four, so that's twelve. That would be
3   the equivalent of twelve, twelve-ounce cans of beer between
4   eight o'clock and 9:30.
5   Q. And that's assuming as to your assumptions as to
6   what he actually had that night are accurate, correct?
7   A. Well, what I have here, if just assuming that
8   that is the correct number, that is a large number of
9   drinks to serve in a short period of time.
10  Q. Okay.
11  A. That's also a criterion in the bartender's guide
12  that we had here as an exhibit that you marked last time,
13  and that's also consistent with what's taught in the TIPS
14  program in terms of how many drinks per unit time.
15  Q. That's, your entire answer is based on the
16  assumption you were asked to make for purposes of putting
17  together this opinion, correct?
18  A. Okay. Well, for purposes of doing this
19  calculation.
20  Q. Okay. And it's kind of a rhetorical question,
21  but if he didn't have all that to drink, your assumptions
22  would have to be different, correct?
23       MR. FARRAH: Objection.
24  A. If he didn't, the assumptions calculations and so

2-11

1   forth would be less. But depending upon how many few you
2   asked me to assume, Mr. Gillis, that would be the factor that
3   would depend on whether I answered you, that's excess, I
4   believe, and that's not excessive.
5   Q. Getting back to the original question here, how
6   many drinks would have to be served to Mr. Southworth that
7   evening at the Longhorn before the wait staff should have
8   been on notice of his intoxication?
9        MR. FARRAH: Objection.
10  A. Don't they have a policy on that?
11  Q. I'm asking you what your opinion is, not what the
12  policy is, not what Mr. Farrah, all the drinks he told you
13  to assume.
14       I'm asking, one to a hundred, how many
15  drinks could he have had before you feel that the wait
16  staff should have been on notice of his intoxication?
17       MR. FARRAH: Objection.
18  A. Okay. That's a fair question. Let me answer
19  it for you this way.
20       You know that I say that you can use about
21  .02 as a ballpark for each beer. With Mr. Southworth, he's
22  going to have on an empty stomach from a twelve-ounce beer
23  a lot lower than .02 because of his increased body weight.
24       So even if you use .02, which is not a

2-113

1  correct number but it's an easy number to work with in an
2  example, then that means if you're going to burn-off one
3  beer an hour and they're there from eight to 9:30, that's
4  an hour and a half.
5          As soon as he has his second double beer,
6  he's now already at the point what he can't burn those two
7  double beers off until more than two hours.
8          So everything he drinks beyond two double
9  beers is going to accumulate in his body.  And those Jack
10  Manhattans, the way they're calculated, they are 1.6 beers
11  each because a typical Budweiser twelve-ounce can of beer
12  like the one that he had after dirt biking is about .5
13  alcohol.
14          And these are calculated, even with the
15  smaller amount of volume in the glass, these are calculated
16  to be .84.
17          MR. GILLIS:  I'm going to move to strike.
18      Q.  The question was very simple, David.  What number
19  of drinks --
20          MR. FARRAH:  He was answering your question.
21      Q.  -- if you can put it in twelve-ounce beers like
22  you recalculated all the Manhattans to, and you
23  recalculated the double beers.
24          Based on your assumption that he was

2-11

1  drinking there from eight to 9:30, how many twelve-ounce
2  beers would they have to serve him before they should be on
3  notice of his visible intoxication?
4          MR. FARRAH:  Objection.
5      A.  Well, I'm not going to sit here and do that
6  calculation, but what I am going to reference you to is the
7  Rule 26 report where I laid out all of that.
8          I talked about what his rate of climb would
9  be on his blood alcohol.
10      Q.  I know you did.  But --
11          MR. FARRAH:  Let him finish, please.  This
12  is the second time you're interrupted him on a question you
13  obviously think is very important.
14      Q.  You put in your --
15          MR. FARRAH:  Let him answer the question.
16      Q.  You put in your guide there what the rate of
17  climb of alcohol was based on what you were asked to
18  assume, correct?
19      A.  Yes, I did.
20      Q.  I'm not asking you that.  I'm asking you very
21  simply as an expert, how many beers or the equivalency
22  thereof -- strike that.
23          What would they have to serve him in the
24  equivalency of twelve-ounce beers before they should be on

2-115

1  notice of his visible intoxication that evening if he was
2  there drinking from eight to 9:30?
3          MR. FARRAH:  Objection.
4      Q.  How many?
5      A.  Well, we have the food, too, that we have to
6  factor in.
7      Q.  Just give me an answer.
8          MR. FARRAH:  Same objection.
9      A.  Read back the question for me, please.
10          (Last question read).
11      A.  Probably about twelve.
12      Q.  Okay.  And I'm going to ask the same question,
13  one word changed, and that is take out the word visible.
14          The equivalency of how many twelve-ounce
15  beers should they have to serve him before they should be
16  on notice of Mr. Southworth's intoxication?
17          MR. FARRAH:  Objection.
18      A.  Okay.  Now, you recall at the beginning of this
19  deposition, I made a distinction between impairment and
20  intoxication.
21          And to me, intoxication means that people
22  can look and see.  And you've taken the word visible out
23  but you've left the word intoxication in --
24      Q.  I know, but in --

2-11

1          MR. FARRAH:  Let him finish.  This is the
2  third time you're interrupted him.
3      Q.  Look at your sentence there what it says --
4          MR. FARRAH:  Wait a minute.  Let him finish.
5          MR. GILLIS:  We can save three hours of
6  nonresponsive.
7          MR. FARRAH:  Please.  What are you showing
8  him?
9      Q.  You put the patron's intoxication.
10          MR. GILLIS:  Page 8 of Exhibit 1.
11      A.  Yes.  But I prefaced it on the prior line by
12  saying visible intoxication, and I'm using intoxication
13  there in the same way.
14      Q.  Is it fair to say when you use the word
15  intoxication, a patron's intoxication and the word visible
16  is not there, you mean it's interchangeable with visible
17  intoxication?
18          MR. FARRAH:  Objection.
19      A.  Yes, that's what I'm saying.
20      Q.  Okay.  I don't want to put words in your mouth.
21  I just want to make sure these two things mean the same
22  thing?
23      A.  Yes.  That's helpful to me, Mike.
24          MR. GILLIS:  Are you about ready?

2-117

1     MR. FARRAH: First of all, I have questions
2 to ask him. Are you saying, you're done? I have a couple
3 of questions for him.
4     MR. GILLIS: I'm not done. I have a couple
5 more hours to go. It's now 5:13 and he said he wanted to
6 leave at 5:05.
7     A. I would be grateful if we could finish up.
8     MR. FARRAH: I do have some questions I want
9 to ask him.
10     MR. GILLIS: It's not your turn yet, Al.
11     MR. FARRAH: I understand. So let me also
12 say this.
13     MR. GILLIS: No. Then I'm going to keep
14 going if he's going to stay because I've got plenty more to
15 go at it. Do you want to leave or do you want to --
16     A. Well, I'd like to leave, of course. I think we
17 all would. It's Friday afternoon.
18     MR. FARRAH: Well, let me make a statement
19 on the record, okay?
20     A couple of things. First of all, I have
21 questions to ask him.
22     Secondly, at the beginning of this
23 deposition, you claimed some prejudice because you had not
24 had a chance to review the materials that were sent to you

2-11

1 with your colleagues, your two colleagues who accompanied
2 you to both depositions last week, and you talked about
3 reserving your right to take further depositions, a further
4 deposition of Mr. Benjamin.
5     I have questions I want to ask him. You
6 and I have made an agreement that I can have 60 days from
7 the time that you file your motion for summary judgment to
8 respond, and in the interest of giving you every
9 opportunity to ask him any questions you want to ask him,
10 I'm willing to shorten that time on my end to 30 days -- I
11 don't need 60 days to respond -- and to work with Mr.
12 Benjamin and you to fix another date for his deposition at
13 which time you'll be able to ask him any questions you want
14 to ask him, and I can ask him any questions I want to ask
15 him and still accommodate the schedule that we've
16 established.
17     MR. GILLIS: Well, I don't know how we can
18 do that without going to Court and moving to strike on
19 his --
20     MR. FARRAH: I'm sorry. I can't hear you.
21     MR. GILLIS: One second.
22     MR. FARRAH: Do you want Mr. Bikofsky to
23 tell you what he's written you?
24     MR. GILLIS: No. I can read it myself.

2-119

1     MR. FARRAH: Okay.
2     MR. GILLIS: Thank you very much, Al.
3     MR. FARRAH: You're welcome.
4     MR. GILLIS: I think we're going to have the
5 Court determine whether or not what you recently submitted
6 to me is going to be stricken or not in order to continue
7 his deposition, and I'll try to get that motion out
8 shortly.
9     MR. FARRAH: Then let's do that.
10     MR. GILLIS: Okay. That's one thing.
11     Second of all, the prejudice we're claiming
12 is that you didn't provide us with materials that you have
13 had in your possession for more than two years, A; and B,
14 you've now two years after he submitted, almost two years
15 his first opinion and then six months after he submitted
16 his second opinion, and a week after we spent, what was it,
17 $2600 to take his deposition, you then change his opinion,
18 and he's already said there's no new evidence that he's
19 basing it upon.
20     So that's the prejudice, the failure to
21 provide materials that you had in your possession and you
22 were supposed to provide, A; and B, the change of your
23 opinion a third time well after the deadline and after his
24 deposition is commenced.

2-12

1     MR. FARRAH: What materials didn't we
2 provide you that we had two years ago?
3     MR. GILLIS: The Widmark for the 60-J
4 affidavit, the photographs, the photographs of the glass,
5 the photographs that he has now changing his entire Widmark
6 R on, the body weight.
7     MR. FARRAH: Those photographs -- let me be
8 clear. The photographs which are now Exhibits 13 in this
9 case are photographs that are as available to you as they
10 are available to me.
11     These are merely photographs that the police
12 produced and --
13     MR. GILLIS: Are you saying you're not
14 required under the rules to produce those if you have them?
15     MR. FARRAH: If I have documents that I got
16 from the police, not by subpoena, I don't think I'm under
17 an obligation to produce those to you.
18     MR. GILLIS: I'll review the rules then.
19     MR. FARRAH: But these are documents -- let
20 me just be clear on this.
21     Exhibits 14 and 15 are documents that he
22 referred to in his 60-J affidavit, and they're also
23 documents that he testified to -- excuse me.
24     They're documents that he referred to in his

2-121

1  Rule 26 report and they're also reports that he said he did
2  not have or asked for at the time of his 60-J affidavit.
3  With respect to the Exhibit 13 --
4  MR. GILLIS: What he referred to is --
5  MR. FARRAH: Let me finish. With respect to
6  Exhibit 13 which is the Widmark calculation, this was not
7  attached to -- I don't believe this was attached to the
8  60-J report or referenced in it.  And it was through
9  oversight that that was not included.
10  There's no reason for us not to have
11  submitted to you the Widmark calculation.  Simply an
12  oversight.  I apologize for it.
13  I don't think you're prejudiced by it.  You
14  had it as of last week.
15  In terms of -- and I just want to make this
16  statement for the record so that you can know where I'm
17  going because I think I know where you're going.
18  In terms of the prejudice of his
19  supplemental report saying that he's going to testify
20  consistent with or about what was in his 60-J affidavit is
21  something I have a hard time seeing since you made his 60-J
22  affidavit an exhibit in this case.
23  You questioned him about it, and certainly
24  had it available to give to your expert, and I dare say you

2-12

1  probably did give it to your expert.
2  You've questioned him about it the last time
3  and then again today, and the fact that he is, the fact
4  that he has expressed some opinions there in that affidavit
5  that are different from the Rule 26 report is simply, as I
6  think he's testified, that he's been asked to assume
7  different scenarios.
8  Given the evidence in this case, it can't be
9  prejudicial to you that we're now seeking, should the
10  occasion arise, to say to the jury, this is a calculation
11  you can consider based on the evidence in the case, based
12  on what Jude Connelly has testified to at the grand jury,
13  based on the statement he made, based on what the various
14  witnesses in the case have testified to.
15  The rest of the, of what was supplied to
16  you, Exhibit 9 which follows up on his statement to you
17  that he relied on certain hypotheticals and supplies you --
18  excuse me -- Exhibit 10 which follows up on the statement
19  to you that he was asked to assume certain hypotheticals
20  and provides the basis for the hypotheticals, it's
21  something you've had for a week and I don't think in any
22  way prejudices you.  But that as it may.
23  So you decide.  If you want to move to
24  strike, that's fine.  I can't stop you.  But I'm just

2-123

1  letting you know what our position is on the record.  I
2  don't see the prejudice.
3  MR. GILLIS: It's more than that, Al.
4  First of all, we're going on the assumptions of his
5  published reports that he uses a 6-8 Widmark, and all of a
6  sudden, we find out it's a 6-4 --
7  MR. FARRAH: It's a 6-4 in his Rule 26
8  report.
9  MR. GILLIS: And he's using a 6-8, we find
10  out today in his prior report.  That's extremely important.
11  You're now claiming he's going to use four
12  and a half ounces of alcohol in the drink, when all along,
13  you're claiming two and a quarter.
14  In addition, he's now telling us that for
15  three years, he's telling you he's going to get the
16  glass, get the drink, and do it in front of the jury.
17  MR. FARRAH: That's not what he testified to
18  at all.
19  MR. GILLIS: I think we both put our
20  positions on the table.  I don't think we have to go any
21  further.
22  MR. FARRAH: Fine.  But I want the record to
23  be clear.  I have questions I want to ask him, so it's
24  really your call.

2-12

1  MR. GILLIS: On your dime, you're more than
2  welcome to.
3  MR. FARRAH: Well, let's resume, and we'll
4  do that.
5  MR. GILLIS: So we're suspended.
6  VIDEO OPERATOR: The time is now 5:23 p.m.,
7  and we're off the record.
8  (Deposition suspended at 5:23 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2-125

## CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS    )

) ss.

COUNTY OF MIDDLESEX         )


I, Josephine C. Aurelio, Registered Professional Reporter, a Notary Public within and for the Commonwealth of Massachusetts, do hereby certify:

That DAVID M. BENJAMIN, whose deposition is hereinbefore set forth, satisfactorily identified themselves, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of February 2007.


_____
Notary Public  in and for the
Commonwealth of Massachusetts


My Commission expires:
January 14, 2011

---

2-12

I, DAVID M. BENJAMIN, having been duly sworn according to law, and under the pains and penalties of perjury, depose and say that I have read the foregoing transcript of testimony, and that it true and correct to the best of my knowledge, information, and belief.


_____


COMMONWEALTH OF MASSACHUSETTS    )
) ss.
COUNTY OF            )


having been satisfactorily identified and duly sworn before me, this _____ day of _____, 2007.


_____
Notary Public in and for the
Commonwealth of Massachusetts


My Commission expires:

---

2-127

## ERRATA SHEET

Corrections should be made as follows:
Page, line            Should read:

---

**9**

1   produce?

2      MR. FARRAH: Objection.

3   A.   Excuse me.

4      MR. FARRAH: You can answer.

5   A.   I don't have a normal or a typical type of

6     thing. Every report I write is case specific.

7   Q.   Based -- this particular report that you wrote

8     in this case, did you review documents before

9     writing it?

10   A.   Yes, I did.

11   Q.   And are those documents listed in here?

12   A.   They should be.

13   Q.   Why don't you take a look at it, and tell me

14     what you reviewed in order to mike your opinion

15     in this case?

16   A.   The documents reviewed for the preparation of

17     this report are listed on page three of the

18     report. When I refer to the number, I'm

19     referring to the numbers that I assigned to the

20     pages.

21   Q.   That would be three at the top of the page,

22     correct?

23   A.   That is correct, three at the top of the page.

24   Q.   Are there any other documents that you have

**10**

1   reviewed in the preparation of this report other

2     than the documents that are listed on page three

3     of your expert report?

4   A.   There may be one other document.

5   Q.   What would that be?

6   A.   That document would be a document that was put

7     out by one of the alcohol trade associations

8     providing guidance to tavern keepers about how

9     many drinks they should serve to people of

10     various body sizes in order to avoid getting

11     them intoxicated.

12   Q.   Why isn't that put in here with the document,

13     under Documents Reviewed?

14   A.   I believe it came to my attention after the

15     report was prepared.

16   Q.   Is that document here with you today?

17   A.   I do have a copy of it.

18   Q.   Could you get a copy of that out?

19   A.   Yes, sure.

20      Maybe you could just, instead of me

21     unhooking, just swivel around and get my little

22     briefcase case.

23      MR. FARRAH: This one here?

24     (Document handed to Attorney Gillis.)

**11**

1   A.   The document to which I was referring was called

2     a Server Guide. It's a three-page document and

3     I don't believe that I had seen it prior to

4     finalizing the report. I think I saw it

5     subsequently, so that's why it wasn't listed

6     among those documents.

7   Q.   Okay. You weren't given the entire book, you

8     were just given three pages of it?

9   A.   That is correct.

10      MR. FARRAH: Objection.

11   Q.   And you seem to have a bar recipe document with

12     you as well, is that correct?

13   A.   I do.

14   Q.   Did you review that in ordinary to make your

15     determination in this case?

16   A.   I'm not sure if I did or did not. Let me see if

17     I have listed it here.

18      I did not list it so the likelihood is

19     I did not rely on it.

20   Q.   When did you -- are there any documents that are

21     not listed in your expert report that you

22     reviewed but did not rely upon other than what

23     you have just mentioned, the bar recipe?

24   A.   Ask that again, please.

**12**

1   Q.   You have listed on page three of your report

2     documents upon which you relied and reviewed in

3     this case, correct?

4   A.   Yes.

5   Q.   You have just testified that you believe you

6     reviewed the bar recipe book papers that you

7     have there, but you did not rely upon it in

8     making your opinion in this case, correct?

9   A.   I'm not sure if I did or did not rely on that

10     bar recipe. I just don't --

11   Q.   Are there any other documents that you reviewed,

12     whether you relied on them or not, that are not

13     listed on page three of your expert report?

14   A.   I don't believe so.

15   Q.   Okay. Can I see the documents that you have

16     there with the bar recipe book, please?

17      This packet of documents that you have

18     handed to me, what does that -- what is that?

19   A.   That's a packet of documents I wanted to bring

20     with me because I thought it might be helpful to

21     me today.

22      MR. GILLIS: Can we get those marked

23     as an exhibit, please?

24      MR. FARRAH: Sure. Can we get copies?

13

1    MR. GILLIS: Sure.
2    MR. FARRAH: Do you want to say what
3    they are for the record, Mike?
4    MR. GILLIS: For the record, the first
5    page is, states it's the Longhorn Bar Recipe
6    followed by some various glasses. Subsequent to
7    that is a grand jury exhibit which appears to be
8    the statement of Jude Connelly. Following that,
9    testimony from -- which appears to be the grand
10    jury testimony of Jude Connelly. Following that
11    is an investigation of the EZ-ALC computer
12    program for the -- which I believe is the
13    Widmark Graph.
14    THE WITNESS: W-i-d-m-a-r-k.
15    MR. GILLIS: Following that is a
16    Widmark Formula with handwritten calculations.
17    And following that is the audit report which I
18    believe is already marked in this case as
19    Exhibit 4.
20    (Exhibit 5 marked for identification.)
21    THE WITNESS: Maybe you want to
22    include the Server Guide in that exhibit?
23    MR. GILLIS: Sure. For the purposes
24    of it, to add on to it, we'll put at the back of

14

1    that three pages which purport to be the cover
2    and a couple of pages from the server guide, bar
3    code server guide which we'll make as a part of
4    Exhibit 5.
5  Q.  Doctor, did any of the documents that are in
6    Exhibit 5 change your opinion in any way in this
7    case?
8    MR. FARRAH: Objection.
9  A.  Change my opinion from what to what, at what
10    point in time?
11  Q.  You gave a report, an opinion in this case that
12    is written and has been marked as an exhibit
13    here, correct?
14  A.  Yes.
15  Q.  And you stated that in Exhibit 5, you have
16    additional documents that you have reviewed
17    other than the ones that are in there, correct?
18  A.  Right. Over and above whatever I relied on for
19    the report.
20  Q.  With the exception of the audit report, those
21    other documents weren't documents that were
22    listed in your report, correct, as documents
23    that you reviewed?
24  A.  Well, maybe some of the witness statements and

15

1    deposition statements were, Mr. Gillis.
2  Q.  Were any of the documents that weren't already
3    listed as being reviewed that are part of that
4    packet, did any of them change in any way the
5    written opinion that you have given in this
6    case?
7  A.  Okay. Could I have that exhibit back, please?
8  Q.  Sure.
9  A.  I would say that the bar recipe document that we
10    have on the top of Exhibit 5, the second page of
11    that document down at the bottom where it says
12    Manhattan Up, which is the glass that's used to
13    serve the Manhattans, is described as a
14    six-ounce cocktail glass. The formula given for
15    preparing the Manhattan is two ounces of bourbon
16    and a quarter ounce of sweet vermouth. That's
17    two and a quarter ounces, yet there appear to be
18    an inconsistency between how you get two and a
19    quarter ounces into a glass that says six
20    ounces, when that glass was served, it was
21    supposed to only -- it's supposed to have volume
22    almost up to the top.
23    There seems to be a discrepancy
24    between the way the Manhattans are actually

16

1    served and the bar recipe in terms of the volume
2    of liquid in the glass.
3  Q.  You were not aware of that when you rendered
4    your opinion in this case?
5    MR. FARRAH: Objection.
6  A.  I was aware of a discrepancy. And I still have
7    not had adequately explained to me how that --
8    how they could serve a drink.
9    I saw the photo of a served drink
10    which is a -- in a six-ounce, Manhattan-type of
11    glass, and that certainly is more than two and a
12    quarter ounces. I don't understand how there
13    can be a representation that the Manhattan is
14    two and a quarter ounces at this formula, as
15    opposed to what I saw which was a -- an almost
16    six-ounce drink.
17  Q.  Where did you see the photograph?
18  A.  Mr. Farrah showed it to me.
19  Q.  He provided you with photographs of drinks?
20  A.  He showed me a photograph that he had taken.
21  Q.  He himself?
22  A.  Yes.
23  Q.  And the photograph was of a drink in a six-ounce
24    glass or that's what you thought it was?

17

1   A.   That's what it appeared to be and that's how it
2        was represented to me.
3   Q.   When were you shown the photograph?
4   A.   Months ago.
5   Q.   How many months ago?
6   A.   I can't break it down any closer than that for
7        you.
8   Q.   Was it last summer, last fall? What time frame?
9   A.   I have -- it has no meaning to me at all,
10       Mr. Gillis.
11  Q.   Was it before or after November 1st?
12  A.   I can't answer that either.
13  Q.   But you were aware of the size of the glass
14       before you rendered your opinion, correct?
15  A.   I was, and it was a source of concern for me.
16  Q.   But you were able to render an opinion anyways,
17       correct?
18  A.   I was.
19            MR. FARRAH: Objection to the form.
20            MR. GILLIS: I don't believe those
21       photos have been produced.
22            MR. FARRAH: To the extent they
23       haven't, I think he said a photo. I'll produce
24       it.

18

1            MR. GILLIS: I appreciate it.
2            MR. FARRAH: Sure.
3   Q.   So in addition to the materials that you said
4        you reviewed, you have also reviewed a
5        photograph, correct?
6   A.   Yes.
7   Q.   Anything else that you reviewed in this case?
8   A.   Not that I recall.
9   Q.   Have you been out to the restaurant at all?
10  A.   No.
11  Q.   Have you measured any drinks yourself out at the
12       restaurant?
13  A.   No.
14  Q.   Has anybody brought you alcohol and asked you to
15       determine the alcohol content related to this
16       case?
17  A.   No.
18  Q.   Have you visited or aware of anybody who visited
19       the establishments where the employees who
20       worked there on September 26, 2003, are
21       currently worked or previously worked?
22  A.   I don't understand that question.
23  Q.   Did you go to any bar to review anything in this
24       case?

19

1   A.   No.
2   Q.   You haven't been to the Longhorn?
3   A.   Haven't been.
4   Q.   To the Longhorn Steakhouse in Leominster?
5   A.   I said I haven't been there.
6   Q.   Have you been to any Longhorn Steakhouse?
7   A.   No.
8   Q.   Have you been to any restaurant that you
9        understand employees who work there back in
10       September of 2003 are currently working?
11  A.   No.
12  Q.   Getting back to the question that we're on, is
13       there anything else now that you can -- physical
14       evidence or written materials -- anything that
15       you reviewed in order to make your opinion in
16       this case?
17  A.   No.
18  Q.   Okay. Based on what you have been able to
19       review, do you feel you're able to make an
20       opinion in this case as to the amount of alcohol
21       that was served to Jeffrey Southworth that
22       evening?
23            MR. FARRAH: Objection.
24  A.   I think I can represent the number of drinks,

20

1        and if I exclude the concern I have about the
2        Manhattan, the two volumes and the formulas
3        being inconsistent, I can certainly make an
4        estimate of what the minimal amount of alcohol
5        would have been in that Manhattan.
6   Q.   What that you use in order to render your opinion
7        in this case as the amount of alcohol in the
8        Manhattans that were served to Jeffrey
9        Southworth that evening?
10            MR. FARRAH: Can he look at his
11       report?
12  A.   I think what I used was an ounce and a half of
13       Jack Daniels and three-quarters of an ounce of
14       vermouth.
15  Q.   How did you come up with that combination?
16  A.   When I asked plaintiff's counsel what kind of a
17       hypothetical or the facts of the hypothetical he
18       would be asking me in court, those were what I
19       was instructed to use.
20  Q.   So your opinion in this case is based on at some
21       point in the evening, Mr. Southworth having a
22       Jack Daniels Manhattan to drink, correct?
23  A.   Several.
24  Q.   For the purposes of those Jack Daniel

**21**

1   Manhattans, you're assigning to that drink one
2   and one-quarter ounce?
3 A. One and a half ounce of 80 proof Jack Daniels
4   and three-quarters of an ounce of sweet
5   vermouth.
6 Q. Based on the materials that you reviewed, did
7   you independently come up with any amount of
8   alcohol that you believe these drinks -- were
9   contained in these drinks this evening?
10       MR. FARRAH: Objection to the form.
11 A. I don't understand what you're asking mow.
12 Q. You read materials in this case, correct?
13 A. I did.
14 Q. Some of those materials had to do with drinks in
15   this case, correct?
16 A. With numbers of drinks served and the names of
17   the drinks.
18 Q. Based on anything that you reviewed in this
19   case, did you come up with an amount of alcohol
20   in those Manhattans that was different than what
21   you just testified to as provided to you by
22   plaintiff's counsel?
23 A. What I believe I just testified to was the
24   amount that I used in my calculations.

**22**

1 Q. Why did you use that amount?
2 A. Because that amount is lower than the amount in
3   the book that would not overestimate it, or it
4   gave me a conservative estimate that I could say
5   to you if indeed the formula was different, such
6   as two ounces of the higher proof liquor, or
7   maybe even more ounces to fill up the six-ounce
8   glass, the calculations that I did were more
9   conservative and would, therefore, represent a
10   blood alcohol concentration that was lower than
11   what a higher number could be. So it was at
12   least what my calculation showed could be
13   higher.
14 Q. But the opinion you gave is the one that you
15   believe is most accurate opinion for that
16   evening, correct?
17       MR. FARRAH: Objection.
18 A. The one that I gave was the one that was based
19   on the hypothetical that would be put to me in
20   court. And I felt it was reasonable to respond,
21   and I still have that same question in my mind,
22   Mr. Gillis. There's no question about it.
23 Q. Did you, in putting together your chronology in
24   your expert report for that evening, did you

**23**

1   determine the chronology yourself or was that
2   given to you by plaintiff's counsel?
3       MR. FARRAH: Objection to the form.
4 A. It was a combination of both. I went through
5   the -- what did you call it? Not the bar bill.
6   You called it an inventory or something, was
7   that the expression that you used? The
8   inventory.
9       I went through the inventory and I
10   tried to, between the inventory and the
11   testimony of the fact witnesses -- in
12   particular, the wait staff and the young lady
13   who was waiting on these gentlemen that night --
14   and the deposition testimony, the witness
15   statements and where I could not fill in the
16   blanks, I asked plaintiff's counsel to assist me
17   in completing the assumptions of the
18   hypothetical scenario.
19 Q. Can you determine which of the facts that you
20   used in your hypothetical are facts that you
21   determined and which are facts that were
22   determined by counsel?
23       MR. FARRAH: Objection.
24 A. Certainly, I cannot discriminate at that level,

**24**

1   no.
2 Q. Now, were any of the facts that you determined,
3   did you find conflicting testimony from various
4   sources?
5       MR. FARRAH: Objection.
6 A. That question is a little difficult to answer
7   because there was a major time period between
8   depositions being taken and so forth. So there
9   were differences in the testimonies at various
10   times.
11 Q. And how did you resolve those differences in
12   order to come up with your chronology in this
13   case?
14       MR. FARRAH: Objection.
15 A. Well, specifically in the report that I put
16   together, I found that the second set of
17   depositions that were taken did not really add
18   any additional information. In many instances,
19   the record was unclear and it was -- there was
20   some obfuscation on the record where I was not
21   able to take any additional information. It
22   turns out that I would guess -- and I think I
23   said in the report, the second set of
24   depositions which I guess would be the ones for

**25**

1    the federal court proceeding.

2  Q.  This case?

3  A.  For this case, were not of any assistance to me.

4      Most of what I relied on were the earlier set

5      that were taken more contemporaneously with the

6      incident itself.

7  Q.  Why don't you take a look and make sure I read

8      this properly.  Starting at the bottom of page

9      three, I believe you addressed that issue?

10 A.  Okay.  How far do you want me to go with this?

11 Q.  I'll just read it and you tell me if I'm reading

12     it correctly.

13         The very last entry:  I have also

14     reviewed the follow-up depositions of Jude

15     Connelly taken February 10, 2006, Michael Espey

16     taken April 25, 2006, and Thomas Scott Espey

17     taken April 25, 2006, and viewed photographs of

18     Jeffrey Southworth taken the day of his arrest,

19     September 27, 2003; is that correct?

20 A.  That is an actual reporting, yes.

21 Q.  My understanding is you did not find those

22     depositions to be helpful to you at all because

23     of the time delay for some reason?

24         MR. FARRAH:  Objection.

**26**

1  A.  For all the reasons I stated earlier.

2  Q.  Is there -- I believe you state on the bottom of

3      page four that you found that to be speculative

4      and scanty and could not help you develop in

5      your facts of the night in question a more

6      accurate chronology, correct?

7  A.  I would agree with that, sure.  That's how I

8      found it.

9  Q.  A lot of that is because the prior depositions

10     were taken more contemporaneous with the day of

11     the accident, is that correct?

12         MR. FARRAH:  Objection.

13 A.  That's only part of it.

14 Q.  What's the other part?

15 A.  I felt that there was -- I felt that there was

16     some obfuscation of the record.  I felt that

17     maybe you were trying to cut off the responses

18     and obfuscate information that was being

19     obtained.  It did not appear that you were

20     providing sufficient time for the answers to be

21     rendered and I didn't feel that those were

22     helpful to me is the bottom line.

23 Q.  So you're, as part of your expertise in order to

24     make a scientific opinion in this case, you're

**27**

1      rendering credibility to various testimony that

2      you weren't present for?

3         MR. FARRAH:  Objection.

4  A.  I'm not rendering credibility.  What I'm doing

5      is I'm first determining whether it sheds any

6      additional light or is consistent with the prior

7      information.  And second of all, I'm talking

8      about the semantics of the question-and-answer

9      process rather than the information that was

10     contained.

11 Q.  And Mr. Farrah was present at that deposition,

12     correct?

13 A.  Say again.

14 Q.  Mr. Farrah was present at that deposition,

15     correct?

16 A.  I assume so, but I don't recall specifically.

17 Q.  So you can't recall what lawyers were at the

18     deposition, but you remember what -- the

19     questions that were cut off and obfuscated?

20 A.  I remember that you were asking the questions.

21         MR. FARRAH:  Objection.

22 Q.  You understand it was Mr. Farrah's deposition?

23         MR. FARRAH:  Which deposition are we

24     talking about?

**28**

1         MR. GILLIS:  All of them were yours.

2  A.  I don't believe that we're talking about the

3      same thing.

4  Q.  Are you aware of any of those depositions that

5      you have listed in this case that were

6      depositions by the defendant, not the plaintiff,

7      in this case?

8         MR. FARRAH:  You mean noticed by

9      the --

10 Q.  Noticed by the defendants instead of the

11     plaintiffs?

12 A.  I really don't know who noticed what.

13 Q.  And all of them were noticed by the plaintiff,

14     and Mr. Farrah asked the questions before we

15     even got to ask one question; you're aware of

16     that, aren't you?

17         MR. FARRAH:  Objection.

18 A.  It's not my recollection.

19 Q.  It's not your recollection?

20 A.  No.

21 Q.  But you do recollect that those aren't

22     trustworthy because the answers provided after

23     Mr. Farrah got through with the witnesses were

24     obfuscated?

**29**

1                MR. FARRAH: Objection.

2   A.   That was part of it, yes.

3   Q.   Did you put that in your report?

4   A.   No. I said --

5   Q.   Did you think it was relevant?

6                MR. FARRAH: You did tell him at the

7     beginning you would let him finish answering his

8     questions. At least you tried to. Here's your

9     chance to try to.

10   A.   I said in the report that the report was not

11     helpful to me, and provided no additional

12     information. And what was the part that I just

13     read into the record a moment ago?

14   Q.   The bottom of page four.

15   A.   Most of the testimony scanty and speculative and

16     didn't help me develop a better indication of

17     the facts or a more accurate chronology, I stand

18     by that statement.

19   Q.   For the purposes of your opinion, can you name

20     one deposition that you relied upon in this

21     case?

22                MR. FARRAH: For the purposes of his

23     opinion?

24                MR. GILLIS: Yes.

**30**

1                MR. FARRAH: Hasn't he put it in the

2     report?

3                MR. GILLIS: Maybe I'm missing it. I

4     don't see any depositions in this case.

5                MR. FARRAH: Page three.

6   A.   The bottom of page three. You asked me to just

7     read that into the record a few moments ago.

8   Q.   You said you didn't rely upon that because they

9     were too scanty and speculative, correct?

10   A.   Right. They didn't add anything over and above.

11   Q.   Are there any other depositions that were taken

12     in this case that you have reviewed at all?

13   A.   On page three, the depositions mentioned under

14     Documents Reviewed above the last sentence on

15     that page.

16   Q.   And none of those depositions are from this

17     case, that's my point?

18   A.   That is correct. They're from the earlier

19     proceeding.

20   Q.   So other than the ones that you rejected, did

21     you review any other depositions in this case?

22   A.   Well, when you say in this case, you mean taken

23     in this case.

24   Q.   Yes, taken in this case?

**31**

1   A.   I reviewed only what I put down, yes.

2   Q.   So you didn't review the testimony of the

3     waitress who actually served the drinks in this

4     case, correct? In order to assist you, her name

5     is Leigh Chabot.

6   A.   Excuse me, I reviewed the November 2003

7     deposition of Leigh Chabot.

8   Q.   You realize there was no deposition of Leigh

9     Chabot in 2003?

10   A.   Excuse me, it's her statement then. If it

11     wasn't a deposition; it was a statement.

12   Q.   Well, you tell me, was it a deposition or a

13     statement?

14   A.   A statement.

15   Q.   Did you review her deposition in this case?

16   A.   If I haven't listed it here, I did not.

17   Q.   Did you think that was important?

18   A.   It may have been.

19   Q.   May have been?

20   A.   Yes.

21   Q.   Why didn't you review it?

22   A.   I'm not certain.

23   Q.   Why didn't you review the bartender's

24     deposition?

**32**

1   A.   I'm not certain of that either.

2   Q.   Wouldn't that have been important?

3   A.   It may have been.

4   Q.   Why didn't you review the manager's report --

5     excuse me, the deposition?

6   A.   I have no special answer for you.

7   Q.   Why didn't you review Sherri Salmon for the

8     waitress who normally served Mr. Southworth at

9     the Longhorn, is there any reason why you didn't

10     review her deposition?

11   A.   Never heard that name, to the best of my

12     knowledge.

13   Q.   Is there anything that you have requested of

14     Mr. Farrah that he hasn't provided you

15     willingly?

16   A.   No.

17   Q.   You have written extensively on the importance

18     of a chronology, correct?

19   A.   Yes.

20   Q.   Don't you think reviewing the people who served

21     the alcohol that night, sworn testimony under

22     oath, would be important in helping you put

23     together that chronology?

24                MR. FARRAH: Objection.

33

1 A.  Sometimes.

2 Q.  Well, do you know if it was important in this

3      case?

4           MR. FARRAH:  Objection.

5 A.  It may have been.

6 Q.  But you don't know because you didn't bother to

7      take the time to review it, did you?

8 A.  Well, I wouldn't phrase it that way.  I am not

9      exactly certain why I didn't review them.

10 Q.  Normally, when you are preparing to give

11      testimony under oath in the case, those would be

12      the type of documents you would want to review;

13      correct?

14 A.  It depends.

15 Q.  There are circumstances where you have the

16      bartender's deposition, waitress's deposition,

17      and you don't think you want to review them to

18      see if they're relevant?

19           MR. FARRAH:  Objection.

20 A.  Sometimes the amount of time that has transpired

21      is so long that there may not be any point to

22      it.

23 Q.  But you don't know until you review it, correct?

24 A.  Well, the amount of time is the issue.  Not

34

1      necessarily what is said that an individual's

2      capacity to recall.

3 Q.  Can you tell me how you determined whether or

4      not they had the ability to recall, if you don't

5      bother to even look at their deposition?

6           MR. FARRAH:  Objection.

7 A.  I don't know how to answer that question.

8 Q.  Did you review the plaintiff's Answers to

9      Interrogatories in this case?

10 A.  I'm not sure if I did or not.

11 Q.  Can you tell me what the relevance of reviewing

12      the statement of facts in a summary judgment

13      motion and the other case, the Southworth case,

14      what relevance that has to this case?

15           MR. FARRAH:  Objection.

16 A.  It was a document that set forth the summary at

17      that point in time, it was available.

18 Q.  By the way, these depositions that you had, you

19      read each one of them?

20 A.  I did.

21 Q.  Front to back?

22 A.  Probably not.

23 Q.  So when you say you reviewed the deposition of

24      Michael Espey, we don't know what pages you read

35

1      and what pages you didn't read, correct?

2 A.  Right.  I can tell you what I did do was look

3      through the deposition to find the testimony

4      that was pertinent about the time interval

5      involved on the evening in question.  And

6      reading things about where the person grew up

7      and where they went to high school and things

8      like that were not important to me.

9 Q.  What someone like Michael Espey had to drink

10      that night is important, isn't it?

11 A.  That's right.

12 Q.  Those are the type of things you were looking

13      for?

14 A.  That's correct.

15 Q.  And you were looking for evidence from them as

16      to visible signs of intoxication, correct?

17 A.  Well, I was looking for first, how many drinks

18      were served and what type of drinks were served,

19      and then what their observations were about

20      Jeffrey.

21 Q.  Now, based on all of the documents that you have

22      reviewed in order to form your opinion in this

23      case, as well as the conversations and

24      information provided to you by Attorney Farrah,

36

1      what is your opinion as to the visible signs of

2      intoxication that Jeffrey Southworth would show

3      when he was intoxicated prior to the date of

4      this accident which we'll use September 26,

5      2003, even though it went into the morning of

6      the 27th?

7           MR. FARRAH:  Objection.

8 A.  I really can't answer it in that form.

9 Q.  What form can you answer it in?

10           MR. FARRAH:  Objection.

11 A.  Instead of saying would show, if you say showed,

12      that would help me.

13 Q.  Prior to September 26, 2003, based on your

14      review of all the documents in this case, as

15      well as the materials provided you from

16      Mr. Farrah that may not be here, as well as any

17      conversations you have had with Mr. Farrah, what

18      are the visible signs of intoxication that you

19      opine Jeffrey Southworth would exhibit when he

20      was intoxicated?

21           MR. FARRAH:  Objection.

22 A.  I just said I couldn't answer using that

23      construction.  If you ask me what testimony or

24      what statements were made about what he showed

37

1    that particular night, I can answer that
2    question.
3    Q.  Okay.  I'm going to get to that in a minute.  I
4    guess my point is this, based on all these
5    documents, can you make an opinion as to what
6    signs he showed when he was visibly intoxicated,
7    on occasions that he was visibly intoxicated
8    prior to September 26, 2003?
9         MR. FARRAH:  Objection.
10   A.  I don't have an opinion to that question.
11   Q.  Based on these documents, can you tell me what
12   visible signs of intoxication Mr. Southworth
13   exhibited on this evening?
14   A.  His eyes were glazed; he was loud; he wasn't
15   carrying himself the way he usually does; and he
16   looked a little unkempt.
17   Q.  Okay, when was he loud that evening?
18   A.  When the manager or the person at the other
19   table came over and asked them all to quiet
20   down.
21   Q.  Is there any testimony that you reviewed that
22   indicated that it was Mr. Southworth solely who
23   was the person that was loud at the table?
24        MR. FARRAH:  That he can recall right

38

1    now, you're asking him?
2         MR. GILLIS:  That you can recall.
3         MR. FARRAH:  Objection.
4    A.  I don't recall anything specific.
5    Q.  The basis of that, is it your memory that the
6    manager came to the table to speak to the entire
7    table, not specifically to Mr. Southworth?
8         MR. FARRAH:  Objection.
9    A.  I recall it as talking to everybody at the
10   table.
11   Q.  Is it your opinion that if the entire table is
12   loud, all of the people at the table are
13   intoxicated?
14        MR. FARRAH:  Objection.
15   A.  Not necessarily.
16   Q.  Which ones at the table were intoxicated based
17   on the loudness?
18   A.  The ones --
19        MR. FARRAH:  Objection.
20   A.  The ones who drank the most in the shortest
21   period of time.
22   Q.  Of the seven people at the table that evening,
23   which ones drank the most and were intoxicated
24   when the table was loud?

39

1         MR. FARRAH:  Objection.
2    A.  I haven't specifically tried to assign drinks to
3    people other than Mr. Southworth.
4    Q.  So how do you opine that the other people were
5    intoxicated due to loudness at the table?
6         MR. FARRAH:  The same objection.
7    A.  I don't opine that.  I just said that the
8    manager came over and told them all to be quiet.
9    Q.  According to your report, it wasn't the manager,
10   it was other patrons?
11   A.  Or other patrons.
12   Q.  There's nowhere in any of the materials you
13   reviewed that said any patron came up to the
14   table that night, isn't that correct?
15   A.  I'm not certain that I recall.
16   Q.  As you sit here today, you're not aware of any
17   evidence that any patron came up to the table
18   and told him to quiet down that evening,
19   correct?
20   A.  Actually, I do recall reading that statement but
21   I may have this case confused with another case.
22   Q.  You mentioned it twice in your report so you're
23   telling me you confused this case with another
24   case?

40

1    A.  If I mentioned it in the report, then there was
2    some document that stated that.
3    Q.  So you indicate on page three that it was so
4    loud, that other patrons had to ask them to be
5    more quiet.  Can you tell me what document, if
6    anywhere, you got that from?
7    A.  No, I cannot.
8    Q.  You said on page two, Other patrons in the
9    Longhorn came over to Southworth's table and
10   asked him and his friends to be more quiet.  Do
11   you know where you got that from?
12   A.  No, I do not.
13   Q.  In fact, you don't mention the manager coming to
14   the table, do you?
15   A.  No, I do not.
16   Q.  Do you know what time during the evening this
17   occurred?
18   A.  I don't recall.
19   Q.  Do you remember Jude Connelly testifying in the
20   earlier deposition, the one you found credible,
21   that they left around 11 o'clock; do you
22   remember that?
23   A.  Not specifically.
24   Q.  Do you remember his testimony that they were

41

1    quiet approximately -- that someone came to the
2    table approximately 25 minutes before they left?
3  A.  Would you say that again, please?
4  Q.  Never mind, I'll get the page out for you to
5    look at.
6        Page 35 of the Jude Connelly
7    deposition in the Southworth case, on page 39
8    here, line 19 through 22.  Can you take a look
9    at that?
10        MR. FARRAH:  39 or 35?  Which is it,
11    39 or 35?
12        MR. GILLIS:  I'll tell you in a
13    second.
14        THE WITNESS:  That's not the right
15    page.
16        MR. FARRAH:  39.
17  Q.  Can you tell me what time you left?
18        I would say that it was, if not just
19    before, right around 11 o'clock.
20        These three lines right here.  Does
21    that refresh your recollection of what time they
22    left that evening?
23        MR. FARRAH:  Objection.
24  A.  This is Connelly stating?

42

1  Q.  Yes.
2  A.  What time he left or what time he thinks he
3    left?
4  Q.  Correct.
5  A.  Okay.
6  Q.  Does that refresh your recollection at all?
7        MR. FARRAH:  Objection.
8  A.  About what?
9  Q.  About what time they left that evening, the
10    restaurant?
11        MR. FARRAH:  Objection.
12  A.  That isn't what time Mr. Southworth left.
13  Q.  Who did Mr. Southworth leave with?
14  A.  I don't recall.
15  Q.  Okay.  So you're not aware that he left with
16    Mr. Connelly, correct?
17  A.  I do not recall with whom he left.
18  Q.  Okay.  I want you to assume that he left with
19    Mr. Connelly.  Do you have any opinion
20    whatsoever as to what time they left that
21    evening?
22        MR. FARRAH:  Objection.
23  A.  Earlier than 11 o'clock.
24  Q.  Based on what?

43

1  A.  Well, it was, all right -- he had,
2    Mr. Southworth had another beer at 10:30 at a
3    second establishment.
4  Q.  Based on what?
5  A.  Based on the documents that I reviewed, that
6    they went to another establishment and he had
7    one beer, twelve-ounce beer.
8  Q.  You, in order to make your opinion, took a fair
9    amount of information from Jude Connelly's
10    deposition in the Southworth case, correct?
11        MR. FARRAH:  Objection.
12  A.  A fair amount of information.  I took whatever
13    information I needed.  I don't know if that's a
14    fair amount or not.
15  Q.  So when Jude Connelly says he left there at 11
16    o'clock, you don't believe that?
17        MR. FARRAH:  Objection.
18  A.  It's inconsistent with other documentation that
19    I found.  I chose to accept that there was a
20    second establishment that he went to, and that
21    he had another beer at 10:30.
22  Q.  What establishment was that?
23  A.  A hotel of some sort, I believe.
24  Q.  Do you know of anybody that said they left

44

1    before 10:30?
2        MR. FARRAH:  Objection.
3  A.  No, I do not.  I do not.
4  Q.  What is your opinion as to what time they left
5    that evening?
6        MR. FARRAH:  Objection.
7  A.  It would have to have been before 10:30.  The
8    bill was closed at 9:35, I believe, and another
9    round of drinks was issued at that time.
10        I don't believe that it's going to
11    take an hour and a half to sit there and finish
12    one more drink.
13  Q.  It's your understanding the bill was closed at
14    9:30 or 9:35?
15  A.  9:35.
16  Q.  And that's when they left?
17  A.  That's when the bill was closed.  And I think
18    that there was at 9:35, another drink was served
19    or ordered.
20  Q.  And what you're using to come up to that
21    conclusion, just so we know, is you're looking
22    at your programming of the Widmark, correct?
23  A.  Right.  I'm looking at the time chronology and
24    the drinks that I put in based on what I was

45

1 able to assemble as the best chronology from the
2 documents that I reviewed at the time that I
3 provided this.
4 Q. So when you look at this document and say, Well,
5 it had to be closed out at 9:30, you're going by
6 what your Widmark shows, correct?
7         MR. FARRAH: Objection.
8 Q. You're not reading a deposition here, correct?
9 A. No. I told you that the 9:35 time reference
10 came from the inventory of the service.
11 Q. Okay.
12 A. And the 10:30 came from another independent
13 source.
14 Q. What source?
15 A. That I can't recall.
16 Q. As you sit here today, you don't have any basis
17 for -- you don't have an opinion as to when they
18 left that night, based on all that you reviewed?
19         MR. FARRAH: Objection.
20 A. I don't have a recollection.
21 Q. Doctor, have you ever done a back extrapolation
22 in any case?
23 A. Certainly.
24 Q. Can you tell me what a back extrapolation is?

46

1 A. Yes. A back extrapolation is when you start
2 with the blood alcohol concentration and a known
3 time and you determine that you are in the
4 postabsorptive time of alcohol disposition, and
5 you make an assessment as to what the person's
6 burn off rate is, and you add the amount that
7 was burnt off for each hour to the time that you
8 began with.
9 Q. And so based on what you just told me, in order
10 to do a back extrapolation, you have to have a
11 blood alcohol, you have to know what the blood
12 alcohol is at a certain time point in order to
13 go backwards, correct?
14 A. Certainly.
15 Q. You are unable to do this in this case, correct,
16 because there is no blood alcohol count at some
17 point in the evening?
18         MR. FARRAH: Objection.
19 A. That's right.
20 Q. You're not aware of any case where -- you have
21 been testifying in Massachusetts for quite a
22 while?
23 A. I have.
24 Q. You testify in other states as well?

47

1 A. I do.
2 Q. How many states have you testified in?
3 A. I don't know, six, eight, ten maybe.
4 Q. Are you aware of any state where you have been
5 able to back extrapolate without having some BAC
6 at a later point in the evening?
7         MR. FARRAH: Objection.
8 A. That's inconsistent with what back extrapolation
9 is.
10 Q. You couldn't do it without that?
11 A. That's correct.
12         MR. FARRAH: Objection.
13 Q. You're not aware of any case in Massachusetts
14 that's allowed that, correct?
15         MR. FARRAH: Objection.
16 Q. Not any legal case, correct?
17 A. I am not.
18 Q. Let's go back to your report and just start at
19 the beginning here.
20         You have the summary of your
21 qualifications and in that, you say that you
22 provide seminars for judges and lawyers and
23 other people, correct?
24 A. I do.

48

1 Q. One of the seminars that you do is a seminar for
2 MCLE on dram shot, correct?
3 A. Yes.
4 Q. In that you discuss, you provide papers and
5 lectures to lawyers on the proper way to
6 determine a blood alcohol based on certain
7 information that you get, correct?
8 A. That's a little vague.
9 Q. Well, what would you describe it as?
10         MR. FARRAH: Objection.
11 A. I would describe that I explain the absorption,
12 distribution, metabolism -- the absorption
13 distribution, metabolism and exclusion of
14 ethanol, and how to do proper ethanol
15 calculations.
16 Q. And is it fair to say in doing your calculations
17 and what you lecture on in these is the use of
18 the Widmark Formula?
19 A. Yes.
20 Q. Can you tell us what the Widmark Formula is?
21 A. Yes. The Widmark Formula is a means of
22 determining a blood alcohol concentration based
23 on the amount of ethanol an individual ingests,
24 based on the person's height and weight, and

49

1   based on the time interval involved.
2   Q.   And the lecturing you do for judges on that
3        subject as well as lawyers, you don't have
4        different conclusions for each one, do you?
5             MR. FARRAH: Objection.
6   A.   I don't understand what that is asking.
7   Q.   We discussed the Widmark with lawyers, you tell
8        them the way you do the Widmark, correct?
9   A.   I tell them the way a proper Widmark calculation
10       is supposed to be done.
11  Q.   And you would lecture on the proper way to do a
12       Widmark when you lectured to judges as well,
13       correct?
14  A.   To anybody.
15  Q.   It doesn't matter who the audience is, the only
16       Widmark calculations that you write about and
17       speak about are those that are the proper way to
18       do it, correct?
19  A.   Yes.
20  Q.   In your summary of qualifications, you talk
21       about seven seminars for judges in Florida,
22       correct?
23  A.   Yes.
24  Q.   Did those involve the proper use of the Widmark

50

1   Formula, any of those seminars?
2   A.   It may be in some small way.
3   Q.   Is it fair to say that those lectures didn't
4        deal primarily with the proper calculations
5        under Widmark?
6   A.   Well, some of them did, but I found that it was
7        not terribly enjoyed to go through the
8        mathematics; so subsequently, I took a lot of
9        the hard math out of it, and just talked
10       generally about the formula and the manner of
11       calculation.
12  Q.   When you teach generally, you basically say a
13       12-ounce beer or four-ounce glass of wine or one
14       and a quarter ounce of 80 proof alcohol all have
15       about the same amount of alcohol content,
16       correct?
17            MR. FARRAH: Objection.
18  A.   They do.
19  Q.   And not specifics, in generalities, there are
20       about -- they will increase your blood alcohol
21       by .02, is that correct?
22  A.   If you want to use just a rule of thumb because
23       it's different from men and women and it's
24       different for body weight, you can use .02 as an

51

1   indicator.
2   Q.   And the burn off rate that you generally lecture
3        on, again generalities, is .02, correct?
4   A.   Well, actually what I really tell people is the
5        range from .01 to .025, but then using .02 can
6        provide a reasonable estimate.
7   Q.   That's what you teach in the MCLE seminars as
8        well, correct?
9   A.   That's right.
10  Q.   What did you -- you say here that you taught a
11       seminar at Suffolk Law School on the
12       breathalyzer, correct?
13  A.   Yes.
14  Q.   Did that lecture deal with proper calculations
15       of the Widmark?
16  A.   No.
17  Q.   The ethanol speech you gave the American Academy
18       of Forensic Scientists and the New Hampshire Bar
19       Association, did those deal with the proper
20       calculations under the Widmark?
21  A.   The one at the American Academy of Forensic
22       Sciences, I have given so many that I don't know
23       which one you're referring to.
24  Q.   Just the one that you put in your paper here?

52

1   A.   Well, I think, why don't you read that to me
2        where it says what I --
3   Q.   Spoken on ethanol at the American College of
4        Forensic Science and the New Hampshire Bar
5        Association?
6             MR. FARRAH: No, no, no. Forensic
7        science is parenthesis see resume, close
8        parenthesis.
9   Q.   We'll go through the resume, if you want to go
10       through each one.
11  A.   All I want to say is, excuse me, that's a
12       general statement. All I said is that I spoke
13       about ethanol at those symposiums.
14  Q.   I'm not trying to trick you or anything. I want
15       to find out how many of these things that -- you
16       speak on a lot of things, you speak on the
17       effects of drugs; correct?
18  A.   I do.
19  Q.   You speak on the topics other than just alcohol,
20       correct?
21  A.   Certainly.
22  Q.   And I'm trying to find out which one of these
23       that you put in your opinion deal directly with
24       the proper use of the Widmark Formula?

53

1            MR. FARRAH: Objection.
2 A.  I can't answer that.
3 Q.  Okay. Which one of your peer reviewed articles
4    deal with the proper calculations under the
5    Widmark?
6 A.  Well, certainly the one that I gave at the
7    Society for Forensic Toxicology last October
8    did.
9 Q.  So October of '06?
10 A.  Yes.
11 Q.  You gave a lecture to the Academy of Forensic
12    Scientists in which you discussed the proper use
13    of the Widmark?
14 A.  No, the Society of Forensic Toxicologists.
15 Q.  The society, where was that given?
16 A.  Nashville, maybe.
17 Q.  Did you provide a paper?
18 A.  No, an abstract.
19 Q.  Was the abstract published?
20 A.  Yes.
21 Q.  Where was it published?
22 A.  In the proceedings.
23 Q.  Is it published anywhere other than -- was this
24    a seminar?

54

1 A.  It was a workshop.
2 Q.  So you understand that to be a peer review where
3    you published something in a workshop?
4 A.  The abstract is peer reviewed by a peer review
5    committee before it's even accepted. If it
6    doesn't pass peer review, it's not accepted and
7    you don't present.
8 Q.  And so the society has its own peer review group
9    that reviewed it before you presented it?
10 A.  That is correct.
11 Q.  Where would I find a copy of that paper?
12 A.  I don't know.
13 Q.  Well, if it's published, where is it published
14    to?
15 A.  In the --
16 Q.  Just a workshop?
17 A.  In the proceedings of the workshop, yes.
18 Q.  It's not in any other volume or periodical?
19 A.  No.
20 Q.  Just the workshop?
21 A.  Yes.
22 Q.  Now, on the bottom of the page two of your
23    opinion, you conclude With reasonable scientific
24    certainty that Jeffrey Southworth consumed the

55

1    equivalent of 13 12-ounce beers in 90 minutes;
2    is that correct?
3 A.  Yes.
4            MR. FARRAH: Could we just let him
5    have a chance to look at it if he wants to?
6 A.  If that's what I said, that's what I said.
7    That's actually the middle-ish, see, so that
8    begins.
9 Q.  Is that what you said?
10 A.  Yes, I did.
11 Q.  Is there a reason why you translate everything
12    into beers as opposed to just putting in the
13    amount of alcohol he drank that evening?
14 A.  Yes.
15 Q.  Why is that?
16 A.  Because I'm translating it to number of drinks
17    is another way of expressing the amount of
18    ethanol, and people are frequently more familiar
19    with how many drinks somebody has.
20           To tell a lay person that a person has
21    a blood alcohol of a certain level may not have
22    exactly the same understandability, or that
23    person may not understand a blood alcohol
24    concentration as opposed to a number of drinks.

56

1 Q.  Is there a particular reason for using beer as
2    opposed to wine or one and a quarter ounces of
3    alcohol?
4 A.  No. I mean as you pointed out earlier, I could
5    have said 12 four-ounce glasses of wine at
6    twelve percent, or I could have said 12 mixed
7    drinks with one and a quarter ounces of 80 proof
8    spirits.
9 Q.  And you conclude to a reasonable degree of
10    scientific certainty certain facts, correct?
11           MR. FARRAH: Objection.
12 A.  Well, I don't know what you're referring to that
13    kind of like --
14 Q.  One, two, three, four, the fifth line of that
15    paragraph as part of your -- you conclude that
16    he became loud and had difficulty carrying
17    himself in the way he normally did. Correct?
18 A.  Yes.
19 Q.  You determined that to a reasonable degree of
20    scientific certainty?
21           MR. FARRAH: Objection.
22 A.  Based on testimony, yes.
23 Q.  But there's no testimony that Mr. Southworth
24    himself was the only person loud at the table,

57

1    correct?
2              MR. FARRAH: Objection.
3    A.  No, that's true.
4    Q.  The only testimony you have is that the table
5        itself at some point during the evening appeared
6        to be loud, correct?
7              MR. FARRAH: Objection.
8              MR. GILLIS: What's your objection?
9              MR. FARRAH: I think you're
10       mischaracterizing the testimony of the documents
11       that he reviewed.
12             MR. GILLIS: Well, then, he can tell
13       me if I'm wrong.
14             MR. FARRAH: Fine.
15   A.  The affidavit of Jude Connelly that was filed
16       the 6th of May 2005, the second page, item five,
17       when he references his own deposition, page 49
18       to 51, he says, I testified -- referring to that
19       deposition -- that during the course of the
20       evening at the Longhorn Steakhouse,
21       Mr. Southworth seemed to be under the influence
22       of alcoholic beverages he was being served at
23       the restaurant.
24   Q.  I think we're talking about the loudness. We'll

58

1        get to the restaurant.
2    A.  I'm not finished. Item 6 on the same page.
3    Q.  Is this concerning loudness?
4              MR. FARRAH: Let him answer. Then you
5        can ask him.
6              MR. GILLIS: If he wants to answer on
7        loudness, I'll let him answer.
8              MR. FARRAH: Otherwise, what are you
9        going to do, interrupt him?
10             MR. GILLIS: Yes, I am, because that's
11       not the question.
12             MR. FARRAH: Let him answer the
13       question.
14   Q.  The question is what evidence do you have that
15       Mr. Southworth, not the restaurant, was loud
16       that evening? That is all the question is.
17   A.  You don't need to raise your voice to me,
18       Mr. Gillis. I'm going to answer your
19       question --
20   Q.  Please do.
21   A.  -- right now. Item six. I also testified at
22       pages 42 to 44 of my deposition, that
23       approximately one-half hour before we left the
24       Longhorn, everyone at the table was loud,

59

1        including Mr. Southworth, and that either a
2        waitress or manager of the restaurant came to us
3        and asked us to be quiet.
4    Q.  So --
5    A.  Let me just add the last statement, then we can
6        move on to your next question.
7              At that time -- this is item seven
8        from the same affidavit -- when the table was
9        asked to quiet down, Mr. Southworth was
10       exhibiting all the signs of intoxication I
11       testified about at pages 49 to 51 of my
12       deposition. Signed under pains and penalties of
13       perjury, the 6th day of May 2005.
14   Q.  Okay, so the table was loud, correct?
15   A.  As well as Mr. Southworth.
16             MR. FARRAH: Objection.
17   A.  You know that statement was right there, I just
18       read it.
19   Q.  Are you aware of any independent testimony that
20       just -- that other than the table itself,
21       meaning everybody at the table, was loud?
22             MR. FARRAH: Objection.
23   A.  What do you mean by independent testimony? I
24       think this is independent testimony.

60

1    Q.  I'm talking about is there anywhere in any of
2        the things that you reviewed that said just
3        Mr. Southworth was loud as opposed to the whole
4        table?
5              MR. FARRAH: Objection.
6    A.  It doesn't -- excuse me. Well, to answer your
7        question, I'm sorry. To answer your question,
8        am I aware of that specific statement which you
9        just fabricated and put to me and has no
10       relevance as to what I just stated? No, I'm
11       not.
12   Q.  Okay. How do you delineate which of the seven
13       people were intoxicated based on being loud at
14       the table versus those who are loud at the table
15       but weren't intoxicated?
16             MR. FARRAH: Objection to the form.
17   A.  Did you say delineate?
18   Q.  How did you determine which ones because they're
19       loud or intoxicated, and which ones because they
20       are loud and not intoxicated?
21             MR. FARRAH: Objection.
22   A.  How do I determine? I determine because
23       Mr. Connelly made that statement in his
24       deposition. He made that statement and spoke

61

1  specifically about Mr. Southworth in this
2  affidavit, and those were credible testimonies;
3  and also consistent with the other statements
4  that Mr. Connelly made about the signs that
5  Mr. Southworth was exhibiting that evening.
6  Q.  As a hypothetical, if he said that they left at
7  11 o'clock, that would be around 10:30, 25
8  minutes beforehand that they were loud, correct?
9        MR. FARRAH:  Objection.
10  A.  I'm sorry, I don't understand what you are
11  asking me.
12  Q.  Jude Connelly in that deposition which you have
13  given this weight to --
14  A.  Yes.
15  Q.  -- to show that signs of loudness were
16  indicative of his intoxication, you testified
17  that they were loud 25 minutes before they left,
18  that's what time you believe they were loud;
19  correct?
20        MR. FARRAH:  Objection.
21  A.  I'm sorry, that question is far too complicated
22  for me to respond to.
23  Q.  I'm going to show you the pages that you
24  referred to in that affidavit.  Specifically

62

1  page 44, and I'll read the question and the
2  answer and you tell me if I read it correctly.
3  Line 14?
4  A.  I can't do so without a copy.
5  Q.  Line 14.  And giving me your best -- this is
6  Mr. Farrah asking the question -- and give me
7  your best estimate of how much time elapsed from
8  when the woman came over and told you to tone it
9  down and when you left the restaurant on maybe
10  25 minutes, half an hour, is that correct?  Did
11  I read that correctly?
12  A.  You did read that correctly.
13  Q.  Is that your understanding as to when they were
14  loud 25 minutes before they left?
15        MR. FARRAH:  I didn't hear the
16  question.  Could you repeat the question?
17  Q.  Is that your understanding as to when they were
18  loud, 25 minutes before they left?
19        MR. FARRAH:  Objection.
20  A.  There is no time reference in that.  I can't
21  answer reference that.
22  Q.  What time reference do you need?
23  A.  I need some time reference.  I just can't take a
24  statement like that without any qualifier as to

63

1  time.
2  Q.  Do you have any reason not to believe Jude
3  Connelly when he said that the time that they
4  were loud was 25 to 30 minutes before they left,
5  regardless of when they left?
6  A.  I don't have any reason to disbelieve that
7  statement.
8  Q.  On page 39 of his deposition -- this is again
9  Mr. Farrah asking the question because as you
10  know, we weren't invited at any of these
11  depositions.
12        I can tell you -- can you tell me at
13  what time you left?  I would say that it was if
14  not just before, right around 11 o'clock,
15  correct?
16        MR. FARRAH:  You read that correctly.
17  Good reading.
18  A.  When you say correct to me, you mean in my --
19  Q.  Did I read that correctly?
20  A.  Yes, you read it correctly.
21  Q.  Did you disbelieve Mr. Connelly that that's the
22  time that he left?
23        MR. FARRAH:  Objection.
24  A.  I don't think that that is correct, no.

64

1  Q.  So you believe him when it suits your purpose,
2  that is, when it's loud, but you don't believe
3  him when he says they left at 11:00, correct?
4        MR. FARRAH:  Objection.
5  A.  I think that the time -- I think that the timing
6  is incorrect, but I think that he is quite
7  correct when he describes everyone at the table
8  as being loud, and Mr. Southworth is as well.
9  Q.  What time do you say they left the restaurant
10  that evening?
11  A.  Well, if I'm -- if I knew the distance between
12  the hotel and the restaurant, I could give you a
13  fair assessment, but I would have to say it was
14  after 9:35, minutes after 9:35, because there
15  was still one more drink to consume.
16  Q.  How many minutes?
17        MR. FARRAH:  Wait.  I don't think he
18  finished his answer.
19  A.  I've got to --
20        MR. FARRAH:  I know you're anxious --
21  A.  Let me run this out.
22        MR. FARRAH:  -- to depose this man.
23  A.  It would have been after 9:35, but it would have
24  been enough time so that they could have gotten

65

1    to the hotel. If he had the last beer at around
2    10:30, 10:35, whatever that time was that I had
3    in my note, they would probably have gotten
4    there about 15 minutes before at the latest.
5    So I would say that the time that they left
6    would probably, and this is only inferring by
7    the other standards, sometime, they would have
8    left between quarter of ten and maybe five after
9    ten. Something like that.
10 Q. I'm going to ask you to assume that the hotel is
11   less than a mile away.
12 A. Okay.
13 Q. What is your opinion as to when they left?
14          MR. FARRAH: Objection.
15 A. Then they could have left a little bit later,
16   too. They could have left at 10:10 maybe.
17 Q. Well, what is your opinion?
18          MR. FARRAH: Objection. He just
19   answered your question.
20          MR. GILLIS: No. He said it could
21   have been. I want to know what is your opinion.
22   Not what it could have been; not what it should
23   have been. What is your opinion based on what
24   you reviewed in this case as to when they left?

66

1          MR. FARRAH: Please. He is not being
2    asked to give opinions as to when people left or
3    didn't leave an establishment. You have asked
4    questions that are completely objectionable.
5          MR. GILLIS: Because he has given a
6    reasonable scientific certainty to exactly what
7    they drank and when.
8          MR. FARRAH: He doesn't have an
9    opinion as to when they left.
10          MR. GILLIS: That's not true. He does
11   have an opinion because he has them drinking in
12   the hole by 10:30. I want to know the basis of
13   that. When did they leave?
14          MR. FARRAH: Objection, same
15   objection. I think he's answered the question.
16 A. I would say between 10:00 and 10:15.
17 Q. Sometime after 10:00?
18 A. Yes.
19          MR. FARRAH: Objection.
20 Q. What did you base that on?
21          MR. FARRAH: Same objection.
22 A. Based it on what I have stated earlier about the
23   next beer having been consumed at the hotel in
24   the 10:30, 10:35 period of time.

67

1 Q. You don't know that you base that statement on,
2    correct?
3 A. Well, I do know that those -- excuse me, those
4    were, the 10:30 was the last beer. Those were
5    based on the documents that I reviewed that were
6    listed in my report.
7 Q. Which document?
8 A. The documents that were listed under Documents
9    Reviewed in my report.
10 Q. I understand, but which of those documents
11   reviewed? You reviewed many.
12 A. I can't tell you. That's right, I did, and I
13   can't tell you which one.
14 Q. When you have a situation like this where Jude
15   Connelly says that he left -- they left at 11
16   o'clock, and apparently somebody else must have
17   said they left earlier because you're saying
18   that person said he had a drink at the hotel at
19   10:30, how do you determine whose statement is
20   more accurate?
21          MR. FARRAH: Objection.
22 A. I try to look at any consistency or
23   inconsistency among all of the documents I
24   looked at.

68

1 Q. So there are portions of Jude Connelly's
2    testimony you find credible and other parts of
3    it you don't find credible, correct?
4          MR. FARRAH: Objection.
5 A. Essentially true. I mean credible, excuse me --
6    I don't want to, I have a problem with the
7    credibility part in the sense that people can be
8    mistaken about time, and it doesn't mean that
9    they are deliberately trying to mislead
10   somebody. They're just mistaken and that's in
11   good faith. So I don't want to say that they're
12   not credible.
13          Just saying that when I had to make a
14   final decision on the times that I was going to
15   use, based on the documents on the totality of
16   the documents that I reviewed, and the
17   consistencies and inconsistencies I was able to
18   perceive among them, this was the best
19   chronology that I could come up with.
20 Q. But you have no, you can't tell me which
21   documents you relied upon as to the 10:30
22   statement and why it is so, is that correct?
23 A. You ask one question. I can't tell you the
24   specific document, no, I cannot.

69

1  Q.  As you sit here today, you can't tell me why you
2      find some other document more credible than what
3      Jude Connelly stated was the time that they left
4      the restaurant?
5  A.  No, I can't.  But your inference is right,
6      that's what I believed at the time I wrote the
7      report.
8  Q.  But you believed Jude Connelly enough that you
9      adopted his statement that the table was loud at
10     some point?
11 A.  Well, that's a fact.  The statement that you
12     read was that the young lady came over and told
13     them all to be quiet.
14 Q.  That's what Jude Connelly testified to?
15 A.  All right, okay.
16 Q.  Correct?  You determined what facts you wished
17     to put in your chronology and which ones you
18     don't?
19     MR. FARRAH:  Objection.  I think we
20     have pretty much covered that.
21 A.  I think I already told you that I agreed with
22     that but I think he was mistaken about the time.
23 Q.  How as an expert do you scientifically determine
24     which statements are misspoken and which

70

1      statements are accurate?
2      MR. FARRAH:  Same objection.
3  A.  I think I already answered that by the --
4  Q.  Let's go over, starting on page five of your
5      expert report, you mention the Widmark method.
6      MR. FARRAH:  Did you say page five?
7  A.  Yes.
8  Q.  Now, in this chronology you have the first beer
9      drunk by Mr. Southworth as a 12-ounce beer at
10     7:30 p.m., correct?
11 A.  Yes, sir.
12 Q.  What's the basis for that opinion?
13 A.  The testimony that they were out dirt bike
14     riding, I believe, and that was the first beer
15     that they had.
16 Q.  You understand that Jude Connelly testified that
17     there was no beer drank that he was aware of,
18     correct?
19     MR. FARRAH:  Objection.
20 Q.  In the deposition that you found credible, the
21     first deposition?
22 A.  I don't have an independent recollection of that
23     at all.
24 Q.  Okay.  Well, if he didn't -- do you know what

71

1      time Jude Connelly said they stopped dirt biking
2      that night?
3  A.  Yes, sometime before 7:30.
4  Q.  Sometime before 7:00, correct?
5      MR. FARRAH:  Objection.
6  A.  7:00 is before 7:30.
7  Q.  What time do you believe they stopped dirt
8      biking that night?
9      MR. FARRAH:  Objection.
10 A.  Sometime before 7:30.
11 Q.  How far before 7:30?
12 A.  I can't tell you specifically.
13 Q.  How long did it take them to get from there to
14     the Longhorn?
15 A.  If -- at least a half an hour, approximately
16     half an hour.
17 Q.  At least a half an hour?
18 A.  From 7:30.  They got there around eight o'clock.
19 Q.  So in order to get there by eight, if it took 30
20     minutes, they would have had to finish their
21     beers sometime before 7:30, correct?
22 A.  I don't think -- first of all, I don't know who
23     they is.  I know Mr. Southworth had a beer.
24 Q.  He would have had to have finished it by 7:30 in

72

1      order to drive 30 minutes to the Longhorn and
2      get there by eight o'clock, correct?
3      MR. FARRAH:  Or drank it as he drove.
4      MR. GILLIS:  Thank you, Mr. Farrah.
5      Do you want to testify?
6  A.  Is there not a possibility that he took the can
7      into the car with him and drank as they were
8      going?  Of course.
9  Q.  I'm asking you what's your opinion:  Did he
10     drink in the car?
11     MR. FARRAH:  Objection.
12 A.  The answer is that it's immaterial whether he
13     drank in the car or whether he drank before he
14     got into the car.  The fact is whether or not he
15     had a beer and whether or not I have included it
16     in the summary of the ingestions, and I have.
17     Where he drank it doesn't make any difference.
18 Q.  But the time he drank it does?
19 A.  The time is important in some capacity.  But it
20     isn't extremely important.
21 Q.  Well, if he had that beer at seven o'clock and
22     his blood alcohol at the time he got to the
23     restaurant would be zero, not .01, correct?
24 A.  It would be below .016.  It may not be zero but

73

1    it would be very low, you're absolutely right,
2    very low.
3    Q.  That would have an effect on the calculations as
4    to what you find his blood alcohol to be when he
5    was served his last drink?
6        MR. FARRAH:  Objection.
7    A.  Not really.  Because by then, it certainly is
8    gone from his body.
9    Q.  I want you to assume that Mr. Connelly testified
10    that they stopped somewhere between 6:00 and
11    7:00, and assuming that, what time do you opine
12    that he had his last beer that night?
13    A.  Then between 7:00 and 7:30.
14        MR. FARRAH:  You mean his first beer?
15    Q.  First beer.
16    A.  First beer, thank you.
17    Q.  And if it was closer to 7:00, it would have been
18    almost all burnt off before he got to the
19    Longhorn, correct?
20    A.  Yes.
21    Q.  The second beer you attribute to him is one
22    25-ounce Bud Light at 8:10, correct?
23    A.  Yes.
24    Q.  How do you come up with 8:10?

74

1    A.  Their testimony was that they arrived at the
2    Longhorn approximately eight o'clock and that
3    they went over to the bar.  And I'm figuring
4    that if you order a drink and it's a busy night,
5    it may take you five to ten minutes to get
6    served.
7    Q.  That's your assumption?
8    A.  I think it's a reasonable assumption.
9    Q.  What is your assumption for him having another
10    beer at 8:20?
11    A.  That there was testimony that they -- that he
12    had two beers at the bar prior to having been
13    seated.  I think that's seated, I can't tell you
14    specifically.
15    Q.  You don't know the basis of that opinion as you
16    sit here today?
17    A.  I don't recall specifically.
18    Q.  Did you review the deposition of Michael Espey?
19    A.  I believe I did.
20    Q.  Did you find it to be credible?
21    A.  Gee, you know, I reviewed these so long ago,
22    that I don't have any independent -- that's why
23    you're asking all these questions.  I just don't
24    have all those independent facts at my disposal

75

1    to it.
2    Q.  So you don't have, for purposes of your
3    deposition today, you don't have the basis for
4    your opinion that he had two beers at the bar?
5        MR. FARRAH:  I'm sorry, I didn't -- I
6    just didn't hear the beginning of that question.
7    Could you repeat the beginning?
8    A.  For the purposes of your deposition.
9    Q.  I'll ask it a different way.  As you sit here
10    right now as an expert in this case, you can't
11    tell me what was the basis for your opinion,
12    what data or testimony you relied upon in coming
13    to the conclusion that he got a second beer at
14    the bar at 8:20?
15    A.  That's not correct.
16    Q.  What is it?
17    A.  The information that you're seeking would be
18    within those documents that were described under
19    Documents Reviewed, if we pulled all those
20    documents out and went through them.
21    Q.  You can't tell me which one it is?
22    A.  That is correct.
23    Q.  They sat down at 8:40, correct?
24    A.  Approximately.

76

1        MR. FARRAH:  Objection.
2    Q.  Well, we know that they sat down because the
3    audit report shows an input of food and drinks
4    at 8:41, correct?
5    A.  Yes.
6    Q.  Is it your opinion that they sat down by 8:40?
7        MR. FARRAH:  Objection.
8    A.  I think the testimony was that they were seated
9    approximately 8:30, and what you're referring to
10    is the time the waitress comes over and actually
11    takes the first drink order, and then records it
12    on the computerized ordering system.  So we're
13    not really disagreeing here, Mr. Gillis.
14    Q.  So you have him ordering a beer at 8:20, getting
15    it served, drinking it, and having it all done
16    before he went and sat down at 8:30?
17    A.  I have him ordering a second beer.  We're
18    talking about the second beer.
19    Q.  It's your testimony, to a reasonable degree of
20    scientific certainty, that he had a beer at 8:20
21    and was able to drink a 25-ounce beer and finish
22    it and get to the table by 8:30, is that your
23    testimony?
24        MR. FARRAH:  Objection.  You can

77

1    answer.
2  A.  The fact that he started the second beer at 8:20
3      doesn't necessarily mean that he finished it by
4      the time they sat down.
5  Q.  Are you aware of any testimony that he brought
6      the beer with him to the table?
7  A.  I am not.
8  Q.  And did you review the deposition of Leigh
9      Chabot?
10 A.  I reviewed nothing before I came to this
11     deposition today.
12 Q.  Wouldn't that be important if the server said
13     the first round of drinks -- don't you think
14     it's important that the server testified that
15     that first round of four drinks was served to
16     those people who didn't come from the bar
17     because the other three brought their drinks
18     from the bar?
19 A.  What I had to go on at the time was what I
20     utilized. And she was -- she testified as best
21     she could, but there were other things that I
22     relied on as well.
23 Q.  How do you know how she testified if you never
24     looked at it?

78

1  A.  Well, maybe I'm confusing the witness statements
2      with the depositions. You may absolutely be
3      correct.
4  Q.  I'm going to ask you to assume that the four
5      drinks -- you have the audit report in front of
6      you, correct?
7  A.  I do.
8  Q.  And the audit report has been premarked as
9      Exhibit 4 in this case. And you have at 8:45,
10     four drinks that were being ordered, correct?
11 A.  At 8:40? Is that what you said?
12 Q.  The bottom of the page.
13 A.  Okay. I'm in the wrong page here. Yes, three
14     Jack Manhattans and a Bud, a large Bud.
15 Q.  Now, your understanding of the facts of this
16     case is that there were three people at the bar
17     before they sat down, correct?
18 A.  My understanding is that there were two people.
19 Q.  You only have two people at the bar before they
20     sat down?
21 A.  Yes. Mr. Southworth and his dirt bike riding
22     friend.
23 Q.  Espey and nobody else?
24 A.  Those are the two I know.

79

1          MR. FARRAH: Objection to Mr. Espey,
2      nobody else.
3  Q.  Who was at the bar, to the best of your
4      recollection, before the group sat down at the
5      table?
6  A.  I have no knowledge of people other than Jeffrey
7      Southworth and the fellow that he came in with.
8  Q.  Do you know what that fellow's name is?
9  A.  No.
10 Q.  Two people, correct?
11 A.  Yes.
12 Q.  And what is your understanding as to how many
13     people sat at the table?
14 A.  Gee, I don't really recall.
15 Q.  Well, isn't that important in order to assign
16     drinks to people, to know how many people are
17     sitting at the table?
18 A.  Not really.
19 Q.  Okay. I want you to assume that Ms. Chabot
20     testified under oath on questions asked to her
21     by Mr. Farrah, that four gentlemen came in that
22     were not at the bar and that the first round of
23     drinks was served to those four gentlemen?
24 A.  The first round of drinks at the bar or at the

80

1      table?
2  Q.  At the table, there's three Manhattans and the
3      Bud Light?
4  A.  All right. Now say that to me again, please?
5  Q.  I want you to assume that in the deposition of
6      Ms. Chabot, she said when the group of gentlemen
7      sat down at the table, there were four gentlemen
8      who sat down who did not come from the bar, and
9      those are the four that ordered those drinks. I
10     want you to assume that, the three Manhattans
11     and the Bud Light?
12 A.  Okay.
13 Q.  Does that change your opinion in any way as to
14     what Mr. Southworth had to drink at the table
15     that evening?
16         MR. FARRAH: Objection.
17 A.  No.
18 Q.  No?
19 A.  No.
20 Q.  Well, in your opinion, you say that
21     Mr. Southworth drank that Bud Light in that
22     first round, correct?
23         MR. FARRAH: Objection.
24 A.  He drank two Bud, he drank two Bud Lights before

81

1    he sat down.

2 Q. At the table, you said he had two Bud Lights in

3    your opinion, correct?

4         MR. FARRAH: Can he look at his

5    opinion?

6         MR. GILLIS: Sure, he can. He's got

7    it right in front of him.

8         Why don't we take a two-minute break?

9         VIDEO OPERATOR: The time is 1:36

10    p.m., and we're now off the record.

11    (Recess.)

12 Q. On the top of page 6 --

13         VIDEO OPERATOR: Stand by. The time

14    is now 1:47 p.m. and we are now back on the

15    record.

16 Q. On the top of page 6 of your expert opinion in

17    this case, you, as part of your chronology, give

18    a 25-ounce beer to Mr. Southworth, and then you

19    have parenthesis check 20043, correct?

20 A. Yes.

21 Q. Is that the beer that was ordered at 8:40?

22 A. Yes.

23 Q. But the only testimony is that -- are you aware

24    of any testimony that the server brought that

82

1    first round of drinks to Mr. Southworth as

2    opposed to the four gentlemen who just showed up

3    at the restaurant?

4         MR. FARRAH: Objection.

5 A. No.

6         VIDEO OPERATOR: Counsel.

7         MR. FARRAH: Sorry.

8 Q. I want you to assume that Leigh Chabot has

9    testified that four gentlemen came in who were

10    not coming from the bar and those were the four

11    that got the drinks as they came -- that was in

12    the first round of drinks that night. Does that

13    change your opinion in any way?

14         MR. FARRAH: Objection.

15 A. No.

16 Q. Why not?

17 A. Because apparently when I put this chronology

18    together, that was the conclusion that I drew.

19 Q. Apparently?

20 A. Or I wouldn't have put it down.

21 Q. How did you conclude it?

22 A. It had to be from the other documents that I

23    listed as documents that I reviewed.

24 Q. You don't know which specific one?

83

1 A. No.

2 Q. What are you charging for this deposition today?

3 A. $650 an hour.

4 Q. You knew when you came here I would be asking

5    you questions about this case, correct?

6 A. I did.

7 Q. And at $650 an hour, you didn't think it

8    important enough to review your documents so

9    that you would have answers as to how you based

10    your opinions?

11         MR. FARRAH: Objection.

12 A. Well, I don't think that that's a fair

13    characterization. I anticipated being able to

14    talk about the Widmark calculations and the

15    composition of the drink. And there were so

16    much conflicting testimony among the people who

17    had testified, and with the several cases and

18    the witness statements and so forth, that I had

19    to use my best judgment when I put this

20    together. And that's what I did.

21 Q. And that best judgment that you used -- by the

22    way, you have already charged $6,600 in this

23    case before you got to the deposition, correct?

24 A. I don't have a recollection as to what I have

84

1    been paid. There's something in the Rule 26

2    report about what I have been paid.

3 Q. Whatever it is, that's what you have been paid

4    to date?

5 A. That would be true.

6 Q. And based on all of that, you can't tell me the

7    basis of your chronology?

8 A. No.

9         MR. FARRAH: Objection.

10 Q. Now, you just testified that there's a lot of

11    conflicting testimony, correct?

12 A. Yes.

13 Q. How did you determine facts to a reasonable

14    degree of scientific certainty when you yourself

15    say that there's a lot of conflicting facts in

16    the case?

17         MR. FARRAH: Objection.

18 A. When I reviewed the documents, I had all the

19    documents laid out and highlighted and yellow

20    stickered. I went through them, and I put

21    together what at that time was scenario that was

22    the most likely to have occurred at that time.

23 Q. The most likely to have occurred?

24 A. Right. And if I had any questions about what

85

1    had occurred, I asked plaintiff's counsel about
2    how to interpret those documents and how he
3    would be putting the hypothetical question to me
4    in court.
5  Q.  So if there was a problem with the chronology,
6    you asked plaintiff counsel to tell you what
7    chronology to use for purposes of the
8    hypothetical?
9  A.  Right.
10 Q.  So if the waitress says, I served the four
11   people who just came in from outside the
12   restaurant those drinks, and Mr. Farrah told you
13   to attribute that drink to Mr. Southworth, you
14   attributed that drink to Mr. Southworth,
15   correct?
16 A.  Most likely.
17       MR. FARRAH:  Objection.  You can
18   answer.
19 Q.  So is the chronology drawn up by you or by
20   Mr. Farrah?
21 A.  By me.
22 Q.  Whenever there's a question, you get what you
23   need for a hypothetical from Mr. Farrah,
24   correct?

86

1  A.  Yes.
2  Q.  Is it fair to say that your expertise is in
3    determining the blood alcohol based on the
4    chronology that you are given?
5        MR. FARRAH:  Objection.
6  A.  My expertise is in taking the set of scenario or
7    set of circumstances with a given number of
8    drinks and then calculating what the blood
9    alcohol would be under that set of
10   circumstances.
11 Q.  Then why do you need Mr. Farrah to give you
12   anything in the chronology?
13       MR. FARRAH:  Objection.
14 A.  Because at that time, there were things that I
15   might not have been able to fit in.  As a matter
16   of fact, there are still inconsistencies as
17   you're pointing out right now.
18 Q.  How much of the chronology was prepared, based
19   on the input from Mr. Farrah, as to the
20   hypothetical he would ask you?
21       MR. FARRAH:  Objection.
22 A.  I can't really answer that.
23 Q.  So you don't know what part of your chronology
24   is based on your determining what you believe to

87

1    be the facts, and what Mr. Farrah has told you
2    to assume for purposes of his hypothetical?
3        MR. FARRAH:  Objection.
4  A.  That is correct.
5  Q.  And when you said earlier in your deposition
6    that you took the information that you needed,
7    what do you mean by that?
8  A.  I took the information about the type of drink
9    and the time that they were served, that's what
10   I needed.
11 Q.  Now, if the drink was ordered at 9:40, why do
12   you have it coming at 9:15?
13       MR. FARRAH:  8:40.
14 Q.  8:40, I'm sorry.
15 A.  Because one, there's a time for ordering a drink
16   and one is for serving the drink.
17 Q.  When you do your Widmark calculations, you don't
18   put the drink in when it was ordered, you put it
19   in at some other time?
20 A.  Well, when a person orders a drink, they don't
21   have it in front of them.
22 Q.  So that wouldn't be the appropriate time to put
23   it in for purposes of calculating, correct?
24 A.  It gives you a window of, say, five to ten

88

1    minutes, and whatever amount of time it takes
2    for the waitress to bring the drink over.
3  Q.  How did you choose the times that you determined
4    from when it was ordered to when it was served
5    and drank?
6  A.  I use a reasonable time interval, such as five
7    or ten minutes.
8  Q.  Do you use the same time or do you switch it
9    around?
10 A.  You mean in this case or in all cases?
11 Q.  In this case.
12 A.  I tried to make what is reasonable time
13   assessment.
14 Q.  How do you go about figuring out what is
15   reasonable?
16 A.  Just from my experiences and from having been in
17   the restaurant business myself.
18 Q.  When you find out -- in this particular, you
19   find out what's reasonable and you stick with it
20   throughout or you change it as it goes along?
21       MR. FARRAH:  Objection to the form.
22 A.  If I get better information or something else
23   that would change my chronology, I would change
24   it.

89

1  Q.  What information, if any, do you have on
2      materials that you reviewed that talks about the
3      intervals between when the drink was ordered and
4      when it was actually served?
5  A.  I don't recall having any specific information
6      about it.
7  Q.  So this is just a guess you made when you said
8      it was ordered at 8:40, you guessed that it took
9      ten minutes to get to the table?
10            MR. FARRAH:  Objection.
11 A.  No, I estimated.
12 Q.  Based on what?
13            MR. FARRAH:  I think you have asked
14     him that already.
15 A.  Yes.
16 Q.  Let me ask it again.  Are there any facts in
17     this case that you have determined from all of
18     the materials that you reviewed that allow you
19     to conclude that the drink came ten minutes
20     later?
21 A.  Are there any specific facts that have been
22     testified to?
23 Q.  Yes.
24 A.  There aren't specific facts as to the time but

90

1      there are -- it takes a certain amount of time
2      to mix several martinis or Manhattans.  It takes
3      a certain amount of time to walk over to the
4      bar, to put in the order, to have the bartender
5      make them, to draw the beers, to bring them
6      back; so a five- or a ten-minute interval is a
7      perfectly reasonable estimate.
8  Q.  That's an estimate you made not based on any
9      facts that you gleaned from the materials in
10     this case?
11 A.  That's correct.
12 Q.  And how did you determine in that first round
13     that if Mr. Southworth got a drink, it was the
14     beer and not one of the three Manhattans?
15 A.  I had to assume that based on Mr. Farrah's
16     input.
17 Q.  Mr. Farrah told you to give him the beer in the
18     first round, correct?
19            MR. FARRAH:  Objection.
20 A.  Yes.
21 Q.  You're aware a 25-ounce beer has more alcohol
22     than a Manhattan, correct?
23 A.  Well, it would depend upon the alcohol
24     concentration, and it would depend upon the

91

1      circumstances, but as I calculated it in this
2      situation, a 25-ounce beer had a little bit more
3      than a Jack Manhattan.
4  Q.  Now, you then have food being ordered at nine
5      o'clock, correct?  According to your chronology
6      on the top of page six of your report.
7  A.  Yes, sir.
8  Q.  In fact, food was ordered at 8:40, wasn't it?
9      Based on the audit report?
10 A.  Well, there were some appetizers ordered at 8:40
11     but there were -- the main courses were ordered
12     later on.
13 Q.  Well, there was also bread served at 8:40,
14     correct, from Ms. Chabot?
15 A.  I don't know about bread but I have at 8:40
16     union soup and chowder and like chicken fingers
17     being ordered.  At nine o'clock, I have the
18     steaks and the ribs and the heavier food.
19 Q.  What effect would the appetizers have on the
20     alcohol absorption that evening?
21            MR. FARRAH:  You mean assuming that
22     Southworth had had them?
23            MR. GILLIS:  Yes.
24            MR. FARRAH:  Objection.

92

1  A.  The appetizers would have a minimal effect on
2      slowing down the rate of absorption, and the
3      food would have a significant effect.
4  Q.  How much effect would the appetizers have?
5            MR. FARRAH:  Objection.  He just
6      answered a minimal of.
7  Q.  Give me specifics.  Would it make it from 30 to
8      45 minutes?  30, 40, 60 minutes, what would it
9      do?
10           MR. FARRAH:  Objection.
11 A.  It probably wouldn't change it too much
12     actually.  Maybe a small amount.
13 Q.  Don't you normally teach people in the proper
14     Widmark formulations that if they're having
15     food, it makes the absorption time 60 minutes,
16     even if it's appetizers?
17 A.  I never said appetizers or specifically.  I said
18     that food will slow down the absorption rate.
19     And if you look at my calculations, you'll see
20     that I did do just exactly what you said.
21           I changed the absorption time from 30
22     to 60 minutes starting at 9:20, which would be
23     the amount of time that it would take for
24     somebody who was starting to eat some material

93

1    around nine o'clock, or maybe even a few chicken
2    fingers or small amount before, to have it in
3    their stomach.
4  Q.  40 minutes after it was ordered, you changed the
5    time, is that correct?
6        MR. FARRAH:  Objection.
7  A.  20 minutes.  9:20.
8  Q.  It was ordered at 8:40?
9        MR. FARRAH:  Objection.
10  A.  The appetizers were ordered at 8:40.  The larger
11    meal was ordered at 9:00 and then there was some
12    reference as to when it was actually served.
13  Q.  Do you remember writing an article for MCLE in
14    2006?
15  A.  Sure.
16  Q.  Do you remember giving a hypothetical in that as
17    to how food is absorbed?
18  A.  Why don't you show me what you're referring to?
19  Q.  I will.  Why don't you start at the bottom of
20    page 97?  They talk about a hypothetical where a
21    gentleman arrives at a tavern at one o'clock and
22    he has a 12-ounce Bud Light and some buffalo
23    wings.
24        MR. FARRAH:  Let me just look on.  You

94

1    want him to read something here, is that right?
2        MR. GILLIS:  He wanted to see his
3    article, there it is.
4        MR. FARRAH:  I don't think he said he
5    wanted --
6  A.  I'm asking what --
7        MR. FARRAH:  What do you want him to
8    do?
9  Q.  I'm directing you to look at that and on the
10    next page to look at your hypothetical.
11        MR. FARRAH:  I'm just reading it to
12    myself.
13  Q.  Do you see that hypothetical?
14        MR. FARRAH:  We haven't finished
15    reading it, or at least I haven't finished
16    reading it.
17        Is this, by the way, what you gave me
18    and then took away since you're asking him to
19    read it.
20        MR. GILLIS:  It was a good idea and I
21    took it away.
22        MR. FARRAH:  Okay.
23  Q.  This is your writing, correct, Dr. Benjamin?
24  A.  It is.

95

1  Q.  This is what you prepare for lawyers and judges
2    as to the proper formulation of the Widmark?
3  A.  Right.
4        MR. FARRAH:  Objection.
5  Q.  In your chronology, by the way, you stress
6    emphatically that the chronology is key in these
7    cases, correct?
8  A.  Chronology is important, yes.
9  Q.  You have given papers on the importance of the
10    chronology, correct?
11  A.  I have.
12  Q.  And in your chronology, you have at one o'clock,
13    you gave it ordering 12-ounce Bud Light and some
14    buffalo wings?
15  A.  Yes.
16  Q.  In your Widmark -- strike that.
17        Going back to the chronology, there is
18    no other food until 3:30 when there is a burger
19    and some fries, correct?
20  A.  Yes.
21  Q.  Yet that Widmark, you have an absorption rate of
22    60 minutes starting at one o'clock and
23    continuing on beyond the time of the burger
24    being ordered, correct?

96

1  A.  That is correct.
2        MR. FARRAH:  Objection.
3  Q.  And that is what you teach people, is that when
4    you get something as simple as buffalo wings,
5    that the absorption time is 60 minutes, not 30,
6    correct?
7  A.  You are mixing apples and oranges here,
8    Mr. Gillis.
9  Q.  How am I mixing apples and orange?
10  A.  In this hypothetical, it's one person consuming
11    all of the buffalo wings.  In the case that
12    we're involved in, there are seven people at the
13    table sharing all of the appetizers.  So people
14    are eating a couple of pieces of appetizers each
15    and some of --
16  Q.  Go ahead.
17  A.  That's all.  That there are seven people here
18    who are sharing the appetizers.  And in this
19    situation, the person is by himself eating all
20    the buffalo wings.  When the person is by
21    themself eating all the buffalo wings, I think
22    it's appropriate to start with a 60-minute
23    absorption time; when people are eating less and
24    I think it's appropriate to start with a 30

97

1    absorption time, and then move it to 60 as more
2    food is ingested.
3  Q.  Which of the appetizers did Mr. Southworth eat?
4  A.  I don't know. I gave him the benefit of the
5    doubt by elongating the interval regardless.
6  Q.  Who had the chowder?
7  A.  I don't know that either.
8  Q.  Who ate the tunion?
9  A.  The what?
10  Q.  The tunion. Look at your report, top first
11    thing ordered is a tunion.
12         MR. FARRAH:  Is that in his report?
13         MR. GILLIS:  Excuse me, the audit
14    report.
15         MR. FARRAH:  Where is it in this
16    report?
17  A.  I see it.
18         MR. GILLIS:  I said in the audit
19    report.
20         Do you want me to say it again, Al?
21    The audit report.
22  A.  Tunion.
23  Q.  Who ate that?
24  A.  I don't know.

98

1  Q.  What is it?
2  A.  Tunion. I thought it was union soup.
3  Q.  So you don't even know what it is?
4  A.  No.
5  Q.  How big is it?
6  A.  I don't know.
7  Q.  Is it big enough to feed a whole table?
8  A.  Well, I don't know, but the fact that I --
9  Q.  Who ate the chicken fingers?
10  A.  The fact that I used the 60 actually is the
11    right thing to do at that point in time. It's
12    not going to have any effect initially, and then
13    subsequently as it increases in the stomach,
14    then it's going to have an effect.
15         If he didn't eat it, if Mr. Southworth
16    did not eat any of those appetizers, then I
17    should go back and make that 30 instead of 60;
18    and then the blood alcohol will be even higher
19    faster.
20  Q.  You didn't assign the 60 until 20 minutes after
21    the main meal was ordered, correct?
22  A.  Yes.
23  Q.  After the salads were served, correct?
24         MR. FARRAH:  Objection.

99

1  A.  Yes, salads.
2  Q.  After all the chowder was served, correct?
3  A.  Yes.
4  Q.  After the chicken fingers were served, correct?
5  A.  Yes.
6  Q.  After the tunion was served, correct?
7  A.  Yes.
8  Q.  And you are now saying that that 60 is
9    inappropriate at 9:40 -- 9:30 when you put it
10    in?
11         MR. FARRAH:  Objection.
12  A.  No. All I'm saying is that if Mr. Southworth
13    didn't eat any of those appetizers, then I
14    should have used a shorter absorption, which
15    would have made it higher. As it is, I used a
16    longer absorption which favors your client.
17  Q.  The Widmark, for an empty stomach, is 30,
18    correct? 30 minutes absorption time?
19  A.  I used 30 minutes.
20  Q.  It's actually 30 to 45, according to the
21    Widmark, correct?
22  A.  Well --
23         MR. FARRAH:  Objection.
24  A.  It's actually, the statistics are that by 30

100

1    minutes, you reach peak on an empty stomach. It
2    would certainly depend upon what was drank. You
3    can't make a statement that it's 30 to 40
4    minutes because our -- taking a shot and
5    drinking a mixed drink or drinking a beer with
6    the same amount of alcohol have different
7    volumes and they're different concentrations.
8  Q.  You gave no weight whatsoever to any of the
9    appetizers?
10  A.  I didn't give much weight to the appetizers.
11  Q.  You gave zero, correct?
12  A.  Right.
13  Q.  Don't you think that it would have had some
14    effect on the absorption rate?
15  A.  Perhaps.
16  Q.  Perhaps?
17  A.  Yes.
18  Q.  There was six salads and appetizers served to
19    the table, and you say perhaps it might have
20    some effect?
21         MR. FARRAH:  Objection.
22  A.  Yes.
23  Q.  So what effect would it have?
24  A.  The answer is it depends truly on the

101

1    interaction between how much food and how much
2    alcoholic beverage was ingested at that time,
3    and there's really --
4  Q.  How much bread did he eat?
5  A.  There's really not any way to be able to figure
6    all of that out.
7  Q.  What you are saying, between the time the food
8    was ordered at 8:45 and until you changed your
9    consumption to 60 minutes?
10 A.  9:20, was it?
11 Q.  9:20, for that 40 minutes, you're unable to
12    determine what effect, if any, the appetizers
13    and bread that he may have eaten had on this
14    absorption rate?
15        MR. FARRAH:  Objection.
16 A.  First of all, you haven't demonstrated nor has
17    anybody else that he ate any of that, to begin
18    with.  So I made an assessment that I thought
19    was fair.
20 Q.  Was that your assumption or is that an
21    assumption Mr. Farrah agreed you to take?
22 A.  Those are my assumptions.
23 Q.  So your assumption is he didn't have anything to
24    eat prior to 9:20?

102

1  A.  No, I didn't say that.  What I did say was that
2    the effect would be a negligible effect.
3  Q.  So tunions, salads, chowders, bread, have no
4    effect, but buffalo wings have an effect
5    immediately, is that your testimony?
6        MR. FARRAH:  Objection.
7  A.  No.  In the other scenario, there was one person
8    eating.  In this situation, there are a number
9    of people sharing the appetizers, and then the
10    salads came, then the heavier food came.
11 Q.  Now, there is another beer ordered to the table
12    at 9:15, correct?
13 A.  Yes.
14 Q.  And at this point, we know that appetizers had
15    been brought to the table, correct?
16        MR. FARRAH:  Objection.
17 A.  Yes.
18 Q.  And at that point, we know that according to
19    your chronology, you already ascribe to him a
20    25-ounce Bud Light, correct?
21 A.  Yes.
22 Q.  You have here that Bud Light coming?
23 A.  9:20.
24 Q.  9:20, correct, thank you.  Tell me the facts and

103

1    basis of your opinion that this round he was
2    able to get the beer in five minutes, when the
3    last round it took ten minutes?
4        MR. FARRAH:  Objection.
5  A.  When I looked at the subsequent drinks that he
6    had, the next Jack Daniels Manhattan and the
7    third Jack Daniels Manhattan after the 9:20 Bud,
8    there were so many drinks in that 15-minute
9    period that what I tried to do was spread them
10    out into a reasonable interval, dividing the
11    time interval into separate time periods.
12    Because there were so many drinks that were
13    served in that short period of time, that at
14    that point in time, I was more concerned with
15    trying to spread them out in a reasonable way
16    rather than specifically relate them to the time
17    of order and the time that they were delivered
18    to the table.
19 Q.  So it's not based on any actual testimony in
20    this case, it's something that you assigned to
21    it, correct?
22        MR. FARRAH:  Objection.
23 A.  It's something I assigned to it, exactly right.
24 Q.  I'm correct, am I not, that as far as you're

104

1    aware, there are only two 25-ounce beers that
2    were brought to the table that evening, correct?
3        MR. FARRAH:  Objection.
4        VIDEO OPERATOR:  Five minutes
5    remaining, counsel.
6  A.  I think that's right.
7  Q.  Well, you're aware that Michael Espey drank one
8    of those two beers, correct?
9        MR. FARRAH:  Objection.
10 A.  I'm not aware of that.
11 Q.  You're not?
12 A.  No.
13 Q.  Isn't that your conclusion?
14        MR. FARRAH:  His conclusion, did you
15    say?
16        MR. GILLIS:  Yes.
17        MR. FARRAH:  Objection.
18 A.  From where?
19 Q.  Didn't you sign an affidavit saying that he had
20    it?
21 A.  If I did, I did.
22 Q.  Okay.  Why don't you --
23        MR. FARRAH:  Show him, show him.
24 Q.  Exhibit 3 on the affidavit is your affidavit in

105

1    this case, correct?
2 A.  It is.
3 Q.  I want you to go to paragraph three on the
4    bottom of page seven.
5 A.  There's no paragraph three.
6 Q.  23, sorry.  Do you see the paragraph?
7 A.  I do, you're talking about item 23.
8 Q.  Yes.  You said he was served, the last line, at
9    least a Manhattan and a beer at the Longhorn
10   that evening, correct?
11       MR. FARRAH:  Do you want to read it?
12 A.  Sure, I'll read it.  Item 23 says, Mike Espey,
13   another member of Southworth's party that night,
14   started drinking alcoholic beverages at 4:00 or
15   5:00 in the afternoon.  Despite that, in his own
16   words, he was drunk.  Espey deposition page 26.
17   While at the Longhorn Steakhouse, he was served
18   at least a Manhattan and a beer.
19 Q.  You based your opinion on that, correct?
20       MR. FARRAH:  Objection.
21 A.  Well, that was what he said.
22 Q.  You based your opinion on it, did you not?
23       MR. FARRAH:  Objection.
24 A.  No, I don't think my opinion includes that.

106

1 Q.  Okay, go to page five, paragraph nine.
2       MR. FARRAH:  Of what?
3       MR. GILLIS:  Of that same document.
4 Q.  Tell me if I read this correctly.
5       From my review of these materials, I
6    have relied upon the following relevant
7    background facts on which I base my opinions.
8    Is that what you said under oath in this
9    affidavit?
10 A.  Okay.  That was what I said at the time the
11   affidavit was filed, yes.
12 Q.  So that was under the pains and penalty of
13   perjury, correct?
14 A.  Yes, it was.
15 Q.  And that was based on all of the documents that
16   you had reviewed in order to make this
17   affidavit, correct?
18 A.  Yes.
19 Q.  And your opinion, after basing it on all that,
20   to a reasonable degree of scientific certainty
21   was that Michael Espey had a beer and a
22   Manhattan, at least a Manhattan, a beer, at that
23   table that evening?
24       MR. FARRAH:  That's not what it says.

107

1    What he says here that's a relevant background
2    fact on which he based his opinion.
3 Q.  Did you base your opinion on Michael Espey being
4    served at least a Manhattan and a beer at the
5    Longhorn that night?
6 A.  No.
7 Q.  What does 23 say?
8 A.  That says just what it does, that this is what
9    he testified to in that deposition on that page.
10 Q.  But it's under the section that you say the
11   relevant facts upon which you base your opinion,
12   correct?
13 A.  Well, it's a fact that that's what he testified
14   to in that deposition.
15 Q.  What is its relevance here?
16 A.  That is not for me to determine.
17 Q.  Which of the beers did you allocate to him in
18   this audit report?
19       MR. FARRAH:  Objection.  He hasn't
20   said that he allocated any of the beers in the
21   audit report.
22 A.  Right, I did not allocate in the audit report
23   and in the -- in the report on October 26, I
24   used different facts and a different scenario

108

1    than the affidavit that was filed in May of '05.
2 Q.  What different facts did you use?
3 A.  The facts that I laid out were the ones that are
4    shown on page five and page six of that report.
5       VIDEO OPERATOR:  Two minutes, counsel.
6    The time is 2:17 p.m.  We are now off the
7    record.
8    (Recess)
9       VIDEO OPERATOR:  We are now recording
10   on the record.  This is the beginning of
11   cassette No. 2 in the deposition of Dr. David
12   Benjamin.  The time is 2:26 p.m.
13 Q.  Dr. Benjamin, you're aware that in cases like
14   this known as liquor liability cases, in order
15   for the plaintiff to go forward, they have to
16   file a 60-J affidavit?
17 A.  I know they have to file some sort of affidavit,
18   yes.
19 Q.  And as part of that in this case, you filed an
20   affidavit with the court, correct?
21 A.  Yes.
22 Q.  And that's been -- I have been calling it
23   Exhibit 3, it's actually Exhibit 2, correct?
24 A.  Well, it does say two, yes, it does.

109

1    Q.   On page four of that exhibit, going on to page
2         five, it states the various documents that you
3         reviewed for purposes of that deposition, excuse
4         me, that affidavit?
5    A.   Yes, it does.
6    Q.   And on page three of your expert report in this
7         case, it says what documents you reviewed in
8         order to make your opinion in this case,
9         correct?
10   A.   Yes.
11   Q.   And then starting on page five of this, of your
12        affidavit that you filed in this case, you start
13        at paragraph nine, a series of paragraphs upon
14        which you say you relied upon them, paragraphs
15        10 through 30, correct?
16             MR. FARRAH:  Objection to the form.
17   A.   I'm not sure I understand that question.
18   Q.   Okay.  Paragraph nine says that you relied upon
19        the following relevant background facts on which
20        you based your opinion, correct?
21   A.   Yes, it does.
22   Q.   The paragraphs that you found to be relevant
23        background facts upon which you base your
24        opinions were paragraphs 10 through 30, correct?

110

1    A.   Yes.
2    Q.   And if they weren't relevant, you wouldn't have
3         put them in there, correct?
4    A.   Most likely not.
5    Q.   And the reason that you put in the fact that
6         Michael Espey had had a beer that night is that
7         that's relevant as to what was served to the
8         table that evening, correct?
9              MR. FARRAH:  Objection.
10   A.   I don't know specifically as to why I put that
11        in.
12   Q.   But as you sit here today, even though you put
13        in an affidavit that said it was relevant that
14        he had a beer at the table that night, you're
15        not assigning any of the beers in this case to
16        him in your report?
17   A.   I did not.
18             MR. FARRAH:  Objection.  No, excuse
19        me, just for the record, the question, the
20        paragraph does not say that Espey has a beer at
21        the table.
22   Q.   Are you aware of Mr. Espey having anything to
23        drink that night other than what he drank at the
24        table?  Again, we're talking Michael Espey.

111

1    A.   Right, right.  As I told you, there were so many
2         documents that I reviewed that I don't have a
3         clear recollection of the independent documents.
4    Q.   Okay.  So you're not aware, are you aware of
5         anybody who said he had anything to drink that
6         night at the Longhorn other than what he drank
7         at the table?
8    A.   He who?
9    Q.   Mike Espey.
10   A.   I don't have any recollection, I don't have a
11        recollection one way or the other.
12   Q.   But you read his deposition, correct?
13   A.   I put it down there.
14   Q.   You read it for purposes of your affidavit,
15        correct?
16   A.   Right.
17   Q.   You read it for purposes of your expert opinion
18        in this case, correct?
19   A.   I did.
20   Q.   And you said that it's a relevant fact that he
21        had a beer at the Longhorn, correct?
22   A.   Well, let me just review that one particular
23        statement.
24   Q.   Well, I'll withdraw the question.  I want you to

112

1         assume that Michael Espey testified in the
2         Southworth case, the deposition you found to be
3         reliable, that when he arrived there, the only
4         thing he had to drink was what he had to drink
5         at the table?
6    A.   Okay.
7    Q.   I want you to assume that.  Assuming that, does
8         that change your opinion in this case at all as
9         to how much Mr. Southworth had to drink at the
10        table that evening?
11             MR. FARRAH:  Objection.
12   A.   No.
13   Q.   I want you -- have you read the interrogatory
14        answers of Mrs. Rosario?
15   A.   Probably not.
16   Q.   Do you understand that in the interrogatory
17        answers, she answers and signs under the pains
18        and penalty of perjury that Michael Espey had a
19        beer at the table that evening?
20   A.   Mrs. Rosario?
21   Q.   Yes.
22   A.   Stated that.
23   Q.   In her Answers to Interrogatories signed by
24        Mr. Farrah and her.

113

1   A.   I'm confused. Where was Mrs. Rosario in this
2        scenario?
3   Q.   I don't believe she was there. I'm just telling
4        you what's in the Answers to Interrogatories,
5        did you bother to read them?
6   A.   I don't know that it was a question of bothering
7        to read them. It was --
8   Q.   Who told you to assign both beers to
9        Mr. Southworth that night, was that Mr. Farrah?
10           MR. FARRAH: Objection.
11   A.   Yes.
12   Q.   That's not based on any independent statements
13        in any of the depositions, correct?
14           MR. FARRAH: Objection.
15   A.   I cannot recall.
16   Q.   What else did he tell you to assume for a fact?
17   A.   Can you clarify something for me?
18   Q.   I'm not here to answer your questions. I don't
19        mean to be disrespectful. I think you know how
20        this works.
21   A.   All right.
22   Q.   What else did Mr. Farrah tell you to assume for
23        purposes of a hypothetical?
24           MR. FARRAH: Objection.

114

1   A.   We're assuming that the drinks that were
2        consumed by Jeffrey Southworth were the ones
3        that I listed. We're also assuming that the
4        composition of the Manhattan was what I was told
5        to use in my calculations.
6   Q.   Which was what, the one and a quarter ounce of
7        bourbon and the three-quarter ounce of vermouth?
8   A.   Yes, I think so.
9           MR. FARRAH: Objection.
10   A.   Which differed, and is less than the recipe from
11        the Longhorn itself.
12   Q.   I hate to go over it again but I don't think I
13        understood the answer. You said we were to
14        assume. Does that mean that Mr. Farrah told you
15        to assume these things or you assumed them based
16        on your review of the documents?
17           MR. FARRAH: Objection.
18   A.   No, I was asked to assume. However, that
19        information came to me because I was unable to
20        figure out what it was from the -- the documents
21        as they were presented were inadequate to allow
22        me, so I would say, What formula shall I use?
23        And I was said -- told to use this formula.
24   Q.   He was the one who told you to assume that he

115

1        had both beers at the table?
2   A.   Yes.
3   Q.   Now you understand from the audit report that
4        there were two entries of Manhattans towards the
5        ends of the evening, one at 9:20 and one at
6        9:24?
7   A.   Let me just look at that. At 9:21 and 9:24, is
8        that what you said?
9   Q.   Yes.
10   A.   Yes.
11   Q.   And combined, they totaled seven, correct?
12   A.   What is "they" referred to?
13   Q.   The number of drinks, the Manhattans, there's
14        four?
15   A.   You're talking about the total number of
16        Manhattans that were delivered to the table over
17        the course of the evening?
18   Q.   No. Between 9:21 and 9:24, there were two
19        entries of Manhattans being ordered, correct?
20   A.   Yes. We just said that.
21   Q.   Four in the first entry at 9:21, and three in
22        the second entry; correct?
23   A.   Yes, that is correct.
24   Q.   A total of seven ordered for the table, correct?

116

1   A.   That would be correct.
2   Q.   Earlier in the evening at 8:51, there are seven
3        Manhattans served ordered all at once, correct?
4   A.   That is correct.
5   Q.   Now, in putting together your chronology, I
6        believe you testified that you put together what
7        you find to be the most reasonable set of facts,
8        correct?
9   A.   Yes.
10   Q.   And is it reasonable to assume that if there
11        were seven people at the table, and seven
12        Manhattans were ordered, that each person got
13        one Manhattan?
14           MR. FARRAH: Objection.
15   A.   Not really, no.
16   Q.   Who do you assign those seven drinks to?
17   A.   It's not possible to determine that.
18   Q.   You have seven possibly at the table?
19   A.   Right.
20   Q.   Seven drinks ordered?
21   A.   Right.
22   Q.   And you're unable to determine who got what
23        drink?
24   A.   That's correct.

117

1 Q. Okay. Now at 9:21 and 9:24, you have a total of
2     seven Manhattans ordered for the table, correct?
3 A. That is correct.
4 Q. Who do you assign those seven Manhattans to?
5 A. Can't really be determined.
6 Q. Why not? There are seven people at the table.
7 A. Sure, but you don't know if one person didn't
8     say, Bring me two.
9 Q. So you can't determine who had what then?
10 A. That's right.
11      MR. FARRAH: Objection.
12 Q. But you did determine for your chronology that
13     Mr. Southworth had one of each at those rounds?
14 A. I did.
15 Q. How did you determine that if you can't
16     determine who drank them?
17 A. I was directed to assume that.
18 Q. By counsel?
19 A. Yes.
20 Q. Okay. You wouldn't assume that if seven beers
21     came -- seven drinks came for seven people, that
22     one person got two out of that round, would you?
23      MR. FARRAH: Objection.
24 Q. Based on your experience?

118

1 A. Based on my experience, I have seen that happen,
2     sure.
3 Q. I'm not asking what you have seen happen. What
4     is the most likely scenario based on your
5     experience?
6      MR. FARRAH: Objection.
7 A. I can't say that there's necessarily one drink
8     for each person.
9 Q. I'm not asking to say that there's necessarily
10     one for each. I'm asking you a simple question:
11     What is your reasonable conclusion, based on
12     your education, your training, your experience,
13     and your years as a nationally recognized
14     expert, what is your most likely scenario of
15     where those seven drinks went?
16      MR. FARRAH: Objection.
17 A. They went to the table and they were distributed
18     among seven or fewer people.
19 Q. The most reasonable fact scenario to you is not
20     that Mr. Southworth got one from each of those
21     rounds ordered three minutes apart, correct?
22      MR. FARRAH: Objection.
23 A. I didn't say that.
24 Q. You think the most reasonable interpretation of

119

1     those seven drinks coming to this table is that
2     Mr. Southworth got two of those drinks?
3      MR. FARRAH: Objection.
4 A. I said that I could not determine.
5 Q. You have a Jack Daniels Manhattan, according to
6     your chronology on page six of your answer,
7     excuse me, your expert answer.
8 A. Expert answers.
9 Q. Expert report on page six, Exhibit 1. You have
10     a Jack Daniel Manhattan being served to
11     Mr. Southworth at 9:25, correct?
12 A. I do.
13 Q. Well, you have another Jack Daniels Manhattan
14     being served to Mr. --
15      MR. FARRAH: Here's your sandwich.
16 Q. -- Mr. Southworth at 9:35, correct?
17 A. Yes.
18      MR. GILLIS: You want to go off the
19     record and take a five-minute break?
20      VIDEO OPERATOR: The time is 2:38 p.m.
21     and we're now off the record.
22     (Recess.)
23      VIDEO OPERATOR: The time is 2:52 p.m.
24     We are now back on the record.

120

1 Q. (MR. GILLIS:) Just as an aside, Doctor, can you
2     tell me how much income you earn on an average
3     year testifying?
4 A. No, I cannot.
5 Q. You're under oath and you're going to tell me
6     you don't know what you earn testifying as an
7     expert?
8 A. Exactly, right.
9 Q. Do you know how much -- can you tell me how much
10     you earn as an expert in a year?
11 A. I don't know that figure either.
12 Q. Do you have a ball park range?
13      MR. FARRAH: Objection to the form.
14 A. No, I do not.
15      MR. FARRAH: Estimate, maybe.
16 Q. Would you estimate what you make, do you know,
17     in a year as an expert?
18 A. I have no way of determining that figure.
19 Q. Well, you file taxes, don't you?
20 A. I do.
21 Q. Are you telling me you don't remember what you
22     filed in previous years as to what you earned as
23     an expert?
24 A. That's true, too, but I don't know what

121

1  percentage of that or what the numbers were that
2  came out from expert work.
3  Q.  How much money did you earn in 2005 as an
4     expert?
5  A.  I don't recall.
6  Q.  How much did you earn in 2006 as an expert?
7  A.  I don't know either of those numbers, I told you
8     that.
9  Q.  How much did you make in 2004 as an expert?
10 A.  I don't know that either.
11 Q.  How much did you earn last year in nonexpert
12    compensation for anything?
13 A.  I have never calculated any of those figures.
14 Q.  What did you earn in 2005 for income other than
15    being an expert?
16 A.  I never calculated that.
17 Q.  What have you earned in your various teaching
18    capacities over the last two years?
19 A.  I don't know what that figure is either.
20 Q.  Okay.  Now your exhibits are being copied so
21    I'll give you a blank copy of the audit report
22    just to follow along.  And you can look along,
23    too, with either your counsel.
24        MR. FARRAH:  Which is Exhibit 4 you're

122

1  talking about?
2        MR. GILLIS:  Exhibit 4 and his Exhibit
3     1, which is a report.
4  Q.  I think we got up to you at 9:20, so we have
5     determined the first beer at 8:50, you said,
6     came ten minutes after it was ordered.  And you
7     assigned to Mr. Southworth, correct?
8  A.  Whatever I said, I said.
9  Q.  And now you're saying the second beer came five
10    minutes after it was ordered, correct?
11 A.  Which beer are you referring to on this, sir?
12 Q.  The second Bud Light at 9:20, if you look at the
13    audit report, page nine, orders items at 9:15?
14 A.  This isn't my copy.
15 Q.  Your copy is being copied and while we're
16    waiting for that, I gave you that to look at.
17 A.  Okay.
18 Q.  Do you see 9:15, one Bud Light ordered to table
19    52?
20        MR. FARRAH:  Are you asking him to
21    look at the audit report now?
22        MR. GILLIS:  Yes.
23 A.  Yes, I do.
24 Q.  And that was ordered at 9:15, correct?

123

1  A.  Yes.
2  Q.  And you have assigned to Mr. Southworth 9:20 as
3     the time that he received that beer, correct?
4  A.  Yes.
5  Q.  Okay, and the next drink you have for him is
6     9:21, excuse me, 9:25, a Jack Daniels Manhattan
7     correct?
8  A.  Yes.
9  Q.  Now, if you look at that audit report on the
10    bottom of that page nine, you see three Jack
11    Daniels Manhattans being ordered and on the top
12    of page ten, one Jack Daniels in that same
13    order, correct?
14 A.  Yes.
15 Q.  That is the round of drinks that you're saying
16    was his next Manhattan, was his?
17 A.  You mean the one that came at 9:25?
18 Q.  Yes.
19 A.  Yes.
20 Q.  So you're now saying that the time of ordering
21    the drink to service is now down to four
22    minutes?
23        MR. FARRAH:  Is that a question?
24 Q.  Is that correct?

124

1        MR. FARRAH:  Objection.
2  A.  I explained to you before that I tried to divide
3     up those drinks in the amount of time that were
4     there.  That there were so many drinks that were
5     ordered, that I tried to divide those drinks up.
6     That's what I explained to you.
7  Q.  Is it your opinion that to a reasonable degree
8     of scientific certainty, that it's reasonable to
9     assume that he got a beer, a 25-ounce beer at
10    9:20, and then ordered a Manhattan one minute
11    later which he was served four minutes
12    thereafter?
13        MR. FARRAH:  Objection.
14 A.  Would you repeat that, please?
15 Q.  You have him getting the 25-ounce beer at 9:20,
16    correct?
17 A.  Yes.
18 Q.  And you have him ordering another beer at 9:21,
19    correct?
20        MR. FARRAH:  A Manhattan.
21 Q.  Excuse me, a Manhattan.
22 A.  A Manhattan.
23 Q.  Based on your expertise, is that a reasonable
24    fact pattern?

125

1    A.   Yes, it is.

2         MR. FARRAH: Objection.

3    Q.   One minute --

4         MR. FARRAH: Objection.

5    Q.   -- is reasonable between getting a drink and

6         ordering the next one?

7    A.   Yes.

8    Q.   And drinking the entire thing before the next

9         beer gets there 9:25, you think that's a

10        reasonable assumption to make here in this case,

11        correct?

12        MR. FARRAH: Objection.

13   A.   People have shots and beers all the time or

14        mixed drinks with beers all the time.

15   Q.   That wasn't the question, Doctor. What I asked

16        you was what is the most reasonable scenario?

17        MR. FARRAH: Objection.

18   A.   Your question was did I think it was reasonable

19        and I think the answer is yes.

20   Q.   If you tried to divide them up, how come you

21        assigned different time intervals between each

22        drink?

23        MR. FARRAH: Objection to the form.

24   A.   I used both the time of ordering and the amount

126

1    of time that was available before they left,

2    before they closed out and left. So I used both

3    of those. I just tried to divide the drinks up

4    in reasonable time intervals.

5    Q.   Wouldn't you divide them up equally in the time

6         frames in between?

7    A.   If they were ordered at equal times, I would.

8         But in this situation, that was the scenario

9         that I used.

10   Q.   So because it was ordered a minute after the

11        previous drink was served, you shortened up the

12        time that it was served?

13        MR. FARRAH: Objection.

14   A.   That wasn't the only thing. I told you I'm

15        trying to fit all the drinks into the allocated

16        time period before they close out the check.

17   Q.   So you have that 9:21 entered into the computer,

18        delivered to the table at 9:25, correct?

19   A.   Correct.

20   Q.   Okay. And then you have the next drink coming

21        at 9:35, is that correct, according to your

22        expert report?

23   A.   Yes, I do.

24   Q.   What time was that beer ordered?

127

1         MR. FARRAH: That Manhattan.

2         MR. GILLIS: The Manhattan, I'm sorry.

3    A.   9:25.

4    Q.   So to a reasonable degree of scientific

5         certainty, it is your opinion that

6         Mr. Southworth ordered his final Manhattan

7         before his previous Manhattan was even delivered

8         to the table?

9    A.   Yes.

10   Q.   Does it not seem more reasonable to you as an

11        expert in this area, that with seven people at

12        the table and seven drinks, all the same drink

13        being ordered three minutes apart, four in one,

14        three in the other, wouldn't it be more

15        reasonable if one went to each person at the

16        table?

17        MR. FARRAH: Objection.

18   A.   Not necessarily, no.

19   Q.   I'm not asking necessarily, I'm asking you

20        what's the most logical conclusion based on your

21        experience and training?

22        MR. FARRAH: Objection.

23   A.   That either scenario could be reasonable.

24   Q.   Is it your opinion as an expert that it's just

128

1    as likely that seven Manhattans that were

2    ordered for 9:21 and three at 9:24 for a table

3    of seven, it's just as likely one gentleman

4    drank from each of those rounds than the other

5    scenario of seven people each getting one drink?

6         MR. FARRAH: Objection.

7    A.   I can't answer that question.

8    Q.   Well, you just said a minute ago that they're

9         equally reasonable?

10   A.   That's the answer.

11   Q.   You think?

12   A.   Either one could have been possible, sure.

13   Q.   I'm not asking what's possible. I'm asking you

14        what is the most reasonable set of facts based

15        on your experience and training?

16   A.   Based on my experience and training there is

17        no -- there is no typical situation. There are

18        plenty of people who order one drink as they're

19        receiving another with the intent of wanting to

20        order that, especially getting late in the

21        evening and leaving.

22   Q.   That's as a reasonable an assumption that he had

23        one of each, correct?

24        MR. FARRAH: Objection.

---

**129**

1  A.  That's the time scenario that I used.

2  Q.  Okay.  Now, if there were four drinks in the

3       first round and three drinks in the second

4       round, you have concluded for purposes of this

5       case, and for putting together your chronology

6       that Mr. Southworth had one from each, correct?

7  A.  Yes.

8  Q.  How many other people at the table had one from

9       each of those two rounds?

10  A.  I don't know.

11  Q.  What's reasonable to assume based on the facts

12       you reviewed in this case?

13           MR. FARRAH:  Objection.

14  A.  That some of them had some of the drinks.  What

15       can I say?

16  Q.  So you don't have an opinion?  Mr. Southworth,

17       as far as you know, is the only person of the

18       seven there who had one from each round?

19           MR. FARRAH:  Objection.

20  A.  Mr. Southworth is a very heavy drinker, and he

21       drank a lot that night.

22  Q.  Maybe you can try answering my question for $650

23       an hour.

24           Do you have any evidence that anyone

---

**130**

1       other than Southworth had in your opinion two

2       drinks that night?

3           MR. FARRAH:  Two drinks, is that the

4       question?

5  Q.  One from each of those two rounds:  9:21 and

6       9:24?

7  A.  When you say do I have any evidence, you mean

8       was there anything in the record?

9  Q.  Yes.

10  A.  Not that I recall.  I don't recall.

11  Q.  What is the basis for your concluding that he

12       was the only one there who drank one of each of

13       those rounds of drinks?

14  A.  Being asked to assume.

15  Q.  So you were asked to assume that from

16       Mr. Farrah, correct?

17  A.  Yes.

18  Q.  That's not something that you would normally

19       assume, would you?

20           MR. FARRAH:  Objection.

21  A.  I might.

22  Q.  I'm not asking what you might.  What would you

23       normally assume if you saw seven drinks of the

24       same coming to seven people three minutes apart?

---

**131**

1           MR. FARRAH:  Objection.

2  A.  There is no typical scenario that constitutes

3       what I might normally assume.

4  Q.  So you can only put a value, you can only assume

5       what the hypothetical you're told from the

6       counsel, correct?

7  A.  That's true.

8  Q.  Okay.

9           VIDEO OPERATOR:  The time is 3:04 p.m

10       We are now off the record.

11       (Recess.)

12           VIDEO OPERATOR:  The time is 3:04

13       p.m. and we are now back on the record.

14  Q.  You have up until this point in your

15       calculations, your chronology, rather, assigned

16       either ten minutes or less for every drink that

17       came to the table that evening, correct?

18  A.  Whatever the document says is what it says.

19  Q.  But now when the drink that you are being asked

20       by Attorney Farrah to assume that Mr. Southworth

21       had a drink in that round at 9:24, you're now

22       assuming that it took 11 minutes for that drink

23       to get to the table, isn't that correct?

24  A.  Would you repeat that, please?

---

**132**

1  Q.  The last drink which Mr. Southworth was ordered,

2       according to the audit report -- and you can

3       have your originals back now -- was ordered at

4       9:24?  Is that correct?

5           MR. BIKOFSKY:  These are the documents

6       you wanted one copy of.

7  A.  9:24, the last group of Jack Manhattans.

8  Q.  Why is it then that you assigned 11 minutes

9       later for this Jack Daniels to get to the table

10       when the previous Jack Daniels was able to make

11       it there in four minutes?

12  A.  Well, I wanted to give them a little time to

13       drink the first one, too.

14  Q.  Well, you only gave them four minutes to drink a

15       25-ounce beer, why did you give him 11 minutes

16       to drink the two-ounce Manhattan?

17           MR. FARRAH:  Objection to the form.

18  A.  I don't have any special answer for that.

19  Q.  You have no basis for that, correct?

20           MR. FARRAH:  Objection.

21  A.  I have no basis in the record or anybody saying

22       he drank it at this time or whatever, no.

23  Q.  In fact, in your prior sworn testimony under

24       oath under the pain and penalties of perjury,

133

1      you said that he had that last drink at 9:30,
2      isn't that correct?
3  A.  That was in the affidavit?
4  Q.  Yes.
5  A.  Yes.
6          MR. FARRAH:  Can we see what the
7      affidavit says before we ask him to assume that?
8      Where is that?
9  Q.  Go to page seven of your previous affidavit.
10     And just below, it says 9:57, check closed out.
11     According to the Longhorn audit report, the last
12     drinks were served to Southworth departing the
13     Longhorn at approximately 9:30, the bill was
14     paid at 9:57. Six meals and four appetizers
15     were served to table 52. That's your opinion,
16     correct?
17         MR. FARRAH:  Objection.
18 A.  That's not my opinion. That's a statement off
19     of the bill.
20 Q.  Where on the bill -- you have the bill there?
21     Where on the bill does it say they got the last
22     drink at 9:30?
23         MR. FARRAH:  It says approximately
24     9:30, Michael.

134

1  Q.  Where on the bill does it say they got the drink
2      at approximately 9:30?
3  A.  The last drink was ordered at 9:24. The check
4      was printed at 9:36. In the midst of that time
5      interval from 9:24 to 9:36, the drink would be
6      delivered or served.
7  Q.  And based on your affidavit in this case where
8      you were asked to give your opinion as to
9      Mr. Southworth's blood alcohol at various
10     levels, various times in the evening, you stated
11     that he got his last drink at 9:30, correct?
12         MR. FARRAH:  It says approximately.
13 A.  It says approximately.
14         MR. FARRAH:  Approximately 9:30.
15 Q.  You're on expert in this field, aren't you?
16 A.  I am.
17 Q.  You try -- and again, you say the chronology,
18     you try to make it as detailed and as accurate
19     as possible, correct?
20 A.  I do try.
21 Q.  And when you were doing that for the first time
22     in this case, you assigned 9:30 as the time when
23     the last drink was served, correct?
24         MR. FARRAH:  It says approximately.

135

1      I'm sorry. You know, I keep forgetting.
2      Approximately, can you see it there?
3      Approximately, Mr. Gillis.
4          MR. GILLIS:  When we're asking you the
5      questions, then you can answer.
6          MR. FARRAH:  Just be true to what the
7      record is.
8          MR. GILLIS:  Don't tell me
9      Dr. Benjamin is an expert in this field isn't
10     able to answer his own questions.
11         MR. FARRAH:  Frame the questions
12     truthfully and he'll answer them.
13 Q.  You wouldn't say approximately 9:30 if you
14     didn't mean 9:30, would you?
15         MR. FARRAH:  You're going to say
16     approximately.
17         MR. GILLIS:  Will you let him answer
18     the question? It's his question; not yours.
19         MR. FARRAH:  Please, I object.
20 A.  I said approximately 9:30.
21 Q.  And that was the time frame at that point when
22     you filed this affidavit under the pains and
23     penalty of perjury that you thought was most
24     accurate, correct?

136

1          MR. FARRAH:  Objection.
2  A.  I did at that time, yes.
3  Q.  And what have you reviewed since then that
4      changed your opinion from 9:30 to 9:36?
5          MR. FARRAH:  Approximately 9:30.
6          MR. GILLIS:  Yes.
7          MR. FARRAH:  To 9:35?
8  Q.  9:35, I'm sorry.
9          MR. FARRAH:  Thank you.
10 A.  Once again, I was trying to fit in that drink
11     into that time scenario.
12 Q.  Well, didn't you have the audit report when you
13     did your affidavit?
14 A.  I'm not sure if I did or not. Did I list it
15     among the documents?
16 Q.  I want you to assume that it was listed. On the
17     top of page five, Exhibit 5?
18 A.  Yes, I did have that.
19 Q.  Okay. And at that time, you were trying to do
20     the same thing, weren't you, to put together as
21     accurate a chronology as you could?
22 A.  Yes, I was.
23         MR. FARRAH:  Objection.
24 Q.  At that time, you have a different time for the

137

1    drink than you currently have, correct?
2              MR. FARRAH:  Objection.
3  A.   Now, just help me out.  Which drink are you
4        referring to specifically, please?
5  Q.   Well, we know from the audit report that there
6        were no drinks ordered by this table after the
7        round of drinks at 9:24, correct?
8  A.   Right.
9  Q.   And we're trying to figure out from you is why
10       you assigned one time to it in your affidavit,
11       which you signed under the pains and penalties
12       of perjury with the same materials available to
13       you that you are currently assigning in your
14       expert submission to this, to the court in this
15       case?
16             MR. FARRAH:  Objection.
17  A.  Which question, which time are you questioning?
18      The 9:35 time on the --
19  Q.  According to your affidavit, what do you assign
20      the last drink being served to Mr. Southworth
21      at, what time?
22  A.  9:24.
23            MR. FARRAH:  No, no.  According to
24      the -- the affidavit speaks for itself.  The

138

1    question is what time was it served.
2              MR. GILLIS:  Are you going to let him
3        answer the question?
4              MR. FARRAH:  Come on.  You have asked
5        the questions in the affidavit.
6  Q.   In this case in your expert submission, you're
7        saying the drink was served at the table at
8        9:35, correct?
9  A.   Excuse me, ask me that again.
10  Q.  In this case, in your expert submission?
11  A.  What are you referring to as the expert
12      submission, please?  You keep calling things by
13      different names.
14  Q.  Document one.
15  A.  That's not helping me either.  Call it either
16      the affidavit or the Rule 26 report, then I'll
17      understand.
18  Q.  Rule 26 report, page six, which you have in
19      front of you there, you have the last drink
20      being served at 9:35; correct?
21  A.  That is what I said, yes.
22  Q.  And that's not what you have in your affidavit,
23      correct?
24  A.  Here I have in the affidavit it was ordered 9:24

139

1    and I'm saying it's being served at 9:30,
2    approximately 9:30.
3  Q.   What documents have you reviewed between the
4        time you filed the affidavit and the time of
5        your Rule 26 submission that changed your time
6        sequence in the chronology as to when he was
7        served his last drink?
8  A.   The time sequences isn't changed at all.  The
9        sequence is absolutely the same.  It's only a
10       five-minute difference.
11  Q.  Well, the five-minute difference changes
12      substantially what his blood alcohol was when he
13      got served his last drink, doesn't it?
14  A.  No, it doesn't.
15            MR. FARRAH:  Objection.
16  Q.  We'll get to that in a minute.
17            Can you tell me the equation that
18      makes up the Widmark Formula?
19            MR. FARRAH:  Objection to the form.
20  A.  Yes.  I've shown it to you already.  It's right
21      here.
22  Q.  Okay.  And that formula is typed up in your
23      affidavit at the top of page ten, correct?
24            MR. FARRAH:  Let's see.

140

1              Page ten of his report or his
2        affidavit?
3  A.   Affidavit.
4  Q.   Does the -- what we have here that you are
5        looking at is a page that's part of Exhibit 5
6        which has some calculations that you did in
7        pencil, that's your handwriting, correct?
8  A.   It is.
9  Q.   And on the top of the equation, you used the
10       specific gravity of blood?
11  A.  Yes.
12  Q.  Does that ever change or is that always the
13      same?
14  A.  It changes.
15  Q.  How does the gravity of blood change?
16            MR. FARRAH:  Objection.
17  A.  It's not the gravity, it's the specific gravity.
18  Q.  How does the specific gravity of blood change?
19  A.  It's a function of how much water is in the
20      blood and how many red blood cells are in the
21      blood.
22  Q.  How much water was in Mr. Southworth's blood
23      that night, and how much red blood cells was in
24      his body that night?

141

1  A.  Right.  Since it's impossible to determine that
2      in just about every case that you do, I used a
3      value that was common to both men and women and
4      overlapped that range.
5  Q.  Is it fair to say that when you can't tell the
6      exact number, you use like you do here, a number
7      that based on your scientific training is
8      consistent with most people?
9  A.  Well, I wouldn't phrase it that way.  I would
10     just say that I use a reasonable estimate that's
11     not extreme in any way.
12 Q.  Based on your experience and training, I believe
13     you put one point --
14 A.  06.
15 Q.  -- 06 is a reasonable estimate?
16 A.  Yes.
17 Q.  Next to that, you have the specific gravity of
18     ethanol, correct?
19 A.  Yes.
20 Q.  How do you determine the specific gravity of
21     ethanol?
22 A.  That's a given.  That's a known scientific fact.
23 Q.  That doesn't change this in any equation that
24     you do?

142

1  A.  It never changes.  It's always the same.
2  Q.  Next to that, you have the grams of ethanol,
3      correct?
4  A.  Yes.
5  Q.  And that is -- is that the total grams over the
6      course of evening or is it just per drink?
7          MR. FARRAH:  Objection.
8  A.  That's the total amount that is used in the time
9      interval that's being calculated.
10 Q.  Okay.  And underneath, you have the body weight
11     in kilograms, correct?
12 A.  Correct.
13 Q.  Now, in order to get kilograms in this case, you
14     had to take Mr. Southworth's weight in pounds
15     and convert it to kilograms, correct?
16 A.  I did.
17 Q.  What do you use to convert that?
18 A.  2.2 pounds per kilogram.
19 Q.  You divide his weight by 2.2?
20 A.  Yes.
21 Q.  And then next is a number that you call a
22     Widmark R?
23 A.  Yes.
24 Q.  What's a Widmark R?

143

1  A.  That's the distribution factor.
2  Q.  What does that mean?
3  A.  That is a factor to control for how extensively
4      the ethanol is distributed into the water
5      soluble parts of the body.
6  Q.  And is that like the specific gravity of blood,
7      that without knowing exactly the distribution
8      within the person, you take a constant?
9  A.  You can take the constant or you usually make an
10     adjustment on that constant based on height and
11     weight, and if you have a photo of the
12     individual, which I had as well.
13 Q.  And based on your -- the information that you
14     were provided in this case, did you make any
15     assumptions as to his body composition,
16     Mr. Southworth's?
17 A.  Just that he wasn't totally lean, and he had a
18     little bit of love handles hanging over his
19     belt.
20 Q.  Is that what you put in your report?
21 A.  I don't know what I put in my report about that.
22 Q.  And what did you assume as a Widmark R for him
23     in this case?
24 A.  .64.

144

1  Q.  Is there a calculation you can do to get an
2      accurate Widmark?
3          MR. FARRAH:  Objection to the form.
4  A.  You can weigh the person in water and weigh the
5      person on a scale.  Take the ratio.
6  Q.  Aren't there calculations you can do to get it?
7          MR. FARRAH:  Objection to the form.
8  A.  Well, I don't know.  Maybe you know some
9      calculations you can do.
10 Q.  Well, are you aware of any calculations you can
11     do?
12         MR. FARRAH:  Objection to the form.
13 A.  You have to measure like doing skin folds and
14     things like that and determine body fat.
15 Q.  Well, if you don't have all that available to
16     you, don't you teach people to assume that all
17     males are a .68 for purposes of calculation?
18         MR. FARRAH:  Objection.
19 A.  .68 is an average factor.
20 Q.  For males?
21 A.  Yes, it is.
22 Q.  And .55 for females?
23 A.  For females is correct.
24 Q.  Did you use that in this case?

145

1  A.  No, I used .64.

2  Q.  Why is that?

3  A.  Because I dropped it four points because when I

4      saw the photo of him because he had those love

5      handles.

6  Q.  I'm going to show you a copy, and I'm going to

7      suggest to you this is a copy of the Widmark R's

8      for males and females, and ask you if you can

9      find any male of any height in any size that has

10     a Widmark of a .64?

11          MR. FARRAH:  Objection, to whatever

12     that document is.

13          Can I have a copy it, by the way,

14     since you have shown it to him?

15          Before he answers, can I get a copy?

16     Will you give it to David?

17          So what is the question?  Thanks.

18  Q.  (MR. GILLIS:)  The question is -- well, let me

19      ask it two ways.  First of all, what literature

20      in the scientific community are you basing your

21      lower Widmark on to give him a 64 as opposed to

22      a .68?

23          MR. FARRAH:  Objection.

24  A.  I'm making that assessment myself.

146

1  Q.  You understand that for an average, male that a

2      .68 is the standard for males, correct?

3  A.  Yes.

4          MR. FARRAH:  Objection.

5  Q.  And you have testified in this case or you have

6      stated under oath in this case that

7      Mr. Southworth was not obese, correct?

8          MR. FARRAH:  Objection.

9  A.  Was not obese, yes.  That depends how you define

10     obese.

11  Q.  How do you define it?

12  A.  There's a formula for body mass index.

13  Q.  I'm going to show you your affidavit again on

14      page 10, and as part of your opinion, you put in

15      there he was not obese and had a height of

16      six-four, correct?

17  A.  He was not obese and had a height of six-four.

18  Q.  You assumed he weighed 210 pounds, correct?

19  A.  Yes.

20  Q.  And according to that chart, the appropriate

21      Widmark should be between 68 and 7, correct?

22          MR. FARRAH:  Objection.

23  Q.  .68 and .7 for someone of that height and

24      weight?

147

1  A.  I'm afraid I don't understand how to read the

2      chart.

3  Q.  You can't read the chart?  You take the height

4      at the top side and the weight on the top and

5      you take your two fingers and go right to the

6      number.  What number do you get in that 6-4,

7      210-pound range?

8          MR. FARRAH:  Objection.

9  A.  I'm sorry, I'm not understanding how to read

10     this chart.

11  Q.  Are you aware of anywhere that has a Widmark of

12     .64?

13          MR. FARRAH:  I'm sorry.

14  A.  Am I aware of what?

15  Q.  Anywhere on that chart, any height, any weight?

16          MR. FARRAH:  It might be helpful to

17     tell him where the chart comes from.

18  A.  I know where it comes from.

19  Q.  Where does it come from?

20  A.  It's from Bill Forest.

21  Q.  Do you know Mr. Forest?

22  A.  I do.

23  Q.  Who is he?

24  A.  He's a forensic guy over in England.

148

1  Q.  Have you met him before?

2  A.  I'm sorry.

3  Q.  Have you met him?

4  A.  Yes.

5  Q.  Is he someone whose opinion you respect?

6  A.  No, not particularly.  But I'm not understanding

7      this chart.  I'm very sorry, but I don't

8      understand this chart.

9  Q.  Well, let's go back to your article you

10     published.

11          MR. FARRAH:  Can I get a copy of the

12     article, since you have referred to it a few

13     times?  I'll waive any copyright claims against

14     you.

15          Thanks.  What page are we going to?

16  Q.  We'll get there.  Can you tell me what

17      scientific basis you have on any literature or

18      anything accepted in the forensic toxicology

19      field that assigns a .64 Widmark to a six foot

20      four, 210-pound male who's not obese?

21          MR. FARRAH:  Objection.

22  A.  I don't have anything to reference.

23  Q.  In fact, what's normally referenced is a .68,

24      correct?

149

1  A.  No.
2          MR. FARRAH: Objection.
3  A.  .68 is the average for all males.
4  Q.  And why did you deviate from that in this case?
5  A.  Because he had that little two-inch love handles
6      protruding from his waist.
7  Q.  So all males, if you were to take all males that
8      are less fat than Mr. Southworth is, based on
9      your review of his picture in this case?
10         MR. FARRAH: Objection.
11 A.  Say that again, please.
12 Q.  The Widmark would be higher if you have less
13     body fat, correct?
14         MR. FARRAH: Objection.
15 A.  The Widmark what?
16 Q.  R.
17         MR. FARRAH: Same objection.
18 A.  Would be higher if you have less body fat?
19 Q.  Right.
20 A.  Is that what you said?
21 Q.  Yes.
22 A.  Yes. And lower if you have more body fat.
23 Q.  Taking the average of all males to be .68
24     looking at Mr. Southworth's picture?

150

1  A.  Right.
2  Q.  You have opined that he is fatter than the
3      average population of males in general?
4          MR. FARRAH: Objection.
5  A.  Yes.
6          MR. FARRAH: Not including anybody in
7      this room, of course.
8  Q.  Based on what?
9  A.  What?
10 Q.  Based on what?
11 A.  Based on my assessment.
12 Q.  I don't know your assessment. What is the
13     average body fat of the males that get a .68 R
14     on the Widmark?
15 A.  Probably, well, I would have to speculate so I
16     can't answer.
17 Q.  So if you don't know what it is, you can't say
18     why you should assign anything differently to
19     Mr. Southworth, correct?
20 A.  No. That's not the case at all.
21         MR. FARRAH: Objection.
22 Q.  Is the picture that you looked at, what picture
23     was it?
24 A.  I think it was a picture of him with no shirt

151

1      on.
2  Q.  And that was part of the police report, correct?
3  A.  I believe so.
4  Q.  In the book that you provide for judges and
5      lawyers, you used a .68 Widmark Formula,
6      correct, R, in your formula?
7          MR. FARRAH: Objection to the form.
8  A.  In an example?
9  Q.  Yes.
10 A.  Yes. In one example. One isolated example,
11     sure.
12 Q.  By the way, getting back to that, this is the
13     same one with the chronology of the buffalo
14     wings, you had the gentleman eating all the
15     buffalo kings, correct?
16 A.  Yes.
17 Q.  He orders them at one o'clock and then eats all
18     of them himself?
19 A.  Correct.
20 Q.  How many buffalo wings are you averaging on an
21     order here?
22 A.  There's no specific amount.
23 Q.  Does he eat them all at once or does he eat them
24     sequentially?

152

1  A.  This is a hypothetical.
2          MR. FARRAH: Objection to the form.
3  A.  This is a hypothetical scenario of a person who
4      is eating them.
5  Q.  How long would you expect him to eat it?
6  A.  I don't know. It depends on how many wings
7      there were in the order, and since it's
8      hypothetical, there's no specific amount.
9  Q.  Okay. But not even knowing the rate at which he
10     was eating or how many buffalo wings he was
11     eating, you assigned an absorption rate of 60
12     minutes from the second he orders that until
13     3:30 when the burger is ordered, correct?
14 A.  I did.
15 Q.  That's what you find to be the most accurate
16     under these circumstances of this chronology,
17     correct?
18         MR. FARRAH: Objection.
19 A.  Those were the parameters that I used in that
20     one particular example, yes.
21 Q.  Didn't you previously testify that this is the
22     manner in which you teach people to use the
23     Widmark?
24 A.  This is the manner in which I teach people.

153

1 Q. This is the proper way to do it, correct?

2          MR. FARRAH: Objection.

3 A. This is an example of using the proper formula

4    and fitting the data into the formula, yes.

5 Q. And the proper data for the average male is to

6    use a .68 R in the Widmark, correct?

7          MR. FARRAH: Objection.

8 A. For an average person, if you want to call that

9    person average, right.

10 Q. Now, in addition to that, you used these to get

11    a particular blood BAC, correct?

12          MR. FARRAH: Objection.

13 A. I use those to calculate the blood alcohol at

14    various points in time.

15 Q. And the blood alcohol is for a male 150 to 200

16    pounds, correct?

17          MR. FARRAH: Objection.

18 A. Whatever I have in that particular example, I

19    have in that example.

20 Q. When you're using those BACs, you're calculating

21    it, when you say that at .15 in the forensic

22    toxicology community, that's the standard you

23    used for visible signs of intoxication, correct?

24          MR. FARRAH: Objection.

154

1 A. I say that that is the -- generally, the number

2    that is utilized that's correct.

3 Q. That's the standard, isn't it?

4          MR. FARRAH: Objection.

5 A. Well, there is no firm standard because an

6    individual's tolerance and an individual's

7    ability to cope with the effects of alcohol vary

8    significantly.

9 Q. There's no standard in the toxicology?

10 A. Not for all people universally. The .15

11    standard is the number that is given most often

12    because there is a change from 62 percent, I

13    think, to almost 90 percent at the .15 level.

14    So the .15 level is given as the standard but

15    you know that you need to evaluate each

16    individual on their own.

17 Q. Let me show you a picture and ask you if that's

18    the photograph that you were referring to?

19          MR. FARRAH: What is this from, do we

20    know.

21 A. The one I have, the one I have is a more

22    complete picture of his abdomen.

23          MR. GILLIS: Do you have other

24    photographs other than this?

155

1          MR. FARRAH: I don't know if I do or

2    don't.

3 A. That is not the full photo I saw.

4 Q. This is the gentleman though, correct?

5 A. Yes,.

6          MR. GILLIS: Can we have this marked

7    as an exhibit?

8 (Exhibits 6-7 marked for identification.)

9 Q. Doctor, I want you to take Exhibit 7, I want you

10    to turn to page 98 of that exhibit. And on the

11    bottom of the page is a paragraph that starts

12    with the word However. And one, two, three,

13    four, five lines down, there is a sentence that

14    starts in the beginning of that line that says,

15    This is why in the forensic toxicology

16    community, the BAC which serves as the standard

17    for visible intoxication is 0.15, is that what

18    you wrote?

19 A. You're taking that out of context. You need to

20    read the next two sentences, too.

21 Q. Okay. Does that mean everyone below .15?

22 A. No, no, does this mean.

23 Q. Does this mean that everyone between 15 will not

24    be visibly intoxicated.

156

1 A. No. Does this mean everyone below .15 percent,

2    keep going.

3 Q. Go ahead, you read it. It's your words.

4 A. Okay. Does this mean that everyone below .15

5    percent will not be visibly intoxicated? Of

6    course not. And does this mean that everyone

7    above .15 percent will be visibly intoxicated?

8    No, again. Just what I said to you before.

9 Q. I'm going to ask you a question, what's the

10    standard in the industry, knowing that people

11    can have different tolerances, what is the

12    standard for showing visible signs of

13    intoxication?

14          MR. FARRAH: Objection.

15 A. The standard is what other people who were with

16    that person say about his behavior at that time.

17 Q. Are you telling me that you wrote that the

18    standard is visible intoxication is 0.15 percent

19    and now you don't agree with that?

20 A. No, I'm not.

21 Q. Is that the standard in the forensic -- is that

22    the standard in the forensic toxicology

23    community, yes or no?

24 A. That is the standard --

157

1  MR. FARRAH: Objection.
2  A.  -- for the blood alcohol concentration. The
3     standard for determining whether the individual
4     is intoxicated or not is the testimony of fact
5     witnesses who were with the person at that time.
6  Q.  Now, you say that not everybody will show signs
7     at 15. Some show it before, some show it
8     afterwards, correct?
9  A.  Absolutely.
10 Q.  In the general public, this .15 at which the
11    standard in the industry is for nontolerant
12    drinkers, correct?
13 A.  That is correct.
14     MR. FARRAH: Objection.
15 Q.  That's the standard for a 150- to 200-pound
16    male, is that correct?
17 A.  It doesn't make any difference about body
18    weight.
19 Q.  You would expect someone who is a tolerant
20    drinker to be able to mask symptoms more easily
21    than a nontolerant drinker?
22 A.  Not symptoms, signs.
23     MR. FARRAH: Objection.
24 Q.  Is that correct?

158

1  A.  Yes.
2  Q.  So and you have put in your report that
3     Mr. Southworth in your opinion is a tolerant
4     drinker, correct?
5  A.  Yes.
6  Q.  He drinks a lot, doesn't he?
7  A.  He does.
8     MR. FARRAH: Objection.
9  Q.  So you would expect that he would not show
10    visible signs of intoxication unless he was
11    above the standard for nontolerant drinkers,
12    correct?
13     MR. FARRAH: Objection.
14 Q.  On average?
15 A.  I would expect that, yes.
16 Q.  How much over .15 would you expect for someone
17    who drinks as much as he does?
18     MR. FARRAH: Objection.
19 A.  It's very hard to say because one of the factors
20    that's very important is how fast you're
21    consuming the ethanol.
22 Q.  Now, going back to the -- by the way, what time
23    did they cash out that evening?
24 A.  Cash out?

159

1  Q.  Cash out their checks?
2  A.  You mean what time was the check paid?
3  Q.  Yes. I would suggest it happened around page
4     11. It says apply payment.
5  A.  Say again.
6  Q.  Look at page 11 where it says, Apply payment.
7     MR. FARRAH: What about it?
8  Q.  Do you see that?
9  A.  Not yet. Now I see it.
10 Q.  It's your understanding that the money was
11    actually put into the register at approximately
12    9:57, correct?
13 A.  That is the way it looks to me.
14     MR. FARRAH: Objection.
15 Q.  After that, obviously she brings the change and
16    so forth back to the table?
17 A.  You can assume if you want.
18 Q.  What did you assume?
19 A.  I wasn't interested in whether she brought the
20    change back to the table or not or whether they
21    said we're all right.
22 Q.  Knowing that she didn't cash the check until
23    9:57, does that change your opinion at all as to
24    when they left that evening?

160

1     MR. FARRAH: Objection.
2  A.  But we don't know who was paying the check or
3     who may have left already.
4  Q.  You don't even know who Mr. Southworth left
5     with, do you?
6  A.  I don't recall.
7  Q.  I want you to assume that he left with Jude
8     Connelly.
9  A.  All right.
10 Q.  And we have already gone over his testimony as
11    to when Jude Connelly said he left, correct?
12     MR. FARRAH: Objection.
13 Q.  That Jude Connelly left at 11 o'clock?
14     MR. FARRAH: Objection.
15 A.  He did say that and I disagreed with that.
16 Q.  Based on what?
17 A.  Based on the fact that he would have had to
18    leave sooner in order to have the next bar --
19    the next drink at the subsequent hotel bar that
20    he went to at 10:30.
21 Q.  Let's go over the visible signs that you
22    assigned to Mr. Southworth that evening.
23     You would agree with me people can be
24    loud without being intoxicated, correct?

161

1   A.   They can be.
2   Q.   And at the time during the evening that they
3        were alleged to have been loud, was the place
4        full or empty or somewhere in between?
5             MR. FARRAH:  Objection.
6   A.   I don't know.
7   Q.   Wouldn't that be important?
8   A.   No.
9             MR. FARRAH:  Objection.
10  Q.   You would agree with me that it would be louder
11       if the place was empty talking at the same
12       decibels than it would have been earlier if it
13       was full?
14  A.   I don't agree with any such statement.
15            MR. FARRAH:  Objection.
16  Q.   And how was he carrying himself?
17            MR. FARRAH:  When?
18  Q.   During the evening?
19            MR. FARRAH:  Objection.
20  Q.   Mr. Southworth?
21            MR. FARRAH:  Objection.
22  A.   All I know is that Jude Connelly said he was not
23       carrying himself the way he usually does towards
24       the end of the evening.

162

1   Q.   Towards the end of the evening?
2   A.   Right.
3   Q.   Sometime just before they left, correct?
4             MR. FARRAH:  Objection.
5   A.   I wouldn't say just before, but let's say within
6        a half-hour or 45 minutes.
7   Q.   Based on what -- who said it was at that time
8        frame?
9             MR. FARRAH:  What is the basis for
10       that statement?
11  (BY MR. GILLIS:)
12  Q.   What's the basis for that time frame?
13            MR. FARRAH:  Objection.
14  A.   I don't recall the specific basis.  I believe it
15       had to do with when they came over to the table
16       and asked them to be quiet.
17  Q.   That's when he wasn't carrying himself the way
18       he usually does?
19  A.   There were four criteria that Jude testified to.
20  Q.   We've gone over the loudness quite a bit.  Let's
21       go -- that's why I'm getting to this.  I'm
22       trying to find out when in the evening did he
23       not carry himself, Mr. Southworth, carry himself
24       the way he usually did based on your review of

163

1        all the documents that you reviewed in this
2        case?
3             MR. FARRAH:  The question is does he
4        have a memory now?
5             MR. GILLIS:  Yes.
6   Q.   Do you know when in the evening he was not
7        carrying himself?
8   A.   I can't give you a specific time but it was
9        certainly while he was in the bar.
10  Q.   Okay.
11  A.   Before they left.
12  Q.   And do you know of anybody other than Jude
13       Connelly who says he wasn't carrying himself the
14       way he usually does?
15  A.   I don't recall.
16  Q.   And what was the way he normally carried
17       himself?
18  A.   These were observations by people who knew him.
19       I'm not a person who knew him.
20  Q.   So you wouldn't be able to tell me the
21       difference between how he normally carries
22       himself and how he was carrying himself at the
23       table that evening?
24  A.   No.  But his friends knew him and were able to

164

1        do so.
2   Q.   Okay.  How is anybody who didn't know him
3        supposed to know that he was carrying himself
4        differently than the way he is supposed to?
5             MR. FARRAH:  Objection.
6   A.   If by carrying himself differently meaning that
7        he had muscle relaxation and his shoulders were
8        slipping or his head was down, that might be a
9        posture that other people would be able to
10       recognize.
11  Q.   But that's not the case here, you have no
12       evidence to that?
13            MR. FARRAH:  Objection.
14  A.   I don't have specific.  I don't know what the
15       specific reference to not carrying himself the
16       way he usually does, I don't know what that
17       refers to.
18  Q.   If you don't know how he usually carries himself
19       and you don't know how he looked when he carried
20       himself differently, you can't opine that the
21       way he carried himself should have indicated to
22       the server that he was visibly intoxicated,
23       correct?
24            MR. FARRAH:  Objection.

165

1  A.  I base my opinion on what his friend Jude
2      Connelly said.  It was not my -- it's not my
3      opinion, I took it from what he said.
4  Q.  What about the way he was carrying himself that
5      evening indicates to the server he's
6      intoxicated?
7          MR. FARRAH:  Objection.
8  A.  You have to ask Jude Connelly about that, not
9      me.
10 Q.  Well, you're the one who opined that that was
11     one of the indicia that he was visibly
12     intoxicated, correct?
13 A.  I did say that but based upon --
14 Q.  What is the indicia, what is he showing you that
15     shows he's visibly intoxicated?
16         MR. FARRAH:  Objection.
17 A.  The fact is that Jude Connelly characterized
18     him that way.  Didn't carry himself the way he
19     usually did; his eyes were glazed over; he was
20     louder than usual.  There were -- and there's a
21     fourth criteria which escapes me at the moment.
22     That is Mr. Connelly's characterization of him;
23     not mine.
24         I only relied on his characterization,

166

1      which he is saying was atypical or unusual and
2      to him connoted that he was intoxicated.
3  Q.  In your opinion, what about the way he was
4      carrying himself that night at the restaurant
5      should the server of the alcohol have picked up
6      on?
7          MR. FARRAH:  Objection.
8  A.  Once again, you would have to ask that of Jude
9      Connelly.
10 Q.  So you have no idea based on the way he carried
11     himself that night, what the waitress, not what
12     you counted, but what the waitress should have
13     known?
14 A.  First of all, I don't know what the waitress --
15     let me put it a different way.  It was
16     Mr. Connelly's characterization that he had some
17     abnormal way he was carrying himself or
18     posturing himself.  That was his
19     characterization.
20 Q.  I understand what you're saying but that's not
21     the question I asked.
22         The question I asked was what about
23     the way he was carrying himself should have
24     indicated to that waitress who served him drinks

167

1      that night at the table that he may be visibly
2      intoxicated?
3  A.  Once again, you would have to ask Jude Connelly
4      what he meant about not carrying himself the way
5      he usually did.
6  Q.  And you were able to opine that his not carrying
7      himself the way he usually does was based solely
8      on his ingestion of alcohol that night as
9      opposed to any other reason?
10         MR. GILLIS:  Objection.
11 A.  I inferred from Connelly's testimony that that
12     was what he was referring to.
13 Q.  Okay.  And it had nothing to do with the fact he
14     had been dirt biking for three hours, is that
15     correct?
16 A.  So had the other fellow.
17 Q.  How were they carrying themselves?
18 A.  There was no testimony to that.
19 Q.  Now, you chose to believe Mr. Connelly's
20     deposition in the Southworth case over his
21     deposition in this case because it was closer in
22     time to the incident, correct?
23 A.  Yes.
24 Q.  And because, as you said, the testimony wasn't

168

1      obfuscated; correct?
2          MR. FARRAH:  Objection.
3  Q.  Was not?  You would agree with me --
4  A.  Yes.
5  Q.  And you would agree with me that statements
6      closer in time you assessed more reliability to,
7      correct?
8  A.  I did.
9  Q.  And you were aware that more than a year prior
10     to that deposition, Mr. Connelly gave sworn
11     testimony to the grand jury, correct?
12 A.  Yes, I do.
13 Q.  And based on what you said, that would be more
14     reliable because it's closer in time, correct?
15 A.  Using the time criterion, yes.
16 Q.  That's your criterion, correct?
17 A.  Yes.
18 Q.  Did you review that testimony in making your
19     opinion here in this case?
20 A.  For which document?
21 Q.  Either one?
22 A.  Well, I don't know, did I include it?  Is it
23     included?  I don't see them included in here.
24 Q.  I'm going to show you a page that I'm going to

169

1    represent to you is page 20 from the grand jury
2    minutes and it's the testimony of Mr. Connelly.
3  A. Okay.
4  Q. I want you to read lines one through four.
5        MR. FARRAH: Can I see it?
6  Q. I'm going to suggest for the record, this grand
7    jury testimony was taken at the grand jury of
8    Middlesex County on Wednesday, November 5, 2003,
9    in Lowell Massachusetts.
10 A. Okay. I'm reading it.
11 Q. Could you read it out loud for the record.
12 A. Yes.
13        Question: At any point did you notice
14    any changes in Jeff Southworth as a result of
15    what he was drinking?
16        Answer: Not in particular, no.
17 Q. Given that this was taken more than a year
18    before the deposition date --
19 A. Mm-hmm.
20 Q. -- you used as a basis for your opinion in this
21    case, does that change your opinion at all
22    whether or not he showed visible signs of
23    intoxication at any time as a result of what he
24    was drinking that night?

170

1  A. No.
2        MR. FARRAH: Objection.
3  A. Not really, no.
4  Q. It doesn't change your opinion at all?
5  A. No.
6  Q. Were you provided that by counsel?
7  A. I don't think so.
8  Q. It's something you would have wanted to review
9    in order to make your determination in this
10    case?
11 A. I would have wanted to review all the documents
12    that were available, sure.
13 Q. That would be helpful in getting an accurate
14    opinion, wouldn't it?
15 A. It's good to have as many documents as possible.
16 Q. I'm going to show you what is purported as page
17    34 of that same grand jury testimony. I want
18    you, if you could, read out loud for the record
19    lines five through ten.
20        MR. FARRAH: Let me see it.
21 A. Okay. It says, now, sir, you indicated that
22    when you -- who's questioning him here. By the
23    way?
24 Q. This is the district attorneys' office.

171

1  A. The same thing in the first?
2  Q. That's correct.
3  A. Now, sir, you indicated that when you were at
4    the Longhorn, you didn't notice any changes in
5    Jeff Southworth's demeanor at any time. Did you
6    notice any changes in his demeanor, and the
7    answer is no.
8  Q. Does that change your opinion as to whether or
9    not Mr. Southworth showed visible signs of
10    intoxication while at the Longhorn Steakhouse on
11    September 26, 2003?
12 A. No. Because demeanor could refer to a person's
13    personality, not their physical way of carrying
14    themselves.
15 Q. So what should the DA have asked?
16        MR. FARRAH: Objection.
17 A. Let me see the other testimony that you asked me
18    to look at.
19        The first one at any point -- this is
20    from page 20, lines one through four -- and at
21    any point, did you notice any changes in Jeff
22    Southworth as a result of what he was drinking?
23        Not in particular.
24        That is an extremely vague question,

172

1    and it would be very different from asking
2    you notice any changes in the way he was
3    carrying himself or his body language or if you
4    asked for anything specific.
5  Q. And you don't interpret demeanor to be specific
6    enough to ask that information, correct?
7  A. Well --
8        MR. FARRAH: Objection.
9  A. I think demeanor can refer to a personality-type
10    of thing. And then again demeanor -- actually,
11    Jude testified that he was louder. So if he was
12    talking about demeanor, he probably didn't
13    understand the question and just wanted to give
14    an answer.
15 Q. That's your assumption?
16 A. That's my assumption. I don't think that --
17 Q. There's no scientific certainty to that?
18 A. There's no signs.
19        MR. FARRAH: Objection.
20 A. This is my impression. These are not really
21    well-formed questions.
22 Q. So even though -- what would you want him to
23    ask? Was he visibly intoxicated? Is that what
24    you would want him to ask?

173

1    MR. FARRAH: Objection.
2  A.  That wouldn't be a bad question, Mr. Gillis.
3  Q.  That would help you in forming you opinion, if
4      he asked that question?
5  A.  Well, if it was more straightforward than a
6      question like that.
7  Q.  What should the DA ask -- the DA have asked at
8      the grand jury which was just six or eight weeks
9      after this accident that would be helpful in
10     forming your opinion?
11     MR. FARRAH: Objection.
12  A.  Well, now, you're asking me to second guess or
13     to play lawyer. I don't think that that's my
14     role here.
15  Q.  Well, you have played lawyer in this, haven't
16     you?
17  A.  No.
18  Q.  You have assessed credibility to all the facts
19     and come up with your own determination based on
20     the law, isn't that what you did?
21     MR. FARRAH: Objection.
22  A.  No, not at all.
23  Q.  Didn't you quote multiple cases in your
24     testimony as to the interpretation of Douillard

174

1      in other cases?
2  A.  Wait a minute, commenting on something is
3      something completely different. I commented on
4      an error in the interpretation on Douillard and
5      that is correct. That isn't playing lawyer;
6      that's pointing out a scientific, a set of
7      scientific facts that the courts did not take
8      into consideration. They counted the number of
9      drinks and never gave any recognition to the
10     time interval.
11  Q.  Let me give you -- I'm going to ask you to read
12     the entire page which is, I'll purport to you,
13     is page 34 of the testimony he gave that day.
14     Could you read that out loud for --
15  A.  Sure. You want the whole page?
16  Q.  Well, just the testimony.
17  A.  Line two.
18     Question: Have you had any contact
19     with Jeff Southworth since then?
20     Answer: Excuse me, no, I have not.
21     Now, sir, you indicated that when you
22     were at the Longhorn, you didn't notice any
23     changes in Jeff Southworth's demeanor at any
24     time. Did you notice any -- this is the same

175

1      thing we just read.
2  Q.  Just read the question.
3  A.  -- changes in his demeanor? No.
4      Have you been with Jeff Southworth
5      before when he's been drinking?
6      Very rarely.
7      So have you ever seen Jeff Southworth
8      when you believed him to be under the influence?
9      And he says no.
10     And Ms. MacDougal, I have no further
11     questions for this witness. Do any of the grand
12     jurors have any questions for this witness?
13  Q.  So according to the testimony under oath by
14     Mr. Connelly, within a couple of months after
15     this accident, Jude Connelly has never seen
16     Mr. Southworth under the influence of alcohol,
17     isn't that correct?
18     MR. FARRAH: Objection.
19  A.  That's certainly what he says in that document.
20  Q.  And that wouldn't change your opinion at all of
21     whether or not he showed visible signs of
22     intoxication this evening?
23  A.  What it does is it makes me suspicious of all of
24     the accounts, many of which are contradicting

176

1      one another, which is one of the first things
2      that I said to you when we started today.
3  Q.  So you make the basis of -- you're now
4      suspicious of the other documents, is that what
5      you're saying?
6      MR. FARRAH: Objection.
7  A.  No. I came here telling you that there were
8      things that I could not reconcile from the
9      record, that there were inconsistencies and
10     contradictions. And that when I picked up those
11     contradictions, I asked plaintiff's counsel How
12     shall I deal with this in my report or how shall
13     I deal with this in my affidavit? And I
14     received instructions and I dealt with them.
15     Assume this, assume that. And that's what I
16     did.
17  Q.  You didn't find any of these facts to a
18     reasonable degree of scientific certainty,
19     correct?
20     MR. FARRAH: Objection.
21  A.  Well, a fact would be of scientific certainty.
22     A person's opinion has some variability.
23  Q.  Everything that you put in as facts as part of
24     your opinion in this case?

177

1    MR. FARRAH: I'm sorry, could you
2    start that question again? I was turning the
3    page.
4 Q. Everything you state as facts in your Rule 26
5    disclosure is based on opinions of other people
6    as to what happened that night, correct?
7    MR. FARRAH: Objection.
8 A. Well, I don't know. Facts or statements upon
9    which I relied. There's a difference between
10   the fact and the testimonial opinion.
11 Q. Okay.
12 A. I mean you can see that there are differences
13   from the same person answering the same question
14   at different times.
15 Q. I can't agree more. That's what I'm trying to
16   get from you.
17   Given the contrary testimony,
18   particularly of someone like Jude Connelly whose
19   testimony you cite several times in both your
20   affidavits and your expert report, how do you
21   determine what is the correct fact pattern or do
22   you just assume a fact pattern based on what you
23   were told by counsel?
24   MR. FARRAH: Objection.

178

1 A. I wouldn't assume on my own without being
2    instructed to do something. When I find an
3    inconsistency, I asked counsel how should I
4    handle this inconsistency. I'm then directed to
5    make the following assumption and that was how I
6    follow through.
7 Q. So which of the facts in your Rule 26 submission
8    are facts that you determined and which are the
9    facts that were determined for you by counsel?
10   MR. FARRAH: Why don't you point to
11   specific facts and ask him to go through it?
12 A. I think I have stated before that I can't
13   differentiate between those or among those at
14   this point in time.
15 Q. But you did testify as far as the chronology --
16   I withdraw the question.
17   Now, on page six of your expert Rule
18   26 submission?
19   MR. FARRAH: I've lost it, page six?
20   I've got it, sorry.
21   MR. GILLIS: All set?
22   MR. FARRAH: I am now.
23 A. Yes.
24 Q. At the very bottom, it says BAC is achieved

179

1    while drinking, correct?
2 A. That's the last line, yes.
3 Q. Two lines above, a few lines above that -- let's
4    go to the paragraph before that. You determined
5    for purposes of your calculation that each Jack
6    Daniel Manhattan contained two ounces of Jack
7    Daniels and a quarter ounce of sweet vermouth,
8    correct?
9 A. I don't know if it's fair to say I determined.
10   I at that point in time was utilizing the
11   formula that's here in the Longhorn bar recipes.
12 Q. That's what you used for the purposes of
13   calculating the drinks that night, correct?
14 A. That is what I used here, yes.
15 Q. So it wouldn't significantly underestimate it as
16   you said earlier using an ounce and a quarter
17   because you actually used two and a quarter for
18   purposes of your calculations here?
19   MR. FARRAH: Objection to the form.
20 A. What you said is true but it's somewhat
21   misleading. Because my biggest concern was the
22   photo of the glass, the triangular-shaped glass
23   that was filled almost to the top that
24   represents six ounces of volume. Even though --

180

1    but you will recognize that using one and a half
2    ounces of Jack Daniels and three-quarters of an
3    ounce of vermouth comes to a total of two and a
4    quarter ounces and using two ounces of Jack
5    Daniels and one-quarter ounce of vermouth also
6    comes to two and a quarter ounce, which still
7    makes it approximately a little less than a
8    third of what the total volume was of the drink.
9 Q. But as far as the amount of the ethanol
10   consumed, it's significantly different because
11   there's two ounces of an 80 proof as opposed to
12   one and a half ounces of an 80 proof, correct?
13 A. You're right. But you're right about the
14   amounts but you may not be right about using the
15   word significant. Because a half ounce of 40
16   proof is only .2 or about -- is only .2 ounces
17   of ethanol. Altogether, two-tenths of an ounce
18   of ethanol so it's a small amount of ethanol.
19 Q. But for purposes of your calculation, you
20   calculated based on the Longhorn recipe, not on
21   the one and a half, correct?
22 A. That is correct, I did do that.
23 Q. You say in there, too, because of a six-ounce
24   glass that it might underestimate it and you

181

1     said two to threefold?
2   A.   Yes.  The difference like from two ounces to six
3        ounces are threefold.  So I'm saying
4        approximately two and a quarter ounces times
5        three would be six and three-quarter ounces.
6   Q.   That would be larger than the glass?
7   A.   That would be larger than the glass.
8   Q.   So it couldn't be threefold?
9   A.   It couldn't be threefold.
10  Q.   You know because of the shape of the glass, the
11       further up you get on it because it's a wider
12       base, each ounce taking --
13  A.   No, it's a narrower base, wider top.
14  Q.   Wider top, each ounce takes up less?
15  A.   Less vertical distance.  That's part of my
16       reasoning, I agree with you.
17  Q.   Now, on the top of page seven, you say that
18       because of Mr. Southworth's size, Widmark
19       calculations indicate that one 25-ounce Bud
20       Light beer consumed on an empty stomach would
21       produce a peak blood ethanol concentration of
22       approximately 02, approximately 60 minutes?
23  A.   You have to put the units in.  .02 percent, you
24       have to say that.

182

1   Q.   .02 percent approximately 60 minutes after
2        beginning to drink the beer, is that correct?
3             MR. FARRAH:  Have you read it right?
4   A.   Hold on.  Yes, concentration approximately .02
5        percent about 60 minutes after beginning.
6   Q.   So the actual peak absorption of the ethanol at
7        that point is not 30 minutes later, but 60?
8   A.   Under this particular calculation that I did, I
9        used 60 minutes.
10  Q.   So if he isn't hitting peak ethanol for an hour
11       after he has the drink, and he has two drinks
12       within ten minutes of the last one being
13       ordered, those drinks aren't even -- they're
14       only slightly in his system at the time the last
15       drink is served?
16  A.   That is correct.
17            MR. FARRAH:  Objection to the form.
18  Q.   By the way, on that same document you have your
19       Widmark calculations, correct?
20            MR. FARRAH:  This is the Rule 26
21       report again?
22            MR. GILLIS:  Yes.
23  A.   Can you give me a page, Mr. Gillis?
24  Q.   There's not a page on it, just a chart in the

183

1        middle.
2   A.   Thank you.
3   Q.   And if you look at the next page which has the
4        time sequences.
5   A.   Yes.
6   Q.   That starts at 9:05, correct?
7   A.   Yes.
8   Q.   Where is the calculations for prior to 9:05?
9   A.   I didn't run them.
10  Q.   Why is that?
11  A.   Well, because I can only get two on the page and
12       the earlier period in time was not a significant
13       time interval for me.
14            MR. FARRAH:  Can we run them for him?
15       Can we provide those when you come back again?
16            THE WITNESS:  I don't know.  I don't
17       know if I still have it on the computer.  It may
18       have been purged.
19  Q.   Well, you can still run them, it's just a matter
20       of putting in the information and getting a new
21       printout, correct?
22  A.   Yes.  I could run it, I can put the whole
23       scenario in and run it.
24  Q.   And at 9:05, you have a BAC of .0951, is that

184

1        correct?
2   A.   Yes.
3   Q.   Is it your opinion in this case that
4        Mr. Southworth was visibly intoxicated at 9:05?
5   A.   Probably not.
6             MR. FARRAH:  Objection.
7   Q.   At 9:10, you have him at .1058, is that correct?
8   A.   Yes.
9   Q.   Is it your opinion in this case that
10       Mr. Southworth was visibly intoxicated at 9:10?
11            MR. FARRAH:  Same objection.
12  A.   You're going to have to go up to a level over
13       .15, like after 9:35, 9:40.
14            MR. FARRAH:  Objection.
15  Q.   So the first -- if I'm reading this correctly --
16       the first reading over .15 is at 9:40, is that
17       correct?
18  A.   9:40, unless you want to round off the 9:35 one
19       to .15.
20  Q.   And that's at the point that a nontolerant
21       person, based on the standard for the forensic
22       toxicology field, that is the point where a
23       nontolerant drinker is expected to show visible
24       signs of intoxication?

185

1              MR. FARRAH: Objection.
2    A.    On average.
3    Q.    By average, you mean it's more likely than not
4          at that point?
5    A.    No.  Because that would be more than average.
6          That would be at least 51 percent.  This is just
7          saying that a typical, nontolerant drinker would
8          usually show visible signs of intoxication
9          around approximately .5.
10   Q.    And in this case, a typical, nontolerant
11         drinker, not someone like Mr. Southworth but a
12         nontolerant would reach that 015 at 9:40?
13   A.    Yes.
14   Q.    You ascribed to him in this case a burn off rate
15         of .2, is that correct?
16   A.    .02.
17   Q.    Oh, 02, I'm sorry.  Is that correct?
18   A.    Yes.
19   Q.    And that is actually what you normally used for
20         someone who is a tolerant drinker, correct?
21   A.    An experienced drinker, yes.
22   Q.    That is not being used -- that's being used
23         because that's what's accurate for someone who
24         drinks the way Mr. Southworth drinks, correct?

186

1    A.    That a person who drinks a lot generally is
2          higher than the .015, yes.
3    Q.    In fact, when you did the two BACs -- was it
4          in the Euclair case, the Albert case, was it --
5          you had two different BACs and the burn off for
6          that gentleman was .021, correct?
7    A.    Yes.  .021 percent an hour, .021 per hour.  In
8          the Albert case when the jurors asked me to
9          subtract the differences between the times,
10         that's what the burn off rate came out to be,
11         and I had used .02.  That's a very good
12         correlation.
13   Q.    People who drink heavily, you ascribe a burn off
14         rate of between 02 and 025, correct?
15   A.    Even higher sometimes.
16   Q.    And had you ascribed a higher burn off rate to
17         Mr. Southworth in this case, that would decrease
18         his blood alcohol at --
19   A.    At each and every point where it was recorded.
20   Q.    So the .02 is on the low end for tolerant
21         drinkers, correct?
22   A.    It's a reasonable number for tolerant drinkers;
23         the higher ones are exceptional but they do
24         exist at certain points in time.

187

1    Q.    I want you to assume that Mr. Southworth only
2          had one of the two beers at the table that
3          night, and that the other beer went to
4          Mr. Michael Espey, I want you to assume that
5          from the facts?
6    A.    Okay.
7    Q.    How would that reduce Mr. Southworth's BAC at
8          9:40 that evening?
9              MR. FARRAH: Objection.
10   A.    It wouldn't have reduced it any more than .02.
11   Q.    So it could reduce?
12   A.    Probably less.  Especially if it was taken with
13         food.
14   Q.    So we have two different ones.  One of them you
15         said he didn't have food in him yet, and you
16         didn't assign him any of those appetizers,
17         correct?
18             MR. FARRAH: Objection to the full
19         statement.
20   A.    I'm referencing something else.  We just went to
21         that calculation I did that said that in 60
22         minutes on an empty stomach drinking a beer, he
23         would have a .02.  Remember, you just asked me
24         to read that into the record?

188

1    Q.    Yes.
2    A.    So for Mr. Southworth, if he had no food in his
3          stomach at all and he drank one beer and you
4          measured his blood alcohol 60 minutes later, it
5          would be .02.
6    Q.    What would it be 30 minutes later?
7              MR. FARRAH: Objection.
8    A.    Probably .01, .01, something heading towards
9          .02.
10             So the answer is that if he consumed
11         it on an empty stomach, was one of the beers
12         that were like earlier in the evening, it
13         couldn't be more than .02 that it would be
14         reduced.
15             If it was one of the beers that was
16         later in the evening, it would be less than .02
17         because the food decreases the amount of ethanol
18         that's absorbed, not just elongates the amount
19         of time required.
20   Q.    The drinks that were -- the beers, the two beers
21         that were served at this table were 25-ounce
22         beers, correct?
23   A.    Yes.
24   Q.    So the peak, okay.  So you're saying the peak is

189

1    .02 an hour later because it's .04 minus the
2    hour for the burn off, correct?
3  A.  No.
4  Q.  Why -- the twelve-ounce beer, according to your
5    rule of thumb, will have a peak alcohol ethanol
6    of .02, correct, a 12-ounce beer?
7  A.  At?
8  Q.  At an hour afterwards?
9  A.  No.  If you're going to quote me, please quote
10    my properly.
11  Q.  That's what I'm asking.  An hour after a
12    12-ounce beer is consumed, if I get a beer at
13    nine o'clock, it's twelve ounces, and I'm
14    Jeffrey Southworth, what will be my peak ethanol
15    and when?
16        MR. FARRAH:  Objection.
17  Q.  If I have nothing else to drink?
18  A.  Try it again.  Say it more slowly and give me
19    all the specifics I need to answer the question.
20  Q.  Well, I want you to assume that Mr. Southworth
21    did not have that beer that you ascribed to him
22    that you say was served at 8:50, but which we
23    know was ordered at 8:40.  How would that change
24    his blood alcohol when he got his last drink at

190

1    the Longhorn Steakhouse that evening?
2        MR. FARRAH:  Objection.
3  A.  Okay.  The 8:50 beer, I have still a 30-minute
4    absorption time because it's not with any food.
5    Okay?
6  Q.  Yes.
7  A.  So the one that I cited for you was drinking
8    that beer on an empty stomach at 60 minutes,
9    this is drinking that same beer without any food
10    in his stomach on 30 minutes, it's going to be
11    higher than .02.  Probably .03 something.
12    Closer to maybe even .04.  Probably .03
13    something, because this is a 30-minute interval.
14    The other one you cited was a 60-minute
15    interval.
16  Q.  But that's what you assigned to him in this
17    case?
18  A.  Well, this is what I assigned to him before what
19    I believe the appetizers and the heavier food
20    came.  Then I used the 60.  Then on the 60, the
21    beers that are -- that is assigned with the
22    60-minute absorption rate, which is drink
23    No. 6 -- you see drink No. 6?
24  Q.  Yes.

191

1  A.  All right, that's at 9:20.  Because at that
2    time, they finished their whole meal.
3    Basically, they're winding down and getting
4    ready to pay the check and leave.  Have one more
5    or two more Jack Manhattans here, but the beer
6    that you are talking about, the one that you're
7    inquiring about now, that beer at 60 minutes is
8    only going to make a difference of about .01 or
9    so.
10  Q.  But that's not what you ascribed to it in this
11    case?  You ascribed to it a 30-minute time limit
12    to get into his system, correct?
13  A.  No.
14        MR. FARRAH:  Objection.
15  A.  Yes, but the difference was the 30-minute drinks
16    are at 8:50, 8:20 and 8:10.  8:10, he's still at
17    the bar; 8:20, he's still at the bar; there's no
18    food.  Finally, at 8:50, he sits down and he has
19    one more beer and they have ordered some of the
20    appetizers and the things that you talked about
21    earlier.
22  Q.  But you said that those appetizers hadn't
23    affected him yet?
24  A.  I said they had a minimal effect.  That's why

192

1    there's still a 30 minute time interval.
2  Q.  Based on the timeframes that you have assigned
3    to these drinks, the 30 minutes for the beer at
4    8:50, which he got at the table?
5  A.  Yes.
6  Q.  If that beer went to Michael Espey, how would that
7    change his blood alcohol at 9:35?
8  A.  I don't know Michael Espey's height and weight.
9    I can't.  I only did that for Mr. Southworth.
10  Q.  That's what I'm saying.  If Michael Espey had
11    that beer, you subtracted out of that equation
12    and said Mr. Southworth didn't drink that beer,
13    how would it change his BAC when he got served
14    his last drink that night?
15  A.  Mr. Southworth?
16  Q.  Yes.
17  A.  That's what I'm trying to answer to you.  That
18    at 30 minutes, if that peaks at 30 minutes, it's
19    probably going to be maybe around .03.
20  Q.  Okay.  So that would reduce his BAC at 9:35 from
21    .1493 down to .1193, correct?
22  A.  Probably not.
23  Q.  Why not?
24  A.  The reason is the following.  If you look at the

193

1      second pages with the time scenario --
2 Q. Yes.
3 A. -- associated with the Widmark, now I suggest to
4      you you turn it horizontally as I am. Come over
5      behind me.
6      MR. FARRAH: I can see.
7 A. Do you see that beginning at, you see at 10:35
8      that there is a value of .22 something?
9 Q. I do.
10 A. And do you see that that value of .22 something
11      is continued all the way up to 11:35, from 10:35
12      to 11:35?
13 Q. Yes.
14 A. Okay. You know from your past experiences that
15      those, that that's called a plateau phase?
16 Q. Correct.
17 A. That means that it stays right at that plateau.
18      It's not going up and it's not coming down. And
19      the reason for that is because the enzyme
20      systems in the body are overwhelmed by the
21      amount of alcohol that is there and that it
22      would make no difference if there were a hundred
23      more drinks in there because the enzymes can no
24      long metabolize the ethanol because the enzymes

194

1      are saturated. So taking out one beer is not
2      going to change that plateau because it's still
3      saturated.
4      It took a whole hour to burn off
5      enough alcohol for that plateau to start to come
6      down. And those drinks that are peaking around
7      10:35 are the ones that were ingested
8      approximately an hour to 90 minutes earlier
9      because those are the ones that were the last
10      couple of drinks when I had the 60 minute-time
11      period. So the drinks that he had later on are
12      so overwhelming his ability to metabolize it,
13      that if he missed one beer earlier in the
14      evening because it went to Mr. Espey -- is that
15      his name? -- instead of to Mr. Southworth, he's
16      still got so much alcohol in his system that he
17      can't metabolize it all. It takes a whole hour
18      before he even starts to come down.
19 Q. It's your testimony that using the proper
20      Widmark Formula, that if I were to give every
21      drink you gave him that night and I was to
22      assume the exact same absorption rate that you
23      assumed, and the only thing that I changed was
24      that I didn't put a beer in him at 9:50, the

195

1      25-ounce beer.
2      MR. BIKOFSKY: It should be 8:50.
3 Q. It should be 8:50. Let me start it again.
4      If I took your calculations that you
5      put in your expert report here and the only
6      thing I changed was I took out the beer that was
7      served as you say at 8:50, you're going to tell
8      me that his blood alcohol at 9:35 would not be
9      significantly different than the .1493 that you
10      came up with?
11      MR. FARRAH: Objection.
12 A. Ask me that again, please, while I have these
13      documents in front of me.
14 Q. What would be his blood alcohol at 9:35 if the
15      only thing you changed in your calculations was
16      you took out the 25-ounce Bud Light beer that he
17      had at 8:50?
18      MR. FARRAH: Objection.
19 A. At 8:50, what would be his blood alcohol at what
20      time, sir?
21 Q. 9:35.
22 A. It would be about .15, I think.
23 Q. If you took that drink out, he would be higher
24      than he would having already drank that drink?

196

1 A. At 9:35, he is about .16.
2 Q. Maybe I'm looking at a different document.
3      I have the document here that says
4      here at 9:35 he's .1493.
5 A. All right. This is a better readout. And you
6      want to know if you took out that one drink at
7      8:20?
8 Q. Yes. 8:50?
9 A. 8:50. He might be a couple of points, he might
10      be .02 or so lower.
11 Q. How about closer to .01?
12      MR. FARRAH: Objection.
13 A. .01 lower.
14 Q. Yes.
15 A. If you want .01 lower, okay.
16 Q. Do you think it would be closer to .01 based on
17      your training and experience?
18      MR. FARRAH: Objection.
19 A. Well, if he drank that on an empty stomach, 60
20      minutes later it would have been .02. It should
21      be about, it should be a little higher at 30
22      minutes.
23 Q. I'm going to show you the EZ-ALC V2.0 Calculated
24      Blood Alcohol Concentration Chart. I want you

197

1  to look at this document.

2  A.  Just hand it to me.

3  MR. FARRAH: Is there a copy for me?

4  Finishing up, I'm waiting until you finish up to

5  get a copy.

6  Q.  I'll make one if you want.

7  A.  Okay. Go ahead.

8  Q.  And that assumes that your R that you assigned

9  him of .64, correct?

10 A.  Yes.

11 Q.  That assumes the same assumptions as yours,

12 correct?

13 MR. FARRAH: Objection.

14 A.  Basically.

15 Q.  And it puts the drinks in at exactly the same

16 time that you put them in with the same rate of

17 absorption, correct?

18 A.  No. There's something wrong here. I see what

19 it is. You left out one drink on this.

20 Q.  At what time?

21 A.  You left out the 8:50 beer.

22 Q.  Right. That's what I'm saying. If everything

23 was the same except for the 8:50 drink, what

24 would be, according to the proper Widmark

198

1  Formula, his BAC at 9:35?

2  MR. FARRAH: Objection.

3  A.  This one says a little over .10.

4  Q.  Do you have any reason to doubt that?

5  MR. FARRAH: Objection.

6  A.  .04 is an awfully big drop.

7  Q.  Well, .04 is what you ascribed to a 25-ounce

8  beer, right?

9  A.  No, it wasn't. I said .02 at 60 minutes.

10 Q.  That's after it's been able to burn off a little

11 bit as well, correct? But the beer itself is

12 equivalent a .04, correct?

13 A.  I didn't say that at all.

14 MR. FARRAH: Objection.

15 A.  There's -- I told you that it would be .02 at 60

16 minutes. There's always contemporaneous burn

17 off.

18 Q.  What is different between that calculation and

19 your calculation other than the removal of the

20 25-ounce Bud Light at 8:50?

21 A.  They're essentially the same.

22 Q.  And according to the Widmark, that would drop it

23 all the way down to .1 something, correct?

24 MR. FARRAH: Objection.

199

1  A.  That's what this graph says.

2  Q.  Do you have any reason to doubt it?

3  A.  Yes, I do. He would not, Southworth would not

4  have a .04 difference from one drink.

5  MR. FARRAH: Shall we call it quits?

6  THE WITNESS: It's 4:30.

7  MR. GILLIS: Okay.

8  VIDEO OPERATOR: It's 4:29 p.m. and we

9  are now off the record.

10 (Exhibit 8 marked for identification.)

11 (Whereupon the deposition suspended at 4:29

12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

200

1  SIGNATURE PAGE/ERRATA SHEET
2
3  Re: Rosario vs. Rare Hospitality International,
   Inc., d/b/a Longhorn Steakhouse

4  Date: January 26, 2007

5  Deposition of: David M. Benjamin

6  I, David M. Benjamin, do hereby certify
7  that I have read the foregoing transcript of my
   testimony and further certify that it is a true
8  and accurate record of my testimony (with the
   exception of the following changes listed
9  below):

10 Page Line  Correction

11 ____  ____  _____

12 ____  ____  _____

13 ____  ____  _____

14 ____  ____  _____

15 ____  ____  _____

16 ____  ____  _____

17 ____  ____  _____

18 ____  ____  _____

19 ____  ____  _____

20 ____  ____  _____

21 ____  ____  _____

22  Signed under the pains and penalties of
   perjury this  day of         , 2007.

23

24      _____
        David M. Benjamin

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| NANCY ROSARIO, INDIVIDUALLY, | ) |
| AS SHE IS THE ADMINISTRATRIX OF | ) |
| THE ESTATE OF AWILDA SANTIAGO, | ) |
| ESSEX PROBATE COURT DOCKET | ) |
| #03P-2499AD1, P/P/A VERONICA | ) |
| ROSARIO AND CHRISTINA SANTIAGO, | ) |
| AND AS SHE IS THE ADMINISTRATRIX | ) |
| OF THE ESTATE OF JOSE SANTIAGO, | ) |
| BERLIN (CONNECTICUT) PROBATE | ) |
| COURT, CASE #03-0713 | ) Civil Action Number: |
| | ) 05-CV-10617MLW |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| RARE HOSPITALITY INTERNATIONAL, | ) |
| INC. d/b/a LONGHORN STEAKHOUSE | ) |
| | ) |
| Defendant | ) |

## NANCY ROSARIO'S ANSWERS TO INTERROGATORIES PROPOUNDED BY RARE HOSPITALITY INTERNATIONAL, INC. D/B/A LONGHORN STEAKHOUSE

Nancy Rosario ("Nancy") objects and responds to RARE Hospitality International, Inc.

d/b/a Longhorn Steakhouse ("RARE") Interrogatories as follows:

### General Objections

1.      Nancy objects to so much of the Interrogatories as would require her to

provide information beyond the scope of discovery permitted by the Federal Rules of

Civil Procedure.

2.      Nancy objects so much of the Interrogatories would require her to disclose

information protected by the attorney-client privilege, information contained in

attorney's work product or materials produced solely for the use by her in anticipation of

litigation.

      3.      Nancy objects to the Interrogatories on the grounds that they are ambiguous, vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

      4.      Nancy objects to the Interrogatories as discovery in this matter is ongoing. Nancy continues to discover additional facts that may support her claims in this case.

## Interrogatories

      1.      Please state your full name, address, date of birth, social security number, name and address of your employer and your job title.

      A.      Nancy Rosario; 4A Fulton Street, Lawrence, MA 01841; March 20, 1974; 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; homemaker and mother.

      2.      Please list each and every fact known to you supporting your allegation that Jeffrey Southworth was served alcohol while visibly intoxicated at the Leominster LongHorn on September 26, 2003.

      A.      Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 20, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy. As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

3.    Please identify all visible signs of intoxication exhibited by Jeffrey Southworth while at the Leominster LongHorn on September 26, 2003, specifying individually for each sign the identity of the person(s) making the observation; exactly what was observed or heard; the time; and where Jeffrey Southworth was when the observation was made.

A.    Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 11, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy.   As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

4.    Concerning the time period between 12:00 PM on September 26, 2003 and 12:10 AM on September 27, 2003, please set forth as best as you are able a verbatim recitation of each and every conversation between you and Jose Santiago setting forth what was said and by whom; the time of each such conversation and identifying each and every person present for any such conversation.

A.    Jose and I had three conversations on September 26, 2003.  The first took place on the telephone, at about 2:45 p.m.  Jose told me he would be at my house around 8:00 p.m. that evening to pick up the girls for the weekend.  I told him that was fine.

The second conversation was by telephone, also, and took place around 9:00 to 9:30 p.m. I asked Jose where he was.  He replied he had a flat tire and that was why he was late, but that he would be at my house shortly.

The third conversation took place outside my house when he arrived, around 10:30. Jose apologized to me for being late and asked if the girls were still awake. I replied that they were awake and that I had made a meal for them to take in the event anyone got hungry on the ride and that I would pack it up, which I then did. While I was doing that and getting the girls ready, Jose spoke to Jose Garcia, and shook his hand and said he didn't want to fight with Jose Garcia any more, that Jose Garcia was doing a good job raising the girls and thanked him for that. A short while later, they left. Present that evening were Jose Santiago, Julia Schmidt, Jose Garcia, the girls and Eileen Rosario.

5.      Insofar as you, your servants, agents, employees, attorneys and insurers are aware, please set forth in full and complete detail all facts known to you supporting your allegation that Jeffrey Southworth was visibly intoxicated when served any alcoholic beverage at the Leominster Longhorn on September 26, 2003. For each fact or allegation recited in your answer, state the name, address, employer, job title and business address of each and every person who was consulted and/or who conveyed this information to you; for each fact or allegation recited in your answer identify (by title, author, number of pages, and current location) all documents consulted and/or relied upon in support of said facts and/or allegations.

A.      Objection. This interrogatory is overbroad and unduly burdensome. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer and without waiving any objections, plaintiff says Jude Connelly, a member of Southworth's party that evening who was not drinking, has testified at deposition and made an affidavit that, at that time of the service of the last drink to him at the LongHorn, Southworth was exhibiting visible signs of intoxication.

According to Jude Connelly, Southworth consumed one 12 ounce beer around dusk, after dirt biking and then two 25 ounce beers at the Longhorn bar between approximately 8:00 and 8:30 p.m. According to the audit report supplied by RARE, from 8:40 p.m. until 9:24 pm, the Southworth party of six was served seventeen Jack Daniels Manhattans and two 25 ounce beers. According to Jude Connelly, Southworth consumed up to four 25 ounce beers with his meal. According to Leigh Chabot, the Longhorn waitress serving the party, Southworth consumed three Jack Daniels Manhattans with his meal.

Plaintiff's expert, David Benjamin, has made an affidavit in this matter, to which RARE is referred, and all of the opinions of which are incorporated by reference herein, (as is the answer to interrogatory 20, below) in which he states he is of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed was so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy. As detailed in his affidavit, Mr. Benjamin also bases his opinion that Southworth was exhibiting visible signs of intoxication on the size, composition and the rate of consumption of the drinks the Longhorn served and that Southworth consumed.

6.    For each of your employers from January 1, 1998 to the present, please state their names and addresses; your rate of pay; a description of your job duties; the identity of your supervisor(s); the reason(s) for leaving each position; and the dates between which you were employed.

A.    During this period I was employed for approximately two months at Dunkin Donuts, serving coffee and doughnuts to customers at a store on South Broadway in Lawrence, MA. I was earning a minimum wage, the exact amount of which I cannot recall, and receiving tips. I left this job because I didn't enjoy it.

I was subsequently employed for approximately a year by Gillette, working in both Andover and Acton, MA. At that job, which involved packing products into boxes, I earned take home pay of up to $600 per week, depending on the number of hours I worked each week. I left that job because I was unable, after a time, to continue to physically perform the work because of an arthritis condition. I cannot remember the names of my supervisors at either job.

7.    Identify every insurer (including, without limitation, health insurers, disability insurers, and liability insurers) to which you, or persons acting on your behalf, have submitted claims for benefits as a result of the incident.

A.    None, other than making claim in Middlesex Superior Court against Jeffrey Southworth and Enterprise Rent a Car of Boston, Inc.   Various medical bills have been paid by Medicaid and Neighborhood Health Plan.

8.    If you have suffered financial loss as a result of the alleged accident or incident, please set forth said loss in specific detail, itemizing any and all claimed losses, including doctor's bills, nurse's bills, hospital expenses, funeral expenses, therapy expenses, and any loss in wages, salary or business.

A.     My medical bills have been paid by Medicaid and, I believe, Neighborhood Health Plan. Awilda's estate has incurred $9,509.75 in funeral expenses.

9.     Please set forth the identity of each person who has conducted an inspection or investigation of the scene of the incident, stating as to each such person the date or dates on which such inspections occurred, the identity of anyone present, and whether any photographs or videotapes were taken in connection with the inspection.

A.     Objection. This interrogatory is over broad and unduly burdensome.   This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I have no personal knowledge of the identities of each person who has conducted an inspection or investigation of the scene of the incident, other than my attorneys.

10.     Please set forth the identity of each person who has conducted an inspection or investigation of the Leominster LongHorn, stating as to each such person the date or dates on which such inspections occurred, the identity of anyone present, and whether any photographs or videotapes were taken in connection with the inspection.

A.     Objection. This interrogatory is over broad and unduly burdensome.   This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I have no personal knowledge of the identities of each person who has conducted an inspection or investigation of the Leominster LongHorn, other than my attorneys and persons working on their behalf, including Michael Marcantonio.

11.     If you, your attorney, insurers, or other representatives have taken the written or recorded statement of any person relative to the allegations set forth in the complaint, please

state the name, address, employer and job title of each person whose statement was taken, the date that each such statement was taken, as well as the name, address, employer and job title of the person(s) who took each such statement.

    A.    Objection. This interrogatory is over broad and unduly burdensome. This question in part calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, I do not know of any such statements except the depositions conducted in this action.

    12.    Please identify every expert retained by you or someone on your behalf whom you expect to offer expert testimony on behalf of you and/or any other plaintiff, specifying for each such person; the subject matters on which he or she is expected to testify; the substance of the facts and opinions to which he or she is expected to testify; and the grounds for each opinion he or she is expected to express.

    A.    Plaintiff may call some or all of the following persons as expert witnesses, and reserves the right to call other experts not listed below. Plaintiff will supply all expert reports on or before the deadlines set forth in joint scheduling order entered in this action.

Lloyd F. Price, M.D., 152 Holdenwood Road, Concord, MA 01742

David Benjamin, Ph.D., 77 Florence Street, Suite 107N, Chestnut Hill, MA 02467

Michael Marcantonio, Dram Shoppe Consultants, 25 Sylvester Road, Natick, MA 01760

Trooper Kerry A. Alvino, Massachusetts State Police, Collision Analysis and Reconstruction Section, 485 Maple Street, Danvers, MA, (978) 538-6065

    13.    At any time since the date of your marriage to Jose Santiago, please state whether you or Jose Santiago commenced any proceeding for separate support, divorce, separation or

other limitation or termination of the marital relationship, and if so please state the date of each such proceeding; the court in which the same was filed; the docket number of each such proceeding; and the final result of each such proceeding.

A.    We never married.

14.    If at any time from the date of your marriage to Jose Santiago until his death, you and Jose Santiago had lived apart or in separate residences, please provide a complete description of each such separation, including the dates, the reasons for such separation, the address where both you and he resided at the time of separation and the full name and address of each person either party lived with during the time of said separation.

A.    We never married.

15.    Describe in complete detail all acts of companionship, support, society, sexual relationship and/or other contacts with your spouse which you allege were lost or impaired as a result of the alleged incident.

A.    We never married.

16.    Describe in complete detail all special acts of companionship, support, society and/or other contacts with your child, Awilda Santiago which you alleged were lost or impaired as a result of the alleged incident.

A.    Objection.  This question calls for work product and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories.  Without waiving that objection, plaintiff says the answer to this question, which is in part a matter of expert opinion, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.  By way of further answer plaintiff says:

Awilda was a wonderful, caring child and an excellent student. She shared what she had with me, her siblings and friends. Awilda was my regular companion. We did virtually everything together. Awilda exhibited a great sense of responsibility in our home. She enjoyed cooking, and would often prepare dinner for her sisters, me and her aunts and uncles. I could rely on her to baby sit her sisters and brother if I needed to take a nap. Awilda would take charge of her siblings in the mall, while shopping or when escorting her siblings to the movie theater and skating. In school, Awilda was often caretaker to her two sisters. She excelled in the school environment and enjoyed attending classes and interacting with her teachers. Awilda was proficient in the use of a computer and had expressed a desire to attend the Greater Lawrence Vocational High School, where she planned to study computers. It was my hope that Awilda would have received a college education and pursued and enjoyed a successful career, perhaps in the information technology field. Awilda's sisters and I were her best friends. Even if she married, at some point I believe Awilda would have wanted me to live with her and her family.

Awilda's records were reviewed by Catharine Newick, Business Decisions Services, 29 River Rd. #8, Bow, NH 03304, who has prepared a report of her findings and opinions. Her report will be will be provided as an expert report by plaintiff pursuant to the discovery order entered in this action.

17.    Please state the full name and date of birth of all of your biological children, including separately for each, the full name and address of their biological father.

A.    With Jose Santiago

Awilda: June 16, 1990
Christina:    May 23, 1991
Veronica:    May 16, 1992

With Jose Garcia

Esmerlelda:    January 22, 1998
Alejandro:     June 29, 1999

18.    Please identify all persons to whom you have been legally married, specifying for each, their name, date of birth, the place of marriage, and the manner in which the marriage was terminated.

A.    I have never married.

19.    Please state in detail all facts which show that the defendant, RARE Hospitality International, Inc. was negligent, as alleged in the complaint, in the sale, service and/or distribution of alcohol to Jeffrey Southworth on September 26, 2003 and how this alleged negligence caused or contributed to the deaths of Jose Santiago and Awilda Santiago and the injuries sustained by Veronica Rosario and Christina Santiago.

A.    Objection. This interrogatory is over broad and unduly burdensome. This question calls for work product, expert opinions, interpretations of questions of law, the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has not produced responsive documents. The answer to this question, which is in part a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action.

By way of further answer, and without waiving any objections, plaintiff says that a tavern keeper has a duty to refuse to serve liquor to a patron whom the tavern keeper knows or should know is intoxicated. A breach of that duty will result in liability because it is a foreseeable risk that a person who had consumed liquor excessively on the premises would operate a motor

vehicle and that it is negligence for a licensee such as RARE to serve alcoholic beverages to a person RARE knew, or should have known, was under the influence of intoxicating alcohol. Southworth was highly intoxicated at the time of the accident. Discovery to date in this action and in Rosario v. Southworth, et al, Middlesex Superior Court CA 03-4704L2, shows that between approximately 8:00 p.m. and 9:30 p.m., the approximate time of the service of the last drink to Southworth's party, while a patron at the Leominster Longhorn Restaurant, Southworth was served as many as six 25 oz. beers, and no fewer than three 25 oz. beers, as well as at least three Jack Daniels Manhattans.

At the time of the service of the last drink, Southworth was exhibiting various signs of intoxication. According to Jude Connelly, who was the only member of Southworth's group not drinking alcoholic beverages since he was underage, during the meal Southworth was displaying signs of intoxication. Southworth appeared to be under the influence of what he had been drinking. In Connelly's view, at the time of the service of the last drink to him, Southworth was sloppier looking than usual, was not standing straight, was louder than usual (he was usually quiet, only speaking when spoken to) and his eyes were glassy. The Southworth party was so loud that evening that at approximately 9:30 p.m., the time of service of the last drink to the table, either a restaurant manager or waitress was forced to request that the table quiet down. Michael Espey, another member of Southworth's party that night, started drinking alcoholic beverages at 4:00 or 5:00 in the afternoon. Despite that, in his own words, he was "drunk" while at the Longhorn, he was served at least a Manhattan and a beer. David Benjamin calculates that Southworth, if he consumed three Jack Daniels Manhattans (containing 1 and ½ ounces of Jack Daniels and 3/4 ounce of sweet vermouth), two 25 ounce beers at the bar and four 25 oz beers at the table, had a BAC of approximately 0.22% at 9:30 p.m., the approximate time he was served

his last drink. He calculates that Southworth, if he consumed three Jack Daniels Manhattans (containing 1 and ½ ounces of Jack Daniels and 3/4 ounce of sweet vermouth), two 25 ounce beers at the bar and the two 25 oz beers at the table, had a BAC of over 0.18% at 9:30 pm, the approximate time he was served his last drink. He is also of the opinion, to a reasonable degree of scientific certainty, that 95% of non-alcoholic individuals with a BAC over 0.20%, and 89% of individuals with a BAC between 0.15% and 0.20%, show visible signs of intoxication. The Leominster Longhorn, which is surrounded by a generous parking lot, is a destination that virtually all of its customers reach by motor vehicle. It is the plaintiff's position that any responsible purveyor of alcoholic beverages would know, or should have known, the profoundly intoxicating effect the quantities of alcoholic beverages served that evening by RARE employees to Southworth would have on him, and that those effects would stay with Southworth, impairing his judgment and his ability to operate a motor vehicle, for hours after he left the restaurant. Indeed, the debilitating effects of over serving alcoholic beverages and guidelines for gauging the amount of alcohol a patron has ingested, and should, if any, be served, are contained in the various Bar Code materials RARE has produced in this case, guidelines RARE negligently failed to enforce and it's employees negligently failed to observe.

As David Benjamin has already opined, based on the fact that even with Southworth's large body mass of 210 lbs, he would be able to burn off only one half of a 25 oz beer in an hour, to serve him up in 1 1/2 hours drinks, of the size and at the rate described above, the Longhorn Steakhouse personnel knew or should have known that Southworth would accumulate the ethanol in all drinks above one half of a 25 oz beer per hour and that his blood alcohol content (BAC) would rapidly rise, due to the rapid rate of service and consumption of ethanol, and that it is a scientific fact that an individual reaches a point when his/her enzymes that metabolize

ethanol become saturated and cannot metabolize any greater amount of ethanol. The result is that the ethanol accumulates in the blood and causes an increasing level of intoxication as the rate of consumption and absorption exceeds its rate of metabolism and elimination. This is called a "kinetic bottle-neck" and is similar to pouring water into a funnel. One can pour more water in or pour it at a faster rate, but the water will only come out of the funnel at the same rate all the time, due to the fixed size of the opening on the stem of the funnel. As more water is poured into the funnel it accumulates.

After leaving the Longhorn, Southworth's BAC continued to rise. See Mr. Benjamin's affidavit for more details. Numerous studies have concluded, and Mr. Benjamin's personal experience confirms, that a person with a BAC of approximately 0.20% is in a confusional stage of intoxication, marked by disorientation, mental confusion, loss of critical judgment, sensory-motor incoordination, dizziness, disturbances of vision and perception of colors, form, motion and dimensions and increased muscular in-coordination, all of which affect the ability of a person to operate a motor vehicle. As the result of RARE's negligence (and indeed gross negligence) in serving Southworth on the evening in question, he was intoxicated and impaired at the time of the accident, which intoxication and impairment were substantial contributing causes of the accident and the deaths and injuries suffered.

Furthermore, RARE, despite that it knew that many of its customers, such as Southworth, first drank at the Longhorn bar before proceeding to the table, negligently had no system in place on the night in question to monitor the total number of drinks a patron consumed while a customer, or a requirement that bartenders communicate with waitresses the number and type of drinks customers have consumed at the bar before being seated at a table; RARE negligently was serving, and indeed served Southworth, what were "double", and potentially "triple" drinks, in

the form of the 25 ounce beer and the Jack Daniels Manhattan served straight up in a six ounce glass filled to within one quarter inch of the lip, and not training employees to recognize this fact; RARE negligently allowed bartenders to free pour drinks without determining whether those bartenders were capable of accurately estimating the amount of alcohol poured, and they were not; RARE negligently failed, after implementing a policy of requiring its bartenders to pass an Exacto Pour test every shift, to administer the test; RARE negligently failed, after implementing the various policies described in its Bar Code training and service materials, to carry out those procedures and negligently permitted the over serving of Southworth on the evening in question, a clear violation of the Bar Code responsible alcohol service procedures; RARE negligently employed personnel who served Southworth, who were not properly trained in responsible service of alcoholic beverages, and who, among others, did not know the potency of the drinks they made and served Southworth; RARE negligently failed to require its employees know the potency of those drinks, and negligently failed to train or retrain employees in these matters.

20.    Please state in detail all facts or information known to you as to whether Jeffrey Southworth consumed any alcoholic beverage between the time he left the Leominster LongHorn on September 26, 2003 and the time of the accident with Jose Santiago, specifying the amount of alcohol consumed, the time said alcohol was consumed, the type of alcohol consumed, the brand of alcohol consumed, the place the alcohol was consumed and the supplier of the alcohol.

A.    Objection.    This interrogatory is over broad and unduly burdensome.    This question calls for work product, expert opinions, interpretations of questions of law, the mental impressions of my attorneys and general information beyond that which is discoverable by way

Page 17 of 19

of interrogatories. By way of further answer, I have no personal knowledge that Jeffrey Southworth consumed any alcoholic beverage between the time he left the Leominster LongHorn on September 26, 2003 and the time of the accident with Jose Santiago. I understand that one or more witnesses testified at deposition that, during that time frame, Jeffrey Southworth consumed one 12 ounce beer.

21.    With respect to your claim for punitive damages, please set forth each and every fact supporting your claim that the Defendant was grossly negligent.

A.    Objection. This question calls for work product, expert opinions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. Without waiving that objection, plaintiff says discovery is still ongoing, and the defendant has neither responded to plaintiff's request for production of documents nor produced responsive documents. Once such production has occurred, the answer to this question, which is a matter of expert opinion interpreting facts about which the plaintiff has no personal knowledge, will be provided in the expert reports supplied by plaintiff pursuant to the discovery order entered in this action. By way of further answer, plaintiff says the negligence described in answer 19., above, which is incorporated by reference herein, amply supports a claim of gross negligence or wanton and reckless conduct.

22.    Please describe in detail the negligence of any third party which may have caused or contributed to the happening of the accident of September 26, 2003 in any way.

A.    Objection. This question calls for work product, expert opinions, legal conclusions and the mental impressions of my attorneys and general information beyond that which is discoverable by way of interrogatories. By way of further answer, suit was brought by me against Jeffrey Southworth alleging negligence.

Signed under the pains and penalties of perjury this 13 day of July, 2006.

_____
Nancy Rosario

As to all objections:

_____
Albert L. Farrah, Jr.

## CERTIFICATE OF SERVICE

SUFFOLK, SS                                                July 14, 2006

An original of Nancy Rosario's Answers to Interrogatories Propounded by RARE Hospitality International, Inc. d/b/a Longhorn Steakhouse was hand delivered today, postage prepaid to Michael Gillis, Esq., Gillis & Bikofsky, P.C., 1150 Walnut Street, Newton Highlands, MA 02461. & Federal Expressed

_____
Albert L. Farrah, Jr., Esq.

# Section 5
# UNDERSTANDING THE PHARMACOLOGY OF ETHANOL

David M. Benjamin, Ph.D.

*Clinical Pharmacologist and Forensic Toxicologist., Chestnut Hill*

## I.   HOW TO DEVELOP YOUR CASE FROM A PHARMACOLOGIC PERSPECTIVE

In my experience, there is only one method to use when evaluating a potential Dram Shop case, regardless of whether you are representing the plaintiff or the defendant. That method involves developing a chronology of the eating and drinking that occurred within the time frame of the day/evening in question.

The driver of the car involved in any accident that occurred and appropriate fact witnesses will be able to relate some information regarding the time they got to the establishment(s) that was patronized, what the driver was drinking and eating at each establishment, how many drinks, and at what time the driver left the establishment(s). Often there are copies of cash register receipts, bills, credit card receipts, or other written materials which help establish the chronology. Police reports can help establish the time of an accident, and hospital records can help establish an individual's Blood Alcohol Concentration (BAC) at a specific time.

Sometimes, people have ingested so much ethanol that they can't remember what happened, or sustained head injuries that prevent them from remembering what happened. It is then necessary to take the depositions of the fact witnesses who were with the driver at various times prior to the accident to help develop a timeline.

The question both plaintiffs and defendants want to answer is "Was the driver visibly intoxicated when he/she was served his/her last drink?" Security cameras also may be helpful in establishing the driver's conduct and appearance while in the establishment, but many times, the chronology will have to be developed from witness statements and depositions.

Let's take a hypothetical case and develop it. Assume John Smith is 5'10" tall and weighs 175 lbs. On the day of the accident, Mr. Smith leaves work early and goes to the local pub just before 1 pm for lunch. He orders a 12 oz. Bud Light beer and some Buffalo Wings. At 1:45 pm, he orders another beer, which he

follows with a "1.5 oz. shot of tequila". He orders another beer at 2 pm and a fourth beer at 3 pm, followed by another "1.5 oz. shot of tequila". He orders a burger and some fries at 3:30 pm and another beer at 4:30 pm and a final beer at 5 pm. He leaves the establishment at approximately 5:30 pm and is involved in a motor vehicle accident at 5:55 pm.

Chronology:

1 pm - 12 oz. Bud Light beer and some Buffalo Wings.
1:45 pm - another Bud Light beer
1:55 pm - 1.5 oz. shot of tequila
2 pm - another Bud Light beer
3 pm – a fourth Bud Light beer
3:10 pm - another 1.5 oz. shot of tequila
3:30 pm – a burger and some fries
4:30 pm - a fourth Bud Light beer
5 pm - a final Bud Light beer
approximately 5:30 pm - he leaves the establishment
5:55 pm – he is involved in a motor vehicle accident

Inputting the above data into the Widmark formula, the graph in Figure 1 was generated. This graph indicates that at 5 pm, the time the last drink was ordered, the hypothetical driver had a BAC of approximately 0.08%. Looking at Table I, it is obvious that only 32% of the tested population was visibly intoxicated at a BAC of 0.08%, and that even at BACs between 0.10% and 0.15%, only 62% of the tested population was visibly intoxicated.

However, when you look at the next group of BACs, between 0.15% and 0.20%, approximately 89% of the tested population was visibly intoxicated. Thus, just below 0.15% up to 6 out of 10 people were visibly intoxicated, while above 0.15%, approximately 9 out of 10 people were visibly intoxicated, a 150% increase over those with BACs below 0.15%. This is why in the forensic toxicology community, the BAC which serves as the standard for visible intoxication is 0.15%. Does this mean that everyone below 0.15% will not be visibly intoxicated? Of course not. And does this mean that everyone above 0.15% will be visibly intoxicated? No, again.



'. He orders another beer at 2 pm and a
er "1.5 oz. shot of tequila". He orders a
iother beer at 4:30 pm and a final beer at
proximately 5:30 pm and is involved in a

Buffalo Wings.

stablishment
icle accident

nark formula, the graph in Figure 1 was
pm, the time the last drink was ordered,
pproximately 0.08%. Looking at Table I,
d population was visibly intoxicated at a
between 0.10% and 0.15%, only 62% of
ated.

up of BACs, between 0.15% and 0.20%,
ation was visibly intoxicated. Thus, just
e were visibly intoxicated, while above
ole were visibly intoxicated, a 150% in-
5%. This is why in the forensic toxicol-
as the standard for visible intoxication is
below 0.15% will not be visibly intoxi-
ean that everyone above 0.15% will be

## Figure 1



## Table I

### Relationship Between BAC and Intoxication*

| Approximate Number of Drinks in You | Blood Alcohol Concentration | Average Percentage of Individuals Diagnosed as Drunk |
|---|---|---|
| 1-3 | less than 0.05% | 4 |
| 3-5 | 0.051- 0.10% | 32 |
| 6-8 | 0.101- 0.15% | 62 |
| 8-10 | 0.151- 0.20% | 89 |
| 11-13 | 0.201- 0.25% | 95 |
| 14-16 | 0.251 – 0.30% | 98 |
| 16-18 | 0.301 – 0.35% | 99 |

*Adapted from Alcohol and the Impaired Driver, The American Medical Association, Chapter II, page 9, 1968.

As a forensic expert, I have applied the "chronology method" to all my ethanol-related cases. It makes no difference whether it is a civil case or a criminal case, and it makes no difference whether I have been retained by the defense, the plaintiff or the prosecution. Moreover, when an opposing expert has used a different method or a different set of assumptions to calculate the BAC, the ability to utilize a graph such as Figure 1 as demonstrative evidence helps to assist the jury in determining the facts at issue, as shown in Figures 2 and 3.

Sometimes, there is a blood ethanol level that was drawn at a hospital after the accident. In those instances, if it can be established that no additional ethanol was ingested after leaving the bar, it is possible to "back-extrapolate" from the hospital blood value back to a time in the last bar patronized. If a drink or shot was ingested just prior to leaving the last establishment, one can usually back-extrapolate to a time 30-60 minutes after leaving, when it can be determined that the driver was in the post-absorptive phase of ethanol disposition.

When you are lucky enough to ha[ve]
sequent BAC from a hospital, the[se]
lated values can serve to confirm
However, hospital ethanol determi[nations]
are frequently analyzed by a "scr[een]
than duplicate determinations. Th[ese]
(weight) but usually don't rise to th[e]

### Tragic Dram-Shop C[ase]

When Joseph Albert was found [ly]ing on his own vomit after a nig[ht in]
Lowell, it seemed a classic case [of]

Albert had been drinking heav[ily]
was a startling..48 - six times th[e]

But the case was a bit more c[omplicated]
witnesses, an inexplicable time[line]
mysterious bottle of liquor that[...]
outside of the bar.

And Albert, the plaintiff, tragi[cally]
years after the incident.

Nevertheless, for the plaintiff's [...]
ing a patron enough drinks to p[...]
police officer who investigated [...]
had never seen someone whose [...]

"When closing arguments were[...]
verdict was coming back," rec[alled]
whose initial demand was $11 m[illion]

But defense attorneys Robert [...]
Myers of North Andover point [...]
at two establishments prior to a[...]
wards he was drinking from a f[...]
blood-alcohol level skyrocketing.

[1] Reprinted with permission from Lawyers W[eekly]

100

ble I

## BAC and Intoxication*

| cohol ation | Average Percentage of Individuals Diagnosed as Drunk |
|---|---|
| )5% | 4 |
| % | 32 |
| % | 62 |
| % | 89 |
| % | 95 |
| )% | 98 |
| 5% | 99 |

ed Driver, The American Medical Asso-

: "chronology method" to all my ethanol-
nether it is a civil case or a criminal case,
have been retained by the defense, the
when an opposing expert has used a dif-
mptions to calculate the BAC, the ability
emonstrative evidence helps to assist the
. shown in Figures 2 and 3.

vel that was drawn at a hospital after the
be established that no additional ethanol
; possible to "back-extrapolate" from the
the last bar patronized. If a drink or shot
ast establishment, one can usually back-
r leaving, when it can be determined that
ase of ethanol disposition.

When you are lucky enough to have both a well-founded chronology and a subsequent BAC from a hospital, the degree of agreement between the two calculated values can serve to confirm or invalidate one of the calculated values. However, hospital ethanol determinations are not done with a chain of custody, are frequently analyzed by a "screening level" test, and are only single rather than duplicate determinations. These factors can detract from their reliability (weight) but usually don't rise to the level to get them suppressed by the courts.

### Figure 2

#### Tragic Dram-Shop Case Just Had Too Many Holes[1]

When Joseph Albert was found passed out in the middle of the road choking on his own vomit after a night of drinking at Gus and Paul's Tavern in Lowell, it seemed a classic case of dram-shop liability.

Albert had been drinking heavily at the bar and his blood-alcohol level was a startling .48 - six times the legal limit for operating a car.

But the case was a bit more complicated than that. There were missing witnesses, an inexplicable time gap during the night in question, and a mysterious bottle of liquor that Albert may have purchased on his own, outside of the bar.

And Albert, the plaintiff, tragically remains in a coma more than five years after the incident.

Nevertheless, for the plaintiff's attorney, it was a case of a bartender serving a patron enough drinks to put him in a dangerous state. The Lowell police officer who investigated the incident and testified at trial said he had never seen someone whose alcohol level was so high.

"When closing arguments were done, I really thought that a plaintiff's verdict was coming back," recalls Tyngsboro attorney Peter J. Nicosia, whose initial demand was $11 million.

But defense attorneys Robert J. Carnevale of Lowell and Andrew D. Myers of North Andover point wit that not only had Albert been drinking at two establishments prior to arriving at Gus and Paul's Tavern, but afterwards he was drinking from a fifth of Jack Daniels whiskey that sent his blood-alcohol level skyrocketing. The bottle, how-ever, was never found.

[1] Reprinted with permission from Lawyers Weekly, Inc., 41 West Street, Boston MA, 02111

"I played that off to be basically an untrue story and basically a red herring," Nicosia says of the Jack Daniels. "The bottle was never found; no one ever saw him drink it."

Toxicologists with widely differing reports then became a focal point of the five-day trial. The plaintiff's expert calculated Albert's BAC at between .25 and .29 when he was last served at the bar, which would have meant he had close to a dozen beers during his two hours at the tavern.

The defense expert, however, put that number closer to .15 based on witnesses saying Albert consumed no more than four or five 10-ounce beers at the bar.

Prompted by a question from the jury, the experts were asked to explain the "burn-off rate" of alcohol. The plaintiff's expert used a lower rate based on total body water, which tends to yield higher BAC levels, while the defense expert used the widely accepted Widmark formula used to measure levels in people with drinking experience.

"His methodology was just undisputable," Myers says of defense expert Dr. David M. Benjamin, an expert the attorney thinks won the jury over.

The timeframe of the evening also became a crucial element for the defense, as the lawyers tried to "widen the gap" between when 28-year-old Albert left the bar and when he was found in the road at approximately 12:30 a.m. on Nov. 8, 1996.

"That was my entire closing argument," says Myers. "The first thing I said to the jury was 'There's a hole in this case,' and I tried to make the hole as big as I could."

However, the defense's main witness, John Walker (who was Albert's drinking partner that evening), could not be located. The defense, in turn, was left to rely on his deposition testimony.

Nicosia says the missing witness worked in the defense's favor at trial.

"If the jury saw Johnnie Walker on the stand and saw his complete lack of credibility, that would have been a big factor in the outcome," asserts Nicosia. "This guy was just a pull-him-off-the-barstool drudge of society." (Though Nicosia now refers to the witness as "Johnnie Walker," attorneys on both sides of the case agreed before trial to refrain from using that reference because of its connotations to the popular brand of whisky.)

Instead of Walker testifying [...]
Walker's deposition. The tes[...]
around 11:30 p.m., a stateme[...]
Walker was keeping track of [...]
since 4 a.m. (Conversely, the [...]
left the bar around midnight.)

Leaving the bar at 11:30 "gave[...]
lot of that fifth (of Jack Daniel[...]
left at midnight and they foun[...]
in trouble with the timeline."

The plaintiff's case was also h[...]
at Albert's request, he had drop[...]
It is another theory the plaintif[...]
defense team says was damagi[...]

After only three hours of delib[...]
in a case that the attorneys had [...]

Ultimately, Nicosia says the ca[...]
some jurors admitting during th[...]
pathy for Albert - a young ma[...]
was chronically unemployed.

"I think they felt that the kid g[...]
him one day anyway," Nicosia s[...]

ı untrue story and basically a red her-
ıiels. "The bottle was never found; no

; reports then became a focal point of
.xpert calculated Albert's BAC at be-
.t served at the bar, which would have
. during his two hours at the tavern.

hat number closer to .15 based on wit-
more than four or five 10-ounce beers

ury, the experts were asked to explain
ıe plaintiff's expert used a lower rate
ends to yield higher BAC levels, while
y accepted Widmark formula used to
:ing experience.

ıutable," Myers says of defense expert
the attorney thinks won the jury over.

ɔ became a crucial element for the de-
en the gap" between when 28-year-old
ʌas found in the road at approximately

ıment," says Myers. "The first thing I
le in this case,' and I tried to make the

:ness, John Walker (who was Albert's
ıld not be located. The defense, in turn,
ɔstimony.

ʌorked in the defense's favor at trial.

n the stand and saw his complete lack of
ı a big factor in the outcome," asserts
ıll-him-off-the-barstool drudge of soci-
to the witness as "Johnnie Walker," at-
agreed before trial to refrain from using
ɔtations to the popular brand of whisky.)

Instead of Walker testifying, it was a young attorney reading from Walker's deposition. The testimony stated that the pair left the bar at around 11:30 p.m., a statement the defense supported by claiming that Walker was keeping track of time that evening because he had been up since 4 a.m. (Conversely, the plaintiffs witnesses all claimed that Albert left the bar around midnight.)

Leaving the bar at 11:30 "gave them plenty of time for Joey to consume a lot of that fifth (of Jack Daniels) that he left with," says Carnevale. "If he left at midnight and they found him at 12:30 [a.m.], we would have been in trouble with the timeline."

The plaintiff's case was also hurt by testimony from Walker stating that, at Albert's request, he had dropped his passenger off with two prostitutes. It is another theory the plaintiff's attorney calls a red herring, but one the defense team says was damaging to the plaintiffs character in the end.

After only three hours of deliberating, the jury returned a defense verdict in a case that the attorneys had been working on for six years.

Ultimately, Nicosia says the case was an uphill battle from the start, with some jurors admitting during the selection process that they had no sympathy for Albert - a young man with a history of alcohol problems who was chronically unemployed.

"I think they felt that the kid got what eventually was going to happen to him one day anyway," Nicosia says disappointedly.

## Figure 3

### Jurors' Right to Question Testifying Expert Rights Lawyers' Wrongs

David M. Benjamin, Ph.D.

(Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Las Vegas, NV, February 20, 2004) In the Commonwealth of Massachusetts, judges may permit jurors to question testifying experts about unresolved issues not covered in direct testimony or cross-examination. At the conclusion of the expert's testimony, some Superior Court judges ask jurors if they have any questions to ask of the forensic expert. If so, the jurors are asked to write down their questions and submit them to the court. The judge calls the lawyers over to a side bar and reviews the questions with the attorneys. If one party has an objection to a question, it is raised at side bar, if both parties agree on a question, it is read to the expert by the judge and the expert has an opportunity to respond. The advantage of allowing jurors to question experts is proven by the results of a recent trial in which this author served as an expert for the defense on the toxicology of ethanol. The case involved a Dram Shop litigation. Dram Shop cases involve an allegation that a restaurant or bar served liquor to a patron who was already exhibiting visible signs of intoxication at the time that drink was served, and that patron then left the establishment and drove a motor vehicle that was subsequently involved in an accident where personal injury and/or property damage occurred. If it is proven that the patron was visibly intoxicated at the time the liquor establishment served him/her ethanol, then the bar or restaurant is civilly liable for the damages caused by the intoxicated driver.

Facts of the case: JA was a middle-aged male with a long history of alcohol abuse. On the night in question, JA was drinking at a local pub. During the course of the evening, JA left the bar with a friend, purchased a fifth of Jack Daniels, and returned to the bar where he met another friend. JA left the bar with the second friend and while driving around, they encountered two women who were "looking for company". JA got out of the care to join the women. Several hours later, JA was found on the street, barely able to crawl or talk. Paramedics were summoned to the scene and JA was taken to the hospital reeking of liquor and only semiconscious. JA subsequently developed respiratory depression and anoxic encephalopathy (brain damage due to lack of oxygen) secondary to ethanol intoxication. On admission, JA' blood alcohol concentration (BAC) was determined to have been approximately 0.450%, a nearly fatal level consistent with respiratory depression and brain damage. The question for the jurors to determine was whether or not an intoxicating amount of ethanol had

been served to JA and consu[...]
whether JA had consumed etha[...]

Testimony from patrons at the [...]
4-5 beers over 2 hours at the ba[...]
had appeared visibly intoxicate[...]
tiffs calculated JA's BAC usin[...]
combined amount of ethanol co[...]
these calculations, plaintiffs' e[...]
hour, an assumption based on [...]
which range from 0.01 to 0.02[...]
tend to yield a higher calculate[...]
tion in favor of the plaintiffs an[...]
JA had consumed enough etha[...]
toxication, despite the fact tha[...]
visibly intoxicated in the bar. T[...]
fendant bar, and calculated JA[...]
generally accepted method in t[...]
burn-off rate of 0.02% per hou[...]
more representative burn-off ra[...]
ethanol consumption. These ca[...]
have been well below the 0.15[...]
cology community as that BAC[...]
would be present in a non-tolera[...]

After completing direct and cr[...]
they had any questions. Unbek[...]
tions had been obtained by the [...]
in JA's BAC. The jurors asked[...]
from the serial BACs obtained.[...]
pert and complimented the jury[...]
tors had failed to ask. The judge[...]
the BAC was 0.406% and at 6:3[...]
rate can be calculated by calcula[...]
number by the amount of time [...]
0.406 - 0.301 = 0.105, and the ti[...]
5 yielded a burn-off rate of 0.0[...]
expert had assumed (0.02%) and[...]
rate plaintiffs' expert had emplo[...]
quested validated this expert's as[...]
discredited plaintiff's expert. The[...]
a defense verdict. Jurors' questio[...]
compensate for errors made by t[...]
perts or not asking key questions[...]

Key Terms: Jurors' Questions; D[...]

ure 3

## stion Testifying Expert
## yers' Wrongs

enjamin, Ph.D.

of Forensic Sciences, Jurisprudence
20, 2004) In the Commonwealth of
jurors to question testifying experts
ered in direct testimony or cross-
the expert's testimony, some Superior
e any questions to ask of the forensic
write down their questions and submit
the lawyers over to a side bar and re-
eys. If one party has an objection to a
both parties agree on a question, it is
d the expert has an opportunity to re-
urors to question experts is proven by
this author served as an expert for the
d. The case involved a Dram Shop liti-
an allegation that a restaurant or bar
already exhibiting visible signs of in-
is served, and that patron then left the
ehicle that was subsequently involved
y and/or property damage occurred. If
sibly intoxicated at the time the liquor
ol, then the bar or restaurant is civilly
e intoxicated driver.

-aged male with a long history of alco-
, JA was drinking at a local pub. Dur-
left the bar with a friend, purchased a
to the bar where he met another friend.
nd and while driving around, they en-
ooking for company". JA got out of the
urs later, JA was found on the street,
dics were summoned to the scene and
g of liquor and only semiconscious. JA
y depression and anoxic encephalopa-
xygen) secondary to ethanol intoxica-
ohol concentration (BAC) was deter-
0.450%, a nearly fatal level consistent
in damage. The question for the jurors
an intoxicating amount of ethanol had

been served to JA and consumed by JA while he was in the bar, or whether JA had consumed ethanol he had purchased, after he left the bar.

Testimony from patrons at the bar indicated that JA had consumed about 4-5 beers over 2 hours at the bar, and no patron was able to testify that JA had appeared visibly intoxicated while in the bar. The expert for the plaintiffs calculated JA's BAC using a calculation for total body water and the combined amount of ethanol consumed over a 2-hour time. In performing these calculations, plaintiffs' expert used a "burn-off" rate of 0.015% per hour, an assumption based on burn-off rates in the general population which range from 0.01 to 0.025% per hour. A lower burn-off rate would tend to yield a higher calculated BAC thus skewing the resulting calculation in favor of the plaintiffs and bolstering plaintiffs' expert's opinion that JA had consumed enough ethanol in the bar to cause visible signs of intoxication, despite the fact that no patron testified that JA had appeared visibly intoxicated in the bar. This author testified as an expert for the defendant bar, and calculated JA's BAC using the Widmark formula, the generally accepted method in the forensic toxicology community, using a burn-off rate of 0.02% per hour, a value published in the literature as a more representative burn-off rate for individuals accustomed to frequent ethanol consumption. These calculations indicated that JA's BAC would have been well below the 0.15% generally accepted by the forensic toxicology community as that BAC at which signs of visible intoxication would be present in a non-tolerant individual.

After completing direct and cross-examination, the court asked jurors if they had any questions. Unbeknown to this expert, serial BAC determinations had been obtained by the hospital, in order to monitor the decrease in JA's BAC. The jurors asked if the burn-off rate could be calculated from the serial BACs obtained. The judge posed the question to this expert and complimented the jury on asking an important question the litigators had failed to ask. The judge provided the following data: at 1:30 am, the BAC was 0.406% and at 6:30 am, the BAC was 0.301%. The burn-off rate can be calculated by calculating the change in BAC and dividing that number by the amount of time that transpired. The change in BAC was: $0.406 - 0.301 = 0.105$, and the time interval was 5 hours. 0.105 divided by 5 yielded a burn-off rate of 0.021% per hour, almost exactly what this expert had assumed (0.02%) and more than 33% higher than the burn-off rate plaintiffs' expert had employed. The calculations the jurors had requested validated this expert's assumption with regard to burn-off rate and discredited plaintiffs' expert. The jurors found no negligence and returned a defense verdict. Jurors' questions can improve the quality of justice and compensate for errors made by the litigators in withholding data from experts or not asking key questions.

Key Terms: Jurors' Questions; Dram Shop; Burn-Off Rate

In the Dram Shop case described in Figures 2 and 3, Joseph Albert by his Guardian et al. v. Harold F. LeClair Co., D/B/A Gus and Paul's Tavern, the jurors were allowed to ask questions of the experts. One juror asked if the burn off rate could be calculated from two serial blood ethanol determinations drawn at the hospital approximately 5 hours apart. I went up to the "flip chart" and did the calculations suggested by the juror and it showed the burn off rate to be 0.021%/hr. I had used 0.02% in my calculations and the opposing expert had used 0.015%. Thus the answer to the juror's question provided support for the burn-off rate I used in my calculations and the jurors returned a verdict for the defendants, the party that had retained me. Moreover, this scenario was so compelling, that the judge complimented the jurors for asking a question the lawyers had not asked, and I wrote up the results and presented the case at the American Academy of Forensic Sciences (see Figure 3).

The information presented in the following pages will permit you to learn how to calculate the amount of ethanol in an alcoholic beverage, how to determine an appropriate time for the ethanol to be absorbed based on the amount of food in the stomach, and how to calculate an individual's BAC from the individual's height, weight, and amount of ethanol consumed over time. The ratio of height to weight provides information on lean body mass so the Widmark "r" factor (or distribution factor) can be selected. Included tables will provide guidance on the continuum of impairment that ensues after ingestion of ethanol, and how to determine the likelihood of visible intoxication at various BACs.

## II.  BASIC PHARMACOLOGY OF ETHANOL

Ethyl alcohol (ethanol, ETOH) or just alcohol has been described as the "perfect" drug. It is a small uncharged molecule, completely miscible (soluble) in water, the major constituent of all bodily fluids and tissues, and not subject to changes in molecular structure as a result of changes in the acidity (pH) of the stomach and intestinal fluids. Because ethanol is an uncharged molecule, it passes easily through the lipid membrane barriers of the body (e.g., from the stomach into the bloodstream or from the intestines into the bloodstream).

Approximately 25% of ingested ethanol is absorbed through the stomach wall, and the remainder is absorbed from the small intestines. Therefore, the faster ethanol leaves the stomach and enters the intestines, the more rapid the accumulation of ethanol in the blood. This is why the presence of food in the stomach decreases the rate of absorption of ethanol, because food delays "gastric emptying time." Medications that slow gastric emptying time also delay ethanol absorption, while medications that increase gastric emptying time increase the rate of absorption.

Because ethanol is not soluble in f[...]
of the body. For example, consider[...]
out of the refrigerator and set it o[...]
water, it floats on top of the water [...]
on the bottom. If you were to pour [...]
dressing, the ethanol would go to [...]
phase. The same analogy holds for [...]
goes to the parts of the body that [...]
gans, the muscles and the blood, p[...]
cumulate very little ethanol.

The movement of ethanol or any ot[...]
by the drug's pharmacokinetics. [...]
movement. Pharmacokinetics is di[...]
**sorption, distribution, metabolis**[...]
has been absorbed into the blood, i[...]
ject to metabolism and excretion. T[...]
occur contemporaneously and con[...]
sorbed, distributed, metabolized an[...]

A schematic model of the absorp[...]
intestinal tract is shown in Figure 4[...]
solve before they can be absorbed,[...]
sorbed.



DRUG ABSORPTI[...]

Figures 2 and 3, Joseph Albert by his
'o., D/B/A Gus and Paul's Tavern, the ju-
he experts. One juror asked if the burn off
.al blood ethanol determinations drawn at
.rt. I went up to the "flip chart" and did the
and it showed the burn off rate to
calculations and the opposing expert had
juror's question provided support for the
s and the jurors returned a verdict for the
me. Moreover, this scenario was so com-
ie jurors for asking a question the lawyers
lts and presented the case at the American
gure 3).

)wing pages will permit you to learn how
n alcoholic beverage, how to determine an
absorbed based on the amount of food in
ι individual's BAC from the individual's
l consumed over time. The ratio of height
ı body mass so the Widmark "r" factor (or
:luded tables will provide guidance on the
after ingestion of ethanol, and how to de-
cation at various BACs.

## )LOGY OF ETHANOL

:t alcohol has been described as the "per-
iolecule, completely miscible (soluble) in
dily fluids and tissues, and not subject to
:sult of changes in the acidity (pH) of the
.se ethanol is an uncharged molecule, it
>rane barriers of the body (e.g., from the
the intestines into the bloodstream).

iol is absorbed through the stomach wall,
the small intestines. Therefore, the faster
the intestines, the more rapid the accumu-
why the presence of food in the stomach
ianol, because food delays "gastric empty-
tric emptying time also delay ethanol ab-
ase gastric emptying time increase the rate

Because ethanol is not soluble in fat, it only goes into the water soluble portion
of the body. For example, consider a bottle of Italian dressing. When you take it
out of the refrigerator and set it on the table, because the oil is less dense than
water, it floats on top of the water phase, while the water and vinegar portion are
on the bottom. If you were to pour ethanol into this hypothetical bottle of Italian
dressing, the ethanol would go to the water phase with the vinegar, not the oil
phase. The same analogy holds for the human body. When ethanol is ingested, it
goes to the parts of the body that contain the most water. This includes the or-
gans, the muscles and the blood, primarily. Fat, bone, and connective tissue ac-
cumulate very little ethanol.

The movement of ethanol or any other drug into and out of the body is described
by the drug's pharmacokinetics. "Pharmaco" for drugs, and "kinetics" for
movement. Pharmacokinetics is divided into four contemporaneous phases: **ab-
sorption, distribution, metabolism and excretion.** As soon as some ethanol
has been absorbed into the blood, it is distributed throughout the body and sub-
ject to metabolism and excretion. The four phases of ethanol pharmaco-kinetics
occur contemporaneously and continuously until all the ethanol has been ab-
sorbed, distributed, metabolized and excreted from the body.

A schematic model of the absorption of drugs and ethanol from the gastro-
intestinal tract is shown in Figure 4. Note that pills have to disintegrate and dis-
solve before they can be absorbed, but ethanol is a liquid and gets rapidly ab-
sorbed.

### Figure 4



DRUG ABSORPTION AND DISPOSITION

## III.    ABSORPTION

The rate of absorption of ethanol and its subsequent appearance in the blood is dependent on the following factors:

1.   The rate of consumption: (chugging vs. sipping)

2.   The concentration or proof of ethanol in the beverage: (e.g., beer = ~4.2%-5.5%), wine = ~12%, and whiskey = Vodkas (40% or 50%), whiskeys (43%), schnapps (variable percentages, look at the bottle).

3.   The volume consumed, e.g., a 1.25-1.5 oz. shot vs. a 12 oz. beer vs. 4 oz. of wine.

4.   The presence or absence of carbonation, i.e., the ethanol from champagne or sparkling wine is absorbed more quickly than uncarbonated white wine, and the ethanol from scotch and soda would be absorbed more quickly than the ethanol from scotch and water.

5.   The presence or absence of food in this the stomach. The presence of food in the stomach delays the absorption of ethanol by increasing the amount of time it takes for the ethanol to move from the stomach to the small intestines, where ethanol is absorbed at its fastest rate. This phenomenon is known as gastric emptying time, and can also be influenced by drugs that affect gastrointestinal (GI) motility.

As a rule of thumb, an individual, drinking a 12 ounce beer on an empty stomach, over 15-20 minutes, will achieve a peak blood ethanol concentration approximately 30 minutes after starting the beer. With food in the stomach, the same person drinking the same 12 ounce beer with a full stomach over the same 15-20 minutes will achieve a peak blood ethanol concentration approximately 60-90 minutes after starting the beer, but the peak concentration will be much lower. This is because not only does food absorb some of the ethanol, food also slows down the gastrointestinal transit (movement) of the ethanol from the stomach to the small intestines.

## IV.    DISTRIBUTION

Once the ethanol has been absorbed from the stomach and/or the intestines into the blood, it is circulated or distributed to all water-containing portions of the body to which there is blood flow. When citizens are taken to the police station for breathalyzer testing, the CMR (501 CMR 2.55) require law enforcement to wait at least 15 minutes before initiating breathalyzer testing. This accomplishes

two things: 1) It minimizes the
alcohol present from the recent u
tobacco, medications, mouthwas
citizen may have used during th
the likelihood that the subject is
tinal tract, which is known to p
cause of the differences between

## V.    METABOLISM

Most ethanol metabolism occurs
genase. However, Alcohol Dehy
stomach and intestines which cau
absorption process. In addition t
body fat content, another reason
alcohol concentration (BAC) tha
because women have a lower am
ach and intestinal walls.

In the liver, ethanol is metaboliz
acetaldehyde, and acetaldehyde i
acetic acid, which re-enters the b
nary excretion.

The burn-off rate for ethanol in o
0.010% per hour to 0.025% per
Those individuals who are freque
rates than infrequent drinkers. I
0.025% per hour, due to the induc
P-450 enzyme 2E1 or CYP2E1 en
liver, but are a different class of en

## VI.    EXCRETION

The "burn-off rate" is a hybrid o
excretion. The burn-off rate has t
metabolism. An individual's burn-
not have anything to do with the i
major differences in the abilities o
Asian people and American India
Caucasians, so they may demonstra
impaired or intoxicated after consu

108

its subsequent appearance in the blood is

ıg vs. sipping)

anol in the beverage: (e.g., beer = ~4.2%-
key = Vodkas (40% or 50%), whiskeys
ages, look at the bottle).

5-1.5 oz. shot vs. a 12 oz. beer vs. 4 oz. of

ıation, i.e., the ethanol from champagne or
ıuickly than uncarbonated white wine, and
would be absorbed more quickly than the

in this the stomach. The presence of food
ion of ethanol by increasing the amount of
ıove from the stomach to the small intes-
. at its fastest rate. This phenomenon is
and can also be influenced by drugs that
y.

nking a 12 ounce beer on an empty stom-
ɔ a peak blood ethanol concentration ap-
the beer. With food in the stomach, the
ıce beer with a full stomach over the same
lood ethanol concentration approximately
but the peak concentration will be much
ood absorb some of the alcohol, food also
sit (movement) of the ethanol from the

rom the stomach and/or the intestines into
ed to all water-containing portions of the
hen citizens are taken to the police station
l CMR 2.55) require law enforcement to
ng breathalyzer testing. This accomplishes

two things: 1) It minimizes the likelihood that there will be any residual mouth alcohol present from the recent use of breath sprays, asthma inhalers, smokeless tobacco, medications, mouthwash, or any other alcohol-containing material the citizen may have used during the prior 15 minute interval, and 2) It minimizes the likelihood that the subject is still absorbing ethanol from his/her gastrointestinal tract, which is known to produce a falsely elevated breathalyzer test because of the differences between venous and arterial blood ethanol concentrations.

## V.    METABOLISM

Most ethanol metabolism occurs in the liver, by the enzyme Alcohol Dehydrogenase. However, Alcohol Dehydrogenase is also present in the walls of the stomach and intestines which causes some ethanol to be metabolized during the absorption process. In addition to their lower average body weights and higher body fat content, another reason why women tend to achieve a higher blood alcohol concentration (BAC) than men from comparable amounts of ethanol is because women have a lower amount of Alcohol Dehydrogenase in their stomach and intestinal walls.

In the liver, ethanol is metabolized by the enzyme Alcohol Dehydrogenase to acetaldehyde, and acetaldehyde is metabolized by Aldehyde Dehydrogenase to acetic acid, which re-enters the blood and is distributed to the kidneys for urinary excretion.

The burn-off rate for ethanol in occasional drinkers ranges from approximately 0.010% per hour to 0.025% per hour, with an average of 0.017% per hour. Those individuals who are frequent drinkers have higher burn-off (metabolic) rates than infrequent drinkers. Frequent drinkers average closer to 0.02%-0.025% per hour, due to the induction of another enzyme called the Cytochrome P-450 enzyme 2E1 or CYP2E1 enzyme. The CYP enzymes also are found in the liver, but are a different class of enzymes than Alcohol Dehydrogenase.

## VI.    EXCRETION

The "burn-off rate" is a hybrid constant encompassing both metabolism and excretion. The burn-off rate has the same numeric ranges shown above under metabolism. An individual's burn-off rate is based on his/her genetics, and does not have anything to do with the individual's body weight or height. There are major differences in the abilities of various individuals to metabolize ethanol. Asian people and American Indians typically have slower burn off rates than Caucasians, so they may demonstrate a reduced tolerance to ethanol and become impaired or intoxicated after consuming relatively small amounts of ethanol.

A small fraction of ethanol is also excreted in tears, sweat, breast milk, and expired air. For the breath, the ratio of the amount of ethanol in 1ml of blood to that in expired air is often cited as 1:2100. This is based on Henry's Law, which states that at 34°C, the amount of ethanol contained in 1ml of blood will be equal to the amount of ethanol contained in 2100 ml of deep lung air. This deep lung air is also called alveolar air, and is the air in the deep portions of the lung that are in equilibrium with the blood, which is on the other side of the capillary membrane that lines the deep alveoli in the lungs.

## VII.  GENERAL OVERVIEW OF ETHANOL PHARMACOKINETICS

As a person begins to drink ethanol, the blood levels begin to rise rapidly because the rate of absorption is greater than the rate of excretion (see Figure 5). When 50% of the ethanol has been absorbed from the GI tract, the absorption phase ends as ethanol blood levels reach a maximum concentration. This maximum concentration is depicted graphically as either a peak or plateau (see Figure 5). As metabolism continues, the rate of metabolism exceeds the rate of absorption, and the blood alcohol concentration begins to decline.

### Figure 5

### Graph of BAC vs. Time



Figure 5 depicts the pharmacokinetics of several drinks with the BAC shown on the vertical axis and time on the horizontal axis. Following the peak BAC, the BAC enters the post-absorptive or elimination phase when the rate of excretion

is greater than the rate of abs
change in BAC (∃), divided by
line with a slope that decrease
slope of this curve now repre
remains fairly constant for any
drinking habits change. At BAC
rate may change due to concer
tion, burn-off rates vary signif
subject variability).

## VIII.  CALCULATIN
IN A BEVERAG

Let

A 12 oz. can of Budweiser Li
Twelve oz. of beer x 0.042% =
can or glass.

On

Scotch or rye whiskey is 86 proc
either "neat" or mixed, contains
ethanol. A 1.5 oz. shot of 80 p
0.40=0.60 fluid ounces of pure et

Or

Wine usually contains 12% ethan
contains 4 fluid ounces. So, 4 oz
glass of wine. Port and other f
higher ethanol concentrations whi
tles.

As you can see, a 12 oz. can of be
whiskey all contain approximately

### Calculating an Individual's
and the Amount of Ethanol

In order to calculate an individual'
sumed, one can use the Widmark
the Forensic Toxicology communit

110

reted in tears, sweat, breast milk, and ex-
he amount of ethanol in 1ml of blood to
.00. This is based on Henry's Law, which
1anol contained in 1ml of blood will be
ed in 2100 ml of deep lung air. This deep
is the air in the deep portions of the lung
which is on the other side of the capillary
the lungs.

## EW OF ETHANOL
## ICS

he blood levels begin to rise rapidly be-
than the rate of excretion (see Figure 5).
sorbed from the GI tract, the absorption
h as either a peak or plateau (see Fig-
ate of metabolism exceeds the rate of ab-
ration begins to decline.

## ure 5

## of BAC vs. Time



orption = Excretion

BAC or Plateau

Excretion > Absorption

12 midnight      2 AM

of several drinks with the BAC shown on
ontal axis. Following the peak BAC, the
ination phase when the rate of excretion

is greater than the rate of absorption. At this time, the slope of the
change in BAC ($\exists$), divided by the change in time) is represented by a straight
line with a slope that decreases from a upper left to lower right. The numeric
slope of this curve now represents the elimination or burn-off rate. This rate
remains fairly constant for any one person (little intra-subject variability) unless
drinking habits change. At BACs below 0.01% or above 0.30%, the elimination
rate may change due to concentration effects. However, in the general popula-
tion, burn-off rates vary significantly among different individuals (great inter-
subject variability).

## VIII.  CALCULATING THE AMOUNT OF ETHANOL IN A BEVERAGE

Let's start with a beer.

A 12 oz. can of Budweiser Light contains 4.2% ethanol volume to volume.
Twelve oz. of beer x 0.042% = 0.50 fluid ounces of pure ethanol in the 12 oz.
can or glass.

One Shot of whiskey:

Scotch or rye whiskey is 86 proof or 43% ethanol. A 1.25 oz. shot of whiskey,
either "neat" or mixed, contains a total of 1.25 x 0.43=0.54 fluid ounces of pure
ethanol. A 1.5 oz. shot of 80 proof whiskey (40%) contains a total of 1.5 x
0.40=0.60 fluid ounces of pure ethanol.

One glass of wine:

Wine usually contains 12% ethanol volume to volume. A glass of wine usually
contains 4 fluid ounces. So, 4 oz. x .12=0.48 fluid ounces of ethanol in a 4 oz.
glass of wine. Port and other fortified wines and "specialty drinks" contain
higher ethanol concentrations which usually are printed on the labels of the bot-
tles.

As you can see, a 12 oz. can of beer, a 4 oz. glass of wine, and a 1.25 oz. shot of
whiskey all contain approximately the same amount of ethanol, one half ounce.

## Calculating an Individual's BAC from his/her Height, Weight and the Amount of Ethanol Consumed

In order to calculate an individual's BAC from the amount of ethanol they con-
sumed, one can use the Widmark Formula, the Generally Accepted method in
the Forensic Toxicology community.

### The Widmark Formula

$$BAC = \frac{(SpGr\ Blood)\ (grams\ of\ ETOH)\ (SpGr\ ETOH)}{(Body\ Weight\ in\ kg.)\ (Widmark\ r)} - \begin{array}{c} Total\ Widmark\ \exists \\ (amt.\ of\ ETOH\ burnt\ off) \end{array}$$

**Problem:** A 170 lb. man consumes a 12 oz. Budweiser Light on an empty stomach in 15 minutes,. What is his BAC 30 minutes later?

Constants: The SpGr (specific gravity) of Blood = ~1.06; the SpGr of ethanol = 0.79; A fluid ounce of water contains approximately 30 ml and weighs 30 grams. One kg.=2.2 lbs. Widmark r = 0.68 for men and 0.55 for women (who are not overweight).

Substituting into the Widmark equation:

$$BAC= \frac{(1.06)\ (0.5\ oz\ of\ ETOH\ in\ a\ beer\ x\ 30)\ (0.79)}{(170\ lbs./2.2=77.3\ kg)\ (Widmark\ r\ for\ non\text{-}fat\ males=0.68)\ x\ 0.5\ hr} - 0.02\%\ per\ hr$$

(170 lbs./2.2 = 77.3 kg) (Widmark r for non-fat males=0.68)

$$BAC = \frac{(1.06)\ (15\ grams)\ (0.79)}{(77.3\ kg)\ (0.68)} - 0.01$$

$$BAC = \frac{12.561}{52.564}\ \frac{grams}{kg} - 0.01 = \frac{0.24\ grams}{kg} - 0.01$$

But, percent (%) has the units grams/100ml, and a kg of water contains 1,000 ml, so we divide top and bottom by 10 by moving the decimal place one place to the left. So, 0.024 grams/100 ml less what was burnt-off in 30 minutes (0.01) and the BAC becomes 0.024 – 0.010 = 0.014%.

This formula is very useful for answering hypothetical questions regarding an individual's BAC following the ingestion of a certain number of alcoholic drinks. All the toxicologist has to do is develop a chronology from the depositions, bar receipts, and testimony of the fact witnesses as to how many of what type of drinks were ingested by the individual in question, calculate the amount of ethanol in each drink, select an absorption rate based on how much food the subject had consumed, determine the subject's height and weight so that the appropriate Widmark distribution factor (r) can be selected (average for men is 0.68, and the average for a woman is 0.55 because women have a higher percent of fat in their bodies), and then select an appropriate burn-off rate (∃), based on the individual's drinking habits (for light drinkers use the Widmark average of 0.017, for frequent drinkers use a faster burn-off rate of at least 0.02).

### General Rule of Thumb

A good general rule of thumb for each drink will produce a BAC of is approximately also 0.02% per as 20 mg/dl/hr. That is where the an hour without getting more i empty stomach, each drink will p and the burn-off rate will still be a

### Problem

A 170 lb. man goes into a bar and estimated to be when he leaves th BAC of 0.02%. That means that would have been 0.12%. But he b x 0.02 = 0.08, so his BAC when h 0.04% (0.12 – 0.08).

## IX.    BACK EXTRAPO
##         EXTRAPOLATIO

When ethanol is ingested, initially gets into the blood, distribution, absorption is greater than excretion rising. When absorption is equal when excretion is greater than abs descends at a rate equal to the in can only be carried out when the g cause only at that time is the relati straight line). Moreover, the contr SJC-08268 (2001) also recognizes every burn-off rate selected so the applied that reflect the variability i *Daubert* criterion of "potential err effect (and a lower limit as well). hour has been used, the variability burn-off rate would be 0.015% and Using an upper and lower limit may and best case scenarios.

nark Formula

pGr ETOH) -   Total Widmark ∃

nark r)    (amt. of ETOH burnt off)

12 oz. Budweiser Light on an empty stom-
0 minutes later?

) of Blood = ~1.06; the SpGr of ethanol =
ns approximately 30 ml and weighs 30
: 0.68 for men and 0.55 for women (who

ገ:

eer x 30) (0.79)        -   0.02% per hr
ark r for non-fat males=0.68) x 0.5 hr

r non-fat males=0.68)

01

ums - 0.01

100ml, and a kg of water contains 1,000
by moving the decimal place one place to
what was burnt-off in 30 minutes (0.01)
0.014%.

ering hypothetical questions regarding an
stion of a certain number of alcoholic
s develop a chronology from the deposi-
e fact witnesses as to how many of what
lividual in question, calculate the amount
orption rate based on how much food the
subject's height and weight so that the
r (r) can be selected (average for men is
.55 because women have a higher percent
an appropriate burn-off rate (∃), based on
ght drinkers use the Widmark average of
· burn-off rate of at least 0.02).

## General Rule of Thumb

A good general rule of thumb for men 150-200 lbs is that on an empty stomach, each drink will produce a BAC of no more than 0.02% and that the burn-off rate is approximately also 0.02% per hour. Scientists also describe the burn-off rate as 20 mg/dl/hr. That is where the old adage about being able to drink one drink an hour without getting more intoxicated. For a woman 110-130 lbs, on an empty stomach, each drink will produce a BAC of no more than 0.025-0.03% and the burn-off rate will still be approximately 0.02% per hour (or a little less).

## Problem

A 170 lb. man goes into a bar and consumes 6 beers in 4 hours. What is his BAC estimated to be when he leaves the bar? He consumed 6 beers, each producing a BAC of 0.02%. That means that if no metabolism took place at all, his BAC would have been 0.12%. But he burnt off approximately 4 beers in 4 hours, or 4 x 0.02 = 0.08, so his BAC when he left the bar would have been approximately 0.04% (0.12 – 0.08).

## IX.   BACK EXTRAPOLATION OR RETROGRADE EXTRAPOLATION

When ethanol is ingested, initially only absorption occurs. Once some ethanol gets into the blood, distribution, metabolism and excretion also occur. When absorption is greater than excretion, the line on the BAC vs. Time graph will be rising. When absorption is equal to excretion, a plateau or peak occurs. And when excretion is greater than absorption, the line on the BAC vs. Time graph descends at a rate equal to the individual's burn-off rate. Back extrapolations can only be carried out when the graph is descending (see Figure 5). This is because only at that time is the relationship between BAC and time linear (i.e., a straight line). Moreover, the controlling case in Massachusetts, Com v. Senior SJC-08268 (2001) also recognizes that there is some variability associated with every burn-off rate selected so the case law asks that upper and lower limits be applied that reflect the variability in the calculations. This is consistent with the *Daubert* criterion of "potential error rate" and *Lanigan's* reference to a ceiling effect (and a lower limit as well). For example, if a burn-off rate of 0.02% per hour has been used, the variability is approximately +/- 0.005, so the lowest burn-off rate would be 0.015% and the highest burn off rate would be 0.025%. Using an upper and lower limit may be considered indications of the worst-case and best case scenarios.

*Example:*

A man orders his last drink at 11:15 pm and leaves a bar at midnight. He gets into an automobile accident at 1 am. At the hospital, his blood is drawn at 2 am and his BAC is determined to be 0.12%. What were his BACs at 1 am, at midnight, and at 11:15 pm when he ordered his last drink?

Hint: See the post-absorptive part of Figure 5.

**Using The Mean Value:**

Assume a mean burn-off rate of 0.02%/hr. Then if the BAC were 0.12% at 2 am, at 1 am it would have been 0.14% and at midnight it would have been 0.16%.

**Best Case Scenario** (i.e., the lowest possible BAC):

Assume a slow burnoff rate of 0.015/hr. Then if the BAC were 0.12% at 2 am, it would have been 0.015% higher or 0.135% at 1 am and it would have been 0.03% higher or 0.15% at midnight.

**Worst Case Scenario** (i.e., the highest possible BAC):

Assume a fast burnoff rate of 0.025/hr. Then if the BAC were 0.12% at 2 am, at 1 am it would have been 0.145% and at midnight it would have been 0.170%.

But what about at 11:15 pm when he ordered his last drink? It cannot be calculated using back-extrapolation because the BAC would have been rising between 11:15 pm and 11:45 pm. Therefore a value at 12 midnight, or possibly 11:45 pm, is as close to 11:15 pm as science will allow you to calculate using back-extrapolation.

## X.  ACTUAL VALUE FOR THE BURNOFF RATE

The only way to determine an individual's actual burn-off rate is to calculate it experimentally from two blood samples obtained at least 60 minutes apart (preferably longer). In the post-absorptive phase, the drop in BAC in one hour is equal to the burn off rate.

As I explained in the Albert v. Gus and Paul's case in Figure 3, pursuant to the juror's question, the judge provided the following data: at 1:30 am, the BAC was 0.406% and at 6:30 am, the BAC was 0.301%. The burn-off rate can be calculated by calculating the change in BAC and dividing that number by the amount of time that transpired. The change in BAC was: $0.406 - 0.301 = 0.105$, and the time interval was 5 hours. 0.105 divided by 5 yielded a burn-off rate of 0.021% per hour.

## XI.  CONVERTING B
    PLASMA LEVEL
    ETHANOL CON

In the hospital, a blood sample fre
separate the red blood cells from
difference between serum and pla
terminations. In the absence of r
conduct. When results are repo
plasma), due to the differences in
and the effect of the red blood c
ethanol result by approximately
level. This can be accomplished b
For example, a serum ethanol of 0
suant to statute, you can then tru
501 CMR 2.56 (2) citing M.G.L.c.

The Office of Alcohol Testing (C
this chart uses ranges of serum et
obtain a more valid result by doi
pert to do so.

## XII.  CONVERTING M
    TO PERCENT

Some hospital laboratories report
which is the same thing since there
of a liter. To convert a BAC repor
mal point 3 places to the left. For
and 80 MG/DL is the same as 0.08
serum ethanol results in MG/L, us
Since there are 1,000 ml in a liter,
ml), and moving the decimal plac
Sometimes, a hospital will report
1,000 mg to a gram, 1/10 of a gram

## XIII.  CORRELATING

When we are sober, we operate "wi
conscience and inhibitions to stop u
we begin to feel the effects of etha
self-control is diminished and we
talking, spilling drinks, boisterous

ı and leaves a bar at midnight. He gets
the hospital, his blood is drawn at 2 am
. What were his BACs at 1 am, at mid-
his last drink?

ıre 5.

ır. Then if the BAC were 0.12% at 2 am,
. midnight it would have been 0.16%.

sible BAC):

Then if the BAC were 0.12% at 2 am, it
135% at 1 am and it would have been

ɔossible BAC):

Then if the BAC were 0.12% at 2 am, at
midnight it would have been 0.170%.

ırdered his last drink? It cannot be calcu-
: the BAC would have been rising be-
'ore a value at 12 midnight, or possibly
cience will allow you to calculate using

ıR THE BURNOFF RATE

ıal's actual burn-off rate is to calculate it
: obtained at least 60 minutes apart (pref-
phase, the drop in BAC in one hour is

1 Paul's case in Figure 3, pursuant to the
ıe following data: at 1:30 am, the BAC
: was 0.301%. The burn-off rate can be
ı BAC and dividing that number by the
ınge in BAC was: 0.406 − 0.301 = 0.105,
ı5 divided by 5 yielded a burn-off rate of

# XI.    CONVERTING BLOOD SERUM OR BLOOD PLASMA LEVELS TO WHOLE BLOOD ETHANOL CONCENTRATIONS

In the hospital, a blood sample frequently will be "spun down" in a centrifuge to separate the red blood cells from the clear fluid called serum or plasma. The difference between serum and plasma is not material with respect to BAC determinations. In the absence of red blood cells, the test for ethanol is easier to conduct. When results are reported as serum ethanol (more common than plasma), due to the differences in water content between serum and whole blood and the effect of the red blood cells themselves, one has to lower the serum ethanol result by approximately 15% to convert that result to a whole blood level. This can be accomplished by multiplying the serum ethanol result by 0.85. For example, a serum ethanol of 0.100% is equivalent to a BAC of 0.085%. Pursuant to statute, you can then truncate the last number and call it a 0.08% (see 501 CMR 2.56 (2) citing M.G.L.c. 90 Section 24.

The Office of Alcohol Testing (OAT) publishes a serum conversion chart, but this chart uses ranges of serum ethanol, not single numbers. Therefore, you can obtain a more valid result by doing the conversion yourself or asking your expert to do so.

# XII.    CONVERTING MG/DL (AND OTHER UNITS) TO PERCENT

Some hospital laboratories report their BAC results in MG/DL or mg/100 ml, which is the same thing since there are 100 ml to a deciliter (DL), which is 1/10 of a liter. To convert a BAC reported in MG/DL to percent, just move the decimal point 3 places to the left. For example, 100 MG/DL is the same as 0.100% and 80 MG/DL is the same as 0.08%. Mass. General Hospital usually reports its serum ethanol results in MG/L, using a three figure value such as 800 MG/L. Since there are 1,000 ml in a liter, 800 MG/L is the same as 80 MG/DL (or 100 ml), and moving the decimal place 4 places to the left gives a value of 0.08%. Sometimes, a hospital will report a BAC as 0.100 g/100 ml. Since there are 1,000 mg to a gram, 1/10 of a gram is 100 mg, so 0.1 g = 100 mg.

# XIII.    CORRELATING BAC WITH IMPAIRMENT

When we are sober, we operate "with the brakes on." That is to say, we have our conscience and inhibitions to stop us from doing impulsive or illegal acts. When we begin to feel the effects of ethanol, we lose some of our inhibitions and our self-control is diminished and we begin to act "without the brakes on." Loud talking, spilling drinks, boisterous actions, bumping into other people all occur

because we are in less control of ourselves and our judgment and coordination are impaired.

It is important to recognize that the effects of ethanol are manifested in a graded manner, like a "dimmer switch" rather than an on/off switch. The first area of the body affected by ethanol is the brain's intellectual or cognitive functions. Therefore you "feel impaired" before you "appear impaired." In non-tolerant individuals, generally this will occur at BACs between 0.05%-0.10%. Impairment then begins to affect fine motor coordination. For example, at BACs consistent with impairment, ethanol affects the ability to put a key in the ignition before it causes you to stagger or fall. At higher BACs (0.10%-0.20%), speaking becomes slurred because you can't coordinate the muscles of the tongue and mouth. As impairment increases, the larger muscles of the arms and legs are affected and incoordination, staggering, impaired balance, and falling or tripping may occur. Finally, a severely intoxicated individual (BAC 0.20%-0.30%) will lack the strength to stand, will remain motionless, and perhaps fall asleep. When BACs exceed 0.30%, speaking, walking, talking, standing and moving become laborious. Should the BAC approach 0.40% most individuals are in danger of passing out, and when the BAC exceeds 0.45%, there is a real risk of death from the depression of respiration and circulatory collapse. These descriptions are a general guideline only and certainly do not describe everyone's response to alcohol all of the time.

However, tolerance to the effects of ethanol and the ability to develop "coping skills" to mask the signs of impairment do develop in frequent high dose imbibers of ethanol. People have been found to have BACs of 1.0% or higher (see Lancet Dec. 18, 1982 p.1394) which is classically described as fatal. Thus the onset and appearance of intoxication are quite variable among individuals and are dependent not only on the rate and amount of alcohol consumed, but also on tolerance, learned coping behaviors, the setting in which it is used, and the expectations of the person. The same amount of ethanol causes a person to laugh hysterically at a wedding, and cry mournfully at a funeral.

Demonstrating impairment is important in obtaining a conviction in a criminal OUI case, but the standard in a Dram Shop case and other types of civil liquor liability is "signs of visible intoxication." Impairment may not be visible to an external observer, but intoxication may be. According to Webster's Dictionary, intoxication involves a person who is stupefied to the point where physical and mental control are markedly diminished. Therefore, people get into fights, drive in the wrong direction on the highway, misjudge their speed or ability to negotiate a curve, and manifest difficulties with vision, hearing, speaking and performing several tasks at the same time (e.g., divided attention tasks). That is why law enforcement uses Standardized Field Sobriety Tests (sFST) which require you to do several things at one time (e.g., divided attention) to assess impairment.

## XIV. SUMMARY

There is no substitute for the com[...] perienced attorney working toget[...] to one another. Many charlatans t[...] toxicology or drug pharmacology [...] the calculations described earlier i[...] leagues in the medical field, me[...] pharmacology or toxicology are a[...] in ethanol, but when their feet a[...] MDs frequently cannot do the mat[...] blood level.

When you retain an expert in eth[...] liquor liability work (like those on[...] her. If you find a potential expert [...] ences of attorneys with whom he c[...] he/she can convert serum levels t[...] individual's BAC from the data in [...] with the standard of care in the f[...] blood, serum, and urine ethanol sa[...] ence between a "screening" test a[...] expert if they are familiar with the[...] pert cannot answer in the affirmati[...] on thin ice, and your client's chanc[...]

of ourselves and our judgment and coordination

.t the effects of ethanol are manifested in a graded
h" rather than an on/off switch. The first area of
is the brain's intellectual or cognitive functions.
" before you "appear impaired." In non-tolerant
l occur at BACs between 0.05%-0.10%. Impair-
: motor coordination. For example, at BACs con-
ιοl affects the ability to put a key in the ignition
or fall. At higher BACs (0.10%-0.20%), speaking
can't coordinate the muscles of the tongue and
ses, the larger muscles of the arms and legs are
aggering, impaired balance, and falling or tripping
' intoxicated individual (BAC 0.20%-0.30%) will
remain motionless, and perhaps fall asleep. When
g, walking, talking, standing and moving become
oproach 0.40% most individuals are in danger of
C exceeds 0.45%, there is a real risk of death from
and circulatory collapse. These descriptions are a
rtainly do not describe everyone's response to al-

ects of ethanol and the ability to develop "coping
ιpairment do develop in frequent high dose imbib-
een found to have BACs of 1.0% or higher (see
) which is classically described as fatal. Thus the
ιication are quite variable among individuals and
rate and amount of alcohol consumed, but also on
ιviors, the setting in which it is used, and the ex-
same amount of ethanol causes a person to laugh
cry mournfully at a funeral.

important in obtaining a conviction in a criminal
a Dram Shop case and other types of civil liquor
ιtoxication." Impairment may not be visible to an
ation may be. According to Webster's Dictionary,
ι who is stupefied to the point where physical and
liminished. Therefore, people get into fights, drive
highway, misjudge their speed or ability to negoti-
culties with vision, hearing, speaking and perform-
ime (e.g., divided attention tasks). That is why law
d Field Sobriety Tests (sFST) which require you to
e.g., divided attention) to assess impairment.

## XIV.  SUMMARY

There is no substitute for the combination of a well-qualified expert a
perienced attorney working together to present the facts of the case to
to one another. Many charlatans try to pass themselves off as experts i
toxicology or drug pharmacology, when in fact, they are unable to do
the calculations described earlier in this chapter. With all due respect to
leagues in the medical field, medical doctors without specialized tra
pharmacology or toxicology are among those who may tell you they are
in ethanol, but when their feet are held to the fire during cross-exam
MDs frequently cannot do the math or convert a serum ethanol level to
blood level.

When you retain an expert in ethanol, call another attorney who does
liquor liability work (like those on today's panel) and get a referral from
her. If you find a potential expert on your own, ask the expert to provid
ences of attorneys with whom he or she has worked in the past. Ask the e
he/she can convert serum levels to whole blood levels, if they can calcu
individual's BAC from the data in the Widmark formula, and if they are f
with the standard of care in the forensic toxicology community for ana
blood, serum, and urine ethanol samples, and if they are familiar with the
ence between a "screening" test and a "confirmatory" test. Ask your po
expert if they are familiar with the limitations of back-extrapolation. If yo
pert cannot answer in the affirmative and the opposing expert can, then yo
on thin ice, and your client's chance of prevailing will be greatly diminishe



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NANCY ROSARIO, INDIVIDUALLY, AS      )
SHE IS THE ADMINISTRATRIX OF THE     )
ESTATE OF AWILDA SANTIAGO, ESSEX     )
PROBATE COURT DOCKET #03P-2499AD1,   )
P/P/A VERONICA ROSARIO AND           )
CHRISTINA SANTIAGO, AND AS           )
SHE IS THE ADMINISTRATRIX OF THE     )
ESTATE OF JOSE SANTIAGO, BERLIN      )          Civil Action #05-CV-10617MLW
(CONNECTICUT)                        )
PROBATE COURT, CASE #03-0713         )
    Plaintiff                    )
                                     )
v.                                   )
                                     )
RARE HOSPITALITY INTERNATIONAL, INC. )
d/b/a LONGHORN STEAKHOUSE            )
    Defendant                    )

## SUPPLEMENT TO DAVID BENJAMIN, PH.D.'S REPORT

This Supplement contains additional opinions to be expressed by me at trial, the data and

information considered by me in forming those opinions, and exhibits to be used by me at trial.

### A. Calculations and Opinions based on a 4.5 Ounce Jack Daniels Manhattan

On page 6 of my Rule 26 report, previously filed, I wrote about the Longhorn Bar Recipes

formula for a Jack Daniels Manhattan straight up, which required a drink containing 2.25 ounces

of alcohol be served in a 6 ounce glass, and stated:

> "however there seems to be a discrepancy between this recipe and the actual size
> of the drink when served since the Jack Daniels Manhattan was served in a 6 oz.
> glass and the above recipe only accounts for 2.25 oz, which means the above
> calculations may significantly underestimate the ethanol content of the Jack
> Daniels Manhattan by 2 – 3 fold. Accordingly, my Widmark calculations may
> significantly underestimate Mr. Southworth's BAC at the time he was served his
> last drink at 9:35 p.m."

I am expanding on that statement, and have been asked to assume, based on the deposition testimony of Christen O'Donnell, the bartender that made the drinks, that the 6 ounce glass in which the Manhattans were served that evening were filled to ¼ inch below the lip. A copy of the relevant portions of her deposition is attached as Exhibit A. Attached hereto as Exhibit B is a Widmark calculation performed by me utilizing all of the same assumptions set forth in the Rule 26 report on pages 5 and 6, except the amount of amounts of bourbon and sweet vermouth in each Jack Daniels Manhattan. Exhibit B assumes the glass was filled to ¼ inch below the lip, contained one maraschino cherry and 4.0 oz. of Jack Daniels (80 proof) and .50 oz. of sweet vermouth (32 proof), and thus that each Jack Daniels Manhattan contained 1.68 ounces of ethanol. Based on that assumption, and using all of the other assumptions in the Rule 26 report, and the observations of Southworth made by Jude Connelly, as described in the Rule 26 report and also herein below, I am of the opinion, to a reasonable degree of scientific certainty that Southworth's BAC at 9:25 p.m. was 0.16% and at 9:35 p.m. was ~0.19%, and that he was, at those times, exhibiting visible outward signs of intoxication.

**B.    Affidavit of May 4, 2005**

I also made an affidavit dated May 4, 2005, already filed in this case, pursuant to the provisions of M.G.L. c. 231, §60J. A copy is attached hereto as Exhibit C, and incorporated by reference herein. I set forth in the affidavit my professional qualifications, my review of materials in this case, the relevant events of September 26-27, 2003, the methods I used to arrive at certain opinions, and the opinions themselves. As described in the affidavit, I reached certain opinions, expressed in the affidavit, concerning Mr. Southworth's blood alcohol content at various times on September 26 and 27, 2003, and whether or not he was exhibiting various

outward signs of intoxication at different times that evening. This affidavit, incorporated as part of my rule 26 report by this supplement, contains opinions to be expressed by me at trial, the data and information considered by me and exhibits to be used by me at trial.

### C. Reliance on Opinions of Jude Connolly

I want to expand on my reliance upon the observations of Jude Connelly testified to in his State Court deposition and which are also the subject of his affidavit of May 6, 2005.

In his deposition, Jude Connelly testified to four different observations he made of Southworth which Connolly characterized in his affidavit as "all the signs of intoxication (he) testified about on pages 49-51 of his deposition." I described those signs in paragraph 21 of my Affidavit,

> While at the Longhorn Steakhouse, Southworth appeared to be under the influence of the alcoholic beverages he was drinking. According to Connelly, Southworth "didn't hold himself the way he usually did", "was sloppier looking than usual", "louder than usual" and his "eyes were glassy" (Connelly deposition pp. 49-50).

I have relied upon each of those observations in forming my opinion that Jeffrey Southworth was exhibiting visible signs of intoxication when served his last drink at the Longhorn Steakhouse on September 26, 2003. Each observation described by Jude Connelly is a sign of intoxication well known in my field. As I wrote in paragraph 15 of the opinion section of my affidavit, my opinion, then, and now, and the one I will express at trial, that Southworth was exhibiting visible signs of intoxication was "buttressed by Mr. Connelly's observations". I went on in that paragraph to state, as I am prepared to state and expand upon at trial:

> "Once again, Connelly's observations were that Southworth didn't hold himself the same way he usually did, was sloppier than usual, was not standing straight, was louder than usual, and that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy. Not standing straight is caused by the central nervous

system (CNS) depressant effects of ethanol which causes sensory-motor incoordination, which is manifested as weakness, lethargy, and muscle relaxation and, in individuals consuming large quantities of ethanol, are visible signs of alcohol intoxication. Loudness or boisterous behavior is caused by ethanol's ability to decreases inhibitions and diminish an individual's judgment and self-control."

David M. Benjamin, Ph. D.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NANCY ROSARIO, INDIVIDUALLY, AS<br>SHE IS THE ADMINISTRATRIX OF THE<br>ESTATE OF AWILDA SANTIAGO, ESSEX<br>PROBATE COURT DOCKET #03P-2499AD1,<br>P/P/A VERONICA ROSARIO AND<br>CHRISTINA SANTIAGO, AND AS<br>SHE IS THE ADMINISTRATRIX OF THE<br>ESTATE OF JOSE SANTIAGO, BERLIN<br>(CONNECTICUT)<br>PROBATE COURT, CASE #03-0713<br>  Plaintiff<br><br>v.<br><br>RARE HOSPITALITY INTERNATIONAL, INC.<br>d/b/a LONGHORN STEAKHOUSE<br>  Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action #05-CV-10617MLW |

## AFFIDAVIT OF DAVID M . BENJAMIN, PH.D.

David M. Benjamin hereby makes the following affidavit under the pains and penalties of

perjury:

1.  The opinions expressed in this affidavit are based on my education, training and

experience and review of the documents enumerated below, and are held by me to a reasonable

degree of scientific certainty.

### My Background and Qualifications

2.  I have a B.A. in Biological Sciences from Boston University and a M.S. and Ph.D.

in Pharmacology from the University of Vermont College of Medicine.  I am a clinical

pharmacologist and toxicologist with over twenty-five years experience designing and analyzing

research studies involving the effects of drugs on people.  I have contributed to the preparation of

numerous Investigational New Drug Files and New Drug Applications which have been approved by the Food and Drug Administration.   A brief resume of my background and qualifications together with a list of my publications relating to alcohol is attached as Exhibit A.

3.       I have held numerous teaching positions in my career.  I am currently Adjunct Assistant Professor in the Dept. of Pharmacology & Experimental Therapeutics at Tufts Medical School, at which I have taught Legal Medicine & Risk Management since 1994, and have been a Faculty Member of the Harvard Medical School Risk Management Program, at which I have taught Legal Medicine & Reducing Medication Errors since 1999.  I have also taught courses at the Harvard School of Public Health, George Washington University Law School, Stetson University College of Law and Fordham Law School, and programs for the FBI and the United States Secret Service.  The program for the FBI laboratory personnel included information on the pharmacokinetics of ethanol and the mechanism of breathalyzer testing.

4.       I have conducted numerous seminars concerning drunk driving and urine and blood drug and alcohol analysis, including the ABA/NHTSA Seminar for Judges: Breathalyzer and Blood Alcohol, Field Sobriety Testing, Urine Drug Screening and Drug Recognition Testing (April 30, 1999); Traffic Adjudication Seminar for Florida Judges: Understanding Breathalyzer Testing & Alcohol Toxicology (1999 to 2004); Massachusetts Academy of Trial Attorneys; Operating Under the Influence Seminar (October 1994); and Massachusetts Continuing Legal Education; OUI (February 13, 1996), Liquor Liability (May 21, 1996 and July 27, 1998); and Understanding the Analysis of Blood and Urine Samples for Drug Abuse (1994/95).  I have also taught at Suffolk Law School (Feb. 2004) about the new breathalyzer machine, the Alcotest 7110, currently used in Massachusetts since 2003, and in April 2005 conducted my 7th judicial

seminar on ethanol, breathalyzer testing, urine and blood drug testing for Kentucky District Court Judges.

5.       I am a member of numerous associations, and have been elected as a Fellow of the American College of Clinical Pharmacology, where I have served on the Board of Regents (200-2005), Fellow of the American College of Legal Medicine, Fellow, the American Academy of Forensic Sciences (Toxicology Section) (AAFS) and Fellow, the American Society of Healthcare Risk Management.  I am also a member of the American Academy of Clinical Toxicology.  I am a member the AAFS/Society of Toxicology joint committee on Drugs & Driving.  I have also published numerous articles, including a book chapter entitled "Forensic Pharmacology" in Forensic Science Handbook Volume III.

6.       In the course of my professional career, I have testified regarding the absorption, distribution, metabolism and excretion of ethanol, and of the effects of alcohol on individuals.  I have performed back extrapolations of blood alcohol concentration ("BAC") results.  I have testified as an alcohol expert in various courts of law, and have never failed to qualify as an expert in ethanol pharmacology and toxicology in any court in any state.  I have been qualified to perform calculations associated with back extrapolations in Massachusetts courts, and the results of my calculations have been admitted as evidence of particular BACs.  I have also testified in Federal District Court here in Boston regarding the breathalyzer and ethanol blood levels.  I have also published a paper on the conversion of urine ethanol levels to blood levels in the Peer Reviewed Medical Review Officers newsletter.

7.       My qualifications regarding determination of BAC by chemical analysis, calculations relating to BAC, back-extrapolation of BAC test results, and the effects of alcohol,

include, among others, a thorough review of the technical literature regarding the effects of alcohol on individuals, methods for the determination of BAC by analysis of body fluids, and methods of calculating BAC, including the principles of alcohol absorption, distribution, metabolism and elimination, and techniques employing the Widmark equation, the generally accepted formula for determining BAC from the amount of ethanol ingested, body weight, height, and burn-off rate as described in a number of my publications and in my lectures to attorneys, judges, forensic scientists, and the FBI laboratory personnel.

## My Review of Materials in This Case

8.    In connection with services rendered to counsel for the plaintiff in the above action, I have been provided the documents listed below:

**Exhibit 1:**  Complaint filed in Middlesex Superior Court #03-4704L2 in January 2005;

**Exhibit 2:**  Statement of Facts in Support of Summary Judgment filed in the a case of <u>Nancy Rosario, et al</u> v. <u>Jeffrey Southworth, et al</u>, Middlesex Superior Court C.A. #03-4704L2.

**Exhibit 3:**  Affidavit of Albert L. Farrah, Jr. dated December 20, 2004 filed in the pending action with the following attached exhibits:

A.    Attached thereto as Exhibit A is the August 19, 2004 deposition of Jude Connelly;

B.    Attached thereto as Exhibit B is the June 22, 2004 deposition of Thomas Scott Espey;

C.    Attached thereto as Exhibit C is the Massachusetts State Police Collision Reconstruction Report dated September 27, 2003;

D.    Attached thereto as Exhibit D is the November 2, 2003 statement of Leigh Chabot.

**Exhibit 4:**  Deposition of Michael J. Espey, dated June 22, 2004

**Exhibit 5:**    A copy September 26, 2003 bill for the group believed to include Jeffrey Southworth and RARE Hospitality International, Inc., d/b/a Longhorn Steakhouse audit report of that date, reflecting food and beverages believed served to the Southworth group

## Relevant Events of September 26-27, 2003

9.    From my review of these materials, I have relied upon the following relevant background facts, on which I base my opinions.

10.    On September 27, 2003 at approximately ten minutes past midnight, a vehicle driven by Jeffrey Southworth on Route 495 in Westford, Massachusetts crashed into the rear of a vehicle driven by Jose Santiago in which his three daughters, Awilda Santiago, Christina Santiago and Veronica Rosario were passengers. Jose and Awilda died. Christina and Veronica were seriously injured in the crash.

11.    On the date of the accident, Mr. Southworth was 23 years old, six feet four inches tall and weighed approximately 210 pounds.

12.    On September 26, 2003, at approximately 8:00 p.m., Southworth, accompanied by Jude Connelly and Thomas Espey, entered the Longhorn Steakhouse in Leominster, MA. Southworth had consumed at least one twelve-ounce beer approximately thirty minutes before his 8:00 p.m. arrival at the Longhorn Steakhouse.

13.    Southworth and Thomas Espey had met that day at an apartment complex in Littleton, Massachusetts near Rt. 495. Thomas Espey left his motor vehicle in that parking lot and had proceeded in Southworth's Dodge Dakota truck to a dirt biking site in Templeton, MA, where they met Connelly.

14.    The three finished dirt biking at dusk. At that time, Southworth consumed a 12

ounce beer at the dirt biking site.

15.    At approximately 7:30 p.m. to 8:00 p.m., Southworth, Thomas Espey and Connelly left the dirt biking site. They proceeded in the Dodge Dakota truck to the Longhorn Steakhouse in Leominster, MA.   The trip took about 25 minutes.  Espey drove, Southworth sat in the front and Connelly sat in the back with Southworth's two rottweiler dogs.

16.    The group first went to the Longhorn Steakhouse bar and waited to be seated at a table for dinner.  According to Connelly, who sat beside him, at the bar, Southworth consumed at least two (2) twenty-four (24) ounce beers, prior to being seated.

17.    Southworth, Connelly and Espey were joined by three or four others for dinner, including Espey's brother, Michael Espey.  This group was seated at approximately 8:35 p. m.

18.    During the meal, Southworth continued consuming alcoholic beverages. According to Connelly, who was sitting directly across the table from him, with an unobstructed view, Southworth had four (4) twenty four (24) ounce beers with his meal and at least two (2) Jack Daniels Manhattans.   He also ate an order of baby back ribs and possibly an appetizer.

19.    According to the statement given to the police by Leigh Chabot, a waitress who served the party, Southworth had three (3), not two (2), Jack Daniels Manhattans.

20.    According to testimony by Connelly and the Longhorn audit report of that date, reflecting food and beverages believed served to the Southworth group, and referred to as Exhibit 5 in Item 8 above, the Southworth party of six were seated at Table 52 and placed orders for food and drinks (that were recorded on check 20043) as follows:

8:40 pm   Appetizers, three Jack Daniels Manhattans and one 25 oz. Bud Light.  (check 20043)

9:00 pm    Food (including 3 orders of a ½ rack of ribs), salads, French fries  (check 20043).

(According to Jude Connelly (Item 18 above) one order of the ribs would have been

for Jeffrey Southworth).

9:15 pm    25 oz Bud Light  (check 20043)

9:21 pm    Four Jack Daniels Manhattans  (check 20043)

9:24 pm    Three Jack Daniels Manhattans (check 20043)

9:31-9:57 pm print check 20043 six times.

9:57 pm    close check 20043 for 202.79

According to the Longhorn audit report, the last drinks were served to Southworth's party

at the Longhorn Steakhouse at approximately 9:30 p.m. and the bill was paid at 9:57 p.m. and

that six meals and four appetizers were served to table 52.

21.    While at the Longhorn Steakhouse, Southworth appeared to be under the

influence of the alcoholic beverages he was drinking.  According to Connelly, Southworth "didn't

hold himself the way he usually did", "was sloppier looking than usual", "not standing straight",

"louder than usual" and his "eyes were glassy" (Connelly deposition pp. 49-50).

22.    According to Connelly, everyone at the Southworth table was loud.   The

Southworth party was so loud that evening that either a restaurant manager or waitress was

forced to request that the table quiet down.   That request was made at approximately 9:30 p.m.,

at or about the time records indicate service of the last drinks to the table.

23.    Michael Espey, another member of Southworth's party that night, started drinking

alcoholic beverages at 4:00 or 5:00 in the afternoon.  Despite that, in his own words, he was

"drunk" (Michael Espey deposition p. 26) while at the Longhorn Steakhouse, he was served at

least a Manhattan and a beer.

Affidavit of David Benjamin (01)                      7
5/4/05

24.    The group left the restaurant at approximately 10:00 p.m. and proceeded to the

Four Points Hotel in Leominster. On the ride to the hotel, Southworth sat in the back of his truck

with his two rottweiler dogs and Michael Espey. Thomas Espey drove and Connelly sat in front

with him. The drive to the hotel took approximately 10-15 minutes. Southworth, Thomas Espey

and Connelly were at the hotel for approximately 35-40 minutes. Southworth had a 12-ounce

beer from a can at the hotel. This was the last alcoholic beverage Southworth consumed that

evening, and the only alcoholic beverage he had after leaving the Longhorn Steakhouse.

(Connelly deposition pp. 51-56)

25.    Southworth, Thomas Espey and Connelly the proceeded to a nightclub in

Leominster known as "The Other Side". As before, Thomas Espey drove. Either leaving the

hotel or when the party pulled into the parking lot of The Other Side, Thomas Espey and

Connelly had a conversation with Southworth in which they told Southworth that he was "too

drunk to drive". The trip took about 10-15 minutes. Although the party originally intended to

go into the nightclub, they quickly made a decision not to do so. (Connelly deposition pp. 51-52)

26.    Thomas Espey, Connelly and Southworth then proceeded, with Thomas Espey

driving, to the apartment parking lot in Littleton where Thomas Espey's motor vehicle was

parked. The trip took 20 to 30 minutes. (Connelly deposition pp. 58-59)

27.    Because Southworth had too much to drink, Thomas Espey told him to "just sleep

in his truck". Southworth refused to do so. Southworth jumped into the front seat of

Southworth's Dodge Dakota truck. According to Thomas Espey, Southworth was intoxicated

and alone in the vehicle. Southworth, in backing out of the parking lot, drove over Thomas

Espey's foot.

28.    At approximately ten minutes past midnight on Route 495 in Westford, MA, Southworth crashed his Dodge Dakota truck into the rear of a vehicle driven by Jose Santiago in which his three daughters, Awilda Santiago, Christina Santiago and Veronica Rosario were passengers. Jose and Awilda died. Christina and Veronica were seriously injured in the crash.

29.    Southworth was subsequently arrested at approximately 7:10 am at the Residence Inn motel in Westford, MA.

30.    A court order to take a blood sample was secured, and his blood was taken at some time after 1:00 pm. Subsequent analysis of that blood showed no alcohol.

### Methods

1.    Using the data from the Longhorn audit report for 9/26/03, reflecting the alcoholic beverages served to the Southworth group at table 52 and referred to as Exhibit 5 in Item 8 above, and the statements and depositions described in items 12-22 above, I constructed a chronology of the number of beers and Jack Daniels Manhattans consumed by Mr. Jeffrey Southworth from approximately 7:30 pm on 9/26/03 after "dirt biking" through dinner at the Longhorn from 8 pm till 10 pm, but excluding the beer consumed at the Four Points Hotel after leaving the Longhorn.

2.    Bud Light beer contains 4.2% ethanol and a 12 oz. beer would contain 0.042 x 12 = 0.50 oz. of pure ethanol. A 25 oz beer would contain a little more than twice as much as a 12 oz beer or approximately 1.0 oz. of pure ethanol.

3.    A standard recipe for a Manhattan is: 1 ½ oz. of bourbon, rye or whiskey and ¾ oz. of sweet vermouth. Jack Daniels is approximately 80 proof (40%) and sweet vermouth is approximately 32 proof (16%).

4.    The Widmark Formula is:

$$BAC = \frac{\text{(Specific Gravity Blood) (Sp.G. Ethanol) (Grams of Ethanol)}}{\text{(Body Weight in kilograms) (Widmark r)}} - \text{Total Widmark } \beta \text{ (Amt of ETOH burnt off)}$$

### Opinions

1.    Based upon my education, experience, training and review of the materials and facts detailed above, I have arrived at various opinions concerning Southworth and the events of September 26-27, 2003, all as set out below.  Each of those opinions is held to a reasonable degree of scientific certainty.

2.    Based upon the calculations I have done using the Widmark formula set forth above and assuming that Jeffrey Southworth weighed 210 lbs. and consumed a 25 oz Bud Light beer containing approximately 30 grams of ethanol, that he was not obese and that his height of 6' 4" was in reasonable proportion to his weight, I conclude that each beer 25 oz beer consumed on an empty stomach produced a Blood Alcohol Concentration (BAC) of approximately 0.016% 30 minutes later.  Having calculated the amount of ethanol in the Jack Daniels Manhattan to be approximately 72% of the ethanol content of the 25 oz beer, I further conclude that each Jack Daniels Manhattan would produce a BAC of approximately 0.012% 30 minutes later.  In these calculations, I used a Widmark $\beta$, or "burn off" rate of 0.02% per hour, which is a little faster than the true Widmark average "burn off" rate of 0.017% per hour.  Use of the higher burn off rate would cause my calculations to under-estimate the BAC and would be more favorable towards the defendant establishment in this case.

3.    Based upon the consumption of alcohol described above, the observations of

Southworth by members of his group and the other events of that evening, I calculate that Jeffrey Southworth, if he consumed four 25 oz beers at the table, had a BAC of approximately 0.22% at 9:30 pm, the approximate time he was served his last drink. I calculate that if he consumed two 25 oz beers at the table Mr. Southworth had a BAC of over 0.18% at 9:30 pm, the approximate time he was served his last drink.

4.    I am also of the opinion, to a reasonable degree of scientific certainty, that 95% of non-alcoholic individuals with a BAC over 0.20%, and 89% of individuals with a BAC between 0.15% and 0.20%, show visible signs of intoxication.

5.    Based upon the consumption of alcohol described above, my calculations, the testimony of the fact witness, Jude Connelly that, at that time, Southworth appeared to him to be under the influence and the data cited in #4 above, I am of the opinion, to a reasonable degree of scientific certainty, that Jeffrey Southworth was intoxicated and exhibiting visible signs of intoxication at the Longhorn Steakhouse at the time of the service of the last drink to him.

6.    Connelly's observations were that Southworth didn't hold himself the same way he usually did (i.e., was not standing straight), was sloppier than usual, was louder than usual (Southworth was generally quiet and did not speak until spoken to), indeed so loud that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy.

7.    I also base this opinion that Southworth was exhibiting visible signs of intoxication on the rate of consumption of the drinks the Longhorn served and that Southworth consumed. Although there are differences among the fact witness as to how many beers were served to/consumed by Southworth, the Longhorn audit report shows that Southworth's table was

served at least two (2) 25 oz beers plus the two (2) he consumed prior to being seated. A statement by waitress Leigh Chabot indicated that Southworth was served three (3) Jack Daniels Manhattans at the Longhorn Steakhouse for a total of at least four (4) "double-sized" beers and three (3) Jack Daniels Manhattans, all between 8:00 p.m. arrival and 9:30 pm, approximately 1 ½ hours time. As stated in opinion 2 above, the true Widmark average "burn off" rate is 0.017% per hour, a rate sufficient to burn off one 12 oz beer in an hour in a man, independent of body mass. Even considering Mr. Southworth's large body mass of 210 lbs, he would be able to burn off only one half of a 25 oz beer in an hour.

8.      Based on the fact that even with Mr. Southworth's large body mass of 210 lbs, he would be able to burn off only one half of a 25 oz beer in an hour, to serve him up to nine (9) drinks in 1 1/2 hours, or a rate of service of 6 drinks per hour, the Longhorn Steakhouse personnel had to know that he would accumulate the ethanol in all drinks above one half of a 25 oz beer per hour and that his BAC would rapidly rise, due to the rapid rate of service and consumption of ethanol.

9.      It is a scientific fact that an individual reaches a point when his/her enzymes that metabolize ethanol become saturated and cannot metabolize any greater amount of ethanol. The result is that the ethanol accumulates in the blood and causes an increasing level of intoxication as the rate of consumption and absorption exceeds its rate of metabolism and elimination. This is called a "kinetic bottle-neck" and is similar to pouring water into a funnel. You can pour more water in or pour it at a faster rate, but the water will only come out of the funnel at the same rate all the time, due to the fixed size of the opening on the stem of the funnel. As more water is poured into the funnel it accumulates. This is a "kinetic bottle-neck".

10.    I am familiar with the scientific calculation of the amount of ethanol contained in an alcoholic beverage. Among professionals in my field, a standard drink of alcoholic beverage is generally accepted as consisting of 12 ounces of domestic beer containing approximately 4.2% ethanol, 4 ounces of table wine containing 12% ethanol, or 1.25 ounces of 80 proof (40%) distilled spirits, each of which has the same ethanol content as the other two, approximately 0.5 oz or 15 grams.

11.    Assuming Southworth consumed four (4) 25 oz beers and three (3) Jack Daniels Manhattans, he consumed the equivalent of at least twelve (12) "standard drinks" (containing 0.5 oz of pure ethanol, as defined in 10 above) over the course of approximately 1 ½ hours between his arrival at Longhorn and his departure, or a rate of 8 drinks per hour. If he in fact consumed six (6) 25 oz beers, that would be equivalent to 15 "standard drinks" in 1 ½ hrs or a rate of 10 drinks per hour.

12.    In performing these calculations I have assumed that a 25 ounce beer contains one ounce of pure ethanol and that a Jack Daniels Manhattan contains 0.72 ounces ethanol. Should further evidence become available regarding the formula or recipe for the Jack Daniels Manhattan, I will re-do my calculations according to the newly discovered data.

13.    Although there is considerable variability among individuals depending upon their experience with ethanol and their development of tolerance and/or coping skills to the effects of ethanol, in my experience, and according to published studies which form the basis of the standard of care in the forensic toxicology community, an individual with a BAC of over 0.15% will demonstrate visible signs of intoxication. All of the many signs of intoxication are not present in every individual. Even in individuals with a high degree of tolerance, at least 3 of 4

people with BACs greater than 0.20% showed some signs of intoxication.

14.    According to the results of seven studies, compiled by the American Medical Association and published in 1968 and the table attached hereto as Exhibit 1, from the study "Alcohol and the impaired driver", Chapter 11, Acute Alcohol Intoxication, 89% of individuals with BACs between .0151 and .20 are acutely intoxicated and visibly drunk, and 95% of persons with BACs of between .201 and .25 are acutely intoxicated and visibly drunk.

15.    As stated in opinion 3 above, Mr. Southworth had a calculated BAC of at least 0.20% at the time he was served his last drink, approximately 9:30 pm. As an experienced drinker with some degree of tolerance it is my opinion, based on these calculations, the studies cited above in items 14 an 15, and particularly as buttressed by Mr. Connelly's observations (item 6 above), that Mr. Southworth would not have been able to mask all the signs of intoxication with a Blood Alcohol Content of .20% or above and did in fact exhibit visible signs of intoxication. Once again, Connelly's observations were that Southworth didn't hold himself the same way he usually did, was sloppier than usual, was not standing straight, was louder than usual, and that the management of the Longhorn Steakhouse needed to request that he and the rest of the party quiet down, and that his eyes were glassy. Not standing straight is caused by the central nervous system (CNS) depressant effects of ethanol which causes sensory-motor incoordination, which is manifested as weakness, lethargy, and muscle relaxation and, in individuals consuming large quantities of ethanol, are visible signs of alcohol intoxication. Loudness or boisterous behavior is caused by ethanol's ability to decreases inhibitions and diminish an individual's judgment and self-control.

16.    Based upon the above facts and assumptions, it is my opinion that Southworth had

the following BACs at the following times relevant to this matter:

**At approximately 9:30 p. m.,** when served his last drink at the Longhorn Steakhouse, his BAC was **approximately 0.18% - 0.22%;**

**At approximately 10:00 p.m.,** when the party left the Longhorn Steakhouse, his BAC was **approximately 0.23%-0.26%;**

**At approximately 10:45 p.m.,** when he consumed a twelve (12) ounce beer at the Four Points Hotel in Leominster, his BAC was **approximately 0.23%-0.26%;**

**At approximately 12:10 a.m.** on September 27, 2003, at the time of the accident, his BAC was **approximately 0.23%-0.25%.**

17.    In my opinion, Southworth's BAC of 0.23%-0.25% at the time of the accident was a direct and proximate result of the alcoholic beverages he consumed at the Longhorn Steakhouse less a contribution of approximately 0.008% from the 12 oz beer at the Four Points Hotel in Leominster.

18.    In my opinion, Southworth's BAC of 0.23%-0.25% at the time of the accident was a substantial contributing factor and proximate cause of the accident in which two persons were killed and two others seriously injured.

19.    As numerous studies have concluded, and my personal experience confirms, that a person with a BAC over 0.20% in a confusional stage of intoxication, marked by disorientation, mental confusion, loss of critical judgment, sensory-motor incoordination. dizziness, disturbances of vision and perception of colors, form, motion and dimensions and increased muscular in-coordination, all of which affect the ability of a person to operate a motor vehicle.

Affidavit of David Benjamin (01)            15
5/4/05

Signed under the pains and penalties of perjury this 4th day of May, 2005.


David M. Benjamin, Ph.D.

## CERTIFICATE OF SERVICE

SUFFOLK, SS                                                    May X, 2005

A copy of the Affidavit of David Benjamin, Ph.D. was today mailed hand delivered to Brian Voke, Esq., Campbell, Campbell, Edwards & Conroy, One Constitution Plaza, Boston, MA 02129.


Albert L. Farrah, Jr., Esq.


Affidavit of David Benjamin (01)
5/4/05

16

E Z - A L C   V2.0

C A L C U L A T E D

B L O O D   A L C O H O L   C O N C E N T R A T I O N   C H A R T

```
                    Client Name - - - - - - -Southworth
                    Body Weight - - - - - - -210 POUNDS.
                    Burnoff Rate  - - - - - -.020% PER HOUR.
                    Widmark 'r' Factor- - - -.68
                    Initial BAC Level - - - -.0000% AT TIME OF DRINK 1
```

B L O O D   A L C O H O L   C O N C E N T R A T I O N   (% W/

```
          Absorb              . . . . . . . . . . . . . . . . . . . . . . . . .
 EtOH     Time                0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2
(FlOz)  (Min) BAC     Time     0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7
 0.50     30 .0000    7:30    *
              .0015    7:35    *
              .0030    7:40    -*
              .0045    7:45    -*
              .0060    7:50    -*
              .0075    7:55    --*
              .0090    8:00    --*
              .0073    8:05    -*
 1.00     30 .0057    8:10    -*
              .0103    8:15    --*
 1.00     30 .0150    8:20    ---*
              .0260    8:25    -----*
              .0370    8:30    -------*
              .0480    8:35    ----------*
              .0590    8:40    ----------:-*
              .0637    8:45    ----------:--*
 1.00     60 .0683    8:50    ----------:---*
              .0698    8:55    ----------:---*
 0.84     60 .0713    9:00    ----------:---*
              .0755    9:05    ----------:----*
              .0797    9:10    ----------:-----*
              .0838    9:15    ----------:------*
 1.00     60 .0880    9:20    ----------:-------*
 0.84     60 .0953    9:25    ----------:--------*
              .1053    9:30    ----------:---------:*
 0.84     60 .1153    9:35    ----------:---------:--*
              .1279    9:40    ----------:---------:-----*
              .1406    9:45    ----------:---------:-------*
              .1532    9:50    ----------:---------:---------:*
              .1627    9:55    ----------:---------:---------:--*
              .1722   10:00    ----------:---------:---------:---*
              .1790   10:05    ----------:---------:---------:-----*
              .1858   10:10    ----------:---------:---------:------*
              .1927   10:15    ----------:---------:---------:--------*
              .1995   10:20    ----------:---------:---------:---------*
              .2031   10:25    ----------:---------:---------:---------:*
 0.50     60 .2041   10:30    ----------:---------:---------:---------:*
              .2067   10:35    ----------:---------:---------:---------:*
              .2066   10:40    ----------:---------:---------:---------:*
              .2065   10:45    ----------:---------:---------:---------:*
              .2065   10:50    ----------:---------:---------:---------:*
              .2064   10:55    ----------:---------:---------:---------:*
              .2063   11:00    ----------:---------:---------:---------:*
              .2062   11:05    ----------:---------:---------:---------:*
```

```
.2061  11:10  ----------:----------:----------:----------:*
.2060  11:15  ----------:----------:----------:----------:*
.2060  11:20  ----------:----------:----------:----------:*
.2059  11:25  ----------:----------:----------:----------:*
.2058  11:30  ----------:----------:----------:----------:*
.2041  11:35  ----------:----------:----------:----------:*
.2025  11:40  ----------:----------:----------:----------*
.2008  11:45  ----------:----------:----------:----------*
.1991  11:50  ----------:----------:----------:----------*
.1975  11:55  ----------:----------:----------:---------*
.1958  12:00  ----------:----------:----------:---------*
.1941  12:05  ----------:----------:----------:---------*
.1925  12:10  ----------:----------:----------:--------*
.1908  12:15  ----------:----------:----------:--------*
.1891  12:20  ----------:----------:----------:--------*
.1875  12:25  ----------:----------:----------:-------*
.1858  12:30  ----------:----------:----------:-------*
.1841  12:35  ----------:----------:----------:-------*
.1825  12:40  ----------:----------:----------:------*
.1808  12:45  ----------:----------:----------:------*
.1791  12:50  ----------:----------:----------:-----*
.1775  12:55  ----------:----------:----------:----*
.1758   1:00  ----------:----------:----------:----*
.1741   1:05  ----------:----------:----------:----*
.1725   1:10  ----------:----------:----------:---*
.1708   1:15  ----------:----------:----------:--*
.1691   1:20  ----------:----------:----------:--*
.1675   1:25  ----------:----------:----------:--*
.1658   1:30  ----------:----------:----------:--*
.1641   1:35  ----------:----------:----------:--*
.1625   1:40  ----------:----------:----------:-*
.1608   1:45  ----------:----------:----------:-*
.1591   1:50  ----------:----------:----------:-*
.1575   1:55  ----------:----------:----------:*
.1558   2:00  ----------:----------:----------:*
.1541   2:05  ----------:----------:----------:*
.1525   2:10  ----------:----------:----------*
.1508   2:15  ----------:----------:----------*
.1491   2:20  ----------:----------:----------*
.1475   2:25  ----------:----------:---------*
.1458   2:30  ----------:----------:---------*
.1441   2:35  ----------:----------:---------*
.1425   2:40  ----------:----------:--------*
.1408   2:45  ----------:----------:--------*
.1391   2:50  ----------:----------:-------*
.1375   2:55  ----------:----------:------*
.1358   3:00  ----------:----------:------*
.1341   3:05  ----------:----------:------*
.1325   3:10  ----------:----------:-----*
.1308   3:15  ----------:----------:-----*
.1291   3:20  ----------:----------:-----*
.1275   3:25  ----------:----------:----*
.1258   3:30  ----------:----------:----*
.1241   3:35  ----------:----------:----*
.1225   3:40  ----------:----------:---*
.1208   3:45  ----------:----------:---*
.1191   3:50  ----------:----------:---*
.1175   3:55  ----------:----------:--*
.1158   4:00  ----------:----------:--*
.1141   4:05  ----------:----------:--*
```

```
.1125   4:10   ----------:----------:-*
.1108   4:15   ----------:----------:-*
.1091   4:20   ----------:----------:-*
.1075   4:25   ----------:----------:*
.1058   4:30   ----------:----------:*
.1041   4:35   ----------:----------:*
.1025   4:40   ----------:----------*
.1008   4:45   ----------:----------*
.0991   4:50   ----------:----------*
.0975   4:55   ----------:---------*
.0958   5:00   ----------:---------*
.0941   5:05   ----------:---------*
.0925   5:10   ----------:-------*
.0908   5:15   ----------:-------*
.0891   5:20   ----------:-------*
.0875   5:25   ----------:------*
.0858   5:30   ----------:------*
.0841   5:35   ----------:------*
.0825   5:40   ----------:-----*
.0808   5:45   ----------:-----*
.0791   5:50   ----------:-----*
.0775   5:55   ----------:----*
.0758   6:00   ----------:----*
.0741   6:05   ----------:----*
.0725   6:10   ----------:---*
.0708   6:15   ----------:---*
.0691   6:20   ----------:---*
.0675   6:25   ----------:--*
.0658   6:30   ----------:--*
.0641   6:35   ----------:--*
.0625   6:40   ----------:-*
.0608   6:45   ----------:-*
.0591   6:50   ----------:-*
.0575   6:55   ----------:*
.0558   7:00   ----------:*
.0541   7:05   ----------:*
.0525   7:10   ----------*
.0508   7:15   ----------*
.0491   7:20   ----------*
.0475   7:25   ---------*
.0458   7:30   ---------*
```